# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

JOSHUA SITZER AND AMY    )
WINGER, SCOTT AND RHONDA    )
BURNETT, AND RYAN    )
HENDRICKSON, on behalf of    )
themselves and all others similarly situated,  )
   )
      Plaintiffs,    )
   )   No: 4:19-cv-00332-SRB
   )
v.    )   **CLASS ACTION**
   )
THE NATIONAL ASSOCIATION OF    )   Judge Stephen R. Bough
REALTORS, REALOGY HOLDINGS    )
CORP., HOMESERVICES OF AMERICA, )
INC., BHH AFFILIATES, LLC, HSF    )   **ORAL ARGUMENT REQUESTED**
AFFILIATES, LLC, THE LONG &    )
FOSTER COMPANIES, INC., RE/MAX, )
LLC, and KELLER WILLIAMS REALTY, )
INC.,    )
   )
      Defendants.    )
_____)

## SUGGESTIONS IN SUPPORT OF THE
## <u>CORPORATE DEFENDANTS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.     The Parties ............................................................................................................ 3

       A.     Plaintiffs ................................................................................................... 3

       B.     NAR and the MLS ..................................................................................... 3

       C.     The Corporate Defendants ......................................................................... 4

II.    STANDARD OF REVIEW .................................................................................. 5

III.   ARGUMENT ....................................................................................................... 6

       A.     Plaintiffs' Antitrust Claims Do Not Allege an Unlawful Agreement .................. 7

              1.     Plaintiffs Admit that the Corporate Defendants' Encouraging or
                     Requiring Brokerages and/or Franchisees to Join an MLS Is
                     Consistent with Independent and Unilateral Action ............................. 7

              2.     Participation in NAR or Its Local Associations Does Not Plausibly
                     Support Involvement in a Conspiracy .......................................................... 8

              3.     Individuals' Participation in Local Realtor® Associations Does
                     Not Sufficiently Allege Conspiracy .......................................................... 10

              4.     That Corporate Defendants May Require Their Brokerages or
                     Franchisees to Follow NAR Rules Is Consistent with Competitive,
                     Unilateral Behavior ................................................................................. 11

              5.     Plaintiffs' Allegation of an Invitation to an Unlawful Agreement Is
                     Both Facially Implausible and Lacks Any Supporting Facts .................. 12

              6.     Plaintiffs' Allegations About "Steering," at Best, Allege an Effect
                     But Do Not Allege an Antitrust Conspiracy ............................................ 13

       B.     Allegations as to Each Corporate Defendant Are Insufficient to Maintain
              Claims Against Any of Them ......................................................................... 14

              1.     The Court Should Dismiss the Claims as to Keller Williams ................. 15

              2.     The Court Should Dismiss the Claims as to RE/MAX ........................... 17

              3.     The Court Should Dismiss the Claims as to Realogy .............................. 18

              4.     The Court Should Dismiss the Claims as to HomeServices and Its
                     Subsidiaries ............................................................................................. 19

       C.     Plaintiffs Have Failed to Allege Competitive Harm in a Properly Defined
              Relevant Market ......................................................................................... 21

       D.     Plaintiffs' Missouri Merchandising Practices Act Claim Should Be
              Dismissed ................................................................................................... 23

CONCLUSION ................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*AD/SAT v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999)................................................................11

*Alpha Shoe Serv. v. Fleming Cos.*,
    849 F.2d 352 (8th Cir. 1988) ...............................................................5

*Anderson v. Bass Pro Outdoor World, LLC*,
    355 F. Supp. 3d 830 (W.D. Mo. 2018) .................................................24

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ...............................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................5

*Buetow v. A.L.S. Enters., Inc.*,
    564 F. Supp. 2d 1038 (D. Minn. 2008) ................................................8

*Carter v. Alcon Labs., Inc.*,
    No. 4:13CV00977 AGF, 2014 WL 989002 (E.D. Mo. Mar. 13, 2014)...................25

*Cascades Computer Innovation LLC v. RPX Corp.*,
    No. 12-CV-01143 YGR, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013) ...................22

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ...............................................................9

*Cromeans v. Morgan Keegan & Co.*,
    No. 2:12-CV-04269, 2014 WL 1901197 (W.D. Mo. May 13, 2014)...........3, 15, 23

*Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan*,
    179 F.2d 882 (8th Cir. 1950) ...............................................................4

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ...........................................................2, 5, 6

*Estate Constr. Co. v. Miller & Smith Holding Co.*,
    14 F.3d 213 (4th Cir. 1994) .................................................................13

*Grawitch v. Charter Commc'ns, Inc.*,
No. 4:12CV01990 AGF, 2013 WL 253534 (E.D. Mo. Jan. 23, 2013), *aff'd*,
750 F.3d 956 (8th Cir. 2014) ........................................................................................25

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc.*,
602 F.3d 237 (3d Cir. 2010)...........................................................................................13

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)...............................................................................................14

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) ...............................................................................1, 14, 18

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ..................................................................................7, 10

*Kyhl v. A-One Plumbing, Inc.*,
679 F. Supp. 911 (E.D. Mo. 1988)...............................................................................10, 17

*Little Rock Cardiology Clinic PA v. Baptist Health*,
591 F.3d 591 (8th Cir. 2009) ....................................................................................6, 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................................................................................................7, 22

*McGraw v. Marshall Pub. Sch. Dist.*,
No. 09-00066, 2009 WL 10704885 (W.D. Mo. Aug. 18, 2009) ...............................................5

*Metts v. Clark Oil & Ref. Corp.*,
618 S.W.2d 698 (Mo. Ct. App. 1981)..............................................................................5

*Moe v. RE/MAX Caribbean Islands, LLC*,
Civ. Action No. 3:11-cv-00073, ECF No. 60 (D.V.I. Mar. 23, 2012)....................................17

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)....................................................................................................1, 5

*Noble Sys. Corp. v. Alorica Cent., LLC*,
543 F.3d 978 (8th Cir. 2008) ...............................................................................3, 15, 23

*O'Riordan v. Long Island Bd. of Realtors, Inc.*,
707 F. Supp. 111 (E.D.N.Y. 1998) ...................................................................................12

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ................................................................................................2, 21, 23

*Oliveira-Brooks v. RE/MAX Int'l, Inc.*,
    865 N.E.2d 252 (Ill. App. Ct. 2007) .........................................................................17

*Padberg v. DISH Network LLC*,
    No. 11-04035-CV-C-NKL, 2012 WL 2120765 (W.D. Mo. June 11, 2012) .........................25

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    310 F. Supp. 3d 1002 (E.D. Mo. 2018) ......................................................................9

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ...................................................................................11

*Perdomo v. Ask 4 Realty & Mgmt., Inc.*,
    298 F. App'x 820 (11th Cir. 2008) ...........................................................................4

*Polk v. KV Pharm. Co.*,
    No. 4:09-CV-00588 .................................................................................................24

*Povich v. Combe Inc.*,
    No. 4:16 CV 97 CDP, 2017 WL 1058850 (E.D. Mo. Mar. 21, 2017) ...................................24

*Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*,
    No. 08-CV-42 JG VVP, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ...................................14

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.*,
    753 F. Supp. 2d 912 (E.D. Mo. 2010) .................................................................5, 13

