IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JOSHUA SITZER AND AMY WINGER, SCOTT AND RHONDA BURNETT, and RYAN HENDRICKSON, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC. <br><br> Defendants. | Case No. 4:19-cv-00332-SRB |

## ORDER

Before the Court is a Motion of the National Association of Realtors ("NAR") to Dismiss the Association for Lack of Personal Jurisdiction and to Dismiss the Complaint for Failure to State a Cause of Action (Doc. #76) and Corporate Defendants' Motion to Dismiss (Doc. #78). For the following reasons, NAR's motion is DENIED and Corporate Defendants' motion is DENIED.

### I. LEGAL STANDARD

#### A. Personal Jurisdiction

When a defendant seeks dismissal for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citing *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d at 591–92 (8th Cir. 2011)). The plaintiff's prima facie showing of personal jurisdiction

1

"must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072–73 (8th Cir. 2004) (internal quotation marks omitted) (quoting *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)).

Plaintiffs filed suit in federal court under Section 1 of the Sherman Act, 15 U.S.C. § 1. The Sherman Act permits nationwide service of process for corporate defendants. *See* 15 U.S.C. § 12. "When a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Aviva Life & Annuity Co. v. Davis*, 20 F. Supp. 3d 694, 703 (S.D. Iowa 2014); *In re Fed. Fountain, Inc.*, 165 F.3d 600, 601 (8th Cir. 1999) (en banc).

### B. Failure to Dismiss a Claim

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ash v. Anderson Merchs., LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678) (internal quotations omitted).

The Court must consider all facts alleged in the complaint as true when considering a motion to dismiss. *See Data Mfg., Inc. v. United Parcel Service, Inc.*, 557 F.3d 849, 851 (8th

Cir. 2009) (noting "[t]he factual allegations of a complaint are assumed true and construed in favor of the plaintiff, even if it strikes a savvy judge that actual proof of those facts is improbable"). However, allegations that are "legal conclusions or [a] formulaic recitation of the elements of a cause of action . . . may properly be set aside." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 677) (internal citations omitted). Ultimately, dismissal under Rule 12(b)(6) should be granted "only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some insuperable bar to relief." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (internal quotations and citations omitted); *see also Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("We note that courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators.").

## II. BACKGROUND

A vast majority of residential real estate sales and purchases in the United States occur on a Multiple Listing Service ("MLS") marketplace.[1] An MLS is a database of properties listed for sale within a defined geographic region accessible to real estate brokers, their realtors, and agents. In a standard real estate transaction, the home seller retains a seller-broker and a home buyer separately retains a buyer-broker. Both brokers utilize a regional MLS listing to sell or locate a given property for their client. Generally, real estate brokers receive compensation in the form of a commission calculated as a percentage of a home's sale price. A seller-broker's compensation is set forth in a listing agreement, a contract between the home seller and broker

---

[1] Plaintiffs' first-amended class-action complaint ("FAC") alleges the following facts, which the Courts accepts as true for purposes of Defendants' motion to dismiss and views in a light most favorable to Plaintiff. *See Data Mfg., Inc.*, 557 F.3d at 851.

3

containing the terms of the listing.  A home buyer enters a similar contract with a buyer-broker, which typically states the buyer-broker's compensation will be paid out of the seller-broker's total commission—a commission paid by the home seller once the property is sold.

