# ECF No. 556-13
# Exhibit K

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

JOSHUA SITZER AND AMY )
WINGER, SCOTT AND RHONDA )
BURNETT, AND RYAN )
HENDRICKSON, on behalf of )
themselves and all others similarly situated, )
)
    Plaintiffs, )
) No: 4:19-cv-00332-SRB
)
v. ) **CLASS ACTION**
)
THE NATIONAL ASSOCIATION OF ) Judge Stephen R. Bough
REALTORS, REALOGY HOLDINGS )
CORP., HOMESERVICES OF AMERICA, )
INC., BHH AFFILIATES, LLC, HSF )
AFFILIATES, LLC, RE/MAX LLC, )
and KELLER WILLIAMS REALTY, )
INC. )
)
    Defendants. )

## DECLARATION OF JOHN PEYTON

1.      My name is John Peyton. I am the President and Chief Executive Officer for

Realogy Franchise Group ("RFG"), which is a business operation of Realogy Holdings Corp.

("Realogy") that focuses on residential real estate franchises. I have personal knowledge of the

matters set forth in this Declaration and am personally competent to testify to those matters.

2.      As Chief Executive Officer for RFG, I am responsible for managing RFG's

portfolio of real estate franchise brands. Realogy has five subsidiary franchisor brands that have

franchisees with offices located in Missouri, including Better Homes and Gardens Real Estate

LLC, Century 21 Real Estate LLC, Coldwell Banker Real Estate LLC, Sotheby's International

Realty Affiliates LLC, and ERA Franchise Systems LLC. Better Homes and Gardens Real

Estate LLC, Century 21 Real Estate LLC, Sotheby's International Realty Affiliates LLC, and

1

ERA Franchise Systems LLC are each wholly owned subsidiaries of Realogy Services Group LLC, which is a wholly-owned subsidiary of Realogy Group LLC, which is a wholly-owned subsidiary of Realogy Intermediate Holdings LLC, which is a wholly-owned subsidiary of Realogy Holdings Corp. Coldwell Banker Real Estate LLC is a wholly-owned subsidiary of Coldwell Banker LLC, which is a wholly-owned subsidiary of Realogy Services Group LLC, which is a wholly-owned subsidiary of Realogy Group LLC, which is a wholly-owned subsidiary of Realogy Intermediate Holdings LLC, which is a wholly-owned subsidiary of Realogy Holdings Corp. As of the date of this Declaration, Realogy's subsidiary franchisor brands have 82 franchisees operating 122 franchised offices in Missouri.

3.      Attached hereto as Exhibit A is a true and accurate copy of ERA Franchise Systems LLC's ("ERA") model franchise agreement ("Franchise Agreement"), excerpted from ERA's Franchise Disclosure Document, issued March 29, 2019, produced to Plaintiffs in this litigation. This excerpted Franchise Agreement bears Bates numbers Realogy-Sitzer-00000755-809. This Franchise Agreement is representative of the franchise agreements for all of Realogy's subsidiary franchisor brands operating in Missouri.

4.      Pursuant to the Franchise Agreement, franchisees are independent contractors, and are independently owned and operated businesses responsible for their day-to-day operations. *See* Exhibit A at Realogy-Sitzer-00000783-84 ("We have no right or obligation to pay your commissions, taxes, wages or other expenses or to regulate or participate in the retention or disaffiliation of your independent agents or employees, or to determine or limit the parties from whom you accept listings, or for whom or to whom you may sell property, the commission rates you charge, your commission splits with your agents, your working conditions, the manner or details of work performed by you, your brokers, independent agents or employees,

2

except as may be necessary to protect the Marks and goodwill associated with the System, and you agree that you are solely responsible for these items . . . Further, you agree that you are solely responsible for the day-to-day operation of the Business according to your own judgment.").

5. Pursuant to the Franchise Agreement, and as is usual in franchise relationships between franchisees and Realogy's subsidiary franchisor brands, franchisees, including those in Missouri, are required to accurately report to the franchisor their revenues and business transacted, for purposes of determining the continuing royalties and other sums payable to the franchisor under the Franchise Agreement. *See* Exhibit A at Realogy-Sitzer-00000768.

6. Within this context, the franchisor will periodically audit the franchisees' reporting and payment history. In order to conduct the audit, in addition to considering the real estate transactional data that the franchisor receives from franchisees in its transaction management database in the ordinary course of business, the franchisor can review certain financial reports, including profit and loss statements, balance sheets, a reconciliation of gross revenues, and tax returns maintained by the franchisees. *See* Exhibit A at Realogy-Sitzer-00000768; Realogy-Sitzer-00000771-73.

7. To enable auditing of franchisees' financial reporting and to ensure that there is no understatement of relevant revenues or business transacted, the franchisor requires franchisees to maintain certain underlying records regarding their revenues and expenditures for audit purposes only. *See* Exhibit A at Realogy-Sitzer-00000771-72 ("You must allow us or our designee(s) to audit your operations, including your financial record retention systems, or to obtain information from other sources, including the Multiple Listing Service, to verify Royalty Fees, BMF contributions, and other fees due to us.")

3

8.      The Franchise Agreement gives the franchisor certain rights to review records of its franchisees in order to ensure compliance with their Franchise Agreement.  *See* Exhibit A at Realogy-Sitzer-00000772-73 ("We . . . have the right during the Term and for three (3) years following termination of the Agreement, to visit your Office . . . during normal business hours . . . to inspect, audit, check and make copies of your books, records (including state and federal tax returns), journals, orders, receipts, any correspondence and other data related to your Business or to any transactions, including books and records of any Related Party or Excluded business if we have reason to believe that (i) its funds were comingled with the Business; or (ii) it was operated in violation of Section 4.2[;] to verify any portion of your records or your Business or any Excluded Business as we may deem reasonable under the circumstances . . .[; and] to discuss your records and the Business or any Excluded Business with any officers, directors and employees responsible for maintain the records, or with your Responsible Broker.").

9.      Nothing in the Franchise Agreement addresses what amount of listing commission should be charged or what offers of cooperative compensation should be made or accepted.  To the contrary, the Franchise Agreement states: "We have no right or obligation to . . . determine or limit the parties from whom you accept listings, or for whom or to whom you may sell property, the commission rates you charge, your commission splits with your agents, your working conditions, the manner or details of work performed by you, your brokers, independent agents or employees, except as may be necessary to protect the Marks and goodwill associated with the System . . .."  Exhibit A at Realogy-Sitzer-00000783-84.

10.     The purpose of the review provision in the Franchise Agreement, referenced above in Paragraph 8, is to provide the franchisor with a means to verify Royalty Fees, Brand Marketing Fund Contributions or any other fees due to it.  The franchisor does not employ those

4

provisions to obtain information about individual franchisee operational policies and procedures, form real estate contracts, records regarding trade association participation or rules, or offers of cooperative compensation. The franchisor does not receive such documents or information from franchisees and has no ability to force franchisees to comply with any demand for them.

11. The Franchise Agreement does not provide the franchisor with any general right or ability to compel documents be produced from franchisees. The only recourse that the Franchise Agreement specifies that franchisor may take against a franchisee is termination for certain conduct specified in the Franchise Agreement, none of which includes termination for failure to produce documents to the franchisor upon request. *See* Exhibit A at Realogy-Sitzer-00000776-80.

12. Realogy does not provide the franchisor brands' franchisees with computers, servers, broker management systems, or cloud-storage. Realogy does not have access to such resources that a franchisee may use to operate its business. Franchisees do not have the ability to save any documents to computers, servers, or cloud-storage owned or controlled by Realogy. Realogy does not have any technical capability to retrieve documents or information that reside on an email system, computer networks, or broker management system of a Missouri franchisee.

13. If Realogy or its subsidiary franchisor brands attempted to obtain from franchisees their proprietary operational documents (such as their policies and procedures, the real estate forms they use, any documents they have regarding NAR rules or participation in

5

NAR or other associations), Realogy and its subsidiary franchisor brands would have no remedies if those franchisees did not comply, or make efforts to do so.

14.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2020.

John Peyton

6

# Exhibit A



**ERA FRANCHISE SYSTEMS LLC**
**REAL ESTATE FRANCHISE AGREEMENT**

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
Realogy-Sitzer-00000755



# REAL ESTATE FRANCHISE AGREEMENT
## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1. PARTIES AND TERM | 1 |
| 2. FRANCHISEE INFORMATION | 2 |
| 3. INTERPRETATION | 3 |
| 4. GRANT OF LICENSE | 3 |
| 5. OFFICE LOCATIONS | 6 |
| 6. SERVICES AND OBLIGATIONS TO FRANCHISEE | 7 |
| 7. FRANCHISE ROYALTIES | 8 |
| 8. BRAND MARKETING FUND | 10 |
| 9. TECHNOLOGY | 12 |
| 10. MANAGEMENT AND GOODWILL | 13 |
| 11. OTHER COSTS AND OBLIGATIONS OF FRANCHISEE | 14 |
| 12. FEE INCREASES | 15 |
| 13. RECORDKEEPING; AUDIT | 15 |
| 14. MODIFICATION OF THE SYSTEM; IMPROVEMENTS | 17 |
| 15. OWNERSHIP CHANGES AND TRANSFERS OF THE FRANCHISE | 17 |
| 16. EXPIRATION AND TERMINATION | 20 |
| 17. INDEMNIFICATION AND INSURANCE | 25 |
| 18. AMENDMENT | 26 |
| 19. WAIVER | 26 |
| 20. NON-COMPETITION COVENANTS | 26 |
| 21. INDEPENDENT CONTRACTOR | 27 |
| 22. MISCELLANEOUS | 28 |
| 23. ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS | 30 |
| 24. STATE LAW ADDENDA | 31 |
| EXHIBIT A. OWNERSHIP INTERESTS | 32 |
| EXHIBIT B. GUARANTY OF PAYMENT AND PERFORMANCE | 34 |
| EXHIBIT C. GLOSSARY OF TERMS | 36 |
| EXHIBIT D. AUTHORIZED OFFICES | 40 |
| EXHIBIT E. VOLUME INCENTIVE PLAN TABLE FOR 2018 | 41 |
| EXHIBIT F. SECURITY AGREEMENT | 42 |
| EXHIBIT G. STATE LAW ADDENDA | 46 |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000756



Office I.D. No.

# ERA FRANCHISE SYSTEMS LLC
# REAL ESTATE FRANCHISE AGREEMENT

**1.0 PARTIES AND TERM:**

**1.1 Franchisor.** The words "Franchisor," "we," or "us" mean:
**ERA Franchise Systems LLC,** a Delaware limited liability company, its successors and assigns.

By: _____  Date: _____ ,20___
Name:                                                                  (the "Effective Date")
Title: Authorized Person

**1.2 Franchisee.** The words "Franchisee," or "you" mean:

(State of Organization:          )

By: _____  Date: _____ , 20__
Print Name:
Print Title: Authorized Person

**EACH PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS THAT HE OR SHE IS AUTHORIZED TO BIND THE RESPECTIVE PARTY TO THIS AGREEMENT. THIS AGREEMENT IS NOT BINDING OR ENFORCEABLE UNTIL WE SIGN IT.**

**1.3 Owners.** The word "Owner(s)" means a sole proprietor or each Person who has a direct or indirect equity ownership interest in Franchisee (if Franchisee is an entity).

**1.3.1** Exhibit A accurately reflects ownership interests in Franchisee, including all Owners and their ownership shares.

**1.3.2** If any Owner is an entity, information about the Persons owning the entity and their ownership interests appears in Exhibit A.

**1.4 Guaranty.** All Owners (and as applicable, their members, shareholders, partners and spouses) will sign the Guaranty of Payment and Performance attached as Exhibit B.

**1.5 Term of Agreement.** The "Term" starts on the Opening Date and expires ten (**10**) years after the Opening Date (the "Expiration Date"). Subject to our approval, you may be granted the right to open additional Offices following the Effective Date in accordance with Sections 5.4 and 5.5. This Agreement will govern the operation of all Office(s).

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                          Realogy-Sitzer-00000757



**1.6    Initial Franchise Fee:**

**1.6.1**    The initial franchise fee for the first ERA office you open is $25,000.

**1.6.2**    The initial franchise fee for additional Branch Offices is $7,500 per office.  We may increase this fee for any Branch Offices you open after the Effective Date, consistent with the fee charged for Branch Offices in our then-current Disclosure Document. The initial franchise fee for any Limited Purpose Office will vary.

**1.6.3**    YOU WILL PAY THE INITIAL FRANCHISE FEE WHEN YOU SIGN THIS AGREEMENT OR ANY ADDENDUM FOR A FUTURE OFFICE, AS APPLICABLE.  THE INITIAL FRANCHISE FEE IS NOT REFUNDABLE; IT IS FULLY EARNED ON THE DATE WE SIGN THIS AGREEMENT OR AN ADDENDUM, AS APPLICABLE.

**1.7    Opening Date.**  You will begin operating the Business at the Main Office and any other Offices listed on Exhibit D using the System on _____, 20_____ (the "Opening Date").  You will pay fees due under this Agreement for all closings that occur on and after the Opening Date.  If you operate any Office using the Marks before the Opening Date, in addition to our other remedies, you must pay all fees under in this Agreement from the date you begin operating the Office(s) using the Marks.

**1.8    Security Agreement.**  You will sign the Security Agreement attached as Exhibit F.

**2.0    FRANCHISEE INFORMATION:**

**2.1    Business Name.**  You must operate the Business solely under the trade name "ERA _____," ("Trade Name") and must use no other name in connection with any advertising or operation of the Business. Any display of the Marks or use of the System must comply with the P&P Manual.  We have the right to review and require changes to any display of your Trade Name or our Marks.

**2.1.1**    You must file and maintain a "Fictitious Name Certificate" or comparable filing with the jurisdiction, county or state where your Office is located as required by law.  Before opening an Office, you will provide us evidence that you comply with laws for the use of fictitious or assumed names.  You may not change your legal entity or Trade Name without our written consent.

**2.1.2**    You must use your Trade Name and the Marks exclusively for the purpose of promoting and operating the Business, and for such other lawful business activities as we may authorize in writing, but we are not required to authorize any additional business activities.

**2.2    Legal Entity.**  If you are an entity, you represent that you were duly formed and are in good standing under applicable laws.  You will not include "ERA" in your legal name.

**2.3    Responsible Broker.**  You will not operate without a Responsible Broker, who must have a license in good standing within the state(s) where you operate.  You will notify us in writing if you change your Responsible Broker.

**2.4    Notice Address.**  All notices required under this Agreement must be in writing at the addresses below and will be deemed given: (i) if personally delivered on the date delivered, (ii) if sent in the United States mail, by certified mail, postage prepaid, three (3) business days after it is sent (iii) if delivered by courier or express delivery service, two (2) business days after it is sent, or (iv) if sent electronically, on the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000758
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 12 of 63



date delivered to the authorized email address. You may change your notice address by giving written notice under this Section.

**2.4.1** Notices to you will be sent to the Main Office address and/or to your primary email address listed in our electronic reporting system. Electronic delivery of notices will not include notices sent under Section 16 of this Agreement, unless you request electronic delivery in writing.

**2.4.2** Unless otherwise provided in the P&P Manual, notices to us will be sent to:

> ERA Franchise Systems LLC
> Attention: Vice President, Franchise Operations
> 175 Park Avenue
> Madison, New Jersey 07940
> eralegalnotice@era.com

**2.5** We may communicate with you, either by telephone or electronic means, about various matters including communications that might otherwise be prohibited by "do not call/text," "do not fax" or similar laws. You consent to these communications without the need for any additional consent.

**3.0 INTERPRETATION:**

**Definitions.** Certain capitalized terms used in this Agreement are defined in Exhibit C, the Glossary of Terms (which is incorporated into this Agreement).

**4.0 GRANT OF LICENSE:**

**4.1 License.** We grant you a nonexclusive license to use the Marks and the System for the Business. You will comply with this Agreement and the P&P Manual in your operation of the Business.

**4.2 Excluded Businesses.** If you or a Related Party intends to operate a real estate related or non-real estate related business (as defined below) other than the Business (as defined in Exhibit C) after the Effective Date, it shall be deemed an excluded business (individually and collectively an "Excluded Business"), and the following will apply.

