## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

SCOTT AND RHONDA BURNETT, RYAN )
HENDRICKSON, JEROD BREIT, SCOTT )
TRUPIANO, AND JEREMY KEEL, on behalf )
of themselves and all others similarly situated, )
                                  )
                Plaintiffs, )
                                  )
      v. )         Case No. 19-CV-00332-SRB
                                  )
THE NATIONAL ASSOCIATION OF )
REALTORS, REALOGY HOLDINGS CORP., )
HOMESERVICES OF AMERICA, INC., BHH )
AFFILIATES, LLC, HSF AFFILIATES, LLC, )
RE/MAX LLC, and KELLER WILLIAMS )
REALTY, INC., )
                                  )
                Defendants. )

## ORDER

Before the Court is Plaintiffs Rhonda Burnett, Scott Burnett, Ryan Hendrickson, Jerod

Breit, Scott Trupiano, and Jeremy Keel's (collectively, "Plaintiffs") Motion for Class

Certification. (Doc. #459.) The Court held oral arguments on April 18, 2022. For the reasons

stated below, the motion is GRANTED.

## TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................................2

II.     LEGAL STANDARD................................................................................................8

III.    DISCUSSION .........................................................................................................9

      A. Requirements Under Rule 23(a) ........................................................................9
         1. Numerosity.........................................................................................................9
         2. Commonality....................................................................................................10
         3. Typicality .........................................................................................................11
         4. Adequacy .........................................................................................................15

      B. Requirements Under Rule 23(b)(3) ....................................................................19
         1. Common Questions Predominate Individual Questions ..................................19

      i.   Subject MLS Class ...................................................................20
           a.  Common Evidence of a Conspiracy ....................................20
           b.  Common Evidence of Impact ..............................................22
                 I.   Australia as an Adequate Benchmark ...........................25
                 II.  Why Sellers Make Buyer Broker Compensation Offers...............27
                 III. Uninjured or Worse Off Class Members .......................29
                 IV. Common Evidence of Steering ....................................30
                 V.  Realogy .................................................................31
           c.  Common Evidence of Damages............................................32
      ii.  Missouri Antitrust Law-Subject MLS Class.............................36
      iii.  MMPA Class.....................................................................36
    2.  Class Certification is the Superior Method to Adjudicate This Case .............39

    C.  Notice Requirements Under Rule 23(c)(2)(B) ....................................39

IV.     CONCLUSION.............................................................................40

# I. BACKGROUND

Plaintiffs bring this lawsuit alleging anticompetitive trade practices within the residential real estate market. Plaintiffs allege that Defendant National Association of Realtors ("NAR"), created and implemented anticompetitive rules which require home sellers to pay commission to the broker representing the home buyer. Plaintiffs also allege that Defendants Home Services of America, Inc. ("Home Services"),[1] Keller Williams Realty, Inc. ("Keller Williams"), Realogy Holdings Corp. ("Realogy"), and RE/MAX, LLC's ("RE/MAX") (collectively, the "Corporate Defendants") enforce those rules through anticompetitive practices. Plaintiffs represent putative classes of home sellers who listed their homes for sale on one of several regional real estate listing marketplaces subject to NAR's and Corporate Defendants' (collectively, "Defendants") anticompetitive rules and practices. The following facts are taken from Plaintiffs' Second

---

[1] HomeServices is also the parent company of Defendant HSF Affiliates, LLC, and Defendant BHH Affiliates, LLC.

Amended Class Action Complaint (Doc. #477)[2] and from the parties' briefs and attached exhibits.[3]

A vast majority of residential real estate sales and purchases in the United States are facilitated through a Multiple Listing Service ("MLS"). An MLS is a centralized database of properties which allows real estate brokers and agents to identify homes for sale within a defined geographic region. In a typical real estate transaction, the home seller retains a seller broker, and the home buyer retains a buyer broker. Real estate brokers generally receive compensation via commission, calculated as a percentage a home's sale price. The seller broker's compensation rate is set forth in a listing agreement, a contract between the home seller and broker. This listing agreement typically states that a portion of the seller's commission will be paid to the buyer broker representing the home buyer who purchases the property. A home buyer enters a similar contract with a buyer broker, which typically states the buyer broker's compensation will be paid out of the seller broker's total commission.

NAR is a national trade association of real estate brokers and agents. NAR members consist of over 1,200 local realtor associations or boards and fifty-four state and territorial realtor associations. NAR is governed by a Board of Directors. The local realtor associations own and operate various MLSs, including the Heartland MLS, Columbia Board of Realtors ("CBOR"), Mid America Regional Information System ("MARIS"), and the Southern Missouri Regional

---

[2] When the motion for class certification was filed, the operative complaint was the First Amended Class Action Complaint. (Doc. #38.) Plaintiffs explain that the Second Amended Complaint substituted certain class representatives. Neither Plaintiffs nor Defendants argue that the filing of the Second Amended Class Action Complaint materially impacts the motion for class certification, and the Court finds it does not.

[3] Only those facts necessary to resolve the pending motion are discussed below, and those facts are simplified to the extent possible. The Court notes that discovery is still ongoing, and as such these are preliminary findings of fact and are only determined for the purposes of resolving this motion. Further relevant facts are discussed in Section III.

MLS (collectively, the "Subject MLSs").  Plaintiffs represent classes of home sellers who listed their property on one of the four Subject MLSs.

NAR promulgates mandatory rules and procedures for the operation of MLSs in its Handbook on Multiple Listing Policy ("NAR Handbook").  NAR also requires its members and MLSs to follow and enforce NAR's Code of Ethics.  Plaintiffs allege that certain rules in both the NAR Handbook and Code of Ethics (the "Challenged Rules")[4] require sellers to make a blanket unilateral offer of compensation to any broker representing potential buyers as a condition of listing their home on a Subject MLS.  Plaintiffs allege the enforcement of the Challenged Rules results in price-fixing which artificially inflates residential real estate broker commissions paid by home sellers because, without these mandatory rules, sellers would not compensate the broker representing their adversary (the buyer) in the transaction.  The Challenged Rules are:

(1) NAR Handbook, Section 2-G-1

This Challenged Rule, which Plaintiffs refer to as the "Adversary Commission Rule," is the cornerstone of Plaintiffs' alleged price-fixing conspiracy.  The Adversary Commission Rule states, in part:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. . . .

> Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships.

---

[4] Plaintiffs refer to the Challenged Rules as the "Challenged Restraints."  Defendants refer to the Challenged Rules as the "Rules at Issue."  The Court will refer to the relevant NAR rules as the "Challenged Rules."

(Doc. #553-25, pp. 50-51.)[5]  Plaintiffs contend this Challenged Rule requires every seller to

make a non-negotiable offer of buyer broker compensation.

(2) NAR Code of Ethics, Standard of Practice 16-15

Standard of Practice 16-15 of the NAR Code of Ethics provides that "In cooperative

transactions REALTORS®[6] shall compensate cooperating REALTORS®[.]"   (Doc. #459-22,

p. 8.)  Plaintiffs allege this rule, like the Adversary Commission Rule, requires sellers to offer

compensation to the buyer broker.

(3) NAR Code of Ethics, Standard of Practice 16-16, which states:

REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall
not use the terms of an offer to purchase/lease to attempt to modify the listing
broker's offer of compensation to subagents or buyer/tenant representatives or
brokers nor make the submission of an executed offer to purchase/lease contingent
on the listing broker's agreement to modify the offer of compensation.

(Doc. #459-22, p. 8.)  Plaintiffs contend this rule impedes consumers' ability to negotiate the

offer of buyer broker compensation.

(4) NAR Code of Ethics, Standard of Practice 3-2, which provides:

Any change in compensation offered for cooperative services must be
communicated to the other REALTOR® prior to the time that REALTOR®
submits an offer to purchase/lease the property.  After a REALTOR® has submitted
an offer to purchase or lease property, the listing broker may not attempt to
unilaterally modify the offered compensation with respect to that cooperative
transaction.

