# Exhibit 1

ROTHBART Exhibit
1
6/22/22   cjc

# Report of Jeff Rothbart

**I.  Qualifications**

1. My name is Jeffrey Rothbart. I am the managing member of Stack Real Estate, LLC in Northbrook, Illinois. I have over 19 years of institutional, commercial and residential real estate experience including, but not limited to, sales, valuation, acquisitions, development, general contracting, equity and debt financing and lending standards, legal document review, asset/portfolio management, capital markets, leasing, dispositions, sustainability, HOA formation and administration and brokerage. I am a licensed real estate broker in Illinois.

2. Over the course of my career, I have participated in over $3 billion worth of real estate transactions, across property types, geography and risk profile. This includes, but is not limited to the following:

    a. Disposal of over $1,750,000,000 in real estate assets.
    b. Formation of over $200,000,000 in real estate joint ventures.
    c. Management of over 11,000,000 SF of real estate assets.
    d. Procurement of over $500,000,000 in equity and debt investments for real estate.
    e. Negotiated over 200 leases totaling more than 2,000,000 SF.
    f. Ownership of approximately 100 acres of raw land for development.

3. In addition to the above, for the majority of my career, I also served as de facto General Counsel. In that role, I have been charged with many roles and responsibilities, one of which review and negotiation of all real estate brokerage agreements.

4. I have published over 40 articles and research reports on the commercial real estate markets which were cited in over 100 different real estate publications.

5. I have consulted, either as an expert witness or on a third-party basis, in over 100 matters. Previous clients include municipalities, public REITs, governmental agencies, universities, religious institutions, insurance companies, creditors to bankruptcy, equity investors, developers, general contractors, property owners, tenants and individual homeowners.

6. I have a B.A. from Emory University, a J.D. from IIT-Chicago Kent College of Law, an LL.M. in Taxation from Northwestern University, a Certificate in Hotel Real Estate and Asset Management from Cornell University as well as a Certificate in Real Estate Investment and Development from Rice University Jones Graduate School of Business.

7. Additionally, I am an Adjunct Professor of Law at IIT-Chicago Kent College of Law, a licensed Illinois attorney, formerly a LEED-AP for New Construction v2.2 and formerly held NASD/FINRA Series 22 and 63 licenses. I have been a 'market participant' for the PwC Korpacz Real Estate Investor Survey since approximately 2006. I am also a Certified Mediator through the National Association of Certified Mediators.

8. My CV, prior testimony and article list is attached hereto as Exhibit A.

## II. Assignment

9. I have been retained by Plaintiffs' counsel as an independent expert witness to provide testimony to the jury regarding how realtors function in the United States in residential real estate transactions. I have been asked to testify regarding the seller/broker relationship, the buyer/broker relationship and the common practices of brokers and agents in residential real estate transactions. I have also been asked to testify regarding the function of the National Association of Realtors, the Multiple Listing Service (MLS), seller and buyer commissions, the rules and Code Ethics that apply to these transactions for realtors and the industry standard for practice and procedure related to residential real estate transactions.

## III. Materials Considered

10. My opinions and conclusions detailed in this report are based on the pleadings that I have reviewed to date; the discovery record in this matter that I have reviewed to date, including, produced documents, data and written discovery responses; public source materials and my background, knowledge and experience of the real estate industry. The facts and data I have considered are of the type reasonably relied upon by experts in my field of real estate. Given that discovery is ongoing, I remain the right to update my opinions based on updated discovery provided.

## IV. Compensation

11. I am being compensated $750.00 per hour of my work on this matter, including for material review and testimony. My compensation is not dependent on the opinions formed or the outcome of this matter.

## V. Differing Roles of Brokers and Agents for Sellers and Buyers

12. A seller's agent is the real estate agent or broker who represents the person who wants to sell their property. The primary services that seller's agents provide, without limitation, are: (1) preparing the home to sell; (2) helping choose a price for the home; (3) devising a selling strategy; and (4) negotiating with buyers when an offer is received.

13. A buyer's agent, by contrast, represents the person who is interested in purchasing the property. The primary services that buyer's agents provide, without limitation, are: (1) locating a property for purchase, and (2) negotiating with the seller.

