**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| SCOTT AND RHONDA BURNETT, RYAN HENDRICKSON, JEROD BREIT, SCOTT TRUPIANO, AND JEREMY KEEL, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:19-cv-00332-SRB |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

Before the Court are four motions for summary judgment filed by Defendants Keller Williams Realty, Inc. ("Keller Williams") (Doc. #917); Re/Max, LLC ("Re/Max") (Doc. #925); HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates, LLC (collectively, "HomeServices Defendants") (Doc. #927); Realogy Holding Corp. ("Realogy") (Doc. #928); and National Association of REALTORS® ("NAR") (collectively, "Defendants") (Doc. #930).[1] As set forth below, the motions are DENIED.

---

[1] The Court finds that the facts and legal arguments set forth in Defendants' motions are similar enough to warrant resolution in a single order. The Court will note if and where the parties' arguments differ.

# I. BACKGROUND

For the purpose of resolving the pending motions, the following facts are uncontroverted or deemed uncontroverted by the Court.[2] Additional facts relevant to the parties' arguments are set forth in Section III. Only those facts and issues necessary to resolve the pending motions are discussed below, and they are simplified to the extent possible.

## A. The Parties

Plaintiffs Rhonda Burnett, Scott Burnett, Ryan Hendrickson, Jerod Breit, Scott Trupiano, Jeremy Keel, Frances Harvey, Hollee Ellis, and Shelly Dreyer (collectively, "Plaintiffs") are individuals who sold their homes through the use of a Multiple Listing Service ("MLS"), discussed in more detail below. Plaintiffs bring this action on behalf of themselves, as well as all persons who listed properties on the relevant Multiple Listing Services and who paid a buyer broker commission from April 9, 2015, to present.

NAR is a trade association that operates local, state, and national real estate associations. Membership in a local association automatically enrolls a broker in the corresponding state and national associations. NAR adopts rules that govern its members through its Handbook on Multiple Listing Policy ("MLS Handbook") and Code of Ethics. NAR has 1.5 million members, 1,200 local associations or boards, and operates in all 50 states.

The HomeServices Defendants[3], Keller Williams, Realogy[4], and Re/Max (collectively, the "Franchisor Defendants") are national real estate broker franchisors that operate brokerage

---

[2] The facts discussed below are taken from the parties' briefs and exhibits, without further quotation or attribution unless otherwise noted.

[3] HomeServices of America, Inc. ("HSoA") is a holding company and subsidiary of Berkshire Hathaway Energy Company. HSoA holds HSF Affiliates, LLC ("HSF"), which owns BHH Affiliates, LLC ("BHH"). HSoA owns three brokerages within Missouri: ReeceNichols, BHHS Kansas City, and BHHS Alliance Real Estate. BHH operates the Berkshire Hathaway Home Services ("BHHS"), and previously operated the Real Living network. Robert Moline ("Moline"), President and Chief Operating Officer of HSoA from 2008–2017, testified that

subsidiaries, franchisees, or affiliates.  The Franchisor Defendants compete for brokerages and affiliated agents.  (Doc. #990, p. 11.)

## B.    A Typical Home Sale

In a standard residential real estate transaction in the United States, a homeowner ("Seller") sells their home to a buyer ("Buyer").  Both Sellers and Buyer retain their own brokers.  As compensation for their services, the Seller's broker ("Seller-Broker") receives compensation, or a commission, calculated as a percentage of a home's sale price.  The Seller-Broker's commission is set out in the home's listing agreement.  Further, in the United States, a standard listing agreement provides that the Seller-Broker will split or share their commission with the Buyer's broker ("Buyer-Broker").  The Seller-Broker and Buyer-Broker generally split commissions 50/50.  (Doc. #963-49, p. 5.)  The Franchisor Defendants receive a percentage of their affiliated brokers' commissions.

Most transactions in the United States are facilitated by the use of an MLS.  An MLS is a database of properties listed for sale in a defined geographic region.  Seller-Brokers and Buyer-Brokers use the MLS to publish and search for property listings.  In 2020, 91% of homes sold were listed on an MLS.  (Doc. #922-2, p. 29.)   MLS membership is considered essential to brokers.  Four MLS are at issue in this case: Kansas City MLS ("Heartland MLS"), St. Louis MLS ("MARIS MLS"), Springfield, Missouri MLS ("Southern Missouri Regional MLS"), and Columbia, Missouri MLS ("CBOR MLS") (collectively, "Subject MLS").

---

franchises associated with HSF and BHHS were considered "wholly-owned" subsidiaries of HSoA.  (Doc. #963-46, p. 8.)  HSF is an entity that oversees both independent and branded franchises.  BHH has eight franchisees operating in Missouri; two are owned by HSoA and six are independently owned.

[4] Realogy owns and operates a subsidiary, NRT Missouri LLC d/b/a Coldwell Banker Gundaker, which is a real estate brokerage that operates within the Subject MLS.  On June 9, 2022, Realogy rebranded and is now known as Anywhere Real Estate Inc.; but, for the purposes of this motion, the Court will refer to it as Realogy.

In order to list a property on an MLS, the Seller-Broker must be a participant of the MLS and abide by the MLS's rules. NAR requires that any MLS affiliated with NAR, including the Subject MLS, comply with NAR's governing rules, which include the MLS Handbook and Code of Ethics. Therefore, all Subject MLS participants are bound by NAR's MLS Handbook and Code of Ethics. The Franchisor Defendants operate within the Subject MLS.

## C.     The MLS and Cooperative Compensation

In 1996, NAR's Multiple Listing Issues and Policies Committee ("the MLS Committee") adopted a rule requiring that a Seller-Broker who lists on an MLS make blanket unilateral offers of commission to any Buyer Broker:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants.

