| From: | Sarah C. Young [SCYoung@realtors.org] |
|---|---|
| Sent: | 5/3/2019 9:08:40 AM |
| To: | Adam Contos [acontos@remax.com]; Charlie Oppler (Charles.oppler@gmail.com) [Charles.oppler@gmail.com]; Chris Kelly (Ebby) [chriskelly@ebby.com]; CRAIG CHEATHAM [craig.cheatham@therealtyalliance.com]; DANIEL ELSEA [danelsea@realestateone.com]; DENISE SMITH [dsmith@weichertrealtors.net]; Dottie Herman [dherman@elliman.com]; Gino Blefari [ginoblefari@homeservices.com]; Glenn Sanford [glenn@expworldholdings.com]; HELEN HANNA CASEY [helenc@howardhanna.com]; JEFF BARNETT [jbarnett@apr.com]; Jeff Detwiler [jeff@lnf.com]; Jim Imhoff [imhoffj@firstweber.com]; Joan Docktor [joan.docktor@foxroach.com]; JOHN HORNING [jphorning@shorewest.com]; John Peyton [john.peyton@realogy.com]; John Smaby [johnsmaby@edinarealty.com]; Kevin Levent [kevin.levent@metrobrokers.com]; J. LENNOX SCOTT [lennox@johnlscott.com]; MARK WOODROOF [mark@garygreene.com]; Matt Widdows [MWiddows@HSmove.com]; Merle Whitehead [MerleWhitehead@howardhanna.com]; Michael Brodie [mike@mikebrodie.com]; MICHAEL PAPPAS [mikepappas@keyes.com]; Patricia Tarhon [PTarhon@realtors.org]; Paul Boomsma [pboomsma@leadingre.com]; Phyllis Brookshire [phyllis.brookshire@allentate.com]; Rei Mesa (BHHS FL) [ReiMesa@BHHSFloridaRealty.com]; Robert Reffkin [robert@compass.com]; Robin Sheakley [rsheakley@sibcycline.com]; Ron Peltier [RonPeltier@homeservices.com]; Ryan Raveis [ryan.raveis@raveis.com]; Sherry Chris [sherry.chris@bhgre.com]; STEPHEN BAIRD [steve.baird@bairdwarner.com]; Steve Brown [stevebrown@crye-leike.com]; Tom Hosack [TOMHOSACK@NORTHWOOD.COM]; Tracy Kasper [tracy@justimagineidaho.com]; Vince Malta [vincemalta@aol.com] |
| CC: | Bob Goldberg [BGoldberg@realtors.org]; Bill Malkasian [BMalkasian@realtors.org]; Joe Ventrone [JVentrone@realtors.org] |
| Subject: | RES Advisory Group Update: Top 75 Meeting Agenda + Briefing Book |
| Attachments: | 2019 Midyear Top 75 Agenda.pdf; 2019 Top 75 Briefing Book DC.pdf |

Dear RES Advisory Group:

Attached is the agenda and briefing book for the Top 75 Large Firm Director's Forum on May 16 at the Omni Shoreham in Washington, DC. If you are not a Top 75 Director, you are welcome to attend as a member of the RES Advisory Group. We will have tent cards available for you.

Let me know if you have any questions.
Sarah


**Sarah C. Young**
Director, Real Estate Services and Policy Oversight | Federal Policy and Industry Relations
NATIONAL ASSOCIATION OF REALTORS® | 500 New Jersey Ave NW | Washington, DC 20001
Email: scyoung@realtors.org | Office: 202-383-1233
www.nar.realtor



The NATIONAL ASSOCIATION OF REALTORS® is an unrivaled advocate and resource in the real estate market for its members and their clients, and only members of NAR can call themselves REALTORS®.

**EXHIBIT 981**

# AGENDA

| | |
|---|---|
| **CHAIR** | Mark Woodroof (TX) |
| **VICE CHAIR** | Dottie Herman (NY) |
| **COMMITTEE LIAISON** | Jim Imhoff (WI) |
| **STAFF EXECUTIVE** | Sarah Young (DC) |

**PURPOSE**
The top 75 real estate firms on the Board of Directors are determined annually based on the greatest number of REALTOR® and REALTOR®–associate members as of July 31 for the following year. The forum is a closed meeting where the Top 75 Large Directors discuss hot button federal policy and real estate business issues. The Chair and Vice-Chair of the Real Estate Services Advisory Group set the forum agenda and run the meeting.

| | | |
|---|---|---|
| 12:30 PM | I. | Doors open – refreshments and snacks available |
| 1:00 PM | II. | Welcome and Introductions, Mark Woodroof, 2019 RES Chair |
| 1:10 PM | III. | RPAC Update, Dottie Herman, 2019 RES Vice-Chair and Jim Imhoff, Large Firms & Industry Relations Liaison |
| 1:15 PM | IV. | NAR REACH® Company Lightning Presentations |
| 1:35 PM | V. | Legal Update, Katie Johnson, NAR Senior Vice-President and Chief Member Experience Officer |
| 2:20 PM | VI. | Government Affairs Update, NAR Senior Vice-President of Government Affairs, Shannon McGahn |
| 2:50 PM | VII. | Commitment to Excellence Program Update, Jo Jenkins, Broker, RE/MAX Real Estate Concepts |
| 3:00 PM | VIII. | Adjourn |

430 North Michigan Avenue • Chicago, IL 60611-4087 • 800.874.6500 • www.NAR.realtor


NATIONAL ASSOCIATION of REALTORS®

Case 4:19-cv-00332-SRB   Document 1128-13   Filed 09/07/23   Page 2 of 18
Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order           HSOA-MOe-0000071851

# National Association of REALTORS®
## Top 75 Large Firm Directors Forum Briefing Book
## Washington, DC

The following briefing book includes background information for each meeting agenda item as well as links to additional resources.

