**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| SCOTT AND RHONDA BURNETT, | ) | |
| RYAN HENDRICKSON, JEROD BREIT, | ) | |
| SCOTT TRUPIANO, and JEREMY KEEL, on | ) | |
| behalf of themselves and all others similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:19-cv-00332-SRB |
| v. | ) | |
| | ) | |
| THE NATIONAL ASSOCIATION OF | ) | |
| REALTORS, REALOGY HOLDINGS CORP., | ) | |
| HOMESERVICES OF AMERICA, INC., BHH | ) | |
| AFFILIATES, LLC, HSF AFFILIATES, LLC, | ) | |
| RE/MAX, LLC, and KELLER WILLIAMS | ) | |
| REALTY, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF INTENT TO ISSUE SUBPOENA TO PRODUCE DOCUMENTS**
**AND TESTIFY AT A DEPOSITION TO**
**KANSAS CITY REGIONAL ASSOCIATION OF REALTORS**

Pursuant to Rule 45, Plaintiffs will take the deposition upon oral examination the representative of the Kansas City Regional Association of Realtors. The deposition will take place at Williams Dirks Dameron LLC at **1100 Main Street, Suite 2600, Kansas City, Missouri 64105 on February 15, 2021 at 9:00 A.M.** The Subpoena is attached hereto and incorporated herein as Exhibit 1. Plaintiffs specifically request that the Kansas City Regional Association of Realtors produce a witness competent to testify to the topics identified as "Designated Matters" in Exhibit A to this Subpoena. Plaintiffs also request the witness produce at the deposition all documents and things in its possession, custody, or control as specified in Exhibit B to the Subpoena.

Dated: December 20, 2021

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Eric Dirks*

| | |
|---|---|
| Eric L. Dirks | MO # 54921 |
| Matthew L. Dameron | MO # 52093 |
| Amy R. Jackson | MO # 70144 |
| Courtney M. Stout | MO # 70375 |

1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Tel:  (816) 945-7110
Fax:  (816) 945-7118
dirks@williamsdirks.com
matt@williamsdirks.com
amy@williamsdirks.com
cstout@williamsdirks.com

**BOULWARE LAW LLC**

| | |
|---|---|
| Brandon J.B. Boulware | MO # 54150 |
| Jeremy M. Suhr | MO # 60075 |
| Erin D. Lawrence | MO # 63021 |

1600 Genessee, Suite 416
Kansas City, MO 64102
Tel:  (816) 492-2826
Fax:  (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com

*Attorneys for Plaintiffs and the Proposed Classes*

**KETCHMARK AND MCCREIGHT P.C.**
Michael Ketchmark MO # 41018
Scott McCreight MO # 44002
11161 Overbrook Rd. Suite 210
Leawood, KS 66211
Tel:  (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of December, 2021, the foregoing was filed on the

Court's electronic filing system, which provided notice to all counsel of record.

/s/ Eric Dirks
Attorney for Plaintiffs

Case 4:19-cv-00332-SRB   Document 1128-19   Filed 09/07/23   Page 3 of 78

**Exhibit 1**

# UNITED STATES DISTRICT COURT
### for the
Western District of Missouri

| | | |
|---|---|---|
| Scott and Rhonda Burnett, et al., | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    19-cv-332-SRB |
| National Association of Realtors, et al., | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Kansas City Regional Association of Realtors
Reg. Agent: NHR&K Corporate Services, Inc., 3145 Broadway, Kansas City, MO 64111
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Exhibit A.

| Place:  Williams Dirks Dameron 1100 Main Street, Suite 2600 Kansas City, Missouri 64105 | Date and Time: 02/15/2021 9:00 am |
|---|---|

The deposition will be recorded by this method:   Certified Court Reporter with Alaris Litigation Services

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Exhibit B.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   12/20/2021

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| | | /s/ Eric L. Dirks |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Scott and Rhonda Burnett, Jeremy Keel, Jerod Breit, Ryan Hendrickson, & Scott Trupiano  , who issues or requests this subpoena, are:

Eric L. Dirks, Williams Dirks Dameron, 1100 Main Street, Suite 2600, Kansas City, MO 64105, Phone: (816) 945-7110; Email: dirks@williamsdirks.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.  19-cv-332-SRB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

        I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

     ❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

     ❒ I returned the subpoena unexecuted because: _____

_____ .

     Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

     I declare under penalty of perjury that this information is true.

Date: _____       _____

                                             *Server's signature*

                       _____

                                         *Printed name and title*

                       _____

                                         *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

---

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| SCOTT and RHONDA BURNETT, | ) | |
| RYAN HENDRICKSON, | ) | |
| JEROD BREIT, SCOTT TRUPIANO, | ) | |
| and JEREMY KEEL, on behalf of | ) | |
| themselves and all others similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 19-CV-332-SRB |
| v. | ) | |
| | ) | |
| NATIONAL ASSOCIATION OF | ) | |
| REALTORS, REALOGY HOLDINGS | ) | |
| CORP., HOMESERVICES OF | ) | |
| AMERICA, INC., BHH AFFILIATES, | ) | |
| LLC, HSF AFFILIATES, LLC, | ) | |
| RE/MAX LLC, and KELLER | ) | |
| WILLIAMS REALTY, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE TO TAKE DEPOSITION DUCES TECUM

You are hereby noticed that Plaintiffs will take the following deposition:

**Deponent: Kansas City Regional Association of Realtors**

**Date/Time: February 15, 2021, at 9:00 A.M.**

**Location: Williams Dirks Dameron, LLC**
**1100 Main Street, Suite 2600**
**Kansas City, Missouri 64105**

The deposition of the witness shall be recorded by stenographic means and taken pursuant

to the Federal Rules of Civil Procedure before a certified court reporter authorized to take such a

deposition (Alaris Litigation Services) and such deposition may be used as evidence in the trial of

this matter. This deposition, as necessary, will be continued from day to day thereafter, at the same place, until completed or adjourned. The Kansas City Regional Association of Realtors must designate a representative to testify regarding the areas of inquiry set forth in this Notice as "Designated Matters" provided in Exhibit A. The deponent is requested to bring with him/her any and all documents as set forth in Exhibit B. Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs request that the Kansas City Regional Association of Realtors produce the documents and things requested within 30 days of the date of service. Pursuant to Federal Rule of Civil Procedure 34(b), unless otherwise specified, all documents must be organized and labeled to correspond to the categories in the associated document request. Corrections and supplemental answers and production of documents are required as provided for in the Federal Rules of Civil Procedure.

**EXHIBIT A**

3

## DEFINITIONS

The following definitions shall apply to Exhibit A and Exhibit B:

1.       "And" and "or" are to be read interchangeably so as to give the broadest possible meaning to a particular request in which either or both is used.

2.       "Broker" is defined as any company, organization, entity or person who represents buyers or sellers of residential real estate, including its present and former directors, officers, employees, agents, attorneys, representatives, independent contractors, or any persons acting or purporting to act on its behalf.

3.       "Challenged Restraints" refer to: (i) the requirement in NAR's Handbook on Multiple Listing Policy (2019) that "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants"; (ii) the requirement in NAR's Handbook on Multiple Listing Policy (2019) that "Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships"; (i)   NAR Standards of Practice 3-2, 12-2, and 16-16; and (iv) NAR Case Interpretation #16-15, and the predecessors and successors of each.

4.       "Communication" or "Communicated" means, without limitation, any oral, written, or other exchange of thoughts, messages, or information, as by speech, signals, writing, or behavior, including but not limited to, any advice, advisement, announcement, articulation, assertion, contact, conversation, written or electronic correspondence, declaration, discussion, dissemination, elucidation, expression, interchange, memoranda, notes, publication, reception,

4

revelation, talk, transfer, transmission, or utterance. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

5.     "Complaint" means the Second Amended Class Action Complaint (ECF No. 477) or any superseding complaint filed in this Action. A copy of the Complaint is attached to this Subpoena as Exhibit C.

6.     "Corporate Defendants" means the following Defendants identified in the Complaint: HomeServices of America, Inc., BHH Affiliates, Inc., HSF Affiliates, Inc., RE/MAX, LLC, Realogy, Inc., Keller Williams Realty, Inc.

7.     "Defendant" means any company, organization, entity or person presently or subsequently named as a Defendant in the Complaint, including its predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity managed or controlled by a named Defendant, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives or any persons acting or purporting to act on behalf of a Defendant.

8.     "Document" shall have the same meaning as used in Rule 34 of the Federal Rules of Civil Procedure, and shall be construed in its broadest sense to include, without limitation, the final form and all drafts and revisions of any paper or other substance or thing, original or reproduced, and all copies thereof that are different in any way from the original, on which any words, letters, numbers, symbols, pictures, graphics, or any other form of information is written, typed, printed, inscribed, or otherwise visibly shown, and also every other form of stored or recorded information, whether on film, tape, disks, cards, computer memories, or any other

5

medium and/or device whereby stored information can, by any means whatsoever, be printed or otherwise recovered, generated or displayed in the form of visible, audible, or otherwise perceptible words, letters, numbers, symbols, pictures, or graphics. To illustrate (and not to limit) the breadth of this definition, "document" in this sense papers or objects bearing handwritten notes, material written in Braille, contracts, letters, bills, telegrams, notes, e-mail, voice mail, books, desk calendars, memoranda, envelopes, drafts or partial copies of anything, signs, photographic negatives and prints, video and audio recordings of all kinds and the contents of storage media used in data-processing systems. Each and every draft of a document is a separate document for purposes of these document requests.

9.  "Electronically Stored Information" or "ESI" means and refers to computer generated information or data of any kind, stored in or on any storage media located on computers, file servers, disks, the cloud, tape, or other real or virtualized devices or media. Non-limiting examples of ESI include:

- Digital communications (e.g., e-mail, phone calls and logs of phone calls, voice mail, text messaging, instant messaging, and ephemeral messaging (SnapChat, etc.));
- E-Mail Server Stores (e.g., Lotus Domino .NSF or Microsoft Exchange .EDB)
- Word processed documents (e.g., MS Word or WordPerfect files and drafts);
- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data);
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- Sound Recordings (e.g., .WAV and .MP3 files);
- Video and Animation (e.g., .AVI and .MOV files);
- Unstructured Data;
- Structured Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);

Case 4:19-cv-00332-SRB   Document 570-1   Filed 12/20/21   Page 10 of 75

Case 4:19-cv-00332-SRB   Document 1128-19   Filed 09/07/23   Page 13 of 78

- Calendar and Diary Application Data (e.g., Outlook PST, blog entries);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Backup and Archival Files (e.g., Veritas, Zip, .GHO, iTunes archives of iPhone content); and
- Cloud based or other virtualized ESI, including application, infrastructure and data.

