**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 19-CV-00332-SRB |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENTS WITH ANYWHERE REAL ESTATE AND RE/MAX,
CERTIFICATION OF SETTLEMENT CLASS, AND APPOINTMENT OF
SETTLEMENT CLASS COUNSEL**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1

II.  BACKGROUND .................................................................................. 2

   A.   THE LITIGATION ............................................................................ 2
   B.   SETTLEMENT NEGOTIATIONS AND MEDIATION ...................................... 4
   C.   SUMMARY OF THE SETTLEMENT AGREEMENTS ..................................... 5
     1.   Settlement Class .................................................................... 5
     2.   Settlement Amounts ............................................................... 6
     3.   Changes to Business Practices .................................................. 6
       a.   Anywhere .................................................................. 6
       b.   RE/MAX ................................................................... 9
     4.   Cooperation Requirements...................................................... 11
     5.   Release of Claims Against Anywhere and RE/MAX ...................... 12
     6.   Application for Award of Attorneys' Fees, Costs and Class Representative Incentive Awards .............................................................................. 13

III. THE CLASS DEFINITION CONTEMPLATED BY THE SETTLEMENTS SATISFIES RULE 23, AND THE CLASS SHOULD BE CERTIFIED ........................................ 13

   A.   CLASS DEFINITION ....................................................................... 13
   B.   LEGAL STANDARD FOR MODIFYING THE CLASS DEFINITION ................... 15
   C.   THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(A) ................... 17
     1.   Numerosity ......................................................................... 18
     2.   Commonality........................................................................ 18
     3.   Typicality ........................................................................... 19
     4.   Adequacy ............................................................................ 20
   D.   THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(B)(3). .............. 21
     1.   Predominance ...................................................................... 21
     2.   Superiority of a Class Action .................................................. 24

IV.  THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENTS ............. 26

   A.   THE MERITS OF THE PLAINTIFFS' CASES, WEIGHED AGAINST THE TERMS OF THE SETTLEMENTS ............................................................................... 27
   B.   DEFENDANTS' FINANCIAL CONDITIONS .............................................. 29
   C.   THE COMPLEXITY AND EXPENSE OF FURTHER LITIGATION ..................... 31
   D.   THE AMOUNT OF OPPOSITION TO THE SETTLEMENT .............................. 32
   E.   THE SETTLEMENTS ALSO SATISFY THE RULE 23(E) FACTORS. ................. 32

V.   THE COURT SHOULD APPOINT CO-LEAD CLASS COUNSEL FOR THE CERTIFIED CLASSES IN BURNETT AND MOEHRL AS CO-LEAD COUNSEL FOR THE SETTLEMENT CLASS ................................................................................. 34

VI.  DEFERRING CLASS NOTICE IS APPROPRIATE IN THIS CASE ...................... 34

VII. CONCLUSION.................................................................................. 36

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................... 20, 22, 25

*Bishop v. DeLaval Inc.*, 2022 WL 18957112 (W.D. Mo. July 20, 2022) ..................................... 33

*Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) .............. Passim

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................................ 27

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................................... 17

*D&M Farms v. Birdsong Corp.*, 2020 WL 7074140 (E.D. Va. Dec. 1, 2020) ........................... 18

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ................................................. 19, 27

*Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977) ......................................................... 19

*Ebert v. Gen. Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016) ............................................................... 21

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ................................................................... 20

*Grunin*, 513 F.2d ........................................................................................................................ 27

*Gunnells*, 348 F.3d ..................................................................................................................... 20

*Hand v. Beach Entertainment KC, LLC*, 456 F. Supp. 3d 1099 (W.D. Mo. 2020) ...................... 17

*Heldt v. Payday Fin., LLC*, 2016 WL 96156 (D.S.D. Jan. 8, 2016) ............................................. 16

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) ................................................................... 16

*Holt v. CommunityAmerica Credit Union*, 2020 WL 12604383 (W.D. Mo. Sept. 4, 2020) .. 21, 33

*Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360 (D. Ariz. 2009) ................................................. 15

*Hughes v. Baird & Warner, Inc*, 1980 WL 1894 (N.D. Ill. Aug. 20, 1980) ................................ 19

*Hyland v. Homeservices of Am., Inc.*, 2008 WL 4858202 (W.D. Ky. Nov. 7, 2008) .................. 19

*In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652 (D.D.C. 1979) ................................................... 28

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) ..................................... 27

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ................................ 20

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019) ......................................... 21

*In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166 ...................................................... 16

*In re IPO Sec. Litig.*, 226 F.R.D. 186 (S.D.N.Y. 2005) ................................................................ 28

*In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654 (E.D. Va. 2001) ............................... 16

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ............................................................ 23

*In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 7160380 (W.D. Mo. Nov. 18, 2019) 21, 33

*In re Serzone Prods. Liab. Litig.*, 231 F.R.D. ............................................................................... 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270 (N.D. Cal. Aug. 24, 2011)... 15, 16

*In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Pracs. Act (FDCPA) Litig.*, 2016 WL 543137 (D. Me. Feb. 10, 2016) .................................................... 15

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013) .......................................................................................................................................... 26

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 2013 WL 716088 (D. Minn. Feb. 27, 2013) .......... 22

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) ............................... 21

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No.*, 921 F.2d 1371 (8th Cir. 1990) . 26

*Marcus v. Kansas*, 209 F. Supp. 2d 1179 (D. Kan. 2002) ............................................................ 29

*Marshall v. Nat'l Football League*, 787 F.3d 502 (8th Cir. 2015) ............................................... 26

*McKinney v. U.S. Postal Serv.*, 292 F.R.D. 62 (D.D.C. 2013) ...................................................... 35

*Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ................Passim

*Paxton v. Union Nat'l Bank*, 688 F.2d 552 (8th Cir. 1982) ................................................... 17, 18

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ........................................... 22, 23, 26

*Rannis v. Rechia*, 380 Fed. App'x 646 (9th Cir. 2010) ............................................................... 17

*Sanderson v. Unilever Supply Chain, Inc.*, 2011 WL 5822413 (W.D. Mo. Nov. 16, 2011) ........ 26

*Temp. Servs. v. Am. Int'l Grp.*, 2012 WL 2370523 (D.S.C. June 22, 2012) ................................. 25

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988) ...................................................................... 27

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................. 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ...................................... 16

*Wireless*, 396 F.3d ....................................................................................................................... 27

**Statutes**

15 U.S.C. § 1 .................................................................................................................................... 2

**Rules**

Fed. R. Civ. P. 23(c)(1)(C) ............................................................................................................ 15

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................................................ 26

Fed. R. Civ. P. 23(e)(2) ................................................................................................................. 33

Fed. Rule Civ. Proc. 23(b)(3)(D) .................................................................................................. 25

Fed R. Civ. P. 23(g) ...................................................................................................................... 33

Federal Rule of Civil Procedure 23(b)(2) ..................................................................................... 14

Federal Rule of Civil Procedure 23(b)(3) ......................................................................... 14, 21, 24

Federal Rule of Civil Procedure 23(e) ..................................................................................... 26, 34

Rule 23 ................................................................................................................................... 15, 16

Rule 23(a) ...................................................................................................................................... 17

Rule 23(a) and 23(b)(3) ................................................................................................................. 15

Rule 23(a) and (b)(3) ..................................................................................................................... 17

Rule 23(a)(1) ............................................................................................................................ 17, 18

Rule 23(a)(2) .................................................................................................................................. 18

Rule 23(a)(3) ........................................................................................................... 19

