IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP. (n/k/a ANYWHERE REAL ESTATE, INC.), HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.<br><br>    Defendants. | Case No. 19-cv-00332-SRB |

**PLAINTIFFS' TRIAL BRIEF**

Pursuant to the Scheduling Order (Doc. 811), Plaintiffs file this Trial Brief setting forth briefly their factual and legal contentions and addressing any important evidentiary issues.[1]

I. **Plaintiffs' Factual and Legal Contentions**

    A. **Introduction and Overview of the Parties**

Plaintiffs challenge overt anticompetitive restraints that have raised, inflated, or stabilized residential real estate commissions throughout Missouri in violation of the federal antitrust laws. The restraints — in particular a rule that Plaintiffs refer to as the Mandatory Offer of Compensation Rule — were adopted by Defendant National Association of Realtors ("**NAR**") and agreed and

---

[1] Given the extensive pre-trial filings made by all parties and the Court's rulings on these filings, Plaintiffs assume the Court is substantially familiar with the parties' factual and legal contentions and any evidentiary issues that may arise during trial. Accordingly, this Trial Brief does not retread ground already covered in prior filings and rulings, and Plaintiffs outline but do not detail all their factual and legal positions to be presented at trial.

adhered to by each Corporate Defendant. Nearly every home sold in the four major metropolitan areas of Missouri is listed on a real estate Multiple Listing Service (a "**Subject MLS**").

The table below sets forth information about the Named Plaintiffs who will appear at trial as Class Representatives, including the Subject MLS and Corporate Defendants involved in their home-sale transaction:

| Plaintiff Representative | MLS | Affiliation of Listing Broker |
|---|---|---|
| Rhonda Burnett | Heartland (KC) | HomeServices Defendants |
| Jerod Breit | MARIS (STL) | RE/MAX |
| Jeremy Keel | Heartland (KC) | Keller Williams |
| Hollee Ellis | Southern Missouri MLS | Realogy |
| Frances Harvey | Columbia Board of Realtors MLS | RE/MAX |

NAR requires the Subject MLSs to follow NAR's mandatory MLS rules, which include the Mandatory Offer of Compensation Rule. And the "Corporate Defendants" — a term including the "HomeServices Defendants" (HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates, LLC), Defendant Keller Williams Realty, Inc., and settling former Defendants Realogy Holdings Corp., n/k/a Anywhere and RE/MAX, LLC — entered into a combination or conspiracy with NAR by requiring and encouraging their respective families of affiliated, franchisee, and subsidiary real estate brokerages to join the Subject MLSs and adhere to and implement NAR's mandatory Rules and its Code of Ethics.

B. Overview of Plaintiffs' Claims

Plaintiffs contend that the Mandatory Offer of Compensation Rule is a market-shaping and distorting rule that has severe anticompetitive effects, stifling innovation and competition. The

2

Rule requires every home seller to offer payment to the broker representing their *adversary*, the buyer, even though the buyer's broker is retained by and owes a fiduciary obligation to the buyer (who may be told, falsely, that the services of the buyer broker are "free"). That is, the Mandatory Offer of Compensation Rule requires the home seller to pay the commission of the buyer broker who, if fulfilling his or her fiduciary duty to the client (the buyer), is actively working against the seller's interest by negotiating for a lower home sales price. This setup defies basic economic commonsense and would not (and ***does not***) exist in a market free of anticompetitive restraints.

The Mandatory Offer of Compensation Rule also requires that the seller's offered commission payment be a "blanket offer," promising the same commission to every buyer broker on the Subject MLS without regard to their experience or the quality of services they provide to their buyer clients. As a result of the alleged conspiracy and NAR's rules, the required offers of payment to buyer brokers are published to every buyer broker, yet were *restricted* from the view of potential home buyers.

