# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No: 4:19-cv-00332-SRB<br>) |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC., | )<br>) Judge Stephen R. Bough<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS'® TRIAL BRIEF**

**I. The Evidence Will Show that NAR Did Not Violate the Antitrust Laws**

    *A.    NAR is a voluntary trade association that prohibits its members from violating the antitrust laws.*

NAR is a trade association that provides education, research, branding and advertising, news, and advocacy for its members and their clients. As a trade association, NAR does not receive commissions from sellers or buyers of real estate, NAR does not set commission amounts, NAR does not determine who receives commissions, and NAR does not decide how commissions are paid. While NAR does not study or track commissions, it produces research for the benefit of its members and their clients. For example, contrary to what Plaintiffs argue in this case, NAR's research finds that while finding a home for sale is easier than ever—largely due to the exact multiple listing services supported by NAR's Model Rules—the value of buyer agents to both buyers and sellers has increased.

NAR's approximately 1.6 million members nationwide account for about half of all licensed real estate professionals. And those members come in all shapes and sizes, from across the country, and with myriad business strategies and commission structures.

The distinguishing feature of a NAR member is that they commit to follow a written and published Code of Ethics, which they can denote to consumers by using the registered trademark "REALTOR®." Thus, a REALTOR® is not synonymous with any licensed real estate professional; it is a subset of those professionals who publicly tell consumers how they will conduct themselves. Specifically, under Article 1 of NAR's Code of Ethics, consumers know that "REALTORS® pledge themselves to protect and promote the interests of their client. This obligation to the client is primary." Code of Ethics, Art. 1. This commitment to putting client interests first permeates everything NAR does. The Code of Ethics is on NAR's website for all consumers to see.

Another provision of NAR's Code of Ethics, which also flows from Article 1, requires all members to make sure their clients know the relevant information about commissions. Specifically, "[w]hen entering into listing contracts, REALTORS® must advise sellers/landlords of . . . the REALTOR®'s company policies regarding cooperation and the amount(s) of any compensation that will be offered to subagents, buyer/tenant agents, and/or brokers acting in legally recognized non-agency capacities" and "the fact that buyer/tenant agents or brokers, even if compensated by listing brokers, or by sellers/landlords may represent the interests of buyers/tenants." Code of Ethics, SOP 1-12. And NAR has a nearly identical requirement for members who represent buyers. Code of Ethics, SOP 1-13. NAR also requires that "whenever possible that all agreements related to real estate transactions . . . are in writing in clear and understandable language." Code of Ethics, Art. 9.

2

Case 4:19-cv-00332-SRB   Document 1203   Filed 10/06/23   Page 2 of 14

NAR also expressly prohibits the exact types of conspiracies Plaintiffs allege here. *First*, NAR has an "Antitrust Compliance Policy" that reads: "Boards and associations of REALTORS® and their MLSs shall not: 1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services (Interpretation 14). 2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers." *Second*, NAR has the following notice in the Model Rules:

> **Notice to Association Members**
>
> Under the long-established policy of this association, the (state) association of REALTORS®, and the NATIONAL ASSOCIATION OF REALTORS®:
>
> 1. The broker's compensation for services rendered in respect to any listing is solely a matter of negotiation between the broker and his or her client, and is not fixed, controlled, recommended, or maintained by any persons not a party to the listing agreement.
>
> 2. The compensation paid by a listing broker to a cooperating broker in respect to any listing is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker. (Amended 4/92)

*Third*, NAR has literature it publishes instructing its members not to violate the antitrust laws. Like the Code of Ethics, these materials are publicly distributed by NAR and available on its website.

Of course, if a buyer or seller of real estate, including Plaintiffs, reads NAR's publications and does not agree with any part of what NAR members do, those buyers and sellers can hire any one of the hundreds of thousands of non-REALTORS®, or even choose to forgo an agent entirely. But Plaintiffs in this case not only chose to hire a REALTOR®, but they also negotiated and agreed to the commissions and to whom it would be paid. Simply stated, they benefitted from NAR, its Code of Ethics, and its Model Rules.

3

### B. Cooperation between agents to sell a home, and offers of compensation from one agent to the other are not evidence of a conspiracy.

To sell a home, real estate agents must cooperate—and there is nothing negative or illegal about that cooperation. As the Supreme Court recognized long ago, every commercial transaction requires some cooperation between the buyer and seller. *See, e.g.*, *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, (1918) ("Every agreement concerning trade, every regulation of trade, restrains."); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) ("[E]very commercial agreement restrains trade."). This is no different in real estate, where the existence of every transaction depends on buyers and sellers—and the agents that assist them—cooperating with one another. Plaintiffs seek to make this normal and legal commerce grounds for liability.

