# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT,
JEREMY KEEL, HOLLEE ELLIS, and
FRANCES HARVEY on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

NATIONAL ASSOCIATION OF
REALTORS, REALOGY HOLDINGS
CORP., HOMESERVICES OF AMERICA,
INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX LLC, and
KELLER WILLIAMS REALTY, INC.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:19-CV-00332-SRB

Honorable Judge Bough

## CORRECTED SUGGESTIONS IN SUPPORT OF
## DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS'®
## MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

LEGAL STANDARD ............................................................................................................ 1

ARGUMENT ..................................................................................................................... 1

    I.      PLAINTIFFS LACK STANDING ................................................................ 1

    II.     NO EVIDENCE THAT NAR CONSPIRED WITH ANYONE ........................... 5

    III.    NO EVIDENCE THAT NAR'S RULES ARE UNREASONABLE
           RESTRAINT OF TRADE ................................................................................ 8

    IV.    NO EVIDENCE THAT NAR'S MODEL RULE HARMED SELLERS
           OR CAUSED INJURY ................................................................................ 11

    V.     NAR RESPECTFULLY RENEWS ITS REQUEST THAT THE COURT
           APPLY THE RULE OF REASON TO THIS CASE ........................................ 14

CONCLUSION ................................................................................................................ 16

i

## Cases

*Admiral Theatre Corp. v. Douglas Theatre Co.*,
    585 F.2d 877 (8th Cir. 1978) ................................................................................12

*Amerinet, Inc. v. Xerox Corp.*,
    972 F.2d 1483 (8th Cir. 1992) ...............................................................11, 12, 14

*Apple Inc. v. Pepper*,
    139 S. Ct. 1514 (2019) ..............................................................................................1

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................................7, 8

*Campos v. Ticketmaster Corp.*,
    140 F.3d 1166 (8th Cir. 1998) ..............................................................................1, 3

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ................................................................................11

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ...................................................................................................15

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ..................................................................................15

*Deaktor v. Fox Grocery Co.*,
    475 F.2d 1112 (3d Cir. 1973) .................................................................................13

*Decker-Ruhl Ford Sales, Inc. v. Ford Motor Credit Co.*,
    523 F.2d 833 (8th Cir. 1975) ....................................................................................1

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) .................................................................................2, 3

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) ...................................................................................11

*Ill. Brick Co. v. Ill.*,
    431 U.S. 720 (1977) ..................................................................................................1

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    791 F.2d 1356 (9th Cir. 1986) ...............................................................................13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ...........................................................................................14, 15

*Lovett v. Gen. Motors Corp.*,
    998 F.2d 575 (8th Cir. 1993) ....................................................................................7

i

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................8

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) .............................................................................11

*In re Midwest Milk Monopolization Litig.*,
    730 F.2d 528 (8th Cir. 1984) ................................................................................2

*Monsanto Co. v. Spray Rite Serv. Corp.*,
    465 U.S. 752 (1984) ................................................................................................8

*Nat'l Ass'n of Rev. Appraisers v. Appraisal Foundation*,
    64 F.3d 1130 (8th Cir. 1995) ...............................................................................16

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ................................................................................................14

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ..........................................................................................10

*O'Riordan v. Long Island Bd. of Realtors, Inc.*,
    707 F. Supp. 111 (E.D.N.Y. 1988) .......................................................................15

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ................................................................................15

*Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*,
    666 F.2d 1130 (8th Cir. 1981) ................................................................................8

*St. Louis Convention & Visitors Comm'n v. National Football League*,
    154 F.3d 851 (8th Cir. 1998) ................................................................................15

*Standard Oil Co. of N.J. v. United States*,
    221 U.S. 1 (1911) ....................................................................................................8

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ..................................................................................................14

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ..............................................................................15

*Supermarket of Homes v. San Fernando Valley Bd. of Realtors*,
    1983 WL 2199 (C.D. Cal. Sept. 1, 1983) .............................................................15

*Teter v. Glass Onion, Inc.*,
    723 F. Supp. 2d 1138 (W.D. Mo. 2010) .................................................................1

ii

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ................................................................................................................14

*United States v. Realty Multi-List, Inc.*,
  629 F.2d 1351 (5th Cir. 1980) ...........................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..............................................................................................................5

*Warren v. State Farm Fire & Cas. Co.*,
  531 F.3d 693 (8th Cir. 2008) ................................................................................................1

**Statutes**

15 U.S.C. § 1 ...................................................................................................................................5

R.S.Mo. § 339.800 ...........................................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 50(a) .......................................................................................................................1

Pursuant to Federal Rule of Civil Procedure 50(a), Defendant the National Association of REALTORS® ("NAR") respectfully moves the Court for judgment as a matter of law resolving the remaining claim against Plaintiffs and in NAR's favor.

