```
 1              IN THE UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3   SCOTT AND RHONDA BURNETT,          )
     RYAN HENDRICKSON, JEROD BREIT,     )
 4   SCOTT TRUPIANO, and JEREMY KEEL,   )
     on behalf of themselves and all    )
 5   others similarly situated,         )
                      Plaintiffs,   )Case No.
 6          vs.                      )19-CV-00332-SRB
                                     )
 7   THE NATIONAL ASSOCIATION OF      )Kansas City, Missouri
     REALTORS, et al.,               )October 19, 2023
 8                   Defendants.      )

 9          .............................
          TRANSCRIPT OF JURY TRIAL - VOLUME 3 OF 11
10        BEFORE THE HONORABLE STEPHEN R. BOUGH
           UNITED STATES DISTRICT COURT JUDGE
11

12     Proceedings recorded by electronic stenography
              Transcript produced by computer
13

14                     APPEARANCES

15   For the Plaintiffs:      MR. MICHAEL S. KETCHMARK
                              MR. BENJAMIN H. FADLER
16                            MR. SCOTT A. McCREIGHT
                              Ketchmark & McCreight PC
17                            Two Hallbrook Place
                              11161 Overbrook Road, Suite 210
18                            Leawood, Kansas 66211

19                            MR. BRANDON J.B. BOULWARE
                              Boulware Law LLC
20                            1600 Genessee Street, Suite 416
                              Kansas City, Missouri 64102

21

22

23

24

25
                         360
```

Case 4:19-cv-00332-SRB    Document 1325    Filed 11/28/23    Page 1 of 242

```
 1                    APPEARANCES
                      (continued)
 2
     For the Defendant         MR. ROBERT D. MacGILL
 3   HomeServices of America:  MR. MATTHEW T. CIULLA
                               MacGill PC
 4                             156 E. Market Street, Suite 1200
                               Indianapolis, Indiana 46204
 5
                               MR. JAY VARON
 6                             Foley & Lardner LLP
                               3000 K Street, NW, Suite 600
 7                             Washington, DC 20007-5109

 8                             MR. JEAN PAUL BRADSHAW, II
                               Lathrop GPM LLP
 9                             2345 Grand Avenue, Suite 2200
                               Kansas City, Missouri 64108
10
     For the Defendant NAR:    MR. ETHAN GLASS
11                             MS. GEORGINA INGLIS
                               MS. SAMANTHA STRAUSS
12                             Cooley LLP
                               1299 Pennsylvania Avenue NW Ste 700
13                             Washington, DC 20004

14                             MS. BEATRIZ MEJIA
                               Cooley LLP
15                             3 Embarcadero Center, 20th Floor
                               San Francisco, California 94111
16
                               MS. SARAH M. TOPOL
17                             Cooley LLP
                               55 Hudson Yards
18                             New York, New York 10001

19   For the Defendant         MR. TIMOTHY RAY
     Keller Williams:          MR. BARACK S. ECHOLS
20                             Holland & Knight
                               150 N. Riverside Plaza, Ste 2700
21                             Chicago, Illinois 60606

22                             MS. ANNA P. HAYES
                               MR. DAVID C. KULLY
23                             Holland & Knight
                               800 17th Street NW
24                             Washington, DC 20006

25
                      361
```

```
 1                    APPEARANCES
                      (continued)
 2

 3                    MS. DINA McKENNEY
                      Holland & Knight
 4                    1722 Routh Street, Suite 1500
                      Dallas, Texas 75201
 5
                      MR. DAVID R. BUCHANAN
 6                    Brown & James, PC-KCMO
                      2345 Grand Blvd., Suite 2100
 7                    Kansas City, Missouri 64108

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23              Gayle M. Wambolt, RMR, CRR
                U.S. Court Reporter, Room 7552
24          Charles Evans Whittaker Courthouse
        400 East Ninth Street - Kansas City, MO 64106
25                         362
```

```
 1                              INDEX
                              JURY TRIAL
 2                          OCTOBER 19, 2023

 3   EVENT                                              PAGE

 4   Proceedings in Courtroom                            368

 5   Proceedings in Courtroom                            446

 6   Proceedings in Courtroom                            447

 7   Proceedings in Courtroom                            521

 8                      CHRONOLOGICAL INDEX

 9   PLAINTIFFS' WITNESSES:

10                              DIR  CROSS  RDIR  RCRS

11   JEROD BREIT                 377   406   441
     CRAIG SCHULMAN              465   570
12                      PLAINTIFFS' EXHIBITS

13   NO.   DESCRIPTION                    OFRD      ADMTD

14   113   Website Printout               453        453

15   114   Website Printout               453        453

16   115   Website Printout               453        453

17   116   Website Printout               453        453

18   118   Photograph                     453        453

19   119   Photograph                     368        368

20   120   Photograph                     368        368

21   136   Handbook                       376        377

22   139   History Page                   368        368

23   201   Website Printout               368        368

24   202A  Not Identified                 368        368

25   205A  Not Identified                 373        374
                              363
```

| | | |
|---|---|---|
| 1 | **PLAINTIFFS' EXHIBITS** | |

| NO. | DESCRIPTION | OFRD | ADMTD |
|---|---|---|---|
| 207 | Compliance Guide | 376 | 377 |
| 208 | Website Printout | 368 | 368 |
| 209A | Not Identified | 368 | 368 |
| 215 | Email Chain | 368 | 368 |
| 216 | NAR Handbook | 376 | 377 |
| 219 | Website Printout | 368 | 368 |
| 220 | NAR Handout | 368 | 368 |
| 224 | Website Printout | 368 | 368 |
| 225 | Website Printout | 368 | 368 |
| 226 | Website Printout | 368 | 368 |
| 227 | Website Printout | 368 | 368 |
| 234A | D.A.N.G.E.R. Report | 368 | 368 |
| 234 | D.A.N.G.E.R. Report | 562 | 562 |
| 235A | D.A.N.G.E.R. Report | 368 | 368 |
| 360 | Clear Cooperation Policy | 368 | 368 |
| 428 | Email Chain | 372 | 372 |
| 446 | Email Chain | 372 | 372 |
| 459 | Email Chain | 372 | 372 |
| 464 | Email Chain | 372 | 372 |
| 467 | Email Chain | 372 | 372 |
| 468 | Email | 372 | 372 |
| 474A | Not Identified | 369 | 370 |
| 479 | Video | 372 | 372 |

364

| | | | |
|---|---|---|---|
1

<u>**PLAINTIFFS' EXHIBITS**</u>

| NO. | DESCRIPTION | OFRD | ADMTD |
|---|---|---|---|
| 481A | Not Identified | 369 | 370 |
| 485 | Chart | 372 | 372 |
| 626 | Policies Manual | 369 | 370 |
| 660A | Article | 371 | 372 |
| 722 | Handbook | 452 | 452 |
| 882 | Email | 368 | 368 |
| 1597X | Demonstrative | 372 | 372 |
| 1598X | Demonstrative | 372 | 372 |
| 1629A | Article | 370 | 370 |
| 1630 | Not Identified | 370 | 371 |
| 1631 | Business Success Plan | 371 | 371 |
| 1632 | Habit of Networking | 371 | 371 |
| 1633 | Coaching Presents | 371 | 371 |
| 1634 | Full Commission | 371 | 371 |
| 1635 | Win Big | 371 | 371 |
| 1636 | Plan Your Big Life | 371 | 371 |
| 1637 | Goal Your Way | 371 | 371 |
| 1638 | Email Chain | 370 | 371 |
| 1640 | Email Chain | 371 | 371 |
| 1641 | Email Chain | 370 | 371 |
| 1643 | Model Your Way | 370 | 371 |
| 1646 | Email | 371 | 371 |
| 1650 | Email Chain | | |

365

| | | | | PLAINTIFFS' EXHIBITS | | |
|---|---|---|---|---|---|---|
1        **PLAINTIFFS' EXHIBITS**

| NO. | DESCRIPTION | OFRD | ADMTD |
|---|---|---|---|
| 1709 | Handbook | 376 | 377 |
| 1724 | Email | 368 | 368 |
| 1743 | For Sale Signs | 368 | 368 |
| 2211 | Listing Contract | 401 | 401 |
| 2212 | Settlement Statement | 402 | 402 |
| 2216 | Photographs | 379 | 379 |
| 2246 | NAR Membership | 510 | 510 |
| 2419 | Schulman CV | 453 | 453 |
| 2527A | Schulman Merits Report | 564 | 564 |
| 2868A | Photograph | 532 | 532 |
| 2868B | Screenshot | 532 | 532 |
| 2868C | Screenshot | 532 | 532 |
| 2868D | Screenshot | 532 | 532 |
| 2876A | Photograph | 532 | 532 |
| 2904 | Rule 1006 | 543 | 543 |
| 2905 | Rule 1006 | 543 | 543 |
| 2906 | Rule 1006 | 543 | 543 |
| 2907 | Rule 1006 | 543 | 543 |
| 2908 | Rule 1006 | 543 | 543 |
| 4587 | NAR Handbook | 452 | 452 |
| 4592A | Report Portion | 564 | 564 |
| 4593 | Slide | 488 | 488 |
| 6454A | Not Identified | 371 | 372 |

366

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1                  DEFENDANTS' EXHIBITS

 2    NO.   DESCRIPTION                    OFRD      ADMTD

 3    8157  Handbook                        452       452

 4    3615  Contract                        410       410

 5    3619  Loan Application                393       393

 6    3687  NAR Handbook                    452       452

 7    3713  NAR Handbook                    452       452

 8    3745  NAR Handbook                    452       452

 9    3842  NAR Handbook                    452       452

10    3948  Email                           431       432

11    3957  Emails                          436       436

12    3971  Closing Timeline                433       433

13    4034  NAR Code of Ethics              595       595

14

15

16

17

18

19

20

21

22

23

24

25
                          367
```

```
 1                THURSDAY, OCTOBER 19, 2023

 2                (The following proceedings were had out of the

 3  presence of the jury:)

 4                THE COURT:  Good morning.  I understand Mr. Fadler

 5  has lots of exhibits, but Mr. Boulware is standing up.

 6                MR. FADLER:  He's blocking my view.

 7                MR. BOULWARE:  I'm standing up to introduce

 8  Mr. Fadler.  Ben Fadler.

 9                THE COURT:  Welcome.  We all need a hype man.

10                MR. KETCHMARK:  Good morning, Your Honor.

11                THE COURT:  Good morning.

12                MR. FADLER:  Glendale, class of '97.

13                THE COURT:  Glendale, class of when?

14                MR. FADLER:  '97.

15                MR. BOULWARE:  '94.

16                MR. KETCHMARK:  Dowling High School, 1983.

17                THE COURT:  Go ahead, Mr. Fadler.

18                MR. FADLER:  Your Honor, we've got an agreement with

19  counsel for NAR to move in the following exhibits:  118, 119,

20  120, 139, 201, 202A, 205A, 208, 209A, 215, 219, 220, 224, 225,

21  226, 227, 234A, 235A, 360, 882, 1724, and 1743.

22                THE COURT:  Does that sound fair, Mr. Glass?

23                Ms. Topol?

24                MS. TOPOL:  Yes, Your Honor, that's correct.

25                THE COURT:  Thank you, Ms. Topol.
```
368

1       And which ones are there disputes about, any that
2  need to be addressed?
3            MR. FADLER:  None of those.
4            Then regarding Keller Williams, Your Honor,
5  plaintiff would move in by agreement Exhibit 474A, which by
6  agreement will not include pages 15 to -- 474A, and it will
7  not include Bates numbers 15 to 17 by agreement.
8            481A, 626A, and on that one, we're just going to
9  move in 626 completely.
10           MR. KULLY:  Yes, thank you.
11           MR. FADLER:  629A as by agreement with Mr. Kully.
12           MR. KULLY:  I'm sorry.  Ben, I think the --
13  Mr. Fadler, I think there was the entirety of the article
14  about Keller Williams within 629A.
15           MR. FADLER:  That's correct.
16           MR. KULLY:  I'm sorry.  We're maintaining the
17  objection to hearsay there, but if you're going to -- or we
18  can address our concerns about the excerpt by putting in the
19  entirety of the article by Keller Williams.
20           MR. FADLER:  Sure.  I'm happy to take that up, Your
21  Honor.  This is the magazine article that was shown to
22  Ms. Maples about Keller Williams that talked about Keller
23  Williams and the employees there and the practices.  And she
24  identified it and talked it through in the video deposition,
25  Your Honor.

                              369

1           MR. KULLY:  Your Honor, we maintain a hearsay

          2   objection over it.

          3           THE COURT:  And that objection is overruled, and the

          4   entirety is admitted.

          5           Go ahead.

          6           MR. FADLER:  1629A as agreed, the content agreed by

          7   Mr. Kully on the email to Mr. Kully.

          8           And there's no objection to that one; is that

          9   correct?

         10           MR. KULLY:  1629, we had the hearsay objection that

         11   was overruled.  As to the excerpt, if you include the entirety

         12   of the Keller article about Keller Williams, we're okay with

         13   the excerpt.

         14           MR. FADLER:  Okay.  1630, do you have an objection

         15   to that one, Mr. Kully?  I apologize.

         16           MR. KULLY:  No objection.

         17           MR. FADLER:  1638.

         18           MR. KULLY:  No objection.

         19           MR. FADLER:  1641.

         20           MR. KULLY:  No objection.

         21           MR. FADLER:  1643.

         22           MR. KULLY:  No objection.

         23           MR. FADLER:  And 1646.

         24           MR. KULLY:  That's a document over which we maintain

         25   an objection on the -- this is one of the presentations

                                       370

```
 1    purportedly made at the Family Reunion, for which there was no
 2    evidence, that we discussed with the court yesterday.
 3              THE COURT:  Subject to that same ruling, admitted.
 4              MR. FADLER:  1640.
 5              MR. KULLY:  So, Your Honor, there's a series of --
 6    this is one of a series of documents.  I can read the entire
 7    length that -- to which the same objection applies.
 8              THE COURT:  Same objection.  Same ruling on those.
 9              MR. KULLY:  Okay.  Those are 1631, 1632, 1633, 1634,
10    1635.  I think we've already mentioned 1636, 1637, 1640, 1646,
11    and 1650.
12              MR. FADLER:  Your Honor, I would just note for the
13    record that Ms. Maples was the custodian of records for those
14    documents.  I understand your ruling.  I just want to put it
15    on the record.  Ms. Maples was noted as the custodian of
16    records for those documents.  They were produced by Keller
17    Williams; so they are authentic.  And we understand they've
18    been admitted subject to their objections.  So thank you for
19    that.
20              6454A and 660A.
21              MR. KULLY:  So as 654 was the notes of Michelle
22    Figgs, we -- our objection to that was overruled yesterday; so
23    we're not agreeing to the admissibility, but subject to the
24    objection.
25              And 660 contains an economic article.  It's an email
```
371

```
 1   attaching an economic article, and we are objecting on hearsay

 2   grounds.

 3            THE COURT:  Overruled.  It's admitted.

 4            MR. FADLER:  And we have, Mr. Kully, redacted that

 5   one pursuant to the motion in limine, and that A version is

 6   what we're going to use.

 7            MR. KULLY:  I agree to the excerpts; maintain the

 8   hearsay objection to 660.

 9            MR. FADLER:  Then, finally, Your Honor, these are, I

10   believe, stipulated to by Keller Williams:  428, 446, 459,

11   464, 467, 468, 479, and 485.

12            MR. KULLY:  Agreed with the exception of 479, which

13   is -- again, was shown to Mr. Keller.  He didn't recognize it.

14   It's another one of the Family Reunion presentations

15   purportedly shown at the Family Reunion for which there's no

16   evidence of that.  So we would maintain our objection over

17   that on that basis.

18            THE COURT:  Very good.  Objection overruled and

19   admitted.

20            MR. FADLER:  Then finally, Your Honor, thank you for

21   the court's patience.  For HSA, we'd like to move in Exhibit

22   1598X and 1597X, which are the longer versions of training

23   videos shown in Mr. MacGill's opening.  I believe there's no

24   objection to that.

25            MR. MacGILL:  No objection, Your Honor.
```

372

1          And, Your Honor, we had one question on the

2   admission of 205A.  I think we have a rule of completeness

3   agreement on that, but I wanted to be sure that 205A would be

4   entered in its entirety and not the excerpt.

5          MR. FADLER:  You're saying 205?

6          MR. MacGILL:  Yeah, 205A.

7          MR. KULLY:  That would be 205.

8          MR. FADLER:  Mr. MacGill, all I would say about 205

9   is Ms. Topol and I discussed that one at length.  I believe

10  there's quite a bit of material in that that would be subject

11  to the motion in limine by the court, especially involving

12  investigation by the Department of Justice, which the court

13  was extremely clear with us that we did not want to wade into

14  for purposes of this trial.

15         So Ms. Topol and I, I think, have worked fairly hard

16  to limit it.  If you would like to take a look at those

17  things -- and we can put all of it in except for those -- we

18  can wait on that.  I'm happy to work with you for

19  completeness.

20         I just don't want to step on any DOJ stuff that's

21  going to weigh us in the wrong direction.

22         MR. MacGILL:  Totally agree, Your Honor.  We'll work

23  with Mr. Fadler to resolve the concern and to excerpt this and

24  report tomorrow morning.

25         MR. FADLER:  Okay.  So for purposes of the record,
                                373

```
 1  205A is in; and if we want to put a 205B that's bigger, I'm
 2  happy to do it, Mr. MacGill.
 3           THE COURT:  Okay.  We can talk about that tonight.
 4           MR. FADLER:  Thank you, Your Honor.  We're good.
 5           THE COURT:  Ms. Topol, anything from defense?
 6           MS. TOPOL:  No, Your Honor.  Thank you.
 7           THE COURT:  Mr. Kully?
 8           MR. KULLY:  No, Your Honor.  Thank you.
 9           THE COURT:  Mr. MacGill?
10           MR. MacGILL:  Very briefly, Your Honor.  I just want
11  to make sure we're in compliance with the court's procedures
12  here.  Dr. Wu is going to be listening to the expert testimony
13  today in the courtroom, and I wanted to be sure that we're
14  clear.  I think that was expressly authorized, but I also want
15  to know, may he also have access to testimony of the witnesses
16  as a part of his -- in preparation for his trial testimony?
17           THE COURT:  Expressly authorized, and, yes, he may
18  have access to the rough draft that Ms. Wambolt is sending you
19  probably every second.
20           MR. MacGILL:  Thank you very much.
21           MR. FADLER:  Your Honor, at the risk of upsetting
22  the wonderful court reporter, does the court want electronic
23  copies of any of these exhibits as trial goes?  Or pursuant to
24  your local rule, would you like us just to have hard copies
25  here in case the jury needs them when the time comes?
```

374

1            THE COURT:  There's a local rule that says there's

    2    hard copies of the daily transcript that can go to the jury?

    3            MR. FADLER:  Admitted exhibits, Your Honor.

    4            THE COURT:  Admitted.  Thank you.

    5            MR. FADLER:  I just want to make sure --

    6            THE COURT:  You should have hard copies that we can

    7    send back to the jurors.

    8            MR. FADLER:  We will do so.  The court does not want

    9    its own copies, correct?

   10            THE COURT:  I don't want my own copy ever.

   11            MR. FADLER:  That was our plan.  That's what we'll

   12    do.  Thank you.

   13            THE COURT:  Thank you.  Boy, as the chair of the

   14    local rules committee, if that was a local rule, we were going

   15    to take that up, like, really quick.

   16            So we've been in contact with No. 44.  She's driving

   17    back just as quick as she can.  She doesn't need to break at

   18    11:30 today; so my hope is that we can get on your final class

   19    rep or a class rep, and then we can tee up your economist at

   20    one o'clock.

   21            MR. FADLER:  That's fine, Your Honor.  Thank you.

   22            THE COURT:  Is that an all day for plaintiff, four

   23    hours kind of thing or --

   24            MR. FADLER:  I think -- I don't want to speak for

   25    Mr. Ketchmark.  That's not something I do very often in open

                                   375

```
1    court, but I believe we'll have our direct done by the

2    afternoon break, Your Honor.

3              THE COURT:  And they knew that coming in this

4    morning?

5              MR. FADLER:  I think Mr. Ketchmark and Mr. Glass

6    discussed it, sir.

7              MR. GLASS:  Mr. Ketchmark told us.

8              THE COURT:  And you guys are getting along very well

9    for the enormity of the case, and I greatly appreciate it.  I

10   greatly appreciate all these exhibits getting worked through

11   subject to all the proper objections.  That's perfect.  And

12   I'm confident that somebody communicates with each other who's

13   coming up the next day, because it just is miserable having to

14   prepare for every witness under the sun.

15             MR. GLASS:  Your Honor, actually we have a

16   stipulation that we're giving 48 good faith -- 48 hours of

17   good-faith notice to each other, and plaintiffs have complied

18   with that.

19             THE COURT:  That's great.

20             MR. GLASS:  Of course, things happen, but they've

21   been good.  We'll do the same.

22             THE COURT:  Thank you.

23             MR. FADLER:  While we're sitting here, Your Honor,

24   and, Ms. Topol, one of our legal assistants was very carefully

25   following my rambling exhibit entry, and we did not enter 136,
```

```
 1   207, 216, 1709.
 2            THE COURT:  No objection, Ms. Topol?
 3            MS. TOPOL:  No objection, Your Honor.
 4            MR. FADLER:  Apologies.  Thank you.
 5            THE COURT:  We'll be off the record.
 6        (A discussion was had off the record.)
 7            THE COURT:  Ben and MacGill, you guys admitted 629A,
 8   and there's not one of those on my exhibit list.  Will you
 9   just tell me something I can write down about what it is?
10            MR. FADLER:  Absolutely.  You said 629, Your Honor?
11            THE COURT:  That's what I thought I wrote down.
12            MR. FADLER:  It's 1629.  I apologize.
13            THE COURT:  I apologize.  My bad.  Thank you.
14            Got awful quiet.  Resume the talking.
15                (A recess was taken.)
16            (The following proceedings were had in the presence
17   of the jury:)
18            THE COURT:  Mr. Ketchmark.
19            MR. KETCHMARK:  Your Honor, the plaintiffs call
20   Jerod Breit to the stand.
21   JEROD BREIT, being duly sworn by the courtroom deputy,
22   testified:
23   DIRECT EXAMINATION BY MR. KETCHMARK:
24    Q   Can you please state your name and introduce yourself to
25   the jury --
```

                                377

```
 1    A    Sure.  My name is Jerod Breit.

 2    Q    And, Mr. Breit, where did you grow up?

 3    A    I grew up here north of the river in Liberty.

 4    Q    And what did your parents do when you were growing up?

 5    A    My father worked in a factory in the Hunt Midwest Caves.

 6    Q    What factory was that?

 7    A    It was a corrugated company called Vanguard Packaging.

 8    Q    How about your mom?

 9    A    She worked for the Metropolitan Community Colleges.

10    Q    Where did you go to high school?

11    A    Liberty High School.

12    Q    What did you do after high school?

13    A    I went to the University of Central Missouri.

14    Q    What did you study?

15    A    I studied criminal justice.

16    Q    Why did you study criminal justice?

17    A    At the time, all I ever wanted to be was a police

18   officer.

19    Q    Can you tell the jury what made you first want to be a

20   police officer.

21    A    Yeah.  I've always wanted to serve, and so I -- I had

22   that drive to serve a community.  And I didn't do it directly

23   after college.  I tried the business field a little bit.  It

24   wasn't for me, and so I joined the police academy in St. Louis

25   and became a policeman.
```

```
 1    Q    How many years did you try to do what you called the

 2    business world?

 3    A    About two almost.

 4    Q    And what type of work was that?

 5    A    First, I managed restaurants.  I managed Applebee's in

 6    Independence and then worked for Sysco Foods doing sales for

 7    restaurants.

 8    Q    Did you ultimately go to the police academy?

 9    A    I did.  I moved to St. Louis without a job to wait to

10    get into the police academy.

11    Q    Did you make your way into the police academy?

12    A    I did.

13    Q    What year did you get in the police academy?

14    A    Started the academy in 2007.

15    Q    Did you graduate from the police academy?

16    A    I did.

17         MR. KETCHMARK:  I'm going to move in Exhibit No.

18    2216.

19         MR. MacGILL:  No objections, Your Honor.

20    Q    (BY MR. KETCHMARK)  Can you tell the jury who that young

21    man is?

22    A    That would be me.

23    Q    Who are you there with?

24    A    That's my mother.

25    Q    What's that a photograph of?
```

379

```
1    A    That was a year that I had won an award, a commendation.

2    Q    What was that commendation you won?

3    A    This particular one I think was a chief's letter of

4    commendation.

5    Q    And I'm going to show you the next photograph in here in

6    Exhibit No. -- I'm sorry, Your Honor.

7              MR. KETCHMARK:  I should have formally moved in, if

8    I did not, Exhibit 2216.

9              THE COURT:  Admitted.

10             MR. KETCHMARK:  Apologize.

11   Q    (BY MR. KETCHMARK)  The next one I'm going to show you

12   is a -- tell the jury what that photograph is about.

13   A    Those are four of my closest friends in St. Louis the

14   night that I won or received Officer of the Year.

15   Q    And how did you receive the Officer of the Year award?

16   A    It was voted on by my peers, by other officers.

17   Q    In the St. Louis Police Department?

18   A    Correct.

19   Q    Now, can you tell the jury -- I want to kind of have you

20   walk through when you first started being a -- how many years

21   were you a police officer for?

22   A    Just under ten.

23   Q    Walk now -- and I'm not suggesting anybody made the

24   mistake intentionally or that it would matter, but during

25   opening statement, I believe the attorney for NAR said you
```
                                   380

```
 1    were a captain in the police department.  Just so we're clear
 2    for the record, you weren't a captain, were you?
 3    A    I was not.  It would have been nice.  No, I left the
 4    department as a detective.
 5    Q    And captain would have been way --
 6    A    About three ranks higher.
 7    Q    Okay.  And so let's walk through when -- in the police
 8    department -- and I just didn't want any confusion in this
 9    case about what your rank was.
10         Walk through with the jury when you first started
11    being a police officer.  Tell them the kind of work that you
12    did.
13    A    I -- the first over half of my career was spent in
14    patrol and neighborhood policing.  I was a neighborhood
15    officer.
16    Q    And I've heard you refer to that as a community police
17    officer, right?
18    A    Absolutely, yes.  I was assigned particular
19    neighborhoods.
20    Q    Explain that to the jury, what a community police
21    officer means.
22    A    Yeah.  So we tried putting police officers assigned only
23    to the neighborhood so that you got to know the people in the
24    neighborhood to help with quality of life violations, things
25    that made it harder to live there.
```
381

1          It wasn't just -- it wasn't just violent crime.  It

2     was street lights out that we could help the city fix or

3     derelict houses that we could help the city move forward to

4     get -- you know, to get them back right.

5     Q    And what -- were you -- you were assigned a set

6     neighborhood, you said?

7     A    I had six of the largest neighborhoods in the city of

8     St. Louis.

9     Q    And you worked in that area for about five years, you

10    said?

11    A    Yes, in combination with patrol.

12    Q    And then what type of other work outside of being a

13    community officer did you do as a police officer?  Tell the

14    jury a little bit about it.

15    A    I was very lucky in ten years to have the career that I

16    had in law enforcement.  I spent time in the homicide division

17    as a homicide detective and then ended the last about three

18    and a half years or so in the intelligence division where I

19    was in charge of dignitary protection for the city of St.

20    Louis.

21    Q    Now, tell me, at some point in time -- I'm going to show

22    you what's been marked as Exhibit No. -- part of 2216.

23          What's that a photograph of?

24    A    That's a photo of my first house in St. Louis before I

25    did the yardwork.

                              382

1    Q    What year did you buy that house?

2    A    I believe it was 2012.

3    Q    And so you were still a police officer at the time?

4    A    I was.

5    Q    And I'm going to walk you through the issues as it

6    involves the purchase of the house.  Maybe this is a -- this

7    is a -- I should have shown you the second one.  I apologize.

8    Maybe a little more reflective of the yardwork that you did?

9    A    Yes, yes.  Took a lot of time.

10   Q    And when -- before we get into that, I want to talk a

11   little bit about what you're doing now.  So you left the

12   police force in what year?

13   A    2017.

14   Q    Why did you make a decision to leave the police force?

15   A    I'd always worked with the youth in Missouri, and wanted

16   to take a step to work with young adults and still do

17   something in the prevention education world.

18           So I left the police department to work for an

19   organization that I was a member of in college to travel

20   around the United States and talk to students on college

21   campuses about sexual assault prevention, hazing prevention,

22   alcohol abuse.

23   Q    And was that a fraternity that you were involved in when

24   you were in college?

25   A    Yes.

383

```
 1   Q     What was the name of that?

 2   A     The Delta Chi International Fraternity.

 3   Q     And what was the position that you held when you first

 4   started doing that?

 5   A     When I first started, it was director of risk management

 6   and prevention education.

 7   Q     And what was the purpose behind you taking that job in

 8   your mind?

 9   A     To -- again, I wanted to do good.  I saw the purpose in

10   it.  I was a member of that organization.  And so 2017 was

11   really the height of fraternities and sororities having the

12   largest amount of critical misbehavior that led to deaths and

13   led to serious injury, and I wanted to try to help fix that in

14   the organization that I was a part of.

15   Q     I mean, there was some pretty high-profile ones I know

16   in our state.  Were you familiar with the horrible situation

17   that happened at MU with the hazing incident with the young

18   man who is now in a coma from that?

19   A     Yes.

20   Q     And did you want to get involved and try to stop stuff

21   like that happening?

22   A     I did.  I -- our organization at the time I took the

23   position and left the police department, of 120 chapters, more

24   than half were in trouble.  Some sort of misconduct on their

25   college campus, and so I wanted to help fix that.
```

                              384

```
 1   Q    Did -- as part of that, did you know and focus on the

 2   fact that when you had kids coming into college, that alcohol

 3   led to real serious problems?

 4   A    Yeah.  I -- just -- yes.  Alcohol led to serious

 5   problems, but they had also -- it's a lot of time it's the

 6   first time they were ever out of their home or hometown, and

 7   so they had the opportunity to make a lot of bad decisions.  I

 8   think it was part of our responsibility as the organization

 9   that they belonged to to put them on a right path or try to

10   put them on the right path to not make those poor decisions.

11   Q    And how many years did you work in -- for that

12   fraternity in that capacity of prevention and control?

13   A    Just over a year before being appointed the executive

14   director.

15   Q    So you went in -- when you first went in, what level

16   were you at?

17   A    I was the director of risk management and prevention.

18   Q    And over how many different fraternity chapters?

19   A    125,000 undergraduates and about 100,000 living alumni.

20   Q    And 125,000 undergraduates at how many different

21   chapters?

22   A    5,000 undergraduates at 120 different chapters

23   throughout the U.S. and Canada.

24   Q    And would you actually physically visit these

25   fraternities and have conversations and do that?
```

385

```
 1   A    Yes.

 2   Q    Tell the jury -- give them a sense of what you would do.

 3   A    Yeah.  I -- and I really enjoyed it.  It was fun to get

 4   in front of -- and most of the time they were first-year

 5   college students who don't know what to do, and so they looked

 6   to older students to tell them how to act and how to be.

 7        So it was nice to come in with our staff and set an

 8   example for them and try to get them to realize that college

 9   is first and foremost academic; and second social, and try to

10   help them succeed.

11        I mean, that's all we were there to do.  The point

12   was to graduate.

13   Q    Did you focus on things like alcohol compliance and

14   sexual assault prevention?

15   A    Yeah.  We taught alcohol.  You know, the one thing they

16   don't teach you when you go to college or in high school is

17   how alcohol affects your body.  And so what we did was go in

18   and teach them how drinking affects their bodies and how

19   excessive alcohol use or abuse could put them in danger.

20   Q    And you -- because of the success you had, you were

21   eventually -- you said you were -- within a year were promoted

22   as executive director?

