```
 1            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3   SCOTT AND RHONDA BURNETT,          )
     RYAN HENDRICKSON, JEROD BREIT,     )
 4   SCOTT TRUPIANO, and JEREMY KEEL,   )
     on behalf of themselves and all    )
 5   others similarly situated,         )
                        Plaintiffs,     )Case No.
 6           vs.                        )19-CV-00332-SRB
                                        )
 7   THE NATIONAL ASSOCIATION OF        )Kansas City, Missouri
     REALTORS, et al.,                  )October 30, 2023
 8                     Defendants.      )

 9           ............................
         TRANSCRIPT OF JURY TRIAL - VOLUME 10 OF 11
10         BEFORE THE HONORABLE STEPHEN R. BOUGH
            UNITED STATES DISTRICT COURT JUDGE
11

12    Proceedings recorded by electronic stenography
             Transcript produced by computer
13

14                     APPEARANCES

15   For the Plaintiffs:      MR. MICHAEL S. KETCHMARK
                              MR. BENJAMIN H. FADLER
16                            MR. SCOTT A. McCREIGHT
                              Ketchmark & McCreight PC
17                            Two Hallbrook Place
                              11161 Overbrook Road, Suite 210
18                            Leawood, Kansas 66211

19                            MR. BRANDON J.B. BOULWARE
                              Boulware Law LLC
20                            1600 Genessee Street, Suite 416
                              Kansas City, Missouri 64102

21

22

23

24

25                         2244
```

```
 1                    APPEARANCES
                      (continued)
 2
    For the Defendant         MR. ROBERT D. MacGILL
 3  HomeServices of America:  MR. MATTHEW T. CIULLA
                              MacGill PC
 4                            156 E. Market Street, Suite 1200
                              Indianapolis, Indiana 46204
 5
                              MR. JAY VARON
 6                            Foley & Lardner LLP
                              3000 K Street, NW, Suite 600
 7                            Washington, DC 20007-5109

 8                            MR. JEAN PAUL BRADSHAW, II
                              Lathrop GPM LLP
 9                            2345 Grand Avenue, Suite 2200
                              Kansas City, Missouri 64108
10
    For the Defendant NAR:    MR. ETHAN GLASS
11                            MS. GEORGINA INGLIS
                              MS. SAMANTHA STRAUSS
12                            Cooley LLP
                              1299 Pennsylvania Avenue NW Ste 700
13                            Washington, DC 20004

14                            MS. BEATRIZ MEJIA
                              Cooley LLP
15                            3 Embarcadero Center, 20th Floor
                              San Francisco, California 94111
16
                              MS. SARAH M. TOPOL
17                            Cooley LLP
                              55 Hudson Yards
18                            New York, New York 10001

19  For the Defendant         MR. TIMOTHY RAY
    Keller Williams:          MR. BARACK S. ECHOLS
20                            Holland & Knight
                              150 N. Riverside Plaza, Ste 2700
21                            Chicago, Illinois 60606

22                            MS. ANNA P. HAYES
                              MR. DAVID C. KULLY
23                            Holland & Knight
                              800 17th Street NW
24                            Washington, DC 20006

25
                      2245
```

```
 1                    APPEARANCES
                      (continued)
 2

 3                         MS. DINA McKENNEY
                           Holland & Knight
 4                         1722 Routh Street, Suite 1500
                           Dallas, Texas 75201
 5
                           MR. DAVID R. BUCHANAN
 6                         Brown & James, PC-KCMO
                           2345 Grand Blvd., Suite 2100
 7                         Kansas City, Missouri 64108

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23            Gayle M. Wambolt, RMR, CRR
            U.S. Court Reporter, Room 7552
24         Charles Evans Whittaker Courthouse
      400 East Ninth Street - Kansas City, MO 64106
25
                      2246
```

```
 1                        INDEX
                       JURY TRIAL
 2                   OCTOBER 30, 2023
```

| EVENT | PAGE |
|---|---|
| Proceedings in Courtroom | 2249 |
| Instructions Read | 2328 |
| Plaintiffs Opening Argument | 2328 |
| Defendant NAR Closing Argument | 2390 |
| Defendant HomeServices Closing Argument | 2420 |
| Defendant Keller Williams Closing Argument | 2464 |
| Plaintiff's Closing Argument | 2492 |

**CHRONOLOGICAL INDEX**

**PLAINTIFFS' WITNESSES:**

| | DIR | CROSS | RDIR | RCRS |
|---|---|---|---|---|
| JEN DAVIS | 2263 | 2315 | 2323 | |

**PLAINTIFFS' EXHIBITS**

| NO. | DESCRIPTION | OFFRD | ADMTD |
|---|---|---|---|
| 626 | Manual | 2255 | 2255 |
| 857 | Handbook | 2256 | 2256 |
| 1065A | Disclosure Document | 2256 | 2256 |
| 2868A-2868D | Screenshots | 2256 | 2256 |
| 2689A-C | Screenshots | 2256 | 2256 |
| 2873 | Stipulation | 2256 | 2256 |
| 4592A | Damage Table | | |

```
                        2247
```

```
1                    DEFENDANTS' EXHIBITS

2    NO.    DESCRIPTION           OFFRD        ADMTD

3    3717   Listing Contract      2259         2260

4    3866   NAR Profile           2258         2259

5    4086   Not Identified        2257         2257

6    4086A  Not Identified        2257         2257

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                              2248
```

MONDAY, OCTOBER 30, 2023

2      (The following proceedings were had out of the presence of the

3      jury:)

4               THE COURT:  Well, good morning.  We're outside the

5      presence of the jury.  Just making sure we're still on path

6      for 8:30 witness, go to about 9:30, read some instructions, do

7      some closings?

8               MR. RAY:  We are, Your Honor.

9               Counsel -- plaintiffs' counsel brought to my

10     attention this morning an issue that he wants to revisit.

11              MR. KETCHMARK:  I was going to let the judge -- if

12     you're ready to do that, I can.

13              THE COURT:  Yeah.

14              MR. KETCHMARK:  On the issue of Ms. Jen Davis, the

15     final witness, on her compensation, it clearly goes to bias,

16     Your Honor.  We filed a trial brief on this.

17              This isn't a situation where we're talking about an

18     existing employee where you see her salary or someone's net

19     worth.  The motions in limine dealt with net worth.  This is

20     someone who was never employed by the defendant.  The

21     defendant has her final affidavit.

22              After she's filed an affidavit, a month before she's

23     listed on the witness list, she is given compensation for the

24     first time, an enormous salary.

25              And all I intend to do is establish -- what I'd like
                                    2249

```
 1   to do -- I intend to do nothing because the court's told me

 2   not to.

 3            But I believe it actually goes to bias.  There's all

 4   kinds of cases in our brief that say that.  I think I should

 5   be allowed to ask her when she testifies what her compensation

 6   is and then move on.  I'm not going to dwell on it.  I'm not

 7   going to move on it.  But to me, that goes to the bias,

 8   particularly in light of the way we saw them use their

 9   president, Marc King.  They got up there, and they're putting

10   up pictures of him playing basketball in high school at Truman

11   High School and Lee's Summit High School.

12            It's absolutely our belief that what they did is

13   they went in and they found Jen Davis to put as the face of

14   this company, and they've given her enormous compensation for

15   her to testify; and it goes to bias.  To exclude that,

16   particularly when she's the last witness, I think it's unfair,

17   and I think I ought to be allowed to do it.

18            I've never -- can you imagine a situation -- I can't

19   remember when I haven't been able to explore that level of

20   bias with a witness.  So we'd ask the court reconsider that

21   and allow me to do it.

22            THE COURT:  I'm not going to let him ask her about

23   the salary.

24            You have any opposition to him laying out that

25   timeline?
```

2250

```
 1            MR. RAY:  Not at all.

 2            THE COURT:  I'm not --

 3            MR. RAY:  Salary's out, though?

 4            THE COURT:  Salary is out.  You can get all the way

 5   to the top.  Don't go over the line.  Don't -- and, They're

 6   paying you a ton of money, or -- don't ask anything about pay.

 7   Don't cross that line.

 8            MR. KETCHMARK:  I understand and respect the court's

 9   ruling.  Thank you.

10            MR. RAY:  Thank you, Your Honor.

11            THE COURT:  Did you guys get out -- work out an

12   agreement on closing times for everybody?

13            MR. KETCHMARK:  Two hours and 15 minutes a side, and

14   I'm going to reserve whatever I reserve for -- by way of my

15   rebuttal.

16            MR. RAY:  Is there rebuttal that's going to be

17   allowed, Your Honor?

18            THE COURT:  Yeah.  We allow rebuttals.  He's got to

19   ask his number in opening, in his initial, but --

20            MR. KETCHMARK:  I will.

21            MR. RAY:  Okay.

22            THE COURT:  How much are you going to reserve?

23            MR. KETCHMARK:  Half hour?

24            THE COURT:  Okay.

25            MR. RAY:  Okay.
                                2251
```

```
 1              MR. KETCHMARK:  Then all I would ask -- I sent them

 2    an email asking if they were going to divide it up, and I

 3    didn't hear back.  I don't care how they do it, but what I

 4    don't want to have happen is to have it run and then the last

 5    person is left with -- Mr. Ray with 20 minutes, because I

 6    can't be a situation where my -- I need to be able to start at

 7    4:30.  I mean, I don't want to be --

 8              THE COURT:  We're not going to be doing this at

 9    4:30.

10              MR. KETCHMARK:  I have no idea.

11              MR. RAY:  That's the one thing we do agree on.  I

12    don't want to be left with 20 minutes.

13              THE COURT:  That's on your buddies.  We like you and

14    your tie so much, you know, we'll find grace for you.

15              MR. RAY:  Thank you.

16              THE COURT:  But how are you going to divide it up?

17    Because Tracy will want to tell you some amount of warning for

18    each of you as well when your time's getting --

19              MR. GLASS:  Your Honor, the National Association of

20    Realtors will be between 45 and 50 minutes.

21              MR. MacGILL:  Your Honor --

22              THE COURT:  We're going to call it 50, and we're

23    going to give you a warning then because I've got to give you

24    a warning when you get close.  If you're done early, then

25    you'll never hear the warning.
                              2252
```

```
 1            MR. GLASS:  Thank you, Your Honor.

 2            MR. MacGILL:  We're going to be a little bit longer

 3    than that because we're doing HomeServices and damages for the

 4    defendants.  So approximately one hour on our end.

 5            THE COURT:  With a five-minute warning.

 6            Do you have the fancy time clock up again?  No?

 7    Somebody had a fancy time clock.

 8            MR. KETCHMARK:  We will.

 9            MR. RAY:  So that leaves me 25 minutes.

10            THE COURT:  How much would you like?

11            MR. RAY:  40.

12            THE COURT:  40 minutes for you.

13            MR. RAY:  Thank you.

14            THE COURT:  With a 5-minute warning.

15            And you get two hours and 15 minutes with a little

16    grace.

17            MR. KETCHMARK:  Okay.  Understand, Your Honor.

18            THE COURT:  I know it's federal court, and we love

19    deadlines and timelines and clocks.

20            MR. KETCHMARK:  I understand, Your Honor.

21            THE COURT:  A five-minute warning for you.

22            MR. KETCHMARK:  I also received this this morning

23    along with 200,000 people in our state.

24            THE COURT:  How do you know it went to 200,000

25    people?
```
                                2253

```
 1            MR. KETCHMARK:  Because I have somebody who is very

 2   keen on social media and blasts and video blasts and text

 3   blasts.

 4            THE COURT:  So I gave each of you this morning.  I

 5   have no indication that this came from anybody in this

 6   courtroom.  I don't think it matters at all, but since I got

 7   it from -- I got it from lawyers.  So they said it popped up

 8   in their feed.

 9            So that had been sent to me.  So I know so little

10   about social media, I just know that you can target whoever

11   you want to target.  So I'm assuming somebody wanted to target

12   lawyers, which is why lawyers kept sending it to me.

13            I have no idea if that's true or not, but I thought

14   I'd just give it to everybody so that -- we'll mark it as

15   Court Exhibit 1.

16            MR. KETCHMARK:  Just for the record, plaintiffs are

17   not making an issue of it and don't feel the need to have it

18   be addressed with the jurors.

19            THE COURT:  I just want to make sure that it's on

20   the record if anything happens to come up.  Again, I don't

21   think it's anybody in this courtroom.

22            MR. GLASS:  Your Honor, can I make a record on Court

23   Exhibit 1.  National Association of Realtors has nothing to do

24   with this.

25            MR. KETCHMARK:  For the record, I'm not making the
                             2254
```

```
 1    accusation against any of the attorneys.  I know --
 2              MR. GLASS:  It's not just the lawyers.  I'm telling
 3    you the National Association of Realtors has nothing to do
 4    with this individual, what that person does.  The first time
 5    we saw it was when Your Honor handed us a copy.  It's not just
 6    the lawyers for the national association.  The National
 7    Association of Realtors has nothing to do with it.
 8              THE COURT:  Very good.
 9              MR. RAY:  That would be the same for Keller Williams
10    Realty, Inc. as well.
11              MR. MacGILL:  Same for HomeServices, no knowledge of
12    any of this.
13              THE COURT:  Very good.
14              MR. KETCHMARK:  And it does not look like me.
15              MR. FADLER:  Your Honor, can we just take up a few?
16    We went through the court's exhibit list over the weekend, our
17    side and the counsel for the National Association of Realtors.
18    I just wanted to clear up just a few things so we're good to
19    go to hand exhibits to the jury should they so desire.
20              The court has 189 as admitted, and that should
21    actually be 1689.  189 is not admitted.
22              THE COURT:  Very good.
23              MR. FADLER:  626 should be in in its entirety, not
24    as A, but the whole exhibit.
25              THE COURT:  If any of the defendants hear him saying
                                2255
```

```
 1    something wrong, please pop up.

 2                MR. MacGILL:  Okay.

 3                MR. FADLER:  857 should be admitted.  It looks like

 4    in the record it was referred to as 8157, which is not an

 5    exhibit.  It's just 857, which is the 2019 MLS handbook.

 6                THE COURT:  Very good.

 7                MR. FADLER:  1065A should be admitted.  It was

 8    offered and admitted but not on the court's list.

 9                THE COURT:  Whose list are you looking at?

10                MR. FADLER:  The one that we had from the --

11                THE COURT:  From the courtroom deputy, not mine, but

12    from hers?

13                MR. FADLER:  Correct.

14                THE COURT:  Okay.

15                MR. FADLER:  And then 2868A through D should be

16    admitted, but not the 2868 itself because that's a big, long

17    video.  These are just screenshots, A through D.

18                And the same would be true for --

19                THE COURT:  Wait.

20                MR. FADLER:  I'm sorry.

21                THE COURT:  Okay.

22                MR. FADLER:  And the same would be true for 2869.

23    That should be A through C, but not the entire video.

24                2873 is a record of stipulation on interstate

25    commerce, but we are not obviously sending that to the jury.
                                  2256
```

```
 1   That's just for the record.  So I don't know if you have it

 2   marked as admitted, but it won't go back.

 3            4086 and 4086A should both be admitted.

 4            THE COURT:  Is that defense?

 5            MR. FADLER:  Correct.

 6            THE COURT:  Thank you.

 7            MR. FADLER:  Back to the plaintiff's list, Your

 8   Honor.  234 and 235, those are the D.A.N.G.E.R. Report and

 9   draft report.  Those should be admitted in their entirety, and

10   I believe they are.  But they should also be admitted as A for

11   each of those exhibits, just the three pages that Mr. MacGill

12   used during that day.

13            So both 234 and 235 are admitted, as well as A for

14   both of those.

15            THE COURT:  Yes, sir.

16            MR. FADLER:  And then on plaintiffs' exhibit list,

17   4562 should not be admitted.  It was for impeachment only.  I

18   want to make sure it's not on the court's list, and that was a

19   request from National Association of Realtors just for

20   clarity.

21            THE COURT:  Yes, sir.

22            MR. FADLER:  4565 should not be admitted.

23   Impeachment only.

24            THE COURT:  Okay.

25            MR. FADLER:  4609 should not be admitted.  That was
                              2257
```

```
 1   impeachment only.

 2                THE COURT:  Very good.

 3                MR. FADLER:  4614 was used for impeachment only and

 4   should not be admitted.

 5                MR. MacGILL:  Your Honor, we don't know what 4609

 6   is.

 7                MR. FADLER:  That was the NAR article handed to

 8   Mr. Gansho but not used or admitted.  There was actually an

 9   objection that was sustained, so we just want to make sure

10   that it's not part of the exhibits going to the jury.

11                MR. MacGILL:  Okay.  Then 4614?

12                MR. FADLER:  That is a front page of a website that

13   was used with Mr. Schulman and discussed but not offered as

14   evidence.

15                MR. MacGILL:  Okay.  So neither one are admitted,

16   correct?

17                MR. FADLER:  Correct.

18                Almost there, Your Honor.  4613, this was the New

19   York rule used with Dr. Wu.  We're just going to call it

20   4613A.  That's just the three pages Mr. Ketchmark referred

21   when he was talking to Dr. Wu.  And we will not use

22   Defendant's 3785.  We're just going to use 4613A, and we've

23   agreed that that's the best way to do it.

24                THE COURT:  Yes, sir.  Anything else?

25                MR. FADLER:  3866 should be noted as admitted.
                            2258
```

```
 1              THE COURT:  Whose is that one?

 2              MR. FADLER:  That's on defendants.

 3              Is that right?

 4              MR. MacGILL:  Not there yet.  One second.

 5              MR. FADLER:  Yes.  That's on defendants.

 6              THE COURT:  Anything else, sir?

 7              MR. FADLER:  Two more, Judge.  I apologize.  2231

 8   are the Hollee Ellis photos.  It was noted on the record at

 9   one point as 2231A, which was just the first one, but we're

10   just -- the entire exhibit was moved in.  So we're just going

11   to move in 2231 in its entirety; so it should be noted as

12   such.

13              THE COURT:  Yes, sir.

14              MR. FADLER:  Lastly, 4592A is the damage table, and

15   that should be noted by the court as admitted on plaintiffs'

16   list.  Not the entire report, just the damage table, 4592A.

17   That was admitted during the testimony of Dr. Schulman.

18              And that's it.

19              Thank you for your patience.

20              THE COURT:  Thank you, Mr. Fadler.

21              MR. MacGILL:  Your Honor, for HomeServices, I have

22   two issues on redactions if I may.

23              On defendants' 3717, this, Your Honor, is the Jerod

24   Breit listing contract, and we have a challenge that we need

25   to deal with here.  This has been admitted.  The proposed
                                2259
```

1    redaction from the plaintiffs is to remove from this the

2    cooperative compensation piece, and we don't agree to that.

3            He agreed to cooperative compensation.  So that

4    redaction --

5            THE COURT:  Could you bring it up here?

6            You said 3717 is admitted.

7            Fadler, do you agree?

8            MR. FADLER:  I do, Your Honor.  But after we were

9    done yesterday -- Friday we discussed that Missouri statutes

10   would be removed, and so --

11           THE COURT:  Let him finish.

12           MR. FADLER:  We would offer those as the statutes

13   themselves.

14           MR. MacGILL:  Your Honor, to be specific about this,

15   and I've highlighted for ease of reference for the court, what

16   the court's ruling was that there -- we should not make

17   reference to the particular statute authorizing cooperative

18   compensation.  What we've highlighted for the court -- that's

19   a Missouri reference to dual agency and related matters.

20           The statutory reference -- there's no statutory law

21   put in there.  We just simply want to make sure that the jury

22   has a full copy of the Jerod Breit listing contract, which

23   shows that he agreed to cooperative compensation.  And then --

24           THE COURT:  Can we just take out the statute

25   numbers?

                              2260

```
 1            MR. MacGILL:  We can, sure.  If we do that -- that's

 2   fine with us if we take out the statute numbers.

 3            THE COURT:  So we're going to redact out on 3717

 4   just 339.710 to 339.860 RSMo.

 5            MR. FADLER:  And below, lines 53 through 69 cite

 6   statutes in each of those paragraphs, and that's what we were

 7   trying to deal with, Your Honor.  It's on page 2.

 8            MR. MacGILL:  Your Honor, we have no problem with

 9   that on page 2.  That's just simply -- those are the disclosed

10   dual agency statutory references.  Not relevant, so we don't

11   have a problem with that.

12            MR. FADLER:  And then, Your Honor, on page 3 of 5,

13   it would be line 120.  Just take out "as defined by" and those

14   statutes, and then pick it back up with "including."  I think

15   we'll be fine.

16            MR. MacGILL:  No problem with that, Your Honor.

17            THE COURT:  Okay.

18            MR. MacGILL:  One last thing --

19            THE COURT:  It was also on page 4 of 5.  There's

20   some numbers.

21            MR. FADLER:  Those were redacted in what we sent to

22   Mr. MacGill last week.

23            THE COURT:  So just take out the numbers,

24   Mr. MacGill.

25            MR. MacGILL:  We sure will.
                                   2261
```

```
 1              Your Honor, and I'll pick this up from the same
 2    exact issue or series of issues on one more exhibit.  And this
 3    is the -- this is Exhibit 3899.  This is Mr. Trupiano's
 4    contract, his listing contract.  It's the same issues.
 5              May we do the same redactions and then submit that
 6    to the jury?
 7              THE COURT:  Perfect.
 8              MR. MacGILL:  Thank you.
 9              MR. FADLER:  Mr. MacGill and I will work before they
10    go back, and we'll make sure that they're redacted as we
11    discussed.  And we'll be fine.  I appreciate Mr. MacGill
12    bringing it up, and we'll take care of it.
13              THE COURT:  So the way this will work is we'll
14    submit the case to them; and then if they start asking for
15    stuff, that's when we'll send it out.  We'll also have a
16    chance to double-check everything at that time.
17              MR. FADLER:  We all worked very hard yesterday to be
18    ready for that; so we'll be good.  Thank you.
19              MR. MacGILL:  Thank you very much, sir.
20              THE COURT:  Anything else for the good of the order?
21              MR. KETCHMARK:  Not from the plaintiffs, Your Honor.
22              MR. GLASS:  Not from the National Association of
23    Realtors.  Thank you.
24              MR. MacGILL:  No, thank you.
25              MR. RAY:  No, Your Honor.  Thank you.
                               2262
```

```
 1              THE COURT:  Very good.

 2                   (A recess was taken.)

 3              (The following proceedings were had in the presence

 4  of the jury:)

 5              THE COURT:  Good morning.  Welcome back.  We are

 6  still right on schedule that I told you from last week for an

 7  hour of a witness.

 8              We're going to do our best to keep it to one hour.

 9  We're going to then switch over.  I'll hand you a bunch of

10  jury instructions, and that will take me about a half an hour

11  to read those to you.  Then we'll move straight into closings.

12              So I anticipate plaintiff will be done before lunch,

13  and then you'll have lunch.  Then you'll have defendants'

14  closings.  Then the case will be yours.

15              Once the case becomes yours, it's really yours.

16  We'll follow your lead.  Tell us when you want lunch breaks,

17  when you want to go home for the evening.  We'll follow your

18  instructions to give you whatever you need to get that done.

19              Mr. Ray.

20              MR. RAY:  Thank you, Your Honor.  At this time we

21  would call Jen Davis.

22  JEN DAVIS, being duly sworn by the courtroom deputy,

23  testified:

24  DIRECT EXAMINATION BY MR. RAY:

25   Q    Good morning.
                              2263
```

```
 1   A    Good morning.

 2   Q    Can you state your name for the record.

 3   A    Jen Davis.

 4   Q    And, Jen, where do you live?

 5   A    Springfield, Missouri.

 6   Q    And how long have you lived there?

 7   A    Oh, gosh, I went to college there.  I went to Missouri

 8   State University, which at that time was SMS, in '98.  So 25

 9   years.

10   Q    And do you have a family?

11   A    Yes, sir, I do.  I've got two kids.  I've got a daughter

12   that's 16.  She's a junior at Kickapoo High School.  And I've

13   got a son that's 12 in sixth grade at Cherokee Middle School.

14   Q    And is this a picture of you at a -- looks like a

15   Chiefs' game along with your kids at a -- some sort of track

16   meet?

17   A    Yes.  So that's a picture of me at a game we won; so

18   better results than we had last night.

19          And then that was my daughter, who ran at state

20   track last year as a sophomore.  So she ran the 4 by 800, and

21   we were just there to watch her.

22   Q    Thank you.

23          So are you employed in Springfield?

24   A    Yes, sir, I am.  I'm a real estate agent.

25   Q    Okay.  And other than your work as a real estate agent,
                              2264
```

```
 1    do you have a second job?

 2    A    I do.

 3    Q    And what's your second job?

 4    A    I'm the vice president of MAPS coaching for Keller

 5    Williams Realty International.

 6    Q    And are you a licensed real estate agent?

 7    A    Yes, sir, I am.

 8    Q    Are you licensed in Missouri?

 9    A    Yes, I am.

10    Q    Where do you work as an agent?

11    A    So I work for Keller Williams of Springfield in

12    Springfield, Missouri.  So I serve the southwest corner of the

13    state.

14    Q    As an agent, do you represent both buyers and sellers?

15    A    I do.  I've primarily worked with buyers over the

16    last -- well, gosh, since 2008 I've worked mainly with buyers.

17    Q    When you work with sellers, do you charge your clients a

18    commission for the work you do for them?

19    A    Yes, sir.

20    Q    Are commission rates negotiable?

21    A    Yes, sir.

22    Q    Has anyone from Keller Williams ever told you that

23    commission rates are not negotiable?

24    A    No.

25    Q    In your career as a real estate agent, have you ever
                              2265
```

```
 1   entered into an agreement with agents from other brokerages to
 2   fix commission rates?
 3   A    No, sir.
 4   Q    Before this case was filed, did you ever discuss a
 5   multiple listing service rule requiring agents for home
 6   sellers to offer compensation to buyer agents with anyone from
 7   Keller Williams?
 8   A    No.
 9   Q    Before this case was filed, did you ever discuss a
10   multiple listing service rule requiring agents for home
11   sellers to offer compensation to buyer agents with anyone?
12   A    No.
13   Q    Before this case was filed, did you even know that such
14   a rule even existed?
15   A    I didn't.
16   Q    Let's talk more about your work as an agent.  With what
17   real estate brokerage are you affiliated?
18   A    I'm with Keller Williams of Springfield.
19   Q    Can you describe for the jury what a real estate
20   brokerage is?
21   A    Sure.  So as an agent, you have to place your license
22   with a broker.  So a broker is an elevated license.  It
23   requires some additional education and testing.
24        And then that broker is the leader of what we call a
25   brokerage.  And so as an agent, you place your license at a
```
                                2266

```
 1   brokerage.

 2   Q    How many agents are in the Keller Williams Springfield

 3   market center?

 4   A    Oh, gosh.  I'd say roughly 450 agents.

 5   Q    And are you involved with a real estate team within the

 6   Keller Williams brokerage?

 7   A    I am.  So I'm also co-owner of a real estate team, Holt

 8   Homes Group.

 9   Q    And explain for the jury what Holt Homes Group is.

10   A    So it's a team of agents.  So we've got many agents that

11   come together to help buyers and sellers; and really what

12   happens with the team is, as you are helping more and more

13   families, occasionally you need additional help.

14        And so we'll bring on additional licensed agents so

15   that they still have a great customer service, yet we can

16   still support those homebuyers and home sellers.

17   Q    How many agents are part of the Holt Homes Group?

18   A    Six.

19   Q    How is the Holt Homes Group related to the Keller

20   Williams brokerage with which you said you were affiliated?

21   A    So Holt Homes Group is a team where all of our agents,

22   including myself, our license is at Keller Williams of

23   Springfield.

24        So we're independently owned and operated as a team;

25   however, that licensing -- we all have agent licenses.  So
                            2267
```

```
 1   it's held at Keller Williams of Springfield, those licenses

 2   are.

 3   Q    I'll follow up about what MAPS coaching is later, but

 4   you had mentioned that the Holt Homes Group is part of Keller

 5   Williams Realty in Springfield and that you now also work for

 6   Keller Williams Realty, Inc.; is that correct?

 7   A    That's correct.

 8   Q    That sounds a little confusing.  So I want to make sure

 9   that we understand how those entities are related, if they are

10   at all.

11        What is the relationship between Keller Williams

12   Realty, Inc., and the Keller Williams Realty brokerage in

13   Springfield?

14   A    So Keller Williams Realty, Inc. is the franchisor.  So

15   it's based out of Austin.

16        Keller Williams of Springfield is the franchisee.

17   So it's independently owned and operated by a group of

18   individuals.

19        And so it's just a franchisor/franchisee

20   relationship.

21   Q    As an agent with the Holt Homes Group, what is your

22   relationship with Keller Williams Realty, Inc., the real

23   estate franchisor, with which you are also now employed?

24   A    As an agent, there's no relationship with KWRI.  So any

25   agent on my team doesn't have a direct relationship.  I have a
```

2268

1   separate relationship because I'm also employed as the vice
       2   president of MAPS; however, as an agent, there's no direct
       3   relationship.
       4          MR. RAY:  Can we pull up demonstrative, please.
       5   Q    (BY MR. RAY)  So can you explain to the jury this notion
       6   of what a franchise is and how you and the Holt Homes Group
       7   and Keller Williams Springfield fits into that.
       8   A    Sure.  So Keller Williams Realty, Inc. is the
       9   franchisor, and then the Keller Williams' market centers are
      10   the franchisees.  So those are all each independently owned
      11   and operated.  They have different groups of what we would
      12   call investors.
      13          So when we talked about a brokerage, that's the --
      14   in Keller Williams' lingo, that's the market center.  And then
      15   you've got independent agents.  However, we're a team.  So
      16   we're a team of independent agents.
      17          So, you know, my license is held with Greater
      18   Springfield, but I'm independently owned and operated within
      19   Holt Homes Group.
      20   Q    And is that true for other agents who are part of the
      21   Holt Homes Group?
      22   A    Yes, sir.
      23   Q    As a Keller Williams' agent, what role does Keller
      24   Williams Realty, Inc. play in finding clients for you?
      25   A    None.
                                2269

```
 1   Q    What role does Keller Williams Realty, Inc. play in

 2   setting the commissions you charge to your buyer and seller

 3   clients?

 4   A    None.

 5   Q    What role does your brokerage, Keller Williams Realty in

 6   Springfield, play in the commissions you charge to your buyer

 7   and seller clients?

 8   A    They play no role.  We set our own commissions.

 9   Q    As a Keller Williams' agent, do you have the ability to

10   negotiate your commission with clients?

11   A    Yes, sir.  And we do.

12   Q    Do you sometimes negotiate the commissions you charge?

13   A    We do.  You know, we -- that happens frequently that we

14   negotiate commissions.

15   Q    I want to shift a little bit and talk about your

16   background.

17        When were you first licensed as a real estate agent?

18   A    2008.

19   Q    When did you join Keller Williams Realty in Springfield?

20   A    2012.  November of 2012.

21   Q    And why did you join Keller Williams?

22   A    You know, first of all, I was recruited by Holt Homes

23   Group.  They needed a buyer's agent, and so I was recruited by

24   them.  I went to some training and honestly learned about that

25   there was a different way to run a real estate business.  And
```

2270

```
1   so I opted in.  It seemed like it would be a good fit for what
2   I wanted to do and what I wanted to accomplish.
3   Q    And were there other reasons?
4   A    There were.  You know, what I learned was there were
5   opportunities to do things different.
6         So before I came over to KW, I think everybody gets
7   into real estate and they think this is going to be easy, or I
8   can set my own schedule, or I can -- it's going to be
9   flexible, right?  I can work around my kids, and I can do what
10  I want to do when I want to do it.
11        And, you know, turns out that you're kind of on
12  demand as an agent.  And so what was happening in my life is I
13  had two little kids.  When I moved over to Keller Williams in
14  2012, Cooper was 15 months old.  And what I was finding is I
15  didn't have the flexibility that I thought I was going to
16  have.  And I wanted it.  I wanted to be present for my kids.
17  I wanted to get to, you know, go to the school events and do
18  those things; and in reality where I was at is I was like a
19  pop tart, right?
20        People would call and they would say, Hey, Jen, can
21  you come show us this house?  And I would pop out and go show
22  it.  And what was happening is that flexibility that I thought
23  I was going to have wasn't there.
24        And so Keller Williams, the -- just even the first
25  class that I went to, it offered a way to have control over my
                              2271
```

```
 1   time and my business so that I would also actually get to be a
 2   mom.
 3   Q    And how has it been?
 4   A    It's changed my life.  You know, I look back over the
 5   last 11 years-ish, you know, give or take, and I've been
 6   present for all those moments.  You know, my daughter ran in
 7   the state cross -- district cross-country meet yesterday, and
 8   I thought I get to be here.  It's a Saturday morning, and I'm
 9   not out showing houses because I've had the ability to learn
10   how to set up my business so that I can also support my
11   family.
12         And so I look back over the last 11 years and the
13   opportunities I've had with my kids, and it's because of what
14   I've learned and the people I've surrounded myself with.
15   Q    You mentioned before that in your work as an agent,
16   you've specialized in representing buyers; is that correct?
17   A    Yes, sir.
18   Q    Why have you specialized in representing buyers?
19   A    Because they're fun.  It's like -- it's the -- it
20   matches my personality.  You know, you get to -- you get to
21   meet buyers, and they're excited, you know?  They get to find
22   a house.  And whether it's one they're going to live in or an
23   investment property or something else, it matched my
24   personality, and I've enjoyed it.
25   Q    And any other reason why you've focused mostly on
                                   2272
```

```
 1   buyers?
 2    A    Well, it was what I was hired to do.  So, you know, when
 3   I mentioned earlier I was recruited to Holt Homes Group and it
 4   was to be their buyer's agent.  So it was the primary reason I
 5   was hired, was to help buyers.
 6    Q    All right.  Over the years, how many buyers would you
 7   say you've helped?
 8    A    Oh, gosh.  Between myself and, you know, team members,
 9   thousands.  We've helped thousands of buyers.
10    Q    Have you also on occasion represented home sellers?
11    A    Yes, sir.
12    Q    And when was that?
13    A    So, you know, I was primarily a buyer's agent and have
14   been my entire career; yet there have been times where, you
15   know, maybe it was a past client of mine or a friend or a
16   family member that wanted for me to help them.  I would list
17   their house.  Potentially if my business partner wasn't
18   available to go on a listing appointment, I would have gone on
19   it.
20          And occasionally there have been times where a home
21   seller felt more comfortable with a female agent, and so I
22   would have gone to those appointments as well.
23    Q    We'll talk more about your career as an agent in a
24   moment, but let's talk about your role as the vice president
25   of MAPS coaching with Keller Williams Realty, Inc., a
                              2273
```

```
 1   franchisor.

 2            When did you begin that job?

 3    A     So I became a coach in 2016.  I had the opportunity to

 4   lead what we call group coaching for buyers' agents.

 5            So at that point I had been successful in being able

 6   to help a lot of buyers, and I got the opportunity to become a

 7   group coach in 2016 to help other buyer agents kind of get

 8   that quality of life, you know, that I was talking about

 9   earlier.

10            In 20 -- it was either the end of 2019 or beginning

11   of 2020, I became a MAPS one-on-one coach.  At that point I

12   had become a co-owner of Holt Homes Group about a year earlier

13   and learned really and earned the right to coach people one on

14   one because of the experience I'd had over the last year in

15   running a business, increasing profit margins, kind of those

16   types of things.

17            And then in June of 2022, I got the offer to become

18   the vice president of MAPS coaching.

19    Q     Why did you first become a MAPS coach?

20    A     Oh, you know, I said earlier that KW changed my life.  I

21   think a lot of that was MAPS.  I had a coach, and I was -- you

22   know, I had gone through challenging times, right?  I went

23   through a divorce and was trying to figure out, you know, how

24   to balance it.  How do you become -- how are you a single mom

25   and still showing houses and still earning an income and being
```

```
 1   able to do those things?
 2            My coach at the time was able to really help me
 3   understand how to build out this business and still protect
 4   that time with my kids.
 5            And so when the opportunity presented itself in
 6   2016, it was my chance to make an impact, right?  It was my
 7   chance to say, okay, gosh, I get to help all of these
 8   homebuyers, and I get to train agents on my team; and now I've
 9   got the opportunity to help other buyer agents that are going
10   to make an impact, you know, nationally with homebuyers.
11   Q    Explain to the jury what MAPS coaching is.
12   A    Sure.  So MAPS is an acronym.  MAPS stands for Make
13   Achievement Productivity Systems, and there are different
14   levels of coaching.  So you -- there's some group coaching,
15   which would be what I referenced earlier where I'm coaching
16   maybe buyers' agents or some day maybe coaching sellers'
17   agents.
18            And then there's an opportunity also for one-on-one
19   coaching.  So for those agents that have a little bit more
20   experience that are looking at how do I take my business to
21   the next level, they would then be in a coaching relationship
22   one on one.
23   Q    And explain what you mean by coaching.
24   A    Sure.  So it's a -- it's basically -- you know, as a
25   coach, you go in and you partner with the agent that you're
```
                                 2275

coaching, and you understand all facets of their business.
So, you know, I can look at their profit and loss statement.
I can look at what they're spending money on, where they're --
you know, what they're doing as far as growing their business,
if they want to grow their business.

       If they're like I don't want to grow anymore, Jen,
but I want to stay at home more; or we've got some people now
that are -- they want to retire, and they're saying how do
I -- I've worked 25 years or I've worked 30 years in doing
this.  What do I do now?  Like how do I make some money out of
this business that I've created?

       And so as a coach, we go in and we coach them, and
here are what your next steps are.  Maybe you need to hire
someone.  Maybe you need to spend money in different places.
Maybe you need to spend less money in certain places.

Q    Now, what do you do as the vice president of MAPS
coaching?

A    So I'm in charge of all of our coaches, and my
responsibilities are really to make sure that our coaches
understand what's happening in the market and what we think is
coming around the corner.  You know, so I'm making sure that
they have up-to-date information so that they can coach their
clients to what we know, you know -- or what we think may be
coming.

