# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,

Defendants.

Case No. 4:19-cv-00332-SRB

**CLASS ACTION**

**ORAL ARGUMENT REQUESTED**

## SUGGESTIONS IN SUPPORT OF THE HOMESERVICES DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

STANDARD OF REVIEW ...................................................................................... 3

ARGUMENT ........................................................................................................... 4

I.  Plaintiffs Presented No Legally Sufficient Evidence That the HomeServices Defendants Agreed with the Other Defendants to Follow and Enforce NAR's Cooperative Compensation Rule ........................................... 4

A.  Plaintiffs Presented No Direct Evidence That the HomeServices Defendants Entered into Any Agreement .................................................. 5

B.  Plaintiffs Presented No Circumstantial Evidence That Tends to Exclude the Possibility of Independent Action by the HomeServices Defendants .......................................................................... 6

1.  Meetings and Participation in Trade Organizations Are Not Evidence of Conspiracy .............................................................. 7

2.  Internal Communications and Coordinated Action Between a Corporation and Its Wholly-Owned Subsidiary Cannot Be Used to Show an Unlawful Agreement, and the Conduct of One Such Entity Cannot Be Imputed to the Other ...................... 11

3.  A Theory Premised on Evidence of Parallel Conduct, Without More, Is Not Sufficient to Permit Inference of an Agreement ................................................................................. 17

II.  Trial Confirmed That Plaintiffs Are Not Direct Purchasers from the HomeServices Defendants and Thus Lack Standing ........................................... 20

III.  Plaintiffs' Damages Expert's Testimony Was Inadmissible and Failed to Establish Impact ........................................................................................................... 26

CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Tobacco Co. v. United States,*
  328 U.S. 781 (1946)................................................................................18

*Apple Inc. v. Pepper,*
  139 S. Ct. 1514 (2019).............................................20, 21, 23, 24, 26

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983)................................................................................20

*In re Baby Food Antitrust Litig.,*
  166 F.3d 112 (3d Cir. 1999).............................................................5, 11

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................17, 18, 19

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan,*
  203 F.3d 1028 (8th Cir. 2000) .............................................................6, 18

*In re Broiler Chicken Antitrust Litig.,*
  --- F. Supp. 3d ---, 2023 WL 7220170 (N.D. Ill. Nov. 2, 2023)...........................18

*Campos v. Ticketmaster Corp.,*
  140 F.3d 1166 (8th Cir. 1998) ...........................................................20, 25

*Concord Boat Corp. v. Brunswick Corp.,*
  207 F.3d 1039 (8th Cir. 2000) ...........................................................26, 29

*Copperweld Corp. v. Indep. Tube Corp.,*
  467 U.S. 752 (1984)..................................................................11, 12

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
  363 F.3d 761 (8th Cir. 2004) ..................................................................7

*In re Dynamic Random Access Memory Antitrust Litig.,*
  No. M 02-1486, 2007 WL 9752971 (N.D. Cal. Feb. 20, 2007)...........................13

*ES Dev., Inc. v. RWM Enters., Inc.,*
  939 F.2d 547 (8th Cir. 1991) ..................................................................5

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.,*
  832 F.3d 1 (1st Cir. 2016)....................................................................10

ii

# TABLE OF AUTHORITIES
## (*Continued*)

**Page(s)**

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
    391 U.S. 253 (1968).................................................................................................10

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ...............................................................................25

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ...................................................................................9

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...............................................................................20, 23, 24

*Insulate SB v. Advanced Finishing Sys.*,
    797 F.3d 538 (8th Cir. 2015) .................................................................................25

*Johnson v. City of Shorewood*,
    360 F.3d 810 (8th Cir. 2004) ...................................................................................9

*Kansas v. UtiliCorp United*,
    497 U.S. 199 (1990)..........................................................................................20, 24

*Larson v. Miller*,
    76 F.3d 1446 (8th Cir. 1996) ...................................................................................4

*Liberty Mut. Fire Ins. Co. v. Scott*,
    486 F.3d 418 (8th Cir. 2007) ...................................................................................4

*Lovett v. Gen. Motors Corp.*,
    998 F.2d 575 (8th Cir. 1993) .....................................................................4, 6, 19

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) .................................................................................25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................6, 17

*McCabe's Furniture, Inc. v. La-Z-Boy Chair Co.*,
    798 F.2d 323 (8th Cir. 1986) ...................................................................................7

*McDonald v. Johnson & Johnson*,
    722 F.2d 1370 (8th Cir. 1983) ...........................................................................20, 21

*In re Midwest Milk Monopolization Litig.*,
    730 F.2d 528 (8th Cir. 1984) ...........................................................................23, 24, 25

Case 4:19-cv-00332-SRB   Document 1350   Filed 01/08/24   Page 4 of 38

*Mitchael v. Intracorp, Inc.*,
179 F.3d 847 (10th Cir. 1999) ............................................................................11

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ..............................................................................................18

*Pegram v. Herdrich*,
530 U.S. 211 (2000) ..............................................................................................22

*Roesch, Inc. v. Star Cooler Corp.*,
671 F.2d 1168 (8th Cir. 1982) .....................................................................4, 9, 10

*Smith v. N. Mich. Hosps., Inc.*,
703 F.2d 942 (6th Cir. 1983) ...............................................................................10

*St. Louis Convention & Visitors Comm'n v. NFL*,
154 F.3d 851 (8th Cir. 1998) ...................................................................16, 17, 26

*Summit Health, Ltd. v. Pinhas*,
500 U.S. 322 (1991) ................................................................................................4

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ...........................................................7, 8, 9, 11, 20

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ...............................................................................10

*United States v. Bestfoods*,
524 U.S. 51 (1998) ................................................................................................13

*United States v. Concentrated Phosphate Exp. Ass'n*,
393 U.S. 199 (1968) ..............................................................................................25

*Walmart Inc. v. Cuker Interactive, LLC*,
949 F.3d 1101 (8th Cir. 2020) ...............................................................................4

*Weit v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*,
641 F.2d 457 (7th Cir. 1981) ...............................................................................10

*Wilk v. Am. Med. Ass'n*,
895 F.2d 352 (7th Cir. 1990) .................................................................................7

*Yannacopoulos v. Gen. Dynamics Corp.*,
75 F.3d 1298 (8th Cir. 1996) ...............................................................................25

**TABLE OF AUTHORITIES**
**(*Continued*)**

**Page(s)**

**Rules**

Fed. R. Civ. P. 50(a) ..........................................................................................................3

Fed. R. Civ. P. 50(b) ........................................................................................1, 4, 29, 30

Fed. R. Civ. P. 51(c)(1) ...................................................................................................25

# INTRODUCTION

At the end of a 12-day trial, the jury in this case found that each of the HomeServices Defendants[1] conspired with each of the other Defendants to follow and enforce NAR's Cooperative Compensation Rule (the "Rule"), even though there was *no evidence* that *any* HomeServices Defendant was *ever* involved in the adoption of the Rule, participated in any meeting or conversation where the Rule was discussed, took *any* action to enforce the Rule, whether as a result of an agreement or independently, or *ever* so much as thought about or discussed the Rule, whether internally or with anyone else. The jury also found that the entire Plaintiff class—no member of which ever bought anything directly from or paid anything directly to any HomeServices Defendant—was injured to the tune of nearly *$1.8 billion in damages*, based on the testimony of Plaintiffs' expert that without the Rule, no Plaintiff would have authorized the payment of any amount of cooperative compensation to the buyer broker, despite ample record evidence that sellers have legitimate reasons to authorize such payments even without the Rule, and in fact have done so in jurisdictions and timeframes in which the Rule was not operative.

The HomeServices Defendants are entitled to judgment as a matter of law under Rule 50(b) because there is no legally sufficient evidentiary basis to support the jury's verdict against them. Specifically, the HomeServices Defendants are entitled to judgment as a matter of law for at least the following reasons.

***First***, there is no legally sufficient evidence that any of the HomeServices Defendants agreed to anything with any of the other Defendants, let alone to follow and enforce the Rule. Indeed, the testimony of the HomeServices Defendants uniformly established that there was no such agreement. Faced with this clear and unequivocal testimony, Plaintiffs resorted to purported

---

[1] The HomeServices Defendants are HomeServices of America, Inc. ("HomeServices"); BHH Affiliates, LLC ("BHH Affiliates"), and HSF Affiliates, LLC ("HSF Affiliates").

1

parallel conduct and innuendo, virtually all of which had nothing to do with the Rule itself. Plaintiffs also improperly glossed over the entirely legitimate corporate separateness of each HomeServices Defendant, confusing the jury as to which entities made which statements and improperly suggesting that communications between and overlapping leadership among HomeServices-affiliated entities is somehow evidence of an unlawful agreement in violation of federal antitrust law. Even Plaintiffs' expert, Dr. Schulman, conceded that he had seen no evidence of communications between Defendants about broker commissions and offered no opinion as to whether an agreement existed.

*Second*, there is no legally sufficient evidence that Plaintiffs directly purchased anything from any of the HomeServices Defendants, as is necessary to confer standing to sue for damages. It is a "bright line" rule of antitrust law that only "direct purchasers" may recover antitrust damages. To be direct purchasers, Plaintiffs must have transacted business directly with a conspiring Defendant. Here, the record is devoid of evidence that any Plaintiff transacted business directly with any HomeServices Defendant, and for good reason. Plaintiffs made payments to their own local brokers, which then shared that commission with the buyer brokers and—with Plaintiffs' informed consent and based on agreements with the buyer brokers—paid most of the remaining real estate commission to the independent contractor sales agents that represented Plaintiffs. Plaintiffs themselves conducted no business directly with any HomeServices Defendant, and thus lack standing to sue them for damages under federal antitrust law. Indeed, in opposing arbitration before this Court and the Eighth Circuit, Plaintiffs repeatedly argued that their contract for real estate services had nothing to do with the HomeServices Defendants, with whom they *admitted* they had not transacted directly.

*Third*, there is no legally sufficient evidence that all members of the Plaintiff class were

impacted or suffered injury as a result of the challenged conduct, let alone support for the colossal award of nearly $1.8 billion in damages that represents every bit of cooperative compensation paid by Plaintiffs' brokers to buyer brokers over the seven-year class period. Plaintiffs' proof of the fact of damage—also referred to as "impact" or "injury," and a necessary element of Plaintiffs' antitrust claim—rested entirely on Dr. Schulman's testimony that without the Rule, *no* member of the Plaintiff class would have authorized payment of the same commission to the buyer's agent in the "but-for" world that the buyer's agent actually received. Dr. Schulman took this extreme position of necessity, because if some class members would have done so, there would have been no way to assess, much less prove, impact and damages on a class-wide basis with common evidence. Plaintiffs' proof of the amount or quantum of damages similarly rests on Dr. Schulman's testimony that absent the Rule, no member of the class would have authorized payment of so much as a penny of compensation to a buyer's agent. If any member of the class would have done so, then the amount of damages awarded by the jury is wrong, and damages cannot be proven on a class-wide basis with common evidence. For the reasons fully developed herein, Dr. Schulman's testimony should never have been admitted in this case and is so fundamentally flawed that the jury's findings of impact and damages cannot stand.

For all of these reasons, the Court should enter judgment as a matter of law in favor of the HomeServices Defendants.[2]

## STANDARD OF REVIEW

A party is entitled to judgment as a matter of law where "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the nonmoving party. Fed. R. Civ. P. 50(a). Where, as here, the Court does not grant a motion for judgment as a matter of law made under

---

[2] The HomeServices Defendants also join in full in the Rule 50(b) motions filed by NAR and Keller Williams and incorporate the arguments in those motions herein.

Rule 50(a), the moving party may renew its motion under Rule 50(b). Fed. R. Civ. P. 50(b). A court reviewing a renewed motion for judgment as a matter of law under Rule 50(b) must "resolve factual conflicts in the nonmovant's favor," "take as true all facts supporting the nonmovant that the evidence tends to prove," "construe all reasonable inferences in the nonmovant's favor," and "deny the motion if the evidence would allow reasonable jurors to reach different conclusions." *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1108 (8th Cir. 2020). But a court should not "give a party the benefit of unreasonable inferences, or those at war with the undisputed facts," *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir. 2007) (quoting *Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996)), and "the range of permissible inferences from ambiguous evidence is limited in a section one case," *Lovett v. Gen. Motors Corp.*, 998 F.2d 575, 578 (8th Cir. 1993). A plaintiff must therefore produce "proof beyond speculation to support the verdict." *Liberty Mutual*, 486 F.3d at 422 (quoting *Larson*, 76 F.3d at 1452). "[I]f an antitrust plaintiff does not present sufficient evidence in [its] case-in-chief to support a finding in [its] favor, a district court has a duty to direct a verdict in favor of the defendant." *Roesch, Inc. v. Star Cooler Corp.*, 671 F.2d 1168, 1171 (8th Cir. 1982), *on reh'g*, 712 F.2d 1235 (8th Cir. 1983).

## ARGUMENT

I.  **Plaintiffs Presented No Legally Sufficient Evidence That the HomeServices Defendants Agreed with the Other Defendants to Follow and Enforce NAR's Cooperative Compensation Rule**

"[T]he essence of any violation of § 1 is the illegal agreement itself." *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991). Thus, if Plaintiffs failed to present evidence at trial sufficient to prove that the HomeServices Defendants actually agreed with one or more of the other Defendants to follow and enforce the Rule, the HomeServices Defendants are entitled to judgment as a matter of law in their favor. Here, it is not even a close call.

The uniform testimony of the HomeServices Defendants' witnesses was that there was no

agreement of any kind with respect to the Rule. And for their part, Plaintiffs presented no evidence whatsoever—direct or circumstantial—sufficient to permit the jury to infer the existence of an unlawful agreement. There was no direct evidence of conspiracy at all, and the circumstantial evidence on which Plaintiffs hung their case is insufficient to prove the claimed conspiracy because it does not tend to exclude the possibility of independent conduct. Plaintiffs' own expert, Dr. Schulman, conceded that he had seen no evidence of so much as a communication between the defendants with respect to broker commissions, and he would not offer the opinion that any agreement existed. The HomeServices Defendants are thus entitled to judgment as a matter of law based on Plaintiffs' complete failure to prove the agreement on which their claims are based.

### A. Plaintiffs Presented No Direct Evidence That the HomeServices Defendants Entered into Any Agreement

Plaintiffs in an antitrust case can prove the essential element of an agreement through either direct or circumstantial evidence. *See ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 554 (8th Cir. 1991). Direct evidence is evidence that is "explicit and requires no inferences." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). Here, Plaintiffs allege that Defendants entered into an illegal agreement to follow and enforce the Rule. Direct evidence of such an agreement might include a writing directly setting out that the parties so agreed or testimony directly acknowledging the existence of such an agreement. There is no such direct evidence anywhere in the record.

Despite the voluminous record, Plaintiffs could point to no evidence at all that directly showed the supposed agreement on which their case is built. The uniform testimony at trial was to the contrary. The HomeServices Defendants' witnesses testified unequivocally that there was no such agreement. *See, e.g.*, Tr. 1345:20–25, 1346:13–1347:17 (Peltier); Tr. 1372:11–14, 1372:25–1373:3, 1384:23–1385:20 (Blefari); Tr. 1531:16–1532:13 (Warner). And as Plaintiffs

5

effectively conceded, they never produced *any* direct evidence that the HomeServices Defendants agreed with any other Defendant to follow and enforce the Rule: Their retained economic expert, Dr. Schulman, testified that after over a thousand hours of personal study—supported by a team that engaged in over five thousand additional hours of study—he had seen neither testimony nor documents showing Defendants even discussing the buyer-broker commissions at the heart of this case. Tr. 541:6–19, 571:6–72:21 (Schulman).

### B. Plaintiffs Presented No Circumstantial Evidence That Tends to Exclude the Possibility of Independent Action by the HomeServices Defendants

In the absence of direct evidence, a court must "decide whether a reasonable juror could infer the existence of a conspiracy from the circumstantial evidence," bearing in mind that "the range of permissible inferences from ambiguous evidence is limited in a section one case." *Lovett*, 998 F.2d at 578. When resting a § 1 claim on circumstantial evidence, Plaintiffs must come forward with evidence that "tends to exclude the possibility" of independent action. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 584 (1986). Conduct that is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588. As the Eighth Circuit has held, "if it is as reasonable to infer from the evidence a . . . conspiracy as it is to infer permissible activity, then the plaintiffs'[] claim, without more, fails." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032 (8th Cir. 2000).

Lacking any substantive circumstantial evidence of the alleged agreement, Plaintiffs decided to play a shell game rather than prove their case, citing to facts and allegations that, even if true, are not probative of Plaintiffs' actual antitrust claim, and which certainly do not "tend to exclude" the possibility of lawful, entirely independent action by the HomeServices Defendants. *See Matsushita*, 475 U.S. at 584. Such distraction, aimed at nothing more than confusing the jury,

6

cannot and does not suffice to prove that HomeServices agreed with anyone else to follow or enforce the Rule.

1.      **Meetings and Participation in Trade Organizations Are Not Evidence of Conspiracy**

Because Plaintiffs failed to adduce any evidence implicating the HomeServices Defendants in an actual agreement, they resorted to evidence of different meetings and interactions between various independent contractor agents and individuals associated with the Defendant corporations and organizations, despite a complete lack of evidence that those run-of-the-mill meetings and interactions served as the occasion for any kind of discussion of conspiracy among the Defendants.

*First*, Plaintiffs repeatedly pointed to evidence of membership in various organizations by individuals associated with the HomeServices Defendants.  For example, Plaintiffs emphasized that Ron Peltier, the former CEO of HomeServices of America, had served on NAR's 900-member board of directors, Strandmo Dep. Tr. 150:13–151:12 (P-2894), and that Gino Blefari, HomeServices of America's current CEO, had attended NAR's RES Advisory Group meetings "[o]n and off" for 25 years, Blefari Dep. Tr. 60:4–9 (P-2900).  But neither of these facts supports an inference of agreement.  There is no evidence any of these meetings related to the Cooperative Compensation Rule.  And in any event, the law does not permit a finding of an unlawful agreement merely because the defendants interacted at trade conventions or in similar professional contexts. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004); *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 374 (7th Cir. 1990) ("[A] trade association is not, just because it involves collective action by competitors, a walking conspiracy.").  The plaintiff must further show some reason for believing that the alleged unlawful agreement resulted from those interactions. *See McCabe's Furniture, Inc. v. La-Z-Boy Chair Co.*, 798 F.2d 323, 327–28 (8th Cir. 1986); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015) (concluding that, without evidence of "what information was exchanged" at meetings, there was "no basis for an

inference that [defendants] use[d] the meetings to plot price increases"). Plaintiffs offered no such additional evidence.[3]

Mr. Peltier and Mr. Blefari's testimony in fact *belies* any suggestion that the HomeServices Defendants participated in any alleged conspiracy. Mr. Peltier testified that his membership on NAR's 900-member board was merely "a token," and he was not even sure he had ever voted on any issue while on the board. Tr. 1343:13–1344:1 (Peltier). He also testified that he had no recollection of having heard of any Cooperative Compensation Rules before this lawsuit, Tr. 1345:16–19 (Peltier), and that he had never discussed commission rates with the other defendants, Tr. 1346:11–12 (Peltier). Mr. Blefari testified that HomeServices of America does not modify the commission policies of franchisees or subsidiaries and imposes no requirement that they follow the Cooperative Compensation Rule or join NAR or an MLS. Tr. 1368:19–1370:13 (Blefari). He also testified that the Rule had never been discussed at any of the large-broker RES Group meetings. Tr. 1372:25–1373:3 (Blefari).

*Second*, Plaintiffs offered evidence of other random connections between defendants to suggest that routine professional encounters should engender suspicion in jurors' minds. For example, Dana Strandmo, HomeServices of America's Chief Administrative Officer, acknowledged that he was invited to a meeting of the Council of Multiple Listing Services (CMLS)—an entity with no relation to the substance of this case and a meeting he did not believe he attended. Strandmo Dep. Tr. 17:5–18:1, 21:3–22 (P-2894). Plaintiffs also referenced BHH

---

[3] They offered, instead, further irrelevant evidence, such as the fact that Mr. Goffstein, President of nonparty Alliance Real Estate, sent an email to someone at a different real estate agency in which he mentioned discussing an upcoming vote before the board of the MARIS MLS (of which they were both members). Goffstein Dep. Tr. 76:7–80:11 (P-4561). But that evidence does not give rise to any inference supporting the alleged conspiracy. Alliance Real Estate is *not* a party—it is a subsidiary of HomeServices of America, Inc. and a BHH franchise. And there is no evidence that the meeting (or email) had anything to do with the Cooperative Compensation Rule.

training materials in which Mr. Blefari stated that one should "include" one's competitors. *See* P-1598. Far from evidence of conspiracy, these comments had nothing to do with the NAR rule at issue and relayed sales techniques designed to help agents "*differentiate themselves*" from competitors. *Id.*; *see Text Messaging*, 782 F.3d at 872–73 (holding evidence of *express collusion* is necessary to support an allegation of a Sherman Act violation). Indeed, the unrebutted interpretation of this statement was consistent with the actual statements made, that Mr. Blefari was "discussing with the homeowner that by listing the property and exposing it to the marketplace, all companies have access to that listing and can sell it, not just his company[,] at the same time," Warner Dep. Tr. 57:18–23 (P-2897), and Mr. Strandmo's testimony that it was advice to focus on the value of one's own services rather than the shortcomings of other firms, Strandmo Dep. Tr. 161:1–23 (P-2894). Moreover, there is no evidence that any HomeServices training was developed as the result of an agreement with competitors. At bottom, none of this is joint conduct or even a meeting among competitors. And even assuming that Mr. Strandmo *did* attend the CMLS meeting or that Mr. Blefari was suggesting that competitors should somehow be considered in sales pitches, the law does not permit finding an agreement based merely on the fact that the alleged conspirators met or talked about each other. *See Johnson v. City of Shorewood*, 360 F.3d 810, 817–18 (8th Cir. 2004); *Roesch*, 671 F.2d at 1171–72; *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) ("[A]n agreement involving actual, verbalized communication[] must be proved in order for a price-fixing conspiracy to be actionable").

*Third*, Plaintiffs elicited testimony that the internal policy manual of nonparty Alliance Real Estate (a recently-acquired HomeServices subsidiary and BHH franchise) requires its agents to join NAR. Goffstein Dep. Tr. 46:22–50:6 (P-4561). But Plaintiffs elicited no testimony that this requirement was even directed by the HomeServices Defendants, much less that it was the

result of any form of agreement between the HomeServices Defendants and any other Defendants. As discussed *infra* at 11–17, this exchange was but one of many instances in which Plaintiffs illicitly sought to use independent decisions of HomeServices Defendants' subsidiaries or franchisees and improperly to attribute them to the HomeServices Defendants—notwithstanding the fact that there is no evidence that HomeServices directed the decisions of those organizations or that the relevant conduct was carried out pursuant to an agreement with any competitor.

Thus, even taken together, Plaintiffs' evidence falls well short of the "'significant probative evidence tending to support [their] complaint'" required to displace Defendants' legitimate explanations for their conduct. *Smith v. N. Mich. Hosps., Inc.*, 703 F.2d 942, 948 (6th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)); *see also Weit v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 641 F.2d 457, 462 (7th Cir. 1981) ("[T]he mere opportunity to conspire, even in the context of parallel business conduct, is not necessarily probative evidence."); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 14 (1st Cir. 2016) (stating that a defendant's "mere participation" in a trade organization "does not create a triable issue"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement" because that fact "is more likely explained by their lawful, free-market behavior.").

Even if Plaintiffs had found evidence of discussions about pricing among competitors (which they did not), that still would not have sufficed to support a claim of illegal price-fixing under § 1. Plaintiffs must also make a further showing:  that the discussion resulted in an agreement that was causally related to later pricing decisions. *See Roesch*, 671 F.2d at 1171–72 (holding that mere discussion of pricing is inadequate to show conspiracy under § 1 because such discussions may "arise in the normal course of business and do not indicate illegal concerted

action"); *accord Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999); *Baby Food*, 166 F.3d at 125; *see also Text Messaging*, 782 F.3d at 873 (noting that the Sherman Act "imposes no duty" on firms to compete in price). Trial produced no evidence at all establishing such discussions, much less linking any such discussions to any conduct of the HomeServices Defendants.

**2.    Internal Communications and Coordinated Action Between a Corporation and Its Wholly-Owned Subsidiary Cannot Be Used to Show an Unlawful Agreement, and the Conduct of One Such Entity Cannot Be Imputed to the Other**

Throughout trial, Plaintiffs made constant reference to the conduct of nonparty HomeServices subsidiaries and franchisees as well as to communications and coordination between the HomeServices Defendants and those subsidiaries and franchisees, insinuating both that the referenced conduct was evidence of an unlawful conspiracy and that the HomeServices Defendants are liable for the conduct of the subsidiaries and franchisees. Both insinuations are false, and Plaintiffs' strategy encouraged the jury to find liability on a legally invalid basis.

*First*, despite acknowledging the *Copperweld* rule—under which a parent and its wholly-owned subsidiary cannot conspire in violation of § 1 of the Sherman Act—Plaintiffs repeatedly referred to a mishmash of evidence regarding intracorporate policies, communications, and staffing as though they were evidence of wrongdoing. *See, e.g.*, Tr. 15:16–21, 535:7–14 (Ketchmark) (acknowledging the rule of *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)); *but see* Tr. 15:23–24 (Ketchmark) (emphasizing that the HomeServices Defendants and their subsidiaries "acted, as it relates to this rule, as a single entity"); Tr. 68:23–69:23 (Ketchmark) (same); Goffstein Dep. Tr. 17:19–18:9 (P-4561) (testimony that if Kevin Goffstein, President of Alliance, received a request from Mr. Blefari, he would respond); Blefari Dep. Tr. 60:12–65:11 (P-2900) (testimony that Mr. Blefari was copied on email from a nonparty subsidiary, Intero, regarding target commission rates). Without an antecedent unlawful agreement between

competitors, such communications do not and cannot give rise to the inference of a broader conspiracy.

Plaintiffs also repeatedly drew attention to evidence of references to the common 6% broker fee. *See, e.g.*, Strandmo Dep. Tr. 98:1–101:24, 103:5–107:15, 110:1–112:14 (P-2894) (regarding P-1582, an internal PowerPoint from Intero Real Estate Services, a California brokerage subsidiary, wherein Intero referred to earning a "full commission"); Blefari Dep. Tr. 60:12–65:11 (P-2900); Goffstein Dep. Tr. 73:7–75:17 (P-4561). But because Plaintiffs never showed any intercorporate agreement with respect to broker fees, intracorporate discussions on that topic are categorically not actionable under the antitrust laws. A parent and its wholly-owned subsidiary "have a complete unity of interest" and therefore "the very notion of an 'agreement' in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning." *Copperweld*, 467 U.S. at 771. The coordinated activity of a parent and its subsidiary thus cannot be probative of the existence of an unlawful intercorporate agreement, and fixation on such evidence could only have had the purpose of confusing the jury.

*Second*, Plaintiffs repeatedly incorrectly suggested that the jury could treat the HomeServices Defendants as liable for the conduct of nonparty HomeServices subsidiaries and franchisees and could treat that conduct as if it were the conduct of the HomeServices Defendants themselves. *See, e.g.*, Goffstein Dep. Tr. 12:2–14:14 (P-4561) (responding to Plaintiffs' examination on whether it is proper for nonparties Alliance and ReeceNichols to have overlapping leadership); Goffstein Dep. Tr. 67:23–69:14 (P-4561) (testimony regarding internal commission policy wherein Alliance asks its sales agents representing buyers to collect at least 2.7% plus a $295 fee); Goffstein Dep. Tr. 79:2–10 (P-4561) (testimony that Alliance's president has served on the board of directors for MARIS, a NAR-affiliated MLS in St. Louis); Warner Dep. Tr. 70:1–

74:5 (P-2897) (responding to Plaintiffs' examination on whether some HomeServices subsidiaries have overlapping leadership).  Plaintiffs offered no evidence to show that any such conduct was directed by a HomeServices Defendant.  Indeed, the unrefuted testimony was to the contrary.  *See, e.g.*, Tr. 1536:4–7 (Warner) (testimony that BHH Affiliates does not, and contractually is prohibited from managing franchisees' day-to-day operations); Tr. 1337:12–1339:21 (Peltier) (testimony that HomeServices, as a founding principle, does not operate the companies that it acquires or change their day-to-day policies); D-3101 at 48 (contractually prohibiting BHH Affiliates from directing "day-to-day activities of" the franchisees' "employees, officers, managers, independent contractors, or others who work for [the] [f]ranchise").  Regardless, such evidence had nothing to do with the Rule or any agreement with a competitor.  Plaintiffs thus had no grounds for imputing antitrust liability to the HomeServices Defendants on the basis of the internal policies and procedures of their subsidiary brokers, having failed to show an inter-enterprise agreement with respect to the Rule and having failed to show that the HomeServices Defendants exercise control over the day-to-day operations of wholly-owned subsidiaries.  It is "a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries," *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted), and Plaintiffs thus proffered to the jury evidence that could not permissibly form the basis of a finding of liability, *see In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486, 2007 WL 9752971, at *4–5 (N.D. Cal. Feb. 20, 2007) (applying the *Bestfoods* rule in the antitrust context and rejecting parent/subsidiary vicarious liability).

Nonetheless, Plaintiffs argued the case as if every nonparty action was that of HomeServices.  *See, e.g.*, Tr. 2338:4–7 (Ketchmark) (arguing in closing that the Burnett Named

Plaintiffs—who listed their subject property with nonparty ReeceNichols, a HomeServices subsidiary—had used "HomeServices' person" to sell their homes); Tr. 2361:13–18 (Ketchmark) (urging the jury to recall that Mr. Goffstein, the president of Alliance, had testified that "[t]hese listing agents, the salespeople over there [at Alliance] have to join NAR" and arguing that this showed "[t]hey're following and enforcing it"). And as to the clustering of commission rates across different defendants' affiliated brokerages, the entirety of Plaintiffs' evidence concerning the HomeServices Defendants involves a handful of documents from HomeServices-owned brokerage subsidiaries, such as nonparties ReeceNichols, Alliance, and Intero, referring to a 6% commission. *See, e.g.*, Blefari Dep. Tr. 35:12–40:15 (P-2900); Warner Dep. Tr. 32:6–34:23, 47:11–49:1 (P-2897). Plaintiffs presented no evidence that those documents reflect anything other than unilateral decisions made by HomeServices subsidiaries or BHH franchisees alone, and their evidence on this point thus amounts at most to showing that corporate brokerage subsidiaries had internal guidelines that encouraged affiliated agents to seek commission rates that match an industry norm.[4] That is not evidence of a conspiracy.

In short, Plaintiffs repeatedly attempted to confuse the jury by presenting evidence relating solely to the conduct of nonparty brokerage companies that are owned by HomeServices and/or have a franchise agreement with BHH Affiliates, when such conduct is neither attributable to the HomeServices Defendants nor actionable as a § 1 violation. Plaintiffs' strategy was improper and could only have served to give jurors the impression that evidence of some amount of internal

---

[4] Not only is following an industry norm as to commission rates not evidence of a conspiracy, it is not even apparent what purpose—aside from confusing the jury—Plaintiffs had in pursuing the issue at such length, given that Plaintiffs did not allege agreement to fix commission rates and the Rule makes no mention of any specific commission. Moreover, internal pricing documents from HomeServices subsidiaries and franchisees are not the result of directives from a HomeServices Defendant. Tr. 1384:16–22 (Blefari); Tr. 1555:9–12 (Warner); Tr. 1678:3–12 (Wilson).

coordination between a parent and its wholly-owned subsidiary was evidence of an unlawful agreement.

These errors were the more egregious in light of testimony offered by the HomeServices Defendants that showed that the HomeServices Defendants' subsidiaries and franchisees operate autonomously. The allegation that the conduct of HomeServices subsidiaries and franchisees is attributable to the HomeServices Defendants' "following" or "enforcing" a NAR rule is thus incoherent given how the HomeServices Defendants are structured and how they operate.

Start with Ron Peltier, the founder and former CEO of HomeServices of America, and Gino Blefari, the present CEO. Their testimony demonstrated that HomeServices of America could not itself follow the Cooperative Compensation Rule because the rule governs brokers listing properties on MLSs, and HomeServices does not conduct "broker transactions" or belong to an MLS. Tr. 1367:6–16 (Blefari). It is a holding company, and the agents who work with HomeServices subsidiaries are independent contractors. Tr. 1334:4–20 (Peltier). Claiming that HomeServices of America itself follows the Cooperative Compensation Rule is thus nonsensical— and unsupported by any trial evidence. Plaintiffs likewise did not show how HomeServices of America could possibly "enforce" the Rule because there is no evidence that it exercises the requisite control over the MLSs that do enforce the Rule, or over its subsidiaries that are the ones to offer broker services. When HomeServices of America acquires a broker, its policy is to "leave everything in place," Tr. 1334:13–15 (Peltier), allowing it to operate as an "independent compan[y]." Tr. 1334:16–1335:2 (Peltier). Indeed, BHH does not run franchisees' operations at all, much less require them to join NAR or abide by any of its rules (including the Cooperative Compensation Rule). Tr. 1340:4–1342:3 (Peltier); Tr. 1368:7–1370:13 (Blefari). As Mr. Blefari testified, those facts are central to HomeServices' "philosophy on how [it] do[es] business"—"We

believe that . . . real estate is local; that it's best to have them operate the business that they know best. They know better than we do." Tr. 1371:22–25 (Blefari).

Mr. Peltier's and Mr. Blefari's testimony was further supported by testimony offered by Rosalie Warner, Senior Vice President of Network Services at HSF and involved in daily operations of BHH. Tr. 1530:15–18 (Warner). She testified that BHH franchisees "are independently owned and operated," Tr. 1528:24–1529:1 (Warner), and that BHH primarily provides administrative support and consulting, referral, and training services to the franchisees, Tr. 1529:12–1530:11 (Warner). In addition to flatly denying any kind of agreement to follow or enforce the Rule, she further testified that neither BHH nor HSF would "have any way to" enforce compliance with the Rule even if they wished to, that BHH and HSF do not monitor whether franchisees comply with the Rule, and that BHH Affiliates is not permitted to manage franchisee operations. Tr. 1532:2–13, 1536:4–7 (Warner)

Finally, even if Plaintiffs *had* produced evidence sufficient to infer that the HomeServices Defendants directed subsidiaries and franchisees to follow the Rule, independently acting on their own business judgment, right or wrong, does not and cannot make the HomeServices Defendants antitrust violators. Instead, plaintiffs in a § 1 case must prove a "plus" factor by presenting "evidence that tends 'to exclude the possibility that the alleged coconspirators acted independently,'" *St. Louis Convention & Visitors Comm'n v. NFL*, 154 F.3d 851, 861 (8th Cir. 1998) (citations omitted), and must show that defendants' conduct was instead the result of an unlawful agreement. That was *never* done here. Instead, Plaintiffs endlessly belabored various aspects of the HomeServices Defendants' corporate structure, presumably hoping that confused jurors would assume that the evidence regarding the HomeServices' Defendants' intracorporate operations must somehow be illicit. But having a complex corporate structure is not a violation of

the antitrust laws. And when plaintiffs fail to present "evidence 'to exclude the possibility that the [defendants] were acting for independent business reasons,'" jurors may not infer liability from circumstantial evidence that merely *permits* inference of a conspiracy without evidence that also excludes non-conspiratorial explanations. *St. Louis Convention*, 154 F.3d at 861; *see also Matsushita*, 475 U.S. at 588. Plaintiffs' claim thus necessarily fails for the additional reason that the requisite "plus" factor was never adequately pleaded or proved.

3. **A Theory Premised on Evidence of Parallel Conduct, Without More, Is Not Sufficient to Permit Inference of an Agreement**

The fullest articulation of Plaintiffs' theory of the case was given in the testimony of their retained economic expert, Dr. Schulman, whose testimony alone was also offered to prove impact and damages. That testimony confirmed the total lack of actual evidence underlying Plaintiffs' claim of an illegal agreement here.

Dr. Schulman had "no opinion" as to whether Defendants had formed an unlawful agreement. Tr. 571:6–572:21 (Schulman). Indeed, he testified that after *over a thousand hours* of study—supported by a team that engaged in *over five thousand additional hours* of study—he had seen neither testimony nor documents showing Defendants even *discussing* the buyer-broker commissions at the heart of this case. *Id.* at 541:6–19. Dr. Schulman's testimony was instead based purely on the circumstantial evidence of the comparative stability and clustering of buyer-broker compensation rates in Missouri—the very kind of parallelism that *Twombly* states is inadequate even at the pleading stage. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Seizing on that data, without any actual evidence of conspiracy, Dr. Schulman conjured a theory on which the observed rates are the result of an illegal agreement, testifying that the alleged conspiracy *could* fit the facts he observed. In that hypothetical conspiracy, he supposed there to have been three mechanisms for implementing the alleged agreement: control, detection, and

Case 4:19-cv-00332-SRB   Document 1350   Filed 01/08/24   Page 23 of 38

punishment, or "steering." Tr. 484:17–25; 523:22–525:8 (Schulman). As Defendant's economic expert, Dr. Wu testified, however, Dr. Schulman's testimony conspicuously skipped the first step: establishing there to have been an agreement antecedent to the other mechanisms he described. Tr. 1816:5–20 (Wu). None of those mechanisms, *even if accurate*, in any way implicate the HomeServices Defendants in an illegal agreement.[5] The most "fundamental" problem with testimony like Dr. Schulman's is that "a litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly." *Blomkest Fertilizer*, 203 F.3d at 1033; *see also In re Broiler Chicken Antitrust Litig.*, --- F. Supp. 3d ---, 2023 WL 7220170, at *10 (N.D. Ill. Nov. 2, 2023) (emphasizing that there must be "some *non-economic* evidence *specifically indicating* express agreement" (emphases added)).

Dr. Schulman's reverse-engineered story conveniently ignores the fact that the observed data is readily explained by lawful conduct. As Dr. Wu extensively testified, price clustering is often a natural and common outgrowth of healthy and lawful competition. *E.g.*, Tr. 1778:9–15, 1825:5–23, 1827:1–12 (Wu). For good reason, the law thus requires that plaintiffs "allege additional facts that tend to exclude independent self-interested conduct." *Twombly*, 550 U.S. at 552 (cleaned up); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) ("Circumstances must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'") (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). Yet Plaintiffs' case established nothing beyond unilateral conduct. That

---

[5] With respect to control, Dr. Schulman testified only as to NAR's practices and then stated in general and conclusory fashion that the HomeServices Defendants "want to support" NAR's rules. Tr. 513:19–20 (Schulman). With respect to detection, Dr. Schulman's testimony only discussed MLSs. Tr. 514:7-24 (Schulman). And with respect to punishment, Dr. Schulman testified only to the steering behavior that he alleges the Cooperative Compensation Rule incentivizes in individual agents and to Keller Williams training materials. Tr. 524:24–525:8, 527:17–529:20 (Schulman).

is not enough.

As the Eighth Circuit explained in *Lovett*, the mere fact that a theorized conspiracy can explain observed facts is not enough to prove a Sherman Act claim when the alleged offender had fully internal reasons to engage in the challenged conduct. 998 F.2d at 580–81. In *Lovett*, a local General Motors dealer engaged in aggressive cost-cutting behaviors. *Id.* at 578, 581. Rival dealers complained to General Motors, and some time later, General Motors restricted the cost-cutting dealer's supply, eventually putting it out of business. *Id.* at 577. The Eighth Circuit reversed the district court's finding that the facts alleged were sufficient for a jury to find that General Motors had conspired with the rival local dealers that had complained. The court emphasized that cases with "highly ambiguous evidence" "as consistent with . . . independent action . . . as with conspiracy" "should not be submitted to a jury" precisely because, as here, it is "extremely difficult" for a defendant to convince a jury that its own internal motivations guided its behavior. *Id.* at 580–81. Were it otherwise, minimally plausible conspiracy theories would be enough to impose massive liabilities on businesses that were merely independently acting according to their own business interests. *See Twombly*, 550 U.S. at 557–58.

Plaintiffs made no attempt whatsoever to square their theory with the unrebutted testimony that, to the extent that HomeServices subsidiaries and franchisees did follow the Rule, that was the decision of each individual broker. And *Twombly* instructs that antitrust plaintiffs do not state a claim (much less obtain judgment) unless they can show that the defendants' behavior is not "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" as it is consistent with a conspiracy. 550 U.S. at 554; *see also Text Messaging*, 782 F.3d at 877. Moreover, even if some nonparty real estate brokers encourage or require their agents to follow NAR's Cooperative Compensation Rule, that

does nothing to show that there was any sort of conspiracy to "follow and enforce" the Rule.  In this case, ample testimony established that the action of the HomeServices Defendants' subsidiaries or franchise brokers were due to, and consistent with, independent action.  Judgment as a matter of law should therefore be entered.

## II.    Trial Confirmed That Plaintiffs Are Not Direct Purchasers from the HomeServices Defendants and Thus Lack Standing

The verdict also cannot stand under the bedrock rule that only "direct purchasers" may recover antitrust damages.  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019); *accord Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 533–35 (1983); *Kansas v. UtiliCorp United*, 497 U.S. 199, 208 (1990); *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Under this "bright line" rule, only "immediate buyers from the alleged antitrust violators" have standing under the Sherman Act.  *Pepper*, 139 S. Ct. at 1521 (quoting *UtiliCorp*, 497 U.S. at 207); *see also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169–70 (8th Cir. 1998) (noting that indirect purchasers cannot sue even though they "bear[] some portion of a monopoly overcharge").  While Plaintiffs deliberately and purposefully only sued real estate franchisors and holding companies that own real estate brokerage companies, they alleged a massive conspiracy that included "all who own, operate, and participate in the subject MLSs [and] agree to, comply with, and implement the Adversary Commission Rule," ECF 477 ¶ 33 (Second Amended Complaint), including dozens of "the franchisees and brokers of the Corporate Defendants" identified as co-conspirators, *id.* ¶ 35.  The trial, however, demonstrated that Plaintiffs are not "direct purchasers" from the HomeServices Defendants; they are "two or more steps removed from" them.  *Pepper*, 139 S. Ct. at 1520.  As a result, Plaintiffs "may not sue" for damages, *id.*, and the Court should enter judgment for the HomeServices Defendants.  *See McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1376–79 (8th Cir. 1983) (holding that "case law mandates a judgment notwithstanding the

verdict" when the plaintiff lacks antitrust standing).

As the Supreme Court explained in its most recent opinion on antitrust standing, a direct purchaser must transact directly with the alleged antitrust violator: "[I]f manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Pepper*, 139 S. Ct. at 1521. Plaintiffs never entered into a required A-B direct relationship with a HomeServices Defendant because no HomeServices Defendant sells broker services, charges commissions, or transacts directly with consumers.[6] In instances where seller brokers transact with a HomeServices-affiliated buyer broker, for example, sellers pay the seller brokers—*multiple* steps away from any HomeServices Defendant:



*See* P-2200; P-2225; P-2211; Tr. 314:25–315:5 (Burnett); Tr. 268:1–11 (Ellis); Tr. 332:1–12 (Keel); Tr. 425:18–23 (Breit); Tr. 1669:24–1670:11 (Wilson); Tr. 1199:12–25 (Gansho); Tr. 931:8–17 (Millett); Tr. 1589:17–21 (Warner); D-3101 at 11–12; Tr. 1340:2–1342:7 (Peltier); P-4612. Nor are Plaintiffs direct purchasers even when a HomeServices affiliate serves as the seller

---

[6] As the trial evidence showed, none of the HomeServices Defendants is a listing agent or brokerage. The relevant listing agents are independent contractors of brokerages, which are separate legal entities. Tr. 1370:22–1371:14 (Blefari); Tr. 1658:20–1659:1 (Wilson). Most of those brokerages are independent franchisees of BHH Affiliates. Tr. 1339:15–1342:7 (Peltier). The only exceptions are ReeceNichols, Alliance, and BHHS Kansas City, which are themselves separate, independently-operated subsidiaries of HomeServices of Mokan, LLC, which is owned by HomeServices of America. Tr. 1337:4–1338:10 (Peltier); P-4612.

broker because no such affiliate is a HomeServices Defendant and Plaintiffs still have no direct transaction with a HomeServices Defendant or any other Defendant.

In every instance involving a HomeServices-affiliated broker, sellers transacted with at least one nonparty intermediary—including at least a local nonparty real estate brokerage company.[7] If the brokerage was a franchisee of BHH Affiliates, the subsequent payment that BHH Affiliates received was a royalty that was a small percentage of the brokerage commission charged. Tr. 1589:17–21 (Warner); D-3101 at 11–12. If the brokerage was an indirect subsidiary of HomeServices of America (*e.g.*, nonparty ReeceNichols), profits—much less than the commissions paid—were passed up an ownership chain to HomeServices of Mokan, HomeServices of America, Berkshire Hathaway Energy, and ultimately Berkshire Hathaway, Inc. P-4612; Tr. 1340:8–1342:7 (Peltier); Tr. 1596:20–1597:8 (Frazier).

Plaintiffs can hardly contest this point given that it is the premise of one of their core arguments to the Eighth Circuit regarding the arbitrability of this dispute. In resisting arbitration, Plaintiffs maintained that HomeServices "does not perform brokerage or agent services" and therefore is "a complete stranger" to any direct agreement, "*two* steps removed from the actual party to the Agreement (ReeceNichols)." Brief of Appellees at 5, 39–40, *Sitzer v. Nat'l Ass'n of Realtors*, No. 20-1779 (8th Cir. Sept. 9, 2020). Having advanced this position before the Eighth Circuit, judicial estoppel prevents Plaintiffs from doing an about-face in this Court and taking a diametrically opposing position to assert standing. *See Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000).

Indeed, Plaintiffs time and again testified that they did *not* purchase anything directly from

---

[7] So too for sales involving brokers related to other Defendants as explained in NAR's and Keller Williams' briefs (which, as noted above, HomeServices joins in full).

the HomeServices Defendants. As Rhonda Burnett agreed, she "authorized specifically *the broker* to cooperate and to share the [six percent] commission payable under the contract *with other brokers*." Tr. 314:25–315:5 (Burnett) (emphases added); *see also* P-2200 (listing agreement stating that Rhonda Burnett agreed to pay a 6% commission, which may be divided between the seller and buyer brokers). Nor was she alone: Ms. Ellis, Mr. Keel, and Mr. Breit each testified that they agreed to pay commissions to *their seller brokers*, and, with Plaintiffs' approval, those seller brokers agreed that they would pay a portion of their *own* commissions to the *buyer brokers*. Tr. 268:1–11 (Ellis); Tr. 332:1–11 (Keel); Tr. 425:18–23 (Breit); P-2225 (Keel Agreement); P-2211 (Breit Agreement). While some brokerages are franchisees of or indirectly owned by the HomeServices Defendants, Tr. 1452:17–20 (Blefari); Tr. 1597:2–8 (Frazier), none are defendants in this case. Under no circumstance did sellers directly transact with HomeServices' employees. Thus, at best, Plaintiffs are consumers, "C," who bought services from seller brokers, "B," who paid buyer brokers, "A"—with the HomeServices' Defendants being paid only fees, royalties, or dividends even further down the chain. *See Pepper*, 139 S. Ct. at 1521.

Permitting Plaintiffs to recover damages despite the lack of a direct relationship would raise the same "express[] concern[s]" that motivate the *Illinois Brick* rule. *In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 530 (8th Cir. 1984); *see also Illinois Brick*, 431 U.S. at 730–31. One problem is that granting Plaintiffs' standing creates a risk of duplicative liability. *See Midwest Milk*, 730 F.2d at 530. Seller brokers are paid by sellers and remit the alleged overcharge from their own commission. Tr. at 1669:24–1670:2 (Wilson); Tr. at 1199:12–25 (Gansho); Tr. at 931:8–17 (Millett). So seller brokers could pursue the same claims to seek the same commission payments as damages. Another problem is that Plaintiffs' damages theory necessarily entails multiple degrees of pass-on—since intermediaries set commissions—creating the "complexities

and uncertainties of proof inherent in an action based on a passing-on theory" that *Illinois Brick* is designed to avoid. *Midwest Milk*, 730 F.2d at 530; *see also Illinois Brick*, 431 U.S. at 733 & n.13 (emphasizing the "difficult[ies]" in "reconstructing" and "trac[ing] the overcharge through each step in the distribution chain" when plaintiffs are "several steps removed from the defendant," "even if . . . the direct purchaser increased its price by the full amount of the overcharge").

To circumvent the standing requirements, Plaintiffs claim they are "direct purchaser[s]" because "every single one of their witnesses said it's the [P]laintiffs' money." Tr. 2504:7–11 (Ketchmark). This argument badly misses the point. Both direct and indirect purchasers pay money. The question is *to whom they paid that money*. The law is clear that to be direct purchasers, Plaintiffs must be the "immediate buyers from the alleged antitrust violators." *UtiliCorp*, 497 U.S. at 207; *accord Pepper*, 139 S. Ct. at 1520. Because Plaintiffs are not, they lack standing to sue.

Plaintiffs' other attempt to manufacture standing—pointing to settlement statements to try to show they are direct purchasers—fails for the same reason. *See* Tr. 22:7–17, 2504:7–11 (Ketchmark). Those statements show that Plaintiffs paid their *local brokers*, not HomeServices. *See, e.g.*, P-2229; P-2201; P-2212. Any subsequent payments to the buyer brokers came from the seller broker's funds, or, if the buyer did not have an agent, the seller broker retained the entire commission. *See* Tr. 1669:24–1670:2 (Wilson); Tr. 1199:12–25 (Gansho) (similar); Tr. 931:8–17 (Millett) (similar). Either way, local brokers—not sellers themselves—then remitted some portion of the monies to others in the transaction cycle; none of the settlement statements reflect a payment from a seller directly to HomeServices. This is further buttressed by the NAR rules, which, contrary to Plaintiffs' arguments, only apply to what needs to be in a real estate listing on certain multiple listing services. *See* D-3842 at 65–66. According to those rules, the seller broker is only required to make an offer of compensation; if that is unpaid, the buyer brokers can only recover

from the seller broker, not the seller. *See id.* Thus, the "economic reality of the relevant transactions" is that home sellers never paid any commission to HomeServices directly. *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 208 (1968).

Although Plaintiffs previously attempted to invoke the co-conspirator exception (or some variation on it, such as a "control" exception), *see* ECF 956 at 31–32 (discussing *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020) and *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003)), they abandoned any such theory at trial and the jury was not instructed on it. ECF 1292. They therefore cannot raise it now to try to defend the judgment post-hoc. *See* Fed. R. Civ. P. 51(c)(1) ("A party who objects to . . . the failure to give an instruction must do so on the record . . . ."); *Yannacopoulos v. Gen. Dynamics Corp.*, 75 F.3d 1298, 1304–05 (8th Cir. 1996) (finding that objections to Court's instruction of a jury must be timely in order not to be waived). But even if they could, the Eighth Circuit has held this exception does not apply "unless the direct purchaser is joined as a defendant," *Campos*, 140 F.3d at 1171 n.4; *see also Insulate SB v. Advanced Finishing Sys.*, 797 F.3d 538, 542 (8th Cir. 2015) ("[I]ndirect purchasers may bring an antitrust claim if they allege the direct purchasers are 'party to the antitrust violation' and join the direct purchasers as defendants.") (quoting *Campos*, 140 F.3d at 1171 n.4); *Midwest Milk*, 730 F.2d at 529–30 (affirming dismissal because Plaintiffs did not name the alleged co-conspirators as defendants); ECF 477 (Second Amended Complaint). Here, Plaintiffs conceded "local agents are not defendants in this case," Tr. 15:2–3 (Ketchmark), and neither is ReeceNichols, nor any BHH Affiliates franchisee.

All evidence admitted at trial thus confirms that Plaintiffs did not purchase any broker services from HomeServices. Rather, they purchased services from seller brokers who in turn paid a portion of their own commission to the buyer brokers—with any royalty, fee, or dividend arriving

to the HomeServices Defendants well down the distribution chain. And with at least one intermediate transaction separating them from HomeServices, Plaintiffs are not "immediate buyers" and therefore lack standing. *See Pepper*, 139 S. Ct. at 1521. The Court should therefore enter judgment in favor of the HomeServices Defendants.

### III. Plaintiffs' Damages Expert's Testimony Was Inadmissible and Failed to Establish Impact

In addition to the shortcomings described above, and as discussed more fully in the HomeServices Defendants' Rule 59 motion,[8] Dr. Schulman's testimony should not have been admitted at trial, and it failed to establish a basis on which the jury could permissibly infer impact. The testimony was inadmissible because it rested entirely on the construct of a "but-for world" that itself was premised on assumptions that were incoherent, implausible, or flatly contradicted by other evidence at trial. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055–57 (8th Cir. 2000) (judgment as a matter of law should have been entered for defendants because the plaintiffs' injury and damages case rested on an expert who did "not incorporate all aspects of the economic reality" of the relevant market into his model and "ignored inconvenient evidence"); *see also St. Louis Convention*, 154 F.3d at 863 (affirming entry of judgment as a matter of law where there was no "evidence tending to show that [the plaintiff's expert's] economic model actually applied" to the facts of the case).

According to Dr. Schulman, no offers of cooperative compensation would have been made in the "but-for" world; thus, in his opinion, 100% of class members were injured by the Rule to the tune of 100% of the buyer commissions they paid. Tr. 563:12–16, 566:11–22 (Schulman).

---

[8] The HomeServices Defendants expressly incorporate the arguments made in their Rule 59 motion addressing impact and damages herein.

But offers of cooperative compensation were made for decades before the Rule came into existence, they are routinely made in markets not subject to the Rule, and they are even made in Dr. Schulman's own cherry-picked benchmark, Australia.[9]  *See* Tr. 635:5–7 (Schulman); Tr. 836:5–13 (Reynolds); Tr. 1912:16–22 (Wu).  As witnesses testified extensively throughout trial, sellers have numerous incentives to make such offers that have nothing to do with the Rule.  For example, Dave Stevens, a former Federal Housing Administration Commissioner, testified that the practice benefits sellers because having sufficient cash on hand is one of the most common barriers to home-buying.  Tr. 1727:3–15 (Stevens).  Having buyer-broker fees paid for by sellers thus broadens the market of possible buyers because it ensures that buyers who would otherwise be able to afford the home are not priced out by having to pay for both a deposit and a buyer-broker fee with cash on hand.  Tr. 1727:22–1728:6 (Stevens).  Dr. Wu likewise testified to other ways sellers benefit from the assistance buyers receive from their brokers:  for example, by ensuring appropriate financing is in place prior to making offers, Tr. 1794:23–1795:2 (Wu), and by actively seeking out buyers who would be a good fit for homes that have been listed for sale, Tr. 1851:20–23 (Wu).  These considerations, in combination with the fact that offers of compensation do not disappear in markets without the Rule, render completely implausible Dr. Schulman's claim that, but for the Rule, *none* of the buyer commissions Plaintiffs paid would still have been paid.

Moreover, in contravention of fundamental economic principles, Dr. Schulman assumed that homes in the "but-for" world would sell for exactly the same price at which they sold in the actual world, notwithstanding the near elimination of buyer brokers (according to Dr. Schulman) and class members' varying goals when listing their homes.  *See* Tr. 564:20–565:2 (Schulman).

---

[9] Todd Reynolds, for example, testified that sellers' agents make offers of compensation for leads "5 to 10 percent of the time."  Tr. 836:5–25 (Reynolds).

In fact, this assumption was contradicted by Dr. Schulman's own testimony that buyers' agents are incentivized to "steer" qualified buyers away from listings with comparatively low offers of cooperative compensation, which, according to Dr. Schulman, impacts the likelihood and timing of a sale. Tr. 675:14–18 (Schulman). If, as Dr. Schulman posits, disincentivized buyer brokers impact the timing and probability of a home sale, then surely the near elimination of buyer brokers would also impact the housing market in myriad ways, including with respect to home prices. The assumption that homes would sell for the same price in the "but-for" world also ignores the fact that some sellers are focused on "clear[ing]" a certain amount from the sale of their home, Trupiano Dep. Tr. 220:11–221:16 (D-9000), and thus might reduce the price of their home if they are no longer paying a commission to the buyer's agent. If the price of a class member's home in the "but-for" world falls by an amount equivalent to, or greater than, what was actually paid to the buyer's agent, that class member has suffered no injury.

Relatedly, Dr. Schulman's testimony simply failed to acknowledge—much less resolve—the puzzle of how the services currently provided by buyer brokers would be paid for in his "but-for" world at no direct or indirect cost to the seller. Although Plaintiffs deny that buyer broker services are worth the commissions that are commonly paid, named Plaintiff Jerod Breit admitted that a 1.5% out-of-pocket fee for the broker he used when buying a house would have been a fair value. Tr. 399:20–25 (Breit). And as Mr. Breit tacitly acknowledged, paying that fee would have reduced the amount of money he had on hand to put toward his down payment. *Id.* (Bright); *see also* Tr. 1789:1–18 (Dr. Wu, opining that if real estate costs were to increase by two to three percent, buyers would likely (1) decrease their offers; (2) only consider less expensive homes; or (3) drop out of the market altogether). Again, in this scenario, sellers are not injured at all if the reduction in the sales price matches or exceeds what they saved in buy-side commissions, and they

are at most injured by an amount equal to the difference between the reduction in commission and the reduction in the amount that would-be buyers are able to offer as a result of paying broker commissions themselves. But Dr. Schulman's testimony made no allowance for buyers having less money to put toward the purchase of a home if saddled with the additional expense of a broker fee; Dr. Schulman thus provided no explanation consonant with any known principle of mathematics or economics to explain how the value provided by buyer brokers would be retained at zero net expense to any party.

The insufficiency, and indeed inadmissibility, of Dr. Schulman's testimony entitles the HomeServices Defendants to judgment as a matter of law under Rule 50(b). In an ill-fated attempt to prove impact on a class-wide basis using common evidence, Plaintiffs' injury and damages case relied entirely on Dr. Schulman's opinion that in the "but-for" world, not one member of the class would have independently chosen to authorize payment to the buyer broker of the same amount the buyer broker actually received in cooperative compensation. Without this opinion, which is founded on an unreliable methodology and contrary to undisputed evidence in the record, there is no evidence to support the jury's finding that all class members were impacted by the challenged conduct. Because of these egregious deficiencies in Dr. Schulman's testimony—and the jury's clear reliance on his testimony in reaching its verdict—the Court should enter judgment as a matter of law in favor of HomeServices. *See Concord Boat*, 207 F.3d at 1055–57 (defendants were entitled to judgment as a matter of law based on the erroneous admission of expert opinion where "the jury clearly relied on [the] opinion in reaching its verdict because the damages it awarded . . . were identical to the detailed figures [the expert] had calculated"); *compare* Tr. 564:23 (Dr. Schulman opining that Plaintiffs suffered approximately $1.8 billion in damages), *with* ECF No. 1294 at 2 (jury awarding the exact amount of damages Dr. Schulman calculated). In the

alternative, and as argued in the Rule 59 motion, the Court should find that HomeServices is entitled to a new trial.

## CONCLUSION

For the foregoing reasons, the HomeServices Defendants respectfully request that the Court enter judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).

Dated: January 8, 2024

Respectfully submitted,

Theodore Joseph Boutrous, Jr, *pro hac vice*
Christopher D. Dusseault, *pro hac vice*
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7804
tboutrous@gibsondunn.com
cdusseault@gibsondunn.com

Gregg J. Costa, *pro hac vice*
Gibson, Dunn & Crutcher LLP
811 Main Street
Suite 3000
Houston, TX 77002
(346) 718-6649
gcosta@gibsondunn.com

Julian Wolfe Kleinbrodt, *pro hac vice*
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
(415) 393-8382
jkleinbrodt@gibsondunn.com

Cynthia Richman, *pro hac vice*
Harry R.S. Phillips, *pro hac vice*
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue NW
Washington, D.C. 20036
(202) 955-8234
crichman@gibsondunn.com
hphillips@gibsondunn.com

*/s/ Robert D. MacGill*
Robert D. MacGill, *pro hac vice*
Scott E. Murray, *pro hac vice*
Matthew T. Ciulla, *pro hac vice*
Patrick J. Sanders, *pro hac vice*
MACGILL PC
156 E. Market Street
Suite 1200
Indianapolis, IN 46204
(317) 721-1253
Robert.MacGill@MacGillLaw.com
Scott.Murray@MacGillLaw.com
Matthew.Ciulla@MacGillLaw.com
Patrick.Sanders@MacGillLaw.com

Brian C. Fries
bfries@lathropgage.com
LATHROP GAGE LLP - KCMO
2345 Grand Avenue
Suite 2200
Kansas City, MO 64108-2618
(816) 292-2000

Jay N. Varon, *pro hac vice*
Jennifer M. Keas, *pro hac vice*
FOLEY & LARDNER LLP
3000 K Street NW
Washington, DC 20007
(202) 672-5300
jvaron@foley.com
jkeas@foley.com

**Counsel for Defendants HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates, LLC.**

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 8, 2024, an electronic copy of the foregoing was filed with the Clerk of the Court by using the CM/ECF system and service upon all counsel of record will be accomplished by the CM/ECF system.

/s/ *Robert D. MacGill*
Robert D. MacGill