## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT,
JEREMY KEEL, HOLLEE ELLIS, and
FRANCES HARVEY, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF
REALTORS, REALOGY HOLDINGS
CORP., HOMESERVICES OF AMERICA,
INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX, LLC, and
KELLER WILLIAMS REALTY, INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No: 4:19-cv-00332-SRB

Judge Stephen R. Bough

## SUGGESTIONS IN SUPPORT OF DEFENDANT KELLER WILLIAMS REALTY, INC.'S MOTION FOR NEW TRIAL

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY ...................................................................1

II.     LEGAL STANDARD ..............................................................................................2

III.    ARGUMENT ..........................................................................................................3

   A.   THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE. ...................................3

   B.   THE COURT'S EVIDENTIARY RULINGS IRREVOCABLY INFECTED THE JURY'S VERDICT. ......4

      1.   Discussions of Commission Rates ............................................................5

      2.   Michelle Figgs's Notes .............................................................................10

      3.   Common Officers and Directors ..............................................................12

      4.   Clear Cooperation ....................................................................................14

      5.   Roger Alford .............................................................................................16

      6.   The Settlements.........................................................................................18

      7.   Missouri Law ............................................................................................20

IV.    CONCLUSION......................................................................................................24

ii

# TABLE OF AUTHORITIES

*Abraham v. BP Am. Prod. Co.*, 685 F.3d 1196 (10th Cir. 2012)............................................. 13, 15

*Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327 (8th Cir. 1996)..................................................... 14

*Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800 (8th Cir. 2017)........................................................... 5

*Butler v. French*, 83 F.3d 942 (8th Cir. 1996) ............................................................................... 6

*Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n*, 551 F.2d 1136 (8th Cir. 1977) ...................... 14

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268 (8th Cir. 1998)........ 17

*Copperweld v. Independence Tube Corp.*, 467 U.S. 752 (1984).................................................. 15

*Greer v. Miller*, 483 U.S. 756 (1987) .......................................................................................... 21

*Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*, 921 F.2d 139 (8th Cir. 1990)............... 14

*In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208, 2011 WL 3300577 (E.D. Tenn. Aug. 1, 2011) .................................................................................................................................... 22, 23

*Lacey Marketplace Assocs. II, LLC v. United Farmers of Alberta Co-op. Ltd*., No. 13-cv-0383-JLR, 2015 WL 2345176 (W.D. Wash. May 14, 2015).......................................................... 6

*Littleton v. McNeely*, 562 F.3d 880 (8th Cir. 2009)....................................................................... 7

*Mawby v. United States*, 999 F.2d 1252 (8th Cir. 1993) ............................................................. 19

*RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, No. 5:18-cv-06037-DGK, 2021 WL 4258747 (W.D. Mo. Sept. 17, 2021)........................................................................... 22

*Ryan v. McDonough Power Equip.*, 734 F.2d 385 (8th Cir. 1984) ............................................... 6

*Spencer v. Young*, 495 F.3d 945 (8th Cir. 2007)........................................................................... 9

*Tenbarge v. Ames Taping Tool Sys., Inc*., 190 F.3d 862 (8th Cir. 1999)..................................... 19

*United States v. Bestfoods*, 524 U.S. 51 (1998) .......................................................................... 17

*United States v. Durham*, 868 F.2d 1010 (8th Cir. 1989) ........................................................... 25

*United States v. J.L.K., Jr.*, 880 F.2d 993 (8th Cir. 1989) .......................................................... 25

*Valadez v. Watkins Motor Lines, Inc*., 758 F.3d 975 (8th Cir. 2014) ................................ 7, 13, 15

*White v. Pence*, 961 F.2d 776 (8th Cir. 1992)............................................................................... 5

iii

# I. INTRODUCTION AND SUMMARY

After twelve days of trial but fewer than three hours of deliberation, the jury returned a verdict for Plaintiffs that included findings that Keller Williams Realty, Inc. ("Keller Williams") conspired with the National Association of REALTORS® ("NAR") and the HomeServices Defendants[1] to follow and enforce the Cooperative Compensation Rule. The jury awarded almost $1.8 billion in damages, consisting of every single penny that home sellers had authorized their listing agents to pay to every buyer agent during the seven-year class period. ECF No. 1294. The only reasonable conclusion based on the trial record is that the jury rendered a verdict not based on evidence suggesting liability for Keller Williams or the other Defendants (because there was none), but due to Plaintiffs' efforts to inflame the passions of the jurors through the introduction of irrelevant and prejudicial evidence. In addition to those reasons set forth in the Motions for New Trial filed by National Association of REALTORS and the HomeServices Defendants, which Keller Williams joins and incorporates, the Court should order a new trial for two reasons.

*First*, the verdict was against the great weight of the evidence. As explained in Keller Williams' Rule 50(b) Motion for Judgment as a Matter of Law ("Keller Williams' Rule 50(b) Motion"), the jury found Keller Williams liable despite the complete lack of evidence that Keller Williams participated in a conspiracy. Plaintiffs put on no evidence that Keller Williams ever attended any meeting, participated in any communication, undertook any internal analysis or discussion, or engaged in any other activity relating in any way to the Cooperative Compensation Rule, let alone did so with the other Defendants. In fact, Plaintiffs introduced zero evidence that any listing agent offered compensation to buyer agents because of the Cooperative Compensation Rule or joined a board of REALTORS® because of Keller Williams. They jury's finding that

---

[1] HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates, LLC.

1

NAR and the HomeServices Defendants also knowingly participated in a conspiracy to follow and enforce the Cooperative Compensation Rule was likewise unsupported by any evidence, as they also explain in their post-trial filings. Because the verdict was against the weight of the evidence and resulted in a miscarriage of justice, the Court should order a new trial.

*Second*, the Court's erroneous evidentiary rulings, which were wrong when issued and should now be reconsidered in light of the full trial record, irrevocably tainted the jury's verdict. Over Defendants' objections, the Court admitted references to national average commission rates that had no relevance to the alleged conspiracy, highly prejudicial notes of Michelle Figgs that contained inadmissible hearsay, irrelevant and misleading evidence regarding a common chief executive for three of HomeServices of America's subsidiaries, evidence regarding the Clear Cooperation Policy that served only to confuse the jury, and testimony from a purported expert that should have been excluded from trial at the outset. The Court also advised the jury that two parties—Anywhere Real Estate, Inc. ("Realogy") and RE/MAX LLC ("RE/MAX") had settled, which invited the jury to assume their culpability and, by extension, the culpability of the non-settling Defendants. On the flip side, the Court excluded important evidence that would have made clear that—contrary to Plaintiffs' position that no home seller would, in the absence of the alleged conspiracy, have authorized his or her listing agent to offer cooperative compensation to buyer agents—Missouri law expressly authorizes commission sharing between listing agents and buyer agents. Because these evidentiary rulings necessarily marred the jury's verdict, the Court should order a new trial.

## II.    LEGAL STANDARD

"A new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996); *see Bavlsik v. Gen. Motors, LLC*, 870 F.3d

2

800, 809 (8th Cir. 2017) ("[The] court may, on motion, grant a new trial on all or some of the issues, provided there is a good reason to do so.").

## III.  ARGUMENT

### A.  The verdict was against the great weight of the evidence.

The Court should order a new trial because the jury's verdict was against the great weight of the evidence.  "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'"  *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992) (quoting *Ryan v. McDonough Power Equip*., 734 F.2d 385, 387 (8th Cir. 1984)).  A new trial is proper where "the verdict was so contrary to the evidence as to amount to a miscarriage of justice."  *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996).

As explained in Keller Williams' Rule 50(b) Motion, Plaintiffs submitted no evidence whatsoever that could support an inference that Keller Williams entered into any agreement with anybody regarding the Cooperative Compensation Rule.  In fact, the only evidence was to the contrary.  For example, the evidence established that Keller Williams has never been meaningfully involved in NAR policymaking activities.  *See, e.g.*, ECF No. 1288-1, Tr. 134:18–134:21 & 134:23–135:04 (C. Sylvester); *id.* at 127:08–128:02; *id.* at 132:19–133:18; Oct. 27, 2023 Tr. 2020:12–24 (G. Keller).  The evidence likewise showed that Keller Williams' requirement that independent contractor agents affiliated with its franchise brokerages join their local MLSs *preceded* NAR's adoption of the Cooperative Compensation Rule.  D-3534 at PDF p.28; Oct. 27, 2023 Tr. 2025:20–2026:4.  Nor did Plaintiffs introduce any evidence that any listing agent offered compensation to buyer agents because of the Cooperative Compensation Rule or that any listing agent joined a board of REALTORS® or MLS because of Keller Williams' requirement that they do so.  Yet again, the evidence was to the contrary.  Oct. 30, 2023 Tr. 2284:3–12; *id.* 2284:13–22;

3

Oct. 27, 2023 Tr. 2166:10–17. For these reasons and those offered in Defendants' Rule 50(b) Motions, the verdict was against the great weight of the evidence and amounts to a miscarriage of justice. If the Court declines to grant judgment as a matter of law as to any Defendant, that Defendant is entitled to a new trial. *See Lacey Marketplace Assocs. II, LLC v. United Farmers of Alberta Co-op. Ltd*., No. 13-cv-0383-JLR, 2015 WL 2345176, at *3 (W.D. Wash. May 14, 2015) ("Courts apply a lower standard of proof to motions for new trial than they do to motions for judgment as a matter of law. . . . A verdict may be support by substantial evidence, yet still be against the clear weight of evidence.").

**B.    The Court's evidentiary rulings irrevocably infected the jury's verdict.**

This Court should order a new trial because its erroneous evidentiary rulings had "a substantial influence on the jury's verdict." *Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009); *see Valadez v. Watkins Motor Lines, Inc*., 758 F.3d 975, 982 (8th Cir. 2014) (reversing and remanding for a new trial where there was an erroneous evidentiary ruling that had an improper and substantial influence on the jury's verdict). As explained below, the Court erred in admitting certain evidence concerning specific commissions rates, the notes of Michelle Figgs, evidence regarding a common chief executive for certain entities, evidence regarding the Clear Cooperation Rule, and Roger Alford's testimony and in notifying the jury that two Defendants had settled. The Court further erred in refusing to admit evidence that Missouri law authorizes commission sharing between listing agents and buyer agents. The jury was exposed repeatedly and throughout trial to evidence with no relation to the Cooperative Compensation Rule or any agreement among Defendants, but cast by Plaintiffs as supportive of their alleged conspiracy to follow and enforce the Rule. And it was denied an opportunity to receive evidence concerning Missouri law that fundamentally undercuts the central premise of their case—that commission sharing between listing and buyer agents would occur *only* if real estate companies conspired to require it. Because

4

the erroneous evidentiary rulings had a substantial influence on the jury's verdict, a new trial is warranted.

## 1. Discussions of Commission Rates

One category of evidence that was improperly admitted at trial and that had a substantial impact on the jury's verdict was evidence of Defendants' mere references to commission rates, in contexts unrelated to the Cooperative Compensation Rule. Defendants moved before trial for an order *in limine* to exclude certain of that evidence. *See* ECF 1070.[2] As Defendants then explained, the mere fact that Plaintiffs alleged a conspiracy to raise, inflate, or stabilize commission rates did not somehow make all references to commission rates relevant evidence. Defendants also warned that, if such evidence were not excluded, the risk of jury confusion would be particularly acute, as Plaintiffs would have every incentive to use the uncontroversial and unproblematic reality that real-estate professionals talk about commissions to suggest that these Defendants were all in some sort of unlawful conspiracy to fix them. Yet the Court denied Defendants' motion, and—as Defendants predicted—Plaintiffs proceeded not only to litter the trial with evidence showing that Keller Williams mentioned commission rates in contexts that had nothing to do with the Cooperative Compensation Rule, but also to use those references in place of actual evidence that Keller Williams was part of the conspiracy to follow and enforce the Cooperative Compensation Rule that Plaintiffs alleged in this case. Had the Court properly precluded Plaintiffs from using this irrelevant evidence, the jury likely would not have—indeed, could not have—found a conspiracy between Defendants and Keller Williams' knowing participation in that conspiracy.

---

[2] *See also* ECF No. 1197 at 2 ("Without evidence connecting Keller Williams to the conduct they allege in this case, Plaintiffs instead seek to focus on what they claim are efforts by Keller Williams . . . to convince agents to charge commission rates of six percent. . . . Not only does this evidence have nothing to do with the NAR rules at issue, it also reflects entirely unilateral conduct consistent with Keller Williams' independent business interests.").

Defendants moved before trial to exclude two specific categories of such evidence: (1) models for agent businesses published or presented by Keller Williams or its employees that contained references to average commission rates, such as in Mr. Keller's book, *The Millionaire Real Estate Agent*;[3] and (2) reports of historical average commission rates earned by thousands of Keller Williams agents across the United States that were reported during Keller Williams' "Family Reunion" events.[4] ECF No. 1070. The Court denied the motion *in limine*, leaving no doubt that it considered the evidence to be admissible. *See* ECF No. 1132; Pretrial Conference Tr. 86:22–25, 87:1–7; *Spencer v. Young*, 495 F.3d 945, 949 (8th Cir. 2007) (noting that definitive rulings on a fully briefed and argued motion *in limine* that affects the entire course of trial preserves issues for review). This evidence became central to Plaintiffs' case and featured prominently in the examination of numerous witnesses and in both opening and closing.[5] For instance, on four

---

[3] These exhibits included D-3578 (admitted in place of P-0491, Plaintiffs' incomplete copy of the same document), P-0479, P-1631, P-1632, P-1633, P-1634, P-1635, P-1636, P-1637, P-1640, P-1646, and P-1650, all admitted over Keller Williams' objections. In addition to the objection to the relevance of these documents, Keller Williams also objected that Plaintiffs failed to lay the foundation that exhibits P-0479, P-1631, P-1632, P-1633, P-1634, P-1635, P-1636, P-1637, P-1640, P-1646, and P-1650 were actually presented at Family Reunion, as Plaintiffs suggested to the jury they were. *See* ECF 1197 at 3–4; Oct. 18, 2023 Tr. 213:13–214:9. The Court agreed that Plaintiffs had not laid the proper foundation for the documents, *id.* 214:22–25, but still admitted them into evidence over Keller Williams' objection. Oct. 19, 2023 Tr. 370:23–371:11. This ruling was also erroneous. As Plaintiffs' counsel himself observed, by allowing the jury to see the exhibits without the proper evidentiary foundation being laid, "[t]he jury will remember" the improper context admission of the evidence allowed Plaintiffs to suggest to the jury. Oct. 27, 2023 Tr. 2195:4–2197:10.

[4] This evidence includes P-2869B and P-2869C.

[5] *See, e.g.*, Oct. 17, 2023 Tr. 35:8–20 (Plaintiffs' Opening) (discussing slides presented at Family Reunion); *id.* 37:11–39:10 (discussing slides presented at Family Reunion and training materials); *id.* at 41:3–15 (discussing Keller's books); Oct. 19, 2023 Tr. 531:6–533:21 (C. Schulman) (discussing slides presented at Family Reunion); *id.* 538:9–541:3 (same); *id.* 572:6–9 (same); Oct. 20, 2023 Tr. 729:21–730:5 (C. Schulman) (addressing slides presented at Family Reunion); P-2886 (ECF No. 1338-7), Tr. 28:1–30:20 (D. King) (testifying about whether it would violate any antitrust policies or laws for Keller to discuss commission rates at Family Reunion); P-2888 (ECF No. 1338-8), Tr. 17:12–25 (M. Maples) (testifying about whether, under Keller Williams' antitrust policy, there should discussion of commissions at Family Reunion); *id.* 23:23–25:14 (testifying about slide presentations that were allegedly used at Keller Williams Family Reunion events); *id.* 27:5–40:11, 41:6–43:4, 44:19–47:2, 49:17–50:7 (same); *id.* 68:19–69:6 (same); *id.* 88:20–91:19 (testifying about whether the slides and presentations that discuss commissions would violate Keller Williams' antitrust policy); *id.* 43:5–44:18 (testifying about *The Millionaire Real Estate*

occasions Plaintiffs referred to a presentation entitled "Get [Y]our Full Commission" with a picture of a line in the sand, evidently suggesting that agents should resist efforts by clients to reduce their commissions. P-1634; Oct. 17, 2023 Tr. 38:1–13 (Plaintiffs' Opening); P-2888 (ECF No. 1338-8), Tr. 38:22–39:16 (M. Maples); Oct. 27, 2023 Tr. 2197:12–2198:11 (M. King); Oct 30, 2023 Tr. 2356:1–4 (Plaintiffs' Closing). Nothing about the presentation refers in any way to the Cooperative Compensation Rule, but it was admitted into evidence over Keller Williams' objections, which then allowed Plaintiffs to suggest to the jury that it related in some unspecified way to the alleged conspiracy.

---

*Agent* and the basic formula for the economic model that incorporates an average a 3 percent commission); *id.* 47:3–49:16 (same); *id.* 53:16–58:6 (testifying about a MAPS Coaching programs); *id.* 64:23–66:19 (testifying about training documents that discuss commission rates); P-2894, Tr. 140:14–25 (D. Strandmo) (testifying about *The Millionaire Real Estate Agent*; Oct. 24, 2023 Tr. 1294:1–14 (R. Gansho) (responding to question about whether it would be appropriate under NAR's antitrust policy for Gary Keller to discuss commission rates at Family Reunion); Oct. 27, 2023 Tr. 2036:6–2039:9, 2041:2–22 (G. Keller) (cross-examination related to Family Reunion commission slides and commission offer rates' clustering); *id.* 2071:3–2073:9 (cross-examination regarding Shift and arguing that the book's reference to "3 percent" commissions constitutes an instruction regarding the amount to pay buyers' agents); *id.* 2077:2–2084:18, 2087:20–23, 2103:10–2105:2 (cross-examination arguing that Family Reunion speech violates antitrust law because it "discuss[es] commission rates" with competitors present); *id.* 2089:20–23, ("Q: A person cannot use a model or a concept as a way to hide the fact that they're trying to engage in an illegal conspiracy in violation of federal antitrust law"); *id.* 2090:6–17 (cross-examination about *The Millionaire Real Estate Agent*); *id.* 2093:20–2096:7, 2098:25–2099:9 (cross-examination related to Keller Williams' awards to agents for "outstanding sales and listing achievements" referencing "sales volume based on a 3-percent commission"); *id.* 2096:18–2098:24, 2099:11–2103:9 (cross-examination related to *The Millionaire Real Estate Agent* model and average commission rates, arguing); *id.* 2105:10–2109:10 (cross-examination about discussion of commission rates at Family Reunion); *id.* 2110:3–2112:13 (cross-examination regarding Keller "stand[ing] on a stage [at Family Reunion] in front of a group of competitors . . . [and] put[ting] up this commission chart . . . based on your internal Keller Williams' research of the actual commissions charged by your agents across the country"); Oct. 27, 2023 Tr. 2194:24–2201:3 (M. King) (cross-examination related to discussions of commission negotiations and commission models at Family Reunion); Oct. 30, 2023 Tr. 2343:11–18 (Plaintiffs' Closing) (conflating the NAR rule, commission rates, training materials, and steering, stating to the jury: "The most problematic of the rule is the requirement that sellers predetermine before even knowing the buyer the amount of the commission that's paid. So when you're standing over here as the seller, before you even know if the buyer's agent did any work, you put the 6 percent in. Let's just talk – let's just call it what it is. They train these agents to scare sellers into doing it, or they'll have steering against them."); *id.* 2354:25–2358:17 ("[T]hey know if they're [discussing national historical average commission rates] in front of competitors, it's a violation of the antitrust policies and laws. And that's exactly what they're doing."); *id.* 2353:8–14 ("Do you find that there was a conspiracy . . . ? Absolutely. The [answer] to that is yes. And how do they do it? Through the training.").

7

That evidence, and all testimony regarding that evidence, should have been excluded. Plaintiffs alleged that the Defendants conspired to follow and enforce the Cooperative Compensation Rule; the alleged conspiracy was not a conspiracy to set commission rates or cooperative compensation offers—and it was certainly not a conspiracy to set all seller- or buyer-side commission rates nationwide. It is thus entirely irrelevant that individuals associated with Keller Williams might have published or presented economic models that include three percent average commissions as examples or reported average national commission rates earned by agents affiliated with Keller Williams' franchisee brokerages. Yet Plaintiffs' counsel made repeated reference to *The Millionaire Real Estate Agent* and Family Reunion throughout the trial including during both during opening and closing arguments. *See supra* n.5. None of that evidence could support an inference that Keller Williams participated in the alleged conspiracy to follow and enforce the Cooperative Compensation Rule. All of that evidence should have been excluded under Rule 402. *See* Fed. R. Evid. 402 (irrelevant evidence is inadmissible).

In all events, even if average national commission rates pass the relevance test, the evidence still should have been excluded under Rule 403, because any alleged minimal probative value was substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403. Again, merely because Plaintiffs alleged that the conspiracy they challenged—to follow and enforce the Cooperative Compensation Rule—had the effect of raising, inflating, or stabilizing commission rates did not make all references to commission rates in Keller Williams' documents relevant to their alleged conspiracy. But it *did* make all references to them unduly prejudicial, as they served no purpose other than to replace actual evidence of coordination.

By admitting this evidence, the Court allowed Plaintiffs to improperly suggest to the jury that evidence of unrelated (and lawful) activity actually constituted evidence of Keller Williams'

knowing participation in a conspiracy to follow and enforce the Cooperative Compensation Rule. But Plaintiffs never actually established any nexus between this irrelevant evidence and the conspiracy they actually challenged in this case. Plaintiffs, for example, implied in questioning of Keller Williams' founder, Gary Keller, that the issues to be presented to the jury would determine the permissibility of his reporting on national historical averages of commissions earned by over 150,000 Keller Williams agents, when Plaintiffs' established no connection whatsoever between Mr. Keller's Vision Speeches and the Cooperative Compensation Rule (because there was no such connection). *See* Oct. 27, 2023 Tr. 2112:22–2113:6 (G. Keller) (Plaintiffs' counsel asking Mr. Keller if he would "stop standing on the stage in front of your competitors" and discussing national historical average commission rates if the jury found that "the purpose or effect [of NAR's rule] is to raise, inflate, or stabilize commissions"). Plaintiffs also suggested to the jury in examining Mr. Keller that his publication of *The Millionaire Real Estate Agent* in 2004 violated the antitrust laws because the book included a reference to average commission rates. *Id.* 2101:9–13 ("Q: You can't write a book that's designed to present a model that's based on actual commission studies that you give to competitors that they can use to set their commission rates? I mean, you know you can't do that under the antitrust laws, don't you?"); *id.* 2101:22–2102:3 ("Q: You cannot write a book—you can't be in a situation where you study the actual commissions of these agents, build a model off of it, put the number in a book that you then put out there for your competitors to see so that they can follow along and do the same commissions so you can participate in stabilizing and inflating or raising commission rates? You're not allowed to do that, are you?"). With no effort to connect Mr. Keller's book to a conspiracy to follow and enforce the Cooperative Compensation Rule, Plaintiffs' attempt to use Mr. Keller's book to support their allegations was incredibly (and unduly) prejudicial. Had this evidence been properly excluded before trial as

9

Defendants requested, Plaintiffs would not have been able to misuse it to support the existence of a conspiracy between the Defendants to follow and enforce the Cooperative Compensation Rule.

But the prejudicial impact of the admission of this evidence did not end there. When it denied Defendants' motion *in limine* to exclude this irrelevant evidence, the Court also allowed Plaintiffs to use it to convince the jury (without any actual evidence) that Keller Williams was involved in a conspiracy wholly unrelated to the Cooperative Compensation Rule to raise, inflate, or stabilize commission rates in Missouri. Plaintiffs' efforts to do so were pervasive. The Court can and should enter a new trial on that basis alone. *See Valadez*, 758 F.3d at 982 (remanding for new trial where a party emphasized improperly admitted evidence during its closing); *Abraham v. BP Am. Prod. Co.*, 685 F.3d 1196, 1203 (10th Cir. 2012) (noting that "considerable use of [inadmissible] evidence . . . during the taking of evidence and during argument may be sufficient to demonstrate substantial prejudice," and that "strong emphasis placed on irrelevant evidence may be sufficient to allow us to infer that a jury likely premised its verdict on such evidence" (citations omitted)).

### 2.    Michelle Figgs's Notes

Defendants also moved before trial for an order *in limine* to prevent Plaintiffs from introducing notes of Michelle Figgs (the "Figgs Notes") that contained, in embedded hearsay to which no hearsay exception applied, a highly prejudicial statement that could be misinterpreted by the jury as supportive of Plaintiffs' alleged conspiracy, even though the statement did not refer or relate to the Cooperative Compensation Rule. ECF No. 1069; *see also* ECF No. 1197 at 4–5. Michelle Figgs is a former Keller Williams industry analyst, who wrote in her notes that "Gary believes strongly in collusion theory for why commissions are stable. 'co-opetition.'" P-0654. The Court denied the motion *in limine*. ECF No. 1132; *see also Spencer*, 495 F.3d at 949 (stating that a definitive ruling on a motion *in limine* obviates the need for further objection to preserve

10

error).  This was error, and the resulting inappropriate use of this evidence by Plaintiffs further confirms that the Court should order a new trial.

The Figgs Notes, and all testimony regarding them, should have been excluded because of multiple levels of hearsay.  First, the notes themselves are hearsay because they are an out-of-court statement offered to prove the matter asserted therein.  Second, the "Gary believes" statement is hearsay within hearsay because Ms. Figgs was taking notes about what an unspecified declarant said at a meeting.  Unless each level of hearsay is subject to a so-called hearsay exception, the Figgs Notes are inadmissible.  Fed. R. Evid. 802.

Plaintiffs did not (and could not) meet their burden of establishing the applicability of a hearsay exception for the second level of hearsay, the "Gary believes" statement.  *See Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 333 (8th Cir. 1996).  Ms. Figgs, the note-taker, could not remember the identity of the person who made the statement, leaving Plaintiffs with no basis to support its admissibility.  Indeed, she admitted that her "note would indicate that likely someone made that statement who I was listening to at that time."  ECF No. 1069-1, Tr. 32:22–33:4 (M. Figgs).

The Eighth Circuit addressed nearly identical circumstances in *Gulbranson v. Duluth, Missabe & Iron Range Railway Co.*, 921 F.2d 139, 141–42 (8th Cir. 1990), and reversed the district court's judgment based on the admission of minutes that did not account for embedded hearsay statements by an unidentified declarant.  The Eighth Circuit reasoned:

> [T]he minutes *fail to identify the speaker or speakers of the particular statements at issue*.  Thus, [the plaintiff] *failed to establish a proper foundation for admitting the minutes as an admission of a party*, and the district court erred in admitting the minutes as such.

*Id.*; *see Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n*, 551 F.2d 1136, 1138 (8th Cir. 1977).

("That part of Murphy's statement which contains a reiteration of what someone told him is not

11

admissible as an admission by party-opponent since the author of the statement is unknown." (emphasis added)). Because Plaintiffs failed to identify the speaker of the "Gary believes" statement, the Figgs Notes were inadmissible.

Like *The Millionaire Real Estate Agent* and Family Reunion, the Figgs Notes were repeatedly paraded in front of the jury as evidence of Keller Williams' participation in the alleged conspiracy and were featured in Plaintiffs' opening and closing. *E.g.*, Oct. 17, 2023 Tr. 47:24–48:8 (Plaintiffs' Opening) (discussing the Figgs Notes); P-2902 (ECF No. 1338-13), Tr. 30:16–34:11 (M. Figgs) (discussing the Figgs Notes); Oct. 19, 2023 Tr. 494:2–12 (C. Schulman) (discussing the Figgs Notes); *id.* 496:11–18 (same); *id.* 497:2–11 (same); Oct. 30, 2023 Tr. 2365:1-20 (Plaintiffs' Closing) (discussing the Figgs Notes). Because the Figgs Notes were emphasized throughout trial, their admission had a substantial impact on the jury's verdict, further underscoring that a new trial is appropriate. *See Valadez*, 758 F.3d at 982; *Abraham*, 685 F.3d at 1203.

### 3. Common Officers and Directors

Plaintiffs also were permitted, over Defendants' repeated objections, to suggest to the jury that intra-corporate relationships among subsidiaries of HomeServices of America supported their alleged conspiracy between Defendants to follow and enforce the Cooperative Compensation Rule, when those relationships could not, as a matter of law, support the existence of any conspiracy of any nature among those subsidiaries—much less any conspiracy between Defendants. Before trial, the HomeServices Defendants moved *in limine* to exclude evidence and testimony criticizing three of HomeServices of America's wholly owned subsidiaries for sharing a common chief executive. ECF No. 1223. The HomeServices Defendants argued that such evidence was irrelevant to any actionable conspiracy claim because co-subsidiaries of the same parent are incapable of conspiring and would serve only to confuse and mislead the jury. *See id.*

12

at 3 (citing *Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) and related Eighth Circuit law extending *Copperweld* to commonly owned subsidiaries.) The Court at first agreed, granting the motion in part and prohibiting Plaintiffs from "introducing evidence regarding intra-corporate conspiracy, *or that the HomeServices Defendants are liable only because their sister subsidiaries hav[e] common officers and directors*." ECF No. 1236 (emphasis added).

When it became clear that Plaintiffs intended to flout the Court's order and offer the same evidence of common officers that the Court had excluded, the HomeServices Defendants moved to enforce the order. *See* ECF No. 1237. In an abrupt reversal and with little explanation, the Court denied the motion to enforce, effectively overturning its prior order, and allowed Plaintiffs to introduce this evidence throughout the trial. *See* ECF No. 1243.

As a result, the jury repeatedly heard testimony and argument implying that Mike Frazier's status as CEO of ReeceNichols, BHHS Alliance Realty, and BHHS Kansas City was evidence of an antitrust conspiracy between those subsidiaries. Plaintiffs raised the subsidiaries' common leadership in their opening statement, noting Mr. Frazier's dual roles at ReeceNichols and Alliance. Oct. 17, 2023 Tr. 72:24–73:3 (Plaintiffs' Opening). During the deposition of Rosalie Warner shown to the jury, Ms. Warner was asked "[h]ow is it fair to have a man who is CEO of ReeceNichols that competes in Kansas City with Berkshire Hathaway Alliance also be the CEO of Berkshire Hathaway Alliance? How is that fair?" Oct. 23, 2023 Tr. 892:6–11; P-2897 (ECF No. 1338-11) Tr. 73:22–74:1 (R. Warner).[6]

---

[6] There is more. Counsel for Plaintiffs renewed this line of questioning when he cross-examined Ms. Warner, asking whether Mr. Frazier "one day wear[s] the hat as CEO over here, and one day wear[s] a hat as CEO over there." Oct. 25, 2023 Tr. 1570:12–5. Kevin Goffstein was similarly asked if he "underst[ood] that in addition to being chief executive officer of Berkshire Hathaway HomeServices Alliance Real Estate, Mr. Frazier is also the chief executive officer of the ReeceNichols company." Oct. 23, 2023 Tr. 897:7–10; ECF No. 1338-14 Tr. 13:23–14:3.

Taken together, these statements left the jury with the misimpression that the subsidiaries' common leadership could be construed as evidence of an intra-corporate conspiracy. As the Court recognized when it granted the HomeServices Defendants' motion *in limine*, that is not the law. *See* ECF No. 1236 ("The [C]ourt is mindful that [a] conspiracy requires a plurality of actors, and . . . no such plurality exists between a corporation and its wholly owned subsidiary corporation" (citing *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 274 (8th Cir. 1998))).

Given an opportunity to issue a curative instruction, the Court declined. The HomeServices Defendants objected and proposed amendments to Jury Instructions Nos. 21 and 22 clarifying both that a corporation's wholly owned subsidiaries are incapable of conspiring with each other and that it is not illegal for corporate officers to "change hats" and represent two corporations separately. *See* ECF No. 1281, at 9, 11 (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)). The Court overruled the objections and rejected the proposed language, Oct. 27, 2023 Tr. 2239:13–19, compounding its prior error of allowing the jury to hear this irrelevant and prejudicial evidence in the first place. The Court was right to grant the HomeServices Defendants' motion *in limine* to exclude testimony related to the subsidiaries' common officers and, respectfully, should have adhered to that ruling or, at the least, given a curative instruction. And that error impacted all Defendants to the extent the jury relied on that evidence to find a conspiracy between Defendants.

### 4. Clear Cooperation

Defendants also moved for an order excluding evidence relating to NAR's Clear Cooperation Policy as irrelevant. ECF No. 1080. The Court denied the motion *in limine*. ECF No. 1132. This too was error.

The Court should have excluded evidence about the Clear Cooperation Policy, under which:

> Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.

P-4587 at PDF p.48 (NAR Policy Statement 8.0, Clear Cooperation). The Clear Cooperation Policy was not part of the alleged conspiracy, was not adopted by NAR until 2019, and did not go into effect until May 2020, which is well after the alleged conspiracy occurred. The Clear Cooperation Policy does not mention, reference, or implicate the Cooperative Compensation Rule. The Clear Cooperation Policy is not mentioned in Plaintiffs' Third Amended Complaint. Simply put, the Clear Cooperation Policy had no connection to the issues in this case and any evidence surrounding that policy stood to confuse the jury. Fed. R. Evid. 401, 402, 403. Yet again, this irrelevant issue featured prominently in Plaintiffs' case.[7]

Not only were Plaintiffs permitted to admit evidence regarding an irrelevant policy, but also they examined witnesses about inadmissible hearsay about that policy. Specifically, the jury

---

[7] *See, e.g.*, Oct. 17, 2023 Tr. 56:22–59:08 (Plaintiffs' Opening) (discussing the Clear Cooperation Policy); id. at 65:2–6 (same); P-2881 (ECF No. 1338-3), Tr. 31:21–32:4, 129:16–147:3 (R. Gansho) (testifying about the Clear Cooperation Policy and feedback from NAR members about the Clear Cooperation Policy); *id.* 167:9–167:25 (same); *id.* 183:21–184:7 (testifying about the Clear Cooperation Policy); P-2897, Tr. 76:24–81:7 (R. Warner) (testifying about the Clear Cooperation Policy); *id.* 112:17–114:23 (same); P-2900 (ECF No. 1338-12), Tr. 17:11–17:19 (G. Blefari) (testifying about the Clear Cooperation Policy); *id.* 18:8–19:6 (same); *id.* 28:10–29:20, 29:23–24 (same); *id.* 30:3–18 (same); Oct. 20, 2023 Tr. 749:4–751:10 (R. Alford) (testifying about the Clear Cooperation Policy); *id.* 752:19–755:14 (same); *id.* 758:22–761:1 (same); *id.* 763:10–25 (same); Oct. 25, 2023 Tr. 1491:10–1501:21 (G. Blefari) (testifying about the Clear Cooperation Policy); Oct. 25, 2023 Tr. 1681:16–1682:1 (K. Wilson) (testifying about the Clear Cooperation Policy); Oct. 27, 2023 Tr. 2062:4–12 (G. Keller) (testifying about the Clear Cooperation Policy); Oct. 30, 2023 Tr. 2342:23–2343:6 (Plaintiffs' Closing) (arguing that NAR members "wrote to NAR saying, Don't do what you're doing. It violates the antitrust laws. Please don't make – pass this clear cooperation policy. Let us be who we are. When Mr. Goldberg and Mr. Gansho took the stand, remarkably silent on that, weren't they? They knew that we – I had shown you that testimony."); *id.* 2353:15–2354:16 (argument regarding Alford testimony on Clear Cooperation).

heard about the following anonymous comments regarding that policy over the objection of Defendants:

- "Sounds like this will only strengthen the case of the lawsuit filed against all the associations and multiple listing services and big brokers."

- "[S]eems that this violates the Sherman Antitrust Act, we have a duty to the seller, not to the MLS."

- "While I agree with this in theory, doesn't such a theory constitute a monopoly?"

P-2881 (ECF No. 1338-3), Tr. 133:21–135:3 (R. Gansho); *id.* 138:21–139:4; *id.* 146:8–146:16. These comments were improper opinion testimony under Fed. R. Evid. 701 regarding the potential legal impact of the Clear Cooperation Policy. Such unsworn comments made outside of the Court were also hearsay under Fed. R. Evid. 801 and unfairly prejudicial under Fed. R. Evid. 403. Because this inadmissible evidence had a substantial influence on the jury's verdict, the Court should order a new trial.

### 5. Roger Alford

Over Defendants' objections, the Court admitted the testimony of Roger Alford, a law professor. ECF No. 1021. Because the Court erred in overruling those objections and Alford's testimony had a substantial influence on the jury's verdict, the Court should order a new trial.

*First*, Alford should not have been permitted to testify about the Clear Cooperation Policy. As noted above, the evidence Plaintiffs adduced about the Clear Cooperation Policy was irrelevant to the issues in the case and unduly prejudicial. *See supra.* But even putting that aside, Plaintiffs did not disclose Alford as an expert to testify about the Clear Cooperation Policy. *See* Oct. 20, 2023 Tr. 615:23–616:8, 751:11–752:16. Under Rule 26(a)(2)(B), an expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). And as the Eighth Circuit has noted, one of the purposes of Rule 26 is "*to eliminate surprise*" so as to permit a party "to develop [its] cross-examination . . . or to

16

present additional expert witnesses to counter [the expert]'s newly arrived at conclusions." *Tenbarge v. Ames Taping Tool Sys., Inc.*, 190 F.3d 862, 865 (8th Cir. 1999) (emphasis added) (quoting *Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir. 1993)). In this regard, "[i]f a party fails to supplement expert testimony, the district court may order appropriate sanctions as provided for in Rule 37(c). Sanctions may include exclusion of the testimony, a continuance to allow depositions to be taken, or the grant of a new trial." *Id.*

The Clear Cooperation Policy was mentioned in only two sentences and one footnote of Alford's 128-paragraph report. *See* ECF No. 920-1 ¶ 108. Those two sentences provide, in full: "However, NAR recently added a rule for MLS participants, which requires agents to post a listing to the MLS within one (1) business day of public marketing. In this way, NAR has foreclosed one (very limited) potential route of defection by agents from the ACR." *Id.* The footnote goes on to cite the text of the Clear Cooperation Policy. *Id.* at 31 n.123. That is it.

His report's cursory reference to the Clear Cooperation Policy was thus limited to the fact that it exists and allegedly prevents "defection." Nevertheless, Alford was permitted to testify broadly about the Clear Cooperation Policy, including:

- "[W]hether or not the corporate real estate defendants and followed and enforced th[e] [C]lear [C]ooperation [P]olicy." Oct. 20, 2023 Tr. 751:2–6.

- The "role" of the corporate defendants with respect to the Clear Cooperation Policy. *E.g.*, *id.* 751:7–10; 753:3–755:2; 763:10–14.

- That the Clear Cooperation Policy "is not designed to promote the interest of home sellers." *Id.* 755:12–14.

- "[W]hether or not this clear cooperation is being used in any of the – what would you consider to be issues dealing with collusion or conspiracies or things of that sort?" *Id.* 758:22–759:3.

Each of these topics far exceeded the scope of Alford's expert report. Indeed, each of the "opinions" contained in the "Summary of Opinions" section of his report addresses only the

"Adversary Commission Rules" (also known as the Cooperative Compensation Rule). None of those "opinions" relates to the Clear Cooperation Policy, and Defendants had no notice that Alford would testify about the above topics. And this evidence had a substantial influence on the jury as it was stressed throughout closing. *See* Oct. 30, 2023 Tr. 2354:4–16; 2365:9–13; 2505:6–11 (Plaintiffs' Closing).

*Second*, Alford tainted the jury with information that the Court had excluded under a motion *in limine*. Before trial, the Court granted Defendants' motion *in limine* to exclude references to prior cases against NAR involving price-fixing allegations. *See* ECF No. 1132. Nonetheless, in violation of that order, Alford gratuitously testified that NAR had mandatory rates in the past, which violated the limine order. Oct. 20, 2023 Tr. 775:8–18. Although the Court granted a subsequent request to strike that testimony, the damage had already been done because the jury was left with the impression that NAR had fixed prices and was now trying to hide that fact from the jury. Therefore, there is an overwhelming probability that, in a case in which Plaintiffs alleged that Defendants engaged in price fixing, the jury would be unable to disregard testimony concerning past price fixing and a strong likelihood that the effect of the evidence would be devastating to Defendants. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (noting that there is an exception to the general rule that a jury is presumed to follow a court's instruction to disregard where there is an "overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant" (citations omitted)).

### 6. The Settlements

Prior to trial, Defendants objected to any reference of settlements between Plaintiffs and Realogy and RE/MAX (the "Settlements"). *See* ECF No. 1186, 1211. Nonetheless, the Court told the jury that "[w]hile both [RE/MAX] and [Realogy] previously took part in all aspects of this

18

case, both corporations settled with the Class of Plaintiffs before trial." ECF No. 1292, Instruction Nos. 7 and 28.

The fact of settlement should not have been admitted and had a substantial effect on the jury's verdict. This Court's previous opinion in *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.* is instructive. No. 5:18-cv-06037-DGK, 2021 WL 4258747, at *2 (W.D. Mo. Sept. 17, 2021). There, the court excluded evidence and arguments regarding settlements between former defendants and alleged co-conspirators, notwithstanding the fact that the plaintiffs maintained such information was relevant "to explain why those defendants are not at trial." *Id*. This Court reasoned, "the former co-defendants' and co-conspirators' settlements with Plaintiffs may impute liability to the [remaining] defendants since it all revolves around the same general factual circumstances." *Id*. The court noted that, because defendants had not participated in any aspects of trial, there was no need to explain their absence to the jury. *Id*. Finally, the court cited significant risk under Rule 403 in informing the jury about the settlements:

> This case involves allegations of a conspiracy between the [remaining d]efendants and the Defendants who have settled. Informing the jury of the other Defendants' settlements risks the jury mistakenly inferring that settlements are a concession of liability. This risk far outweighs the marginal value of informing the jury of their absence to avoid potential confusion here.

*Id*. (citations omitted); *see also In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208, 2011 WL 3300577, at *1 (E.D. Tenn. Aug. 1, 2011) (refusing to admit the fact that certain defendants had settled because "even if the evidence were admissible for some proper purpose, which it is not, admission of the evidence would raise Rule 403 problems and would be unfairly prejudicial to the remaining defendants").

So too here. The Settlements had no relevance. There was no need to explain the absence of RE/MAX and Realogy to the jury because the Settlements occurred before trial had begun. And to address any concerns regarding joint and several liability, the Court could have simply instructed

19

the jury that "there is no requirement in a conspiracy case that all alleged coconspirators be tried in the same proceeding in one trial [and] they are not to even consider the fact that the claims of plaintiffs against other coconspirators are not being tried at the same time and should not even discuss it in their deliberation." *In re Se. Milk Antitrust Litig.*, 2011 WL 3300577, at *2. Finally, even assuming some marginal relevance—and there was none—the Settlements allowed the jury to presume RE/MAX's and Realogy's liability. Because the non-settling Defendants were alleged to have conspired with those entities, the jury would therefore also impute liability to the non-settling Defendants as well. This was extremely prejudicial and warrants a new trial.

### 7. Missouri Law

During trial, the Court repeatedly sustained Plaintiffs' objection to evidence regarding Missouri law. Oct. 16, 2023 Tr. 16:11–19:16; *id.* 21:2–12; Oct. 23, 2023 Tr. 989:1–22; Oct. 25, 2023 Tr. 1675:24–1676:16; Oct. 27, 2023 Tr. 1938:5–15; *id.* 1941:7–1942:15; *id.* 2241:19–2242:10.[8] Specifically, Defendants sought to introduce evidence that Missouri law authorizes the sharing of commissions between seller agents and buyer agents:

---

[8] The Court not only refused to permit Defendants to inform the jury that Missouri law permitted the practice Plaintiffs asserted occurred only because of the alleged conspiracy, the Court also required redactions of any references to that statute from the listing contracts the class representatives entered into with their listing agents. Oct. 27, 2023 Trial Tr. 1939:25–1942:14 (requiring, over Defendants' objection, redaction of references to statutory language from several exhibits, including listing agreements); Oct. 30, 2023 Trial Tr. 2259:23–2262:7 (same).

20

**Compensation of designated broker, paid by whom, sharing compensation —
payment establishing agency — agreement by seller or buyer on sharing
compensation.** —

      1. In any real estate transaction, the designated broker's compensation may
be paid by the *seller*, the landlord, the buyer, the tenant, or a third party *or by
sharing the compensation between designated brokers* ….

      3. A seller or landlord may agree that a designated broker may share with
another designated broker the compensation paid by the seller or landlord.

Mo. Rev. Stat. 339.800 (emphasis added).[9] *See also* 4 Mo. Code of State Regulations 250-8.090

("Every written listing agreement or other written agreement for brokerage services shall contain

all of the following … 9. Specification of whether or not the designated broker is authorized to

cooperate with and compensate other designated brokers acting pursuant to any other brokerage

---

[9] Among other states, Kansas also adopted a similar statute during the same period. *See* K.S.A. 58-30,105:

> **58-30,105. Compensation.** …
> (c) In any transaction, the broker's compensation may be paid by the seller, the
> landlord, the buyer or the tenant.…
> (d) A broker may: …
> > (2) with the written agreement of the seller, landlord, buyer or tenant share a
> > commission with another broker who acted as a transaction broker, a subagent or
> > an agent of the other party

One of the four MLSs at issue in this case—the Heartland MLS—includes home sellers in Kansas.

      Illinois also adopted a similar statute. *See* 255 Ill. Cop. Stat. 454/10-5 and 454/10-10. Under
Illinois law, "[o]ne sponsoring broker may pay compensation to another sponsoring broker for the
performance of licensed activities," 225 Ill. Cop. Stat. 454/10-5, and a licensee "must disclose to a client
the sponsoring broker's compensation and policy with regard to cooperating with brokers who represent
other parties in a transaction." 225 Ill. Cop. Stat. 454/10-10. Another MLS at issue in this case—the
MARIS MLS—includes home sellers in Illinois.

      Thus, each of the states covered by the MLSs at issue in this case have statutes that specifically
authorize the practice of cooperative compensation. Nonetheless, the jury was denied this evidence and
erroneously led to believe that the practice of cooperative compensation would not exist without the
Cooperative Compensation Rule. This resulted in a miscarriage of justice.

relationship as defined by 339.710 to 339.860, RSMo, including but not limited to buyer's agents and/or transaction brokers").

Despite Missouri law permitting the practice of cooperative compensation and Plaintiffs' listing agreements being governed by that law, Plaintiffs created the impression with the jury that cooperative compensation is fundamentally unfair to home sellers and would have *never* been adopted or used as a lawful practice in the absence of the alleged conspiracy between Defendants.[10] But the mere existence of Mo. Rev. Stat. 339.800 is evidence that disproves Plaintiffs' theory of liability. Indeed, its existence directly rebuts Plaintiffs' claim that no seller would ever have authorized his or her listing broker to offer even a penny in cooperative compensation. Rather than conduct that would emerge only as a result of a conspiracy, the Missouri legislature expressly recognized the practice of cooperative compensation to be one that would help coordinate buyers and sellers and provide upfront costs—shared with agents on both sides—on a well-organized platform (*i.e.*, an MLS). It is accordingly relevant and should have been admitted. Fed. R. Evid. 401; *see United States v. J.L.K., Jr.*, 880 F.2d 993, 994–95 (8th Cir. 1989) (determining that federal regulations regarding the administrative remedy procedure available to inmates was admissible in

---

[10] *See, e.g.*, Oct. 17, 2023 Tr. 14:11–12 (Plaintiffs' Opening) ("We will prove to you and the evidence will show that [the alleged conspiracy is] unfair."); *id.* 22:16–17 ("[I]t's not right."); id. 25:6–7 ("Hollee [Ellis] is going to come here and tell you this isn't fair."); *id*. 74:10–11 ("[J]ust because someone's been getting away with something for a long time doesn't make it right."); *id.* 77:4–5 ("And but for this rule, like the rest of the world, it would not be happening."); *id.* 77:18–20 ("If that was removed like it is around the rest of the world, that wouldn't be happening."); Oct. 19, 2023 Tr. 392:7–9 (J. Breit) (testifying that he didn't think the way home selling works "was fair"); *id*. 406:13–16 ("I still don't see the fairness in paying the commission for somebody you're never going to meet or that never works for you in any way. I don't – I don't think it's fair."); Oct. 19, 2023 Tr. 567:16–21 (C. Schulman) (testifying that absent the Cooperative Compensation Rule "[s]ellers would not be paying buyer brokers' fees. They would not be making those offers upfront."); Oct. 18, 2023 Tr. 232:20–25 (H. Ellis) (testifying that she did not think having to pay the buyer's agent was a fair practice); *id*. 240:13–19 (same); id. 277:4–13 (same); *id.* 335:6–9 (J. Keel) (testifying that he did not think the process was fair).

22

a trial for attempted escape from prison because those regulations were relevant to whether the defendant has other remedies available to him).

Even if this evidence were somehow initially inadmissible, Plaintiffs opened the door to its admission. As the Eighth Circuit has noted, "[t]he doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination." *United States v. Durham*, 868 F.2d 1010, 1012 (8th Cir. 1989). "In theory, the admission of inadmissible evidence allows the injured party to cure the problem and clear up the false impression or to clarify or complete an issue opened up by [opposing] counsel." *Valadez*, 758 F.3d at 981 (alteration in original).

Plaintiffs opened the door to Missouri law regarding commission sharing. As NAR's counsel stated during trial "there has been law of virtually every other state in the country talked about by the plaintiffs, yet [defendants are] not able to tell the jury that in Missouri, the conduct the plaintiffs are claiming is bad is allowed by statute." Oct. 27, 2023 Tr. 1941:9–16; *see* Oct. 23, 2023 Tr. 989:1–22; Oct. 27, 2023 Tr. 1938:5–15; *id.* 1941:7–1942:15. Plaintiffs' economic expert also based his selection of Australia as a proper comparator market based on a common legal "heritage" between the United States and Australia, making the legal environment applicable to each market a clearly relevant consideration. Oct. 20, 2023 Tr. 699:19–700:3 (C. Schulman). Once Plaintiffs opened this door, Defendants' should have been able to introduce Missouri law to rebut Dr. Schulman's opinion that sellers in Missouri would never voluntarily agree to pay buyer agent commissions because sellers do not pay buyer agent commissions in Australia. Oct. 19, 2023 Tr. 560:2–14 (C. Schulman). And because this evidence also rebutted Plaintiffs' theory that commission sharing is unfair—a theory touted throughout trial—its absence had a substantial impact on the jury verdict and warrants a new trial.

## IV.  CONCLUSION

For the foregoing reasons, and those stated in motions for a new trial filed by the National Association of Realtors and the HomeServices Defendants, which Keller Williams joins and incorporates herein, the Court should order a new trial.

Dated: January 8, 2024

Respectfully submitted,

David R. Buchanan
dbuchanan@bjpc.com
BROWN & JAMES, PC-KCMO
2345 Grand Boulevard
Suite 2100
Kansas City, MO 64108
(816) 472-0800

Timothy Ray, *pro hac vice*
timothy.ray@hklaw.com
Barack S. Echols, pro hac vice
barack.echols@hklaw.com
HOLLAND & KNIGHT LLP
150 North Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600

*/s/ David C. Kully*
David C. Kully, *pro hac vice*
david.kully@hklaw.com
Anna P. Hayes, *pro hac vice*
anna.hayes@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, DC 20530
(202) 469-5415

Jennifer Lada, *pro hac vice*
jennifer.lada@hklaw.com
HOLLAND & KNIGHT LLP
31 West 52nd Street, 12th Floor
New York, NY 10019
(212) 513-3513

Dina W. McKenney, *pro hac vice*
dina.mckenney@hklaw.com
HOLLAND & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1757

***Counsel for Keller Williams Realty, Inc.***

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on January 8, 2024, an electronic copy of the

foregoing was filed with the Clerk of the Court by using the CM/ECF system, and service upon

all counsel of record will be accomplished by the CM/ECF system.

/s/ *David C. Kully*
David C.  Kully