# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

|  |  |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated, | Case No. 4:19-cv-00332-SRB |
| Plaintiffs, | **CLASS ACTION** |
| v. | **ORAL ARGUMENT REQUESTED** |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | |
| Defendants. | |

## SUGGESTIONS IN SUPPORT OF THE HOMESERVICES DEFENDANTS' MOTION FOR A NEW TRIAL

i

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STANDARD FOR NEW TRIAL ...........................................................................4

III.    DR. SCHULMAN'S FLAWED "BUT-FOR" WORLD ......................................4

IV.    ARGUMENT ...........................................................................................................6

     A.      Dr. Schulman's Testimony Should Not Have Been Admitted ...............6

         1.      Dr. Schulman's Opinions Regarding Cooperative Compensation In The "But-For" World Ignore Inconvenient Evidence...............................8

         2.      Dr. Schulman's "But-For" World Also Rests On Nonsensical Assumptions............................................................................................12

     B.      The Jury's Verdict And Damages Award Are Against The Weight Of The Evidence.................................................................................................16

V.     CONCLUSION.......................................................................................................18

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Blue Dane Simmental Corp. v. Am. Simmental Ass'n,
178 F.3d 1035 (8th Cir. 1999) ...........................................................................7

Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,
509 U.S. 209 (1993)........................................................................................3, 7

Child.'s Broad. Corp. v. Walt Disney Co.,
245 F.3d 1008 (8th Cir. 2001) ........................................................................4, 7

Concord Boat Corp. v. Brunswick Corp.,
207 F.3d 1039 (8th Cir. 2000) .......................................................3, 6, 7, 11, 16

Craftsmen Limousine, Inc. v. Ford Motor Co.,
363 F.3d 761 (8th Cir. 2004) ..............................................................................6

In re Elec. Books Antitrust Litig.,
No. C11-2293DLC, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ....................13

Hale v. Firestone Tire & Rubber Co.,
756 F.2d 1322 (8th Cir. 1985) ..........................................................................16

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999)............................................................................................6

McGee v. S. Pemiscot Sch. Dist. R–V,
712 F.2d 339 (8th Cir. 1983) ........................................................................4, 16

Montgomery Ward & Co. v. Duncan,
311 U.S. 243 (1940)............................................................................................4

Nichols v. Am. Nat'l Ins. Co.,
154 F.3d 875 (8th Cir. 1998) ..............................................................................6

Ryan v. McDonough Power Equip., Inc.,
734 F.2d 385 (8th Cir. 1984) ....................................................................4, 16, 18

Sip-Top, Inc. v. Ekco Grp., Inc.,
86 F.3d 827 (8th Cir. 1996) ..............................................................................17

St. Louis Convention & Visitors Comm'n v. Nat'l Football League,
154 F.3d 851 (8th Cir. 1998) .............................................................. 16, 17, 18

Sullivan v. Nat'l Football League,
34 F.3d 1091 (1st Cir. 1994)..............................................................................16

Virgin Atl. Airways Ltd. v. British Airways PLC,
69 F. Supp. 2d 571 (S.D.N.Y. 1999).................................................................7

**Page(s)**

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ............................................................................................16

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   946 F.3d 995 (8th Cir. 2019) ..............................................................................7

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   No. C09-2090ADM, 2018 WL 3862773 (D. Minn. Aug. 14, 2018) ......................12

*Wright v. Willamette Indus., Inc.*,
   91 F.3d 1105 (8th Cir. 1996) ..............................................................................17

**Statutes**

Mo. Rev. Stat. § 339.800 (2023) ...............................................................................12

**Rules**

Fed. R. Civ. P. 59 .....................................................................................................4

**Regulations**

Mo. Code Regs. Ann. tit. 20, § 250-8.090 (2023) ......................................................12

# I. INTRODUCTION

At trial, Plaintiffs offered the testimony of their economic expert, Dr. Craig Schulman ("Dr. Schulman"), to prove antitrust injury and damages. According to Dr. Schulman, *100% of class members* were injured by the challenged Cooperative Compensation Rule (the "Rule") to the tune of *100% of the buyer commissions* that were paid by their seller brokers. Dr. Schulman arrived at his extreme and illogical opinion regarding a 100% overcharge by positing that in a "but-for" world without the Rule, *no* home seller would *ever* authorize his or her seller broker to pay *any* amount in cooperative compensation. Thus, according to Dr. Schulman: (1) every class member was injured (because no class member would have authorized his or her seller broker to pay in the "but-for" world the same amount of cooperative compensation they authorized in the actual world); and (2) every class member was damaged in an amount equivalent to the entirety of the cooperative compensation his or her seller broker paid (because no class member would have authorized *any* cooperative compensation, not even a reduced amount, in the "but-for" world).

Dr. Schulman's opinions regarding antitrust injury and damages—and the assumptions on which his "but-for" world relies—find no support in the trial record. In fact, they are flatly contradicted by and inconsistent with the evidence presented at trial. For instance, evidence presented at trial demonstrated that at least some sellers would continue to authorize offers of cooperative compensation in a world without the Rule: cooperative compensation was prevalent for decades before the Rule came into existence, cooperative compensation is routinely offered in markets that are not subject to the Rule, and there are many good reasons why such offers would continue to be made in a world without the Rule. Worse, Dr. Schulman ignored important differences between Missouri and his cherry-picked benchmark, Australia—including testimony from Plaintiffs' own witnesses that *even in Australia* some seller brokers pay some compensation

1

to agents who locate a successful buyer. He also erroneously assumed that each class member's home would sell in the "but-for" world at the exact same price as in the actual world (where buyer brokers, compensated through the Rule, are incentivized to find and bring qualified buyers to the seller). That assumption is at odds with basic economic theory, and was contradicted by Dr. Schulman's own testimony that competitive offers of cooperative compensation incentivize buyer brokers to "steer" qualified buyers toward those listings. Lastly, Dr. Schulman wrongly assumed that the payment each class member made to his or her seller broker would be reduced in the "but-for" world by the exact amount his or her broker paid to a successful buyer broker, even though (1) class members agreed with their seller brokers to *overall commissions*, suggesting that at least some class members would be willing to reach the same agreement in the "but-for" world; (2) Dr. Schulman did not analyze overall commissions; and (3) seller brokers would have to do additional work in the "but-for" world.

For the reasons discussed in Defendants' concurrently filed motions for judgment as a matter of law ("JMOLs"), the defects in Dr. Schulman's model mean that Plaintiffs have failed to prove impact—a key element of their antitrust claim. *See* HomeServices Defendants'[1] JMOL § III; Keller Williams Realty, Inc.'s JMOL § III.D–E; The National Association of REALTORS®'s JMOL § IV. Defendants therefore are entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50(b). But in the event the Court denies Defendants' JMOLs, a new trial is required both because Dr. Schulman's testimony should not have been admitted and because the jury's verdict (and damages award), which rest entirely on Dr. Schulman's flawed "but-for" world, are against the weight of the evidence. As Plaintiffs offered

---

[1] The HomeServices Defendants are HomeServices of America, Inc. ("HomeServices"); BHH Affiliates, LLC ("BHH Affiliates"), and HSF Affiliates, LLC ("HSF Affiliates").

no other evidence at trial to prove antitrust injury or their claim for damages, the jury necessarily adopted Dr. Schulman's opinions wholesale in reaching its verdict. This is apparent not only from the lack of any other probative evidence admitted at trial, but also from the fact that the jury awarded the exact amount of damages Dr. Schulman calculated, which is 100% of the cooperative compensation paid by all seller brokers to all buyer brokers during the entire class period. *Compare* Tr. 564:23, *with* ECF No. 1294 at 2 (verdict form). The jury's clear reliance on Dr. Schulman's flawed expert opinion renders its admission prejudicial and entitles Defendants to a new trial. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055–57 (8th Cir. 2000) (it is prejudicial error to admit an expert's testimony at trial if the expert constructs "a hypothetical market" that "ignore[s] inconvenient evidence" and the jury relies on the expert's testimony in reaching a verdict). Moreover, even considering Dr. Schulman's erroneously admitted testimony, both the jury's finding of antitrust injury and its award of damages were against the weight of the evidence. *See, e.g.*, *id.* at 1057 ("An expert opinion cannot sustain a jury's verdict when it 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable . . . .'" (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). Thus, Defendants are entitled to a new trial on this basis as well.[2]

---

[2] As the aforementioned discussion makes clear, in this Rule 59(a) motion, the HomeServices Defendants focus on the erroneous admission of Dr. Schulman's unreliable and speculative testimony, which severely prejudiced Defendants and can be remedied only through a new trial, as well as the fact that the jury's finding of antitrust injury and damages award are against the weight of the evidence. *See infra* § IV. The HomeServices Defendants also move for a new trial on the grounds that (1) the jury's finding of a conspiracy was against the weight of the evidence; (2) legal errors in the jury instructions and pervasive misconduct by Plaintiffs' counsel severely prejudiced Defendants; and (3) the Court made a number of other erroneous evidentiary rulings, including (a) its failure to exclude admission of and references to the Clear Cooperation Policy and Roger Alford's testimony thereto, the Figgs hearsay notes, evidence that three of HomeServices of America's subsidiaries share a common chief executive, irrelevant documents

## II.     STANDARD FOR NEW TRIAL

Following a jury verdict, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Grounds for granting a new trial include, among others, erroneous evidentiary rulings or a verdict that is against the weight of the evidence. *Child.'s Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1017 (8th Cir. 2001) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). Indeed, a court may "grant a new trial even where there is substantial evidence to sustain the verdict," such as where the evidence supporting the verdict is not credible. *Ryan v. McDonough Power Equip., Inc.*, 734 F.2d 385, 387–88 (8th Cir. 1984) (quoting *McGee v. S. Pemiscot Sch. Dist. R–V*, 712 F.2d 339, 344 (8th Cir. 1983)); *see, e.g.*, *id.* at 388 (affirming grant of new trial where the trial court found that although there was "*some* evidence" to support the jury's verdict, "there was an absence of credible evidence" (emphasis in original)).

## III.     DR. SCHULMAN'S FLAWED "BUT-FOR" WORLD

The only evidence Plaintiffs offered at trial to show they were injured at all, let alone suffered $1.8 billion in damages, was the opinion of their economic expert, Dr. Schulman. Tr. 481:25–482:1 (Dr. Schulman testifying he was hired to opine on whether Plaintiffs "were harmed; and if they were, what was the quantum of damage"). Dr. Schulman reached that staggering figure by concluding (1) that *100% of class members were injured* by the Rule (because, according to Dr. Schulman, none would have authorized in the "but-for" world the same amount of cooperative

---

related to commissions, and the settlements by former defendants Realogy and RE/MAX, and (b) its exclusion of evidence demonstrating that Missouri law permits cooperative compensation. To avoid duplicative briefing, the HomeServices Defendants fully join and incorporate by reference the arguments elaborating those grounds in the Rule 59(a) motions filed concurrently by the other Defendants. *See* The National Association of REALTORS® Motion for a New Trial; Keller Williams Realty, Inc.'s Motion for a New Trial.

4

compensation they authorized in the actual world, notwithstanding that the Rule that says nothing about the amount of commission to be paid), and (2) that each class member paid a *100% overcharge* (because, according to Dr. Schulman, no class member would have authorized his or her seller broker to pay *even a penny* in compensation to a buyer broker in the absence of the Rule). Tr. 563:12–13 ("So the answer is in the U.S., if this rule had never existed, sellers wouldn't be paying buy side agents."); Tr. 563:13–16 ("So every single penny that sellers had to pay a buy side agent here in Missouri during this time period is the measure of antitrust damages."). In other words, Dr. Schulman offered the opinion that *not one* home seller in the entire state of Missouri, from 2015 to 2022, would have authorized payment of a penny to a single buyer broker in a world without the Rule.[3]

The problem for Dr. Schulman—and Plaintiffs—is that this "but-for" world is one of fantasy, not reliable economic analysis faithfully applied to the record evidence. In constructing his "but-for" world, Dr. Schulman compared the markets covered by the four multiple listing services at issue (the "Subject MLSs") with six countries identified in a 2015 industry report known as the D.A.N.G.E.R. Report. Tr. 556:12–557:7, 560:15–19. Of these six countries, Dr. Schulman concluded that Australia provided the "most comparable" benchmark to the Subject MLSs because of similarities between the United States and Australia in terms of "legal structure, [] tradition of laws, and [] tradition of free market economics." Tr. 557:6–7, 558:17–20, 699:24–700:8. Dr. Schulman also determined that in Australia, there is "no industry mandated rule" regarding cooperative compensation and "sellers don't offer to pay buy side agents" there. Tr. 560:12–13, 563:7–8. Based on these findings—and ignoring key, inconvenient evidence *from the*

---

[3] In Dr. Schulman's flawed "but-for" world, buyer brokers would rarely be used, and their commissions, if any, would be paid by buyers. Tr. 566:11–22.

*United States itself* that sellers have authorized offers of cooperative compensation both before the Rule came into existence and in regions where the Rule does not exist—Dr. Schulman opined that in the "but-for" world, the Subject MLSs would operate as the real estate market does in Australia, *i.e.*, no home sellers would authorize their brokers to pay any cooperative compensation. Tr. 560:3–14. Dr. Schulman thus constructed his entire "but-for world" around his characterization of what happens in Australia, while dismissing evidence of what happened in the United States before the Rule existed and what happens in regions of the United States where the Rule does not exist today, and ignoring evidence about Australia that undermines his extreme opinions.

## IV.    ARGUMENT

Defendants are entitled to a new trial (on both liability and damages) because (A) Dr. Schulman's unreliable expert testimony was erroneously admitted at trial; and (B) the jury's finding of antitrust injury, and its corresponding damages award—both of which rely entirely on Dr. Schulman's testimony—are against the weight of the evidence.

### A.    Dr. Schulman's Testimony Should Not Have Been Admitted

An erroneous evidentiary ruling can serve as the basis for setting aside a verdict or granting a new trial where the ruling "ha[s] a substantial influence on the jury verdict." *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 889–90 (8th Cir. 1998). Courts routinely grant new trials on the basis that expert testimony was erroneously admitted if the expert puts forth a "but-for" world that does not "fit the particular facts of the case," such as where it is contrary to undisputed record evidence, fails to incorporate relevant circumstances, ignores inconvenient facts, or relies on invalid assumptions. *Concord Boat*, 207 F.3d at 1055–56 ("Even a theory that might meet certain *Daubert* factors . . . should not be admitted if it does not apply to the specific facts of the case." (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154 (1999)); *see, e.g.*, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (remanding for new trial on Sherman Act

claims where the expert simply "assumed" that an alleged injury "was caused by defendants' alleged conspiracy"); *Child.'s Broad. Corp.*, 245 F.3d at 1017–19 (affirming grant of new trial where expert "failed to consider the effect of competition on [plaintiff]" and relied on "dubious" assertions).[4]

This case is a repetition of *Concord Boat*, another antitrust case in which the Eighth Circuit reversed a trial verdict because the plaintiffs' injury and damages case rested on unreliable economic opinions that "should have been excluded." 207 F.3d at 1055–57. There, as here, the expert "construct[ed] a hypothetical market which was not grounded in the economic reality" of the relevant market and "ignored inconvenient evidence." *Id.* at 1056. Relying on the Supreme Court's admonition that "[a]n expert opinion cannot sustain a jury's verdict when it 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable,'" *id.* at 1057 (quoting *Brooke Grp.*, 509 U.S. at 242), *Concord Boat* held that "the deficiencies in the foundation of [the expert's] opinion" meant his "resulting conclusions were 'mere speculation,'" *id.* (quoting *Virgin Atl. Airways Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 580 (S.D.N.Y. 1999)). The same is true here. As a result, Dr. Schulman's opinions in this case can no more "sustain a jury's verdict" than Dr. Hall's could in *Concord Boat*—both because his "but-for" world is contrary to undisputed record evidence and because the methodology he used to construct that "but-for" world was not "grounded in . . . economic reality." *Id.*

---

[4] *Cf. In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 999–1003 (8th Cir. 2019) (affirming order excluding expert whose "benchmark analysis [was] unreliable" because it was premised on a comparison to an inadequate yardstick and failed to "control for non-conspiratorial factors as required to demonstrate antitrust impact"); *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040–41 (8th Cir. 1999) (affirming exclusion of expert testimony where the "methodology [the expert] employed was unreliable" and the expert failed to consider "all independent variables that could affect [his] conclusion").

### 1. Dr. Schulman's Opinions Regarding Cooperative Compensation In The "But-For" World Ignore Inconvenient Evidence

Most notably, Dr. Schulman's "but-for" world rests on his opinion that in the absence of the Rule, no seller would ever authorize his or her seller broker to offer cooperative compensation. This opinion is flatly contradicted by evidence admitted at trial regarding numerous real estate markets that are not subject to the Rule. For instance, evidence was admitted at trial that cooperative compensation was a well-established practice in the United States long before the Rule was implemented, indicating that in a "but-for" world, the practice would likely continue. *See* Tr. 1912:16–1913:6 (explaining that the practice of cooperative compensation began in the late 1800s, approximately 100 years before the Rule was adopted, and that the practice is a "market outcome"); Tr. 635:5–7 (Dr. Schulman testifying that the practice of "listing brokers offering to pay buyers' agents has existed for decades" in the United States). In fact, cooperative compensation is offered in 99% to 100% of listings on the Northwest MLS and the Real Estate Board of New York ("REBNY"), two multiple listing services in the United States that are not subject to the Rule. Tr. 1849:19–1850:10. Additionally, in For Sale By Owner transactions, sellers typically pay buyer broker commissions, even though those transactions are not listed on the MLS and therefore not subject to the Rule. Tr. 2295:1–20 (broker Jen Davis testifying that when representing buyers in for sale by owner transactions, she is able to negotiate a commission with the seller "90 percent of the time"). Lastly, Plaintiffs' own expert, Todd Reynolds, testified at trial that cooperative compensation sometimes occurs even in Australia, Dr. Schulman's benchmark country. *See* Tr. 836:5–10 (discussing practice of "conjunction agency" in Australia, whereby the agent representing the seller engages a subagent and agrees to share his or her commission if the subagent brings him or her a buyer).

Dr. Schulman's opinion that no cooperative compensation would occur in the "but-for" world is also belied by the trial evidence demonstrating that at least some sellers are unilaterally incentivized to authorize offers of cooperative compensation (and that some seller brokers are so incentivized as well). For instance, broker Jen Davis testified that she would still offer cooperative compensation absent the Rule because "it helps our sellers" in that it drives interest, and "[w]e want more buyers in our sellers' homes." Tr. 2287:7–25; *see also* Tr. 1674:12–16 (broker Krista Wilson explaining that buyer brokers help sellers "get . . . the most eyeballs on the house. So the more buyers you have that see the property, the more likely you are to get the terms and price that you're looking for"). The evidence also showed that cooperative compensation benefits sellers because sellers "want the highest market price for their house, and that means they need more buyers to see their house so they can get more bidders for their property. And that happens when you have motivated buyer brokers helping the buyers get there." Tr. 1793:24–1794:4; *see also* Tr. 1739:17–1740:6 (David Stevens testifying that "home sellers benefit far better" in the current system because buyer brokers "bring[] more traffic and more competition to the sale of that home for the seller of that home"); Tr. 2314:10–13 (Jen Davis testifying that "[i]t's more likely that we're going to get to the closing table when both parties have . . . representation. It's more likely that the seller will actually get to close on the property."); D-3886 at 134, 138 (survey finding that three of the top five things home sellers "most want from [a] real estate agent" are help marketing their home to potential buyers, selling their home within a specific timeframe, and finding a buyer for their home).

Relatedly, Dr. Schulman ignored evidence that in slow markets, sellers sometimes offer bonuses to successful buyer brokers (in addition to cooperative compensation), suggesting that, at least under some circumstances, sellers are incentivized to compensate buyer brokers. Tr.

9

2289:24–2290:7. Dr. Schulman also failed to account for the fact that some sellers—including former named Plaintiff Scott Trupiano—price their homes in order to "net" a certain amount regardless of commission and are agnostic about cooperative compensation. *See, e.g.*, Trupiano Dep. Tr. 220:11–231:07 (D-9000) (Trupiano testifying that the 8.3% listing commission attached to his home sale "didn't matter" to him because he had pre-defined with his seller broker the amount of money he needed to "net" from the transaction and the house was priced accordingly). In such a situation, the elimination of a cooperative compensation payment owed to the broker would result in a corresponding reduction of the price, allowing the seller to "net" the same amount. A seller who would respond to the elimination of a cooperative compensation payment with a corresponding reduction in price suffers no damage.

Dr. Schulman also ignored that home sellers regularly allocate part of the purchase price towards costs that might otherwise be covered by the buyer in order to close the sale—for example, by contributing to closing costs, paying for repairs, and purchasing home warranties. *See* Tr. 340:8–17 (named Plaintiff Jeremy Keel succeeded in getting a home seller to pay $4,000 towards his closing costs); Tr. 252:14–253:1 (named Plaintiff Hollee Ellis offered to contribute towards the buyer's closing costs and pay for a home warranty in order to help the "house . . . sell quicker" even though it was not "required"). Dr. Schulman fails to explain why this common and longstanding practice would not extend to offers to pay buyer broker costs in at least some cases absent the Rule. Dr. Schulman's theory of injury also ignores that many of the class members both sold and purchased homes during the class period, and thus benefitted from the Rule in instances where their buyer broker fees (which they did not pay out of pocket) were higher than the cooperative compensation their seller brokers paid. *See, e.g.*, Tr. 1855:17–1856:19 (Dr. Wu testifying that named Plaintiff Jerod Breit "would have [paid] $6,000 more in commissions" in a

world where buyers pay their broker commission directly).

Lastly, another opinion offered by Dr. Schulman—*i.e.*, that buyer brokers would rarely, if ever, be used in the "but-for" world suffers from similar defects. In fact, this opinion was contradicted *by three of the four* class members who testified at trial. *See* Trupiano Dep. Tr. 46:19–21, 112:20–21 (D-9000) (former named Plaintiff Scott Trupiano testifying that if he were to buy another house, he would "choose to continue to use" the buyer broker he used in his "past three home transactions"); Tr. 399:12–19, 415:3 (named Plaintiff Jerod Breit testifying that he would have been "willing and able" to pay his buyer broker when he was acting as a home buyer, and that he "valued" his buyer broker); Tr. 238:19–20 (named Plaintiff Hollee Ellis testifying that buyer brokers "serve a purpose"). Dr. Schulman's opinion regarding the near elimination of buyer brokers also flies in the face of evidence admitted at trial that buyers continue to be represented by buyer brokers in markets without the Rule, such as the Northwest MLS and REBNY. *See* Tr. 1850:11–18.

*     *     *

In sum, contrary to Dr. Schulman's opinion, the evidence admitted at trial demonstrates that the Rule is not the sole reason sellers authorize their brokers to offer compensation to buyer brokers (nor is the Rule the sole reason that seller brokers make such offers). Rather, the trial record indicates that in a world without the Rule, cooperative compensation would still be offered in at least some instances. Similarly, Dr. Schulman's opinion that buyer brokers would rarely be used in the "but-for" world was flatly contradicted by the evidence admitted at trial—including the testimony of the named Plaintiffs themselves. As in *Concord Boat*, then, Dr. Schulman's "but-for" world is "not grounded in the economic reality" of the Subject MLSs "for it ignored inconvenient evidence." 207 F.3d at 1056.

## 2. Dr. Schulman's "But-For" World Also Rests On Nonsensical Assumptions

Dr. Schulman's "but-for" world also rests on three invalid assumptions—(1) Australia provides a proper benchmark for determining what the "but-for" world would look like absent the Rule; (2) if buyer brokers were largely eliminated (as Dr. Schulman's "but-for" world posits they would be), home prices on the Subject MLSs would remain exactly the same; and (3) the overall commission rate that Plaintiffs paid their seller brokers would decrease by the exact amount their brokers paid in cooperative compensation to buyer brokers. These faulty assumptions render Dr. Schulman's opinions unreliable. *See In re Wholesale Grocery Prods. Antitrust Litig.*, No. C09-2090ADM, 2018 WL 3862773, at *7–8 (D. Minn. Aug. 14, 2018) (excluding expert whose benchmark model was founded on an "unvalidated" assumption that made his opinions "unreliable").

First, Dr. Schulman's model rests on the unfounded assumption that Australia provides an appropriate benchmark in this case. As noted *supra* p. 5, Dr. Schulman selected Australia as his benchmark in part because it was identified in a 2015 industry report. However, the author of that report, Stefan Swanepoel, testified at trial (by way of deposition designation) that the countries identified in that report were selected because they were *not* "comparators" to the United States. Swanepoel Dep. Tr. 54:10–54:21 (D-9001) (I "deliberately did not list" "countries which are almost identical to the United States"; rather, I listed countries that "specifically were not comparators"). Moreover, other evidence was admitted at trial that demonstrates that the real estate market in Australia is markedly different from that of Missouri.[5] For instance, while auction

---

[5] Notably, Dr. Schulman based his selection of Australia as a benchmark in part on his determination that Australia and the United States share a common legal "heritage." Tr. 699:19–700:3. But Missouri law expressly authorizes the sharing of commissions between seller agents and buyer agents. *See* Mo. Rev. Stat. § 339.800 (2023); *see also* Mo. Code Regs. Ann. tit. 20, § 250-8.090 (2023). The Missouri legislature's codification of and express authorization for this

sales are common in Australia, they are rarely used in the United States. *See* Tr. 1846:22–1847:5.

Additionally, buyer brokers in the United States perform various services that are performed by

other professionals in Australia, such as lawyers and accountants. Tr. 1847:6–12. Ultimately, in

selecting Australia as a benchmark, Dr. Schulman conveniently ignored two far more obvious

benchmarks—(1) domestic markets in which the Rule does not exist (*i.e.*, the Northwest MLS and

REBNY); and (2) the residential real estate market in the United States before the Rule's adoption

in 1996. *Supra* p. 8; *see, e.g.*, *In re Elec. Books Antitrust Litig.*, No. C11-2293DLC, 2014 WL

1282293, at *25 (S.D.N.Y. Mar. 28, 2014) (endorsing the "'before-and-after' method," which

looks to pre-conspiracy prices to determine prices in the "but-for" world as a "well accepted

method of measuring antitrust damages" and collecting cases).

Second, Dr. Schulman's damages calculation makes clear that his "but-for" world rests on

the nonsensical assumption that in a world with *no* cooperative compensation and few (if any)

buyer brokers, home prices would remain the same.[6] This assumption is at odds with basic

economic theory, as eliminating most buyer brokers (as Dr. Schulman posits would occur) would

undoubtedly have ripple effects across the Subject MLSs, including with respect to home pricing.

For instance, as noted above, evidence was admitted at trial that buyer brokers drive "traffic and

more competition," which in turn helps sellers get the terms and price they are looking for. Tr.

1739:17–1740:6. In fact, Dr. Schulman's assumption is belied by his own testimony regarding

"steering," which, according to Dr. Schulman, occurs when buyer brokers face weakened

incentives to bring potential buyers to a home due to a relatively low offer of cooperative

---

practice further undermines Dr. Schulman's nonsensical conclusion that sellers in Missouri would
never voluntarily agree to authorize buyer broker commissions in the "but-for" world.

[6] That Dr. Schulman relies on this assumption is clear from his testimony that his damages
calculation is equivalent to "all the buy side commissions paid by home sellers that listed with one
of the agent's brokers affiliated with" one of Defendants. Tr. 564:20–565:2.

compensation. Under those circumstances, Dr. Schulman's analysis indicates that homes take "significantly longer . . . to sell" and there is "a higher probability of not selling." Tr. 675:14–18. If, as Dr. Schulman posits, *disincentivized* buyer brokers impact the timing and probability of a home sale, then surely the *near elimination of* buyer brokers would also impact the housing market in myriad ways, including with respect to home prices. Dr. Schulman's model does not, however, attempt to account for the effect of these changes on the Subject MLSs, rendering his damages calculation wholly unreliable.

Dr. Schulman's assumption that home prices in the "but-for" world would remain the same is further contradicted by evidence that many buyers find paying a down payment difficult. *See* Tr. 1725:19–21 (David Stevens testifying that "36 percent of consumers find it very difficult to save for a down payment, and another 30 percent find it somewhat difficult"); *see also* Tr. 408:13 (named Plaintiff Jerod Breit found it "challeng[ing]" to save enough money for his first down payment). In fact, the evidence admitted at trial demonstrated that the added out-of-pocket cost that buyers would be forced to shoulder in a world without the Rule *would* impact home prices (particularly in sales involving cash-constrained buyers). *See* Tr. 1726:25–1727:1–2 (David Stevens testifying that eliminating cooperative compensation would "cause extraordinary, serious damage, particularly to first-time homebuyers and cash-constrained homebuyers"); Tr. 1789:8–15 (Dr. Wu testifying that if real estate costs were to increase by two to three percent, buyers might (1) make lower offers; (2) limit their home search to less expensive homes; or (3) drop out of the market entirely); *see also* Tr. 342:2 (named Plaintiff Jeremy Keel testifying that, as a buyer, not having to pay his buyer broker out of pocket was "a help" to him).

Finally, Dr. Schulman's damages calculation rests on the unsupported assumption that in a world without the Rule, the overall commission rate that Plaintiffs paid their seller brokers would

decrease by the exact amount that those brokers paid in cooperative compensation, even though Plaintiffs agreed to pay their seller brokers an *overall commission*, *see, e.g.*, Tr. 314:16–315:15 (named Plaintiff Rhonda Burnett agreed to pay an "overall commission amount of 6 percent" and "authorized the broker to cooperate and share the commission payable under this contract with other brokers"). In fact, common sense dictates otherwise—*i.e.*, the fact Plaintiffs agreed to pay a particular overall commission to their seller brokers suggests that at least some class members would be willing to pay the same total commission in the "but-for" world, particularly if (as Dr. Schulman wrongly assumes) the sale price of their home is unchanged. Such class members are *not even injured*, let alone damaged to the tune of 100% of the cooperative commissions their seller brokers paid. Other Plaintiffs may well be willing to pay a commission in the "but-for" world that is less than they actually paid but greater than the difference between what they paid to the seller broker and the amount of cooperative compensation that went to the buyer broker, in which case the amount of damage calculated by Dr. Schulman is overstated. Moreover, despite relying on this assumption, Dr. Schulman conceded at trial that he "did not do an analysis of sell side commissions," or an analysis of how much sellers paid overall in commissions. Tr. 668:4–669:4. Finally, evidence was admitted at trial that in a world without buyer brokers, seller brokers would be required to take on additional work and would thus likely maintain commission rates at the same level, or at least seek a higher commission than they actually received when buyer brokers were performing valuable services. *See* Tr. 2326:14–2327:3 (J. Davis); *see also* Tr. 836:22–837:2 (Plaintiffs' witness Todd Reynolds testifying that total commissions are the same in Australia irrespective of whether the cooperative "conjunction agency" approach is used). Ultimately, Dr. Schulman's reliance on this erroneous assumption renders his damages calculation fatally flawed.

*       *       *

In sum, Dr. Schulman's "but for" world rests on unsupported assumptions that are contrary to the record evidence and ignore inconvenient facts. His opinion thus should not have been admitted at trial. As "the jury clearly relied on his opinion in reaching its verdict because the damages it awarded to [Plaintiffs] were identical to the detailed figures Dr. [Schulman] had calculated . . . . It cannot be said that the verdict would have been the same without the expert testimony, and its admission affected [Defendants'] substantial rights." *Concord Boat*, 207 F.3d at 1057. Defendants are therefore entitled to a new trial. *See Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1333 (8th Cir. 1985) (granting motion for a new trial where the court could not "say with certainty that the jury's decision would have been the same absent [the erroneously admitted] evidence").

**B.      The Jury's Verdict And Damages Award Are Against The Weight Of The Evidence**

Even if it was not error to allow Dr. Schulman to testify at trial, a new trial would still be required because the jury's finding of antitrust injury, and its damages award based on 100% overcharge, are against the weight of the evidence. *See Concord Boat*, 207 F.3d at 1063 (holding that the defendant was entitled to judgment as a matter of law because "[e]ven considering the erroneously admitted testimony of [plaintiff's expert], the [plaintiffs] failed to offer a 'legally sufficient evidentiary basis for a reasonable jury to find for [them]'" (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 453–54 (2000))). "In determining whether a verdict is against the weight of the evidence, a trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'" *Ryan*, 734 F.2d at 387 (quoting *McGee*, 712 F.2d at 344).

A "jury may not rest its verdict on an expert's conclusion 'without some underlying facts and reasons, or a logical inferential process to support the expert's opinion.'" *St. Louis Convention & Visitors Comm'n v. Nat'l Football League,* 154 F.3d 851, 863 (8th Cir. 1998) (quoting *Sullivan*

*v. Nat'l Football League*, 34 F.3d 1091, 1105 (1st Cir. 1994)).  In *St. Louis Convention*, the Eighth Circuit held that the defendants were entitled to judgment as a matter of law on the plaintiffs' Section 1 claim because there was no "evidence tending to show that [the plaintiff's expert's] economic model actually applied" to the facts of the case.  *Id.* at 859, 863–64.  There, the plaintiff's expert opined that the NFL's relocation rules "had a direct effect on the [plaintiff's] lease price" because in a "but-for" world without those rules, teams would "seek out the best lease opportunities and . . . bid against each other on them."  *Id.* at 858.  Because the expert "rested his conclusions on economic theory that states that in a freely competitive market NFL teams would want to move to the most advantageous lease opportunity," but "there was no evidence which tended to show that this was actually the case," the Eighth Circuit held there was "no evidence on which the jury could have drawn a logical inference from [the expert's] opinion."  *Id.* at 863; *see also Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1108 (8th Cir. 1996) (holding that the district court erred in denying defendants' motion for judgment as a matter of law where the plaintiffs' expert's opinion on causation was speculative); *Sip-Top, Inc. v. Ekco Grp., Inc.*, 86 F.3d 827, 830 (8th Cir. 1996) (a defendant is entitled to judgment as a matter of law if the plaintiff relies on speculation alone).

    As in *St. Louis Convention*, here there is no "evidence tending to show that" Dr. Schulman's "economic model actually applied" to the Subject MLSs.  154 F.3d at 863.  Indeed, as discussed in detail above, Dr. Schulman's "but-for" world is *contradicted by* and *inconsistent with* the evidence admitted at trial regarding the realities of the Subject MLSs.  For instance, Dr. Schulman built his "but-for" world in reliance on the assumption that sellers do not have unilateral incentives to authorize offers of cooperative compensation, but the trial record indicates just the opposite, *i.e.*, that in a world without the Rule, there are many reasons why sellers would authorize such offers (just as they often pay buyer closing costs).  *Supra* p. 10.  Relatedly, Dr. Schulman

built his "but-for" world on the assumption that the Subject MLSs are sufficiently similar to Australia to treat the latter as an appropriate benchmark, but as discussed above, the real estate markets in Australia and Missouri are markedly different. *Supra* pp. 12–13. And perhaps most significantly, Australia provides no support for Dr. Schulman's ultimate conclusion that no offers of cooperative compensation would be made absent the Rule because cooperative compensation *is* offered in at least some instances there. *Supra* p. 8.

Ultimately, as in *St. Louis Convention*, there is "no evidence on which the jury could have drawn a logical inference from [Dr. Schulman's] opinion," because the trial record shows that his economic model does not "actually appl[y]" to the facts of this case. 154 F.3d at 863. Thus, because the jury's finding of antitrust injury and award of damages relied exclusively on Dr. Schulman's testimony, both the jury's verdict and the damages award are against the weight of the evidence. Accordingly, a new trial must be granted. *Ryan*, 734 F.2d at 387–89 (affirming grant of a new trial where the "court found the jury's verdict to be against the weight of the evidence").

## V.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court order a new trial.

Dated: January 8, 2024

Respectfully submitted,

Theodore Joseph Boutrous, Jr, *pro hac vice*
Christopher D. Dusseault, *pro hac vice*
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7804
tboutrous@gibsondunn.com
cdusseault@gibsondunn.com

Gregg J. Costa, *pro hac vice*
Gibson, Dunn & Crutcher LLP
811 Main Street
Suite 3000
Houston, TX 77002
(346) 718-6649
gcosta@gibsondunn.com

Julian Wolfe Kleinbrodt, *pro hac vice*
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
(415) 393-8382
jkleinbrodt@gibsondunn.com

Cynthia Richman, *pro hac vice*
Harry R.S. Phillips, *pro hac vice*
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue NW
Washington, D.C. 20036
(202) 955-8234
crichman@gibsondunn.com
hphillips@gibsondunn.com

/s/ Robert D. MacGill
Robert D. MacGill, *pro hac vice*
Scott E. Murray, *pro hac vice*
Matthew T. Ciulla, *pro hac vice*
Patrick J. Sanders, *pro hac vice*
MACGILL PC
156 E. Market Street
Suite 1200
Indianapolis, IN 46204
(317) 721-1253
Robert.MacGill@MacGillLaw.com
Scott.Murray@MacGillLaw.com
Matthew.Ciulla@MacGillLaw.com
Patrick.Sanders@MacGillLaw.com

Brian C. Fries
bfries@lathropgage.com
LATHROP GAGE LLP - KCMO
2345 Grand Avenue
Suite 2200
Kansas City, MO 64108-2618
(816) 292-2000

Jay N. Varon, *pro hac vice*
Jennifer M. Keas, *pro hac vice*
FOLEY & LARDNER LLP
3000 K Street NW
Washington, DC 20007
(202) 672-5300
jvaron@foley.com
jkeas@foley.com

***Counsel for Defendants
HomeServices of America, Inc., BHH
Affiliates, LLC, and HSF Affiliates,
LLC.***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 8, 2024, an electronic copy of the foregoing was filed with the Clerk of the Court by using the CM/ECF system and service upon all counsel of record will be accomplished by the CM/ECF system.

*/s/ Robert D. MacGill*
Robert D. MacGill
