**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:19-CV-00332-SRB<br><br>Honorable Judge Bough |

**SUGGESTIONS IN SUPPORT OF DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS®' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

<b>Page</b>

TABLE OF AUTHORITIES ..................................................................................................II

LEGAL STANDARD ..........................................................................................................1

ARGUMENT ........................................................................................................................1

I.     THE DIRECT-PURCHASER REQUIREMENT BARS PLAINTIFFS' SUIT .................2

     A.     Plaintiffs Did Not Purchase Directly From Defendants ................................2

     B.     No Exception To The Direct-Purchaser Requirement Applies..............................3

          1.     The Co-Conspirator Exception Does Not Apply .......................................4

          2.     The Control Exception Does Not Apply....................................................6

          3.     No Other Valid Exception Applies ............................................................9

     C.     Judgment As A Matter Of Law Is Required ................................................11

II.     THE MODEL RULE IS NOT AN UNREASONABLE RESTRAINT OF TRADE........13

     A.     The Model Rule Is Not A Per Se Antitrust Violation...........................................13

     B.     The Undisputed Evidence Presented At Trial Establishes That The Model Rule Satisfies The Rule Of Reason........................................................................14

          1.     There Is No Evidence That The Model Rule Has Anticompetitive Effects ...................................................................................................14

          2.     Even If The Model Rule Had Some Effect On Commissions, It Would Be Permissible As A Matter Of Law Under The Rule Of Reason...................................................................................................18

III.     PLAINTIFFS PRESENTED NO EVIDENCE THAT NAR CONSPIRED WITH ANYONE...................................................................................................................20

IV.     PLAINTIFFS FAILED TO PROVE INJURY OR DAMAGES RESULTING FROM THE CHALLENGED MODEL RULE................................................................24

     A.     Plaintiffs Failed To Establish Injury Resulting From The Challenged Rule .........25

     B.     Plaintiffs Failed To Prove Any Legally Supportable Amount Of Damages .........27

CONCLUSION...................................................................................................................29

CERTIFICATE OF SERVICE ..........................................................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Admiral Theatre Corp. v. Douglas Theatre Co.*,
585 F.2d 877 (8th Cir. 1978) .................................................................................................28

*Amerinet, Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992) ..........................................................................................25, 29

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ..........................................................................................2, 3, 9, 10, 12

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012) ...........................................................................................10, 11

*In re Beef Indus. Antitrust Litig.*,
600 F.2d 1148 (5th Cir. 1979) .............................................................................................4, 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................................24

*Bonjorno v. Kaiser Aluminum & Chem. Corp.*,
518 F. Supp. 102 (E.D. Pa. 1981) ........................................................................................26

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997) .................................................................................................6

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979).................................................................................................................14

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993).............................................................................................................25

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017) ...........................................................................................14

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989)............................................................................................................2, 12

*Campos v. Ticketmaster Corp.*,
140 F.3d 1166 (8th Cir. 1998) .....................................................................2, 3, 4, 5, 7, 8, 11

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .........................................................................................24, 27

ii

*In re Coordinated Pretrial Procs.*,
691 F.2d 1335 (9th Cir. 1982) .............................................................................5, 6

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
491 F.3d 380 (8th Cir. 2007) .................................................................................14

*Deaktor v. Fox Grocery Co.*,
475 F.2d 1112 (3d Cir. 1973)................................................................................27

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) ...........................................................................9, 10

*Hackman v. Dickerson Realtors, Inc.*,
595 F. Supp. 2d 875 (N.D. Ill. 2009) ...................................................................11

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) .................................................................................................9

*Howard Hess Dental Lab'ys. Inc. v. Dentsply Int'l, Inc.*,
424 F.3d 363 (3rd Cir. 2005) ...........................................................................5, 6, 8

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)............................................................................24, 26

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)...........................................................................................2, 3, 6

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) .................................................................................5

*Jewish Hosp. Ass'n v. Stewart Mech. Enters.*,
628 F.2d 971 (6th Cir. 1980) ...............................................................................8, 9

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990).................................................................................................3

*Keller v. Greater Augusta Ass'n of Realtors, Inc.*,
760 F. Supp. 2d 1373 (S.D. Ga. 2011)..................................................................10

*Kinserlow v. CMI Corp.*,
217 F.3d 1021 (8th Cir. 2000) ..............................................................................1

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)................................................................................................13

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
791 F.2d 1356 (9th Cir. 1986) ..............................................................................27

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) ....................................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...............................................................................24

*McDonald v. Johnson & Johnson*,
   722 F.2d 1370 (8th Cir. 1983) ..............................................................24

*Midwest Commc'ns v. Minnesota Twins, Inc.*,
   779 F.2d 444 (8th Cir. 1985) ................................................................25

*In re Midwest Milk Monopolization Litig.*,
   730 F.2d 528 (8th Cir. 1984) .............................................3, 4, 5, 6, 7, 11

*Monsanto Co. v. Spray-Rite Serv. Corp.*
   465 U.S. 752 (1984) .........................................................................21, 24

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   2017 WL 696983 (E.D. Pa. Feb. 22, 2017) ..........................................13

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   533 F.3d 1 (1st Cir. 2008) ....................................................................5, 6

*New Prime Inc. v. Espar, Inc.*,
   2016 WL 10644516 (W.D. Mo. Oct. 27, 2016) ...................................11

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ..........................................................................19

*Reifert v. South Cent. Wisconsin MLS Corp.*,
   450 F.3d 312 (7th Cir. 2006) ................................................................10

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) .............................................................18

*Royal Printing Co. v. Kimberly-Clark Corp.*,
   621 F.2d 323 (9th Cir. 1980) ............................................................7, 10

*Se. Missouri Hosp. v. C.R. Bard, Inc.*,
   616 F.3d 888 (8th Cir. 2010) ..................................................................8

*Sitzer v. Nat'l Ass'n of Realtors*,
   No. 20-1779 (8th Cir. 2020) ...................................................................3

*St. Francis Med. Ctr. v. C.R. Bard, Inc.*,
   657 F. Supp. 2d 1069 (E.D. Mo. 2009)..................................................7

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006).................................................................................14, 18

*Thomas v. U.S. Bank N.A., N.D.*,
    2012 WL 12897284 (W.D. Mo. Sept. 27, 2012) ...................................12

*Turtle Island Foods, SPC v. Richardson*,
    425 F. Supp. 3d 1131 (W.D. Mo. 2019) ...............................................12

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940).............................................................................14

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) .............................................................8

*Warren v. Kemp*,
    79 F.4th 967 (8th Cir. 2023) ...................................................................1

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) ................................................................17

*Willman v. Heartland Hosp. E.*,
    34 F.3d 605 (8th Cir. 1994) ...........................................................13, 20

**Statutes**

15 U.S.C. § 15(a) ............................................................................................2

Mo. Rev. Stat. § 339.800 (2004)...........................................................17, 29

**Rules**

Fed. R. Civ. P. 50............................................................................................1, 2, 4

**Other Authorities**

2A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2007) ..............................5, 6, 10

ABA Antitrust Section, 1-9 *Antitrust Law Developments* (9th ed. 2022) ....................................17

David S. Evans, *The Antitrust Economics of Two-Sided Markets*, 20 Yale J.
    Regul. 325 (2003) ................................................................................19

Jean-Charles Rochet & Jean Tirole, *Cooperation Among Competitors: Some
    Economics of Payment Card Associations*, 33 RAND J. Econ., no. 4 (Winter
    2002) .....................................................................................................19

Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, 37
    RAND J. Econ., no. 3 (Autumn 2006).................................................19

v

Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*,
   1 J. Eur. Econ. Ass'n, no. 4 (2003) ........................................................................................19

6 William Rubenstein et al., *Newberg and Rubenstein on Class Actions* § 20:9
   (6th ed. 2022) ....................................................................................................................5, 6

Before submission of the case to the jury, Defendant the National Association of REALTORS® (NAR) timely moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). ECF 1273, 1275. The Court denied the motion, ECF 1278, and NAR now renews its request pursuant to Rule 50(b). Should the Court decline to enter judgment as a matter of law, NAR moves for a new trial pursuant to Rule 59 in a motion contemporaneously filed with this one. ECF 1361, 1362.

## LEGAL STANDARD

"Judgment as a matter of law is appropriate where there is no 'legally sufficient evidentiary basis' for a reasonable jury to find for the non-moving party." *Warren v. Kemp*, 79 F.4th 967, 972 (8th Cir. 2023) (citation omitted). The non-moving party is "entitled to the benefit of reasonable inferences." *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1026 (8th Cir. 2000) (citation omitted). "When the record contains no proof beyond speculation to support the verdict," however, "judgment as a matter of law is appropriate." *Id.* (quotation marks and citations omitted).

## ARGUMENT

Plaintiffs obtained a nearly $1.8 billion verdict—one of the largest antitrust damages awards ever issued—based on a challenge to the Cooperative Compensation Model Rule (Model Rule), which requires only that a seller broker disclose an offer of compensation to the buyer broker among other disclosures on a Multiple Listing Service (MLS). Plaintiffs obtained that astonishing recovery even though they purchased nothing directly from any Defendant, the rule does not restrain trade in any way (let alone in any way ever recognized as per se anticompetitive), NAR did not agree with the other Defendants on anything pertinent to Plaintiffs' allegations, and Plaintiffs made no effort to calculate a legally defensible damages amount. In short, Plaintiffs'

1

case was rife with legal defects from start to finish, and Defendants should be granted judgment as a matter of law for any or all of the following reasons.[1]

## I. THE DIRECT-PURCHASER REQUIREMENT BARS PLAINTIFFS' SUIT

The Clayton Act authorizes a private damages action by a person "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Interpreting that provision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny, the Supreme Court has "established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). Here, it is undisputed that Plaintiffs did not purchase anything directly from Defendants; Plaintiffs instead purchased real-estate services directly from local brokers, who "are not defendants in this case." 10/17/2023 Trial Tr. 15:2-3 (M. Ketchmark). Plaintiffs' suit can therefore proceed only if an exception to the direct-purchaser requirement applies. None does. By declining to sue the alleged antitrust violators from whom they purchased directly, Plaintiffs failed to satisfy a core requirement of a private damages action. Their suit must accordingly be dismissed. *See* ECF 1275 at 1 (NAR's Rule 50(a) motion preserving this argument).[2]

### A. Plaintiffs Did Not Purchase Directly From Defendants

For all the other complexities in this case, the direct-purchaser analysis is simple. Plaintiffs did not purchase anything from Defendants. They are accordingly indirect purchasers with respect to the parties they sued. *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93, 97 (1989) (explaining that "indirect purchasers" are those who "did not purchase . . . directly from the [allegedly] price-fixing defendants"); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (same).

---

[1] NAR joins in full and incorporates by reference the arguments in the Rule 50(b) motions filed by Defendant Keller Williams and the HomeServices Defendants.

[2] Plaintiffs initially asserted state-law antitrust claims, which are not governed by *Illinois Brick* and its progeny, but Plaintiffs later voluntarily dismissed those claims. ECF 1142, 1227.

2

To be sure, Plaintiffs did make direct purchases. But they made those direct purchases from—*i.e.*, they paid real-estate commissions to—local brokers. *See, e.g.*, PX-2200 at 1, PX-2225 at 1, PX-2211 at 5, PX-2217 at 4, DX-3655 at 4, DX-3899 at 5 (home-sale listing agreements between Plaintiffs and local brokers); PX-2201 at 2, PX-2212 at 2, PX-2226 at 2 (closing statement contracts between Plaintiffs and local brokers). And it is undisputed that these local brokers "are not defendants in this case." 10/17/2023 Trial Tr. 15:2-3 (M. Ketchmark).[3]

Plaintiffs therefore may maintain this suit only if some exception to the direct-purchaser requirement applies. *See, e.g.*, *Illinois Brick*, 431 U.S. at 726, 728-729 (barring suit by plaintiffs who purchased directly from general contractors but sued only manufacturers and distributors from whom they purchased indirectly); *id.* at 735-36 (explaining that no exception applies).

### B.    No Exception To The Direct-Purchaser Requirement Applies

The Supreme Court has repeatedly refused to "engage in 'an unwarranted and counterproductive exercise to litigate a series of exceptions'" to the direct-purchaser requirement. *Apple*, 139 S. Ct. at 1524 (citation omitted). The Court has explained that the "possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990). Lower courts, including the Eighth Circuit, have accordingly recognized only "very limited circumstances" under which an indirect purchaser may sue, including where the defendant has "conspired with" or "own[s] or control[s]" an intermediary antitrust violator. *Campos*, 140 F.3d at 1170-71. Critically, an indirect purchaser can invoke those exceptions only if the intermediary violators are "joined as parties" to the case. *In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 529 (8th Cir. 1984). Because Plaintiffs

---

[3] Indeed, Plaintiffs acknowledged in their prior Eighth Circuit briefing that Corporate Defendants are "*two* steps removed" from any home-sale transaction. *Sitzer v. Nat'l Ass'n of Realtors*, No. 20-1779 (8th Cir. 2020), Resp. Br. at 5, 39-40.

did not join as defendants the alleged intermediary violators here—local brokers—Plaintiffs cannot invoke any valid exception to the direct-purchaser requirement.

## 1. The Co-Conspirator Exception Does Not Apply

At earlier stages of the case, Plaintiffs contended that the co-conspirator exception allows them to sue Defendants despite not purchasing directly from them. Specifically, Plaintiffs asserted that they can sue Defendants because Defendants allegedly conspired with the local brokers from whom Plaintiffs purchased directly. *See* ECF 759 at 17, ¶ 34 (complaint alleging that local brokers "have participated as co-conspirators in the antitrust violations"); ECF 956 at 31 (summary judgment brief arguing that, "[u]nder *Illinois Brick*, . . . standing is given to 'the first purchasers from *outside* the conspiracy'") (citation omitted); 10/26/2023 Trial Tr. 1717:12-16 (incorporating summary judgment arguments in response to NAR's Rule 50(a) motion). Plaintiffs failed to buttress their allegation of a conspiracy between NAR and local brokers with any evidentiary support. *See infra* Part III. But even setting that aside, Plaintiffs' attempt to invoke the co-conspirator exception has a fatal defect: "the alleged coconspirators, that is, the [local brokers], are not joined as parties." *Midwest Milk*, 730 F.2d at 529; *accord Campos*, 140 F.3d at 1171 n.4.

The Eighth Circuit explained that a plaintiff invoking the co-conspirator exception must name the alleged co-conspirators as defendants 40 years ago in *Midwest Milk*. There, the plaintiffs sued milk producers for alleged price fixing but "concede[d] that they did not buy . . . milk products" directly from those defendants. 730 F.2d at 529-30. The plaintiffs argued that their suit could proceed because the "dealers or vendors" from whom they purchased directly "[we]re alleged to be coconspirators," even though they were "not joined as party defendants." *Id.* The Eighth Circuit rejected that argument, reasoning that "[w]hatever the merits of the arguments for [a co-conspirator] exception in general, we do not think that the reasoning of *Illinois Brick* permits recognizing the exception when, *as here, the alleged co-conspirator middlemen are not named as*

4

*parties defendant.*" *Id.* at 530 (quoting *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979)). The court explained that, "[a]bsent joinder of the [alleged co-conspirators]," the defendants would not be adequately protected "from the risk of overlapping liability," because the non-parties would not be bound by the judgment and could assert "in their own lawsuit that they did not in fact conspire with the [defendants] and are therefore not barred . . . from recovering" from the same defendants. *Id.* (citation and emphasis omitted). Such a "possibility of inconsistent adjudications," the court reasoned, "leaves the defendants subject to the risk of multiple liability that the *Illinois Brick* Court found unacceptable." *Id.* (citation and emphasis omitted).

The Eighth Circuit has since repeatedly confirmed that straightforward rule. *See, e.g.*, *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015); *Campos*, 140 F.3d at 1171 n.4. And the Eighth Circuit is not alone. The leading antitrust treatise explains that "courts generally hold that," when a plaintiff invokes the co-conspirator exception to the direct-purchaser requirement, "the alleged co-conspirators must be named as parties." 2A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 346h (3d ed. 2007). The leading class-action treatise similarly instructs that "indirect purchasers are generally required to join the" allegedly conspiring intermediaries "as defendants if they want to take advantage of the co-conspirator exception to *Illinois Brick*." 6 William Rubenstein et al., *Newberg and Rubenstein on Class Actions* § 20:9 (6th ed. 2022). And numerous courts of appeals have "expressly refused to adopt a co-conspirator exception to *Illinois Brick* absent the joinder as defendants of the alleged co-conspirators." *Howard Hess Dental Lab'ys. Inc. v. Dentsply Int'l, Inc*., 424 F.3d 363, 371 (3rd Cir. 2005); *see also, e.g.*, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 533 F.3d 1, 4-5 (1st Cir. 2008); *In re Coordinated Pretrial Procs.*, 691 F.2d 1335, 1342 (9th Cir. 1982); *Beef Industry*, 600 F.2d at 1163. Those authorities require joinder for precisely the same reason the Eighth Circuit

5

articulated in *Midwest Milk*: "Absent joinder of [the alleged co-conspirators], serious risks of duplicative recovery and inconsistent adjudications would ensue." *Pretrial Proceedings*, 691 F.2d at 1342; *see, e.g.*, *Antitrust Law*, *supra*, ¶ 346h; *Newberg and Rubenstein on Class Actions*, *supra*, § 20:9; *New Motor Vehicles*, 533 F.3d at 5; *Dentsply*, 424 F.3d at 371.[4]

The Eighth Circuit's settled joinder rule plainly bars Plaintiffs' attempt to invoke the co-conspirator exception to the direct-purchaser requirement here. Not only did Plaintiffs "fail[] to join" as defendants the alleged co-conspirators from whom they purchased directly (the local brokers), *Midwest Milk*, 730 F.2d at 533 n.6, but Plaintiffs emphatically reiterated that those alleged co-conspirators "are not defendants in this case," 10/17/2023 Trial Tr. 15:2-3 (M. Ketchmark). It is difficult to imagine a clearer illustration of the principle that "non-joinder defeats plaintiffs' claims." *Midwest Milk*, 730 F.2d at 533. !

### 2. The Control Exception Does Not Apply

Plaintiffs also briefly suggested at summary judgment that a "control" exception to the direct-purchaser requirement may permit their suit. *See* ECF 956 at 31 (stating that the direct-purchaser requirement does not apply "where the direct purchaser is owned or controlled by its customer") (quoting *Illinois Brick*, 431 U.S. at 736 n.16). But any such claim would be even more misplaced than Plaintiffs' attempted reliance on the co-conspirator exception.

---

[4] Courts outside the Eighth Circuit have referenced the co-conspirator exception without noting the corresponding joinder requirement. *See, e.g.*, *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347 (7th Cir. 2022) ("[A plaintiff] may sue any member of an alleged antitrust conspiracy, so long as the plaintiff is a direct purchaser from at least one member of the conspiracy."). But that is likely because the alleged co-conspirators were already joined as defendants in those cases, so there was no need to address the joinder requirement. *See id.* at 344 (noting that the alleged conspirators were named defendants); *see also, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (noting the rule that conspiring intermediaries must "be joined as defendants" and observing "that requirement is satisfied"). !

As an initial matter, the control relationship that Plaintiffs invoke—where an intermediary between an indirect-purchaser plaintiff and the defendants is "owned or controlled by its customer"—does not apply by its own terms. There is no allegation that the intermediaries here (local brokers) are owned or controlled by any "customer." And while the Eighth Circuit has suggested a possible exception where "indirect purchasers own or control the direct purchasers," *Campos*, 140 F.3d at 1171, the indirect purchasers here are Plaintiffs themselves, and they do not purport to own or control anyone. What Plaintiffs seem to envision is an exception under which indirect purchasers can sue defendants who own or control an intermediary. Although some courts have allowed suits in such circumstances, *see, e.g.*, *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980), the Eighth Circuit has not.

Even if Plaintiffs' modified version of the control exception were theoretically cognizable, it would fail here for the same reason that their invocation of the co-conspirator exception fails: Plaintiffs declined to join the intermediaries as defendants in the suit. *See supra* § I.B.1. Just as an indirect-purchaser plaintiff's failure to join an intermediary that allegedly conspired with the defendants "leaves the defendants subject to the risk of multiple liability that the *Illinois Brick* Court found unacceptable," *Midwest Milk*, 730 F.2d at 530 (emphasis and citation omitted), so too does an indirect-purchaser plaintiff's failure to join an intermediary that is allegedly controlled by the defendants. In both scenarios, the non-party intermediary would not be bound by the judgment and could therefore bring a later suit seeking to recover duplicative damages from the same defendants. *See id.* To avoid that result, courts that recognize the control exception have applied the same joinder requirement that accompanies the co-conspirator exception. *See, e.g.*, *St. Francis Med. Ctr. v. C.R. Bard, Inc.*, 657 F. Supp. 2d 1069, 1105 (E.D. Mo. 2009) (rejecting a plaintiff's invocation of an "exception to the direct purchaser rule that permits an indirect purchaser to

7

recover when the [intermediary] is owned or controlled by the seller" because the intermediary was not "'joined as a defendant'" (quoting *Campos*, 140 F.3d at 1171 n.4)), *aff'd sub nom. Se. Missouri Hosp. v. C.R. Bard, Inc.*, 616 F.3d 888 (8th Cir. 2010).

Plaintiffs' invocation of a control exception also fails for the independent reason that the intermediaries from whom they purchased directly—the local brokers—are not controlled by Defendants in the sense contemplated by the exception, and Plaintiffs did not prove otherwise. Courts have generally "applied the control exception only when the [defendant] *owned* the" relevant intermediary. *Dentsply*, 424 F.3d at 371 (emphasis added). But here, Defendants do not "own" local brokers. NAR does not own any brokerages. Defendant Keller Williams is a real estate franchise company that enters into arm's-length commercial relationships with "*independently owned and operated*" brokerages. 10/30/2023 Trial Tr. 2269:5-19 (J. Davis) (emphasis added); *accord id.* at 2268:8-20; 10/27/2023 Trial Tr. 1946:23-1947:14, 1948:9-14 (G. Keller). And Defendant HSF Affiliates is a holding company for BHH Affiliates, which similarly franchises "independently owned and operated" companies. PX 4612 (HomeServices of America organization chart); *see also* 10/25/2023 Trial Tr. 1523:24-1524:7, 1528:22-1529:1, 1530:19-25, 1588:5-1589:8 (R. Warner); *id.* at 1452:14-20 (G. Blefari).

Even when a defendant formally owns an intermediary, that alone does not establish the requisite degree of control for an indirect-purchaser plaintiff to invoke the control exception. *See, e.g.*, *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101 (E.D.N.Y. 2012) ("A plaintiff seeking to gain the benefit of this exception . . . may not rely simply on the existence of a parent-subsidiary relationship."). The plaintiff must show "functional economic or other unity between the" intermediary and the defendant. *Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir. 1980); *see, e.g.*, *Vitamin C*, 279 F.R.D. at 101 (requiring the plaintiff to "present facts

demonstrating that such unity exists"). Plaintiffs fall far short of that standard here. There is no argument that Defendants NAR, Keller Williams, or HSF Affiliates have anything approaching "functional economic or other unity" with any local brokers. *Jewish Hosp. Ass'n*, 628 F.2d at 975. And while Home Services of America does indirectly own—via a different holding company— three brokerages in Missouri, it is undisputed that those local brokerages maintain operational independence. PX 4612; 10/24/2023 Trial Tr. 1334:16-1335:4, 1337:4-11 (R. Peltier); *id.* at 1368:7-25 (G. Blefari); 10/25/2023 Trial Tr. 1616:9-1618:12 (M. Frazier).

### 3. No Other Valid Exception Applies

At summary judgment, Plaintiffs also contended that they can sue Defendants despite not purchasing from them directly because—in Plaintiffs' view—"[n]o listing broker will ever sue its parent company claiming damage caused by the challenged rules." ECF 956 at 32. Plaintiffs based that supposed exception to the direct-purchaser requirement on the Ninth Circuit's decision in *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003). *Id.* This Court—while holding that it "need not address" the issue—appeared inclined to accept Plaintiffs' position at that stage of the case. ECF 1019 at 13 n.9. Plaintiffs' argument, however, rests on a demonstrable misreading of *Freeman*.

*Freeman* did not endorse a freestanding judicial inquiry into the probability that a hypothetical antitrust suit might be brought. Such a speculative test would have no basis in the Supreme Court's jurisprudence, which has stressed the need for a clear and administrable direct-purchaser rule. *See Apple*, 139 S. Ct. at 1524; *see also, e.g.*, *Hertz Corp. v. Friend*, 559 U.S. 77, 94-95 (2010) (explaining the need for "straightforward" and "predictab[le]" jurisdictional rules). *Freeman* instead referred to the lack of a "realistic possibility that the direct purchaser will sue its supplier" only in the context where the direct purchaser was "own[ed]" by and "accused of conspiring with" that supplier. *Freeman*, 322 F.3d at 1145-46. And *Freeman* relied on an earlier

9

decision that likewise referred to the unlikelihood of an enforcement suit only as a byproduct of conspiracy and control. *Id.* (citing *Royal Printing*, 621 F.2d at 326). Thus, as the Ninth Circuit later expressly clarified, "*Freeman* did not create a new variation of" a direct-purchaser exception, but simply "relied on ownership and control to find standing." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 756 (9th Cir. 2012); *see Antitrust Law*, *supra*, ¶ 346f ("What [*Freeman*] was really describing was a 'control' or perhaps a 'co-conspirator' exception."). As explained above, Plaintiffs cannot invoke the control exception here for multiple reasons, including that they failed to name the allegedly controlled intermediaries as defendants and to establish the requisite degree of control. *See supra* § I.B.2; *cf. Freeman*, 322 F.3d at 1142, 1146 (noting that the plaintiffs "nam[ed] as defendant[]" the relevant intermediary, which was created, owned, and fully controlled by the other defendants).

In any event, even if Plaintiffs' reading of *Freeman* were correct, they would still not be permitted to sue. The Eighth Circuit has never suggested that it would adopt anything resembling the likelihood-of-suit inquiry that Plaintiffs claim to find in *Freeman*, and the Supreme Court has recently reiterated that the "bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case." *Apple*, 139 S. Ct. at 1524 (citation omitted). Moreover, Plaintiffs offer no evidence to support their conclusory claim that no local brokers "will ever sue" Defendants. ECF 956 at 32. That is an especially puzzling claim for Plaintiffs to make while relying on *Freeman*, which was a suit *by local real-estate brokers against real-estate associations*. *Freeman*, 322 F.3d at 1140-43. And *Freeman* is hardly the only such suit. *See, e.g.*, *Reifert v. South Cent. Wisconsin MLS Corp.*, 450 F.3d 312 (7th Cir. 2006) (suit by real-estate broker against real-estate trade association alleging Sherman Act violation based on MLS access rules); *Keller v. Greater Augusta Ass'n of Realtors,*

*Inc.*, 760 F. Supp. 2d 1373 (S.D. Ga. 2011) (suit by brokers against real-estate association alleging that MLS advertising rules violate the Sherman Act); *Hackman v. Dickerson Realtors, Inc.*, 595 F. Supp. 2d 875 (N.D. Ill. 2009) (suit by brokers and agencies against real-estate associations and others alleging an anticompetitive conspiracy to exclude plaintiffs from the local real estate market). Contrary to Plaintiffs' *ipse dixit* assertion, it is not hard to imagine that some seller brokers might oppose sharing commissions with buyer brokers and choose to sue Defendants on grounds similar to those advanced by Plaintiffs. Thus, even if Plaintiffs were correct that indirect purchasers can bring an antitrust suit based solely on a prediction that no one else will, such an exception would not allow Plaintiffs to evade the direct-purchaser requirement here.

### C.      Judgment As A Matter Of Law Is Required

Compliance with the direct-purchaser requirement is "a question of law for the district court to decide." *ATM Fee Antitrust Litig.*, 686 F.3d at 747. Because Plaintiffs undisputedly did not purchase directly from Defendants and have not established any valid exception to the direct-purchaser requirement, judgment as a matter of law is required. *See Midwest Milk*, 730 F.2d at 533 ("Under our view that non-joinder defeats plaintiffs' claims, it is not necessary to review the arguments made relating to allegedly disputed facts and the appropriateness of the grant of summary judgment."); *see also, e.g.*, *Campos*, 140 F.3d at 1171-72 (dismissing claims based on failure to comply with direct-purchaser rule or to invoke a valid exception); *New Prime Inc. v. Espar, Inc.*, 2016 WL 10644516, at *2 (W.D. Mo. Oct. 27, 2016) (same).

Although the Court did not reach that result at earlier stages of the case, it remains free to do so here. And even if the Court were to consider the evidence that went to the jury, judgment as a matter of law for Defendants would nevertheless be required. The Court instructed the jury that, "[i]f you find that the plaintiffs have not shown they paid . . . allegedly inflated commissions directly to the buyers' brokers, the plaintiffs are not entitled to damages and you must find for the

11

defendants on these claims." ECF 1292 at 43. Given that instruction, the jury was required as a matter of law to "find that the plaintiffs have not shown they paid . . . allegedly inflated commissions directly to the buyers' brokers," *id.*, because Plaintiffs adduced no evidence demonstrating that they paid any commissions directly to buyer brokers. To the contrary, the unrefuted evidence demonstrated that payments from Plaintiffs went only to *seller* brokers. For example, the listing agreement between Plaintiff Rhonda Burnett and her seller broker states that "SELLER agrees to pay Reece & Nichols Realtors [the seller broker] a commission consisting of . . . 6% of the selling price" and that the "BROKER will offer a commission" to the buyer broker. PX-2200 at 2. All of the other listing agreements introduced into evidence have the same structure. *See* PX-2211, PX-2225. The inescapable meaning of those documents is that Plaintiffs did not make any payments directly to buyer brokers, but only did so through an "intermediary"—which makes Plaintiffs paradigmatic "indirect purchasers" who cannot sue. *Apple*, 139 S. Ct. at 1522.[5]

Dismissing Plaintiffs' claims would not mean that no one can ever challenge the practices at issue here. Indeed, Plaintiffs themselves may have been able to do so if they had chosen to join as defendants the local brokers from whom they purchased directly or if they had maintained their state-law claims. *See ARC Am. Corp.*, 490 U.S. at 105-06 (holding that state-law antitrust claims are not subject to the *Illinois Brick* rule); *Turtle Island Foods, SPC v. Richardson*, 425 F. Supp. 3d 1131, 1138 (W.D. Mo. 2019) (naming a putative class of defendants); *Thomas v. U.S. Bank N.A., N.D.*, 2012 WL 12897284, at *1 n.2 (W.D. Mo. Sept. 27, 2012) (same). But Plaintiffs made—and

---

[5] Plaintiffs' trial presentation was nonresponsive to that legal defect. Plaintiffs' position was instead that they qualify as "direct purchaser[s]" because "they paid the [allegedly] inflated commissions." 10/30/2023 Trial Tr. 2504:7-11 (M. Ketchmark). That is not an accurate statement of the law. After all, the plaintiffs in *Illinois Brick* also paid allegedly inflated prices; the whole point of the Court's decision in that case and the decades of direct-purchaser jurisprudence that has followed is that only certain parties who pay allegedly inflated prices can bring suit.

12

trumpeted—the deliberate decision not to bring this case against local brokers. Whatever strategic benefits they might have expected at trial from that decision, the cost now is dismissal of their suit. *Cf. In re Mushroom Direct Purchaser Antitrust Litig.*, 2017 WL 696983, at *7 (E.D. Pa. Feb. 22, 2017) ("Plaintiffs' failure to name [the required intermediary] as a defendant is what creates any 'gap in antitrust enforcement,' not application of the *Illinois Brick* direct purchaser rule." (citation omitted)).

## II. THE MODEL RULE IS NOT AN UNREASONABLE RESTRAINT OF TRADE

Plaintiffs were required to prove that the Model Rule is "an unreasonable restraint on trade." *Willman v. Heartland Hosp. E.*, 34 F.3d 605, 610 (8th Cir. 1994). But they failed to submit sufficient evidence to support the jury's verdict. They proceeded at trial exclusively under a per se theory of antitrust liability, but that theory is legally defective, and the evidence could not support the jury's verdict under the rule of reason.

### A. The Model Rule Is Not A Per Se Antitrust Violation

NAR explains at length in its motion for a new trial under Rule 59 why settled law does not allow per se condemnation of the Model Rule. *See* ECF 1362 at 4-16. For the sake of brevity, NAR does not repeat that full analysis here and incorporates the discussion from the Rule 59 motion by reference. In short, a court may not condemn a given arrangement as a per se violation unless "courts have had considerable experience with the type of restraint at issue" and the restraint "would always or almost always tend to restrict competition and decrease output." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citation and internal quotation marks omitted). Neither the Model Rule nor any analogous disclosure rule has ever been subject to judicial scrutiny, let alone found to virtually always restrict competition. And although Plaintiffs have characterized the Model Rule as a form of horizontal price-fixing, the Supreme Court has not condemned all arrangements that might be described that way, even where they

13

clearly involved agreements on price. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5-6 (2006); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979). Plaintiffs rely principally on isolated statements from *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), to argue that any practice with the "purpose and effect" of increasing or stabilizing prices automatically warrants per se treatment, but that interpretation is far too broad, particularly in light of the many ensuing decades of development of the per se framework since *Socony-Vacuum Oil* was issued in 1940.

### B. The Undisputed Evidence Presented At Trial Establishes That The Model Rule Satisfies The Rule Of Reason

When analyzed under the rule of reason, the Model Rule does not amount to an unreasonable restraint of trade as a matter of law. "Under rule-of-reason analysis, courts seek to ascertain the extent to which challenged conduct harms competition and to then determine whether any such harm is nonetheless justified by countervailing procompetitive benefits." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388-89 (8th Cir. 2007). As overwhelmingly shown at trial—indeed, as made clear by undisputed and indisputable facts—the Model Rule has no effect on whether seller brokers make offers of commissions or on the rates paid by sellers. Even if it did have some effect on the rates that sellers pay, moreover, the Model Rule would be justified under antitrust principles governing ancillary restraints and two-sided platforms.

#### 1. There Is No Evidence That The Model Rule Has Anticompetitive Effects

Despite hinging their case at trial on the alleged price effects of the Model Rule, *see, e.g.*, 10/30/2023 Trial Tr. 2346:25-2347:2 (M. Ketchmark), Plaintiffs presented no evidence that the Model Rule—which does no more than require a seller broker to make an offer of compensation of any amount, even $1—has any effect whatsoever on the commissions that sellers pay (or that the purpose of the Model Rule is to inflate or stabilize commissions). The claim is deeply

14

implausible on its face.  The Model Rule does not impose any obligation whatsoever on sellers; neither NAR's Handbook on Multiple Listing Policy nor its Code of Ethics requires sellers to pay anything to anyone.  PX-216 at 37-39; 10/19/2023 Trial Tr. 588:2-4 ("Q And this rule does not say anything about what sellers must do, correct? A No, it does not.") (C. Schulman).  As the testimony and listing agreements from the named Plaintiffs show, sellers commit *only* to pay the seller brokers their commissions, which sellers are free to negotiate, and it is the seller brokers who decide how they will share their commissions with buyer brokers.  *See e.g.*, PX-2200; PX-2225; 10/18/2023 Trial Tr. 267:18-268:11 (H. Ellis).

Other features of the Model Rules make clear that, as a practical matter, sellers are under no obligation to pay any particular commission.  Offers of compensation made by seller brokers to buyer brokers are disclosed to sellers in Missouri, and sellers must consent to the arrangement.  *See* DX-4034 (Code of Ethics, SOP 1-12).  The offers are negotiable at all times before closing, and, in practice, brokers regularly negotiate the listing commission.  *See* 10/24/2023 Trial Tr. 1217:24-1220:23 (R. Gansho); 10/30/2023 Trial Tr. 2270:12-14 (J. Davis).  In fact, a "significant portion" of offers made in Missouri on the MLS between 2014 and 2020, ranging from 23% to 33% depending upon the year, differed from the commissions ultimately paid. 10/26/2023 Trial Tr. 1830:1-1831:15 (L. Wu).  And at any rate, if a seller objects to any of the mandatory rules in NAR's Handbook on Multiple Listing Policy—including if the seller does not want the seller broker to pay a buyer broker anything—the seller can easily avoid the requirement entirely by selling the property without a broker, hiring a nonmember of NAR, or marketing the property privately with a NAR member.  *See* 10/24/2023 Trial Tr. 1243:4-10 (R. Gansho).

The Model Rule thus does not require sellers to pay any particular commission or to do anything at all.  They can freely negotiate commissions with their seller brokers or can take

advantage of multiple alternative ways to sell their homes.  Nor does the Model Rule impose any obligation on seller brokers that could plausibly result in higher commissions for buyer brokers. The Model Rule is simply a disclosure obligation, and seller brokers are free to list offers of $1 and to renegotiate commissions up to closing.  10/24/2023 Trial Tr. 1220:13-23 ("You can always negotiate what the commission is.") (R. Gansho); *id.* at 1162:8-17 ("Q Is there anything in this rule that tells a seller what they have to do? A No. It's up to the seller to decide what they want to do.") (R. Goldberg).  For that reason, the Model Rule can hardly even be deemed a "restraint."  It does not restrain anything.

At trial, Plaintiffs never coherently explained how a mere disclosure rule could increase commission rates at all, let alone be solely responsible for the existence of the practice of seller brokers paying buyer-side commissions—the preposterous premise of Plaintiffs' damages theory. Revealingly, the Plaintiffs' experts focused on *other* alleged rules and practices as the mechanisms by which commissions were supposedly raised or stabilized, including the alleged practice of steering and the NAR model rule requiring seller brokers to file listings into an MLS within one business day of public marketing.  *See, e.g.,* 10/19/2023 Trial Tr. 524:17-525:24 (C. Schulman); 10/20/2023 Trial Tr. 626:1-24 (C. Schulman); *id.* at 698:7-21; *id.* at 750:2-22 (R. Alford); *id.* at 764:16-765:16.  But the Plaintiffs presented no evidence of a conspiracy to enforce those other rules or practices, and the jury was not asked to make any such finding.  In short, there was simply no evidence that the Model Rule itself is responsible for the paying of buyer broker commissions or for the rate of commissions that sellers pay their brokers.

To the contrary, the empirical evidence presented at trial uniformly demonstrates that the Model Rule has no effect on commissions.  For one thing, Plaintiffs' own expert, Dr. Schulman, admitted that commission sharing existed in the real estate industry for *decades* before NAR

adopted a Model Rule requiring that seller brokers disclose their offers of compensation. 10/20/2023 Trial Tr. 635:5-7 ("Q In fact, listing brokers offering to pay buyer's agents has existed for decades, fair? A Yes.") (C. Schulman).  That shows that the Model Rule did not cause the practice that Plaintiffs claim to have injured them.  *See* ABA Antitrust Section, 1-9 *Antitrust Law Developments* § 9C-3-b (9th ed. 2022) (One common method of determining whether conduct is a restraint is to look at behavior, such as prices, "during the period" with the alleged restraint and compare it to behavior "prior to the beginning of the violation or after its termination.").  In fact, offers of compensation from seller brokers or sellers to buyer brokers have been authorized by a Missouri statute since long before the Model Rule was promulgated—a curious feature of the law if such arrangements were solely the product of the Model Rule.  Mo. Rev. Stat. § 339.800 (2004).

Other undisputed empirical evidence presented at trial confirms the common-sense conclusion that a mere disclosure rule could have no effect on commission rates.  Dr. Wu's analysis of residential markets in the United States that do not have a requirement akin to the Model Rule shows there is no material difference in commissions or offers of compensation. 10/26/2023 Trial Tr. 1837:12-1838:6 ("I also have looked at commission rates in other U.S. cities, including cities where the rule at issue was not present. And you also will see commissions that are clustered around a single rate.") (L. Wu); *see In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1002-03 (8th Cir. 2019) (analyzing whether conduct causes harm by examining similar markets that do not have the conduct).  Perhaps most notably, Plaintiffs' expert, Dr. Schulman, agreed that the amounts offered by seller brokers to buyer brokers vary across and within the subject MLSs, despite all having identical NAR rules. *See infra* at 22-23.  This variation shows that market factors and competition, and not NAR's rules, determine offers of compensation.

17

## 2. Even If The Model Rule Had Some Effect On Commissions, It Would Be Permissible As A Matter Of Law Under The Rule Of Reason

Even if the Model Rule had some effect on commissions, the Model Rule would not be an unreasonable restraint of trade under the traditional rule of reason analysis as a matter of law. Given controlling legal principles and the evidence presented at trial, no reasonable jury could conclude otherwise.

As an initial matter, the Model Rule is justified as a valid ancillary restraint supporting the MLS, which qualifies as a type of business association or joint venture. An MLS indisputably creates efficiencies for consumers by pooling information about home listings into one platform, vastly reducing transactions costs and facilitating sales between buyers and sellers. Because Plaintiffs have not contested that each MLS is a "legitimate business collaboration," the Model Rule is "valid" so long as it "is ancillary to the legitimate and competitive purposes of the business association," even if it does not lie at the "core" of an MLS. *Dagher*, 547 U.S. at 7. Given that a central purpose of an MLS is to collect all information about a home sale into a single location, requiring disclosure of what the seller broker is willing to offer the buyer broker makes the MLS "more effective in accomplishing its purpose." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) (Bork, J., for the court). Indeed, although the Model Rule is not a necessary component of a functioning MLS, the Model Rule likely qualifies as part of the "core activity of the joint venture itself" within the meaning of *Dagher* insofar as the MLS's activity is pooling information about proposed home-sale transactions. *Dagher*, 547 U.S. at 7. Because Plaintiffs have not challenged the MLS itself as an antitrust violation, *cf. Dagher*, 547 U.S. at 6 n.1, the Model Rule is necessarily valid as a matter of law under *Dagher*.

In addition, Plaintiffs' trial evidence could not justify invaliding the Model Rule under the rule of reason because Plaintiffs' arguments and evidence did not accord with the proper

18

framework for addressing rules in platforms like an MLS. An MLS is a "two-sided platform," because it "offers different products or services to two different groups"—buyers and sellers—"who both depend on the platform to intermediate between them." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018) (*AmEx*).[6] The sale to the buyer, the payment by the seller, and the payment of commissions are made simultaneously, *see AmEx*, 138 S. Ct. at 2286, and offers of compensation to buyer brokers cannot be lowered or eliminated "without risking a feedback loop of declining demand." *Id.* at 2285. In *AmEx*, the Supreme Court was crystal clear that the antitrust analysis of a two-sided platform generally "must include both sides of the platform," because "[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." *Id.* at 2286. Here, however, Plaintiffs never attempted to show that the Model Rule increases the "overall cost" of MLS services for all participants but rather focused exclusively on the effect on sellers.

That failure of proof requires that judgment be entered for Defendants. It cannot be disputed, after all, that offers of compensation benefit home buyers, because they receive representation without having to pay for broker services out of their own pocket, making it possible for them to make offers for properties that they may not otherwise have been able to afford. 10/26/2023 Trial Tr. 1726:14-1728:6 ("[I]f a home buyer wants professional representation, which I think is critically needed if you've never bought a home before, it's going to then take some of the money you were going to use for a down payment.") (D. Stevens). Assuming *arguendo* that

---

[6] *See generally* Jean-Charles Rochet & Jean Tirole, *Cooperation Among Competitors: Some Economics of Payment Card Associations*, 33 RAND J. Econ., no. 4, 549-70 (Winter 2002); Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*, 1 J. Eur. Econ. Ass'n, no. 4, 990 (2003); Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, 37 RAND J. Econ., no. 3, 645 (Autumn 2006); David S. Evans, *The Antitrust Economics of Two-Sided Markets*, 20 Yale J. Regul. 325 (2003).

Plaintiffs succeeded in showing that the Model Rule causes offers of compensation to be made or affects commission rates (*but see supra* at 16-17), they nevertheless failed to establish an antitrust violation as a matter of law because they did not offer any evidence that whatever anticompetitive effect (if any) exists with respect to home sellers more than offsets the benefit to home buyers.

Finally, apart from those two fundamental legal flaws in Plaintiffs' position, they simply presented no rebuttal to Defendants' considerable evidence that the Model Rule benefits home sellers. 10/26/2023 Trial Tr. 1726:14-1727:19 (changing the model rule "would cause extraordinary, serious damage, particularly to first-time homebuyers and cash-constrained homebuyers") (D. Stevens); *id.* at 1728:7-1729:8 ("In the absence of [the model rule], there would be a lot of buyers who could not afford a buyer broker in some cases, and they wouldn't necessarily know what's coming on the market at any given point in time, or even if it's a market that they should be looking at.") (D. Stevens); *id.* at 1739:14-1740:7 (the model rule benefits sellers because "there are so many buyer brokers representing all these potential homebuyers in the market" who "bring[] more traffic and more competition to the sale of that home") (D. Stevens). Given the overwhelming evidence of benefits, and the paucity of evidence (if any) that the rule affects the commissions paid by sellers, Defendants are entitled to judgment as a matter of law because no reasonable jury could find that the Model Rule fails the rule of reason.

## III.   PLAINTIFFS PRESENTED NO EVIDENCE THAT NAR CONSPIRED WITH ANYONE

In addition to failing to prove that the Model Rule is an unreasonable restraint of trade, Plaintiffs failed to prove "an agreement in the form of a contract, combination, or conspiracy" to enforce the Model Rule. *Willman*, 34 F.3d at 610. To satisfy that element, Plaintiffs were required to present evidence showing that the alleged conspirators "had a conscious commitment to a

common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.* 465 U.S. 752, 764 (1984) (citation omitted).

Plaintiffs failed to present the jury with evidence that NAR conspired with another Defendant to enforce the Model Rule. The trial record contains no evidence of any agreement between NAR and any of the Corporate Defendants and does not otherwise establish a "conscious commitment to a common scheme." *Id.* Plaintiffs' own expert, Dr. Schulman, admitted that he had no opinion on whether there was a conspiracy and saw no documents or testimony showing that a conspiracy existed:

> Q. Sir, isn't it true that you have no opinion on whether there's a conspiracy between NAR and HomeServices?
>
> A. I believe I testified to that effect, yes.
>
> Q. Okay. And isn't it true that you have no opinion whether there is a conspiracy between NAR and Keller Williams?
>
> A. I believe that's what I testified to at deposition, yes.
>
> Q. And you have no opinion on whether or not there's a conspiracy between HomeServices and Keller Williams?
>
> A. I believe I testified to that at deposition, yes.
>
> . . . .
>
> Q. Let's focus on the facts. Okay? You have not seen a single document showing any Defendant discussing commissions with each other, correct, sir?
>
> A. That's correct.

10/19/2023 Trial Tr. 571:9-572:5 (C. Schulman).

Nor did the jury hear any other testimony or see any documents showing an agreement. To the contrary, every single witness who testified about the Model Rule affirmed that there was no conspiracy. Without exception, they all denied that they were involved in any agreement with

competitors on pricing.  *See* 10/23/2023 Trial Tr. 915:2-11 (S. Millet); *id.* at 1030:13-1031:1 (R. Goldberg); 10/24/2023 Trial Tr. 1169:7-19 (R. Gansho); *id.* at 1346:13-1347:9 (R. Peltier); *id.* at 1384:16-1385:20 (G. Blefari); 10/25/2023 Trial Tr. 1531:16-1532:5 (R. Warner); 10/27/2023 Trial Tr. 2032:21-2033:5 (G. Keller); *id.* at 2191:6-16 (M. King).  Witnesses from the Corporate Defendants testified that they did not even know about the Model Rule.  *See, e.g.*, 10/24/2023 Trial Tr. 1345:12-1346:25 (R. Peltier); 10/25/2023 Trial Tr. 1482:10-19 (G. Blefari).

While some Corporate Defendants require brokers to join NAR, there is no evidence that the Corporate Defendants require their brokers to follow the Model Rule, make offers of compensation at all, or stabilize, fix, or raise commissions.  10/19/2023 Trial Tr. 574:17-21 ("Q And you have not seen any documents or any testimony that would show any of the defendants have discussed how much a seller or their agent should offer to buyer brokers, correct? A Correct.") (C. Schulman).  And there was no evidence that NAR entered into an agreement with any Corporate Defendant requiring its brokers to either join NAR or abide by the Model Rule.

Dr. Schulman's testimony confirms that there could not have been a conspiracy to fix prices because he admitted that offers by seller brokers to buyer brokers varied materially through Missouri.  10/20/2023 Trial Tr. 619:20-628:18 (C. Schulman).  From April 29, 2015, through June 30, 2022, the buyer-broker commission rate across the four subject MLSs included 33,872 instances of a buyer broker being offered 2.5%, 80,633 instances of a buyer broker being offered 2.7%, and 139,116 instances of a buyer broker being offered 3%.



Heartland, Southern MO, Columbia, and MARIS: Distribution of Sold Listings
By Buyer Agent Commission Rate
April 29, 2015 - June 30, 2022
HomeServices of America Defendants, Keller Williams, REMAX, Realogy (Anywhere)

PLAINTIFFS' TRIAL EXHIBIT 2908 4:19-cv-00332-SRB

SITZER_006126

PX-2908; 10/20/2023 Trial Tr. 623:25-624:22 (C. Schulman). Offers of compensations to buyer brokers vary even within the individual subject MLSs. *See* PX-2907 (In MARIS MLS, 22% of buyer brokers are offered 2.5% commission, while 65% of buyer brokers are offered 2.7% commission and 7% of buyer brokers are offered 3%.).

There was no dispute, moreover, that those are just ***offers*** of compensation and are not what brokers were actually paid. As noted above, the trial evidence shows that the ultimate compensation paid differs from the offer in 23% to 33% of transactions. *See supra at* 15. These adjustments are evidence of negotiation, which is inconsistent with an antitrust conspiracy.

At most, Plaintiffs showed some degree of parallel pricing. But parallel behavior can be evidence of a conspiracy only if the evidence shows it "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an

23

advance understanding among the parties." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007) (internal quotation marks and citation omitted). In other words, "[t]here must be evidence that tends to exclude the possibility of independent action." *Monsanto*, 465 U.S. at 768; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."); *Twombly*, 550 U.S. at 554 ("An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict.").

Plaintiffs submitted no such evidence here. Plaintiffs heavily relied on the Corporate Defendants' internal training materials, videos, and meetings. But those are not evidence of a conspiracy *with NAR* because they have nothing to do with NAR or the Model Rule. *See, e.g*., PX-503; PX-686; PX-1187. There is no evidence that these training materials were developed as a part of any communication or understanding with NAR or any other Defendant.

In short, no reasonable jury could conclude that the trial evidence in this case met the legal standard for a conspiracy. NAR is entitled to judgment on that basis.

## IV.  PLAINTIFFS FAILED TO PROVE INJURY OR DAMAGES RESULTING FROM THE CHALLENGED MODEL RULE

To recover for an antitrust violation, a plaintiff must prove "the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054 (8th Cir. 2000) (citation omitted). In a class action, those elements must be proven for each class member. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). Because Plaintiffs failed to establish those elements here, their claim fails as a matter of law. *See, e.g., McDonald v. Johnson & Johnson*,

722 F.2d 1370, 1379 (8th Cir. 1983) (discussing the "solid line of case law [that] mandates" judgment as a matter of law "for failure to prove damages cognizable under the antitrust laws").

## A. Plaintiffs Failed To Establish Injury Resulting From The Challenged Rule

As a threshold matter, Plaintiffs fail to establish any injury resulting from the challenged Model Rule for a straightforward reason: the Model Rule does not require them to do anything. *See supra* § II.B.1. Plaintiffs are home sellers, but the Model Rule they challenge imposes obligations only on sellers' *brokers*. Any harm Plaintiffs allegedly suffered is therefore not traceable to the antitrust violation they assert. Plaintiffs are accordingly barred from collecting any damages. *See Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir. 1992) ("It is a requirement that an antitrust plaintiff must prove that his damages were caused by the *unlawful* acts of the defendant."); *Midwest Commc'ns v. Minnesota Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985) (similar).

Plaintiffs' evidence did not provide any legally cognizable basis for the jury to find that they suffered an injury resulting from the challenged Model Rule. Plaintiffs' damages case was presented entirely through the testimony of one expert witness, Dr. Schulman. He presented a series of charts that showed, through percentages, the buyer's commission offered by brokers affiliated with the Corporate Defendants during the class period, 10/19/2023 Trial Tr. 543:14-20 (C. Schulman); PX-2904 through PX-2908, and a one-page table representing "all the buy side commissions paid for by home sellers that listed with one of the agent's brokers affiliated with [the Corporate Defendants]," 10/19/2023 Trial Tr. 564:9-565:2 (C. Schulman); PX-4592A. Neither those figures themselves nor anything else in Dr. Schulman's testimony attempted to connect the amount of the buy-side commissions to the Model Rule. The premise of Plaintiffs' claimed injury was that *no* real-estate transaction in a market without the Model Rule would *ever* result in payment of the same buyer broker commissions as occurred during the class period. Thus,

if even *one* transaction without the Model Rule would include the same (or greater) buyer broker commission as was paid with the Model Rule, Plaintiffs would not be able to claim classwide harm. Yet Dr. Schulman presented no evidence to support that critical—and dubious—premise, and Plaintiffs failed to refute clear evidence showing that, in the markets without the Model Rule, buyer broker commission offers are in fact largely unchanged. *See* 10/26/2023 Trial Tr. 1848:25-1851:2 (L. Wu). Plaintiffs' evidence was accordingly legally insufficient to establish harm. *See, e.g.*, *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 518 F. Supp. 102, 117, 119 (E.D. Pa. 1981) (granting judgment as a matter of law where "the illusion of complete accuracy created by graphs, charts, and garbled expert testimony created a speculative verdict"); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

Plaintiffs' assertion of injury is also legally defective because it fails to account for class members who suffered no harm because they negotiated a home sales price net of any commissions paid, rather than a gross price. For example, former named Plaintiff Scott Trupiano testified that he sold a house to a hedge fund and negotiated a net sales price of $285,000. Deposition Designations of Scott Trupiano ("Trupiano Dep.") 220:11-221:16. Trupiano testified that he was agnostic as to the commissions and other transaction costs that were added to the total sales price, including the commission paid to the hedge fund's buyer broker. *Id.* at 230:17-231:07. Thus, even if the Model Rule that Plaintiffs challenge did affect the commissions ultimately paid, Plaintiffs like Trupiano were not harmed. Plaintiffs' failure to show injury for all members of the class they proposed is a legal defect requiring judgment for Defendants. *See Hydrogen Peroxide*,

552 F.3d at 311.[7]

**B.  Plaintiffs Failed To Prove Any Legally Supportable Amount Of Damages**

Even if Plaintiffs could show that they were injured by the Model Rule, they did not present any legally valid theory for determining damages.  *See Concord Boat*, 207 F.3d at 1057 (granting judgment as a matter of law based on flawed damages theory); *see also*, *e.g.*, *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116-17 (3d Cir. 1973) (affirming directed verdict for antitrust defendant where plaintiffs failed to produce "evidence concerning the factors essential to establish net profit" and thus "did not meet their burden of establishing the quantum of damages").

As explained above, the only evidence that Plaintiffs presented in support of their damages figure—the same $1,785,310,872 that the jury awarded—was a series of charts depicting the percentages and amounts of buyer commissions offered and paid in connection with home sales through brokers affiliated with the Corporate Defendants.  *See supra* § IV.A.  That paltry presentation was woefully inadequate to support the jury's award.  To begin, Plaintiffs' claim fails to account for benefits that Plaintiffs received from the Model Rule.  *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.").  Many class members who sold homes during the class period also bought homes during that same period, and in the process engaged buyer brokers who were compensated through commissions shared by seller brokers.  *See, e.g.*, 10/18/2023 Trial Tr. 265:11-15 (H. Ellis); *id.* at 341:21-23 (J. Keel).  In the but-for world envisioned by Plaintiffs, such class members would have to pay their buyer brokers directly.  *See* 10/19/2023 Trial Tr. 569:18-570:1 (C. Schulman).  Dr.

---

[7] That defect and others also require decertification of the class, as explained further in Defendants' motion for decertification filed contemporaneously with this motion.

27

Schulman refused to even consider that shift in his damages theory, but it would have dramatic ramifications. For example, named Plaintiff Jeremy Breit paid about $9,000 to his seller broker when he sold a home during the class period and paid nothing to his buyer broker when he bought a home during that period. 10/26/2023 Trial Tr. 1855:4-1856:19. In Dr. Schulman's but-for world, Mr. Breit would have paid about $5,000 to his seller broker and about $10,000 to his buyer broker—leaving him with a total commissions bill of about $6,000 *more*. *Id*.

Dr. Schulman also admitted that he failed to even attempt to calculate the total commissions that any Plaintiff paid, which is critical to any credible determination of Plaintiffs' damage amount. 10/20/2023 Trial Tr. 668:10-23. And Dr. Schulman made no effort to account for additional costs that sellers could incur in a world without the Model Rule, such as higher seller-side commissions or lower home-sale prices. Those errors are fatal to Plaintiffs' ability to present a legally sufficient basis for damages. *See, e.g.*, *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 893 (8th Cir. 1978) ("[D]amages accruing from the injury must be capable of reasonable ascertainment and must not be speculative or conjectural.").

Perhaps most egregiously, Dr. Schulman relied on a fantasy of a but-for world in which *no* class member—not one person—would have authorized a seller broker to offer *any* compensation to *any* buyer broker in *any* circumstance during the class period. 10/19/2023 Trial Tr. 563:13-16. That is, in Dr. Schulman's but-for world, the model that has prevailed in American real-estate for roughly the past half century would come to a total and immediate conclusion, with the entire state of Missouri transformed overnight into an Australia on the Plains in which buyer brokers are largely extinct. Confirming that his position was indeed that radical, Dr. Schulman testified that "every single penny that sellers had to pay a buy side agent here in Missouri during this time period is the measure of antitrust damages." *Id.* Dr. Schulman not only failed to provide legally sufficient

28

evidence to support that implausible result, but also failed to refute the overwhelming evidence that at least some compensation from seller brokers to buyer brokers would continue to exist—as occurred for decades before the Model Rule existed (starting in the nineteenth century), occurs regularly in markets where the Model Rule is not in force (such as those governed by the Northwest MLS and Real Estate Board of New York), is expressly authorized by Missouri law, and even sometimes happens in Australia. *See* 10/20/2023 Trial Tr. 635:5-7 (C. Schulman); *id.* at 836:5-10 (T. Reynolds); 10/26/2023 Trial Tr. 1848:15-1850:23, 1912:16-1913:6 (L. Wu); 10/30/2023 Trial Tr. 2294:25-2295:20 (J. Davis); *see also* Mo. Rev. Stat. § 339.800.

In short, "[w]hen a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage." *Amerinet*, 972 F.2d at 1494 (citation omitted). That is what happened here. Plaintiffs chose an all-or-nothing approach to damages and failed to support their request for all of the damages they sought. The legally required result is accordingly no damages.

## **CONCLUSION**

The Court should enter judgment as a matter of law for NAR.

Dated: January 8, 2024

Respectfully submitted,

/s/ Ethan Glass

Ethan Glass (*pro hac vice*)
Samantha Strauss (*pro hac vice*)
Georgina Inglis (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 776-2244
eglass@cooley.com
sastrauss@cooley.com
ginglis@cooley.com

Beatriz Mejia (*pro hac vice*)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
mejiab@cooley.com

Sarah Topol (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000
stopol@cooley.com

Charles W. Hatfield (MO Bar # 40363)
Alexander C. Barrett (MO Bar # 68695)
STINSON LLP
230 W. McCarty Street
Jefferson City, MO 65101
(573) 636-6263
chuck.hatfield@stinson.com
alexander.barrett@stinson.com

William A. Burck (*pro hac vice*)
Michael D. Bonanno (*pro hac vice*)
Christopher G. Michel (*pro hac vice*)
Rachel G. Frank (*pro hac vice*)
Michael J. Sebring (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
williamburck@quinnemanuel.com
mikebonanno@quinnemanuel.com
christophermichel@quinnemanuel.com
rachelfrank@quinnemanuel.com
michaelsebring@quinnemanuel.com

John F. Bash (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, TX 78701
(737) 221-7006
johnbash@quinnemanuel.com

**Attorneys for Defendant the NATIONAL ASSOCIATION OF REALTORS®**

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2024, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

/s/ *Ethan Glass*
Ethan Glass (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC  20004-2400
Phone (202) 776-2244
Fax (202) 842-7899
eglass@cooley.com

***Attorney for Defendant the NATIONAL ASSOCIATION OF REALTORS®***

31