## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT,          )
JEREMY KEEL, HOLLEE ELLIS, and        )
FRANCES HARVEY, on behalf of          )
themselves and all others similarly situated,  )
                                      )
        Plaintiffs,                   )
                                      )    Case No: 4:19-cv-00332-SRB
v.                                    )
                                      )
THE NATIONAL ASSOCIATION OF           )    Judge Stephen R. Bough
REALTORS, REALOGY HOLDINGS            )
CORP., HOMESERVICES OF AMERICA,       )
INC., BHH AFFILIATES, LLC, HSF        )
AFFILIATES, LLC, RE/MAX, LLC, and     )
KELLER WILLIAMS REALTY, INC.,         )
                                      )
        Defendants.                   )
                                      )

### SUGGESTIONS IN SUPPORT OF DEFENDANT
### THE NATIONAL ASSOCIATION OF REALTORS'®
### ADDITIONAL RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW[1]

---

[1] These Suggestions are a refiling of Keller Williams' Suggestions in Support of its Renewed Motion for Judgment as a Matter of Law (ECF 1354). On February 8, 2024, the Court granted NAR's request to have these Suggestions refiled by NAR as a new docket entry signed by NAR's counsel. ECF 1383, 1384. These Suggestions are "deemed timely filed under Federal Rules of Civil Procedure 50(b)" in accordance with the Court's order. ECF 1384.

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY ..................................................................1

II.     LEGAL STANDARD..........................................................................................1

III.    ARGUMENT .......................................................................................................2

    A.     THERE WAS INSUFFICIENT EVIDENTIARY BASIS FOR THE JURY TO FIND THAT
        PLAINTIFFS WERE DIRECT PURCHASERS WHO SUFFERED HARM UNDER THE RULE OF
        REASON. ................................................................................................................2

    B.     THERE WAS INSUFFICIENT EVIDENTIARY BASIS FOR THE JURY TO FIND THAT KELLER
        WILLIAMS ENTERED INTO A CONSPIRACY. ............................................................4

      1.   Plaintiffs presented no direct evidence of Keller Williams' participation in any
          conspiracy. .................................................................................................5

      2.   Plaintiffs presented no evidence that tends to exclude the possibility of Keller
          Williams' independent conduct. .................................................................6

    C.     THERE WAS NO SUFFICIENT EVIDENTIARY BASIS FOR THE JURY TO FIND THERE WAS
        AN UNREASONABLE RESTRAINT OF TRADE. ..........................................................19

    D.     THERE WAS INSUFFICIENT EVIDENTIARY BASIS FOR THE JURY TO FIND CAUSATION
        OR INJURY. ...........................................................................................................23

    E.     THERE WAS INSUFFICIENT EVIDENTIARY BASIS FOR JURY'S AWARD OF DAMAGES. .........28

IV.    CONCLUSION..................................................................................................30

# TABLE OF AUTHORITIES

*Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483 (8th Cir. 1992) ................................................. 23, 28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 13

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000).... 5, 12

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000).................................... 23

*Cont'l T.V. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)................................................................... 2

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)..................................................... 4

*Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761 (8th Cir. 2004) .............................. 7

*Hathaway v. Runyon*, 132 F.3d 1214 (8th Cir. 1997) .................................................................... 14

*Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310 (6th Cir. 2014) ............................................ 12

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) .......................................................................... 4

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999)....................................................... 6

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ........................... 6

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)................................................ 6

*In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970 (W.D. Ark. 2017) ................................. 7

*Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927 (7th Cir. 2018)..................................... 9

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ................................. 2

*Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563 (1925).............................................. 17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 584 (1986) ............................ 5

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983)............................... 23

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)................................................... 4, 5

*Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417 (8th Cir. 2009)............................................... 5, 6

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993)...... 10

*Pumps & Power Co. v. Southern States Indus. Inc.*, 787 F.2d 1252 (8th Cir. 1986)..................... 5

*Riggs v. Gibbs*, No. 14-cv-0676, 2017 WL 4391778 (W.D. Mo. Sept. 29, 2017)........................ 10

iii

*Roark v. City of Cotton Plant*, 323 F. App'x 481 (8th Cir. 2009) .................................................. 14

*Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278 (4th Cir. 2012) ................................ 3

*Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000) ............................................................. 15

*St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851 (8th Cir. 1998)
.................................................................................................................................................. 24, 26

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994) ............................................................................. 26

*United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980) ......................................... 3

*Williamson Oil Co. v. Philip Morris U.S.A.*, 346 F.3d 1287 (11th Cir. 2003) ............................. 17

iv

# I. INTRODUCTION AND SUMMARY

On October 31, 2023, after twelve days of trial, the jury returned a verdict for Plaintiffs, finding that Keller Williams Realty, Inc. ("Keller Williams") conspired with the National Association of REALTORS® ("NAR") and the HomeServices Defendants to follow and enforce the Cooperative Compensation Rule. ECF No. 1294. The jury returned this verdict notwithstanding the complete lack of evidence that Keller Williams at any point in its history had attended any meeting, participated in any communication, undertaken any internal analysis or discussion, or engaged in any other activity relating in any way to the Cooperative Compensation Rule, and despite the complete lack of evidence that any listing agent had offered compensation to buyer agents because of the Cooperative Compensation Rule. Adding insult to injury, the jury awarded as damages "every single penny" that every home seller had authorized his or her listing agent to pay to every buyer agent during the seven-year class period, in the face of significant evidence that listing agents offer compensation to buyer agents to help their clients and that listing agents and sellers would offer compensation in the absence of the Cooperative Compensation Rule.

That extraordinary verdict is deeply flawed as a matter of law. The Plaintiffs here were not direct purchasers from any of the named Defendants, and the long-established and state-authorized practices here were not tested under the rule of reason. But even beyond those threshold legal defects, the trial record is bereft of any evidence that Keller Williams entered into a conspiracy with anyone, let alone legally sufficient evidence to satisfy the elements for the antitrust violations that undergird the jury's massive verdict.

# II. LEGAL STANDARD

Entry of judgment as a matter of law is proper where there is no evidence that is legally sufficient for a reasonable jury to find for a party on an issue on which that party has been fully

1

heard.  Fed. R. Civ. P. 50(a)(1).  In determining whether judgment is proper, the court reviews all facts in favor of the nonmoving party and gives the nonmovant the benefit of all reasonable inferences, *Arthaud v. Mut. of Omaha Ins. Co*., 170 F.3d 860, 862 (8th Cir. 1999), but not to inferences that are not reasonably supported by the evidence.  *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1026 (8th Cir. 2000).  "When the record contains no proof beyond speculation to support the verdict, judgment as a matter of law is appropriate."  *Id.* (quotation marks and citations omitted).

Keller Williams moved for judgment as a matter of law under Rule 50(a) on several grounds, including those urged in motions filed by NAR and the HomeServices Defendants.  *See* ECF Nos. 1267, 1268.  Keller Williams hereby renews that motion pursuant to Federal Rule of Civil Procedure 50(b).

## III.    ARGUMENT

### A.    There was insufficient evidentiary basis for the jury to find that Plaintiffs were direct purchasers who suffered harm under the rule of reason.

As discussed in NAR's motion for a new trial, which Keller Williams joins and incorporates herein, the Court erred in instructing the jury to evaluate the alleged conspiracy as a *per se* violation of Section 1 of the Sherman Act, rather than asking the jury to "balance the competitive harm against the competitive benefit" of the alleged conspiracy under the rule of reason.  ABA Model Jury Instructions in Civil Antitrust Cases § 3.A.

The *per se* standard applies only to specific "manifestly anticompetitive" conduct, *Cont'l T.V. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977), that "would always or almost always tend to restrict competition and decrease output," *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal quotation marks omitted).  That is not remotely the case here.  Indeed, because of the "enormously procompetitive objectives" and "significant economic

efficiencies" offered by MLSs, courts in the past several decades have uniformly determined that "out-of-hand condemnation" of MLS rules under the *per se* standard would be inappropriate. *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1368–69 (5th Cir. 1980); *see also, e.g.*, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 290 (4th Cir. 2012) ("Because trade associations may be protective of consumer interests and not just inimical to them, the cooperative actions of MLS members are not per se unreasonable."). Those courts have instead determined the rule of reason to be applicable to challenges to MLS rules.

This Court should have done the same—and had the jury been properly instructed under the rule of reason, the trial record could not have supported a verdict for Plaintiffs. As discussed below, *see* §§ III.D & III.E, *infra*, cooperative compensation, and the Rule that Plaintiffs alleged requires it, produces significant benefits for home sellers, including by stimulating demand for sellers' homes by ensuring that cash-constrained buyers are not excluded as potential purchasers, *see, e.g.*, Oct. 26, 2023 Trial Tr. 1739:17–24 (D. Stevens) (testifying that sellers benefit because "there are so many buyer brokers representing all these potential homebuyers," which "brings more traffic and more competition" for sellers' properties); Oct. 23, 2023 Trial Tr. 936:10–937:11 (S. Millett) (explaining how the presence of buyer agents helps home sellers by increasing interest in sellers' properties, producing "better pricing offers," and helping homes sell more quickly), and by allowing agents to work together to bring even troubled transactions to the closing table, *see* Oct. 30, 2023 Trial Tr. 2314:9–13 (J. Davis) ("It's more likely that we're going to get to the closing table when both parties have . . . representation. It's more likely that the seller will actually get to close on the property."). Sellers themselves recognize these benefits and compensate buyer agents *even when not required to do so*, which is the exact opposite of what one would expect to happen under a true *per se* restraint. *See id.* 2294:21–2295:20 (J. Davis) (testifying that 90 percent of

3

FSBO sellers agree to compensate her when she finds a buyer for their homes). Properly instructed under the rule of reason, the jury would have reached the same conclusion as those sellers and found cooperative compensation and the Cooperative Compensation Rule to have been overwhelmingly more beneficial than harmful.

The trial record was also insufficient to support the jury's determination that home sellers were direct purchasers with standing to sue for damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728–29, 741–41 (1977). As argued by NAR in its motion for judgment as a matter of law under Rule 50(a), ECF No. 1274, and in the motions by NAR and the HomeServices Defendants under Rule 50(b) (which Keller Williams joins and incorporates herein), Plaintiffs purchased nothing from NAR, Keller Williams, or the HomeServices Defendants and paid nothing to buyer agents. Plaintiffs were thus only indirect purchasers and lacked standing to sue. *See* ECF No. 1274 at 1–5.

**B.** **There was insufficient evidentiary basis for the jury to find that Keller Williams entered into a conspiracy.**

Plaintiffs failed to present evidence from which a reasonable jury could find that Keller Williams participated in any conspiracy. To establish a claim for a violation of Section 1 of the Sherman Act, Plaintiffs had to show that Keller Williams entered into a contract, combination, or conspiracy. 15 U.S.C. § 1; *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Section 1 of the Sherman Act "does not reach conduct that is wholly unilateral." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). Proof of concerted action—that is, proof of a "conscious commitment to a common scheme designed to achieve an unlawful objective"— is essential to any claim under Section 1 of the Sherman Act. *Monsanto*, 465 U.S. at 768.

The Supreme Court has set forth explicit standards for determining whether there exists sufficient evidence of such a "conscious commitment" or agreement. The plaintiff must bring

forth evidence that "tends to exclude the possibility" of independent action. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 584, 587 (1986) (quoting *Monsanto*, 465 U.S. at 764). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588. The Eighth Circuit has echoed this standard, stating "if it is as reasonable to infer from the evidence a . . . conspiracy as it is to infer permissible activity, then the plaintiffs'[] claim, without more, fails." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032 (8th Cir. 2000); *see Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 423 (8th Cir. 2009) ("We apply *Monsanto* and *Matsushita* broadly . . . ."). "Unless an antitrust plaintiff offers 'evidence that tends to exclude the possibility' of independent action, an inference of conspiracy is unreasonable." *Pumps & Power Co. v. S. States Indus. Inc.*, 787 F.2d 1252, 1256 (8th Cir. 1986) (quoting *Monsanto*, 465 U.S. at 764) (finding judgment notwithstanding the verdict appropriate because the record contained no proof, beyond speculation, upon which a finding of concerted action could rationally be based).

As explained below, the Court should enter judgment in favor of Keller Williams because the evidence was insufficient for a reasonable jury to find that Keller Williams entered into any conspiracy.

### 1. Plaintiffs presented no direct evidence of Keller Williams' participation in any conspiracy.

Plaintiffs were required to prove that each Defendant they sued entered into an unlawful conspiracy. *See supra*. Plaintiffs alleged that Defendants entered into a conspiracy "to follow and enforce a 'Cooperative Compensation Rule'" applicable to MLSs in Missouri that had "the purpose or effect" of "rais[ing], inflat[ing], or stabiliz[ing] broker commission rates paid by home sellers." *See* Instruction No. 18 (ECF No. 1292). But Plaintiffs offered no direct evidence that Keller Williams entered into any agreement with anyone concerning the Cooperative Compensation Rule.

5

Direct evidence must be "explicit and require[] no inferences" to establish Plaintiffs' proposition. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (noting that direct of evidence of a conspiracy is "evidence tantamount to an acknowledgment of guilt," while circumstantial evidence is "everything else including ambiguous statements" (emphasis omitted)).

None of the evidence Plaintiffs presented against Keller Williams was of that nature. For example, there was no evidence such as "a document or conversation explicitly manifesting the existence of the agreement in question." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 325 n.23 (3d Cir. 2010). Plaintiffs presented no evidence whatsoever of any meeting involving Keller Williams at which the Cooperative Compensation Rule was discussed, any communication involving Keller Williams relating to the Rule, or even any internal Keller Williams documents that addressed the Rule. In fact, Plaintiffs' economic expert agreed that he saw no documents or testimony showing any conspiracy among Defendants. Oct. 19, 2023 Trial Tr. 571:6–11, 572:2–5 (C. Schulman). Simply put, the trial record is utterly devoid of direct evidence of a conspiracy involving Keller Williams to follow and enforce the Cooperative Compensation Rule.[1]

## 2. Plaintiffs presented no evidence that tends to exclude the possibility of Keller Williams' independent conduct.

With no direct evidence that Keller Williams participated in any conspiracy to follow and enforce the Cooperative Compensation Rule, Plaintiffs instead urged the jury to infer a conspiracy from only the following three categories of evidence: (1) Keller Williams' conduct relating to

---

[1] Even if Plaintiffs had presented direct evidence of a conspiracy, the Eighth Circuit has explicitly rejected the argument that providing direct evidence removes the requirement that plaintiffs disprove independent action: "Although the presentation of direct evidence of an unlawful conspiracy will likely preclude a lawful explanation, *it does not follow that the possibility of independent action need not be excluded when direct evidence is provided*." *Nitro Distrib.*, 565 F.3d at 424 (emphasis added); *see also id.* at 423 ("We require a showing of independent action, *whether it be by circumstantial or direct evidence*." (emphasis added)). As explained below, Plaintiffs did not (and cannot) disprove independent action.

6

NAR, including a requirement that franchisee agents join their local Board of REALTORS® and MLS unless exempted by their local franchisee brokerage; (2) training materials; and (3) Keller Williams' inclusion of example commission amounts in published economic models and of historical national average commission rates in speeches by Keller Williams executives. As explained below, reasonable jurors could not draw any inference of conspiracy from the paltry evidence presented because it neither tends to exclude the possibility of independent action nor suggests the existence of any conspiracy at all, much less a conspiracy to follow and enforce the Cooperative Compensation Rule. Indeed, none of the evidence offered by Plaintiffs against Keller Williams has any relationship whatsoever to the Cooperative Compensation Rule. Accordingly, the Court should enter judgment in favor of Keller Williams.

> a) <u>Keller Williams' conduct relating to NAR provides no basis to infer a conspiracy.</u>

To the extent Plaintiffs sought to have the jury infer the existence of a conspiracy involving Keller Williams merely from involvement in NAR, Plaintiffs' effort fails for multiple reasons.

<u>First</u>, and as a threshold matter, Keller Williams is not a member of NAR. Oct. 23, 2023 Trial Tr. 1041:4–6 (R. Goldberg). Even if it were a member of NAR (and it is not), Keller Williams could not be held liable under Section 1 of the Sherman Act as a co-conspirator merely based on membership in the trade association. *See, e.g.*, *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 995 (W.D. Ark. 2017) ("[M]ere membership in a trade association will not nudge an allegation from the realm of parallelism to the land of agreement." (citing cases)). Courts that have held association members liable for association rules have demanded evidence of "actual knowledge of, and participation in, the illegal scheme." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 769, 771–72 (8th Cir. 2004) (finding that Ford joined a conspiracy with the association based on evidence of its deliberate efforts to influence the association's positions and

explicit directions to the association's president concerning its activities). Plaintiffs offered no such evidence as to Keller Williams. Indeed, Keller Williams has never been meaningfully involved in NAR policymaking activities. *See, e.g.*, ECF No. 1288-1, Tr. 134:18–134:21 & 134:23–24 (C. Sylvester) (Keller Williams had "no involvement whatsoever" in NAR or other industry organizations); *id.* 127:08–128:02 (testifying that the view of Keller Williams leadership was that "participating in the industry did not build your business, it did not grow your business and if anything it would harm your business"); *id.* 132:19–133:14 (testifying that the lack of support Ms. Sylvester received from Keller Williams leadership for industry relations activities was "the whole reason" she left the company and that her attempt to get Keller Williams more involved in industry relations "was a complete and total waste of my time"). Keller Williams' founder, Gary Keller, testified that at no time in his forty-year career in real estate did he participate in NAR activities. Oct. 27, 2023 Trial Tr. 2020:12–24 (G. Keller).

Plaintiffs offered no evidence to the contrary. They instead pointed to general participation by independent contractor agents affiliated with Keller Williams' franchisee brokerages on NAR's 800-member board[2] or on NAR committees. *See* P-446. But those agents are two steps removed from Keller Williams. As a result, their actions cannot be attributed to Keller Williams whether or not they are related to issues in this case (and they were not). *See* Oct. 30, 2023 Trial Tr. 2268:8–2269:19 (J. Davis) (describing differences between Keller Williams, its franchisee brokerages, and independent contractor agents, and testifying that "there's no direct relationship" between agents and Keller Williams). And even with respect to any NAR activities in which those independent contractor agents might have been involved, Plaintiffs provided no evidence whatsoever that the Cooperative Compensation Rule was ever a topic of discussion at any meeting attended by any

---

[2] Oct. 24, 2023 Trial Tr. 1171:16–21 (R. Gansho) ("We have 800-plus individuals on [NAR's] board of directors").

Keller Williams agent. Plaintiffs also provided no evidence that Keller Williams agents who participated on NAR's board or on NAR committees acted as representatives of Keller Williams when they did so, and the evidence in fact is to the contrary. *See id.* 1179:8–1180:17 (R. Gansho) (stating that participants on NAR's board and committees owe a fiduciary duty to NAR when engaged in board or committee activities and are regularly reminded of their obligations); ECF No. 1288-2, Tr. 106:3–17 (A. Kelm) (testifying that Keller Williams "can't control" agents and that agents involved in NAR activities do what is "best for their business" and consider only how issues might "affect[] themselves"). They also provided no evidence of any communications between Keller Williams and any agents concerning any board or committee activities in which the agents might have been involved.

Plaintiffs also referred to a single document suggesting involvement by Keller Williams in an NAR body called the RES Advisory Group, *see* P-0485; *but see* ECF No. 1288-2, Tr. 109:11–21 (A. Kelm) (stating that no "C-Suite" executive from Keller Williams ever participated in the RES group), but again provided no evidence that the RES group ever engaged in any activities related to the Cooperative Compensation Rule or that it did anything other than engage in legal trade association activities protected by the First Amendment.

<u>Second</u>, even if evidence existed of attendance by a Keller Williams executive at a NAR meeting or other meeting involving competitors (and the record contains no such evidence), attendance at meetings of legitimate organizations offers nothing more than a mere *opportunity* to conspire, which cannot support an inference of any agreement as a matter of law. *See, e.g.*, *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018) (finding opportunities to conspire, including at legitimate trade association meetings, did not support existence of conspiracy); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1235

9

(3d Cir. 1993) (granting summary judgment as to defendant who socialized with other alleged conspirators and "had the opportunity to conspire" but did not participate in discussions relevant to the alleged antitrust conspiracy); *see also Riggs v. Gibbs*, No. 14-cv-0676, 2017 WL 4391778, at *8 (W.D. Mo. Sept. 29, 2017) (observing that a "bare, unsupported allegation that the defendants had the opportunity to conspire" did not support conspiracy allegation sufficiently to survive summary judgment in a Section 1983 action).  Without evidence that Keller Williams representatives attended meetings of NAR or other organizations to advance the purposes of the alleged conspiracy to follow and enforce the Cooperative Compensation Rule, any evidence of those meetings (if any were to exist) would fail to provide a legally sufficient basis for the finding that Keller Williams knowingly entered into an unlawful agreement under Section 1 of the Sherman Act.

Third, evidence that Keller Williams requires independent contractor agents affiliated with its independently owned and operated franchisees to join their local Board of REALTORS® and MLS (unless exempted by the local franchisee) is unilateral conduct that is not indicative of any conspiracy.  As Plaintiffs themselves acknowledged, MLS participation is important to brokers, ECF No. 759, Third Am. Compl. ¶ 106; Oct. 19, 2023 Trial Tr. 531:2–5, 593:24–594:6 (C. Schulman) (noting the benefits of listing a home on the MLS and stating that access to the MLS is a "core product" offered by agents); *id*. at 591:25–592:22 (C. Schulman) (testifying that real estate agents who are not members of NAR are not "reasonable substitutes in an economic sense" and not a "viable economic choice"), making MLS participation by agents and Keller Williams' requirement that they participate in MLSs (unless exempted by franchisee brokerages) consistent with their unilateral interests and not at all suggestive of a conspiracy.  *See* P-0426 at PDF p.56 (KWRI_000456).  Keller Williams adopted this policy independently and not in coordination with

any Defendant (or anyone else outside of Keller Williams), and Plaintiffs offered no evidence whatsoever that Keller Williams adopted or maintained the policy as part of a conspiracy to follow and enforce the Cooperative Compensation Rule. Again, the record evidence is to the contrary. It is undisputed that Keller Williams' requirement preceded NAR's adoption of the Cooperative Compensation Rule. D-3534 at PDF p.28; Oct. 27, 2023 Trial Tr. 2025:20–2026:4 (G. Keller) (testifying that Keller Williams adopted the requirement in 1989 when the company began franchising). The requirement exists because Keller Williams regards MLS participation by agents to be good for buyers and sellers; it has nothing to do with Keller Williams' supposed desire to ensure that agents followed the Cooperative Compensation Rule (or any other MLS rules). *Id.* 2026:18– 2027:4 (G. Keller).

Fourth, Plaintiffs also failed to provide any evidence that any Keller Williams franchisee agent joined NAR or his or her local MLS for reasons related to Keller Williams' policy. Agents join MLSs because it helps them when working with their clients, not because of any requirement that they do so. MLSs help listing agents market their seller clients' properties to all other agents who are members of the MLS, and they keep agents representing buyers informed of all properties listed by other MLS members. *See* Oct. 23, 2023 Trial Tr. 930:13–931:21 (S. Millett) (describing benefits of MLSs in helping market listed properties). Unsurprisingly, given the value of the MLS to agents and their independent interests in becoming members, the only evidence offered in this case concerning Keller Williams' policy was that the policy *had no bearing on agents' decisions to join MLSs*. Keller Williams agent Jen Davis testified that, although she joined a Keller Williams franchisee brokerage in Missouri in 2012, she was unaware until this case that Keller Williams maintained a policy requiring agents to join their local MLS. Oct. 30, 2023 Trial Tr. 2284:3–12 (J. Davis). Ms. Davis joined her local MLS in Springfield when she was affiliated with another

11

brokerage and before she joined Keller Williams.  Keller Williams' policy had nothing to do with her membership in her local MLS.  *Id.* 2284:13–22; *see also id.* 2281:13–19 (explaining that she is a member of the MLS "[t]o help our buyers and sellers").  Keller Williams' President, Marc King, testified similarly that every one of the thousands of agents he has recruited from other brokerages to a Keller Williams franchisee brokerage (including agents in Missouri) was already a member of the MLS.  Oct. 27, 2023 Trial. Tr. 2166:10–17 (M. King).  There is simply no evidence in the record that *any* agent in Missouri (or anywhere else) joined an MLS and followed the MLS's rules because of Keller Williams' policy.  With a non-conspiratorial explanation for the existence of the requirement and no evidence whatsoever that any agent joined his or her local MLS as a result of anything Keller Williams did—let alone anything Keller Williams did in concert with others—Plaintiffs' reliance on Keller Williams' requirement that agents join NAR and MLSs to establish a conspiracy is the type of "assume conspiracy first" reasoning that the Eighth Circuit has explicitly rejected.  *Blomkest*, 203 F.3d at 1033 ("[A] litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly").[3]

> b)  <u>Similarity in training materials, without evidence of any coordination with alleged co-conspirators, cannot support allegations of conspiracy.</u>

Plaintiffs presented evidence of similarity of messaging in Defendants' training materials—again wholly unrelated to the Cooperative Compensation Rule—to invite the jury to infer the existence of a conspiracy based only on that similarity.  But Plaintiffs have offered no evidence of *any* communications between Keller Williams and anyone outside the company concerning its training.  *See* Oct. 27, 2023 Trial. Tr. 1976:12–14 (G. Keller) (testifying that Keller Williams does not coordinate with other real estate companies in developing training content).

---

[3] *See also Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 319–22 (6th Cir. 2014) (affirming grant of summary judgment where the conduct allegedly indicative of a conspiracy to fix real estate commission rates was consistent with independent conduct).

Without any connection between alleged conspirators, Plaintiffs' evidence amounts to nothing more than evidence of parallel conduct, which cannot provide a legally sufficient basis on which the jury could conclude that Keller Williams engaged in any conspiracy, let alone the alleged conspiracy to follow and enforce the Cooperative Compensation Rule. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) ("Without more, parallel conduct does not suggest conspiracy . . . .").

Plaintiffs also never attempted to establish any nexus between Keller Williams' and other Defendants' training materials and the Cooperative Compensation Rule. They instead used these materials for no purpose other than to suggest that Keller Williams and independent contractor agents affiliated with its franchisees seek to charge higher commissions than Plaintiffs believed they deserve. Absent some connection to the Cooperative Compensation Rule and any indication of coordination among Defendants on the content of the training, Plaintiffs' evidence concerning Keller Williams' training materials was legally insufficient to support the jury's verdict.

Additionally, Plaintiffs offered no evidence that any independent contractor agents affiliated with a Keller Williams franchisee brokerage in Missouri either attended any training involving instructional materials published by Keller Williams or followed any such materials. Keller Williams develops sales training materials, but it is entirely up to independent contractor agents to decide what training courses to take. Oct. 30, 2023 Trial Tr. 2278:6–20 (J. Davis). There is no evidence in the record of any Keller Williams agent in Missouri actually employing any of the sales methods included in the training materials to which Plaintiffs referred. Indeed, because Mr. Keel—the only named plaintiff who used a listing agent affiliated with a Keller Williams franchisee—testified that he did not attempt to negotiate the commission, his agent would have had no reason to employ so-called "objection-handling" scripts to deflect Mr. Keel's attempts to negotiate. *See* Oct. 18, 2023 Trial Tr. 332:21–333:3, 339:5–13 (J. Keel) (admitting he knows, as

an attorney, that contracts are negotiable, but that he did not negotiate the commission percentage on his home sale); *id.* at 344:14–20 (stating in the purchase context that he did not know commissions were negotiable because "[n]o one ever mentioned negotiating commission to me").

c)      Evidence concerning <u>*The Millionaire Real Estate Agent*</u> and Family Reunion speeches cannot support a finding of conspiracy.

Lacking evidence of any involvement by Keller Williams in any activities relating in any way to the Cooperative Compensation Rule, Plaintiffs further sought to distract the jury with evidence of completely irrelevant subjects, which Keller Williams sought unsuccessfully to have excluded before trial. *See* ECF No. 1070 (motion); ECF No. 1032 (order denying motion). Plaintiffs claimed to the jury that Keller Williams conspired to follow and enforce the Cooperative Compensation Rule through (1) references to commissions in *The Millionaire Real Estate Agent*, a *New York Times* bestselling book published over nineteen years ago, and (2) reports during Keller Williams' annual "Family Reunion" convention of historical national average commission rates earned annually by over 150,000 independent contractor agents affiliated with over 800 Keller Williams franchisee brokerages across all 50 states. Neither subject has anything at all to do with a conspiracy to follow and enforce the Cooperative Compensation Rule. Evidence wholly unrelated to the challenged conspiracy does not tend to exclude the possibility of independent conduct under *Matsushita* and does not provide a legally sufficient basis for the jury's verdict. *See Hathaway v. Runyon*, 132 F.3d 1214, 1220 (8th Cir. 1997) (stating that judgment as a matter of law is proper "when there is a complete absence of *probative facts* to support the conclusion reached" (emphasis added)); *Roark v. City of Cotton Plant*, 323 F. App'x 481, 482 (8th Cir. 2009) (affirming grant of judgment as a matter of law where the plaintiff "failed to offer evidence of a City policy or custom relevant to her claims"); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752,

14

760–63 (6th Cir. 2000) (granting judgment as a matter of law in favor of defendant where jury based its verdict on irrelevant evidence that was improperly admitted).

Plaintiffs did not even attempt to connect *The Millionaire Real Estate Agent* to a conspiracy to follow and enforce the Cooperative Compensation Rule. Publication of *The Millionaire Real Estate Agent* was a wholly unilateral act that cannot support inferences of a conspiracy. Plaintiffs nevertheless point to references in one illustration of the use of the book's "Economic Model" to average commission rates earned from sellers and buyers of three percent, *see* D-3578 at 183, to argue to the book constituted an effort on the part of Keller Williams to dictate commission rates that agents should charge. *The Millionaire Real Estate Agent* provided no basis on which a reasonable juror could conclude that Keller Williams knowingly participated in a conspiracy to follow and enforce the Cooperative Compensation Rule, particularly when the book never mentions the Rule. Plaintiffs offered no evidence that the content of the book and the decision to publish it were anything but unilateral acts that had nothing to do with the conduct of any alleged co-conspirators. The evidence presented concerning the book only confirms that.

Mr. Keller explained at trial that *The Millionaire Real Estate Agent* seeks to convey to agents that, to succeed in real estate, they need to approach their work as an agent as a business, meaning they need to commit time daily to generating new clients, manage expenses carefully, and pay attention to other business variables on which agent incomes depend. *See* Oct. 27, 2023 Trial Tr. 1972:2–22 (G. Keller). The Economic Model, one of several models presented in the book (but the only one on which Plaintiffs focused), reveals how generating the income agents seek to achieve begins with being invited to meet with new seller and buyer clients—and, as Mr. Keller testified, seeks to impress upon agents the importance of constant attention to lead generation. *Id.* 1977:20–1980:7, 1982:9–1983:7, 1985:15–1986:12 (G. Keller); *see also id.*

2171:11–17; 2177:4–13 (M. King).  Plaintiffs did not attempt to rebut the testimony presented at trial that including one illustration of the model with a three percent commission rate did not in any way constitute an effort by Keller Williams to suggest commissions that agents should charge, *id.*  1984:18–1985:7 (G. Keller); 2180:11-25 (M. King) ("[T]hat makes as much sense as telling agents to only sell $250,000 houses."), or testimony that the Economic Model would be of no use to any agent if he or she did not complete it based on the agent's own average commission rates and other figures.  *Id.*  2175:25–2178:9 (M. King) ("It's not a useful tool for [agents] if they're using someone else's numbers."); 1985:5–1989:2 (G. Keller).  Nothing about *The Millionaire Real Estate Agent* is at all suggestive of a conspiracy to follow and enforce the Cooperative Compensation Rule.  Nothing about it tends to exclude the possibility of independent conduct on the part of Keller Williams.

The same is true for Plaintiffs' repeated references to the reporting of historical national average commission rates during the Vision Speech at Keller William's annual Family Reunion convention.  Plaintiffs again made no effort to attempt to connect these speeches to a conspiracy to follow and enforce the Cooperative Compensation Rule.  Plaintiffs merely referred to these reports and the presence in the audience of agents affiliated with competitor brokerages to suggest to the jury a connection to the conspiracy alleged in the case *that simply does not exist*.  With the context provided by Keller Williams' witnesses at trial, it is clear that the speech constituted unilateral conduct on the part of Keller Williams, not at all indicative of the existence of any conspiracy, much less one to follow and enforce the Cooperative Compensation Rule (which was not mentioned once in any Family Reunion speeches).

As the unrebutted evidence at trial showed, the reporting of national historical averages of commission rates followed a lengthy discussion of economic and other information about all

16

aspects of the real estate business, an effort to educate agents and allow them to speak as experts to clients about factors that might impact an upcoming sale or purchase. *See* Oct. 27, 2023 Trial Tr. 1992:23–1994:5 (G. Keller). As Mr. Keller explained, he based the reports of average commission rates over time on data from the more than 150,000 agents affiliated with Keller Williams franchisee brokerages across all 50 states. *Id.* 2007:16–2008:8. Plaintiffs offered no rebuttal to testimony concerning the obvious fact that national commission averages would be of no use as a competitive matter to what any agent could charge in their local markets, where commission rates are based on local competitive conditions and the ability of agents to convey their value to clients. *Id.* 2187:17–2189:8 (M. King) (equating national commission averages to reporting on average temperatures in the United States, which "wouldn't have dictated what I wore to the courthouse today," and stating that "[c]omission rates are charged based on local market conditions and that agent's value proposition"); 2009:10–2010:22, 2012:19–2013:5, 2013:24–2014:3 (G. Keller). Plaintiffs made much of the presence in the audience of agents from competitor brokerages—suggesting to the jury that merely mentioning the word commission before such an audience was evidence of Keller Williams' participation in a conspiracy to follow and enforce the Cooperative Compensation Rule. Given the non-competitive nature of the information to any agent in the audience from a Keller Williams brokerage or a competitor brokerage (who were, in any event, invited to attend Family Reunion only to recruit them to join Keller Williams), the reporting of national historical commission averages presents no issues under the antitrust laws.[4]

---

[4] *See Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 574 (1925) (finding no antitrust violation from exchange among competitors of past pricing information with no disclosure of specific customers or their geographic location). While price "signaling" or advance announcements of price moves have been found to constitute a "plus factor" that can support inferences of a conspiracy, *see Williamson Oil Co. v. Philip Morris U.S.A.*, 346 F.3d 1287, 1305 (11th Cir. 2003), Plaintiffs make no allegations that Keller Williams executives are announcing any competitively sensitive, forward-looking information in reports of past commission rates. Plaintiffs' allegations concerning aggregated reports of *past* commission rates at Keller Williams' Family Reunion, which they do not even attempt to tie to the Cooperative Compensation Rule, cannot provide a legally sufficient basis for a jury verdict against Keller Williams.

But more to the point here, the reports simply are no evidence of Keller Williams' knowing participation in a conspiracy to follow and enforce the Cooperative Compensation Rule. Merely because Plaintiffs claimed (incorrectly) that the alleged conspiracy had an impact on commission rates does not make unrelated references to commission rates evidence of the alleged conspiracy. Without some connection to the Cooperative Compensation Rule, nothing about the Vision Speeches tended to exclude the possibility that Keller Williams was acting entirely independently and not in furtherance of a conspiracy to follow and enforce the Rule.

Other similar evidence offered by Plaintiffs is of the same nature and does not support Keller Williams' participation in a conspiracy to follow and enforce the Cooperative Compensation Rule. Plaintiffs offered a number of presentations found in Keller Williams' files that made reference to commission rates—including, for example, P-1633, with a picture of a line in the sand, implying that agents should resist commission discounting[5]—but none that referred to the Cooperative Compensation Rule or that reflected any coordination with other Defendants on any subject. Again, references to commission rates in documents found in the files of a real estate company are hardly surprising—and, absent some connection to the conspiracy at issue in this case (that does not exist), they are not evidence that can support the jury's verdict. Plaintiffs also presented by video deposition the testimony of former Keller Williams employee Darrell King (P-2886), who testified that an antitrust compliance policy contained in Keller Williams' Policies & Guidelines Manual (P-0426) applied to Keller Williams agents but not to the company itself.

---

[5] Plaintiffs wanted to argue to the jury that these presentations were presented at Keller Williams' Family Reunion, but failed to establish the appropriate foundation that they were actually shown to anyone. Oct. 18, 2023 Trial Tr. 213:13–214:25 (Court requiring additional foundation before Plaintiffs could argue that presentations were shown at Family Reunion); Oct. 19, 2023 Trial Tr. at 370:24–371:11 (noting admission of P-1631, P-1632, P-1633, P-1634, P-1635, P-1636, P-1637, P-1640, P-1646, and P-1650 subject to ruling that Plaintiffs not argue that the presentations were presented at Family Reunion). Plaintiffs recognized that admission of these presentations over Keller Williams' objections allowed Plaintiffs to leave their desired impression with the jury, see Oct. 27, 2023 Tr. 2195:4–2197:10 ("The jury will remember" the context, even if Plaintiffs failed to establish that context), but that does not mean that these presentations are entitled to any weight as evidence of Keller Williams' participation in the alleged conspiracy.

Nothing about Mr. King's testimony about his interpretation of Keller Williams' policies provides evidence of any conspiracy with anyone about any subject, much less specific evidence that Keller Williams conspired with other Defendants to follow and enforce the Cooperative Compensation Rule. Finally, Plaintiffs referred to a reference to a "collusion theory" in notes of a former Keller Williams employee, *see* P-0654, but the notes do not suggest Keller Williams' involvement in any conspiracy. Plaintiffs offered no evidence connecting the "collusion theory" referred to the notes to the Cooperative Compensation Rule and none is suggested by the notes themselves.[6]

## C. There was no sufficient evidentiary basis for the jury to find there was an unreasonable restraint of trade.

As discussed above, *see* § III.A, *supra*, Plaintiffs should have been required to prove harm to competition under the rule of reason because the *per se* rule is inapplicable in this context. But even under the Court's view that the *per se* treatment is applicable because Plaintiffs alleged that Defendants conspired "with the purpose and effect of inflating or stabilizing broker commission

---

[6] At times, Plaintiffs appeared to be attempting to suggest to the jury the existence of a conspiracy concerning commission rates unrelated to the Cooperative Compensation Rule, even though Plaintiffs expressly disavowed any intention of asserting the existence of such a conspiracy. ECF 956 at 6 n.6. Even if that were their aim, Plaintiffs' effort failed completely as to Keller Williams, which as a franchisor of independently owned and operated real estate brokerages, and has no involvement in the commissions independent contractor agents in Missouri charge or the cooperative compensation amounts they offer. *See* Oct. 27, 2023 Trial Tr. 1948:9-14 (G. Keller) ("Agents are independent contractors. Think of them as . . . small business owners; and they determine the commission that they charge"); *id.* 2163:24–2165:9 (M. King) (testifying based on his experience as an agent, as an owner of franchisee brokerages, and as President of Keller Williams that agents are responsible for setting their own commissions and that Keller Williams and its franchisee brokerages do not interfere); Oct. 30, 2023 Trial Tr. 2270:1–8 (J. Davis) (testifying that neither Keller Williams nor the franchisee brokerage with which she is affiliated plays any role in the commissions she charges); D-3604 (Gary Keller stating that intruding on an agent's ability "to charge whatever commission they want or can . . . is so far outside our culture it isn't even funny"). The unrebutted record evidence is that, as a company "built by agents, for agents," *see, e.g.*, Oct. 27, 2023 Trial Tr. 1947:20–1948:8 (G. Keller), Keller Williams' company philosophy has been to offer tools and training to support agents but to otherwise avoid intruding on agents' businesses and to let them operate their businesses as they see fit, *see, e.g., id.* 2163:4–23 (M. King) (Keller Williams positions itself as a place "where entrepreneurs thrive" by providing training and models but otherwise "get[ting] out of their way and let[ting] them build big businesses"). Keller Williams also presented evidence that Plaintiffs did not attempt to rebut that, under Keller Williams' "capping" business model, where the royalties Keller Williams receives from any agent "caps" at $3,000 per agent, Keller Williams' profitability depends on the number of agents who affiliate with its franchisee brokerage and not on the commission rates those agents earn. *See id.* 2157:13 – 2159:21 (M. King). Keller Williams thus has little incentive to enter into any conspiracy to increase commission rates or cooperative compensation levels. *See id.* 2168:7–12 (increasing commission rates is not among the 25 economic fundamentals to the success of Keller Williams' franchisee brokerages).

rates,"[7] no reasonable jury could conclude based on the evidence at trial that either the purpose or the effect of the alleged conspiracy was to inflate or stabilize commission rates.

The evidence presented at trial as to the purpose of the Cooperative Compensation Rule was clear and unrebutted by Plaintiffs—and had nothing to do with inflating or stabilizing commission rates. The purpose is provided in the Rule itself, which states that requiring listing agents to make and disclose cooperative compensation offers "is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell." P-4587 at PDF p.54 (NAR Policy Statement 7.23, "Commission/Cooperative Compensation Offers"). Particularly where buyer agents are typically compensated only upon the successful completion of transactions, and often incur significant expenses during the course of representing clients,[8] it is reasonable for buyer agents to be informed of how much compensation they can expect to receive if they succeed in finding a buyer for a listed property. But, more important, there is nothing about this explanation that could support a finding by the jury that the purpose of the Rule was to inflate or stabilize commissions. Sharon Millett, who chaired the NAR Presidential Advisory Group that recommended NAR policy changes that resulted in the Cooperative Compensation Rule, explained that NAR modified the rule that existed prior to 1992 to ensure that buyer agents owing duties to buyers, and not only "sub-agents" owing duties to home sellers, could receive compensation if they procured buyers for properties listed on MLSs. *See* Oct. 23, 2023 Trial Tr. 944:10–24, 949:16–950:9, 950:23–951:16 (S. Millett). There was no evidence that would support a finding that Defendants sought through the Rule to increase

---

[7] ECF No. 1019 at 20–21. Ultimately the jury was instructed to determine whether the conspiracy had the "purpose *or* effect of raising, inflating, or stabilizing broker commission rates paid by home sellers," ECF No. 1292 at 29 (emphasis added), which, as NAR points out was improper and provides grounds for a new trial. Keller Williams joins NAR's motion for a new trial and incorporates its arguments herein.

[8] *See, e.g.*, Oct. 30, 2023 Trial Tr. 2296:21–2300:5 (J. Davis) (identifying expenses incurred by buyer agents "[w]hether we close on the property or not"); Oct. 27, 2023 Trial Tr. 2181:22–2182:7 (M. King) ("We pay all of our expenses. And if we don't close a home, we don't make any money.").

commission rates. Indeed, Plaintiffs' counsel recognized as much when he specifically asked the jury to "[f]orget the purpose" and to focus only on the effect of the alleged conspiracy. Oct. 30, 2023 Trial Tr. 2346:22–2347:2.

But the trial record also cannot support a finding that the effect of the Rule was to inflate or stabilize commission rates. The evidence showed that the Cooperative Compensation Rule requires only that listing brokers make *an* offer of compensation, but leaves the amount of the offer to the complete discretion of the listing agent. P-0216 at 38; Oct. 19, 2023 Trial Tr. 589:12–14 (C. Schulman) ("Q And there's no rule that mandates a specific amount the seller's agent has to offer to buyer's agents, correct? A That's correct."). Plaintiffs' expert also presented evidence that offers of compensation varied significantly in the four Missouri MLSs at issue in this case, even though all four of the MLSs had adopted the same Cooperative Compensation Rule. *See* P-2908; Oct. 20, 2023 Trial Tr. 627:10–14, 628:14–18 (C. Schulman) (acknowledging that there is variation in commission rates among the four MLSs at issue and conceding that his analysis did not include an "explain[ation] why in the same state with the same rule, there is such a difference in the amounts that people are being offered across these cities"). When confronted with the variation among the Missouri MLSs, Plaintiffs' expert suggested there was a *separate* unproven agreement among the Defendants to set commissions for different markets. Oct. 19, 2023 Trial Tr. 550:21–551:1 (C. Schulman) ("It seemed that the St. Louis area had a different standard kind of rate that they focused in on 2.7 percent for the buy side rather than 3 percent."); Oct. 20, 2023 Trial Tr. 626:7–13 (C. Schulman) ("St. Louis, the MARIS MLS appeared to have a slightly different sharing rule where most of them were clustered around 2.7 percent."). But Plaintiffs offer no evidence whatsoever of such a separate conspiracy among the Defendants to agree to different commission rates in different MLS markets—and it should go without saying that the mere

speculation of Plaintiffs' expert concerning such a conspiracy cannot suffice to support the jury's verdict. No reasonable jury could conclude based on this evidence that it was the Rule that produced the market outcomes Plaintiffs' expert observed.

Further, as Plaintiffs recognized when they pleaded an antitrust market consisting of the "bundle of services provided to home buyers and sellers," ECF 759 (Third Amended Complaint) ¶ 106, real estate markets are two-sided markets. Plaintiffs were thus required under *Ohio v. American Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2287–88 (2018), to show harm to competition considering the impacts of the challenged conduct on both sides of the market. But Plaintiffs offered no evidence of the impact of the alleged conspiracy that satisfies the requirements of *Amex*.

Instead, Plaintiffs presented evidence only of the amounts of cooperative compensation their listing agents offered to buyer agents. They did not attempt to account for benefits to buyers or how it benefits sellers as well to have a larger pool of potential buyers and increased demand for their properties. *See, e.g.*, Oct. 30, 2023 Trial Tr. 2325:20–2326:19 (J. Davis) (testifying that, if buyers do not have representation, "I think the seller will look up, and they'll have less offers. And with less offers, they'll have worse terms."); Oct. 23, 2023 Trial Tr. 936:10–937:11 (S. Millett) (explaining how the presence of buyer agents helps home sellers by increasing interest in sellers' properties, producing "better pricing offers," and helping homes sell more quickly); Oct. 25, 2023 Trial Tr. 1674:19–1675:12 (K. Wilson) (testifying that cooperative compensation benefits sellers by providing an "incentive for the buyer's agent to bring a buyer their way," allowing sellers to receive "a higher price for their home"). The evidence presented at trial also established that class representatives themselves benefitted from the challenged conduct, as compensation paid to their agents when they purchased a home more than offset any commissions they paid to buyer agents when they were sellers. *See* Oct. 26, 2023 Trial Tr. 1855:4–1856:19

(L. Wu). Cooperative compensation yields benefits across both sides of the market, which under *Amex* must have been accounted for—but was ignored by Plaintiffs. Accordingly, no reasonable juror could conclude that the conspiracy Plaintiffs challenged unreasonably restrained trade.

**D. There was insufficient evidentiary basis for the jury to find causation or injury.**

Plaintiffs failed to present evidence from which a reasonable jury could find that the alleged conspiracy to follow and enforce the Cooperative Compensation Rule caused them injury. To prevail, Plaintiffs were required to establish that they "suffered antitrust injury caused by the defendant's anticompetitive wrongdoing" and that their "damages were caused by the unlawful acts of the defendants." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir. 1992) (emphasis omitted) (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054 (8th Cir. 2000) ("In order to prevail plaintiffs must prove for each claim '. . . a causal relationship between the violation and the injury, and the amount of damages.'" (quoting *Amerinet*, 972 F.2d at 1490)).

The trial record is replete with evidence that listing agents would offer compensation to buyer agents without any rule requiring them to do so. Based on this evidence, no reasonable jury could conclude that it was the Cooperative Compensation Rule or a conspiracy to follow and enforce the Rule that caused listing agents representing sellers in Missouri to compensate buyer agents. As discussed above, the evidence reflects that cooperative compensation benefits home sellers by increasing the pool of buyers available for sellers' homes and leads to homes selling more quickly and for higher prices. *See*, § III.C., *supra* (citing testimony from Jen Davis, Sharon Millett, and Krista Wilson). Because of these benefits, agents testified at trial that they regularly offered cooperative compensation without even knowing that an MLS rule mandated that they do so because they regarded the practice to be good for their seller clients and the marketing of their clients' homes. *See* Oct. 30, 2023 Trial Tr. 2286:20–2287:15 (J. Davis); Oct. 27, 2023 Trial Tr.

23

2189:9–23 (M. King). For these agents, the alleged conspiracy to follow and enforce the Cooperative Compensation Rule did not cause them to provide compensation to buyer agents; they did so because they regarded the practice to be beneficial to their clients. This evidence was unrebutted. Plaintiffs did not call a single listing agent who testified that he or she did not want to offer to compensate buyer agents but did so because of the Rule or the alleged conspiracy to follow and enforce the Rule. *See St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 863 (8th Cir. 1998) (affirming judgment as a matter of law for defendants where there were "legitimate reasons" for challenged conduct and plaintiffs offered no testimony from market actors supporting plaintiffs' causation allegations).[9]

Defendants also presented evidence that, in markets in the United States where listing agents are not required to offer cooperative compensation under local MLS rules, they nonetheless continue to do so with the same frequency as they do in Missouri. Oct. 26, 2023 Trial Tr. 1848:19–1950:10 (L. Wu). The continued existence of cooperative compensation those markets where the Cooperative Compensation Rule did not exist shows that the practice of listing agents sharing commissions with buyer agents is not caused by the Rule but by market forces and because the practice makes economic sense for both buyers and sellers. Again, that evidence was unrebutted.

Defendants also provided evidence of various types of home sellers who chose to compensate buyer agents without being required to do so by any MLS rule. This evidence contradicts Plaintiffs' position that no seller would ever agree to compensate the agent for their "adversary" unless mandated to do so by the Cooperative Compensation Rule. So-called "For Sale

---

[9] Plaintiffs' expert testified that there were over 30,000 licensed residential real estate agents in Missouri, including over 4,000 agents who were not members of NAR. Oct. 20, 2023 Trial Tr. 705:2–21 (C. Schulman). Plaintiffs did not introduce any evidence regarding the Rule or offers of cooperative compensation *from any of these agents*, let alone any evidence suggesting that they would not offer cooperative compensation absent the Rule, or that they did not regard the practice to be beneficial to their clients.

by Owner" or "FSBO" sellers seeking to sell their homes without the assistance of an agent regularly compensate buyer agents, reflecting the value they see in having buyer agents deliver buyers to their homes and work with buyers to help close deals. *See* Oct. 30, 2023 Trial Tr. 2294:21–2295:20 (J. Davis) (testifying that 90 percent of FSBO sellers agree to compensate her when she finds a buyer for their homes). Home builders and financial institutions like banks and Fannie Mae have conveyed their expectation to listing agents for homes they own that the agents offer to compensate buyer agents. Oct. 27, 2023 Trial Tr. 2190:14–2191:2 (M. King) (testifying that no seller ever objected to him sharing commission with buyer agents and that professional sellers like builders and banks expected him to do so to "get the most amount of exposure for their properties, which would lead to the highest price"). In slow real estate markets, such as during the Great Recession, sellers and listing agents increased cooperative compensation offers and even offered significant bonuses to buyer agents who brought qualified buyers. Oct. 30, 2023 Trial Tr. 2289:22–2290:16 (J. Davis) (testifying that, during the Great Recession, "sellers were doing anything possible that they could to set their home apart from other homes," including offering bonuses of "$10,000 or more with an acceptable offer"); Oct. 27, 2023 Trial Tr. 2008:9–2009:7 (G. Keller) (observing increase in buyer agent commissions during the Great Recession and explaining that it reflected sellers saying to buyer agents, "please come sell my home").

Plaintiffs offered no facts to rebut the evidence that it was market forces, and not the alleged conspiracy, that caused sellers to authorize listing agents to share commissions with buyer agents. They merely relied on their economic expert, Dr. Schulman, who asserted that sellers would never voluntarily agree to pay buyer agent commissions because sellers do not pay buyer agent commissions in Australia, Oct. 19, 2023 Trial Tr. 560:2–14 (C. Schulman), and because "[i]t doesn't make economic sense that a seller would pay for an agent that is representing somebody

directly adverse to their interest." *Id.* 567:16–21 (C. Schulman).[10] But "[a] jury may not rest its verdict on an expert's conclusion 'without some underlying facts and reasons, or a logical inferential process to support the expert's opinion.'" *St. Louis Convention & Visitors Comm'n*, 154 F.3d at 863 (rejecting expert's opinions on causation when based on "economic theory" and without "evidence which tended to show that this was actually the case" (citing *Sullivan v. NFL*, 34 F.3d 1091, 1105 (1st Cir. 1994))).

Not only did Dr. Schulman's position that it makes no "economic sense" for sellers to agree to compensate buyer agents lack evidentiary support, but it also ignored evidence of the more complicated nature of relationships between "adversaries" in real estate transactions. As former NAR president Sharon Millett testified, while buyers and sellers have "totally different goals . . . if a buyer wants to buy this property and a seller wants to sell it, ultimately somewhere you're going to have to find common ground because the seller will never sell it if they can't get a price that's acceptable to them, and the buyer is never going to buy it unless they can get a price that's acceptable to them." Oct. 23, 2023 Trial Tr. 937:12–938:5 (S. Millett); *see also* Oct. 27, 2023 Trial Tr. 2016:22–2017:24 (G. Keller) (explaining how "the second that you have a contract, the buyer and seller fully expect the two agents involved to drop all of that competitiveness and now cooperate to make sure that the transaction closes"). The evidence reflects that, in this context, compensating the buyer's agent helps the seller by bringing transactions to fruition, further undercutting Plaintiffs' speculative and unsupported position that sellers and listing agents would never compensate buyer agents in the absence of the alleged conspiracy. *See* Oct. 23, 2023 Trial

---

[10] Dr. Schulman asserted the threat of steering—the possibility that buyer agents might put their own interests ahead of their clients' interests and not inform buyers of properties where they would receive lower compensation—keeps listing agents from reducing cooperative compensation offers. Plaintiffs offered no evidence of any buyer agent actually engaging in steering, and the same market forces that might incentivize listing agents to offer cooperative compensation would exist regardless of whether MLS rules require agents to offer cooperative compensation.

Tr. 938:6–939:3 (S. Millett) (providing example of how the presence of a dedicated buyer agent led to completion of a challenging transaction); Oct. 30, 2023 Trial Tr. 2314:9–13 (J. Davis) ("It's more likely that we're going to get to the closing table when both parties have . . . representation. It's more likely that the seller will actually get to close on the property.").

The law in Missouri (and surrounding states) shows why Plaintiffs and Dr. Schulman could provide no evidentiary support for their extreme view that it is only the alleged conspiracy that caused any seller to pay a buyer agent's commission. As the Court knows, Missouri law expressly authorizes buyer agents to receive compensation from sellers or listing agents:

> **Compensation of designated broker, paid by whom, sharing compensation — payment establishing agency — agreement by seller or buyer on sharing compensation.** —
> 1. In any real estate transaction, the designated broker's compensation may be paid by the *seller*, the landlord, the buyer, the tenant, or a third party *or by sharing the compensation between designated brokers*. . . .
> 3. A seller or landlord may agree that a designated broker may share with another designated broker the compensation paid by the seller or landlord.

Mo. Rev. Stat. 339.800 (emphasis added).[11] Moreover, Missouri expressly requires every listing agent to disclose whether compensation is being offered to buyers' agents. Pursuant to regulations adopted by the Missouri Real Estate Commission, "[e]very written listing agreement or other

---

[11] Among other states, Kansas also adopted a similar statute:

**58-30,105. Compensation.** . . .
(c) In any transaction, the broker's compensation may be paid by the seller, the landlord, the buyer or the tenant. . . .
(d) A broker may: . . .
    (2) with the written agreement of the seller, landlord, buyer or tenant share a commission with another broker who acted as a transaction broker, a subagent or an agent of the other party

K.S.A. 58-30,105. One of the MLSs at issue in this case—the Heartland MLS—includes home sellers in Kansas. Illinois also adopted similar statutes:

**§ 10-5. Payment of compensation.** . . .
(d) One sponsoring broker may pay compensation directly to another sponsoring broker for the performance of licensed activities.
**§ 10-10. Disclosure of compensation.** . . .
(a) A licensee must disclose to a client the sponsoring broker's compensation and policy with regard to cooperating with brokers who represent other parties in a transaction.

225 ILCS 454/10-5; 225 ILCS 454/10-10. One of the MLSs at issue in this case—the MARIS MLS—includes home sellers in Illinois.

27

written agreement for brokerage services shall contain," among other things, "[s]pecification of whether or not the designated broker is authorized to cooperate with and compensate other designated brokers acting pursuant to any other brokerage relationship as defined by 339.710 to 339.860, RSMo, including but not limited to buyer's agents and/or transaction brokers."  4 Mo. Code of State Regulations 250-8.090.

Plaintiffs' position that no home seller in Missouri would have paid a buyer agent's commission in the absence of the alleged conspiracy is unsupported by any record evidence.  No reasonable jury would have concluded based on the evidence presented at trial that the alleged conspiracy to follow and enforce the Cooperative Compensation Rule caused harm to home sellers. Keller Williams is entitled to judgment as a matter of law on this basis.

### E.    There was insufficient evidentiary basis for jury's award of damages.

Plaintiffs' damages calculation flowed directly from their unsupported position that no home seller would have paid a buyer agent's commission in the absence of the alleged conspiracy. As Plaintiffs' economic expert testified, because sellers in Australia do not pay buyer agents, "*every single penny* that sellers had to pay a buy side agent here in Missouri is the measure of antitrust damages."  Oct. 19, 2023 Trial Tr. 562:24–563:18 (C. Schulman) (emphasis added); *see also id.* 564:20–565:2 (damages were "*all* the buy side commission paid by home sellers that listed with one of the agent's brokers affiliated with these four companies" (emphasis added)).

Plaintiffs are permitted to recover only for alleged overpayments caused by Defendants' illegal acts. *See Amerinet, Inc.*, 972 F.2d at 1494.  Just as there was no legally sufficient evidentiary basis for the jury's finding that the alleged conspiracy caused harm to Plaintiffs, the jury's damages award should be overturned as a matter of law.

Plaintiffs' damages calculation fails as a matter of law because it simply assumes that, if sellers and listing agents had not offered compensation to buyer agents, the overall commission

rate that sellers paid to their listing agents would have been reduced by the same exact amount paid to buyer agents. There is no evidence in the record that supports this conclusion and, again, evidence to the contrary. Plaintiffs' expert conceded that he "did not do an analysis of sell side commissions," or an analysis of how much sellers paid overall in commissions. Oct. 20, 2023 Trial Tr. 668:4–669:4 (C. Schulman). The class representatives' listing agreements with their agents specified the overall commission rate each Plaintiff agreed to pay his or her listing agent and then disclosed the amount that the *listing agent* agreed to compensate a buyer agent who procured a buyer for the property. *See, e.g.*, P-2211; Oct. 19, 2023 Trial Tr. 422:9–17, 425:18–426:3 (J. Breit) (acknowledging that he agreed to pay 5.5 percent commission to his listing agent and that his contract authorized the listing agent to share a portion of the commission with a buyer agent). Nothing in those agreements called for a reduction in the listing agent's agreed-to commission if no compensation were shared with a buyer agent. Further, there is evidence in the record that, because listing agents would have to take on the work performed by buyer agents in the absence of buyer agents, listing agents would likely maintain rates at the same level, even if they no longer shared their commissions with buyer agents. *See* Oct. 30, 2023 Trial Tr. 2325:20–2327:3 (J. Davis). Plaintiffs did not attempt to rebut this evidence. Accordingly, there is no legally sufficient basis on which to sustain the jury's damages determination that every single penny paid to buyer agents during the seven-year class period would have been retained by home sellers instead of being paid to listing agents.

The lack of evidentiary support for Plaintiffs' damages calculation is illustrated by the extreme and illogical result it necessarily requires. During the seven-year class period, there were ten or more independently owned and operated Keller Williams franchisee brokerages that separately contracted with thousands of Missouri-licensed real estate agents to affiliate with their

brokerages. Those agents separately negotiated and entered tens of thousands of listing agreements with tens of thousands of different home sellers and subsequently closed over 65,000 individually negotiated transactions in which buyer agents were collectively paid over $430 million. *See* P-4592A. Yet, according to Plaintiffs' theory, not one home seller in any one of these tens of thousands of transactions would have authorized even one penny to be paid to one buyer agent, even when the overwhelming majority of home owners selling without an agent compensate the buyer agent. *See* Oct. 30, 2023 Trial Tr. 2294:21–2295:20 (J. Davis). And not even one listing agent would have received even one penny more, even though the listing agreements obligated home sellers to pay the overall commissions to the listing agents and it would have been in those agents' economic interests to charge more for doing more work. Because there is no evidentiary support for Plaintiffs' extreme position and it defies common sense, the jury's damages award should be overturned as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons and those offered in NAR's and the HomeServices Defendants' Renewed Motions for Judgment as a Matter of Law, the Could should enter judgment as a matter of law in favor of Keller Williams.

Dated: February 9, 2024

Respectfully submitted,

/s/ Ethan Glass

Ethan Glass (*pro hac vice*)
Samantha Strauss (*pro hac vice*)
Georgina Inglis (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004-2400
(202) 776-2244
eglass@cooley.com
sastrauss@cooley.com
ginglis@cooley.com

Beatriz Mejia (*pro hac vice*)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
mejiab@cooley.com

Sarah Topol (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000
stopol@cooley.com

Charles W. Hatfield (MO Bar # 40363)
Alexander C. Barrett (MO Bar # 68695)
STINSON LLP
230 W. McCarty Street
Jefferson City, MO 65101
(573) 636-6263
chuck.hatfield@stinson.com
alexander.barrett@stinson.com

William A. Burck (*pro hac vice*)
Michael D. Bonanno (*pro hac vice*)
Christopher G. Michel (*pro hac vice*)
Michael J. Sebring (*pro hac vice*)
Rachel G. Frank (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
williamburck@quinnemanuel.com
mikebonanno@quinnemanuel.com
christophermichel@quinnemanuel.com
michaelsebring@quinnemanuel.com
rachelfrank@quinnemanuel.com

John Bash (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, TX 78701
(737) 221-7006
johnbash@quinnemanuel.com

**Attorneys for Defendant the NATIONAL ASSOCIATION OF REALTORS®**

## CERTIFICATE OF SERVICE

I hereby certify that on this February 9, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for this case.

/s/ *Ethan Glass*

Ethan Glass (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC  20004-2400
Phone (202) 776-2244
Fax (202) 842-7899
eglass@cooley.com

**Attorney for Defendant the NATIONAL ASSOCIATION OF REALTORS®**