**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

RHONDA BURNETT, JEROD BREIT, )
JEREMY KEEL, HOLLEE ELLIS, and )
FRANCES HARVEY, on behalf of )
themselves and all others similarly situated, )
  )
     Plaintiffs, )
  )
   v. )    Case No. 4:19-CV-00332-SRB
  )
THE NATIONAL ASSOCIATION OF )
REALTORS, REALOGY HOLDINGS CORP., )
HOMESERVICES OF AMERICA, INC., BHH )
AFFILIATES, LLC, HSF AFFILIATES, LLC, )
RE/MAX LLC, and KELLER WILLIAMS )
REALTY, INC., )
  )
    Defendants. )

**CERTIFICATION OF SERVICE**

I, Chia Whitehouse, certify that on March 25, 2024, I served true and correct copies of the attached Opposition, including Attachments A, B, and C, by placing one copy in a postage paid (for first class mail) envelope for each of the Law Firms at the addresses listed below, and depositing said envelope in the U.S. Mail.

Signature:   *Chia W. Whitehouse*  on March, 25, 2024

Chia Whitehouse
13676 Chauvin Avenue
Orlando, FL 32827
Tel: (732) 762 7003
Email: chiawangw0606@gmail.com

**First Class Mailings to:**

Williams Dirks Dameron LLC
c/o Eric Dirks
1100 Main Street, Suite 2600
Kansas City, MO 64105

Continued...

Faegre Drinker Biddle & Reath LLP
c/o Aaron Van Oort
2200 Wells Fargo Center, 90 South Seventh Street
Minneapolis, MN 55402

Jones Day
c/o Jeffrey LeVee
555 S Flower Street, 50th Floor
Los Angeles, CA 90071

Skadden Arps Slate Meagher & Flom LLP
c/o Boris Bershteyn
One Manhatten West
New York, NY 10001

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:19-CV-00332-SRB |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPPOSITION TO PROPOSED SETTLEMENT WITHOUT MODIFICATIONS

Chia Whitehouse and Herbert Whitehouse submit this statement of opposition, and suggestions for modification of the Settlement terms, as elderly home sellers who, in the last four years:

    a) overpaid Buyer Broker Commissions by tens of thousands of dollars because of the "Buyer Broker Commission Rule"; and

    b) suffered hundreds of thousands of dollars in damages, because of Broker practice standards that adversely affect consumers;[1] practices that ultimately stem from financial incentives that are connected to "unfair methods of competition" inherent in the "Buyer Broker Commission Rule",

        a. including an increasingly important incentive that the rule provides to Selling (Listing) Brokers who become Contributing Brokers in order to keep that "Buyer Broker" Commission for themselves.[2]

---

[1] Compare Policy Statement of the Federal Trade Commission Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act Commission (November 10,2022). https://www.ftc.gov/legal-library/browse/policy-statement-regarding-scope-unfair-methods-competition-under-section-5-federal-trade-commission

[2] This required sharing of the Selling (Listing) Broker commission with a Contributing Broker is the meaning of the phrase "Buyer Broker Commission Rule" in this Opposition statement.

1

Unless the proposed Settlement is modified to remove the "coercive, exploitative, collusive, abusive, deceptive, predatory" impact of the "Buyer Broker Commission Rule" on consumers, Real Estate Industry practices that the Settlement encourages will continue to violate Section 5 of the FTC Act.[3] An important consideration for the Court in evaluating the proposed Settlement is that the proposed changes to MLS requirements will have no material effect as to how, and whether, commission sharing and overall commission levels will change for consumers. Even the proposed notices to Sellers from Selling (Listing) Brokers (to the effect that Sellers need not agree to let Selling (Listing) Brokers use Seller's money to pay a Buyer's Broker) are unlikely to have a material impact.

At a minimum, the Settlement should increase the disclosures made to Consumers so that the "Buyer Broker Commission Rule" will not continue through the Exclusive Listing Agreements that Selling (Listing Agents) require from Sellers. Currently, these Exclusive Listing Agreements control the information given to MLS; and Sellers have been convinced to sign Exclusive Listing Agreements (typically requiring a 6% commission) because they are told that paying such a large commission is needed so that half that large commission can pay for a separate Buyer Broker. **But Selling (Listing) Brokers do not disclose that the preferred (and increasingly common) result for Selling (Listing) Brokers is that they will keep the full commission -- all 6% -- as a Contributing Broker.** This Opposition Statement will discuss why that is.

In addition, we recommend that the Settlement should prohibit Selling (Listing) Brokers from contracting with Sellers for the "Buyer Broker Commission Rule"[4] in two (2) situations:

1. When the Selling (Listing) Broker is a fiduciary (Single Agent in Florida) Broker, and therefore obligated to act in the best interests of the Seller.
    a. The fiduciary Broker for a Seller should not propose contract terms to Seller, allowing the Seller's fiduciary to pay more in commissions to Contributing Brokers than the benefit to the Seller being provided by that Contributing Broker.
    b. Certainly, a Selling (Listing) Broker should not have a Seller execute an Exclusive Listing Agreement that requires the Selling (Listing) Broker to pay, regardless of the benefit to the Seller, half of the Seller's commission payment to the Selling (Listing) Broker, but under the classification of a Contributing Broker, while the fiduciary keeps the first half as a Selling (Listing) Broker.
2. In the now ubiquitous situation in which Selling (Listing) Brokers elect to provide fiduciary renovation services for the Seller, *c.f.,* **Attachment A**, knowing that the renovation services will delay, and give the Broker influence over the extent of the delay, the Buyer Broker Commission should not be permitted to be memorialized in Exclusive Listing Agreements when the Broker's normal public marking and MLS listing obligations are expected to be delayed by more than thirty (30) days.
    a. The withholding of Selling (Listing) Broker public marketing services and MLS listings should not continue as a preferred strategy for the Selling (Listing) Broker to become a Contributing Broker.

---

[3] *Id.*

[4] See fn 2.

2

This Opposition Statement will illustrate the real-world significance of these recommendations through:

- two (2) properties for sale and marketing under COMPASS Exclusive Listing Agreements reflecting the typical obligations of Selling (Listing) Brokers to immediately list homes on MLS; but where the "Broker Pre-Sale Renovation Business Model" (see **Attachment A**) was being applied instead.
    - These were both Transaction (facilitator) Broker Exclusive Listing Agreements.
    - There was never any public marketing or MLS listings
    - The "extra" commission that COMPASS claimed from one of these properties (Mead Garden) in a Purchase and Sale contract showing COMPASS as the Contributing Broker) was $7,275. See **Attachment B** for additional context.
    - If the $600,000 price on the COMPASS Exclusive Listing Agreement for the other (Amelia) property is used to calculate the "extra" Contributing Broker commission it would be $18,000.
        - There was no contract offer during the 10.20.21 to 7.20.22 COMPASS Exclusive Listing Agreement term.
- two (2) other Exclusive Listing Agreements with MAVREALTY similarly reflected typical Selling (Listing) Broker public marketing obligations, including an MLS listing; but with two differences.
    - First, the MAVREALTY Agreements had sixty (60) day and ninety-one (91) day delays, respectively for the Mead Garden and Amelia Agreements as to MAVREALTY MLS listing obligations.
    - Second, the MAVREATY Exclusive Listing Agreements were Single Agent Agreements, making MAVREALTY a fiduciary Broker.
    - The "extra" commission that MAVREALTY claimed from one of these properties (Mead Garden) in a Purchase and Sale contract showing MAVREALTY as the Contributing Broker) was $7,650. See **Attachment B** for additional context.
    - If the $595,000 price on the MAVREALTY Exclusive Listing Agreement is used to calculate the "extra" Contributing Broker commission available for the other (Amelia) property, that incentive for Contributing Broker status was $17,850.
        - There was no contract offer during the 1.14.22 to 6.15.22 MAVREALTY Exclusive Listing Agreement term.
- Both COMPASS and MAVREALTY were executing the "Broker Pre-Sale Renovation Business Model", sequentially, (c.f., **Attachment A**) on both the Mead Garden and Amelia properties.
    - There was no public marketing or MLS listing under any of the four (4) Exclusive Listing Agreements.
- While the "Broker Pre-Sale Renovation Business Model" gives Selling (Listing) Brokers unique opportunities to claim the "Buyer Broker Commission Rule" commission as a Cooperating Broker, the financial incentive of that rule, when codified into an Exclusive Listing Agreement, is powerful enough to play a part in overcoming the expected practice standards of Single Agent (fiduciary) Brokers, *even when the instructions and special needs of the Seller reinforce the Exclusive Listing Agreements obligation for public marketing and an MLS listing.* See **Attachment C** for additional context.
- On February 1, 2022, by asserting Contributing Broker status in a Purchase and Sale contract, MAVREALTY, a Single Agent (fiduciary) Selling (Listing) Agent Broker claimed a $16,800 "Buyer Broker Commission Rule" commission. See **Attachment C** for additional context to the MAVREALTY decision, beyond the $16,800 financial incentive to claim

Contributory Broker status instead of following through on the Exclusive Listing Agreement's intended path of public marketing and an MLS listing.

The Broker Pre-Sale Renovation Business Model is now an important path for Selling (Listing) Brokers to take toward their intended destination of "Cooperating Broker" status. Cooperating Broker status allows the Selling (Listing) Broker to claim for itself the share of the Selling (Listing) Broker Commission that is said to be for Buying Broker compensation. This sharing is deceptively provided for under the language of Exclusive Listing Agreements that are consistent with the current commission sharing in the Broker marketplace.

With the commission sharing structure created by the "Buyer Broker Commission Rule", Selling (Listing) Brokers now seek to become a "Cooperating Broker" so as to keep the entire inflated commission. This sharing has been explained to Sellers as being needed to attract Buyers from other Brokers. But when a Selling (Listing) Broker already has the Buyer, and is adequately compensated by a 3% Selling (Listing) Broker commission, there is likely no justification for doubling the Selling (Listing) Broker's commission.

Significantly, by becoming "Cooperating Brokers", Selling (Listing) Brokers have also gained control of Purchase & Sale drafting so as to be able to include provisions requiring the Seller to indemnify, hold harmless, and release the Selling (Listing) Broker, Broker officers, Broker directors, and Broker agents from liability for loss or damage (and attorney fees in the event of problems) from the Selling (Listing) Brokers execution of pre-sale renovations and other fiduciary services.

Essentially, the Selling Broker, acting in the role of a "Contributing Broker", prepares a Purchase and Sale contract offer through which the Buyer purportedly asks the Seller to accept obligations to indemnify, hold harmless, and give a liability release to the Selling (Listing) Broker for renovation advice, guidance, and coordination provided to Seller in the course of executing the "Broker Pre-Sale Renovation Business Model".

Such a Seller indemnification, hold harmless, and liability release of Seller's Broker for renovations that Buyer is purchasing is not in Buyer's best interest. Of course, a Buyer Broker release (also provided in the contract) is also not in Buyer's best interest. Up to now, Broker regulators in the states (Florida anyway) have not challenged the propriety of a Broker, acting in a supposedly regulated Broker role creating indemnification, hold harmless obligations, and liability release obligations for Seller with respect to what the Broker drafted language calls the non-Broker acts of the Broker. With no sense of irony or embarrassment, the indemnification, hold harmless, and release language in the Broker drafted Purchase and Sale contracts apply only to Broker acts that are "beyond the scope of services regulated by Chapter 475, F.S.[5] [ ] "including Broker's referral, recommendation or retention of an vendor for, or on behalf of [Buyer and Seller]"; and products and services provided by (or expensed incurred by) such renovation vendors.[6]

_____

[5] Florida state law regulating Brokers.

[6] The impression of "free" Purchase and Sale contract preparation, that the "Buyer Broker Commission Rule" helps the Real Estate industry perpetuate, is strongly analogous to the illegal antitrust tying of our antitrust laws in the selling of products. The cost for a Buyer to have an attorney draft a Purchase and Sale contract (perhaps $1,000 or $2,000) is seen by Buyers as an extra cost compared to the "free" Broker prepared

4

The legal drafting of sophisticated indemnification and hold harmless clauses[7] in Purchase and Sale contracts is beyond the capacity of regular consumers to understand. Worse, it is even included in the contract language presented by Single Agent Selling (Listing) Brokers (albeit, in a Contributing Broker role) who have a fiduciary duty to act in the best interest of the Seller. Of course, the fiction is that the offer contract was drafted for the Buyer under the cover of Cooperating Broker status that the Selling (listing) Broker is claiming for itself. Again, the bigger issue is the entirety of the breakdown in fiduciary standards that is encouraged by primacy of the "Buyer Broker Commission Rule" and the incentive that it gives to Selling (listing) Brokers to grab the second 3%, even if it means never putting the Seller's property on MLS.

**SIGNATURES ON NEXT PAGE**

---

contract. But, of course, the preparation is not free; and it appears to be free only because the Seller's 6% commission is shared with a Contributing Broker.

[7] This technical legal drafting is violation of any Single Agent Broker's fiduciary duty to Seller, if not a Transaction (facilitator) Broker duty to be honest and fair. But it is also the unlicensed practice of law. *See* The Florida Bar v. Moses, 380 So. 2d 412, 417 (Fla. 1980). "In The Florida Bar v. Sperry, 140 So. 2d 587, 591 (Fla. 1962), judg. vacated on other grounds, 373 U.S. 379 (1963) the Court [ ] developed the following test to determine whether an activity is the practice of law:

> . . .if the giving of [the] advice and performance of [the] services affect important rights of a person under the law, and if the reasonable protection of the rights and property of those advised and served requires that the persons giving such advice possess legal skill and a knowledge of the law greater than that possessed by the average citizen, then the giving of such advice and the performance of such services by one for another as a course of conduct constitute the practice of law.

To the extent that a Broker's drafting of sophisticated legal provisions takes Buyers and Sellers beyond the arrangements actually negotiated by the Broker, it becomes the practice of law. A non-licensed Broker may not provide Buyer or Seller with the necessary advice and guidance needed to understand and evaluate such concepts; especially, complex legal clauses inserted in contracts for the benefit of the Broker. *C.f.,* Keyes Co. v. Dade Cty. Bar Ass'n, 46 So. 2d 605 (Fla. 1950) ("...if a broker is employed to find a purchaser of the property of the one by whom he is employed or to effect its sale, he performs his service when he produces a prospective purchaser ready, willing, and able to buy or procures from the purchaser a binding contract. So it seems logical and fair that the realtor be restricted in the drafting of papers to those, such as a memorandum, deposit receipt, or the contract, as the case may be, recording his handiwork -- that is, the bringing together of buyer and seller. Thus his activities would coincide with the service he was employed to perform and which, performed, would entitle him to his compensation. Once this point is reached, the field is the lawyer's...").

5

Chia and Herbert Whitehouse respectfully submit the Objection Statement to the proposed settlement contained in the above pages 1 – 5; asking that the court and the parties to the "Buyer Broker Commission Rule" litigation address:

> The practice of Single Agent (fiduciary) Brokers claiming through unfair and deceptive trade practices that portion of the commission paid by Seller that the Seller intends to be used for a Buyer Broker that is independent of the Selling (Listing) Broker.

The Settlement should especially address the growing Broker Pre-Sale Renovation Business Model when the use of that approach delays the use of MLS and related public marketing, sometimes for the entire term of an Exclusive Listing Agreement. This concern is not hypothetical; and was precisely what happened in connection with two (2) COMPASS, and two (2) MAVREALTY Exclusive Listing Agreements discussed in this Opposition Statement.

These delays should not become leverage for Selling (Listing) Brokers to claim any Buyer Broker Commission as Contributing Brokers.

*Chia W. Whitehouse*
03/24/24

Chia Whithouse
13676 Chauvin Avenue
Orlando, Florida 32827
Tel: (732) 762 7003
Email: Chiawangw0606@gmail.com

*Herbert Whitehouse*
03/24/24

Herbert Whitehouse
13676 Chauvin Avenue
Orlando, Florida 32827
Tel: (732) 462 5583
Email: herbwhitehouse@outlook.com

6

**ATTACHMENT A:** The (Compass) Broker Pre-Sale Renovation Business Model

Under this business model Selling (Listing) Brokers provide sellers with fiduciary renovation advice, guidance, and even subcontractor management. Of course, except for the zero interest loans that Compass provides for loans to Sellers who enter into an Exclusive Listing Agreement (ELA) with Compass, whether Compass convinces a Seller to spend $10,000 or $50,000 on home improvements, these Seller investments will likely increase the sale price of the home being sold; and therefore, Compass commissions on the sale will also increase.

Plus, if Compass effectively uses the time and involvement that it puts into the home renovations to postpone MLS listings and other public marketing, it will increase the odds of attracting a Buyer who has an existing (or new) Compass relationship, perhaps with a different Compass Agent. If this happens, the convention under the "Buyer Broker Commission Rule" is that the typical commission paid by a Seller (currently 6%) is not shared with another Buyer Broker; but rather, paid to Compass as a "Contributing Broker." This can double the Compass commission. On a $500,000 dollar house; a $15,000 commission becomes $30,000. And if the renovation increases the sale price by even 10%, or $50,000, the commission increases another $3,000.

**The Broker Renovation Promise**
"The client chooses the work and the vendor up front and also approves costs before work begins, directing Compass to pay vendors on their behalf. Compass Concierge clients know exactly what Concierge will cost because they are in control of those costs." Real estate agencies put the spotlight on staging - The Washington Post
"This is another example of a great idea that came from one of our agents that we are excited to bring to life," said founder and CEO Robert Refkin in the emailed press release. "It's an opportunity for Compass to use our capital to **help our agents better serve their clients**." Mission Title || Compass launches its own Concierge staging and renovation service (bingj.com)

Even if the Compass ELA is for Transaction Broker services, Compass Concierge was intended to support a core Broker business model by further empowering Compass Agents, so that the Compass Agent can be by the side of the Compass Client (Seller) as advisor and guide for the home Seller's renovation/repair needs.

Here are the four primary components of Compass Concierge marketing.
1. **Smart**
   "Your Compass agent can help you determine which [renovation/repair] service can deliver the greatest return of your investment.
2. **Fast**
   "The entire process is designed for speed, so that work can begin – and your home can sell – as quickly as possible."
3. **Transparent**
   "Zero due until closing."
4. **Easy**
   "Your Compass Agent will be by your side throughout the process."
Compass Concierge

## Services may include:

| | |
|---|---|
| Staging | Roofing repair |
| Deep-cleaning | Moving + storage |
| Decluttering | Pest control |
| Cosmetic renovations | Custom closet work |
| Landscaping | Fencing |
| Plumbing repair | Water heating |
| Interior + exterior painting | Electrical work |
| HVAC | Seller-side inspections + evaluations |
| Sewer lateral inspections + remediation | Kitchen improvements |
| | Bathroom improvements |

As available on 3.04.24 at: https://www.compass.com/sell/



I would absolutely recommend this program to friends. It was so simple. Our agent guided us through the entire process and our home sold for 200k over ask!

*- Corey, Seller | LA*

As available on 3.04.24 at: **https://www.compass.com/sell/**

"In 2019, the firm said 5,000 agents used Concierge on 11,000 listings valued at $8.5 billion. That accounts for 17.5 percent of Compass' listings.

On average, Compass said agents who used Concierge increased their number of listings by 47 percent within 90 days.

That contributed to Compass more than doubling its listing volume year over year. In 2019, Compass sold $88 billion worth of real estate, up from $45.5 billion in 2018.

Since 2012, Compass has raised $1.5 billion from investors at a $6.4 billion valuation. At the end of 2019, it had 15,500 agents nationwide."

As available on 3.10.24, at: Compass Restarts Concierge Lending Program - The Real Deal

As the above article illustrates, getting Compass Agents to pitch pre-sale renovations, (Compass Concierge is one tool for these Agents) is important to the Broker Pre-Sale Renovation Business Model. Compass trains its Agents in how to use Compass Concierge, taking special care that Compass Agents are even encouraged to sell reluctant Brokerage clients (Compass Concierge is available only to Sellers who have signed an Exclusive Listing Agreement with Compass) on the importance of renovations and repairs.

For example: See the three videos from Compass Academy on the following pages:

The first is on how and why a Compass Agent should pitch Compass Concierge even to Sellers who don't think that their property needs renovation.

The second gives Compass Agents a tip on using Renovation Magazines' Annual "Cost vs Value Report" as a tool for estimating the ROI of different home renovations and getting educated on profit margins and residential contractor fees.

The third illustrates how a small $15,000 Renovation (paid for by the Seller) can increase the selling price by $30,000, if the Compass Agent is smart, does his or her homework, and knows the local market. Of course, the whole increased sale price is subject to the Compass commission.

**Pitching Concierge to the Seller Who Doesn't Think They Need Concierge (2:53)**



Entire video as available on 3.04.24 at:
Compass Academy - Free Educational Resources for Real Estate Agents | Compass

## Maximizing Compass Concierge with Kristin McFeely (3:17)

"One of the things I have made a habit of is frequently checking out the ROI on home projects - I
ask questions, I make deductions and I make educated guesses about renovation profit margins and contractor prices. I'm pretty good at it, and one way I make myself sound



even smarter on these matters is using Renovation Magazine's annual "Cost vs. Value Report." That report details regional renovation costs vs. the resale value of comparables - it's not precise; however, it offers a perspective that can help you communicate with sellers who need to gauge their costs. For maximum ROI, the trend that I see time and time again is that exterior projects have the most "line item" cost vs. value payoff on a home's sale. Soon we will have the enriched AI of Compass Lens available to show us this type of data as well."

Excerpt from video transcript. Entire video and transcript as available on 3.04.24 at:
Compass Academy - Free Educational Resources for Real Estate Agents | Compass

**Note:** After the next video transcript is an April 20, 2020, email introducing Compass Lens (a tool to show sellers what a buyer-ready home looks like through Compass Concierge) to Compass Agents.

## Focusing on the First Impression with Lee Taylor (5:06)

"We just had a listing that settled recently. Using $15K in Concierge funds, we were able to do a lot of small updates, including painting the front door, and painting the interior of the house. We added flower boxes, some new house numbers and a new outdoor light for curb appeal, updated the kitchen with new moroccan floor tile, installed a simple subway tile backsplash, painted the cabinets, added some new hardware, replaced old light fixtures, and installed an affordable butcher block countertop, as well as staging.

This listing eventually sold for thirty thousand over our list price, with two offers in the first week.

Of course, it always depends on the property, but there is a lot you can do with $15,000 if you're smart, do your homework and know your market."

Excerpt from video transcript. Entire video and transcript as available on 3.04.24 at:
Compass Academy - Free Educational Resources for Real Estate Agents | Compass



**Win EVERY Listing with Compass Lens**

COMPASS

Robert Reffkin
Founder & CEO at Compass
35 articles **Follow**
April 20, 2020

Compass Family,
Entrepreneurs adapt. It's what you do. And I see it as Compass's job to help *empower* you to do so, now more than ever.
Since launching Compass Concierge less than 2 years ago, there have been over 15,000 Compass Concierge listings and 1 out of 5 Compass listings are currently Concierge listings. It's been a game-changing service.
**Today, we're introducing** Compass Lens, a cutting-edge technology to virtually show your sellers what a buyer-ready home looks like through Compass Concierge. And you can <u>click here to learn more about the launch.</u>
 **Compass Lens uses Artificial Intelligence (AI) to give you and your clients the power to visualize how Compass Concierge can transform a listing and improve its sale price.** By matching a photo of your client's home to similar before & after photos, you'll be able to show your sellers exactly the difference working with you can make.
 And this is something you can do remotely with your clients today. Because once SIP ends and your clients want to sell their homes again, you want your client to be **first in line** to book the right vendors and **get their listings on the market earlier than competitive properties** — this

will put them in the best possible position to capture the interest of buyers who have been
waiting to make their move.
 **So, how does it work? The power of AI makes it this simple:**
1.   Your client sends you a single photo of a room
2.   Upload the photo to Compass Lens
3.   Compass Lens uses AI technology to match it against our listing database
4.   See listing results with beautiful, interactive before & after photos highlighting the impact
Compass Concierge can have (see the image below to show the transformation!)
5.   Advise your clients on how best to prepare their home to maximize its sales price and
minimize days on market


https://media.licdn.com/dms/image/C4E12AQHh6bZQYJLv2Q/article-inline_image-
shrink_1500_2232/0/1587391901569?e=1715212800&v=beta&t=lqbtqp0ZWbhEYkrrfqjVlwoox_mlj
FZSrv5eg5HsOXY


Please provide feedback and ideas of how we can make the tool better in this Compass Lens
Early Access Workplace Group.
 Best,
Robert
Published by



Robert ReffkinRobert Reffkin
Founder & CEO at Compass
Published • 3y
35 articles**Follow**
This was the email I shared this morning with our Compass agents launching Compass Lens —
our AI-powered technology to virtually show sellers what a buyer-ready home looks like through
Compass Concierge.
 As available on Linkedin on 3.10.24 at: (1) Win EVERY Listing with Compass Lens | LinkedIn

**ATTACHMENT B:** <u>Context for Seller (Listing) Brokers Becoming Contributing Brokers in the Course of the Pre-Sale Broker Renovation Business Model</u>
(Mead Garden Property)

### FIRST EXCLUSIVE LISTING AGREEMENT

- A Transaction Broker (facilitator) Exclusive Listing Agreement (ELA) with COMPASS FLORIDA, LLC (COMPASS) had a term of 5.31.21 through 11.30.21; plus, a three week period after execution of the ELA, but before its 5.31.21 Effective Date, and almost an eight (8) week month extension while a 10.12.22 Purchase and Sale contract remained in effect.
- The ELA required <u>immediate</u> public marketing and an MLS listing.
    - There were three parts to the COMPASS Broker obligations under the ELA:
        - "diligent and continued efforts to sell the Property";
        - "in accordance with this Agreement"; and
        - "until a sales contract is pending".
    - Sections 5 and 6 of the ELA were clear and unambiguous in providing that the Agreement required Compass to engage in public marketing of the Property, and to use MLS (Multiple Listing Service) as the core of that public marketing.
    - Section 5 of the ELA, **Multiple Listing Service,** provides:
        - "Placing the Property on a multiple listing service (the "MLS") is beneficial to **Seller** because the Property will be exposed to a large number of potential buyers. As a MLS participant, **Broker** is obligated to enter the Property into the MLS within one (1) business day of marketing the Property to the public (see Paragraph 6(a)) or as necessary to comply with local MLS rule(s). This listing will be published accordingly in the MLS unless **Seller** directs **Broker** otherwise in writing.[1] Seller authorizes Broker to report to the MLS this listing information and price, terms, and financing information on any resulting sale for use by authorized Board / Association members an MLS participants and subscribers unless **Seller** directs **Broker** otherwise in writing."
- The property was never listed on MLS.
- Instead, COMPASS, in the course of executing its Pre-Sale Broker Renovation Business Model (See Attachment A) abandoned its Broker obligations under the ELA in order to become a fiduciary advisor and renovation coordinator.
- This gave COMPASS some five (5) months while coordinating renovations to find a Buyer and become the Contributing Broker in order to claim the 3% Buyer's Broker commission under a typical "Buyer Broker Commission Rule" commission sharing ELA provision.

### SECOND EXCLUSIVE LISTING AGREEMENT

- A new Single Agent (fiduciary) Broker ELA with MAVREALTY LLC (MAVREALTY) on this same property was entered into on 1.26.22, extending through 7.25.22.
- This new ELA, unlike the prior COMPASS ELA, which had required immediate MLS listing, provided: "Listing to be excluded from MLS due to renovations for 60 days";
- MAVREALTY presented Seller with a Purchase and Sale contract offer already signed by (the same Buyer as with the Compass contract) at 3:01 PM, 55 minutes after presenting Seller with a MAVREALTY signed ELA; indicating that it had already found the Buyer before entering into the ELA with Seller.

- **The new Purchase and Sale contract listed MAVREALTY as the Contributing Broker, entitled to a 3% commission under the Buyer Broker Commission Rule.**
    - This demonstrates the higher priority for the Buyer Broker Commission Rule than the fiduciary obligations of the Selling Broker under Florida law.
    - Although expressly prohibited under Florida law, MAVREALTY was acting in the dual roles of i) a Single Agent Fiduciary for Seller; and ii) Buyer's Transaction Broker.
        - All communications with Buyer on the renovations being coordinated by MAVREALTY were handled directly by MAVREALTY
- Buyer gave notice to terminate the Purchase and Sale contract on 2.13.22, because the renovations promised to Buyer under the Broker Pre-Sale Renovation Business model were not getting completed.
- MAVREALTY then stopped all renovation work; the property was still not listed on MLS; and even though MAVREALTY had stopped all renovation work and declined to market the property for sale, MAVREALTY refused to let Seller out of the ELA without a release of all liability.
- As soon as Seller was able to list with another Broker, Seller and the local Broker mitigated losses by selling the gutted Property quickly in August, as is.

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT,**

**IN AND FOR ORANGE COUNTY, FLORIDA**

| | |
|---|---|
| CHIA WHITEHOUSE AND HERBERT WHITEHOUSE | CASE NO.: 2024-CA-000906-O |
| Plaintiffs, | |
| v. | |
| MAVREALTY LLC, a Florida limited liability company,<br><br>and PEDRO GERMANO, individually, | |
| Defendants. | |

### FIRST SET OF REQUESTS FOR ADMISSION

Plaintiffs, Chia Whitehouse and Herbert Whitehouse, request MAVREALTY LLC, a Florida limited liability company, pursuant to Fla. R. Civ. P. 1.370, within forty-five (45) days after service of this Request, to admit the truth of the following matters, or deny the item, or by explaining why you cannot specifically admit or deny the item. subject to all allowable objections. Any denial must meet the substance of the requested admission.

If necessary for an honest Response, an objection may be made as to part of a Request, and the rest admitted. If you do make a partial objection, you must specify the part of the Request to which your objection applies.

If you intend to deny, in part, a matter, you must still specify that some of the requested matter is true; and then qualify or deny only the remainder. If you cannot truthfully admit or deny the matter, you are required to set forth the reasons why you cannot truthfully admit or deny the matter.

Further, you cannot give lack of information or knowledge as a reason for failing to ADMIT or DENY unless you state that, despite having made reasonable inquiry, that the means of obtaining the information is not available to you, and that the information is out of your reach. Your Response includes not only information directly known to you, or in your possession; it also includes information and knowledge of your agents, servants, and representatives, including your past and current law firm(s), investigators, and anyone else who may have obtained information on your behalf or on behalf of your attorney(s). In addition, you cannot object to a Request because you consider the matter to present a genuine issue for trial.

53776735 v1

When responding, you shall state each Request in full as numbered below, followed by your Response. Alternatively, for your convenience if the space after a Request permits, you may select ADMIT following each item, or select DENY and type in the space provided an allowable objection or clarification of your denial, or inability to Respond as explained above.

## FOURTEEN (14) INDIVIDUAL REQUESTS:

**REQUEST FOR ADMISSION NO. 1**: Admit that in January of 2022, agent Pedro Germano, an agent acting with actual or apparent authority for MAVREALTY LLC, a Florida limited liability company (MAVREALTY), entered into an Exclusive Listing Agreement on behalf of his disclosed principal, licensed Broker MAVREALTY LLC.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 2**:    Admit that MAVREALTY LLC, a Florida limited liability company, Pedro Germano's principal, and Chia Whitehouse and Herbert Whitehouse, are parties to the
the attached Exclusive Listing Agreement.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 3**: Admit that by the terms of the attached Exclusive Listing Agreement, that MAVREALTY LLC, a Florida limited liability company, undertook Broker obligations to make "diligent and continued efforts to sell the Property in accordance with [that] Agreement" as a fiduciary Single Agent Broker for Chia Whitehouse and Herbert Whitehouse.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 4**: Admit that in the months of January and February of 2022, that the relationship of Pedro Germano to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) was one in which MAVREALTY had manifested assent to Pedro Germano (Germano) such that Germano would act as an agent for MAVREALTY (as Principal), and that Germano (as agent) would be subject to the Principal's control, and that Germano had so consented to so act.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 5:** Admit that prior to the effective date of the Exclusive Listing Agreement, that Pedro Germano had acted as a licensed Real Estate Agent in multiple property transactions in which Joshua Briscoe and/or Ralph Briscoe were the Buyer or Seller.

ANSWER: ___ADMIT ___DENY
If your response is in any way a denial, please explain.


**REQUEST FOR ADMISSION NO. 6:** Admit that in the months of January and February of 2022, before and after execution of the attached Exclusive Listing Agreement, that Pedro Germano, as agent to his principal, MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) had received repeated instructions from Chia Whitehouse that the public marketing of the 13676 Chavin Avenue property was to include a MLS listing followed by an Open House, before Germano was to work on any offer from the Briscoes.

ANSWER: ___ADMIT ___DENY
If your response is in any way a denial, please explain.


**REQUEST FOR ADMISSION NO. 7:** Admit that after execution of the attached Exclusive Listing Agreement, that Pedro Germano, as agent to his principal, MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) had called Chia Whitehouse to confirm her instructions to him, and/or to determine if her instructions were negotiable with respect to her not wanting to consider any offer from Joshua Briscoe (the Briscoes) before the public marketing of the 13676 Chavin Avenue property that was to include a MLS listing followed by an Open House.

ANSWER: ___ADMIT ___DENY
If your response is in any way a denial, please explain.


**REQUEST FOR ADMISSION NO. 8:** Admit that following the execution of the attached Exclusive Listing Agreement, that Pedro Germano, as agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of loyalty to Sellers by providing advice and guidance to Joshua Briscoe and/or Ralph and Gisella Briscoe on the amount and terms of a purchase offer for Seller's property that might be accepted by Sellers, even though Germano had been told by Chia Whitehouse that dealing with an offer from the Briscoe's as a stand-alone offer without public marketing of the property would be personally difficult for Chia because of her relationship with the Briscoes.
ANSWER: ___ADMIT ___DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 9**: Admit that following the execution of the attached Exclusive Listing Agreement, that Pedro Germano, as agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of confidentiality to Sellers disclosing to Ralph Briscoe and/or Gisella Briscoe, and/or Joshua Briscoe information that Germano had obtained in the course of his fiduciary relationship with Seller, but as to which Sellers had not authorized disclosure.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.


**REQUEST FOR ADMISSION NO. 10**: Admit that Pedro Germano (Germano), as Agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of honesty and fair dealing to Sellers by secretly providing Joshua Briscoe and/or Ralph and Gisella Briscoe with information that Germano had obtained from Chia Whitehouse as to Seller's preliminary expectations as to the potential outcome of the marketing strategy on which Germano and Sellers had previously agreed.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.


**REQUEST FOR ADMISSION NO. 11:** Admit that Pedro Germano (Germano), as Agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of loyalty to Sellers by secretly providing Joshua Briscoe and/or Ralph and Gisella Briscoe with information that he had obtained from Chia Whitehouse as to Seller's preliminary expectations as to the potential outcome of the marketing strategy on which Germano and Sellers had previously agreed.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 12:** Admit that Pedro Germano (Germano), as Agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of obedience to Sellers by secretly providing Joshua Briscoe and/or Ralph and Gisella Briscoe with information that he had obtained from Chia Whitehouse as to Seller's preliminary expectations as to the potential outcome of the marketing strategy on which Germano and Sellers had previously agreed.

ANSWER: ___ADMIT ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 13:** Admit that in the months of January and February of 2022, that Pedro Germano (Germano), as Agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of loyalty to Sellers by failing to disclose to Sellers information that Germano had obtained from Ralph Briscoe and/or Gisella Briscoe, and/or from Joshua Briscoe that would be relevant to Sellers evaluating a purchase offer from Joshua Briscoe or the Briscoes in general.

ANSWER: ___ADMIT ____DENY
If your response is in any way a denial, please explain

**REQUEST FOR ADMISSION NO. 14:** Admit that following the execution of the attached Exclusive Listing Agreement, that Pedro Germano, as agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of obedience to Sellers Chia Whitehouse and Herb Whitehouse by actively assisting Joshua Briscoe and/or Ralph and Gisella Briscoe in the preparation of a purchase offer for Seller's property at the expense of efforts toward a goal that he had agreed to with Chia Whitehouse; namely, preparing for and setting up the public marketing strategy on which Germano and Sellers had previously agreed.

ANSWER: ___ADMIT ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 15**: Admit that following the execution of the attached Exclusive Listing Agreement, that Pedro Germano, as agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's fiduciary duty of obedience to Sellers Chia Whitehouse and Herb Whitehouse by actively assisting Joshua Briscoe and/or Ralph and Gisella Briscoe in the preparation of a purchase offer for Seller's property, knowingly against Seller's wishes, and at the expense of MAVREALTY efforts toward a goal that MAVREALTY had agreed to with Chia Whitehouse; namely, preparing for and setting up opportunities for the time sensitive Section 1031 Exchange into commercial real estate as reflected in the MAVREALTY Exclusive Listing Agreement.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.

**REQUEST FOR ADMISSION NO. 16**: Admit that following the execution of the attached Exclusive Listing Agreement, that Pedro Germano, as agent to MAVREALTY LLC, a Florida limited liability company, (MAVREALTY) materially violated MAVREALTY's duties as a Single Agent fiduciary of confidentiality obedience and loyalty, as well as its duty of honesty and fair dealing.

ANSWER:     ___ADMIT     ____DENY
If your response is in any way a denial, please explain.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Sixteen (16) Requests for Admission was included in the process server package along with the Summons and Complaint to:

**MavRealty LLC**
**c/o Navbrands LLC, Registered Agent 2**
**32 Indian Rocks Road N, Suite B**
**Belleair Bluffs, Florida 33770**

Dated this 19th day of March, 2024.

By: /s/ Chia Whitehouse_____
Chia Whitehouse on behalf of Herbert and Chia Whitehouse
13676 Chauvin Avenue Orlando FL 32827
Telephone: (732) 462-5583
Emails: chiawangw0606@gmail.com   herbwhitehouse@outlook.com

53776735 v1

dotloop signature verification: dtlp.us/Qjnw-3rRU-5E5R

## Exclusive Right of Sale Listing Agreement

1  This Exclusive Right of Sale Listing Agreement ("Agreement") is between

2* Herbert Whitehouse and Chia W Whitehouse _____ ("**Seller**")

3* and MavRealty - Pedro Germano _____ ("**Broker**").

4  **1. Authority to Sell Property: Seller** gives **Broker** the EXCLUSIVE RIGHT TO SELL the real and personal
5  property (collectively "Property") described below, at the price and terms described below, beginning
6* 01/25/2022 _____ and terminating at 11:59 p.m. on 07/25/2022 _____ ("Termination Date"). Upon
7  full execution of a contract for sale and purchase of the Property, all rights and obligations of this Agreement will
8  automatically extend through the date of the actual closing of the sales contract. **Seller** and **Broker** acknowledge
9  that this Agreement does not guarantee a sale. This Property will be offered to any person without regard to race,
10 color, religion, sex, handicap, familial status, national origin, or any other factor protected by federal, state, or local
11 law. **Seller** certifies and represents that she/he/it is legally entitled to convey the Property and all improvements.

12 **2. Description of Property:**
13* **(a) Street Address:** 13676 Chauvin Avenue, Orlando, FL 32827 _____

14 _____

15* **Legal Description:** LAUREATE PARK PHASE 5A 83/77 LOT 159

16* _____ ☐ See Attachment _____

17* **(b) Personal Property, including appliances:** Washer and Dryer, security cams, fridge, fixtures and ceiling lightings

18* _____ ☐ See Attachment _____

19 **(c) Occupancy:**
20* Property ☑ is ☐ is not currently occupied by a tenant. If occupied, the lease term expires 03/01/2022 .

21 **3. Price and Terms:** The property is offered for sale on the following terms or on other terms acceptable to **Seller:**
22* **(a) Price:** $548,000.00 _____
23* **(b) Financing Terms:** ☑ Cash ☑ Conventional ☐ VA ☐ FHA ☐ Other (specify) _____
24* ☐ **Seller** Financing: **Seller** will hold a purchase money mortgage in the amount of $_____
25* with the following terms: _____
26* ☐ Assumption of Existing Mortgage: Buyer may assume existing mortgage for $_____ plus
27* an assumption fee of $_____ . The mortgage is for a term of _____ years beginning in
28* _____ , at an interest rate of _____ % ☐ fixed ☐ variable (describe) _____
29* Lender approval of assumption ☐ is required ☐ is not required ☐ unknown. **Notice to Seller: (1)** You may
30 remain liable for an assumed mortgage for a number of years after the Property is sold. Check with your
31 lender to determine the extent of your liability. **Seller** will ensure that all mortgage payments and required
32 escrow deposits are current at the time of closing and will convey the escrow deposit to the buyer at closing.
33 **(2)** Extensive regulations affect **Seller** financed transactions. It is beyond the scope of a real estate licensee's
34 authority to determine whether the terms of your **Seller** financing agreement comply with all applicable laws
35 or whether you must be registered and/or licensed as a loan originator before offering **Seller** financing. You
36 are advised to consult with a legal or mortgage professional to make this determination.
37* **(c) Seller Expenses: Seller** will pay mortgage discount or other closing costs not to exceed _____ % of the
38 purchase price and any other expenses **Seller** agrees to pay in connection with a transaction.

39 **4. Broker Obligations: Broker** agrees to make diligent and continued efforts to sell the Property in accordance with
40 this Agreement until a sales contract is pending on the Property.

41 **5. Multiple Listing Service:** Placing the Property in a multiple listing service (the "MLS") is beneficial to **Seller**
42 because the Property will be exposed to a large number of potential buyers. As a MLS participant, **Broker** is
43 obligated to enter the Property into the MLS within one (1) business day of marketing the Property to the public
44 (see Paragraph 6(a)) or as necessary to comply with local MLS rule(s). This listing will be published accordingly in
45 the MLS unless **Seller** directs **Broker** otherwise in writing. (See paragraph 6(b)(i)). **Seller** authorizes **Broker** to
46 report to the MLS this listing information and price, terms, and financing information on any resulting sale for use
47 by authorized Board / Association members and MLS participants and subscribers unless **Seller** directs **Broker**
48 otherwise in writing.

Seller ____ ____ and Broker/Sales Associate ____ acknowledge receipt of a copy of this page, which is Page 1 of 4.
ERS-17 Rev 5/20 © 2020 Florida Realtors®

dotloop signature verification: dtlp.us/2jnw-BrRU-5ESR

**6. Broker Authority: Seller** authorizes **Broker** to:
    **(a)** Market the Property to the Public (unless limited in Paragraph 6(b)(i) below):
        **(i)** Public marketing includes, but is not limited to, flyers, yard signs, digital marketing on public facing websites, brokerage website displays (i.e. IDX or VOW), email blasts, multi-brokerage listing sharing networks and applications available to the general public.
        **(ii) Public marketing also includes marketing the Property to real estate agents outside Broker's office.**
        **(iii)** Place appropriate transaction signs on the Property, except if Paragraph 6(b)(i) is checked below.
        **(iv)** Use **Seller's** name in connection with marketing or advertising the Property.
        ☐ Display the Property on the Internet except the street address.
    **(b)** Not Publicly Market to the Public/Seller Opt-Out:
        **(i.)** ☐ **Seller** does not authorize **Broker** to display the Property on the MLS.
        **(ii.) Seller** understands and acknowledges that if **Seller** checks option 6(b)(i), a For Sale sign will not be placed on the Property and
        **(iii.) Seller** understands and acknowledges that if **Seller** checks option 6(b)(i), **Broker** will be limited to marketing the Property only to agents within **Broker's** office.
        | _AW_ / _CKW_ | Initials of Seller
    **(c)** Obtain information relating to the present mortgage(s) on the Property.
    **(d)** Provide objective comparative market analysis information to potential buyers.
    **(e)** **(Check if applicable)** ☑ Use a lock box system to show and access the Property. A lock box does not ensure the Property's security. **Seller** is advised to secure or remove valuables. **Seller** agrees that the lock box is for **Seller's** benefit and releases **Broker**, persons working through **Broker**, and **Broker's** local Realtor Board / Association from all liability and responsibility in connection with any damage or loss that occurs.
        ☐ Withhold verbal offers. ☐ Withhold all offers once **Seller** accepts a sales contract for the Property.
    **(f)** Act as a single agent of **Seller**.
    **(g) Virtual Office Websites:** Some real estate brokerages offer real estate brokerage services online. These websites are referred to as Virtual Office Websites ("VOWs"). An automated estimate of market value or reviews and comments about a property may be displayed in conjunction with a property on some VOWs. Anyone who registers on a VOW may gain access to such automated valuations or comments and reviews about any property displayed on a VOW. Unless limited below, a VOW may display automated valuations or comments and reviews about this Property.
        ☑ **Seller** does not authorize an automated estimate of the market value of the listing (or a hyperlink to such estimate) to be displayed in immediate conjunction with the listing of this Property.
        ☑ **Seller** does not authorize third parties to write comments or reviews about the listing of the Property (or display a hyperlink to such comments or reviews) in immediate conjunction with the listing of this Property.

**7. Seller Obligations:** In consideration of **Broker's** obligations, **Seller** agrees to:
    **(a)** Cooperate with **Broker** in carrying out the purpose of this Agreement, including referring immediately to **Broker** all inquiries regarding the Property's transfer, whether by purchase or any other means of transfer.
    **(b)** Recognize **Broker** may be subject to additional MLS obligations and potential penalties for failure to comply with them.
    **(c)** Provide **Broker** with keys to the Property and make the Property available for **Broker** to show during reasonable times.
    **(d)** Inform **Broker** before leasing, mortgaging, or otherwise encumbering the Property.
    **(e)** Indemnify **Broker** and hold **Broker** harmless from losses, damages, costs, and expenses of any nature, including attorney's fees, and from liability to any person, that **Broker** incurs because of (1) **Seller's** negligence, representations, misrepresentations, actions, or inactions; (2) the use of a lock box; (3) the existence of undisclosed material facts about the Property; or (4) a court or arbitration decision that a broker who was not compensated in connection with a transaction is entitled to compensation from **Broker**. This clause will survive **Broker's** performance and the transfer of title.
    **(f)** Perform any act reasonably necessary to comply with FIRPTA (Section 1445 of the Internal Revenue Code).
    **(g)** Make all legally required disclosures, including all facts that materially affect the Property's value and are not readily observable or known by the buyer. **Seller** certifies and represents that **Seller** knows of no such material facts (local government building code violations, unobservable defects, etc.) other than the following:

    _____
    **Seller** will immediately inform **Broker** of any material facts that arise after signing this Agreement.
    **(h)** Consult appropriate professionals for related legal, tax, property condition, environmental, foreign reporting requirements, and other specialized advice.

Seller [_AW_ _CKW_] and Broker/Sales Associate [_JV_] acknowledge receipt of a copy of this page, which is Page 2 of 4.
ERS-17sa Rev 5/20
© 2020 Florida Realtors®

dotloop signature verification: dtlp.us/Qjnw-9rRU-5ESR

8. **Compensation:** **Seller** will compensate **Broker** as specified below for procuring a buyer who is ready, willing, and able to purchase the Property or any interest in the Property on the terms of this Agreement or on any other terms acceptable to **Seller**. **Seller** will pay **Broker** as follows (plus applicable sales tax):

   **(a)** 6%_____% of the total purchase price plus $_____ OR $_____, no later than the date of closing specified in the sales contract. However, closing is not a prerequisite for **Broker's** fee being earned.

   **(b)** _____($ or %) of the consideration paid for an option, at the time an option is created. If the option is exercised, **Seller** will pay **Broker** the Paragraph 8(a) fee, less the amount **Broker** received under this subparagraph.

   **(c)** _____($ or %) of gross lease value as a leasing fee, on the date **Seller** enters into a lease or agreement to lease, whichever is earlier. This fee is not due if the Property is or becomes the subject of a contract granting an exclusive right to lease the Property.

   **(d)** **Broker's** fee is due in the following circumstances: (1) If any interest in the Property is transferred, whether by sale, lease, exchange, governmental action, bankruptcy, or any other means of transfer, regardless of whether the buyer is secured by **Seller**, **Broker**, or any other person. (2) If **Seller** refuses or fails to sign an offer at the price and terms stated in this Agreement, defaults on an executed sales contract, or agrees with a buyer to cancel an executed sales contract. (3) If, within __60__ days after Termination Date ("Protection Period"), **Seller** transfers or contracts to transfer the Property or any interest in the Property to any prospects with whom **Seller**, **Broker**, or any real estate licensee communicated regarding the Property before Termination Date. However, no fee will be due **Broker** if the Property is relisted after Termination Date and sold through another broker.

   **(e)** **Retained Deposits:** As consideration for **Broker's** services, **Broker** is entitled to receive _____% (50% if left blank) of all deposits that **Seller** retains as liquidated damages for a buyer's default in a transaction, not to exceed the Paragraph 8(a) fee.

9. **Cooperation with and Compensation to Other Brokers: Notice to Seller:** The buyer's broker, even if compensated by **Seller** or **Broker**, may represent the interests of the buyer. **Broker's** office policy is to cooperate with all other brokers except when not in **Seller's** best interest and to offer compensation in the amount of ☑ 3_____% of the purchase price or $_____ to a single agent for the buyer; ☑ 3_____% of the purchase price or $_____ to a transaction broker for the buyer; and ☑ 3_____% of the purchase price or $_____ to a broker who has no brokerage relationship with the buyer. ☐ None of the above. (If this is checked, the Property cannot be placed in the MLS.)

10. **Brokerage Relationship:**

**SINGLE AGENT NOTICE**

**FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES OPERATING AS SINGLE AGENTS DISCLOSE TO BUYERS AND SELLERS THEIR DUTIES.**

As a single agent, MavRealty_____ and its associates owe to you the following duties:

1. Dealing honestly and fairly;
2. Loyalty;
3. Confidentiality;
4. Obedience;
5. Full Disclosure;
6. Accounting for all funds;
7. Skill, care, and diligence in the transaction;
8. Presenting all offers and counteroffers in a timely manner, unless a party has previously directed the licensee otherwise in writing; and
9. Disclosing all known facts that materially affect the value of residential real property and are not readily observable.

_Herbert Whitehouse_

dotloop verified
01/27/22 12:24 PM EST
QZBP-UJV4-7BOH-G3IK

Signature                                              Date

_Chia W Whitehouse_

dotloop verified
01/25/22 8:17 AM EST
BA8Y-ZRDB-VCXK-DNZS

Signature                                              Date

Seller [HW] [CWW] and Broker/Sales Associate [FG] acknowledge receipt of a copy of this page, which is Page 3 of 4.
ERS-17sab Rev 8/20

© 2020 Florida Realtors®

dotloop signature verification: dtlp.us/2jnw-BrRU-5E5R

**11. Conditional Termination:** At **Seller's** request, **Broker** may agree to conditionally terminate this Agreement. If **Broker** agrees to conditional termination, **Seller** must sign a withdrawal agreement, reimburse **Broker** for all direct expenses incurred in marketing the Property, and pay a cancellation fee of $_____ plus applicable sales tax. **Broker** may void the conditional termination, and **Seller** will pay the fee stated in Paragraph 8(a) less the cancellation fee if **Seller** transfers or contracts to transfer the Property or any interest in the Property during the time period from the date of conditional termination to Termination Date and Protection Period, if applicable.

**12. Dispute Resolution:** This Agreement will be construed under Florida law. All controversies, claims, and other matters in question between the parties arising out of or relating to this Agreement or the breach thereof will be settled by first attempting mediation under the rules of the American Mediation Association or other mediator agreed upon by the parties. If litigation arises out of this Agreement, the prevailing party will be entitled to recover reasonable attorney's fees and costs, unless the parties agree that disputes will be settled by arbitration as follows: **Arbitration:** By initialing in the space provided, **Seller** [____] [____] Sales Associate [____] and **Broker** [____] agree that disputes not resolved by mediation will be settled by neutral binding arbitration in the county in which the Property is located in accordance with the rules of the American Arbitration Association or other arbitrator agreed upon by the parties. Each party to any arbitration (or litigation to enforce the arbitration provision of this Agreement or an arbitration award) will pay its own fees, costs, and expenses, including attorney's fees, and will equally split the arbitrator's fees and administrative fees of arbitration.

**13. Miscellaneous:** This Agreement is binding on **Seller's** and **Broker's** heirs, personal representatives, administrators, successors, and assigns. **Broker** may assign this Agreement to another listing office. This Agreement is the entire agreement between **Seller** and **Broker**. No prior or present agreements or representations will be binding on **Seller** or **Broker** unless included in this Agreement. Electronic signatures are acceptable and will be binding. Signatures, initials, and modifications communicated by facsimile will be considered as originals. The term "buyer" as used in this Agreement includes buyers, tenants, exchangors, optionees, and other categories of potential or actual transferees.

**14. Additional Terms:** This transaction will be a Section1031 Exchange sale and subject to adherence of the related IRS code including the actions and handling of the appointed trustee

_____

_____

_____

**Seller's Signature:** _Herbert Whitehouse_ [dotloop verified 01/27/22 12:24 AM EST UGXC-MKNB-51R1K-QZT1] Date: _____

Home Telephone: _____ Work Telephone: _____ Facsimile: _____

Address: 997 Juel Street Orlando FL

Email Address: herbwhitehouse@gmail.com

**Seller's Signature:** _Chia W Whitehouse_ [dotloop verified 01/25/22 8:17 AM EST J2LU-PLGO-6XT8-EQ4IB] Date: _____

Home Telephone: 7327627003 _____ Work Telephone: _____ Facsimile: _____

Address: 997 Juel Street Orlando FL

Email Address: chiawangw0606@gmail.com

**Authorized Sales Associate or Broker:** _Pedro German_ [dotloop verified 01/25/22 13:14 AM EST EYWO-QJGK-BLCW-JJ0S] Date: 01/25/2022

Brokerage Firm Name: MavRealty _____ Telephone: _____

Address: 232 Indian Rocks Rd N, Belleair Bluffs, FL 33770

Copy returned to **Seller** on _____ by ☑ email ☐ facsimile ☐ mail ☑ personal delivery.

Florida REALTORS® makes no representation as to the legal validity or adequacy of any provision of this form in any specific transaction. This standardized form should not be used in complex transactions or with extensive riders or additions. This form is available for use by the entire real estate industry and is not intended to identify the user as REALTOR®. REALTOR® is a registered collective membership mark which may be used only be real estate licensees who are members of the NATIONAL ASSOCIATION OF REALTORS® and who subscribe to its Code of Ethics. The copyright laws of United States (17 U.S. Code) forbid the unauthorized reproduction of this form by any means including facsimile or computerized forms

Seller [____] [____] and Broker/Sales Associate [____] acknowledge receipt of a copy of this page, which is Page 4 of 4.

ERS-17SB Rev 5/20 © 2020 Florida Realtors®