IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | CASE NO. 19-CV-00332-SRB |
| Plaintiffs, | ) ) ) | OBJECTION TO NATIONAL CLASS ACTION SETTLEMENTS FOR REALOGY HOLDINGS CORP., |
| vs. | ) ) | RE/MAX LLC., AND KELLER WILLIAMS REALTY, INC. |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP. (n/k/a ANYWHERE REAL ESTATE, INC.), HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) ) ) | AND SUGGESTIONS IN SUPPORT OF THE OBJECTION |
| Defendants. | ) | |

In compliance with the Preliminary Approval Order and the Long Form Notice of Proposed Settlements of Realogy Holdings Corp., Re/Max LLC., and Keller Williams the following members, none of whom have ever objected to a class action settlement before, object on behalf of a proposed class of individuals who sold a home on a Multiple Listing Service servicing the District of South Carolina:

    Robert Benjamin Douglas
    Rdoug2172@gmail.com
    Address: 631/2 Maple Street
    Charleston, SC 29403
    Phone # (859)-699-3952
    Home sold:  14 N Tracy Street          .

1

Charleston, SC 29403
Date of Sale: 2/28/2023
Listing Broker: Daniel Ravenel
Sotheby's International Realty
Buyer's Broker: Maven Realty

Benny D Cheatham
Benny_cheatham@yahoo.com
101 Five Oaks Drive, Landrum, SC 29356
Home Sold: 513 Minnow Drive, Pawleys Island, SC 29585
Date of Sale: 7/24/2023
Listing Broker: The Litchfield Company
Buyers Broker: The Litchfield Company

Douglas W. Fender II, Dena Marie Fender
doug.w.fender@gmail.com
134 Lancelot Court
Lexington, SC
(803)542-8019
Home sold: 208 Spring Water Dr
Columbia, SC 29233
8/30/2023
Listing Broker: Century 21 Vanguard
Buyer's Broker: Coldwell Banker Realty

## I. Introduction

The Objectors oppose the national class action settlements in their present form and propose that the settlements be denied final approval for a number of reasons.

To begin, the class settlement significantly exceeds the narrow scope for which the classes were certified and for which discovery was conducted. The *Moehrl* and *Sitzer/Burnett* classes were originally certified for a total of 24 Multiple Listing Services (MLSs). This settlement attempts to expand that class certification to more than 600 MLSs around the country. This despite the fact that real estate is, at its base, local. Many of those 600 MLSs operate and enforce their rules differently from other MLSs even within the same state, let alone across the

country. It is also easy to conflate the illegal activity these MLS engaged in with the means by which it was accomplished. These MLSs may have used many of the same rules, but often enforced them in various ways. The participants in these MLSs took part in fixing prices for commissions, the actual illegal activity, using rules adopted for its particular MLS, though they may have used similar instrumentalities to do it.

Realogy Holdings and RE/MAX settled their cases pretrial for $83,500,000 and $55,000,000 respectively. As a condition of these settlements, both parties agreed to certain "practice changes" and to cooperate with the Plaintiff lead counsel in the trial of the *Burnett* and *Moerhl* cases. This cooperation agreement does not benefit most of the absent class members. Indeed, it only benefited those Plaintiffs in the trial of the *Burnett* action and, should *Moerhl* proceed to trial, it may benefit those litigants. (Plaintiff's Motion for Preliminary Approval for Realogy and RE/MAX Settlement Agreements, dkt. 1192 at 11) This use of a nationwide settlement class to benefit particular groups of litigants at the cost of other, absent class members is a theme running throughout these settlement agreements.

Keller Williams proceeded to trial in the *Burnett* case, with Mr. Williams even testifying in the trial of the case. Having lost at trial in which only four (4) MLSs were at issue, Keller Williams has agreed to pay a total of $70 million to a national class numbering in the "tens of millions" in order to settle a $1.7 billion verdict (subject to trebling) awarded to half a million Missourians. Keller Williams has agreed to similar "practice changes" as are present in the Realogy and RE/MAX settlements, such as they are. They have further agreed to cooperate with the Plaintiff's counsel in the *Moerhl*, *Burnett*, and *Umpa* actions, meaning that Keller Williams need not cooperate with any other actions alleging the same or similar conduct for any absent

3

class member against the Defendants sued in those actions or any other bad actor. (Keller Williams Settlement Agreement, dkt. 1371-1 at 24)

Further, the settlement amount, $208,500,000, in the aggregate, is far too low to adequately compensate the massive number of injured parties here. While the outcome of the trial and appeals is uncertain, that uncertainty does not mean that Plaintiffs should be able to handicap other absent class members' ability to effectively try their own cases, in their own states, with their own evidence. In other words, Plaintiffs in these cases have bargained away rights of the citizens of other states in order to ensure that their own cases were settled, their own clients received cooperation at trial, and their own fees and expenses of trial paid. They did not conduct even the barest of discovery into the conduct of this conspiracy in other states because they could not. Yet it is their contention that $208,500,000 is sufficient to make whole absent class members in radically different circumstances and in radically different conspiratorial environments. While it is true that two other defendants are presently jointly and severally liable for the damages verdict delivered in the *Burnett* case, that does not help absent class members because the National Association of Realtors' purported settlement has not even requested preliminary approval and the remaining defendant has not settled and is apparently continuing to litigate.

Next, the settlement agreements at issue here release Franchisees despite not requiring anything of them. The national brands in this case are able to act only through franchisees. As will be discussed below, those franchisees are not required to pay any remuneration to those people they harmed. The fact that they pay a franchise fee of course does not provide consideration for these releases because they would be required to pay that anyway. They are

4

further not required to change any practices or procedures. Antitrust law is designed to deter bad actors. Here, by requiring the franchisees to neither pay nor change, it is unclear how these settlements further the purposes of antitrust law.

Lastly, the practice changes, to the extent that they require any changes at all, sunset after only five years. The price fixing activity, which is set out as well as it can be in the DOJ's Statement of Interest in *Nosalek v. MLS Property Information Network, Inc. et. al.*, No. 1:20-cv-12244-PBS (D. Mass.), is of a very long vintage. It is foolish to believe that such a long history of price fixing can be undone by five years of mild practice changes, i.e. not providing particular software. (DOJ Statement of Interest by the United States in *Nosalek*, Exhibit 1 at pp. 6-8)

For these reasons, more thoroughly set out below, objectors from South Carolina ask this Court deny Final Approval to these three settlement agreements in their present form.

## II. Pre- Certification Settlements Require Careful Scrutiny

Rule 23 of the Federal Rules of Civil Procedure requires that a class action settlement may only be approved after a hearing and only on finding that it is fair, reasonable, and adequate *Marshall v. NFL*, 787 F.3d 502, 508 (8th Cir., 2015). In determining that the settlement terms are fair, adequate, and reasonable the court must also act as a fiduciary "serving as a guardian of the rights of the class members." *In re: Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). In determining whether a settlement is fair, adequate, and reasonable, the court must consider four (4) factors: (1) The merits of the Plaintiffs' case weighed against the terms of the settlement; (2) The Defendants financial condition; (3) The complexity and expense of further litigation; and (4) The Amount of opposition to the settlement *Id.* The most important

5

Case 4:19-cv-00332-SRB     Document 1441     Filed 04/12/24     Page 5 of 14

consideration... is "the strength of the case for Plaintiffs' on the merits balanced against the amount offered in settlement." *Petrovic v. Amco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999), although the District Court cannot value the claims with a high degree of certainty the court must "insist that the parties present evidence" that would at least enable it to make a "ball park evaluation" before deciding whether to approve a settlement. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F. 3d 646, 653 (7th Cir. 2006).

### III. The Class Has Been Impermissibly Expanded

In *Blue Shield of Virginia v. McCready*, the Court said that "Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472 (1982). These three settlement agreements all purport to expand the relevant classes from 24 MLSs to the entire country. Under the policies explicated by *McCready* and its progeny, this is not permissible. This current iteration of the industry's price fixing activity, namely using the MLS rules to facilitate and hide price fixing by real estate agents, may very well have been initiated by the NAR. It may also be that the large national brokerages in their capacity as franchisors drove the NAR to take on that mantle. It cannot be maintained, however, that the violators are only the national brokerages in their capacity as franchisors. Likewise, the NAR's rules would have been hollow verbiage without willing participation by the local MLSs. As detailed in the previously cited Statement of Interest, six of the enforcement actions taken against MLSs were not against the National Association of Realtors. They were rather against local MLSs. In one of the other enforcement actions, the seminal Supreme Court case *United States v. National Association of Real Estate*

6

*Board,* 339 U.S. 485 (1950), a jury found that the local real estate board was guilty of price fixing while the national association was not.

This is important because, while the framework and incentive for this iteration of the conspiracy was made by NAR and the franchisors, it was accepted, promulgated, and enforced differently by franchisees and independent real estate brokerages in 600 MLSs throughout the country. That framework was enforced in various ways by the franchisees within the corporate umbrellas of the settling Defendants. This fact that franchisees are at least as complicit in this conspiracy as the national brokerage as franchisor is borne out by the *Burnett* complaint in paragraphs 78 – 84. (Third Amended Complaint, dkt. 759 at ¶¶ 78-84). Franchisees within the four subject MLSs at issue in *Burnett* served at very high levels within the NAR and the state association. Yet those Franchisees were neither sued nor will they pay any penalty in this settlement.

An antitrust settlement must serve to deter violators. Here, because discovery was necessarily circumscribed to the 24 MLSs at issue in the various suits, Plaintiff counsel cannot have determined, with any granularity, which franchisees, which violators, need to be deterred in South Carolina. They likely could not have determined that in any of the MLSs outside the 24 MLSs. As such, almost no bad actor will be deterred and, as discussed below, victims will not be remunerated either.
Further, because the conspiracy was necessarily carried out in individual MLSs by their own MLS rules, even though many of the operative rules may have been modeled after the NAR's Handbook, the correct measure of damages, the availability of proof, and the egregiousness of the illegal activity would all be different among the hundreds of individual MLSs. As such, this

7

Court and these Plaintiffs should not bargain away absent class members ability to discover their own evidence and try their own cases where the likelihood of success for those absent class members is unknowable. Plaintiffs are essentially asking this Court to generalize the likelihood of success in each MLS based on the likelihood of success in their two cases, one spanning four MLSs and the other twenty, despite the fact that the conspiracy operates differently throughout each MLS.

IV. **The Settlement Agreements are Insufficiently Compensatory and The Financial Condition of Two of the Companies are in Much Better Condition that Plaintiffs Claim. The Financial Condition of the Third Company Cannot Be Determined By the Class Members and Objectors Based on Currently Available Information**

As to the financial condition of the three settling parties, Objectors would offer the Declaration/Affidavit of Dr. Charles Alford as Exhibit 2. It does bear pointing out, however, that both Realogy and RE/MAX both tout EBITDA as their preferred forms of determining the health of their corporations. Operating EBITDA in 2023 was positive $200 million for Realogy. It has also been positive in terms of Free Cash Flow and Adjusted Net Income Further, over the total damages period, from 2015-2023, Realogy's operating EBITDA was $5.8 billion, or an average of $649,000,000 each year. (Exhibit 2 at ¶ 10 c). This is a massive EBITDA, much of which resulted from illegal price fixing activity. The proposed settlement amount is 1.4% of that EBITDA figure. Similarly, RE/MAX, the financial condition of which the Plaintiffs view very pessimistically, has also reported positive EBITDA, adjusted net income, and free cash flow. (Exhibit 2 at ¶ 11). Further, over the damages period, RE/MAX earned a total adjusted EBITDA of $928 million, making the $55,000,000 settlement amount 6% of that original figure. As this Court pointed out in the pretrial conference which addressed the Plaintiff's motion in Limine No. 6, "…defendants here in this case obviously made huge profits." (Plaintiff's Opposition to

Defendant's Motion in Limine No. 20, dkt. 1159 at p.2)

Unfortunately, Keller Williams's financials are not so easy to obtain. As such, Objectors would ask that he be allowed to view the same financial information as the Plaintiffs have so that a similar analysis to the one above may be made by Dr. Alford.

As Dr. Alford points out, this settling compensation would, at best, lead to each member of a twenty million member class receiving $10.43 and likely less than that. (Exhibit 2 at ¶ 19). Even adding in the purported NAR settlement, each member of that class would receive at most $31.33. Indeed, Plaintiffs intend to recover the roughly $12,000,000 they spent on the trial of the *Burnett* case, as well as their fees, from this aggregate settlement amount. Absent class members, then, would bear the costs of trying to verdict a case that led to a joint and several verdict against Keller Williams, NAR, and HomeServices, despite their inability to recover anything at this time against HomeServices. Again, absent class members may have been better placed to extract value of their own based on the conduct of the franchisees. It certainly may be that the Plaintiffs in these cases had valid reasons not to pursue the franchisees. It is just as likely, however, that in other jurisdictions, the absent class members could have pursued those franchisees, resulting in higher or more collectible awards.

### V. Settlement Agreements Release Franchisees Despite Not Requiring Anything of Them

It is axiomatic in our law that a release is a contract and subject to contractual principles. It is further axiomatic that, for a contract to form, there must be consideration. Consideration is "the exchange of something of value as between the parties, which may include a promise." *Crutcher v. Multiplan, Inc.*, 22 F.4th 756, 768 (8th Cir. 2022). These settlement agreements do not bind the franchisees at all because there is no exchange between the parties, despite the fact that

9

the complaint is replete with examples of franchisees taking active part in the price fixing activities complained of and the formulation of the rules by which much of price fixing was accomplished.

It is uncontroverted that the franchisees of the Defendants in this case will pay no money toward the total monetary settlement. While one could argue that, by paying a franchise fee, these franchisees are somehow contributing to that fund, the franchisees were already required to pay that franchise fee. Of course, doing what they were already required to do is not consideration for a new contract. It further cannot be argued that these agreements *require* franchisees to do anything. The settlement agreements do contain what are denominated as "practice changes," but those practice changes use no mandatory language when addressing franchisees. Rather, with respect to the franchisees the settlement agreements contain language like "make clear and periodically remind" and "advise and periodically remind." (Preliminary Motion for Approval for Realogy and RE/MAX Settlement Agreements, dkt 1192 at pp. 12-17 and Keller Williams Settlement Agreement, dkt. 1371-1 at pp. 21-24). In order to be effective, these settlement agreements should make mandatory adoption of these practice changes as a condition of owning a franchise and the failure to follow those provisions a condition exposing the franchisees to revocation of the franchise. Another alternative would be an injunction that forbids the Seller from making an offer of compensation to the buyer broker at all. This alternative is proposed by the Department of Justice in its Statement of Interest of the United States in *Nosalek*. (Ex. 1 at pp. 20-22). This would stop the price fixing behavior, the actual illegal activity, from recurring. That proposal is in the context of an MLS, but would be even more effective when imposed on franchisees of the largest brokerage firms in the nation.

10

Further, the underlying purpose of antitrust law, that violators be punished, victims be amply compensated, and incentivize private actors to vindicate the public interest in having open, competitive markets, is undermined by the fact that these franchisees are able to escape any accountability. Plaintiffs made a decision not to sue the franchisees who directly harmed their clients and that decision may very well have been a good one for the facts and circumstances prevailing at the time they made it. Neither the *Moerhl* nor the *Burnett* plaintiffs held those franchisees to account, just as this settlement fails to hold them to account, despite the fact that these franchisees accomplished the conspiracy that directly harmed those plaintiffs in the Subject MLSs. Those franchisees, the active participants in the conspiracy, will not have to disgorge their profit from the conspiracy they carried out against those plaintiffs. Those franchisees will not have to change any of their conduct as a result of this trial or these settlements. Now, those plaintiffs are asking this Court to impose that same decision on every single member of a national class. That imposition does not serve the public interest, nor does it serve the absent class members.

V. **Sunset Provision**

Each Settlement Agreement provides for a sunset provision as to the "practice changes," such as they are, of five (5) years after the effective date of the agreement. As discussed above, the NAR and its local real estate boards have, since 1939, attempted to fix real estate commissions nationwide. Five years is simply inadequate based on these Defendants' decades long practice of fixing the commissions for both sides of the sale, and their highly profitable results, the surreptitious return to this practice can almost be guaranteed unless clear prohibitions against it are put in place for a substantially longer period of time. The history of this industry

shows an incorrigible predilection for the fixing of commissions.

VI.  **There Are No Available Financial Documents To Establish The Earnings, EBITDA, Or Net Worth Of Keller Williams.**

Objectors are informed and believe that during the course of the trial regarding this matter, the presiding judge placed the Keller Williams financial information under seal or it was otherwise excluded as evidence. Objectors also have no way to otherwise examine the financial condition of Keller Williams. It is impossible to analyze the fairness, reasonableness, and adequacy of the settlement without reviewing those financial records. Paragraph 62 of the settlement agreement refers to a mediation conducted with references made to "materials exchanged." (Keller Williams Settlement Agreement, dkt. 1371-1 at ¶ 62). Plaintiffs' counsel have also informally represented to counsel for these Objectors that they were provided with sufficient financial information regarding these companies' financial status to make an informed and intelligent decision regarding settlement.

In a Sixth Circuit Case, *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, *et. al.*, 825 F.3d 299 (6th Cir. 2016), Judge Kethledge pointed out that "class members cannot participate meaningfully in the process contemplated by Federal Rule of Civil Procedure 23(e) unless they can review the bases of the proposed settlement." *Shane Group* at *309. This is particularly true when that documentation is "the keystone of the settlement agreement." *Id.* at *306. Keller Williams's actual financial condition is one of the keystone factors in this settlement agreement. In every case where a verdict is rendered, the Defendants threaten bankruptcy because that gives them the most possible leverage in negotiating a verdict. They also threaten appeals and post-

12

Case 4:19-cv-00332-SRB    Document 1441    Filed 04/12/24    Page 12 of 14

trial motions in an effort to drive up costs. It may very well be that Keller Williams is presently teetering on the edge of bankruptcy. It may be that more than $70 million over the next 3 years will bankrupt them. But Objectors, on behalf of the proposed class members of South Carolina, cannot know that without access to sufficient information to make that determination for themselves.

These Objectors are informed and believe that they should be entitled to the financial records under seal or subpoenaed for trial, any documents reviewed at mediation, and any other documents provided by Keller Williams used to prove its financial condition to the Plaintiffs. Keller Williams' financial condition is an essential factor in determining whether the proposed settlement is fair, reasonable, and adequate. Class members need to know Keller Williams' financial condition before they can know if the proposed settlement is fair, reasonable, and adequate.

**VII. Conclusion**

For the foregoing reasons, the Objectors object to this settlement. They have been advised solely by the undersigned counsel, who intend to appear on their behalf at the fairness hearing to be held on May 9, 2024 in Kansas City, MO at the Charles Evans Whittaker U.S. Courthouse.

*** Signature Pages to Follow ***

                KNIE & SHEALY

                */s/ Patrick E. Knie*
                Patrick E. Knie
                pat@knieshealy.com
                Federal I.D. No. 2370
                Matthew W. Shealy
                matt@knieshealy.com
                Federal I.D. No. 12823
                P.O. Box 5159
                250 Magnolia Street
                Spartanburg, S.C. 29304
                Telephone No. (864) 582-5118
                Telefax No.   (864) 585-1615

                Mitch Slade
                MITCH SLADE LAW OFFICE, P.A.
                FEDERAL I.D. NO. 5352
                P.O. Box 1007
                Spartanburg, S.C. 29304
                Telephone: (864)582-4212
                mitch@mitchsladelaw.com

                ATTORNEYS FOR PLAINTIFF

April 12, 2024