**UNITED STATES DISTRICT COURT | WESTERN DISTRICT OF MISSOURI**

**WESTERN DIVISION**

**Case No. 19-cv-00332-SRB**

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS,
FRANCES HARVEY and JEREMY KEEL, on behalf of
themselves and all others similarly situated,

    **Plaintiffs,**

v.

THE NATIONAL ASSOCIATION OF REALTORS,
REALOGY HOLDINGS CORP., HOMESERVICES OF
AMERICA, INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC.,

    **Defendants.**

    I, Anthony Phillips, as a real estate practitioner and concerned citizen, certify that on April 16, 2024, I distributed accurate and complete copies of the attached Opposition. This was accomplished by placing one copy in an envelope addressed to each party listed below. These documents were dispatched via USPS Certified Mail.

Signature: Anthony Phillips on April 16, 2024.

*Anthony Phillips*
DocuSigned By: Anthony Phillips
7823B1471B314A9...

Anthony Phillips
Luxury Real Estate Advisors
US Bank Tower | 2300 W Sahara Ave #800
Las Vegas, NV 89102
Tel: 702.482.8885
Email: TeamLuxAdvisors@gmail.com

**FIRST-CLASS MAILINGS TO:**

**EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS**
c/o Norman Wong, Acting Director
U.S. Department of Justice
950 Pennsylvania Avenue NW.
Room 2242
Washington, DC 20530-0001

**FEDERAL BUREAU OF INVESTIGATION**
c/o Stephen A. Cyrus, Special Agent in Charge
1300 Summit Street
Kansas City, MO 64105

**US DEPARTMENT OF VETERANS AFFAIRS**
**c/o Andi Phillips,** Chief Officer
451 7th Street SW Washington DC 20410

**US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**c/o Jacquelyn Phillips,** Chief Strategy Officer, Office of Inspector General
451 7th Street SW, Washington, DC. United States

**US Department Of Justice**
**c/o Matthew Phillips,** Chief Officer, TAX Division
950 Pennsylvania Avenue NW
Washington, DC, United States

**United States District Court for the Western District of Missouri**
**c/o Beth Phillips,** Chief United States District Judge
400 E. 9th Street
Kansas City, MO 64106

**MISSOURI BAR ASSOCIATION**
**c/o Megan Phillips,** President
PO Box 119, 326 Monroe
Jefferson City, MO 65102-0119

**OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE**
**c/o Timothy A. Phillips,** Deputy Director
Inspector General of the Intelligence Community,
Investigations Division, Reston 3, Washington, DC 20511

**FINALLY**

williams dirks dameron llc
c/o matthew l. dameron, plaintiffs' counsel
1100 main street, suite 2600
kansas city, mo 64105

DocuSign Envelope ID: 576E75E5-D213-48D7-9278-60BBE9310EEF

## INTRODUCTION

The adjudication and verdict of Burnett v National Association of Realtors (4:19-cv-00332) resulted in an astonishing injustice. The Plaintiffs, Plaintiffs' experts, and media outlets executed a sophisticated propaganda campaign spreading knowingly false statements, half-truths, and conflation of economic models.

### EXPERTS | PROPAGANDISTS | OSCILLATING ECONOMIC BENCHMARKS

Industry leaders, including Redfin's CEO Glenn Kelman, Inman News Deputy Editor Andrea Brimhall, real estate consultant Rob Hahn, expert witness Dr. Schulman, The Consumer Federation of America's Senior Fellow Stephen Brobeck, FCC Attorney/Advisor Mark S. Nadel, NYU Professor Lawrence White, Cornell's Dr. Peng Liu, and economists Natalya Delcoure and Norm Miller, along with Moehrl's economic experts Einer Elhauge professor at Harvard University, Nicholas Economides of NYU, and notably Plaintiff's Attorney Michael Ketchmark, have reached a consensus. They endorse that **"COMMISSION PERCENTAGE"** is the definitive economic measure for determining an agent's income and forming the foundation for damage calculations. **Introducing dollar-specific monetary details is deemed entirely unsuitable for this context.**

**Egregiously, section 5. of the Burnett verdict form was prepopulated with a $ sign, restricting the ability for jurors to cite a simple "3%" when determining damages.**

### DEVIATION OF ESTABLISHED ECONOMIC MODELS

If the Plaintiffs intended to invent damages based on specific monetary amounts rather than fractions, the courts should require the Plaintiffs' counsel to elect a final position. For example, the complaint states, *"Economists Natalya Delcoure and Norm Miller, cited in all complaints, claim: "Total broker commissions (i.e., the aggregate commission paid to the seller broker and buyer broker) in the areas in which the Covered MLSs operate average between five and six percent,"* **thus attempting to blur distinct economic measures within a single paragraph.** In reality, a *"commission"* should be understood as a specific monetary amount, whereas *"rates"* and *"percentages"* represent proportional values or fractions.

The Internal Revenue Service uses precise financial and dollar-specific amounts to determine income and tax obligations. The exclusive reliance on **"percentages"** to determine income does not align with any logical evaluation, except in cases presided in the Western District of Missouri.

## PLAINTIFF'S EXPERTS | REAL ESTATE INDUSTRY PARTICIPANTS APPEARING TO CORROBORATE ASSERTIONS

### "INDUSTRY EXPERTS" | GLENN KELMAN | ADMONISHING "6%" COMMISSIONS

Redfin CEO Glenn Kelman is known for criticizing the traditional 6% real estate commissions. Nevertheless, Redfin's practices, such as those highlighted by a 2022 legal settlement over redlining allegations, reveal a contradiction. The company acknowledges that its service decisions are driven by economic, not demographic, factors, showing a profit-motivated approach that contradicts its public stance against standard commissions. Particularly in markets like Joplin, Missouri, Redfin refers clients to partner agents, including those from Keller Williams, who share a significant portion of their commissions as referral fees. Given its ongoing profitability challenges, this business model focused on selective markets questions Redfin's position to critique fee structures.

On April 11, 2024, Housing Wire published an article titled **"MANY HOMEBUYERS LACK KNOWLEDGE ABOUT AGENT COMPENSATION: REDFIN."** The subtitle stated, *"Nearly 20% of recent buyers don't know who paid their agent or how the amount was determined."*

I believe 20% may be understated and rise to 90% when retaining Redfin. As Redfin states, **"*Fees are subject to change, and minimums apply. Buyer's agent fee not included, e.g., if buyer's agent fee is 2.5%, seller will pay a total fee of 3.5%. Listing fee increased by 1% of sale price if buyer is unrepresented. Sell for a 1% listing fee only if you also buy with Redfin within 365 days of closing on your Redfin listing. We will charge a 1.5% listing fee, then send you a check for the 0.5% difference after you buy your next home with us."**

---

https://www.redfin.com/
https://www.usatoday.com/story/news/nation/2020/10/31/redfin-sued-fair-housing-groups-redlining-minority-communities/6102172002/

## STEPHEN BROBECK | ALLEGED SENIOR FELLOW | CFA

In the first quarter of 2021, Brobeck participated in an opinion that cited dozens of studies. The study **"OBSTACLES TO PRICE COMPETITION IN THE RESIDENTIAL"** asserted that the current commission framework harms consumers by up to **$50B annually.**

Notably, the study states: *"Some complain that forcing the buyer to negotiate a buyer's broker fee separate from the sale price of the home would saddle buyers with an additional large closing cost. They assume that because the fee would not be part of the purchase price, it could not be amortized as part of the mortgage. BUT AS LONG AS THE FEE A BUYER PAYS TO A BUYER'S BROKER IS LEGITIMATE, MORTGAGE LENDERS SHOULD BE WILLING TO VIEW THE FEE AS PART OF THE PURCHASE PRICE OF THE HOME FOR THE PURPOSES OF THE MORTGAGE, AS IT IS NOW. (emphasis added)*

Also, In the first quarter of 2021, Brobeck published a press release titled "**CFA Predicts Impact on Consumers and Real Estate Brokers If Courts Require Uncoupled Commissions.**"

Brobeck's first prediction claimed, *"Mortgage lenders and the GSEs (Fannie Mae and Freddie Mac) will quickly accept the desirability of buyer broker commissions being financed, then work with brokers to facilitate this transition. These lenders will understand that to afford a new home, many buyers will need these fees to be included in their mortgage. Lenders will also k size of loans will not change appreciably now that these fees are, so the size of loans will not change appreciably."*

**Following Brobeck's Logic:**

- Buyers contribute towards commissions as they are *"largely or wholly included in the sale price."*
- The impact of decoupling commissions would be negligible as *"the size of loans will not change appreciably."*
- The assertion that sellers suffer harm from a mere one dollar, **let alone $5.35 billion**, is without substantiation.
- Brobeck acknowledged *"that to afford a new home, many buyers will need these fees to be included in their mortgage."* (THE STATUS QUO)

---

https://consumerfed.org/press_release/cfa-predicts-impact-on-consumers-and-real-estate-brokers-if-courts-require-uncoupled-commissions/
https://www.antitrustinstitute.org/wp-content/uploads/2021/02/BBLJ-ONLINE-Nadel-.pdf

Despite the apparent advocacy of the current framework, plaintiffs' counsel and experts are pushing to overhaul the US real estate market by imposing rules that appear to provide no benefits to consumers. This advocacy seems less to enhance market fairness and more to secure millions in *"legal and expert"* fees.

Although these assertions were cited 1169 days ago, there seems to be a glaring lack of initiative to seek verification from Government-Sponsored Enterprises (GSEs) regarding Brobeck's stance. The absence of such validation, whether confirming or refuting his position, is critical to the integrity of the argument. Failure to engage Government-Sponsored Enterprises may have been strategic.

From a critical standpoint, obtaining confirmation could decisively refute the notion that transactions are inherently adversarial and sellers are burdened solely by commission payments, effectively dismantling the foundation of anti-trust allegations. On the other hand, rejecting this confirmation might bolster the argument that sellers covering buy-side fees serve consumer interests, particularly by facilitating homeownership for low-income and veteran buyers.

### REAL ESTATE AGENTS | PROSPEROUS OR POVERTY-STRICKEN

In July 2023, Brobeck released a contentious study titled "A SURFEIT OF REAL ESTATE AGENTS: INDUSTRY AND CONSUMER IMPACTS," asserting an analysis of the incomes of over 1.5 million residential sales agents and brokers.

**The opinion deviates from claims that agents impose egregiously excessive fees, stating that median earnings provided a gross income of $38,300 in 2021 and net income after taxes and expenses dropping to $25,000, reaching parity with Taco Bell cashiers.**

The study's conclusion that high agent fees persist despite many agents is criticized for ignoring basic economic principles of supply and demand, which casts doubt on its reliability. Additionally, the lack of transparency about Brobeck's association with the Consumer Federation of America and undisclosed fee structures for him and the involved law firms raises concerns about the validity of his criticisms and points to a possible double standard in transparency.

---

https://consumerfed.org/expert/stephen-brobeck/

https://projects.propublica.org/nonprofits/organizations/541386480/202331799349301423/full

DocuSign Envelope ID: 576E75E5-D213-48D7-9278-60BBE9310EEF

**My interest in the viability of VA loans is personal, as members of the Phillips family have benefited from the VA loan program. Currently, several Phillips members hold leadership roles in the Department of Defense, including:**

- Executive | Office of the Director of National Intelligence.
- Director of DLA Installation Management
- Director for Operations at the Defense Intelligence Agency
- Executive Director of the Office of Special Investigations
- Military Assistant in the Office of the Secretary of Defense

**Brobeck's failure to secure confirmation from the FHA and VA is startling and has led to widespread and unacceptable confusion in the mortgage sector.**

On March 25, 2024, The Community Home Lenders of America sent a letter to Mr. John Bell, Executive Director, Loan Guaranty Service, Veterans Benefits Administration.

**This letter was also sent to:**

- The Honorable Denis R. McDonough, Secretary, US Department of Veterans Affairs
- Chairs and Ranking Members, Senate and House Committees on Veterans Affairs
- Chairs and Ranking Members. Senate Banking and House Financial Services Committees

**The letter states in the relevant part:**

*"The Community Home Lenders of America (CHLA)1 writes to ask you to expedite a regulatory change allowing veterans and active-duty service members to fund Realtor "buyer's broker" commission fees when purchasing a home with a Veterans Affairs (VA) mortgage loan."*

*"However, one aspect of this settlement is fairly simple. Due to unintended consequences arising from existing regulatory requirements regarding VA mortgage loans, veterans and active-duty personnel may find themselves at an unfair disadvantage when buying a home (or being forced to not utilize their VA mortgage earned benefit.)."*

*"As we first pointed out in our December CHLA Letter to regulator/administrators of our federal mortgage programs (FHA, VA, RHS, and GSE), these lawsuits (and now the settlement) are likely to result in or increase the practice of homebuyers directly paying – or having to pay – broker Realtor commissions."*

"Our December letter also pointed out that veterans, minorities, and other underserved first-time homebuyers, particularly those with limited down payment capabilities, could be adversely affected by industry practices, which result in more buyers paying or having to pay buyer broker realty commissions."

"This problem is particularly a concern for first-time homebuyers who are veterans or active-duty military personnel, because it is our understanding that such homebuyers are not permitted to use their own funds to pay such commission costs when using their VA mortgage benefit. (This is not the case with other federal mortgage loan programs.) It is also our understanding that a handbook change is required to address this situation."

"Therefore, we urge your agency to address this problem quickly by adopting an appropriate administrative remedy. Lenders report today that changes in the marketplace have already occurred in ways that hamper veterans and active-duty personnel seeking to purchase a home with their VA mortgage."

## MISSOURI RULES OF PROFESSIONAL CONDUCT, RULE 4-3.3: CANDOR TOWARD THE TRIBUNAL

**These rules apply to all evidence presented in court, INCLUDING TESTIMONY FROM ECONOMIC EXPERT WITNESSES:**

1. **Disclosure of Facts and Law:** Attorneys must ensure all statements made by expert witnesses are accurate and truthful, and they must correct any previously made false statements (Rule 4-3.3(a)(1)).

2. **Evidence Integrity:** If a lawyer discovers that an expert witness has provided false evidence, they are required to take corrective actions, which may include informing the court, unless bound by confidentiality (Rule 4-3.3(a)(3) and (a)(4)).

3. **Duty in Ex Parte Proceedings:** In one-sided proceedings, lawyers must disclose all material facts to the court, helping judges make informed decisions (Rule 4-3.3(d)). This is crucial in cases where economic expert testimony is pivotal.

4. **Clarification of Issues:** Lawyers are expected to present expert testimony in a manner that is clear and unambiguous, aiding the court in understanding the issues without confusion.

5. **Role of the Court:** Missouri judges actively ensure that trials are fair and that the evidence, including expert testimony, is both relevant and reliable.

### PLAINTIFF EXPERT | DR. CRAIG SCHULMAN | DISTURBINGLY DEFICIENT ANALYSIS

No comparable market exists among the 194 countries worldwide, even as the plaintiffs' experts propose impressively creative yet unrealistic economic theories. We contend that up to 36 factors need consideration for a fair comparison of foreign markets, yet Dr. Schulman has only cited three.

1. **GDP Per Capita:** Applying GDP factors is a reach; Australia's GDP is ½ of California's and a fraction of the US.
2. **Corruption Index:** This index is **SPECIFIC TO THE GOVERNMENT SECTOR** and irrelevant to private market real estate transactions. Ironically, The Center For Public Integrity published a study grading various government sectors in Missouri. Relevant grades include:
    a. Public Access to Information: F
    b. Political Financing: F
    c. Electoral Oversight: F
    d. Legislative Accountability: F
    e. Judicial Accountability: D
3. **Finally, Commission Rates/Fractions**

### APPLICATION OF DOLLAR SPECIFIC METRICS

According to propertyupdate.com.au, the median price of a dwelling in Australia is $1,173,312 (AU) or $765,762 (converted to USD.)

- Real Estate Commission at 3%: $35,199 (AU.)
- Non-Refundable Marketing Costs 1% or up to $10,000 on homes valued at $1,173,312 (AU.)
- Commission + Marketing: $45,199 (AU.)
- Capital Gains Tax: $54,097 (AU.) For this analysis, we will generously assume all transactions received the discount; thus, capital gains taxes are $27,048 (AU.)

DocuSign Envelope ID: 576E75E5-D213-48D7-9278-60BBE9310EEF

**SELLING COSTS: $72,247 (AU.)**

Buyers Seeking To Acquire A seller's Residence are subject to monetary requirements, for example:

- 10% down payment AU: $117,331 (AU.)
- Stamp Duty Tax | Victoria: $64,515 (AU.)
- Lenders Mortgage Insurance based on 10% down: $28,831 (AU.)

BUYER COSTS/DOWN PAYMENT REQUIREMENTS: $210,677 (AU.)

**TWO-SIDED COSTS $282,924 (AU.)**

Claims that transaction fees are lower in Australia than in Missouri are patently false when scrutinized against the actual monetary requirements. In Australia, two-sided downpayment and transaction costs can soar to $282,924 AU. This figure dwarfs the expenses faced by buyers/sellers in Joplin, Missouri, who pay a mere $11,777 USD in commissions and, when subsequently buying, down payments ranging from $0 (VA loans) or $ 6,869 (FHA) based on average home values in Joplin Missouri at $196,283 USD.

## CLARIFYING ADDITIONAL FALLACIES

### ALLEGATIONS OF AGENTS CONCEALING LISTINGS WITH BELOW-AVERAGE COMMISSIONS

Common regurgitations assert that the role of buyers' agents has become obsolete in the digital real estate exploration age **AS BUYERS OFTEN SELECT THE HOME THEY ACQUIRE BEFORE CONTACTING AN AGENT** while simultaneously accusing agents of steering buyers toward or away from specific properties.

This contradiction is glaringly irrational, undermining the premise that agents wield considerable influence over buyers presumed to have independently pre-selected their properties via online platforms. The allegation of concealing properties is unfounded and ignores the reality of the modern MLS systems and their property syndication to real estate portals. These platforms ensure widespread listing visibility across major real estate websites such as Zillow, Realtor.com, and Redfin.

**Top 5 US Real Estate Portals (2022 Estimated Traffic)**

- Zillow.com: Estimated Traffic: 250+ million monthly visitors
- Realtor.com: Estimated Traffic: 130+ million monthly visitors
- Redfin.com: Estimated Traffic: 75+ million monthly visitors
- Trulia.com: A Zillow Group subsidiary: Estimated Traffic: 45+ million monthly visitors
- Apartments.com: Estimated Traffic: 50+ million monthly visitors

**PORTALS DO NOT FILTER PROPERTIES BY COMMISSION VARIABLES**. To emphasize the absurdity of property concealment and steering, the US population is 18 years old or older, thus meeting the age requirement to enter into contracts/purchase homes, which is approximately 258.3 million people.

**The sum of monthly visitors to the top five portals is approximately 550 million people or 18,333,333 visitors per day; therefore, the visitor count reaches population count parity every 14 days. (2022, the U.S. Census Bureau.)**

### VILIFICATION OF THE CLEAR CO-OP RULES

Failure *"to list all properties on the MLS"* is plausibly unlawful. The Clear Cooperation Policy (CCP), which mandates listing a property on the MLS within one business day of public marketing, is often criticized by private listing services as an illegitimate trade constraint.

Private listings services champion the dubious merits of "Testing the Market" strategies, which could border on illegality.

Forbes outlines such tactics, suggesting sellers might initially list their homes on private networks to gauge price interest. This method allows sellers to adjust pricing in secrecy before officially listing on the MLS, thereby avoiding public records of price changes or initial market presence.

This approach not only skews the market by hiding vital information from buyers but also potentially infringes upon fair trade practices by impeding a buyer's access to complete property histories, directly impacting their negotiating position. Such practices could contravene Section 5 of the FTC Act, which prevents deceptive commercial activities, and state-specific regulations like NRS 645.252, which demand full disclosure of all relevant property details.

DocuSign Envelope ID: 576E75E5-D213-48D7-9278-60BBE9310EEF

Moreover, the opacity inherent in these concealment schemes ultimately harms all parties involved, including the sellers themselves. While sellers may initially gain from such schemes, they become immediate victims of the same deceptive practices when they seek to acquire another property.

## SCRUTINIZING THE DISPARITY: LEGAL FEE EXTRAVAGANCE

When attorney Michael S. Ketchmark filed the Notice of Appearance on November 1, 2021, it marked the beginning of an engagement that revealed shockingly high legal fees. By calculating the working days between November 1, 2021, and February 1, 2024, totaling approximately 728 days, Ketchmark's legal fees amounted to an exorbitant $22,709,710, averaging an astonishing $31,194 per day. Furthermore, Ketchmark's demand for an additional $4,124,047 in expert fee reimbursement far exceeds reasonable bounds.

To contextualize these figures, this reimbursement alone surpasses the cumulative 20-year earnings of their principal expert, Dr. Schulman from Texas A&M University, whose annual salary is estimated at $150,000. Ketchmark also claims $265,931 for meals and travel, which breaks down to $365 per workday.

Positioning himself as a champion of teachers and nurses, Ketchmark's fees equate to the annual salaries of these professionals every 1.5 working days—a stark contrast that highlights a profound disparity.

Additionally, Ketchmark's firm and its co-counsel justify these staggering sums, stating that the lead Plaintiffs agreed to this upfront compensation, **similar to real estate listing agreements.**

More alarming is the aggregate **$10,042,829** in "expert" fees distributed among eleven law firms, suggesting that these fees may also cover payments to media influencers, bloggers, and other proxies echoing anti-Realtor sentiments under the guise of expertise.

This strategy appears designed to skirt Rule 3.6 concerning Trial Publicity, which restricts lawyers from making public statements that could significantly impact legal proceedings. Unlike Ketchmark's approach of retaining propaganda proxies, the National Association of Realtors and the defendants did not participate in a comparably aggressive media strategy.

It is believed that economic experts cited in both Moehrl and Burnett are experienced (Tenured) professors. The estimated annual salary for experienced professors is ~$150,000; thus, reaching **$10,042,829** would take **66 years**. Split between three professors reduces the time parity to **22 years.**

This uneven narrative propagation creates a significant imbalance, potentially swaying public opinion and influencing the judicial outcome, thus undermining the fairness and integrity of the legal process.

## JURISDICTIONAL JUSTIFICATION

The decision by conspiring law firms to adjudicate Sitzer first was perplexing.

Following the Moehrl v. National Association of Realtors et al. lawsuit, similar and duplicate lawsuits have emerged. The Moehrl class action potentially involves up to 50,000,000 participants, whereas the Burnett lawsuit includes about 500,000. The decision to have these cases initially led by relatively unknown lawyers from Kansas City rather than the renowned firm Cohen Milstein, which specializes in such legal matters, has been met with skepticism and viewed as lacking rational justification.

This decision is akin to the Kansas City Chiefs reaching the Superbowl and asking a local high school team to play on their behalf.

## CORRUPTION AND ITS POTENTIAL EFFECTS ON DECISION-MAKING

The plaintiff's counsel, Michael Ketchmark, is a Missouri powerbroker whose influence extends beyond monetary considerations to plausible influencing outcomes by merely engaging.

Michael Ketchmark's notable financial contributions within Missouri's political landscape have been directed individually and to various Political Action Committees (PACs), believed to include Uniting Missouri and Taxpayers Unlimited.

Contributions appear strategic as they align with Ketchmark's short-term financial interests. Recipients include **Governor Mike Parson, former Governor Jay Nixon, and Kansas City Mayor Quinten Lucas. Governor Mike Parson, former Governor Jay Nixon appointed the vast majority of current Apelet and Supreme Court Justices.**

**Missouri Supreme Court**

- Judge Kelly C. Broniec | Appointed by Governor Mike Parson
- Judge Ginger Gooch | Appointed by Governor Mike Parson
- Judge Robin Ransom | Appointed by Governor Mike Parson
- Judge Paul C. Wilson | Appointed by Governor Jay Nixon

**Missouri Court of Appeals Western District**

- Judge Janet Lee Sutton | Appointed by Governor Mike Parson
- Judge Thomas N. Chapman | Appointed by Governor Mike Parson
- Judge Doug Thomson | Appointed by Governor Mike Parson.
- Judge Karen Mitchell | Appointed by Governor Jay Nixon
- Judge Cynthia Lynette Martin | Appointed by Governor Jay Nixon
- Judge Edward Ardini | Appointed by Governor Jay Nixon
- Judge Anthony Rex Gabbert | Appointed by Governor Jay Nixon
- Judge Gary D. Witt | Appointed by Governor Jay Nixon
- Judge Mark D. Pfeiffer | Appointed by Governor Jay Nixon

**Taxpayers United | Plaintiff's Attorney Matthew Dameron | Judge Stephen Bough | Andre Bough**

In 2019, the spouse of Judge Bough, Andrea Bough, pursued a city council position. Based on campaign finance records, Taxpayers Unlimited nor Plaintiff's Attorney Matthew Dameron lacked interest in Bough's campaign; however, **upon Judge Bough's assignment to Sitzer, Taxpayers Unlimited and Plaintiff's Attorney Matthew Dameron provided a combined seven campaign contributions to Andrea Bough.**

**Contributions are detailed per reporting on:**

- 1/7/2020 (Non-election year)
- 1/11/2021 (Non-election year)
- 1/14/2022 (Non-election year)
- 1/9/2023 (Re-elected on June 20, 2023)

**Reporting on 10/6/2023 includes an expense/payment by Councilperson Bough of $25,000 to UMKC Law Foundation, where Judge Bough is believed to serve on the Board.**

Suppose the real estate community knew Missouri norms of widespread funneling and kickback schemes. In that case, Realtors might have been able to contribute funds to various parties to neutralize any perceived bias. Supporting Lucas, for instance, could have led to public endorsements that might favorably influence Realtors' standing in the anticipated Gibson jury.



### THE KANSAS CITY STAR | THERE'S BIG MONEY TO BE MADE AT KCI AIRPORT

Most articles covering corruption in Kansas City are concealed behind paywalls; however, an anonymous intelligence officer evaluated the source code and gleaned troubling assertions. The article's description states: *"Transparency and openness are essential for self-government. Kansas Citians were right to question the Kansas City International Airport contract award process."*

The alt-image tag states, *"People both for and against the deal with Vantage Airport Group to supply concessions at the airport have accused one another of influence-peddling and lying."* *"People both for and against the deal with Vantage Airport Group to supply concessions at the airport have accused one another of influence-peddling and lying."*

The body of the text states in the relevant part: "*In February, Kansas City Mayor Quinton Lucas attended the Super Bowl. For part of that game, he shared a suite with Mike Ketchmark, who has raised and spent hundreds of thousands of dollars for political candidates and committees from both parties over many years. One of those candidates was Quinton Lucas.* **In the weeks before the mayoral election, Ketchmark gave $100,000 in cash and in-kind services to TAXPAYERS UNLIMITED, THE POLITICAL ARM OF THE FIREFIGHTERS UNION."**

"*In that same period, Taxpayers Unlimited spent $200,000 supporting Lucas. Another person in the suite with Lucas and Ketchmark that Super Bowl Sunday was Ketchmark's close friend Steve Tilley. Tilley, once Missouri's House Speaker, is now a well-connected lobbyist. OHM*

DocuSign Envelope ID: 576E75E5-D213-48D7-9278-60BBE9310EEF

*Concessions, the food and beverage subcontractor to Vantage Airport Group, is one of Tilley's clients."*

On NOVEMBER 10, 2021, the Missouri Independent published an article in part, **"A pair of political action committees connected to a Missouri lobbyist under FBI scrutiny have begun taking steps to account for nearly $170,000 in cash that went unreported on disclosures to the state ethics commission."** Moreover, *"Tilley is also connected to at least four other political action committees — Missouri AG PAC, Missouri C PAC, Missouri Senior PAC, and Conservative Leaders of Missouri. Each are bankrolled by Tilley's clients and regularly donate to myriad candidates of both parties."*

*"The practice of funneling money through his PACs to political candidates has drawn scrutiny in the past by federal investigators. In 2017, one of Tilley's clients, Gardner Capital, donated to four of his PACs. Those PACs then made donations that combined to total of $10,000 to Independence Mayor Eileen Weir. Just days after the donations, Weir and the city council voted to spend nearly $1 million to buy a golf course for a solar farm in a joint venture with Gardner Capital. The money used to purchase the golf club came from another Tilley lobbying client, the city's utility, Independence Power & Light."*

Revisiting **Taxpayers Unlimited**, the political arm of the **FIREFIGHTER's UNION**, the fact that **Burnett's JURY FORMAN IAN YOCUM** and **FIRE CHIEF JOHN YOCUM**, a former member of the International Fire Chiefs, Missouri Valley Fire Chiefs, Missouri Fire Chiefs, and Western Missouri Fire Chiefs, past president of the Missouri Association of Fire Protection Districts and Western Missouri Chiefs, should not suggest that the Jury Forman is related to entities enriched by Ketchmark. **SHARING A LAST NAME IS LIKELY A COINCIDENCE.**

---

https://www.stlpr.org/government-politics-issues/2022-01-18/medical-marijuana-and-utility-contracts-records-show-continued-fbi-interest-in-independence-deals

https://missouriindependent.com/2021/11/10/pacs-tied-to-controversial-missouri-lobbyist-scramble-to-account-for-missing-cash/

**PLAN TO ENHANCE CONSUMER SERVICE AND PERCEIVED VALUE OF LEGACY AGENTS**

Although I am afraid I have to disagree with the exaggerated proclamations citing legacy agent incompetence, I do believe specific requirements must be enacted to enhance professionalism and public perception while increasing consumer protection.

- **Enhanced educational requirements, focusing on topics that enhance consumer perceptions of real estate professionals, which may include.**
    - Principles Of Economics
    - Marketing Management
    - Managerial Communication
    - Communication Etiquette
    - Written Communication
    - Social Media Etiquette
    - International Business Communication (which teaches communication strategies and business etiquette for various cultures.)
- **Mandate that agents employ professional photographers for property marketing.**
- **Require National Brokerages to divest in mortgage and title segments**
    - Traditionally, legacy agents referred clients to mortgage and title entities based on favorable performance. PropTech firms plausibly refer consumers based on the proximity between agents and lenders cubical.
- **Brokerages are required to display properties received via MLS API feeds to display all listings.**
    - Cherry-picking properties to display is the ultimate example of "steering."
- **Eliminate private or exclusive listing services.**
    - Denying consumers vital information benefits no one except agents seeking to "double-end deals."
- **Compel iBuying firms and others to perform home inspections prior to listing.**
    - Historically, disclosures in real estate transactions have necessitated sellers to inform potential buyers of any known problems with a property. In contrast, iBuyers typically operate on a model where they purchase properties sight unseen, without knowledge of the property's condition, and offer to buy the properties "As-Is." Consequently, if any issues arise post-purchase, the responsibility falls on the consumer without recourse from the iBuyer
- **Expand dispute resolution by arbitration to the locality where a disputed transaction occurred.**

- o Presently, clauses often stipulate that arbitration must take place in the city of the company's headquarters or possibly in the location where the company is legally incorporated. For instance, a consumer from Alaska wishing to resolve a $5,000 dispute through arbitration might be obligated to travel to the Cayman Islands for the proceedings.

- **Prohibit brokerages from using "savings" as a reliable economic assumption/consideration.**
    - o Net proceeds are superior. Consumers do not benefit when saving $4k in fees while selling residences for $20k less.
- **Any brokerage attempting to claim superiority over legacy agents, emphasizing excessive fees, must publish financial statements on consumer-facing websites.**
    - o Most firms claiming legacy agents' commission structures as predatory operate alt-brokerages that lack profitability.
- **Restrict syndication of personal identifying data to third parties.**
    - o For Example, Backdoor.Com States: We May Disclose Your Information To Services That Perform Various Checks, Including, But Not Limited To, Background Checks And Credit Checks, As Permitted By Law.

### PUBLIC CONFIDENCE IN THE INTEGRITY AND IMPARTIALITY OF THE JUDICIARY

In the State of Missouri, maintaining public confidence in the integrity and impartiality of the judiciary is paramount. The ethical standards governing judicial conduct are designed to ensure that judges are free from actual bias and avoid any situation that might create an appearance of bias. This distinction is critical because the perception of bias can be as damaging to public trust as the presence of actual bias. **In our view, actions and events exceed the threshold of an appearance of bias to an affirmation.**

### UNDUE INFLUENCE IN CONTRACT LAW | CONTRACT INHERENTLY UNFAIR AND VOIDABLE

Real estate firms, recognizing the impossibility of a fair trial, felt compelled to settle for millions, disproportionately benefiting plaintiffs' counsel and experts, with minimal proceeds left for class participants, perhaps just enough to cover a meal.

This perception was fueled by instances such as Judge Stephen Bough imposing per se liability and various actions suggesting a compromised judiciary influenced by strategic contributions from interested parties to key political figures who appointed most current appellate and supreme court justices. These concerns deepened with the dismissal of critical plaintiffs, including Shelly Dreyer, President-Elect of The Missouri Bar, who was enlightened of case deficiencies and reminded of the obligations of candor.

**Dreyer was promptly noticed for deposition but immediately dismissed as a lead plaintiff, thus evading testifying under oath. Dreyer is believed to have ethical oversight over related parties; wrap your mind around that statement.**

## SUMMARY

- Claims of damages based on the Australian market fail.
- Allegations of widespread property concealment fail.
- Criticisms of 6% commissions by unprofitable brokerages fail.
- Claims made by Stephen Brobeck and Dr. Craig Schulman fail and are plausibly actionable.
- Arguments that the Clear Co-Op damages consumers and undermines alternative brokerage models fail.
- Assertions that the Burnett trial was fair and unbiased fail.

## PRAYER FOR RELIEF

- Vacate the Burnett verdict
- Dismiss Moehrl
- Dismiss Gibson
- Void all settlements, refund any fees imposed on defendants
- Reimburse defendants for legal fees
- Impose sanctions on Dr. Craig Schuman and Stephen Brobeck, equal to compensation gained.
- Disbar Attorney Michael Ketchmark (if regulatory and criminal investigations warrant action.)
- Disbar Attorney Mathew Dameron (if regulatory and criminal investigations warrant action.)

Respectfully submitted,

*Anthony Phillips*
DocuSigned By: Anthony Phillips
Anthony Phillips