# Exhibit 1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES, HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>          Defendants. | Civil Action No. 19-CV-00332-SRB |

**DECLARATION OF STEVE W. BERMAN**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF**
**SETTLEMENTS WITH THE NATIONAL ASSOCIATION OF REALTORS,**
**CERTIFICATION OF A SETTLEMENT CLASS,**
**AND APPOINTMENT OF SETTLEMENT CLASS COUNSEL**

I, Steve W. Berman, state under oath, as follows:

1.      I am the Managing Partner of Hagens Berman Sobol Shapiro LLP ("Hagens Berman").  The Court in *Moehrl v National Association of Realtors*, Case No. 1:19-cv-01610-ARW (Northern District of Illinois) ("Moehrl") appointed my firm, together with Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), and Susman Godfrey LLP ("Susman Godfrey"), as Co-Lead Class Counsel in the *Moehrl* litigation.

2.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Settlements with the National Association of Realtors, Certification of a Settlement Class, and Appointment of Settlement Class Counsel.  Based on personal knowledge or discussions with counsel in my firm and co-counsel regarding the matters stated herein, if called upon, I could and would testify competently thereto.

3.      I have served as lead or co-lead counsel in antitrust, securities, consumer, products liability, and employment class actions, and other complex litigation matters throughout the country.  For example, I have represented thousands of plaintiffs in large antitrust cases and have achieved favorable results for them. I was a co-lead trial lawyer in *In re National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation*, MDL No. 2541 (N.D. Cal.) where the class obtained injunctive relief following a bench trial.  That judgment was unanimously affirmed by the Supreme Court in *Alston v NCAA* and has been credited for the adoption of new NCAA rules allowing college athletes to monetize their name, image, and likeness (NIL) rights. Prior to the injunction, the class settled the damages portion of the case for $208 million, resulting in an almost complete recovery of single damages.  As co-lead counsel in *In re Visa Check/Mastercard Antitrust Litigation*, No. 96-cv-05238 (E.D.N.Y.), we obtained the then largest antitrust settlement in history for consumers while challenging alleged anti-competitive agreements among U.S. banks, Visa, and Mastercard, regarding ATM fees. I also represented consumers in *In re Optical Disk Drive Products Antitrust Litigation*, No. 10-md-2143-RS (N.D. Cal.), *In re Electronic Books Antitrust Litigation*, No. 11-md-02293 (DLC) (S.D.N.Y.), and *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-md-02430 (N.D. Cal.),

obtaining court-approved settlements for class members in all three cases. I was approved as co-lead counsel to represent a certified class of thousands of consumers in *In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill. May 27, 2022), ECF No.5644. I have negotiated settlements for and tried numerous class and non-class cases during my decades of practice including settlements that were at the time, the largest securities, ERISA, and automobile defect class settlements in history.

4. Proposed Settlement Class Counsel are highly experienced in the areas of antitrust and class action litigation. They have tried antitrust class actions to verdict and prosecuted and settled numerous others. Hagens Berman, Cohen Milstein, and Susman Godfrey—Co-Lead Class Counsel in *Moehrl*—each have extensive antitrust class action experience and have successfully prosecuted some of the most complex private antitrust cases in the last two decades. Each has a history of winning landmark verdicts and negotiating favorable settlements for their clients. Their collective and individual litigation experience—discussed in the memorandum of law and exhibits filed in Support of Plaintiffs' Motion to Appoint Interim Co-Lead Class Counsel in the *Moehrl* action—amply demonstrates that these three firms have extensive knowledge of the relevant law, as well as the resources for effective representation of Settlement Class Plaintiffs, and the proven ability to reach superior results for parties injured by anticompetitive practices. (*Moehrl* Docs. 50-1 – 50-14)

5. On behalf of Plaintiffs, other Co-Lead Counsel and I personally conducted intensive settlement negotiations with counsel for the National Association of Realtors ("NAR") over the course of more than a year.

6. Plaintiffs and NAR executed a Settlement Agreement on March 15, 2024. Attached as Exhibit A is a true and accurate copy of the Settlement Agreement between Plaintiffs and NAR.

7. In my opinion, and in that of highly experienced Co-Lead Counsel, the proposed Settlement Agreement is fair, reasonable, and adequate. It provides substantial monetary and non-monetary benefits to the Settlement Class, and it avoids the risks, costs, and delay of

continuing protracted litigation against NAR. Details of the agreed monetary relief, changes to business practices, and cooperation in Plaintiffs' ongoing litigation against the non-settling defendants are set forth in the Settlement Agreement attached as Exhibit A.

8.     Plaintiffs' Co-Lead Counsel and counsel for NAR engaged in extensive arm's-length settlement negotiations that lasted over many months, including telephonic and in-person mediations with a nationally recognized and highly experienced mediator. Plaintiffs and NAR also engaged in numerous direct settlement negotiations, including several days of in-person negotiation that culminated in the ultimate Settlement Agreement with NAR. Many of these sessions resulted in heated exchanges and walk aways for periods of time.

9.     There was no collusion among counsel for the parties at any time during these settlement negotiations.  To the contrary, the negotiations were contentious, hard fought, and fully informed.  Plaintiffs sought to obtain the largest possible monetary recovery, as well as the most impactful changes to the NAR's business practices, to avert anticompetitive conduct going forward.  Plaintiffs further sought the most helpful cooperation possible from NAR.

10.     When the Settlement Agreement was executed, Co-Lead Counsel were fully aware of the strengths and weaknesses of each side's positions.  The parties in both actions completed over four years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests for production, followed by the production of well over 5 million pages of documents from the parties and dozens of non-parties across both actions. Plaintiffs briefed numerous discovery motions and disputed items in order to obtain important evidence to support their claims. The parties conducted over 100 depositions in the *Moehrl* action and over 80 depositions in the *Burnett* action. *Moehrl* Plaintiffs engaged six experts and *Burnett* Plaintiffs engaged five experts to support their claims and to rebut arguments from the nine experts retained by Defendants in each case. Most experts in the case were deposed in connection with the submission of 24 expert reports in *Moehrl* and 19 expert reports in *Burnett*. The *Burnett* Plaintiffs also successfully won a trial verdict against NAR and other Defendants. The *Moehrl* Plaintiffs had nearly completed briefing of summary judgment. Based

on their extensive investigative and analytical efforts, Co-Lead Counsel were well informed of the value and consequences of the Settlement Agreements.

11.    Plaintiffs and Class Counsel reached the Settlement Agreement after considering the risk and cost of litigation. Plaintiffs and Class Counsel believe the claims asserted are meritorious and that the evidence developed to date supports the claims, but also recognize the risk and delay of further proceedings in a complex case like this, and believe that the Settlement confers substantial benefits upon the Settlement Class Members.

12.    Moreover, Plaintiffs and counsel, including counsel who is a certified CPA and forensic fraud examiner conducted a thorough financial analysis of the ability to pay of the National Association of Realtors, which directly affected the monetary amounts that it was feasible to recover from NAR through settlement. In my opinion, the Settlement is fair and reasonable in light of the financial condition of NAR.

13.    The Settlement Class Representatives in *Moehrl* approved the terms of the Settlements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 16, 2024, at Seattle, Washington.

*/s/ Steve W. Berman*
STEVE W. BERMAN

# Exhibit A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS,
FRANCES HARVEY, and JEREMY KEEL, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS,
REALOGY HOLDINGS CORP., HOMESERVICES OF
AMERICA, INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX, LLC, and KELLER
WILLIAMS REALTY, INC.,

        Defendants.

Case No. 19-cv-00332-SRB

---

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE
DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH
on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS,
REALOGY HOLDINGS CORP., HOMESERVICES OF
AMERICA, INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, THE LONG & FOSTER COMPANIES,
INC., RE/MAX, LLC, and KELLER WILLIAMS REALTY,
INC.,

        Defendants.

Case No. 1:19-cv-01610-ARW

**CORRECTED SETTLEMENT AGREEMENT**

This Settlement Agreement ("Settlement Agreement") is made and entered into this 15th day of March, 2024 (the "Execution Date"), by and between defendant the National Association of REALTORS® and plaintiffs Rhonda Burnett, Jerod Breit, Jeremy Keel, Hollee Ellis, Frances Harvey, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, Jane Ruh, Don Gibson, Lauren Criss, and John Meiners (collectively "Plaintiffs"), who filed suit in the above captioned actions and in *Daniel Umpa v. The National Association of Realtors, et al.*, No. 23-cv-945 (W.D. Mo.), and *Don Gibson v. The National Association of Realtors, et al*., No. 23-cv-00788 (W.D. Mo.) (all four actions collectively, "the Actions"), both individually and as representatives of one or more classes of home sellers. Plaintiffs enter this Settlement Agreement both individually and on behalf of the Settlement Class, as defined below.

WHEREAS, in the Actions, Plaintiffs allege that the National Association of REALTORS® participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act and corresponding state laws;

WHEREAS, the National Association of REALTORS® denies Plaintiffs' allegations in the Actions and has asserted defenses to Plaintiffs' claims;

WHEREAS, the parties in Burnett proceeded to a jury trial, and the jury returned a verdict in favor of the plaintiffs in that action;

WHEREAS, the National Association of REALTORS® has filed post-trial motions in Burnett pursuant to Federal Rules of Civil Procedure 50 and 59 and a motion to decertify the class, and joined in post-trial motions filed by Keller Williams, Inc., HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates, LLC, which are pending;

WHEREAS, the National Association of REALTORS® has filed a motion in Moehrl pursuant to Federal Rule of Civil Procedure 56;

1

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for the National Association of REALTORS®, including several telephonic mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal district judge, and a mediation with a federal magistrate judge;

WHEREAS, the Actions will continue, including against certain other defendants, unless Plaintiffs separately settle with those defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, including more than four years of fact and expert discovery, and have concluded that a settlement with the National Association of REALTORS® according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, the National Association of REALTORS® believes that it is not liable for the claims asserted and has good defenses to Plaintiffs' claims and meritorious summary judgment and post-trial motions, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, the National Association of REALTORS®, in addition to the settlement payments set forth below, has agreed to cooperate in discovery and at trial with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between the National Association of REALTORS® and the Plaintiffs that the Actions be settled,

compromised, and dismissed with prejudice as to the National Association of REALTORS® only, without costs to Plaintiffs, the Settlement Class, or the National Association of REALTORS® except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

A.    **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.    "Burnett" means the case pending in the United States District Court for the Western District of Missouri, Case No. 4:19-cv-00332-SRB.

2.    "Burnett MLSs" means the multiple listing services identified as "Subject MLSs" in Burnett.

3.    "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

4.    "Court" means the United States District Court for the Western District of Missouri.

3

5.     "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

6.     "Effective Date" means the date when both: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against the National Association of REALTORS® with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-National Association of REALTORS® Defendant, and any such appeal or other proceedings shall not delay this Settlement Agreement from becoming final and shall not apply to this Paragraph.  This Paragraph shall not be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

7.     "REALTOR® Member Boards" means local or state/territory real estate boards or associations of REALTORS®, all of whose members are also members of the National Association of REALTORS® through those boards or associations.

8.     "Moehrl" means the case pending in the Northern District of Illinois Case No. 1:19-cv-01610-ARW.

9.     "Moehrl MLSs" means the multiple listing services identified as "Covered MLSs" in Moehrl.

4

10.     "MLS PIN" means the multiple listing service identified in United States District Court for the District of Massachusetts, Case No. 1:20-cv-12244-PBS, which is currently pending.

11.     "REALTOR® MLS" means: (a) any separately incorporated multiple listing service that is owned exclusively by one or more REALTOR® Member Boards as of the Execution Date (and not in whole or part by any non-Member Board Person); or (b) any other multiple listing service that is not separately incorporated from and is operated exclusively by a Member Board.

12.     "Non-National Association of REALTORS® Defendant" means any defendant in the Actions excepting the National Association of REALTORS®.

13.     "Opt-Outs" means members of the Settlement Class who have timely exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

14.     "Participant" means a principal broker or a brokerage firm participating in a multiple listing service.

15.     "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates, and assignees.

16.     "Principal" means licensed or certified individuals who are sole proprietors, partners in a partnership, officers or majority shareholders of a corporation, or office managers (including branch office managers) acting on behalf of principals of a real estate firm.

17.     "Released Claims" means any and all manner of claims, regardless of the cause of action, arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but

not limited to commissions negotiated, offered, obtained, rebated, or paid to brokerages in connection with the sale of any residential home.

18.      "Released Parties" means:

a.      the National Association of REALTORS®, and all of its respective past, present, and future, direct and indirect, subsidiaries, predecessors, successors, affiliates (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), institutes, societies, councils, and all of their officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns.

b.      Any REALTORS® (members of the National Association of REALTORS®), REALTOR-Associate® Members, and REALTOR® Member Boards that do not operate an unincorporated multiple listing service, and all of their respective past and present, direct and indirect, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all of their officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, that (i) is a member of the National Association of REALTORS® on the date of Class Notice; and (ii) complies with the practice changes reflected in Paragraphs 58(vi)-(x) of this Settlement Agreement and agrees to provide proof of such compliance if requested by Co-Lead Counsel; and (iii) does not assert any claims in the time period specified in Paragraph 59 they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged in the Actions or the

practice changes in this Settlement Agreement. Any Settlement Class Member shall have the right to inquire of the National Association of REALTORS® as to whether a Person is a REALTOR®, REALTOR-Associate® Member, or REALTOR® Member Board and has satisfied the conditions for being a "Released Party," and the National Association of REALTORS® shall promptly provide this information.

c.       Any REALTOR® MLS (including a REALTOR® Member Board that operates an unincorporated multiple listing service), including its respective past and present, direct and indirect, subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all of their officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, but only if that REALTOR® MLS (i) complies with the procedures and requirements reflected in Paragraph 66 of this Settlement Agreement; (ii) complies with the practice changes reflected in Paragraph 68 of this Settlement Agreement and agrees to provide proof of such compliance if requested by Co-Lead Counsel; and (iii) does not assert any claims in the time period specified in Paragraph 59, they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged in the Actions or the practice changes in this Settlement Agreement.

d.       Any non-REALTOR® MLS, including its respective past and present, direct and indirect, subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all of their officers, directors, managing directors, employees, agents, contractors, independent contractors,

attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, but only if that non-REALTOR® MLS (i) complies with the procedures and requirements reflected in Paragraph 67 of this Settlement Agreement; (ii) complies with the practice changes reflected in Paragraph 68 of this Settlement Agreement and agrees to provide proof of such compliance if requested by Co-Lead Counsel; (iii) does not assert any claims, in the time period specified in Paragraph 59, they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged in the Actions or the practice changes in this Settlement Agreement; and (iv) pays the Settlement Class pursuant to the procedures in Appendix D.

      e.      Any real estate brokerage with a calendar year 2022 Total Transaction Volume for residential home sales of $2 billion or less, including all of their respective past, present, and future, direct and indirect, subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all of their franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, but only if that brokerage (i) has a REALTOR® as a Principal with membership in the National Association of REALTORS® on the date of Class Notice; (ii) has a Principal who was a Participant in any MLS (including a Member Board that operates an unincorporated multiple listing service) at any time during the time period covered by the Settlement Class; (iii) complies with the practice changes reflected in Paragraphs 58(vi)-(x) of this Settlement Agreement and agrees to provide proof of such compliance if requested by

8

1

2

3

4

5

6

7

8

9

0

1

2

3

4

5

6

7

8

9

0

Co-Lead Counsel; and (iv) does not assert any claims, in the time period specified in Paragraph 59, they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged in the Actions or the practice changes in this Settlement Agreement. Any Settlement Class Member shall have the right to inquire of the National Association of REALTORS® as to whether a Person is a REALTOR®, REALTOR-Associate® Member, or REALTOR® Member Board and has satisfied the conditions for being a "Released Party," and the National Association of REALTORS® shall promptly provide this information.

      f.     Notwithstanding Paragraphs 18(a)-(e) of this Settlement Agreement, any real estate brokerage with a calendar year 2022 Total Transaction Volume for residential home sales in excess of $2 billion, including all of their respective past, present, and future, direct and indirect, parents subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all of their franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, but only if that brokerage (i) has a REALTOR® as a Principal with membership in the National Association of REALTORS® on the date of Class Notice; (ii) has a Principal who was a Participant in any MLS (including a Member Board that operates an unincorporated multiple listing service) at any time during the time period covered by the Settlement Class; (iii) does not assert any claims in the time period specified in Paragraph 59, they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged

9

Case 4:19-cv-00332-SRB   Document 1458-1   Filed 04/19/24   Page 17 of 116

Co-Lead Counsel; and (iv) does not assert any claims, in the time period specified in Paragraph 59, they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged in the Actions or the practice changes in this Settlement Agreement. Any Settlement Class Member shall have the right to inquire of the National Association of REALTORS® as to whether a Person is a REALTOR®, REALTOR-Associate® Member, or REALTOR® Member Board and has satisfied the conditions for being a "Released Party," and the National Association of REALTORS® shall promptly provide this information.

    f.    Notwithstanding Paragraphs 18(a)-(e) of this Settlement Agreement, any real estate brokerage with a calendar year 2022 Total Transaction Volume for residential home sales in excess of $2 billion, including all of their respective past, present, and future, direct and indirect, parents subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all of their franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, but only if that brokerage (i) has a REALTOR® as a Principal with membership in the National Association of REALTORS® on the date of Class Notice; (ii) has a Principal who was a Participant in any MLS (including a Member Board that operates an unincorporated multiple listing service) at any time during the time period covered by the Settlement Class; (iii) does not assert any claims in the time period specified in Paragraph 59, they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged

9

in the Actions or the practice changes in this Settlement Agreement; (iv) complies with the practice changes reflected in Paragraphs 58(vi)-(x) of this Settlement Agreement and agrees to provide proof of such compliance if requested by Co-Lead Counsel; and (v) agrees to be bound by the procedure and requirements reflected in Section B of Appendix C, including by making payments pursuant to those Paragraphs.

       g.      Notwithstanding Paragraph 18(a)-(f) of this Settlement Agreement, HomeServices of America, Inc., BHH Affiliates, LLC, Berkshire Hathaway Energy Company, Long & Foster Companies, Inc., and HSF Affiliates, LLC shall not be a "Released Party," nor shall any such defendant's past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, related entities, associates, predecessors, successors, or affiliates (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), nor any of their respective franchisors, franchisees, officers, directors, managing directors, employees, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, assigns, or independent contractor real estate agents—but only for the times in which they were franchisors, franchisees, officers, directors, managing directors, employees, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, assigns, or independent contractor real estate agents of HomeServices of America, Inc., BHH Affiliates, LLC, Berkshire Hathaway Energy Company, Long & Foster Companies, Inc., or HSF Affiliates, LLC or any of their past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, related entities, associates, predecessors, successors, or affiliates (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934).

h.      Notwithstanding Paragraphs 18(a)-(f) of this Settlement Agreement, no defendant in the Actions as of the Execution Date—other than the National Association of REALTORS® (which is addressed in Paragraph 18(a) of this Settlement Agreement) and HomeServices of America, Inc., BHH Affiliates, LLC, Berkshire Hathaway Energy Company, Long & Foster Companies, Inc., and HSF Affiliates, LLC (which are addressed in Paragraph 18(g) of this Settlement Agreement)—(i) shall be a "Released Party," (ii) nor shall any such defendant's past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, affiliates, associates (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, (iii) nor any of their respective franchisors, franchisees, officers, directors, managing directors, employees, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, or assigns—but only for the times in which they were franchisors, franchisees, officers, directors, managing directors, employees, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, or assigns of such a defendant.  Independent contractor real estate agents affiliated with a defendant in the Actions, other than the National Association of REALTORS® or Persons not released under Paragraph 18(g), are covered by Paragraph 18(b) of this Settlement Agreement for the period of such affiliation.

19.     "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint

ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

20.     "Settlement" means the settlement contemplated by this Settlement Agreement.

21.     "Settlement Class" means the class of persons that will be certified by the Court for Settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

- Homes listed on Moehrl MLSs: March 6, 2015 to date of Class Notice;

- Homes listed on Burnett MLSs: April 29, 2014

- to date of Class Notice;

- Homes listed on MLS PIN: December 17, 2016 to date of Class Notice;

- Homes in Arkansas, Kentucky, and Missouri, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2018 to date of Class Notice;

- Homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2017 to date of Class Notice;

- For all other homes: October 31, 2019 to date of Class Notice.

Plaintiffs and National Association of REALTORS® intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release.

22.     "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

23.     "Settling Parties" means Plaintiffs and the National Association of REALTORS®.

24.    "Total Monetary Settlement Amount" means $418.00 million.  All costs of settlement, including all payments to Settlement Class Members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of Class Notice and administration, will be paid out of the Total Monetary Settlement Amount, and the National Association of REALTORS® will pay nothing apart from the Total Monetary Settlement Amount, except as provided in Paragraphs 37 and 40 of this Settlement Agreement.

25.    "Total Transaction Volume" means the aggregate dollar value of all residential home sales and purchases of a real estate brokerage, together with the aggregate dollar value of all residential home sales and purchases of that brokerage's direct and indirect parents (including holding companies), subsidiaries, affiliates, associates (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934) and of each's franchisees, in which each such Person represented the buyer, the seller, or both in a real estate brokerage capacity.  For any transactions in which a real estate broker represented both the buyer and the seller, that transaction shall be counted twice for purposes of calculating the "Total Transaction Volume." The "Sales Volume" reflected in the T360 Real Estate Almanac shall serve as an irrebuttable presumption of a Person's "Total Transaction Volume."

**B.    <u>Stipulation to Class Certification</u>**

26.    The Settling Parties hereby stipulate, for purposes of this Settlement only, that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied, and, subject to Court approval, the Settlement Class shall be certified for Settlement purposes as to the National Association of REALTORS®.  The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only.  Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

27.     Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by the National Association of REALTORS® that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

C.     **Approval of this Settlement Agreement and Dismissal of the Actions**

28.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of Class Notice under Federal Rules of Civil Procedure 23(c) and (e)); scheduling a final fairness hearing to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to the National Association of REALTORS®; and the National Association of REALTORS®'s cooperation by providing information reflecting its ability to pay limitations.  The Settling Parties further agree that Co-Lead Counsel may seek whatever approvals are required by the court in Moehrl related to obtaining approval of and effectuating this Settlement Agreement.

29.     Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement.  The motion for preliminary approval shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement.  At least 48 hours before submission to the Court, the papers in support of the motion for preliminary approval shall be provided by Co-Lead Counsel to counsel for the National Association of REALTORS® for its review.  To the extent that the National Association of REALTORS® objects to any aspect of the motion for preliminary approval, it shall communicate such objection to Co-Lead Counsel and the Settling Parties shall meet and confer to resolve any such objection.  The Settling Parties shall take

all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify this Settlement Agreement directly or with the assistance of an agreed mediator and will endeavor to resolve any issues to the satisfaction of the Court.

30. Subject to approval by the Court, the Settling Parties will agree on a method or methods of providing notice of this Settlement to the Settlement Class and for claim administration that meet the requirements of due process and Federal Rule of Civil Procedure 23 ("Class Notice") and are substantially similar to the forms of notice already agreed-to and approved by the Court in the previous settlements with Anywhere, RE/MAX, and Keller Williams. Class members who file a claim to participate in the Anywhere, RE/MAX, or Keller Williams settlements will be deemed to also have made a claim to participate in this Settlement unless they affirmatively state they are excluding themselves from this Settlement Class. The Settling Parties agree to the use of the claims administrator previously selected to administer the Anywhere, RE/MAX, and Keller Williams settlements and approved by the Court. The Settling Parties agree that Class Notice must not be provided earlier than 120 days following the filing of the first motion for preliminary approval of this Settlement Agreement.

31. Within 10 calendar days after the filing of the first motion for preliminary approval of this Settlement Agreement, the claims administrator shall at the National Association of REALTORS®'s expense, to be credited against the Total Monetary Settlement Amount, cause notice of this Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

15

32.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to the National Association of REALTORS®:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) enjoining the National Association of REALTORS® and any opting in REALTOR® MLS, non-REALTOR® MLS, and real estate brokerage in accordance with Paragraph 58 and Paragraph 66 of this Settlement Agreement.

(d) directing that, as to the National Association of REALTORS® only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(e) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the Court; and

(f) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to the National Association of REALTORS®.

33.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth in the definition of the Effective Date.

**D.     Releases, Discharge, and Covenant Not to Sue**

34.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties

16

from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of Class Notice of the Settlement arising from or related to the Released Claims.  The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes.  In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (a) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of Class Notice; and (b) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims.  For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

35.     The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (a) Cal. Civ. Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS

THAT THE CREDITOR OR RELEASING PARTY DOES

NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
FAVOR AT THE TIME OF EXECUTING THE RELEASE
AND THAT, IF KNOWN BY HIM OR HER, WOULD
HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR OR RELEASED
PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (b) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of this Settlement Agreement.

36. The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or

18

other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

**E.    Payment of the Settlement Amount**

37.    Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the United States Treasury Regulations (the "Escrow Account"). Within 30 days following the filing of the first motion for preliminary approval of this Settlement Agreement, the National Association of REALTORS® will deposit $5 million into the Escrow Account. Within 90 days following final approval of the Settlement by the Court (and notwithstanding the exhaustion of any appellate rights), the National Association of REALTORS® will deposit $197 million into the Escrow Account. No later than one year after the initial $197 million payment, the National Association of REALTORS® will deposit $72 million in principal into the Escrow Account. No later than two years after the initial $197 million payment, the National Association of REALTORS® will deposit another $72 million in principal into the Escrow Account. No later than three years after the initial $197 million payment, the National Association of REALTORS® will deposit into the Escrow Account the remaining principal, along with interest on each of the installment payments, as determined at the federal statutory rate under 28 U.S.C. 1961, into the Escrow Account. All accrued interest shall be for the benefit of the Settlement Class unless the Settlement is not approved, in which case the interest shall be for the benefit of the National Association of REALTORS®.

38.    The obligation to make the three installment payments reflected above will be evidenced by a promissory note ("Note") that will be assignable by Plaintiffs, acting on behalf of the Settlement Class, with advance written notice of any assignment provided to the National Association of REALTORS®. The obligation and Note will be enforceable by the Court upon motion by Plaintiffs or Plaintiffs' assignee, and the Court shall retain continuing jurisdiction over the Settling

Parties regarding its enforcement notwithstanding the entry of a final judgment.

39.     The National Association of REALTORS® represents that, as of the date of the Settlement Agreement, its current obligations with respect to funded debt are not greater than $35 million.  The Note will be secured by liens and perfected security interests ("Liens") against the entirety of the assets of the National Association of REALTORS® and its subsidiaries as specified in the Security Agreement ("Obligors").  The Liens securing the Note will be evidenced by a security agreement ("Security Agreement") and any ancillary documentation necessary to perfect the Liens and/or document their priority relative to other security interests held by the Obligors' creditors ("Security Documentation") to be entered into between the Settling Parties.  The Liens securing the Note shall be expressly subordinated to security interests granted to the lender ("Truist") under that certain Construction Loan Agreement dated as of September 14, 2018, between the National Association of REALTORS® and Truist (as amended, restated, supplemented, or otherwise modified from time to time, the "Loan Agreement") not more than the amount of the funded debt described above incurred as Obligations (as defined in the Loan Agreement) as of the date of this Settlement Agreement and interest on the principal on the amount of the Obligations as of the date of this Settlement Agreement and any compounding thereof, as consideration for Truist's agreement to waive alleged events of default under the Loan Agreement.  The Settling Parties agree to negotiate the Note, Security Agreement, and Security Documentation (including, for the avoidance of doubt, a satisfactory intercreditor and/or subordination agreement between Truist and the Plaintiffs) in good faith during the 90 days following Execution Date.  To the extent the Settling Parties are unable to reach agreement on the Note, Security Agreement, or Security Documentation they agree to submit their dispute to Greg Lindstrom or another mediator agreed to by the parties for binding resolution.

**F.     The Settlement Fund**

40.     The Total Monetary Settlement Amount, any interest earned thereon, and any payments by Released Parties pursuant to this Settlement Agreement shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the Class Notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund. If separate Class Notice occurs with respect to any settlement with a non-REALTOR® MLS or brokerage that opts into the Settlement (including by executing an Appendix C or D), the National Association of REALTORS® agrees to pay the full and complete cost of such Class Notice above and beyond the Total Monetary Settlement Amount, up to $3,000,000.00.

41.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing Class Notice to the Settlement Class or administering the settlement except in Paragraphs 40-42 of this Settlement Agreement. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

42.     After preliminary approval of the Settlement and approval of a Class Notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide Class Notice of the Settlement to potential members of the Settlement Class. The National Association of REALTORS® will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $5,000,000.00 to pay the costs for Class Notice. If Plaintiffs settle with one (or more) Non-National Association of REALTORS® Defendants and Class Notice of one or more other

settlements is included in the Class Notice of the National Association of REALTORS® settlement, then the cost of such Class Notice will be apportioned equitably between (or among) the National Association of REALTORS® Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for Class Notice and administration costs is not refundable to the National Association of REALTORS® in the event the Settlement is disapproved, rescinded, or otherwise fails to become Effective.

43.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with any rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund. Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or class representative incentive awards or such later date as directed by Co-Lead Counsel, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award up to the amount specified in Paragraph 24 of this Settlement Agreement for such fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

44.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

45.     The National Association of REALTORS® will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment,

22

distribution, use or administration except as expressly otherwise provided in this Settlement Agreement. The National Association of REALTORS®'s only payment obligation is to pay the Total Monetary Settlement Amount.

46.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Outs. The Settlement will be non-reversionary except as set forth below in Section G of this Settlement Agreement. If the Settlement becomes Effective, no proceeds from the Settlement will revert to the National Association of REALTORS® regardless of the claims that are made.

47.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 40-42 of this Settlement Agreement.

48.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. The National Association of REALTORS® will have no participatory or approval rights with respect to the Plan of Allocation. It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of this Settlement Agreement. The Settlement Class, Plaintiffs, and the National Association of REALTORS® shall be bound by the terms of this Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

49.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against the National Association of REALTORS® or the Released Parties.

**F.     Taxes**

50.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. The National Association of REALTORS® has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to the National Association of REALTORS®. In the event the Settlement does not become Effective and any funds including interest or other income are returned to the National Association of REALTORS®, the National Association of REALTORS® will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income. The National Association of REALTORS® makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**G.     Rescission**

51.     If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if

such approval is modified in or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by the National Association of REALTORS® or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement.  A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order. The Settling Parties have agreed in the Confidential Supplemental Agreement that, after the deadline for filing timely Opt-Out requests has passed, Plaintiffs will provide to the National Association of REALTORS® a list of exclusion requests.  In its sole discretion, the National Association of REALTORS® shall have the right to rescind or terminate this Settlement Agreement if Opt-Out requests for exclusion exceed the threshold specified the Confidential Supplemental Agreement.

52.     If the Settlement or Settlement Agreement is rescinded or terminated for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to the National Association of REALTORS®.  In the event that this Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of Class Notice and administration will not be returned to the National Association of REALTORS®.  Funds to cover Class Notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to the National Association of REALTORS®.

53.     If the Settlement or Settlement Agreement is rescinded or terminated for any reason permitted under this Settlement Agreement, then the Settling Parties will be restored to their

respective positions in the Actions as of the Execution Date. Plaintiffs and the National Association of REALTORS® agree that any rulings or judgments that occur in the Actions after Execution Date and before this Settlement Agreement is rescinded will not bind Plaintiffs, the National Association of REALTORS® or any of the Released Parties. Plaintiffs and the National Association of REALTORS® agree to waive any argument of claim or issue preclusion against Plaintiffs or the National Association of REALTORS® arising from such rulings or judgments. In the event of a rescission or termination for any reason permitted under this Agreement, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. The National Association of REALTORS® and Plaintiffs expressly reserve all rights if this Settlement Agreement does not become Effective or if it is rescinded or terminated as permitted by this Agreement by the National Association of REALTORS® or the Plaintiffs, including the National Association of REALTORS®'s rights to seek review, including appeal, of any judgment entered in Burnett on any available ground.

54.     The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from Execution Date, until the date this Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement. The Settling Parties further agree that, within five business days of the Execution Date, they will jointly petition the courts overseeing the Actions to request a stay of all pending deadlines as to the National Association of REALTORS® only.

55.     The National Association of REALTORS® warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Settlement

Agreement is executed. For the avoidance of doubt, this representation takes no account of the jury verdict rendered in Burnett. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of the National Association of REALTORS® to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the United States Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of the National Association of REALTORS®, then, at the election of Co-Lead Counsel, this Settlement Agreement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

56.     The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

57.     The National Association of REALTORS® reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Outs.

**H.     Practice Changes**

58.     As soon as practicable, and in no event later than the date of Class Notice (as provided in Paragraph 30 of this Settlement Agreement), the National Association of REALTORS® (defined for purposes of this paragraph to include present and future, direct and indirect subsidiaries, predecessors, and successors) will implement the following practice changes:

      i.          eliminate and prohibit any requirement by the National Association of REALTORS®, REALTOR® MLSs, or Member Boards that listing brokers or sellers must make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), and eliminate and prohibit any requirement that such offers, if made, must be blanket, unconditional, or unilateral;

ii.     prohibit REALTOR® MLS Participants, subscribers, other real estate brokers, other real estate agents, and their sellers from (a) making offers of compensation on the MLS to buyer brokers or other buyer representatives (either directly or through buyers) or (b) disclosing on the MLS listing broker compensation or total broker compensation (i.e., the combined compensation to both listing brokers and cooperating brokers);

iii.     require REALTOR® MLSs to (a) eliminate all broker compensation fields on the MLS and (b) prohibit the sharing of the offers of compensation to buyer brokers or other buyer representatives described in Paragraphs 58(i) and (ii) of this Settlement Agreement via any other REALTOR® MLS field;

iv.     eliminate and prohibit any requirements conditioning participation or membership in a REALTOR® MLS on offering or accepting offers of compensation to buyer brokers or other buyer representatives;

v.     agree not to create, facilitate, or support any non-MLS mechanism (including by providing listing information to an internet aggregators' website for such purpose) for listing brokers or sellers to make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), however, this provision is not violated by (a) a REALTOR® MLS providing data or data feeds to a REALTOR®, REALTOR® MLS Participant, or third party unless the REALTOR® MLS knows those data or data feeds are being used directly or indirectly to establish or maintain a platform for offers of compensation from multiple brokers (i.e., the REALTOR® MLS cannot intentionally circumvent this requirement); or (b) a REALTOR® or REALTOR® MLS Participant displaying both (1) data or data feeds from a REALTOR® MLS and (2) offers of compensation to buyer brokers or other buyer representatives but only on listings from their own brokerage;

vi.     unless inconsistent with state or federal law or regulation before or during the

operation of this Paragraph 58(vi) of this Settlement Agreement, require that all REALTOR®
MLS Participants working with a buyer enter into a written agreement before the buyer tours
any home with the following:

     a.    to the extent that such a REALTOR® or Participant will receive
compensation from any source, the agreement must specify and conspicuously
disclose the amount or rate of compensation it will receive or how this amount will
be determined;

     b.    the amount of compensation reflected must be objectively
ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be
whatever amount the seller is offering to the buyer"); and

     c.    such a REALTOR® or Participant may not receive compensation for
brokerage services from any source that exceeds the amount or rate agreed to in the
agreement with the buyer;

     vii.    prohibit REALTORS® and REALTOR® MLS Participants from representing
to a client or customer that their brokerage services are free or available at no cost to their
clients, unless they will receive no financial compensation from any source for those services;

     viii.    require REALTORS® and REALTOR® MLS Participants acting for sellers
to conspicuously disclose to sellers and obtain seller approval for any payment or offer of
payment that the listing broker or seller will make to another broker, agent, or other
representative (e.g., a real estate attorney) acting for buyers; and such disclosure must be in
writing, provided in advance of any payment or agreement to pay to another broker acting for
buyers, and specify the amount or rate of any such payment;

     ix.    require REALTORS® and REALTOR® MLS Participants to disclose to
prospective sellers and buyers in conspicuous language that broker commissions are not set

by law and are fully negotiable (a) in their listing agreement if it is not a government-specified form, (b) in their agreement with buyers if it is not a government-specified form, and (c) in pre-closing disclosure documents if there are any and they are not government-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government form, then REALTORS® and REALTOR® MLS Participants must include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable. NAR also shall require that REALTOR® Member Boards and REALTOR® MLSs, to the extent they publish form listing agreements, buyer representation agreements, and pre-closing disclosure documents for use by REALTORS®, Participants, and/or subscribers, must conform those documents to this Paragraph 58(ix).

      x.      require that REALTORS® and REALTOR® MLS Participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the buyer broker or other buyer representative assisting the buyer;

      xi.      rescind or modify any existing rules that are inconsistent with the practice changes reflected in this Settlement Agreement; and

      xii.      develop educational materials that reflect and are consistent with each provision in these practice changes, and eliminate educational materials, if any, that are contrary to it.

      xiii.      the practice changes in Paragraph 58 of this Settlement Agreement shall not prevent (a) offers of compensation to buyer brokers or other buyer representatives off of the multiple listing service; or (b) sellers from offering buyer concessions on a REALTOR® MLS (e.g., for buyer closing costs), so long as such concessions are not limited to or

conditioned on the retention of or payment to a cooperating broker, buyer broker, or other buyer representative.

59. The obligations set forth in Paragraph 58 of this Settlement Agreement will terminate 7 years after the Class Notice date. Moreover, if in an action brought against the National Association of REALTORS® by the United States Department of Justice, United States Federal Trade Commission, or any State Attorney General and a final judgment is entered by a court (with all stay rights exhausted) which requires the National Association of REALTORS® to adopt any practice changes that are inconsistent with the practice changes required by this Settlement Agreement, the National Association of REALTORS® may comply with the terms of such judgment, unless the judgment is reversed or vacated, notwithstanding the practice changes specified in this Settlement Agreement. In such circumstance, the National Association of REALTORS® will continue to be obligated to observe the practice changes specified in this Settlement Agreement that are not affected by such judgment.

60. The National Association of REALTORS® acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its best efforts to implement the practice changes specified in Paragraph 58 of this Settlement Agreement.

## I.  **Cooperation**

61. The National Association of REALTORS® (defined for purposes of this paragraph to include present and future, direct and indirect subsidiaries, predecessors, and successors) will provide valuable cooperation to Plaintiffs and Settlement Class Member as follows in the Actions, including to the extent that any is consolidated pursuant to *In re Real Estate Commission Antitrust Litigation* (MDL No. 3100):

i.      use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

ii.     use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

iii.    make available up to six (6) then-current employees, who are not practicing attorneys, identified by Plaintiffs who will sit for deposition in the Actions and will testify live at trial in any of the Actions if requested by Plaintiffs;

iv.     agree that Plaintiffs in the Actions may use any discovery materials provided by the National Association of REALTORS® or its officers or employees in Moehrl or Burnett;

v.      agree to produce in any Actions (excepting Moehrl and Burnett) non-privileged documents in its possession, custody, or control from up to eight (8) current or former employees or officers ("Custodians"), that are returned by a reasonable and agreed-upon list of search terms for documents created after January 1, 2022. The National Association of REALTORS® will, within 150 days of the later of (a) the Date of Preliminary Approval or (b) the date by which Plaintiffs identify Custodians and the Settling Parties agree on search terms, whichever is later, produce those documents. If the Parties are unable to reach agreement on a final list of Search Terms after good faith negotiations, they will submit any dispute for mediation by an agreed mediator. For any documents that are withheld on the basis of privilege or as attorney work product, the National Association of REALTORS®

will produce a privilege log according to the requirements of the ESI Order entered in Burnett. Any disputes over privilege or as to attorney work product will be governed by the procedure reflected in the ESI Order entered in Burnett.

vi.       submit a withdrawal of expert designations and obtain agreement with any experts retained solely by the National Association of REALTORS® as of February 1, 2024 that they will not testify at trial as a retained expert for any Non-National Association of REALTORS® Defendant in the Actions;

vii.      decline to waive any conflict that its counsel may have with respect to representing any non-Released Parties in the Actions;

viii.     agree that, if a Non-National Association of REALTORS® Defendant includes a witness on a witness list in the Actions who is then a current officer or employee of the National Association of REALTORS® or its subsidiaries, the National Association of REALTORS® will cooperate in providing access via counsel to that witness prior to trial testimony for up to two (2) hours;

ix.       within five business days after the Execution Date, withdraw their existing response before the Judicial Panel on Multidistrict Litigation with respect to *In re Real Estate Commission Antitrust Litigation* (MDL No. 3100);

x.        within five business days after the Execution Date, withdraw any pending non-settlement related motions and supporting filings in the Actions filed by the National Association of REALTORS® only, including those concerning summary judgment, the exclusion of experts, and post-trial motions without prejudice to renewal in the event this Settlement or Settlement Agreement is rescinded, and in that event Plaintiffs shall not contend that renewal was rendered untimely by or was waived by the operation of this Settlement Agreement; and

xi.        agree not to provide greater assistance in discovery or trial to any defendant or other non-Released Party in the Actions than to the Plaintiffs, unless required by subpoena or other compulsory process.

62.        The National Association of REALTORS®'s cooperation obligations, as set forth in Paragraph 61 of this Settlement Agreement, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

63.        The National Association of REALTORS®'s obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to the National Association of REALTORS®.  Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in all of the Actions and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

64.        The National Association of REALTORS® acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its reasonable best efforts to provide the cooperation specified in Paragraph 61 of this Settlement Agreement.

65.        Notwithstanding any of the foregoing, nothing herein shall restrict or impact the ability of the National Association of REALTORS® to defend itself in any way in any litigation aside from the Actions, or government investigations.

## J.    REALTOR® and Non-REALTOR® MLS Opt-In, Release, and Cooperation

66.        In order to be included as a Released Party, each REALTOR® MLS must among other requirements agree to be bound by the practice changes in Paragraph 68 and the cooperation

terms in Paragraph 69, including by executing Appendix B and providing it to the below email address within 60 days of the filing of the first motion for preliminary approval of this Settlement Agreement:

(1) realtorsoptin@jndla.com, (2) realtorsoptin@cohenmilstein.com, and

(3) nargovernance@nar.realtor

67.    In order to be included as a Released Party, each non-REALTOR® MLS must among other requirements agree to be bound by the practice changes in Paragraph 68 of this Settlement Agreement, the cooperation terms in Paragraph 69 of this Settlement Agreement, and the payment terms reflected in Appendix D, including by executing Appendix D and providing it to the below email address within 60 days of the filing of the first motion for preliminary approval of this Settlement Agreement:

(1) realtorsoptin@jndla.com, (2) realtorsoptin@cohenmilstein.com, and

(3) nargovernance@nar.realtor

68.    As soon as practicable, and in no event later than 150 days after the filing of the first motion for preliminary approval of this Settlement Agreement, each opting-in REALTOR® MLS and non-REALTOR® MLS will implement the following practice changes:

     i.    eliminate any requirement by the MLS that listing brokers or sellers must make offers of cooperating compensation to brokers or other buyer representatives (either directly or through buyers), and eliminate any requirement that such offers, if made, must be blanket, unconditional, or unilateral;

     ii.    prohibit MLS Participants, subscribers, other real estate brokers, other real estate agents, and sellers from (a) making offers of compensation on the MLS to cooperating brokers or other buyer representatives (either directly or through buyers); or (b) disclosing on the MLS listing broker compensation or total brokerage compensation (i.e., the combined

compensation to both listing brokers and cooperating brokers);

iii.    eliminate all broker compensation fields on the MLS, and prohibit the sharing of offers of compensation to buyer brokers or other buyer representatives described in Paragraphs 68(i) and (ii) of this Settlement Agreement via any other fields on the MLS;

iv.    eliminate and prohibit any requirements conditioning participation or membership in an MLS on offering or accepting compensation to buyer brokers or other buyer representatives;

v.    agree not to create, facilitate, or support any non-MLS mechanism (including by providing listing information to an internet aggregators' website for such purpose) for listing brokers or sellers to make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), however, this provision is not violated by (a) an MLS providing data or data feeds to an MLS Participant, or third party unless the MLS knows those data or data feeds are being used directly or indirectly to establish or maintain a platform for offers of compensation from multiple brokers (i.e., the MLS cannot intentionally circumvent this requirement); or (b) a REALTOR® or MLS Participant displaying both (1) data or data feeds from an MLS and (2) offers of compensation to buyer brokers or other buyer representatives, but only on listings from their own brokerage;

vi.    unless inconsistent with state or federal law or regulation before or during the operation of this Paragraph 68(vi) of this Settlement Agreement, require that all MLS Participants working with a buyer enter into a written agreement before the buyer tours any home with the following:

a.    to the extent that such an MLS Participant will receive compensation from any source, the agreement must specify and conspicuously disclose the amount or rate of compensation it will receive or how this amount will be determined;

b. the amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer"); and

c. such an MLS Participant may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer;

vii. prohibit MLS Participants, subscribers, and other real estate brokers and agents accessing the multiple listing service from representing to a client or customer that their brokerage services are free or available at no cost to their clients, unless they will receive no financial compensation from any source for those services;

viii. require MLS Participants acting for sellers to conspicuously disclose to sellers and obtain seller approval for any payment or offer of payment that the listing broker or seller will make to another broker, agent, or other representative (e.g., a real estate attorney) acting for buyers; and such disclosure must be in writing, provided in advance of any payment or agreement to pay to another broker acting for buyers, and specify the amount or rate of any such payment;

ix. require MLS Participants to disclose to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable (a) in their listing agreement if it is not a government-specified form, (b) in their agreement with buyers if it is not a government-specified form, and (c) in pre-closing disclosure documents if there are any and they are not government-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government form, then MLS Participants must include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully

negotiable.

     x.     to the extent that the MLS publishes form listing agreements, buyer representation agreements, or pre-closing disclosure documents for use by REALTORS®, participants, and/or subscribers, ensure that those forms include language disclosing to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable;

     xi.     require that MLS Participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the buyer broker or other buyer representative assisting the buyer;

     xii.     rescind or modify any existing rules that are inconsistent with the practice changes reflected in this Paragraph 68 of this Settlement Agreement; and

     xiii.     develop or provide from the National Association of REALTORS® educational materials that reflect and are consistent with each provision in these practice changes, and eliminate educational materials, if any, that are contrary to it;

     xiv.     the practice changes in Paragraph 68 of this Settlement Agreement shall not prevent (a) offers of compensation off of the MLS to buyer brokers or buyer representatives; or (b) sellers from offering buyer concessions on an MLS (e.g., for buyer closing costs), so long as such concessions are not limited to or conditioned on the retention of or payment to a cooperating broker, buyer broker, or other buyer representative.

69.     Each opting-in REALTOR® MLS and non-REALTOR® MLS will provide valuable cooperation to Plaintiffs and Settlement Class Member as follows in the Actions, including to the extent that any is consolidated pursuant to In re Real Estate Commission Antitrust Litigation (MDL No. 3100):

i.     use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

ii.     use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

iii.     use reasonable efforts at their expense to provide relevant class member and listing data and answer questions about that data to support the provision of Class Notice, administration of any settlements, or the litigation of the Actions;

iv.     stipulate that Plaintiffs have the consent to obtain from third parties relevant class member and listing data to support the provision of Class Notice, administration of any settlements, or the litigation of the Actions;

v.     agree that Plaintiffs may use in the Actions any discovery materials provided by it or its officers or employees in Moehrl or Burnett;

vi.     agree that this Settlement Agreement shall not preclude Plaintiffs from seeking the production of non-privileged documents in its possession, custody, or control;

vii.     if a Defendant includes a witness on a witness list in the Actions who is then a current officer or employee of the multiple listing service, the multiple listing service will cooperate in providing access via counsel to that witness prior to trial testimony for up to two (2) hours;

viii.     withdraw any existing response before the Judicial Panel on Multidistrict Litigation with respect to *In re Real Estate Commission Antitrust Litigation* (MDL No. 3100);

ix.     agree not to provide greater assistance in discovery or trial to any defendant or other non-Released Party in the Actions than to the Plaintiffs unless required by subpoena or other compulsory process.

70.     Each opting-in REALTOR® MLS's and non-REALTOR® MLS's cooperation obligations, as set forth in Paragraph 69 of this Settlement Agreement, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

71.     Each opting-in REALTOR® MLS's and non-REALTOR® MLS's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to the National Association of REALTORS® or the opting-in REALTOR® MLS or non-REALTOR® MLS.  Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in all of the Actions and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

## K.     Miscellaneous

72.     This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any Settling Party.  The National Association of REALTORS® denies the allegations of the complaints in the Actions.  Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or

omission by the National Association of REALTORS®, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by the National Association of REALTORS® in any proceeding.

73.     This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations. The Settling Parties also participated in mediation sessions before a neutral mediator, Greg Lindstrom, of Phillips ADR Enterprises, P.C. and with two other mediators.  The Settling Parties reached this Settlement Agreement after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation.  The terms of the settlement continue to be subject to mediation privilege and must be kept strictly confidential until 10:00am Eastern Daylight Time on March 15, 2024, except as necessary for the National Association of REALTORS® to inform certain members, REALTOR® Boards, and REALTOR® MLSs or as otherwise agreed in writing by the Co-Lead Counsel and the National Association of REALTORS®.

74.     Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.

75.     This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against any alleged co-conspirator or other Person or entity other than the Released Parties, including but not limited to the non-National Association of REALTORS® defendants in the Actions.  All rights of any Settlement Class Member against any Non-National Association of REALTORS® Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

76.     This Settlement Agreement constitutes the entire agreement among Plaintiffs and the National Association of REALTORS® pertaining to the Settlement of the Actions against the

National Association of REALTORS®. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and the National Association of REALTORS®.

77. This Settlement Agreement may be executed in counterparts by Plaintiffs and the National Association of REALTORS®, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

78. Neither Plaintiffs nor the National Association of REALTORS® shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

79. The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

80. The provisions of this Settlement Agreement governing the opt-in and release of certain MLSs and brokerages (including Appendices B, C, and D) shall be deemed severable, and the invalidity, ineffectiveness, or unenforceability of those provisions shall not affect the validity or enforceability of the other provisions of this Settlement Agreement. The validity, effectiveness, and enforceability of this Settlement Agreement with and as it pertains to the National Association of REALTORS® shall not be affected in any way by the decisions of MLSs or brokerages to accept or decline the opt-in provisions reflected in this Settlement Agreement or of any court with respect to the approval of the opt-in and release provisions of certain MLSs and brokerages (including Appendices B, C, and D).

81. The opt-in and release of REALTOR® MLSs shall be subject to the same separate opt-out, objection, and Class Notice deadlines as this Settlement Agreement with the National Association of REALTORS®. At Plaintiffs' sole option (and in consultation with the opting-in non-REALTOR® MLSs or brokerages), the opt-out, objection, and class notice deadlines for any

42

Settlements with non-REALTOR® MLSs (as reflected in Appendix D) and brokerages (as reflected in Appendix C) may be subject to different opt-out, objection, and class notice deadlines from this Settlement Agreement with the National Association of REALTORS®.

82.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

83.     The terms of this Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

84.     Any disputes between the National Association of REALTORS® and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented first to Gregory Lindstrom or another mediator agreed to by the parties for assistance in mediating a resolution and, if a resolution is not reached, to the Court.

85.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will.  Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

86.     The Settling Parties shall have the right to amend this Settlement Agreement, upon mutual written consent, to correct any scrivener's errors in this Settlement Agreement, provided that

such amendment does not materially adversely affect the rights of the Settling Parties.

87.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

LEAD COUNSEL

_____

Hagens Berman Sobol Shapiro LLP

_____

Cohen Milstein Sellers & Toll PLLC

_____

Susman Godfrey LLP

_____

Ketchmark & McCreight PC

_____

Boulware Law LLC

_____

Williams Dirks Dameron LLC

NATIONAL ASSOCIATION OF REALTORS®

By:_____

Cooley LLP

43

# APPENDIX A

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and NATIONAL ASSOCIATION OF REALTORS® REALTY, INC.,

        Defendants.

Case No. 19-cv-00332-SRB

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,

        Defendants.

Case No. 1:19-cv-01610-ARW

46

Plaintiffs Rhonda Burnett, Jerod Breit, Jeremy Keel, Hollee Ellis, Frances Harvey, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, Jane Ruh, Don Gibson, Lauren Criss, and John Meiners (collectively "Plaintiffs") and defendant the National Association of REALTORS® (collectively, "the Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, each firm defined in the Settlement Agreement as Co-Lead Counsel desires to give an undertaking (the "Undertaking") for repayment of the award of attorneys' fees, costs, and expenses approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned counsel, individually and as agent for his/her law firm, hereby submits both to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Settlement Agreement.

By receiving any payments pursuant to the Settlement Agreement, Co-Lead Counsel and their shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Western District of Missouri for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and in the Settlement Agreement.

In the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to the National Association of REALTORS®, based upon written instructions provided by the National Association of REALTORS®, the full amount of

the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund, including any accrued interest.

In the event the Settlement Agreement becomes Effective, but the attorneys' fees, costs, and expenses awarded by the Court or any part of them are vacated, overturned, modified, reversed, or rendered void as a result of an appeal, Co-Lead Counsel shall within thirty (30) days repay to the Settlement Fund, based upon written instructions provided by the settlement administrator, the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the final settlement order and judgment pertaining to attorneys' fees, such that the finality of those fees no longer remains in doubt.

In the event Co-Lead Counsel fails to repay to the National Association of REALTORS® any of attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court shall, upon application of the National Association of REALTORS®, and notice to Co-Lead Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Co-Lead Counsel.

The undersigned stipulate, warrant, and represent that they have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of each firm identified as Co-Lead Counsel.  This agreement will only be effective upon its execution by each firm identified in the Settlement Agreement as Co-Lead Counsel.

Co-Lead Counsel acknowledge that this Undertaking is a material component of the Settlement Agreement and agree to use its reasonable efforts to timely effect the terms specified in this Undertaking.  Each undersigned warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Undertaking is executed.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:

Ketchmark & McCreight PC

Boulware Law LLC

Williams Dirks Dameron LLC

Hagens Berman Sobol Shapiro LLP

Cohen Milstein Sellers & Toll PLLC

Susman Godfrey LLP

By:

Cooley LLP

<u>**APPENDIX B - REALTOR® MLS "OPT IN" AGREEMENT**</u>

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS,
FRANCES HARVEY, and JEREMY KEEL, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®,
REALOGY HOLDINGS CORP., HOMESERVICES OF
AMERICA, INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX LLC, and NATIONAL
ASSOCIATION OF REALTORS® REALTY, INC.,

        Defendants.

Case No. 19-cv-00332-SRB

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE
DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH
on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®,
REALOGY HOLDINGS CORP., HOMESERVICES OF
AMERICA, INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, THE LONG & FOSTER COMPANIES,
INC., RE/MAX LLC, and KELLER WILLIAMS REALTY,
INC.,

        Defendants.

Case No. 1:19-cv-01610-ARW

1

WHEREAS, some plaintiffs have alleged that certain MLSs participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act and corresponding state laws;

WHEREAS, Stipulating MLS is a REALTOR® MLS and denies Plaintiffs' allegations in the Actions;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims and allegations asserted in the Actions, including more than four years of fact and expert discovery, and have concluded that a settlement according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, Stipulating MLS believes that it is not liable for the claims and allegations asserted and has good defenses, but nevertheless has decided to enter into this agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by the Settlement Agreement, and to put to rest with finality all claims and allegations that Plaintiffs and Settlement Class Members have or could have asserted against the Stipulating MLS; and

WHEREAS, Stipulating MLS has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in the Settlement Agreement and Appendix B.

NOW, THEREFORE, in consideration of the agreements and releases set forth in the Settlement Agreement and Appendix B and other good and valuable consideration, and intending to be legally bound, it is agreed by and between _____ ("Stipulating MLS") and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to Stipulating MLS only, without costs to Plaintiffs, the Settlement Class or Stipulating MLS except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

2

1.      Stipulating MLS agrees that the terms reflected in this Appendix B shall have the same meaning as those defined in the Settlement Agreement.

2.      Stipulating MLS represents that it is a REALTOR® MLS, as that term is defined in the Settlement Agreement. This representation is a material component of Appendix B and Stipulating MLS's inclusion as a Released Party.

3.      Stipulating MLS agrees that, to be effective, it must provide an executed version of this Appendix B to the below email address within 60 days of the filing of the first motion for preliminary approval of the Settlement Agreement:

(1) realtorsoptin@jndla.com, (2) realtorsoptin@cohenmilstein.com, and

(3) nargovernance@nar.realtor

4.      As a condition for being a Released Party, as that term is defined in the Settlement Agreement, stipulating MLS agrees to be bound by the practice changes in Paragraph 68 and the cooperation terms in Paragraph 69 of the Settlement Agreement.

5.      As soon as practicable, and in no event later than 150 days after the filing of the first motion for preliminary approval of the Settlement Agreement, each Stipulating MLS will implement the following practice changes:

i.      eliminate any requirement by the MLS that listing brokers or sellers must make offers of compensation to cooperating brokers or other buyer representatives (either directly or through buyers), and eliminate any requirement that such offers, if made, must be blanket, unconditional, or unilateral;

ii.      prohibit the MLS participants, subscribers, other real estate brokers, other real estate agents, and sellers from (a) making offers of compensation on the multiple listing service to cooperating brokers or other buyer representatives (either directly or through buyers); or (b) disclosing on the multiple listing service listing broker compensation or total

brokerage compensation (i.e., the combined compensation to both listing brokers and cooperating brokers);

iii.     eliminate all broker compensation fields on the MLS, and prohibit the sharing of offers of compensation to buyer brokers or other buyer representatives via any other fields on the MLS;

iv.     eliminate and prohibit any requirements conditioning participation or membership in an MLS on offering or accepting compensation to buyer brokers or other buyer representatives;

v.     agree not to create, facilitate, or support any non-MLS mechanism (including by providing listing information to an internet aggregators' website for such purpose) for listing brokers or sellers to make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), however, this provision is not violated by (a) a REALTOR® MLS providing data or data feeds to a REALTOR®, REALTOR® MLS participant, or third party unless the REALTOR® MLS knows those data or data feeds are being used directly or indirectly to establish or maintain a platform for offers of compensation from multiple brokers (i.e., the REALTOR® MLS cannot intentionally circumvent this requirement); or (b) a REALTOR® or REALTOR® MLS Participant displaying both (1) data or data feeds from an MLS and (2) offers of compensation to buyer brokers or other buyer representatives but only on listings from their own brokerage;

vi.     unless inconsistent with state or federal law or regulation before or during the operation of this Paragraph 5(vi) of Appendix B, require that all MLS Participants working with a buyer enter into a written agreement before the buyer tours any home with the following:

a.     to the extent that such a Participant will receive compensation from

4

any source, the agreement must specify and conspicuously disclose the amount or rate of compensation it will receive or how this amount will be determined;

b.    the amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer"); and

c.    such a Participant may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer;

vii.    prohibit Participants, subscribers, and other real estate brokers and agents accessing the multiple listing service from representing to a client or customer that their brokerage services are free or available at no cost to their clients, unless they will receive no financial compensation from any source for those services;

viii.    require MLS Participants acting for sellers to conspicuously disclose to sellers and obtain seller approval for any payment or offer of payment that the listing broker or seller will make to another broker, agent, or other representative (e.g., a real estate attorney) acting for buyers; and such disclosure must be in writing, provided in advance of any payment or agreement to pay to another broker acting for buyers, and specify the amount or rate of any such payment;

ix.    require MLS Participants to disclose to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government-specified form, (ii) in their agreement with buyers if it is not a government-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a

5

government form, then MLS participants must include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable.

x.     to the extent that the multiple listing services publishes form listing agreements, buyer representation agreements, or pre-closing disclosure documents for use by REALTORS®, participants, and/or subscribers, ensure that those forms include language disclosing to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable.

xi.     require that MLS Participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the broker assisting the buyer;

xii.     rescind or modify any existing rules that are inconsistent with the practice changes reflected in this Paragraph 5 of Appendix B; and

xiii.     develop or provide educational materials developed by the National Association of REALTORS® that reflect and are consistent with each provision in these practice changes, and eliminate educational materials, if any, that are contrary to it.

xiv.     the practice changes in Paragraph 5 of Appendix B shall not prevent (a) offers of compensation to buyer brokers or other buyer representatives off of the multiple listing service or (b) sellers from offering buyer concessions on an MLS (e.g., for buyer closing costs), so long as such concessions are not limited to or conditioned on the retention of or payment to a cooperating broker, buyer broker, or other buyer representative.

6.     The obligations set forth in Paragraph 5 of this Appendix B will terminate 7 years after the notice date.

7.     Stipulating MLS agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel.

8.     Stipulating MLS will provide valuable cooperation to Plaintiffs and Settlement Class Member as follows in the Actions, including to the extent that any is consolidated pursuant to In re Real Estate Commission Antitrust Litigation (MDL No. 3100):

i.     use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

ii.     use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

iii.     use reasonable efforts at their expense to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

iv.     stipulate that Plaintiffs have the consent to obtain from third parties relevant class member and listing data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

v.     agree that Plaintiffs may use in the remaining Actions any discovery materials provided by it or its officers or employees in Moehrl or Burnett;

vi.     agree that the Settlement Agreement and Appendix B shall not preclude Plaintiffs from seeking the production of non-privileged documents in its possession, custody, or control;

vii.     if a Defendant includes a witness on a witness list in the Actions who is then a current officer or employee of the multiple listing service, the multiple listing service will cooperate in providing access via counsel to that witness prior to trial testimony for up to two (2) hours;

viii.     withdraw any existing response before the Judicial Panel on Multidistrict Litigation with respect to *In re Real Estate Commission Antitrust Litigation* (MDL No. 3100); and

ix.     agree not to provide greater assistance in discovery or trial to any defendant or other non-Released Party in the Actions than to the Plaintiffs unless required by subpoena or other compulsory process.

9.     Stipulating MLS's cooperation obligations, as set forth in Paragraph 8 of Appendix B, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

10.     Stipulating MLS's obligation to cooperate will not be affected by the release set forth in the Settlement Agreement, Appendix B, or the final judgment orders with respect to National Association of REALTORS®.  Unless this Settlement Agreement or Appendix B is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in all of the Actions and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

11.     Stipulating MLS acknowledges that the practice changes and cooperation set forth in Paragraphs 5 and 8 of Appendix B are material components of Appendix B and agrees to use its reasonable best efforts to provide them.

12.     Stipulating MLS consents to entry of a final judgment order enjoining Stipulating MLS in accordance with the provisions of Paragraph 68 of the Settlement Agreement.

13.     The terms of Appendix B are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of Plaintiffs and Stipulating MLS, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

14.     Any disputes between Stipulating MLS and Co-Lead Counsel concerning this Appendix B shall, if they cannot be resolved, be presented first to an agreed mediator for assistance in mediating a resolution and, if a resolution is not reached, to the Court.

15.     The Court shall retain jurisdiction over the implementation and enforcement of the Settlement Agreement and the Settlement, including Appendix B.

16.     Stipulating MLS acknowledges that it has been and is being fully advised by competent legal counsel of Stipulating MLS's own choice and fully understands the terms and conditions of the Settlement Agreement, including Appendix B, and the meaning and import thereof, and that such Stipulating MLS's execution of this Appendix B is with the advice of such Stipulating MLS's counsel and of such Stipulating MLS's own free will.  Stipulating MLS submits to the exclusive jurisdiction of the Court for the purposes of interpreting and enforcing the terms of Appendix B, including but not limited to, the practice changes contained therein. Stipulating MLS represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter

9

into the Settlement Agreement, including Appendix B, and was not fraudulently or otherwise wrongfully induced to enter into the Settlement Agreement.

17.    Each of the undersigned represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Appendix B.


Date: _____ day of _____, 2024


_____

On behalf of _____

<u>**APPENDIX C – BROKERAGE "OPT IN" AGREEMENT**</u>

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and NATIONAL ASSOCIATION OF REALTORS® REALTY, INC.,

        Defendants.

Case No. 19-CV-00332-SRB

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,

        Defendants.

Case No. 1:19-cv-01610-ARW

WHEREAS, Plaintiffs allege that the National Association of REALTORS®, its members, and real estate brokers participating in MLSs throughout the United States participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act and corresponding state laws;

WHEREAS, Stipulating Party denies these allegations;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims and allegations that have been and/or could be asserted against Stipulating Party, including more than four years of fact and expert discovery, and have concluded that a settlement according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, Stipulating Party believes that it is not liable for the claims and allegations asserted and has good defenses, but nevertheless has decided to enter into this Appendix C to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Appendix C, and to put to rest with finality all claims and allegations that Plaintiffs and Settlement Class Members have or could have asserted against the Stipulating Party; and

WHEREAS, Stipulating Party has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Appendix C.

NOW, THEREFORE, in consideration of the agreements and releases set forth in the Settlement Agreement and Appendix C and other good and valuable consideration, and intending to be legally bound, it is agreed by and between _____ ("Stipulating Party") and the Plaintiffs that certain actual or potential claims be settled, compromised, and dismissed with prejudice as to Stipulating Party, without costs to Plaintiffs, the Settlement Class or Stipulating Party except as provided for herein, subject to the approval of the Court, on the

1

following terms and conditions:

A.     **Definitions**

Stipulating Party agrees that the terms reflected in this Appendix C shall have the same meaning as those defined in the Settlement Agreement, unless otherwise specified. The following terms, as used in this Appendix C only, have the following meanings:

1.     "Burnett" means the case pending in the United States District Court for the Western District of Missouri Case No. 4:19-cv-00332-SRB, which is currently pending.

2.     "Burnett MLSs" means the multiple listing services identified as Subject MLSs in Burnett.

3.     "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

4.     "Court" means the United States District Court for the Western District of Missouri.

5. "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

6. "Effective Date" means the date when both: (a) the Court has entered a final judgment order approving the Settlement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against the National Association of REALTORS® with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement initiated by any Non-National Association of REALTORS® Defendant, and any such appeal or other proceedings shall not delay this Settlement from becoming final and shall not apply to this Paragraph; nor shall this Paragraph be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

7. "Moehrl" means the case pending in the Northern District of Illinois Case No. 1:19-cv-01610-ARW, which is currently pending.

8. "Moehrl MLSs" means the multiple listing services named in Moehrl.

9. "MLS PIN" means the multiple listing service at issue in United States District Court for the District of Massachusetts Case No. I :20-cv-12244-PBS, which is currently pending.

10. "Opt-Outs" means members of the Settlement Class who have timely exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

3

11.     "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates, and assignees.

12.     "Released Claims" means any and all manner of claims, regardless of the cause of action, arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, rebated, or paid to brokerages in connection with the sale of any residential home.

13.     "Released Parties" means Stipulating Party and its past, present, and future, direct and indirect, parents, subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns.  However, "Released Parties" shall not include any Person who is excluded from being a released party under Paragraphs 18(g) or (h) of the Settlement Agreement.

14.     "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting

4

in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

15.    "Settlement" means the settlement of the Actions contemplated by this Appendix C.

16.    "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

- Homes listed on Moehrl MLSs: March 6, 2015 to date of Class Notice;

- Homes listed on Burnett MLSs: April 29, 2014 to date of Class Notice;

- Homes listed on MLS PIN: December 17, 2016 to date of Class Notice;

- Homes in Arkansas, Kentucky, and Missouri, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2018 to date of Class Notice;

- Homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2017 to date of Class Notice;

- For all other homes: October 31, 2019 to date of Class Notice.

For avoidance of doubt, Plaintiffs and Stipulating Party intend this Settlement to provide for a nationwide class with a nationwide settlement and release.

17.    "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

18.    "Settling Parties" means Plaintiffs and Stipulating Party.

**B.    Operation of the Settlement**

19.    Stipulating Party represents that neither it nor its past or present, direct or indirect parents (including holding companies), subsidiaries, affiliates (all as defined in SEC rule 12b-2

promulgated pursuant to the Securities Exchange Act of 1934), associates, predecessors, successors, franchisors, or franchisees is a defendant in the Actions, as that term is defined in the Settlement Agreement. This representation is a material component of Appendix C and Stipulating Party's inclusion as a Released Party

20. Settling Parties agree that, as a condition precedent for this Appendix C to become effective, Stipulating Party must deliver to the below email address within 60 days of the filing of the first motion for preliminary approval of the Settlement Agreement each of the following: (i) an executed version of this Appendix C; (ii) a declaration sworn pursuant 28 U.S.C. § 1746 by a competent officer of Stipulating Party accurately attesting to the Stipulating Party's "Total Transaction Volume" for each of the most recent four calendar years; and (iii) an indication of whether Stipulating Party selects either "Option 1" or "Option 2" as defined in this Appendix C:

(1) realtorsoptin@jndla.com (2) realtorsoptin@cohenmilstein.com and

(3) nargovernance@nar.realtor

21. As a condition for being a Released Party, Stipulating Party agrees to be bound by this Appendix C, including the practice changes and cooperation terms reflected in Paragraphs 35-41 of Appendix C.

22. **Option 1**: Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the United States Treasury Regulations (the "Escrow Account"). Within 120 days following preliminary approval of the Settlement Agreement by the Court, Stipulating Party will deposit into the Escrow Account an amount equal to 0.0025 multiplied by its average annual Total Transaction Volume over the most recent four calendar years ("Total Monetary Settlement Amount"). "Total Transaction Volume" is defined as the aggregate value of all residential home sales and purchases in which the Stipulating Entity and its direct and indirect parents (including holding companies),

6

subsidiaries, affiliates, associates (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and any of their franchisees represented in a real estate brokerage capacity either the buyer, the seller, or both. For any transactions in which a real estate broker represented both the buyer and the seller, that transaction shall be counted twice for purposes of calculating the "Total Transaction Volume." By way of example, a Stipulating Party with a $2 billion average annual Total Transaction Volume would be required under this agreement to deposit $5 million in the Escrow Account.

23. **Option 2**: Alternatively, to the extent Stipulating Party has a good faith belief that it lacks the ability to pay the amount required under Option 1, Stipulating Party agrees to participate in a non-binding mediation with Co-Lead Counsel to occur within 110 days following preliminary approval of the Settlement Agreement by the Court. That mediation will occur before Greg Lindstrom, of Phillips ADR Enterprises, P.C. or another mediator jointly selected by the parties to Appendix C. The costs of the mediation shall be borne entirely by Stipulating Party. Plaintiffs and Stipulating Party agree to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation, including the mediation. If, following the non-binding mediation described herein, Stipulating Party and Co-Lead Counsel are unable to reach agreement on a settlement within 130 days following preliminary approval of the Settlement Agreement by the Court, Stipulating Party shall not become a "Released Party" under the Settlement Agreement (including this Appendix C) and any further rights or obligations under the Settlement Agreement (including this Appendix C) of Stipulating Party, Plaintiffs, Co-Lead Counsel, or the Settlement Class to one another shall terminate.

C. **Stipulation to Class Certification**

24. The Settling Parties hereby stipulate for purposes of this settlement only, that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and,

subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Stipulating Party. The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only. Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

25.     Neither the Settlement, Appendix C, or Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of the Settlement, Appendix C, or Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by Stipulating Party that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**D.     Approval of this Appendix C and Dismissal of the Actions**

26.     The Settling Parties agree to make reasonable best efforts to effectuate the Settlement Agreement (including Appendix C), including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e)); scheduling a final fairness hearing to obtain final approval of the settlement and the final dismissal with prejudice of the Actions as to Stipulating Party; and Stipulating Party's cooperation by providing information reflecting its ability to pay limitations.

27.     Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement reflected in Appendix C (the "Motion"). The Motion may be separate from and be filed at a different time than the preliminary approval motion provided in connection with the other class relief afforded in the Settlement Agreement by the National Association of REALTORS®. The Motion shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until

the Effective Date of this Settlement reflected in Appendix C. Stipulating Party shall not have any right or opportunity to review the Motion. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement reflected in Appendix C. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify Appendix C directly or with the assistance of an agreed mediator and will endeavor to resolve any issues to the satisfaction of the Court.

28. Subject to approval by the Court, Plaintiffs will undertake a method of providing notice of this Settlement to the Settlement Class and for claim administration that meets the requirements of due process and Federal Rule of Civil Procedure 23 and is substantially similar to the forms of notice already agreed-to and approved by the Court in the previous settlements with Anywhere, RE/MAX, and Keller Williams. Class members who file a claim under the Anywhere, RE/MAX and Keller Williams settlements will be deemed to also make a claim against this Settlement unless they affirmatively state they are not claiming this Settlement. The Settling Parties agree to the use of the claims administrator previously selected to administer the Anywhere, RE/MAX, and Keller Williams settlements and approved by the Court. The timing of any request to disseminate notice to the Settlement Class will be at the discretion of Co-Lead Counsel and may occur separately from and at a different time than the class notice provided in connection with the class relief afforded in the Settlement Agreement by the National Association of REALTORS®.

29. Within ten (10) calendar days after the filing with the Court of this Appendix C and the accompanying motion papers seeking its preliminary approval, the claims administrator shall at Stipulating Party's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

9

30.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to Stipulating Party:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) enjoining the Stipulating Party in accordance with the provisions of Paragraph 35 of Appendix C.

(d) directing that, as to Stipulating Party only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(e) reserving exclusive jurisdiction over the Settlement and this Appendix C, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the Court; and

(f) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to Stipulating Party.

31.     This Appendix C will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

**E.     <u>Releases, Discharge, and Covenant Not to Sue</u>**

32.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive,

declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

33. The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD

HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Settlement Agreement.

34.     The Releasing Parties intend by this Appendix C to settle with and release only the Released Parties, and the Settling Parties do not intend this Appendix C, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

F.     **Practice Changes**

35. Stipulating Party agrees that, as soon as practicable, and in no event later than 150 days after the filing of the first motion for preliminary approval of this Settlement Agreement, Stipulating Party (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors, but not franchisees) will implement the following practice changes:

     i. advise and periodically remind Stipulating Party's company-owned brokerages, franchisees (if any), and their agents that there is no Stipulating Party requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

     ii. require that any Stipulating Party company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then Stipulating Party will require that any company-owned brokerages and their agents (and recommend and encourage that any Stipulating Party franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

     iii. prohibit all Stipulating Party company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their

agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv.       require that company owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each active listing shared with prospective buyers in any format;

v.       prohibit company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.       advise and periodically remind company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii.       for each of the above points, for company owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

36.     If not automatically terminated earlier by their own terms, the obligations set forth in the immediately preceding paragraph will sunset 5 years after the Effective Date.

37.     Stipulating Party agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel.

**G.**    **<u>Cooperation</u>**

38.     Stipulating Party agrees to provide valuable cooperation to Plaintiffs as follows in the Actions, including to the extent that any is consolidated pursuant to In re Real Estate Commission Antitrust Litigation (MDL No. 3100):

     i.     use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

     ii.     use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

     iii.     agree that this Settlement Agreement shall not preclude Plaintiffs from seeking the production of non-privileged documents in its possession, custody, or control;

     iv.     if a defendant includes a witness on a witness list in the Actions who is then a current officer or employee of Stipulating Party, Stipulating Party will cooperate in providing access via counsel to that witness prior to trial testimony for up to two (2) hours;

     v.     withdraw any existing response before the Judicial Panel on Multidistrict Litigation with respect to *In re Real Estate Commission Antitrust Litigation* (MDL No. 3100); and

     vi.     agree not to provide greater assistance in discovery or trial to any defendant or other non-Released Party in the Actions than to the Plaintiffs unless required by subpoena or other compulsory process.

39.     Stipulating Party's cooperation obligations, as set forth in Paragraph 38 of Appendix C, shall not require the production of information, testimony, and/or documents that are protected

from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

40.     Stipulating Party's obligation to cooperate will not be affected by the releases set forth in this Settlement Agreement or Appendix C or the final judgment orders with respect to the National Association of REALTORS® or Stipulating Party.  Unless this Appendix C is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in all of the Actions and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

41.     Stipulating Party acknowledges that the practice changes and cooperation set forth in this Appendix C are a material component of Appendix C and agrees to use its reasonable best efforts to provide them.

## H.     The Settlement Fund

42.     The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund."  The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund.  In no event will Stipulating Party's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

43.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement

Class or administering the settlement except in Paragraphs 40 and 42 of Appendix C. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

44.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund. Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or class representative incentive awards or such later date as directed by Co-Lead Counsel,, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award up to the amount specified in Paragraphs 22 or 23 of Appendix C for such fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

45.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

46.     Stipulating Party will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Appendix C.

17

47.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers.  The Settlement will be non-reversionary except as set forth below in Paragraphs 33-37 of Appendix C.  If the Settlement becomes Effective, no proceeds from the Settlement will revert to Stipulating Party regardless of the claims that are made.

48.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in this Appendix C.

49.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court.  Stipulating Party will have no participatory or approval rights with respect to the Plan of Allocation.  It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement (including Appendix C) and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement.  The Settlement Class, Plaintiffs, and Stipulating Party shall be bound by the terms of the Settlement Agreement (including Appendix C), irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

50.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against Stipulating Party or the Released Parties.

**I.     Taxes**

51.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund.  All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund.  Stipulating Party has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to Stipulating Party.  In the event the Settlement does not become Effective and any funds including interest or other income are returned to Stipulating Party, Stipulating Party will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income.  Stipulating Party makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement to Co-Lead Counsel or to any Settlement Class Member.

**J.     Rescission**

52.     If the Court does not certify the Settlement Class as defined in this Appendix C, or if the Court does not approve this Appendix C in all material respects, or if such approval is modified or set aside on appeal, or if the Court does not enter final approval, or if any judgment approving this Appendix C is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Appendix C may be rescinded by Stipulating Party or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within ten (10) business days of the entry of an order not granting court

19

approval or having the effect of disapproving or materially modifying the terms of the Appendix C. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement or such final judgment order. The decision of certain Settlement Class Members to opt out of the Settlement shall not be a basis for Stipulating Party to rescind or terminate the Appendix C.

53.     If Appendix C is rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to Stipulating Party.

54.     Stipulating Party warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Appendix C is executed. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of Stipulating Party to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the United States Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Stipulating Party, then, at the election of Co-Lead Counsel, the Settlement Agreement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

55.     The Settling Parties' rights to terminate this Settlement and withdraw from Appendix C are a material term of this Settlement.

56.     Stipulating Party reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

**K.     Miscellaneous**

57.     This Appendix C and any actions taken to carry out the Settlement are not intended

to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party. Stipulating Party denies the material allegations of the complaints in the Actions and in the other cases in In re Real Estate Commission Antitrust Litigation (MDL No. 3100). Neither this Appendix C, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Stipulating Party, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by Stipulating Party in any proceeding.

58.     The terms of Appendix C are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of Plaintiffs and Stipulating Party, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

59.     Any disputes between Stipulating Party and Co-Lead Counsel concerning this Appendix C shall, if they cannot be resolved, be presented first to an agreed mediator for assistance in mediating a resolution and, if a resolution is not reached, to the Court.

60.     The provisions of this Appendix C shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

61.     Any disputes relating to this Appendix C will be governed by Missouri law without regard to conflicts of law provisions.

62.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and Appendix C.

63.     This Settlement Agreement and Appendix C constitute the entire agreement among Plaintiffs and Stipulating Party pertaining to the Settlement of any claims or potential claims against Stipulating Party. This Appendix C may be modified or amended only by a writing executed by

Plaintiffs and Stipulating Party.

64.     Stipulating Party acknowledges that it has been and is being fully advised by competent legal counsel of Stipulating Party's own choice and fully understands the terms and conditions of this Settlement Agreement, including Appendix C, and the meaning and import thereof, and that such Stipulating Party's execution of this Appendix C is with the advice of such Stipulating Party's counsel and of such Stipulating Party's own free will.  Stipulating Party submits to the exclusive jurisdiction of the Court for the purposes of interpreting and enforcing the terms of Appendix C, including but not limited to, the practice changes contained therein. Stipulating Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement, including Appendix C, and was not fraudulently or otherwise wrongfully induced to enter into this Appendix C.

65.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Appendix C.


Date: _____ day of _____, 2024



_____

On behalf of _____


ON BEHALF OF CO-LEAD COUNSEL


_____

Cohen Milstein Sellers & Toll PLLC

_____

## APPENDIX D – NON-REALTOR® MLS "OPT IN" AGREEMENT

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and NATIONAL ASSOCIATION OF REALTORS® REALTY, INC.,

        Defendants.

Case No. 19-cv-00332-SRB

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS®, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,

        Defendants.

Case No. 1:19-cv-01610-ARW

WHEREAS, some plaintiffs have alleged that certain MLSs participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act and corresponding state laws;

WHEREAS, Stipulating MLS denies Plaintiffs' allegations in the Actions;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims and allegations asserted in the Actions, including more than four years of fact and expert discovery, and have concluded that a settlement according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, Stipulating MLS believes that it is not liable for the claims and allegations asserted and has good defenses, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims and allegations that Plaintiffs and Settlement Class Members have or could have asserted against the Stipulating MLS; and

WHEREAS, Stipulating MLS, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in the Settlement Agreement and Appendix D.

NOW, THEREFORE, in consideration of the agreements and releases set forth in the Settlement Agreement and Appendix D and other good and valuable consideration, and intending to be legally bound, it is agreed by and between _____ ("Stipulating MLS") and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to Stipulating MLS only, without costs to Plaintiffs, the Settlement Class or Stipulating MLS except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

**A.** **Definitions**

Stipulating MLS agrees that the terms reflected in this Appendix D shall have the same meaning as those defined in the Settlement Agreement, unless otherwise specified. The following terms, as used in this Appendix D only, have the following meanings:

1.  "Burnett" means the case pending in the United States District Court for the Western District of Missouri Case No. 4:19-cv-00332-SRB, which is currently pending.

2.  "Burnett MLSs" means the multiple listing services at issue in Burnett.

3.  "Co-Lead Counsel" means the following law firms:

    KETCHMARK AND MCCREIGHT P.C.
    11161 Overbrook Road, Suite 210
    Leawood, KS 66211

    BOULWARE LAW LLC
    1600 Genessee, Suite 416
    Kansas City, MO 64102

    WILLIAMS DIRKS DAMERON LLC
    1100 Main Street, Suite 2600
    Kansas City, MO 64105

    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101

    COHEN MILSTEIN SELLERS & TOLL PLLC
    1100 New York Ave. NW, Fifth Floor
    Washington, DC 20005

    SUSMAN GODFREY L.L.P.
    1900 Avenue of the Stars, Suite 1400
    Los Angeles, CA 90067

4.  "Court" means the United States District Court for the Western District of Missouri.

5.  "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

6.  "Effective Date" means the date when both: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal

Rules of Civil Procedure and a final judgment dismissing the Actions against the National Association of REALTORS® with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement initiated by any Non-National Association of REALTORS® Defendant, and any such appeal or other proceedings shall not delay the Settlement from becoming final and shall not apply to this Paragraph; nor shall this Paragraph be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

7.      "Moehrl" means the case pending in the Northern District of Illinois Case No. 1:19-cv-01610-ARW, which is currently pending.

8.      "Moehrl MLSs" means the multiple listing services named in Moehrl.

9.      "MLS PIN" means the multiple listing service at issue in United States District Court for the District of Massachusetts Case No. I :20-cv-12244-PBS, which is currently pending.

10.     "Opt-Outs" means members of the Settlement Class who have timely exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

11.     "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such

individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates, and assignees.

12.     "Released Claims" means any and all manner of claims, regardless of the cause of action, arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, rebated, or paid to brokerages in connection with the sale of any residential home.

13.     "Released Parties" for purposes of this Appendix D means Stipulating MLS and its past and present, direct and indirect, subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns.  However, "Released Parties" shall not include any Person who is excluded from being a released party under Paragraphs 18(g) or (h) of the Settlement Agreement.

14.     "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

15.     "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

4

16. "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

- Homes listed on Moehrl MLSs: March 6, 2015 to date of Class Notice;

- Homes listed on Burnett MLSs: April 29, 2014 to date of Class Notice;

- Homes listed on MLS PIN: December 17, 2016 to date of Class Notice;

- Homes in Arkansas, Kentucky, and Missouri, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2018 to date of Class Notice;

- Homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2017 to date of Class Notice;

- For all other homes: October 31, 2019 to date of Class Notice.

For avoidance of doubt, Plaintiffs and National Association of REALTORS® intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release.

17. "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

18. "Settling Parties" means Plaintiffs and Stipulating MLS.

**B.      Operation of the Settlement**

19. Stipulating MLS represents that neither it nor its past or present, direct or indirect parents (including holding companies), subsidiaries, affiliates, associates (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, successors, franchisors, or franchisees is a defendant in the Actions, as that term is defined in the Settlement Agreement. This representation is a material component of Appendix D and Stipulating MLS's

5

inclusion as a Released Party.

20.     Settling Parties agree that, as a condition precedent for this Appendix D to become effective, Stipulating MLS must deliver to the below email address within 60 days of the filing of the first motion for preliminary approval of the Settlement Agreement each of the following: (i) an executed version of this Appendix D; and (ii) an indication of whether Stipulating MLS selects either "Option 1" or "Option 2" as defined in this Appendix D:

(1) realtorsoptin@jndla.com, (2) realtorsoptin@cohenmilstein.com, and

(3) nargovernance@nar.realtor

21.     As a condition for being a Released Party, Stipulating MLS agrees to be bound by this Appendix D, including the practice changes and cooperation terms reflected in Paragraphs 35-36 of Appendix D.

22.     **Option 1**: Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). Within 120 days following preliminary approval of the settlement by the Court, Stipulating MLS will deposit into the Escrow Account a dollar amount equal to 100 multiplied by the number of its subscribers in calendar year 2023.  The "2023 Subscribers" reflected in the T360 Real Estate Almanac (2023) shall serve as an irrebuttable presumption of that Stipulating MLS's number of subscribers in calendar year 2023.

23.     **Option 2**: Alternatively, to the extent Stipulating MLS has a good faith belief that it lacks the ability to pay the amount required under Option 1, Stipulating MLS agrees to participate in a non-binding mediation with Co-Lead Counsel to occur within 110 days following preliminary approval of the Settlement by the Court.  That mediation will occur before Greg Lindstrom, of Phillips ADR Enterprises, P.C. or another mediator jointly selected by the parties to Appendix D. The costs of the mediation shall be borne entirely by Stipulating MLS.  Plaintiffs and Stipulating

MLS agree to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation, including the mediation.  If, following the non-binding mediation described herein, Stipulating MLS and Co-Lead Counsel are unable to reach agreement on a settlement within 130 days following preliminary approval of the Settlement Agreement by the Court, Stipulating MLS shall not become a "Released Party" under the Settlement Agreement (including this Appendix D) and any further rights or obligations under the Settlement Agreement (including this Appendix D) of Stipulating MLS, Plaintiffs, Co-Lead Counsel, or the Settlement Class to one another shall terminate.

**C.**     **Stipulation to Class Certification**

24.     The Settling Parties hereby stipulate for purposes of this settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Stipulating MLS.  The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only.  Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

25.     Neither the Settlement, Appendix D, or Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement, Appendix D, or Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by Stipulating MLS that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**D.**     **Approval of this Appendix D and Dismissal of the Actions**

7

26.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement (including Appendix D), including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e)); scheduling a final fairness hearing to obtain final approval of the settlement and the final dismissal with prejudice of the Actions as to Stipulating MLS; and Stipulating MLS cooperation by providing information reflecting its ability to pay limitations.

27.     Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the settlement reflected in Appendix D (the "Motion"). The Motion may be separate from and be filed at a different time than the preliminary approval motion provided in connection with the other class relief afforded in the Settlement Agreement by the National Association of REALTORS®. The Motion shall include a proposed form of order preliminarily approving the settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this settlement reflected in Appendix D. Stipulating MLS shall not have any right or opportunity to review the Motion. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the settlement reflected in Appendix D. To the extent the Court finds that the settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify Appendix D directly or with the assistance of an agreed mediator and will endeavor to resolve any issues to the satisfaction of the Court.

28.     Subject to approval by the Court, Plaintiffs will undertake a method of providing notice of this settlement to the Settlement Class and for claim administration that meets the requirements of due process and Federal Rule of Civil Procedure 23 and is substantially similar to the forms of notice already agreed-to and approved by the Court in the previous settlements with Anywhere, RE/MAX, and Keller Williams. Class members who file a claim under the Anywhere, RE/MAX and Keller Williams settlements will be deemed to also make a claim against this

Settlement unless they affirmatively state they are not claiming this Settlement. The Settling Parties agree to the use of the claims administrator previously selected to administer the Anywhere, RE/MAX, and Keller Williams settlements and approved by the Court. The timing of any request to disseminate notice to the Settlement Class will be at the discretion of Co-Lead Counsel and may occur separately from and at a different time than the class notice provided in connection with the class relief afforded in the Settlement Agreement by the National Association of REALTORS®.

29. Within ten (10) calendar days after the filing with the Court of this Appendix D and the accompanying motion papers seeking its preliminary approval, the claims administrator shall at Stipulating MLS's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

30. If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to Stipulating MLS:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) enjoining the Stipulating MLS in accordance with the provisions of Paragraph 35 of Appendix D.

(d) directing that, as to Stipulating MLS only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

9

(e) reserving exclusive jurisdiction over the Settlement and this Appendix D, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the Court; and

(f) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to Stipulating MLS.

31.     This Appendix D will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

**E.     <u>Releases, Discharge, and Covenant Not to Sue</u>**

32.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes.  In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims.  For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

33.     The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts.  The

11

Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Settlement Agreement.

34.     The Releasing Parties intend by this Appendix D to settle with and release only the Released Parties, and the Settling Parties do not intend this Appendix D, or any part hereof, or any other aspect of the proposed settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

**F.     <u>Practice Changes</u>**

35.     Stipulating MLS agrees that, as soon as practicable, and in no event later than 150 days after the filing of the first motion for preliminary approval of the Settlement Agreement, each Stipulating MLS will implement the following practice changes:

   i.      eliminate any requirement by the MLS that listing brokers or sellers must make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), and eliminate any requirement that such offers, if made, must be blanket, unconditional, or unilateral;

   ii.     prohibit the MLS Participants, subscribers, other real estate brokers, other real estate agents, and sellers from (a) making offers of compensation on the multiple listing service to cooperating brokers or other buyer representatives (either directly or through buyers); or (b) disclosing on the multiple listing service listing broker compensation or total

brokerage compensation (i.e., the combined compensation to both listing brokers and cooperating brokers);

iii.      eliminate all broker compensation fields on the MLS, and prohibit the sharing of offers of compensation to buyer brokers or other buyer representatives via any other fields on the MLS;

iv.      eliminate and prohibit any requirements conditioning multiple listing service participation or membership in an MLS on offering or accepting compensation to buyer brokers or other buyer representatives;

v.      agree not to create, facilitate, or support any non-MLS mechanism (including by providing listing information to an internet aggregators' website for such purpose) for listing brokers or sellers to make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), however, this provision is not violated by (a) an MLS providing data or data feeds to a REALTOR®, MLS Participant, or third party unless the MLS knows those data or data feeds are being used directly or indirectly to establish or maintain a platform for offers of compensation from multiple brokers (i.e., the MLS cannot intentionally circumvent this requirement); or (b) a REALTOR® or MLS Participant displaying both (1) data or data feeds from an MLS and (2) offers of compensation to buyer brokers or other buyer representatives but only on listings from their own brokerage;

vi.      unless inconsistent with state or federal law or regulation before or during the operation of this Paragraph 35(vi) of Appendix D, require that all MLS Participants working with a buyer enter into a written agreement before the buyer tours any home with the following:

a.      to the extent that such a Participant will receive compensation from any source, the agreement must specify and conspicuously disclose the amount or rate

of compensation it will receive or how this amount will be determined;

        b.     the amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer"); and

        c.     such a Participant may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer;

    vii.     prohibit Participants, subscribers, and other real estate brokers and agents accessing the multiple listing service from representing to a client or customer that their brokerage services are free or available at no cost to their clients, unless they will receive no financial compensation from any source for those services;

    viii.     require MLS Participants acting for sellers to conspicuously disclose to sellers and obtain seller approval for any payment or offer of payment that the listing broker or seller will make to another broker, agent, or other representative (e.g., a real estate attorney) acting for buyers; and such disclosure must be in writing, provided in advance of any payment or agreement to pay to another broker acting for buyers, and specify the amount or rate of any such payment;

    ix.     require MLS Participants to disclose to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government-specified form, (ii) in their agreement with buyers if it is not a government-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government-specified forms.  In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government form, then MLS participants must include a disclosure with conspicuous

language expressly stating that broker commissions are not set by law and are fully negotiable;

     x.      to the extent that the multiple listing services publishes form listing agreements, buyer representation agreements, or pre-closing disclosure documents for use by REALTORS®, participants, and/or subscribers, ensure that those forms include language disclosing to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable;

     xi.      require that MLS participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the broker assisting the buyer;

     xii.      rescind or modify any existing rules that are inconsistent with the practice changes reflected in this Paragraph 35 of Appendix D; and

     xiii.      develop educational materials that reflect and are consistent with each provision in these practice changes, and eliminate educational materials, if any, that are contrary to it.

     xiv.      the practice changes in the Paragraph 35 of Appendix D shall not prevent (a) offers of compensation to buyer brokers or other buyer representatives off of the multiple listing service or (b) sellers from offering buyer concessions on an MLS (e.g., for buyer closing costs), so long as such concessions are not limited to or conditioned on the retention of or payment to a cooperating broker, buyer broker, or other buyer representative.

36.     Stipulating MLS agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel.

**G.**     **Cooperation**

37. Stipulating MLS will provide valuable cooperation to Plaintiffs and Settlement Class Member as follows in the Actions, including to the extent that any is consolidated pursuant to In re Real Estate Commission Antitrust Litigation (MDL No. 3100):

    i.    use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

    ii.    use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

    iii.    use reasonable efforts at their expense to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

    iv.    stipulate that Plaintiffs have the consent to obtain from third parties relevant class member and listing data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

    v.    agree that Plaintiffs may use in the remaining Actions any discovery materials provided by it or its officers or employees in Moehrl or Burnett;

    vi.    agree that this Settlement Agreement shall not preclude Plaintiffs from seeking the production of non-privileged documents in its possession, custody, or control;

    vii.    if a Defendant includes a witness on a witness list in the Actions who is then a current officer or employee of the multiple listing service, the multiple listing

service will cooperate in providing access via counsel to that witness prior to trial testimony for up to two (2) hours;

    viii.      withdraw any existing response before the Judicial Panel on Multidistrict Litigation with respect to *In re Real Estate Commission Antitrust Litigation* (MDL No. 3100); and

    ix.      agree not to provide greater assistance in discovery or trial to any defendant or other non-Released Party in the Actions than to the Plaintiffs unless required by subpoena or other compulsory process.

38.    Stipulating MLS's cooperation obligations, as set forth in Paragraph 37 of Appendix D, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

39.    Stipulating MLS's obligation to cooperate will not be affected by the releases set forth in this Settlement Agreement or Appendix D or the final judgment orders with respect to National Association of REALTORS® or Stipulating Party. Unless this Appendix D is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in all of the Actions and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

40.    Stipulating MLS acknowledges that the practice changes and cooperation set forth in this Appendix D are a material component of Appendix D and agrees to use its reasonable best efforts to provide them.

**H.**    <u>**The Settlement Fund**</u>

41.     The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund."  The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund.  In no event will Stipulating MLS's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

42.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement except in this Appendix D.  Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval.  The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court.  The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

43.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund.  Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or class representative incentive awards or such later date as directed by Co-Lead Counsel, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award up to the amount specified in Paragraphs 22 or 23 of Appendix D for such fees, expenses, costs, and class representative service award by wire transfer as directed by Co-

Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

44. The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

45. Stipulating MLS will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Appendix D.

46. There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers. The Settlement will be non-reversionary except as set forth below in Paragraphs 51 of Appendix D. If the Settlement becomes Effective, no proceeds from the Settlement will revert to Stipulating MLS regardless of the claims that are made.

47. No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in this Appendix D.

48. The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. Stipulating MLS will have no participatory or approval rights with respect to the Plan of Allocation. It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement (including Appendix D) and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement. The Settlement Class, Plaintiffs, and Stipulating MLS shall be bound by the terms of the Settlement Agreement (including

19

Appendix D), irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

49.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against Stipulating MLS or the Released Parties.

**I.      Taxes**

50.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund.  All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund.  Stipulating MLS has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to Stipulating MLS.  In the event the Settlement does not become Effective and any funds including interest or other income are returned to Stipulating MLS, Stipulating MLS will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income.  Stipulating MLS makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**J.      Rescission**

51.     If the Court does not certify the Settlement Class as defined in this Appendix D, or if the Court does not approve this Appendix D in all material respects, or if such approval is modified or set aside on appeal, or if the Court does not enter final approval, or if any judgment approving this Appendix D is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Appendix D may be rescinded by Stipulating MLS or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within ten (10) business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of the Appendix D. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement or such final judgment order.  The decision of certain Settlement Class Members to opt out of the Settlement shall not be a basis for Stipulating MLS to rescind or terminate the Appendix D.

52.     If Appendix D is rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to Stipulating MLS.

53.     Stipulating MLS warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Appendix D is executed.  In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of Stipulating MLS to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Stipulating MLS, then, at the election of Co-Lead Counsel, the Settlement Agreement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null

21

and void.

54.     The Settling Parties' rights to terminate this Settlement and withdraw from Appendix D are a material term of this Settlement.

55.     Stipulating MLS reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

**K.     Miscellaneous**

56.     This Appendix D and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party.  Stipulating MLS denies the material allegations of the complaints in the Actions and in the other cases in In re Real Estate Commission Antitrust Litigation (MDL No. 3100).  Neither this Appendix D, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Stipulating MLS, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by Stipulating MLS in any proceeding.

57.     The terms of Appendix D are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of Plaintiffs and Stipulating MLS, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

58.     Any disputes between Stipulating MLS and Co-Lead Counsel concerning this Appendix D shall, if they cannot be resolved, be presented first to an agreed mediator for assistance in mediating a resolution and, if a resolution is not reached, to the Court.

59.     The provisions of this Appendix D shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

60.     Any disputes relating to this Appendix D will be governed by Missouri law without regard to conflicts of law provisions.

61.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and Appendix D.

62.     This Settlement Agreement and Appendix D constitute the entire agreement among Plaintiffs and Stipulating MLS pertaining to the Settlement of any claims or potential claims against Stipulating MLS.  This Appendix D may be modified or amended only by a writing executed by Plaintiffs and Stipulating MLS.

63.     Stipulating MLS acknowledges that it has been and is being fully advised by competent legal counsel of Stipulating MLS's own choice and fully understands the terms and conditions of this Settlement Agreement, including Appendix D, and the meaning and import thereof, and that such Stipulating MLS's execution of this Appendix D is with the advice of such Stipulating MLS's counsel and of such Stipulating MLS's own free will.  Stipulating MLS submits to the exclusive jurisdiction of the Court for the purposes of interpreting and enforcing the terms of Appendix D, including but not limited to, the practice changes contained therein. Stipulating MLS represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement, including Appendix D, and was not fraudulently or otherwise wrongfully induced to enter into this Appendix D.

64.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Appendix D.

Date: _____ day of _____, 2024

_____

On behalf of _____


ON BEHALF OF CO-LEAD COUNSEL


_____
Cohen Milstein Sellers & Toll PLLC