# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT,
HOLLEE ELLIS, FRANCES HARVEY,
and JEREMY KEEL, on behalf of
themselves and all others similarly situated,

                Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF
REALTORS, REALOGY HOLDINGS
CORP., HOMESERVICES OF AMERICA,
INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX LLC, and
KELLER WILLIAMS REALTY, INC.,

                Defendants.

Case No. 19-CV-00332-SRB

## PLAINTIFFS' MOTION AND SUGGESTIONS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENTS WITH ANYWHERE, RE/MAX AND KELLER WILLIAMS

i

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND AND SETTLEMENT TERMS ............................................ 2

        A.      The Litigation. ...................................................................................... 2

        B.      Settlement Negotiations and Mediations. ............................................. 3

        C.      Summary of the Settlement Agreements. .............................................. 4

                1.      Settlement Classes. .................................................................... 4

                2.      Settlement Amounts. .................................................................. 5

                3.      Practice Changes. ....................................................................... 5

                4.      Release of Claims. ...................................................................... 6

III.    NOTICE WAS EFFECTIVELY DISSEMINATED TO THE SETTLEMENT
        CLASSES ........................................................................................................... 7

IV.     THE CLASS'S REACTION TO THE SETTLEMENT HAS BEEN
        OVERWHELMINGLY POSITIVE .................................................................. 8

V.      LEGAL STANDARDS AND SETTLEMENT APPROVAL ........................... 9

        A.      The Merits of the Plaintiffs' Cases, Weighed Against the Terms of the
                Settlement. ........................................................................................... 10

        B.      The Settling Defendants' Financial Condition. ................................... 12

        C.      The Complexity and Expense of Further Litigation. ........................... 13

        D.      The Amount of Opposition to the Settlements. ................................... 14

        E.      The Settlements Also Satisfy the Rule 23(e) Factors. ........................ 15

VI.     THE COURT SHOULD CONSIDER AND OVERRULE EACH OBJECTION .......... 17

        A.      Overview and Legal Standard. ............................................................ 18

        B.      The Court Should Overrule the Pro Se Objections. ............................ 20

        C.      Upset Realtors Statements. ................................................................. 24

        D.      The Court Should Overrule the Pulte Objection (Doc. 1445). ............ 25

                1.      An Allocation Plan Is Not Required at this Juncture. ............... 25

                2.      The Claims Administrator Offers a Bulk Submission Process—as Pulte
                        Seeks—But Pulte Never Bothered to Ask About It. ................ 31

                3.      The Notice Plan Easily Satisfies Due Process and Rule 23. .... 32

E.      The Court Should Overrule Objections Submitted by Attorneys Who Filed
        Competing Cases. ................................................................................................. 35

        1.      The Court should overrule the South Carolina objection (Doc. 1441). .. 36

                a. The Alford Declaration should be disregarded. .................................. 38

                b. Each specific South Carolina objection fails. ..................................... 43
                        i.      Broad settlement classes creating global peace are encouraged.
                                43
                        ii.     The rules and conspiracy at issue are nationwide in scope. .. 46
                        iii.    Cooperation is unnecessary for a fair settlement but this
                        cooperation assists all class members. ........................................ 48
                        iv.     The Settlement amounts are fair and adequate and were
                        reached over many years of arm's length negotiations. .............. 48
                        v.      Releasing corporate affiliated, including franchisees, is
                        common, and does not undermine the Settlements' fairness,
                        reasonableness or adequacy. ....................................................... 51
                        vi.     The injunctive relief duration is fair, reasonable and adequate
                        and in line with other injunctive relief settlements. ................... 53

        2.      The Court Should Overrule the Pennsylvania Objection (Doc. 1448). ... 54

        3.      The Court Should Overrule the *Batton* Objections. ............................... 55

VII.    CLASS CERTIFICATION REMAINS APPROPRIATE ............................................. 62

VIII.   CONCLUSION .......................................................................................................... 63

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. Nestle Purina PetCare Co.*, 2015 WL 10892070 (N.D. Ill. June 23, 2015) ................ 53

*Aguirre v. Genesis Logistics*, 2017 WL 11632912 (C.D. Cal. May 8, 2017) .............................. 23

*Albin v. Resort Sales Missouri, Inc.*, 2021 WL 5107730 (W.D. Mo. May 21, 2021) ........... 44, 56

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................... 62

*Barfield v. Sho-Me Power Elec. Co-op.*, 2013 WL 3872181 (W.D. Mo. July 25, 2013) ............ 35

*Batton v. Nat'l Ass'n of Realtors*, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ..................... 58, 61

*Beck-Ellman v. Kaz USA, Inc.*, 2013 WL 1748729 (S.D. Cal. Jan. 7, 2013) ............................... 34

*Bishop v. DeLaval Inc.*, 2022 WL 18957112 (W.D. Mo. July 20, 2022) .................................... 14

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) .......................................................... 21

*Branson v. Pulaski Bank*, 2015 WL 139759 (W.D. Mo. Jan. 12, 2015) ...................................... 61

*Bruzek v. Husky Energy Inc.*, 2021 WL 9474270 (W.D. Wis. Aug. 6, 2021) ............................. 34

*Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100 ................................................... 15

*Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) ..................................... 21

*Carlson v. C.H. Robinson Worldwide, Inc.*, 2006 WL 2671105 (D. Minn. Sept. 18, 2006) .. 26, 31

*Christine Asia Co. v. Yun Ma*, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ............................. 34

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ................................. 27

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................. 9

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ....................................................... 49

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................... 38

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) .................................... 10, 14, 18, 25

*Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118 (S.D.N.Y. 2001) ........................................ 35

*Dusenbery v. United States*, 534 U.S. 161 (2002) ...................................................... 35

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ........................................................................ 33

*Eubank v. Pella Corp.*, 2019 WL 1227832 (N.D. Ill. Mar. 15, 2019) .......................................... 62

*Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579 (5th Cir. 2007) ................................. 22, 23, 25

*Fla. ex rel. Crist v. HCA, Inc.*, 2002 WL 32116840 (M.D. Fla. Apr. 23, 2002) ......................... 54

*Flaum v. Doctor's Assocs., Inc.*, 2019 WL 2576361 (S.D. Fla. Mar. 11, 2019) ......................... 53

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) ..................................................................... 49

*Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461 (E.D. Pa. 2000) .................................................... 34

*Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35 (W.D.N.Y. 2018) ........................... 49

*Gould v. Alleco, Inc.*, 883 F.2d 281 (4th Cir. 1989) ..................................................................... 21

*Graves v. Cam2 Int'l LLC*, 2020 WL 3968040 (W.D. Mo. July 13, 2020) ................................... 59

*Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628 (11th Cir. 2015) .............................................. 36

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) ..................................... 10, 12, 50

*Gulbankian v. MW Mfrs., Inc.*, 2014 WL 7384075 (D. Mass. Dec. 29, 2014) ............................ 36

*Haggart v. Woodley*, 809 F.3d 1336 (Fed. Cir. 2016) ............................................................ 29, 30

*Hand v. Beach Ent. Kc, LLC*, 2021 WL 199729 (W.D. Mo. Jan. 19, 2021) ................................ 34

*Haworth v. New Prime, Inc.*, 2020 WL 1899276 (W.D. Mo. Apr. 16, 2020) .............................. 23

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) .................................................................... 52

*Huyer v. Njema*, 847 F.3d 934 (8th Cir. 2017) ............................................................................. 59

*Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621 (S.D. Iowa 2016) .................................................. 59

*In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145 (2d Cir. 1987) ............. Passim

*In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740 (E.D.N.Y. 1984) ................................ 49

*In re Am. Inv'rs Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, 263 F.R.D. 226 (E.D. Pa. 2009) ............................................................................................................................................ 52

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.* ("*Bair Hugger*, 9 F.4th 768 (8th Cir. 2021) ........................................................................................................... 38, 42

*In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) ......................... 19, 44, 61

*In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167347 (N.D. Ill. Apr. 4, 1996) ........................................................................................................................................ 27

*In re Capital One Consumer Data Sec. Breach Litig.*, 2022 WL 18107626 (E.D. Va. Sept. 13, 2022) ................................................................................................................................ 19, 20

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) ..................................... 11

*In re Chicken Antitrust Litig.*, 560 F. Supp. 957 (N.D. Ga. 1980) ............................................. 28

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, 12-MD-2320, 2015 WL 7282543 (D.N.H. Nov. 16, 2015) ........................................................... 54

*In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669 (D. Minn. 1974) .................................................................................................................................. 13, 31

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ................................ 61

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993) ...................... 12, 49

*In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10 (D.D.C. 2019) ..............Passim

*In re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910 (S.D.N.Y. 1991) .............................. 27

*In re Envision Healthcare Corp. Sec. Litig.*, 2023 WL 8110157 (M.D. Tenn. Nov. 20, 2023) ... 30

*In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128 (8th Cir. 1984) ........................................ 13

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800 (8th Cir. 2004) ............... 43, 55, 60

*In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248 (11th Cir. 2009) .................................... 27

*In re HIV Antitrust Litig.*, 2023 WL 7397567 (N.D. Cal. Nov. 8, 2023) ..................................... 57

*In re HP Inkjet Printer Litig.*, 2011 WL 13156938 (N.D. Cal. Mar. 29, 2011) .......................... 54

*In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166 ..................................................... 44

*In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186 (S.D.N.Y. 2005) ................................ 44, 30

*In re Int'l House of Pancakes Franchise Litig.*, 78 F.R.D. 379 (W.D. Mo. 1978) ...................... 27

*In re Johns-Manville Corp.*, 340 B.R. 49 (S.D.N.Y. 2006) ........................................................ 26

*In re LinkedIn User Priv. Litig.,* 309 F.R.D. 573 (N.D. Cal. 2015) .............................................. 14

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011)............. 44

*In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ........ 11

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ....................... 13

*In re Mass. Diet Drug Litig.*, 338 F. Supp. 2d 198 (D. Mass. 2004) ........................................... 35

*In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57 (S.D.N.Y. 1993) .............................. 31

*In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654 (E.D. Va. 2001) ................................ 44

*In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ................... 27, 29

*In re Packaged Ice Antitrust Litig.*, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011) ..................... 29

*In re Phila. Stock Exch., Inc.*, 945 A.2d 1123 (Del. 2008) .................................................... 26, 29

*In re Pinterest Derivative Litig.*, 2022 WL 2079712 (N.D. Cal. June 9, 2022) ........................... 32

*In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985 (N.D. Ohio 2016) ..................... 11

*In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) .......... 26

*In re Pork Antitrust Litig.*, 2022 WL 4238416 (D. Minn. Sept. 14, 2022) .................................. 11

*In re Potash Antitrust Litig.*, 161 F.R.D. 411 (D. Minn. 1995) .................................................... 23

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998)36, 43

*In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450 (D.N.J. 1997)
.................................................................................................................................................. 52

*In re Refco, Inc. Sec. Litigation*, 2010 WL 11586941 (S.D.N.Y. May 11, 2010) ........................ 30

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) .................................................... 63

*In re Sony SXRD Rear Projection T.V. Class Action Litig.*, 2008 WL 1956267 (S.D.N.Y. May 1, 2008) .................................................................................................................................. 12, 50

*In re Tex. Prison Litig.*, 191 F.R.D. 164 (W.D. Mo. 1999) .................................................... 14, 24

Case 4:19-cv-00332-SRB   Document 1469   Filed 05/02/24   Page 7 of 75

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270 (N.D. Cal. Aug. 24, 2011).... 43

*In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554 (9th Cir. 2017) ................................................................................................................. 57

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013) ............................................................................................................. 9, 59

*In re VMS Ltd. P'ship Securities Litig.*, 1995 WL 678493 (N.D. Ill. Nov. 8, 1995) ................... 56

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 1988 WL 158947 (W.D. Wash. July 28, 1988) ............................................................................................................ 26, 28

*In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995 (8th Cir. 2019) ........................... 43

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) ..................................................................................................... 14, 18, 19

*Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477 (8th Cir. 1979) ......................................................... 22

*Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996) ............................................. 21

*Karg v. TransAmerica Corp.*, 2019 WL 3938471 (N.D. Iowa Aug. 20, 2019) ........................... 59

*Keil v. Lopez*, 862 F.3d 685 (8th Cir. 2017) ....................................................................... Passim

*Khoday v. Symantec Corp.*, 2016 WL 1637039 (D. Minn. Apr. 5, 2016) ................................... 34

*Larson v. Sprint Nextel Corp.*, 2009 WL 1228443 (D.N.J. Apr. 30, 2009) ........................... 27, 30

*Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301 (N.D. Ill. 2022) .............................. 58, 61

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ............................................... 19

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No.*, 921 F.2d 1371 (8th Cir. 1990) ... 9

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................................... 22

*Maine State Ret. System v. Countrywide Fin. Corp.*, 2013 WL 6577020 (C.D. Cal. Dec. 5, 2013) ...................................................................................................................... 52

*Marshall v. Nat'l Football League*, 787 F.3d 502 (8th Cir. 2015) ....................................... Passim

*Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) ........................................................... 61

*McCabe v. Six Continents Hotels, Inc.*, 2015 WL 3990915 (N.D. Cal. June 30, 2015) .............. 53

*McMorrow v. Mondelez Int'l, Inc.*, 2022 WL 1056098 (S.D. Cal. Apr. 8, 2022) ....................... 62

*Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650 (S.D.N.Y. 2015) ........................... 12, 21, 50

*Montgomery v. Beneficial Consumer Disc. Co.*, 2005 WL 497776 (E.D. Pa. Mar. 2, 2005) ....... 35

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ................................. 33

*Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999) ...................................................... 61, 62

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ....................................Passim

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ................................................. 33

*Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198 (W.D. Mo. 2017) ........................... 33, 34

*Pro. Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640 (8th Cir. 2012) 10, 22, 49

*Reid v. I.C. Sys. Inc.*, 2018 WL 11352039 (D. Ariz. July 27, 2018) ........................... 34

*Retta v. Millennium Prods., Inc.*, 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) ....................... 52

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18 (7th Cir. 1976) .................. 56

*Rikos v. Proctor & Gamble Co.*, 2018 WL 2009681 (S.D. Ohio Apr. 30, 2018) ........................ 62

*Robertson v. Nat'l Basketball Ass'n*, 622 F.2d 34 (2d Cir. 1980) ................................. 56

*Sanderson v. Unilever Supply Chain, Inc.*, 2011 WL 5822413 (W.D. Mo. Nov. 16, 2011) ......... 9

*Shay v. Apple Inc.*, 2024 WL 1184693 (S.D. Cal. Mar. 19, 2024) ................................. 52

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) ........................................................... 35

*Spann v. J.C. Penney Corp.*, 314 F.R.D. 312 (C.D. Cal. 2016) ....................................... 43

*Strathclyde Pension Fund v. Bank OZK*, 2022 WL 2307136 (E.D. Ark. June 27, 2022) ........... 27

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011) ................................................. 44

*Swetz v. GSK Consumer Health, Inc.*, 2021 WL 5449932 (S.D.N.Y. Nov. 22, 2021) ................ 34

*Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848 (S.D. Iowa 2020) ......................... 15

ix

*Taft v. Ackermans*, 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ............................................. 30, 31

*TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982)................................. 56

*Thompson v. Edward D. Jones & Co.*, 992 F.2d 187 (8th Cir. 1993)........................................ 59

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988) ............................................................. 10, 14

*Vogt v. State Farm Life Ins. Co.*, 2021 WL 247958 (W.D. Mo. Jan. 25, 2021) .................... 21, 22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) .......................... 44, 45, 53

*In re Wireless*, 396 F.3d 922, 932 (8th Cir. 2005). ...................................................................... 10

*Zepeda v. PayPal, Inc.*, No. 10-, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) ........................ 54

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................................... 7, 33

Fed. R. Civ. P. 23(e)(1)(B) ........................................................................................................ 9

Fed. R. Civ. P. 23(e)(2)........................................................................................................... 15

Fed. R. Civ. P. 23(e)(5)(A) ..................................................................................................... 23

Fed. R. Civ. P. 23(a) ........................................................................................................... 57, 62

Fed. R. Civ. P. 23(e) .............................................................................................. 9, 10, 19, 21

Federal Rule of Evidence 702 ................................................................................................. 38

Fed. R. Civ. P. 23 ............................................................................................................ 18, 34, 35

Fed. R. Civ. P. 23(b)(3).......................................................................................................... 62

Fed. R. Civ. P. 23(f) ............................................................................................................... 13

**Regulations**

17 C.F.R. § 210.4-01............................................................................................................... 40

**Other Authorities**

2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update)..................................... 27, 28

4 Newberg and Rubenstein on Class Actions § 13:35 (5th ed. 2012) ........................................... 18

4 Newberg on Class Actions § 11:55 (4th ed. 2002) ................................................................. 22

4 Newberg on Class Actions § 11.41 ......................................................................................... 9

7B Wright & Miller, Federal Practice & Procedure § 1798.1 (3d ed. 2005).............................. 46

*Manual for Complex Litigation, Fourth* § 21.312 (2005)............................................................ 27

## I. INTRODUCTION

The Court granted Plaintiffs' Motions for Preliminary Approval of the Anywhere, RE/MAX, and Keller Williams Settlements and directed that notice be disseminated to the Class. Docs. 1321, 1372. In its Preliminary Approval Orders, the Court found, among other things, that the Settlements negotiated by the Parties are fair, reasonable, and adequate, and that the Class Representatives and Class Counsel have adequately represented the Class. *Id.* at 2. Accordingly, the Court held that it would likely approve the Settlements, provisionally certified the proposed Settlement Classes under Rule 23(b)(3), and directed the Parties to issue notice to putative class members. *Id.*

Pursuant to the Court's direction, the Claims Administrator appointed by the Court implemented a robust notice program and the Settlements have been extremely well-received by the class. As of May 2, 2024, 194,733 individuals made a claim, with many more claims likely to be submitted before the May 9, 2025 claims deadline. And the $208.5 million fund created under these three Settlements is only the beginning. Class Counsel have since obtained additional Settlements, bringing the current total pending settlement amount to over $900 million, with more anticipated. Importantly, these Settlements also include practice change relief, that, when coupled with the practice change relief in the Settlement with NAR, will promote price competition and facilitate meaningful negotiation for consumers.

In addition, a remarkably low number of objections for a class of this size have been filed with the Court. The few objections that have been filed quibble with aspects of the Settlements, but they fail to identify any reason why the Settlements are not fair, reasonable, and adequate. Several of the "objections" are from individuals who are not even class members. Others are based on personal opinions that the industry should not change despite a jury concluding that its practices

1

are anticompetitive. And two others were submitted by law firms, apparently working in coordination with one another, that sat by for years while Class Counsel litigated these cases and obtained a favorable jury verdict—and only then filed complaints based on Class Counsel's work. None of these objections provide a legitimate basis for rejecting the Settlements.

In support of this Motion, Plaintiffs submit the declarations of Class Counsel, Eric Dirks (Ex. 1), Karl Barth (Ex. 2) (forensic accountant) and Jennifer Keough (Settlement Administrator) (Ex. 3).

## II.  BACKGROUND AND SETTLEMENT TERMS

Below is a summary of the case background, procedural posture, and settlement terms, which were previously discussed at length in Plaintiffs' Motion for Preliminary Approval (Docs. 1192, 1371), Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. 1400), and Plaintiffs' Motion for Preliminary Approval of the NAR Settlement (Doc. 1458).

### A.  The Litigation.

The *Moehrl* class action was filed in the Northern District of Illinois on March 6, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on one of 20 Covered Multiple Listing Services ("MLSs") spanning 19 states. Moehrl Doc. 1. The *Burnett* action was filed in this Court on April 29, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on one of four Subject MLSs in Missouri. Burnett Doc. 1.

The parties in both actions subsequently completed over four years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests for production, followed by the production of well over 5 million pages of documents from the parties and dozens of non-parties across both actions. Plaintiffs briefed numerous

2

discovery motions and disputed items in order to obtain evidence supporting their claims. The parties conducted around 100 depositions in the *Moehrl* action and over 80 depositions in the *Burnett* action. *Moehrl* Plaintiffs engaged six experts and *Burnett* Plaintiffs engaged five experts supporting their claims and rebutting opinions from the nine experts retained by Defendants in each case. Those experts submitted 24 expert reports in *Moehrl* and 19 expert reports in *Burnett,* and most experts were deposed at least once and several multiple times. Dirks Decl. ¶¶ 11-15.

On April 22, 2022, this Court granted *Burnett* Plaintiffs' motion for class certification. Burnett Doc. 741. On March 29, 2023, Judge Wood granted the plaintiffs' motion for class certification in the *Moehrl* action. Moehrl Doc. 403. The *Burnett* Plaintiffs subsequently successfully tried their case to a jury, obtaining a verdict against Settling Defendant Keller Williams, among others. Dirks Decl. ¶ 15. In addition, there were two appeals to the Eighth Circuit on the issue of arbitration, a denied petition for certiorari, and two Rule 23(f) petitions that were denied by the Seventh and Eighth Circuits. *Id*. at 14.

### B. Settlement Negotiations and Mediations.

In reaching the Settlements with Anywhere, RE/MAX and Keller Williams, the parties conducted extensive and hard-fought settlement negotiations, including through mediation, over a period of several years. *See* Dirks Decl. ¶ 17. The Settling Parties reached the Settlement Agreements after considering the risks and costs of litigation. Plaintiffs and Class Counsel believe the claims asserted have merit and that the evidence developed supports the claims. Plaintiffs and counsel, however, also recognize the risks and delay of further proceedings in a complex case like this, and believe that the Settlements confer substantial benefits upon the Settlement Class Members. Dirks Decl. ¶ 18. Moreover, Plaintiffs conducted a thorough financial analysis of the ability-to-pay limitations of Anywhere, RE/MAX and Keller Williams, and whether they could withstand a greater monetary judgment, which directly affected the monetary amounts that were

feasible to recover from the Settling Defendants through settlement or otherwise. Barth Decl. ¶ 5, 11. For example, Keller Williams did not have sufficient cash on hand to fund even the first settlement payment required by the settlement agreement and had to obtain financing to make that payment. Barth Decl. at ¶ 23. Indeed, Keller Williams retained bankruptcy counsel given the specter of bankruptcy. Barth Decl. at ¶ 22. If any of the Settling Defendants had declared bankruptcy, Settlement Class Members would have risked obtaining no recovery. And because Defendants could not pay even the full *Burnett* verdict, let alone additional verdicts and judgments, the only viable path to a resolution of any kind was a nationwide Settlement. Dirks Decl. ¶ 22.

     **C.    Summary of the Settlement Agreements.**

        **1.    Settlement Classes.**

The proposed Settlement Class in the Settlement Agreements with Anywhere and RE/MAX is: All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

    a.    Moehrl MLSs: March 6, 2015 to Feb 1, 2024;

    b.    Burnett MLSs: April 29, 2014 to Feb 1, 2024;

    c.    MLS PIN: December 17, 2016 to Feb 1, 2024;

    d.    All other MLSs: February 1, 2020 to Feb 1, 2024;

Anywhere Agreement ¶ 18; RE/MAX Agreement ¶ 18. The Settlement Class for the Keller Williams Settlement is similar but uses an October 31, 2019 through Feb 1, 2024 class period for MLSs that were not included in the *Moehrl*, *Burnett* or *Nosalek* cases. Keller Williams Agreement at ¶ 19.

## 2.     Settlement Amounts.

The Settlements provide for a total monetary recovery of **$208.5 million**—including $83,500,000 from Anywhere (Anywhere Agreement ¶ 21); $55,000,000 from RE/MAX (RE/MAX Agreement ¶ 21); and $70,000,000 from Keller Williams (Keller Williams Agreement ¶ 22). The Settlement amounts are non-reversionary; once the Settlements are finally approved by the Court and after administrative costs, litigation expenses, and attorneys' fees are deducted, the net funds will be distributed to Settlement Class Members with no amount reverting back to any Defendant, regardless of the number of Opt-Outs or claims made. Anywhere Agreement ¶ 40; RE/MAX Agreement ¶ 40; Keller Williams Agreement ¶ 42.

## 3.     Practice Changes.

Each of the three Settlements requires the Settling Defendants to make practice changes which, among other things, require Settling Defendants to:

- advise and periodically remind the company owned brokerages, franchisees, and their agents that there is no requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

- require that any company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then the Settling Defendants will require that any company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

- prohibit the company owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer

representatives refrain) from advertising or otherwise representing that their services are free;

- prohibit the company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

- advise and periodically remind the company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities;

- for company owned brokerages eliminate any minimum client commission requirements;

- for franchisees, not express or imply a minimum commission requirement in franchise agreements, training materials or other policies;

- develop educational materials that reflect and are consistent with each provision above, and eliminate educational materials, if any, that are contrary to it.

Anywhere Agreement ¶ 51; RE/MAX Agreement ¶ 51; Keller Williams Agreement ¶ 53.

### 4. Release of Claims.

As consideration for the Settlement Amounts, Practice Changes, and Cooperation commitments from Anywhere, RE/MAX and Keller Williams, upon entry of a final judgment approving the Settlement Agreements, Plaintiffs and the Settlement Classes will release and discharge Anywhere, RE/MAX and Keller Williams, and all of their respective subsidiaries, related entities, affiliated franchisees, and independent contractors, from any and all claims arising from or relating to "conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." Anywhere Agreement ¶¶ 14-15, 30–32; RE/MAX Agreement ¶¶ 14-15, 30–32; Keller Williams Agreement ¶¶ 16-17, 32-34.

6

The Settlement Agreements, however, preserve the rights of any member of the Settlement Classes to recover from any other defendant. Anywhere Agreement ¶ 62; RE/MAX Agreement ¶ 62; Keller Williams Agreement ¶ 64. The Settlement Agreements also expressly exclude from the Release individual claims that Class Members may have concerning product liability, breach of warranty, breach of contract, or torts of any kind (other than a breach of contract or tort based on any factual predicate in this Action). Also exempted are "individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue in these Actions." Anywhere Agreement ¶ 32; RE/MAX Agreement ¶ 32; Keller Williams Agreement.

## III. NOTICE WAS EFFECTIVELY DISSEMINATED TO THE SETTLEMENT CLASSES

The Settlement Notice Plan was robust and implemented in accordance with the requirements of the Court's Preliminary Approval Order, and it satisfied due process. *See* Doc. 1321 at ¶ 9. In consultation and collaboration with the parties, the Settlement Administrator, JND Legal Administration ("JND"), provided Notice to Settlement Class Members in the manner approved by the Court through first-class U.S. mail, electronic mail, and digital and print publication. Keough Decl. at ¶ 3. The Notice Plan "met, and exceeded, the standards for providing the best practicable notice in class action settlements." Keough Decl. at ¶ 4. The notices complied with Rule 23(c)(2)(B), in that they "clearly and concisely state in plain, easily understood language" a description of the Settlement Class, a description of the claims, the names of Class Counsel, a description of Settlement Class Members' opportunity to appear at the Fairness Hearing, opt-out and objection requirements, and the manner in which to obtain further information. *See* Fed. R. Civ. P. 23(c)(2)(B).

7

The Notice Program consisted in part of direct notices, in the form of postcard and email notice to all potential Settlement Class Members that JND was able to locate through third-party data. Postcard notice was sent to over 10 million individuals, and email notice was sent to over 27 million individuals. Keough Decl. at ¶¶ 16, 19. The direct notice program "was extremely successful and reached more than 85% of the potential Settlement Class Members." Keough Decl. at ¶ 21.

In addition to the extensive direct notice program, JND also implemented a comprehensive media notice program which reached over 71% of the Settlement Class Members. Keough Decl. at ¶ 21. The digital portion of the media effort alone delivered more that 300 million impressions. *Id*. at ¶ 22. The media notice program also included a press release and press coverage that resulted in 415 news stories with an additional 133 million potential viewers. *Id*. at ¶ 33. Combined, the direct notice and publication notice programs reached at least **95%** of the class. *Id*. at ¶ 38.

JND also created and maintained a Settlement Website that had 934,707 unique visitors and nearly 5 million page views. *Id*. at ¶ 40.

## IV. THE CLASS'S REACTION TO THE SETTLEMENT HAS BEEN OVERWHELMINGLY POSITIVE

The Class's reaction to the Settlements has been positive and strongly supports final approval. As of May 2, 2024, JND has received almost 200,000 claims. Because the funds are non-reversionary, all of the money from the net fund will be distributed to Claimants. Plaintiffs expect that the claims rate will rise because Class Members are eligible to submit claims through May 9, 2025.

In contrast, only 61 Class Members requested exclusion from the Settlements and there were only 12 total objectors. These objections are discussed in Part VI, below.

8

## V. LEGAL STANDARDS AND SETTLEMENT APPROVAL

Federal Rule of Civil Procedure 23(e) sets out a two-part process for approving class settlements. The Court already completed the first stage of the approval process, often called "preliminary approval," when it determined that "the Court will likely be able to approve the Settlements," and ordered that notice be directed to the class. Docs. 1321, 1372; Fed. R. Civ. P. 23(e)(1)(B). Now that notice has been disseminated and reaction of the Class Members has been received, the Court can make its final decision to approve the Settlements.

As a general matter, "the law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"). Courts adhere to "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval." 4 Newberg on Class Actions § 11.41; *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'") (quoting *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate). The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005).

The standard for reviewing a proposed settlement of a class action is set by Rule 23(e). The ultimate question is whether the settlement is "fair, reasonable, and adequate." *In re Wireless*, 396 F.3d 922, 932 (8th Cir. 2005). The Eighth Circuit has set forth four factors that a court should review in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *Id.* (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975); *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). The first factor is "[t]he most important consideration" in the fairness analysis. *Pro. Firefighters Ass'n of Omaha*, *Local 385 v. Zalewski*, 678 F.3d 640, 648 (8th Cir. 2012) (citation omitted). "The views of the parties to the settlement must also be considered." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

The determination whether a class action settlement is "fair, reasonable, and adequate" is "committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Van Horn*, 840 F.2d at 606–07.

### A. The Merits of the Plaintiffs' Cases, Weighed Against the Terms of the Settlement.

The parties naturally dispute the strength of their claims and defenses. The Settlement reflects a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes. Plaintiffs' best-case scenario is prevailing and recovering on the merits at trial in *Moehrl*, *Gibson*, and *Umpa*, and upholding their award on appeal in those cases as well as *Burnett*. But "experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict,

particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020) ("Antitrust cases are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute."). And under the circumstances of this case, it would make no sense to try additional cases when enforcement of the *Burnett* judgment alone would bankrupt each of the Settling Defendants. Barth Decl. at ¶ 5. The only way that any Settlement was possible was if it provided for a nationwide recovery and release. Dirks Decl. at ¶22.

Against this risk, the Settlements provide for a $208.5 million recovery from Anywhere, RE/MAX and Keller Williams and substantial practice changes. *See In re Pork Antitrust Litig.*, No. 18-1776, 2022 WL 4238416, at *2 (D. Minn. Sept. 14, 2022) (granting final approval of antitrust settlement that provided "substantial relief against the backdrop of a great deal of uncertainty where the merits are highly contested" in case involving alleged price-fixing conspiracy among pork processing companies); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 995-96 (N.D. Ohio 2016) (granting final approval of settlement in light of "real possibility that [plaintiffs] could have received much less—even zero—from a jury at trial or following an appeal"). The Settlement is supported by the fact that the Settling Defendants could not satisfy the *Burnett* judgment, let alone potential judgments in numerous other cases, including *Moehrl*. It is also supported by the fact that this is a partial settlement of the claims arising from the alleged conspiracy, and Class Counsel have continued to work to achieve additional recoveries on behalf of the Class, including $418 million from NAR and elimination of the Mandatory Offer of Compensation Rule.

Finally, the Settlements' terms were reached following arm's length negotiations over several years that were assisted by multiple well-respected mediators. Dirks Decl. ¶ 17. There has been no suggestion by anyone that the Settlements were the product of collusion. Nor, given the history of this case and the interests of all involved, would any such suggestion be credible. As a result, the Court is entitled to rely on the judgment and experience of Class Counsel. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312–13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. The trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel") (cleaned up).

### B. The Settling Defendants' Financial Condition.

The fairness, adequacy, and reasonableness of the Settlements are supported by the Settling Defendants' financial condition and their inability to satisfy even the *Burnett* judgment. Dirks Decl. ¶¶ 20-23. In order to evaluate the Settling Defendants' financial condition, Plaintiffs reviewed financial documents of each of the Settling Defendants. Barth Decl. at ¶¶ 13, 16, 20. Plaintiffs further utilized on a forensic accountant to evaluate the Settling Defendants' ability to pay. Barth Decl. at ¶ 2. Importantly, Plaintiffs walked away from the bargaining table against each of these Settling Defendants on multiple occasions before reaching these Settlements, and Class Counsel firmly believe these amounts were reasonable in light of limitations on the Settling Defendants' ability to pay. Dirks Dec. at ¶¶ 7, 17-18. "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 125 (8th Cir. 1975) (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the

defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

### C. The Complexity and Expense of Further Litigation.

Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the parties' voluminous briefing to date, which includes extensive class certification and summary judgment briefing in both *Moehrl* and *Burnett*, as well as post-trial briefing in *Burnett*. In addition, the parties have engaged in extensive appellate briefing, including (rejected) Rule 23(f) petitions in both *Moehrl* and *Burnett* as well as two separate appeals in the *Burnett* litigation concerning arbitration issues, and a denial of certiorari by the United States Supreme Court. Furthermore, even after the *Burnett* trial, litigating Defendants, including Keller Williams, were poised to mount a strenuous appeal. In *Moehrl*, trial was imminent. By contrast, the Settlements ensure recovery to the Class that will be allocated and distributed in an equitable manner. In light of the many uncertainties still pending in the litigation, an equitable and certain recovery is highly favorable, and weighs in favor of approving the proposed Settlements. Dirks Decl. ¶¶ 15-18; *In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669, 678 (D. Minn. 1974) (approving settlement where price-fixing claims faced "substantial roadblocks" on top of the "difficulties inherent" in prevailing on such claims); *see also In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1137 (8th Cir. 1984) (affirming final approval of settlement where "no reported opinion addresses the precise [merits] question presented here," which created "a substantial question whether [plaintiff] would prevail") *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) ("[A]ny verdict would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement.") (internal quotation omitted).

**D.  The Amount of Opposition to the Settlements.**

The Settlement Class Representatives in both *Moehrl* and *Burnett* have approved the terms of the Settlements. More than 194,000 Class Members have submitted claims, while only a small handful have objected and 61 opted out of the Settlements. Keough Decl. at ¶¶ 49, 52-53. This weighs heavily in favor of granting final approval. *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) (with a settlement class of approximately 3.5 million households, and "only fourteen class members submitted timely objections," the "amount of opposition is minuscule when compared with other settlements that we have approved"); *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129-SRB, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval") (quoting *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015)); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) (of the 4,838,789 settlement class members who were sent notice, only 620 (0.012%) opted out of the settlement and only 33 (0.00068%) objected to the settlement, which "are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement"); *In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) ("The objectors represent only about 8 per cent of the class, and this relatively low level of opposition to the settlement also indicates its fairness. The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement.") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)); *see also, e.g.*, *Van Horn*, 840 F.2d at 607 ("the amount of opposition to the settlement" is a key factor to be considered in the settlement approval process); *Marshall v. Nat'l Football League*, 787 F.3d 502,

513 (8th Cir. 2015) ("We have previously approved class-action settlements even when almost half the class objected to it.").

### E. The Settlements Also Satisfy the Rule 23(e) Factors.

In addition to the factors set forth by the Eighth Circuit, courts in this district also consider the Rule 23(e)(2) factors, which generally overlap with the *Van Horn* factors:

(A) the Class Representatives and Class Counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the Class is adequate, taking into account:

    (i)      the costs, risks, and delay of trial and appeal;
    (ii)    the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;
    (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and
    (iv)   any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Swinton v. SquareTrade, Inc.,* 454 F. Supp. 3d 848, 861 (S.D. Iowa 2020) (finding analysis of certain Rule 23(e)(2) factors will "necessarily include analysis of [certain] related *Van Horn* factors"). The Settlements satisfy each of these factors.

**First**, Settlement Class Representatives and Class Counsel have adequately represented the Class. Indeed, both this Court and the *Moehrl* Court previously appointed Settlement Class Counsel as class counsel on behalf of the *Burnett* and *Moehrl* classes at the class certification stage. Both courts have also previously appointed the proposed Settlement Class Representatives as representatives on behalf of the respective classes. *Burnett*, 2022 WL 1203100; *Moehrl*, 2023 WL 2683199. These class representatives sat for grueling depositions and several went so far as to testify at the *Burnett* trial.

15

**Second**, as discussed above, the Settlements were negotiated at arm's length over an extended period, with the assistance of professional mediators and, in the case of the Keller Williams Settlement, following a trial verdict.

**Third**, for the reasons stated above, the relief for the Class is fair and adequate. The Settlements provide a significant financial recovery to the Settlement Classes, considering the risks and costs of litigation and the Settling Defendants' financial resources. The Settlements also include meaningful changes to the Settling Defendants' policies. In addition, the Settlements effectively distribute relief to the Class. The Notice had greater than a 95% reach. Indeed, it is difficult to find a person who has not heard about these cases. Finally, the attorneys' fee request is reasonable and in line with Eighth Circuit precedent. The only objection from a class member with standing to object was from Ms. Kinzer and she provides no legal authority or basis for her opinion. It is black letter law that attorneys' fees should be paid from the settlement fund. *See* Plaintiffs' Motion for Fees and Costs. Doc. 1400.

**Fourth**, the Settlements treat Class Members fairly and equitably relative to each other. No class member is treated differently from any other. The practice change relief applies to all Class Members. With respect to the monetary relief, every individual with a transaction that falls within the class definition is eligible to submit a claim. Even so, some class members have complained that they may not recover every dollar they paid to real estate agents. This is true. But any settlement that guaranteed a full recovery to every class member would have bankrupted each Defendant, perhaps resulting in no recovery at all. The Settlements ensure that Class Members who submit valid claims will receive an equitable share of the recovery for their eligible transactions. That is all that is required. *Petrovic*, 200 F.3d at 1152–53 ("We do not agree with the objectors' contention that a mailed notice of settlement must contain a formula

for calculating individual awards. It is well settled that the notice is not required to provide a complete source of information. The weight of authority rejects the proposition that a specific formula must always be included in the notice. In our case the mailed notice provided a reasonable summary of the stakes of the litigation, and class members could easily acquire more detailed information, including data on potential individual awards, through the telephone number that was provided. Due process requires no more.") (cleaned up and citations omitted); *Marshall v. Nat'l Football League*, 787 F.3d 502, 510–12 (8th Cir. 2015) ("We do not believe it fails as a matter of law merely because it does not provide a specific financial payout to each class member"); *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 21–22 (D.D.C. 2019) (agreeing that "it's not an impediment to approval of the settlement that the actual amount to be distributed to class members is not known at this time.").

Finally, some individuals have asked that the class periods be identical across all three Settlements and/or all MLSs. But claims outside of the Class Period set out in the Settlements, by definition, are not part of the Class, and, therefore, any such objection lacks standing. Each Defendant bargained for a specific release of a specific set of claims. If a person's claim falls outside of the bargained-for time period, they are releasing nothing and have no standing to object. There is no requirement to include such transactions, especially those that are likely time-barred.

## VI. THE COURT SHOULD CONSIDER AND OVERRULE EACH OBJECTION

Class Counsel respond to the objections grouped by: (A) pro se objections; (B) disappointed Realtors; (C) the PulteGroup objection; and (D) the objections submitted by attorneys with later-filed cases involving the same conspiracy.

### A. Overview and Legal Standard.

Although "[n]o particular standard governs judicial review of objections," courts evaluate objections in the course of "determining whether the settlement meets Rule 23's fairness standard." 4 Newberg and Rubenstein on Class Actions § 13:35 (5th ed. 2012). "[T]he trial court has some obligation to consider objections but is given significant leeway in resolving them." *Id.* For a class of this size, or any size, the number of objections received is remarkably low. Indeed, there are only 12 purported objectors before the Court. This is out of a class size of approximately 30 million home sales. This means that 99.9999% of the Class did not object. And the claims made as of May 2, 2024 exceed objections by 194,733 to 12. While the Court should consider each objection, objections by a tiny but vocal minority should not prevent approval of the Settlements as fair, reasonable, and adequate. *See Marshall v. Nat'l Football League*, 787 F.3d 502, 513–14 (8th Cir. 2015) ("The district court refused to give credence to the vocal minority" and "the court aptly noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement."); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) ("[t]he Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement . . . The percentage of objectors in this case is minuscule. Only 33 out of the 4,838,789 current and former account holders who were sent notice—representing .00068%—have objected to the settlement. Indeed, the number of Settlement Class members opting out of the settlement— 620 out of 4,838,789 Settlement Class members—represents only .00024% of the Settlement Class. These numbers are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement.") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)). The

numbers here are even in even stronger support of the Settlements than in *Marshall* or *In re Wireless*.

In considering these objections, "the Court should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 700 (E.D. Mo. 2002). "[I]n determining whether to approve a class action settlement, the issue is not whether everyone affected by the settlement is completely satisfied. Instead, the test is whether the settlement, *as a whole*, is a fair, adequate, and reasonable resolution of the class claims asserted." *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915, 2022 WL 18107626, at *8 (E.D. Va. Sept. 13, 2022) (emphasis added). "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (cleaned up); *see also Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." (cleaned up)). "Objections that the settlement fund is too small for the class size, or that a defendant should be required to pay more to punish and deter future bad behavior, while understandable, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement." *Capital One*, 2022 WL 18107626, at *8.

As discussed above, and as this Court provisionally determined in its Preliminary Approval Order, the relief provided by the Settlements is "fair, reasonable, and adequate, in accordance with Rule 23(e) of the Federal Rules of Civil Procedure." Doc. 162 at 2. Importantly,

any class members who did not like the Settlements had the option to exclude themselves from the Settlement Class and to pursue damages and any other relief on an individual basis—and a few Class Members have done so. This favors approval of these Settlements. *See, e.g.*, *Marshall v. Nat'l Football League*, 787 F.3d 502, 513 (8th Cir. 2015) (affirming class settlement, stating that objectors "were not required to forgo what they believed to be meritorious claims—they could have opted out of the settlement to pursue their own claims, as some class members did"). When weighed against the risks attendant to and time required for litigation to a potential class judgment after trial, these immediate benefits strongly support a finding that the settlement relief is fair, reasonable, and adequate. *See Keil*, 862 F.3d at 697.

### B. The Court Should Overrule the Pro Se Objections.

Plaintiffs received seven objections from pro se individuals, including Realtors. Such objections are not uncommon. But however well-intentioned and sincerely held, they are not a basis for rejecting the Settlements here. "[I]n determining whether to approve a class action settlement, the issue is not whether everyone affected by the settlement is completely satisfied. Instead, the test is whether the settlement, *as a whole*, is a fair, adequate, and reasonable resolution of the class claims asserted." *In re: Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915, 2022 WL 18107626, at *8 (E.D. Va. Sept. 13, 2022) (emphasis added).

Chia and Herbert Whitehouse submit an objection (Doc. 1424) suggesting the Settlements should be modified to require eliminating the Mandatory Offer of Compensation Rule. As this Court knows, that rule is promulgated by NAR. And the Whitehouses should be pleased to learn that the preliminarily approved NAR Settlement does require eliminating the Mandatory Offer of Compensation Rule. That settlement also requires brokers to make additional compensation disclosures to consumers. The Whitehouse's final objection, relating to "the Broker Presale

Renovation Model," was not at issue in this case and is, therefore, not a reasonable basis for objecting to these Settlements. These Settlements, coupled with the NAR Settlement, address the business practices at the core of the Whitehouse's concerns and therefore should be approved. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 666 (S.D.N.Y. 2015) ("[T]he long-term conduct relief provided for in the settlement will yield, in the Court's assessment, an even greater long-term recovery to the settlement class.").

Diane Knizer (Doc. 1439) objects that attorneys should not be paid from the common Settlement Fund. Although no doubt well-meaning, this objection is contrary to the law. *See Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (noting the well-established rule that attorneys' fees are paid out of the common fund); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (paying attorneys out of the fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170, 2021 WL 247958, at *1 (W.D. Mo. Jan. 25, 2021) ("When a class action creates a common fund for the benefit of the class members, the Court may award class counsel reasonable attorneys' fees 'equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.'") (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244-45 (8th Cir. 1996)); *see also* Plaintiffs' Motion for Attorneys' Fees, Doc. 1400.

Cynthia Goralksi (Doc. 1453), a South Carolina resident, objects on several grounds. As a preliminary matter, however, Ms. Goralski does not indicate that she is a class member or sold a home within the Class Period. Thus, she does not appear to have standing to object to the Settlements. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.")

(citing *Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979)); *Feder v. Elec. Data Sys. Corp.,* 248 F. App'x 579, 580 (5th Cir. 2007) ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg on Class Actions § 11:55 (4th ed. 2002) ("[A]s a general rule, only class members have standing to object to a proposed settlement."). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Moreover, the Settlements would not release any claim she might have based on a home sold outside of the Class Period.

Even considering her objections, none shows that the Settlements should be rejected. First, she complains that the monetary recovery is insufficient. But as explained elsewhere, the Settlements are fair, reasonable, and adequate. Of course, every plaintiff would like more money, but that is not the standard for approving settlements. "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (cleaned up); *see also Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678 F.3d 640, 649 (8th Cir. 2012) ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 520 (8th Cir. 2015) ("The plaintiffs who opted out of the settlement could have brought their own individual or collective action against the NFL and potentially obtained the direct financial payout they allege is lacking in this settlement."). Second, she states that attorneys are receiving too much, but does not state why the Court should depart from the well-established law of awarding attorneys' fees as a percentage of the fund. *See* Doc. 1400. *See Vogt*, 2021 WL 247958, at *1. Third, she says the

claims process is lengthy. But she does not state why allowing more time for Class Members to submit claims is a bad thing. Class action administration is not a simple or easy task, and part of the delay is to ensure claimants are eligible to receive funds from future settlements and the funds are distributed appropriately.

Fourth, Ms. Goralksi says the court-approved notice does not allow an adequate time to respond. Yet she was able to file an objection. And the notice timelines are consistent with those approved by courts in other class action settlements. *See, e.g., In re Potash Antitrust Litig.,* 161 F.R.D. 411, 414 (D. Minn. 1995) ("The selection of the appropriate period, during which potential class members may consider the advisability of class membership, is almost wholly an exercise of the Court's discretion. In selecting a 60–day period, we are satisfied that the period allowed will neither compel an unnecessarily rushed response, nor will it lull the potential class member into complacency."); *Haworth v. New Prime, Inc.,* No. 6:19-03025-CV-RK, 2020 WL 1899276, at *2 (W.D. Mo. Apr. 16, 2020) (finding 60 days to be the appropriate length for notice period); *Woods v. Caremark PHC, LLC,* No. 4:14-cv-00583-SRB, at ECF 265 (W.D. Mo. 2019) (approving 60-day notice plan); *Aguirre v. Genesis Logistics,* No. 12-CV-00687, 2017 WL 11632912, at *10 (C.D. Cal. May 8, 2017) (60 days to object or exclude from settlement).

Fifth, Ms. Goralksi claims the Settlements do not address the "problem" in the case, but then does not state what the "problem" is or what is not being addressed. This complaint is insufficient. *See* Fed. R. Civ. P. 23(e)(5)(A) (objectors must "state with specificity" the grounds for any objection).

Sharon Saunders (Doc. 1454) asks the Court to broaden the Class Period for New Hampshire. Ms. Saunders, however, does not indicate that she is a class member or sold a home during the class period. *See Feder,* 248 F. App'x at 581 (burden on objector to establish standing).

And her request suggests that she is not a class member. Thus, she is without standing to object. Furthermore, her request, although not stated as an objection, is to provide relief to home sellers who sold prior to the Class Period. But there is no legal basis for extending a class period to include time-barred claims. For these reasons and because Ms. Sanders apparently does not have a claim within any conceivable statute of limitations, her request should be denied.

Jeffrey Nordquist (Doc. 1404) similarly asks the Court to broaden the applicable Class Period of the Anywhere and RE/MAX Settlements. He too does not indicate he has standing to object. Mr. Nordquist's objection should be rejected for all the same reasons as Ms. Saunders' objection.[1]

### C. Upset Realtors Statements.

Plaintiffs received correspondence from several pro se individuals who do not state they are class members, are not objecting, have no standing to object, and/or are taking issue with the NAR Settlement, which is not presently before the Court. Art Gonzalez (Docs. 1416 and 1430) does not appear to be a class member, but rather a member of NAR who does not like the outcome of the case. He has no standing to object, does not state he is objecting, and appears to be critical of the practice changes at issue in the NAR Settlement. If he is a class member, he will have an opportunity to object to the NAR practice changes at the appropriate time. Moreover, even if he had standing with respect to the present Settlements and his complaints were ripe, his displeasure with the case outcome and the Settlements is no basis for the Court to reject the Settlements. *See In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) ("The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their

---

[1] Elaine Gerber (Doc. 1456) does not object but states Plaintiffs' counsel did not contact her to assist her in filing a claim. A Williams Dirks Dameron staff member did respond to Ms. Gerber on March 5, 2024 in an email. *See* Dirks Decl. at ¶ 31. In any event, Mr. Dirks and Ms. Gerber spoke on the phone on April 19, 2024 and her concerns were resolved. Dirks Decl. at ¶ 31.

24

silence, indicated their approval of the Settlement Agreement." (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995))). Nor do his statements suggest what he wants the Court to do.

Larry Giamano (Doc. 1405) is a real estate agent who likewise appears to object to the NAR Settlement and thinks the practice changes from the NAR settlement go too far and restrict NAR members too much. He does not appear to have standing as a class member and references the NAR Settlement.

Anthony Phillips (Doc. 1455) is also a Realtor who lodged multiple complaints after the Court's deadline about the trial, the Settlement, the witnesses, and the lawyers. Mr. Phillips does not suggest he has standing to object. *See Feder*, 248 F. App'x at 581 (burden on objector to establish standing). In any event, this is not an objection but rather a letter from a dissatisfied Realtor.

At most, these objections reflect that no matter what settlements were reached in this case, there would be critics on both sides—some saying the Settlements go too far and others saying they do not go far enough. None of the correspondence received from these Realtors is a valid objection, and none has demonstrated standing to object. But to the extent these objections are considered, they should be overruled.

### D. The Court Should Overrule the Pulte Objection (Doc. 1445).

Homebuilder PulteGroup raises three objections to the proposed Settlements. None is a basis for denying approval.

#### 1. An Allocation Plan Is Not Required at this Juncture.

*First*, Pulte's complaint that the Settlements do not state exactly how much individual class members can expect to receive or include a precise allocation formula conflicts with authority rejecting similar objections. Pulte Objs. at 1, 2–4.

A precise allocation formula is not required in a class notice or before final settlement approval. *See In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1135-36 (Del. 2008) ("The Objectors cite no authority that would prohibit a trial court, on constitutional or any other grounds, from approving a settlement without simultaneously approving the propriety of a plan of allocation. Nor have we located any authority for that proposition. That comes as no surprise, since bifurcated class action settlements have been approved by the Delaware and the federal courts. . . . A decision that a settlement will not include a plan of allocation is a matter of judicial discretion.") (citing *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152-53 (8th Cir. 1999)); *In re Johns-Manville Corp.*, 340 B.R. 49, 70 (S.D.N.Y. 2006) ("The Objecting Claimants argue that the fairness of a settlement cannot be properly evaluated until the fund distribution procedures are already known. This argument has no merit and is contradicted by considerable precedent.") (citing *Petrovic*, 200 F.3d at 1153), *rev'd on other grounds*, 600 F.3d 135 (2d Cir. 2010); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 170 (2d Cir. 1987) ("There is, however, no absolute requirement that [a distribution] plan be formulated prior to notification of the class."); *Carlson v. C.H. Robinson Worldwide, Inc.*, 2006 WL 2671105, at *7 (D. Minn. Sept. 18, 2006) (approving settlement where the allocation plan was "to be proposed by class counsel and approved by the Court," "even though the precise details are not yet determined") (citing *In re Agent Orange*, 818 F.2d at 170); *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *6 (N.D. Ohio Feb. 26, 2015) (acknowledging "extensive[]" body of case law supporting "the proposition that a plan of allocation need not be proposed prior to final settlement approval"); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 1988 WL 158947, at *3 (W.D. Wash. July 28, 1988) ("[T]hat kind of ultimate data is not required in order to evaluate and approve a partial settlement."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167347, at *5 (N.D. Ill. Apr. 4, 1996)

("Although the objectors maintain that such an allocation plan is necessary to evaluate the fairness of the partial settlements, we disagree."); *Manual for Complex Litigation, Fourth* § 21.312 (2005) ("Often . . . the details of allocation and distribution are not established until after the settlement is approved.").[2]

"[C]ourts frequently approve" class settlements and allocation plans "separately," 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update), because it "is appropriate, and often prudent, in massive class actions to follow a two-stage procedure" and defer consideration of the plan of distribution until after final settlement approval. *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 480 (S.D.N.Y. 1998)). This is because "court approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update). "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done

---

[2] *See also In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248, 255 (11th Cir. 2009) (rejecting argument that allocation plan was required to be included in notice); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1275–76 (9th Cir. 1992) (affirming class action settlement where plan of allocation was confirmed a year after the lump-sum settlement); *In re Int'l House of Pancakes Franchise Litig.*, 78 F.R.D. 379, 381 (W.D. Mo. 1978) ("The Court's order approving the settlement agreement directed class counsel to submit a proposed formula for the distribution of [the settlement] funds."); *Strathclyde Pension Fund v. Bank OZK*, 2022 WL 2307136, at *5 (E.D. Ark. June 27, 2022) ("The Court reserves the right to enter the Judgment finally approving the settlement regardless of whether it has approved the plan of allocation . . . ."); *Larson v. Sprint Nextel Corp.*, 2009 WL 1228443, at *14 (D.N.J. Apr. 30, 2009) (rejecting argument that notice needed to "describe the range of possible recovery for potential class members" as inconsistent with authority holding that "a notice need not delve into specific recovery values where the ultimate recovery is uncertain"); *In re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910, 925 (S.D.N.Y. 1991) ("It is not an impediment to approval of the Settlement that the actual amounts to be distributed to Class members will be subject to further allocation procedures."), *aff'd*, 960 F.2d 285 (2d Cir. 1992).

before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement." *In re Agent Orange*, 818 F.2d at 170.

Further, the formation of a plan of allocation "is a difficult, time-consuming process." *In re Agent Orange*, 818 F.2d at 170. "To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished." *Id.* Relatedly, "if a hearing on a settlement must follow formulation of a distribution plan, then reversal of any significant aspect of the plan on appeal . . . would require a remand for reconsideration of the settlement, followed by yet another appeal." *Id.* As courts have held, "[t]here is no sound reason to impose such procedural straitjackets upon the settlements of class actions." *Id.*

It is particularly appropriate to defer creation of an allocation plan when, as here, there are multiple defendants, including many not named in the original suit, and only some have settled. "[D]eferral of allocation decisions is routinely followed in" these circumstances because "the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 1988 WL 158947, at *4 (W.D. Wash. July 28, 1988) (citing *In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 959 (N.D. Ga. 1980), *aff'd*, 669 F.2d 228 (5th Cir. 1982)); *see also In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known."); *In re Packaged Ice*

*Antitrust Litig.*, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011) (developing plan of allocation is properly delayed until after final approval of settlement where "the potential for additional settlements with other Defendants . . . may affect the final plan of allocation").

Among the cases rejecting Pulte's contention is the primary case Pulte *itself* relies on: *Petrovic*. The Eighth Circuit in *Petrovic* stated that it did "not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards" and dismissed the same objection Pulte raises because "[t]he notice described with sufficient particularity the stakes involved: the settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic*, 200 F.3d at 1152–53.[3] The same is true here. The notice explains the claims being settled and released. Dkt. No. 1442-2 at 4, 6 (Anywhere & RE/MAX notice); Dkt. No. 1442-3 at 4, 6 (Keller Williams notice). It also states the total

---

[3] Another case Pulte cites likewise holds that "notice need not contain a formula for calculating individual awards." *Haggart v. Woodley*, 809 F.3d 1336, 1348 (Fed. Cir. 2016) (cited at Pulte Objs. at 2). The issue in *Haggart* was whether the Court of Federal Claims abused its discretion in granting final approval of a settlement that *included* an allocation plan where class counsel had refused to disclose the "precise methodology" it used to calculate the awards that individual class members were to receive. *Id. Haggart* "d[id] not concern the notice provided by class counsel to class members outlining the details of the settlement agreement." *Id.*

Unlike *Haggart* (a Fifth Amendment takings action in which the United States was the only defendant), the instant settlement follows a "two-stage" structure that is commonly employed in multidefendant class actions, whereby consideration of the allocation plan is deferred until after the substantive terms of the settlement are approved. *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 480 (S.D.N.Y. 1998)). *Haggart* does not, as Pulte asserts, stand for the proposition that class members need to be able to calculate or estimate their individual recoveries prior to final approval of a settlement agreement. *See In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1136 (Del. 2008) ("Since the amount of any class member's individual recovery has yet to be formulated, that argument is a truism that misses the point.").

settlement amounts. Dkt. No. 1442-2 at 5 (Anywhere & RE/MAX notice); Dkt. No. 1442-3 at 5 (Keller Williams notice).

Further, just as in *Petrovic*, class members could obtain additional information regarding the likely value of claims and the allocation process by contacting counsel or the settlement administrator. 200 F.3d at 1153. For those class members who made such inquiries, class counsel explained that the Settlements are unlikely to pay the full value of their claims, but the settlement proceeds will be distributed equitably and discounted on a pro rata basis. Dirks Decl. at ¶¶ 24-29. Class counsel further explained that, subsequent to notice issuing, there were additional proposed settlements benefitting the class and others expected, making it premature to set a detailed allocation formula or provide precise estimates of potential recovery. *Id.* at ¶ 29. In fact, class counsel provided this same information to Pulte's counsel on a recent call.

Given the above authority and the information already provided to class members, Pulte's objection fails.[4] To be sure, the Court has an obligation to "ensure that the distribution of funds is

---

[4] Pulte, for its part, claims that "courts routinely reject class settlement agreements that do not advise a potential claimant of the amount of its recovery." Pulte Objs. at 2 (quotation marks omitted). Neither of the cases it cites support this proposition. In *In re Refco, Inc. Sec. Litigation*, a special master recommended preliminarily *approving* a settlement and class notice. 2010 WL 11586941, at *13 (S.D.N.Y. May 11, 2010). Similarly, in *In re Initial Pub. Offering Sec. Litigation*, the court preliminarily *approved* an agreement, while holding that the proposed notice needed amendment. 243 F.R.D. 79, 94 (S.D.N.Y. 2007). Neither court "reject[ed]" a settlement agreement or found one to be "defective," as Pulte falsely asserts. Pulte Objs. at 2–3. Moreover, any suggestion in either decision that class notice must include an estimated amount of recovery is dubious. The Second Circuit expressly declined to impose such a requirement in *In re Agent Orange*—a decision that was binding on the *In re Refco* and *In re Initial Pub. Offering Sec. Litigation* courts—and other courts have likewise rejected this suggestion. *See Larson*, 2009 WL 1228443, at *14 ("To the extent that the *Public Offering* court suggests that estimated pro rata recoveries must be detailed on the class notice, this Court disagrees."). None of the other cases cited by Pulte rejected settlement agreements for lack of an allocation plan. *See Petrovic*, 200 F.3d at 1157 (affirming settlement approval); *Haggart*, 809 F.3d at 1348 (holding that the Court of Federal Claims erred by not requiring class counsel to provide readily-available information concerning how it allocated settlement amounts); *In re Envision Healthcare Corp. Sec. Litig.*, 2023

fair and reasonable." *Taft*, 2007 WL 414493, at *9. Accordingly, class counsel will propose an allocation plan in due course—subject to the Court's approval.[5] But there is no requirement that class counsel must do so *before* the Court can approve the Settlements. *See Carlson*, 2006 WL 2671105, at *7 ("An allocation plan such as the one at issue here that is subject to close scrutiny at every stage is fair and reasonable even though the precise details are not yet determined.") (citing *In re Agent Orange*, 818 F.2d at 170); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 669, 678-79 (D. Minn. 1974) (overruling objection that "the Court should not approve the settlement until a formal plan of distribution has been presented to the Court," because the court will "retain jurisdiction and supervise the distribution of the funds" to ensure an equitable allocation); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 67 (S.D.N.Y. 1993) ("[T]he procedures, which will govern distributions of the Settlement proceeds, . . . will be subject to the Court's approval. Thus, adequate safeguards exist to provide that plaintiffs will be fairly and adequately compensated out of the Milken Global Settlement.").

### 2. The Claims Administrator Offers a Bulk Submission Process—as Pulte Seeks—But Pulte Never Bothered to Ask About It.

*Second*, Pulte's objection that there is no mechanism for homebuilding companies to efficiently submit a large number of claims is incorrect and not a basis for disapproving the

---

WL 8110157 (M.D. Tenn. Nov. 20, 2023) (preliminarily approving settlement); *Taft v. Ackermans*, 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) (approving settlement).

[5] Indeed, Class Counsel posted the following FAQ answer to the Settlement Website, FAQ 10: "The Plaintiffs will propose a plan of allocation of the proceeds of the settlements to the Court prior to any distribution of settlement funds to claimants. That proposal will be posted to this website and emailed to all individuals who submit a claim with an opportunity to object to the plan of allocation. The plan will be subject to the approval of the Court. It is anticipated that the plan will take into account the amount of commissions class member claimants paid to a real estate broker or agent during the relevant statute of limitations periods for the MLS in which the sale was made. To the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." *See* https://www.realestatecommissionlitigation.com/faq

Settlements themselves. Pulte Objs. at 1–2, 4–6. To the contrary, the claims administrator has been actively working with homebuilders and others with large claims to streamline the submission of those claims. Keough Decl. at ¶ 54. Neither class counsel nor the claims administrator are aware of any inquiries from Pulte seeking information on this process prior to filing its objection. Keough Decl. at ¶ 55; Dirks Decl. at ¶ 30. However, after receiving Pulte's objection, class counsel contacted and spoke with Pulte's counsel about the claims submission procedures for large homebuilders and directly connected it with the claims administrator. This objection should be overruled.

### 3. The Notice Plan Easily Satisfies Due Process and Rule 23.

*Third*, Pulte's objection to the notice campaign previously approved by the Court does not raise any due process concerns. Pulte Objs. at 1–2, 6–7. Pulte complains that it "did not receive notice," Pulte Objs. at 6, but obviously it did—otherwise it would not have been able to raise its objections before the deadline. Thus, as Pulte itself acknowledges, the "notice issues" it raises are "moot." Pulte Objs. at 7; *see also In re Pinterest Derivative Litig.*, 2022 WL 2079712, at *2 (N.D. Cal. June 9, 2022) ("[T]hough delayed, Mr. Sweeney received actual notice of the proposed settlement, voiced his objections, and has been heard. Having been heard, Mr. Sweeney's objections [to notice] are OVERRULED.").

Pulte speculates that some other class members may not have received notice. Pulte, however, does not offer any evidence to support this assertion, nor are there any other indications that notice has somehow been deficient. Indeed, Pulte does not even state whether or not its officers and executives received direct notice. Even accepting the premise that some of the millions of class members did not receive direct notice, that does not violate due process of Rule 23 requirements. Both due process and Rule 23 require the "best notice that is practicable under the circumstances."

Fed. R. Civ. P. 23(c)(2)(B); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (notice "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'") (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). "[I]ndividual notice" is to be provided "to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974) ("[I]ndividual notice must be provided to those class members who are identifiable through reasonable effort."). "[W]hen class members' names and addresses cannot be determined with reasonable efforts, courts have found publication of the settlement notice is adequate and appropriate." *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 212 (W.D. Mo. 2017), *aff'd*, 896 F.3d 900 (8th Cir. 2018); *see also In re Agent Orange*, 818 F.2d at 168 (constructive notice by publication is sufficient "as to persons whose whereabouts or interests c[an] not be determined through due diligence" (citing *Mullane*, 339 U.S. at 317–18)).

Here, the court-approved notice plan provided for direct mail notice to every class member who could be located through reasonable efforts—specifically, every class member for whom the settling defendants "provide[d] contact information or for whom contact information [could be] located via other means (e.g., third-party data)." Dkt. No. 1319 at 2. To reach class members who could not be individually identified through reasonable efforts, the court-approved notice plan provided for publication notice through the consumer magazine *Better Homes & Gardens* and digital advertising "with the leading digital network (Google Display Network – 'GDN'), the top social media platform (Facebook), and a respected programmatic partner (OMTD)." *Id.* Courts commonly approve similar notice plans—plans that included individual notice for class members who can be identified through reasonable efforts plus publication notice to reach those who could

not. *See, e.g.*, *Swetz v. GSK Consumer Health, Inc.*, 2021 WL 5449932, at *3 (S.D.N.Y. Nov. 22, 2021) (finding that notice plan that included "direct notice" to "identified Settlement Class Members," a nationwide press release, and "notice through electronic media—such as Google Display Network and Facebook"—was the "best notice practicable"); *Pollard*, 320 F.R.D. at 211–12 (approving notice plan where direct notice was provided to the fraction of the class who could be identified with reasonable efforts and publication notice in magazines and using banner advertisements was use to notify most of the class).[6]

The notice plan here was estimated to reach 70–95% of class members—a robust reach given the millions of class members. Dkt. No. 1319 at 2. Courts have repeatedly approved notice plans that were expected to reach over 70% of class members. *E.g.*, *In re Packaged Seafood Prod. Antitrust Litig.*, 202 WL 2483474, at *2 (S.D. Cal. Mar. 13, 2023); *Bruzek v. Husky Energy Inc.*, 2021 WL 9474270, at *2, 4 (W.D. Wis. Aug. 6, 2021); *Reid v. I.C. Sys. Inc.*, 2018 WL 11352039, at *3 (D. Ariz. July 27, 2018); *Beck-Ellman v. Kaz USA, Inc.*, 2013 WL 1748729 at *3–4, *8–9 (S.D. Cal. Jan. 7, 2013); *see also Pollard*, 320 F.R.D. at 212–13 (approving notice plan where there was a dispute as to whether it reached 49% or 73.7% of class members). Indeed, "[t]he Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable." *Hand v. Beach Ent. Kc, LLC*, 2021 WL 199729, at *2 (W.D. Mo. Jan. 19, 2021).

---

[6] *See also Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *16 (S.D.N.Y. Oct. 16, 2019) (concluding settlement notice campaign satisfied Rule 23 where it consisted of mailed notices and publication of the summary notice once in each of three newspapers and once over *PR Newswire*); *Khoday v. Symantec Corp.*, 2016 WL 1637039, at *7 (D. Minn. Apr. 5, 2016) (approving notice plan consisting of direct notice and "supplemental notice" through "online social media" and "national publication"); *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 475 (E.D. Pa. 2000) (approving individual notice plus notice "through one-time publication in USA Today and on the Internet through the Business Wire").

By contrast, "actual notice to all class members is not required." *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 123–24 (S.D.N.Y. 2001) (approving notice plan and concluding that "reasonable efforts were taken to notify all members of the class," where part of the class received direct mail notice and part of the class was covered by publication notice); *see also Dusenbery v. United States*, 534 U.S. 161, 170–71 (2002) (holding that "actual notice" is not required by the Due Process Clause; rather, "it requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action"); *Montgomery v. Beneficial Consumer Disc. Co.*, 2005 WL 497776, at *5 (E.D. Pa. Mar. 2, 2005) ("The requirement of 'best notice practicable under the circumstances' has consistently been held *not* to require actual notice for every class member." (emphasis in original)); *In re Mass. Diet Drug Litig.*, 338 F. Supp. 2d 198, 209 (D. Mass. 2004) (neither "Rule 23 nor due process, however, requires that each class member receive actual notice").

Instead, the standard is the best notice practicable. *See Barfield v. Sho-Me Power Elec. Co-op.*, 2013 WL 3872181, at *14 (W.D. Mo. July 25, 2013) ("[T]he Court is only required to provide the best practicable notice to those members identifiable by reasonable effort—not achieve actual notice on every potential class member."); *see also Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994) (concluding that the standard for class notice is "best practicable," rather than "actually received" notice). And that is exactly what was provided here.

### E. The Court Should Overrule Objections Submitted by Attorneys Who Filed Competing Cases.

Three objections were lodged by counsel for plaintiffs in other cases filed after *Moehrl* and *Burnett*. None of these cases is a certified class, and all are in their infancy. Each of these cases is derivative of *Moehrl* and *Burnett* and was filed only after and on the back of Class Counsel's successes. Indeed, two of these cases were not filed until *after* the Anywhere and RE/MAX

35

Settlements were concluded and *after* the *Burnett* plaintiffs obtained a favorable verdict. They all allege largely identical conspiracies. Yet they now seek to blow up the important monetary and practice change relief made available in the Settlements. Each of these objectors could have opted out of the Settlements and pursued their own claims, but instead each chose to object in an attempt to rescind the Settlements. *See Marshall v. Nat'l Football League*, 787 F.3d 502, 520 (8th Cir. 2015) ("The plaintiffs who opted out of the settlement could have brought their own individual or collective action against the NFL and potentially obtained the direct financial payout they allege is lacking in this settlement."). None of these objections furthers the interest of class members who will benefit from both the monetary and practice change relief afforded by the Settlements.

Such objections lodged by attorneys filing competing cases should be viewed with skepticism. *See, e.g.*, *Gulbankian v. MW Mfrs., Inc.*, No. 10-cv-10392-RWZ, 2014 WL 7384075, at *3 (D. Mass. Dec. 29, 2014) ("in assessing the weight of objections to class settlement agreements, the district court may properly consider the fact that the most vociferous objectors were persons enlisted by counsel competing with [lead] counsel for control of the litigation") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998); *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 633 (11th Cir. 2015) (affirming trial court in overruling objector whose "counsel is also counsel in *Lawrie*, a competing action that also asserts class based claims [against Ginn], some of which will be barred by the final certification of this Class. Although not initially convinced of an ulterior motive regarding Mr. Greco's objections, the Court now has serious concerns.").

### 1. The Court should overrule the South Carolina objection (Doc. 1441).

The lawyers prosecuting *Burton v. National Association of Realtors, et al.*, 23-05666 (D. S.C.) filed an objection on behalf of three home sellers in South Carolina. Instead of a global

resolution, certainty, and practice changes, they seek to unwind the Settlement, which would result in protracted, inefficient, and costly piecemeal litigation that would unnecessarily proceed on a state-by-state basis and yield worse results for class members, including their own clients.

Their objection claims that the Settlements should not release local Keller Williams franchisees because South Carolina plaintiffs' counsel should be the ones to sue local Keller Williams franchisees in order to obtain money from those local brokerages. This objection is belied by the fact that *Burton* does not name any Keller Williams franchisees. And importantly, it is the corporate parents and franchisors that have assets to provide significant compensation to class members and the power to change brokerage training and policies.[7]

In any event, courts routinely recognize the permissibility of releasing unnamed corporate affiliates in nationwide class settlements, including franchisees. *See infra*, at Part VI(E)(b)(1) (gathering cases authorizing class settlements that include a release of corporate affiliates, including franchisees). South Carolina objectors claim to be the guardian of all South Carolina claims, but they did not even file suit until *after* the Anywhere and RE/MAX Settlements were announced and after the *Burnett* verdict. In the meantime, the *Moehrl* plaintiffs obtained certification of a litigation class that includes many South Carolina residents and were appointed as class counsel to represent their interests. Nor do the South Carolina objectors purport to speak for the satisfied Class Members from the rest of the United States, let alone the 2,173 South Carolina residents who have submitted a claim. Keough Decl. at ¶ 49. Objectors' motives are obvious—they want to blow up the Settlement so they can litigate against Keller Williams on their

---

[7] Burton plaintiffs seem to recognize this not only because they failed to name any franchisees, but also because *they admit the policies at issue are disseminated from Keller Williams*. Their complaint states: "Keller Williams Realty, Inc. has policy making authority over the various franchisees located in the District of South Carolina. Amended Complaint at Doc. 19, ¶ 57.

own. But they represent no certified class and their attempt to unwind this historic Settlement should be rejected.

### a. The Alford Declaration should be disregarded.

As an initial matter, both the South Carolina objection (Doc. 1441) and the Pennsylvania objection (Doc. 1448) rely upon the Declaration/Affidavit of Charles Alford, Ph. D. ("Alford Dec.") (Doc. 1441-3). But the Alford Dec. fails to comply with the Federal Rules of Evidence and should be disregarded in its entirety.

The Objectors have the burden to prove the admissibility of the expert testimony of Dr. Alford by a preponderance of the evidence. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.* ("*Bair Hugger*"), 9 F.4th 768, 776 (8th Cir. 2021). Federal Rule of Evidence 702, which governs the admissibility of expert testimony, vests a "gatekeeping" function on this Court to ensure the relevance and reliability of any expert testimony. *Id.*, citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). To fulfill this gatekeeping function, courts employ a three-part test: 1) the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, *i.e.* it must be relevant; 2) the expert must be qualified to assist the finder of fact; and 3) the testimony must be reliable or trustworthy in an evidentiary sense. *Bair Hugger*, 9 F.4th at 777. The Alford Dec. fails to meet each of these requirements.

*First*, the Alford Dec. is not helpful to the Court in determining whether the proposed settlements are fair and reasonable in light of the Defendants' financial conditions. Indeed, the Alford Dec. offers no expert opinions regarding either the fairness of the Settlements or the financial condition of the Settling Defendants. It does not provide the Court with any opinion as to how much additional money any of the Settling Defendants could pay beyond the settlement amounts, and fails even to opine that the Settlements are too low in light of the Defendants'

financial condition. Instead, the Alford Dec. merely cites a host of financial metrics that it contends should be considered, without expressing any opinion as to what these metrics demonstrate or how they might show that the settlements are too low.

Market Capitalization. The Alford Dec. quibbles that the market capitalization of Anywhere had risen from $634 million on October 5, 2023, as identified by Plaintiffs in their preliminary approval motion, to $640 million on April 8, 2024. Alford Dec., ¶ 10(a). As of April 30, 2024, it had fallen to approximately $540 million. These minor fluctuations make no real difference to the analysis. The Alford Dec. also offers the *ipse dixit* conclusory assertion that the "enterprise value" of a company is a "much more relevant measure of true market value" than market capitalization and cites the purported enterprise value of Anywhere. Alford Dec., ¶ 10(a). But it declines to identify any basis for this assertion, to explain the significance of the proposed settlement purportedly being 2-5% of enterprise value, or even to identify why enterprise value is an appropriate benchmark from which to assess a settlement.

Cash and Equivalents. The Alford Dec. takes issue with Plaintiffs' identification of Anywhere's cash balance of just $179 million as supporting the reasonableness of the $83.5 million settlement, offering only an unsupported assertion that cash used in investing activities plus cash used in financing activities averaged 81% of the beginning cash balance in each operating year. Alford Dec., ¶ 10(b). But this assertion again fails to explain the relevance of this statistic or what it shows. One is left to wonder whether 81% shows that the settlement is reasonable or not, and whether 70% or 90% would demonstrate something different. Likewise, the Alford Dec. recognizes that RE/MAX's cash balance was just $83 million at the end of 2023, but states that such a balance is "well within the range of $51 million to $126 million during the damages period." Alford Dec., ¶ 13. But again, it fails to identify the significance of this apparently irrelevant

assertion. The amount of cash RE/MAX had on hand in 2015 has no significance to analyzing what it can afford to pay currently—nearly a decade later—and the Alford Dec. does not opine to the contrary. Merely citing a financial metric without explaining its significance or relevance is entirely worthless in assessing the Settlements.

Plaintiffs' use of net losses to show poor financial performance. Dr. Alford, who is not a Certified Public Accountant, admits that Plaintiffs accurately identify the $297 million net losses suffered by Anywhere during the past three years. The Alford Dec. nevertheless quibbles with Plaintiffs' use of "net loss" as identified in the Settling Defendants' audited financial statements and calculated pursuant to the requirements of Generally Accepted Accounting Principles ("GAAP"), incorrectly contending that other non-GAAP measures of various metrics should instead be considered.[8] Alford Dec., ¶¶ 10(c), 11. But his explanation that Anywhere tends to emphasize non-GAAP measures of performance" is unavailing. The Alford Dec. fails to explain why the Company purportedly emphasizing some non-GAAP financial measure for some other purpose requires the Court to consider that measure when assessing the fairness of the Settlements. The Alford Dec. notes that while the company's net income was negative, various other non-GAAP measures were positive over the period from 2020 to 2023. This is hardly surprising, as these measures deliberately exclude expenses and are not a measure of the overall performance of a company.

Purported Financial Results From 2015 – 2023. Another metric cited by the Alford Dec. is the purported cumulative EBITDA for the companies from 2015 – 2023. Alford Dec., ¶¶ 10(c),

---

[8] GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has delegated the creation of GAAP to the Financial Accounting Standards Board. Financial statements that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate. 17 C.F.R. § 210.4-01.

12. But the Alford Dec. again fails to explain the significance of this calculation, or how EBITDA generated in 2015 has anything to do with assessing the current ability of the Defendants to pay a larger settlement.

Noncontrolling Interests. The Alford Dec. concedes that RE/MAX's net worth was only $24 million on June 30, 2023. Alford Dec., ¶ 14. However, Dr. Alford criticizes Plaintiffs for "fail(ing) to point out" that total stockholder's equity was $478 million on that date. Dr. Alford either deliberately or unknowingly (due to a lack of basic understanding of accounting principles) confuses that number with the actual net worth of the company, which is the number correctly cited by the Plaintiffs. The Alford Dec. disregards that, in situations where a company owns less than 100% of a subsidiary, GAAP requires the company to consolidate the entire financial results of the company on its balance sheet, and then reverse out the portion owned by other parties in calculating total shareholder equity, or net worth.[9] The Alford Dec. makes no assertion regarding the relevance of the portion of the subsidiaries owned by third parties to RE/MAX's ability to pay a larger settlement, and does not explain how the metric he cites impacts the Defendants' capacity to pay a larger settlement.

Future Prospects. The Alford Dec. disagrees with Class Counsel's assertion that "there is no indication that residential real estate sales will increase significantly in the future." Alford Dec., ¶¶ 10(d), 15. Dr. Alford has done no independent research or analysis on this topic, but merely parrots an Anywhere press release that it "expects more normal seasonal volumes throughout the year" and a RE/MAX press release claiming that there are "many reasons to be optimistic" about a "progressively better housing market performance moving forward." But this puffery from the

---

[9] *Business Combinations*, Accounting Standards Codification 805, Financial Accounting Standards Board (2025).

Defendants makes no assurances, couching its optimism in phrases that don't say anything specific.

In sum, none of the financial metrics or statements of puffery by the Defendants identified by the Alford Dec. were accompanied by an opinion that they bear upon the issues at bar, or even a description of how they could conceivably be relevant. The mere identification of alternative financial metrics, without any explanation of their relevance or a description of how they impact the analysis, is not useful to the Court in assessing the Settlements and thus fails to meet the relevance requirement.

*Second*, though Dr. Alford is an economist, he is not qualified to assist the Court in determining the ability or capacity of the Defendants to pay a larger settlement. He has no special expertise and appears to have little concept of the various legal and financial obstacles that may prevent a company from paying a settlement. He also is not a Certified Public Accountant and does not appear to be qualified to opine on accounting methodology, as described above.

*Third*, the Alford Dec. also fails the requirement that the testimony must be reliable or trustworthy in an evidentiary sense. The Court may exclude an expert's opinion if it is "so fundamentally unsupported" by its factual basis "that it can offer no assistance to the jury." *Bair Hugger*, 9 F.4th at 778. Here, the Alford Dec. merely identifies various financial metrics without expressing any opinion on what these metrics do, or even could demonstrate, leaving the Court to draw its own conclusions. "In exercising its gatekeeping function, the trial court must first make a 'preliminary assessment of whether the reasoning or methodology underlying the [proposed expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019). Here, the Alford Dec. makes no conclusions and offers no expert opinion.

And to the extent that the Objectors will seek to imply some conclusion from Alford's citation to various irrelevant financial metrics, such conclusions would be entirely unsupported by relevant authority and thus unreliable and untrustworthy.

### b. Each specific South Carolina objection fails.

The Court should overrule the South Carolina objection on each specific point raised.

### i. Broad settlement classes creating global peace are encouraged.

South Carolina objectors claim that the scope of the Settlements is broader than the certified classes in *Burnett* and *Moehrl*. Doc. 1441 at 2. Of course the Settlement classes are broader. In the settlement context, courts regularly certify broader classes. *See, e.g.*, *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this."); *Smith v. Atkins*, 2:18-cv-04004-MDH (W.D. Mo.); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 318 (C.D. Cal. 2016) (court can "expand the scope of a settlement class") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 325-26 (3d Cir. 1998)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-cv-1827, 2011 WL 13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("For the history of class certifications, courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated. Courts have noted that the concerns about manageability and/or the class-wide applicability of proof (which can serve to limit or defeat class certification for trial) are in large part no longer relevant when establishment of a defendant's liability is replaced by a settlement."); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("[A] court may approve a settlement class broader than a litigation class that has already been certified."); *In re*

*MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 661 (E.D. Va. 2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (same).

Often, broader classes are a practical prerequisite to reaching any settlement because a defendant will not agree to any meaningful settlement unless it can obtain global peace. *See, e.g.*, *Albin v. Resort Sales Missouri, Inc.*, No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (reasoning that the absence of "a single nationwide class action" would "discourage class action defendants from settling") (quotation omitted); *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 103 n.5, 106 (2d Cir. 2005) ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country. Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability" (quotation omitted)) (affirming nationwide settlement in an antitrust case); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247-48 (2d Cir. 2011) ("Parties often reach broad settlement agreements encompassing claims not presented in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 310-11 (3d Cir. 2011) (en banc) ("[Without] global peace . . . there would be no settlements.") (affirming nationwide settlement in an antitrust case). Conversely, because global peace is most valuable to defendants, defendants will pay more to obtain it, thus benefitting class members. *See, e.g.*, *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 705 (E.D. Mo. 2002) ("[Defendants] paid both classes of plaintiffs more in the instant global settlement out of a desire to obtain 'total peace' than they would have paid either group of plaintiffs individually.").

44

That is exactly what happened in this case. The Settling Defendants refused to settle on anything less than a nationwide basis, because doing so would leave them exposed to potentially crippling liability. They therefore insisted that the Settlement Class include all "multiple listing services," regardless of whether they were affiliated with NAR. To get the benefits of the Settlements, Plaintiffs therefore agreed to settle on a nationwide basis. Thus, the Settlements are in the best interest of the *Burnett* and *Moehrl* classes, in addition to the nationwide class as a whole, because, among other things, Settlement was not possible on a piecemeal basis, and enforcement of the *Burnett* verdict alone would have bankrupted the Settling Defendants. In other words, the alternative to settling on a nationwide basis would not have been a greater recovery for South Carolina class members (many of whom were part of the *Moehrl* class regardless)—it would have resulted in no recovery at all due to near certain bankruptcy by each of the Settling Defendants.

Accordingly, here, certifying a nationwide class covering all multiple listing services is warranted for several reasons. First, the alleged conspiracy is nationwide in nature with a nationwide impact, and so a nationwide settlement is justified. *See, e.g.,* Doc. 759 at ¶ 38, Third Amended Complaint (alleging nationwide conspiracy and effect). Due to the nationwide scope of the alleged conspiracy and the likelihood of unlimited lawsuits asserting claims exceeding Defendants' limited resources, the only path to a resolution was through a nationwide settlement. Second, Plaintiffs have conducted extensive discovery into the alleged nationwide conspiracy and have thoroughly litigated the claims, providing a robust factual record on which to assess the claims and base negotiations, including expert testimony that the alleged conspiracy affected home sales across the country, regardless of which multiple listing service was used and whether it was affiliated with NAR. *See, e.g.,* section VI E(1)(b)(ii), below.  Third, Plaintiffs could have made nationwide allegations covering all multiple listing services in this action as they did in *Gibson*

and *Umpa*. Fourth, a nationwide settlement will conserve judicial and private resources as compared to protracted piecemeal litigation across the country, which also results in a greater recovery for the class, which will not have to bear the costs associated with piecemeal antitrust litigation. 7B Wright & Miller, Federal Practice & Procedure § 1798.1 (3d ed. 2005) ("Clearly, a single nationwide class action seems to be the best means of achieving judicial economy."). Fifth, class members were fully apprised of the settlement class definition through the notice process and had the opportunity to opt out if they felt they could do better on their own. Notice did not distinguish between NAR and Non-NAR MLSs and the claims administrator has been accepting claims from sellers in non-NAR MLSs. Keough Decl. at ¶ 56. If the South Carolina objectors or any other sellers did not want to get paid under the Settlement, they could have opted out and sued their local broker or agent if that was really their desire. *Marshall* 787 F.3d at 520.

### ii. The rules and conspiracy at issue are nationwide in scope.

South Carolina objectors claim that the rules at issue are different in South Carolina. Their Amended Complaint again belies their argument. They allege the identical rules and conspiracy raised in *Burnett* and *Moehrl*. Relatedly, they claim Class Counsel "did not conduct even the barest of discovery" relating to South Carolina. Not true. The discovery addressed the corporate policies that applied to South Carolina. Indeed, Canopy MLS, which includes part of South Carolina, is one of the Covered MLS in the Moehrl litigation. And Plaintiffs received the data for transactions in South Carolina as well as nationwide. Dirks Decl. at ¶ 19. Trial testimony in *Burnett* specifically addressed whether the system was different in South Carolina. It is not. Hollee Ellis testified as follows:

> *Q When you moved back from South Carolina to Missouri, did*
> *you end up paying -- you sold your house out there?*
> *A We did.*
> *Q Part of the same system?*

> *A Yes.*
> *Q So it sounds like in South Carolina, they're part of the same system that's at issue here?*
> *A Correct.*
> *Q What was your commission out there that was paid?*
> *A It was 6 percent: 3 percent to the selling agent; 3 percent to the buyer's agent.*
> *Q So it doesn't make a difference if you're down in Southwest Missouri or if you're out in South Carolina, the same things happen?*
> *A That is correct.*

Trial Transcript 237:19-238:8.

As expressly alleged in *Umpa*, and as supported by expert analysis in *Moehrl*, the vast majority of MLSs nationwide are formally controlled by local NAR associations that are required to implement the challenged rules. *Umpa* Complaint at ¶2. Only a small number of MLSs are not exclusively owned or operated by NAR associations, and even those MLSs are not fully independent from NAR. *Id.* at ¶4. For example, most of those MLSs have adopted rules identical or similar to the NAR rule mandating blanket unilateral offers of compensation and all MLSs typically require adherence to NAR's Code of Ethics applies to Realtors participating even in non-NAR MLSs. *Id.* at ¶¶4-5. In both *Burnett* and *Moehrl*, Plaintiffs' experts specifically analyzed rules implemented by non-NAR MLSs, including Northwest MLS, WPMLS, and REBNY (8-10-22 Schulman Reply Rept. at ¶¶61-86) and concluded that Realtors® operating in these jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of Ethics and are thereby incentivize to require sellers to make unilateral offers of compensation to buy-side brokers/agents." *Id.* at ¶75; *see also* Elhague Report, Appendix C (addressing Non-NAR MLSs and concluding "it was common among these MLSs to adopt restrains that were identical or similar to those imposed by NAR"). Therefore, the rules and conspiracies at issue are nationwide in scope, and Plaintiffs adequately represented the nationwide class that is subject to the Settlements.

### iii. Cooperation is unnecessary for a fair settlement but this cooperation assists all class members.

South Carolina objectors complain that the cooperation provisions in the Settlements apply only to *Burnett* and *Moehrl*. But they point to no authority requiring Plaintiffs to obtain cooperation from Settling Defendants at all, much less cooperation that would benefit *other* later-filed cases. That is especially true here, given that, at the time of the Anywhere and RE/MAX Settlements the South Carolina case had not even been filed. And, while *Burton* had been filed at the time of the Keller Williams Settlement, a motion to coordinate the cases was pending for the JPML, and the Keller Williams Agreement included a provision that would have required cooperation in the potential MDL, including in *Burton* to the extent it was included. Keller Williams Agreement at ¶ 57. But instead of availing themselves of this benefit, the South Carolina Objectors strenuously and successfully opposed the formation of an MDL that would have given them access to the cooperation they now say they want. And it would have been unrealistic to expect the Settling Defendants to agree to provide cooperation to unknown plaintiffs' counsel in an unknown number of cases of equally unknown scope and composition. There is nothing about the cooperation agreement that makes the Settlement unfair, unreasonable, or inadequate.

### iv. The Settlement amounts are fair and adequate and were reached over many years of arm's length negotiations.

South Carolina objectors complain that the Settlement amounts are too low. They do not say what amount would have been adequate, only that they do not like what was obtained. But because they fail to point to even a scintilla of evidence of collusion, the South Carolina objectors lack a cognizable complaint. "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (cleaned up); *see also Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678

F.3d 640, 649 (8th Cir. 2012) ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 520 (8th Cir. 2015) ("The plaintiffs who opted out of the settlement could have brought their own individual or collective action against the NFL and potentially obtained the direct financial payout they allege is lacking in this settlement."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312–13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. The trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." (cleaned up) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) and *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975))); *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (approving settlement despite the fact that "the settlement amount would not begin to cover the total costs of medical treatment for the class which easily could amount to billions of dollars" and holding "[t]he fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate"), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

The standard before the Court is whether the settlement is fair, reasonable, and adequate—not perfection. *See Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 54 (W.D.N.Y. 2018) ("The court's task, then, is simply to decide whether the settlement agreement *as written* is fair, reasonable, and adequate, not whether the parties or the court could conceivably have come up with a 'better' agreement.") (emphasis in original). Class Counsel, having strenuously litigated the case for years, were in the best position to make this determination. There is no suggestion, nor could there be, that Class Counsel were uninformed, lacked experience and expertise, or that they were prevented from negotiating the best deal possible for the class. Class Counsel negotiated

based on a fully-developed record on liability, damages, the risks of continued litigation, and the financial condition of the Settling Defendants. And the Settlements obtained are impressive in a case where that defendants fought at every turn, any trial judgment would have been appealed, and the possibility of bankruptcy was ever present.

As Class Counsel reflected in previous filings and the concurrently filed Declaration of Karl P. Barth, Class Counsel exhaustively analyzed the finances of Settling Defendants, including the possibility that they could file for bankruptcy protection, which likely would have resulted in lower recoveries, if any, for the class than were obtained via the Settlements. Barth Decl., ¶¶ 6-9; 12-24. Regardless of the South Carolina Objectors' quibbles, settlement amounts were reached at arms-length between experienced counsel and represented the most Class Counsel believed Settling Defendants were reasonably able and willing to pay under the financial and legal circumstances existing at the time of the Settlements. And Class Counsel acted prudently in obtaining certain relief now, rather than risking bankruptcy and/or reversal on appeal. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate.") (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) ("While it is undisputed that [the settling defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate."); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 125 (8th Cir. 1975) (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

The South Carolina objectors argue that the settlements are "insufficiently compensatory" because the Settling Defendants are "in much better financial condition" than Plaintiffs claim. ECF No. 1441 at 8-9. But their only support for this proposition is an assertion by their "expert" that the Settling Defendants purportedly generated a positive return over various non-GAAP metrics *over a nine-year period from 2015 – 2023*. ECF No. 1441, p. 8. The Alford Dec. should be disregarded for the reasons set forth above. And, even if these factual assertions regarding non-GAAP financial metrics were accepted, the South Carolina objectors do not and cannot argue that operating EBITDA purportedly generated as long ago as 2015 has any relevance to the Settling Defendants' current ability to pay a judgment. The current capacity to pay a settlement must be assessed base on the current level of cash and other assets, and possibly from future revenue streams. Barth Decl., ¶¶ 6-9, 12-24. These objections to the Settlement amounts based on unsupported characterizations of the Settling Defendants' financial and legal ability to pay a larger judgment should be rejected.

> ### v. Releasing corporate affiliated, including franchisees, is common, and does not undermine the Settlements' fairness, reasonableness or adequacy.

South Carolina Objectors say that the Keller Williams Settlement releases Keller Williams franchisees without formally binding Keller Williams franchisees to do anything. But this ignores the actual facts, the history of this case, and common sense. Plaintiffs' alleged that, among other things, Keller Williams required franchisees to belong to NAR and trained its agents to make offers of compensation, including at a particular level. But under the Settlement, Keller Williams has agreed to remove any requirement to join NAR. And Keller Williams is also now required to instruct and train its franchisees that, among other things: offers of compensation are not required; they must be transparent with customers that commissions are negotiable; steering is not permissible; and minimum commissions are not permitted in franchise agreements. *See* ECF No.

1371-1, ¶ 53 (listing changes to business practices that Keller Williams will implement). In addition, to the extent that Keller Williams franchisees engage in anticompetitive conduct in the future, they are not protected from suit.

Moreover, courts routinely recognize that corporate affiliates may be released in class settlements, even where the settlement does not explicitly allocate separate consideration to those affiliates. *In re Am. Inv'rs Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, 263 F.R.D. 226, 240 (E.D. Pa. 2009) (overruling objection to release of independent sales agents of insurance company because "the release of agents is a necessary component of the settlement agreement in order to provide finality. Otherwise, dissatisfied policyholders could sue the defendants' agents who would then, in turn, look to the defendants for indemnity or contribution.") (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450, 522-23 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)); *Shay v. Apple Inc.*, No. 3:20-cv-1629, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.") (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010)); *Maine State Ret. System v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2013 WL 6577020, at *7, *17 (C.D. Cal. Dec. 5, 2013) (overruling objection that argued "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Prods., Inc.*, No. 15-CV-1801, 2017 WL 5479637, at *8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third party retailers was inappropriate: "this argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims . . . . Millennium is a manufacturer that sells its products through various retailers, so any claims Ference purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling

allegations asserted here. This objection is overruled."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) (approving class settlement with broad releases including non-parties, including member banks, insurance companies and Swiss governmental entities).

This principle applies to the release of franchisees. *See Flaum v. Doctor's Assocs., Inc.*, No. 16-CV-61198, 2019 WL 2576361, at *3 (S.D. Fla. Mar. 11, 2019) (final approval of settlement releasing all Subway franchisees in suit against Subway franchisor); *Adkins v. Nestle Purina PetCare Co.*, No. 12-CV-2871, 2015 WL 10892070, at *4 (N.D. Ill. June 23, 2015) (final approval of settlement releasing variety of non-parties, including suppliers, manufacturers, retailers, and franchisees); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-4818, 2015 WL 3990915, at *3 (N.D. Cal. June 30, 2015) (preliminary approval of settlement releasing franchisees) & ECF No. 167 (Feb. 8, 2016) (ordering final approval of settlement).

> ### vi. The injunctive relief duration is fair, reasonable and adequate and in line with other injunctive relief settlements.

The South Carolina Objectors question the duration of practice change relief. *See, e.g.*, ECF No. 1371-1 (Keller Williams Settlement) ¶ 54 (business practice changes "will sunset 5 years after the Effective Date" unless automatically terminated at an earlier time by another provision). But a time limitation on practice changes is reasonable. No company wishes to stay under the enforcement power of a court indefinitely, nor does a court wish to retain such indefinite jurisdiction. For these reasons, injunctive relief settlements with sunset provisions are routinely approved, often for shorter periods than the five-year periods at issue here. *See, e.g., Smith v. Atkins*, 2:18- cv-04004-MDH, Order Approving Settlement, at ECF 53 (W.D. Mo. June 26, 2020) (approving settlement of nationwide class with 2-year practice change requirement)*; Zepeda v. PayPal, Inc.*, No. 10-CV-1668, 2017 WL 1113293, at *13 (N.D. Cal. Mar. 24, 2017) (approving final settlement with expiration of injunctive relief after two years: "ensuring that Defendants

maintain such practices until two years following the date of the Preliminary Approval Order"); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, No. 12-MD-2320, 2015 WL 7282543, at *10 (D.N.H. Nov. 16, 2015) (approving final settlement and overruling objections "that the injunctive remedies go away in five years" and observing the injunctive relief "provides a valuable benefit to the class" and just because the injunction is not as broad as some class members wanted "does not make this settlement inadequate"); *Fla. ex rel. Crist v. HCA, Inc.*, No. 03-CV-177, 2002 WL 32116840, at *4 (M.D. Fla. Apr. 23, 2002) (entering a final consent judgment in a Sherman Act case, in which monetary payments and injunctive relief were provided and the judgment was set to expire in five years); *In re HP Inkjet Printer Litig.*, No. 05-CV-3580, 2011 WL 13156938, at *5 (N.D. Cal. Mar. 29, 2011) (order approving settlement with injunctive relief expiring within at least three years). Not to mention that the settlements at issue here provide a longer period of injunctive relief than other settlements that have been reached in other real estate commission antitrust suits. *See Nosalek v. MLS Property Information Network, Inc.,* No. 20-cv-12244 (D. Mass,) (Doc 268-1) ¶ 9(a) (MLS PIN injunction of three years).

### 2. The Court Should Overrule the Pennsylvania Objection (Doc. 1448).

The Pennsylvania objection was filed by the plaintiff and lawyers who brought a case filed on December 6, 2023—again, after the Anywhere and RE/MAX Settlements and after the *Burnett* verdict. Their objections closely track the South Carolina objections, and the arguments are generally word-for-word identical. The Pennsylvania objection should be overruled for the same reasons as the South Carolina objections should be overruled.

And as with the South Carolina Objectors, the Pennsylvania Objectors' claim that the Pennsylvania real estate industry is somehow unique, is belied by their Amended Complaint which

says the opposite: "Defendants' anticompetitive practices are not unique--as they represent western Pennsylvania's local version of collusive practices that are widespread within the residential real estate industry." Amended Complaint Doc. 30 at ¶ 11. The Amended Complaint further stated: "Recently, a federal jury in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-00332-SRB (Western District of Missouri), found that rules, policies, and practices similar in both design and effect to those at issue here violated federal antitrust law. The jury in Burnett imposed a historic ten-figure judgment on the defendants." Amended Complaint Doc. 30 at ¶ 11. The Complaint further alleges: "Like the defendants in *Burnett*, Defendants' conduct unlawfully restrains trade and competition, harms home sellers in the form of inflating the cost of selling a house (therefore eating into the equity a seller may have accrued in his or her property), and is, therefore, violative of federal antitrust law." Amended Complaint at ¶ 12. Thus, according to the Pennsylvania Objectors' own allegations, a nationwide class settlement is appropriate due to the similarity of practices and alleged anticompetitive effect across the United States.

For all the reasons stated above with respect to the South Carolina objection, the Pennsylvania objection should also be overruled.

### 3. The Court Should Overrule the *Batton* Objections.

As discussed above, when approving a proposed settlement, courts regularly certify broader classes and release broader claims than those originally pleaded in the action. *See, e.g.*, *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this."); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (concluding that "in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the

core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action"); *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20-21 (7th Cir. 1976) (rejecting argument that settlement could release only claims asserted in underlying litigation); *Robertson v. Nat'l Basketball Ass'n*, 622 F.2d 34, 35 (2d Cir. 1980) (affirming injunction against individual player's suit that was released by class action in which he was member); *In re VMS Ltd. P'ship Securities Litig.*, 1995 WL 678493, at *1 (N.D. Ill. Nov. 8, 1995) ("There is no barrier to such releases even if they encompass claims broader than those plead in the complaint so long as the release is clear and part of a just settlement."). Achieving this kind of broad relief is often a prerequisite to reaching a settlement in the first place, because a defendant will not agree to a meaningful settlement unless it can obtain global peace. *See, e.g.*, *Albin v. Resort Sales Missouri, Inc.*, No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (reasoning that the absence of "a single nationwide class action" would "discourage class action defendants from settling") (quotation omitted).

Accordingly, the releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the settlement defendant arising out of the same conspiracy, including to the extent those direct purchasers may also have indirect-purchaser claims. *See, e.g.*, *In re Transpacific Passenger Air Transportation Antitrust Litigation* (N.D. Cal, 07-cv-5634), ECF No. 900-2 § 1.11 (releasing "any and all claims . . . on account of, arising from, or in any way related to, the pricing of passenger air transportation by JAL or Defendants . . . with respect to the facts, occurrences, transactions or other matters that were alleged or could have been alleged [in the action] . . . regardless of legal theory, and regardless of the type or amount of relief or damages claimed"); *In re: Processed Egg Products Antitrust Litigation* (E.D.P.A., MDL 2002),

ECF No. 349-1 ¶ 25 (similar); *In re Intuniv Antitrust Litigation* (D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar); *In re: Prograf Antitrust Litigation* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re Pre-Filled Propane Tank Antitrust Litigation* (W.D. Mo. 14-md-2567 / MDL No. 2567), ECF No. 362-1 ¶ 12 (similar); *In re HIV Antitrust Litigation* (N.D. Cal, 19-cv-02573), ECF No. 711-2  at 11-12 (similar); *In re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637), ECF No. 3324, ¶ 26 (similar).

Courts have approved these settlements even over objections that the settlement improperly releases or otherwise devalues a subset of claims. *See In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554, 555-56 (9th Cir. 2017) ("The district court properly certified the settlement class and was not obligated to create subclasses for purchasers of U.S.-originating travel and direct purchasers of airfare. Federal Rule of Civil Procedure 23(a) does not require a district court to weigh the prospective value of each class member's claims or conduct a claim-by-claim review when certifying a settlement class."); *In re HIV Antitrust Litig.*, 2023 WL 7397567, at *1 (N.D. Cal. Nov. 8, 2023) (rejecting indirect purchasers' request to set aside portion of direct-purchaser settlement).

Here, James Mullis has filed an objection based on his status as a plaintiff in the homebuyer actions pending in the Northern District of Illinois, *Batton v. Nat'l Ass'n of Realtors, et al.*, No. 21-cv-430 (N.D. Ill.) (*Batton I*) and *Batton v. Compass, et al.*, No. 23-cv-15618 (N.D. Ill.) (*Batton II*). The complaint in *Batton I* was first dismissed on May 2, 2022, because the homebuyer plaintiffs are indirect purchasers who lack federal antitrust standing under *Illinois Brick. Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 308-11 (N.D. Ill. 2022). Notably, the *Batton I* Court dismissed the claims for injunctive relief because "home sellers, as the direct purchasers of buyer-broker services, are necessarily more directly injured by Defendants' alleged antitrust violations.

Moreover, home sellers are, in fact, vindicating the public interest in antitrust enforcement as they are actively challenging the same NAR rules." *Id.* At 313. The *Batton I* plaintiffs filed an amended complaint, which was dismissed in part on February 20, 2024. *See Batton v. Nat'l Ass'n of Realtors*, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024). The amended complaint sought only injunctive, not monetary, relief under federal law and asserted antitrust or consumer-protection law claims under 35 states' laws. *Id.* at *2. The *Batton I* Court permitted some state-law indirect purchaser claims to proceed, but dismissed the claim for injunctive relief under federal law—noting, once again, that "home seller plaintiffs are better suited to seek the injunctive relief that Plaintiffs seek here." *Id.* at *10.

Mullis first contends that the proposed settlements should not be read to release any claims by homeseller members of the settlement class that relate to home purchases made by those class members within the class period. Plaintiffs do not opine on how to interpret the Settling Defendants' conduct, on which Mullis largely relies. But Plaintiffs believe that the settlement language means what it says: as is common in antitrust direct-purchaser settlements, the settlements release "any and all manner of claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." Homebuyer claims asserted by homeseller class members indisputably arise out of the same alleged conspiracy and the same factual predicates as the seller claims. *See Batton I* Am. Compl., ECF No. 84 ¶¶ 1-11 (describing background of conspiracy centered around NAR and the buyer-broker commission rules); *Batton II* Compl., ECF No. 1 ¶¶ 1-12 (same). The class notice was also explicit that "[t]he release does not extend to any individual claims that a class

member may have against his or her own broker or agent . . other than a claim that a class member paid an excessive commission *or home price* due to the claims at issue."  The release is thus consistent with Eighth Circuit authority holding that parties may release *all* claims—even those *not* pleaded—so long as they are based on the same factual predicate as the pleaded claims. *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (rejecting objection that "the settlement contained an overbroad release" and finding that it permissibly released only claims "[]related to leaky brass fittings," i.e., the subject of the litigation); *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 190-91 (8th Cir. 1993) (affirming district court's approval of settlement that released claims which could have been but were not brought and finding that "the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action"); *Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 628 (S.D. Iowa 2016) (release was "not overly broad" because it was "only applicable to claims 'arising out of, or relating to'" the factual predicate giving rise to the plaintiffs' claims), *aff'd sub nom. Huyer v. Njema*, 847 F.3d 934 (8th Cir. 2017).[10]

Mullis next argues that if the settlements do cover homebuyer claims asserted by homeseller class members, the settlements are necessarily objectionable. This argument fails in light of the substantial discretion afforded to settling parties, and the courts tasked with evaluating the settlements.[11] Furthermore, as discussed above, the settlements took into account each Settling

---

[10] The cases Mullis cites to the contrary are inapposite. *See Graves v. Cam2 Int'l LLC*, 2020 WL 3968040, at *9 (W.D. Mo. July 13, 2020) (settlement involving one type of product did not release claims involving a different type of product); *Karg v. TransAmerica Corp.*, 2019 WL 3938471, at *4 (N.D. Iowa Aug. 20, 2019) (settlement releasing claims related to defendants' use of a middleman to manage plan portfolio and incurring related fees did not release later claims for plan's improper retention of challenged funds despite sustained poor performance).

[11] And to the extent that the *Batton* objectors might quibble with the allocation formula, their objections (if appropriate) are at most premature. *See* section VI(D)(1) above.

Defendant's ability to pay. Of course, if a homeseller believed that they would be better off by opting out of the settlement to be able to pursue buyer claims, they were entitled to do so.

Mullis's complaints about adequacy are likewise unfounded. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members."). At least nine of the named Plaintiffs in this case both bought and sold homes within the class period (Scott Trupiano, Ryan Hendrickson, Jeremy Keel, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh). (Stiroh Expert Rpts.) These Plaintiffs have, of course, considered the strength and value of potential homebuyer claims and are capable of ably representing the interests of home seller Class Members who also purchased homes. As the Eighth Circuit stated in *General American*, confronting a claim by a class member that some of her claims had been improperly released:

> It simply is not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims, were released. The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefitted, and a claims-evaluation procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things. That is the way settlements usually work. It was the judgment of the class representative that the general class of claims rising out of policy charges, known and unknown, was a proper thing to give up to obtain the benefits offered by General American.

357 F.3d at 805. So too here, where Plaintiffs determined that the best result for all homesellers— including Mullis—was to obtain these substantial settlements by releasing all of Class Members'

claims arising out of the same conspiracy. This is not a case where there are different groups of plaintiffs with non-overlapping claims that might conflict. *See, e.g.*, *Leeder*, 601 F. Supp. 3d at 308-11; *Batton*, 2024 WL 689989, at \*10; *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes.").

None of the Batton Objector's cited cases support denying approval of the Settlements. Some of them involve cases where the objectors' claims had either been previously represented as an integral part of the case, or where the court had no basis on which to assess them. *Cf. In re Bank of America Securities Litig.*, 210 F.R.D. 694, 712 (E.D. Mo. 2002) (finding settlement unreasonable where it allocated no damages to set of claims that plaintiffs had previously pursued and represented as among the strongest in the case); *Branson v. Pulaski Bank*, 2015 WL 139759, at \*6-7 (W.D. Mo. Jan. 12, 2015) (rejecting settlement where there was no evidence of the merits of plaintiffs' claims and settlement appeared to be the result of unequal bargaining power); *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 387 (D. Minn. 2013) (rejecting proposed settlement submitted the day after complaint was filed where the court had no information about the potential damages or relative strengths and weaknesses of claims). The rest are cases where there were intractable conflicts between subclasses of class members holding present, known claims and those holding claims for potentially future, unknown injuries. *Cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626-27 (1997) (finding adequacy requirement was not satisfied where plaintiff class included potential claimants with unrealized claims and damages that conflicted with claimants with present claims); *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999) (finding proposed settlement inadequate where it failed to distinguish between presently-held and future claims and ignored consequence

of the timing of claims covered by insurance policy); *see also Petrovic*, 200 F.3d at 1145-46 (distinguishing *Ortiz* and *Amchem*). Neither set of authorities apply here, where Plaintiffs reached Settlements that further the interests of the homeseller class as a whole and afford monetary relief to all class members.

## VII. CLASS CERTIFICATION REMAINS APPROPRIATE

In its Preliminary Approval Orders, the Court provisionally certified the Settlement Classes for settlement purposes, finding that these classes met each of Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and that these classes met each of Rule 23(b)(3)'s predominance and superiority requirements. Nothing has changed since the Court's ruling to call the Court's conclusions regarding class certification into question. Accordingly, for the reasons set forth in the Preliminary Approval Motion and Order, Plaintiffs ask that the Court certify the Settlement Classes. *See McMorrow v. Mondelez Int'l, Inc.*, 2022 WL 1056098, at *3 (S.D. Cal. Apr. 8, 2022) (granting final approval to settlement that expanded previously certified litigation classes to a nationwide settlement class, because "[e]xpansion of the class to include all purchasers nationwide . . . does not change the class certification analysis," as defendant's alleged misconduct of selling products bearing false and misleading information about nutritional value "appear[ed] to be uniform across the United States"); *Eubank v. Pella Corp.*, 2019 WL 1227832, at *4 (N.D. Ill. Mar. 15, 2019) ("As the Court previously found when it entered the original class certification order, common questions of fact exist as to whether Pella's ProLine windows suffered from an inherent defect, when Pella knew of the defect, and what steps Pella took to address the defect. Although the current class definition expands the scope of the class [to a nationwide class], these common questions remain and the settlement class therefore satisfies the commonality requirement."); *Rikos v. Proctor & Gamble Co.*, 2018 WL 2009681, at *4, *6 (S.D. Ohio Apr. 30,

2018) (granting final approval to settlement that expanded five-state litigation class to a nationwide settlement class, because the expansion "does not undermine the fundamental cohesion" of the class, and the common issue of whether defendant falsely advertised that its product promotes digestive health remained predominant); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 57, 73 (D. Mass. 2005) (granting final approval to "an expanded fifty-state class" of end-payors, because the issue of whether defendants enforced a fraudulent patent for the purpose of "delaying the availability of a less expensive generic alternative" remained predominant).

## VIII. CONCLUSION

The Settlement Agreements achieve the goals of the litigation, benefits the Settlement Classes, and account for the risks and uncertainties of continued, vigorously contested nationwide litigation. For the reasons set forth herein, the Settlements are fair, reasonable, and adequate and merit final approval. Plaintiffs therefore respectfully request that the Court certify the Settlement Classes, consider and overrule all objections to the Settlements, grant final approval to the Settlements, approve the requested attorneys' fees and expenses, and enter a final judgment. Plaintiffs will also submit a Proposed Final Approval Order for consideration by the Court.

May 2, 2024                                        Respectfully Submitted,


/s/ Robert A. Braun                               /s/ Eric L. Dirks

Benjamin D. Brown (*pro hac vice*)                Eric L. Dirks MO #54921
Robert A. Braun (*pro hac vice*)                  Matthew L. Dameron MO #52093
**COHEN MILSTEIN SELLERS & TOLL**                 **WILLIAMS DIRKS DAMERON LLC**
**PLLC**                                          1100 Main Street, Suite 2600
1100 New York Ave. NW, Fifth Floor                Kansas City, Missouri 64105
Washington, DC 20005                              Tel:    (816) 945-7110
(202) 408-4600                                    Fax:    (816) 945-7118
bbrown@cohenmilstein.com                          dirks@williamsdirks.com
rbraun@cohenmilstein.com                          matt@williamsdirks.com

Steve W. Berman (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com

Rio S. Pierce (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000
riop@hbsslaw.com

Marc M. Seltzer (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
(310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Brandon J.B. Boulware MO # 54150
Jeremy M. Suhr MO # 60075
Erin D. Lawrence MO # 63021
**BOULWARE LAW LLC**
1600 Genessee, Suite 416
Kansas City, MO 64102
Tel:   (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com

Michael Ketchmark MO # 41018
Scott McCreight MO # 44002
**KETCHMARK AND MCCREIGHT P.C.**
11161 Overbrook Rd. Suite 210
Leawood, KS 66211
Tel:   (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

*Attorneys for the Settlement Classes*

US.363840865.02