# Exhibit 2

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES, HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Civil Action No. 19-CV-00332-SRB |

**DECLARATION OF KARL P. BARTH
IN SUPPORT OF FINAL
APPROVAL OF PLAINTIFFS' SETTLEMENTS WITH
ANYWHERE REAL ESTATE, INC. (f/k/a REALOGY HOLDINGS CORP.), RE/MAX
LLC, AND KELLER WILLIAMS REALTY, INC.**

010788-11/2538794 V1

G:\Real Estate Commissions Antitrust\00332\Settlement\Final Approval\Declaration of Karl Barth ISO Motion (2538794.1).docx

Case 4:19-cv-00332-SRB Document 1469-2 Filed 05/02/24 Page 2 of 7

I, Karl P. Barth, state under oath, as follows:

1. I submit this declaration in support of Plaintiffs' Motion for Final Approval of Settlements with Realogy Holdings Corp., RE/MAX LLC and Keller Williams Realty, Inc. based on personal knowledge regarding the matters stated herein.

2. I am an attorney at Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), Co-Lead Class Counsel in the *Moehrl* litigation. In addition to being an attorney, I am also a licensed Certified Public Accountant and a Certified Fraud Examiner.

3. Prior to agreeing to the settlements with Realogy Holdings Corp. ("Anywhere"), RE/MAX LLC ("RE/MAX") and Keller Williams Realty, Inc. ("KW") (combined, "Defendants"), in conjunction with the other members of Plaintiffs' co-lead counsel, I performed a thorough financial and legal analysis of each of these Defendants' ability to fund a settlement or judgment in this case. I file this Declaration as a factual description and explanation of the processes that Plaintiffs' counsel employed in determining the Defendants' ability and capacity to pay a settlement.

4. The real estate brokerage industry has declined precipitously in 2022 and 2023, as can easily been seen by virtue of the declines in share price and market capitalization of all of its participants which we have studied. Brokerage companies have suffered huge losses in 2022 and 2023 that have drained their financial positions (including their cash balances and net assets), and have harmed their ability to generate profits into the future.

5. Because none of the defendants in *Burnett* could cover the *Burnett* judgment (particularly when trebled to $5.3 billion), let alone potential judgments in *Moehrl* and other cases, each of the Defendants' ability or capacity to pay has become a significant factor in evaluating the fairness of the potential settlements to the Class.

6. These "ability to pay" analyses considered various legal and financial metrics relevant each company's current ability to fund a settlement or judgment in this case. Specifically, we considered each company's: i) current net asset position and liquidation value; ii) value as a going concern (including future profitability and cash flows); iii) current borrowing

capacity; iv) ability to issue additional stock or equity; and v) contractual or other legal impediments to using existing assets to fund a settlement.

7. The current liquidation value of a company approximates the value of a company if its assets were sold and its existing liabilities were paid from the proceeds. The value that the Class could receive in such a liquidation is also impacted by security agreements or other liens on the company's assets. Further, the likely recovery for the Class in the event a Defendant files for bankruptcy is also considered in this phase. The amount of any potential cash settlement is judged against this liquidation value.

8. The "going concern" value of a company approximates the current value of a business as the present value of its future cash flows, adjusted by an appropriate discount rate. The going concern value, including the estimated cash flows and net income for the upcoming several years, is assessed and considered with respect to a company's ability: a) to make payments over the next several years; b) to borrow money to use in payment of the settlement; and c) to issue stock as part of the settlement or to sell stock or equity to third parties.

9. While we considered a wide variety of financial metrics in assessing the Defendants' likely future profitability, we primarily relied upon the Defendants' most recent Net Income (as calculated pursuant to Generally Accepted Accounting Principles) and Cash Flows, also as calculated pursuant to GAAP standards.

10. I have reviewed Professor Alford's Declaration filed in support of the objection to these settlements.[1] I note that he offered no opinion that any of the Settling Defendants had the ability to pay a larger settlement amount. Instead, he criticized certain of the metrics described in Plaintiffs' motion for preliminary approval and offered additional metrics, largely without any reason that they would have assisted in the analysis. Professor Alford's Declaration fails to consider certain overriding legal realities that were part of our analysis and are critically important to assessing a company's ability to fund a settlement, such as: 1) debt covenants or other contractual limitations; 2) security interests in the Defendants' assets; 3) minimum capital

---

[1] *Declaration/Affidavit of Charles Alford, Ph.D.*, ECF No. 1441-3, filed April 12, 2024.

requirements for regulatory reasons or securities exchanges; and 4) the availability of a Chapter 11 bankruptcy filing. These legal realities are central to any analysis of the Defendants' capacity to pay a settlement amount.

11. Prior to settling with the Defendants, we undertook extensive analysis of their financial condition by performing a financial review of important financial results and forecasts and legal review of certain parameters and limitations directly impacting their capacity to pay a settlement amount, including the following:

### Realogy Holdings Corp. (Anywhere)

12. We have continuously analyzed Anywhere since December 2022, when the Company first asserted that its ability to pay would be a constraining factor in any settlement. At that time, we analyzed the Company's SEC filings, earnings calls and various reports written by stock market analysts. By June of 2023, we had noted a significant decline in both the market conditions for real estate brokerages and Anywhere's prospects in particular.

13. Prior to settlement, we analyzed Anywhere's current liquidation value, including its cash balances and other liquid assets. Based upon its most recent (at the time) March 31, 2023 financial statements, Anywhere had only $179 million in cash. Because any company needs some amount of cash to operate, we believed that the proposed settlement of $83.5 million, which was nearly 50% of the Company's cash, was the most cash we could reasonably expect in settlement. Indeed, due to the continuing deterioration of the Company's financials, its cash balance had declined to just $106 million as of the end of 2023, making the proposed settlement now more than 78% of its total cash balances. Further, our review concluded that none of Anywhere's assets other than cash could be easily liquidated without an unacceptable disruption to the Company's business.

14. We also considered the company's value as a going concern, which we considered to be important to determining whether the Company could pay a significant additional amount over time or could borrow money or sell equity to further increase the settlement amount.

15. Based on these analyses, particularly in light of our perception of the risk that the Company could ultimately file bankruptcy if a settlement could not be reached, we concluded that the $83.5 million settlement was the largest amount that we could realistically expect to collect from the Company in settlement.

**RE/MAX LLC**

16. Prior to settlement, we analyzed RE/MAX's current liquidation value, including its cash balances and other liquid assets. Our analysis noted that RE/MAX had a relatively small amount of cash (which has since declined to less than $83 million by the end of 2023)[2] and more liabilities than assets as of the end of 2023.[3] Further, our review concluded that none of RE/MAX's assets other than cash could be easily liquidated without an unacceptable disruption to the Company's business.

17. We also considered the company's value as a going concern, which we considered to be important to determining whether the Company could pay a significant additional amount over time or could borrow money or sell equity to further increase the settlement amount. Based on these analyses, we concluded that none of those routes were viable for adding to the settlement.

18. Our conclusions regarding RE/MAX's going concern value has been proven correct as REMAX's share price closed at $7.02 on April 30, 2024, giving the Company a total market capitalization of just over $220 million.

19. Based on these analyses, and our analysis of the financial trajectory of both the industry and the Defendants, particularly in light of our perception of the risk that the Company could ultimately file bankruptcy if a settlement could not be reached, it was our conclusion that the proposed $55 million settlement is the highest amount that we could reasonably expect to recover for the Class.

---

[2] Alford Dec., ¶ 13.
[3] https://finance.yahoo.com/quote/RMAX/balance-sheet, viewed 4/30/24.

## Keller Williams Realty, Inc

20. We analyzed KW's current ability to pay a judgment prior to agreeing to settle with the Company in a manner similar to what we performed with respect to Anywhere and Re/Max. Although KW is a private company, Plaintiffs' co-counsel requested and received extensive financial information to pursuant to a protective order and FRE 408.

21. We analyzed the company's cash position, current assets and net assets, including KW's ability to pay a portion of its cash balances in settlement. Although KW is a private company without a quoted stock price, we estimated its value as a going concern, which we believed to be relevant to KW's ability to borrow money or sell equity in the company in order to help fund a settlement.

22. There were numerous discussions with KW representatives regarding the Company's financial condition. During the course of these discussions, we were made aware that the Company had retained bankruptcy counsel and intended to file for bankruptcy protection if a settlement could not be reached. We analyzed the potential recoveries for the Class in a bankruptcy filing scenario and concluded that the proposed settlement was superior to any potential recovery that we might obtain as part of a bankruptcy proceeding.

23. The settlement amount paid by KW was in excess of its cash on hand as of the date of its most recent financial statements (Q3 2023) at the time of the settlement.

24. Based on these analyses, we believe that the proposed settlement amount of $70 million is the largest amount that we could reasonably expect to collect from KW.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May 2, 2024, at Seattle, Washington.

                                           */s/ Karl P. Barth*
                                           KARL P. BARTH