IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Case No. 19-CV-00332-SRB |

**RE/MAX, LLC'S SUGGESTIONS IN RESPONSE TO OBJECTIONS AND IN SUPPORT OF FINAL APPROVAL OF THE PROPOSED NATIONWIDE CLASS SETTLEMENT**

**I.      INTRODUCTION**

This Court should grant final approval of the nationwide settlement between Plaintiffs and RE/MAX, LLC ("RMLLC") because the settlement terms are fair, reasonable, and adequate under Fed. R. Civ. P. 23(e)(2). After almost five years of extensive litigation, and following arms-length negotiations that included multiple mediations with different arbitrators and culminated in an extended mediation with a nationally recognized mediator, Plaintiffs representing two separate classes reached a settlement with RMLLC on behalf of themselves and the Settlement Class. (*See* Dkts. 1138, 1192). The settlement was reached in September 2023, a month before the trial against the National Association of Realtors and other defendants in *Burnett, et al. v. National Association*

- 1 -
Case 4:19-cv-00332-SRB   Document 1473   Filed 05/03/24   Page 1 of 12

*of Realtors, et al.*, Case No. 19-CV-00332-SRB, and before the few copycat cases[1] that name RMLLC as a defendant were filed later that year and earlier this year. The settlement agreement resolves on a nationwide basis all actual and potential claims for damages and injunctive relief against RMLLC and its affiliates by any member of the Settlement Class that engaged a residential real estate broker or agent and paid cooperative compensation in connection with a residential home transaction.

In Plaintiffs' Suggestions in Support of Final Approval of Settlements with Anywhere, RE/MAX and Keller Williams ("Plaintiffs' Suggestions in Support of Final Approval"), Plaintiffs explain that the settlement agreement reached between Plaintiffs and RMLLC is fair, reasonable, and adequate. (*See* Dkt. 1469). RMLLC joins Plaintiffs' Suggestions in Support of Final Approval, and submits this separate filing to further address why the few objections to final approval should be rejected, and the settlement with RMLLC should receive final approval.

## II. THE COURT SHOULD GRANT FINAL APPROVAL OF RMLLC'S SETTLEMENT

A class action must be resolved on terms that are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This Court has wide discretion in determining whether to grant approval. *See Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988) (listing factors for district courts to consider). Plaintiffs' Suggestions in Support of Final Approval analyzes these factors and explains why the settlement with RMLLC should receive final approval.

Despite the incredibly large size of the nationwide settlement class, there were exceedingly few objections filed to the settlement. RMLLC addresses the following arguments raised by the

---

[1] The cases are *March v. Real Estate Board of New York, et al.*, Case No. 1:23-cv-09995 (S.D. NY); *Grace v. National Association of Realtors, et al.*, Case No. 4:23-cv-06352 (N.D. Cal.); *Willsim Latham, LLC v. Metrolist Services, Inc., et al.*, Case No. 2:24-cv-00244 (E.D. Cal.); and *Jensen v. National Association of Realtors, et al.*, Case No. 2:24-cv-0109 (D. Utah).

objectors insofar as they apply to RMLLC: (1) the amount paid by RMLLC was inadequate (Dkt. Nos. 1441, 1448), (2) the RMLLC settlement agreement improperly included franchisees (Dkt. Nos. 1441, 1448), and (3) the scope of the RMLLC settlement agreement is broader than the certified classes in *Burnett* and *Moehrl* (Dkt. Nos. 1441, 1447, 1448).

### A. The Settlement Agreement Adequately Compensates the Settlement Class.

The $55 million settlement amount paid by RMLLC, along with the practice changes that RMLLC agreed to implement, fairly and adequately compensate the Settlement Class. The Court received only two filings objecting to the monetary terms of Plaintiffs' settlement. (Dkt. Nos. 1441, 1448).[2] Although RMLLC agrees with the points raised by Plaintiffs' in their Suggestions in Support of Final Approval regarding the adequacy of the monetary terms included in Plaintiffs' settlement agreement with RMLLC, the broader procedural posture of this case at the time of settlement is important in evaluating the monetary relief included in the settlement agreement.

At the time RMLLC entered into a settlement agreement with Plaintiffs, the outcome of any trial was very much in doubt. In evaluating the adequacy of the settlement terms agreed to between RMLLC and Plaintiffs, the Court should look at the strength of the credible defenses available to the settling party. *See Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017) (endorsing determination by the district court that the merits of the case weighed in favor of approving the settlement terms because the defendant "had credible defenses"); *In re Pork Antitrust Litig.*, No. 18-cv-17776, 2022 WL 4238416, at *2 (D. Minn. Sept. 14, 2022) (granting final approval of antitrust settlement that provided "substantial relief against the backdrop of a great deal of

---

[2] One of the two objections is styled as an "OBJECTION TO THE NATIONWIDE CLASS ACTION SETTLEMENT FOR REALOGY HOLDINGS CORP." (Dkt. No. 1448). Although the objection does not purport to apply to RMLLC, the reasons for rejecting it as to RMLLC are addressed here.

uncertainty where the merits are highly contested"). These facts should be evaluated within the context of the "stage of the litigation at the time of settlement." *Prince v. Aramark Corp.*, 257 F. Supp. 3d 20, 25 (D.D.C. 2017); *see also In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 105 (D.D.C. 2013). Although the claims against some of RMLLC's co-defendants proceeded to trial and Plaintiffs ultimately received a sizable award, that verdict did not include the defenses that RMLLC would have presented at trial. Furthermore, the Court evaluates the financial terms of RMLLC's settlement at the time that Plaintiffs entered into the settlement and does not take subsequent events into account. *See, e.g.*, *Moreno v. San Francisco Bay Area Rapid Transit Dist.*, No. 17-CV-02911-JSC, 2019 WL 343472, at *4 (N.D. Cal. Jan. 28, 2019) (evaluating the strength of Plaintiff's claims in light of various risks to Plaintiff's case "at the time of settlement").

If Plaintiffs and RMLLC had proceeded to trial in the *Burnett* case, there would have been evidence of RMLLC's requirements in its franchise agreements that franchisees be members of the National Association of Realtors, and in its model independent contractor agreements that affiliated real estate agents be members of and have access to the local Multiple Listing Service. The language in these agreements was added ***decades before*** the start of the alleged conspiracy and, indeed, decades before the National Association of Realtors rules that were the subject of the lawsuit. (Dkt. No. 926 at 11). The provisions in these agreements involved unilateral business decisions and could not have been viewed as part of any conspiracy. Plaintiffs would have been hard-pressed to prove otherwise given the unrefuted testimony of RMLLC's key executives, each of whom testified in deposition and would have so testified at trial, that rational non-conspiratorial business justifications existed for including the requirements in franchise and independent contractor agreements. Indeed, these executives further testified that they were unaware of the

Cooperative Compensation Rule that Plaintiffs claim is the basis of the conspiracy until after the lawsuits were filed. (*Id.* at 10). In addition, RMLLC received a disproportionately small amount of revenue in Missouri from commissions paid to franchisees, smaller than any of the other defendants in the litigation, rendering the notion that RMLLC would conspire to inflate commissions implausible. (*See id.* at 19).

Plaintiffs would have had particular difficulty proving that RMLLC joined a conspiracy because Plaintiffs lacked any direct evidence of RMLLC's alleged involvement in the conspiracy. RMLLC is a franchisor and does not own or operate any real estate brokerages businesses. (*Id.* at 7). Moreover, RMLLC is not involved in the day-to-day operations of its franchisees and does not dictate how those franchisees conduct their business, outside of the limited contractual provisions included in Franchise Agreements. (*Id.* at 8). In fact, RMLLC's trademarks manual, which all franchisees and sales associates must abide by, explicitly stated that its franchisees and their sales associates cannot "lead consumers to believe that commission rates or fees of RE/MAX offices or Associates are uniform, set at any specific level, or are not negotiable." (*Id.* at 16).

Taken together, these facts would have posed significant obstacles for Plaintiffs had they proceeded to trial against RMLLC — obstacles that the Court must take into account when evaluating the financial terms of RMLLC's settlement agreement. *See Huyer*, 847 F.3d at 939. Further, even if Plaintiffs had succeeded against RMLLC at trial, the result of any appeal would have been uncertain and any jury verdict against RMLLC could have been overturned. *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 995–96 (N.D. Ohio 2016) (granting final approval of settlement in light of "real possibility that [Plaintiffs] could have received much less— even zero—from a jury at trial or following an appeal"); *White v. Nat'l Football League*, 836 F. Supp. 1458, 1478–79 (D. Minn. 1993) (granting final approval of settlement in antitrust class

action where a risk existed that "if defendants were to prevail on certain issues" on appeal then the plaintiffs could be "entirely precluded from establishing liability"); *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) ("[A]ny verdict would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement." (citation omitted)).

The settlement between RMLLC and Plaintiffs is particularly reasonable in light of RMLLC's financial condition, which Plaintiffs also explain in their final approval brief. The $55 million settlement represents almost a quarter of the company's current total market capitalization value. *See* https://finance.yahoo.com/quote/RMAX?p=RMAX&.tsrc=fin-srch (last viewed Apr. 24, 2024). Moreover, RMLLC's June 30, 2023 financial statements demonstrate that the company is unable to pay a materially higher amount, with the settlement totaling 56.9% of the company's total cash and equivalents of $96.8 million held by RMLLC at the time the settlement was reached. *See* RE/MAX Holdings, Inc., Quarterly Report (Form 10-Q), at 3 (Aug. 2, 2023). In similar circumstances, courts have found that a company's ability to pay weighed in favor of settlement where continued litigation could further deteriorate that company's finances and potentially decreased the amount of funds distributed to the class. *See, e.g.*, *Long v. Se. Pennsylvania Transportation Auth.*, No. CV 16-1991, 2021 WL 10343501, at *1 (E.D. Pa. Oct. 8, 2021) ("The Court finds that Defendant's ability to withstand a greater judgment is uncertain, and settlement alleviates uncertainty about Defendant's financial condition."); *Aramburu v. Healthcare Fin. Servs., Inc.*, No. 02-CV-6535MDG, 2009 WL 1086938, at *4 (E.D.N.Y. Apr. 22, 2009) ("Even if plaintiffs secured a judgment greater than the settlement, after trial, defendant's financial condition could decline further in the future and would undoubtedly be impacted by the costs of further

litigation."); *Dekro v. Stern Bros. & Co.*, 571 F. Supp. 97, 101 (W.D. Mo. 1983) ("[I]t is uncertain whether defendant could pay a substantially greater judgment at some time in the future, especially if defendant incurred considerable additional expense in the defense of this action.").

### B. The Settlement Agreement Appropriately Releases RMLLC's Franchisees.

The settlement agreement also addresses and releases RMLLC's franchisees, which are affected by the practice changes set forth in the settlement agreement. The Court received two objections asserting that the RMLLC settlement agreement "requir[es] the franchisees to neither pay nor change" and "releases franchisees in exchange for nothing." (Dkt. No. 1441 at 5; Dkt. No. 1448 at 4). These objections are based on a fundamental misunderstanding of the allegations in the underlying litigation, the terms of the settlement agreement, and the reality of RMLLC's business as a franchisor.

Plaintiffs alleged a conspiracy involving RMLLC and all of its affiliates. (*See* Third Amended Complaint, Dkt. No. 759 ¶ 35 (referring to "franchisees and brokers" as "co-conspirators"); *Moehrl* Amended Complaint, Dkt. No. 84 ¶ 39 (referring to "Multiple franchisees and brokers" as "co-conspirators")). The settlement agreement included practice changes that will affect all franchisees that affiliate with RMLLC. These practice changes include requirements that RMLLC: (1) make clear and periodically remind "franchisees and agents affiliated with those franchisees that [RMLLC] does not require them to make offers of compensation or to accept offers of compensation from cooperating brokers"; (2) make clear that "franchisees and affiliated agents acting as buyer-side brokers or agents must be transparent with their clients in accurately disclosing their compensation structure"; (3) refrain from providing certain software to franchisees and affiliated agents; (4) advise and periodically remind "franchisees and affiliated agents of their obligation to show and market properties regardless of the existence or amount of cooperative

compensation offered"; (5) refrain from expressing or implying a "minimum commission requirement in franchise agreements, training materials or other policies"; (6) develop certain educational materials for franchisees; and (7) no longer require franchisees and their affiliated agents to join or be members of the National Association of Realtors or follow NAR's code of ethics or MLS handbook. (Dkt. No. 1192-4 ¶ 51). Thus, the settlement agreement requires RMLLC to make practice changes that will have a direct impact on all of its affiliated franchisees.

Moreover, it would have made no economic sense for RMLLC to enter into a settlement agreement that releases it from liability as a franchisor but fails to release its franchisees from the same liability. Inasmuch as RMLLC operates only as a franchisor, it likely would not be able to continue to operate if a jury found that its franchisees were subject to the same co-conspirator liability that RMLLC faced. As a result, any settlement by RMLLC had to include a release for RMLLC's franchisees or else it would have little to no value to RMLLC.

By entering into this settlement agreement, agreeing to pay $55 million, and agreeing to the various practice changes, RMLLC sought peace from the ongoing distraction of litigation for itself and its affiliated franchisees. The agreement is fair, reasonable, and adequate.

## C. The Scope of the Settlement Agreement is Proper.

The nationwide scope of the settlement agreement properly reflects the scope of the nationwide conspiracy alleged by Plaintiffs in *Moehrl* and *Burnett*. In both cases, Plaintiffs alleged that RMLLC, alongside other Defendants, participated in a nationwide conspiracy to inflate buyer-broker commissions. (*See* Third Amended Complaint, Dkt. No. 759 ¶ 38 ("Defendants' conduct alleged herein has inflated buyer broker commissions nationwide."); *Moehrl* Amended Complaint, Dkt. No. 84 ¶ 22 ("The Buyer Broker Commission Rule and other anticompetitive NAR rules apply and have been implemented and enforced by Defendants and coconspirators nationwide.")).

And in light of the nationwide allegations, Plaintiffs conducted nationwide discovery into RMLLC's practices and received expansive productions in response. It is far more efficient for Plaintiffs' claims to be resolved in one action where nationwide discovery has already taken place instead of through copycat suits filed elsewhere. *See* 7B Wright & Miller, Federal Practice & Procedure § 1798.1 (3d ed. 2005) ("Clearly, a single nationwide class action seems to be the best means of achieving judicial economy.").

Further, to the extent that any objector argues that the settlement class has been improperly broadened compared to the certified classes in *Moehrl* and *Burnett*, that argument has no merit. As the Eighth Circuit has recognized, "[t]here is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded." *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004). Not only is this common practice, but it is necessary in complex class-action litigation to ensure finality for defendants and global settlements that run to the benefit of plaintiffs. *See Albin v. Resort Sales Missouri, Inc.*, No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (concluding that the absence of "a single nationwide class action" would "discourage class action defendants from settling" (quotation omitted)); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005) ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country."). It would have made no sense for RMLLC to settle with only a subset of the potential claimants and thereby incentivize copycat lawsuits in every single geography where residential real estate is sold that was not covered by the *Moehrl* and *Burnett* cases, and the Court need look no further than the numerous copycat suits that have already been filed to recognize the necessity of a nationwide settlement. Similarly, RMLLC would not have settled a

subset of the potential theories of liability that the members of the Settlement Class could have asserted against it and its franchisees arising out of the same alleged conduct that resulted in this nationwide settlement. Members of the Settlement Class agreed to release all actual or potential claims, even those not pleaded in the *Moehrl* and *Burnett* cases, that are based on the same factual predicate. RMLLC obtained this broad release in exchange for the significant monetary relief and practice changes in the settlement agreement that benefit all members of the Settlement Class.

## CONCLUSION

For the foregoing reasons, the Court should enter an order granting final approval of the settlement between RMLLC and Plaintiffs.

- 10 -
Case 4:19-cv-00332-SRB     Document 1473     Filed 05/03/24     Page 10 of 12

Dated: May 3, 2024

/s/ Jeffrey A. LeVee
Jeffrey A. LeVee (*Pro Hac Vice*)
jlevee@jonesday.com
JONES DAY
555 Flower St
Los Angeles, California 90071
Tel: (213) 489-3939
Fax: (213) 243-2539

Eddie Hasdoo (*Pro Hac Vice*)
ehasdoo@jonesday.com
JONES DAY
110 N Wacker Drive, Suite 4800
Chicago, Illinois 60606
Tel: (312) 782-3939
Fax: (312) 782-8585

Danne W. Webb (MO #39384)
Andrea S. McMurtry (MO#62495)
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Telephone: (816) 421-0700
Facsimile: (816) 421-0899
Email: dwebb@hab-law.com
Email: amcmurtry@hab-law.com

*Counsel for Defendant RE/MAX, LLC*

- 11 -
Case 4:19-cv-00332-SRB    Document 1473    Filed 05/03/24    Page 11 of 12

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2024, the foregoing was filed via the Court's electronic filing system, which sent notice to all counsel of record.

*/s/ Eddie Hasdoo*
Attorney for RE/MAX, LLC
