IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT, )
JEREMY KEEL, HOLLEE ELLIS, and )
FRANCES HARVEY, on behalf of )
themselves and all others similarly situated, )
)
Plaintiffs, )
)
v. ) Case No. 4:19-CV-00332-SRB
)
THE NATIONAL ASSOCIATION OF )
REALTORS, REALOGY HOLDINGS CORP., )
HOMESERVICES OF AMERICA, INC., BHH )
AFFILIATES, LLC, HSF AFFILIATES, LLC, )
RE/MAX LLC, and KELLER WILLIAMS )
REALTY, INC., )
)
Defendants. )

## ORDER

Before the Court is Plaintiffs'[1] Motion for Final Approval of Settlements with Anywhere

Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere"); RE/MAX LLC ("RE/MAX"); and

Keller Williams Realty, Inc. ("Keller Williams").  (Doc. #1469.)  The Court preliminarily

approved the Settlements on November 20, 2023, and February 2, 2024, respectively.  (Doc.

#1321; Doc. #1372.)  Notice to the Settlement Classes commenced February 1, 2024, and class

members were provided with an opportunity to opt out of, or object to, the Settlements.  A small

number of class members filed objections.  (Doc. #1404; Doc. #1424; Doc. #1430; Doc. #1439;

Doc. #1441; Doc. #1445; Doc. #1447; Doc. #1448; Doc. #1453; Doc. #1454; Doc. #1455.)

Settling Defendants filed briefs in support of final approval.  (Doc. #1471; Doc. #1473; Doc.

---

[1] Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, Jeremy Keel, Christopher Moehrl, Michael
Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh (collectively "Plaintiffs").

#1478.) The Court held a hearing on May 9, 2024, at which arguments were presented for and against final approval. Having considered the arguments at the hearing and reviewed the written submissions, and based on all materials in the record, the motion for final approval is GRANTED.

The Court hereby ORDERS the following:

1.      Unless defined herein, all defined terms in this Final Approval Order and any accompanying Judgment shall have the respective meanings set forth in the Settlement Agreements.

2.      At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. As directed by the Court, JND implemented the parties' Class Notice Plan. Now at the final approval stage, Plaintiffs submitted with their motion a declaration of Jennifer M. Keough from JND summarizing the notice that was given to class members and the resulting claims to date, opt-outs, and objections. (Doc. #1469-3.) Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication. Without repeating all the details from Keough's declaration, the Court finds that the direct notice program was extremely successful and reached more than 95% of the potential Settlement class members. More than 30 million direct notices were mailed or emailed to the Class. The digital effort alone delivered more than 300 million impressions. In addition to the formal class notice process, more than 415 news stories addressed the litigation and settlement, with over 133 million potential viewers. The media effort alone reached at least 71 percent of the Settlement Class members. JND also implemented a Settlement Website that had over 934,000 unique visitors and nearly 5 million page views.

3.      As of May 2, 2024, nearly 200,000 claims have been made. This is only the beginning of the claims, because the claims period extends until May 9, 2025. This extended claims period is valuable because additional settlements covering the same Settlement Class (with

minor variations on the length of the class periods) have been reached with other defendants, and the notice process for those settlements will provide additional opportunities to submit claims.

4. In contrast to the massive scale of the notice program and the large volume of claims, there were only 12 objectors and 61 opt outs from the Settlement Classes.

5. Based on the record, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. The Court further finds that the notice given to the Settlement Class was adequate and reasonable.

6. The notice fully and accurately informed members of the Settlement Class of all material elements of the Settlements. The Settlement Class Members received notice of: (a) the pendency of the Actions; (b) the terms of the proposed Settlements, including the Released Claims, Released Parties, and Releasing Parties; (c) their rights under the proposed Settlement, including how to receive the benefits offered by the Settlements; (d) their right to exclude themselves from the Settlement Class and the proposed Settlements; (e) their right to object to any aspect of the proposed Settlements; (f) their right to appear at the Final Approval Hearing; (g) Class Counsel's request for attorneys' fees and expenses and an incentive award to the Class Representatives; and (h) the binding effect of this Final Judgment and Order Approving Settlement on all Persons who did not timely exclude themselves from the Settlement Class. Some of the objectors challenged certain aspects of the notice program. The Court addresses those objections below and finds that they present no valid challenge to the notice.

7. The Court also finds that the appropriate state and federal officials were timely notified of the Settlement Agreements under the Class Action Fairness Act of 2005 ("CAFA"), 28

U.S.C. § 1715, and that ninety (90) days have passed without comment or objection from any governmental entity.

8. For the purposes of the settlement of the claims against Anywhere and RE/MAX, and only for that purpose, the Court certifies the following class:

    a. All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

        i. Moehrl MLSs: March 6, 2015 to date of notice;

        ii. Burnett MLSs: April 29, 2014 to date of notice;

        iii. MLS PIN: December 17, 2016 to date of notice;

        iv. All other MLSs: February 1, 2020 to the date of notice.

9. For the purposes of the settlement of the claims against Keller Williams, and only for that purpose, the Court certifies the following class:

    b. All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

        i. Moehrl MLSs: March 6, 2015 to date of notice;

        ii. Burnett MLSs: April 29, 2014 to date of notice;

        iii. MLS PIN: December 17, 2016 to date of notice;

        iv. All Other MLSs: October 31, 2019 to date of notice.

10. The Court finds that certification of the Settlement Classes is warranted in light of the Settlements under the prerequisites of Federal Rule of Civil Procedure 23(a) because: (1) the members of the Settlement Classes are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Settlement Classes; (3) Plaintiffs' claims are typical of the

4

claims of the Settlement Class Members; and (4) Plaintiffs and Co-Lead Counsel will fairly and adequately represent the interests of the Settlement Class Members.

11.      The Court finds that certification of the Settlement Classes is warranted in light of and solely for purposes of the Settlements under Federal Rule of Civil Procedure 23(b)(3) because common issues, including whether Anywhere, RE/MAX, and Keller Williams entered into any conspiracy, predominate over any questions affecting only individual members of the Settlement Class in the settlement context, and settlement of the Actions on a class basis is superior to other means of resolving the Actions as to Anywhere, RE/MAX, and Keller Williams.

12.      The Court reaffirms the appointment of Plaintiffs Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, Jeremy Keel, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh as the Settlement Class Representatives. The Court finds that the Settlement Class Representatives will fairly and adequately protect the interests of the Settlement Class because: (1) the interests of the Settlement Class Representatives are consistent with those of Settlement Class Members; (2) there appear to be no conflicts between or among the Settlement Class Representatives and the other Settlement Class Members; (3) the Settlement Class Representatives have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this litigation; and (4) the Settlement Class Representatives and Settlement Class Members are represented by qualified, reputable counsel who are experienced in preparing and prosecuting large, complicated class action cases, including those concerning violation of the antitrust laws.

13.      In making these findings, the Court has considered, *inter alia*, (1) the interests of the Settlement Class Members in individually controlling the prosecution or defense of separate actions; (2) the impracticality or inefficiency of prosecuting or defending separate actions; (3) the

extent and nature of any litigation concerning these claims already commenced; and (4) the desirability of concentrating the litigation of the claims in a particular forum.

14.     The Court has also specifically considered that the settlement class is broader than the class alleged in the complaint. In the settlement context, courts in this district and elsewhere regularly certify broader settlement classes than litigation classes. *See, e.g.*, *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this."); *Smith v. Atkins*, 2:18-cv-04004-MDH (W.D. Mo.). Here, the Court finds that certifying a nationwide class is warranted, including because Plaintiffs have conducted extensive discovery into the alleged nationwide conspiracy and have thoroughly litigated the claims, providing a robust factual record on which to assess the claims and base negotiations, Plaintiffs could have made nationwide allegations in this matter, a nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class, a nationwide settlement will conserve judicial and private resources, and Class Members were fully apprised of the settlement class definition through the notice process. As the Court explains more thoroughly below, it was both justified and necessary to achieve any settlement for the Settlement Classes to include all multiple listing services for residential real estate nationwide, however the multiple listing services were named (e.g., real estate listing service), and regardless of whether the services were affiliated or associated with NAR or not.

15.     As a general matter, "the law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"). Courts adhere to "an initial presumption of fairness when a proposed class settlement,

which was negotiated at arm's length by counsel for the class, is presented for court approval." 4 Newberg on Class Actions § 11.41; *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'" (quoting *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate). The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005).

16. The standard for reviewing a proposed settlement of a class action is whether it is "fair, reasonable, and adequate." *In re Wireless Tel. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). Federal Rule of Civil Procedure 23(e)(2) establishes factors the court must consider reviewing a class settlement. Eighth Circuit precedent also sets forth four factors which overlap with the Rule 23(e)(2) factors that a court should review in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *Id.* (citing *Grunin v. Int'l House of Pancakes,*, 513 F.2d 114, 124 (8th Cir. 1975); *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). "The views of the parties to the settlement must also be considered." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

17.     Under Federal Rule of Civil Procedure 23(e)(2), the Court finds that the Settlements with Anywhere, RE/MAX, and Keller Williams, as set forth in the Settlement Agreements, are fair, reasonable and adequate.  The Class Representatives have adequately represented the class, the Settlement Agreements were negotiated at arm's-length by experienced counsel acting in good faith, including mediation with a nationally recognized and highly experienced mediator, and the Settlement Agreements were reached as a result of those negotiations; there has been adequate opportunity for discovery for experienced counsel to evaluate the claims and risks at this stage of the litigation; and the Court therefore approves the Settlements.

18.     This Court's Order granting final approval of the Settlements is informed by the risks that the Settlement Class would have faced in continuing to litigate against Anywhere, RE/MAX, and Keller Williams and the cost and complexity of continued litigation.  "[E]xperience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003).  "Antitrust cases are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020). Here, some of the Settling Defendants claim to have opposed the rules in question (*See* Doc. #1478, p. 11), and all of the Settling Defendants challenged this Court's finding of a *per se* antitrust violation (Doc. #1471, pp. 3-4; Doc. #1473, pp. 5-6, Doc. #1478, p. 14).  These defenses presented risks to the Settlement Class in continuing to litigate.  Moreover, appeals alone, even if ultimately unsuccessful, would have delayed any recovery to the Settlement Class by more than a year. Therefore, these factors favor approving the Settlements.

19.     This Court's Order granting final approval is also supported by the financial condition of the Settling Defendants.  Before settling, Plaintiffs used a forensic accountant to confirm each defendant's ability to pay while still maintaining a viable business.  This analysis was complicated by the recent and prolonged downturn in the real estate market.  The Settlements each capture a significant portion of the Settling Defendants' available assets while still allowing them to continue operations.  In contrast, the joint and several liability that would have resulted from a judgment would have been disastrous for any of the defendants.  Therefore, this factor also favors approval.  *See Grunin,* 513 F.2d at 125 (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability"); *see also Petrovic.*, 200 F.3d at 1153 ("While it is undisputed that [the settling defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate."); *Meredith v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("class actions are strong medicine" that "confront defendants with potentially ruinous financial exposure," but "a defendant is not required to 'empty its coffers' before a settlement can be found adequate").

20.     As discussed above, the minuscule amount of opposition to the Settlements also favors approval.  "The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement."  *In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)).  As of May 2, 2024, almost 200,000 claims have been made.  In contrast, there were only 12 objections and 61 opt outs from the Settlement Classes.  This weighs heavily in favor of granting final approval.  *See, e.g.*, *Keil v.*

9

*Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) (with a settlement class of approximately 3.5 million households, and "only fourteen class members submitted timely objections," the "amount of opposition is minuscule when compared with other settlements that we have approved"); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) (of the 4,838,789 settlement class members who were sent notice, only 620 (0.012%) opted out of the settlement and only 33 (0.00068%) objected to the settlement, which "are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement"); *see also, e.g.*, *Van Horn*, 840 F.2d at 607 ("the amount of opposition to the settlement" is a key factor to be considered in the settlement approval process).

21.     This Court's order granting final approval of the Settlements is further supported both by the substantial monetary compensation to the Settlement Class that will result directly from the Settlements, which collectively totals $208.5 million, and by the icebreaker status of the Anywhere and RE/MAX Settlements.  Specifically, following the Anywhere, RE/MAX, and Keller Williams Settlements, this Court preliminary approved settlements by the National Association of Realtors ("NAR"), Compass, The Real Brokerage, At World Properties, Realty ONE Group, and Douglas Elliman. (Doc. #1460; *Gibson v. Nat'l Assn of Realtors*, No. 23-cv-00788, Doc. #163 (W.D. Mo.)).  Collectively, together with the Anywhere, RE/MAX and Keller Williams settlements, these settlements provide a total settlement fund of over $600 million with other settlements announced bringing the total to over $900 million.  The NAR settlement also provides opportunities for various multiple listing services and brokerages to opt-in to the settlement, which may provide still further financial compensation to the Settlement Class.  All of this further supports approval of the Settlements.  *In re Packaged Seafood Prods. Antitrust Litig.*,

2022 WL 228823, at \*5 (S.D. Cal. Jan. 26, 2022) ("Courts typically approve settlements that offer the first settling party a discount due to 'the significant value in and of itself as an icebreaker settlement,' particularly when, as here, the settling defendants have agreed to cooperate in the remaining litigation." (quoting *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 19 (D.D.C. 2019)); *see also, e.g.*, *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, No. 15-CV-3538, 2023 WL 3749996, at \*5 (S.D.N.Y. June 1, 2023) (finding that settlement "provides adequate recovery for the Class, not only through its monetary value, but also through . . . the value of serving as an 'ice-breaker' settlement to potentially facilitate future settlements"); *accord In re Packaged Seafood*, 2022 WL 228823, at \*5; *In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 293-94 (E.D. Mich. 2017); *Standard Iron Works v. ArcelorMittal*, No. 08C5214, 2014 WL 11350176, at \*3 (N.D. Ill. Oct. 23, 2014); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 304-05 (E.D. Pa. 2012); *In re Corrugated Container Antitrust Litig.*, No. MDL 310, 1981 WL 2093, at \*19 (S.D. Tex. June 4, 1981).

22.     This Court's order granting final approval of the Settlements is also supported by the substantial benefits to the class afforded by the practice changes obtained by the Settlements. Those changes include:

    a.  advise and periodically remind the company owned brokerages, franchisees, and their agents that there is no requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

    b.  require that any company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-

11

specified form, then the Settling Defendants will require that any company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

c.  prohibit the company owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

d.  prohibit the company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

e.  advise and periodically remind the company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities;

f.  develop educational materials that reflect and are consistent with each provision above, and eliminate educational materials, if any, that are contrary to it.

(Anywhere Agreement ¶ 51; RE/MAX Agreement ¶ 51; Keller Williams Agreement ¶ 53).

23.  Additional practice changes are reflected in a subsequent NAR settlement that would impact not only the Settling Defendants but also the broader industry. Collectively, these practice changes provide a substantial additional benefit to the Settlement Class. The NAR practice changes prohibit the communication of any offer of compensation to a cooperating brokerage on an MLS. As a further example, the NAR settlement prohibits efforts to circumvent the prohibition on conveying offers of compensation on MLS by prohibiting the aggregation of MLS data with offers of compensation on public websites. Nothing set forth in the Settlements requires Anywhere, RE/MAX, or Keller Williams to violate the NAR practice changes.

12

Collectively these practice changes present great value to the Settlement Classes and further support approval of the Settlements.

24. The Court has carefully considered each of the timely filed objections, as well as a handful received after the deadline. The untimely objections are barred by the terms of the Court's orders granting preliminary approval, but the Court has also considered their merits. The Court finds that none of the objections, whether timely or untimely, provides a basis for denying final approval of the Settlements. *See Marshall*, 787 at 513–14 ("The district court refused to give credence to the vocal minority" and "the court aptly noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement."). All objections are overruled.

25. Seven objections were submitted by individuals acting without counsel. (Doc. #1404; Doc. #1424; Doc. #1430; Doc. #1439; Doc. #1453; Doc. #1454; Doc. #1455.) These objections cast no doubt on the fairness, adequacy, or reasonableness of the Settlements. All objections are overruled.

26. The Court finds that a number of objectors are not members of the class and do not have standing to object because they did not sell a home within the class period, including several objections from Realtors who have not indicated they are home sellers. *See* (Doc. #1404; Doc. #1405; Doc. #1416; Doc. #1430; Doc. #1453; Doc. #1454; Doc. #1455.)

27. The Court overrules objections that the injunctive relief does not go far enough because the injunctive relief in the Settlements, either alone or coupled with the relief provided in the NAR settlement, is fair, reasonable, and adequate. The Court oversaw the trial of the *Burnett* Plaintiffs' claims, and the injunctive relief addresses the issues raised by Plaintiffs.

13

28.     The Court overrules objections that the injunctive relief goes too far.   The injunction is reasonably tailored to address the Plaintiffs' claims – which centered on the Mandatory Offer of Compensation Rule.

29.     The Court overrules objections that the Settlement Class Period for the Anywhere and RE/MAX Settlements is slightly different from the Class Period for the Keller Williams Settlement.  Individuals who do not fall within the respective settlement Class Period are not class members to that Settlement.  Moreover, a defendant is free to bargain for a narrower or broader release as it sees fit, consistent with the risks it determines are at issue.

30.     The Court overrules objections that the Settlement amounts paid are too low.  The Court has presided over the *Burnett* litigation for five years and is in a superior position to evaluate this objection.  The Court finds the settlement amounts are fair, reasonable, and adequate.  The Court further finds that there is no suggestion or evidence of collusion or other wrongdoing that would merit additional analysis of the Settling Defendants' ability to pay.  The Court finds that Class Counsel acted diligently on behalf of the Settlement Class in obtaining meaningful recoveries for the class without risking bankruptcy by the Settling Defendants.  The Court observes that, given the *Burnett* judgment, Class Counsel's interests are aligned with the Settlement Class to obtain as high of a settlement amount as possible.

31.     The Court overrules the objections that attorneys' fees should not be paid out of the common fund or that the requested fees are too high.  *See* Paragraphs 67-80 below.

32.     The Court overrules the objections that the notice and claim process is deficient, because, among other things, the notice process meets and exceeds best notice practicable.  *See* Paragraph 2 above.

33.     The Pulte Group objection is overruled.  *First*, courts repeatedly hold that parties do not need to include a detailed allocation formula in class notice or formulate one before final settlement approval, rejecting Pulte's contention.  *See In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1135-36 (Del. 2008); *In re Johns-Manville Corp.*, 340 B.R. 49, 70 (S.D.N.Y. 2006); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 170 (2d Cir. 1987); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10MD2196, 2015 WL 1639269, at *6 (N.D. Ohio Feb. 26, 2015); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, No. MDL 551, 1988 WL 158947, at *3 (W.D. Wash. July 28, 1988); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94C897, 1996 WL 167347, at *5 (N.D. Ill. Apr. 4, 1996).  "[C]ourts frequently approve" class settlements and allocation plans "separately," 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update), because it "is appropriate, and often prudent, in massive class actions to follow a two-stage procedure" and defer consideration of the plan of distribution until after final settlement approval.  *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 480 (S.D.N.Y. 1998)).

34.     This is because "court approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation."  2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update).  "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement."  *In re Agent Orange*, 818 F.2d at 170.  Further, the formation of a plan of allocation "is a difficult, time-consuming process."  *Id.*  "To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate

15

settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished." *Id.* Relatedly, "if a hearing on a settlement must follow formulation of a distribution plan, then reversal of any significant aspect of the plan on appeal . . . would require a remand for reconsideration of the settlement, followed by yet another appeal." *Id.* As courts have held, "[t]here is no sound reason to impose such procedural straitjackets upon the settlements of class actions." *Id.*

35.     It is particularly appropriate to defer creation of an allocation plan when, as here, there are multiple defendants, only some have settled, and additional settlements may add to the fund to be distributed. *Washington Pub. Power Supply Sys.*, 1988 WL 158947, at *4 (citing *In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 959 (N.D. Ga. 1980), *aff'd*, 669 F.2d 228 (5th Cir. 1982)); *see also In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011) (developing plan of allocation is properly delayed until after final approval of settlement where "the potential for additional settlements with other Defendants . . . may affect the final plan of allocation").

36.     Among the cases rejecting Pulte's contention is the primary authority Pulte relies on: *Petrovic*. The Eighth Circuit in *Petrovic* stated that it did "not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards" and dismissed the same objection Pulte raises because "[t]he notice described with sufficient particularity the stakes involved: the settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic*, 200 F.3d at 1152–53. The same is true here. The notice explains the claims being settled and released. (Doc. #1442-2, pp. 4, 6

16

(Anywhere & RE/MAX notice); Doc. #1442-3, pp. 4, 6 (Keller Williams notice).)  It also states the total settlement amounts.  (Doc. #1442-2, p. 5 (Anywhere & RE/MAX notice); Doc.#1442-3, p. 5 (Keller Williams notice).)

37.     Further, just as in *Petrovic*, class members could obtain more information on the allocation process by contacting counsel or the settlement administrator.  200 F.3d at 1153.  For those class members who did email and/or call and inquire about allocation, class counsel explained that class members are unlikely to receive the full value of their claims, but that settlement proceeds will be distributed equitably and reduced on a pro rata basis.  Class counsel further explained that—subsequent to notice going out—there were additional settlements benefitting the class, and others expected, making it premature to set a detailed allocation formula or provide estimates of how much each class member would recover.  Dirks Decl. ¶ 29.

38.     *Second*, Pulte's objection that there is no mechanism for homebuilding companies to make bulk claim submissions is meritless.  Pulte Objs. at 1–2, 4–6.  Class Counsel have submitted evidence that, the claims administrator worked with bulk filers who wished to submit multiple claims—exactly what Pulte is requesting through its objections.  Keough Decl. 54.  The objection is overruled.

39.     *Third*, Pulte's objection to the notice campaign previously approved by the Court does not raise any due process concerns.  Pulte Objs. at 1–2, 6–7.  Pulte complains that it "did not receive notice," Pulte Objs. at 6, but obviously it did—otherwise it would not have been able to raise its objections before the deadline.  Thus, as Pulte itself acknowledges, the "notice issues" it raises are "moot."  Pulte Objs. at 7; *see also In re Pinterest Derivative Litig.*, No. C21-05385-WHA, 2022 WL 2079712, at *2 (N.D. Cal. June 9, 2022) ("[T]hough delayed, Mr. Sweeney

received actual notice of the proposed settlement, voiced his objections, and has been heard. Having been heard, Mr. Sweeney's objections [to notice] are OVERRULED.").

40.     The Court has already found that the notice program constituted the best notice practicable.  Pulte's objection is overruled.

41.     Three objections were lodged by counsel for plaintiffs in other cases alleging the same or similar as those in *Moehrl* and *Burnett*.  None of these cases is a certified class.  All are at the infancy of the litigation.  All were filed after and appear to have been derived from *Moehrl* and *Burnett*.  The Court finds that none of these objections advances the best interest of the class members who stand to gain monetary and practice change relief from the Settlements.

42.     The attorneys prosecuting *Burton v. National Association of Realtors,* 23-05666 (D. S.C.) filed an objection on behalf of three home sellers in South Carolina.  Instead of a global resolution, certainty, and practice changes, they seek to unwind the Settlements This would result in protracted and costly piecemeal litigation, the risk of inconsistent results, and a redo of the last five years of litigation on a state-by-state basis.

43.     South Carolina objectors claim that the scope of the Settlements is broader than the certified litigation classes in *Burnett* and *Moehrl*.  (Doc. #1441, p. 2.)  But as noted above, in the settlement context, courts regularly certify broader classes.  *See, e.g*., *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig*., 357 F.3d at 805; *Smith v. Atkins*, 2:18- cv-04004-MDH (W.D. Mo.); *Spann v. J.C. Penney Corp*., 314 F.R.D. 312, 318 (C.D. Cal. 2016) (court can "expand the scope of a settlement class"); *In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 07-cv-1827, 2011 WL 13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("For the history of class certifications, courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated. Courts have noted that the

18

concerns about manageability and/or the class-wide applicability of proof (which can serve to limit or defeat class certification for trial) are in large part no longer relevant when establishment of a defendant's liability is replaced by a settlement."); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("[A] court may approve a settlement class broader than a litigation class that has already been certified."); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 661 (E.D. Va. 2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (E.D. Pa. 2000) (same).

44.     Often, broad classes are a practical prerequisite to reaching any settlement because a defendant will not agree to any meaningful settlement unless it can obtain global peace. *See, e.g.*, *Albin v. Resort Sales Missouri, Inc*., No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (reasoning that the absence of "a single nationwide class action" would "discourage class action defendants from settling" (quotation omitted)); *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 103 n.5, 106 (2d Cir. 2005) ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country. Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability" (quotation omitted)) (affirming nationwide settlement in an antitrust case); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247-48 (2d Cir. 2011) ("Parties often reach broad settlement agreements encompassing claims not presented in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle."); *Sullivan v. DB Invs., Inc*., 667 F.3d 273, 310-11 (3d Cir. 2011) (en banc) ("[Without] global peace . . . there would be no settlements.") (affirming nationwide settlement in an antitrust case).  Conversely, because global

peace is most valuable to defendants, defendants will pay more to obtain it, thus benefitting class members. *See, e.g., In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 705 (E.D. Mo. 2002) ("[Defendants] paid both classes of plaintiffs more in the instant global settlement out of a desire to obtain 'total peace' than they would have paid either group of plaintiffs individually.").

45.     The Court finds these considerations apply here. The record supports the view that the Settling Defendants would not have settled on anything less than a nationwide basis, because doing so would have left them exposed to potentially crippling liability. (Doc. ##1473, pp. 8-10; Doc. #1478, pp. 20-22.) They therefore insisted that the Settlement Class include all "multiple listing services," regardless of whether they were affiliated with NAR. To get the benefits of the Settlements, Plaintiffs therefore agreed to settle on a nationwide basis. Thus, the Settlements are in the best interest of the *Burnett* and *Moehrl* classes, in addition to the nationwide class as a whole, because, among other things, Settlement was not possible on a piecemeal basis, and enforcement of the *Burnett* verdict alone would have bankrupted the Settling Defendants.

46.     South Carolina objectors claim that the rules at issue are different in South Carolina. The Court is intimately familiar with the record of the case and alleged conspiracy and agrees with Plaintiffs that it is, as alleged, nationwide in scope. Plaintiffs here were well positioned to adequately represent a nationwide settlement class because they alleged a nationwide conspiracy. As expressly alleged in *Umpa*, and as supported by expert analysis in *Moehrl*, the vast majority of MLSs nationwide are formally controlled by local NAR associations that are required to implement the challenged rules. *Umpa v. Nat'l Assn of Realtors,* No. 23-cv-00945 (W.D. Mo.), Doc. #1, ¶ 2. Only a small number of MLSs are not exclusively owned or operated by NAR associations, and even those MLSs are not fully independent from NAR. *Id.* at ¶ 4. For example, most of those MLSs have adopted rules identical or similar to the NAR rule mandating blanket

unilateral offers of compensation, and NAR's Code of Ethics applies to Realtors participating even in non-NAR MLSs. *Id.* at ¶¶ 4-5. In both *Burnett* and *Moehrl*, Plaintiffs' experts specifically analyzed rules implemented by non-NAR MLSs, including Northwest MLS, WPMLS, and REBNY/RLS (8-10-22 Schulman Reply Rept., *Burnett* Doc. #922-3, pp. 23-25) and concluded that Realtors® operating in these jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of Ethics and are thereby incentivized to require sellers to make unilateral offers of compensation to buy-side brokers/agents." *Id.* at ¶ 75; *see also* Elhague Report, Appendix C (*Moehrl v. Nat'l Assn of Realtors* (N.D. Ill.) Doc. #324-6, pp. 231-250, addressing Non-NAR MLSs and concluding "it was common among these MLSs to adopt restrains that were identical or similar to those imposed by NAR"). Therefore, Plaintiffs adequately represented the nationwide class that is subject to the Settlements.

47.     South Carolina objectors argue that the cooperation provisions in the Settlements apply only to *Burnett* and *Moerhl*. The Court finds that while cooperation is unnecessary for the Settlements to be fair, reasonable, and adequate, there are good reasons for the scope of cooperation Class Counsel obtained. At the time of the Anywhere and RE/MAX settlements the South Carolina case had not even been filed. When Plaintiffs settled with Keller Williams, *Burton* had been filed and a motion to coordinate the cases was pending before the JPML, so the Keller Williams Agreement specifically included cooperation in *the nationwide cases Gibson* and *Umpa* as well as in the pending MDL. (Keller Williams Agreement at ¶ 57). The South Carolina Objectors opposed the formation of an MDL with the JPML; had one been formed, the cooperation agreement would have extended to *Burton* as well. Nothing about the cooperation agreement makes the Settlement unfair, unreasonable, or inadequate.

48.     South Carolina objectors next state that the Settlement amounts are too low. The Court finds this argument unsubstantiated, and even if the Court believed the Settlements could have been higher, that does not make them unfair, unreasonable, or inadequate.   *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017); *see also Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678 F.3d 640, 649 (8th Cir. 2012) ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *Marshall*, 787 F.3d at 520 ("The plaintiffs who opted out of the settlement could have brought their own individual or collective action against the NFL and potentially obtained the direct financial payout they allege is lacking in this settlement."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312–13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. The trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.") (cleaned up) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)); *In re Agent Orange Prod. Liab. Litig.,* 597 F. Supp. at 762 (approving settlement despite the fact that "the settlement amount would not begin to cover the total costs of medical treatment for the class which easily could amount to billions of dollars" and holding "[t]he fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate").

49.     The standard the Court applies is whether the settlement is fair, reasonable, and adequate -- not perfection.  *See Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 54 (W.D.N.Y. 2018) ("The court's task, then, is simply to decide whether the settlement agreement *as written* is fair, reasonable, and adequate, not whether the parties or the court could conceivably have come up with a 'better' agreement.") (emphasis in original).   Class counsel, having

strenuously litigated the case for years, were in the best position to determine the extent of the best relief that reasonably could be obtained for the class. There is no suggestion, nor could there be, that they were uninformed, lacked experience and expertise, or that they had any inability that kept them from negotiating the best deal possible for the class.

50. Moreover, Class Counsel made clear in their filings and declarations that they analyzed the finances of Settling Defendants and determined this was the most they could reasonably pay. The Settlement amounts were reached at arms-length between experienced counsel. Obtaining relief now, rather than risk bankruptcy or reversal on appeal, was the most prudent thing Class Counsel could have done. *See Meredith Corp.*, 87 F. Supp. 3d at 665 ("[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)) (alteration in original)); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) ("While it is undisputed that [the settling defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate."); *Grunin*, 513 F.2d at 125 (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

51. The Court gives little weight to the Declaration of Professor Alford. His analysis does not seek to (and in any event, does not) answer the question of whether the Settlements are fair, reasonable, and adequate.

52. South Carolina Objectors next say that the Keller Williams Settlement releases Keller Williams franchisees without formally binding Keller Williams Franchisees to do anything.

The Court disagrees with this characterization and, having overseen this case for five years, finds that the practice change relief is significant.  Nor is it unfair or inappropriate to release corporate affiliates or franchisees (or agents affiliated with those affiliates or franchisees).  *In re Am. Inv'rs Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, 263 F.R.D. 226, 240 (E.D. Pa. 2009) (overruling objection to release of independent sales agents of insurance company because "the release of agents is a necessary component of the settlement agreement in order to provide finality. Otherwise, dissatisfied policyholders could sue the defendants' agents who would then, in turn, look to the defendants for indemnity or contribution." (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450, 522-23 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998))); *Shay v. Apple Inc.*, No. 3:20-cv-1629, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts." (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010))); *Maine State Ret. System v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2013 WL 6577020, at *7, *17 (C.D. Cal. Dec. 5, 2013) (overruling objection that argued "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Products, Inc.*, No. 15-CV-1801, 2017 WL 5479637, at *8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third party retailers was inappropriate: "this argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims. . . . Millennium is a manufacturer that sells its products through various retailers, so any claims Ference purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling allegations asserted here. This objection is overruled." (citations omitted)); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) (approving class settlement with broad releases against non-

parties, including member banks, insurance companies and Swiss governmental entities); *Flaum v. Doctor's Associates, Inc.*, No. 16-CV-61198, 2019 WL 2576361, at *3 (S.D. Fla. Mar. 11, 2019) (final approval of settlement releasing all Subway franchisees in suit against Subway franchisor); *Adkins v. Nestle Purina PetCare Co.*, No. 12-CV-2871, 2015 WL 10892070, at *4 (N.D. Ill. June 23, 2015) (final approval of settlement releasing variety of non-parties, including suppliers, manufacturers, retailers, and franchisees); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-4818, 2015 WL 3990915, at *3 (N.D. Cal. June 30, 2015) (preliminary approval of settlement releasing franchisees) ECF No. 167 (Feb. 8, 2016) (ordering final approval of settlement).

53.     Finally, the South Carolina Objectors question the duration of practice change relief. *See, e.g.*, (Doc. #1371-1 (Keller Williams Settlement) ¶ 54) (business practice changes "will sunset 5 years after the Effective Date" unless automatically terminated at an earlier time by another provision).   The Court finds that the time limitation on these practice changes is reasonable.  No company wishes to stay under the enforcement power of a court indefinitely, nor does a court wish to retain such indefinite jurisdiction.  Injunctive relief settlements with sunset provisions are routinely approved, often for shorter periods than the five-year periods at issue here. *See, e.g., Smith v. Atkins*, 2:18- cv-04004-MDH, Order Approving Settlement, at ECF 53 (W.D. Mo. June 26, 2020) (approving settlement of nationwide class with 2-year practice change requirement); *Zepeda v. PayPal, Inc.*, No. 10-CV-1668, 2017 WL 1113293, at *13 (N.D. Cal. Mar. 24, 2017) (approving final settlement with expiration of injunctive relief after two years, "ensuring that Defendants maintain such practices until two years following the date of the Preliminary Approval Order"); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, No. 12-MD-2320, 2015 WL 7282543, at *10 (D.N.H. Nov. 16, 2015) (approving final settlement and overruling objections "that the injunctive remedies go away in five years" and

observing the injunctive relief "provides a valuable benefit to the class" and just because the injunction is not as broad as some class members wanted "does not make this settlement inadequate"); *Fla. ex rel. Crist v. HCA, Inc.*, No. 03-CV-177, 2002 WL 32116840, at *4 (M.D. Fla. Apr. 23, 2002) (entering a final consent judgment in a Sherman Act case, in which monetary payments and injunctive relief were provided and the judgment was set to expire in five years); *In re HP Inkjet Printer Litig.*, No. 05-CV-3580, 2011 WL 13156938, at *5 (N.D. Cal. Mar. 29, 2011) (order approving settlement with injunctive relief expiring within at least three years).

54. The Pennsylvania objection was filed by the plaintiff and lawyers who brought a case filed on December 6, 2023 – again, after the Anywhere and RE/MAX Settlements and after the *Burnett* verdict. Their objections closely track the South Carolina objections, and the arguments are nearly identical. The Pennsylvania objection is overruled for the same reasons discussed above.

55. James Mullis has filed objections based on his status as a plaintiff in the homebuyer actions pending in the Northern District of Illinois, *Batton v. Nat'l Ass'n of Realtors, et al.*, No. 21-cv-430 (N.D. Ill.) (*Batton I*) and *Batton v. Compass, et al.*, No. 23-cv-15618 (N.D. Ill.) (*Batton II*). The *Batton* buyer case objections are also overruled. As discussed above, when approving a proposed settlement, courts regularly certify broader classes and release broader claims than those originally pleaded in the action. Achieving this kind of broad relief is often a prerequisite to reaching a settlement in the first place, because a defendant will not agree to a meaningful settlement unless it can obtain global peace. *See, e.g.*, *Albin*, 2021 WL 5107730, at *5 (reasoning that the absence of "a single nationwide class action" would "discourage class action defendants from settling") (quotation omitted). The record in this case shows that a nationwide settlement

class and release of all potential claims arising out of the same alleged antitrust conspiracy was necessary to enable the settlements to occur.  (Doc. #1473, pp. 7-10; Doc. #1478, pp. 20-22.)

56.    Releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the Settling Defendant arising out of the same conspiracy, including indirect-purchaser claims.  *See, e.g.*, *In re Transpacific Passenger Air Transportation Antitrust Litigation* (N.D. Cal, 07-cv-5634), ECF No. 900-2 § 1.11 (releasing "any and all claims . . . on account of, arising from, or in any way related to, the pricing of passenger air transportation by JAL or Defendants . . . with respect to the facts, occurrences, transactions or other matters that were alleged or could have been alleged [in the action] . . . regardless of legal theory, and regardless of the type or amount of relief or damages claimed"); *In re: Processed Egg Products Antitrust Litigation* (E.D.P.A., MDL 2002), ECF No. 349-1 ¶ 25 (similar); *In re Intuniv Antitrust Litigation* (D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar);  *In re: Prograf Antitrust Litigation* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re Pre-Filled Propane Tank Antitrust Litigation* (W.D. Mo. 14-md-2567 / MDL No. 2567), ECF No. 362-1 ¶ 12 (similar); *In re HIV Antitrust Litigation* (N.D. Cal, 19-cv-02573), ECF No. 711-2  at 11-12 (similar); *In re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637), ECF No. 3324, ¶ 26 (similar).  Courts have approved these settlements even over objections that the settlement improperly releases or otherwise devalues a subset of claims.  *See In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554, 555-56 (9th Cir. 2017) ("The district court properly certified the settlement class and was not obligated to create subclasses for purchasers of U.S.-originating travel and direct purchasers of airfare.  Federal Rule of Civil Procedure 23(a) does not require a district court to weigh the prospective value of each class member's claims or conduct a claim-by-claim review when certifying a settlement class."); *In re HIV Antitrust Litig.*, No. 19-

27

cv-02573, 2023 WL 7397567, at *1 (N.D. Cal. Nov. 8, 2023) (rejecting indirect purchasers' request to set aside portion of direct-purchaser settlement).

57.     The *Batton* objection that Settlement Class members who both sold and bought houses during the class period could not release of all their claims arising out of the same alleged conspiracy is therefore overruled.   The homebuyer claims by homeseller Class Members indisputably arise out of the same alleged conspiracy and the same factual predicates as the asserted homeseller claims.  *See Batton I* Am. Compl., ECF No. 84 ¶¶ 1-11 (describing background of conspiracy centered around NAR and the buyer-broker commission rules); *Batton II* Compl., ECF No. 1 ¶¶ 1-12 (same).  The releases in the Settlements are thus consistent with Eighth Circuit authority holding that parties may release all claims—even those not pleaded—so long as they are based on the same factual predicate as the pleaded claims.  *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (rejecting objection that "the settlement contained an overbroad release" and finding that it permissibly released only claims "[]related to leaky brass fittings," i.e., the subject of the litigation); *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 190-91 (8th Cir. 1993) (affirming district court's approval of settlement that released claims which could have been but were not brought and finding that "the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action"); *Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 628 (S.D. Iowa 2016) (release was "not overly broad" because it was "only applicable to claims 'arising out of, or relating to'" the factual predicate giving rise to the plaintiffs' claims), *aff'd sub nom. Huyer v. Njema*, 847 F.3d 934 (8th Cir. 2017).

58.     Mullis's complaints about adequacy are likewise unfounded.  *See Petrovic*, 200 F.3d at 1146 ("If the objectors mean to maintain that a conflict of interest requiring subdivision is

created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members."). Several of the named Plaintiffs in this case both bought and sold homes within the class period.

59.     This is not a case where there are different groups of plaintiffs with non-overlapping claims that might conflict.

60.     And of course, if a homeseller believed that they would be better off by opting out of the settlement to be able to pursue additional buyer claims, they were entitled to do so.

61.     The requirements of Rule 23(g) of the Federal Rules of Civil Procedure are met, and the Court reaffirms the appointment of the law firms of Ketchmark and McCreight P.C., Williams Dirks Dameron LLC, Boulware Law LLC, Hagens Berman Sobol Shapiro LLP, Cohen, Milstein, Sellers & Toll, PLLC, and Susman Godfrey LLP as Co-Lead Counsel for the Settlement Class.

62.     The 61 persons and entities identified in the Parties paperwork (*see* Exhibit J to Keough Decl.) have timely and validly requested exclusion from the Settlement Class and are therefore excluded from the Settlement Class and are not bound by this Order, and may not make any claim upon or receive any benefit from the Settlements, whether monetary or otherwise. These excluded persons and entities may not pursue any Released Claims on behalf of those who are bound by this Order. Nothing in this order should be construed as a determination by this Court that the excluded persons and entities are members of the Settlement Class or that they meet other prerequisites, such as standing, for bringing claims alleged in the Actions. Each Settlement Class member who is not listed in Exhibit J to the Keough Declaration is bound by this Order and will remain forever bound, including by releasing all Released Claims of Releasing Parties against

Released Parties.  The Court specifically approves these releases as set forth in the Settlement Agreements.

63.     Members of the Settlement Class, unless they excluded themselves from the Settlement Class, are hereby enjoined from filing, commencing, prosecuting, intervening in, or pursuing as a plaintiff or class member any Released Claims against any of the Released Parties, which include Settling Defendants' franchisees and affiliated brokerages, and agents affiliated with those franchisees or affiliated brokerages.  *See* 28 U.S.C. § 1651; *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 914 (8th Cir. 2010) (noting that "the district court has the inherent ability to protect its own jurisdiction over the dispute pending before it"); *Janson v. LegalZoom.com, Inc.*, 2012 WL 13047852, at *2 (W.D. Mo. Apr. 30, 2012) ("In order to protect the continuing jurisdiction of the Court, prevent a multiplicity of lawsuits, and protect and effectuate the Court's Judgment in this Litigation, Plaintiffs and Class Members . . . are barred and enjoined from instituting, commencing, or continuing to prosecute . . . any action in this Court, any other state or federal court, or any other tribunal or forum of any kind, against any Released Party that asserts any claims that are Released Claims under the terms of the Settlement[.]") (granting final approval); *accord Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-cv-0699-KJN, 2024 WL 36175, at *13 (E.D. Cal. Jan. 3, 2024); *Smith v. Floor & Decor Outlets of Am., Inc.*, No. 1:15-cv-04316-ELR, 2017 WL 11495273, at *6 (N.D. Ga. Jan. 10, 2017); *In re Ortho. Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 188 (E.D. Pa. 1997).  Released Claims include claims that arise from or relate to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home. This injunction extends to claims arising from or relating to

30

transactions where Settlement Class Members either sold or purchased a home on any multiple listing service nationwide, regardless of affiliation or association with NAR or not, and thus includes, *e.g.*, NWMLS, WPMLS, and REBNY/RLS. This injunction does not extend to any individual claims that a plaintiff or class member may have against his or her own broker or agent based on breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

64. This Order does not settle or compromise any claims by Class Representatives or the Settlement Classes against entities or persons other than Released Parties, and all rights against any other person or entity are specifically reserved.

65. Settling Defendants shall issue payment in accordance with the Settlement Agreement.

66. Plaintiff's request for service awards for current and former Class Representatives and other individuals as set forth in the Settlement is hereby approved. The Court finds these individuals not only put their names on the line to advance the litigation, but that they also sat for lengthy depositions and approved multiple settlements. Some even testified at trial. Courts routinely approve service awards to compensate class representatives for the services they provide and the risks they incur on behalf of the class. The factors for deciding whether the service awards are warranted are: "(1) actions the plaintiffs took to protect the class's interests, (2) the degree to which the class has benefited from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing litigation." *Caligiuri*, 855 F.3d at 867. Here, Plaintiffs seek a service award of $15,000 per Settlement Class Representative and $25,000 for Class Representatives who testified at trial. The Settlement Class Representatives performed important work on the case,

31

including time-consuming gathering of facts and documents, assisting Class Counsel with the specifics of their transactions, preparing for and sitting for depositions, reviewing the Settlement Agreements, and for some, attending and testifying at trial. That work materially advanced the litigation and protected the Settlement Class's interests. *Id.* Indeed, without their time and effort, these Settlements would have been impossible. Finally, the requested service awards are consistent with other awards approved in the Eighth Circuit. *Tussey*, 850 F.3d 951, 961–62 (8th Cir. 2017) (approving $25,000 service awards); *Rogowski*, 2023 WL 5125113, at *6 (approving $25,000 service awards for named plaintiffs); *Wolfert v. UnitedHealth Group, Inc.,* No. 08-CV-01643 (E.D. Mo. Aug. 21, 2009), ECF No. 38 at 4–5 (approving a service award of $30,000). Accordingly, Plaintiffs' request falls within a fair range of service awards—especially given the landmark nature of this litigation. The Court should therefore approve the requested service awards for each Settlement Class Representative.

67. Class Counsel has adequately represented the Class. Their application for an award of attorneys' fees and reimbursement of costs as set forth in the Motion for Attorneys' Fees and Costs (Doc. #1392) is hereby GRANTED and shall be paid in accordance with the Settlement Agreements.

68. Courts in the Eighth Circuit typically use the "percentage-of-the-fund method" to award attorneys' fees from a common fund. *See, e.g.*, *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019). "In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established,'" *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999)), or even "preferable,'" *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-4321, 2015 WL 3460346, at *3 (W.D. Mo. June 1, 2015) (quoting

*West v. PSS World Med., Inc.*, No. 13-CV-574, 2014 WL 1648741, at *1 (E.D. Mo. Apr. 24, 2014)). The percentage method aligns the interests of the attorneys and the class members by incentivizing counsel to maximize the class's recovery. *See Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 (8th Cir. 1996) ("[T]he Task Force [established by the Third Circuit] recommended that the percentage of the benefit method be employed in common fund situations." (citing *Court Awarded Attorneys Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 255 (3rd Cir. 1985))). The Court will therefore use the percentage approach to award fees in this case. This Court and others within the Eighth Circuit confirm that one-third of the common fund is an appropriate amount for class counsels' fees in complex class actions, including antitrust litigation. Eighth Circuit and Missouri courts "have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions." *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) (quoting *In re Xcel,* 364 F. Supp. 2d at 998); *see also Rawa*, 934 F.3d at 870 ("courts have frequently awarded attorneys' fees ranging up to 36% in class actions" (quoting *Huyer*, 849 F.3d at 399)); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1064 (D. Minn. 2010) (holding fee award of 33% reasonable); *In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir.2002) (affirming fee award representing 36% of the settlement fund as reasonable)); *In re Xcel,* 364 F.Supp.2d 998 (collecting cases demonstrating that district courts routinely approve fee awards between 25% and 36%). Just recently, this District approved one-third of the fund in a settlement valued at $325 million. *See Rogowski v. State Farm Life Ins. Co.*, No. 22-CV-203, 2023 WL 5125113, *4-5 (W.D. Mo. April 18, 2023). Thus, judges in the Western District of Missouri and the Eighth Circuit routinely apply the one-third-of-the-fund fee calculation, even to large settlements.

69.     In doing so, courts typically consider some or all of the relevant factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *See In re Target Corp. Customer Data Security Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018). The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*In re Target,* 892 F.3d at 977 n.7. To be sure, "[m]any of the *Johnson* factors are related to one another and lend themselves to being analyzed in tandem." *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 886 (S.D. Iowa 2020). Therefore, courts in the Eighth Circuit often focus on the most relevant *Johnson* factors in evaluating fee requests. *See Huyer*, 849 F.3d at 398–400 (affirming trial court's award of one-third of the common fund after review of Johnson factors 1-5 only); *In re Xcel*, 364 F. Supp. 2d at 993; *Tussey v. ABB, Inc.*, No. 06-CV-4305, 2019 WL 3859763, at *2 (W.D. Mo. Aug. 16, 2019); *Yarrington*, 697 F. Supp. 2d at 1062; *Hardman v. Bd. of Educ. of Dollarway, Arkansas Sch. Dist.*, 714 F.2d 823, 825 (8th Cir. 1983). The Court has considered the Johnson factors here, and finds that each weighs in favor of Plaintiffs' fee request.

70.     Here, Class Counsel's time and labor invested was substantial and necessarily precluded other work. In addition to the substantial number of hours it took to reach the Settlements, Class Counsel were also required to expend $12,923,266.48 of their own money toward the litigation through the date of the initial settlements. That work was undertaken without any guarantee of payment. Moreover, this case faced low odds of early settlements given the attack on practices that were central to the real estate brokerage industry. *See, e.g.*, *How the $1.8*

34

*Billion Real-Estate Commissions Lawsuit Came to Be*, Wall Street Journal, November 26, 2023 ("Antitrust cases almost always settle before trial, giving attorneys some assurance they will get paid something. But in this case, the damages were so high and the threat to the industry so existential that plaintiff attorneys thought it unlikely NAR would settle."). Indeed, from the outset, NAR took the position that the cases were "baseless." *See, e.g., Realtor Group Moves to Dismiss Class Action Lawsuit Alleging Collusion,* Forbes, May 21, 2019 ("According to John Smaby, president of NAR, all three claims have no merit. 'In today's complex real estate environment, REALTORS and Multiple Listing Services promote a pro-consumer, pro-competitive market for home buyers and sellers, contrary to the baseless claims of these class action attorneys,' he said. 'Our filing today shows the lawsuit is wrong on the facts, wrong on the economics and wrong on the law.'").

71. "Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees." *Yarrington*, 697 F. Supp. 2d at 1062 (quoting *In re Xcel*, 364 F. Supp. 2d at 994); Theodore Eisenberg & Geoffrey Miller, *Attorney Fees In Class Action Settlements: An Empirical Study*, 1 J. Emp. L. Studies 27, 27, 38 (2004) ("Fees are also correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees . . . . [This] is widely accepted in the literature.")). "Unless that risk is compensated with a commensurate award, no firm, no matter how large or well-financed, will have the incentive to consider pursuing a case such as this." *Tussey*, 2019 WL 3859763, at *3. "Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success." *Been v. O.K. Industries, Inc.*, No. 02-CV-285, 2011 WL 4478766, at *9 (E.D. Okla. Aug. 16, 2011). And critically, "[t]he risks plaintiffs' counsel faced must be assessed as they existed in the

35

morning of the action, not in light of the settlement ultimately achieved at the end of the day." *In re Xcel*, 364 F. Supp. 2d at 994.

72.     Because antitrust claims are especially complex, expensive, and difficult to prosecute, courts have recognized that antitrust settlements should result in attorneys' fees equal to one-third of the fund. *See In re Peanut Farmers Antitrust Litig.,* No. 19-CV-00463, 2021 WL 9494033, at *6 (E.D. Va. Aug. 10, 2021) ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane Antitrust Litig.*, No. 04-CV-1616, 2016 WL 4060156, at *5 (D. Kan. July 29, 2016) (awarding one-third of $835 million settlement, noting "a one-third fee is customary"); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 100, 106 (E.D. Pa. 2013) (awarding one-third of the settlement fund as attorneys' fees in which court relied upon the fact that class counsel had litigated a number of hotly contested *Daubert* challenges).

73.     Here it is undeniable that the antitrust claims at issue in these cases were challenging to prosecute.

74.     Courts often judge class counsel's skill against the "quality and vigor of opposing counsel[.]" *In re Charter Commc'ns, Inc.*, MDL No. 1506, No. 02-CV-1186, 2005 WL 4045741, at *29 (E.D. Mo. June 30, 2005) (citing *In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004)). Here, Class Counsel faced off against no fewer than twenty highly-respected law firms over the course of the litigation. Although Class Counsel's team included some of the country's most accomplished class action and trial lawyers, Defendants also hired some of the country's most prominent and respected defense attorneys. This weighs heavily in favor of the requested award.

75.     In the Eighth Circuit, courts have "frequently awarded attorneys' fees ranging up to 36% in class actions." *Huyer*, 849 F.3d at 399. Courts have recognized that prosecution of

antitrust claims should result in a one-third-of-the-fund fee award.  *See In re Peanut Farmers,* 2021 WL 9494033, at *6 ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane*, 2016 WL 4060156, at *5 (awarding one-third of $835 million antitrust settlement, noting "a one-third fee is customary").

76.     Moreover, the requested one-third fee award is equal to or less than what the actual Named Plaintiffs—those with the most on the line and most involved in the case—agreed to at the outset of the case.  Class representatives in *Burnett* agreed to 35%.  Dirks Decl. at ¶27.  Class representative in *Moehrl* agreed to up to 33.3%.  Berman Dec. at ¶ 16.

77.     Here, the Fund is pure cash and non-reversionary; so, the Settlements, plus interest earned until its distribution, require no further valuation.  In requesting a fee as a percentage of the Fund, Class Counsel necessarily seeks a fee proportionate to the degree of monetary success obtained.

78.     Equally important, the Settlements include significant practice change relief which require the Settling Defendants, among other things, to not enforce the Mandatory Offer of Compensation Rule and to train their agents that commissions are negotiable.  Counsel is not seeking any additional fee for this valuable relief on these Settlements, but the value of that relief is substantial in itself and should be considered when evaluating the fee that is sought.

79.     Here, the request is supported by both the size of the recovery and the results obtained as compared to the risk of a lesser recovery or none at all.  Moreover, the Settlements represent the first recovery on behalf of the Class.  Rather than stop at these settlements and move on to less risky litigation, Class Counsel have continued to prosecute these joint and several liability claims against other Defendants.  Thus, any future settlements or judgments will also benefit the Class.  This factor supports a contingency percentage of one-third, particularly given

the benefits achieved.  Importantly, success—including "exceptional success"—is not measured solely by the maximum damages alleged but must be evaluated against any "unusually difficult or risky circumstances and the size of plaintiffs' recovery." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204–05 (S.D. Fla. 2006).

80.     A lodestar crosscheck is "not required" in the Eighth Circuit, *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017); *PHT Holdings II, LLC v. N. Am. Co. Life & Health Ins.*, 2023 WL 8522980, *7 (S.D. Iowa November 30, 2023).  The Court declines to do one here.  But in any event, a crosscheck here confirms that the requested fee is reasonable and should be approved. The hours and rates submitted are consistent with the large undertaking of this case.  Class Counsel's request is reasonable and the Court approves their requested fee of one-third of the Settlement Fund.

81.     The Court also grants Plaintiffs' request for their costs.  The expenses submitted were reasonable expenses in such a large and complex litigation.

82.     The Settlement Administrator shall be paid in accordance with the Settlement Agreement.

83.     The Court authorizes payments to be made from the Escrow Accounts under the Settlement Agreements as qualified settlement funds ("QSF") as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations and retains continuing jurisdiction as to any issue that may arise in connection with the formation or administration of the QSFs.  Co-Lead Counsel are, in accordance with the Settlement Agreements, authorized to withdraw up to the amounts allowed by the Settlement Agreements out of the Escrow Accounts.

84.     Co-Lead Counsel are directed to prepare and submit for Court approval a plan of allocation for the Settlement Fund, and to propose a schedule for comment and Court review.  The

38

proposed plan of allocation must be posted to https://www.realestatecommissionlitigation.com and emailed to all individuals who submit a claim in order to provide those individuals an opportunity to comment on the plan. After the plan of allocation is proposed and an opportunity to comment has been provided, the Court will evaluate the proposed plan and any objections thereto. The Court's review of the plan of allocation will be conducted separately from this final review of the Settlements.

85. Pursuant to Federal Rule of Civil Procedure 54(b), this Court directs entry of final judgment of dismissal with prejudice and without costs (except as provided in the Settlements) as to the defendants covered by the Settlements. This case contains claims against multiple parties, and there is no just reason to delay the entry of final judgment as to these Settling Defendants.

86. Settling Defendants have denied any liability, fault, or wrongdoing of any kind in connection with the allegations in the Actions, and as such, neither the Settlements, nor any of their respective terms or provisions, nor any of the negotiations or proceedings connected with the Settlements shall be construed as an admission or concession of the truth of any of the allegations, or of any liability, fault, or wrongdoing of any kind by Settling Defendants.

87. The Court expressly retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlements and to interpret, implement, administer and enforce the Settlements (including with respect to the scope of the Settlement Classes, Released Claims, and Released Parties), in accordance with their terms, and to implement and complete the claims administration process, in accordance with the Settlements, for the benefit of the Settlement Class. The Court does this for the purpose of satisfying the requirements of *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), concerning the obligation of a Court entering a settlement agreement to speak clearly when it wishes to retain jurisdiction.

**IT IS SO ORDERED.**

          /s/ Stephen R. Bough        
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: <u>May 9, 2024</u>