IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SCOTT AND RHONDA BURNETT, RYAN HENDRICKSON, JEROD BREIT, SCOTT TRUPIANO, and JEREMY KEEL, on behalf of themselves and all others similarly situated,
Plaintiffs,
vs.
THE NATIONAL ASSOCIATION OF REALTORS, et al.,
Defendants.

Case No. 19-CV-00332-SRB
Kansas City, Missouri
May 9, 2024

.............................

TRANSCRIPT OF SETTLEMENT CONFERENCE
BEFORE THE HONORABLE STEPHEN R. BOUGH
UNITED STATES DISTRICT COURT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

APPEARANCES

For the Plaintiffs:

MR. ERIC L. DIRKS
Williams Dirks Dameron LLC
1100 Main Street,Suite 2600
Kansas City, Missouri 64105

MS. BEATRICE FRANKLIN
Susman Godfrey LLP
One Manhattan West, Ste 50th FL
New York, New York 10001

MR. MICHAEL S. KETCHMARK
Ketchmark & McCreight PC
Two Hallbrook Place
11161 Overbrook Road, Suite 210
Leawood, Kansas 66211

APPEARANCES
(continued)

For the Defendant Anywhere:
MR. AARON VAN OORT
Faegre Drinker Biddle & Reath LLP
90 S. 7th Street, Suite 2200
Minneapolis, MN 55402

For the Defendant RE/MAX:
MR. JEFFREY A. LeVEE
Jones Day
555 South Flower Street, 50th Floor
Los Angeles, California 90071

For the Defendant Keller Williams:
MR. BORIS BERSHTEYN
Skadden, Arps, Slate, Meagher & Flom
One Manhattan West
New York, New York 10001-8602

For the South Carolina objectors:
MR. PATRICK E. KNIE
Knie & Shealy
PO Box 5159
Spartanburg, South Carolina 29304

For Spring Way and Wehrheim objectors:
MR. ANDREW J. HOROWITZ
Obermayer Rebmann Maxwell & Hippel
525 William Penn Place, Suite 1710
Pittsburgh, Pennsylvania 15219

For James Mullis objector:
MR. RANDALL PAUL EWING, JR.
Korein Tillery
205 North Michigan Avenue, Ste 1950
Chicago, Illinois 60601

THE COURT: It looks like it's now ten o'clock. We are here on the case of Burnett, et al. v. NAR, et al., Case No. 19-332. Rather than have every lawyer enter an appearance, I'd like just one person identify -- whoever's going to be speaking, enter an appearance, and, of course, we can supplement that if needed.

From the plaintiff.

MR. DIRKS: Morning, Your Honor. Eric Dirks for the plaintiffs, and Beatrice Franklin will be riding shotgun and may have some things to say.

THE COURT: Thank you.

MR. VAN OORT: Good morning, Your Honor. Aaron Van Oort for Anywhere Real Estate.

MR. LeVEE: Morning, Your Honor. Nice to see you. Jeff LeVee on behalf of RE/MAX LLC.

THE COURT: Welcome back, sir.

MR. LeVEE: Thank you.

MR. BERSHTEYN: Good morning, Your Honor. Boris Bershteyn on behalf of Keller Williams Realty, Inc.

THE COURT: Welcome. Well, very good.

The first thing I would like to address, and I distributed to everyone, this morning at 5:06 a.m., I received an email from Mr. Anthony Phillips, who is identified by his email as the president of the Luxury Companies in Las Vegas, Nevada, and he sent a rather amusing email comparing this

settlement to a Supreme Variety Taco Pack. Clearly this individual does not appreciate the settlement and does not wish it to be resolved.

They did not follow the rules on stating an objection; so normally I would not consider it. The reason I printed it out and am talking about it is on page 3 of that email, it alleges what I think could be a conflict between myself and counsel for plaintiff Matt Dameron.

I think it's come up a couple times over the last five years that my wife is on city council. Because of that, I'm not an expert in legal ethics but spent way too much time looking at the legal ethics rules on this because my wife is an attorney as well in this community. So the ethics rules make it abundantly clear if I know someone is donating to my wife, then I need to put them on the conflicts list.

I did not know Mr. Dameron donated to my wife. The legal ethic rules say if I don't go look at these disclosures, then I can just in essence not have to know who donated to her and that's how it can go.

So this is the first time in the five or six years that she's been on the council that this has come up. So I went back and looked at those ethics rules again today and also went to the disclosures that were hyperlinked in this email.

So there's a reference to Taxpayers Unlimited. By

my calculation, Taxpayer Unlimited is a PAC associated with the local firefighters. The local union is Local 42 by all accounts of their financial disclosures. So Local 42 I don't believe is controlled by Mr. Ketchmark or Mr. Dameron, which is somewhat referenced in page 3 of that email.

But I did discover in particular that in 2019, Mr. Dameron did in fact donate to my wife, but that was my first opportunity ever to look at one of her financial disclosures. So it was interesting for me to discover that on October 29th, 2019, that the Kansas City Association of Realtors PAC donated to my wife.

I look around this room and go through Bryan Cave or Polsinelli or Lathrop or Shook or any other major firm appears to have donated to my wife as well. So I believe the ethics rules require me to ask each of the parties if they would like to conflict me off the case, and if you would, I'll be more than glad to step down based upon that.

I have not looked at all of these disclosures. Again, this is my -- got this early this morning. As you guys sadly know, I get up too early and so gave me a chance to look through those disclosures.

But from plaintiff, do you wish me to conflict myself off this case based upon the Kansas City Association of Realtor PAC donating to my wife in 2019?

MR. KETCHMARK: No, Your Honor.

THE COURT: How about from Anywhere, would you like for me to conflict off this list based upon Mr. Dameron's donation to my wife in 2019?

MR. VAN OORT: No, Your Honor.

THE COURT: From RE/MAX?

MR. LeVEE: No, Your Honor.

THE COURT: Keller Williams?

MR. BERSHTEYN: No, Your Honor.

THE COURT: Would anyone else like to be heard on this potential conflict?

Mr. Phillips also references sending this on to the U.S. Attorney, the Department of Justice, and the FTC; and so I beat him to the punch and sent it on to Teresa Moore downstairs, our U.S. Attorney, so that she can do what law enforcement needs to do for judicial ethics.

I have reviewed the motions and the briefings that have been filed. This is plaintiffs' motion, and so, Mr. Dirks, Ms. Franklin.

MR. DIRKS: Thank you, Your Honor.

Just to start things off, if it's okay with the court, I might give you five minutes, just overview of why the settlements should be approved, and then turn it over to the defense counsel that I don't think have a lot to add. And then perhaps the objectors would have their opportunity, and then if the court would oblige me to come back, me and

Ms. Franklin, to rebut what the objectors have to say.

THE COURT: Outstanding plan.

MR. DIRKS: Okay. Thank you, Your Honor.

Well, I'm pleased again to be here after five years of litigation for final approval of these settlements. All the case law and all the common sense support approving these motions -- this motion. The settlements provide $208.5 million to the class, practice changes from all three settling defendants, and importantly peace is achieved. The war is over with respect to these defendants, and more relief is on the way, as the court knows.

At the preliminary approval stage, the court held that it's likely to approve these settlements and directed us to issue notice. And that's what we did. And the notice process was a success.

Postcards to over 10 million folks, emails to over 25 million folks, a digital campaign with 300 -- more than 300 impressions, a website with 5 million page views, 415 press stories, and an overall, when you combine it all, a reach of over 95 percent, which exceeds what we told the court our plan was. So by any measure, it's a success.

It's also been well-received. We continue to receive claims every day. So as of today, we're over 200,000 claims, and there's a whole other year for folks to make claims on the settlement. Only 12 objectors, only 61

exclusions.

As the court listens today, I ask that it keep three principles in mind. One, these settlements were hard fought. It was hard-fought litigation and hard-fought negotiations. We walked away from the table many times over a period of years. We worked diligently on this case and to reach these settlements. We didn't leave a dollar on the table.

Two, class settlements should be hospitably welcome, and the presumption is in favor of approval even if there's a small minority of folks who don't like the settlement.

Three, the law and common sense favor nationwide settlement and a nationwide release and a release that releases all claims arising from the same factual predicate, the same conspiracy. That means that the law and common sense require you to overrule the objections.

Little bit of housekeeping. One, I think the court may know the PulteGroup is not here. We've been working with them to try to satisfy their concerns. Things are going well. They did request that to the extent the court is looking at our proposed order, that in paragraph 38, we remove -- and we agree to this -- we remove the sentence, Pulte could have availed itself of the same streamlined process if it had asked, but it appears Pulte did not do so. We -- to the extent the court's looking at that, we would agree to strike that.

The second housekeeping issue is in the proposed order because the court just a few weeks ago denied a 54(b) certification request with respect to the HomeServices judgment, I wanted to point out that we're requesting that here. I didn't want the court to think we were, you know, sneaking that in there, but here it's a completely different context, a completely different situation.

In the HomeServices issue, they had opposed it, and there was an issue with setoff and the finality of the settlements would cause problems. Here if you look at page 26 of our brief, we set out a -- several cases that stand for the proposition that in a partial settlement like this, you go ahead and you approve the 54(b) request.

Happy to answer any questions you have about that. I'm done. I'm proud to be presenting these settlements, which are by any measure fair, reasonable, and adequate.

THE COURT: Thank you, sir.

MR. VAN OORT: Your Honor, again Aaron Van Oort for Anywhere Real Estate. You have our papers. I will not repeat what we've said in them other than to say we agree the settlement is fair, reasonable, and adequate, and we strongly support its approval.

If Your Honor has questions, I'll be glad to answer them. Otherwise, that's all I have planned.

THE COURT: Thank you, sir.

MR. LeVEE: Your Honor, Jeff LeVee on behalf of RE/MAX. I fully endorse what my colleague representing Anywhere Real Estate has just said. We literally have nothing to add, including endorsing what Mr. Dirks has provided to the court. And we are here to answer questions, if any, but I don't want to take any additional time.

THE COURT: Thank you, sir.

MR. BERSHTEYN: Your Honor, Boris Bershteyn for Keller Williams. Keller Williams likewise strongly supports approval of the settlement, and we'd be pleased to rest on the papers and Mr. Dirks' presentation. Should there be any questions we can answer after the objectors speak, we, of course, stand ready to do so.

THE COURT: Thank you.

In no particular order, I printed off all these objections, and so we have counsel from South Carolina, my second favorite state besides Missouri. Come on up, sir. Are you Mr. Slade or you Mr. --

MR. KNIE: I'm Mr. Knie, Your Honor.

THE COURT: Mr. Knie, welcome.

MR. KNIE: If I can climb over the luggage, I'll get up there.

THE COURT: You're going to make it just fine. Have you ever been to Isle of Palms?

MR. KNIE: I have not.

THE COURT: If you want to come visit on 4th of July, that's where I'll be.

MR. KNIE: I've not been to this part of the country, but we've enjoyed it thus far.

THE COURT: Isle of Palms is north of Charleston.

MR. KNIE: Oh, have I been -- I'm a little hard of hearing. I'm 77. Yes, I've been to Isle of Palms. Lovely place.

THE COURT: Lovely place.

MR. KNIE: May it please the court. Matt Shealy, Mitch Slade, and myself appear on behalf of South Carolina objectors regarding both the amounts of the proposed settlement and the terms thereof.

First and foremost, I feel like I need to point out the obvious. This was a -- this was a $1.7 billion verdict for a class of 500,000 Missourians. Why should their verdict, which they own, be diluted by 97 1/2 percent? This is a fairness hearing; so I would respectfully submit the first question the court should address is, is it fair to the Missouri class?

With respect to the settlement notices, Your Honor, Keller Williams, as you know, settled after trial. There was no mention of the $1.7 billion verdict in the notices that went out. Specifically, in No. 5 it said the court did not decide this case in favor of the plaintiffs or the defendants,

and we, as lawyers, understand what that means, but the average citizen does not. Frankly, I think it was honestly a misrepresentation.

With regard to all the notices, Your Honor, the people that received the notices don't understand that they don't have the right to sue the individual franchisees. There's no mention of the vast number of victims and the draining effect that it's going to have on the fund.

The summary mentions the costs, which are $11 million, and certainly those costs were justified. But I think the class deserves to know that $11 million is going to come from the fund.

Now, there are 37 million people, as we understand it, that have a claim. They're going to receive between $5 and $10 each. That just does not seem fair. With respect to the franchisees, the franchisees will be released, and they're not going to have to pay anything for being released.

Without the active participation of franchisees, this anticompetitive conspiracy could not have taken place. They don't deserve a free pass. There is no consideration for them being released.

With respect to the financial condition of Anywhere and RE/MAX, in 2023, RE/MAX increased its compensation to its executives by 40 percent. The CEO was paid a $5 million bonus for his leadership in obtaining what they believed was an

excellent settlement. In-house counsel got a $1 million bonus.

With respect to RE/MAX, it increased its executive compensation 57 percent. I mean, that alone is 37 percent of the settlement. Anywhere and RE/MAX are in a far better financial condition than has been portrayed.

We retained a well-respected economist, Dr. Charles Alford. I won't go through his report.

THE COURT: I read it.

MR. KNIE: I thought you had it, Your Honor. Thank you.

Obviously we think his report is important. The court, yourself, Your Honor, said in an in limine motion defendants here have obviously made huge profits. This conspiracy has been going on for decades.

We're all familiar with the settlements in big tobacco. Same thing. Big tobacco had to pay over 25 years. So why couldn't we do the same thing with these settling defendants?

Now, with respect to the Keller Williams' financials, we made it clear in our timely objection that we could not evaluate the proposed Keller Williams' settlement without financial data, and four days after we filed our timely objection, we moved for discovery of the Keller Williams' financials, and Dr. Alford submitted a second

declaration asking what he needed.

Instead of cooperating and giving us that financial information, Keller Williams filed a lengthy response as to why we should not get that information. Transparency is the cornerstone to a fairness hearing. We asked plaintiffs' counsel if we could have Keller Williams' financial data that was disclosed to them. They said they'd get back to us. We've never seen anything.

We think we're entitled to that, but more importantly we believe that the court is entitled to that even if it's in camera. We understand they're a private company, but I don't know how the court could make a decision on this matter without seeing Keller Williams' financials.

Now, Keller Williams had posted on their website before the verdict what their annual sales volume was from 2019 to 2022. Their sales volume in those four years was $1.76 trillion. 3 percent of that amount is $52.9 billion. We're talking about them paying just $70 million. That's -- they damaged their sellers by $52.9 billion over that four-year period.

Your Honor, Keller Williams suggests that they sent out these 37 or 35 million dollar [sic] notices and the class overwhelmingly embraced the settlement. That was their language.

Well, 200,000 people responding is less than

one-half of 1 percent. Your Honor, we believe that what's taking place here is an impermissible expansion of what was a 4 MLS class to an 800 MLS class.

Congress intended for there to be ample compensation for victims of antitrust violations. These settlements can hardly be considered as ample compensation.

Again, Your Honor, there is no binding effect on the franchisees despite what these fine lawyers have said. The language that they have put in the settlement agreements are they will make clear and periodically remind, advise, and periodically remind. In South Carolina, we call that best efforts, which means nothing.

Even worse, the settlement agreements provide for a sunset provision after five years. So it will be back to business as usual, but in fact it's already business as usual. We would ask two things of the court respectfully, Your Honor, that the Keller Williams folks be required to disclose their financials to the court before the court makes the decision; that the notices be reworked; and we would humbly ask that this court continue this matter until the November 26th hearing for that to take place.

Thank you, Your Honor.

THE COURT: Thank you, sir.

Just to ensure that everybody has an opportunity to be heard, I'm not sure if I've got a list of who all requested

time to be heard, but anybody here from Spring Way Center?

MR. HOROWITZ: Yes, sir, I am.

Good morning, Your Honor. Andrew Horowitz for objectors Spring Way Center and Nancy Wehrheim.

THE COURT: Welcome.

MR. HOROWITZ: Thank you, Your Honor. May I proceed?

THE COURT: Please.

MR. HOROWITZ: Good morning, Your Honor. May it please the court.

Spring Way Center and Ms. Wehrheim brought these objections because they strongly believe that the real estate industry conspired for over three decades to take advantage of the American home seller and that the named plaintiffs and class counsel, despite engaging in three years of hard-fought litigation, are not representing the interests of the absent class members like Spring Way and Ms. Wehrheim.

As to Anywhere, the broker that my client sold their properties through, the settlement is only 1.4 percent of its EBITDA for the relevant damages period. The total EBITDA for that period is $5.8 billion. A settling defendant's financial condition and ability to pay a higher settlement is a key factor in determining the fairness of a class action settlement.

And this is not novel. The Eighth Circuit

specifically has been clear on this since the *Grunin v. International House of Pancakes* case in 1975. That's 513 F.2d 114.

This settlement fails to meaningfully address that factor. As to Spring Way -- or, I'm sorry, as to Anywhere -- sorry. Class counsel claims that they conducted an analysis of Anywhere's ability to pay while maintaining corporate viability, something that is required as part of the settlement process, but we don't see their work, Your Honor. Instead we're just asked to take their word for it. Instead, the -- we're asked to blindly trust it.

In fact, nobody in -- neither Anywhere nor the named plaintiffs explain why Anywhere cannot afford to pay a larger amount over a period of years let alone in a lump sum now. Multiyear payouts are commonplace in large class action settlements. The tobacco litigation settlement is a prime example having paid out nearly $200 billion and counting over a 25-year period.

Moreover, plaintiffs rely on the declaration of attorney Karl Barth to challenge the conclusion of the objectors' economist Dr. Alford. While attorney Barth is a CPA, his firm is also co-lead class counsel and, therefore, stands to earn a contingency fee if the settlement is approved.

It's well-established that experts cannot be paid

contingency fees, and that's probably why plaintiffs have stopped short of actually calling him an expert. But that doesn't change the fact that they rely on his declaration for opinions that would not be admissible under -- except under Rule 7.02, their expert testimony.

Mr. Barth's opinions, therefore, have no credibility and should be disregarded, and based on the authority cited in our rely brief that we filed yesterday, they may not even be admissible at all.

And without Mr. Barth's opinions, class counsel has no meaningful argument to rebut Dr. Alford's declaration. Meanwhile, there's a clear financial motivation here. Class counsel are seeking a significant percentage of an $83.5 million settlement from Anywhere alone and more from the other defendants in the settlement that is being heard today and the other pending settlements.

To be clear, we respect their work and what they've accomplished here, a lot of hard work, I'm sure, but the plaintiff class members will barely get enough to pay for a fast food meal. Yes, it's in my outline. I thought of it before the guy from Las Vegas.

And meanwhile they were fleeced out of 3 percent on average of the value of their homes, which for millions of people is a single largest financial transaction of their lifetimes.

It's axiomatic that all real estate is local, and that's part of the reason the MDL panel denied class counsel's motion to consolidate, something that they attempted to orchestrate by filing the UMPA national class action only after numerous local class actions had been already filed by ourselves and other counsel.

To be clear, while the conspiracy originated with NAR and was national in scope, we have to look at how it was implemented and carried out across the country. There is a reason after all that there is not a single nationwide Multiple Listing Service. We believe that these market nuances are important, but class counsel took no relevant discovery for big swathes of the country.

For example, they haven't given any indication that they looked in any way at the Pittsburgh area real estate market where my clients are located. It's presumptuous for class counsel to assume without investigating that they understand the market in Pittsburgh.

We need to make sure that all class members, wherever they're located, are treated fairly. Objectors have an important role in protecting the interests of the absent class members since the named plaintiffs are now jointly advocating with the defendants for a settlement. Our judicial system relies on an adversarial process to discern the merits of the case.

But without objectors, there's no longer adverse parties to make that system work. We're here to test the work of the named plaintiffs and the defendants, and, Your Honor, we submit that their work is one thing.

Ultimately the court is the final protector of the interests of the absent class members, and, Your Honor, we respectfully ask you to perform that function. Alternatively, we join in the South Carolina objectors' request that this be continued until the November fairness hearing when all of the settlements can be viewed holistically.

And also, as Mr. Knie has pointed out, the jury verdict of $1.7 billion for the home sellers in Missouri is being reduced by 97.5 percent by this settlement, and then after that, it's diluted from half a million home sellers in Missouri to home sellers in 49 other states.

This is perhaps the most critical, unfair aspect of the proposed settlement, yet plaintiffs' papers and the class notice fail to even mention it, nor do they provide any justification for this massive transfer of funds from Missourians to home sellers in 49 other states.

For this reason, in no universe can the proposed settlement be construed as fair, reasonable, and adequate.

Thank you, Your Honor.

THE COURT: Thank you, sir.

Looks like I've got an objection from Mr. James

Mullis.

MR. EWING: Good morning, Your Honor. Randall Ewing on behalf of James Mullis. We are counsel in the *Batton v. NAR* action in the Northern District of Illinois.

The *Batton* claims are unique in two significant ways. First, they're the only major case that is asserting claims on behalf of homebuyers instead of home sellers. Our theory, which has been sustained past motions to dismiss, multiple motions to dismiss, is that the significant or all of the commissions are passed through to homebuyers through increased home purchase prices.

We see this through the Department of Justice's own statement of interests, which says that the buyer/broker commission rule ultimately harms homebuyers through higher home prices. The *Batton* claims are also unique because unlike many of the other objectors or other cases out there, these were not recently filed after the verdict. The *Batton* claims have been on the docket and actively litigated for three years.

THE COURT: I don't know if you'll know the answer to this question. When I first got this case, whenever that was, apparently in 2019, there were efforts to consolidate up in the Northern District of Illinois. Was yours one of those that came up?

MR. EWING: No. Our case was filed in January of

2021. I believe that would have been the *Moehrl* case that would have been the only pending case at that time.

THE COURT: Thank you.

MR. EWING: But the main point is these are significantly valuable claims, valuable claims that are being actively litigated, and they're significantly different than the seller claims. We're not here trying to upend the settlement. We're only here trying to ensure that the homebuyer claims that have been actively litigated are not being released, and we don't believe they should be released for three reasons.

First, class members were not provided with notice that the *Batton* claims were being released or that homebuyer claims were being released in general. There's no mention of *Batton* or homebuyer claims anywhere in the notices that were sent out to class members.

In fact, there's even a section in the notice that specifically -- FAQ to class members that says are there other similar cases? This case is mentioned. *Moehrl* case is mentioned. *Nosalek* case is mentioned. There's no mention of *Batton* whatsoever, even though we believe those claims are as -- or as valuable or more valuable even than the home seller claims.

In fact, it wasn't until the proposed order two days ago that it was made apparent that the parties believed that a

significant portion, up to 70 percent perhaps of the *Batton* claims were being released through the proposed order.

We also believe the claims are being released for no additional consideration. The claim form doesn't even ask class members about their home purchases. There's no indication that a plan of allocation is going to account for the number of home purchases or the price of home purchases whatsoever.

There's also no evidence in the record or put forward by any party that these homebuyer claims were part of the give and take of negotiations. Plaintiffs have put in a statement saying that they interpret the release that way. Anywhere has put in a statement saying it wouldn't have settled without a release that included part of the *Batton* claims, but yet there's nothing about those homebuyer claims ever being litigated in this court, any discovery, or even any back and forth as part of the negotiations whatsoever.

It's black letter law that valuable -- potentially valuable significant claims cannot be released for no additional consideration.

Third, we believe that if these claims were being released, if the Batton claims were being released, it would raise an inadequacy of representation issue and potential conflicts of interest.

In antitrust actions, typically direct and indirect

purchaser claims, which is essentially what the *Batton* court has ruled that our claims are, indirect claims, are represented by separate counsel. And the reason that is, is because of the conflict of interest that exists with respect to the extent to which those damages were passed through from the direct purchaser through the indirect purchaser. The direct purchaser's interest is to say there was no pass-through or as little pass-through as possible.

The indirect purchaser's interest is to say it was entirely passed through or a large portion of it was passed through. And that's an inherent conflict of interest that cannot be represented by just one counsel.

And as the Supreme Court has stated, these type of conflicts of interest become even more pronounced when you're dealing with defendants that claim to have limited funds, which is what the defendants here claim.

Now, the defendants and the parties say that there are no nonoverlapping groups, and we don't believe that's correct. There are people who only sold a home. You know they may not be a large number, but for various reasons, there are people who sell a home and do not purchase. And those people's interest is for there to be no pass-through.

And then there are people who bought many more homes than they sold, whether for investment properties or maybe they traded up and paid a much higher purchase price. And

those groups of people's interests are to maximize the amount of the pass-through.

And I don't believe that -- our position is that these claims can't be resolved by the same counsel without any sort of representation in the negotiations or the allocation.

I think the differences in these actions were even reflected by class counsel when they filed their MDL petition in the related action. They did not seek to include the *Batton* actions. They said they didn't include the *Batton* actions because they were different. And they are different. So they shouldn't be released.

Alternatively we would ask that if you are going to overrule the objection, that the scope of the release issue is something that should be decided by the *Batton* court by Judge Wood in the Northern District of Illinois. In the proposed order that was sent to Your Honor two days ago, there's one sentence in paragraph 57 that says, The homebuyer claims by home seller class members indisputably arise out of the same alleged conspiracy and the same factual predicates as the asserted home seller claims.

First, we don't believe that's correct. The mechanism of injury is entirely different. The class members' perspective and their relationship to the transaction is entirely different. This is often in many circuits called the identical factual predicate test. And these claims are not

just identical.

So if Your Honor were inclined to overrule our objection, we would also ask that that sentence be struck. We believe it's premature for this court to make that conclusion based on an undeveloped factual record. These issues are normally decided at summary judgment or with discovery.

And then we would also ask in 63 where there is language that would enjoin our claimants from currently litigating the *Batton* case, we would ask that that be struck because we believe at least with respect to the *Batton* plaintiffs that we believe that Judge Wood is best positioned to determine that.

And then the paragraph 87, I believe it is, which has -- retains this court's exclusive jurisdiction to interpret the scope of the release, as I mentioned earlier, if you are going to overrule the objection, Judge Wood in the Northern District of Illinois should be the court that determines the scope of the release as it applies to the *Batton* claims once there is a more developed factual record and these differences or the lack thereof, as defendants may claim, can actually be fleshed out and tested.

Thank you, Your Honor.

THE COURT: Thank you, sir.

Next I have an objection from -- maybe this is redundant -- Robert Benjamin Douglas. I think we've already

heard from Mr. Knie. The rest of them I do not believe have requested oral argument, but just for the sake of thoroughness, is Cynthia Goralski, G-o-r-a-l-s-k-i, here?

How about Sharon Saunders, S-a-u-n-d-e-r-s?

We have an objection by Mr. Anthony Phillips. Mr. Phillips? Jeffrey Nordquist, N-o-r-d-q-u-i-s-t. Larry Giammo, L -- you can spell Larry. Giammo, G-i-a-m-m-o. Chia, C-h-i-a, Whitehouse; Arturo Gonzalez, G-o-n-z-a-l-e-z, and Drane Knizer, K- -- maybe it's Diane. I'm sorry. D-i-a-n-e, Knizer, K-n-i-z-e-r.

Anyone else wish to be heard as an objector?

Mr. Dirks or Ms. Franklin?

MR. DIRKS: Thank you, Your Honor.

We'll try not to retread what's already set out in the papers of plaintiffs and the defendants. So I'll keep it short, but I do want to address a couple of what I hear are new arguments that were not in the papers.

To start with, I want to talk about what we did not hear. We didn't hear about the significant practice change relief going forward. Everybody knows these defendants can't pay the hundreds of billions of dollars that are being discussed. But what they can do is make changes going forward to save consumers money, and that's valuable relief in addition to the relief that we were able to obtain monetarily.

We didn't hear about the more than 2,000 South

Carolina claimants who have already made claims on this settlement. We didn't hear about the 6,000 -- more than 6,000 Pennsylvania claimants who have already made claims on this settlement. They have a voice too.

We didn't hear anything about the increased complexity. The war is over. What they want to do is start a ground war and literally on dozens of courts across the country starting from scratch. And what's that going to do? That's going to only further drain the coffers of these defendants as they litigate a groundwork across the nation.

It's going to mean there's no guarantee of payment for these plaintiffs at all, no practice change guarantee. Inconsistent results could possibly appear across the country and the court's dockets are going to be flooded with these cases.

There is -- this wasn't in the papers. There was a discussion about the JPML. The JPML, my understanding is, denied transfer because they said, well, there's all these settlements already, let's let that process occur.

That was their reasoning.

THE COURT: Mr. Dirks, when you're able to figure out what the JPML is doing, there's a couple other lawyers in this country that would like your insights.

MR. DIRKS: I'm right there with you, Your Honor.

One of the new things we heard today is that, oh,

these folks are only getting X dollars. I don't think that these lawyers understand. This is a nonreversionary settlement. As of today, if you take 200,000 and you divide that by the pot of money out there, these folks are getting way more. We're talking in the hundreds, and, of course, there's more money on the way with the NAR and other settlements that are coming in the door.

The papers set out, so I won't do it in great detail, there would be no deal unless there was a nationwide deal. That's something that we heard today that's brand new is this isn't fair to the Missouri class. Yes, it is, because there could be no recovery to the Missouri class absent a nationwide settlement. None of these companies could pay the judgment. They were going bankrupt, and this was the only way to get relief for Missouri and the nationwide class.

Professor Alford, I'm sure he's a great guy, but you know what he didn't do? He didn't give an opinion as to the fairness, reasonableness, or adequacy of the settlement. There's nothing in there that discusses that. He didn't even give an opinion as to the correct amount of the settlement in his view.

I'll let Ms. Franklin talk about the *Batton* objection quickly.

Couple other new things, that we misrepresented the settlement and the notice. That's not true. I've got the

notice right here. The court approved it. It went out. It's on the website. There's also frequently asked questions on the website. It absolutely tells the class what they were giving up and what they're getting.

He also said we didn't tell them what our costs and fees were. We filed a motion, motion -- docket 1392, I believe, which we're asking the court to grant today as well.

They said we didn't do discovery. Yeah, we did. We had nationwide data. We had experts who were talking about Pennsylvania throughout this litigation.

Those are the new arguments I heard and the ones I wanted to address. If the court has any questions, I'm happy to answer them, and I think Ms. Franklin may want to have a few words about the buyer objection.

THE COURT: While you're standing up, you wanted me to grant a Rule 54(b) motion --

MR. DIRKS: Yes, Your Honor.

THE COURT: -- that I previously denied. What I'd like to do because this is involving a nationwide class and so many people are unable to attend here today and I didn't allow people to call in, I'd like for you to just file a brief motion if the defendants all agree to it. It doesn't need to be more than a sentence, and that way there's something on the docket that I can point to so if there's anything other than the final motion for approval, 1469, that you'd like me to do,

just file another motion, and we'll -- if there's no opposition, we can get it done.

MR. DIRKS: Okay. We will do that, Your Honor.

THE COURT: Thank you.

Ms. Franklin, ma'am.

MS. FRANKLIN: Thank you, Your Honor. Beatrice Franklin on behalf of the settlement class. I'm going to address the *Batton* plaintiffs' objections. Again I don't want to retread what was in our papers; so I just want to emphasize a few points.

First, as to the request that we're hearing for the first time today that it should be Judge Wood who decides the scope of the releases in our settlement agreements, for several reasons that request should be rejected. Perhaps first and foremost, Judge Wood has already rejected that.

As I think the court is aware, the *Batton* plaintiffs filed a motion for a temporary restraining order early yesterday morning. Judge Wood promptly denied it in large part because she noted that these issues are squarely in front of this court and it should be this court who decides the objectors' arguments.

Second, this court is obviously the court that has jurisdiction over the settlement. It is this court that has preliminarily approved the settlement, that the settlement agreements provide for exclusive jurisdiction of this court.

So, frankly, I'm not sure what the basis is for Judge Wood to be interpreting anything related to the settlements.

Next I want to emphasize that there is no homebuyer class that's been certified anywhere in the country. So that takes this case outside of the realm of the authority on which the *Batton* plaintiffs largely rely. This is not an *Amchem* case. This is not an *Ortiz* case. What this is, is a case where the settlement provides for a release of any claims that arise at the same factual predicates as the claims are pleaded in this action.

So what that means is that members of this settlement class, home sellers, are agreeing to release any claims that they have that arise out of the same factual predicates, which may also include homebuyer claims. This is routinely done in antitrust class action settlements and in all other kinds of settlements and is routinely approved by courts around the country.

For particular authority, I would direct the court to *Uponor* 716 F.3d 1057; *Petrovic*, 200 F.3d 1140; *General American* 357 F.3d 800; and the *Walmart* case, which is really on all fours with this one, 396 F.3d 96.

Next there can be no serious question that notice here was adequate. The language of the settlement is very clear about the claims that are being released, claims arising out of the same factual predicate, including specifically

claims related to the home price that any of the settlement class members may have. That release claims language was included in the notice. It was included on the website. It was included in the FAQs.

So, again, in many of those authorities that I just listed, courts have specifically said that notices that highlight the settlement language itself or point to the settlement language itself, point to the release provisions, that is adequate notice and it provides no reason not to approve a settlement.

And, finally, I want to say that it's simply wrong that these claims are being released without consideration. As the defendants made abundantly clear in their papers and as was very clear during the settlement negotiation process, these settlements would not have happened if class members were not releasing all of their claims arising out of the underlying conduct.

So what's happening is that the home sellers are getting more money for the class, more money for their claims because they are agreeing again, as is routinely done, to release all of their claims. There are -- *Batton* is still going to be able to go forward. There will still be plaintiffs who are not class members who have not released their claims who still have buyer actions. We're not extinguishing the *Batton* cases entirely.

What we are doing is achieving global peace for our class members, including our class representatives, many of whom both bought and sold homes and clearly believe that this settlement is fair, reasonable, and adequate.

Unless the court has further questions, I'm happy to rely on our papers.

THE COURT: Thank you, ma'am.

MS. FRANKLIN: Thank you, Your Honor.

THE COURT: Anything else from the defense side?

MR. VAN OORT: Your Honor, Mr. Dirks and Ms. Franklin covered all the legal points. I just want to emphasize what Ms. Franklin just said.

I negotiated the first settlement, and my client gave me very clear directions that I was not to settle on anything other than a nationwide class and I was not to settle on any basis that would have the same people suing us again for claims arising out of the same antitrust conspiracy. And we fought hard on that. Without disclosing mediation, what plaintiff said is exactly right. There would be no settlement without these terms, and because they have defended that as fair, reasonable, and adequate, and it is, we, again, strongly support approval, Your Honor.

MR. LeVEE: Morning again, Your Honor. Jeff LeVee on behalf of RE/MAX. I'll be very brief.

First, in response to the South Carolina objectors'

reference of certain financial information that he attributed to RE/MAX, that financial information actually is Anywhere's financial information, not RE/MAX. Just for the record.

Second, and I want to be clear, and I believe this would be on behalf of all the defendants who are here, the settling defendants, RE/MAX would only have settled on a nationwide basis. It would have made no sense for RE/MAX to fund on an ability-to-pay basis millions of dollars only to be able to be sued in multiple other states. Wouldn't have done it.

Finally, RE/MAX would only have settled if its franchisees were included in the release. There would have been no economic reason for RE/MAX to settle the case so that it would know that the following day its thousands of franchisees across the country could have then been sued. We just wouldn't have done it.

So we endorse what plaintiffs' counsel has said, and we thank you, Your Honor.

MR. BERSHTEYN: Your Honor, Boris Bershteyn for Keller Williams. For Keller Williams, we respectfully join the comments from Mr. Dirks, Ms. Franklin, and our colleagues from Anywhere and RE/MAX, and I'll just add two very brief points.

First, you heard South Carolina objectors make mention of alleged deficiencies in the notice. For the

reasons Mr. Dirks said and for the reasons in the papers, the notice is ample. So those objections are meritorious, but I will just add that those objections are also not preserved. Nowhere in the timely objection the South Carolina objectors filed did they raise any concerns about the notice in this case.

Secondly, Keller Williams respectfully asks Your Honor to deny the South Carolina objectors' request for discovery from Keller Williams. Under circumstances like this, the law is clear. Objectors are not entitled to discovery and to materials exchanged during settlement negotiations. There might be exceptional circumstances in cases where there are credible allegations of a collusive settlement. There's no suggestion, let alone evidence that settlement here has been anything but extraordinarily hard fought. To entertain discovery now would only delay these proceedings for no legitimate purpose.

Thank you, Your Honor.

THE COURT: Thank you.

Well, I'm going to grant plaintiffs' motion for final approval of settlements, Document No. 1469, and overrule all objections. We will get the order out and posted today.

If there's any other residual motions, Mr. Dirks, that you need done, again, shorter is better than a longer motion, and please only file things that the defendants have

consented to so we don't have to exhaust two weeks to get their response. But thank you.

If anybody knows that this was a hard fought -- we had motions in limine on things going on in Pittsburgh that I ruled on, and we spent almost five full years working on this case, and as we talk about MDLs, no offense to any of the lawyers at Horn Aylward & Bandy, this case sucked up a lot more time than my MDL case did. Nothing against you lawyers. You guys just fought hard and most of the time fought respectfully.

MR. KETCHMARK: Duly noted.

THE COURT: Thank you. We'll be in recess.

********************

REPORTER'S CERTIFICATE

I certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____________ Date

_____________________________
/s/Gayle M. Wambolt
GAYLE M. WAMBOLT, CRR, RMR
United States Court Reporter