# Exhibit 13

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>     v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Case No. 19-CV-00332-SRB |

# Declaration of Dr. Nicholas Economides Concerning the Proposed Settlement with the National Association of Realtors

September 13, 2024

i

1. I am Nicholas Economides. I am Professor of Economics at the Stern School of Business of New York University, located at 44 West 4th Street, New York, NY 10012.

2. I received a B.Sc. in mathematical economics (first-class honors) from the London School of Economics in 1976, an M.A. in economics from the University of California at Berkeley in 1979, and a Ph.D. in economics from the University of California at Berkeley in 1981.

3. From 1981 to 1988, I was assistant and then associate professor of economics at Columbia University. From 1988 to 1990, I was associate professor of economics at Stanford University. I have taught at the Stern School of Business of New York University since 1990. During the academic year 1996–1997, in January 200l to August 2001, and in January 2004 to August 2004, I was visiting professor at Stanford University, where I am also currently visiting until December 2024. Between June 2007 and December 2007, from January 2011 to August 2011, from June 2012 to August 2014, and from January 2017 to August 2017 I was a visiting professor at the Haas School of Business at the University of California at Berkeley. In academic year 1997-1998 I was a visiting scholar at the Federal Reserve Bank of New York.

4. I specialize in industrial organization and antitrust. I have published more than 100 research papers in the areas of industrial organization, microeconomics, antitrust, network economics, finance, and telecommunications policy, and I have given numerous seminar presentations at academic and government institutions and conferences. I have published academic research articles in the *Antitrust Bulletin,* the *Antitrust Law Journal,* the *American Economic Review,* the *International Economic Review,* the *International Journal of Industrial Organization,* the *Journal of Competition Law and Economics*, the *Journal of Economic Theory,* the *Journal of Industrial Economics,* the *Journal of Law and Economics,* and the *RAND Journal of Economics,* among others. I am editor of the *Journal of Economics and Management Strategy*, a leading journal in Industrial Organization, the *Journal of Competition Law and Economics,* a leading journal on Antitrust, as well as other journals. Previously, I was editor of the *International Journal of Industrial Organization,* another leading journal in Industrial Organization, for seven years. I teach graduate (M.B.A. and Ph.D.) courses in antitrust, industrial organization, microeconomics, and network industries and platforms. A copy of my curriculum vitae is attached as Attachment A.

5. In the past, I have prepared reports and affidavits, submitted testimony, and been deposed. A list of cases over the past four years in which I provided trial or deposition testimony is in Attachment B. I previously submitted an expert class certification report in Moehrl v. National Association of Realtors on February 23, 2022, a corrected version of that same report on March 8, 2022,[1] an expert rebuttal class certification report on August 22, 2022,[2] an expert merits report on March 23, 2023,[3] and an expert merits rebuttal report on August 14, 2023.[4]

6. I am being compensated at an hourly rate of $1250 and my compensation is not contingent on the outcome of this proceeding. I reserve the right to modify or supplement my opinion as additional information becomes available.

7. I have been asked to consider the Settlement Agreement entered into between Plaintiffs Rhonda Burnett et al. and Christopher Moehrl et al., and Defendants National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, the Long & Foster Companies, Inc., Re/MAX, LLC, and Keller Williams Realty, Inc. and opine on the potential value to U.S. home sellers and buyers of the injunctive relief included in this settlement agreement.

8. I understand that the injunctive relief in this settlement agreement includes, but is not limited to, the following elements:
- Removing any requirement to offer compensation to buyer brokers or to make such an offer blanket, unconditional, or unilateral (whether required by NAR or by MLSs)
- Prohibiting offers of compensation to buyer brokers through MLSs (including removing relevant fields from MLS listings and databases)
- Requiring buyer brokers to have written agreements with buyers they represent, specifying how much brokers will be paid and how payment will be determined, and prohibiting open-ended agreements, including those depending on seller offers of compensation to buyer brokers

---

[1] Expert Class Certification Report of Dr. Nicholas Economides, February 23, 2022 [Corrected: March 8, 2022] (*hereinafter* "Economides Class Report"). Unless otherwise specified, all references are to the corrected version of that report.
[2] Expert Class Certification Rebuttal Report of Dr. Nicholas Economides, August 22, 2022 (*hereinafter* "Economides Class Rebuttal Report").
[3] Expert Merits Report of Dr. Nicholas Economides, March 23, 2023 (*hereinafter* "Economides Merits Report").
[4] Expert Merits Rebuttal Report of Dr. Nicholas Economides, August 17, 2023 (*hereinafter* "Economides Merits Rebuttal Report").

- Prohibiting brokers from representing their services to clients as free or no-cost, unless they will receive no compensation from any source for their services
- Requiring seller brokers to conspicuously disclose to, and obtain agreement from sellers for, any payment made or offered to buyer brokers or other buyer representatives[5]

9. Jointly, this injunctive relief will have three important effects. First, it will greatly reduce the incentives of buyer brokers to steer buyers towards properties offering high buyer-broker compensation. Previously, the threat of steering had put strong pressure on sellers to protect themselves against such steering by offering (through seller brokers) market-prevailing levels of compensation to buyer brokers. In the absence of blanket offers of buyer-broker compensation through the MLS, this pressure will be significantly reduced.

10. Second, this injunctive relief will introduce an incentive for the buyer to limit their buyer broker's compensation, to the extent buyers choose to hire an buyer broker at all. Previously, because almost all sellers offered blanket compensation at market-prevailing levels (for reasons described in the prior paragraph) buyers had little or no incentive to negotiate buyer broker compensation, or for that matter, to save money by forgoing a buyer broker altogether. As explained above, I understand that this injunctive relief includes requiring buyer brokers and buyers to sign agreements specifying buyer broker compensation ahead of time, and thus explicitly and clearly commits the buyer to pay the agreed-to buyer broker compensation regardless of whether compensation is included by the seller or seller broker as part of the sales negotiation. Thus, buyers have an incentive to limit buyer broker compensation or to seek other alternatives.

11. Third, while buyers may still request buyer-broker compensation as part of the sales negotiation, in the absence of blanket, unilateral offers of compensation by sellers or seller brokers, buyers' requests for broker compensation can be made in the context of their offers of purchase, allowing sellers to weigh different offers, including offers without requests for compensation. If the seller chooses to pay compensation to the buyer broker, this competitive context reinforces buyers' incentive to limit the compensation of their buyer broker, while potentially allowing sellers to avoid compensating buyer brokers entirely.

---

[5] For simplicity, subsequent references to seller offers of compensation to buyer brokers include those made directly by the seller or by the seller through the seller broker.

3

12.     Real-world outcomes in the yardstick countries identified and discussed in my expert reports show the effects of significantly reducing buyer-broker steering incentives and incentivizing buyers to limit buyer broker compensation. In Australia, the Netherlands, and the United Kingdom, sellers do not make blanket offers of compensation to buyer brokers, and buyers are responsible for paying their own brokers (when they retain them at all).[6] As a result, buyer brokers will be incentivized to compete to offer higher quality services for lower prices—in fact, as I showed in my previous expert reports, substantially lower prices than those paid to buyer brokers in the U.S. during the class period (an average of 1.55% of the sales transaction amount in the yardstick countries in the rare circumstance when buyer brokers were used, as compared to 2.78% in the 20 Covered MLSs at issue in the *Moehrl* case in the U.S.).[7] While under the injunctive relief, sellers in the U.S. may still agree to compensate buyer brokers as part of the sales negotiation, and may be particularly likely to do so in the short run following the introduction of these injunctive relief measures, the injunctive relief clearly represents a significant shift toward the competitive environment in the yardstick countries, where buyers have a robust incentive to limit buyer broker compensation.

13.     Because of the volume of housing transactions in the U.S. and the high dollar amount of each transaction, any reduction in the average commission rate paid by sellers to buyer brokers constitutes a substantial aggregate decrease in the cost of housing transactions.[8] The National Association of REALTORS® ("NAR") regularly prepares a forecast of the number of U.S. home sales in the next two years, and of their median sales price.[9] NAR's forecast as of June 2024 indicates that the estimated number of home sales in the U.S. in 2025 will be 4.92 million existing homes and 0.81 million newly constructed homes. They further estimate that the median selling price for those existing homes will be $412,000 and for those new homes will be $441,300. Multiplying NAR's projected quantities of homes sold by the median selling prices for those homes indicates the total projected transaction value for existing homes is $2.0 trillion and for new homes is $0.4 trillion, for a total of $2.4 trillion. Because the median home sale price is lower than the mean (or

---

[6] See Economides Class Report (Redacted) ¶35, ¶39, and ¶43.
[7] See Economides Class Report (Redacted) ¶¶93-94.
[8] Note also that, in the yardstick countries discussed in my expert reports (Australia, the Netherlands, and the United Kingdom) where buyer brokers were used less frequently and paid much lower commission rates, this was not offset by higher commission rates paid to seller brokers. In fact, in each of these countries, seller brokers were not compensated more than in the U.S. and in the Netherlands and the United Kingdom they were compensated substantially less. See Economides Class Report (Redacted), ¶¶76-78.
[9] NAR, "Economic and Housing Market Outlook as of June 2024," available at https://cdn.nar.realtor/sites/default/files/documents/forecast-q2-2024-us-economic-outlook-06-27-2024.pdf.

4

average) home price,[10] this represents a conservative (low) estimate of the total transaction value.

**Table 1: Estimates of Total Sales Transaction Value in 2025 for Existing and New Homes**

|  | **Existing Homes** | **New Homes** | **Total** |
|---|---|---|---|
| Estimated Number of Homes Sold | 4.92 Million | 0.81 Million | 5.73 Million |
| Estimated Median Home Price | $412,000 | $441,300 | - |
| Estimated Total Transaction Value | $2.0 Trillion | $0.4 Trillion | $2.4 Trillion |
| Estimated Total Subject to Buyer Broker Commission | $1.8 Trillion | $0.3 Trillion | $2.1 Trillion |
| Estimated Total BB Commission Paid at 2023 U.S. Average (2.66%) | $48 Billion | $8 Billion | $56 Billion |

14. Of these transactions, NAR's "2023 Profile of Home Buyers and Sellers" reports that 89% of home buyers used a broker when purchasing their home in 2023.[11] If this level were to remain the same in 2025, this would indicate that a buyer broker commission would be paid on approximately $2.1 trillion worth of transactions (that is, 89% of $2.4 trillion). For context, based on public estimates of pre-settlement (2023) average buyer broker commission rates in the U.S. of 2.66%[12] this indicates that NAR's projections of 2025 U.S. home sales would result in total

---

[10] This can be seen by comparing historical data on mean vs. median home prices collected by the Federal Reserve Bank of St. Louis. For example, the mean price of a home sold in Q2 of 2024 was $501,700, while the median price in the same period was $412,300 (available at https://fred.stlouisfed.org/series/MSPUS and https://fred.stlouisfed.org/series/ASPUS). This is because the distribution of home prices includes a long "right tail" of homes priced in the millions, while on the low side a home's price is generally bounded at zero.

[11] NAR, "2023 Profile of Home Buyers and Sellers," p. 7 (available at https://www.nar.realtor/sites/default/files/documents/2023-profile-of-home-buyers-and-sellers-highlights-11-13-2023.pdf ).

[12] The real estate company Redfin tracks the average commission rate paid to buyer brokers. Redfin reports that commission rates paid to buyer brokers were an average of 2.66% in 2023, before the settlement was announced. See Redfin, "The Typical Buyer's Agent Earns 2.55% in Commission, a Rate That Has Declined Since the NAR Settlement Was Announced in March," August 2, 2024 (available at https://www.redfin.com/news/buyers-agent-commission-july-2024/).

commissions paid to buyer brokers of approximately $56 billion in 2025, absent the injunctive relief.

15. The full effect of the injunctive relief on housing market outcomes (including buyer broker commission rates and usage) will likely take several years to unfold. In particular, because housing transactions are an infrequent occurrence in most home buyers' and sellers' experience, it may take time for all parties to the transaction to understand their options and for a new equilibrium to be established. Sellers will take time to understand how best to respond to buyer requests for buyer broker compensation, given the reduced risk of steering by buyer brokers. Buyers will take time to understand how such requests affect the chances of their offers being accepted by sellers, and then subsequently take time to incorporate this understanding into their decisions over whether to retain a buyer broker at all and in their price negotiations with buyer brokers. Brokers will also take time to adjust their practices and expectations to these new considerations, and it will take time for discount brokers to enter the market. Finally, it will take time for all of these considerations to result in new market prices, and for these new prices to lead to improvements in broker efficiency (and the exit of less efficient or less motivated brokers).

16. Although the effects of the injunctive relief may be thus delayed, even preliminary, relatively small decreases in buyer broker commission rates substantially lower the overall cost of housing transactions. For example, even small reductions from pre-settlement (2023) buyer broker commission rates (approximately 2.66% of transaction value) in the direction of the market outcomes in the yardstick countries (approximately 1.55% of transaction value) would substantially lower the overall cost of housing transactions. Table 2 below shows that for every shift of 0.1% in the average commission rate (e.g., from 2.66% to 2.56%) the total commission paid would be lowered by $2.1 billion.

**Table 2: Estimates of Commission Savings in 2025 for Certain Decreases in Buyer Broker Commission Rates**

|  | Total |
|---|---|
| Estimated Total Subject to Buyer Broker Commission | $2.1 Trillion |
| Commission Savings for a Decrease of 0.1% in Commission Rate | $2.1 Billion |
| Commission Savings for a Decrease of 0.5% in Commission Rate | $10.5 Billion |

6

Case 4:19-cv-00332-SRB    Document 1535-13    Filed 09/13/24    Page 8 of 10

17. This estimate of the decrease in the cost of housing transactions is extremely conservative, because it does not account for the possibility that many buyers (if not all or nearly all over time) will simply choose not to use a buyer broker. As explained in my expert reports, in the yardstick countries buyer brokers are only used by buyers in 5% to 20% of transactions.[13] For such transactions, the cost savings would be even greater. Table 3 below shows the impact of decreases in buyer broker usage on commissions paid, utilizing the 2.66% pre-settlement (2023) average U.S. buyer broker commission rate, of even relatively small decreases in buyer broker utilization.[14] This impact would be in addition to the cost savings from transactions where some buyers continued to use buyer brokers but paid lower rates.

**Table 3: 2025 Estimates of Commission Savings for Certain Decreases in Buyer Broker Usage Rates, Based on Average Commission of 2.66%**

|  | Total |
|---|---|
| Estimated Total BB Commission Paid at 2023 Rate (2.66%) if 89% of Buyers Use BBs | $56 Billion |
| Commission Savings for a Decrease of 1% in BB Usage Rate, from 89% to 88% | $0.6 Billion |
| Commission Savings for a Decrease of 5% in BB Usage Rate, from 89% to 84% | $3.2 Billion |
| Commission Savings for a Decrease of 10% in BB Usage Rate, from 89% to 79% | $6.3 Billion |

18. Finally, the benefits of the injunctive relief will accrue to both buyers and sellers. Buyers and sellers will collectively pay lower costs to complete housing transactions because of lower commission rates. Additionally, under the injunctive relief, a seller who does not wish to compensate buyer brokers will have the freedom

---

[13] See Economides Merits Report ¶60, ¶64, and ¶68.
[14] The value of this effect will vary depending upon both what commission rates would have been absent the injunctive relief, and depending upon the extent to which commission rates are lowered by the injunctive relief. Generally, all else equal, a higher buyer broker commission rate absent the injunctive relief would result in greater commission savings from reduced buyer broker utilization. Conversely, a greater reduction in buyer broker commission rates as a result of the injunctive relief would result in comparatively lower commission savings resulting from a reduction in buyer-broker utilization.

to do so without the fear that buyer brokers will steer buyers away from that seller's home. And a buyer who does not need the services of a buyer broker will be able to forgo utilizing one and thereby either directly benefit by avoiding having to pay for a buyer broker, or by being able to make his/her purchase offer more attractive by not including a request for the seller to compensate their buyer broker.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on September 13, 2024, at San Francisco, California.

Nicholas Economides

8

Case 4:19-cv-00332-SRB    Document 1535-13    Filed 09/13/24    Page 10 of 10