IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
MISSOURI WESTERN DIVISION, Case No. 4:19-CV-00332-SRB

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, | ) |
| JEREMY KEEL, HOLLEE ELLIS, | ) |
| AND FRANCES HARVERY, ON BEHALF | ) |
| OF THEMSELVES AND ALL OTHERS | ) |
| SIMILARLY SITUATED, Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE NATIONAL ASSOCIATION OF | ) |
| REALTORS, et al. | ) |

**HAO ZHE WANG'S OBJECTION TO FINAL APPROVAL OF THE NATIONAL**

**ASSOCIATION OF REALTORS SETTLEMENT AGREEMENT AND REQUEST FOR**

**PERMISSION TO SPEAK AT FAIRNESS HEARING AND TO BRING ELECTRONIC**

**DEVICES TO COURTROOM ON THE DAY OF HEARING**

I am an interested party who has both sold and purchased homes in recent years. I hereby

object to the final approval of the settlement agreement that plaintiffs reached with the National

Association of Realtors (Document 1458).

I have primarily been a buyer of residential homes but hav also sold two of my properties

in the past three years. The details of these transactions are laid out in the "factual background"

section that follows. In the same section, I also give a detailed account of my routine interactions

with hundreds, if not thousands, of real estate brokers and a ground-level observation of how

broker fees are advertised to and collected from homebuyers like myself. This account

contradicts key factual elements in the home-seller plaintiffs' complaint in this case, including

their central allegation that NAR self-servingly and collusively chose not to contest: that home

1

sellers, not homebuyers, paid for buyer brokers' commission and offered them to homebuyers as a "seller concession."

All told, I have paid hundreds of thousands of dollars more to buyer brokers than to listing brokers in the past few years. Home sellers who have been in the housing market primarily as homebuyers would have be far better off if we could bring direct purchaser claims as homebuyers and bring claims under state consumer protection statutes or false advertising statutes. In our adversary legal system, my potential claims must not be precluded when direct purchaser homebuyers have facts that were never alleged, investigated, or litigated in this case. I seek clarification whether the settlement agreement may release any direct purchaser claims and other state consumer protection claims against NAR I may have as a homebuyer.

I object to the NAR settlement for its unfairness that disfavors market participants who are in the housing market primarily as homebuyers. The class representatives have failed to adequately represent the interests of home sellers who have paid more in buyer broker fees than in listing broker fees. The unfair outcome for homebuyers stemmed directly from the class representatives' choice to build their narrative around NAR's lie that buyers did not pay for buyer brokers. In prosecuting their claims around this lie, the lead representatives failed to adequately represent the interests of class members who were in the market primarily as homebuyers and who paid more in buyer broker fees than in listing broker fees.

Because racial minorities are less like to inherit homes and tend to pay more in buyer broker fees than in listing broker fees and because first-generation Americans have nothing to inherit and tend to pay more in buyer broker fees than in listing broker fees, the settlement that home-seller plaintiffs reached with NAR not only disfavors homebuyers but is racially

discriminatory in impact and in effect. I object to NAR's settlement for this unlawful discrimination.

I also object on the ground that the "practice changes" codified in the settlement reinforce NAR's most abusive, oppressive, and anticompetitive conduct against homebuyers. Over the summer I have experienced first-hand the result of the "practice changes" that home-seller plaintiffs have negotiated with some of NAR's co-defendants that required the same type of "practice changes" and won final approval from this Court. These changes merely lend moral legitimacy and legal mandate to unlawful monopolistic practices that the brokers continue to inflict upon homebuyers. The NAR settlement is facially unreasonable for incorporating the same harmful "practice changes."

I also object on the ground that the non-reversionary clause violates the doctrine of transsubstantivity in federal civil procedural rules, including Rule 23. It sets up this Court to infringe upon the prerogatives of the legislative and executive powers and is unconstitutional.

I also object on the ground that the noticing process of this settlement has been bizarrely ineffective and artificially suppressed the number of opt-outs and objections. The design of the opt-out process is also unconstitutional and violative of class members' due process rights.

I also object on the ground that Paragraph 18 of the settlement agreement is deliberately and irredeemably vague and is unconscionable and unenforceable.

I also hope to appear at the fairness hearing on November 26, 2024, and respectfully ask for the Court's permission to speak at the occasion.

I have never objected to a class action settlement before; I have never appeared at a fairness hearing before. The class counsel and NAR counsel have both agreed to waive the

service of this objection through mail. This Court has permitted my electronic filing of the objection. *Gibson v. National Association of Realtors*, No. 4:23-cv-00788, Document 266.

## I. Factual background

Most real estate brokers and agents occupy dual roles: they simultaneously operate as listing brokers for some home sales and as buyer-brokers in other transactions. In buying a home, some buyers start the process by hiring a buyer broker or buyer agent who identifies listings that suit the buyer's budget and other considerations such as location and size. In recent years, however, buyers increasingly start their house-hunting on Zillow, Streeteasy, or similar online tools. Many a buyer would show up at open houses on her own.

Invariably, however, buyers must be represented by brokers before they can put in an offer for the property. Significantly, whereas prior to mid-1980's the defendants required all realtors to pass onto the sellers offers presented by unrepresented buyers, in recent decades unrepresented buyers trying to present an offer on their own would be rejected by the listing brokers who cite "ethical" rules promulgated by the defendants about not dealing with unrepresented buyers. The rejection is always followed by either an offer by the listing broker to become the buyer agent – with the broker in effect becoming a dual agent, representing both sides of the transaction – or a request that the buyer hire the listing broker's colleague or employee to be the buyer agent.

Once an offer is submitted, a buyer broker negotiates with the listing broker on the buyer's behalf; in the event of a dual agent, of course, a buyer essentially negotiates on her own behalf with the listing broker. After the offer is accepted, the buyer broker advises the buyer on hiring home inspectors, title insurance company, and other products and services needed or

recommended before the closing of the sale. The buyer broker's advice and assistance are inevitably more useful to some buyers than to others: buying an apartment in a condo building entails little need for home inspection because the homeowner is not responsible for the building's structure; buying in New York City where a buyer is usually advised primarily by her own lawyer in a transaction may have less need for a buyer's agent than a buyer in D.C. where the buyer does not have to pay a lawyer; a buyer with good credit and established banking relations may have little need for the connections with mortgage brokers that a buyer's agent may offer; etc.

Commissions to the listing broker and the buyer broker are paid – along with fees and charges by other vendors such as the lender, mortgage broker, attorneys, title insurers, etc. – when the home sells and on the day of closing. Unlike a closing attorney, a land surveyor or a home inspector who usually advertises or negotiates a fixed price with the buyer or seller, the realtors' compensation is calculated as a percentage of a home's sale price. And that sale price usually deviates from the listing price, sometimes drastically, and the price may also change during the closing process as the buyer frequently discovers some defects with the property during the final "walk-through" and gets a discount or if the seller of a new-build convinces the buyer to pay for additional amenities or features. So the brokers' compensation is not determined until the seller and buyer agree on the final purchase price.

But the commission *rate*, the percentage peg of the brokers' compensation to the final sale price, is fixed long before the seller and buyer meet and before the property is listed or before the buyer even finds her own agent. Pursuant to the defendants' rules and regulation for their members, subsidiaries, franchisees, employees and affiliates, the brokers should have the seller nominate a commission rate for both the seller's agent and the buyer agent before listing

5

the seller's property on MLS. NAR's Buyer Broker Commission Rule obligated a listing broker, on behalf of the seller, to set the commission rate for both brokers when listing a home on an MLS owned by a local realtor association. If a buyer represented by a broker purchases the home, the buyer broker receives the commission.

To the extent that the buyer had no role in setting the commission rate for her own broker or even knows the rate, the same rules and regulations have long permitted realtors to tell the buyer that buyer representation is free, and some brokerage defendants apparently trained their realtors to do so.

At closing, a number of costs on top of the home purchase price are paid and settled. On the day of closing, the attorneys (or a title or closing agent) receive funds from the buyer and/or her lender and disburse the funds to the seller (and/or her creditors) and pay the closing costs for the lender, mortgage broker's fees, title fees, the listing broker's fees, the buyer broker's fees, the attorneys' own legal fees, and sometimes fees and charges from other vendors whom the buyer or the seller has hired and who have agreed to be paid at the time of closing (e.g., home inspector, land surveyor, oil tank inspector, septic tank inspector, lead paint inspector, and sometimes plumbers or electricians who performed repairs when the home was pending sale).

Yet, in contrast to the costs of the buyer's attorney, mortgage broker, or home inspector, which are usually agreed upon before hiring and which are clearly marked on the buyer's closing statement, the amount of compensation for the buyer broker is not shown on the buyer's closing or settlement statement and is typically not listed as a line item. This perpetuates the impression that buyer brokerage is all a freebie to the buyer. Only in the past year and amid a litany of legal troubles did the defendants take to change their "ethical" rules to ban the misrepresentation about "free" buyer representation among the ranks of their agents and brokers and to publicly

6

acknowledge that buyer brokers are not free.

I have bought residential real estate many times and also sold homes for a couple of times.

In 2014, for example, I identified a home for purchase in Massachusetts through searches on Zillow. I scheduled a viewing with the listing broker, and was first questioned whether I was represented by a buyer agent. When I said no, the listing broker met me at the property for the showing. I indicated my intention to make an offer for the property during the showing, at which point the broker indicated that I must sign a dual agent agreement before she was permitted by rules to take my offer to the seller. I did, made an offer through the listing broker, negotiated the price through the broker, and eventually closed on the property.

In a 2018 example, I identified an apartment for purchase in New York City through searches on Zillow. I scheduled a viewing with the listing broker, and was first questioned whether I was represented by a buyer agent. When I said no, the broker sent an assistant to show me the apartment. I indicated my intention to make an offer for the property and scheduled a second visit to the apartment, at which point I met with the listing broker in person. She indicated that I must sign a dual agent agreement before she could pass on my offer to the seller. I did, made offer through the listing broker, negotiated the price through the broker, and eventually closed on the property.

In another example, in 2019, I identified a home for purchase in District of Columbia through searches on Zillow. I scheduled a viewing with the listing broker and was first questioned whether I was represented by a buyer agent. When I said no, the listing broker met me at the property for the showing. I indicated my intention to make an offer for the property during the showing, at which point the broker indicated that he must become a dual agent before he could pass on my offer to the seller. I consented, made an offer through the listing broker,

negotiated the price through the broker, and eventually closed on the property.

In yet another example, in 2022, I identified a home for purchase in New Jersey through searches on Zillow. I contacted the listing broker to request a showing and was first questioned whether I was represented by a buyer agent. When I said no, the broker indicated that I must be represented by a second broker, an employee in her office, before I could see that property or make an offer on it. I agreed to hire the listing broker's employee as my buyer broker before making an offer. I subsequently met with that employee at the property and indicated my intention to make an offer for the property, at which point I made an offer on the property through the second broker and eventually closed on that property.

Later that year, I engaged a Home Services America broker to list one of my Massachusetts properties for sale. The broker and I executed an exclusive MLS listing agreement that stipulated commission rates for listing and buyer brokers. The property at 69 Amherst Road, South Hadley, MA, sold for $205,000 on August 26, 2022, with the two brokers collecting $10,250 from the transaction.

Also in 2023, I identified a home for purchase in New Jersey through searches on Zillow. I scheduled a viewing with the listing broker, a Compass broker, and was first questioned whether I was represented by a buyer agent. When I said no, the broker sent an employee to show me the property. I indicated my intention to put in a bid for the property, at which point the broker told me that I must sign a dual agent agreement before he could accept my bid for the property. I did, submitted the winning bid, and eventually closed on the property.

I often identified dozens of properties of interest before each purchase and sometimes had to bid for multiple properties before winning one. I have thus contacted hundreds of listing brokers, and the conversations they had with me always turned into their professional "ethics" of

8

not taking offers from unrepresented buyers and about my "need" to use the listing broker as a dual agent or a colleague or employee of the broker as my buyer agent.

Yet, I typically brought my own vendors to the table instead of relying on the broker's recommendations. In selling a property, I usually brought in my own plumbers or electricians or contractors to make repairs or home improvements that I deemed necessary for marketing the properties for sale. In buying the properties, I had my own attorneys, home inspectors, land surveyors, lead paint inspector, and mortgage brokers at the ready and did not solicit or use advice from the buyer brokers. In purchasing properties, I usually did my own research before approaching each listing broker. During subsequent price negotiations with sellers I rarely solicited advice from the buyer brokers, nor did I trust unsolicited advice that I received from them, because the brokers were either the listing brokers themselves or their employees whose loyalty may be divided.

Of course, sheer coercion aside, in nearly all my shopping experience as a buyer, I was told by the listing brokers that the buyer representation they imposed on me was "free", which is part of the reason I went along with dual agency or buyer "representation" by the listing broker's employee or "friend".

Prior to 1987, NAR's Code of Ethics and Standards of Practice required listing brokers to pass on offers made by a buyer broker as well as offers made by the prospective buyers themselves. Standard of Practice 7-1 in both the 1985 and 1986 editions of the Code of Ethics says "The REALTOR® shall receive and shall transmit all offers on a specified property to the owner for his decision, whether such offers are received *from a prospective purchaser or another broker*." Emphasis added. The rules at the time clearly contemplated listing brokers' interaction and dealing with unrepresented buyers and mandated that they accept and transmit offers made

9

by these buyers as well as offers made through buyer brokers. But this language was dropped from 1987 onwards: instead, the universal refrain among listing brokers since then has been that their professional ethics now forbids them from taking offers from an unrepresented buyer until she retains representation, a line that hundreds of listing brokers tirelessly repeated to me with only slight variations.

NAR itself sees the MLSs and the "offline" services performed by buyer brokers as two distinct types of products and two distinct markets. On its new propaganda website set up in face of the onslaught of lawsuits in recent years, "Real Estate Compensation Facts" (https://www.realestatecommissionfacts.com), it notes that while the information on the MLSs is provided to home search sites like Zillow and made available to the public "for free," brokers must be compensated for the work they perform for buyers: on the one hand, "local broker marketplaces…are the primary source of information for home search sites. Local REALTOR® associations also make most of this information publicly available for free, and each database often feeds home search sites"; on the other, buyer brokers must be paid "to see all the available homes" on buyers' behalves and do the "offline" work typically associated with brokering.

The online and offline products are linked, however, at least from NAR's perspective. For NAR warns that the MLS service would degrade or vanish if brokers – whose membership dues pay for the MLSs – do not get paid for their offline work. In other words, what home sellers and buyers pay for the offline service eventually subsidizes the online listing services' operation and maintenance.

It is thus a curious and unnerving phenomenon that all NAR's rules and all the efforts that it devoted to enforcing the rules were really meant to protect the dominance of the nominally "free" online product rather than the value and utility of the offline "brokering" services that

promise the big payday for the defendants' members, employees, and franchisees. NAR would be hard pressed to explain why forcing unrepresented buyers to use the listing broker as dual agent before allowing them to make an offer on a property makes realtors more useful to the buyers or why concealing the scale of the brokers' compensation makes the brokers more helpful to the buyers. Sure, NAR claimed to offer its members networking, training and educational opportunities that purported to improve the brokers' professional skills. But missing a networking opportunity or an online seminar about real estate photography would not result in financial penalties or expulsion in the way that violating the MLS listing rules would. The rules that defendants crafted and enforced were meant to protect the unassailable market dominance of the "free" MLS, not the value and usefulness of offline "brokering" skills of the NAR members.

The term "free" thus takes on an entirely different meaning: the MLS is a "free" service because NAR and its members would not relinquish their control of it at any price. It is this "free" product that NAR-aligned brokers and the brokerage defendants relied upon to coerce the general home-selling and home-buying public to pay them a cut of 5-6% in every real estate transaction.

For homebuyers, for example, the "free" MLS feeds, widely spread by Zillow, Streeteasy or Google, are indeed useful information. But the "ethical" rules barring the submission of an offer by an unrepresented buyer and transmission of such an offer means the information is useless to buyers unless they also agree to pay 2.5-3% for buyer's representation that they may or may not want – and they do not get to negotiate the percentage because the price tag of buyer agency is nominally zero.

By the same token, home sellers are hardly ever permitted to pay for a stand-alone "listing" service that just consists of the listing part. Rather, the "listing" service would come

with a bundle of distinct "brokering" services: staging, photography, showings, price negotiation, help with closings, etc.

In essence, the MLSs are a tying good, and the brokerage services are a different, tied good that may seem an overpriced and not always desirable product to the home-buying and home–selling public. NAR conceded as much on its shiny new propaganda website: most of the information on MLS is available to the public for free, NAR says, but imagine what would happen if the buyer brokers stop getting paid? The doomsday scenario would result in the disappearance of MLSs and all the "free" information and Zillow feeds, NAR admonishes the American public: "No centralized source of available homes for consumers or brokers," "Buyers would have to visit every broker in town to see all available homes," "Outdated home status information," "Fewer homes for buyers to choose from on real estate sites," "Unverified, inaccurate and unreliable property information," "Sellers would likely have to pay to list and advertise their properties on websites," "Buyers unable to afford a buyer broker would have fewer options," and "Inconsistent broker information in listings across websites".

NAR's shrill propaganda at once reveals the defendants' darkest secret: the MLSs are not a free product, and the defendants always needed the home-buying and home-selling public to purchase a second, distinct but adjacent product – the offline service that involves interacting with buyers and sellers on a human level, the showings, the price negotiations, and the closings – before they were willing to let the buyers and sellers use first product. To the extent that virtually all sellers and buyers needed the first product but not all of them found the second product useful, the defendants desperately wanted to tie the less desirable product to the first product.

To begin with, most buyers use buyer brokers affiliated with the defendants for the simple reasons that they have to and that they are told the buyer brokers are free. The defendants,

through their training and education of brokers and the "ethical" rules they published and enforced, allowed and even encouraged brokers to pitch buyer's representation as "free" to buyers. Ironically, before the recent wave of NAR propaganda that the MLSs are free and the buyer brokers need to be paid in order to subsidize the free MLSs, NAR took the opposite position that it was the buyer brokerage that was free. A buyer broker working outside the strictures of NAR and its co-defendants' code of ethics and the MLS's rules could not possibly compete with a "free" product. Therefore, a buyer broker who competes for business with those aligned with NAR and its co-defendants could never compete on cost – at least not on paper – and would never see an opportunity to snatch a client away from a dual agent anyway.

This bundling or tying of the MLS product to the offline, "brokering" services has been an enormous success for the latter. From 2015-2022, 86-92% of sellers listed their homes on an MLS. 86% of sellers sold their home with the assistance of a real estate broker in 2022, and 86% of buyers purchased their home with the assistance of a real estate broker in 2022. The dominance of the MLS also translated into brisk sale and dominance for the brokerage defendants. In the areas in which the MLSs operated, the brokerage defendants collectively provided the vast majority of the broker services.

NAR's "ethical" rule that listing brokers not transmit offers made by unrepresented buyers created an illegal and anticompetitive bundling of the MLS product and their members' offline buyer brokerage service. And the rules harmed me as a home buyer.

In its early days, NAR did not even see home buyers as potential clients for its members. Its code of ethics spoke of only home sellers when discussing realtors' obligations to "clients" and broadly categorized prospective home buyers as members of "the public".

As late as 1986, NAR still contemplated that a listing broker may be approached by an unrepresented home buyer and mandated that an offer from the latter must be presented to the home seller immediately.

In recent decades, of course, unrepresented home buyers have had the opposite experience. The NAR and its co-defendants' rules and training meant that a buyer must be represented and take on a buyer agent (which in nearly all cases meant paying the listing broker as the dual agent) before the listing broker would pass on the buyer's offers to the seller. Their "ethics" allowed no exception even for people like me who distrust dual agents or buyer's agents.

In other words, in order to access the MLS listings, the dominant product on the market, home buyers are forced by the defendants to pay for a second type of service, namely that of buyer representation. The latter service is imposed on buyers and often unwanted and undesirable, but the defendants made it clear that in order to make use of its "free" MLS listings in shopping for homes buyers must use the defendants' licensed, franchised, and affiliated brokers to make offers and put in bids for the homes listed on MLS.

The coercive tying of the unsavory and undesired product – that of buyer representation – to the workhorse product that is nominally free and that buyers could not sidestep, namely access to listings of homes for sale, is anticompetitive and illegal. The defendants set the rules and regulations and directed their co-conspirators, licensees, franchisees, affiliates, or subsidiaries to deny me the opportunity to make offers on properties I was interested in unless and until I agreed to hire buyer agents, which in virtually all the cases meant making the listing broker the dual agent. In a small number of incidents in which the listing broker had agreed in advance with the home seller not to be a dual agent, the broker would still impose on me her own choice of the buyer broker, inevitably a colleague or an employee.

14

Consequently, I always had to settle with a buyer agent whose loyalty was split or, more probably, entirely aligned with the seller and against me. This led to disadvantages in negotiating with the sellers and extra costs I had to pay in closing that I would have preferred to avoid.

The idea that the "ethical" rules might have intended to serve a moral purpose and to create a level playing field so that a represented party (i.e., the seller) would not get to take advantage of an unrepresented party (namely the buyer) is easily debunked by the fact that an unrepresented buyer who showed up at an open house and wanted to make an offer almost always ended up with the listing broker as the dual agent whose primary fealty remained with the seller. In other words, in hiring the listing broker as the buyer broker and anointing her as the dual agent, the unrepresented buyer did not buy her loyal service, only the privilege to be able to bid on the home for sale that the listing broker represented.

In my own experience, I would have no incentive to use a buyer agent at all. In my purchases, I usually identified the properties by doing my own Zillow search and approached the listing brokers directly. I had my own team of lawyers, architects, home inspectors, contractors, lead inspectors, and oil tank inspectors and did not solicit or receive advice from the listing brokers in making bids or negotiating contingencies, price cuts, discounts, extensions, or other terms of the sales.

Even in a buyer's market in which sellers may indeed have incentives to pay for a range of free items to entice buyers (new appliances, new septic tank, buyer brokerage, a year of home warranty, new flooring, prepaid condo fees, etc.), I could have leverage to ask the seller to simply cut all the frills and give me hard cash in the form of a credit at closing. But time and again I ran into the phony "ethical" rule that I must have representation before I could submit an offer to sellers and was forced to pay for a product that was of little use to me and I could not trust to use anyway.

15

Worse still, I was forced to pay for a product whose cost I could not negotiate. For NAR's ethical code also mandated that the commission rates for both buyer and listing brokers be set before the home comes onto the market.

Absent the "ethical" rules and deception about the scale of buyer broker's compensation, buyers would have the incentive to set and negotiate buyer broker pricing (where such brokers are used at all), and buyer brokers would compete to be retained by offering lower commissions to their prospective clients for their services. The rules restrain price competition among buyer brokers because their clients, i.e., home buyers, have little incentive or ability to reduce their broker's commission because they were typically told that buyer brokerage was a free service.

For an unrepresented buyer who wants to put in an offer for a property and who must accept the listing broker's service of buyer representation, there is even less of a chance of negotiating a lower buyer broker's commission, for that commission is paid to the listing broker, who would have every reason to oppose it and is unlikely to transmit an offer that is conditional upon a cut to the commission the listing broker expects to receive.

The housing market has its highs and lows and wax and wane. It normally has a seller's market when there is more demand than inventory and a buyer's market when the opposite is true. In a competitive market that does away with the "ethical" rule of not allowing unrepresented buyers to make offers without first accepting the listing broker as a dual agent and with a mandatory buyer commission for each MLS listing, a seller certainly has incentive to offer to pay some of the buyer's costs at closing (e.g., buyer's representation, land survey, mortgage points, home warranty, a year of condo fees), but a buyer always has the power and leverage in a buyer's market to make the seller convert an unwanted "freebie" to hard cash. Conversely, in a seller's market, the buyer must pay her own way on all these services *if she opts to use them*.

16

Indeed, most buyers skip home warranties and land surveys, and some even skip inspections in buying a home. Skipping home inspections may not always be a good idea, but in a competitive market it is up to the vendors to prove their value to the buyers and up to the buyers to decide whether or not – and how much – to pay for the vendors' services.

Absent the rules created and enforced by NAR and its co-defendants, buyers would decide whether or not they need representation. Even in a buyer's market where sellers are incentivized to offer some "sweeteners" to prospective buyers by offering to pay for buyer representation, a buyer could simply make an offer that requests for some or all the incentives to be converted into a cash credit at closing.

Regardless of whether the buyers shop for their own representation or the sellers offer to pay for the representation as a kind of buyer incentives in a difficult market for sellers, they all would get to negotiate the rate for buyer brokerage, which would go up and down depending on the buyer's needs and market conditions. A first-time buyer might need more services and depend on her agent to handle inspections and find attorneys and land surveyors for her and could agree to a 4% commission rate, while a more experienced buyer might not need an agent at all or need her agent to do only some legwork in visiting open houses and take some pictures on her behalf and might pay a flat $200 for each open house that her agent visits on her behalf. In a market where inventory slightly outstrips demand, it might serve the seller's purpose adequately to offer, say, $2000 in incentives for a buyer broker to "steer" the buyers to open houses at the property, whereas in a sharp market downturn the seller may be motivated to reimburse whatever the buyer agreed to pay her broker plus a 10% commission to the broker who brings in the buyer. In a competitive market, all these would be possibilities. But all these possibilities were taken away by the rules of "ethics" that the defendants relentlessly enforced.

The "ethical" rules – and the defendants' conspiracy to implement them – harmed home buyers like me grievously. Since 1987, the defendants' ironically named "ethical" rules no longer provided for realtors who represented sellers to pass on offers made by unrepresented buyers. As a result – and in contrast to the land survey, home inspection, home warranty, and mortgage markets – the buyer brokerage became a product that the defendants forced upon home buyers. In a seller's market, the buyers would have little power to resist the listing broker's demand of dual agency. Even in a buyer's market where the buyer otherwise might otherwise dictate terms, the listing broker would simply refuse on phony "ethical" rules to entertain an offer from a buyer who refuses to take the broker on as a dual agent.

In more competitive but otherwise comparable foreign markets, homebuyers can forgo buyer representation completely in bidding for a home. When they choose to have brokers represent them, they set the price for buyer representation directly with the brokers, and they pay less than half the rate paid to buyer-brokers in the United States.

The defendants' conspiracy thus illegally forced an unwanted, tied good upon me. It has also illegally and artificially maintained buyer broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the Internet and the diminishing role of buyer brokers. Indeed, the defendants have successfully stabilized buyer-broker commissions (and significantly increased the dollar cost) charged despite the diminishing role of buyer brokers.

In addition to their restraint on interstate commerce, NAR's phony "ethics" rules that tied my use of MLSs to my purchase of buyer brokers' service may also have violated state consumer ~~protection laws in statutes in~~ Massachusetts, New York, District of Columbia and New Jersey.

Until recently, home sellers and buyers, unlike brokers, did *not* have access to the universe of "blanket unilateral offers of compensation" being made to buyer-brokers. The defendants' rules and practice of setting the buyer broker's commission at the time of the listing and not disclosing the figure to the buyer broker's client before, during and even after closing were a huge part of their wider anticompetitive conspiracy to inflate and artificially maintain a supra-competitive price for buyer brokerage. But even if the non-disclosure of the price of the buyer brokerage were not part of the wider conspiracy, the non-disclosure would still be stand-alone and *per se* violations of consumer protection statutes in Massachusetts, New York, District of Columbia and New Jersey as well.

In purchases made in all these states and district, I was told by the defendants' subsidiaries, franchisees, employees, and members that I was going to receive the buyer brokerage service for "free" and was never informed of the true price I paid for it. Both the coercive sale and the fraudulent misrepresentation about the true cost of the service, which NAR now publicly concedes not to be "free", are flagrant violations of state consumer protection statutes in New Jersey, Massachusetts, New York, and D.C.

NAR instituted a series of rules that ensured that commission offers and private remarks were not disclosed through data sharing agreements with third-party websites or other MLS syndication services. So although I did all my own Zillow searches and read the fine print of the MLS listings pooled by Zillow, I did not find any disclosure of the compensation to buyer agents.

To further mask and conceal the true nature and cost buyer representation, the defendants trained and directed their licensees and franchisees and affiliates to falsely advertise their services for buyers as free. From 2014 on, buyer agents or listing brokers who asked to be dual

agents when I wanted to submit bids for their listings as unrepresented buyers all toed defendants' lines and repeatedly represented to me that their service was free to me.

Indeed, until recently, NAR's ethical rule expressly permitted buyer-brokers to tell buyers that their services were free. NAR's Code of Ethics Standard 12-2 stated that "REALTORS may represent their services as 'free' or without cost." This is because the defendants created this ruse in which they left it to the home seller to set the commission rate for the buyer brokers and presented the seller as the purchaser of the buyer brokering service. (In this elaborate ruse, the seller must be good sport and play the role of a patsy; not going along with the ruse meant all the buyer brokers would not bring their clients to her property.)

The reality is, of course, that on the day of closing I would need to pay the buyer broker, just like I do my mortgage broker, my lawyer, my home inspector, etc. Yet, because of the elaborate lie and ruse, I was perennially given to believe that I was not paying for buyer representation.

These misrepresentations and false advertisement misled me and denied me the chance to set terms of my relationship with these buyer or dual agents and caused me to miss out on possible savings from negotiated rates of services I received from the buyer or dual agents. From the defendants' perspective, by disingenuously marketing their services as free, home buyers would not bother to negotiate buyer broker commissions or search for alternative buyer brokers who might offer discounts. But the misrepresentation and deception are also stand-alone offenses under state consumer protection statutes.


II.    **A home buyer's direct purchaser claim stemming from the allegations above must not be released by the NAR settlement**

In an adversary legal system like the US system, a court's jurisdiction in the civil case extends only as far as the plaintiff asks for it. Home-seller plaintiffs and NAR can cite the Court's orders at ECF No.1700 or No.8200, but what matters is ECF No.1 – what the home-seller plaintiffs alleged in their original complaint and whether the factual allegations in this complaint at all overlap with the factual allegations outlined in my objection. The plaintiffs here allege that they are sellers who paid for buyer commissions. I allege that I, as the home buyer, paid for buyer commission, like I did mortgage brokers' commission or a home inspector's fees. I allege that NAR deceived buyers – and ultimately their lenders and Fannie Mae and Freddie Mac - by pretending buyer commission was a seller concession.

The allegations based on my experience that buyers paid buyer brokers directly like they did mortgage brokers or attorneys and that unrepresented homebuyers were forced to retain the service of buyer brokers – or those homebuyers with experience similar to mine – were not investigated, not litigated, not presented to the jury last year. These facts were not investigated or litigated because they were never alleged in the complaints of home sellers' suits and directly contradicted the allegations made by home sellers that they paid commissions to buyer brokers. These facts were not even alleged in other homebuyer lawsuits against NAR so far that have asserted *indirect purchaser* claims, which means these claims stemmed from the same factual predicates as the home-seller suits – that home sellers rather than homebuyers paid the buyer brokers – and are contradicted by my allegations above. For this reason, this Court never obtained jurisdiction over claims stemming from these facts.

Courts rightly have an interest in favoring settlements to preserve judicial resources, and class settlements can be upheld only if these settlements can be protected from overlapping claims. Still, circuit courts recognize that "[c]lass actions may release claims...when such claims

arise out of the same factual predicate as settled class claims." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108 (2d Cir. 2005), citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. Apr. 1981). Courts in the Eighth Circuit rightly recognize that only claims stemming from the same set of factual predicates can be released. Huyer v. Wells Fargo & Co., 314 F.R.D. 621, 628 (S.D. Iowa 2016). The factual predicates that would underpin my claims against NAR are divergent from those alleged, investigated, and litigated in cases in front of this Court in important ways.

I allege that I was forced to use brokers in buying homes. I allege that I was forced to do so even though I had little use for the realtors' advice and had my own ensemble of lawyers, home inspectors, mortgage brokers, and contractors and did my own market research. I allege that I searched for homes on my own on Zillow or other platforms that pooled listings published by local MLSs and always approached listing brokers directly. I alleges that I was nonetheless forced to use listing brokers as dual agents or to use buyer brokers closely affiliated with the listing brokers.

None of my allegations outlined above was alleged or investigated in cases that have been litigated in this courtroom. In the end, the settlements and judgments did not address at all the defendant misconduct that I experienced.

Still, it is telling that the loudest complaint by the real estate industry since the trial and settlements since last year is the realtors' collective apprehension that future buyers may want to purchase a home without representation. Although the home-seller commissions cases all alleged that realtors cheated home sellers, it is certainly odd that realtors have worried little about their future relationship with sellers. Although the home-seller cases all alleged that home sellers were made to overpay in commission, realtors have worried little that sellers may abandon them.

22

Rather, brokers universally see buyers' potential reluctance to use buyer agency as the singular threat to their livelihood.

Some simple math can explain the source of realtors' deep anxiety about buyers and the source of buyers' reluctance to use their services. "[F]or buyers who barely cobbled together enough cash to cover down payments and closing costs, coming up with more money at the bargaining table might be one check too many...With no money left [for buyers] to cover another line item, the one that will go...will be [buyer agent's] paycheck."[1]

Sellers and buyers, of course, often come from opposite sides of financial spectrum. Sellers often sit on some home equity, while buyers may barely have enough cash to pay for a 5% or even 1% down payment. As of 2022, an average seller was sitting on nearly $200,000 in home equity.[2] By contrast, I entertained a few offers for my Massachusetts properties in the same year from buyers who could afford down payments of only $2,000 and $5,000. For those buyers to pay commission on the buyer side in cash would basically double or triple the cost of their purchase and could possibly dash their dreams of owning a home. "Most entry and lower end buyers BARELY can come up with 3 percent down...They don't have enough money for a can of paint, much less a $20k Commission."[3]

The obvious solution would be for buyers to finance their use of buyer brokers instead of paying for the service in cash. However, this solution cuts against government policies (or at least the policies set by two government-sponsored enterprises, Fannie Mae and Freddie Mac) that home mortgage lenders must not finance the cost to the buyer if the cost is a separate line item on the closing statement and not deemed as a seller concession.[4] Buyers simply cannot

---

[1] https://www.nytimes.com/2024/03/25/realestate/first-time-home-buyers-nar-commission.html.
[2] https://www.investopedia.com/average-equity-in-u-s-homes-5270147.
[3] https://www.nytimes.com/2024/03/16/realestate/buy-sell-house.html. Emphasis original.
[4] https://www.housingwire.com/articles/gses-will-not-count-buyer-agent-commissions-as-ipcs/.

finance the cost of using buyer agents and include the cost in their mortgage unless the expense is *phrased* as a "seller concession."

The contractual language in all listing agreements that said home sellers must pay for buyer commissions was thus an elaborate but necessary ruse to beat Fannie Mae and Freddie Mac's policies of not financing homebuyers' additional expenditure by burying the buyer commission in the seller's column in the closing statement. The contractual provision about sellers paying buyer brokers is all nominal and merely an industry-wide deception to subvert the public policy objectives behind Freddie Mac and Fannie Mae's underwriting criteria for lenders. The policy objectives are to protect buyers – and the banks that issue the home loans and ultimately the two government-sponsored enterprises that guarantee the home loans – from excessive expenses on top of paying for the home itself. Realtors' deception, in turn, purported to coerce buyers into using realtor services that the buyers neither needed nor could afford.

If buyers realized they could not afford buyer representation, and if they were permitted to skip this part, the overall commission charged in a typical transaction in the US would instantly fall to 2.5-3%, a number much more in line with the figures seen in other developed economies, which often involve only a broker on the listing/sales side – and this would be a gut punch to the real estate brokerage industry and instantaneously decimate the ranks of realtors nationwide. In the final analysis, making buyers use and pay for buyer agents was always the chief objective of the industry and the secret to their success in overcharging wildly inflated commissions.

As a trade organization and lobbying group, NAR could have put their effort into advocating changes to the lending criteria to allow financing for buyer brokerage or to push for, say, some form of public subsidy for inexperienced home buyers in hiring buyer brokers. Else, it

could have simply modified its professional rules and protocols to mandate that listing brokers be honest and helpful to home buyers. Instead, NAR resorted to fraud and deception and coined phony terms like "subagents" and "sub-brokers" and manufactured this wholly fantastical relationship between sellers and buyer brokers to cheat the existing lending rules. In so doing, NAR was no better than the subprime lenders before the 2008 financial crisis who cheated the system in order to market risky loan products to aspiring homeowners who could not really afford it. NAR used this ruse in order to make an end-run around the underwriting rules and public policy in order to sell products that it knew many buyers could not afford. The criminal nature of this ruse is one and the same as those subprime lenders' predatory lending practice prior to 2008.

None of the home-seller cases challenged the defendants' conduct in coercing buyers into using buyer agents. None challenged the defendants' conduct in deceiving buyers as to the true cost of buyer representation. None challenged the defendants' practice of disguising the commission buyers paid as a "seller concession." My experience and the factual allegations outlined above thus diverge significantly from those of the home-seller cases. As such, whatever claims I have against NAR as a homebuyer cannot be encompassed by judgment or settlements reached in these home-seller cases. To force me to release my direct purchaser homebuyer claims against NAR stemming from these allegations is violative of my due process rights. *Hansberry v. Lee*, 311 U.S. 32 (1940). Therefore, I seek the Court's clarification and declaration that NAR settlement agreement may not release any direct purchaser claims and other state consumer protection claims that I may have as a homebuyer against NAR and other released parties under that agreement.

### III.    There Is No Alignment of Interests between Class Representatives and Me

While the class representatives hold themselves to be representatives of all home sellers, they do not assert any claims on behalf of homebuyers. I am a home seller who has also bought many homes. In fact, I have bought a great deal more than I have sold and as such have paid hundreds of thousands of dollars more in buyer broker commissioner than in listing broker commission. There is no hint in record that the class representatives understood themselves to be representing homebuyers.

The problem engendered by the class representatives' self-understanding is that they could not have represented the interests of homebuyers. In the final analysis, the problem boils down to the simple fact that neither the class representatives nor the Court could have protected my interests as a homebuyer thus far in the lawsuit. In *South Central Bell Telephone Co. v. Alabama*, the Supreme Court held that the claims brought by a later group of plaintiffs could not precluded by the lawsuit brought by an earlier group of plaintiffs when "[plaintiffs] in Case One…did not understand their suit to be on behalf of the different [plaintiffs] involved in Case Two, nor did the Case One court make any special effort "to protect the interests" of the Case Two plaintiffs. *South Central Bell Telephone Co.*, 526 U.S. 160, 167 (1999). By the same court, the Court in *Taylor v. Sturgell* held that "nonparty preclusion was inconsistent with due process where there was no showing (1) that the court in the first suit took care to protect the interests of absent parties, or (2) that the parties to the first litigation understood their suit to be on behalf of absent [parties]." *Taylor*, 553 U.S. 880, 882 (2008)

The Taylor court thus instructs that "[a] party's representation of a nonparty is "adequate" for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned, see; and (2) either the party understood herself to be acting in a

representative capacity or the original court took care to protect the interests of the nonparty.") *Taylor*, 553 U.S. 880, 890 (2008), citing Hansberry, 311 U.S., at 43, 61 S.Ct. 115 and Richards, 517 U.S., at 801, 116 S.Ct. 1761. The diverging factual predicates between the home-seller suits and my experience are important because to adequately recover for my losses I would have to be compensated first and foremost as a homebuyer. Homebuyers, as it happens, are not currently entitled to any compensation under the proposed settlements.

The lead plaintiffs in this case did not allege that they paid more commissions in transactions in which they were buyers than in transactions in which they were sellers. In most cases, the plaintiffs did not at all allege that they also bought homes. People who were in the housing market solely or predominantly as home sellers can get a bigger share of the spoil if they ignore or minimize the harm that the defendants inflicted on people who were in the housing market solely or predominantly as homebuyers. This is exactly what the lead plaintiffs in this case did. In ignoring the experience of homebuyers, however, these plaintiffs positioned themselves diametrically opposed to the interests of people who were in the housing market solely or primarily to buy.

The *Wal-Mart Stores* court held that "[c]laims arising from a shared set of facts will not be precluded where class plaintiffs have not adequately represented the interests of class members." *Wal-Mart Stores*, 396 F.3d 96, 109 (2d Cir. 2005). In *National Super Spuds v. N.Y. Mercantile Exchange*, Second Circuit likewise emphasized that "[p]laintiffs were...empowered to represent members of the class *solely with respect to the contracts in which all members of the class had a common interest.*" *National Super Spuds*, 660 F.2d 9, 17 (2d Cir. 1981); emphasis added.

If the Court deems me a member of the settlement classes in *Burnett* or *Gibson* by virtue of a small number of sales in my name, my more active activity in buying homes – compared to the lack of alleged home-buying activities of class representatives in earlier cases – makes the lead plaintiffs in this cases poor representatives of my interests. I paid hundreds of thousands of dollars in commissions in transactions in which I was the buyer and paid a tiny fraction of that figure in commissions in transactions in which I was the seller. The current settlements purported to almost bankrupt NAR to pay home sellers, but that would severely dim the prospects for my recovery when I participated in the market primarily as a home buyer rather than a seller.

Other home-seller plaintiffs or homebuyer plaintiffs with *indirect purchase* claims in parallel cases may debate whether or not the settlements reached in this case were the result of sufficiently vigorous pursuit of the claims or sufficiently skilled negotiations. But I would not benefit at all if the pursuit of the claims for the class plaintiffs was maximally vigorous. The more the settlements benefit home sellers, the less I may be able to recover as a home buyer. The success of these lead home-seller plaintiffs is the bane of homebuyers' hope to recover for NAR' deceit and predatory and coercive sales of buyer services. When home sellers' and home buyers' litigation interests are so sharply opposed, my homebuyer claims cannot be encompassed by judgment or settlements reached in these earlier cases.

IV.     **In two-sided markets, *Illinois Brick* must not be misconstrued and abused to benefit defendants**

Under the indirect purchaser rule in *llinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), courts regularly dismiss indirect purchasers' claims in antitrust litigation or include the claims in releases in antitrust settlements between direct purchaser plaintiffs and defendants. *In re:*

28

*Processed Egg Products Antitrust Litigation* (E.D.P.A., MDL 2002), ECF No. 349-1; *In re Intuniv Antitrust Litigation* (D. Mass., 16-cv-12653), ECF No. 480-1*; In re: Prograf Antitrust Litigation* (D. Mass. 1:11-md-2242), ECF No. 652-2; *In re HIV Antitrust Litigati*on (N.D. Cal, 19-cv-02573), ECF No. 711-2 at 11-12; *In re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637), ECF No. 3324). Notably, a large number of the antitrust class settlement cases where courts have overruled objections from indirect purchasers are pharmaceutical litigations or cases in which there were typically distributors or retailers involved. A common thread in these litigations is the apparent existence of a manufacturer-distributor nexus where end users can be readily classified as indirect purchasers.

However, the evolution of modern economy, especially the sudden ubiquity of two-sided markets in modern digital economy, complicates the application of *Illinois Brick*. *Apple, Inc. v. Pepper*, 587 U.S. ___ (2019) is a lesson that courts do not just take a defendant's word on its face on what type of plaintiffs qualifies as direct purchasers and not be deceived by how the defendant structures a transaction.

In the instant case, homebuyers have every reason to be skeptical of NAR's nomenclature labeling buyer broker fees as "seller's concession" and of home-seller plaintiffs' ready adoption and propagation of NAR's lies. Both sides of the settlement agreement will be represented at the fairness hearing by eminent attorneys: class counsel who have earned tens of millions of dollars from this case and got profiled on the *New York Times*, and defendant counsel at white-shoe firms who bill at $2,500 an hour. Missing from the courtroom will most likely be Main Street lawyers who toil three weeks on a closing and charge only a flat $1,000 fee. I often observe first-hand these lawyers' work on closing days: once the funds are received from buyers, the lawyers (or closing agents in some states) are charged of cutting one check for the seller, one for the

listing broker, one for the buyer broker, one for mortgage broker, one check for the attorney herself, one check for the other attorney, etc. If the buyer broker drops by the attorney's office first, she gets paid before the listing broker is (unless, as is the case sometimes, one agent represents both the buyer and seller), and she does not receive her pay from the listing broker.

The fundamental characteristics of real estate transactions suggest buyers are not indirect purchases of the brokerage service. Sellers do not set the price of the house. Sellers come up with a listing price, which is not always indicative of the sale price. As indicated above, neither the listing broker nor the buyer broker get their compensation set until sellers and buyers meet and agree on the sale price. The seller, listing broker, and buyer broker all get paid on the very same day.

In the final analysis, the realtor's service, unlike a component or a technology that goes into a downstream, consumer-facing, final product, has little bearing on the quality of the house that the owner tries to sell. Hermes can talk about the superior quality of the leather that its handbags are made of; Samsung can talk about the superior quality of a chip that goes into its cellphones; Whole Foods can tout the authenticity of the imported Thai chili sauce and factor the cost of logistics into the sticker price of the sauce. All these elements – the quality of the raw material, the quality of an individual component, the distance of travel for an exotic chili sauce – go "into" the final product. Indirect purchasers do not pay for raw leather, or a single chip or the cost of transportation of the chili sauce, but these are all elements of the product that can conceivably appeal to the end users. By contrast, every single real estate listing talks about the size, amenities, location, or construction quality and material of the house. It can even talk about price (e.g., "new price cut", "motivated seller"). But imagine we treat broker services the way we treat interim goods or components or the long distance the chili sauce traveled from Southeast

Asia to Whole Foods' shelves: imagine the owner would talk up the superior quality of her listing broker's services – "my broker is the best in town and is savvier and more aggressive than any broker you as a buyer can find and will run rings around your broker in the transaction" – buyers would be repulsed and all stay away from the listing. In short, the realtor's service does not go "into" the product that the buyers buy. Buyers are not indirect purchasers of the broker service.

So why did NAR and home-seller plaintiffs in this case call home sellers the direct purchasers of the buyer broker service? NAR motives in crafting and maintaining the false narrative about homebuyers being indirect purchasers are easy to discern. NAR's reasons for deploying the ruse of making sellers pretend to pay for the buyer's broker fees are twofold: the ruse misled buyers about the true cost of using the brokerage service of NAR members, and the ruse circumvented the Freddie Mac and Fannie Mae's rules about not financing the buyer's incidental costs of a home purchase and many buyers' inability to pay their brokers with cash.

The home-seller plaintiffs' motives in propagating NAR's lies are simpler still: the lead plaintiffs and their counsel did so just so that they could prosecute the home sellers' claims via the path of least resistance. In building their cases around the defendants' own lies, the home seller plaintiffs in this case made sure their cases involve the least amount of controverted factual elements and could go through trials or reach settlements more quickly.

Yet, quick results of these earlier lawsuits and punitive settlements do not translate into justice. Rather, parties to these litigations cheated and robbed the foremost victims of NAR and brokers' oppressive sales conduct, namely the home buyers, by stipulating to the defendants' propaganda that sellers, not buyers, paid for buyer commission. The two sides did so because the defendants got to answer for fewer crimes and because the home-seller plaintiffs got to try or

31

settle their cases sooner. These earlier litigations and settlements have in essence turned into collusion against home buyers.

This Court must protect the interests of home-sellers who have also been homebuyers, especially market participants like me who were in the market more often as buyers than as sellers. The Court should further draw a line in sand to stop the abuses of defendants in antitrust litigations that falsely and deceptively structure transactions to bar recovery by true victims of their crimes. For this reason alone, the Court must reject the final approval of the NAR settlement. In the age of digital economy and ubiquitous two-sided markets, a forceful and analytical judicial voice that unmasks deceptively structured transactions would carry universal importance in antitrust jurisprudence and reverberate far beyond this case.

## V. The settlement agreement is unreasonable and the "Practice Changes" promised in the agreement perversely sanctify NAR's illegal and oppressive conduct against home buyers

NAR reported $5.13 million home sales in 2022,[5] which would translate to over 50 million transactions over a ten-year eligibility period. So on average class member would get less than $10 in compensation from the NAR settlement. As such, practice changes would be far more meaningful to the average American homebuyer in the housing market than the petty cash they may get as compensation from this settlement. Alas, the practice changes we see in the current settlement do not alter the most abusive and oppressive aspect of NAR and its affiliates' antitrust violations. If anything, the "practice changes" promised in the agreement do the opposite by perpetuating and lending legitimacy to the most odious and coercive sales tactics that NAR has deployed against homebuyers.

---

[5] https://www.nar.realtor/newsroom/nar-forecasts-4-78-million-existing-home-sales-stable-prices-in-2023.

Sections 58, 59, and 60 of the settlement agreement stipulate to "practice changes" that NAR would mandate of its members and local affiliates. They are also largely identical to the practice changes that an earlier defendant, Keller Williams, agreed to with the plaintiffs in the icebreaker settlement that was executed last year and won the Court's final approval in May.

Also in May, I went shopping in North Carolina. I approached the listing agents of two properties, both Keller Williams agents. The first said I must have a buyer agent in order to view his listing and put in an offer, and he recommended to me a second Keller Williams agent to be my buyer agent. When I approached the second listing agent, he told me the same thing and recommended to me yet another Keller Williams agent.

It was absolutely fascinating – and utterly demoralizing as a homebuyer – to witness how buyer agency works in the post-settlement world. The Keller Williams agents uniformly told me I could negotiate the buyer commission rate with the buyer agents they recommended. Obviously I was even permitted to use the buyer agents they recommended and free to negotiate the commission with any broker of my own choosing (though surely it cannot be wise for a buyer in a seller's market to alienate the seller's broker by ignoring her preference). However, if I end up not signing representation agreement with any buyer broker, then the listing broker would just assign their buddies to work with me. Their buddies would not be "representing" me and would not advise me on what price to offer and how to negotiate and how to shop for home inspectors and mortgage but just as some sort of facilitator – and here is the kicker: the facilitator is compensated at whatever rate the listing broker sets.

In other words, I am free to choose any broker and negotiate downwards from the 3% default rate, but if the buyer broker does not agree to depart from the 3% or too far away from that number, his buddy, the listing broker, can impose the terms on me. So much for consumer

choice and unrestrained commerce! We do not know if it is a national thing yet or limited to the North Carolina market or whether brokers just testing different coercive tactics on buyers in different markets right now. But we know that nothing in the Keller Williams settlement agreement stopped Keller Williams agents from doing that to me only four months ago. NAR's settlement terms call for the same type of policy changes that Keller Williams agreed to. We now know that these changes will not stop defendants' oppressive sales tactics against buyers.

In a sense, the abysmal failure to protect homebuyers' interests and the perpetuation of NAR and co-defendants' abuses against homebuyers are a direct result – and the most direct evidence – of the class counsel's failure to adequately homebuyers whom they do not represent and whose interests they militate against. Buyers are not getting any relief because from the very beginning, from ECF No.1, this case has never been about defendants' misconduct against buyers. The home seller plaintiffs never cared about buyers. Therefore, the agreement the home-seller plaintiffs made with NAR must not cut off the avenue of legal relief that homebuyers like me may ask for in another court and must not release claims homebuyers may have. If the Court believes the settlement precludes homebuyer claims by those who happen to have sold homes as well, then the Court ought to deny final approval of the settlement.


### VI. The settlements Defendants reached are and racially discriminatory

The NAR settlement sound punitive and financially painful enough. Even if it does not match the amount of judgment already awarded in a case that reached jury trial last fall, it represents a large portion of NAR's liquid assets on hand.

But merely driving a defendant to the brink of financial ruin does not amount to justice. Defendants' misconduct targeted first and foremost the homebuyers. Class representatives and

counsel in these earlier settlements chose not to challenge NAR and its co-defendants' most oppressive practice and most odious conduct. Rather, class representatives and counsel adopted and further propagated Defendants' lies that buyer commissions were paid by sellers.

The lead plaintiffs and their counsel did so just so that they could have the convenience of building their cases around Defendants' own lies and that their cases could proceed faster than any possible homebuyer claims. They did it because they wanted the least amount of factual controversies and a path of least resistance. Understandably, they wanted to reach trial or settlement before everyone else.

Quick resolution of the home seller claims, however, does not equate justice. There are sellers who never bought a home. Conversely, there are buyers who never sold a house. The settlements robbed the latter group blind to benefit the former group. Hence the injustice of these settlements.

This injustice results in a subclass that would be seriously undercompensated in this case, namely home sellers who were in the housing market primarily as homebuyers. If home sellers and homebuyers alike directly paid for their respective brokers, home sellers who have also been homebuyers would be entitled to more compensation than home sellers who have not. Yet, no effort has been made to create a subclass for these home sellers who are bound to be undercompensated if grouped together with other class members. In a recent federal employee-pay class action suit in another federal forum in Missouri, the court decertified the class because "Plaintiffs' proposed damages analysis cannot be performed on a classwide basis" and some subclasses "would receive a windfall while others would be undercompensated." *Arnold v. Directv, LLC*, No. 4:10–CV–352–JAR, 2017 WL 1251033, at *12 (E.D. Mo. Mar. 31, 2017).

In this case, racial minorities tend to be overrepresented in the subclass of home sellers who have also bought homes. In effect and in impact, therefore, the settlements are racially discriminatory.

The class representatives in cases brought in this district were clearly comfortable with pressing their claims solely as home sellers. No doubt some of them have also bought homes, and yet they saw advantage in pressing their claims solely as home sellers. It is also conceivable that some class representatives have indeed only ever been home sellers and never bought in the market: they may have inherited properties and sold them upon inheritance.

Many racial minorities, of course, would have the opposite experience. Black and Hispanic populations tend not to inherit houses, and these minority homeowners would have paid more commission to buyer agents than to seller agents. Furthermore, first-generation Americans are also inevitably buyers rather than sellers of a property, and first-generation Americans are proportionally overrepresented in Asian and Hispanic communities than the overall American population. Class representatives in the Missouri cases cannot adequately represent the experience of all Americans who participated in the housing market partly because there is a lack of meaningful representation of racial and ethnic minorities among them.

I live in New York City, which has a demographic that is almost 40% foreign-born,[6] even a person who has sold a house is likely to have paid more commission as a buyer than as a seller and certainly more likely to have done so than a Missouri home seller. I am one such example. While I have sold a couple of my homes, I paid out about hundreds of thousands dollars more in buyer's commission than in seller's commission. In New York City, where the demographic is minority-majority (and where the majority of the minority groups were foreign-born and would

---

[6] https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork/PST045222.

have to be home buyers before they ever become sellers), the effect of racially discriminatory payouts would be acutely felt.

Minority homeowners in my adopted hometown likely number in millions, and many of them are first-time homeowners and are categorically excluded from the benefits of the settlements. The divergent housing market experience between different demographics and racial groups entail that home sellers and buyers in this district cannot adequately or justly represent all market participants in America. Class representatives who look only to recoup for home sellers are unrepresentative of all Americans who participated in the real estate market. A class settlement that pays only home sellers effectively discriminates against minority and immigrant communities who are less likely to have inherited properties and are thus more likely to have been a buyer than a seller.

For a century, NAR and its members built their wealth and power through discrimination against Asian and Black communities.[7] Now, in its demise, NAR wants to spite them one last time by making sure that other racial groups get to feast on its carcass first. But it would be unjust and unconstitutional to deploy public power to enforce a settlement agreement that effectively, if not explicitly, discriminates against racial and ethnic groups. The defendants and plaintiffs in this case are private parties that are free to sign any settlement agreements they like. Courts, however, have no business in enforcing these private agreements if they discriminate against minority participants in the housing market. *Shelley v. Kraemer*, 334 U.S. 1 (1948). The

---

[7] There was many a time when I visited a house for sale, proceeded to make an offer on it, only to find that the deed, in language no longer accepted in conversation among polite company, declares that Blacks or Chinese are not permitted to occupy the house except as "domestics." NAR and its local affiliates were chiefly responsible for crafting and giving popularity to such restrictive covenants in many parts of the country. And it would be a grave mistake to think that the defendants had put that history of naked racism against minorities behind them. The racism of some real estate brokerages is alive and well, including some that stand to benefit enormously from the NAR settlement. Since 2021, one of the largest New York City brokers subjected me and my family to a relentless campaign of racist assaults, harassment, verbal abuse, and midnight stalking. That brokerage is likely poised to opt into the NAR settlement, which, as the Court may imagine, makes this settlement exceedingly offensive and morally repugnant to the victims of these racist assaults.

defendant is clearly a housing service provider under the definition of Title VIII, and its proposal to rebate brokerage fees is clearly covered by Title VIII. The long and heinous history of NAR and its members' racism and the strong public policy interest in prohibiting racial discrimination in housing all call for the defendant's proposal to provide brokerage rebate to one racial group disproportionately more than other groups call for the Court's close scrutiny.

NAR may protest that their settlement agreements would promptly fail without federal courts approving these nationwide settlements and enforcing the universal releases that NAR crafted for itself in the settlements. But the courts' interest in protecting settlements must not supersede the interest of justice for racial minorities who are now disproportionately handicapped by the settlement. The settlement deserves to fail and not the blessing of the public power vested in our judiciary.

### VII.    Non-reversionary clause is unconstitutional

Section 46 of the settlement agreement says "[t]he Settlement will be non-reversionary…no proceeds from the Settlement will revert to the National Association of REALTORS® regardless of the claims that are made." Money left in the fund presumably goes to some charities. The non-reversionary clause is a fairly common creature among class action settlements. The clause also sets up the judiciary to unconstitutionally infringe upon the prerogatives of the legislative and executive branches of the government.

Ordinarily, a defendant's money remains its own unless and until it has been awarded as damages to a plaintiff. But in class action settlements and with non-reversionary clause, courts often have to step in and invoke *cy pres* and assign the unused portion of the fund to a non-party. As such, "*cy pres* transforms what begins as an adversary bilateral dispute (in accord with

constitutional dictates) into a less-than-fully-adversary trilateral process, wholly unknown to the adjudicatory structure contemplated by Article III."[8]

The first issue with the non-reversionary clause and the inevitable problem of the court's administration of the left-over fund is that "[a]warding "damages" to an uninjured third party effectively transforms the court's function into a fundamentally executive role, because no longer is the court functioning as a judicial vehicle by which legal injuries suffered by those bringing suit are remedied. Instead, the court presides over the administrative redistribution of wealth for social good. As a result, the practice violates both the constitutional separation of powers and the case-or-controversy requirement of Article III."[9]

The unsettling implications of a court-approved class action settlement that has a non-reversionary clause are well noted by jurists. "The cy pres doctrine originated in the field of trust law to save testamentary charitable gifts that would otherwise fail. It has been imported into the class action context to distribute unclaimed funds "for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated. It is inherently dubious to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement" Klier v. Elf Atochem N. Am., Inc., 658 F.3d 468, 481 (5th Cir.2011) (Jones, J., concurring). Chief Judge Jones further cautioned that "[c]ourts should be troubled that a cy pres distribution to an outsider uninvolved in the original litigation may confer standing to intervene in the subsequent

---

[8] M. Redish, P. Julian, S. Zyontz, "*Cy Pres* Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis," *Florida Law Review*, Volume 62, 2010, p.641.

[9] Ibid., pp.641-42. The authors further contend that "requiring the defendant to donate to an uninjured charitable recipient amounts to a remedial non-sequitur. The recipient has sued no one - - and with good reason, since its legal rights have presumably been violated by no one. Ordering the transfer of defendants' funds to the charitable third party thus remedies no violation of anyone's legally protected rights. The charitable third party and the defendant are in no way adverse to each other when the suit begins. Despite the superficial resemblance of the cy pres litigation to a live case or controversy, then, a *cy pres* award fails to satisfy any of the foundational requirements of Article III." Ibid, p.643.

proceedings should the distribution somehow go awry." And she urged that the right course of action would be to refund the defendants, an option explicitly foreclosed by the settlement agreement.

Class counsel may be tempted to argue that not giving back unused funds to the defendant serves a noble public policy purpose of increased deterrence on NAR, and NAR counsel may well concur that their client deserves and craves the extra punishment. Having hundreds of thousands of dollars of my money robbed by NAR, I certainly want to see the defendant punished. But the punishment must be provided for in a substantive law, and handing NAR's money to a charity and a non-party because of a non-reversionary clause is not provided in antitrust law.

The fact that non-reversionary clause is a common feature in class action suits does not confer legality either. The mere fact that an antitrust claim is brought in a class action cannot alter the substantive law underlying the plaintiffs' claims. For "like virtually all of the Federal Rules of Civil Procedure, Rule 23's class action device is inherently 'transsubstantive.' Its use should not vary based upon differences in the nature of the substantive claim. Invocation of the class action device in no way authorizes creative interpretation or application of the particular substantive law in a case."[10]

At the end of the day, "[u]nlike the settlement of a non-class proceeding, settlement of a class action requires court approval, following the conduct of a fairness hearing…judiciary is necessarily and substantially involved in every class settlement...It is therefore impossible to view use of *cy pres* in the course of class settlements as untied to the federal courts' exercise of

---

[10] Martin Redish, "Class Actions and the Democratic Difficulty: Rethinking the Intersection of Private Litigation and Public Goals," *University of Chicago Legal Forum*, Volume 2003 Issue 1, p.75.

the judicial power."[11] That power should not be deployed unconstitutionally and in a manner that infringes upon legislative and executive powers. This Court should not give approval and imprimatur of its power to a settlement agreement that has the non-reversionary clause embedded.

## VIII. Even a collusive deal with home sellers would leave NAR too financially ruined and enfeebled to face true reckoning and accountability for its misconduct in cheating and defrauding homebuyers

In this particular case, the unconstitutional non-reversionary clause is especially harmful to homebuyers with direct purchaser claims against NAR because homebuyers, too, have potential claims against NAR that are not released by the settlement. These homebuyers include those who have actually sold a home like me and who may be considered part of the class in this case. These homebuyers also include many of my friends and family members who have never sold a home because they never inherited any property. These homebuyers have property interests in the claims. The non-reversionary clause in NAR's settlement with the home sellers damages the homebuyers' interests.

Corporate America faces class action lawsuits often and settles them almost as often. But some defendants possess more resources than others do. And some lawsuits – and settlements – bleed the defendants more than others.

In the past year, Walmart is reported to have settled a class-action suit for $45 million for incorrectly weighing the meat it sold in its stores.[12] Google settled a class-action suit about

---

[11] Redish, Julian, Zyontz, "*Cy Pres* Relief and the Pathologies of the Modern Class Action," p.644.
[12] https://www.nytimes.com/2024/04/05/business/walmart-settlement-overcharge-refund.html.

leaked user queries recently for $23 million.[13] Walmart and Google are vastly bigger companies than the defendants in this case; neither suit got to the fundamentals of Walmart or Google's business model; and by the end of the day both companies can easily survive a $20-40 million payout.

This settlement with NAR is different. NAR is not a corporate behemoth like Walmart and Google to begin with. And the settlement represents an exceedingly large portion of its total assets. In fact, NAR would have faced bankruptcy from the judgment entered against it had it not settled; even with the settlement, industry insiders spoke of "extinction-level event" when discussing the lawsuits.[14] Real estate industry is looking to face much lower revenue and rapid decline in head counts of brokers, and NAR may be mortally wounded with or without the final approval of the settlement. Even with a settlement in lieu of paying the judgment, NAR has turned over financial records during settlement negotiations to demonstrate that it had mostly exhausted its financial resources: NAR's proposed settlement "obtains greater than 50% of NAR's net assets...captures an amount that represents a majority of NAR's liquid assets...This is especially so where NAR anticipates a decline in future membership revenues as a result of this Settlement". Plaintiff's Motion for Preliminary Approval of Settlement, *Burnett et al v. National Association of Realtors et al*. (Document 1458-2).

Court records from these other cases thus paint a picture of a defendant in dire financial situations that is unlikely to pay much more in judgments or settlements in future cases to homebuyers with direct purchaser claims or state law claims against it. Because NAR is rapidly becoming judgment proof, out of consideration for the interests of homebuyers who may have direct purchaser claims and other state law claims against NAR, the Court should deny approval

---

[13] https://www.nytimes.com/2023/06/14/technology/google-class-action-settlement-claim.html.
[14] https://www.nytimes.com/2023/12/27/realestate/national-association-realtors-real-estate.html.

of the current settlement. The unconstitutional non-reversionary clause only adds to the doubt that NAR would be able to compensate homebuyers adequately.

### IX. Due process violations of absent class members' rights will have depressed the number of opt-outs and objections and masked the true extent of American homebuyers' dissatisfaction with this settlement

If the class counsel and the defendants' best retort is going to be that homebuyers who wish to recover more should simply opt out pursuant to Rule 23, then it necessarily raises the issue of unequal burden and unfair design of the opt-out process.

First, the notice is inadequate. If the Keller Williams's settlement is any indication, the vendor/administrator in charge of the settlement noticing process will dutifully provide the Court with a short list of perhaps a few dozen home sellers who opted out of the NAR settlement. Some of the opt-outs will come from New York. A big contingent of the New York home sellers who opted out did so at my urging – and they did so even though they never received any notice of the settlement and their inclusion in the settlement class, despite their recent sales.

I also never received any notice from the settlement administrator. In the past month or two, I have received class settlement notices about 1) antitrust lawsuit against a few universities' practice of awarding financial aid; 2) Oracle's data collection practice; 3) some ATM fee overcharge; and 4) Clif Bar, a brand of energy bar. In truth, I scarcely spent one week or two without receiving another class settlement notice. Yet, I did not receive any notice of the Keller Williams or NAR settlement or notice about settlements reached in any of the co-defendants; I only read about the settlements in a news article (that is to say, not an advertisement) that sits behind a paywall on nytimes.com.

The settlement notice vendor's failure is all the more astounding given that local governments maintain a reliable registry of each property transaction in the country, whereas an energy bar manufacturer would have a much harder time to track transactions involving its merchandise and an even harder time to verify the transaction records. Only gross incompetence or bad faith can explain why the notices failed to reach people who were home sellers on registered transactions from the past two, three years.

Second, even for those home sellers who presumably received notice, the notice gave them the option of 1) opt-in and giving up their potential claims against NAR and their property interest in the claims and 2) opt-out and spending a few dollars on purchasing stationary and stamps to mail out the opt-out notice. In contrast to class members who opt in and are given the choice of doing so online at no cost, class members who want to opt out must incur the extra expenses of stationary and postage. In other words, absent parties face two choices and both would entail deprivation of their property interest in some way without any due process.

Class counsel and NAR counsel may argue that the loss of a few dollars is negligible and people who want to opt out would not hesitate in incurring the cost. But we again note that there were $5.13 million home sales in America in 2022 and scores of millions of home sales throughout the class eligibility period. Thus, on average a class member who opt in would receive probably just ten dollars. The opt-outs' loss of property interest of a few dollars in stationary and postage is not insignificant compared to what the opt-ins would receive.

If a few dollars in stationary and postage is *de minimus* property interest for the opt-outs and should not deter opt-outs from taking action to preserve their claims, then the argument must go both ways: a few dollars in compensation for the opt-ins are too insignificant to exchange for a release of the opt-ins' claims against NAR. The NAR settlement should be considered

substantively unconscionable and unenforceable. In other words, either the opt-out process was designed to violate the opt-outs' due process rights, or the NAR settlement must be declared substantively unconscionable.

The defect in the noticing process and the due process violations will have greatly and artificially depressed the number of opt-outs and objections to the settlement. It would be unfair and unreasonable for the two parties to cite the inevitably low number of opt-outs and objections to the settlement agreement – a low number they may well have engineered – to urge the Court's overruling of my objection.

### X.      Uncertainty surrounding the identities of the released parties is unusual and violative of class members' due process rights

Unlike some of the earlier settlements reached in this case, the NAR settlement, through Paragraph 18 of the agreement, fashions a singular mechanism through which many brokers and brokerages around the country, including non-defendants and even non-NAR members, to become "released parties." Releases as a part of settlement agreements routinely include unknown claims, and different states have different rules as to whether settlement agreements that release claims unknown to both parties at the time of the settlement may be enforced. Scarce case law exists to illuminate us as to the enforceability of a settlement agreement that releases parties unknown to litigants at the time of the settlement agreement.

Paragraph 18 is not an immaterial provision. These other "released parties" are asked to contribute money to NAR's fund. Class members cannot sue the "released parties" after they opt in. For some class members, whether or not a particular broker or a brokerage is going to be a

"released party" makes a huge difference in their calculation of whether to opt out. NAR's counsel certainly knew how important the question was to me.

On June 14, I reached out to NAR's counsel, Cooley LLP, and asked for an answer as to whether Brown Harris Stevens and Halstead "are 'released parties' under NAR's settlement agreement." Cooley attorneys responded on June 17 that "None of the entities you list fall into either category. NAR's settlement however also includes releases for certain brokerages and MLSs. Please reach out to counsel for the other defendants directly should you need further information."

On August 21, I again wrote to NAR's counsel to say that "I need to know whether Halstead/BHS are in or out on NAR's settlement." Later that day, NAR's counsel replied that "I'm sorry, but we can't speak for BHS or Halstead and you will have to reach out to their counsel for their position." Brown Harris Stevens's and Halstead's counsel helpfully told me to my face the same day that Brown Harris Stevens and Halstead would not share their thoughts with me.

So in my case, I was not even asking NAR for a list of all the released parties under the settlement agreement. I was asking about the inclusion (or exclusion) in the settlement agreement of two specific brokerages, which are large firms with billions of dollars in annual commissions revenues and hundreds of billions of dollars in transaction volume and which are known to NAR and whose outside counsel are in communication with NAR's external counsel. And over six months of regular contact with NAR counsel I made clear to the defendant that knowledge of their inclusion or exclusion in NAR's settlement was important to me. Yet, NAR has failed to provide a simple "yes" or "no" answer that would have been a big factor in my decision in joining its settlement agreement.

Judging from NAR counsel's email, NAR is not the arbiter whether a person or entity can or will become a "released party" under its settlement agreement. Paragraph 18 leaves it an open question who is the arbiter on whether or not a broker is eligible to be the released party. To borrow from Donald Rumsfeld's famous epistemology, the current settlement proposal presents us 1) known knowns (known claims against known "released parties", such as NAR itself); 2) known unknowns (unlitigated claims against NAR); 3) unknown knowns (the tens of thousands of brokers who may opt into the NAR settlement and whose identities are not yet known to NAR – but whose eligibility and corresponding rights and obligations under NAR's settlement might be easily ascertained pursuant to Paragraph 18(b), presumably after they step forward and reveal themselves); and 4) unknown unknowns (those brokerages that may or may have opted into the settlement and whose eligibility to opt into the contract would remain uncertain and unknown even if their identities were given to NAR).

Courts have usually found releases of known claims against known parties as binding. Courts in different states have split on whether releases can be enforced that touch upon known unknowns (claims unknown at the time of settlement): "the release itself is as broad as it could be made, acquitting the company of all liability arising on account of the injuries received by appellee, whether then appearing or growing out of the same by development in the future, or arising or to arise out of any and all personal injuries sustained at any time or place while in the employ of the railway company prior to the date of the release. In such a release, however, *the general language will be held not to include a particular injury, then unknown to both parties, of a character so serious as clearly to indicate that, if it had been known, the release would not have been signed.*" *Great Northern R. Co. v. Reid*, 245 F. 86, 89 (9th Cir., 1917). Emphasis added.

Courts do not seem to have dealt with a situation in which class members are asked to release claims against parties not even known at the time of settlement; yet, this settlement explicitly asks class members to release their claims against these unknown released parties. But there is strong reason to believe courts are unlikely look kindly upon this type of releases. Even for courts that enforce releases for unknown claims, it is important for court to ascertain the intent of these parties: "the binding effect of a general release provision for unknown claims depends on the intent of the parties. If it can be shown that the parties intended to release all unknown claims, it will be considered binding." *Convey Compliance Systems, Inc. v. 1099 Pro, Inc.*, 443 F.3d 327 (4th Cir., 2006). If the Fourth Circuit *requires* a showing of all parties' intention before enforcing a release of unknown claims, it must be taken to mean that when the parties are unknown, their intent cannot be ascertained and the release cannot be enforced.

More alarming still, we have unknown parties that, even when named, cannot have their eligibility ascertained under Paragraph 18(b). NAR has no clue about Brown Harris Stevens's or Halstead's eligibility and rights under the release. I can ask NAR to identify all the unnamed brokers that are eligible for release under Paragraph 18(b): the task may be exceedingly onerous but ultimately finite and ascertainable. But when I posed the rather modest question of whether two particular brokers, which had billions of dollars in annual commissions revenues and which have their outside counsel in regular contact with NAR's outside counsel, were released parties or not, NAR could not answer that simple question. This tells us that this settlement agreement has taken us beyond the unknown knowns and into the territory of unknown unknowns and that the agreement is utterly, hopelessly ambiguous and indefinite.

Unlike the settlements reached by its co-defendants, therefore, NAR has asked class members to accept – and this Court to approve – a settlement agreement that is ambiguous and

uncertain about a material provisio: what persons and entities class members are in fact being asked to release their claims against? The NAR settlement has further failed to provide a meaningful mechanism to adjudicate this issue when disagreement or doubt arises. Paragraph 18 is thus irredeemably and fatally vague and ambiguous.

This settlement agreement is subject to Missouri law, and Missouri Supreme Court, sitting *en banc*, has long held that a contract that referenced terms unknown is unconscionable and cannot be enforced. *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798 (2015) ("Hewitt's contract does not establish mutual assent to the essential terms of an arbitration process. Instead, the contract and incorporated documents provide only that Hewitt is required to arbitrate disputes pursuant to unknown and undisclosed terms that the commissioner, in his or her sole discretion, deems appropriate. There is no agreement to the essential terms of arbitration.") In this case, a settlement agreement involving unknown claims against unknown parties whose eligibility under the agreement proved to be unknowable *even after they were identified to NAR* is unlikely to be enforced by the same Missouri court as *Kerr*.

To the extent that class members have a property interest in their claims, a vague contractual provision forcing us to give up our claims against unenumerated and unknown third parties is both procedurally and substantively unconscionable. To the extent that this Court may exercise its power to impose this contractual provision on class members and enforce this provision, it would be violative of class members' due process rights. The deliberate and unconscionable ambiguity and vagueness of Paragraph 18 alone is sufficient reason for the Court to deny approval of the settlement agreement.

## XI.    Conclusion

Given the unreasonable terms of the settlement and its racist nature, class counsel's representation of homebuyers who happened to have sold homes was – even in the best light – inadequate, unconscionable, and unfair. I respectfully ask the Court to rule that my potential claims as a homebuyer are not released under the NAR settlement. I further ask that the Court denies the final approval of the settlement.

I also ask that the Court allows me to speak at the fairness hearing. Because I may lack the privilege of attorneys to bring in electronic devices such as laptops into the courthouse, I further ask that the Court grants me the privilege to do so on the day of the fairness hearing.

Name: Hao Zhe Wang

Address: PO Box 7075, New York, NY 10150

Phone: 617-320-6448