# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, AND JEREMY KEEL, on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC., )<br><br>Defendants. ) | Case No. 19-CV-00332-SRB<br><br>Hon. Stephen R. Bough |

## OBJECTION OF TANYA MONESTIER
## TO THE PROPOSED NATIONAL CLASS ACTION SETTLEMENT WITH THE
## NATIONAL ASSOCIATION OF REALTORS AND TO PLAINTIFFS' REQUEST FOR
## ATTORNEYS' FEES

Tanya Monestier
101 Charleston Ave
Kenmore, NY
14217
(401) 644-2383

## Objection of Tanya Monestier
## To Settlement and Plaintiffs' Request for Attorneys' Fees

*Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB*

# TABLE OF CONTENTS

INTRODUCTION AND OVERVIEW................................................................4

INFORMATION REQUESTED BY THIS COURT...............................................8

BIOGRAPHICAL INFORMATION AND DISCLOSURES......................................11

OBJECTION TO THE SETTLEMENT (PRACTICE CHANGES)..............................18

    1. Realtors are Breaching the Settlement and Engaging in Workarounds..................18

        WORKAROUND #1: AMENDING THE BUYER REPRESENTATION
AGREEMENT TO ENABLE BROKER TO RECEIVE ADDITIONAL
COMPENSATION..................................................................................19

        WORKAROUND # 2: BUYER BEING ASKED TO AGREE TO
SELLER-PAID BONUSES..........................................................................29

        WORKAROUND #3: "TOURING" OR "SHOWING" AGREEMENTS
SUPPLEMENTED BY BUYER REPRESENTATION AGREEMENTS............................34

        WORKAROUND #4: PROVISIONS THAT GUARANTEE
A MINIMUM LEVEL OF COMPENSATION UP TO MAXIMUM...............................36

        WORKAROUND #5: BUYER BROKERS WAIVING COMMISSION...........................37

        WORKAROUND #6: PROVISIONS WHICH SEEM TO SAY THE AGENT
WILL ACCEPT WHATEVER IS BEING OFFERED BY COOPERATING BROKER..............40

        WORKAROUND #7: TAILORING THE BUYER REPRESENTATION
AGREEMENT TO SELLER-OFFERED COMPENSATION......................................41

    2. Realtors Are Adopting Anti-Consumer Practices Post-Settlement
Designed to Maintain Artificially High Commissions....................................42

        A. CONTINUED STEERING AND UNETHICAL REALTOR PRACTICES ...................42

            *Listing Agents Not Taking Listings Unless Seller Pays Buyer Broker
Commission*..................................................................................42

            *Listing Agents Telling Sellers That If They Don't Offer Compensation,
They Won't Get Offers*.......................................................................44

            *Buyers "Skipping" Houses That Don't Offer Guaranteed
Compensation to Buyer Broker*.............................................................47

        B. REALTORS EXPLOITING THE SETTLEMENT TO GET NEW BUSINESS..............51

            *The "Open House" Debacle*..................................................................52

*The "Driveway" Debacle* ............................................................... 60

*The Bait-and-Switch and "I Can't Legally Show You the House" Debacle* ............... 62

C. LISTING AGENTS SHUTTING OUT UNREPRESENTED SELLERS ................. 63

*Agents Unilaterally Deciding Not to Show Property to Unrepresented Buyers* ........... 64

*Realtors Scaring Buyers into Representation* .......................................... 69

*Imposing Barriers to Entry: Forms and Financial Disclosures* ....................... 70

*Relying on Stereotypes and Assumptions About Unrepresented Buyers* ............... 71

D. REALTORS ARE CHARGING NEW FEES TO ENSURE COMMISSIONS STAY
HIGH .......................................................................................... 71

3. The Settlement Has Caused Mass Confusion for Sellers and Buyers ..................... 73

4. There are Unresolved Ambiguities in the Settlement ...................................... 84

*Overage Amounts* ......................................................................... 84

*Cooperative Compensation* ............................................................... 85

*The Initially Unrepresented Buyer* ....................................................... 86

5. The Settlement Lacks an Effective Enforcement Mechanism ........................... 87

*Co-Lead Counsel May Ask for Proof of Compliance with Practice Changes
and NAR is Required to Provide that Proof* ............................................ 88

*NAR must "Track" Whether Certain of its Affiliates Have Satisfied the
Conditions for Obtaining Relief* .......................................................... 88

6. The Value of the Injunctive Relief is Overstated ........................................ 90

7. The Settlement Should Not Be Salvaged .................................................. 93

OBJECTION TO THE SETTLEMENT (MONETARY RELIEF) ................................. 96

OBJECTION TO THE PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES ................... 97

1. PLAINTIFF HAVE NOT PROVIDED THIS COURT WITH ALL THE INFORMATION
REQUIRED TO MAKE A DECISION ON A THIRD-OF-A-BILLION DOLLAR FEE ............ 97

2. THE DECLARATION OF PLAINTIFF' PAID EXPERT DOES NOT PAINT AN
ACCURATE PICTURE OF FEE AWARDS ................................................... 99

3. PLAINTIFFS DO NOT CONSIDER THE FEES IN RELATION TO THE
VALUE OF THE SETTLEMENT TO A CLASS MEMBER .................................. 101

4. A ONE-THIRD FEE IS ALMOST NEVER AWARDED IN A $1 BILLION
MEGA-FUND CASE ......................................................................... 102

5. EIGHTH CIRCUIT PRECEDENT DOES NOT SUPPORT SUCH AN EXORBITANT
FEE .......................................................................................... 107

6. PLAINTIFFS HAVE NOT ESTABLISHED THAT THEIR LODESTAR FEES WERE BILLED AT PREVAILING MARKET RATES......................................108

7. PLAINTIFFS' ATTORNEYS MAY HAVE MISSTATED THEIR HOURLY BILLING RATES..............................................................................112

8. PLAINTIFFS HAVE NOT PUT FORWARD EVIDENCE OF APPROPRIATE BILLING PRACTICES............................................................116

9. PLAINTIFFS SHOULD NOT RECEIVE A LODESTAR MULTIPLIER FOR NON-ATTORNEY TIME.........................................................117

10. THIS COURT SHOULD REVISIT ITS PRIOR RULING ON ATTORNEYS' FEES.................118

RELIEF REQUESTED........................................................................122

APPENDIX (CV)..............................................................................123

# I. INTRODUCTION AND OVERVIEW

I am a member of the settlement class in *Burnett v. National Association of Realtors* and am filing this objection to urge you to disapprove the settlement reached by Plaintiffs and Defendants and to reject the Plaintiffs' application for approximately $333,000,000 in attorneys' fees.

The settlement will provide only nominal financial relief for class members who paid inflated commissions to buyer brokers during the class period. By one estimate, if every class member filed a claim, the average payout would be about $13.[1] I paid approximately $27,500 to the buyer's agent when I sold my home in 2022. The monetary relief I will receive from the settlement is nowhere in the vicinity of compensating me for the harm caused by the Defendants' allegedly anti-competitive practices.

I recognize that the only purported value of this settlement to the class lies in the practice changes that Defendants have agreed to implement. These practice changes are a "material component"[2] of the settlement and are said to provide immense value to class members. Plaintiffs claim that this settlement involves "significant groundbreaking changes in the real estate marketplace that will provide very substantial benefits to millions of Americans in the future."[3]

Fundamentally, the National Association of Realtors ("NAR") agreed to *only two* practice changes:

1. Taking offers of compensation off the Multiple Listing Service (MLS) (and not creating an MLS-surrogate); and

2. Requiring buyer agreements that cap buyer broker compensation to be signed before touring.

Although the practice changes span several pages of the settlement, it is only these two basic things that NAR agreed to do.

Several of the "changes" are not changes at all[4] but are basically just affirmations that NAR members will not engage in misconduct. For instance, one provision says that "REALTORS® and REALTOR® MLS Participants [are prohibited] from representing to a client or customer that their brokerage services are free or available at no cost to their clients, unless they will receive no financial compensation from any source for those services[.]" This was already prohibited under NAR ethical rules. Moreover, agreeing not to make a factual misrepresentation is not a practice change. Similarly, the settlement "require[s] that REALTORS® and REALTOR® MLS Participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the

---

[1] https://robbinsllp.com/new-rules-real-estate-commissions/. To be clear, individual class members will almost certainly receive more than $13 because not every class member will file a claim (due to not knowing about the settlement, the requirements being too onerous, or feeling like it is not worth their time). Accordingly, the money intended for the class members who do not file a claim will be re-allocated to other class members who do file a claim. In my opinion, the settlement value should still be regarded as $13/class member. The fact that certain class members forego payment which is then re-apportioned does not make the settlement more valuable overall.

[2] Plaintiff's Motion for Preliminary Approval of Settlement with the National Association of Realtors, Certification of Settlement Class, and Appointment of Class Representatives and Settlement Class Counsel, at p. 31 (hereinafter "Motion for Preliminary Approval").

[3] Plaintiff's Motion for Attorneys' Fees, Costs, and Expenses Regarding the NAR and Homeservices Settlement and Suggestions in Support Thereof, at p. 1 (hereinafter "Motion for Attorneys' Fees").

[4] Apparently, this is a common tactic to create the illusion of a valuable settlement. *See* Howard M. Erichson & Ethan J. Leib, *Class Action Settlements As Contracts?*, 102 N.C. L. REV. 73, 91 (2023) ("Yet another technique is to include injunctive-style remedies with little value to claimants and little cost to defendants, such as pointless disclosures, promises to take steps that have already occurred, or steps that are reversible at the defendant's discretion.").

existence or level of compensation offered to the buyer broker or other buyer representative assisting the buyer." All this is saying is that realtors will not steer—which they weren't allowed to do to begin with. The point is that the injunctive relief appears more robust[5] than it is because it contains undertakings by NAR that it will simply follow the law and its own pre-existing ethical rules.

The goal of the settlement was laudable. It was based on the premise that buyer brokers were using commission rates posted on the MLS to steer buyers to properties that provided higher levels of compensation. If you make it harder to see what commission is being offered by taking commission rates off the MLS, you decrease the potential for steering. Additionally, if you put the buyer on the hook for paying the commission, then there is no reason to steer. Buyer brokers would steer because they were paid by sellers; now that they are (theoretically) going to be paid by their clients no matter what, there is really no reason to steer.

The settlement makes sense—but only on paper. It is an example of something concocted by lawyers without a full appreciation of how this would play out in the real world. In the real world, the implementation of the settlement has been a disaster. It has not eliminated steering. It has not resulted in lower commissions. It has not shifted the obligation to buyers to pay their own agents. It has led to widespread confusion and the exploitation of consumers. It has not accounted for the psychology of buyers and sellers. And it did not anticipate the lengths to which the industry would go to ensure that the commission structure that has prevailed for decades stays firmly in place.

This settlement is the worst of all possible worlds. Under the pre-NAR settlement paradigm, the rules were clear, and confusion did not reign supreme. Sure, sellers paid inflated commissions, but the rules of the game were well-established. The settlement agreement takes a tiny baby step toward decoupling, but in a way that is just an illusion. We basically just have the pre-NAR settlement system in place with a whole lot more paperwork, headaches, lies, chaos, and frustration. The settlement, as applied in the real world, is an abject failure. The words on a piece of paper in a document that no realtor will read or understand do not matter. How this was supposed to theoretically play out doesn't matter. What matters is how the settlement is being implemented in real life. And it is being implemented in a way that preserves the status quo of sellers paying both brokers, and commissions remaining steady at 5%-6%.

I have asked myself the question: *But isn't something better than nothing? Isn't a step toward decoupling helpful in combatting steering and anti-competitive behavior?* In my view, the answer is no. The settlement has not meaningfully decoupled anything because sellers (and/or listing agents) are still permitted to offer buy-side commission in advance. As long as this is possible, the current system of seller-financed commissions will remain intact. If this Court approves this settlement, it will be taking a large step backward. The industry will continue with all its anti-consumer shenanigans for many more years until another lawsuit is launched. I doubt there is much desire on the part of any attorney to take on the real estate industry after this case.

*Where would that leave us?* It would leave us with a quasi-regulatory scheme conjured up by lawyers to govern an industry that is thumbing its nose at the settlement. It would leave us with quasi-regulation

---

[5] *Id.* at 874 ("regardless of a settlement's true cost to a defendant, the defendant and class counsel share an interest in making the settlement *appear* as large as possible. The more valuable the settlement appears to the judge, the more likely the judge will find it 'fair, reasonable, and adequate' for purposes of judicial approval. And the bigger the settlement, the bigger the fee for class counsel.").

with absolutely no enforcement mechanism. The "enforcer" of this settlement is the Defendant itself. Sort of like the fox guarding the henhouse. It will leave sellers still offering buyer broker commission in advance because they fear that buyers will skip their house if they don't. It will leave buyers only seeking out properties where they know their buyer broker will be compensated by the seller. It will leave any potential unrepresented buyer out in the cold; if you don't play by the rules of the industry, you get shut out. And it will leave us in a worse position than we were before. There is at least something to be said for the clarity and simplicity of the former system.

In its Motion in Support of Preliminary Approval of the Settlement, the Plaintiffs succinctly captured the essence of the alleged misconduct that the settlement is intended to remedy:

> Here, all Plaintiffs seek to remedy the same grievance—widespread conduct by NAR throughout the United States that has resulted in supracompetitive broker commission rates. This conduct includes nationwide policies enacted by NAR, including nationwide MLS rules that mandate blanket unilateral offers of compensation to cooperating brokers that, before this Settlement, existed in MLSs throughout the United States. All Plaintiffs seek the same relief— compensation for the higher broker rates that they have had to pay, as well as systemic reforms that address the underlying conduct.[6]

As discussed in this submission, the settlement has *not* in any way "remed[ied] . . . [the] widespread conduct by NAR throughout the United States that has resulted in supracompetitive broker commission rates."[7] Instead, it has solidified it.

Below, I discuss how the settlement fails to provide for meaningful decoupling and continues to facilitate steering, thereby holding sellers like me to industry norms of paying both sell-side and buy-side commissions. I have divided the objection to the practice changes into six discrete, but interrelated, arguments.[8] It is my submission that the practices described in this objection serve to facilitate and perpetuate the anticompetitive conduct at the heart of this lawsuit.

1. MLS participants are already breaching the settlement agreement *en masse* and creating so-called "workarounds."

2. MLS participants are engaging in anti-consumer practices in response to the NAR settlement that prejudice members of the plaintiff class (sellers) as well as buyers.

3. The settlement has caused mass confusion in the real estate industry. This confusion is not just temporary "growing pains" confusion. It is what happens when a settlement that is crafted by lawyers behind closed doors is imposed as a form of regulation on industry participants and consumers.

4. The settlement has logistical ambiguities that have not been worked out. These deficiencies contribute to the mass confusion and workaround problem. NAR and the Plaintiffs are aware of these ambiguities and have not stepped in to address them.

5. The settlement does not contain a legitimate and viable enforcement mechanism.

---

[6] Motion for Preliminary Approval, at p. 21.
[7] *Id.*
[8] My seventh argument is that the settlement should not be salvaged.

6. The value of the practice changes is grossly overstated because it rests on erroneous assumptions.

In short, the settlement creates an illusion of change without providing any actual change. The settlement serves to further entrench a system where the seller pays the buyer's broker fees.

You will notice that this is a lengthy submission. This is because I am hoping to do two things. First, I am hoping to convince you that a certain practice is widespread. To do that, I have attempted to provide real-world evidence that the practice exists and is not simply an isolated incident.[9] Second, I link the practice that I have identified to the settlement and explain how it violates the settlement or serves to preserve anticompetitive practices that lead to inflated commissions in real estate transactions. It is worth noting that these materials were not particularly difficult to find—they are all hiding in plain sight. If this is what realtors and realtor organizations are doing when they know others (like the Department of Justice) are watching, I shudder to think about what is happening behind closed doors.

After discussing why I believe the settlement does not provide any benefit to class members, I explain why I believe the fee sought by the Plaintiffs is unreasonable and should be disapproved.

One final note: I am providing you with all this information because the parties, at this stage of the game, won't. The dynamics have now shifted from adversarial to cooperative, with everyone trying to convince this Court that the judgment is fair and reasonable. In the words of one author:

> The litigation process in this setting is, essentially, an *ex parte* process *with the illusion of an adversarial one*. The parties before the court attempt to persuade it that a settlement is adequate. Whether or not this is the case, neither party can be expected to unearth evidence or conduct in-depth legal research in an attempt to challenge its opponent's contentions. A court cannot be expected to effectively supervise the adequacy of a specific outcome if neither party before it submits evidence, brings forward witnesses, or contests the adequacy of the settlement.[10]

Truer words have never been spoken. Unless someone speaks up, this Court is likely to be convinced that this settlement is "fair, reasonable, and adequate."[11] It is not. It simply reinforces the existing system of seller-paid inflated compensation while pretending to eliminate it.

---

[9] You will notice that there are many references to social media sites such as YouTube, Facebook, Twitter, Reddit, Linkedin and Tik Tok. It may be that some of these videos and comments have been removed since I saw them. However, I have accurately captured their content by either transcribing the words verbatim or relying on an electronically-provided translation (e.g., YouTube has a transcript feature). I have also saved many of these screenshots and posts in a personal folder after an attorney at the Department of Justice warned me that "these things have a way of disappearing."

[10] Ittai Paldor, *Lawyers on Auction - Protecting Class Members*, 89 U. CIN. L. REV. 344, 359 (2021) (emphasis added).

[11] FEDERAL RULE OF CIVIL PROCEDURE 23(e)(2).

## II. INFORMATION REQUESTED BY THE COURT

Below is the information this Court requested in its Order dated April 22, 2024, granting preliminary approval of the settlement:[12]

(a) The full name, address, telephone number and email address, if any, of the Settlement Class Member;

Tanya Monestier
101 Charleston Ave
Kenmore, NY
14217
Email: tanyamonestier@hotmail.com; tanyam@buffalo.edu
Phone: (401) 644-2384

(b) The address of the home sold, the date of the sale, the listing broker, and the Buyer's broker;

347 Doyle Ave
Providence, Rhode Island
02906

Date of Sale: May 2, 2022
Listing agent: Gerri Schiffman, Residential Properties
Buyer agent: Joe Roch, Residential Properties
Broker for Residential Properties: Sally Lapides

(c) A specific statement of all grounds for the objection and, if applicable, any legal support for the objection;

See below.

(d) A statement whether the objection applies only to the objector, to a specific subset of the Class, or to the entire Class;

To the entire class.

(e) The name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection;

None.

(f) A list of all class action settlements to which the Settlement Class Member has objected in the past five (5) years, if any;

None.

---

[12] These requirements were not included in the Long Form class notice. https://www.realestate
commissionlitigation.com/admin/api/connectedapps.cms.extensions/asset?id=722069c7-72dc-4993-9879-cf5d707da8
a5&languageId=1033&inline=true. Nonetheless, in an abundance of caution, I've provided all the information requested
by this Court in the Order for Preliminary Approval.

(g) Copies of any papers, briefs, or other documents upon which the objection is based;

See submission.

(h) A statement of whether the Settlement Class Member intends to appear at the fairness hearing either personally or through counsel; and

I request the ability to participate in the fairness hearing telephonically or via Zoom. I think it is an unfair burden to place on class members/objectors to expect them to take time off of work and come up with the money to travel to a fairness hearing hundreds of miles away from their home.

This in-person requirement serves to stifle the voice of objectors. No reasonable person would pay thousands of dollars out of pocket to come to a hearing for a settlement which, if approved, would net them a few dollars.[13]

Even the burdens placed on objectors with respect to this submission are unreasonable. In this day and age, there is no reason why an objector cannot file an electronic submission. Yet, I need to print a copy of this 135-page objection and physically mail it out both to the Court and the parties—again, at a cost to myself which likely exceeds my recovery. By contrast, the settlement is set up to make it easy for *defendants* to opt into the settlement—they can simply send an opt-in notice to a specified email address.[14]

These unfair burdens placed on objectors have been a problem for decades, and I ask the Court to consider the reality of why a class member would rationally choose not to object even if he or she disapproved of the settlement:

> Although courts that treat the silence of class members as endorsement of the proposed settlement seem to think that a class member could easily object, objecting to any proposed settlement, in fact, entails significant costs for the would-be objector. Simply determining whether to object entails costs. For example, many class members will be unable to interpret the notice or evaluate the merits of the claims being settled without consulting an independent attorney. But it can be prohibitively expensive for class members, particularly in garden variety consumer class actions, to consult an attorney simply to determine the appropriate response to the notice of the proposed settlement.

> If a class member does decide that the proposed settlement is inadequate or somehow unfair, she must undertake the expense of deciphering and following the rules for written objections. The writing requirements can approach those appropriate for a formal legal brief. Yet, it is important to get this right because often only those members that properly file the necessary paperwork are allowed to present their objections at the fairness hearing. In

---

[13] Susan P. Koniak & George M. Cohen, *Under Cloak of Settlement*, 82 VA. L. REV. 1051, 1106 (1996) ("According to court files, class members, other than the named plaintiffs, or objectors actually attended only 7% to 14% of the settlement hearings. In the absence of anyone to present the problems with a proposed settlement, the likelihood that a judge could ferret out corruption or illegality leading to or embedded in a proposal presented jointly by class and defense counsel, who come well prepared to portray the deal as fair, legal and just, is quite small.").

[14] NAR Settlement Agreement, p. 35. The settlement, therefore, is structured to encourage opt-ins from defendants but discourage objectors.

order to object in person, most judges require the objector to have properly filed a written objection with the clerk of the court.

In order to have her objections taken seriously, an "objector should appear at the final approval hearing and be prepared to explain the objections." But explaining one's objections to a judge in front of a courtroom is often too daunting a task for class members who do not pay for separate legal representation. . . .

The expense of hiring a lawyer can be significant and objectors generally do not get awarded attorneys' fees. While "[o]bjectors may petition the court for [attorneys'] fees separate from the fees paid to class counsel," in general "an objector in a class action settlement proceeding is not entitled to a fee award."
. . .

In any case, it is unlikely that the objector will affect the settlement and hence unlikely that she will be reimbursed for her attorneys' fees. Thus, we have situations in which the court ignores the objections and then denies attorneys' fees to objectors for failure to change the proposed settlement. Even in cases in which the objectors did improve the settlement, their fees sometimes are denied.
. . .

Finally, attending the fairness hearing is rarely cost-free. Hearings are held during regular court hours, which is when most employed class members are at work. Class members are often geographically dispersed and may have to travel relatively long distances to present their objections in court. One major study by the RAND Corporation noted one fairness hearing "scheduled for the morning of a workday in the county courthouse in downtown Los Angeles-not easily accessible to many in far-flung Los Angeles County, much less to residents of other parts of California." The cost of parking alone is likely to exceed the individual class members' recovery under the settlement.
. . .

The aggregate effect of all of these individual costs can make the expected overall costs of objecting quite high. As Professor Owen Fiss has observed, "The forces that discourage most members of the group from stepping forward to initiate suits will also discourage them from responding to whatever notice may reach them." These costs must be weighed against the benefits of objecting.[15]

(i) The signature of the Settlement Class Member.

Appears at the end of the document.

---

[15] Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 100 (2007).

# III. BIOGRAPHICAL BACKGROUND AND DISCLOSURES

In March of 2022, I sold my home in Providence, Rhode Island through a NAR-affiliated brokerage; the property was listed on the local MLS.

At the time, I felt forced to use a real estate broker to sell the property, even though it was a seller's market with virtually no inventory. Every listing agent I spoke to made it very clear that buyers' agents would steer buyers away from the property if I listed the property For Sale by Owner (even if I offered buy-side commission). It was also clear that commissions were not truly negotiable—brokerage policy dictated that the lowest they would agree to was 5%, split between the listing agent and the buyer's agent.

My property was listed on a Thursday, and I received eight offers for over the asking price on Monday. I ended up paying my realtor $55,000 for what was, at most, fifteen hours of work. I like my realtor and believe she is eminently competent. And I made the rational calculus that I would get more offers (and for a higher amount) if I had a realtor than if I did not. Not because of anything intrinsically related to the realtor's services, but simply because industry participants would punish me if I didn't have a realtor.

In addition to being a class member, I am also a law professor who has been teaching contract law (among other things) for over fifteen years. Briefly:

➤ I joined the University at Buffalo Faculty of Law in July 2022 as a Professor of Law (with tenure) where I teach Contracts, Sales, and Conflict of Laws.

➤ From 2009-2022, I was a Professor of Law at Roger Williams University School of Law (teaching subjects: Contracts, Sales, Conflict of Laws, Contract Law Practicum, Class Actions). From 2007-2009, I was a Visiting Professor of Law at Queen's University (teaching subjects: Civil Procedure, Commercial Law, Conflict of Laws).

➤ I've published in leading academic journals, including *Cornell Law Review, Wisconsin Law Review, Boston University Law Review, Cardozo Law Review, American University Law Review, Hastings Law Journal,* and the *Ohio State Law Journal.*

➤ My academic work has been cited by numerous trial and appellate courts, including the Supreme Court of Canada, the Second Circuit Court of Appeals, the Ninth Circuit Court of Appeals, and dozens of other federal and state courts.

➤ An amicus brief that I wrote was recently quoted by the United States Supreme Court in *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2054 (2023) (Justice Alito, concurring).

➤ I am a Staff Editor for the *American Business Law Journal.*

➤ I have written articles about residential real estate. My article, *Fixer Upper: Buyer Deposits in Residential Real Estate Transactions,* 80 OHIO ST. L. J. 1149 (2019) argues that buyer deposits often operate as unlawful penalties. The article is cited in a leading Property Law casebook. My follow-up article, *Cake-and-Eat-It-Too Clauses* was recently published in Wisconsin Law Review. *Cake-And-Eat-It-Too Clauses,* 2024 WISC. L. R. 87 (2024).

➤ I graduated first in my class from Osgoode Hall Law School in Toronto, Canada.

➤ I clerked for the Honorable Justice Frank Iacobucci at the Supreme Court of Canada.

➤ I earned an LL.M. from Cambridge University, graduating with first class honors and receiving a specialty designation in Commercial Law.

➤ Prior to entering academia, I practiced in-house at a pharmaceutical company, specializing in class action and products liability litigation.

My C.V. is attached as an Appendix. Based on my legal background, I am not your typical class member or objector. But I believe that my knowledge of contract law, background in class action litigation, familiarity with consumer protection law and research, and knowledge of real estate industry practices make me uniquely poised to explain why the settlement is problematic.

Before I lay out my concerns with the settlement, I think it is necessary to provide you with some background about my recent academic and advocacy work as well as communications with potential stakeholders.

*Consumer Federation of America*

Shortly after the NAR settlement was announced, I attended (remotely) a workshop on the settlement that had been organized by the University of Minnesota School of Law. It piqued my interest in learning more about the settlement and the new contracts that realtors would need to enter into with clients. To that end, I reached out by email to Steven Brobeck, a senior fellow at the Consumer Federation of America, regarding a report on buyer agreements the organization had published earlier this year. I did not know Steve at the time—but recalled having reached out to him in 2019 after I published an article on earnest money deposits. I asked Steve whether he had electronic copies of the buyer agreements he had referenced in his report that he would be willing to share with me; he did not. As part our email exchange, I mentioned that I had recently seen the California Association of Realtors' (CAR) draft buyer representation agreement and that it was "a mess, in my opinion." Steve replied that the listing agreement was "just as bad." After some emails back and forth, he asked if I would be willing to prepare a critique of the forms for the Consumer Federation of America. I agreed. Within a few weeks, I had prepared two separate reports, one on the CAR buyer representation agreement and one on the CAR listing agreement.[16] The Consumer Federation of America circulated these broadly, including to the Department of Justice (DOJ), before releasing them publicly. Shortly after the reports were released, DOJ issued a "formal inquiry" into the CAR forms. CAR halted the public release of the forms, which had been set for late June. About a month later, CAR released new forms, which addressed many of the substantive concerns I had raised.

*Department of Justice*

As part of the process of preparing the reports on the CAR forms, I tried to learn as much as possible about how the real estate industry was responding to the NAR settlement. What I found alarmed me. It was clear that many industry participants were trying to find "workarounds" to the settlement and, essentially, continue with "business as usual." I wanted to raise some of these issues before the settlement was approved. At the time, I did not know whether I would be permitted to object to the settlement (the notice I received by mail did not mention the Oct. 28th deadline and only referred to an earlier objection deadline).

---

[16] https://www.law.buffalo.edu/faculty/facultyDirectory/monestier-tanya.html.

I decided to raise my concerns with the Department of Justice who I knew was tracking these developments. I prepared a 41-page memo primarily on the workarounds I was seeing and sent that memo to the DOJ in mid-July.[17] Within hours, I received a phone call from the lead trial counsel. She asked if I would be willing to do a presentation for some people at the DOJ. We also vaguely discussed the possibility of me doing consulting work for the DOJ. About a week and a half later, I did a presentation via Zoom for approximately a dozen people from the DOJ. The next day, I was asked to have a phone call with two lawyers from the DOJ about an issue that I had not discussed in my memo. I provided my general thoughts, with the caveat that what they were asking wasn't really my area of expertise. I asked the lawyers on the call if they were still interested in having a conversation about consulting. They asked about my hourly rate and said they would look into it.

*Independent Work on Settlement Issues*

After my conversation with the DOJ, I transitioned into seeing what I could do independently to move the needle in a positive direction.

To that end:[18]

1. I prepared guides for buyers and sellers that explained the NAR settlement in plain language.

2. I prepared a critique of the forms that had been released by state realtor associations, MLSs, and private/state organizations in anticipation of the settlement coming into effect.

Initially, I had planned to do this work in conjunction with the Consumer Federation of America. But I ultimately decided that I preferred to continue my work independently. I posted these materials on my law school webpage and notified various media contacts I had developed that they were free to distribute the materials as they saw fit. As a courtesy, I sent a copy of my report to the DOJ. They thanked me and also let me know that they would not be able to engage me as a consultant.

Around this time, Mr. Ketchmark had come out with a public statement to the effect of "every move you make we'll be watching you."[19] Based on this statement, I assumed that Mr. Ketchmark would be interested in my research on the ways that agents were violating the settlement. I reached out to him and two of his associates by email on August 23, 2024, asking whether they would like copies of my memo to the DOJ or my research on workarounds. I did not hear back from Mr. Ketchmark or his associates.

I continued my work independently. I subsequently prepared a critique of the Real Estate Board of New York's buyer agreement criteria.[20] And I drafted a sample representation agreement that is more consumer-friendly than anything I have seen to date.[21] I have plans for at least one (or maybe even two) academic articles on residential real estate and the NAR settlement. That has been placed on the back burner for now.

I have been asked to consult on the NAR settlement by various individuals and companies; I have declined all such requests. I have been asked to be a board member for a technology-based real estate company; I declined that request. I have been asked to attend two expenses-paid industry speaking

---

[17] Much of what appeared in the memo to the DOJ is also contained in this objection.
[18] https://www.law.buffalo.edu/faculty/facultyDirectory/monestier-tanya.html.
[19] *See* https://www.inman.com/2024/08/19/michael-ketchmark-every-move-you-make-well-be-watching-you/.
[20] https://www.law.buffalo.edu/faculty/facultyDirectory/monestier-tanya.html.
[21] *Id.*

engagements; I declined both requests. I have been asked to participate in two leading industry podcasts; I declined both requests.

I have corresponded with five or six general counsels for state realtor associations. I have had various email exchanges and phone conversations from frustrated realtors, buyers, and sellers.

I have no financial, personal or other interest in the settlement being disapproved. In fact, the opposite. If the settlement is not approved, I will lose out on the money I would be entitled to under the settlement.

*My Decision to Object*

I have chosen to file an objection of this length and with this level of detail[22] for one simple reason: because I think no one else will.

This settlement is sorely lacking outside, neutral analysis.[23] I wish there were more voices closely scrutinizing whether this settlement provides the value it claims to aggrieved class members and whether the attorneys have provided a third of a billion dollars in value to the class. As far as I know, those voices are nowhere to be heard.[24]

In a recent article, Plaintiffs' expert Professor Klonoff reflects on the role of objectors in class action settlements. He categorizes objectors into "the good," "the bad," and "the ugly." With respect to the good objectors, he says this:

> Some objectors are good; they offer thoughtful and potentially meritorious objections that engage the court and require substantive responses from the parties. Such objections sometimes serve to improve the settlement in significant ways. Good objectors are critical to the process because, as noted, the judge reviewing the settlement does not have the benefit of the usual adversarial setting.[25]

---

[22] Notably, Rule 23(e)(5)(A) requires an objection to "state with specificity the grounds for the objection." FED. R. CIV. P. 23.

[23] Obviously, I am not neutral in the sense that I do not support the settlement. I am neutral in the sense that I have nothing to gain or lose from the settlement being approved or disapproved.

[24] This is not surprising, perhaps, given the difficulty of filing a meaningful objection, the lack of personal benefit from the disapproval of a settlement, and the slim chance that an objection will make a difference. Susan P. Koniak & George M. Cohen, *Under Cloak of Settlement*, 82 VA. L. REV. 1051, 1106–08 (1996) ("Moreover, pro se objectors will generally be no match for the lawyers presenting the settlement as fair. The Federal Judicial Center study does not say how many of the small number of objectors who appeared at fairness hearings had counsel, but it is probably safe to assume that many objections to class action settlements are raised pro se. The current system provides little incentive for lawyers to seek out corruption or illegality in proposed settlements. Objecting lawyers stand little chance of receiving fees or even the reimbursement of expenses incurred in mounting a challenge. . . . However, because the chances of convincing a trial judge to reject a settlement are extremely slim, and the chances on, appeal may not be high enough to justify the added expenses, the expected benefit from derailing the settlement would have to be enormous to make it rational to launch a serious challenge.").

[25] Robert Klonoff, *Class Action Objectors: The Good, the Bad, and the Ugly*, 89 FORDHAM L. REV. 475, 477 (2020). *See also* Brian T. Fitzpatrick, *Objector Blackmail Update: What Have the 2018 Amendments Done?*, 89 FORDHAM L. REV. 437, 438 (2020)("Class members who object to class action settlements and fee awards can serve a vital role in class action litigation. Because both class counsel and the defendant, by definition, support class settlements, the only adversarial testing of settlements and fee petitions in either the district court or the court of appeals usually comes from objections litigated by absent class members. For this reason, it is important to ensure that class members who wish to improve settlements and trigger closer scrutiny of fee awards have the means and opportunity to do so through objections.").

I hope that I am what Professor Klonoff would regard as a "good objector." I am here to tell you what the parties won't.[26] In the words of the Seventh Circuit Court of Appeals,

> Class counsel support the settlement to get fees; the defendants support it to evade liability; the court can't vindicate the class's rights because the friendly presentation means that it lacks essential information. That is why objectors play an essential role in judicial review of proposed settlements of class actions and why judges must be both vigilant and realistic in that review.[27]

I am cognizant that filing this objection will not make me a popular person. One academic commentator observes that "objectors may be the least popular litigation participants in the history of civil procedure."[28] He analogizes an objector as comparable in popularity to the person who speaks up when an officiant says, "Is there anyone here who objects to this marriage?"[29]

I have already taken some heat for my academic work and commentary on the settlement and real estate contracting post-settlement. One general counsel of an MLS posted the following ad hominem about my commentary on MLS concessions: "Apparently the law professor has a hard time understanding contracts, . . . Since this law professor cannot interpret the clear language of the NAR Settlement Agreement, I must assume she is also not capable or qualified to interpret the C.A.R. Listing Agreement either."[30] General counsels at large state associations have reached out to me with vaguely threatening messages. One accusing me of failing to do "due diligence" and expressing patronizing "disappointment" that "an attorney and a law professor" would not contact them "before offering . . . erroneous analysis."[31] This same attorney referred to my report as my "study" in quotes (to diminish its significance).

The California Association of Realtors (CAR) attempted to discredit my reports by calling the critiques "misguided" and stating that my reports "demonstrate[ ] [a] lack of familiarity with California-specific statutory language required for our real estate contracts."[32] CAR also misstated the content of my report and lied about the drafts I reviewed being works-in-progress.[33]

Online commentators have said things such as that I am looking for my fifteen minutes of fame, don't know how real estate works, live in an ivory tower bubble, and am promoting a false narrative.[34] One

---

[26] Robert Klonoff, *Class Action Objectors: The Good, the Bad, and the Ugly*, 89 FORDHAM L. REV. 475, 475 (2020) ("When litigants reach a class action settlement, they usually present a unified front in seeking judicial approval of the settlement. Plaintiffs' counsel, the class representatives, and the defendant are typically on the same page regarding the fairness of the settlement; and they are frequently on the same page with regard to the amount of attorneys' fees as well, with agreements often providing that a defendant will not oppose attorneys' fees up to a specified amount.").

[27] In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig., 869 F.3d 551, 556 (7th Cir. 2017) (internal citations and quotations omitted).

[28] Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 411 (2003).

[29] *Id.*, n. 21.

[30] Communication on file with author. I do not think it is productive to reveal the identity of the attorney.

[31] Communication on file with author. I do not think it is productive to reveal the identity of the attorney.

[32] https://www.car.org/aboutus/mediacenter/news/cfarlaresponse; https://www.car.org/aboutus/mediacenter/news/cfaresponse.

[33] The drafts that I reviewed were final drafts. CAR was already training agents on the forms, and they were set to be released within days.

[34] One of the nastier comments was this one: "Have you read her so-called consumer help guides linked in this post? She all but says real estate agents are the scum of the earth. She has a pros and cons list that demeans an agent more than it gives advice to consumers, who she says she cares about. It's disgusting. She's giving preconceived ideas about all agents. She has absolutely no idea what real agents do or what they are about but rather fabricated, trashy, assumptions. Thanks .

real estate "influencer" with a huge online following responded to an innocuous message I posted on LinkedIn with the words "delusional talk." Even efforts to move the conversation forward in a productive way—by providing a free sample agreement for brokers to use—was met with hostility and derision. One realtor said, "this draft lacks" and another said, "[h]er go to move is to talk about the worst buyer contracts in the country (out of thousands apparently) and then provide a contract that looks a lot like my state association's buyer agreement."[35]

All of this is to say that I am filing this objection with full knowledge that it will be met with the sort of backlash outlined above. I expect Plaintiffs and Defendants to similarly cast doubt on my qualifications, background, or motives to muddy the waters for this Court. I trust that this Court will be able to see past any such efforts.

Despite all this, I have decided to proceed because I do not think that class members have anyone else to serve as their spokesperson. In the words of one commentator:

> In the small stakes class action, there will be an unsatisfactory stake or incentive for the absent class member to enter a class action in order to voice an objection. As pointed out by Professor Issacharoff, this is the very reason that the class action monitoring problem exists. There is simply no reason to think that the small stakes class member will possess either the information or the incentive needed to evaluate the performance of class counsel or, more specifically, the adequacy of a proposed settlement.' Judge Posner put the matter succinctly by asserting that "ordinarily the unnamed class members have individually too little at stake to spend time monitoring the lawyer."[36]

The system is unfortunately set up in such a way that there is no one positioned to meaningfully "monitor the monitors." In the words of Professor Tidmarsh and Marumo:

> Objections serve as a critical backstop against settlements that disserve the class. When a settlement proposes to bind class members, the court must approve it; and it can do so only if it finds, after a hearing, that the settlement is "fair, reasonable, and adequate." At the point of settlement, however, class counsel and the defendant agree: they want the court's approval. The court has limited powers of investigation, and in an adversarial system, it must remain neutral. So how is the court to know if the settlement is in the best interests of the class? One answer is to empower class members to voice their objections, thus generating the kind of adversarial disagreement that can frame the settlement's fairness for the court.[37]

Similarly, Professor Leslie argues:

---

. . for contributing to her 15 seconds of fame." Communication on file with author. I do not think it is productive to reveal the identity of the commentators.

[35] My draft contract was reviewed by half a dozen commentators and the feedback was overwhelmingly positive. The commentators were: a professor who wrote a leading textbook on real estate transactions; a professor who is an expert on "plain English"; a professor who is one of the leading voices on consumer psychology; a professor who is very familiar with the NAR settlement and teaches and writes about consumer protection; and a consumer protection advocate.

[36] Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 428 (2003).

[37] Jay Tidmarsh & Tladi Marumo, *Good Representatives, Bad Objectors, and Restitution in Class Settlements*, 48 B.Y.U. L. REV. 2221, 2253 (2023).

In the absence of objectors, every person before the judge-the defendants, the class counsel, and often the class representatives-supports the settlement and, thus, the judicial process of evaluating facts through an adversarial contest is thwarted. In our adversarial system, judges are ill-equipped to investigate and discover evidence against a proposed settlement on their own initiative. Professor Brunet notes that "a district judge lacks the incentive, information, and practical ability to effectively monitor class counsel. Under these conditions, the trial court alone cannot be an effective check on the potential abuse that can arise in the class action settlement process." This makes objectors important because class members can potentially provide critical objective viewpoints on the adequacy of a proposed settlement.[38]

I plan to release a copy of this objection (with my personal information redacted) because, to quote Justice Brandeis, "sunlight is the best disinfectant."

---

[38] Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements,* 59 FLA. L. REV. 71, 86–87 (2007).

# IV. OBJECTIONS TO THE SETTLEMENT
## (PRACTICE CHANGES)

## 1. Realtors are Breaching the Settlement Agreement and Engaging in "Workarounds"

In the months since the NAR settlement went into effect, MLS participants have been breaching the agreement outright and engaging in workarounds that violate the intent of the NAR settlement. I use the term "breach" in the legal sense—i.e., breaking a promise under a settlement contract. I use the term "workaround" to denote a practice that exploits an ambiguity in the settlement and seeks to evade its intent. Whether something is an actual breach, or a so-called "workaround" does not really matter. Both destroy what everyone understood was the parties' intent under the settlement. If these breaches and workarounds continue unabated, the settlement is deprived of the effect that it was intended to have.[39] Both Plaintiffs and Defendants are aware of these workarounds and have largely remained silent, allowing them to continue.[40]

I have identified these breaches or workarounds by examining real estate forms, guidance put out by realtor groups, comments on public forums, and presentations and videos on the NAR settlement. I do not consider these breaches or workarounds to be something that one or two errant realtors are engaging in. Instead, I view these as a widespread practice, explicitly or implicitly endorsed by state realtor groups, brokerages, and NAR.

I want to make a quick observation on real estate forms promulgated by state and local realtor organizations and MLSs. Some of these forms are very telling and expressly spell out how realtors will violate the settlement with the blessing of their regulating body. For these reasons, most of these forms are kept under lock-and-key. Nonetheless, I have been able to track down a couple dozen or so forms which provide an insight into what will certainly become industry practice if this Court gives final approval to the settlement.

---

[39] I should note that this objection does not discuss the possibility for widespread outright and willful breaches of the NAR settlement agreement. The reality is that that many realtors will refuse to have a client sign a representation agreement prior to touring a property. In these cases, the realtor will likely backdate any buyer representation agreement and have his or her buyer sign the backdated agreement as part of the offer. Unless brokerages actively police their agents' practices, no one will be any the wiser to the practice.

[40] For instance, the Pennsylvania Association of Realtors attempted to address the issue head on with humor. In response to the question "I think I have a workaround," it stated: "Please don't. The words "workaround" and "loophole" are why we can't have nice things. Across the country there are already changes being made to various standardized forms and MLS policies, not because the policies/forms were non-compliant but because certain brokers and agents were already abusing the rules and forms with "workarounds." Remember that the protections you gain from the settlement only apply to those who actually follow the rules. If brokers play fast and loose with the rules, not only could they find themselves in a new lawsuit, but they could expose the MLS, the association, and other brokers in the market to lawsuits and other compliance actions as well. *See* https://www.parealtors.org/blog/nar-settlement-implementation-all-your-questions-answered/.

One of the two core components of the NAR settlement is the requirement that realtors working with a buyer must have a representation agreement in place prior to touring a property if they want to collect a commission. That written agreement must clearly spell out the amount or rate of compensation in a way that is objectively ascertainable and not open-ended. And, importantly, the buyer's broker may not receive compensation from any source for brokerage services that exceeds the amount agreed to in this buyer representation agreement. These requirements serve multiple purposes but are designed primarily to decouple commissions and to combat steering.

The most talked about workaround is simply modifying a representation agreement upward once the promised rate of compensation is known. One Texas brokerage perfectly captures the dynamics at play and why realtors will be inclined to sign up clients at a low commission rate and then bump them up to a higher rate via a modification later in the process:

> You have the ability to amend the buyer rep agreement. That's important because, if you think about it, buyers are going to be nervous when they're filling out the buyer representation agreement stating that they're going to be responsible for your commission if the seller doesn't provide it . . . [T]hey're going to feel like they're going to be on the hook for that and so you're going to feel a lot of pressure to squeeze that number down: "Well, I'll work for 1% or I'll work for 2%."

> Negotiate something fair to yourself, but then know that there is an opportunity for more. *You can always amend the agreement* to get [more] and you simply explain to your buyer at that time: "Hey we're putting an offer on this new darling home. They're offering a bonus by the way. They're going to pay the full amount of my compensation that's in the agreement, plus another $5,000. I just need you to sign off on this. It's a great deal for you Mr./Mrs. Buyer because it's not going to cost you a cent and they're covering all of my expenses." But you'll need the amendment to do that . . .[41]

This statement taps into the reality that buyers are nervous to sign an agreement where they are on the hook for, say, 3% commission. They are much more comfortable signing a contract with a lower number (e.g., 1% or 1.5%) and then agreeing to more—so long as that excess is going to be paid by a seller.

In my view, modifying a representation agreement to increase the level of compensation for a buyer broker violates the NAR settlement agreement. In this respect, I don't think this is a "workaround" so much as a flat-out breach of the agreement. The NAR settlement provides:

> [T]he National Association of REALTORS® . . . will implement the following practice changes:

> 58.vi. unless inconsistent with state or federal law or regulation before or during the operation of this Paragraph 58(vi) of this Settlement Agreement, require that all REALTOR® MLS Participants working with a buyer enter *into a written agreement before the buyer tours any home* with the following:

---

[41] https://www.youtube.com/watch?v=WlvSaLdUucs.

a. to the extent that such a REALTOR® or Participant will receive compensation from any source, the agreement must specify and conspicuously disclose the amount or rate of compensation it will receive or how this amount will be determined;

b. the amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer"); and

c. such a REALTOR® or Participant may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in *the agreement* with the buyer;[42]

The NAR settlement agreement states that the compensation for a buyer broker may not exceed that which is agreed to in "*the* agreement with the buyer."[43] This refers to the agreement in Section H.58.(vi) that the realtor has already "enter[ed] into . . . before the buyer tours any home."[44] By its plain terms, "the agreement" that provides the cap on compensation is the one entered into prior to the buyer touring the home. By definition, a modified agreement entered *after* an overage amount is known is not "the agreement" referred to in section 58(vi)(c) of the NAR Settlement Agreement.

Moreover, the structure of the section is telling. Section H.58(iv) refers to the obligation of a realtor who wants to collect buy-side compensation to enter into an agreement prior to a buyer touring the home. This agreement (i.e., the one signed prior to touring) must meet the parameters of subsections (a)-(c). Subsection (c), in other words, is a component of, and must be read in conjunction with, the rest of section 58.

This interpretation of section 58 is buttressed by considering what would happen if realtors were permitted to increase their commissions via a modification to match what a seller was offering. The modified "bump up" agreement would run roughshod over the settlement provision that "the amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer")[.]"[45] What a modification would allow, albeit indirectly, is the broker to collect "whatever amount the seller is offering to the buyer."[46] This could be easily accomplished by specifying a compensation rate of 0% to secure potential buyers who will be reluctant to enter into a buyer agreement that obligates them to pay any commission.[47] The implicit understanding between the buyer and agent will be that a new agreement will be entered into after the seller's promised rate of compensation is known.[48]

---

[42] *See* NAR Settlement Agreement, Section H.58.(vi).

[43] *Id.* (emphasis added).

[44] *Id.*

[45] *See* NAR Settlement Agreement, Section H.58.(vi)(b).

[46] *Id.*

[47] https://www.reddit.com/r/realtors/comments/1cih3ka/buyers_agent_commission_rules_hesitating_to_sign/ ("I once had someone do all their research and then sought me out to be their Buyer's Agent. The interview went great right up until we started discussing my fee. At that point they refused to sign anything with compensation in it. I explained that the contract would obligate me to work in their best interests even if it meant helping them buy a property with no Buyer Agent fee and that I needed to protect myself from working for months for free. Their response was, 'I don't care if you get paid. I just know that I won't sign anything where I would have to pay you.'").

[48] *See* https://notoriousrob.substack.com/p/a-few-random-thoughts-and-questions (quoting from commentator: "I've been to three different seminars/conferences in the last two weeks. This question has come up every time (not shocked to see you bring it up). The legal answer has been consistent. The buyer's agent and buyer can agree to whatever they want to agree to. If the buyer wants to sign a new buyer agency agreement because the payout is higher, then so be it. It's crazy how fast relationships can be formed between agents and clients. I can certainly see a BUYER initiating that conversation.

It is important to understand the dynamics at play here and why the requirement that these modifications be in writing is insufficient to ensure voluntariness on the part of buyers.[49] In almost all cases, a buyer will be all too happy to sign a modified agreement after a guarantee of payment for the buyer's agent has been secured. After all, it's: (a) not his money; and (b) failing to sign a modification could lead to an awkward or acrimonious relationship with the agent going forward. With respect to (b), it is critical to consider that the agent's request for a modification to the compensation comes at the same time the agent is submitting and negotiating an offer for the buyer. Why would a buyer want to alienate his agent at this pivotal moment in the process? Any statement in the form that the buyer is not obligated to agree to the modification doesn't mean anything in the real world because it ignores the not-so-subtle pressure on buyers to sign the modification.[50]

The buyer likely would also not fully appreciate the personal or broader implications of signing a provision allowing his agent to receive more compensation than originally agreed to. If an extra 1% is on the table, why should that money go to the agent? Practices like this where realtors scoop up "excess" funds result in the maintenance of the commission structure that the NAR settlement was intended to dismantle.

Leaving aside the text of the NAR settlement agreement for the moment, it is unclear if a modified compensation agreement would be legally binding as a matter of contract law. A modification of a contract at common law requires new consideration to be binding.[51] A unilateral change to the terms of compensation for work already performed and already required to be performed is not supported by adequate consideration.[52] The buyer's agent has a pre-existing duty to represent the buyer in the transaction. He or she has agreed to do so at a rate of x%. Increasing the compensation of the agent with no corresponding additional consideration offered by the agent falls squarely under the rule that a modification unsupported by consideration is not binding.[53] While it may become common practice to agree to such modifications, that does not make the modification legally enforceable.

---

"I understand the seller is paying out more than our contract. Do you want to sign another (higher) one so you can get paid more." Of course, I can also picture a discussion starting with the buyer's agent, "I'll sign an agreement at X% but if the payout is more, we'll sign another one...as long as you don't have to pay out of pocket." Unless buyer benefits directly, they'll sign another contract in most cases, regardless of who brings it up.").

[49] The fact remains that regardless of whether buyers' consent, these modifications still run afoul of the NAR settlement.

[50] For an example of a buyer that did not cave to the pressure. *See* https://www.reddit.com/r/RealEstate/comments/1fr0xwp/signed_a_buyers_agreement_with_agent_that_i_owe_2/ ("Signed a buyer's agreement with agent that I owe 2% of home sale price. Made an offer and it the seller is offering additional 1% to my buyer's agent (to make it 3% total). However, I told him he cannot get that extra money as our agreement is 2% and to recounter the home's price that difference. Since the commission law has now changed and I'm paying him, I know that the seller "offering" it really is coming out of my amount because it's making the home price higher than what it should be. We signed and agreed at 2% so I don't think he should be getting an extra 1% in the deal. I know I sound like an ahole but the money in the transaction only comes from the buyer (me). Curious who is correct with the new regulations now."). Tellingly, though, the buyer was aware that this made him "sound like an ahole" – and for that reason alone, most buyers would have simply agreed to the modification.

[51] 14A CAL. JUR. 3D CONTRACTS § 278 ("The general rule is that a contract for the modification of an existing written agreement, equally with other contracts, requires a consideration.").

[52] RESTATEMENT (SECOND) OF CONTRACTS § 73 (1981) ("Performance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration[.]").

[53] § 7:41. Promise to perform or performance of preexisting obligation other than debt as consideration; contractual preexisting duty rule—Promise to perform or performance of preexisting contractual duty as consideration for third party's promise, 3 WILLISTON ON CONTRACTS § 7:41 (4th ed.) ("Analytically, when a party has a contractual duty to perform a specified act, the performance or agreement to perform the act does not constitute a legal detriment, since the actor had a preexisting legal duty to perform the act, and the performance or agreement to perform the act cannot, therefore,

The problem is that this practice cannot be meaningfully monitored. The only parties with standing to challenge the modification are the parties to the modification itself. Obviously, the broker won't challenge the modification; he is getting more money out of it. And the buyer would have no reason to challenge the modification since he doesn't feel like it's his money that he's parting with. Thus, it may be that realtor organizations are encouraging or facilitating modifications that are not even legally binding.

There is ample evidence that realtors are asking buyers to sign modification agreements and that the practice is being sanctioned by NAR, state and local associations, MLSs, and private brokerages. NAR president Kevin Sears has indicated that it is permissible for realtors to amend their buyer representation agreements to collect a higher commission than originally agreed to. A recent news article reports:

> According to NAR president Kevin Sears, agents and their clients can amend their representation agreement, which opens up the possibility of agents and their clients changing how much their agent is being compensated if the seller of the property they are purchasing has decided to offer a higher amount of cooperative compensation than what the buyer and their agent originally agreed upon. Although the FAQs do not address this, NAR does note that agents can have more than one agreement with their buyer clients.[54]

NAR's official guidance on buyer representation contracts, called "Written Buyer Agreements 101," states that a buyer representation agreement must "Include a statement that MLS Participants may not receive compensation from any source that exceeds the amount or rate agreed to with the buyer[.]"[55] NAR's statement is misleading, perhaps deliberately so. It is not that realtors may not "receive compensation from any source that exceeds the amount or rate agreed to with the buyer"; it is that realtors may not "receive compensation from any source that exceeds the amount or rate agreed to [*in the agreement signed prior to touring*] with the buyer."

The statement of NAR's president, coupled with the deliberate NAR ambiguity on this point, is what allows these sorts of breaches to flourish and realtors to proceed with impunity. To be clear, it would not be difficult for NAR to implement a rule change that expressly says: "Brokers are not permitted to increase their compensation after a buyer-broker agreement has been signed." The fact that it hasn't done so is telling—it is a "wink and nod" that modifying an agreement is a NAR-sanctioned way that realtors can avoid the settlement provision that prohibits realtors from collecting more than they agreed to in the agreement entered into with their buyer.

Certain forms used by state realtor associations expressly spell out this possibility that realtors can "up" their compensation via a subsequent agreement:

> TEXAS REALTORS: Additional Compensation: In addition to Broker's Fee specified under Paragraph 7A, Broker is entitled to the following compensation. . . . In addition to Broker's Fee specified under Paragraph 7A, *seller, landlord, or their agent may offer Broker other compensation, such as a bonus*, if Client purchases or leases certain properties. Broker

---

constitute consideration for any promise made by a third party. Likewise, if instead of performing, the party previously bound promises to perform what it has already undertaken, its promise does not constitute a detriment.").

[54] https://www.housingwire.com/articles/nar-addresses-steering-in-latest-settlement-agreement-update/#:~:text=According%20to%20NAR's%20FAQ%20update,a%20virtual%20or%20in%20person.

[55] https://www.nar.realtor/the-facts/written-buyer-agreements-101.

will disclose the specific amount of other compensation offered to Broker. *Broker may not receive other compensation unless authorized by Client in writing. Client authorization may be made by amending this agreement* (use TXR 1505). (emphasis added).

NORTH CAROLINA ASSOCIATION OF REALTORS: (i) Firm may seek the Fee from a cooperating listing firm or from the seller, and Buyer agrees that Firm shall be entitled to receive same in consideration for Firm's services hereunder, provided that any compensation paid by a cooperating listing firm or seller shall not exceed the amount of the Fee, *unless otherwise agreed.* (emphasis added).[56]

NEW MEXICO ASSOCIATION OF REALTORS: IMPORTANT NOTE: Buyer's Brokerage cannot receive from one source or multiple sources . . . more than the Brokerage Compensation set for herein. While *Buyer and Buyer Brokerage may agree to adjust the amount of the Brokerage Compensation set forth herein at any time* . . . neither Buyer, nor the Buyer Brokerage, is *obligated* to change the amount of compensation established in this Agreement once this Agreement has been signed by all parties. (emphasis added).[57]

COLORADO REAL ESTATE COMMISSION: 7. COMPENSATION TO BROKERAGE FIRM. In consideration of the services to be performed by Broker, Brokerage Firm 118 will be paid as set forth in this section, with no discount or allowance for any efforts made by Buyer or any other person. *Unless approved by Buyer, in writing, Brokerage Firm is not entitled to receive additional compensation, bonuses, and incentives paid by listing brokerage firm or seller.* (emphasis added). . . .[58]

. . .

Buyer Will Pay. Buyer is obligated to pay Brokerage Firm's Success Fee. *Brokerage Firm is NOT entitled to receive additional compensation, bonuses or incentives from listing brokerage firm, seller or any other source unless agreed to by Buyer in writing.*

WESTERN NEW YORK REAL ESTATE INFORMATION SERVICES MLS: . . . **REIS MLS MEMBERS OR PARTICIPANTS MAY NOT ACCEPT COMPENSATION FROM ANY SOURCE THAT EXCEEDS THE AMOUNT OR RATE AGREED TO WITH THE BUYER, *UNLESS THE BROKER AND THE BUYER AGREE TO SUCH ADDITIONAL COMPENSATION IN WRITING.*** (bold in original, italics added)[59]

NORTHWEST MLS: **COMPENSATION.** Buyer acknowledges that there are no standard compensation rates and the compensation in this Agreement is fully negotiable and not set by law. Firm may not receive any compensation for brokerage services provided to Buyer from any source greater than the amount set forth in this Section 5 *or any subsequent amendment hereto.* (bold in original, italics added)[60]

These same state realtor groups are conducting training and issuing guidance to the effect that buyer representation agreements can be modified to increase the level of compensation for buyer brokers.

---

[56] https://www.ncrealtors.org/legal-ethics/forms-contracts/document-library/.
[57] On file with author.
[58] This form is drafted by the Colorado Real Estate Commission and used by the Colorado Association of Realtors per state law.
[59] On file with author.
[60] On file with author.

For instance, the general counsel to the Georgia Association of Realtors has issued the following information for its members:

> GEORGIA: {3} Consumers Must Approve the Specific Commission Being Paid to REALTORS®. Under the NAR Settlement, consumers must approve the specific compensation being paid to their broker in a written agreement entered into between the parties, even if the consumer is not the party paying it. Once an agreement is reached, it cannot be changed *without amending that agreement.* Let's look at the example below to better understand how this will work. EXAMPLE #1: Buyer agrees in a written agreement with the buyer's broker to pay buyer's broker a two percent commission minus any amount paid by the seller or seller's broker. Buyer puts a house under contract in which the seller has agreed to pay the buyer's broker a three percent commission. What commission amount does the buyer's broker receive? ANSWER: Since the written agreement between the buyer and broker's broker limits the buyer broker's commission to two percent, this is the total amount that the buyer's broker can receive *unless the buyer agrees otherwise. Of course, the buyer's broker can ask the buyer's [sic] to amend their agreement, and hopefully, the buyer will not object to that.*[61]

He then went further and stated: "The GAR Forms Committee is exploring ways to get the buyer to pre-agree to a maximum amount paid by the buyer, but where the buyer's broker can get an additional pre-agreed amount from the seller or listing broker."[62] This is a clear violation of the requirement that compensation be objectively ascertainable and cannot be "whatever the seller is offering." The fact that a general counsel of a state realtor association is proposing these workarounds speaks volumes about what the rest of the industry is currently doing or seeking to do.

The Rhode Island Association of Realtors has explicitly said that realtors can collect more than agreed to in their buyer representation agreements so long as they modify their agreements:

> I have had some people asked me in the past month or so 'let's say that I agree to you know x amount in . . . [the] buyer representation agreement, but then I find that a seller might be willing to pay me y, which is more than the original amount, so can I do that? . . . [Answer] You can change the contract at any time so the short answer is 'yes' and you could use the amendment to do.[63]

The Rhode Island Association of Realtors created a new form just for the purpose of amending the buyer representation agreement. So too have most state and local realtor associations.[64] In all the new forms that I have seen, compensation is the primary focus of the amendment form. For instance, the new Oregon buyer representation agreement is silent on modification.[65] Yet, Oregon Real Estate Forms include a new form entitled "Buyer Representation Agreement Addendum" and states:

> • New form used to modify the terms of an existing Buyer Representation Agreement.

---

[61] https://garealtor.com/wp-content/uploads/Summer-2024-Magazine-The-New-World-of-Real-Estate-Commissions.pdf.

[62] *Id.*

[63] https://www.youtube.com/watch?v=HqMLb_WafRg. Even after the question was answered, a realtor asked the hosts to confirm the practice again: "We are allowed to amend our buyer broker agreement if a higher amount is offered with permission of the buyer, correct?" The host responded, "So Deborah, the answer is correct."

[64] *See e.g.* https://www.aaronline.com/2024/07/08/arizona-realtors-forms-for-august-2024-release-3/.

[65] Oregon Real Estate Forms were developed to provide uniform state-wide real estate forms for use by realtors throughout Oregon. https://orefonline.com/. Thus, there may be a disconnect between these forms and forms and guidance promulgated by various Oregon real estate organizations.

- Sections 1 & 2 were added to easily revise the expiration *and fee* of the agreement.
- Space for additional provisions is provided to modify other terms.
- *When modifying the fee*, be sure it is easily understood by both the buyer and the buyer's agent. (emphasis added).

As one can see below, other than extending the term of the agreement, the form exists pretty much only to modify compensation.

**OREF**

RESIDENTIAL

**BUYER REPRESENTATION AGREEMENT ADDENDUM**

1  Buyer and Buyer's Agent enter into this Buyer Representation Agreement Addendum to modify the Buyer Representation Agreement between them
2  dated (*insert date*) _____ (the "Representation Agreement") as follows:

3  **1. TERM:** Section 3 of the Representation Agreement is modified to provide that the Term will end at 5:00 p.m. on (*insert date*)
4  _____. The entire Term, including any extensions, will not exceed twenty-four (24) months.

5  **2. COMPENSATION:** Section 4 of the Representation Agreement is modified to provide that the Fee will be (*select and complete one*)
6  ☐ $_____ or ☐ ____% of the purchase, lease, or option price.

7  **3. ADDITIONAL PROVISIONS:** (*If this section is used to modify the Fee, it must be easily understood by Buyer and Buyer's Agent*)
8  _____
9  _____
10 _____
11 _____
12 _____

It is not a coincidence that all these modification agreements are springing up in conjunction with newly drafted buyer representation agreements.

To its credit, the Pennsylvania Association of Realtors has gone on record as saying that the practice of negotiating "up" through a modification agreement is problematic:

> Practice Tip: There have been questions about whether buyer brokers can renegotiate buyer agency fees based on what a listing broker and/or seller are willing to contribute – e.g., renegotiating up if the seller side is willing to offer more than the negotiated fee (so the broker can collect more), or down if the seller side is offering less (to avoid a buyer potentially having to pay at closing). Brokers should be exceedingly cautious about this approach. The terms of the NAR settlement agreement say that buyer broker fees must be "objectively ascertainable" and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer"). Any buyer broker fee practice should be judged against this standard. If a buyer broker occasionally renegotiates a contract with terms that work better for the buyer and broker based on special circumstances, that may be acceptable. If a buyer broker regularly tells buyer clients something like, "we'll just put a number in here as a placeholder then renegotiate a different number once we figure out how much we can get from the listing broker and/or seller" then that would likely be seen as a violation of the settlement terms.[66]

Individual brokerages are training their agents on how to modify their agreements to collect excess commission. One Texas brokerage is advising its agents that buyer representation agreements can be

---

[66] PAR Standard Forms Update 2024. It stands to reason that a state realtor association would not issue this guidance unless this was a widespread phenomenon. Even this statement, however, suggests that increasing compensation is permissible if it is done "occasionally" and based on "special circumstances." It is not clear what those circumstances would be as it concerns a broker receiving more compensation than originally contracted-for.

amended to collect additional compensation from the seller. In a video explaining the new Texas forms, a broker at ExP Realty states:

> Let's say in the Builder's contract or the Builder's form it said it was paying 5% and your buyer rep agreement says three, you can only collect 3% unless you amend your buyer agreement . . . 3% that's the most you can collect from the buyer without an amendment . . . Yeah, you want to make sure you have the amendment because anything that changes needs to be amended. . .[67]

A Louisiana realtor echoes this sentiment in explaining the new buyer representation agreement: "you're aware that we're trying to get a commission and what amount that we're trying to get, so we typically put 3% in here, and if there's anything . . . above that then *we would have to re-negotiate.*"[68]

Finally, online forums already demonstrate that realtors are tracking on modified agreements being an easy way around the NAR settlement. Consider the following comments on Reddit,[69] most of which were made just days after the settlement was announced:

> Or I guess if you have a good relationship with the buyer, you can just call the LA see what, if anything, they sellers are offering and if it's more than what the buyers agreement says, cancel that agreement and write a new one with the higher number. Lol

> If seller is offering 3% and your agreement is 2%. I imagine if your offer was accepted you'd create an addendum to change it to 3%.

> I'm from north carolina and you can update/amend a buyer agreement at any time. I suspect your state will create documents to cover these very scenarios.

> The settlement makes it quite clear that the BBA must offer a set amount; no ranges, bonuses, etc. . . . However, contracts were made to be amended and it doesn't say anything about that.

> So basically you can only get up to what you've agreed with your buyer. So if they agreed to 2% but seller is offering 3%... you are capped at the 2%. The extra % may go back to the LA or seller... depends in how their agreement is worded. Now if you're able to amend the buyer's agreement, then maybe you can get the higher amount.

> That's exactly right. Amend or you've agreed to 2%.

Below are other screenshots from Facebook of realtors discussing how they are planning to get additional compensation through a modification agreement:[70]

---

[67] https://www.youtube.com/watch?v=acJfiBWopwA.

[68] https://www.youtube.com/watch?v=kOov8eeQs08.

[69] https://www.reddit.com/r/realtors/ comments/1bt643v/buyer_rep_agreement/.

[70] These are all from a private realtor Facebook group.





**Real Estate Mastermind**
Carly Daniels · 6h · 🌐

Ex. I have a BAA with my client and they are only willing to pay me 2%, if the listing agent is offering 3%, can I collect the 3%?

👍 Like          📤 Send

😆😮❤ 14

Newest ⌄

**Abe Cadoura**
⭐ Level 1 contributor
This question doesn't make sense. If the listing agent is offering out 3 then there is no need for your buyers to pay anything The answers are even more troubling

6h  Like                                        35 👍

**Real Estate Mastermind**
Carly Daniels · 6h · 🌐

**Brian D. Perrone** ⬤
⭐ Level 1 contributor
Abe Cadoura According to the NAR settlement you can only collect what you agree to with the buyer in your buyer broker agreement whether or not it is offered by the seller.

5h   Like                              16 😆❤

**Kristina Smith Stader**
⭐ Level 1 contributor
Brian D. Perrone you are correct!

5h   Like

**Rhi Crawford**
⭐ Level 1 contributor
Brian D. Perrone unless you obtain permission from your client and initial said changes on the agreement. I just took an update ABR class and this was discussed.

24m   Like                                      1 👍



**Pam Morantez Behnken**
There's a form for that to amend the compensation. At least Coldwell Banker has a form. We have our own attorneys that write the contracts we use.

15m  Like

**Scott Fogleman**
📍 Level 2 contributor
Ask your broker, in VA Once the new rules start, the answer is no, what is listed is max compensation--however you can always agree to take less...today you can

5h   Like                                        1 👍

**Rhi Crawford**
⭐ Level 1 contributor
Scott Fogleman this is not correct. You can accept more with signed permission from your client

25m   Like

**Scott Fogleman**
📍 Level 2 contributor
Rhi Crawford our associations attorney just went over this with us. You can not accept a commission above the amount on the ba. Talk to your broker or

⭐ Level 1 contributor
If you close before the new Rines take effect you can accept anything. They have not taken effect yet. When they do take effect fill out your BAA properly to accommodate what you will only accept no matter who is paying. Get a loan officer who has a program that helps the buyer cover the commission in the worst case scenario.

52m   Like

**Trina Danley**
In our state we have a BAA Amendment - problem solved 😊.

It's the way it's always supposed to have been done really.

1h   Like                                        2 👍

**Amanda Fulford**
⭐ Level 1 contributor
Just tell the buyer that the seller has agreed to pay you and amend the BA. Recently I got 4%, a $3000 agent bonus, and a $2000 agent bonus from a seller. They were all fine with signing to update

1h   Like

27





As is clear from the above, almost everyone in the industry believes it is perfectly acceptable to have a buyer sign a modified representation agreement to allow a buyer broker to collect a fee in excess of that which was original agreed to. I believe that this is not permitted under the plain wording of the agreement and because an interpretation of the agreement to allow such modification would completely defeat the intent of the settlement.

One final point. There are various ways to modify an agreement: by signing an addendum, by signing an agreement to amend or modify, by signing a modified agreement that supersedes the original agreement, or by rescinding the original agreement and entering into a new one.[71] All of these means of adjusting compensation have the same effect and—at least as it concerns the compensation provisions—violate the requirement that a broker may not receive more compensation than agreed to in the agreement entered into prior to touring the property.

## WORKAROUND # 2: BUYER BEING ASKED TO AGREE TO SELLER-PAID BONUSES

A variation of the first workaround (which I believe is actually a breach) is found in provisions that allow the buyer's agent to collect bonuses from sellers. Apparently, there is a belief that a bonus is distinct from compensation. I do not believe this is permitted by the NAR settlement. Buyers' agents are permitted to only collect the amount listed in their buyer representation agreement, whether characterized as commission, a fee, a bonus, or anything else.

For example, the North Carolina Association of Realtors' form explicitly allows for realtors to collect bonuses "over and above" the agreed-upon commission:

> consideration for Firm's services hereunder, provided that any compensation paid by a cooperating listing firm or seller shall not exceed the amount of the Fee, unless otherwise agreed.
>
> (ii)  If Buyer purchases property where the compensation offered by the listing firm and/or seller is less than the Fee, or where no compensation is offered by either the listing firm or the seller, Buyer and Firm agree that Buyer will pay the difference between the Fee and the compensation offered unless prohibited by law.  Prior to making an offer, Firm will timely inform Buyer if the compensation offered is less than expected the Fee. Per federal regulations, a buyer obtaining a VA loan is not permitted to pay a brokerage fee or commission in connection with the services of a buyer agent, though use of a buyer agent is permitted. Firm may ~~not~~ seek compensation pursuant to paragraph 4(b)(i) if Buyer is seeking a VA loan.
>
> (iii)  If additional compensation, incentive, bonus, rebate and/or other valuable consideration over and above the Fee ("Additional Compensation") is offered to Firm through the MLS or otherwise, Buyer will permit the Firm to receive it in addition to the Fee.  Firm shall timely disclose the promise or expectation of receiving any such Additional Compensation and obtain Buyer's consent confirm the disclosure in writing before Buyer makes or accepts an offer to buy.  (Note: NCAR Form #770 may be used to confirm the disclosure and obtain consent of any such Additional Compensation)
>
> _____ (initial) Buyer understands that: (1) Firm's services are not free; (2) if listing firm or seller agree to pay Firm all or a portion of the fee, a portion of the purchase price will be paid to a listing firm who will , in turn, pay Firm as a cooperating agent as explained in ¶4(b)(i) herein; and (3) if the cooperating compensation offered is not sufficient to satisfy the Fee, then Buyer is obligated to pay the difference unless exempted by law.

> NOTE: Form 770 may be used to disclose to Buyer any potential Additional Compensation and obtain Buyer's consent to Firm. Form 220 can be used to adjust the amount of compensation offered by a listing firm in the MLS.

Consider the wording: "Firm shall timely disclose the . . . *expectation* of receiving any such Additional Compensation and obtain Buyer's consent . . ." Notably, the consent does not need to be in writing (though the broker "may" use Form 770 if they wish). This can be as simple as an agent saying, "Hey, builder has a policy of giving agents $5,000. Just wanted to let you know." I think most buyers would not object to the agent receiving a bonus from the builder so long as they were not out-of-pocket for it.

Texas forms also contemplate these bonuses:

> TEXAS REALTORS: Additional Compensation: In addition to Broker's Fee specified under Paragraph 7A, Broker is entitled to the following compensation. . . . In addition to Broker's Fee specified under Paragraph 7A, *seller, landlord, or their agent may offer Broker other compensation, such as a bonus*, if Client purchases or leases certain properties. Broker

---

[71] Some brokers apparently believe that rescinding the original agreement and signing a new one puts them on the "right side of the law" in terms of the settlement agreement.

will disclose the specific amount of other compensation offered to Broker. Broker may not receive other compensation unless authorized by Client in writing. Client authorization may be made by amending this agreement (use TXR 1505).[72]

Texas Realtors have created an amendment form that expressly allows the buyer's agent to collect bonuses:

## ▲ TEXAS REALTORS

### AMENDMENT TO BUYER/TENANT REPRESENTATION AGREEMENT

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS®, INC. IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2004201A

On or about _____, Client and Broker entered into a Buyer/Tenant Representation Agreement (the aAgreement).

Effective _____, Client and Broker amend the aAgreement as follows:

❑  A.  The "market area" in Paragraph 3G is redefined as _____
_____
_____.

❑  B.  The date the aAgreement ends specified in Paragraph 4 is changed to _____.

❑  C.  **(For TXR 1507 only)**
      (1) Brokers Obligations in Paragraph 5 is changed to ❑ Full Services or ❑ Showing Services.
      (2) Client ❑ does or ❑ does not authorize Broker to act as an intermediary under Paragraph 8.
      **Note: To change Broker's Fees, also complete Paragraph D below.**

❑  D.  **(For TXR 1501 and TXR 1507 only)** Broker's Fees in Paragraph 7A are changed to (*Complete all that apply*):

      **(1) (Purchases)** _____ **% of the sales price or $** _____.

      **(2) (Leases)** _____ **% of one month's rent or** _____ **% of all rents to be paid over the term of the lease or $** _____.

❑  E.  **(For TXR 1501 and TXR 1507 only) Bonuses and Other Compensation:** In addition to Broker's Fees listed in Paragraph 7A, Broker will receive other compensation from seller, landlord, or their agent in an amount equal to $ _____ if Client purchases or leases the following property:
      _____ (property address).

The Georgia Association of Realtors forms also allow for bonuses, and Georgia realtors are being trained to include the bonus amount in the buyer representation agreement.[73]

---

[72] On file with author.
[73] It is not entirely clear how a bonus amount would be known at the outset of the representation period.

a dual agency capacity, as that agency relationship is explained in Section B.3(b) below and in the CB01 ABCs of Agency. Buyer expressly consents to Broker acting in any other agency relationship offered by Broker.

**4. Compensation for Professional Services of Broker ("Compensation").** New title of paragraph

New **(a) Generally:** Compensation to Broker(s) is negotiable and is not set by state law. However, this does not obligate individual licensees and brokerage firms to necessarily negotiate their Compensation.

**b. Compensation to Buyer's Broker:** Buyer agrees to pay Buyer's Broker the Compensation set forth below at the closing of any Contract to Purchase (as that term is hereinafter defined)

☐ _____ percent (_____ %) of the sales price;

☐ $ _____ ;

☐ (other) _____

New **(c) Optional Compensation from Seller or Seller's Broker to Buyer's Broker:** Buyer hereby ☐ approves or ☐ disapproves Buyer's Broker receiving Compensation from Seller or Seller's Broker. Nothing herein should be interpreted as a promise by Seller or Seller's Broker to pay or offer to pay Compensation to Buyer's Broker herein.

If Buyer approves such Compensation being paid by the Seller and/or Seller's Broker to the Buyer's Broker, the maximum amount the Buyer's Broker may receive from Seller and/or Seller's Broker is as follows:

☐ _____ percent (_____ %) of the sales price;  To cover any Seller-Side offered

☐ $ _____ ;  Bonuses. DO NOT LEAVE BLANK!

☐ (other) _____  May NOT be "Open-Ended" such as

"Any Bonus offered by Seller Side

**d. Possible Reduction in Buyer's Compensation Obligation to Buyer's Broker:** Any Compensation Buyer's Broker receives from Seller or Seller's Broker shall: *[Select one. The boxes not checked shall not be a part of this Agreement.]*

☐ not reduce the Compensation Buyer shall pay to Buyer's Broker dollar for dollar;

☐ reduce the Compensation Buyer shall pay to Buyer's Broker;

The South Carolina Association of Realtors' forms[74] also refer to additional bonuses:

☐ **a. Brokerage Fee:**

Buyer will pay Broker the following **(Initial only one from Compensation Amount and One from Method of Payment for Compensation).** If Broker is offered a bonus in addition to the agreed upon amount below the Broker will provide the Buyer written notice of the bonus via an addendum to this agreement. The Broker may only accept the bonus if the Buyer agrees to sign the addendum:

**COMPENSATION AMOUNT (initial only one):**

_____ (initials) A) A Brokerage Fee of $_____ will be paid at Closing.

_____ (initials) B) A Brokerage Fee of _____ % of the purchase price or total lease price(renewable, if applicable) of any property purchased or leased by Buyer, including "For Sale by Owner" properties.

_____ (initials) C) A Brokerage Fee of _____ % of another amount and calculated by: _____

Bonuses are particularly prevalent with new-build construction. It is thought that builders do not like discounting properties because it sets a bad precedent for future sales. Instead, they often give significant bonuses to agents so that they steer their clients toward the builders' properties (something that the NAR settlement was designed to put an end to). One builder in Florida recently announced an 8% bonus for buyer agents.[75]

Brokerages and state and local realtor associations are specifically training agents on how to ensure they get these bonuses. A Texas brokerage recently explained that agents could receive bonuses exceeding the agreed commission simply by amending the agreement. He referred to this multiple times as "an escape clause":

> The long form goes on to talk about additional compensation and this is very important, so let's talk about this for a moment. Let me just explain: there's a little Catch 22 that you don't want to be caught in. The NAR settlement says that you are entitled to broker compensation through the buyer tenant representation agreement and you put that amount in the buyer tenant representation agreement just as we do

---

[74] On file with author.
[75] https://youtube.com/watch?v=2zJ5Zv0p8vI&si=emqlBjjK1bEec1er.

now. You might say 'well I want uh 3% or I want $10,000' or whatever it is. The difference is under the NAR settlement you are not permitted to earn more than the amount specified in the buyer tenant rep agreement. So for example let's say that you put 3% in there and then you take them to a new home community where they're offering a $10,000 BTSA [bonus to selling agent] or it's a a stale property and a resale listing and the seller has agreed to offer a $1500 BTSA—well too bad, so sad, you don't get that money because you're not allowed to collect more than is specified in the buyer tenant rep agreement. Now there's an escape clause and I'll cover that in just a moment

Now let's get to what is really going to come up more often: the final paragraph notice regarding bonuses and other compensation in addition to broker's fee specified under paragraph 7A … *The buyer's broker . . . may not receive other compensation unless authorized by client in writing. Client authorization may be made by amending this agreement. Okay, this is the escape clause!* You may have put 3% in there [the representation agreement] and then discovered they want to buy that new construction and *you want that doggone $10,000 BTSA. You are not locked out from receiving it just because it's not on the original agreement! You can amend the agreement to extend your compensation to whatever degree the … selling broker or the seller is offering okay. So, you can get paid, so don't ever forget that.*[76] (emphasis added).

Another Texas brokerage has said the same thing:

*What if a builder is offering a bonus? Can I accept it? Absolutely.* So, remember that the buyer's representation agreement has to be definitive in what your fee is. So if you put 3% and the Builder is offering four, you can take it. You just have to amend that . . . buyer representation agreement. Okay, so that may feel weird, . . . *Let's just get it out there -- so if a builder's offering you 4% you're entitled to that 4%, right?* You just have to amend the original buyer rep agreement. Now you may elect to give back a portion of that to your buyer if you kind of feel weird about it, because let's face it, there's not a lot of heavy lifting when it comes to new construction as much as there is with a pre-owned home. So, if you feel bad about taking that extra percent or a bonus, whatever it is, maybe you give a portion of that to the buyer in exchange for them signing the amendment.[77] (emphasis added).

And another:

[Let's say] the Builder just so happens to be generous enough to offer you a bonus or an extra percent in compensation. Can you take it if it is above and beyond 3%? And the short answer is yes, but you will need to fill out an amendment to the buyer representation agreement . . . but it is completely possible. *Agents do it all the time and that is the only way to legally get around . . . taking more than what you have [agreed to].*[78] (emphasis added).

A state association in New Mexico has said that realtors can get bonuses in excess of the amount originally agreed to just by signing an amendment:

[76] https://www.youtube.com/watch?v=WlvSaLdUucs.
[77] https://www.youtube.com/watch?v=RbV7IElG-90.
[78] https://www.youtube.com/watch?v=erAIS777xLc.

The other part is you have a term that prohibits participants from receiving compensation from any source that would make you exceed [the agreement]. And I know one of the most common questions here is "Okay I have an agreement with my buyer for compensation. But I go to a new construction build and they're offering a plus a bonus then, what your agreement with that buyer [is] sets your ceiling." But now, of course, any agreement can be amended, right?

. . .

How do we address any bonuses on the buyer broker agreement? An amendment to the buyer broker agreement after the fact, correct okay? This is this is the way I've been saying it. . . . We have an agreement on what the compensation is . . . between ourselves as the buyer broker . . . [Let's say a seller is] offering a big you . . . bonus, we now have to go back to the buyer and say, "Hey they're offering me this bonus. Can you sign this and agree to let me have that money?" Now you have to have that uncomfortable conversation with your buyer and the buyer has to agree to that. So, yes, they can agree to that, but you have to have that conversation and in writing which means the buyer's going to go "well, wait I want that money thank you[.]"[79]

In training on the new Arizona forms, a viewer asked about bonuses and the Managing Broker had this to say:

So, no, bonuses won't come into play guys. I know what you're referencing, but at the end of the day, remember it had to be specific and ascertainable and without knowing in advance what a potential bonus would be how could you possibly make that ascertainable and specifically delineated on this agreement? You couldn't, so this is potentially ill advised.

*But I will tell you how you could legally go about doing this and that is through your employment agreement addendum* . . . If you come across a property that will offer you more just right up front through the listing broker or through the seller than what you currently have in place on your buyer broker agreement you could utilize that buyer broker agreement addendum for this purpose so you could modify how much you are able to be paid based . . . That is a possibility, I started that sentence with it's ill-advised based on what we're all going through right now.[80]

The NAR settlement prohibits realtors from receiving "compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer." Bringing a buyer to a certain listing because of a bonus certainly constitutes "brokerage services"—and is exactly the sort of steering the settlement was designed to combat.

It doesn't matter what we call it: additional compensation, incentive, bonus, rebate, or other valuable consideration. If the compensation is offered by a seller or seller's broker, then it is compensation for brokerage services which is capped at the ascertainable amount specified in the buyer representation agreement.

---

[79] hhttps://www.youtube.com/watch?v=W8ewECMSZxY&t=8s (video since removed). Transcript captured from YouTube transcript feature.
[80] https://www.youtube.com/watch?v=iJ9SpiqUxys.

There is talk about new models of rendering real estate services. One such model is à la carte services provided by brokerages to tour or show properties (e.g., $50-$100 per showing or a flat-fee one-week touring contract).

Zillow's touring agreement, for instance, provides:

> No Fee for the Touring Services.
>
> (a) Buyer shall not owe or pay Broker any fee for the Touring Services.
>
> (b) If Broker is going to provide Buyer with brokerage services beyond the Touring Services, Buyer and Broker will *enter into a separate agreement for such additional brokerage services*. The fee or commission the parties agree to for those services are not set by law, are fully negotiable, and shall be documented in that agreement.[81]

A brokerage in Tennessee has also created a touring agreement with the expectation that it will be supplemented with a full representation agreement. This touring plus representation agreement is conceived as a workaround to the buyer agreement requirement in the NAR settlement, as evidenced by the heading: "How do we Solve Settlement Change #1?"[82]



Texas forms also contemplate this possibility.[83]

> On the short form, it can either be for full service or for showing services and this amendment . . . would be to change it . . . I said that I was just going to show you houses and now you want me to present an offer for you and so we're going to go with paragraph C one and we're going to change it to full services. Now I am a full service broker . . . Also, if you were going to change your fees because maybe as a showing service maybe your fee to the client is zero . . . [but] now I'm going to be your agent and I'm going to represent you and we're going to want to change . . . that

---

[81] https://www.zillowstatic.com/bedrock/app/uploads/sites/21/2024/04/Touring-Agreement-zCopyrighted-vr041124.pdf.

[82] https://www.youtube.com/watch?v=1eg0fD_uu8Y (" . . . buyer representatives must enter into a written agreement with buyers before touring a home. . . . So we're splitting this into the touring agreement that we've created . . . [and the] representation agreement. But for right now, we've got a written agreement which . . . meets the settlement requirement but it doesn't detail out all the nitty-gritty information in the buyer representation agreement . . .").

[83] https://www.youtube.com/watch?v=acJfiBWopwA.

[fee] we don't want it to be zero right? . . . [W]e're going to say whatever it is, 3%, and then for bonuses. . .[84]

These sorts of agreements seem to envision a free (or low cost) initial representation period, followed by a subsequent contract establishing the broker's right to commission for properties that have already been toured pursuant to a prior agreement.[85] In my view, the subsequent buyer representation agreement cannot provide the basis for compensation for a home that the buyer has already toured with an MLS participant.

Again, the language of the Settlement agreement reads: "58.vi. unless inconsistent with state or federal law or regulation before or during the operation of this Paragraph 58(vi) of this Settlement Agreement, require that all REALTOR® *MLS Participants working with a buyer enter into a written agreement before the buyer tours any home* with the following . . ." When Zillow or any other realtor facilitates the touring of a property for a buyer, they are "working with" that buyer. This is true even under NAR's own guidance:

> The "working with" language is intended to distinguish MLS Participants who provide brokerage services to a buyer—such as identifying potential properties, arranging for the buyer to tour a property, performing or facilitating negotiations on behalf of the buyer, presenting offers by the buyer, or other services for the buyer —from MLS Participants who simply market their services or just talk to a buyer—like at an open house or by providing an unrepresented buyer access to a house they have listed.[86]

The written agreement that governs their relationship for that toured property is the one they executed prior to the tour, even if the scope of services was limited. The realtor will not be able to collect any fees in excess of what was agreed to in that initial agreement. In other words, a realtor is limited to the amount set out in the agreement that was signed *prior to the showing*—not an amount reflected in a new buyer representation agreement entered at the time the buyer decides to submit an offer.

Any other interpretation would eviscerate the settlement agreement. Every realtor could enter into a one-month touring agreement (and keep renewing it) and then sign a formal buyer representation agreement when his or her client decided to proceed with an offer. Functionally, this would be the exact same thing as the status quo where realtors proceed without written agreements in place.

To the extent that a touring agreement is a "get to know the realtor" type-situation, it is probably fine. If a buyer signs a representation agreement after the trial period and puts an offer on a property viewed *after* that representation agreement is signed, this would be compliant with the settlement. But a full-commission buyer representation agreement cannot "relate back"[87] to the date of a touring agreement to satisfy the requirement that a written agreement spelling out compensation be signed prior to touring the property.

Even assuming I am incorrect, these touring agreements create the very real potential for brokers to take advantage of buyers. If a buyer has toured a property with a realtor pursuant to one of these free

---

[84] https://www.youtube.com/watch?v=acJfiBWopwA.

[85] https://therealdeal.com/national/2024/05/04/brokers-weigh-in-on-zillows-touring-agreements/ ("But Zillow claims the agreement is just the first step to developing an agent-client relationship, and it can be replaced with a more formal, exclusive buyer's agent agreement at any time.").

[86] https://www.nar.realtor/the-facts/nar-settlement-faqs.

[87] I am using the term as the equivalent to the civil procedure doctrine of relation-back.

or low-cost touring agreements, then he is not obligated to that realtor in any way if he wants to put an offer on the property. But the agreements are worded in such a way that a buyer will feel like he is obligated to use that broker's services—at a rate not yet agreed—if he wants to proceed with an offer.

Take Zillow's language: "If Broker is going to provide Buyer with brokerage services beyond the Touring Services, Buyer and Broker will enter into a separate agreement for such additional brokerage services. The fee or commission the parties agree to for those services are not set by law, are fully negotiable, and shall be documented in that agreement."[88] Based on this language, a buyer would expect that he was required to use the agent who showed him the property to put an offer on that property. And it is likely that an agent will tell him just that.

Frankly, the limited services written touring agreement does not make sense as currently conceived. A realtor is only obligated to have a written agreement in place if he is "working with" a buyer. If we are saying that showing a home is not "working with" a buyer, then a broker does not need a written agreement under the settlement. If showing a home is "working with" a buyer, then the touring agreement needs to set the maximum compensation rate for the broker.

WORKAROUND #4: PROVISIONS THAT GUARANTEE A MINIMUM LEVEL OF COMPENSATION UP TO A MAXIMUM

At least one state realtor association has structured its buyer representation agreements in a way that most certainly violates the NAR settlement. There seems to be a broad consensus that compensation "ranges" are not permitted in buyer representation agreements. The number needs to be clearly ascertainable and not open-ended.

The Georgia Association of Realtors has crafted a provision where the buyer agrees to a set fee ("three apples") and then they also agree that the agent can collect more money ("ten apples") from the seller or the seller's agent.

Here are the relevant forms and training materials:

# Let's Start with What Buyer Agrees To
## NOTE: AMOUNTS ARE FOR
## ILLUSTRATION ONLY

- Buyer agrees to pay Buyer's Broker 3 apples for their services
- Buyer agrees that Buyer's Broker may receive a MAXIMUM of 10 apples – i.e. up to 7 ADDITIONAL apples paid by someone other than Buyer
- Buyer agrees that ANY Number of apples paid to Buyer's Broker would be subtracted from their obligation to pay Broker 3 apples

Presentation by Dana Sparks, Qualifying Broker, Maximum One Greater Atlanta, REALTORS® – 61

[88] https://www.zillowstatic.com/bedrock/app/uploads/sites/21/2024/04/Touring-Agreement-zCopyrighted-vr041124.pdf.

# Buyer Brokerage Reflecting Above Example

Buyer expressly consents to Broker acting in any other agency relationships offered by Broker.

4. **Compensation for Professional Services of Broker ("Compensation")**.
   a. **Generally**: Compensation to Broker(s) is negotiable and is not set by state law. However, this does not obligate individual licensees and brokerage firms to necessarily negotiate their Compensation.
   b. **Compensation to Buyer's Broker**: Buyer agrees to pay Buyer's Broker the Compensation set forth below at the closing of any Contract to Purchase (as that term is hereinafter defined)
   ☒ ____3 (apples)____ percent (____%) of the sales price;
   ☐ $____
   ☐ (other) ____.
   c. **Optional Compensation from Seller or Seller's Broker to Buyer's Broker**: Buyer hereby ☒ approves or ☐ disapproves Buyer's Broker receiving Compensation from Seller or Seller's Broker. Nothing herein should be interpreted as a promise by Seller or Seller's Broker to pay or offer to pay Compensation to Buyer's Broker herein.

   If Buyer approves such Compensation being paid by the Seller and/or Seller's Broker to the Buyer's Broker, the maximum amount the Buyer's Broker may receive from Seller and/or Seller's Broker is as follows:
   ☒ ____10 (apples)____ percent (____%) of the sales price;
   ☐ $____
   ☐ (other) ____.

   d. **Possible Reduction in Buyer's Compensation Obligation to Buyer's Broker**: Any Compensation Buyer's Broker receives from Seller or Seller's Broker shall: *[Select one. The boxes not checked shall not be a part of this Agreement.]*
   ☒ reduce the Compensation Buyer shall pay to Buyer's Broker dollar for dollar,
   ☐ not reduce the Compensation Buyer shall pay to Buyer's Broker;
   ☐ special exceptions to the Compensation paid from Buyer to Buyer's Broker, as set forth below:

*FOR EXAMPLE*

*NOTE: AMOUNTS ARE FOR ILLUSTRATION ONLY*

This provision almost certainly violates the requirement that the amount of compensation be clearly ascertainable. Again, I have not been able to access the vast majority of buyer representation agreements out there. It stands to reason that this is not the only one that is structured in this way.

<u>WORKAROUND #5: BUYER BROKERS WAIVING COMMISSION</u>

Another workaround that is most certainly happening involves brokers promising orally to waive commissions that exceed the rate agreed to be paid by the seller. Here, I envision a realtor having a buyer sign a representation agreement stating that compensation is 3%, for example, but agreeing to waive collection of any amount above what the seller is offering. Essentially, this creates a no downside risk scenario—where a buyer "agrees" to pay a fee, but not really. This is no different than the scenario where a realtor proceeds without a representation agreement in place and then has the client sign a representation agreement when making an offer (when seller-paid compensation is known).

Realtor associations and private brokerages are advising that this practice is permissible. For instance, guidance offered by the Arizona Association of Realtors suggests that an agent can waive commission:

> Q9. The buyer and buyer broker agree upon compensation in the amount of 100 apples, which is documented in the Agreement to Show Property. Ultimately, the buyer purchases a property pursuant to which cooperative compensation is offered to the buyer broker in the amount of 90 apples. In this scenario, can the buyer broker accept 90 apples in cooperative compensation and waive the right to the additional 10 apples?

> A9. Yes. The parties can always revise the terms to their agreement. Best practice would be for the buyer and buyer broker to modify the "Broker Compensation" in the Buyer/Tenant Employment Agreement Addendum.[89]

---

[89] https://www.aaronline.com/2024/07/08/buyer-broker-agreement-to-show-property-frequently-asked-questions/.

A Texas brokerage explains that this is an option for agents trying to get a buyer to sign a representation agreement where they are not comfortable to committing to a number other than what a seller will pay:

> This is my price, but oh, by the way, nine out of 10 houses we're going to go see, the seller is going to pay most likely. But let's just see how it goes, so tell me, are you able to do that? Because, if not, do you want to talk through ... alternatives? Because we can do that. And one of those is . . . if the seller only pays x amount, I'll agree to take that amount[.][90]

Florida realtors are also asking about this possibility:

> So, you have your buyer broker agreement, right, you agree to Three Bananas that they're going to pay . . . So, then you . . . make your offer you include the Three Bananas within the offer and they come back and they say no but we'll do two bananas. So, at that point do you . . . then redo that form just to say [two bananas]?
>
> Yeah, I think you would amend your buyer brokerage agreement or if your buyer trusts you, you know, who cares?[91]
>
> . . .
>
> I'm one of the I guess you call stubborn people that don't go down on their commissions, I'll go up but I won't go down. So, if . . . I'm losing fruit on the table there I would rather have them sign for . . . four [percent], explaining to them "Yeah we can then alter this according to what the sellers offer."[92]

So are New Mexico realtors:

> Okay next question, I think I know the answer to this but, back to the buyer broker agreement. You can accept less [compensation] though, right? You can't accept more. But if you put x amount and someone's paying less, you can accept less without changing your agreement?[93]

And Utah realtors:

> . . . the other question that just barely came in is "well what if you're willing to reduce your brokerage fee so that it is completely offset? What would be the appropriate way to do that? [Answer] We do have an addendum to the buyer broker agreement and so that would be one way again transparently to modify brokerage fee that you were initially charging to be something else and that would be that would be perfectly fine.[94]

One (apparent) realtor on an online forum indicates that in his region, "they rewrote the Exclusive Buyer Agency Agreement [and] added an option that the purchaser is not responsible for any shortfall

---

[90] This is such a shady practice, but one that is likely to happen. The entire agreement clause in most of these buyer representation agreements will preclude the buyer from offering evidence of this promise made by the broker before the agreement was signed.

[91] https://www.youtube.com/watch?v=Sf2pbfQI4Sk.

[92] *Id.* This particular broker wants to put an inflated number in the buyer representation agreement with a notation that she would go down on her percentage commission, if necessary.

[93] hhttps://www.youtube.com/watch?v=W8ewECMSZxY&t=8s.

[94] https://www.youtube.com/watch?v=KyuvYue6Rc8&t=177s.

[if] the seller doesn't cover agreed upon compensation." He states that this direction is premised on "hoping that sellers will continue to offer a certain level of compensation."[95]


**MattW22192** · 2h ago
Agent

To be clear the seller will be offering the commission/concession not the listing broker.

I'm prepared to just have a very frank conversation similar to what I do now during my initial buyer consultation/meeting (which hopefully all buyer agents will now being doing with their potential customers/clients). Also it depends on how the agreement(s) you have access to are written. Example in my region how they rewrote the Exclusive Buyer Agency Agreement they added an option that the purchaser is not responsible for any shortfall of the seller doesn't cover the agreed upon compensation.


**MattW22192** · 33m ago
Agent

Without any extra language in the other provisions the broker would receive that amount the seller pays no matter what that is (up to the agreed upon compensation).

IMHO going that direction is the broker hoping that sellers will continue to offer a certain level of compensation or fairly easily be willing to pay it if asked in a sales contract.

⊖   ⇧ 1 ⇩   💬 Reply   🏅 Award   ↗ Share   ⋯


**pm_me_your_rate** · 20m ago

Definitely scary for the buyer agent. But I could see how this would attract more buyers.

⊖   ⇧ 1 ⇩   💬 Reply   🏅 Award   ↗ Share   ⋯

**MattW22192** · 20m ago
Agent

Agreed

⇧ 1 ⇩   💬 Reply   🏅 Award   ↗ Share   ⋯

Entering into an agreement of this sort is likely consistent with the wording of the settlement agreement. In other words, I do not think that waiving commission is a breach of the settlement agreement. A buyer enters into a representation agreement prior to touring a home, the agreement specifies a set rate of compensation, and the broker does not get more than that set rate. With that said, it certainly is not what the settlement agreement envisioned—in effect, the realtor is agreeing to be compensated at whatever amount the seller authorizes, which is what the settlement was attempting to avoid.

Waiver also raises the specter of fraud on the consumer. In these scenarios, one could imagine a buyer being told orally that their realtor will not hold them responsible for the full amount laid out in the buyer representation agreement only to have the realtor later deny saying that or tell them they plan to enforce the contract as written. There's evidence this is already happening:[96]

---

[95] https://www.reddit.com/r/RealEstate/comments/1e5igbx/buyers_agents_commission/.
[96] https://www.reddit.com/r/RealEstate/comments/1flr2x6/dispute_over_buyer_agent_fee_difference/.

← 🏢 r/RealEstate • 13 days ago
3002AMSU                                                        •••

## Dispute over buyer agent fee difference

On Monday evening, I was discussing making offer with my buyer agent. They told me not to worry about the .5% difference between what the seller has agreed to compensate the buyer's agent (2.5%) and what I had previously agreed to with my agent (3%). The agent fee was not even part of the conversation. It was their idea that they brought up. They knew that this home is at the top of my price range and that they would be making as much by accepting the 2.5% on this home as they would if they were to get the full 3% on a home more affordable to me. That sounded great to me, so on Tuesday we presented an offer that included $3k for closing costs, and it was accepted the same day. Now 3 days later, my agent says that their broker does not agree with reducing the fee to 2.5%. The broker wants me to cover the .5% difference out of the $3k in closing costs (with the rationale being that they helped negotiate it for me). Of course, in hindsight I should have waited to make the offer to have the verbal agreement with my agent fully confirmed by the broker. However, since it was the agent's idea to begin with, how was I supposed to know my agent wasn't authorized to offer the discount? If I had known they would not honor waiving the .5%, I would have asked for additional closing costs from the seller. Any advice on how to proceed?

Because most of these buyer representation agreements contain an entire agreement clause, the buyer may be foreclosed from introducing this parol evidence to prove that the broker promised to waive excess commission.

### WORKAROUND #6: PROVISIONS WHICH SEEM TO SAY THE AGENT WILL ACCEPT WHATEVER IS BEING OFFERED BY COOPERATING BROKER

One contract I have examined seems to be in direct contravention of the NAR settlement's mandate that the buyer representation agreement sets the maximum level of compensation for the buyer's agent. The contract appears to allow the buyer's agent to collect more compensation than they negotiated with the buyer.

The Western New York REIS draft buyer agreement includes a convoluted compensation section which reads:

> ❑ **(A) Commission. Buyer** shall pay Broker a commission (the "Commission") which is the greater of $ _____ or _____ % of the total purchase, exchange, option or aggregate lease price (and renewals if applicable) of any Property purchased, exchanged, optioned or leased by Buyer. This Commission shall be due upon entering into a contract or lease with the seller/exchange party/landlord or option grantor and payable upon closing of the contract of sale, exchange, exercise of option, or lease. If such contract of sale, exchange, option or lease fails to close due to default by the Buyer, this Commission shall become immediately due and payable to Broker. Broker shall use Broker's best efforts to obtain payment of the Commission from the proceeds of the transaction, but Buyer shall have the obligation to pay Broker the Commission set forth in this Agreement, if Broker does not obtain payment of such fee out of the proceeds of the transaction. If the Property is listed on the REIS MLS, any MLS or otherwise, the Broker will accept a fee or compensation equal to the fee or compensation offered to a cooperating broker, but in no event less than the amount stated above as the Commission. If such fee or compensation, or any portion thereof, is paid by the owner, seller, exchange party or landlord's agent as a convenience of the transaction or otherwise, Buyer will be credited by the Broker for the amount so paid.

The draft provision states that for MLS listed properties, the buyer's agent "will accept a fee or compensation equal to the fee or compensation offered to a cooperating broker, but in no event less than the amount stated above as the Commission." The drafting is very unclear. It is not apparent whether this means that the buyer broker will receive the same amount as the listing agent or whether the buyer broker will receive whatever amount is offered to him by the listing agent. Either way, this

allows the agent to collect *more* than the number agreed to in the buyer representation agreement, something that is not allowed under the settlement.

## WORKAROUND #7: TAILORING THE BUYER REPRESENTATION AGREEMENT TO SELLER-OFFERED COMPENSATION

Another common way of circumventing the intent of the settlement involves brokers entering into house-specific representation agreements that are tailored to the commission being offered by a particular seller.

I received an email from a realtor who told me that he is crafting "property specific agreements." He writes "Before we sign anything, I call the listing agent and get a disclosure from them regarding the compensation offered. Then tailor the agreement to that amount. If I show 3 houses I execute 3 agreements."[97]

There are also references to this practice on internet forums:[98]

bizzaroworldnow  OP · 11d ago ·

Yes, that's what bothers me. Planning on cash buy. If I say 2.5% to BA. and seller was willing to go to 3%, my BA won't make as much. I could not afford to pay BA 3% on top of all closing costs, etc.

⊖  ⬆ 1 ⬇   💬 Reply   🏅 Award   ↗ Share   ⋯

Jenikovista · 11d ago ·

Tell your agent you will sign single-house BAAs based on whatever the seller is offering.

⬆ 2 ⬇   💬 Reply   🏅 Award   ↗ Share   ⋯

These property-specific agreements are probably consistent with the wording of the settlement agreement, though I am certain they are not what the drafters intended. Under this practice, a broker could have dozens of virtually identical representation agreements with each individual buyer. The practice of matching an agreement to the compensation offered by a seller in advance also raises major concerns about steering, discussed in more detail below.

\* \* \*

I hope it is apparent that these workarounds are a widespread problem and not an isolated one-off. And what I have presented here just barely scratches the surface using what is publicly available.

All of this shows a concerted effort to allow buyer brokers to collect whatever the listing agent or seller is offering—something that is explicitly prohibited by the settlement. The point of this settlement, in part, was to decouple commission. In its simplest form, sellers pay for their agents and buyers pay for their agents. By putting the buyer on the hook for their own agent's fees, the thinking was that: (a) buyers would actively negotiate their fees, and; (b) buyer brokers would not have any incentive to steer. Given these workarounds, buyer brokers still have every incentive to steer, and commissions are not meaningfully decoupled. Any practice which continues to tie the compensation

---

[97] Email on file with author.

[98] https://www.reddit.com/r/RealEstate/comments/1fmz3t6/confusion_about_the_new_nar_rules_and_just_how/ ("Confusion about the new NAR rules and just how transparent are they? To simplify things, can a potential buyer just ask the seller's agent if the sellers are offering to pay the buyer's commission and what that percentage is? Buyer can then use that same % when they have to fill out and sign the buyer's agent agreement (which is required before they can see the house with an agent)?). Responses included "Tell your agent you will sign single-house BAAs based on whatever the seller is offering." "Yes. It's that simple."

of buyer brokers to what is offered by sellers or listing agents will continue to perpetuate steering and run afoul of antitrust laws.

## 2. Anti-Consumer Practices Post-NAR Settlement Designed to Maintain Artificially High Commissions

Many realtor organizations across the country began implementing the provisions of the settlement in the summer before the changes officially went into effect. We have several months of real-world data on current realtor practices. Apart from the workarounds, there are myriad ways that realtors have exploited the settlement to continue unlawful, anticompetitive practices that harm home sellers.

### A. CONTINUED STEERING AND UNETHICAL REALTOR PRACTICES

Industry participants are doing several interrelated things to perpetuate the system of seller-paid buyer broker compensation: refusing to take listings where the seller does not agree to compensate the buyer's broker; messaging to the seller that if they don't offer compensation, they won't get offers, and steering buyers away from properties that don't offer buyer broker compensation.

*Listing Agents Not Taking Listings Unless Seller Pays Buyer Broker Commission*

There are basically three models of compensation that are currently being used in the marketplace.

> MODEL 1: COOPERATIVE COMPENSATION. The seller agrees to pay a certain percentage which is then shared by the listing agent with the buyer's agent. This model basically preserves the status quo.

> MODEL 2: SELLER AGREES TO TWO SEPARATE COMMISSIONS. The seller will negotiate the listing agent's commission. Separately, they will specify what they want to pay the buyer's agent. This commission, in turn, is advertised as part of the marketing of the property (though of course can't be advertised on the MLS).

> MODEL 3: SELLER AGREES TO LISTING AGENT COMMISSION ONLY. The seller negotiates a commission for the listing agent. If the buyer would like the seller to contribute toward buyer agent commission, they will ask for that in the offer, and the seller can decide what they want to do.

Apparently, there may even be a fourth. One video I watched talked about a buyer broker calling a listing agent to ask what compensation was being offered. If no compensation was being offered as a blanket policy, the listing agent would then negotiate (presumably with the authorization of their seller) for the seller to pay the buyer's broker's compensation. *Then*, the buyer broker would submit an offer.

If a brokerage has adopted Model 1, there is very little room for negotiation on the part of the seller. To use that broker's services, you need to agree to pay both sides. Technically, the settlement requires that the seller "consent" to the sharing of compensation. But the agreement will be presented as take-it-or-leave it. If a brokerage has adopted Model 2, either by choice or because the law or industry rules mandate it, then the seller should be in the driver's seat. The listing agent has every right to negotiate their commission, but the seller decides whether and what to offer the buyer's agent.

I received an email message from a frustrated seller who was in a jurisdiction where realtor rules prohibited cooperative compensation. The listing agent was only permitted to negotiate their own commission. The seller's property was to be priced at close to $2 million. The seller and realtor agreed

to a 2% listing fee. The seller indicated that she did not want to offer compensation to a buyer's broker in advance, but that she was completely open to considering concessions. The realtor flat-out refused to proceed with representing her unless the seller agreed to offer at least 2% to the buyer's broker.

Here are the relevant portions of the contract the seller was asked to sign. The listing agent would not proceed unless the seller agreed to check box [b] and sign the addendum (which ironically states that "whether or not seller elects to offer compensation to the buyer's broker is solely up to the seller").

**SELLER CONCESSION**

7.  [a]  _____/_____ **PLEASE INITIAL.** OWNER does **not** wish to offer a seller's concession. *(If the parties initial [a], please proceed to section 8).*

**OR**

  [b]  _____/_____ **PLEASE INITIAL.** OWNER agrees to pay a fixed amount or percentage of the purchase price at closing, toward buyer's loan closing fees, prepaid expenses, and/or other permitted closing costs to be paid by buyer or which are ordinarily deemed a buyer's expense.

## ADDENDUM TO EXCLUSIVE RIGHT TO SELL AGREEMENT
### Seller's Offer of Compensation to Buyer's Broker

Property Address: ████████████████████████████████████

**Seller understands that commissions are not set by law and are fully negotiable.** Seller understands this offer of compensation to a Buyer's Broker is separate and in addition to the compensation offered to ██████████████ ████████████ as Listing Broker in the Exclusive Right to Sell Agreement. Seller agrees that whether or not Seller elects to offer compensation to the buyer's broker is solely up to the Seller. Seller agrees to offer compensation as follows:

Check applicable box below:

☐ Seller does not agree to offer compensation to buyer's broker at this time.

☑ Seller agrees to offer to pay buyer's broker compensation as follows:

  A.  ___2___ % of the gross sale price or $_____ to a Cooperating broker representing a buyer

  B.  ___2___ % of the gross sale price or $_____ to ████ representing a buyer in a dual agency relationship (this occurs when your listing agent and/or an agent on their team is representing you and the buyer)

  C.  ___2___ % of the gross sale price or $_____ to ████ representing a buyer in a designated dual agency relationship (this occurs when your listing agent represents you and another ████ agent besides your listing agent or an agent on their team is representing the buyer)

  D.  ___1___ % or $_____ to ████ when a buyer is unrepresented.

Here is a portion of their email exchange.[99]

Seller:      Ok can we just pull the amendment then or just put TBD in for all? Putting in specific numbers is not something I want to do, although I will say again we are more than happy to cover whatever buyer percentage the broker has agreed to with their buyers (assuming as stated before it clears our hurdle). If the buyer and their broker agreed on 1.5% I don't want to give them 2%.

---

[99] Communication on file with author to preserve the buyer's anonymity. The seller was extremely concerned she would face retaliation from realtors if this information was publicly released. The seller intends to file a complaint against the realtor once her house has sold (she has since hired a different realtor).

Reading the new rules I don't understand why a broker would not show a house when they have agreements with their clients guaranteeing them a commission if a deal closes.

Broker: *I am extremely concerned we won't get showing requests.* Before any showing occurs I will get a phone call from a broker asking if 2% is being paid out and it's their and their client's decision if they want to see it. I'm happy to discuss over the phone, *but I don't want to list your place without being able to get the most people through the door.*

Seller: But the buyer's broker agreement is with their buyer now. If their buyer has agreed to pay them less than 2% why should we make up the difference? We can of course communicate that we are open to covering the buyer's commission that they have with their client. I would prefer just to remove the amendment for now. If we market it and get no interest after two weeks then we can revisit strategy. Again our interests are to move this quickly, we aren't going to not move forward with a deal bc we have to cover a buyer's commission, even if it is more than 2%.

Broker: If a buyer has an agreement with their agent that says 1.5% then the broker is not allowed to accept more. So you would be only paying out 1.5%. Buyers have to sign agreements to see homes with their agent, *but they are being told that sellers are paying their commission. I have been on 30 calls about this and all agents here still have their sellers agreeing to pay out 2%, including [names of brokerages]. It's all over the email blasts, etc, to continue to encourage brokers to show their listings. I am sorry, but I will not list the home without the amendment as previously agreed.*

I don't think what this realtor is doing is a one-off. The realtor in question is at a top brokerage, has over 20 years of experience, is listed as one of the best agents in trade publications, and has over one hundred 5-star reviews. She says that buyers "are being told that sellers are paying their commission"; that "all agents . . . still have their sellers agreeing to pay out 2%" and "it's all over the email blasts [that sellers are offering 2%] to continue to encourage brokers to show their listings."

*Listing Agents Telling Sellers That If They Don't Offer Compensation, They Won't Get Offers*

I believe many listing agents are telling their sellers that if they don't offer compensation in advance, then they will not get offers. This, in turn, scares sellers into offering buy-side compensation.

Here is a comment by a realtor in Minnesota:

I am a broker in group B [abandoning cooperative compensation]. I do not require sellers to state a coop commission or fee within the listing agreement. When agents from group A [pro cooperative compensation] contact me I state that the seller may pay compensation and the coop comp is negotiable. Group A agents do not like our approach as 90% of them require their seller clients to sign a listing agreement that guarantees 2.7% to the coop broker. *Many of the agents unethically tell the seller that if they do not pay the 2.7 coop commission agents will not show their home. By doing so, group A has thus*

*far succeeded in ensuring that buyer agents continue to receive the 2.7% payout* and risk further action by DOJ and other authorities.[100]

Compass Realty has created "scripts" for their realtors to use to convince sellers to offer buy-side compensation in advance:[101]



**1** " As a real estate professional, one of my goals is to expose your property to the highest number of potential buyers, which will, in turn, generate the greatest number of offers. One way to do this is to ensure buyer's agents are incentivized to show their buyers your home.

**2** " Here is a list of all competitive properties to yours, and, as you can see, [nearly all] of your competition is offering a buyer's agent commission. By not offering a buyer's agent commission, you could be putting yourself at a disadvantage.

**3** " More buyers seek agent representation today than not. Would you want to alienate your biggest, best educated, and most prepared pool of prospective buyers when other sellers are offering to pay a buyer's agent commissions their listings?



**4** " Offering compensation to the buyer's agent is key to successfully marketing your home. Historically, nearly 90% of transactions have involved both a seller and a buyer broker

**5** " While ultimately the choice is yours, I believe the benefits of compensating a buyer's agent far outweigh the costs. Can I walk you through those benefits?

**6** " Offering a buyer's agent commission may get more eyeballs on your listing.



**7** " You're not required to offer a commission to a buyer's agent, but as your broker, I have a fiduciary responsibility to look out for your best interests. I would advise you that not offering any commission to your buyer's agent may have a negative effect on your listing's traffic which might ultimately affect your sales price.

**8** " Not all buyers may be able to afford to come out of their pockets to cover a buyer's agent fee so we are limiting the size of the buyer pool who will look at your property. The best way to sell your house is to have the largest audience possible.

**9** " Because buyers can only finance their home purchase - and NOT the buyer's agent fee for now - there are a lot of buyers out there who may not want to look at properties where they're responsible for their agent's fee.



**10** " Having multiple interested parties is a significant driver for a successful sale. Waiving an offer to compensate the buyer's agent, potentially reduces the number of buyers which could affect the performance of your listing.

Sellers are posting on social media about their realtors telling them that if they don't offer buyer broker compensation, they won't get offers on their house:[102]

[100] Comment to: https://www.inman.com/2024/10/01/why-are-some-agents-still-flirting-with-cooperative-compensation/.

[101] https://www.inman.com/2024/08/22/consumer-group-stop-trying-to-force-sellers-to-pay-buyer-brokers/.

[102] https://www.reddit.com/r/RealEstate/comments/1ffip29/spirit_of_the_new_law/.



**Malkovtheclown** · 21d ago ·

I was flat out told by a few agents that we won't get offers if we didn't offer to pay the buyer agent. I had to
agree to that before the offer I accepted came through. So I jacked up my asking price 7k to pay for the agent
on the buyers dime basically. Agent got paid but wasn't cash at closing for the buyer because they were doing
a VA loan. I still got my asking price but the buyer now has 7k more on their loan.

The messaging that "no one will buy your house if you don't offer to compensate the buyer broker"
has been so pervasive in the past couple of months that NAR had to put out special guidance in
September to try to put an end to it:

> **What does it mean for a REALTOR® to act in a SELLER's best interest?** A
> REALTOR® should explain to their seller the benefits and costs of the various types
> of marketing that can be done for a listing, and how potential buyers might respond to
> such marketing. A REALTOR® is ethically prohibited from telling a seller that their
> home will be hidden from buyers unless the seller pays a particular type or amount of
> compensation.
>
> **What is wrongful "steering"?** The REALTOR® Code of Ethics prohibits "steering"
> buyers toward homes because the REALTOR® will be paid more, or away from homes
> because the REALTOR® will be paid less. Similarly, the REALTOR® Code of Ethics
> prohibits a REALTOR® from telling a seller that buyers will be "steered" toward
> homes because the REALTOR® will be paid more, or away from homes because the
> REALTOR® will be paid less.[103]

This generic messaging is about as effective as shouting into a hurricane. A seller who is told that their
house will not sell if they do not offer buy-side compensation will offer buy-side compensation. And
where does that leave us? In precisely the same position we were in before the settlement with sellers
paying double commission.

Here is a screenshot from a top brokerage in Philadelphia. All the properties on this particular webpage
were offering 2.5%-3% seller-paid commission in advance:[104]

---

[103] https://www.nar.realtor/the-facts/consumer-guide-realtors-duty-to-put-client-interests-above-their-own.
[104] https://pamthistle.foxroach.com/Featured-Properties//5.



| $650,000 • ACTIVE | $375,000 • ACTIVE | $525,900 • ACTIVE | $250,000 • ACTIVE |

$650,000 • ACTIVE
20 N 3RD STREET #202
PHILADELPHIA, PA 19106
2 Beds • 2 Baths • 2064 sq ft
Buyer Broker Compensation: 2.50%

$375,000 • ACTIVE
1425 LOCUST STREET #15C
PHILADELPHIA, PA 19102
2 Beds • 3 Baths • 1560 sq ft
Buyer Broker Compensation: 3.00%

$525,900 • ACTIVE
821 MOUNTAIN STREET
PHILADELPHIA, PA 19148
3 Beds • 3 Baths • 1800 sq ft • 0.02 Acres
Buyer Broker Compensation: 2.50%

$250,000 • ACTIVE
111 S 15TH STREET #1606
PHILADELPHIA, PA 19102
1 Beds • 1 Baths • 736 sq ft
Buyer Broker Compensation: 2.50%

OPEN HOUSE OCT 20 AT 12:30PM - 2:00PM

$650,000 • ACTIVE
200 CHRISTIAN STREET #10
PHILADELPHIA, PA 19147
3 Beds • 4 Baths • 2133 sq ft
Buyer Broker Compensation: 3.00%

$109,000 • ACTIVE
2428 W LEHIGH AVENUE
PHILADELPHIA, PA 19132
4 Beds • 3 Baths • 3226 sq ft • 0.04 Acres
Buyer Broker Compensation: 2.50%

$275,000 • ACTIVE UNDER CONTRACT
1426 LOCUST STREET #330
PHILADELPHIA, PA 19102
1 Beds • 1 Baths • 736 sq ft
Buyer Broker Compensation: 3.00%

$200,000 • ACTIVE
2665 BRADDOCK STREET
PHILADELPHIA, PA 19125
3 Beds • 1 Baths • 809 sq ft • 0.02 Acres
Buyer Broker Compensation: 2.50%

To be sure, not all properties listed by this broker offered compensation in advance (it appeared like maybe half of them did). But a large number of sellers offering commission in advance will ultimately trickle down into *all* sellers offering compensation in advance.

*Buyers Are Told To "Skip" Houses That Don't Offer Guaranteed Compensation to Buyer Broker*

Buyers are being told that they should "skip" houses where the seller is not offering buyer broker compensation in advance. Certain buyer representation agreements contain a check box that allows a buyer to opt out of seeing homes unless the seller agrees in advance to compensate the buyer's agent. For instance, the New Jersey Association of Realtors' form contains a check box saying, "Do not introduce Buyer to any properties where the following conditions exist."[105] This section is intended to be used for property where the seller does not offer in advance to cover buyer broker compensation:

❏ Introduce Buyer to all properties that Buyer's Agent believes would be acceptable to Buyer regardless of the compensation being offered by the seller to Buyer's Agent.
❏ Do not introduce Buyer to any properties where the following conditions exist ____

Below are screenshots from just one post in a real estate Facebook group showing that the practice is common:

---

[105] https://www.youtube.com/watch?v=D6vvmnpBb2c ("we can check that box or you can instruct me to perhaps not show you or introduce you to any properties that the seller is not paying a two and a half percent commission for the buyer agent").

**Thomas McNamara** ⊛ Top contributor

That's exactly how I've been handling it.

Now what are you doing on your listings?

When the seller will pay is easy, what when they refuse?

13h   Like   Reply                                    2 

> **Beth Shaine Stein**
>
> Thomas McNamara you show them the buyer agency agreement and point out the part where buyers can tell their agent not to show them anything where the seller is not offering compensation.
>
> 13h   Like   Reply                              1 

**Karen Enright Foy**

My buyers are refusing to see any properties where the seller is not paying the commission...their choice.

10m   Like   Reply                                   11

**Rebecca Lee Thomas**

We have on our BBA's the option for the Buyer to say if the Seller is paying less than X%, Buyer does not want to tour the property. It is the Buyer's RIGHT to do this!!!

1w   Like   Reply                                8 

 **Shane Wise** · Follow  ⊛ Top contributor
Rebecca Lee Thomas Exactly! Opt Out clause in full effect.

**Stephanie Mascaro** ⊛ Top contributor

I let the buyer know that they will have to pay my commission and they say yes or no. If they say no we don't go to that house. Of course all is transparent and this is the choice of buyer.  Very simple. There are many many more sellers who will pay the commissions and motivated to sell their homes. A buyer is not going to want to deal or work with that kind of seller anyway.

11m   Like   Reply                                 1 

**Jason Crouch** · Follow  ⊛ Top contributor
I would take the direction from my client

This sentiment is echoed on other social media platforms:[106]



The perception is that this practice is not problematic because the buyers themselves are "self-steering."[107]

But consider what happens when this practice becomes widespread (which it already might be): buyers blackball sellers who don't offer compensation in advance and therefore sellers are compelled to offer to compensate the buyer's broker in advance. And that leads us right back to square one—with the seller covering the full cost of commissions. According to some buyers' agents, sellers are covering the commissions post-NAR settlement in 99% of cases (and are telling their clients that).[108]

---

[106] https://www.reddit.com/r/RealEstate/comments/1ffip29/spirit_of_the_new_law/.

[107] *See* https://x.com/melissasavenko/status/1843834254406643954 (attorney/realtor stating, "Not steering, IMO, if at the EXPLICIT direction of the seller.").

[108] https://www.linkedin.com/posts/shanan-hartel-king-79293b77_shananhartelking-topproducer-yourfavoriterealtor-activity-7251476679942967297-HMml/?utm_source=share&utm_medium=member_android ("CURRENTLY: All clients must sign an exclusive agreement establishing our relationship, the timeline of our exclusivity, the buy-side commission, and agree to pay the buyer's agent commission in the case that the seller is not paying. Let me explain... IN PRACTICE 99% of all listings in NY are still paying the buy-side commission. In the chance that they don't, we would simply incorporate an offer contingent on the seller paying the commission. In practice, there are simple [sic.] a few more administrative hoops to jump through to land right where we were."); https://www.linkedin.com/feed/update/urn:li:activity:7240495664713887744/?commentUrn=urn%3Ali%3Ac

***

Because of the cooperative nature of the industry, if all agents (or top agents) play by these unwritten rules, then sellers will continue to foot the bill for buyer's agents.[109]

Barbara Corcoran—one of the country's leading real estate professionals—casually observes:

> Most buyers that I have spoken with don't like the idea of having to negotiate the fee that they have to pay. But actually what happens in the end, so far, is most sellers are paying anyway. They say, cut the fee because then it'll bring the customers in. It hasn't really made much of a difference in my opinion[.][110]

One broker wrote an article for the trade publication *Inman* where he asserted:

> While some edge cases may arise where sellers question paying the buyer agent's commission, the market standard has been firmly established for decades. The vast majority of transactions will continue with sellers covering the buyer agent.
>
> These dynamics are deeply ingrained in the structure of most deals, and there's no reason to believe this will change.[111]

Another broker asserts:

> The twisted irony in the industry policy changes is that while the buyer pledges to pay commission to their agent, the seller relieves the buyer of their obligation by paying the buyer's broker directly. There's even a form now called "the seller payment to buyer's broker." Was that not the whole premise of the lawsuit to start with the claim was that the seller paid an inflated Commission because they presumed that a portion of the listing commission would ultimately be shared with the buyer agent? . . . So what is the net effect of all this? Well just some more paperwork to shuffle, and that's about it . . . it's a little more than an exercise in irony.[112]

---

omment%3A%28activity%3A7240495664713887744%2C7242857407679275008%29&dashCommentUrn=urn%3Ali%
3Afsd_comment%3A%287242857407679275008%2Curn%3Ali%3Aactivity%3A7240495664713887744%29 ("I don't
know which market you are in but here in my market in NJ majority of homes listed without BAC are sitting stale on the
market . You can't be priced above market value and then expect buyers to cough up an extra 2% on top of that!
95% of the sellers here still WANT to offer incentives to Buyer brokers to sell their homes because they see the value of
cooperating and compensating all brokers! If you're primarily looking at new developments, then there is even less to
worry about as there is no sign of them not paying buy-side commission.");
https://www.reddit.com/r/RealEstate/comments/1g5fh4a/real_estate_buyer_fees_worth_it/ ("In the end, the seller
paid the 2.5% and I did not have to write a check to the realtor. From what my realtor said, the sellers are still paying the
commissions.").

[109] https://www.tiktok.com/@oh.gaylord_/video/7415607663704198442?is_from_webapp=1 (realtor Tik Tok saying
that buyers will "never pay their own agent" and that sellers who refuse to pay are "greedy").

[110] https://www.entrepreneur.com/business-news/barbara-corcoran-nar-ruling-not-a-big-deal-so-far/480759 (quote
abbreviated for clarity).

[111] https://www.inman.com/2024/09/24/fears-of-a-widespread-commission-shift-are-unfounded-heres-why/. *See also*
Buyer-broker Commissions Remain Mostly Steady Since Aug. 17: Survey - Inman ("According to The Real Brokerage's
latest survey of 300 agents, the early answers show business has largely continued as usual with 63 percent of agents
reporting that homesellers are 'frequently' covering buyer-broker commissions.").

[112] https://www.youtube.com/watch?v=F-KtfWMpOXs. Some buyer brokers maintain that they are making more money
after the NAR settlement than before. *See e.g.* https://www.youtube.com/watch?v=lYvd7VmFcQo.

A personal finance and real estate expert is confident that the NAR settlement has not changed anything: "As a person who's now selling a condo, I can just tell you, in the real world, nothing has changed. Agents are back-channeling each other about commissions."[113]

A recent survey by a trade publication reveals that most sellers are still covering, or open to covering, buyer commissions:

> But even as seller awareness has grown, their agents have been largely successful at convincing them that taking a hardline stance could hurt their listing.
>
> - 58 percent of active home-shoppers who are also listing a home for sale said their agent advised them that declining to cover the buyer's fee might put their listing at a disadvantage.
>
> - Fewer than 11 percent of active homesellers in early October told Intel they were taking a firm stance against covering the buyer's fee.
>
> This picture largely lines up with the story told by agents themselves. . . .
>
> - Still, only 9 percent of agents say a significant share of sellers are taking a hardline approach against covering the buyer's agent fee — roughly the same share as the 11 percent who said the same the month before.
>
> In other words, sellers are heeding their agents' advice, for now. And it's limiting the impact that the new rules might otherwise have on commissions.[114]

As the above illustrates, not much has changed,[115] or will change, under the NAR settlement because realtors have found a host of ways to replicate the current system of seller-paid compensation.

### B. REALTORS EXPLOITING THE SETTLEMENT TO GET NEW BUSINESS

There are a number of realtors who are capitalizing on the confusion surrounding the NAR settlement in order to get buyer clients. For instance, realtors are routinely telling prospective buyers that there's a "new law" that "requires" buyers to have a written agreement before touring a house.[116] Statements like this play fast and loose with the truth.

An accurate statement of the settlement is that realtors working with a buyer will have to have a representation agreement in place before a buyer tours a home to be eligible to earn a buy-side commission. Thus, if a buyer tours a home (for example, at an open house) and does not have an

---

[113] https://www.checkbook.org/washington-area/consumers-notebook/articles/How-New-Rules-Could-Change-Real-Estate-Agent-Commissions-7869.

[114] https://www.inman.com/2024/10/18/majority-of-sellers-know-they-arent-on-hook-for-buyer-commission-poll/.

[115] *See* https://www.linkedin.com/search/results/content/?datePosted=%22past-week%22&keywords=%23narsettlement&sid=P_! ("Just completed 8 showings, and guess what? All properties are still offering 2.5%-3% commissions!").

[116] One Texas-based realtor writes on his blog: Do You Have to Sign a Buyer's Representation Agreement? *The short answer: Yes, you absolutely and unequivocally now have to sign one.* In accordance with new National Association of REALTORS changes, any and all home buyers must sign a buyer representation agreement before seeing one home. In addition, should you want to visit an open house that is being held by someone other than the listing agent, you too will have to sign an agreement with that agent probably covering just that home should you decide to purchase it. Long gone are the days that as a consumer, it's your right to choose whether or not to enter into an exclusive agreement with a buyer's agent and when during the process you want to sign such an agreement. https://www.robbieenglish.com/blog/do-i-have-to-sign-a-buyer-representation-agreement-before-looking-at-homes/.

existing representation agreement in place with his realtor, then that realtor will not be able to collect any commission for representing the buyer if the buyer ultimately purchases that property.

To be clear, the NAR settlement that precipitated this change does not require *the buyer* to have a representation agreement in place to view the property, put an offer on it, or purchase it.[117] If a buyer tours a property and then decides to proceed with an offer, he is presumably permitted to contact a realtor that he was not already working with to represent him with an eventual offer or purchase.[118] Alternatively, a buyer could seek out a non-realtor agent or an attorney to represent them, or proceed as an unrepresented buyer. All of this, however, will be lost on a prospective buyer, who is being told they "need" a signed agreement in place before touring a property and that it's "the law."

Statements like this, which appear all over the place, are incredibly deceptive. But the post-NAR settlement landscape creates an opportunity for unscrupulous or uninformed realtors to take advantage of buyers' ignorance and have them sign representation agreements under the guise of this being "required" or "the law."[119]

*The "Open House" Debacle*

Shortly after the settlement was announced, some realtors seized on the perceived opportunities created by the "written agreement requirement" in the NAR settlement, particularly in relation to open houses. Open houses would now be a gold mine.[120] When unrepresented buyers came in, the listing agent could get them to sign a representation agreement.[121] Like shooting fish in a barrel!

---

[117] https://www.nar.realtor/the-facts/nar-settlement-faqs#60-if-an-mls-participant-hosts-an-open-house-or-provides-access-to-a-property-on-behalf-of-the-seller-only-to-an-unrepresented-buyer-will-they-be-required-to-enter-into-a-written-agreement-with-those-buyers-touring-the-home- ("If an MLS Participant hosts an open house or provides access to a property, on behalf of the seller only, to an unrepresented buyer, will they be required to enter into a written agreement with those buyers touring the home? • No. In this case, since the MLS Participant is only working for the seller, and not the buyer, the MLS Participant does not need to enter into a written agreement with the buyer.").

[118] Whether this is permitted by the Settlement agreement is unclear. But common sense supports the proposition that a prospective buyer should not be foreclosed from representation by someone he has not been working with. Otherwise, we would be saying that anyone who ever looked at a home by themselves on a weekend before getting serious about purchasing will be forever foreclosed from obtaining realtor representation for a property they already saw.

[119] To be clear, agents soliciting buyer-clients at open houses is an open industry secret. *See, e.g.,* https://www.linkedin.com/pulse/dirty-secret-open-houses-theyre-selling-juan-carlos-garcia/; https://www.caare.org/realtor-open-houses-dont-sell-houses-detailed-version/; https://www.thisoldhouse.com/home-finances/21018372/15-secrets-no-real-estate-broker-will-tell-you; https://www.rd.com/list/real-estate-agent-secrets/. Sometimes brokerages have a "buyer agent" host open houses instead of the listing agent. This way, there is no potential dual agency or conflict of interest concerns if the prospective buyer wishes to put an offer on the house. It is win-win for the brokerage, who can double-end the deal. This practice, however, is contrary to the interests of the seller, who would expect their agent to host the open house and represent their interests. Suffice it to say that the entire practice of soliciting clients at open houses operates in an ethical gray zone.

[120] *See, e.g.,* https://www.inman.com/2024/09/11/8-tips-for-optimizing-opportunity-at-your-next-open-house/ ("The potential increase in traffic through open houses by buyers who are currently not represented by an agent should be viewed as a significant opportunity. Although there will still be agents out there who will — for whatever reason — view open houses as an obligation, those who are well prepared for the new reality and see the new reality as the opportunity it is stand to make significant gains in their businesses. . . . buyer-broker agreements are now the new reality. This means that open houses have once again become one of the best lead sources available. As stated before, in my opinion, we are going to start seeing an increase of unrepresented buyers through our opens — smart agents are going to see this for the opportunity it is and – instead of doing open houses out of obligation, start seeing them for the business building opportunities they really are.").

[121] Some realtors turn away buyers who won't sign a representation agreement. *See* https://www.facebook.com/groups/realesthumor/posts/3807874159491333/ ("I turned down 5 people from my open house yesterday because they

In June of 2024, the California Association of Realtors (CAR) drafted a listing agreement and two other documents where it readily telegraphed its "plan" to use the NAR settlement to sign up buyers at open houses and at showings. These three documents provided a roadmap of what its realtors were being allowed or encouraged to do.[122] The forms were set to be released June 24, 2024. In mid-June, I released reports criticizing both the CAR listing agreement and the CAR buyer representation agreement. Both reports were sent to the Department of Justice, who issued a "formal inquiry" into the CAR forms. Because of this, CAR delayed release of the forms, significantly revised them,[123] and released them later in the summer.[124]

The original CAR Listing Agreement (since superseded) provided the clearest roadmap on how realtors would capitalize on all the confusion to get buyers to sign representation agreements at open houses. That Listing Agreement contained a provision explicitly authorizing the seller's agent to use showings and open houses as an opportunity to solicit buyer-clients:

> Seller acknowledges that real estate brokers must have a representation agreement with a buyer before showing properties to that buyer. Seller consents to Broker entering into a Buyer Representation and Broker Compensation Agreement with a buyer, and that by doing so the brokerage company will become a dual agent representing both buyer and seller.

> UNREPRESENTED BUYERS: If a buyer interested in viewing Seller's property is not already represented by a real estate broker, and such buyer refuses to be represented by Broker . . .

The wording here was extremely telling: "If a buyer interested in viewing Seller's property . . . *refuses* to be represented by Broker, Seller authorizes Broker to obtain a signed document from such buyer refusing representation by Broker." The term "refuses" (rather than "chooses"), coupled with the "requirement" for a buyer to sign a form "refusing representation," leads one to believe that the plan was to have brokers use this as a scare tactic. Brokers would present this not as an "option" but as a quasi-requirement that needed to be explicitly rejected in writing.

Additionally, in its guidance to realtors on "Open Houses in a NAR Post-Settlement World" (since removed from the internet) CAR emphasized:

> If the visitor *refuses* to sign anything but instead only wants to look at the property, then it is advisable for the open house agent *to refrain* from providing any information about the property other than what is on the information sheet prepared by the listing agent. Engaging beyond that may lead the visitor to believe that the open house agent is acting as their agent. If the visitor asks for information beyond what is contained in

---

wouldn't sign a buyers rep agreement. This settlement has made it impossible to do business. How can I find clients besides open houses?").

[122] The other two documents were the Open House Visitor Non-Agency Disclosure and Sign-in (OHNA-SI); and the Limited Property Representation and Broker Compensation Agreement (LPRBC).

[123] In my view, the forms are still terrible from a consumer comprehension standpoint.

[124] *See* https://www.car.org/en/aboutus/mediacenter/news/narsettlement ("C.A.R. is continuing to review not just the NAR settlement but also Department of Justice (DOJ) statements to the industry, as well as feedback from our members, and this decision is being made from an abundance of caution. C.A.R. has received a formal inquiry about these forms from the DOJ, and the organization requires additional time to consider the DOJ's concerns.").

the information sheet, the open house agent should tell the visitor that *they cannot provide* such information unless the visitor is willing to sign in.[125]

This tactic of withholding information under the pretense of "we don't want the buyer to think we represent them" is designed to strongarm buyers into providing personal information to generate leads for agents.

The CAR Listing Agreement was revised so it no longer overtly spells out the suggestion that brokers use open houses and showings to solicit buyer-clients. But it still functions to pre-authorize dual agency by exploiting the confusion surrounding the settlement. CAR's Listing Agreement now states:

> (2) Showing Properties: Seller acknowledges that real estate brokers must have a written agreement in order to work with a buyer before showing properties to that buyer and that some buyers working through Broker may consider or make an offer on Seller's property. Seller consents to Broker entering into a representation agreement with a buyer, and if that buyer makes an offer on Seller's property, Broker will become a dual agent representing both that buyer and Seller.[126]

This is basically a toned-down version of the original listing agreement—where the seller allows his own broker to solicit new buyer-clients as part of representing the seller.

So, what exactly are realtors getting buyers to sign now at open houses (at least in California)?

(a) An Open House Visitor Non-Agency Disclosure and Sign-in (OHNA-SI) and/or
(b) A limited representation agreement, previously called Limited Property Representation and Broker Compensation Agreement (LPRBC) and since rebranded as Property Showing and Representation Agreement (PSA).[127]

The OHNA-SI is ostensibly a sign-in sheet, but with some added—and confusing—provisions:

> IF VISITOR WRITES AN OFFER ON THE PROPERTY through Agent, at that time Agent will disclose if Agent and Agent's Broker represent the seller exclusively or both the seller and the Visitor.

> IF VISITOR WANTS TO BE REPRESENTED BY THE AGENT HOLDING THE OPEN HOUSE Visitor should sign a representation with the Agent holding the open house such as a Property Showing and Representation Agreement (C.A.R. Form PSRA) or Buyer Representation and Broker compensation Agreement (C.A.R. Form BRBC).

The first provision will not make sense to a buyer. What does it mean to "write an offer . . . through Agent?" An unrepresented buyer may submit an offer to an agent to pass along to his seller, but this does not mean he wants the Agent to represent him. And it makes no sense that a visitor who "writes an offer" will *then subsequently learn* whether the seller's agent will operate as his agent.[128] In short, buyers will have no clue what this means.

---

[125] https://gavar.org/wp-content/uploads/2024/06/Open-Houses-in-a-NAR-Post-Settlement-World-20240603.pdf (file removed post-DOJ inquiry). Original form on file with author.
[126] The first sentence does not quite make sense.
[127] It is not clear why CAR moved from a ready-to-be-released Limited Property Representation form to a Property Showing and Representation Agreement.
[128] How can someone be your agent retroactively?

The second provision just points the buyer to different forms, which the buyer is encouraged to sign on the spot (prior to seeing the house). And if brokerages start sending buyers' agents to open houses instead of (or in addition to) the listing agent, then the OHNA-SI form makes no sense since it explicitly says that the agent at the open house is the agent of the seller.[129]

The sign-in sheet, however, is less problematic than the Property Showing and Representation Agreement. Buyers may feel pressured into signing this representation agreement based on messaging that buyers "need" to have a representation agreement in place before touring a property. Buyers will be left with the impression that they need to sign with this broker, here and now, to potentially put an offer on this property. Here is the relevant portion of the agreement:

---

**PROSPECTIVE BUYERS ATTENDING AN OPEN HOUSE WITHOUT REPRESENTATION:**
(1) You are not required to sign a representation agreement to see this Property at an open house.
(2) If you do not want the agent holding the open house to represent you, then you should not sign this form, and you should read and understand the Open House Visitor Non-Agency Disclosure and Sign-In (C.A.R Form OHNA-SI).

**ALL PROSPECTIVE BUYERS:**
(1) If you have already signed a representation agreement with another broker, you should inform Broker of the name of that other broker and provide a copy of that agreement to Broker or request Broker to obtain a copy from the other broker.
(2) If you have already signed a representation agreement with another broker, and you sign this form, you may be obligated to pay two different brokers if you purchase this Property.



PSRA 7/24 (PAGE 2 OF 3)

**PROPERTY SHOWING AND REPRESENTATION AGREEMENT (PSRA PAGE 2 OF 3)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   Feb 24

---

The practice of having buyers sign these sorts of agreements at open houses is hugely concerning.

First, the buyer will have just met the broker a couple of minutes earlier. And they will be asked to commit to some sort of ongoing relationship, involving potentially tens of thousands of dollars, with someone they do not know and who they have had no opportunity to meaningfully vet. Most states have laws allowing a consumer to cancel a $25 transaction entered into with a door-to-door salesperson;[130] yet, a commitment to pay tens of thousands of dollars entered into in a high-pressure environment would be presumptively binding.

Second, the buyer is committing themselves to less-than-ideal representation since the agent will also be the seller's agent. All things being equal, why would a buyer want to hire the agent that works for the benefit of his prospective counterparty?[131]

---

[129] To the author's knowledge, there is no legal requirement for a buyer to sign this form. The Assistant General Counsel of CAR, in response to the question, "What if . . . visitor will not sign[?]" replies: "Let them view property • Be careful how you respond (You do not want to create an implied or inadvertent agency) • You can ask them to sign later if you are having a discussion." Neil D. Kalin, CAR Assistant General Counsel and Senior Legal Advisor to CAR's Standard Forms Advisory Committee, Bay East Association of REALTORS® June 6, 2024, CAR's Residential Listing Agreement, Buyer Representation Agreement and related forms (revised June 2024).
[130]  https://www.scbar.org/public/get-legal-help/common-legal-topics/consumers-right-to-cancel-door-to-door-sales-contracts/;https://www.ohioattorneygeneral.gov/Media/Newsletters/Consumer-Advocate/April-2023/Door-to-door-sales-Know-your-rights.
[131] It would seem that soliciting buyer clients at open houses violates duties the listing agent owes to the seller. It is one thing to end up in a dual agency situation; it is another thing to actively create a dual agency situation.

Third, these agreements are all several pages long. How would a buyer be expected to read and understand all of this at an open house? It is laughable that the form says that "commissions are negotiable" (per NAR Settlement guidance). Is a visitor expected to start negotiating commissions with the agent at the open house?

Fourth, the whole process of capitalizing on buyers' fears and ignorance at an open house and having them sign an agreement they will certainly not understand is plainly wrong. Buyers who will be particularly susceptible to being convinced into signing are likely those with limited education, lower literacy skills, and those for whom English is not a first language.

All these predictions about using open houses and showings exploitatively are not just wild speculation[132] dreamed up by a law professor. They mirror the predictions of the Broker/Owner of Rise Realty, Travis Breton.[133] He believes that realtors will use these forms to "aggressive[ly]" go after clients who will be "talked into signing" even though they don't know what they are signing. In a recent YouTube video, Mr. Breton states:

> There's going to be aggressive open house agents out there trying to get visitors to sign forms like this [the Limited Property Representation and Broker Compensation Agreement].
>
> . . .
>
> I think there are going to be listing agents out there that are really going to use these forms to their benefit, get buyers to sign these forms, probably put some pressure on them to sign these forms. They may say certain things like 'It's mandated now because of the NAR settlement.' And there's going to be a lot of visitors out there that go along with that.
>
> . . .
>
> [I]f your buyer is talked into signing one of these agreements just in case they want to make an offer, maybe that's what the hosting agent's saying, 'Well in case you want to make an offer you need to sign this form.' And again the public, they don't have the knowledge of these forms like we do—and they may go ahead and just sign this form thinking 'oh yes I might make an offer on this and I need to sign this you know.' We don't know how these listing agents are going to present this form to the public so we really need to be mindful of this moving forward.
>
> . . .
>
> [A] lot of times these buyers . . . they don't they don't know what they're signing all the time. They don't read it. They just know what the agent tells them and a lot of times the agents don't tell them correct info or they present it in a way where . . . maybe they're, the buyer, is a little bit pressured to sign[.]

An accompanying PowerPoint slide reiterated the concern, albeit from the perspective of a buyer's agent who goes to an open house unaccompanied, noting that "listing agents and agents hosting open houses will most likely be aggressively pursuing these agreements with your buyers."[134]

---

[132] https://www.car.org/en/aboutus/mediacenter/news/cfarlaresponse CAR accused the author of advancing "wild speculations" about how the forms would be used. And yet, CAR's forms changed in material respects based on the author's report (Seller form: buyer broker compensation removed; concessions removed; compensation sections made clearer; open house provision modified. Buyer form: modification provision removed).

[133] https://www.youtube.com/watch?v=VGDpHtXRo7A.

[134] https://www.youtube.com/watch?v=VGDpHtXRo7A. The sentiment is corroborated by posts on Reddit. *See, e.g.,* https://www.reddit.com/r/RealEstate/comments/1df7co4/redfin_wont_book_tours_unless_we_sign_buyers/ ("There

REMINDER: Last week I mentioned that it's time to step up your game as a Buyers agent touching on the point of discontinuing the practice of not accompanying your buyers to open houses. Listing agents and agents hosting open houses will most likely be aggressively pursuing these agreements with your buyers. If your buyer is talked into signing one of these agreements just in case they want to make an offer" and you do not have an EXCLUSIVE 27 / 11.05.23 presentation agreement with them, you will most likely lose your ability to earn a

Joshua Smith, a realtor in Pheonix, Arizona claims that the NAR settlement presents a huge opportunity for listing agents to snag buyer clients. He repeatedly calls open houses post-NAR settlement "a secret weapon":

> [I want to] do a deep dive into my personal Mega open house strategy that has made me millions of dollars throughout my almost 20 year-long real estate career now and why I also believe that this is going to become a huge secret weapon once the new NAR rules take place here in August of 2024. I truly believe this is going to be a secret weapon once these NAR rulings are rolled out here in August of 2024
>
> . . . open houses are . . . a great way free to go out there and meet an abundance of now buyer clients . . . I truly believe this is going to be a secret weapon and I plan on pouring insane amounts of gasoline on this fire you know throughout these different changes.[135]

One broker says it's mandatory for agents to have buyers sign an agreement if they are hosting an open house for another brokerage:

> Do I need to do a representation agreement in an open house? There's good news and bad news here. . . . I tell you, yes, if you are hosting an open house for a listing that is not with White Rock Realty . . . Before you implode, let me kind of tell you how that's going to look. There is a short form one-pager buyer rep agreement where there's a box that says 'showing services only' and you can put zero in there and you're going to have to have one though for everyone that comes in . . .[136]

---

are two forms: Limited Property Representation and Broker Compensation Agreement (For use by an agent holding an open house or another agency giving a prospective purchaser a tour of an open house or another property) and the Open House Visitor Non-Agency Disclosure and Sign-In. *You bet your ass agents are going to lead with the first one because otherwise what's the point in hosting an open house?* If a buyer refuses to sign it then they have to sign the second one. Bottom line, like I said above, is you have to sign a form in order to view an open house.") (emphasis added). *See also* https://www.youtube.com/watch?v=D6Ejxg4fWcM (Comment: "I have had more than one agent say they will be at the door with property specific buyer agreements for people to sign at their Open Houses. Will be interesting to see how long that lasts since it's not necessary.").

[135] https://www.youtube.com/watch?v=5X1hhQ3TSBA&t=5s (Mega Open House Process That Has Made Me Millions (Secret Weapon with New NAR Rules). *See also* https://www.youtube.com/watch?v= 0rPuBN6_yX0&t=1065s (different real estate broker commenting: "The value of your open house just went through the roof. Why did the value of the open house just go through the roof because I believe somewhere around 15% of buyers are going to say I don't want to mess with buyer agency commissions, I don't want to mess with having to negotiate there's going to be a certain percentage of the population that says I don't want to mess with that what are they going to do they're going to go right to the listing agents so the good news is my listing agents just got a raise. I love that for you and for me of course and also that also means the value of the open house just went up think about it the value of your open house just went up.").

[136] https://www.youtube.com/watch?v=RbV7IElG-90. This same brokerage is also explicitly endorsing steering: "In addition to all the other conversations and caveats [with the seller] about the document, the thing[] you're going to

The South Carolina Association of Realtors also advises:

> When staffing your listing brokerage's open houses, you will explain and give a copy of SCR110 the LLR brokerage relationship form when engaging in substantive contact with a consumer entering the open house. The sooner you can convert a consumer into a client or customer under a written agreement, the more protected you will be while working with the consumer and ultimately getting paid.[137]

Most egregiously, realtors in Colorado have already tricked buyers into signing representation agreements at open houses by telling them they needed to sign certain papers for "insurance" purposes. The following letter from the Colorado Department of Regulatory Agencies chronicles what happened:

Dear Mr. Adams:

I writing to express some concerns that I have regarding inquiries and complaints that the Division of Real Estate is now receiving regarding touring agreements or compensation agreements being signed when a consumer wishes to view a property. Within the past week, we received several complaints that real estate brokers misrepresented documents to consumers as insurance related documents. The consumers were told that the documents were required to be signed to view properties. Several consumers signed the documents, thinking they addressed possible liability issues arising from damage that may occur during property showings. They later discovered that they had unwittingly signed listing agreements and are ensnared in contracts with brokers with whom they do not want to represent their interests. There appears to be growing confusion surrounding the requirements of the proposed NAR settlement and its applicability to real estate brokers in Colorado.

A real estate broker's license is not required to show property in this state. In their representation of consumers, licensed brokers are required to comply with the duties enumerated in the statutes regarding single agency and transaction brokerage. Neither single agency nor transaction brokerage require a signed agreement with a broker to view property. C.R.S. §12-10-301 states that a real estate agent or broker is entitled to a commission for finding a purchaser who is ready, willing and able to complete the purchase of real estate as proposed by the owner until the same is consummated or is defeated by the refusal or neglect of the owner to consummate the same as agreed. Requiring a consumer to sign a compensation agreement to view a property doesn't meet the criteria in the statute for when a broker is entitled to a commission, nor does it align with the performance of their licensed uniform duties. As illuminated by the example in the first paragraph, the Division has significant concerns about these agreements as they do not appear to align with our mission of consumer protection. Consumers should have the opportunity to evaluate the qualifications of a real estate professional before signing a binding agreement with a broker. I have instructed Division staff to tell inquiring consumers that Colorado law does not require a prospective buyer to sign an agreement with a real estate broker to view a property, and that the consumer is under no obligation to sign such an agreement if presented with one.

I'm bringing this to your attention because this is a potential MLS rule that if abused, may be subject the broker to license discipline. If you would like to discuss this further, please let me know.

Thank you,

*Marcia Waters*

Marcia Waters
Division Director

I am confident that things like this are happening all over the country. In fact, one of my students told me that she signed a representation agreement at an open house this summer because the realtor told her it was a "requirement" in order to see the house.

Just a few days ago, a real estate agent in California posted on Reddit that her broker sent her a "pre-filled BRBC at 2.5%" and told her that if the visitor is unrepresented, "agents are now required to get . . . the BRBC signed" before "showing around an open house."[138]

---

have to add is "You're gonna have to pay the buyer's agent Commission because [otherwise] we're going to become real good friends . . . because it's going to sit here a long time if you don't.").

[137] https://www.screaltors.org/nar-lawsuit-settlement-scr-faqs-and-resources/.

[138] https://www.reddit.com/r/realtors/comments/1g77qtv/how_to_handle_open_house_visitors/.

I am a new Realtor (SoCal) and I'm doing my first open house today.

My mentor sent me a pre-filled BRBC at 2.5% and told me this:

> As they walk in, introduce yourself, thank them for coming and ask if they are currently being represented by an agent. If yes, let them know you cannot discuss details of the home to them other than what's on the flyer and that they're required to sign in on the sign in sheet and provide their agent's name. If the answer is no then say, I'm sure you've heard about the changes going on with agents and how commission is handled but if you haven't ... agents are now required to get a document called the BRBC signed before performing any duties considered acting in real estate. This includes showing around an open house. I joke with them and say, yeah I know it's silly but before I can walk you around. I'll need you to sign this BRBC. Should you choose to buy this home ... and only this home, I'd be representing you on the purchase. You're not required to use me on any other home at any other time. It's literally just for viewing and representing on this home.

And on October 21, 2024, a prospective buyer in New Jersey asked, "Is this new real estate law being handled ethically?"[139] He describes aggressive tactics at open houses to get him to sign a representation agreement:

### Is this new real estate law being handled ethically?

I went to an open house yesterday in a new neighborhood that I'm just interested in. I heard good things about it, so I came to check it out for the first time.

We enter the home during an open house and are greeted by 2 realtors. We're asked to "sign-in", and also if we're working with anyone. I told them I was unsure since we've always had a realtor in NJ but given the circumstances of the distance (40 mins and 30 miles away) I was unsure if we we're technically represented at this point. The realtor we've worked with is a realtor we love, she sold us our first home and Is semi retired as of last year, so we are unsure, we just came to see an open house and an area to see if we would consider it. The sign in paper asks how we liked the home, which means it may be better signed at the end of the walk-thru, but anyhow.

We get a stack of papers about representation. The realtor says if we make an offer that they would be representing both buyer and seller. And that their commission is 2.5% but the seller will pay 2% so we would have to come up with the difference. She mentions something about exclusive agent and the only way she would work for us is if we signed the paper work, etc.

I watched this whole thing go down and all i could think to myself was: hey I might not like this house, I may not want to work with you as my realtor, but I just got here 2 seconds ago and I'm not even sure if I want to move to this area (a stat I told her as soon as I met her). Anyway I feel like these realtors are not doing the seller any favors here. I think they're really ruining the chances of the home being sold and for the amount it will sell for by pushing their commissions in as the most important thing, the home being second. I get the importance of disclosure but there has to be a tasteful way of doing this.

Also one more thing, if they represent the seller, could I not make an offer in represented? What exactly would they be doing earning 2.5% if I were to make an offer and it get accepted after this open house. Besides writing up the offer and letting the inspector into the home?

Needless to say we went to the next open house and almost exact same thing happened. The realtor at the open house wanted to know what time we should schedule our free consultation tomorrow to discuss her working for us.

We ran for the hills. I'm just saying, are they really doing their seller a service like this? I really don't think so. What are your thoughts?

NAR has had to put out guidance several times that buyers are permitted to attend open houses without signing a buyer representation agreement:

> **I am attending an open house without an agent. Do I need a written buyer agreement in order to tour the home?** No. If you are simply visiting an open house on your own or asking a real estate professional about their services, you do not need to sign a written buyer agreement.

---

[139] https://www.reddit.com/r/RealEstate/comments/1g8rkks/is_this_new_real_estate_law_being_handled/.

**Is an agent who is hosting an open house required to enter into written agreements with the potential buyers who attend the open house?** No. In this case, since the agent is only there at the direction of the listing broker or seller, the agent is not required to have a written agreement with the buyers touring the home.[140]

NAR would not have issued this guidance—on multiple occasions—if it were not an ongoing issue.

Any agreement signed at an open house is likely signed under something akin to economic duress and without a full understanding of what is being signed; no such agreement should be enforceable. Why would any buyer want to commit to having someone they literally just met minutes earlier represent them when there are so many choices for representation out there? And specifically, why would any buyer agree to pay thousands of dollars to an agent *for the seller* when there are so many other options out there?

All of this seems like it is an unfortunate consequence of the settlement. Buyers are very confused as to what is and is not required. And many of them will be duped into signing buyer representation agreements with a listing agent[141] without a full understanding of the implications (i.e. commission and dual agency).[142]

*The "Driveway" Debacle*

Most buyers are not familiar with the NAR settlement or even how hiring a real estate agent works. It is common to call up an agent whose name or picture pops up on Zillow or Realtor.com and "request a tour." When the agent and buyer meet at the property, the agent will have the buyer sign some "paperwork"—which includes a buyer representation agreement. The prospective buyer will not understand that they have signed an agreement that (in many cases) commits them to a long-term relationship with that agent. It is not uncommon for buyer representation agreements to last six months or a year.

Here are just a few examples of what's happening:[143]

---

[140] https://www.nar.realtor/sites/default/files/2024-09/consumer-guide-to-open-houses-written-agreements-2024-08-29.pdf.

[141] Many of these open houses are now being outsourced to "buyer's agents" from the same brokerage or from another brokerage. These agents would then pay a referral fee to the listing agent if they signed a buyer at the open house. I'm not certain why this practice is permitted. It seems like a breach of a listing agent's fiduciary obligation to their seller to allow an agent for the buyer to man the open house.

[142] Based on the psychology of consumer behavior, many of these people will not report the unethical agent. Instead, they will be embarrassed that they signed a document they shouldn't have and blame themselves for the transgression.

[143] https://www.reddit.com/r/RealEstate/comments/1fqz0ni/buyer_broker_nightmare/;
https://www.reddit.com/r/RealEstate/comments/1fv8rxf/casual_buyer_agent_made_me_sign_agreement_for/;
https://www.reddit.com/r/RealEstate/comments/1fvc6z1/buyer_beware/;
https://www.reddit.com/r/RealEstate/comments/1g679lp/realtor_wants_us_to_sign_a_contract_to_see_a_house/.



## Buyer broker nightmare

Please advise. Husband and I saw a listing for a property and wanted to jump on it. We have a friend who is a realtor, but who was unavailable when the listing popped up. We contacted the listing agent (directly, not through Zillow) and left a message (no answer). A woman named "R" from the same brokerage called us back right away and told us that listing agent "V" was out of town but that she could help us. She explained that the property was section 8 tenant occupied and difficult to get into because "the tenants were being difficult." but that she could get us in to view it the following day at 6pm. Not wanting to miss the opportunity, we agreed. She mentioned that we would need to sign some papers but that she would explain everything there.

We got there and were in the middle of unloading our 3 small children from the car when "R" handed me a clipboard and said something like "this is a formality because of the new laws- but once you sign this we're in compliance, and then I can show you the house." Given that we were there and wanted to see the house, stupid me just signed it. Turns out that was a buyer broker agreement. She never reviewed what was in it or gave us a copy of it. That night I googled "what do you sign before viewing a house" and realized what we had done.

We decided just hope for the best and move forward with this woman because we didn't want to miss out on the property.

Turns out she owns the brokerage, so she's not just the agent, and the seller/listing agent is also from her brokerage. We happen to know the seller personally, and he was on sight when we viewed the house (he had to open a large shop on the property so we could view it) and was pleased to see that we wanted it. Long story short, after a week and half of confusing back and forth, we got such a bad deal in the end that we walked away from the sale. The seller contacted us privately and was furious; explained that he was not at all happy with the way he was represented and we explained that we weren't either.



## Casual buyer, agent made me sign agreement for today only? Thoughts

Homebuyer

So, I have a family friend who has casually shown me a few houses. Until the other day, we had no agreement in place. She isn't finding listings for me. I've reached out to her to literally let me in the house as I have found them on Zillow.

She has shown me maybe 2, and then the other day before I got out of the car she handed me a buyers agreement for "today only" with her 3% in there in case I put an offer in these properties that day only. She said it was a new regulation. Is that the case?



## Buyer Beware

Homebuyer

After the recent NAR ruling took effect, many realtors are saying that it is now required that house buyers sign a buyers agreement in order to view a house. This is not true. The truth is that the buyers agreement only needs to be signed for the agent to work as your buyers agent, and essentially is your agreement to work with the buyers agent as your agent.

Read what a realtor hands to you VERY CAREFULLY before signing, especially if you only wanted to view a property and are not ready to choose a buyers agent. Realtors are passing buyers agreements off as routine paper work that is "required" to be signed in order for them to show the house.

Agents are using this paperwork to entrap potential buyers into a legally binding agreement that requires the buyer to use them as their sole and exclusive agent for a determined amount of time.



Actual-Journalist-69   OP · 12h ago ·

What sort of things should we expect in the agreement/contract? We're slated to view a home this weekend and they said we can go over at the showing.

⊖   ⇧ -1 ⇩     ⬜ Reply     ⚬ Award     ↗ Share     ···

These sorts of buyers are caught completely off-guard in a driveway (or equivalent) and told that they need to sign documents to access the house. Most of them will simply not understand what they have just committed to and will think the paperwork is just a formality. Buyers usually then blame themselves for not having been more prudent—rather than placing the blame on the realtor that tricked them into signing.

*The Bait-and-Switch and "I Can't Legally Show You the House" Debacle*

There are also buyers who reach out to the listing agent and are redirected to a buyer agent in the same brokerage. In turn, that buyer agent tries to get the buyer to sign a representation agreement so that the brokerage can sign up a new client. Alternatively, listing agents sometimes insist that they are not legally permitted to show the house without having a representation agreement in place. The amount of buyer confusion is off-the-charts.

Here are illustrative screenshots:[144]



← r/RealEstate · 2 days ago
MangoSorbet695                                                                    ...

**What to say to listing agent who claims he cannot legally show me a home without a buyers agent agreement in place?**

Today, a listing agent said, "If you call me as an unrepresented buyer interested in this property, I cannot legally show you the property without having a buyer's agent agreement in place that states I am your agent and what the buyers agent compensation will be, or you have to have your own buyer's agent." In other words, he is claiming that it is illegal for a seller's agent to show their listed property to an unrepresented buyer.

How do you get around this? We are willing to hire a real estate attorney to handle drafting the offer and any remaining documents in the transaction should our offer be accepted.

How do you explain to a listing/sellers agent that they can show you the house (as the listing agent) without being your agent?

ETA: Yes, it was the listing agent that made this comment. I am 100% certain of that. It was not an agent I clicked on through Zillow or anything like that.

---

[144] https://www.reddit.com/r/RealEstate/comments/1ftvhby/what_to_say_to_listing_agent_who_claims_he_cannot/;
https://www.reddit.com/r/RealEstate/comments/1fpzmuf/buyers_representation_when_viewing_with_a_listing/;
https://www.reddit.com/r/RealEstate/comments/1fijzx0/unrepresented_buyer_tour_agreement_with_1/



← r/RealEstate · 7 days ago
skoolie1994
···

**Buyers Representation when viewing with a listing agent. PLEASE HELP!**

In light of the recent NAR settlement. I have started finding the listing agents of properties that my wife and I are interested in and setting up showings ourselves without a buyers agent. Many of the listing agents have requested us to start signing exclusive buyers representation agreements. most for just a day (or other short period of time) or just that property. The problem arises when we see multiple properties in a week and there are multiple agreements that may accidentally overlap. Are we required to show the listing agent our buyers agreement? Can we just say that we won't be touring with a buyers agent or that we will be self representing? Research on the bills themselves from the various government is hard to find a definitive answer and personally. I take NAR "settlement 101 articles" with a grain of salt.

For context, it isn't that I disagree with all commissions for buyers agents. but I generally disagree that it should be a flat percentage of the home as was traditional before the settlement. That seems to be the wrong incentive for me as a buyer. I've participated in half a dozen real estate transactions. so at this point. buying real estate doesn't necessarily intimidate me. Has anyone come across buyers agreements that incentivize the buyers agent to work down the price or monthly payment?

TL:DR - Do you need a buyers agent agreement to see a home with a listing agent? Can I say that we will be self representing and sign an affidavit saying as much.?

EDIT: I am specifically looking at properties in IL and IN. but often this claim I need a buyers agreement is because of a "federal law"



← r/RealEstate · 17 days ago
Larothun
···

**Unrepresented Buyer - Tour Agreement with 1%?**

Hello all!

I am an unrepresented buyer looking to view a property and have read well about the new NAR rules.

For most agents. a simple No Brokerage Relationship Disclosure and / or Touring agreement has been fine. However, today I have a listing agent that is requiring me to sign a Pre-property Touring agreement with the following language: "If you wish to work with the brokerage to purchase the property, brokers compensation is as follows: 1% + a $400.00 fee".

I've told the listing agent I don't want to work with their brokerage and am looking for customary services to see the property (just to open the door lol), but he is saying he won't show the property unless I sign the 1% Touring Agreement.

EDIT: the agent I'm talking to is the listing agent. I'm not represented.

EDIT: My question is, how does this help facilitate the transaction or help the seller sell their property? Right now as it stands. the seller is loosing a potential offer because their agent is forcing me to sign a 1% touring agreement or he won't show the property.

UPDATE: After threatening to contact their broker. they sent me an updated tour agreement around midnight for the extra $400.00 if the contract closes. I signed and am seeing the house this week. Judging by the comments on this post. there is clearly a war of expectations going on. Thank you to everyone for their perspectives.

Realtors are capitalizing on buyer confusion about the industry, the various participants, and the NAR settlement to get business.

## C.  LISTING AGENTS SHUTTING OUT UNREPRESENTED BUYERS

Another unintended consequence of this settlement is that listing brokers are *de facto* forcing prospective buyers into signing a representation agreement—either with them (as discussed above) or with someone else. They will do this by refusing to show a property to, or otherwise deal with, an unrepresented buyer. The net effect is that buyers will be compelled to hire an agent, and gross commissions will remain at the standard 5-6%, with the seller likely paying both sides.

A large number of listing agents do not believe they are contractually or ethically required to facilitate showings or offers for unrepresented buyers. For instance, two realtors based in Cleveland believe it is perfectly acceptable to unilaterally decide not to show a seller's property to an unrepresented buyer:[145]

> Our legal opinion going through our attorneys is that as a listing agent we have nothing in our agreement with our sellers that we have to show buyers their house. I don't think most companies ever had it in there, "I promise to show every buyer your house . . .".
>
> If a buyer calls you as a listing agent and wants to see that house, you could have an unrepresented buyer agreement . . . and we can charge them for our services. . . . But you still work for the buyer you can charge them. What I'm telling our agents if a buyer . . . want[s] to see one of your listings and they don't want to sign it, you just say "Well, I'm sorry, go find an agent. I don't know what to tell you. It's not my agreement with the seller I have to show you. . . I think a lot of buyers are going to start learning this that before they see a house, they have to have an agent either the listing agent or someone else they have to sign something with somebody. That's the thing, you have to by the way I read it and what we're doing if you're a listing agent before you can show your own listing, you have to have them sign (outside of open houses), so. . . this is a learning curve for buyers who are thinking "I just want to see the house." Well, you can't just see a house without an agent. You got to find representation.
>
> . . . I'm really promoting out there to listing agents is not work with buy unrepresented buyers for free. You can charge them or the seller can pay you.

One South Carolina listing agent explained that she wouldn't show her seller's property without the unrepresented buyer signing an agreement: "When I show up at that house, she's going to have to sign something for me to show her that property[.]"[146]

Texas agents are also talking about this:

> [As a buyer] I'm just going to go directly to the listing agent and ask them to show me the property the listing agent has a choice. [T]hey can show that property to an unrepresented buyer . . . or they could insist that that buyer sign a buyer representation agreement. Then the listing agent would move to an intermediary situation . . . by the way, there's an opportunity there for the listing agent to double end it . . . [147]

In training on the new CAR forms, a Keller Williams broker stated:

> If the [prospective buyer is] unrepresented you have a discussion with your seller, "Mr. Seller, I'm going to have to be preparing paperwork. I'm going to have to still be coordinating inspections and doing all of this. It's more work for me. Are you going

---

[145] https://www.youtube.com/watch?v=PmYwglddA10 (noting "Our legal opinion, going through our attorneys, is that as a listing agent we have nothing in our agreement with our sellers that we have to show buyers their house. I don't think most companies ever had it in there, 'I promise to show every buyer to your house . . .'").
[146] https://www.youtube.com/watch?v=7KjS5vFvmQE.
[147] https://www.youtube.com/watch?v=WlvSaLdUucs. One Cleveland realtor envisions having prospective buyers sign these representation agreements in a driveway prior to a home showing. https://www.youtube.com/watch?v=PmYwglddA10 (discussing how to overcome these objections).

to pay me more of a commission in order to do that?" If [the seller doesn't want to do that], *and you don't want that added burden, you say to anybody who's not represented "I'm sorry, you need to get representation*[.]"[148]

There have been numerous references on social media that unrepresented buyers are being denied access to property by a listing agent and being told that they "need" to have an agent. For instance, a prospective unrepresented buyer on Twitter chronicled a situation where she was told that she "MUST" use a buyer agent. She asked whether this was, in fact, true (it is obviously not).[149] In response I wrote the following: "If you want to proceed unrepresented or with an attorney, you do not need a buyer agreement. The listing agent must show you the property on behalf of the seller—unless the seller has explicitly directed the agent otherwise." A realtor then bombarded me with tweets asking me to "show him" where it said that.[150] I pointed to the Realtor Code of Ethics, and he was not content with my response. He kept reiterating "show me where the listing agent must show an unrepresented buyer the home" and "find me a real estate commission law, or listing agreement that states the listing agent must show the house." He then claimed that it was an "asinine obligation" to put on a listing agent. When another person pointed out that this arguably falls withing the scope your duties as a listing agent, the poster responded "False" and "No, you made up the responsibility of showing the property. It is no[where] on NCREC's rules, no where in the Listing Agreement, and no where in the Code of Ethics." This realtor is part of a large national brokerage. A separate broker chimed in on the thread and claimed that it was, in part, up to the broker whether to show the property to unrepresented buyers. He surmised that he would have to charge more if he was required to open doors for people without agents. The level of ignorance, confusion, or plain ineptitude is astounding.

Certain realtor association forms are specifically dealing with the "unrepresented buyer" problem—either by the seller charging more or by having the seller authorize the listing agent not to work with them. For example, the New Mexico Association of Realtors listing agreement provides:

10. **UNREPRESENTED BUYERS. An** *Unrepresented Buyer* **is a buyer in the transaction who is not working with Broker or with any other buyer's broker in the transaction.**
   A. **Listing Broker ☐ WILL or ☐ WILL NOT** show/open the Property to Unrepresented Buyers. **Per MLS Rules, if Broker is strictly working on behalf of Seller when showing the Property; Broker is not required to have a Buyer Broker Agreement with the buyer; however, if Broker is also representing the Buyer, Broker is required to have a Buyer Broker Agreement with the buyer.**
      **IMPORTANT NOTE TO SELLER:** If Broker is *not* willing to open/show the Property for/to an Unrepresented Buyer, Seller understands that the Unrepresented Buyer will have **no access** to the Property.
      **By selecting "WILL NOT" and signing this Agreement, Seller is agreeing that Broker is NOT obligated to open/show the Property for/to an Unrepresented Buyer.**
   B. **Listing Broker ☐ WILL or ☐ WILL NOT** provide NMAR Forms to an Unrepresented Buyer. **IMPORTANT NOTE TO SELLER:** If Broker is *not* willing to provide NMAR forms to an Unrepresented Buyer, Broker will likely not be familiar with the forms used by the buyer, including, but not limited to, the offer to purchase; and unless Broker is also a licensed New Mexico attorney, Broker is prohibited by New Mexico law from providing Seller with legal advice regarding the offer/forms buyer presents. Seller will need to seek legal advice on such forms from a licensed New Mexico real estate attorney.
      **By selecting "WILL NOT" and signing this Agreement, Seller warrants they agree that Broker is NOT obligated to provide NMAR forms to an Unrepresented Buyer.**
      If Broker is willing to provide NMAR forms for use by a buyer who would not otherwise have access to NMAR forms, See – NMAR Form 1208 – Notice to Unrepresented Buyer; and NMAR Form 1208A - Use of NMAR Forms by Unrepresented Party

---

[148] https://www.youtube.com/watch?v=RiwJiLXqmOA (emphasis added).

[149] https://x.com/Live_Under_Par/status/1831409569945534974.

[150] In retrospect, I should not have engaged. I was clearly not going to convince this realtor that the concept of fiduciary duty includes taking all steps to facilitate the sale of the property.

Interestingly, the form reads "If *Broker* is **_not_** willing to provide NMAR forms to an Unrepresented Buyer" suggesting that the choice lies with the broker, not the seller.

There is much talk on social media forums that listing agents are blackballing unrepresented buyers:[151]

**Sapphyrre** · 19d ago ·

A lot of listing agents aren't working with buyers who aren't represented.

⊖   ⇧ 2 ⇩   💬 Reply   ⚗ Award   ↗ Share   ⋯

    **GlitteringExcuse5524** · 19d ago ·

    This is what is going to bite the good relators in the butt. and going to start another class action lawsuit. Brokers really should step up and put a stop to this.

    ⇧ 4 ⇩   💬 Reply   ⚗ Award   ↗ Share   ⋯

    **Previous-Grocery4827** · 19d ago ·

    That's yet more proof of a monopoly. Also. that's not representing their clients best interest. just their own.

    ⇧ 5 ⇩   💬 Reply   ⚗ Award   ↗ Share   ⋯

    ⊕ 3 more replies

    **Streani** · 16d ago ·

    A lot of brokers are getting complaints of this too because sellers are complaining they aren't showing there house to unrepresented buyers.

    This is an issue in markets that are not hot where houses are now sitting for 20+ days

    An unrepresented buyer is still likely to go grab a realtor if they want the house.

**batmanforlife** · 4mo ago

If they are open to representation. offer to represent them or refer them out if you are uncomfortable with dual agency.

If they don't want representation want to represent themselves on their offer, in my state (CA) with my brokerage, we are not allowed to work with a self-represented buyer who is not a licensed agent unless they are an attorney. The reason is because our E&O insurance would not cover such a transaction.

⊖   ⇧ 5 ⇩   💬 Reply   ↗ Share   ⋯

---

[151]    https://www.reddit.com/r/RealEstate/comments/1fg271h/slimey_agents_are_tricking_people_into_signing/; https://www.reddit.com/r/realtors/comments/1e7tk6c/sellers_are_going_to_be_constantly_bombarded_by/?sort=ne w;        https://www.reddit.com/r/realtors/comments/1buww36/if_youre_primarily_a_listing_agent_how_do_you/; https://www.reddit.com/r/RealEstate/comments/1g3qygh/it_happened_listing_agent_refused_to_show_home/.

←  r/RealEstate · 2 hr. ago
obviousgaijin   House Shopping   •••

**It happened - listing agent refused to show home**

Homebuyer

Looking to move in the next few months to an area about 2 hours from where I live now. Not using a buyer's agent. I have a pre approval letter. I'm a lawyer and this will be the fourth house my spouse and I have bought together, so I feel confident doing it myself.

I contacted two listing agents about properties to see over the weekend. One went smoothly. I let the agent know I was self-representing and there was no issue, the listing agent showed me the property.

The second listing agent sent me a buyer rep agreement. I told him he was mistaken. I wasn't interested in him dual representing me and the sellers... I was representing myself. He tried to tell me the agreement was required. I told him I'm a lawyer and no it is not. I asked if his brokerage or seller was opposed to working with self-rep buyers. He didn't answer and just canceled our showing. Does the NAR want another lawsuit? Because this is how they are going to get another lawsuit.

One seller laments, "My own agent is refusing to show my house to people who call."[152] In response, other posters chime in, making it very clear that shutting out unrepresented buyers is a common industry practice post-NAR settlement:

> It's becoming embarrassing at this point. I wish I could say it's being done maliciously, but from my experience, it's literally agents that aren't making any real attempt to be educated.

> You are attributing this to malice, but I can tell you from experience that it is simply a product of ignorance

> Here's the issue. Some agents refuse to read the changes, have not been properly taught by their brokers, did not listen to their brokers, or their brokers interpretation is wrong. It's sad all around.

> Your listing agent should be showing the house once a pre approval letter is provided and verified after a phone call to that lender. Their job is to sell your house. It should save you money if no other agent is involved. When this first popped up all I kept hearing was make sure you get the compensation agreement signed form the listing agent before showing a house- like what in the actual fuck. Just show the house and NEGOTIATE. If you can't negotiate with the seller then your buyer client pays. Just show the damn house and get to work.

> Selling agents refusing to show the home to all comers that they are supposedly working to sell was always my key piece of evidence that something was fucky in the realtor market.

> [P]lot twist: your agent understands the settlement well enough, but doesn't want to show it to unrepresented buyers to protect the realtor class. You should indeed have a honest conversation with your agent to gently remind them who they work for in this transaction. They should be showing the home to every interested buyer.

> [D]on't understand your point - agents/brokers are licensed and insured. Sellers agents typically never show the home - even when it's an open house, different agents (buyer's agents) show the home. I'm not saying sellers agents CANT show to unrepped buyers,

---

[152] https://www.reddit.com/r/RealEstate/comments/1g6bux2/new_nar_ruling_apparently_written_by_monkeys/.

but most people greatly overestimate their skills and abilities to negotiate this situation alone, and therefore it's pretty rare that these types of transactions actually close.

In any case, unrepped buyers still need to sign something to see a home so the liability angle is clearly understood by all parties.

It's clear. I'm an agent and I'm embarrassed by the agents that aren't understanding this on the list side. I would make sure any buyer is pre-approved before showing, but I do that with any buyer before showing. If the[y] are qualified, it's my job to show the home and get it sold.

It is seriously embarrassing. Real estate licensees are exposing themselves as being incompetent and not worthy of licensure.[153]

Shockingly, one agent claims that his/her brokerage—the "top brokerage in [their] county"—has a policy of not allowing unrepresented buyers to view their listings.[154]



The broker believes this is perfectly acceptable:

[153] *Id.*
[154] https://www.reddit.com/r/RealEstate/comments/1g679lp/realtor_wants_us_to_sign_a_contract_to_see_a_house/.

 **RidgetopDarlin** · 10h ago ·

A seller is free to go with another brokerage. No monopoly here.

You don't have to sign with us if you want to entertain unrepresented buyers. Go with KW or Century 21 or United Country or Fathom or EXP. They'll do it for you.

But we won't, and we don't recommend it, and we'll tell you why when you interview one of us for your listing.

We are a boutique brokerage, but we're the best in town with a long-standing reputation of integrity and success.

As a seller, it's your choice.

This is a problem that remains in the shadows (much like many of the other problems described in this objection). Who does an unrepresented buyer complain to? Who will listen? These buyers will eventually get so fed up with the hassle of trying to engage with listing agents that they will bite the bullet and hire an agent—especially because sellers are almost always covering the cost of commissions anyway.

*Realtors Scaring Buyers into Representation*

Another tactic involves scaring an unrepresented buyer into being represented. In New Mexico, here is what unrepresented buyers are "obligated" to sign:

### ⚠ ATTENTION BUYER ⚠

**IMPORTANT NOTICE TO BUYER FROM LISTING/SELLER'S BROKERAGE AND IF APPLICABLE, THE LISTING/SELLER'S BROKER'S TRANSACTION COORDINATOR, AND BUYER'S AFFIRMATION**

**<u>NO BUYER BROKER REPRESENTATION.</u>** By your signature below, you affirm the following:

- **You have represented to the Listing Broker that you do not have a Buyer's Broker; AND**
- **You have been advised by the Listing Broker/Brokerage to retain a broker to represent you in the transaction; AND**
- **Despite this advice, you have elected <u>NOT</u> to work with a buyer's broker in this transaction; AND**
- **You will be representing yourself in this transaction.**

**As such, I, as well as any transaction coordinator that I have engaged, will be working STRICTLY on behalf of the Seller throughout this transaction.**

### ⚠ATTENTION BUYER⚠

**<u>USE OF FORMS:</u>** Broker may, but is not obligated, to provide you with forms to use in this transaction. If Broker provides you with an NMAR Purchase Agreement for use in this transaction, nothing herein requires the Broker to provide you with any additional NMAR Forms. NMAR Form 1208A - Use of NMAR Forms by Unrepresented Party.

**<u>ASSISTANCE:</u>** If you require assistance, you should retain your own broker or attorney. Nothing herein precludes you from later obtaining a buyer's broker to represent you, later requesting that I, the Listing Broker, represent you (though I make no commitment herein to represent you at a later date) and/or obtaining a licensed New Mexico real estate attorney to assist you in the transaction.

**<u>SELLER COMPENSATION TO LISTING BROKERAGE.</u>** Your decision to proceed in this transaction without the representation of a broker will not automatically result in a reduction in the amount of compensation that the Seller will pay the Listing Brokerage under the Listing Agreement.

Notice all the scare tactics:

- ➤ Caution icons
- ➤ ALL CAPS AND **BOLD**
- ➤ We have advised you to get representation and "despite this advice" you "have elected NOT" to hire a broker
- ➤ We may not give you the forms you need
- ➤ You may not be saving the seller any money (with the implication being "you might as well hire an agent")

These forms are not motivated by a desire to protect an unrepresented buyer (or even protect the brokerage from liability). They are designed to scare someone into hiring a buyer's agent and keeping commissions at their current 5-6% levels.

*Imposing Barriers to Entry: Forms and Financial Disclosures*

There is also a more subtle way that listing agents are icing out unrepresented buyers: by imposing certain financial disclosure requirements on them and withholding forms.

Listing agents who agree to show their clients' properties to unrepresented buyers often require financial disclosures and documentation that they do not require of anyone else.[155] This is differential treatment of buyers depending on whether they have decided to engage the services of a realtor.

Additionally, listing agents sometimes make it difficult for buyers to submit offers. They claim the offer must be on a certain form, but then refuse to provide that form. If an offer comes on a different form (or is crafted by the buyer from scratch), they may refuse to present it or they tell their client that they are on their own in understanding and responding to the offer.

Here's a snapshot of a video posted recently about the "dangers of unrepresented buyers."[156]

> Now, where I'm very concerned about issues coming into play is when the potential buyer says, "Absolutely, I don't want any representation at all." And the listing agent says, "That's fine." But then the potential buyer says, "I want to submit an offer. I don't have a form."
>
> - **If you just give the buyer the form and help them out, especially if it's a first-time home buyer, in their mind you are representing them.**
>
> You just put on that hat. And of course, in Nevada, you can't print out those forms without your name being on the bottom of it. So, it's clear who gave the buyers the form.
>
> So just don't do it. Just say, "**If you're determined to represent yourself, that's fine. You can do that, but I can't help you represent yourself.** You either need to do it yourself, or you need to go find an agent to help you, and I strongly recommend you go find an agent to help you."
>
> So whatever form they pull off the internet might play into the fact as you're comparing those offers apples to apples. It may be very difficult to do that because **you may get a form from the unrepresented buyer that is not in compliance** with the state of Nevada. And so those offers will be much more likely to be put aside by the seller, which is another disadvantage of being an unrepresented buyer.

---

[155] https://www.robbieenglish.com/blog/path-of-the-unrepresented-buyer-what-to-expect-when-looking-at-homes/ ("Unlike buyers with representation, you'll find yourself facing additional verification steps before even setting foot in a potential dream home. Expect requests for your preapproval letter, proof of financing, and various forms of identification including photos of your driver's license and the driver's license of anyone else with you.").

[156] https://www.cresinsurance.com/cres-risk-management-webinar-the-dangers-of-unrepresented-buyers/.

. . .

They should always encourage the buyers to get representation. If the buyer flat out refuses to get representation, they should work with that buyer. But always be aware that **their cooperation and working with the buyer never ever crosses the line into actually representing the buyer.**

They're going to have to communicate and work with them, but:

- Licensees shouldn't give them forms.
- They shouldn't help them fill out the forms

In short, listing agents create artificial barriers to entry which force buyers into hiring an agent—not because they want to but because it is far less hassle (especially when they know that the sellers will likely end up paying for that agent).

*Relying on Stereotypes and Assumptions About Unrepresented Buyers*

There is a widespread belief in the industry that unrepresented buyers are difficult to work with, will tank the deal, need a lot of handholding, are just "looky-loos," and will increase the workload for the listing agent. One agent refers to them as "misfits."[157] Some of this may be true in some cases. But "unrepresented buyers" cannot be painted with the same broad brush and elbowed out of the marketplace *en masse* based on stereotypes and assumptions. Particularly now, some savvy buyers may decide that they wish to proceed alone or with the assistance of an attorney.

Additionally, some prospective homebuyers from historically disadvantaged groups might now choose to forego hiring a buyer's agent. A listing agent refusing to deal with these unrepresented buyers then enters difficult "fair housing" discrimination territory.

It is concerning that realtors are taking the position that they will not engage with unrepresented buyers. The essence of a listing agreement is that the listing agent will make every reasonable effort to sell the house. This certainly includes the obligation to facilitate showings for prospective buyers, represented or unrepresented. The fact that realtors are attempting to force a 3% surtax on a buyer who wants to proceed unrepresented is yet another way of maintaining the status quo.

D. Realtors Are Charging New Fees To Ensure That Commissions Stay High

One interesting way that realtors are looking to make up for any potential lost revenue from the NAR settlement is by charging fees to their clients that differ depending on whether there is an agent on the other side of the transaction.

Many (if not most) listing agreements provide the possibility for the realtor to charge an extra fee if the buyer is unrepresented. Usually, the number that is inserted is 1%-1.5%, which translates into thousands of dollars extra that the seller must pay solely because a buyer has chosen not to engage the services of a real estate agent. The Northern Virginia listing agreement[158] is typical:

---

[157] https://www.youtube.com/watch?v=vtRJv7phItM.
[158] On file with author.

**A. Listing Broker Compensation.** Seller will pay Broker compensation of ☐ _____% of gross sales price, **OR** ☐ $_____, **OR** ☐ _____% of gross sales price + $_____ ("Broker Compensation") if, during the term of Agreement, anyone produces a buyer ready, willing, and able to buy Property.

Broker Compensation is also earned if, within _____ days after the expiration or termination of Agreement, a contract is ratified with a ready, willing, and able buyer to whom Property had been shown during the term of Agreement; provided, however, that Broker Compensation need not be paid if a contract is ratified on Property while Property is listed with another real estate company.

**B.** ☐ **Additional Listing Broker Compensation for Unrepresented Buyer.** If anyone produces a buyer ready, willing, and able to buy Property, and such buyer is not represented by a broker at the time of ratification of the sales contract, Seller will pay Broker the following (in addition to Broker Compensation): ☐ _____% of gross sales price, **OR** ☐ $_____, **OR** ☐_____% of gross sales price + $_____.

**C. Variable Rate Compensation.** If applicable, Broker and Seller agree to variable rate compensation to be paid as follows: _____
_____.

**D.** ☐ **Listing Broker Service Fee.** Seller will pay Broker an additional flat fee of $_____ as Listing Broker Service Fee if, during the term of Agreement, anyone produces a buyer ready, willing, and able to buy Property.

**E. Retainer Fee.** Broker acknowledges receipt of a retainer fee in the amount of $_____ which ☐ **will OR** ☐ **will not** be subtracted from Compensation. The retainer fee is non-refundable and is earned when paid.

**F. Early Termination.** In the event Seller wishes to terminate Agreement prior to the end of Agreement Term, Seller will deliver written notice to terminate the Agency Relationship between the Parties. The Parties will then execute a Release of Brokerage Representation Agreement to terminate the Brokerage Relationship between the Parties. Should termination be without good cause, Seller will pay Broker $_____ as an early termination fee prior to executing

---

Note, as well, the proliferation of what has been termed "junk fees": a retainer fee and an early termination fee.

At least two buyer contracts I reviewed enabled the buyer's agent to charge an additional fee to a buyer if the seller was listing their property without an agent. This provision seems intended to discourage buyers from purchasing property from sellers who have not hired a listing agent, and ultimately serve to coerce sellers into hiring an agent to list their property.

The Pennsylvania Association of Realtors' form, for instance, includes a blank spot for agents to have buyers pay more for their services if the seller is unrepresented. This provision actually contains blank spaces for a percentage or a flat fee for a FSBO seller, *plus* an additional blank space for even more compensation.

(B) Broker's Fee, paid by Buyer to Broker, is as follows:
  1. In a purchase transaction:
    a. with a seller represented by a real estate broker (this Broker or another broker) the fee is _____% of the Purchase Price OR $_____, whichever is greater, AND $_____.
    b. with a seller who is **not** represented by a real estate broker the fee is_____% of the Purchase Price OR _____, whichever is greater, AND $_____.
  2. Advance Fee/Retainer: $_____ of Broker's Fee is earned and due (non-refundable) at signing of this Contract. This Advance Fee will be credited against any other fees stated in this paragraph unless otherwise stated here: _____
  3. Other: _____
  4. **Broker will not retain any amount greater than the Broker's Fee agreed to in Paragraph 2(B), regardless of the source.**

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2024
rev. 8/24; rel. 8/24

Additionally, this form does not seem to allow for the possibility of negotiating a discounted fee if the agent serves as a dual agent. The provision simply states that if the seller is represented (either by the

agent themselves or someone else) then x% or amount will be paid. This section also contains an extra blank for even more compensation. The point is that post-NAR settlement, there is a scramble by realtors to upcharge everywhere they can.

The Northwest MLS form[159] also allows a broker to charge more if the seller is unrepresented:

**COMPENSATION.** Buyer acknowledges that there are no standard compensation rates and the compensation in this Agreement is fully negotiable and not set by law. Firm may not receive any compensation for brokerage services provided to Buyer from any source greater than the amount set forth in this Section 5 or any subsequent amendment hereto. The compensation for Buyer Brokerage Firm's services (the "Compensation") shall be:

a. _____ % of purchase price; $_____; other: _____; or

b. If Buyer Broker is a limited dual agent and represents both Buyer and the seller, then the Compensation shall be (equal to the amount in subsection 5(a) if not filled in):

_____ % of purchase price; $_____; other: _____; or

c. If the seller is not represented by a licensed real estate firm, then the Compensation shall be (equal to the amount in subsection 5(a) if not filled in):

_____ % of purchase price; $_____; other: _____.

Thus, to the extent that the NAR settlement was supposed to lower fees for sellers (and buyers), this certainly has not happened. Instead, the industry has used the settlement as an opportunity to tack on fees based solely on whether the other side has agent representation.

In its Third Amended Class Action Complaint, Plaintiffs argued:

> Moreover, in the absence of the Adversary Commission Rule, seller brokers would likely face additional competitive pressures. That is, instead of following long-time practice of setting total commissions at or near 6% and assigning roughly half of that amount to and roughly the other half to the buyer broker commission (and selecting that amount at a level to remain in the good graces of buyer brokers), *seller brokers would set a commission to pay themselves alone and would likely begin to engage in more vigorous competition with one another to lower their rates* and/or provide additional services to justify their newly transparent rates.[160]

Not only have listing agents *not* lowered their rates since the NAR settlement as Plaintiffs predicted, but they have also increased their rates in the form of these additional charges to ensure the greatest possible compensation.

## 3. The Settlement Has Caused Mass Confusion for Sellers and Buyers

If there is anything that anyone agrees upon, it is that this settlement has caused mass confusion for both buyers and sellers.[161] One industry compliance expert says "There's gray everywhere—from

---

[159] On file with author.

[160] Third Class Action Complaint at p. 9-10.

[161] A compliance expert recently wrote an article saying that the NAR Settlement has left realtors in a "gray" zone https://www.inman.com/2024/10/01/why-are-some-agents-still-flirting-with-cooperative-compensation/ ("In the current real estate environment, these gray areas — both real and perceived — are preventing Realtors from finding certainty and achieving full compliance. While the ultimate goal should be to implement the practice changes from the National Association of Realtors' (NAR) proposed settlement in a clear, black-and-white manner to avoid non-compliance or legal scrutiny, there are still conflicting directives on what compliance with the new rules should actually look like. It's not just commentary or speculation from the peanut gallery, either. There's gray everywhere — from industry clarifications at the top to inconsistencies in multiple listing service (MLS) portals and rules, and disparities in the real estate forms being created and used by Realtors. If I were to address both questions right now, without further explanation, I'd say this: The reason some Realtors are still talking about cooperative commissions while others are questioning whether listing

industry clarifications at the top to inconsistencies in multiple listing service (MLS) portals and rules, and disparities in the real estate forms being created and used by Realtors."[162] She continues, "Put more plainly, we are not all on the same page; the gray has gotten in the way, obscuring clarity and creating confusion. It's a fog I had hoped would have lifted by now."[163]

Plaintiffs and Defendants may believe that this confusion will be worked out in time, that these are just "growing pains." I disagree. I think if this settlement is given final approval, home selling and buying will be forever changed—for the worse. I have spent about six months trying to understand the settlement, the industry, real estate practices, forms, etc. And I am confused. What hope is there for the average everyday consumer? Adding to the confusion is the fact that a large number of realtors do not themselves fully understand the settlement. How can they then be entrusted to put it into practice?

Here are just a few of the confusing things about this settlement that are enough to make your head spin:

1. The mantra is that "commissions are negotiable," but most agents will not negotiate them. Forms are presented to buyers and sellers with numbers already filled in.

2. There are at least three different models of seller-paid compensation for a buyer broker: seller pays listing agent full commission which is shared; seller pays listing agent and separately offers to pay buyer's agent; seller agrees to a concession which buyer uses to pay agent.

3. If you are a seller and you agree to a full commission which is shared, you don't get any money back if the buyer is unrepresented. If you agree to pay the buyer broker separately, you may get money back if the buyer is unrepresented.

4. Listing agents are now charging a higher fee if the buyer is not represented by an agent. Some buyer's agents charge more if the seller is not being represented by an agent.

5. Buyer brokers are not permitted to collect more than agreed to in their compensation agreement. Yet, no one seems to understand where the excess goes. The confluence of at least three different contracts[164] and a quasi-regulatory scheme makes this impossible to sort out.

6. Buyer brokers are asking clients to modify an agreement upward or to allow an agent to collect a bonus. This is a clear conflict of interest. But it is likely happening all the time with no way to monitor it.

7. Sellers are being told that they don't have to pay buyer broker compensation but if they don't, "no one will come see the house." Some agents won't take a listing unless a seller agrees to cover both commissions.

---

agreements should include provisions for buyer-broker compensation is that the narrative on effecting change remains mixed. Put more plainly, we are not all on the same page; the gray has gotten in the way, obscuring clarity and creating confusion. It's a fog I had hoped would have lifted by now. Consequently, instead of one clear process for Realtors to follow or implement, there are varying interpretations of the new practice rules, which have led to different trajectories and applications of change.").

[162] Id.

[163] Id.

[164] Buyer broker representation agreement; listing agreement; purchase and sale agreement. There may also be a fourth agreement—an agreement between brokers or between the seller and the buyer broker to cover commission.

8. On the flipside, some buyers are skipping houses if they can't be sure that a seller will pay their broker's commission.

9. Buyers are being told that they must sign representation agreements to view a house. That is not true. A listing agent may (and should) show a house as an agent of the seller.

10. Certain real estate agents are not realtors so none of this applies to them.

11. Buyers are calling up listing agents to see properties that they are listing and are either met with "I need you to sign this so I can be your agent" or they are transferred to a buyer's agent. Buyers don't understand that if they wish, they don't have to use an agent.

12. Listing agents are routinely staffing open houses with buyers' agents who tell people that the "new law" requires them to sign here and now, or they won't have representation. The new requirements are seen as an "opportunity" to build business, rather than show a property on behalf of the seller. Most sellers have no idea that their house is used as a locale for a meet-and-greet to drum up business for agents.

13. Unrepresented buyers are told that they must use certain forms to submit an offer (not true). When unrepresented buyers ask for those forms, they are told that they are proprietary, and that the listing agent is not permitted to give them to the buyer. When the buyer then uses forms from the internet or creates a document from scratch, the listing agent tells their seller that they can't advise on the offer because they are not familiar with the form.

14. Most listing agreements and buyer representation agreements are written so that you would need a law degree to understand them.[165] There are numerous provisions that are indecipherable to the average person and that would certainly catch a hapless buyer off-guard.[166]

15. State law may impose additional or different requirements.

16. No one is enforcing the rules, so it is impossible to be sure that buyers' agents are having their clients sign representation agreements as soon as they start working with them (vs. when they put an offer on a house).

---

[165] As part of a report I released in August, I reviewed nineteen different forms from the following organizations: California Association of Realtors; Texas Realtors; Florida Realtors; NC Realtors (North Carolina); New Mexico Association of Realtors; Northwest Multiple Listing Service; Colorado Real Estate Commission; Tennessee Realtors; Western New York REIS; Georgia Association of Realtors; Oklahoma Real Estate Commission; Pennsylvania Association of Realtors; Minnesota Realtors; Oregon Real Estate Forms; Northern Virginia Association of Realtors; Rhode Island Association of Realtors; Massachusetts Association of Realtors; Utah Association of Realtors; South Carolina Realtors. Since then, I have reviewed even more (and this does not include all the listing agreements I have reviewed). Most of these forms are kept under strict lock-and-key, perhaps to shield them from public scrutiny. In my concluding remarks, I stated, "The NAR Settlement has ushered in new rules and realtor practices unfamiliar to home buyers and sellers. These forms just add to the confusion and potential for exploitation. I would ask regulators and those drafting these forms: Do you think your mother or father would understand this? Would you want your son or daughter to sign these forms? If the answer to either of these questions is no, then it is time for a do-over. https://www.law.buffalo.edu/content/dam/law/content/faculty-staff/monestier-report-on-bra-post-nar-settlement.pdf.

[166] Almost all these contracts are written so that the buyer owes full commission if he breaches the representation agreement or if he breaches the purchase and sale agreement. Oftentimes, buyers breach a contract because of unfortunate life circumstances. They may lose their earnest money deposit in these circumstances. On top of that, they certainly would not contemplate having to come up out-of-pocket with cash to pay their agent for a deal that didn't happen.

Truly, the mass confusion cannot be overstated. In fact, James Dwiggins, the CEO of NextHome and leading industry podcaster, details just how much of a mess we are dealing with.

1.) Almost all MLS's aren't collecting a copy of the buyer rep agreement so nobody even knows whether agents are following the settlement rules and using them before doing a showing.

2.) Buyers are signing buyer rep agreements they don't understand at all, that are exclusive, can be one sided to the brokerage, and for lengths of time up to 6 months with little ways of getting out of them. Lawsuits will fly soon!

3.) Buyers are signing MULTIPLE buyer rep agreements because they don't know what they are signing, and agents aren't explaining them thoroughly and nobody is asking either. Imagine what's going to happen when agents/brokerages find out the buyer signed 3 of these with different companies after they bought a house.

4.) Because cooperative compensation is still occurring EVERYWHERE, and most title companies aren't asking for a copy of the buyer rep agreement, nobody is verifying what the buyer agent agreed to with their buyer as a fee and are allowed to be paid. Put another way, buyer agents are being overpaid because of cooperative compensation. They are not allowed to be paid more than what is in the buyer rep agreement.

5.) Real estate licensees (non Realtors) are not obligated to follow the settlement terms NAR agreed to because they are not an NAR member. In other words, they don't have to follow anything in the settlement, which is now causing confusion in the marketplace. Buyers are like: "why does this agent not require any of this and this other agent does."

6.) Sellers are being harmed by listing agents who continue to do cooperative compensation. Listing agents don't know what the buyer and their agent worked out for their fee, and stating a commission amount the seller is willing to pay in advance of an offer, could easily force sellers to pay more than they need to. I've already proven this is happening. Lawsuits will fly soon when sellers feel they were harmed by this practice. If you are doing this practice, get ready for more litigation!

There are so many things coming that haven't been thought through yet and are about to become huge problems.

The Texas Real Estate Commission recently had a meeting to discuss changes to the forms post-NAR settlement. The agenda was over 180 pages long![167] It was replete with comments from frustrated realtors like:

In order to provide complete transparency and clarity to consumers, TREC must act immediately to provide fields in all of their contracts (similarly to Commercial, Farm and Ranch) to state who is paying the agents and what amount. The lawsuit settlement(s) states compensation must be objectively ascertainable. Using multiple forms or addenda with different purposes and stated representation agreements is not providing the tools to meet the test of clearly identifying where the money is coming from (ie consumers) and where does it go (ie to listing agents and buyer agents.) For

---

[167] https://www.trec.texas.gov/apps/meetings/view.php?meeting_id=662 (172 pages); https://www.trec.texas.gov/apps/meetings/view.php?meeting_id=662 (11 pages).

TREC to do anything less than this would not serve the public in real estate transactions.[168]

Some variation of the word "confusing" is used 54 times in the agenda, all reflecting comments from realtors about how this is playing out in the real world.

One reporter recently delved into this confusion at the California Association of Realtors' annual convention.[169] The reporter writes:

> Despite Realtor assurances their industry is adapting smoothly to new homebuying rules, signs of hiccups, confusion and frustration surfaced last week when more than 7,000 industry professionals gathered in Long Beach for the California Association of Realtors' annual convention.
>
> Misinformation about the settlement has been rampant on social media, several convention speakers complained. One agent lamented about competitors pirating away clients at open houses.
>
> In some cases, real estate license holders appear unaware of new requirements, which took effect in mid-August, like the need for buyers to sign contracts with their brokers. Others expressed frustration over the amount of paperwork now required.
>
> . . .
>
> Although professionals need to guide consumers through this complex new process, agents are feeling "overwhelmed, exhausted, a little confused and uneasy," said Barbara Betts, chief executive of The RECollective of Long Beach.
>
> . . .
>
> Other problems include "uneducated agents" on the other side of a transaction, several agents said.
>
> "I don't think our industry has bad actors. It has people who are uninformed," said Santa Cruz County broker Robert Bailey. "And you cannot assume that your peers are getting the same education that's being offered (at your brokerage)."
>
> Tustin-based Seven Gables Real Estate received five offers without requests for buyer-agent compensation since Aug. 17, said Chief Executive Mike Hickman. Four of those offers were from agents who hadn't signed a contract with their clients.
>
> . . .
>
> At a forum with CAR legal counsel, some agents expressed frustration with all the additional paperwork.
>
> "It's too complicated. It shouldn't have to come to this," one agent said.
>
> Another agent warned about open house hosts trying to "ace" her brokerage's clients.

---

[168] *Id.* (supplement).
[169] https://www.siliconvalley.com/2024/09/30/misinformation-frustration-plague-new-home-buying-rules-realtors-say/?ref=biztoc.com.

"When people show up, (some open house hosts) say, 'Well, I'm not going to show you the house unless you sign a buyer-broker agreement with me,'" said the agent at the back of a packed meeting room. "So, if you're beginning to work with a buyer, and maybe you haven't gotten that far yet, and … they pop into an open house and they bump into that agent, now you've lost your client."

"But they can do that," said Hutchinson, the assistant general counsel.

"But it's not right," the agent shot back. "I'm just saying, watch out for it."

One broker and commissioner of a state licensing board reached out to me with the following synopsis of where things stand post-NAR settlement:

> As I mentioned, everyone is confused and it is getting worse. Teachers aren't teaching correctly, state associations continue to change things, etc. Sadly, the consumer is overly confused, appraisers don't know what to do because the prices reflected on MLS don't provide how or if compensation was paid, agents aren't returning calls, some ask for a form to be signed by the other agent prior to showing a house and won't show if not signed, and the list could go on. Fraud is terrible in [state] and I have a feeling it is about to get worse.[170]

Lawsuits are already being filed which reference the extreme confusion engendered by this settlement and how realtors are using the settlement to exploit consumers.[171]

Below, I have crafted two "fictional" conversations that I think replicate conversations that are being had every day in living rooms across this country. The conversations are intended to illustrate how an average seller or buyer would feel when inundated with all these new "rules," as interpreted through the lens of a broker trying to get their business:

### SELLER/LISTING AGENT CONVERSATION

| | |
|---|---|
| Realtor: | I'd like to list your property at $500,000. Here's a listing agreement that specifies all the other details. |
| Seller: | OK, $500,000 seems like a good number. I see here in the commission section that you charge 6%. It's already filled in. But, up top here, there's a notice saying, "commissions are fully negotiable." So, would it be possible to agree on 5% instead? |
| Realtor: | No, my brokerage's policy is that we have a 6% minimum. I can't go lower than that. |
| Seller: | I see. So, it's not really "negotiable" is it? |

---

[170] Email dated 10/15/2024 on file with author.

[171] HardyvNAR_COMPLAINT_08122024_searchable.pdf, available through https://www.inman.com/2024/08/12/ michigan-agents-and-brokers-sue-nar-due-to-antitrust-settlement/ ("These claims are predicated in part on the recent settlement by the NAR of a national class action lawsuit which eliminated the broker's compensation transparency for buyers and restrained sellers' choice by prohibiting sellers from making offers of compensation though the MLS essentially inviting Brokers and agents to participate in deceptive compensation practices, a requirement which Plaintiffs neither agree with nor believe will benefit the consumers or their industry. . . . Further, while NAR and MLS have argued that the removal of this information is for the benefit of the consumer, Plaintiffs believe it is contrary thereto and invites side negotiations, disharmony among agents and brokers and confusion for the consuming public and even allows for individual and potentially discriminatory pricing per buyer which is a fair housing violation."). *See also* https://www.inman.com/2024/10/21/broker-files-multimillion-dollar-suit-over-forced-nar-membership/.

| Realtor: | Well, it is. It's just that we *personally* are not required to negotiate. |
|---|---|
| Seller: | OK, I'm not sure I understand. But I do want to get into exactly how this works. In this contract, it says you get 3.5% and the buyer's agent gets 2.5%. I'd rather split it 50-50. Can we change the percentages? |
| Realtor: | No. Again, brokerage policy. |
| Seller: | Well, what happens if there is no buyer's agent on the other side. Do I get the 2.5% back? |
| Realtor: | No, it doesn't work that way. There are two things that could happen here. Either I could represent the buyer and collect the 2.5% that way. Or, the buyer could proceed unrepresented, and I'd get the full 6%. |
| Seller: | Why would I want you to represent the buyer? And why would you get the full 6% when your share was supposed to be 3.5%? |
| Realtor: | Because that's the way the contract is drafted. It's just how it's done. |
| Seller: | I talked to a different agent last week and he explained it differently. His form had me separately designate a number to offer the buyer's agent. It was my choice and different from the compensation I would pay to him. |
| Realtor: | Yeah, some brokerages do it that way. It's basically the same thing. |
| Seller: | But not really. Based on what you're saying, I owe you 6% no matter what. With the other agent's contract, I might end up owing only 3% if there's no buyer's agent on the other side. That's $15,000—it's a big difference. Or, based on this "NAR Settlement" I keep hearing about, if the buyer's agent has agreed to less than 3%, then I can get back some of my money. Like if the buyer's agent has agreed to 2%, I can at least get that 1% back--$5000. |
| Realtor: | Probably not. I think under the new law, the buyer is just going to get the money instead of their agent. Or the buyer and seller will just modify their 2% agreement up to a 3% agreement, so you'd owe the whole thing. |
| Seller: | They can't do that, can they? |
| Realtor: | For sure they can. They are training us on how to do it and even created forms for us. |
| Seller: | But what if I don't want to offer anything to the buyer's agent right now. I just want to see how things shake out. I'm not against it. I just don't want to throw away $15,000 for nothing. |
| Realtor: | That's a terrible way to look at it. If you don't offer something up front, buyers just won't come to your house or make an offer on it. Buyers want to know up front that their agent costs are covered. |
| Seller: | I'm so confused. I thought the lawsuit was all about preventing steering. Why would buyers be steered away from my house if their agents are going to be paid. |

| | |
|---|---|
| Realtor: | Oh, it's not agent steering now. It's the buyers steering themselves. Since they know they will be on the hook, they would prefer to skip out on properties where they don't know for sure in advance if they'd have to pay. |
| Seller: | But don't their agents tell them they can just ask to have commission covered in an offer? |
| Realtor: | Too much hassle. Easier to skip the house entirely. Plus, if a seller doesn't offer commission up front, it shows that you're difficult to work with. I watched a TikTok a couple of days ago that used a great expression—it shows you're not willing to "play ball." |
| Seller: | So how am I any better off after the settlement than before? |
| Realtor: | You're not. It's basically just the same thing. Just more paperwork for us. The industry has just adapted to the new normal. Buyers' agents are very important to the process and everyone recognizes that they should be paid. |
| Seller: | Wow. This is a lot to process. I'd like to take some time to read through the contract. If I have questions or concerns about it, can I ask you? |
| Realtor: | I'm not a lawyer, so I could try to explain. But best to consult a lawyer if you want legal advice. |
| Seller: | Does that mean you'd be open to any changes—aside from compensation, which you said was non-negotiable—if my lawyer sees something that worries him? |
| Realtor: | Oh, no. We can't change the forms. You have to sign as is. |
| Seller: | Well, that makes no sense. So, the commission is non-negotiable. The terms are non-negotiable. So, what is negotiable? |
| Realtor: | Well, the length of the contract is negotiable—we normally do 3 months, but I can do 2. And the geographic area is negotiable. You get to pick where we are going to be looking. |
| Seller: | Let me get this straight. If I go with you, I have to pay 6%, no matter what. I can't change any actual terms or conditions. You might end up representing the person who buys the house (it says that right here in the contract). And I can't cancel this contract if I'm not satisfied. Do I have that right? |
| Realtor: | Yes. And there's also a $575 administrative fee that you'd have to pay today. |

BROKER/BUYER CONVERSATION

| | |
|---|---|
| Realtor: | [Finishes buyer presentation showing his "value proposition" and giving the buyer a five-page, single-spaced agreement to sign.] |
| Buyer: | What's this? |
| Realtor: | It's an agreement that lays out the specifics of our relationship. It is intended to protect you and to protect me. It lays out my compensation and all the other terms of our agreement. |

| | |
|---|---|
| Buyer: | Your compensation? I have to pay you to be my realtor? I thought the seller paid—that's was how it worked last time I bought a house. |
| Realtor: | Well, there's a new law in effect that says buyers have to sign agreements. Or you won't be able to see a house. But don't worry, sellers will still likely end up covering my commission. In 99% of deals I have done since the law came into effect, the buyer wasn't on the hook for commission. |
| Buyer: | [Looking at agreement] Here is says I owe you 3% commission. That's $15,000 on a $500,000 house. I don't have that kind of money. |
| Realtor: | Totally understand. Like I said, chances are the seller will cover the cost of my commission, so you don't need to worry about it. And if they are not offering to cover my commission up front, we can just ask them to cover it in an offer. It's called a concession. |
| Buyer: | [skeptical] But this says I *might* be on the hook, right? |
| Realtor: | Theoretically, yes. But, listen, if the seller is offering 2.5%, I'm not going to come after you for the extra 0.5%. And almost every seller out there knows that to attract buyers like you, they need to offer between 2-3%. Plus, if they are not offering compensation, we can just put it in the offer. |
| Buyer: | I don't know about this. Can we just limit our search to properties where we know for sure the seller will pay? I would hate to get my heart set on a property and then the seller doesn't pay for your commission—and I can't buy the house. |
| Realtor: | Absolutely. I will only show you properties where the seller is offering at least 2.5% commission. |
| Buyer: | [pausing] Even so, I just feel weird signing an agreement and committing to paying so much money. It makes me uncomfortable. Are there any other options for me? Like could I just pay you on a per showing basis? |
| Realtor: | No, I don't do that. But I understand your discomfort. There's another way we can do this. Why don't we put 0.5 or 1% in here [pointing to commission rate in contract]—a really low number. Just so you feel comfortable. And then once we know what the seller is offering, we can change it. We have forms for that. |
| Buyer: | Yes, I'm much more comfortable with that. |
| Realtor: | And you mentioned you might be interested in a new-build property. A lot of those builders offer realtor bonuses. So, if you end up going with one of those, we will also have to amend the agreement—but my policy is to rebate half the bonus to you! So, it's totally win-win. |
| Buyer: | Wow, thank you. This is so much better than the meeting I had with another agent last week. He does it totally differently. He basically says he puts 4% in the contract to cover his basis, but he will waive it if the seller isn't offering that. I guess it's the same thing, but I feel way more comfortable with your approach. |
| Realtor: | There are different ways to do it. We're all adapting. Basically, it's still the old system, but done a little differently. |

| Buyer: | One last question because you've been so helpful. It's kind of awkward, but do you think it would be possible for a buyer who knows what they want to just proceed without a realtor? I don't mean that as a reflection of you and what you bring to the table. But I guess I'm thinking that an extra 3% could help my offer be more competitive. |
|---|---|
| Realtor: | I understand the thinking and it makes total sense, but only in theory. The thing is, listing agents will not deal with what we called "unrepresented buyers." It's too much of a hassle and a risk. If you call them up for a showing, they are going to stonewall you—that is, if they even respond. And here's the thing nobody knows about: being unrepresented doesn't mean that the seller gets to keep the extra 3% and therefore your offer is more competitive. Instead, the listing agent is going to pocket the full 6% in a lot of cases. So, what I'm saying is that if the seller is going to be paying 6% anyway, you might as well have 3% go towards an independent fiduciary for you. It's a no-brainer. |
| Buyer: | So, you are my fiduciary only? That means you don't represent sellers? |
| Realtor: | Oh, I represent sellers too. If you are interested in one of my listings, then I'll act for both of you. See, it says so here in the "Advance Consent to Dual Agency." |
| Buyer: | Hmmm…it seems like you can't really represent both me and them. If we do that, will there be a lower commission rate since you're also working for the other side? |
| Realtor: | No, unfortunately—brokerage policy. I'm doing double the work, so it justifies double the commission. |

I drafted these conversations to mimic what real life conversations look like for buyers and sellers in this post-NAR settlement era. The amount of information being thrown at buyers and sellers is staggering. And much of that information is false. Yet consumers don't know that and are not able to protect themselves. Eventually, they get so worn down by the industry that they agree to anything.

One final note: the forms that are being promulgated by realtor groups and MLSs in response to the NAR settlement are terrible. In a recent report, I wrote:

> There are going to be hundreds (if not thousands) of different versions of buyer representation agreements floating around post-NAR Settlement. It is likely that most will be drafted using legalese and in ways that maximize benefits to brokerages. Many buyers will not be able to read and understand these documents. The New Mexico Association of Realtors buyer's agreement, for example, is seven single-spaced pages. So too is the North Carolina Association of Realtors buyer agreement. Buyers who try to read these agreements will likely not be able to fully understand all their terms.[172]

> . . .

> Most buyer forms are complicated and confusing. Buyers will not be able to understand them and will likely get burned by provisions they did not anticipate. I expect this to happen, for example, with clauses that require a defaulting buyer to pay

---

[172] Almost every one of these contracts is full of real estate jargon and legal jargon. The average buyer will not understand the many terms used in these agreements: broker, brokerage, licensee, agent, listing agent, dual agent, designated agent, sub-agent, facilitator, etc.

their agent's commission. If a buyer is considering breaching a contract to purchase a home—perhaps because they lost their financing, or their life circumstances changed—they would not be aware that that they owed their realtor for the failed sale. Yet almost every single contract includes that as the default provision. . . . The NAR Settlement has ushered in new rules and realtor practices unfamiliar to home buyers and sellers. These forms just add to the confusion and potential for exploitation.[173]

Thus, the buyer representation agreements which are a hallmark of the NAR settlement are drafted in a way that is completely inaccessible to the average consumer. Substantively, the forms are wholly lopsided in favor of the broker. They almost never contain an option to cancel; it is common to see contracts lasting six months to a year; they almost all require the buyer to forfeit their right to judicial redress; many pre-authorize dual agency, etc. The supposedly "negotiable" contracts are anything but.[174]

The same is true of listing agreements. I said the following about the California Association of Realtors' draft listing agreement:[175]

No seller will read this monster of a document—much less be able to understand it. The author, a tenured law professor who has been teaching Contract Law for fifteen years, had difficulty getting through the document. It is unrealistic to think that the average seller will understand anything more than, perhaps, 20% of this document.

. . .

The proposed Listing Agreement is a whopping seven pages long (almost 7,000 words). The sheer amount of information will be overwhelming to a prospective seller. There is virtually zero chance that a seller will slog through this document. . . .

Like the Buyer Representation Agreement, the Listing Agreement is single spaced, pure text in what appears to be 10 or 11-point font. There is no white space between provisions. Sections appear to bleed into one another. The numbering and lettering schema is confusing.

There are over 50 internal cross-references. There are an additional 25 cross-references to separate documents and attachments. This amounts to a total of at least 75 cross-references.[176]

An interesting parallel here is worth making to show that NAR is not capable of, or chooses not to, enforce its own rules. Realtors are under an obligation to make sure that contracts are written in "clear and understandable language." Article 9 of the Realtor Code of Ethics provides:

REALTORS®, for the protection of all parties, shall assure whenever possible that all agreements related to real estate transactions including, but not limited to, listing and representation agreements, purchase contracts, and leases are in writing in clear and

[173] Report available at https://www.law.buffalo.edu/content/dam/law/content/faculty-staff/monestier-report-on-bra-post-nar-settlement.pdf.
[174] Id.
[175] This was the agreement that was slated for release until the DOJ issued its formal inquiry.
[176] https://www.law.buffalo.edu/content/dam/law/content/faculty-staff/monestier-report-on-sla.pdf.

understandable language expressing the specific terms, conditions, obligations and commitments of the parties. . . .

Very few contracts I have seen would satisfy the "clear and understandable language" threshold that the industry *itself* imposes upon NAR-affiliated participants. This complete non-enforcement is a microcosm for the entire settlement.

Here is yet another example. NAR has a strict Clear Cooperation policy where listings must be placed on the MLS within one business day of them being marketed publicly. One CEO of an MLS is quoted as saying, "At this time we are not enforcing the policy but honestly we have not had any fees for agents breaking this policy in the past either[.] If someone called in about an agent that they felt was in violation we just contacted the agent and asked them to get the listing in the MLS, and they always have." This is emblematic of the lackadaisical way in which "regulator" participants enforce their own rules.[177]

NAR makes rules and puts out guidance—and nobody follows it. NAR is a paper tiger, incapable or unwilling to ensure participants abide by the rules.

## 4. There are Unresolved Ambiguities in the Settlement

There are several ambiguities in the NAR settlement that have not been adequately addressed through NAR guidance and rule changes. I have already discussed one arguable[178] ambiguity: whether the NAR settlement allows a buyer broker to modify an agreement or collect a bonus after the broker learns that more money is potentially on the table.

Additional areas of ambiguity include:

*Overage Amounts*

Under the settlement, a buyer's agent "may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer[.]" What is unclear, however, is what happens to the excess.

The first question is whether the settlement envisions the possibility for a buyer's broker to collect the excess via a modification. A seller would not be happy to learn that a buyer broker had an existing contract with a buyer at 1.5% but changed that number to 3% right before putting in an offer to purchase (so as to take advantage of the seller's offer to compensate a buyer broker at the rate of 3%). As a logistical matter, how can the seller make sure he is not overpaying and that these shenanigans are not happening? Is there a point at which the seller cannot change the buyer representation agreement to match up with what the seller is offering?

Assuming there is no modification at play, the second question is whether the seller, seller's broker, or the buyer is entitled to the excess. It is not clear whether this is determined by the settlement or the individual contracts at issue. Based on the language of the settlement itself, it seems that any overage goes back to the seller. The wording is that the buyer broker "may not receive" compensation beyond the agreed amount. Thus, it does not appear that the buyer broker can somehow redirect the money to the buyer, for instance, in the form of a rebate. Certainly, the broker could ask for the overage to

---

[177] https://www.inman.com/2024/10/11/local-realtor-association-wont-enforce-nar-clear-cooperation/.
[178] I personally do not think it is ambiguous. I believe the practice is not permitted. Yet, I seem to be in the minority.

be credited to the buyer as a concession, or the offer price could reflect the overage which would have gone to the agent.

Moreover, the listing agreement should spell out what happens to the seller's money if the buyer's agent is not able to "receive" it. Unfortunately, I don't think many of them do. Adding to the confusion is that there are two different ways that the seller can offer to compensate the buyer broker: directly or through the listing agent.

If the seller is offering the money directly, then any excess should automatically revert to the seller. I do not see how this offer can be "repurposed" by other parties in the transaction without the seller's consent.

If the seller is offering compensation via a listing agent, I believe the standard practice is that the listing agent pockets the excess. But this may be difficult to square with the wording of the settlement which says that "REALTORS® and REALTOR® MLS Participants acting for sellers [must] conspicuously disclose to sellers and obtain seller approval for any payment or offer of payment that the listing broker . . . will make to another broker. . . " If the other broker is not able to "receive" the amount the seller authorized, it is not clear that it should inure to the benefit of the listing agent.

*Cooperative Compensation*

It appears that cooperative compensation is left intact by the settlement, as evidenced by the provision quoted above: "REALTORS® and REALTOR® MLS Participants acting for sellers [must] conspicuously disclose to sellers and obtain seller approval for any payment or offer of payment that the *listing broker* . . . will make to another broker." Some realtors are interpreting the NAR settlement to prohibit cooperative compensation, and other realtors are forging ahead with business as usual.

It is not clear what purpose cooperative compensation now serves when there is a separate ability for the seller to specifically designate an amount to be offered to the buyer broker.

One way to look at it is as follows: if cooperative compensation is still permitted under the settlement, then every broker or brokerage could insist that they charge 6% with a plan to split 3%-3%. If the seller does not agree to this allocation, then they are free to contact another brokerage who will tell them the same thing (or something similar). In other words, if cooperative compensation remains a permissible model, then we have not moved away *at all* from the model of compensation that prevailed for decades. Even though some brokerages may have begun to experiment with a direct seller offer model or a concession model of compensation, nothing is to stop all these brokerages from coming back to the model in which sellers handsomely compensated both sides of the transaction.

It is not clear why Plaintiffs and Defendants have refused to clarify this major point. Mr. Ketchmark was repeatedly asked this question in an interview—can sellers make preemptive offers of compensation? He evaded the question every single time he was asked:[179]

> **I don't know if you saw an article I wrote about our Inman Connect conference where the panelists on stage were saying, 'Don't make pre-emptive offers of compensation. Just say your seller will consider all requests and wait for the buyer to put it in their purchase offer.' Then somebody in the audience said,**

---

[179] https://www.inman.com/2024/08/19/michael-ketchmark-every-move-you-make-well-be-watching-you/.

**'Hey, are we doing it wrong? Because our buyer agents are calling the listing agents to ask what the sellers are offering.' So, is that wrong?**

We're not going to weigh in on these hypothetical questions. My involvement in this for the last five years has told me that the resolution of the right or wrong is so fact-dependent upon what actually is happening.

I know when the plaintiffs' attorneys say something, that the industry can rely upon that and they can use that or they can think that that guides their behavior, but the guiding behavior that they need to be worried about is they can't violate the antitrust laws. They can't use the MLS or those vehicles as a way for announcing that they're sharing cooperation or setting the commissions, and if anyone's doing that, it's going to be a problem.

Whether or not specific behavior violates the terms of the settlement agreement is going to depend upon the circumstances of when it happens. We're going to call balls and strikes when the ball crosses the plate, not ahead of time.

**So pre-emptive offers of compensation are allowed under the settlement? If the seller decides, 'I do want to offer to the buyer's agent and I want you to not put it in the MLS, but you can put it on a flyer for my house or on the listing broker's website or anywhere else'?**

I don't know. I'd have to look at what's being done, how it's being done, and apply it to the terms of the settlement agreement. I'm not going to just say yes or no on a question like that. It's going to be dependent upon the facts.

. . .

**The settlement says [offers of compensation] not prohibited outside of the MLS and I just want to know if that means they're allowed.**

Even if something's not prohibited, it doesn't mean that the way that they're doing it is okay. If a seller is being coerced or forced into making an offer of cooperation because of fear of steering, there's all kinds of factors that could go into creating some type of illegal sharing provision. It's just gonna depend upon the facts and how it plays out.

It is insane that Plaintiffs' counsel has refused to answer a simple "yes" or "no" question. It is not a hypothetical question that "depends." Either this is permitted by the settlement or not. Cagey answers like this are why we are in the current mess that we are in.

*The Initially Unrepresented Buyer*

One thing that is unclear from the settlement is whether a buyer who is initially unrepresented can later choose to engage the services of a realtor at a point when he decides it makes sense for him. For instance, assume I decide that I would like to proceed unrepresented. I attend open houses, and I attend showings through the listing agent (provided the agent will facilitate them for me). I do not sign a buyer representation agreement with any listing agent. Subsequently, I decide that I would prefer to have a realtor's assistance in making an offer—can I *then* enter into a contract with a realtor? Would that realtor be entitled to any commission on a property I toured without them? I think the answer is

yes, but I suspect these sorts of buyers and realtors will get into sticky situations with other MLS participants.[180]

Consider, once again, Paragraph 58: ". . . all REALTOR® MLS Participants working with a buyer [must] enter into a written agreement before the buyer tours any home with the following: [provisions omitted]." If a realtor is contacted *after* a buyer has done all the leg work themselves, then logically they cannot be bound by this provision. At the time where an agreement should have been signed, the realtor was not yet "working with a buyer"—the realtor had likely not even met them yet!

Yet, I foresee this becoming an issue. If a listing agent shows a property to a then-unrepresented buyer, the agent will not be pleased to learn that the buyer has gone on to sign with someone else. I suspect that commission fights will ensue, particularly if the listing agent stands to gain additional compensation from having an unrepresented buyer on the other side of the transaction.

## 5. The Settlement Lacks an Effective Enforcement Mechanism

The NAR settlement has created something tantamount to a complicated regulatory scheme with virtually no oversight.[181] In its Motion for Preliminary Approval, Plaintiffs outline the full extent of the enforcement mechanism provided for under the settlement:

> Moreover, the Agreement includes several monitoring and enforcement mechanisms and incentives. As a condition for obtaining releases under the Settlement, REALTORS®, REALTOR® Member Boards, and REALTOR® MLSs must not only comply with the relevant practice changes, but they must also "*agree[] to provide proof of such compliance if requested by Co-Lead Counsel*" (Agreement ¶ 18(b), (c), (d)). In addition, the Settlement Agreement *requires NAR to track* whether certain of its affiliates have satisfied the conditions for obtaining a [sic.] relief.
>
> It affords "[a]ny Settlement Class Member . . . the right to inquire of [NAR] as to whether a Person is a REALTOR®, REALTOR-Associate® Member, or REALTOR® Member Board and has satisfied the conditions for being a 'Released Party,'" and requires NAR to "promptly provide this information." (Agreement ¶ 18(b)). It also requires NAR to "develop educational materials" consistent with "each provision in these practice changes, and to eliminate any contrary materials." (Agreement ¶ 58(xiii)).[182]

The entire latter half of this section has nothing to do with enforcement. The first part simply says that a class member can ask NAR to prove that any given released party has satisfied the conditions for being designated a "released party." I am not quite sure what that means, but I am confident that no class member will make any such request. And the second half of the section simply says that NAR must implement rules to put this settlement into practice, something that is obvious.

---

[180]   https://www.robbieenglish.com/blog/path-of-the-unrepresented-buyer-what-to-expect-when-looking-at-homes/ ("Oh, and you may be presented with a document to sign before entering the home. That document might say that the listing agent only represents the seller and not you as an unrepresented buyer, that you are foregoing any agent compensation that might be payable to an agent in the future (it's called procuring cause) because you are now a registered unrepresented buyer with the listing agent and buyer agent compensation would not be available going forward, you know, should you change your mind.").

[181] The only part of the settlement that can be effectively policed is the prohibition of offers of compensation on the MLS.

[182] Motion for Preliminary Approval, at p. 8 (paragraph bifurcated for clarity).

In terms of actual "enforcement" mechanisms, we are left with two things: (1) Co-Lead Counsel may ask for proof of compliance with practice changes and NAR is required to provide that proof; and (2) NAR must "track" whether certain of its affiliates have satisfied the conditions for obtaining relief.

*Co-Lead Counsel May Ask for Proof of Compliance*

We are largely leaving enforcement of this settlement to a handful of Plaintiffs' lawyers who will benefit to the tune of approximately a third of a billion dollars so long as meaningful problems *don't arise* with the settlement. This appears to be a huge conflict of interest. If the settlement falls apart or is rescinded, Plaintiffs' attorneys will not be paid for the years of work they put into the case. It stands to reason that they are not going to look very hard for violations or be receptive to all the ways that the settlement is failing class members.

Indeed, when I reached out to lead counsel about perceived workarounds, I did not get a response from him. Certainly, there is no obligation on lead counsel to follow up on every lead. But one might think that research provided by a law professor and shared with the Department of Justice would warrant a response. Although I obviously have no proof of this, I believe this is emblematic of the hands-off approach that Plaintiffs' attorneys are taking in this case.

Mr. Ketchmark's interview with Inman is telling—he focuses exclusively on the "no listing compensation on the MLS" component of the settlement to the exclusion of all else.

> **You mentioned different interpretations of the new rules. What interpretations are you seeing?**
>
> Not a day goes by where somebody doesn't send me some type of an Instagram or a Tiktok or a Facebook page or something on X or on social media where someone's saying, 'Hey, this means this,' or 'This means that,' and that's what I'm talking about. There's a lot of that.
>
> There have been some forces out there that have created some uncertainty as to what the requirements are, *but the requirements are real straightforward: You can no longer use the MLS as a vehicle for sharing cooperation or for fixing prices. If anyone thinks that they can get around that they're wrong. If we see anything out there where there's an attempt to violate that fundamental premise of this settlement agreement, that's what we're going to take action against.*[183]

Mr. Ketchmark seems to completely ignore the other half of the settlement: the requirement for buyer representation agreements to be signed prior to touring.

Moreover, it is hard to believe that Plaintiffs' attorneys will be spending the next seven years working to ensure that Defendants are complying with the settlement—all for "free" since, at that point, they will presumably have already been paid. Once this settlement is approved, the reality is that there will be no oversight of it.

*NAR Must "Track" Whether Affiliates Have Satisfied the Conditions for Obtaining Relief*

This is a very vague undertaking. How can NAR track whether 1.5 million agents across the country are properly implementing the settlement?

How is NAR making sure that:

---

[183] https://www.inman.com/2024/08/19/michael-ketchmark-every-move-you-make-well-be-watching-you/.

- brokers working with buyers have signed agreements prior to touring?
- brokers aren't just backdating agreements to the date of the first tour?
- agreements aren't being modified to receive additional commission or bonuses?
- brokers with a "touring agreement" aren't forcing buyers to use their services to put offers in on properties viewed pursuant to that agreement?
- listing agents aren't telling sellers that if they don't offer compensation, no one will come see their house?
- buyer's agents aren't steering buyers away from properties based on what compensation is being offered?
- buyers aren't being told that "99% of the time, the seller will pay my fee"?
- agents aren't scooping up excess funds that should belong to a seller?
- buyers aren't being duped into signing representation agreements at open houses or in driveways prior to showings?
- unrepresented buyers aren't being denied access to properties?

It seems like NAR has outsourced its enforcement responsibilities under this settlement to individual MLSs.[184] NAR emphasized that MLSs are not required to collect buyer representation agreements and can set up their own compliance rules and protocols.[185] For its part, NAR keeps on putting out generic guidance, training, and Q&As and realtors largely keep ignoring it.

One compliance expert believes that supervising brokers are the "cornerstone" of making sure the NAR settlement is being implemented properly.

> It might seem like I'm stuck on repeat, but that's because broker supervision is the cornerstone of real estate compliance — and it's essential for keeping operations running smoothly and in full compliance with regulations.
>
> . . .
>
> Nevertheless, without adequate supervision, a host of problems can arise for a real estate company, from civil lawsuits to regulatory investigations — or worse, formal license discipline. Designated brokers are the essential gatekeepers of real estate compliance, playing a pivotal role in ensuring adherence to regulations and professionalism while also safeguarding consumers involved in the transaction.
>
> In fact, competent designated brokers who exercise thoughtful and thorough supervision can do more than just keep agents compliant in their real estate practices — they can also prevent inexperienced or negligent licensees from causing any harm to the public. That's the real power and value of proper broker supervision.

---

[184] Apparently, it is outsourcing this task to the various MLSs. https://www.parealtors.org/blog/nar-settlement-implementation-all-your-questions-answered/ ("And since the bulk of the settlement terms are technically being implemented via MLS rules, each MLS will be responsible for monitoring compliance just as they are do for the rest of their rules and policies. An MLS that is lax with enforcement and allows regular non-compliance isn't just going to annoy the members who are following the rules, they're quite likely to be targeted in a future lawsuit based on that lack of enforcement. Many MLSs are setting up various methods to monitor compliance and have implemented substantial fines for non-compliance.").

[185] *See also* https://www.inman.com/2024/05/08/godspeed-enforcement-of-nar-settlement-changes-shifts-to-mlss/ (noting that ""the MLS is not required to receive a copy of the written agreement, but it can request it as a matter of its local enforcement. So that is up to your MLS whether or not they want to receive a copy of that written agreement.").

. . .

> As part of their mission, designated brokers must make sure that every agent under their supervision successfully maneuvers through each level of compliance, adhering to ethical decrees, professional standards of care, state laws governing licensed activities, and the new rules borne by the NAR settlement.
>
> . . .
>
> Ultimately, designated brokers are not just gatekeepers; they also act as "architects" of compliance in today's real estate industry. [186]

This outsourcing of supervisory and enforcement responsibility to individuals who necessarily have a conflict of interest is hugely problematic.[187] Many brokers themselves don't understand the rules and are openly flouting them. And we expect these same people to make sure that their agents are playing by the rules of the game? It is laughable that Plaintiffs and Defendants have created the functional equivalent to a regulatory scheme with no one to enforce it other than the people who are bound by it and have every interest in finding ways around it.

I think it is safe to say that many of these practices, by their very nature, fly beneath the radar and will never be caught. How does an unrepresented buyer prove that she was shut out of the market? How does a prospective seller prove that the listing agent wouldn't take the listing because seller refused to offer buy-side compensation? Who is going to report a buyer-broker for steering when that steering is at the request of the buyer? Who is going to challenge the practice of brokers modifying contracts upwards and collecting bonuses: Buyers who have just "approved" the practice? Or sellers who know nothing about the practice? All of these things happen in secret, behind closed doors. All are the product of an industry that is hell-bent on maintaining a 5-6% commission structure.[188]

## 6. The Value of the Injunctive Relief is Overstated

Plaintiffs and Defendants now unite in asking this Court to approve the settlement. Over one billion dollars is at stake. Neither party has an interest in rocking the boat. Defendants want to move forward without the constant fear of being bankrupted by future antitrust suits. And Plaintiffs have over three hundred million reasons to call this a "win" and move on. One of the named plaintiffs in this case, Josh Sitzer, has a vested interest in seeing the settlement approved—he has just launched a new real estate platform which is intended to operate as an alternative to the traditional model.[189]

In support of their motion for attorneys' fees, Plaintiffs proffered the testimony of Dr. Nicholas Economides, a professor of Economics at the Stern School of Business at New York University. Dr. Economides concludes that these practice changes could save consumers billions of dollars. Dr. Economides' projections, however, are based on a variety of assumptions that simply don't hold true.

---

[186] https://www.inman.com/2024/10/22/brokers-youre-accountable-for-your-agents-behavior/.

[187] A broker is interested in making money for his or her brokerage, not carefully monitoring agents' every step and reporting them for regulatory non-compliance.

[188] I believe it is not a coincidence that once the real estate industry perceived a threat to its monopolistic practices owing to the NAR settlement, it turned to challenging its own "Clear Cooperation" policy. This is essentially a policy that prevented brokerages from having pocket listings, thereby keeping all business in-house. Now certain MLSs are refusing to enforce that policy under the guise of consumer choice. *See* https://www.inman.com/2024/10/11/local-realtor-association-wont-enforce-nar-clear-cooperation/. The reality is that eliminating Clear Cooperation enables brokerages to double-end the commission on a given sale.

[189] https://techcrunch.com/2024/08/29/the-guy-who-sued-nar-over-real-estate-fees-has-co-founded-a-startup/.

No doubt, these assumptions were grounded in what the parties represented was theoretically the intent of the settlement. But how the settlement has been interpreted and implemented by the 1.5 million realtors on the ground is what matters. And a close look at that reveals that steering is alive and well, most sellers are offering compensation in advance to buyer brokers, and commissions remain virtually unchanged. Really the only thing that has changed is that there is more work for buyer's agents on the front-end to figure out how much compensation they will be getting from a seller.

It is helpful to examine all the assumptions underlying Dr. Economides' statement that this injunctive relief is providing significant value to both class members (sellers) as well as buyers.

Economides:    Jointly, this injunctive relief will have three important effects. First, it *will greatly reduce the incentives of buyer brokers to steer buyers* towards properties offering high buyer-broker compensation. *Previously, the threat of steering had put strong pressure on sellers to protect themselves against such steering by offering (through seller brokers) market-prevailing levels of compensation to buyer brokers.* In the absence of blanket offers of buyer-broker compensation through the MLS, this pressure will be significantly reduced.

Response:    Nothing could be further from the truth. Buyers, aided by their brokers, are steering themselves away from properties where a seller is not offering buyer broker compensation in advance. There are forms that allow buyers to "skip" houses. Sellers are getting the message loud and clear and are offering buy-side compensation to make sure they are not among the "skipped" houses.

* * *

Economides:    Second, this injunctive relief *will introduce an incentive for the buyer to limit their buyer broker's compensation*, to the extent buyers choose to hire an buyer broker at all. Previously, because almost all sellers offered blanket compensation at market-prevailing levels (for reasons described in the prior paragraph) buyers had little or no incentive to negotiate buyer broker compensation, or for that matter, to save money by forgoing a buyer broker altogether. As explained above, I understand that this injunctive relief includes requiring buyer brokers and buyers to sign agreements specifying buyer broker compensation ahead of time, and thus explicitly and clearly commits the buyer to pay the agreed-to buyer broker compensation regardless of whether compensation is included by the seller or seller broker as part of the sales negotiation. Thus, buyers have an incentive to limit buyer broker compensation or to seek other alternatives.

Response:    This is certainly true in theory. But many of these agreements come filled in for a buyer to sign. Buyers don't always fully understand or appreciate that they are committing to paying the buyer broker fee. And even if they do, they are told that the common practice is for the seller to cover the fee. All of this greatly diminishes the incentive to negotiate a lower fee. And even if they do negotiate a lower fee, buyer brokers are being trained to ask buyers to modify a representation agreement to collect more than what is specified in the agreement.

* * *

Economides:    Third, while buyers *may still request buyer-broker compensation as part of the sales negotiation*, in the absence of blanket, unilateral offers of compensation by sellers or seller brokers, buyers' requests for broker compensation *can be made in the context of their offers of purchase*, allowing sellers to weigh different offers, including offers without requests for

compensation. *If the seller chooses to pay compensation to the buyer broker*, this competitive context reinforces buyers' incentive to limit the compensation of their buyer broker, while potentially allowing sellers to avoid compensating buyer brokers entirely.

. . .

While under the injunctive relief, sellers in the U.S. may still agree to compensate buyer brokers *as part of the sales negotiation*, and may be particularly likely to do so in the short run following the introduction of these injunctive relief measures, the injunctive relief clearly represents a significant shift toward the competitive environment in the yardstick countries, where buyers have a robust incentive to limit buyer broker compensation.

Response: This is the biggest flawed assumption underlying Dr. Economides' projections. It is clear that he believes that sellers and listing agents will no longer be making offers of compensation to buyer brokers *in advance*. Instead, he envisions that a buyer will request that the seller cover the buyer's broker's compensation "as part of the sales negotiation." This is absolutely not how the settlement agreement is playing out in practice. Listing agents and sellers are offering to compensate buyer's brokers at a standard rate (usually 2.5%-3%) in advance. They are not waiting for requests to come in via an offer.

\* \* \*

Economides: This estimate of the decrease in the cost of housing transactions is extremely conservative, because it does not account for the possibility that many buyers (if not all or nearly all over time) will simply choose not to use a buyer broker.

Response: Dr. Economides does not account for the industry dynamics and institutional forces at play that will keep agents entrenched on both sides of the transaction. If a buyer tries to proceed unrepresented, he will not readily be able to access property, he will likely be met with resistance in conveying offers, and he may not even be saving the seller any money. As the New Mexico Association of Realtors notes in their forms "Your decision to proceed in this transaction without the representation of a broker will not automatically result in a reduction in the amount of compensation that the Seller will pay the Listing Brokerage under the Listing Agreement."

\* \* \*

Economides: Finally, the benefits of the injunctive relief will accrue to both buyers and sellers. Buyers and sellers will *collectively pay lower costs* to complete housing transactions because of lower commission rates. Additionally, under the injunctive relief, a seller *who does not wish to compensate buyer brokers will have the freedom to do so without the fear that buyer brokers will steer buyers away from that seller's home. And a buyer who does not need the services of a buyer broker will be able to forgo utilizing one* and thereby either directly benefit by avoiding having to pay for a buyer broker, or by being able to make his/her purchase offer more attractive by not including a request for the seller to compensate their buyer broker.

Response: Current evidence belies any notion that commissions will come down. A seller who does not wish to compensate buyer brokers will be told that this is a bad decision and

that he may not get offers on the property. And the thing is that *this is a truthful statement*. Buyers and buyer brokers are reluctant to engage with properties where they are not assured in advance that buyer broker compensation will be covered. And it is unlikely that buyers will forego representation because: (a) they will be stonewalled by listing agents; (b) they will be bombarded with messaging about the value of a buyer's agent; and (c) a rational actor will choose to use an agent when any financial benefit from not having one would benefit the listing agent, not the buyer himself.

To be clear, I do not doubt that Dr. Economides' calculations would be correct if all the underlying assumptions held true. But all signs point to those assumptions not being true. There is ample evidence that overall commissions have changed very little—if at all—since the settlement was announced.

## 7. The Settlement Should Not Be Salvaged

For the reasons discussed above, I urge this Court to reject the settlement. The practice changes do not help class members. Instead, the changes have created a confusing mess for class members (as well as buyers). And the changes have allowed gamesmanship and subterfuge to flourish.

If this Court would prefer to work with the parties to salvage the settlement, then *at the very least*, the parties need to provide clarity on the following:

1. OFFERS IN ADVANCE: Is a seller or listing agent permitted to make advance offer compensation to a buyer broker? If a listing agent is permitted to share their compensation and there is no broker on the other side to receive it, who is entitled to the extra commission?

2. MODIFICATION TO COLLECT MORE COMPENSATION: Is a buyer broker permitted to amend an agreement upward to receive more compensation than originally agreed to under the buyer broker representation agreement?

3. BONUSES: Is a buyer broker permitted to receive bonuses or other compensation in excess of what was agreed to in the buyer broker agreement?

4. COMPENSATION RANGES: Can a buyer representation agreement include a range or a pre-authorization of a number up to a certain amount?

5. DUTIES OF LISTING AGENT IN REGARD TO UNREPRESENTED BUYERS: Is a listing agent required to facilitate showings and offers for an unrepresented buyer?

6. TOURING AGREEMENT: Is a touring agreement required to simply facilitate showings where brokerage services are not provided? Is a buyer obligated to use the same agent he toured with if he wants to put an offer on a property he toured?

7. THE INITIALLY UNREPRESENTED BUYER: Is a realtor compliant with the settlement if he represents a buyer who already viewed a property without a representation agreement in place (because at the time the buyer viewed the property, the realtor was not "working with" the buyer)?[190]

8. EXCESS COMPENSATION: If a buyer agent is not able to "receive" compensation in excess of what is specified in the agreement, where does the excess go?

---

[190] This question contemplates a buyer initially deciding to proceed unrepresented and then changing his mind later in the process.

How can industry participants be expected to play by the rules of the game when they don't know what those rules are? Plaintiffs and Defendants have been deliberately opaque on the answers to all these questions. That opacity—especially in the face of a simple yes/no question—is what has led to the current state of mass chaos and confusion.

As I have outlined above, I do not believe that the injunctive relief meaningfully benefits the class. It fundamentally keeps the same seller-paid commission structure in place with a lot more hassle, confusion, and paperwork.

I am mindful of how many hours have been worked, how many law firms participated on both sides, how much money was spent bringing and trying this case, and how risky the case was. None of that, however, changes the fact that the settlement is woefully inadequate in doing the very things it purports to do: decoupling commissions, eliminating steering, and ensuring the sellers don't have to pay inflated commission rates. The litigants have basically spent five years and millions of dollars to come up with a system that is virtually the same as that which has been in place for decades, albeit with some cosmetic changes.

In *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, the Seventh Circuit Court of Appeals disapproved of a class action settlement where the class was basically in the same position after the settlement as it was before:

> The plaintiffs and Subway defend this settlement by insisting that it actually provides meaningful benefits to the class because Subway has bound itself, for a period of four years, to a set of procedures designed to achieve better bread-length uniformity. *A simple comparison of the state of affairs before and after the settlement exposes the cynicism in this argument.*
>
> Before the settlement, class members could be fairly certain that a Subway Footlong sandwich would be at least 12 inches long. They could rest assured that because all loaves are baked from the same quantity of dough, each sandwich contained the same amount of bread even if an occasional loaf failed to bake to the full 12 inches in length. . . . In sum, before the settlement there was a small chance that Subway would sell a class member a sandwich that was slightly shorter than advertised, but that sandwich would provide no less food than any other.
>
> *After* the settlement—despite the new measuring tools, protocols, and inspections— there's *still* the same small chance that Subway will sell a class member a sandwich that is slightly shorter than advertised. Indeed, the settlement explicitly acknowledges that "because of the inherent variability in food production and the bread baking process, [Subway] will never be able to guarantee that each loaf of bread will always be exactly 12 inches or greater in length after baking." . . . And after the settlement, just as before, the rare sandwich that falls short of the full 12 inches will still provide the customer the same amount of food as any other. The injunctive relief approved by the district judge is utterly worthless. The settlement enriches only class counsel and, to a lesser degree, the class representatives.[191]

If I were selling my house today instead of in 2022, I would still feel immense pressure to offer standard commission to make sure that buyers and their agents did not "skip" my house. I would want

---

[191] 869 F.3d 551, 556–57 (7th Cir. 2017).

as many eyeballs as possible on my house to drive up the possibility of a bidding war where the benefit provided by increased interest was more than offset by the 2.5% or 3% I offered.

Nothing about the settlement, including the fact that buyers have to sign agreements with their agents, would change this calculus. As long as buyers insist on hiring buyer brokers, sellers will continue offering to compensate them out of fear. It is instilled in sellers that you don't want to be perceived as "difficult" or "uncooperative" or, God forbid, have your listing go stale. Indeed, listing agents have turned this into a marketing tool, telegraphing to prospective buyers how much sellers "value" the buyer's contract with their agent.[192]

One final question this Court might have is why disapproval of the settlement should be the remedy for breach of the agreement.

First, the fact that the settlement is being breached and realtors are finding all sorts of creative ways to exploit it demonstrates that the settlement is not fair, adequate or reasonable.

Second, it is not at all clear who could sue for breach of contract and how such a breach could be established. As you know, a class action settlement is not a traditional contract and also not a traditional judgment.[193] So, who has the ability to sue for breach? The Plaintiffs' attorneys who will have moved onto different things and have no interest in policing this settlement? A class member? Another attorney? And what exactly does a breach of contract action look like? Is NAR breaching the contract because its members are choosing not to follow the settlement? Are actions of NAR-affiliates (such as realtors) imputed to NAR? In short, it is not at all clear how someone would go about alleging "breach" of this settlement agreement.

Third, if there was ever a time when the industry would "behave" it would be now—before the settlement is finally approved and when the Department of Justice is still monitoring NAR practices. The fact that the settlement is being breached left and right shows that there is really no hope for this getting any better. As I said earlier, the words on a piece of paper and how they were supposed to play out doesn't matter. What matters is that the industry is blatantly defying the settlement, while all the litigation participants are pretending that everything is hunky-dory.

---

[192] One recent listing I saw said "Send your buyers. All relationships respected. 2.7% BUYER BROKER COMPENSATION PAID." Another said, "Buyer's [sic.] agency relationships are treated with utmost respect!!" Listings on file with author.

[193] Howard M. Erichson & Ethan J. Leib, *Class Action Settlements As Contracts?*, 102 N.C. L. REV. 73, 76 (2023)("Thus the question: Is a class action settlement rightly understood as a privately negotiated agreement—a *contract*—whose binding effect as a contract happens to be conditioned on judicial approval just as some other contracts involve conditional terms? Or, is a class action settlement rightly understood as a determination by a court of a resolution of a dispute--a *judgment*--whose origin and terms happen to derive from negotiation rather than trial? And if it is both, how ought courts give respect to that duality?").

# VI. OBJECTIONS TO THE SETTLEMENT
# (MONETARY RELIEF)

This settlement is constantly referred to in superlative terms. Words like "historic," "landmark," "groundbreaking," and "immense" are constantly bandied about. These words obscure a very important fact: the average class member will get next-to-no-money in his pocket from this settlement.

Sure, the settlement is big. That's because a huge number of defendants have opted-in to shield themselves from liability. Meanwhile, the class is gargantuan in size—likely in the tens of millions. No matter how big of a fund you have, when you divide it among tens of millions of people, the recovery will be negligible.

The estimate of $13/class member I mentioned earlier was premised on a smaller fund. Now that the settlement has increased in monetary value, perhaps it is closer to $20 or $25—not even enough money to buy a pizza. This is supposed to compensate me for the $27,500 I paid that I shouldn't have had to pay but for the Defendant's alleged misconduct.

Plaintiffs will counter this argument with the fact that not everyone will submit a claim; thus, the denominator will not be the tens of millions I referred to, but some smaller number. This argument is specious as it relies on the hope that people who are entitled to recovery do not claim that recovery. In other words, if I get more than pizza money, it is not because it was negotiated for me by Plaintiffs' counsel; it will be because other class members are forfeiting their entitlement to the money. They may rightly decide that it is not worth the time, hassle, and expense of filing this paperwork just to get a check in the mail that feels like a slap in the face.

In short, the numbers cannot be looked at, in gross, in the abstract. A one-billion-dollar settlement is likely a valuable settlement if there are only 100,000 class members. A one-billion-dollar settlement is not a valuable settlement if there are thirty million class members.[194] Context matters. And the role of the Court is to ascertain what value these attorneys provided to an individual class member—not what value they provided to a giant amorphous "class" that is deliberately made as large as possible to buy peace for the Defendants and to maximize Plaintiffs' fees.[195] As Professors Erichson and Leib argue in a recent article:

> [D]efendants and class counsel share an interest in maximizing the *apparent* size of a proposed class action settlement. Even if neither the real value of a settlement to class members nor the real cost to defendants is as big as it appears, defendants and class counsel want a settlement to appear as large as possible to the judge. Indeed, a cynic would say they share an interest in maximizing the ratio of the settlement's apparent value to its actual cost.[196]

---

[194] Burnett v. Nat'l Ass'n of Realtors, No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *1 (W.D. Mo. May 9, 2024) ("More than 30 million direct notices were mailed or emailed to the Class.").
[195] Howard M. Erichson & Ethan J. Leib, *Class Action Settlements As Contracts?*, 102 N.C. L. REV. 73, 89 (2023)("Class counsel's willingness to give a defendant broader protection from future liability, even at a low price, is driven by more than class counsel's desire to maximize the total size of the settlement and thus earn greater fees.").
[196] *Id.*

# VIII. OBJECTION TO PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES

The lion's share of the settlement fund is going to the lawyers and other participants in the lawsuit—not class members. Billing at their "normal" rates, Plaintiffs' claim that the value of their work product is approximately $92 million.[197] This includes fees for many attorneys billing at rates of $1,000-$2,200/hour. Plaintiffs' attorneys are seeking approximately $333,000,000 in fees plus $16 million in expenses.

For the following reasons, this fee request should be disapproved. Any amount greater than 10-15% percent would constitute an unwarranted windfall and would be grossly disproportionate to the "relief" provided to class members:

1. PLAINTIFFS HAVE NOT PROVIDED THIS COURT WITH ALL THE INFORMATION REQUIRED TO MAKE A DECISION ON A THIRD-OF-A-BILLION DOLLAR FEE

In short, Plaintiffs' attorneys in this case are seeking 3.62 times the purported value of their services to account for the "unique risks and challenges in this litigation."[198] Plaintiffs' motion in support of their petition for attorneys' fees reads like a cut-and-paste job of every other petition for attorneys' fees: the fee is justified because of the extraordinary results, the skill and experience of counsel, and the difficulty of prosecuting the case.

What Plaintiffs omit from their submission is the following:

a) ANY ACTUAL STATEMENT OF VALUE TO INDIVIDUAL CLASS MEMBERS. There is no indication of how many home sellers are in class and how much monetary value this settlement will provide them. This is because Plaintiffs know that the payouts will be nominal and will come nowhere close to compensating class members for the thousands of dollars (or tens of thousands of dollars) that they paid in inflated commissions.

b) ANY REFERENCE TO THIS BEING A "MEGA-FUND" CASE. The expression is well-established in the caselaw and is thought to refer to any settlement over $100 million. In most mega-fund cases, courts do not award "normal" attorney fee percentages because these percentages would result in a windfall to attorneys. One academic text on attorneys' fees states: "When extraordinary large class recoveries of $75 to $200 million and more are recovered, courts most stringently weigh the economies of scale that are inherent in class actions in fixing an appropriate percentage of recovery for reasonable class counsel fees. Accordingly, *fee awards in the range of 6 to 10% are common in this large-scale context*, but mega-fund recoveries have also yielded common-fund fees up to 16%."[199] Plaintiffs never once draw this Court's attention to the mega-fund issue or attempt to justify why an outsized fee is warranted in this mega-fund case.

---

[197] Motion in Support of Attorney's Fees, at p. 7 ("Prosecuting the litigation required over $92 million in lodestar through August 31, 2024").

[198] *Id.*, Klonoff Declaration, at p. 21.

[199] § 2:9. Emerging common-fund-fee formula: Reasonable percentage of fund after consideration of specified guidelines under particular circumstances involved—Deviation from percentage norm or range in exceptional cases, 1 ATTORNEY FEE AWARDS § 2:9 (3d ed.).

c) BINDING EIGHTH CIRCUIT COURT OF APPEALS PRECEDENT FROM THREE MONTHS AGO THAT IS DIRECTLY ON POINT. Just three months ago, in *In re T-Mobile Customer Data Sec. Breach Litig.*,[200] the Eighth Circuit *refused* to approve a 22.5% fee in a mega-fund case. It is hard to understand how Plaintiffs can justify a request for 33.3%, over 10% higher than the amount that was disapproved of in *In re T-Mobile*. Plaintiffs do mention the case in a string cite, and in a footnote—but for innocuous propositions. Plaintiffs themselves had an ethical obligation to bring the case to this Court's *direct* attention. More egregiously, one of the plaintiffs' attorneys referred to the *overruled district court's opinion* in support of the fee petition.[201]

d) ANY PROOF THAT THE RATES THEY HAVE PROVIDED ARE "PREVAILING MARKET" RATES: Plaintiffs did not provide this Court with any evidence that their claimed lodestar rates are prevailing market rates. This is because they are decidedly not, as discussed in more detail below. These rates are egregiously inflated.

e) ANY PROOF THAT TIME ENTRIES WERE ACCURATE AND ACCOUNTED FOR INEFFICIENCIES: Plaintiffs did not provide this Court (or at least the public) with detailed time keeping entries to enable class members to see what sort of work was billed at what rate. The sheer numbers are staggering—particularly for partners—and it is hard to believe there weren't massive redundancies, inefficiencies, and partner-level billing for ministerial tasks.

f) ANY STATEMENT THAT THE LEAD PLAINTIFF HAS A CONFLICT OF INTEREST: One of the named plaintiffs in this case currently has a conflict of interest, which prevents him from being a fiduciary for the class. He has started a real estate company which hopes to profit from the supposed "new" model of commission structuring.[202] He has every interest not to challenge the settlement or raise an objection to the fee.

These omissions are glaring and warrant disapproval not only of the fee requested here, but also require that the Court revisit its prior fee ruling.

I am not sure whether there is a clear sailing agreement in place here or just a tacit understanding that Defendants will not contest a request for attorneys' fees.[203] In either event, this creates a very difficult situation for this Courts because it can no longer rely on the adversary process to inform its decision-making:

> However, court supervision is notoriously ineffective when class actions settle. The key reason for this has to do with courts' institutional capacity and with the parties' incentives. When class actions are adjudicated, the parties before the court are adversaries. Class counsel's incentives are diametrically opposed to defendant's incentives. Class counsel wants the court to award the highest possible amount to the class. Defendants naturally try to persuade the court to award the lowest possible amount. By contrast, when class actions settle, both parties before the court--class counsel and the defendant--seek approval of the settlement. Consequently, the court finds itself in a peculiar position. It must act as an adversary to the parties before it

---

[200] 111 F.4th 849 (8th Cir. 2024).

[201] *See* Motion in Support of Attorneys' Fees, Dirks Declaration, at p. 8.

[202] https://landian.co/.

[203] Robert Klonoff, *Class Action Objectors: The Good, the Bad, and the Ugly*, 89 FORDHAM L. REV. 475 (2020) ("[the parties] are frequently on the same page with regard to the amount of attorneys' fees as well, with agreements often providing that a defendant will not oppose attorneys' fees up to a specified amount.").

and as a fiduciary for absent class members. This is a task courts are ill-equipped to perform.[204]

When all the available evidence is coming from one side, it is hard not to accept all this information as true and accurate. If the attorneys' fees motion had been contested and Defendants had presented evidence of their own, I am confident that this Court would have seen that a one-third fee is unreasonable in this case.

## 2. THE DECLARATION OF PLAINTIFFS' PAID EXPERT DOES NOT PAINT AN ACCURATE PICTURE OF FEE AWARDS

Plaintiffs' attorneys submit the declaration of Professor Klonoff to support their request for approximately a third of a billion dollars in fees (plus expenses). Plaintiffs' attorneys paid Professor Klonoff $1,250/hour to write his declaration in support of their motion for fees.

Professor Linda Mullenix, a well-known expert on class action litigation, discusses the phenomenon of parties hiring the same experts over and over to support class action fee petitions. She writes:

> Unless the court appoints its own expert to assess the attorney fee request, the courts and the settling parties chiefly rely on the testimony of retained fee experts. The leading class attorney fee experts primarily consist of a relatively small universe of law professors who repeatedly appear in support of attorney fee requests, some of whom research and write about class action attorney fees, and others who do not, but instead rely on the expertise of their colleagues.[205]
> . . .
> The use of expert fee declarants suggests additional concerns. There is a small universe of repeat experts who for decades successively file affidavits, relying as authoritative support their own previous testimony or the testimony of their colleagues. An even more interesting phenomenon is the ratchetting effect of fee research and testimony--that is, academic fee experts who publish successive empirical studies justifying an ever-rising range of fee reasonableness. And, as is true for notice expert reports, reports of fee experts are rarely, if ever, subject to challenge.[206]

She identifies by name who falls within this cadre of the "relatively small universe of law professors who repeatedly appear in support of attorney fee requests":

> The academic law fee experts who repeatedly file reports in support of fee requests include Professors John C. Coffee, Jr., Brian Fitzpatrick, Sam Issacharoff, *Robert Klonoff*, Arthur Miller, Geoffrey Miller, William Rubenstein, and Charles Silver. The Westlaw database on expert reports & affidavits lists numerous reports, affidavits, and declarations submitted by these fee experts, extending over several decades.[207]

Notably, this universe includes Plaintiffs' expert. Professor Klonoff lists twenty cases where he has filed declarations in support of attorney fee requests and says that there are "many others."[208] The very nature of hiring an expert and paying them $1,250/hour to support your fee petition should call into

---

[204] Ittai Paldor, *Lawyers on Auction - Protecting Class Members*, 89 U. CIN. L. REV. 344, 345–46 (2021). This statement is both true of the settlement itself and of the request for attorneys' fees.
[205] Linda Mullenix, *Reflections on the Flying Buttresses of Class Action Settlement Approval*, 84 U. PITT. L. REV. 395, 415 (2022).
[206] *Id.* at 431-32.
[207] *Id.* at n. 73.
[208] Motion in Support of Attorney's Fees, Klonoff Declaration, at p. 6.

question the neutrality and reliability of the opinion. It appears that Professor Klonoff almost always testifies that the plaintiffs' request for fees is reasonable.

Professor Mullenix delivers a harsh critique of this practice, which she decries as tantamount to "regulatory capture":

> Commentators have observed that the universe of these experts tends to consist of small cohorts of fraternal colleagues. The settling parties hire these experts, sometimes well in advance of an actual agreement. This is especially true for the experienced professional class of class litigators, who are well-aware of the fraternity of testifying experts.
>
> What is little noted is that well-paid expert fees incentivize the fraternity of testifying experts to author reports that support class certification, settlement fairness, and the propriety of attorney fees and ethics. Parties will not rehire an expert who reaches any possible contrary conclusion; hence, repeat player experts populate the class action landscape. Although the experts purport to be neutral and independent, there is an unspoken understanding among all the actors that the expert will deliver for the parties. In this regard, the relationship between the settling parties and their retained experts resembles regulatory capture.[209]

Professor Mullenix contends that these expert reports follow a "boilerplate format":

> After an attestation of expertise and the number of cases in which the expert had reviewed fee requests, the affidavits typically set forth the prevailing standards for assessing the fairness of fee petitions. The affiant then indicates his review of the fees in the settled litigation, assesses these fees in the context of the prevailing circuit standard, and concludes that the fee requests are within the range of reasonableness as evidenced by approved fee requests in other litigation, as well as empirical studies of class attorney fees.[210]

Professor Klonoff's declaration follows this canned format to a tee. And many of the citations in his declaration are to other "repeat-experts" and to cases in which he served as an expert witness. Professor Mullenix refers to this as "daisy-chaining": "In addition, academic fairness experts frequently rely for their conclusions on their previous involvement with past settlements, again daisy-chaining authority from one settlement to another."[211] You end up with a vicious cycle where experts continue to opine that outsized attorney fee awards are reasonable, courts accept that argument, and then those experts make arguments that court precedent supports the fee award.

Professor Mullenix laments this "cottage industry" of fee experts:

> . . . Rule 23 amendments relating to attorney fees in class settlement have given rise to a cottage industry of flying buttress fee declarants who supply expert testimony in support of the reasonableness of fee petitions. Judges rely on these reports and declarations and . . . pay deference to attorney fee requests. Unless an objector appears

---

[209] *Id.* at 433.

[210] *Id.* at 415.

[211] *Id.* at 432.

and successfully challenges an attorney fee motion, judges rarely reject or modify fee requests.[212]

I hope to be the objector who convinces this Court to reject or modify the fee request—or at least to apply additional scrutiny to it. I do not believe the fee request is reasonable for the reasons outlined below.[213]

### 3. PLAINTIFFS DO NOT CONSIDER THE FEES IN RELATION TO THE VALUE OF THE SETTLEMENT TO A CLASS MEMBER

In the expert declaration and in Plaintiffs' motion for attorneys' fees, the analysis is cast at a very high level of generality. The fee petition is justified because:

> ➢ This is a very difficult and complex antitrust case.
> ➢ The litigation was hard-fought with formidable opponents on both sides.
> ➢ Success was not guaranteed, and plaintiffs raised novel claims against a very powerful industry.
> ➢ Class counsel poured years of time and money into the case.
> ➢ Class counsel are among the most highly experienced and qualified in the country.
> ➢ The monetary relief for the class is "historic."

Literally, these are rote statements that appear in almost *every single* application for attorneys' fees across the country.[214] When cast at such a high level of generality, they are hard to argue with.

What Plaintiffs and their expert fail to do is relate the *results* they have obtained for class members to their fee. It doesn't matter how long you've worked, how hard you've fought, or how smart your opponents were if you have not negotiated a settlement that provides any actual value to the class. "The degree of success obtained" is "'the most critical factor' in determining the reasonableness of a fee award."[215]

In the words of the Ninth Circuit in *Lowery v. Rhapsody Int'l*, "The touchstone for determining the reasonableness of attorneys' fees in a class action is the benefit to the class. It matters little that the plaintiffs' counsel may have poured their blood, sweat, and tears into a case if they end up merely spinning wheels on behalf of the class. What matters most is the result for the class members."[216] The court in *Lowery* remanded the case to the district court with the directive that it should "rigorously evaluate the *actual benefit provided to the class* and award reasonable attorneys' fees considering that benefit."[217] The Second Circuit recently said something similar:

> [W]hen reviewing the substantive fairness of a proposed settlement, "the district court is required to review both the terms of the settlement and any fee award encompassed in a settlement agreement" in tandem. *Fresno County Employees' Ret. Ass'n*, 925 F.3d at 72; *see also McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021) ("[T]he new

---

[212] Linda Mullenix, *Reflections on the Flying Buttresses of Class Action Settlement Approval*, 84 U. PITT. L. REV. 395, 416 (2022).
[213] I have not done as extensive research on the attorney fee issue as I would have liked. This is because I have a limited window to file this objection and, unlike a paid expert, I am not being compensated in any way for my time.
[214] And they tend to appear in every judgment. *See* In re Dell Techs. Inc. Class V S'holders Litig., No. 349, 2023, 2024 WL 3811075, at *6 (Del. Aug. 14, 2024) ("According to the court, the plaintiff's counsel worked on a fully contingent basis, expended 53,000 hours litigating the case, faced nearly 100 attorneys from prestigious firms, addressed complex legal and factual issues, and were of good standing in the legal community.").
[215] Vines v. Welspun Pipes Inc., 9 F.4th 849, 856 (8th Cir. 2021).
[216] Lowery v. Rhapsody Int'l, Inc., 75 F.4th 985, 988 (9th Cir. 2023).
[217] *Id.*

Rule 23(e) makes clear that courts must balance the proposed award of attorney's fees vis-à-vis the relief provided for the class in determining whether the settlement is adequate for class members.").[218]

Here, Plaintiffs have negotiated a nearly one-billion-dollar settlement amount—giant, in absolute terms. But the class is a nationwide class, and the class period spans multiple years (for part of the subclass, it spans a decade). In other words, there are millions and millions of members in the class. An objector in the *Gibson* case claims that "class exceeds thirty (30) million members."[219]

Plaintiffs and Defendants don't once mention the actual size of the class, which is the most critical component of the monetary "value" delivered. A billion-dollar fund—which would be reduced to under $600 million after all fees and expenses are deducted if Plaintiffs have their way—amounts to negligible recovery for an individual class member if there are thirty million class members.

It's simple math. The larger the denominator, the less valuable the recovery is. Not one expert or economist in this litigation has estimated what the actual monetary value of this settlement is for an *individual class member*. This is because Plaintiffs want to obfuscate the fact that the monetary recovery is next-to-nothing for an individual home seller in Kansas, Missouri. Meanwhile, attorneys will pocket a third of a billion dollars.

Plaintiffs and their expert attempt to bolster the value of the settlement by including the value of non-monetary relief. For reasons I discussed above, an attempt to value the injunctive relief is nothing but pure speculation at this point and should not be figured into the monetary value conferred by this settlement.[220]

### 4. A One-Third Fee is Almost *Never* Awarded in a $1 Billion Mega-Fund Case

Professor Klonoff notes that this is what is called a "mega-fund" case—a case where the monetary award is over $100 million. He observes that there is some difference of opinion among courts and commentors about whether plaintiffs should get a lower percentage fee in these sorts of cases:

> I am fully aware that *empirical studies reveal that a fee of 1/3 is above the average and median fee awards in class actions*, although it is close to the percentage range in the Eighth Circuit. I further recognize that, according to empirical studies, fee awards (as a percentage) tend to decline as the amount of the settlement increases, with the lowest percentage awards appearing in so-called mega-fund settlements.[221]

In a footnote, he cites studies[222] conducted by many of the other repeat-expert players. Based on their positioning in a footnote, the Court is likely to miss the significance of these studies. These studies all say that in mega-fund cases, the attorneys' fees awarded are *nowhere close* to the "normal" 33% range. Instead, they tend to be in the 10-15% range.

> ➤ In a detailed study of federal class action settlements over a two-year period, Professor Brian Fitzpatrick noted that fee percentages for a settlement exceeding $100 million

---

[218] Moses v. New York Times Co., 79 F.4th 235, 244 (2d Cir. 2023).
[219] OBJECTIONS_non_motions_by_Knie_Shealy_Mitch_Slade_10032024.pdf (accessed via https://www.inman.com /2024/10/07/seven-homesellers-object-to-deals-reached-in-gibson-commission-suit/).
[220] *See* Staton v. Boeing Co. (9th Cir. 2003) 327 F.3d 938, 974 (court may not include injunctive relief in valuing the common fund).
[221] Motion for Attorneys' Fees, Klonoff Declaration, at p. 48
[222] *Id.*

plunged well below 20 percent. By the time $500 million was reached, they plunged well below 15 percent, with most awards at that level *under even 10 percent.*[223]

➤ Professor Fitzpatrick's study reveals that for the period studied (2006–2007), both the mean and median fee percentages awarded from settlements between $500 million and $1 billion *were less than 13 percent.* Below is a table from Professor Fitzpatrick's study:

Table 11: Mean, Median, and Standard Deviation of Fee Awards of the Largest 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD |
|---|---|---|---|
| [$72.5 to $100] (n = 12) | 23.7% | 24.3% | 5.3% |
| [$100 to $250] (n = 14) | 17.9% | 16.9% | 5.2% |
| [$250 to $500] (n = 8) | 17.8% | 19.5% | 7.9% |
| [$500 to $1,000] (n = 2) | 12.9% | 12.9% | 7.2% |
| [$1,000 to $6,600] (n = 9) | 13.7% | 9.5% | 11% |

Sources: Westlaw, PACER, district court clerks' offices.

Another empirical study found that in settlements over $175 million, *the mean fee award was 12 percent, and the median award was 10.2 percent* as illustrated in this chart:[224]

Table 7: Mean, Median, and Standard Deviation of Fee Percent, Controlling for Class Recovery Amount, 1993–2008

| Range of Class Recovery (Millions) Decile | Mean | Median | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery > 1.1 <= 2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery > 2.8 <= 5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery > 5.3 <= 8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery > 8.7 <= 14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery > 14.3 <= 22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery > 22.8 <= 38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery > 38.3 <= 69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery > 69.6 <= 175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery > 175.5 | 12.0 | 10.2 | 7.9 | 69 |

Sources: Westlaw, LexisNexis, PACER.

[223] B. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 838 (2010).
[224] T. Eisenberg & G. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 265 tbl.7 (2010).

A study from 2024 found that in the securities law context, "as the settlements get into the top deciles, judges use *substantially lower fee percentages*, likely recognizing that higher percentages of mega-settlements could result in a windfall for the attorneys."[225]

All these studies conducted by leading class action scholars and empiricists show that in mega-fund cases, recovery is *much, much* lower than 33%.[226] Just three months ago, the Eighth Circuit Court of Appeals articulated the rationales supporting a lower percentage in mega-fund cases:

> The idea that underpins [the objector's] suggested method is that there's an "instinct that as funds reach gargantuan proportions, normal fee percentages would generate fees of such a high magnitude that they would provide a windfall to class counsel," *see* 5 William B. Rubenstein, Newberg on Class Actions § 15:81 (6th ed. June 2024 Update), as large recoveries are driven more by class size than attorney effort. In short, the argument runs, "it isn't ten times as hard to try a $100 million case as it [is] a $10 million case." *See, e.g., In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 933 (9th Cir. 2020).[227]
>
> . . .
>
> This does not mean that a court in a particular case must ignore the empirical reality that the percentage of fee awards tend to decrease as the size of a settlement fund increases, perhaps because of the potential that attorneys might receive an undeserved windfall.[228]

Despite the empirical evidence that mega-fund cases almost always receive lower fee awards on a percentage basis, Professor Klonoff proceeds to discuss why he nonetheless believes a 33% fee award is warranted in this billion-dollar mega-fund case. He provides a table where he collects "51 mega-fund cases that involved fee awards of 30 percent or greater (30 of which awarded 33 percent or more)." Apparently, this "cherry picking" of results is common among plaintiffs trying to get a large fee.[229] The messaging here is clear: other courts have approved large awards in mega-fund cases and so too should this Court.

What Professor Klonoff does not provide to this Court is the number of mega-fund cases there were during the relevant time period and how many of them approved rates that were lower than 33%.[230]

---

[225] Stephen J. Choi, Jessica M. Erickson, A.C. Pritchard, *The Business of Securities Class Action Lawyering*, 99 IND. L.J. 775, 827 (2024).

[226] *See also* § 2:9. Emerging common-fund-fee formula: Reasonable percentage of fund after consideration of specified guidelines under particular circumstances involved—Deviation from percentage norm or range in exceptional cases, 1 ATTORNEY FEE AWARDS § 2:9 (3d ed.)(quoting *In re Domestic Air Transp. Antitrust Litigation*: "While the benchmark for a percentage award in a normal common fund case falls between 20–30%, the present action is an exception to the typical common fund case because of the size of the recovery. ... Where fund recoveries range from $51–$75 million, fee awards usually fall in the 13–20% range. In megafund cases where extraordinarily large class recoveries of $75–$200 million and more are recovered, courts most stringently weigh the economics of scale inherent in class actions in fixing an appropriate percent recovery for reasonable fees ... . Accordingly, fees in the range of 6–10% and even lower are common in this large scale context.").

[227] In re T-Mobile Customer Data Sec. Breach Litig., 111 F.4th 849, 859-60 (8th Cir. 2024).

[228] *Id.*

[229] Stephen J. Choi, Jessica M. Erickson, A.C. Pritchard, *The Business of Securities Class Action Lawyering*, 99 IND. L.J. 775, 788 (2024) ("Law firms can cite the fee percentages awarded in other cases as precedent, but they cherry-pick cases with high fee percentages.").

[230] Professor Fitzpatrick notes that "district court judges approved 688 class action settlements over [a] two-year period" in 2006-2007. B. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD.

In other words, it is almost certain that during the period examined, there were hundreds of other cases awarding lower than 33% fees in mega-fund cases, thereby making the cases in the chart look like outliers rather than the norm.[231] This exact sentiment is echoed in a 2024 law review article by leading securities class actions scholars:

> For example, it is common for fee motions to cite cases in which the court awarded lead counsel 30% or more of the settlement fund, even though such fees are unusual in securities class actions, especially in cases involving larger settlements. Without more comprehensive data, however, judges and lead plaintiffs may not know that these precedents are outliers.[232]

This is such a problem that the authors of the study suggest that the parties themselves should have an obligation to provide judges with an accurate and comprehensive data set:

> Under current practice, law firms are not required to provide the court with the typical fee percentage or multiplier in similar cases. Instead, these firms often present a few examples of cases in which courts awarded an unusually high fee percentage or multiplier, typically without disclosing that these cases are outliers. Federal judges typically do not have enough experience with securities class actions to know the norms in different types of cases. Rather than allowing lead counsel to cherry pick the cases on which they rely, *judges should require them to disclose the mean fee percentage and multiplier in cases involving settlements of similar sizes*, using data from this study or other studies of securities class actions. This data should be *included in the brief itself*, not buried in voluminous appendices.[233]

To use a concrete example, if there were 1000 mega-fund cases during the time period examined[234] that awarded less than 30%, then 51/1000 wouldn't look like that many. It would mean that only 5% of awards were at 30% or above and that 95% of awards were lower than that. Like the point I made earlier, the denominator is important. This point was eloquently made by the Southern District of New York:

> More troubling, a non-random sample of five fee awards amounts to no more than looking out over a crowd and picking out one's friends. This approach just as easily could support a fee much lower than 13 percent. It does not take a statistical whiz to appreciate that a more helpful, though certainly not conclusive, approach would be to

---

811 (2010). It stands to reason that there were thousands of settlements entered into during the time period Professor Klonoff looked into.

[231] Apparently, it is common for experts to create a chart with all the cases where a court awarded outsized fees in mega-fund cases. Professor Silver (one of the repeat-experts) did so in a recent case. Objectors in that case pointed out the same thing I do here: "In all events, Professor Silver's citations in his Declaration, Table 1 – with average fee awards of 32.3% -- do not accurately portray the balance of case outcomes. There are scores of cases with settlements between $100 million and $1 billion -- not mentioned by Class Counsel or Professor Silver – that award much lower fees." https://fingfx.thomsonreuters.com/gfx/legaldocs/zgpomwrjqpd/uebt-objection-fees.pdf.

[232] Stephen J. Choi, Jessica M. Erickson, A.C. Pritchard, *The Business of Securities Class Action Lawyering*, 99 IND. L.J. 775, 788 (2024).

[233] *Id.* at 839.

[234] It seems like Professor Klonoff went back approximately 30 years.

consider the proposed fee in light of the distribution of all attorney fee awards in cases involving comparable settlement funds.[235]

Moreover, thirty-two of the fifty mega-fund cases referenced by Professor Klonoff involve funds of less than $200 million—less than one-fifth of what we are dealing with in this case. While they are technically mega-fund cases, they are not comparable to the $1 billion fund at issue in this case. The real question to be answered is what percentage of courts award 33% in attorneys' fees in billion-dollar mega-fund cases? I venture to guess that percentage is very low.

Professor Klonoff can only point to two recent cases[236] with recovery in the range involved in the instant case (around a billion dollars):

|  |  |
| --- | --- |
| In re Syngenta[237] | $1.5 billion (33.3%) |
| In re Urethane Antitrust Litig.[238] | $835 million (33.3%) |

Notably, Professor Klonoff was the attorney fee expert in *In re Syngenta*, so any argument that invokes *In re Syngenta* involves bootstrapping. Professor Klonoff convinced the Court in *In re Syngenta* to approve a 33% fee and is now using that case as support for the fee petition here. Professor Fitzpatrick, one of the other repeat-players that Professor Mullenix identified in her article, filed the declaration in support of attorneys' fees in *In re Urethane Antitrust Litig.*

Neither of these cases, however, support the award sought here. That is because in both cases, the settlement afforded significant monetary relief to individual class members. In *In re Urethane Antitrust Litig.*, the class size appeared to be only 2,200 class members.[239] $835 million dollars (pre-deductions for attorneys' fees) spread among only 2,000 class members is a very healthy chunk of change.

Similarly, in *In re Syngenta*, the court found that the amount of the settlement "represents a significant percentage of the *actual* nationwide damages alleged by the MDL plaintiffs' experts."[240] The court stated that the class size was approximately "650,000 in number."[241] By contrast, here, the class size is well into the millions (maybe tens of millions)[242] which means that the value of what otherwise seems like a sizeable settlement is diluted substantially.

In short, in the only two recent "comparable" mega-fund cases that Professor Klonoff identified, the class sizes were much smaller than the one in this case (in one case, only 2,200 class members). Monetary recovery, therefore, was meaningful and valuable for the class. Plaintiffs do not argue—and cannot argue—that this settlement provides significant compensatory redress to individual members of the class.

---

[235] In re IndyMac Mortg.-Backed Sec. Litig., 94 F. Supp. 3d 517, 523 (S.D.N.Y. 2015), *aff'd sub nom.* DeValerio v. Olinski, 673 F. App'x 87 (2d Cir. 2016) (court declined a 13% award in a $346 million mega-fund case).
[236] The other is a nearly twenty-year old case from Florida. Allapattah Services, Inc. v. Exxon Corp., 454 F. Supp. 2d 1185 (S.D. Fla 2006).
[237] AG MIR 162 Corn Litig., 357 F.Supp.3d 1094 (D. Kan. 2018).
[238] No. 2:04 md-01616-JWL (D. Kan. July 29, 2016) (Dkt. No. 3276).
[239] In re Urethane Antitrust Litig., No. 2:04 md-01616-JWL (D. Kan. July 29, 2016) (Dkt. No. 3276)("Objections were filed by only two sets of objectors *out of some 2,200 class members.*")(emphasis added).
[240] 357 F. Supp. 3d 1094, 1103 (D. Kan. 2018).
[241] *Id.*
[242] On average, 5-6 million properties are sold per year and the class period spans multiple years (10 years in the case of Missouri class members). https://www.statista.com/statistics/226144/us-existing-home-sales/. Granted, not all of these sales would necessarily qualify for membership in the class.

If this Court awards Plaintiffs $333,000,000, I believe it will be one of the largest awards in Missouri history (if not, the largest). Recently, a court in Delaware awarded $267 million in attorneys' fees, which garnered national headlines like "Whopper $267 Million Fee Award Shows Why Delaware is Different."[243] The settlement was the *second highest* securities class action recovery in Delaware history.[244] Notably, this gargantuan award was only 26.67% of the settlement amount. In that case, despite awarding a very large fee in a mega-fund case (still lower than that requested here), the court said:

> Windfalls are a particular concern in megafund cases. As lawyers and judges, we understand that representative litigation performs a valuable service to stockholders who individually might not have the resources or the will to pursue fiduciaries for breach of their duties. The potential for large fees incentivizes counsel to accept challenging cases. They assume the risk of recovering nothing in the end. In Delaware, we are used to big numbers.

> But it is also legitimate to ask, outside our somewhat insular legal universe, whether the public would ever believe that lawyers must be awarded many hundreds of millions of dollars in any given case to motivate them to pursue representative litigation or to discourage counsel from settling cases for less than they are worth. At some point, the percentage of fees awarded in a megafund case exceed their value as an incentive to take representative cases and turn into a windfall.[245]

The court alludes to something important with the sentiment questioning whether "the public would ever believe that lawyers must be awarded many hundreds of millions of dollars in any given case. . . "[246]

It is no secret that class actions get a bad reputation. And that reputation is sometimes well deserved. There is a perception that in a class action, an average class member walks away with a toaster while the attorneys walk away with millions of dollars (here, hundreds of millions of dollars).[247] Fee requests such as the one in the instant case do nothing but validate that perception.

### 5. EIGHTH CIRCUIT PRECEDENT DOES NOT SUPPORT SUCH AN EXORBITANT FEE

Professor Klonoff points this Court to a very recent decision by the Eight Circuit Court of Appeals dealing with attorneys' fees, *In re T-Mobile Customer Data Sec. Breach Litig.*[248] He uses this case to say that this Court is not required to (but may choose to) perform a lodestar check. What he does not reveal

---

[243] https://www.reuters.com/legal/transactional/column-whopper-267-million-fee-award-1-billion-dell-case-shows-why-delaware-is-2023-08-01/.

[244] In re Dell Techs. Inc. Class V S'holders Litig., No. 349, 2023, 2024 WL 3811075, at *6 (Del. Aug. 14, 2024) ("The Court stated that "the settlement ranks highly when considering the equity value of the transaction (4.18%)" and that "[p]laintiff's counsel achieved an unprecedented result.").

[245] In re Dell Techs. Inc. Class V S'holders Litig., No. 349, 2023, 2024 WL 3811075, at *12 (Del. Aug. 14, 2024).

[246] *Id.*

[247] Ittai Paldor, *Lawyers on Auction - Protecting Class Members*, 89 U. CIN. L. REV. 344, 348 (2021)("It has been argued that 'most class actions lead to no recovery for absent class members, at all, and those that do quite often provide only minimal benefits.' Studies have found that gains reaped by plaintiffs' lawyers are grossly disproportionate to the supposed benefits of attorney-driven class actions, and that 'too many cases are settled with illusory benefits to class members and large fees for lawyers.' There is an abundance of examples where 'class members received nearly worthless coupons and class counsel walked away with large fees.'").

[248] In re T-Mobile Customer Data Sec. Breach Litig., 111 F.4th 849 (8th Cir. 2024). Note that Professor Fitzpatrick, one of the frequent go-to experts on attorneys' fees, filed a declaration in this case.

(nor do the Plaintiffs reveal) is that the Eighth Circuit disapproved of a 22.5% fee request in this most recent mega-fund case.

In that case, T-Mobile agreed to create a "$350 million fund from which individual class members could recover up to $25,000 for out-of-pocket losses that they could prove resulted from [a] data breach, including time spent trying to remedy issues relating to the breach. Those who didn't submit proof of loss could receive $25 (or $100 if a member of the California subclass)."[249] Class counsel moved for a fee award of 22.5% of the $350 million settlement fund. The Eighth Circuit Court of Appeals denied the request for attorneys' fees—at a rate more than 10% *less than sought here* and on an amount *three times less than sought here*. Otherwise stated, the Eighth Circuit thought that a fee award of 22.5% was too high where the recovery was $350 million.[250] The plaintiffs came back and requested a fee of just over 13%.[251]

The Eighth Circuit dealt what I believe is a fatal blow to the Plaintiffs' petition for 33% in attorneys' fees. In disapproving the requested 22.5% fee, the Court noted:

> If we permitted the fee award here to stand, *it would mean that counsel could make $7,000 to $9,500 an hour, which we think no reasonable class member would willingly pay to an attorney* to help resolve this claim, . . . . Reducing the fee award to, say, half of what was requested (resulting in fees of $3,500 to $4,750 per hour) could hardly be considered a penalty.[252]

This is *concrete guidance* from the Eighth Circuit just three months ago that an award which gives plaintiffs' attorneys between $7,000 to $9,500 an hour is not "reasonable."[253]

In the instant litigation, there is one attorney, Mr. Seltzer, who would be making $7,964 an hour under the fee request ($2,200/hour multiplied by a 3.62 multiplier). This falls squarely within what the Eighth Circuit refused to award. Another attorney, Mr. Ketchmark, would be making $5,240/hour ($1,450/hour multiplied by a 3.62 multiplier), just a little lower than the fee that was disapproved by the Eighth Circuit. There are many other attorneys billing at similar rates to Mr. Ketchmark.

No reasonable class member would willingly pay an attorney between $5,240/hour and nearly $8,000/hour—particularly not to receive a paltry payout representing a less-than-negligible portion of their actual losses.

6. <u>PLAINTIFFS HAVE NOT ESTABLISHED THAT THEIR LODESTAR FEES WERE BILLED AT PREVAILING MARKET RATES</u>

Counsel seeking recovery of fees bears the burden of establishing "a factual basis to support the award."[254] Plaintiffs have also not put forward evidence to show that billing rates of $1,000-

---

[249] *Id.* ("Class members could also enroll free of charge in an identity-defense and monitoring service for two years, which class counsel say carries a retail price of $96 per year. And even if they didn't enroll in that service, all class members would receive two years of "restoration services" that gave them access to "fraud resolution specialists who can assist with important tasks" like disputing inaccurate credit reports and placing fraud alerts with credit bureaus. Finally, T-Mobile committed to spend an additional $150 million over two years to improve its data security.").

[250] In re T-Mobile Customer Data Sec. Breach Litig., 111 F.4th 849, 861 (8th Cir. 2024) ("We believe that the district court abused its discretion by awarding an unreasonable fee.").

[251] In re: T-MOBILE CUSTOMER DATA SECURITY BREACH LITIGATION., 2024 WL 4203651 (W.D. Mo.).

[252] *Id.* at 856 (emphasis added).

[253] *Id.*

[254] Thornburg v. Open Dealer Exch., LLC, No. 17-06056-CV-SJ-ODS, 2019 WL 3291569, at *4 (W.D. Mo. July 22, 2019).

$2,200/hour are normal or customary. Are these the rates that they charge anyone off the street? Or are these inflated, "we-are-pursing-a-class-action" rates? It matters because all we have is the say-so of the plaintiffs that "these are our rates."

Plaintiffs are required to establish that these are standard market rates[255] in that geographical area that do not already account for the risk involved in prosecuting a class action. In other words, you don't get to charge higher rates because it's a risky case and then multiply those higher rates by 3.62 because, once again, it's a risky case.[256]

In *Martin v. Safe Haven Sec. Servs., Inc.*, the Western District of Missouri said:

> A reasonable hourly rate is usually the ordinary rate for similar work in the community where the case has been litigated. When determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing market rates.[257]

It said the following about typical hourly rates for attorneys in Missouri:

> To support their hourly rates, Class Counsel represents "the average hourly rate for a partner-level attorney in class action litigation" in the Kansas City area is $675.75. Class Counsel provides information published by *Missouri Lawyers Weekly* but does not explain how they calculated the average hourly rate. According to the exhibit provided, the hourly rate of the fourteen highest paid attorneys (identified as partners or of counsel) in Kansas City ranged from $650 to $865 in 2019. Twelve attorneys' practices are identified as "Class Action/MDL," and two attorneys' practices are identified as "Public Interest Class Action." Regarding other Kansas City partners who practiced in "Class Action/MDL," their hourly rates ranged from $400 to $580.

> The data provides some insight into Kansas City-based attorneys' hourly rates. But the information is based on a small segment of the Missouri bar. *See 2019 Billing Rates*, Mo. Law. Wkly., Aug. 5, 2019, at BR2-BR7 (noting data was obtained "from fee applications filed with courts within the past twelve months" from "213 Missouri-based attorneys" of varying experience and out-of-state counsel associated with Missouri-based firms). Additionally, as the publication noted, "[a] large portion of [the] data [was] thanks to a massive [$1.5 billion] class-action settlement" where "[a] third of the settlement went to fees for hundreds of lawyers across the country who aided in the litigation." The filings accompanying the class-action settlement "reveal[ed] the biggest hourly fees" in the publication's billing rate report for 2019. *Even when including the class-action settlement in its analysis, the publication found the median hourly rate for a Kansas City partner was $475.* (noting the hourly rate was calculated from "a pool of 178 lawyers" in Kansas City). Critical to this Court's analysis of what constitutes a reasonable hourly rate, the data does not identify the community in which the matters were litigated. Given that the listed attorneys were involved in class actions and

---

[255] Vines v. Welspun Pipes Inc., 9 F.4th 849, 855 (8th Cir. 2021) ("To calculate reasonable attorneys' fees, federal courts begin by "employ[ing] the lodestar method, which multiplies the number of hours worked by the *prevailing* hourly rate."). The prevailing hourly rate is not the rate that an attorney unilaterally sets for himself.

[256] I am mindful that the attorneys are seeking a percentage-of-the-fund recovery. However, a court has discretion to apply a lodestar analysis—whether freestanding or as a check. If the purported lodestar rates are not accurate, then the check is not accurate.

[257] No. 19-CV-00063-ODS, 2020 WL 4816418, at *5 (W.D. Mo. Aug. 19, 2020)(citations omitted).

multidistrict litigation, it is reasonable to assume at least some cases were litigated outside the Kansas City area.[258]

Even though this case is a couple years old, the rates it cites are instructive. It indicates that the "median hourly rate for a Kansas City partner was $475."[259] The plaintiffs in that case had argued it was $675.

In either event, it is nowhere near the $1,450 Mr. Ketchmark charges or the $2,200 that Mr. Seltzer charges.[260] Plaintiffs in *Martin* also claimed that $150/hour was a reasonable rate for a paralegal. The hourly rates of the paralegals in this case are two to three times that amount—usually in the $300/hour to $400/hour range. With a 3.62 multiplier, it is over $1,000/hour.

In *M.B. v. Tidball*, a case decided in 2020 and affirmed in 2021, the plaintiffs represented a class of foster children and reached "a settlement that will improve the processes by which children in foster care are administered psychotropic drugs, reducing the risk of inappropriate and excessive medication."[261] In considering appropriate attorneys' fees, the Court said "its rulings regarding rates will be in keeping with Missouri rates, they will take into account any unique experience, knowledge, or specialization that a given attorney brought to bear on this case."[262] It then proceeded to award a rate of $500/hour for an attorney with "more than 30 years of litigation experience." The attorney's experience "includes serving as General Counsel of the Office of Administration within the Executive Office of the President and as a partner in the Chicago litigation firm Cahill, Christian & Kunkle Ltd."[263] The court proceeded to award attorneys' fees at rates of $500/hour or lower for very experienced and very successful counsel.[264]

The reason that the actual "prevailing" rates are used and information about what tasks an attorney undertook must be provided is to have an accurate lodestar crosscheck. If the prevailing rates are half of what Plaintiffs are claiming, then the $92 million in fees drops to $46 million. The lodestar multiplier doubles to over 7 times the reasonable hourly rate, a number the Eighth Circuit would surely say is outside the reasonable lodestar cross-check range.[265]

*In re T-Mobile Customer Data Sec. Breach Litig.* provides insight into what billing rates might be in Missouri for experienced counsel in high-profile litigation. In that case, the court said that plaintiffs were asking

---

[258] *Id.* (internal citations omitted). *See also id.* ("For example, Defendant cites a decision issued by the Honorable Nanette Laughrey in 2020 where she found hourly rates between $215 through $400 were reasonable.").

[259] *Id.*

[260] See also Thornburg v. Open Dealer Exch., LLC, No. 17-06056-CV-SJ-ODS, 2019 WL 3291569, at *4 (W.D. Mo. July 22, 2019) ("In support of their argument, Class Counsel submitted, among other things, a declaration from a Kansas City attorney, Tracey George, whose hourly rate for collective actions is $575. Doc. #146-3, at 3-4. However, according to her declaration, George litigates "high value collective and class actions" and "primarily" litigates "wage and hour and product liability cases." *Id.* at 3. This declaration does not support Class Counsel's argument that the hourly rate in this particular matter, an FCRA class action (unlike George's cases which include wage and hour and product liability cases), should be $550."). *See also id.* *5 ("Within the last two years, this Court and the District of Kansas found $450 to be a reasonable hourly rate for Class Counsel in other class actions.").

[261] M.B. v. Tidball, No. 2:17-CV-4102-NKL, 2020 WL 1666159, at *10 (W.D. Mo. Apr. 3, 2020), aff'd sub nom. M.B. by Eggemeyer v. Tidball, 18 F.4th 565 (8th Cir. 2021).

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] In re T-Mobile Customer Data Sec. Breach Litig., 111 F.4th 849, 861 (8th Cir. 2024) ("Though our court has never held that a particular multiplier is always unreasonable, we have recognized that an award with a multiplier of 5.3 is "high.""). The multiplier of 7 would be exceedingly high in a mega-fund case.

for a multiplier of 9.6.[266] That multiplier would result in impermissible fees of $7,000-$9,500 per hour. This means that class counsels' hourly rates in *In re T-Mobile Customer Data Sec. Breach Litig.* were $729/hour to $989/hour ($7,000-$9,500 divided by 9.6).

By contrast, in this case, there are *fifteen attorneys* billing at rates much higher than $729/hour to $989/hour. The rates range from $1,057/hour on the low end to $2,200/hour on the high end.

| TIMEKEEPER | POSITTION | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Berry, Matthew R. | Partner | 1179 | $1,100 | $1,296,900 |
| Seltzer, Marc M. | Partner | 1441 | $2,200 | $3,170,200 |
| Sklaver, Steven G. | Partner | 16 | $1,500 | $24,000 |

| TIMEKEEPER | POSITION | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Michael Ketchmark | Partner | 6,986.3 | $1,450 | $10,130,135.00 |
| Scott McCreight | Partner | 7,061.3 | $1,350 | $9,532,755.00 |
| Ben Fadler | Partner | 2,328.8 | $1,250 | $2,911,000.00 |

| TIMEKEEPER | POSITTION | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Brandon Boulware | Attorney | 5,841.3 | $1,250 | $7,301,625.00 |
| Jeremy Suhr | Attorney | 3,648.6 | $1,100 | $4,013,460.00 |

| TIMEKEEPER | POSITTION | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Daniel C. Hedlund | Partner | 21.25 | $1,100.00 | $23,375.00 |
| Jason S. Kilene | Partner | 22.75 | $1,000.00 | $22,750.00 |

---

[266] *Id.* ("That resulted in a lodestar "multiplier" of 9.6, meaning that counsel would get paid about 9.6 times their customary hourly rates.").

| TIMEKEEPER | POSTITION | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| George Farah | Partner | 638.1 | $1057 | $674,471.70 |
| William Anderson | Partner | 145.1 | $1057 | $153,370.70 |
| Matthew Handley | Partner | 5.7 | $1057 | $6,024.9 |

| Herold, Janet | Legal Director (current) | 2 | 1260.00 | $2520.00 |
|---|---|---|---|---|

| ATTORNEY | STATUS | CURRENT HOURLY RATE | TOTAL HOURS | LODESTAR AT CURRENT RATES |
|---|---|---|---|---|
| Steve Berman | Partner | $1,350.00 | 397.90 | $537,165.00 |

What *In re T-Mobile Customer Data Sec. Breach Litig.* makes clear is that the attorneys in this case are not billing at normal or prevailing market rates for experienced counsel in Missouri.

In a 2023 case, the Western District of Missouri stated that "Plaintiff's counsel's claimed rate of $550 an hour" was "an amount which is already high for this market."[267] The court declined to award fees which would make the "effective rate Plaintiff's counsel seeks to charge [ ] more than $2,700 an hour." It viewed such a request as "wildly disproportionate."[268] Yet, Plaintiffs in this case seek to have us believe that rates of $1,000-$2,200/hour are typical lodestar rates that should be bumped up by 362%. In other words, the Western District of Missouri refused to approve multiplied rates which are about the same as some of the lodestar rates sought here.

Only one law firm declaration (out of a dozen or so submitted) even recognizes that a firm must establish that its rates are "prevailing" market rates. This, in itself, is concerning. It seems like Plaintiffs are just submitting what they say their rates are and are asking this Court to rubber stamp them.

The Dirks declaration cites the following authority in support of its contention that it charges prevailing market rates: *In re T-Mobile Customer Data Security Breach Litigation, Rogowski v. State Farm Life Insurance,* and *Jackson County v. Trinity Industries.*[269] First, the Dirks declaration cites the district court's decision in *In re T-Mobile Customer Data Security Breach Litigation,* not the Eighth Circuit decision that *reversed* the district court and said that the hourly rates approved were exorbitant. With respect to *Rogowski,* where Professor Klonoff again was the fee expert, the court did not mention hourly rates at all in its judgment, nor did it find that a certain hourly rate was reasonable. And *Jackson County* simply said that a "blended rate" of $662 was reasonable.[270] We don't know what went into this blended rate. But certainly, if you blend the rate of the partners in this case, it is likely at least double the blended rate in *Jackson.*

7. PLAINTIFFS' ATTORNEYS MAY HAVE MISSTATED THEIR HOURLY BILLING RATES

There are anomalies I have found that suggest certain plaintiffs' attorneys misstated their billing rates—or, more charitably, charged completely different rates to different clients during the same time period. For instance, In 2022, Mr. Dameron a partner at Williams, Dirks, Dameron LLC submitted a

---

[267] Rouse v. Language Line Servs., Inc., No. 4:22-CV-0204-DGK, 2023 WL 4535873, at *3 (W.D. Mo. June 6, 2023).

[268] *Id.*

[269] Cited at Dirks Declaration, at p. 8.

[270] Note that in that case, the court awarded an 18% fee to class counsel, which is eminently more reasonable than the 33% requested in this case. *County v. Trinity Industries, Inc.,* No. 1516-CV23684, 2022 WL 4235745, at *2 (Mo.Cir. Aug. 30, 2022).

declaration[271] in a different class action, *Hayes v. Nissan*, where he claimed his hourly rate was $950/hour:

**HAYES v. NISSAN DECLARATION – AUGUST 2022**
**(CLAIMED RATES FOR 2017-2022)**

| TIMEKEEPER | ROLE | HOURLY RATE ($) | HOURS | LODESTAR ($) |
|---|---|---|---|---|
| Matt Dameron | Partner | $950 | 720.8 | 684,760 |
| Eric Dirks | Partner | $950 | 82.1 | 77,995 |
| John Doyle | Attorney | $550 | 34.8 | 19,140 |
| Amy Jackson | Attorney | $450 | 271.8 | 122,310 |
| Courtney Stout | Attorney | $450 | 8.5 | 3,825 |
| Katie Graham | Paralegal | $175 | 116.1 | 20,317.50 |
| Brittni Strickland | Paralegal | $175 | 1.3 | 227.50 |
| **TOTAL** | | | **1,235.4** | **928,575** |

Approximately two years later in this case, Mr. Dirks (Mr. Dameron's partner) submitted that Williams, Dirks, Dameron LLC partner rates were $1,250/hour:

**BURNETT v. NAR DECLARATION – SEPTEMBER 2024**
**(CLAIMED RATES FOR 2019-2024)**

32.    My firm's lodestar through August 31, 2024, in the litigation is:

| TIMEKEEPER | POSITION | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Allen, Alexis | Associate | 49.2 | $600 | $29,520.00 |
| Cheung, Katie | Associate | 2,139.6 | $600 | $1,283,760.00 |
| Dameron, Matthew | Partner | 1,283.7 | $1,250 | $1,604,625.00 |
| Dirks, Eric | Partner | 4,183.3 | $1,250 | $5,229,125.00 |
| Flores, Carlos | Paralegal | 66.3 | $300 | $19,890.00 |
| Graham, Katie | Paralegal | 24.9 | $300 | $7,470.00 |
| Mann, Clinton | Associate | 137.4 | $600 | $82,440.00 |
| Stout, Courtney | Associate | 2,204.8 | $600 | $1,322,880.00 |
| Strickland, Brittni | Paralegal | 76.5 | $300 | $22,950.00 |

Consider the enormous rate jumps across the board:

Partner:        $950 to $1,250 = 32% rate increase

Associate:      $450 to $600   = 33% rate increase

Paralegal:      $175 to $300   = 71% rate increase

Bear in mind that the *Burnett* class action was filed in 2019, when the litigation in *Hayes v. Nissan* was still ongoing. As of August 2022, when Mr. Dameron submitted his declaration, he had presumably been working on the *Burnett* case for three years (since 2019). By his own admission, in the 2019-to-2022-time frame, prevailing rates were $950 for a partner, $450 for an associate, and $175 for a paralegal. Yet, those weren't the rates he was charging to the *Burnett* plaintiffs. Mr. Dameron was "billing" the *Hayes* plaintiffs at a rate of $950/hour and the *Burnett* plaintiffs at a rate of $1,250/hour. Similarly, Brittani Strickland (a paralegal) was "billing" the *Hayes* plaintiffs at a rate of $175/hour and the *Burnett* plaintiffs at a rate of $300/hour.

---

[271] http://www.missourifloorpansettlement.com/media/3998676/mld_declaration_for_attorneys__fees.pdf.

This goes to show you that these numbers have just been made up. It cannot be that $950 was the going rate for partners in 2022 in the *Hayes* case, but not the going rate for partners in 2022 in the *Burnett* case.

In his *Hayes* declaration, Mr. Dameron says:

> 18.     Our billing rates are set in line with our research into the prevailing rates charged by comparable firms in our legal market. Our rates are based on the years of experience of our various practitioners, their standing in their respective fields, the prevailing rates charged by comparable firms, the legal markets where services are rendered, and the complexity of the work undertaken for our clients.

> 22.     The time that I have spent on this case has limited my ability to take on other, potentially profitable work. Because my office is relatively small, any time I spend on this case necessarily reduces the time I have available to work on other matters.

> Executed this 16th day of August, 2022 in Kansas City, Missouri.

In the *Burnett* declaration, Mr. Dirks submits completely different billing rates even though there is extensive crossover between the two periods:

> 41.     The lodestar summary reflects Williams Dirks Dameron LLC's extensive experience in the field, the complexity of the matters involved in this litigation, and the prevailing rate for providing such services. We further affirm that the rates submitted with this Declaration are based on rate scales, as annually adjusted, submitted and approved by other courts.

> 29.     The time we have spent on this litigation over the last five years has substantially limited our ability to take on other, potentially profitable work. Because my office is relatively small, any time I spend on this litigation necessarily reduces the time I have available to work on other matters. I have personally declined to work on numerous promising cases due to my commitments in prosecuting this litigation.

114

Notably, in both declarations, the firm contends that the complicated nature of the case supports an outsized fee because of the inability to work on other matters (yet, clearly, the firm was prosecuting several class actions simultaneously).[272]

There are also anomalies in billing rates for Marc Seltzer, the highest billing attorney in this case. His purported hourly rate (from 2019-2024) was $2,200. Yet, in 2017,[273] his hourly rate was $1,000/hour lower:

## IN RE ANIMATION WORKERS ANTITRUST LITIGATION
### (CLAIMED RATES FOR 2017)

| Marc Seltzer | Partner | $1,200 | 201.8 | $242,160.00 |
| Steven Sklaver | Partner | $750 | 369.8 | $277,350.00 |
| Matthew Berry | Partner | $575 | 1466.80 | $843,410.00 |

## BURNETT V. NAR
### (CLAIMED RATES FOR 2019-2024)

| TIMEKEEPER | POSTITION | HOURS | RATE | TOTAL |
| --- | --- | --- | --- | --- |
| Berry, Matthew R. | Partner | 1179 | $1,100 | $1,296,900 |
| Seltzer, Marc M. | Partner | 1441 | $2,200 | $3,170,200 |
| Sklaver, Steven G. | Partner | 16 | $1,500 | $24,000 |

Mr. Seltzer's rate went from $1,200/hour to $2,200/hour = 83.3% increase

Mr. Berry's rate went from $575/hour to $1,100/hour = 91% increase

Mr. Sklaver's rate went from $750 to $1,500/hour = 100% rate increase

It is impossible to believe that billing rates increased from 83% to 100% in a two-year period (recall, *Burnett* was filed in 2019). Again, these charts just show that the Plaintiffs' billing numbers seem to be plucked from thin air.

Similar patterns appear with other attorneys in this case. As of late 2021, according to a U.S. magistrate judge in Kansas, "[Attorney] Boulware's hourly rate is $575, . . ."[274] The Court stated that plaintiff had "submitted a declaration from a Kansas City-area attorney with extensive wage and hour experience to support the claimed rates." In that attorney's experience, the hourly rate "is commensurate with those charged by hourly attorneys of similar experience and success handling complex litigation on both a local and national basis."[275]

---

[272] https://x.com/wddlaw?lang=en. Firm's Twitter account shows class counsel prosecuting multiple complicated class actions simultaneously.

[273] http://www.animationlawsuit.com/media/895541/04-10-17_declaration_of_steven_sklaver_iso_motion_for_attorneys_fees__3_.pdf.

[274] https://ecf.ksd.uscourts.gov/cgi-bin/show_public_doc?2020cv2339-92.

[275] Florece v. Jose Pepper's Restaurants, LLC, No. 20-2339-ADM, 2021 WL 5042715, at *7 (D. Kan. Oct. 29, 2021).

Somehow, that "reasonable" rate magically increased to $1,250/hour—a 117% increase—for *this* case. Mr. Boulware is one of the highest-billing attorneys in this case.

| TIMEKEEPER | POSTITION | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Brandon Boulware | Attorney | 5,841.3 | $1,250 | $7,301,625.00 |

Billing at his actual $575/hour rate, Mr. Boulware would have recorded fees of approximately $3.5 million (not over $7 million). And recall, Plaintiffs are asking for a 3.62 multiplier on the inflated billing rates—which means that he is asking this Court to award $26,431,882.50 for his work. This would amount to a 7.5 multiplier if we used Mr. Boulware's actual rates.

This Court should, at the very least, look into these billing anomalies. From an outside perspective, it looks like counsel created special billing rates *just for this case* which are highly inflated and different from what they have publicly represented constitute their normal billing rates.

8. <u>PLAINTIFFS HAVE NOT PUT FORWARD EVIDENCE OF APPROPRIATE BILLING PRACTICES</u>

There are no billing records submitted[276] so we have no ability to see what sort of work was being done and billed at these extremely high rates.[277] Was travel time being billed at rates of $2,200/hour? Clerical or administrative work? This Court and class members have no ability to gauge what the lead attorneys in this case were doing to bill these hours at these rates.[278]

I highly suspect that the lodestar hours are bloated. In *Brown v. Google*, the defendant recently opposed a motion for attorneys' fees exceeding $200,000,000 arguing, in part:

> First, the Court should reduce counsel's bloated lodestar. Counsel seek reimbursement for an army of 72 attorneys (including 21 partners) and 25 staff seemingly assigned with no concern for efficiency-e.g., four attorneys to defend depositions, ten attorneys at hearings. Twenty-four partners and associates billed four million dollars in fees *but did not even appear in the case.* And with no client minding the bills, counsel recorded time with abandon-e.g., a senior partner block-billed 23 hours in a single day (at $1,450/hr) for travel and research, and another block-billed 10 hours (at $2,500/hr) to attend a hearing at which he did not appear. Counsel exacerbated their over-lawyering by charging market-leading rates, including $676/hr for document reviewers-leading to over $15 million for document review alone. At the threshold, the Court should reduce counsel's lodestar to no more than $40 million to account for these and other inefficiencies . . .[279]
>
> . . .
>
> Any one of the three national law firms seeking compensation could have prosecuted this case. They teamed up to mitigate contingency risk, but tripled the effort in the

---

[276] At least not as part of the motion.

[277] Martin v. Safe Haven Sec. Servs., Inc., No. 19-CV-00063-ODS, 2020 WL 4816418, at *7 (W.D. Mo. Aug. 19, 2020) ("[W]hile staffing a case with multiple attorneys across multiple organizations is not unreasonable, it necessarily carries inefficiencies that should be addressed through the exercise of billing judgment." *M.B. v. Tidball*, No. 2:17-CV-4102-NKL, 2020 WL 1666019, at *15 (W.D. Mo. Apr. 3, 2020) (applying a ten percent reduction to attorneys' hours to address the "inefficiencies inherent in cases that are staffed by multiple attorneys")).

[278] Martin v. Safe Haven Sec. Servs., Inc., No. 19-CV-00063-ODS, 2020 WL 4816418, at *7 (W.D. Mo. Aug. 19, 2020).

[279] Chasom BROWN, et al., on behalf of themselves and all others similarly situated, Plaintiffs, v. GOOGLE LLC, Defendant., 2024 WL 3797001 (N.D.Cal.).

process with no regard for the resulting inefficiencies. The numbers are staggering. They seek reimbursement for the time of 72 attorneys and 25 staff. As a point of reference, Google's outside counsel team consisted of 43 attorneys, including 10 who billed fewer than 20 hours to the case. Plaintiffs' retention of three firms caused egregious over-staffing that would have made any paying client balk. [280]

Although I have not seen time records in the instant case, the statement about "an army" of attorneys is equally applicable here. It stands to reason that there were, at the very least, inefficiencies in billing. According to a news report, the court in *Brown* seemed poised to disapprove the fee request involving a 3.5x multiplier. The judge in that case is reported to have indicated that she would unlikely ever give a multiplier above three for a successful class action.[281]

### 9. PLAINTIFFS SHOULD NOT RECEIVE A LODESTAR MULTIPLIER FOR NON-ATTORNEY TIME

It was my belief prior to preparing this submission that when a plaintiff submitted a request for attorneys' fees, it was for *attorneys'* fees. Apparently, I was wrong. Here, Plaintiffs would like the Court to award a 3.62 multiplier for attorney hours as well as the hours of non-attorneys: paralegals, paralegal assistants, law clerks, law fellows, and investigators. In my view, it is inappropriate for the Court to apply a multiplier to these charges.

First, as with the attorney time, Plaintiffs have not established that the paralegal and other staff rates were reasonable and prevailing market rates. In fact, all evidence is to the contrary.[282] Second, using a multiplier for these non-legal roles means that class members are "paying" upwards of $1,500/hour for paralegal work and over $2,300/hour for investigative work. Plaintiffs are seeking almost *$20 million in inflated "fees"* for non-legal staff.[283] The money would not go to the paralegals, law clerks, and investigators. It would go into the pockets of the lawyers.

Where does it end? Why not bill at 3.62 times normal rates for administrative assistants, couriers, accounting clerks, and anyone else with a non-attorney role? It may well be the standard in class actions that anyone who "bills" gets to have their rates multiplied by some ridiculous number. But someone needs to call attention to what seems like an unscrupulous attempt to pad already very generous billing rates.

---

[280] *Id.*

[281] https://news.bloomberglaw.com/litigation/google-incognito-case-attorneys-unlikely-to-win-217-million ("The close-to-quarter-billion-dollar request by the plaintiffs' attorneys—from Boies Schiller Flexner LLP, Susman Godfrey LLP, and Morgan & Morgan—is based on what they said was 78,880 hours of work on the case. That accounts for $62 million in standard billing rates, which should be multiplied by 3.5 in what is known as a "lodestar multiplier" given to lawyers in successful class actions, the plaintiffs' attorney argued. Rogers said that it is unlikely she would ever give a multiplier above three for successful class actions.").

[282] Florece v. Jose Pepper's Restaurants, LLC, No. 20-2339-ADM, 2021 WL 5042715, at *7 (D. Kan. Oct. 29, 2021) ("Paralegal Donnelly's hourly rate is $200. Florece provides no information as to Donnelly's experience or the prevailing market rate for similar paralegals in the Kansas City area. In a recent civil rights case, Judge Crabtree observed that "[r]ecent rulings by our court and the Western District of Missouri will not support a rate of $200 an hour for ... paralegals." *M.B. v. Howard*, —— F.Supp.3d ——, 2021 WL 3681084, at *14 (D. Kan. Aug. 19, 2021) (finding $150 per hour is reasonable for paralegals). In the wage and hour context, courts have generally approved hourly rates of $150 or less for paralegals. *See, e.g., McMillian v. BP Serv., LLC*, No. 19-2665-DDC-TJJ, 2020 WL 4015259, at *2 (D. Kan. July 16, 2020) (approving $150); *Hoffman*, 2017 WL 25386, at *7 (approving $130, $110, and $100).

[283] The number is calculated by multiplying non-lawyer time by 3.62. By my calculations, the number is $19,739,652.55.

Again, I am cognizant that Plaintiffs are asking the Court to use the percentage of the fund method of recovery.[284] However, the actual amount of work performed by *attorneys* at prevailing market rates informs the lodestar cross-check at the very least.

## 10. THIS COURT SHOULD REVISIT ITS PRIOR RULING ON ATTORNEYS' FEES

In May 2024, this Court ruled that a 33% attorneys' fee award was warranted. With respect, I do not believe that the award can stand under the Eighth Circuit precedent issued this summer. In particular:

➤ *In re T-Mobile Customer Data Sec. Breach Litig* decided after the Court's ruling, disapproved of a 22.5% attorneys' fees award in a mega-fund case. The court considered it unreasonable to award fees in the range of $7,000-$9,000/hour.

➤ In its May 9th decision, this Court stated:

> This Court and others within the Eighth Circuit confirm that one-third of the common fund is an appropriate amount for class counsels' fees in complex class actions, including antitrust litigation. Eighth Circuit and Missouri courts "have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions." *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) (quoting *In re Xcel*, 364 F. Supp. 2d at 998); *see also Rawa*, 934 F.3d at 870 ("courts have frequently awarded attorneys' fees ranging up to 36% in class actions" (quoting *Huyer*, 849 F.3d at 399)); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1064 (D. Minn. 2010) (holding fee award of 33% reasonable); *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir.2002) (affirming fee award representing 36% of the settlement fund as reasonable)); *In re Xcel*, 364 F.Supp.2d at 998 (collecting cases demonstrating that district courts routinely approve fee awards between 25% and 36%). Just recently, this District approved one-third of the fund in a settlement valued at $325 million. *See Rogowski v. State Farm Life Ins. Co.*, No. 22-CV-203, 2023 WL 5125113, *4-5 (W.D. Mo. April 18, 2023). Thus, judges in the Western District of Missouri and the Eighth Circuit routinely apply the one-third-of-the-fund fee calculation, even to large settlements.[285]

It is not the case that Missouri courts and courts within the Eighth Circuit have "routinely" awarded fees in the 33% range *in mega-fund cases*. A closer look at some of these citations is warranted:

*Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017): $27.5 million settlement; court awarded 33% which was a multiplier of 1.82.

*Rawa v. Monsanto Co.*, 934 F.3d 862, 871 (8th Cir. 2019): $7.17 million settlement; court awarded 28% fee.

---

[284] I do not believe this is an appropriate test to employ, at least not without careful scrutiny of actual (and accurate) lodestar rates.
[285] Burnett v. Nat'l Ass'n of Realtors, No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *14 (W.D. Mo. May 9, 2024).

> *Yarrington v. Solvay Pharms., Inc.*, 697 F. Supp. 2d 1057, 1065 (D. Minn. 2010): Minnesota case; $16.5 million settlement; court awarded 33% which represented a 2.26 multiplier.
>
> *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002): 22-year-old case; $3.5-5.5 million judgment; 36% fee awarded.
>
> *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005): 19-year-old Minnesota case; $80 million settlement; 25% fee awarded.

Most of these settlements were paltry compared to the instant case. Indeed, the largest settlement in the string cite was an $80 million settlement from Minnesota (technically, not a mega-fund) where a 25% fee was awarded. None of these cases supports the proposition that a 33% fee is warranted in a billion-dollar mega-fund case.

➢ This Court in its ruling then noted:

> Just recently, this District approved one-third of the fund in a settlement valued at $325 million. *See Rogowski v. State Farm Life Ins. Co.*, No. 22-CV-203, 2023 WL 5125113, *4-5 (W.D. Mo. April 18, 2023). Thus, judges in the Western District of Missouri and the Eighth Circuit routinely apply the one-third-of-the-fund fee calculation, even to large settlements.[286]

This last statement is not accurate. There is only one case cited, *Rogowski*, where a court applied a one-third-of-the-fund fee calculation to a large settlement. Notably, Professor Klonoff was the plaintiffs' fee expert in *Rogowski* as well, perfectly illustrating the "daisy-chaining" problem that Professor Mullenix identified. The Court in *Rogowski* barely analyzed whether the fee was reasonable and instead rubber-stamped counsels' unopposed motion.[287]

Rather than follow an outlier unreported district court decision, this Court should follow the guidance of the Eight Circuit Court of Appeals in a case involving approximately the same size settlement--$350 million. The Eighth Circuit refused to award 22.5% of the $350 million settlement fund, finding that the district court abused its discretion. It stated that "[r]educing

---

[286] *Id.*

[287] The full extent of its analysis is as follows:

> Here, Class Counsel seeks an award of one-third (or 33⅓ percent) of the Settlement Fund ($325 million). Although the requested fee is a large sum in absolute terms, so is this Settlement, achieved on behalf of and for the benefit of the Settlement Class Members to resolve the nationwide claims for the large class in this Action and Related Actions. As indicated above, the class overwhelmingly supports the requested attorney's fee award with only one Settlement Class Member having filed an objection to the requested fee.
>
> Working on a contingency-fee basis and taking on the risk of four-plus years of hotly contested litigation, including more than 24,000 hours of legal work, Class Counsel ultimately received an excellent outcome on behalf of the class. In light of the extensive time, effort, skill, and expertise exhibited by Class Counsel in the course of litigating this Action and Related Actions, after careful review of the record and submissions in support of the motion and consideration of the relevant law, the Court finds that an award of attorney's fees in the amount of one-third or 33⅓ percent of the Settlement Amount is reasonable and fair under the circumstances of this case, as a nationwide settlement of this Action and Related Actions.

Rogowski v. State Farm Life Ins. Co., No. 4:22-CV-00203-RK, 2023 WL 5125113, at *5 (W.D. Mo. Apr. 18, 2023).

the fee award to, say, half of what was requested (resulting in fees of $3,500 to $4,750 per hour) could hardly be considered a penalty." Thus, the Eighth Circuit suggested that an 11% fee was more appropriate in a case involving a $350 mega-fund.[288] The Court declined to adopt a "per se rule requiring a percentage reduction in every megafund case" because that "would introduce arbitrary and formulaic rules into an inquiry that needs to be anything but." Additionally, the Court did not think it was necessary to instruct lower courts to be mindful of the complicated issues involving fees in mega-fund cases because judges should already be aware of them:

> But we don't think that's necessary given that the existing criteria for determining fee awards already give courts ample room to consider the potential economies of scale that a large class action entails. For example, courts are to consider "the time and labor required," "the amount involved and the results obtained," and "awards in similar cases," among other matters. Those considerations already tune courts' attention to the circumstances that megafund-method advocates want courts to consider, such as the work attorneys have performed, the size of the award and the class, the amount attorneys have received in similar cases, and whether attorney effort contributed to the award and is deserving of additional fees.[289]

➢ This Court in its prior ruling stated, "Moreover, the requested one-third fee award is equal to or less than what the actual Named Plaintiffs—those with the most on the line and most involved in the case—agreed to at the outset of the case."[290] This argument, which was advanced by Plaintiffs, is specious and would *de facto* support a one-third fee in virtually any case. The named plaintiffs weren't going to be out of pocket anyway and would have agreed to anything put in front of them. This is reminiscent of prospective home buyers "hiring" agents at 3% because they know the seller is going to pay the buyer's agent's commission.[291]

➢ This Court in its prior ruling stated that "the request is supported by both the size of the recovery and the results obtained . . ."[292] Yet, the Court does not link the size of the recovery to the enormous size of the class. The Court stated:

> The media effort alone reached at least 71 percent of the Settlement Class members. JND also implemented a Settlement Website that had over 934,000 unique visitors and nearly 5 million page views. As of May 2, 2024, nearly 200,000 claims have been made. This is only the beginning of the claims, because the claims period extends until May 9, 2025. This extended claims

---

[288] In re T-Mobile Customer Data Sec. Breach Litig., 111 F.4th 849, 861 (8th Cir. 2024).

[289] *Id.* at 860.

[290] Burnett v. Nat'l Ass'n of Realtors, No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *16 (W.D. Mo. May 9, 2024).

[291] The Court should also not consider the number of objectors or opts out to be reflective of the fairness of the settlement. With the sums at stake being so small, there is very little incentive for class members to do anything. This is rational self-interest, not a stamp of approval. *See* Jay Tidmarsh & Tladi Marumo, *Good Representatives, Bad Objectors, and Restitution in Class Settlements*, 48 B.Y.U. L. REV. 2221, 2254 (2023) ("At the same time, the absolute number of objections tends to be small, perhaps because the modest recoveries that class members receive in small-stakes class actions make objection economically infeasible.); Nicholas Almendares, *The Undemocratic Class Action*, 100 WASH. U.L. REV. 611, 651 (2023) ("In the archetypal class action, each member of the class has little at stake and so has correspondingly little interest in carefully reviewing the settlement terms and possibly going to court to object to them. This is simply rational ignorance and apathy emerging again. The same holds true for the named plaintiffs; while they have been willing to play a larger role in the case, there will be serious limits to how extensively they will "double check" their attorney's work.").

[292] *Id.* at 17.

period is valuable because additional settlements covering the same Settlement Class (with minor variations on the length of the class periods) have been reached with other defendants, and the notice process for those settlements will provide additional opportunities to submit claims.

This recognizes that there are millions of class members who will have to divvy up the settlement proceeds—making the settlement not-at-all-valuable from the perspective of the average individual class member.

In light of these issues, and the other issues identified herein, I request this Court to revisit any prior fee ruling and to disapprove the Plaintiffs' request in the instant petition.

* * *

For these reasons, I respectfully ask this Court to disapprove of the Plaintiffs request for attorneys' fees in the amount of 33% of the settlement fund.

# VIII. RELIEF REQUESTED

"Without the adversarial posture of a contested class action, the court, as fiduciary for the class, must independently assess the settlement to ensure that it is fair to the class (including the many absent class members)."[293] As a fiduciary of the class, I respectfully urge this Court to disapprove of this Settlement in its entirety. The monetary relief is paltry considering the number of people in the class; most will get pennies on the dollar for their losses. The injunctive relief is even worse. It has not helped class members at all and may put them in a worse situation than they were before.

If this Court chooses to approve the settlement, in whole or in part, then I ask this Court to disapprove the exorbitant request for attorneys' fees. I don't think this Court wants to be known as the one who provided a few dollars to class members and a private jet to each of the attorneys in the case.

Additionally, it is within the Court's inherent jurisdiction to award attorneys' fees to an objector.[294] Accordingly, I ask this Court to award attorneys' fees as follows:

➢ My normal rate for consulting is $250/hour.[295]
➢ Since I am taking a risk in not being paid and doing all this work for nothing, my new hourly rate is $1,250 (to match Plaintiffs' expert).
➢ I have worked approximately 50 hours on this submission.
➢ This would make my fee $62,500.
➢ Then, I would like to request a multiplier of 3.62 (like the Plaintiffs requested), making the total fee I request $226,250.

I trust you understand that this is intended tongue-in-cheek to illustrate the absurdity of Plaintiffs' fee petition. Instead, if this Court determines that this submission provided meaningful value to the class, I request reasonable attorney fees determined as the Court deems appropriate.[296]

Thank you for considering this objection. As mentioned at the outset of this submission, I request the ability to participate in the fairness hearing telephonically or via Zoom.

REPECTFULLY SUBMITTED,

Tanya Monestier

---

[293] Robert Klonoff, *Class Action Objectors: The Good, the Bad, and the Ugly*, 89 FORDHAM L. REV. 475, 475–76 (2020).
[294] *Id.*, at 480.
[295] Through this objection, I have learned that I am apparently grossly underpaid.
[296] Brian T. Fitzpatrick, *Objector Blackmail Update: What Have the 2018 Amendments Done?*, 89 FORDHAM L. REV. 437, 449 (2020) ("It is an interesting question *how* judges should compensate successful objectors. Although I have not examined the question in detail, my intuition is that it should be done the same way we compensate class counsel: pay them a percentage of the benefits they create for the class.").

APPENDIX

# TANYA J. MONESTIER

UNIVERSITY AT BUFFALO SCHOOL OF LAW, O'BRIAN HALL
211 MARY TALBERT WAY
BUFFALO, NEW YORK, 14260
TANYAM@BUFFALO.EDU | (716) 645-7878

## ACADEMIC APPOINTMENTS

**UNIVERSITY AT BUFFALO SCHOOL OF LAW**   Buffalo, New York
*Professor (with Tenure)*   July 2022-present

Courses:   Contracts, Sales Law, Conflict of Laws

Impact:   Top 10% of authors on SSRN by all-time downloads
Amicus brief quoted by United States Supreme Court in *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2054 (2023)(Justice Alito, concurring).
Academic articles cited in:
- ✧ Dozens of court decisions, including by the Supreme Court of Canada, the United States Court of Appeals for the Second Circuit, and the United States Court of Appeals for the Ninth Circuit
- ✧ Petitions for Certiorari to the United States Supreme Court
- ✧ Hundreds of academic articles, practice publications, and other secondary sources
- ✧ Over 175 trial court and appellate briefs/motions
- ✧ Legislative bills, policy papers, advisory committee reports, business and law firm blogs
- ✧ Civil Procedure, Sales Law, and Property Law case books

Service:   Arbitrator, Financial Industry Regulatory Authority (FINRA)
Staff Editor, *American Business Law Journal*

**ROGER WILLIAMS UNIVERSITY SCHOOL OF LAW**   Bristol, Rhode Island
*Professor (with Tenure)*   July 2015 - Present
*Associate Professor*   July 2009 - June 2015

Courses:   Contracts I and Contracts II, Sales Law, Conflict of Laws, Class Actions, Contract Law Practicum

Honors:   Voted "Professor of the Year" by the graduating class of 2018
Named Distinguished Teaching Professor of Law (2018-2019)
Named Distinguished Research Professor of Law (2018-2020)

**QUEEN'S UNIVERSITY FACULTY OF LAW**   Kingston, Canada
*Visiting Assistant Professor*   July 2007 - June 2009

Courses:   Conflict of Laws, Civil Procedure, Commercial Law (Sales Law and Secured Transactions)

Honors:    Recipient of Queen's Law Students' Society Award for Excellence in Teaching (2009)

# EDUCATION

**UNIVERSITY OF CAMBRIDGE**                                          Cambridge, England

Degree:  LL.M. with first class Honors

Honors: Specialty designation in Commercial Law

Awards:
- ✧ Foundation Scholarship for first class standing in the LL.M. degree
- ✧ Queens' College Prize for first class standing in the LL.M. degree
- ✧ Commonwealth Scholarship for LL.M. studies in the U.K. (full academic scholarship)
- ✧ Mackenzie King Traveling Scholarship
- ✧ The Right Honorable Paul Martin scholarship (declined)

**OSGOODE HALL LAW SCHOOL**                                          Toronto, Canada

Degree:  LL.B., ranked 1st in class of 280

GPA:     3.9/4.0

Other:   Studied at University of Bologna, specializing in Comparative Italian Law

Awards:
- ✧ Gold Medal for the student standing first in the graduating class
- ✧ Harley D. Hallett Renewable Entrance Scholarship (full academic scholarship)
- ✧ George Graham Sinclair Memorial Prize
- ✧ McCarthy Tétrault Prize for student standing second in the second year
- ✧ York University Faculty Association scholarship for the student with the highest cumulative standing in the second year
- ✧ McCarthy Tétrault Prize for the student standing first in the first year
- ✧ Carswell Prize for the student achieving the highest standing in the first year
- ✧ Canadian Italian Business and Professional Association Scholarship
- ✧ Subject matter awards for highest standing in: Contract Law, Property Law, Tort Law, Family Law, Criminal Law, Estate Law, and Commercial Law, Business Association Law and Taxation Law (combined)

**YORK UNIVERSITY**                                          Toronto, Canada

Degree:  B.A., Political Science, with distinction

GPA:     3.8/4.0

Honors: Dean's Sessional Academic List (1997-1999) and Master's Honor Roll (1999)

Awards:
- ✧ York University Renewable President's Scholarship (full academic scholarship)

- ✧ York University Faculty Association Scholarship
- ✧ Carl E. Smith Prize for outstanding achievement in Political Science

---

## PUBLICATIONS

### Books

*Sh\*t No One Tells You About Law School*, CAROLINA ACADEMIC PRESS, 2022 (368 pages).

IMPACT:
- ✧ Carried and recommended by numerous law schools throughout the country.
- ✧ Selected by the University of St. Thomas School of Law's First-Generation Law Student Association as their "book club" selection.
- ✧ Subject of articles "UB faculty member offers new voice in preparing law students" (Nov. 2022).
- ✧ Overwhelmingly positive reviews on Amazon.
- ✧ Publisher authorized a free release of "A Chapter for the Girls," rebranded under the name *Sh\*t No One Tells ~~You~~ GIRLS About Law School.*

### Law Review Articles

*Amazon's Dirty Little Secret*, 69 VILLANOVA LAW REVIEW 521-573 (2024).

*Cake-And-Eat-It-Too Clauses*, 2024 WISCONSIN LAW REVIEW 87-128 (2024).

*The Scope of Generic Choice of Law Clauses*, 56 UC DAVIS LAW REVIEW 959-1018 (2023).

CITATIONS
- ✧ *Heritage Glob. Network Los Angeles, Inc. v. Welch*, No. 3:23-CV-00685, 2024 WL 695772 (M.D. Tenn. Feb. 20, 2024)

*Amazon as a Seller of Marketplace Goods Under Article 2*, 107 CORNELL LAW REVIEW 101-178 (2022).

IMPACT:
- ✧ Featured on the American Law Institute (ALI) Adviser website.
- ✧ Featured on E-Commerce Liability News & Resources website.

*Damages for Breach of a Forum Selection Clause*, 58 AMERICAN BUSINESS LAW JOURNAL 271-325 (2021) (peer reviewed).

*When Forum Selection Clauses Meet Choice of Law Clauses*, 69 AMERICAN UNIVERSITY LAW REVIEW 325-385 (2019).

RESPONSE ARTICLE (SOLICITED)
- ✧ Kevin M. Clermont, *Reconciling Forum-Selection and Choice-of-Law Clauses*, 69

AMERICAN UNIVERSITY LAW REVIEW FORUM 174 (2020).

*Fixer Upper: Buyer Deposits in Residential Real Estate Transactions*, 80 OHIO STATE LAW JOURNAL 1149-1228 (2019).

*Forum Selection Clauses and Consumer Contracts in Canada*, 36 BOSTON UNIVERSITY INTERNATIONAL LAW JOURNAL 177-220 (2018).

*You're It! Tag Jurisdiction Over Corporations in Canada*, 50 VANDERBILT JOURNAL OF TRANSNATIONAL LAW 583-624 (2017).

*Whose Law of Personal Jurisdiction? The Choice of Law Problem in the Recognition of Foreign Judgments,* 96 BOSTON UNIVERSITY LAW REVIEW 1729-1788 (2016).

CITATIONS
- *De Fontbrune v. Wofsy*, 39 F.4th 1214 (9th Cir. 2022)
- *AO Alfa-Bank v. Yakovlev*, 230 Cal. Rptr. 3d 214 (Ct. App. 2018)

*Registration Statutes, General Jurisdiction, and the Fallacy of Consent,* 36 CARDOZO L. REV. 1343-1414 (2015).

CITATIONS
- *Mallory v. Norfolk S. Ry. Co.*, 266 A.3d 542 (Pa. 2021), cert. granted, 142 S. Ct. 2646, 212 L. Ed. 2d 605 (2022)
- *Avus Designs v. Grexxx LLC,*, No. 22-CV-0173-SWS, 2022 WL 17404426 (D. Wyo. Dec. 2, 2022)
- *Chavez v. Bridgestone Americas Tire Operations, LLC*, 2022-NMSC-006, 503 P.3d 332 (2021)
- *Lanham v. BNSF Ry. Co.*, 305 Neb. 124 (2020)
- *In re Asbestos Prod. Liab. Litig. (No. VI)*, No. 18-3622, 2019 WL 2399738 (E.D. Pa. June 6, 2019)
- *In re Aso*, No. 19MC190JGKJLC, 2019 WL 3244151 (S.D.N.Y. July 19, 2019)
- *Aybar v. Aybar*, 2019 WL 288307 (N.Y. App. Div. Jan. 23, 2019)
- *Am. Dairy Queen Corp. v. W.B. Mason Co.*, 2019 WL 135699 (D. Minn. Jan. 8, 2019)
- *Rodriguez v. Ford Motor Co.*, 2018 WL 6716038 (N.M. Ct. App. Dec. 20, 2018)
- *Murray v. Am. LaFrance, LLC*, 2018 PA Super 267 (Sept. 25, 2018)
- *DeLeon v. BNSF Ry. Co.*, 392 Mont. 446 (2018)
- *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. 2018)
- *Gorton v. Air & Liquid Sys. Corp.*, 303 F. Supp. 3d 278 (M.D. Pa. 2018)
- *Mischel v Safe Haven Enterprises, LLC*, 2017 WL 1384214 (Sup. Ct. Apr. 17, 2017)
- *Amelius v. Grand Imperial LLC*, 64 N.Y.S.3d 855 (N.Y. Sup. Ct. 2017)
- *Wilderness USA, Inc. v. DeAngelo Bros. LLC*, 265 F. Supp. 3d 301 (W.D.N.Y. 2017)

- ❖ *Gulf Coast Bank v. Designed Conveyor Sys.*, LLC, 2017 WL 120645 (M.D. La. Jan. 12, 2017)
- ❖ *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016)
- ❖ *Serov ex rel. Serova v. Kerzner Int'l Resorts, Inc.*, 52 Misc. 3d 1214(A) (N.Y. Sup. Ct. 2016)
- ❖ *Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016)
- ❖ *In re: Zofran (Ondansetron) Prod. Liab. Litig.*, No. 2016 WL 2349105 (D. Mass. May 4, 2016)
- ❖ *In re Asbestos Litig.*, 2015 WL 5016493 (Del. Super. Aug. 25, 2015)

RESPONSE ARTICLE
- ❖ Oscar G. Chase, *Consent to Judicial Jurisdiction: The Foundation of "Registration" Statutes*, 73 N.Y.U. ANN. SURV. AM. L. 159, 196 (2018).

*Where is Home Depot "At Home"? Daimler v. Bauman and the End of Doing Business Jurisdiction*, 66 HASTINGS LAW JOURNAL 233-293 (2014).

CITATIONS
- ❖ *Amerisure Ins. Co. v. Auchter Co.*, No. 1:15CV235-MW/GRJ, 2016 WL 9506024 (N.D. Fla. Apr. 4, 2016)
- ❖ *Burdette v Marriott Intern.*, 2016 WL 9107119 (Md.Cir.Ct. Sep. 22, 2016)
- ❖ *Kinsman v. Florida State Univ. Bd. of Trustees*, 2015 WL 11110542 (M.D. Fla. Apr. 27, 2015)
- ❖ *Presby Patent Trust v. Infiltrator Sys., Inc.*, 2015 WL 3506517 (D.N.H. June 3, 2015)

*Jurisdiction and the Enforcement of Foreign Judgments*, 42 THE ADVOCATES' QUARTERLY 107-142 (2013).

CITATIONS
- ❖ *Chevron Corp. v. Yaiguaje*, 2015 SCC 42

*(Still) A "Real and Substantial" Mess: The Law of Jurisdiction in Canada*, 36 FORDHAM INTERNATIONAL LAW JOURNAL 396-465 (2013).

CITATIONS
- ❖ *Lapointe Rosenstein Marchand Melançon LLP v. Cassels Brock & Blackwell LLP*, 2016 SCC 30
- ❖ *Chevron Corp. v. Yaiguaje*, 2015 SCC 42
- ❖ *Goldhar v. Haaretz.com*, 2016 ONCA 515
- ❖ *Trillium v. General Motors of Canada*, 2013 ONSC 2289

*Is Canada the New Shangri-La of Global Securities Class Actions?* 32 NORTHWESTERN JOURNAL OF INTERNATIONAL LAW AND BUSINESS 305-363 (2012).

CITATIONS
- ❖ *Benamor c. Air Canada*, 2020 QCCA 1597
- ❖ *Paniccia v. MDC Partners Inc.*, 2017 ONSC 7298

*Transnational Class Actions and the Illusory Search for Res Judicata*, 86 TULANE LAW REVIEW 1-79 (2011).

HONORS
- ✧ Recipient of the John Minor Wisdom Award for Academic Excellence in Legal Scholarship for best piece in current volume.

*A "Real and Substantial" Improvement? Van Breda Reformulates the Law of Jurisdiction in Ontario*, eds. T. Archibald and R. Echlin, ANNUAL REVIEW OF CIVIL LITIGATION 185-219 (2010).

CITATIONS
- ✧ *Club Resorts Ltd. v. Van Breda*, 2012 SCC 17
- ✧ *Marciano v. Guess ? Inc.*, 2015 QCCS 3481
- ✧ *West Van Inc. v. Daisley*, 2014 ONCA 232 (Can. Ont. C.A.)

*Personal Jurisdiction Over Non-Resident Class Members: Have We Gone Down the Wrong Road?*, 45 TEXAS INTERNATIONAL LAW JOURNAL 537-572 (2010).

CITATIONS
- ✧ *Sandoz Canada Inc. v. British Columbia*, 2023 BCCA 306
- ✧ *Airia Brands Inc. v. Air Canada*, 2017 ONCA 792

*A "Real and Substantial" Mess: The Law of Jurisdiction in Canada*, 33 QUEEN'S LAW JOURNAL 179-215 (2007)(peer reviewed).

CITATIONS
- ✧ *Lapointe Rosenstein Marchand Melançon LLP v. Cassels Brock & Blackwell LLP*, 2016 SCC 30
- ✧ *Chevron Corp. v. Yaiguaje*, 2015 SCC 42
- ✧ *Fernandes v Wal-Mart Canada Corp*, 2017 MBCA 96
- ✧ *Goldhar v. Haaretz.com*, 2016 ONCA 515
- ✧ *Van Breda v. Village Resorts Limited*, 2010 ONCA 84
- ✧ *Stanway v. Wyeth Pharmaceuticals Inc.*, 2009 BCCA 592
- ✧ *Bouch v. Penny*, 2009 NSCA 80
- ✧ *Fewer v. Ellis*, 2010 NLTD 35
- ✧ *Universal Helicopters Newfoundland Ltd. v. Rolls-Royce Corporation*, 2009 NLTD 125
- ✧ *Josephson v. Balfour Recreation Commission*, 2010 BCSC 603
- ✧ *Black v. Breeden*, [2009] 309 D.L.R. (4th) 708 (Ont. S.C.J.)

HONORS
- ✧ Reprinted in Patrick Borchers (ed.), JURISDICTION AND PRIVATE INTERNATIONAL LAW, Edward Elgar (2014) as one of the most influential articles on the topic of personal jurisdiction in the common law world.

RESPONSE
- ✧ Vaughan Black & Mat Brechtel, "Revising *Muscutt*: The Ontario Court of Appeal Takes Another Look" (2009) 36 ADV. Q. 35.

*Foreign Judgments at Common Law: Rethinking the Enforcement Rules*, 28 DALHOUSIE LAW JOURNAL 163-197 (2005) (peer reviewed).

*Nothing Comes of Nothing …Or Does It? A Critical Re-Examination of the Doctrine of Separability in American Arbitration*, 12 AMERICAN REVIEW OF INTERNATIONAL ARBITRATION 223-247 (2001).

## Book Reviews and Shorter Articles

Book Review, *Cross-Border Torts, Canadian-U.S. Litigation Strategies*, by Wyatt Pickett, 51 CANADIAN YEARBOOK OF INTERNATIONAL LAW 644-653 (2013).

*Lépine v. Canada Post: Ironing Out the Wrinkles in the Inter-provincial Enforcement of Class Judgments*, 34 THE ADVOCATES' QUARTERLY 499-516 (2008).

*A Win-Win Proposition: The Viability of a Rule 23(B)(1)(b) Class Action in the American Mass Tort Context*, CLASS ACTION: A JOURNAL DEVOTED TO CLASS PROCEEDINGS, PROCEDURE AND LEGISLATION, Vol. I, No. 3, 2002.

## Reports and Guides

Sample Buyer Representation Agreement and Detailed Commentary (September 2024).

Report on Buyer Representation Agreements Post NAR Settlement Agreement (August 2024).

The Ultimate Buyer's Guide to Real Estate Commissions and Signing a Representation Agreement (August 2024).

The Ultimate Seller's Guide to Real Estate Commissions and Signing a Listing Agreement (August 2024).

Report on the California Association of Realtors' Proposed Buyer Agreement, prepared for the Consumer Federation of America (June 2024).

Report on the California Association of Realtors' Proposed Seller Listing Agreement, prepared for the Consumer Federation of America (June 2024).

## AMICUS BRIEFS, EXPERT TESTIMONY & HIGH-PROFILE LITIGATION

Submitted forty-page memorandum to the Department of Justice concerning contractual workarounds to the National Association of Realtors' settlement (July 2024).

Filed Amicus Brief to the United States Supreme Court on behalf of the Respondent in *Mallory v. Norfolk Southern Railway* (Sept. 2022)(quoted by Justice Alito in his concurring opinion).

Provided expert declaration for the plaintiffs in *Petty v. Niantic, Inc.*, 2022 BCSC 1077 (opined on whether an arbitrator applying California law would apply the Canadian *Arbitration Act* to the plaintiffs' claims) (2022).

Assisted in the defense of Chelsea Manning, whose 35-year jail sentence for disclosing classified documents to WikiLeaks was commuted by President Obama (2010-2013).

## OTHER PROFESSIONAL EXPERIENCE

PURDUE PHARMA LP                                    Jan. 2005 – June 2007
*Associate Attorney*

UNIVERSITY OF CAMBRIDGE                             Sept. 2004 – Dec. 2004
*Research Assistant to Professor Richard Fentiman*

SUPREME COURT OF CANADA                             July 2002 – July 2003
*Law Clerk to the Honorable Justice Frank Iacobucci*

SULLIVAN & CROMWELL LLP                             June 2002 – July 2002
*Summer Associate (London, England)*

SIMPSON THACHER & BARTLETT LLP                      May 2001 – Aug. 2001
*Summer Associate (New York, New York)*

Blake, Cassels & Graydon LLP                        May 2000 – Aug. 2000
*Summer Student (Toronto, Ontario)*

## MEDIA AND COMMENTARY

### Newspaper and Print Media

"'Nothing Is Good for the Consumer Right Now': Experts Weigh Benefits, Drawbacks of Updated Real Estate Commission Policies," LAW.COM (August 27, 2024) (quoted in article regarding changes in the real estate industry due to the National Association of Realtors' settlement).

"The New Etiquette of Negotiating with Your Real Estate Agent," THE WALL ST. JOURNAL (August 23, 2024) (quoted in article regarding changes in the real estate industry due to the National Association of Realtors' settlement).

"The Housing Market Just Got Turned Upside Down — Here's What Buyers & Sellers Need to Know," APARTMENT THERAPY (August 19, 2024) (quoted in article regarding changes in the real estate industry due to the National Association of Realtors' settlement).

"New Rules Will End Casual House Hunting," THE BUSINESS INSIDER (August 17, 2024) (quoted in

article regarding changes in the real estate industry due to the National Association of Realtors' settlement).

"Big changes to how you buy and sell a home go into effect today: What you need to know" CNN (August 17, 2024) (quoted in article regarding changes in the real estate industry due to the National Association of Realtors' settlement)

"What's About to Change for People Buying and Selling Homes," TIME MAGAZINE (August 6, 2024) (quoted in article regarding upcoming changes in the real estate industry due to the National Association of Realtors' settlement).

"New Contracts for Homebuyers Draw Criticism Over Complexity," THE WASHINGTON POST (July 29, 2024) (quoted in article regarding upcoming changes in the real estate industry due to the National Association of Realtors' settlement).

"California Realtors accused of creating 'anti-consumer' forms," THE ORANGE COUNTY REGISTER (July 18, 2024) (quoting reports prepared for the Consumer Federation of America on the California Association of Realtors' proposed seller listing agreement and proposed buyer representation agreement).

"Listing agreement slammed as CFA resumes California Realtors probe," INMAN (July 2, 2024) (discussing report prepared for the Consumer Federation of America on the California Association of Realtors' proposed seller listing agreement).

"Watchdog group takes aim at California buyer rep agreements," INMAN (June 25, 2024) (discussing report prepared for the Consumer Federation of America on the California Association of Realtors' proposed buyer representation agreement).

"Consumer advocates call California Realtors' buyer representation agreement 'unreadable'," HOUSINGWIRE (June 25, 2024) (discussing report prepared for the Consumer Federation of America on the California Association of Realtors' proposed buyer representation agreement).

"This Lawyer Wants to Sue Amazon Where Some Have Failed—Has He Figured Out How?" Daily Business Review, LAW.COM (December 2022) (discussing prospect of liability for Amazon for third party goods sold on its platform).

"Consent or Coercion Before Supreme Court in Corporate Dispute," BLOOMBERG LAW (November 8, 2022) (cited in article about the *Mallory* case pending before the United States Supreme Court).

"Supreme Court Clamps Down on State-Court Forum Shopping," RHODE ISLAND LAWYER'S WEEKLY (July 13, 2017) (discussing potential impact of *Bristol Myers Squibb* decision).

"Freeze Order on Omar Khadr Payout Needs Proof of Risk: Experts," THE GLOBE AND MAIL, (July 11, 2017) (discussing the enforceability of a Utah civil judgement against former Guantanamo detainee in Canada).

"Lawsuit over Fatal Motorcycle Crash Not Barred by Settlement," RHODE ISLAND LAWYER'S WEEKLY (Jan. 7, 2016) (discussing Rhode Island case in which court found that there was no valid

offer and acceptance in settlement negotiations).

"Suit vs Kansas Employer can Proceed in 1ˢᵗ Circuit," RHODE ISLAND LAWYER'S WEEKLY (Oct. 9, 2015) (discussing First Circuit judgment finding that court had personal jurisdiction in contract dispute over employer based in Kansas).

"The Global Lawyer: *Daimler v. Bauman* One Year Later," THE AMERICAN LAWYER (Jan. 4, 2015) (discussing ways for litigators to avoid the *Daimler* decision).

"Canadian co. subject to state's jurisdiction," RHODE ISLAND LAWYER'S WEEKLY (Nov. 20, 2014) (discussing First Circuit ruling finding that Massachusetts court had personal jurisdiction over Canadian corporate defendant).

"Expert: Facebook Lawsuit Has Better Chance than Others," GOLOCALPROV.COM (May 26, 2010) (interview discussing the likely fate of a proposed class action brought in Rhode Island by users of the social networking site Facebook).

## Blogs, Podcasts and Social Media

Podcast, *The Law School Lounge* (Aug. 2023) (discussing "Womanhood in Law School and Law").

Podcast, *The Law School Lounge* (Aug. 2023) (discussing "What is it Like Being a First-Generation Student?").

Podcast, *The Law School Lounge* (Aug. 2023) (discussing "How to Take (Good) Notes in Law School").

Podcast, *The Law School Lounge* (Aug. 2023) (discussing "How do I Prepare for Class and the Socratic Method?").

Podcast, *The Law School Lounge* (Aug. 2023) (discussing "What is Outlining for a Law School Course?").

Podcast, *Bloomberg Law: Cases and Controversies* (Oct. 2022) (discussing "Justices May Further Limit Where Business Can Be Sued").

Solicited guest blogger for Transnational Litigation Blog: *Consent and Personal Jurisdiction: The* Mallory *Oral Argument* (Oct. 2022).

Podcast, *The Law School Show* (Oct. 2022) (discussing book *Sh\*t No One Tells You About Law School*).

Hosted an AMA (Ask Me Anything) on Reddit for prospective and current law students (post garnered over 20,000 views) (Oct. 2022).

Podcast, *Ladies Who Law School* (Sept. 2022) (discussing book *Sh\*t No One Tells You About Law School*).

Solicited guest blogger for Contracts Prof Blog: *Amazon as a Seller of Marketplace Goods under Article 2* (two-part guest post) (April 2021).

Solicited guest blogger for Contracts Prof Blog: *Damages for Breach of a Forum Selection Clause* (Aug. 2021).

## PROFESSIONAL PRESENTATIONS

Panelist, Brooklyn Law School International Litigation Conference, Topic: *Damages for Breach of a Forum Selection Clause* (October 2021).

Panelist, *Evolving Constraints on Liquidated Damages*, Professors Corner, American Bar Association Section on Real Estate (July 2021) (presented "Fixer Upper" paper where I argued that deposits in most residential real estate transactions function as penalty provisions).

Panelist, "Toward a New Equilibrium in Personal Jurisdiction," Discussion Group: Procedural Hurdles and the Day in Court, Southeast Association of Law Schools conference (August 2014) (presented "Where is Home Depot at Home? *Daimler v. Bauman* and the End of Doing Business Jurisdiction").

Panelist, Rhode Island Bar Association, *The Future of Law School Education* (2013) (discussed salient differences between law schools in Canada and the United States).

## SERVICE

### PROFESSIONAL

Pro bono collaborator with the Consumer Federation of America (opining on real estate contracting) (May 2024-August 2024)

Volunteer, Center for Elder Law and Justice (January 2024-May 2024)
- ✧ Drafted Amended Complaint in breach of contract action
- ✧ Drafted Motion in Support of Leave to Amend Complaint in breach of contract action

Arbitrator, Financial Industry Regulatory Authority (FINRA) (June 2023-present)

Staff Editor, *American Business Law Journal* (July 2021-present)

Ad hoc peer reviewer for *Yale Law Journal; Osgoode Hall Law Journal; Alberta Law Review; University of British Columbia Law Review; Queen's Law Journal; University of Ottawa Law Journal; Canadian Bar Review* (2009-present)

Performed external tenure review for candidate applying for tenure at ABA-approved law school

Member, Planning Committee, Federal Judicial District Court Conference (2017)

Member, Ontario Law Reform Commission's Working Group of Specialists in Private International Law on codification of judicial jurisdiction in Ontario (2008)

Member, Organizing Committee, Ontario Chief Justice Advisory Committee's 12th Annual Colloquium on Professionalism (2008)

**UNIVERSITY AT BUFFALO SCHOOL OF LAW**

Hosted session on "So, You Want to Do Things Differently This Semester?" (Jan. 2024)

Academic Advisor for 1L students (2022-present)

Faculty Advisor to the UB Business Law Association (2022-present)

Advisor for Law Review Student Outline Workshop (2022-2023; 2023-2024)

Guest Speaker for the First-Generation Law Students Association on "Emotional Reactions to Law School" (2022)

Law School Committees:
- ◇ Academic Standards Committee (2024-present)
- ◇ Appointments Committee (2023-2024)
- ◇ Scholarship Committee (2024-present)
- ◇ Chair, Review Committee Tenure-Track Faculty (2023-present)
- ◇ Academic Policy and Programs Committee (2022-2023)
- ◇ Graduate and International Programs Committee (2022-2023)

Chair, Visiting Subcommittee for Reappointment of Junior Faculty Member (2023-present)

Faculty Observer, Adjunct and Contract Faculty Reappointment (2023, 2024)

**ROGER WILLIAMS UNIVERSITY SCHOOL OF LAW**

Director of the Honors Program (2014-2020)

Faculty Advisor for the Tax & Business Law Society (2021)

Co-Coach of the Trial Team (2016-2018)
Academic Advisor for 1L students (2009-2022)

Supervisor for Directed Research and Law Review Notes (2009-2022)

Mock Class Presenter for Accepted Students Day (various occasions)

Instructor for Bar Exam Preparation Class on Contracts and Sales (2020)

Honor Board Hearing Chair (2018) and Honor Board Hearing Panelist (2019)

Judge for National Moot Court Competition (2018)

Brief Grader for Esther Clark Moot Court Competition (2017-2020)

Participant in student events (non-exhaustive):

- ✧ Member of the faculty team for Student-Faculty Jeopardy (various years)
- ✧ Donor, Champions for Justice Public Interest Auction (2009-2020)
- ✧ Host, Honors Program Annual Dinner (2014-2020)
- ✧ Host, Honor Program Accepted Student Dinner (2014-2020)
- ✧ Host, Advising Lunches for 1L Students (2009-2022)
- ✧ Faculty Ambassador, Accepted Students Day (various years)
- ✧ Faculty Ambassador, Women in Robes Dinner (various years)

Law School Committees:

- ✧ Admissions Committee (2010-2020)
- ✧ Outcomes and Assessments Committee (2010-2011)
- ✧ Library and Technology Committee (2010-2011)
- ✧ Curriculum Committee(2011-2014)
- ✧ Legal Writing Committee (2012-2014)
- ✧ Honor Board Committee (2014-2017)
- ✧ Appointments Committee (2017-2018)
- ✧ Contract Faculty Evaluation Committee (2018-2019)
- ✧ Dean's Council (2018-present)
- ✧ Adjunct Faculty Evaluation Committee (2019-2022)
- ✧ Retention, Promotion, Tenure Committee (2015-2022)

## QUEEN'S UNIVERSITY FACULTY OF LAW

Coach of the Vis International Commercial Arbitration Moot (2007-2009)

Chair of the Subcommittee on Mature Student Admissions (2007-2009)

Supervisor for Independent Study Projects (2007-2009)

# BAR ADMISSIONS

New York (2006)