IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, AND JEREMY KEEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | OBJECTION TO THE NATIONAL ASSOCIATION OF REALTORS' SETTLEMENT |
| Plaintiffs, | ) ) ) | C/A No. 19-CV-00332-SRB |
| vs. | ) ) | |
| The National Association of Realtors, et al., | ) ) ) | |
| Defendants. | ) ) | |

In compliance with the Preliminary Approval Order and the
Long Form Notice of Proposed Settlements of the National
Association of Realtors the following members, who have only
objected previously in *Burnett, et al. V. The NAR, et al.*, C/A
No. 19-CV-00332-SRB and in *Gibson, et al. V. The NAR, et al.,*
C/A No. 4:23-CV-00788-SRB, object on behalf of the proposed class of
individuals who sold homes on an MLS Listing Service servicing
the District of South Carolina:

> Robert Benjamin Douglas
> Rdoug2172@gmail.com
> Address: 63 ½ Maple Street
> Charleston, SC 29403
> Phone # (859) 699-3952
> Home Sold: 14 N. Tracy Street
> Charleston SC 29403
> Date of Sale: 2/28/2023
> Listing Broker: Daniel Ravenel
> Sotheby's International Realty
> Buyer's Broker: Maven Realty

Benny D. Cheatman
Benny_cheatham@yahoo.com
101 Five Oaks Drive, Landrum, SC 29356
Home Sold: 513 Minnow Drive, Pawleys Island, SC 29585
Date of Sale: 7/24/2023
Listing Broker: The Litchfield Company
Buyers Broker: The Litchfield Company

Douglas W. Fender II, Dena Marie Fender
doug.w.fender@gmail.com
134 Lancelot Court
Lexington, SC 29072
Telephone: (803) 542-8019
Home Sold: 208 Spring Water Drive
Columbia, SC 29233
Date of Sale: 8/30/23
Listing Broker: Century 21 Vanguard
Buyer's Broker: Coldwell Bank Realty

## I.    INTRODUCTION

At issue before the Court is a settlement agreement
between Plaintiffs' Counsel and the National Association of
REALTORS.  This Settlement came as a result of a trial which
resulted in a very large verdict, subject to trebling, against
the National Association of REALTORS and other Defendants,
including Berkshire Hathaway, another settling party.  This
Settlement Agreement is a complicated one, but one that amply
demonstrates the monopoly position of the National Association of
REALTORS.  Indeed, the Settlement Agreement endeavors to insulate
comprehensively the entire real estate industry from the
punishment due it for its long, storied history of commission
fixing. It further fails to address the ultimate issue, price
fixing within the real estate business and adequate compensation
for the millions of harmed home owners.

Only one brokerage in South Carolina was above the arbitrary Total Transaction Volume (TTV) threshold identified by Co-Lead Counsel. In other states, it is certain that there were no such brokerages. This settlement leaves those States with wrongdoers who will not be punished, despite having made substantial profits at the expense of residents of those States, all because Co-Lead Counsel are personally uninterested in pursuing suit against them, deeming them too small. In those markets, a TTV of less than that arbitrarily identified by Plaintiffs' Counsel was still massive rent seeking in terms of the smaller markets in which they operated. By nationalizing this class, Co-Lead Counsel asks this Court to leave behind those jurisdictions that, in their eyes, are too small to care about. South Carolinians and other small market residents may be eligible to apply for the negotiated pittance, but they will not be able to pursue what would be considered large brokerages in our respective States.

## II.  Pre-Certification Settlements Require Careful Scrutiny and Must Comply with Due Process

Rule 23 of the Federal Rules of Civil Procedure require that a class action settlement may only be approved after a hearing and only on finding that it is fair, reasonable, and adequate *Marshall v. NFL*, 787 F.3d 502, 508 (8th Cir., 2015). In determining that the settlement terms are fair, adequate, and reasonable the court must also act as a fiduciary "serving as a

guardian of the rights of the class members." *In re: Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). In determining whether a settlement is fair, adequate, and reasonable, the court must consider four (4) factors: (1) the merits of the Plaintiffs' case weighed against the terms of the settlement; (2) the Defendants financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement *Id.* The most important consideration... is "the strength of the case for Plaintiffs' on the merits balanced against the amount offered in settlement." *Petrovic v. Amco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999), although where the District Court cannot value the claims with a high degree of certainty the court must "insist that the parties present evidence" that would at least enable it to make a "ball park evaluation" before deciding whether to approve a settlement. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F. 3d 646, 653 (7th Cir. 2006).

Further, the settlement must comply with "minimal procedural due process protection" for absent Plaintiffs. Further, "the notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum v. Shutts*, 472 U.S. 797, 812, 105S.Ct. 2965, 2974 (1985) qtg.

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S., at 314–315, 70 S.Ct., at 657; cf. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174–175, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974).

Finally, the underlying traditional reasons for class action do not support a certification of a national class here. As pointed out in *Phillips*, class actions generally are aimed at allowing "litigation of a suit involving common questions when there are too many plaintiffs for proper joinder" and "permit[ing] plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips* at 809. While there may be some common questions of law, the questions of fact vary widely by state. Further, the claims at issue would generally be economical for plaintiffs to pursue, at least on a state class basis. Each claim is worth at least several thousand dollars. These are not the $100 claims discussed in *Phillips.* A national class is far too complicated, and far too unwieldy, for any Plaintiffs' group to handle by themselves. This reality is born out by the slapdash way the Plaintiffs' Counsel has handled administering this settlement, discussed below, and the arbitrary, crude lines drawn within the Settlement Agreement.

### III. The Purported Opt-In Brokerages Failed to Opt-In By the Deadlines In the Settlement Agreement

The parties to the Settlement Agreement at issue here drafted into that Agreement certain deadlines. Those deadlines

began on the date of the Preliminary Settlement Approval, which occurred on April 19, 2024. Dkt. 1458-1.

The first deadline set required that, in order to opt-in, a brokerage with a total transaction volume of more than $2 Billion in 2022 was required to deliver to certain email addresses "(i) an executed version of this Appendix C; (ii) a declaration sworn pursuant to 28 U.S.C. § 1746 by a competent officer of Stipulating Party accurately attesting to the Stipulating Party's 'Total Transaction Volume' for each of the most recent four calendar years; and (iii) an indication of whether Stipulating Party selects either 'Option No. 1' or 'Option No. 2' as defined in this Appendix." Settlement Agreement, App. C. Dkt. 1458-1 at 74.

The second deadline presented in the Settlement Agreement deals with Option 1. None of the opting-in brokerage firms chose Option 1 of the Appendix, so the next operative deadline is found in Option 2. That option requires that "Stipulating Party agrees to participate in a non-binding mediation with Co-Lead Counsel to occur within 110 days following preliminary approval of the Settlement Agreement by the Court." Id. At 75. Given that preliminary approval occurred on April 19, 2024, that deadline is August 7, 2024.

The next operative deadline is that settlement had to occur "within 130 days following preliminary approval of the

6

Settlement Agreement by the Court." <u>Id</u>. That deadline was August 27, 2024, which was a Sunday.  If that deadline passed, the Settlement Agreement states that "Stipulating Party shall not become a 'Released Party' under the Settlement Agreement."  Thus, "any further rights or obligations under the Settlement Agreement (including this Appendix C) of Stipulating Party, Plaintiffs, Co-Lead Counsel, or the Settlement Class to one another shall terminate." <u>Id</u>. This is mandatory language that became effective immediately upon the expiry of the 130 day period.

        This is the framework that the NAR and the Plaintiffs' Counsel created.  This is the framework approved by this Court preliminarily on April 19, 2024.  It is important to note that the execution of Appendix C and the execution of a Settlement Agreement are treated as two separate requirements within this framework.  It is also important to note that the mediation was non-binding, meaning that any agreement that came out of that mediation was not binding on the parties unless and until a Settlement Agreement was signed. None of these brokerages opted-in within these time limits.

    In their Motion for Preliminary Approval of Settlements with Brokerages and Non-REALTOR Multiple Listing Services Opting Into the National Association of REALTORS Settlement, Lead Counsel point Class Members to the settlement website realestatecommissionlitigation.com for the settlement documents

for each brokerage, saying that "each settlement agreement with an opting brokerage or non-Realtor MLS has been posted to the settlement website." Dkt. 1538 at 4.

Fathom Holdings executed Appendix C on the 18th of June, 2024.  This meets the above discussed deadline for the execution of Appendix C.  However, the Supplemental Settlement Agreement was not executed until September 16, 2024. Ex. A, 4. This is 21 days after Fathom ceased to be eligible to become a Released Party under this agreement.  As such by the terms of the Settlement Agreement between the NAR and Plaintiffs' counsel, Fathom Holdings shall not be a released party under the terms of this settlement.

Key Realty executed Appendix C on June 17, 2024.  This meets the initial deadline.  However, it did not execute the Supplemental Settlement Agreement, a separate requirement within the framework created by the NAR and Plaintiffs' counsel and approved by this Court, until September 4, 2024. Ex. B, 5.  This is 9 days too late.

Brown Harris Stevens similarly met the initial execution date with respect to Appendix C.  However, the Supplemental Settlement Agreement was made and entered into on the 5th day of September 2024 between Brown Harris Stevens and Halstead and the Plaintiffs. Ex. C, p. 3.

McGraw Davisson Stewart failed to meet any of the deadlines.  It executed the Appendix C on the 17th of September, 2024, months after it was required to by the NAR Settlement Agreement.  Its Settlement Agreement was also signed on September 17, 2024, weeks late. Ex. D, p. 4.

As to the other Settlement Agreements, it appears that Michael Saunders, Pinnacle Estate Properties, Rose and Womble, Silver Creek Realty, The Agency, Vanguard, and Watson Realty all executed Appendix C within the required time period.  However, the documents provided on realestatelitigation.com reflect either a lack of signatures by the parties to be bound or no dates on the required supplemental agreement.  That makes it impossible for the settlement class to know whether the opt-in was effective or not.

Downing-Frye Realty's Settlement Agreement, attached as Exhibit E, does not contain a date and so it is not possible from the face of the document to know when the Settlement Agreement was entered into, preventing Objectors, Absent Class Members, and this Court from knowing whether or not Downing-Frye Realty, Inc. properly opted into the Settlement Agreement.

Pinnacle Estate Properties' Settlement Agreement, attached as Exhibit F, also does not contain within the Supplemental Settlement Agreement the date of execution.  This similarly renders it impossible for Objectors, Absent Class

Members, and this Court to know whether this brokerage firm properly opted-in to the settlement.

The Settlement Agreement for Rose and Womble as posted is signed by both bound parties. Ex. G, p. 4. It does not include, however, a date on which the Agreement was signed. This, as previously discussed, makes it impossible for Objectors, Absent Class Members, and this Court to know whether this brokerage firm properly opted-in to the settlement.

The Settlement Agreement for Silver Creek Realty Group does not include a signature from a representative of the Co-Lead Counsel Group. Ex. H, p. 4. As such, this is not an executed Settlement Agreement. Objectors contend that renders this purported settlement null. Further, there is no indication as to when this Settlement Agreement was signed by Silver Creek Realty Group's representative. As such, it is impossible for Objectors, Absent Class Members, and this Court to determine whether this brokerage firm properly opted-in to the settlement.

The purported Settlement Agreement between The Agency and Plaintiffs' counsel appears to have been properly signed through Docusign, however, no execution date is apparent on either the signature or within the text of the Settlement Agreement. Ex. I, p. 3. As such, it is impossible for Objectors, Absent Class Members, and this Court to determine whether this brokerage firm properly opted-in to the NAR Settlement.

10

The purported Settlement Agreement between Vanguard and the Plaintiffs' counsel appears to have been appropriately signed by a representative of Vanguard Properties, Inc., a member of Co-Lead Counsel's Group, Robert A. Braun of Cohen Millstein Sellers & Toll, PLLC, and Jill M. Manning of Pearson Warshaw, LLP who is listed as additional counsel. Ex. J, p. 5. However, as is a running theme, no date is evident from the face of this Settlement Agreement, nor is there a date affixed to the signature. As such, it is impossible for Objectors, Absent Class Members, and this Court to determine whether this brokerage firm properly opted-in to this Settlement.

Lastly, Watson Realty Corp.'s purported Settlement Agreement is not signed by either Watson Realty Corp. or additional counsel, Jill M. Manning of Pearson Warshaw, LLP. It was signed by a member of Co-Lead Counsel's Group, Robert A. Braun of Cohen Millstein Sellers & Toll, PLLC, but that is not an appropriately executed Settlement Agreement. Ex. K, p. 4. Even were it properly executed, there is no date evident from the face of the Supplemental Settlement Agreement or the signatures. As such, it is impossible for Objectors, Absent Class Members, and this Court to determine if this brokerage firm properly opted-in to this Settlement.

As discussed above, there is also a requirement that non-binding mediation occur within 110 days of April 19, 2024.

Mediation dates have not been provided for any of these purportedly opting-in brokerages. Those mediation dates were a separate requirement, bargained for by Plaintiffs' counsel and the National Association of Realtors. Without those mediation dates, this Court cannot determine that these brokerage firms properly opted-in to this Settlement. Further, even if the ettlements were reached at mediation, the terms of the NAR Settlement Agreement at issue today were not binding on the parties. Rather, the settlement agreements were effective at the time of their signatures or the times on the face of the document. This reality is recognized within the NAR Settlement Agreement Appendices by the twenty (20) days between the mediation deadline and the settlement deadline.

Each of these purported opt-ins are not properly executed; not executed in a manner to give Objectors, Class Members, or this Court sufficient information to determine whether the opt-ins were properly executed; or executed out of time. Due Process requires notice to the parties. In class action settlements, that notice is particularly important because causes of action are being compromised where the holder of that cause of action is not directly involved in the litigation. *Phillips Petroleum* at 807. Further, the agreement made between the NAR and Plaintiffs' Counsel specifically creates deadlines that were noticed to absent class members and those class members are entitled to rely

12

upon them.  Here, to simply disregard those deadlines would be to disregard the duty to the absent class members.

In addition, the difficulty Co-Lead Counsel has had in administering these settlement negotiations, missing deadlines, failing to post properly executed settlement agreements, and even failing to date those agreements, demonstrates why this should have been left as a state by state class action.  A national settlement with the goal of punishing an entire industry for its sins is simply too unwieldy to be administered properly.

**IV.   The Non-REALTOR Multiple Listing Services Similarly Either Failed to Meet the Deadlines of The Court Lacks the Ability to Determine the Effectiveness of Their Agreements with Two Exceptions**

The putatively opting-in non-REALTOR MLSs failed to do so properly with the possible exception of the Upstate New York Real Estate Information Services, Inc. and Western New York Real Estate Information Services.  For non-REALTOR Multiple Listing Services to opt-in to the Settlement Agreement negotiated between the National Association of Realtors and Plaintiffs' Counsel, those MLSs were required to meet certain deadlines.  Those deadlines are set out in Appendix D of the Settlement Agreement and mirror the deadlines set out in Appendix C, already discussed.  As previously mentioned, the Settlement Agreement was preliminarily approved on April 19, 2024, meaning that non-REALTOR MLSs had to signal their intention to opt-in to the Settlement Agreement by executing Appendix D by June 18, 2024.

If those MLSs chose Option 2, which it appears each of the four
(4) for whom Settlement Agreements are public did, there was a
requirement that they participate in non-binding mediation within
110 days of April 19, 2024. They were then required to have
settled the case within 130 days of April 19, 2024. That set the
deadlines for non-binding mediation at August 7, 2024 and
settlement on August 27, 2024. Plaintiffs' Counsel has asserted
that fifteen (15) non-REALTOR MLSs have opted-in to the NAR
Settlement Agreement. However, they have only made publicly
available the settlement agreements in four (4) of those opt-in
agreements. There is no settlement agreement publicly available
as of October 24, 2024 for Alaska MLS, BAREIS MLS, Metrolist MLS,
Minot MLS, MLS Exchange, Real Estate Information Network,
Richmond MLS, SE Alaska MLS, Southeast Georgia MLS, Spanish Peaks
MLS, and West Penn Multi-List. Because those settlement
agreements are not publicly available, this Court, Absent Class
Members, and Objectors cannot know whether those settlement
agreements were effective to opt-in to the NAR Settlement.
Plaintiffs' Counsel have provided the Settlement Agreements for
four (4) of the MLSs.

Central Virginia MLS opted-in to Appendix D on the 13th
of June, 2024. However, the Settlement Agreement was not executed
until August 30, 2024. Ex. L, p. 25. This is at least two (2)
days after the NAR Settlement Agreement deadline.

14

MiRealSource executed Appendix D on May 28, 2024. The Settlement Agreement was not executed until September 11, 2024, at least by MiRealSource's representative. Ex. M, p. 3. No signature is evident from Co-Lead Counsel's group. Neither of these Settlement Agreements were executed within the required deadlines set forth by the parties and preliminarily approved by this Court.

Upstate New York Real Estate Information Services, Inc. executed its agreement on August 23, 2024 (Ex. N) and Western New York Real Estate Information Services (Ex. O) executed its agreement on August 28, 2024. As previously noted, August 27 fell on a Sunday, so execution on August 28 likely satisfies the agreement.

## V. There Is No Evidence That Any Brokerages with Under $2 billion Total Transaction Volume Have Agreed to Provide Information To CO-Lead Counsel Upon Request

Section 18(e) of the NAR Settlement Agreement makes brokerages with less than $2 billion dollars in Total Transaction Volume (TTV) for the calendar year of 2022 Released Parties so long as they comply with certain requirements. Dkt. 1458-1 at 16. The first requirement is that the brokerage "has a REALTOR as a principal" and the second is that "a Principal who was a Participant in any MLS at any time" during the covered time period. The third requirement is a two part requirement: (1) that the brokerage must comply with the practice changes set out

15

within the Settlement Agreement and (2) "agree[] to provide proof
of such compliance if requested by Co-Lead Counsel." Id. At 17-
18.  The fourth is that the brokerage may not assert any claims
relating to the factual predicate against the NAR or Mlss.  The
third requirement is at issue here.

Co-Lead Counsel and the NAR bargained for this
provision.  Section 18(e) requires that a brokerage under the
arbitrarily chosen TTV take the positive step of agreeing to
provide certain information to Co-Lead Counsel to become a
Released Party under this section.  There has been no proof that
any brokerage has provided such an agreement to Co-Lead Counsel.
Indeed, this would potentially be sufficient consideration for a
Release, but no such consideration has been produced.

Further, while there is no deadline within section
18(e), as there was in both Appendices C and D, it would be
improper for those agreements to issue *after* the objection
period.  Objectors and Classs Members have a due process right to
know who is actually being released and the mechanism by which
they are being released before being asked whether to object or
opt-out of a settlement.  Here, they know that a brokerage must
provide this agreement, but there is no way to know who has made
that agreement. Without knowing who is being released, Objectors
and Class Members also can not effectively be heard on the issue.
Co-Lead Counsel concede this point, listing all of the brokerages

above the arbitrarily chosen TTV, non-REALTOR MLS opt-ins, and the REALTOR opt-ins individually on the settlement website. There is no such list of brokerages under the arbitrary TTV.

Plaintiffs' Counsel may point to a provision in the Agreement that allows Settlement Class Members the right to inquire of the NAR whether a brokerage has satisfied the requirements to become a Released Party. This is not sufficient because Class Members need to know pre-settlement who has satisfied the requirements to become a Released Party in order to properly exercise their opt-in rights. It is also inconsistent with the duties of an absent class member to ask that they approach the NAR with every brokerage under the arbitrarily chosen TTV before determining whether to opt out or object to a settlement. It is also not consistent with this Court's fiduciary duty not to know what entities are Released Parties under its order.

Finally, upon discussion with various REALTORS, it is Objectors' information and belief that no written agreement to provide information has been requested from brokerages under the arbitrary TTV by either the NAR or Co-Lead Counsel beyond that which is in the Settlement Agreement.

## VI. The Settlement Agreement Perversely Strengthens The Monopolistic Position of Large Franchisor Brokers At The Expense of Smaller Brokerages

As discussed, properly interpreted, the Settlement

Agreement requires action by brokerage firms under the arbitrarily set TTV of $2 billion. As pointed out by these Objectors in previous objections, the franchisees or other corporate family members of Keller Williams, Anywhere Real Estate, RE/MAX, and, should its settlement be approved, Berkshire Hathaway were allowed releases without being forced to agree to comply with practice changes. The NAR's Settlement Agreement, when taken in conjunction with the other agreements, allows Keller Williams, Anywhere Real Estate, RE/MAX, and should it be approved, Berkshire Hathaway to strengthen their market dominance through franchisees and other corporate family members by continuing to extort buyer broker commissions from sellers. This is precisely the opposite of the goal of the Sherman Act.

> **VII. The Settlement Agreement is Arbitrary In Picking 2022 As The Year For Determining TTV, Picking $2 Billion TTV As The Cutoff For Payments, And Using The T360 Real Estate Almanac As The Determiner of TTV**

To begin, the use of a single trade publication's database of Total Transaction Volume is the height of arbitrariness. Two of the putative opt-in brokers dispute the veracity of the T360 Almanac's numbers. It appears that the database, if that is the correct term, is generated by a hodge-podge of data, some of which is entered by the broker at issue, some of which is gathered in other ways. It would have been substantially more accurate to use the declarations provided for

18

in Appendix C to determine the TTV of each brokerage. Settlement Classes here begin anywhere from 2014 to 2019. These are the starting points for recovery from a scheme that began much earlier than those dates. Rather than attempting to punish the conspirators who profited most from the length of this scheme by using an average TTV for the claims period, Co-Lead Counsel has arbitrarily picked the year 2022 as the year to determine which brokerages shall pay and which shall not. There is no reason, of course, that Co-Lead Counsel could not have used the same formula set out in Appendix C's declaration, which requires four (4) years of TTV for mediation purposes. Indeed, such a declaration should have been made a part of the agreement to provide Co-Lead Counsel proof of practice change compliance. This would have ensured that a brokerage was not unduly punished for a bumper 2022 or unduly reprieved by an unusually poor year.

Further, a total transaction volume of $2 billion is similarly arbitrary. Co-Lead Counsel has provided no reason why some portion of ill-gotten profit from marginally smaller TTV brokers should not be recovered by victims. Indeed, by picking such a high number for TTV and making it determined at a specific point in time, this settlement fails to reliably punish the companies which routinely made use of this conspiracy, allowing one bad year to allow a broker to escape punishment.

The arbitrariness of these measures is because there is

far too much abstraction in this Settlement.  As discussed above, this case would have been better dealt with on a state-wide basis.  By attempting to form a national class, Co-Lead Counsel has been forced to abstract damages, reasonable profit margins, local market conditions over a country spanning 3,796,742 square miles and more than 334 million people, etc.  A large brokerage in South Carolina taking advantage of South Carolinians, for example, may only have a TTV of $1.6 billion because the market is much smaller than other markets.  That does not render South Carolina's damages any less cognizable. Indeed, given South Carolina's relative poverty compared to many of the other real estate markets covered by this settlement, by percentage South Carolinians may be more hurt than those other markets.  This settlement fails to recognize that issue, largely because Co-Lead Counsel is trying to homogenize different regions with greatly varying demographics to make a one-size-fits-all Class, where commonality and typicality do not exist.  Asking for a declaration from every brokerage in America would have created far too much work even for the large Plaintiff firms that make up the Lead Counsel group and so, rather than narrowing their universe of clients, Co-Lead Counsel decided to narrow their universe of Defendants.  This is rather badly out of step with the interests of their putative clients, absent class members.

**VIII.    Without Express Agreement By Brokerages Under $2 Billion, There Is No Valid Consideration For Their Release**

It is axiomatic in our law that a release is a contract and subject to contractual principles.  It is further axiomatic that, for a contract to form, there must be consideration. Consideration is "the exchange of something of value as between the parties, which may include a promise." *Crutcher v. Multiplan, Inc.*, 22 F.4th 756, 768 (8th Cir. 2022). This Settlement Agreement, if the Court holds that there was no express requirement that brokerages under $2 billion TTV for the calendar year 2022 make written agreement to follow practice changes and to provide proof of compliance with those practice changes, does not bind them at all because there is no exchange between the parties.

It is uncontroverted that these brokerages will pay no money toward the total monetary settlement.  While one could argue that, by paying a membership fee to the NAR, these brokerages are somehow contributing to the fund, the membership fee was already required to be a member of the NAR. Of course, doing what they were already doing is not consideration for a new contract.

It further cannot be argued that these agreements *require* these brokerages to do anything if no written agreement is required.  There is discussion in Section 18(e) that these

brokerages will make practice changes and provide proof of those practice changes to Co-Lead Counsel upon request, but, without requiring they agree in writing, these requirements are paper tigers. Co-Lead Counsel has demonstrated that they do not care about the compliance of "small" brokerages by writing such a broad release and attempting to shoehorn them into this settlement.

Further, the underlying purpose of antitrust law, that violators be punished, victims be amply compensated, and incentivize private actors to vindicate the public interest in having open, competitive markets, is undermined by the fact that these brokerages are able to escape any accountability. Plaintiffs made a decision not to sue brokerages under $2 billion TTV who directly harmed their clients and that decision may very well have been a good one for the facts and circumstances prevailing at the time they made it. Neither the *Moehrl* nor the *Burnett* plaintiffs held those brokerages to account, just as this settlement fails to hold them to account, again despite the fact that these brokerages accomplished the conspiracy that directly harmed those plaintiffs in the Subject MLSs. Those brokerages, the active participants in the conspiracy, will not have to disgorge their profit from the conspiracy they wrought on those plaintiffs. Those brokerages will not have to certify that they have changed any of their conduct as a result of this trial or

these settlements if no written agreement is required pre-approval. Now, those plaintiffs are asking this Court to impose that same decision on every single member of a national class. That imposition does not serve the public interest, nor does it serve the absent class members.

IX.  **The Long Form Notice of Proposed Settlement With The National Association Of REALTORS Does Not Contain Sufficient Information For Interested Parties To Properly Object**

The Long Form Notice of Proposed Settlement does not list the size of the verdict or the much smaller class certified for trial in *Burnett*.  It further says only that "a jury found in favor of the Plaintiffs in the *Burnett* action."  Exhibit P at 5. There is no discussion that this is a much expanded class for settlement purposes.  On page 6 of the Notice, when answering the question "what does the Settlement provide?" there is no discussion of the practice changes allegedly being made by brokers under the $ 2 billion TTV.  There is also no mention that only the year 2022 is being considered when determining whether a real estate brokerage has "over $ 2 billion in total sales volume."  Id. At 6.  The first, and only, mention of brokers under $2 billion in the calendar year 2022 being given a release is on page 9, buried halfway through a dense paragraph of legalese:

> (i) NAR; (ii) NAR's Members, Associate Members, and its Member Boards that do not operate an unincorporated MLS on certain conditions, including that they agree to abide by applicable

practice changes; (iii) REALTOR® MLSs, as defined in the
Settlement Agreement, on certain conditions, including that they
agree to abide by applicable practice changes; (iv) any
nonREALTOR® MLSs, as defined in the Settlement Agreement, but          only
on certain conditions, including that they agree to practice
changes and pay an additional amount for the benefit of the Class
as outlined in Appendix D; (v) qualifying real estate brokerages
with a calendar year 2022 Total Transaction Volume for residential
home sales of $2 billion or less, including all parents,
subsidiaries, affiliates, associates, and franchisees, that have a
REALTOR® as a Principal and comply with the practice changes; and
(vi) qualifying real estate brokerages with a REALTOR® Principal
that, together with their affiliates, have over $2 billion in
total sales volume but only on certain conditions, including that
they agree to practice changes and pay an additional amount for
the benefit of the Class as specified in the Settlement Agreement.
Please check the Settlement website for more information about
entities participating in this Settlement.

Further, that paragraph refers Class members to "check the

Settlement website for more information about entities

participating in this Settlement." Id.  The website does not

have a listing of brokerages under the $ 2 billion TTV.

There is a prominent announcement of the seemingly

large figure that the NAR has agreed to pay in and the seemingly

even larger figure of the current value of all the settlements.

Missing, however, is the giant divisor that is the massive

settlement class, which will render payment to the settlement

class members $35 at most for causes of action that were worth

thousands had they been pressed individually.

### X. The Class Has Been Impermissibly Expanded

In *Blue Shield of Virginia v. McCready*, the Court said that

"Congress sought to create a private enforcement mechanism that

would deter violators and deprive them of the fruits of their

illegal actions, and would provide ample compensation to the

victims of antitrust violations." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472 (1982). This Settlement Agreement purports to expand the relevant classes from 24 MLSs to the entire country. Under the rubric provided by *McCready* and its progeny, this is not permissible. The current iteration of price fixing activity, namely using the MLS rules to facilitate and hide price fixing by real estate agents, may very well have been initiated by the NAR. It cannot be sustained, however, that the violators are only national brokerages with more than a $2 billion TTV in the calendar year of 2022 and the NAR. Six enforcement actions by the Department of Justice taken against MLSs were not against the National Association of Realtors. They were rather against local MLSs. In one of the other enforcement actions, the seminal Supreme Court case *United States v. National Association of Real Estate Board,* 339 U.S. 485 (1950), a jury found that the local real estate board was guilty of price fixing while the national association was not.

This is important because, while invitation to this iteration of the conspiracy was made by NAR and very large national brokerages, it was accepted, promulgated, and enforced differently in 600 MLSs throughout the country. That invitation was accepted differently by franchisees within the corporate umbrellas of the larger Settling Defendants, but also every other brokerage within a particular MLS. The fact is that all brokers

25

are complicit in this conspiracy, no matter their Total Transaction Volume. Franchisees within the four subject MLSs at issue in *Burnett* served at very high levels within the NAR and the state association. Yet those Franchisees were neither sued nor will they pay any penalty in this settlement. Just so, in South Carolina, a number of brokers in South Carolina who served within the REALTOR boards and on MLSs were Principals in what Co-Lead Counsel considers "small brokers." Ex. P, p. 10. These brokers are able to avoid disgorging any profit because Co-Lead Counsel, in attempting to nationalize the class, has decided South Carolina's damages are insufficient to pursue.

An antitrust settlement must serve to deter violators. Here, because discovery was necessarily circumscribed to the 24 MLSs at issue in the various suits, Plaintiff counsel cannot have determined, with any granularity, which violators need to be deterred in South Carolina. As such, almost no bad actor will be deterred and, as discussed below, victims will not be remunerated either.

Further, because the conspiracy was necessarily carried out differently in each MLS, though many of the operative rules may have been the same, the correct measure of damages, the availability of proof, the egregiousness of the illegal activity, are all different among and between MLSs. As such, this Court and these Plaintiffs should not bargain away absent class members

ability to discover their own evidence and try their own cases where the likelihood of success for those absent class members is unknowable. Plaintiffs are essentially asking this Court to generalize the likelihood of success in each MLS based on the likelihood of success in their two cases, one spanning four MLSs and the other twenty, despite the fact that the conspiracy operates differently throughout each MLS.

### XI. This Settlement Is Insufficiently Remunerative

Given the above, the bare amount NAR is paying is $408 million.  That number is to be divided over something like 35 million claimants, meaning that each claimant, even after the approved settlements are considered, is likely to receive something like $35.  As discussed above, that is a paltry amount, particularly considering the amounts that would likely be available in a state class action, without the crudely arbitrary lines drawn by Co-Lead Counsel to exclude payments from bad actors.

### XII. Conclusion

By nationalizing this class action, Co-Lead Counsel has arbitrarily determined what they believe to be large brokerages without undergoing any kind of rigorous analysis of what makes a brokerage large in the context of the markets in which it operates.  This has been discussed above, but it is important to understand that the crudity of the lines drawn by Co-Lead Counsel

destroys the integrity of this Settlement with respect to all but the largest markets, the largest conspiracies, and tells smaller markets that they do not matter within the context of the conspiracy.

Further, Co-Lead Counsel has failed so spectacularly in managing the opt ins or outs of this Settlement that it is impossible to determine who has opted in effectively. The only group definitively opted in appear to be those REALTOR MLSs and the NAR itself, though even the agreements for those REALTOR MLSs are not posted to the website on which Co-Lead Counsel sets so much store for notice purposes. This in itself merits rejecting this Settlement because absent class members, objectors, and this Court cannot know who is being released. More than that, without this information, there can be no analysis as to the fairness, adequacy, or the reasonableness of this Settlement.

Class Members have not received adequate notice, rights to be heard, and they will not receive adequate compensation, as compared to the far superior vehicle of a state by state class action. That was the reasonable vehicle to follow, as agreed by these Plaintiffs' lawyers when consolidation of *Burnett* with *Moehrl* was proposed many years ago.

For the foregoing reasons, the Objectors object to the settlement. They have been advised solely by the undersigned counsel, who intend to appear on their behalf at the fairness

hearing on November 26, 2024 in Kansas City, Missouri at the Charles Evans Whittaker U.S. Court house.

KNIE & SHEALY

*/s/ Patrick E. Knie*

Patrick E. Knie
Federal I.D. No. 2370
Matthew W. Shealy
Federal I.D. No. 12823
P.O. Box 5159
250 Magnolia Street
Spartanburg, S.C.  29304
Telephone No.  (864) 582-5118
Telefax No.    (864) 585-1615

Mitch Slade
MITCH SLADE LAW OFFICE, P.A.
Federal I.D. No. 5352
P.O. Box 1007
Spartanburg, S.C.  29304
Telephone: (864) 582-4212
mitch@mitchsladelaw.com

ATTORNEYS FOR OBJECTORS

October 28, 2024