IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, AND JEREMY KEEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | OBJECTION TO THE HOMESERVICES SETTLEMENT |
| Plaintiffs, | C/A No. 19-CV-00332-SRB |
| vs. | |
| The National Association of Realtors, et al., | |
| Defendants. | |

In compliance with the Preliminary Approval Order and the Long Form Notice of Proposed Settlements of HomeServices of America the following members, who have only objected previously in *Burnett, et al. V. The NAR, et al.*, C/A No. 19-CV-00332-SRB and in *Gibson, et al. V. The NAR, et al.,* C/A No. 4:23-CV-00788-SRB, object on behalf of the proposed class of individuals who sold homes on an MLS Listing Service servicing the District of South Carolina:

    Robert Benjamin Douglas
    Rdoug2172@gmail.com
    Address: 63 ½ Maple Street
    Charleston, SC 29403
    Phone # (859) 699-3952
    Home Sold: 14 N. Tracy Street
    Charleston SC 29403
    Date of Sale: 2/28/2023
    Listing Broker: Daniel Ravenel
    Sotheby's International Realty
    Buyer's Broker: Maven Realty

Benny D. Cheatman
Benny_cheatham@yahoo.com
101 Five Oaks Drive, Landrum, SC 29356
Home Sold: 513 Minnow Drive, Pawleys Island, SC 29585
Date of Sale: 7/24/2023
Listing Broker: The Litchfield Company
Buyers Broker: The Litchfield Company

Douglas W. Fender II, Dena Marie Fender
doug.w.fender@gmail.com
134 Lancelot Court
Lexington, SC 29072
Telephone: (803) 542-8019
Home Sold: 208 Spring Water Drive
Columbia, SC 29233
Date of Sale: 8/30/23
Listing Broker: Century 21 Vanguard
Buyer's Broker: Coldwell Bank Realty

## I. INTRODUCTION

At issue before the Court is a settlement agreement between Plaintiffs' Counsel and HomeServices of America and its corporate family. This Settlement came as a result of a trial which resulted in a very large verdict, subject to trebling, against the HomeServices of America and other Defendants. HomeServices of America is a subsidiary of Berkshire Hathaway, which is one of the largest, richest companies in the United States. HomeServices has agreed to pay $250,000,000 toward the settlement of the claims against it.

## II. Pre-Certification Settlements Require Careful Scrutiny and Must Comply with Due Process

Rule 23 of the Federal Rules of Civil Procedure require that a class action settlement may only be approved after a hearing and only on finding that it is fair, reasonable, and

adequate. *Marshall v. NFL*, 787 F.3d 502, 508 (8th Cir., 2015). In determining that the settlement terms are fair, adequate, and reasonable the court must also act as a fiduciary "serving as a guardian of the rights of the class members." *In re: Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). In determining whether a settlement is fair, adequate, and reasonable, the court must consider four (4) factors: (1) the merits of the Plaintiffs' case weighed against the terms of the settlement; (2) the Defendants financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement *Id.* The most important consideration... is "the strength of the case for Plaintiffs' on the merits balanced against the amount offered in settlement." *Petrovic v. Amco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999), although where the District Court cannot value the claims with a high degree of certainty the court must "insist that the parties present evidence" that would at least enable it to make a "ball park evaluation" before deciding whether to approve a settlement. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F. 3d 646, 653 (7th Cir. 2006).

    Further, the settlement must comply with "minimal procedural due process protection" for absent Plaintiffs. Further, "the notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested

3

parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum v. Shutts*, 472 U.S. 797, 812, 105S.Ct. 2965, 2974 (1985) qtg. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S., at 314-315, 70 S.Ct., at 657; cf. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-175, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974).

Finally, the underlying traditional reasons for class action do not support a certification of a national class here. As pointed out in *Phillips*, class actions generally are aimed at allowing "litigation of a suit involving common questions when there are too many plaintiffs for proper joinder" and "permit[ing] plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips* at 809. While there may be some common questions of law, the questions of fact vary widely by state. Further, the claims at issue would generally be economical for plaintiffs to pursue, at least on a state class basis. Each claim is worth at least several thousand dollars. These are not the $100 claims discussed in *Phillips*

### III. This Settlement Agreement Releases Franchisees Despite Not Requiring Anything of Them

It is axiomatic in our law that a release is a contract and subject to contractual principles. It is further axiomatic that, for a contract to form, there must be consideration. Consideration is "the exchange of something of value as between

4

the parties, which may include a promise." *Crutcher v. Multiplan, Inc.*, 22 F.4th 756, 768 (8th Cir. 2022). This settlement agreement does not bind the franchisees at all because there is no exchange between the parties, despite the fact that the complaint is replete with examples of franchisees taking active part in the price fixing activities complained of and the formulation of the rules by which much of price fixing was accomplished.

It is uncontroverted that the franchisees of the Defendant in this case will pay no money toward the total monetary settlement. While one could argue that, by paying a franchise fee, these franchisees are somehow contributing to that fund, the franchisees were already required to pay that franchise fee. Of course, doing what they were already required to do is not consideration for a new contract. It further cannot be argued that these agreements *require* franchisees to do anything. The settlement agreements do contain what are denominated as "practice changes," but those practice changes use no mandatory language when addressing franchisees. Rather, with respect to the franchisees the settlement agreements contain language like "make clear and periodically remind" and "advise and periodically remind." In order to be effective, these settlement agreements should make mandatory adoption of these practice changes as a condition of owning a franchise and the failure to follow those provisions a condition exposing the franchisees to revocation of

5

the franchise.

Further, the underlying purpose of antitrust law, that violators be punished, victims be amply compensated, and incentivize private actors to vindicate the public interest in having open, competitive markets, is undermined by the fact that these franchisees are able to escape any accountability. Plaintiffs made a decision not to sue the franchisees who directly harmed their clients and that decision may very well have been a good one for the facts and circumstances prevailing at the time they made it. Neither the *Moerhl* nor the *Burnett* plaintiffs held those franchisees to account, just as this settlement fails to hold them to account, again despite the fact that these franchisees accomplished the conspiracy that directly harmed those plaintiffs in the Subject MLSs. Those Franchisees, the active participants in the conspiracy, will not have to disgorge their profit from the conspiracy they wrought on those plaintiffs. Those franchisees will not have to change any of their conduct as a result of this trial or these settlements. Now, those plaintiffs are asking this Court to impose that same decision on every single member of a national class. That imposition does not serve the public interest, nor does it serve the absent class members.

### IV. The Class Has Been Impermissibly Expanded

In *Blue Shield of Virginia v. McCready*, the Court said

that "Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472 (1982)These three settlement agreements all purport to expand the relevant classes from 24 MLSs to the entire country. Under the rubric provided by *McCready* and its progeny, this is not permissible. The current iteration of price fixing activity, namely using the MLS rules to facilitate and hide price fixing by real estate agents, may very well have been initiated by the NAR. It may also be that the large national brokerages in their person as Franchisors drove the NAR to take on that mantle. It cannot be sustained, however, that the violators are only the national brokerages in their person as franchisors and NAR. Six of the enforcement actions taken against MLSs were not against the National Association of Realtors. They were rather against local MLSs. In one of the other enforcement actions, the seminal Supreme Court case *United States v. National Association of Real Estate Board,* 339 U.S. 485 (1950), a jury found that the local real estate board was guilty of price fixing while the national association was not.

  This is important because, while invitation to this iteration of the conspiracy was made by NAR and the franchisors, it was accepted, promulgated, and enforced differently in 600

7

MLSs throughout the country. That invitation was accepted differently by franchisees within the corporate umbrellas of the settling Defendants. This fact that franchisees are at least as complicit in this conspiracy as the national brokerage as franchisor is borne out by the *Burnett* complaint in paragraphs 78 – 84. (dkt. 759 at ¶¶ 78-84). Franchisees within the four subject MLSs at issue in *Burnett* served at very high levels within the NAR and the state association. Yet those Franchisees were neither sued nor will they pay any penalty in this settlement.

An antitrust settlement must serve to deter violators. Here, because discovery was necessarily circumscribed to the 24 MLSs at issue in the various suits, Plaintiff counsel cannot have determined, with any granularity, which franchisees, which violators, need to be deterred in South Carolina. They likely could not have determined that in any of the MLSs outside the 24 MLSs. As such, almost no bad actor will be deterred and, as discussed below, victims will not be remunerated either. Further, because the conspiracy was necessarily carried out differently in each MLS, though many of the operative rules may have been the same, the correct measure of damages, the availability of proof, the egregiousness of the illegal activity, are all different among and between MLSs. As such, this Court and these Plaintiffs should not bargain away absent class members

8

ability to discover their own evidence and try their own cases where the likelihood of success for those absent class members is unknowable. Plaintiffs are essentially asking this Court to generalize the likelihood of success in each MLS based on the likelihood of success in their two cases, one spanning four MLSs and the other twenty, despite the fact that the conspiracy operates differently throughout each MLS.

### V. The Long Form Notice of Proposed Settlement With HomeServices Does Not Contain Sufficient Information For Interested Parties To Properly Object

The Long Form Notice of Proposed Settlement does not list the size of the verdict or the much smaller class certified for trial in *Burnett*. It further says only that "a jury found in favor of the Plaintiffs in the *Burnett* action." Exhibit A at 5. There is no discussion that this is a much expanded class for settlement purposes.

There is a prominent announcement of the seemingly large figure that the NAR has agreed to pay in and the seemingly even larger figure of the current value of all the settlements. Missing, however, is the giant divisor that is the massive settlement class, which will render payment to the settlement class members $35 at most for causes of action that were worth thousands had they been pressed individually.

9

### VI. Conclusion

For the foregoing reasons, the Objectors object to this settlement. They have been advised solely by the undersigned counsel, who intend to appear on their behalf at the fairness hearing to be held on November 26, 2024 in Kansas City, MO at the Charles Evans Whittaker U.S. Courthouse.

KNIE & SHEALY

*/s/ Patrick E. Knie*

Patrick E. Knie
Federal I.D. No. 2370
Matthew W. Shealy
Federal I.D. No. 12823
P.O. Box 5159
250 Magnolia Street
Spartanburg, S.C.  29304
Telephone No.  (864) 582-5118
Telefax No.    (864) 585-1615

Mitch Slade
MITCH SLADE LAW OFFICE, P.A.
Federal I.D. No. 5352
P.O. Box 1007
Spartanburg, S.C.  29304
Telephone: (864) 582-4212
mitch@mitchsladelaw.com

ATTORNEYS FOR OBJECTORS

October 28, 2024