UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br>     v. <br><br> NATIONAL ASSOCIATION OF REALTORS, et al., <br><br> Defendants. | Civil Action No. 4:19-cv-00332-SRB <br><br> Hon. Stephen R. Bough |

**OBJECTION OF ROBERT FRIEDMAN TO THE PROPOSED NATIONAL CLASS ACTION SETTLEMENT WITH THE NATIONAL ASSOCIATION OF REALTORS, THE RELATED "OPT-IN" SETTLEMENTS WITH BROWN HARRIS STEVENS AND THE AGENCY, AND THE RELEASES PROVIDED TO NON-CONTRIBUTING BROKERAGES**

Robert Friedman ("Friedman") objects to the proposed nationwide settlement with the National Association of Realtors ("NAR"), the related "opt-in" settlements with Brown Harris Stevens ("BHS") and The Agency IP Holding Co., LLC ("The Agency") (collectively, the "Opt-In Settlements"), and the releases to be provided to certain brokerages who are not contributing anything to the proposed settlements. Friedman objects on behalf of himself and all individuals or entities who sold residential real estate in areas of Brooklyn, New York, dominated by the Real Estate Board of New York's ("REBNY") Residential Listing Service ("RLS"), using the services of a broker, and who paid a buyer-broker commission in accordance with REBNY rules (the "REBNY Brooklyn Class"). Friedman is the named plaintiff in a pending class action on behalf of a proposed class of such sellers, *Friedman v. Real Estate Board of N.Y., Inc.*, No. 1:24-cv-00405-JGLC-RWL (S.D.N.Y.) ("*Friedman*" or the "*Friedman* Action").

This objection is brought in accordance with Rule 23(e)(5) of the Federal Rules of Civil Procedure and the April 23, 2024 Order granting preliminary approval of a proposed nationwide class action settlement with NAR in the above-captioned action (ECF No. 1460, the "Preliminary Approval Order"), the long form settlement notice published on the website https://www.realestatecommissionlitigation.com/ (the "Settlement Website"), and instructions on the Frequently Asked Questions page of the Settlement Website.

As required by ¶ 12 of the Preliminary Approval Order, Friedman states as follows:

(a) Full name: Robert Friedman
c/o Dan Goldman, Esq.
Bienert Katzman Littrell Williams LLP
Telephone Number: (973) 476-5485
Email Address: dgoldman@bklwlaw.com

(b) Address of home sold: 297 5th Avenue, Apartment 4L, Brooklyn, NY 11215
Date of sale: May 28, 2021
Listing Broker: Douglas Elliman
Buyer's Broker: R New York Real Estate LLC

(c) The grounds for this objection are stated herein.

(d) This Objection applies to objector and the proposed class set forth in *Friedman*.

(e) This Objection applies to the settlement with NAR.

(f) Names and contact information for attorneys representing Friedman and the proposed class in *Friedman* are listed in the signature block below.

(g) Friedman has not objected to any settlement other than the related proposed nationwide class action settlements with Defendants Compass, Inc. ("Compass"), Douglas Elliman, Inc. ("Douglas Elliman"), and Engel & Völkers New York Real Estate LLC ("E&V") filed in the action styled as *Gibson, et al. v. National Association of Realtors, et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.) (the "Compass, Douglas Elliman, and E&V Settlements").

(h) To the extent that any documents supporting this objection are not already publicly available on this Court's CM/ECF system (including those submitted in support of Friedman's objection to the Compass, Douglas Elliman, and E&V Settlements), they are being submitted as exhibits to the Declaration of Steven J. Buttacavoli ("Buttacavoli Declaration"), filed concurrently herewith.

(i) Friedman intends to appear at the Fairness hearing through his counsel.

(j) Objector's signature is provided below.

**PRELIMINARY STATEMENT**

Friedman represents the REBNY Brooklyn Class, which alleges a conspiracy perpetrated through REBNY in New York City to inflate buyer broker commissions for homes listed on REBNY's RLS. *See* Seaver Decl. Ex. 1 ("*Friedman* Compl.") ¶¶ 35–41, 49–61, 101–104, p. 26 n.32.[1] Friedman opposes the proposed nationwide settlement with NAR. Although NAR is not a defendant in the *Friedman* Action and is the center of a wholly separate antitrust conspiracy, the NAR settlement includes provisions that, if approved, would provide for stunningly broad releases that would apply to brokerages, listing services, and conduct ***wholly unaffiliated with NAR and unconnected to the NAR-centered conspiracy***. This would include a release of claims asserted in the *Friedman* Action that concern the distinct REBNY/RLS conspiracy and do not arise out of the

---

[1] References to "Seaver Decl. Ex. _" are to the exhibits filed in connection with Friedman's objection to the Compass, Douglas Elliman, and E&V Settlements (*Gibson v. NAR, et al.*, No. 4:23-cv-788-SRB (W.D. Mo. Oct. 31, 2023) ("*Gibson*") ECF Nos. 467-1 to 467-19) and references to "Ex. _" are to the exhibits attached to the Buttacavoli Declaration.

same factual predicate as the NAR conspiracy to be resolved by a settlement with NAR. Worse, the NAR settlement includes provisions that, if approved, would allow certain brokerage defendants, including defendants in *Friedman* who operate exclusively within New York City pursuant to REBNY/RLS rules and have no connection to NAR, to escape liability with *zero* consideration paid in exchange for their release, notwithstanding those defendants' exposure to massive joint and several liability for the harm to the REBNY Brooklyn Class alleged in *Friedman*.

The NAR settlement and the related Opt-In Settlements currently before the Court are the third round of settlements[2] that seek to resolve, on a nationwide basis, claims involving a conspiracy perpetrated by and through NAR to inflate buyer-broker commissions for homes listed by NAR-affiliated "Realtors" on NAR-affiliated Multiple Listing Services ("MLSs"), pursuant to NAR rules, and/or MLS rules that were controlled or influenced by NAR. *See* Third Amended Complaint, *Burnett v. Nat'l Assoc. of Realtors*, No. 19-CV-00332-SRB (W.D. Mo. May. 6, 2022) ("*Burnett*"), ECF No. 759 (*Burnett* Compl.") ¶¶ 1-24.

The alleged REBNY and NAR conspiracies are wholly distinct and unrelated. Each involves entirely separate real estate associations, listing services, broker rules, and mechanisms through which the conspiracy was formed and maintained. *Friedman* Compl. ¶¶52-56, p. 26 n.32. Indeed, nothing in the record of proceedings of any action involving the NAR conspiracy supports the release of claims involving REBNY and the RLS, including those asserted in *Friedman*.

The NAR Settlement Agreement, Plaintiffs' motion for preliminary approval, and the Court's Preliminary Approval Order implicitly acknowledge this; they do not mention REBNY/RLS at all. *See* ECF Nos. 1458, 1458-1, 1460. The Long Form Notice of the settlement,

---

[2] Friedman previously objected to the second round of settlements with Defendants Compass, Douglas Elliman, and E&V. *See Gibson* ECF No. 467 (the "First Friedman Objection"). Friedman incorporates herein the arguments set forth in the First Friedman Objection and the supporting materials filed concurrently therewith.

however, states the parties' intent to release claims involving REBNY and the RLS.[3] The justification for such an expansive view of the NAR settlement likely flows from a particular and highly problematic aspect of the settlement: non-NAR brokerages (including New York-based defendants in *Friedman*) and non-NAR listing services (including REBNY/RLS) may elect to opt-in to the NAR settlement, regardless of whether there is any factual connection between those brokerages or listing services and NAR, NAR's rules, or any NAR-controlled or affiliated MLS. There is no factual or legal basis upon which a settlement with NAR could release such unrelated claims, including those of Friedman and the REBNY Brooklyn Class.

The Court should therefore reject the proposed NAR settlement and find that Friedman's and the REBNY Brooklyn Class's claims are not released or, alternatively, reject the opt-in and release provisions of the NAR settlement (including Appendices B, C, and D thereto), which are severable from the remainder of the agreement pursuant to ¶ 80 thereto. *See* ECF 1458-1 ¶ 80. Should the parties (1) modify the proposed "Settlement Class" definition so that it expressly *excludes* transactions associated with REBNY and/or on the RLS, and (2) expressly exclude conduct concerning transactions associated with REBNY and/or on the RLS from the releases covered by any "opt-in" settlement governed by Appendixes C and D to the NAR settlement, Friedman would have no objection to the NAR settlement and would withdraw his objection.

**GROUNDS FOR OBJECTION**

**A.     The Settlement Impermissibly Seeks to Release Claims Wholly Unrelated to the NAR Litigation That Do Not Arise Out of the Same Factual Predicate**

The proposed NAR settlement cannot release *Friedman*'s claims because they do not arise

---

[3] *See* https://www.realestatecommissionlitigation.com/admin/api/connectedapps.cms.extensions/asset?id=722069c7-72dc-4993-9879-cf5d707da8a5&languageId=1033&inline=true. The Long Form Notice for the NAR settlement does not appear to have been presented to the Court for approval. Although the Preliminary Approval Order states the Court's approval of a notice plan "as outlined in" the declaration of Plaintiff's notice administrator (*see* ECF No. 1460 ¶ 9), the declaration does not include a copy of any proposed class notice (*see* ECF No. 1458-3).

out of the identical factual predicate as the horizontal conspiracy underpinning the NAR litigation. A settlement in one case may release claims asserted in a different case, but only when "the claims arise out of the same nucleus of operative facts or are based upon the same factual predicate." *Murphy v. Jones*, 877 F.2d 682, 684–85 (8th Cir. 1989); *see also In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063–65 (8th Cir. 2013). Where, as here, the "source of [an] alleged antitrust conspiracy … is wholly different from the source of the alleged antitrust conspiracy" in a settled case, the settlement cannot release claims related to the separate conspiracy, even if it involves facially similar subject matter. *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 400 (S.D.N.Y. 2011). What is required is that the released claims share "the very same set of facts." *Id.* at 399. Here, they do not.

There is zero factual connection between the agreement alleged to constitute the REBNY/RLS conspiracy in *Friedman* and the nationwide NAR conspiracy alleged in *Burnett*. Accordingly, there is no same factual predicate or nucleus of operative fact, and the instant proposed settlements cannot release the claims alleged in *Friedman*.

### 1. The REBNY/RLS Conspiracy is Not Part of the NAR/MLS Conspiracy

The real estate commission litigation that has been before this Court for years is, and always has been, about a conspiracy, perpetrated by and through NAR, to inflate buyer broker commissions on MLSs. MLSs are affiliated with and/or influenced by NAR, and NAR member brokers transact as "Realtors" on MLSs. *Friedman* Compl. ¶¶47, 52 & n.17. *See also Burnett v. Nat'l Assoc. of Realtors*, No. 19-CV-00332-SRB, 2022 WL 1203100, at *2, *7 (W.D. Mo. Apr. 22, 2022) (granting class certification of the initial "four Subject MLSs" in part because the "identical" applicable NAR rules did "not differ based on the MLS" and that NAR's Code of Ethics and Handbook "apply to each subject MLS uniformly"). Indeed, the terms "MLS" and "Realtor" are

NAR trademarks. *Friedman* Compl. ¶47. The NAR conspiracy was formed through NAR member brokers' policies and conduct at the corporate level to enforce NAR rules on MLSs at the broker/agent level. *See Burnett* Compl. ¶¶ 74-84.

In contrast, *Friedman* alleges a wholly separate conspiracy perpetrated through REBNY to inflate buyer-broker commissions in specific areas of Brooklyn for homes listed on the RLS using the REBNY Rules and Code of Ethics. *Friedman* Compl. ¶¶ 35–41, 49–61, 101–104, p. 26 n.32. NAR is not a party in *Friedman*, and REBNY is not a party in the NAR cases. REBNY and NAR have nothing do with each other—they have not since 1994, when REBNY broke off all ties to NAR. *Id.* ¶52. In fact, NAR acknowledged that it is unrelated to the separate REBNY/RLS conspiracy when it opposed class certification in the *Moehrl v. The Nat'l Assoc. of Realtors, et al.*, No. 1:19-CV-01610 (N.D. Ill.), in the Northern District of Illinois, describing REBNY/RLS as a service "unaffiliated with NAR and that serves the New York City area." Ex. 1 at 16.

Critically, unlike the NAR conspiracy that was perpetrated at the broker defendants' corporate level, the REBNY conspiracy was perpetrated by REBNY itself requiring individual agents and brokers to agree in writing to abide by the REBNY Rules and Code of Ethics as a precondition to transacting on the RLS. *Friedman* Compl. ¶¶ 55-56. The clear absence of any common agreement between NAR and REBNY (and its members transacting on the RLS) demonstrates the separateness of the alleged conspiracies. *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 118–20 (S.D.N.Y. 2010) (separate antitrust conspiracies about similar subject matter do not share identical factual predicate because "***the agreement itself***, not its performance, ***is the crime of conspiracy***") (emphasis added); *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 561-64 (9th Cir. 2018) (finding claims do not share an "identical factual predicate" when they "depend on proof of different facts to establish a different

6

injury" arising out of separate agreements). The *Burnett* complaint does not dispute this, making no mention of REBNY or the RLS. And related NAR complaints pending before this Court distinguish REBNY/RLS from the NAR conspiracy. *See* First Friedman Objection at 4-7.

Also demonstrating that the REBNY conspiracy is wholly separate is the fact that changes to NAR rules have no effect on changes to REBNY rules. Indeed, REBNY unilaterally amended its rules, effective January 1, 2024, and brokers must sign these new rules as a precondition to transacting on the RLS. *See Friedman* Compl. ¶¶ 102-03. The REBNY Brooklyn Class continues to be harmed by the amended REBNY rules. Changes to NAR rules and/or broker practices on MLSs arising out of these and other NAR-related settlements have no effect whatsoever on broker adherence to REBNY rules and/or broker practices on the RLS. *See id*. ¶¶ 8, 53, 102–104.

Further, the REBNY conspiracy's effects are more anticompetitive and harmful to home sellers than the NAR conspiracy's effects in Brooklyn, in part because REBNY/RLS rules are meaningfully different from NAR rules. REBNY rules imposed a default 50/50 split of broker commissions and a "Commission Reduction Rule" requiring that any unilateral reduction in buyer broker commissions be borne entirely by the seller broker. *Friedman* Compl. ¶¶ 57-59. Buyer broker commissions on sales of homes in "Brownstone Brooklyn," where REBNY dominates, consistently exceed 2.5%, whereas areas of Brooklyn where two MLSs (Brooklyn MLS and OneKey, which adheres to NAR rules) compete with one another, commissions were less, averaging 1.5%. *Id.* at 26 n.32. *See also* First Friedman Objection, § A.3 (describing Plaintiffs' expert's opinion that REBNY/RLS Rules had enhanced anticompetitive effects).

### 2. Opt-In Settlement Defendants Agree REBNY/RLS is a Different Conspiracy

Until recently, the Opt-In Settlement Defendants unambiguously agreed that *Friedman* and a companion class action alleging similar violations of the REBNY/RLS Rules on behalf of a

Manhattan class (*March v. Real Estate Board of N.Y.*, No. 1:23-cv-09995 (S.D.N.Y) ("*March*")), do not share the same factual predicate with the NAR conspiracy. Those Defendants previously opposed the transfer of *March* and *Friedman* to this Court to be consolidated with *Gibson* and *Umpa, v. NAR, et al.*, No. 4:23-cv-945-SRB (W.D. Mo. Dec. 27, 2023). In doing so, the Opt-In Settlement Defendants stated unequivocally that the alleged REBNY conspiracy is wholly separate from the alleged NAR conspiracy.[4]

Opt-In Settlement Defendant BHS represented the following to the JPML:

- *Friedman* "deals exclusively with sales in the Borough of Brooklyn in New York City by cooperating brokers ***who do not operate under the rules of NAR and the MLSs***" (Seaver Decl. Ex. 7 at 2) (emphasis added);

- "BHS, along with other defendants to the *March* and *Friedman* Actions . . . are members of [REBNY], which has its own unique rules, constitution, and listing exchange [the RLS], and thus ***are not party to rules promulgated by NAR that are the subject of the NAR Actions***" (*Id.*) (emphasis added);

- "[T]he REBNY Actions present a different context in which alleged antitrust violations will be adjudicated. The distinctions between NAR and REBNY and the brokerage firms that operate thereunder are significant" (*Id.*);

- "[T]he REBNY rule that is the gravamen of the REBNY Actions differs significantly from the NAR rule that is the focus of . . . the NAR Actions. . . . This NAR rule—and its functional equivalent which was adopted by the remaining MLSs—is the gravamen of the NAR actions and **does not** appear in any form in REBNY's rules . . . the REBNY Actions do not utilize the NAR rule or have a functional equivalent to the NAR rule at issue in the NAR Actions" (*Id.* at 5) (emphasis in original); and

- "Quite simply, there is no conspiracy or agreement to follow NAR amongst the defendants in the REBNY Actions" (*Id.* at 6).

Consistent with this position, a BHS agent from New York City wrote, in an April 17, 2024 blog post addressing the NAR settlement that, "[t]he impact of the settlement on New York City is anticipated to be minimal, if at all. New York agents operate under the [REBNY], distinct from

---

[4] All but one of the other Defendants in *Friedman* (excluding Anywhere, which had previously entered into a settlement with Plaintiffs) agreed that the REBNY conspiracy was completely factually separate from the alleged NAR conspiracy. *See* Seaver Decl. Exs. 3-6, 8-10 (submissions to the JPML); Seaver Decl. ¶¶ 3-4 and Exs. 12-16 (public statements by REBNY-member New York City real estate brokers explaining that REBNY members are not NAR members and otherwise how the NAR settlement does not impact the real estate business in New York City).

8

the NAR," and noting the earlier REBNY rule amendment. Seaver Decl. Ex. 15 at 1-2.

Opt-In Settlement Defendant The Agency made similar representations to the JPML. The Agency referenced REBNY's JPML brief (Seaver Decl. Ex. 5) and stated: "there are distinctions between NAR's Rules, Code of Ethics and Handbook and REBNY's Rules and Code of Ethics . . . [which are] meaningful and significantly distinguish the *March* and *Friedman* Actions from both the W.D. Mo. Actions and the NAR Cases" (Seaver Decl. Ex. 11 at 6). Moreover, on May 15, 2024, New York City agents of The Agency published a blog post (*see* Seaver Decl. Ex. 14), which included analysis from attorneys at "a Manhattan-based boutique real estate law firm" regarding the NAR settlement, explaining why the settlements have no bearing on the New York City real estate market and stating: "First, REBNY Agents are not members of NAR. Therefore, the NAR Settlement does not actually affect any REBNY Agents." *Id.* at 1.[5]

The Court should take the Opt-In Settlement Defendants at their word. The claims in *Friedman* do not arise out of the same factual predicate, cannot be released through settlements in the NAR litigation, and the settlement should be rejected.

### 3. There is No Evidence to Support a Common Factual Predicate Between the REBNY Conspiracy and the NAR Conspiracy

While the Long Form Notice indicates that Plaintiffs and the Settling Defendants intend to release REBNY/RLS-based claims, merely reciting an intent to wipe away Friedman's claims and those of other sellers based on transactions carried out through the RLS (not an MLS) under REBNY (not NAR) rules does not permit the parties to do so. Similarly, while the later-filed the

---

[5] *See also* Anna Kodé, *What Does the Real Estate Shake-Up Mean for New Yorkers?*, The New York Times, Mar. 21, 2024, https://www.nytimes.com/2024/03/21/realestate/nar-rebny-new-york-buying-selling.html ("in New York City, where the primary real estate trade group is [REBNY], most agents aren't members of N.A.R. and thus aren't subject to the group's amended rules"); Jonathan Miller, *August 17 Looms Large For Buyer's Agents, Yet a Third Don't Even Know About The NAR Settlement*, Housing Notes, Aug. 16, 2024, https://housingnotes.com/august-17-looms-large-for-buyers-agents-yet-a-third-dont-even-know-about-the-nar-settlement/ ("In the Manhattan market, the Real Estate Board of New York (REBNY) is the dominant industry trade group . . . . REBNY is not part of NAR and probably most REBNY members are not members of NAR").

Motion for Preliminary Approval of Settlements With Brokerages and Non-Realtor Multiple Listing Services Opting Into the National Association of Realtors Settlement and for Permissive Joinder of Opt-in Entities (ECF No. 1538, the "Opt-in Motion") states that claims against the Opt-In Defendants "aris[e] out of the same, transaction, occurrence, or series of transactions or occurrences" as the claims against NAR, that assertion is entirely without factual support. Opt-in Motion at 3-4. The NAR claims do not share the same factual predicate with the REBNY/RLS conspiracy alleged in *Friedman* and there is no support in the record to suggest that they do; neither the NAR settlement itself or the settlements with the Opt-In Defendants can release the claims of the REBNY Brooklyn Class.[6]

**B.     Plaintiffs Have Not Demonstrated That the Settlement, Including the Allowance for "Opt-In" Settlements, is Fair, Reasonable, and Adequate Under Rule 23(e)**

While the law strongly favors settlements, and while cases like *Burnett*, *Gibson*, and *Friedman*, are strong candidates for consensual resolution, this Court nonetheless has a fiduciary obligation to ensure that all settlement class members' interests are protected and that the settlement provides fair value in exchange for the release of claims that is to be foisted upon absent settlement class members. *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005); Manual for Complex Litigation (Fourth) § 21.61 (describing court's obligation as particularly "demanding because the adversariness of litigation is often lost after the agreement to settle," resulting in the "settling parties frequently mak[ing] a joint presentation of the benefits of the settlement without significant information about any drawbacks"); Fed R. Civ. P. 23(e)(2) advisory committee's notes to the 2018 amendment (requiring consideration of, *inter alia*,

---

[6] To the extent that, at the final approval stage, the settling parties may rely on the same or similar support provided at the final approval stage in the Anywhere settlement, or in the context of the Compass, Douglas Elliman, and E&V Settlements—including reliance on certain expert opinions—those arguments and factual support do not and cannot support a release of the claims in *Friedman*. *See* First Friedman Objection at 9-11.

"whether the scope of the release may affect class members in different ways that bear on the apportionment of relief").

The NAR settlement cannot be approved as fair, reasonable, and adequate under Fed. R. Civ. P. 23(e) because it would have the effect of releasing Friedman's and the REBNY Brooklyn Class's claims that are completely untethered from any conspiracy including, or even remotely connected to, NAR, including claims against defendant brokerages who are due to ***pay nothing*** under the terms of the NAR settlement. "The settlement's proponents bear the burden of developing the record and proving that the settlement is fair, reasonable, and adequate." *Galloway v. Kan. City Landsmen, LLC*, No. 4:11-1020-CV-W-DGK, 2013 WL 3336636, at *2 (W.D. Mo. July 2, 2013). Plaintiffs, NAR, and the Opt-In Defendants have failed to meet that burden.

1. **The NAR Settlement Allows Multiple *Friedman* Defendants to Escape Liability With *Zero* Cash Contribution**

The most egregiously unfair, unreasonable, and inadequate provision of the NAR settlement is one that appears unprecedented[7] in its reach: all real estate brokerages whose 2022 "Total Transaction Volume" falls below an arbitrary threshold of $2 billion ("Sub-$2B Brokerages") will be gifted a proverbial "get out of jail free" card, regardless of their participation in the NAR conspiracy, culpability, potential exposure, or ability to pay. *See* NAR Settlement, Appendix C, ¶ 18.e. Sub-$2B Brokerages—which may include as many as six defendants in *Friedman* that operate substantially or exclusively in New York City and exclusively under

---

[7] Neither Plaintiffs' motion for preliminary approval of the NAR Settlement nor the Opt-in Motion includes any citation to authority in which a court has approved a similar settlement that allows for such broad release (1) of parties who will not pay any settlement consideration and (2) claims unrelated to the same factual predicate. Indeed, the 8th Circuit has observed that it had "found no cases in which a release protected noncontributing third parties like Dean Witter; in addition to being apparently unprecedented in federal case law, such a free ride for bad actors is counterintuitive." *In re Y & A Grp. Sec. Litig.*, 38 F.3d 380, 384 (8th Cir. 1994). While *Y&A* ultimately found that "the district court, with the benefit of having conducted several hearings . . . concluded that Dean Witter is likely to be able to prove that the class plaintiffs actually intended to release for free third-party brokers like Dean Witter from liability for bad acts," *id.*, such an extensive record supporting the propriety of the releases is not before the court here.

REBNY rules[8]—will be automatically covered by the NAR settlement ***without making any monetary contribution***. The settling parties have made no showing how this is fair, reasonable, or adequate to Friedman and the REBNY Brooklyn Class.

The Court may not release any Sub-$2B Brokerages who are *Friedman* Defendants because there has been no showing of an identical factual predicate between the REBNY/RLS conspiracy and the NAR conspiracy. *See supra* § A.1. Consistent with that clear rule, "settling class members generally cannot validly release other class members' claims that they themselves do not possess, for no consideration." *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 181–82 (W.D.N.Y. 2011). *See also Nat'l Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 19 (2d Cir.1981) ("An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class"). Accordingly, Plaintiffs have not met their burden of demonstrating that the free release provided to the Sub-$2B Brokerages, including *Friedman* defendants, is fair, reasonable, or adequate. Also, the settling parties have made ***no showing*** that, among other things: (1) use of a single year's (2022) transaction volume is appropriate to establish a cutoff when the conduct at issue spans multiple years (from October 2019 until roughly mid-2024 as would apply to a release of REBNY/RLS claims); (2) less than $2 billion in 2022 transactions is a reasonable universal threshold for allowing brokerages to avoid making ***any*** monetary contribution; (3) there are no brokerages that had less than $2 billion in 2022

---

[8] These defendants may include Serhant LLC ("Serhant"), Nest Seekers LLC, Elegran LLC, R New York Real Estate LLC, TDG-TREGNY, LLC d/b/a MNS, and Leslie J. Garfield & Co. Inc. There is, however, no reliable public source of these brokerages' sales or revenues to demonstrate whether they, in fact, are Sub-$2B Brokerages. The NAR settlement definition of "Total Transaction Volume" states that the "Sales Volume" reflected in a third party source called the "T360 Real Estate Almanac" (the "Almanac") provides an "irrebuttable presumption" of a brokerage's Total Transaction Volume. ECF No. 1458-1 ¶25. However, ***none*** of the six *Friedman* Defendants who might be Sub-$2B Brokerages are included in the publicly available version of the Almanac. *See* T360, Extract of the 2023 Real Estate Almanac, https://www.t3trends.com/intel/top-brokerages-in-2023/.

transactions that presently have the ability to pay a substantial settlement to resolve the claims in this case; and (4) how much compensation to class members is being foregone by not requiring contributions from all brokerages obtaining a release.

A further unfair and unreasonable aspect of the blanket release provided to Sub-$2B Brokerages is that brokerages need not do anything to demonstrate their eligibility to receive this benefit. At least one *Friedman* defendant, Serhant, made this clear in email correspondence to Friedman's counsel in the context of requesting a stay of proceedings in the Southern District of New York: "there is no requirement in the settlement agreement for any proof by released parties to be submitted." Ex. 2. Serhant's example, in fact, reveals a critical problem with the lack of transparency into the treatment of purported Sub-$2B Brokerages: Serhant may not meet the criteria based on the statements of its CEO and Founder, who posted to LinkedIn that "SERHANT. sold $2,200,000,000+ worth of real estate in 2022." Ex. 3. Once again, the Court should take the settling parties at their word. This assertion cannot be contradicted by reported transaction volume in the Almanac since Serhant doesn't appear in it.

2. **The Settling Parties Have Not Met Their Burden of Proving That the NAR Settlement, With Sweeping Releases That Encompass an Unpled Conspiracy, is Fair, Reasonable, and Adequate Under Fed. R. Civ. P. 23(e)**

Based on the record before the Court, the Court cannot find that the NAR settlement is fair, reasonable, and adequate as it pertains to a release of the claims of the REBNY Brooklyn Class. Among other things, the Settling Parties have not met their burden with respect to the following:

- The settlement class representatives do not have standing to release *Friedman*'s claims against the *Friedman* Defendants—including but not limited to Defendants that operate substantially or exclusively within REBNY Brooklyn or New York City—that arise out of an entirely separate conspiracy with distinct anticompetitive effects.

- The monetary consideration to be provided by the Opt-In Defendants is not fair, reasonable, and adequate to REBNY Brooklyn Class members because Plaintiffs have not explained the substantial departure from the already low expected contributions from Opt-In Defendants under the default "Option 1" amount from Appendix C to the NAR settlement

13

and the purportedly negotiated amounts that the Opt-In Defendants would pay pursuant to "Option 2" of Appendix C if the settlement is approved.[9] The proposed contributions by the Opt-In Defendants are not merely pennies on the dollar compared to their massive liability to the REBNY Brooklyn Class, they are pennies on the pennies themselves.

- o BHS, which had a reported 2022 total sales volume of ***$10.45 billion***,[10] would escape liability for a mere $26.125 million under "Option 1." However, the proposed opt-in settlement before the court contemplates that BHS would pay just $2.9 million for conduct spanning a period of approximately four years, or about 11% of the already discounted price of a release.

- o The Agency, which had a reported 2022 total sales volume of ***$8.941 billion***,[11] would escape liability for approximately $22.353 million under "Option 1." However, the proposed opt-in settlement before the court contemplates that The Agency would pay just $3.75 million for conduct spanning a period of approximately four years, or about 16.8% of the already discounted price of a release.

- The monetary consideration to be provided by the Opt-In Defendants is not fair, reasonable, and adequate to REBNY Brooklyn Class members who suffered a different and greater injury compared to the alleged harm of the NAR conspiracy.

- The terms of the settlement do not provide settlement class members, particularly members of the REBNY Brooklyn Class, with meaningful guidance describing the manner in which settlement proceeds will be distributed in order to allow those individuals to evaluate reasonably whether to opt-out of the settlements. In that regard:

  - o There is no assurance that REBNY Brooklyn Class members will be provided with proportionally larger distributions based on the higher prices of real estate in New York City or the scope of the harm in New York City.

  - o Class members who sold a home under the REBNY/RLS conspiracy will not receive additional cash consideration to compensate for the fact that the non-monetary NAR-focused practice changes touted as a benefit of the settlements do not and cannot apply to conduct in New York City given that REBNY/RLS rules apply to those transactions.

  - o Plaintiffs have not explained how, if at all, they will treat different types of settlement class members who sold homes in Brooklyn based on whether the sale involved a listing on the RLS in REBNY Brooklyn (and thus subject to higher buyer-broker

---

[9] At a minimum, Friedman is entitled to discovery on (i) Opt-In Defendants' ability to pay; and (ii) whether the NAR and REBNY conspiracies share the same factual predicate. Fairness, reasonableness, and adequacy considerations require the appointment of Friedman to serve as an additional settlement class representative, and Friedman's counsel as additional settlement class counsel, to protect the interests of the REBNY Brooklyn Class and other individuals who sold residential real estate under the REBNY/RLS Rules.

[10] *See* Almanac, at p. 10 of embedded pdf, https://www.t3trends.com/intel/top-brokerages-in-2023/. Under the terms of the settlement, the Almanac is to provide an "irrebuttable presumption" of a defendant's total sales volume. *See* ECF No. 1458-1 ¶ 25. It is not clear, however, whether the 2023 Real Estate Almanac captures the value of transactions carried out on the RLS that are at issue in *Friedman*. Notably, multiple *Friedman* defendants that are significant players in the New York City real estate market do not appear *at all* in the Almanac (*see supra* § B.1 & note 8), even though the Almanac reports data for brokerages operating in much smaller and less expensive real estate markets.

[11] *See* Almanac at p. 10 of embedded pdf.

commissions due to enhanced anticompetitive conduct under REBNY's Rules) versus on MLSs that operate primarily in different sections of the borough (i.e., Brooklyn MLS and OneKey, where buyer broker commissions have been found to have been lower and the product of greater competition than in REBNY Brooklyn).

3. **Although the Settling Parties, Including the Opt-In Defendants, May Want the Broadest Release Possible, Plaintiffs and NAR Cannot Provide a Release That Includes Unrelated Conduct Including REBNY/RLS Claims**

The sweeping process through which non-NAR brokerages, non-NAR listing services, and non-NAR-centered conduct would be released through the "opt-in" settlement process appears to be the product of a so-called "collusive settlement." The preliminary approval briefing for the present settlement makes generic arguments in favor of broad settlements that provide defendants with "global peace." *See* ECF No. 1458 at 14. However, the Settling Parties (including the Opt-In Defendants) have not sufficiently established that the present settlement and its release of unelated conduct including the claims of the REBNY Brooklyn Class is free of any collusion or improper selling out of the interests of the REBNY Brooklyn Class.[12] The concerns with defendants' similar insistence on "global peace" described in the First Friedman Objection apply with equal force here. *See Gibson* ECF No. 467 at 14-15.

**CONCLUSION**

For the reasons stated herein, the Court should reject the NAR settlement.

///

///

///

---

[12] While the preliminary approval papers reference negotiations assisted by mediators (ECF No. 1458 at 26), it is not clear when those negotiations occurred or whether they included discussion of, *inter alia*, the claims in *Friedman*, the inclusion of REBNY/RLS claims in any proposed settlement, the value of REBNY/RLS claims. Counsel for *Friedman* or the companion *March* action were not invited to participate in any mediation or other discussion of the settlement of the separate claims in those actions. The Court cannot take at face value the Settling Parties' vague and unsupported assertions regarding the purported arms-length negotiation of any settlement.

Dated: October 28, 2024                    Respectfully submitted,

**BERMAN TABACCO**

*/s/ Steven J. Buttacavoli*
Steven J. Buttacavoli (admitted *pro hac vice*)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
sbuttacavoli@bermantabacco.com

| | |
|---|---|
| Daniel Goldman (admitted *pro hac vice*) | Todd A. Seaver (admitted *pro hac vice*) |
| **BIENERT KATZMAN** | **BERMAN TABACCO** |
| **LITRELL WILLIAMS LLP** | 425 California Street, Suite 2300 |
| 903 Calle Amanecer, Suite 350 | San Francisco, CA 94104 |
| San Clemente, CA 92673 | Telephone: (415) 433-3200 |
| Telephone: (973) 476-5485 | Facsimile: (415) 433-6382 |
| dgoldman@bklwlaw.com | tseaver@bermantabacco.com |

Robert Friedman
Objector

October 28, 2024