IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | CASE NO. 19-CV-00332-SRB |
| Plaintiffs, | ) ) | |
| v. | ) ) ) ) ) ) | OBJECTIONS TO NATIONAL ASSOCIATION OF REALTORS AND HOMESERVICES OF AMERICA SETTLEMENTS |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP. (n/k/a ANYWHERE REAL ESTATE, INC.), HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) ) ) | AND SUGGESTIONS IN SUPPORT OF THE OBJECTION |
| Defendants. | | |

In compliance with the Preliminary Approval Order and the Long Form Notice of Proposed Settlements of the National Association of Realtors ("NAR") and HomeServices of America, the below objectors (Objectors), having never objected to a class action settlement outside of this Action before, object on behalf of a proposed class of individuals who sold homes on the West Penn MLS in the Western District of Pennsylvania:

Spring Way Center, LLC
1140 Blank Road
Freedom, PA 15042
Phone: (724) 371-0471

1

Property sold: 160 Steel School Road Freedom, PA 15042
Date of Sale: 09/08/2023
Listing Broker: Austin Kyle Rusert
Coldwell Banker (a Realogy Holding Corp. subsidiary)

Nancy Wehrheim
Pittsburgh, PA
Date of Sale: July 2021
Listing Brokerage: Coldwell Banker

John and Nancy Moratis
2252 Copper Kettle Hwy
Rockwood, PA
Date of sale: December 3, 2021
Listing Brokerage: Berkshire Hathaway HomeServices The Preferred Realty

Danielle and Jessie Kay
Baden, PA
Date of Sale: December 14, 2021
Listing Brokerage: Realty ONE Group Gold Standard

Kaitlyn Slavic
630 Locust Street
Greensburg, PA
Date of Sale: July 7, 2023
Listing Brokerage: Realty ONE Group Gold Standard

Maria Iannome
200 Carroll Lane
Washington, PA
Date of Sale: March 29, 2024
Listing Brokerage: Realty ONE Group Gold Standard

**I. Standing to Object**

Pursuant to Federal Rule of Civil Procedure 23(e)(5), Objectors have standing to object to the NAR settlement because they sold homes on the West Penn MLS, which has opted into the NAR settlement. Additionally, Objectors John and Nancy Moratis have standing to object to the HomeServices settlement because they sold a home through a HomeServices franchisee that is being released by the HomeServices settlement.

**II. Introduction**

Objectors object to the NAR and HomeServices national class action settlements and requests that the settlements be denied final approval.

First, the settlement agreements greatly exceed the scope for which classes were certified and for which discovery was conducted. The *Moerhl* and *Sitzer/Burnett* classes were originally certified for a total of 24 Multiple Listing Services (MLSs). The proposed settlement, however, seeks to expand that class certification to more than 600 MLSs across the country. These 600-some MLSs operate and each have their own unique methods of enforcing their rules. Those methods operate differently from other MLSs, even within the same state, let alone across the country. Although the rules of each MLS may overlap, each MLS enforces them differently. And, each MLS engaged in the price-fixing, participated in the illegal activity, and used rules adopted for its particular MLS, although they may have used similar mechanisms to accomplish it. Moreover, the NAR settlement allows non-NAR MLS organizations, such as West Penn MLS, to opt-in even though they did not operate under NAR's rules during the class period and had their own, separate interactions with their co-conspirators not related to or mediated through NAR. Their actions, while similar, were separate and distinct, and require separate and distinct remedies.

The proposed NAR settlement amount is $408,000,000 in the aggregate. This amount is grossly disproportionate to the amount appropriate to adequately compensate the enormous number of injured parties. While the outcome of the trial and appeals is uncertain, that uncertainty does not mean that plaintiffs should be able to obstruct the other class members' ability to effectively try their own cases in their own states with their own evidence. Plaintiffs in these cases have apparently bargained away the rights of the citizens of other states in order to

4885-6051-0451 v2

opportunistically settle their own cases, ensure their own representative clients receive additional compensation, and guarantee coverage of their own trial fees and expenses. These plaintiffs did not conduct any discovery regarding the operation of related conspiracies in other states and regions, including Western Pennsylvania. Nonetheless, they contend that $408,000,000 is adequate to properly compensate absent class members in entirely different circumstances and environments in all parts of the United States.

Similarly, HomeServices is proposed to pay $250,000,000 towards the settlement of the claims against it and its franchisees, with the franchisees themselves paying nothing. This will not provide sufficient renumeration to HomeServices clients in Western Pennsylvania. The proposed settlement fails to acknowledge that HomeServices and its affiliates are only able to act through their franchisees. None of the franchisees have been required to compensate persons they harmed in any manner. Giving the franchisees a "free pass" does nothing to further the underlying purposes of antitrust law to deter bad actors.

The "practice changes" proposed, meanwhile, are illusory. The challenged behavior is a conspiracy to maintain unnaturally high buyer-broker compensation, to the detriment of the sellers who must pay it (despite whatever services the buyer-broker provides being provided to the buyer). It is well understood in the real estate business that this amount is "standard" or "customary," and there is no reason to believe that this combination in restraint of trade will carry on, simply in a form that is more difficult to detect, because it is the result of one-to-one discussions or decentralized alternate platforms rather than committed in the open on the MLS.

Finally, the proposed "practice changes," even insofar as they have any salutary effect, expire after just five years. As revealed by the Department of Justice's Statement of Interest in *Nosalek v. MLS Property Information Network et al.*, No. 1:20-cv-12244-PBS (D. Mass.), the

price-fixing activity at issue here extends back decades. Five years of the illusory "practice changes" proposed is highly unlikely to remedy this longstanding practice of price-fixing. Exhibit 1 at pp. 6-8.

Accordingly, the Objectors from Pennsylvania request that this Honorable Court deny final approval of the proposed settlement agreement.

**III. Pre-Certification Settlements Require Close Examination**

Under Rule 23 of the Federal Rules of Civil Procedure, a class action settlement may only be approved after a hearing and a finding by the court that it is fair, reasonable, and adequate. *Marshall v. NFL*, 787 F.3d 502, 508 (8th Cir. 2015). In this regard, the court must act as fiduciary, "serving as a guardian of the rights of absent class members." *In re Wireless Tel. Fed. Cost Recovery Fee Litig.*, 396 F.3d 922, 932 (8th Cir. 2005) (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975)). The court must consider four factors: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendants' financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *Id.* (citing *Grunin*, 513 F.2d at 124). The paramount consideration is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in the settlement." *Petrovic v. Amco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999). As part of this analytical process, the court must "insist[] that the parties present evidence" that would at least enable it to make a "ball park evaluation" before deciding whether to approve a settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

**IV. Moving Parties Seek to Impermissibly Expand the Class**

The Supreme Court proclaimed in *Blue Shield of Virginia v. McCready* that "Congress

4885-6051-0451 v2

sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." 457 U.S. 465, 472 (1982). The proposed settlement agreement, however, impermissibly attempts to expand the relevant classes from just 24 MLSs to 600-some MLSs scattered across the country. The price-fixing conspiracy engaged in by Defendants was carried out differently by their franchisees, the independent brokerages, and various MLSs, and differently in different geographical areas because of differing rules, real estate markets, local laws, and mix of real estate brokerages operating in each region. As revealed by the *Burnett* complaint, this current iteration of the industry's price-fixing activity, principally, but not exclusively, using the MLS rules to facilitate and conceal price-fixing by real estate agents, may very well have been first created by the NAR.

It cannot be maintained, however, that the violators are only the national brokerages in their capacity as franchisors. As detailed in the previously cited Statement of Interest by the DOJ, six of the enforcement actions, including Spring Way, were not against the National Association of Realtors. Rather, they were against local MLSs. Defendants' franchisees and independent real estate brokerages engaged in their price-fixing conspiracy differently and did so differently in different locations. This is important because, while the framework and incentive for this iteration of the conspiracy was made by NAR and the franchisors, it was accepted, promulgated, and enforced differently by franchisees and independent real estate brokerages in 600 MLSs throughout the country. The fact that franchisees are at least as potentially complicit in this activity as the national brokerages is revealed by the *Burnett* complaint. *See Burnett et al.*, Third Amended Complaint, Dkt. 759 at ¶¶ 78-84. None of the franchisees of any of the settling

brokerage firms, however, were sued in *Burnett* nor will they participate in funding a dollar of the proposed settlement.

It is axiomatic that an antitrust settlement must serve to deter violators. Indeed, that is why treble damages are available against antitrust violators. In these cases, discovery was necessarily circumscribed to the 24 MLSs at issue in the subject suits. Accordingly, plaintiffs' counsel was unable to make any determination which franchisee violators need to be deterred in Pennsylvania. They had no ability to make any such determination in the 600 MLSs outside of the 24 MLSs, including independent MLSs like West Penn MLS. As a result, none of the bad actors will be deterred nor will victims be properly compensated. Moreover, the proper measure of damages, the availability of proof, and the severity of the illegal activity will all differ among the hundreds of individual MLSs. Hence, these plaintiffs should not be permitted to bargain away absent class members' ability to take discovery of their own evidence and try their own cases where the likelihood of success for those absent class members is unknown.

**V. The Proposed Compensation is Woefully Insufficient and the Financial Condition of the Settling Companies is Unknown**

As this Court observed at the outset, ". . . defendants here in this case obviously made huge profits." *Burnett et al.*, No. 4:19-cv-00332, Plaintiffs' Opposition to Defendant's Motion in Limine No. 20, Dkt. No. 1159, p.2.

The proposed settlements rely upon insufficient data regarding the opt-in Defendants' profitability and finances and allow them to settle for a pittance. Even worse, smaller brokerages are allowed to opt-in for no payment at all, despite the large percentage of the real estate market that they command in the aggregate.

As to HomeServices, according to the website of Berkshire Hathaway (HomeServices' corporate parent), HomeServices had a sales volume of $136.1 billion in 2023 alone.[1] Assuming that HomeServices and its franchisees made 3% in commissions of this volume, they made $4.083 billion in 2023 alone. HomeServices $250,000,000 settlement payment is a mere 6% of HomeServices' 2023 income—say nothing of its income in prior years during the statute of limitations period.

Furthermore, Plaintiffs' counsel seek to recover approximately $12,000,000 spent by them on the *Burnett* trial from this aggregate settlement amount. Hence, the proposed settlement, particularly in light of the $1.78 billion *Burnett* verdict, which when trebled, amounts to $5.34 billion, is vanishingly small.

**VI. The Proposed Settlement Releases HomeServices Franchisees in Exchange for Nothing**

The proposed settlement fails to seek any consideration from HomeServices' franchisees. This is true despite the *Burnett* complaint's recitation of examples of franchisees actively participating in the price-fixing activities at issue. Moreover, the modest "practice changes" in the proposed settlement contain no mandatory language applicable to franchisees. Nor does the proposed settlement contemplate an injunction forbidding sellers from making offers of compensation to buyer brokers as proposed in the DOJ's Statement of Interest in *Nosalek*. *See* Exhibit 1. Under the proposed settlement, even though they were active participants in the conspiracy, the franchisees will be permitted to retain their profits from the conspiracy they carried out against the plaintiffs. Moreover, they will not have to reform any of their conduct moving forward under the proposed settlement. Inexplicably, the plaintiffs are seeking to give a

---

[1] *See* https://www.brkenergy.com/our-businesses/homeservices-of-america (accessed Oct. 28, 2024).

"free pass" to the franchisees which fails to serve the public interest, enforce the policies of deterrence under the antitrust laws, and runs contrary to the interests of the absent class members.

**VII. The Sunset Provision Fails to Ensure a Long-Term Remedy for Antitrust Violations**

The history of this industry shows an ingrained predilection for the fixing of commissions. The settlement agreement, however, provides that the "practice changes" will expire after five years from the effective date of the agreements. This ignores the reality that the nationwide price-fixing activity complained of originated in 1939. Five years is grossly insufficient given the 85-year practice of price-fixing commissions. Given the highly profitable incentives for defendants, the practice is almost certainly likely to resume unless it is prohibited for a much longer period of time.

This, or course, only applies to open violations on the MLS. Using other means to continue the same conspiracy is not only likely under this structure, but nearly guaranteed: already real estate brokers groups are openly discussing hiding their price fixing in the "concessions" field of a real estate contract. No doubt they will find many clever ways to funnel clients' money to each other as long as this settlement only addresses the means of the conspiracy and not the meat of it.

**VIII. The Long Form Settlement Notice is Misleading**

The Settlement Notice misleadingly states the amounts that NAR and HomeServices have agreed to pay without providing class members with information necessary to determine what their payout will be. It does not state the likely number of individuals who would potentially have claims against the settlement fund. It does not explain that any individual home

9

seller is likely to get a tiny fraction of their damages. Nor does it explain that brokerages with total transaction volume under $2 billion and franchisees of smaller brokerages pay nothing.

The settlement must comply with "minimal procedural due process protection" for absent Plaintiffs. Further, "the notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum v. Shutts*, 472 U.S. 797, 812, 105S.Ct. 2965, 2974 (1985), quoting *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314-315 (1950); *cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174–175 (1974).

## IX. Conclusion

For the foregoing reasons, Objectors request that the Court deny the proposed settlement. Objectors have been advised solely by the undersigned counsel who intend to appear on their behalf at the fairness hearing.

| | |
|---|---|
| Dated: October 28, 2024 | By: *Andrew J. Horowitz, Esquire*_____<br>Bert S. Braud, Esquire<br>MO ID No.: 34325<br>bbraud@pophamlaw.com<br>THE POPHAM LAW FIRM<br>712 Broadway, Suite 100<br>Kansas City, MO 64105<br>(816) 221-2288<br><br>Bruce C. Fox, Esquire<br>*Pro Hac Vice*<br>Bruce.Fox@Obermayer.com<br>Andrew J. Horowitz, Esquire<br>*Pro Hac Vice*<br>Andrew.Horowitz@Obermayer.com<br>OBERMAYER REBMANN MAXWELL & HIPPEL, LLP<br>525 William Penn Place, Ste. 1710<br>Pittsburgh, PA 15219<br>(412) 566-1500<br><br>*Counsel for Objectors* |