```
 1  Art Gonzalez
    1139 Sanford Ave.
 2  Wilmington, Ca 90744
    310-200-7010
 3  Pro Se Plaintiff
 4  Email: southbayhomesla@gmail.com
```

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, AND FRANCES HARVERY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED PLAINTIFFS<br>V.<br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDING CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, AND KELLER WILLIAMS REALTY, INC., | ) COVER PAGE<br>) CASE NO:4:19-cv-00332-SRB<br>)<br>) 1. NAR MEMBER ART GONZALEZ<br>) FORGOT TO PUT THE HON. JUDGE<br>) COURTROOM INFORMATION ON<br>) THE MOTION SUBMITTED AND IS<br>) INFORMING THE PARTIES OF THE<br>) LOCATION. 2. ALSO SUBMITTING<br>) THE SIGNATURE PAGE OF THE<br>) BRIEF.<br>) |

CASE NO:4:19-cv-00332-SRB
**NOTICE OF MOTION FOR:**
**1. MOTION FOR THE CLASS MEMBERS TO HAVE THE CERTIFICATION BE VACATED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(a) DUE TO THE CLASS MEMBERS HAVING MISREPRESENTED THEIR CLAIMS.**
**2. MOTION FOR THE CLASS MEMBERS SETTLEMET TO BE VACATED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(e) AS THE SETTLEMENT IS NOT FAIR TO THE CLASS MEMBERS.**
**DATE: NOVEMBER 26, 2024**
**TIME: 1:30 P.M.**
**PLACE: Charles Evans Whittaker U.S. Courthouse**
**400 E. 9th Street**
**Kansas City, MO 64106**

To the Hon. Judge Stephen R. Bough, NAR member Art Gonzalez is adding the location to the motion submitted by NAR member Art Gonzalez.

Respectfully submitted,

*Art G.* 11/2/24

Art Gonzalez                    Date:

- 2 -

Arturo Gonzalez
1139 Sanford Ave.
Wilmington, Ca 90744
310-200-7010
Pro Se Plaintiff
Email: southbayhomesla@gmail.com

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, AND FRANCES HARVERY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED<br>PLAINTIFFS<br>V.<br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDING CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, AND KELLER WILLIAMS REALTY, INC., | ) CASE NO:4:19-cv-00332-SRB<br>) NOTICE OF MOTION FOR:<br>)<br>) **1. MOTION FOR THE CLASS MEMBERS TO**<br>) **HAVE THE CERTIFICATION BE VACATED**<br>) **PURSUANT TO FEDERAL RULE OF CIVIL**<br>) **PROCEDURE 23(a) DUE TO THE CLASS**<br>) **MEMBERS HAVING MISREPRESENTED**<br>) **THEIR CLAIMS.**<br>)<br>) **2. MOTION FOR THE CLASS MEMBERS**<br>) **SETTLEMET TO BE VACATED PURSUANT**<br>  **TO FEDERAL RULE OF CIVIL PROCEDURE**<br>  **23(e) AS THE SETTLEMENT IS NOT FAIR TO**<br>  **THE CLASS MEMBERS.**<br><br>  **DATE: NOVEMBER 26, 2024**<br>  **TIME: 1:30 P.M.** |

## INTRODUCTION

To the Honorable Judge Stephen R. Bough, the Sellers of case number 4:19-cv-00332-SRB and parties in interest, Art Gonzalez with eXp Realty previously submitted a brief and notified the parties of certain issues that parties might not have been aware of because of the complexity and yet simplicity of the commission structure. Art Gonzalez NAR member number 204501476 **notified the Court and Attorney that in this class action lawsuit, the class members were Sellers that**

**sold their home and sued for damages, however, they were not a damaged party as will be proven below, the class members misrepresented their claims probably due to the confusion that exists in the real estate industry. The class members were able to be certified meaning they were allowed to proceed with their claims for damages, but that should not have been the case and therefore, as will be proven below, the Court never should have proceeded with jurisdiction over the case.**

It's very important to note that this case was not appealed as it was "SETTLED". There are several issues with the NAR settlement. NAR member Art Gonzalez will focus on 2 issues, one issue is who has paid for the commissions in real estate transactions when the "Adversary Commission Rule" was mandated? Sellers which are the class members were not the damaged party. The second issue is that since the Sellers were not the damaged party, the Court doesn't have jurisdiction over the case.

There is a lot of confusion on who has paid the commissions. As a matter of fact, this confusion was mentioned in the lawsuit in the following paragraphs,

**Page 19-20, paragraph 45** of the complaint states, "The result of these agreements and the Adversary Commission Rule is that **Buyer brokers — who are supposed to assist their clients in negotiating against the Seller — receive their compensation from the total commission paid by the Seller, not from the Buyer they represent**. Real estate insiders recognize that the Adversary Commission Rule leads to a marketplace where there is **"a lot of confusion around how commissions work,"** where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject. And other market participants agreed that the practice is **"confusing"** and **that most consumers "just don't understand how commission works**."

**Page 32, paragraph 86,** of the complaint states, "Plaintiffs are not aware of any pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition. While the prior system of sub agency might partially explain the historical practice of sellers paying commission to both the selling agent or broker and to the agent or broker working with and/or procuring the buyer, with the demise of that **confusing** and misleading system no such justification remains for the seller to continue paying the broker now working for and retained by the buyer."

As NAR member Art Gonzalez has demonstrated above, the complaint stated a couple of times that there exists confusion. **The question is what is the confusion about? What are the alleged damages and what's the truth of the matter?** Page 3 paragraph 3 states the following in regards to the reason for the complaint, "**The cornerstone of Defendants' conspiracy** is NAR's adoption and implementation of **a rule that requires all seller's brokers to make a blanket, unilateral and effectively non negotiable offer of buyer broker compensation** (the **"Adversary Commission Rule"**) when listing a property on a Multiple Listing Service ("MLS"). Page 3, paragraph 4 explains what an MLS is, "An MLS is a database of properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS marketplace. Brokers, if they are members of an MLS, are required to list all properties on the MLS."

Let's take a look at what the complaint stated and analyze it. Several times the complaint stated that the Sellers paid the commission which NAR member Art Gonzalez will prove that this was not the case. The complaint stated "…**Buyer brokers-who are supposed to assist their clients in negotiation against the Seller---receive their compensation from the total commission paid by the Seller, not from the Buyer they represent".** Real estate insiders recognize that the Adversary Commission Rule leads to a marketplace where there is **"a lot of confusion around how**

**commissions work,"** where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject. And other market participants agreed that the practice is **"confusing"** and **that most consumers "just don't understand how commission works**." This statement will be proven false as far as the Seller having been paying the commissions in a real estate transaction. What is **TRUE** is that there exists a lot of confusion in the industry.

Nar member will get to the point at this point and further explain the commission structure below. The Sellers sued for damages, however, they were not the damage party as the cost of the commissions were shifted to the Buyer when the "Adversary Commission Rule" was mandatory. When the "Adversary Commission Rule" was mandatory, the Seller's Agent negotiated a commission to be given to the Agent who negotiate the deal to buy Seller's home. Let's suppose that a Seller decided to pay a 5% commission which would be split among the Seller's Agent and the Buyer's Agent in half and let's suppose the Seller sold the home for $500,000, when the transaction is finalized, the Buyer would have obtained a loan or pay cash in the amount of $500,000 the agents will receive $25,000 ($500,000 X 5%= $25,000), $12,500 each. The Seller would have walked away with $500,000 - $25,000=**$475,000**. The transaction must be itemized as follows, the cost of the "good" and the cost of the "service". Clearly the cost of the service was $25,000 and therefore, the cost of the "good" was $475,000. The question then becomes who paid for the cost of the "service" (commissions) and the cost of the "good" (home)? Clearly, the Buyer did because the $500,000 he brought to close the deal paid for both the cost of the "service" and cost of the "good".

The real estate industry is really confused, more on this below. In the above example, it would have been clear had the Seller told the Buyer, I'll sell you the home for $475,000 and you pay the commissions of $25,000 for a total of $500,000. Clearly in this example and in this manner, it would have been clear who paid for the "good" and for the "service". Both examples are equivalent.

- 4 -

Case 4:19-cv-00332-SRB    Document 1564    Filed 11/03/24    Page 6 of 20

In both examples, the Buyer paid the commissions, and therefore, the class members in this case misrepresented their claims as they didn't pay the commissions and could not have been the damage party. It appears that they misrepresented their claims due to the confusion that exists in the real estate industry as the complaint states.

Here is where the issue lies, in all transactions where a "service" and "good" is sold, the final cost for both the "good" and the service is known. The formula to determine the costs for example, when a buyer goes to an automotive shop and purchases a tire, the automotive shop will charge say $100 for the tire (cost of the "good") and $30 for the (cost of the "service") for a total bill of $130. What happens in real estate because the home is offered for sale as a total cost including commissions, its equivalent to the buyer paying $130 for both the cost of the good and the cost of the service. In this tire shop example the transaction is straight forward, the cost of the tire ($100) plus the cost of the service ($30) is upfront and itemized meaning the cost for each and the total in this case is $130. However, if the buyer was given a bill for just $130, he could ask that the cost of the "good" and cost of the "service" be itemized. In Real Estate, because of the dynamics of the commission model, the Seller chooses the **initial price** for the cost of the home (cost of the "good") and the cost of the commissions as a percentage of the final price (cost of the "service"). Once the **final price is determined**, the final price represents the total cost of the "good" and the cost of the "service" combined. The issue lies in the fact that it wasn't itemized as such once the final price for both was determined. Unlike the tire shop example above where the cost of the good and the cost of the service was determined upfront, the cost of the good and the cost of the service was never determined. The Supreme Court case **Mourning v. Family Publications Service, Inc., 411 US 356 - Supreme Court 1973** which involves the Truth in Lending Act alludes to the fact that consumers are not told the truth about what they are actually paying and consumers don't bother to do the

- 5 -

Case 4:19-cv-00332-SRB     Document 1564     Filed 11/03/24     Page 7 of 20

computations. The Supreme Court in this case stated, "Some may claim that it is a relatively easy matter to calculate the total payments to which petitioner was committed by her contract with respondent; but **at the time of sale, such computations are often not encouraged by the solicitor or performed by the purchaser**."

In Real Estate transactions, the amount that the Buyer paid for the cost of the good and cost of the service was never computed. The computation as the Supreme Court case stated needed to be determined. In Real Estate the computation needed to be determined backwards once the total bill (total cost of the service and total cost of the good was determined), but it wasn't never itemized or computed. The industry never itemized the cost of the good and the cost of the service once the final price was determined. Unlike the tire shop example where the cost of the good and the cost of the service was determined upfront, in the real estate industry the cost of the service and the cost of the good could not be determined until the final purchase price was determined. So for example, as demonstrated in the above commission example, if the final bill for the cost of the good and cost of the real estate agent services (cost of commissions) was $500,000 with the agent services being 5%, the cost of the real estate agent services was $25,000 and the cost of the good was $475,000. In other words, the formula for total bill was cost of the good + cost of the service = total bill, in other words $475,000 + $25,000 = $500,000. The Buyer paid for the cost of the good and the cost of the real estate commissions. As proven, the Seller did not pay the real estate commissions and therefore, could not be a damaged party. Gonzalez can further prove that the Seller didn't pay the commissions.

**TO FURTHER PROVE THE POINT HOME THAT THE BUYER HAS PAID THE COMMISSIONS IN THE PAST, LET'S ANALYZE A SHORT SALE.**

In a short sale the Seller doesn't have equity to pay commissions and therefore clearly we will determine who ultimately has payed commissions prior to the lawsuit. In a Short Sale, the Seller has not payed the commissions because the **Seller can't pay the commissions since the home is worth**

**less than what the Seller owes and there is no money that the Seller can pay from.** Let's suppose that a Seller wants to sell their home and they owe $520,000 and for simplification, the home sells and appraises for $500,000. Since the bank is owed $520,000, the Bank must approve the sale as it will not be paid in full as it will take a loss. Let's suppose that the commission rate is set at 5% by the Seller. The bank must approve the short sale that means that the bank will receive $475,000 (the cost of the **good**) instead of $520,000 (what's owed) and the agents will receive $25,000 (the cost of the **service**). In this example, clearly the Seller cannot pay the agent representing them. The question than becomes did the Buyer or the Seller's bank pay the commissions. Since the Seller's Bank owns the property, the Bank could have paid the commissions, but in the past there was no special computation for the Bank to pay the Seller's commissions, and therefore, it was the Buyer who paid the commissions as he paid the cost of the good and the cost of the service when he would bring the funds to pay for the total bill, in this case the Buyer would pay $475,000 for the product and $25,000 for the service. We must keep in mind that the Seller's bank only has the good and can only be payed for the good. The Seller would walk away with $0, the Seller's bank would walk away with $475,000 which represents the cost of the good and the agents would walk away with $25,000 which represents the total cost of the service and the Buyer would walk away with a total bill of $500,000 when he obtained the loan or brought the cash and therefore the Buyer payed for both the cost of the (good) and the cost of the (service). **IN CONCLUSION,** THE BUYER PAYED THE COMMISSIONS.

### A CRUCIAL OBSERVATION MUST BE MADE AT THIS POINT TO CLARIFY THE CONFUSION

Because of the unique dynamics of real estate where you have 2 services needed when using real estate agents to purchase 1 home in other words one good, you must make the following observation. Since the Seller only has the product, we must clarify that the buyers in the past have

paid for the real estate service cost as proven above. If the Seller is to truly pay for their agent's commission services and/or the services for the Buyer's Agent, the Seller has suffered damages because the Seller's didn't pay commissions and now the Seller is forced to if the Seller signs the contract. Furthermore, the following observation must also be made, if the Seller was to truly pay for the cost of any of the agents services (the commissions), the funds to pay the agents cannot come from the Buyer. For example, suppose that the Seller would truly pay the cost of the agent commissions, we must make a special calculation. We must determine the actual cost of the good. So in the example above where the Buyer was paying $475,000 for the cost of the good and the Seller would then have to pay for the commissions out of pocket or sell the home for $475,000 and pay the commissions from the sale of $475,000 and in this case if the commission was set at 5%, the Seller would have netted the following $475,000 x .05(5%)= $23,750 cost of the commissions, $475,000 (actual cost of good)-$23,750 (cost of the commissions) =$451,250. In other words the Seller has suffered damages. Seller could have paid out of pocket if he had the funds, but here again the Seller has suffered damages.

    Another observation is that based on the practice before the lawsuit, the commission cost was added to the cost of the good, although the figures had to be figured out after the final purchase cost was determined.

    Another observation is that for the Seller to truly pay any cost of the commissions, either to pay for the Seller's agent or both the Seller's Agent and Buyer's Agent service (commissions costs), the Seller cannot have any of it paid from the funds coming from the Buyer because otherwise the Buyer is the one that is paying for them. This is always going to be the dilemma in this unique situation that appears to exist only in real estate. Gonzalez could not find another similar situation. The dilemma arises from the dynamics of having to pay for the cost of 2 service agents and there is

only one good. If there was only one good and one service provider, then it's obvious that the consumer having the need for the good and service pays for the total bill that includes the good and the service costs. Because of the unique real estate situation where 2 services are required, whenever the Seller truly pays for any part of the commissions, it creates less profit for the Seller and since the Seller didn't pay commissions, and now based on the contract as will be demonstrated, the Seller is obligated to pay the commissions per the contract if they sign it, logically speaking if the Sellers were not paying the commissions and now they are forced to pay the commissions, they are automatically damaged based on the transparency of this brief and as will be further proven below

**CLASS MEMBERS MISREPRESENTED THEIR CLAIMS AS THEY DIDN'T PAY THE COMMISSIONS AND THEREFORE SHOULD NOT HAVE BEEN CERTIFIED AS THEY DON'T HAVE STANDING.**

The class members **clearly** misrepresented their claims for damages probably due to the confusion and therefore NAR member Art Gonzalez key seeks that the class be decertify. In class action lawsuits it is required that the class members be certified meaning that the court must certify that the class members have standing to pursue their claims. This is an article III requirement, if the class cannot prove it suffered damages, the class cannot be certified or the class must be decertified. The cases where the class members have been decertified are the following, the Supreme Court in the case **Wal-Mart Stores, Inc. v. Dukes, 564 US 338 - Supreme Court 2011** stated, "The Ninth Circuit erred in trying to replace such proceedings with Trial by Formula. Because Rule 23 cannot be interpreted to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims." Another case in which the class was decertify was **Comcast Corp. v. Behrend, 569 US 27 - Supreme Court 2013.** The Supreme Court in this case stated, "Respondents' class action was improperly certified under Rule 23(b)(3). By refusing to entertain arguments against

respondents' damages model that bore on the propriety of class certification, 1433*1433 simply because those arguments would also be pertinent to the merits determination, the Court of Appeals ran afoul of our precedents requiring precisely that inquiry." Gonzalez seeks to decertify the class based on the following cases because they didn't suffer damages, **Goldman Sachs Group v. AR TEACHER RETIREMENT SYS, 594 US 113 - Supreme Court 2021 (hereafter Goldman).** The Supreme Court in Goldman stated, **"**In assessing price impact at class certification, courts "`should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'" In re Allstate Corp. Securities Litig., 966 F.3d 595, 613, n. 6 (C.A.7 2020) (quoting Langevoort, Judgment Day for Fraud-on-the-Market: Reflection on *Amgen* and the Second Coming of *Halliburton,* 57 Ariz. L. Rev. 37, 56 (2015); emphasis added). That is so regardless whether the evidence is also relevant to a merits question like materiality. As we have repeatedly explained, a court has an 1961*1961 obligation before certifying a class to "determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits." Comcast Corp. v. Behrend, 569 U.S. 27, 35, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013); see Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, and n. 6, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)." In other words, based on the fact that Gonzalez has proven that the class members didn't pay commissions, they don't have standing, **the evidence is the proofs above**. Furthermore, Gonzalez brings this motion to de certify the class based on TRANSUNION LLC v. Ramirez, 594 US 413 - Supreme Court 2021 (hereafter Transunion). In Transunion the court stated, "To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, **that they suffered a concrete harm**. **No concrete harm, no standing**. Central to assessing concreteness is whether the asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including (as relevant

here) reputational harm. *Spokeo, Inc.* v. *Robins,* 578 U. S. 330, 340-341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)."

**DUE TO THE SETTLEMENT THE SELLERS HAVE SUFFERED DAMAGES AND HAVE A POTENTIAL LAWSUIT AGAINT THE ATTORNEYS REPRESENTING THE CLASS MEMBERS FOR MALPRACTICE.**

Due to the confusion that exists, the Class members and the Attorneys don't realize the damage that they have caused to the (class members, the Sellers) due to the Settlement. With the confusion being clarified above, we must analyze the new rules and see how they are detrimental to the Seller and the Buyer for that matter, but the detriment to Buyers has to be addressed by The Truth in Lending Act (TILA) which was enacted in 1968 as part of the Consumer Credit Protection Act. Prior to the lawsuit, the class members didn't pay commissions. Now, in California, they are forced to pay commissions if they sign the contract. Pursuant to **Ortiz v. Fibreboard Corp., 527 US 815 - Supreme Court 1999, the court stated,** "After an 8-day fairness hearing, the District Court certified the class and approved the settlement as "fair, adequate, and reasonable" under Rule 23(e)." In other words the case pursuant to Federal Rule of Civil Procedure 23(e) must be fair to the class members and NAR member Gonzalez has proven and will continue to prove that that settlement is not fair and actually is detrimental to both the class members and buyers.

**NAR MEMBER GONZALEZ WILL CONTINUE TO PROVE THAT THE SETTLEMENT IS DETRIMENTAL TO THE CLASS MEMBERS AND ALSO TO BUYERS BY ADDRESSING THE NEW CONTRACT FORMS.**

The contract reads as follows, Residential Listing Agreement page 1 paragraph 2C reads as follows, "**Compensation: NOTICE: The amount or rate of real estate commissions is not fixed by law. They are set by each broker individually and may be negotiable between Seller and Broker**. See attached Broker Compensation Advisory (C.A.R. Form BCA)." Paragraph 2C(1) reads as follows, " **Compensation to Seller's Broker (only Seller's side of transaction)".** The Seller than

picks the amount to be paid to the Selling Broker, but prior to the lawsuit, the Seller didn't pay commissions, now based on the clarity on this matter by Gonzalez above, the Seller has to pay a cost that they didn't have to incur before and this is a damage matter and not a fair to the class members as they have suffered damages. Furthermore, paragraph 2C(2) reads as follows, "**Additional Compensation to Seller's Broker if buyer is unrepresented**", Seller than picks the amount to be paid to the Seller's Broker, prior to the lawsuit, the Seller didn't pay any commissions and the class members (the Sellers) have suffered damages. Paragraph 4 reads as follows, "**COMPENSATION TO BROKER**: **Notice: the amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and maybe negotiable between Seller and Broker**." Paragraph 4B reads as follows, "**COMPENSATION TO BROKER**: Seller agrees to pay to Broker as compensation for services under this Agreement, the amounts specified in paragraph 2C(1)". Prior to the lawsuit, the Seller didn't pay commissions as proven above, now the Sellers' are forced to pay commissions if they sign the contract. Paragraph 4 D(1) reads as follows, "**COMPENSATION TERMS:** Compensation is earned, and Seller shall pay Broker as follows:

(1) **Completed Transaction or Seller Default**: If during the Listing Period, or any extension, Broker, any other broker, Seller or any other person procures a ready, willing, and able buyer(s) whose offer to purchase the Property on any price and terms is accepted by Seller, provided the buyer completes the transaction or is prevented from doing so by Seller. (Broker is entitled to compensation whether any escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.) Prior to the lawsuit, the Seller didn't pay commissions at the conclusion of a completed transaction.

      In the **BROKER COMPENSATION ADVISORY** page 1, paragraph 1 reads as follows, "**WHEN SELLERS LIST THEIR PROPERTY FOR SALE THROUGH A REAL ESTATE

**BROKER THEY AGREE TO PAY THE SELLER'S BROKER WHEN ESCROW CLOSES**." Sellers did not pay commissions prior to the lawsuit and therefore, now when they sign the agreement, they are forced to pay commissions and they have been damaged. Paragraph 1A reads as follows, "**LISTING AGREEMENT COMPENSATION IS FULLY NEGOTIABLE:** When a seller enters into a listing agreement with a broker, the seller authorizes the broker to find a buyer for the seller's property and **agrees to pay the seller's broker** if a buyer is found who purchases the property. **Compensation amounts are not fixed by law and are fully negotiable between the seller and the seller's broker**. When negotiating compensation, the parties may discuss factors such as the broker's expertise and experience, the type of broker services to be performed, and the broker's time and expenses, among other considerations." Prior to the lawsuit, the class members didn't pay commissions as the commissions were paid by the buyers, now the Sellers' in California have been damaged by the settlement and the settlement is not fair to the sellers. NAR member Gonzalez has clearly proven that the new settlement is not only not fair to the class members (the Sellers), but it's detrimental to the class members as now based on the confusion being cleared, the Seller's have suffered damages. NAR member Gonzalez can speak about California, but can also speak to all class members regardless of the state, because now the costs are being shifted to the Seller because all the class members were operating under the same structure and now they will still be operating on the same detrimental structure. NAR member Gonzalez will further prove that the class members have suffered damages with the new settlement along with the Buyers.

**NAR MEMBER GONZALEZ REALIZES THAT BASED ON NEW DISTINCTIONS, THE TRUTH IN LENDING ACT COMES INTO PLAY IN THIS CASE.**

As demonstrated above, not only have the Sellers suffered damages, but buyers for many reasons as will be proven by the contract have also suffered damages. **Page 1 of the BROKER COMPENSATION ADVISORY** reads as follows**, 2. BROKER AGREEMENTS WITH**

**BUYERS:** Paragraph 2A states the following. **BUYER REPRESENTATION COMPENSATION IS FULLY NEGOTIABLE:** When a buyer enters into a representation agreement with a broker, the buyer authorizes the broker to locate properties for the buyer to buy and agrees to pay the buyer's broker if a transaction is completed. Compensation amounts are not fixed by law and are fully negotiable. When negotiating compensation, the parties may discuss factors such as the broker's expertise and experience, the type of broker services to be performed, and the broker's time and expenses, among other considerations." Paragraph 2B states the following, **REQUIREMENT FOR WRITTEN AGREEMENTS**: Pursuant to a nationwide class action settlement reached by the National Association of REALTORS® (NAR), **participants in Multiple Listing Services are required to have a written agreement with a buyer prior to showing a buyer a residential property or giving a buyer a tour of such a property**. The agreement must identify the amount of compensation to be paid to the broker for services provided and require that the broker cannot receive any compensation in excess of the amount specified in the agreement. Pursuant to legislation expected to become law in California on January 1, 2025, all licensees showing a buyer any type of property will be required to have a written agreement with that buyer prior to the showing." Page 2 paragraph 2C states the following, "**ADVANTAGES OF WRITTEN AGREEMENTS**: Buyers and their brokers benefit when the terms of their relationship and respective duties are in writing. A written agreement establishes clear, mutual expectations and helps avoid misunderstandings over the buyer and broker's duties and the amount of compensation the buyer's agent is to be paid." Paragraph 3 of the Broker Compensation Advisory reads as follows, "3. **WHEN ENLISTING A REAL ESTATE BROKER TO REPRESENT THEM, BUYERS AGREE TO PAY THE BUYER'S BROKER WHEN ESCROW CLOSES, BUT THE PERSON RESPONSIBLE FOR PAYMENT MAY BE NEGOTIATED IN THE TRANSACTION:".** Paragraph 3A states the following, **"A.**

**BUYER PAYS THE COMPENSATION PURSUANT TO A BUYER REPRESENTATION AGREEMENT:** A buyer's broker may negotiate the amount of compensation directly with the Buyer and then document that agreement in a buyer representation agreement (C.A.R. Form BRBC or PSRA). The buyer then becomes contractually obligated to pay the broker by providing funds to escrow prior to the closing of a transaction**."** In this case, the Buyer would finance the commissions for both himself and the Seller, now if the Buyer has to come out of pocket and provide the funds to escrow more than likely the Buyer would have to save that amount and would suffer if they needed to save the funds and also because he would also by paying the Seller's Agent commissions when the Buyer brings the funds to close the deal. Paragraph 3B states the following, **"SELLER PAYS THE COMPENSATION:"** Paragraph 3B(1) states the following**, "Buyer negotiates for Seller to Compensate Buyer's Broker:** A buyer may make a conditional offer to the seller by including a term in the purchase offer asking the seller to pay the buyer's broker if the buyer has already agreed to pay their own broker pursuant to a buyer representation agreement. If such a term is included in the purchase offer, the request will become one term among many that a seller may accept, reject, or negotiate by way of a counter offer. The possibility of asking the seller to pay the buyer's contractual compensation obligation option should be discussed when creating a buyer representation agreement and prior to an offer being made." As demonstrated above, if the Seller is to pay the commissions for the Buyer's Agent and/or the Seller's Agent, the class members have suffered damages, as prior to the lawsuit, the Buyer payed the service for commissions. Paragraph 3B(2) states the following, "**Buyer's Agent negotiates an agreement directly with Seller**: If a seller is unrepresented or does not have an exclusive agency relationship with another broker, a buyer's broker may approach that seller asking the seller to sign an agreement (C.A.R. Form SP, Single Party Compensation Agreement) to pay the buyer's broker. In this situation, the seller agrees to pay the buyer's broker

compensation without necessarily creating an agency relationship with the broker. When that happens, the buyer's broker is advised to use a Seller Non-Agency (C.A.R. Form SNA) to inform the seller that the buyer's broker will be acting on behalf of the buyer only, and not act as the seller's agent, throughout the transaction. However, because the seller is unrepresented, the buyer's agent will inevitably have to do more work to facilitate the transaction, which may be factored into the negotiation of the single party compensation agreement." As demonstrated above, if Seller is to pay commissions, the Seller has suffered damages because prior to the lawsuit, Buyers were the ones paying for commissions. Paragraph 3C states the following, "**CHANGING PRACTICE RELATED TO A SELLER'S BROKER'S OFFER OF COMPENSATION:** Historically, in California, many seller's brokers used a Multiple Listing Service (MLS) to make a unilateral offer to compensate a buyer's broker who procured a buyer for the seller's property. However, the nationwide NAR settlement prohibits the seller's broker from using an MLS to make such an offer of compensation. The California Association REALTORS®' (C.A.R.) listing agreement forms no longer provide for such offers of cooperating broker compensation nor does C.A.R. include other forms in its library of forms that might facilitate such offers. Buyers and sellers must separately negotiate compensation with their respective brokers, as specified above." As NAR member Gonzalez has proven, when this procedure was in place and the seller's broker used the MLS to make an offer of compensation, the Buyer was the one that ultimately paid the commissions for both the Seller's Agent and the Buyer's Agent. Now that Buyers and Sellers must separately negotiate compensation with their respective brokers, as specified, the Seller must pay and is on the hook for commissions, whereas prior to the lawsuit, the Seller was not on the hook based on the custom as proven above.

in some instances they will pay commissions when they choose not to follow the commission model that was in practice prior to the lawsuit. Class members are in much worse position now for the following reasons key. In California, the Broker Compensation Advisory page 2 summarizes the changes to the rules in regards to compensation to the Real Estate Agents. Page 2 paragraph 3 section C reads as follows, "Historically, in California, many seller's brokers used a Multiple Listing Service (MLS) to make a unilateral offer to compensate a buyer's broker who procured a buyer for the seller's property. However, the nationwide NAR settlement prohibits the seller's broker from using an MLS to make such an offer of compensation. The California Association REALTORS®' (C.A.R.) listing agreement forms no longer provide for such offers of cooperating broker compensation nor does C.A.R. include other forms in its library of forms that might facilitate such offers. Buyers and sellers must separately negotiate compensation with their respective brokers, as specified above."

## THE CONCLUSION

As proven above, based on the confusion, the class members and their attorney brought a lawsuit that should not have been certified as the class members as proven, didn't have standing. Now the new settlement, mandates that the Seller pick up the costs based on the contract and once they signed it they must pay the commissions whereas prior to the lawsuit, the Sellers didn't pay commissions. Furthermore, based on the Truth in lending Act (TILA), the government mandates that the Buyer must be informed of their use of credit as the Court in **Mourning v. Family Publications Service, Inc., 411 US 356 - Supreme Court 1973 ruled that** "Congress expressly sought "to . . . avoid the uninformed use of credit." 15 U. S. C. § 1601." Since Buyers will ultimately incur the costs of the commissions as proven above since the class members will not be willing to make the special

adjustment as they will lose money, the Buyers will still pick up the cost of paying for the commissions when the loan is financed and therefore, they need to be informed by law of this fact.

Respectfully submitted,

/ART GONZALEZ/ 11/2/2024

_____ 11/2/24

NAR member Art Gonzalez     Date: