## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, AND JEREMY KEEL, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    Case No. 19-CV-00332-SRB ) |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC., | )    Hon. Stephen R. Bough ) ) ) ) ) ) |
| Defendants. | ) ) |

## SUGGESTIONS IN SUPPORT OF OBJECTOR TANYA MONESTIER'S
## MOTION FOR RECONSIDERATION OF ORDER COMPELLING ATTENDANCE AT
## FAIRNESS HEARING

# TABLE OF CONTENTS

FACTS …………………………………………………………………………………………… 1

ARGUMENT …………………………………………………………………………………….. 6

I. The Court Cannot Violate Class Members' Due Process Rights Because It Has Received Unwelcome Personal "Correspondence"………………………………………………………………….. 6

II. This Court Does Not Have The Authority To Order An Objector To Appear In Person After They Have Already Complied With A Court Order………………………………………………………… 8

III. The Cases Cited By The Court Do Not Support The Court's Authority To Issue This Order………… 11

IV. This Court's Order Creates A Chilling Effect On Future Objectors…………………………………13

V. I Request That The Court Consider My Written Objection And Rule On This Motion For Reconsideration On The Record…………………………………………………………………...19

CONCLUSION………………………………………………………………………………19

# TABLE OF AUTHORITIES

**Cases**

*Ferron v. Kraft Heinz Foods Co.* No 20-CV-62136-RAR, 2021 U.S. Dist. LEXIS 129955, at *41 (S.D. Fla. July 13, 2021)…………………………………………………………………………………..13

*In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 682–83 (D. Colo. 2014)………………………………………...13

*In re S.S. Body Armor I Inc.*, 961 F.3d 216, 230 (3d Cir. 2020)………………………………………………... 17

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litigation*, 869 F.3d 551, 556 (7th Cir. 2017)…………17

*In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 857–58 (8th Cir. 2024)…………………....16, 17

*In re Train Derailment Near Amite La.*, on Oct. 12, 2002, No. CIV.A. MDL 1531, 2006 WL 644494, at *2 (E.D. La. Jan. 27, 2006)…………………………………………………………………………………..…...12

Litwin v. iRenew Bio Energy Sols., LLC, 226 Cal. App. 4th 877, 883–84, 172 Cal. Rptr. 3d 328, 332 (2014) *as modified* (May 29, 2014)………………………………………………………………………………13

*Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687-688 (7th Cir. 2008), cert. denied, 129 S. Ct. 2767, 174 L. Ed. 2d 271 (2009)……………………………………………………………………………………....17

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950)…….8, 14

*Nadendla v. WakeMed*, 24 F.th 299, 304 (4th Cir. 2022)……………………………………………………

*Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014)………………………………………………...17

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S. Ct. 2965, 2974, 86 L. Ed. 2d 628 (1985)…….…..8

*Shaun Fauley, Sabon, Inc. v. Metro. Life Ins. Co.*, 2016 IL App (2d) 150236, ¶¶ 8-9, 52 N.E.3d 427, 432-433….…………………………………………………………………………………………...12, 13

*Vollmer v. Selden*, 350 F.3d 656, 660, 57 Fed. R. Serv. 3d 318 (7th Cir. 2003)………………………………18

**Other Authorities**

§ 9:94. Motion for reconsideration, generally, 3 MOTIONS IN FEDERAL COURT § 9:94 (3d ed.)……………19

CODE OF CONDUCT FOR U.S. JUDGES, Cannon 3(C) ………………………………………………………8

Managing Class Action Litigation: A Pocket Guide for Judges Barbara J. Rothstein & Thomas E. Willging Federal Judicial Center 2005…………………………………………………………………………….

**Rules**

Fed. R. Civ. P. 23(c)(2)…………………………………..…………………………………………..9

**Constitutional Provisions**

U.S. CONST. AMEND. V ………………………………………………………………………..9

# FACTS

1. In September 2024, I read a newspaper article that plaintiffs in the *Burnett* case had filed a motion for final approval of the settlement and a request for a 33% fee award.

2. I then went on the settlement website, https://www.realestatecommissionlitigation.com/, to read the relevant documents. As part my review of the documents, I carefully read the class notice.

3. The class notice reads, in relevant part, as follows:

## 16. How do I tell the Court that I don't like the Settlement?

If you are a Class Member, you can object to this Settlement if you do not like any part of it, including the forthcoming motion for attorneys' fees, costs and service awards. You can give reasons why you think the Court should not approve it. The Court will consider your view. To object, you must file or send a written objection to the Court, as instructed by the Court, by October 28, 2024 or you will waive your right to object (whether in opposition to the motion for Preliminary Approval, motion for attorneys' fees, costs and service awards, motion for Final Approval, on appeal, or otherwise) to the Settlement. Be sure to include the case name and number (Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB), your name, address, telephone number, your signature, and the reasons you object to the Settlement.

You must file any objection with the Clerk of the Court at the address below by October 28, 2024:

United States District Court for the Western District of Missouri 400 E. 9th St., Room 7462, Kansas City, Missouri 64106 Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB

You must also send your objection by first class mail, postmarked on or before October 28, 2024, to Class Counsel and Defendant's Counsel.

These documents should be mailed to Class Counsel at:

Williams Dirks Dameron LLC c/o Eric Dirks 1100 Main Street, Suite 2600 Kansas City MO 64105

and to NAR Counsel at:

Ethan Glass Cooley LLP 1299 Pennsylvania Ave. NW #700 Washington, DC 20004

Any member of the Settlement Class who does not file and serve an objection in the time and manner described above will not be permitted to raise that objection later.

## 17. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to a Settlement only if you stay in it. Excluding yourself is telling the Court that you do not want to be part of a Settlement. If

1

you exclude yourself, you have no basis to object because the Settlement no longer affects you.

**18. When and where will the Court decide whether to approve the Settlement?**

There will be a final Fairness Hearing to consider approval of the proposed Settlement, at 1:30 PM on November 26, 2024 at the United States District Court for the Western District of Missouri, 400 E. 9th St., Courtroom 7B, Kansas City, Missouri 64106. The hearing may be postponed to a later date without further notice. Any such postponements will be posted on the Court docket and/or settlement website at www.RealEstateCommissionLitigation.com. The purpose of the hearing is to determine the fairness, reasonableness, and adequacy of the terms of the Settlement, whether the Settlement Class is adequately represented by the Plaintiffs and Class Counsel, and whether an order and final judgment should be entered approving the proposed Settlement. The Court will also consider Class Counsel's application for an award of attorneys' fees and expenses, and any class representative service awards. You will be represented by Class Counsel at the Fairness Hearing unless you choose to enter an appearance in person or through your own counsel. The appearance of your own attorney is not necessary to participate in the Fairness Hearing.

**19. Do I have to come to the hearing?** No. Class Counsel will represent the Settlement Class at the Fairness Hearing, but you are welcome to come at your own expense. If you send any objection, you do not have to come to Court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend if you wish.

4. Based on the assurance that if I filed an objection correctly, my objection "would" be considered[1] and that I was *not* required to attend a fairness hearing in Missouri,[2] I decided to file an objection on behalf of the class.

5. I knew that attending the hearing in person would not be a viable option for me for reasons discussed in more detail below. I specifically noted this in my objection and asked for the opportunity to participate remotely. I made my objection as detailed as possible, considering that I only had three weeks to prepare it. The objection was 136 pages (including my C.V.). It contains in detail the basis and proof for all my objections.

6. I spent at least fifty hours preparing the objection. This is an extremely conservative estimate. It does not include all the background work/research[3] that went into the objection; the time my husband (an attorney and class member) spent proofreading it; the time I spent printing it up and mailing it.

7. Additionally, I spent $45 to mail my objection to the Court and three separate counsel as required by the Court notice.

---

[1] Class Action Notice ("As long as you filed and mailed your written objection on time, the Court *will* consider it.") (emphasis added).

[2] *Id.* ("Do I have to come to the hearing? No.").

[3] I spent hundreds of hours over the summer researching various aspects of the settlement.

2

8.  I then followed up with Tracey Peters to ensure the objection had been received. And I emailed class counsel for the plaintiffs and for NAR to ensure they were aware an objection was in the mail.

9.  I filed the objection in good faith and with the intention of helping the Court assess whether the settlement was fair, adequate and reasonable and to assist the Court in making an appropriate fee determination.

10. I am not a "serial" or "professional" objector. I am not being paid for my work. I have filed this objection out of a sense of professional duty as a lawyer and law professor and because I think that there are serious shortcomings in an important consumer-oriented class action settlement.

11. Shortly after I filed the objection, a reporter informed me that this Court issued an order in the *Gibson* case requiring individual objectors and their attorneys to appear at the October 31, 2024 fairness hearing in person.

12. I was genuinely confused by the order. I could not find it on the website. The reporter sent me an email saying:

> As for Judge Bough's order, it wasn't a filing but a text order. I've pasted it below: Full docket text for document 510: Considering the upcoming October 31, 2024, hearing on: Motion for Attorney Fees, Costs, Expenses and Service Awards, and to ensure due process is satisfied, the Court ORDERS all objectors and their attorneys to appear in person at the October 31, 2024, hearing at 10:30 AM to argue their objections. See In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 931 (8th Cir. 2005) ([D]ue process [is] satisfied where class members received notice of the settlement proposal and were able to argue their objections to the district court.). Signed on 10/21/2024 by District Judge Stephen R. Bough.[4]

13. I was not able to track down any more information or the reason why class members were ordered to appear in person. I assumed that perhaps these weren't "regular" objectors like me—but objectors who were proceeding in bad faith, or who had filed their own parallel actions. In short, I assumed there was a particular reason that the Court had for ordering these objectors to be present. Nonetheless, I was very troubled by this as I had never heard of a court ordering objectors to appear in person at a fairness hearing.

14. After hearing about the order, I asked my law library for access to Pacer. I had not previously monitored the week-to-week happenings in the *Burnett* case (and related cases). But the order to appear in person was so odd to me that I wanted to keep a closer eye on what was happening.

15. On November 6, 2024, I printed the Court's approval of the class action settlement and attorneys' fees in *Gibson*. I saw the statement that ". . . the Court stated on the record at the Final Settlement Hearing important reasons for requiring Objectors' in person appearance. (Doc. #526.)" I was confused why the Court waited until the fairness hearing to put those "important" reasons on the record rather than explaining them as part of the order to compel attendance and permitting an opportunity to respond.

---

[4] Email on file with author.

16. On November 7, 2024, I requested a transcript of the *Gibson* fairness hearing so that I could understand why this Court believed that in person appearance was so "important" and to read what role objectors had at the fairness hearing.

17. Also on November 7, 2024, I happened to see the following docket entry on Pacer:

> Considering the upcoming November 26, 2024, hearing on: Final Settlement Approval and Motion for Attorney Fees, Costs, Expenses, and to ensure due process is satisfied, the Court ORDERS all objectors and their attorneys to appear in person at the November 26, 2024, hearing at 1:30 PM to argue their objections. Failure to comply with a Court's order can result in an objection being struck or waived. See Ferron v. Kraft Heinz Foods Co., No 20-CV-62136-RAR, 2021 U.S. Dist. LEXIS 129955, at *41 (S.D. Fla. July 13, 2021) (finding when an objector failed to follow the Court order of appearing after providing the Court intent to appear at the final approval hearing, he provided the Court sufficient grounds alone to strike his Objection.); In re Crocs, Inc. Sec. Litig., 306 F.R.D. 672, 682 (D. Colo. 2014) (As a threshold matter, National Roofings objection failed to comply with the Courts order... [t]hus, National Roofings objection is deemed waived[.]) Signed on 11/4/2024 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 11/04/2024)

18. It took me a moment to realize that this order apparently applies to my objection and requires me to "appear in person at the November 26, 2024, hearing at 1:30 PM to argue [my] objections."

19. I would not have seen this order if I had not been checking Pacer for other documents. No one alerted me (or presumably any other objector) to the Court's newest order.

20. On November 8, 2024, I reached out to the following counsel about this issue: Mr. Ketchmark; Mr. Boulware; Mr. Dirks; Mr. Glass; and Ms. Mirold. I left voicemails for most of them,[5] explaining that I believe the order is a violation of objectors' due process rights. I asked for their support in allowing me, and other objectors, to appear via remote means. Although I am sure they were already fully aware, I alerted them to the glaring appellate issue this presents (I believe one of my voicemails used the term "unforced error.").

21. I received the transcript of the *Gibson* fairness hearing on November 8, 2024. In reading the transcript, I see that the Court mentioned my name and asked if I was present. I did not object to the *Gibson* settlement; I objected in the *Burnett* case (there were different filing deadlines and different fairness hearings[6]). The Court was mistaken in believing I was an objector in *Gibson*. The Court made this same mistake with two or three other *Burnett* objectors.[7] Not one attorney

---

[5] I left a message with Mr. Ketchmark's assistant, not a voicemail.

[6] This fact, in itself, makes it incredibly confusing for class members. The splintering of the litigation where the Court considers cases that are all interrelated piecemeal also raises fairness concerns. The Plaintiffs in *Burnett* submitted a motion and declaration continually referring to the nearly one-billion-dollar settlement. The first sentence in their motion was "After years of hard-fought litigation in multiple lawsuits, Plaintiffs have achieved proposed nationwide settlements now totaling at least $998.375 million1 in monetary relief." Plaintiff's Motion for Attorneys' Fees, Costs, and Expenses Regarding the NAR and Homeservices Settlement and Suggestions in Support Thereof, at p. 1. Professor Klonoff's declaration in support of the motion similarly lumped all the monetary settlements together for the purpose of assessing fees.

[7] I ask that the record be corrected.

at the hearing corrected the Court, suggesting either a lack of desire to correct the record or inattention to the proceedings at hand.

22. Also on November 8, 2024, I learned of the so-called "important" reasons the Court ordered objectors to appear in person when I read the transcript of the fairness hearing. The Court stated:

> There's obviously been a little bit of concern about my order that any objectors show up in person, and I wanted to provide you and more importantly the Eighth Circuit the rationale for that. As you may recall from the prior settlement approval hearing, we got a somewhat -- I got a somewhat alarming objection that accused me of criminal acts, and so turned that over to the U.S. Attorney. As you can imagine, based upon my presence here today, I've not been charged with any particular federal crimes, and the generously call it correspondence from that objector has continued privately and publicly to me and some of my peers and some of my peers in the Article III up to the Eighth Circuit. So I'm now at a point that I have to turn those over to the United States Marshals. So as you can imagine, I'm somewhat suspect about objectors in this case given the fact that now I have to have the U.S. Marshals monitoring that correspondence. So for those reasons and others concerned about objectors, I'm assuming the vast majority of these objectors are folks that are not like that; that is not what we're dealing with. And we have good lawyers representing many of those people. So I'm not lumping everybody into that category, but forgive me if I'm a little bit suspect in this particular matter given when I got to turn over information to the U.S. Attorney's Office because of accusations of federal crimes.

> So that's the basis for why I entered that prior order.[8]

23. After I learned of the Court's order, and before I received the transcript, I reached out by email to some of the country's leading class actions scholars. I asked them whether they had ever heard of a court requiring in person attendance at a class action fairness hearing when the class notice said that written submissions would be considered. Four of these scholars responded to me.[9] All professors I heard from were tenured faculty at top 20 law schools. Between them, *they have 126 years of legal experience*. They have written hundreds of articles on class actions. None of them had ever heard of a case where a Court ordered an objector to appear in person at a class action fairness hearing. I also reached out by phone to two prominent lawyer friends of mine who practice, respectively, appellate litigation and class action antitrust litigation. They have *approximately 55 years of experience* between them; neither of them had ever heard such a requirement either. Based on the feedback of five of the most prominent class action experts[10] in the country and relying on their over 180 years of combined experience, I feel confident that this Court's order is completely without precedent. I bring this to the Court's attention simply to demonstrate that I am making this motion in good faith, with a *bona fide* belief in the merits of the motion, and having done as much research as possible given my time constraints.

---

[8] *Gibson* Fairness Hearing Transcript, at p. 3-4.
[9] One was an acquaintance of mine that I have corresponded with over the past decade. The other three I had never corresponded with but were kind enough to provide me with their thoughts. Two have not responded yet; and one that I had corresponded with some years ago indicated that he would prefer to "sit this one out."
[10] The appellate litigator is not an expert on class action litigation. The antitrust litigator is.

24. On November 11, 2024, I heard back from Mr. Dirks by email, who indicated he would reach out to me the afternoon of November 12, 2024. I told him that I had since read a transcript of the fairness hearing in *Gibson* and believe that the Court does not have a basis for the order. I told him I planned to file this motion.

25. For the reasons stated below, I do not believe that this Court has the authority to order me, or any other objector, to appear in person after issuing an order stating that objections *would be considered* as long as they were properly filed by the deadline.

## ARGUMENT

### I. THE COURT CANNOT VIOLATE CLASS MEMBERS' DUE PROCESS RIGHTS BECAUSE IT HAS RECEIVED UNWELCOME PERSONAL "CORRESPONDENCE"

According to the Court's statement at the *Gibson* fairness hearing, some time ago it received a "alarming objection that accused [the Court] of criminal acts."[11] Apparently, "correspondence from that objector has continued privately and publicly to me and some of my peers."[12] Because of this, the Court is "somewhat suspect about objectors in this case."[13] The Court repeats ". . . forgive me if I'm a little bit suspect in this particular matter."[14] And "that's the basis for why [the Court]"[15] ordered completely *different objectors* to appear in court in Missouri.

I am confident this Court is referring to Mr. Anthony Phillips as the "objector" sending the correspondence.[16] I, too, received messages from Mr. Phillips. To be clear, Mr. Phillips is *not an objector*. He is a realtor—i.e., a member of NAR (the defendant).

Here is a description provided by a legal ethics "watchdog" organization when this issue was first put on the record at the preliminary fairness hearing on May 17, 2024: "Judge Bough went on to note that Phillips' email also referenced plans to send information about the case to law enforcement agencies like the U.S. Attorney's office and Department of Justice. In response, *Judge Bough proactively notified the local U.S. Attorney about the situation*, so their office could follow proper protocols for handling any judicial ethics issues."[17] At the October 31, 2024 *Gibson* fairness hearing, this Court stated, "but forgive me if I'm a little bit suspect in this particular matter given when I got to *turn over information to the U.S. Attorney's Office*." Based on the reference to the U.S. Attorneys' office and the statement that the concern was put on the record at the "prior settlement approval hearing" in May, it stands to reason this Court is referring to the same individual. RISMedia, a real estate news outlet, also makes this connection.[18]

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] https://ace.rismedia.com/2024/11/07/the-four-biggest-takeaways-from-the-copycat-settlement-approvals/.

[17] https://abusivediscretion.com/missouri-judge-stephen-r-bough-addresses-alleged-conflicts-of-interest-regarding-campaign-contributions/.

[18] https://ace.rismedia.com/2024/11/07/the-four-biggest-takeaways-from-the-copycat-settlement-approvals/ ("Bough appeared to be referring to Anthony Phillips, a broker in Nevada, who back in May objected to separate settlements in the Burnett case, extensively criticizing the agreements and lawsuit as a whole, as well as legal fees charged by plaintiffs lawyers. Phillips also deviated extensively to talk about alleged corruption in the greater Kansas City area, including from airport contracts and campaign contributions to gubernatorial and mayoral candidates. At the hearing for those settlements, Bough claimed he discovered one of the lawyers for the plaintiffs had indeed contributed to the election campaign for his wife—a Kansas City councilperson—based on Phillips' accusations, and offered to recuse himself from the case, noting that REALTOR® organizations had also donated to his wife's campaign. Lawyers representing both plaintiffs and

The Court's characterization of Mr. Phillips as a class action "objector" is erroneous. In his legal filing, Mr. Phillips does not state that he is an objector; instead, he claims to be a "real estate practitioner and concerned citizen."[19] As far as I can tell, Mr. Phillips has not filed an objection in the case, nor would he have standing to. Moreover, Mr. Phillips has a bunch of different people in his crosshairs including multiple attorneys in this case, Steve Brobeck at the Consumer Federation of America, industry insider Robert Hahn, and dozens of others.[20] I point this out specifically because there is no justification for forcing innocent class objectors into a courtroom in Missouri because the Court has received unwelcome messages from a *random realtor* in Las Vegas, Nevada accusing the Court of "federal crimes."

While I am sympathetic to the Court's personal situation,[21] none of this remotely bears on whether it is proper for the Court to order nationwide objectors to come to Missouri in person to have their objections count.[22] This Court seems to be using its powers of compulsion to investigate and/or address what is purely a personal situation. I am not even clear what the Court was intending to do: "Suss out"[23] potential future interlopers? Ensure that objectors are "legitimate" by being able to see them in person during their two-to-three-minute objection? It is genuinely confusing to even understand what the Court's goal was in ordering in person appearance.[24]

In any event, this is not an "important" reason for compelling personal attendance; it is an abuse of the Court's authority.[25] The Court seems to confuse its own personal *reason* for apparently wanting to see class members in person with *an appropriate legal basis* for using its powers of compulsion. If the Court is concerned about this one individual, and therefore considers all objectors "suspect" and views them with a jaundiced eye, then the Court should disqualify itself from the case.[26] It should not deny dozens of class action objectors their due process rights.

I am grateful, however, that this Court put the "rationale" for ordering in person attendance on the record specifically for "the Eighth Circuit." I am confident that the Eighth Circuit will not justify violating class members' due process rights because a district Court is "a bit suspect" and "somewhat suspect" about objectors. I also believe this statement provides a basis for reconsideration of all objections that were stricken by this Court at the *Gibson* hearing, and also a re-evaluation of any objections that were considered by this Court.

---

defendants said they did not think he needed to. At this latest hearing, Bough claimed correspondence from this unnamed objector had continued "both publicly and privately," and was also being sent to other judges in Missouri").

[19] Document 1455.

[20] *See id.*, at p. 3.

[21] I say this with sincerity. I currently have a former student who has been stalking my husband and I for several years. It is distressing. But it is not a reason to punish other people who have abided by the Court's orders and done nothing wrong.

[22] https://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges ("Commentary Cannon 2B ("A judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen.").

[23] https://dictionary.cambridge.org/us/dictionary/english/suss-out.

[24] Notably, there does not even seem to be a concern about safety concerns, since the Court joked that "As you can imagine, *based upon my presence here today*, I've not been charged with any particular federal crimes." *See* https://ace.rismedia.com/2024/11/07/the-four-biggest-takeaways-from-the-copycat-settlement-approvals/ ("Bough opened the hearing, according to a transcript obtained by RISMedia, with a little bit of humor. "As you may recall from the prior settlement approval hearing…I got a somewhat alarming objection that accused me of criminal acts," he said. "As you can imagine, *based upon my presence here today*, I've not been charged with any particular federal crimes.").

[26] CODE OF CONDUCT FOR U.S. JUDGES, Cannon 3(C) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: (a) the judge has a personal bias or prejudice concerning a party . . .").

Due process requires that absent class members have notice and the opportunity to be heard.[27] Class members were explicitly told that they *would be heard* if they followed certain steps. Now they are being told they *will __not__ be heard* unless they completely disrupt their life, pay large sums of money out of pocket, and orally tell the Court in two to three minutes (max) exactly what is already contained in their written submission that the Court promised it would consider. It is hard to imagine a more flagrant deprivation of due process. And all because a guy in Nevada—a non-objector—has made this Court "suspect" of objectors. I trust this Court and the Defendant, National Association of Realtors, have taken steps to investigate this realtor and suspend his license. If his actions are sufficient to justify the draconian order the Court has issued here, then surely this gentleman falls short of NAR's ethical standards and should not be able to continue to advise home buyers and sellers on real estate transactions.

There is one other point worth noting. It is curious that this Court has been aware of the "alarming objection[28] that accused [the Court] of criminal acts" since the "prior settlement approval hearing" in May, 2024. Yet, the Court approved a notice in September that said that written objections would be considered and that objectors did not need to attend in person. Then, six months after the individual that made this Court "suspect" of objectors accused this Court of criminal acts, and only three weeks before the fairness hearing, the Court decided on November 4, 2024, to order all objectors (via a docket entry many of them will not see) to appear in person. The timeline simply makes no sense. But even if it did, the order still violates class members' due process rights.

II. <span style="font-variant:small-caps">This Court Does Not Have the Authority to Order an Objector to Appear in Person After They Have Already Complied With a Court Order</span>

The notice in *Burnett* was a Court order that I relied on and complied with. This Court cannot now issue a completely contradictory order and have that order withstand due process scrutiny.

The class action notice—repeatedly approved by this Court—could not have made it more clear that if an absent class member follows certain steps, "[t]he Court *will* consider [their view]."[29] The notice explicitly says that a class member does *not* have to come to a fairness hearing unless he or she "choose[s] to enter an appearance in person or through . . . counsel."[30] As if that weren't enough, the notice says that "If you send any objection, *you do not have to come to Court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it.*"[31] The notice reiterates that whether to attend is completely optional: "you are welcome to come at your own expense . . . You may also

---

[27] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S. Ct. 2965, 2974, 86 L. Ed. 2d 628 (1985)(" If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S., at 314–315, 70 S.Ct., at 657; cf. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174–175, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974). The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.").

[28] Which I do not believe was an actual "objection" in the legal sense.

[29] Class Action Notice.

[30] *Id.*

[31] *Id. See also* <span style="font-variant:small-caps">Fed. R. Civ. P.</span> 23(c)(2) ("The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member *may* enter an appearance through an attorney *if the member so desires*; . . .").

pay your own lawyer to attend *if you wish*."[32] In fact, an absent class member who wanted to participate at a fairness hearing actually needed to make that request in writing as part of the objection.[33]

Through this notice, the parties and the Court made it clear to absent class members that their views would be considered so long as the requirements outlined in the notice were followed. In no universe would an absent class member read this notice and contemplate the possibility that if they took the onerous steps required to file an objection, they would be haled into a faraway court upon pain of having their objection stricken.

Changing the rules of the game after they are relied on is unconstitutional and deprives absent class members of their due process rights under the Fifth Amendment of the U.S. Constitution.[34] This is not just my view. It is the view held by Professor William Rubenstein, the Harvard law professor who authored the treatise that this Court cited *fifty-nine times* in its decision approving the class settlement and fees in *Gibson*. As this Court is well aware, Professor Rubenstein literally wrote the book on class action litigation. In a declaration filed by Professor Rubenstein in *Fitzgerald Farms LLC v. Chesapeake Operating L.L.C.*, Professor Rubenstein explicitly calls a requirement for in person participation at a fairness hearing "unconstitutional."[35] And importantly, Professor Rubenstein was referring to a *class action notice that expressly included* the requirement for in person attendance, so that class members were at least alerted to the possibility before making their decision on whether to object.

In his declaration, Professor Rubenstein states:

> C. The Settlement's Procedures Place Artificial and Unconstitutional Hurdles in the Path of Class Member Objections
>
> 47. The Manual for Complex Litigation cautions judges to look out for settlements that "impos[e] strict eligibility conditions or cumbersome claims procedures." This proposed settlement process has at least three such requirements: *that objectors appear in person at the fairness hearing in Beaver, Oklahoma*; [other requirements omitted].
>
> The Objector Appearance Requirement
>
> 48. This Court's preliminary approval order and the Notice in this case both declare that class members who wish to object to the settlement file a written statement that "must contain . . . a statement that the objector will appear at the Settlement Fairness Hearing in person." This requirement does not appear in the parties' settlement agreement and hence appears to have been added by putative class counsel in creating the notice and in proposing the preliminary approval order.
>
> 49. Prior to reviewing this settlement, in nearly 30 years of practicing, teaching, and writing about complex litigation, I had never seen a provision requiring class members to appear personally at a fairness hearing so as to register an objection to a proposed settlement. So surprised was I by this requirement that I asked my research assistant to

---

[32] *Id.*

[33] *Id.* ("You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB." Be sure to include your name, address, telephone number and your signature. Your Notice of Intention to Appear must be postmarked no later than October 28, 2024, and be sent to the Clerk of the Court, Class Counsel and Counsel for NAR, at the addresses in Section 16. You cannot speak at the hearing if you excluded yourself.").

[34] U.S. CONST. AMEND. V.

[35] Declaration of Professor Rubenstein (without exhibits) attached as Appendix A.

9

undertake an informal empirical investigation – namely, I instructed her to find 50 class action settlements and to look for such a provision in each. My research assistant's results . . . disclosed not a single case in which such a requirement has appeared. Indeed, what she found is precisely the opposite: that it is quite common in class actions to inform class members that they do not need to appear at the fairness hearing.

50. The case law is similarly sparse. [Omission of case which Professor Rubenstein says does not provide authority for order to compel in person attendance].

b. In the only case to actually address this issue head on, a California state court found the practice unconstitutional and an abuse of the class action process as it undermined the court's capacity to review the settlement by stifling opposition thereto; the court accordingly reversed a lower court's settlement approval, stating: As explained by a leading treatise on class actions,

> "[i]t is unnecessary for objectors to appear personally at the settlement hearing in order to have their written objections considered by the court." (Newberg, Class Actions (4th ed. 2013) § 11:56.) . . . Requiring class members in a nationwide class or even a statewide class to appear at the final approval hearing or hire an attorney to have their objections heard works a hardship on objectors, as the benefit to the objector from the class action may be so low that it would be cost prohibitive or physically challenging to personally assert one's rights at a hearing in a potentially distant location. For example, here appellant indicated he was unable to attend the hearing because it was prohibitively expensive for him to do so as an out-of-state class member. In contrast, if an objector is permitted to file written objections to be considered, the burden on the court to review them is minimal and the cost to the parties remains the same. Requiring any objector to attend the final approval hearing does not offer a meaningful opportunity to be heard, and therefore violates class members' due process rights. Adherence to these principles directly impacts the trial court's role in determining if the settlement is fair. That determination requires that the trial court balance several factors, which include, among others, class member reactions to the proposed settlement, which the trial court cannot accurately evaluate when members' objections may have been stifled by the onerous requirement that they attend the final approval hearing. Although appellant was afforded the opportunity to be heard, there may have been many class members whose objections were chilled. Misstating objectors' rights such that they are dissuaded from exercising their opportunity to be heard does not fairly apprise class members of their options associated with the settlement. For these reasons, the order granting final approval of the settlement must be reversed.
> . . .

53. What I conclude from these facts is that [1] it would be very burdensome for most class members [from Oklahoma] to have to travel to Beaver, Oklahoma to appear at the fairness hearing; [2] requiring objectors to appear in person at a fairness hearing is

an extraordinarily rare – almost unheard of – practice in class action practice; . . .; [4] the requirement runs afoul of the Oklahoma class action rule, which enables objections without an appearance requirement; [5] the primary legal authority that considered a full objection to this procedure found it both unconstitutional and a perversion of class action procedures.

Professor Rubenstein's class action treatise—the same one that that this Court cites fifty-nine times— also states that class members "need not appear at the fairness hearing for their objections to be considered by the court."[36] Professor Rubenstein's treatise cites *Litwin v. iRenew Bio Energy Sols., LLC*, where the court specifically held that requiring in person participation at a fairness hearing is unconstitutional, *even if* that requirement were contained in the class notice. The *Litwin* court states:

> Here, the notice explicitly informed class members "[i]f you send an objection, you or your attorney will need to come to Court to talk about it or the Court will not consider it." *Requiring class members in a nationwide class or even a statewide class to appear at the final approval hearing or hire an attorney to have their objections heard works a hardship on objectors, as the benefit to the objector from the class action may be so low that it would be cost prohibitive or physically challenging to personally assert one's rights at a hearing in a potentially distant location.* For example, here appellant indicated he was unable to attend the hearing because it was prohibitively expensive for him to do so as an out-of-state class member. In contrast, if an objector is permitted to file written objections to be considered, the burden on the court to review them is minimal and the cost to the parties remains the same. *Requiring any objector to attend the final approval hearing does not offer a meaningful opportunity to be heard, and therefore violates class members' due process rights.*[37]

Thus, the leading class action scholar in the country—the author of the treatise that every judge hearing a class action relies on—is of the view that an order the compelling in person attendance of an objector is unconstitutional. If it is unconstitutional when it is included in the class action notice, then surely it is unconstitutional when applied after the Court expressly assured class members that it would consider all properly filed written objections.

## II.    THE CASES CITED BY THE COURT DO NOT SUPPORT THE COURT'S AUTHORITY TO ISSUE THIS ORDER

This Court cites no authority at all for the proposition that a federal court in Missouri can solicit objections through a class action notice that expressly says to a class member, "you do *not* have to come to the Court to talk about it"[38] and then later change its mind when it receives the objection and issue a secret[39] order demanding that a class member appear in person.

This Court in *Gibson* cites a number of cases to support its statement that ordering objectors to appear in person is "not outside the Court's purview."[40] First, it is telling that the Court does not refer to even one Missouri or Eighth Circuit case. Instead, the Court cites a case from a state court in Illinois and

---

[36] *See* Appendix B.

[37] Litwin v. iRenew Bio Energy Sols., LLC, 226 Cal. App. 4th 877, 883–84, 172 Cal. Rptr. 3d 328, 332 (2014), *as modified* (May 29, 2014).

[38] Emphasis added.

[39] Actual notice of the order was not provided to class objectors. Most class objectors do not have access to the Court's docket entries; and those that do are not constantly "refreshing" the website to see if a Court might suddenly change its mind about objections three weeks before the fairness hearing.

[40] *Gibson* Order dated 11/04/24 at p. 17.

from federal court in Indiana. Neither case remotely supports the Court's authority to compel objector attendance.

This Court has incorrectly characterized the holdings of the cases it cites in support of its order. It cites *Fauley v. Metro. Life Ins. Co.*[41] for the following proposition: "requiring class members to be present in court to object did not violate their due process rights" when the Court ordered 'if you want the Court to consider your objection, then you must also appear at the final approval hearing.'" What this Court omits is that *the class action notice itself* was where the court in *Fauley* said, "if you want the Court to consider your objection, then you must also appear at the final approval hearing." In other words, objectors had notice that the court would require them to attend the hearing in person in order to object. Here was the notice in *Fauly*: "Claim forms are available from the claims administrator or the website listed below. Claim forms are due by November 26, 2014. If you wish to object to the settlement, you must identify yourself as a class member and state the reason for and file and serve your objection by October 14, 2014, and you must appear at the Court hearing on November 14, 2014."[42] Thus, the objectors in *Fauly* knew at the time they filed the objection that they were required to appear at the fairness hearing to have the court consider their objection. In this case, the notice assured class members the opposite: that they would *not* have to come to the fairness hearing and that the Court would consider their written objections.

This Court also cites *In re Train Derailment Near Amite La.*,[43] a nearly twenty-year old case from the Eastern District of Louisiana, for the proposition that this Court has authority to compel objectors to appear in person. It cites the case for the proposition that "To preserve the right to be heard at the Fairness Hearing in opposition to the settlement, the objecting Class Member must appear at the federal court in person not later than 8:30 a.m. on the date the Fairness Hearing is to begin and register with Class Counsel." Again, in the *In re Train Derailment* case this directive to appear in person was expressly contained in the class notice: "To preserve the right to be heard at the Fairness Hearing in opposition to the settlement, the objecting Class Member must appear at the federal court in person not later than 8:30 a.m. on the date the Fairness Hearing is to begin and register with Class Counsel."[44] As with *Fauley*, class members therefore knew in advance of deciding whether to file an objection that "to preserve the right to be heard" they "must appear at the Fairness hearing." Moreover, the requirement to appear in person was only applicable to objectors who stated in their objection that they would appear in person. With respect to other objectors, the notice stated, "Every written objection to the proposed settlement filed in compliance with this Order will be considered by the Court regardless of whether the objector has or has not asked to be heard at the Fairness Hearing."[45]

In its November 4, 2024 order compelling attendance of the *Burnett* settlement objectors, this Court cites two cases that it also cited in its *Gibson* Order. These cases do not support the proposition that this Court has the authority to compel an objector to appear in person at a fairness hearing after assuring them that the Court will consider their written objections.

This Court cites *Ferron v. Kraft Heinz Foods Co.*[46] for the following proposition: "finding when an objector failed to follow the Court order of appearing *after providing the Court intent to appear at the final*

---

[41] 52 N.E.3d 427, 438-39 (Ill. App. Ct. 2016).

[42] Shaun Fauley, Sabon, Inc. v. Metro. Life Ins. Co., 2016 IL App (2d) 150236, ¶¶ 8-9, 52 N.E.3d 427, 432–33.

[43] No. CIV.A. MDL 1531, 2006 WL 644494, at *2 (E.D. La. Jan. 27, 2006).

[44] In re Train Derailment Near Amite La., on Oct. 12, 2002, No. CIV.A. MDL 1531, 2006 WL 644494, at *2 (E.D. La. Jan. 27, 2006).

[45] *Id.*

[46] No 20-CV-62136-RAR, 2021 U.S. Dist. LEXIS 129955, at *41 (S.D. Fla. July 13, 2021).

*approval hearing*, he provided the Court sufficient grounds alone to strike his Objection." The case is not remotely on point. It its own parenthetical, the Court notes that the objector in *Ferron* provided the Court with notice of "intent to appear at the final approval hearing" and then failed to appear. Similarly, the Court cites *In re Crocs, Inc. Sec. Litig.*[47] for the proposition that "National Roofings objection failed to comply with the Courts [sic.] order ... [t]hus, National Roofings objection is deemed waived[.]" It fails to mention, however, that the failure to comply with the Court's order was nothing more than simply failing to submit a written objection in accordance with the class notice: "As a threshold matter, National Roofing's objection failed to comply with the Court's order directing that each written objection to the Settlement include "a representation as to whether such Person or entity intends to appear to be heard at the Settlement Hearing [and] proof of all purchases, acquisitions or sales of Crocs securities during the Settlement Class Period.""[48] The case had nothing to do with in person attendance or the authority of a Court to order in person attendance after notifying a class member that in person attendance was not required.

There is a reason that this Court has had to dig deep into state and federal law in other jurisdictions and into cases that don't bear on the issue at hand—because no legal authority exists that would allow a court to compel attendance of an objector in the circumstances presented here.

III.   This Court's Order Creates A Chilling Effect on Future Objectors

If something like this happened in any other context, we might call it a bait-and-switch. Consider the perspective of an absent class member (like me) who is considering whether to object. I read what the requirements were for submitting an objection and decided that the Court could benefit from hearing a different perspective on the NAR settlement and attorneys' fees. I spent an inordinate amount of time over three weeks getting the objection ready for the Court and followed all the instructions posted in the notice. I spent $45 just mailing out my objection. To use the Court's language, I "play[ed] by the rules the district court has set."[49]

My substantive position is that the settlement should not be approved (not that monetary recovery should be higher) and that I—a class member—should get zero dollars. So far, it has cost me 50 hours and $45 to be able to say that.[50]

Then, this Court orders me to appear in person. I don't get an email or a phone call or a letter telling me this, even though the Court has all my contact information because the class action notice required that I include it and that it be posted publicly for the world to see. I just randomly stumble across the information on my own. I don't get an opportunity to respond to the order; there is no hearing or opportunity to be heard. It does not seem that the Court, or the parties, were "desirous of actually informing the absentee" class member of the order.[51]

To attend the fairness hearing in person would require me to cancel a class and disrupt the schedule of seventy-five law students. This would mean I could not be available for a three-day stretch right

---

[47] 306 F.R.D. 672, 682 (D. Colo. 2014).

[48] In re Crocs, Inc. Sec. Litig., 306 F.R.D. 672, 682–83 (D. Colo. 2014).

[49] *Gibson* Order 11/04/24, at p. 18.

[50] It has taken another 15 hours to prepare this motion, including phone calls and emails with several lawyers and academics.

[51] Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 315, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950)("But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.").

13

before final exams. Additionally, I would have to schedule a make-up class to cover two hours and fifteen minutes of missed material on contract damages. But there is literally no time to schedule a make-up class because students take the Contracts exam on December 6, 2024.

It would require me to take four planes to get to Missouri and back. There are no direct flights between Buffalo, NY and Kansas City, MS. So, I would need to spend about ten hours in the air. As someone who is an anxious flier, this is not a particularly appealing proposition. Alternatively, I could drive twenty-eight hours (fourteen hours each way).

It would require me to take three "vacation" days. Meaning that it's not just out-of-pocket money that I would be forfeiting, but also vacation time that I have earned.

It would require me to change Thanksgiving plans. I would not be back in enough time to prepare to host Thanksgiving for my family. But, I guess there's always next year.

It would require me to spend at least a thousand dollars out of pocket between travel, accommodation, car rental, food, etc. Unlike counsel in the case who charge over $1000 *per hour*, $1,000 is not an insignificant sum to a professor at a state law school. It represents about a quarter of my bi-weekly pay,[52] meaning that I would have to work two to three days to make enough money to cover expenses to come to Missouri and explain to this Court why it should give me no money. That is provided that the Court even allows me to speak; explaining my 136-page objection in detail would take hours. And I am confident that the Court will not entertain an hours-long objection considering it only allowed *Gibson* objectors "two or three minutes to tell me whatever they would want."[53] The Court cut off four objectors after their three minutes were "up."[54]

Finally, given my familiarity with class litigation, I am cognizant of the success rates of objections generally, and of objections in this case. I am therefore aware that my chances of convincing this Court to disapprove the settlement or the attorneys' fees are hovering around 0%.

*How does this make any sense?*

If ever there was a system that feels rigged for the class members whose rights are apparently being "vindicated" by this class action settlement, it is this. No legitimate objector[55] would ever dare file an objection, fearing that to do good, they might fall victim to the adage "no good deed goes unpunished." No reasonable class member would take the time to research and file an objection if they believed that a court would figuratively, or perhaps literally, throw their objection in the garbage unless they upended their lives to travel on their own dime to a far-away courtroom where they were allowed to speak for between 120 and 180 seconds.

As a class member, it feels to me like this order is just a convenient tool being used to dispose of my objection. Indeed, the Court was able to wipe out the voices of eleven objectors this way: "Mr. Zaffarkhan, Mr. Wischer, Mr. Dyer, Ms. Cunningham, Mr. Douglass, Mr. Cheatham, Mr. Fender, Mrs. Fender, Mr. Friedman, Mr. March, and Mr. Mullis did not personally appear at the Final Settlement

---

[52] My pay is a matter of public record.
[53] *Gibson* Fairness Hearing Transcript, at p. 3.
[54] *Id.* at p. 19 ("THE COURT: Mr. Knie, you're well over your two to three minutes."); p. 23 ("THE COURT: You're getting close to your two to three minutes as well."); p. 28 ("THE COURT: You close to wrapping up, Mr. Miller?"), p. 25 ("THE COURT: Let's wrap her up.").
[55] I am excluding professional and frivolous objectors.

Hearing. . . . all objections filed by the above named Objectors . . . are waived for failing to comply with the Court's order."[56]

The Court appears dismissive of the monetary impact of its order. This is unfortunate. The Court stated in its *Gibson* ruling that "while objectors may 'have to spend one thousand dollars for a flight, hotel and other out of town expenses' if they had to personally travel, this pales in comparison to the $13,147,775,19 in reasonable and necessary expenses exhausted by Plaintiffs' counsel in curating the current settlement for the Class."[57] I do not understand how the due process burdens placed on an objector are even remotely connected to class counsels' expenses; the sentence is a non-sequitur. Moreover, the comparison is inapt. A class member must spend $1,000 in the hopes of getting, say, $50 instead of $25.[58] But class counsel spends $13 million in the hopes of getting $333 million.

The pivotal question is why any objector should have to pay *any amount of money* to have their voice heard. The Court's ruling makes justice potentially available only to those with enough money to pay the admission fee the Court has set. The ability to make your voice heard should not come with a price tag. I currently live in a working-class neighborhood where the median price of a home is approximately $250,000.[59] I do not think that any one of my neighbors (at least three of whom are home sellers and class members) would be able to afford to come to Missouri to have their voices heard. These are the home sellers that the Court, Plaintiffs' counsel, and the class representatives have a fiduciary obligation to protect. And they are the sorts of sellers that are shut out of participation by the Court's order. This "pay to play" justice creates a perception that this Court and/or the parties are deliberately stifling the voices of objectors. Whether this is the intent, or simply the consequence, doesn't matter. Justice must not only be done but must be seen to be done.[60]

I am troubled by some of the language in this Court's decision in *Gibson* that seems to reflect a negative view of class action objectors. Indeed, seeing what the Court put on the record about how it is "suspect" of objectors gives me even more pause. This Court in *Gibson* wrote:

> Objectors may not "essentially insert[] [themselves] into the dispute and then, without explaining why, [they] refuse[] to play by the rules that the district court set." *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 858 (8th Cir. 2024). An objector in T-Mobile refused to cooperate with counsel's efforts to conduct discovery ordered by the district court, claiming "that by subjecting her to a deposition, the district court 'unduly encumbered' her due-process right to be heard." *Id.* Both the Eighth Circuit and District Court disagreed with her refusal to follow the court's orders and struck her objection. *Id.* Similarly here, after the Court ordered their appearance, many objectors mailed letters protesting the Court's order and requesting excusal based on the cost of travel (See Doc. #512-1; Doc. #520), family care requirements (See Doc. #524-2, Doc. #523-1), or a death in the family (See Doc. #519-1). However, these excuses do not play [sic.] "the rules that the district court has set." *Id.*

---

[56] *Gibson* Order dated 11/04/24 at p. 19.
[57] *Gibson* Order dated 11/04/24 at p. 19.
[58] In my case, this isn't even true—I am advocating for the settlement to be disapproved and therefore receive no recovery.
[59] Google AI puts it a bit lower at $227,000 to $230,000 in 2023 and 2024.
[60] I received the following email from an individual I don't know in Nevada on November 9, 2024 as I was preparing this motion: "Unfortunately, as in most of these cases, the table is stacked against you. Plus, the judge wants you to show up in court in Missouri. He has already stated in another case that he is not very interested in accommodating objectors via zoom or conference calls. He seems to say, if you can't come a thousand miles, then I'm not going to listen to you." It is not just *my perception*, but the perception of the public that this Court is "not very interested" in hearing from objectors.

The selective quote from the Eighth Circuit in *T-Mobile* does accurately represent that Court's position on objectors. This is the quote in its entirety:

> Pentz's situation is different. For her, the court identified case-specific behavior that it believed was deserving of sanction. According to class counsel, Pentz initially said that she was acting pro se, but she later disclosed that she was indeed represented by an attorney. She nonetheless refused to disclose her attorney's identity even though the class notice that she received required her to do so. She also evaded personal service of a subpoena compelling her to sit for a deposition, and when she spoke to class counsel on the telephone, she advised that she would not sit for a deposition. In short, she repeatedly refused to cooperate with class counsel's efforts to conduct the discovery that the district court ordered. And if she had concerns about sitting for a deposition, she never brought them to the district court's attention, for instance by moving to quash the subpoena or seeking a protective order. Nor did she respond after class counsel moved to strike her objection. She essentially inserted herself into the dispute and then, without explaining why, refused to play by the rules that the district court set. Pentz objects that by subjecting her to a deposition, the district court "unduly encumbered" her due-process right to be heard. We doubt it. Regardless, it was incumbent on Pentz to raise this argument in the district court first rather than stand mute. In the circumstances, we cannot fault the court for striking her objection.[61]

In light of the above, the Eighth Circuit said that *this particular objector* "essentially inserted herself into the dispute and then, without explaining why, refused to play by the rules that the district court set."[62] This Court uses the "rules that the district court set" language in a way that is not representative of the way it was used in the actual case:

> Similarly here, after the Court ordered their appearance, many objectors mailed letters protesting the Court's order and requesting excusal based on the cost of travel, family care requirements, or a death in the family. However, these excuses do not play [sic.] "the rules that the district court has set."[63]

I am disheartened that this Court would refer to "death in the family"[64] or "family care requirements"[65] or "cost of travel" as "excuses" that "do not play [by?] 'the rules that the district court has set.'"[66] A more apt characterization would be that these are legitimate reasons why individuals with limited time and resources would not be able to travel thousands of miles to partake in a process for which there is next-to-no-upside for them after being explicitly told by the Court that they would not have to physically appear in person.[67] And I venture to guess that some of these objectors did not *even know* that they were required to show up in person because nobody told them.

---

[61] *In re T-Mobile Customer Data Sec. Breach Litig.,* 111 F.4th 849, 858 (8th Cir. 2024)(citations omitted).

[62] *Id.*

[63] *Gibson* Order dated 11/04/24, at p. 18 (internal citations omitted).

[64] Transcript of *Gibson* Fairness Hearing, at p. 25 ("Mr. March could not be here today. My cocounsel, Michael Buchman from Motley Rice, submitted a letter to the court, which is on the court's docket, ECF 519, that Mr. March had to attend a funeral in Michigan today, and in fact it's the funeral of a family member, and he's giving a eulogy.").

[65] One objector had his counsel appear on his behalf. His counsel stated, "We submitted a declaration. Mr. Friedman could not. He is a school teacher. His wife is traveling out of the country, and he has children that he could care for. He was unable to make arrangements on short notice. We do apologize that he is not able to participate here today." The Court struck his objection as being an "excuse." Transcript of *Gibson* Fairness Hearing, p. 13.

[66] *Id.*

[67] It is particularly disheartening that the Court shows so little compassion for objectors' personal circumstances when the Court was clear that the reason for compelling attendance was related to *its* personal circumstances.

The Eighth Circuit's decision in *T-Mobile* reaffirms that objectors are an important part of the class action process, not a scourge on the court. Speaking of the other objector in the case, the Eighth Circuit writes:

> We begin with Hampe. The district court found that she and her attorneys are serial objectors with a history of raising frivolous objections to class settlements for their own pecuniary gain. But even if this is correct, we can't see how that is relevant in this particular case. "Merely characterizing some of the attorneys as 'professional objectors' without specifying what, exactly, they have done that is either in bad faith or vexatious, is not enough." There is just no evidence that either Hampe or her attorneys in this case are attempting to extort a payout, have acted vexatiously, have broken any rules, or have acted unethically. No one contends that her objection is frivolous. In fact, as we will explain, it is meritorious. And though it's possible that her meritorious objection is delaying execution of the settlement (a matter she vigorously contests), if so, that's par for the course when class members are given an opportunity to object to the terms of a class settlement. "A district judge ought not try to insulate his decisions from appellate review by preventing a person from acquiring a status essential to that review." So we reverse the ad hominem decision to strike Hampe's objection as well as the decision to revoke the pro hac vice admission of her attorneys.[68]

Circuit courts routinely confirm that objectors are a pivotal part of ensuring fairness in class action settlements.[69]

This Court stated in its ruling in *Gibson* that it has "carefully considered each of the timely filed objections."[70] This statement does not appear to be accurate in light of what the Court later stated:

> After issuing the order, the Court stated on the record at the Final Settlement Hearing important reasons for requiring Objectors' in person appearance. Mr. Zaffarkhan, Mr. Wischer, Mr. Dyer, Ms. Cunningham, Mr. Douglass, Mr. Cheatham, Mr. Fender, Mrs. Fender, Mr. Friedman, Mr. March, and Mr. Mullis did not personally appear at the Final Settlement Hearing. *All Objectors who did not appear in person failed to comply with the Court's*

---

[68] In re T-Mobile Customer Data Sec. Breach Litig., 111 F.4th 849, 857–58 (8th Cir. 2024) (internal citations omitted).
[69] In re S.S. Body Armor I Inc., 961 F.3d 216, 230 (3d Cir. 2020) ("Meritorious objectors … 'play an important role' in advancing that interest [in assuring fair and adequate settlements] 'by giving courts access to information on the settlement's merits'" in situations in which "judges no longer have the full benefit of the adversarial process.'"); In re Subway Footlong Sandwich Mktg. & Sales Practices Litigation, 869 F.3d 551, 556 (7th Cir. 2017) (reversing settlement approval following objection, stating that "[i]f the class settlement does not provide 'effectual relief' to the class and its 'principal effect' is to 'induce the defendants to pay the class's lawyers enough to make them go away,' then the class representatives have failed in their duty under Rule 23 to 'fairly and adequately protect the interests of the class'") (citations omitted); Pearson v. NBTY, Inc., 772 F.3d 778, 787 (7th Cir. 2014) (reversing settlement approval, noting that "objectors play an essential role in judicial review of proposed settlements of class actions and … judges must be both vigilant and realistic in that review"); Mirfasihi v. Fleet Mortg. Corp., 551 F.3d 682, 687-688 (7th Cir. 2008), cert. denied, 129 S. Ct. 2767, 174 L. Ed. 2d 271 (2009) (acknowledging "'it is desirable to have as broad a range of participants in the [class action] fairness hearing as possible because of the risk of collusion over attorney's fees and the terms of settlement generally,' and that 'this participation is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee'"); Vollmer v. Selden, 350 F.3d 656, 660, 57 Fed. R. Serv. 3d 318 (7th Cir. 2003) (noting that objectors may "counteract any inherent objectionable tendencies by reintroducing an adversarial relationship into the settlement process and thereby improving the chances that a claim will be settled for its fair value").
[70] *Gibson* Order dated 11/04/24, at p. 17.

17

*order. Therefore, all objections filed by the above named Objectors who did not appear in person at the October 31, 2024, Final Settlement Hearing, are waived for failing to comply with the Court's order.*[71]

Far from "carefully consider[ing]" each of the timely filed objections, this Court completely disregarded the submissions of eleven objectors. Apparently, the Court believed their voices were "important" to warrant an order that is *never* made in class action litigation (an order to appear in person), but not "important" enough to actually consider.

Additionally, the Court improperly determined that class members did not comply with certain technical rules that it did not actually communicate to class members in the class notice. The notice in *Gibson* simply said that an objector must provide: "your name, address, telephone number, your signature, and the reasons you object to the Settlements."[72] Mr. Zaffarkahn,[73] for instance, did all these things. The Court somehow faults him for not buying a copy of the Federal Rules of Civil Procedure and knowing that he should also have looked at the Rule 23(e)(5)(A) parameters (such as stating whether an objection applies only to the objector or to the class). The fault lies with the parties and the Court in not including exactly what it wanted in the class notice. The fault does not lie with the objector.

Moreover, the Court holds Mr. Zaffarkahn to requirements that are completely made up *ex post facto*: "Nor does Mr. Zaffarkhan provide basic information about the homes he claims to have sold, including whether he hired a listing broker, whether the homes were listed on an MLS, or how any broker fees he paid may have been allocated among those brokers."[74] Where were all of these requirements?[75] Certainly not in the notice. The fault that the Court finds with the objection (failing to comply with requirements that were not actual requirements) strongly suggests that the voices of objectors are simply not being considered or heard. Moreover, the statement that if Mr. Zaffarkahn didn't like the settlement, "he was free to opt out . . . and retain an attorney"[76] misapprehends the role of objectors. Every objector could theoretically opt out; using the logic of "if you didn't like the settlement, you should just have opted out" would mean there's no such than as an objector anymore.

Additionally, the fact that the Court ruled from the bench at the fairness hearing makes it appear that objectors' opinions were not thoughtfully considered in the process.[77] "The Pocket Guide for Judges" in Managing Class Action Litigation describes the fairness hearing in the following terms: "Your preliminary finding is that the proposed settlement is within the range of reasonableness; that finding is not a final judgment that the proposal is fair, reasonable, and adequate as shown by evidence at the fairness hearing. *Reserve that judgment* and expect to be informed by counsel for the class and for the defendants (maybe in response to your pointed questions), and by class members, objectors, lawyers from similar litigation, or, perhaps, your own expert or special master. *Bring an inquiring mind to the fairness hearing and, as noted above, seek out the information you need* to decide whether the settlement is fair, reasonable, and adequate."[78] The fairness hearing envisioned in the Guide is very different than the

---

[71] *Id.* (internal citations omitted).

[72] *Gibson,* Class Notice.

[73] *Gibson* Order dated 11/04/24, at p. 19. I am using Mr. Zaffarian as an example, but it seems like the Court imposed requirements on all the objecting class members that were not contained in the class action notice.

[74] *Id.*

[75] If the Court believed the objector may not have been a class member, then the remedy would be asking the objector for proof of membership, not striking the objection.

[76] *Gibson* Order dated 11/04/24, at p. 21.

[77] *Gibson* Fairness Hearing Transcript ("Well, I'm going to approve the settlement, overrule all the objections. We'll issue a big order as soon as we can and get this out and thank you all for being here.").

[78] https://www.uscourts.gov/sites/default/files/classgde.pdf.

one that played out on the ground in the *Gibson* case and that seems poised to repeat itself in the related *Burnett* case.[79]

### IV.  I REQUEST THAT THE COURT CONSIDER MY WRITTEN OBJECTION AND RULE ON THIS MOTION FOR RECONSIDERATION ON THE RECORD.

In my objection, I specifically requested the ability to participate in the fairness hearing telephonically or via Zoom. Based on the lack of meaningful opportunity to be heard at the fairness hearing, I withdraw that request. Class action rules require that I present all my arguments "with specificity." I did just that. I presented twenty-seven arguments supporting my position that the injunctive and monetary relief were not fair, adequate and reasonable. I presented ten arguments challenging the 33% percent request for attorneys' fees as not being appropriate. I did so in this level of detail so that I would not be accused of failing to provide the "specificity" required. No human being is physically capable of distilling thirty-seven arguments into a two-minute soundbite.

According, I ask this Court for the following: 1) To read my submission in its entirety and to consider it as it weighs whether to approve the settlement and the attorneys' fees; and 2) To make a ruling on the record on this motion for reconsideration, with detailed factual findings to permit de novo review.[80]

## CONCLUSION

I filed this objection with pure intentions. I wanted this Court to have a full picture of how this "groundbreaking" and "historic" injunctive relief was being implemented in practice. My goal was to demonstrate that this settlement has more holes than Swiss cheese. I have amassed vast amounts of evidence that paint a very different picture than the parties will show you. I have done so not for myself, but for consumers who want to speak out but can't. Not all class members have the ability or wherewithal to participate in a process like this one. For instance, here is one of the emails I received after I filed my objection:

> I just read the summary of the objections you filed re. the Burnett case, and wanted to thank you for speaking up for everyone who can't. The settlement is egregious, I paid $18,900 in commissions when I sold my house in 2019, and I'm going to get something like $10-$20, maybe even $100? It's absurd, why even bother filling out the paperwork. It is egregious, I wish there were more conscientious objectors in the world like you. Thank you.

After this experience, I can confidently say that I will no longer choose to be that "conscientious objector" who tries to do right by other people. I followed this Court's rules. I devoted a great deal of time to presenting a compelling and evidence-based argument to the Court. I spent weekends and nights preparing this submission so that I could have a polished product in a mere three weeks' time. I drew heavily on my knowledge of contract law, consumer protection law, and the real estate industry. And all this, apparently, is not enough for the Court. Now it would like me to do *even more*—appear in person—even though it promised me that if I played by the rules, it would consider my submission.

---

[79] Counsel for NAR indicated that he was hoping to "keep this [hearing] under an hour." *Gibson* Fairness Hearing Transcript, at p. 9.

[80] § 9:94. Motion for reconsideration, generally, 3 MOTIONS IN FEDERAL COURT § 9:94 (3d ed.) ("When the District Court's denial of a motion for reconsideration is based on legal issues, the Court of Appeals reviews that determination de novo, but the District Court's factual findings are reviewed for clear error. Huber v. Simon's Agency, Inc., 84 F.4th 132, 116 Fed. R. Serv. 3d 1833 (3d Cir. 2023).").

And the reason the Court apparently wants me to appear in person is because it is "suspect" of objectors.

If the Court strikes my submission because I choose not to appear in person, it is abandoning its fiduciary responsibilities to the class. So too are class counsel and the class representatives. The Court may not ultimately agree with my position, but I have done the Court, the parties, and the industry a great service in preparing this submission. I believe the Court would be hard-pressed to find any legal academic in the United States with the ability to amass, distill, and present the Court with the information I have. If the Court chooses to throw all this away, that is on the Court.

SUBMITTED BY:


/s/


Tanya Monestier
Dated: 11/12/2024

## IN THE DISTRICT COURT OF BEAVER COUNTY
## STATE OF OKLAHOMA

|  |  |
|---|---|
| **FITZEGERALD FARMS, LLC, on behalf of itself and all others similarly situated,** | : |
|  | : |
|  | : |
|  | : |
| **Plaintiff,** | : |
|  | : |
| **vs.** | :     Case No. CJ-2010-38 |
|  | : |
| **CHESAPEAKE OPERATING, L.L.C., including affiliated predecessors and, successors,** | : |
|  | : |
|  | : |
|  | : |
| **Defendant.** | : |

### EXPERT DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN

1.      I am the Sidley Austin Professor of Law at Harvard Law School and a leading national expert on class action law and practice.  The McDonald Law Firm has retained me to provide my expert opinion on the three sets of issues currently pending before this Court: whether to certify a class in this case, approve the proposed settlement, and affirm the requested attorney's fee and incentive fee.  After setting forth my qualifications to serve as an expert (Part I, *infra*), and briefly describing the underlying litigation (Part II, *infra*), I express the following three expert opinions:

- ***The class cannot be certified***. (Part III, *infra*).  The Oklahoma Court of Civil Appeals held that a class cannot be certified in this case because the putative class members' claims do not share common issues with respect to liability or damages and because a class action is not a superior form of litigation.[1]  The United States Supreme Court held in the *Amchem* case that the Rule 23 requirements "demand undiluted, *even*

---

[1] *Fitzgerald v. Chesapeake Operating, Inc.*, 2014 WL 813861 (Okla. Civ. App. Feb. 14, 2014).

1

*heightened*, attention in the settlement context."[2] What this means is that (with one inapplicable exception) if a class cannot be certified for trial it cannot be certified for settlement. Since the Court of Civil Appeals has already ruled that this class cannot be certified for trial, it therefore cannot be certified for settlement. The only apparent justification the proponents of the settlement offer is that the settlement itself provides a common issue among the class members – but this is the precise argument the Supreme Court adjudicated and rejected in the *Amchem* case.

- **The settlement is not fair, adequate, and reasonable.** (Part IV, *infra*). Since the Oklahoma Court of Civil Appeals held that the class members do not have common claims, the *pro rata* distribution scheme – which treats them all as if they did – necessarily creates conflicts of interest, disfavoring those with better claims to the advantage of those with weaker claims. That inherent conflict renders the settlement not fair across the whole class and disables one class representative and one set of counsel from representing the whole proposed class. Worse, the settlement bears all of the hallmarks of a reverse auction. Absent class members have two alternative forms of adjudication available to them – individual representation by the McDonald Law Firm and others or this proposed settlement. The defendant likely settled with these lawyers only because it was the cheapest alternative. Putative class counsel had no bargaining leverage in negotiating the settlement since – having failed to secure class certification – they could not pursue the case if the negotiation failed. This rendered them the least effective counsel with whom to negotiate a settlement – indeed, they were counsel with but one client. Yet, putative class counsel simultaneously bargained for an extraordinarily high fee for themselves (see below) and included a disfavored "clear sailing agreement" in the settlement. Putative class counsel then attempted to insulate the settlement from scrutiny by, *inter alia*, requiring class members seeking to object to appear personally in Beaver, Oklahoma – a practice unheard of in class action law and one declared both unconstitutional and anathema to class action practice in the only case directly on point. These facts not only doom the settlement but render putative class counsel inadequate to represent the proposed class, as well.

- **The requested attorney's fee and incentive awards are not reasonable.** (Part V, *infra*). Putative class counsel seek 40% of $119 million, or $47.5 million in fees. The percentage they seek is more than twice the normal percentage for a settlement of this magnitude. They have provided the Court no information about how much time they have spent on the case and their hourly rates (their lodestar), despite Oklahoma's requirement that they do so.[3] While the absence of time records makes a lodestar

---

[2] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (emphasis added).

[3] *State ex rel. Burk v. Oklahoma City*, 598 P.2d 659, 663 (Okla. 1979) (holding, in common fund case, that "[h]ereafter, attorneys in this state should be required to present to the trial court detailed time records showing the work performed and offer evidence as to the reasonable value for the services performed for different types of legal work."); Okla. Stat. Ann. tit. 12, §

2

cross-check impossible, it is fair to assume that the $47.5 million is about 20 times counsel's lodestar. This is so because this case involved very little litigation. What litigation there was, putative class counsel lost. Putative class counsel's request for a fee – and bonus – of this magnitude in these circumstances is clearly excessive. The requested incentive award of $357,000 is as well; the normal incentive award in class action lawsuits is between $15,000-20,000. The fee and incentive awards must be rejected. The very pursuit of these exorbitant amounts *of the class's money* renders putative class counsel inadequate to represent the class.

In short, every motion pending before this Court fails: the class cannot be certified consistent with the Oklahoma Court of Civil Appeals' ruling in this case and the Supreme Court's holding in *Amchem*; the settlement cannot be approved given all of the indications that it is a collusive settlement and all of the class action rules that it violates; and the proposed attorney's fees and incentive awards are too excessive to be approved, particularly in light of the amount of work undertaken here, most of which was unsuccessful. Put simply, this is the type of case that drives criticisms of the class action mechanism: putative class counsel seek for themselves and their sole client truly stunning rewards – nearly $50 million – for settling a case that the Oklahoma appellate courts had ruled that they were not even permitted to litigate in the aggregate. The problems here are so apparent and so manifest that discharging this Court's legal responsibility to safeguard the interests of absent class members[4] should be straightforward: the Court must reject the certification, settlement, and fees.

---

2023(g)(4) (requiring court in "arriving at a fair and reasonable fee for class counsel" to "consider . . . (1) time and labor required").

[4] Okla. Stat. Ann. tit. 12, § 2023(g)(4) ("[T]he court shall act in a fiduciary capacity on behalf of the class . . . ."). *See generally*, WILLIAM B. RUBENSTEIN, 4 NEWBERG ON CLASS ACTIONS § 13:40 (5th ed. 2014) (herineafter "*Newberg on Class Actions*").

3

# I.
## BACKGROUND AND QUALIFICATIONS[5]

2.      I am the Sidley Austin Professor of Law at Harvard Law School.  I graduated from Yale College, *magna cum laude*, in 1982 and from Harvard Law School, *magna cum laude*, in 1986.  I clerked for the Hon. Stanley Sporkin in the U.S. District Court for the District of Columbia following my graduation from law school.  Before joining the Harvard faculty as a tenured professor in 2007, I was a law professor at UCLA School of Law for a decade, and an adjunct faculty member at Harvard, Stanford, and Yale Law Schools while a litigator in private practice during the preceding decade.  I am admitted to practice law in the Commonwealth of Massachusetts, the State of California, the Commonwealth of Pennsylvania (inactive), the District of Columbia (inactive), the U.S. Supreme Court, five U.S. Courts of Appeals, and four U.S. District Courts.

3.      My principal area of scholarship is complex civil litigation, with a special emphasis on class action law.  I am the author, co-author, or editor of five books and more than a dozen scholarly articles, as well as many shorter publications (a fuller bibliography appears in my c.v., Exhibit A).  Much of this work concerns various aspects of class action law.  I am the sole author of the leading national treatise on class action law, *Newberg on Class Actions*.  For five years (2007-2011), I published a regular column entitled "Expert's Corner" in the publication *Class Action Attorney Fee Digest*.  My work has been excerpted in casebooks on complex litigation, as noted on my c.v.

4.      My expertise in complex litigation has been recognized by judges, scholars, and lawyers in private practice throughout the country for whom I regularly provide consulting

---

[5] My full c.v. is attached as Exhibit A.

advice and educational training programs. For the last five years, the Judicial Panel on Multidistrict Litigation has invited me to give a presentation on the current state of class action law at the annual MDL Transferee Judges Conference. The Ninth Circuit recently invited me to moderate a panel on class action law at the 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop. The American Law Institute selected me to serve as an Adviser on a Restatement-like project developing the *Principles of the Law of Aggregate Litigation*. In 2007, I was the co-chair of the Class Action Subcommittee of the Mass Torts Committee of the ABA's Litigation Section. I am on the Advisory Board of the publication *Class Action Law Monitor*. I have often presented continuing legal education programs on class action law at law firms and conferences.

5.     My teaching focuses on procedure and complex litigation. I regularly teach the basic civil procedure course to first-year law students, and I have taught a variety of advanced courses on complex litigation, remedies, and federal litigation. I have received honors for my teaching activities, including: the Albert M. Sacks-Paul A. Freund Award for Teaching Excellence, as the best teacher at Harvard Law School during the 2011-2012 school year; the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law during the 2001-2002 school year; and the John Bingham Hurlbut Award for Excellence in Teaching, as the best teacher at Stanford Law School during the 1996-1997 school year.

6.     My academic work on class action law follows a significant career as a litigator. For nearly eight years, I worked as a staff attorney and project director at the national office of the American Civil Liberties Union in New York City. In those capacities, I litigated dozens of cases on behalf of plaintiffs pursuing civil rights matters in state and federal courts throughout

the United States; I also oversaw and coordinated hundreds of additional cases being litigated by ACLU affiliates and cooperating attorneys in courts around the country. I therefore have personally initiated and pursued complex litigation, including class actions.

7.     I have been retained as an expert witness in roughly 50 class action cases and as an expert consultant in about another 20 cases. These cases have been in state and federal courts throughout the United States, including many MDL proceedings. I have been retained to testify as an expert witness on issues ranging from the propriety of class certification to the reasonableness of settlements and fees. I have been retained by counsel for plaintiffs, for defendants, and for objectors.

8.     I have been retained in this case to provide an opinion concerning the issues set forth in the first paragraph above. I am being compensated for providing this expert opinion. My compensation was in no way contingent upon the content of my opinion.

9.     In analyzing these issues, I have discussed the case with the counsel who retained me. I have also reviewed documents from this and related litigations, a list of which is attached as Exhibit B. I have also reviewed the applicable case law and scholarship on the topics of this Declaration.

10.     This is an action for underpaid oil and gas royalties.

11.     Plaintiff originally filed this putative class action on November 29, 2010.  The complaint alleged that the defendant was underpaying royalties owed to Oklahoma royalty holders and stated causes of action for breach of lease, unjust enrichment, an accounting, fraud, deceit, and constructive fraud.  Much of the issue in the case concerns what costs defendant is entitled to deduct from royalties according to various contracts with the royalty owners and the governing legal framework.

12.     Defendant denied the plaintiff's claims and asserted "that the class proposed included 75,000 leases with varying terms covering 1,100 fields in which gas is of varying quality and therefore requires varying amounts of gathering, compression, dehydration, treatment and processing to bring it to market."[7]  According to the defendant, this meant that the types of costs that were properly deducted from royalties varied significantly across the proposed class. The defendant also alleged other differences among the putative class members.

13.     The parties engaged in some discovery.  Plaintiff served one request for documents in 2011, one request for documents in 2012, and two unanswered requests for documents in 2014.  Putative class counsel avers that his team "took a number of key

---

[6] The facts in this section are culled from the documents listed in Exhibit B.

[7] *Fitzgerald*, 2014 WL 813861, at *1.

depositions"[8] without specifying the quantity thereof, though identifying a total of five with specificity,[9] and he states that defendant produced 52,000 documents.

14. Plaintiff moved for class certification on April 17, 2012, seeking certification of a statewide class of Chesapeake royalty owners. This Court heard the motion in September 2012, and by order dated February 11, 2013, certified a class.

15. Defendant appealed.

16. In an order dated February 14, 2014, the Oklahoma Court of Civil Appeals reversed. The appellate court found three attributes of Rule 23 lacking, holding that issues of [1] liability and [2] damages were not common across the class, as required by Rule 2023(a)(2), and [3] that a class action was not a superior method of adjudication, as required by Rule 2023(b)(3). The core of the court's holding is summarized in its conclusion:

> Our review of the record shows a class action is not the superior method of adjudicating these claims due to two material questions which will have to be proved individually: whether a particular lease allows some or all GCDTP costs to be born by the royalty owners and at what point the gas in a particular field or gathering system is marketable (and therefore what GCDTP services and costs are necessary and whether they may be passed on to the royalty owner). The question of liability is not common to the whole class, and counsel essentially conceded the question of damages was not common to the whole class. If a class proceeding would require thousands of mini trials on the questions of liability and damages, it is difficult to perceive what might be accomplished by class certification.[10]

---

[8] Declaration of Rex A. Sharp in Support of Incentive Award, Attorney's Fees and Expenses ¶ 22 (March 24, 2015) (hereinafter "Sharp Dec.").
[9] *Id.* at ¶¶ 23-26.
[10] *Fitzgerald*, 2014 WL 813861, at *6.

8

In support of these conclusions the appellate court affirmatively cited two recent Tenth Circuit cases denying certification on commonality grounds[11] and the United States Supreme Court's decision in the *Wal-Mart* case,[12] similarly denying certification on commonality grounds.

17.    On March 6, 2014, plaintiff asked the Oklahoma Supreme Court to review the Court of Civil Appeals' Opinion.  On June 2, 2014, the high Court denied the petition, while withdrawing the appellate court decision from publication.

18.    The appellate courts remanded the case to this Court with the mandate that class certification be reversed on July 14, 2014.

19.    Following remand, the docket reflects but one activity:    an agreed-upon scheduling order entered on September 23, 2014.

20.    On January 5, 2015, the plaintiff filed a motion for preliminary approval of a class-wide settlement.  Therein, the plaintiff reports that it entered settlement negotiations with the defendant in early 2014 and mediated in 2014 with the assistance of a professional mediator, ultimately accepting the "mediator's number" of $119 million late December 2014.

21.    One day after the filing of the preliminary approval papers, on January 6, 2015, the Court signed the preliminary approval order, noting there that it did so, "after hearing argument of counsel, and being fully and sufficiently advised."[13]

---

[11] *Id.*at *5 (citing *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013) and *Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 Fed. App'x 938 (10th Cir. 2013)).

[12] *Id.* at *5 (citing *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)).

[13] Preliminary Approval Order at 2.

9

22.     The Preliminary Approval Order provided, as its name suggests, *preliminary* approval for the proposed settlement, and it awarded "conditional certification" to the Settlement Class.[14]

23.     This Preliminary Approval Order sets a fairness hearing for April 17, 2015, at 9:30 a.m. at the Beaver County Courthouse.

24.     The Preliminary Approval Order requires that any putative class member who wishes to object to the settlement must, by April 1, 2015, file a notarized written objection that avers, *inter alia*, that the "objector shall appear at the Settlement Fairness Hearing in person."[15]

25.     On March 24, 2015, one week before the deadline for objections or opt outs, putative class counsel filed a motion for attorney's fees, costs, and an incentive award for the putative class representative.

## III.
## THE CLASS CANNOT BE CERTIFIED

26.     As noted above, this Court certified a class in this matter on February 11, 2013. The class was defined as:

> All persons who are or were royalty owners in Oklahoma wells since January 1, 2004 to the present where Chesapeake Operating, Inc., including its predecessors or affiliates, is or was the operator (or, as a non-operator separately marketed gas). The Class Claims relate only to royalty payment for gas and its constituents (helium, residue gas, natural gas liquids, nitrogen and condensate) produced from the wells. The Class does not include overriding royalty owners or other owners who derive their interest through the lessee.[16]

---

[14] *Id.* at 3.
[15] *Id.* at 5.
[16] *Fitzgerald*, 2014 WL 813861, at *2.

10

The defendant appealed and the Oklahoma Court of Civil Appeals reversed, holding that a class could not be certified.[17]  The appellate court ruled that *neither* the liability nor the damages issue met the commonality requirement of Rule 2023(a)(2) *and* that litigation as a class action was not a superior method of adjudication, as required by Rule 2023(b)(3).[18]

27.     Although no motion for final class certification has been filed and the Court has only *conditionally* certified a settlement class, the settling parties would appear to be proposing that the Court finally certify a class for settlement purposes.[19]  The class is defined as:

> All persons who are or were royalty owners in Oklahoma wells from January 1, 2004-December 31, 2014, where Chesapeake Operating, L.L.C., formerly known as Chesapeake Operating, Inc., including its predecessors or affiliates, is or was the operator or is or was a working interest owner who marketed its share of the gas.  The Class claims relate to royalty payment for gas and its constituents (such as helium, residue gas, natural gas liquids, nitrogen, and condensate) produced from the wells. The Class does not include overriding royalty owners or other owners who derive their interest through the lessee.[20]

28.     As is evident, the definition of the class now proposed for settlement purposes is the same as the definition of the proposed class that the Oklahoma Court of Civil Appeals previously rejected on commonality and superiority grounds.

29.     The United States Supreme Court held, in the *Amchem* case, that when parties propose a class for settlement purposes, the same requirements of Rule 23 apply *with heightened*

---

[17] *Id.*

[18] *Id.* at *6.

[19] The class notice misrepresents the class as having been certified, not conditionally certified, although the short form (one page) notice correctly characterizes the situation as involving a "proposed settlement class."

[20] Settlement Agreement at ¶ 1.24.

*attention*, except for the requirement that a trial be "manageable."[21]  Specifically, the Court stated:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.  But other specifications of the Rule . . . demand undiluted, even heightened, attention in the settlement context.[22]

30.  The application of the Supreme Court's decision in *Amchem* to the certification proposed here is simple, straightforward, and inescapable:  the class cannot be certified.[23]  If, as the Oklahoma Court of Civil Appeals has here held, the class lacks common issues concerning liability and damages, then applying the required "undiluted, even heightened, attention" to those questions at settlement means that the class lacks common issues now *even more* than it did at the trial stage.[24]

---

[21] *Amchem*, 521 U.S. at 620.

[22] *Id.* (internal citation omitted).

[23] The *Amchem* case interpreted Rule 23 of the Federal Rules of Civil Procedure, but the Oklahoma courts regularly turn to federal class action law in interpreting the Oklahoma class action rule, as the appellate court did in this case in relying on the Supreme Court's *Wal-Mart* decision and two Tenth Circuit cases in denying class certification.  *See Fitzgerald*, 2014 WL 813861, at *5 (citing *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc*., 725 F.3d 1213 (10th Cir. 2013); and *Chieftain Royalty Co. v. XTO Energy, Inc*., 528 Fed. App'x 938 (10th Cir. 2013)); *see also Burgess v. Farmers Ins. Co*., 151 P.3d 92, 98 (Okla. 2006) ("The requirements for certifying a class set forth in 12 O.S. § 2023 mirror those set forth in Rule 23 to the Federal Rules of Civil Procedure, and we may look to federal authority in interpreting our own class certification statute."); *Black Hawk Oil Co. v. Exxon Corp.*, 969 P.2d 337, 342-43 (Okla. 1998), as amended on denial of reh'g (Dec. 17, 1998) ("The requirements for certifying a class are set forth in § 2023, which  is identical to Rule 23 Federal Rules of Civil Procedure in all respects material to this appeal.  We may look to federal authority in interpreting § 2023.").

[24] The fact that the Oklahoma Supreme Court ordered the depublication of the Court of Civil Appeals' decision in no way alters the binding effect of that decertification order *on this case*. Okla. Sup. Ct. R. 1.200(c)(5) (holding that unpublished opinions may be cited "to support a claim of res judicata, collateral estoppel, or law of the case").

12

31.     This Court's order preliminarily certifying a class for settlement purposes states that:   "The Court finds that Plaintiff, [a] as a result of the Settlement Agreement and for purposes of settlement, [b] through the existing extensive record, has satisfied [the requirements] for conditional certification of the Settlement Class . . ."[25]  The two clauses set off by the letters [a] and [b] appear to imply that these conditions make the certification decision somehow different than it was at the time the Oklahoma Court of Civil Appeals rejected certification. Neither clause can perform that magic though, as the first is legally, and the second factually, inaccurate.

- Clause [a] states that the certification requirements might now be met "as a result of the Settlement Agreement and for purposes of settlement."  This is precisely the argument the Supreme Court reviewed and rejected in the *Amchem* case.  The Court noted a split among the lower courts, with the Third Circuit holding that "a class cannot be certified for settlement when certification for trial would be unwarranted,"[26] while other circuits had "held that settlement obviates or reduces the need to measure a proposed class against the enumerated Rule 23 requirements."[27]  The Court squarely sided with the Third Circuit,[28] holding that the specifications of Rule 23 – other than the trial manageability requirement – are "designed to protect absentees by blocking unwarranted or overbroad class definitions,"[29] and that each of these Rule 23 requirements "demand undiluted, even heightened, attention in the settlement context."[30]  The Court further noted that Rule 23(e)'s requirement that a class action settlement be fair, adequate, and reasonable is "an additional requirement, not a superseding direction, for the 'class action' to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b)."[31]  And thus the Court concluded:  "Federal courts . . . lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper."[32]  So too here.

---

[25] Order Preliminarily Approving Class Settlement, Approving Notice to Class Members and the Plan of Notice, and Setting Dates for Settlement Fairness Hearing 3 (Jan. 6, 2015).
[26] *Amchem*, 521 U.S. at 618.
[27] *Id.* at 618.
[28] *Id.* at 622 ("[W]e conclude that the Third Circuit's appraisal is essentially correct.").
[29] *Id.*.at 618.
[30] *Id.* at 620.
[31] *Id.* at 621.
[32] *Id.* at 622.

13

The proposed settlement can legally add nothing to the *class certification* requirements: if those requirements were not met prior to settlement, they are not met because of the settlement.[33]

- Clause [b] might be read to imply that there is now an "existing extensive record" that perhaps creates changed circumstances enabling certification. I reviewed the Docket Sheet in this matter. There is not a single entry of any litigation activity whatsoever on the Docket Sheet between the remand (July 14, 2014) and the Motion for Preliminary Approval of Class-wide Settlement (January 5, 2015), except for one scheduling order. There has never been an "extensive record" in this case but there is surely no "extensive record" since the Oklahoma Court of Civil Appeals explicitly ordered this court to de-certify the class. There are therefore no changed circumstances that would justify flouting the clear mandate of the appellate court that this class not be certified.

32.    In sum, the Oklahoma Court of Civil Appeals held in this very case that the proposed class lacks the glue necessary for class certification. The plaintiff attempts to argue that the proposed settlement provides that glue. However, the United States Supreme Court rejected just this argument in the *Amchem* case. The class can, therefore, no more be certified for settlement than it could have been certified for trial.

33.    The situation is actually worse here than just recited. As outlined in the succeeding sections, neither the single proposed class representative nor putative class counsel can represent the single proposed class, and both the putative class representative and putative class counsel are inadequate for a host of other reasons. These facts add additional bases to those already affirmed by the Oklahoma Court of Civil Appeals as to why this class cannot be certified.

---

[33] The few cases in which a case has been certified for settlement after having been denied certification for trial tend to have been ones in which trial manageability problems precluded certification, a problem that the *Amchem* court stated would not block certification for settlement. *See* 3 *Newberg on Class Actions, supra* note 4, § 7:35 n.15. In this case, the Court of Civil Appeals unambiguously held that the class failed for a lack of commonality and superiority, not on manageability grounds.

14

34.     Because the class cannot be certified, the Court need not even consider the merits of the proposed class settlement:  denial of certification alone sinks a proposal for a classwide settlement.

## IV.
## THE PROPOSED SETTLEMENT SHOULD BE REJECTED

35.     The Federal Judicial Center's *Manual for Complex Litigation, Fourth*, the basic resource guide for federal judges overseeing class action lawsuits, instructs federal judges that "[t]here are a number of recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements," and then specifically enumerates nine (9) such concerns.[34]  While any one such concern is troubling, this settlement raises at least five such red flags (described in the following five sub-sections), each of which independently argues for rejecting the proposed settlement.

A.     The Settlement Bears All of the Hallmarks of a Collusive Reverse Auction

36.     The first, and over-arching, red flag that the *Manual* cautions against is that the defendant has conducted a "reverse auction."[35]  The Federal Judicial Center's *Pocket Guide* instructs that a:

> "Reverse auction" is the label for a defendant's collusive selection of the weakest attorney among a number of plaintiff attorneys who have filed lawsuits dealing with the same subject matter; in other words, a reverse auction is the "sale" of a settlement to the lowest bidder among counsel for competing or overlapping classes. [36]

The *Guide* explains that "[d]etermining whether a reverse auction might have occurred requires information about all litigation, in state as well as federal courts, dealing with the subject matter of the dispute."[37]  And the *Pocket Guide* explicitly warns that "[a] typical element of a reverse

---

[34] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.61 (2004) (hereinafter "*Manual*").

[35] *Manual*, *supra* note 34, at § 21.61.

[36] BARBARA J. ROTHSTEIN & THOMAS E. WILLGING, FEDERAL JUDICIAL CENTER, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES 21 (3d ed. 2010) (hereinafter "*Pocket Guide*").

[37] *Id.*

15

auction is a promise to pay attorneys more than a reasonable value for the time they invested in negotiating the settlement."[38]  Courts have similarly noted that "there are incentives for defendants to settle with the most ineffective plaintiffs' attorneys and for plaintiffs' attorneys to sell out the class in return for generous fees."[39]

37.    The following facts support the conclusion that the defendant engaged in a reverse auction and that the proposed settlement is therefore an unfair compromise of the true value of the class's claims:

- The defendant had succeeded in having the class certification ruling reversed in the appellate court.  That means the defendant had won the case – denial of class certification is the "death knell" of a class action.[40]  The only claim left on the table following the appellate court's ruling was the single claim of the putative class representative, now an individual plaintiff following de-certification.

- As the defendant had won the case, the question arises:  why would it pay $119 million to settle a case it won?  The only logical answer to that question is that the $119 million it paid to settle here must have been less than the liability it might have faced had it not settled here and gained the preclusive effect of the class action.

- How might Chesapeake have faced greater liability?  As the Court is aware, the McDonald Law Firm is actively pursuing significant individual litigation against Chesapeake in Texas, Pennsylvania, and Oklahoma.  Indeed, the McDonald Law Firm's papers filed herein state that the firm has been "engaged by approximately 10,000 Chesapeake royalty owners throughout the country suing Chesapeake for underpayment of royalties."[41]

---

[38] *Id.*

[39] *Consumer Advocacy Grp., Inc. v. Kintetsu Enters. of Am.*, 141 Cal. App. 4th 46, 50 n.2 (Cal. Ct. App. 2006) (citing *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002)).

[40] *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469-70 (1978) ("The 'death knell' doctrine assumes that without the incentive of a possible group recovery the individual plaintiff may find it economically imprudent to pursue his lawsuit to a final judgment and then seek appellate review of an adverse class determination.").  For a discussion of the doctrine, see 3 *Newberg on Class Actions, supra* note 4, at § 7:44.

[41] Non-Party The MacDonald Law Firm's Response in Opposition to Motion for Temporary Restraining Order and Temporary Injunction and Brief in Support at 8 (Feb. 20, 2015).

16

- Obviously, the defendant is fully aware of the McDonald Law Firm's litigation activities and may well have concluded that the possible outcome of those litigations in Oklahoma exceed the $119 million it offered here.

- Similarly, it is likely that putative class counsel were aware of the McDonald Law Firm's individual cases. Nonetheless, with but one individual client – and a Court of Civil Appeals decision barring aggregate litigation – putative class counsel proceeded to negotiate a proposed class-based settlement with the defendant.

- In negotiating this settlement, putative class counsel had absolutely no leverage: they could not threaten to go to trial if the settlement fell through as the Oklahoma appellate court held that they were not permitted to represent this class in this case. The Supreme Court explicitly noted this problem in the *Amchem* case, relying on it as one of the bases for insisting that the class certification requirements must be met even for settlement classes; otherwise, the Court held "[c]lass counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer."[42] Other courts have reached similar conclusions in similar circumstances.[43]

- Because putative class counsel had no bargaining power – other than the threat of continued litigation by the McDonald Law Firm – all they could do was essentially threaten the defendant with that collateral litigation possibility if it did not settle with them.

- The defendant knew full well that if putative class counsel did not settle a class suit with it, putative class counsel would garner no fees. So almost any settlement it proposed would be better for putative class counsel than the negligible fee those counsel might have received in litigating on behalf of their one individual client – in

---

[42] *Amchem*, 521 U.S. at 621 ("[I]f a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, and the court would face a bargain proffered for its approval without benefit of adversarial investigation." (citing, *inter alia*, John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1379 (1995))).

[43] *See, e.g., Smith v. Sprint Commc'ns Co.*, 387 F.3d 612, 614 (7th Cir. 2004) (citation omitted) (rejecting settlement on adequacy grounds because the court had held that the class could not be certified and therefore class counsel "entered negotiations in what the *Amchem* court describes as a 'disarmed' state, unable to 'use the threat of litigation to press for a better offer,'—not a good position from which to represent the interests of parties that do wield such a threat" (quoting *Amchem*, 521 U.S. at 621))); *Epstein v. MCA, Inc.,* 126 F.3d 1235, 1250 (9th Cir. 1997), *opinion withdrawn and superseded on reh'g*, 179 F.3d 641 (9th Cir. 1999) (rejecting binding effect of prior class action settlement on grounds class was not adequately represented since class counsel settled claims they could not have litigated).

17

other words, putative class counsel would have been receptive to most any settlement offer.

- But that is precisely the definition of the reverse auction: putative class counsel "sold" the class's claims to the defendant at a price below which the individuals could have recovered through the McDonald Law Firm's processes or other individual representations. The proposal is a win/win situation in that, if approved, putative class counsel will secure a startlingly high fee for itself and the defendant will settle the whole class's claims on the cheap.

- Indeed, the reverse auction conclusion is buttressed by the proposed fee which is, as the Federal Judicial Center warns it might be in a reverse auction, "more than a reasonable value for the time [counsel] invested in negotiating the settlement."[44]

38. The reverse auction conclusion is inescapable: there is no other logical reason for the defendant to have settled a case it had already won.[45]

B. The Settlement's *Pro-Rata* Distribution Scheme Creates Conflicts of Interest Among the Class Members

39. The *Manual for Complex Litigation* cautions judges to be on the lookout for settlements that "treat[] similarly situated class members differently."[46] The corollary problem is, of course, settlements that treat dissimilarly situated class members as if they were similarly situated.

---

[44] *Pocket Guide*, *supra* note 36, at 21.

[45] There is some possibility that the parties herein worked out some global deal involving this case and a parallel case pending in federal court in Kansas, *Arkalon Grazing Assoc. v. Chesapeake Operating, Inc.,* No. 6:09-cv-01394 (D. Kan.). *See* Sharp Declaration at ¶¶ 3-11 (discussing parallel litigation). This prospect seems plausible as that case was, coincidentally, stayed on the same exact day the settlement in this case was preliminarily approved, *Arkalon* Dkt. # 287, although the Docket in the case reveals no motion seeking that stay and although the factual basis of the federal court's stay (that an issue was awaiting resolution in Kansas state court) had existed for more than a year when the stay was entered. The parties have not apprised this Court of any such global agreement despite a legal obligation to do so if such an agreement exists, Okla. Stat. Ann. tit. 12, § 2023(e)(3) (requiring settling parties to "file a statement identifying any agreement made in connection with the [settlement] proposal"), and, of course, such a deal trading the rights of one class for the rights of another would be prohibited by class action law. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 854-59 (1999).

[46] *Manual*, *supra* note 34, at § 21.61.

18

40.     This proposed settlement agreement treats all class members as if they are similarly situated by dividing up the common fund on a *pro rata* basis.

41.     The Oklahoma Court of Civil Appeals' decision, binding on this Court, holds that the class members are not similarly situated.  Indeed, the appellate court denied certification on this very ground, noting that there were not common issues of liability or damages among the class because of different contracts governing different royalties and different issues generated therefrom.

42.     A necessary consequence of the fact that class members have different royalty contracts that raise different legal and factual issues is that some of these class members are more likely to succeed on the merits of their claims and/or likely to collect more money if and when they do while other class members have less strong claims.

43.     By treating all claims equally, the proposed settlement disadvantages class members with more valuable claims and advantages class members with less valuable, or zero-dollar claims.

44.     The proposed settlement is therefore not fair, adequate, and reasonable to class members with stronger claims – it sells their claims on the cheap so as to provide some relief to the rest of the royalty holders and thereby provide the defendant the global peace that a class action settlement delivers.

45.     The settlement should be rejected for failing to meet the fair, adequate, and reasonable standard.

46.     The conflict among the class that is created by the *pro rata* settlement structure also has ramifications for class certification:  an internally-conflicted class cannot be represented by a single class representative[47] or a single group of attorneys.[48]

C.     The Settlement's Procedures Place Artificial and Unconstitutional Hurdles in the Path of Class Member Objections

47.     The *Manual for Complex Litigation* cautions judges to look out for settlements that "impos[e] strict eligibility conditions or cumbersome claims procedures."[49]  This proposed settlement process has at least three such requirements:  that objectors appear in person at the fairness hearing in Beaver, Oklahoma; that objectors post a 5% bond if they seek to appeal the denial of their objections; and that objectors respond to the proposed certification and settlement without the filing of formal motions and supporting documentation and to the proposed fee petition only seven days after its filing and without the necessary supporting documentation.

*The Objector Appearance Requirement*

48.     This Court's preliminary approval order and the Notice in this case both declare that class members who wish to object to the settlement file a written statement that "must contain . . . a statement that the objector will appear at the Settlement Fairness Hearing in person."[50]  This requirement does not appear in the parties' settlement agreement and hence

---

[47] *Amchem*, 521 U.S. at 625-26.
[48] 1 *Newberg on Class Actions, supra* note 4, at § 3:75.
[49] *Manual, supra* note 34, at § 21.61.
[50] The Preliminary Approval Order states the class members may appear by counsel, but the allowance of counsel provision does not supplant the personal appearance requirement. Similarly, at the settlement website, in response to the question "How do I object to the Proposed Settlement?," class members are informed that they must file a written statement that "must contain" a "statement that the objector will appear at the Settlement Fairness Hearing in person" and that if they fail to file such a statement they "will not be considered an objector the Settlement."  Yet on the same page of the settlement website, another question appears saying

20

appears to have been added by putative class counsel in creating the notice and in proposing the preliminary approval order.

49.     Prior to reviewing this settlement, in nearly 30 years of practicing, teaching, and writing about complex litigation, I had never seen a provision requiring class members to appear personally at a fairness hearing so as to register an objection to a proposed settlement.  So surprised was I by this requirement that I asked my research assistant to undertake an informal empirical investigation – namely, I instructed her to find 50 class action settlements and to look for such a provision in each.  My research assistant's results, appended as Exhibit C, disclosed not a single case in which such a requirement has appeared.  Indeed, what she found is precisely the opposite:  that it is quite common in class actions to inform class members that they do ***not*** need to appear at the fairness hearing.

50.     The case law is similarly sparse.  I could identify only a few cases discussing an objector appearance requirement[51] and most of those cases involved counsel herein.  There are two reported decisions on point:

a.     In *Hershey v. ExxonMobil Oil Corp.*, the only federal case directly on point that I could identify, the court disposed of the Due Process challenge in one sentence and with one citation, stating:

_____

"Do I have to come to the hearing?," the notice instructs class members:  "No. Subject to the conditions set forth in the question 'How do I Object to the Proposed Settlement?,' above, you have the right to retain your own attorney to represent you at the Settlement Fairness Hearing." The phrase "subject to the conditions set forth in the [prior] question" references the fact that the objector must state that she will appear.  Therefore, the appearance requirement is inescapable.

[51] Two circuits have held that it does not violate the Due Process Clause to require *either* the objector *or* a representing attorney to appear at the fairness hearing.  *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 266 (2d Cir. 2011); *Spark v. MBNA Corp.*, 48 F. App'x 385, 391 (3d Cir. 2002).  However, neither case addressed the more specific question of whether it would violate Due Process to insist that the objector herself appear in person.

21

> [C]ourts have specifically approved the requirement that an objector seeking to thwart a proposed class-wide settlement submit to deposition . . . and personally attend the fairness hearing. *Freebird, Inc. v. Cimarex Energy*, 264 P.3d 500, 506 (Kan. 2011).[52]

The single case the court cited – a Kansas state case, *Freebird* – does not actually support the principle for which it is cited, as there is no discussion in that case whatsoever of a challenge to an objector appearance requirement. Putative class counsel herein were class counsel in *Hershey* and in *Freebird* and hence were responsible for the objector appearance requirement in both of those cases, as well as for the argument in *Hershey* that *Freebird* supported an objector appearance requirement.[53]

      b.    In the only case to actually address this issue head on, a California state court found the practice unconstitutional ***and*** an abuse of the class action process as it undermined the court's capacity to review the settlement by stifling opposition thereto; the court accordingly reversed a lower's court settlement approval, stating:

> As explained by a leading treatise on class actions, "[i]t is unnecessary for objectors to appear personally at the settlement hearing in order to have their written objections considered by the court." (Newberg, Class Actions (4th ed. 2013) § 11:56.) . . . Requiring class members in a nationwide class or even a statewide class to appear at the final approval hearing or hire an attorney to have their objections heard works a hardship on objectors, as the benefit to the objector from the class action may be so low that it

---

[52] *Hershey v. ExxonMobil Oil Corp.,* 2012 WL 5306260, at *3 (D. Kan. Oct. 26, 2012), *aff'd in part, dismissed in part*, 550 F. App'x 566 (10th Cir. 2013).

[53] Putative class counsel also included an objector appearance requirement in the notice of a class action case that they recently co-counseled with this Court. *Hitch Enters., Inc., v. Cimarex Energy Co.*, No. 5:11-cv-00013-W (W.D. Okla.). In preliminarily approving the proposed settlement, the judge in that case amended the language in the proposed preliminary approval order (which had sought to require objectors to appear) to specifically state that objectors could "appear at the Settlement Fairness Hearing, either in person or through separate counsel." *Compare* Proposed Order for Preliminary Approval of Settlement at 7 (Dkt. #82-1), *with* Order Conditionally Certifying Settlement Class, Preliminarily Approving Class Action Settlement and Approving Form and Manner of Notice at 7 (Dkt. #83). Nonetheless, the parties issued the notice with the objector appearance requirement in it. Notice of Proposed Settlement of Class Action at 7 (Dkt. #84-1).

would be cost prohibitive or physically challenging to personally assert one's rights at a hearing in a potentially distant location. For example, here appellant indicated he was unable to attend the hearing because it was prohibitively expensive for him to do so as an out-of-state class member. In contrast, if an objector is permitted to file written objections to be considered, the burden on the court to review them is minimal and the cost to the parties remains the same. ***Requiring any objector to attend the final approval hearing does not offer a meaningful opportunity to be heard, and therefore violates class members' due process rights***.

Adherence to these principles directly impacts the trial court's role in determining if the settlement is fair. That determination requires that the trial court balance several factors, which include, among others, class member reactions to the proposed settlement, which the trial court cannot accurately evaluate when members' objections may have been stifled by the onerous requirement that they attend the final approval hearing. Although appellant was afforded the opportunity to be heard, there may have been many class members whose objections were chilled. Misstating objectors' rights such that they are dissuaded from exercising their opportunity to be heard does not fairly apprise class members of their options associated with the settlement. For these reasons, the order granting final approval of the settlement must be reversed.[54]

51.     The Oklahoma class action rule states, without qualification, that "[a]ny class member may object to the proposal if it requires court approval under this subsection."[55] That Rule does not require class members to appear at a fairness hearing to file an objection.

52.     The 2010 United States Census lists the 10 largest cities in Oklahoma as Oklahoma City, Tulsa, Broken Arrow, Norman, Lawton, Edmond, Moore, Midwest City, Enid, and Stillwater. Only one of these 10 cities is fewer than 200 miles from Beaver, Oklahoma, and that one (Enid) is still 164 miles away. Hence much of the state's population – and therefore much of the class[56] – would have to drive hundreds of miles to appear at the fairness hearing.

---

[54] *Litwin v. iRenew Bio Energy Solutions*, *LLC*, 226 Cal. App. 4th 877, 884 (2014), *as modified* (May 29, 2014).

[55] Okla. Stat. Ann. tit. 12, § 2023(e)(5).

[56] Some, if not many, class members do not even live in Oklahoma, but own interests in the royalties there. These class members would have to travel from other states and/or countries to Beaver to attend the fairness hearing.

53.     What I conclude from these facts is that [1] it would be very burdensome for most class members to have to travel to Beaver, Oklahoma to appear at the fairness hearing; [2] requiring objectors to appear in person at a fairness hearing is an extraordinarily rare – almost unheard of – practice in class action practice; [3] counsel herein uniquely and repeatedly attempt to add this clause into their settlement agreements (and have done so when co-counseling with this Court); [4] the requirement runs afoul of the Oklahoma class action rule, which enables objections without an appearance requirement; [5] the primary legal authority that considered a full objection to this procedure found it both unconstitutional and a perversion of class action procedures.

<u>*The Objector Appeal Bond Requirement*</u>

54.     The parties' settlement agreement states that:

> If the Settlement Court denies the objection, the objector's claim will be either severed from the rest of the Class that did not object or the Settlement Court will require the objector to post an appeal bond in the amount of not more than five percent (5%) of the Common Fund Settlement Proceeds to cover the appellate risk, cost, and delay (including lost interest) to the rest of the Class that did not object.[57]

55.     This provision requires any objector who seeks to appeal an objection to post a bond of 5% of $119 million, or $5.95 million.

56.     The requirement is obviously onerous and hence likely renders an appeal impossible, thereby creating an artificial hurdle to a class member seeking to exercise her constitutionally-protected right to object to the settlement in the first place.[58]

---

[57] Settlement Agreement ¶ 8.5.

[58] Class members in (b)(3) class actions have a constitutional right to object to a proposed settlement. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) ("If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus

24

57.     Courts must impose appeal bonds based on the circumstances of the particular case, rather than fixing a set amount artificially in advance.[59]   The purpose of the appeal bond is to secure against the cost shifting permitted at the appeals court.[60]   The amount of the bond should therefore have some relationship to the costs that a losing appellant would have to shoulder.[61]  The costs permitted under the Oklahoma rules are modest and could never rise to the level of $5.95 million.  Okla. Sup. Ct. R. 1.14.

58.     The proposed appeal bond is punitive and it has the effect of insulating this proposed settlement from objections and hence from judicial scrutiny.  This is a red flag further warranting denial of the proposed settlement.

### The Lack of Information and Time

59.     Putative class counsel further attempted to insulate this settlement from class member review by failing to file a motion for final class certification and a motion for final approval of the settlement prior to the objection deadline and by filing a fee petition only seven days before the objection deadline.

60.     Without a full motion for class certification and settlement approval, class members lack the information they need to make a reasoned decision about whether to exit the class, object to the settlement, or take from it.  They do not have any information about how

---

an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950))).

[59] 4 *Newberg on Class Actions, supra* note 4, at § 14:15 (identifying factors that figure into a court's determination of whether to impose an appeal bond in federal court).

[60] *Id.* at § 14:14.

[61] *Id.* at § 14:16.

putative class counsel purport to evade the Oklahoma Court of Civil Appeals' ruling that a class could not be certified in this matter. They do not have information about why putative class counsel believe a *pro rata* distribution to the class a fair mechanism, given the Court of Civil Appeals' decision that all class members were not similarly situated. And they have no information justifying the amount of the settlement, nor informing any class member about how much she should expect to receive from the settlement.[62]

61.     Finally, putative class counsel filed a fee petition eight days before the objection or opt out deadline and that motion was posted at the settlement website only seven days before the objection deadline. Not only was the fee petition filed late, but, as discussed below, it also did not contain the necessary information, such as putative class counsel's hours and billing rates. The timing and content of the petition fail to provide absent class members sufficient opportunity to respond to it. Oklahoma procedure gives litigants fifteen days to respond to normal motions. Okla. Dist. Ct. R. 4 ("Any party opposing a motion . . . shall serve and file a brief or a list of authorities in opposition within fifteen (15) days after service of the motion, or the motion may be deemed confessed."). Absent class members should be entitled to *at least* those fifteen days since, unlike normal litigants in ongoing litigation, they are not even engaged parties represented by individual counsel. The Advisory Committee Notes to the 2003 amendments to Rule 23(h) of the Federal Rules of Civil Procedure so hold, noting that "[i]n setting the date objections are due, the court should provide sufficient time after the ***full fee***

---

[62] Notably, putative class counsel also did not post at the settlement's website either the motion for preliminary approval of the settlement or the supporting papers thereto, which encompassed their motion for conditional class certification.

_**motion**_ is on file to enable potential objectors to examine the motion."[63] Courts have thus reversed fee awards lacking such time periods.[64]

* * *

62. The objector appearance requirement, the appeal bond requirements, the lack of formal motions, and the late-arriving and incomplete fee petition, not only raise red flags showing that putative class counsel are attempting to erect unique, artificial, and unconstitutional hurdles in the path of class member objections, they also therefore render putative class counsel unfit to represent this class. Lawyers who view their clients as their adversaries cannot be deemed adequate class counsel.

D.  The Settlement Agreement Rewards the Proposed Class Representative Disproportionately and in an Inappropriate Fashion

63. The _Manual_'s nine warnings include a caution against "treating similarly situated class members differently."[65]  The proposed class representative is a royalty owner like other putative class members but for its service as class representative, yet it is provided an extravagant reward for this "service," out of line with normal incentive awards.

64. Specifically, the Settlement Agreement states that:

> Class Counsel will request that the Settlement Court . . . pay the Class Representative an incentive award not to exceed three-tenths of one percent (0.3%) of the Common Fund Settlement Proceeds, all of which shall be paid from the Common Fund Settlement Proceeds. Chesapeake shall take no position regarding [this] request[].[66]

---

[63] Fed. R. Civ. P. 23, 2003 Advisory Committee Notes (emphasis added).
[64] _In re Mercury Interactive Corp. Sec. Litig._, 618 F.3d 988 (9th Cir. 2010).
[65] _Manual, supra_ note 34, at § 21.61.
[66] Settlement Agreement ¶ 1.5.

The bargained for .3% of the settlement fund amounts to a $357,000 payment to the class representation in addition to whatever it is entitled to under the settlement agreement. Putative class counsel has filed a motion seeking an award of this amount.

65. This number is the highest individual incentive award that I have ever seen in my career. Incentive awards "are justified when necessary to induce individuals to become named representatives, but there is no need for such an award if at least one class member would have stepped forward without the lure of an incentive award."[67] Empirical evidence demonstrates that courts approve incentives awards only in about one quarter of all cases,[68] and the "average award per class representative [is] $15,992 and the median award per class representative [is] $4357."[69] The incentive award proposed here is therefore 22 times greater than the mean, and 82 times greater than the median award typically provided.

66. The incentive award is also expressed as a percentage of the class's recovery. Percentage incentive awards are disfavored and may suggest a significant conflict of interest between the class representative and the class.[70] Moreover, any agreement counsel had with the

---

[67] *Fankhouser v. XTO Energy, Inc.*, 2012 WL 4867715, at *3 (W.D. Okla. Oct. 12, 2012) (internal quotation and alteration omitted).

[68] *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303, 1323 (2006) (Tbl. 2).

[69] *Id.* at 1348*; see also id.* at 1346 ("With respect to incentive-award levels, Willging et al. report median awards of $7500, $12,000, $7500, and $17,000 for four districts. The median total incentive award in our sample was $18,191, which is not strikingly different from Willging et al.'s findings." (citing Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges*, 71 N.Y.U. L. REV. 74, 101 (1996))).

[70] *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959-60 (9th Cir. 2009) (disqualifying class representative under similar circumstances).

representative concerning an incentive award should have been – but was not – disclosed at the time the settlement was put forward.[71]

67. Putative class counsel aim to justify the $357,000 award by averring that:

Each Class Representative, Mr. John Fitzgerald and then Mr. Mark Fitzgerald, on behalf of Fitzgerald Farms, LLC, provided information such as check stubs over the years and leases to justify their claims. Each remained in close contact with Class Counsel, reviewed materials pertinent to their claims and Mark Fitzgerald stayed involved in the case throughout the initial class certification, COCA opinion, the Oklahoma Supreme Court de-publishing of that opinion, the mediation, and finally a class-wide settlement. ¶ Each Class Representative participated in telephone conferences during the investigation, litigation, mediation, and settlement process, and exchanged emails on all aspects of this lawsuit. ¶ Each Class Representative reviewed the discovery, litigation pleadings, mediation materials, and settlement materials. When reason and common sense suggested mediating a resolution, Mark Fitzgerald participated fully in the process to ensure it was fair, reasonable, fully adversarial, and non-collusive.[72]

These are normal functions performed by class representatives and precisely the functions that typically support a $15,000-20,000 award.

68. Putative class counsel argue that "Oklahoma courts commonly award case contribution awards of 1-2% of the gross common fund."[73] In support of that statement, they cite only to five unreported cases.[74] They do not supply any of the orders in those cases, suggest that the issue was contested in any of those five cases, nor that the court approved such an award after adversary presentation of the question. Moreover, they provide not a single reported decision of an Oklahoma court or a court anywhere in the United States granting $357,000 to a single class representative for her service to the class.

---

[71] Okla. Stat. Ann. tit. 12, § 2023(e)(3) (requiring settling parties to "file a statement identifying any agreement made in connection with the [settlement] proposal").

[72] Sharp Declaration at ¶¶ 71-73.

[73] Motion for Attorneys' Fees, Litigation Expenses and Incentive Award and Brief in Support at 8-9 (Mar. 24, 2015).

[74] This Court served as co-counsel with putative class counsel in one of the cited cases. *Id.* (citing *Hitch Enters., Inc. v. Cimarex Energy Co.*, No. CIV-11-13-W (W.D. Okla. July 2, 2013)).

29

69.     A Westlaw search shows:

- While putative class counsel argue that "Oklahoma courts commonly award case contribution awards of 1-2% of the gross common fund," the phrase "case contribution award" has never once been used in a reported Oklahoma state court decision.

- The phrase "case contribution award" appears in a single Oklahoma federal court decision and in that case, the court approved $50,000 awards to the named plaintiffs.[75]

- The phrase "incentive award" appears in one reported Oklahoma state court decision, but only in passing.[76]

- The phrase "incentive award" appears in 11 Tenth Circuit and Oklahoma federal district court decisions, only 5 of which are on point. In one case, the court approved awards ranging from $10,000 to $40,000 per class representative;[77] in two cases, courts approved incentive awards of $10,000 and $15,000, although noting in each that these awards would not diminish the class's recovery as the defendant paid it on top of that recovery;[78] in a fourth case, the court approved awards of $1,000, $10,000, and $15,000 to different class representatives.[79] Only one case approved a higher award – $100,000 to each of five class representatives – but that court did so because the defendant retaliated against each of the named plaintiffs by firing them for their involvement in the lawsuit, resulting in "a substantial loss of income" to each.[80]

This review of the reported caselaw supports my conclusion that the requested awards are significantly out of line with normal incentive awards, and it disproves putative class counsel's assertion that "Oklahoma courts commonly award case contribution awards of 1-2% of the gross common fund."

---

[75] *CompSource Okla v. BNY Mellon, N.A.*, 2012 WL 6864701, at *7 (E.D. Okla., Oct. 25, 2012).

[76] *Parsons v. Volkswagen of Am., Inc.*, 341 P.3d 662, 666 (Okla. 2014).

[77] *Fankhouser v. XTO Energy, Inc.*, 2012 WL 4867715, at *3 (W.D. Okla. Oct. 12, 2012).

[78] *Childs v. Unified Life Ins. Co.*, 2011 WL 6016486, at *16 (N.D. Okla. Dec. 2, 2011) ($10,000); *McNeely v. Nat'l Mobile Health Care, LLC*, 2008 WL 4816510, at *16 (W.D. Okla. Oct. 27, 2008) ($15,000).

[79] *Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*, 2009 WL 2836508, at *3 (W.D. Okla. July 30, 2009).

[80] *Been v. O.K. Indus., Inc.*, 2011 WL 4478766, at *12 (Aug. 16, 2011), *report and recommendation adopted*, 2011 WL 4475291 (Sept. 26, 2011).

70.     Finally, to put the requested incentive award in perspective, consider the following facts.  This case was pending for roughly four years (the complaint was filed November 29, 2010 and preliminary approval was granted January 6, 2015).  About a third of that time, the case was sitting in the appellate courts.  Putative class counsel's request that the Court award the single named plaintiff $357,000 of the class's money means that that entity would be receiving about $90,000 for each year that this case has been pending.  The United States Census reports that the median household income in Oklahoma from 2009-2013 was $45,339.  Putative class counsel's motion therefore implies that the work described above entitles the putative class representative to an award of ***twice Oklahoma's median household income, every year for the past four years***.  If merely stating that fact does not alone refute the request, class action jurisprudence has achieved terminal silliness.[81]

71.     The fact that putative class counsel would recommend, and putative class representative accept, an award at this level further renders each inadequate to represent the class.[82]

E.     The Settlement Couples a Strikingly High Fee Request with a Clear Sailing Agreement

72.     The *Manual*'s nine warnings include a caution against approval of settlements that set high attorney's fees.[83]  Three aspects of the proposed fee are troubling – putative class

---

[81] *Cf. Romer v. Evans*, 517 U.S. 620, 639 (1996) (Scalia, J., dissenting) ("If merely stating this alleged 'equal protection' violation does not suffice to refute it, our constitutional jurisprudence has achieved terminal silliness.").

[82] *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (analyzing situation where incentive awards far outstripped class members' recoveries and concluding that "[w]here, as here, the class representatives face significantly different financial incentives than the rest of the class because of the conditional incentive awards that are built into the structure of the settlement, we cannot say that the representatives are adequate").

[83] *Manual, supra* note 34, at § 21.61.

counsel have entered into a "clear sailing agreement" with the defendant; putative class counsel have created a fee process that makes review of their fee request by class members nearly impossible; and putative class counsel seek a fee that is significantly out of line with fees in similar cases along every possible metric. The second of these issues (onerous process) is discussed above; the third (high fee) is discussed below. This sub-section discusses the first problem (clear sailing agreement) explaining why such an agreement is a reason to distrust the proposed *settlement*.

73. The settlement agreement states that "Chesapeake shall take no position regarding" counsel's fee request.[84] This is a so-called "clear sailing agreement."[85] Clear sailing agreements are disfavored and often a sign of a collusive settlement. This is so for several reasons.

- *First*, since the fee is coming out of the fund, and not being paid by the defendant, the defendant has no particular interest in what the fee will be. That raises the question of why the parties therefore bargained over it and included it in the settlement agreement.

- Thus, *second*, the core concern of the clear sailing agreement is that as part of a bargain, it implies that putative class counsel gave up something of the class's interest to secure this agreement with the defendant, serving only their own purposes, not the class's. Clear sailing agreements therefore seem like a conflict of interest between putative class counsel and the class.

- *Third*, the clear sailing agreement is often a way a defendant secures a cheap settlement – by agreeing not to contest a nearly $50 million dollar fee, it can get putative class counsel to agree to a smaller common fund. As the Supreme Court has stated: "In a strictly rational world, plaintiffs' counsel would always press for the limit of what the defense would pay. But with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it would in a case brought on behalf of one claimant."[86]

---

[84] Settlement Agreement ¶ 1.5.
[85] On clear sailing agreements, see 4 *Newberg on Class Actions*, *supra* note 4, at § 13:9.
[86] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 n.30 (1999).

- *Fourth,* clear sailing agreements are particularly problematic when coupled with high fee requests (see below).

* * *

74.     In sum, this proposed settlement raises at least five significant red flags arguing against its approval:  the *pro rata* distribution scheme treats dissimilarly situated class members similarly, disadvantaging those with stronger claims, and hence embodies a conflict of interest disqualifying the proposed class representative and proposed class counsel from representing the whole class; the settlement has all of the hallmarks of a reverse auction; putative class counsel have erected a number of artificial and mean-spirited barriers to any dissent from the proposed settlement or from their proposed fee; the proposed class representative's requested incentive award is extraordinary and creates a conflict of interest between it and the rest of the class; and putative class counsel's clear sailing agreement is a further sign that they compromised the class's claims at a discount.  This Court should reject the settlement as it is clearly not fair, adequate, and reasonable.

## III.
### THE PROPOSED FEE SHOULD BE REJECTED AS IT IS WILDLY OUT OF LINE WITH THE NORM IN CLASS ACTION CASES

75.     Counsel responsible for the creation of a common fund are entitled to a fee from that fund.[87]  Courts utilize either a percentage of the fund method or a lodestar (hours x rate)

---

[87] *Fent v. State ex rel. Dep't of Human Servs.*, 236 P.3d 61, 70 (Okla. 2010) ("The common fund doctrine is an exception to the general rule that attorney fees are not recoverable absent some statutory authority therefor or an enforceable contract.  When an individual's efforts succeed in creating or preserving a fund that benefits similarly situated non-litigants, equity powers may be invoked to charge that fund with attorney fees for legal services rendered in its creation or preservation.  The created or preserved fund must be brought under the direct supervision of the court. The idea is that those who benefit from the fund's preservation should contribute to the

method to ascertain the proper fee. Roughly half the courts that utilize a percentage method also employ a lodestar cross-check, by which they compare the percentage sought to counsel's time in the case.[88] If the percentage sought is greater than the time counsel has invested in the case, the fee sought is said to include a positive "multiplier," if it is less, a negative multiplier.

76.    Oklahoma law mandates use of a lodestar method and permits the lodestar to be multiplied following application of several factors;[89] in the seminal case on point, the Oklahoma Supreme Court approved a multiplier of 1.4.[90]

77.    Putative class counsel seek a fee award based on a percentage and fail to provide the Court evidence of the amount of time they expended on the litigation and of their hourly rates.

78.    Empirical studies show that the mean fee award in class actions is 24% (and in the Tenth Circuit it is 22%).[91] These numbers decrease as the fund size increases, with the mean fee award for funds in the $119 million range being 19.4%.[92]

---

[88] Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 833 (2010) ("It should be noted that in 218 of these 444 settlements (49 percent), district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded.") (herineafter "Fitzpatrick"); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 269 (2010) (Tbl. 12) (showing 146 cases in which courts use percentage method and 165 in which courts used percentage with lodestar cross-check) (hereinafter "Eisenberg & Miller").

[89] *State ex rel. Burk v. Oklahoma City*, 598 P.2d 659, 663 (Okla. 1979) (holding, in common fund case, that "[h]ereafter, attorneys in this state should be required to present to the trial court detailed time records showing the work performed and offer evidence as to the reasonable value for the services performed for different types of legal work").

[90] *Id.*

34

79.     Counsel's request for 40% of the common fund is therefore more than double the mean fee award in a case with a fund of this size.[93]  In support of that fee, they cite thirteen unreported Oklahoma decisions and not a single reported decision.   While it is therefore impossible to check the accuracy of this report – particularly with but seven days provided between the filing of the fee petition and the objection deadline – it is worth noting that eleven of these thirteen cases involved common funds of less than $27,000,000.  These cases are therefore inapposite, as it is commonly understood that the percentage awarded decreases as the size of the fund increases.[94]  Thus, only two of the unreported cases upon which putative class counsel seek to rely are of the same magnitude as this case and both are outliers from the thousands of cases in the empirical studies cited above.

80.     The mean multiplier in class action cases is between 1.5-2[95] and 2.7 in cases with settlements this size.[96]  The multiplier approved by the Oklahoma Supreme Court in its seminal common fund fee award decision was similarly 1.4.[97]

---

[91] Eisenberg & Miller, *supra* note 88, at 260 (Tbl. 4).

[92] *Id.* at 265 (Tbl. 7).

[93] This fact speaks to at least four of the thirteen factors enumerated in Okla. Stat. Ann. tit. 12, § 2023(g)(4)(e), namely (1) time and labor required; (5) the customary fee; (8) the amount in controversy and the results obtained; and (12) awards in similar causes.

[94] Eisenberg & Miller, *supra* note 88, at 265 (Tbl. 7)*; see also Manual, supra* note 34, at § 14.121 ("Accordingly, in 'mega-cases' in which large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate. One court's survey of fee awards in class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%." (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 339-40 (3d Cir. 1998))).

[95] Fitzpatrick, *supra* note 88, at 833-34 (mean is 1.65); Eisenberg & Miller, *supra* note 87, at 272 (mean is 1.81) (Tbl. 14).

[96] Eisenberg & Miller, *supra* note 88, at 274 (Tbl. 15).

[97] *Burk*, 598 P.2d at 662.

81.     Counsel request a fee of $47.6 million but have not made available to the class or Court their lodestar – that is, the hours they have invested in the case and their hourly rates, notwithstanding the requirement that this Court examine the "time and labor" required in evaluating the fee request.[98]  An estimate is therefore required.  Several facts underlay such an estimate.[99]  This case involved little actual litigation.  Four years elapsed between the filing of the initial complaint in this case and the parties' settlement of it.  During that time period, it appears that the only contested motion was a motion for class certification (and perhaps for a single protective order).[100]  Putative class counsel lost that motion and hence the case.  The parties took some limited discovery and then engaged in mediation and settled the case.  Based on this record, it would be quite generous to assume that counsel spent 2,000 hours/year on this matter (that is one lawyer working all year for each year that the case was pending up to settlement) or 8,000 hours total, but for purposes of estimating a lodestar, I will use that figure.  I will further accord counsel a similarly generous blended billing rate of $300/hour.[101]  With these

---

[98] Okla. Stat. Ann. tit. 12, § 2023(g)(4)(e)(1).  *See also Burk*, 598 P.2d at 663 ("[A]ttorneys in this state should be required to present to the trial court detailed time records showing the work performed and offer evidence as to the reasonable value for the services performed for different types of legal work.").

[99] The following sentences speak to at least eight of the thirteen factors enumerated in Okla. Stat. Ann. tit. 12, § 2023(g)(4)(e), namely (1) time and labor required; (2) the novelty and difficulty of the questions presented by the litigation; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (7) time limitations imposed by the client or the circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) whether or not the case is an undesirable case.

[100] In the entire four year history of the case (from filing to the preliminary approval motion), there are only eight calendar events on the docket, and only three of those (two for the class certification hearing and one for a hearing on a protective order) are substantive.

[101] The proper hourly rate is the rate in the community where the case is pending, herein Beaver County, Oklahoma.  *Blum v. Stenson*, 465 U.S. 886, 895 (1984). A 2013 survey of the Oklahoma

36

estimates, counsel's total lodestar for the entire case would be $2,400,000. Counsel seek a fee of $47.6 million. That means that they are seeking a multiplier of about 20 (19.833). The multiplier they seek is more than seven times greater than the multiplier courts tend to employ in cases with funds of this magnitude.[102] Put another way, the state's high Court, in setting forth the governing criteria for common fund fee awards, assigned a bonus of 1.4[103] and here putative class counsel deem their own work worthy of a bonus I estimate to be 14 times greater than that.

82. What is perhaps most shocking about the fee request – although there is significant competition for that honor – is that counsel are asking this Court to approve that fee be *taken from their clients' money*. Oklahoma law states that this Court, of course, has a fiduciary duty to the absent class members in the fee process.[104] That duty – when it comes to the fee – is to ensure that the absent class members are not overpaying for the legal services they received. Assuming counsel had a lodestar of $2.4 million – and even assuming that they had prevailed in some aspect of this case entitling them to a multiplier fee award[105] – would they not have been sufficiently compensated with an award of $5 million for the work that they did in this

---

Bar Association showed that 58.1% of responding attorneys billed between $151-$250/hr and only 5.28% billed over $300/hr. *See* OKLAHOMA BAR ASS'N, MEMBERSHIP SURVEY 12 (2013), http://www.okbar.org/Portals/13/PDF/Governance/MembershipSurvey2013resultsfinalJul8.pdf. The $300 "blended billing rate" I use would encompass all hours billed in the case, including those of paralegals, associates, and partners. Thus, using the rate of the top 5% of all Oklahoma billers for all hours in this case is an overly-generous approach.

[102] *See* ¶ 80, *supra*.

[103] *Burk*, 598 P.2d at 662.

[104] Okla. Stat. Ann. tit. 12, § 2023(g)(4)(b) ("[T]he court shall act in a fiduciary capacity on behalf of the class in making [the fee] determination.").

[105] This analysis speaks to at least nine of the thirteen factors enumerated in Okla. Stat. Ann. tit. 12, § 2023(g)(4)(e), namely (1) time and labor required; (2) the novelty and difficulty of the questions presented by the litigation; (3) the skill required to perform the legal service properly; (6) whether the fee is fixed or contingent; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) whether or not the case is an undesirable case; (12) awards in similar causes; and (13) the risk of recovery in the litigation.

37

case, or 2 times their estimated lodestar? $10 million, or 4 times their lodestar? $20 million, or 8 times their lodestar? $30 million, or 12 times their lodestar? $40 million, or 16 times their lodestar? The amount they seek – about ***$1 million/month*** for each month this case was pending between filing and settlement – is so disproportionate to what they are entitled to that the Court would be fully justified in rejecting an award altogether.[106]

83.     Counsel's overreaching further demonstrates that they are inadequate. Counsel who seek to take a portion of their clients' recovery so far beyond the amount they invested on behalf of, and the results that they achieved for, those clients – and so out of line with prevailing rates in class action settlements of this magnitude – are not adequate class counsel.

* * *

84.     I have testified that each pending motion should be rejected:

- the class cannot be certified, given the binding decisions of the Oklahoma Court of Civil Appeals in this case and the United States Supreme Court in the *Amchem* case;

- the settlement should not be approved as it is not fair, adequate, and reasonable; and

- the fee and incentive awards must be rejected as they are so far outside the normal range.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of March, 2015, in Cambridge, Massachusetts

_____
William B. Rubenstein

---

[106] *Serrano v. Unruh*, 652 P.2d 985, 994 (Cal. 1982) ("A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether.").

38

# APPENDIX B

**4 Newberg and Rubenstein on Class Actions § 13:30 (6th ed.)**

**Newberg and Rubenstein on Class Actions** June 2024 Update
William B. Rubenstein[a0]

**Chapter 13. Settlement**

**III. Class Members' Rights to Object or Opt Out[*]**

# § 13:30. Format of objections

Rule 23(e)(5) guarantees class members the right to object to proposed class action settlements.[1] Three sources provide the format for class members' objections.

*First*, and most importantly, Rule 23(e)(5) itself sets forth the basic structure for objections.[2] It holds that any "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."[3] The Advisory Committee that drafted this language noted:

> [O]bjections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them. One feature required of objections is specification whether the objection asserts interests of only the objector, or of some subset of the class, or of all class members. Beyond that, the rule directs that the objection state its grounds "with specificity." Failure to provide needed specificity may be a basis for rejecting an objection.[4]

*Second,* the court's order preliminarily approving a class action settlement and ordering that notice be sent to the class will typically outline a specific process for filing objections, including an objection deadline (discussed in the preceding section) and an objection format.[5] The *Manual for Complex Litigation* directs courts to require "objectors to file written statements of their objections with the clerk of court by a specified date in advance of the hearing and to give notice if they intend to appear at the fairness hearing."[6] The Federal Judicial Center's website posts sample notices. The notice for a securities class action settlement instructs potential objectors:

> If you're a Class Member, you can object to the settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must send a letter saying that you object to North v. XYZ. Be sure to include your name, address, telephone number, your signature, and the reasons you object to the settlement. Mail the objection to these three different places [the court, class counsel, and defense counsel] postmarked no later than [DATE].[7]

*Third,* because they have some interest in curtailing objections generally, and professional objectors specifically,[8] the settling parties will often propose to the court a more complex and onerous procedure for the filing of objections. Thus, many settlement agreements may propose that the court's preliminary approval order require objectors to:

- prove their membership in the class;
- detail their problems with the settlement with specificity;
- identify whether they have objected to other settlements in the past;
- sign under penalty of perjury; and
- serve numerous parties in particular ways.

Courts should be cautious of objection formats that unduly chill class members' capacity to object to the settlement.[9] It is true that some objections are made for ulterior motives[10] and that many class members lack the capacity to understand class action notices;[11] nonetheless, a court's role is to safeguard the class's interest by ensuring that class members, most of who are operating in good faith, receive the best opportunity possible to comprehend and respond to the proposed settlement. Courts will accordingly carefully scrutinize proposed limitations on objection formats and curtail those that over-reach.[12]

Finally, class members may file written objections and need not appear at the fairness hearing for their objections to be considered by the court.[13] However, if class members do want to appear at the fairness hearing, they typically must so inform the court prior to the hearing by filing a written objection and noting therein their intent to appear at the hearing.[14] This enables a court to plan the timing of the fairness hearing. Nevertheless, courts are typically forgiving of class members who appear without having filed an objection.[15] As discussed elsewhere in the Treatise,[16] a court has some obligation to consider and respond to the objections of class members before granting final approval to a settlement.[17] But a "district court has the discretion to limit the fairness hearing, and the consideration of those objections, so long as such limitations are consistent with the ultimate goal of determining whether the proposed settlement is fair, adequate and reasonable."[18]

Westlaw. © 2024 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

## Footnotes

a0    Bruce Bromley Professor of Law
      Harvard Law School

*     Professor Rubenstein thanks Elizabeth Jensen, Harvard Law School Class of 2014, and Albert Rivero, Harvard Law School Class of 2016, for their help in preparing this unit and Nicholas Abbott, Harvard Law School Class of 2022, Anne Deng, Harvard Law School Class of 2023, Aditi Shah, Harvard Law School Class of 2020, and Ephraim McDowell and Ben Schwartz, both Harvard Law School Class of 2016, for their help in editing it.

1     Fed. R. Civ. P. 23(e)(5)(A) ("Any class member may object to the proposal if it requires court approval under this subdivision (e).").

2     Fed. R. Civ. P. 23(e)(5)(A) ("The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.").

3     Fed. R. Civ. P. 23(e)(5)(A).

4     Fed. R. Civ. P. 23(e)(5)(A) advisory committee notes to 2018 amendment.

5     Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264 P.3d 500, 505 (2011) (quoting **Newberg on Class Actions**) ("In order to prevent spurious objections to a class action settlement, most notices of proposed settlement also contain a mandatory procedure that objectors must follow.").

6     Manual for Complex Litigation, Fourth, § 21.633.

7     This document can be found by accessing page 7 of the following website: https://www.fjc.gov/sites/default/files/2016/ClaAct13.pdf.

8     For a discussion, *see* Newberg and Rubenstein on Class Actions § 13:21 (6th ed.).

9    Fed. R. Civ. P. 23(e)(5)(A) advisory committee notes (2018) ("Courts should take care, however, to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards.").

10    *See* Newberg and Rubenstein on Class Actions § 13:21 (6th ed.).

11    Deborah L. Rhode, *Class Conflicts in Class Actions*, 34 Stan. L. Rev. 1183, 1235 (1982) (reviewing reactions to an antitrust class action notice and noting that "many if not most [class comments] evinced some degree of misunderstanding").

12    Lloyd v. Navy Federal Credit Union, 2018 WL 5247367, *11 (S.D. Cal. 2018), order approved, 2019 WL 2269958 (S.D. Cal. 2019) (citing **Newberg on Class Actions**) (ordering that the long form notice be modified, as it "require[d] an overly complex and onerous procedure for filing objections" and thus could "have the effect of unduly chilling objections").
Rhodes v. Olson Associates, P.C., 308 F.R.D. 664, 668, 91 Fed. R. Serv. 3d 1912 (D. Colo. 2015) (citing **Newberg on Class Actions**) (finding "too onerous for lay class members" the requirement that objectors attend the final fairness hearing in person, "provide a detailed statement of the specific legal and factual basis for each objection, and a list of the legal authority you will present at the settlement approval hearing" in order to object) (internal quotation marks and citation omitted).

13    Rhodes v. Olson Associates, P.C., 308 F.R.D. 664, 668, 91 Fed. R. Serv. 3d 1912 (D. Colo. 2015) ("The Court sees no reason why a personal appearance is necessary for the Court's consideration of an objection …. Additionally, [this] provision [was not] contained in the Settlement Agreement, which provides only that '[i]n the written objection, the Class Member must state: his or her full name, address, telephone number, and email address (if available); the reasons for his or her objection; and, whether he or she intends to appear at the fairness hearing on his or her own behalf or through counsel.' As such, [it] shall be deleted from the Notice prior to its issuance …").
Litwin v. iRenew Bio Energy Solutions, LLC, 226 Cal. App. 4th 877, 172 Cal. Rptr. 3d 328, 332 (2d Dist. 2014), as modified, (May 29, 2014) (quoting **Newberg on Class Actions**) ("As explained by a leading treatise on class actions, '[i]t is unnecessary for objectors to appear personally at the settlement hearing in order to have their written objections considered by the court.' … Requiring class members in a nationwide class or even a statewide class to appear at the final approval hearing or hire an attorney to have their objections heard works a hardship on objectors, as the benefit to the objector from the class action may be so low that it would be cost prohibitive or physically challenging to personally assert one's rights at a hearing in a potentially distant location. For example, here appellant indicated he was unable to attend the hearing because it was prohibitively expensive for him to do so as an out-of-state class member. In contrast, if an objector is permitted to file written objections to be considered, the burden on the court to review them is minimal and the cost to the parties remains the same. Requiring any objector to attend the final approval hearing does not offer a meaningful opportunity to be heard, and therefore violates class members' due process rights.").

14    Tijero v. Aaron Brothers, Inc., 301 F.R.D. 314, 326 (N.D. Cal. 2013) (preliminarily approving a settlement but ordering settling parties to modify the class notice "to expressly state that an objector will not be allowed to present any argument or comment at the Final Fairness Hearing unless he or she has timely objected to the settlement and accompanied said objection with a request to appear").
McClellan v. SFN Group, Inc., 2012 WL 2367905, *5 (N.D. Cal. 2012) (preliminarily approving a settlement but ordering counsel to modify notice to "state that any objector desiring to be heard at the fairness hearing must contemporaneously request permission to appear at the hearing, and that the objector will not be allowed to present any argument or comment at the fairness hearing unless he or she has timely objected to the settlement and accompanied said objection with a request to appear").
*See generally*:
Manual for Complex Litigation, Fourth, § 21.633 (noting that the court should set an objection deadline and require objectors to specify whether they intend to appear at the fairness hearing).

15    Barbara J. Rothstein and Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, 32 (3d ed. 2010) ("If objectors and unrepresented class members appear at the fairness hearing, it is important to permit them to fully voice their concerns. For class members who feel strongly enough about their injuries to appear, the fairness hearing is their 'day in court.'"); Manual for Complex Litigation, Fourth, § 21.633 (noting that

the court should set an objection deadline and require objectors to specify whether they intend to appear at the fairness hearing, but "[d]espite such ground rules, people who have not filed a written statement may be allowed to present objections at the hearing") (citation omitted).

16   *See* Newberg and Rubenstein on Class Actions § 13:35 (6th ed.); Newberg and Rubenstein on Class Actions § 13:54 (6th ed.).

17   Dennis v. Kellogg Co., 697 F.3d 858, 864, 83 Fed. R. Serv. 3d 461 (9th Cir. 2012) (noting a court must give a "reasoned response" to all nonfrivolous objections) (citation omitted).
     In re Pacific Enterprises Securities Litigation, 47 F.3d 373, 377, Fed. Sec. L. Rep. (CCH) P 98,524, 31 Fed. R. Serv. 3d 746 (9th Cir. 1995) (noting that a district court should provide a "reasoned response" in the record to settlement objections) (citation omitted).
     Saunders v. Naval Air Rework Facility, Alameda, Cal., 608 F.2d 1308, 1312, 21 Fair Empl. Prac. Cas. (BNA) 631, 21 Empl. Prac. Dec. (CCH) P 30423, 28 Fed. R. Serv. 2d 738 (9th Cir. 1979) (reversing approval of a settlement for failing to address objections adequately).
     Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832, 837, 13 Fair Empl. Prac. Cas. (BNA) 694, 12 Empl. Prac. Dec. (CCH) P 11178, 22 Fed. R. Serv. 2d 269 (9th Cir. 1976) (reversing the approval of a settlement because the "record reveal[ed] no reasoned response to numerous objections to the settlement").
     Klein v. O'Neal, Inc., 705 F. Supp. 2d 632, 650 (N.D. Tex. 2010), as modified, (June 14, 2010) and judgment entered, (June 18, 2010) ("[T]he trial court must … examine the settlement in light of objections raised and set forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response.") (quoting Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1219, 17 Fair Empl. Prac. Cas. (BNA) 1712, 17 Empl. Prac. Dec. (CCH) P 8470, 25 Fed. R. Serv. 2d 1165 (5th Cir. 1978)).

18   Tennessee Ass'n of Health Maintenance Organizations, Inc. v. Grier, 262 F.3d 559, 567, 50 Fed. R. Serv. 3d 1717, 2001 Fed. App. 0278P (6th Cir. 2001).

---

**End of Document** | © 2024 Thomson Reuters. No claim to original U.S. Government Works.