*Razorback Ready Mix Concrete Co. v. Weaver*,
    761 F.2d 484 (8th Cir. 1985) ..............................................................................6, 21

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ..................................................................................11

*Schuyler v Sotheby's Int'l Realty, Inc.*,
    No. 112578/2011, 2013 N.Y. Misc. LEXIS 4487 (NY Sup. Ct. Oct. 2, 2013) .....................18

*Sherr v. HealthEast Care Sys.*,
    262 F. Supp. 3d 869 (D. Minn. 2017) ......................................................................17

*State of Mo. v. Nat'l Org. for Women, Inc.*,
    620 F.2d 1301 (8th Cir. 1980) ..................................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................3, 15

*Thompson v. Allergan USA, Inc.*,
    993 F. Supp. 2d 1007 (E.D. Mo. 2014)....................................................................24

*Ward v. W. Cty. Motor Co.*,
    403 S.W.3d 82 (Mo. 2013), *as modified* (May 28, 2013)......................................23

*Weber v. St. Louis County*,
    342 S.W.3d 318 (Mo. 2011) ....................................................................................23

*Wholesale All., LLC v. Express Scripts, Inc.*,
    366 F. Supp. 3d 1069 (E.D. Mo. 2019)................................................................5, 7

## STATUTES

15 U.S.C. § 1 ................................................................................................................5, 12

Mo. Rev. Stat. § 416.031 ..................................................................................................5

Mo. Rev. Stat. § 287.090 ..................................................................................................4

Mo. Rev. Stat. § 416.141 ..................................................................................................5

## RULES

Fed. R. Civ. P. 12(b)(6)............................................................................................3, 5, 25

# INTRODUCTION

The First Amended Class Action Complaint ("Complaint") fails to state any viable cause of action. The Complaint lacks facts plausibly alleging an anticompetitive agreement between The National Association of Realtors® ("NAR") and the non-NAR Defendants (the "Corporate Defendants"). Plaintiffs also fail to allege any anticompetitive agreement, express or implied, among the Corporate Defendants—or between any Corporate Defendant and one or more multiple listing services ("MLSs") run by local Realtor® associations (the so-called "Subject MLSs") or any real estate agents. Nothing in the Complaint supports an inference that any of the Corporate Defendants did anything other than unilaterally act in their individual interests, including by encouraging or requiring the real estate brokerage companies that they respectively own and/or franchise to abide by NAR's rules and code of ethics, and to generally support and improve the professionalism and ethical standards in the industry. Plaintiffs themselves acknowledge that participation in the Subject MLSs is "critical" for brokers, agents and real estate franchisees to compete effectively, admitting that such participation is in their individual interests and thus not the result of any anticompetitive agreement. *See* Compl. ¶¶ 48, 107, 112.

Plaintiffs claim that the Corporate Defendants violated antitrust laws by agreeing "to adopt, promote, implement, and enforce" a NAR rule that allegedly requires home sellers' real estate agents to offer buyers' real estate agents part of the commission received upon the sale of a seller's home. Compl. ¶ 74. Plaintiffs entirely fail, however, to allege any facts that would show that the Corporate Defendants have a "conscious commitment to a common scheme designed to achieve an unlawful objective" as required to state their antitrust claims under Section 1 of the Sherman Act and the Missouri Antitrust Law. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (plaintiffs must "satisfy the concerted action requirement," which requires allegations "that

the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds") (internal quotation omitted).

Plaintiffs also fail plausibly to allege anticompetitive effects in a relevant market, which is an independent basis upon which to dismiss Plaintiffs' Complaint. *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (discussing the necessity of pleading "a valid relevant market"). Plaintiffs define the relevant market as "the bundle of services provided to home *buyers and sellers* by residential real estate brokers with access to the Subject MLSs," Compl. ¶ 107 (emphasis added), but fail to allege anticompetitive effects in that defined market— the same type of fatal legal error identified by the Supreme Court in its recent *American Express* decision. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).

Plaintiffs' Missouri Merchandising Practices Act ("MMPA") count also fails to state a claim. First, Plaintiffs' MMPA claim is based entirely on their flawed antitrust claims, and thus fails for the reasons outlined above. Second, Plaintiffs fail to allege that they were denied the value of services provided by their real estate agents as required by the MMPA, a separate and equally compelling basis for dismissal.

For these reasons, as amplified below, the Complaint against the Corporate Defendants should be dismissed.[1]

---

[1] The Corporate Defendants are investigating whether the underlying listing agreements potentially require arbitration of the claims asserted by Plaintiffs in this lawsuit. That information is not readily available to the Corporate Defendants because it resides with Plaintiffs and third-party real estate brokerages or franchisees. The Corporate Defendants do not waive their right to compel arbitration if they determine that arbitration is warranted.

## I. The Parties

### A. Plaintiffs

Plaintiffs are four citizens of Missouri and one citizen of Illinois who sold homes in the Kansas City and St. Louis metropolitan areas. Compl. ¶¶ 39-41 (at 13-14).[2] They each paid commissions to their respective real estate agents,[3] a portion of which was paid to the buyers' agents. *Id.* Plaintiffs fail to allege that they sought to negotiate the commission paid to their own real estate agents or the portion to be offered to any buyer's agent, or that they were precluded in any way from negotiating a lower commission.

### B. NAR and the MLS

NAR is a trade association for the real estate industry, and it includes local Realtor® associations and boards. *Id.* ¶ 43 (at 14). NAR develops "standards for efficient, effective, and ethical real estate business practices," (NAR, About Us, at https://www.nar.realtor/about-nar), including its Code of Ethics and Handbook on Multiple Listing Policy, which are "intended to guide member associations of Realtors® in the operation of [MLSs] consistent with the policies established by the National Association's Board of Directors." NAR, Handbook on Multiple Listing Policy 2019, at iii ("NAR Handbook"); Compl. ¶¶ 5, 59-60, 67 (citing NAR Handbook).[4] Plaintiffs challenge what they have termed the "Adversary Commission Rule," which is Section

---

[2] The Complaint includes two sets of paragraphs numbered 31-46. For clarity, the citations herein include a pin-cite to the specific page(s) when citing to one of these paragraphs of the Complaint.

[3] The term broker, which Plaintiffs use in their Complaint, means certain entities and individuals with a state license to lead a real estate office and supervise real estate agents. The Corporate Defendants have used the term "real estate agents" to refer to individuals who act as agents for buyers and sellers in real estate transactions.

[4] In ruling on a Rule 12(b)(6) motion, a district court may consider documents referenced in the complaint and central to the plaintiff's claims. *Cromeans v. Morgan Keegan & Co.*, No. 2:12-CV-04269, 2014 WL 1901197, at *3 n.1 (W.D. Mo. May 13, 2014); *see also Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

2-G-1 of the NAR Handbook.

An MLS is a database of properties listed for sale in a particular geographic region, and is the system used to convey sales information for the vast majority of home transactions in the United States. Compl. ¶¶ 4, 112. As alleged, participants in an MLS are required to list all properties on the MLS in which they are members. *Id.* ¶ 4. The Complaint alleges that the ability to list homes on the Subject MLSs is conditioned on the broker following NAR's rules. *Id.* ¶ 5.

## C. The Corporate Defendants

Corporate Defendants are franchise companies and some of them also own brokerages. None of the Corporate Defendants is alleged to be a broker or to oversee the independent contractor real estate agents who are affiliated with a broker and who handle real estate sales for home sellers. Instead, Plaintiffs' theory appears to center on different, unspecified ownership or franchise relationships that the Corporate Defendants have with various nonparty real estate brokerage subsidiaries, affiliates, and/or franchisees. [5] No Corporate Defendant is alleged to have membership in NAR.

---

[5] A number of the Corporate Defendants are holding companies. Two of the seven Corporate Defendants, Realogy Holdings Corp. ("Realogy") and HomeServices, have company-owned brokerages as well as franchisees who are real estate brokerages. RE/MAX, LLC, Keller Williams, and BHH Affiliates, LLC are franchise companies with no company-owned brokerages. The Long & Foster Companies, Inc. ("L&F Companies") has a company-owned brokerage but no franchise operations. Regardless of whether a brokerage is owned by a Corporate Defendant or is a franchisee, the underlying real estate agents who are affiliated with a brokerage are independent contractors of the brokerage, not employees. *See Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan*, 179 F.2d 882, 887 (8th Cir. 1950) ("The Supreme Court of Missouri has been of the opinion that, under the usual tests for determining the employer-employee relationship, [real estate] salesmen such as those here involved are not the employees of their principal, but are independent contractors."); *Perdomo v. Ask 4 Realty & Mgmt., Inc.*, 298 F. App'x 820, 822 (11th Cir. 2008) (holding that a real estate agent is an independent contractor); *see also* Mo. Rev. Stat. § 287.090 (2018) (exempting qualified real estate agents from classification as employees under Missouri's workers' compensation law).

## II.    STANDARD OF REVIEW

To state a claim under Section 1 of the Sherman Act against the Corporate Defendants, Plaintiffs must allege: "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade; and (3) that the restraint affected interstate commerce." *Wholesale All., LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1076 (E.D. Mo. 2019).  Merely asserting these elements in a complaint is insufficient.  Rather, to survive a Rule 12(b)(6) challenge, the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  For that reason, the "essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal" under Rule 12(b)(6).  *Double D*, 136 F.3d at 558.  Absent "further factual enhancement," conclusory allegations "'stop[ ] short of the line between possibility and plausibility of entitle[ment] to relief.'"  *McGraw v. Marshall Pub. Sch. Dist.*, No. 09-00066, 2009 WL 10704885, at *4 (W.D. Mo. Aug. 18, 2009) (quoting *Twombly*, 550 U.S. at 557).[6]

As to the first element of a Section 1 claim, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.   This requires plausible factual allegations that the defendants demonstrated a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *See Monsanto*, 465 U.S. at 764.  "[I]t is well established that the mere opportunity to conspire, even in the context of parallel business activity, is insufficient to state a Section 1 claim."  *Process Controls Int'l, Inc. v. Emerson*

---

[6] Plaintiffs' claim for violation of the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031 (Count III), is identical to their federal antitrust claim and must be dismissed under the same criteria.  The Missouri antitrust statute expressly states that it "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes."  Mo. Rev. Stat. § 416.141.  Missouri courts recognize that the Missouri antitrust statute is "analogous to and derived from" the Sherman Act.  *Metts v. Clark Oil & Ref. Corp.*, 618 S.W.2d 698, 701 (Mo. Ct. App. 1981); *accord Alpha Shoe Serv. v. Fleming Cos.*, 849 F.2d 352, 353 (8th Cir. 1988); *State of Mo. v. Nat'l Org. for Women, Inc.*, 620 F.2d 1301, 1316 (8th Cir. 1980); *Process Controls*, 753 F. Supp. 2d at 920 n.3, 924.

*Process Mgmt.*, 753 F. Supp. 2d 912, 922 (E.D. Mo. 2010).  Thus, a mere "allegation of parallel conduct and a bare assertion of conspiracy will not suffice" because "that could just as well be independent action."  *Twombly*, 550 U.S. at 556-57.

The second element of a Section 1 claim requires "'an inquiry into market power and market structure' to assess the actual effect of the restraint."  *Double D*, 136 F.3d at 560 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).  "Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition."  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009).  Where a plaintiff has failed to plead anticompetitive effects in a properly defined relevant market, dismissal is appropriate.  *See, e.g.*, *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 488 (8th Cir. 1985) (affirming dismissal for failure to allege that "conduct had any adverse effect on competition"); *Little Rock*, 591 F.3d at 601 (affirming dismissal for failure to allege a proper product or geographic market).

## III.  ARGUMENT

The Corporate Defendants join in NAR's Suggestions in Support of its Motion to Dismiss (ECF No. 77).   In addition, the Corporate Defendants move to dismiss the Complaint because Plaintiffs: (1) fail to allege facts supporting any anticompetitive agreement between or among any Defendants or other co-conspirators; (2) fail to allege any actions by the Corporate Defendants other than those that are fully consistent with each Corporate Defendant acting in its own lawful, independent interest; (3) fail to allege any competitive harm in a properly defined relevant market; and (4) fail to allege required elements of their claim under the MMPA.  These are independent bases upon which the Court should dismiss Plaintiffs' claims against the Corporate Defendants.

### A. Plaintiffs' Antitrust Claims Do Not Allege an Unlawful Agreement.

Rather than alleging facts that the Corporate Defendants had the required "conscious commitment" and "meeting of the minds" to show conspiracy or agreement, Plaintiffs' Complaint alleges only independent, lawful actions by the Corporate Defendants that cannot support Plaintiffs' antitrust allegations. *Wholesale All.*, 366 F. Supp. 3d at 1079 (reasoning that "an independent business decision does not constitute unlawful concerted action"). Plaintiffs allege that the Corporate Defendants participate in the purported conspiracy through: (1) the Corporate Defendants' executives and franchisees' participation in NAR's management and operation; (2) the Corporate Defendants' franchisees' participation in local Realtor® associations that have implemented NAR's rules; and (3) the Corporate Defendants' requirement that their franchisees join NAR and the local MLSs and comply with NAR's rules. Compl. ¶¶ 75-83. However, as explained further below, these allegations provide no basis for inferring that the Corporate Defendants entered into an unlawful agreement with NAR or anyone else to restrain trade. Rather, even taken at face value, Plaintiffs' allegations are consistent with each Corporate Defendant acting in its own independent interest. Alleging "facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy [is] insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 553-57 & n.5); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cited favorably in *Twombly*, 550 U.S. at 554, 560-61).

### 1. Plaintiffs Admit that the Corporate Defendants' Encouraging or Requiring Brokerages and/or Franchisees to Join an MLS Is Consistent with Independent and Unilateral Action.

Plaintiffs defeat their own claim that the Corporate Defendants entered into an unlawful agreement by requiring or encouraging brokerages and franchisees to join local MLSs. *See* Compl.

¶¶ 75-77. First, a unilateral requirement imposed by a Corporate Defendant that its brokerages or franchisees join an MLS, even if true, says nothing about an agreement between the Corporate Defendants and NAR or among the Corporate Defendants. Second, Plaintiffs' own allegations explain why any such requirement or encouragement is lawful and in each Corporate Defendant's independent interest: according to Plaintiffs, "[a]ccess to the Subject MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate," *id.* ¶ 107, and "[b]rokers cannot compete effectively without access to a listing service," *id.* ¶ 112. Given the "critical" importance of belonging to an MLS, it is in each Corporate Defendant's individual interest to encourage its franchisees or brokerages to participate in MLSs, because, as Plaintiffs allege, such participation is necessary for competitive success. Accordingly, Plaintiffs' allegation that Corporate Defendants encourage or require their brokerages or franchisees to join an MLS does not support an inference of an illegal agreement, but only identifies independent business judgment. *See Buetow v. A.L.S. Enters., Inc.*, 564 F. Supp. 2d 1038, 1042-44 (D. Minn. 2008) (dismissing conspiracy claim for failure to adequately plead the existence of a conspiracy, including because defendants' conduct had a lawful alternative explanation).

### 2. Participation in NAR or Its Local Associations Does Not Plausibly Support Involvement in a Conspiracy.

Allegations that one Corporate Defendant's executive[7] participated in NAR governance or that independent contractor real estate agents affiliated with Corporate Defendants' independent brokerages or franchisees participated in NAR or local Realtor® associations, *see* Compl. ¶¶ 75, 78-80, are insufficient to infer that any of the Corporate Defendants entered into an unlawful agreement with NAR or each other to restrain trade.

---

[7] The Complaint purports to list more than one executive from HomeServices entities, but only one of the HomeServices entities listed is a Defendant. Compl. ¶ 79.

First, trade associations are a ubiquitous feature in many industries, and the law provides that even if "a trade association, its officers, employees or members are found to have violated the antitrust laws, membership in the association will not automatically involve all members in the violation." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004) (quoting *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999)). Rather, to hold a Corporate Defendant liable, based on its executives' alleged participation in NAR leadership, there must be "some evidence of actual knowledge of, and participation in, the illegal scheme." *Id.*; *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1015 (E.D. Mo. 2018) (allegation that executives serving on trade association board "lacks temporal context and is not, in and of itself, indicative of any anticompetitive influence"). Plaintiffs' Complaint lacks any factual allegations of such knowledge or participation.

Second, the Complaint does not allege that any Corporate Defendant engaged in conduct relating to Section 2-G-1 of the NAR Handbook in 1996 when the challenged rule allegedly was adopted. Indeed, only one of the seven Corporate Defendants is alleged to have personnel who participated in NAR leadership at all, making NAR governance an implausible vehicle for the claimed conspiracy.

Third, although the Complaint identifies various independent contractor real estate agents associated with various franchisees or brokerages, who allegedly participated in some way in NAR leadership, it does not allege that any Corporate Defendant directed them to do so or even knew of their involvement. There are also no allegations identifying the manner in which the identified individuals participated in NAR leadership or the actions they took, if any, with respect to any NAR rule. Plaintiffs simply allege that certain individuals served on NAR boards or committees, nothing more. Compl. ¶¶ 78-80. That is not enough to raise an inference of any illegal agreement.

*Kendall*, 518 F.3d at 1048 ("[e]ven participation on the association's board of directors is not enough by itself" to create liability) (citing *Twombly*, 550 U.S. at 556-57).

Plaintiffs' allegation that certain independent contractor real estate agents affiliated with some franchisees or brokerages of the Corporate Defendants have participated in the NAR Multiple Listing Issues and Policies Committee at some undisclosed point over the past four years, Compl. ¶ 80, is also unavailing. Plaintiffs do not allege that the Committee took any action with respect to the challenged rule, much less discussed it; that the other Corporate Defendants had anything to do with the Committee; or that any of the independent contractor real estate agents were directed by any Corporate Defendant to participate on the Committee or to take any action with respect to any rule. Alleged participation on this Committee, without more, does not support an inference of conspiracy.

In sum, Plaintiffs' allegations do not establish, as required, any Corporate Defendant's "role in the conspiracy," *Kyhl v. A-One Plumbing, Inc.*, 679 F. Supp. 911, 914 (E.D. Mo. 1988), or that each "defendant joined the conspiracy and knew of its scope," *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Rather, the differences in the levels of alleged participation suggest the absence of coordination among the Corporate Defendants or with NAR.

### 3. Individuals' Participation in Local Realtor® Associations Does Not Sufficiently Allege Conspiracy.

No inference of conspiratorial conduct can be drawn from the allegation that executives and independent contractor real estate agents of franchisees or brokerages of Corporate Defendants, but not any of the Corporate Defendants themselves, "influence" local Realtor® associations. Compl. ¶¶ 75, 81-83. The only alleged connection between the Corporate Defendants and the individuals' participation in local Realtor® associations is that the Corporate Defendants encourage such participation. That allegation, like the others in the Complaint, says

nothing about an agreement between the Corporate Defendants and NAR or anyone else. Moreover, an allegation of encouragement with no agreement does not plausibly state a Sherman Act Section 1 claim. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002) (affirming dismissal of a Section 1 claim because one party's assurance that a policy would be uniformly enforced and encouragement to report violations by any party did not constitute an agreement); *AD/SAT*, 181 F.3d at 243 (holding conspiracy could not be inferred from encouragement or endorsement). Allegations that a Corporate Defendant encourages involvement in local Realtor associations do not cross "the line between possibility and plausibility" in order to state a valid conspiracy claim. *Twombly*, 550 U.S. at 557.

Additionally, Plaintiffs allege only that a few executives of franchisees of certain Corporate Defendants *participated* in governance of local Realtor® associations. Compl. ¶¶ 81-82. There are no allegations regarding the nature of that alleged participation or that it had or has anything to do with the issues in this case. Again, a general allegation that certain individuals from entities separate from the Corporate Defendants may participate in a local Realtor® association does not come close to establishing a knowing agreement between any Corporate Defendant and NAR to restrain trade.

### 4. That Corporate Defendants May Require Their Brokerages or Franchisees to Follow NAR Rules Is Consistent with Competitive, Unilateral Behavior.

That the Corporate Defendants may require their brokerages or franchisees to follow NAR rules also does not raise an inference of any illegal agreement with NAR or any other entity. Courts on several occasions have concluded that NAR's rules are intended to ensure the effective and efficient functioning of its affiliated MLSs and ethical interactions among real estate professionals. *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006) (holding that NAR code of ethics provision prohibiting Realtors® from soliciting clients who have already entered into

agreement with other Realtors® "aids competition and fulfills the purposes of the Sherman Act by providing a more transparent marketplace"); *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1998) (noting that MLSs function "like an exchange and provide[] wide dissemination of market information"). Compliance with NAR's rules thus reflects a sound decision on the part of each real estate brokerage to promote a competitive market that facilitates real estate transactions by fostering transparency and professionalism. Those independent business reasons for adhering to NAR's rules make implausible any inference of illegal conduct.

5.    **Plaintiffs' Allegation of an Invitation to an Unlawful Agreement Is Both Facially Implausible and Lacks Any Supporting Facts.**

In an attempt to at least reference some "agreement," Plaintiffs make the conclusory and implausible allegation that, by keeping Section 2-G-1 in existence when the NAR Handbook has been periodically reissued, NAR somehow "invited" each of the Corporate Defendants and other unnamed co-conspirators (apparently numbering in the hundreds) to enter into a made-up agreement: that the Corporate Defendants "can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook." Compl. ¶ 58. But according to Plaintiffs, Section 2-G-1, which appears once in NAR's 160-page Handbook, has been included in the Handbook without change since at least 1996. *Id.* ¶ 55. Accordingly, Plaintiffs' implausible theory is that the Corporate Defendants accepted NAR's invitation and consciously committed to a common scheme with NAR by standing by passively as NAR maintained its rule for over twenty years.

Plaintiffs, however, do not allege that any Corporate Defendant understood that NAR maintaining existing rules meant that it was extending an invitation to agree to violate the antitrust laws or explain how the Corporate Defendants could have accepted an invitation they did not

understand existed. Moreover, because the Corporate Defendants are not members of NAR or its affiliated MLSs, they were in no position to accept NAR's alleged invitation, even if they understood it to have been made. Plaintiffs allege no facts regarding the how, when, or what any Corporate Defendant did to accept this supposed invitation. Thus, this allegation regarding NAR's supposed "invitation" should be disregarded. *See Twombly*, 550 U.S. at 565 n.10 (affirming dismissal of complaint and noting that the complaint "furnishes no clue as to which of the [defendants] supposedly agreed, or when and where the illicit agreement took place"); *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (dismissing claim based on finding that plaintiff's "allegations do no offer even a gossamer inference of any degree of coordination," or an opportunity to coordinate among defendants); *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994) (affirming dismissal of complaint "lack[ing] completely any allegations of communications, meetings, or other means through which one might infer the existence of a conspiracy"); *Process Controls*, 753 F. Supp. 2d at 922 ("in the absence of allegations of defendants' prior agreement, defendants' mere knowledge of each other's activities does not amount to a Section 1 violation").

### 6. Plaintiffs' Allegations About "Steering," at Best, Allege an Effect But Do Not Allege an Antitrust Conspiracy.

Finally, Plaintiffs fail to allege facts from which a conspiracy may be inferred by alleging that because sellers and their real estate agents extend offers of compensation to buyers' agents, "buyer brokers face strong incentives to 'steer' their buyer clients toward homes" with higher commissions for the buyer's agent. Compl. ¶ 22. Plaintiffs offer these allegations to show a purported *effect* of the alleged conspiracy, but this alleged conduct does not support an inference of an underlying conspiracy because the incentive to offer compensation to buyers' agents is as consistent, if not more consistent, with the demands of the marketplace (and indeed preceded by

many years the adoption in 1996 of the challenged rule, Compl. ¶¶ 51-52) than it is with an inference of collusion. *See Twombly*, 550 U.S. at 557 (to be viable, an antitrust claim must plausibly allege that conduct resulted from an agreement, "not merely parallel conduct that could just as well be independent action"). In addition, this steering allegation is undermined by Plaintiffs' assertion that most home buyers find their homes on the internet without the assistance of a buyer's agent. Compl. ¶ 19. If most home buyers are finding their own homes as a result of accessing information publicly available over the internet, buyers' real estate agents are unable, as a practical matter, to steer their customers away from the customers' preferred homes, regardless of their ultimate compensation.

**B.      Allegations as to Each Corporate Defendant Are Insufficient to Maintain Claims Against Any of Them.**

Plaintiffs fail plausibly to allege a conspiracy for another reason: the limited, specific references to each Corporate Defendant do not save the allegations or plausibly tie any of the individual Corporate Defendants to a conspiracy. They also fail to support that inference through their vague conclusions that "Corporate Defendants" did one thing or another—with no specifics as to which Defendant did what. *See, e.g.,* Compl. ¶¶ 74-75, 84. This kind of vague, group pleading does not satisfy the *Twombly* standard. *See Insulate*, 797 F.3d at 546 (dismissing claim containing "vague references to concerted action" that failed to allege "when the agreements occurred or even identify which of the distributors named as defendants . . . were party to the agreements"); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2011 WL 7053807, at *19 (E.D.N.Y. Jan. 4, 2011), *R&R adopted*, No. 08-CV-00042 JG VVP, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) (rejecting antitrust claims with group pleading that ignored corporate

separateness).  The antitrust claims as to all of the Corporate Defendants, as well as with respect to each individually, should therefore be dismissed.

## 1. The Court Should Dismiss the Claims as to Keller Williams.

Plaintiffs fail to allege any conduct by Keller Williams that supports its involvement in any conspiracy.  They identify no Keller Williams executive, or even anyone associated with a Keller Williams franchisee, that serves on NAR's board of directors or leadership team.  Compl. ¶¶ 78-79.  The best Plaintiffs can do is to point to Sue Cartun, a Keller Williams "franchisee broker"—not an employee of Keller Williams itself—who allegedly participated in the "NAR Multiple Listing Issues and Policies Committee."  *Id.* ¶ 80.  Plaintiffs do not allege that any executive of Keller Williams participates or has participated in NAR's governance.

Plaintiffs also cannot point to any Keller Williams executive involved in the "governance of the local realtor associations that own and operate the Subject MLSs."  *See id.* ¶ 81.  Plaintiffs broadly and ambiguously point to only "multiple representatives from . . . Keller Williams *franchisees or affiliates*," *id.* ¶ 82 (emphasis added), entities distinct from Keller Williams itself.

Finally, Plaintiffs' allegation that Keller Williams' policies encourage franchisees "to be involved in local realtor association governance," Compl. ¶ 83, selectively quotes from Keller Williams' policies in a misleading way.  Keller Williams' Policies & Guidelines Manual not only fails to support Plaintiffs' points, but in fact provides an independent, non-conspiratorial explanation for each agent's participation.  The complete provisions of the Keller Williams' Policies & Guidelines Manual from which Plaintiffs selectively quote read as follows:[8]

---

[8] As noted, *supra* n.4, when a complaint relies on documents not attached to the complaint, the court may consider the entire document–not just the portions cited by the plaintiff–when deciding a motion to dismiss.  *See Tellabs*, 551 U.S. at 322; *Noble Sys.*, 543 F.3d at 982; *Cromeans*, 2014 WL 1901197, at *3 n.1.  True and correct copies of the pages of the Keller Williams "Policies & Guidelines Manual" containing the quoted provisions referenced in and central to the Complaint are attached to this motion.  *See* Ex. 1: Decl. of Chad Allen at Ex. A.

§ 4.9.1.28.3: **State or Provincial [REALTOR® Associations]**: We encourage you to be actively involved to the greatest possible extent. We realize the time factor causes you to be less active in these than your local Board, but we do want to encourage you to attend these conventions and seminars. These seminars could put money in your pocket as you might receive referrals from other associates.

§ 4.9.1.28.4: **Local [REALTOR® Associations]**: A REALTOR® association is a trade association of the professionals dealing in the real-estate business. Members conform to the high ideals set forth in the Code of Ethics. We encourage you to take an active role in any such local association.

Allen Decl. Ex. A, at 4-30.

Contrary to the impression Plaintiffs seek to create by selectively quoting only part of these provisions, neither suggests involvement in "local realtor association *governance*." Compl. ¶ 83 (emphasis added). Each calls only for involvement in the associations themselves, with no explicit or even implicit reference to involvement in governing activities. The quoted provisions, read in context, also explain the independent basis behind Keller Williams' encouragement to franchisees (and franchisees' agents) to become involved in local Realtor® associations. The Policies & Guidelines Manual expressly encourages participation because doing so "could put money in your pocket as you might receive referrals" from local brokers and agents. With this independent, economically procompetitive, and non-conspiratorial explanation for Keller Williams' encouragement, Plaintiffs' thin allegation of Keller Williams' involvement in a conspiracy "stops short of the line" between the possibility and plausibility of the existence of a conspiracy, and fails to support allegations that Keller Williams participated in a conspiracy. *See Twombly*, 550 U.S. at 557.

For these reasons, Keller Williams respectfully requests that the Court dismiss Plaintiffs' claims as against it.

## 2.     The Court Should Dismiss the Claims as to RE/MAX.

As set forth above, to sustain its antitrust claims, Plaintiffs must allege the "role in the conspiracy" played by RE/MAX, *Kyhl*, 679 F. Supp. at 914, and cannot engage in generalized group pleading "lacking [] factual allegations to explain why, how, or for what purpose" RE/MAX engaged in the alleged conspiracy.  *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 883 (D. Minn. 2017).

The Complaint nowhere alleges that any RE/MAX employee or executive is or has been involved in NAR leadership, any NAR committees, or any MLSs, and notes only that individual real estate agents of different, independently owned and operated franchisees have held positions with NAR and one MLS.  Compl. ¶¶ 79-80, 82.  Plaintiffs make no allegations tying any acts (which amount to nothing more than general participation in NAR or an MLS) of these individual real estate agents associated with franchisees to RE/MAX itself.  They further plead no facts upon which the Court could conclude that these individuals, who have no direct relationship with RE/MAX, are agents of RE/MAX whose actions could be attributed to RE/MAX.  *See Oliveira-Brooks v. RE/MAX Int'l, Inc.*, 865 N.E.2d 252 (Ill. App. Ct. 2007) (affirming lower court finding that real estate agent was not an agent of RE/MAX International); *Moe v. RE/MAX Caribbean Islands, LLC*, Civ. Action No. 3:11-cv-00073, ECF No. 60 (D.V.I. Mar. 23, 2012)  (dismissing claims against RE/MAX Caribbean Islands, LLC and RE/MAX, LLC for acts of franchisee) (Motions at ECF Nos. 4-5).  The Complaint thus fails to allege plausibly any participation in NAR or any MLSs by RE/MAX.

Even more importantly, Plaintiffs do not allege that RE/MAX participated in the creation or adoption of the provision of the NAR Handbook and Code of Ethics that Plaintiffs challenge; or that RE/MAX agreed with any other Defendant or anyone else to require or encourage real estate agent compliance.  Plaintiffs' general assertion that the Corporate Defendants require

franchisees "to comply with NAR rules," Compl. ¶ 75, fails to allege a conspiracy because it is wholly conclusory. Plaintiffs plead no facts even suggesting that RE/MAX included this alleged requirement in its franchise agreement in order to ensure compliance with NAR rules regarding real estate agent compensation, that RE/MAX has ever discussed any NAR rules regarding real estate agent compensation with any of its franchisees, or that RE/MAX has ever enforced the alleged requirement to follow NAR rules with any of its franchisees. Furthermore, Plaintiffs provide the procompetitive, non-conspiratorial explanation for this alleged requirement: it provides franchisees with "critical" access to necessary information to enable home sales. *Id.* ¶ 107. Plaintiffs' claims against RE/MAX should be dismissed.

### 3. The Court Should Dismiss the Claims as to Realogy.

As to Realogy, the Complaint is fatally deficient as well. The Complaint alleges no conduct whatsoever by Realogy itself, either now or in 1996, at the time the challenged commission rule was purportedly adopted by NAR. *Id.* ¶ 79. The sole substantive allegation that even mentions Realogy alleges that an *independent sales agent affiliated with an independently owned and operated franchisee* associated with a Realogy-owned brand ("an independent franchisee agent") participated on each of NAR's 2018 and 2019 leadership teams. *Id.* The Complaint also notes that one independent franchisee agent is on one of the Subject MLS's Board of Directors, and three independent franchisee agents participated on the NAR Multiple Listings Issues and Policies Committee at some point in the past four years. *Id.* ¶¶ 80, 82. But absent allegations of "any particular activities" by Realogy itself (as opposed to independent contractor agents of franchisees), Plaintiffs' claims against Realogy should be dismissed. *See Insulate SB*, 797 F.3d at 546 (allegations of conspiracy are insufficient "without any specification of any particular activities" by a particular defendant) (quoting *In re Elevator Antitrust Litig.*, 502 F.3d at 50); *see also Schuyler v Sotheby's Int'l Realty, Inc.*, No. 112578/2011, 2013 N.Y. Misc. LEXIS 4487, at

\*6-7 (NY Sup. Ct. Oct. 2, 2013) (denying motion to amend complaint that sought to "pierce the corporate veil" as futile to hold Realogy responsible for subsidiary).

### 4. The Court Should Dismiss the Claims as to HomeServices and Its Subsidiaries.

The Complaint likewise fails to allege any specific conduct by HomeServices of America, Inc., or three of its newly named subsidiaries, The Long & Foster Companies, Inc. ("L&F Companies"), HSF Affiliates, and BHH Affiliates, LLC ("BHH Affiliates"), which plausibly indicates that any of these separate HomeServices companies participated in a conspiracy. The allegations against L&F Companies are particularly egregious, as L&F Companies was not even part of HomeServices before 2017, *see* Compl. ¶ 44 (at 14-15), and neither it, nor its subsidiary real estate brokerage entities, including Long & Foster Real Estate, Inc. ("L&F Real Estate"), have any connection to Missouri.

The Complaint does not allege that L&F Companies or L&F Real Estate (i) are authorized to do business in Missouri or Kansas; (ii) hold real estate licenses in those states; or (iii) participate in, own, or have any relationship with any of the Subject MLSs around which this case revolves.[9] And thus there are no facts linking L&F Companies or L&F Real Estate to the alleged conduct animating this suit.

---

[9] Nor could there be, given that L&F Companies is a holding company that conducts no business other than the ownership of its subsidiaries and related corporate services, and that its real estate brokerage holdings operate in the mid-Atlantic region, namely, in the District of Columbia, Maryland, Virginia, West Virginia, North Carolina, Pennsylvania, Delaware, and New Jersey. *See* https://www.longandfoster.com/pages/real-estate-agent-office-search ("Find a Realtor or Office" feature on Long & Foster webpage, where the "Find Offices" shows 230 Long & Foster real estate offices, all within the previously-described geographic footprint) (last accessed August 1, 2019); *see also generally* Ben Lane, *Berkshire Hathaway's HomeServices of America Acquires Long & Foster*, HousingWire, Sept. 7, 2017, attached hereto as Ex. 2. The Court may judicially notice the description of Long & Foster's real estate brokerage office locations as it exists on Long & Foster's webpage and as was widely reported in press accounts surrounding HomeServices' acquisition of Long & Foster in 2017.

The same is true for HSF Affiliates and BHH Affiliates. HSF Affiliates is alleged only to "operate[] many real estate franchise networks," *id*., with no clarity or supporting factual allegation as to whether or how this may relate to any franchise networks that exist in Missouri and/or that may participate in the Subject MLSs. [10] Likewise, the Complaint says nothing about BHH Affiliates other than it "is a subsidiary of HSF Affiliates and offers real estate brokerage services." *Id*.

The allegations in the Complaint specifically relating to Defendant HomeServices of America, Inc. are difficult to discern given that the Complaint uses the term "HomeServices" to mean both the individual company HomeServices of America, Inc., *see id*., together with "HomeServices of America, Inc., HSF Affiliates, LLC, BHH Affiliates, LLC, The Long & Foster Companies, Inc., as well as the other entities referred to in this paragraph and their other wholly owned or controlled subsidiaries or affiliates." *Id*. Most rationally understood, however, the allegations regarding HomeServices individually also fail to plausibly state a claim. While the Complaint alleges that HomeServices' executive chairman currently serves as a NAR director, *id*. ¶ 78, Plaintiffs do not allege that HomeServices, or its current chairman or other personnel acting on its behalf, had anything to do with the adoption, implementation, or enforcement of the Section 2-G-1 or NAR's Code of Ethics, Standard of Practice 16-16. Indeed, the Complaint does not even allege that HomeServices existed at that time of the November 1996 enactment of Section 2-G-1. Plaintiffs also do not allege that HomeServices (or any of its current or former personnel allegedly

_____

[10] The Complaint alleges that HFS Affiliates operates many real estate franchise networks including ReeceNichols Real Estate, HomeServices, Prudential and Real Living. Compl. ¶ 44 (at 14-15). Of these supposed "franchise networks," the only one that is alleged to have anything to do with the geographic region at issue is ReeceNichols Real Estate, which the Complaint confusingly describes as a Kansas City real estate brokerage that is "an affiliate of HomeServices, HSF Affiliates, and/or Berkshire Hathaway." *Id*. Thus, it is unclear whether ReeceNichols Real Estate is even alleged to be a franchisee of HSF Affiliates or that HSF Affiliates is alleged to have *any* franchise networks that operate in Missouri or participate in a Subject MLS.

acting on its behalf) even discussed Section 2-G-1's operation or had anything to do with any (unalleged) enforcement of the Rule that may have occurred—much less that any such action occurred pursuant to a conspiracy. Indeed, this iteration of the Complaint—like the original Complaint—is devoid of any factual allegation regarding collusion or conduct between HomeServices and any other Corporate Defendant with respect to the challenged rule.

For these additional reasons, HomeServices, L&F Companies, HSF Affiliates, and BHH Affiliates each respectfully request that the Court dismiss Plaintiffs' claims against it.

### C. Plaintiffs Have Failed to Allege Competitive Harm in a Properly Defined Relevant Market.

Plaintiffs have also failed to allege adequately that the supposed conspiracy had an anticompetitive effect in a legally cognizable relevant market because Plaintiffs have failed to allege a properly defined market. The Supreme Court has explained that in order to assess whether an antitrust claim has been adequately asserted, a plaintiff must allege a cognizable relevant market in which the supposed anticompetitive restraint has been imposed by the defendant's conduct. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018). The relevant market in a Section 1 case is "the area of effective competition . . . within which significant substitution in consumption or production occurs." *Id.* Where a plaintiff has failed to plead anticompetitive effects in a properly defined relevant market, dismissal is appropriate. *See, e.g.*, *Razorback*, 761 at 488; *Little Rock*, 591 F.3d at 601.

Here, Plaintiffs allege that the relevant market is the market of "the bundle of services provided to home *buyers and sellers* by residential real estate brokers with access to the Subject MLSs." Compl. ¶ 107 (emphasis added). Plaintiffs, however, focus entirely on the impact of sellers and ignore the competitive effects on buyers and overall. *See Am. Express Co.*, 138 S. Ct. at 2287. Plaintiffs' alleged harm is a shifting of a cost between two participants in its alleged

relevant market, and Plaintiffs ignore the corresponding benefits to both home sellers (for example, the ability to incentivize home showings) and home buyers (for example, more money available to purchase a home) under Section 2-G-1. Plaintiffs' allegation that none of the purported benefits of the MLS depend on the commission structure, Compl. ¶ 87, is belied by Plaintiffs' own allegation that Section 2-G-1 "provides an incentive for seller brokers to cooperate with buyer brokers" and "fosters an environment in which brokers work cooperatively," *id.* ¶ 62, on a transaction. In the absence of cooperation between real estate agents, the MLS and its procompetitive benefits are diminished.

Moreover, Plaintiffs have failed to allege facts showing that real estate agent commissions for the relevant market would be lower in the absence of the supposed rule being challenged. *See Matsushita Elec.*, 475 U.S. at 593-98 (rejecting antitrust claim that was unsupported by economic theory); *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-CV-01143 YGR, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013) ("Where the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed."). Rather, Plaintiffs point to one academic study that suggests brokerage rates "should run closer to 3.0%" in comparison to international markets, Compl. ¶ 91, but Plaintiffs allege no facts that relate this assertion to the conduct alleged in the Complaint and make no allegations that the services provided in such international markets are comparable to those in the United States. Plaintiffs' cited report itself acknowledges that "*agents do not earn excess profits.*"[11] *See* Delcoure & Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage*

---

[11] This contradicts Plaintiffs' conclusory assertion that that even if negotiation does occur, Section 2-G-1 "elevate[s] the baseline" for such negotiation. Compl. ¶ 64 n.18.

*Industry*, 5 Int'l Real Estate Rev. 12, 13 n.3 (2002) (emphasis added), attached as Ex. 3.[12]  Because

Plaintiffs' authority demonstrates that "agents do not earn excess profits" and Plaintiffs allege no

other facts that show anticompetitive effects in the alleged relevant market "as a whole," *Am.*

*Express Co.*, 138 S. Ct. at 2287, the Complaint should be dismissed.

>    **D.**    **Plaintiffs' Missouri Merchandising Practices Act Claim Should Be Dismissed.**

Because Plaintiffs' antitrust claims fail to state a valid claim for relief, their claim under

the Missouri Merchandising Practices Act ("MMPA"), which depends entirely on the antitrust

claims, must also be dismissed.  Plaintiffs allege no conduct whatsoever that is specific to the

MMPA claim and seek to hold Defendants liable for a violation of the MMPA based solely on the

alleged antitrust violation.  *See* Compl. ¶¶ 145-53.  Where an MMPA claim is based on a statutory

violation, and the plaintiff cannot show a violation of the underlying statute on which the MMPA

claim is based, the MMPA claim will be dismissed.  *See e.g., Ward v. W. Cty. Motor Co.*, 403

S.W.3d 82, 85 (Mo. 2013), *as modified* (May 28, 2013) ("West County did not violate section

365.070.4 by declining to return the deposits. The trial court did not err in dismissing that portion

of plaintiffs' Count I alleging violations of the MMPA based on violations of section 365.070.4.");

*Weber v. St. Louis County*, 342 S.W.3d 318, 324 (Mo. 2011) (affirming dismissal of MMPA claim

that was derivative of other claims that failed).

Even if Plaintiffs' antitrust claims were valid, their MMPA claim should still be dismissed

because they do not allege that the services they received in connection with the sale of their homes

denied them the "benefit of the bargain" they struck with their real estate agents.  "The 'benefit of

the bargain' rule awards a defrauded party the difference between the value of the product as

---

[12] The full content of this report is subject to judicial notice because it is cited and quoted in Plaintiffs' Complaint.  *See, e.g.*, *Noble Sys.*, 543 F.3d at 982; *Cromeans*, 2014 WL 1901197, at *3 n.1.

represented and the actual value of the product as received." *Polk v. KV Pharm. Co.*, No. 4:09-CV-00588 SNLJ, 2011 WL 6257466, at *5 (E.D. Mo. Dec. 15, 2011). Here, Plaintiffs' claim fails to satisfy this rule on multiple levels. First, Plaintiffs do not allege that the value of the services they received from their real estate agents was anything other than what was represented to them. In other words, Plaintiffs do not allege that they were unaware of the terms of their listing agreements, or the amount of commission that was to be paid under those agreements.

Further, Plaintiffs fail to allege that they even attempted to negotiate lower commissions for either the sellers' or buyers' agents, let alone that their real estate agents refused to lower commissions due to Section 2-G-1. Rather, Plaintiffs' own allegations demonstrate that they received exactly what they bargained for. The Complaint describes typical listing arrangements in which home sellers agree to pay their brokerage company a commission based on the percentage of the home sale price in exchange for assistance in completing the sale of the home, *see* Compl. ¶¶ 41-42 (at 17), and demonstrates that Plaintiffs received those services from their chosen real estate agents, to whom Plaintiffs paid the agreed commissions after the sellers' agents successfully sold their homes. Compl. ¶¶ 39-40 (at 13-14). Under these circumstances, where Plaintiffs do not dispute that they received the services for which they bargained, they cannot satisfy the benefit of the bargain rule. *See Polk*, 2011 WL 6257466, at *5 ("Plaintiff has not alleged the Medication was anything other than what it has always purported to be. Further, Plaintiff failed to allege he did not receive the benefit from the Medication for which he bargained; i.e. the medication did not perform as intended."); *see also Anderson v. Bass Pro Outdoor World, LLC*, 355 F. Supp. 3d 830, 837 (W.D. Mo. 2018); *Povich v. Combe Inc.*, No. 4:16 CV 97 CDP, 2017 WL 1058850, at *2 (E.D. Mo. Mar. 21, 2017); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007, 1012 (E.D.

Mo. 2014); *Carter v. Alcon Labs., Inc.*, No. 4:13CV00977 AGF, 2014 WL 989002, at *4 (E.D. Mo. Mar. 13, 2014).

As this Court has recognized, plaintiffs cannot sustain a claim under the MMPA based on the satisfactory performance of a valid contract. *Padberg v. DISH Network LLC*, No. 11-04035-CV-C-NKL, 2012 WL 2120765, at *6 (W.D. Mo. June 11, 2012) (dismissing MMPA claim). *Padberg* further recognized that Missouri has a long-held public policy of allowing entities to freely contract, and that courts in Missouri enforce lawful contracts even though they may be bad deals for one of the parties. *Id.*; *see also Grawitch v. Charter Commc'ns, Inc.*, No. 4:12CV01990 AGF, 2013 WL 253534, at *3 (E.D. Mo. Jan. 23, 2013), *aff'd*, 750 F.3d 956 (8th Cir. 2014). Without a finding that Defendants' conduct constituted an antitrust violation, Plaintiffs' retroactive dissatisfaction with the terms of their listing agreements, the validity of which Plaintiffs do not question, does not give rise to an MMPA claim.

## CONCLUSION

For the foregoing reasons, and the arguments made in NAR's Suggestions in Support of its Motion to Dismiss in which the Corporate Defendants have joined, the Court should grant the Corporate Defendants' Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated: August 5, 2019                    Respectfully submitted by:


*Counsel for Realogy Holdings Corp.*     *Counsel for Keller Williams Realty, Inc.*

/s/Megan J. Ochs                         /s/David R. Buchanan
Megan J. Ochs                            David R. Buchanan
 mochs@armstrongteasdale.com             dbuchanan@bjpc.com
Karrie Clinkinbeard                      BROWN & JAMES, PC-KCMO
 kclinkinbeard@armstrongteasdale.com     2345 Grand Boulevard
ARMSTRONG TEASDALE LLP-KCMO              Suite 2100
2345 Grand Boulevard                     Kansas City, MO 64108
Suite 1500                               (816) 472-0800
Kansas City, MO 64108
(816) 221-3240                           Timothy Ray, *pro hac vice*
                                          Timothy.Ray@hklaw.com
Kenneth Michael Kliebard, *pro hac vice* Martin G. Durkin, *pro hac vice*
 kenneth.kliebard@morganlewis.com         martin.durkin@hklaw.com
MORGAN LEWIS & BOCKIUS LLP               William F. Farley, *pro hac vice*
77 West Wacker Drive                      william.farley@hklaw.com
Chicago, IL 60601-5094                   HOLLAND & KNIGHT LLP
(312) 324-1000                           131 South Dearborn Street
                                         30th Floor
Stacey Anne Mahoney, *pro hac vice*      Chicago, IL 60603
 stacey.mahoney@morganlewis.com          (312) 263-3600
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue                          Anna P. Hayes, *pro hac vice*
New York, NY 10178                        anna.hayes@hklaw.com
(212) 309-6000                           HOLLAND & KNIGHT LLP
                                         800 17th Street NW, Suite 1100
                                         Washington, DC 20530
                                         (202) 469-5415

*Counsel for HomeServices of America, Inc.,*
*BHH Affiliates, LLC, HSF Affiliates, LLC,*
*and The Long & Foster Companies, Inc.*


/s/Brian C. Fries
Brian C. Fries
  bfries@lathropgage.com
LATHROP GAGE LLP - KCMO
2345 Grand Avenue
Suite 2200
Kansas City, MO 64108-2618
(816) 292-2000

Matthew B. Barr, *pro hac vice*
  matthew.barr@btlaw.com
Matthew T. Ciulla, *pro hac vice*
  matthew.ciulla@btlaw.com
Karoline E. Jackson, *pro hac vice*
  kjackson@btlaw.com
Robert D. Macgill, *pro hac vice*
  robert.macgill@btlaw.com
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
(317) 231-6498

Jay N. Varon, *pro hac vice*
  jvaron@foley.com
Jennifer M. Keas, *pro hac vice*
  jkeas@foley.com
FOLEY AND LARDNER LLP
3000 K Street NW, Suite 600
Washington, DC 20007
(202) 672-5436

*Counsel for RE/MAX, LLC*

/s/Danne W. Webb
Danne W. Webb (MO # 39384)
  dwebb@hab-law.com
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Telephone:     816-421-0700
Facsimile:     816-421-0899

Paula W. Render, *pro hac vice*
  prender@jonesday.com
Erin L. Shencopp, *pro hac vice*
  eshencopp@jonesday.com
Odeshoo Hasdoo, *pro hac vice*
  ehasdoo@jonesday.com
JONES DAY
77 W Wacker, Suite 3500
Chicago, IL 60605
(312) 782-3939

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2019, I electronically filed the foregoing SUGGESTIONS IN SUPPORT OF THE CORPORATE DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court using the CM/ECF system, which will send notice to counsel for all parties that have appeared in this case.

*/s/ Odeshoo Hasdoo*

Odeshoo Hasdoo