Plaintiffs Joshua Sitzer and Amy Winger, Scott and Rhonda Burnett, and Ryan Hendrickson ("Plaintiffs") filed their FAC on June 21, 2019.  (Doc. #38).  Plaintiffs are home sellers who listed their homes on one of four MLS marketplaces: Kansas City MLS ("Heartland MLS"), St. Louis MLS ("MARIS MLS"), Springfield, Missouri MLS ("Southern Missouri Regional MLS"), and Columbia, Missouri MLS ("CBOR MLS") (collectively, "Subject MLS").  The Subject MLS are governed by local realtor associations that are members of NAR and must adhere to NAR rules and policies.  Defendant NAR is a trade association for the real-estate industry that promulgates professional standards and policies its members and affiliates must abide by, including specific guidelines for listing properties on MLS marketplaces.  Corporate Defendants are national real estate broker franchisors who each operate brokerage subsidiaries, franchisees, and/or affiliates within the geographic regions covered by the Subject MLS: Realogy Holdings Corp.; Homeservices of America, Inc.; BHH Affiliates, LLC; HSF Affiliates, LLC; RE/MAX, LLC; and Keller Williams Realty, Inc. (collectively, "Corporate Defendants").

Plaintiffs allege Defendants adopted and imposed anticompetitive restraints that inflated residential real estate commissions throughout Missouri, focusing primarily on Section 2-G-1 of NAR's MLS Listing Handbook—what Plaintiffs refer to as the "Adversary Commission Rule." Plaintiffs allege "[t]he cornerstone of Defendants' conspiracy is NAR's adoption and implementation of a rule that requires all seller's brokers to make blanket, unilateral and effectively non-negotiable offer [sic] of buyer broker compensation ("the Adversary Commission Rule") when listing a property on a [MLS]."  (Doc. #38, p. 3).  Plaintiff's FAC includes three

4

Case 4:19-cv-00332-SRB   Document 131   Filed 10/16/19   Page 4 of 19

counts against Defendants: (1) Count I: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) Count II: Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*; and (3) Count III: Violation of the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031. NAR asks the Court to dismiss it from the action for lack of personal jurisdiction under Rule 12(b)(2) or, alternatively, to dismiss Plaintiffs' FAC under Rule 12(b)(6) for failure to state a claim. Corporate Defendants seek dismissal of Plaintiffs' FAC only pursuant to Rule 12(b)(6).

## III. DISCUSSION

### A. Lack of Personal Jurisdiction

Only NAR argues dismissal is appropriate under Rule 12(b)(2) for lack of personal jurisdiction. In an Order previously denying NAR's Motion to Transfer (Doc. #82), this Court found personal jurisdiction existed under Section 12 of the Clayton Act. The result here is the same. For the reasons discussed in this Court's prior Order, the Court may properly exercise personal jurisdiction over NAR and its motion to dismiss due to lack of personal jurisdiction is accordingly denied.

### B. Count I: Violation of Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To establish a claim under Section 1 of the Sherman Act, a plaintiff must plead evidentiary facts which, if true, will prove: (1) there was a contract, combination, or conspiracy; (2) the agreement unreasonably restrained trade under either a *per se* rule of illegality or a rule-of-reason analysis; and (3) the restraint affected interstate commerce.[2] *See HM Compounding Servs., Inc. v. Express Scripts,*

---

[2] No party disputes whether the alleged anticompetitive conspiracy in this case substantially affects interstate commerce. NAR's nationwide presence and influence, Corporate Defendants' multistate operational and business structures, and the subject matter of the alleged conspiracy all sufficiently implicate interstate commerce. *See Diversified Brokerage Servs., Inc. v. Greater Des Moines Bd. of Realtors*, 521 F.2d 1343, 1345 (8th Cir. 1975) (citing

5

*Inc.*, No. 4:14-CV-1858-JAR, 2015 WL 4162762, at *3 (E.D. Mo. July 9, 2015) (citations omitted). A plaintiff must additionally "demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (quoting *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006)).

### a. Existence of a Conspiracy

To demonstrate concerted action among defendants to restrain trade, a plaintiff must plead facts plausibly showing "the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds." *Insulate*, 797 F.3d at 543–44 (citations and internal quotations omitted). No formal or explicit agreement between the parties is required. *Id*. at 544, 548 (quoting *United States v. Parke, Davis & Co.*, 362 U.S. 29, 44 (1960)) ("[P]laintiffs can prove concerted action by showing a [defendant] took some action 'beyond mere announcement of his policy and the simple refusal to deal [and] employ[ed] other means which effect adherence to his' policies."). Concerted or collaborative action may be demonstrated by showing two or more parties "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal citations and quotations omitted). "[T]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018) (quoting *Twombly*, 550 U.S. at 553) (internal quotation marks omitted).

---

*Burke v. Ford*, 389 U.S. 320, 321 (1967) ("For it is well established that an activity which does not itself occur in interstate commerce comes within the scope of the Sherman Act if it substantially affects interstate commerce."). Accordingly, the threshold question of whether the activities alleged here affect interstate commerce is considered undisputed for purposes of the motion to dismiss.

6

The parties dispute whether Plaintiffs' factual allegations plausibly demonstrate the existence of an agreement among and between Defendants. NAR primarily disputes Plaintiffs' anticompetitive characterization of Section 2-G-1 and its effects. Corporate Defendants contend Plaintiffs present no evidence showing the existence of an agreement between Defendants or any affirmative steps by Corporate Defendants and their associated brokers to adopt or implement Section 2-G-1. Corporate Defendants argue each Defendant's decision to join a Subject MLS and enforce its listing policies is an act of independent business judgment necessary for competitive success in regional real estate markets. Plaintiffs argue NAR imposes an anticompetitive trade restraint by mandating all Subject MLS participants comply with Section 2-G-1 and its related provisions. Plaintiffs allege NAR invites each Corporate Defendant to agree to, and participate in, this anticompetitive restraint by conditioning the benefits of participation in the MLS system on adherence to Section 2-G-1. Plaintiffs also allege each Corporate Defendant agrees to NAR's anticompetitive restraint by requiring its subsidiaries, franchisees, and associated brokerages (and those brokerages' affiliated agents) to join NAR member groups, participate in the MLS, and adhere to all NAR-imposed listing rules and policies, including Section 2-G-1. Additionally, Plaintiffs allege executives of each Corporate Defendant serve or served in management and/or leadership positions within NAR and the local realtor associations governing the Subject MLS, arguing that involvement shows Corporate Defendants' continued adoption, implementation, and agreement to enforce NAR's anticompetitive policies.

As for the conspiracy element of their Section 1 claim, the Court finds Plaintiffs satisfy the pleading requirements necessary to survive a motion to dismiss. Plaintiffs' assertion that NAR and Corporate Defendants agreed to carry out NAR's allegedly anticompetitive policies is

7

adequately supported by factual allegations regarding both the substance and nature of their purported agreement. Plaintiffs present facts showing the terms and effects of the alleged agreement and the methods allegedly used by NAR and Corporate Defendants to uphold and perpetuate it. In turn, Plaintiffs' allegations plausibly suggest the franchisees, subsidiaries, and agents of each Corporate Defendant knew of, complied with, participated in, and benefitted from Section 2-G-1 and its related provisions. *See, e.g.*, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("Acceptance by competitors without previous agreement of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish unlawful 'conspiracy' under the Sherman Anti-Trust Act."). Taken as true and in a light most favorable to them, Plaintiffs adequately allege facts placing the conduct of NAR and each Corporate Defendant "in a context that raises a suggestion of a preceding agreement" rather than "identical, independent action." *Twombly*, 550 U.S. at 557, 549; *see also Interstate Circuit*, 306 U.S. at 227; *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195, 199 (2010) ("Any joint venture involves multiple sources of economic power cooperating to produce a product. And for many such ventures, the participation of others is necessary. But that does not mean that necessity of cooperation transforms concerted action into independent action."). As to this element, that is sufficient to survive dismissal.

    b.  **Unreasonable Restraint of Trade**

"Despite its broad language, Section 1 has long been interpreted to outlaw only those restraints that are 'unreasonable.'" *Craftsmen Limousine, Inc. v. Ford Motor Co. (Craftsmen I)*, 363 F.3d 761, 772 (8th Cir. 2004) (quoting *Arizona v. Maricopa Cnty. Med. Soc'y,* 457 U.S. 332, 343 (1982). An antitrust plaintiff must demonstrate the alleged conspiracy "unreasonably restrains trade in a relevant product or geographic market." *Minn. Ass'n of Nurse Anesthetists v.*

8

Case 4:19-cv-00332-SRB   Document 131   Filed 10/16/19   Page 8 of 19

*Unity Hosp.*, 208 F.3d 655, 659 (8th Cir. 2000). Whether a trade restraint is unreasonable is evaluated under either the *per se* rule of illegality, the more common "rule of reason" analysis, or the "quick look" analysis.[3] *Id.*; *Craftsmen I*, 363 F.3d at 772. Under the rule-of-reason standard, relevant inquiry "is whether, on balance, the challenged agreement is one that 'merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'" *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1138 (8th Cir. 1981) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)). The unreasonableness of a restraint on competition is a fact-intensive inquiry evaluated within the context of the relevant product and/or geographic market. *Rosebrough*, 666 F.2d at 1138; *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 691 (1978).

### i. Relevant Product and Geographic Market

As a preliminary matter, Plaintiffs must properly define the relevant product or market where competition is suppressed by the allegedly anticompetitive restraint. *See Double D*, 136 F.3d at 558–560 ("the 'rule of reason' analysis involves an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint."). Given that a "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers," dismissal at the motion to dismiss stage based on a plaintiff's market definition is disfavored. *Id.* at 560.

---

[3] Plaintiffs contend there are ample grounds to conclude Section 2-G-1 is *per se* illegal. Corporate Defendants contend Section 2-G-1 is not part of the small and shrinking group of "manifestly anticompetitive conduct" typically evaluated under a *per se* standard. (Doc. #118, p. 4 n.5). In considering a motion to dismiss, it is not necessary for this Court to determine whether the facts might ultimately support a finding of a *per se* violation, nor whether Section 2-G-1 warrants evaluation under a *per se* standard. That determination is best left to the merits stage of this proceeding. *See Craftsmen I*, 363 F.3d at 772 ("although a court's determination that the *per se* rule applies 'might involve many fact questions, the selection of a mode [of analysis] is entirely a question of law.") (citations omitted). For purposes of a motion to dismiss, evaluating whether Plaintiffs' factual allegations could plausibly satisfy a rule-of-reason standard is sufficient.

NAR does not dispute whether Plaintiff sufficiently defined the relevant market impacted by Section 2-G-1 and its attendant policies. Corporate Defendants contend Plaintiffs do not allege a legally cognizable relevant market and further argue Plaintiffs ignore the procompetitive effects of the MLS system. In their FAC, Plaintiffs describe the relevant product market as "the bundle of services provided to buyers and sellers by residential real estate brokers with access to the Subject MLSs." (Doc. #38, p. 38). Plaintiffs further define the relevant geographic market as the geographic areas in which the Subject MLS exclusively operate.

The Court finds Plaintiffs adequately define the relevant market impacted by Section 2-G-1. The FAC describes in detail residential real estate commission structures and how brokers in the industry utilize MLS marketplaces, including the Subject MLS, to sell and purchase homes. Plaintiffs also present factual allegations demonstrating the ubiquitous use of MLS services and the limited alternatives available to those who cannot utilize MLS listings. In sum, these allegations define a plausible, valid, and sufficiently-broad relevant market to which a rule-of-reason analysis can be applied. *See Double D*, 136 F.3d at 560; *Foam Supplies, Inc. v. Dow Chem. Co.*, No. 4:05-CV-1772-CDP, 2006 WL 2225392, at *4 (E.D. Mo. Aug. 2, 2006) (noting dismissal due to inadequate market definition appropriate when "it is clear that the alleged relevant market is too narrow, implausible, defined solely by franchise agreement, or simply not defined anywhere in the pleadings.").

### ii. Detrimental Effects on Competition

Having adequately defined the relevant market, the rule of reason requires Plaintiffs to allege facts plausibly showing the alleged anticompetitive conduct has a detrimental effect on competition within the relevant market or "the potential for genuine adverse effects on competition." *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993); *Craftsmen*

10

*Limousine, Inc. v. Ford Motor Co. (Craftsmen II)*, 491 F.3d 380, 388 (8th Cir. 2007). While recognizing the parties have not yet had the benefit of discovery, Plaintiffs must still present a plausible factual basis for the alleged anticompetitive effects. *See Double D*, 136 F.3d at 560.

Defendants argue Plaintiffs mischaracterize Section 2-G-1, its attendant policies, and their purported anticompetitive effects. Relying on the plain language of the rule itself, NAR argues Section 2-G-1 only mandates listing brokers make some offer of compensation and that no minimum commission rate or amount is required. Defendants also contend the allegations and economic rationale cited by Plaintiffs illustrate the procompetitive nature of the MLS system, not an unreasonable restraint on trade. Plaintiffs allege Section 2-G-1 mandates seller brokers make "blanket, unilateral and effectively non-negotiable" offers of compensation to buyer brokers whenever they list a home on an MLS owned by a local NAR association. (Doc. #38, p. 19). Plaintiffs argue this blanket-offer of compensation, when implemented in concert with other mandatory commission rules and provisions, limits the ability of buyer-brokers to negotiate commission reductions. As a result, Plaintiffs allege Section 2-G-1 and its related rules—and NAR and Corporate Defendants' enforcement of them—force home sellers to pay inflated sales commissions and buyer-broker commission rates, force home sellers to pay elevated buyer-broker commissions to ensure their homes are competitively marketed,[4] and limits competition among buyer-brokers by severely limiting their ability to negotiate for lower commission rates.

---

[4] Relevant to this alleged effect is the practice of steering. As alleged by Plaintiffs, buyer-brokers can use their access to MLS information (unavailable to potential homebuyers) to view details about the offered levels of buyer-broker compensation and dissuade clients from viewing or purchasing homes with lower buyer-broker commission offers, thus "steering" them to properties with higher-paying commissions. (Doc. #38, p. 8; Doc. #88, p. 25). Plaintiffs allege the documented practice of steering causes home sellers to pay elevated commission rates, and thus elevated buyer-broker commissions, to avoid or dissuade buyer-brokers from engaging in steering.

11

At this stage of the proceeding, the Court's job is not to balance the anticompetitive effects of Section 2-G-1 against the procompetitive justifications advanced by Defendants. Instead, the Court must evaluate whether Plaintiffs' FAC presents facts which, when viewed in a light most favorable to Plaintiffs, show the challenged conduct plausibly exerts an unreasonable restraint on trade. *See Ash*, 799 F.3d at 960. The Court finds Plaintiffs have satisfied that requirement. Given the sheer market power possessed by the Subject MLS and few available listing alternatives, combined with the fact that each MLS participant must adhere to NAR listing rules or face professional sanctions and/or repercussions, Plaintiffs demonstrate the significant influence exerted by Defendants and their listing policies in the Subject MLS. Viewed in a light most favorable to Plaintiffs, allegations that Section 2-G-1 requires seller-brokers to present blanket commission offers to buyer-brokers could plausibly create a skewed compensation structure within the residential real estate market, leading to inflated commissions that would otherwise be lower under competitive market conditions. According to Plaintiffs, Section 2-G-1 and other identified NAR provisions cooperatively limit negotiation, which could plausibly maintain elevated commission rates and deter price-cutting. Plaintiffs also describe buyer-brokers' unique access to MLS listings, the historical practice of steering, and plausibly suggest Section 2-G-1 creates or exacerbates upward pressure on commission rates. The fact-intensive arguments raised by Defendants do not operate as a bar to relief and are appropriate for resolution at a later stage of the proceeding. *See Strand*, 380 F.3d at 317. As to this element, Plaintiffs present enough factual allegations to survive dismissal.

### c. Antitrust Injury

To recover damages, "a private plaintiff must demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants, and that he has standing to

12

Case 4:19-cv-00332-SRB   Document 131   Filed 10/16/19   Page 12 of 19

pursue a claim under the federal antitrust laws." *Insulate*, 797 F.3d at 542 (quoting *In re Canadian Import Antitrust Litig.*, 470 F.3d at 791). Standing to sue under the Sherman Act "requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987) ("[M]ere causal connection between an antitrust violation and harm to a plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect.").

NAR argues Plaintiffs do not allege the challenged NAR rules are the cause of their claimed injury and contend Plaintiffs cannot show they suffered a legally-cognizable injury under antitrust law. NAR also notes Plaintiffs omit allegations of any failed attempts by a Plaintiff to negotiate a lower commission with their respective brokers as a result of Section 2-G-1. Plaintiffs argue all that is required of them to survive dismissal is to allege that Section 2-G-1 was "either a material cause, a substantial factor, or a proximate cause of Plaintiffs' injuries." (Doc. #88, pp. 32–33).

The Court finds Plaintiffs allege a legally-cognizable injury under the Sherman Act. Plaintiffs claim Defendants' anticompetitive agreement forced them to pay higher total sales commissions when they sold their homes and forced them to pay elevated buyer-broker commissions to induce buyer-brokers to show their homes to prospective buyers. Paying a higher price as a result of the alleged trade restraint is certainly the type of injury "antitrust laws were intended to prevent." *See Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 624–25 (8th Cir. 2011) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Plaintiffs also present facts sufficiently linking their alleged injury to NAR's adoption and implementation of Section 2-G-1, its related rules and provisions, and Corporate Defendants'

13

adherence to and enforcement of them. While Plaintiffs will have to account for the various economic and market factors that may have caused or contributed to their alleged injuries, Plaintiffs do not have to do so to survive a motion to dismiss. Instead, Plaintiffs must present enough factual allegations to plausibly show Defendants' alleged anticompetitive actions are a "material cause" of their alleged injuries. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (quoting *Nat'l Ass'n of Rev. Appraisers & Mortgage Underwriters, Inc. v. Appraisal Found.*, 64 F.3d 1130, 1135 (8th Cir. 1995)). They have done so.

In sum, Plaintiffs satisfy their burden under Rule 12(b)(6) for each element of their federal antitrust claim under Section 1 of the Sherman Act. NAR and Corporate Defendants' motions to dismiss Count I for failure to state a claim are accordingly denied.

### C. Count II: Violation of the Missouri Merchandising Practices Act

The MMPA prohibits the "act, use or employment by any person of any deception" or "unfair practice . . . in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1. To successfully present a claim under the MMPA, Plaintiffs must allege they: "(1) purchased merchandise from the defendant (2) for personal, family, or household purposes and (3) suffered an ascertainable loss of money or property (4) as a result of defendant's use of one of the methods, acts, or practices declared unlawful by the Act." *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 757 (W.D. Mo. 2015) (citing Mo. Rev. Stat. § 407.025.1). MMPA broadly defines the term "merchandise" to include services. *See* Mo. Rev. Stat. § 407.020.4; *Pointer v. Edward L. Kuhs Co.*, 678 S.W.2d 836, 841 (Mo. App. E.D. 1984) (holding real estate broker services fall within scope of the MMPA). Unlawful methods, acts, or practices under the MMPA are those which "include any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or

14

omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." *Kelly*, 81 F. Supp. 3d at 757 (quoting Mo. Rev. Stat. § 407.020.1) (internal quotation marks omitted). Here, Defendants do not dispute the purchases alleged by Plaintiffs were for personal, family, or household purposes or whether the alleged anticompetitive conduct constitutes an "unlawful act" within the scope of MMPA.

### a. Use of Unfair Practices "In Connection With" Sale or Advertisement

The MMPA's requirement that the unfair or deceptive practice be done "in connection with the sale or advertisement of any merchandise" has been broadly construed. *See, e.g.*, *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414–16 (Mo. banc 2014) ("Given the potentially broad scope of what is prohibited under the MMPA, it would seem incongruous to limit 'in connection with' to only apply to the original parties in a transaction."). Even persons who were not direct parties to the original sale transaction may still be implicated in an MMPA violation if their deceptive practice occurred "before, during or after a sale." *Id.* at 414 (quoting Mo. Rev. Stat. § 407.020.1). In *Conway*, the Missouri Supreme Court interpreted the phrase "in connection with" as meaning "to have a relationship," and held that to validly state a claim under the MMPA a plaintiff must allege a relationship between the losses suffered and the defendant's unlawful act. *Id.* ("Section 407.020.1 prohibits the use of the enumerated deceptive practices if there is a relationship between the sale of merchandise and the alleged unlawful action.). In light of this broad construction, the critical inquiry is whether a relationship plausibly exists between NAR's alleged anticompetitive practices and Plaintiffs' payment of inflated commission rates by purchasing real-estate brokerage services. *See, e.g.*, *Jackson v. Barton*, 548 S.W.3d 263, 270 (Mo. banc 2018); *Faltermeier v. FCA US LLC*, 899 F.3d 617, 622 (8th Cir. 2018).

15

NAR argues its connection to the sales of Plaintiffs' homes is too remote to implicate the MMPA, contending Plaintiffs do not—and cannot—allege they purchased any services directly from NAR.  NAR argues it has no "direct connection" to the sale of Plaintiffs' homes.  Absent allegations that it was directly involved in or induced the contracts between Plaintiffs and their brokers, NAR argues the MMPA claim against it should be dismissed.  Plaintiffs argue NAR's requirement that local realtor associations governing the Subject MLS comply with Section 2-G-1 and other listing provisions plausibly shows NAR's "connection" with Plaintiffs' purchase of brokerage services that include buyer-broker compensation terms within their listing agreements.

Since Plaintiffs' purchase of real estate broker services underlies the basis of their MMPA claim against Defendants, at issue is whether NAR's alleged anticompetitive practices occurred "in connection with" the sale or advertisement of the residential real estate brokerage services purchased by Plaintiffs.  At this early stage, the Court finds Plaintiffs provide sufficient factual allegations that plausibly show a relationship between NAR's alleged anticompetitive practices and Plaintiffs' purchase of real-estate brokerage services containing inflated commission structures.  The FAC contains factual allegations regarding NAR's creation, adoption, and implementation of Section 2-G-1 and its complementary provisions, as well as NAR's requirement that any participant in its member-MLS listings (including the Subject MLS) adhere to those rules or face professional sanctions.  Plaintiffs also present facts plausibly showing how Section 2-G-1 leads to inflated commission levels in seller-broker listing agreements.  A direct contractual relationship between Plaintiffs and NAR is not necessary, nor is evidence showing NAR directly induced Plaintiffs into entering their brokerage contracts.  It is enough that Plaintiffs can plausibly show a relationship between NAR's challenged policies and the higher commission prices paid pursuant to Plaintiffs' real-estate brokerage contracts, even if

NAR's unfair or deceptive practices occurred before those brokerage services were purchased. *See Conway*, 438 S.W.3d at 416 ("a plaintiff can maintain a suit under the MMPA against a party with a connection to the merchandise *before* a buyer enters the transaction."). In light of precedent describing MMPA's language "regarding unlawful merchandising as unrestricted, all-encompassing and exceedingly broad" and a scope which covers "every practice imaginable and every unfairness to whatever degree," Plaintiffs have pled enough as to this element to survive dismissal. *Perras v. H & R Block*, 789 F.3d 914, 917–18 (8th Cir. 2015) (internal quotation marks and citations omitted).

### b. Ascertainable Loss

"A plaintiff adequately pleads this element of an MMPA claim if he alleges an ascertainable loss under the benefit-of-the-bargain rule, which compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 313 (Mo. Ct. App. 2016). The alleged loss should also be a result of the defendant's unlawful or deceptive practice. *Id.*

Defendants argue Plaintiffs do not allege facts establishing an ascertainable loss under MMPA. NAR presents two arguments as to why Plaintiffs fall short on showing they suffered an ascertainable loss: (1) failure to allege the services they bought were not as represented, and (2) failure to allege they bore the costs attributed to NAR's alleged unfair practices. Corporate Defendants argue Plaintiffs failed to allege they were denied the benefit of their bargain under the listing agreements executed with real estate agents for the sale of their homes.[5]

---

[5] Corporate Defendants also argue they cannot be held liable for a violation of the MMPA based solely on the alleged antitrust violation because Plaintiffs fail to allege conduct violative of state or federal antitrust laws. Given this Court's finding that Plaintiffs adequately plead factual allegations which plausibly suggest Corporate Defendants entered into an anticompetitive agreement, this argument need not be evaluated here.

17

Here, Plaintiffs allege they lost money because they paid artificially inflated commission rates upon the sale of their homes pursuant to their listing agreements. Plaintiffs specifically allege their commission rates would be lower in a competitive market but for the alleged anticompetitive restraints imposed by Defendants. This is an allegation which plausibly states an objectively ascertainable loss. Plaintiffs' allegations that they received the services they contracted for—a brokerage firm's assistance in selling their homes in exchange for a commission based on the percentage of the home's sale price—do not mean Plaintiffs fail to plead an ascertainable loss. Plaintiffs' alleged losses arise from their payment of artificially-inflated commissions pursuant to those listing agreements, agreements which did not represent to Plaintiffs the inflated commission values they were paying as a result of Defendants' allegedly anticompetitive activities. In sum, Plaintiffs' allegations adequately and plausibly attribute the inflated commissions they paid to Section 2-G-1 and its related provision and, thus, allege an ascertainable loss. Whether Plaintiffs actually incurred those losses or subsequently passed those losses on to buyers via increased sales prices is a question of fact to be resolved at a later stage of this case. *See, e.g.*, *Roberts v. BJC Health System*, 391 S.W.3d 433, 438–39 (Mo. banc 2013).

Accordingly, Plaintiffs present sufficient factual allegations to plausibly support their MMPA claims against Defendants. NAR and Corporate Defendants' motions to dismiss Count II for failure to state a claim are accordingly denied.

**D. Count III: Violation of the Missouri Antitrust Law**

Under the Missouri Antitrust Law, "every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful." Mo. Rev. Stat. § 416.031.1. "Missouri antitrust statutes are construed 'in harmony with ruling judicial interpretations of comparable federal antitrust statutes.'" *Se. Missouri Hosp.*, 642 F.3d at 612 n. 3 (8th Cir. 2011) (quoting Mo. Rev.

18

Stat. § 416.141); *see, e.g.*, *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 920 (E.D. Mo. 2010) (applying federal antitrust law to Missouri antitrust claims).

Defendants argue Plaintiffs' Missouri Antitrust Law action should be dismissed for the same reasons as their federal antitrust claim. Plaintiffs contend they have presented enough factual allegations to survive a motion to dismiss. Based on this Court's earlier analysis regarding the sufficiency of Plaintiffs' allegations with respect to their federal antitrust claim under Section 1 of the Sherman Act, Plaintiffs' Count III may proceed against NAR and Corporate Defendants.

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendant National Association of Realtor's Motion to Dismiss (Doc. #76) is denied. It is further ORDERED that Corporate Defendants' Motion to Dismiss (Doc. #78) is denied.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: October 16, 2019