**4.2.1 Real Estate Related Businesses.** You must obtain our prior written consent for any real estate related business, including, but not limited to, title, mortgage, escrow, real estate investment, real estate development, lead management, real estate software or technology related businesses, or other personal investment interests in real estate related companies, other than the Business (the "Real Estate Related Excluded Business"), you or a Related Party intends to operate. If we consent in writing to your operation of the Real Estate Related Excluded Business, you may operate the Real Estate Related Excluded Business, and no fees will be payable on the Real Estate Related Excluded Business's revenue, if you satisfy the following conditions:

(i) You do not use or mention, directly or indirectly, our Marks or System in connection with the Excluded Business.

(ii) You conduct the Excluded Business independently of your Business and our System, and you do not act in any way that could reasonably cause confusion among the public about whether the Excluded Business is operated under our Marks or System.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000759



(iii)  You do not use the Trade Name or any name similar to the Trade Name for the Excluded Business.  You operate the Excluded Business using separate signage, URL addresses, telephone and facsimile numbers, and different stationery, business cards, and related documents for the Excluded Business.

(iv)  You maintain separate books and records for the Excluded Business.

(v)  You do not create or publish any cooperative advertising for the Excluded Business and your Office(s).  You do not mention our Marks, System or your Office(s) and/or any relationship between the Excluded Business and your Office(s) in any advertising or promotional materials.

(vi)  If you operate the Excluded Business from the Business's location, you take all steps necessary to avoid confusing the public about whether the Excluded Business is operated under the Marks, which steps include segregation of personnel, and workspaces and installation of separate interior and exterior signage for the Excluded Business.  On your Business website, you will not promote or identify any Excluded Business (except through a hyperlink to a separate URL with a disclaimer that states the Excluded Business is unrelated to the Marks or the System).  Similarly, on the Excluded Business website, you (or your Related Parties) will not promote the Business (other than through a hyperlink to a separate URL).  We may impose other reasonable requirements on you to advise consumers that the operations and website of the Excluded Business are not related to us or our System.

**4.2.2**  We have the right to audit or review the Excluded Business's financial records if we have a reasonable belief you are diverting revenues qualifying as Gross Revenue to the Excluded Business or are otherwise in violation of this Section.  Notwithstanding the terms of this Section, all revenue, commissions, and referral fees the Excluded Business pays or transfers to you will be considered Gross Revenue and subject to fees under this Agreement.

**4.2.3**  If any Excluded Business is conducted using the Marks or System or does not meet any conditions we may impose in Section 4.2.1 or as reasonably required in the P&P Manual, in addition to any other rights and remedies, revenue received from such products or services will be considered Gross Revenue and subject to fees under this Agreement.

**4.2.4**  **Non-Real Estate Related Businesses**. If you or a Related Party intends to operate a non-real estate related business ("Non-Real Estate Related Business"), our consent is not required; however, a list of such Non-Real Estate Related Businesses shall be provided to us for identification of such businesses. All requirements regarding separation of the businesses and non-usage of the Marks described in Section 4.2.1(i) – (vi) and Section 4.2.3 above will apply to all businesses, operated by you or a Related Party. Our right to audit or review financial records described in Section 4.2.2 does not apply to Non-Real Estate Related Businesses unless we have reason to believe you or a Related Party are operating the Non-Real Estate Related Business in violation of this Agreement.

**4.3**  **Program Expansion and Modification.**  We may modify existing programs and introduce new programs.  We reserve the right to offer, add to, qualify, or eliminate programs as we deem necessary in the best interests of the System.

**4.4**  **Participation in Programs.**  We may condition participation in our programs on compliance with this Agreement and certain other requirements as described in the P&P Manual.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                    Realogy-Sitzer-00000760



**4.5**      **Identification and Use of Marks.**

**4.5.1**    The Marks, System and other products and items we deliver to you (collectively, the "System Components") are our exclusive property, and your right to use them is contingent on your full and timely performance under this Agreement.  You will be responsible for the proper use of the System Components and compliance with this Agreement, including use by your Related Parties, independent agents and employees.  You acquire no rights in the System Components, except for your right to use them under this Agreement.  You will not directly or indirectly contest our sole and exclusive rights in the System Components.  You will not claim any interest in the System Components contrary to this Section or at any time dispute the validity of the Marks and/or the System.  You will not adopt, use, or seek to register any names, marks, insignias, colors, trade dress, or symbols that are confusingly similar to the Marks.  You will notify us promptly if you learn about any unauthorized or improper use of the Marks, if anyone challenges your right to use them, and assist us and our attorneys in any legal action regarding the System Components, but you will not be required to incur any unreasonable costs in connection with your cooperation.

**4.5.2**    We reserve the right to approve your use of the Marks, except for your use of any advertising templates that we may approve and update on a periodic basis.  We may determine if you are meeting the Standards for the Marks' usage and you will promptly correct any deficiencies.  All use of the Marks and the System inures to our benefit.  At our sole option, we or our Related Parties will obtain and maintain the Marks' registrations and exercise rights against unauthorized use of the Marks.  You will use the Marks only in connection with the Business.

**4.5.3**    All advertising and promotions shall: (i) be presented in a professional and dignified manner; (ii) be completely accurate and truthful; (iii) conform to all applicable laws and regulations relating to consumer advertising; and (iv) give notice that your Business is an independently owned and operated franchise.

**4.6**      **Office Appearance.**  We may require reasonable changes or upgrades to the Office(s).  You must maintain all Office facilities, equipment, office sign(s), yard signs, stationery goods, and all other items in first-class condition and in compliance with the P&P Manual.

**4.7**      **Office Sign.**  You will install one (1) or more internally lighted exterior signs displaying your Trade Name.  Your sign(s) must conform to the P&P Manual and MUST BE APPROVED BY US IN WRITING, IN ADVANCE, AS TO ARTWORK, LETTERING, COLOR SCHEME, SIZE, AND OVERALL APPEARANCE.  You must obtain our prior written approval for any exception to Office sign requirements due to local ordinances or other reasons for any Office.

**4.8**      **Yard Signs.**  You will purchase or lease from our Approved Suppliers or other vendors an adequate quantity of yard signs displaying your Trade Name and any other information required by law and complying with the mandatory standards in the P&P Manual and Identity Standards Manual.  Upon request, you will provide either color photographs of the signs or a copy of the order for the signs.

**4.9**      **Business Hours.**  You will continuously conduct the Business at the Office(s), which must be open during regular business hours at least five (5) days per week.

**4.10**     **Disclaimer.**  You will place a conspicuous notice on or near the entrance(s) of the Office(s) that clearly states "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED," or any modification of this statement as we may require in the P&P Manual (the "Disclaimer").  You must include the Disclaimer on

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000761
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 15 of 63



all signage, business cards, stationery, promotional and advertising materials, website and internet communications, real estate documents, and all other materials you use.

**4.11    Confidentiality.**    You will not disclose and will treat as confidential all of the Confidential Information you have now or in the future.   You will not, directly or indirectly, engage or aid in the misappropriation, disclosure or distribution of any Confidential Information.   You will use System Components solely in connection with the Business and will not direct or permit their reproduction without our prior written consent.   You will require all of your management personnel, brokers and independent agents to treat Confidential Information as confidential.

**4.12    Internet and Domain Name.**   You may use the internet to market your Business as set forth in the Standards.   You, your employees, brokers, independent agents and representatives will not use, license or register any domain name or URL (or other Internet identification) that uses a Mark or a mark, image or words confusingly similar to the Marks or any abbreviation, acronym, or phonetic or visual variation of a Mark without our prior written consent.   At our request, you will promptly assign or redirect (or cause to be assigned or redirected to us) any domain name, URL, or other identification that violates this Agreement or the P&P Manual at your expense and without compensation from us.   Any consent you may have received from us for the use and/or registration of a domain name will be automatically withdrawn upon expiration, or termination for any reason, of this Agreement, and any such domain names registered by you shall be promptly transferred to us without any compensation from us.   Any domains registered by you without our prior consent, that contain any of our Marks, or portions thereof, or that are confusingly similar to any of our Marks, shall be promptly transferred to us upon request and without any compensation from us.

**5.0    OFFICE LOCATIONS:**

**5.1    Office.**   You will conduct the Business only from the Office(s) identified in Exhibit D, or any other Office authorized in a writing signed by you and us.   You will not operate any other business or engage in any other activity at or from the Office(s), except in compliance with this Agreement.

**5.2    Relocation of Office.**   You cannot relocate an Office (or announce the relocation of an Office) without our prior written consent. You must request our consent for any proposed relocation through the procedures described in the P&P Manual.

**5.3    No Exclusivity.**   The ERA franchise granted by this Agreement is non-exclusive and covers only the Office(s) described in Exhibit D and any other Offices added under a Location Addendum or a Limited Purpose Office Addendum executed after the Effective Date.   This Agreement does not grant you any market, territorial rights, or protected area.   This Agreement does not grant you any right to purchase additional franchises, or grant any right or priority for the location of additional franchises.   We and our Related Parties retain all rights and discretion with respect to the Marks, the System and other real estate offices, including the rights to:

**5.3.1**    Operate and grant others the right to operate ERA offices identified at locations within or outside the area where you operate, on such terms as we deem appropriate;

**5.3.2**    Sell products or services under the Marks, or under any other trademarks, service marks or trade dress, through other channels of distribution; and

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                        Realogy-Sitzer-00000762
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 16 of 63



**5.3.3** Operate and grant others the right to operate real estate offices identified by trademarks, service marks or trade dress other than the Marks, at locations within or outside the area where you operate, and on terms as we or our Related Parties deems appropriate.

**5.4** **Future Offices.** If you seek to operate the Business from an additional Branch Office or a Limited Purpose Office (collectively referred to herein as a "Future Office") after the Effective Date, we must approve such Future Office in a Location Addendum or Limited Purpose Office Addendum, as applicable, in the form and with such terms and conditions in effect at that time, signed by you and us. We have the right to accept or reject your application for any Future Office.

**5.5** **Limited Purpose Offices.** We may establish and modify requirements for "Limited Purpose Offices" (e.g., seasonal offices, satellite offices, kiosk, administrative offices or temporary tract offices). Conditions and restrictions for opening, operating and closing Limited Purpose Offices, including signage, services and fees, will be described in the P&P Manual or in a Limited Purpose Office Addendum.

**6.0** **SERVICES AND OBLIGATIONS TO FRANCHISEE:**

**6.1** **Our Obligations.** After the Effective Date, we will provide the services described in this section.

**6.1.1** **Orientation**. The "Orientation" is our program to introduce the System to the Responsible Broker and other staff. The Orientation will be held at times and places as we designate.

    **6.1.1.1** If the Office(s) covered by this Agreement are your first offices in the System, we will provide the registration fee, reasonable lodging (limited to one (1) double room), continental breakfast, and lunch for two (2) persons (for one (1) person if this is for your second or subsequent Office) from your organization in a location we designate. You and your Responsible Broker or another agreed upon individual ("Designee") will attend the first Orientation offered after the Opening Date at which space is available and pay all transportation and personal expenses to attend. If you fail to attend the first Orientation offered after the Opening Date, you must pay the registration fee and all other expenses. Failure to attend the first Orientation offered is a material breach of this Agreement.

    **6.1.1.2** You must pay all costs incurred by the Responsible Broker or Designee in attending Orientation if you acquired the Office through a transfer.

    **6.1.1.3** Any new Responsible Broker must attend the first available Orientation after he or she becomes your Responsible Broker. You will pay all costs for the new Responsible Broker's attendance at the Orientation.

    **6.1.1.4** The failure of your Responsible Broker or Designee to attend the Orientation is a material breach of this Agreement.

**6.1.2** **Optional Education Courses.** We may make available to you optional learning and other programs, courses, seminars or conferences at times and places and for fees as we designate. You must pay all course fees, travel and living expenses to attend optional courses.

**6.1.3** **Continuing Assistance.** We will provide you with guidance on marketing and compliance with the System in the P&P Manual, bulletins and other written materials, consultations by telephone

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000763



or in person at our facilities or an Office, or by other means of communication. We may, at your request, provide special assistance for which you will be required to pay fees and expenses as we then charge. Any guidance or special assistance we provide is not intended to exercise and does not constitute, control over your day-to-day operation of the Business

**6.1.4    Optional Programs.**  We have the right to develop, implement, modify and/or discontinue optional programs to enhance the System.

**6.2    Fuel ERA Conference.**  You or your representative will attend and encourage your independent agents and employees to attend our annual Fuel ERA Conference (the "Conference").  You must pay at least one (1) registration fee for the Conference, whether or not you or your representative attends. We have the right to bill you at any time before the Conference for one (1) full-price registration fee, if we have received no registration from your Office at the time of billing.

**6.3    Services and Products.**  We and our Related Parties have the right, but not the obligation, to introduce and make available real estate related services and products, including, but not limited to, those related to mortgage origination, escrow, property management, insurance, home warranties, software, technology, and communications systems for a fee. For the sake of clarity, we have no obligation to introduce or make any new services or products available.

**6.3.1    Optional Services and Products**.  We will give you written notice that a service or product is available for your use.  If you voluntarily elect to use an optional service or product, you will pay us, our Related Party or any Approved Supplier any fees and costs associated with such service or product.

**6.3.2    Essential Services and Products.** If we advise you through written notice that a service or product is an essential element of the System, as we may determine, and accordingly must be utilized, you will, at your sole expense: (i) obtain all necessary equipment, technology, services or products that we advise you are necessary to use the essential service or product; and (ii) begin using such essential service or product within ninety (90) days after your receipt of the written notice.

**6.4    No Implied Duties.**  This Section 6 describes our express obligations to you.  We assume no implied duties to you under this Agreement.  This Section 6.4 does not disclaim the representations of the Disclosure Document.

**7.0    FRANCHISE ROYALTIES:**

**7.1    Royalty Fee.**

**7.1.1**    Except as described in Section 7.1.3, you will pay us a continuing fee equal to 6% of your Gross Revenue during the Term (the "Royalty Fee").  For each real estate transaction that occurs on or after the Opening Date, you must report the transaction and pay a Royalty Fee by ePay (or other method we designate) on the date of settlement (closing).  Royalty Fees are also due for all transactions and sales contracts entered into before the Expiration Date or the date this Agreement is terminated.

**7.1.2**    Royalty Fee and Brand Marketing Contributions (as defined in Section 8 below) shall not be due on any "Pending Transactions." Pending Transactions are those that are evidenced <u>by a binding</u>

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                      Realogy-Sitzer-00000764



agreement between the parties and have been submitted to escrow for closing prior to the Opening Date.

**7.1.3** **Personal Transactions.** You will pay a Royalty Fee on real estate transactions where you, your Owners and/or your Related Parties conduct transactions for you, your friends or family ("Personal Transactions"), except that we will waive Royalty Fees on Personal Transactions that account for less than one half of one percent (0.5%) of Gross Revenue per calendar year if you did not collect a commission or fee, directly or indirectly, on the Personal Transaction. For all other Personal Transactions, you will pay us a Royalty Fee based on your regularly charged brokerage commission or fee.

**7.1.4** You are not required to pay Royalty Fees on revenues received as a result of Property Management Services and Broker Price Opinions. However, if more than 25% of your total annual Gross Revenue is derived from these services, you must pay Royalty Fees on all Gross Revenue attributable to these services. We may require you to submit a periodic report of your gross revenue derived from Property Management Services and Broker Price Opinions.

**7.1.5** Each month, you must pay us the greater of the Royalty Fee due or $796 per Office (the "Minimum Monthly Royalty Fee"). If, at any time, your monthly Royalty Fees do not exceed the Minimum Monthly Royalty Fee, you must pay by the 10th day of the following calendar month the lesser of (i) the Minimum Monthly Royalty Fee; or (ii) the Minimum Monthly Royalty Fee less the Royalty Fee already paid. The Minimum Monthly Royalty Fee may be adjusted annually as described in Section 12.

**7.1.6** We reserve the right to charge a Minimum Annual Royalty Fee for new Branch Offices opened in certain markets, which fee will vary based upon the market and specific circumstances. Such fee will be payable by January 10th of the following calendar year, but only if your Royalty Fee payments for the calendar year are less than the Minimum Annual Royalty Fee.

**7.2** **Volume Incentive Plan.** "Volume Incentive Plan Award" or "VIP Award" means a cash award we provide to you based on your achievement of certain levels of Gross Revenue and compliance with the operational criteria described in this Agreement and the P&P Manual (See **Exhibit E**). Each calendar year in which you operate the Business under the Marks for which your Gross Revenue is measured for VIP Award purposes is referred to as a "Calculation Year."

**7.2.1** We may establish reasonable conditions to our obligation to pay VIP Award, including, without limitation, the following:

**7.2.1.1** You, your Owners and Related Parties must be current with respect to all financial obligations owed to us and must be in full compliance with this Agreement, the P&P Manual, and all other agreements with us and our Related Parties;

**7.2.1.2** If during any calendar quarter we send you a default notice and you fail to cure the default before the end of the quarter, all of your Gross Revenue for that quarter may be excluded from the calculation of your VIP for that year, even though you later cure the default. In addition, if you are in default on the day the VIP is paid, the VIP payment will be canceled.

**7.2.1.3** You must achieve minimum levels of participation and performance in our various sponsored programs during the Calculation Year; and

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000765



**7.2.1.4** You must have at least fifteen (15) months left before the Expiration Date.

**7.2.2** The "Award Date" will be April 15th of the year following the Calculation Year for the VIP Award. On or before the Award Date, we will pay you a VIP Award for the Calculation Year in accordance with the VIP Award table in Exhibit E (subject to the terms of this Section 7.2).

**7.2.3** Additional conditions for the VIP Award and all adjustments to the VIP Award will be described in the P&P Manual. We may annually increase or decrease the percentages and/or dollar amounts the VIP Award table, provided that such adjustments may not exceed 20% of the percentages and/or dollar amounts then in effect.

**7.2.4** We have the right to pay in advance of the Award Date any or all of the VIP Award for any Calculation Year. You must pay us any unearned portion of the advanced VIP Award immediately upon our request.

**7.2.5** For purposes of this Section, Gross Revenue includes annual Gross Revenues for all Offices operating under the System with identical equity ownership as you; provided that only one (1) VIP Award will be payable for all Offices.

**7.3** **Continuing Obligation.** You will pay us the full amount of Royalty Fees when due regardless of our obligations or payments of the VIP Award.

**8.0** **BRAND MARKETING FUND:**

**8.1** **Brand Marketing Fund Contribution.** You will pay us each month during the Term by ePay (or other method we designate) a Brand Marketing Fund ("BMF") contribution equal to a percentage of Gross Revenue according to the following schedule:

| Gross Revenue (reported and paid on a calendar year basis) | Percentage Payable as a BMF Contribution |
|---|---|
| Up to $4,000,000 | 1.5% |
| More than $4,000,000 | 0.5% |

You must pay the BMF contribution for each month within twenty (20) days after being invoiced. To be eligible for the .5% BMF contribution rate above, you must have reported and paid Royalty Fees and BMF contributions on all Gross Revenue. All Gross Revenue on which Royalty Fees and BMF contributions are not paid within thirty (30) days of accrual shall be subject to a 1.5% BMF contribution. On January 1st of each year, your Gross Revenue, for purposes of this Section will be reset and on an annualized basis, you will pay a BMF contribution of 1.5% of Gross Revenue on all Gross Revenue up to $4,000,000 (the "BMF Threshold") and 0.5% on all Gross Revenue over $4,000,000 (except as otherwise stated in this Section). We reserve the right to increase the BMF Threshold each year by an amount not to exceed 5% of the BMF Threshold, as adjusted.

**8.2** **Use and Management of BMF.**

**8.2.1** The BMF is not held in trust and we do not manage it in a fiduciary capacity. The BMF is a contractually generated fund. We may deposit BMF contributions with our other monies, but will separately and distinctly identify and account for BMF contributions on our books and records. We use the BMF for the development, implementation, production, placement, payment and costs

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000766



of national and regional (as defined by us) advertising, marketing, promotions, public relations and/or other programs, which includes direct mail (and email), market research, social media, customer surveys and test marketing to promote and further the recognition of the Marks, the System, franchisees and independent agents generally. The BMF may also be used for other purposes such as website development, including the Zap® platform, online marketing and maintenance for the brand consumer website and accompanying consumer websites and blogs, the System intranet site, search engine marketing and search engine optimization, learning, customer service support, real estate listing enhancement costs and subsidies, listing distribution arrangements, regional and national ERA® system events and related activities, social media development and learning, awards, LeadRouter™ or any similar or successor leads management system development, maintenance and updates, lead generation, customer loyalty programs, agent or broker productivity resources, system communications, identity standards and website compliance, brand extension development and marketing, talent attraction initiatives, resources and marketing, software development and distribution and other related activities in support of the ERA® Marks and the ERA® system. The BMF compensates us or our Related Parties for out-of-pocket costs on behalf of the BMF, for marketing staff compensation and a portion of our senior management compensation, and for reasonable expenses incurred for rent, overhead, accounting, collection, reporting, technology system support, legal, human resources, finance, operations, management and other services, which we or our Related Parties provide to, or which relate to the administration of services provided to, the BMF and its programs (collectively "Corporate Services"). We and our Related Parties may provide certain products and/or services to the BMF, including the Corporate Services outlined above, which would otherwise be provided by third parties. Any products and/or services provided by us or our Related Parties will be provided at a cost comparable to those costs that the BMF would otherwise incur if the products or services were obtained from unaffiliated third parties.

8.2.2   We are not required to use or allocate BMF contributions on a proportional basis with the contributions collected from any geographic area or to benefit any particular franchisee or franchisees. We are not obligated to use BMF contributions in the year we receive them. If we spend less of the BMF in any calendar year than we collect, the excess contributions will be used in future years. The BMF may borrow from us or other lenders to cover its deficits or invest any of its surplus for future use. In the event that BMF contributions made by any of our Related Parties in any calendar year exceed the required amount, such Related Parties may be reimbursed for the excess contributions from amounts later contributed to the BMF or may use the excess as credit against future contributions.

8.2.3   On your written request, we will provide you a financial report of the BMF showing the total BMF contributions collected and disbursed for the previous year, certified to be true and correct by one of our authorized officers. We are not required to cause the BMF to be audited or reviewed by an independent certified public accounting firm. The report is typically available after April 30th of the following year.

8.2.4   Except as provided in this Section, we assume no direct or indirect liability or obligation to you with respect to BMF's maintenance, direction or administration.

8.2.5   We will not be liable for any act or omission with respect to the BMF that is consistent with this Agreement or done in good faith.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000767



**9.0 TECHNOLOGY:**

**9.1 Internet Reporting System.** You must use our or our Related Parties' Internet based reporting system to promptly report all listings, pending and closed transactions for which a Royalty Fee is, or may be, payable. The system consists of our proprietary software and non-proprietary operating programs that enables you to transmit required listing information, transaction information and other data. We will provide the reporting system to you without charge. You must obtain appropriate connectivity and browser software for this application as well as any platform upgrades that may be necessary. You are responsible for purchasing compatible hardware from a vendor you select.

**9.2 Technology Tools.** We may make available to you technology products or services provided by us, our Related Parties, or Approved Suppliers, including the reporting system set forth in Section 9.1, ("Technology Tools") as designated and for the purposes set forth in the P&P Manual. We have the right to require you to use a specific Technology Tool as we deem essential for the System as set forth in Section 6.3.2. We, our Related Parties, or Approved Suppliers may (a) charge a fee, and (b) require execution of separate legal terms for access to a Technology Tool. Technology Tools are made available on an "as is" basis, subject to applicable terms. You will use your best efforts to properly use any Technology Tool for its designated purpose and to and ensure all employees and independent agents properly use such Technology Tool.

**9.3 Access and Use Requirements; Equipment.** You are responsible for and must provide all hardware, software, services and other components necessary to access and use the Technology Tools. The current minimum equipment standards are listed in the P&P Manual. Use of all Technology Tools, including adapting to required changes and upgrades, are solely at your expense. We make no representations, warranties, or assurances that any hardware, software, services, and other components will be compatible with any Technology Tool. We may require you to use an Approved Supplier of technology products and services to meet our standards.

**9.4 Multiple Listing Services Technology.** If permitted under law and/or the rules of the applicable Multiple Listing Services, at our request, you will provide us access to the Multiple Listing Services in which you are a member. You will cooperate with us and our Related Parties and promptly execute any documents we determine necessary to provide us access to the listings in the Multiple Listing Service. You acknowledge and agree that you are solely responsible for all compliance of your Multiple Listing Service data in connection with an associated Technology Tool.

**9.5 Additional Products and Technology.** You agree, at your sole expense, to purchase or participate in any additional programs that may require special licensing, software, other technology products or upgrades to the Technology Tools which we may deem necessary from time to time to improve the services and efficiency of operation of the System.

**9.6 Technology Protection.** You are solely responsible for protecting your Business from disruptions, internet access failures, internet connection failures, and attacks by hackers and other unauthorized intruders. For any technology you use in connection with the Business, you will ensure such technology has adequate data security controls, including but not limited to: (i) authentication mechanisms designed so that they cannot be bypassed to gain unauthorized access to your system; (ii) encryption; (iii) password protection measures, such as protecting the form in which they are stored and complexity of character classes and password length; and (iv) any other security measure reasonable for our industry. You and your owners you waive any and all claims you may have against us arising from or related to the direct or indirect result of such disruptions, failures, or attacks.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000768



## 10.0    MANAGEMENT AND GOODWILL:

**10.1    Management.** You and your Owners will actively manage and supervise the Business's operation in a competent and professional manner. Any education, support, advice or resources we provide to you in connection with the Business is solely for the purpose of protecting the Marks and goodwill associated with the System and assisting you in the operation of the Business, and not for the purpose of controlling or in any way exercising or exerting control over your decisions or the day-to-day operation of the Business.

**10.2    P&P Manual.** We will provide you with access to the P&P Manual on our intranet site. The P&P Manual contains various suggestions as well as certain mandatory specifications, standards and operating procedures that we have developed as part of the System. You acknowledge that the mandatory provisions of the P&P Manual are designed to protect our standards and systems, our Marks and the goodwill associated with the System, and not to control the day-to-day operation of the Business. You must comply with all mandatory provisions in the P&P Manual and ensure compliance with such mandatory provisions by your brokers, independent agents, employees, Responsible Broker and Related Parties for the protection of the ERA® brand and System.

We reserve the right to make reasonable changes in the P&P Manual that we determine are appropriate in our Reasonable Business Judgment for the continued success and development of the System and its franchisees. We may also modify the P&P Manual at any time to reflect changes in the System and will reflect those in the P&P Manual located on the intranet site. At your own expense, you must adopt on a timely basis (but no later than ninety (90) days after notice) any such modifications. If there is any conflict, discrepancy or ambiguity between the terms of this Agreement and the P&P Manual, the terms of this Agreement will control. If a dispute arises over the P&P Manual contents, the master copy that we maintain on our intranet site, will control.

**10.3    Ethical Conduct, Consumer Relations and Protection of Goodwill.** You must give prompt, courteous and efficient service to the public and operate the Business in compliance with the requirements set forth in the P&P Manual and professional standards to preserve and enhance the value and goodwill of the Marks and the System. You will uphold, and take reasonable steps to ensure that your brokers, independent agents and employees uphold, high standards of honesty, integrity, fair dealing and ethical conduct in dealing with the general public, customers of the Business, other franchisees and us. All persons engaged in the Business must comply with the National Association of REALTORS® Code of Ethics. You hereby authorize any federal, state or local body regulating or supervising real estate practices to release to us information about complaints and disciplinary actions related to your (or your Related Parties') practices. You will notify us within five (5) business days of any such complaints or disciplinary actions. You must maintain all required permits, certificates and licenses in good standing and in compliance with applicable laws. You must operate the Business in compliance with all laws, including laws and regulations of the real estate commission or other licensing authority governing your operation. We and you acknowledge that disputes may arise between you, or your Related Parties or independent agents, and a client or other Person involved in a real estate transaction, and that it is in the best interest of all parties, when possible, to quickly resolve disputes. You must promptly respond to all complaints received from your clients or other individuals in an attempt to resolve the dispute in a reasonable business manner. In connection with any consumer complaints that we receive from your clients regarding the Business, you will cooperate and respond to any inquiry from us and provide us with all information reasonably related to any such complaints. You will not make or publish any statement or advertisement which would reasonably be expected to demean the image, value, identity, reputation or goodwill associated with our name or the Marks. This covenant is independent of and will survive any termination, expiration or Transfer of the Franchise.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                            Realogy-Sitzer-00000769
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 23 of 63



## 11.0 OTHER COSTS AND OBLIGATIONS OF FRANCHISEE:

**11.1 Marketing Materials.** We will make materials available for you to promote your Business and our products, services, and programs. Some materials may have associated costs or fees.

**11.2 Payments and Interest.** Any payments more than ten (10) days past due will bear interest at the lesser of the highest rate allowed by law or 18% per annum (1.5% per month). We will apply your payments (and, at our discretion, any amounts we (or our Related Parties) owe you or your Related Parties) to any of your past due indebtedness for Royalty Fees, BMF contributions, purchases from us or our Related Parties, interest or other indebtedness as we may determine in our Reasonable Business Judgment. No restriction on any check or in any communications accompanying payment will bind us or our Related Parties. Our acceptance of any payment will not constitute an accord or satisfaction and will not be construed as a waiver of any breach of this Agreement. You may not withhold payment of any fee or amount due based on alleged non-performance or breach of our or our Related Parties' obligations under this Agreement or other agreement, including for the sale of products or services to you.

**11.3 Payment Procedure.** You must pay amounts due to us using ePay a web-based, self-service application for electronic payments. We may revise the required form of payment from time to time in the P&P Manual and you must comply with any changes.

**11.4 Offsets.** At our discretion, we may offset any amounts we owe you in full or partial satisfaction of any amounts you owe under this Agreement or other agreements between you and us or our Related Parties, whenever your payments are more than thirty (30) days past due.

**11.5 Returned Checks.** You must pay a returned check charge on any checks returned unpaid for any reason. We may charge you the highest commercial rate allowed by law. You must replace any such check with a certified or cashier's check, money order or electronic transfer of funds within three (3) days of notification.

**11.6 Net Worth.** You acknowledge that a material consideration for us in granting you rights under this Agreement is your representation that you and your Owner(s) are financially responsible and have both (A) a net worth in tangible assets in excess of $150,000, not including (i) the value of any interest in this Agreement (or notes provided to you from us or our Related Parties in conjunction with this agreement) or (ii) any of your working capital (defined as total current assets less total current liabilities, all prepared in accordance with generally accepted accounting principles); and (B) liquid assets (cash or securities that can be easily converted into cash) of at least $75,000. You agree and warrant that you and your Owners will maintain the minimum net worth requirement throughout the Term. You further agree that maintaining these requirements and remaining in financial good standing with us and your third-party creditors is critical to the protection of our goodwill and the Marks. If the net worth requirement is not maintained at any time, you must procure a guarantor acceptable to us to the extent of the deficiency, which guarantor will guarantee your performance under this Agreement.

**11.7 Listing and Pending Listing Inventory.** You will provide, within fifteen (15) days of the Effective Date, and thereafter maintain with us, a complete and current inventory of all listings, pending or otherwise, of your Business, in our required format, except as otherwise required by Section 7.1.2 as it relates to Pending Transactions. You will use best efforts to ensure that all listing inventory and transaction information, pictures, media and other listing content (collectively "Listing Content") are true and accurate. You will procure the permission of the property's owner(s) to depict the property in Listing Content for Permitted

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000770
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 24 of 63



Purposes as defined below. To the extent you own any copyright to any Listing Content you supply to us (including those used in listings on our website), you irrevocably consent to our royalty free use of the Listing Content or any portion thereof for any purpose (including purposes beyond selling the property, such as to promote our brand and our business generally), and in any manner or medium now known or developed in the future, which may include use of your Listing Content or portions thereof on consumer facing websites, and our sublicensing of your Listing Content to Related Parties and third parties, like listing portal aggregators or services, whether web-based or otherwise, as we deem appropriate in our Reasonable Business Judgment (collectively "Permitted Purposes"). You may elect to opt out of us providing your Listing Content to third parties by providing express prior written notice to us. To the extent you provide Listing Content with copyrights owned by third parties (including, but not limited to, agents, photographers and videographers), you will procure all necessary rights and licenses to authorize our use for Permitted Purposes, and you will furnish proof of same if requested. You agree that if you do not furnish proof of the foregoing rights and licenses that is satisfactory in our Reasonable Business Judgment, we have the right to refuse to use the Listing Content. You agree to indemnify and hold us harmless against any third-party claims that our use infringes such third party's rights or as to any claims relating to Listing Content.

**12.0    FEE INCREASES:**

**12.1    Annual Increases.** On April 1st, each year, we have the right to increase the Minimum Monthly Royalty Fee and the BMF Threshold in Section 8 by an amount not to exceed 5% per year. The amount of the increase in the BMF Threshold shall be cumulative. Therefore, if for any reason we do not increase the BMF Threshold by the maximum amount permitted in any given year, we may add the amount not increased in any given year to the BMF Threshold in subsequent years. We may round to the nearest dollar any increase.

**12.2    Other Fee Increases.** Except for the fees described in Section 7.1 (the Royalty Fee which is not subject to increase), we have the right to impose, eliminate or modify fees, including, learning fees, fees to participate in programs or services, administrative fees, referral fees, late charges, returned check charges, cancelled audit and access fees, which revisions are not subject to the limitations of Section 12.1.

**13.0    RECORDKEEPING; AUDIT:**

**13.1    Recordkeeping, Financial Statements and Audit.**

**13.1.1    Recordkeeping.** During the Term and for three (3) years after the expiration or termination of the Term, you must maintain accurate records in the form we require. You must transmit information to us in the manner and format we require.

**13.1.2    Financial Statements.** Upon our request, you will provide us with a detailed profit and loss statement. You will submit any additional information we require in the P&P Manual. You will also supply a complete financial statement and a copy of your federal tax return, on an annual basis within one hundred twenty (120) days of your fiscal year-end. You, your authorized officer, or a general partner, if applicable, or your independent accountant will sign the financial statement certifying its truth and accuracy. Financial statements must be prepared in accordance with generally accepted accounting principles.

**13.1.3    Audit.** You must allow us or our designee(s) to audit your operations, including your financial record retention systems, or to obtain information from other sources, including the local Multiple Listing Service, to verify Royalty Fees, BMF contributions and other fees due to us. You must

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                    Realogy-Sitzer-00000771
Case 4:19-cv-00332-SRB    Document 597-3    Filed 01/06/22    Page 25 of 63



immediately pay us any fees that the audit reveals were due during the audit period but not paid, plus interest at Prime plus 2%. If you fail to cooperate, fail to keep readily auditable records, cancel or reschedule the audit, or if the audit exposes a deficiency of 5% or more in amounts due for any consecutive three-month period, you must also pay all of our audit costs plus fees past due, interest, late charges and costs, and the deficiency will constitute a material breach of this Agreement. You must dispute any audit findings in writing and identify the basis for any dispute in accordance with the P&P Manual and Section 13.7. Any audit or inspection we conduct is solely for determining your compliance with contractual obligations and does not constitute control over your day-to-day operation of the Business.

**13.2      Access to Records.**  We, or our designee, have the right during the Term and for three (3) years following termination of the Agreement, to visit your Office (or such other place where your records are located) during normal business hours and without hindrance or delay, proceed:

**13.2.1**   to  inspect, audit, check and make copies of your books, records (including state and federal tax returns), journals, orders, receipts, any correspondence and other data relating to your Business or to any transactions, including the books and records of any Related Party or Excluded Business if we have reason to believe that (i) its funds were commingled with the Business; or (ii) it was operated in violation of Section 4.2

**13.2.2**   to verify any portion of your records or your Business or any Excluded Business as we may deem reasonable under the circumstances, including prompt response to any post-audit request for additional information; and

**13.2.3**   to discuss your records and the Business or any Excluded Business with any officers, directors and employees responsible for maintaining the records, or with your Responsible Broker.

**13.3      Condition of Transfer of the Franchise.**  We have the right to audit the operations of the Business at any time, including as a condition of our approval of any Transfer of the Franchise.

**13.4      Sales Associate Information.**  You will provide us information about your independent agents and teams and assist us in any survey of your independent agents and teams.  Independent sales agent and team information will be updated promptly; all independent agent and team information will be current as of the end of each calendar quarter. We may require you to report detailed information on teams and team income, from time to time.

**13.5      Other Matters relating to Information.**  We expressly agree to keep confidential any financial statements you submit under the Agreement, provided that our confidentiality obligations do not extend to information that (a) is or becomes generally available to the public; (b) was in our possession before it was furnished; (c) is or becomes available to us from a source that is not prohibited from disclosing such information by any confidentiality obligation; or (d) is independently developed by us.  This restriction shall not apply if we (or any of our Related Parties) are required under a court or government agency order or applicable law to disclose any non-public information we received.  Other than financial statements, no information supplied to us will be considered confidential.  We have the right to use any information you supply, including Client Information (as defined in Section 16.7.3): (i) for our own business purposes, (ii) to disclose information as may be required by law and governmental authority, (iii) to disclose information to third parties in connection with the system and offering products and services, and (iv) to aggregate your information with other franchisee information and disclose aggregated information or anonymized information as we deem appropriate.  You will provide us and/or cooperate with us in collecting

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                                    Realogy-Sitzer-00000772



other information as we may reasonably request, including information for research and development of services, products and programs, identification of demographic information, industry reports and preparation of our Disclosure Document.

**13.6    Cooperation.**  You must cooperate in scheduling any requested audit and providing access to records, which must be maintained and presented in reasonable order to allow the audit to be conducted in a reasonable time.  You acknowledge that all communications regarding the audit including, but not limited to, audit results may be communicated electronically unless you otherwise expressly indicate otherwise to the auditor.

**13.7    Waiver.**  Your failure, refusal or neglect to dispute fees or contributions that an audit reveals you owe, including any fees, costs and penalties assessed with an audit, constitutes a waiver of any right to challenge such fees, unless you provide us written notice of your dispute, along with an explanation of the basis for your dispute, within thirty (30) days of the date we deliver the audit results to you in writing.

**14.0    MODIFICATION OF THE SYSTEM; IMPROVEMENTS:**

**14.1    Agreement to Accept Modifications.**  We have the right to change or add to the Marks or the System, including the adoption of new or modified trade names, trademarks, trade dress, service marks, copyrighted materials, new products or services, new equipment, new business methods or new techniques from time to time, without your consent.  We have the right to modify, suspend or eliminate any new or existing portion of the System or the Marks.  Changes related to the Marks or System will be communicated to you and reflected in the P&P Manual.  You will accept, use and display changes in the System and will make such expenditures as may be required to implement the changes.

**14.2    Improvements by You.**  If you conceive or develop any improvements or additions to the System, new trade names, trademarks, service marks or other commercial symbols related to the System or any advertising or promotion ideas related to the System ("Improvements"), you will fully disclose the Improvements to us and obtain our written approval prior to use. Any Improvements we approve will be deemed licensed to us on a royalty-free, paid-up, perpetual worldwide license, and may be used by us and our franchisees without paying you royalties or similar fees.  We have the right to apply for and own copyrights, trade names, trademarks and service marks relating to Improvements.  Improvements will be our property and trade secret.  We will authorize you to use Improvements authorized for use by other franchisees.

**15.0    OWNERSHIP CHANGES AND TRANSFERS OF THE FRANCHISE:**

**15.1    Ownership Changes.**  We must first approve in writing any proposed ownership change to transfer 10% or more of the Franchisee ownership rights.  If an ownership change results in a Transfer of the Franchise, the provisions set forth in this Section 15 apply.

**15.2    No Transfer or Assignment.**  You acknowledge that your rights and obligations under this Agreement are personal to you and we have granted this franchise in reliance on many factors, including your (and your Owners') character, skill, knowledge, business and financial capacity.  You may not assign your rights or delegate your duties under this Agreement, except as permitted by this Agreement or required by law.

**15.3    Limited Assignment Right for Sole Proprietorships or Partnerships.**  If you are a sole proprietorship or partnership, we expressly consent to the assignment of this Agreement, without payment of a fee, to an entity owned and controlled by the same Owners, provided that the Owners execute an

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000773
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 27 of 63



assignment agreement and guaranty of the assignee's obligations to us. You must notify us in writing of any proposed assignment under this Section and must provide and/or sign all documents we request including assignment documents, Articles of Incorporation or Organization and Bylaws.

**15.4    Transfer of the Franchise – Definition.** "Transfer of the Franchise" will mean any transaction or series of transactions that results in: (i) the sale or transfer of substantially all of the Business's assets, (ii) the majority Owner(s) before the transaction(s) holding less than 51% equity interest in you or the Business's assets, (iii) another entity becoming a franchisee, or (iv) the Owner(s) no longer controlling or managing the Business. The Transfer of the Franchise may include transfers resulting from a divorce, death, insolvency, dissolution, declaration of or transfer in trust, or a foreclosure on the Business assets. If any Owners are entities, a Transfer of the Franchise will be deemed to occur if such Owner entity experiences any of these events or transactions.

**15.5    Operational Control – Trust.** In the event a trust is an Owner of the Franchise, Guarantor(s) will, at all times, directly (i) control all aspects of Franchisee and the operation of the Franchise; and (ii) serve as trustee of the trust and retain sole control over the voting of the trust's equity interest in Franchisee. Franchisee acknowledges and agrees that: (a) if the Guarantor(s) do not maintain operational control of the entire Franchise, Franchisee and the trust, such an event will constitute a transfer as described in Section 15.4 of this Agreement and Franchisee must comply with all applicable provisions of this Section 15; and (b) if the Guarantor(s) desires to turn over operational control of the Franchisee, the trust or the Franchise to one or more trust beneficiaries, such beneficiaries must satisfy all conditions of approval described in Section 15.7 of this Agreement.

**15.6    Prohibited Assignments or Transfers of the Franchise.** You may not complete a Transfer of the Franchise without our prior written approval, which will be subject to our Reasonable Business Judgment. Failure to obtain our approval will be a material breach of this Agreement. Any attempted Transfer of the Franchise not expressly permitted by this Agreement or approved by us will be null and void, and you will remain liable for all obligations under this Agreement. After a Transfer of the Franchise, you will be liable for events that occurred before the Transfer of the Franchise and for all obligations that survive termination of this Agreement, including your indemnification obligations for any claims arising before the Transfer of the Franchise. If you complete a Transfer of the Franchise in violation of this Section, our continued performance and acceptance of payments do not waive our rights.

**15.7    Approval of Transfer of the Franchise; Prerequisites.** Provided you are not in default under the terms of the Agreement, we will consider your application for the Transfer of the Franchise to a new Owner or franchisee ("Transferee"), if you provide us thirty (30) business days' advance written notice of any proposed Transfer of the Franchise. The Transferee must submit any documents we reasonably require to approve the Transfer of the Franchise. Our approval will be based on our consideration of various factors that include:  (i) Transferee is a licensed real estate broker and arranges for adequate management of the Business to our satisfaction, (ii) Transferee's franchise application (and supporting documents), (iii) Transferee's or prospective owner's business experience, character, reputation and financial condition (including credit checks and financial statements), (iv) proposed transfer documents and/or any new entity organizational documents, (v) unless prohibited by law, the Transferee's execution of the then-current form of franchise agreement and new Owners' execution of the then-current form of guaranty, (vi) payment and/or assumption of any outstanding indebtedness you owe us, (vii) payment of a $5,000 transfer fee, (viii) execution by you and any departing Owners of a release of all claims against us and our Related Parties, (ix) an audit of your operations, and (x) your purchase of tail coverage on your errors and omissions insurance policy naming us as an additional insured. In connection with any proposed Transfer of the Franchise, we may also consider the financial impact that a Transfer of the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                         Realogy-Sitzer-00000774
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 28 of 63



Franchise to an existing franchisee may have on us, including a potential increase in VIP or decrease in the net effective Royalty Fee rate paid to us. We may require adjustments to the Agreement to account for or eliminate any financial impact to us as a condition of our approval.

**15.8    Right of First Refusal**.  If you and/or any of your Owners intend to Transfer the Franchise for valuable consideration, you must obtain a bona fide, signed, written offer from the potential purchaser and deliver a complete and accurate copy of the offer immediately to us.  If the offeror proposes to buy any other tangible or intangible assets that do not relate to or are not used by or in the Business, the proposal for such assets or rights must be described in a separate offer that is disclosed to us, but to which this right of first refusal is not applicable.  The purchase price and terms for the Transfer of the Franchise will reflect the bona fide offered price and not reflect any value for any other assets.

15.8.1    Within thirty (30) days after you deliver a complete and accurate copy of the offer to us, we or our designee will have the option, exercisable by written notice to you, to purchase the interest that is the subject of the offer for the price and on the terms in the offer, provided, however, that (a) we may substitute cash for any in-kind payment proposed in the offer, (b) our credit will be deemed equal to the proposed purchaser's credit, and (c) we will have no more than one hundred twenty (120) days from the option exercise date to consummate the transaction.  You will promptly respond to all our reasonable due diligence requests.  Terms and conditions for the purchase will be as similar as practicable to the offer's terms and conditions subject to the exceptions above.

15.8.2    Unless expressly limited in the third party offer, we have the right to purchase the interest subject to all customary representations and warranties, closing documents, releases and indemnities as we reasonably may require, including representations and warranties as to the ownership and condition of, and title to, shares of ownership and/or assets, the validity and status of contracts and leases and the extent of any liabilities, contingent or otherwise.  We also will have the option to acquire from you, for nominal consideration, an assignment of your leasehold rights for the Office(s) premises.

15.8.3    If we do not exercise our purchase option, you or your Owners may complete the sale to the offeror on the offer's exact terms, subject to our approval of the Transfer of the Franchise, provided that if there is a material change in the offer's terms, we will have an additional option to purchase during the thirty (30) day period after your notice to us of a material change in the offer's terms.

15.84    If the proposed Transfer of the Franchise is not supported by valuable consideration (e.g. gift, testamentary transfer or involves the transfer of ownership to an immediate family member of an Owner, or reorganization of your entity without any change in the Owners), we have no right of first refusal. We have the right to approve the new Owner under Section 15.6.

**15.9    Orientation for Transferee.**  The Transferee must attend the Orientation seminar described in Section 6.

**15.9    Assignment by us.**  We may assign, transfer, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent.  You are not the third-party beneficiary of any of our contracts with third parties, including vendors or other franchisees.  We will have no obligations to you after you are notified that a transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                        Realogy-Sitzer-00000775



## 16.0 EXPIRATION AND TERMINATION:

**16.1   Non-Renewability of Agreement**.  NEITHER PARTY HAS RENEWAL RIGHTS.  The tender or acceptance of your payments after expiration of this Agreement will neither prejudice our rights to enforce the expiration or your obligations on expiration, nor create any additional rights in your favor under this Agreement.

**16.1.1   Transition.**  If this Agreement terminates or expires, we have the right to communicate directly with your independent agents in order to facilitate an orderly and efficient transition, preserve the goodwill of the System and the Marks, and to determine their interest in affiliating with another franchisee. We can communicate directly with your independent agents immediately after notice of termination is delivered, or in the case of expiration, within six (6) months prior to the expiration date and any time thereafter.

**16.1.2   Holding Over.**  If you or an Owner uses the Marks after the expiration of this Agreement, you will be deemed to be operating on a month-to-month basis ("Holdover Period").  During any Holdover Period, all of your obligations will remain in full force and effect, as if this Agreement had not expired, and all obligations imposed on you upon expiration of this Agreement will take effect upon termination of the Holdover Period.  During any Holdover Period, we may consider you in default of this Agreement and may exercise all remedies available to us, including our pre-termination options set forth in Section 16.3 or termination

**16.2   Termination.**  This Agreement may be terminated only on the terms and conditions established in this Section.

**16.2.1   Mutual Consent.**  By mutual consent of the parties;

**16.2.2   Termination by us for Good Cause**.  By us for good cause means your material breach of any obligations under this Agreement as we may determine in our Reasonable Business Judgment as stated in this Agreement.  Good cause includes both curable and non-curable defaults and the failure to meet the Minimum Office Design and Appearance Standards or Minimum Operating Standards.

**16.2.3   Curable Defaults; Notice.**  After giving you written notice and thirty (30) days to cure identified defaults (except for cure periods established elsewhere in this Agreement and any longer periods required by applicable state's law), we may terminate this Agreement for the following uncured defaults:

**16.2.3.1**  Your failure to timely and consistently report transactions or to pay when due any financial obligation to us, or to the BMF;

**16.2.3.2**  Your underreporting and/or underpayment of at least 5% of Royalty Fees and/or BMF contributions within any three (3) month period, your refusal to permit us to audit your operations and records, or your failure to reasonably cooperate with an audit;

**16.2.3.3**  Your Transfer of the Franchise without our prior approval or on the death, judicial determination of incompetence, or the appointment of a conservator or guardian over you or an Owner, the failure to seek our written approval for Transfer of the Franchise within one hundred eighty (180) days after such event;

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                    Realogy-Sitzer-00000776



**16.2.3.4** Your attempt to subfranchise, license or grant to any other person or entity the right to use the Marks or the System licensed to you under this Agreement;

**16.2.3.5** Your or an Owner's failure to comply with all applicable municipal, county, state or federal laws;

**16.2.3.6** The operation of any other business within the Office(s), except as permitted under this Agreement;

**16.2.3.7** Your failure to properly display and use our Marks as described in the P&P Manual;

**16.2.3.8** Your failure to begin operation using the Marks and System on the Opening Date;

**16.2.3.9** The creation of a security interest in this Agreement or the assets of the Business without our prior written consent; or

**16.2.3.10** Any other material breach of this Agreement not listed above or listed below as a noncurable default.

**16.2.4 Noncurable Defaults; No Notice Required.** We may terminate this Agreement immediately without prior notice or an opportunity to cure, if any of the following defaults occurs:

**16.2.4.1** Suspension or revocation of your Responsible Broker's license, unless you timely appoint a substitute Responsible Broker as permitted under applicable law and such suspension or revocation does not otherwise breach this Agreement;

**16.2.4.2** Any conduct by you or an Owner that impairs the image, identity, value or goodwill associated with the Marks or the System;

**16.2.4.3** The filing or imposition of any bankruptcy, receivership, composition, assignment, marshaling, insolvency or similar proceeding for the benefit of creditors related to you or your assets, provided that termination on bankruptcy may not be enforceable under the Bankruptcy Code;

**16.2.4.4** Any default for which we have issued you a notice of default during the last twelve (12) months advising you of our intent to terminate for the same cause, even if the default(s) were cured;

**16.2.4.5** Any material misrepresentation or omission by you, an Owner or guarantor to us in the franchise application or otherwise with respect to the Business;

**16.2.4.6** The operation of a competing residential brokerage business in violation of the in-term non-competition covenant; or

**16.2.4.7** Abandonment of your Office(s), demonstrated by (i) the failure to commence operation of any Office as required under the Agreement and any related Addenda, (ii) removal of the Marks, or (iii) failure to operate the Business for five (5) consecutive business days or any shorter period when, under the facts and circumstances, it would be reasonable for us to conclude that you do not intend to continue to operate the Business, unless the cause is a force majeure, e.g., flood, earthquake or similar acts of God. If any of the above circumstances apply to some, but not all of your Offices, we may, in our Reasonable Business Judgment, terminate the license to operate at the abandoned Offices, rather than terminate the Agreement.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                          Realogy-Sitzer-00000777



**16.2.5    Termination upon Death/Disability of Majority Owner.**   If a majority Owner dies or becomes physically or mentally disabled (corroborated by written evidence from a treating physician) and you elect to wind up the Business and distribute all of the Business's assets to the Owners (as opposed to transferring the assets to a third party), you may terminate the Agreement, without penalty, if the following conditions are satisfied:

(a)    You provide us at least ninety (90) days prior written notice of your intent to terminate;

(b)    At the time of the notice, the deceased or disabled majority Owner owns at least 51% of the equity interest in you or the Business's assets and manages your day-to-day operations;

(c)    You are not in default on the date that the notice is delivered or on the date of termination ("Termination Date");

(d)    You provide any documents we request demonstrating your dissolution;

(e)    Before the Termination Date, you pay any outstanding indebtedness you owe us including, but not limited to, Royalty Fees, advertising fund contributions and all amounts not previously paid and/or forgiven under any existing promissory notes (or any other instrument of indebtedness);

(f)    You and each remaining Owner agree that they will not own or operate any real estate brokerage within two miles of any authorized Office for a period ending the earlier of (i) the Expiration Date, or (ii) two years after the Termination Date; and

(g)    You enter into a written termination agreement.  We will not be entitled to recover any liquidated damages under the Agreement if you comply with this Section and perform the post-termination obligations within ten (10) days after the Termination Date.

**16.2.6    Failure to Meet Minimum Office Design and Appearance Standards.**  You acknowledge and recognize that all Offices must meet certain required minimum standards of professionalism for size, interior design and decor, exterior attractiveness, general appearance and cleanliness.   These standards are contained in the P&P Manual.  If your Office(s) fail to meet these standards, we will notify you in writing and describe the deficiencies, and you will be given ninety (90) days to correct them.  If such deficiencies are not corrected to our satisfaction within ninety (90) days, we have the right to terminate this Agreement.

**16.2.7    Failure to Meet Minimum Operating Standards.** You must meet the minimum operating standards we prescribe from time to time in the P&P Manual ("Minimum Operating Standards").  If you fail to meet these standards, you will be notified in writing and you may be placed on probation for a period of not less than six (6) months, nor more than twelve (12) months.  If the deficiency is not corrected within the probationary period, we may at our option, terminate this Agreement.  The Minimum Operating Standards require that you will, during every calendar year, beginning the second full calendar year after the Effective Date, close not less than fifty (50) Residential Sales as defined below.  A Residential Sales is defined as the closing of the sale of residential real estate for which you were the selling or listing broker, on which you were obligated to pay Royalties and BMF contributions under the terms of this Agreement.  If you are the listing and selling broker for a Residential Sale, it will count as two (2) Residential Sales for the purpose of the Minimum Operating

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                    Realogy-Sitzer-00000778



Standards. You acknowledge that these Minimum Operating Standards may be modified or supplemented from time to time as published by us in the P&P Manual.

**16.3    Our Pre-Termination Options.**  If you fail to pay any amount owed under this Agreement or the Manual, or fail to comply with any term of this Agreement, in addition to our right to terminate this Agreement (subject to applicable notice and cure periods), or to bring a claim for damages, we have the following options as we deem necessary, each of which may be exercised without providing notice or opportunity to cure:

**16.3.1**    To suspend all services provided to you under this Agreement or otherwise, including learning, marketing assistance, VIP, sale of products and supplies, and award(s) eligibility for you and the independent agents affiliated with you;

**16.3.2**    To suspend taking or placing referrals, leads, or relocation requests, Home Protection Plans and/or Sellers Security Plan applications, for or from you and to direct any inquiries regarding these or other programs or services to other franchisees;

**16.3.3**    To eliminate listing you and/or publishing your real estate listings in any advertising, marketing or promotional materials, including on our principal website and third-party websites to which we may direct listing information.

We may continue taking these actions until you comply with our requirements and we acknowledge your compliance in writing.  The options in this Section will have no effect on, and will not release you from, any obligation you owe to us, our Related Parties, or to the BMF.  Your right to cure does not restrict our right to file any legal action or exercise any of our pre-termination options before, during or after the cure period.

**16.4    Effect of Expiration or Termination.**  On expiration or termination, you must immediately, at your expense, return to us all of our property, including originals and copies of the P&P Manual, technology products (including copies that your independent agents hold or control), and all films, DVDs, CDs, flash drives, materials and instruction manuals, electronic or otherwise, which are part of our programs, or destroy the same and certify the destruction.  You must also immediately discontinue all use of the Marks in your materials.  You must, at your expense, immediately discontinue use of and destroy all signs displaying our unique style, logo, colors, color patterns and designs and/or Marks. If you fail to immediately de-identify your Business, you must pay all expenses we incur to de-identify your Business.  Effective on the date of termination or expiration, you must refrain from any representation that you are our franchisee or are or have been affiliated with us; and take affirmative action to remove any use of the Marks in connection with your business.  You must de-identify your business from the System in a manner that does not confuse the public about the fact that you are no longer part of the System.  You must (i) immediately advise all of your then-current clients that you are no longer associated with us; and (ii) immediately cause any business or telephone directory publisher and internet directories to remove you from their listings as our franchisee.  You must immediately cause any web masters or websites to remove our Marks from their web pages, including social media websites.  You must remove the Marks from your website(s) and social media sites and accounts that you or your independent agent's control.  You must remove our Marks from any source code or other mechanism that may direct a consumer searching for our Marks to your website.  If your URL contains our Marks, you must cancel such URL registrations for the Business or, at our option, assign your URL(s) to us. You must cause all agents to cancel all URLs containing our Marks that they may have established in violation of this Agreement.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                              Realogy-Sitzer-00000779



**16.5** **Effect of Continued Use of the Marks.** On expiration or termination, any continued use of the Marks by you, the Business or any of your independent agents: (i) will constitute willful and knowing infringement, dilution of our trademark rights and unfair competition; and (ii) may constitute trafficking in a counterfeit mark for which both civil remedies and criminal penalties may be imposed.

**16.6** **Infringement Damages.** If we bring an action against you or anyone associated with you during or after the Term, seeking to halt infringement of the Marks, you acknowledge that any court of competent jurisdiction may enter temporary restraining orders or preliminary and permanent injunctions (under applicable law) without requiring a bond or other security and may order the immediate seizure and destruction of any infringing materials. If any court rule requires a bond, you agree that a $1,000 bond is sufficient. You must pay Royalty Fees and BMF contributions on all Gross Revenues during the period of any infringement, our attorneys' fees, costs and disbursements incurred in enforcing our trademark and contract rights. You agree that if you breach this Agreement and/or continue to utilize the System or Marks after termination or expiration, we will have no adequate remedy at law. You expressly consent and agree that we may, in addition to other available remedies, obtain an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent any threatened default or violation, by you of this Agreement.

**16.7** **Surviving Obligations.**

**16.7.1** Except as otherwise provided in this Agreement, on expiration or termination of the Agreement, you will have no further interest or rights in this Agreement. All financial obligations incurred before termination or expiration will not be affected by termination or expiration and must be satisfied. You remain obligated to pay Royalty Fees, BMF contributions, and referral fees, on transactions pending at the time of expiration, termination or Transfer of the Franchise. The provisions of this Section survive termination or expiration of this Agreement.

**16.7.2** If an "early termination" of this Agreement occurs (which will mean any termination of the Agreement before the Expiration Date, other than a mutual termination under Section 16.2.1 or termination by you under Section 16.2.5), you will immediately pay us liquidated damages. The parties agree that it will be impracticable or extremely difficult to calculate the actual amount you would have been obligated to pay as Royalty Fees, BMF contributions, and any other fees due under this Agreement, from the date of early termination through the Expiration Date and that the following method of calculation represents a fair and reasonable estimate of our damages: Liquidated damages will be equal to the combined monthly average of Royalty Fees, BMF contributions, and other fees under this Agreement (without regard to any fee waivers or fee reductions) payable from the Opening Date through the date of early termination, multiplied by the lesser of (i) thirty-six (36) or (ii) the number of full months remaining in the Term.

**16.7.3** We have the right to access and use (i) all information you provide to us as required by the P&P Manual, including, without limitation, any reporting items or categories that may later be adopted; (ii) all information you provide to us contained in your sales and transaction reports, and in such other operational reports that we request from you; and (iii) all information you provide to us regarding your customers' enrollment in any client contact program we may adopt. The information in (i), (ii) and (iii) above is referred to collectively as "the Client Information." We may use the Client Information for business purposes including, without limitation, public relations, advertising, statistical compilations, investigations and resolutions of client complaints, and quality surveys. We have the right, on termination, to use the Client Information and to make the Client Information available to other franchisees or prospective franchisees as we deem appropriate. On termination,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000780



you will be deemed to have assigned your client contact program enrollments to us to deal with as we deem appropriate.

**16.8    Other Damages.**  Our right to collect reasonable attorneys' fees, costs of investigation, court costs and other litigation expenses incurred in enforcing our rights under this Agreement will survive termination.

**17.0    INDEMNIFICATION AND INSURANCE:**

**17.1    Your Indemnification.**  You will indemnify and hold harmless us, our Related Parties, and all other franchisees from all expenses, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or related to the operation of the Business or an Excluded Business and any acts and omissions of you, your Owners, employees, brokers or your independent agents.  If we are made a party to a lawsuit or other legal action or we have a claim asserted against us in connection with your (or your Related Parties') activities, regardless of whether you were named or served in the action, we may at our option, (i) tender the defense and/or prosecution of the case to you and you will be responsible for diligently pursuing the case at your expense; or (ii) hire counsel directly to protect our interests and bill you for all costs and attorneys' fees incurred, which bill you must promptly pay.  This indemnity will apply to claims that we were negligent or failed to train, supervise or discipline you, and to claims that you, your Owners, employees, brokers or your independent agents are our employees, agents or part of a common enterprise with us, including claims regarding violations of labor or employment laws or regulations.  The obligations under this Section survive the expiration or termination of this Agreement.

**17.2    Insurance.**

> **17.2.1    Required Policies and Coverage.**  You will obtain and maintain for the Term the following types of insurance:  (1) if you use an automobile in connection with your business operations, automobile liability coverage, including hired and non-owned autos, with limits of at least $1,000,000 per occurrence; (2) general liability coverage, including contractual liability, Property Management coverage and (if not covered in a separate automobile liability policy) hired and non-owned autos, with limits of at least $1,000,000 per occurrence; (3) professional liability (real estate errors and omissions) coverage, including coverage for Property Management, with limits of at least $1,000,000 per claim; and (4) any additional types of policies and coverage as may be required by law, including, without limitation, workers compensation coverage. You must furnish us with certificates of insurance before the Opening Date.  We reserve the right to require you to obtain additional types of insurance, including Employment Practices Liability Insurance ("EPLI"), to increase limits or to reduce minimum coverage requirements, but you may carry reduced coverage only if you first receive our written approval.  Approval to do so may be revoked at any time.  If you fail to maintain required insurance, we may, but are not obligated to, obtain any and all required insurance on your behalf and to charge you for the cost.  You will promptly reimburse us for all our costs upon demand. We do not represent or warrant that any insurance that you are required to purchase, or which we procure on your behalf, will provide adequate coverage for you. You should consult with your own insurance agents, brokers, attorneys or other insurance advisors to determine the level of insurance protection you need and desire, including any insurance coverage it may be advisable for you to require your affiliated agents to obtain, in addition to the coverage and limits we require.

> **17.2.2    Carriers.**  All policies must be in form and content satisfactory to us and must be issued by an insurer(s) rated A-VIII or better in Class X by Alfred M. Best and Company Inc., or comparably

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                          Realogy-Sitzer-00000781



rated by Moody's and/or Standard and Poor's or similarly reliable rating services acceptable to us. We reserve the right to change the minimum acceptable rating requirement.

**17.2.3  Additional Insureds.**  We, Realogy Holdings Corp., and their subsidiaries, successors and assigns must be named as additional insureds on all insurance policies listed and maintained by you (excluding workers compensation insurance and EPLI).

**17.2.4  Notice of Policy Changes or Cancellation.**  All policies must provide that they may not be canceled except upon thirty (30) days' advance written notice to us.

**17.2.5  Annual Certificates.**  You must furnish us certificates of coverage and endorsements (i) on or prior to your Opening Date, (ii) annually on the anniversary of your policy renewal date, and (iii) upon our request.

**18.0  AMENDMENT:**

**18.1  Written and Signed.**  Any modification of this Agreement must be in writing and signed by the authorized representatives of both parties.

**18.2  Authority to Amend.**  NO FIELD REPRESENTATIVE, INCLUDING ANY DIVISIONAL OR REGIONAL OFFICER OR BUSINESS MANAGER OF OURS HAS THE RIGHT OR AUTHORITY TO MAKE ORAL OR WRITTEN MODIFICATIONS TO THIS AGREEMENT.  NO UNAUTHORIZED MODIFICATION WILL BE BINDING ON EITHER PARTY.

**19.0  WAIVER:**

**19.1  Waiver; Severability.**  If any provision(s) of this Agreement is or becomes in violation of any local, state or federal law, such provision(s) will be considered immediately amended to conform to the law.  If the violative provision cannot be amended to conform to law, each party expressly releases the other from any liability under the violative provision of this Agreement.  To the extent any provision of this Agreement is deemed invalid or unenforceable for any reason, the remainder of this Agreement will not be adversely affected, but rather will be enforced to the greatest extent permitted by law.  No waiver of any breach of this Agreement will constitute a waiver of any subsequent breach.

**19.2  Disputes with Others.**  Each party waives the right to assert that principles of collateral estoppel or issue preclusion prevent raising any claim or defense because either party lost a similar claim or defense in another action.  Any ruling by a third-party fact finder or court in a prior proceeding in which either party was involved (such party referred to as a "Litigant") with a third party will not prevent the Litigant from asserting similar arguments or positions in any action between the parties to this Agreement.

**20.0  NON-COMPETITION COVENANTS:**

**20.1  In Term.**  During the Term, you, your Owners, officers, guarantors and Responsible Broker (for so long as each are engaged or employed by you) will not, directly or indirectly, through ownership or otherwise, engage in any real estate brokerage business, other than the Business or any Real Estate Related Excluded Business authorized under this Agreement.  Moreover, your Owners, officers, guarantors and Responsible Broker will not engage in any other residential real estate brokerage business or divert real estate brokerage business from the Business in the market you serve. Notwithstanding the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                          Realogy-Sitzer-00000782
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 36 of 63



above, with our prior written permission, you, your Owners or guarantors may own and/or operate a real estate brokerage business under the marks of one of our Related Parties during the Term.

**20.2     Transfer of the Franchise.**  Any Transferee must be protected against unfair competition by your use of our educational programs and resources, assistance and trade secrets in direct competition after a Transfer of the Franchise.  For twenty-four (24) months after a Transfer of the Franchise (or the remaining Term, whichever is less), you, your Owners, officers, guarantors, and the spouses of such Persons, will not, directly or indirectly, operate, own, license, franchise, be employed by or consult with any residential real estate brokerage within a two (2) mile radius of any Office operating as of the date of the Transfer of the Franchise.

**20.3     Competing Services or Products.**  During the Term, you, your Owners, officers, employees, independent agents, or any entity in which any of you hold an ownership interest in or receive compensation from, will not provide or seek to provide equipment, supplies, services or other operating materials to our other franchisees or Related Parties and their respective franchisees, without our advance written consent.

**20.4     Post Term Restriction on Start-Ups.**  If you were a Start-Up Company on the Effective Date, you agree that you, your Owners, officers and guarantors, as well as any of the immediate family members of these Persons (collectively, the "Restricted Parties") will not, directly or indirectly, through ownership or otherwise, engage in any real estate brokerage business from any Office for a period of one (1) year after termination or expiration of the Agreement.  A Start-Up Company is a real estate brokerage that operated a stand-alone licensed real estate business for less than twelve (12) months before the Effective Date.

**21.0     INDEPENDENT CONTRACTOR:**

**21.1     **We are not the employer of you or any of your employees, your brokers or independent agents.  At all times, you will hold yourself and the Business out to be independently owned and operated.  Any education, support, advice or resources we provide to you in connection with the Business is solely for the purpose of protecting the Marks and goodwill associated with the System and assisting you in the operation of the Business, and not for the purpose of controlling in or in any way exercising or exerting control over your decisions or the day-to-day operation of the Business, including your personnel-related decisions.

**21.2     **You must conspicuously disclose in the Office(s), in your real estate sale documents, listing agreements and on all business cards, stationery, and in all advertisements and in all other printed or recorded material you, your employees and independent agents use, that you are independently owned and operated and are not our agent or owned by us.  You expressly understand that you will be an independent contractor and must hold yourself out to the general public as such.  This Agreement does not make you our agent, legal representative, joint venture, partner, employee or servant for any purpose.  You are not authorized to make or promise any contract, agreement, warranty or representation on our (or our Related Parties') behalf, or to create any express or implied obligation on our behalf.  You are not authorized to accept service of process or legal notices directed to us.  You acknowledge that this Agreement does not create a fiduciary relationship, and the relationship between the parties is not, and is not intended to be a fiduciary relationship.

**21.3     **We have no right or obligation to pay your commissions, taxes, wages or other expenses or  to regulate or participate in the retention or disaffiliation of your independent agents  or employees, or to determine or limit the parties from whom you accept listings, or for whom or to whom you may sell property, the commission rates you charge, your commission splits with your agents, your working conditions, the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                          Realogy-Sitzer-00000783
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 37 of 63



manner or details of work performed by you, your brokers, independent agents or employees, except as may be necessary to protect the Marks and goodwill associated with the System, and you agree that you are solely responsible for these items (regardless of any advice, education or resources you may receive from us). Further, you agree that you are solely responsible for the day-to-day operation of the Business according to your own judgment, and in accordance with this Agreement and the mandatory provisions in the P&P Manual.

## 22.0    MISCELLANEOUS:

**22.1    Broker Councils.**  You may support the concept of cooperative marketing activities with other franchisees in your area in order to derive more fully the benefits of local and regional identity. Broker Councils are voluntary at the local level and membership is not required.

**22.2    Taxes.**  You will pay promptly when due all taxes, accounts, liabilities and indebtedness of any kind incurred by you in the conduct of the Business.  If any fees (including, without limitation, Royalty Fees, Property Management Fees and the Initial Franchise Fee) payable by you to us are subject to Value Added Taxes, Gross Receipts Taxes, or similar taxes imposed by taxing authorities within the jurisdiction where you operate, you will, in addition to the fees due us, pay us an additional sum equal to the amount of such tax imposed on fees due us.

**22.3    Successors and Assigns.**  Subject to Section 15, this Agreement will be binding on and inure to the benefit of the parties and their respective legal representatives, successors and assigns.

**22.4    Headings; Interpretation.**  The headings in this Agreement are for convenience only, do not constitute a part of this Agreement, and will not be deemed to limit or affect any of the provisions of this Agreement. The use of the term "including" in this Agreement shall mean "including without limitation."

**22.5    Time of the Essence.**  Time is of the essence for all of this Agreement's provisions that specify a time for performance.

**22.6    Applicable Law and Waiver.**  Subject to our rights under federal trademark laws, the parties' rights under this Agreement, and the relationship between the parties is governed by, and will be interpreted in accordance with New Jersey laws (statutory and otherwise), except that the New Jersey Franchise Practices Act will not apply to agreements for Offices located outside New Jersey.  You waive, to the fullest extent permitted by law, the rights and protections that might be provided through franchise or business opportunity laws of any state other than the state where the Main Office is located.

**22.7    Venue and Jurisdiction.**  You submit to the non-exclusive personal jurisdiction of the New Jersey state and federal courts for any litigation arising out of or related to this Agreement or to any aspect of the business relationship between the parties.  Such litigation will have venue in state courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

**22.8    Waiver of Class Action.**  You agree that any judicial proceeding will be considered as to its facts and may not be brought as a class action.  You and your Owners waive any right to proceed against us by way of class action.

**22.9    WAIVER OF JURY TRIAL.  The parties waive the right to a jury trial in any action arising out of or related to this Agreement or any aspect of the relationship between you, us, any guarantor and their respective successors and assigns**.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                        Realogy-Sitzer-00000784
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 38 of 63



**22.10    Waiver of Punitive Damages.**  We and you (and your Owners and guarantors) fully waive any right to or claim for any punitive or exemplary damages against each other.  If any dispute arises between the parties, each party will be limited to recovery of actual damages which, in our case, includes liquidated damages in Section 16 and damages provided in the Lanham Act or its state counterpart.

**22.11    Attorneys' Fees.**  We will be entitled to collect, in addition to any award of damages or injunctive relief, our costs in enforcing our rights under this Agreement against you, including reasonable attorneys' fees, court costs, expert fees, costs of investigation, and other litigation expenses.  We will also be entitled to collect our attorneys' fees, court costs, expert fees, costs of investigation, and other litigation expenses in the event we are the prevailing party with respect to any claim or counterclaim or other legal proceeding brought by you against us in connection with this Agreement or our relationship.

**22.12    USA PATRIOT Act and Foreign Assets Control Regulations Compliance.**  You will, at all times, operate in compliance with any applicable laws, rules and regulations, including the USA PATRIOT Act (Public Law 107-56) and Foreign Assets Control Regulations (31 CFR Parts 500; 501).  You represent and warrant that you, your Owners, directors, and employees: (i) are not included on any U.S. government list (including the Office of Foreign Assets Control ("OFAC")) of Persons with whom financial or similar transactions are prohibited; and (ii) are not subject to embargo or sanctions under OFAC regulations or similar U.S. government laws, regulations, or Executive Orders.  Further, you will promptly notify us if any of the covenants and representations in this Section is inaccurate, and you will cooperate with us in any resulting audits or investigations.

**22.13    Variations Among Agreements.**  We reserve the right to vary standards for any other franchisee based on a particular area, circumstance, business practice or other condition that we deem important to the other franchisee's successful operation.  You have no rights based on our variation from standard practices and will not be entitled to require us to grant you a similar variation under this Agreement.

**22.14    Opportunity to Investigate.**  You acknowledge that you have had full opportunity to investigate independently our operations and be thoroughly advised of the terms and conditions of this Agreement by counsel of your choice.  Unless expressly provided otherwise, this Agreement is exclusively for our and your benefit and may not give rise to liability to any third party unless specifically stated.

**22.15    Integration.**  You acknowledge that we have fully explained our operations to you, that you understand their uses, benefits and limitations; and that we made no representations to you as to the financial benefit to be gained under this Agreement.  You have not relied on any written or oral representations except those specifically made a part of this Agreement in writing.  This Agreement, any Exhibits, and any Addendum signed by our authorized officer and you represent the entire integrated agreement between us and you and supersede all prior negotiations or agreements, either written or oral, between the parties.  Nothing in this or any related agreement, however, is intended to disclaim the representations we made in the Franchise Disclosure Document that we furnished to you. DO NOT SIGN THIS AGREEMENT IF YOU BELIEVE WE OR ANY OF OUR REPRESENTATIVES HAS PROMISED YOU SOMETHING THAT IS NOT PART OF THIS AGREEMENT, ANY ATTACHED ADDENDUM OR THE DISCLOSURE DOCUMENT.

**22.16    Consent.**  In those instances where our prior consent is required without identifying the method or timing for consent, you will request consent in writing, and we will notify you of our decision within thirty (30) days after receiving your written request and all supporting documents.  Whenever our consent or approval is required under this Agreement, it must be in writing.  If we do not respond within thirty (30) days the request is deemed denied.  Our consent or approval will be effective only to the extent

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                    Realogy-Sitzer-00000785
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 39 of 63



specifically stated and we will not be deemed to waive our right to consent to or approve any later request.

**22.17    Our Rights.** We have the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by this Agreement. You understand and agree that during the Term hereof, we or our Related Parties may develop internally or be in discussions with third parties for, products, services, concepts, systems, and techniques, including but not limited to, those that may be similar to or competitive with those offered by you, your Owners or your Related Parties and that nothing herein shall limit or restrict our right to develop or have developed, protect (whether by patent, trademark, copyright or other means) or market any such products, services, concepts, systems, or techniques.

**22.18    Our Reasonable Business Judgment.** Whenever we reserve discretion, or are deemed to have reserved discretion, in a particular area or we agree or are deemed to be required to exercise our rights reasonably or in good faith, we will satisfy our obligations by exercising Reasonable Business Judgment in making our decision or exercising our rights.

**22.19    Counterparts/Facsimiles.** This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which constitute one and the same agreement. Electronic or facsimile copies of this Agreement have the same force and effect as the original and will be fully binding.

**22.20    Further Assurances.** The parties will execute any documents necessary to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

**23.0    ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS:** You make the following additional warranties and representations that are an inducement on which we are relying to enter into this Agreement:

**23.1** The information in the franchise application is accurate and complete. Any consents or authorizations in the application are incorporated into this Agreement and are effective for the Term.

**23.2** You are not obtaining this Business for speculative purposes and have no present intention to sell or transfer or attempt to sell or transfer the Business in whole or in part.

**23.3** You acknowledge the importance of the high and uniform standards of quality, appearance and service we impose in order to maintain the value of our name and the necessity of operating the Business in compliance with our Standards. You represent that you have the ability and intention to meet those Standards.

**23.4** You have procured such certificates, licenses and permits, in addition to appropriate real estate licenses, necessary for you to carry on the Business contemplated by this Agreement.

**23.5** Your signing of this Agreement does not violate or breach any other agreement or commitment to which you are bound.

**23.6** Neither we nor any of our employees or representatives made any representations, promises, guarantees or warranties of any kind to induce you to sign this Agreement, except as specifically described in the Disclosure Document delivered to you. You acknowledge that the success of the Business is dependent on you and your Owners' efforts. Your non-exclusive right to use the System and its programs does not imply or guarantee you any level of business, any specific advertising programs, any number of recruits,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                    Realogy-Sitzer-00000786
Case 4:19-cv-00332-SRB    Document 597-3    Filed 01/06/22    Page 40 of 63



or the receipt of referrals from our other franchisees or our Related Parties' franchisees. You and the Owners represent that you each intend to engage in the management or supervision of the Business. You agree to conduct the Business strictly in accordance with this Agreement and to exercise your continuous best efforts to maintain and develop the Business to its greatest potential.

**23.7**    You and each of your Owners acknowledge that your Owners, employees, brokers and independent agents are not our employees, brokers or independent agents, and that you are solely responsible for the day-to-day operation of the Business according to your own judgment, and in accordance with the Agreement and the mandatory provisions in the P&P Manual.

**23.8**    You and each Owner have fully read this Agreement, the P&P Manual table of contents, and the Disclosure Document, and understand their terms. You acknowledge that you have had not less than fourteen (14) calendar days (or 10 business days in Michigan and New York) to review our Disclosure Document before signing this Agreement.

**23.9**    As of the Opening Date, the Owners will be, and shall during the entire Term remain in full compliance with all applicable federal, state and local laws and regulations, including without limitation all applicable laws and regulations governing (i) the operation of a real estate brokerage office, (including the Real Estate Settlement Procedures Act), (ii) labor and employment, including, but not limited, to, wage and hour laws and laws prohibiting forced or child labor, and (iii) data privacy, data breach response policies and security. You acknowledge that we have no responsibility for ensuring that the Business is developed and operated in compliance with all applicable laws and regulations, and that we shall have no liability in the event the development and operation of the Business violates any law or regulation. Further, Owners will not engage in any human trafficking, nor use any child or forced labor, including indentured labor, bonded labor or prison labor, in connection with the Business.

**24.0    STATE LAW ADDENDA.**  The state law addenda included in Exhibits G through  G-3 are an integral part of this Agreement.  If your Office is to be located in California, Georgia, Illinois,  North Dakota, Rhode Island, South Dakota or Wisconsin, or you are a resident of any of those states (except for Virginia), the respective state law addendum included in Exhibit G amends this Agreement. Additionally, if you are a resident of Maryland, Minnesota or Washington, the state law addendum included in Exhibits G-1 through G-3 amend this Agreement, and you must sign the Maryland, Minnesota or Washington Addendum to Franchise Agreement, as applicable.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                      Realogy-Sitzer-00000787



**EXHIBIT A**
**REAL ESTATE FRANCHISE AGREEMENT**

Franchisee's Legal Name:_____ _____
Business Name: ERA _____

This Exhibit is an integral part of the Real Estate Franchise Agreement ("Agreement") between ERA Franchise Systems LLC ("we" or "us") and you ("Franchisee" or "you"). This Exhibit will not be modified except by written agreement signed by both you and us.

**OWNERSHIP INTERESTS**

**I.** **Franchisee Ownership.** You represent and warrant that the following Persons own ownership interests in Franchisee as stated below:

**Name:** **Interest:**

| | |
|---|---|
| | |
| | |
| | |
| | |

**II.** **Underlying Ownership.** The words "Owner" and "Owners" in the Agreement include each "Person" who has a direct ownership interest in Franchisee. If any Owner listed above is a corporation, partnership or other legal entity, you represent and warrant that the ownership interest stated below for the Owners are accurate and complete:

Name of Legal Entity: _____

**Name:** **Ownership Interest:**

| | |
|---|---|
| | |
| | |
| | |
| | |

Name of Legal Entity: _____

**Name:** **Ownership Interest:**

| | |
|---|---|
| | |
| | |
| | |
| | |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER Realogy-Sitzer-00000788



Name of Legal Entity: _____

|  | **Ownership Interest:** |
| :-- | :--: |
| **Name:** | |
| | |
| | |
| | |
| | |

Name of Legal Entity: _____

|  | **Ownership Interest:** |
| :-- | :--: |
| **Name:** | |
| | |
| | |
| | |
| | |

Name of Legal Entity: _____

|  | **Ownership Interest:** |
| :-- | :--: |
| **Name:** | |
| | |
| | |
| | |
| | |

If additional legal entities are Owners of Franchisee or if additional Persons have ownership interests in the legal entity listed above, such information is included on additional pages attached to, and made a part of, this Exhibit A.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000789



**EXHIBIT B**
**REAL ESTATE FRANCHISE AGREEMENT**

**GUARANTY OF PAYMENT AND PERFORMANCE**

This Guaranty of Payment and Performance is given by the undersigned, _____ **(individually a "Guarantor" and collectively "Guarantors"),** effective as of the Effective Date of the Franchise Agreement to ERA Franchise Systems LLC ("Franchisor"), in order to induce Franchisor to accept _____ ("Franchisee") as a franchisee of Franchisor.

Each Guarantor, independently of Franchisee's obligations**,** jointly and severally, guarantees to Franchisor the prompt payment and performance, when due of all of Franchisee's obligations under the Franchise Agreement(s) between Franchisor and Franchisee, including any renewal, extension replacement or modification of the agreement (the "Agreement"), and other agreements or instruments of indebtedness now existing or hereafter signed by Franchisee. This Guaranty applies to all obligations in the Agreement, including payment of the initial franchise fee, all Royalty Fees, advertising fund contributions, charges for manuals, supplies, materials, services and products furnished by Franchisor, audit fees, assignment fees, attorneys' fees, referral fees, obligations to indemnify and other such charges, fees and assessments under the Agreement. This Guaranty incorporates by reference, as if contained fully in this Guaranty, Sections 22.9 (Waiver of Jury Trial) and 22.10 (Waiver of Punitive Damages) of the Agreement, and the Guarantors knowingly and voluntarily waive their right to a jury trial and to seek punitive damages. Guarantors also agree that Section 22.8 (Waiver of Class Action) of the Agreement is incorporated in this Guaranty, as if contained fully in this Guaranty, and Guarantors waive any right to proceed against Franchisor by way of a class action.

This Guaranty will be deemed continuing in nature and will apply to Franchisee's obligations for the Office(s) (as defined in the Agreement) and all Future Office(s) (as defined in the Agreement). This Guaranty will not be discharged by any compromise of any debt and/or the extension of payment deadlines. Guarantors waive defenses based on presentment, demand, protest, notice of protest and dishonor, and diligence in collecting any obligation under the Agreement. Franchisor will not be required to pursue any remedy against Franchisee as a condition of the Guarantors' obligation under this Guaranty.

It will not be a condition to the enforcement of this Guaranty that Guarantors will be given any notice.

The obligation of each Guarantor is an absolute and unconditional obligation and constitutes a guaranty of payment and performance. Separate action(s) may be brought and prosecuted against Guarantors whether action is brought against Franchisee or Franchisee is joined in any such action(s). Guarantors waive to the fullest extent permitted by law, the benefit of any statute of limitations affecting their liability under this agreement or the enforcement of this Guaranty. Any Guarantor who is a married person agrees that recourse may be had against his or her separate property for his or her obligations under the Agreement. Without the prior written consent of Franchisor, Guarantors will not transfer or convey any property described in the Personal Financial Statement (or such other similar document) submitted to Franchisor for review and acceptance of Franchisee to an individual, trust or other legal entity for the purpose of protecting or shielding such assets from the claims or rights that Franchisor may have under this Guaranty.

Each Guarantor expressly waives notice of the acceptance of this Guaranty and agrees that Franchisor's actions or failure to act will not in any way limit or discharge Guarantor's liability under this Guaranty.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000790
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 44 of 63



This Guaranty and the Guarantors' liabilities and obligations under this Guaranty are binding on Guarantors and their respective heirs, executors, successors and assigns (and if applicable, successor trusts and trustees), and inure to the benefit of and are enforceable by Franchisor and its successors, transferees, and assigns.

This Guaranty will be governed by the laws of the State of New Jersey in all respects, including matters of construction, validity, and performance, and its terms and provisions may not be waived, altered, modified, or amended except in writing duly signed by an authorized officer of Franchisor and by Guarantors.

Each Guarantor submits to the non-exclusive personal jurisdiction of the state and federal courts of New Jersey with respect to any claims arising out of the Agreement, this Guaranty or the business relationship between Franchisor and Franchisee. Such litigation will have venue in the state courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty will be construed as if it did not contain that provision, and the rights and liabilities of the parties will be construed and enforced accordingly.

This Guaranty may be executed in counterparts, each of which will be deemed an original, and all of which, when taken together, will constitute one Guaranty. Electronic and facsimile copies of this Guaranty will be deemed to have the same force and effect as the original and will be fully binding on all Guarantors.

**THE GUARANTORS SIGNING THIS GUARANTY REPRESENT AND WARRANT THAT THE PERSON SIGNING THE AGREEMENT IS AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THE AGREEMENT AND ANY FUTURE AGREEMENTS UNLESS THEY PROVIDE NOTICE OTHERWISE TO FRANCHISOR. THE GUARANTORS ACKNOWLEDGE THAT FRANCHISOR IS EXPRESSLY RELYING ON THIS REPRESENTATION IN ENTERING INTO THE AGREEMENT.**


_____,
Individually and Personally


_____,
Individually and Personally


_____,
Individually and Personally

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000791
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 45 of 63



**EXHIBIT C**
**REAL ESTATE FRANCHISE AGREEMENT**

**GLOSSARY OF TERMS**

For your reference, the capitalized terms used in the Agreement will have the meaning set forth below.

**"Approved Supplier"** means all suppliers we approve in the P&P Manual or other written communication with you.

**"Branch Office"** is any approved ERA® Office you operate, other than the Main Office or a Limited Purpose Office.

**"Broker Price Opinions"** means standard, non-substantive residential value estimates issued to financial institutions or others for a nominal fee and do not include appraisals or other substantive estimates or opinions of value.

**"Business"** means the performance of real estate brokerage services for Residential Real Estate or Commercial Real Estate.

**"Calculation Year"** is defined in Section 7.2.

**"Client Information"** is defined in Section 16.7.3.

**"Confidential Information"** means information owned or licensed by us and involving the operation of the Business, including without limitation, the P&P Manual, procedures related to our proprietary communications and referral systems, and other methods and information. Confidential Information does not include information that (a) is or becomes generally available to the public; (b) was within the recipient's possession prior to it being furnished; (c) is or becomes available to the recipient from a source that is not, to its knowledge, prohibited from disclosing such information to it by a legal, contractual, or fiduciary obligation of confidentiality; or (d) is independently developed by the recipient.

**"Commercial Real Estate"** means services relating to the listing, offering, selling, exchanging, purchasing, auctioning, managing, leasing, renting or consulting regarding any and all commercial real property and any ancillary personal property related to a commercial real estate transaction authorized under applicable commercial real estate licensing laws, which may vary, from time to time based on state laws.

**"CPI"** is defined in Section 12.1.

**"Disclaimer"** is defined in Section 4.10.

**"Disclosure Document"** means our Franchise Disclosure Document used in the offer and sale of franchises in your state in effect at the time you sign the Agreement.

**"Effective Date"** is defined in Section 1.1.

**"Excluded Business"** is defined in Section 4.2.

**"Expiration Date"** is defined in Section 1.5.

**"Franchisee"** is defined in Section 1.2.

**"Franchisor"** is defined in Section 1.1.

**"Future Office"** means future Branch Offices and Limited Purpose Offices.

**"Gross Revenue"** means all money or things of value, calculated at their fair market value in United States currency, received or receivable (earned but not yet received), by you (including, without limitation, all revenues and commissions whether or not other individuals or entities are entitled to retain such revenues or commissions), directly or indirectly, in connection with the Business (earned in compliance with all laws)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000792

Case 4:19-cv-00332-SRB    Document 597-3    Filed 01/06/22    Page 46 of 63



including transactions and services that require a real estate or auctioneer's license and/or in which you use the Marks or the System in any manner. "Gross Revenue" will include all such revenue before the deduction of <u>any</u> fees, costs or expenses you incur. Notwithstanding the above, the following referral fees will be deducted from Gross Revenue: (i) referral fees paid to other licensed brokers operating under a Realogy brand franchise agreement; (ii) referral fees paid to any referral networks owned or operated by Realogy or its Related Parties; or (iii) referral fees up to 5% of Gross Revenue paid to brokers or referral networks not related to Realogy. Any amounts deposited in the Business's bank accounts will be deemed Gross Revenue earned in compliance with all laws unless proven otherwise.

**"Improvements"** is defined in Section 14.2.

**"Limited Purpose Offices"** is defined in Section 5.5.

**"Limited Purpose Office Addendum"** means the Limited Purpose Office Addendum in the form and with such terms and conditions in effect at the time you are granted the right to operate from a particular or new Limited Purpose Office.

**"Location Addendum"** means the Location Addendum in the form and with such terms and conditions in effect, at the time you are granted rights to operate from a particular or new Branch Office.

**"Main Office"** is the first ERA® Office you operate (or such other substitute Office that has been designated as your Main Office in our electronic reporting system).

**"Marks"** means the trademarks, service marks and trade dress that we authorize you to use in the P&P Manual, including all additional or substitute trademarks, service marks and trade dress that we may authorize you to use.

**"Minimum Monthly Royalty Fees"** is defined in Section 7.1.5.

**"Minimum Operating Standards"** is defined in Section 16.2.6.

**"Office"** means any authorized office covered by this Agreement as of the Effective Date or later added by a writing signed by both parties.

**"Opening Date"** is defined in Section 1.7.

**"Owner"** is defined in Section 1.3 and Exhibit A.

**"Pending Transactions"** is defined in Section 7.1.2.

**"Person"** means an individual, a partnership, a trust, a corporation, a limited liability company, an association and any other incorporated or unincorporated organization or entity.

**"Personal Transaction"** is defined in Section 7.1.3.

**"P&P Manual"** means our Policy and Procedures Manual, including the Identity Standards Manual.

 **"Property Management Services"** means acting as agent for an owner of real property (including projects governed by Homeowners' Associations, apartment complexes, and resort properties), performing all services required in connection with the day-to-day management and operation of the property, including, but not limited to: (i) collecting rents or other amounts due the property owner; (ii) enforcing tenants' lease obligations; (iii) receiving service of process for litigation or condemnation proceedings; (iv) securing permits and licenses for the property's management and operation; (v) contracting for or overseeing utility repairs, maintenance, alterations, and/or purchasing and maintaining equipment, personal property, supplies or materials; (vi) performing property maintenance services; (vii) performing construction services on the property; and/or (viii) any short-term leasing or rental activity (having a nonrenewable term of less than 90 days). Leasing or rental activity involving

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000793

Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 47 of 63



longer term rentals ("Extended Rentals") will only be considered Property Management services if, in connection with the Extended Rentals, you perform additional Property Management services described above and your fees for the Extended Rentals are not distinguishable from the other Property Management service fees.

"**Qualified ERA Firm**" means an ERA Firm that is eligible to receive VIP under this Agreement and the P&P Manual.

"**Realogy**" means our parent company, Realogy Holdings Corp., its successors and assigns.

"**Reasonable Business Judgment**" means any decision we make or action we take that promotes or benefits the System generally, even if the decision or action also promotes our financial or other interest, or if other reasonable or arguably preferable alternatives exist and regardless of whether an individual brokerage may be unfavorably affected. This includes, but is not limited to, our actions to (i) increase the value of the Marks; (ii) increase or enhance the overall franchisee or customer satisfaction; (iii) minimize possible brand inconsistencies or customer confusion; (iv) enhance or encourage modernization; or (v) improve the competitive position of the System.

"**Related Party**" means, with respect to a particular Person, a Person who, directly or indirectly, owns or controls that Person, is owned or controlled by that Person, or is under common control with that Person. Control, in this context, means the possession of executive power to direct or to cause the direction of the management and policies of a Person, whether through voting power, ownership, by contract or otherwise.

"**Residential Real Estate**" means real estate consisting of a residential dwelling (including an apartment within a multi-family building), including leaseholds of dwellings (including rental and management of properties), cooperatives, condominiums, fractional ownership, timeshares, manufactured homes, panelized or pre-fabricated housing, undeveloped land, building lots, resort, farm and ranch real estate and any other form of real estate for which a residential real estate brokerage license is required under applicable law.

"**Responsible Broker**" means your licensed real estate broker as required under the laws of the state in which the Office is located.

"**Restricted Parties**" is defined in Section 20.4.

"**Royalty Fee**" has the meaning in Section 7.1.1.

"**Standards**" means our mandatory specifications, standards, methods and procedures prescribed by us in the P&P Manual, the Identity Standards Manual or this Agreement.

"**Start-Up Company**" is defined in Section 20.4.

"**System**" means the business format and methods developed or licensed by us for the promotion of independently owned and operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate sales market. The System includes use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, talent attraction programs, referral programs and sales and management education programs. We have the right to update the System at any time and expect to continue to do so in our Reasonable Business Judgment. The System does not include any real estate or other investment syndication business of any kind.

"**System Components**" is defined in Section 4.5.1.

"**Term**" is defined in Section 1.5.

"**Trade Name**" is defined in Section 2.1.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER         Realogy-Sitzer-00000794



**"Transferee"** is defined in Section 15.7.

**"Transfer of the Franchise"** is defined in Section 15.4.

**"URL"** means uniform resource locator (also known as a domain name or website address).

**"VIP Table"** is defined in Section 7.2.

**"Volume Incentive Plan Award"** is defined in Section 7.2.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000795



**EXHIBIT D**
**REAL ESTATE FRANCHISE AGREEMENT**

**AUTHORIZED OFFICES**

You are authorized to operate Offices under the terms of this Agreement at the following addresses:

| | |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |

This Exhibit is an integral part of the Franchise Agreement ("Agreement") between ERA Franchise Systems LLC ("we" or "us") and you ("Franchisee" or "you"). This Exhibit will not be modified except by written agreement signed by both you and us.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                              Realogy-Sitzer-00000796



**EXHIBIT E**
**REAL ESTATE FRANCHISE AGREEMENT**

**2019 VOLUME INCENTIVE PLAN TABLE**

| | Annual Gross Revenue Ranges | | | Maximum Range Amount | Multiplier Rate | Maximum Award Per Range | Cumulative Maximum Award |
|---|---|---|---|---|---|---|---|
| | **From** | | **To** | | | | |
| **I** | $0 | - | $3,646,188 | $3,646,188 | N/A | $0 | $0 |
| **II** | $3,646,189 | - | $4,861,584 | $1,215,396 | N/A[1] | $3,750 | $3,750 |
| **III** | $4,861,585 | - | $7,292,376 | $2,430,792 | 1.25% | $30,385 | $34,135 |
| **IV** | $7,292,377 | - | $9,723,168 | $2,430,792 | 1.50% | $36,462 | $70,597 |
| **V** | $9,723,169 | - | $12,153,960 | $2,430,792 | 1.75% | $42,539 | $113,136 |
| **VI** | $12,153,961 | - | $14,584,752 | $2,430,792 | 2.00% | $48,616 | $161,751 |
| **VII** | $14,584,753 | - | $17,015,544 | $2,430,792 | 2.25% | $54,693 | $216,444 |
| **VIII** | $17,015,545 | - | $19,446,336 | $2,430,792 | 2.50% | $60,770 | $277,214 |
| **VIV** | $19,446,337 | - | $21,877,128 | $2,430,792 | 2.75% | $66,847 | $344,061 |
| **X** | $21,877,129 | - | and above | * | 3.00% | * | * |

The maximum award is paid upon Franchisee achieving the Range II minimum amount.

*No maximum, award will be calculated at 3% of Gross Revenues above $21,877,129.

Within each range over $4,861,584, an Award is calculated by multiplying the "Gross Revenues" achieved by you within the range by the "Multiplier Rate" for that range. The total Volume Incentive Plan for any year is equal to the sum of the Volume Incentive Plan attributable to all the ranges.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                     Realogy-Sitzer-00000797
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 51 of 63



**EXHIBIT F**
**REAL ESTATE FRANCHISE AGREEMENT**

**SECURITY AGREEMENT**

This Security Agreement ("Security Agreement") is made as of _____, between _____, ("Debtor"), and ERA Franchise Systems LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are acknowledged, Debtor grants to Secured Party a security interest in all accounts receivable and payment intangibles; cash proceeds; contract rights; leases; furniture; furnishings; equipment; fixtures; inventory; commissions; real estate listings, listing agreements and related rights which are located at, utilized by or related to the real estate brokerage business conducted by Debtor and including the proceeds therefrom and any and all amendments or replacements thereto and any rebate/award program (or similar incentive programs) to which Debtor and/or any Co-Debtors may be entitled pursuant to any franchise agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor and Co-Debtors; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto). [Add following only for Security Agreements filed in New Jersey - The Collateral described herein falls within the scope of the Uniform Commercial Code enacted in New Jersey, including N.J.S.A. 12A:9-102 and N.J.S.A. 12A:9-109.] The foregoing Collateral is granted to Secured Party as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

SECTION 1 -- DEBTOR'S OBLIGATIONS.  Debtor agrees to the following:

(a)  Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Offices (as defined in the Franchise Agreements).

(b)  Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)  Debtor has not executed and will not execute as Debtor any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)  Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)  Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                           Realogy-Sitzer-00000798



SECTION 2 -- DEFAULTS.   Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a)   The failure by Debtor to pay any amount when due under the terms and provisions of the Notes (after applicable grace periods, if any); or

(b)   Debtor's breach of any term, provision, warranty or representation set forth in this Security Agreement or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c)   The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days; or

(d)   The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e)   Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if Debtor does not cure the default within five (5) days of receiving written notice.

SECTION 3 -- REMEDIES AFTER DEFAULT.

(a)   If an Event of Default occurs, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

1)   Declare all obligations secured by this Security Agreement immediately due and payable;

2)   Enforce the security interest given under this Security Agreement and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

3)   Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

4)   Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b)   Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference that Secured Party, chooses in its sole discretion.  Debtor shall remain liable for any deficiency.

SECTION 4 -- INSURANCE PROCEEDS.   So long as no default exists under this Security Agreement, the proceeds of fire and casualty insurance covering the Collateral may be used by Debtor for the repair and restoration of Debtor's facilities or Offices (as defined in the Franchise Agreements).

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000799



SECTION 5 -- DUTIES OF SECURED PARTY. Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as described in this Security Agreement. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

SECTION 6 -- MISCELLANEOUS.

(a)    Waiver.  Any express or implied waiver of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from later enforcing any such provision.

(b)    Governing Law.  This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(c)    Remedies.  All rights and remedies provided in this Security Agreement are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude its further exercise or the exercise of any other right or remedy.

(d)    Financing Statement.  At the same time this Security Agreement is signed, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if a sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created by this Security Agreement. Debtor will sign such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(e)    Notices.  In the event either party desires to give notice to the other with regard to this Security Agreement, the notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail.  Mailed notices as provided under this Security Agreement shall be deemed to be given two (2) days after they are sent.  Such notices shall be sent to the address provided for such party in the Franchise Agreements, unless a party gives notice of a change of its address.

(f)    Successors in Interest.  This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(g)    Amendments.  This Security Agreement may only be amended by a writing signed by both parties.

(h)    Entire Agreement.  This Security Agreement constitutes the entire agreement between the parties regarding the matters discussed in this Security Agreement, all representations or understandings, whether oral or written, having been incorporated or otherwise superseded by this Security Agreement.

(i)    Facsimiles. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and shall be fully binding on all parties.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000800



**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE DEBTOR TO THE TERMS OF THIS SECURITY AGREEMENT.**

WHEREFORE, the parties have signed this Security Agreement effective as of the date set forth above.

**DEBTOR**

By: _____
Name:
Title:   **Authorized Person**
Date:_____

**SECURED PARTY**

By:_____
                     [Authorized Person]
Date: _____



**EXHIBIT G
REAL ESTATE FRANCHISE AGREEMENT**

**STATE LAW ADDENDA**

<u>**CALIFORNIA**</u>

If you are a resident of California, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.  Termination and Non-renewal:  Section 16 of this Agreement relates to renewal and termination of the franchise.  California Business and Professions Codes Sections 20000 through 20043 provide rights to you concerning termination or non-renewal of the franchise.  The Federal Bankruptcy Code also provides rights to you concerning termination of the Franchise Agreement upon certain bankruptcy-related events.  If this Agreement contains a provision that is inconsistent with the law, the law will control.

B.  The Franchise Agreement requires application of the laws of New Jersey.  This provision may not be enforceable under California law.

C.  The Franchise Agreement contains a liquidated damages clause.  Under California Civil Code §1671, certain liquidated damages clauses are unenforceable.

D.  The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the franchise.  This provision may not be enforceable under California law.

<u>**GEORGIA**</u>

If you are a resident of Georgia, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.  Section 20.1 of the Agreement is deleted in its entirety and replaced with the following:

**20.1    In Term.**  During the Term, you, your Owners, officers, guarantors, and  Responsible Broker (for so long as each are engaged or employed by you) will not, directly or indirectly, through ownership or otherwise, engage in any other real estate brokerage business, other than the Business or any Real Estate Related Excluded Business authorized under this Agreement, within 15 miles of any Office authorized under this Agreement without our advance written consent. Moreover, your Owners, officers, guarantors, and Responsible Broker will not engage in any other residential real estate brokerage business or divert real estate brokerage business from the Business in the market you serve.

<u>**ILLINOIS**</u>

If you are a resident of Illinois, or you are a resident of another state and you intend for the franchise to be operational in Illinois, the state law addendum included in Exhibit G-4 amends this Agreement. You must sign the Illinois State Addendum to Franchise Agreement provided in Exhibit G-4.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                           Realogy-Sitzer-00000802



**MARYLAND**

If you are a resident of Maryland or you are a resident of another state and you intend for the franchise to be operational in Maryland, the state law addendum included in Exhibit G-1 amends this Agreement. You must sign the Maryland State Addendum to Franchise Agreement provided in Exhibit G-1.

**MINNESOTA**

If you are a resident of Minnesota, the state law addendum included in Exhibit G-2 amends this Agreement. You must sign the Minnesota Addendum to Franchise Agreement provided in Exhibit G-2.

**NORTH DAKOTA**

If you are a resident of North Dakota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

Revisions: The North Dakota Securities Commissioner has held the following to be appropriate and required revisions to franchise agreements for Franchisees in North Dakota:

      A.     Covenants not to compete on termination or expiration of the franchise agreement that conflict with Section 9-08-06 of the North Dakota Century Code are generally unenforceable in the State of North Dakota.

      B.     North Dakota law provides that any arbitration between Franchisor and Franchisee relating to the franchise be held at a location mutually agreeable to both Franchisor and Franchisee. North Dakota law prohibits mandatory arbitration at a site remote from the location of the franchise.

      C.     North Dakota Franchisees are not required to consent to the jurisdiction of courts outside of North Dakota. All franchise agreements for North Dakota franchises will be governed by the laws of the state of North Dakota.

      D.     Any provision of the franchise agreement requiring the Franchisee to consent to liquidated damages or termination penalties is unfair and inequitable to Franchisees.

      E.     North Dakota Franchisees are not required to sign a general release on the renewal of the franchise agreement. Consequently, any provision of a franchise agreement as it applies to the requirement that Franchisee's execute a general release on renewal does not apply to North Dakota Franchises.

      F.     North Dakota Franchisees are not required to consent to a waiver of the right to a class action. Consequently, Section 22.8 of the Agreement as it applies to the waiver of the right to a class action does not apply to North Dakota Franchisees.

      G.     North Dakota Franchisees are not required to waive their right to a jury trial. Consequently, Section 22.9 does not apply to North Dakota Franchisees.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER          Realogy-Sitzer-00000803



H.   North Dakota Franchisees are not required to consent to a waiver of exemplary and punitive damages. Consequently, Section 22.10 of the Agreement does not apply to North Dakota Franchisees.

I.   This Agreement will be governed by the laws of the state of North Dakota.

## RHODE ISLAND

If you are a resident of Rhode Island, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.   Jurisdiction and Venue: A provision in a franchise agreement restricting jurisdiction or venue to a forum outside Rhode Island or requiring the application of the laws of another state is  void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

B.   Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that:

"A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

This supersedes Section 22.7 or any other contrary provision of the Agreement.

## SOUTH DAKOTA

If you are a resident of South Dakota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.   South Dakota Law:  Section 22.6 of this Agreement relates to the laws governing this Agreement.  Notwithstanding anything to the contrary in Section 22.6, the law regarding franchise registration, employment, covenants not to compete, and other matters of local concern will be governed by the laws of the State of South Dakota.  However, as to contractual and all other matters, this Agreement and all of its provisions will be and remain subject to the application, construction, enforcement and interpretation under the governing law in Section 22.6.

B.   South Dakota Cause of Action:  Section 22.7 of this Agreement relates to, among other things, judicial proceedings between the parties.   Notwithstanding anything to the contrary contained in Section 22.7, under South Dakota law any provision in this Agreement that designates jurisdiction or venue, or that requires Franchisee to agree to jurisdiction or venue, in a judicial forum outside of South Dakota is void with respect to any cause of action which is otherwise enforceable in South Dakota.

C.   Termination:  Section 16 of this Agreement pertains to default and termination of the franchise.  Notwithstanding the provisions of Section 16, you will be provided with 30 days' written notice and opportunity to cure any breach of this Agreement, any failure to

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                              Realogy-Sitzer-00000804
Case 4:19-cv-00332-SRB   Document 597-3   Filed 01/06/22   Page 58 of 63



meet performance and quality standards or any failure to make payments of Royalty Fees required by this Agreement.

    D.       Disclaimers: Notwithstanding anything to the contrary contained in this Agreement, under South Dakota Codified Laws, Section 37-5B-21, any acknowledgment provision, disclaimer or integration clause, or other provision having a similar effect, in this Agreement will not negate or act to remove from judicial review any statement, misrepresentation or action that would violate this Chapter of the Law or a rule or order under this Chapter.

## WASHINGTON

If you are a resident of Washington, the state law addendum included in Exhibit G-3 amends this Agreement. You must sign the Washington Addendum to Franchise Agreement provided in Exhibit G-3.

## WISCONSIN

If you are a resident of Wisconsin, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.       Wisconsin Law: The Wisconsin Fair Dealership Law applies to franchising in the State of Wisconsin. This Law prohibits the termination, cancellation, non-renewal or substantial change of the competitive circumstances of a franchise agreement without good cause.

    B.       Inconsistent Provisions: The Wisconsin Fair Dealership Law supersedes any provisions contained in this Agreement that are inconsistent with the Law. If a conflict under this Agreement arises, the Law will prevail.

    C.       Written Notice: The Wisconsin Fair Dealership Law further provides that 90 days' prior written notice of termination, cancellation, non-renewal or substantial change of the competitive circumstances of a franchise agreement must be given to the Franchisee. The Franchisee has 10 days to cure the non-payment of fees to franchisor and 60 days to cure any other deficiency and, if the deficiency is so cured within the applicable cure period, the notice of termination is void.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER          Realogy-Sitzer-00000805



**EXHIBIT G-1**
**MARYLAND ADDENDUM TO FRANCHISE AGREEMENT**

If you are a resident of Maryland or you are a resident of another state and you intend for the franchise to be operational in Maryland, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.  Franchisee may bring a lawsuit in Maryland against us for claims arising under the Maryland Franchise Registration and Disclosure Law.

    B.  The general release required as a condition to renewal, sale and or assignment/transfer will not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

    C.  Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

    D.  The representations of Franchisee in the Franchise Agreement are not intended, nor will they act, as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

Each provision of this Section will be effective only to the extent that, with respect to the provision, the jurisdictional requirement of the Maryland Franchise Registration and Disclosure Law are met independently without reference to this Section.

       IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date Franchisor signs below.

**FRANCHISOR:**                     **FRANCHISEE:**

**ERA Franchise Systems, LLC**       _____

By:_____      By:_____
Its:_____      Its:_____
Date:_____     Date:_____

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000806



**EXHIBIT G-2**
**MINNESOTA ADDENDUM TO FRANCHISE AGREEMENT**

If you are a resident of Minnesota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A. Termination and Non-renewal: Section 16 of this Agreement relates to renewal and termination of the franchise. With respect to franchises governed by Minnesota law, Franchisor will comply with Minnesota Statutes, Section 80C.14, Subdivisions 3, 4, and 5, which require, except in certain specified cases, that the Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the Agreement.

B. Sections 22.5 through 22.9 of this Agreement relate to judicial proceedings. Judicial proceedings may take place outside of Minnesota. The provisions of Sections 22.5 through 22.9 will not in any way abrogate or reduce any right of Franchisee, as provided under Minnesota Statutes, Chapter 80C, or Minnesota Rule 2860.4400J, including the right to submit matters to the jurisdiction of Minnesota courts or the right to a jury trial.

C. Franchisee Indemnification: We agree to indemnify and save you harmless from any loss, costs or expenses arising out of or related to any claim, suit or demand against you relating to your use of the Marks in accordance with this Agreement.

D. General Release Not Required: Notwithstanding any terms in this Agreement, you are not required to agree to any general release as a condition for approval of any assignment, transfer or renewal of this Agreement.

E. No Waiver of Bond: Notwithstanding any terms of this Agreement, Franchisee is not required to consent in advance as to any application by Franchisor for injunctive relief or to waive any bond.

**FRANCHISOR:**                                    **FRANCHISEE:**

**ERA Franchise Systems, LLC**          _____

By:_____          By:_____
Its:_____          Its:_____
Date:_____          Date:_____

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000807



**EXHIBIT G-3**
**WASHINGTON ADDENDUM TO FRANCHISE AGREEMENT**

If you are a resident of Washington, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A. Termination and Non-renewal: Section 16 of this Agreement relates to renewal and termination of the franchise. Washington statute, RCW 19.100.180 may supersede the franchise agreement in your relationship with Franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the Agreement in your relationship with us, including the areas of termination and renewal of your franchise.

B. Arbitration: In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or as determined by the arbitrator.

C. Governing Law: Section 22.5 of this Agreement prescribes the laws governing this Agreement. Notwithstanding anything to the contrary contained in Section 22.5, in the event of a conflict of law, the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will take precedence.

D. Release or Waiver: Any release or waiver of rights executed by you will not include rights under the Washington Franchise Investment Protection Act except when executed under a negotiated settlement after the Agreement is in effect and where the parties are represented by independent counsel. Provisions like those that unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

E. Transfer Fees: Section 15 of this Agreement relates to franchise ownership and transfer. Section 15.7 requires the transferee of the franchise to pay a transfer fee. Transfer fees are collectable to the extent that they reflect franchisor's reasonable estimated or actual costs in effecting a transfer.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date Franchisor signs below.

**FRANCHISOR:**                                                   **FRANCHISEE:**

**ERA Franchise Systems, LLC**                    _____

By:_____                    By:_____
Its:_____                    Its:_____
Date:_____                    Date:_____

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    Realogy-Sitzer-00000808



**EXHIBIT G-4**
**ILLINOIS ADDENDUM TO FRANCHISE AGREEMENT**

If you are a resident of Illinois or you are a resident of another state and you intend for the franchise to be operational in Illinois, to the extent 815 ILCS 705/1 et seq. (the Illinois Franchise Disclosure Act, Ill) applies, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

      A.      Illinois law governs the Franchise Agreement.

      B.      Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a franchise agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration outside of Illinois.

      C.      Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

Your rights upon termination and non-renewal of a franchise agreement are set forth in section 19 and 20 of the Illinois Franchise Disclosure Act.

      IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date Franchisor signs below.

**FRANCHISOR:**                          **FRANCHISEE:**

**ERA Franchise Systems, LLC**       _____

By:_____      By:_____
Its:_____      Its:_____
Date:_____     Date:_____

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      Realogy-Sitzer-00000809