(Doc. #459-22, p. 4.)  Plaintiffs allege that this Challenge Rule "strengthens the Adversary

Commission Rule and serves to inflate commissions by eliminating opportunities for consumers

---

[5] Page numbers refer to pagination automatically generated by CM/ECF.

[6] NAR defines a "REALTOR® as a federally registered collective membership mark which identifies a real estate
professional who is [a] member of the NATIONAL ASSOCIATION OF REALTORS® and subscribes to its strict
code of ethics."  (Doc. #459-34, p. 2.)

to be able to negotiate the existence or amount of the buyer broker commission."  (Doc. #459-22, p. 23.)

Plaintiffs also claim that, during most of the class period, the NAR Code of Ethics encouraged buyer brokers to represent to their clients that their services were free.  Plaintiffs also allege the buyer broker commission offers on the Subject MLSs are hidden from public view. Plaintiffs argue these practices help enforce the Challenged Rules and prevent a buyer and seller from negotiating commission rates.

The Subject MLSs adopt the Challenged Rules by requiring each MLS "Participant" to be a "REALTOR®."  (*See, e.g.*, Heartland MLS Rules & Regulations, Doc. #459-22, p. 8.) NAR also requires the Subject MLSs to adopt NAR policies, including the Challenged Rules, and failure to do so "will lead to the denial of insurance coverage under NAR's Errors and Omissions Insurance policy."  (Doc. #459-19.)  Further, NAR may discipline brokers or local realtor associations who do not comply with the Challenge Rules, including "substantial fines, suspension, and termination of MLS rights and privileges."  (Doc. #553-25, p. 50.)

Plaintiffs allege that the Corporate Defendants have conspired with NAR to ratify and enforce the Challenged Rules.  Corporate Defendants are national real estate broker franchisors that operate brokerage subsidiaries, franchisees, or affiliates within the geographic regions covered by the Subject MLSs.  The Corporate Defendants actively participate in NAR, with some of their high-level employees occupying influential positions.  Plaintiffs contend that the Corporate Defendants require each of their franchisees, subsidiaries, brokers, and agents to abide by the Challenged Rules.  For example, Plaintiffs point to various Policies and Procedures Manuals and Franchise Disclosure Documents of the Corporate Defendants which require compliance with the NAR Code of Ethics and either require or strongly encourage NAR and

local MLS membership. Plaintiffs argue enforcement of the Challenged Rules is important to the Corporate Defendants because most of their profits are derived from broker commission rates. For example, approximately "80% of Realogy's revenue" in 2017 came from commissions. (Doc. #459-14, p. 3.) Plaintiffs also allege Corporate Defendants provide sales scripts to their brokers and agents with canned responses to prevent sellers from deviating from the standard offer of buyer broker compensation.

Plaintiffs contend the adoption and enforcement of the Challenged Rules has resulted in class members paying buyer broker commissions, and thus total commissions, that have been inflated to an anticompetitive level in the areas in which the Subject MLSs operate. Plaintiffs allege Defendants have engaged in an illegal conspiracy, or unfair practices, to harm the class members, and assert the following causes of action: Count I: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;[7] Count II: Violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020; and Count III: Violation of Missouri Antitrust Law, Mo. Rev. Stat. § 416.031.

Plaintiffs now move for class certification under Federal Rules of Civil Procedure 23. Plaintiffs seek certification of the following classes:

(1) the "Subject MLS Class," asserting Count I, defined as:

> All persons in the United States who, from April 29, 2015 through the present, used a listing broker affiliated with a Corporate Defendant in the sale of a home listed on a Subject MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

(2) the "Missouri Antitrust Law-Subject MLS Class," asserting Count III, defined as:

> All persons who, from April 29, 2015 through the present, used a listing broker affiliated with a Corporate Defendant in the sale of a home in Missouri listed on a

---

[7] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.

Subject MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

and (3) the "MMPA Class," asserting Count II, defined as

All persons who, from April 29, 2014 through the present, used a listing broker affiliated with a Corporate Defendant in the sale of a residential home in Missouri listed on a Subject MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

Defendants oppose the motion. The parties' arguments are addressed below.

## II. LEGAL STANDARD

Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23 requires a plaintiff to satisfy all four prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, a plaintiff "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original).

A district court "must undertake a 'rigorous analysis' to ensure that the requirements of Rule 23 are met." *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011). The Rule 23 analysis will frequently overlap to some extent with the merits of the underlying claims. *Dukes*, 564 U.S. at 351. However, there are limits to a court's analysis of the merits of a matter at the class certification stage. "A court's inquiry on a motion for class certification is 'tentative,' 'preliminary,' and 'limited.'" *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class

certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

## III.  DISCUSSION

Plaintiffs seek class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3).  The Court will rigorously analyze the Motion for Class Certification in accordance with the requirements of Rule 23.  Consistent with the parties' briefing, the Court will address the Rule 23(a) requirements as they pertain to the three proposed classes together, noting any arguments specific to one proposed class.  The Court will then address the Rule 23(b)(3) requirements, which constitute the bulk of the parties' dispute.

### A. Requirements Under Rule 23(a)

Under Rule 23(a), a proposed class must satisfy four elements: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative party are typical of the claims or defenses of the class (typicality); and (4) the representative party will fairly and adequately protect the interests of the absent class members (adequacy). Fed. R. Civ. P. 23(a).  Each element is addressed below.

#### 1.  Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  In determining whether the numerosity requirement is satisfied, "the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joinder is relevant." *Emanuel v. Marsh*, 828 F.2d 438, 444 (8th Cir. 1987), *cert. granted and judgment vacated on other grounds*, 487 U.S. 1229 (1988) (citing *Paxton v. Union Nat. Bank*, 688 F.2d 552, 559–560 (8th Cir. 1982)).

Plaintiffs estimate each proposed class includes "hundreds of thousands of class members geographically dispersed throughout the state of Missouri and portions of Kansas and Illinois." (Doc. #459, p. 42.) Defendants do not dispute Plaintiffs estimates or that the numerosity requirement is met. As a result, the Court agrees with Plaintiffs that joining hundreds of thousands of plaintiffs is impracticable. *See, e.g.*, *Ark. Educ. Ass'n v. Bd. Of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971) (twenty class members sufficient); *Paxton*, 688 F.2d at 561 (impracticable to join some portion of the seventy-four class members). Plaintiffs have satisfied the Rule 23(a)(1) numerosity requirement.

### 2. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 349–50. The "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350. Commonality "'does not require that every question of law or fact be common to every member of the class . . . and may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Downing v. Goldman Phipps PLLC*, No. 13-206 CDP, 2015 WL 4255342, at *4 (E.D. Mo. July 14, 2015) (quoting *Paxton*, 688 F.2d at 561).

Here, Plaintiffs argue many issues are common to the classes, including: (1) whether the conspiracy was implemented in the areas in which the Subject MLSs operate; (2) whether the

conspiracy violates Section 1 of the Sherman Act; (3) whether the conspiracy violates the Missouri Antitrust Statute; (4) whether the Challenged restrains are unfair within the meaning of the MMPA; (5) the duration, scope, extent, and effect of the conspiracy; (5) whether a *per se* or rule of reason analysis should apply;[8] and (6) whether Plaintiffs and other members of the classes are entitled to, among other things, damages and/or injunctive relief.

Upon review, the Court agrees. For the purposes of Rule 23(a)(2),[9] whether Defendants conspired to enforce the Challenged Rules to artificially inflate seller broker commission rates creates common questions of fact. Whether that conspiracy amounts to an antitrust violation under federal and Missouri law, or whether it amounts to unfair practices under the MMPA, creates common question of law. Plaintiffs have satisfied the Rule 23(a)(2) commonality requirement.

### 3. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." "The burden of demonstrating typicality is fairly easily

---

[8] The parties dispute whether this case is a *per se* antitrust violation or if the Court should adopt a "rule of reason" approach. Plaintiffs contend this is a *per se* case and argue that those types of antitrust cases are routinely certified as class actions. Defendants argues this is not a *per se* case and that the rule of reason should apply. Neither party discusses how this analysis would impact class certification other than Plaintiffs claiming *per se* cases are routinely certified.

"When a restraint's negative impact on competition is immediately discernable and the restraint has no redeeming virtue, the *per se* mode of analysis applies." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 773 (8th Cir. 2004). "The *per se* mode of analysis applies a conclusive presumption of illegality." *Id.* (internal citations and quotations omitted). Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.* at 772-73.

The Court notes that discovery is still ongoing in this case and thus it is premature to make this determination. Regardless of whether the *per se* rule or rule of reason applies, the Court finds class certification is appropriate.

[9] Defendants do not directly argue the Rule 23(a)(2) commonality requirement, but instead focuses their arguments on whether common questions predominate under Rule 23(b)(3). The Court will address these issues in more detail when analyzing the predominance element.

met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996). "In the antitrust context, typicality is established when the named plaintiffs and all class members alleged the same antitrust violations by defendants. Specifically, named plaintiffs' claims are typical in that they must prove a conspiracy, its effectuation, and damages therefrom – precisely what the absent class members must prove to recover." *Hyland v. Homeservices of Am., Inc.*, No. 3:05-CV-612-R, 2008 WL 4858202, at *4 (W.D. Ky. Nov. 7, 2008) (internal citations and quotations omitted).

Plaintiffs argue their claims are typical of the members of the proposed classes because all class members were subject to the Challenged Rules, each class member used a Corporate Defendant to list a home on a Subject MLS, each class member paid a buyer broker, and Plaintiffs' and class members' claims are based on the same legal theories. Defendants argue that Plaintiffs lack standing, and therefore cannot show typicality, as to class members who used the Southern Missouri Regional MLS or CBOR MLS because "(1) Plaintiffs' assert[] that each MLS is a distinct relevant market for antitrust purposes, and (2) [there is a] lack of participation in the Southern Missouri [Regional] or CBOR MLS 'markets' by any named Plaintiff." (Doc. #553, p. 95.) In their reply brief, Plaintiffs argue that Defendants conflate the standing requirement with the typicality requirement, and Plaintiffs' claims are typical of the unnamed

class members who sold a home through the CBOR and Southern Missouri Regional MLSs because they suffered the same harm caused by Defendants. The Court agrees with Plaintiffs.

"A fundamental requirement of representatives in a class action is that they must be members of the subclasses they seek to represent." *Se. Missouri Hosp. v. C.R. Bard, Inc.*, No. 1:07cv0031 TCM, 2008 WL 4372741, at *4 (E.D. Mo. Sept. 22, 2008) (quoting *Roby v. St. Louis Sw. Ry. Co.*, 775 F.2d 959, 961 (8th Cir.1985)). "The representatives must possess the same interest and suffer the same injury as their fellow class members." *Id.* First, regarding standing, Defendants do not argue that Plaintiffs lack standing to bring their own individual antitrust claims. Each plaintiff sold a home subject to the Challenged Rules. Nor do Defendants claim Plaintiffs are not members of the classes they seek to represent. In turn, the Court finds that Plaintiffs have standing as to their individual claims and to represent the putative classes.

Regarding typicality, Defendants rely, in part, on *In re Milk Products Antitrust Litigation.*, 195 F.3d 430 (8th Cir. 1999), to support their contention that Plaintiffs cannot represent class members who listed their homes on the Southern Missouri Regional MLS and CBOR MLS because those MLSs represent distinct markets. *Milk Products* involved price-fixing allegations in the Minnesota milk industry. *Id.* at 432. The typicality concern in that case was not that the named plaintiff failed to participate in each distinct geographical milk market in Minnesota. Instead, the concern was that "[the plaintiff] operated a small convenience store in northernmost Minnesota, [and thus] 'any evidence regarding an alleged conspiracy in [the plaintiff's] geographic area would not necessarily translate into evidence of a conspiracy in other regions of Minnesota." *Id.* at 436. "Milk is a perishable and rather bulky product. . . . The district court was legitimately concerned that [the plaintiff's] isolated location made it an inappropriate sole representative for this large, State-wide class." *Id.*

Here, the Court is not met with the same geographical concerns as the court in *Milk Products* because the Subject MLSs are bound by the same Challenged Rules regardless of location. To demonstrate compliance with the typicality requirement, Plaintiffs attach the relevant language in each Corporate Defendant's Franchise Disclosure Documents that Plaintiffs argue help enforce the Challenged Rules. The language does not differ based on the MLS. NAR's Code of Ethics and the NAR Handbook also apply to each Subject MLS uniformly. Similarly, the Subject MLSs each require a seller to submit a blanket, unilateral offer of compensation to the buyer broker. Based on those identical rules, the Court finds no substantive distinction between the Southern Missouri Regional MLS and the CBOR MLS compared to the other MLS markets that would preclude a finding of typicality.

Upon review, at this stage of the litigation, Plaintiffs have sufficiently shown that the legal theories and remedial relief that apply to both Plaintiffs' claims and the class members who sold a home using the CBOR MLS and Southern Missouri Regional MLS. Each class member seeks damages based on the same theory of harm: Defendants' conspiracy to implement and enforce the Challenged Rules caused home sellers to pay a buyer broker commission, or at least a fixed, inflated commission, that they would not have otherwise paid as a condition of listing their market on a Subject MLS.[10] Plaintiffs have thus satisfied the Rule 23(a)(3) typicality requirement. *See, e.g., Hyland*, 2008 WL 4858202, at *4 (finding Rule 23(a)(3) typicality because "Plaintiffs' claims arise from an alleged conspiracy to fix real estate broker's commission rates. . . . Plaintiffs allege that they paid a higher rate than they would have absent the conspiracy. . . . [and] every class member's claim is based on the same legal theory – conspiracy to fix prices in violation of Section 1 of the Sherman Act").

---

[10] Defendants' arguments are targeted specifically at the antitrust classes. For the same reasons discussed in this section, the Court finds Plaintiffs' claims are typical of the members of the MMPA Class.

Alternatively, Plaintiffs request that they be granted leave to amend their Second Amended Complaint to add as named plaintiffs individuals who sold a home that was listed on the CBOR and Southern Missouri Regional MLS. As discussed above, typicality is present absent an amendment. However, for good cause stated, the Court grants Plaintiffs' request to add two additional plaintiffs.

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Lopez v. Tyson Foods*, No. 8:06CV459, 2008 WL 3485289, at *18 (D. Neb. Aug. 7, 2008) (quoting *Paxton*, 688 F.2d at 562). The requirement of adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy has been found in antitrust cases alleging a common conspiracy when the named plaintiffs shared the "same interests as the other class members in proving they were all damaged by defendants' alleged price-fixing conspiracy." *Urethane Antitrust Litig.* II, 251 F.R.D. 629, 644 (D. Kan. 2008); *see also Hyland*, 2008 WL 4858202, at *5 (finding the adequacy requirement satisfied where "[a]ll class members, including Plaintiffs, have an interest in establishing the existence of the alleged conspiracy[] [and] Plaintiffs, as well as the members of the putative Class, were allegedly injured by Defendants in the same manner and seek substantially identical relief").

Plaintiffs argue they are adequate class representatives because they share a common interest with the proposed classes and have willingly participated in the litigation of this case.[11] Defendants argue that Plaintiffs are not adequate because their interests conflict with the interests of some class members who actually benefitted from the Challenged Rules. For example, Defendants contend that some home sellers throughout the class period purchased a more expensive home than the home they sold through a buyer broker who was paid by the seller. Defendants argue these class members gained a net benefit from the Challenged Rules because the buyer broker commission they had to pay as a seller was less than the buyer broker commission paid when they were a buyer. Defendants also state that seller-paid buyer broker commissions increase the pool of potential buyers, specifically, cash-constrained or first-time home buyers who cannot afford to pay a buyer broker themselves.[12]

Upon review, the Court finds that Defendants' argument that some class members benefitted or were otherwise uninjured from the Challenged Rules does not defeat adequacy. First, this argument misstates Plaintiffs' theory of the case. As explained in greater detail in the context of Rule 23(b)(3), Plaintiffs rely on the expert testimony of Dr. Craig T. Schulman ("Dr. Schulman"). Dr. Schulman opines that, in a world without the Challenged Rules (the "but-for world"), buyer brokers would be eliminated, or at the very least, would be rare, around "1% to 5% of real estate sales." (Doc. #459-23, p. 114.) Dr. Schulman based this conclusion, in part, by

---

[11] Defendants do not dispute, and the Court finds, that Plaintiffs are represented by qualified counsel.

[12] Defendants also argue that Plaintiff Ryan Hendrickson ("Hendrickson") is not a member of the class he purports to represent. Defendants contend that Hendrickson's brokerage "is not affiliated with Keller Williams" or any other Corporate Defendant and thus he is not an adequate class representative. (Doc. #553, p. 83.) Plaintiffs in response attach emails between Hendrickson and his brokerage which show that, at the very least, the brokerage represented to Hendrickson that it was a Keller Williams affiliate. At this stage of the litigation, the Court need not determine the actual affiliation of Hendrickson's brokerage. Defendants do not dispute that another named plaintiff, Jeremy Keel, used a Keller Williams affiliated brokerage and all Corporate Defendants are otherwise represented by a named plaintiff.

comparing the United States real estate market to similar countries that do not have the Challenged Rules, such as Australia. Even if home sellers would still offer buyer broker compensation in the but-for world, Dr. Schulman also opines that the Challenged Rules "virtually eliminate the ability to negotiate on commissions, as they remove all incentive for buyers to negotiate the amount of their agent's fee, and they punish sellers for attempting to offer a fee that is lower than the going rate." (Doc. #114, p. 40.)

Accordingly, in Plaintiffs' alleged but-for world, all class members would benefit from removal of the Challenged Rules even if they did not have to compensate their own buyer broker. This is because, absent the Challenged Rules, (1) class members would not have used a buyer broker, (2) class members would pay a lesser, more competitive buyer broker commission rate – and thus broker rates would still be free to buyers – or (3) the cost of buyer broker fees would significantly decrease because buyers would be incentivized to negotiate their fee. A conflict therefore does not exist among the class members. Each class member has the same interest in establishing the existence of the conspiracy, and the class members were allegedly injured by Defendants in the same manner and seek substantially identical relief – reimbursement of the overcharged buyer broker commission. At this stage of the litigation, Plaintiffs have provided sufficient evidentiary proof demonstrating that all class members were harmed and do not possess conflicting interests in the outcome of this litigation.

Furthermore, the Court finds Defendants' conflict argument is legally insufficient. Defendants rely on *Valley Drug Co v. Geneva Pharm., Inc.*, 350 F.3d 1181 (11th Cir. 2003), to support their contention that an irreconcilable conflict exists among Plaintiffs and class members who supposedly benefited from the Challenged Rules. In *Valley Drug*, the plaintiffs did "not offer[] any facts to challenge the defendants' assertions that the three national wholesalers,

whose transactions with [defendant] constitute over fifty percent of the plaintiffs' total claims, experienced a net gain" from the allegedly unlawful monopoly. *Id.* at 1190. "By contrast . . . the defendants strenuously argue[d] that a number of the parties included in the class certified by the district court . . . arguably make more money" due to the defendants allegedly unlawful practices. *Id.* at 1190-91. The Eleventh Circuit stressed that "we do not here pass judgment on the ultimate legitimacy of [the defendants'] arguments. It may turn out that the [class members] . . . do not experience a net benefit[.]" *Id.* at 1192. Unlike the plaintiffs in *Valley Drug*, Plaintiffs in this case do offer facts which demonstrate that, if Plaintiffs' allegations are true, potential class members do not benefit from Defendants' alleged price-fixing conspiracy.

Furthermore, "*Valley Drug Co.* . . . has been met with almost universal criticism" because it conflicts with the Supreme Court's rulings in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *In re Glumetza Antitrust Litig.*, 2020 WL 3498067, at *12 (N.D. Cal. July 29, 2020) (collecting cases). Under *Hanover Shoe* and *Illinois Brick*, a plaintiff "may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust injury occurs and is complete when the defendant sells at the illegally high price." *Meijer, Inc. v. Abbott Labs.*, 246 F.R.D. 431, 304 (N.D. Cal. 2008) (internal citations and quotation marks omitted). "[B]ecause all class members have the right to pursue overcharge damages, there is no conflict among class members allegedly harmed by the same violation." *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-5525, 2008 WL 1946848, at *6 (E.D. Pa. May 2, 2008) (declining to follow the

"conflict" rationale adopted in *Valley Drug*). Accordingly, Plaintiffs have satisfied the Rule

23(a)(4) adequacy requirement.[13]

**B. Requirements Under Rule 23(b)(3)**

If Rule 23(a) is satisfied, the party seeking certification "must also satisfy through

evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast,* 569 U.S. at 33.

Plaintiffs move for class certification under Rule 23(b)(3), which requires a finding that:

> The questions of law or fact common to class members predominate over any
> questions affecting only individual members, and that a class action is superior to
> other available methods for fairly and efficiently adjudicating the controversy. The
> matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution
>> or defense of separate actions;
>> (B) the extent and nature of any litigation concerning the controversy
>> already begun by or against class members;
>> (C) the desirability or undesirability of concentrating the litigation of the
>> claims in the particular forum; and
>> (D) the likely difficulties in managing a class action.

**1. Common Questions Predominate Individual Questions**

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."

*Comcast*, 569 U.S. at 34. "The predominance inquiry tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation . . . and goes to the efficiency of a

class action as an alternative to individual suits." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479

(8th Cir. 2016) (internal citations omitted). "What matters to class certification . . . is not the

raising of common 'questions'—even in droves—but rather, the capacity of a classwide

proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564

U.S. 338 at 350. The predominance inquiry "asks whether the common, aggregation-enabling,

---

[13] Again, the parties' arguments appear to be targeted specifically at the Subject MLS and Missouri Antitrust Law-Subject MLS classes, not the MMPA Class. For the same reasons discussed above, the Court finds Plaintiffs have established the adequacy requirement for the MMPA Class.

issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) (citations and quotation marks omitted). "To determine whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). "In conducting this preliminary inquiry, however, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Id.*

Because the predominance inquiry must "begin by considering the nature of the plaintiffs' claim to determine whether it is suitable for class certification," the Court will address each class separately. *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020).

### i. Subject MLS Class

The Subject MLS Class alleges that Defendants' buyer-broker-commission conspiracy violates the Sherman Act, 15 U.S.C. § 1. "To establish a claim under the antitrust laws, the plaintiffs must prove "(1) a violation of antitrust law; (2) injury and causation; and (3) damages." *In re Air Cargo Shipping Serv. Antitrust Litig.*, No. 06-md-1175, 2014 WL 7882100, at *35 (E.D.N.Y. Oct. 15, 2014) (internal citation omitted). For an antitrust violation to be certified, "plaintiffs need to demonstrate that common issues prevail as to the existence of a conspiracy and the fact of injury." *Blades*, 400 F.3d at 566. The Court will address each element in turn.

### a. Common Evidence of a Conspiracy

To satisfy the conspiracy element, "the plaintiff must demonstrate that the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds." *Insulate SB, Inc. v. Advanced Finishing Sys. Inc.*, 797 F.3d 538, 544 (8th Cir. 2015) (internal

citations and quotations omitted). "Because defendants typically cannot be relied on to confess that they have entered into an unlawful agreement, conspiracy cases usually must be proved by circumstantial evidence." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004) (internal citations and quotations omitted). "The mere act of agreeing to raise prices, even if the undertaking agreed upon is 'wholly nascent or abortive,' violates the prohibition of conspiracies in restraint of trade of section one of the Sherman Act." *Blades*, 400 F.3d at 572 (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59 (1940)). "Evidence that [the defendants] entered into a conspiracy that would affect all class members would perforce be evidence common to all class members for proving the conspiracy." *Id.*

At the class certification stage, Plaintiffs must demonstrate through evidentiary proof that, if Plaintiffs' allegations are true, a conspiracy can be proven with common evidence. After conducting a rigorous analysis, the Court finds that Plaintiffs have met their burden. For example, Plaintiffs attach Defendants' own documents, including Franchise Disclosure Documents and Subject MLS procedures, requiring compliance with NAR policies including the Challenged Rules. Plaintiffs allege these documents demonstrate that Defendants entered a conspiracy to artificially inflate commission rates for the entire class. Whether Defendants entered a conspiracy in violation of antitrust law creates common issues of fact and law common to the class. In contrast, Defendants do not provide any individual issues which would be more important than those common questions.

Realogy, in a separate opposition brief, argues it "is in favor of eliminating the mandatory aspect of NAR's [Challenged Rules] . . . . However, only NAR can change the [Challenged Rules]; Realogy is powerless to do so." (Doc. #556, p. 4.) Upon review, the Court agrees with Plaintiffs that, at this this stage of the litigation, "Plaintiffs have assembled ample evidence in the

motion showing Realogy's involvement with NAR and its requirement that its subsidiaries and franchisees comply with the relevant NAR rules[.]" (Doc. #638, p. 2.) For example, Plaintiffs quote language from Realogy's February 23, 2021 Annual Report filed with the Securities and Exchange Commission, which states:

> Multiple Listing Services Rules. We are a member of many multiple listing services ("MLSs"), a member-owner of certain MLSs, and a member of the National Association of REALTORS ("NAR") and respective state realtor associations and, accordingly, are subject to each group's rules, policies, data licenses, and terms of service, which specify, among other things, how we may access and use MLS data and listings and how MLS data and listings must be displayed on our and our franchisees' websites and mobile applications.

(Doc. #459, p. 32) (emphasis removed). Realogy also admits that it requires its affiliates to follow the NAR Code of Ethics, which Plaintiffs allege are integral to enforcement of the conspiracy. At best, this issue goes to the merits of the case, not whether common issues predominate. Because the existence of a conspiracy focuses on Defendants' conduct, the Court finds common issues prevail.

### b. Common Evidence of Impact

"To meet the predominance requirement, the party seeking certification must show that the fact of antitrust impact can be established through common proof and that any resulting damages would likewise be established by sufficiently common proof." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015) (cleaned up). "Plaintiffs must do more than present 'common evidence that defendants colluded to raise [prices]'; they 'must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy.'" *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *5 (W.D. Mo. Nov. 9, 2021) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013)). "[A]n expert is 'required to construct a

hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive.'" *Blades,* 400 F.3d at 569 (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir.2000)). At the class certification phase, "the question is whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact." *B & R Supermarket Inc. v. Mastercard Int'l Inc.*, No. 17-cv-02738 (MKB) (JO), 2021 WL 234550, at *22 (E.D.N.Y. Jan. 19, 2021) (internal citations and quotations omitted).

Plaintiffs argue their alleged antitrust impact is capable of proof through common evidence. To prove the existence of an overcharge, Plaintiffs submit the expert opinions of Dr. Schulman.[14] Dr. Schulman analyzed Defendants' data, third-party transaction data, and Subject MLS commission data, to show that commission rates remain uniformly high throughout the class period. Dr. Schulman explains that the Challenged Rules must be the cause of sellers offering buyer broker compensation, because otherwise a seller would not pay for the services used by their adversary (the buyer). Dr. Schulman also uses a regression analysis to show that the Challenged Rules and Defendants' training materials lead to "steering," in which buyer brokers steer clients away from home sellers who offer less-than-standard commission rates.

Dr. Schulman basis part of his analysis by looking to benchmark countries, which, through use of commonly available economic data, have similar real estate markets as the United States, but do not have the Challenged Rules. To identify which countries would be the best comparators to the United States, Dr. Schulman looked at Defendants' own comparison of six countries in the Definitive Analysis of Negative Game Changers Emerging in Real Estate

---

[14] The Court previously determined that Dr. Schulman's opinions satisfy the *Daubert* admissibility requirement at the April 18, 2022, oral arguments on Plaintiffs' Motion for Class Certification. (Doc. #733.) The Court's analysis in this section is focused on whether Plaintiffs, in part through the opinions of Dr. Schulman, can meet the Rule 23(b)(3) predominance inquiry regarding antitrust impact.

("D.A.N.G.E.R.") Report.  The D.A.N.G.E.R. report was commissioned by NAR and discusses that the United States real estate market may be susceptible to a "gradual downward slide or a realignment of fees as charged in other countries in the world," such as Australia, the United Kingdom, Belgium, Netherlands, Singapore, and Germany (collectively, the "D.A.N.G.E.R. Countries").  (Doc. #459-63, p. 6.)  Dr. Schulman opines that the D.A.N.G.E.R. countries are good potential benchmark countries because: (1) the D.A.N.G.E.R. Report highlighted these countries as comparators to the US; (2) they are well-developed, market-based, rule-of-law countries where property rights are well established; and (3) in none of these countries are there rules requiring sellers to make offers of buyer broker compensation.  Dr. Schulman specifically determined that out of the D.A.N.G.E.R. countries, Australia was the best benchmark country of its similar history to the United States and "are very similar based on various economic indices." (Doc. #459-23, p. 110.)

Dr. Schulman demonstrates through these benchmark countries that, in the but-for world, (1) sellers would not pay for buyer's agents, (2) buyer brokers would be used infrequently, (3) buyers who use brokers would pay for them, and (4) sellers would pay must lower overall commission rates.  As explained throughout this Order, the Court finds Dr. Schulman's opinion and testimony persuasive for the purposes of establishing that Plaintiffs' theory of impact could be proven through common evidence.  *See Pre-Filled Propane Tank*, 2021 WL 5632089, at *5 (holding that the class certification standard "'requires district courts to closely scrutinize factual evidence and expert reports that demonstrate that impact can be proven on a classwide basis'" including "'whether that expert evidence is persuasive[.]'") (quoting *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1186-87 (N.D. Cal. 2013)).

## I. Australia as an Adequate Benchmark Country

Defendants challenge Dr. Schulman's use of certain international markets to demonstrate construct his but-for world absent the Challenged Rules. Defendants rely, in part, on the expert report of Dr. Lauren J. Stiroh ("Dr. Stiroh"). Dr. Stiroh opines that Australia is an inadequate benchmark country. According to Dr. Stiroh, if Dr. Schulman expanded the time period and considered other factors, he would have found that United States real estate market is more like Germany, where sellers pay buyer broker compensation to some degree. Dr. Stiroh also stated at oral arguments that no international country could be used as a benchmark because no country has an adequately similar real estate market as the United States. In response, Dr. Schulman testified that the United States real estate market has historically been manipulated by anticompetitive practices and only an international country with that history can show how the but-for market would function.

The Court need not determine the merits of these arguments at the class certification stage. While the Court must weigh conflicting expert evidence, it must do so only to the extent necessary to determine if common issues predominate. While Dr. Stiroh has issues with Dr. Schulman choosing Australia as the best comparator country, Dr. Stiroh supports her position by analyzing United States' economic data and the history of the United States real estate market which she compared to Australia and Germany data. In other words, Dr. Stiroh challenged Dr. Schulman's analysis through use of evidence common to the entire class. Furthermore, as explained at oral argument in which the Court denied Defendants' *Daubert* motion, the Court reiterates that it finds Dr. Schulman's testimony is based on sufficiently reliable methods. *See, e.g., SourceOne Dental, Inc. v. Patterson Cos., Inc.,* No. 15-cv-5440, 2018 WL 2172667, at *4 (E.D.N.Y. May 10, 2018) (holding that a benchmark methodology is "a generally accepted

method for measuring antitrust damages.")  The jury will weigh the expert opinions at the merits stage of this litigation.

Dr. Stiroh also opines that the Northwest MLS, an MLS not being sued in this case, proves that the Challenged Rules do not have an anticompetitive impact on the broker commission rates.  Defendants argue that in October 2019, the Northwest MLS removed the requirement that sellers must make blanket unilateral offers of compensation as a condition of listing a home on that MLS.  After that removal, contrary to Plaintiffs' arguments regarding the but-for world, the commission rates paid by sellers have not decreased and remain relatively uniform, sellers still make blanket unilateral offers of buyer broker compensation, and buyer brokers have not been eliminated.  Defendants contend this real-world example proves that other factors besides the Challenged Rules influence whether a seller would offer a buyer broker compensation.

However, Dr. Schulman addressees the Northwest MLS changes in his report and explains that eliminating the Challenged Rules would be a disruptive event.  The real estate market would take considerable time to change the way people think about how the market works and for the information to disseminate.  Dr. Schulman cites examples of other United States industries which experienced major disruptions: travel agencies, stock brokerages, cable television, and hard-wired telephones.  In each industry, the market adapted to disruption slowly, over the course of several years, and not enough time has passed to see a significant market adjustment in the Northwest MLS.  Dr. Schulman opines that in the absence of the Challenged Rules, the United States real estate market would eventually resemble Australia and other countries that lack the Challenged Rules.  The Northwest MLS data does not defeat class certification.

## II. Why Sellers Make Buyer Broker Compensation Offers

Defendants argue that sellers and their brokers have individualized reasons to offer buyer broker compensation, and whether they would continue to make those offers in a but-for world without the Challenged Rules is an individualized inquiry that defeats the predominance requirement.[15]  Plaintiffs' own seller brokers testified that offering buyer broker commission attracts the most buyers because it incentivizes a real estate broker to find a new client to buy the seller's home.  For example, in a slow market, offering buyer broker compensation increases the chance of finding a buyer.

The Court is not persuaded by Defendants' argument as it relates to certification.  Dr. Schulman presents classwide evidence that buyer broker compensation rates were not impacted by market conditions throughout the class period.  For example, Defendants claim that offering buyer broker compensations is important when sellers needs to quickly sell their home.  Dr. Schulman analyzed buyer broker commissions based on how long a house was on the market.  If a house did not sell quickly, "it is not unreasonable to expect that more effort will be required on behalf of agents to find a willing buyer," such as raising the offered buyer broker commission. (Doc. #459-23, p. 23.)  However, buyer broker commission rates experienced very little variation, with yearly averages ranging from 2.974% to 2.985%, regardless of how long a house remained on the market.  Defendants assume that, in the but-for world, buyer brokers would be as prevalent as they are today.  However, Dr. Schulman demonstrates that buyer brokers are rare in comparative countries without the Challenged Rules.  The Court finds individual broker

---

[15] Defendants also argue that a lack of *de minimus* offers, that is, buyer broker compensation offers that are very low, such as one cent, which would technically comply with the Challenged Rules, proves that sellers are responding to individual market forces other than the Challenged Rules.  The Court agrees with Plaintiffs that the lack of *de minimus* offers could also prove that the Challenged Rules result in uniform commission rates to prevent steering, or that Defendants train their agents to use the threat of steering to persuade sellers to not make low offers.  A jury may disagree, but the lack of *de minimus* offers does not defeat the predominance inquiry.

strategies do not predominate over the common, more relevant question of whether the Challenged Rules create the need to offer buyer broker commissions in the first place.

Similarly, Defendants argue that sellers have "unilateral incentives to compensate buyer brokers, confirming that impact cannot be established with common evidence." (Doc. #553, p. 57.) In support of this argument, Dr. Stiroh opines that home sellers often pay buyer expenses, such as closing costs, when that buyer is cash-constrained to ensure the home is sold. Defendants argue that paying the buyer broker's compensation is no different.

The Court finds this argument does not defeat the predominance requirement. Defendants do not dispute that the Challenged Rules require every seller to offer compensation to the buyer broker, even before the home is listed on an MLS for buyers and their brokers to view. Because of this requirement, Plaintiffs allege that the baseline for commission negotiations is artificially inflated, and Plaintiffs have shown that this impact can be demonstrated using common evidence. For example, Plaintiffs show that Corporate Defendants provide sales scripts to their brokers and agents with canned responses to ensure broker commissions maintain anticompetitive rates and to maintain compliance with the Challenged Rules. Artificially inflating the baseline for commission rates is evidence of a classwide, antitrust impact. *See Hyland*, 2008 WL 4858202, at *7 ("To the extent that an individual paid more in commissions due to the inflated baseline, despite any negotiations, that class member will have been impacted by the conspiracy."); *see also Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ.4911 HB, 2003 WL 21659373, at *6 (S.D.N.Y. July 15, 2013) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally.").

Like the conspiracy element, Plaintiffs' impact theory predominately focuses on Defendants' conduct in enforcing the Challenged Rules, not on individual broker decisions. The Court also finds that the near uniformity of commission rates is common evidence which demonstrates that a seller's decision to offer buyer broker compensation is not predominated by individual circumstances.[16] Further, as discussed above, Dr. Schulman demonstrates that buyer brokers would be nearly eliminated absent the Challenged Rules, meaning a seller would not need to entice a buyer by offering to pay the buyer broker commission.

### III. Uninjured or Worse Off Class Members

Defendants argue that individualized issues predominate common ones because some class members benefitted from the Challenged Rules and, therefore, suffered no antitrust impact. Defendants contend Plaintiffs must offset the benefits that class members realized when they themselves were buyers using "free" broker services. For the reasons previously explained, this offset argument fails. Under *Hanover Shoe* and *Illinois Brick*, a plaintiff "may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust injury occurs and is complete when the defendant sells at the illegally high price." *Meijer*, 246 F.R.D. at 304. Once Plaintiffs prove an overcharge "there is an injury, even if that class members suffers no damages." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785, 2020 WL 1164869, at *7 (D. Kan. March 10, 2020) (quoting *Nexium*, 777 F.3d at 27)). Plaintiffs have established that they can prove such overcharge through common evidence.

Further, as explained under the Rule 23(a)(4) adequacy analysis, *infra* Section III.A.4, the contention that some class members were uninjured misstates Plaintiffs' theory of this case. Dr.

---

[16] For the same reasons, the Court rejects Defendants arguments that Dr. Schulman ignores these supposed individualized incentives in his impact analysis.

Schulman opines that the competitive rate for sellers to pay buyer broker commissions is zero because no class member would have paid a buyer broker but for the Challenged Rules and, therefore, every class member paid more than that amount by virtue of their inclusion in the class. *See Nexium*, 777 F.3d at 27 ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage."). Plaintiffs have shown they can demonstrate prima facie proof of an antitrust impact through common evidence.

Defendants also contend that, absent the Challenged Rules, sellers would be worse off because there would be fewer buyers, buyers would make lower offers, and housing prices would decrease. In the Rule 23(b)(3) context, Plaintiffs demonstrate that the common question of how the real estate market would function absent the Challenged Rules is capable of classwide resolution. Plaintiffs' theory of liability is that buyer brokers would not be used, or at least would be rare and akin to travel agents today. Dr. Schulman also accounts for lower housing prices in his analysis. The Court finds Defendants' arguments go to the heart of the merits of this case – that is, whether Plaintiffs' and Dr. Schulman's but-for world is accurate. The Court need not decide that issue here. At this stage, the Court need only to find that Plaintiffs have satisfied the predominance requirement, which they have.

## IV. Common Evidence of Steering

Dr. Schulman opines that the Challenged Rules cause steering, in which buyer brokers steer clients away from home sellers who offer less-than-standard commission rates. Defendants argue, through Dr. Stiroh's opinions, that Dr. Schulman's steering analysis is flawed because (1) steering does not occur, (2) Dr. Schulman's analysis fails to link the Challenged Rules with

steering, and (3) Dr. Schulman's regression analysis ignores relevant factors. For the reasons explained below, the Court rejects Defendants' steering arguments.

Dr. Schulman uses common evidence to support his theory that homes with less than standard commission rates remain on the market longer than those that offer the standard commission rates. Dr. Schulman also testified in his deposition that, without NAR Handbook Section 2-G-1, "the other restraints really have no reason to exist. They would disappear." (Doc. #553, p. 70.) Defendants do not challenge this position. Dr. Schulman, in his rebuttal report, introduced more controls in his regression analysis and found that the "results are consistent with the broad array of evidence [he] cited in [his] original report as to adverse steering effects sellers face if they offer below standard buy-side commission rates[.]" (Doc. #637-4, p. 34.) Regardless of which expert is correct on the effects of steering, both Dr. Schulman and Dr. Stiroh use common evidence to conduct their competing regression analyses. Because Dr. Schulman's regression analysis was consistent after introducing other allegedly important factors and relies on common evidence, the Court finds Plaintiffs have demonstrated a classwide impact of steering is capable of common proof.[17]

### V. Realogy

Realogy, in its separate brief, argues that Dr. Schulman failed to consider any of Realogy's data. However, Dr. Schulman states that he analyzed all data of the Subject MLS, which includes data relating to Realogy transactions. To the extent Realogy commission rates vary, the Court already explained that proof that Defendants' conduct, including Realogy, artificially inflated the baseline for commission rates is evidence of a classwide antitrust impact.

---

[17] Defendants also argue that both *Blades*, 400 F.3d 562, and *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.3d 671 (5th Cir. 1982) preclude class certification. Upon review of these cases, and for the reasons stated above, the Court disagrees and finds class certification is appropriate in this case.

Realogy further argues that whether the alleged co-conspirators, that is, individual brokers, offered buyer broker compensation because of the Challenged Rules is a highly individualized inquiry and would require it to have thousands of brokers testify as to why they made offers of buyer broker compensation. The Court finds this argument largely duplicative of Defendants' collective argument that sellers and their brokers have unilateral incentives to offer buyer broker compensation. Plaintiffs demonstrate, and Realogy and Defendants do not dispute, that Plaintiffs can show through common evidence that the Challenged Rules require sellers to offer buyer broker compensation. For the same reasons discussed above, common issues predominates over individualized ones.

In accordance with the Rule 23(b)(3) requirements, the Court finds Plaintiffs have demonstrated that common issues, capable of being answered with common evidence, predominate any individualized issues regarding an antitrust impact.

### c. Common Evidence of Damages

"To establish predominance, a plaintiff must produce a reliable method of measuring classwide damages based on common proof." *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 601 (N.D. Ill. 2015). "Individual damage calculations, however, are permissible if they do not 'overwhelm questions common to the class.'" *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 798 n.5 (8th Cir. 2014) (citing *Comcast*, 569 U.S. at 34). Plaintiffs need not prove damages at this stage of the litigation, but Plaintiffs' damages model "must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast*, 569 U.S. at 37 (internal citations and quotations omitted).

Plaintiffs' theory of liability is that Defendants adopted and enforced the Challenged Rules to require every seller to make a blanket, unilateral offer of buyer broker compensation as

a condition of listing a property on a Subject MLS.  Without the Challenged Rules, sellers would not make an offer of compensation to the buyer broker – either because the buyer would pay their own broker or, as in other industries and countries without the Challenged Rules, buyers would not use a buyer broker.  Because Plaintiffs claim that home sellers would not pay buyer broker commission absent Defendants' alleged conspiracy, "the total overcharge (and thus the class-wide damages) is the amount of all buyer broker commissions paid during the class period."  (Doc. #637, p. 28.)   Dr. Schulman's damages model uses Subject MLS data, including the sold home's address, the listing price of the home, the sold price of the home, and the offered buyer broker commission (listed on the MLS) to calculate damages.

Defendants argue Plaintiffs' damage analysis requires individualized inquiry because Plaintiffs fail to identify "pocket listings" in the MLS data.  Defendants explain that:

> Listing agents must submit the closing or sales information for all transactions to an MLS, even if the listing was exempt or waived from marketing on the MLS.  If a broker or agent markets a home off the MLS, sometimes referred to as a "pocket listing" or an "office exclusive," then that listing was not subject to the Cooperative Compensation Rule[18] and was, therefore, unaffected by the alleged conspiracy.  Even though no offer of compensation was made in the Subject MLS, brokers in the Subject MLSs are required to record these types of transactions, which involve compensation to cooperating brokers, with the MLS after closing.  Because there is no way to determine if a transaction that appears on the MLS would have been listed after a pocket listing or office exclusive, Schulman's damages model includes false positives that cannot be identified without individualized inquiry.

(Doc. #553, p. 74) (internal citations omitted).  Dr. Schulman, however, provides a reliable method for identifying these pocket listings, which Dr. Schulman estimates range from "0.2% to 1.8%" of listings depending on the MLS and year.  (Doc. #637-4, p. 13.)  According to Dr. Schulman:

> Each MLS listing includes the date it was entered into the MLS system.  By comparing the date of entry to the contract date, listings that meet the profile of pocket listing can be removed from the analysis.  If a listing was entered into the

---

[18] The "Cooperative Compensation Rule" refers to Section 2-G-1 of the NAR Handbook.

> MLS after the property has been placed under contract, then it is a conservative indicator that it was a pocket listing.

(Doc. #637-4, p. 13.)  The Court finds this method is reliable and defeats Defendants' argument that an individualized damages inquiry is necessary to identify pocket listings.

Defendants also argue that Plaintiffs' damages model does not comply with the requirements of *Comcast*.  Defendants contend that Plaintiffs allege several theories of anticompetitive restraints, but Plaintiffs' damages model makes no attempt to distinguish between them.[19]  Plaintiffs argue that because the Court has not excluded any theories of anticompetitive restraints, Plaintiffs' damages theory need not distinguish damages by each alleged restraint.  The Court agrees with Plaintiff.

In *Comcast*, the plaintiffs "proposed four theories of antitrust impact[.]"  569 U.S. at 31.  The district court only granted class certification as to one of the four theories.  Because only one theory of antitrust impact was accepted for class treatment, "[i]t follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."  *Id.* at 35.  However, the plaintiffs' damages model "did not isolate damages resulting from any one theory of antitrust impact" and instead relied on all four theories to calculate damages.  *Id.* at 32.  The plaintiffs' aggregate methodology "might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case."  *Id.* at 37.

Here, Plaintiffs have one unified damage theory – overcharging by requiring the seller to pay buyer broker compensation.  Unlike *Comcast*, the Court has not rejected any theory of

---

[19] Defendants contend Dr. Schulman does not account for transactions that would have included offers of compensation in the but-for world or account for other market adjustments.  The Court rejects this argument for the same reasons it rejected this argument regarding classwide impact.  Plaintiffs' damages model is consistent with their impact theory, which is that buyer brokers only exist because of the Challenged Rules.  If buyers had to pay, they would only do so in outlier circumstances, and would otherwise not use them.

antitrust impact. *Comcast* does not require an isolation of damages by Challenged Rule or practice.

Defendants finally argue that Plaintiffs' damages model does not account for any offset for class members that benefitted from the Challenged Rules. This misstates the theory of Plaintiffs' case, which is that all class members were harmed even if at one point they had "free" buyer broker services when they purchased a house. "'[M]itigation and offset generally do not affect the ultimate measure of damages'" in overcharge cases. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 684 (N.D. Ga. 2016) (quoting *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283, 286 (D.Minn.1996)) (collecting similar cases cases). Even if the Court allows Defendants to submit offset to the jury, that issue wouldn't affect certification because it "would go at most to calculation of damages, not the fact of injury." *Delta/Air Tran*, 317 F.R.D. at 685. The jury determines damages on an aggregate basis and could consider any offset evidence when deciding that total number. Offset evidence might focus on questions such as what percentage of transactions would include a buyer broker in the but-for world, and what the average cost of such services would be. All such evidence could be used on a classwide basis through use of a common methodology. In turn, the Court finds this damages model is consistent with Plaintiffs' theory of liability and satisfies the Rule 23(b)(3) predominance requirement.

The Court finds that class members are sufficiently cohesive to warrant adjudication by class representation. Common questions of fact and law predominate over any questions affecting only individual members regarding the existence of a conspiracy, antitrust impact, and damages. The Court finds Plaintiffs have satisfied the Rule 23(b)(3) predominance requirement for the Subject MLS Class.

### ii. Missouri Antitrust Law-Subject MLS Class

Both parties agree the same arguments that apply to the Subject MLS Class equally apply to the Missouri Antitrust Law-Subject MLS Class, and so does the Court. Missouri antitrust law "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." Mo. Rev. Stat. § 416.141. For the same reason regarding the Subject MLS Class, Plaintiffs have met the Rule 23(b)(3) predominance requirement for the Missouri Antitrust Law-Subject MLS Class.

### iii. MMPA Class

The MMPA prohibits the "act, use or employment by any person of any deception, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce[.]" Mo. Rev. Stat. § 407.020.1. To prevail on an MMPA claim, a plaintiff must demonstrate that he or she: "(1) purchased [good or services] from the defendant; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of defendant's use of one of the methods, acts, or practices declared unlawful by the Act." *Kelly v. Cape Cod Potato Chip Co*., 81 F. Supp. 3d 754, 757 (W.D. Mo. 2015) (citing Mo. Rev. Stat. § 407.025.1). "The MMPA is interpreted broadly to promote its purpose to protect consumers." *Thornton v. Pinnacle Foods Grp. LLC*, No. 16-CV-00158 JAR, 2016 WL 4073713 *2 (E.D. Mo. Aug. 1, 2016) (citing *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 724 (Mo. banc 2009)). "The focus of the statutory scheme is on the defendant's conduct." *Hawkins v. Nestle USA Inc.*, 309 F. Supp. 3d 696, 701 (E.D. Mo. 2018); *see also Plubell v. Merk & Co*, 289 S.W.3d 707, 713-14 (Mo. App. W.D. 2009) ("[A]n unlawful practice under the MMPA may be demonstrated by the defendant's conduct[.]").

Plaintiffs argue common issues predominate individual ones regarding the MMPA Class because the claim focuses "almost exclusively on the conduct of the Defendants and the fairness and lawfulness of Defendants' conduct." (Doc. #459, p. 51.) Defendants disagree, arguing that individual issues predominate (1) whether an injury occurred, and (2) whether class members used Defendants' services for personal, family, or household purposes.

As a threshold matter, the Court agrees with Plaintiffs that common issues predominate whether Defendants' conduct was unlawful. As previously explained, Plaintiffs have shown that common evidence can prove that Defendants' enforcement of the Challenged Rules artificially inflated commission prices by requiring sellers to make blanket, unilateral offers of compensation is common to all class members. Whether that conduct amounts to an unfair practice creates common questions and is the central issue to the MMPA claim.

Regarding whether an injury occurred, Defendants contend that Plaintiffs and class members were not harmed because they were aware that they had to offer buyer broker compensation but went through with the transaction anyway. The Court disagrees. Defendants primarily rely on *State ex rel. Coca-Cola v. Nixon*, 249 S.W.3d 855 (Mo. banc 2008). In that case, the plaintiffs alleged that the defendants deceptively hid the fact that saccharin was an ingredient in Diet Coke. The plaintiffs' own expert found that "only twenty percent of those who currently consume fountain Diet Coke would not continue to do so if they knew it contained saccharin." *Id.* at 862. In turn, eighty percent of the class members suffered no injury. *Id.* However, the court made certain to distinguish the plaintiffs' subjective injury, which requires proof that the class members actually had a certain preference, from MMPA cases involving "an economic injury that was based on an objective characteristic." *Id.* at 863.

Plaintiffs allege an objective economic loss – overcharging broker commissions that Plaintiffs had no power to negotiate. Plaintiffs' theory does not rely on what the class members knew or preferred. Further, the MMPA does not allow a defense of waiver by contract. *Huch*, 290 S.W.3d at 726 ("To allow [the MMPA] to be ignored by waiver of by contract, adhesive or otherwise, renders the statutes useless and meaningless.").

Defendants also argue that individual issues of whether putative class members sold their home for personal, family, or household purposes predominate common ones. The MMPA permits civil actions for consumers who purchase goods or services "primarily for personal, family or household purposes." Mo. Rev. Stat. § 407.025.1. Plaintiffs comply with this provision by limiting their MMPA class to sales of residential homes. Rule 23 does not require every question to be common, only that common issues predominate. Based on common questions regarding Defendants' conduct and the alleged injury of an overcharge the Court finds common issues predominate over any individualized issues of how the house was used. *See Hays v. North Am. Inc.*, No. 4:17-CV-00353-BCW, 2021 WL 912262, at *7 (W.D. Mo. Mar. 8, 2021) (holding, in an MMPA class action claim, "[t]o the extent class members must demonstrate the purpose of their purchase, the Court finds this is not an individual issue that overtakes the common issues, and thus does not preclude class certification"). The Court also agrees with Plaintiffs that the Court can determine "whether potential class members lived in their homes or rented them out, either during the class notification process or through a claims process at a later stage." (Doc. #637, p. 52.)

For these reasons, Plaintiffs have satisfied the Rule 23(b)(3) predominance requirement for the MMPA Class.

## 2. Class Certification is the Superior Method to Adjudicate This Case

"In determining whether a class action is the superior vehicle for litigation, courts consider, inter alia, the difficulties likely to be encountered in the management of the action." *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-cv-04321-NKL, 2013 WL 3872181, at *12 (W.D. Mo. July 25, 2013). Plaintiffs argue that class certification is the superior method because each member has little incentive to control the litigation because the identical claims would result in uniform damages calculation, each class members' damages will be small compared with the relatively high costs of bringing litigation, separate proceedings would produce duplicative efforts and risk inconsistent verdicts, and class action is the superior method of adjudication because of the size of the case and issues involved. Defendants do not dispute that the superiority requirement is met. After analyzing Plaintiffs' arguments, the nature of each class's claim, and the relevant factors under Rule 23(b)(3), the Court agrees with Plaintiffs that a class action is the superior method for fairly and efficiently adjudicating the controversy. Accordingly, the superiority requirement of Rule 23(b)(3) is satisfied.

### C. Notice Requirements Under Rule 23(c)(2)(B)

For classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Plaintiffs' counsel states that they "have proactively contacted a class administration company for the purpose of sending notice to the class members." (Doc. #459, p. 49.) Plaintiffs also attached a robust notice plan aimed at reaching an overwhelming majority of class members. Defendants do not argue whether this notice is sufficient.

In view of the Court's mandate to direct to class members the best practicable notice, the Court finds it is unable to determine whether Plaintiffs' proposed notice complies with Rule 23(c)(2)(B) at this time. Accordingly, the Court orders the parties to meet and confer to determine agreed upon proper notice procedures.

## IV. CONCLUSION

Accordingly, is it hereby **ORDERED** that Plaintiffs' Motion for Class Certification (Doc. #459) is GRANTED. The Court hereby certifies the following classes in accordance with Rule 23:

(1) the "Subject MLS Class," asserting Count I, defined as:

> All persons who, from April 29, 2015 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX, LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a home listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

(2) the "Missouri Antitrust Law-Subject MLS Class," asserting Count III, defined as:

> All persons who, from April 29, 2015 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX, LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a home in Missouri listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

and (3) the "MMPA Class," asserting Count II, defined as

> All persons who, from April 29, 2014 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX, LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a residential home in Missouri listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

Additionally, it is **FURTHER ORDERED** that

(1) Plaintiffs shall have up to an including fourteen (14) calendar days from the filing of this Order to file a Third Amended Complaint for the purpose of adding as named plaintiffs individuals who sold their home using the CBOR and Southern Missouri Regional MLS;

(2) the parties shall meet and confer to agree on the proposed notice to potential class members pursuant to Federal Rule of Civil Procedure 23(c)(2)(B). The proposed notice shall be filed within fourteen (14) calendar days of the filing of this Order.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: April 22, 2022