14. Technology is changing the way that seller's and buyer's agents perform these roles. First and foremost, buyer's agents play an increasingly reduced role in locating properties for purchase. Buyers can (and do) perform their own home searches using the internet. In

addition, features such as virtual tours allow buyers to become comfortable with a home (and even make an offer) without conducting an in-person visit. The result is that most buyers no longer need an agent to locate properties for them to purchase.

15. Also, the separation of duties between seller's agents and buyer's agents is particularly important with respect to negotiations. Each agent owes a duty of loyalty to their own client, regardless of who is paying for their services. Thus, under the current system of compensation, the home seller ends up paying for someone who has the duty to work against their interests.

## VI. The National Association of Realtors

16. The National Association of Realtors ("NAR") is the largest trade association in the United States, with over 1.5 million members.[1] The vast majority of brokers and agents involved in buying and selling residential real estate are members of NAR. Most brokerages, or local associations, require their agents to be NAR members.

17. NAR has established various rules that its members must follow. One set of these rules is its "Code of Ethics." Any NAR member who violates these rules is subject to disciplinary action. This could include being expelled from membership or having their professional liability insurance withdrawn.[2]

## VII. Multiple Listing Services

18. A multiple listing service (MLS) is a database established by cooperating real estate brokers to provide data about properties for sale. An MLS allows brokers to see one another's listings of properties for sale with the goal of connecting homebuyers to sellers. The MLS is essentially an agreement among real estate agents to list each other's properties through a cooperative service.

19. Most MLSs, including the subject MLSs in this case, follow rules established by NAR. NAR publishes these rules in its "NAR Handbook." NAR enforces its rules by withholding professional liability insurance from any realtor association that does not follow them.[3]

20. Membership in an MLS is virtually required for all residential brokers and agents. More than 90% of all homes are listed on the various MLSs.[4] Most, if not all, brokers and agents could not conduct their business if they were denied access to the MLS in their markets.

---

[1] https://www.nar.realtor/about-nar/history
[2] NAR Handbook, pp. iii, 19, 20, 63
[3] NAR Handbook, p. 8
[4] NAR 2020 Profile of Home Buyers and Sellers, available at: https://www.gaar.com/images/uploads/2020_NAR_Consumer_Profile.pdf, at pages 8, 131.

3

21. To obtain access to an MLS, brokers and agents must join it, pay membership fees, and agree to follow all of the MLS rules. This includes following all rules set forth in the NAR Handbook and the NAR Code of Ethics. Violating these rules could lead to expulsion from the MLS, which could put the broker or agent out of business.

### VIII. The Challenged Restraints

22. I understand that plaintiffs are challenging several rules and practices that are collectively referred to as the "Challenged Restraints." The primary challenged rule is the Adversary Commission Rule (found in Part 2.G.1 of the NAR Handbook), which requires listings on an MLS to include a blanket unilateral offer of compensation to the buyer's broker or agent, and prohibits MLSs from publishing listings without such offers.

    Other rules act to sharply limit the ability of brokers and agents to negotiate the amount of compensation offered. These include NAR Code of Ethics Standards Practice 3-2 and 16-16, along with NAR Case Interpretation 16-15.

23. Still other rules act to discourage sales of property without listing it on an MLS. For example, NAR's Clear Cooperation Policy mandates that property be listed on an MLS within one business day of it being marketed.

24. The Challenged Restraints are contained within NAR rules, including the NAR Handbook and the Code of Ethics. For this reason, all brokers and agents must follow the Challenged Restraints or risk being denied access to their local MLSs if they do not. - OPEN

### IX. Effects of the Challenged Restraints on Competition

25. The effect of the Challenged Restraints is to eliminate virtually all negotiation regarding the commission rates paid to buyer. There are several reasons for this.

26. First, sellers must make the offer of compensation to buyer brokers and agents in advance. This guarantees that the offer will bear no relationship to the experience or qualifications of the buyer broker or agent, or the amount or quality of services provided.

27. Second, the buyers have no incentive to negotiate because they are not the ones paying their agents. The buyers are told their agents are free, and they have no incentive to negotiate for a lower commission rate.

28. Third, NAR's rules declare attempts to negotiate commissions after a showing is made or a buyer is found to be unethical.

29. Fourth, sellers are strongly discouraged from negotiating commission rates by the practice of steering.

4

## X. Effects of the Challenged Restraints on Competition

30. Steering refers to the act of failing to show buyers properties that offer a lower rate or amount of commission. Steering absolutely happens in the real world. Many agents feel that if two properties offer differing rates of compensation, they have no reason to show the property with lower compensation.

31. I have reviewed defendants' training materials. In such materials, defendants teach agents how to discourage customers from negotiating commission rates by raising the threat of steering. Agents and brokers in the real world use exactly these types of tactics to prevent sellers from attempting to negotiate commission rates. One of the ironies of steering is that it does not need to occur to prevent negotiation. The mere threat of steering is being used to keep sellers from negotiating.

32. Steering (and the threat of steering) is caused by defendants' Challenged Restraints. If sellers were not forced to make unilateral offers of compensation, then agents would have nothing to steer towards or away from. The same would be true if buyers paid their agents and brokers directly, rather than having the seller do so.

33. Defendants' other rules and practices also facilitate steering. Preventing the public from seeing compensation offers means that no buyer can tell if they are being subjected to steering or not. Likewise, the Clear Cooperation Policy ensures that virtually all transactions end up on an MLS, and therefore subject both to the Challenged Restraints and the threat of steering.

34. It should also be noted that steering harms both sellers and buyers. Sellers get hurt because if they make lower commission offers their property might go unsold or be on the market for longer periods. Buyers, on the other hand, are harmed because they do not get to see all the homes that are available, and might miss out of buying the home they would prefer.

## XI. The Result of the Challenged Restraints – the "Going Rate"

35. Because the Challenged Restraints eliminate virtually all negotiation regarding the commission rates paid to buyer, they result in a remarkably uniform level for commissions in a given area. This is the "going rate" that one sees. Some negotiation and variation can take place, but the vast majority of all transactions take place at the going rate.

36. The going rate for commissions in a given area is remarkable because it ignores most every factor that one would expect to affect a broker or agent's compensation. Among other things, the commissions do not vary based on:

    a. How good or bad a broker or agent is;
    b. The reputation of a broker or agent;
    c. The level of experience for a broker or agent;
    d. The amount of work done by a broker or agent;
    e. The level or quality of service provided; or

5

f.  The time of year, or other market conditions.

37. The going rate for commissions also has held up remarkably over time. Over the last 30 years, home prices have increased dramatically. But at the same time, commission rates have remained largely the same. This has led to a huge increase in the actual dollar amounts paid to agents.

38. At the same time, the amount of work required to earn those larger commissions has decreased, particularly for brokers and agents representing buyers. This is because of the increased use of technology by buyers, particularly in finding the homes they wish to purchase.

39. I have reviewed the tables set forth in the Expert Report of Craig T. Schulman, Ph.D. paragraphs 156-69, figures 3-9. I understand that these tables reflect the distribution of sold listings by buyer agent commission rate for the MLSs at issue during the relevant time period. This distribution of commissions contains exactly the relative uniformity that I would expect and is consistent with my overall experience in the real estate industry. Based on my industry experience, I believe it is caused by the structural impediments to negotiating commission rates, and in particular by the Challenged Restraints at issue in this case.

## XII. For Sale by Owner

40. Some sellers might try to avoid paying these higher commission rates by selling their property themselves. This is called "For Sale by Owner" or "FSBO."

41. Sellers that attempt FSBO face large obstacles. Most brokers and agents flatly refuse to show any properties being marketed as FSBO. FSBO properties do not appear on MLSs, and other major websites such as www.realtor.com do not allow FSBO listings.

42. In my experience, marketing a property FSBO is not a viable alternative to listing it on an MLS. FSBO homes take longer to sell, if they ever sell at all. When they do sell, it is usually at a significantly lower price than they would have achieved if marketed through the MLS.

I reserve the right to supplement these opinions as new discovery occurs. I also may have additional opinions to reply or respond to any opinions offered by defendants' experts in this case.

Respectfully Submitted:

_____  5/6/22_____
Jeffrey Rothbart           Date
Chicago, IL

**EXHIBIT A**

# Jeffrey S. Rothbart, Esq., LL.M.



Mobile - (312) 307-1429
jr@realestateexpertwitnesses.com
www.realestateexpertwitnesses.com

Mr. Rothbart has been an expert witness since 2006 and has retained on over 100 matters. Previous clients include, but are not limited to, municipalities, public REITs, Fortune 100 Companies, governmental agencies, universities, insurance companies, creditors to bankruptcy, equity investors, developers, general contractors, property owners, tenants and individual homeowners.

Mr. Rothbart's qualifications include, without limitation:
- Over 19 years of direct commercial and residential real estate experience.
- Licensed Illinois attorney with focus on real estate, tax, bankruptcy and securities law.
- Licensed Illinois real estate broker.
- Adjunct Professor of Law since 2007.
- Participated in over $3,000,000,000 of commercial real estate transactions.
- Direct experience working for publicly traded REIT's, private equity, developers and general contracting.
- Experienced across property type, geography and risk profile.
- Formed over $200,000,000 in real estate joint ventures.
- Managed over 11,000,000 SF of commercial real estate assets.
- Procured over $500,000,000 in equity and debt investments.
- Approved over 200 leases totaling more than 2,000,000 SF.
- Published over 40 articles on commercial real estate investments and markets; cited in over 100 articles.
- Reviewed, commented and critiqued on over 100 MAI Appraisals.

Prior expert experience includes, without limitation, real estate valuation, LLC Operating Agreements, breach of fiduciary duties, breach of representations and warranties, land use, construction damages, standard of care issues, homeowners associations, divorce related issues, brokerage relationships, property tax appeal, eminent domain, landlord/tenant disputes and deceptive leasing practices.

***PROFESSIONAL EXPERIENCE***



### STACK REAL ESTATE, LLC                                              2013 to Present
**Managing Member**
*A full service real estate firm focused on acquisitions, development, capital markets procurement and consulting.*
- Acquisitions – Acquired over 500 senior living beds, throughout the acuity spectrum.
- Development – Actively developing residential, retail, hotel and industrial sites on nearly 100 acres of owned development land.
- Procured equity and debt capital for institutional quality acquisition and development projects on a nationwide basis.
- Served as an independent manager of real estate related limited liability companies.
- Licensed as a Real Estate Mediatior by the National Assocaiton of Certified Mediators.
- Affilaited entities include, but are not limited to, Real Estate Expert Witnesses, LLC, Real Estate Dispute Mediation, LLC, Real Estate Independent Manager, LLC, Real Estate Appraisal Review, LLC, Berkshire Hathaway Home Services Chicago, Golden Years Advisors, LLC, Birchwood Health Care Partners, LLC, Insignia Homes, LLC, Peer Realty, LLC and Ernst & Young.

**EPN INVESTMENT MANAGEMENT, LLC | EDT RETAIL TRUST, Skokie, IL**  2011 to 2013
*A private investment group focused on retail real estate investments throughout the United States, Europe and Latin America.*

**Vice President, Capital Markets** (8/2011 – 8/2013) | EPN INVESTMENT MANAGEMENT, LLC
Recruited by EPN after its privatization of EDT Retail Trust (see below) to lead the capital markets department which was responsible for equity and debt capital procurement throughout the global platform.
- Spearheaded business development efforts to develop new and further existing equity capital relationships.
- Originated complex capital markets products such as subordinated and mezzanine debt, preferred equity or similar.
- Maintained all of the firm's global relationships with lending institutions (insurance companies, commercial banks and CMBS conduits) and equity investors (pensions, endowments, foundations, sovereign wealth funds, hedge funds and family offices).
- Sourced, negotiated or closed over $500M in crossed collateralized financing for both fixed and floating rate debt.
- Launched EPN's Latin American development and acquisitions platform and evaluated M&A opportunities.
- Advised acquisition team on forecasting and budgeting for prospective investments.
- Served as de-facto general counsel by drafting or negotiating substantially all legal agreements and managing all litigation.

**Vice President, Finance and Asset Management** (1/2011 – 8/2011) | EDT RETAIL TRUST
Oversaw operations of a publicly traded REIT (ASX: EDT) working directly under the CEO. EDT owned 12M square feet of institutional grade real estate located across 20 states with an approximate valuation of $1.43B.
- Spearheaded portfolio and financial management including financial forecasting and budgeting, strategic repositioning, redevelopment, leasing, debt financing and asset-level marketing.
- Managed condemnation process due to road expansion where potential damages exceeded $40 million.
- Prepared financial and investor reporting, including annual reports, quarterly supplemental and Board of Director materials.
- Served as a liaison between the Board Finance, Audit and Investment Committees and third-parties.
- Forecasted REIT and asset level net operating income, expenses and cash flow.
- Worked with DDR Corp. (NYSE: DDR) to streamline reporting to ensure accuracy of property level forecasting and budgeting.
- Reviewed and approved operating and capital expenditure budgets and corporate income statements and balance sheets.
- Performed quarterly, asset valuations across the entire portfolio on an individual asset basis.
- Generated 6.0% annual revenue growth from owned real estate by approving 200 new and renewal retail leases totaling 2M SF with a cumulative first year NOI in excess of $25M.
- Assisted investment banks and advisory consultants in relation to EPN's tender offer and the ultimate disposition of EDT.

**SUPERIOR STREET CAPITAL LLC, Chicago, IL**  2009 to 2011
*A privately-held real estate firm focused on recapitalization and monetization of distressed situations.*

**Managing Director**
Founded a real estate investment firm focused on the acquisition of U.S. commercial real estate through the recapitalization of distressed assets and the monetization of real estate related derivative instruments.
- Implemented tax structuring to mitigate tax consequences to owners of distressed Tenant-in-Common syndications through debt restructuring of debt, subordinating investor interest and consolidating management operations.

**BOULDER NET LEASE FUNDS, LLC | THE BOULDER GROUP, Northbrook, IL**  2003 to 2009
*A private commercial real estate group focused on office and industrial investments throughout the United States.*

**Principal** (2004 - 2009) | BOULDER NET LEASE FUNDS, LLC
Co-founded a real estate private equity company specializing in the acquisition of net leased properties.
- Originated $175 million for two real estate private equity vehicles through discretionary and joint-venture investors.
- Managed all aspects of operations including acquisitions, capital markets, finance, asset management and dispositions.
- Acquired and managed over 1.7M SF of net leased properties nationwide.
- Realized a leveraged, net IRR of 25.5% with an equity multiple of 1.8x.
- Sourced on-balance sheet LIBOR based line of credit with Merrill Lynch Capital.
- Structured sale-leaseback transactions in conformance with FASB and GAAP.
- Served as the primary liaison to legal, accounting, securities, insurance and financial advisors.
- Conducted all due diligence review of property, financial, legal, debt, market and tenant related documentation.
- Underwrote transactions and evaluated IRR, equity multiple and cash-on-cash returns using ARGUS and Excel.
- Managed condemnation process re expansion of a state highway with potential damages exceeding $15M.
- Drafted all investment committee memoranda and implemented all post-Closing, asset business plans.
- Managed all investor relations related functions including investor presentations, financial reporting and cash flow forecasting.
- Negotiated all Private Placement Memorandums and Joint Venture Agreements, Letters of Intent, Purchase and Sale Agreements and Loan Documentation.

**Research Director** (2003 - 2009) | THE BOULDER GROUP
Served as the Research Director for a commercial real estate brokerage firm focused on the net lease sector. All published research was used to generate and affirm the investment strategies implemented by Boulder Net Lease Funds.
- Published over 40 articles on the net lease real estate market which have been cited in over 95 real estate publications including Forbes Magazine, The Korpacz Real Estate Investor Survey published by PriceWaterhouseCoopers, Retail Traffic, Net Lease Forum, Globe Street, Commercial Property News, as well as other national and local real estate publications.
- Prepared and reviewed legal documents including, such as limited liability company operating agreements, assignment agreements, triple net leases, real estate purchase contracts and securitized loan documents.
- Consulted, either as an expert witness or on a third-party basis, for institutional investors, municipalities, corporation and secured and unsecured creditors to a bankruptcy as to the valuation of net leased assets on a nationwide basis.

**Associate Real Estate and Tax Attorney,** Field and Goldberg, LLC, Chicago, IL  2003

**Legal Department Associate**, Related Midwest (f/k/a LR Development Company, LLC), Chicago, IL  2000 to 2002

***INDUSTRY LEADERSHIP***
**Adjunct Professor of Law,** CHICAGO-KENT COLLEGE OF LAW – ILLINOIS INSTITUTE OF TECHNOLOGY, Chicago, IL  2007 to Present
**Survey Participant, PWC Korpecz Real Estate Survey**  2006 to Present

## EDUCATION

**Real Estate Investment and Development Certificate,** RICE BUSINESS, Houston, TX — 2021

**Hotel Real Estate Investments and Asset Management Certificate,** CORNELL UNIVERSITY, Ithaca, NY — 2020

**Masters of Law in Taxation,** NORTHWESTERN UNIVERSITY, Chicago, IL — 2003

**Juris Doctor**, CHICAGO-KENT COLLEGE OF LAW – ILLINOIS INSTITUTE OF TECHNOLOGY, Chicago, IL — 2002

**Bachelor of Arts in Political Science**, EMORY UNIVERSITY, Atlanta, GA — 1999

## LICENSES & CERTIFICATIONS

| | |
|---|---|
| **Certified Mediator,** NATIONAL ASSOCIATION OF CERTIFIED MEDIATORS | 2021 |
| Illinois Managing Real Estate Broker | Expected 2022 |
| Illinois Real Estate Broker | 2015 |
| LEED-AP for New Construction v2.2 | 2009 |
| NASD Series 22 and 63 License | 2004 |
| American Bar Association (State of IL Attorney Registration & Disciplinary Commission) | 2002 to Present |

## COMPUTER LITERACY

Highly proficient in Microsoft Office, ARGUS and YARDI

# JEFFREY S. ROTHBART

**EXPERT TESTIMONY**

**Morabito v. Jennings and Hall** — Orange County, CA
- Served as an expert witness relating liability of a general partner.

**Bistum Eichstatt K.D.O.R. Finanzkammer et al v Silverman et al** — Dallas, TX
- Served as an expert witness relating to financing documentation

**Arlington Heights Medical Center, LLC v. Arlington Dermatology, S.C.** — Arlington Heights, IL
- Served as an expert witness relating to landlord tenant, leasing dispute

**Hoodbhoy v. The City View Condominium, et al.** — Washington, DC
- Served as an expert witness relating to HOA standards of care

**Michael Greenberg et. al. v. Jim Angelopoulos et. al** — Chicago, IL
- Served as an expert witness on industry standards for the purchase and sale of real estate.

**Target 5, LLLP v Chicago Real Estate Resources, Inc.*** — Chicago, IL
- Served as an expert witness relating to brokerage standard of care issues.

**Richard Rudlaff & Pure Michigan, LLC v. Traverse Bay RV Park Condominium Association** — Acme, MI
- Served as an expert witness relating to damages corresponding to COA restrictive covenants.

**Spector v. Hammer** — Deerfield, IL
- Served as an expert witness on breach of representation and warranty in a Purchase Agreement as well as title and survey matters.

**White House Ventures, LLC v. Alice Phelan Sullivan Corp.** — San Francisco, CA
- Served as an expert witness on valuation due to an incomplete 1031 exchange.

**J.G. Wahlert v. Kovitz Shifrin Nesbit, a Professional Corporation, et. al.** — Mundelein, IL
- Served as an expert witness relating to title and survey and rights of a Property Owners Association

**Centerpointe TIC et. Al v, VEREIT, Inc., EFA Asset Management, LLC, et. al. *** — Los Angeles, CA
- Served as an expert witness relating to standard of care for a retail asset manager in a Tenant In Common program.

**Hunter's Ridge Loan Group, LLC v. US Capital Alliance, LLC, Allan Feker, et. Al.** — Volusia County, FL
- Served as an expert witness relating to foreclosure of land by private lender.

**Munster Steel Co., Inc., v. CPV Partners and Centennial Village, LLC** — Munster, IN
- Served as a litigation consultant relating to breach of contract for a purchase and sale agreement.

**In re Morrow Park*** — Dover, DE
- Served as an expert witness relating to market standards for the three-appraiser rule and corresponding business interference from failure to refinance.

**NNN 400 v. Wells Fargo** — Little Rock, AR
- Served as an expert witness relating to confidentiality and disclosure of information.

**Meribeth Nelson v. City of Kankakee** — Kankakee, IL
- Served as an expert witness on the diminution in value due to premature demolition.

**Meltzer et al v. Rixey, LLC and Hillhouse Group, LLC** — Baltimore, MD
- Served as an expert witness on partnership dispute and market standards for exempt private LLC offerings

# JEFFREY S. ROTHBART

**Oak Creek Investment Properties, Inc. v. American Electric Power Services Corporation, KMT Group, Inc., and Clearresult Consulting, Inc.**  Texarkana, AR
- Served as an expert witness on breach of contract, negligence and damages to a manufactured housing community.

**Tuan Mahn Dang v. Tiffany Nguyen *** Chicago, IL
- Served as an expert witness on deceptive leasing practices

**Jack Riser, et al v. City of Chicago** Chicago, IL
- Served as an expert witness to opine on the diminution of value of residential homes from the opening of a new runaway at O'Hare International Airport

**OM Capital FM, LLC v. Hotel Capital, LLC** Fort Myers, FL
- Served as an expert witness on a dispute concerning brokerage fees

**The Groves of Palatine Condominium Association v. Groves of Palatine, LLC** Chicago, IL
- Served as an expert witness on the standard of care for real estate developers as it relates to construction defects.

**Crystal Lake Limited Partnership v. Baird & Warner Residential Sales, Inc.** Chicago, IL
- Served as an expert witness in a landlord tenant dispute.

**Mark Carlson, Robb Carlson and Thomas Vana v. Letke & Associates, et al** Chicago, IL
- Served as an expert witness for the Defendant in litigation discussing the standard of care for commercial real estate investment.

**Brian Germain and Rita Germain v. Steven Link and Emily Link*** Winnetka, IL
- Served as an expert witness for the Plaintiff in a breach of representation and warranties in a residential Purchase and Sale Agreement.

**Blackrock Burr Ridge, Inc. v Sterling Bay Companies, LLC et al*** Chicago, IL
- Served as an expert witness for the Plaintiff in litigation relating to the interoperation of the LLC operating Agreements and profit sharing.

* Denotes testimony at trial

# JEFFREY S. ROTHBART

**PUBLISHED AND CITED ARTICLES**
- Net Lease Transaction Volume down 63% in Q4, Globest.com, January 22, 2009
- Net Lease Market Report Q4 2008, Boulder Net Lease Funds, December 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2008
- Net Lease Market Report Q3 2008, Boulder Net Lease Funds, October 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2008
- National Real Estate Investor, Sale Leaseback Quandary, September 1, 2008
- Net Lease Market Report Q2 2008, Boulder Net Lease Funds, June 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2008
- Forbes Magazine, Building Boom, Matthew Swibel, June 2, 2008
- Net Lease Insiders: Take What the Market Gives, Globest.com, April 28, 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2008
- Net Lease Market Report Q1 2008, Boulder Net Lease Funds, March 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2007
- Net Lease Market Report Q4 2007, Boulder Net Lease Funds, December 2007
- Real Estate Forum, Tomorrows Newsmakers, Top 250 Real Estate Executives under 35, August 2007
- Real Estate Forum, New Tools of the Trade, July 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2007
- Net Lease Market Report Q3 2007, Boulder Net Lease Funds, September 2007
- Commercial Property News Website, Net Lease Market Growth Slows, July 10 2007
- Retail Traffic, Traffic Patters May 2007
- Real Estate Forum, Today's Sale Leaseback Transactions Give Sellers More Than Just Cash Back, April 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2007
- Net Lease Market Report Q2 2007, Boulder Net Lease Funds, June 2007
- Real Estate Forum, Net Lease Review: Retail Still Riding High, April 2007
- Commercial Property News, Online Edition, March 3, 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2007
- Net Lease Market Report Q1 2007, Boulder Net Lease Funds, March 2007
- Commercial Property News, February 1, 2007
- Real Estate Forum, Another Wild Ride? January 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2006
- Net Lease Market Report Q4 2006, Boulder Net Lease Funds, December 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2006
- Net Lease Market Report Q3 2006, Boulder Net Lease Funds, September 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2006
- The Net Lease Restaurant Report, Boulder Net Lease Funds, June 2006
- Net Lease Market Report Q2 2006, Boulder Net Lease Funds, June 2006
- The Net Lease Bank Branch Report, Boulder Net Lease Funds, July 2006
- The Net Lease Drug Store Report, Boulder Net Lease Funds, July 2006
- Retail Traffic, April 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2006
- Net Lease Market Report Q1 2006, Boulder Net Lease Funds, March 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2005
- Net Lease Market Report Q4 2005, Boulder Net Lease Funds, December 2005
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2005
- Net Lease Market Report Q3 2005, The Boulder Group, September 2005
- The Sale Leaseback Report, The Boulder Group, August 2005
- Net Lease Forum, July 19, 2005, Vol. 03 No. 10
- The Credit Ratings Report, The Boulder Group, July 2005
- Net Lease Market Report Q2 2005, The Boulder Group, June 2005
- Mortgage and Real Estate Executives Report, May 15, 2005, Volume 38 Number 6
- The Net Lease Restaurant Market Report, The Boulder Group, May 2005
- Drugstores Command Higher Prices, Globest.com, April 20, 2005
- Mortgage and Real Estate Executives Report, April 1, 2005, Volume 38 Number 3
- The Net Lease Drug Store Report, The Boulder Group, April 2005
- Net Lease Market Report Q1 2005, The Boulder Group, March 2005
- The Big Box Net Lease Market Report, The Boulder Group, February 2005
- High Cap Rate Properties Report, The Boulder Group, January 2005

- Net Lease Market Report Q4 2004, The Boulder Group, December 2004
- The Chicago Net Lease Market Report, The Boulder Group, November 2004
- Net Lease Forum, October 19, 2004, Vol. 2 No. 16
- Net Lease Fund Returns Outperform Competitors, The Boulder Group, October 2004.
- Mortgage and Real Estate Executives Report, September 15, 2004, Volume 37 Number 14
- Mortgage and Real Estate Executives Report, September 1, 2004, Volume 37 Number 13
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2004
- Shopping Center Business, September 2004
- Mortgage and Real Estate Executives Report, September 15, 2004, Volume 38 Number 14
- Net Lease Forum, September 7, 2004, Vol. 2 No. 13
- Net Lease Market Report Q3 2004, The Boulder Group, September 2004
- Net Lease Forum, August 3, 2004, Vol. 2; Quarter Sees Jump in Net Lease Asset Market, Globest.com, August 25, 2004
- Mortgage and Real Estate Executives Report, August 1, 2004, Volume 37 Number 11
- The Estate Planning Net Lease Report, The Boulder Group, August 2004
- Mortgage and Real Estate Executives Report, July 15, 2004, Volume 37 Number 10
- Institutional Real Estate Investor, July 2004
- The Big Box Net Lease Market Report, The Boulder Group, July 2004
- Big-Box Net-Lease Properties Harder to Find, Globest.com, June 29, 2004
- More Retail Users Buying Big Boxes, Commercial Property News Website, June 29, 2004
- Net Lease Forum, June 15, 2004
- Net Lease Market Report Q2 2004, The Boulder Group, June 2004
- Mortgage and Real Estate Executives Report, June 1, 2004, Volume 37 Number 7
- Mortgage and Real Estate Executives Report, May 1, 2004, Volume 37 Number 5
- The Net Lease Drug Store Report, The Boulder Group, May 2004
- Mortgage and Real Estate Executives Report, April 1, 2004, Volume 37 Number 3
- The Net Lease Restaurant Report, The Boulder Group, April 2004
- The Chicago Net Lease Market Report, The Boulder Group, March 2004
- Net Lease Market Report Q1 2004, The Boulder Group, March 2004
- Chicago Area Real Estate Investors Association – Gave Presentation on I.R.C. §1031 exchanges, January 2004. I.R.C. §1033 Exchanges, The Boulder Group, February 2004
- Commercial Property News, January 1, 2004
- Retail Traffic, January 2004
- Ground Leases, The Boulder Group, January 2004
- Net Lease Forum, December 18, 2003, Vol. 1 No. 18
- Mortgage and Real Estate Executives Report, December 15, 2003, Volume 36 Number 20
- Net Lease Market Report Q4 2003, The Boulder Group, December 2003
- Retail Traffic, December 2003
- Mortgage and Real Estate Executives Report, December 15, 2003, Volume 36 Number 20
- Triple Net v. Tax?, The Boulder Group, November 2003