(Doc. #963-72, p. 55.) This rule is incorporated into NAR's MLS Handbook at Section 2-G-1 (hereinafter "Section 2-G-1").

Section 2-G-1 prohibits participants from "publish[ing] listings that do not include an offer of compensation" or "include general invitations . . . to discuss terms and conditions of possible cooperative relationships." (Doc. #963-72, p. 56.) "Entitlement" to a blanket unilateral offer of compensation "is based on being the procuring cause[,]" or bringing the buyer to the table, and is not "based on the hours an individual has worked or different services that the individual has provided." (Doc. #963-76, p. 5.) Compliance with Section 2-G-1 is mandatory in order to post listings on the MLS.

NAR's Code of Ethics also requires Seller-Brokers to compensate Buyer-Brokers: "In cooperative transactions REALTORS® shall compensate cooperating REALTORS®[.]" (Doc. #963-11, p. 8) Article 3 of the Code of Ethics states that "REALTORS® shall cooperate

4

with other brokers except when cooperation is not in the client's best interest." (Doc. #931-22, p. 4.) Plaintiffs have put forth evidence indicating that "the public marketing of a listing indicates that the [Seller-Broker] has concluded that cooperation with other MLS participants is in their client's best interest." (Doc. #963-84, p. 4.) At the oral arguments held on these motions, the parties agreed there is no such thing as a non-cooperative transaction that is facilitated by an MLS. Additionally, the Code of Ethics requires that any negotiation of the cooperative compensation offer must occur before the property is shown and cannot be negotiated after that point. (Doc. #963-11, p. 7;) (Doc. #963-78, p. 3.)

The Franchisor Defendants require their franchisees to be members of NAR and/or abide by NAR's Code of Ethics. As part of a broker's employment with Keller Williams[5] and Re/Max,[6] they are required to maintain NAR membership, and therefore follow NAR's Code of Ethics and Rule 2-G-1. Since 2015, HSoA encouraged its franchisees to be members of NAR.[7] (Doc. #966-30, pp. 6–7; Doc. #963-40, p. 8.) BHH, a subsidiary of HSoA, requires its

---

[5] Plaintiffs produced Keller Williams's "Policies and Guidelines Manual," revised on April 1, 2020, which requires its brokers to "become members of their local Board/Association of REALTORS® and MLS except when exempted by their TL, and will keep their membership current and active at all times." (Doc. #963-23, p. 8.)

[6] Plaintiffs produced a "Franchise Disclosure Document" issued by Re/Max in 2014 that states: "You agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS® (or comparable organization[.]" (Doc. #963-98, p. 3.) Plaintiffs also produced a brokerage agreement requiring brokers to "maintain membership . . . with the National Association of REALTORS® ("NAR") . . . [and] abide by the Code of Ethics promulgated by NAR and all of the rules and regulations of NAR and each local or regional MLS in which Broker participates." (Doc. #963-99, p. 4.)

[7] HomeServices's Code of Business Conduct, published in 2013, stated:

> You are encouraged to belong to trade associations when such groups contribute significant benefits sufficient to justify the time and cost of membership or support. By their nature, trade associations involve meetings and discussions with competitors and care must be taken to avoid antitrust problems. You must obtain permission from a corporate officer before joining a trade association and before you appear at any meeting as a speaker or a member of a panel where statements will be made on behalf of the company.

(Doc. #963-111, p. 34.) The Court finds that Plaintiffs have produced evidence creating a genuine dispute of material fact as to whether HSoA required its franchisees and affiliated agents to be members of NAR.

5

franchisees to "at all times comply with the Code of Ethics of the National Association of Realtors[.]"  (Doc. #963-41, p. 16.)  Until July 2022, Realogy's franchise agreements required its franchisees to follow NAR's Code of Ethics, "whether or not they are members of NAR," and encourages them to become members of NAR.  Realogy's subsidiary, Coldwell Banker Gundaker, requires that its brokers are members of NAR.  Realogy, in its 2020 annual filing with the United States Securities and Exchange Commission, states, "We are a member of many [MLS] . . . and a member of [NAR] . . . and, accordingly, are subject to each group's rules," and defines the term "we" as referring to Realogy Holdings Corporation and its subsidiaries. (Doc. #963-103, pp. 3, 5.)

The Franchisor Defendants' executives testified that cooperative compensation, codified by Section 2-G-1, is beneficial and a core component of organized real estate.  (Doc. #963-66, p. 6;) (Doc. #963-54, p. 8;) (Doc. #990, p. 27;) (Doc. #963-68, p. 2.)  Gino Blefari ("Blefari"), CEO of HSoA and Chairman of both HSF and BHH, testified that "coupled with the duty to cooperate, th[e] unconditioned offer of compensation is a chief rationale for the existence of the [MLS]" and "a core component of organized real estate[.]"  (Doc. #963-54, p. 8.)  Blefari also stated in a scripted training video: "The only way you can eliminate all competition is to include them."  (Doc. #990, p. 27.)  Gary Keller ("Keller"), founder and current Executive Chairman of Keller Williams, coined the term "co-opetition" to describe "cooperative competition" among "trade associations, local boards, and multiple listing services."  (Doc. #963-31, p. 3.)  Keller testified that "the reason real estate is so cooperative is because [NAR] and the MLS gave evolved into a system that inspires cooperation amongst competitors."  (Doc. #963-62, p. 6.)  Re/Max Founder and Chairman of the Board, Dave Lininger, testified that he believes sharing average commission rates publicly is beneficial.  (Doc. #963-66, p. 8.)

NAR's CEO, Dale Stinson ("Stinson"), believes that there are "threats to the system" that include "commission-thirsty outsiders, broker/association and broker/MLS chafing, [and] data syndication offenders." (Doc. #963-50, pp. 3–4.) To fight these threats, Stinson believes that "Brokers, Agents, Franchises, Independents, the National, State, and Local Associations, the Institutes, Societies, and Councils, and the MLSs" must "ORGANIZE AS ONE AND COMMIT TO EACH OTHER WITH URGENT RESOLVE." (Doc. #963-50, pp. 3–4) (emphasis in original). In discussing the benefits of "[o]rganized real estate," Stinson states, "Where else would the offer of cooperation and compensation have come from?" (Doc. #963-50, pp. 4.)

Robert Moline ("Moline"), HSoA's prior President and COO, testified that he "always thought you could do real estate so much less expensive if" the United States adopted an "auctioneering model" that exists in Australia. (Doc. #963-46, p. 6.) Moline was interviewed for a report published by NAR, and discussed the dangers of "commissions spiral[ing] downward" if Buyers find ways to avoid using brokers, noting that brokerage fees in the United States are higher than other developed countries. (Doc. #966-40, pp. 25–26.)

### D.     NAR's Clear Cooperation Rule

In 2019, NAR adopted the Clear Cooperation Rule. This rule requires all listings to be posted on the MLS within one "business day of marketing a property to the public," which includes "flyers displayed in windows, yard signs, digital marketing . . . and applications available to the general public." (Doc. #963-72, p. 78.) The Clear Cooperation Rule's rationale is that MLS participation "is procompetitive and proconsumer." (Doc. #966-42, p. 4.) If a Seller "refuses to permit the listing to be disseminated by the service," the Seller-Broker must still file it on the MLS but must include a "certification signed by the seller that he does not desire the listing to be disseminated by the [MLS]." (Doc. #963-72, p. 80.) NAR's position is that the Clear Cooperation Rule is "consistent with . . . the NAR Code of Ethics[,]" which requires

7

cooperation with competitors when in the client's best interest, because "the public marketing of a listing indicates that the MLS Participant has concluded that cooperation with other MLS participants is in their client's best interests." (Doc. #966-43, p. 8.)

The HomeServices Defendants campaigned for NAR to adopt the Clear Cooperation Rule. Blefari stated that it was HSoA's opinion the Clear Cooperation Rule should be adopted because "[o]ff-MLS listings aren't good for consumers, and they aren't good for competition." (Doc. #963-89, p. 2.) Blefari stated that pocket listings, or houses listed privately and outside of an MLS, "threaten[] the fundamental concept of cooperation that is the bedrock of our industry[.]" (Doc. #973-89, p. 2.) Blefari encouraged recipients to share his message with any "managers or agents who are Directors of NAR, or members of the MLS Committee that will vote on this important rule" to garner support and "put a stop to wide use of pocket listings." (Doc. #963-89, p. 3.)

### E. Training

The Franchisor Defendants provided training to brokers which directed them to offer a 6% commission rate, to be split equally among the Seller-Broker and the Buyer-Broker. The Franchisor Defendants used this 6% commission rate split in educational transaction models. For example, Re/Max training documents instructed brokers to develop their "Economic Model" and "define the 'average' commission that will come from each of [their] closings," including an example of a 6% commission rate per transaction, split 50/50 between the Seller-Broker and Buyer-Broker. (Doc. #964-30, p. 4.) Similarly, Keller Williams trained its brokers to develop an "economic model" which provided a "standard 6% commission" rate per transaction, split 50/50 between the Seller-Broker and Buyer-Broker. (Doc. #964-46, p. 8; Doc. #964-43, p. 12.) Additionally, the HomeServices Defendants circulated training materials from Intero, a California subsidiary, that instructed brokers to "[a]lways have 6% written in on ALL listing

8

agreements" and, if they "have to give something," to "remember [they] always have to pay [the Buyer-Broker] a minimum of 2.5%."  (Doc. #966-55, p. 3.)

Further, the Franchisor Defendants trained brokers to never lower their rates.  For example, Re/Max trained brokers to "[h]ave the commission typed into the listing agreement" before speaking to Sellers, and to tell Sellers "'This is what my company charges.'" (Doc. #964-35, p. 4.)  Re/Max franchises must "maintain . . . quality," including avoiding "[d]iscount[ing] rates," or the franchise may be sold.  (Doc. #962-42, p. 5.)  Keller Williams provided brokers with scripted responses to requests to lower commissions, stating that brokers "require a full 6 percent" to "do the advertising that [they] do" and that a "discount rate will not provide you with enough exposure to get you top dollar[.]"  (Doc. #964-47, p. 5.)  Realogy acknowledged that its franchisees compete with one another, and instructs franchisees to "avoid any action or discussion intended to eliminate or restrict competition" including discussions of "commission structures[.]"  (Doc. #964-58, p. 3.)  However, Realogy provided training to its franchisees and subsidiaries regarding commissions and trains its agent to tell clients they cannot cut commissions.

### F.       The Instant Action

The instant action's procedural history is set out in the Court's prior Orders and need not be repeated here.  Only the facts and issues relevant to the resolution of the pending motions are discussed.  Plaintiffs assert three claims against Defendants in their First Amended Complaint: (1) Count I: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) Count II: Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*; and (3) Count III: Violation of the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031.  Plaintiffs allege Defendants

adopted and imposed Section 2-G-1, an anticompetitive restraint, that inflated residential real estate commissions throughout Missouri in the Subject MLS.

On August 29, 2022, the Court granted HomeServices' motion to stay this case as to claims asserted by unnamed class members, pending appeal of the Court's denial of its motion to compel arbitration. (Doc. #916.) This Order does not address or dispose of any claims asserted by the unnamed class members against HomeServices. On August 29, 2022, Defendants filed the instant motions for summary judgment. Plaintiffs oppose the motions. The parties' arguments are addressed below.

## II.     LEGAL STANDARD

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of identifying "the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up). If the moving party makes this showing, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* (quotation marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quotation marks omitted).

## III.    DISCUSSION

Defendants move for summary judgment on Counts I–III. The Court will address the parties' arguments as to (A) Counts I and III, Plaintiffs' antitrust claims, and (B) Count II, Plaintiffs' MMPA claims, separately below.

### A. Counts I & III, Antitrust Claims

Defendants argue that summary judgment is appropriate on Counts I and III, which allege violations of the Sherman Act and the Missouri Antitrust Law. Plaintiffs disagree, arguing that genuine issues of material fact preclude summary judgment. As both Counts I and III are analyzed under the same applicable legal standards,[8] the parties' arguments are addressed below as follows: (1) whether Plaintiffs have antitrust standing; (2) whether Plaintiffs have produced evidence of a conspiracy; (3) whether Plaintiffs have produced evidence that Section 2-G-1 restrains trade; and (4) whether Plaintiffs have produced evidence of an antitrust injury.

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. "The Sherman Act was specifically intended to prohibit independent businesses from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete." *Associated Press v. United States*, 326 U.S. 1, 15 (1945). "To establish a claim under Section 1 of the Sherman Act, a plaintiff must demonstrate (1) that there was a contract, combination or conspiracy; (2) that the agreement unreasonably restrained trade; and (3) that the restraint affected interstate commerce." *Wholesale Alliance, LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1076 (E.D. Mo. 2019) (citation omitted). As the parties have stipulated to the third element, the Court will address only the first two elements.

### 1. Standing

As a threshold issue, NAR asserts that Plaintiffs lack standing to assert Counts I and III. Plaintiffs allege they were harmed because they overpaid for the Buyer-Broker's services, which

---

[8] *See* Mo. Rev. Stat. § 416.141 (stating the Missouri Antitrust Law "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes"); *see also State of Mo. v. Nat'l Org. for Women, Inc.*, 620 F.2d 1301, 1316 (8th Cir. 1980) (holding that "the Missouri antitrust law . . . can be disposed of with the same rationale with which we have disposed of the Sherman Act claim") (citing Mo. Rev. Stat. § 416.141).

is provided for in the listing agreement as a share of the Seller-Broker's commission. NAR argues that Plaintiffs "did not directly purchase anything from Defendants[.]" (Doc. #932, p. 23.) NAR argues that Plaintiffs did not directly purchase the Buyer-Broker's services because the Buyer-Broker's commission comes from the Seller-Broker's commission and is not directly paid by the Seller. Plaintiffs disagree, arguing that they are direct purchasers who have standing to pursue their claims under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

"The bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue. By contrast, direct purchasers–that is, those who are 'the immediate buyers from the alleged antitrust violators'–may sue." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) (quoting *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990)). "[O]nly the 'overcharged direct purchaser, and not others in the chain of manufacture or distribution' can sue for antitrust damages[.]" *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.2d 1047, 1058 (8th Cir. 2018) (quoting *Illinois Brick*, 431 U.S. at 729)). "The direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges between direct and indirect purchasers." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208 (1990) (citations omitted).

Here, the Court finds that Plaintiffs have established a genuine dispute of material fact as to whether they are considered direct purchasers under *Illinois Brick*. Despite Defendants' contentions to the contrary, Plaintiffs have produced evidence showing that the Buyer-Broker's commission rates are negotiated between the Seller and the Seller-Broker, agreed to by the Seller, and set out in the Seller's listing agreement. *See, e.g.,* (Doc. #932-20, p. 3; Doc. #932-21, p. 4.) The HomeServices Defendants and Keller Williams' expert witnesses acknowledge that "the seller pays for the buyer's agent and the seller's agent" with funds from "the closing."

(Doc. #963-73, p. 8;) (Doc. #964-118, p. 4) (stating the existence of a "convention that sellers pay both listing brokers and buyer brokers from the proceeds of the sale of their property").

Although Defendants argue that the Seller is not purchasing the Buyer-Broker's services, the record shows that the Seller must explicitly consent to the amount of the Buyer-Broker's commission. Defendants have not put forth any evidence of negotiations or contracts between the Seller-Broker and the Buyer-Broker. Accordingly, the Court finds that Plaintiffs have created a genuine dispute of material fact as to whether the Seller is the direct purchaser of the Buyer-Broker's commission.[9]

## 2.     A Contract, Combination, or Conspiracy

Defendants argue Plaintiffs cannot present evidence meeting the first element of their antitrust claims, or show the existence of a contract, combination, or conspiracy. Plaintiffs disagree, and argue they have presented direct evidence of a conspiracy among the Defendants–Section 2-G-1 itself.

In analyzing a Section 1 claim, the question is whether the contract or conspiracy "joins together separate decisionmakers . . . . such that the agreement deprives the marketplace of independent centers of decisionmaking." *Am. Needle, Inv. v. Nat'l Football League*, 560 U.S. 183, 195–96 (2010) (cleaned up) (citations and quotations omitted). Plaintiffs need not prove a formal agreement existed between the Defendants. *Interstate Cir. v. United States* 306 U.S. 208, 227 (1939). All that is required is "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764

---

[9] Because the Court finds a genuine dispute of material fact as to whether Plaintiffs were direct purchasers of the Buyer-Broker's services, the Court need not address Plaintiffs' arguments regarding the exception to *Illinois Brick* set out by *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003). Regardless, even if the Seller-Brokers are considered the direct purchasers, the Court finds that Plaintiffs have standing because there is no realistic possibility the Seller-Brokers would sue Defendants over the alleged antitrust violation. *Freeman*, 322 F.3d at 1145–46 (citing *Royal Printing Co v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980)).

(1984) (citation and quotations omitted). The Sherman Act is violated where participants in a "widespread combination ha[ve] surrendered [their] freedom of action in the matter . . . and agreed to abide by the will of the association[.]" *Anderson v. Shipowners' Ass'n of Pacific Coast*, 272 U.S. 359, 364 (1926) (citation omitted). Trade association rules "in and of themselves [are] contracts in restraint of commerce [where] . . . they contain[] provisions designed to stifle competition in [that] . . . field." *Associated Press v. United States*, 326 U.S. 1, 11 (1945).

The Court finds that Plaintiffs have created a genuine dispute of material fact as to whether Section 2-G-1 and the Franchisor Defendants' adoption thereof is direct evidence of a conspiracy.[10] Here, the record creates a genuine question of material fact as to whether Defendants adhered to a common scheme. *See PLS.Com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022). A reasonable jury could find that "the concerted conduct is both plainly documented and readily available[.]" *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 289 (4th Cir. 2012).

Plaintiffs have produced evidence that Section 2-G-1 stifles competition among brokers by artificially inflating commission rates. Additionally, Plaintiffs have produced evidence that NAR adopted Section 2-G-1 and the Franchisor Defendants required their franchisees to follow Section 2-G-1, either explicitly or through NAR's Code of Ethics.[11] *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004) ("[W]here a trade association . . . [is]

---

[10] Further, as the Court finds that Plaintiffs have presented evidence creating a genuine dispute of material fact as to whether Defendants conspired to restrain trade in the adoption and enforcement of Section 2-G-1, the Court need not address NAR and the HomeServices Defendants arguments that they cannot conspire with only themselves.

[11] The HomeServices Defendants and Realogy admit they require associated brokers to follow NAR's Code of Ethics, but argue that NAR's Code of Ethics does not require compliance with Section 2-G-1. However, a reasonable jury could find to the contrary. NAR's Code of Ethics Standard of Practice 16-15 states: "In cooperative transactions REALTORS® shall compensate cooperating REALTORS®[.]" (Doc. #963-11, p. 8.)

found to have violated antitrust laws, membership in the association will not automatically involve all members in the violation. There must, instead, be some evidence of actual knowledge of, and participation in, the illegal scheme[.]"). Section 2-G-1 requires Seller-Brokers to offer Buyer-Brokers blanket unilateral offers of compensation. Although Defendants argue that cooperative compensation is required only when it is in the client's best interest, Plaintiffs have produced evidence indicating that Defendants' position is that it is always in the client's best interest to market a property on an MLS, subjecting it to Section 2-G-1. Additionally, at oral arguments, the parties agreed that all transactions facilitated by the MLS are cooperative transactions.

Further, Plaintiffs have presented evidence that Defendants provided uniform training to Seller-Brokers to obtain 6% commission rates and to split commissions equally with Buyer-Brokers. Because these commission offers are blanket offers and agreed to prior to listing the house, the Buyer-Broker will receive the same amount in commission regardless of the effort made, stifling competition.[12] *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price . . . , the . . . member institutions have created a horizontal restraint–an agreement among competitors on the way in which they will compete with one another."). The Court finds that Plaintiffs have produced sufficient evidence to create a genuine question of material fact as to whether Defendants' adoption and enforcement of Section 2-G-1 is a conspiracy to restrain trade, in violation of the Sherman Act.

---

[12] NAR's Code of Ethics Standard of Practice 3-2 states "After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." (Doc. #963-11, p. 4.)

The Franchisor Defendants argue that requiring NAR and MLS membership, and therefore requiring compliance with Section 2-G-1, cannot support a conspiracy as it was a result of independent business judgment. However, where direct evidence is used to show the existence of a conspiracy, a plaintiff need not present evidence to rule out independent action. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000) ("However, where there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn."); *see also Anderson*, 272 U.S. at 363 ("A restraint of interstate commerce cannot be justified by the fact that the object of the participants in the combination was to benefit themselves in a way which might have been unobjectionable, in the absence of such restraint.").

Similarly, the Franchisor Defendants argue that Plaintiffs cannot show a conspiracy because they cannot be held liable for the conduct of their associated brokers, who negotiate and set commission rates.[13] However, the Franchisor Defendants misstate Plaintiffs' antitrust claims. Plaintiffs allege that the Franchisor Defendants restrain trade by enforcing policies and practices that artificially inflate commission rates. *See Nobody in Particular Presents, Inc. v. Clear*

---

[13] The HomeServices Defendants argue that HSoA cannot be liable for the actions of BHH. (Doc. #986, p. 9.) The Court finds that Plaintiffs have presented sufficient evidence to create a genuine dispute of material fact as to whether all of the HomeServices Defendants engaged in the conspiracy discussed herein such that HSoA's liability is not derivative of BHH.

However, for the reasons discussed below, the Court also finds that Plaintiffs have presented sufficient evidence to create a genuine dispute of material fact as to whether the HomeServices Defendants are independently managed and have consolidated decision-making power, or entities capable of conspiring under § 1 of the Sherman Act. *See American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196–97 (2010) (holding the determinative "question is whether the agreement joins together 'independent centers of decisionmaking'" and finding entities were not capable of conspiring for § 1 purposes where they were each "a substantial, independently owned, and independently managed business"). For example, Robert Moline served as CEO of HSoA at some point from 2008 to 2017, and "[s]omewhere towards the end" was "given the title of CEO of HomeServices Residential Real Estate Brokerage or whatever, which is a nonexistent entity;" however, these titles "didn't matter" because, regardless of his position, he "kept doing the same things [he] was doing before." (Doc. #936-46, p. 3.) When asked if HSoA's subsidiaries and franchisees competed with one another, Moline responded, "[H]ow do you compete with yourself?" (Doc. #963-46, p. 7.)

*Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1069 (D. Colo. 2004) (citing *Copperweld Corp v. Independence Tube Corp.*, 467 U.S. 752, 773–74 (1984) ("When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.")). As discussed above, Plaintiffs have presented evidence creating a genuine dispute of material fact as to whether Defendants encouraged or directed compliance with Section 2-G-1, resulting in the artificial inflation of commission rates. The effects of the brokers' actions, or what commission rates the associated brokers actually used, do not bear on whether a conspiracy existed. *See Associated Press*, 326 U.S. at 12 (citation and quotations omitted) ("An agreement or combination to follow a course of conduct which will necessarily restrain . . . trade or commerce may violate the Sherman Act, whether it be wholly nascent or abortive on one hand, or successful on the other.").

Finally, the Franchisor Defendants argue that they could not have conspired because they did not exist as entities when Section 2-G-1 came into effect. This is immaterial:

> It is elementary that an unlawful conspiracy may be and is often formed without simultaneous action or agreement on the part of the conspirators. . . . Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if arrived out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.

*Interstate Cir.*, 306 U.S. at 227. Accordingly, the Court finds that Plaintiff have created a genuine dispute of material fact precluding summary judgment.[14]

---

[14] As the Court finds Plaintiffs have created a genuine dispute of material fact as to whether Plaintiffs have produced direct evidence of a conspiracy among the Defendants, the Court need not address Defendants' arguments relating to circumstantial evidence of a conspiracy. *See Robertson*, 679 F.3d at 289–90. Regardless, the Court finds that Plaintiffs have produced sufficient circumstantial evidence of a conspiracy among the Defendants such that the outcome would be the same.

17

### 3.    Unreasonable Restraint of Trade

The parties dispute whether Section 2-G-1 is an unreasonable restraint of trade.  As a threshold matter, the Court must determine the applicable standard to analyze Section 2-G-1. "Whether an agreement unreasonably restraints trade is determined under one of two approaches: the *per se* standard or a standard that examines all of the circumstances, the so-called rule of reason test."  *Wholesale Alliance*, 366 F. Supp. 3d at 1076 (citing *Am. Express Co.*, 138 S. Ct. at 2283; *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058 (8th Cir. 2000)). Defendants contend that the rule of reason test, which involves a study of the relevant market and effects of the challenged restraint, is applicable here.  Plaintiffs argue the *per se* standard is appropriate.

"*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"  *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *Nat'l Soc. of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978)).  "Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful."  *Id.* (citation omitted).  "That price-fixing includes more than the mere establishment of uniform prices is clearly evident[.]"  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940)

Defendants argue the Court should not apply the *per se* rule because Section 2-G-1 does not explicitly set commission rates.  Here, however, the fact that Section 2-G-1 does not explicitly set out acceptable commission rates is not dispositive.  "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*."  *Socony*, 310 U.S. at 223 (emphasis added).  Plaintiffs have produced evidence that Defendants have

18

stabilized the price of residential real estate brokers' services, as reflected through commission rates. For example, Plaintiffs have produced evidence that Defendants train associated brokers to set commission rates at 6%, to split commission equally among Buyer-Brokers and Seller-Brokers, and to never lower commissions. *See, e.g.*, (Doc. #964-33, p. 4) (discussing a Re/Max training document which says: "Once you start cutting commissions, you can never stop. . . . Charge everyone the same and let them know it[.]").

In addition to training, Plaintiffs have presented expert testimony showing that Section 2-G-1 had the effect of stabilizing commission rates. (Doc. #922-2, pp. 86–95) (noting that upwards of 90% of transactions on the Subject MLS offer buyer agent commissions of exactly 3% during the class period, with the exception of the MARIS MLS consistently offering 2.7%). Plaintiffs have also produced evidence that Section 2-G-1 creates a system that rewards all Buyer-Brokers similarly, despite their skill as a broker or the amount of effort expended in procuring the Buyer. *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 348 (1982) ("In this case the rule is violated by a price restraint that tends to provide the same economic reward to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases."). Although it is true that a nominal commission of $1 would satisfy Section 2-G-1 and Defendants agree such nominal commission is mandated, Plaintiffs have produced evidence that no transaction within the Subject MLS took place using a nominal commission. (Doc. #963-54, p. 6.) Therefore, Defendants' argument is rejected.

Defendants also argue that application of the *per se* rule is inappropriate under *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979). Defendants provide little explanation for why *Broadcast Music*, which dealt with blanket licensing fees in the music

industry, is applicable here. In *Broadcast Music*, the Supreme Court found the blanket license "developed . . . out of the practical situation in the marketplace" where "users want unplanned, rapid, and indemnified access to" music and "owners want a reliable method of collecting for the use of their copyrights." *Id.* at 20. More importantly, the blanket license scheme in *Broadcast Music* was developed in concert with a consent decree imposed by the Department of Justice, among others, and the Supreme Court found this was a large factor in declining to apply the *per se* rule. *Id.* at 13 ("[I]t cannot be ignored that the Federal Executive and Judiciary have carefully scrutinized . . . the challenged conduct . . . and, by the terms of the decree, stand ready to provide further consideration, supervision, and perhaps invalidation of asserted anticompetitive practices.").

The rationale used to apply the rule of reason in *Broadcast Music* is not present here. The residential real estate market involves slower and more complex transactions than the music licensing industry. The transactions at issue here involve only two parties and only one product, or home, per transaction. Although an MLS can assist a transaction by making listings easily available to brokers that are members, the actual sale of the home takes place through a negotiated and written agreement. In contrast, the market in *Broadcast Music* involved quick transactions licensing one product to multiple consumers. And, notably, Section 2-G-1 has not been continually scrutinized by any government entity for antitrust implications, unlike the alleged restraint at issue in *Broadcast Music*. Accordingly, *Broadcast Music* is factually distinguishable and does not preclude the application of the *per se* rule.

To the contrary, the Court agrees with Plaintiffs and finds that the *per se* rule is applicable here. As discussed above, Plaintiffs have produced evidence, creating a genuine dispute of material fact, that Defendants implemented or enforced Section 2-G-1 with the

purpose and effect of inflating or stabilizing broker commission rates. The record creates a genuine material fact as to whether Defendants have engaged in a horizontal price-fixing scheme, exactly the situation where applying the *per se* rule is appropriate. *Texaco*, 547 U.S. at 5. For this reason, the Court finds the *per se* rule is applicable here, and Plaintiffs have met their "burden of proving the unreasonableness of the restraint merely by proving the existence of substance of the restraint itself." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 387 (8th Cir. 2007).[15]

### 4. Antitrust Injury

Defendants argue Plaintiffs cannot show an antitrust injury because (1) Plaintiffs were not harmed by Section 2-G-1; and (2) Plaintiffs have failed to specify any amount of damages. The parties' arguments are addressed separately below.

To prevail, Plaintiffs must present facts indicating they suffered an 'antitrust injury' as a result of the alleged conduct of the defendants[.]" *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006). "An antitrust plaintiff must show that a defendant's anticompetitive act was a material and but-for cause of plaintiff's injury, although not necessarily the sole cause." *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97 (2nd Cir. 2017) (citation and quotations omitted). "[A] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).

---

[15] As the Court finds that the *per se* standard is applicable, the Court need not address the Parties' arguments regarding the rule of reason and whether the relevant market is a two-sided platform, as discussed in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018). However, even if the rule of reason was applicable, the Court finds that Plaintiffs have produced evidence about the relevant market and effect of Section 2-G-1 that creates a genuine dispute of material fact as to whether Section 2-G-1 is an unreasonable restraint of trade.

First, Defendants argue that Section 2-G-1 has not harmed Plaintiffs. Plaintiffs disagree, arguing that, but for Section 2-G-1, they would not have paid any commission to a Buyer-Broker. "At base, an antitrust plaintiff's damages should reflect the difference between its performance in a hypothetical market free of all antitrust violations and its actual performance in the market infected by the anticompetitive conduct." *Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.*, 850 F.2d 1286, 1306 (8th Cir. 1988) (citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)).

The Court finds that Plaintiffs have produced evidence that Section 2-G-1 caused them harm. Plaintiffs' expert, Dr. Craig Schulman, opines that, in a market without Section 2-G-1, Sellers would not pay Buyer-Brokers' commissions.[16] The Court does not find Defendants' argument that Plaintiffs passed on any costs associated with artificially inflated home prices to Buyers persuasive. The Court agrees with Plaintiffs in that:

> Even if real estate prices were lower in the but-for world, that would apply both when a house is bought and when it's sold. A seller might get a 2% to 3% lower sales price, but that same seller also would have paid 2% to 3% less when they bought the house. For example, imagine someone buys a house for $100,000.00, holds it for five years (in which time it appreciates 10%), and then sells for $110,000.00. After paying a 6% commission (3% to the buyer broker), the seller is left with sales proceeds of $103,400.00, and a profit of $3,400. Now imagine that same transaction in the but-for world with 3% lower prices. The house is now bought for $97,000.00, appreciates 10% in five years, and sells for $106,700.00. The seller now pays a 3% commission (0% to the buyer broker), leaving sales proceeds of $103,499.00 and a profit of $6,499.00.

(Doc. #956, pp. 36–37.)

Defendants argue that Dr. Schulman's opinion is not dispositive because some MLS in the United States do not require compliance with Section 2-G-1 but still have similar commission rates. However, Plaintiffs have produced evidence these markets are infected by anticompetitive

---

[16] In a companion Order, the Court denies Defendants' *Daubert* motion to exclude Dr. Schulman from testifying at trial.

conduct, in that those MLS and applicable state laws encourage cooperative compensation between brokers. *See, e.g.*, Wash. Rev. Code Ann. § 18.86.050; *see also* (Doc. #966-61.) Therefore, the Court finds that Plaintiffs have produced evidence creating a genuine issue of material fact as to whether they have been harmed by Section 2-G-1.

Second, Defendants argue that Plaintiffs have failed to demonstrate what amount of injury is attributable to their conduct. However, the Court disagrees that Plaintiffs are required to identify a specific dollar amount. "'Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show–as a legal and factual matter– impact or fact of damage.'" *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (quoting Davis & Cramer, *Antitrust, Class Certification, and the Politics of Procedure*, 17 Geo. Mason L. Rev. 969, 984–85 (2010) (internal quotations omitted)). Here, Plaintiffs have produced sufficient evidence to create a genuine dispute of material fact as to whether they were overcharged as a result of Section 2-G-1. Therefore, Defendants' argument is rejected.

### B.    Count II, MMPA

Defendants argue they are entitled to summary judgment on Count II, alleging a violation of the MMPA. In particular, Defendants argue (1) the alleged harm was not in connection with Defendants' conduct; (2) Plaintiffs have not shown they suffered an ascertainable loss; and (3) Section 2-G-1 is not an unfair practice.[17] Plaintiffs disagree. The parties' arguments are addressed separately below.

"To establish a claim under the MMPA, a plaintiff must show that she (1) leased or purchased a product or service from defendant; (2) primarily for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act

---

[17] Defendants argue that Count II is derivative of and dependent on Plaintiffs' antitrust claims. The Court rejects this argument for the same reason it declines to grant summary judgment, as discussed above.

declared unlawful by [Mo. Rev. Stat.] § 407.020[.]" *Toben v. Bridgestone Retail Ops. LLC*, 751 F.3d 888, 897 (8th Cir. 2014). The MMPA prohibits "[t]he act, use or employment by any person of any . . . unfair practice . . . in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri[.]" Mo. Rev. Stat. § 406.020.

### 1. "In Connection With"

Defendants argue that Count II fails because Plaintiffs' alleged harm was not "in connection with" Defendants' conduct because Defendants did not enter into any transactions Plaintiffs. Plaintiffs disagree, arguing that they have shown direct causation between the enforcement of Section 2-G-1 and "their payment of inflated real estate commissions[.]" (Doc. #956, p. 34.)

"Consumers need not have 'a direct contractual relationship' to 'maintain a suit under the MMPA against a party with a connection to the merchandise before a buyer enters the transaction.'" *Schulte v. Conopco, Inc.*, 997 F.3d 823, 826 (8th Cir. 2021) (quoting *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. banc 2014)). There must be "a relationship between the sale of merchandise and the alleged unlawful action." *Conway*, 438 S.W.3d at 414. "[T]he unlawful action may occur at any time before, during or after the sale and by any person." *Id.*

As discussed at length above, Plaintiffs have shown a connection between their home purchases and Section 2-G-1. Further, Plaintiffs have shown that Defendants continue to enforce Section 2-G-1, requiring Sellers to compensate Buyer-Brokers from home sales' proceeds. Defendants' argument that they cannot be held vicariously liable for the actions of their associated brokerages and franchisors is not relevant because Plaintiffs are challenging Defendants' own actions here. For the reasons discussed above and for the reasons set out in

Plaintiffs' brief, the Court finds that Plaintiffs have shown evidence sufficient to survive summary judgment that Defendants' enforcement of Section 2-G-1 is in connection with Plaintiffs' home sales transactions.

### 2. Ascertainable Loss

Defendants argue that Count II fails because Plaintiffs have not shown they suffered an ascertainable loss. Plaintiffs disagree, arguing that "[e]very dollar that Plaintiffs paid to buyer's brokers and agents is a dollar of loss." (Doc. #965, p. 36.)

"Under Missouri law, the plaintiffs must prove that they suffered pecuniary loss in order to prevail on their MMPA claim[.]" *Grawitch v. Charter Commc'ns, Inc.*, 750 F.3d 956, 960 (8th Cir. 2014) (citing *Ward v. W. Cnty. Motor Co.*, 403 S.W.3d 82, 84 (Mo. banc 2013)). Where a plaintiff asserting an MMPA claim alleges a product "was worth less than the product as represented," the "benefit-of-the-bargain rule" is the appropriate measure of damages. *Plubell v. Merck  Co., Inc.*, 289 S.W.3d 707, 715 (Mo. App. W.D. 2009); *see Schoenlein v. Routt Homes, Inc.*, 260 S.W.3d 852, 855 (Mo. App. E.D. 2008) (holding that, when using the benefit-of-the-bargain rule, the plaintiff must show evidence of the bargained-for value and the actual value of the good). However, this measure of damages is not appropriate where the buyer alleges "the misrepresented good was worthless." *Kerr*, 439 S.W.3d at 814. Further, "[i]n fraud cases where the benefit of the bargain rule is inadequate, other measures of damages may be used." *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 669 (Mo. banc 1999) (citation omitted).

Defendants argue that Plaintiffs have failed to show an ascertainable loss. Plaintiffs argue that, because they assert they received nothing of value from the Buyer-Broker, they are not required to show an ascertainable loss. The Court agrees with Plaintiffs. As discussed above, Plaintiffs have presented evidence that, but-for Section 2-G-1, they would not have paid any commission to the Buyer-Broker. Plaintiffs' theory of recovery does not rely on allegations

that Defendants misrepresented anything or that they received less than what they are promised. Consequently, Defendants' argument is rejected.

Additionally, Defendants argue that Plaintiffs suffered no ascertainable loss because the cost of the Buyer-Brokers commission is passed onto the Buyer as part of the increased home price. As discussed above, the Court rejects this argument. Because Plaintiffs have shown a genuine dispute of material fact, summary judgment is not warranted on this issue.

### 3. Unfair Practice

Defendants argue that Count II fails because Plaintiffs have not shown the enforcement of Section 2-G-1 is unfair or unlawful within the meaning of the MMPA. Plaintiffs disagree, arguing that the question of whether Section 2-G-1 is unfair is more appropriately left to a jury.

The MMPA does not describe an unfair practice:

> Sec. 407.020 does not define deceptive practices; it simply declares unfair or deceptive practices unlawful. This was done to give broad scope to the meaning of the statute and to prevent evasion because of overly meticulous definitions. This leaves to the court in each particular instance the determination whether fair dealing has been violated. It is the defendant's conduct, not his intent, which determines whether a violation has occurred. It is not necessary in order to establish 'unlawful practice' to prove the elements of common law fraud.

*Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 724 (Mo. banc 2009) (citation and quotations omitted). Accordingly, "whether a practice is unfair can be a factual issue." *Schulte*, 997 F.3d at 826. Missouri regulations interpret an "unfair practice" as a practice that "[o]ffends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretative decisions" or "[i]s unethical, oppressive or unscrupulous." 15 CSR 60-8.020(1)(A).

As discussed above, the Court finds that Plaintiff has presented genuine disputes of material fact as to whether Section 2-G-1 and Defendants' actions in enforcing a scheme to stabilize commission rates violates the Sherman Act and Missouri's Antitrust Law. The Court

26

need not repeat its findings here.  Further, as there is genuine dispute of material fact as to whether Defendants' conduct violated federal and state law, it follows that there is a genuine dispute of material fact as to whether Defendants engaged in unfair practices that offend public policy.  For those reasons, Defendants' motions for summary judgment are denied.

## IV.     CONCLUSION

Accordingly, it is ORDERED that Defendants' motions for summary judgment (Doc. #917), (Doc. #925), (Doc. #927), (Doc. #928), (Doc. #930) are DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
DATE: <u>December 16, 2022</u>                 UNITED STATES DISTRICT COURT