## Thursday, May 16, 2019

## Introductions and RPAC Update

  

Mark Woodroof, Chair of the Top 75 Large Residential Firm Directors Forum, will preside over the meeting. Dottie Herman, Vice-Chair, will give an update on RPAC, specifically on the increase in major donors to NAR in 2019. Jim Imhoff, Large Firms & Industry Relations Liaison, will give an update on the Corporate Ally Program.

## REACH® Company Presentations

We will kick off the meeting with a lightening round of pitches by NAR's 2019 REACH® class (see the list of companies below). REACH® is a growth technology accelerator program helping launch companies into the real estate, financial services, banking, home services and insurance industries.

The REACH® accelerator focuses on providing early- to mid-stage companies with access to NAR's industry expertise, influence and key relationships as businesses launch into the trillion-dollar real estate space. The vertical focus within real estate industries and the growth stage at which most companies enter the program make Second Century Ventures unique compared to other accelerators.

1

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order        HSOA-MOe-0000071852



---

**Amarki** - A seamless, automated marketing platform that helps real estate professionals integrate their favorite systems in one place

**curbio** - Helps agents deliver exceptional results for home sellers through ROI-focused, pay-at-close renovations;

**evocalize** - A platform that makes sophisticated digital marketing simple, and helps brokerages and agents collaborate to generate demand when and where it's needed;

**kleard** - A safety and productivity app that provides real-time verification for open houses and showings;

**ratemyagent** - A digital marketing tool designed to help agents easily collect, share and promote verified client feedback;

**reConsortia** - An open, crowdsourced referral consortium that builds transparency, enhances professionalism and provides an improved customer experience; and

**STAGING & DESIGN NETWORK** - The first-ever online shared rental pool for home furnishings built for the real estate and home staging communities.

**PROPY** - An end-to-end real estate transaction management platform that facilitates safe, fast & simple real estate transactions entirely online.

To learn more about the REACH® class of 2019 or the accelerator program, visit www.narREACH.com.

2

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order                    HSOA-MOe-0000071853

## Legal Update



Katie Johnson, NAR's Senior Vice-President and General Counsel, will give an update on pressing legal topics and moderate a discussion with the group. Below are some links to NAR legal resources on risk management, copyright, and compliance with the TCPA.

- **Risk Management Updates**
  https://www.nar.realtor/topics/risk-management
- **Copyright Issues**
  https://www.nar.realtor/videos/window-to-the-law-listing-video-copyright-issues
  https://www.nar.realtor/videos/window-to-the-law/copyright-best-practices-for-listing-photos/?cid=ip023
- **Telephone Consumer Protection Act (TCPA)**
  5 min video for brokers and agents on TCPA compliance and texting:
  https://www.nar.realtor/videos/window-to-the-law/window-to-the-law-tcpa-and-texting
- **NAR White Paper on Services Animals**
  https://realtorparty.realtor/state-local-issues/issues/issues/fair-housing-ada-reasonable-accommodations-with-service-animals

## Government Affairs Update



Shannon McGahn, NAR's Senior Vice-President of Government Affairs, will give an update on NAR's legislative priorities in the 116th Congress. She will also reflect on REALTOR® visits with members of Congress and how members communicated the impact of real estate on the economy and the value that REALTORS® bring to communities.

- **NAR's 2019 Advocacy Agenda**
  https://www.nar.realtor/political-advocacy/federal-advocacy/2019-advocacy-agenda

3

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order    HSOA-MOe-0000071854

## Commitment to Excellence Program Update and Overview of Broker Benefits


Jo Jenkins, a managing broker with RE/Max Concepts, will give an update on NAR's Commitment to Excellence Program. Jo has been in Real Estate since 1987 and a Broker since 1995. She was the President of her local Board of REALTORS®, President of the Iowa Association of REALTORS® and Regional Vice-President for the National Association of REALTORS®.

- **NAR's Commitment to Excellence Program**
  https://www.c2ex.realtor/

## NAR ACTION ITEMS

Below are action items that may come before the Board of Directors. If you are interested in attending any of the committee meetings, the dates and locations are included.

**Commercial Committee**
*Wednesday, May 15, 2019 10:30 AM–12:30 PM; Omni Shoreham, Blue Room, Main Floor*
The Commercial Federal Policy Committee expects an action item related to banking services for state licensed cannabis businesses.

**Federal Financing and Housing Policy Committee**
*Wednesday, May 15, 2019 10:00 AM–12:00 PM; Marriott Wardman Park, Thurgood Marshall Ballroom West, Mezzanine Level*
The Committee may propose a new policy related to the use of FHA reserves to pay for improving operations of the FHA.

**Conventional Finance and Lending Committee**
*Wednesday, May 15, 2019 10:00 AM–12:00 PM; Washington Hilton, Jefferson Room, Concourse Level*
The Committee expects two motions – one on changes to the existing principles for housing finance reform and one on proposed principles for how the Community Reinvestment Act should be modernized.

**Diversity Committee**
*Wednesday, May 15, 2019 10:00 AM–12:00 PM; Omni Shoreham, Congressional Room, West Conference Center*
The Committee expects two motions – one to adopt a veteran's non-discrimination policy and the other to adopt a policy related to source of income protections.

4

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order                    HSOA-MOe-0000071855

**Insurance Committee**
*Tuesday, May 14, 2019 11:00 AM–1:00 PM; Marriott Wardman Park, Maryland Suite, Lobby Level*
The Insurance Committee is expected to propose new policy on natural disaster insurance, response and prevention.

## Other Policy Issues of Note

### Fair Housing Issues in the Changing Real Estate Landscape

*Facebook Ad Discrimination Settlement*

Facebook recently agreed to pay $5 million to settle five lawsuits (Mobley et al. v. Facebook, National Fair Housing Alliance et al. v. Facebook, Communications Workers of America et al. v. Facebook, Spees et al. v. Facebook, and Riddick v. Facebook) and take steps to block discriminatory advertising on its platforms.

Despite Facebook's settlement with fair housing groups, the U.S. Department of Housing and Urban Development (HUD) clearly feels that this does not go far enough in remedying housing discrimination. In fact, right after the settlement was announced, HUD filed charges against Facebook for violating the Fair Housing Act. HUD's charges caught Facebook off-guard as Facebook felt that it had taken steps to prevent ad discrimination, such as removing over 5,000 targeting options to help prevent misuse. Apparently, conversations between Facebook and HUD broke down when the government asked for access to the company's user base, a request Facebook denied. HUD's charge will be heard by an administrative law judge unless Facebook elects to have the case heard in federal district court.

In the meantime, Mark Zuckerberg has issued an op-ed stating that we need new regulation in four areas: harmful content, election integrity, privacy and data portability. He says, "I believe Facebook has a responsibility to help address these issues, and I'm looking forward to discussing them with lawmakers around the world." Zuckerberg's op-ed received some immediate criticism. For instance, Representative David Cicilline, who chairs the Democratic Policy and Communications Committee, tweeted, "Mark Zuckerberg doesn't get to make the rules anymore. Facebook is under criminal and civil investigation. It has shown it cannot regulate itself. Does anyone even want his advice?"

**Additional articles on the lawsuit:**

- https://www.forbes.com/sites/amydobson/2019/03/29/you-cant-say-a-home-is-good-for-families-and-more-fair-housing-rules-as-facebooks-lawsuit-roils/#6512e0a46761
- https://www.inman.com/2018/08/23/facebook-slashes-5000-targeted-ad-options-after-hud-complaint/
- https://www.washingtonpost.com/business/2019/03/28/hud-charges-facebook-with-housing-discrimination/?utm_term=.5246f96e64a6

5

Case 4:19-cv-00332-SRB   Document 1128-13   Filed 09/07/23   Page 7 of 18
Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order                HSOA-MOe-0000071856

*Attention on Diversity/Inclusion in the financial services industry*

Section 342 of the Dodd-Frank Act created an Office of Minority and Women Inclusion (OMWI) office in each of the financial regulatory agencies, including the Consumer Financial Protection Bureau. The OMWI offices do not have any enforcement authority, but are responsible for all matters relating to diversity in management, employment, and business activities and are required to set standards for assessing the diversity policies and practices of entities that the CFPB regulates.

The CFPB's Office of Minority and Women Inclusion recently sent letters to several mortgage banking firms that are regulated by the CFPB, including many of your affiliated mortgage companies. For those of you who have not seen the letter, the letters advise lenders of the CFPB's plan to raise awareness and to learn more about diversity and inclusion in the marketplace.

The letter says that participation is voluntary, but urges firms to provide the CFPB with contact information for the person leading Diversity and Inclusion efforts. The mortgage companies we have talked to have already provided the CFPB with their contact information. The CFPB states that the "aim of both the assessment process and the post-assessment report is to provide you with best practices and a better understanding of your industry peers."

Diversity in the financial services industry will likely be a focus for lawmakers, especially in the US House of Representatives. In March, the newly created House Financial Services Committee, Subcommittee on Diversity, held its first hearing on diversity in the financial services industry. GAO testified on its report, "Financial Services Industry: Representation of Minorities and Women in Management and Practices to Promote Diversity, 2007-2015." While nothing ground-breaking was shared at the hearing, the members at the hearing expressed an interest in making this an on-going priority for the Committee.

*Reducing African-American Homeownership Gap*

NAR is collaborating with the National Association of Real Estate Brokers (NAREB) and the Urban Institute in Washington, DC, to develop a strategic framework for addressing racial homeownership disparities in the U.S. Today's black-white homeownership gap is about 30 percentage points, and this gap has not decreased since the passage of the 1968 Fair Housing Act. In fact, the racial homeownership gap has widened in recent years as black households were of the hardest hit during the housing crisis, and are experiencing the slowest recovery in the aftermath. As homeownership is one of the most important pathways to building household wealth, the black-white homeownership gap largely explains why the overall racial wealth gap between blacks and whites is also growing. We have identified five strategic priorities to reduce the homeownership gap:

- Advance local policy solutions in select markets
- Tackle housing supply constraints and affordability
- Promote an equitable housing finance system that serves all markets
- Outreach to mortgage-ready millennials and renters
- Focus on sustainable homeownership

6

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order          HSOA-MOe-0000071857

*The Equality Act*

NAR, beginning in 2009, has developed policy to call for equal opportunity in housing based on sexual orientation and gender identity. In November 2016, the Board of Directors passed a motion that NAR seek and support legislation to amend the fair housing act to add these provisions.

In the last Congress, NAR was able to get HR 1447 introduced which would have amended the Fair Housing Act as we envisioned. That bill did not pass. This year we were unable to secure bipartisan sponsorship of a stand-alone bill that addresses just fair housing protections, instead, the Equality Act was introduced in early March. The Equality Act amends the Fair Housing Act to prohibit discrimination in housing, employment, credit, public accommodations and voting rights based on sexual orientation and gender identity. While it touches business issues outside of fair housing considerations, it is consistent with NAR's fair housing policy. NAR requires members through the Code of Ethics to agree not to discriminate in all transactions including commercial transactions and to not discriminate in their real estate employment practices. These ethical requirements are also supported by the Equality Act.

We will monitor this bill as it progresses through the legislative process and continue to express our support for provisions that amend the Fair Housing Act to provide protections based on Sexual Orientation and Gender Identity.

**Key Facts on Equal Opportunity Housing**
- https://www.nar.realtor/fair-housing/fair-housing-program/what-everyone-should-know-about-equal-opportunity-housing

### GSE Reform – Fannie Mae and Freddie Mac

NAR has collaborated with Dr. Susan Wachter of the Wharton School at the University of Pennsylvania and Dr. Richard Cooperstein of Andrew Davidson and Company on new research exploring ideal restructuring of the secondary mortgage market. NAR released a working paper this February during NAR's Policy Forum with industry leaders, policy advisors and academic experts in Washington, DC. The vision includes:

- Leveraging reforms and innovations implemented since the crisis while completing the process with instrumental updates for a fully functioning liquid market.
- Promoting competition in the secondary market through proven structures to correct market failures.
- Preserving the 30-year fixed rate mortgage and focusing the mission on liquid secondary markets for Middle America and underserved borrowers.
- Minimizing the cost to consumers in normal and stress periods while maximizing access for creditworthy borrowers.
- Protecting taxpayers by using private capital.
- Maintaining simplicity in the transition while avoiding market disruptions.

The Administration and Congress are also continuing discussions on restructuring Fannie Mae and Freddie Mac ("the GSEs"). In March, the Senate Banking Committee solicited feedback on Chairman

7

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order          HSOA-MOe-0000071858

Mike Crapo's plan to restructure America's housing finance system at multiple hearings. NAR President-Elect Vince Malta testified before the committee and the desire for a well-regulated utility reformed under congressional legislation was heavily emphasized. Other witnesses echoed support for NAR's positions, which illustrated the consensus building around smart reforms with smooth transitions to guarantee a liquid and affordable mortgage market. While the White House and Chairman Crapo's plans differ in substantive details, both include some form of a government guarantee, which is a significant shift in the overall housing finance reform discussion.

On April 4, the Senate confirmed Dr. Mark Calabria as the next Director of the Federal Housing Finance Agency (FHFA), which oversees the GSEs. Given this leadership shift at the FHFA, we expect more focus on ending the GSE conservatorships. We anticipate a more detailed GSE reform proposal from the Treasury Department later this year, which will build off the White House's recent Memorandum on Federal Housing Finance Reform. On Tuesday, May 14, Director Calabria will present during NAR's Regulatory Issues forum in the Marriott Ballroom where he will outline his policy priorities.

NAR also continues to weigh in on the Guarantee fees (G-fees) that are charged by Fannie Mae and Freddie Mac to lenders for bundling, selling, and guaranteeing the payment of principal and interest on their Mortgage Backed Securities (MBS). These fees are generally passed on to consumers in the form of higher interest rates. The guarantee fee covers projected credit losses from borrower defaults over the life of the loans, administrative costs, and a return on capital. NAR continues to advocate that G-fees should not be extended, increased, or diverted for unrelated government spending.

- **NAR Issue Summary: G-Fees**
  http://narfocus.com/billdatabase/clientfiles/172/issue_pdfs/320.pdf
- **NAR Issue Summary: GSEs**
  https://www.nar.realtor/fannie-mae-freddie-mac-gses
  http://narfocus.com/billdatabase/clientfiles/172/issue_pdfs/110.pdf
- **NAR GSE Working Paper**
  https://www.nar.realtor/fannie-mae-freddie-mac-gses/working-paper-nar-s-vision-for-housing-finance-reform
- **Industry Consensus on GSE Reform**
  https://www.nar.realtor/newsroom/what-theyre-saying-senators-industry-leaders-comment-on-gse-reform

## Tax Cuts and Jobs Act, Section 199A

### Section 199A Deduction for Qualified Business Income

As you know, the "Tax Cuts and Jobs Act" includes a new deduction for pass-through business income, which is positive for the great majority of real estate professionals. This deduction is also known as the deduction for Qualified Business Income or Section 199A, which is where it is found in the Internal Revenue Code.

This provision allows sole proprietors and owners of pass-through businesses (*i.e.*, partnerships, limited liability companies (LLCs), and S corporations) to claim a new deduction of as much as 20% of their "qualified business income," within certain limitations.

### *Specified Service Businesses*

A major limitation of the new deduction is that certain types of professionals are prohibited from claiming the deduction if their income exceeds certain thresholds. One of these prohibited "specified service businesses" is "brokerage services." Until the IRS and Treasury Department issued proposed regulations last August that narrowly defines "brokerage services" and exempts real estate brokers and agents from this prohibited category, it appeared that many higher-income real estate professionals would not be eligible to claim the deduction. NAR wrote to Treasury and IRS urging that real property be exempted from the prohibition. The regulatory guidance means that real estate brokerages can qualify for the Sec. 199A deduction above the taxable income thresholds of $157,500 (single) and $315,000 (married). Above these income levels, the calculation can depend in part on how your business is structured (S-corp, LLC, etc.) and the deduction cannot exceed the greater of 1) 50% of the W-2 wages paid by the business, or 2) the sum of 25% of those W-2 wages paid plus 2.5% of the original cost of "qualified property." This is generally the original cost of the business's depreciable property during its useful life. This is a very basic explanation and there are other considerations, particularly if you have multiple qualified businesses. We recommend you consult your tax advisor to give you guidance on your eligibility and how to file for the deduction. NAR has finalized four informational videos about Sec. 199A tax and other provisions in the Tax Cuts and Jobs Act and the links are provided below.

### *Sec. 199A Deductions for Owners of Rental Real Estate*

The proposed regulations were unclear about which owners of rental real estate are able to claim the deduction for net income from the property. NAR was among several organizations to send in comment letters to the Treasury Department and IRS last year urging that the issue be simplified in the final regulations so that the estimated 10 million real property rental owners (including an estimated 40% of NAR members) will have specific guidance in knowing whether their properties qualify for the deduction. In requesting this simplicity, we asked that the guidance simply allow all owners of rental real property be deemed to be qualified as having a trade or business with that rental, even if there is only one such unit.

Not surprisingly, Treasury and IRS reacted positively to the need for simplicity but did not follow our request to deem all owners of rental units to be in a trade or business. Instead, they put forward a new proposed rule that said if real property rental owners are engaged in landlord-type activities with respect to their rentals for at least 250 hours per year, and they can substantiate this activity with contemporaneous records, they will be deemed to be in a trade or business and can claim the deduction. However, this proposed 250-hour safe harbor rule does not restrict property owners from claiming that they are indeed in a trade or business with their rental under one or more case law decisions or IRS pronouncements.

Naturally, NAR was disappointed that the IRS and Treasury did not accept our suggestion that the issue be resolved by simply deeming that all rental property be considered to be in a trade or

9

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order     HSOA-MOe-0000071860

business. However, we were not surprised, as this approach would be giving many passive owners of rental property the deduction that the statute does not seem to grant them. Most casual owners of real property that is rented out are probably not in the "trade or business" of real estate rentals. They clearly do not meet the overriding Supreme Court definition, which is found in a case called *Commissioner vs. Groetzinger.* In that case, the Court explained that in deciding whether an activity is a trade or business, courts need to examine the facts on a case-by-case basis, looking into whether the taxpayer devoted his or her full-time efforts towards a profit-seeking activity on a regular, continuous, and substantial basis.

Had the 250-hour safe harbor not been proposed, every owner of rental real property would have to be able to demonstrate that their landlord-type activities be carried on a "regular, continuous, and substantial" basis in order to claim the 20% deduction. Or they would have to show that their own activity is similar to one of a confusing and conflicting array of case law decisions and IRS pronouncements that indicate a trade or business. The proposed safe harbor essentially says that if the owner can show that they have spent the 250 hours, including the efforts of employees and independent contractors, they do not have to meet the Groetzinger burden or sift through the cases and IRS decisions. But it does not preclude those who do not reach this threshold from demonstrating that they do meet the burden. It may not be an easy burden, but the new 250-hour rule provides much-needed clarity.

### *Deductions for Business Meals Expenses*

The IRS clarified in temporary guidance that you can still deduct 50% of your business meal expenses even if they're part of an entertainment activity. Effective on January 1, 2018, the "Tax Cuts and Jobs Act" retained the 50% deduction for business meal expenses but ended deductions for business-related entertainment, amusement, or recreation. The changes created uncertainty over whether meals remain partially deductible if they were part of entertainment, amusement, or recreation activities. Under the temporary guidance, those meal expenses remain 50% deductible provided you can show those expenses were incurred separately from the entertainment expenses.

The meal expenses are eligible, the guidance says, when "the cost of the food and beverages is stated separately from the cost of the entertainment on one or more bills, invoices, or receipts."

The clarification is a win for real estate, because business-related meal expenses are common in the industry.

For example, suppose Randi Realtor invites her business contacts Bob and Bev to a baseball game. Randi purchases tickets for the three of them to attend the game, and while at the game she also buys hot dogs and drinks for herself and Bob and Bev. The guidance indicates that the cost of the game tickets is an entertainment expense and is not deductible. However, the cost of the hot dogs and drinks, which were purchased separately from the game tickets, is still 50% deductible by Randi. Here are some of the key points in the guidance:
1. The meal expense must be ordinary and necessary and paid or incurred in a trade or business context.
2. The expense is not lavish or extravagant under the circumstances.

10

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order       HSOA-MOe-0000071861

3. The taxpayer, or an employee of the taxpayer, is present at the furnishing of the food or beverages.
   4. The food and beverages are provided to a current or potential business customer, client, consultant, or similar business contact.
   5. In the case of food and beverages provided during or at an entertainment activity, the food and beverages are purchased separately from the entertainment, or the cost of the food and beverages is stated separately from the cost of the entertainment on one or more bills, invoices, or receipts. The entertainment disallowance rule may not be circumvented through inflating the amount charged for food and beverages.

The temporary guidance is in effect until the IRS issues formal rules on the deductibility of expenses for business meals.

*Qualified Opportunity Zones*

Congress created the federal Qualified Opportunity Zone ("QOZ") program in the "Tax Cuts and Jobs Act" to encourage economic growth in underserved communities through tax benefits to investors. U.S. states and territories, including Washington, DC, nominated areas (by census tract) to be designated as QOZs in 2018, and the IRS and Treasury finalized the designations that year. This program presents opportunities for real estate investment and development in distressed communities.

**Second round of proposed rules released**: On April 17, the Treasury released the second round of proposed rules, titled "Investing in Qualified Opportunity Funds." This set includes guidelines for deferral of capital gains reinvested into an Opportunity Fund, as well as the exclusion from tax for gains on investments held for at least 10 years in an O Fund. It also provides updates to the first round of rules (released in October), clarifying sections and definitions. NAR is currently reviewing the proposed rules and will have a summary and analysis out shortly; you can read the full proposed rules from the Treasury here, and here is an article outlining what is included in them.

**White House Opportunity Zone event**: The White House held an event on April 17, which NAR's 2019 Commercial Liaison, Bob Turner, attended. President Trump was there and made remarks, emphasizing his commitment to improving and helping distressed communities and the economy through the QOZ program. You can read the President's remarks here. The event also featured remarks from federal agency leadership, including Secretary Ben Carson from Housing and Urban Development, Secretary Steve Mnuchin from the Treasury, and Larry Kudlow, Assistant to the President and Director of the National Economic Council. The White House has released a new "fact sheet" on QOZs following the event, which you can find here.

**HUD and QOZ Article**: Finally, Bruce Katz from *The New Localism* has a piece titled, "HUD and Opportunity Zones," focusing on the nexus of Opportunity Zones and the need for affordable housing in those communities. It is a good read that touches on some of the discussions we've had as a committee on this topic. Mr. Katz will be one of the panelists at the Midyear Meeting education session on Friday, May 17 from 9:00 - 10:00 AM on Opportunity Zones - "Planning for Opportunity Zone Investments."

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order    HSOA-MOe-0000071862

- **IRS FAQ on Sec. 199A**
  https://www.irs.gov/newsroom/tax-cuts-and-jobs-act-provision-11011-section-199a-deduction-for-qualified-business-income-faqs
- **Informational Videos on Tax Reform**
  https://www.nar.realtor/taxes/what-realtors-need-to-know-about-the-new-tax-law
- **Realtor Mag Article on Business Meals Expenses**
  https://magazine.realtor/daily-news/2018/09/28/you-can-t-deduct-the-ballgame-but-what-about-the-beer
- **Qualified Opportunity Zones**
  https://www.nar.realtor/taxes/qualified-opportunity-zones

## Other tax policy issues

In addition to the further clarification that NAR is watching for on Opportunity Zones, NAR supports legislative changes on several other tax issues:
- NAR supports a permanent extension of the tax exclusion on mortgage debt forgiveness.
- NAR supports reauthorization of the 179D Energy Efficient Commercial Deduction.
- NAR believes caps on the Mortgage Interest Deduction (MID) Loan Limit of $750K, the State and Local Tax (SALT) Deduction of $10K and the maximum exclusion amounts for gain on sale of a principal residence ($250K/$500K), should be indexed to protect against future inflation.
- NAR also supports ending the marriage penalty in the SALT deduction cap. Currently single filers and married couples are subject to the same $10K cap.

## Association Health Plans:

On June 19, 2018, the Department of Labor (DOL) issued a final rule to expand access to health coverage through Association Health Plans (AHPs) by broadening the definition of "employer" to include "working owners" (sole proprietors/self-employed/independent contractors). Thanks to NAR's advocacy efforts, the final rule reflected important changes that ensured access to AHPs for independent contractors, increasing health insurance options that are better suited to the health care needs of members and their families.

However, in July of last year, twelve attorney generals (AGs) filed suit against DOL challenging the final rule in the U.S. District Court for the District of Columbia. State AG's include New York, Massachusetts, California, Delaware, Kentucky, Maryland, New Jersey, Oregon, Pennsylvania, Virginia and Washington, plus D.C. The AG's argued that DOL exceed its authority in issuing the rule, which would also circumvent protections put in place by the Affordable Care Act (ACA). NAR joined in amicus brief in support of DOL's rule through the Coalition to Protect and Promote Association Health Plans.

On March 28, 2019, the court held in favor of the AGs, striking down essential parts of the rule that would allow self-employed individuals to participate in an AHP and for "unrelated" employers to band together to sponsor an AHP. In defense of the DOL, the Department of Justice has filed a notice of appeal, which NAR supports but could take another 12-24 months. In the meantime, NAR is analyzing the potential nationwide impact of this decision and working with state and local REALTOR®

12

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order          HSOA-MOe-0000071863

Associations that have already implemented or are pursuing AHPs as a benefit option to better understand the effect and offer useful resources. NAR will also continue working independently and with its AHP coalition to influence federal policymakers on supporting AHPs and other health insurance solutions for self-employed real estate professionals.

- **NAR's Legal Update on AHP Court Case**
  https://narfocus.com/billdatabase/clientfiles/172/26/3339.pdf
  NAR's Letter to DOJ Supporting the Appeal
  https://narfocus.com/billdatabase/clientfiles/172/3/3364.pdf
- **NAR's Comment Letter on AHP Rule**
  narfocus.com/billdatabase/clientfiles/172/3/3116.pdf
- **NAR's Testimony on AHPs**
  https://narfocus.com/billdatabase/clientfiles/172/1/3128.pdf
- **Coalition Letter to PA Insurance Commissioner**
  https://narfocus.com/billdatabase/clientfiles/172/4/3249.pdf
- **Statements for the Congressional Record for Health Insurance Hearings**
  https://www.nar.realtor/washington-report/nar-defends-ahps-on-the-hill

## ADA Website Accessibility

NAR is working with an informal coalition of industry groups to explore legislative and/or regulatory guidance on ADA website accessibility. We have been successful in getting two bipartisan Congressional sign-on letters sent to the Department of Justice (DOJ) urging action on guidance. The Department of Justice responded in writing to Rep. Budd (R-NC) and noted that ADA does apply to websites even if there is no formal guidance, BUT noncompliance with a voluntary technical standard for website accessibility does not necessarily indicate noncompliance with the ADA. We will continue to press the DOJ on this issue as plaintiffs filed 4965 federal ADA Title III lawsuits in the first six months of 2018, as compared to 7,663 *for all of 2017*. If the filings continue at the same rate, there will be close to 10,000 ADA Title III lawsuits for all of 2018 – a 30% increase over 2017. For more statistics, click here.

- **NAR Video on ADA Website Accessibility**
  http://www.realtor.org/videos/window-to-the-law-accessible-websites-and-the-ada
- **NAR Response to DOJ Notice of Proposed Rulemaking**
  https://www.nar.realtor/articles/nar-comments-on-ada-website-accessibility
- **Congressional Sign-on Letters**
  https://narfocus.com/billdatabase/clientfiles/172/30/3181.pdf
  https://narfocus.com/billdatabase/clientfiles/172/30/3244.pdf
- **DOJ Response to Rep. Budd**
  https://narfocus.com/billdatabase/clientfiles/172/4/3245.pdf

## Consumer Financial Protection Bureau (CFPB) Update

*Industry Roundtable*

13

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order          HSOA-MOe-0000071864

Over the past year, NAR has participated in Industry Roundtable Discussions at the Bureau with Acting Director Mulvaney and newly appointed Director Kraninger. NAR joined other banking and consumer trade associations in providing feedback on important agency operations affecting members of the real estate and housing finance industries. The Directors each provided feedback on the new direction of the Bureau, including increased transparency and communication with agency staff, improved engagement with industry, and better coordination with federal and state examiners enforcing consumer protection laws. In 2018, the Bureau issued a series of Requests for Information (RFIs) about its supervisory and enforcement practices and inherited rules such as RESPA. NAR submitted comment letters on the RFIs, which the Bureau is still reviewing. The review of all the RFI comments will likely inform the priorities of the spring regulatory agenda, which should be out in early May.

- **NAR Comments on CFPB RFIs**
  https://www.nar.realtor/washington-report/nar-offers-comments-on-bcfp-operations

*RESPA Education*

NAR continues to educate members about RESPA Section 8(a) compliance. NAR has developed educational materials for brokers to give their agents including a pocket card of Dos and Don'ts for co-marketing (see link below for word version) and Marketing Services Agreements (MSAs). On February 12, NAR staff, along with trade group representatives from the Mortgage Bankers Association (MBA), American Land and Title Association (ALTA), and the Real Estate Service Providers Council (RESPRO) met with Real Estate Settlement Procedures Act (RESPA) legal experts to discuss ways to collaborate across our trade groups on RESPA compliance education. On April 11, NAR again met with MBA, ALTA, and RESPRO to discuss next steps on seeking CFPB guidance with a united industry message.

- **Dos and Don'ts for Co-marketing**
  http://narfocus.com/billdatabase/clientfiles/172/4/2855.pdf
- **Dos and Don'ts for MSAs**
  https://store.realtor.org/product/brochure/respa-do-s-and-don-ts-msas?sku=E126-123

## National Flood Insurance Program Reauthorization

Congress passed a short-term extension of the National Flood Insurance Program (NFIP) through May 31, 2019. NAR has strongly urged Congress to prevent a lapse in the program at the end of the month. NAR supports a strengthened NFIP coupled with a robust private market to offer choices and maintain access to flood insurance in all markets at all times. Click here for NAR principles. NAR member Mabél Guzmán recently testified in March before the House Financial Services Committee and stressed the importance of closing the flood insurance gap in the US.

In 2015, NAR commissioned a study by Milliman, an independent actuarial consulting firm, to evaluate National Flood Insurance Program (NFIP) rates in 5 counties. The study found that NFIP rates are not well aligned with risk and NAR has advocated for several changes to better align NFIP rates to the property-specific risk. FEMA has since hired the same Milliman actuaries to help them

14

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order     HSOA-MOe-0000071865

revamp their insurance rating methods (dubbed Risk Rating 2.0) and bring the program into the 21st Century.

NFIP Risk Rating 2.0 will allow FEMA to better align flood insurance prices to the specific flood risk of individual properties based on each building's unique elevation, distance to water and replacement cost. This will enable the program to help customers better understand their flood risk and provide them with more accurate rates based on their unique risk. The new rates for all single-family homes will be rolled out over the next two years with a target effective date of October 1, 2020. NAR has been working closely with FEMA to understand the impact to homeowner insurance rates and preliminary research shows that NFIP rates could go down for many property owners – including in high-risk zones – under the new rating system. While some higher value and risk properties could see rates increases, by law, any increases are strictly capped at no more than 18-25% annually and will be phased in gradually over a period of years. FEMA has also told us at our last annual meeting that grandfathering is NOT going away under the new rating system and property buyers will continue to be able to assume the previous owner's policy, if they choose to do so.

**Data Privacy:**

Technology has dramatically increased the amount of consumer data collected and used by businesses. Several recent high profile data breaches, coupled with a high rate of identity theft crime has made data security and consumer privacy hot issues for policymakers in Washington. On March 26, 2019, Nina Dosanjh, Vice Chair of NAR's Federal Technology Policy Committee, presented testimony before the Senate Commerce Subcommittee on Manufacturing, Trade and Consumer Protection for the hearing entitled "Small Business Perspectives on a Federal Data Privacy Framework." Ms. Dosanjh urged the Subcommittee to take into account several key principles and considerations when developing federal privacy legislation:

**Establish Uniform Standards for Businesses and Equal Protection for Consumers**
Federal law should provide consumer data with uniform legal protections across all industries. Any federal data privacy legislation should apply requirements to all industries that handle personal data and not exempt certain sectors of the economy from providing consumer data protection. The level of protection for data should not depend on arbitrary distinctions between industries, such as whether a business directly collected data from a consumer or obtained it in a business-to-business transaction. Businesses that obtain consumer information indirectly should have the same obligations and responsibilities to protect that information as the businesses that obtain consumer information directly.

**Direct Statutory Obligations for All Service Providers Handling Consumer Data**
Effective consumer protection regulations cannot be achieved by relying on some businesses to regulate the conduct of other businesses through contracts alone. For example, small businesses and independent contractors may lack experienced personnel, legal expertise, bargaining power or business contract sophistication to negotiate terms to require larger businesses to adequately protect the smaller business's customer data when it is in the larger business's possession. Such data service providers, particularly those offering transmission, storage, analytical processing or other consumer data services for thousands of small businesses, need direct statutory obligations to ensure they comply with relevant laws to govern customer information. Small businesses and independent

15

Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order      HSOA-MOe-0000071866

contractors, such as those operating in the real estate industry are often in substantially the same position as an individual consumer when negotiating a contract with a large service provider. Ultimately, we are left with only two choices use the service under their standard terms or go without such services, directly harming the business and its clients. Expecting small businesses to effectively negotiate contract terms surrounding privacy and data security on their own against large corporations with extensive legal departments is simply not a viable option.

**Transparency and Customer Choice**
Consumers deserve to know what categories of personal data that businesses collect and how that data is generally used by them. These policies should be clearly disclosed in company privacy policies and readily accessible to consumers looking to learn how their data is collected and used by the business providing the goods or services. Federal data privacy law should provide the regulatory flexibility necessary to ensure that transparency in privacy policies is provided to consumers without unnecessarily burdening businesses with requirements to seek consumer consent when they are continuing to use data based on reasonable consumer expectations. Accountability for Business's Own Actions Privacy legislation should not include terms that could potentially expose businesses to liability for the actions or non-compliance of a business partner. Those business partners should be responsible for their own compliance and any resulting liability. In particular, consumer-facing businesses should not be unfairly saddled with liability if partner businesses do not fulfill their own obligations under the law.

**Uniform Nationwide Standard and Enforcement for Data Privacy**
Congress should create a sensible, uniform federal framework for data privacy regulation that benefits consumers and businesses alike by ensuring that sensitive consumer information is protected in a consistent manner regardless of the state in which a consumer resides. Preempting state laws effectively setting an alternative set of nationwide rules is necessary to achieve the important, national public policy goal of uniformity while at the same time providing businesses operating in multiple states the confidence of consistency for their consumer transactions. Consumers will likewise be confident that their data is protected regardless of where they live or travel.

**Reasonable FTC Enforcement Authority**
The Federal Trade Commission (FTC) should have the appropriate authority to enforce comprehensive privacy regulations. NAR appreciates that the FTC employs a scalable reasonableness approach that determines the appropriateness of business practices in light of the size of the business and the sensitive nature of the data they process under Section 5 of the FTC Act. Any future privacy legislation should ensure that the FTC continues to employ flexibility in their implementation of reasonable privacy standards that will permit the Commission to enforce such regulations fairly and equitably to ensure businesses' compliance with them and to promote robust consumer protection.

- **NAR Testimony on Data Privacy**
  https://www.nar.realtor/washington-report/nar-testifies-in-senate-on-data-privacy
- **Letter to Senate Banking Chairs on Data Privacy**
  https://narfocus.com/billdatabase/clientfiles/172/2/3338.pdf

16

Case 4:19-cv-00332-SRB   Document 1128-13   Filed 09/07/23   Page 18 of 18
Highly Confidential – Outside Counsel Eyes Only – Subject to Protective Order          HSOA-MOe-0000071867