10.    "Employee" means, without limitation, any current or former officer, director, employee, independent contractor, or agent.

11.    "Franchisee" means any Broker or direct or indirect owner of Brokers licensing intellectual property, a business model, a brand, or other rights.

12.    "Including" is used to emphasize certain types of Documents requested and should not be construed as limiting the request in any way. Including therefore means "including, but not limited to," or "including without limitation."

13.    "Local Realtor Boards" refers to members associations of REALTORS®.

14.    "Management" shall be construed broadly and means without limitation, Employees or other Persons with executive, management, supervisory or policy-setting responsibilities, both individually and collectively, and, depending upon context, includes their administrative assistants, secretaries, or other support staff.

15.    "Meeting" means, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

16.     "MLS" is defined according to Section 1 of the National Association of Realtors' Handbook on Multiple Listing Policy (2021).

17.     "Named Plaintiffs" means those individuals listed as plaintiffs in the Complaint, and any persons or entities subsequently added as named plaintiffs in this matter.

18.     "NAR" means National Association of Realtors.

19.     "Person" means, without limitation, any individual, corporation, partnership or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, group or other form of legal entity or business existing under the laws of the United States, any state or any foreign country.

20.     "Policy" or "Procedure" means any rule, practice or course of conduct, guidelines or business methods or traditions whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed, explicitly or implicitly, by You.

21.     "Real Estate Services" means the bundle of services provided to homebuyers and sellers by residential real estate Brokers or Realtors with MLS access.

22.     "Relating to," "referring to," "regarding," "with respect to" or "concerning" mean without limitation the following concepts: concerning, constituting, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part, directly or indirectly. Documents are considered relating to the subject matter whether they are viewed alone or in combination with other Documents.

23.     "Representative" shall mean any and all agents, employees, servants, independent contractors, consultants, officers, directors, associates, or other persons acting or purporting to act on Your behalf or on behalf of the person in question.

24.     "Structured Data" or "Structured Database" refers to any data that resides in a fixed field within a record or file, such as data stored in Oracle, SQL, or files that are in Columns/Rows or a fixed field with a predefined format.

25.     "Studies" or "Analyses" include all reports, memoranda, statistical compilations, reviews, audits and other types of written, printed, or electronic submissions of information.

26.     "Subject MLS" is defined as the Kansas City Regional Association of Realtors a/k/a Heartland MLS.

27.     "Trade Association" means any group, committee, subcommittee, or association, formal or informal, relating to the market for Real Estate Services, including but not limited to the National Association of Realtors, Missouri REALTORS, Kansas Association of Realtors, Illinois REALTORS, Kansas City Regional Association of Realtors, Columbia Board of Realtors, St. Louis Realtors, Greater Springfield Board of Realtors, Local Realtor Associations, and the Council on Multiple Listing Services.

28.     "You" and "Your" mean the responding party, including its predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity that the responding party manages or controls, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives or any persons acting or purporting to act on their behalf, including but not limited to Heartland MLS.

**DESIGNATED MATTERS**

1.  Your general operations including your primary business function, governance, leadership, running of the Heartland MLS and general revenues and expenses.

9

2. Identification of Your leadership and key personnel, including but not limited to, the identification of the board of directors and their affiliated real estate brokerage companies and key personnel.

3. Identification of leadership and key personnel in Heartland MLS, including but not limited to, the identification of the board of directors and their affiliated real estate brokerage companies and key personnel.

4. Identify and explain the amount and allocation of annual membership dues paid by Your members.

5. Describe in detail the process to obtain membership in the Kansas City Regional Association of Realtors, including but not limited to requirements or prerequisites for membership.

6. Describe in detail the process for your members to become members of Heartland MLS, including but not limited to requirements or prerequisites for membership.

7. Identify and describe Your policies and procedures regarding mandating or requiring Your members to maintain membership in good standing with NAR and that Your members are in compliance with NAR rules, policies, Handbook on Multiple Listing Policy, and/or Code of Ethics.

8. Identify and describe Your policies and procedures for ensuring Your members are in compliance with Your bylaws and policies.

9. Identify and describe generally the technological platform You use to advertise and seek listings on the Heartland MLS, including the identification of the creator, owner, or licensor of such technology.

10. Identify and describe all efforts aimed at implementing or preparing to implement the following changes mandated by NAR on or about November 15, 2021, and to take effect January 1, 2022:

    a.  Prohibit agents from representing their brokerage services are free;

    b.  Require the disclosure of buyer agent compensation to consumers; and

    c.  Prevent the ability to filter listings on the MLS based on the amount of compensation offered to buyer brokers.

**EXHIBIT B**

12

**DOCUMENTS REQUESTED**

1. From Jan. 1, 2014, to present, all Documents and Communications discussing or providing direction or instruction on whether and how to become a member of Your organization or Heartland MLS.

2. All manuals, brochures, guidelines, recommendations, policies, and training materials related to Your rules or requirements for MLS listings, including but not limited to whether listings must include an offer of compensation to a prospective buyer's broker.

3. From January 1, 2014, to present, all versions of Your governing documents, including but not limited to bylaws and articles of incorporation.

4. All Communications between You and NAR concerning membership in NAR, compliance and/or enforcement of NAR's rules, policies, Handbook on Multiple Listing Policy, or Code of Ethics.

5. All Documents and Communications concerning any enforcement mechanism You employ to ensure Your members maintain compliance with Your Rules or NAR's rules, policies, Handbook on Multiple Listing Policy, and Code of Ethics.

6. From January 1, 2014, to Present, all Documents and Communications concerning any disciplinary action taken regarding any member's alleged noncompliance with Your Rules or NAR rules, policies, Handbook on Multiple Listing Policy, or Code of Ethics.

7. All Documents identifying the name and title of Your leadership and key personnel, including but not limited to Your Board of Directors and their affiliated real estate brokerage firms, CEO, COO, and CFO, from January 1, 2014, to present.

8. From January 1, 2014, to present, Your membership list for all members of Heartland MLS and their affiliated brokerage firms.

13

9. From January 1, 2014, to present, documents sufficient to show the amount and allocation of local, state, and national membership dues paid annually by each of Your members or members of Heartland MLS, including but not limited to, HMLS quarterly bills, lockbox fees, and dues related to local, state, or national advocacy efforts.

10. From Jan. 1, 2014, to present, all Documents and Communications concerning the Board of Choice. *See e.g.*, https://www.nar.realtor/about-nar/policies/commonly-asked-questions-on-board-of-choice (last visited December 6, 2021).

11. From January 1, 2014, to present, all Documents and Communication regarding NAR Local Education Meetings at NAR conferences, including but not limited to, agendas, meeting minutes, brochures, handouts, and presentation transcripts.

12. From January 1, 2014, to present, all versions of implementation kits received by You or Heartland MLS from NAR.

13. From January 1, 2014, to present, all Communications between You and any of the Corporate Defendants concerning MLS listing requirements, NAR membership and/or cooperative commissions.

14. All Documents and Communications you provide to Your membership delivering guidance and instructions on how to become a member of NAR and if NAR membership is required.

15. All Documents and Communications discussing or referencing training that you offer to Your members to maintain compliance with NAR's education requirements, including but not limited to NAR Code of Ethics trainings.

16. All Documents and Communications discussing NAR's decision to implement the following changes to their policies on or around November 15, 2021, and going into effect Jan. 1, 2022:

14

a. Prohibit agents from representing their brokerage services are free;

b. Require the disclosure of buyer agent compensation to consumers; and

c. Prevent the ability to filter listings on the MLS based on the amount of compensation offered to buyer brokers.

Dated: December 20, 2021

**WILLIAMS DIRKS DAMERON LLC**

_/s/ Eric Dirks_

| | |
|---|---|
| Eric L. Dirks | MO # 54921 |
| Matthew L. Dameron | MO # 52093 |
| Amy R. Jackson | MO # 70144 |
| Courtney M. Stout | MO # 70375 |

1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Tel:     (816) 945-7110
Fax:    (816) 945-7118
dirks@williamsdirks.com
matt@williamsdirks.com
amy@williamsdirks.com
cstout@williamsdirks.com

**BOULWARE LAW LLC**

| | |
|---|---|
| Brandon J.B. Boulware | MO # 54150 |
| Jeremy M. Suhr | MO # 60075 |
| Erin D. Lawrence | MO # 63021 |

1600 Genessee, Suite 416
Kansas City, MO 64102
Tel:     (816) 492-2826
Fax:    (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com

**KETCHMARK AND MCCREIGHT P.C.**

Michael  Ketchmark  MO  #  41018
Scott  McCreight  MO  #  44002
11161 Overbrook Rd. Suite 210
Leawood, KS 66211
Tel:     (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

_**Attorneys for Plaintiffs and the Proposed Classes**_

15

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of December, 2021, the foregoing was sent via electronic mail to all counsel of record.

/s/ Eric Dirks
Attorney for Plaintiffs

## AFFIDAVIT OF BUSINESS RECORDS CUSTODIAN

STATE OF_____)

_____) ss.

COUNTY OF_____)


      I,_____, of lawful age, being first duly sworn upon oath, state:

1. I am a duly authorized custodian of the business records of Kansas City Regional Association of Realtors, and I have authority to certify those records.

2. The copy of the records attached to this Affidavit is a true copy of the records described in the Subpoena.

3. The records were prepared by the personnel or staff of Kansas City Regional Association of Realtors or persons acting under its control, in the regular course of the business at or about the time of the act, condition or event recorded.


_____

Records Custodian


Subscribed and sworn to before me this_____day of_____, 20__.


_____

Notary Public

My commission expires:

17

**EXHIBIT C**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| SCOTT and RHONDA BURNETT,<br>RYAN HENDRICKSON,<br>JEROD BREIT, SCOTT TRUPIANO,<br>and JEREMY KEEL, on behalf of<br>themselves and all others similarly<br>situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF<br>REALTORS, REALOGY HOLDINGS<br>CORP., HOMESERVICES OF<br>AMERICA, INC., BHH AFFILIATES,<br>LLC, HSF AFFILIATES, LLC,<br>RE/MAX LLC, and KELLER<br>WILLIAMS REALTY, INC.<br><br>_____ Defendants. _____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 19-CV-332-SRB |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Scott and Rhonda Burnett, Ryan Hendrickson, Jerod Breit, Scott Trupiano, and Jeremy Keel ("Plaintiffs"), bring this action on behalf of themselves and on behalf of the plaintiff classes (the "Classes") consisting of all persons and entities who listed properties on one of four Multiple Listing Services (the "Subject MLS") and paid a broker commission from at least April 29, 2015 until the Present (the "Subject MLS Class Period").[1] Defendants are the National Association of Realtors and the four largest national real estate broker franchisors: Realogy Holdings Corp.; HomeServices of America, Inc., and its subsidiaries and/or affiliates BHH

---

[1] Plaintiffs also bring this action on behalf of themselves and the MMPA Class and the Missouri Antitrust Law Class, as those terms are defined herein. The Class Period for the MMPA Class is April 29, 2014 (or earlier) until the Present.

1

Affiliates, LLC, HSF Affiliates, LLC, and The Long & Foster Companies, Inc.; RE/MAX, LLC.; and Keller Williams Realty, Inc., each of which has a significant presence in the Kansas City metropolitan area and the other areas identified in this Complaint. Together, Defendants have conspired to require home sellers to pay the broker representing the buyer of their homes, and to pay an inflated amount, in violation of federal antitrust law, the Missouri Merchandising Practices Act ("MMPA"), and the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031.

Plaintiffs seek treble damages under federal antitrust law, threefold damages under the Missouri Antitrust Law, punitive damages under the MMPA, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees, and demand a trial by jury.

## NATURE OF THE ACTION

1.    Plaintiffs, home sellers who listed their homes on one of four Multiple Listing Services (identified below), bring this action against Defendants for agreeing, combining, and conspiring to impose and enforce an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes, and to pay an inflated amount, in violation of federal antitrust law and in violation of Missouri law. Indeed, the Antitrust Division of the United States Department of Justice is currently and actively investigating practices in residential real estate brokerage marketplace, with an apparent focus on compensation paid to brokers among other conduct and practices.

2.    Defendants are the National Association of Realtors ("**NAR**") and the four largest national real estate brokers, Realogy Holdings Corp., HomeServices of America, Inc. (and its subsidiaries and/or affiliates BHH Affiliates, LLC, HSF Affiliates, LLC, and The Long & Foster Companies, Inc.), RE/MAX, LLC, and Keller Williams Realty, Inc. (the latter group is the "**Corporate Defendants**," and collectively with NAR they are "**Defendants**").

2

3. The cornerstone of Defendants' conspiracy is NAR's adoption and implementation of a rule that requires all seller's brokers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation (the "**Adversary Commission Rule**") when listing a property on a Multiple Listing Service ("**MLS**").

4. An MLS is a database of properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS marketplace. Brokers, if they are members of an MLS, are required to list all properties on the MLS.

5. The MLSs at issue in this case are controlled by local NAR associations, and access to such MLSs is conditioned on brokers agreeing to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy.[2] The Adversary Commission Rule is a mandatory rule in NAR's Handbook.

6. Defendants and their co-conspirators collectively possess market power in local markets for real estate broker services through their control of the local MLS.

7. Due to Defendants' conspiracy, NAR conditions a broker's access to and use of NAR's MLSs on a broker's agreement to adhere to and implement terms that restrain competition. Further, each of the Corporate Defendants plays an active role in NAR and mandates that franchisees, brokerages, and individual realtors join and implement NAR's anticompetitive rules, including the Adversary Commission Rule, otherwise these parties would not receive the benefit of the Corporate Defendants' branding, brokerage infrastructure, and other support. As the leading brokers in the United States (and also in the four MLS markets covered by the Class Definition), their knowing acts of forming and/or joining and participating in the conspiracy, by

---

[2] *See* National Association of Realtors, Handbook on Multiple Listing Policy 2019, *available at* https://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdf ("**NAR Handbook**").

implementing and enforcing its rules and policies, is essential to the conspiracy's success. The unlawful restraints implemented and enforced by the conspirators benefit NAR and the Corporate Defendants, furthering their common goals by permitting brokers to impose supra-competitive charges on home sellers and restrain competition by precluding competition from innovative or lower-priced alternatives.

8. Defendants' conspiracy forces home sellers to pay a cost that, in a competitive market and were it not for Defendants' anticompetitive restraint, would be paid by the buyer.

9. Most buyer brokers will not show homes to their clients where the seller is offering a lower adversary / buyer commission, or they will give priority to showing homes with higher adversary / buyer commission offers first. As a result, to gain the cooperation of buyer brokers, selling brokers are incentivized to offer a higher adversary / buyer broker commission as part of complying with NAR's mandatory Adversary Commission Rule.

10. If NAR's Adversary Commission Rule were not in place, then the cost of buyer broker commissions would be paid by their clients (home buyers). Buyer brokers would thus have to compete with one another by offering a lower commission rate. The Adversary Commission Rule thereby restrains price competition among buyer brokers because the person who actually retains the buyer broker — the home buyer — does not negotiate or pay the commission for his or her broker.

11. Deepening the anticompetitive effects of the Adversary Commission Rule, NAR rules also prohibit buyer brokers from making home purchase offers contingent on the reduction of the buyer broker commission.

12. Real estate brokers handle most residential real estate sales in the United States. In a typical transaction, one broker will represent the seller, and another broker will represent the

buyer of a home. Both the buyer broker and seller broker (also known as the listing broker) are paid a percentage of the property's sales price. Currently, total broker compensation in the United States is typically five to six percent of the home sales price, with approximately half of that amount paid to the buyer broker.

13.     In competitive foreign markets, home buyers pay their brokers, if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United States. These international markets include United Kingdom, Germany, Israel, Australia, and New Zealand. In these markets, which are not affected by any policy like the Adversary Commission Rule, buyer brokers are paid by home buyers, rather than home sellers. According to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" whereas in the United States the average total commission rates continue to remain between 5% and 6%, which is "no lower than it was in 2001" despite significant advances in technology.[3]

14.     Indeed, a 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium. According to the report commissioned by NAR, in those countries the average total commissions ranges between 1% and 3%.[4]

---

[3]     FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf.

[4]     Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

5

15.     As a representative of a brokerage that operates in both the United States and internationally observed at an FTC/DOJ Joint Public Workshop on the real estate industry, "[i]t's hard to believe it's 2018 and we're in the US and the average commission fee is still between 5% and 6% when we have one of the largest, most developed markets in the [world]. But we still maintain that *elevated* level of commission expense." (emphasis added).[5]

16.     The Adversary Commission Rule explains why commissions in the United States remain artificially and anticompetitively "elevated" beyond where they would be in a market free from Defendants' conspiracy. Indeed, other industry participants recognize that "this seller agent/buyer agent model" is why commission amounts are "very different" in the United States compared to countries like "the UK," as Defendants and their co-conspirators are "dead set on not letting 6% commissions go away" in the United States.[6]

17.     Defendants use their control of the MLSs — and the Corporate Defendants use their agreements with their local franchisees, their employee policy and procedures manuals, and leadership roles in NAR and local realtor associations — to require brokers in local residential real estate markets to adhere to NAR's rules, including the Adversary Commission Rule. Doing so helps implement and enforce the conspiracy. The Corporate Defendants further implement the conspiracy by reviewing NAR's Rules and agreeing to them at yearly meetings, and NAR further advances the conspiracy by re-issuing its Rules (including the Adversary Commission Rule). Further, Defendants participate in and implement the conspiracy by serving on boards and

---

[5] FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

[6] *Id.*

committees that enforce compliance with NAR Rules.

18.     Through these actions, and others alleged in this Complaint, each of the Corporate Defendants, and NAR, has taken actions to further the conspiracy and thereby have agreed to join, participate in, facilitate, and implement the conspiracy.

19.     Defendants' conspiracy has kept buyer broker commissions in the 2.5 to 3.0 percent range for many years despite the diminishing role of buyer brokers. Many home buyers no longer search for prospective homes with the assistance of a broker, but rather independently through online services. Upon information and belief, NAR and the Corporate Defendants have studied and are aware of this trend and fact. Prospective home buyers increasingly retain a buyer broker after the client has already found the home the client wishes to buy. Despite this diminishing role for buyer brokers, their percentage of commission has remained steady, due to Defendants' conspiracy. And at the same time, because housing prices have significantly increased during the last several years (far outpacing inflation) and because commissions are calculated as a percentage of the home's sale price, the actual dollar amounts have substantially risen as well.

20.     Defendants' success in maintaining (and, in inflation-adjusted dollars, increasing) the same artificially and anticompetitively inflated commission rates despite these technological and social changes starkly contrasts with results in other industries. For example, the introduction of the Internet and innovative or discount service providers have provided enormous financial benefits to consumers of numerous goods and services in various sectors, such as travel booking, insurance, banking, and stock brokering, as well as retailing and bookselling. Despite transaction costs dramatically decreasing in myriad other sectors and industries, real estate commission rates have persisted and remained steady in a range of 5% to 6%.

21.     The disconnect between buyer broker costs and commissions illustrates the effect of Defendants' conspiracy. Whether a home purchased by their client costs $250,000 or $2,500,000, the buyer broker's costs are roughly similar. But the sum received by the buyer broker as a commission is *significantly* greater for the more costly property. Why? Many if not most of the services that buyer brokers provide do not vary based on the sale price, so in a rational, competitive market the percentage fee should decrease as the home price increases. Instead, due to Defendants' conspiracy and anticompetitive practices such as the Adversary Commission Rule, the commission overcharges imposed on home sellers bear little relation to the quantity or quality of the services or value allegedly provided by the brokers who are paid the commissions. This structure results from a lack of competition and makes no economic sense, except for the buyer broker.

22.     Moreover, another pernicious effect in the marketplace that results from and is amplified by Defendants' anticompetitive conspiracy is the practice of "steering." That is, given the requirement for seller brokers to make a blanket, unilateral offer of commission to buyer brokers (which is visible through the MLS system only to other realtor participants, and not to consumers), buyer brokers face strong incentives to "steer" their buyer clients toward homes where the buyer broker would receive a greater commission percentage. Indeed, economic studies have documented and confirmed the prevalence and significance of steering and further "suggest[ed] that this could limit price competition."[7]

23.     Given that buyer brokers will not show homes to their clients where the seller

---

[7]     *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf.

broker is offering a lower buyer-broker commission (or will show such homes later), seller brokers face pressure in making their unilateral blanket offers to provide high commissions to buyer brokers. In sum, the conspiracy has multiple illogical, harmful, irrational, and anticompetitive effects, including that it: (a) requires sellers to pay overcharges for services provided by buyer-brokers to the buyer, who is seller's adversary in the transaction; (b) raises, fixes, and maintains buyer-broker compensation at levels that would not exist in a competitive marketplace; and (c) encourages and facilitates steering and other actions that impede innovation and entry by new and lower-cost real estate brokerage service providers.

24.     Defendants' conspiracy has inflated buyer broker commissions, which, in turn, have inflated the total commissions paid by home sellers such as Plaintiffs and the other Class members. Plaintiffs and the other Class members have each incurred, on average, thousands of dollars in overcharges and damages as a result of Defendants' conspiracy.

25.     For example, a class member who sells a house for $400,000 would have paid roughly $10,000 to $12,000 in additional commissions to the buyer's broker due to the conspiracy.

26.     In a competitive market not affected by Defendants' anticompetitive restraint, the seller would pay nothing to the buyer broker, who would be paid instead by the buyer (their client), and the total commission paid by the seller would be set at a level to compensate only the seller broker. And even assuming *arguendo* that in a competitive market the seller would pay all or a portion of the buyer broker's commission, the commission would be far less than the 2.5 to 3.0 percent that is currently and typically paid to buyer brokers.

27.     Moreover, in the absence of the Adversary Commission Rule, seller brokers would likely face additional competitive pressures. That is, instead of following long-time practice of setting total commissions at or near 6% and assigning roughly half of that amount to themselves

9

and roughly the other half to the buyer broker commission (and selecting that amount at a level to remain in the good graces of buyer brokers), seller brokers would set a commission to pay themselves alone and would likely begin to engage in more vigorous competition with one another to lower their rates and/or provide additional services to justify their newly transparent rates.

28. Plaintiffs, on behalf of themselves and the Class, sue for Defendants' violations of the federal and state antitrust laws as alleged herein, and seek treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.[8]

29. Plaintiffs bring this lawsuit as a class action on behalf of home sellers who paid a broker commission in the last four years in connection with the sale of residential real estate listed on one of the following MLSs ("Subject MLS" or "Subject MLSs"):

- o The Kansas City MLS, or the "**Heartland MLS**";

- o The St. Louis MLS, or the Mid America Regional Information System MLS or the "**MARIS MLS**";

- o The Springfield, Missouri MLS, or the "**Southern Missouri Regional MLS**"; and

- o The Columbia, Missouri MLS, or the Columbia Board of Realtors MLS or "**CBOR MLS**."

**JURISDICTION AND VENUE**

30. This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from

---

[8] As noted, Plaintiffs also bring this action on behalf of themselves, the MMPA Class, and the Missouri Antitrust Law Class. *See infra* at Count II and Count III.

10

Defendants. Subject matter jurisdiction over this action also exists under 15 U.S.C. § 4 and under 28 U.S.C. §§ 1331, 1337.

31. This Court has personal jurisdiction over Defendants, each of which has been properly served. Defendants have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

32. Each Defendant transacts substantial business in this District, as alleged throughout this Complaint. For instance, for each of the Corporate Defendants, such substantial business includes the extensive business operations of each of their real estate brokerage subsidiaries, franchisees, and/or affiliates, which collectively are involved in a substantial majority of residential real estate listings on the Subject MLSs and in sales occurring in the areas covered by the Subject MLSs, including in this District. Each of the Corporate Defendants has received millions of dollars in revenue attributable to business transacted in Missouri and in this District from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in Missouri and in this District.

33. For NAR, it collects substantial revenues and fees from its nationwide membership — including substantial numbers of members located and transacting business in Missouri, including in this District — as public estimates suggest that NAR makes almost $200 million in revenue every year, with most of that coming from member dues. Accordingly, during the Subject MLS Class Period, NAR has collected millions of dollars, if not tens of millions of dollars, in membership fees and revenues attributable to real estate brokerages, brokers, and/or realtors

11

operating in the areas covered by the Subject MLSs (and within in this District).

34.     In addition, NAR conducts and transacts substantial business in this District through its involvement in drafting, reviewing, and publishing regularly updated editions of the "Interpretations of the Code of Ethics," with its 31st Edition published in 2019. NAR's Interpretations of the Code of Ethics reflects that NAR, through its Professional Standards Committee, interacts and conducts business with arbitration Hearing Panels and Boards of Directors of local real estate associations (including local associations operating in areas covered by the Subject MLSs) to review and articulate purported policies and principles that have been applied in specific disputes involving realtors and that are also forward-looking "official statements of [NAR's] policy and are not merely advisory," thereby governing arbitration of disputes among realtors occurring in this District.

35.     NAR requires each of the Corporate Defendants, as well as other co-conspirators operating in this District, to comply with NAR policies, including its Handbook on Multiple Listing Policy and Code of Ethics. Among the policies that NAR requires the Corporate Defendants and other co-conspirators to follow in this District is the Adversary Commission Rule. Upon information and belief, NAR actively monitors and polices the Corporate Defendants and other co-conspirators operating in this District to ensure full compliance with its Rules and Policies, including the Adversary Commission Rule. Failure to comply with the Adversary Commission rule will result in removal of the entity or individual from NAR membership and, in turn, expulsion from the Subject MLSs.

36.     NAR also engages in substantial lobbying activities directed at various government entities and political candidates, at the local, state, and federal levels. Upon information and belief, NAR has transacted such lobbying business directed at Missouri and at this District.

37.     Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). Each Defendant transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

38.     The Adversary Commission Rule and other anticompetitive NAR rules apply and have been implemented by Defendants and co-conspirators in interstate commerce, including in this District. These rules govern the conduct of local NAR associations, local brokers, and local sales agents across multiple states, including but not limited to Missouri and the Subject MLSs. Defendants' conduct alleged herein has inflated buyer broker commissions nationwide including in the areas in which the Subject MLSs operate, and has injured home sellers in those areas. Defendant NAR, through its members and other co-conspirators, and the Corporate Defendants, through their franchisees, subsidiaries, and/or affiliates, and other co-conspirators, are engaged in interstate commerce, and are engaged in activities affecting interstate commerce, in the United States.

## THE PARTIES

**Plaintiffs**

39.     [To maintain paragraph numbering, this paragraph is intentionally left blank because it previously referred to transactions by Joshua Sitzer and Amy Winger who are no longer Plaintiffs in this case.]

40.     Scott and Rhonda Burnett are citizens of Missouri and residents of Kansas City, Missouri. On January 26, 2016, they sold a home located in the Kansas City metropolitan area. The home was listed on the Heartland MLS. In that sales transaction, the Burnetts were

13

represented by a ReeceNichols-affiliated realtor, and the buyer was represented by a Re/Max-affiliated broker. As a part of the sales transaction, the Burnetts paid a substantial buyer-broker commission, with a total broker commission of 6%, of which 3% was paid to the buyer's broker.

41.     Ryan Hendrickson is a citizen of Illinois and resident of Belleville, Illinois. On May 10, 2019, he sold a home located in the St. Louis metropolitan area.  The home was listed on the MARIS MLS. As a part of the sales transaction, Mr. Hendrickson paid a substantial buyer-broker commission, with a total broker commission of 6%, of which 3% was paid to the buyer's broker.

41(a). Jerod Breit is a citizen of Indiana and a resident of Indianapolis, Indiana. On or about March 1, 2017, Mr. Breit sold a home located in the St. Louis metropolitan area. The home was listed on the MARIS MLS. Mr. Breit was represented by a RE/MAX-affiliated broker. As part of the transaction, Mr. Breit paid a substantial buyer-broker commission, with a total broker commission of 6%, of which 2.7% was paid to the buyer's broker.

41(b). Scott Trupiano is a citizen of Missouri and a resident of St. Louis, Missouri. On or about June 24, 2015, Mr. Trupiano sold a home located in the St. Louis metropolitan area. The home was listed on the MARIS MLS. Mr. Trupiano was represented by a Realogy-affiliated broker. As part of the transaction, Mr. Trupiano paid a substantial buyer-broker commission, with a total broker commission of 6%, of which 2.7% was paid to the buyer's broker.

41(c). Jeremy Keel is a citizen of Missouri and resident of Kansas City, Missouri. On or about September 28, 2020, Mr. Keel sold a home located in the Kansas City metropolitan area. The home was listed on the Heartland MLS. In that sales transaction, Mr. Keel was represented by a Keller Williams-affiliated broker. As part of the sales transaction, Mr. Keel paid a substantial buyer-broker commission, with a total commission of 6%, of which 3% was paid to the buyer's

broker.

42.     As set forth in this Complaint, Defendants' unlawful conduct and conspiracy has caused home sellers, including each of the Plaintiffs, to pay a buyer-broker commission and has also increased the amount of the buyer-broker commission over the amount that would be charged to the buyer in a competitive marketplace absent the Adversary Commission Rule and Defendants' conspiracy.

**Defendants**

43.     Defendant National Association of Realtors, a lobbying group that advocates for the interests of real estate brokers, has over 1.2 million individual members from whom it has collected hundreds of millions of dollars in dues and membership fees during the Subject MLS Class Period, including millions of dollars in dues and membership fees from NAR members located in this District. NAR oversees fifty-four state and territorial realtor associations and over 1,200 local realtor associations. NAR is headquartered in Chicago, Illinois.

44.     Defendant HomeServices of America, Inc. ("**HomeServices**") is one of the nation's largest real estate brokerages. It is headquartered in Minneapolis, Minnesota. HomeServices is an affiliate of Berkshire Hathaway. HomeServices is a majority owner of Defendant HSF Affiliates, LLC ("**HSF Affiliates**"). HSF Affiliates operates many real estate franchise networks, including ReeceNichols Real Estate, HomeServices, Prudential Real Estate, and Real Living. ReeceNichols Real Estate, for example, is by far the largest real estate brokerage in the Kansas City Metropolitan area, with nearly three times as many transactions as its next competitor, and is an affiliate of HomeServices, HSF Affiliaties, and/or Berkshire Hathaway. The local gross sales of ReeceNichols Real Estate are also nearly three times as large as its next competitor in the Kansas City Metropolitan area. In addition, in 2017 HomeServices acquired

15

Defendant The Long & Foster Companies, Inc., a large residential real estate company. Defendant BHH Affiliates, LLC is a subsidiary of HSF Affiliates and offers real estate brokerage services. This Complaint will use the term "HomeServices" to refer to Defendants HomeServices of America, Inc., HSF Affiliates, LLC, BHH Affiliates, LLC, The Long & Foster Companies, Inc., as well as the other entities referred to in this paragraph and their other wholly owned or controlled subsidiaries or affiliates.

45.     Defendant Keller Williams Realty, Inc. ("**Keller Williams**") is a privately held company headquartered in Austin, Texas. It is one of the nation's largest real estate brokerages, and franchises local Keller Williams brokers around the country, including numerous franchisees that transact substantial business in Missouri and in particular in this District.

46.     Defendant Realogy Holdings Corp. ("**Realogy**"), a publicly traded corporation with a market value exceeding $4 billion, has its headquarters in Madison, NJ. It owns, operates, and franchises many real estate brokerage firms, including Better Homes and Garden Real Estate, Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate. Realogy is the nation's largest real estate brokerage company and has franchises in and transacts substantial business in Missouri and in particular in this District.

31.     Defendant RE/MAX, LLC ("**RE/MAX**") franchises brokers around the country, including in the Subject MLSs and in particular in this District. This Complaint will refer to RE/MAX, LLC, its predecessors, and its wholly owned or controlled subsidiaries or affiliated as "RE/MAX."

32.     Each of the Defendants has a significant presence in the markets covered by the Subject MLSs and transacts substantial business in this District.

16

**Co-Conspirators and Agents**

33.     In addition to the named Defendants, many other local realtor associations and real estate brokers participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, all who own, operate, and participate in the Subject MLSs agree to, comply with, and implement the Adversary Commission Rule.

34.     By adopting the Adversary Commission Rule, the Subject MLSs, among others, have participated as co-conspirators in the antitrust violations and unfair practices alleged herein and performed acts and made statements in furtherance thereof.

35.     Furthermore, the franchisees and brokers of the Corporate Defendants agreed to, complied with, and implemented the Adversary Commission Rule in the geographic areas covered by the Subject MLSs and thereby have participated as co-conspirators in the antitrust violations and unfair practices alleged herein and performed acts and made statements in furtherance thereof.

36.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

## FACTUAL ALLEGATIONS

**Real Estate Industry Background**

37.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"), and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

38.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. That is why real estate brokerage contracts with sellers

and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through brokers.

39.     Most brokers and their individual realtors or agents occupy dual roles: that is, a broker may act as a seller broker for some home sales and act as a buyer broker for other home sales.

40.     According to NAR, 92% of sellers sold their home with the assistance of a real estate broker in 2017, and 87% of buyers purchased their home with the assistance of a real estate broker in 2017.

41.     In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

42.     A seller broker's compensation is set forth in a listing agreement, a contract between the seller and the seller broker. The listing agreement includes the terms of the listing and often provides that the seller broker has the exclusive right to market the seller's home. Notably, due to the Adversary Commission Rule, the listing agreement specifies the total commission that a home seller will pay to the seller broker and also specifies the amount earmarked to be paid to the buyer broker (in the event the buyer has a broker).

43.     When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

44.     If the buyer has a broker, the seller broker pays the buyer broker a commission out of the total commission paid by the seller. In fact, a standard of conduct in NAR's Code of Ethics permits and encourages buyer brokers to tell their clients that their services are free, which

obviously is not a true statement.

45. The result of these agreements and the Adversary Commission Rule is that buyer brokers — who are supposed to assist their clients in negotiating against the seller — receive their compensation from the total commission paid by the seller, not from the buyer they represent. Real estate insiders recognize that the Adversary Commission Rule leads to a marketplace where there is "a lot of confusion around how commissions work," where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject.[9] And other market participants agreed that the practice is "confusing" and that most consumers "just don't understand how commission works."[10]

46. Absent the Adversary Commission Rule and in a competitive market (after all, a seller has no incentive to compensate a buyer broker for actively negotiating against a seller's interests), a buyer would instead pay his or her broker, and a seller would agree to a pay a commission that would go solely toward the seller's own broker. The seller's total broker commission would thus be approximately half (or less) than the amount that sellers have paid as a total commission to compensate both their selling broker and their adversary's broker, the buying broker.

**Multiple Listing Services (MLSs) and the Adversary Commission Rule**

47. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their realtors or agents, if they are in compliance with the rules

---

[9]  FTC-DOJ Joint Public Workshop, Segment 1 Tr., June 5, 2018 (link provided *supra*).

[10]  FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

of the MLS. The Subject MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR.

48.     As required by NAR rules, seller brokers list their clients' property on an MLS. If a seller broker does not list a client's property on an MLS, most buyer brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites, such as Zillow, through which many prospective home buyers find homes.

49.     The Adversary Commission Rule requires a seller broker, on behalf of the seller, to make a blanket, unilateral and effectively non-negotiable offer of compensation to buyer brokers whenever listing a home on an MLS owned by a local NAR association. If a buyer represented by a broker purchases the home, then the buyer broker receives the offered compensation.

**Anticompetitive NAR Rules**

50.     The Adversary Commission Rule was adopted by NAR in 1996 in its Handbook on Multiple Listing Policy (the "**Handbook**"). The rule has been in effect ever since.

51.     Before the adoption of the Adversary Commission Rule in 1996, NAR played a central role in designing, implementing, and enforcing through the MLS system a similar and also deceptive and flawed market structure in which *all* brokers involved in residential home sales tended to represent the seller, either as the seller's broker or as the "sub-agent" of the seller's broker.

52.     Under this prevailing system of sub-agency, even if a broker was primarily working with buyers, the broker remained legally obligated to represent the interests of sellers.[11]

---

[11] Further information regarding the system of sub-agency is set forth in the following publication: Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM. (2006), *available at* https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

Accordingly, when a transaction closed, the seller would pay a total commission to the seller broker, who would in turn compensate the "sub-agent" broker who had been working with the buyer, albeit while owing legal and fiduciary obligations to the seller.

53.     As a result of this confusing and misleading marketplace practice, many homebuyers believed (mistakenly) that the sub-agent broker was working on their behalf. "When this sub agency system, in which brokers working with buyers were legally obligated to pass on information disadvantageous to their clients to sellers, was exposed through press coverage, it collapsed almost overnight."[12]

54.     Once brokers working with buyers were no longer serving as "sub-agents" for the seller's broker, the prior practice of the seller paying commission to both brokers involved in the transaction should have disappeared, as no justification remained to warrant it. However, that is around when NAR and its co-conspirators stepped in to implement and enforce an anticompetitive and deceptive scheme designed to continue and maintain supra-competitive commissions and impede innovation and lower-priced competition by requiring, through the Adversary Commission Rule, that seller brokers make blanket, unilateral offers of compensation to buyer brokers when listing a home on an MLS.

55.     Specifically, in November 1996, NAR adopted the Adversary Commission Rule in its Handbook on Multiple Listing Policy (the "**Handbook**").

56.     The NAR Board of Directors, and committees reporting to it, determine from time to time whether to modify any policies in the Handbook, and the Board has approved certain changes in recent years within the Subject MLS Class Period.

57.     All policies that are retained unchanged, and all modified or revised or new policies,

---

[12] *Id.* at 3, *available at* https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

Case 4:19-cv-00332-SRB   Document 570-1   Filed 01/20/21   Page 143 of 375

are then set forth in new editions of the Handbook that tend to be issued annually. The Board of Directors of NAR have consistently and repeatedly agreed and chosen to retain the Adversary Commission Rule in the Handbook even in the face of criticism by economists and industry experts that the Adversary Commission Rule is anticompetitive and causes supra-competitive commission rates.

58.     In revising and re-issuing the Handbook, NAR has invited each of the Corporate Defendants and other co-conspirators to participate in the following agreement, combination, and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook. Thus, to the extent any Corporate Defendant argues that it was not involved in the initial drafting or adoption of the Adversary Commission Rule, that argument lacks legal significance because each Corporate Defendant has joined the conspiracy and agreed to abide by, implement, and enforce the Adversary Commission Rule.

59.     The Handbook states the Adversary Commission Rule as follows:

> In filing a property with the multiple listing service of an association of Realtors®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.[13]

60.     The Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[14]

---

[13] NAR Handbook, at 65.

[14] NAR Handbook, at 35.

61.     The Adversary Commission Rule shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As the *Wall Street Journal* recently opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a "potentially illegal tying arrangement under the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[15]

62.     Moreover, the NAR requirement that the seller broker make a blanket, unilateral offer provides an incentive for seller brokers to cooperate with buyer brokers by offering a high commission for the buyer broker. And, of course, brokers often act as a selling broker in one transaction but as a buyer broker in another, which fact further contributes to the competition-restraining effects of the Adversary Commission Rule in that it fosters an environment in which brokers work cooperatively to split a total commission, instead of openly competing to earn the business of both potential home sellers and potential home buyers based solely on the services to be provided to that represented party.[16]

---

[15] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

[16] In addition, the requirement that the offer of compensation be "blanket" means that the Adversary Commission Rule compels home sellers to make this financial offer without regard to the experience or quality of the buyer-broker and without regard to the services or value being provided by that buyer broker. The same "blanket" fee must be offered to a brand new buyer-broker with no experience as that offered to a buyer-broker with many years of experience. In a competitive and rational market, competitors with more experience and a track record of results tend to command higher prices than new entrants with no experience or track record, but the Adversary Commission Rule blocks this kind of competitive differentiation. Moreover, because the offer is blanket and can be easily compared to the blanket offers that every other seller broker must include and publish (to fellow brokers only) on the MLS, the Adversary Commission Rule by design creates strong incentives for sellers and seller brokers to offer the high, standard commission rates to buyer brokers that the conspiracy has long sought to maintain. Seller brokers know that if they list a home and include a lower blanket offer of compensation to buyer brokers,

23

63.     As to the potential possibility that a buyer might seek to reduce his or her broker's commission by making that reduction a condition of a purchase offer, NAR has adopted another rule that prevents this.  Specifically, NAR's Code of Ethics, Standard Practice 16-16, states:

> REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[17]

In other words, for a buyer broker even to present an offer to a seller that is conditional on the seller reducing the buyer-broker commission would expressly violate NAR's ethics rules. There is nothing ethical or economically rational about Standard Practice 16-16, especially when coupled with the Adversary Commission Rule.

64.     NAR has published "Case Interpretations" that exacerbate the anticompetitive effects of its ethics rules and provide a mirage of potential negotiation regarding the buyer broker commission. For example, NAR's Case Interpretation #16-15 states that negotiation over the amount of a buyer broker's commission may only occur if it is "completed prior to showing of the property" by the buyer broker to the potential buyer. That is, the buyer broker, if inclined to reduce the amount of buyer broker commission, must request a commission reduction *before the broker can even show* the property to his or her client (the potential buyer). Obviously, the NAR Rule and Case Interpretation practically and effectively guarantee that no such negotiations will ever

---

then due to the practice of "steering" the community of buyer brokers is likely to avoid showing that home to their clients (potential home buyers).

[17] National Association of Realtors, Code of Ethics and Standard of Practice (Jan. 1, 2019), *available at* https://www.nar.realtor/sites/default/files/documents/2019-COE.pdf.

take place.[18]

65.     But for the Adversary Commission Rule and other anticompetitive rules and policies of NAR, buyers (not sellers) would pay the commission to their broker, and brokers would have to engage in competition by offering lower commissions to prospective buyers. And, selling brokers would face downward pressure on total commissions and renewed competition to earn business from home sellers, as seller brokers would no longer be calculating their commission rates to include any compensation for the buyer broker.[19]

**NAR's Oversight and Enforcement of its Anticompetitive Rules**

66.     NAR has experienced success in requiring that its members — which include state and local realtor associations in the Subject MLSs and, in particular, in this District, as well as non-member brokers and agents who operate in geographic areas with MLSs operated by local realtor associations — comply with its anticompetitive rules and with other rules set out in the Handbook and NAR's Code of Ethics.

67.     NAR requires that its members which own and operate MLSs comply with the mandatory provisions in the Handbook and the Code of Ethics. The Handbook states that an agreement by an association to establish an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s)

---

[18] Even if some negotiation does rarely occur, the Adversary Commission Rule still works to elevate the baseline for any such rare negotiations. Just as an agreement to fix prices (or an agreement to announce uniform price increases) is *per se* unlawful even though the marketplace might reflect some potential negotiation with the conspirators' customers, the Defendants' conspiracy here is unlawful and anticompetitive because it elevates the baseline for any negotiations.

[19] Even if one assumes for the sake of argument that, in a market free of the Adversary Commission Rule, a seller continue to pay all or a portion of the buyer broker's commission, the commission would be far less than the 2.5 to 3.0 percent currently charged to home sellers like Plaintiffs and paid to buyer brokers.

to operate in compliance with the multiple listing policies of the National Association."[20]

68.     Local realtor associations own each of the Subject MLS and are required by NAR to monitor their MLS and the MLS's participants to ensure that they comply with mandatory provisions from the NAR Handbook. Thus, each local realtor association and MLS, and each participant in those associations and MLSs, agrees to the anticompetitive restraints challenged in this lawsuit, and they all play important roles in implementing and enforcing those restraints.

69.     Failure to strictly comply with the Code of Ethics can lead to expulsion for NAR's individual and associational members.  NAR's Code of Ethics and Arbitration Manual states:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[21]

70.     If a broker or agent were denied access to a local MLS, including the Subject MLS, then that broker and its agents could not list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

71.     NAR's model rules for local realtor associations operating in the Subject MLSs also require adherence to NAR's Code of Ethics.

72.     NAR further penalizes and discourages potential noncompliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules not approved by NAR.[22] NAR's position and monitoring of potential non-compliance includes conduct to oversee and monitor associations that operate in and

---

[20]  NAR Handbook, at 9.

[21] National Association of Realtors, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.

[22]  NAR Handbook, at 8.

transact business in the areas covered by the Subject MLSs and, in particular, in this District

73.     NAR reviews the governing documents of its local realtor associations, including those operating in the Subject MLSs and in this District, to ensure compliance with NAR rules. NAR requires its local realtor associations, including those operating in the Subject MLSs and in this District, to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

**The Corporate Defendants Designed, Joined, and Participated in the Conspiracy**

74.     The Corporate Defendants — HomeServices, Keller Williams, Realogy, and RE/MAX — have agreed to adopt, promote, implement, and enforce the Adversary Commission Rule through their active and direct involvement in NAR governance and by imposing NAR rules on local real estate associations and the Corporate Defendants' affiliated franchisees, brokers, and employees. By participating in an association which prevents members from allowing their associates to compete with one another for commissions (and which requires illegal tying arrangements), and by agreeing to follow and enforce these anticompetitive rules, the Corporate Defendants have joined the conspiracy and acted to further its implementation and enforcement.

75.     The Corporate Defendants have orchestrated, joined, and participated in the alleged conspiracy in at least three ways: (1) the Corporate Defendants have required their franchisees (and the agents or realtors employed by those franchisees) operating in and transacting business in the Subject MLSs and in this District to comply with NAR rules, including the Adversary Commission Rule; (2) executives of the Corporate Defendants have supervised NAR's operations, including NAR's adoption, maintenance, and enforcement of the Adversary Commission Rule in the Subject MLLs and in this District; and (3) the Corporate Defendants have caused their franchisees to influence local realtor associations within the Subject MLSs and in this

District to adopt and enforce NAR's rules, including the Adversary Commission Rule.

76. First, the Corporate Defendants implemented the conspiracy by requiring that their franchisees (and by necessary implication, the franchisees' agents and realtors) in the geographic areas in which the Subject MLSs operate to comply with NAR's rules, including the Adversary Commission Rule.

77. Franchise agreements between the Corporate Defendants and their franchisees require those franchisees and their agents to (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the local realtor association; and (c) participate in and comply with the rules of the local MLS, which include the mandatory rules in the NAR Handbook. Each of the Corporate Defendants is party to one or more agreements with subsidiaries, franchisees, and/or affiliates that are located in this District and that transact business in this District.

78. Second, executives from the Corporate Defendants, the four largest real estate brokerage franchisors in the country, have actively participated in the management and operation of NAR. Indeed, senior executives of the Corporate Defendants have served on NAR's governing board of directors. For example, both Ronald J. Peltier, the Executive Chairman of HomeServices of America, and Nancy Nagy, CEO of Berkshire Hathaway HomeServices KoenigRubloff Realty Group, currently serve as directors of NAR, and Bruce Aydt, Senior Vice President and General Counsel of Berkshire Hathaway HomeServices Alliance Real Estate, is the former Chair of NAR's Professional Standards Committee. Both NAR's Handbook and in its Code of Ethics (and thus the Adversary Commission Rule) were drafted, developed, and promulgated by NAR's board of directors or NAR's Professional Standards Committee.

79. NAR's day-to-day operations are managed by an eight-person Leadership Team. In 2018, that team was dominated by executives of franchisees of the Corporate Defendants. For

example, the immediate past President of NAR, Elizabeth Mendenhall, is the CEO of RE/MAX Boone Realty in Columbia, Missouri, one of the Subject MLSs in this lawsuit. The President of NAR is John Smaby, a sales agent at Edina Realty, which is a HomeServices of America company. NAR's Vice President of Association Affairs, Colleen Badagliacco, is an agent for Legacy Real Estate & Associates, which is a franchisee of a Realogy firm. The 2019 leadership team includes John Smaby and Elizabeth Mendenhall, as well as Charlie Oppler, First Vice President and COO of a Sotheby's International Realty franchisee, and Tracy Kasper, Vice President of Advocacy and a broker/owner of a Berkshire Hathaway franchisee.

80. Further, the following representatives from the Corporate Defendants or their franchisees participated in the NAR Multiple Listing Issues and Policies Committee, responsible for reviewing and reissuing the Handbook, in the past four years: Mike Nugent, Berkshire Hathaway; Laurie Weston Davis, Better Homes and Gardens Real Estate; Kenneth Walker, RE/MAX Paradigm Realty Group; Sue Cartun, Keller Williams; Mark Trenka, Century 21; and Sam DeBord, Coldwell Banker.

81. Third, executives of franchisees of the Corporate Defendants have participated in the governance of the local realtor associations that own and operate the Subject MLSs (and participate in the governance of other local realtor associations), and they implemented the conspiracy through those associations. Those executives and local realtor associations required compliance with the NAR rules, including the Adversary Commission Rule, and adopted standard form contracts to implement these NAR rules.

82. For example, in 2019 the Heartland MLS Board of Directors has an Executive Committee whose members include representatives from RE/MAX Elite Realtors (affiliated with and/or franchisee of RE/MAX), ReeceNichols Southgate (owned by and/or affiliated with

29

HomeServices), and BHG Kansas City Homes (owned by and/or affiliated with Realogy), while multiple representatives from Kansas City-area Keller Williams franchisees or affiliates also serve on the Board of Directors.

83.    The Corporate Defendants actively encourage their franchisees to be involved in local realtor association governance. For example, Keller Williams' "Policy & Guidelines Manual" encourages its agents to participate "to the greatest possible extent" in state NAR associations and "to take an active role in" local realtor associations. The manual further stresses cooperation with other realtors: "We cooperate and live by the spirit of cooperation with all other REALTORS® and brokers."[23]

84.    Accordingly, in each of the areas in which the Subject MLS operate, including in this District, the franchisees of the Corporate Defendants have joined and furthered the alleged conspiracy through their collaboration with local realtor associations to implement, comply with, and enforce NAR's rules, including the Adversary Commission Rule.

## EFFECTS OF THE CONSPIRACY

85.    Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which a Subject MLS operates:

    a.    Home sellers have been forced to pay commissions to buyer brokers — who represent their adversaries in negotiations to sell their homes — thereby substantially inflating the cost of selling their homes.

    b.    Home sellers have been compelled to set a high buyer-broker commission

---

[23] Keller Williams Realty, Inc., Policies & Guidelines Manual (Apr. 1, 2019) at 51, 46 *available at* https://s3.amazonaws.com/prodkwconnect-core/uploads/faq_resources_block_faqs_0_content/5ca2613326ef7.pdf.

Case 4:19-cv-00332-SRB   Document 570-1   Filed 06/22/21   Page 52 of 75

to induce buyer brokers to show their homes to the buyer brokers' clients.

    c.    Home sellers have paid inflated buyer-broker commissions and inflated total commissions.

    d.    The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller's agent actually sets the buyer broker's compensation.

    e.    Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to sell homes.

    f.    Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission.

    g.    The Corporate Defendants and their franchisees have increased their profits substantially by receiving inflated buyer-broker commissions and inflated total commissions.

86.    Plaintiffs are not aware of any pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition. While the prior system of sub-agency might partially explain the historical practice of sellers paying commission to both the selling agent or broker and to the agent or broker working with and/or procuring the buyer, with the demise of that confusing and misleading system no such justification remains for the seller to continue paying the broker now working for and retained by the buyer.

87.    To the extent Defendants may seek to argue that the MLS system in some abstract fashion has certain pro-competitive benefits, none of these purported benefits depends in any way

31

upon specifying brokers' respective commission rates.

88. Even if any alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

89. Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer-broker commissions paid by home sellers, at levels far above what a competitive market would produce.

90. Compared to other countries with competitive markets for residential real estate brokerage services, the commissions in the Subject MLSs are substantially higher. Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States.[24] They concluded:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand  In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[25]

91. Delcoure and Miller also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[26] Ultimately, the economists concluded that, "based on global data,

---

[24] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).

[25] *Id*. at 14.

[26] *Id.* at 17.

the [total] US residential brokerage fees should run closer to 3.0%."[27]

92.     In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller broker and buyer broker) in the areas in which the Subject MLSs operate average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices (which lead to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites. Indeed, upon information and belief, a representative of Defendant Keller Williams reported to other industry participants that its buyer brokers were receiving an average commission of 2.7% in 2015, an amount nearly identical to the 2.8% it reported in 2002.

93.     Other economists have reached similar conclusions. A Professor of Economics from Cornell University has described the Adversary Commission Rule — that is, the NAR requirement of having "the seller pay[] for the commission of both the listing [selling] agent and the cooperative [buyer's] agent" — as a "structural hurdle" that has prevented innovation and price competition in the real estate market.[28] This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of real estate markets.

94.     In addition, Defendants' conspiracy exerts particularly strong effects in certain of the Subject MLSs, in particular the Heartland MLS that covers the Kansas City Metropolitan area

---

[27] *Id.* at 13.

[28]     *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

and includes parts of Missouri and Kansas. That is, as noted by the Antitrust Division of the United States Department of Justice, ten states prohibit buyer brokers from offering rebates to buyers.[29] Kansas and Missouri are both among those ten states that prohibit such rebates to buyers paid out of a buyer broker's commission. This aspect of state law makes Defendants' anticompetitive conspiracy even more effective in the Subject MLSs and easier to enforce, in that state law has foreclosed one potential avenue through which buyer brokers might attempt to compete with one another for prospective home buyers. As observed by the Consumer Federation of America, when an anti-rebate law is combined with "the coupling of listing and buyer brokerage" commission rates, as required by the Adversary Commission Rule, "there's just really no hope for effective [price] competition on the buyer's side."[30]

95.     The Adversary Commission Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the "standard" commission practices and rates. Keller Williams, through materials prepared for its "Keller Williams University" program used to train realtors, boasts that "the standard real estate commission has stabilized, over the years, at right around 6 percent." The Adversary Commission Rule enables buyer brokers to identify and compare the buyer-broker compensation offered by every seller in the Subject MLSs and then steer their clients toward homes offering higher commissions.

---

[29] *See* https://www.justice.gov/atr/consumers-save-thousands-commissions.

[30] *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

96. Defendant Keller Williams even trains its seller brokers on how to persuade home sellers not to reduce the buyer-broker commission to be offered and do so based on a presumption that steering is widespread and will occur. In materials for its "Keller Williams University," Keller Williams provides "scripts" with recommended talking points to be used to address potential concerns or questions from home sellers. One such "script" from the Keller Williams University materials is below:

Explaining How Commission Is Used: Script #4

| | |
|---|---|
| SELLER: | *Can you reduce your commission?* |
| AGENT: | Of course. As you know, commissions are negotiable. But let me ask you—what are you trying to accomplish by getting me to reduce the commission? |
| SELLER: | *I'm trying to save money.* |
| AGENT: | I understand. Do you know how a commission structure works? |
| SELLER: | *Not really. I just know that I have to pay you a certain amount of what I receive for my house, and that means I get to keep less.* |
| AGENT: | Let me explain what happens when you reduce a commission. First of all, half of the commission usually goes to a cooperating agent. When you reduce the commission, you reduce the incentive for that agent to bring a buyer to your house. If an agent has ten different houses, nine of which come with a 3 percent commission, one of which comes with 2.5 percent commission, which houses do you think they're going to show? |
| SELLER: | *The ones with the larger commission.* |
| AGENT: | Absolutely. You're putting yourself at a disadvantage competitively when you reduce your commission, wouldn't you agree? |
| SELLER: | *I guess that's true.* |

97. In an earlier script ("Explaining How Commission Is Used: Script #2"), the Keller Williams guide suggests that a realtor point out that "the homes that are really selling almost always have 3 percent to the other agent," in contrast to "these other listings where they're asking just 2.5 percent for the other agent."

98. This practice of steering, confirmed by economic literature and by Defendants'

35

own training materials, has manifest anticompetitive effects. Steering deters reductions from the "standard" commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

99.    The Corporate Defendants, and their franchisees and brokers and other co-conspirators, also appear to use software technology to help facilitate steering based on MLS commission information. They have taken further actions to prevent buyers from learning about properties that offer discount buyer-broker commissions.

100.    CoreLogic is a software technology company that provides software and data services to many MLSs around the country and, upon information and belief, to the Subject MLSs. CoreLogic's software program is called "Matrix." Matrix has features that allow a broker to create and curate a tailored electronic listing of potential properties to send to their buyer clients when those properties match certain criteria applicable to that buyer client's interests. The Matrix software allows the broker, however, to filter listings by the buyer-broker commission being offered, which means that the buyer broker can use the Matrix software to ensure that his or her client only receives information about potential homes offering buyer-broker commission in a desired range.

101.    The Antitrust Division of the United States Department of Justice is now conducting an active investigation into potentially anticompetitive practices in the residential real estate brokerage business, including a focus on compensation to brokers and restrictions on their access to listings. The Antitrust Division has recently served Civil Investigative Demands ("**CIDs**") as part of its investigation into "[p]ractices that may unreasonably restrain competition

in the provision of residential real-estate brokerage services."[31]

102.    The CID that the Antitrust Division served on CoreLogic directed it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer brokers; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer brokers."[32]

103.    In addition, NAR has enacted certain other rules and policies — which the Corporate Defendants have helped draft and then abided by, agreed to, and implemented — that further exacerbate the anticompetitive effects of steering.  That is, requiring that the offered buyer-broker commission be specified in only certain ways (such as a percentage of the sale price) makes it easy for realtor participants to see and compare offers. Further, Defendants have ensured that while *realtors* can easily see buyer-broker compensation offers, regular home buyers and sellers *cannot* see such information whenever they are permitted access to view MLS listings (through a virtual office, for example). NAR also prohibits such information from being shared or disclosed through data sharing arrangements with third-party websites (such as Zillow) or other MLS syndication services.

104.    At the same time, the NAR Rules *mandate* that commission price information be listed and shared among brokers and realtors. Such a one-way, concealed information flow prevents price competition that could benefit consumers while allowing brokers to exert upward pressure on pricing and to punish fellow brokers and realtors who deviate downward on

---

[31] Civil Investigative Demand to CoreLogic, U.S. Dept. of Justice, No. 29938 (issued April 16, 2019).

[32] *Id.*

commission rates. And because home sellers and potential home buyers do not have access to information reflecting the blanket, unilateral offers of buyer-broker compensation, they have essentially no ability to detect steering by buyer brokers if it is taking place.

105.     The economic evidence is plain that the Adversary Commission Rule works to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise should.

106.     Defendants' conspiracy and the Adversary Commission Rule was designed to keep real estate commissions at elevated, supra-competitive levels, and Defendants have managed to keep the "standard real estate commission" "stabilized . . . at right around 6 percent" for many years, despite significant changes in technology that should have substantially reduced commission charges.

## RELEVANT MARKETS AND DEFENDANTS' MARKET POWER

107.     The relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to the Subject MLSs. Defendants' control of the Subject MLSs allows Defendants to impose the Adversary Commission Rule and other anticompetitive NAR rules on Class members and other market participants. Access to the Subject MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

108.     The relevant geographic markets for the claims asserted herein are no broader than the geographic areas in which the four Subject MLSs operate. Nearly all homes sold in these geographic areas were listed on the MLS by brokers that are subject to the MLS and NAR rules and standards. The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or

affiliated sales associates located reasonably near the seller's property. Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area where the buyer has an interest.

109. The Corporate Defendants, through their co-conspirator franchisees and other conspiring brokers in the areas in which the Subject MLSs operate, collectively provide the vast majority of the residential real estate broker services in these areas and in this District.

110. Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

111. Any buyer brokers in the areas in which the Subject MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' effective control of the Subject MLSs through their co-conspirators (*i.e.*, through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service.

112. A seller's broker without access to a listing service like the Subject MLS would be unable to reach the large majority of potential buyers, and a broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

113. For an alternative listing service to compete effectively with one of the Subject MLSs, the alternative would need to have listings as comprehensive (or at least nearly so) as the Subject MLS. But Brokers and their individual realtors or agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate

39

on an alternative listing service that would generate lower total commissions and lower buyer broker commissions and seller broker commissions. Further, many buyers would be reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on the Subject MLSs are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients.

114.    Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers. Any listing service attempting to compete with any of the Subject MLSs would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLS. The absence of listing services that compete with the Subject MLSs (or other MLSs) reflects the very substantial barriers to entry.

115.    As an additional impediment to potential competition, NAR advises MLSs to enter into non-compete agreements with third-party websites, such as Zillow, so that those websites do not become competitive rivals to MLSs. NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." The non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." NAR has thus advised MLSs to take affirmative steps to further the alleged conspiracy by preventing third-party websites from becoming possible competitors.

116.    NAR has also previously taken actions to stifle innovation and competition among real estate brokers, including actions which led to the Antitrust Division of the Department of

Justice ("**DOJ**") filing a lawsuit to enjoin a NAR "policy that obstruct[ed] real estate brokers who use innovative Internet-based tools to offer better services and lower costs to consumers." NAR ultimately agreed to a Final Judgment in which it agreed to modify and abandon its challenged policy.[33] The DOJ's lawsuit illustrates that NAR has a history of formulating, adopting, and enforcing anticompetitive policies — like the Adversary Commission Rule challenged in this case — that stifle innovation and restrain competition in violation of federal law. NAR and the real estate industry's history of anticompetitive conduct extends much farther back as well, in that for much of the first half of the 20th Century realtors operated under express agreements to use specified commission percentages in home sale transactions, until the United States Supreme Court declared that scheme an illegal price-fixing arrangement under the federal antitrust laws in *United States v. Nat'l Ass'n of Real Estate Bds., et al.*, 339 U.S. 485 (1950).

## CONTINUOUS ACCRUAL

117.    During the four years preceding the filing of this Complaint, Defendants, through their co-conspirator brokers in the areas in which the Subject MLSs operate, repeatedly charged and received buyer-broker commissions and total commissions that were inflated as a result of the conspiracy. These inflated commissions during the preceding four years were paid by Plaintiffs and the other Class members in connection with the sale of residential real estate listed on one of the Subject MLSs. Each payment of these inflated commissions by Plaintiffs and the other Class Members during the last four years injured them and gave rise to a new cause of action for that injury.

118.    During the last four years, Defendants and their co-conspirators have maintained,

---

[33]    *See* https://www.justice.gov/archive/atr/public/press_releases/2005/211008.htm;  *see also* https://www.justice.gov/atr/case-document/final-judgment-142.

implemented, and enforced the Adversary Commission Rule and other anticompetitive NAR rules

nationwide, including in the areas in which the Subject MLSs operate and in this District.

## **CLASS ACTION ALLEGATIONS**

119.    Plaintiffs bring this action on behalf of themselves, and as a class action under

Federal Rule of Civil Procedure 23, on behalf of the members of the following Class ("the Subject

MLS Class"):

> All persons and entities in the United States who, from April 29, 2015
> through the present, paid a broker commission in connection with the
> sale of residential real estate listed on one of Subject MLS.[34]

120.    Plaintiffs also bring this action on behalf of themselves, and as a class action under

Federal Rule of Civil Procedure 23 on behalf of the members of the following Class ("the MMPA

Class"):

> All persons and entities in the United States who, from April 29, 2014
> through the present, paid a broker commission in connection with the
> sale of residential real estate in Missouri listed on one of Subject MLS.[35]

121.    Plaintiffs also bring this action on behalf of themselves, and as a class action under

Federal Rule of Civil Procedure 23 on behalf of the members of the following Class ("the Missouri

Antitrust Law Class"):

> All persons and entities in the United States who, from April 29, 2015
> through the present, paid a broker commission in connection with the

---

[34] Plaintiffs' Motion for Class Certification modifies this class definition as follows: All persons in the United States who, from April 29, 2015 through the present, used a listing broker affiliated with a Corporate Defendant in the sale of a home listed on a Subject MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

[35] Plaintiffs' Motion for Class Certification modifies this class definition as follows: All persons who, from April 29, 2014 through the present, used a listing broker affiliated with a Corporate Defendant in the sale of a residential home in Missouri listed on a Subject MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

42

sale of residential real estate in Missouri listed on one of Subject MLS.[36]

122.    Excluded from the Classes are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Classes are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

123.    The Classes are readily ascertainable because records of the relevant transactions should exist.

124.    The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Classes have many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

125.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes.

126.    Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

        a.    Whether Defendants engaged in the alleged conspiracy;

---

[36] Plaintiffs' Motion for Class Certification modifies this class definition as follows: All persons who, from April 29, 2015 through the present, used a listing broker affiliated with a Corporate Defendant in the sale of a home in Missouri listed on a Subject MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

43

b. Whether the conspiracy was implemented in the areas in which the Subject MLSs operate;

c. Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Classes;

d. Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions in the areas in which the Subject MLSs operate;

e. Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

f. Whether Plaintiffs and the other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

g. Whether Defendants' conduct is unlawful; and

h. The appropriate class-wide measures of damages.

127. Plaintiffs' claims are typical of the claims of the members of the Classes because their claims arise from the same course of conduct by Defendants and the relief sought within the Classes is common to each member.

128. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Classes. Together Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Classes. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

129. A class action is superior to other available methods for the fair and efficient

44

Case 4:19-cv-00332-SRB   Document 570-1   Filed 01/20/21   Page 46 of 75

adjudication of this controversy. The prosecution of separate actions by individual members of the Classes would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Classes to seek redress for the violations of law alleged herein.

130. Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

     a.   The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

     b.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

     c.   Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

45

## ANTITRUST INJURY

131.    Defendants' anticompetitive agreements and conduct have had the following effects, among others:

      a.    Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

      b.    Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

      c.    Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers; and

      d.    The Corporate Defendants and their franchisees have inflated their profits by a significant margin by the increased total commissions and increased buyer broker commissions.

132.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy, and as a result have suffered damages.

133.    There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

134.    Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Class members paying buyer-broker commissions and total commissions that have been inflated to a supra-competitive level in the areas in which the Subject MLS operate.

135.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLAIMS FOR RELIEF

### COUNT I:
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### Against all Defendants
### (Brought on behalf of the Subject MLS Class)

136.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

137.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

138.    The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

139.    In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

      a.    Participated in the creation, maintenance, re-publication, and implementation of the Adversary Commission Rule and other anticompetitive NAR rules;

      b.    Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which the Subject MLSs operate; and

      c.    Requiring franchisees of the Corporate Defendants and others to implement

47

the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which the Subject MLSs operate, which each Corporate Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

140.     Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer-broker commission and an inflated total commission, and it has restrained price competition among buyer brokers in the areas in which the Subject MLSs operate. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

141.     Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which the Subject MLSs operate to be inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on one of the Subject MLSs. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

142.     Defendants' conspiracy is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

143.     In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

144.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

48

**COUNT II:**
**Violation of the Missouri Merchandising Practices Act**
**Against all Defendants**
**(Brought on behalf of the MMPA Class)**

145.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

146.    The Missouri Merchandising Practices Act ("the Act") provides that "[t]he act, use or employment by any person of any deception . . . [or] unfair practice, or the concealment . . . of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice." Mo. Rev. Stat. § 407.020.1.

147.    The enabling regulations for the Act define an "unfair practice" as conduct that (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes a risk of substantial injury to consumers; (4) was not in good faith; (5) is unconscionable; or (6) is unlawful. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.

148.    Under the Act, the term "merchandise" is broadly defined to include "any objects . . . or services." Mo. Rev. Stat. § 407.020.4.

149.    The Act authorizes private causes of action, and class actions. Mo. Rev. Stat. §§ 407.025.1; 407.025.2.

150.    Plaintiffs purchased services from Defendants and other members of the conspiracy in the form of real estate broker services.

151.    As set forth herein, Defendants' conduct is unlawful and in violation of public policy governing the restraint of trade.

152.    Defendant's violations of the Act were willful and knowing.

153.    Plaintiffs and Class members seek actual damages; a declaration that Defendants' methods, acts and practices violate the Missouri Merchandising Practices Act, Mo. Rev. Stat.

49

§§ 407.010 *et seq.*; restitution; rescission; disgorgement of all profits obtained from Defendants'
unlawful conduct; pre- and post-judgment interest; punitive damages, and attorneys' fees and
costs.

**COUNT III:**
**Violation of the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031**
**Against all Defendants**
**(Brought on behalf of the Missouri Antitrust Law Class)**

154.    Plaintiffs repeat and incorporate by reference each paragraph above and in any
other count of this Complaint.

155.    Beginning more than four years before the filing of this Complaint, and continuing
into the present, Defendants engaged in a continuing contract, combination, or conspiracy to
unreasonably restrain trade and commerce in Missouri in violation of the Missouri Antitrust Law,
Mo. Rev. Stat. § 416.031.

156.    The conspiracy alleged herein consists of a continuing agreement among
Defendants and Defendants' co-conspirators to require sellers of residential property to make
inflated payments to the buyer broker.

157.    In furtherance of the contract, combination, or conspiracy, Defendants and their
co-conspirators have committed one or more of the following overt acts:

     a.    Participated in the creation, maintenance, re-publication, and implementation
           of the Adversary Commission Rule and other anticompetitive NAR rules;

     b.    Participated in the establishment, maintenance, and implementation of rules
           by local NAR associations and MLSs that implemented the Adversary
           Commission Rule and other anticompetitive NAR rules in the areas in which
           the Subject MLSs operate; and

     c.    Requiring franchisees of the Corporate Defendants and others to implement

50

the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which the Subject MLSs operate, which each Corporate Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

158.    Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer-broker commission and an inflated total commission, and it has restrained price competition among buyer brokers in the areas in which the Subject MLSs operate. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

159.    Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which the Subject MLSs operate in Missouri to be inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate located in Missouri and listed on one of the Subject MLSs. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

160.    Defendants' conspiracy is a *per se* violation under the Missouri Antitrust Law.

161.    In the alternative, Defendants' conspiracy is illegal under the Missouri Antitrust Law under a rule-of-reason analysis.

162.    As a direct and proximate result of Defendants' past and continuing violation of the Missouri Antitrust Law, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

163.    Under Mo. Rev. Stat. § 416.121, Plaintiffs' are entitled to an award of threefold damages and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, requests relief and prays for judgment against Defendants as follows:

A.     An Order certifying the Classes under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Classes;

B.     Declarations that the actions of Defendants, as set forth above, are unlawful;

C.     A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any conduct determined to be unlawful;

D.     A permanent injunction under the MMPA enjoining Defendants from engaging in conduct in violation of the MMPA;

E.     Appropriate injunctive and equitable relief;

F.     An award to Plaintiffs and the other members of the Classes for damages and/or restitution in an amount to be determined at trial;

G.     An award of pre- and post-judgment interest to Plaintiffs;

H.     An award of punitive damages to Plaintiffs under the MMPA;

I.     An award to Plaintiffs for their costs of suit, including reasonable attorneys' fees and expenses;

J.     An award of such other relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial of all issues so triable.

Dated: June 30, 2021

Respectfully submitted by:

/s/ Matthew L. Dameron

WILLIAMS DIRKS DAMERON LLC

| | |
|---|---|
| Matthew L. Dameron | MO # 52093 |
| Eric L. Dirks | MO # 54921 |
| Amy R. Jackson | MO # 70144 |
| Courtney M. Stout | MO # 70375 |

1100 Main Street, Suite 2600
Kansas City, MO 64105
Tele:   (816) 945-7110
Fax:     (816) 945-7118
matt@williamsdirks.com
dirks@williamsdirks.com
amy@williamsdirks.com

BOULWARE LAW LLC

| | |
|---|---|
| Brandon J.B. Boulware | MO # 54150 |
| Jeremy M. Suhr | MO # 60075 |
| Erin D. Lawrence | MO # 63021 |

1600 Genessee, Suite 416
Kansas City, MO 64102
Tele:   (816) 492-2826
Fax:     (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for this case.

/s/ Matthew L. Dameron
*Attorney for Plaintiffs*

53