Rule 23(b) ............................................................................................................... 17

Rule 23(b)(3)(A–D) ................................................................................................ 22

Rule 23(c)(2)(B) ................................................................................................ 34, 35

**Other Authorities**

4 Newberg on Class Actions § 11.41 .................................................................... 26

## I.  INTRODUCTION

After extensive litigation and arms-length negotiations, Plaintiffs Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, and Jeremy Keel ("*Burnett* Plaintiffs") and Plaintiffs Christopher Moehrl, Daniel Umpa, Jane Ruh, Jack Ramey, Steve Darnell, Michael Cole ("*Moehrl* Plaintiffs") (collectively "Plaintiffs"), on behalf of themselves and the proposed Settlement Class (defined herein), have reached agreements with Defendants Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") and RE/MAX LLC ("RE/MAX") (together the "Settling Defendants") to settle and resolve on a national basis, Plaintiffs' claims for damages and injunctive relief against the Settling Defendants for their alleged anticompetitive trade practices within the market for residential real estate brokerage services, including the claims in this case and the *Moehrl* case. The settlements are fair, reasonable, and beneficial to the Settlement Class, and thus Plaintiffs respectfully move this Court for preliminary approval of the Settlements.

As the Court is aware, both the *Burnett* litigation and the *Moehrl* litigation (*Moehrl v National Association of Realtors*, Case No. 1:19-cv-01610-ARW (Northern District of Illinois)), raise similar claims against the same set of Defendant families. Burnett and Moehrl Plaintiffs worked together to achieve a comprehensive, nationwide resolution.

*Burnett* Plaintiffs, *Moehrl* Plaintiffs, and the Settling Defendants have entered into settlements that would recover $138.5 million for the Settlement Class. Specifically, Plaintiffs have entered into a Settlement with Anywhere for $83.5 million and a Settlement with RE/MAX for $55 million (together the "Settlement Agreements"). Both Settlements were the product of extensive negotiations over the course of many years, including intensive negotiations over the last many months, facilitated by experienced mediators. The Settlements were informed by the risks, cost, and delay of litigation, and the financial terms were informed by a thorough analysis of each Defendant's ability to pay. Settling Defendants have also agreed to implement meaningful

Practice Changes and to provide cooperation to Plaintiffs in the litigation against the remaining Defendants.

Accordingly, Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the Settlements; (2) certifying a Settlement Class for settlement purposes only; (3) appointing Plaintiffs as Settlement Class Representatives; (4) appointing Settlement Class Counsel as defined below; and (5) deferring notice of the Settlement Agreements to the Settlement Class until an appropriate future date.

## II.    BACKGROUND

### A.    The Litigation

The *Moehrl* class action was filed in the Northern District of Illinois on March 6, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on one of 20 Covered Multiple Listing Services ("MLSs") spanning 19 states. (Moehrl Doc. 1) The *Burnett* action was filed in this Court on April 29, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on one of four Subject MLSs in Missouri. (Burnett Doc. 1).

Plaintiffs in both actions alleged that the National Association of Realtors ("NAR") and the nation's largest real estate brokerage firms entered into an unlawful agreement in violation of the Sherman Act, 15 U.S.C. § 1, to artificially inflate the cost of commissions in residential real estate transactions. Specifically, Plaintiffs alleged a longstanding conspiracy among Defendants to agree to NAR rules (a) requiring home sellers to make blanket unilateral offers of compensation to real estate brokers working with buyers; (b) restraining negotiation of those offers; (c) denying buyers information on the commissions being offered; (d) allowing buyer agents to represent that their services are "free;" and (e) incentivizing and facilitating steering by brokers towards high commission listings and away from discounted listings (together, the "Challenged Rules").

Plaintiffs claim that the Challenged Rules are anticompetitive and caused them to pay artificially inflated broker commissions when they sold their homes. Defendants have denied Plaintiffs' allegations.

Defendants filed motions to dismiss the *Burnett* action on August 5, 2019, and this Court denied their motions on October 16, 2019. (Burnett Doc. 131) Similarly, Defendants filed motions to dismiss the *Moehrl* action on August 9, 2019, and the Court in that action denied their motions on October 2, 2020. (Moehrl Doc. 184). The parties proceeded with discovery.

On April 22, 2022, this Court granted *Burnett* Plaintiffs' motion for class certification; appointed Scott and Rhonda Burnett, Jerod Breit, Ryan Hendrickson, Jeremy Keel, and Scott Trupiano as class representatives[1]; and appointed their counsel as co-lead class counsel. (Burnett Doc. 741) Hollee Ellis and Frances Harvey joined as class representatives in *Burnett* with the Third Amended Complaint (Burnett Doc. 759) On March 29, 2023, Judge Wood granted the plaintiffs' motion for class certification in the *Moehrl* action, appointed Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh as class representatives; and appointed Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP as co-lead class counsel. (Moehrl Doc. 403).

The parties in both actions completed over four years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests for production, followed by the production of well over 5 million pages of documents from the parties and dozens of non-parties across both actions. Plaintiffs briefed numerous discovery motions and disputed items in order to obtain important evidence to support their claims. The

---

[1] With the Court's permission, three class representatives were withdrawn from the lawsuit as litigation class representatives: Scott Burnett, Ryan Hendrickson, and Scott Trupiano. They remain absent members of the class.

parties conducted around 100 depositions in the *Moehrl* action and over 80 depositions in the *Burnett* action. *Moehrl* Plaintiffs engaged six experts and *Burnett* Plaintiffs engaged five experts to support their claims and to rebut claims from the nine experts retained by Defendants in each case. Most experts in the case were deposed after the submission of 24 expert reports in *Moehrl* and 19 expert reports in *Burnett*. *Burnett* Plaintiffs also briefed summary judgment and began preparing for trial, including against the Settling Defendants. (Berman Decl. ¶ 11; Dameron Decl. ¶¶ 3-6).

**B. Settlement Negotiations and Mediation**

Plaintiffs' Co-Lead Counsel and counsel for Anywhere engaged in extensive arm's-length settlement negotiations that lasted nearly three and a half years, including several telephonic and in-person mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a mediation with a federal magistrate judge, leading to this Settlement Agreement. Plaintiffs' Co-Lead Counsel and counsel for Anywhere also participated in dozens of one-on-one calls as part of the settlement negotiations. Plaintiffs' Co-Lead Counsel and counsel for RE/MAX further held several mediations over nearly three and a half years, including remote mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a remote mediation with a federal magistrate judge, as well as numerous direct communications. (Berman Decl. ¶ 9; Dameron Decl. ¶ 12).

The Settling Parties reached the Settlement Agreements after considering the risks and costs of litigation. Plaintiffs and Class Counsel believe the claims asserted have merit and that the evidence developed to date supports the claims. Plaintiffs and counsel, however, also recognize the myriad risks and delay of further proceedings in a complex case like this, and believe that the

Settlements confer substantial benefits upon the Settlement Class Members. (Berman Decl. ¶¶ 10, 12; Dameron Decl. ¶¶ 9-11).

Moreover, Plaintiffs and counsel conducted a thorough financial analysis of the limited ability to pay of both Anywhere and RE/MAX, and whether Anywhere and RE/MAX could withstand a greater monetary judgment, which directly affected the monetary amounts that it was feasible to recover from both Settling Defendants through settlement. (Berman Decl. ¶ 13; Dameron Decl. ¶ 8).

The Settling Defendants have indicated that they deny Plaintiffs' claims and deny any wrongdoing but wish to avoid the uncertainty and risk attendant with further litigation.

## C. Summary of the Settlement Agreements

### 1. Settlement Class

The proposed Settlement Class in the Settlement Agreements with both Anywhere and RE/MAX is as follows: All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

a.   Moehrl MLSs: March 6, 2015 to date of notice;

b.   Burnett MLSs: April 29, 2014 to date of notice;

c.   MLS PIN: December 17, 2016 to date of notice;

d.   All other MLSs: four years prior to (i) the date a new or amended complaint (if any) is filed in the Actions reflecting any MLSs aside from the Moehrl MLSs, Burnett MLSs, and MLS PIN or (ii) the date of notice, whichever is earlier, up to the date of notice. (Anywhere Agreement ¶ 18; RE/MAX Agreement ¶ 18).

### 2. Settlement Amounts

The proposed Settlement Agreement provides that Anywhere will pay a Total Settlement Amount of eighty-three million five hundred thousand U.S. dollars ($83,500,000) for the benefit of the Settlement Class. This amount is inclusive of all costs of settlement, including payments to class members, attorneys' fees and costs, service awards for current and former class representatives (including Settlement Class Representatives), and costs of notice and administration. (Anywhere Agreement ¶ 21).

The proposed Settlement Agreement provides that RE/MAX will pay a total Settlement Amount of fifty-five million U.S. dollars ($55,000,000) for the benefit of the Settlement Class. This amount is likewise inclusive of all costs of settlement, including payments to class members, attorneys' fees and costs, service awards to current and former class representatives, and costs of notice and administration. (RE/MAX Agreement ¶ 21). Both Total Settlement Amounts are non-reversionary; once the Settlements with Anywhere and RE/MAX are finally approved by the Court and after administrative costs, litigation expenses, and attorneys' fees are deducted, the net funds will be distributed to Settlement Class Members with no amount reverting back to Anywhere or RE/MAX, regardless of the number of Opt-Out Sellers or claims made. (Anywhere Agreement ¶ 40; RE/MAX Agreement ¶ 40).

### 3. Changes to Business Practices

#### *a.* Anywhere

The proposed Settlement provides for Anywhere Real Estate, Inc. and its subsidiaries and company-owned brokerages ("Anywhere") to make the following Practice Changes within six months after the Settlements become effective:

      i.     refrain from adopting any Anywhere requirements that company owned brokerages, franchisees, or agents (i) belong to NAR or (ii) follow NAR's Code of Ethics

or MLS Handbook. (This provision automatically terminates if NAR reaches a settlement agreement or is subject through court order to injunctive relief in these matters.);

      ii.     advise and periodically remind the Anywhere company owned brokerages, franchisees, and their agents that there is no Anywhere requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

      iii.     require that any Anywhere company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then Anywhere will require that any company owned brokerages and their agents (and recommend and encourage that any Anywhere franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

      iv.     prohibit the Anywhere company owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

v. to the extent allowed by MLS rules and/or the capabilities of third-party platforms that operate websites for Anywhere, require that the Anywhere company owned brokerages and their agents include, at the earliest possible moment, the listing broker's offer of compensation in each active listing shared with prospective buyers through IDX or VOW displays, or through any other form or format;

vi. prohibit the Anywhere company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vii. advise and periodically remind the Anywhere company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities;

viii. for Anywhere company owned brokerages eliminate any minimum client commission requirements; and

ix. for each of the above points, for the Anywhere company owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used. (Anywhere Agreement ¶ 51). If not automatically terminated earlier by their own terms, these practice changes will sunset 5 years after the effective date.

### b. RE/MAX

The proposed Settlement provides for RE/MAX to make the following Practice Changes within six months after the Settlements become effective:

i.        make clear and periodically remind franchisees and agents affiliated with those franchisees that it does not require them to make offers of compensation to or accept offers of compensation from cooperating brokers or that, if made, does not require such offers to be blanket, unconditional, or unilateral;

ii.        RE/MAX will make clear that (i) franchisees and affiliated agents must be transparent to prospective home sellers and buyers that broker commissions are not set by law and are negotiable and (ii) buyer-side brokers and agents must be transparent regarding the cooperative compensation offered on any listings for which a client requests information. Toward that end, RE/MAX will recommend and encourage that any franchisees and their agents disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. RE/MAX will further recommend and encourage that, in the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, franchisees and their agents include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable.

iii.        make clear that franchisees and affiliated agents acting as buyer-side brokers or agents must be transparent with their clients in accurately disclosing their compensation structure in connection with each transaction and must refrain from advertising or otherwise representing that their services are free (unless they are, in fact, not receiving any compensation for those services from any party);

iv.        display offers of compensation made by listing brokers or agents, where such data is available and/or provided to REMAX for all active listings shared on REMAX.com and recommend and encourage that franchisees and agents include cooperative compensation offers (if any) on any listings that they publicly display or share with prospective buyers through IDX or VOW displays, or through any other form or format;

v.        not provide software that permits franchisees and affiliated agents to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker and recommend and encourage that any franchisees and their agents refrain from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by or displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.        expressly advise and periodically remind franchisees and affiliated agents of their obligation to show and market properties regardless of the existence or amount of cooperative compensation offered;

vii.     not express or imply a minimum commission requirement in franchise agreements, training materials or other policies;

viii.     develop educational materials that reflect and are consistent with each provision in this injunction, and eliminate educational materials, if any, that are contrary to it;

ix.     not require franchisees and their affiliated agents to join or be members of the National Association of Realtors or follow NAR's Code of Ethics or MLS Handbook. (RE/MAX Agreement ¶ 51).

### 4. Cooperation Requirements

In addition to providing substantial monetary payments and meaningful injunctive relief, the Settlement Agreements obligate the Settling Defendants to cooperate with Plaintiffs in the further prosecution of their claims against the remaining Defendants, which remaining Defendants each remain jointly and severally liable for *all* damages caused by the members of the alleged conspiracy. Both Anywhere and RE/MAX's cooperation includes the following: (1) providing up to three current officers or employees of the Settling Defendant or its subsidiaries to participate as witnesses at trial in *Moehrl* and providing access via counsel to those witnesses prior to trial for up to two hours (if requested by Plaintiffs); (2) withdrawing expert designations and obtaining agreement with any separately retained experts that they will not testify at trial as a retained expert for any other Defendant in the Actions; (3) using reasonable efforts to authenticate documents produced by the Settling Defendants and establish that those documents are admissible; and (4) using reasonable efforts to provide relevant class member data and answer questions about the data to support the provision of class notice. (Anywhere Agreement ¶ 55; RE/MAX Agreement ¶ 55).

### 5. Release of Claims Against Anywhere and RE/MAX

In exchange for the Settlement Amounts, Practice Changes, and Cooperation commitments from Anywhere and RE/MAX, upon entry of a final judgment approving the Settlement Agreements, Plaintiffs and the Settlement Class will release and discharge Anywhere and RE/MAX, and all of their respective subsidiaries, related entities, affiliated franchisees, and independent contractors, from any and all claims arising from or relating to "conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." (Anywhere Agreement ¶¶ 14-15, 30–32; RE/MAX Agreement ¶ 14-15, 30–32). The actual terms of the releases are contained in the Settlement Agreements.

The Settlement Agreements with Anywhere and RE/MAX, however, do nothing to abrogate the rights of any member of the Settlement Class to recover from any other Defendant. (Anywhere ¶ 62; RE/MAX ¶ 62). The Settlement Agreements also expressly exclude from the Release a variety of individual claims that Class Members may have concerning product liability, breach of warranty, breach of contract, or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Action). Also exempted are any "individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue in these Actions." (Anywhere Agreement ¶ 32; RE/MAX Agreement ¶ 32).

6. **Application for Award of Attorneys' Fees, Costs and Class Representative Incentive Awards**

The Settlements authorize Settlement Class Counsel to seek to recover their attorneys' fees and costs incurred in prosecuting the Actions, as well as to seek service awards for current and former class representatives, including the Settlement Class Representatives. (Anywhere Agreement ¶ 33, 37; RE/MAX Agreement ¶ 33, 37). Following the Court's preliminary approval of the Settlements, Class Counsel will submit an application to the Court for an award of attorneys' fees, costs, and potentially for service awards, to be paid out of the Settlement Fund.

## III. THE CLASS DEFINITION CONTEMPLATED BY THE SETTLEMENTS SATISFIES RULE 23, AND THE CLASS SHOULD BE CERTIFIED

Certifying a nationwide Settlement Class is appropriate here, where the additional class Members are home sellers who suffered the same or similar harms as *Burnett* and *Moehrl* Plaintiffs from the same defendants—but in other parts of the country.

### A. Class Definition

***This Court*** previously certified the following classes pursuant to Rule 23(b)(3):

(1) the "Subject MLS Class," asserting Count I, defined as:

> All persons who, from April 29, 2015 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a home listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

(2) the "Missouri Antitrust Law-Subject MLS Class," asserting Count III, defined as:

> All persons who, from April 29, 2015 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a home in Missouri listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern

Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

and (3) the "MMPA Class," asserting Count II, defined as:[2]

> All persons who, from April 29, 2014 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a residential home in Missouri listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home. (Burnett Doc. 741).

The Subject MLSs in the **_Burnett_** action were four MLSs in Missouri.

**_The Moehrl Court_** previously certified the following damages class under Federal Rule of Civil Procedure 23(b)(3):

> Home sellers who paid a commission between March 6, 2015, and December 31, 2020, to a brokerage affiliated with a Corporate Defendant in connection with the sale of residential real estate listed on a Covered MLS and in a covered jurisdiction. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff. (Moehrl Doc. 403).

In addition, **_the Moehrl Court_** previously certified the following injunctive relief class under Federal Rule of Civil Procedure 23(b)(2):

> Current and future owners of residential real estate in the covered jurisdictions who are presently listing or will in the future list their home for sale on a Covered MLS. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff. (_Id._)

The Covered MLSs in the Moehrl action are 20 MLSs spanning 19 states across the United States.

---

[2] With leave of Court, Plaintiffs in _Burnett_ recently dismissed the Missouri state law claims in advance of trial as to the non-settling Defendants. (Burnett Doc. 1142, 1144).

The Settlements are conditioned upon the Court certifying a class *for settlement purposes only* that is broader than the litigation classes certified in *Moehrl* and *Burnett*, as to Anywhere and RE/MAX only, including in the following respects: (a) persons who sold homes that were listed on all MLSs in the United States (rather than just a subset); (b) sellers regardless of the broker used (rather than only those affiliated with the Defendants); and (c) a date range that generally extends to the date of notice. The proposed Settlement Class definition, pursuant to Rule 23(b)(3) is as follows:

> All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:
>
> a. Moehrl MLSs: March 6, 2015 to date of notice;
>
> b. Burnett MLSs: April 29, 2014 to date of notice;
>
> c. MLS PIN: December 17, 2016 to date of notice;
>
> d. All other MLSs: (i) four years prior to the date a new or amended complaint (if any) is filed in the Actions reflecting any MLS aside from the Moehrl MLSs, Burnett MLSs, and MLS PIN, or (ii) the date of notice, whichever is earlier, up to the date of notice.
>
> Excluded from the Settlement Class are those who opt out of the Settlements in a timely manner.

(Anywhere ¶¶ 13 and 18; RE/MAX ¶¶ 13 and 18).

The Settlement Class definition satisfies the requirements of Rule 23(a) and 23(b)(3). Accordingly, Plaintiffs request that the Court certify the Settlement Class for settlement purposes only.

**B. Legal Standard for Modifying the Class Definition**

The Court can amend or alter the class definition at any time before a decision on the merits. Fed. R. Civ. P. 23(c)(1)(C). When analyzing whether to certify a broader class definition than was initially certified, courts conduct the standard Rule 23 class certification analysis. *See,*

*e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2011 WL 13152270, at \*5 (N.D. Cal. Aug. 24, 2011) ("Rule 23 explicitly empowers a federal court to certify a class in every case that satisfies its criteria."); *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 364 (D. Ariz. 2009) (a "federal court applying Rule 23 of the Federal Rules of Civil Procedure may certify a nationwide class if the requirements for certification are satisfied."). If the Rule 23 requirements are met, a nationwide class should be certified, regardless of whether a narrower class was pled or certified earlier in the litigation. *See, e.g.*, *In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Pracs. Act (FDCPA) Litig.*, No. 2:13-MD-2426, 2016 WL 543137, at \*2–5 (D. Me. Feb. 10, 2016) (approving the expansion of a class of Maine residents to a nationwide class where it satisfied the Rule 23 requirements).

Courts around the country acknowledge that to achieve settlement, it is often necessary to broaden the class and/or the scope of the claims. *See, e.g.*, *Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) (explaining that class settlements that include a broad release of claims are permissible, and that the scope of released claims may exceed those actually brought in the underlying action, and may even exceed the scope of claims that could have been brought in a lawsuit); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005) ("Practically speaking, [c]lass action settlements simply will not occur if parties cannot put limits on defendant's liability."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270, at \*9 ("For the history of class certifications, courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated.").

Courts routinely certify settlement classes that are broader than previously pled or certified in the litigation. *See, e.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 661 (E.D. Va.

2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (same). The interests of fairness, equity, and justice are often better served by a broader class than a narrower class. *See, e.g.*, *Heldt v. Payday Fin., LLC*, No. 3:13-cv-03023, 2016 WL 96156, at *10 (D.S.D. Jan. 8, 2016) (observing that "[i]t would be ideal to include the Intervenors and their counsel in another round of negotiation to get broader class representation to evaluate whether $7 million is an appropriate settlement fund given the financial standing of the Defendants"); Nancy Morawetz, *Underinclusive Class Actions*, NYU Law Review 402–438 (April–May 1996), https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-71-1-Morawetz.pdf ("The principal harm caused by defining a class narrowly is the potential of denying similarly situated persons the same opportunity for relief for similar claims." (p.420) . . . "Inclusion in the class may be expected to be in the interest of the potential class members when it is unlikely that they will be able to litigate their claims independently." (p.430)).

### C. The Proposed Settlement Class Satisfies Rule 23(a).

The Settlement Class must satisfy the four requirements of Rule 23(a) and one of the subsections of Rule 23(b). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-00332, 2022 WL 1203100, at *4 (W.D. Mo. Apr. 22, 2022). The Court should grant provisional certification here because the proposed Settlement Class satisfies Rule 23(a) and (b)(3). Provisional certification will allow the Settlement Class to receive notice of the Settlement and its terms, including the rights of Class Members to submit a claim and recover a class award if the Settlements are finally approved, to object to and/or be heard on the Settlements' fairness at the Fairness Hearing, or to opt out of the Settlements.

### 1. Numerosity

As set forth in *Burnett* Plaintiffs' previous class certification briefing before this Court, Rule 23(a)(1) requires "the class be so numerous that joinder of all members is impracticable." "[A] plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good faith estimates." *Hand v. Beach Entertainment KC, LLC*, 456 F. Supp. 3d 1099, 1140 (W.D. Mo. 2020). Although the Eighth Circuit has not established strict requirements regarding the size of a proposed class, *see Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982), class sizes as small as forty have satisfied this requirement. *Rannis v. Rechia*, 380 Fed. App'x 646, 651 (9th Cir. 2010).

Here, Plaintiffs estimate that Settlement Class Members number in the tens of millions, dispersed across the United States. Moreover, this Court and the *Moehrl* Court have previously held that litigation classes that are smaller than the Settlement Class at issue here satisfied the numerosity requirement. *See Burnett*, 2022 WL 1203100, at *19; *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-cv-01610, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023). Thus, the Settlement Class plainly satisfies Rule 23(a)(1)'s numerosity requirement.

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim; "[e]ven a single [common] question will" satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011); *see also Paxton*, 688 F.2d at 561 (8th Cir. 1982) ("[t]he rule does not require that every question of law or fact be common to every member of the class"). "In the antitrust context, courts have generally held that an alleged conspiracy or monopoly is a common issue that will satisfy Rule 23(a)(2) as the singular

question of whether defendants conspired to harm plaintiffs will likely prevail." *D&M Farms v. Birdsong Corp.*, No. 2:19-cv-463, 2020 WL 7074140, at *3 (E.D. Va. Dec. 1, 2020).

Here, the Court previously held that there are many issues common to the *Burnett* classes, including (1) whether defendants engaged in a conspiracy to artificially inflate the cost of commissions in residential real estate transactions; (2) whether the conspiracy violates Section 1 of the Sherman Act; (3) the duration, scope, extent, and effect of the conspiracy; (4) whether a per se or rule of reason analysis should apply; and (5) whether Plaintiffs and other members of the Classes are entitled to, among other things, damages, and/or injunctive relief. *See Burnett*, 2022 WL 1203100, at *5. Similarly, the *Moehrl* Court found that the commonality requirement was met based on the common question "whether Defendants conspired to artificially inflate the buyer-broker commissions paid by the class by adopting the Challenged Restraints, in violation of § 1 of the Sherman Act." *Moehrl*, 2023 WL 2683199, at *11. These common issues exist with respect to the Settlement Class as they did with respect to the classes initially certified in the *Burnett* and *Moehrl* actions. *See, e.g.*, *Hughes v. Baird & Warner, Inc*, No. 76-cv-3929, 1980 WL 1894, at *2 (N.D. Ill. Aug. 20, 1980) ("The obvious question of fact common to the entire class is whether or not a conspiracy existed. This question will most probably predominate the entire lawsuit."). In particular, the conduct of Anywhere and RE/MAX that is being challenged generally centers on rules adopted nationwide that each Defendant had with respect to participation in both NAR and non-NAR MLSs and compliance with NAR's Code of Ethics, which applies to Realtors nationwide.

### 3. Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of Class Members' claims. "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th

Cir. 1995); *Burnett*, 2022 WL 1203100, at *6. Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." Donaldson v. Pillsbury Co., 554 F.2d 825, 830 (8th Cir. 1977). "In the antitrust context, typicality is established when the named plaintiffs and all class members alleged the same antitrust violations by defendants. Specifically, named plaintiffs' claims are typical in that they must prove a conspiracy, its effectuation, and damages therefrom – precisely what the absent class members must prove to recover." *Hyland v. Homeservices of Am., Inc.*, No. 3:05-cv-612, 2008 WL 4858202, at *4 (W.D. Ky. Nov. 7, 2008) (internal citations and quotations omitted); *Burnett*, 2022 WL 1203100, at *6.

This Court previously held that *Burnett* Plaintiffs' claims are typical of members of the *Burnett* classes. Similarly, here, Plaintiffs' claims are typical of members of the proposed Settlement Class. Each Settlement Class Member sold a home that was listed on an MLS in the United States. Settlement Class Members' claims arise out of a common course of misconduct by Defendants, and each paid a commission when they sold their homes that was inflated by Defendants' conduct. As such, Rule 23(a)(3) is satisfied.

### 4. Adequacy

Rule 23(a)(4) requires that, for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982)). For a conflict to defeat class certification, the conflict "must be more than merely speculative or hypothetical," but rather "go to the heart of the litigation." *Gunnells*, 348 F.3d at 430-31 (citation omitted).

As with the classes earlier certified in the Actions, *Burnett*, 2022 WL 1203100, at \*1; *Moehrl*, 2023 WL 2683199, at \*11, there is no conflict here; the interests of Plaintiffs are aligned with those of Settlement Class Members. Plaintiffs, like all Settlement Class Members, share an overriding interest in obtaining the largest possible monetary recovery, the most effective business practice changes, and the most helpful cooperation from Settling Defendants. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."). Moreover, because any non-nationwide settlement would have left Anywhere and RE/MAX exposed to litigation involving claims exceeding each Settling Defendant's ability to pay, the only feasible means for Plaintiffs to obtain *any* settlement *at all* was to settle on a nationwide basis on behalf of the entire Settlement Class. Finally, Plaintiffs are not afforded any special or unique compensation by the proposed Settlement Agreements. As such, Rule 23(a)(4) is satisfied.

**D. The Proposed Settlement Class Satisfies Rule 23(b)(3).**

Once Rule 23(a)'s four prerequisites are met, Plaintiffs must demonstrate that the proposed Settlement Class satisfies Rule 23(b)(3). Specifically, Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs have done so.

**1. Predominance**

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation . . . and goes to the efficiency of a class action as an alternative to individual suits." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479 (8th Cir. 2016) (internal citations omitted). The predominance question at class certification is not whether Plaintiffs have

already proven their claims through common evidence. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011). Rather it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions. *Id.*

"[W]hether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019). "[T]he predominance requirement is relaxed in the settlement context." *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567, 2019 WL 7160380, at *4 (W.D. Mo. Nov. 18, 2019); *see also Holt v. CommunityAmerica Credit Union*, No. 4:19-cv-00629, 2020 WL 12604383, at *4 (W.D. Mo. Sept. 4, 2020). When a class is being certified for settlement, "a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. 591 at 620. Therefore, as courts in this circuit recognize, "When a class is being certified for settlement, the court need only analyze the predominance of common questions of law and the superiority of class action for fairly and effectively resolving the controversy; it need not examine Rule 23(b)(3)(A–D) manageability issues, because it will not be managing a class action trial." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, No. 08-MDL-1958, 2013 WL 716088, at *5 (D. Minn. Feb. 27, 2013). For example, in *Zurn Pex*, the district court found that common issues predominated because class representatives and members of the settlement class all sought to remedy a "shared legal grievance." *Id.*

Indeed, the Eighth Circuit, in rejecting objections to another class action settlement, stated that "the interests of the various plaintiffs do not have to be identical to the interests of every class member." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999). Instead, the Eighth Circuit emphasized that certification of a settlement class was appropriate where "all of the plaintiffs seek essentially the same things: compensation for damage already incurred, restoration

of property values to the extent possible, and preventive steps to limit the scope of future damage."
*Id.*

Here, all Plaintiffs seek to remedy the same shared legal grievance—widespread conduct by Defendants throughout the United States that has resulted in supracompetitive broker commission rates. This conduct includes nationwide policies enacted by the various Defendants to perpetuate the challenged conduct—including requirements that agents and brokerages affiliated with Defendants belong to NAR, participate in both NAR-affiliated and non-NAR affiliated MLSs and/or follow NAR's Code of Ethics and MLS Handbook. It also includes nationwide policies enacted by NAR, including NAR's Code of Ethics. Indeed, Defendants' requirements that their subsidiaries and franchises comply with relevant NAR rules and/or belong to NAR raise issues that are common to the Settlement Class. *See id.* Such evidence comes from Defendants' own files, statements, policies, contracts, records, and employees, and is not specific to individual Class Members. Also at issue are specific MLS rules, including rules mandating blanket unilateral offers of compensation to cooperating brokers, that are present in MLSs throughout the entire United States— including in MLSs that are not directly or indirectly affiliated with NAR.[3] All Plaintiffs seek the same relief—compensation for the higher broker rates that they have had to pay, as well as systemic reforms that address the underlying conduct.

---

[3] Consistent with this conclusion, Plaintiffs and their experts conducted an extensive analysis of both NAR and non-NAR MLSs throughout the United States, determining that they were subject to the same or similar rules challenged here. *See, e.g.*, Moehrl Doc. 324-6, Redacted Elhauge Class Certification Expert Report, App. C (reflecting that around 97% of the several hundred MLSs nationwide are NAR-affiliated and thus subject to all of the mandatory NAR MLS rules challenged in this litigation, and that even for the few non-NAR MLSs it was "was common among these MLSs to adopt restraints that were identical or similar to those imposed by NAR."). Moreover, several of the challenged rules are reflected in NAR's Code of Ethics, which applies to Realtors nationwide, including those operating in non-NAR MLSs. *Id.* ¶ 25 (finding that, "even in non-NAR MLSs, Realtors are—by definition—required to comply with NAR's Code of Ethics").

Common issues also predominate for each element that Plaintiffs must prove to prevail in an antitrust case: (1) a violation of the antitrust laws; (2) the impact of the unlawful activity; and (3) measurable damages. *See, e.g.*, *Burnett*, 2022 WL 1203100, at *10. First, as discussed above, all members of the Settlement Class share the same legal grievance—a violation of the antitrust laws by Defendants. Second, this Court has already recognized that "the fact of antitrust impact can be established through common proof . . . ." *Burnett*, 2022 WL 1203100, at *11 (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015). *Burnett* and *Moehrl* Plaintiffs have already "shown the existence of common questions concerning antitrust impact that can be answered with common evidence" (*Moehrl*, 2023 WL 2683199, at *19; *Burnett*, 2022 WL 1203100, at *12), including expert opinions, analysis of residential real estate transactions in foreign benchmark countries, and transaction data from defendants and MLSs. At bottom, evidence of impact from the fact that commissions in the United States are higher than international markets is evidence common to the nationwide settlement class. Third, all members of the Settlement Class have been damaged by paying inflated commissions as a result of the Challenged Rules or other similar rules or by paying any commission to a buyer broker. The experts in *Burnett* and *Moehrl* presented reliable methods of measuring damages as the difference between the amount Class Members paid for buyer agent commissions in the actual world versus what they would have paid in the but-for world. The same type of methodology could be used for the broader Settlement Class.

### 2. Superiority of a Class Action

In addition to the predominance of common questions, Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Factors relevant to the superiority of a class action under Rule 23(b)(3) include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or

against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

In this case, the first three factors weigh heavily in favor of class certification. First, Class Members have little economic incentive to sue individually based on the amount of potential recovery involved, and any Settlement Class Member who wishes to opt out will have an opportunity to do so. Second, there are no known existing *individual* lawsuits filed by Settlement Class Members; no Class Member has demonstrated any interest in litigating individually. Third, judicial efficiency is served by approving the Settlements. It would be inefficient—for both the Court and the parties—to engage in millions of individual trials involving similar claims. "Requiring individual Class Members to file their own suits would cause unnecessary, duplicative litigation and expense, with parties, witnesses and courts required to litigate time and again the same issues, possibly in different forums." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. at 240.

Moreover, "the expense of individual actions, weighed against the potential individual recovery of the vast majority of class members here, would be prohibitive." *Temp. Servs. v. Am. Int'l Grp.*, 2012 WL 2370523, at *5 (D.S.C. June 22, 2012); *see also Amchem Prods., Inc.*, 521 U.S. at 617 (stating that certification is especially important in cases with relatively small recoveries per class member "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"). Because it would be economically unreasonable for Settlement Class Members to adjudicate their separate claims individually, the superiority of a class action is evident. Proceeding as a class action, rather than a host of separate individual trials, would provide significant economies in time, effort, and expense,

and permit Settlement Class Members to seek damages that would otherwise be too costly to pursue.

Finally, the Supreme Court has found that when certifying a settlement class "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. Such is the case here. If approved, the Settlement Agreements would obviate the need for a trial against the Settling Defendants, and thus questions concerning that trial's manageability are irrelevant. Accordingly, the Court should certify the Settlement Class.

## IV.   THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENTS

Federal Rule of Civil Procedure 23(e) sets out a two-part process for approving class settlements. This case is at the first stage of the approval process, often called "preliminary approval," where the Court decides if it is "likely" to approve the settlements such that notice of the settlements should be sent to the class. Fed. R. Civ. P. 23(e)(1)(B). At this stage, the Court does not make a final determination of the merits of the proposed settlements. Full evaluation is made at the final approval stage, after notice of the Settlements has been provided to the members of the Settlement Class and those class members have had an opportunity to voice their views of the settlements. At this first stage, the parties request that the Court grant "preliminary approval" of the Settlements.

As a general matter, "the law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"). Courts adhere to "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval." 4 Newberg on Class Actions § 11.41; *see also Petrovic*, 200 F.3d at 1148 (8th Cir. 1999) ("A strong public policy

favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'" (quoting *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate). The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005).

The standard for reviewing a proposed settlement of a class action is whether it is "fair, reasonable, and adequate." *Wireless II*, 396 F.3d at 932. The Eighth Circuit has set forth four factors that a court should review in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *Id.* (citing *Grunin*, 513 F.2d at 124; *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). "The views of the parties to the settlement must also be considered." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

### A. The merits of the Plaintiffs' cases, weighed against the terms of the Settlements

The parties naturally dispute the strength of their claims and defenses. The Settlements reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes. Plaintiffs' best-case scenario is prevailing and recovering on the merits at trial, and upholding their award on appeal. But "experience proves that, no matter how confident trial counsel may be, they cannot predict with

100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003).

Against this risk, the Settlements provide for recovery of $138.5 million from just two of the five defendants in the Actions. As discussed in detail below, these settlements are supported by the financial condition of the Settling Defendants, who lack the ability to pay the cumulative damages alleged and sought in the *Burnett* and *Moehrl* litigations.

The Settlements further provide meaningful changes to the Settling Defendants' business practices to protect Class Members who sell homes in the future. Among other things, the Settling Defendants have committed to take steps to educate their affiliated agents that (a) the companies do not require listing agents to make offers of compensation to buyer agents; (b) commissions are negotiable; (c) buyer agents may not represent that their services are free; (d) offers of compensation to buyer brokers should be disclosed to buyers; (e) buyer agents should not filter listings based on level of compensation offered unless instructed by buyer clients to do so; (f) buyer agents are obligated to show relevant properties to their clients regardless of the level of compensation offered; and (g) that Anywhere company owned brokerages may not require minimum client commissions. (Anywhere ¶ 51(i)–(ix); RE/MAX ¶ 51(i)–(ix)). Crucially, nothing in the Settlements precludes the *Burnett* and *Moehrl* Plaintiffs from obtaining additional injunctive relief—including changes to the rules being challenged in both cases—from NAR or the other non-Settling Defendants through trial or further settlements.

Toward that end, Plaintiffs further secured cooperation from the Settling Defendants to assist Plaintiffs with prosecuting their claims against the remaining Defendants at trial where Plaintiffs will strive to secure additional monetary and non-monetary relief from the remaining defendants, including necessary changes to NAR rules. As courts recognize, this is a significant

factor in approving settlements. *See In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652, 654 (D.D.C. 1979) (approving settlement in light of settling defendant's "assistance in the case against [a non-settling defendant]"); *see generally In re IPO Sec. Litig.*, 226 F.R.D. 186, 198–99 (S.D.N.Y. 2005) (recognizing the value of cooperating defendants in complex class action litigation).

Finally, the Settlements' terms were reached as the product of arm's length negotiations over a period of multiple years, including nearly a year of intensive negotiations, and involved the assistance of multiple well-respected mediators. Plaintiffs held several in-person mediation sessions with Anywhere over a span of months from December of last year through August of this year. Plaintiffs also held virtual mediation sessions with RE/MAX, which were attended by senior RE/MAX executives including its General Counsel and Chief Financial Officer. (Berman Decl. ¶ 9; Dameron Decl. ¶ 12). "When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable." *Marcus v. Kansas*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002).

## B. Defendants' financial conditions

The Settlements are fair and reasonable in light of the financial condition of Settling Defendants, Anywhere and RE/MAX, and the limited resources available to each to satisfy a settlement as compared to the size of the potential damages. (Berman Decl. ¶ 13; Dameron Decl. ¶¶ 7-9).

With respect to Settling Defendant Anywhere Real Estate, ***the settlement of $83.5 million represents a significant proportion (more than 13%) of the company's total market capitalization value of approximately $634 million***.[4] Further, the company's June 30, 2023

---

[4] https://finance.yahoo.com/quote/HOUS?p=HOUS&.tsrc=fin-srch (last viewed Oct. 5, 2023 at 1:50pm).

financial statements (the statements that had been filed with the Securities and Exchange Commission most recently prior to the mediation) further demonstrate that the company is unable to pay a materially higher amount.[5] These reported financial results show that the company had total cash and equivalents of $179 million and few other tangible assets that could be used to satisfy a judgment. *Id*. at 8. Any company needs some cash on hand to fund its operations, and the Settlement captures a large proportion of this cash, without depleting the working capital the company requires to operate. The Settlement is also significant in light of Anywhere's lack of total cumulative income. Over the last three years, according to generally accepted accounting principles, Anywhere's total net income has been negative $297 million. *See* Anywhere Real Estate, Inc. Form 10-K at F-8 (p. 86) (February 24, 2023).

Further, the declining real estate market has caused the company to suffer a decrease in revenues of 32.4% from the first six months of 2022. *Id*. The decrease in revenues led to a loss of $119 million for the first six months of 2023, when the company had reported a profit of $111 million for the first six months of the previous year. *Id*. There is no indication that residential real estate sales will increase significantly in the near future, and any continued losses suffered by the company in future periods would only create more risk for the classes in delaying settlement. This is particularly concerning because Anywhere has a significant debt load of more than $2.8 billion dollars, far in excess of its market capitalization. *See* Anywhere Real Estate, Inc. Form 10-Q at p. 8 (August 4, 2023). In short, the Settlement captures the highest amount that the Class could reasonably expect at the current date, and the company's financial condition makes it unlikely that a higher amount could be paid in the future even if Plaintiffs were to obtain a successful trial verdict against Anywhere.

---

[5] Anywhere Real Estate, Inc. Form 10-Q (Aug. 4, 2023).

The Settlement with RE/MAX is similarly fair and reasonable in light of its financial condition. ***The settlement of $55 million represents approximately 14.2% of the company's total market capitalization value of approximately $386 million***.[6] Further, the company's June 30, 2023 financial statements (the statements that had been filed with the Securities and Exchange Commission most recently prior to the mediation) further demonstrate that the company is unable to pay a materially higher amount, with the Settlement Amount capturing 56.9% of the company's total cash and equivalents of $96.8 million.[7] *Id.* at 8. RE/MAX also has debt covenants that significantly limit the ability of RE/MAX to draw on financing sources, such as their revolver, to fund the Settlement Amount. The Settlement Amount is also fair and reasonable in light of RE/MAX's cumulative total net income over the three years ended December 31, 2022 of approximately $6.7 million total dollars. The Settlement Amount represents more than eight times RE/MAX's total cumulative net income during that period.

Further, the Settlement captures the entirety of the company's reported net equity (total assets less total liabilities), which was only $24 million on June 30, 2023. Similar to Anywhere, RE/MAX's net income fell 80.6% from the first six months of 2022 to the first six months of 2023 and its cash position declined from $108.7 million on December 31, 2022 to $96.8 million on June 30, 2023. *Id.* at 3–4.

## C. The Complexity and Expense of Further Litigation

Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the parties' voluminous briefing to date, which includes extensive class certification

---

[6] https://finance.yahoo.com/quote/RMAX?p=RMAX&.tsrc=fin-srch (last viewed Oct. 5, 2023 at 1:50pm).

[7] RE/MAX Holdings, Inc., Quarterly Report (Form 10-Q), at 3 (Aug. 2, 2023). A true and correct copy can be downloaded at: https://www.sec.gov/Archives/edgar/data/1581091/000155837023 012941/0001558370-23-012941-index.htm.

briefing in both *Moehrl* and *Burnett*, as well as summary judgment briefing in *Burnett*. In addition, the parties have engaged in extensive appellate briefing, including (rejected) Rule 23(f) petitions in both *Moehrl* and *Burnett* as well as two separate appeals in the *Burnett* litigation concerning arbitration issues. The *Burnett* litigation is nearing trial, but trial itself promises to be a complex and laborious event. Furthermore, in the event that the *Burnett* Plaintiffs are successful at trial, they anticipate that any remaining Defendants would pursue appellate review of the jury verdict. In *Moehrl*, the Plaintiffs still have to navigate both a complex summary judgment process, including six different experts that may testify on behalf of defendants at trial. By contrast, the Settlement ensures recovery to the Class that will be allocated and distributed in an equitable manner. In light of the many uncertainties still pending in the litigation, an equitable and certain recovery is highly favorable, and weighs in favor of approving the proposed Settlement. (Berman Decl. ¶¶ 8, 12-13; Dameron Decl. ¶ 9).

**D. The Amount of Opposition to the Settlement**

The Settlement Class Representatives in both *Moehrl* and *Burnett* have been provided the Settlement Agreements for review and approved the terms of the Settlements. (Berman Decl. ¶ 14; Dameron Decl. ¶ 13). Notice regarding the Settlements has not yet been distributed. In the event any objections are received after notice is issued, they will be addressed by counsel as part of the final approval process.

**E. The Settlements Also Satisfy the Rule 23(e) Factors.**

In addition to the *Van Horn* factors set forth by the Eighth Circuit, courts in this district also routinely consider the overlapping Rule 23(e)(2) factors:

(A) the Class Representatives and Class Counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the Class is adequate, taking into account:

(i)      the costs, risks, and delay of trial and appeal;

(ii)     the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[8]

The Settlements also satisfy each of these factors. First, Settlement Class Representatives and Class Counsel have adequately represented the Class. Indeed, both this Court and the *Moehrl* Court previously appointed Settlement Class Counsel as class counsel on behalf of the *Burnett* and *Moehrl* classes at the class certification stage. Both courts have also previously appointed the proposed Settlement Class Representatives as representatives on behalf of the respective classes. (*Burnett*, 2022 WL 1203100; *Moehrl*, 2023 WL 2683199). Second, as discussed above, the Settlements were negotiated at arm's length, with the assistance of professional mediators, over an extended period across multiple mediations. Third, for the reasons stated above, the relief provided to the Class is adequate. The Settlements provide significant financial recovery for the Settlement Class, considering the limited financial resources that both Defendants had available. Furthermore, the Settlements include remedies for the challenged conduct with relief that meaningfully changes Defendants' business practices. Fourth, the Settlements treat Class Members fairly and equitably relative to each other. Furthermore, as part of Final Approval, an allocation plan will be submitted

---

[8] *See generally Bishop v. DeLaval Inc*., No. 5:19-cv-06129, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) (Judge Bough); *Holt v. CommunityAmerica Credit Union*, No. 4:19-cv-00629, 2020 WL 12604383, at *2 (W.D. Mo. Sept. 4, 2020); *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567, 2019 WL 7160380, at *1–2 (W.D. Mo. Nov. 18, 2019).

for approval by the Court that ensures an equitable distribution of monetary funds amongst the Settlement Class.

## V.   THE COURT SHOULD APPOINT CO-LEAD CLASS COUNSEL FOR THE CERTIFIED CLASSES IN BURNETT AND MOEHRL AS CO-LEAD COUNSEL FOR THE SETTLEMENT CLASS

Fed R. Civ. P. 23(g) requires a court certifying a case as a class action to appoint class counsel. Plaintiffs respectfully request that the Court appoint *Burnett* and *Moehrl* Lead Counsel as Settlement Class Counsel, namely Ketchmark & McCreight, Boulware Law LLC, Williams Dirks Dameron LLC, Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP.[9] Proposed Settlement Class Counsel are highly experienced in the areas of antitrust and class action litigation. They have tried antitrust class actions to verdict and prosecuted and settled numerous others. (Berman Decl. ¶¶ 3-4). Moreover, as detailed above, they have diligently prosecuted this case for over four years, handling, among other things, motions to dismiss, protracted fact discovery from parties and non-parties, review and synthesis of millions of pages of documents, expert discovery, discovery disputes, class certification, and depositions of fact and expert witnesses. (Berman Decl. ¶ 11.; Dameron Decl. ¶¶ 3-7). Both this Court and the *Moehrl* Court have already recognized Lead Counsels' diligent prosecution of their cases by appointing them as Class Counsel for the *Burnett* and *Moehrl* Classes, respectively, as part of their rulings on class certification. Class Counsel have participated in a lengthy mediation process to achieve the best possible result for the classes.

## VI.   DEFERRING CLASS NOTICE IS APPROPRIATE IN THIS CASE

---

[9] This appointment is solely with respect to the Settlement Class. *Moehrl* Lead Counsel are not seeking appointment as Counsel on behalf of the *Burnett* Class in any way with respect to the still pending litigation claims in *Burnett*. *Burnett* Lead Counsel are likewise not seeking appointment as Counsel on behalf of the *Moehrl* Class in any way with respect to the still pending litigation in *Moehrl*.

Rule 23(e) requires that, prior to final approval of a settlement, notice must be provided to class members who would be bound by it. Rule 23(c)(2)(B) requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

Plaintiffs seek to defer formal notice of the Settlement Agreements to the Settlement Class.[10] In light of the proposed nationwide Settlement Class consisting of over 30 million home sellers, Plaintiffs are working to gather additional Class Member contact information from defendants and other sources. (Berman Decl. ¶ 15). As part of the Settlement Agreements, the Settling Defendants have agreed to use reasonable efforts at their expense to provide Class Member data in support of the provision of class notice. (Anywhere Agreement ¶ 55(iii); RE/MAX Agreement ¶ 55(iii)). If necessary, pursuant to Federal Rule of Civil Procedure 23(c)(2)(B), Plaintiffs may also seek permission to serve subpoenas for the limited purpose of collecting Class Member contact information in order to facilitate notice.

After pursuing additional Class Member contact information, Plaintiffs intend to file a motion to direct notice. *See, e.g.*, *McKinney v. U.S. Postal Serv.*, 292 F.R.D. 62, 68 (D.D.C. 2013) (court deferred the issuance of class notice "pending the completion of [an] additional six-month search period" that would "allow [party's] counsel to locate more accurate information" regarding class members). The proposed notice plan will, pursuant to Rule 23(c)(2)(B), provide the "best notice practicable" to all potential Settlement Class Members who will be bound by the proposed

---

[10] Plaintiffs and Settling Defendants have agreed that the timing of a request to disseminate notice to the Settlement Class of the Settlement Agreement is at the discretion of proposed Co-Lead Class Counsel, and may be combined with notice of other settlements in this action. (Anywhere ¶ 26; RE/MAX ¶ 26).

Settlement Agreements. Plaintiffs anticipate submitting a proposed notice plan promptly following the completion of the trial in this case against the non-settling Defendants.

## VII.    CONCLUSION

The Settlement Agreements provide an immediate, substantial, and fair recovery for the Settlement Class. Accordingly, Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the Settlements; (2) certifying the Settlement Class for settlement purposes only; (3) appointing Plaintiffs as Settlement Class Representatives; (4) appointing *Burnett* Class Counsel and *Moehrl* Class Counsel as Settlement Class Counsel; and (5) deferring notice of the Settlement Agreements to the Settlement Class until an appropriate future date.

Dated: October 5, 2023                    Respectfully submitted by:


                                          **WILLIAMS DIRKS DAMERON LLC**


                                          _/s/ Matthew L. Dameron_
                                          Matthew L. Dameron        MO Bar No. 52093
                                          Eric L. Dirks             MO Bar No. 54921
                                          1100 Main Street, Suite 2600
                                          Kansas City, Missouri 64105
                                          Tel:    (816) 945-7110
                                          matt@williamsdirks.com
                                          dirks@williamsdirks.com

                                          **KETCHMARK AND MCCREIGHT P.C.**
                                          Michael Ketchmark         MO Bar No. 41018
                                          Scott McCreight           MO Bar No. 44002
                                          11161 Overbrook Rd. Suite 210
                                          Leawood, Kansas 66211
                                          Tel:    (913) 266-4500
                                          mike@ketchmclaw.com
                                          smccreight@ketchmclaw.com

                                          **BOULWARE LAW LLC**
                                          Brandon J.B. Boulware     MO Bar No. 54150
                                          Jeremy M. Suhr            MO Bar No. 60075
                                          Erin D. Lawrence          MO Bar No. 63021
                                          1600 Genessee, Suite 416
                                          Kansas City, Missouri 64102
                                          Tel:    (816) 492-2826
                                          brandon@boulware-law.com
                                          jeremy@boulware-law.com
                                          erin@boulware-law.com

                                          _**Attorneys for Plaintiffs**_

                          **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on this 5th day of October 2023, the foregoing was
electronically filed through the Court's ECF system which will send notification of the same to all
counsel of record.

                                          _/s/ Matthew L. Dameron_
                                          Attorney for Plaintiffs