The mandatory NAR Rules have severed the decision to retain a buyer broker (which is done by a potential home buyer) from the negotiation of the price to be paid to the buyer broker (which is set in the listing agreement between a home seller and the listing agent). This artificial and severed market structure created by Defendants' conduct deters price-cutting competition and innovation, resulting in inflated commissions. The Mandatory NAR Rules impede the ability of a free market to function in the residential real estate industry, and the plain purpose and/or effect of the Rules is to raise, inflate, or stabilize commission rates.

The Mandatory NAR Rules by definition apply uniformly to the Class because to be in the Class, a seller must have sold a home on one of the Subject MLSs through one of the Corporate Defendants, whose franchisees, subsidiaries, brokers, and agents adhered to and complied with the

3

Case 4:19-cv-00332-SRB   Document 1200   Filed 10/06/23   Page 3 of 12

Rules. Plaintiffs allege these Rules have the same impact on the Class — to require sellers to pay the buyer's broker in a residential real estate transaction. This impact is shown in the data (which reflect highly uniform and consistent commission rates) and is confirmed by Defendants' admissions and by economic principles.

Each of the Corporate Defendants embraces, adopts, and enforces the mandatory NAR Rules by, among other things, requiring their franchisees, subsidiaries, brokers, and agents to comply with the NAR Rules. The Corporate Defendants compel compliance in multiple ways, including by requiring their franchisees, subsidiaries, brokers, and agents become members of NAR; writing the NAR Rules into their own corporate documents; and requiring that their franchisees, subsidiaries, brokers, and agents become members of and participants in the Subject MLSs — entities that compel NAR membership and adopt the mandatory NAR Rules. And to join or participate in one of the four Subject MLSs, an agent *must* be a member of NAR. Being a member of NAR requires each agent to adhere to all of NAR's Rules, Handbooks, and Code of Ethics.

Aside from parallel membership requirements, NAR and the Subject MLSs are intertwined in other ways. NAR creates policies and rules that govern the MLSs, and these rules and policies are set forth in the MLS Handbook ("**Handbook**"), which includes the Mandatory Offer of Compensation Rule as a "mandatory" rule for MLSs. Similarly, the Subject MLSs require their members to abide by NAR rules and regulations; therefore, when a Corporate Defendant requires membership in local MLSs, the Corporate Defendants require compliance with NAR rules, including the Mandatory Offer of Compensation Rule challenged by Plaintiffs. The Corporate Defendants acknowledge this interconnected relationship between NAR and MLSs, and by

requiring membership in the Subject MLSs, the Corporate Defendants embrace NAR and its mandatory Rules.

### C. Overview of Plaintiffs' Damages Theories and Evidence

Plaintiffs will prove their damages at trial through the expert testimony of Dr. Craig Schulman, an experienced and highly credentialed economist. Dr. Schulman studied Defendants' and third-party transaction data and other documents and applied economic analysis to the facts. Dr. Schulman concludes that common evidence and methods are capable of showing that: (a) the NAR Rules have anticompetitive effects; (b) the NAR Rules caused a seller to pay his adversary (buyer broker) and that, but for the conspiracy, a seller would not pay the buyer broker; and (c) all class members were impacted. Dr. Schulman's analysis and testimony will also show that the NAR Rules have an observable effect of keeping and stabilizing commission rates at anticompetitive levels. Specifically, Dr. Schulman determined that, in the Subject MLSs, the offered commission rates are highly uniform, and the offered rates are almost always the rate that is paid.

In reviewing the data provided by Defendants, as well as data from other sources, Dr. Schulman observed that commission rates have remained uniform and steady at approximately 6% for many years. Dr. Schulman opined that this uniformity of commissions does not make economic sense and could only occur in a market with anticompetitive restraints. Dr. Schulman also observed that buyer agent commissions do not vary based on competitive forces or market conditions, including agent experience or quality, seasonal trends, or competition in the market. This makes no economic sense, and it can only be explained as resulting from the anti-competitive effects of the challenged NAR Rules.

Dr. Schulman's testimony will discuss functions performed by buyer brokers, and why it makes no economic or competitive sense for sellers to pay buyer brokers anything. He will also

5

Case 4:19-cv-00332-SRB   Document 1200   Filed 10/06/23   Page 5 of 12

apply a benchmark analysis to determine how the U.S. real estate market would look if the mandatory NAR Rules never existed. A benchmark analysis involves identifying a comparison market and seeing how it differs from the market affected by an antitrust violation. Dr. Schulman will provide detailed reasoning of how he chose the relevant comparison market here. Notably, commission rates in other countries are markedly lower than in the United States, and sellers in the comparable countries analyzed by Dr. Schulman do not pay buyer broker's commissions. Focusing on Australia, sellers there pay much lower commissions than do sellers in the U.S., with rates typically between 2% to 2.5% in Australia. Buyer brokers are used infrequently, in as few as 1% to 5% of real estate sales. Moreover, when buyer brokers are used, the buyer pays that broker, not the seller. That's what the U.S. market would be like without the mandatory NAR Rules — sellers would not pay buyer broker commissions. Every class member therefore suffered antitrust injury because all were forced to pay an improper and inflated or stabilized commission to a buyer broker.

Finally, Dr. Schulman will provide the proper method for calculating the Class's damages. Again, absent the mandatory NAR Rules, sellers would not pay buyer broker commissions. The Class-wide damages therefore are the total of all buyer broker commissions paid by the Class during the Class Period. To date, Defendants have siphoned off well more than $1.3 billion in economically irrational and unlawful commissions from the Class.

## II. Important Evidentiary Issues

At this time, Plaintiffs believe the parties have made substantial progress in resolving many potential evidentiary disputes. However, at times Defendants have adopted positions seemingly designed to render the trial process inefficient and unduly burdensome, including by resisting agreements to authenticity and foundation of documents that the Defendants themselves produced

in this litigation. In the event that Defendants resurrect such positions at trial, Plaintiffs briefly preview here why such objections should be overruled by the Court.

First, "[a]uthenticity is an issue decided by the court," and "[o]nce evidence offered against one party is deemed authentic, its authenticity is established as against all other parties as well." WRIGHT & MILLER, 31 Fed. Prac. & Proc. Evid. § 7104 (2d ed.) (citing *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002)). Rule 901 governs authentication, and to satisfy the rule the proponent of the evidence need only "produce evidence sufficient to support a finding that the item is what the proponent claims it is." FRE 901(a); *see also Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010) ("The party authenticating the exhibit need only prove a rational basis for that party's claim that the document is what it is asserted to be," something that "may be done with circumstantial evidence") (quotation omitted). "To authenticate evidence, a party must clear only a 'low bar.'" *United States v. Lamm*, 5 F.4th 942, 947 (8th Cir. 2021) (quoting *United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019)).

Many courts, including in this District, have found circumstantial evidence on the face of an email sufficient for authentication: "Emails are generally authenticated under FRE 901(b)(4)," in that the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" easily allow courts to conclude an email is authentic. *Graham v. Noeuy*, No. 2:15-CV-04155-NKL, 2016 WL 9045739, at *2 (W.D. Mo. Nov. 21, 2016); *see also Advanced Physical Therapy, LLC v. Apex Physical Therapy, LLC*, No. 6:20-CV-03043-RK, 2022 WL 18584768, at *7 (W.D. Mo. July 26, 2022) (denying motion in limine to exclude email, citing *Graham*, and noting "Defendant does not argue that Plaintiffs **cannot** authenticate the "Marketing Log Email." Rather, Defendant argues that they have not done so,"

and concluding Plaintiffs could authenticate it at trial based on its appearance and circumstantial evidence) (emphasis in original).

In *Graham*, Judge Laughrey explained: "Factors that courts have concluded support authenticity of an email under all the circumstances include the use of the "@" symbol in the email address; that a party's name is included in the email address; that the names of senders and receivers in the headers and body of the email; the nature of the information contained in the email." 2016 WL 9045739, at *2. Accordingly, Judge Laughrey concluded that the email at issue "is what it purports to be: a record of two emails received by Graham. The email contains email addresses using the '@' symbol, and Graham's first name and the name of her business; Graham's name is reflected in the text; and the nature and the content of the emails relate to the underlying issues in this case." *Id.*

Courts also recognize that documents established as business records "with a Rule 902(11) certification" can "obviate[] the need for a 'sponsoring witness' to introduce" the records into evidence. *Valdez v. Lowry*, No. 18 CV 5434, 2021 WL 5769533, at *17 (N.D. Ill. Dec. 5, 2021) (ruling that because "plaintiff's Rule 902(11) certification is sufficient, plaintiff need not call a sponsoring witness to introduce his medical records into evidence."). Likewise, courts reject arguments that "only the *author* of the e-mails may authenticate them" because that contention "assumes incorrectly that a witness must have personal knowledge of the *contents* of a document in order to authenticate it." *U.S. E.E.O.C. v. Olsten Staffing Servs. Corp.*, 657 F. Supp. 2d 1029, 1033–34 (W.D. Wis. 2009) (emphasis in original). As that court explained, the "rules of evidence are not so punctilious," and "even without a custodian, e-mails may be authenticated through the e-mail addresses in the headers and other circumstantial evidence." *Id.*

8

Indeed, courts around the country reject a producing party's "gambit" or playing of "gotcha" games as to the authenticity of documents that the objecting party itself produced. Courts label these arguments "disingenuous," "wasteful," and "specious." *See infra*.

Recently, the First Circuit reversed a district court which "reward[ed] this gambit" of fighting the authenticity of one's own documents. *See Joseph v. Lincare, Inc.*, 989 F.3d 147, 156–57 (1st Cir. 2021). The First Circuit explained: "Discovery is expensive enough without adding make-work. When a party in response to discovery requests points to a document that appears on its face to be a business record of the producing party, the other parties should be able to treat the document as authentic unless someone offers some reason to think otherwise, before it is too late to do something about it." *Id.* Describing the proceedings before the district court, the First Circuit noted that when the plaintiff "sought to use the documents as being what they appeared to be, Lincare never offered any suggestion that it had produced unauthentic documents. Rather, it simply played 'gotcha,' waiting until discovery was over to challenge authenticity by arguing that Joseph had failed to obtain an express admission of authentication by Lincare of its employees who created the documents. In rewarding this gambit, the district court erred." *Id.*

Numerous other courts have reached similar conclusions and rejected similar efforts to erect authenticity or foundation roadblocks to documents that litigants themselves produced:

1. "[C]ourts have warned litigants like Defendant that '[i]t is disingenuous and wasteful' to object to one's own documents based upon personal knowledge or authentication." *OFI Int'l, Inc. v. Port Newark Refrigerated Warehouse*, No. 2:11-CV-06376 WJM, 2015 WL 140134, at *3 (D.N.J. Jan. 12, 2015) (quoting and citing *Shell Trademark Mgmt. BV & Motiva Enterprises, LLC v. Ray Thomas Petroleum Co.*, 642 F. Supp. 2d 493, 510–11 (W.D.N.C. 2009) and *Comm. Data Servers, Inc. v. IBM,* 262 F.Supp.2d 50, 60 (S.D.N.Y.2003)).

2. "Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent."*Corelink v. Phygen, LLC*, No. 4:13-CV-1842 CEJ, 2014 WL 7140442, at

9

*2 (E.D. Mo. Dec. 12, 2014) (quoting *Anand v. BP W. Coast Products LLC,* 484 F.Supp.2d 1086, 1092 (C.D.Cal.2007)).

3. "Paramount contends that AFM's failure to elicit deposition testimony about the email is fatal to its authenticity. However, Paramount itself produced the email, which includes Toth's Paramount email signature and Paramount email address. Given the 'contents, substance ... [and] other distinctive characteristics of the item,' Fed. R. Evid. 901(b)(4), plus the fact that it was produced by Paramount in discovery, a reasonable juror could find that the email is what AFM claims it is." *Am. Fed'n of Musicians of United States & Canada v. Paramount Pictures Corp.*, 903 F.3d 968, 976 (9th Cir. 2018) (concluding the "district court abused its discretion in excluding the Toth email") (quoting FRE 901(b)(4)).

4. "'[D]ocuments produced by a party in discovery are deemed authentic when offered into evidence by the producing party's party-opponent.'" *Walsh v. Fusion Japanese Steakhouse, Inc.*, 585 F. Supp. 3d 766, 781 (W.D. Pa. 2022) (quoting *Schedler v. Fieldturf United States*, No. 3:16-CV-344-PK, 2018 WL 7132502, at *5, 2018 U.S. Dist. LEXIS 224884, at *13 (D. Or. Sep. 11, 2018)).

5. Noting that the documents at issue "were produced by defendants in discovery," the court stated "[a]uthentication is a specious issue" and "Defendants 'cannot have it both ways. They cannot voluntarily produce documents and implicitly represent their authenticity and then contend they cannot be used by the Plaintiffs because the authenticity is lacking.'" *Jones v. Chapman*, No. CV ELH-14-2627, 2017 WL 1546432, at *3–4 (D. Md. Apr. 28, 2017) (quoting *Indianapolis Minority Contractions Ass'n, Inc. v. Wiley*, No. IP 94-1175-C-T/G, 1998 WL 1988826, at *6 (S.D. Ind. May 13, 1998), *aff'd*, 187 F.3d 743 (7th Cir. 1999)).

6. "We disagree with Swaco's contention that Trial Exhibit 52 was not properly authenticated. This document was prepared on Geolograph letterhead and was provided to Denison during discovery by Geolograph, a co-participant in the Swaco joint venture and formerly a defendant. Consequently, there was sufficient circumstantial evidence to support its authenticity." *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423–24 (10th Cir. 1991).

7. Noting that the document at issue "contains a Bates number," the court "finds the production of this email in discovery by the defendants is sufficient to authenticate the document." *In re Directech Sw., Inc.*, No. 08-1984, 2009 WL 10663104, at *4 (E.D. La. Nov. 19, 2009).

8. "USAA does not actually contest the authenticity of the evidence at issue, just the Salkins' failure to authenticate it properly," and the court rejected that position, citing a

10

Ninth Circuit case as "holding that an objection to a party's failure to authenticate documents, without a corresponding denial of the documents' authenticity, is insufficient to exclude documents produced in discovery by the objecting party." *Salkin v. United Servs. Auto. Ass'n*, 835 F. Supp. 2d 825, 828 (C.D. Cal. 2011), *aff'd sub nom. Salkin v. USAA Life Ins. Co.*, 544 F. App'x 713 (9th Cir. 2013) (citing *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster,* 454 F.Supp.2d 966, 972 (C.D. Cal. 2006), and (citing *Maljack Prods., Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 889 n. 12 (9th Cir.1996)).

### III. Conclusion

For the reasons stated above and in other filings, Plaintiffs expect that the evidence at trial will show that Defendants violated the Sherman Antitrust Act and caused substantial damages to the Class.

Dated: October 6, 2023              Respectfully submitted by:

**KETCHMARK & McCREIGHT, P.C.**

*/s/ Scott A. McCreight*
Michael S. Ketchmark #41018
Scott A. McCreight #44002
11161 Overbrook Road, Suite 210
Leawood, KS 66211
(913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

Eric L. Dirks #54921
Matthew L. Dameron #52093
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, MO 64105
(816) 945-7110
dirks@williamsdirks.com
matt@williamsdirks.com

Brandon J.B. Boulware #54150
Jeremy M. Suhr #60075
Erin D. Lawrence #63021
**BOULWARE LAW LLC**
1600 Genessee, Suite 416
Kansas City, MO 64102
(816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com

Counsel for Plaintiffs and the Classes

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of October, 2023, the foregoing was filed on the Court's electronic system, which sends notification of the same to all counsel of record.

*/s/ Scott A. McCreight*
Attorney for Plaintiffs and the Classes

12