"Cooperation" under NAR's Code of Ethics is a defined term that simply means sharing the information about a listed property or making the listed property available to other agents to show to potential buyers. Code of Ethics, SOP 3-10 ("The duty to cooperate established in Article 3 relates to the obligation to share information on listed property, and to make property available to other brokers for showing to prospective purchasers/tenants when it is in the best interests of sellers/landlords."). Cooperation is subject to the best interests of the client. *See* Code of Ethics, Art. 3 ("REALTORS® shall cooperate with other brokers except when cooperation is not in the client's best interest. The obligation to cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker."); NAR Case #3-4, "Cooperation Not Mandatory." And NAR specifies that cooperation "does not include the obligation to share commissions, fees, or to otherwise compensate another broker." Code of Ethics, Art. 3.

Missouri law recognizes cooperation between real estate agents. Missouri statute expressly provides that "[a] transaction broker may cooperate with other brokers[.]" Mo. Rev. Stat

4

339.755(8). Cooperation is expressly authorized by Missouri regulations as well. *See* 20 CSR 2250-8.090(4)(A)(9) & (5)(A)(9).

One way a cooperating agent (the one who helps the seller's agent sell the home) can be paid for her work selling the home is by the seller's agent, and, in real estate, that is called an "offer of compensation." Like cooperation, offers of compensation are authorized by Missouri law. "In any real estate transaction, the designated broker's compensation may be paid by the seller, the landlord, the buyer, the tenant, or a third party or by sharing the compensation between designated brokers," and a seller "may agree that a designated broker may share with another designated broker the compensation paid by the seller or landlord." Mo. Rev. Stat. 339.800; *see also* 20 CSR 2250-8.090(4)(A)(9) (providing the brokerage agreement must specify "whether or not the designated broker is authorized to cooperate with and compensate other designated brokers acting pursuant to any other brokerage relationship").

Not only are cooperation and offers of compensation authorized by Missouri law, they have also existed for over 100 years—although at trial NAR will not seek to introduce any evidence from prior to 1950 (so as to not open the door to the evidence the Court has excluded in Defendants' MIL No. 4). NAR did not invent cooperation or offers of compensation—they evolved in the free marketplace based on what was best for buyers and sellers and the most efficient way to sell homes. Therefore, both concepts are found in NAR's Model Rules and Code of Ethics as a reflection of the free marketplace, and not anything NAR is forcing.

Another example of how the free market, not NAR, decides how real estate agents' services are given and paid for, is how buyer agents emerged. Prior to the mid-1980s buyers did not have their own agents. Then, in the mid-1980s consumer protection advocates argued that buyers should have their own agents. NAR convened a Presidential Advisory Group on how to change

5

its practices in light of those free market changes. The PAG studied the issues for years and made numerous recommendations to the NAR membership. One of those many changes that the PAG recommended, and the NAR membership adopted, was a revision of the Offer of Compensation Model Rule to change its wording to accommodate buyer agents. Therefore, based on market forces, NAR expanded the options and choices for consumers.

> C. *Even where followed, NAR's Model Rules do not require <u>sellers</u> to do anything, and do not prevent <u>sellers</u> from doing anything; NAR's Model Rules do not fix, set, inflate, or suggest commission amounts.*

The Model Rule at the center of Plaintiffs' case is Policy Statement 7.23, which is titled "Commission/Cooperative Compensation Offers." That Model Rule reads:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell.
>
> The listing broker retains the right to determine the amount of compensation offered to subagents, buyer agents, or to brokers acting in other agency or nonagency capacities, which may be the same or different. (Revised 11/96)

There are three notable and undisputed facts about this Model Rule: (1) it imposes no obligations on sellers; (2) it imposes no particular amount the agent representing the seller must offer to pay the agents helping her sell the home; and (3) it explains that its purpose is to make sure agents know how much they will be paid before they do any work. Therefore, even if they hire agents who follow NAR's Model Rules, sellers are free to choose their agents, how much to pay them, and how they are paid; and under the Model Rules, sellers have no obligation to pay anything to anyone, including the buyer agents.

> D. *NAR's Model Rules do not prohibit any negotiations, whether between the agents and their clients or between agents.*

NAR's Code of Ethics and Model Rules do not impose any obligations on sellers, and thus they are free to negotiate commissions with their agents. NAR also does not prohibit any negotiations between agents. While NAR prohibits one agent from *unilaterally* changing the compensation she is being paid, Code of Ethics, SOP 3-2 and 16-16, it "does not preclude the listing broker and cooperating broker from entering into an agreement to change cooperative compensation." Code of Ethics, SOP 3-3. Under NAR's Code of Ethics, "REALTORS® are free to enter into contractual relationships or to negotiate with sellers/landlords, buyers/tenants or others who are not subject to an exclusive agreement but shall not knowingly obligate them to pay more than one commission except with their informed consent." Code of Ethics, SOP 16-14. Consequently, NAR has publicly advised that it "never prohibits negotiations between the listing broker and a cooperating broker at any time during the transaction." 2021 Code of Comprehension: Article 16. In conjunction with the Model Rule on offers of compensation, this means that every agent is informed how much she will be paid before she works, and she can then decide, before she starts working to sell a house, whether to do the work at that amount, find other work, or negotiate a different amount.

> E. *There is no evidence NAR's members conspired with the other Defendants.*

There is no direct evidence that the Defendants agreed with each other to enforce or follow NAR's Model Rules. Instead, Plaintiffs point to the fact that agents affiliated with Defendants make offers of compensation and communicate them through the multiple listing service. But as described above, that would happen without NAR's Model Rules. Plaintiffs then point to a few NAR meetings that people affiliated with the other Defendants attended over the years where there is no evidence that the Offer of Compensation Model Rule was even referenced. But mere

7

attendance is not sufficient to show participation in a conspiracy. *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) ("[A]n antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective."); *see also id*. at 242 (analyzing the language of a specific speech by a trade association officer); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004) (referring to specific meeting minutes, a letter, and a fax). Finally, Plaintiffs point to meetings held by other Defendants or those Defendants' internal documents, none of which involved NAR.

In fact, Plaintiffs' conspiracy allegations boil down to an argument that trade associations are walking conspiracies, which courts routinely have rejected. *See Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F. 2d 284, 293-94 (5th Cir. 1988) ("[A] trade association is not by its nature a 'walking conspiracy.'"); *Wilk v. Am. Med. Ass'n*, 895 F. 2d 352, 374 (7th Cir. 1990) (holding a trade association is not a "walking conspiracy"); *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1049 n.5 (D. Minn. 1992) (same). Moreover, "participation in trade organizations provides no indication of conspiracy." *Am. Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1295 (11th Cir. 2010).

Plaintiffs also claim that offers of compensation have allegedly been clustered at certain levels. But Plaintiffs ignore the fact that there is competition—including commissions decreasing, offers of different compensation rates in Missouri, and negotiations of commissions between listing agents and sellers. Competition is inconsistent with an antitrust conspiracy. *See Lovett v. Gen. Motors Corp.*, 998 F.2d 575, 581 (8th Cir. 1993) (reversing district court and finding evidence was insufficient to support the alleged conspiracy). Moreover, market participants do not act like there is a conspiracy. Individual agents negotiate commissions and modify listing agreements to

8

reflect various price and other terms, and agents do that to assist their clients in finding a home and closing real estate transactions.

## II. Sellers, Including the Plaintiffs, Do Not Purchase Anything Directly From NAR or the Other Defendants

Under both federal and Missouri antitrust law, only "direct purchasers" have standing to sue for damages. *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 728-29, 740 (1977); *Ireland v. Microsoft Corp.*, No. 00CV-201515, 2001 WL 1868946, at *1 (Mo. Cir. Ct. Jan. 24, 2001) ("It is clear that plaintiff, as an indirect purchaser, lacks standing to sue."). The Supreme Court has "incorporate[ed] principles of proximate cause into" the antitrust laws, ruling that "*indirect* purchasers who are two or more steps removed from the violator in a distribution chain may not sue. Our decision in *Illinois Brick* established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (emphases in original). "For example, if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator." *Id*. at 1521. Therefore, Plaintiffs must allege that they purchased something from Defendants. *Id*.; *see Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (holding that *Illinois Brick* requires joinder of the persons from whom plaintiffs actually purchased); *In re Midwest Milk Monopolization Litig.*, 730 F. 2d 528, 529-30 (8th Cir. 1984) (same); *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 370 (3rd Cir. 2005) (same).

Here, however, Plaintiffs specifically, and sellers generally, are not direct purchasers from Defendants or cooperating buyer agents; it is undisputed that Plaintiffs have not bought anything from NAR or the other Defendants. NAR receives membership dues from its members, which do not include Plaintiffs. In fact, according to the Model Rules and Plaintiffs' own listing agreements,

9

when a listing agent makes an offer to pay cooperating agents, the listing agent is the direct purchaser (of the cooperating agent's services), not Plaintiffs or other sellers. And, according to those same Model Rules and listing agreements, Plaintiffs did not directly pay cooperating agents, NAR, or the other Defendants; sellers only directly pay their listing agents and only directly receive services from their own agents. Therefore, at best, Plaintiffs might claim that they paid their listing agents (who are not parties to this case) who, only then, paid Defendants. But such an indirect claim is prohibited by Supreme Court case law. As such, Plaintiffs do not have standing to recover from Defendants. *See, e.g.*, *Campos*, 140 F.3d at 1171 n.4 ("In this circuit, an antitrust plaintiff cannot avoid the *Illinois Brick* rule by characterizing a direct purchaser as a party to the antitrust violation, unless the direct purchaser is joined as a defendant."); *see also Howard Hess*, 424 F.3d at 370 ("We have rejected attempts to invoke a coconspirator exception to *Illinois Brick*'s bar on indirect purchaser standing when plaintiffs have not named the co-conspirators immediately upstream as defendants.").

In its summary judgment decision, the Court held "that Plaintiffs have established a genuine dispute of material fact as to whether they are considered direct purchasers under *Illinois Brick*." Order on Motion for Summary Judgment at 12, ECF No. 1019. But to prevail at trial, Plaintiffs must show they directly purchased something from NAR and the other Defendants.

### III. Particular Issues That May Come Up at Trial

NAR foresees the following as likely to come up during trial.

- *Scope of cross:* Plaintiffs have said their case-in-chief will include testimony by NAR witnesses by deposition video. NAR told Plaintiffs it will be bringing some of those witnesses to testify live, and NAR offered to bring them for Plaintiffs' case-in-chief to do a combined examination. Plaintiffs refused, and the Court

10

ordered that Plaintiffs could play the deposition videos of witnesses, even if they will appear later in person. Pretrial Hearing Transcript at 88:15-21, ECF No. 1139. By Plaintiffs making that decision, NAR respectfully requests that the Court prevent Plaintiffs from asking any questions exceeding the scope of NAR's direct. *See* Fed. R. Evid. 611(b) ("Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility.").

- *Exhibits without sponsoring witnesses:* NAR continues to object to the admission of any exhibits for which there is no sponsoring witness. As stated at the pretrial hearing, Plaintiffs intend to introduce exhibits through deposition testimony. However, "many of the exhibits were shown to a witness who's not competent. That witness was badgered about the contents of that exhibit, and then the deposing attorney moved on. That is not a proper sponsoring witness for a document." ECF No. 1139 at 14:11-15. This particularly applies to Anywhere and RE/MAX, from which no employees will appear live at trial and Plaintiffs are limited to their deposition designations.

- *Objections and examinations of Plaintiffs' witnesses:* NAR understands the Court's Trial Rule 7 and Local Rule 83.3(b), and only one attorney for NAR will question any particular witness or object to Plaintiffs' questions, though we expect that there will be occasions during which NAR will need to object even though another Defendant objected or ask questions of a witness even if another Defendant already inquired. If the Court allows for a stipulation that a question or objection by one Defendant is a question or objection by all Defendants, we expect the occasions for an additional NAR question or objection will be limited.

- *Rule 50(a) Motion and the Rule of Reason:* NAR expects it will file a Rule 50(a) motion at the end of Plaintiffs' case-in-chief and that it will continue to argue, in that motion, in the jury instructions conference, and elsewhere, that the evidence shows that the jury should consider this case under the Rule of Reason, and not per se.

Dated: October 6, 2023							Respectfully submitted,


							/s/   *Ethan Glass*
							Ethan Glass (*pro hac vice*)
							Samantha Strauss (*pro hac vice*)
							Georgina Inglis (*pro hac vice)*
							COOLEY LLP
							1299 Pennsylvania Avenue, NW
							Suite 700
							Washington, DC  20004-2400
							(202) 776-2244
							eglass@cooley.com
							sastrauss@cooley.com
							ginglis@cooley.com

							Beatriz Mejia (*pro hac vice*)
							COOLEY LLP
							3 Embarcadero Center, 20th Floor
							San Francisco, CA 94111
							(415) 693-2000
							mejiab@cooley.com

							Sarah Topol (*pro hac vice*)
							COOLEY LLP
							55 Hudson Yards
							New York, NY 10001
							(212) 479-6000
							stopol@cooley.com

							Charles W. Hatfield (MO Bar # 40363)
							Alexander C. Barrett (MO Bar # 68695)
							STINSON LLP
							230 W. McCarty Street
							Jefferson City, MO 65101
							(573) 636-6263
							chuck.hatfield@stinson.com
							alexander.barrett@stinson.com

							***Attorneys for Defendant the NATIONAL ASSOCIATION OF REALTORS®***

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2023, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

/s/ *Ethan Glass*
Ethan Glass (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC  20004-2400
Phone (202) 776-2244
Fax (202) 842-7899
eglass@cooley.com

***Attorney for Defendant the NATIONAL ASSOCIATION OF REALTORS®***