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) provides that a party may move for judgment as a matter of law where, based on the evidence presented to the jury, there is not a "legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a)(1); *see also Warren v. State Farm Fire & Cas. Co*., 531 F.3d 693, 698 (8th Cir. 2008) and *Teter v. Glass Onion, Inc*., 723 F. Supp. 2d 1138, 1155 (W.D. Mo. 2010). Judgment as a matter of law should be granted "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." *Decker-Ruhl Ford Sales, Inc. v. Ford Motor Credit Co*., 523 F.2d 833, 836 (8th Cir. 1975). In making this determination, the Court reviews the evidence "together with all reasonable inferences to be drawn therefrom . . . in the light most favorable to the nonmoving party." *Id.*

## ARGUMENT

## I.     PLAINTIFFS LACK STANDING

Only "direct purchasers" have standing to sue for damages. *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 728-29, 740-41 (1977). The Supreme Court has "incorporate[ed] principles of proximate cause into" the antitrust laws, ruling that "*indirect* purchasers who are two or more steps removed from the violator in a distribution chain may not sue." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (emphasis in original). "Our decision in *Illinois Brick* established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers." *Id.* In short, Plaintiffs must establish that they purchased something from Defendants. *Apple Inc.*, 139 S. Ct. at 1514; *see Campos v. Ticketmaster Corp*., 140 F.3d 1166, 1169, 1171 n.4 (8th Cir. 1998) (holding that *Illinois*

*Brick* requires joinder of the persons from whom plaintiffs actually purchased); *In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 529-30 (8th Cir. 1984) (same); *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 370 (3d Cir. 2005) (same).  In its summary judgment decision, the Court held "that Plaintiffs have established a genuine dispute of material fact as to whether they are considered direct purchasers under *Illinois Brick*."  Order on Motion for Summary Judgment at 12, ECF No. 1019.  At trial, Plaintiffs failed to show they are direct purchasers, and in fact proved they are not.

   ***Plaintiffs did not purchase anything directly from NAR or the Corporate Defendants.***
Plaintiffs repeatedly emphasized that "local agents are not defendants in this case."  10/17/2023 Rough Trial Tr. at 11:10-11 ("[L]ocal agents are not defendants in this case.  We are bringing this case against the National Association of Realtors…") (M. Ketchmark); 10/16/2023 Rough Trial Tr. at 59:9-10 ("[T]his is not a case against local agents or brokers.") (M. Ketchmark).  The three listing agreements introduced as evidence are between the named Plaintiffs and their local agents.

**EXCLUSIVE RIGHT TO SELL CONTRACT**

(Residential Use Only)

F315-M



This Contract between (Print) Harry Scott Burnett and Rhonda Burnett  h/w_____SELLER (include marital status) and Reece & Nichols Realtors, BROKER, for the property known as or legally described as: 3630 Holmes Street_____KENWOOD ADD LOT 16 BLK 5

(City) Kansas City_____(State) MO_____(Zip) 64109_____(the "Property") is **EXCLUSIVE** for a period beginning 09/11/2015_____ and ending at 11:59 p.m. on 03/11/2016_____ inclusive unless terminated sooner by the BROKER. The Property is offered for sale for the Purchase Price of $ 275000_____ on terms agreeable to SELLER. Except as otherwise provided herein, **BROKER** agrees to market the Property at **BROKER'S** cost and expense.  **SELLER hereby warrants to BROKER that this is the one and only Right to Sell Contract in effect regarding the Property** and SELLER has the capacity to convey merchantable title to the Property.  BROKER and licensee(s) are licensed under the laws of the state in which the Property is located.

PX-2200; *see also* PX-2225; PX-2211.  Neither NAR nor the Corporate Defendants are identified in these listing agreements.  Similarly, the closing statements—whose irrelevance is discussed below—expressly name local agents, not NAR nor the Corporate Defendants.

| 700. Total Real Estate Broker Fees | $15,298.00 | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | |
| 701. $7,798.00 | | to Reece and Nichols | | |
| 702. $7,500.00 | | to Re/Max State Line | | |
| 703. Commission Paid at Settlement | | | $0.00 | $15,298.00 |

PX-2201; *see also* PX-2212; PX-2226; PX-2229. Thus, Plaintiffs have proven they are ***not*** direct purchasers from NAR or the Corporate Defendants.

Plaintiffs cannot claim the co-conspirator exception to the direct purchaser rule. In addition to Plaintiffs already having repudiated local agents as a party to this case, the Eighth Circuit has determined the co-conspirator exception applies only where the Plaintiffs have sued the alleged co-conspirator. *See Campos*, 140 F.3d at 1171 n.4 ("In this circuit, an antitrust plaintiff cannot avoid the *Illinois Brick* rule by characterizing a direct purchaser as a party to the antitrust violation, unless the direct purchaser is joined as a defendant."); *see also Howard Hess*, 424 F.3d at 370 ("We have rejected attempts to invoke a co-conspirator exception to *Illinois Brick's* bar on indirect purchaser standing when plaintiffs have not named the coconspirators immediately upstream as defendants."). The local agents, who provide the only connection to the purchase, are not named as co-conspirators. Without these local agents, Plaintiffs cannot establish that sellers are the direct purchasers of services from NAR or the Corporate Defendants.

***The Model Rule does not require sellers to do anything.*** Even if local agents were co-conspirators, the Model Rule at the center of Plaintiffs' case still does not establish that sellers are the direct purchasers. As Plaintiffs made clear during their case in chief, their case is about the Model Rule that applies only to a seller's agent, not to the seller. PX-216 at 37 ("In filing property with the multiple listing service, ***participants make blanket unilateral offers of compensation to the other MLS participants*** and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants." (emphasis added)); 10/19/2023 Rough Trial Tr. 222:9-14 ("So it's the seller's agent who makes the offer to

other agents who help her sell the home under this rule, correct? A The seller enters the offer that -- pardon me. The agent enters the offer into the MLS that the seller tells them they're willing to make.") (C. Schulman).

While Plaintiffs seek to rebut the inapplicability of the Model Rule to sellers by offering the named Plaintiffs' closing statements,[1] these documents are irrelevant since the Model Rule pertains solely to the filing of property on the MLS by an agent. PX-216 at 37 ("In filing property with the multiple listing service . . . ."); 10/19/2023 Rough Trial Tr. 221:3-7 ("Q And shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. Do you see that? A Yes, I do.") (C. Schulman). Closing on a home is a separate process that occurs weeks or even months after the home is listed on the MLS. In fact, the evidence has shown that significant negotiation and change happens between listing and closing. 10/18/2023 Rough Trial Tr. at 142:25-143:2 ("Q As part of your negotiation to buy the property, you said, This is what I want in order to buy the property, and they agreed? A Correct.") (J. Keel).

***The closing statements are not evidence of class-wide direct purchasing.*** Since the Model Rule does not apply to sellers and Plaintiffs failed to demonstrate that sellers pay NAR or the Corporate Defendants, Plaintiffs' anecdotal closing statements are not proof that the closing statements for all 265,697 class members reflect the same payment structure. Plaintiffs cannot prove that their entire class is comprised of direct purchasers with only four examples. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (Rule 23 requires the party seeking to

---

[1] PX-2201; 10/18/2023 Rough Trial Tr. at 96:9-98:18 (testimony regarding PX-2201); PX-2212; 10/19/2023 Rough Trial Tr. at 35:22-37:2 (testimony regarding PX-2212); PX-2226; 10/18/2023 Rough Trial Tr. at 135:18-137:7 (testimony regarding PX-2226); PX-2229; 10/18/2023 Rough Trial Tr. at 29:6-31:16 (testimony regarding PX-2229).

4

maintain a class action show affirmatively that there are questions of law or fact common to the class).  Plaintiffs do not have standing to recover from Defendants.

## II.  NO EVIDENCE THAT NAR CONSPIRED WITH ANYONE

Plaintiffs' antitrust claims require proof of conspiracy.  *See* 15 U.S.C. § 1 (requiring a "contract, combination . . . or conspiracy").  At trial, Plaintiffs alleged "a conspiracy to follow and enforce a rule that had the purpose and effect of raising, inflating, or stabilizing the prices for brokers fees when you go to sell your house."  10/17/2023 Rough Trial Tr. at 10:16-18 (M. Ketchmark).  Yet, Plaintiffs have not presented the jury with evidence that Defendants conspired with one another.  In fact, Plaintiffs' own expert agreed he had no opinion of whether there was a conspiracy, and saw no documents or testimony showing that a conspiracy existed:

> Q Sir, isn't it true that you have no opinion on whether there's a conspiracy between NAR and HomeServices?
> A I believe I testified to that effect, yes.
> Q Okay. And isn't it true that you have no opinion whether there is a conspiracy between NAR and Keller Williams?
> A I believe that's what I testified to at deposition, yes.
> Q And you have no opinion on whether or not there's a conspiracy between HomeServices and Keller Williams?
> A I believe I testified to that at deposition, yes.
> . . . .
> Q (BY MR. GLASS) Let's focus on the facts. Okay? You have not seen a single document showing any Defendant discussing commissions with each other, correct, sir?
> A That's correct.

10/19/2023 Rough Trial Tr. at 204:19-205:2 & 205:11-15 (C. Schulman).

The evidence Plaintiffs did submit during their case-in-chief fails to show a conspiracy.

***First***, the Model Rule is a rule for MLSs, not agents.  *See, e.g.*, PX-626; PX-1089.  Thus, while some Corporate Defendants require agents to join NAR, the evidence has ***not*** shown they require those agents to follow and enforce the Model Rule for MLSs.  Furthermore, there is no evidence that the Corporate Defendants require their agents to make offers of compensation at all,

let alone at amounts that stabilize, fix, or raise commissions.  10/19/2023 Rough Trial Tr. at 208:2-6 ("Q And you have not seen any documents or any testimony that would show any of the defendants have discussed how much a seller or their agent should offer to buyer brokers, correct? A Correct.") (C. Schulman).  In fact, being a member of NAR obligates those local agents to comply with the antitrust laws, and NAR provides significant education and training to help them do that.  PX-205A; 10/19/2023 Rough Trial Tr. at 219:4-7 ("Q Okay. So NAR's own training, which describes what the antitrust issues in real estate are, instructs the readers that they should not price fix, correct? A A certain type of price fixing, yes.") (C. Schulman).

*Second*, the Corporate Defendants' internal training materials, videos, and meetings are not evidence of a conspiracy because they have nothing to do with NAR or the Model Rule.  *See e.g.*, PX-503A; PX-686; PX-1187.

*Third*, Plaintiffs' own expert showed that offers by seller's agents to buyer's agents varied materially through Missouri—despite the same rule.  10/20/2023 Rough Trial Tr. at 12:10-21:8 (C. Schulman).  All four subject MLSs in the state of Missouri—Heartland MLS, Southern Missouri MLS, Columbia MLS, and MARIS MLS—have the same market conditions, but the offer of compensation rates vary widely.  From April 29, 2015, through June 30, 2022, the buyer agent commission rate across the subject MLSs includes 33,872 instances of a buyer's broker being offered 2.5%, 80,633 instances of a buyer's broker being offered 2.7%, and 139,116 instances of a buyer's broker being offered 3%.





PLAINTIFFS' TRIAL EXHIBIT
2908
4:19-cv-00332-SRB

**Heartland, Southern MO, Columbia, and MARIS: Distribution of Sold Listings By Buyer Agent Commission Rate April 29, 2015 - June 30, 2022 HomeServices of America Defendants, Keller Williams, REMAX, Realogy (Anywhere)**

SITZER_006126

PX-2908; 10/20/2023 Rough Trial Tr. at 17:2-13 (C. Schulman).

Offers of compensations to buyers' brokers vary even within the individual subject MLSs. *See* PX-2907 (In MARIS MLS, 22% of buyers' brokers are offered 2.5% commission, while 65% of buyers' brokers are offered 2.7% commission, and 7% of buyers' brokers are offered 3%.). Despite predominant offered commission rates varying widely across and within the subject MLSs, Dr. Schulman admitted that he did not do any analysis to explain these variations. 10/20/2023 Rough Trial Tr. at 20:5-14. This evidence shows competition, which is inconsistent with an antitrust conspiracy. *See Lovett v. Gen. Motors Corp.*, 998 F.2d 575, 581 (8th Cir. 1993) (reversing district court and finding evidence was insufficient to support the alleged conspiracy).

**Finally**, even if there were less variation between offers, that alone would not show the Model Rule had any impact on commissions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 n.4

7

(2007) ("[P]arallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." (internal quotation marks and citation omitted).). "There must be evidence that tends to exclude the possibility of independent action." *Monsanto Co. v. Spray Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."); *Twombly*, 550 U.S. at 554 ("An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict.").

In short, judgment as a matter of law is appropriate where, as here, Plaintiffs challenge "conduct [which is] as consistent with permissible competition as with illegal conspiracy." *Matsushita*, 475 U.S. at 588.

## III. NO EVIDENCE THAT NAR'S RULES ARE UNREASONABLE RESTRAINT OF TRADE

Plaintiffs must prove an unreasonable restraint of trade. *See Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 62, 87-90 (1911) (holding §1 claims only apply to unreasonable restraints of trade); *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1138 (8th Cir. 1981) (same). But Plaintiffs have offered no evidence that the NAR rules restrain trade at all, let alone unreasonably.

***First***, offers of compensation from seller's agents to buyer's agents is legal in Missouri. R.S.Mo. § 339.800.

***Second***, Plaintiffs have presented no evidence of restraint because neither NAR's Handbook on Multiple Listing Policy nor its Code of Ethics requires ***sellers*** to pay anything to anyone; all that the NAR rules provide is that participants (*e.g.*, brokers who participate in MLSs)

must make offers of compensation to other MLS participants.  PX-216 at 37–39; 10/19/2023 Rough Trial Tr. at 221:12-14 ("Q And this rule does not say anything about what sellers must do, correct? A No, it does not.") (C. Schulman).  As the testimony and listing agreements from the named Plaintiffs show, sellers commit ***only*** to pay the listing broker his commission, and it is the listing broker who commits to the seller how she will share her commission with cooperating brokers.  *See e.g.*, PX-2200 (R. Burnett); PX-2225 (J. Keel);10/18/2023 Rough Trial Tr. at 70:2-20 (H. Ellis).  Thus, under the NAR rules, only listing brokers must make an offer of compensation to cooperating brokers, and Plaintiffs are not restrained at all.

**Third**, the evidence shows that the Model Rule requires only that listing brokers make an offer of compensation but leave the amount of the commission to the discretion of the listing broker.  PX-216 at 38; 10/19/2023 Rough Trial Tr. at 222:22-25 ("Q And there's no rule that mandates a specific amount the seller's agent has to offer to buyer's agents, correct? A That's correct.") (C. Schulman).  As Dr. Schulman's testimony also established, the amounts offered by listing brokers to cooperating brokers vary across and within the subject MLSs, despite all having identical NAR rules.  *See supra* at 6-7.  This variation shows that market factors and competition, and not NAR's rules, determine offers of compensation.

**Fourth**, the NAR rules are not a restraint because undisputed testimony showed that listing brokers share their commissions with cooperating brokers with or without the NAR rules.  Dr. Schulman admitted that commission-sharing existed in the real estate industry for decades before NAR adopted a requirement that a listing broker offer compensation.  10/20/2023 Rough Trial Tr. at 27:20-22 ("Q In fact, listing brokers offering to pay buyer's agents has existed for decades, fair? A Yes.") (C. Schulman).  Thus, the before-and-after analysis shows that NAR's rules did not restrain anyone.  *See* ABA Antitrust Section, Antitrust Law Developments, 669-73 (3d ed. 1992)

9

(One common method of determining whether conduct is a restraint is to look at behavior, such as prices, "during the period" with the alleged restraint and compare it to behavior "prior to the beginning of the violation or after its termination.").

***Finally***, the NAR Rules are not an unreasonable restraint. Offers of compensation from listing brokers to cooperating brokers benefit home sellers because an offer incentivizes brokers to find buyers for the listing. *See infra* at 11–12. Offers of compensation also benefit home buyers, as they receive representation without having to pay for broker services out of their own pocket, making it possible for them to make offers for properties that they may not otherwise have been able to afford. *See id.* In other words, commission sharing cannot be eliminated without impacting both buyers and sellers. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 (2018) (to optimize two-sided markets, "the network must find the balance of pricing that encourages the greatest number of matches between cardholders and merchants").

As a matter of law, these benefits are important, even though the class is described as sellers. Whether the NAR rules are unreasonable requires an examination of the potential impact of those rules on buyers, in addition to sellers, because multiple listing services are two-sided platforms. *Id.* at 2286 (holding that where conduct impacts a two-sided platform, the analysis "must include both sides of the platform."). Brokerage services in real estate are a quintessential example of such a two-sided market. *See generally* Jean-Charles Rochet & Jean Tirole, *Cooperation among Competitors: Some Economics of Payment Card Associations*, The RAND Journal of Economics 33, no. 4, 549-70 (2002); Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*, Journal of the European Economic Association 1, no. 4, 990-1029 (2003); Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, The RAND Journal of Economics 37, no. 3, 645-67 (2006); and David S. Evans, *Antitrust Economics*

*of Two-Sided Markets*, November 14, 2002. Plaintiffs failed to follow the Supreme Court's instruction in *Amex* and presented only allegations regarding one side of the platform—the alleged harm of listing brokers having to make an offer of compensation to cooperating brokers—rather than to both sides. Accordingly, Plaintiffs have not shown that the conduct was unreasonable.

## IV. NO EVIDENCE THAT NAR'S MODEL RULE HARMED SELLERS OR CAUSED INJURY

Plaintiffs have not established that any of the Defendants' conduct caused them injury. Plaintiffs must establish that they have in fact "suffered antitrust injury caused by the defendant's anticompetitive wrongdoing." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir. 1992). Put another way, "[i]t is a requirement that an antitrust plaintiff must prove that his damages were caused by the unlawful acts of the defendants." *Id.* (emphasis omitted) (*citing MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054 (8th Cir. 2000) ("In order to prevail plaintiffs must prove for each claim "an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages." (internal citations and quotation marks omitted)). Additionally, "to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009).

At trial, Plaintiffs failed to establish that the named Plaintiffs suffered any injury. In fact, their testimony proved the opposite. The named Plaintiffs bought during the class period and received benefits. *See e.g.*, 10/18/2023 Rough Trial Tr. at 62:16-21 ("Q Now, did you benefit from the results of that practice and from that context of having cooperative compensation in the sense that your house was sold? A I benefited from the work that my selling agent did in the sense that -- the effort he put in to represent me to get that house sold."). And the named Plaintiffs sold

11

during the class period and received benefits:

| Hollee Ellis | "Q So for your part and your husband's part in connection with the purchase of this sale when you were the buyer, you and your husband did not pay a buyer's commission of approximately $4,980; is that fair?<br><br>A That is fair."<br><br>10/18/2023 Rough Trial Tr. 67:20-24 (referring to house purchased on 3/21/2018) |
|---|---|
| Jeremy Keel | "Q In this Tracy Avenue transaction, you benefited from the sellers paying your broker's commission, correct?<br><br>A Yes."<br><br>10/18/2023 Rough Trial Tr. at 144:7-9 (referring to house purchased on 12/28/2018) |
| Jared Breit | "Q Did you understand that your broker, your buyer's broker here, was not going to be paid by you directly for his services?<br><br>A Correct."<br><br>10/19/2023 Rough Trial Tr. at 67:24-68:2 (referring to house purchased on 11/19/2021) |

Moreover, Plaintiffs failed to present any evidence of the harm attributable to just the NAR Model Rule. Plaintiffs' expert admitted that he did not even look at the amounts that sellers actually paid in commissions to their brokers. 10/20/2023 Rough Trial Tr. at 61:7-11 ("You did not review, you do not disclose in your report how much sellers paid overall in commission, correct? A That wasn't the focus of my analysis; so, no, I didn't do it.") (C. Schulman). Since Plaintiffs do not have any evidence of what they paid with the rule and what they allegedly would have paid without the rule, they cannot show harm. Instead, Plaintiffs simply ***assume*** that the amount paid by listing brokers to cooperating brokers is damages. This is impermissible. *See Amerinet, Inc.*, 972 F.2d at 1494 ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.") (citation omitted).

12

Plaintiffs' expert also admitted that the Model Rule had benefits, but that he failed to include them in his analysis:

> Q Okay. You have not considered any of the value of making an offer to the buyer's broker to the seller, correct? You haven't considered any of the value that that could have to sell a home faster or get a better price, right?
> A I acknowledge that buyer brokers can present services that have some value to buyers, but that wasn't part of my analysis. It wasn't necessary for my analysis; so I didn't do it.

10/20/2023 Rough Trial Tr. at 36:1-8 (C. Schulman). Any calculation of antitrust damages must "take into account any benefits which would not have been received by plaintiff 'but for' the defendant's anticompetitive conduct." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986). In other words, "if benefits accrued to [the plaintiffs] because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." *Id.* And Plaintiffs bear the burden of establishing the size of their net harm. *See Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116-17 (3d Cir. 1973) (affirming directed verdict for antitrust defendant where plaintiffs failed to produce "evidence concerning the factors essential to establish net profit" and thus "did not meet their burden of establishing the quantum of damages"). Yet Plaintiffs failed to provide any evidence of the amount of the benefit to Plaintiffs attributable to the NAR rules. Because Plaintiffs fail to offer any evidence from which a reasonable jury would have a legally sufficient evidentiary basis, the Court should grant judgment in favor of Defendants. *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 893 (8th Cir. 1978) ("[D]amages accruing from the injury must be capable of reasonable ascertainment and must not be speculative or conjectural.").

Nor have Plaintiffs presented evidence from which a jury could infer that any injury that Plaintiffs or class members allegedly suffered was the result of any of the Defendants' conduct as

13

opposed to other forces or factors. *Amerinet, Inc*., 972 F.2d at 1494. ("The case law is clear …

that the treble-damage plaintiff may not recover for losses due to factors other than the defendant's

anticompetitive violations."). There is no evidence that the Defendants' alleged conduct is "a

material cause" of the Plaintiffs' alleged injury. *Id*.; Phillip E. Areeda & Herbert Hovenkamp,

*Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 338a (5th ed. 2022)

(footnote omitted) ("[A] plaintiff initially obtains standing by showing that the alleged violation

contributed significantly to its injury. Ultimately, of course, the plaintiff must provide the jury

with a reasonable basis for separating the impact of the violation from other factors.").

## V.   NAR RESPECTFULLY RENEWS ITS REQUEST THAT THE COURT APPLY THE RULE OF REASON TO THIS CASE

The Supreme Court has instructed that courts "presumptively appl[y] rule of reason

analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination

is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v.

Dagher*, 547 U.S. 1, 5 (2006) (citations omitted); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10

(1997) (holding that whether a restraint is unreasonable and in conflict with the Act is normally

evaluated under the "rule of reason"). In contrast, the *per se* rule applies in a much narrower set

of circumstances. *Per se* analysis "is reserved for only those agreements that are so plainly

anticompetitive that no elaborate study of the industry is needed to establish their illegality."

*Texaco*, 547 U.S. at 5 (internal quotation and citation omitted); *see also Nat'l Collegiate Athletic

Ass'n v. Bd. of Regents of Univ. of Okla*., 468 U.S. 85, 103-04 (1984) ("Per se rules are invoked

when [the] surrounding circumstances make the likelihood of anticompetitive conduct so great as

to render unjustified further examination of the challenged conduct."). *Per se* liability applies

"only if courts can predict with confidence that it would be invalidated in all or almost all instances

under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-

14

87 (2007) (citations omitted); *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-12 (7th Cir. 2012) ("The per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever."). Courts have applied the *per se* rule to a small number of practices, including price fixing, division of markets, and group boycotts. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 773 (8th Cir. 2004); *see also Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977) (explaining that *per se* treatment is applicable only to conduct that is "manifestly anticompetitive"). Only restraints that have "pernicious effect on competition and lack of any redeeming virtue" are *per se* illegal. *St. Louis Convention & Visitors Comm'n v. National Football League*, 154 F.3d 851, 861 (8th Cir. 1998) (internal quotation marks and citation omitted).

Moreover, federal courts have repeatedly found that the rule of reason applies to cases about the operation of multiple listing services.[2] For example, the rule of reason was applied to an antitrust challenge to multiple listing practices because the operation of the multiple listing services "helps reduce 'information and communication barriers,'" aids the market and the seller, provides "buyer benefits" and overall provides "clear competitive benefits to all parties. *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1368 (5th Cir. 1980) (citations omitted). As a result of these "enormously procompetitive objectives," rules governing multiple listing services "are not subject to out-of-hand condemnation" under the *per se* rule. *Id.* These prior decisions specifically holding that the rules governing the multiple listing services are subject to the rule of reason, are

---

[2] *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006) (applying rule of reason); *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988) (noting that "there appears [to be] no federal case in which a court has applied a *per se* analysis to an MLS"); *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, No. CV 80-1888 PAR, 1983 WL 2199, at *7 (C.D. Cal. Sept. 1, 1983), *aff'd*, 786 F.2d 1400 (9th Cir. 1986) (applying rule of reason to antitrust claims regarding MLS).

consistent with other cases applying the rule of reason to other industry standards or regulation. *See, e.g.*, *Nat'l Ass'n of Rev. Appraisers v. Appraisal Found.*, 64 F.3d 1130, 1133 (8th Cir. 1995) ("[C]ourts should hesitate to apply a *per se* rule when there is a question as to the extent of a practice's economic impact.").

In its summary judgment decision, the Court held the *per se* rule was applicable because "Plaintiffs have produced evidence, creating a genuine dispute of material fact, that Defendants implemented or enforced Section 2-G-1 with the purpose and effect of inflating or stabilizing broker commission rates." Order on Motion for Summary Judgment, ECF No. 1019 at 20-21.

Now at the conclusion of Plaintiffs' affirmative evidence, it is clear that Plaintiffs have not proven that broker commission rates were raised, inflated or stabilized. Their expert, Dr. Schulman, testified that despite the same market conditions, commission rates were unstable across both the four subject MLSs as well as within the individual MLSs. *See supra* at 6-7. This instability is conclusive proof that brokers can make offers of compensation at their own discretion. Therefore, NAR respectfully requests that the Court find the rule of reason applies to this case.

## <u>CONCLUSION</u>

For the foregoing reasons, NAR respectfully requests that the Court grant its motion for judgment as a matter of law.

Dated: October 25, 2023

Respectfully submitted,

/s/    Ethan Glass
Ethan Glass (*pro hac vice*)
Samantha Strauss (*pro hac vice*)
Georgina Inglis (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004-2400
(202) 776-2244
eglass@cooley.com
sastrauss@cooley.com
ginglis@cooley.com

Beatriz Mejia (*pro hac vice*)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
mejiab@cooley.com

Sarah Topol (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000
stopol@cooley.com

Charles W. Hatfield (MO Bar # 40363)
Alexander C. Barrett (MO Bar # 68695)
STINSON LLP
230 W. McCarty Street
Jefferson City, MO 65101
(573) 636-6263
chuck.hatfield@stinson.com
alexander.barrett@stinson.com

**Attorneys for Defendant the NATIONAL
ASSOCIATION OF REALTORS®**

17

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2023, a copy of the foregoing document was

electronically filed through the ECF system and will be sent electronically to all persons

identified on the Notice of Electronic Filing.

/s/ *Ethan Glass*

Ethan Glass (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC 20004-2400
Phone (202) 776-2244
Fax (202) 842-7899
eglass@cooley.com

***Attorney for Defendant the NATIONAL ASSOCIATION OF REALTORS®***