23   A    The position -- yes, the position came open, and I threw

24   my name in the hat and went through the interview process, a

25   nationwide search, and then was appointed the executive
                                 386
```

1  director and CEO in January of 2019.

2  Q    Did you relocate or move for that position?

3  A    I had moved as the director to Iowa City, Iowa, small

4  town called Coralville right outside Iowa City, and about a

5  year or so later had relocated our headquarters to

6  Indianapolis, Indiana, for the first time in 120 years.

7  Q    You saw me kind of rock back because, despite knowing

8  you in this case, I didn't realize -- I went to the University

9  of Iowa, and I know where Coralville is at, and I know where

10  that chapter is at.

11       What years were you at the University of Iowa?

12  A    Living in Iowa City?

13  Q    Yeah.

14  A    I was there from 2017 until 2019.

15  Q    Shows you how much older I was.  I graduated law school

16  in 1990.

17  A    Yeah.  And we -- that -- our -- that chapter there is no

18  longer there because of misconduct.

19  Q    And were you involved in having to shut some chapters

20  down?

21  A    Absolutely.

22  Q    Why would you do that?

23  A    Look, it's a -- you're adults, and it was a

24  responsibility.  And as an organization, we had zero

25  tolerance.  And so when I came on board, having had the law

                              387

1  enforcement background, zero tolerance was zero tolerance.

2  And if you were going to do bad things that put yourself or

3  other people in jeopardy, we didn't have time for it, and we

4  closed the chapter.

5  Q    Did you have real-life experience in knowing there's a

6  difference between having something in writing and calling it

7  a compliance guide or a policy and then actually having it, in

8  effect, in front of people?

9  A    Yeah, absolutely.  So many times -- and this, in my

10  opinion, was the number one thing that college students would

11  do would be to sign everything without reading it or truly

12  understand it.  Something I'm guilty of too.

13           But at the end of the day, part of our job was to

14  help educate them on the policies, the rules, and good

15  behavior, citizenship, right?

16  Q    And did -- when -- did there come a time when you made a

17  decision to leave that organization?

18  A    Yes.

19  Q    Did you reflect back and decide in your mind if you were

20  able to effectuate any change or accomplish any of your goals?

21  A    Yes.  I was really proud that in the first three years

22  of working for that organization -- at the height of

23  misconduct for our organization, my organization, in the first

24  three years, we reduced misconduct by 90 percent.

25  Q    90?

388

```
 1    A    90 percent.  And also at the same time reduced
 2   recidivism of those chapters reengaging back in poor behavior.
 3    Q    And did -- and so that -- that would have been what year
 4   that you would have left now?
 5    A    So I started with my current organization in February of
 6   this year.
 7    Q    And in February of this year, where -- what's your
 8   current organization?
 9    A    So I'm the executive director of Mothers Against Drunk
10   Driving.
11    Q    And where are you located at?
12    A    I live here in Kansas City north -- I always do that.  I
13   live in -- north of the river in Gladstone, which is not
14   Kansas City.  It's Gladstone.
15    Q    And why did you decide to move back to Kansas City and
16   take this job?
17    A    Number one, I was -- I'm from here, and, number two, all
18   of my family lives here.  So I had lived away from my family
19   for 20-plus years, and I wanted to come back.
20    Q    So you live north of the river up in Gladstone now?
21    A    I do.
22    Q    What do you do with Mothers Against Drunk Drivers?
23    A    So we focus on -- so I have a -- the heartland region,
24   and we have Missouri, Kansas, Oklahoma, and Arkansas.
25   Predominantly our number one mission is to work with victims
```
                                389

1  and survivors of impaired driving crashes that are most of the

 2  time fatality based.

 3          And so we provide services when court services for

 4  advocacy stop.  We continue for life, and we also do underage

 5  drinking prevention education in our schools in the community

 6  and do other advocacy work in Jefferson City and state

 7  capitals across our region.

 8  Q    Now, as a patrol officer in St. Louis, did you ever

 9  have -- did you personally witness the horrific nature of some

10  drunk driving accidents and problems that happened there?

11  A    Yes.  I absolutely saw crashes that were alcohol or drug

12  related, but also saw the effects of alcohol and drugs on

13  youth.  And so seeing what -- the work that could be done, for

14  me, again, a purpose to do something was to come and work for

15  an organization that really wanted to make change.

16  Q    And on an average year now in the position you were in,

17  what -- tell the jury the type of people that you have contact

18  with and throughout the state of Missouri, for example.  What

19  is involved?

20  A    Yeah.  In Missouri, this year, we will probably service

21  around 250 families that have been affected by drunk or drug

22  driving fatalities, and that also includes survivors of

23  crashes.  And we'll also this year -- Missouri is number one

24  in the nation now for underage drinking prevention reaching

25  the most students, and so we're very proud of that.

                              390

```
 1              So we'll reach approximately 5,000 students in
 2    Missouri over the year.
 3     Q    Were you able to take some of the lessons you learned
 4    from your work in the fraternity and come and help apply that
 5    with Mothers Against Drunk Drivers in your educational
 6    programs?
 7     A    Absolutely.  I think -- I firmly believe that abstinence
 8    and complete eradication of alcohol, right, so no drinking
 9    doesn't work.  We have to talk about the effects of and how
10    that decision-making process -- most kids under the age of 13
11    have a negative view of alcohol.  So it's nice to be able to
12    work with students again.
13     Q    I want to thank you for going through that background
14    because I'm going to tie it directly into this case as we talk
15    about your home here.
16              Before we get into the details of this, did there
17    come a time where you were -- had the opportunity to step up
18    as a representative of the class that involves over 265,000
19    homebuyers -- or I'm sorry.  Strike that.
20              Did you have an opportunity to step up as a
21    representative of the class that involves over 265,000 home
22    sellers, the sellers of homes, and to be their voice to this
23    jury in this courtroom?
24     A    I did, yes.
25     Q    And why did you decide to get involved in that and to
```

```
 1   sit through a day-long deposition and all the discovery and

 2   all the -- nothing wrong with that.  I'm not suggesting they

 3   did anything wrong.  I did the same thing to their witnesses.

 4            But you knew you were stepping into a court process.

 5   A    Yeah.

 6   Q    Why did you decide to do that?

 7   A    After my first experience selling a home, you know, I

 8   was exposed for the first time to the way that it works, and I

 9   didn't think necessarily that it was fair.  And so when I

10   learned more about it, I had heard through a friend about the

11   case and offered to be a part of it.

12   Q    One of the attorneys who knows me in Kansas City is

13   somebody who -- that you knew from growing up.  Is that a fair

14   statement?

15   A    Yes.  Yes, sir.

16   Q    I'm going to show you now, going back to this

17   photograph, this -- but before that happened, I'd never even

18   had a chance to meet you before you got involved as a class

19   representative, had I?

20   A    No, no.

21   Q    2216, this home, tell the jury about your decision to

22   purchase this home that's at issue in this case.

23   A    So I had never bought a home before.  When I moved to

24   St. Louis, I lived with a friend until I got into the police

25   academy, and then was asked to be a neighborhood officer
```

                                  392

```
 1   living in apartments that was there for the community and
 2   decided it was time for me to be -- to try to be a homeowner,
 3   which I had never done before.  So I started looking and
 4   ultimately found this house.
 5   Q    And you ended up purchasing that home in -- I don't have
 6   the exact date here.  You ended up purchasing that home in
 7   2006; is that correct?  Let me see.  The date for that would
 8   be --
 9   A    It would be 2012.
10   Q    2012.  Thank you for correcting me.
11        You ended up purchasing this home in 2012?
12   A    Yes.
13        MR. KETCHMARK:  I'm going to move Exhibit No. 3619
14   into evidence.
15        MR. MacGILL:  No objection.
16        THE COURT:  Admitted.
17   Q    (BY MR. KETCHMARK)  One of the things that the lawyers
18   for the defendants talked about during opening statements --
19   stood here and talked about cash-strapped buyers, and how if
20   we didn't have the system that you're part of bringing a
21   challenge to in this case, meaning that homeowners have to pay
22   the buyer's commission; that that's a cash-strapped buyer, and
23   all these buyers won't be able to buy anything.  I'm going to
24   represent that to you.  You weren't here for that, but you
25   understand that that's happened in this case, correct?
```
393

```
1    A    Yes.

2    Q    Can you tell the jury -- we don't have to have an

3    example of a cash-strapped buyer.  Were you a cash-strapped

4    buyer when you went to buy a house?

5    A    Yes, I was.

6    Q    And obviously working very hard and making a lot of

7    money, but how much were you making as a police officer in

8    St. Louis?

9    A    Yeah, without overtime I was bringing in about $40,000 a

10   year, and worked overtime as I needed to do yardwork or things

11   of that nature.

12   Q    And did you learn with this Exhibit No. 3619, which has

13   now been moved into evidence -- we see across the top of it

14   that there is a potential borrower's application affidavit.

15   Do you see that?

16   A    I do, yes.

17   Q    And it's listed there the sales contract price for your

18   home that you were purchasing.  You see that?

19   A    Yes.

20   Q    And it talks down here about amount of requirements,

21   that you had a purchase limit.  And what we're about ready to

22   talk about:  You could have actually purchased a home all the

23   way up to a quarter of a million dollars if you had so chosen;

24   is that correct?

25   A    Yes, that's true.
```
394

```
 1    Q    Then there was an income limit for what we're going to
 2  talk about for this application of $70,400, correct?
 3    A    That's right.
 4    Q    So it means if you had been making all the way up to
 5  $70,000, you could have filed this application and received
 6  the funding we're about ready to talk about.  Is that a fair
 7  statement?
 8    A    It is, yes.
 9    Q    Before we get into the specifics of what this is --
10  because there was no mention of this to the jury when they
11  brought up cash-strapped buyers.  I want you to talk about
12  this.  Can you tell the jury what this Exhibit 3619 is?
13    A    Yes.  So this is my application to what's called
14  First-Time Homebuyers Program in Missouri, which --
15    Q    It's called the Missouri First-Time Homebuyers Program,
16  correct?
17    A    Yes.  Thank you.
18    Q    And it's still in existence today, correct?
19    A    It is, yes.
20    Q    How did you learn about this Missouri First-Time
21  Homebuyers Program?
22    A    Yeah.  I definitely had not heard about it until I asked
23  my partner at work about buying a home.  He had bought a home,
24  and he said, you know, this -- there is a program out there
25   for first-time homebuyers, and that's when I looked into it
```
395

1    and started looking for a home.

2    Q     One of the guys you were riding around in the patrol car

3    started talking about how he bought his home?

4    A     Yes.

5    Q     Did any real estate agents ever tell you about that

6    program?

7    A     Prior to then, no.

8    Q     And so tell the jury, explain what this Missouri

9    First-time Homebuyers Program, which is a part of the Missouri

10   Housing Development Commission in the state of Missouri, tell

11   them how it works, what the deal is.

12   A     So the -- if you apply for the program and you make

13   under a certain salary, then you're -- and you commit to

14   living in your house for a period of time, then you don't have

15   to pay back the percent that you're given.

16   Q     And the salary, what we had listed there was under

17   $70,000 for a single person.  And if it was a couple or a

18   married couple, a household income, it could be even higher?

19   A     I believe so, yes.

20   Q     So in your case, if it was under $70,000, you apply, you

21   can receive this -- is it effectively a grant that you don't

22   have to pay back?

23   A     Yes.  Grant's a good way to put it.  Yeah, you don't

24   have to pay it back, and it's your money that you can use

25   towards the house.

                                      396

```
 1   Q    So as the state of Missouri, the Missouri Housing
 2   Development Commission and our state has made a decision for
 3   cash-strapped buyers, we're not going to leave it to the real
 4   estate industry to take care of them; that we as Missourians
 5   are going to make programs like this available?  Is that kind
 6   of how the --
 7            MR. MacGILL:  Objection, leading.
 8            THE COURT:  Sustained.
 9   Q    (BY MR. KETCHMARK)  How is your understanding of how
10   this program was working and why it was working there for you?
11   A    Yeah.  It was an opportunity to -- you know, I saved
12   money for a down payment or had money available that I had
13   saved up.  But this was to help me get a lower monthly
14   payment, and that's what I worried about, was the monthly
15   payment.  So using this that I didn't have to pay back, and I
16   knew I was going to stay in the house for a period of time, it
17   really helped.
18   Q    And in this case, you were approved and received 3.6
19   percent of the amount of the -- the amount of the mortgage --
20   or, I'm sorry, the sales price, that they just gave that to
21   you as a grant?
22   A    Yes, that's right.
23   Q    Now, under the rules, you -- did you read the rules?
24   You're familiar with the rules at the time you went through
25   that process for the first-time homebuyers?
```
397

1   A    I'm sure I read it.  I knew the one rule to stick to was

2   you had to stay in the house for, I believe, two years.

3   Q    And could you use that money when it was given?  So

4   let's say you have a $200,000 house, and you get 4 percent of

5   that $8,000.  Under your understanding at the time when you

6   received this, could you have used that for anything you

7   wanted to related to the house at the time?

8   A    Yes.

9   Q    Could you have used it to try to lower your monthly

10  payment like you did?

11  A    Yes.

12  Q    Could you use it for improvements on the house if you so

13  chose?

14  A    Yes.

15  Q    Could you have used it to negotiate in the fair

16  marketplace for a buyer -- to pay a buyer's commission if the

17  sellers weren't forced to pay it?

18  A    Yes.

19  Q    Now, when you bought that house, you -- did you find

20  that house on your own?

21  A    No.  I -- I'm sorry.  I found it on my own in a list.

22  Every time that I saw a house that I wanted to look at, I

23  would send it to Greg.

24  Q    To who?

25  A    To Greg.  Greg was my agent.

                          398

```
 1   Q    So how would you find the list that you would send to
 2   the agent you were working with?  How would you find it?
 3   A    Primarily on the internet, looking for homes that fit my
 4   criteria, like on Zillow.
 5   Q    So you'd go on Zillow, find a home and send it to the
 6   agent who was working with you?
 7   A    Yes.
 8   Q    Now, if you had been told as part of that process that
 9   you had to pay for -- I'm sorry.  I'm a last name guy in
10   court.  So Greg's last name?
11   A    Harwood.
12   Q    Mr. Harwood.  If you had been told that you were
13   required to pay Mr. Harwood, would you use some of that money
14   to cut a deal with him as to how much he was to be paid for
15   his services?
16   A    I could have, yes.
17   Q    And that's something that, I mean, you would have been
18   able and willing to do, correct?
19   A    Yes.
20   Q    And would it ever have been in your mind, because you
21   went through this, that the services you received would have
22   ever been 3 percent of the value of that or --
23   A    No.  I think I probably would have -- I'd like to think
24   I would have gone 1 and a half to save some of that money and
25   put it down; but, yeah.
                              399
```

```
 1   Q    Now, the fact of the matter is that you received that
 2   money and you had that money, you could use it the way you
 3   want, and that's how that worked.
 4   A    Right.
 5   Q    Did you stay in the house long enough where you never
 6   even had to pay it back?
 7   A    I did.
 8   Q    Did you at some point in time come make a decision to
 9   sell that home?
10   A    Yes, yeah.
11   Q    And is that when you took the new job?
12   A    Took the new job in Iowa City and moved in January of
13   2017.
14   Q    And I'm going to show you what's been marked as the
15   listing contract I showed counsel.  2216.
16           MR. KETCHMARK:  I'm going to move into evidence
17   2216.
18           MR. MacGILL:  No objection, Your Honor.
19           THE COURT:  Admitted.
20   Q    (BY MR. KETCHMARK)  Do you see that, Mr. Breit, as the
21   listing contract for this particular home in St. Louis?
22   A    Yes, yep.
23   Q    And do you see here where it says that this realtor's
24   commission was 5.5 percent?  Do you see that?
25   A    Yes, I do.
```

400

```
 1              THE COURT:  Let me pause you real quick.  That was
 2    2211.
 3              MR. KETCHMARK:  I'm sorry.  2211.
 4              THE COURT:  Any opposition to 2211, the listing --
 5              MR. KETCHMARK:  I said 2216.  I misspoke.  Sorry.
 6    It's already been stipulated to as admissible.
 7              Thank you for correcting me, Your Honor.
 8              MR. MacGILL:  2211 is correct.  No objection.
 9              THE COURT:  Admitted.
10    Q    (BY MR. KETCHMARK)  2211.
11              MR. KETCHMARK:  Thank you for catching that, Your
12    Honor.  My mistake.
13    Q    (BY MR. KETCHMARK)  2211.  Is this the listing contract
14    that you entered into for the sale of your home in St. Louis?
15    A    It is.
16    Q    And does it show the sales price?
17    A    Yes, 149,9.
18    Q    And it indicates that a price that you would pay if
19    there wasn't a buyer's agent, if it was just sold by the
20    listing agent and they used one of their own agents, you would
21    pay -- on the buyer's side, you would pay 4 percent.  Do you
22    see that?
23    A    Yes.
24    Q    But if you were to pay -- if they ultimately, as they
25    did here, and there was going to be a buyer's agent involved,
                                401
```

1    that you would -- that you would pay 5.5, correct?

2    A    Yes, that's correct.

3    Q    And on page 3 under here, first we see the realtor,

4    which is the -- the jury has heard in this case, that's the

5    National Association of Realtors' trademark, that this

6    National Association of Realtors that you were working with

7    was going to cooperate and compensate the buyer's agent; and

8    that as part of that, did you agree that you were to pay the

9    buyer's agent 2.7 percent?

10    A    Yes.

11            MR. KETCHMARK:  Going to move 2212, I believe, has

12    been stipulated in.  Settlement statement.

13            MR. MacGILL:  No objection.

14            THE COURT:  Admitted.

15    Q    (BY MR. KETCHMARK)  I'm going to show you Exhibit 2212,

16    the settlement statement for the sale of this home.  Do you

17    see that?

18    A    Yes, yep.

19    Q    And on the second page of this, it shows -- excuse me.

20    The first page we looked at, it shows your sales price of

21    $149,900.  Do you see that?

22    A    Yes.

23    Q    And on the next page, it shows the commissions that you

24    ended up paying -- you worked with a RE/MAX agent; is that

25    true?

                              402

```
 1   A    Yes, that's right.

 2   Q    It shows the commissions that you paid the RE/MAX agent,

 3   which included a fee, and then it shows the payment to the

 4   other group, correct?

 5   A    Yes.

 6   Q    The -- when you look at the -- that's just the

 7   commission.  When it shows under the commissions the total

 8   commissions that were paid, the amount of commissions paid to

 9   RE/MAX was $49,946.70 that you would have paid -- I'm sorry.

10   Misspoke.

11        The commissions that you paid to RE/MAX was

12   $4,946.70, correct?

13   A    Yes.

14   Q    The commission that you would have paid to the buyer's

15   agent under this agreement was $4,047.30; is that correct?

16   A    Yes.

17   Q    When you add the two of those together, I'll do it right

18   now --

19        MR. KETCHMARK:  Doublecheck my math, Mr. Fadler.

20   Q    (BY MR. KETCHMARK) -- is $8,994.  I'll represent that to

21   you, okay, sir?

22   A    Yes.

23   Q    When you take that as a percentage of the sales price,

24   when you got involved in this case and we met, I did that for

25   you; did I not?
```

403

```
 1    A    Yes.

 2    Q    And I showed you that despite the fact that RE/MAX

 3   signed a contract with you saying they were going to charge

 4   you -- and let's go back and look at that contract -- that

 5   they were going to charge you 5.5 percent in commission.  You

 6   see that?

 7    A    Yep, yes.

 8    Q    When I did the math on how much $8,994 is of the sales

 9   price of $149,900, and I'll do it right here.  I just did the

10   math.  What percent did RE/MAX charge you?

11    A    6 percent.

12    Q    And you didn't know that until after you became a class

13   representative in this matter, did you?

14    A    No, I didn't.

15    Q    How did that make you feel when you learned that?

16    A    It made me feel stupid.

17    Q    When you signed that contract with RE/MAX, the one that

18   we're looking at here, there's been a lot of talk in this case

19   about negotiations, and you can negotiate your choices in all

20   of these different things.  I want to ask you about that.

21            MR. MacGILL:  I object, Your Honor.  Counsel's

22   statement.  I'd ask to strike counsel's statement from the

23   record.

24            THE COURT:  What basis?

25            MR. MacGILL:  I'm sorry?
```

404

```
 1           THE COURT:  What basis?

 2           MR. MacGILL:  It's a counsel comment, not a

 3  question.

 4           THE COURT:  Ask a question.

 5  Q    (BY MR. KETCHMARK)  My question to you is, when I show

 6  you here the signature on this, do you see -- do you see this?

 7  A    Yes.

 8  Q    When you signed these documents in this case, is that

 9  what's called a Docusign?

10  A    Yes.  That's a Docusigned signature, yeah.

11  Q    And explain to the jury just for the record what

12  Docusign means and what that is.

13  A    So Docusign is where they send you the electronic

14  contract, and you click start at the top, and it takes you to

15  where you sign.  And you just click to sign.  It rolls through

16  the document to the signature lines.

17  Q    And did you have any kind of negotiation on what these

18  fees were or how you were going to do any of that?

19  A    The -- originally Greg Harwood, Mr. Harwood, gave a

20  first responder discount to first responders, and that was the

21  5 and a half percent.

22  Q    But how about the rest of it?  Is that something you

23  thought you could have a voice in or negotiation in or --

24  A    Oh, no.  It was preloaded on the contract, and I thought

25  I was signing what I had to sign.
```
                                    405

```
 1   Q    Now, in fairness to -- I forgot Greg's last name.

 2   A    Harwood.

 3   Q    Mr. Harwood.  In fairness to Mr. Harwood, they're

 4   usually used to charging people 6 percent.  I'm not suggesting

 5   he did anything nefarious or wrong.  But the point was, is

 6   that you didn't even get the contracted amount.  Is that a

 7   fair statement?

 8   A    That's right.

 9   Q    And why did you decide to get involved in this as a

10   class representative for people who have -- RE/MAX clients,

11   the folks that we're representing as part of this, home

12   sellers for RE/MAX?

13   A    Yeah.  I still don't see the fairness in paying the

14   commission for somebody you're never going to meet or that

15   never works for you in any way.  I don't -- I don't think it's

16   fair.

17        MR. KETCHMARK:  Thank you.  I have no further

18   questions.

19   CROSS-EXAMINATION BY MR. MacGILL:

20   Q    Good morning, sir.

21   A    Good morning.

22   Q    Sir, I'm Rob MacGill.  I represent HomeServices of

23   America and two separate companies, one called BHH and one

24   called HSF.

25             So I have a few questions.  I want to see if I can't
```

```
 1   get a little more detail on some of your real estate-related
 2   activities here this morning.
 3          If you don't mind, I'm going to hand you a binder
 4   with a few documents in it that I may be asking you about.  So
 5   I'm going to hand this up to you.  I've given Mr. Ketchmark a
 6   copy of this binder previously.
 7   A    Okay.
 8          MR. KETCHMARK:  And for the sake of efficiency, we
 9   have no objection to any of the -- we'll stipulate to the
10   admissibility of all these documents you want to use,
11   Mr. MacGill.
12          MR. MacGILL:  Thank you.
13   Q    (BY MR. MACGILL)  So, sir, what I'd like to do is go
14   back to the year 2012, and that's the year that you -- you
15   purchased the property at French Court; is that right?
16   A    Yes.
17   Q    And with respect to that, you were -- you know, just to
18   be adding one detail here, you, of course, were the buyer in
19   that case.  You were needing to put the money up to make a
20   purchase; fair statement?
21   A    Correct.
22   Q    And with respect to this home buying process, you were
23   new to it at that time; is that fair?
24   A    Yes.
25   Q    All right.  And is it fair to say that as you began that
```
                                   407

```
 1   process, that you were looking at the need to make sure that

 2   you, for your part, could afford the down payment?

 3    A    Yeah, definitely a part of that process.

 4    Q    And as you looked to purchasing a home, was that

 5   something that was of concern to you, to make sure you would

 6   have that down payment?

 7    A    Yes.  I had been working to try to save money and was

 8   trying to repair my credit and try to be a good buyer and --

 9   yeah.

10    Q    And like many buyers in a situation such as yours, did

11   you look, at least in general terms, as a down payment as

12   potentially a significant hurdle to becoming a homeowner?

13    A    It was a challenge.  I definitely -- it was a goal.

14    Q    Now, is -- in terms of looking to make the purchase that

15   you did, as you looked to make the purchase at French Court,

16   if you were required to put a 20-percent down payment on a

17   $129,000 purchase price, did you have sufficient funds at that

18   time available to you, based on your work history at that

19   time, to make that down payment?

20    A    Probably not all of the 20 percent.  I probably would

21   have had to hold off and keep saving.

22    Q    And so this is one of the reasons that you went to

23   the -- to get the additional assistance and -- that

24   Mr. Ketchmark asked you about, fair?  Is that fair?

25    A    Yes.
                              408
```

```
 1   Q    Okay.  Now, with respect to -- did you decide, as you
 2   were looking to make this purchase, to hire a broker?
 3   A    I did.
 4   Q    All right.  And was this a gentleman by the name of Greg
 5   Harwood?
 6   A    Yes, that --
 7   Q    And Mr. Harwood, he began the process early on to help
 8   you find a home?
 9   A    He did.
10   Q    And what entity did he work for, sir?
11   A    I believe he worked for RE/MAX.
12   Q    Is the name RE/MAX Results a name that's familiar to
13   you?
14   A    Yes.  I think that's it, yes.
15   Q    Now, Mr. Ketchmark had asked you about a settlement
16   statement, and we're going to talk about it in a few minutes.
17   But RE/MAX Results was listed on that settlement statement,
18   wasn't it?  Do you remember?
19   A    I believe so.
20   Q    Okay.  Fair enough.
21           Now, when you hired Mr. Harwood, had you relied on a
22   recommendation of a friend in terms of making the choice of
23   him to be your representative?
24   A    I did.  It was -- my partner at work, it was his dad.
25   Q    Sir, what I'd like to do is turn to the process of
```

409

```
 1   engaging Mr. Harwood.  And at Tab 1, I've got a paper copy for

 2   you of one of the exhibits that's already been introduced

 3   here, and this is Trial Exhibit 3615.  Do you have that in

 4   front of you now?

 5   A    Yes.

 6   Q    All right.  And if I could, we can pull this up on the

 7   screen.  This is the buyer's exclusive limited agency

 8   employment contract that you signed in 2012; is that right?

 9   A    Yes.

10   Q    And this was the contract through which you got

11   Mr. Harwood to work on your behalf; is that correct?

12   A    Yes.

13   Q    Okay.

14          THE COURT:  3615 is admitted.

15   Q    (BY MR. MACGILL)  Sir, and you see the signature here.

16   You see Greg Harwood's name.  Is that your hand signature

17   there on August 1st, 2012?

18   A    It is.

19   Q    And with respect to brokerage fees, do you see the

20   reference here on brokerage fee?

21   A    Yes.

22   Q    Now, sir, just looking at this part of the contract,

23   just to make sure we're understanding the context, this was

24   where you were hiring somebody to represent you in your role

25   as a potential buyer; is that right?
```

```
 1   A    That's correct.

 2   Q    And did you understand that there was going to be a

 3   process of cooperative compensation in this transaction in the

 4   sense that if compensation was offered by the seller or the

 5   listing company, that your realtor would accept that

 6   compensation?

 7   A    Yes.

 8   Q    And just if you don't mind, I'd like to just show you or

 9   call out to you the language of the contract that confirms

10   what you just testified to, doesn't it, that you agreed for

11   your part relative to paying Mr. Harwood and his firm, that if

12   compensation is offered by the seller or the listing company,

13   realtor shall accept that compensation?  Agreed?

14   A    Yes, that's what it says.

15   Q    And that's part of what you agreed to at the time; is

16   that right?

17   A    Yes.

18   Q    Now, with respect to the -- one of the details that

19   Mr. Ketchmark asked you about was the down payment assistance

20   program.  You remember that line of testimony?

21   A    Yes, sir.

22   Q    And specifically it was Mr. Harwood that introduced you

23   to that concept; is that right?

24   A    I think at first his son Aaron did, but then, yes, we

25   absolutely talked about it with Greg, and that's how I got the
```
411

```
 1   application.

 2   Q    Okay.  So it was Mr. Harwood that actually had

 3   introduced that concept to you and his son?

 4   A    Yes, yeah.

 5   Q    And based on that advice and based on that series of

 6   conversations, you were able to gain the benefits associated

 7   with that program, right?

 8   A    Yes.  Greg was super nice, yeah.

 9   Q    All right.  When you signed this particular contract,

10   did you understand, sir, for -- this was a legally binding

11   contract that you entered into with this company?

12   A    Yes.

13   Q    And did you know that Mr. Harwood, as the

14   representative, you as the buyer, was not going to be working

15   for free?

16   A    Yes.

17   Q    Okay.  And Mr. Harwood himself never told you at any

18   time, I take it, that he was going to work for free; fair

19   statement?

20   A    Fair statement.

21   Q    Now, did you understand in this transaction that

22   Mr. Breit, his firm, was going to be paid out of the purchase

23   price of the home?

24   A    Can you say that one more time?

25   Q    I'm sorry.  Did you understand Mr. Harwood and his firm
```
412

1    were going to be paid out of the purchase price of the home?

2    A    Yeah.  The seller would have to pay that.

3    Q    Okay.  And with respect to just being a little bit more

4    specific about this agreement, did you understand specifically

5    that Mr. Harwood would receive some portion of those

6    commissions that are called for by the sales agreement?

7    A    Yes.

8    Q    All right.  And, in fact, when we look at those

9    commissions, some portion of those commissions being

10   allocated, that's exactly what that settlement statement said

11   in terms of what Mr. Ketchmark asked you about, right?  It

12   showed that specific form of payment?

13   A    Oh, yes.

14   Q    Okay.  So I want to ask you a few questions about how

15   you relied, if at all, on the buyer agents here in connection

16   with this particular purchase.

17            You, yourself, had no prior experience in purchasing

18   a home; is that fair?

19   A    That's fair.

20   Q    And like all first-time homeowners, this is a big

21   purchase for you personally, correct?

22   A    Yes.  It was -- yes.

23   Q    Now, as a first-time buyer, was the home buying process

24   itself a little bit of a mystery to you in terms of what

25   needed to be done?

                              413

```
 1   A     Yeah, yes.  Absolutely.  I mean, I didn't know anything
 2   about it.
 3   Q     And like all home -- like all first-time buyers, is it
 4   fair also to confirm to the jury here that buying a house is a
 5   lot of money to spend on any one particular item?  Fair
 6   statement?
 7   A     Yes, fair statement.
 8   Q     Now, as you relied on -- so you were relying on
 9   Mr. Harwood to give you good advice about this purchase; is
10   that fair?
11   A     Yes.
12   Q     And were you concerned yourself that you wanted to be
13   sure you made a good decision on which particular house to
14   purchase, right?
15   A     Yes.
16   Q     You wanted to be in a good neighborhood?
17   A     Yes.
18   Q     You didn't, of course, want to make any mistake on a
19   purchase?
20   A     I -- that was the goal.
21   Q     And then relative to these goals that you had, you
22   certainly, during this process with respect to this particular
23   home, you were going to rely on Mr. Harwood from beginning to
24   end to help you through that home buying process, right?
25   A     Yes, correct.
```

414

```
 1   Q    And looking back, did you -- do you value the advice
 2   that he gave you in connection with that first purchase?
 3   A    Yeah.  I valued Greg.
 4   Q    And did he -- he helped you get through the process
 5   of --
 6   A    He did.
 7   Q    Okay.  Now, as you sit here today, did you look at the
 8   purchase of this home with the assistance of Mr. Harwood as
 9   something that was a successful transaction for you
10   personally?
11   A    Yes.
12   Q    You were happy with the services Mr. Harwood gave you?
13   A    I was happy with Greg.  Like I said earlier, I had to
14   find a lot of the houses.  I think in some of my emails, I had
15   to list 10 or 15 properties for him to then either show me or
16   tell me no, but I was -- but, yes, I liked Greg.
17   Q    And you liked him well enough and you had good enough
18   service for him -- from him that you hired him again --
19   A    Yes.
20   Q    -- in the future?  Okay.
21   A    Yeah.
22   Q    Now, I want to ask about what you and Mr. Harwood did in
23   terms of looking for homes before you bought this home.  Is it
24   fair to say that you didn't just look at one or two or three,
25   but you looked at dozens of homes with Mr. Harwood?
```
415

1    A    I don't know about dozens.  I don't recall, but, yes, we

2   looked at, you know, the list that I would email him.  I would

3   like to look at these houses, yeah.

4    Q    And did you have -- we may get into this with some of

5   the documents in a minute, but is it fair to say that you

6   communicated extensively with Mr. Harwood as you were making

7   this decision to purchase?

8    A    Yeah.  Yes, correct.

9    Q    In your own words I think you've described you sent a

10  lot of emails in connection with this first purchase; is that

11  fair?

12   A    Yes.  It was a good thing I knew his son.

13   Q    And first -- as a first-time purchaser, you had a lot of

14  phone conversations and a lot of in-person meetings, right?

15   A    I would probably say we talked on the phone.  I think we

16  only met when we were looking at a house.

17   Q    Okay.  Now, just to focus on how long you worked with

18  Mr. Harwood, you worked with Mr. Harwood in relation to this

19  particular purpose -- purchase for between eight and ten

20  months; did you not?

21   A    I think that's right.

22   Q    As Mr. Harwood assisted you during this eight- or

23  ten-month period, do you know that he was not being paid at

24  that time and would not be paid unless and until there was a

25  purchase that was made?

                              416

```
 1   A    Yes.  Yep.

 2   Q    Sir, have you heard, in the context of your role as a

 3   class representative, of a concept called "steering"?

 4   A    Yeah.  Once, maybe twice, but, yes.

 5   Q    Do you have at least a general understanding in the

 6   context of this lawsuit of this concept of steering?

 7   A    Somewhat.

 8   Q    All right.  Based on that understanding, at least to

 9   some degree, do you have any evidence that steering took place

10   in connection with your purchase of this particular

11   transaction?

12   A    I don't have any evidence.

13   Q    Do you have any information to suggest that Mr. Harwood

14   for his part as your representative was trying to direct you

15   to a home that would pay him more as opposed to finding

16   something that you wanted?

17   A    No.

18   Q    Sir, I want to now turn to a second transaction that you

19   were involved with in this real estate context, and

20   specifically I'd like to turn to the sale of the French Court

21   home.  And that was the sale that occurred in what year, sir?

22   A    2017, January, I believe.

23   Q    All right.  And I'm going to refer you to --

24   Mr. Ketchmark and you identified Exhibit 2211, which is the

25   listing contract associated with that home, and I'll refer to
```

417

```
 1    that in a minute.
 2           But before we get to the contract itself, I'd like
 3    to have the jury and the court understand a little bit more
 4    about your choice of an agent to sell your home.  Do you know
 5    what I'm referring to?  Who you chose --
 6    A     Oh, sure, yeah.
 7    Q     -- to list your home?
 8    A     Sure.
 9    Q     So is it fair to say that you decided yourself, as you
10    began the process of wanting to sell the French Court home,
11    that you were -- you didn't consider selling the home without
12    a broker?
13    A     No.
14    Q     Okay.  You wanted a broker?
15    A     Yeah.  I didn't think you could -- I didn't think for
16    sale by owner would work.  But, yeah, and I'd known Greg,
17    yeah.
18    Q     Okay.  In fairness, due to all the circumstances that
19    you were facing at the time, you were -- personally were under
20    some time pressures to get the home sold; is that fair?
21    A     Yes, absolutely.
22    Q     And you didn't want to be renting in Iowa at the same
23    time you were still paying for ownership costs back in the
24    city of St. Louis; is that fair?
25    A     Yes.
```

418

```
 1   Q    So all things considered, one of your goals as you
 2   looked to hire a broker to assist you in the sale of French
 3   Court was you wanted to do what you could to sell that house
 4   and to do it quickly?
 5   A    Yes.
 6   Q    Okay.
 7   A    Yep.
 8   Q    Mr. Ketchmark gave a good series of questions to you
 9   about all of the things you've been doing and all of the
10   things you've been accomplishing.  It's fair to say at the
11   time that you were selling your house, you were a very busy
12   man; is that right?
13   A    Yes.  I was packing and trying to figure out when to
14   move to Iowa and -- yeah.
15   Q    And one of the reasons that you went to a broker, a
16   full-service broker to sell your house at French Court was you
17   didn't, for your part, want to spend your own time trying to
18   figure out the home sale process?
19   A    That's accurate, yeah.
20   Q    And it's accurate because you had a good agent that you
21   could work with who was going to give you full service in
22   connection with this effort; fair statement?
23   A    That's fair.  I liked Greg.
24   Q    When you made the decision that you have now been
25   describing to sell the French Court home, for your part, you
                                419
```

1  did not give any consideration to how much you would have to

2  pay in commissions to list the home; is that fair?

3  A    Correct.

4  Q    Okay.  And, in fact, commissions, they were not -- let

5  me restate.

6        The amount of commission was not one of the things

7  that was at the top of your mind when you went through the

8  decision of the sales process here?

9  A    I mean, I think it may not have been the first priority,

10 but certainly it's money out of my pocket.  So, I mean, I'm

11 sure I thought about it.

12 Q    But -- fair statement.  So it's fair to say, again, you

13 had many things to consider, but the commission was not one of

14 the things at the top of your mind as you were deciding to

15 hire or not hire this broker; fair?

16 A    It wasn't the top.

17 Q    Okay.  And then when you peel away all this background

18 and all these considerations that you were making in deciding

19 whether to hire a full-service broker or not, the most

20 important thing to you was to find a broker who was competent;

21 is that correct?

22 A    I didn't really -- there wasn't a finding, right?  It

23 was Greg.

24 Q    Fair comment then.  You knew that Mr. Harwood was

25 competent?

                              420

```
 1    A    Yes, yes.

 2    Q    And he was somebody that you knew by your own

 3    observations previously was good at his job?

 4    A    Yes.

 5    Q    And he was going to help you sell your house quickly

 6    as -- at least as you projected at the time?

 7    A    Yeah.  And for what I thought was, you know, a discount,

 8    yeah.  I did.

 9    Q    So one other consideration as you went back to

10    Mr. Harwood, you knew he was a full-service brokerage, right?

11    A    I'm not really sure what that means; but, yeah.  I mean,

12    he did everything.

13    Q    I'm sorry?

14    A    Greg did -- he was a buyer's agent; he was a seller's

15    agent.  I don't know what full service means.

16    Q    Okay.  Fair enough.  He was -- he worked at a brokerage;

17    fair enough?

18    A    Sure.

19    Q    You knew that?  You wanted somebody who would -- a

20    broker.  You wanted a broker who would maximize the purchase

21    price for you based on their skill and their experience?

22    A    Yes.

23    Q    Now, sir, I want to turn back to the listing agreement

24    which we had up a few minutes ago, and this is -- based on the

25    background that you've now just described to this court and to
                                  421
```

1    this jury, you entered into a listing agreement; did you not?

2    A    I did.

3    Q    And this is the exhibit --

4         MR. MacGILL:  If we could redisplay 2211, please.

5    Q    (BY MR. MACGILL) So this is the listing contract that

6    you entered into with Mr. Harwood and his agency; is that

7    correct?

8    A    Yes.

9    Q    All right.  Now, the terms -- did you have a commission

10   amount that you agreed to?

11   A    Yes.  It was 5 and a half percent.

12   Q    Okay.  And that's listed here on line 15:  Owner agrees

13   to pay said realtor a commission of 5.5 percent?

14   A    Yes.

15   Q    And that's part of what you agreed to.  You signed this

16   contract?

17   A    Yes.

18   Q    Okay.  Now, you mentioned in some of the background, and

19   Mr. Ketchmark asked you about it in terms of your teachings to

20   young people, to college students about responsibilities,

21   citizenship, those kinds of things.  Do you recall that line

22   of testimony?

23   A    I do.

24   Q    And common parlance is one of the things you teach, is

25   essentially a deal is a deal?

                                422

1   A    I'm not sure I've ever taught that.

2   Q    Okay.  But being responsible citizens, something you've

3   taught in your work?

4   A    Yes.

5   Q    And also for your own part, you believe if you sign a

6   contract, you ought to abide by it if this is something you've

7   agreed to, right?

8   A    Me, yes, I believe that.

9   Q    And so for your part, you agreed to a commission of 5.5

10  percent; is that right?

11  A    Yes.

12  Q    All right.  Now, I want to follow up on negotiation for

13  a minute.

14        Mr. Harwood didn't tell you at any time that you

15  could not attempt to negotiate the terms of this agreement,

16  did he?

17  A    He never said those words, no.

18  Q    No one else told you.  No one else told you that you

19  were prohibited from attempting to negotiate the terms of this

20  agreement, did they?

21  A    No.

22  Q    And you, yourself, chose not to negotiate this

23  agreement -- the terms of this agreement, including the 5.5

24  percent commission, right?

25  A    Yeah.  You can't do what you -- you can't do what you

                              423

```
 1   don't know.  I mean, I -- correct, no, I didn't.
 2   Q    All right.  Well, let's look at lines 88 to 93 of this
 3   if we could.  I'm referring now to the owner authorizations.
 4         If we look at lines 88 to 93, do you see a part of
 5   this contract that you signed includes what's highlighted
 6   here, owner authorizes realtor?  Do you see that part, sir?
 7   A    Yes.
 8   Q    It continues to use all reasonable and recognized
 9   professional practices, including, but not limited to,
10   association and cooperation, in cooperation with other brokers
11   and the right to submit the property to any multiple listing
12   organization.  Do you see that?
13   A    Yes.
14   Q    All right.  So you chose to use a brokerage in
15   Mr. Harwood, right?
16   A    Yes.
17   Q    And then so now we see that you also chose and
18   contracted for specifically that there would be cooperation
19   with other brokers, another one of your decisions and
20   agreements, right?
21   A    Yes, that's in there.
22   Q    And if you don't mind, sir, I've got one more question
23   about this section.
24         And also as a part of the decisions that you made in
25   hiring this broker and in hiring -- and in authorizing
                              424
```

```
 1    cooperation, you also agreed that this -- that your property

 2    would be submitted to any multiple listing organization; is

 3    that right?

 4    A    Yes.

 5    Q    And at the time you signed the contract, you can confirm

 6    to the jury on your testimony, that you were comfortable

 7    hiring a broker; yes?

 8    A    Yes.

 9    Q    You were also comfortable that there was going to be

10    cooperation with other brokers, right?

11    A    Correct.

12    Q    You were also comfortable with this being a multiple

13    listing service.  Pardon me.  Let me state it better.

14         You were also comfortable and agreed that your

15    property would be or could be submitted to any multiple

16    listing organization; is that fair?

17    A    Yes.

18    Q    I want to ask you one more part of this.  You also --

19    you also authorized the -- at line -- I think it's 93.

20         You also authorized to offer the property to and pay

21    a portion of the commission to subagents, buyers' agents, dual

22    agents, and transaction brokers.  Do you see that, sir?

23    A    Yes.

24    Q    And so that was an agreement that you had made for your

25    part that, yes, that your brokerage could, in fact, pay a
```

425

```
 1   portion of their commission to subagents or buyers' agents,
 2   dual agents, et cetera; is that right?
 3    A    If that's what that means, sure.
 4    Q    Okay.  In fact, we'll go to the settlement statement in
 5   a minute.  But the settlement statement shows that this is
 6   exactly what happened, right?  Your broker paid -- made
 7   certain payments.  Remember that from the settlement
 8   statement?
 9    A    Where it showed that I paid a total of like $8,000?
10   Yes.
11    Q    The brokerage made payments.  Do you remember the lines
12   where it said the brokerage is to make these different
13   payments?
14    A    Sure.  It's still my money.
15    Q    Let me do this.  Let me show you the document.  Maybe
16   that would be easier.
17    A    Okay.
18    Q    Okay.  So this is -- these are the terms of the listing
19   agreement that you agreed to.  And you signed this and
20   intended to be bound by this in all respects; is that fair?
21    A    Yes.
22    Q    And to be a little more specific about the language that
23   we highlighted, I want to separate ourselves from the
24   agreement for a moment and talk with the jury and the court
25   here about your understanding at the time you signed this.
```
                              426

```
 1              It's fair to say that when you signed this listing

 2     agreement, you, sir, understood that the buyer's broker would

 3     also get paid a commission just like what had occurred back in

 4     2012 in your transaction, right?

 5     A    Yes.

 6     Q    Okay.  And you didn't complain at the time to

 7     Mr. Harwood about that?

 8     A    No.

 9     Q    And you signed this agreement, as you've said,

10     voluntarily?

11     A    Yes.

12     Q    All right.  Sir, I want to go to the multiple listing

13     service choice that you made.  We talked about that just a

14     minute ago.  But when you decided that, yes, you would

15     authorize the use of the -- not only the brokerage, but the

16     cooperative compensation and the MLS listing, did you

17     understand generally that that was going to make your property

18     available to more eyes and ears, so to speak?

19     A    I know that's what the MLS is, and that's the only way

20     to get it on the MLS.  I mean, I -- reading the document on

21     Docusign, I'm not sure I -- I did what it asked me to.  I

22     clicked and signed.

23     Q    Let me see if I can ask a better question.

24     A    Okay.

25     Q    When you listed your house, you wanted the listing to be
```

427

```
 1    disseminated amongst the brokers in St. Louis; is that fair?
 2    A    Yes.
 3    Q    And by using -- by authorizing the MLS, you knew that
 4    there was going to be dissemination on that MLS system there
 5    in St. Louis; is that fair?
 6    A    Yes.
 7    Q    And you wanted buyers, other buyers through the MLS to
 8    be able to find out that their house was, in fact -- that your
 9    house, I should say, was for sale?
10    A    Correct.
11    Q    When you closed on the French Court home, did you
12    understand there was going to be some commission paid to the
13    buyer's broker as a part of the closing process?
14    A    Yes.
15    Q    Okay.  And you signed off on that process -- this
16    closing process we just mentioned?
17    A    Yes.
18    Q    All right.  Now, we've covered two of your transactions.
19    One final transaction.  You recently purchased Omar Drive in
20    2021; is that right?
21    A    Yes.  In Indianapolis.
22    Q    And this purchase was made -- you said Indianapolis?
23    A    Yeah, Indianapolis, Indiana.
24    Q    You're near my area.  That's where I live, sir.
25              So the -- so that was some two years after this
                              428
```

Footer with reporter info and case details.

```
 1   complaint in this lawsuit was filed in April of 2019?

 2   A    When I purchased?

 3   Q    Yes, sir.

 4   A    Yes, I believe that's right.

 5   Q    All right.  And you purchased a home in Indianapolis,

 6   Indiana, on -- in November of 2021?

 7            MR. KETCHMARK:  Objection, Your Honor, relevance.

 8            THE COURT:  Overruled.

 9            You may ask.

10   Q    (BY MR. MACGILL)  You purchased a home in Indiana in

11   November 2021?

12   A    Yes, a townhouse.

13   Q    And, again, in connection with that purchase, did you

14   hire Mr. Brad Hamann of Hamann Sense, LLC?

15   A    Yes.

16   Q    And did he provide services to you as the buyer's agent,

17   sir?

18   A    Yes, he did.  I didn't know anything about Indianapolis.

19   So yes.

20   Q    All right.  So I'd like to talk about the services that

21   he provided to you in connection with the purchase on Omar

22   Drive.

23            I have in your binder there, sir, Exhibit 3077.

24   Could you take a look at that, sir?  I'm sorry, sir.  This is

25   Tab No. 4 in your binder.
```

                                    429

```
1    A    Yes.

2    Q    All right.  And do you -- if you wouldn't mind, would

3    you take a quick look at that and -- just to familiarize

4    yourself.  Is this, in fact, a chain of emails that was

5    between you and your buyer's agent in connection with the

6    purchase at Omar Drive?

7    A    Yes.

8    Q    All right.  If you don't mind, I'm going to put this in.

9             MR. MacGILL:  We'd offer into evidence 3077, Your

10   Honor.

11            THE COURT:  Any objections, Mr. Ketchmark?

12            MR. KETCHMARK:  I'm sorry.  I was talking to

13   Mr. Fadler.

14            THE COURT:  3077.

15            MR. KETCHMARK:  Is that one of the ones you showed

16   me?

17            MR. MacGILL:  Yes, sir.  It's Tab 4.

18            MR. KETCHMARK:  I have no objection to the ones you

19   showed me.

20            MR. MacGILL:  Tab 4.  It's Tab 4 in your binder.

21            MR. KETCHMARK:  Tab 4.  Okay.

22            No objection, Your Honor.  I'm sorry.

23   Q    (BY MR. MACGILL)  Okay.  So with respect to this, sir, I

24   want to focus for a minute just on the type of services that

25   you were provided now in your third real estate transaction
```

430

```
 1    involving the Omar Drive purchase.
 2              And I'd like to focus, if you wouldn't mind, on
 3    page 2 of Exhibit 3077.  And in Exhibit 2, you can see -- and
 4    we'll enlarge it here.  Did you -- did you write an email to
 5    your agent saying that you had put together a list of houses
 6    that piqued your interest?  Do you see that?
 7    A    Yes.
 8    Q    And this was 17 different properties that you were
 9    asking your agent to review?
10    A    Yes.
11    Q    And did he review them as you requested?
12    A    I think so, yes.
13    Q    All right.  And did Mr. -- did your buyer's agent in
14    that case also provide not only the analysis of these
15    different 17 properties to you, but did he also assist you
16    with a sample offer that you might consider for your part in
17    purchasing Omar Drive?
18    A    I don't -- I don't remember, but if --
19    Q    Don't remember?
20    A    -- yeah, I'm sure he did.
21    Q    All right.  Well, let me -- may I show you another
22    exhibit.  This is 3948.
23              MR. MacGILL:  Counsel, this is Tab No. 5.
24              MR. KETCHMARK:  I have no objection to any of these.
25              MR. MacGILL:  We'd offer 3948, Your Honor.
```
                                    431

```
 1          THE COURT:  Admitted.
 2    Q    (BY MR. MACGILL)   And is this an email -- sir, again,
 3    if you don't -- if you'd like to look at what we have for you,
 4    this is a series of emails between you and your buyer's agent;
 5    is that right?
 6    A    Yes.
 7    Q    We see here -- is this an October 13, 2021, email that
 8    he sent to you where he said, as is highlighted here, I
 9    prepared a sample offer for 1537 Omar Drive?
10    A    Correct.
11    Q    And did he give you offer terms where he described to
12    you, as part of his role for you, sample offer
13    terms:  Contingency, closing costs, home warranty, those kinds
14    of things, financing?
15    A    Yes, I believe so, yes.
16    Q    Okay.  Were you satisfied with this level of service
17    from this gentleman, this buyer's broker, Mr. Hamann?
18    A    Yeah.  Brad was a nice guy.
19    Q    Okay.  And then did Mr. Hamann, in terms of his buyer's
20    work -- pardon me.
21          Did Mr. Hamann, in terms of his work for you as a
22    buyer's agent, also give you a closing timeline that advised
23    you of how the closing would go about in connection with this
24    transaction?
25    A    Yes.
                              432
```

```
 1   Q    I'm going to hand you -- pardon me.  I'm going to --
 2           MR. MacGILL:  First, I'm going to mention 3971,
 3   Counsel.  This is at Tab 5.  I'm sorry.  Tab 6.
 4           MR. KETCHMARK:  No objection.
 5           MR. MacGILL:  We'd offer that into evidence, Your
 6   Honor.
 7           THE COURT:  Admitted.
 8   Q    (BY MR. MACGILL)  Sir, we'll call up 3971.  And is this
 9   a timeline that he prepared for you to assist you in
10   connection with this particular transaction?
11   A    Yes, it is.
12   Q    All right.  And he was representing you as the buyer?
13   A    Yes.
14   Q    And I see here he shows event date.  You see that?
15   A    Yes.
16   Q    Estimated cost, involvement, those kinds of things?
17   A    Uh-huh.
18   Q    And this is where you were buying a house?
19   A    Yes.
20   Q    And the home price there was $356,995; is that right?
21   A    Correct.
22   Q    And in connection with this first series of actions, it
23   required his involvement, but also your involvement; is that
24   right?
25   A    Yes.
```

433

1    Q    Okay.  And if we look at some other portions of this --
2    if we look -- you know, for example, he gave you earnest money
3    delivery timeframes, mortgage applications, all those kinds of
4    things.
5          Did you find that this -- the provision of this
6    closing timeline to you by your buyer's broker assisted you in
7    connection with getting this purchase made?
8    A    Yes.  It was helpful.
9    Q    Okay.  And did you understand that you would not be
10   paying for -- directly for these services -- for his
11   service -- let me restate.  I'm sorry.  It was not a good
12   question.
13         Did you understand that your broker, your buyer's
14   broker here, was not going to be paid by you directly for his
15   services?
16   A    Correct.
17   Q    And specifically you understood for your part that
18   Mr. Harwood's compensation would come out of the purchase
19   price of the home; is that fair?
20   A    Right, correct.
21   Q    Now, did Mr. Hamann, in connection with this
22   transaction, lower his commission to help you close this
23   particular deal?
24   A    I don't believe so.
25   Q    Now, on this particular transaction, you paid how much

                                434

```
 1   for this house?

 2   A     356,995.

 3   Q     Okay.  Now, this was a -- this transaction occurred in

 4   the context of a cooperative -- it was -- there was

 5   cooperation between the buyers -- your buyer's agent and the

 6   buyer -- and the seller's agent; is that right?

 7   A     Yes, I think.

 8   Q     All right.  And with respect to that, this was a

 9   cooperative arrangement as you described previously in some of

10   your testimony; is that right?

11   A     Yes.

12   Q     All right.  And under that cooperative compensation

13   practice, you did not pay 3 percent on $356,000; is that

14   right?

15   A     Correct.

16   Q     All right.

17   A     Yes.  Sorry.  Correct.

18   Q     Let's do some math together.  If we could call up the

19   calculator and look at the number $356,000 times 3 percent,

20   and that's $10,680.  Do you see the calculation that was just

21   made?

22   A     Yes.

23   Q     Did you understand that, in connection with this

24   cooperative -- cooperation between the buyer and the seller

25   agents or brokerages in this transaction, that you were not
```
                              435

```
 1   going to pay $10,680 for your part?

 2   A    Correct, yes.

 3   Q    Sir, I'm going to call up another exhibit, Exhibit 3957.

 4        MR. MacGILL:  Counsel, this is Tab No. 8.

 5        MR. KETCHMARK:  No objection.

 6        THE COURT:  Admitted.

 7   Q    (BY MR. KETCHMARK)  Sir, I'm going to -- we're going to

 8   call up Exhibit 3957.

 9        I'd like to ask you first -- and this is Tab No. 8,

10   sir, if you have it.  Do you have that in front of you?

11   A    Yes.

12   Q    Do you recognize this, sir, as an email exchange between

13   you and your buyer's brokerage or your buyer's agent?

14   A    Yes.  Yes, it is.

15   Q    And this is dated on the 10th of -- pardon me -- on

16   October 19th, 2021?

17   A    It is.

18   Q    Thank you for E-signing, it says.  Do you have any other

19   questions?  And just to continue, I will submit everything

20   once I have the preapproval back.  Do you remember getting

21   this email?

22   A    Yes.

23   Q    Then he continues also, I wanted to let you know that I

24   am signing a broker comp agreement to reduce my seller-paid

25   commission by $500.  Do you see this?
```
                                436

```
 1   A    Yes.

 2   Q    And he says further, This is not something you pay me

 3   back?

 4   A    Yes.

 5   Q    He then says, I think it will be that close.  I wanted

 6   to contribute to the good energy.  Once your offer is

 7   submitted, we will look for a seller response on or before

 8   7 p.m. midnight.

 9        Is that a compromise that your broker offered in

10   order to get this -- your broker offered in order to get this

11   deal done?

12   A    It looks like it, yes.

13   Q    And does this remind you, sir, of what happened a couple

14   of years ago in connection with the transaction, that your

15   broker did just what it said here; that he reduced the

16   seller-paid commission by $500?

17   A    The prior one?

18   Q    Just referring now to the transaction in October 19th,

19   2021, did he reduce his seller-paid commission by $500?

20   A    Yes.  That's what it says.

21   Q    Now, sir, I've got one more question for you, I believe.

22        MR. MacGILL:  Mr. Ketchmark -- if we could call up

23   Exhibit 2212, please.

24   Q    (BY MR. MacGILL) Mr. Ketchmark --

25        MR. KETCHMARK:  No objection.
                            437
```

```
 1   Q    (BY MR. MacGILL) -- had referred to this exhibit, which

 2   has now been admitted into evidence.  And you recall testimony

 3   to Mr. -- to the court, I should say, testimony about this

 4   particular settlement statement?

 5   A    Yes.

 6   Q    Okay.  And this was the settlement statement in

 7   connection with which property, do you remember?

 8   A    It looks like French Court.

 9   Q    Yeah, in 2017?

10   A    Yes.

11   Q    All right.

12        MR. MacGILL:  If we could, go to page -- I believe

13   the final page, there's a reference to commissions.

14   Q    (BY MR. MacGILL) Do you see the commissions, where it

15   says "commissions"?

16   A    Yes.

17   Q    And there were commissions to the listing broker, to

18   RE/MAX Results.  Do you see that?

19   A    Yes.

20   Q    And commissions, selling broker to Herman London Group,

21   LLC.  Do you see that?

22   A    Yes.

23   Q    And that's what you understood happened; that is, that

24   the listing broker remitted a payment to RE/MAX Results in the

25   amount of $4,946.70?
```

438

1    A    I took it as this is what I'm paying, but I -- if that's
2    what happened, sure.  But it's my money at the bottom line.
3    Q    All right.  And you look at the commissions, you see
4    here that it's on this closing document.  This is the United
5    States government form; is it not?
6    A    I don't know where it -- I don't see where it says U.S.
7    government form.
8    Q    Fair enough.
9    A    Sure.
10   Q    Then looking at this next line and the commissions to
11   the selling broker were to Herman London Group, LLC; is that
12   right?
13   A    Yes.
14   Q    All right.  Now, in 2017, you were the buyer; is that
15   right?
16   A    No.  In 2017, I was selling the house.
17   Q    I'm sorry.  My mistake.
18        Sir, going back to the French Court when you were
19   the purchaser in 2012, I have one question for you that I see
20   that I omitted.  If we could go back to the French Court
21   transaction for just a minute, I have a question for you.
22        You sold that house for how much; do you recall?
23   You purchased that house for how much?
24   A    I want to say it was like 130 something, but I don't
25   recall.

439

1    Q    Let me see if I can find that real quickly.

2          This was a transaction in which you -- this was a

3    transaction in which you were the purchaser or the buyer,

4    right?

5    A    No.  What I'm looking at is from 2017.  I was the

6    seller.

7    Q    I'm sorry.  I should have been more clear.

8          In 2012, you did purchase the French Court home,

9    right?

10   A    Yes, in 2012.

11   Q    And when you made that purchase, you did not pay the

12   buyer broker, did you?

13   A    No.

14   Q    And if we looked at -- and this was a transaction

15   consistent with what you've described, at least in general

16   terms, and what you contracted for in specific terms.  This

17   was a cooperative compensation transaction, wasn't it?

18   A    Yes.

19   Q    And that's where the seller and the buyer cooperate.

20   And specifically, if you assume a sales price of $130,000, and

21   we do a calculation, $130,000 times 3 percent -- let's do that

22   calculation very quickly -- it amounts to $3,900.  Do you see

23   that?

24   A    Yes.

25   Q    And that's a $3,900 payment that you did not make when

                              440

```
 1   you purchased the French Court home; is that correct?

 2    A    Correct.

 3    Q    Because that home was handled under a cooperative

 4   compensation arrangement as you've described in your

 5   testimony?

 6    A    Yes.

 7         MR. MacGILL:  Nothing further, Your Honor.

 8         THE COURT:  Are any of the other defendants going to

 9   have any questions?

10         MR. RAY:  No, Your Honor.

11         MR. KETCHMARK:  I'm mindful of the time.  I probably

12   have five minutes.  Does the court want to do it before or

13   after lunch?

14         THE COURT:  Let's get it done.  Put the clock on

15   him, five minutes.

16         MR. KETCHMARK:  Ish, but I'm mindful.

17   REDIRECT EXAMINATION BY MR. KETCHMARK:

18    Q    A few things.  The purchase in 2012, you were a buyer,

19   right?

20    A    Yes.

21    Q    Indiana, you were a buyer, right?

22    A    Correct.

23    Q    As part of this lawsuit, if there's any suggestion that

24   you're against buyers' agents, you're not against -- are you

25   against buyers' agents?
```

441

```
 1    A     No.

 2    Q     Is it your position that just as a seller, that you

 3    shouldn't be paying the buyer's agent?

 4    A     Yes.

 5    Q     So I'm going to not talk about 2012.  I'm not going to

 6    talk about all this Indiana stuff.  I'm going to focus in on

 7    the issues in this case when you sold your house, okay?

 8              One of the things that we just went through, and

 9    Mr. MacGill went through and showed you this contract.  And he

10    put it up, and he referred to it where he was trying to get

11    you to say -- Exhibit 2212.  He was trying to get you to agree

12    that you didn't pay this money, but that the Herman London --

13    or that the seller paid that.  So they were like the ones who

14    had to pay that.  Remember that?

15    A     Yes.

16    Q     And you told him, no, that you thought this was -- I

17    mean, this was your money; is that what you told him?

18    A     Yes.

19    Q     He referred to this as a form from the United States

20    government, somehow like -- that's what he told you, right?

21    A     Yes, that's what he said.

22    Q     Well, let's look at what this really is because you said

23    you didn't know.  Let's not guess because it's right there in

24    front of the HomeServices' attorney.

25              This isn't a form from the United States government.
                                442
```

```
 1   This was from the title company that was right there.
 2    A    Yes.
 3    Q    And they were telling you where your money went when you
 4   sold the house, and that a portion of your money was going to
 5   the buyer's agent.  That's what they told you, correct?
 6    A    Correct.
 7    Q    It wasn't the United States government telling you on
 8   some government form that somebody else was paying them; you
 9   were being told that, right?
10    A    Correct.
11    Q    Now, the last thing I want to talk about before I get my
12   five minutes in, the last thing I want to talk about, and I've
13   heard it over and over again, is a deal is a deal.  And he put
14   this contract up and said to you:  Is a deal a deal?  And they
15   all want to talk about this part of the deal.
16          Do you see that?
17    A    Yes.
18    Q    Now, when a deal is a deal or a man's handshake is as
19   good as a contract or a man's word is his bond, I mean, you've
20   heard those -- believe in those things; do you not?
21    A    Yes.
22    Q    But that means there's two parties to a deal; are there
23   not?
24    A    Correct.
25    Q    And you were one party to this deal, correct?
```
                                443

```
 1    A    That's right.

 2    Q    The other party to every one of these contracts,

 3   including yours, that no one talked to you about is on the

 4   back page of all of these contracts and your fellow class

 5   representatives' contracts, is the folks we're alleging are in

 6   this conspiracy; and in your case, it's RE/MAX, correct?

 7    A    Correct.

 8    Q    And when they talked about this Mr. Harwood, he was the

 9   father of the police officer who was a patrol officer with

10   you; is that a fact?

11    A    Yes.

12    Q    So the police officer was a patrol officer with you told

13   you about this program, introduced you to his dad, and that's

14   how it worked, right?

15    A    Yes.

16    Q    Now, let's talk about a deal is a deal.  Two sides of

17   that handshake.

18         You're shaking the hand as the seller of the home,

19   and RE/MAX is shaking your hand as the buyer, as your agent,

20   correct?

21    A    Yes.

22    Q    Let's talk about something that they have not mentioned

23   to you or to anybody else or this jury, to my knowledge.

24         In these contracts, there are duties and obligations

25   that are placed on these corporations, these corporate
```
                                  444

```
 1    defendants who we're suggesting to this jury, alleging to this
 2    jury are conspirators; they're the agents.  You see that?
 3    A    Yes.
 4            MR. MacGILL:  Your Honor, we're going to object to
 5    counsel's statement.  Question and answer format.
 6            THE COURT:  Overruled.
 7    Q    (BY MR. KETCHMARK)  In this, a deal is a deal.
 8            Did RE/MAX and these other corporations who are
 9    being challenged in this case, do you see here where they told
10    you that they were going to apply with all applicable federal
11    law?
12    A    Yes.
13    Q    Did you have an expectation that when you were entering
14    into this deal and this contract, that these corporations,
15    that they would comply with the federal antitrust laws?
16    You're not an antitrust guy, but did you think they were going
17    to comply with the laws?
18    A    Yes.
19    Q    Did you think that they were going to conspire to set up
20    a system in the MLS?
21    A    No.
22    Q    Designed to pick your pocket?
23    A    No.
24    Q    And when you found out that that happened, did you come
25    and agree to be a voice to this jury?
                                 445
```

```
 1    A     100 percent.

 2    Q     Do you believe that a deal is a deal?

 3    A     I do.

 4    Q     Are you asking that they keep up their side of the deal

 5   by complying with the federal antitrust laws?

 6    A     Yes.

 7              MR. KETCHMARK:  I thank you very much for your time.

 8              THE COURT:  Ladies and gentlemen of the jury, it's

 9   12:30.  We're going to take our lunch break.  We'll start back

10   up at 1:30 to go from there.

11              Please don't talk about the case.

12              (The following proceedings were had out of the

13   presence of the jury:)

14              THE COURT:  Please be seated.

15              So for all of you journalists, I'm asking you don't

16   write about this, please.

17              No. 44's child needs to have surgery on its tongue

18   because it's not feeding well.  So they want to schedule the

19   surgery as soon as possible, which makes sense.

20              So I'm going to have her come back in at 1:20 to

21   kind of explore that.  I'm asking you guys to all go back and

22   really explore if now is the time to remove her from the jury.

23              I would imagine any decent human being would want to

24   be there with their child when they have this surgery.  I

25   would imagine you guys are all decent people that want to
```
                              446

```
 1    support her and try to figure out this.

 2              I'm not asking you to tell me now.  You guys go back

 3    and talk among yourselves, but they wanted to schedule the

 4    surgery ASAP so she can continue to have nutrients.

 5              See you at 1:15.

 6                   (A recess was taken.)

 7                   AFTERNOON SESSION

 8    (The following proceedings were had outside the presence of

 9    the jury:)

10              THE COURT:  What do you think, Mr. Ketchmark?  What

11    do you think about No. 44?

12              MR. KETCHMARK:  We agree with the court that this

13    issue with the childcare -- it's been a continuing issue.  I

14    can't imagine keeping a juror with those types of issues.

15    That's why we have alternates.

16              MR. RAY:  May we approach, Your Honor?

17              THE COURT:  Sure.

18              (Counsel approached the bench and the following

19    proceedings were had:)

20              MR. RAY:  Your Honor, obviously, we'll do what you

21    believe is best, but I believe the procedure that she's

22    referring to is a frenotomy, and it's an outpatient procedure.

23    So, I mean, we would be inclined to accommodate her if it was

24    something --

25              THE COURT:  To take off next Wednesday?
                               447
```

```
 1              MR. RAY:  Yes.

 2              MR. KETCHMARK:  Oh, I misunderstood.  The -- she

 3    wants to take off -- the problem I have --

 4              THE COURT:  Wednesday.

 5              MR. KETCHMARK:  The problem I have with that is we

 6    had these other jurors who were talking about excruciating --

 7    missing work and excruciating -- and a lot of low-income

 8    people and a lot of difficulty.  I don't want them being mad

 9    at the process because they're missing a day of work.  That's

10    why we have an alternate.

11              THE COURT:  Or mad at her.

12              MR. KETCHMARK:  Or mad at her.  It creates an issue.

13    We've had some late starts.  And I just think it's

14    problematic.

15              But what we would ask if the court decides they're

16    going to release her, because of the massive amount of press

17    attention, we would like her to be directed not to talk to

18    counsel or the press.  But I just don't think it's a good idea

19    under the circumstances to keep her on the jury.

20              THE COURT:  Well, let's see what she says.  We don't

21    have to decide right now.

22              MR. RAY:  Thank you, Judge.  Appreciate it.

23              MR. KETCHMARK:  How long are you going to take?  How

24    long is your case going to be?

25              MR. RAY:  Maybe a couple of days at best.
                                  448
```

```
 1              MR. KETCHMARK:  If we took off next Wednesday, would
 2    you get your case in by next Friday?  I'm going to finish
 3    tomorrow.
 4              MR. RAY:  Well, we have two weeks to get our case
 5    in.
 6              MR. KETCHMARK:  That's not what I'm asking.
 7              MR. RAY:  I don't know.
 8              THE COURT:  All I care about is it getting done in
 9    two weeks.
10              MR. KETCHMARK:  No, no.  I didn't know if that would
11    make an impact on the other jurors, if we're taking next
12    Wednesday off.  If they know it's not going to be a three-week
13    case, to take one day off, if they know it's going to be two
14    weeks instead of three.  That's the only reason I was asking.
15    That's the only reason I was asking.
16              THE COURT:  Sure.
17              (The following proceedings were had at the bench:)
18              THE COURT:  So just checking in with you.  If we let
19    you take off next Wednesday, if we shut down all court next
20    Wednesday, would that be okay?  Or do you need to follow up,
21    or what do you --
22              VENIREMAN 44:  I know that she'll first need a
23    consultation, her procedure consultation, and then the actual
24    procedure.  And I don't know when that is.
25              So I called over lunch, and they said the
                                   449
```

```
 1   consultation could either be next Wednesday or Thursday.  And
 2   then sometime right after, they do the actual procedure.
 3           So, I mean, do you want me to, like, find a early --
 4   really early time, and then we do something like we did today?
 5           THE COURT:  It's kind of an outpatient procedure, if
 6   my research is correct.
 7           VENIREMAN 44:  Uh-huh.  Yeah, yeah, yeah.
 8           THE COURT:  But it's your baby.
 9           VENIREMAN 44:  Yeah.  I mean, yeah, she's going to
10   struggle to feed that day.
11           THE COURT:  There's all that, and so I just -- your
12   baby is more important than you serving on the jury, in my
13   opinion.
14           VENIREMAN 44:  Yeah, yeah.
15           THE COURT:  And if you're -- if there's concerns
16   about, you know, follow-up appointments and all those other
17   things.  I can skip next Wednesday for the outpatient
18   procedure, whenever it is.
19           VENIREMAN 44:  Okay.
20           THE COURT:  But to get it all crammed in, I don't
21   have any extra days if I take off next Wednesday.
22           VENIREMAN 44:  Yeah.
23           THE COURT:  So that's kind of the concern is how --
24           VENIREMAN 44:  Yeah.
25           THE COURT:  -- how do we keep it all going and be
                           450
```

1    enormously respectful of you.

2              VENIREMAN 44:  Yeah.  I mean, I guess that's one of

3    the reasons I asked for an excuse, just because I knew, as a

4    newborn, you're going to have these things come up, you know.

5              THE COURT:  So let me -- we'll get started back up.

6    Will you go back in there with them, and then we'll --

7              VENIREMAN 44:  I have to finish pumping anyway.  I'm

8    pumping right now.

9              THE COURT:  Okay.  Sorry.

10        (The proceedings returned to open court.)

11             THE COURT:  Counsel.

12             (Counsel approached the bench and the following

13   proceedings were had:)

14             THE COURT:  So she's back pumping right now.  We've

15   got to finish that up.  She has to go in for a screening with

16   the doc, and she'd like to go with the baby.  There's the

17   procedure, and it is outpatient just like you and I thought.

18             She says they have to check in the procedure and

19   take home, and she's worried about eating.  And we can follow

20   up with her.

21             So we're now looking at three -- missing one day and

22   two delayed starts and a distracted juror.

23             So don't decide right now.  We'll decide at the

24   break.  I'll obviously tell you my inclination is to be done

25   and move on.

                              451

1         MR. KETCHMARK:  Okay.  Thank you, Your Honor.

    2         THE COURT:  We'll talk again.

    3      (The proceedings returned to open court.)

    4         MR. FADLER:  Your Honor, just before we get started,

    5  we just wanted to put, as a housekeeping matter, these MLS

    6  handbooks in for the years.  They're on both parties' witness

    7  lists.  If I can just get these moved in so I don't have to do

    8  it while Dr. Schulman is on the stand.

    9         That would be -- 2015 handbook is 136.  Then the

   10  2016 handbook is 3687.  2017 is 3713.  2018 is 3745.  2019 is

   11  8157.  2020 is 3842.  We've already put '21 in; so we're good

   12  there.  2022 is 722, and 2023 is 4587.

   13         THE COURT:  Any objections from defendant?

   14         MS. TOPOL:  No, Your Honor.  We stipulated to these

   15  already.

   16         THE COURT:  Thank you, Ms. Topol.

   17         MR. FADLER:  Thank you.

   18         THE COURT:  All those are admitted.

   19         MR. KETCHMARK:  And, Your Honor, just for

   20  housekeeping so we don't have to do it ...

   21         THE COURT:  Ben, did you say 3687?  Are you coming

   22  off their list?  You're coming off both lists?

   23         MR. FADLER:  Off their list, Your Honor, 3687, 2016

   24  multiple listing handbook.

   25         THE COURT:  Okay.
                              452

```
 1              MR. KETCHMARK:  Your Honor, if the court thinks this
 2   will move it along with Dr. Schulman, we have an agreement on
 3   a lot of the exhibits with him if the court will take -- you
 4   want to stand there and look at this one?
 5              MR. GLASS:  Sure.
 6              MR. KETCHMARK:  Exhibit No. 2419.
 7              MR. GLASS:  No objection.
 8              MR. KETCHMARK:  Exhibit Nos. 113, 114, 115, and 116,
 9   and 117.  I'm sorry.  I'm sorry.  113, 114, 115, 116, and 118.
10              MR. GLASS:  No objection.
11              THE COURT:  All those are admitted.
12              MR. KETCHMARK:  119 and 120.
13              MR. GLASS:  No objection.
14              THE COURT:  Admitted.
15              MR. KETCHMARK:  205A I believe might already be in,
16   but if it's not, that's just the --
17              THE COURT:  It's already in.
18              MR. KETCHMARK:  235.
19              MR. MacGILL:  No objection.
20              THE COURT:  Admitted.
21              MR. MacGILL:  Wait a second.  235 is the entire
22   report, the --
23              MR. KETCHMARK:  No, it's the D.A.N.G.E.R. report.
24              MR. MacGILL:  I'm sorry.  That's my mistake.
25              We object to the entire report coming in.  This is
                                 453
```

```
 1   Rob MacGill from HomeServices.

 2             MR. KETCHMARK:  Then I won't admit it.  I'll do it

 3   later with the witness.

 4             Okay.  The part that I would move then -- I'll just

 5   do it here.  The only part I really care about would be -- I'm

 6   going to move the whole thing in.  That's fine.

 7             205 is the --

 8             Ben, can you come here?

 9             MR. FADLER:  Sure.

10             MR. KETCHMARK:  We don't have to put this in because

11   we just have the 205A, right?

12             MR. FADLER:  That's correct.

13             MR. KETCHMARK:  This should not be in here.  Can you

14   open that?  207 is already -- no.  207 you have no objection?

15             MS. TOPOL:  It's been admitted.

16             THE COURT:  207 is in.

17             MR. KETCHMARK:  Okay.  209A.

18             MR. FADLER:  That's in.

19             MR. KETCHMARK:  One of the ones that we were -- we

20   could probably take this up now.  We were going to move in

21   the -- there was reference in the opening statement by counsel

22   for NAR as to the amount of the dues that were paid.  They

23   indicated they were $150.  We have the underlying dues

24   information showing the $150.  That's the only purpose of

25   moving that in as a part of Dr. Schulman's opinions as to the
                                454
```

```
 1   amount of dues that were paid you referenced in your opening.
 2             MR. GLASS:  Your Honor, Mr. Ketchmark said the dues
 3   were $500 --
 4             THE COURT:  I remember.
 5             MR. GLASS:  -- times 1.5 million.  This has been
 6   excluded by Your Honor's motion in limine order on the
 7   financials.  He can't provoke in opening the door.
 8             MR. KETCHMARK:  I didn't provoke.  The financials
 9   were -- we had a whole stack of tax returns in the financials
10   and the net worth.  One of the points that they were making in
11   their opening is that they had no incentive because if there
12   was no economic incentive for them being because they didn't
13   get commissions.  Their economic incentive -- and our expert
14   is going to testify to --
15             THE COURT:  What he's saying is you said it was 500.
16   He said it was 100.  And now you want to introduce evidence
17   about it being 100?
18             MR. KETCHMARK:  No.  He said it was 150.  We want to
19   introduce that he's -- what he said is right.
20             MR. GLASS:  And then multiply it by the number of
21   members and see how much money NAR has.
22             MR. KETCHMARK:  Right.  Our Dr. Schulman is going to
23   testify that's their incentive for the -- it's not the
24   commissions.  They said, We don't get paid commissions.  Their
25   incentive to participate in this conspiracy is not about their
                                    455
```

1   financials or their tax returns; it's that that's their

2   economic incentive, the membership dues that are paid by the

3   1.5 million members.  He actually referenced it in his opening

4   statement.

5           You didn't object when I said 500.

6           MR. GLASS:  I just corrected you.  Your Honor, I've

7   got a solution.  There's no dispute that we are funded by

8   membership dues; so I have no objection to the questioning of

9   the witness that we receive membership dues.

10          What I do object to is the number and then trying to

11  multiply it by the number of members and saying, See how rich

12  NAR is.

13          MR. KETCHMARK:  I didn't say see how rich they are.

14  I'm saying they're saying we don't get paid commissions; we

15  have no economic incentive to participate in the conspiracy.

16  I'm saying $150 by the number of members is that number.  That

17  is the reason you're doing it.

18          THE COURT:  I'm going to allow you to do that.  You

19  need to move that into admission during the testimony.

20          MR. KETCHMARK:  I will do it.

21          THE COURT:  Because they're objecting to it.

22          MR. KETCHMARK:  Got it.

23          Clear cooperation policy, 360.

24          MR. MacGILL:  Your Honor, we renew our objection on

25  the clear cooperation policy.  It's not relevant to this

                                456

```
 1    lawsuit for the reasons we have said previously.

 2              MR. RAY:  We join in that objection.

 3              THE COURT:  Same ruling as before.  Still objecting

 4    to the -- well, it's already in evidence.  Clear cooperation

 5    is already in.

 6              MR. GLASS:  Can I raise an issue, Your Honor?

 7              THE COURT:  Yeah.

 8              MR. GLASS:  Can we do this outside the presence?

 9    Dr. Schulman is here.  I would like to address the court.  Can

10    we approach?

11              THE COURT:  Dr. Schulman, sneak out.

12              MR. KETCHMARK:  And I guess Dr. Wu probably should

13    be out too, if you're concerned about my expert.  Yours should

14    be out too.

15              MR. GLASS:  I don't care if Wu is here.

16              THE COURT:  He's sneaking out.

17              MR. GLASS:  Okay.  Clear cooperation is not in

18    Schulman's report.  He's precluded from talking about clear

19    cooperation with Schulman.

20              MR. KETCHMARK:  We're finished.  Thank you, Judge.

21              MR. GLASS:  I've got the report for you, Your Honor.

22              Your Honor, here's the report.

23              THE COURT:  It's going to be hard for me to read the

24    whole report.

25              MR. GLASS:  But Mr. Ketchmark can point you to where
```

457

```
 1  Dr. Schulman actually talks about clear cooperation if he

 2  does, right?

 3          MR. KETCHMARK:  Listen, we will look at that if it's

 4  in his deposition or his report.  If it's not --

 5          MR. GLASS:  No.

 6          MR. KETCHMARK:  Hang on.  There wasn't any kind of

 7  motion in limine on that.  I'm not going to get into it unless

 8  I can lay the foundation for it for this witness.  And at that

 9  point in time, it will be later in my examination, if I don't

10  --

11          MR. RAY:  But it's not in his report.

12          MR. KETCHMARK:  This has been moved into evidence.

13          MR. GLASS:  If it's not in his report, he can't

14  testify about it.  I don't care if it came up in his

15  deposition.  That's black letter law.  And what Mr. Ketchmark

16  is trying to do is he's trying to have the witness talk about

17  things that were not in his report.

18          MR. MacGILL:  Your Honor, if I may --

19          THE COURT:  Where's Ben?  Ben got thrown under the

20  bus here.  Is it in his deposition?

21          MR. FADLER:  I'll take a look right now, Your Honor.

22          THE COURT:  Okay.  I think you're right, Mr. Glass,

23  that is black letter law, that the whole point of these

24  enormously lengthy expert reports is ideally they wouldn't

25  take a deposition.
```

458

```
 1            MR. KETCHMARK:  I agree and understand.  We're

 2   checking on that.

 3            MR. MacGILL:  Could I do a problem solving

 4   suggestion here?

 5            THE COURT:  We already solved it on the clear

 6   cooperation.

 7            MR. KETCHMARK:  No.  Can we keep moving?  Is 679 in

 8   evidence, Your Honor?

 9            THE COURT:  Yes.

10            MR. KETCHMARK:  Is 1841 in evidence, Your Honor?

11            THE COURT:  No.

12            MR. KETCHMARK:  Okay.

13            THE COURT:  Any objection to that?

14            MR. KETCHMARK:  Any objection to this?  It's the

15   RE/MAX one.

16            THE COURT:  That's a clear cooperation policy.

17            MR. KETCHMARK:  No, I'm sorry.  1841 is not the

18   clear cooperation policy.

19            THE COURT:  It's the email from Eric Malmberg, the

20   clear cooperation policy, according to your exhibit list.

21            MR. MacGILL:  We object to it for the reasons --

22            THE COURT:  Same reason.  Overruled.  Or not

23   overruled.  Sustained.

24            MR. KETCHMARK:  He's not ruling on it yet.  I

25   understand.
```
459

1          MR. RAY:  He sustained the objection.

2          MR. KETCHMARK:  He hasn't -- there hasn't been an

3   objection.

4          THE COURT:  There has been an objection, Mr.

5   Ketchmark.

6          MR. KETCHMARK:  But he hasn't ruled on it yet.

7          THE COURT:  I just did.  If it's not in his report,

8   it shouldn't come in.

9          MR. KETCHMARK:  I understand when you're saying

10  that, Your Honor.  I get that.  I guess I'm not --

11          THE COURT:  I'm not excluding it from all evidence

12  throughout the trial.

13          MR. KETCHMARK:  I understand.  You're saying if it's

14  not in his report, I can't get it in.  I understand that.

15          Exhibit No. 2830, that's the 2022 Family Reunion.

16          MR. RAY:  That's not in.

17          MR. KETCHMARK:  Right.  I'm asking if you're going

18  to object to it.

19          MR. RAY:  I am objecting to it.

20          MR. KETCHMARK:  We'll take it up then.  We don't

21  need to do it now.

22          All right.  That's all I have.

23          MR. GLASS:  Your Honor, I have another thing that I

24  expect Mr. Ketchmark is going to cover that's not in

25  Dr. Schulman's report.

                         460

In opening, you might have heard that Mr. Ketchmark

represented to you and the jury that the average home sale

price in St. Louis is higher than the average home sale price

here in Kansas City, and they would have an expert come and

testify to that.

                    That also is not in Schulman's report, and we are

going to object when he tries to do that.

                    MR. KETCHMARK:  I'm not going to do that with this

witness.

                    MR. GLASS:  Okay.

                    MR. MacGILL:  Your Honor, may I raise one point?

                    THE COURT:  Yes.

                    MR. MacGILL:  So rather than quarrel about the full

Swanepoel report, the D.A.N.G.E.R. report, the court's

admitted 234A and 235A, which are portions of --

                    THE COURT:  If he's not listening, it's not going to

do any good.  He's not listening.

                    Hey, Mr. Ketchmark, he's trying to find some

compromise here on the D.A.N.G.E.R. report.

                    MR. KETCHMARK:  Right.

                    MR. MacGILL:  So what I'm proposing, Your Honor, is

this:  We have -- the parties have stipulated to the admission

of 234A and 235A.

                    234A are the three pages of the D.A.N.G.E.R. report

that they rely on and that were shown in the opening statement

                                      461

showing commissions in different places.

MR. KETCHMARK:  That's fine.  Can you show me where that's in 235 at?

MR. MacGILL:  I'm in 234A.  I can give you a copy if that's helpful.

And then 235A, we did the same thing.  It's a draft of the report, of the Swanepoel report.  What we're suggesting is --

MR. KETCHMARK:  I'm fine with that.  Just tell me the pages.

MR. MacGILL:  Okay.  You mean the exhibit numbers?

MR. KETCHMARK:  Yes.

MR. MacGILL:  We can give you the pages if you want them.  234A and 235A.  If Mr. Ketchmark and the witness want to do that in lieu of the whole report --

MR. KETCHMARK:  I'm going to move the whole report in with him.  Thank you.

MR. MacGILL:  Your Honor, last thing.  We could work with counsel overnight.  We have redactions proposed on a very lengthy report, which would be a position between what's already in evidence and what he wants, which is the full report.  I would like to work with Mr. Fadler and Mr. Ketchmark to reduce the harm -- not the harmful, but the irrelevant materials from that report.  We've done it.  We have it ready.  We can hand it over this afternoon.

462

```
 1          But I think that to put in the whole report now is
 2  prejudicial to us for the reasons I've indicated.  234A and
 3  235A are exactly what he's referred to.  Those are the pages
 4  that Dr. Schulman's relying on.
 5          MR. KETCHMARK:  No.  He's relied on the whole
 6  report, and I'll lay the foundation with the witness.  If you
 7  want to object at the time, you can.  I'm not going to agree
 8  to your self-redacted part.  But I'll address it with the
 9  witness on the stand.
10          THE COURT:  We'll take it up.  He doesn't want to
11  accept your compromise, so we'll tee it up.
12          Go ahead, Mr. Ketchmark.
13          MR. KETCHMARK:  We've reached a stipulation, and I
14  just want to state it for the record.  I think I've got it.
15          As part of the motions in limine we filed and the
16  parties have reached a stipulation as relates to all
17  experts -- that relates to all experts, that we are not going
18  to talk to the experts about the amount of money they were
19  paid, their hourly rates, the compensation they were paid, the
20  compensation to their organizations, how much money they make
21  in expert witnesses in this case or other cases.  We are
22  staying completely away from all of that for -- and I'm doing
23  that and you're doing that for both of our experts, for Alford
24  and Schulman, and I'm doing that for your experts and
25  Reynolds, our person tomorrow.  I'm doing that for all your
```

463

```
 1    experts.  Do I have that as an accurate statement?

 2              MR. GLASS:  Agreed.

 3              MR. KETCHMARK:  I'm not going to touch it.  And all

 4    I would ask -- and I don't expect anyone to.  But to the

 5    extent that it happens, if I did it, whack me over the head

 6    with a bat, and same with them too.  It would be really bad to

 7    have that come up during the first time during

 8    cross-examination.  Don't expect anybody to do it.

 9              MR. MacGILL:  We have one point.

10              THE COURT:  One more second.

11              MR. MacGILL:  Mr. Ketchmark said in opening

12    statement the Australian witness was willing to come.  He's

13    been paid to come.  I just want to confirm that.

14              Reynolds, you indicated in opening statement he said

15    that he was willing to come.  We just want to ask one

16    question.  I presume we want to ask one question.

17              MR. KETCHMARK:  I will say we paid him to come over.

18    And Mr. Fadler corrected me.  The clear cooperation is on

19    Alford, not on Schulman.  I'm not touching that with Schulman

20    at all.

21              MR. GLASS:  Okay.  It's not in Alford's report

22    either, but we'll take that up when Mr. Alford is here.

23              (The following proceedings were had in the presence

24    of the jury:)

25              THE COURT:  Mr. Ketchmark.
                                464
```

```
 1            MR. KETCHMARK:  The plaintiffs call Dr. Schulman to

 2   the stand.

 3            THE COURT:  Dr. Schulman, come on up, sir.

 4   CRAIG SCHULMAN, being duly sworn by the courtroom deputy,

 5   testified:

 6   DIRECT EXAMINATION BY MR. KETCHMARK:

 7   Q    Can you please state your name and introduce yourself to

 8   the jury.

 9   A    My name's Craig Schulman.

10   Q    And are you a professor of economics at Texas A&M right

11   now?

12   A    Yes, I am.

13   Q    Do you also have a Ph.D. in economics?

14   A    Yes, I do.

15   Q    In the academic world as a Ph.D., is that referred to as

16   a doctorate degree?

17   A    Yes, that's correct.

18   Q    When I call you and refer to you as Dr. Schulman today,

19   is that a reference to your doctor's degree in economics?

20   A    That's correct.

21   Q    Certainly I know that you and the jury understands this,

22   but I'm not suggesting you're some type of a medical doctor,

23   correct?

24   A    That's correct.

25   Q    Now, Dr. Schulman, did you and your team, were they
```

                                   465

1    hired by our law firm to provide expert economic testimony to

2    this jury to help us explain some of the economic issues in

3    this case to this jury?

4    A    That was my assignment, yes.

5    Q    Now, before I talk to you about your qualifications and

6    your background, I want to talk to you a little bit about how

7    you got in the field of economics.  Okay, Dr. Schulman?

8    A    Yes.

9    Q    Can you tell this jury where you were born and raised.

10   A    So I was born and raised in Bryan-College Station,

11   Texas.

12   Q    Is that the home of Texas A&M?

13   A    Yes, it is.

14   Q    And when you were growing up, how big a town was that?

15   A    17,000, 20,000, somewhere in that range.

16   Q    What did your mom and dad do when you were growing up?

17   A    So my father was -- he ran local movie theaters,

18   drive-in theaters and movie houses, and my mother was a school

19   teacher.

20   Q    Did you work in the movie theaters that your dad -- that

21   your mom and dad ran when you were growing up?

22   A    Yes, I did.

23   Q    Tell the jury a little bit about the background and

24   experience you had as a child growing up in the movie

25   theaters, the kind of work you did.

                              466

```
 1    A    Well, the theater business went back all the way to

 2   1920s when my -- my grandfather actually, and so I --

 3   everything from popping popcorn, cleaning up trash at the

 4   drive-in to running the movie projectors.

 5              So -- and all the way when I was an undergraduate at

 6   times managing some of the theaters.

 7    Q    When you went to college, when you first started

 8   college, tell the jury what kind of student you were.

 9    A    Not the best student.  Not the best at all.

10    Q    Did you get married when you were in college?

11    A    It was actually when I took a hiatus from A&M.  I took

12   some time off and was married in 1982.

13    Q    And what's your wife's name?

14    A    Wife's name is Cheryl.

15    Q    How long have you and Cheryl been married?

16    A    41 years this year.

17    Q    How many years did you go to college before you decided

18   to take some time off?

19    A    Two years.

20    Q    What did you do when you took that time off?

21    A    So I worked in the theaters for a while, and then my

22   brother and I went into business with a 24-hour cafe.

23    Q    Did you and your brother buy that cafe?

24    A    Yes, we did.

25    Q    Where was that located at?
```

467

```
 1   A    That was in east Texas in a little town called Crockett,
 2   Texas.
 3   Q    How big was that town?
 4   A    About 12,000.
 5   Q    Had you ever owned a cafe or been in the cafe business
 6   before?
 7   A    I worked in like a Whataburger or a burger shop and a
 8   small restaurant in Bryan when I was a teenager.
 9   Q    I guess Patrick Mahomes has kind of introduced
10   Whataburger up here to Kansas City now.  That's the only
11   reason I'm familiar with it.
12   A    Yeah.
13   Q    How long did you own that cafe for?
14   A    About two years.
15   Q    And what type of work did you do at that cafe?
16   A    Everything from wash dishes to short order cook to doing
17   payroll.
18   Q    And did you end up deciding -- did you get out of the
19   cafe business?
20   A    Yes, I did.
21   Q    Did you go back to college?
22   A    My wife convinced me I should give it another try, yes.
23   Q    Did you give it another try?
24   A    Yes, I did.
25   Q    What was your wife doing at that time?
```

468

```
 1   A    She was a school teacher.

 2   Q    And when you went back to college the second time around

 3   after having that couple years' experience, were you a better

 4   student?

 5   A    The economics at that point just really grabbed my

 6   attention.  And it clicked, and I did very well, yes.

 7   Q    So you took an economics class?

 8   A    A series of them, yes.

 9   Q    And did you have any professors that had any particular

10   connection with you and drew you to the field?

11   A    There was a couple in particular, yes.

12   Q    And did you decide -- what did you major in?

13   A    So my major was in economics, and, you know, it was the

14   field of econometrics, which is applying data to real-world

15   problems that really caught my attention.  And that's what

16   really kind of turned me onto the subject.

17   Q    Sir, I didn't even catch the name of this.  What did you

18   say it was?

19   A    Econometrics.

20   Q    Econometrics.

21   A    So it's statistics applied to economics.

22   Q    Okay.  And does that involve crunching numbers and math

23   and things like that?

24   A    Yes, it does.

25   Q    What type of classes did you have to take to do that?
```

469

1    A    Statistics classes, computer programming classes, and
2    then the actual econometrics classes.
3    Q    And when you graduated from undergrad, did you continue
4    in the field of economics?
5    A    I had a couple of professors suggest that I try grad
6    school.  My wife thought it was kind of strange, but I gave it
7    a shot.  So, yeah, I went to grad school at A&M.
8    Q    Did you get your Ph.D. in economics from A&M?
9    A    Yes, I did.
10   Q    Can you tell the jury what percentage of students, when
11   they have an undergraduate degree in economics, what
12   percentage will go on and get a doctorate or a Ph.D. in
13   economics?
14   A    It's less than 2 percent.
15   Q    Now, how many years did it take you to get your Ph.D. in
16   economics?
17   A    Four years.
18   Q    Did you write what I always have heard as a thesis?
19   A    Thesis, also called a dissertation, yes.
20   Q    Can you tell the jury what a thesis or dissertation is?
21   A    So for a doctorate, the idea is that you're trying to
22   expand the field of knowledge in your particular area, and so
23   it's to come up with a new idea and try to, you know, make the
24   profession a little bit wiser, so to speak, by adding new
25   knowledge to the knowledge base.

470

1    Q    And what did you write that on?

2    A    So my thesis dealt with government policy and

3    international trade when firms have market power.

4    Q    So government policy in international trade when

5    corporate firms or firms have market power?

6    A    Yes.

7    Q    Does that deal with antitrust principles and concepts?

8    A    It can, yes, very much so.

9    Q    And did you have to defend that thesis or doctorate?

10   A    Yes, I did.

11   Q    Explain to the jury what it means to defend your written

12   thesis or doctorate?

13   A    So I had a committee of professors, and you literally

14   stand up and work through your thesis and your theory just

15   like you're giving a lecture.  And they bombard you with

16   questions, kind of like cross-examination.  And if you make it

17   through, you pass.

18   Q    I guess we'll have you wait until after today to say if

19   it's like cross-examination, but the idea is you have to

20   defend it, right?

21   A    Yes.

22   Q    Now, tell me this:  I want to show you what's been

23   marked and admitted in this case as Exhibit No. 2419.  Do you

24   recognize that as a copy of your -- I guess I would call it

25   like a resume or a CV?

                              471

```
 1    A    Yes.
 2    Q    And when we look at the second page of that, is that
 3    where, across the top of it, where we see this information
 4    about your Ph.D. in economics?
 5    A    Yes, that's correct.
 6    Q    And can you tell the jury what was your first job --
 7    let's go down here and look at your positions.
 8         What was the first job that you held when you
 9    graduated from college -- or when you finished with your
10    Ph.D., what was the first job that you had?
11    A    So my first position was with the Department of
12    Economics at the University of Arkansas, Fayetteville,
13    Arkansas.
14    Q    And what did you do there?
15    A    Taught economics classes, both undergrad Ph.D. and
16    master's classes, and part of that -- the nature of the
17    position also expected significant research output.
18    Q    And I see here on your resume that's for the University
19    of Arkansas.  That's when you were assistant professor from
20    1990 to 1997?
21    A    That's correct.
22    Q    And it says you taught courses at undergraduate,
23    master's, and Ph.D. doctorate levels, including antitrust
24    economics and international trade and ecometrics -- eco --
25    A    Econometrics, that's right.
```

472

```
 1    Q     Econometrics.  Thank you.

 2          And what did your wife do at that time?

 3    A     She was a junior high school math teacher.

 4    Q     And can you tell the jury what your wife is doing now?

 5    Is she still working, or is she --

 6    A     She's retired.

 7    Q     And now, when we look at your resume, can you tell the

 8    jury after you -- from the University of Arkansas, where you

 9    went after that?

10    A     So I was at the University of Arkansas from 1990 to

11    2001, except for a one-year period where I took a year off to

12    work at the U.S. International Trade Commission in Washington

13    D.C.  Got back to Arkansas.

14    Q     Let me -- before we jump past that, this is on page 3 of

15    your resume.  The U.S. Trade Commission, do I have that pulled

16    up there?

17    A     Yes, you do.

18    Q     When you worked at the United States International Trade

19    Commission, where was that at?

20    A     It was in Washington D.C.

21    Q     And did your wife move to Washington D.C. with you when

22    you did that?

23    A     She and my three-year-old son, yes.

24    Q     And what did you do for the U.S. International Trade

25    Commission?
```

473

```
 1    A    So the division in the International Trade Commission I
 2   was working in, it's kind of like the International Trade
 3   version of the Federal Trade Commission.  It deals with unfair
 4   trade practices.  And U.S. companies can go to the ITC and
 5   complain, hey, firms overseas are selling products into the
 6   U.S. that use our technology wrongly, or they're selling below
 7   price or somehow harming the U.S. economy.
 8           So that's what the International Trade Commission
 9   deals with is those international trade laws.
10    Q    Making sure that when competitors from around the world
11   are coming into our economy, that they're playing by our rules
12   and our laws?
13    A    That's correct.
14    Q    And one of the things that you said that you -- you
15   provided technical support and advice regarding modeling of
16   economic damages.  What does that mean?
17    A    So in those kinds of cases, when there's an allegation
18   foreign firms have done something wrong, you have to quantify
19   how much have they harmed the U.S. economy and U.S. producers.
20   So that's the quantum of economic damages.
21    Q    And you referenced that you had a three-year-old son.
22   How many children do you have?
23    A    I have two children.
24    Q    And you have a son and a --
25    A    And a daughter.
                                474
```

```
 1   Q    What do your kids do now?  Either one of them follow you
 2   in the field?
 3   A    Well, my son is a college baseball coach out on the East
 4   Coast.  My daughter kind of took my undergraduate path.  She
 5   is now back at Texas A&M working on an undergraduate degree in
 6   economics.
 7   Q    So she's back at the school where you're teaching and
 8   getting an economics degree?
 9   A    That's correct.
10   Q    Were you surprised she followed you down the path of
11   getting a degree in economics?
12   A    A little bit, yes.
13   Q    She ever say anything to you about it?
14   A    As she took a couple of the first introduction courses,
15   she came by the house one evening and told me she was really
16   mad at me because everything she was hearing in class made
17   total sense because she'd been hearing it all her life.
18   Q    Did you move back -- where did you go from Washington
19   D.C.?
20   A    So from Washington D.C., we went back to Fayetteville,
21   Arkansas, the University of Arkansas.
22   Q    What did you do when you moved back to the University of
23   Arkansas?  Let me just pull it up here on your resume.
24        When you moved back, it would have been in 1997; is
25   that true?
```
                              475

```
 1   A     '96.

 2   Q     '96.  I see.

 3          And so I see here that you were -- why don't you

 4   tell the jury what type of professor were you at that point?

 5   A     So in 1997, I was promoted from assistant professor to

 6   associate professor with tenure, and that means that I met the

 7   -- kind of the hurdle in terms of my research output and my --

 8   the quality of my teaching.

 9   Q     I want to look here with you to this section here in

10   1998 to 2001.

11          Tell the jury what you were -- what we see here from

12   1998 to 2001.  What is that?

13   A     So while I was at the university of Arkansas, I was

14   appointed to the Arkansas Governor's Council of Economic

15   Advisers, and we would advise the governor's office and the

16   legislature on various policy issues and undertake different

17   kinds of analyses on behalf of the governor's office and the

18   legislature.

19   Q     And did you have an opportunity to take things you had

20   learned in a classroom and apply them to the real world like

21   you did when you were out there working with the -- in D.C. on

22   behalf of the United States?

23   A     Very much so, yes.

24   Q     Tell the jury how -- just big picture, how would you do

25   that?  What were you doing when you were working there in the
```

476

```
 1   state of Arkansas for the governor's council?
 2    A    Well, it was just like some of the analysis I did for
 3   this case.  We take very big, messy datasets, try to
 4   understand them, analyze them with the point of view of trying
 5   to help the government of Arkansas design better policies for
 6   the citizens of Arkansas.
 7    Q    And we're certainly going to get to it in this case, but
 8   when you talk about taking data, how much -- how did you
 9   receive the information from the 265,000-plus homeowners that
10   I'm standing here representing?  How did you take that
11   information in as part of your work in this case since you
12   kind of brought that up?
13    A    So it came in two different sources.  One was from the
14   subject MLSs, and that included every single transaction that
15   ran across each of the four subject MLSs over the time period.
16          And there was a second traunch of data from each of
17   the --
18    Q    How do you spell that?
19    A    T-r-a-u-n-c-h.
20    Q    Got that Texas accent working on me a little bit.
21    A    Yeah.  Apologize for that Texas accent.
22          The second group of data came from the defendants.
23    Q    And what type of information was that when it -- did it
24   come to you in electronic form?
25    A    Electronic form, yes, sir.
                                477
```

```
1    Q    And what does it look like when it comes to you
2    electronically?  Like, how much is it volumewise?  What are
3    you talking about?
4    A    So hundreds of columns and millions of rows of data.
5    Q    Millions of rows, like on an Excel sheet-type situation
6    or --
7    A    Well, it's too big to fit in Excel; so we had to use
8    other computer software to analyze the data.
9    Q    Is this something that in your background and experience
10   and training and expertise, that you would routinely do as
11   part of your work?
12   A    Absolutely, yes.
13   Q    Is that the type of thing outside of this case that you
14   were doing in the real world in other situations before you
15   got involved in this?
16   A    Yes.
17   Q    Give the jury just a couple of big-picture examples of
18   how you would do that in the real world.  Have you ever done
19   that for government agencies?
20   A    Yes, for the governor's office of Arkansas, for example.
21   Q    What type of data would they dump?  I call it a data
22   dump.  I think that's what we told you, we had a data dump for
23   you.  Is that a term you heard before in your industry?
24   A    Yes.
25   Q    What does that mean to you when I say you're about ready
```

478

```
1    to get a data dump?

2    A    A lot of very messy data we'd have to comb through.

3    Q    When it's messy, what do you have to do as an economist?

4    A    Try to make sense out of it.

5    Q    How would you do that?  In general, how do you do it in

6    this case?

7    A    Well, you carefully check the data to -- and make sure

8    you understand what the different fields in the data are

9    supposed to represent before we try to start drawing opinions

10   about it.

11   Q    Now, I want to talk to you about how you dealt with that

12   data in this case.  When you did that, do you have a team of

13   people you work with?

14   A    Yes, I do.

15   Q    And tell the jury the type of people who are on that

16   team.

17   A    So everything from senior case managers to research

18   associates to data analysts that help me understand and

19   compile and analyze the data.  And my case manager tries to

20   help keep everything going in the right direction, and I sit

21   at the top of that, managing and directing that work.

22   Q    And how many -- one of the things that I should talk to

23   you about -- jumping back before we get into that.

24            Did you leave the University of Arkansas at some

25   point and go back to Texas A&M?
```

479

```
 1    A     In 2001, yes.

 2    Q     And why did you do that?

 3    A     Partly to get back closer to home, but also because

 4    instead of the academic world, I wanted to do more applied

 5    work, work that would have more impact.

 6    Q     And when you returned to Texas A&M, did you return to

 7    teaching there?

 8    A     Yes.

 9    Q     And when did you return to teaching at Texas A&M?

10    A     So I went back to Bryan-College Station in 2001 and

11    started teaching part time at A&M in 2002.

12    Q     And how long did you continue to teach at -- in any

13    capacity there?

14    A     So I continued to teach all the way up to today.  In

15    2017, I went full time.

16    Q     What type of classes would you teach?

17    A     So data analytics.  Two courses I'm teaching this

18    semester, one is an undergraduate class in data analysis, and

19    then I have a master's class that is basically how do you

20    handle the kind of data we got in this case.  Big data where

21    you have to try to synthesize it and analyze it and boil it

22    down to something that's understandable.

23    Q     And have you ever taught any classes dealing with

24    antitrust principles or issues like the federal United States

25    Sherman Antitrust Act?
```
                                480

```
 1    A    Very much so.

 2    Q    Tell the jury about your background and experience and

 3    expertise in that field.

 4    A    So as Mr. Ketchmark noted earlier, one of the courses I

 5    taught at the University of Arkansas was antitrust economics.

 6    And during my Ph.D. program, I had a course of study in

 7    antitrust economics and the economics that applies to

 8    antitrust situations.  And then 30 years of experience as an

 9    economist, actually putting these tools to work on antitrust

10    questions.

11    Q    Now, you understand that we represent or that I

12    represent and my two cocounsel here with me represent, my

13    partner, Ben Fadler, and my cocounsel, Mr. Boulware, that we

14    represent 265,697 Missourians who have -- homeowners who sold

15    that, which actually means about 500,000 people from Missouri

16    and the poorer states of Kansas and Illinois who were the --

17    had sales during this -- in these four subject MLSs during the

18    time period.  You understand that?

19    A    Yes.

20    Q    What did we ask you to do as part of your job duty in

21    this case as it relates to your testimony today?

22    A    Well, for each of those 265 --

23    Q    Big picture before we get into the specifics.  What was

24    our big picture request of you?

25    A    Whether those homeowners were harmed; and if they were,
```
                                481

1  what was the quantum damage.

2  Q    And in the field of economics, is the topic of economic

3  conspiracies an issue that you would have any particular

4  education, training, or background in?

5  A    That's something we study in antitrust economics, yes.

6  Q    And have you ever heard -- like there's some reference

7  in -- I believe -- I don't know if it was during the jury --

8  what we call voir dire, the questioning, or during opening

9  statement.

10       There was some reference to a concept of a

11  conspiracy theory.  Have you ever heard of general things

12  called conspiracy theories?

13  A    Yes, I have.

14  Q    When you teach in classes about the Sherman Antitrust

15  Act or antitrust matters with students, do you talk about

16  those things with them?

17  A    I talk about price fixing.

18  Q    And as part of that, do you ever have conversations with

19  your students about if they're familiar with conspiracy

20  theories or if -- things like that?

21  A    Typically I'll open that discussion up, asking students,

22  what do you guys think of the notion of conspiracy?  And I'll

23  always get back, Well, did they really land on the moon?  Are

24  they withholding information about Big Foot or who shot JFK,

25  stuff like that.

                          482

```
 1    Q    And in the world of economics -- are there also issues

 2   dealing with like criminal conspiracies, which are different

 3   than economic conspiracies?  You talk to your students about

 4   that?

 5    A    Yes.

 6    Q    What do you talk about if you're talking about a

 7   criminal conspiracy?

 8    A    It's, you know, like the mob getting together, the

 9   Mafia, that kind of conspiracy that touches on the criminal

10   law.

11    Q    Like a group of bank robbers having a conspiracy to rob

12   a bank, right?

13    A    Yes.

14    Q    Now, economic conspiracies, is that -- in your field, is

15   that something that's different?  When corporations or

16   competitors join together in an economic conspiracy, is that

17   something that's different?

18    A    Yes, it is.

19    Q    And this is going to bring me back to when I first

20   started practicing law.  Before my son was alive, we used to

21   use these easels.

22             I'm going to write here -- I'll turn so you can see

23   it.

24             MR. GLASS:  I'll just move.

25             Your Honor, may I?
                                483
```

```
 1              THE COURT:  Sure.
 2     Q    (BY MR. KETCHMARK)  I'm just writing down the word
 3    "conspiracy."  I get nervous about it because my handwriting
 4    is awful; my spelling's worse.  Do you see where I wrote that?
 5     A    Yes.
 6     Q    Can you tell the jury, please, in -- when you're
 7    teaching an economics class to new students about the concept
 8    of an antitrust conspiracy, are there some core elements that
 9    you look for in trying to decide if there's a conspiracy
10    amongst competitors; like follow and enforce a rule or
11    something like that?
12     A    Yes, there are.
13     Q    How many of them are there?
14     A    Three key ones.
15     Q    So can -- I'm going to write No. 1.  Can you tell me
16    what the first one is?
17     A    One is what we call control.
18     Q    Control.  We're going to talk about each of these
19    separately.
20              What's the second one?
21     A    The second one is detection.
22     Q    Detection.
23              What's the third one?
24     A    Punishment.
25     Q    Punishment.
                                484
```

```
 1            Did I write those down right?

 2   A    Yes, you did.

 3   Q    Okay.  Thank you.  We're going to get back to this in a

 4   minute.

 5            MR. KETCHMARK:  Mr. Glass, that's all I have on that

 6   right now.

 7   Q    (BY MR. KETCHMARK)  Now, on control, I want to talk

 8   about a conspiracy as it relates to like, say, having --

 9   following and enforcing a rule to fix prices.  Let's talk

10   about that type of situation, okay?

11   A    Okay.

12   Q    Do you give real-world examples to your students when

13   you're talking about a conspiracy, for example, of competitors

14   trying to control and fix prices?  Have you ever done that

15   before?

16   A    Yes.

17   Q    One of the things I talked about after visiting with you

18   and kind of learning about this is the group of chicken

19   producers or people making chickens, and you told me about the

20   examples that you give the students on that, following and

21   enforcing the rule at a trade association to fix prices on

22   chickens.

23            I want you to tell the jury how you would teach that

24   as a concept to your class and how you explained it to me

25   early on when I first started talking to you in this case.
```
                                485

```
 1   A     So within this notion of control, if those chicken

 2   producers got together and decided to fix the price of chicken

 3   and raise the price of chicken, if there were a few producers

 4   that were outside the group and all you guys could -- instead

 5   of buying the high-priced, fixed-price chicken, you could go

 6   over to the other producers, they couldn't control you.

 7           But if everybody is in on the deal and everybody

 8   raises their price, then you're under their control because

 9   you have to pay their prices if you want their product.

10   Q     So under the control in that situation with the chicken

11   producers, they need to have some vehicle to control how each

12   other -- how they do it?

13   A     Well, it's -- the object of the control are their

14   consumers, their buyers.

15   Q     Okay.

16   A     Can they control the guys that are buying their product.

17   Q     So in the chicken case, can they somehow kind of have

18   some control over who's buying them?

19   A     Correct.

20   Q     So let's do this.  I'm going to get off the chicken, and

21   I'm going to get to real estate, kind of make more sense in

22   this case, and I won't waste this jury's time.

23           But in the case of chicken, if a group of producers

24   had got together and they fixed the chickens at the highest

25   prices at the highest level, and I'm at the store buying
```

486

chicken, and I make a deal to buy it for $6 a pound. And I
take it home and I cook it up for my 4th of July barbecue, and
I like the way it tastes, and I serve a couple of pounds of
that to all my friends. And Mr. Fadler and Mr. Boulware and
their families are over, and I serve it and everyone -- no one
gets sick, and it's great chicken.

       If -- in the antitrust world, if there was price
fixing that took place and if those chicken producers, that
part of their deal is they're going to comply with the law and
if they didn't do it and they fixed the prices, in your world
and the world of economics, does that matter to the consumer
that I paid the fixed prices?

A    No.  I mean, no price-fixing conspiracy that I've ever
been aware of price themselves out of the market. They want
to get the price up but still keep people buying the product.

Q    Did I hear -- if I heard what you said, in every
price-fixing case, the consumer has made a deal to buy the
fixed price?

       MR. GLASS:  Objection, leading.

       THE COURT:  Sustained.

Q    (BY MR. KETCHMARK)  What do you mean by -- in a
price-fixing case, if a consumer pays the fixed price, what's
important from an economic standpoint to you?

A    That the price is above what would emerge in a
competitive market.

487

```
 1   Q   Now, let's talk about these concepts here as it relates

 2   to this particular case, and I'm going to show you what's been

 3   marked as Exhibit No. 4593 that we've been using for

 4   demonstrative purposes in this case.

 5             Do you see that?

 6   A   Yes, I do.

 7             MR. KETCHMARK:  In fact, just for the jury's

 8   convenience, I'd move that into evidence, 4593.

 9             MR. GLASS:  I object, Your Honor.  This is a slide

10   from the opening statement.

11             MR. KETCHMARK:  What's the objection?

12             THE COURT:  For demonstrative purposes only, it's

13   admitted.  Can't go back to the jury.

14             MR. KETCHMARK:  That was my point.  I'm sorry,

15   counsel.  I said for demonstrative purposes.

16   Q   (BY MR. KETCHMARK)  Let's look over here.  In this case,

17   we see the National Association of Realtors.  Do you see that?

18   A   Yes.

19   Q   You understand that they're one of the defendants in

20   this case who we're alleging is part of a conspiracy in this

21   case?  Do you see that?

22   A   Yes.

23   Q   The Keller Williams at the high corporate level, do you

24   understand they're a defendant in this case who we're alleging

25   is part of the conspiracy?
                              488
```

```
 1    A    Yes.

 2    Q    A parent corporation and three subsidiaries of

 3  HomeServices, do you understand that we're alleging in this

 4  case that those are also companies that are part of this

 5  conspiracy?

 6    A    Yes.

 7    Q    And then we have Anywhere, a corporation that you're

 8  also -- you understand in this case we're alleging that has

 9  also participated in the conspiracy?

10    A    Yes, that's correct.

11    Q    And RE/MAX, another corporate broker, do you understand

12  that we're also alleging is part of this conspiracy?

13    A    Yes.

14    Q    And do you see here where we've pulled out from the

15  National Association of Realtors during the -- a rule that's

16  consistent from 2015 through 2022, the time period of this

17  alleged conspiracy, this rule that -- of cooperative

18  compensation in this case?  Do you see that?

19    A    Yes, I do.

20    Q    And do you see across the top the allegation that we're

21  making that there's a conspiracy to follow and enforce the

22  cooperative compensation rule that has a purpose and a -- or

23  effect of inflating, raising, or stabilizing commission rates

24  paid by homeowners during the sale of homes?  Do you see that?

25    A    Yes, sir.
                              489
```

```
 1   Q    Now, when we talk about that, let's first talk about
 2   this word "or" when it says "purpose or effect."  Do you see
 3   that?
 4   A    Yes, sir.
 5   Q    The -- on the purpose side, there could be -- what is
 6   the word "or"?  How is -- is that an important word in the
 7   field of economics as it relates to you when you're teaching
 8   the concept of conspiracy or understanding the concept of
 9   conspiracy?
10           MR. GLASS:  Objection, Your Honor.  He's asking the
11   witness to interpret your instructions.
12           MR. KETCHMARK:  It's not an instruction.  This is --
13           (Counsel approached the bench and the following
14   proceedings were had:)
15           THE COURT:  What are you going to say to his
16   objection?
17           MR. KETCHMARK:  I'm not going to ever refer to this
18   as a jury instruction.
19           THE COURT:  Those are words out of my jury
20   instructions.
21           MR. KETCHMARK:  Okay.  I'll take it down.  I
22   understand.  It's a demonstrative exhibit that's in, and I'm
23   not going to refer to it as a jury instruction.  It's no
24   different than --
25           THE COURT:  I'm just worried that you're going to
                                   490
```

Case 4:19-cv-00332-SRB    Document 1325    Filed 11/28/23    Page 131 of 242

```
 1   ask him to define something that --
 2           MR. KETCHMARK:  No, I will not ask him to define
 3   anything the court is defining.  I'll move off that.  And I
 4   understand that.  I'll stay away from that.
 5       (The proceedings returned to open court.)
 6   Q    (BY MR. KETCHMARK)  What I want to talk about is I want
 7   to talk about the purpose side of the situation of that -- the
 8   purpose or effect.  I don't want to focus on the purpose, the
 9   purpose behind something.  I want to focus on the effect side
10   of that purpose or effect.
11           Do you understand that?
12   A    Yes, sir.
13   Q    So when we're looking at this and if we're focusing on
14   the effect side of the word "or," and if the effect is to
15   inflate, raise, or stabilize commission rates -- do you see
16   that?
17   A    Yes, sir, I do.
18   Q    Now, tell me -- talk to the jury about the concept of
19   what stabilization does as it relates to commission rates in
20   the real estate industry, how stabilizing commission rates,
21   say, between 5 and a half and 6 percent over time, what effect
22   that can have on the real commission rates that are being paid
23   by homeowners?
24   A    The price of housing in Missouri in particular has gone
25   up pretty dramatically, much higher than the rate of
                              491
```

```
 1   inflation, and if you got these commissions expressed as the
 2   percentage of the price of the home, they're going up faster
 3   than overall prices are.
 4            So it has a dramatic impact in terms of how much
 5   home sellers are having to pay out in these commissions.
 6   Q    So, for example, if you bought a house and -- a $100,000
 7   house in 1990 and you -- and the seller had to pay -- or paid
 8   3 percent for the buyer's commission and then that house is
 9   sold in the year 2020 for $300,000 and they're paid at that
10   point 3 percent for the buyer's commission, if it was stable,
11   that 3 percent was stable, what would the effect of amount of
12   commission being paid in 2020 when this jumped up to 300,000?
13   A    So it would go from $3,000 in commission up to $9,000 in
14   commission.
15   Q    So --
16   A    Triple.
17   Q    Excuse me.  Go ahead.
18   A    Triple.
19   Q    Triple.
20            And is that what stabilization in the economic
21   world, how stabilizing commission rates can have an economic
22   impact in the real world?
23   A    Yes.
24   Q    And one of the exhibits, which has already been
25   introduced into this case into evidence is from the training
```

492

material that Keller Williams -- this is Exhibit No. 1635.  Do
you see that?

A    Yes, I do.

Q    Is that not simply an actual example of the very thing
that you were just talking about, how stabilization of
commission rates over a 20-year time period can let them
make -- go from a $6,000 commission, $6,750 commission to a
$12,000 commission?

A    Yes.

Q    And the bottom of the slide from Keller Williams where
they -- they have it listed, Win big with first-time
homebuyers.  Do you see that?

A    Yes, I do.

Q    As part of your work in this case, did you review not
just the material like I've shown you from Keller Williams,
but did you also do it for the various defendants,
HomeServices and the various subsidiaries?

A    Yes, I did.

Q    Did you also do it for RE/MAX and Realogy, which is now
called Anywhere?

A    Yes, I did.

Q    Did you look at whether or not they had training
materials and other information training frontline agents on
what would happen when you were able to stabilize commission
rates over time?  Did you do that?

493

1    A    Yes, I did.

2    Q    The -- I want to show you what's been previously

3   introduced into evidence in this case as 654A.  And I'm going

4   to go down here under this part and tell you this is -- did

5   you read Michelle -- Ms. Michelle Figgs' deposition in this

6   case?

7    A    Yes, I did.

8    Q    And did you also see what I have played -- or displayed

9   here in front of the jury for 654A, which is this section

10  where it says, Gary believes strongly in collusion theory for

11  why commissions are stable, co-opetition?  Do you see that?

12   A    Yes, I do.

13   Q    When -- if a corporation is involved in a plan to

14  stabilize commissions over time, does that -- what economic

15  impact would that have in this case?  You understand that's

16  the allegations that we're making against these corporate

17  defendants?

18   A    Yes.

19   Q    If there's been an attempt to stabilize commissions in

20  the real estate industry so home sellers pay between 2 and a

21  half and 3 percent in commissions to the -- to the buyers of

22  homes; when you're selling your home, you have to pay the

23  buyer's agent.  If it stabilizes over time, what economic

24  impact does that have, based upon your expertise and

25  background?

                            494

```
 1    A    So we talked about home prices going up much higher than

 2   the rate of inflation, but the other thing it does, it means

 3   that those prices don't respond at all to market forces.  If

 4   you have a really hot housing market, it's stuck right at the

 5   stabilized price.  If you have a really slow market, it's

 6   stuck right at the stabilized price.

 7              It doesn't adjust.  It doesn't respond to those

 8   market forces.  I mean, imagine if the price of gasoline was

 9   always a constant fixed percentage of the price of an

10   automobile, always, it wouldn't make any sense, right?  It's

11   not responding to any of the basic economic forces we expect

12   those prices to respond to.

13    Q    How many years you been in the antitrust field before --

14   for?

15    A    Including teaching, 30 years.

16    Q    And you've been involved in multiple cases dealing with

17   different allegations of conspiracies in corporations and in

18   all different shapes and sizes have you done over your time?

19    A    Yes, I have.

20    Q    And in this case, how many hours -- I should have asked

21   that.  The team that you're working with now, what's the name

22   of that team?

23    A    Berkeley Research Group is the name of the company I'm

24   with.

25    Q    So in addition to teaching, do you also do outside
```
                              495

```
 1   consulting work?

 2   A    Yes, I do.

 3   Q    And how long have you been doing that?

 4   A    Since 2001, when I came back to Bryan-College Station.

 5   Q    Why do you do that?

 6   A    Because it works hand in hand with my teaching.  I can

 7   take the actual practice of economics that we're using to help

 8   companies and governments back into the classroom, and the

 9   classroom is like sitting here trying to describe my work for

10   the ladies and gentlemen of the jury.

11   Q    And in all of the cases you've been involved in, have

12   you ever seen a document where there's someone there who's --

13   and the jury will remember who that was identified as.  But

14   have you ever seen something where there's reference to a

15   collusion theory as to why commissions are stable?  Have you

16   ever seen that -- such evidence in cases you've been involved

17   in?

18   A    One other case where -- but this is pretty clear.

19   Q    Stabilization -- the reasons commissions are stable is

20   because of the collusion theory.  You see that?

21   A    Yes.

22             MR. GLASS:  Objection; leading.

23             THE COURT:  Sustained.

24   Q    (BY MR. KETCHMARK)  Is that what it states?

25             THE COURT:  Sustained.  You can ask him to explain
                             496
```

```
 1   it if --

 2   Q    (BY MR. KETCHMARK)  What does that say there?  Can you

 3   read it out loud.

 4   A    Gary Keller -- Gary believes strongly --

 5   Q    Let's restate that.  It says what?  It doesn't say Gary

 6   Keller.

 7   A    It says, Gary believes strongly in collusion theory for

 8   why commissions are stable, co-opetition.

 9   Q    As an economist, when you see that, what does that mean

10   to you?

11   A    Collusion is another word for a price-fixing conspiracy.

12   Q    I want to show you what's been marked in this case

13   as Exhibit No. 686 is in evidence and is talking about here --

14   this is a script -- that front page of this is a script

15   from -- dealing with Mr. Gino Blefari.

16              As the jury knows, the reference to Gino Blefari is

17   the individual who's associated with the HomeServices and

18   HomeServices defendants.  You understand that?

19   A    Yes.

20   Q    And I want to show you here a portion of this where it

21   states here on the Bates page on the bottom -- these are Bates

22   numbers.  I was actually told it's Mr. Bates that made that.

23   I don't know if that's true or not.

24              But it says Bates 94134.  Do you see that?

25   A    Yes, I do.
                            497
```

1  Q    That's just the way lawyers kind of have every -- of the

2  millions of documents -- that we stamp those so we can know

3  what they are.  Do you understand that?

4  A    Yes.

5  Q    And it says up here -- it's the page before that.

6         I was always supremely confident.  For example, when

7  home sellers saw that I had written a 6-percent commission in

8  the contract and would ask, Gino, but aren't commissions

9  negotiable?  I would always confidently answer, Yes,

10 commissions are negotiable, but I can only go up from

11 6 percent, from 6.  Do you see that?

12 A    Yes, I do.

13 Q    As part of your work in this case, did you do an

14 undertaking to look at how the HomeServices and HomeServices

15 defendants addressed this issue of training or teaching their

16 folks about how to stabilize or set commissions?

17 A    Yes, I did.

18 Q    Now, when you talk about this concept of control, as

19 part of this case under control, did you look at anything

20 dealing with the National Association of Realtors?

21        MR. KETCHMARK:  I've just written NAR on there.  If

22 I do anything more exotic, I'll let you know.

23 Q    (BY MR. KETCHMARK) Did you see how I've written NAR on

24 there?

25 A    Yes.
                              498

1   Q   Did you look at the role the National Association of

2   Realtors played from an economic standpoint under this control

3   piece?

4   A   Yes, I did.

5   Q   Can you tell the jury what you looked at as it relates

6   to the National Association of Realtors on the NAR piece?

7   A   The MLS handbook and the rules that govern the MLS.

8           MR. KETCHMARK:  I'm going to move into evidence -- I

9   guess they're already in.  Thank you.

10  Q   (BY MR. KETCHMARK)  The various MLS handbooks.  During

11  the time period we're dealing with from 2015 to 2022, I'll

12  represent to you that those are in evidence, and I'm just

13  going to show you the front pages of each of those, okay,

14  Doctor?

15  A   Okay.

16  Q   The front page of Exhibit No. 136.

17          Do you see that as the front page of the handbook

18  for the year 2015, the NAR handbook on the MLS policies?

19  A   Yes, sir.

20  Q   Defendant's Exhibit No. 3681, do you see that as the

21  front page of the 2016 handbook?

22  A   Yes, sir.

23  Q   Now, I'm not pulling all of them up, but just so you and

24  the jury knows, these MLS handbooks, I mean, there's a whole

25  big thick set of the rules and regulations that these local

                            499

```
 1   MLSs have to follow; is that true?

 2    A    That's correct.

 3    Q    We're just narrowly focusing on the one right now with

 4   you on this cooperative compensation, correct?

 5    A    That's correct.

 6    Q    But are there other aspects in this handbook that deals

 7   with control that NAR has over these NAR MLSs?

 8    A    The cooperative compensation rule is kind of the trunk

 9   of the tree, and there's other rules that help support that.

10    Q    The trunk of the tree.  Okay.  I'm going to talk to you

11   a little bit about that.

12           Now, the next one I want to show you is the one

13   that's in evidence, Defendant 3713.  Is that for 2017, the

14   same handbook?

15    A    Yes, it is.

16    Q    We have Defendant's 3745, a handbook for 19 -- or 2018

17   for the National Association of Realtors.  Do you see that?

18    A    Yes, I do.

19    Q    In fact, when we look at that one -- I wasn't doing this

20   before to kind of move it along, but we actually see the

21   National Association of Realtors there, right?

22    A    Yes.

23    Q    The Defendant's 3842, do we see 2020, the handbook on

24   multiple listings policy for the National Association of

25   Realtors?  Do you see that?
```
                                500

```
 1    A    Yes, I do.

 2    Q    Defendant's -- I'm sorry.  This would be Plaintiffs'

 3   216.  Do you see the 2021 for the National Association of

 4   Realtors?

 5    A    Yes, I do.

 6    Q    Policy handbook?

 7    A    Yes.

 8    Q    Now, the Exhibit 722, the multiple listing handbook for

 9   2022 from the National Association of Realtors, do you see

10   that?

11    A    Yes, I do.

12    Q    And even though this is after we had to stop -- at some

13   point did we have to stop the data collection so we could --

14   so you could deal with all the data and prepare to testify in

15   this trial?

16    A    Yes.

17    Q    And when that happened -- at some point in June of 2022,

18   did we cut off the collection of the data?

19    A    That's correct.

20    Q    But just so there's no confusion, Exhibit No. 4587, do

21   you see the 2023?

22    A    Yes.

23    Q    And when we go and look at that rule that's at issue

24   here that we've been talking about, in 2023, this rule is

25   still -- is it your understanding that that clear cooperation
```

501

1    policy is still in place now for the National Association --
         2    I'm sorry.  I misspoke.
         3             The -- not here to talk to you about clear
         4    cooperation.  That's my next witness, Mr. Alford, Professor
         5    Alford.  I won't be talking to you about that at all.  And
         6    that's kind of why you looked at me like what are you talking
         7    about?
         8             The cooperative compensation policy, is it your
         9    understanding that the cooperative compensation policy is
        10    still in place, the one that we put up here before that we
        11    were just visiting about, is still in place in 2023?
        12    A    That's my understanding, yes.
        13             MR. KETCHMARK:  Thank you, Mr. Fadler.
        14    Q    (BY MR. KETCHMARK)  It was on June 30th of 2022 that we
        15    shut the data off and we closed the window on the class of
        16    people that we're asking this jury damages for; is that true?
        17    A    That's correct.
        18    Q    The people from that point forward, though -- I mean,
        19    these rules that you have in front of you here, this Exhibit
        20    4587 that I pulled up, I mean, that rule is still right there
        21    in place and has not changed; is that a fair statement?
        22    A    That's correct.
        23    Q    Now, one of the exhibits -- before I get into more in
        24    this control issue, I want to talk to you about is Exhibit
        25    205A, the navigating legal risks.  Have you reviewed that as
                                      502

```
 1   part of your expert work in this case?

 2    A    Yes, I have.

 3    Q    And there's a page on this that I want to talk to you

 4   about that's called antitrust in real estate, unlawful per se

 5   restraints.  Do you see that?

 6    A    Yes, I do.

 7    Q    What does the term "unlawful per se restraint" mean in

 8   the field of economics?

 9    A    So "per se" means it's a kind of practice that almost

10   always harms the competitive process and harms consumers.

11   Price fixing is one of those that there's just no economic

12   rationale for it.  There's other kind of practices that, while

13   they may harm consumers and harm competition, sometimes they

14   will always harm them.

15           So those are what we call per se.  Per se is one of

16   those that all you've got to do is look; and if you see that

17   going on, yeah, people are being hurt.

18    Q    And you understand in this case, the allegations that we

19   are bringing on behalf of these homeowners in Missouri is that

20   the defendants have engaged in an unlawful per se restraint of

21   trade under the Sherman Antitrust Act?  Do you understand

22   that?

23    A    That's my understanding, yes.

24    Q    And do you understand that as part of that, our

25   allegation is that there -- that there's -- this rule, this
```

1    cooperative compensation rule is being followed and enforced

2    in order to raise, inflate, or stabilize prices to make

3    homeowners pay more in buyer brokers' commissions than they

4    would pay in a fair market?  Do you understand that's what

5    we're alleging?

6    A    Yes.

7    Q    And you understand that -- when you said the trunk of

8    the tree, do you remember talking about that?

9    A    Yes.

10   Q    And if this case involves an allegation of price fixing,

11   what do you mean by when you talk about that this rule is the

12   trunk of that?  What do you mean by that?

13   A    Well, it's the core rule that puts this in place, and

14   they have a couple other rules that kind of help support it.

15   Q    Let's not talk about those other ones because the only

16   one I want to talk to you about is the trunk.  We'll let

17   Professor Alford talk about the other rules, okay?

18   A    Okay.

19   Q    Now, tell me this:  When it comes to this control, I

20   want to talk about the National Association of Realtors.  You

21   understand that as it relates to these other defendants in

22   this case, and we're looking at this demonstrative exhibit,

23   No. 4593, that we are alleging that the corporate real estate

24   companies have benefited in this conspiracy from the

25   commission money that's being paid.  Do you understand that's

504

```
1    the allegation against the corporate real estate companies?
2    Do you understand that?
3    A    Yes.
4    Q    Now, if the National Association of Realtors -- I want
5    to talk about their part in this, and what I want to visit
6    with you about is, as part of your work and investigation
7    here -- you understand as it relates to the National
8    Association of Realtors, that they're the association that the
9    other folks down here -- that they have real estate agents
10   that are members of that association or they're a part of that
11   association?
12   A    That's my understanding, yes.
13   Q    And when we're talking about the control, did you look
14   at -- did you look at the subject -- you referred to it as the
15   subject MLSs.  Did you look at that here in the state of
16   Missouri?
17   A    Yes, each of the four MLSs.
18   Q    Tell me about -- can you tell the jury about the subject
19   MLSs?  What do you mean when you talk about the concept of a
20   subject MLS?
21   A    So the Heartland MLS that covers greater Kansas City
22   area, the southern Missouri MLS, the Columbia MLS, and then
23   the MARIS MLS that covers the St. Louis area.
24   Q    Let me show you some exhibits that have been moved into
25   evidence, and we tried to do this ahead of time over the lunch
```
505

```
 1    break to kind of speed it along a little bit for the jury.

 2              So Exhibit 113 has already been moved and admitted

 3    into evidence by this court.

 4              Exhibit No. 113, do you see that as a log-in page

 5    for the M-A-R-I-S MLS that's over in St. Louis?

 6    A    Yes.

 7    Q    Now, as part of your work in this case -- and I'll go

 8    through the four of these.  Do you see the next one, Exhibit

 9    114, the log-in page for the Heartland MLS?

10    A    Yes, I do.

11    Q    The next one, 115, the log-in page for the Columbia MLS?

12    A    Yes.

13    Q    And the next one, 116, the log-in page for the Southwest

14    Missouri MLS?

15    A    For the Southern Missouri MLS.

16    Q    Southern Missouri.  I'm sorry.  I'm calling it Southwest

17    Missouri.  That's just the Missouri in me.

18              But they refer to it as the title, and you're

19    absolutely right, it's the Southern Missouri Regional MLS,

20    correct?

21    A    That's correct.

22    Q    Now, is it your understanding that these four MLSs that

23    we've listed here, that these are the ones that have been

24    referred to in this case by the NAR witnesses as the

25    NAR-affiliated or NAR-controlled MLSs?
```

506

```
 1   A    Yes.

 2             MR. GLASS:  Objection.

 3             MR. KETCHMARK:  Can --

 4             THE COURT:  What is the objection?

 5             MR. GLASS:  Mr. Ketchmark is testifying about what

 6   the witness has said.  He's not asking a question.

 7             THE COURT:  Sustained.  You can go ahead and ask

 8   one.

 9   Q    (BY MR. KETCHMARK)  Do you know what control the NAR,

10   the defendant NAR, the National Association of Realtors, has

11   over these four subject MLSs?  Can you tell the jury in your

12   own words?

13   A    So up until recently, every association MLS had to send

14   in all their rules to NAR for review and approval.  Now

15   instead of having to send all those rules in, they just have

16   to certify, yes, we follow the National MLS Handbook, that all

17   those examples every year that you saw that include that

18   mandatory compensation rule.  And every subject -- every MLS,

19   if they're NAR affiliated, they have to follow those rules in

20   order to maintain their affiliation.

21   Q    So now I'm not going to show you this, but this is --

22   not going through it.

23             But when I went through 2015 to 2023, I mean, that

24   literally are the rules that we're talking about, correct?

25   A    Yes, that's correct.
```

507

```
1    Q    Can you hold it sideways so the jury can see that?

2              When you say until recently, do you know what period

3    of time the National Association of Realtors required these

4    four subject MLSs to actually send their rules in so that the

5    folks and the -- they could certify it at the National

6    Association of Realtors' level when that was done?

7    A    I know I cited that in my report, and I believe it's

8    2021 they changed that rule.

9    Q    Would you like to see your report?  Would that help?

10   A    That would help.

11   Q    I'm not going to move your report into evidence.  Oh,

12   you have it.  Of course, you do.

13             Can you just use that to refresh your memory?  Would

14   that be helpful?

15   A    Yes.

16   Q    You know what, Dr. Schulman, we'll just come back to

17   that at a break unless you've got your hand on it right there.

18   A    Yeah.  We'll come back to that.  I can't find it right

19   off --

20   Q    Okay.  We'll come back to that at a break.

21             But at some point in time, it went from having to

22   send it in to now they just have to certify here in Missouri

23   that they're following it; is that your understanding?

24   A    That's correct.

25   Q    Now, one of the ways with these local MLSs, like, when I
```

508

```
 1   showed you this, when I -- if I go to that web page as a
 2   homeowner, or if you're not a member of NAR or member of --
 3   you're not one of their members, can anybody just log into
 4   these MLSs?
 5   A    They have to be a member of the local association to get
 6   MLS access.
 7   Q    Now, in -- to be as a -- as a participant in NAR -- I'm
 8   going to have you turn with me -- I'm not going to publish
 9   this yet to a jury -- the jury, but I want you to turn with me
10   to Exhibit No. 2246, which is your -- the page off of NAR from
11   the membership dues page.
12           We'd like to -- as part of your -- do you see that
13   2246?
14   A    I'm digging for it.
15   Q    Yeah, I don't have it up on the screen yet because it's
16   not in evidence.  2246.
17           Speed it up here for you, Dr. Schulman.
18   A    I don't seem to have it in my --
19   Q    Here it is.  My mistake.  It wasn't on there.
20           Do you see that?
21   A    Yes.
22   Q    Did you review the membership dues that the National
23   Association of Realtors charges its members in order to be a
24   part of their organization as part of your work in this case?
25   A    Yes.
```

509

```
 1              MR. KETCHMARK:  We'd move Exhibit No. 2246 into

 2     evidence.

 3              THE COURT:  Subject to all those same objections?

 4              MR. MacGILL:  Yes.

 5              MR. GLASS:  Yes, Your Honor.

 6              THE COURT:  Admitted.

 7     Q    (BY MR. KETCHMARK)  And No. 2246 shows the current dues

 8     of the National Association of Realtors at $150 per year per

 9     member.  Do you see that?

10     A    Yes.

11     Q    Now, as part of my -- I'll just tell you, there's other

12     fees and expenses and things associated with being a realtor

13     that are unrelated to that, based upon your -- is that true,

14     based upon your review and information in this case?

15              MR. GLASS:  I'm going to object, Your Honor.  None

16     of this is in his report.

17              MR. KETCHMARK:  I'll just move on.

18     Q    (BY MR. KETCHMARK)  Let's just focus on the dues.  If

19     1.5 million members of the National Association of Realtors

20     pay annual dues of $150 -- do you have a calculator up there?

21     A    Yes.

22     Q    Can you do $150 per member times 1.5 million members a

23     year and tell me what the math is on that.

24     A    Let me doublecheck, but I believe it's $225 million.

25              $225 million.
                            510
```

```
 1   Q    That's per year, correct?

 2   A    Per year.

 3   Q    Now, if there is -- to be a participant in a conspiracy,

 4   one of the things that you said that you're looking at, do

 5   they have some type of control?  Do they have some interest in

 6   controlling other people's participation in it?  Do you

 7   understand that?

 8   A    Yes.

 9   Q    If you're an association that has a control over a rule

10   that -- in this case the allegation is that the other people

11   who are the alleged coconspirators, the other coconspirators,

12   the real estate companies, if they have to belong and their

13   members have to belong to the National Association of

14   Realtors, is there an economic incentive for a corporation or

15   a company, like the National Association of Realtors, to be

16   involved in something like that from an economic standpoint?

17            MR. GLASS:  Objection.  Not in his report.

18            MR. KETCHMARK:  It's very much a part of his report.

19   He's here to testify about this fundamental issue of their

20   participation in this conspiracy.

21            THE COURT:  Objection overruled.

22            You can answer.

23   Q    (BY MR. KETCHMARK)  Tell the jury.

24   A    So, yes, the association has an incentive to maintain

25   very high membership rolls.  The more members they have, the
```
                              511

```
 1   more funds they're bringing in.

 2    Q    Now, detection -- let's move away from control.  And I'm

 3   not suggesting that we -- I'm going to leave it to the jury

 4   whether we have proved different things, but I'm just going to

 5   put a checkmark next to that to show I've covered that with

 6   you.

 7          Do you believe that we've covered the big issues as

 8   it relates to control?  Or if I've missed some stuff, don't

 9   let me do that.  Have I missed some stuff you talked about

10   under the control?

11    A    So most of what we talked about control is kind of

12   NRA -- NAR controlling members.

13    Q    Thank you.  And I was -- I was getting ready to pivot

14   off.

15          We need to talk about the corporate defendants and

16   the other corporations.  Talk to the jury about the control as

17   it relates to non -- to the other folks in -- that we are

18   alleging are members of this conspiracy, the HomeServices and

19   their subsidiaries and Keller Williams and RE/MAX and Realogy.

20   How does the control issue apply to those folks?

21    A    So each and every transaction that we're examining here

22   went through one of the four MLSs, and that forces every

23   single seller that the only way you get on that MLS is by

24   making an offer to pay the buy side agent.  You don't want to

25   make that offer, you cannot get on the MLS.
```

512

1    And beyond that, it's become the situation in the

2    U.S. where --

3    Q    Let me keep you in Missouri, just because we're not

4    around the United States with these defendants here.

5    A    So in Missouri, the MLS system is the predominant way to

6    sell a home, and so that's how they assert control over

7    sellers, that we've got this really great thing, the MLS.  If

8    you want to be a part of it, there's a condition.  You have to

9    offer to pay the buy side agent.

10   Q    And with Keller Williams and HomeServices and the

11   HomeServices subsidiaries, did you review the deposition

12   testimony and the documents in evidence in this case to see if

13   those corporate defendants and RE/MAX and Realogy, those other

14   alleged coconspirators -- did you review the information to

15   decide or to see whether or not they took steps to see that

16   their agents and these independent contractors were following

17   the National Association of Realtors' rules?  Did you do that?

18   A    Yes, I did.

19   Q    What did you find when you did that?

20   A    That they uniformly want to support this rule.

21   Q    And so now am I safe to put the check up there for the

22   control?

23   A    Now we got it.

24   Q    Probably wouldn't have done very well on the exam if I'd

25   submitted just with the NAR.  Thank you.

                                513

```
 1              So now let's move down to the second one on
 2    detection.  What does detection mean in the world of
 3    conspiracy in an economic role?  What does detection mean?
 4    A    So it's -- one of the fundamental things we see in
 5    economics, it is really difficult to hold a collusive
 6    arrangement together, because if guys get together and say,
 7    Let's fix the price, and they initially fix the price, well,
 8    there's always an incentive for one of those guys to break off
 9    and try to capture a big part of the market by cutting price.
10              And if the other guys that are in the conspiracy
11    have no way to actually see what the -- their coconspirators
12    are doing, they can't detect.
13    Q    Let me go back to our chicken thing and see if we can
14    use that.
15              You got a group of four or five chicken producers
16    who are saying that they're going to fix their prices at $6 a
17    pound, but then I'm over here on the side saying, If I start
18    selling it at $3 a pound, the market -- from an economic
19    standpoint, are you saying the market would kind of flood to
20    me?
21    A    Yes.
22    Q    And if there's not a way for other people to detect that
23    one of their coconspirators isn't playing along with this --
24    with the price fixing, does that make it hard to hold that
25    conspiracy together?
```

514

```
 1   A    Yes, it does.

 2   Q    And so in this case, from an economic standpoint, from

 3   an antitrust standpoint, from a person investigating this with

 4   your expertise, what did you do to determine if there was a

 5   detection vehicle for these alleged coconspirators to carry

 6   out this conspiracy?

 7   A    Well, it's built into how these MLSs operate.  When you

 8   list with the selling agent and they post to the MLS, you have

 9   to post that offered commission rate for every other broker in

10   the MLS to see.  And if a seller wants to try to offer below

11   the standard, well, everybody can see it.  It's right there.

12        So it's a very easy way to check if anybody's trying

13   to shift away from kind of the standard practice of what these

14   offered rates are.

15   Q    And so in this particular rule -- and my partner, Ben,

16   is going to find the example -- the rule is, as listed here on

17   Exhibit 4593, In filing property with the multiple listing

18   service, participants make blanket unilateral offers of

19   compensation to the other MLS participants and shall,

20   therefore, specify on each listing filled with the service the

21   compensation being offered to the listing broker to the other

22   MLS participants.

23        Do you see that?

24   A    Yes, I do.

25   Q    And how do they -- how does that work on these MLSs?
```
                              515

How would -- if -- for example, if Keller Williams puts a property on the MLS, how would HomeServices know what's being offered, or how would HSF Affiliates' people or BHH or Anywhere -- how would their agents for those people know?

A    Well, the MLS listing identifies the listing broker.  If Keller Williams -- a Keller Williams Realty affiliate lists a home in the Kansas City area and comes in and says, Oh, I'm only going to offer 1 percent for the buy side, every single other participant in the Heartland MLS sees that offer, and they also see exactly who's making the offer.  All right?

Now, it's tied to a specific home and a specific listing agent.  So all that information is there for everybody that's part of the MLSs.

Q    And there's a second part of that.  This is an example from one of the many ones.  This is 2021, and it's the -- I'll represent to you that during the class period, it's the same.

We see the rule that we have on the demonstrative exhibit that's there from the actual -- this is from the actual MLS policy handbook.  Do you see that?

A    Yes.

Q    Exhibit 216?

And this is the actual commission rule that we just -- that I had up on what we call a "demonstrative."  I'm sorry.  Demonstrative is just something that I put together on that other one to demonstrate.  But here's the actual rule

516

1    from the actual exhibit in evidence, 216.  Do you see that?

2    A    Yes, I do.

3    Q    And then when you look down to the next page, page 36,

4    there's another portion of this that says, One of the rules

5    amended in 1996 and remains in place today.  I'm going to try

6    to read it slow.  Tell me if I read it right.

7            Multiple listing services shall not publish listings

8    that do not include an offer of compensation expressed as a

9    percentage of the gross selling price or as a definitive

10   dollar amount, nor shall it include general invitations by

11   listing brokers to other participants to discuss the terms and

12   conditions of possible cooperative relationships.

13           Do you see that?

14   A    Yes, I do.

15   Q    And I apologize for reading it, but that's what -- you

16   know that we're just creating the record, and it's important

17   that I do that as part of this case.  You understand that?

18   A    Yes, I do.

19   Q    What does it mean, from a detection standpoint in this

20   alleged conspiracy, to have a rule like that at the National

21   Association of Realtors that we're alleging the other

22   defendants are following and enforcing?  What does that mean?

23   A    They can see when any listing agent or a seller

24   specifically deviates from kind of the standard rate.

25   Q    So on these -- so you're telling me on these four MLSs

                                517

1   in Kansas City, St. Louis, in Columbia, and southern Missouri,

2   that they're having to log on there and see what percentages

3   are being offered or amounts?

4   A    As the -- this rule states, they have to express it as a

5   percentage of the gross selling price or a definitive dollar

6   amount.  That has to be posted on the MLS for all those agents

7   to see.

8   Q    So going back to our chicken producer thing, if I was a

9   chicken producer corporation sitting at the top, I could log

10  on there and see what the other folks are selling their

11  chickens for?

12  A    At every individual store they happen to be selling at.

13  Q    And that's a good point.  In this case, to be clear, to

14  make sure -- see if you have an understanding.  Do you

15  understand that as part of this case, that the defendants in

16  this case, the people who are alleged to be in this -- who we

17  brought as the defendants in this case, that the jury has

18  here, the -- on the corporate real estate side, Keller

19  Williams and these HomeServices defendants -- do you

20  understand that the case is against at the corporate level and

21  not the real estate agents and that the folks who are on the

22  frontline?  Do you understand that?

23  A    Yes.

24  Q    So in the chicken situation, it would be, like, the

25  chicken producers, but not the person who runs the hen house

                              518

1    or the butcher or the person checking somebody out, not those

2    folks, similar example?

3    A    That's correct.

4    Q    Now, in a price-fixing case, if you're teaching a class

5    on price fixing and chicken folks and there's someone price

6    fixing for chicken, if someone's mad at the producers fixed

7    it, does that mean that they have to be mad at the butcher or

8    the hen house or the person who sold it to them?

9    A    No.

10   Q    Do you, in your classrooms when you're teaching -- I

11   mean, this is -- I'm trying to -- and you're doing a wonderful

12   job.  You taught it to me when I first got involved in it.

13        But effectively what you're doing is you're

14   explaining these economic principles, correct?

15   A    That's what I'm trying to do, yes, sir.

16   Q    When you're talking to your classrooms and you're

17   teaching price-fixing conspiracies to your students, do you

18   use examples?  You actually told me you play games, which I

19   should have done economics.  I never had a professor in

20   college play games with us.  Tell the jury about that.

21   A    So in talking about collusion and conspiracy, we

22   actually run these classroom experiments where they have

23   choices to make.  And if they can all stick together, they

24   get, as a group, a whole lot more of a big pie.  And I'm

25   actually paying them out cash.  If they can all stick

                        519

```
 1  together, the whole pot gets bigger; but there's an incentive

 2  for each individual to kind of cheat, deviate, to get a bigger

 3  individual payout.

 4          So the notion is let them go through them once, and

 5  then let them actually talk together and try to punish one

 6  another for not cooperating.  And it's hitting these three

 7  specific points:  Control, detection, punishment.

 8  Q    And the detection piece of it here, did there come a

 9  time -- so members of the public.  I'm a homebuyer, and I'm

10  buying a house that's being shown to me by somebody.

11          Would I be able to see the stuff that was listed on

12  the MLS in 2015, '16, '17, '18, '19?  Would I know what the

13  commissions were being paid?  Could I log on the MLS and see

14  that?

15  A    Back then, no.

16  Q    At some point in time, did they change that; do you

17  know?

18  A    They changed the rule to allow the local associations to

19  decide whether or not they would publish the buy side

20  commission rights.

21  Q    So for a while, the National Association of Realtors

22  wouldn't even let the local associations that these MLSs in

23  Missouri publish those rates?

24  A    They were expressly told not to.

25  Q    And so the detection can be determined by them, but the
```

520

```
 1   rest of the world couldn't see it?

 2   A    No.

 3   Q    And when did that change; do you know?

 4   A    2021, I believe, is when they made that change.

 5          MR. KETCHMARK:  Your Honor --

 6   Q    (BY MR. KETCHMARK) Before I do that, does that cover the

 7   detection piece of it?

 8   A    Yes, it does.

 9   Q    So I'm going to put a check there.  And before we move

10   into the next part -- I'm not suggesting when we take a break,

11   but it looks like it's three o'clock.

12          THE COURT:  Let's take a break.  We'll see you back

13   here in 15 minutes, 3:15.  Don't talk about the case.

14          (The following proceedings were had out of the

15   presence of the jury:)

16          THE COURT:  You may be seated.  Counsel, approach.

17          (Counsel approached the bench and the following

18   proceedings were had:)

19          THE COURT:  I'm going to kick 44 off after we're

20   done for the day.  Any objection from plaintiff?

21          MR. KETCHMARK:  No.

22          THE COURT:  Mr. Ray?

23          MR. RAY:  Yes.

24          THE COURT:  State whatever for the record.

25          MR. RAY:  Yeah.  We would be willing to accommodate
                                521
```

```
 1    her for the time that she needs based upon the procedure that
 2    we believe she's described.
 3              THE COURT:  Thank you.
 4              Mr. Glass?
 5              MR. GLASS:  No objection from NAR.
 6              MR. MacGILL:  HomeServices defendants have no
 7    objection.
 8              THE COURT:  Thank you.
 9              MR. KETCHMARK:  We would ask, Your Honor, that
10    because of the tremendous amount of press attention --
11              THE COURT:  I'll tell her not to talk to anybody.
12              MR. KETCHMARK:  Including the lawyers?  I see no
13    reason for counsel for either side, but if -- what's good for
14    the goose is good for the gander.  I'm happy to talk to her if
15    they're allowed to talk to her.  It doesn't matter.  But I'm
16    happy to have there be a prohibition.
17              MR. RAY:  He's asking her not to speak to the press?
18    Okay.  I'm a little concerned about it, Judge, because every
19    day Mr. Ketchmark has been talking to the press --
20              MR. KETCHMARK:  I'm not a juror.
21              MR. RAY:  -- after this proceeding.  So I'm just --
22    I don't want to put a gag order on this woman if -- I don't --
23              THE COURT:  I'm going to tell her she can talk to
24    anybody she wants any time she wants.  If she wants to just
25    say, No, thank you, then it's a no, thank you.
```

522

```
 1              MR. RAY:  Thank you.

 2              MR. KETCHMARK:  Got it.  Thank you.

 3                   (A recess was taken.)

 4              (The following proceedings were had out of the

 5    presence of the jury:)

 6              MR. RAY:  We just wanted to remind counsel that

 7    because he's taking the bench, they're not going to have any

 8    communication with him during breaks or certainly overnight.

 9              MR. KETCHMARK:  What's that now?

10              MR. RAY:  Because your expert has taken the bench,

11    you're not to have any communications with him about the case

12    during breaks and overnight.

13              MR. KETCHMARK:  No, I understand that.  But I was

14    asking him what their -- the exhibit number for his report.

15    That's all I was asking him.  But I understand that.  I

16    wouldn't do that.

17              THE COURT:  Thank you.

18              (The following proceedings were had in the presence

19    of the jury:)

20    CRAIG SCHULMAN, previously being sworn, resumed the stand:

21    DIRECT EXAMINATION (CONTINUED) BY MR. KETCHMARK:

22     Q    Dr. Schulman, can we now turn to this detection issue.

23    I'm sorry.  We moved past detection to the punishment.

24              Can you tell the jury from an economics standpoint

25    when you're dealing with these antitrust issues and these
```
                              523

1    conspiracy issues, what do you mean by punishment?

2    A    So if you're talking about a price-fixing arrangement

3    and you want to keep all the guys in the arrangement, if you

4    can't punish them for, you know, trying to grab more market by

5    cutting their prices or moving away from the price-fixing

6    agreement, there's still that incentive.  You know, so

7    they'll -- and that's when those collusive agreements, those

8    price-fixing agreements start to break down.

9              If you've got a mechanism where you can punish folks

10   that move away from the price-fixing arrangement, it holds

11   together.

12   Q    And do you believe from an economics standpoint that

13   there's a mechanism as part of this alleged conspiracy for

14   this punishment?

15   A    Yes, I do.

16   Q    And can you tell the jury what that is?

17   A    It's what in the real estate industry they call

18   steering.

19   Q    Do you see where I've written underneath punishment

20   "steering"?

21   A    Yes.

22   Q    Now, tell the jury what that is as it relates to the

23   real estate industry.

24   A    Well, the actual act of steering would be where a buyer

25   agent or a buyer broker that can see these offered rates, they

                              524

1     see a home that has got a posted offer rate of 1 percent and a

        2     second home that's got an offer rate of 3 percent.  And if

        3     they tell their buyer, Hey, this home over here, you don't

        4     want to see that one.  You want to see this home that's got

        5     this higher commission, the buyer might not know that.

        6             That's steering the buyer to a home that has the

        7     higher commission or away from the home that has the lower

        8     commission.

        9     Q     Now, in the world of economics, if you are in part of a

       10     conspiracy, you set it at the highest level or you're even an

       11     unwilling participant, now there's an agent who's following

       12     and enforcing those rules, does the threat of punishment have

       13     economic consequences?

       14     A     It's not just the act of it.  It's the threat that can

       15     be just as good.

       16     Q     So if a -- if there's a perception of a real estate

       17     agent, for example, that if they don't list a home for -- with

       18     a 3-percent buyer's commission in the MLS, if they're taught

       19     or they're made to believe if they don't do that, that that

       20     home won't sell, is that -- how does that fit in your analysis

       21     under punishment?  Tell the jury.

       22     A     That's the threat of steering.  If you're sitting down

       23     as a home seller and they tell you, Hey, what are we going to

       24     offer the buy side?  Everybody right here offers 3 percent.

       25             Well, I don't really want to offer 3 percent.  I
                                        525

1  want to offer 2 or 1.

2           If you do that -- and these agents are trained to

3  tell their seller clients, If you do that, nobody's going to

4  show your home, and it's going to take longer to sell your

5  home.

6  Q    I was being a little more subtle in my question, and I'm

7  going to apologize for being lost.

8           I'm not only talking about telling the seller that.

9  But if an agent is trained to believe that that happens, if

10 the agent -- him or herself is trained to believe that if they

11 lower it, that they won't have the sales, does that have any

12 economic benefit to the conspiracy?

13 A    Yes.

14 Q    Talk about the subtlety of the difference between that,

15 not just that the homeowners made that threat, but if the

16 front-level agents are trained that.  Explain that.

17 A    Well, then from the sale side, that if they truly

18 believe it's going to take longer, more effort to sell the

19 home, then they have a big incentive to try to convince their

20 seller to keep that commission rate up.

21 Q    So even if an agent isn't doing it because they're like

22 somehow trying to do something illegal or they're a part of

23 it, but if it's been baked into their mind to believe that,

24 does that have an impact in this alleged conspiracy?

25 A    Yes, it does.

                          526

```
1    Q    Explain -- talk about that again.

2    A    So that -- if it's baked into their head that, look,

3    below-market commissions or below-standard commissions are

4    going to be harder to sell, then it just totally incentivizes

5    the notion of trying to keep those commission rates up, not

6    only from the sale side, because half the time they're on the

7    buy side as well, and so they want to try to keep the system

8    going as part of the system that they're in.

9    Q    And as part of your analysis in this case, did you try

10   to make a determination if the corporate defendants in this

11   case -- what percentage of their -- how much money they're

12   making from the -- as buy side versus the sale side?  Have you

13   looked at that?

14   A    I looked at some of the high-level financials.  I didn't

15   actually calculate in Missouri how much they made on the buy

16   side.

17   Q    Now, tell me this -- one of these exhibits that's

18   already in this case, and I'm not going to go through all this

19   because the jury certainly remembers this, but 503A is a --

20   some Keller Williams training materials that talks about

21   commission objections, working with sellers.  Do you see that?

22   A    Yes, I do.

23   Q    It's Exhibit 503.  I apologize.

24        MR. KETCHMARK:  Thank you, Mr. Fadler.

25   Q    (BY MR. KETCHMARK)  Here it says, If the seller asks an
                          527
```

```
 1   agent -- can you read that for the jury, what the seller is
 2   saying to the agent -- or let me be the seller, and then you
 3   be the agent on this.
 4             Can you reduce your commission?
 5             And the agent is being trained to respond what?
 6    A    Of course.  As you know, commissions are negotiable.
 7   Let me ask you, what are you trying to accomplish by getting
 8   me to reduce my commission?
 9    Q    And I say:  I'm trying to save money.
10             And the agent's trained to say?
11    A    I can fully understand that.  Are you aware of how a
12   commission structure works?
13    Q    And as the seller, if I respond to you and say, Not
14   really.  I just know that I have to pay a certain amount of
15   what I receive for my house, and that means I get to keep
16   less.
17             And the agent is trained to say -- and read that
18   slow if you would.
19    A    Let me explain what happens when you reduce a
20   commission.  First of all, half of the commission usually goes
21   to a cooperating agent.  When you reduce the commission, you
22   reduce the incentive for that agent to bring a buyer to your
23   house.  If an agent has ten different houses, nine of which
24   come with a 3-percent commission, one with a 2.5-percent
25   commission, which houses do you think they're going to show?
```
                                528

```
 1   Q    And then the agent's trained to say that the seller is

 2   to respond to that by saying:  The ones with the larger

 3   commissions.  Do you see that?

 4   A    Yes, I do.

 5   Q    And the agent is trained to say?

 6   A    Absolutely.  So you're putting yourself at a

 7   disadvantage competitively when you reduce your commission;

 8   wouldn't you agree?

 9   Q    When you look at that training material from the

10   defendant Keller Williams -- have you looked at similar

11   training from the other -- from RE/MAX and Realogy and from

12   the HomeServices' folks and their types of training and how

13   they train people?

14   A    Yes.

15   Q    When you look at that, what we have just read there as

16   an example, can you tell the jury, does that have any role in

17   your determination that there's been a punishment as part of

18   this conspiracy?

19   A    That's the threat of steering.  That's what they're

20   describing.

21   Q    Now, in the economic world, when you're looking at this

22   control on these things like that, do you -- did you try --

23   did you do an analysis here to see if there's other

24   alternatives for homeowners?

25   A    Yes, I did.
```

                                529

```
 1   Q    Tell the jury about that.
 2   A    So there's two key alternatives, for sale by owner, just
 3   do it yourself, right, don't use the MLS.
 4           And there's other -- there are some brokerages that
 5   are not affiliated with the MLS; so you get around the MLS
 6   rules.
 7           But what we see is, by National Association of
 8   Realtors' own studies, that if you go the for-sale-by-owner
 9   route, you're going to get 20 percent less than your market
10   value for your home.
11           So that hurts to get that kind of discount, and the
12   nonMLS-affiliated brokerages that we've seen trying to break
13   in this market, they just haven't been able to break in.  And
14   they certainly have not had any restraining effect on the
15   commission rates that we absorb in the real world.  They just
16   haven't had an impact.
17   Q    Did you do any determination -- did you look at anything
18   from the National Association of Realtors to look at what they
19   said about the for sale by owner or these issues of the impact
20   that that would have on a house if you sold a house for sale
21   by owner?
22   A    Yeah.  The for sale by owner would get 20 percent less.
23   Q    So if you tried to sell it outside of this system, your
24   home, the National Association of Realtors has said that
25   homeowners would get 20 percent less?
```

530

```
 1   A    Yes.

 2   Q    From an economic standpoint, if I'm the homeowner,

 3   what's the benefit of having my house in MLS?

 4   A    Everybody gets to see it.  A lot more people get to see

 5   it.

 6   Q    As part of your investi- -- or as part of your work that

 7   we had you do in this case, did you also look at -- I'm going

 8   to have you turn with your book, if you would, with me to --

 9   I'm going to have you look with me to Exhibit No. 2868.

10        Did you look at the information in 2868 from the

11   Keller Williams' Family Reunion of 2022?  2868 and 2868B, C,

12   and D?

13        MR. RAY:  Your Honor, we're going to object to that.

14        THE COURT:  Subject to all those same objections

15   that were previously made?

16        MR. RAY:  Yes, Your Honor.

17        THE COURT:  Admitted.

18   Q    (BY MR. KETCHMARK)  I want you to look with me to

19   Exhibit No. 2868.  Do you see that from a Family Reunion from

20   Keller Williams in 2000 --

21   A    2022, yes.

22   Q    I'm sorry.  This is Exhibit No. 2868A from the 2022

23   Family Reunion?

24   A    Yes, sir.

25   Q    And the same exhibit number, B, do you see that, a slide
```

```
 1   of the average seller's commissions?

 2    A    Yes.

 3    Q    And the same one, a slide from the average buyer

 4   commission?

 5    A    Yes.

 6    Q    And a slide D where we see here Mr. Gary Keller from

 7   Keller Williams standing on the stage at this Family Reunion

 8   with the average buyer commissions there for the people in

 9   attendance to see?  Do you see that?

10    A    Yes, I do.

11          THE COURT:  Mr. Ketchmark, are you moving 6A, B, C,

12   and D all in?

13          MR. KETCHMARK:  I'm sorry, Your Honor.  I should

14   have done that separately.  I am.  I apologize.

15          So we're moving 2868A, B, C, and D in as well, Your

16   Honor.

17          THE COURT:  Subject to all those same objections?

18          MR. RAY:  Yes, Your Honor.

19          THE COURT:  Thank you.

20          Admitted.

21    Q    (BY MR. KETCHMARK)  And let's turn before I ask you --

22   or let's just start with that 2022.

23          When you see a slide where you have someone like

24   Gary Keller standing on a stage at the Family Reunion and

25   showing the people who are in attendance there the average
```
                                532

1    buyer commissions that are paid, what does that mean to you

2    from an economic standpoint?  How does that fit into your

3    analysis?  And let's hone in here on the time period that

4    we're dealing with with the -- this time period of this

5    conspiracy where we're going here from 2015 to a period

6    that -- this would be the end of -- or in 2021.

7            What does that mean to you from -- as an economist

8    when you see that?

9    A    One thing, it tells me that the commission rates are

10   very, very stable; that they're hovering right around

11   2.7 percent.  And it's a signal that, hey, you're doing what

12   we ask you to do.  You're keeping these buy side commissions

13   at a pretty stable rate.

14   Q    And you saw -- have you seen the testimony or read the

15   testimony in this case on how they've acknowledged at Keller

16   Williams that they have competitors who are actually in the

17   audience?  But not just the Keller Williams' agents, but --

18   not talking about Keller Williams' agents.  But I'm talking

19   about from outside companies like RE/MAX and HomeServices and

20   Anywhere.  Did you see that?

21   A    Yes, I did.

22   Q    Now, as part of this case -- I'm going to be real

23   crystal clear when we talk about this with you.  When we look

24   at these different companies, let's start with -- first with

25   Keller Williams.  Do you see that?

                                533

```
 1    A    Yes, I do.

 2    Q    Did we ask you, as part of your work and background, to

 3   make a determination if you thought or had reached any

 4   conclusions as to whether or not there was evidence that you

 5   felt that Keller Williams was engaging in this type of

 6   behavior with its competitor Anywhere?  Did we have you look

 7   at that?

 8         MR. RAY:  Your Honor, we have an objection.  May we

 9   approach, please?

10         THE COURT:  Yes.

11         (Counsel approached the bench and the following

12   proceedings were had:)

13         MR. RAY:  Your Honor, I thought you had ruled that

14   he was limited to testify about what was in his report.

15         MR. KETCHMARK:  He did.

16         MR. RAY:  Can you show me where in his report he

17   mentions Family Reunion?

18         MR. KETCHMARK:  The Family Reunion, that's all the

19   underlying data that supports his opinions in his report.  He

20   testified about it at length.

21         MR. RAY:  Actually he didn't.  It's not in his

22   report.  If you can identify where it is in his -- where is it

23   in his report?

24         MR. KETCHMARK:  His report says that these folks

25   have all engaged in a price-fixing conspiracy.
```

534

```
1          THE COURT:  Objection sustained.  If he didn't talk
2   about the report, don't bring up that report.
3        (The proceedings returned to open court.)
4   Q    (BY MR. KETCHMARK)  Now, I want to talk with you about
5   the -- what we're seeing here about these different
6   defendants.
7          Do you understand that with respect to HomeServices
8   and the two affiliates companies, that there's a conspiracy
9   amongst competitors, but then when you're talking within a
10  corporate structure, like the parent and the two subsidiaries,
11  you understand that we're not making an allegation in this
12  case that HomeServices engaged in a conspiracy with its two
13  subsidiaries?  Do you understand that as part of your work
14  that that's not something we're alleging in this case?
15  A    That's my understanding.
16  Q    Can you tell the jury the role -- your understanding
17  of -- based upon your report and your background on this,
18  the -- who the conspirators would be as it relates to the
19  corporate conspirators?  Is it Keller Williams and the
20  HomeServices family and Anywhere and RE/MAX?  Is that your
21  understanding?
22          MR. MacGILL:  Objection, Your Honor.
23          THE COURT:  What's the basis?
24          MR. MacGILL:  Leading, and no foundation in the
25  report.
```
535

```
 1              THE COURT:  Overruled.  Go ahead.
 2    Q    (BY MR. KETCHMARK)  Go ahead.
 3    A    So in -- forgive me, Mr. Ketchmark.  Could you repeat?
 4    Q    Sure.  Tell the jury about the -- when we've asked you
 5    to look at the alleged coconspirators as it relates to the
 6    corporate defendants, Keller Williams and the family of
 7    HomeServices and Anywhere and RE/MAX, tell the jury what you
 8    looked at at that, as the interaction that they had with each
 9    other as it relates to these elements that you've talked about
10    here.
11    A    So kind of the -- Mr. Ketchmark, the proof is in the
12    data.  And every single one of the agents and brokers
13    affiliated with the corporate defendants that listed on the
14    MLS enforced and supported the mandatory compensation rule.
15    So they all work together in the sense of keeping the rule
16    alive and keeping it functioning.
17    Q    Did we have you go through all of the data, these
18    millions and millions of rows of data, and then you said you
19    had to scrub it or what -- tell the jury what you did when
20    you've got it and how you got it to where it was usable.
21    Explain to them what you did.
22    A    Well, one of the things with the MLS data is we had to
23    track office names for all the various individual realty
24    offices and identify who were they associated with.  Are they
25    associated with Keller Williams?  Are they associated with
                                   536
```

1   Berkshire Hathaway?  Are they associated with the HomeServices

2   affiliate, RE/MAX, so forth?

3           So just untangling some fairly messy data because

4   those names are sometimes entered in very different ways and

5   just had to clean it up so that we could compile the data,

6   what listings were associated with which one of these

7   defendants.

8   Q    And how did you go about doing that?  Tell the jury what

9   your team of people did and how they procedurally went about

10  that.

11  A    So this -- it comes down to the computer coding.  You

12  know, identifying every unique office name and then going in,

13  well, this office name is actually the same as another one.

14  It's just a slight misspelling, or there's some -- and

15  matching all of those up so that we could compile them

16  properly.

17  Q    Now, if you would with me, would you turn with your --

18  in your report.  I'm not moving your report in.  But I want

19  you to turn with me.

20          Did you have a table of contents in your report?

21  A    Yes, I did.

22  Q    And do you have a section on there on relied materials

23  that you disclosed to the defendants on the materials that you

24  relied upon in issuing your report?

25  A    Yes.

537

```
 1   Q    And contained in the relied -- in that attachment, is
 2   that listed as Attachment No. 2?
 3   A    Yes, it is.
 4   Q    In that, did you -- did you rely upon this -- it's kind
 5   of small on mine, but did you read and rely upon the
 6   deposition of Gary Keller in your deposition -- I mean, as
 7   part of your report?
 8   A    Yes, I did.
 9   Q    And in Gary Keller's deposition, did you review and rely
10   upon his testimony and the exhibits that relate to the Family
11   Reunion?
12   A    Yes, I did.
13   Q    Is that what you were showing me earlier when you were
14   talking about your report when we were talking about the
15   exhibits which have already been entered into evidence from
16   his Family Reunion on Exhibit No. 2869C?
17            MR. RAY:  Objection, Your Honor.
18            THE COURT:  That it wasn't in his report?
19            MR. RAY:  Correct.
20            THE COURT:  Overruled.  Go ahead.
21   Q    (BY MR. KETCHMARK)  Now, I want to talk to you about
22   2876A.  Did you -- do you see that?  Look in the book there.
23   I'm not going to display it to the jury yet.  2876A.
24            Do you see that?
25   A    I've got 2876.
```
538

```
 1    Q    Here we go.  I'll show you.

 2              2876A, do you see that?

 3    A    Yes.

 4    Q    As part of your report, is that contained in the

 5    material that you would have looked at that information as it

 6    relates to this Family Reunion from Keller Williams?

 7              MR. RAY:  Objection, Your Honor.

 8              THE COURT:  Please approach.

 9              (Counsel approached the bench and the following

10    proceedings were had:)

11              MR. RAY:  He's showing him a 2023 Family Reunion

12    slide.  His report is about 2022.  He did not review this.

13              THE COURT:  It says 2022.

14              MR. RAY:  Right.  But that's 2023.  That's exactly

15    right.  That's my point.

16              MR. KETCHMARK:  I'll move off it.  This isn't from

17    2023.

18              MR. RAY:  That's not Family Reunion.  That's exactly

19    right.

20              MR. KETCHMARK:  This isn't 2022.

21              MR. RAY:  Correct.  It's not.

22              MR. KETCHMARK:  If this is 2022, this is part of --

23              THE COURT:  You said you're moving off of it.

24              MR. KETCHMARK:  No, no.  This is 2022.  It's not

25    2023.  I won't give him 2023.  This is 2022.
```
                                539

```
 1              MR. RAY:  That's not Family Reunion, though.

 2              MR. KETCHMARK:  It's Gary Keller's testimony.  This

 3     is part of the information he has.  This is from his file.

 4              MR. RAY:  I'm just talking about what's in his

 5     report.

 6              MR. KETCHMARK:  I'm talking about his report is

 7     referencing all of this --

 8              THE COURT:  Go ahead.  Objection overruled.

 9          (The proceedings returned to open court.)

10              MR. KETCHMARK:  I would move Exhibit No. 2876 into

11     evidence, Your Honor, A.

12              THE COURT:  Subject to all those same objections,

13     admitted.

14     Q    (BY MR. KETCHMARK)  In 2876A, you see this?  This is a

15     photograph from a Family Reunion; and in the background of

16     that, we can actually see in here where it says 2022.  Do you

17     see that?

18     A    Yes.

19     Q    And is this the 2022 Family Reunion information that you

20     reviewed and disclosed as part of your report -- as part of

21     the work that you did in this case?

22     A    Yes, it is.

23     Q    And you see in this photograph where there's this -- on

24     the stage in this Family Reunion, you can actually kind of see

25     the corner of the Family Reunion symbol over there, where it's
                                540
```

1    filled with all of the -- with the people who are in the

2    audience?

3    A    Yes.

4    Q    Now, after you scrubbed this data, I want you to turn

5    with me to Exhibit No. 2904.

6         How many hours have -- we talked about over 6,000

7    hours with your team.  How many hours did you personally,

8    Dr. Schulman, work and spend on this case scrubbing the data,

9    reviewing the data, or analyzing the data to prepare you for

10   this moment in time right now that I'm going to ask you to

11   testify to this jury about, you personally?

12   A    All told, over a thousand hours.

13   Q    That you personally did?

14   A    Yes.

15   Q    And under your data analysts team, how many hours did

16   they spend to prepare you to work on the very graphs that you

17   have in front of you that I'm going to ask you to talk to this

18   jury about now?

19   A    That would have been over 5,000 hours.

20   Q    And as part of that, did you actually prepare graphs,

21   demonstrative exhibits and graphs to show -- these aren't

22   demonstrative exhibits.

23        Did you actually prepare graphs to show the results

24   like a compilation of all that underlying data?

25   A    Yes, I did.

                              541

```
 1   Q    And was the purpose behind that instead of trying to
 2   move in the terabytes of data or however much data it is, to
 3   have a compilation of that that shows what that information
 4   is?
 5   A    That's the purpose, yes.
 6   Q    Is that something you do in your economic field when
 7   you're working either with states or regulators or even juries
 8   so they can understand this data?
 9   A    Not only that, it's what I teach every day at A&M.
10   Q    And so when you look at Exhibit No. 2900, is that --
11   sorry.  Exhibit No. 2904, is that the first of a series of
12   exhibits that you prepared and provided to my office showing
13   this information?
14   A    Yes, it is.
15   Q    And based upon all of the time that you have spent and
16   your data assistants have spent and your office has spent, did
17   you personally review that information after they did that?
18   A    Yes.
19   Q    And did you do that with the idea in mind that you knew
20   you were going to be here and going to be asked to testify
21   about what's on that graph and on those reports?
22   A    Yes, I did.
23   Q    Doing that, did you know you were going to be subject to
24   examination by defense lawyers on that?
25   A    Yes, I did.
```
                                    542

```
 1   Q    In Exhibit No. 2904, does that show -- is that a series
 2   of exhibits showing the results of that for the Heartland MLS?
 3   A    Yes, it is.
 4            MR. KETCHMARK:  Your Honor, we would move 2904 into
 5   evidence.  Look at all of them.  Move them all.
 6            MR. GLASS:  Until what number?
 7            THE COURT:  2908.
 8            MR. KETCHMARK:  Doing good on water, Dr. Schulman?
 9            THE WITNESS:  I'm good.  Thank you.
10            MR. GLASS:  No objection from NAR, Your Honor.
11            THE COURT:  2904, 05, 06, 07, and 08 are admitted.
12            MR. KETCHMARK:  Thank you, Your Honor, and
13   Mr. Glass.
14   Q    (BY MR. KETCHMARK)  Exhibit No. 2904.  Can you tell the
15   jury what that document represents?
16   A    So among all -- every listing in the Heartland MLS that
17   was listed by a broker affiliated with one of the four
18   corporate defendants, this is a count of how many had an
19   offered buyer's commission of different percentages, different
20   rates.
21   Q    So let's break that down because I think you said
22   corporate defendants, but there's actually corporate real
23   estate agents or corporate real estate companies is what we're
24   calling them because the corporate defendants would be
25   HomeService defendants -- would be HomeServices and its two
                              543
```

```
 1   subsidiaries, correct?

 2    A    That's correct.

 3    Q    And then corporate defendant Keller Williams, correct?

 4    A    Correct.

 5    Q    But you understand that -- that even though we're

 6   talking and asking this jury to review RE/MAX's and Realogy,

 7   which is now Anywhere's involvement as coconspirators, they're

 8   not here present as corporate defendants.  Do you understand

 9   that?

10    A    I understand that.

11    Q    And so with that small clarification, did you go through

12   this and -- apologize.

13         Did you go through this and look to see from the

14   time period of April 2015, April 29th, 2015, to June 30th,

15   2022, for those corporate real estate companies, did you go

16   through all of the data in the Heartland MLS, the Kansas City

17   area?  Did you do that?

18    A    Yes, I did.

19    Q    And did you look at what home sellers, our clients, the

20   people we represent, that I represent, did you go through to

21   see what they paid in buyers' commissions?  Did you do that?

22    A    Well, these were the rates that they offered.

23    Q    That were offered by them?

24    A    Yes.

25    Q    Did you go through and do that?
```
544

1    A    Yes, I did.

2    Q    And as part of that analysis, is this the -- does this

3    show the total during that time period?

4    A    Yes, it does.  It shows the total count in each one of

5    these categories and then the percentage.

6    Q    And I'm not going to go through each of these, but you

7    saw there between 2 and a half and 3 percent, the total that

8    was offered in those MLSs, that's what you looked at there,

9    does it show that 98 percent of them were between 2 and a half

10   and 3 percent?

11   A    Well, actually 98 percent were exactly 3 and 2 and a

12   half combined.

13   Q    Thank you.  94 percent of them were exactly 3, correct?

14   A    Correct.

15   Q    And then the other 4 percent were at what level?

16   A    Exactly 2.5.

17   Q    Exactly 2.5.

18   A    And that's over a seven-year period.

19   Q    Do you know what a scatter graph is in the field of

20   economics?

21   A    Oh, yes.

22   Q    Tell the jury what a scatter graph is.

23   A    Well, it's instead of piling things up in a single

24   block, you just have separate dots for each and every

25   individual transaction, and it makes it really messy to see.

545

```
 1    It's kind of hard to see what's going on in a scatter graph
 2    like that in a lot of cases.
 3    Q    But here you don't see stuff down beneath 2 and a half
 4    percent for all of these transactions here below the 2 and a
 5    half percent.  Can you tell the jury how many were below out
 6    of these total number of transactions, which I'm not going to
 7    do the math, but if you ballparked it, what, about -- your
 8    math is better than mine.  What would that ballpark at?
 9    Around hundred and how many thousand would you say?
10    A    So below 2 and a half percent?
11    Q    No, total on this.  What would those numbers add up to
12    ballpark?
13    A    About a hundred -- a little over 105,000.
14    Q    It's 103 here --
15    A    108,000.  Pardon me.
16    Q    Yeah, 108,000.  Okay.
17          Below -- so out of the 108,000 transactions, how
18    many were underneath 2 and a half percent?
19    A    Less than 500.
20    Q    Less than 500?
21    A    Yes.
22    Q    Now, the second page of this -- and these will be in
23    evidence for the jury.  But the second page of this, does it
24    go defendant by defendant, HomeServices for that time period?
25    Does it show what HomeServices numbers were?
```

546

```
 1   A     Yes, it does.

 2   Q     And that's what it reflects for HomeServices, correct?

 3   A     Yes, it does.

 4   Q     HomeServices, what were exactly at 3 percent for the

 5   HomeServices defendants?

 6   A     31,000 or 94 percent.

 7   Q     What did they have exactly at 2 and a half percent?

 8   A     4 percent.

 9   Q     Keller Williams -- the next page of this exhibit, how

10   about Keller Williams?  What do they have at exactly at

11   3 percent?

12   A     96 percent.

13   Q     What did they have at 2 and a half?

14   A     3 percent.

15   Q     The -- did -- you then look at for all of the -- what

16   does that -- and when you look at it for all of these, do it

17   year by year for all of them.  For example, in 2015, this next

18   portion of Exhibit No. 2 -- sorry -- 2904, for 2015, did you

19   look at it for all of 2015?

20   A     Yes, I did.

21   Q     The next page, 2016, did you see that?

22   A     Yes.

23   Q     Are you seeing stability between 2015 and '16?

24   A     95, 96 percent, exactly at 3-percent offered rates.

25   Q     2017, for these same corporate real estate companies,
```

547

```
 1   what did you see exactly there?
 2   A    96 percent, exactly 3-percent offered rate.
 3   Q    That's in the Kansas City area?
 4   A    That's correct.
 5   Q    2018, what are you seeing?
 6   A    95 percent at exactly 3 percent.
 7   Q    2019, what are you seeing?
 8   A    95 percent.
 9   Q    2020, what are you seeing?
10   A    94 percent.
11   Q    2021, what are you seeing?
12        Right there, 2021 -- I'm sorry -- what do you see?
13   A    91 percent.
14   Q    And 2022, what are you seeing?
15   A    89 percent.
16   Q    And that's just Kansas City.  What is that telling you
17   is happening in the Kansas City market in the MLS system
18   during that time period as far as the buyers' commissions?
19   A    These offered rates have been incredibly stable.
20   Q    Now, let's look at Exhibit No. 2905.  I won't go through
21   each of the years, but as you flip through it, let's do for
22   the full time period, the first page of that.
23        That's for the Southern Missouri MLS, for the
24   Southwest Missouri area.  Do you see that?
25   A    Yes, I do.
```

548

```
 1   Q    And the backup pages for that are year by year; is that
 2   true?
 3   A    That's correct.
 4   Q    Did you see the same level of stability in the MLS in
 5   Southwest Missouri amongst the corporate defendants here as
 6   well as RE/MAX and Anywhere?
 7   A    Yes, I did.
 8   Q    Columbia MLS, 2906, did you -- the front page of 2906,
 9   does that show the 2015 to 2022, the graph that it shows you
10   for that time period, for the Columbia -- for the mid-Missouri
11   MLS?  Did you see that?
12   A    Yes.
13   Q    What did you find with respect to the -- whether or not
14   the buyers' commissions were stable in that area?
15   A    For over seven years, 95 percent of the offered
16   commissions were exactly 3 percent.
17   Q    Now, in St. Louis, 2907, it jumps to a different number
18   there.  Do you see that?
19   A    Yes.
20   Q    And we see -- where have they mostly stabilized --
21   predominant number in St. Louis, where did it stabilize?
22   A    Stabilized at 2.7 percent.
23   Q    And as part of your -- the review in your report and
24   then the depositions you looked at in your report, did you see
25   that there was something different in St. Louis as far as the
                              549
```

```
 1   pricing and how they were setting prices there?

 2              MR. GLASS:  Objection, Your Honor; outside the scope

 3   of his report.

 4              MR. KETCHMARK:  It's very much contained in his

 5   report.

 6              MR. GLASS:  I believe Mr. Ketchmark said he wasn't

 7   going to even ask this question when we raised it earlier.

 8              MR. KETCHMARK:  I said nothing of that sort.

 9              THE COURT:  You said you were going to rephrase it.

10   Rephrase it.

11   Q     (BY MR. KETCHMARK)  As part of your report, did you

12   review the depositions that were taken in this case dealing

13   with the issues in St. Louis and the depositions about the

14   pricing over in St. Louis?

15   A     Yes, I did.

16   Q     And as part of that, did you look at whether or not

17   St. Louis, as part of their pricing system, dealt with

18   commissions that were stabilizing at 2.7 percent?  Did you do

19   that?

20   A     Yes, I did.

21   Q     Can you tell the jury what you found in St. Louis that

22   was talked about as part of the information you relied upon in

23   your report.  Can you tell them.

24   A     It seemed that the St. Louis area had a different

25   standard kind of rate; that they focused in on 2.7 percent for
```
                                550

1  the buy side rather than 3 percent.

2  Q    So now if you pulled St. Louis out of this and we would

3  only go back to the statewide one and the main one that we

4  have here, Exhibit No. 29 -- let's see.  I believe one of

5  these is for all of the MLSs.  Let's see.  That would be --

6             MR. KETCHMARK:  Which number is that?

7             MR. FADLER:  2908.

8             MR. KETCHMARK:  2908.  Thank you, Mr. Fadler.

9  Q    (BY MR. KETCHMARK)  2908, did that do the statewide,

10 where you combined all of these four MLSs in statewide?

11 A    Yes.

12 Q    Did you do that?

13 A    That's what we did.

14 Q    If you had pulled St. Louis out, would those numbers be

15 different on that chart?

16 A    Oh, very much so.

17 Q    So if you just pulled out the St. Louis where you said

18 it was a different pricing structure, what would that do -- if

19 you just looked at Kansas City, the Heartland MLS, the

20 Columbia MLS, and the Southwest Missouri MLS, what would that

21 show as far as the 3 percent?

22 A    We'd have over -- probably over 95 percent on the

23 3-percent line.

24 Q    Now, from an economics standpoint, when you're looking

25 at these elements of the conspiracy and the data, does that

                                  551

1    allow you as an economist to draw any conclusions as to what's

2    happening here in this marketplace as it relates to these

3    MLSs?

4    A    It tells me that the rule has been incredibly effective

5    at stabilizing these offered commission rates over a very long

6    period of time.

7    Q    Do you know something -- in -- in your report, did you

8    talk about non-MLS participants, like brokers who are not part

9    of the MLS?  Did you talk about that in your report?

10   A    Yes, I did.

11   Q    Explain to the jury what a non-MLS participant is and

12   what that meant in your report.  Go ahead.

13   A    So you have brokerages that don't join the MLS, and

14   they're trying to kind of break into the system to get part of

15   this market by being innovative and saying, well, instead of

16   going through the MLS where I have to make you as a seller

17   offer to pay the buy side, I'm going to try to break in a

18   different way.  And they just haven't been able to get a

19   foothold.

20   Q    Now, one of the things from 2015 to 2022 in the economy,

21   different things are happening in the economy, right?

22   A    Oh, yes.

23   Q    So I know this maybe as a consumer, like, that -- I see,

24   like, the price of goods for bread or eggs or gas and all this

25   stuff is bouncing around.  Does that happen in the rest of the

                                552

```
 1   economy, non-real estate economy?  During that time period,
 2   would you see fluctuations in prices in a different
 3   marketplace?
 4   A    Yes, very much so.
 5   Q    Is -- did you -- from -- if your analysis is this level
 6   of stability from an economic standpoint, from an antitrust --
 7   a doctor in economics, what does that mean to you when you see
 8   this level of stability?
 9   A    It tells me there's something fishy going on.
10   Q    Based upon your review and analysis of this and all of
11   these factors, did you reach any conclusions from an economic
12   standpoint as to what you attributed this level of stability
13   in these commissions to?
14   A    This to me is a -- one of the most clearest cases of a
15   price-fixing collusion conspiracy that I've ever seen.
16   Q    And at the core of it, is there -- what do you attribute
17   it to, or is there a rule or anything that you're seeing is
18   being followed and enforced at the core of it?  What is it?
19   Can you tell the jury?
20   A    The core of it is this mandatory compensation rule, that
21   the only way you as a home seller get to get on the MLS is by
22   making an offer of compensation.  And then that threat of
23   steering where agents are trained to tell sellers, hey, if you
24   offer below rate, nobody's going to show your home, that keeps
25   it at what you saw 95 percent of the time for seven straight
```
553

```
 1   years.  That's unheard of.
 2    Q    Now, as part of your report and the evidence you gave in
 3   your report and the opinions you've given in this court, do
 4   you have any view as to whether or not this is harmful or
 5   impactful to homeowners in the state of Missouri?
 6    A    Oh, absolutely.
 7    Q    Tell the jury.
 8    A    So part of my analysis here was to try to figure out,
 9   well, what would the world look like if this rule had never
10   existed.  How would homeowners -- what would their economic
11   position look like if this rule had never existed?
12           And unfortunately there just wasn't anywhere in the
13   U.S. where the National Association of Realtors and these kind
14   of rules haven't had an effect.  So I had to look at
15   international benchmarks to try to figure out which way the
16   world would look if we didn't have this kind of mandatory
17   compensation rule.
18    Q    Now, as part of that process, the -- in this case, did
19   you rely upon a cite in your report that -- that the CEO of
20   NAR's deposition, Mr. Goldberg, the chief executive officer
21   and the exhibits in his deposition, did you review that?
22    A    Yes, I did.
23    Q    As part of that, did you review and rely upon -- if you
24   would turn with me to Exhibit No. 235.  It's not in evidence
25   yet.  But 235, the D.A.N.G.E.R. Report, do you see that?
```
                                   554

```
 1    A    Yes.

 2    Q    Did you review and rely upon that report in reaching the

 3    economic conclusions that you reached in this case?

 4    A    It was an input, yes.

 5    Q    And --

 6         MR. KETCHMARK:  We would move Exhibit No. 235 into

 7    evidence, the D.A.N.G.E.R. Report from the National

 8    Association of Realtors.

 9         THE COURT:  Subject to all those same objections?

10         MR. MacGILL:  Yes, Your Honor.

11         MR. GLASS:  Yes.

12         MR. MacGILL:  Same objections as stated before.

13         MR. RAY:  Yes, Your Honor.

14         THE COURT:  Admitted.

15    Q    (BY MR. KETCHMARK)  The front page of that, the

16    D.A.N.G.E.R. Report, a commissioned report from the National

17    Association of Realtors.  Do you see that?

18    A    Yes, I do.

19    Q    And in that report, there was a section I just want to

20    go to with you.

21         As part of that report, did you go through and do

22    analysis of commissions from around -- did you look at whether

23    or not they talked about commissions around the world?

24    A    Yes, I did.

25    Q    And I just said I found it when he flipped past; so I
```

```
 1   guess technically Mr. Fadler found it.

 2              If you would turn with me -- or I'll just pull it

 3   up.  I'm pulling this up on the screen in front of you, which

 4   kind of makes it a little more helpful.

 5              Do you see contained in this D.A.N.G.E.R. Report

 6   from the National Association of Realtors where it shows

 7   commissions spiraled downward?  Do you see that?

 8   A    Yes.

 9   Q    And they talked about real estate brokerage commissions

10   around the world.  Do you see that?

11   A    Yes.

12   Q    Did you look at that in trying to -- trying to determine

13   what the world would be like here in Missouri but for this

14   rule?  Did you try to do that?

15   A    That was the starting point, yes.

16   Q    What does a but-for world mean?

17   A    Well, it's -- so here the allegation is price fixing,

18   driven primarily by this mandatory rule that sellers have to

19   offer compensation.

20              So in doing the economic analysis, the -- what you

21   try to look at is, well, what would the world look like absent

22   that rule?  If you get rid of the rule, but for the bad act,

23   the alleged bad act, what would the world look like?  So

24   that's what we mean by "but for."

25   Q    And did you look at the different countries here?
```

```
 1   A    Yes, I did.
 2   Q    And did you decide to -- as part of your report and part
 3   of your analysis to focus on one of them?
 4   A    One in particular, yes.
 5   Q    Which one did you decide to focus on?
 6   A    I felt Australia was the most comparable for the
 7   purposes I was -- for what my task was.
 8   Q    And Australia, can you tell the jury what the average
 9   commission paid by homeowners in Australia is?  Can you tell
10   them what that is?
11   A    According to this report, 2 to 3 percent.  I had another
12   source from Australia.
13   Q    And let's look at -- before I talk about the other
14   sources, according to the National Association of Realtors
15   when they're looking at this commissions spiraling downward
16   around the world, is that what it says here?
17   A    Yes, that's what it says.
18   Q    What do they say in this report that they provided to
19   the corporate defendants here?  What does it show that the --
20   in the United Kingdom that the average commissions were?
21   A    1 to 2 percent.
22   Q    In Singapore, the average commissions?
23   A    1 and a half to 2.
24   Q    In Belgium?
25   A    3 percent.
```
557

```
 1   Q    In the Netherlands?

 2   A    1 and a half to 2.

 3   Q    You said that in addition to the National Association of

 4   Realtors' report that they have here that was -- it was

 5   actually commissioned for them -- I want to be clear this is a

 6   report they commissioned.  It's actually going back to the

 7   front page.  It was commissioned by the National Association

 8   of Realtors, and researched and compiled by what's called the

 9   Swanepoel Group.  Do you see that?

10   A    Yes, I do.

11   Q    Other than that, did you look at Australia to determine

12   what the average real estate commissions were in Australia?

13   A    So we did a deep dive, tried to get as much information

14   as we could find over the internet about the Australian real

15   estate market, how it operated, and what kind of commission

16   rates you would see across that market.

17        But in addition, just the overall economic kind of

18   situation.  How well does Australia compare to the economy in

19   Missouri, their legal structure, their tradition of laws,

20   their tradition of free market economics.

21   Q    And before we get into that, the next page of this

22   report, in this report that was commissioned by the National

23   Association of Realtors, there's a section here that on the

24   next page after commissions spiral downwards, there's a quote

25   that says:  Homebuyers don't always want to use an agent, but
```
                                558

```
 1    they think they have to.  Wait till they discover they don't

 2    have to.

 3              Do you see that?

 4    A     Yes.

 5    Q     And they have in here there's a score of probability

 6    ranging, a score, and it's listed as a 5.  Do you see that?

 7    A     Yes.

 8    Q     Under the D.A.N.G.E.R. report, what does a 5 mean?  Is

 9    it the highest level; do you know?

10    A     That's my understanding, yes.

11    Q     And the impact if they -- if people discover that they

12    don't -- if homebuyers discover they don't need to have an

13    agent, what is it listed here as the impact that would have?

14    A     That's the same highest impact 5 like probability.

15    Q     And the D.A.N.G.E.R. index, 100 being the highest, what

16    do they have that ranked as?

17    A     87.5.

18    Q     Why -- did you make a decision to kind of look at

19    Australia and compare what's going on here with -- and say,

20    hey, look, if we didn't have the rule, it would be more like

21    what's going on down there literally down under?  Did you do

22    that?

23    A     That among the other countries, yes.

24    Q     Let's focus on Australia and talk about the other

25    countries as well as part of your report.
```

559

```
 1   A     Okay.

 2   Q     What did you learn about Australia?

 3   A     Well, the key question I had to ask, and it was really

 4   very narrowly focused.  The key question is if I take a real

 5   estate market that does not have any kind of mandatory

 6   compensation rule, do sellers offer to pay buy side agents?  A

 7   simple yes, no question.  If the answer is no, I'm done.

 8         If the answer is yes, then the question is, well,

 9   how much do they tend to offer them; and is it, you know,

10   about the same as the U.S. or higher or lower?

11         Well, the answer was no.  In Australia, sellers do

12   not offer to pay buy side agents.  There's no industry

13   mandated rule, and that drives the bus.  That's the outcome.

14   They don't make those offers.

15   Q     As part of your analysis in your report, did you look at

16   other countries as well?

17   A     Yes, I did.

18   Q     What other countries did you look at?

19   A     All of those listed in the D.A.N.G.E.R. report.

20   Q     The ones that are listed in the D.A.N.G.E.R. report,

21   these other countries that you looked at, do those other

22   countries, do they have this mandatory MLS system where they

23   have an association that has a rule that their real estate

24   companies are following in force?  Do they have that anywhere

25   around in those other countries?
```

560

1    A    Nothing like the mandatory compensation rule.

    2    Q    Now, look, if this has been -- there's been evidence in

    3   this case that it's been around for a long time in our

    4   country.  If a rule's been around for a long time and followed

    5   and enforced for a long time, does that -- what kind of -- how

    6   does that have an impact upon the marketplace or consumers'

    7   brains or for buyers and sellers?  What happens?

    8    A    You get conditioned to it:  Well, that's just how things

    9   are done.  And so you get:  Well, that's how we do it here,

   10   and so that's the way it is.

   11    Q    Are there laws in place in our country to say that

   12   corporations, competitors can't get together to conspire with

   13   each other to follow and enforce rules in a conspiracy to fix

   14   prices?  Are there laws that say that?

   15    A    Yes, there are.

   16    Q    And if those laws -- are those laws in our country, is

   17   one the Sherman Antitrust Act?

   18    A    Yes, it is.

   19    Q    And you understand that that's at the core of this case

   20   and this jury's being asked, and the court will instruct --

   21   I'm not talking to you about that law.  But you understand

   22   that's the core of this case, and this jury is going to be

   23   asked to rule on that?

   24    A    Yes, I do.

   25    Q    From an economic standpoint, as a professor of

                                     561

```
 1    economics, a doctor of economics, can you tell the jury what
 2    role that you see the jury system as part of this playing, as
 3    part of this as part of your report and your analysis?
 4    A    It's to help enforce the law and bring those to justice
 5    that violate it.
 6    Q    Now, Exhibit No. 234.
 7            MR. KETCHMARK:  We'd move the D.A.N.G.E.R. report,
 8    234.  This is a draft report we've been talking to you about,
 9    and Mr. Fadler just pointed me out.  234 is the actual
10    D.A.N.G.E.R. report.
11    Q    (BY MR. KETCHMARK)  You reviewed that as well, correct?
12    It's the same thing; is that correct?
13    A    Yes.
14            MR. KETCHMARK:  We'd move 234 into evidence.
15            THE COURT:  Subject to all those same objections,
16    counsel?
17            MR. GLASS:  Yes.
18            MR. RAY:  Yes, Your Honor.
19            THE COURT:  Admitted.
20    Q    (BY MR. KETCHMARK)  So now when you did all of that, did
21    you ultimately reach down and do an actual calculation of the
22    damages in this case as it relates to the various defendants?
23    A    Yes, I did.
24    Q    How did you calculate that for each of the corporate
25    defendants, for the HomeServices-related and -- and the
                                  562
```

```
 1   HomeServices defendants and the Keller Williams defendants as
 2   well as the Realogy party and Anywhere and RE/MAX?  How did
 3   you do that?
 4    A    So the -- in a price-fixing case, the measure of
 5   antitrust damages, it's how much more consumers paid for the
 6   product or service than they would have absent the bad act.
 7           Our key competitor here, Australia, home sellers
 8   don't offer to pay buy side agents.  They just don't do it.
 9   So actually -- actually in none of the countries that were
10   part of the D.A.N.G.E.R. report did home sellers offer to pay
11   buy side agents.
12           So the answer is in the U.S., if this rule had never
13   existed, sellers wouldn't be paying buy side agents.  So every
14   single penny that sellers had to pay a buy side agent here in
15   Missouri during this time period is the measure of antitrust
16   damages.
17           So I added up all those buy side commissions that
18   these sellers had to pay.
19    Q    And I'm going to show you what's been marked as 4592,
20   and I'm going to mark this one as sub A, which is just a
21   portion of your report that comes off there from table 9 of
22   your report.
23           Does that show the calculations that you reached in
24   this case?
25    A    Yes, it does.
                              563
```

```
 1            MR. KETCHMARK:  Counsel, we would move No. 4592A
 2    into evidence.
 3            MR. GLASS:  No objection from NAR.
 4            THE COURT:  Admitted.
 5            MR. KETCHMARK:  And also -- and Exhibit No. 2527A is
 6    the same one, Mr. Glass.  We'd move 2527A in as well.
 7            MR. GLASS:  No objection from NAR.
 8            THE COURT:  Admitted.
 9    Q    (BY MR. KETCHMARK)  Let's walk through this.  Let's
10    start with the total number at the bottom.  First across the
11    top it says table 9A, summary of total damages.  Do you see
12    that?
13    A    Yes, I do.
14    Q    Subject:  MLS classes.  Is that the four MLS classes
15    that we've been -- that -- MLSs that we've been talking about?
16    A    Yes.
17    Q    Across the bottom of that, there's a total number that's
18    there.  Do you see that?
19    A    Yes, I do.
20    Q    Can you read for the record -- I know the jury can see
21    that, but can you read for the record what that dollar amount
22    is?
23    A    $1,785,310,872.
24    Q    And is that -- what does that number represent?
25    A    That is all the buy side commissions paid by home
```

```
 1    sellers that listed with one of the agent's brokers affiliated

 2    with these four companies.

 3    Q    And did you go through for each of these defendants year

 4    by year for the HomeServices-related defendants, year by year

 5    in this report, show the actual transactions as reflected in

 6    this report year by year, and the actual buy side commissions?

 7    A    Yes, I did.

 8    Q    And so you did that for Keller Williams, for

 9    HomeServices, for Realogy, and for Anywhere?

10    A    Yes, that's correct.

11    Q    What was the purpose behind reaching that calculation of

12    damages?  Why did you do that?

13    A    That's the measure of antitrust damages in a

14    price-fixing case.

15    Q    Now, as part of your report, did you look at the concept

16    or the idea of this -- of whether or not there should be any

17    value given -- or an offset for the services that were

18    received on the buy side of that?  When someone sells a house

19    and they turn around and they're a buyer later, do you

20    understand what I'm talking about there?

21    A    Yes, I do.

22    Q    As part of your report and your analysis in this case,

23    did you look at that issue?

24    A    I considered it, yes.

25    Q    Can you tell the jury about that?
```

565

1   A    It just doesn't make economic sense that in a rigged

2   system where sellers have over a billion dollars taken out of

3   their pocket because of this mandatory rule, you somehow get

4   to offset that because those same sellers entered into another

5   transaction that was also rigged where a different seller got

6   ripped off for their buy side commission.

7           So it -- you just don't get to do that in

8   price-fixing cases.  It doesn't make sense.

9   Q    Why doesn't it make sense from an economic standpoint?

10  A    Because --

11  Q    What would happen -- in the but-for world, what would

12  happen if there wasn't price fixing?  Would that ever happen?

13  Would the -- like -- in your opinion, would those buyer

14  commissions have ever been paid?

15  A    No, they would not have.  That's one of the things we

16  observed in these benchmark countries, that buyers' agents get

17  used very, very rarely.  When they do, buyers pay for them.

18          If this rule had never existed, I think buy side

19  agents would -- you wouldn't see that many of them.  Buyers

20  would deal with that on their own.

21          So in this but-for world, that buyer agent just

22  wouldn't exist.

23  Q    If you would turn with me in your report to page 147.  I

24  mean, it's a very long report, correct?

25  A    Yes.

                        566

```
1    Q    How many pages is -- was your report?

2    A    Main report was 150 --

3    Q    One page is where your signature is at?

4    A    Yes.

5    Q    Did you do a supplemental report as well?

6    A    Yes, I did.

7    Q    How many pages was your supplemental report, Exhibit

8    No. -- the 2552, to refresh your memory.

9              Signature page be on page 48?

10   A    That was 48 pages.

11   Q    If you would turn with me to page 147 of your main

12   report.

13             Under your damage analysis, did you reach any

14   conclusions where -- about what would happen absent this rule?

15   A    Yes, I did.

16   Q    Can you tell the jury in your economic opinion what

17   would -- what would be happening absent that rule?

18   A    Sellers would not be paying buyer brokers' fees.  They

19   would not be making those offers upfront.  It doesn't make

20   economic sense that a seller would be paying for an agent that

21   is representing somebody directly adverse to their interest.

22   Q    Now, does that mean that buyers' agents are bad or

23   you're against buyers' agents?

24   A    No.  It's just -- you know, when you're in that kind of

25   adversarial relationship, why should one party pay for the
```
                                    567

```
 1    other guy's agent that's negotiating against him?
 2     Q    And what about -- when you talk in that, it says that
 3    there is a -- that you considered in your report about an
 4    antitrust overcharge and a pass-through.  What does that mean
 5    for overcharge and pass-through in your report?  What do you
 6    mean by that?
 7              MR. GLASS:  Your Honor, may we approach?
 8              (Counsel approached the bench and the following
 9    proceedings were had:)
10              MR. GLASS:  In his report, he cites case law.  He's
11    going to be testifying on the law.
12              MR. KETCHMARK:  No, no, I'm not --
13              MR. GLASS:  Here's a copy.  It's in this section.
14    Your Honor, the objection is that he's going to testify on the
15    law.  Here's his sentence that he's going to, the
16    pass-through.  The only citation is the law.
17              MR. KETCHMARK:  I'm not going to ask him anything
18    about the law.  I'm talking about the economic principle of
19    offset.
20              MR. GLASS:  There's no economic principle in that
21    section.  That's the section he just asked him to refer to.
22              MR. KETCHMARK:  It's damage analysis.  He says here
23    that price fixing, a pass-through should not be considered as
24    part of the analysis.
25              MR. GLASS:  Right.  The footnote is to *Illinois*
```

*Brick*.

          MR. KETCHMARK:  Well, it's an economic principle.
He's not going to be talking about the law.

          THE COURT:  Don't talk about that case.

          MR. KETCHMARK:  I will not.  Absolutely not.

          THE COURT:  Overruled.

          MR. GLASS:  Thank you, Your Honor.

     (The proceedings returned to open court.)

Q     (BY MR. KETCHMARK)  So going back to the question that I
was just asking, I don't want to get into anything other than
economic principles behind this concept of overcharge.

          In your background and experience as a -- as a
professor and doctor -- doctor of economics, what does the
concept of offset mean in the world of economics?

A     So are we talking about offset or overcharge?

Q     Start with either one.  You pick.  Explain to the jury,
if you would.

A     So the overcharge is how much more did I pay than I
should have, right.

          Pass-through is -- the simplest example here in this
particular -- this particular market, sellers have to pay an
extra 3 percent in buy side commissions than they would not
have paid.  If they raised the price of their home to capture
that 3 percent, they've, in effect, passed it through to the
buyer.  You don't get to account for that in the antitrust

                         569

```
 1    overcharge.  That pass-through, you ignore it.
 2     Q    Is that an economic principle that you learned and teach
 3    as part of your background and rule in that?
 4     A    Absolutely, yes.
 5     Q    Did you reach a conclusion in your mind to what this
 6    class of Missourians who we represent, the 265,697
 7    Missourians -- did you reach a conclusion in your mind as to
 8    the amount of damages that the class of people I'm standing
 9    here representing, the homeowners -- that's the number of
10    homeowners and the people, more than that -- did you reach a
11    conclusion on the amount of damages that that class of people
12    suffered in total?
13     A    Yes, I did.
14     Q    And is that the number that you read when you read from
15    2527 that I'm rounding to $1.78 billion?
16     A    That's correct.
17          MR. KETCHMARK:  Thank you.  I have no further
18    questions for you.
19          THE WITNESS:  Thank you, sir.
20          THE COURT:  Mr. Glass.
21    CROSS-EXAMINATION BY MR. GLASS:
22     Q    Good afternoon, Dr. Schulman.
23     A    Good afternoon.
24     Q    I don't think we've met before.  I'm the lawyer for the
25    National Association of Realtors.  It's good to meet you.
                                   570
```

```
 1    A    Pleasure to meet you, sir.
 2    Q    So I believe I heard you say this is one of the clearest
 3   examples of a price-fixing conspiracy you've ever seen; is
 4   that right?
 5    A    That's correct.
 6    Q    Isn't it true, though, that you have no opinion on
 7   whether there's a conspiracy between NAR and HomeServices?
 8    A    So I believe --
 9    Q    Sir, isn't it true that you have no opinion on whether
10   there's a conspiracy between NAR and HomeServices?
11    A    I believe I testified to that effect, yes.
12    Q    Okay.  And isn't it true that you have no opinion
13   whether there is a conspiracy between NAR and Keller Williams?
14    A    I believe that's what I testified to at deposition, yes.
15    Q    And you have no opinion on whether or not there's a
16   conspiracy between HomeServices and Keller Williams?
17    A    I believe I testified to that at deposition, yes.
18    Q    Okay.  So everything we talked about for the last two
19   hours is wrong because you testified you had no opinion that
20   there is a conspiracy, sir?
21    A    I didn't --
22    Q    So let's focus on --
23              MR. KETCHMARK:  Well --  hang on.  Counsel --
24              MR. GLASS:  This is cross-examination, Your Honor.
25              THE COURT:  This is cross.  Overruled.
                                571
```

```
 1    Q     (BY MR. GLASS)  Let's focus on the facts, okay?

 2           You have not seen a single document showing any

 3    defendant discussing commissions with each other, correct,

 4    sir?

 5    A     That's correct.

 6    Q     You have not seen any testimony showing any defendant

 7    discussing commissions with each other, correct?

 8    A     If you exclude the Keller Williams Family Reunion

 9    commission charts, I'd agree with that, yes.

10    Q     Sir, you have not seen any testimony showing any

11    defendants discuss commissions with each other, correct?

12    A     No, I don't think so.

13    Q     No, you are agreeing with me, or you disagree with me?

14    A     I'm not disagreeing with you.

15    Q     Okay.

16    A     I have not.

17    Q     You have not seen any documents showing that any

18    defendant discussed with any other defendant a particular

19    amount that a listing broker would offer to the agents who

20    helped sell the home, correct, sir?

21    A     That's correct.

22    Q     You have not seen any documents showing any defendant

23    discuss with any other defendant a particular amount that a

24    seller would pay to a buyer's broker, correct?

25    A     Pardon me.  Could you repeat that?
```

```
 1    Q    Yes, of course.  You have not seen any documents showing
 2    that any defendant discussed with any other defendant --
 3    A    Okay.
 4    Q    -- a particular amount that the seller was going to pay
 5    to the buyer broker, the buyer agent?
 6    A    I don't believe I have, no.
 7    Q    You have not seen any testimony showing that any
 8    defendant discussed with another defendant a particular amount
 9    that the listing broker would offer to buyer brokers, correct?
10    A    The CEO of HomeServices testified that in some of their
11    gatherings, when he's doing his training --
12    Q    Okay.
13              MR. GLASS:  Why don't we play Clip 2, please.
14    Q    (BY MR. GLASS)  Before we do that, Dr. Schulman, you
15    were deposed in this case on August 26th, 2022, correct?
16    A    That's correct.
17    Q    And Mr. Ketchmark was there, and Mr. Boulware were
18    there, one of them?
19    A    Yes.
20    Q    And during that deposition, you swore an oath to tell
21    the truth, correct?
22    A    I always try to, yes, sir.
23    Q    Okay.
24              MR. GLASS:  Let's play Schulman 2.
25              MR. KETCHMARK:  Can you show me what you're -- for
                                573
```

```
 1    impeachment --

 2              MR. GLASS:  You have your own transcript.  You

 3    haven't provided me with any copies of anything that you're

 4    using.

 5              MR. KETCHMARK:  Well, that's absolutely not true.

 6              THE COURT:  Hey, hey, fellas.  Let's try the case.

 7              Play your videotaped deposition on impeachment.  Go

 8    ahead.

 9              MR. GLASS:  Thank you, Your Honor.

10              (Video played.)

11              MR. GLASS:  Thank you.

12    Q    (BY MR. GLASS)  Sir, isn't it true that you have not

13    seen any documents or any testimony showing that any of the

14    defendants have talked about how much a commission should be

15    charged to sellers, correct?

16    A    Correct.

17    Q    And you have not seen any documents or any testimony

18    that would show any of the defendants have discussed how much

19    a seller or their agent should offer to buyer brokers,

20    correct?

21    A    Correct.

22    Q    Okay.  Sir, you would agree with me that a seller of a

23    house and a buyer of a house have to cooperate to actually

24    sell the home, correct?

25    A    That's true in any transaction.
```

574

```
 1   Q    Okay.  True in every transaction.

 2            So the seller's agent and the buyer's agent must

 3   cooperate in every transaction, right, sir?

 4   A    That's not what I -- no, I don't agree with that.

 5   Q    You don't agree that a seller's agent on behalf of the

 6   seller and the buyer's agent on behalf of the buyer, must

 7   cooperate to sell the home?

 8   A    Not necessarily, no.  Your first question was about a

 9   seller and a buyer.  Now you're talking about agents.

10   Q    Right.  The seller has an agent, correct?

11   A    Yes.

12   Q    They represent their interests, correct?

13   A    Correct.

14   Q    A buyer has an agent, correct?

15   A    Correct.

16   Q    They represent their interests?

17   A    That's correct.

18   Q    If the seller and the buyer need to cooperate to make a

19   house sale, their agents necessarily must cooperate to make a

20   house sale, correct?

21   A    If by "cooperate," you just mean, all right, let's get

22   the transaction done, I won't disagree with that, no.

23   Q    Okay.  So in every single house sale in the state of

24   Missouri from 2014 to 2022, the seller and her agent and the

25   buyer and her agent had to cooperate to make that sale happen,
```
575

```
 1   correct?

 2   A     They had to cooperate.  They didn't need to --

 3   Q     That's -- that's good.

 4   A     They had to cooperate, yes.

 5   Q     Thank you.

 6           You would agree with me that, as a matter of

 7   economics, there's nothing wrong with a seller's agent and a

 8   buyer's agent cooperating to facilitate the sale of a home?

 9   A     If they're just facilitating the sale, no, there's

10   nothing wrong with that.

11   Q     In fact, I believe an example that you've given in the

12   past is that's how stocks are sold, correct?

13   A     Yes.

14   Q     Now, I don't have any stock, but I believe that you give

15   the example that the buyer of the stock and the seller of the

16   stock have to cooperate through an exchange to sell that

17   stock, correct?

18   A     It can happen on exchange, but it can also happen over

19   the counter or happen just between two parties.

20   Q     And all those are cooperations between two people who

21   are adversaries, one trying to get a higher price and one

22   trying to get a lower price, correct?

23   A     They're transactions.

24   Q     The seller is trying to get a higher price, and the

25   buyer is trying to get a lower price, correct, sir?
```
576

```
 1   A    That's true.

 2   Q    And they cooperate, correct?  To make the transaction

 3   happen, they have to cooperate?

 4   A    To the extent that they come to an agreement to

 5   transact, yes.

 6   Q    Okay.  Now, let's think about the New York Stock

 7   Exchange.  You would agree with me that hundreds of millions

 8   of stock sales happen on the New York Stock Exchange every

 9   single day, correct?

10   A    That's correct.

11   Q    Okay.  So in the example that you gave, hundreds of

12   millions of times people who are on opposite sides have to

13   cooperate to make a sale, correct?

14   A    If they want to transact, yes, that's correct.

15   Q    All right.  Now let me turn to a different topic.

16        You would agree with me that NAR's mission is to

17   empower realtors as they preserve, protect, and advance the

18   right to real property for all?

19   A    That's what NAR states is their mission, yes.

20   Q    And we've heard a lot of confusion in this case.  I just

21   want to make sure that we're clear, you and I.  A realtor is a

22   member of NAR, correct?

23   A    That's what I understand, yes.

24   Q    And there's about 1.5 million of them?

25   A    Yes.
```
                                577

```
 1   Q    And there are realtor -- there are real estate

 2   professionals who are not members of NAR, correct?

 3   A    Yes.

 4   Q    And there's about 1, 1.5 million of them in the country

 5   too, correct?

 6   A    If you represent that, I wouldn't dispute it.

 7   Q    So you don't know?

 8   A    Not for a fact, no.

 9   Q    Okay.  So you have no reason to disagree that there's

10   about 1 to 1 and a half million real estate professionals who

11   do not belong to the National Association of Realtors?

12   A    I wouldn't dispute that.

13   Q    Okay.  So when an individual describes themselves as a

14   realtor, they are using a trademark that the National

15   Association of Realtors has allowed them to use because

16   they're a member, correct?

17   A    That's my understanding, yes.

18   Q    Okay.  So we've seen lots of documents over the last

19   couple of days that will say "realtor" on them.  You would

20   agree with me that it doesn't necessarily mean that that came

21   from the National Association of Realtors just because it uses

22   the word "realtor" somewhere on it, correct?

23   A    I'm sorry?

24   Q    Yeah.

25   A    Could you repeat, please?
```
                                578

```
 1   Q    I will try to do better.  I won't repeat.  I will try to
 2   do better.
 3             So if there's a document and it just simply has the
 4   word "realtor" on it, you would agree with me that there's no
 5   way to understand whether it comes from the National
 6   Association of Realtors just from its use of realtor since
 7   every single of the 1.5 million people can use that term,
 8   correct?
 9   A    I think that's correct, yes.
10   Q    Now, you agree with me that since the early 1970s, NAR
11   has had a, quote, hands-off policy regarding commission rates?
12   A    That's my understanding, yes.
13   Q    Let's turn to a different subject.
14             Until the mid 1990s, buyer brokers worked for the
15   seller and their agent, correct?
16   A    That's correct.
17   Q    That meant that before the mid 1990s, every single real
18   estate agent owed -- involved in a home sale, owed their
19   allegiance to the seller; is that right?
20   A    Well, there were exclusive buyer agents at that time,
21   but those that were operating under the subagency system where
22   you had the listing broker and the subagent, yeah, both of
23   those guys had duties to the seller.
24   Q    And that was the vast majority of transactions were done
25   under the subagency system, correct?
```
                              579

```
 1   A    That's correct.

 2   Q    And so under the subagency system where the buyer's

 3   agent actually worked for the seller's agent and the seller,

 4   buyers were unrepresented?  You would agree with me on that?

 5   A    That's my understanding.  That's correct.

 6   Q    Now, under this subagency system that existed prior to

 7   the mid 1990s, you would agree with me that the buyer's agent

 8   would work with the buyer, but she owed no fiduciary duties to

 9   the buyer, correct?

10   A    That's correct.

11   Q    And, in fact, the -- the agent who worked for the buyer

12   owed a fiduciary duty to the seller; is that correct?

13   A    That's correct.

14   Q    Now, you would agree with me that all that changed in

15   the mid 1990s?

16   A    Yes.

17   Q    The free market drove that buyers should have their own

18   representation?

19   A    I don't believe it was a free-market force.  Well, there

20   were forces raising serious questions about the subagency

21   system, and a lot -- I didn't do a deep dive into that

22   history.  That's more Professor Alford's line of analysis.

23        But there were a lot of states that were changing

24   their laws to deal with this.

25             THE COURT:  Counsel, can you ask another question so
                              580
```

Case 4:19-cv-00332-SRB    Document 1325    Filed 11/28/23    Page 221 of 242

```
 1    we don't have to get into this, please.
 2             MR. GLASS:  Yes.
 3    Q    (BY MR. GLASS)  NAR did not impose the change on the
 4    market in the mid 1990s that buyer agency emerged from?
 5             MR. KETCHMARK:  Your Honor, may we approach?
 6             THE COURT:  Yes.
 7             (Counsel approached the bench and the following
 8    proceedings were had:)
 9             MR. KETCHMARK:  So, look, I mean, this case involves
10    a rule in 2015 to 2022, and this is a subject of a motion in
11    limine.
12             In 1990, this rule changed because of a Department
13    of Justice and the Department of Trade Commission
14    investigation into this matter.  And this witness or Professor
15    Alford, more importantly, is going to be prepared to testify
16    about that.
17             I was told we weren't going to open the door on
18    that.  If they're going to suggest with this witness through
19    cross-examination --
20             THE COURT:  Let's see what he says.
21             MR. GLASS:  Your Honor, that's false.  The rule
22    changed in 1996 because the market demanded that there be
23    buyer representation.  The Department of Justice and FTC had
24    nothing to do with it.  This is all in Dr. Schulman's report.
25             MR. KETCHMARK:  I disagree with that, but you're
                                  581
```

```
 1  going to open the door on this.
 2          MR. GLASS:  No, there's no opening the door.
 3          MR. KETCHMARK:  I'm warning you that it's going to
 4  be our position with Professor Alford that the door's been
 5  opened.
 6          THE COURT:  To the extent it's an objection right
 7  now, it's overruled.
 8          MR. KETCHMARK:  It's more of a warning.
 9      (The proceedings returned to open court.)
10          MR. GLASS:  Thank you, Your Honor.
11  Q    (BY MR. GLASS)  So let me ask that same question again.
12  So this change in the mid 1990s where buyers were going to get
13  their own agents was not driven by the National Association of
14  Realtors, correct?
15  A    I don't agree with that.
16  Q    So you're saying that in the mid 1990s, the National
17  Association of Realtors was saying buyers need to have their
18  own agents, let's make sure that that happens?  Let's make
19  sure buyers have the choice to hire their own agents, that's
20  what you're saying, right?
21  A    No, that's not what I'm saying.
22  Q    Okay.  You looked at a bunch of countries; six, I
23  believe, right?
24  A    That's correct.
25  Q    Do you know whether or not any of those countries, any
```
                                582

```
1    of them, went through the evolution that the United States
2    went through to go from subagency to having buyers have their
3    own agents?
4    A    None of those countries ever had an industry-dominated
5    rule that --
6    Q    No, sir.  Sir, the question is --
7         THE COURT:  You need to let him finish his answer.
8    Go ahead.
9    A    None of those countries had an industry-dominated
10   association that mandated a rule like the mandatory
11   compensation rule that was in place under subagency and the
12   mandatory compensation rule that got put in place in '93 or
13   '96 here in the U.S.
14   Q    (BY MR. GLASS) So your answer is --
15   A    So the answer is, no, they didn't go through that
16   evolution because they never had that kind of anticompetitive
17   market structure.
18   Q    Just so the jury and I are clear, the answer is no, you
19   do not know if any of those six other countries went through
20   the evolution that the United States went through to go from
21   subagency to buyer agents, correct?
22   A    I do know.  They did not go through it because they
23   never had such an anticompetitive institution.
24   Q    Okay.  So every single one of those countries still can
25   operate under a subagency where the buyer is represented by
                              583
```

```
 1   somebody who doesn't have a fiduciary duty to them and doesn't

 2   represent their interests, correct?

 3   A     No, they don't have subagents at all.

 4   Q     On to another topic.  Let's take a look at 2509.  So

 5   this is a document --

 6              MR. GLASS:  Your Honor, may I use the Elmo?

 7              THE COURT:  Yes, sir.

 8   Q     (BY MR. GLASS) So, Dr. Alford, [sic] you remember this

 9   document from your direct testimony?  Counsel showed you this

10   document?

11   A     Yes.

12   Q     And you recall that counsel showed you the unlawful per

13   se restraint section of this document, correct?

14   A     Yes, I recall.

15   Q     And I'm going to zoom in a little bit to show --

16              MR. KETCHMARK:  Is this 2509 that you're showing?  I

17   believe it's 205.

18              MR. GLASS:  205A, sir.

19   Q     (BY MR. GLASS)  We've seen this several times in this

20   trial, so I just want to make sure that we're all clear.

21              There's a section that says price slash commission

22   fixing, and it reads:  Antitrust problems most frequently rise

23   out of agreements, conspiracies amongst competitors that have

24   the purpose or effect of eliminating or restricting

25   competition between the parties to the agreement.  Do you see
```

584

```
 1    that?

 2    A    Yes.

 3    Q    And we've read several sections of several antitrust

 4    policies by the National Association of Realtors, but I don't

 5    think the plaintiffs have ever shown the next paragraph.

 6    Let's take a look at that.

 7              The antitrust prohibition on fixing commission rates

 8    simply means that two or more real estate firms may not agree

 9    on the commission rate that each will charge.  As noted

10    earlier, price fixing is a per se violation of antitrust laws.

11    Brokers must not agree with others on commission rates and

12    must take care to avoid even implying that they have discussed

13    or reached agreement on fees.  Salespeople must exercise

14    similar caution to avoid the implication that the firm with

15    which they are affiliated is part of a price-fixing

16    conspiracy.

17              Do you see that?

18    A    I see that.

19    Q    Okay.  So NAR's own training, which describes what the

20    antitrust issues in real estate are, instructs the readers

21    that they should not price fix, correct?

22    A    A certain type of price fixing, yes.

23    Q    And this document is available for the public, correct?

24    This is a publicly-available document?

25    A    That's correct.
```

                              585

```
 1   Q    Let's turn to another topic.

 2         MR. GLASS:  Please, if you could turn off the Elmo.

 3         Thank you.

 4   Q    (BY MR. GLASS)  Your opinion in this case is based on

 5   your belief that sellers, not their agents, are the ones who

 6   are making the offer to buyers' agents who help sell the home,

 7   correct?

 8   A    That's correct.

 9   Q    So if that assumption is wrong and if it's the seller's

10   agent who is paying and making the offer to buyer agents, then

11   everything we talked about today is irrelevant, correct?

12   A    The fact that the funds that go to buyers' agents come

13   out of funds due to seller to me says there's no way that can

14   be false; that it comes out of the seller's pocket.  So, no, I

15   don't agree with that.

16   Q    If your premise that sellers are the ones who are

17   obligated to pay is false, then everything you discussed today

18   is wrong, correct?

19   A    No, I don't agree with that.

20         MR. GLASS:  Okay.  Let's put up Exhibit 4587.  It's

21   already been admitted.  PDF page 54.  And if you can please

22   highlight the paragraph "in filing property" right in the

23   middle of the page.

24   Q    (BY MR. GLASS)  All right.  This is the trunk of the

25   tree, right?
                              586
```

```
 1   A    That's it.
 2   Q    This is the rule that we're here saying that real estate
 3   commissions are price fixed at 2 percent, 3 percent, 5
 4   percent, 6 percent.  I'm not quite sure what they're fixed at:
 5   2.7, 3, 2.9.  But this is the rule that allegedly does that,
 6   correct?
 7   A    That's correct.
 8   Q    Okay.  Let's read this rule really carefully:  In filing
 9   property with the multiple listing service, participants --
10   let's stop there.
11           Participants are agents, correct?
12   A    It says participants.  You tell me it means agents, I
13   wouldn't dispute that.
14   Q    Okay.  They make blanket, unilateral offers of
15   compensation to other MLS participants.  Again, agents,
16   correct?
17   A    Yes.
18   Q    And shall, therefore, specify on each listing filed with
19   the service the compensation being offered by the listing
20   broker to the other MLS participants.
21           Do you see that?
22   A    Yes, I do.
23   Q    This rule has no price in it, correct?
24   A    No, it does not.
25   Q    This rule does not have a price.  You agree with me?
                          587
```

```
 1   A    Yeah, I agree with you.  It does not have a price.

 2   Q    And this rule does not say anything about what sellers

 3   must do, correct?

 4   A    No, it does not.

 5   Q    You agree with me, this does not say anything about what

 6   sellers would do?

 7   A    I know what the rule does in practice.

 8   Q    No, no.  I want to talk about what the rule says.

 9        So the rule in its plain language does not obligate

10   sellers to do anything, fair?

11   A    No, I disagree with that.

12   Q    Where is the word "seller" in this paragraph?

13   A    The implication of the rule is that if I as a seller

14   want to go to a participant to get my home listed on the MLS,

15   if I'm not willing to make an offer of compensation to a buy

16   side agent, I don't get on it.

17        So you say it doesn't have the word "seller," the

18   implication is sellers cannot get on the MLS unless they're

19   willing to make those offers of compensation.

20   Q    Your answer is the word "seller" is nowhere in this

21   rule, correct?  The word "seller" is nowhere in this rule.  We

22   can all read it.  I mean, you can testify however you want.

23   A    My answer was my answer.

24   Q    Okay.  So it's the seller's agent who makes the offer to

25   other agents who help her sell the home under this rule,
```

588

```
 1   correct?

 2   A    The seller enters the offer that -- pardon me.  The

 3   agent enters the offer into the MLS that the seller tells them

 4   they're willing to make.

 5   Q    Okay.  You would agree with me that no rule by the

 6   National Association of Realtors mandates any particular

 7   amount of commission, correct?

 8   A    I would not disagree with that.

 9   Q    You agree with that?

10   A    Yeah.  There's no rule that mandates a specific

11   commission rate, that's correct.

12   Q    And there's no rule that mandates a specific amount the

13   seller's agent has to offer to buyers' agents, correct?

14   A    That's correct.

15   Q    Let's look at a sentence that's always carefully omitted

16   from the plaintiffs' presentations.  It's the only -- it's the

17   second sentence in this paragraph.  There's only two.  Let's

18   look at the second sentence.

19         This is necessary because cooperating participants

20   have the right to know their compensation will be prior to

21   commencing their efforts to sell.  Do you see that?

22   A    I see what it says, yes.

23   Q    You don't disagree that people have the right to know

24   how much they're going to get paid before they start to work,

25   correct?
```

589

1    A    And if they were negotiating directly with the buyer who

 2    was going to pay that commission, they know.

 3    Q    So you don't disagree with the premise that everybody's

 4    entitled to know how much they're getting paid, from a penny

 5    to a million dollars, before they start working, correct?

 6    A    In those situations, I think I would agree with that.

 7    Q    So in your detection section, you talked about how

 8    people knowing how much they're going to get paid was somehow

 9    indicative of an antitrust problem, and it struck me that the

10    chicken example was helpful.

11         When the chicken suppliers sell their meat in the

12    supermarket, they have to put a price on it so consumers know

13    how much to pay, correct?

14    A    That's correct.

15    Q    So every chicken supplier could go to the grocery store

16    and read those and detect how much the chickens are being sold

17    by their competitors, correct?

18    A    Possibly, yes.

19    Q    And that's really important because you can't do a

20    transaction without talking about price, correct?

21    A    You don't always have to talk about price, but probably

22    be wise if you did, yes.

23    Q    That's absolutely correct.  You have to talk about price

24    if you're wise.

25         Now, there are some people who have decided that
                                590

```
 1   they're not going to talk with their agents about price.

 2   We've heard some testimony from them.  They're good people.

 3   But you say it would be wise to always talk about price before

 4   you buy something, correct?

 5   A    Yes.

 6   Q    Now, I want to talk a little bit about control.

 7        So you didn't disagree with me that there's over a

 8   million agents in the United States who are not members of the

 9   National Association of Realtors.  Remember that?

10   A    I'll take your word for that number.

11   Q    Okay.  And so if a seller wants to use an agent who is

12   not --

13        MR. GLASS:  Oh, thank you.

14   Q    (BY MR. GLASS)  -- who is not a member of the National

15   Association of Realtors, they have over a million choices

16   across the country, correct?

17   A    Not that have access to an MLS, no.

18   Q    I'm not talking about the services the agents provide;

19   I'm just talking about if you're a seller and you don't like

20   something about the National Association of Realtors, you have

21   over a million choices, correct?

22   A    And it was my conclusion in my MARIS report that those

23   services do not compete with MLS-based real estate brokerage

24   services; so they're not part of the same antitrust market.

25   Q    But I don't want to get to antitrust market.  I want to
```

                                    591

```
 1   talk about the examples you gave on your direct, and I want to
 2   talk about real life.
 3              If I want to sell a house in the United States and I
 4   don't want to hire a realtor, a National Association of
 5   Realtors member, I have over a million choices on doing that,
 6   correct?
 7   A    They're not reasonable substitutes in an economic sense,
 8   and therefore -- they're there.  But it's kind of like between
 9   a fresh pack of bubble gum and a piece of used bubble gum
10   underneath the table.  I'm not going to take the used bubble
11   gum.  It's just not a viable alternative.
12   Q    I take exception to that.  I think there's a lot of real
13   estate professionals who would be offended by being called
14   inferior to a realtor.
15   A    I did not use the word "inferior."
16   Q    Okay.  I think you're saying that if somebody does not
17   want to hire a realtor, if somebody does not want to hire a
18   member of the National Association of Realtors, they do have
19   over a million choices to avoid whatever they don't like about
20   in NAR.  Okay?  Is that fair?
21   A    That choice is there.  It's not a viable economic
22   choice.
23   Q    So in your example about the chicken, the chicken
24   example where you said there's some chicken suppliers over
25   here who have agreed to price, and there's some chicken
```
592

suppliers over here who haven't agreed to price, you're saying

that the chicken suppliers who haven't agreed to price will

ensure that the ones that do agree to price stop any agreement

they have, fair?

A     They can help break down the collusive agreement if --

unless the original price fixers have sufficient market power

to shut them down.

Q     Okay.  So there's over one million people in the United

States who, if your theory is correct, could shut down and

break apart whatever the conspiracy is that you have put in

your report, fair?

A     The operative word there is "could," and the answer is,

no, they can't because they don't have access to MLS-based

services.

Q     You keep saying that, but the MLS is a service that

agents provide, like driving their customers around or being

open on Sundays, correct?

A     Each MLS is association owned in each local area and by

the local members.  It's an information-sharing platform among

agents.  And so -- and it's become the dominant way to market

properties in the United States.

        It's that market power that allows NAR and the rest

of the coconspirators in this case to control home sellers.

Q     Okay.  So that was not responsive to my question.

        All I was asking -- let me ask it to you again,

593

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

Case 4:19-cv-00332-SRB     Document 1325     Filed 11/28/23     Page 234 of 242

```
 1    because I think it's pretty simple.
 2              All I'm asking again is that the multiple listing
 3    service is a service that some agents provide, just like some
 4    agents provide a ride, some agents provide Sunday hours,
 5    right?  It's a -- it's just part of their product, correct?
 6    A    No.  It is the core product.
 7    Q    So the one million agents in the United States who don't
 8    use the multiple listing service have somehow failed because
 9    they don't have a service that you're saying is a core
10    product, right?
11    A    They're not able to compete without that core product.
12    Q    But there's one million of them?
13    A    One million that cannot compete.
14    Q    Let's look at another point that you made on your
15    direct.  You said that the multiple listing service is
16    password only, right?
17    A    That's correct.
18    Q    Okay.  Are you aware that the multiple listing service
19    has confidential information in it that is not allowed to be
20    publicized?
21    A    Yes, I do understand that.
22    Q    And that confidential information is things like got a
23    child at home or the pass code to get into the house, correct?
24    A    Yes.
25    Q    And so it would be inappropriate for everybody in the
```
                                       594

```
 1   world to be able to access the entire MLS and all of its
 2   information, correct?
 3   A   All that's deemed confidential and sensitive, certainly.
 4   Q   Right.  There's a purpose for it being confidential and
 5   sensitive, because when you are entrusting your agent to sell
 6   your home and you tell them personal things, like your
 7   password, your alarm code, that you have children at home, you
 8   do not want those things freely available on the internet,
 9   fair?
10   A   Yes, fair.
11   Q   But you said something about how offers of compensation
12   are somehow hidden by this password requirement, right?
13   A   Until they change the rule, yes.
14   Q   Okay.  Let's take a look at the code of ethics, DX4034.
15           MR. GLASS:  Don't publish it please yet.
16           Your Honor, the plaintiffs have stipulated to the
17   admissibility of this document; so we move it into admission.
18           MR. KETCHMARK:  No objection.
19           MR. GLASS:  Okay.  Let's publish it, please.
20           THE COURT:  Admitted.
21   Q   (BY MR. GLASS)  If we can please turn to the next page.
22   Actually, let's start here.
23           MR. GLASS:  Let's go back -- please highlight
24   Article 1.
25   Q   (BY MR. GLASS)  Okay.  So you're aware that the National
```

595

```
 1   Association of Realtors has a code of ethics, correct?

 2   A    Yes.

 3   Q    It's based on the golden rule?

 4   A    I wouldn't speak to that.  I haven't read the golden

 5   rule specifically in this code of ethics.

 6   Q    Well, I've read it and so has NAR, and they've based

 7   their code of ethics on it.

 8        So let's take a look at principle one.  When

 9   representing a buyer, seller, landlord, tenant, or other

10   client as an agent, realtors pledge themselves to protect and

11   promote the interests of their client.  Do you see that?

12   A    Yes, I do.

13   Q    And then it says, This obligation to the client is

14   primary.  Do you see that?

15   A    Yes, I do.

16   Q    And then it continues:  But it does not relieve realtors

17   of their obligation to treat all parties honestly.

18   A    Yes, I see that.

19   Q    Okay.  And you're aware of this code of ethics, correct?

20   A    Yes, I am.

21   Q    Now, let's please turn to the next page.

22        MR. GLASS:  If you can bring up 1-12.

23   Q    (BY MR. GLASS)  Now, sir, we are looking at a standard

24   of practice under that golden rule -- under Article 1.  This

25   says, When entering into listing contracts, realtors must
```

596

```
 1   advise sellers of the realtors' company policies regarding
 2   cooperation and the amounts of any compensation that will be
 3   offered to buyers' agents, correct?
 4   A    Yes.
 5   Q    So even before NAR changed its rule in 2021, there was
 6   an ethical obligation for every single realtor to tell their
 7   clients not only their policies on cooperation but the amounts
 8   of any compensation that would be offered to buyer agents,
 9   correct?
10   A    I see what it says.
11   Q    Okay.  Let's look at 1.13.
12         THE WITNESS:  Your Honor, can we take a break?
13         THE COURT:  We're about done in three minutes.  Can
14   you do that?
15         THE WITNESS:  Okay.  Yes.
16   Q    (BY MR. GLASS)  Now, 1-13, you saw on the seller side.
17   This is the buyer side:  When entering into potential buyer
18   agreements, realtors must advise potential clients of -- and,
19   again, the realtor company policies regarding cooperation,
20   right?
21   A    I see what it says, yes.
22   Q    Then it says, The amount of compensation to be paid by
23   the client, correct?
24   A    I see what it says, yes.
25   Q    And so any realtor was under an ethical obligation,
                          597
```

```
 1   whether they represented a seller or buyer, to tell those

 2   clients under Article 1, Standard Practice 1-12, and Standard

 3   Practice 1-13 how much money they were going to be paid and

 4   how much money they were going to pay the other agent,

 5   correct?

 6   A    I see what the document says, sir.

 7   Q    So you agree with me, reading the document, correct?

 8   A    I wouldn't disagree, no.

 9   Q    Okay.

10         MR. GLASS:  Your Honor, now is a good time.

11         THE COURT:  Very good.

12         Ladies and gentlemen of the jury, we are going to

13   break for the evening.  We'll see you back here at 8:30.  I'll

14   remind you of your obligation not to talk about this case.

15         No. 44, can I talk to you real quick.

16         (Counsel approached the bench and the following

17   proceedings were had:)

18         THE COURT:  So we've decided to let you off the

19   jury.  Thank you so much for participating.  We're just not

20   going to be able to make sure you have that time and get done.

21         I so appreciate you and your sacrifices.

22         VENIREMAN 44:  I'm so sorry.

23         THE COURT:  Oh, you're so kind.  Take care of that

24   baby.

25         There's one other thing we need to talk to you
                              598
```

```
 1   about.  As you can tell, there's a lot of attention on this
 2   case, lawyers, newspapers.  You are relieved from jury duty.
 3   You can talk to anybody you want to, but I told all these
 4   lawyers if you say no once, that should be it.
 5           VENIREMAN 44:  Yeah.
 6           THE COURT:  If I were you, I would not talk to them,
 7   because they're going to ask you what your thoughts are and
 8   you haven't heard all the evidence.
 9           VENIREMAN 44:  You mean don't talk to who?
10           THE COURT:  Lawyers or newspaper people.
11           VENIREMAN 44:  Oh, yeah.
12           THE COURT:  You are welcome to.  You have every
13   First Amendment right to, but if anybody calls and you say,
14   No, thank you, and they call back, call us.
15           VENIREMAN 44:  Let you know.  Okay.
16           THE COURT:  I will fix it right out the gate.  I
17   wish you the best of luck with that baby.  You're a great mom.
18           VENIREMAN 44:  Thank you.  It's very hard.
19           THE COURT:  It is really hard.  I really appreciate
20   it.
21           VENIREMAN 44:  I didn't interrupt anything, right?
22   Like things are going to be able to move forward and
23   everything?
24           THE COURT:  Yes.
25           VENIREMAN 44:  Okay.  Thank goodness.
                                599
```

```
 1              THE COURT:  We have a couple of what we call
 2    alternates, everybody who's going to be able to deliberate;
 3    but if we lose one or two, I can get it done under our
 4    constitution.
 5              VENIREMAN 44:  I was so worried about that.
 6              THE COURT:  No.  We're not going to restart.
 7              VENIREMAN 44:  Thank goodness.
 8              THE COURT:  Everybody here really appreciates you.
 9    Thank you so much, and take care of that baby.
10              VENIREMAN 44:  Maybe I'll see you again.
11              THE COURT:  Come on any time.
12              VENIREMAN 44:  This was fun.  Why did I go into
13    education?  I should have gone into law.
14              THE COURT:  It's not too late.  I'll get you into
15    law school.
16              VENIREMAN 44:  Thank you so much.  Judge Bough,
17    right?
18              THE COURT:  Yes.
19              VENIREMAN 44:  So nice to meet you.  Thank you.
20              THE COURT:  Counsel, on that D.A.N.G.E.R. report,
21    Mr. MacGill.
22              MR. MacGILL:  Yes, sir.
23              THE COURT:  Ben, if you could meet with Mr. MacGill
24    or whomever.  If there's something in there that, you know,
25    that we should redact out, it's not too late.  I'd appreciate
                                600
```

```
 1   you having that conversation.
 2           MR. KETCHMARK:  Perfect.  We'll send it to you right
 3   away.  Thank you, Your Honor.
 4                   ****************
 5                REPORTER'S CERTIFICATE
 6
 7           I certify that the foregoing pages are a correct
 8   transcript from the record of proceedings in the
 9   above-entitled matter.
10
11   _____        _____
12      Date                /s/Gayle M. Wambolt
                            GAYLE M. WAMBOLT, CRR, RMR
                            United States Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25
```

601