       There have been a lot of changes in the market over
                          2276

1    the last few months, and so my responsibility is to really

2    pour into those coaches so that they can pour into our

3    associates.

4    Q    Why did you decide to take that job?

5    A    Honestly, because it was the opportunity that I had to

6    provide what our coaches need, which ultimately will provide

7    what our agents need.

8              I said earlier, you know, there was -- I only had so

9    much impact that I could make on the agents on my team and

10   then only so much impact that I could make on buyers' agents.

11   This is my opportunity to make an impact on coaches, which

12   then is going to impact, you know, more agents, which impacts

13   more homebuyers and sellers.

14   Q    Do you still work as a real estate agent?

15   A    Yes, sir, I do.  I -- maybe not as much, right?  I've

16   got a lot of responsibilities now.  However, I went on a

17   listing appointment not last week, but the week before.  So

18   still licensed and still active in the market.

19   Q    Now, turning back to MAPS, how many agents who are

20   affiliated with the Keller Williams' franchisee brokerage use

21   MAPS coaching?

22   A    So, you know, I'll go into just maybe like kind of the

23   two bigger topics.  So the one-on-one coaching, we have

24   roughly 3,500 of our agents that are in a one-on-one coaching

25   relationship.

                              2277

1           And then our biggest group coaching program is

        2    called BOLD, which is another acronym, Business Objective, a

        3    Life by Design.

        4           And that is a group coaching program that probably

        5    15 to 18,000 of our agents go through each year.

        6    Q    How do agents decide what training to take, MAPS

        7    coaching or any other training?

        8    A    Oh, how do agents decide -- they can go to any training

        9    they want.  So, I mean, it's all optional.  They would decide

       10    based on what their need was.  They would look at maybe what

       11    struggles they were having in their business and then

       12    determine from there do I want training, do I not want

       13    training.

       14    Q    When you say "optional," expand on that a little bit.

       15    A    It's optional.  So there are no mandatory training

       16    within KW.  Sometimes I wish there was, but there's not.

       17           So Keller Williams was built by agents for agents;

       18    so there are agents that opt into all of the training, and

       19    then there are agents that opt into none of the training.  So

       20    there are no mandatory requirements.

       21    Q    You mentioned the BOLD program.  Explain to the jury

       22    what BOLD is.

       23    A    So BOLD is a way for us to get into our local market

       24    centers.  That was the other term for brokerages.  And so BOLD

       25    is really focused on two things.  It's the activities that we

                                        2278

```
1    know will create the business that an agent wants or needs.

2    So it's focused on the activities to become a great real

3    estate agent.  It's also focused on mind-set.

4             So, you know, one of the things that we know around

5    mind-set is what we're thinking about kind of comes out in our

6    activities, and so we want to make sure that we can match

7    those two things up.

8             So BOLD is really this idea of how do we get you to

9    have a great mind-set; and at the same time, do the activities

10   we know will help you become successful.

11   Q    When you talk about helping agents improve their

12   businesses, does that mean helping them increase their

13   commission rate?

14   A    No, sir.

15   Q    Expound on that answer.

16   A    So when we're coaching and talking to people about their

17   businesses, it's very much -- especially in a one-to-one

18   relationship, it's very much a what do they want, where do

19   they want to go.  Not everybody wants to help thousands of

20   buyers.

21            Some people want to help 12 buyers.  Some people

22   want to help 50.  Some people want to help 200.  And so it's

23   our opportunity to go in and say here's what your business

24   looks like, and here's where you're saying you want to be, and

25   this is what matters to you.  What you're saying is this is
```
                                      2279

1  the life you want to live and the business you want to design.

2  And so as a coach, we're coming in and saying how do

3  we help you decrease those costs; how do we help you make

4  better decisions; how do we -- you know, I called it being a

5  pop tart earlier, right?

6  How do we help coach you to become a business

7  person, not just a real estate -- not just a real estate

8  agent, right?  How do we teach you or coach you how to become

9  proactive instead of reactive?

10 Q    Let's talk about MLS membership.  Are you a member of a

11 multiple listing service?

12 A    Yes, sir.

13 Q    And how long have you been a member of the multiple

14 listing service?

15 A    Since I got licensed in 2008.

16 Q    And can you describe for the jury what a multiple

17 listing service is.

18 A    Sure.  Multiple listing service, also called an MLS, is

19 really the database where home sellers will have their agents

20 put their homes, and it's where buyer agents and buyers will

21 go to look for the home.

22 So it's a database that really collects all of the

23 information about a house.  So square footage, bedroom,

24 bathroom, any amenities in the neighborhood that might be

25 important, those types of things.

2280

```
 1   Q    So when a property is submitted to the multiple listing

 2   service, what is it called?

 3   A    It's called a listing.

 4   Q    And does the MLS have various fields?

 5   A    It does.  It has many fields.  Like I referenced a few

 6   of them, you know, the square footage, bedroom and bathroom

 7   count.  It also would say, you know, what style of home is it.

 8   You know, is the exterior brick, is it vinyl siding; you know,

 9   does it have a crawlspace, does it have a basement, those

10   types of fields.

11   Q    Which MLS are you a member of?

12   A    Southern Missouri Regional MLS, also called SOMO.

13   Q    And why are you a member of the Southern Missouri

14   Regional MLS?

15   A    So that I have access to the MLS.

16   Q    Why do you want access to the MLS?

17   A    To help our buyers and sellers.  I mean, that has the

18   most up-to-date and accurate information; so if I'm going to

19   do a great job, I need to have access to it.

20   Q    What about websites like Zillow?

21   A    Yeah.  I mean, Zillow, Realtor.com, any of those are

22   websites that homebuyers may start and look at; however,

23   they're not going to have all of the information.  They may

24   have some of those, you know, things, like the bedrooms,

25   bathrooms.  They'll have pictures and things, yet it wouldn't
```

                              2281

```
 1   have all of the information.  It wouldn't have sellers'
 2   disclosures.  It wouldn't have all of the accurate history of
 3   the property.
 4            So MLS would be the most robust amount of
 5   information.
 6   Q    Now, you said that when you're working with buyers, that
 7   MLS is the best source of information about what properties.
 8   Can you expound on that answer a little bit more.
 9   A    Sure.  So, you know, there are things that those other
10   websites can't provide that the MLS does.
11            So, for example, if I am -- let's say a buyer wants
12   to make an offer on a property, and I'm looking at the house.
13   I can see what everything else in the neighborhood sold for.
14   I can also see where there's seller concessions, what type of
15   loan did it sell for, how long was it on the market.
16            But I can also see those seller disclosures, and the
17   seller disclosures are things that talk about the seller has
18   to disclose.  So how old is the roof?  You know, have there
19   been any insurance claims, any -- was it built before 1978,
20   which would indicate that there was lead-based paint in the
21   house.
22            Those types of things are going to be on the MLS
23   that are not going to be on these other websites.
24   Q    When you say "other websites," you're referring to
25   websites like Zillow?
                              2282
```

```
 1   A     Yeah.  Yes, sir.

 2   Q     Is the accurate -- is the information on Zillow accurate

 3   in your experience?

 4   A     Not always.  You know, there are times that a buyer will

 5   screenshot a house to me that they see on Zillow.  And they'll

 6   send it, and they're like, Hey, Jen, I want to go take a look

 7   at this.

 8         There's a little line under there that says, like,

 9   preforeclosure.  Well, preforeclosure doesn't mean

10   foreclosure.  It doesn't even actually mean that they've

11   always -- I -- you know, that it's going to go into

12   foreclosure.  So it's not even a house that's available.

13         So there are times that that information is not

14   accurate.  So that -- while it can be a fun place for our

15   buyers to go look, it certainly wouldn't provide the

16   information that I would feel confident in making a decision

17   based on.

18         MR. RAY:  Can we pull up P426, please.

19   Q     (BY MR. RAY)  Do you recognize this document?

20   A     Yes, sir.  That's the policies and guidelines manual for

21   Keller Williams.

22   Q     And for whom are the policies and the policies and

23   guidelines manual applicable to?

24   A     Keller Williams agents like me.

25   Q     Okay.
                          2283
```

1      MR. RAY:  And can we pull up the provision requiring

2  membership in local boards and MLSs.

3  Q    (BY MR. RAY) As a Keller Williams agent, what do you

4  interpret this provision to require?  And that's the

5  associates representing Keller Williams Realty, 4.9.42.

6  A    That all associates that are part of KW would become

7  members of their local board association of realtors and the

8  MLS, except exempted by their TL.  TL is a -- it stands for

9  Team Leader.  So somebody that would be leading kind of that

10  brokerage side of things.

11  Q    Now, were you aware of this provision before this case?

12  A    No.

13  Q    To what extent was this provision a factor in your

14  decision to join the Southern Missouri Regional MLS?

15  A    It wasn't a factor.

16  Q    And why is that?

17  A    Well, I joined the MLS in 2008, and I didn't join KW

18  until 2012.  So I was already part of the MLS before I even

19  came to KW.

20  Q    And would you have joined the Southern Missouri Regional

21  MLS even if Keller Williams had not required it?

22  A    Yes, sir.

23  Q    Are you a member of your local board of realtors?

24  A    Yes, I am.

25  Q    What is the name of your local board of realtors?

                              2284

```
 1    A     Greater Springfield Board of Realtors.

 2    Q     Do you attend meetings of the board of realtors?

 3    A     No.

 4    Q     Why?

 5    A     It's not a priority for my business.

 6    Q     Why are you a member of the Greater Springfield Board of

 7  Realtors?

 8    A     To have -- oh, well, to have access to the MLS.

 9    Q     To what extent was the requirement in the policies and

10  guidelines manual that you join a local board of realtors a

11  factor in your decision to join the Greater Springfield Board

12  of Realtors?

13    A     It wasn't a factor.  I -- I mean, as I said, I was -- I

14  joined in 2008, the MLS, and didn't come to KW until 2012.

15    Q     Would you have joined the Greater Springfield Board of

16  Realtors even if Keller Williams had not required it?

17    A     Yes.

18    Q     So can we talk about -- I didn't ask this, but what

19  areas does your MLS cover?

20    A     So our MLS covers really that southwest corner of

21  Missouri.  So, you know, I think -- and this is just

22  estimates.  You know, I think as far north as, you know,

23  Bolivar, Buffalo, kind of those areas, and then we're going to

24  go as far south as the Arkansas border.  So Springfield and

25  Branson are relatively close.  Arkansas is not that far past.
                                2285
```

1          And then east to west, we're going to go, you know,

 2     Springfield, Republic, Aurora, Monett, kind of Barry County,

 3     in that area.  And then Rogersville, Fordland, Seymour, kind

 4     of out east.

 5          So it's a pretty big geographical area.

 6     Q    Thank you.

 7          Now, I'd like to talk about multiple listing service

 8     rules and cooperative compensation.  If the Keller Williams'

 9     policies and guidelines manual did not require MLS, would you

10     still be a member of the MLS and follow its rules?

11     A    Yes.

12     Q    Explain your answer.

13     A    Well, I would follow the rules so that I could still

14     have access to it.  I don't want to get kicked out of the MLS.

15     I want to still be able to help our homebuyers and sellers.

16          So, you know, in the effort to have access to making

17     sure that our listings can go on the MLS and that I would have

18     access to doing searches for homebuyers, I would follow the

19     rules to the best of my ability.

20     Q    Do the rules of the Southern Missouri Regional MLS

21     include a requirement that when you are hired to represent a

22     seller and you submit the seller's listing to the multiple

23     listing service, you need to include an offer to compensate

24     the agent who finds the buyer of the listing?

25     A    Yes.  And I think that -- yes.  I mean, I didn't know

                              2286

```
 1   that until recently.  But, yes, there is a rule that requires

 2   that.

 3   Q    Before this case, were you aware that listing agents

 4   were required by the multiple listing service rule to offer

 5   compensation to buyer agents?

 6   A    No, I was not aware of that.

 7   Q    If there were no MLS rule requiring listing agents to

 8   offer compensation to buyer agents, would you still follow

 9   that practice when you're working with sellers?

10   A    I would.  I mean, it's --

11   Q    Why would you still follow that practice?

12   A    It's good for business.  I mean, I think that it helps

13   our sellers and buyers to have that -- to offer buyer agent

14   commission.  We would still offer it.  We want more buyers in

15   our sellers' homes; so we would still offer it.

16   Q    When you work with sellers, do you explain to them that

17   you intend to offer part of the commission the seller agrees

18   to pay to you to buyer agents?

19   A    We do.  So, I mean, when we sit down with a home seller,

20   we talk about it.  We talk about all of the money that is

21   going to come out of, you know, what their proceeds would be.

22          So we talk about commissions.  We talk about title

23   fees.  We talk about potential home inspection repairs and

24   those types of things.  And so we put together what we would

25   call a seller net sheet.
                           2287
```

```
 1          And that net sheet really goes through, you know,
 2   here is, based on what we know of the market, where we likely
 3   will list the home.  Here's what those commissions would be.
 4   And then we work our way down that net sheet to really show
 5   the seller here's likely, you know, very close to what you
 6   would walk away with the day of closing.
 7   Q    Has any seller ever complained to you about paying the
 8   commission of the buyer agents?
 9   A    No.  I mean, honestly, if they were worried about the
10   buyer agent commissions, they have other options.  They could
11   list their home for sale by owner.  They could list with a
12   flat fee.
13          I mean, they could -- there are other options if
14   they didn't want to have a buyer agent as part of the
15   transaction.
16   Q    And based on your experience as an agent, would you
17   expect seller's agents to offer compensation to buyer agents
18   even if there were no rule requiring them to do so?
19   A    Yes.
20   Q    Why?
21   A    It's -- you know, I think that we would still continue
22   to offer it and other agents would.  And I think they'd have
23   those conversations with their sellers.  They would talk to
24   their sellers about if you want to net the most amount of
25   money, we want more people to be in your house.  We want
                              2288
```

1  people to see it.  We want them to have representation.
2         So, you know, as a -- having a buyer agent part of
3  it, number one, it takes a lot of the headache away.  We know
4  that we're going to have qualified buyers that are going to go
5  through their home, which likely is going to give the seller
6  better terms.
7  Q    Would you expect that sellers' agents would advise their
8  clients to continue to make offers of compensation to buyer
9  agents?
10 A    Yes.
11 Q    Would you expect that seller clients would take that
12 advice?
13 A    I would.  I mean, I think if I'm sitting across from a
14 seller and they're saying to me, Jen, I want to sell my house
15 and I need to do this by, you know, whatever that timeline is,
16 just like I would advise them to, you know, repaint or remulch
17 or stage their house or get their carpets cleaned or, you
18 know, whatever it is, if I'm going to advise them to get the
19 best -- to have the best opportunity possible to get their
20 home sold, absolutely I think they're going to take my advice
21 on that we should still offer buyer agent compensation.
22 Q    Would you -- what have you observed in slow markets
23 about sellers offering compensation?
24 A    Well, we talked about I got licensed in 2008, which many
25 of you may not remember, was not an ideal time in real estate.
                              2289

```
 1   It was slow.  And in that slow market, there were -- sellers
 2   were doing anything possible that they could to set their home
 3   apart from other homes.
 4            Sometimes it would be offering, in addition to the
 5   compensation that was offered, the commission that was
 6   offered, there would be bonuses offered; sometimes $10,000 or
 7   more with an acceptable offer by that timeline.
 8   Q    And can you explain to the jury what you mean by a slow
 9   market?
10   A    You know, just supply and demand.  There were too
11   many -- there were so many houses on the market and not enough
12   qualified buyers.  And so when we look at days on market, it
13   was longer days on market with fewer offers.  Sellers had to
14   do more to get to the closing table.
15   Q    So it's a way of sort of incentivizing the marketplace?
16   A    That's right.
17   Q    And when you're representing sellers, have you ever had
18   a buyer contact you that doesn't want representation?
19   A    Yeah.  We have.  We have buyers that reach out and say,
20   Hey, I just want to get in the house, and I don't want a
21   buyer's agent.
22   Q    And what do you tell the buyer about -- who contacts you
23   in that way?
24   A    You know, if a buyer calls and says, Hey, I don't want
25   an agent, I just -- I want to -- I'm going to represent
```
2290

```
 1   myself; or, you know, I don't need help.  Then I say, Hey,
 2   just as full transparency, I represent the seller.  And so
 3   I -- any information that I have, you know, I'm the fiduciary
 4   of the seller.
 5   Q    And what would happen to your commission then?
 6   A    Well, nothing.  I mean, if I've negotiated my commission
 7   at the listing appointment, whatever that percentage is, it
 8   would remain the same.  There's not a discount to the buyer
 9   because they're not taking -- choosing representation.
10         Our team, because we're going to likely do double
11   the work, will still take the full commission.
12   Q    Let's talk about buyer agency agreements.
13   A    Okay.
14   Q    Now, when you work with buyers, do you discuss how you
15   might receive your compensation from the seller's agent?
16   A    We do.  So we typically will -- I'll meet with a buyer,
17   you know, before we go out and look at homes, and we go
18   through what we call a strategy session or a buyer
19   consultation.  And during that time, I show them this buyer
20   broker agreement or buyer agency agreement.  And we talk about
21   that I can make, you know, up to 3 percent commission when --
22   on the -- of the sale of the home.  So whatever that purchase
23   price is plus the transaction fee.
24         So we talk about that; you know, when we get to
25   closing day, this is how I get paid.  I'm going to make every
```
2291

```
 1    effort for the seller to pay that commission.  And in the
 2    event that they won't, that there would be -- it would be the
 3    buyer's responsibility to make up that gap.
 4    Q    Why ask clients to sign a buyer representation
 5    agreement?  Explain that to the jury.
 6    A    You know, it's a loyalty agreement.  We're going to put
 7    a lot of work in.  We're going to do searches.  We're going to
 8    show them properties.  We're going to do all of these things,
 9    and so it's just that agreement between the buyer and I of,
10    Hey, we're going to work together.  And at the end of the day,
11    if you purchase a house, at closing I'll get paid.
12            If you don't purchase the house and you don't close
13    on it, I won't get paid.
14    Q    Okay.  And what does it mean when you and the buyer sign
15    a representation agreement?
16    A    It means that we're working together; that my
17    responsibility is to find them the best house at the best
18    price in the timeframe that they want to get into the house.
19    Q    And what, if anything, does your agreement say about
20    your compensation?
21    A    It shows that.  It shows that, you know, here's the
22    percentage that we can make out of the purchase price of the
23    house, plus that transaction fee.  We are first going to see
24    if the seller will pay it; and if not, then the buyer may need
25    to make up the difference.
                             2292
```

```
 1    Q    Have you ever faced circumstances where you have had to
 2  ask a buyer client to pay your commission when the amount
 3  offered by the listing agent was less than the amount you had
 4  in your agreement with the buyer?
 5    A    No, I've never asked a buyer to make up the difference.
 6    Q    Was that because you never had been offered less in
 7  compensation?
 8    A    No.  We've been offered less in compensation.  I think,
 9  you know, I -- we talked -- I referenced the 3 percent being
10  in the agreement.  I think on average, our team closes out
11  somewhere around 2.7 percent in commissions.  So it happens
12  often that that happens, that it's less than what we agreed
13  upon.
14    Q    When you say that your team closes out on average 2.7,
15  Keller Williams Realty, Inc. has nothing to do with that,
16  correct?
17    A    No.  Keller Williams has nothing to do with that.
18    Q    When you were looking for homes for your buyer clients,
19  to what extent do you pay attention to the amount of
20  commission that the seller's agent is offering to the agent
21  who finds a buyer?
22    A    I don't pay any attention to it at all.
23    Q    Why don't you pay attention to it?
24    A    You know, I've been doing this a long time, and I intend
25  to do it for a lot longer.  So I think when I look -- it
```
2293

```
1    doesn't make sense to look at it.  I think when I help a buyer
2    and I get them into the house that they want, it's always
3    worked out.
4          My goal is to have a career, not a single sale.  And
5    so when I look at -- if I were to just look at commission and
6    decide that was how I was going to determine what houses I was
7    going to show them or not, I think the buyer would be pretty
8    upset, right?
9          They're going to still see -- we talked about
10   Zillow.  They're going to see the houses on Zillow or
11   Realtor.com, and aren't they going to be like, Hey, Jen, why
12   didn't you show me this house?  It's not good business.
13         So I think for me when I look at it, is I want to
14   help buyers.  I want to help them get into the home that works
15   for them, and the individual can -- commission on any
16   individual sale hasn't mattered.
17   Q    How much of your business comes from referrals or repeat
18   business?
19   A    I'd say about 50 percent is repeat and referral
20   business.
21   Q    We talked a moment ago about how your buyer agency
22   agreements refers to how you usually expect to receive your
23   compensation from the agent for the seller.
24   A    Uh-huh.
25   Q    What happens when the seller doesn't have an agent?
```
2294

```
 1   A     So, you know, if you look at something like a for sale
 2   by owner, you know, would be a good example of that.  Or
 3   something maybe that's not on the market, I would ask the
 4   seller.  I would call and just say, Hey, Mr. and Mrs. Seller,
 5   I've got a buyer that would like to take a look at your
 6   property.
 7             You know, is -- would it be okay with you if they
 8   used a buyer's agent?  And most of the time they say yes.
 9   Most of the time a for sale by owner chose not to list their
10   house not because they didn't want to work with a buyer agent,
11   but because they didn't want to work with a listing agent.
12   Q     Does that mean that if your client buys the house, you
13   won't receive any compensation for your services?
14   A     No.  I typically am able to negotiate my commission into
15   an agreement with the seller, so the seller still typically
16   pays the commission on that -- on a for sale by owner.
17   Q     How often do sellers agree to pay your commission?
18   A     I would say 90 percent of the time.  I mean, it -- it's
19   a fair amount that a seller is prepared to pay for the
20   commission of a buyer agent.
21   Q     What happens in the rare occasion in which the seller
22   won't offer compensation?
23   A     So we have a conversation about it.  You know, I go back
24   to the buyer and say, Hey, this seller is unwilling to pay the
25   commission.  We've got two options.  You know, option one is
```
                                   2295

```
1    you all can pay the -- pay my fee; and if they say no, you

2    know, we can't, we don't have the money, we've only got our

3    down payment, we don't have money for the commission too, then

4    at that point I would likely just step out of the way and let

5    the buyer and seller handle it from there.

6    Q    And you've done that before?

7    A    I have.  You know, it's never fun to do it.  And, again,

8    my responsibility is for the buyer to get the house that they

9    want.  So I'm never going to stand in the way of the sale of a

10   house.

11   Q    And would you on those occasions ask for compensation

12   from your buyer client?

13   A    You know, if -- we have the conversation, right?  We

14   have the conversation.  Sometimes they pay the flat fee.

15   Sometimes the buyer is like, Jen, I can't do this, but I can

16   do this.  I'm like, cool, right?  That's great.

17          Sometimes they can't pay anything, and that's okay.

18   It is what it is.  I think that's the thing is, like, in the

19   scheme of a career, yes, it happens, and it's unfortunate.

20   And at the end of the day, it's okay.

21   Q    Do buyer agents incur costs?

22   A    Yes.  Buyer agents incur costs.

23   Q    What types of costs?  Explain to the jury.

24   A    So, you know, we've got -- clearly we've got, you know,

25   fuel and phones and MLS access.  We've got typically what we
```

                                    2296

```
 1  call like a CRM.  It's a client relationship manager.  So it's
 2  where we house information for our buyers; so that could be
 3  homes that they bought with us before or sold with us before.
 4          It could be their birthdays, their home
 5  anniversaries.  And those types of costs are part of it,
 6  right?  I mean, it -- and it just is.  And it's a way to
 7  manage your business.  Just like any other, you know, business
 8  owner would have expenses, buyer's agents have expenses.
 9  Q    Are there technology-related costs?
10  A    Yeah.  I mean, clearly we've got any type of -- you
11  know, if you've got a website, you've got to maintain the
12  website, you've got to update the website.  You've got to have
13  the little things that I fully don't understand of how one
14  thing connects to another, right?  You know, if I want to get
15  information from here to here, what's the -- what closes that
16  gap.
17          So, yeah, I mean, you've got app costs, all those
18  things.
19  Q    Do you incur costs when you receive a lead from Zillow?
20  A    We do.  So, you know, it used to be better than it is
21  now.  So when I got into the business in 2008, and I think
22  maybe I started buying leads in 2010 or 2011, the leads were
23  not very expensive, and the leads were great.
24          Now the leads are really expensive, and they sell
25  them to multiple agents.  So they aren't very great.
                              2297
```

```
 1            So we spend -- we spend money on Zillow leads.  We

 2   spend money on Google ads.  We spend money on, you know,

 3   Facebook campaigns or social media campaigns, which would --

 4   you know, we're out there trying to collect leads so that we

 5   can help more homebuyers.

 6   Q    And up to how much of your compensation that you receive

 7   could be tied to paying for referrals from Zillow?

 8   A    Oh, gosh.  I mean, it could be -- it could be 25, 30

 9   percent, 35 percent.  I know there are some markets where it

10   goes up to 50 percent.  You know, we do --

11   Q    50 percent of what?  30 percent on what?  Explain that

12   to the jury.

13   A    So it could be -- you know, I'm going to go with

14   HomeLight because I'm confident in what that number is.  So

15   HomeLight is a source for leads, and that's 35 percent of the

16   commission.

17            So let's say you were -- it was a $100,000 home, and

18   you were going to take a 3 percent commission, and so that's

19   $3,000.  That HomeLight would take 35 percent of the $3,000

20   before it even came into our team.

21   Q    And then you would have to subtract the expenses that we

22   just spoke about?

23   A    Oh, yeah.  I mean, the referrals come off the top for

24   Zillow or HomeLight or Realtor.com, any of those.  That money

25   comes straight off of the top of the commission; so you pay
```

                                2298

                    Gayle M. Wambolt, CCR No. 462
                        Registered Merit Reporter
Case 4:19-cv-00332-SRB    Document 1332    Filed 11/28/23    Page 55 of 268

```
 1    that in first.
 2            And then you would pay any office fees.  So, like,
 3    anything that I would owe to Keller Williams for a cap,
 4    anything that I would owe for, you know, the technology and
 5    all of those things.
 6            Oh, sorry.  I forgot there was a microphone there.
 7    Sorry.
 8            So anything like that would -- you know, would come
 9    from whatever is left.
10    Q    You cover your health insurance?
11    A    Cover health insurance for myself.  I cover health
12    insurance for my team.  We have personal liability insurance.
13            So, like, when you're in the public and you are
14    showing homes and you may have people in your car, you have to
15    have other insurance, right?
16            So I also have an umbrella policy and those types of
17    things.  So, yeah, I mean, we have all kinds of additional
18    costs.
19    Q    Are there operational costs?
20    A    Operational costs.  We've got staff, right?  So, I mean,
21    I referenced earlier that we have six agents.  What I didn't
22    mention is in addition to the agents, we also have help with
23    paperwork and photos and all of those things that happen.
24            So operationally, we have staff that we pay their
25    salaries and their insurance as well.
                                2299
```

1    Q     On top of gas, car repairs, marketing fliers?

2    A     Yes, sir.

3    Q     You fund all of those things?

4    A     Yes, sir.  Whether we close on the property or not, I

5    mean, those things all still happen.

6    Q     And have those costs increased over time?

7    A     Well, I think we all know that gas costs have increased

8    over time, yeah.  So, you know, if you look at a buyer's

9    agent -- let's say you show ten houses to a buyer or 15 houses

10   to a buyer and they never buy, that stinks.

11          And, yeah, insurance clearly has gone up.  Rent

12   costs have gone up for commercial spaces, right?  So we have

13   an office.  Salaries have gone up, health insurance -- I mean,

14   everything has gone up.

15   Q     Do you get reimbursed for these costs if the home sale

16   doesn't close?

17   A     No.

18   Q     Let's shift to working with buyers.  Let's talk about

19   the process of -- you said earlier that you work with buyers.

20   How does that process begin when you work with buyers?

21   A     So, you know, we just talked about leads coming in.

22          So a lead can come in a few different ways.  That

23   could be a repeat client, right?  Somebody that calls me back.

24   It could be a referral.  It also could be one of the leads we

25   just mentioned.  So Zillow, HomeLight, one of those.

                                2300

```
 1          When a lead comes in, my goal is to meet with the
 2    person in person, and so we do what we call a strategy
 3    session.
 4          So a homebuyer would come to our office, and we
 5    would sit down and meet.  And typically we're going to meet
 6    for about an hour to an hour and a half, and we're going to
 7    talk.  We're going to talk about what's going on in the
 8    market, what do they know about the market, what information
 9    have they heard, how can -- you know, what questions can I
10    answer.
11          We're also going to talk about what they want in a
12    house, right?  What do they want?  What do they need?  What
13    are the nonnegotiables?  Sometimes wants and needs get a
14    little fuzzy when we're first starting out.
15          We talk about what it looks like to get approved.
16    You know, what lender are they using?  Are they a cash
17    purchase?  What -- you know, what's the money part of it look
18    like?
19          But we also look at why.  Why are they moving?
20    What's important to them about moving?  What's their timeframe
21    for moving?
22          And so I spend an hour to an hour and a half going
23    into a deep dive of what is it they want, where do they want
24    to be, by when, and then we go from there.
25    Q    I assume you have a discussion about interest rates in
```

```
 1   today's market, right?
 2   A    We have a discussion about interest rates in today's
 3   market; you know, and sometimes what we're finding is that
 4   strategy session that we did 30 days ago, we have to redo now,
 5   right?  Because 30 days ago interest rates -- they may have
 6   qualified for a different home 30 days ago than they do now.
 7   Q    What happens at the end of your strategy session?
 8   A    End of the strategy session is when we bring up that
 9   buyer agency agreement or buyer broker agreement that we
10   talked about earlier.
11        So we decide if we're going to work together, right?
12   Are we a good fit?  Do they feel like I'm the best agent to
13   find them the best house at the best price?  Do I want to work
14   with them?  Do we think that we can find them something?  And
15   when are we going to start?
16   Q    Now, after they sign the buyer representation agreement,
17   what's the next step?
18   A    So the next step is typically I'm going to send them
19   houses, right?  I'm going to send them some properties and
20   make sure that we're on the same page.  Then they're going to
21   pick out their two or three top choices, and we're going to go
22   take a look at them.
23        It's funny when you -- this is the fun part, right?
24   Going and looking at houses is the fun part.  So we go and we
25   take a look at the two or three houses, and then we decide,
                            2302
```

```
 1    right, did I listen well?  Did I hear what they said?  Did we
 2    find the right property, and do they want to make an offer on
 3    one of them?
 4           Sometimes they do.  Sometimes they're like, No, Jen,
 5    you were way off base.  Then I go back and regroup and find
 6    another round of houses to take them to look at.
 7    Q    When listings are available on Zillow and other
 8    websites, do you still think that you as a buyer agent provide
 9    value to your clients in helping them search for homes?
10    A    I know I do.  I mean, I -- I think they -- yes, can a
11    homebuyer find a house on Zillow?  They can.
12           Do I have access to more information?  I do.  Have I
13    seen more houses?  Yeah, I have.  And I've got access to them.
14    I've got -- as a new -- even as a new agent, I provide them
15    value because I had other agents I could ask questions of,
16    right?  What do I do in this situation?
17           So, yeah, I know I provide value.
18    Q    Explain to the jury what you mean by low inventory.
19    A    You know, in a low-inventory market -- so when we look
20    at the -- like, the market that we just came out of and we're
21    kind of still sitting in, you know, no one exactly knows
22    what's going on, but that -- the market that we just came out
23    of, when I look at, you know, looking at things on the MLS and
24    those types of things, there was such low inventory, and there
25    were so many buyers that it was this idea of, you know, you
```
                                    2303

```
 1    look at supply and demand.
 2              And you guys may not be old enough.  But I don't
 3    know if you remember, like, Tickle Me Elmo, right?  Like,
 4    there was the Christmas of Tickle Me Elmo, and, like, moms
 5    were wrestling in Walmart, right, over these dolls to get
 6    their kids for Christmas.
 7              That's what the housing market was just like.  It
 8    was -- you would pull up to a house.  It would show up on MLS,
 9    and you would show -- you would get there to show it, and
10    there would be a line of 35 people waiting to see it.  And it
11    was just this very tense time of we've got way more buyers
12    than we've got homes to put them in.
13    Q    What can you do for those buyers other than just looking
14    for new listings submitted to the MLS?
15    A    Well, we do a lot of things.  So MLS is great.  It's a
16    great place to start, and there are times that there's not
17    enough.  There just is.
18              And so we will reach out to for sale by owners and
19    see, you know, do they have the home match?  We'll look at
20    properties that didn't sell.  So they're called expired
21    listings, and, you know, in -- from my perspective.  And so
22    maybe they didn't sell because of pricing.  Maybe they didn't
23    sell because they didn't have great marketing.  Maybe their
24    pictures weren't very good.
25              But I'll reach out to them and say, Do you still
                                     2304
```

```
 1   want to sell?  I've got a buyer that's looking.  Would you

 2   still sell?

 3            And then really our third option is to dig in and

 4   really to start to match make.  And so what I mean by match

 5   make is if I know that a buyer wants to be in a certain

 6   neighborhood or a certain school district or, you know, a

 7   certain area, right, then I can start to look at homes that

 8   would fit that buyer that are not on the market and see if I

 9   can find somebody that's not on the market that would be

10   willing to sell their home.

11   Q    Is there a real-life example of how this effort has

12   worked for one of your clients?

13   A    Yeah.  I mean, I think -- gosh, it was probably end

14   of -- I don't know if it was 2021 or beginning of 2022.

15   Inventory was really low, and there was really not much coming

16   on the market.  And I had a homebuyer that was relocating, and

17   they were going to use a VA loan.

18            So VA loans are veteran loans, and it's for people

19   that have served in the -- one of the military branches.

20            And during a low-inventory market, what was

21   happening is we had cash buyers, and those cash buyers were

22   waiving inspections.  They were waiving appraisals.  They were

23   going so far over list price and then waiving that appraisal,

24   which is kind of the gut check, from the lender perspective,

25   on does this -- is this going to hold its value?
```

2305

```
 1          And this -- the veteran and his family, when they
 2  were moving to Springfield, we were in a space where they
 3  couldn't find a house.  They were making offer after offer
 4  after offer, and nobody would -- nobody would take a bite on
 5  it because they couldn't waive inspections.  They couldn't
 6  waive appraisals because their loan requirement, the
 7  government-backed loan, requires that to be in a certain
 8  condition and to make sure that that value is accurate.
 9          So they kept missing out on it.  I was, like, I
10  don't know what to do, right?  These guys are going to end up,
11  and they've got to be here.
12          So we went and looked in the neighborhood that they
13  wanted to be in, and we just started -- my team just started
14  calling.  So we called the neighborhood, and we asked, you
15  know, Would you be willing to sell?  At what price would you
16  be willing to sell?
17          And we eventually found a home seller, oddly enough,
18  that was actually a veteran; so he understood how the VA
19  system, the VA loan process worked.
20          They were willing to sell, and so we were able to
21  match make them and get that family into a home that wasn't on
22  the MLS.
23  Q    Once you made the match and your client is under
24  contract, is your work as a buyer agent over?
25  A    Oh, heavens, no.  I wish it was.  Right?  You get
                          2306
```

```
 1    into -- that's the fun part.  You find the house, you

 2    negotiate the contract, and then it really just -- we get

 3    started.

 4            So the offer gets accepted, and then we turn the

 5    contract in to the lender to make sure that they can start and

 6    finish loan approval.

 7            Then we send it over to the title company.  So

 8    Missouri is a title state.  So we make sure that there's free

 9    and clear title so when the homebuyer buys, that the house has

10    free and clear title with no liens, tax liens, those types of

11    things.

12            And then from there, we go into the home inspection.

13    And so our team will set the home inspection; and likely, you

14    know, I'll either attend the home inspection with the buyer or

15    somebody from my team will.

16    Q    How can you provide value in these circumstances -- you

17    talked about the home inspection.  You're not a home

18    inspector.  How can you provide value in situations like that?

19    A    I'm not a home inspector, no.  You know, I provide value

20    because, number one, I can connect the buyer with two or three

21    home inspectors that they can interview, right, to see who it

22    is that's going to fit their needs the best.

23            But, number two, I've seen a lot of home

24    inspections, and I've seen a lot of reports.  And I have

25    access to contractors that can give us bids on the things that
```

2307

```
 1   pop up in inspection reports.  It's overwhelming.  I mean, a
 2   home inspection report can be upwards of 90 pages long.
 3              So my value comes in in explaining to the buyer,
 4   Hey, what's a big deal and what isn't a big deal, right?
 5   Like, what should we be worried about and what should we not
 6   be worried about?
 7   Q    What is the conversation that you may have with the
 8   buyer around those things?
 9   A    So the -- you know, I guess an example may be the
10   easiest way for me to explain it is Missouri -- like
11   Springfield anyway.  I don't know -- I've never sold real
12   estate up in Kansas City, so -- in Springfield, it's wet.  So
13   a lot of the houses are on crawlspaces.  So if you're not on
14   a -- in a basement home, it's not on a concrete slab.  There's
15   a space between the subfloor and the -- you know, and the
16   foundation.
17              And so one of the things that we find is there's a
18   lot of water that happens in crawlspaces; and some water is
19   okay, and some water is not okay.
20              So the conversation with the homebuyer is, you know,
21   Hey, guys, this isn't a big deal, right?  We need a sump pump.
22   We need a vapor barrier, and we need, you know, maybe some
23   Kilz to handle the water issue.
24              Other times, though, the conversation is, Guys, I'm
25   worried about this.  Foundationally there's a problem.
                              2308
```

```
1   There's enough water in here where we've got subfloor rot.

2   We've got actual mold.  We've got these other things

3   happening.

4            So the conversation really goes one of two ways,

5   which is this isn't a big deal and we can move forward and

6   this is a great house at a great price; or I have concerns,

7   and maybe we need to pull back a little bit.

8   Q    So if -- after talking to them, they've done the

9   inspection and decide to move forward, what happens next?

10  A    So if they decide to move forward, then we move forward

11  and we talk with the listing agent about those repairs.  So do

12  we want repairs?  Do we want a reduction in sales price?  You

13  know, do we want a credit towards the repairs?  It's a variety

14  of different choices for the buyer.

15  Q    I'm sorry.  What was your answer?

16  A    One of three things can happen.  They can decide to ask

17  for the repairs to be completed by the seller, and they can

18  ask for a credit from the seller or a reduction in sales

19  price.

20  Q    What role can you play as a buyer agent in helping your

21  clients resolve these types of disputes?

22  A    You know, sometimes the buyer wants these repairs to be

23  completed, and they -- and the seller is out of money.  They

24  can't make -- they don't want to make any more repairs or any

25  repairs.
                         2309
```

```
 1              And so sometimes what will happen is as an agent,

 2    the listing agent and I will chip in commission to get the

 3    deal done, to make those repairs or to give a credit for those

 4    repairs to be done.

 5    Q    So what happens then?  What happens after that?

 6    A    So, you know, if we're good, if everyone agrees, hey,

 7    this is what's happening and we're going to move to closing,

 8    then we get to the appraisal section of it, and we determine

 9    is value good, not good.  If it's good, then we roll forward

10    to closing.

11    Q    And have you been in situations where you've had to

12    negotiate where the deal was about to fall apart?

13    A    Yes, I have.  So when that happens, that's when we give

14    on the commission a little bit, the buyer and seller agent

15    would.

16    Q    Are you aware of any restrictions that prevent you from

17    giving in on the commissions or negotiating at that point?

18    A    No, sir.

19    Q    Does this mean that you might receive less commission

20    than what is offered in the multiple listing service?

21    A    Yeah, we do.  You know, I talked about it a little

22    earlier that we end up typically somewhere around that 2.7

23    percent commission instead of the 3 percent.  And it's because

24    of, you know, that negotiation during the inspection period of

25    it.
                                  2310
```

```
 1   Q    So you've negotiated.  You've kept the deal alive.  The
 2   buyer and the seller are in a good place.
 3        What happens next?
 4   A    Then we have the appraisal; and then from there, we're
 5   really moving forward to closing date.
 6   Q    And are there any pitfalls that can happen during the
 7   course of the appraisal?
 8   A    Yeah.  I mean, the value could come back low.  If that
 9   happens, then we would, you know, need to have another round
10   of negotiations.  If it comes back at or above the purchase
11   price, then we're good to move forward.
12   Q    And do you provide any advice to your clients during
13   this period of time?
14   A    I do.  So this is the point in time where you've got to
15   make sure that your buyers understand that they can't make any
16   big purchases, right?  So don't change jobs.  Don't open a new
17   line of credit.
18        You know, there have been times in the past where,
19   you know, the buyer wants to get back in the house, right, and
20   they want to see it and do measurements.  And then they walk
21   in and there's like this empty space where the refrigerator
22   should be.  And they're like, Oh, my gosh, I need a fridge,
23   right?  My friends are all going to come help me move, and I
24   need to be able to put, you know, the thing that goes with
25   pizza in the fridge for when they move, and that's how I'm
```
                                    2311

```
 1    going to pay my buddies to move me.
 2            So I -- in the past what's happened is I've had a
 3    buyer that went to Home Depot or Lowe's and bought a fridge on
 4    credit, right?  It was like President's Day, and they were
 5    like, Hey, it's 0 percent down or 0 percent financing.  They
 6    open a line of credit, and they no longer qualify for the
 7    loan.
 8            They were close enough on the debt-to-income ratio
 9    that by opening the -- by opening that line of credit, they
10    were no longer able to buy the house.
11    Q    What happens -- we're coming down the stretch here.
12    What happens the last week before closing?
13    A    So last week before closing, we validate and verify that
14    all the repairs were done.  We may send an inspector back over
15    there to make sure that the repairs were done properly.  We're
16    going to do a final walk-through to make sure that the
17    property is in the same condition that it was in when we made
18    the offer.
19            We're going to look through their settlement
20    statement, make sure they understand the money due at closing
21    and how to bring those funds, right, in certified check form.
22            And then I'm going to connect with the listing agent
23    and make sure that they're going to pull the sign and lockbox
24    from the property.
25    Q    Has the internet made home buying easier?
                                2312
```

1    A    No.  There's so much information out there for buyers, I
2    think that it's put more work on the agent to sort through the
3    good information from the bad information.
4    Q    What have you observed during your time as a buyer agent
5    about the struggles that buyers sometimes face in coming up
6    with the funds for a down payment?
7    A    It's hard.  It's a lot of money to buy a house.  So
8    oftentimes, the buyer will have the down payment money.  They
9    don't have much more, though.
10          So, you know, they -- there are ways around it and
11   whether that's gift funds or, you know, doing a different type
12   of loan so they have to put less money down.  It's a
13   challenge, though, for buyers to get into a home.
14   Q    And based on your experience as a buyer agent, what are
15   some of the pitfalls that buyers could confront proceeding
16   without an agent?
17   A    There are so many.  I mean, it's a lot to buy a house.
18   There are a lot of steps to go through, and there are a lot of
19   things that can go wrong, whether that's inspections or
20   financing or making that last-minute purchase that may prevent
21   them from owning the home.  I mean, there are a dozen points
22   during the transaction where something could fall apart.
23          I think over the years, I've likely helped thousands
24   of buyers avoid those pitfalls because they have
25   representation.
                              2313

1    Q    Based on your experience, would the absence of buyer

2    agents be bad for home sellers as well?

3    A    It would be.  I mean, I think with buyers' agents, we

4    bring a level of value to the home seller because, number one,

5    we're bringing in qualified buyers.

6            Number two, you've got more buyers coming into the

7    home that you're attempting to sell, which likely will give

8    you better terms in the contract.

9    Q    And you work to keep transactions together?

10   A    It's more likely that we're going to get to the closing

11   table when both parties have -- when both parties have

12   representation.  It's more likely that the seller will

13   actually get to close on the property.

14   Q    Now, as an agent who has specialized in working with

15   buyers, do you believe that you offer value to your clients?

16   Explain to the jury.

17   A    I know I offer value.  You know, I know that I do.  I

18   know that I'm there as a resource for them.  I know that I'm

19   there to help guide them through it.  I know that I can help

20   find them the house that they want, and it's more than just

21   showing houses.  It's so much more than just showing houses.

22   Q    Have you participated in a conspiracy to harm home

23   sellers here in Missouri?

24   A    No.  I would say that home sellers also think I'm

25   valuable.
                              2314

1    Q    Have any of the agents on your team participated in a

2    conspiracy to harm home sellers here in Missouri?

3    A    No, sir.

4    Q    Are you proud to be a Keller Williams' agent?  And if

5    so, explain to the jury why.

6    A    I am.  I am.  It's changed my life.  In the last 11

7    years, I've learned how to help more families get what they

8    want.  I've also learned how to be a better parent, a better

9    friend, a better coach.

10          Keller Williams gave me the ability to run a really

11   big business and still be at home when I wanted to be at home

12   and be at my kids' activities when I want to be at my kids'

13   activities.

14          MR. RAY:  Thank you, Jen.  Thank you, Your Honor.

15   CROSS-EXAMINATION BY MR. KETCHMARK:

16   Q    Good morning, Ms. Davis.

17   A    Good morning.

18   Q    We had a chance to meet maybe a couple -- maybe two

19   weeks ago when I came down to Springfield to take your

20   deposition, didn't we?

21   A    Yes, sir.

22   Q    I want to see if I can clear up timing on some things.

23   You are currently the vice president of MAPS coaching,

24   correct?

25   A    Yes.

                              2315

1    Q    And in that capacity, you report to the chief operating

2    officer for the defendant Keller Williams, correct?

3    A    I do.

4    Q    And then he -- the chief operating officer reports

5    directly to Gary Keller, correct?

6    A    That's correct.

7    Q    And Gary Keller is no stranger to you, is he, ma'am?

8    A    No.

9    Q    In fact, in 2023, just a couple months ago, you were on

10   the stage at the Keller Williams Family Reunion with Gary

11   Keller in front of all these agents who were out there in the

12   audience, correct?

13   A    Yes.

14   Q    And you will acknowledge and admit to the jury that you

15   know at the Keller Williams Family Reunion that competitors

16   are there?  You know that, right?

17   A    I know that we have recruits there, yes.

18   Q    I don't want to quibble about this.  But when I took

19   your deposition, you told me they were competitors who were

20   there, correct?

21   A    Okay.  Sure, yes, sir.

22   Q    Now, timing-wise, when -- let's just get this down.

23   You'll acknowledge to this jury that you signed an affidavit

24   supporting the defendants' position in this case in November

25   of 2021, correct?
                               2316

```
 1    A    Yes.

 2    Q    And at the time you signed that affidavit, were you

 3    represented by any of the defense attorneys in this case?

 4    A    No.

 5    Q    Were you represented by any attorneys?

 6    A    No.

 7    Q    Did you draft that affidavit on your own, or did someone

 8    draft it for you?

 9    A    They -- no, they sent it.  Yeah, someone else drafted it

10    for me.

11    Q    So an attorney -- was it Mr. Ray?

12    A    I don't think so.  Can I see it?  I could tell you whose

13    name is on it.  I don't know.

14    Q    Sure.  Been marked as Exhibit No. 4616, a copy of your

15    affidavit.

16    A    Oh, I don't -- it doesn't say on here who prepared it.

17    It was one of the attorneys, though.

18    Q    But it does say on there when you look at the last page

19    of it that it was signed by you on November 4th, 2021,

20    correct?

21    A    Yes, sir.

22    Q    It's 12 paragraphs long, correct?

23    A    Yes, sir.

24    Q    And you knew they were filing that affidavit in this

25    courthouse in opposition to a motion where I was asking to be
```
                                     2317

```
 1   representatives' class counsel for all these plaintiffs?  Did
 2   you know that?
 3   A    I didn't know where it was going to be filed.  I had a
 4   conversation with them.  I answered it to the best of my
 5   ability, and I signed the document.
 6   Q    I'm sorry -- Mr. Fadler's pointed it out.  I said it's
 7   4615.  Just to correct, you see where it says 4615?
 8   A    4615, yes, sir.
 9   Q    Now, so that affidavit is filed that's prepared by the
10   defense lawyers laying out what's in that affidavit, correct?
11   A    It was based on a conversation that we had, yes.  I
12   lined out this.  These are -- this is what I said.
13   Q    And then we know that you were then put on the payroll
14   or hired by Keller Williams for the very first time in June of
15   2022, as this trial was approaching, right?
16   A    Well, I started being paid as a MAPS coach in 2016.
17   Q    You were hired for the first time by Keller Williams as
18   an employee in June of 2022; is that not a fact?
19   A    Yes, sir.
20   Q    I'm not talking about if they paid you as an outside
21   independent contractor.  I'm talking about when you were put
22   on the payroll for Keller Williams the very first time in June
23   of 2022, correct?
24   A    Yes, sir.
25   Q    Now, one of the things that I want to talk to you about
```
2318

```
 1    is the fact that you'll acknowledge to this jury that you're a

 2    member of the National Association of Realtors, correct?

 3    A    Yes.

 4    Q    And that you're required to join the National

 5    Association of Realtors as part of your job to get on the MLS

 6    down in Springfield, correct?

 7    A    Yes.

 8    Q    And the only reason that you pay the dues to the

 9    National Association of Realtors is to get access to that MLS,

10    correct?

11    A    Yes.

12    Q    Now, you're what's known as a buyer's agent specialist,

13    correct?

14    A    Correct.

15    Q    Which means you're focusing on the buyer's side of the

16    equation, correct?

17    A    That's correct.

18    Q    So when a seller puts a home on the MLS, they make an

19    offer of compensation to pay the buyer's agent, correct?

20    A    Yes.

21    Q    In fact, I wrote it down, when the attorney for Keller

22    Williams asked you if the seller pays.  And I wrote down -- I

23    kept a little check mark -- 12 different times you

24    acknowledged that it's the seller, the home seller that's

25    paying the buyer's agent's commission, correct?
```

```
 1    A    Yes.
 2    Q    So if there's ever an issue in front of this jury today,
 3   from your standpoint, the person who's a buyer's agent
 4   specialist, you acknowledge and admit that it's the home
 5   seller that's paying the buyer's agent's commission, right?
 6    A    More often than not, yes.
 7    Q    Now, one of the things that you'll acknowledge and admit
 8   to this jury is sometimes you have a buyer who's done their
 9   own work, and they found a house that's not on the MLS.  In
10   that situation when they come to you, if it's not already on
11   the MLS what you're going to be paid, you'll actually work out
12   a deal with the buyer to pay you a flat fee, correct?
13    A    If the seller won't pay the commission.  I typically go
14   to the seller first, yes, sir.
15    Q    Right.  But if it's not on the MLS, you would go to the
16   seller.  If they say they don't want to do it, then you would
17   work out a flat fee with the buyer to pay you, right?
18    A    It has been the percentage or a flat fee, yes.  It could
19   be either one.
20    Q    That the buyer pays?
21    A    Correct.
22    Q    And, look, you're obviously a very talented real estate
23   agent, and you have had a very successful career.  You're not
24   afraid of the fair and free market, are you?
25    A    No.
                            2320
```

```
 1   Q    You're not afraid of a situation where the buyers would
 2   have to negotiate with you on what they're going to pay you.
 3   You're not afraid of that, are you?
 4   A    I think "afraid" is the wrong word.  I don't think
 5   it's -- I don't think it's -- it's not going to happen, sir.
 6   I mean, the -- a buyer isn't -- I can't possibly be able to
 7   negotiate with a buyer to pay my fee when they barely have
 8   down payment money.
 9   Q    Every single buyer who you work with signs a contract
10   with you and with your company that you're the CEO of that
11   says if it's not being covered by the seller, that they will
12   pay you.  Your goal is to have every single buyer sign that
13   contract, correct?
14   A    They do.  And they don't pay it.  They -- it's -- I
15   understand that, and the ability of a buyer to pay that, they
16   just won't have representation.
17   Q    Now, as a MAPS coach, you'll admit to this jury -- I
18   mean, as vice president of the MAPS coach -- anybody higher
19   than you in the MAPS program at Keller Williams now?
20   A    No.
21   Q    As the very top person of the MAPS program, you will
22   acknowledge and admit to this jury that it's inappropriate for
23   any MAPS training to talk about a standard commission.  That
24   would be inappropriate under antitrust policies, correct?
25   A    If they were telling people what to charge, it would be
                                2321
```

```
 1   inappropriate.  If they were using a number in training to
 2   just have a number, I don't know that that's inappropriate.
 3   Q    My question was very specific.
 4   A    Okay.
 5   Q    Will you admit that it would be inappropriate to refer
 6   to a standard commission in the MAPS training?
 7   A    I'm going to stand by it would be inappropriate for a
 8   MAPS coach to tell someone what to charge.
 9   Q    You, in fact, know that there's training materials in
10   the MAPS program that talks about a standard commission?  You
11   know that, do you not?
12   A    I would need to see what you're referencing.
13   Q    Sure.  It's already been admitted into evidence in this
14   case as Exhibit No. 1642.
15        MAPS, language of sales.  Do you see that?
16   A    I do.
17   Q    On page 7, objection of a home seller.  The other agent
18   said they'd do it for 4 percent.  Will you match that rate?
19        What they're trained to say, If you hire me at a
20   standard 6-percent commission, I'd be willing to spend three
21   hours a day.
22        You see that?
23   A    I see that, but I don't teach this class, nor have I --
24   nor have I ever taught this class.
25   Q    Okay.  Exhibit No. 1643, already in evidence.  Model
```
2322

```
1   your way to a million, MAPS coaching.  Do you see that?
2    A    Yeah.  I don't even think this is still a class, sir.  I
3   don't even know who teaches this.
4    Q    Well, this is in evidence in this case.
5    A    Okay.
6    Q    And we see the copyright here, 2017, Keller Williams
7   Realty International.  Do you see that?
8    A    I do.
9    Q    And it has -- I'm not going to go through this, but this
10  has -- the jury will recall this.  This has all these
11  different models.  Do you see that?
12   A    I do.
13   Q    How many different Keller Williams Family Reunions have
14  you been at?
15   A    Oh, gosh, I think we tried to figure it up in the depo.
16  I don't remember the exact number that we landed on, but quite
17  a few.
18          MR. KETCHMARK:  Thank you.  I don't have any further
19  questions, and I wish you and your family well.
20          THE WITNESS:  Thank you.
21          MR. RAY:  Just a few, Your Honor.
22  REDIRECT EXAMINATION BY MR. RAY:
23   Q    When you signed this affidavit, you signed this
24  affidavit as someone who represents buyer agents, correct?
25   A    That's correct.
                        2323
```

```
 1   Q    You were providing to us your perspective in terms of
 2   what buyer agents do, right?
 3   A    That's right.
 4   Q    That's why you're here today, right?
 5   A    It is.
 6   Q    We asked you to give your perspective, correct?
 7   A    Yes.
 8   Q    And when counsel showed you the MAPS training materials,
 9   were you familiar with those documents?
10   A    I saw them in the deposition for -- but, no, I've not
11   taken those classes.
12   Q    Does the word -- does the -- does HomeServices of
13   America appear in any of those documents -- in any of the
14   training documents that you've seen?
15   A    No.
16   Q    Does the National Association of Realtors appear in any
17   training documents that you've seen?
18   A    No, sir.
19   Q    Does the words "offer of compensation" appear in any
20   documents that -- or training that you've seen?
21   A    No, sir.
22   Q    You testified -- counsel asked you about, well, the
23   buyers could just pay a flat fee, or they could just -- and
24   you said or it could be a percentage of some kind.
25   A    Uh-huh.
                              2324
```

```
 1   Q    But you went on to say that they just won't have

 2   representation.  What were you saying?  Expound upon your

 3   answer.

 4   A    So, you know, are there some buyers in some cases that

 5   have paid a flat fee to me or paid a commission?  They have,

 6   yes.  It's so unlikely for a first-time homebuyer to be able

 7   to pay that.  It's so unlikely for someone that's at that

 8   median income level to be able to pay that fee.

 9        So what will end up happening is a couple of things.

10   Either they won't buy a house because without a buyer agent,

11   they actually won't know that it costs less -- a mortgage can

12   cost less than their rent, or they'll move forward on their

13   own without representation and not have somebody to guide them

14   through the process.

15   Q    And, yes, you make them sign buyer representation

16   agreements, but they never have the money to pay you, right?

17   A    They don't have the money to pay me, no.

18   Q    And what's your concern?

19   A    What's my concern with why do I have them sign it?

20   Q    No.  Your concern about what counsel was asking you

21   about -- you said that they just would not have

22   representation.  What's your concern about that?

23   A    I think my concern with that is just I've seen the

24   impact that purchasing a home can make on that family and

25   generationally.  I mean, it really is the number of families
```

2325

```
1    that I've helped that they didn't know that they could buy.
2    They never -- they're the first homebuyer in their family.
3              And so my concern is, in the event that this goes
4    away and that buyers' agents are no longer going to be
5    compensated, buyers will be left to fend for themselves, and
6    they will be left to make the decision of is now a good time
7    for me to buy?  Is this the right house for me to buy?  Is
8    this going to be a good investment for me?  Is this going to
9    be a good investment for my family?
10             And I actually think it impacts the seller too.  I
11   think the seller will look up, and they'll have less offers.
12   And with less offers, they'll have worse terms.  And I don't
13   just mean price.  I mean all of it.
14             It will -- I mean, I don't even know -- for a
15   seller, I don't know who will show -- like, the listing agent
16   won't possibly be able to show the house enough times for them
17   to get the number of offers in that they've been able to get
18   over the last few years to get the pricing and the terms and
19   everything else that matter to them.
20   Q    So this notion of just, oh, the seller -- the buyer
21   could just write a check can have significant implications on
22   the industry, correct?
23   A    It could.  And, quite frankly, it's not going to save
24   the seller any money.  I mean, the listing agent is still
25   going to ask for 6 percent.  They're going to do double the
```
                              2326

```
 1  work.
 2           So not only are buyers not going to have
 3  representation, sellers are going to pay the same money.
 4  Q    So they aren't saving anything?
 5  A    They're not saving anything.
 6           MR. RAY:  Nothing further.
 7           THE COURT:  Ma'am, you may step down.
 8           THE WITNESS:  Thank you.
 9           THE COURT:  Ladies and gentlemen of the jury, we're
10  going to take our morning break.  Plan to be back in here at
11  10:05.  You can't talk about the case, but you will very soon.
12  So please don't talk or research.
13           (The following proceedings were had out of the
14  presence of the jury:)
15           MR. KETCHMARK:  Earlier in talking to the jury about
16  today, you said I would go and be done, and then they would
17  go.  I would just ask that -- I don't want them being upset
18  with me that I have a rebuttal.  Briefly before we start that
19  process, if we can clean that up.  If so, the court decides.
20           THE COURT:  I'll do it.
21           Nothing else?
22           MR. KETCHMARK:  Nothing else, Your Honor.
23           THE COURT:  Restroom break.
24              (A recess was taken.)
25           (The following proceedings were had in the presence
                               2327
```

```
 1   of the jury:)
 2                   (Instructions read.)
 3             THE COURT:  Mr. Ketchmark gets to go first because
 4   he has the burden of proof, and he gets to reserve some amount
 5   of time to come back in rebuttal just as we've done on every
 6   witness in this case.  Each of the defendants will have a
 7   chance for closing arguments.  They're going to go after
 8   lunch.
 9             This took a little longer than I anticipated; so if
10   we get to a point around noon and anyone needs to use the
11   restroom, just raise a hand, and we'll take a quick restroom
12   break.  If you can make it, Mr. Ketchmark has -- will be doing
13   his closing arguments.
14             MR. KETCHMARK:  Your Honor, I anticipate going an
15   hour and 45 minutes in my first portion and reserving 30
16   minutes for whatever remaining time I have left that I haven't
17   used from the hour and 45 for my rebuttal.
18             THE COURT:  Very good.  Thank you, sir.
19             MR. KETCHMARK:  You know, I stood right here two
20   weeks ago Friday and told you every single thing that I would
21   prove to you during the course of this trial, and every single
22   thing I told each and every one of you we've done.  We've
23   proven it to you.  We've proven it to you so you know it's
24   true.  Not just this balancing the scale with a piece of sand.
25   We've proven it to you with overwhelming evidence.
```
                                2328

```
 1    Overwhelming evidence.
 2              You know, this has been a colossal undertaking the
 3    last four and a half years of my life.  You just got a small
 4    taste of what it's been by watching things unfold in this
 5    trial.  But I really truly believe in my heart that everything
 6    I have ever done in my life has prepared me to stand right
 7    here in front of you right now.
 8              You know, this is a beautiful, glorious courthouse,
 9    and this witness stand is a place of -- should be of truth, of
10    honesty, a place of integrity.  And there's a reason that we
11    all stand when you walk in.  And really think about it.  There
12    was some reference by the court to begin with about the
13    Seventh Amendment, but it means something.
14              Our country battled and fought to allow people to
15    sit on a jury and hold people accountable, corporations
16    accountable for their conduct.
17              And today there is absolutely no fear in my heart.
18    Today is a glorious day because today is the day of
19    accountability.  It has finally come.
20              It's come for Mrs. Ellis and Mr. Breit and Mr. Keel
21    and Mrs. Burnett and for every one of the Missourians and the
22    people in the border states who I have the privilege and honor
23    of representing.  It's been the single greatest honor of my
24    career.
25              What I've been doing, striving the entire time is to
                                   2329
```

1    do my job, to bring them the facts.  While I bring you expert
2    witnesses who've devoted their life to this issue, and now my
3    job is very simple.  It's very straightforward.  It's to help
4    you do your job, to help you apply the law.  Not what some
5    lawyer stands up and tells you a conspiracy means; not what
6    some witness gives you a lecture about.  It's what the law is.
7         And we have it right here.  It's five questions.  We
8    talked about that during the jury selection process.  Five
9    questions that you have to answer.  Five monumental questions
10   that are so fundamentally important to everything that this
11   case has been about.  I'll walk you through those.
12        We've alleged in this case a conspiracy to follow
13   and enforce the cooperative compensation rule that has the
14   purpose or effect of inflating, raising, or stabilizing
15   commission rates paid by homeowners.  That's the rule.
16        We allege that that rule is from the National
17   Association of Realtors, and they're all following and
18   enforcing it.
19        The first question that you're going to have is do
20   you find the class plaintiffs proved by a preponderance of the
21   evidence that a conspiracy existed?  The key word here is
22   "conspiracy existed."  And what does that mean?
23        And let's look at that because I absolutely know
24   that there's been an intentional and deliberate attempt by
25   witnesses on the stand and arguments have been made in this

                                   2330

```
 1   case to confuse you or fool you as to what a conspiracy is.
 2   This is not a situation where we're saying there's some
 3   smoke-filled room, or Mr. Keller and Mr. Blefari and Bailey
 4   and the other CEO have met in some room.
 5            They don't have to meet at all.  You have the law.
 6   Let's walk through the law because law matters in this
 7   courtroom.  It absolutely matters.  And I know that you know
 8   it matters.
 9            What is the law on conspiracy?  You have
10   instructions, and I'm going to walk through those and try to
11   help teach you as to what these instructions are.  But you
12   will have these there.
13            The core of it, Instruction 23:  The class
14   plaintiffs allege the defendants participated in a conspiracy
15   to restrain trade by following and enforcing the rule.
16            A conspiracy is an agreement or understanding
17   between two persons to accomplish some unlawful purpose.  And
18   when they say "persons," it means a corporation.  Every time
19   it says "person," it's a corporation.
20            We're alleging that the defendants in this case, the
21   corporations, the National Association of Realtors, engaged in
22   unlawful conspiracy.
23            To show a conspiracy, we have the burden of proving
24   two elements; that it existed and that they joined it.  They
25   didn't just stumble into it.  It's not like one day you're
```
2331

1    walking out and you hop in a car and you think you're going to

2    a restaurant and you wind up at a bank robbery.  What am I

3    doing here?

4            It's an intentional decision by these corporations.

5    We have brought this evidence in truckloads to this jury and

6    to you.

7            Instruction 23:  The basis of a conspiracy is an

8    understanding between two or more corporations.  An agreement

9    or understanding between two or more corporations existed to a

10   common scheme.

11           It's right here.  The written rule.  The NAR rule.

12           To establish a conspiracy, we need not show that the

13   defendants entered into a formal or written agreement.  It

14   could be entirely unspoken.  You know, they don't even have to

15   have this written rule.  They could have an unspoken thing

16   that says when the seller's over here, we're going to take

17   some of their money.  We're going to offer it over here.  And

18   half the time you're going to get the money; half the time you

19   give us the money.  It could be entirely unspoken, but it's

20   not.  It is so brazen that they put it in writing.  It's

21   because they've been doing it for a long time.  You heard them

22   say that.

23           And they used to kind of get away with it, didn't

24   they, when they had those books and before the internet came

25   along.  But now technology is not only making it easier to buy

                                   2332

1  homes, but it's easier to hold them accountable.  And I'll
2  talk about that just for just a second.  I'll deviate.
3          How silly is it for somebody to stand up here and
4  tell you their defense is the internet's made it more
5  difficult to buy homes?
6          You heard that from them.  You saw their witnesses
7  try to dance around that when their own documents show you.
8  If they won't be honest about that, can they be honest about
9  anything?
10         One of the instructions you have says if you find
11 them to be dishonest on one thing, you can disregard their
12 testimony.  Anybody who would sit here and stand here and say
13 the internet's made it harder to find homes, they're not being
14 honest with you.  Their own documents show that that's not
15 honest.
16         This is a place of accountability.  Today is the day
17 of accountability.
18         A person can be a member, a corporation can be a
19 member of a conspiracy without full details of the whole
20 conspiracy, the identity of everybody else, or even know what
21 the other people's roles apply.
22         Why is this the law in the Sherman Antitrust Act?
23 Because when corporations conspire to follow and enforce rules
24 that inflate the prices consumer pays, it's bad for our
25 country.  It's bad for people.  It's bad for homeowners.

                                2333

And in the 1800s, a group of people got together and
passed that law.  If they could see what was happening right
now, they would be proud of what's happening.  They would be
proud of the sacrifice you're making to be here, to hold them
accountable for what they have been doing.

         The members of the conspiracy, the defendants didn't
have to meet together, didn't have to state their purpose or
their details.

         Gary Keller:  Well, I never had a meeting.

         Mr. Blefari:  I never met.

         Who cares?  The law doesn't say they have to meet.
Every one of them knows that rule.  Every one of them forces
that rule upon people in our community in the state of
Missouri.

         To prove a conspiracy, they had to come to some
agreement amongst themselves to accomplish the common purpose.
Boy, they sure did, didn't they?  They passed the rule, and
they follow it and enforce it to a T.

         A conspiracy may be formed without all the parties
coming to an agreement at the same time, such as where
competitors, like these corporate defendants, without previous
agreement, separately accept invitations to participate to
restrain trade.

         If you went out today and set up a corporation and
you started creating franchises and you required those local

                                 2334

people to follow and enforce this rule, welcome to this
 1

 2     conspiracy.  That's what's been happening.

 3              The class plaintiffs must prove the existence

 4     through -- may prove -- I'm sorry.  Not must, may prove the

 5     existence of the alleged conspiracy through direct evidence,

 6     circumstantial evidence, or both.

 7              What is direct evidence?  Direct evidence is

 8     explicit and requires no inferences to establish the existence

 9     of an alleged conspiracy.

10              Can you bring me a bottle of water?

11              MR. FADLER:  Sure.

12              MR. KETCHMARK:  Direct evidence requires no

13     inferences.  What is the direct evidence here?  We have the

14     written rule.

15              Thank you, Mr. Fadler.

16              Before you can find any defendant was a member of

17     the conspiracy that we've alleged, the evidence must show they

18     knowingly joined the unlawful plan at its inception or some

19     later date with the intent to further it.

20              This is a really important instruction because what

21     it shows you is what these defendants have been trying to do.

22     There's been an active effort to mislead you as to the law.

23     Why else would -- do we have this board put up from

24     HomeServices saying the rule was in existence in 1972 or

25     whatever, and we didn't even come into existence until here?
                                   2335

Or Mr. Keller:  The rule is after -- as if because
the rule existed before and they were formed later they should
get off the hook?

                    They know that's not true.  That's not the law of
the land.  That's not the law of this courtroom.  It's right
here in the instruction the court just read you.  The
defendant was a member of the conspiracy if the evidence shows
defendants knowingly joined the unlawful plan at its inception
or at some later time.

                    They are at the core of this conspiracy.  They are
driving this nationwide and in Missouri.

                    To act knowingly means to participate deliberately
and not by mistake or accident.  A corporation becomes a
member of a conspiracy without full knowledge of all the
details, the identity of the members, or the parts played.

                    Knowledge of the essential nature of the plan is
enough.  Knowing that rule is enough.  The law is so
straightforward.  What you're going to find out is they know
the answer to these questions are all yes.

                    We're down here for one reason and one reason only.
It's the amount of money.  They want a break on the amount of
money, and we're going to get to that because they do not
deserve a break.  But all of these first three questions,
they're very simple yeses because the law demands it, and they
know that.

                                 2336

1              A person joins a conspiracy -- a corporation who

          2     knowingly joins an existing conspiracy or participates in only

          3     part of it with knowledge of the overall conspiracy is just as

          4     responsible if they had been there when it was formed.  When

          5     HomeServices joined this conspiracy, they're just as

          6     responsible as if they wrote the rule.

          7              This is how it used to be.  And, boy, they had a

          8     grasp on it, didn't they?  They put out books that said

          9     there's a fine.  Don't let this fall into hands.  Keep it in

         10     the MLS.  This is what Gary Keller sat here and told you was

         11     their sacred data that drives their commissions.

         12              But then that came along.  And they want to say,

         13     well, this actually made it harder.  Nonsense.  Garbage.

         14     Anyone who testifies, that's not being honest with you.  I

         15     mean, come on.  It's made it harder?  This is their graph.

         16              I literally almost fell out of my chair when I heard

         17     that testimony.  I thought, unbelievable.  Remember how they

         18     struggled with that?  Because it's the facts and the evidence.

         19     It means that the answers to these questions are yes, yes,

         20     yes.

         21              Their document.  I did not create this in some

         22     PowerPoint slide with an expert witness.  I would never even

         23     think about doing something like that.  This is their

         24     evidence.  They know 72 percent of homebuyers find their house

         25     without using a real estate agent, and they wanted to keep in
                                              2337

```
 1   the game.

 2          So that's when this rule became supercharged, became

 3   supercharged.  Now they can electronically strangle that data.

 4          And the Burnetts had the courage to stand up and use

 5   their voice and say this is not right.  When they went to sell

 6   that house and use the HomeServices' person, they paid the

 7   buyer's commission.  We know why it was paid.  It's because of

 8   this rule.  They all followed and enforced this rule.

 9          And what's the link when HomeServices is on this

10   side?  I talked about throwing a football on the commission.

11   The link is always this rule in the National Association of

12   Realtors.  And they all know it works, and they're so

13   desperate to hang onto it.

14          You know, that's the state of Missouri.  We have

15   these different MLSs.  And what's consistent with every single

16   one of the people we represent, every single one of the

17   homeowners had to pay the commission because of this rule, the

18   NAR rule that they're all following and enforcing, every

19   single one of them.

20          To show the conspiracy; first, the alleged

21   conspiracy existed.  That's just the rule that they're

22   following and enforcing.  This is stabilizing prices.

23          The defendant sought to be liable knowingly and

24   voluntarily joined.  Yes.

25          Did they knowingly and voluntarily join?  Well,
                              2338
```

let's talk about NAR.

Instruction 29: A trade association, we claim --
not only claim, we have proven to you and the evidence has
shown that the other corporate defendants conspired with NAR
to use its rules in an anticompetitive manner by enforcing
that rule. And NAR, man, they were an enforcement arm for
this.

Trade associations may not be used to commit
violations of the Sherman Act. For example, trade association
cannot be used as a vehicle by its members to reach agreement
or understanding to raise, stabilize, or maintain prices.

Remember when Mr. Goldberg was here? I don't see
him here in the courtroom here today. Remember when he
testified and sat here and talked about that? And I said to
him: If this jury finds that you're doing this, you're
violating a law, will you take action?

Well, maybe; maybe not.

What did he just say? That's exactly what NAR has
been doing.

A trade association is capable of violations of
antitrust laws. The actions of the group of competitors taken
through an association to which they belong present the same
issues as a group of competitors who have not formed an
organization. And it's, they say, a place that's common for
hatching unlawful conspiracies. That's what he told you. He

2339

```
1    didn't want to admit it at first until I confronted him with
2    it.
3              A trade association cannot lawfully act to
4    facilitate raising, stabilizing, or maintaining prices.  You
5    know what they do?  They do more than just facilitate it.
6    They are the arm of enforcement.
7              Mr. Goldberg -- and when I put up references to the
8    testimony in the transcript, you all will be driven by your
9    memory of the testimony.  This is just to anchor us back.
10             The transcript from his testimony:
11             Question:  They follow and enforce that as part of
12   the MLS, correct?
13             That's part of the MLS.
14             And then I asked him this, because one of the silly
15   arguments that -- silly is not the legal word.  One of the
16   ridiculous arguments -- that's a better word -- that they've
17   made is that the sellers aren't paying it.  You know why?
18   Because they now know this trial isn't going well for them.
19   You're going to see that they hope -- that's their last hope,
20   that they can escape from this.
21             But we're going to show you they can't because I
22   knew that's where it was heading, because I knew the strength
23   of this evidence.  I knew the law was on our side.  I knew we
24   had brought all the evidence and the facts and the law.
25             And so that's why I started asking witness after
                                  2340
```

witness:  It's the home seller that's paying it?

He says yes.  He admits that.  I wrote it on the board.

Dr. Schulman.  Just narrowly focusing right now on this cooperative compensation rule, what is it?

He calls it the trunk of the tree.  It's what allows this to happen.

Remember Professor Alford?  He's given his life to the pursuit of free and fair competition, a massively impressive background.

When I've been involved in this case for two years and I found this article online and had this conversation with him, it was just an unbelievable moment of joy for me because it confirmed something I already knew.  And, I mean, here's this really bright, powerful, smart law professor who's saying the same thing.

And I stood here.  And under the law and the rules, I was able to read to you.  Remember that was kind of weird, but that's how it works.  I read to you.

When Dr. Schulman was up there, I said:  Did you rely on this?

The purchase of a home is one of the most important events in a person's life, he wrote.  To many, the market for buying and selling homes may appear competitive, allowing current and aspiring homeowners to freely buy and sell their

2341

properties according to our base principles.

That's what you believe until you sit through this trial and see what they have done.

In truth, a stringent set of rules and norms dominates the residential housing market, dictating how much real estate agents are compensated and whether one can practically sell a home without paying a small fortune in fees.

Imagine.  Sit there with me after I've taken these depositions and you've seen the testimony and I've been through the documents.  Imagine when I'm reading this for the first time.  It just flooded over me.  I have to talk to this man, and I did.  And I said, I have to bring this man to talk to the jury.  And I did.

I didn't sit in some conference room with him and create PowerPoints.  I said, Come and speak truth to these people.  Come and speak facts to these people.  And he did.

The cost of this to consumers amounts to tens of billions of dollars a year.  The heart of this problem, he wrote, is a set of rules maintained by the National Association of Realtors, a powerful association representing 1.5 million members.

Another thing they've done to try to make it look like I'm -- now the villains, I guess, are these members who they shove this rule on.  No, those members are the voices you

2342

1   heard when they wrote to NAR saying, Don't do what you're
                2   doing.  It violates the antitrust laws.  Please don't make --
                3   pass this clear cooperation policy.  Let us be who we are.
                4           When Mr. Goldberg and Mr. Gansho took the stand,
                5   remarkably silent on that, weren't they?  They knew that we --
                6   I had shown you that testimony.
                7           My dad was fine to tell me when I was growing up,
                8   you've always got to look at the dog that doesn't bark,
                9   because it is not the men and women in our communities that
               10   are doing this.  It's these corporate defendants.
               11           The most problematic of the rule is the requirement
               12   that sellers predetermine before even knowing the buyer the
               13   amount of the commission that's paid.
               14           So when you're standing over here as the seller,
               15   before you even know if the buyer's agent did any work, you
               16   put the 6 percent in.  Let's just talk -- let's just call it
               17   what it is.  They train these agents to scare sellers into
               18   doing it, or they'll have steering against them.
               19           In fact, it is so ingrained in our culture now that
               20   people just think that's just the way it is.  That's what
               21   these folks thought, and that's what they hoped.  But it's
               22   going to stop.  It can end today.
               23           In 2019, I stood here and read to you, realtors
               24   collected roughly 100 billion dollars in commissions,
               25   indicating U.S. consumers annually would pay 50 billion less

                                         2343

```
 1   in fees if U.S. realtors changed the commission rates in line

 2   with international norms.

 3              They know that.  That's what the -- that's what's

 4   going on here.  They're desperate to hang onto that.

 5              He called it the trunk of the tree, this rule.

 6              Dr. Schulman.  What control did NAR have over these

 7   four subject MLSs?

 8              He said, Until recently every MLS had to send their

 9   rules into NAR for review and approval, and they all had to

10   follow that in order to maintain their affiliation.

11              Who can forget this email when Mr. Gansho is up

12   here?  Boy, he didn't like talking about that one.  This

13   lawyer up in Minnesota writing to him and saying, I have some

14   MLSs that don't want to follow the mandatory rules.  Tell me

15   what's going to happen.  What's going to happen to me, to my

16   clients if they don't follow it?

17              And he responded:  For MLSs owned and operated by a

18   NAR association, refusal to adopt the policies within 60 days,

19   first you lose your insurance coverage.

20              And, first, he said that's the only thing that will

21   happen.  You remember he sat there and said that?  I wrote it

22   on the board.  That's the only thing that will happen.

23              He wasn't being honest because right there,

24   Continued failure will lead to additional action, charter

25   revocation.  You must maintain effective control.  If you
```
2344

don't follow the policies, we'll remove your officers and

directors.  That's what they would do.  That's what they would

do in Missouri.

I mean, talk about -- this is more than just an NAR

passively by, letting you use a vehicle.  They are the

enforcement arm.  And rest assured that what happened here,

they are involved.  They are accountable.

He went on to say, It's also important to note that

benefits extended to MLS and operated by one of our NAR

associations are not provided to services where ownership is

shared with an outside entity.  We only do this for people who

are part of the conspiracy.

This would include loss of insurance coverage, staff

and governance support, and other information.  They're trying

to hang onto that book, aren't they?  We only help people if

they're a part of our group because they want their fees.

They want their initiation money.  It adds up.  You heard the

numbers year after year.

Dr. Schulman, talk about the corporate defendants,

Keller Williams and HomeServices, RE/MAX and Realogy.

He says each and every transaction he's examined

went through the four MLSs and forced the seller to make that

offer.  Each and every one of the transactions at issue.

This is the thing that was interesting to me.  I

say, Hey, let's talk about it.

2345

```
 1              He says the proof is in the data.  They're all
 2     working together.  The proof is in the data.  He said that
 3     over and over and over again.
 4              The proof is in the data, isn't it?  It is shocking.
 5     When I first saw this report that came back from them, I'm,
 6     like, I knew it was true.  I knew, based upon the internal
 7     documentation and the training and everything else, it was
 8     true.
 9              98 percent in that stabilized zone.  But I thought,
10     Wow, what's going on?  Why is 31 percent over here?  That's
11     the most stunning evidence of this conspiracy, that they
12     can -- that these companies can drive a separate number in
13     St. Louis by just agreeing on it.
14              Do you find by a preponderance of the evidence that
15     a conspiracy existed amongst these defendants?  Do these
16     defendants -- do they commit to a common scheme of following
17     and enforcing this rule?
18              Absolutely.  I mean, that's not even a question.
19     That's a -- that's a yes.  They know that.
20              If you answer yes, you move on to Question 2.  They
21     know you're moving on to Question 2.
22              Do you find the conspiracy we have that this rule
23     that they're following and enforcing has had the purpose or
24     effect of raising, inflating, or stabilizing commissions?
25              Let's look at the second part because it had the
                                   2346
```

effect.  Forget the purpose.  They spent a lot of time talking
about their purpose.  Has it had the effect of that?

He talks about the threat of steering.  You know,
you saw the training.  Homeowners, if they say they're going
to pay less, people won't show your houses.  We don't want
your houses going stale.  So they get them to set the rate
higher.

The most stunning admission of that came from the
CEO of Berkshire Hathaway and ReeceNichols.  And that's no
knock against him.  He was being honest when he sat here and
looked you in the eye.  And I asked him, What happens if they
put a smaller dollar amount in there?  Will it reduce the
incentive for buyer agents to show the home?

Certainly.  It's human nature.

That's why they want them to put it in there,
because they know.  If you don't put it in there, the house
won't be shown.  If you're going to sell your house, they can
scare you to do that.

So why would they do that?  Because half the time
they're over here catching the money.  And they're all doing
it, every one of them.  All the training material is
consistent.

From an economic standpoint, when you're looking at
the elements of conspiracy and the data, does that allow an
economist to draw any conclusions as to what's happening in

2347

```
 1   these MLSs?
 2              It tells me the rule has been incredibly effective
 3   at stabilizing these commissions over a very long period of
 4   time.
 5              You think?  Seven-year time period in Kansas City
 6   for HomeServices, Keller Williams, RE/MAX, and Realogy?
 7   95 percent of it at 3 percent?  3 percent here.  That's
 8   stable.
 9              Southwest Missouri, stable.  But it's not just
10   stable, it's inflated because, I mean, you'll remember if it's
11   3 percent of a $100,000 house, then a $200,000 house and
12   $300,000 house, it's inflating.  $3,000 buyer commission goes
13   to $6,000, goes to $9,000 from their own documents.  They know
14   exactly what they're doing, and we're going to ask that you
15   make them stop.
16              Kansas City, St. Louis.  It's been really hard.  And
17   I'm just going to -- moment of transparency.  There's a lot
18   that goes into putting this case on; and oftentimes when I
19   leave here -- I'm actually staying down here during the week
20   before trial and two weeks of trial.  And because when we
21   leave, I need to get ready for the next day.  And then I have
22   to sit there.  And witness after witness after witness, I
23   think, are they trying to fool, are they trying to trick,
24   because they have been, and I'll prove it to you.
25              He comes up -- and, look, I am not here to knock
                              2348
```

Mr. King or Ms. Davis, but facts matter.  Gary Keller knows
   1
        when he made him his president, when he pulled him from
   2
        Missouri.
   3
                    He acted up here like, well, I can't believe that.
   4
                    You know, sir.
   5
                    And it was really even more profound to me when they
   6
        started -- instead of explaining what they did, let's put up
   7
        pictures of him playing basketball at Lee's Summit or Truman
   8
        High School, talk about I love the Chiefs.  And they even did
   9
        it with Ms. Davis.
  10
                    It is a cynical ploy to try to make you think, well,
  11
        this is really -- if you're against what we're doing here, you
  12
        must not like the Kansas City Chiefs.  What is going on with
  13
        these people?  Why would they do that?
  14
                    Let's talk about the law.  And he sits here and
  15
        says, Lee's Summit, Lee's Summit, Lee's Summit, Lee's Summit.
  16
        And I've been to Lee's Summit, and then he says -- then they
  17
        ask him, Have you ever had a 3 percent commission?
  18
                    I've never seen it that high.
  19
                    So they're always below 3 percent?
  20
                    And I thought, wait a minute here.  The data shows
  21
        otherwise.  And then it occurred to me what they didn't tell
  22
        you when they did that, that six years before they tapped him
  23
        to go down to Austin, Texas, he was in St. Louis.  This is his
  24
        LinkedIn.  It's in evidence.  1660.  Mr. King was over in
  25
                                    2349

St. Louis.  Of course you never saw 3 percent.  You saw 2.7

percent.

Why would a corporation do that?  Because they know

they are liable for what happened here.

I bet you didn't see 3 percent very often because

you're over there driving your -- it's actually a written

commission guideline.  Didn't hear a thing about that, did we?

Dr. Wu puts together this PowerPoint slide with the

defense lawyers.  When it was up there, I was looking at that,

and I thought, Oh, man, I know we got some really smart jurors

here.  I know you know what I know.  I know when you looked at

that and you heard his testimony.

Did you do a data analysis?

I did.  I looked at the eight largest metropolitan

areas in Missouri and created this map.

Well, listen.  When I was younger, my dad took me

down to Kennett, Missouri.  It's a wonderful place in the

bootheel.  We went fishing down there.  It's a population of

about 10,000 people.  This is not the eight largest

metropolitan areas of Missouri.

Why did they do that?  Because if they

cherry-picked, then maybe there's a couple transactions here

that can show this variation.  The largest metropolitan areas

of Missouri?  What about Springfield?  Not on their map.  What

about Columbia?  Not on their map.  What about Independence?

                              2350

1    Not on their map.

2              I mean, massive cities.  What about Lee's Summit?

3    O'Fallon over in St. Louis?  St. Charles?  St. Joe?  Blue

4    Springs?

5              Why would they put together a PowerPoint slide and

6    have him sit there on the stand and tell you, look, the eight

7    largest cities.  We're not doing anything.

8              It's an attempt to be deceitful.  It is not worthy

9    of evidence in a court of law.  It is not worthy of a witness

10   taking that stand and telling you that.

11             This is what his map would look like if you take

12   away the smaller ones that are there.  And you know why they

13   don't want to talk about that?

14             Oh, because Kansas City is at 3 percent, and

15   St. Louis is at 6.8 percent.  Right there.

16             They had all the same data that Dr. Schulman did.

17   Where is their chart that shows something different?  What

18   chart did they show you?

19             And, man, I had to be quick on this one.  You don't

20   see my partners there, Mr. Fadler and Mr. Boulware from

21   another firm, but they're passing me notes.  And sometimes

22   you're probably wondering what's going on over there.  You're,

23   like, look what they're doing.  Then the lightbulb went off.

24             They said, Well, here's offers to be negotiated.

25   And they put this slide up.  Remember that?

                           2351

```
 1              And then they say, This can be negotiated.  And then
 2    I realize what it is, and we talked to Dr. Wu about it.
 3              See, they're taking the list price.  They're saying
 4    if you had the list price of $200,000 and the offer of
 5    commission was 3 percent, the commission would be $6,000.  But
 6    then they compared it to the actual commission and say, Look,
 7    it didn't meet the -- the final commission was only
 8    2.6 percent because the final commission was $5,200.
 9              But what do they base that chart on?  They call it a
10    mismatched chart.  So it can be 3 percent.  It can be 2.6.
11    What did they base that chart on?  What did he tell me he
12    bases that chart on?  The sales price.
13              It's deceitful.  If the sales price is $173,333 and
14    you get $5,200, it's still 3 percent.  There's no mismatch.
15    There's no mismatch.
16              What's even worse, that doesn't prove they can be
17    negotiated.  What that proves is when you're as a seller of a
18    home and you're paying for the buyer's agent, just like Rhonda
19    Burnett, they came in and they negotiated a price down.
20    They're keeping their 3 percent, their precious 3 percent.
21              That's what it shows.  That's what they claim their
22    mismatch is.
23              What's even worse -- and he had to reveal this to
24    you.  I mean, maybe he thought it was in like some little fine
25    print, that I won't be able to see it.  2014 to 2020.
                                  2352
```

1    Garbage in.  That data wasn't -- who cares what they
2    were paying in 2014?  New data came in.  Dr. Schulman did his
3    report.  They had the report.  The data shows what it shows,
4    and they know it.  They know it.
5    And what you don't do is get an expert witness and
6    get together and conjure that stuff up.  You don't do that.
7    You don't do that.
8    Do you find there was a conspiracy that had the
9    effect of raising, inflating, or stabilizing prices?
10    Absolutely.  The question to that is yes.
11    And how do they do it?  Through the training.  You
12    have the system, and then you do this training.  And I'm not
13    going to spend any time -- much time on it but a little bit.
14    But everyone's doing it.  The video.
15    What happened is when these coming soon signs came
16    along and local agents said, Hey, I'm not going to plug it
17    into this MLS; I'm just going to sell it.  Boy, they were
18    worried.  They wanted that control.
19    So they did this clear cooperation policy while this
20    lawsuit is pending.  I thought, Oh, my -- is this really what
21    they're doing?
22    Mr. Blefari, this pocket listing, what that means is
23    you're not putting it on MLS.  You're keeping it in your
24    pocket.  You're trying to sell it in our community without
25    putting in the offer to pay the buyer's commission.

2353

1          It threatens the fundamental concept of cooperation,
2   the bedrock of our industry.  Vote yes, they tell them, on
3   this clear cooperation policy.
4          Professor Alford.  As part of your work in this
5   conspiracy, do you draw any conclusions on the clear
6   cooperation policy and inclusion?
7          Yes, I do.
8          Tell the jury about it.
9          The clear cooperation rule was designed to maintain
10  central focus on MLS and the focus on the mandatory
11  compensation.
12         What they're saying is, once you do any marketing,
13  you have 24 hours to plug it in here.
14         Did you do work to determine whether or not Keller
15  Williams and HomeServices are following it?
16         Yes, they were, absolutely.
17         Gary Keller.  When he takes the stand -- and who
18  could forget this?  I don't know what it means to be the most
19  powerful person in real estate.
20         If you won't answer that question in a
21  straightforward, honest manner when your marketing team is
22  trumpeting that out to everybody, is he going to be
23  straightforward about engaging in a conspiracy?
24         You know the answer to that.  No.
25         His email from a Mega Camp where someone says, Hey,
                                   2354

1  when someone talks about letting a home seller set the price,

2  use that as an opportunity to tell them not to.  He says, We

3  can't discuss commissions or splits.  We have to talk in

4  concepts.

5          So how does he talk in concepts in his book?  Well,

6  that's not really commission.

7          I mean, you know that's nonsense.  You saw that

8  testimony.

9          We don't talk about commissions, but -- and he's

10  putting it right there in his book.

11          You know, these Family Reunions they have -- the

12  first time I heard the word "recruits" is in this trial.  Been

13  in this thing for four and a half years.  It was always

14  competitors, competitors, competitors.  You saw the sworn

15  testimony of Mr. Keller.  They're competitors.  You saw all

16  the sworn testimony.  These are competitors at the Family

17  Reunion.  But now they want to start using them as recruits.

18          So what I say here is Family Reunion is for agents

19  and recruits, a/k/a -- that's also known as -- competitors.

20  They're their competitors.

21          And why do they try so desperately to slip that new

22  word in?  You even heard Ms. Davis say it.  Because they know

23  if they're doing it in front of competitors, it's a violation

24  of the antitrust policies and laws.  And that's exactly what

25  they're doing.

                            2355

1          They're not just doing it here.  You can find this

2    online.  They put these models up.  They do this training,

3    telling them 3 percent, 3 percent.  Three percent, Family

4    Reunion, draw a line in the sand.

5          Oh, but we're not trying to use this rule to

6    stabilize prices or inflate prices.

7          Yes, you are, and you've been caught.  And today is

8    the day of accountability.  It's as simple as that.  You're

9    not -- I mean, you cannot do something like that and then take

10   the stand and say we're not talking about commissions when you

11   are, in fact, talking about commissions.

12         The closest thing I could think of that kind of

13   reminds me and -- like when you're talking to a very young

14   child and they're eating candy:  I'm not eating candy.

15         I'm watching you do it.  I can see it.

16         What?  They're doing it.  They did it.  They're

17   responsible.

18         And why?  The value of a customer, a buyer, keep it

19   at that stable percent and watch our money grow.

20         Work your way to a million in MAPS.  The last

21   witness, head of coaching, files an affidavit that they type

22   up, and they bring her in.  I'm not trying to knock her, but

23   let's just call it what it is.

24         Who did they put on the stand?  They put Gary Keller

25   and a person from Lee's Summit who has moved down there after

                             2356

1  this trial started, and a person from -- he actually was over

2  in St. Louis, but from Lee's Summit originally -- and a person

3  from Springfield.  Those are the two people they put on there.

4          I'm a local person.

5          I was respectful of those people, and I'm respectful

6  of them now.  I'm not saying that those people did a

7  conspiracy.

8          It starts at the top.  It's the head of the snake.

9  They're training on that.  And to stand up there and argue

10 that -- well, he kept wanting to call it -- well, it's this

11 national average, like it's some weather report.  This is

12 based upon intense study at that organization of all the

13 commissions charged by their independent contractors.  And

14 they reveal it to all the competitors, and they put it out on

15 the web because they want everyone to know they're keeping up

16 their side of the bargain.

17         And they just did it in 2023 during this case,

18 knowing they're going to be here.

19         And why?  There's not a chance in the world that

20 Gary Keller and Keller Williams thinks that anyone's going to

21 believe that they're not talking about commissions.  I mean,

22 they're clearly talking about commissions.

23         So why are they doing that?  Because they wanted to

24 wring every last dollar out of it before a jury shuts it down.

25 That's what's happening.  That's what's happening.

                              2357

When he's up there in 2023, puts it up there and
puts it in broad concepts, hope people understand where he's
coming from.

         Well, I know where he's coming from and this
corporation is coming from.  And the facts know where it's
coming from, and the law knows where it's coming from.  The
day of accountability is here for you.  You can't do this.

         Who can forget this antitrust policy they have?  And
Mr. King, their compliance officer, I mean, really?  I mean,
I've taken depositions of all their people.  I'm down there
taking it, and he's looking at it for the first time.  They
don't take it seriously.

         They have in there an award for writing 3 percent
commission.  And then he says -- but I don't remember the word
he said.  He was flummoxed.  I know what that word means when
I asked him that.  It's right there in the policy.  That's
what they're doing.

         But, look, we don't have to look at this stuff, do
we?  The proof is in the data, in the data.  That's what
they're doing.

         Do you find that it had the purpose or effect of
raising, inflating, or stabilizing prices?  And the answer is
absolutely yes.

         If you answer yes to Question 2, you proceed to
Question 3.
                              2358

Look, those are two really easy, straightforward

questions to answer.  And they know it, and they're terrified.

          What's Question 3?  We go through each of the groups

of defendants.  Did they participate in it?

          The National Association of Realtors, the first

question:  Do you find the following corporations or entities

knowingly and voluntarily joined a conspiracy?  The National

Association of Realtors.  Do you find that they did?

          Well, yeah, it's their rule.  They're the ones who

are putting it out.  They're the link here.  So they

absolutely did.

          And I actually asked him Tuesday, the 24th:  They

follow and enforce that as part of your MLS?  Your MLS.

          That's part of the MLS rules.

          Not that they're part of some unrelated MLS that,

boy, who's set this MLS?

          It's their MLS.  And the enforcement arm would come

down on somebody if they didn't do it, take away their

insurance, kick them out of the association, remove them as a

director.

          Yes.

          Next one, HomeServices.  And I told you before.  I'm

going to say it again.  We're not alleging HomeServices

conspired with BHH or HomeServices conspired with HSF.  This

is one family is what we're showing, and that they're

                              2359

acting -- they're acting in unison to get this rule down to
the street level.

We don't have to guess, do we?  I mean, it's right
there.  In fact, Mr. Blefari sat here and said, Well, I don't
even know about operating committees.  I just kind of tell
them what to do, and they do it.

And who can forget the chairman who's retired who
comes out?  Who can forget that?  When I went down to take his
deposition -- he's retired.  Very nice man.  I said, Do you
know anything about this?

I don't.  I don't know anything about it.  I'm not
involved in the day-to-day operations.  It's Gino Blefari.

I said, Great, shook his hand, chatted, had a
pleasant conversation.

Then they realize how horrible this case is coming
together; so they bring him up here to try to put a good face
on it.  Well, you all remember how that went.

Ms. Warner, the video you saw of her.  She was the
corporate voice of those two subsidiaries.  She testified in
this case.

You're not aware of any franchise associated with
your company that do not list their properties on MLS in the
state of Missouri, are you?

No.  I believe all of the Missouri franchises do
belong.

                        2360

```
 1              And I've tightened it up a little bit.  I said, In
 2   fact, you know that, don't you?
 3              I do.
 4              Follow and enforce?  You bet they're following and
 5   enforcing it.
 6              Mr. Blefari.  A more specific question.  If you have
 7   an operation guide that's given to a company like the folks
 8   over in St. Louis and BHH and there's a contract in there,
 9   you're telling them you want the real estate agents to sign
10   it.  You would have an expectation they would sign it, they
11   would follow it.  Fair statement?
12              Yes.
13              So they have this franchise over there, 450 agents
14   under it.  You remember Mr. Goffstein's testimony on this.
15   There it is, the franchise disclosure document.  It has the
16   contract.  These listing agents, the salespeople over there
17   have to join NAR.  They have to pay NAR their fee.  They're
18   following and enforcing it.
19              This is one of the most wild things that's happened
20   to me in my practice of law right here, and you watched it
21   unfold.  And I know some of you caught it.  I mean, it really
22   was just the most amazing thing that's ever happened to me.
23   And I had this tremendous amount of -- just a wave of relief
24   that just flooded me.
25              They have this contract, this agreement that all my
                               2361
```

```
 1    clients, the home sellers, sign.  They sign it in St. Louis.
 2    And they tell them Berkshire Hathaway is wholly owned by the
 3    mother ship, by this local Berkshire Hathaway HomeServices
 4    Alliance that they say is an independent contractor that's
 5    owned by HomeServices either directly or indirectly.  And it
 6    has this commission.  I've always seen that.
 7              And Mr. Boulware, to his credit, passes me a note
 8    and goes, Look at this.  Look at this.
 9              And I thought before -- I thought, Well, that's just
10    a Bates stamp.
11              But no, no.  It's a computer stamp from
12    HomeServices.  And then you heard the witness admit that to
13    you.  This document comes from HomeServices of America saying
14    what the rate's going to be.
15              Oh, we have no involvement down here.
16              You do and you have been caught, HomeServices of
17    America, and it has been exposed right here in front of you.
18    Game, set, match is what that is.
19              I don't have to explain that document to Mr. Breit.
20    He knows what that document is because he saw that testimony.
21    He heard that from me.
22              I don't have to explain this one to Ms. Burnett
23    because she signed it over in Kansas City.  ReeceNichols,
24    owned, directly or indirectly, by HomeServices.  Commission
25    they don't even put unless negotiated here.  It's just flat
                                  2362
```

```
 1   out it's going to be that.
 2            It's a HomeServices document.  Word for word the
 3   same.  They are controlling every aspect of this.  And they
 4   had to sit there and look you in the eye and admit to that.
 5            Mr. Frazier, this independent, he's, like, Oh, well,
 6   we had nothing to do with it.
 7            This is in evidence, 2054.  And I should have said
 8   that before.  Every time these come up, there's exhibit
 9   stickers on top.  2912.  If someone wants to look at it, you
10   can just later ask for those to be sent back to you.
11            2054, their flowchart.  Not the kind of flowchart
12   their lawyer brings in here with a bunch of confusing stuff.
13   What does their flowchart show?  He reports to who?
14   HomeServices of America.  He's a CEO of one -- of the Real
15   Estate Alliance in St. Louis, the CEO of ReeceNichols here.
16            We have proven that.  We have shown that.  That's
17   the easiest one.
18            Next, you check "yes" on all those boxes.
19            How about Keller Williams?  What do we have with
20   Keller Williams?  Are they following and enforcing it?  You
21   bet.  Right there.
22            And in my opening statement, I said it was $500 was
23   the fee, and I got kind of punched at because they said, Oh,
24   well, it's really only 150.
25            So 150 -- we did the math.  A quarter of a billion
                              2363
```

dollars a year, whatever it was.  This is where I got the $500
from here.

Let's call it the 150.  That's how much money NAR is
getting every single year, and they're saying to all of their
agents you have to do this because you have to belong.

I asked them, sworn testimony:  Because if they join
the MLS, they have to follow and enforce the rules, right?

That's it.  That's right.  But they have no choice.
They have to join the MLS, or they have to quit work.

You're not allowed to work as a Keller Williams
agent unless you join the MLS.

So you just acknowledged to this jury that you know
that the agents in the state of Missouri, if they don't join
the MLS, they have to quit work?

Well, yeah.

Follow and enforce.  Either you do this, ma'am, or
you have to quit work.

This isn't just the voice of the class
representatives and the homeowners.  This is the voice of the
agents, the voices you heard in telling NAR to stop this.

Call it co-opetition.  You know, the most -- one of
the more interesting documents I found in this case and I
uncovered earlier, they said he doesn't have any emails.  Got
no evidence.

Loads of evidence, and you've seen it.

2364

```
 1            What about this one?  Michelle Figgs.  You saw the
 2   testimony; when she starts working there, trying to understand
 3   why these commissions are so stable at 6 percent.
 4            Apparently the uniformity and commission rates is a
 5   puzzle because the cost of selling a house doesn't increase
 6   with the price of housing.  Same amount of work to sell a
 7   $100,000 house as one of those $10 million houses you saw over
 8   in St. Louis.
 9            One possibility is collusion by the real estate
10   brokers, by these defendants.  And every realtor has to list
11   it through the MLS, which makes price cutting easily detected.
12            I mean, that's exactly what Professor Alford and
13   Dr. Schulman told you.
14            She's at a meeting, a general business meeting at
15   the top.  Here's what she said, folks.  She says, Gary
16   believes strongly in collusion theory for why commissions are
17   stable.  Co-opetition.  Straight from his book.
18            He's just admitted to a central element of this
19   case.  That's why commissions are stable is because of this
20   rule.
21            Remember these admission boards?  And I'm not going
22   to go through all 14 of them.  I could.  But one of the
23   reasons I did this with him is I knew if I had the email in
24   front of you, he would be forced to answer a question instead
25   of give a speech.
                              2365
```

1    I asked him:  Keller Williams' goal is to do
         2   everything in its power to protect your real estate agents'
         3   commissions, isn't it?
         4          I asked him.  And this is from his email:  Keller
         5   Williams views the MLS data as its sacred data.  Admitted.
         6   It's my client's data.
         7          No, we view it as our sacred data.  He admits it.
         8          Keller Williams notes changes in that rule but
         9   Keller Williams' participation -- I crossed off this data war
        10   and went with Keller Williams' participation is a choice.
        11          He admitted that.
        12          It's a voluntary choice.  None of these corporations
        13   have to be doing this.  NAR doesn't have to allow it.  We're
        14   going to ask that you make it stop.  The answer is yes.
        15          I picked up the wrong clicker.  My technology's
        16   failing me.
        17          Mr. Boulware, another assist.
        18          The answer is yes.
        19          Anywhere.  You remember his deposition, the CEO, all
        20   these different brands, franchise disclosure documents.  I'm
        21   not going to bore you with it.  The same thing, they were
        22   following and enforcing this NAR rule.
        23          His training.  This is an amazing piece that I saw
        24   and thought, Wow, this is unbelievable.  He says not only do
        25   they have in the franchise disclosure agreements that they
                                  2366

1   follow and enforce this rule and the code and all these
  2   things, but Exhibit 9.  And they say, What are examples of
  3   things that a judge or a jury would refer as an illegal
  4   conspiracy?
  5          One of the things they say would be an example of
  6   saying we won't cut prices.  Then I showed him that.  And
  7   there it is, a script.  They have a brand name, a script:  We
  8   won't -- I could not cut my commission because I won't offer
  9   you less than my best.
 10          They had it for all of them, the same page of the
 11   exhibit, 146, Better Homes and Gardens, for Coldwell Banker,
 12   for the other ones.  They're doing exactly what they said.
 13   They're following the same program, the same thing.
 14          The answer for them is yes.
 15          RE/MAX, same thing.  Franchise disclosure documents.
 16   The contractor -- that's their salesperson -- must maintain
 17   their NAR membership.  They must comply with the rules and
 18   regulations.  They bake it in there just like these other
 19   corporate defendants are doing.
 20          This is the exchange when he talks about the
 21   chairman of the board when this clear cooperation policy comes
 22   up.  Says, We at RE/MAX stand behind the concept of what the
 23   MLS stands for, the platform of cooperation and compensation.
 24   You're either in or out.  If you're going to be a member of
 25   the MLS, you should be committed to the spirit of cooperation

                                    2367

```
 1   and compensation.
 2          Because half the time they're making their money on
 3   the buy side; half the time they're making it on the seller.
 4   All these people are doing that.
 5          And who can forget this?  I mean, at some point in
 6   time -- just imagine taking these depositions when they won't
 7   answer a question.  I mean, right here she said, Well, that's
 8   not what she said, and gave like a five-minute answer.
 9          You're training people to put 6 percent in.
10   Mr. Blefari, you say commissions are negotiable, but they only
11   go up.  You're baking it in all the contracts.
12          No, we're not.  This is a training module 101.
13          Every single one of them sounds exactly alike.
14          Why is that?  Because they're in a conspiracy, and
15   they're all doing it.  And they know they're doing it.  The
16   answer here is yes.
17          See, I told you the first three questions were easy,
18   and they are.  They know that.  And none of them get a break.
19   Every one of them needs to be held accountable.  They need to
20   know.
21          And I don't see the CEOs out here today; but when
22   you return your verdict, trust me, there will be a scramble
23   there to have them be the first phone calls they get because
24   this is a courtroom of accountability, and you have the power
25   to hold them accountable, to apply the law.
                              2368
```

```
 1              So then you go to the next question:  Do you find it
 2     required the plaintiffs to pay more for real estate
 3     commissions when selling their homes?
 4              And this is where it occurred to me they really knew
 5     that they were in trouble and that they had lost the case,
 6     when they started for the very first time kind of running this
 7     play of, Well, no, the home sellers weren't the one who were
 8     paying it.  You see, it's the real estate agent who's paying
 9     it, and they're paying the -- you remember that.  They go over
10     and over and over again they did it.
11              Once I got a sense that that's what they were going
12     to do, I thought, they know this jury is getting to Question
13     No. 4, because they wouldn't be running that -- I'm going to
14     call it a scam.  They wouldn't be running that scam and then
15     trying to fool you if they didn't think you were going to get
16     to Question 4, would you?
17              Why are they doing that?
18              So I started asking their witnesses and locking them
19     down, and I wrote it on a board:  You've admitted the seller
20     is the one.  The money comes from the seller.  They're the
21     ones paying the commission from their closing costs.  You
22     acknowledge that?
23              If they've offered a fee for compensation, yes.
24              Do you find that the plaintiff paid more, the
25     plaintiff class, the sellers?
```

2369

```
 1              He's acknowledged it's the sellers.

 2              Ms. Warner.  And so when the listing -- when you're

 3    listing higher rates when you're selling a home, it's the

 4    seller's money that's paying for those.  I mean, you know

 5    that?

 6              Yes, I do.

 7              And you know who else knows that?  Every lawyer on

 8    that side of the room knows it, and every one of their clients

 9    know it.  They're just hoping they can fool you to think

10    otherwise.

11              This is the sworn testimony.  You heard that.  And I

12    asked that for a reason, because I know you're going to be on

13    Question 4, and I know what the answer to that one is.

14              Mr. Keller.  In fact, a seller is required to make a

15    unilateral offer of compensation of some money to the buyer's

16    agent.  Fair statement?

17              I believe that's right.

18              Mr. Blefari.  So the seller of the home is required

19    to take money from the sale of the house and pay the agent?

20              The seller -- as I understand it, the seller gets

21    the commission with the listing agent, and part of that

22    commission is assigned to the buyer.  So the seller is paying

23    the commission.

24              They have made your job so remarkably easy, and you

25    know why?  Because they are responsible under the law, and
                                2370
```

```
1    they know it.
2           Mr. -- Dr. Schulman, when you go through these
3    defendants year by year -- HomeServices defendants year by
4    year in this report, and they show the actual transactions
5    year by year.
6           Yes, I did.
7           And did you do it for Keller Williams and Realogy
8    and Anywhere?
9           Yes, that's correct.
10          And what was the purpose behind reaching that
11   calculation?
12          That's the antitrust damages, how much they paid.
13          Said, Across the bottom, there's a number.  Do you
14   see that?
15          Yes.
16          Can you read that for the record.
17          $1,785,310,872.
18          What does that number represent?
19          The buy side commissions that were paid by home
20   sellers that listed with an agent.
21          You know, I had forgotten, and I'm not going to go
22   back in the slide.  But Ms. Davis just sat here and 10 or 12
23   different times admitted to you it's the sellers that pay it.
24          Don't let them fool you into thinking otherwise.
25   They are so desperate because they know that is the number.
```
                                   2371

1    They know that's the number.

2           And they're just hoping you think, well, that's just

3    too much.

4           Well, is there anybody here who thinks, after the

5    story of what you heard these people went through, that

6    Mrs. Ellis isn't entitled to that $7,000 back that they took

7    from her?

8           The answer is yes.

9           And Mr. Keel, the same thing, the answer is yes.

10          And Mr. Breit -- I mean, my Lord, he had a

11   5.5 percent contract because he's a first responder.  They

12   dinged him for 6 percent anyway.

13          Ms. Burnett, same thing.

14          But what they're hoping they can do is they can do

15   this 265,697 times and say it's just too much money.

16          Well, the answer is that's why we have a class

17   action so we can pool together and hold them accountable.

18          They know that the answer to this is check "yes."

19   They know that.

20          If you answer yes, you go on to the next question,

21   the amount of damages.  And where are the amount of damages?

22   Where do you find that?

23          Your Honor, making pretty good time; but at the same

24   time, I want to be respectful of the noon hour.  I don't know

25   if you want to see if people want to take a quick break or

                              2372

```
 1    however you want to proceed.

 2              THE COURT:  Keep going.

 3              MR. KETCHMARK:  All right.

 4              The amount of the damages.  Instruction No. 33:  If

 5    you find it, you must determine the amount of damages.  It

 6    doesn't say you might or you can or you should.  You must,

 7    because as a society, as a country, we can't let things like

 8    this happen to people.

 9              How do you calculate the damages?  The proper way to

10    calculate damages is determine the difference paid by the

11    class for residential real estate services and the price it

12    would have paid had there been no conspiracy, had you not had

13    the rule.  What would have been paid?

14              It's what they call in economics the but-for world,

15    the but-for world.

16              Dr. Schulman.  What would happen in the but-for

17    world?  What would happen if there wasn't this price fixing?

18    Would that ever happen?  In your opinion, would the buyer

19    commissions have been paid?

20              No, they would not have.  That's one of the things

21    we observed in those benchmark countries, that buyer's agents

22    get used very, very rarely.  When they do, buyers pay for

23    them.  If this rule had never existed, I think the buyer's

24    agents -- you wouldn't see many of them.  Buyers would deal

25    with that on their own.
                              2373
```

```
 1              Amazing.  We actually have a situation where you pay
 2     for the agent who's working for you; and if somebody wants to
 3     hire an agent on their side, they pay for them.  That's how it
 4     works around the country.  I mean around the world is what I
 5     meant.
 6              Who knows that?  Before I ever even spoke with him,
 7     he talks about is this rule a problem?  In a word, yes.  The
 8     most obvious first order of concern is a massive transfer of
 9     wealth away from consumers, homeowners.  Commissions in the
10     United States are two to three times higher than other
11     developed countries, such as Australia, Canada, Ireland, the
12     Netherlands, and the United Kingdom.
13              What he didn't know is what I uncovered and what we
14     found in this case.  You know who else knows it?  They know
15     it.  The National Association of Realtors knows it.
16              When they were playing this deposition from
17     Swanepoel, I actually was sitting there thinking, this is
18     actually proving my case.  Remember Swanepoel, the guy in
19     Hawaii who says they tried really hard to keep these
20     commissions high and to thwart attempts to lower commissions.
21              I'm like, this is their evidence?
22              This is their report.  NAR is the one who set
23     commissions around the world.  They don't have these buyer's
24     agents.
25              They cited to Australia.  They put up a slide:
                                   2374
```

1  Homebuyers might not always want to use a real estate agent,

2  but most think they have to.  What happens when their

3  perspective changes?

4          Author's perspective:  Consumers are definitely

5  becoming more motivated to find an alternative solution, and a

6  growing generation of brokers and agents are trying to find

7  new business models.  Most likely will be commonplace in the

8  next five to ten years.

9          I hope it's more commonplace tomorrow or the next

10  day or however many days it takes you to resolve your case

11  when they know they can't do this anymore.  Stop it.

12          When you have a report that says Australia -- and we

13  bring a man here from Australia.  What is their response to

14  that?  To insult him by putting up a kangaroo and make fun of

15  his country.

16          I actually sat here and listened to the attorney for

17  the National Association of Realtors stand up here and tell

18  you when he thinks of Australia, he laughs.

19          When I think of Australia, I think of Todd Reynolds,

20  a decent, honorable man who came all the way over here.

21  Didn't fly the way they made you think he was flying.  Another

22  subtle attempt to trick you.  Make it look like he had to fly

23  across Africa and three times as far as he did.

24          They know what they're doing when they put together

25  those PowerPoint slides.  They know what they're doing.

2375

```
 1              He sat here and said, There's a better way.  It's
 2      the way we do it.  It's the free market.  The rest of the
 3      world.
 4              They are so desperate to hang onto this, but the law
 5      says, No, stop it.
 6              Mr. Gansho, boy, he was uncomfortable with 4603.
 7      Remember this one?  They -- BREW, Basic Real Estate World,
 8      where they had the Zoom call with the competitors, folks from
 9      HomeServices and the other people.  No minutes of that call,
10      was there?  And when did this take place?  May of -- 19th of
11      2020.
12              With no mandatory compensation and no MLS, no
13      blanket offer of compensation for cooperation exists, fees are
14      negotiable by brokers with consumers they serve.
15              Yes.  That's what should be happening.  The sellers
16      pay their agent.  If the buyers want to have an agent, they do
17      it.  And fees are frequently negotiated as part of the sales
18      agreement.
19              Hey, I have an agent who's going to -- a buyer who's
20      going to pay.  I don't want to pay that because I can pay less
21      over here.  It is called a free market.  This is their
22      document, NAR's document.
23              Buyer agency may disappear.  That's what they say,
24      although buyer advocates may finally create a business model
25      focused on finding and securing property rather than
                                   2376
```

```
 1   navigating MLS.

 2           Buyer advocates, the consumer groups, the people

 3   that actually had the audacity to stand here and say that they

 4   did this to represent, it's not true.

 5           Technology may finally work, and buyer's agent may

 6   disappear.  That's okay.

 7           Ms. Davis is a wonderful person.  She'll find

 8   another way in real estate.

 9           It reminds me of like -- you know, man, I used to

10   love going to Blockbuster, and my son used to love going up

11   there.  One day he's, like, Well, Dad, where are all those

12   people going to work?

13           I said, They're going to be fine.  It's an advance

14   of technology.

15           The operators who used to pick up the phone when you

16   called information, wonderful people, but they found other

17   jobs.  It's called technology advancing and saving money.

18           They know that.  This is NAR saying buyer agency may

19   disappear.  That's the but-for world.  And they are terrified

20   of that.  And that's why they make fun of him and insult him

21   and his country.  Shame on them for the way they treated that

22   man.

23           Why not go to the fundamental issue?  And if they

24   think that there's a -- that I'm wrong on that, bring your own

25   evidence in.  But they can't because they know from their own
```

2377

documentation the truth about Australia.  They know.  They
absolutely know.

        And what is this case?  It's a refund.  It's a
refund.  We're asking that they be refunded.  Refund the money
to them.  And don't let them make you think, well, just
because they have $7,000 on an average for these people, that
would be no problem.  They'd probably just throw it out of
their pocket.

        But the stories you heard from the stand here --
there's 265,697 other homes that were sold, about 500,000
stories statistically when you look at the average number.
Sometimes you have more than even two people in your home in a
family.  All those stories.

        And, look, this has been a tremendous sacrifice on
your part, and it is not lost on me or my clients for you
being here.  I mean, I was here, and I heard the stories about
the impact this has on your lives.

        Do we really want to even for a minute think what it
would be like if I had to bring a couple hundred thousand
people in here to testify to you?  You don't do that.

        What you do is you bring some people who are
representative of what these corporations have done, and we
show you from their documentation what they've done.  And we
say refund the money to them, and refund the money to the
other people.

                    2378

```
 1            I want you to be there with me.  If you think about
 2      this, we heard some discussion talked about during voir dire
 3      in this very courtroom about how sometimes class actions get a
 4      bad name.  And, like, oh, it's a coupon; it's bad, so this is
 5      that.
 6            But sometimes they're a glorious vehicle that's
 7      designed to do exactly what the Sherman Antitrust Act is
 8      there, to hold some of the largest corporations and powerful
 9      people accountable.  I'm not presuming what you're going to
10      find under the law.  That's up to you.  I would never do that.
11      I trust you.  I know -- because I know in my heart what the
12      evidence and the law shows.
13            But if you find in favor of the plaintiffs and you
14      award that money, walk down that country path with me, with
15      that farmer and his wife when they go to the mailbox and they
16      realize, wow.  Be there in the streets and our cities when the
17      homeowners who were bilked by the system, the forgotten
18      people, they have not been forgotten in this case.  I've done
19      everything in my power to give voice to them, and these people
20      have given everything in their power to give voice to them.
21            Imagine sitting through an eight-hour deposition
22      like they did.  They have no skin in the game other than a
23      refund.  Why do they do it?  Because this is wrong.  You heard
24      Hollee Ellis tell you, I'm doing this because my mom was a
25      member of NAR.  This is not right.  I have grandkids.  I want
```

2379

```
 1   the system to change.
 2           Mr. Breit, who's given his life in public service,
 3   tremendously high-quality man, who I love the fact that you
 4   moved back here to come back north of the river.  I love
 5   everything about you, sir.
 6           Why is he doing this?  Because he knows this is
 7   wrong.  Don't let them get away with it just because they did
 8   it so many times.
 9           It's important, and this is so important with this
10   number.  And it's really important.  I've got to really
11   emphasize this.  It cannot be a dollar more than that, and I'm
12   going to show you why.  It just can't be because a dollar more
13   than that causes all kinds of problems; because under the law,
14   what you get is you refund the money.
15           There's an instruction.  Antitrust damages are only
16   compensatory.  Their purpose is to put the injured plaintiff
17   as near as possible to a position they would have been in
18   without the violation.  It's a refund.
19           The law does not permit you to award damages to
20   punish a wrongdoer.
21           They're lucky the law doesn't allow that because,
22   trust me, I would ask for it if it did.
23           We sometimes refer to those as punitive damages.
24   You can't do that here.  You're not permitted to award amount
25   for attorney fees.  Put that out of your mind.  That's not --
                                2380
```

1    you can only refund the money.  And it's that number there,
2    Exhibit 2592A.
3            What I would ask is if you're back there and you're
4    considering this, when you look at that and you -- and the
5    names are there, multiple eyes.  There's a wisdom in your
6    group.
7            Make sure not a dollar more because that's what
8    they'd be hoping for; be hoping someone is really angry and
9    they want to put more.  You can't do it.
10           The law says you can make reasonable estimates in
11   calculating damages.  You're not required to calculate with
12   mathematical certainty.  But you know what we did for you?
13           Dr. Schulman calculated with mathematical certainty.
14   6,000 hours they spent doing that, pouring over that to give
15   that report.
16           Where's their report on their numbers?  All we get
17   is these silly PowerPoint slides because they know.  They
18   know.
19           You do not actually need to determine the exact
20   overcharge with absolute certainty or precision, but we did it
21   down to the dollar.  You can use a reasonable basis for
22   estimating it, but we did it to the dollar.
23           Every participant is jointly liable for the damages
24   of the conspiracy, and that's stuff for the court to sort out.
25   That's why you have one line for the damages.
                              2381

```
 1          Once we've proved the conspiracy, we're entitled to
 2    recover damages based on the other instructions.  The
 3    defendants are liable for all the damages caused by the
 4    conspiracy, including all overcharges in the payment of
 5    commissions.
 6          Look, I was sitting here thinking, why are we
 7    spending this jury's time this morning with Ms. Davis telling
 8    you about all the costs on the buyer side commissions she has?
 9    This is not a buyer side case.
10          What does that -- okay.  So when this money -- when
11    this $1.7 billion was taken from our clients and paid over
12    there, so maybe they had some expenses.  What does that have
13    to do with anything in the event you find the defendants are
14    liable for all the overcharges?
15          If, however, you find any of the conspirators were
16    not members of the conspiracy, including Anywhere or RE/MAX,
17    you have to deduct that.  And that's really, I think, a lot of
18    it, what's been going on in this case.  I really started
19    thinking about that.  That's really what's going on.
20          Look, NAR and HomeServices and Keller Williams, they
21    know they're on the hook.  They know.  They know.  They know.
22    But you don't give a pass to Realogy or RE/MAX because all
23    those damages they're on the hook for.
24          That's why you write the total dollar amount up
25    there.  You write it there.  They're hoping maybe you'll check
```
                                2382

1  "no" on one of these.  Maybe you'll check "no," and they'll

2  get some kind of a break.

3         But all of these people and all of the clients for

4  all these defendants are entitled to a refund.  We broke it

5  down.  Now, this one is not in evidence as an exhibit.  Put

6  the total in there, but I didn't break it down.  This is kind

7  of an amazing thing when I did it, though.  You could

8  calculate it up and get to the same.

9         HomeServices, $458 million.  I'm going to round them

10  up, round number.

11         Keller Williams, 440 million.

12         Realogy, 414 million.

13         RE/MAX, 447 million.

14         So if you didn't check RE/MAX, that would be

15  deducted by that amount.  That's what they're hoping.

16         But isn't something shocking when you look at that?

17  Look at over a seven-year time period.  What's the odds that

18  all these different transactions, that they're all just right

19  around the same?

20         Stunning evidence of what's happening here, folks,

21  because half the time they're making their money from the

22  seller paying to the buyer; half the time it's the other way.

23         You know, the defendants then know that this is a

24  real problem.  That's why they spend all their time arguing

25  that the sellers really didn't pay the money, that they didn't

                                2383

1    pay the money.

2          I see a typo.  That's what happens at two in the

3    morning, I guess.

4          In this case, the plaintiffs contend the defendants

5    conspired to require home sellers to pay inflated commissions

6    to the brokers representing the buyers of their homes.

7          The defendants respond that plaintiffs' listing

8    brokers, not the plaintiffs themselves, made those offers.  If

9    you find the plaintiffs have not shown they paid the money

10   directly to the buyers' brokers, the plaintiffs are entitled

11   to damages.  So they're kind of hoping maybe that will be like

12   their last grasp.

13         But this is all the testimony.  I'm not going to go

14   through it again.  They've admitted that the sellers are the

15   ones who are paying it.

16         So if they're trying to do that, the only reason

17   you're going to ever hear that argument from them is they know

18   that they're responsible for the $1.78 billion.  They've

19   admitted it's the sellers.  Ms. Warner admits it.  Mr. Keller

20   admits it.  Mr. Blefari admitted it, and Ms. Davis admits it.

21         Now, this other thing like cash-strapped buyers.

22   Brought Mr. Stevens in to talk about how -- I mean, you

23   remember that.  These poor cash-strapped buyers, as if we're

24   to believe for one minute that the reason HomeServices and

25   Keller Williams and NAR are doing this, because they're
                              2384

worried about cash-strapped buyers.

They don't have any evidence of that. So you know what you do? Well, one thing you do is you get your -- you get Dr. Wu together in a conference room and put him up there and lawyers and create PowerPoints and do that. Or what you do if you're HomeServices, you fund a study and have your lawyer give it to your expert witness.

You remember what he said to the defense lawyers here, gave Mr. Stevens this study. It is unbelievable the audacity, the behavior I have witnessed from these corporations. And the thing that's the most troubling to me really at a core level. I'm standing here in a federal courthouse, a beautiful courthouse that we have built as a society for laws and for the jury to get together and you're taking your time.

It is -- just bothers me that they think anybody would be -- ever would buy that with the kind of garbage we've seen delivered here; you'd ever be fooled by that.

I know it's not true. And so do you.

I asked them, Mr. Stevens, Well, there's actually this program, this first borrower's program that -- that Mr. Breit knows about that he used where you can get 4 percent of the value of your house; you live there for a couple of years, you don't pay it back. If somebody really wants to use a buyer's agent, use that.

2385

He says there's thousands of those programs.  They

actually did a study that -- their expert, Dr. Wu, had to say,

Well, yeah, only 7 percent of the people wouldn't have done it

here.  But then those people could have used that program.

          I'm not against first-time homebuyers.  My clients

aren't against first-time homebuyers.  What they are against

is rigging a system to take money from homeowners.

          But more importantly, what is one of the shortest

instructions that's there?  It's really phenomenal how short

it is.  Instruction 26.  If you find the defendants engaged in

a price-fixing conspiracy, it is not a defense that defendant

acted with good motives, thought its conduct was legal, or the

conduct had some good results.

          It's not an offense if you set up a charity called

Keller Cares and spend the first half hour of your time in

here talking about all these good deeds that they did.  If

Keller Williams cared, they wouldn't be doing this to people.

Mr. Keller would have stood on the stand and said, I was

talking about commissions.  I made a mistake.  I'm going to

right my way, and I'm going to give the money back.  If you

take something that doesn't belong to you, you return it.  I

learned that rule in kindergarten.

          You don't go out there -- and here's the other crazy

thing.  It just was mind boggling to me.  I didn't even spend

time talking to him about it.

                              2386

```
 1            He wasn't talking about he's out there doing this.
 2    This Keller Cares, that's the local agents who are doing this.
 3    Wait a minute now.  So when the local agents are doing things
 4    that you like, you control them; but, otherwise, they're these
 5    independent contractors.  It's just a bunch of garbage.
 6            Their offset argument, their offset argument, what
 7    is that?  What they want to say is this is kind of two wrongs
 8    make a right.  They say, Okay, well, maybe you had to pay the
 9    buyer's commission over here; but then when you sold the
10    house, you had to pay it.  But when you buy the house, you
11    benefit from it.  It's called offset.
12            So I asked Dr. Schulman:  Now, as part of your
13    report, did you look at the concept of whether or not there
14    should be any value given for offset of services they received
15    on the buy side?  When someone sells a house and they turn
16    around and they're a buyer, do you understand what I'm talking
17    about?
18            Yes, I do.
19            As part of your report and your analysis, did you
20    look at that issue?
21            Yes, I did.
22            Can you tell the jury about it?
23            It doesn't make economic sense that in a rigged
24    system where sellers have over a billion dollars taken out of
25    their pockets because of this mandatory rule, you somehow get
                              2387
```

to offset that because the same sellers entered into another
transaction that was also rigged where a different seller got
ripped off for their buy side commission.

So you just don't do that in a price-fixing case.
It doesn't make sense.  You don't have to be an economist to
know two wrongs don't make a right.

And also they had no explanation for the people who
don't buy it.  You sell your house, you live there your whole
life, and you sell it; you don't buy another one.

But who's winning every time on both sides of that?
They are.  And it needs to stop today.  It needs to stop with
that number.  That's the number.

Now, listen.  It has to be unanimous for you, which
means all eight of you have to agree on these questions and
agree on that number.

Now, I want to be clear on this.  This isn't a this
number or a zero.  It's not an alternative.  You can decide.
You can use your judgment.  If somehow you want to credit this
two-wrong-makes-a-right argument and give them a little bit of
a discount, hey, you can give a little bit, 5, 10 percent
discount, whatever.  You can use your judgment and put that
number there.  But what you can never, ever, ever do is go
above that number.  You can't do that.

Use your judgment.  But that's the number.

And what's the one voice -- I'm almost wrapping this

2388

```
 1    part up and then I get to come back here after three hours of
 2    the defendants.
 3            What's the voice we've never heard?  I kept
 4    thinking, Oh, come on.  Come on, Mr. Goldberg, talk to the
 5    jury about it -- about her.  Come on, Mr. Gansho.  Come on,
 6    NAR.
 7            They know.  They're lawyers.  We're here.  They
 8    talked about her in opening.  You saw Gansho or Niersbach.  It
 9    was Mr. Niersbach talked about her.  And she had this report,
10    and she told them back in 2012.  She blew the whistle on this.
11            The Sherman Antitrust law is very clear about price
12    fixing.  We all understand we cannot set fees other than our
13    own.  There can be no standardization, express or implied,
14    regarding fees of any nature.  My contention is the
15    traditional method of compensation of a seller and broker
16    setting compensation to be paid to a cooperating agent's
17    company or firm is the ultimate form of restraint of trade
18    and, indeed, represents price fixing in a free market.
19            If they had listened to her voice in 2012, we
20    wouldn't be here, would we?  But they silenced her.  They made
21    no mention of her.
22            You know what she told them.  The Sherman Antitrust
23    Act is very clear, and every one of these defendants violated
24    it.  Every one of them violated it.
25            I'm going to have a chance to come back and talk to
                                    2389
```

```
 1   you after we're done.  And the sacrifice that you all have
 2   made has been overwhelming, and it's got to be really hard.  I
 3   get it.  I can't even imagine sitting there for two weeks and
 4   not being able to talk or ask questions; but it's so important
 5   because the power that you have, the ability that you have, it
 6   matters.  It matters.
 7            Thank you for your time, and I'm sorry I kept you a
 8   little bit longer into lunch than anticipated.  That witness
 9   this morning went longer than I thought.
10            Thank you.
11            THE COURT:  Ladies and gentlemen, we're going to
12   break until 1:30.  We'll wrap up, and the case will be yours.
13   Still don't talk about it.  Still not yours yet.
14                  (A recess was taken.)
15                  AFTERNOON SESSION
16   (The following proceedings were had in the presence of the
17   jury:)
18            THE COURT:  Mr. Glass.
19            MR. GLASS:  Thank you, Your Honor.  May it please
20   the court.
21            Good afternoon.  It's been a long two weeks.  This
22   is my last opportunity to speak with you.  I very much
23   appreciate the sacrifices the eight of you have made to be
24   here for these three weeks.
25            This is an incredibly important case to the National
                           2390
```

Association of Realtors, and it's an incredibly important case to how real estate is bought and sold here in the United States.

I want to start where the plaintiffs' lawyer ended. I'm proud to represent the 1.6 million people who are NAR. Those are the local agents who work day in and day out to represent buyers and sellers, sometimes not even getting paid. They work nights, they work weekends, and they bust their behinds to make sure that they satisfy Article No. 1, that they're putting their clients' interests ahead of their own.

Remember every single member of the 1.6 million, every single one of the 26,000 here in Missouri have committed themselves that they are going to put their clients' interests above their own. So this case, this is an insult to their hard work.

It says they haven't worked hard for what they're getting paid for. It says they have to fix prices or rig the system, and that cannot be farther from the truth.

NAR and NAR alone gives voice to those 1.6 million people across the country and the 26,000 here. And I am proud to stand here before you and tell you what those 1.6 million people want you to know.

Let's start where we ended last time I spoke to you. There's four elements to the plaintiffs' case. He went over them really fast, but it's critical for the decision that you

2391

```
 1   all have to make.
 2           This is found in Instruction No. 22, and I'm going
 3   to try and go slowly.  I only have 50 minutes, but it's
 4   important that I give you the exact citation to where you can
 5   find everything I say so you can go look and make sure that
 6   I'm reading it correctly.  And I'm going to start with the
 7   judge's instructions.
 8           Instruction No. 22 has the four elements I told you
 9   about in opening.  The plaintiff must prove each and every one
10   of these by a preponderance of the evidence against each of
11   the defendants.
12           Instruction No. 15.  It's not enough to have a
13   kitchen sink approach where you take a handful of documents
14   from Company A and a handful of documents from Company B and a
15   couple gotcha questions from a deposition by a company that's
16   not even here.
17           It's plaintiffs' burden to prove each element
18   against each defendant.
19           So all I ask is that when you go back and you
20   deliberate, you ask yourself:  Has the plaintiffs' lawyer
21   proved each element against NAR?  I'll show you that he has
22   not.
23           Now, one other thing that I want to talk about is
24   that the law matters.  The judge is telling you the law.  We
25   have to all follow what the judge says.
                           2392
```

```
 1          Evidence matters, but there's something that I
 2   always remind juries:  Common sense matters.
 3          Instruction No. 3.  Sorry.  I'm not going to put it
 4   up.
 5          Instruction No. 3 says those are the three things
 6   that you are allowed to take back to that room and make your
 7   decision based on:  The law, the evidence, and your common
 8   sense.  Don't leave your common sense at the door.
 9          Let's take a look at the jury verdict form.
10   Plaintiff went through this with you, but I'm going to go
11   through it with you as well because this is the single most
12   important document in this entire case.  There is no document
13   that's more important than this.  This is where you get to
14   tell us what your decision is.
15          Remember, the judge said you are the judges of the
16   facts, and this is where you tell us.  So it's really
17   important that you take seriously each of those questions and
18   not glide through them as quickly as the plaintiffs' lawyer
19   did.
20          The first one I want to point your attention to is
21   No. 1.  Do you find that class plaintiffs have proved by a
22   preponderance of the evidence -- and this is the important
23   point -- that a conspiracy existed to follow and enforce the
24   cooperative compensation rule in Missouri?
25          That is the only question that is before you.  Is
                             2393
```

1   there a preponderance of the evidence that there is a
2   conspiracy to follow and enforce the cooperative compensation
3   rule?
4          You've seen that many times.  This is that rule.
5   The question before you is did 1.6 million people who are NAR
6   conspire with four corporations to follow and enforce this
7   rule?
8          But you have not seen a single document showing NAR
9   and any of these real estate companies spoke about this rule.
10  You have not seen any testimony that NAR and any of the
11  corporations spoke about this rule.
12         And I love when plaintiffs come up and they say,
13  yeah, yeah, sure there's no documents.  Sure there's no
14  testimony.  But you should still find a conspiracy.  The
15  evidence matters.
16         The plaintiffs came here to this court to testify.
17  None of them said anything about a conspiracy.  In fact, none
18  of them said anything about the rule, right?  How could they?
19  I mean, practicing real estate agents aren't even aware of
20  this rule.
21         And so with no documents, none of the dozens of
22  deposition videos you've played, no testimony live here at
23  trial, that just leaves the experts, and that's what this case
24  really is.  It's a cobbling together of various internal
25  documents of the corporate defendants and then experts.

                          2394

We saw a lot about Mr. Alford.  We saw a lot about
Mr. Schulman.  Remember, Mr. Alford was the gentleman who
could not answer a question, a simple question.  He's a
lawyer.  He's here to advocate.  He has a position.  He wrote
it in a paper, and he's come here not because the facts show a
conspiracy, but because he wants to be published more.  He
wants to advocate for his position.  And even he was unable to
tell you there was a conspiracy.

          Mr. Reynolds, the gentleman from Australia, he came
to talk simply about Australia.  He didn't come to talk about
Missouri.  He didn't come to talk about the rule.  He has no
idea this rule even exists.

          And I love the jab that I got in opening and in
closing that I laughed about Australia.  I didn't laugh
because of Mr. Reynolds.  He seems like a nice guy.

          I laughed because the plaintiffs are so desperate to
score $1.7 billion from the good people here in Missouri who
are working every day, that they dragged a poor guy across the
world to say Missouri would be just like Australia if only
this paragraph weren't in existence.

          Finally, Dr. Schulman.  That was the plaintiffs'
expert who spent the most time on the stand.  He spent the
most time testifying for the plaintiffs, and he expressly
conceded he had no opinion about conspiracy.

          These are things you didn't see in plaintiffs'
                              2395

1    closing, you didn't see in plaintiffs' opening, and these are

2    critical facts.  You don't have to take my word for it.

3              Here's what he said:  Isn't it true that you have no

4    opinion on whether there's a conspiracy between NAR and

5    HomeServices?

6              I believe I testified to that effect, yes.

7              And isn't it true that you have no opinion whether

8    there's a conspiracy between NAR and Keller Williams?

9              I believe that's what I testified to at deposition,

10   yes.

11             And you have no opinion whether or not there's a

12   conspiracy between HomeServices and Keller Williams?

13             I believe I testified to that at deposition, yes.

14             No documents, no testimony, and even the expert who

15   spent 6,000 hours -- I've heard it at least a dozen times over

16   the past ten days -- 6,000 hours he spent on this case, and he

17   has no opinion on conspiracy.

18             He had access to every single document in this case.

19   Not just all the ones that you saw in this trial, not just the

20   ones that plaintiffs cherry-picked in opening and closing, not

21   just the ones where there's an out-of-context quote taken, and

22   we'll talk a little bit about that.

23             Every single document produced in this case, he had

24   access to.  Every single deposition, not just the ones that

25   were played in video before you, he had access to.  Every

                                  2396

single little bit of computer information, he had access to.

And even then, working 6,000 hours being paid for by the

plaintiffs' lawyer, he still had no opinion on whether there

was a conspiracy.

There's another thing that I was pretty surprised

about when I saw it right at the end of plaintiffs' closing.

A picture of a woman I don't recognize; I've never seen

before.  This woman, Linda O'Connor, this alleged

whistleblower.  Here's what the plaintiffs' lawyer said in

opening.

Back in 2012 -- don't raise your hand.  We can't

talk like we did during voir dire.  But if you've ever heard

of a whistleblower before, you're going to meet one, Linda

O'Connor.

I didn't meet her.  She didn't come here to testify.

Her deposition was not played.  Plaintiff could have brought

her, but he didn't.  The plaintiffs' lawyer could have played

her deposition, but he didn't.

You know why?  Because Ms. O'Connor is just one of

the 1.6 million members of the National Association of

Realtors.  She's not a lawyer.  She's not an antitrust expert.

She's a realtor.  She's a real estate agent.

And she didn't get her way.  She wanted a change to

NAR policy, but no one person can change NAR.  Not

Mr. Goldberg, not Ms. Millett, not Mr. Gansho, not any one of

                              2397

```
 1   the 1.6 million members.

 2          NAR is governed through a legislative process.  And

 3   so Ms. O'Connor -- she was upset.  She sent the letter that

 4   said it's an antitrust violation, but she didn't know anything

 5   that you don't know.  She didn't know anything that the public

 6   didn't know.

 7          We also heard the plaintiffs' lawyer say that he

 8   challenged Mr. Goldberg to change the rule.  Mr. Goldberg said

 9   he couldn't.  That's because he can't.  Mr. Goldberg is a

10   steward.  He's somebody who takes care of the association.  He

11   helps the association run, but he doesn't make decisions on

12   policy.  Decisions on policy are made by the 1.6 million

13   members of NAR.

14          So when Mr. Goldberg said, I would have to check

15   with my membership, that's exactly right.  He can't tell the

16   members what to do.  The members tell him what to do.

17          And so if this rule needs to be changed, it has to

18   be done through the legislative process, not a question of a

19   staff person at the National Association of Realtors.

20          We also heard from senior executives at each of the

21   corporate defendants.  None of them said they'd even heard of

22   the rule before this case.  What kind of conspiracy to follow

23   and enforce a rule that you've never heard of?

24          So what has the plaintiffs' lawyer done?  He's

25   continuously changed what the alleged conspiracy is.
```
2398

1          So we heard it several times in closing today.

2     Here's several other times during this trial:  Are you aware

3     at the core of this case is our allegation that the conspiracy

4     is the rule itself?

5          Another time:  Just so we're clear -- and, look, I

6     was looking to be clear.  He said, Just so we're clear, as the

7     attorney representing the plaintiffs who's going to be arguing

8     to this jury about whether you engaged in a conspiracy or not,

9     it's not a component; what we're saying the conspiracy is, is

10    this rule of the National Association of Realtors.

11         He repeated that at closing.

12         But you know what?  The rule is not the conspiracy

13    that he's alleged.  The conspiracy alleged is a conspiracy to

14    follow and enforce the rule.  You know why he's playing that

15    shell game?  Remember, follow the pea, shells, shells, change

16    story, look at -- look over here, look over here?

17         It's because Jury Instruction No. 29:  Trade

18    associations may lawfully adopt and enforce rules for members

19    of the industry.

20         Instruction No. 29 says what he really wants to do

21    he can't, which is say the rule is the conspiracy.  The rule

22    is not a conspiracy.  It's not the conspiracy the plaintiffs'

23    lawyer has challenged, and it's not illegal.

24         Let's talk a little bit about offers of

25    compensation.  That's, remember, the offer that a seller's

                              2399

```
 1    agent is making to other agents who help them find a buyer.

 2    That's not legal evidence.  In Missouri, in any real estate

 3    transaction, the buyer's agent's compensation may be paid by

 4    the seller, the landlord, the buyer, the tenant, or a third

 5    party or by sharing the compensation between agents.

 6              Completely legal in Missouri.  In fact, in Missouri

 7    it's legal for a seller --

 8              MR. KETCHMARK:  Your Honor, may we approach?

 9              THE COURT:  Please approach.

10              (Counsel approached the bench and the following

11    proceedings were had:)

12              MR. KETCHMARK:  He's literally reading the statute

13    that he was ordered not to read.  He's standing there reading

14    the statute.

15              MR. GLASS:  That's what you told me I could do as

16    long as I didn't reference it as a Missouri statute.

17              THE COURT:  What are you going to do with this after

18    you read it?

19              MR. GLASS:  Nothing.

20              THE COURT:  Okay.  Overruled.

21         (The proceedings returned to open court.)

22              MR. GLASS:  Thank you, Your Honor.

23              So in Missouri a seller may legally agree that her

24    agent may share with another agent the compensation paid by

25    the seller.
                                2400
```

```
 1              We've also seen a lot, a lot of internal documents
 2     from the corporate defendants, some videos from the corporate
 3     defendants, New York Times best-selling books written by some
 4     of the corporate defendants, and speeches.  Those have nothing
 5     to do with whether there is a conspiracy to follow and enforce
 6     the rule.  They have nothing to do with the National
 7     Association of Realtors.  They don't reference the rule.  They
 8     don't reference the National Association of Realtors.
 9              So whatever the corporations were doing, it cannot
10     be the conspiracy that plaintiffs have alleged in this case.
11              I also heard the plaintiffs' lawyer in closing talk
12     about this Swanepoel paper.  I'm not going to spend too much
13     time on Swanepoel.  But what the plaintiffs' lawyer
14     continuously admits is that paper has nothing to do with the
15     rule.  The paper says nothing about the rule or an alleged
16     conspiracy to follow and enforce the rule.
17              It also doesn't say anything about without the rule,
18     Missouri would be just like Australia.
19              The plaintiffs' lawyer has utterly failed to prove
20     by a preponderance of the evidence that a conspiracy to follow
21     and enforce the rule even exists.
22              But NAR didn't stop there.  We could have.  We
23     wanted you to understand why NAR did what it did.
24              So the National Association of Realtors brought
25     three witnesses, only three.  We only needed three witnesses.
                                2401
```

1    And as you'll see, we only had a handful of documents.  I'll

2    give you the exhibit numbers so you can look at them yourself.

3            Combined, these three people have over 90 years with

4    the National Association of Realtors, including Ms. Millett,

5    who was the president.  That's the highest position NAR has.

6    We didn't hear much about Ms. Millett in closing for anything.

7    That's because Ms. Millett is devastating to the plaintiffs'

8    case against the National Association of Realtors, but I'll

9    talk about that in a second.

10           Between their 90-plus years, they've seen

11   everything.  But you know what they testified here and told

12   each and every one of you?  There's no conspiracy.  You got to

13   see them live and assess whether or not you believe them or

14   not.

15           Mr. Gansho.  Mr. Gansho, poor Mr. Gansho, who I've

16   now heard be called a liar, a perjurer, a crook; but you got

17   to see him, and you can make your own assessments.

18           Again, it's solely up to you to determine whether or

19   not you find somebody credible.  The plaintiffs' lawyer

20   doesn't get to throw insults and say somebody's a liar.  You

21   get to decide that, and I'll leave that up to you.

22           But I find Mr. Gansho to be incredibly persuasive.

23   I find Mr. Gansho to be incredibly honest even when he was

24   being called names to his face.

25           Mr. Gansho, the expert at the National Association
                              2402

of Realtors on these rules, testified that neither NAR nor the
corporations enforce or follow the rules in Missouri.  Shell
game.

There's national association model rules.  Those are
not the rules in Missouri.  Here is how it works, and
Mr. Gansho testified.

In Kansas City, there's a regional association of
realtors.  Remember, that's a completely separate entity from
the National Association of Realtors and the Missouri
Association of Realtors.  They are allowed to call themselves
realtors because they license the name from the national
association.

They own Heartland Multiple Listing Service.  That's
the MLS here in Missouri.  And participants, which are the
local primary brokers here in Kansas City, they are the ones
who participate in Heartland MLS.

So the testimony is clear.  Heartland MLS enforces
its own rules.  It has to adopt its own rules.  The model
rules are just that, model.

And the participants, the local primary brokers,
they follow the MLS rules.

There's no evidence that NAR enforces or follows the
rules here in Kansas City, the rules in Springfield or
Columbia or St. Louis.

So what are we left with?  I told you there wouldn't
                              2403

be any recordings.  I think the plaintiffs' attorney admitted today there's no recordings or emails showing conspiracy.  But also there's no whistleblower.  We saw no whistleblowers.

On the other side of the ledger -- and, remember, three things, law, facts, common sense -- 1.6 million people, a public process that resulted in public documents and has been around for 30 years.  Plaintiff says he and Mr. Alford uncovered this in the last five years.

I'll leave it up to you to decide what he uncovered.  That means there were 25 years where nobody had any concerns.

I ask humbly for the good people who belong to the National Association of Realtors that you mark "no."  And if you do, you're done.

But because the plaintiff went through each of these, I'm going to go through each of these.

He keeps saying that's some sort of concession that I'm not convinced you should mark "no" on 1.  That's not true.  But I would be remiss if I didn't show you all the ways he's wrong on the other ones; so let me do that.

Number 2, do you find that the conspiracy set forth in Question 1, the conspiracy to follow and enforce the cooperative compensation rule, had the purpose or effect of raising, inflating, or stabilizing broker commissions?

We haven't seen any testimony from any witness saying that a corporation spoke to the National Association of

2404

Realtors about commission amounts. We have not seen a single
document between the National Association of Realtors and any
corporation discussing specific commission amounts. And,
again, plaintiffs' own expert agrees.

Question: Isn't it true that you have not seen any
documents or any testimony showing that any of the defendants
have talked about how much a commission should be charged to
sellers, correct?

Correct.

And you have not seen any documents or any testimony
that would show any of the defendants have discussed how much
a seller or their agent should offer to buyer brokers,
correct?

Correct.

This is plaintiffs' expert. Remember, he spent
6,000 hours on this case. He had access to all the documents,
all the testimony, all the trial transcripts, all the computer
information.

In fact, I heard today -- plaintiffs' lawyer even
said it -- they don't have that kind of evidence. That's not
uncommon. He said throughout this trial, We're not saying
that they met in some smoke-filled room and fixed prices.
This is the plaintiffs' lawyer himself. We're not suggesting
there's some emails between you and the defendants telling
them how to carry out this conspiracy as far as using it as a

2405

vehicle for stabilizing prices.

In fact, I've been trying to keep track of what this alleged conspiracy is. You saw that the only conspiracy before you is whether there's a conspiracy to follow and enforce the rule. You also saw that the plaintiffs said today and throughout this trial they think the conspiracy is the rule itself.

They've also said that it's a price fix. But oddly, the price that's fixed changes depending on which way the wind is blowing. I've heard in this trial the plaintiffs' lawyer or his witnesses say the price was fixed at 6 percent, 5 percent, 3 percent, 2.7 percent, and 2.5 percent. There's no evidence that the price was fixed at all.

On the other hand, the National Association of Realtors proved with evidence what the purpose and effect of the model rule is, and it has nothing to do with commissions.

Remember last week when the plaintiffs' lawyer said he was searching for four years to find out the purpose and effect of the model rule?

Well, I think I found what his problem was. We've seen this slide dozens of times. This is the plaintiffs' lawyer's slide from his opening that he's used continuously with witnesses.

I want to draw your attention to this bottom box. This is allegedly the rule. Notice a white space right there,

2406

a white space where words have been whited out. Wonder what
those words are?

This is necessary because cooperating participants
have the right to know what their compensation will be prior
to commencing their efforts to sell.

That's the purpose and effect of the rule. It's in
the rule itself. It's the second sentence. If plaintiffs'
counsel read past the first sentence to the second sentence,
maybe NAR wouldn't even be here.

NAR also brought to trial Ms. Millett to testify
about what the purpose and effect of this rule was when her
group in 1992 changed what used to be a restriction on
consumers to expand and allow consumers more choice.

Now, there was some suggestion during trial, after
Ms. Millett came and testified, that somehow we only brought
Ms. Millett because she's a friendly face.

Well, she is a friendly face. She's an incredibly
successful entrepreneur and grandmother. But the reason is
because she was the chair of the group that adopted the rule
that allowed seller's agents to offer compensation to buyer's
agents.

It's in the report. This is D3533. The report from
March of 1992 says the purpose and effect was to protect
freedom of choice of agency relationships for buyers and
sellers. And it was to establish a level playing field by
                        2407

1  eliminating barriers to competition for all forms of
2  relationships.
3          The purpose and effect of the rule was to provide
4  more choice and more competition.
5          Now, remember that in the 1990s, buyers' agents
6  weren't around.  Sellers had their own agent.  Buyers worked
7  with the seller's agent.  Remember, there's that subagent
8  concept?  Buyers didn't get their own agent.
9          The free market said that's bad.  We want it
10  changed.  Consumer protection advocates said that's bad.  We
11  want it changed.  NAR said that's bad.  Let's give people a
12  choice.  We're not directing people to use buyer agents.
13  We're just saying let's open it up and make sure that buyer
14  agents are available.
15          I heard today, today, that if plaintiffs' lawyer has
16  his way, buyers won't get agents.  We're going to go back
17  30 years.  We're going to go back to a time where the free
18  market and consumer protection advocates have said that is not
19  good.
20          Plaintiffs' case is a broadside challenge to what
21  the free market wanted here in the United States, which is
22  buyer agents.
23          Next you heard from Mr. Goldberg.
24          Put his picture up.
25          Mr. Goldberg testified that NAR is a voluntary trade
                                    2408

association.  NAR doesn't tell anyone they have to join, but
NAR provides a great value for 150 bucks.  For 150 bucks, you
get all of the services that Mr. Goldberg described.  That's
why people join.  They join because NAR gives them value.

They also join because they want to be associated
with other real estate agents who abide by the code of ethics.

It's not about making money.  It's about promoting
homeownership.  Mr. Goldberg told you that.  And contrary to
what plaintiffs' lawyer said this afternoon, NAR is concerned
about cash-strapped buyers.  NAR is concerned about promoting
homeownership.  That's what Mr. Goldberg testified.

Finally, Mr. Goldberg testified that the local
agents, they are NAR.  They decide the direction the trade
association is going to go.  They are the ones who are on the
other side of the gun in this case.

Mr. Goldberg also testified about how consumers have
choice.  They can choose to use an agent or not.  They can
choose to use a National Association of Realtors' member or
not.  In fact, plaintiffs' lawyer and his expert, Schulman,
went through some math.  And I think it ended up with over
3,000 real estate agents here in Missouri who are not members
of the National Association of Realtors.  3,000 options that
if you don't like anything about the National Association of
Realtors, you have alternative choices.

Remember plaintiffs' expert called those people "a
2409

piece of used bubble gum underneath the table"?  Whoa, whoa,
whoa.  They are not members of the National Association of
Realtors, but they are good agents.  They are agents who are
used by Missouri residents today.  And if they decide that
it's not worth their 150 bucks to become a member of the
National Association of Realtors, that's okay, but let's not
insult them.

Let's also talk about the many ways that the
National Association of Realtors prevents price fixing.  The
National Association of Realtors is telling people do not
inflate, stabilize, or fix commissions.

Here's one example:  In the model rule book in this
case -- that's PX4587.  That's the newest one, 2023.  They all
have the same thing.  Notice to association members, big red
box.  Under long-established policy, broker compensation is
solely a matter of negotiation between the broker and his or
her client.  It is not fixed, controlled, recommended, or
maintained by any persons not a party to the listing
agreement.

NAR tells in the same book in another place:  One
shall not fix, control, recommend, or suggest the commissions
or fees charged for real estate brokerage services.

We saw this in opening.  We didn't see it in
closing.

NAR issues guidance for its members that say that
2410

```
 1   compensation is to be unilateral and independent.  That's the
 2   opposite of an agreement.  That's the opposite of a
 3   conspiracy.
 4          We saw this one in opening.  We didn't see it in
 5   closing.  The association executive and, if necessary,
 6   association counsel should attend all meetings of the board of
 7   directors or executive committee to ensure that prohibited
 8   discussions of commission rates or potential boycotts do not
 9   occur.
10          That is guidance for association leadership, the
11   national association of leadership, the state association of
12   leadership, and the Kansas City association of leadership.
13          We heard a little bit about this today, that there
14   is some sort of concession that the National Association of
15   Realtors in this book of legal guidance says here -- this is
16   the sentence you heard here in opening and heard today:  Trade
17   association activities are common venues for hatching unlawful
18   conspiracies since, by their nature, they involve collective
19   action by the competitors or members of the organization.
20          You heard that today.  That was some sort of
21   concession by NAR that it's engaging in a conspiracy.
22          We didn't hear the next sentence:  A broker who
23   participates in the affairs of association of realtors must
24   always be alert to discuss at association meetings -- to
25   discussions at association meetings relating to commission
```
                                    2411

rates, pricing structures, listing policies, or marketing
practices by the brokers. A broker who finds him or herself
in the midst of such a discussion should immediately suggest
that the topic be changed; and if unsuccessful, he or she
should promptly leave the meeting.

Just in case that wasn't clear enough, if you looked
at the page right before it -- so this is page 173. If you
looked at PX205A, page 172, it says: Brokers must not agree
with others on commission rates and must take care to avoid
even implying that they have discussed or reached agreement on
fees.

There's no purpose or effect of raising, inflating,
or stabilizing commissions. It's the opposite.

We also heard from Mr. Gansho. Mr. Gansho, I guess,
is the new victim -- or the new villain of plaintiffs'
lawyer's story.

That was Ms. Millett before the trial started. I
told you that in opening. The plaintiffs' lawyer saw
Ms. Millett and said, Oh, gosh, I can't make her the villain;
so now Mr. Gansho's the villain.

But he testified here under oath that NAR's model
rules, as part of its mission to promote homeownership, the
model rules are rules that local multiple listing services can
choose to adopt or not.

The reason NAR has them is because it's good that

2412

```
1   people have a model that they can choose to adopt or not
2   adopt.  In fact, this rule is the model rule at issue in this
3   case.
4           As Mr. Gansho testified, this is just one of many
5   parts of the model rules that allow the multiple listing
6   services to collect the relevant information to promote
7   homeownership:  Addresses, home listing prices, sales agent
8   contact information.  This rule is just information.
9           And notice, consistent with NAR's policy, nowhere in
10  there, nowhere does it say an amount.  We saw evidence -- it
11  was hard to follow because it was a video.  But in one of the
12  videos, the witness was asked by the plaintiffs' counsel about
13  $1 offers.
14          They happen.  If a seller's agent doesn't want to
15  make an offer of compensation, they can put a dollar in.  If
16  the seller doesn't want their agent to make an offer of
17  compensation, put a dollar in.  Nobody's requiring anybody to
18  put 3 percent or 2.5 percent or 2.7 percent or 5 percent or
19  6 percent.
20          We also heard a lot of time spent in closing about
21  what the plaintiffs' lawyer called silly, a silly argument,
22  which is whether the sellers are paying or not.  That's not
23  NAR's position.
24          NAR's position is that when you read the rule, it
25  only talks about participants.  The undisputed testimony is
                              2413
```

1  that participants are the principal brokers, the local agents

2  here in Kansas City and elsewhere in Missouri.  They are the

3  ones who, under the rule, make the offers.

4          Now, sure, it may be true that after a property goes

5  into the multiple listing service, there's significant

6  negotiation on amounts, on who pays; and in the end, the

7  seller pays.  And I actually think that's more common than not

8  that the seller does pay.

9          But this case is about the rule.  The rule says

10  nothing about sellers.

11          There's another point, an important point the

12  plaintiffs' lawyer completely misses about that jury

13  instruction.  It's Jury Instruction No. 31, and it says that

14  if you find that plaintiffs have not shown they paid these

15  allegedly inflated commissions directly to buyer brokers, the

16  plaintiffs are not entitled to damages, and you must find for

17  the defendants in the -- on these claims.

18          But if you read the paragraph before that, it says

19  that the sellers must have directly paid money to the

20  defendants.  That's our point.  Instruction No. 31 requires

21  for any claim that the sellers paid the defendants directly.

22          So even in plaintiffs' world where sellers are

23  paying somebody, we saw in the closing statements the sellers

24  are paying their local agents.  They're not paying NAR.

25  They're not paying these corporations.

                              2414

1          This isn't a get-out-of-jail-free card.  This is a

2   critical element to this case that is in the jury

3   instructions.

4          Now, I want to talk a little bit about the

5   contracts.  Here -- I showed you one contract in opening.  I

6   want to show you another one.  Mr. Keel.  Remember, Mr. Keel

7   is the lawyer, the lawyer who didn't know how to negotiate, I

8   guess.

9          His contract -- and I highlighted this because I

10  think it's really important.  This right here, Kansas City

11  Regional Association of Realtors, this is the form that's used

12  here in Kansas City for listing properties.

13         So this is the same form that you would see for

14  anybody who uses the Kansas City Regional Association of

15  Realtors.

16         Seller agrees to pay broker a commission which shall

17  be 6 percent.  That's what it says.  Doesn't say anything

18  about getting a discount if there's no buyer broker.  It

19  doesn't say anything about getting a discount if the selling

20  agent does a lot of work or a little work.

21         You know why?  Because Mr. Keel doesn't care how

22  much work anybody does if his house sells for the price he

23  wants.  That's what he's paying for.  He's paying 6 percent to

24  sell his house.

25         So if the seller's agent makes an offer to buyers'

                              2415

agents and that buyer's agent is inexperienced or does no work but has a great buyer, that benefits Mr. Keel.

But you know what?  The next provision says the commission shall be due and payable if broker or anyone else produces or finds a purchaser ready, willing, and able to purchase the property at the price and terms offered now or at the price and terms acceptable to the seller at a later date.

So that's a lot of words that says you're agreeing to pay 6 percent, whether there's a buyer's agent or not, whether the seller's agent finds a buyer, whether you find a buyer.  It says the commission shall be due and payable if anyone else finds the buyer.

So if Mr. Keel found the buyer himself, he'd still pay 6 percent.

So this whole idea, this whole house of cards that if you got rid of buyer's agents and you said buyer's agents are unnecessary, you would still pay 6 percent.  And that makes sense because the seller's agent is doing more work. That makes sense because someone has to do the work the buyer's agent is doing.

Again, in the end, all the seller cares about is selling their home for a price that's acceptable.

Now I want to look at another reason why there is no purpose or effect of stabilizing prices.  We've seen various blue lines; and, candidly, I can't follow them all.  I'm not

2416

```
 1    sure -- they flash by so fast, I don't know exactly what
 2    they're for.
 3            But this is the one that I find the most
 4    interesting.  For the entire time period, all four cities in
 5    Missouri for all the defendants -- look at the red boxes.
 6    That's how many times a seller's agent did not offer 3
 7    percent.
 8            Remember, Dr. Schulman and I added that up.  That's
 9    110,000 times.  110,000 times in this state that a seller's
10    agent, who's using the multiple listing service, who's
11    following the multiple listing services' rules, offered
12    something other than the alleged price fix.
13            Now, we heard lots of explanations.  I mean, we
14    heard this in opening.  Plaintiffs are concerned about this.
15    The plaintiffs' lawyer said the explanation for this was that
16    in St. Louis home prices are higher.  Remember that?
17            I'll read it to you.  He said, and I'm quoting, In
18    St. Louis area, they're actually -- over there, they've
19    decided instead of stabilizing at 3 percent for the buyer
20    side, they're going to keep a little money on the seller's
21    side.  They're going to shoot for 2.7 percent on the buyer's
22    side.  Houses are more expensive over there.
23            You didn't hear any evidence of that.
24            There's also this steering gimmick that we've heard
25    a lot about.  But remember, Dr. Schulman testified that in the
                                2417
```

110,000 times that a seller's agent offered something other than 3 percent, he couldn't identify one time there was steering.

THE COURTROOM DEPUTY:  Five minutes.

MR. GLASS:  Thank you.

With only five minutes, I'm going to move over to "no."

Now, this is not to say you should get to Question 2.  Plaintiffs are saying somehow we're conceding by talking about that.  This is just in response to them.

So third question is whether we knowingly and voluntarily joined the conspiracy.  I'm not going to take much time on that.

You'll see in Instruction No. 29 businesses that are actual or potential competitors may lawfully form into trade associations to advance common interests and may communicate. They may meet.

That's all NAR did.  NAR did standard trade association activities, including, in Instruction No. 29, adopting a rule, which is legal.

Last thing I want to talk to you about, these alleged damages.

So, look, NAR's not on here.  Schulman had an opportunity to explain why NAR is not on there, but he didn't. I'll tell you why.  NAR does not make any commissions in

2418

1  Missouri or anywhere else.
2          The plaintiffs' lawyer wants to hang on NAR $1.785
3  billion, when NAR did not make a single cent from commissions.
4          But also the damages calculation, which was flown
5  through in just several minutes with Dr. Schulman and flown
6  through today for $1.78 billion is wrong.
7          You'll see in the judge's instructions that the
8  question -- the proper way to calculate damages is to figure
9  out what sellers actually paid.
10         Dr. Schulman.  So you don't know how much sellers
11  pay in the four cities here in Missouri to sell their home,
12  correct?
13         So that's in the data.  I didn't focus on the sale
14  side.  My focus was on the buy side.  So I could calculate
15  that total.  But it wasn't part of my analysis; so I didn't do
16  it.
17         He had the data, and he didn't even calculate it.
18  His excuse was he -- he was only looking at the buy side.
19         Here's another one of his answers:  I looked at some
20  of the high-level financials.  I didn't actually calculate in
21  Missouri how much they made on the buy side.
22         These numbers are made up.  Zero.
23         Ladies and gentlemen, I truly appreciate the time
24  and attention that you've given to this case over three weeks.
25  I know you will come to the right decision, but just don't
                                2419

```
 1    leave your common sense.

 2              The claim by the plaintiffs' lawyer is that

 3    1.6 million people conspired with four corporations to follow

 4    and enforce a rule that's been in existence for over 30 years,

 5    all with the purpose of fixing or stabilizing prices when NAR

 6    doesn't talk about commission amounts and tells its members in

 7    public documents don't fix prices.

 8              I have confidence in the jury system, and I know

 9    you'll come to the right decision.

10              Thank you for your time.

11              THE COURT:  Thank you, Mr. Glass.

12              While Mr. MacGill is getting set up, if you want to

13    stretch your legs, feel free to.

14              Ready, Mr. MacGill?

15              Please be seated.

16              MR. MacGILL:  Your Honor, may it please the court.

17              THE COURT:  Let's just wait one second.

18              MR. MacGILL:  Okay.

19              THE COURT:  Please proceed, Mr. MacGill.

20              MR. MacGILL:  Thank you, Your Honor.

21              Lady and gentlemen of the jury, maybe I should start

22    by just reminding you I'm Rob MacGill.  I represent

23    HomeServices -- you've heard that a few times -- HSF and BHH.

24    The representatives of our client has been here for the entire

25    trial, Mr. Brown and Ms. Pierre Warren.
                              2420
```

Also, as you know, my partner, Matt Ciulla, is here

representing our client as well as Mr. Varon, who you also

have heard from.

          So as we get a context of what is the analysis and

what are you being asked to do, you remember this court has

described to you that what your role will be is to determine

the facts in this case.  That's a critical role here because

we have to -- you have to determine what happened and what

does the evidence mean.

          You can see by virtue of all the presentations that

have been made how important this case is, right?  You -- we

have a courtroom that's full of spectators, people interested.

And what Mr. Glass just shared with you is that we have --

obviously, some folks have come to court, and they've alleged

a conspiracy that's a -- that's anticompetitive.  That's a

very, very serious charge to make.  Okay?

          People on the plaintiffs' side are quite interested

in that.  You heard Mr. Glass just describe that the people

being charged with the conspiracy include 1.6 million people

at NAR, the people that work for our companies.  That's a lot

of people being accused of a conspiracy.

          So we want to keep -- I want to ask you to consider

one other part of this and about your role because I think

it's very, very important.

          You know, as grade school children, we all would go
                              2421

to school in the morning.  The first thing we would do is give

2  a pledge of allegiance to the flag of the United States of

3  America and to the Republic for which it stands, one nation

4  under God, and then a critical part, with justice and liberty

5  for all.  All right?  To the Republic and for which it stands,

6  with liberty and justice for all.

7         Well, as grade school children, we don't think about

8  that a lot.  At least I didn't, but I sure did it every

9  morning.

10        But here we are in the United States court, and

11  we're in a very important place.  There's no question.  I said

12  in opening statement we don't get to come to the United States

13  court unless it's a special case that has certain

14  characteristics.  We have a judge that was appointed by the

15  President of the United States and was confirmed by the United

16  States Senate.

17        So this is an important place.  You're here to

18  resolve an important question.

19        So what about this equal justice?  Is it a situation

20  where just this side of the courtroom, they wrap themselves in

21  the American flag and say it's about justice for the people?

22        It doesn't work that way.  It's more important

23  because there's equal justice under the law because

24  Instruction No. 20 of this court says that all persons,

25  including corporations, are equal before the law.  In other

2422

```
 1   words, it's a balanced analysis.
 2          How does it -- are you biased in favor of the
 3   plaintiffs?  Are you biased in favor of the defendants, for
 4   any one of them?  Of course not.  You're going to resolve it
 5   based on evidence.  Okay?
 6          So we come to what the evidence is.  But before we
 7   get to the evidence, I want to share with you something that I
 8   hope you find and I think you should find is very, very
 9   important.  And that is no one invented NAR, the corporate
10   defendants.  No one invented this practice of cooperative
11   compensation.  This is a market outcome that has existed.
12   This practice of cooperative compensation has existed, as
13   Dr. Wu said.  And we asked him specifically:  How long has the
14   practice been involved in the United States?
15          The practice of cooperative compensation started in
16   the late 1800s.  NAR didn't invent it.  No corporate defendant
17   invented it.  This is a market outcome of what United States
18   real estate parties decided was best, to have cooperative
19   compensation.
20          The practice of cooperative compensation is a market
21   outcome, he testified to, Dr. Wu did.  In other words, it's a
22   result of people in our country, not Australia, not some
23   foreign country, but for 100-plus years have decided if we're
24   selling real estate or buying real estate, this makes a lot of
25   sense.
                                2423
```

```
 1              So nobody legislated this practice.  It's an

 2   American market outcome.  I think -- you'll keep that in mind,

 3   I hope, and remember how important that context is.

 4              And finally, is it your opinion that cooperative

 5   compensation occurred before there was any NAR rule adopted in

 6   the United States?

 7              And his answer was, of course, yes.

 8              And you may remember in the courtroom when he

 9   testified, I was -- I did what I could to separate these two

10   points:  The practice, the late 1800s; and the rule that

11   they're focused on is 1996.  Okay?

12              So we think that's very important.  And if we could

13   look at this, one more bit of context for you.  Cooperative

14   compensation, the practice.  If we focus on the practice,

15   that's point one.

16              You heard testimony from Dr. Wu and others it

17   increases demand for homes.  It helps buyers who are low on

18   cash, and it allows buyers to afford agents.  That, lady and

19   gentlemen, is the practice.

20              What about the rule?

21              Well, the rule is also very specific because Dr. Wu

22   explained to us that it simplifies transactions, and it

23   creates efficiency.

24              So that's the testimony that we have, and that's the

25   context that brings us to where we are.
```

                                2424

```
 1              So we asked him now -- Dr. Wu -- you'll remember he
 2    came to testify, and he said, look -- I asked him what --
 3    how -- what does the rule do?  We know this practice has
 4    existed for a long time.  So what does the rule do?  What does
 5    the rule do?
 6              It helps sellers get the highest market price for
 7    their home.  The rule provides transparency and clarity.
 8    Buyer brokers know that if they bring a successful buyer to a
 9    seller, they'll be compensated.
10              So what he's explaining is there are good reasons
11    for this rule that came into existence.
12              So it's that background that I'm asking you to keep
13    in mind:  How did this practice develop?  Why did it develop?
14    It's an American outcome.  And then what's the benefit of the
15    rule?
16              Now let's turn to the evidence.  So I'm going to
17    talk about two things.  I'm going to talk about no conspiracy
18    existing, and I'm going to talk about specifically there is no
19    evidence that any defendant in this lawsuit entered into any
20    conspiracy to follow and enforce the offer of compensation
21    model rule.
22              And separately, lady and gentlemen, I'm going to
23    talk about no injury or damages.  It didn't cause any class
24    members any energy -- injury.  And I'm going to be a little
25    bit more specific on some of the issues associated with
```
2425

```
 1   Question 2.
 2              All right.  Well, let's go to what we know about
 3   conspiracy.  We say there's no evidence of conspiracy from
 4   anywhere, and we're going to explain that in some detail, but
 5   we start -- the proof requires Mr. Glass has reviewed.
 6              But let's talk about what did Dr. Schulman admit to?
 7   6,000 hours of work.  Imagine.  6,000 hours of work.  Every
 8   document, every detail under the supervision of this court
 9   providing whatever was required.
10              And he says that he's not seen a single document
11   showing any of the defendants discussing commission rates with
12   each other.  Not a single document.
13              If there's going to be a conspiracy to follow and
14   enforce a rule, you would think over the years involved here
15   from 1996, the rule they're focusing on to present day, there
16   would be a document, there would be an email or something that
17   was an exchange between one defendant and another defendant.
18   And there is none.
19              Dr. Schulman has no opinions on whether there was a
20   conspiracy involving any one of the defendants, and you heard
21   that testimony too.  And the specifics I'd like to review with
22   you because I think his admissions to you are very important.
23              And this is not a lawyer statement.  This is not a
24   lawyer argument.  This is evidence.  Okay?
25              You have not seen a single document showing any
                              2426
```

defendant discussing commissions with each other, correct, sir?

That's correct.

You've not seen any documents showing that any defendant discussed with any other defendant a particular amount that a listing broker would offer to the agents who helped sell the home; is that correct, sir?

Their expert, based on 6,000 hours of work, so testified.

So if we look specifically -- and I'm going to grab a couple of exhibits here.

I want to make two other points about what he admitted to after 6,000 hours of work.

Isn't it true that you have no opinion, no opinion on whether there's a conspiracy between NAR and HomeServices?

I believe I testified to that effect, yes.

And you have no opinion whether there's a conspiracy between HomeServices and Keller Williams?

I believe I testified to that effect, yes.

And isn't it true -- he was asked, Isn't it true that you have no opinion on whether there's a conspiracy between NAR and Keller Williams?

I believe that's what I've testified to at deposition, yes.

And this coupled, lady and gentlemen, with the
2427

```
 1    admission he didn't see any document either.
 2              So no documents and no testimony of any kind.
 3    Pardon me.  No opinion, I should say, and no documents of any
 4    kind.
 5              So there's a point of context that I think is very,
 6    very important; and if you can bear with the concept for a
 7    moment.  Okay?
 8              So the court is describing to you -- to us the law,
 9    and this is extremely important to so much that you heard
10    about.  A corporation is not capable under the law of
11    conspiring with its own agents, unincorporated divisions, or
12    wholly-owned subsidiaries.  Okay?
13              A family of companies -- and in our case, that's
14    HomeServices, to HSF and BHH, down to the franchisees and to
15    the subsidiaries, is not capable of conspiring with its own
16    agents.  Okay?
17              Well, that makes good sense; because if you're a
18    company, you get to set your own prices and make your own
19    policies, right?
20              But you can't make your prices and then say, hey, to
21    a competitor -- we couldn't go, for example, okay, this is our
22    series of companies.  Let's go over here, and let's talk to
23    Keller Williams.  Our prices are X.  How about we agree on
24    something?
25              You can't do that, and nobody did.  Right?
                                    2428
```

```
 1              We couldn't go to any other market participant
 2    outside of our family of companies and say, Let's talk about
 3    price; let's make an agreement.
 4              The only issue in this case, and it's there in every
 5    one of the instructions that this court is providing us, did
 6    anybody agree to follow and enforce?
 7              Well, outside of our family and companies -- outside
 8    of our family of companies, did we have any conversation with
 9    anyone about following and enforcing the cooperative
10    compensation rule?  No.
11              Did we, within our own company, have that
12    conversation?  Never.  Never.  And we'll talk about that in
13    just a minute.
14              Now, with the context that this court has provided
15    to us specifically here, that is, what happened within our own
16    unincorporated divisions or subsidiaries?  What happened?
17    And this we think is very important for not just us but a lot
18    of things you heard.  All right?
19              And I'm sorry for bringing this chart out so much.
20    But we represent HomeServices of America in blue; HSF; and the
21    franchisor organization, BHH.  You heard questioning of
22    Mr. Goffstein by video.  The president of that company,
23    Mr. Goffstein, described how they have an internal -- they
24    have an internal commission guideline of 2.7 percent.
25              Of course, he has, they have as the company the
                                  2429
```

right to set their own pricing, right?

There's no evidence that he went outside his company to another family of companies and talk about this. And there's nothing wrong -- as the court has instructed you now, there's nothing wrong with him putting guidelines in his own company.

So we think that's very important to make a context, a legal context, and to be correct about what's really happened here. People have the right to set their own guidelines inside the family company.

Okay. Now, what we have to say -- and this is why this is so important. There's been a grand conspiracy involved with -- and just think about this for a moment.

If there's 1.6 million members of NAR and if we have hundreds of thousands of agents working throughout the country, the conspiracy alleged would have involved 1 percent of the American adult population. It could be 2 million to 3 million people, right? So it's a very serious allegation.

They admit, their expert says, no evidence. No evidence of inter -- between companies -- communications on commissions or the rule. Admissions there. No documents. And not one plaintiff was able to identify any conspiracy evidence at all. Okay?

So they raised their hand and say, Well, hold on, hold on. The proof is in the data. Counsel said that to you,

2430

```
 1    I think, three or four times in the final argument, and we
 2    heard that from Dr. Schulman, not the lawyer argument.  But he
 3    said, Well, hold on.  I think that I can draw an inference of
 4    a conspiracy from the data.
 5              No, he can't.  No, he can't.
 6              And I want to talk to you about this, and I want to
 7    be somewhat specific in what I describe to you.
 8              Now, there are a couple details here that I think
 9    are quite important.  And there are three things that I want
10    to visit with you about in terms of the economic testimony.
11              Number one, there is no data that creates an
12    inference of conspiracy.  Notwithstanding the conclusory
13    testimony of Dr. Schulman, there are three things I want to
14    review with you about the evidence that you heard from Dr. Wu.
15              Number one -- sorry about my handwriting.  But
16    Dr. Wu said three things to us, lady and gentlemen.  I'd like
17    to review each one of them.
18              He confirmed that the data could not provide any
19    conspiracy inference, and he shared with us three things.  He
20    said, one, the market conditions in the residential real
21    estate market are such that the conditions -- you can't
22    conspire in this marketplace, and he described why.  And I'm
23    going to talk with you about that.
24              He said that there's no price -- there's no
25    price-fixing conditions -- there's no conditions in the market
                              2431
```

1    under which you could have a price-fixing conspiracy.  He says
                2    the data shows competition, and he says that there's
                3    clustering and that that's expected.
                4              Let's go through each of those things about why the
                5    data creates no inference here.
                6              Did the conditions for a conspiracy even exist?  Did
                7    Dr. Schulman say, well, I can use data to make an inference?
                8              No, he can't, for this reason among others.
                9              Dr. Wu testified there are no restrictions on seller
               10    choice.  There's no requirement they sell their house on the
               11    MLS.  There's no requirement they use a full-service agent.
               12    There's no requirement they use an agent at all.
               13              Dr. Wu also said there's no requirement that a buyer
               14    agent commission rate be offered at any particular rate.
               15    Well, that's on the seller side.
               16              So those conditions on the seller side make it so
               17    you can't have a conspiracy.  Conditions don't even exist.
               18    You can't do it.
               19              Second, he says there are no restrictions on the
               20    buyer's choice, right?  There's no requirement to use a buyer
               21    agent.  There's no restrictions on who the buyer can choose to
               22    be their agent, and there are no restrictions on the homes
               23    buyers can see.
               24              So he further says, Well, look, you need to know
               25    what the data is here in the state of Missouri.  Almost
                                        2432

```
 1   20 percent of home sales don't involve agents at all.  Okay?
 2              So the first thing he says is, Look, the market
 3   conditions -- you can't even conspire under these
 4   circumstances.  You can't do it.  Okay?
 5              Second thing he said -- and you'll remember I made a
 6   note or two to keep track of things myself.  He said, Well,
 7   what does an economist do to determine whether you can detect
 8   price fixing?
 9              He said, Well, you have to look at four things, and
10   he reviewed each of those four things.
11              So what did he review?
12              Is there an agreement here?
13              He said, No, Dr. Schulman completely looked over it,
14   of course, because he testified he's got no evidence of
15   conspiracy.  Control over price.  You can't conspire, he said,
16   in this marketplace because the corporate defendants at NAR,
17   they don't control the price.
18              Who does?
19              The sellers, the buyers, the agents.  That's who
20   controls.
21              So he said you can't -- that condition doesn't
22   exist.
23              Detecting cheating?  No, you can't do that.
24              And punishment?  No.
25              None of those elements are met here.  And this whole
                                 2433
```

concept of steering -- he indicated that steering is not

practical or economically reasonable to suggest because

there's an internet out there; buyers can say I want to see

this house.

Reputational interest and needs. Nobody's going to

cheat their client because that is their lifeblood. It's

their client. They don't want to get bad reputations. They

want to deal honestly and fairly. So you heard that.

So that's the second reason that these conditions

don't exist in which you could have a conspiracy.

The data shows competition. That's the second thing

he said.

Well, let's be specific about that. The data that

he cites, the data that's involved here is very specific. You

saw Dr. Schulman make an analysis. What he said --

Dr. Schulman said, Well, the offered commission rates, look at

this -- look at this 95 percent number. Take a look. This is

data that shows maybe that that suggests a conspiracy.

No, it doesn't.

That's offered commission rate. Okay?

Let's go to the next slide.

What did Dr. Wu have to say? You don't look at the

offered rate. You look at whether there's competition about

the rate. You look at whether there's competition.

What he said was, from 2014 to 2020, look at the

2434

numbers.  There's a big difference between what was offered on
the MLS and what was actually paid in the transaction.  And
somewhere between 23 percent and 33 percent of the time, the
cooperative compensation actually paid was different.

What does that tell us?  Competition at work.
There's no -- there's no fixed price there.  This is
competition at work.

So what else?  Why is Dr. Schulman wrong on this
data for another reason?  Well, Dr. Schulman admits he makes
admissions on the Missouri market that you may find are
stunning and breathtaking in every respect.

He says almost half of all offers in Missouri are
below 3 percent.  That's from Dr. Schulman.  Okay?

So what else do we know in terms of these
circumstances here, in terms of this, quote, data giving us an
inference of a conspiracy?  It doesn't for yet another reason.

The data shows competition in another way.  Dr. Wu
said -- shared with us, all right, let me show you the
Missouri market.  And consistent to some extent with what
Dr. Schulman himself found is, of course, there's no fixed
rate.

In the Missouri market, there's competition driving
results, not some agreement.  And the variance he identified
specifically, he shares with us the substantial variation in
the average offer rates throughout each major metropolitan

2435

```
 1   area, each major area.  And he highlighted in his testimony
 2   the two largest metro areas have different average offer
 3   rates.
 4            St. Louis, 2.68; Kansas City, 2.98.  The clustering
 5   of prices, he said, that can't -- that may mean nothing.  And
 6   I want to talk about that in two different ways.
 7            So the offered buyer broker commission shows
 8   competition again at work.  When you look at the Missouri
 9   market, whether you look at Dr. Schulman's data or whether you
10   look at Dr. Wu's data, it's the same.  The data does not
11   suggest a conspiracy.  It says anything but.  The data that
12   we've just reviewed shows us competition at work.  Okay?
13            Now, I'm going to ask you to take a look -- so first
14   thing we said, the data doesn't give an inference because you
15   can't conspire in the market for the reasons we've said.  The
16   data shows competition, and now let's talk about clustering.
17            There are two things I want to talk to you about
18   clustering.
19            Dr. Schulman cannot say the data supports a
20   conspiracy because there's the clustering testimony that
21   confirms otherwise.  Let's talk about clustering.
22            But before we go to what Dr. Wu said, there's
23   nothing wrong with clustering.  Okay?
24            This court says, Instruction No. 24, the mere fact
25   the defendants have engaged in similar conduct does not by
```
2436

itself establish the existence of a conspiracy among the
defendants.

A business may lawfully adopt the same prices,
conditions of sale, or other practices as its competitors as
long as it does so independently and not as a part of an
agreement or understanding with one or more of its
competitors. That's from the court.

Now, let's move from the legal principle to the
factual reality. Here's the reality of what Dr. Wu said.
Prices can cluster at a competitive level for many reasons, he
testified. It's not unusual in real estate to see commissions
clustering around a particular rate.

Now, if you have in your mind for a minute the rates
we showed you for the state of Missouri, the offer variance
that Dr. Schulman himself testified to, that may suggest to
you there's not any clustering at all.

But let's say that you think it's clustering. We
don't think it is, and we think you'll conclude there's no
clustering based on this variance.

Let's say you do. It's not unusual to see a
clustering around a market price. There's a collusive price
in some circumstances, and there's a market price.

If there is clustering, I think you can and I think
you should conclude that that is a market outcome. Okay?

Now, if we look at this in one other way with

2437

respect to clustering in these markets.  There's one example
he gave, hamburgers and the pricing of hamburgers.  I think
you can consider that example that he gave is demonstrative of
how prices in competition and with competition can come to a
certain range.  Okay?

Now, let's go to the next -- before going there,
there is no evidence of conspiracy that we have described.
And the last effort was to make the conclusory statement from
Dr. Schulman, the data.  He says the data gives us an
inference of conspiracy.

No, it doesn't.  No, it doesn't for each of these
three reasons.

You couldn't conspire in this market.  The data
shows competition, and clustering may just be a market price.
Okay.

So let's turn now to something -- some specifics.
And what I'd like to do now is talk to you about our clients
and Question No. 3.  I'm going to put the verdict form up
first.

So before going to Question 3, just to conclude,
lady and gentlemen, I think that based on what you've heard in
the evidence in this case and what you have not heard in this
case, that this lawsuit ends with your answer to Question 1.

And in the language from our court, if your answer
to Question 1 is no, stop here.  I think that's what you'll

2438

conclude after reviewing the evidence and collaborating, discussing amongst yourself that the case ends here.

However, we need to explain and give you overviews of the other questions indicates you do not stop here, okay?

So Mr. Glass has covered Question 2.

What I want to turn to now is I want to talk about Question 3, and I want to talk about has there been any evidence that HomeServices of America, BHH Affiliates, or HSF Affiliates did anything to willingly and knowingly join a conspiracy to follow and enforce the rule?

We did not.

Now, this process, I need to make some corrections here. And I don't mean any disrespect by correcting what you heard on the opening -- the closing argument from counsel, but I want to be pretty firm on this because there's some clarifications that need to be made before we start any discussion here.

The first clarification: Mr. Ketchmark said -- let me use the phrase, if I may -- game, set, and match. I had this affiliated business disclosure statement, and it says things that -- that's it. That's all you need to know in answering Question No. 3.

Well, ladies and gentlemen, that's just not right. That's just not right to say such a thing in a United States courtroom. Okay?

                                        2439

```
 1              The affiliated business disclosure statement is a
 2       disclosure statement.  It is not a directive to follow or
 3       enforce the cooperative compensation rule.  It is a legal
 4       requirement that when we make a sale or we make a listing
 5       agreement at ReeceNichols -- or not we, but if ReeceNichols
 6       does, it is required to tell the consumers that, yes, we're
 7       giving you a menu of HomeServices, right?  HomeServices of
 8       America includes title.  It includes insurance.  It includes
 9       these different companies that you've heard about.
10              If we're going to be a HomeServices company, we are
11       legally required to disclose certain things.  It's a legal
12       requirement for us to do this if we're owned by the same
13       entities, and ReeceNichols has -- is in part of a corporate
14       family.  They must disclose.  Okay?
15              Let's look at this.  This is the Burnett contract.
16       Reece and Nichols Realtors, Inc., doing business as
17       ReeceNichols, HomeServices Lending, Kansas City Title, and
18       ReeceNichols Insurance are part of a family of companies, and
19       each may refer you to the services of another.
20              And then they -- there's a description in this
21       affiliated disclosure document of, look, service providers,
22       ReeceNichols, HomeServices, et cetera.
23              This is a disclosure document.  We're doing what the
24       law requires.  That has nothing to do -- this disclosure
25       requirement has nothing to do with whether we instructed
                                 2440
```

anyone to follow or enforce the cooperative compensation rule.

Okay?

One more correction that's important before we get started on this subject. During the testimony and during the argument that you just heard by Mr. Ketchmark, he indicated that there was testimony from Mr. Blefari about the BHH operations manual, and that -- he said, or implied as strongly as a person could possibly imply it, that that operations manual on the left side of this chart contained a commission guideline of 2 percent -- pardon me, 2.7 percent.

That's not true. It's not right to suggest it. It's not right to say it.

That operations manual is a BHH manual. Berkshire Hathaway, HomeServices Alliance Real Estate, that separate company that Mr. Goffstein has, that's where he, Mr. Goffstein and his management team, decided there would be a guideline. BHH had nothing to do with that. Nothing.

So Rosalie Warner, asked on redirect examination, and cleared this up. She said, Look, this document was depicted the way it was.

Is there any relationship between these two documents and that commission guideline?

Absolutely not.

Okay. Now, let's turn to the question in Question 3.

2441

```
 1              So what's the lawsuit about?  Well, you can look at
 2   many different instructions.  Did anyone, did any party direct
 3   anybody to follow and enforce this rule?

 4              Okay.  Well, let's look at the testimony.  But
 5   before we do that, I want to go back to where we started.

 6              Remember at the beginning we talked to you about
 7   specifically, did someone legislate the practice of
 8   cooperative compensation?

 9              No, it's the American outcome, late 1800s.
10   Mr. Glass and then our witnesses confirmed that through Sharon
11   Millett's presidential advisory group, they came up with the
12   rule amended for the reasons that they've explained in 1993.
13   The plaintiffs here chose to focus on 1996.  That's fine.

14              But we need to put this in context.  Did we even
15   exist at the time that this rule came into effect in 1996?
16   HomeServices did not.  We didn't exist at the time.  Two years
17   later is when we were formed.  All right?

18              How about BHH and HSF?  It was 16 years later that
19   we came into existence.  That doesn't resolve the question.
20   But we want you to have that context.  We didn't even exist at
21   the time.

22              So let's talk about whether, after we came into
23   existence, we followed or enforced the rule?  The answer to
24   that is none of these companies did.

25              After 16 years later, or two years later in the case
                                   2442
```

of HomeServices, we never did anything, took any step at HomeServices or BHH or HSF to follow or enforce the rule.

What was the testimony?  And before we go there, I want to give you one legal context from this court.  And our judge has instructed you as follows:  The fact that a company owns a subsidiary does not mean the company is liable for the subsidiary's actions.  This is true even if the parent elects the subsidiary's directors or if the parent's own directors also serve as the subsidiary directors at the same time.

Well, I wanted you to see that, because if we saw it once, we saw it 15 times.  Mr. Blefari is the chairman of HSF, the chairman of BHH, and that was -- a lot of drama was associated with that.  That makes no difference.  That's legally permissible, and the court has so said.

Then the court continues:  A subsidiary and its employees and agents are agents of the parent only if the parent exercises -- and if you don't mind, I'm going to emphasize this -- actual, participatory, and total control over the conduct at issue.

Did HomeServices of America, HSF, or BHH ever exercise total control?

So as we look at Question 3 -- I'm just going to do one quick reminder.  As we look at Question 3, did HomeServices of America, HSF, or BHH exercise total control over directing anybody, total control over directing anybody

2443

```
 1   to follow and enforce this rule?
 2            And the answer is a resounding, unequivocal no.
 3   Okay?
 4            Let's look at this.  Okay?  Let's look specifically
 5   at some evidence.  And if you don't mind, lady and gentlemen,
 6   I'm going to take you through testimony from HomeServices,
 7   HSF, and then testimony from ReeceNichols and from
 8   Mr. Goffstein.  Okay?
 9            Let's go through each level.  Number one:
10   Mr. Blefari, does HomeServices of America control the
11   day-to-day operations of its subsidiaries?
12            They do not.
13            They do not require its subsidiaries to follow and
14   enforce the rule -- or the offer of compensation model rule, I
15   should say?
16            HomeServices of America has never directed its
17   subsidiaries to join NAR, local realtor associations, or any
18   MLS.
19            And finally, Mr. Blefari:  HomeServices of America
20   is not a member of NAR.
21            So with respect to this question, Question 3, and
22   HomeServices of America, his testimony is there.  It's clear,
23   and it's unrebutted.
24            And we go to the next level, if you don't mind.
25   We'll talk about HSF.
                                2444
```

1          Rosalie Warner, the senior vice president of network
2    services, what does she say?  Well, these two companies do not
3    control the day-to-day operations of their franchisees.  They
4    don't require their franchisees to follow and enforce the
5    offer of compensation model rule.  They do not dictate agent
6    compensation policies to their franchisees, such as BHH
7    Alliance.  That's Mr. Goffstein's company.
8          And then further she confirms that HSF and BHH have
9    never directed their franchisees to join NAR, local realtor
10   associations, or any MLS.  And finally, HSF and BHH are not
11   members of NAR.
12         So looking at this, these two companies never
13   directed to follow or enforce.  That testimony is unrebutted.
14         We then go to one thing that I wanted to give you in
15   terms of legal detail.  Ms. Warner was asked by Mr. Varon --
16   he was asked -- she was asked:  Do you have any relation --
17   what's your relationship with the franchisee -- between the
18   franchisee and the franchisor?
19         And she confirmed that, with respect to this
20   particular language, that they -- in paragraph 1 up there,
21   franchisee has no authority to create or assume in
22   franchisor's name or on behalf of franchisor any obligation,
23   express or implied, or to act or to purport to act as agent or
24   representative on behalf of the franchisee for any purpose
25   whatsoever.
                                    2445

```
 1           And the document continues, but that -- in terms of
 2   the reality of what Ms. Warner testified to, no direction.
 3   And whether you want to take her testimony or Exhibit 3101 as
 4   your reference guide, they say the same thing.  No direction
 5   to follow or enforce that rule, and no authority to do so.
 6           So a couple other things.  ReeceNichols is not owned
 7   or operated by HomeServices of America.  You met Mr. Frazier.
 8   You learned about his background.  You learned about his CEO
 9   role of -- at ReeceNichols.  You heard from Ms. Krista Wilson,
10   the senior vice president of brokerage.
11           So that in the context of this question:  Was there
12   anybody -- did you join the conspiracy?  Did anybody direct
13   you to follow or enforce the rule?
14           We now look at ReeceNichols.  And what they say,
15   Hey, we're the subsidiary.  No one told us, never discussed
16   with us what to do, nor directed us -- never directed us to
17   follow and enforce the offer of compensation model rule; and
18   that furthermore -- not that they were overly proud, but they
19   were very direct.  We run our own business.  We have our own
20   management team.
21           Mr. Frazier said that in a modest, forthright, but
22   clear way.  Ms. Wilson said the same thing.  They're managed
23   independently, and they make their own policy decisions.
24   Okay?
25           Whether or not they're going to follow that rule,
                              2446
```

that decision is made at this level of subsidiaries or the
level of the franchisees.  Whether they're going to join NAR,
they do at that level, at the brokerage level.  It's not done,
HomeServices or any of these companies.  They make their own
decisions.

So there's one last -- just to summarize then on
Question 3 before we go to a couple of other things.  When we
look at this, there's no evidence that HomeServices of
America, BHH, or HSF had any role in a conspiracy or telling
anybody to do anything about enforcing that particular rule.

I want to go back, if you don't mind, to opening
statement.  I indicated to you we expected -- we didn't know
for sure because the witnesses had not testified.  We didn't
know what was going to happen.  We just made certain
assumptions.  We did our level best to tell you what we
thought the evidence would be.  I have to tell you, all we're
doing is making our best assessment of what we thought we'd
hear.

But I did come to the court, and I did speak to you.
And I said at the beginning, here's my expectations of what I
think the evidence will show:  No evidence of conspiracy.  No
documents.

The admissions from Dr. Schulman I anticipated.  But
I assumed there would be no evidence, and I thought there
would be a trial strategy that you would encounter.

2447

1      So I decided -- I didn't decide this until the night

2  before I gave the opening statement.

3      I said, you know what?  I'm not only going to rely

4  on what I'm thinking the evidence is going to be; I'm going to

5  explain to the jury that I think there's going to be a

6  strategy that we're going to see during the two to three weeks

7  of them changing the subject; of them changing the subject

8  because of their lack of evidence.

9      So here are the predictions I made and I want to

10  talk to you about.  You'll decide whether they were correct.

11      One, I suggested to you that they would specifically

12  make reference to the clear cooperation policy.

13      That policy has nothing to do with this lawsuit.

14  Nothing.  Okay?  Mr. Blefari testified.  I want to give you

15  one reference.

16      So this is the timeline that this is the evidence

17  that you've heard in this case, that the cooperative

18  compensation came into existence in the 1800s.  This is the

19  conspiracy that they alleged in 1996.

20      Mr. Blefari testified to you the clear cooperation

21  policy has nothing to do with the offer of compensation model

22  rule.  Nothing.  And, yes, he did write in the email

23  suggesting that people consider, consider supporting this rule

24  because it would be good for sellers and it would be good for

25  buyers.

2448

1    Everybody made their choice.  He didn't tell anybody

2    what to do.  Consider supporting the rule.  Okay?  It's a

3    different rule.  It has nothing -- clear cooperation has

4    nothing to do with this issue of cooperative compensation.

5    Nothing.

6         But there's something else interesting I want to

7    point out.  The clear cooperation policy came into effect how

8    many years later?  How many years later was it?  '96 to 2020.

9    Have to think about that.  24 years, right?  24 years later.

10         So that was the first effort to change the subject

11   and to get away from what we consider a lack of evidence.

12   That will be your decision.

13         Operations by independent subsidiaries.  We thought

14   they would point to operations here and say, Well, gee,

15   ReeceNichols or BHH, they have a commission guideline; so,

16   boy, that must be wrong.

17         Well, legally there's nothing wrong with that.  That

18   doesn't really have anything to do with whether anybody

19   conspired to follow or enforce.

20         Industry meetings.  We predicted they'd make

21   reference to industry meetings.  Well, they did.  There's no

22   evidence that you heard or that we heard that anyone spoke to

23   anybody about cooperative compensation at any industry meeting

24   ever.  Okay?

25         Finally, sales training.  Spent an awful lot of time

                        2449

1   talking about Mr. Blefari's invited lecture.  If I were

2   running that business or you were running that business and

3   you had Mr. Blefari as a part of your company, you might

4   decide who better to give some insights on how to sell other

5   than Mr. Blefari.

6           Well, he was invited.  He gave the sales training

7   that he did, and that was to instill confidence.  Had nothing

8   to do with setting any policies.  He explained it.  You heard

9   it:  Here's what I did.  This is what I did.  This is what I

10  did.  He explained that in terms of being the leading sales

11  agent for 14 years in Silicon Valley.

12          So that's what we think has occurred in terms of

13  changing the subject.

14          So, ladies and gentlemen, for these reasons, on this

15  first question of whether a conspiracy existed, for the

16  reasons that we have indicated, no one, no one conspired about

17  anything in this -- following and enforcing this rule, and

18  there's no evidence of it.

19          Now, let's turn to injury or damages.  I wanted to

20  talk with you about this and share a summary of the evidence

21  because I think this is also very important.  Why would it

22  become important?  Okay.

23          It would become important if you -- if you don't

24  stop here on Question 1 and you come to the question of

25  whether or not this caused any antitrust injury.  In other

                               2450

```
 1    words, because of this rule -- because of this rule, did
 2    anybody get impacted?
 3              And the answer to that is no.  So I'd like to talk
 4    with you about that.
 5              If you don't mind, I want to go back to -- the judge
 6    has a lot of instructions, but Instruction 30.  You may find
 7    it very helpful, like some of us do, when a court summarizes a
 8    long instruction for us, the court then is distilling a lot of
 9    principles into a paragraph oftentimes.  And I think the judge
10    did it here.
11              In summary, if class -- I'll start one more time.
12              In summary, if the class plaintiffs can establish
13    that the entire class was, in fact, injured.
14              So can we pause there?  Entire class, in fact,
15    injured.  Okay?  That's very important because I want to talk
16    about did the plaintiffs get -- did the plaintiffs get
17    everything they bargained for?  Yes.
18              Did the plaintiffs get everything they contracted
19    for?  Yes.  And much more.
20              Let's talk about it.  Let's talk about the evidence
21    now.  No more lawyer statements.  No more lawyer arguments.
22    Let's talk about evidence.  All right?
23              So what was the first thing that the class members
24    got?  Every plaintiff testified and confirmed the same thing.
25    Every plaintiff made a decision on type of representation.
```
2451

```
 1  Did they want for sale by owner, discount agent, or full
 2  service?
 3            Every one of the plaintiffs that testified in this
 4  courtroom said full service, right?
 5            MLS listing.  Nearly 20 percent of home sales don't
 6  go through the MLS, but these plaintiffs chose to, right?
 7  Every one of them; the ones that you heard from.
 8            Listing terms.  They agreed to an overall commission
 9  amount, but they then did two things.  They agreed to, yes, we
10  agree by contract to be -- to offer cooperative compensation,
11  and they agreed to the amount.  Okay.
12            So they made their choices in each of these
13  respects.  They made these choices.  All right.
14            Now, Ms. Burnett, I asked her some questions.  I
15  asked her to confirm the compensation that she had agreed --
16  she and her husband had agreed to.  We agree to pay
17  ReeceNichols Realtors a commission consisting of the fee of
18  $258 plus 6 percent.  That was the overall compensation.
19            Then there were two other agreements, and the
20  agreements were we'll offer a commission split.  We would
21  agree to an offer of compensation, cooperative compensation of
22  3 percent.  That was everything that they had sought to do,
23  and so they agreed to it.  And they confirmed their choices by
24  contract.  And in the contract, you remember they also
25  consented to MLS use.  Okay?
                            2452
```

1              So you may decide that, yeah, I think, based on the

          2     evidence that we heard, the plaintiffs got everything they

          3     bargained for and everything they contracted for.

          4              Now, let's turn to a couple other things.

          5              I had some questions.  We had some questions, the

          6     lawyers on the defense side.  Did you benefit, each of you

          7     plaintiffs -- each of you plaintiffs in this case, did you

          8     benefit from this cooperative compensation practice that began

          9     as a market outcome from the late 1800s to present day?  Did

         10     you benefit from that practice?

         11              We wanted to know, okay, we've got an American

         12     practice.  Did you benefit from it?  Yes or no?

         13              Well, what we learned is that they were transacting

         14     as buyers.  And when they transacted as buyers, they bought

         15     homes with the assistance of a buyer agent, and they paid no

         16     real estate commission when they were buyers.

         17              The transactions as sellers, they successfully sold

         18     their homes by utilizing the marketing engine that cooperative

         19     compensation provided them.

         20              Mr. Trupiano for his part said, Look, in terms of

         21     his work -- and you heard him last Friday afternoon.  He

         22     bought and sold, right?  He said, Well, look, I considered

         23     these transactions one event that had two legs to it.  It was

         24     a package deal; buy and sell.

         25              Okay.  What else do we -- what else happened?

                                         2453

1    Ms. Ellis was here, and I wanted to know about her transaction

2    history.  You'll recall -- you may remember it.  There was a

3    demonstrative exhibit that the Keller Williams lawyer asked

4    her about.  Does this summarize your transaction history?

5              For her part, she confirmed, yes, it did.

6              Well, hold on a second.  Well, she confirmed that

7    she has made five purchases and gotten the benefit of

8    cooperative compensation five times and that she made four

9    sales.

10             But I need to make a note about one of those sales.

11   She did a for sale by owner in 1998, but had three sales where

12   she used cooperative compensation.  So she got it coming and

13   going, so to speak, as a buyer five times and as a seller

14   three times.

15             She testified -- I also asked her:  What about buyer

16   agents?  Do you think they serve a purpose?

17             Yeah, they do.

18             So benefited many times over many years from the

19   practice of cooperative compensation that is being complained

20   about here.

21             Mr. Trupiano, he has a sale and a purchase agreement

22   in 2015 and 2021.  Did he benefit from cooperative

23   compensation?  Yes, as a seller and as a buyer.

24             And he confirmed to you that, Yeah, I would have --

25   I would choose to continue to use Leigh Ann Arling.

                                   2454

```
 1          Ms. Burnett -- little bit more detail here.  We just
 2   wanted to know who did you understand was going to -- who had
 3   the commission?  Who had the right to the commission?
 4          We wanted to know what she had to say.  Not a
 5   lawyer, not a lawyer characterization, but what did you
 6   understand?  Whose commission was it that was being split?
 7          Well, it was always clear to you, ma'am, wasn't it,
 8   that Ms. Gard was going to share her commission with another
 9   agent, whether it was at ReeceNichols or some other brokerage;
10   fair statement?
11          Yes.
12          Mr. Breit.  We had a lot of questions for Mr. Breit,
13   and he benefited from cooperative compensation.  We asked him
14   about it in the French Court transaction and the Omar Drive
15   transaction, and he confirmed that he chose and contracted for
16   specifically.  There would be cooperation with other agents,
17   with other brokers.
18          Another one of your decisions and agreements, right?
19          Yes.
20          That's in there.
21          Mr. Breit also:  You were also comfortable that
22   there was going to be cooperation with other brokers, right?
23          And his answer:  Correct.
24          Okay.  One final example.  Mr. Keel, he has a
25   transaction history where he also benefited from the practice
```
2455

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

of cooperative compensation in the Tracy Avenue purchase, of the Troostwood purchase, and the purchase that you see at 63rd Terrace. And we asked him -- counsel for Keller Williams asked him: And it was helpful to you to have the seller pay Mr. Bryant's commission so you didn't have to come out of pocket with that money?

Answer: I did not have to come out of pocket with the money, that's correct.

Okay. So if we go back to where the judge started us with this, has the entire class, has the entire class demonstrated an injury?

No. They got exactly what they bargained for. They got exactly what they contracted for. Exactly.

But in addition, we also know that they benefited from cooperative compensation also, right, as sellers and buyers.

So a deal is a deal. They got what they contracted for.

In addition, they also benefited from cooperative compensation as buyers and sellers.

So there's one other thing I want to make mention of real quickly on this topic.

Cooperative compensation also allowed various groups who are members of the class that you heard Mr. Stevens testify about and others. First-time homebuyers would benefit

2456

1   from this.  Lower-income buyers would benefit from the
2   practice of cooperative compensation, and other constrained
3   cash buyers would as well.
4           And remember what the court has said in Instruction
5   No. 30.  You know, these -- large -- let me just -- two quick
6   things.
7           Large percentages of these buyers with those
8   characteristics could not have afforded to buy their home
9   without cooperative compensation.  Sellers benefited
10  because -- they benefited because specifically that allowed
11  the buyers to make the purchase.
12          And the FHA -- former FHA commissioner, Mr. Stevens,
13  down payment assistance programs are not sufficient alone.
14  Cooperative compensation assists people who are low on down
15  payment capability.
16          Last thing here.  Let's go back to the judge's
17  instruction, if the plaintiffs can establish that the entire
18  class was, in fact, injured.
19          Ladies and gentlemen, they cannot.
20          So last two things here to cover.  We wanted Dr. Wu
21  to describe whether there -- the entire class has been injured
22  by giving you two illustrations.
23          Mr. Breit, he talked about what actually happened in
24  his world and what happened if it would be Schulman's world.
25  He was $6,162 better off in the actual world as compared to

                                 2457

1    what Dr. Schulman proposed we have.

2             The other illustration he gave was Mr. Keel.  In the

3    actual world his total commission to be paid was $12,200.  In

4    Mr. Schulman's world, it would have been $12,237.  Essentially

5    no difference between the two; but, remember, Jeremy Keel was

6    also a buyer in two other transactions that aren't referenced

7    by this one example.

8             So, ladies and gentlemen, they cannot establish that

9    the entire class was, in fact, injured.  For that reason

10   alone, if you look -- if you get to this question of whether

11   they had to pay more or not, the answer is a resounding no.

12            So the last couple of things we want to share with

13   you are that Dr. Schulman made economic predictions for the

14   Missouri market.  He made the linchpin of his entire opinion

15   the D.A.N.G.E.R. Report.  That was the linchpin of what he had

16   to say.

17            He made three predictions.  Sellers would not pay

18   for buyer agent fees at all.  He said the buyer agent use

19   would be rare, and he said that buyers would be responsible

20   for paying their own agents.

21            The reality is, in fact, what Dr. Wu said is

22   Dr. Schulman's economic predictions for Missouri make no

23   sense.  It's a flawed methodology.  He criticized him for his

24   economic methods, and he also -- we know from -- you heard it

25   from Mr. Swanepoel.  There's no basis for relying on the
                              2458

D.A.N.G.E.R. Report.  The South African gentlemen testified

from his home in Hawaii that's just -- there's no basis for

using my report for the reasons that he did.  You heard that

testimony.

Second, Dr. Wu confirmed Dr. Schulman is wrong

because listing agents offer cooperative compensation in the

U.S. markets without the rule.  And without the rule, there

would still be cooperative compensation.

Now, if I could go to one -- the first board.

THE COURTROOM DEPUTY:  Five minutes.

MR. MacGILL:  Thank you.

You heard Mr. Swanepoel when he talked about whether

or not the D.A.N.G.E.R. Report was appropriate to rely -- for

Dr. Schulman to rely upon.

Here's what he testified to.  You heard his video

testimony.

I don't know the person Schulman, but he is

incorrect.

Question:  And is it fair to say that the listing of

six countries were not, quote, comparisons for market

conditions for real estate service in the United States?

Answer:  By no means.  This is -- the D.A.N.G.E.R.

Report is not an analytical report.  It is a list.  It is a

list.  And, as I said, hypothetically of future dangers in the

sense it's not an analytical report.  Completely different.

2459

```
 1              Now, this was the linchpin of Schulman's --
 2    Dr. Schulman's work.  And Mr. Swanepoel has shown -- he's just
 3    said that's just not right.  You shouldn't rely on it.  Okay?
 4              Now, he was cross-examined:  Gee, aren't you paid by
 5    people in the real estate industry?
 6              Of course, he is.  He's a consultant.
 7              But he also said unequivocally:  If I'm biased in
 8    any way in favor of anybody or any part of this industry, I'm
 9    out of a job.
10              Questioned, questioned, questioned about it.  How
11    about this?  How about that in terms of payments by different
12    companies?
13              Well, he summarized this in a way I thought was
14    pretty South African perhaps.  He says, Look, I have no horse
15    in this race.  This is not my race, not my horse.
16              So he's not involved in this case, and that's
17    something to keep in mind.
18              Two other quick things.  I'll go back to the slide.
19    Dr. Schulman makes a prediction and says let's go to
20    Australia.  And he testified to you on his oath that I
21    rejected the U.S. markets.  I rejected the U.S. markets.
22              Well, okay.  Why?
23              Because specifically in New York, there's no rule;
24    and in Seattle, there's no rule.
25              What happens when there's no rule?
```
                                2460

```
 1              Well, the cooperative compensation is offered in
 2    99 percent of the listings even without the rule in New York.
 3    99 percent.
 4              Northwest and Seattle, 100 percent of the listings
 5    in the Northwest MLS without the rule have cooperative
 6    compensation.  100 percent.  So just like you would expect
 7    from what happened in the late 1980s to present day, that's
 8    the reality.
 9              The other reality about the U.S., not Australia,
10    that Dr. Wu testified to, buyers continue to be represented by
11    buyer agents in Seattle and in New York.
12              Now, couple of other things.  David Stevens.
13    Mr. Stevens testified, the former federal housing
14    commissioner, home sellers benefit far better here in this
15    system in this country from what we have.  I think changing it
16    would cause an extraordinary and serious damage.  That you
17    heard from Mr. Stevens.
18              Now, two questions we asked Dr. Wu to summarize.  As
19    we look at this Question No. 4, we asked him two questions to
20    summarize his testimony.
21              We asked him:  Have the plaintiffs proven class
22    members were injured or damaged as a direct result of the
23    alleged conspiracy?
24              No.
25              The plaintiffs' damages is based on -- plaintiffs'
                                2461
```

damages' claim is based on Schulman's flawed economic
prediction.

        The damage claim ignores fundamental market
realities.  Again, speaking to the United States.

        Sellers actually agreed with their listing agents to
make offers of compensation.  Our sellers.

        Sellers benefit and have incentives to make offers
of compensation as we've just seen.

        And sellers were also buyers and paid no commissions
in those transactions.

        So that is the first thing that we asked him to
conclude.

        And the second thing, lady and gentlemen, is this:
Did the rule cause any injury?  Did it cause the plaintiffs to
pay commissions they otherwise would not have paid?

        No.  Even without the rule, listing agents in
Missouri would offer cooperative compensation.  And he gives
you -- gave you his reasoning.  One, listing agents would
offer cooperative compensation without the rule.  Buyer
brokers provide valuable services and incentives to offer
compensation even without the rule, confirmed by the data in
the United States.

        So Schulman is wrong for every reason we talked
about on his injury testimony.

        And then finally, ladies and gentlemen, cooperative
                            2462

```
1    compensation, the practice that's existed in this country for
2    120 years, and the rule which has existed for the last
3    20-something years plus, they're good for sellers and buyers.
4    This is competition at work.
5              Sellers get more buyers and more competitive bids,
6    and buyers have more home choices and access to affordable
7    representation.
8              So, ladies and gentlemen, we ask you to look at
9    this, use your judgment based on the evidence that you have;
10   based specifically on evidence, not bias, not pushing this in
11   any direction other than what the evidence tells you.  And
12   when you go to that evidence, ladies and gentlemen, I think
13   that you will conclude that you can stop here.
14             There is no conspiracy under any way of looking at
15   this.  No one conspired with anyone.  And that's why we're
16   here, and that's why so many people care about this.  Perhaps
17   as much as 1 percent of the adult population in America has
18   been accused of a conspiracy by this side of the courtroom.
19             That's a very serious thing to say without any
20   evidence.  There is no evidence of that.
21             So, ladies and gentlemen, I want to thank you.  I
22   can tell you wholeheartedly and sincerely that I have been
23   thankful -- we have been thankful for every morning you've sat
24   as jurors; for every afternoon that you sat as jurors.  You've
25   come here for 11 days, being thankful for what you're doing.
```
                                 2463

```
 1              And we ask that you evaluate the evidence, all of
 2    the evidence, and make a judgment and make the determination
 3    that no one participated in a conspiracy with anyone; and no
 4    one from HomeServices, BHH, or HSF participated in a
 5    conspiracy to follow and enforce this rule at any time ever.
 6              Thank you.
 7              THE COURT:  Afternoon break.  We'll be back in here
 8    at 3:35.  Finish up the last defendant's closing and
 9    plaintiff's rebuttal.  Don't talk about the case yet.
10                   (A recess was taken.)
11              (The following proceedings were had in the presence
12    of the jury:)
13              THE COURT:  Mr. Ray.
14              MR. RAY:  Thank you, Your Honor.
15              Good afternoon.  I'd like to first start off by
16    saying thank you.  I'd like to thank you on behalf of my
17    client Keller Williams Realty, Inc., our chief legal officer
18    and our senior associate general counsel who have been here
19    throughout this entire trial.
20              They've been here because this trial is important to
21    us.  Your time that you've committed here over the last 11 or
22    12 days has been admirable.  So I'd just like to say thank you
23    on behalf of my client and my entire team.
24              After almost five years of fighting a case and after
25    a two-week trial, there isn't a shred of evidence that
                                    2464
```

```
 1   supports Keller Williams' involvement in a conspiracy with
 2   anyone.  As you sit here today, what are you left with?
 3   That's going to be a recurring question that I have throughout
 4   my presentation.
 5           You've been left with accusations of my client being
 6   called a thief, being accused of robbing people here in
 7   Missouri; counting the number of times the word "commissions"
 8   appears in a document that has nothing to do with this case.
 9   You've had everything imaginable thrown in front of you.
10           But what's clear and what truly matters is what you
11   have not seen; and that you have not seen any agreement
12   between Keller Williams and anyone else to do anything here in
13   Missouri.  That cuts through everything that you've heard over
14   these past two weeks.
15           What is a conspiracy?  Over the past two weeks,
16   you've been given shifting and confusing theories of what the
17   conspiracy is and that it has changed with each passing day.
18   And each theory is alleged to be a violation of the antitrust
19   laws.
20           Plaintiffs have alleged that it's a conspiracy to
21   charge 6-percent commissions; a conspiracy to stabilize
22   commissions at some broad range across the state; that the
23   rule itself is the conspiracy; that Keller Williams entered
24   into a conspiracy with the National Association of Realtors,
25   HomeServices of America, and other defendants to follow and
                                2465
```

enforce the National Association of Realtors' cooperative
compensation rule.

And none of what you've heard, none of what you've
heard about Keller Williams is true.

In fact, there has been an intense focus on anything
but the rule.  You've heard a lot about clear cooperation,
that policy, a rule that has absolutely nothing to do with
this case.

You were shown emails from 10 to 15 years ago from a
real estate franchise company with the word commission in them
as though that was a violation of the antitrust laws.  You
were shown various exhibits where the use of the word
"commission" was counted, as though documents from a real
estate company mentioning the word commission is an antitrust
violation.  It's not.

You were told that Keller Williams controls agents
here in Missouri.  And all of the testimony that you heard was
clear.  We don't.  Every person who testified on behalf of
Keller Williams, decent, honest, hardworking people, were
called thieves who constantly rob and steal from sellers here
in Missouri.  That's what you were given over the past two
weeks; that it's not about buyer agents, just the corporate
defendants.  Well, who's selling real estate here in the state
of Missouri?  Who's buying real estate here in the state of
Missouri?  It's not Keller Williams.

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

1      You've heard that the D.A.N.G.E.R. Report identified

2   Australia as being similar and comparable to America; and in

3   particular, Missouri.  It's not.

4      That absent the rule, Missouri would evolve to look

5   like Australia.  It would not.  None of what you've been told

6   is true.  Not a single thing.

7      You may recall during my opening when I said

8   plaintiffs never answered the who, what, how, and when

9   questions about the conspiracy.  And after two weeks, 11 days,

10  they still haven't answered that question.  Who from Keller

11  Williams participated in this alleged conspiracy to adopt or

12  maintain the National Association of Realtors' rules?

13     What did Keller Williams or the agents here in

14  Missouri do in furtherance of the rule or the conspiracy?  How

15  did Keller Williams and the agents here in Missouri contribute

16  to the so-called conspiracy?

17     When did we join?  When did we join the conspiracy?

18     I'd like to talk to you about the evidence in this

19  case.  Keller Williams is a franchise company.  I shared that

20  with you during the course of -- throughout this case.  We

21  have -- our franchisees are called market centers.  They're

22  independently owned and operated.

23     Keller Williams does not own any brokerages here in

24  the state of Missouri.  There are 4,400 independent contractor

25  agents who work in these market centers throughout the state

                              2467

```
 1   of Missouri.  We are not a member of the National Association
 2   of Realtors.  We do not represent buyers and sellers here in
 3   the state of Missouri.
 4            We have not negotiated any commissions or entered
 5   into any listing agreements or set any commissions here in
 6   Missouri.  That evidence was clear and unrefuted.
 7            All commissions earned by Keller Williams agents
 8   here are split between the agents and their franchisee market
 9   centers where they work, and the agents' payment to the market
10   center is capped.  That was the testimony that you heard when
11   we presented our case.
12            We receive six cents of every dollar of commission
13   earned by agents, but that amount is also capped.  Once the
14   agent hits their cap, which can happen with just a few
15   transactions, the agent keeps 100 percent of their commission.
16            Let's talk about the witnesses that were called.  We
17   called Gary Keller, Marc King, and Jen Davis.  What did you
18   hear this morning?  When you don't have evidence, you resort
19   to personal attacks.
20            You heard that Marc King got his position because of
21   nepotism.  You heard that he's the president of our company
22   because of this case.  You heard that Jen Davis is in her role
23   because of this case.
24            Not because Marc King has over 20 years of
25   experience as an agent and someone who's worked his way up
                                2468
```

through the ranks.  That's not the reason he's the president
of our company according to plaintiffs.

Jen Davis has been an agent since 2015.  She's been
a coach since 2016.  When you don't have evidence to support
your theory, you resort to personal attacks.

Bias.  What bias?  You heard them testify.  Their
testimony was clear.  They answered the questions that counsel
presented to them, and they were truthful.

What did they say?  What did Gary Keller say; that
agents are independent contractors; that we respect them; that
they determine what commissions they charge.

What did Marc King say?  Every agent makes their own
decision on what they charge.  They're independent
contractors.  They are their own business owners.  They decide
what commissions to charge based on their value.

What did Ashley Kelm say?  Agents are going to do
what works best for them and their business.  There's 180,000
of them.  We can't control them.  That evidence is unrefuted.

Our policies and guidelines manual serves as a
restraint on what we can do, how much control we can exercise
over agents.  It's right there in our policies and guidelines
manuals.  Commission rates are not determined by Keller
Williams Realty, Inc. or any other person not a party to a
listing agreement or buyer representation agreement.

That's a fact.  That's the evidence in this case.

2469

```
1    They haven't put forth a single person or any piece of
2    evidence to refute any of that.  That's the evidence in this
3    case.
4              Built by agents for agents.
5              Now, the judge read to you Instruction 22.  That to
6    establish -- to establish that any defendant violated Section
7    1 of the Sherman Act in this case, the plaintiffs must prove
8    the following elements:
9              First, that a conspiracy existed to follow and
10   enforce the cooperative compensation rule in the subject MLSs.
11             Second, that the defendant sought to be held liable
12   knowingly; that is, voluntarily and intentionally that they
13   joined that conspiracy.
14             Third, that the conspiracy had the purpose or effect
15   of raising, inflating, or stabilizing broker commission rates
16   paid by home sellers.
17             And, fourth, that the conspiracy caused the class
18   plaintiffs to suffer injury to their property.
19             Now, let's get into what the plaintiffs have alleged
20   is their evidence of a conspiracy.  Remember during my
21   opening, I told you that they were going to focus on a speech,
22   a book, and rules, and that was exactly what they focused on.
23             Let's talk about Family Reunion.  They focused a lot
24   on Gary Keller's vision speeches.  I told you that those
25   speeches -- that the information contained in those speeches
```
2470

1    is historical information; that it's comprised from over
2    150,000 transactions a year over a 17-year period.
3         Plaintiffs have alleged that him reporting that
4    information is an antitrust violation. We went through great
5    detail to explain to you that he reports on GDP, that he
6    reports on mortgage rates, that he reports on first-time
7    homebuyers; that there is a litany of information that
8    Mr. Keller reported on, Gary reported on during the course of
9    his vision speeches.
10        And, yes, there are competitors in the audience, and
11   you heard that those competitors are invited by local market
12   centers to be -- they are recruits. Nothing that Mr. Keller
13   says during the course of that speech is in violation of an
14   antitrust law.
15        He's reporting on information that historical --
16   that has a historical context; and nothing that he says in
17   that speech is competitively sensitive information that would
18   preclude competitors from being in the audience.
19        You heard that that is a recruiting event for us.
20   That was the testimony. That's unrefuted; that local market
21   centers invite agents to attend; and most of the time that
22   they attend, they become Keller Williams' agents.
23        You also heard that this is nationwide data. No one
24   can take what they heard at Family Reunion and then come here
25   in Kansas City and say, You know what? I want to apply what I

                                  2471

heard from Gary Keller to see if it works here.

You heard that commission rates are set locally based on competitive market conditions, and these -- and these historical averages have nothing to do with what goes on right here in Kansas City.

That was the average seller side. Plaintiffs would have you believe that Gary Keller was telling agents here in Missouri that this is what they should charge. If you look at these reports, they show that commissions vary over time when market conditions change. That's what Gary Keller testified to.

The perception that rates are always at 6 percent is simply not true, and that's not even the conspiracy that plaintiffs allege.

Now, plaintiffs try to diminish the movement of these percentages, but Gary Keller testified that it's actually a big deal. If you do the math, that could be a house payment, college tuition. It's meaningful. These are real dollars.

This is the buyer side. You'll see on this slide that the average buyer agent commissions dipped significantly from 2021 to 2022. These slides are at odds with plaintiffs' theory in the case. The evidence about the speech does not prove that Keller Williams participated in a conspiracy to follow and enforce the offer of compensation rule.

2472

1          There's no violation of our policies and guidelines

2   manual.  That information is unrefuted.

3          As I said, this is data that reflects transactions

4   by 150,000 agents across 50 states over a 17-year period.

5   Shows that commissions varied significantly with market

6   conditions.  No year equals 6 percent, and the commissions

7   rate changes are meaningful.

8          Gary Keller does not discuss or mention the rule.

9   You didn't hear any evidence or any testimony about a

10  discussion of the rule at this vision speech.  Nothing.

11         Historical national averages are not competitively

12  sensitive information, and we don't tell agents what to charge

13  competitors or otherwise.

14         I'm going to leave you with this.  There is nothing

15  in the record that you've heard over the last two weeks to

16  refute anything that Gary Keller said or any other witness

17  said about this.

18         You know what you really have?  All you have is

19  plaintiffs' counsel describing that it's an antitrust

20  violation.  Think about that.  There's not a single witness

21  that came in and said, Oh, this is an antitrust.  All you have

22  is him interpreting what the evidence is for you.

23         You don't have anyone saying that, Hey, this is

24  wrong.  What does that mean?  No agreement.

25         No agreement.  No agreement with the National

                                  2473

Association of Realtors; no agreement with HomeServices of
America. That was the speech.

Now I'd like to talk about the book. Remember I
showed you this book, The Millionaire Real Estate Agent. I
would encourage you when you're deliberating, leaf through it.
There's nothing competitively sensitive in the book.

You heard that Mr. Keller testified that this was a
compilation of best practices that he had gathered since 1979.
And you heard that the book was written over 20 years ago and
that it was intended to help agents think about how to
approach being a real estate agent like a business. It
offered various ways to help agents organize their thoughts
around that to help them be more effective as agents.

You also heard it's not limited to agents. He
talked about models and how they could be used to organize
your business around certain goals and objectives that you
had.

You will not see anywhere in this book, and
Mr. Keller specifically said it was not published to help
agents increase their commission rates.

If you think about it, it's impossible to talk about
the business of real estate agents without talking about
commissions.

The book also does not mention any other defendant.
Doesn't talk about the National Association of Realtors. It
2474

```
 1    says nothing about HomeServices of America.

 2              Remember I showed you this chart in my opening.  I

 3    specifically told you that the plaintiffs are going to make a

 4    big deal about this; and sure enough, they did.  I talked

 5    about listing appointments and how many listing appointments

 6    an agent would need to have during the course of a year if

 7    they were trying to reach certain goals.

 8              We talked about the average home sale price of

 9    $250,000.  Talked about the listing sales volume, and I also

10    talked about the 3 percent average.

11              All of these variables need to be customized for

12    what works for the individual agent.  That was what Mr. King

13    testified to.  That was what Gary Keller testified to.

14              But plaintiffs would have you believe that

15    Mr. Keller is instructing agents to charge three percent; and

16    that because the word commission appears -- commission appears

17    in this book, that that's an antitrust violation.

18              And you recall what Mr. King said?  Looking at 3

19    percent as an instruction that that's what agents have to

20    charge is comparable to saying that every agent would have to

21    charge -- to sell a home valued at at least $250,000.  That's

22    not the market here.  There are homes that exceed that.  There

23    are homes that are below that.

24              This is -- this book isn't instructing agents on

25    what commissions to charge.
```
2475

```
 1          This book reflects the illustration of the economic

 2    model and what someone would need to do in order to generate

 3    the type of income they want.  And if you were trying to

 4    generate at least a million dollars of income a year, you

 5    would at least need to have an appointment a day every day all

 6    year to be able to try to reach that goal.

 7          What's interesting is that eight pages before that

 8    model, there is a section in the book where Mr. -- Gary talks

 9    about gross commission income; and it talks about the

10    assumptions that he used in coming up with the 3 percent; 6

11    percent and then 3 percent.

12          He said it's based on an assumed 6 percent total

13    commission with 3 percent for each side of the sale.  Although

14    this will vary by agent and by city and is always negotiable,

15    we had to pick a basic commission standard.

16          That's right there in the book.  But you didn't hear

17    that from -- you didn't hear anything about that from

18    plaintiffs' counsel.

19          Furthermore, where does the word "NAR" appear,

20    National Association of Realtors?  Where does that appear?

21    Where do the words "cooperative compensation" appear in this

22    book?  Where do the words "HomeServices of America" appear in

23    this book?

24          You may recall this is the economic model, and Marc

25    King testified that when he completed this model, he used a
```

commission rate of 2.5 percent because that was the commission
he actually earned when he worked as an agent.

Filling in 3 percent or anyone else's numbers does
not -- is not a useful exercise. You have to fill in the
numbers that work for you. You have to fill in the numbers
that are consistent with your market in your market
conditions.

Plaintiffs offer no evidence that this is anything
but what it is. All they do is make assumptions. But as I've
stated before, there is no evidence in the record that refutes
what Marc King said about this or what Gary Keller said about
this.

All you have is plaintiffs' attorney interpreting
what this is and that you should treat it as some sort of
instruction to agents; look at it as some sort of instruction
to agents to charge a certain amount of commissions.

Next I'd like to talk about our policies and
guidelines manual. Much has been made to do about this
section in our policies and guidelines manual that says that
all associates representing Keller Williams Realty will become
members of their local board of realtors slash association of
realtors and multiple listing service except when exempted by
their team lead and will keep their membership current and
active at all times.

Now, I told you that plaintiffs would try to show

2477

Registered Merit Reporter

Case 4:19-cv-00332-SRB    Document 1332    Filed 11/28/23    Page 234 of 268

that Keller Williams participated in a conspiracy through this
requirement.  Plaintiffs have, again, failed at that.  They
cannot establish that Keller Williams conspired with the
National Association of Realtors or HomeServices of America or
anyone else to follow or enforce the offer of compensation
model rule that is the subject of this lawsuit.

Why is that the case?  Mr. Keller testified that
this requirement has been a part of the policies and
guidelines manual since at least 1989.  This is a 1992 version
with that same requirement.  All associates representing our
firm will become members of their local board of realtors and
MLS except when exempted by their manager and will keep their
membership current and active at all times.

Remember I showed you that timeline?  I showed you
that timeline to establish when we were founded as a company,
when we became a franchise company; and it was seven years,
seven years before plaintiffs alleged that the conspiracy
began.  Gary Keller told you and testified that he adopted
this provision before plaintiffs' conspiracy started.  Think
about it for a minute.  How did we join the conspiracy seven
years before it started?  We didn't.  That's the answer.  We
did not.  Second, Gary Keller explained that the company views
agent participation in the multiple listing service to be good
for buyers and sellers.  But consistently, consistently with
the company's by-agents-for-agents mindset, agents are allowed

2478

exemptions to the requirement if that is how they want to
operate their individual businesses as an agent.  It's totally
up to them.

            And Keller Williams has nothing to do with that.  We
don't track it.  It's totally between them and their market
center.

            There's another point.  The evidence is clear that
agents join the multiple listing service because it's in their
interest to do so, not because of Keller Williams' policy.
Jen Davis testified this morning that she wasn't even aware of
the policy; that she was already a member of the multiple
listing service before she joined Keller Williams.

            She thought it was good for her business.  Marc King
also testified about that hundreds of agents that he recruited
to Keller Williams' market centers from other brokerages,
every one of them was already a member of the multiple listing
service in the markets where they operated.

            In other words, none of them joined -- none of them
joined the multiple listing service because of a Keller
Williams' requirement.

            And, finally, there is also the related question of
whether Keller Williams participated in the conspiracy to
follow and enforce the offer of compensation model rule
through our involvement with the National Association of
Realtors' activities.

                              2479

1          The evidence is clear on this.  Keller Williams has

         2    never participated in any -- meaningfully in any National

         3    Association of Realtors' activities, never.  Gary said that he

         4    has never been involved because he's focused on running his

         5    business.  Marc King testified that he never viewed the

         6    National Association of Realtors as a way to sell more houses

         7    or to serve clients better.

         8          Cary Sylvester and Ashley Kelm, former employees of

         9    the company, both of whom testified with some degree of

        10    frustration that their efforts to have Keller Williams become

        11    more involved with the National Association of Realtors were

        12    completely ignored by the company.

        13          You heard Ms. Sylvester say that she resigned

        14    because of that.  Her ideas never got any traction.  Nothing

        15    about our policies and guidelines manual that agents join the

        16    multiple listing service shows a commitment by Keller Williams

        17    to any conspiracy to follow or enforce the cooperative

        18    compensation rule.

        19          Plaintiffs offer no evidence, no evidence whatsoever

        20    that anyone from Keller Williams ever participated in any

        21    meeting.  No evidence of any communications involving Keller

        22    Williams or anyone, NAR, national -- HomeServices.  They waved

        23    around several documents, but none of them were related to the

        24    rule.  None of them.  None of the evidence that plaintiffs

        25    have shown you supports a conspiracy.
                                      2480

```
 1            I want you to remember -- I want you to remember
 2    something too.  If you agree that Keller Williams' agents
 3    joined the multiple listing service because of their
 4    independent interest and not because of an agreement between
 5    Keller Williams and the other defendants, there's no
 6    conspiracy.
 7            You can answer no to Question 1 of the verdict form,
 8    and your job is done.  Finished.  But even if you go on to
 9    Question 2, you should also answer no.  Because, as Jen Davis
10    told you this morning and as the evidence from the Northwest
11    MLS and REBNY shows you agents would continue advising their
12    clients to offer compensation to buyers' agents because it's
13    great marketing and it helps them sell homes.
14            For these reasons you can answer no to Question 2
15    because the rule cannot have had any effect on commissions
16    paid by home sellers.
17            Even then, even then in looking at Question 3, which
18    entities do you find joined a conspiracy?  There's no question
19    that Keller Williams did -- there is no question that Keller
20    Williams did not participate in a conspiracy to follow and
21    enforce the offer of compensation model rule through
22    involvement in National Association of Realtors.
23            This evidence is clear.  We never participated in
24    any National Association of Realtors' activities.  And for all
25    of these reasons, the answers to Questions 1, 2, and 3 on your
```
                                     2481

```
 1    verdict form should all be no.

 2              And once again, I have to make this point.  There is

 3    no evidence in the record that refutes what Gary, Marc, or Jen

 4    testified to about our policies and guidelines manual.  All

 5    you have is plaintiffs' counsel describing how it restricts

 6    competition.  That's not evidence.  What I say is not

 7    evidence.  What he says is not evidence.

 8              You have had the benefit of listening to witnesses,

 9    looking at documents.  That's evidence.

10              I find it odd that they didn't call a Keller

11    Williams' agent to ask them any questions about their

12    involvement in the local board of realtors or their local

13    multiple listing service; in other words, if their involvement

14    was a result of the policies and guidelines manual.  Not a

15    one; throughout the entire state, single agent.

16              What you had is half truths, cherrypicking emails

17    over 10 or 15 years.  We turned over everything.  This is an

18    email that you specifically heard Gary Keller talking about

19    that is from 2017, and counsel showed you some box where he

20    was like, admit, admit, admit.  Admit what?

21              Gary specifically said, I'm talking about Zillow

22    costs.  I'm talking about what the agents keep, what they

23    keep, and how much Zillow and other sources are taking more

24    and more money out of their pocket.

25              And guess what?  Jen Davis said the same thing this
                            2482
```

| | |
|---|---|
| 1 | morning.  She specifically told you that it costs money to get |
| 2 | a lead from Zillow or websites like that.  Up to a third of |
| 3 | their commission would be given to them. |
| 4 | That's what Gary was talking about.  That's what -- |
| 5 | about empowering agents, trying to help him.  That's what he |
| 6 | testified to. |
| 7 | You don't see HomeServices of America listed in that |
| 8 | email from five years ago.  You don't see anything about the |
| 9 | National Association of Realtors' cooperative compensation |
| 10 | rule in that email from five years ago. |
| 11 | Slicing and dicing and, you know, clipping here and |
| 12 | putting something there, that's what this case has come down |
| 13 | to?  That's their evidence?  It's not evidence of a |
| 14 | conspiracy. |
| 15 | What else did we see?  Gross mischaracterization of |
| 16 | Gary Keller's testimony.  Gary Keller, they -- the false |
| 17 | assertion was that Gary Keller testified that Keller Williams |
| 18 | would not let an agent work for a Keller Williams' brokerage |
| 19 | if the agent were not a member of the multiple listing |
| 20 | service.  Flat out wrong.  Flat out wrong. |
| 21 | You heard what I just said about our policies and |
| 22 | guidelines manual.  What is the reality?  Gary Keller believes |
| 23 | that the multiple listing service is the lifeblood of agent |
| 24 | business and that it is in their interest to participate, but |
| 25 | Keller Williams still provides an exemption from its policies |

2483

1    for agents who want one.

2                Once again, who is that between?  The agent and

3    their local market center.

4                Question:  You made the comment earlier when

5    Mr. Ketchmark was questioning you about how difficult it would

6    be for agents to work if they did not have access to the

7    multiple listing service.  You said some of -- that they would

8    have to quit their job.  Explain what you mean by that.

9                Answer:  Well, I mean, it's their lifeblood.  It's

10   the marketplace, right?  It's like if you, you know,

11   professionally were a truck driver.  If someone told you you

12   couldn't drive on the highways, how would you make a living?

13               That was his testimony.

14               The reality confirmed by Mr. Keller's deposition

15   testimony:  Agents wouldn't be able to make a living if they

16   weren't a member of the MLS.

17               Once again, taking pieces of what someone said,

18   twisting it around, giving the impression that what they said

19   was something totally different.  We've seen that throughout

20   this case, and I'm going to talk about some other instances

21   where you've seen it coming up just shortly.

22               We talked about clustering.  Clustering is also not

23   evidence of a conspiracy.  Agents set their commissions based

24   on their value and the conditions in their markets.  That's

25   the testimony in this case.
                                    2484

```
 1              Now, plaintiffs misrepresented to you on three

 2    separate occasions what this slide was.  Each time they

 3    represented that it was the amount of commissions paid.  Each

 4    time they were wrong.

 5              These are quotes from plaintiffs' counsel during the

 6    course of this trial where he intentionally misrepresented

 7    Schulman's findings.

 8              Did you go through the data to see what they paid in

 9    buyer's commissions?

10              This is the amount of the buyer's commissions that

11    is paid through the MLS.

12              The buyer's commission rates that are paid by your

13    customers will be 3 percent.

14              Nothing.  None of those questions were true, and he

15    knew it.

16              And let's keep something in mind.  If listing agents

17    here in Missouri are telling their clients to offer 2 percent,

18    2.5, 2.7, 3 percent or any other amount to buyer agents,

19    that's a conversation between those agents and their clients.

20              THE COURTROOM DEPUTY:  Five minutes.

21              MR. RAY:  Thank you.

22              Keller Williams Realty has absolutely nothing to do

23    with those individual and personal conversations between

24    listing agents and home sellers.

25              What did Schulman say?  When Schulman was testify --
```
                                  2485

testified about this and he was questioned, he actually

corrects plaintiffs' counsel, his misrepresentation by

identifying that these were offered rates.

Question:  And did you look at what home sellers,

our clients, the people that I represent, did you go through

to see what they paid in buyers' commissions?  Did you do

that?

Well, these were the rates that they offered.

That was his answer.

Question:  That were offered by them?

Answer:  Yes.

Why does it matter that these offered rates are not

actual rates?  It matters, because as Dr. Wu testified, the

actual rates often differ from the rates that listing agents

offer to buyer agents through the multiple listing service.

These differences between what is offered and what

is actually paid is the direct result of negotiations.  That's

why it matters.

Plaintiffs told you that the rule applied throughout

Missouri, but plaintiffs' slides showing commissions offered

also does not support their conclusion; that the alleged

conspiracy caused buyer agent commissions to be uniform.

That's not true.

If you look across the state of Missouri where

plaintiffs tell you that the rule has been uniformly applied,

2486

```
1    you see the rates very significantly, even on plaintiffs'
2    experts' own slides.  This shows you that there is actually
3    little uniformity, and plaintiffs provided you no explanation
4    whatsoever for the differences in those markets.
5            And what did Dr. Wu say?  The clustering of offers
6    reflects competition.  There could be clustering around 3
7    percent out of competition, clustering around 2.7 percent and
8    clustering around 2.75 percent, and that would be an outcome
9    of competition too.
10           Now, the -- Your Honor read to you Instruction No.
11   24, and this instruction is commonly referred to as the
12   parallel conduct instruction.  If defendants acted similarly
13   but independently of one another without any agreement or
14   understanding between two or more of them, there would not be
15   a conspiracy.
16           The instruction continues and addresses clustering
17   of offers of compensation specifically.  Thus a defendant may
18   make offers of compensation identical to those charged by its
19   competitors without violating the Sherman Act.  A defendant
20   may even copy the offers of a competitor or follow and conform
21   exactly to the compensation policies or changes of its
22   competitors.
23           This is parallel conduct.  Just because everyone has
24   an umbrella doesn't mean that they reached an agreement to do
25   so.  It might just mean that it's raining outside.  That's
```
2487

```
1    parallel conduct, and it is not evidence of a conspiracy.
2              Now, let's talk about Stefan Swanepoel.  Plaintiffs
3    didn't want to spend a whole lot of time on him, and I know
4    the reason why they didn't.  I found his testimony
5    breathtaking.  What did he say?
6              I do not know the person Schulman, but he is
7    incorrect.  The D.A.N.G.E.R. Report countries were not used as
8    comparators.  There are many countries that are more
9    comparable to the United States.
10             If I had to do comparators, he says Australia is the
11   most comparable country in the world.  Even that is not
12   correct.  It's completely different from the U.S.  So not --
13   that's not a true statement.
14             The author of the D.A.N.G.E.R. Report says that it
15   was an arbitrary selection.  That's what he said.  A man who,
16   by his own testimony, has been to Australia six times and who
17   said that Australia is nothing like the U.S., let alone
18   Missouri.
19             This D.A.N.G.E.R. Report is the foundational pillar
20   of what Dr. Schulman testified about.  He took what was in the
21   D.A.N.G.E.R. Report and he ran with it.
22             Why?  Because it was a low commission country.  That
23   was the only basis for it.
24             He said -- I don't know if you recall, he said that,
25   Hey, I was just surveying some people, asking do you know of
                                      2488
```

any countries with low commissions?  Well, yeah, you might want to check out Australia.  Really?

That becomes the foundation of what Dr. Schulman testified to you about.  He also said that Australia was part of an eclectic compilation, an eclectic compilation.  An eclectic compilation is the definition of arbitrary.

THE COURTROOM DEPUTY:  Time.

MR. RAY:  Missouri is more than an eclectic compilation.  If you're going to compare Australia to Missouri, make sure that the comparison makes sense.  Make sure you have a rational basis for doing so.

Let's talk about the plaintiffs a little bit before I wrap up.

THE COURT:  Mr. Ray, your time has run.  You can have a few minutes to wrap it up.

MR. RAY:  Thank you.

The rule did not prevent plaintiffs from negotiating the cooperative compensation offered in their sale transactions.  Even plaintiffs acknowledge that commissions were negotiable.

Plaintiffs were all sellers and then they were all buyers.  Each time they were buyers, they accepted seller concessions.  Each of their agents accepted cooperative compensation.  They want everyone else in Missouri to forego an opportunity from which each one of them benefited.

2489

1            They want all commissions paid by their listing

         2    agents to buyer agents to be returned to them.  They want it

         3    all back.

         4            You heard from Jen Davis this morning, and she

         5    testified about the importance of buyer agents.  One thing

         6    that was crystal clear in Schulman's report is that in a world

         7    without the rule like in Australia, that buyer agents would be

         8    used very rarely, and mostly on high-end properties.

         9            She laid out all of the incredibly important things

        10    that buyer agents provide for their clients; and that if you

        11    make a mistake buying a home, it can be a costly mistake.  She

        12    talked about the veteran that she helped.

        13            Plaintiffs will tell you that what she does can be

        14    replaced by simply looking on Zillow.  And if that were

        15    correct, you would not see the continued increase in the use

        16    of buyer agents.  That's what Ms. Davis testified to.

        17            Schulman says that her value is worth zero.  I told

        18    you that in my opening.  That's what he testified to.  She

        19    testified that she brings buyers to sellers, touring homes

        20    with them, working with listing agents, maintaining demands

        21    for sellers' properties.  That's what the buyer agent does.

        22            If Missouri looked like Australia, home sellers

        23    would be harmed and buyers would be harmed.  Sellers would be

        24    frustrated.  Buyers would be frustrated.  That's not what we

        25    want.

                                        2490

```
 1              Plaintiffs brought you Todd Reynolds all the way
 2    from Australia, but they cannot go right down the street and
 3    bring a listing agent in or bring a buyer agent in and ask
 4    them anything about this case.  How many agents in Missouri
 5    actually follow the rule?
 6              As you sit here today, do you know that?  Do you
 7    know of one -- the name of one agent that follows the rule?
 8    They didn't tell you that.
 9              Now, I want to talk about the verdict forms while I
10    wrap up.
11              THE COURT:  You need to wrap her up.
12              MR. RAY:  Thank you.
13              Now, first question:  Do you find that class
14    plaintiffs have proved by a preponderance of the evidence that
15    a conspiracy existed to follow and enforce the cooperative
16    compensation rule in the subject MLSs during the conspiracy
17    period alleged in this case from April 29, 2015, through
18    June 30, 2022?
19              The answer, we would submit to you, is no.  And we
20    would ask that you put an X right there.  And that should end
21    your inquiry as it concerns Keller Williams.
22              They haven't met the first prong of this verdict
23    form.  And so as to these other questions I went through
24    earlier in my presentation, if you do find that the conspiracy
25    set forth in Question 1 had the purpose or effect of raising,
                              2491
```

1    inflating, or stabilizing broker commission rates paid by home

2    sellers, the answer to that should be no.

3              Which of the following corporations or entities do

4    you find knowingly and voluntarily joined the conspiracy set

5    forth in Question 1 with the purpose of furthering its goals?

6              As to Keller Williams, that answer should be no.

7              And if you get through all of this, you may recall

8    me asking you at the very beginning during this process, could

9    you award zero damages?  That is what I'm asking you to do

10   today.  I'm asking you to award zero damages.

11             And with that, I thank you.

12             Thank you, Your Honor.

13             THE COURT:  Thank you, sir.

14             MR. KETCHMARK:  Wow.  We're here.  Four and a half,

15   five years of my life.  It's finally here.  I sat there and

16   listened to them say there's four questions I haven't

17   answered.  They looked you in the eye and said I haven't

18   answered the who, the what, the how, or the when.  They know

19   that's not true.

20             I stood here on the opening statement and put it on

21   the board for the world to see, for you to see.  The who I'll

22   answer right now.  The National Association of Realtors,

23   Keller Williams, HomeServices of America, BHH, HSF, RE/MAX,

24   and Realogy.  That is the who.  I put it on the board.  I

25   mean, you remember, I literally put their names up here.

                              2492

That's the who and they know it.

The what.  They say, well, what is it?  He keeps
dancing around and moving different places.  That is not true.
I put it right there on the board.

A conspiracy to follow and enforce a rule that has
the purpose or effect to raise, inflate, or stabilize the
amount of buyers -- the amount of commissions paid in the sale
of a home.  I put it right there.

Well, we don't know what he's talking about.  He's
bouncing all around.  It's just not true.

The how.  I didn't explain the how?  I mean, I might
not be the smartest guy in this courthouse, but I showed you
the how.  I stood here and taught you and explained to you.
You know more now about the residential real estate market
than anybody.  What you know is you know the who, you know the
what, you know the how, and you know the when.

The how, they used it in their book that they would
tell people you're going to be fine if you let other people
see it.  Don't let it fall into other hands, this sacred data
of ours.  Keep this from the public.  The how are they doing
it now on the internet?  They're putting it there.

The when?  I literally put the when.  I put the
dates up there.  I put it up there.

The who, the what, the how, the when.  What I was
waiting for is a W that they didn't answer.  The why.

2493

```
 1              I kept thinking for five years, for -- I mean,
 2    just -- what, it's been -- what we've gone through is mind
 3    numbing.  I kept thinking, they're going to come in here and
 4    explain why this is a mandatory rule.
 5              If it's the greatest thing ever -- I think actually
 6    in trial you heard me say, if it's the greatest thing since
 7    sliced bread, why is it mandatory?  You own your house.  Own
 8    it by yourself.  Own it with your partner.  Own it with your
 9    spouse, your wife, your husband.  Your parents own their
10    house.  They want to sell it.  Why can -- do these
11    corporations have a right to come in and tell you the only way
12    you can use technology is if you pay; you pay for it?
13              Remember the silly example I gave?  You're selling
14    your car.  And someone shows up, and they bring a mechanic.
15    And they say, Well, I'm from the national mechanic
16    association.  You have to pay me.  It doesn't exist anywhere
17    else.
18              Why is it a mandatory rule?  They have not explained
19    that to you.
20              They haven't said a word about that.
21              Now, what I did hear them say is that I didn't bring
22    an agent?  They're the ones with all the agents.  Where are
23    their agents?  Where are their people?  Who did they bring?
24    HomeServices of America, where are their agents?
25              The reason I didn't bring the agents in here, we're
                                   2494
```

```
 1   not blaming the agents.
 2           I brought you the voices of the agents.  You saw the
 3   testimony from Cliff Niersbach where I went through all the
 4   different complaints from the agents when they shoved that
 5   clear cooperation policy down their throat saying, don't do
 6   it.  It violates the Sherman Antitrust Act.  This will only
 7   make the case stronger.
 8           I'm not going to turn this into a month-long trial
 9   of warring agents.  We started at the head of the conspiracy.
10   If Keller Williams wanted an agent here, don't bring one of
11   your corporate officers on your payroll here.  Bring one of
12   the however many thousands of agents they have.
13           That's just -- it's just nuts.  And they say, oh --
14   and he just does some math I heard for the first time.  We get
15   this percent and that percent.  What?  The testimony I heard
16   from Marc King is that they call them "cappers."  They like to
17   have cappers.  These agents, they turn into cappers.  They cap
18   them at $3,000.
19           Well, I did -- actually literally had to turn my
20   calculator sideways.  You take 3,000 times 160,000, that's
21   $480 million.
22           Then they have more fees, the technology fees and
23   this fees and that fees.
24           The whistleblower, Mrs. O'Connor.  I literally
25   played the deposition where I confronted Mr. Niersbach with
                              2495
```

1   the complaint.  I showed it to him.  It is literally in

2   evidence as Exhibit 601.  If you want it, it's there as

3   evidence.

4           They make no mention of her.  I'm the one who told

5   you that.  I had that evidence.  We've put it in the record.

6   You have that.

7           She said, Stop doing this to these people.  It's a

8   classic Sherman Antitrust violation.  And they let it die.

9           When they bring Mr. Stevens in, their expert on

10  cash-restrained buyers, I said:  How many years does it take

11  someone like Hollee to make a mortgage payment before she can

12  even pay the grift that -- the commission for the buyer side?

13          He said seven years.

14          That's crazy.

15          I did not call all of these agents the villains.

16  That's nonsense.

17          Then I sat there and listened to them say it.  Can't

18  remember which one of them said it.  It kind of blurring

19  together, to be honest with you.  But one of them said, I am

20  trying to -- plaintiffs -- they kept pointing at me.

21  Plaintiffs' attorney is trying to take -- I believe it was

22  maybe NAR's attorney -- $1.785 billion from Missourians.

23          I thought, have you not been paying attention to

24  what's happening in this courtroom?  I am representing the

25  Missourians.  I am saying you need to give the money back to

                              2496

```
 1    the people you took it from.
 2            I'm not trying to take money from Missourians.  They
 3    are intentionally trying to make you think that I'm attacking
 4    these buyer's agents.  No.  It has no impact on them.
 5            If we wanted to, we could have named all those
 6    people.  I could have named ReeceNichols and these local
 7    franchises.  I could have done it.  I didn't do it.
 8            In fact, what they said is we're just kind of doing
 9    what we have to do.  And Mr. Keller sat up there and told you
10    that they would have to quit if they didn't follow these MLS
11    rules.
12            And NAR still stands here and tells you -- their
13    lawyer says, well, we don't make any money in commissions.
14    $150 a person a year times 1.8 -- or 1.6 million people is
15    $240 million a year.
16            We all know what's going on.  We know why they're
17    doing it.
18            And they say, Well, wait a minute here.  We've had
19    this level of cooperation since the 1890s.  It's been going on
20    so long.
21            Well, you know, this is a game of Whack-A-Mole.  It
22    reminds me that at Chuck E. Cheese, when my kids were little,
23    and a mole would pop up, and you hit it here, and you hit it
24    there.
25            And they're running this game in the early '90s
```
2497

1    where they were calling them subagents.  And they're saying,
2    you know, you remember, the seller's agent, they'd have a
3    subagent.
4            And the consumer advocacy group said knock it off.
5    Those buyers think you're representing them.  You're not.
6    Disclose it.
7            So 44 different states passed disclosure laws, and
8    people thought, finally.
9            So what do they start doing?  Now they just start
10   picking the seller's pocket and transferring it in a different
11   way.
12           I'm accused of running a shell game?  I'm accused of
13   misleading you?  I'm like -- I was flat out accused.  I take
14   an oath.  Just as you as a juror, I take an oath as an officer
15   of the court, and that means something to me.
16           I have been taught in my life to protect my
17   integrity at all costs.  I would never stand in front of you
18   or the court and say something that's misrepresenting, say
19   something that's not true.  I would never do that.
20           And I take it personally, but I can handle it
21   because it's a game that's designed to somehow make you mad at
22   me and think, oh, he's just a bad man.
23           When I received the appointment to represent these
24   people, it was a glorious day.  It was a day I was thankful
25   because I knew I could do something profound.  I could use my
                                2498

voice.  And, man, I said it to you and I meant it during voir

         dire.  When I was a kid, I was afraid to talk.  I was shy.

                And my mother taught me to use my voice, and that's

         what I've been trying to do.  And I've tried to do it with

         integrity, with honesty.  Every single thing I stood here and

         told you, you know you've seen it.  It's true.  It's accurate.

                I didn't meet with experts and create a PowerPoint

         presentation.  Did not happen.

                You want to talk about a shell game, the hunt for

         the villain.  They first said, Well, he's accused Ms. Millett

         of being a villain.  When they said that, I'm like, what?

                And when they realized that won't work -- and you

         can see she didn't hate me.  She said, I'd like to think of us

         as friends.

                I said, Come back and come to a game.

                So then they shift.  They're now the villains.  Did

         I ever one time say that Marc King or Mrs. Davis -- Ms. Davis,

         that they're thieves or liars?  I never said anything of that

         sort.

                Did I ever one time say 1.6 million realtors are

         part of this conspiracy that I'm now accusing 1 percent of the

         population?  What is going on?  It's a direct and deliberate

         attempt to confuse you, to try to make you think something

         that's not true.

                Dr. Wu.  I mean, I've -- I mean, you were here.
                                    2499

```
 1    When I saw that PowerPoint, I thought, Well, that's weird.  It

 2    looks an awful lot like what I saw in the opening statement.

 3    Looks a lot like the same -- and you know what?  It's the same

 4    thing as their closing argument.

 5              So I asked them:  Are you meeting with them?

 6              Yeah.

 7              We went back and forth.  I don't need to go through

 8    all that again.  You saw it.  You know what happened.

 9              And then the response to that is to say, well, I

10    mean, Ketchmark and Boulware and Fadler and these lawyers in

11    the audience --

12              I'm like, lawyers in the audience?

13              -- they must have met with Schulman before, like

14    everyone does it.

15              It does not happen.  In fact, we know because before

16    that even came up, when they asked Dr. Schulman if they met --

17    did he meet with them, he said, Well, I talked to them for

18    five minutes.  He said, Well, I talked to his dad about the

19    Chiefs.

20              I got up and asked him:  Did you have any

21    conversations -- this is my redirect from the transcript.

22              Did you have any conversations at any time about the

23    substance of your opinions?

24              No, we did not.

25              If I would ever try to do that to you, what would
                                   2500
```

```
 1    you tell me?
 2            I'd tell you either to stop it, or I need to go find
 3    another job because my opinions are my own.  They're driven by
 4    the data.  They're driven by economics.  And I've had to turn
 5    down work where lawyers wanted to say, I need you to say the
 6    following, and the data and the evidence wouldn't support it.
 7    I don't do that.
 8            I asked him:  Of the 6,000 hours of time that you've
 9    been -- worked on this and the thousands of hours of time that
10    you've put on that personally, has any attorney in my firm or
11    any of Mr. Boulware or Mr. Fadler or any of our --
12    Mr. Boulware's firm, two lawyers, Mr. Fadler, myself, and the
13    two people in my firm, have any of us ever suggested or told
14    you what your opinions should be?
15            No.
16            Do not stand here and attack my integrity in front
17    of these people like that.  I never would meet with a man and
18    create a PowerPoint and have them come here and tell you it's
19    evidence.
20            He would never allow that to happen.  You know why
21    that happens?  Because they know the answer to these
22    questions.
23            The most stunning thing to me is they say there's no
24    evidence of any commissions ever being exchanged between these
25    parties.  I mean, I've heard it over and over again.  I kept
                                  2501
```

track at one point.  I gave up because it was just too many.
Hundreds of times they said it.

Other than every single transaction at issue in this
case, starting with the Burnetts right there, 7, 8, 9, 10
percent.  Like Mr. Blefari says, 6 percent.  It can only go
up.

Every one of the contracts talks about a split
between the seller's agent and the buyer's agent.

Every closing statement, Dr. Wu told you he's
collected these.  This is part of what his company did.  Every
one of the selling statements shows what -- the split and this
one between HomeServices and RE/MAX.

What do you mean you're not talking about
commissions?  We collected the information to show they've
done that across the state.  The who?  You guys.  The where?
Missouri.  The when?  This time period.

What does the law say?  The law says you cannot do
that.  They said, Well, there's no evidence that these people
actually did it.

Every single one of these homeowners paid a --
forced to pay a buyer's commission in order to list it on the
MLS, and the money changed hands with these folks.

And if they thought that wasn't true, Dr. Wu
wouldn't be cranking together some PowerPoint the night before
he testifies.  They would have put their own data there.
                              2502

1          And the lawyer for NAR says, well, they flashed

        2    up -- that graph flashed up so quick.  They had that graph for

        3    years in this discovery in this case.  They knew what was

        4    coming.

        5          What is the law?  The law says they can't do that.

        6          They say, Well, we never talked about commissions.

        7    Oh, that's not true.  You know it's not true.  Because on the

        8    MLS, they actually literally list their commissions.  They

        9    literally put their commissions on the MLS, and they hide that

       10    from the public.

       11          You remember Professor Alford.  He told you that.

       12    On the MLS, when Keller Williams is listing how much they're

       13    going to be paying and they're going to be throwing that

       14    football over there to HomeServices, it says you'll get

       15    3 percent on this deal in Kansas City.

       16          It's literally there.  You don't have to exchange

       17    emails.  It's right there, hidden from the public.

       18          At length, Dr. Schulman testified about that, and

       19    Professor Alford testified about that.  They know that.

       20          They talk about Instruction 31.  And Instruction

       21    31 -- that's one where they say it means they get off the

       22    hook.  I call it the two wrongs make a right.

       23          But Instruction 31 talks about indirect purchasers.

       24    Indirect purchaser is a person who purchases -- purchased

       25    their product from someone else -- may not recover if they

                                      2503

```
 1    paid an inflated price, resulting in something else.

 2              What that would mean -- an example of that would be

 3    is you buy a truck at Ford Motor, and then there's a part of

 4    it that somebody else way up the line charged an inflated

 5    amount for.  You can't do that, but that's not what's going on

 6    here.

 7              Here you're a direct purchaser.  That's why every

 8    single one of their witnesses said it's the plaintiffs' money.

 9    The bottom of it, what they didn't read to you:  If you find

10    the plaintiffs have not shown they paid the inflated

11    commissions, they're not entitled to money.

12              We did show it.  They admitted that we're the ones

13    who paid it.

14              Now, they've been fighting with us about whether

15    it's inflated or not, but there's no question whose money it

16    is.  It's the plaintiffs' money.  They know that.

17              This clear cooperation policy, they say, Well, this

18    is all news to us.  We didn't know -- look, you got the

19    instruction about what depositions are, and they're to have

20    the same weight.  It's not just clips.  It's -- I mean, the

21    amount of time that goes into taking these depositions, to

22    both sides designating what they want, to the court

23    determining what's admissible.  Everyone has a voice on that.

24    They heard all of those.

25              It says I can't compel witnesses to come here from
                                    2504
```

```
 1   around the country.  There's a limit how far we can -- it's a
 2   hundred miles.
 3           So we do depositions, and it's better, right?  We
 4   all talked about that in the beginning, and the instruction
 5   says you have to give that weight.
 6           In the depositions was the clear cooperation policy.
 7   In Professor Alford's report was the clear cooperation policy.
 8   They knew that was at the core of this case.  And what is
 9   that?  That's their design.  They start seeing it slip away,
10   where local agents aren't putting it in there, and they're,
11   like, we're going to stop that.
12           I thought after -- after Mr. Breit took the stand
13   and I said:  Are there two sides to a deal?  I actually stood
14   here and said:  You reached your hand out.  Your word is your
15   bond.  You expect them to keep their word and to follow the
16   law, those corporations?
17           He said, Yes.
18           I showed him in the contract they're to follow the
19   law.  They didn't do it.
20           A deal is a deal, but a deal means you're going to
21   treat consumers honestly.  You're going to treat homeowners
22   fairly.  And if you violate the law, you will be held
23   accountable.  You're not allowed to fix prices and then later
24   say, Well, you paid the fixed price.  That goes back to the
25   whole chicken thing.  It probably seems silly, but it's true.
```
                                    2505

```
 1              They rig the prices for chicken.  You buy the
 2    chicken.  You pay the inflated prices.  If you prove it's
 3    inflated, it doesn't matter if you like the chicken, if the
 4    chicken tasted great.  It doesn't -- you don't have to go sue
 5    the butcher or the local store or the hen house.  Go at the
 6    head of it because we do not want to inflate prices.
 7              A deal is a deal, and it's time they keep their part
 8    of the deal.  When you talk about commissions, admit that
 9    you're doing it.
10              Let me just address this right now.  Because when
11    they played the video of Trupiano and everyone is, like, what?
12    Who is this?  He was a class rep who's no longer a class rep.
13    We had multiple class reps, but there's a redundancy at some
14    point in time where we're not going to continue to bring
15    different class reps.
16              He was over in St. Louis, a TSA agent, with a wife
17    and kids.  He said -- I said, we have a voice from St. Louis,
18    and he's right here.  We don't need to have multiple ones.  So
19    he was withdrawn.
20              So that's fine.  They have every right to play his
21    deposition.  They did that.
22              But to waste your time about, well, was your
23    agent -- when were they divorced and when were they married?
24    What's going on here?  It's an attempt, I guess, to maybe just
25    bore you to the point where you lose track of what's going on.
                                2506
```

```
 1            The D.A.N.G.E.R. Report.  They said -- he stood here

 2   and said that Mr. Swanepoel has no horse in this race.

 3            Man, you heard my cross-examination of him, the

 4   millions of dollars he's received from them.  Sounds like a

 5   pretty expensive horse in the race.

 6            They sat here and they still talked about this New

 7   York and Seattle statute, even though Dr. Wu had to admit in

 8   New York they're forced to split commissions; in Seattle they

 9   bake it into the contracts; if you don't do it, that you'll be

10   on the hook.

11            What didn't they talk about at all in their closing?

12   I kept thinking, man, I'm really kind of interested to hear an

13   explanation.  The training and the models.  They're right.

14   They have produced tremendous amounts of documents, millions

15   of pages.

16            Have they shown you any of them where they're

17   pushing commissions anything less than the 6 percent in the

18   split?  Oh, yeah, there's that one where they trained the

19   people if you do it at 2 and a half percent to make your

20   million dollars, you're going to have to sell more houses.

21            That's what they're doing.  Gary Keller sat here and

22   acknowledged it to you.

23            They said, Where are they?  Where are these agents?

24   Why haven't I called these agents?

25            I ask, Where are they?  Where are the corporate
```

```
 1   titans who came in here and testified and scurried on out of
 2   here?  They're not here now.
 3           But they're waiting.  They're waiting to hear what
 4   you have to say.
 5           In this we started.  I talked about that these are
 6   the most powerful seats in this courthouse, and they
 7   absolutely are.
 8           It is time for the day of accountability.  Hold them
 9   accountable.  Hit the reset button on this housing market.
10   Return the homes to the homeowners.
11           Tell them, It's not your sacred data, Mr. Keller.
12   Don't come in here and tell me -- I mean, when he said it, I
13   just -- well, we're agnostic when it comes to commissions.
14           Whatever.  Anybody who tells you that is not being
15   honest.
16           I said:  You stand on the stage, and you talk about
17   commissions?
18           No, we don't.
19           Yes, they do.
20           And the reason they're doing it is they've been
21   getting away with it for so long, so long.
22           Don't attack the integrity of Dr. Schulman,
23   Professor Alford, who's given -- given their life in the
24   pursuit of fairness in the free market.  That's who they are.
25           And I want to tell you two things in the end.
                                2508
```

```
 1            I'd ask that the plaintiffs please stand, the class
 2  representatives.
 3            They want to thank you because they know the
 4  sacrifice that you've made.  And the reason they did it,
 5  they're the voices of the forgotten people.
 6            Thank you for what you have done, and thank you for
 7  what you have done and what you're about ready to do.  I know
 8  you will be guided by the law.  I know you will be guided by
 9  the facts.  There's not an ounce of fear that I have in me
10  because I know what we have done is right.  We have delivered
11  it.
12            Man, the scale, it's up here with evidence.  And it
13  stops now.  It stops today.
14            When you read that verdict and you go through those
15  questions, walk with me to the mailbox for the people who have
16  been a victim of this.  Our system doesn't have to forget
17  people.  Our system can hold corporations accountable.  We can
18  be that voice.
19            And if there was a way in time for us to go back
20  when that law was passed by the patriots and the Sherman Act,
21  when it was passed in 1892 or whatever year it was, 1872, they
22  would be proud of this moment right now.
23            You are the embodiment of the Seventh Amendment.
24  Use your voice.  Let them know.  Answer those questions.
25            And thank you so very much for your time.
```

2509

```
 1              And I'm going to stop early.

 2              So thank you.

 3              THE COURT:  Ladies and gentlemen of the jury, it's

 4    now yours.  I gave Tracy my copy of the instructions that says

 5    "Original" in red.  That will be the one you fill out.  I

 6    spent 11 days telling you not to talk about it.  Please talk

 7    about it.

 8              But please still don't research.  Everything needs

 9    to be the evidence that we have.

10              I'm not telling you what to do when you get back

11    there, but you might have an initial conversation about when

12    you want to go home tonight, and just let us know.  Whatever

13    you decide will be just fine.

14              If you want to come back tomorrow and start at 8:30,

15    that's fine.  If you want to do some initial conversation

16    tonight, all that's driven by you.

17              Thank you.

18              (The following proceedings were had out of the

19    presence of the jury:)

20              THE COURT:  Please be seated.

21              I'm just going to wait here because I'm hoping they

22    come back and say let's start tomorrow at 8:30.

23              So if any of you want to take off and leave in the

24    audience, feel free to right now.

25              MR. GLASS:  Your Honor, for tomorrow, assuming they
```

2510

```
 1   don't come back with a verdict in eight minutes, would you
 2   like us to leave a contact with your courtroom deputy, or
 3   would you like us to be in the courthouse while they're
 4   deliberating?
 5            THE COURT:  I need you to be in the courthouse.  I
 6   need somebody with access to the exhibits in the courthouse
 7   from 8:30 as long as they're staying.  So just somebody with
 8   that access.
 9            You should leave the person who we can call at the
10   drop of a hat.
11            MR. GLASS:  Thank you, Your Honor.
12            THE COURT:  The phone number.  I'll give all that to
13   Tracy.
14            MR. GLASS:  Thank you, Your Honor.
15            THE COURTROOM DEPUTY:  They want to go home.  They
16   will be here at nine in the morning.
17            THE COURT:  They will be here at nine in the
18   morning.
19                   REPORTER'S CERTIFICATE
20            I certify that the foregoing pages are a correct
21   transcript from the record of proceedings in the
22   above-entitled matter.
23
24   _____      _____
         Date                 /s/Gayle M. Wambolt
25                       GAYLE M. WAMBOLT, CRR, RMR
                         United States Court Reporter
                              2518
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter