**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,

Defendants.

Case No. 19-CV-00332-SRB

**PLAINTIFFS' MOTION AND SUGGESTIONS IN SUPPORT OF FINAL APPROVAL
OF SETTLEMENTS WITH THE NATIONAL ASSOCIATION OF REALTORS,
HOMESERVICES DEFENDANTS, AND OPT-IN ENTITIES**

i

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND AND SETTLEMENT TERMS ................................................... 2

    A. The Litigation ................................................................................................ 2

    B. Settlement Negotiations ................................................................................ 5

    C. Summary of Settlement Agreements ............................................................ 6

        1. Settlement Class ................................................................................. 6

        2. Settlement Amounts .......................................................................... 7

        3. Practice Changes ............................................................................... 8

            a. NAR Practice Changes ......................................................... 8

            b. HSA Practice Changes ....................................................... 11

        4. Release of Claims Against Settling Defendants ...................................... 13

            a. NAR ................................................................................... 13

            b. HomeServices ..................................................................... 14

    D. Application for Award of Attorneys' Fees, Costs, and Class Representative Incentive Awards .......................................................................................... 15

III. NOTICE WAS EFFECTIVELY DISSEMINATED TO THE SETTLEMENT CLASS 15

IV. THE REACTION OF THE MEMBERS OF THE SETTLEMENT CLASS TO THE SETTLEMENTS HAS BEEN OVERWHELMINGLY POSITIVE .............................. 16

V. LEGAL STANDARDS AND SETTLEMENT APPROVAL ........................................ 16

    A. The Standard for Reviewing a Proposed Settlement of a Class Action .............. 17

    B. The Settlements Satisfy Each of the Rule 23(e)(2) Factors ................................ 18

    C. The *Van Horn* Factors Also Support Approval ................................................ 21

        1. The Merits of the Plaintiffs' Cases, Weighed Against the Terms of the Settlement .......................................................................................... 22

        2. The Settling Defendants' Financial Condition ....................................... 22

        3. The Complexity and Expense of Further Litigation................................ 22

    D. The Amount of Opposition to the Settlements .................................................. 23

VI. THE COURT SHOULD CONSIDER AND OVERRULE EACH OBJECTION .......... 24

    A. Overview and Legal Standard ........................................................................ 25

B. The Court Should Overrule the Pro Se Objections: Zaffarkhan (Doc. 1539); Duthler (Doc. 1541); Tonya Monestier (Doc. 1552); Black Tie Realty (*Gibson* Doc. 527); Vivienne Cunningham (*Gibson* Doc. 528); and complaints from Arturo Gonzalez (Doc. 1564) and Peter Gustis (Doc. 1510). ............................ 27

    1. Zaffarhan Objection (Doc. 1539) ........................................................ 27

    2. Duthler Objection (Doc. 1541) ............................................................ 29

    3. Monestier Objection (Doc. 1552) ........................................................ 30

        a. Prof. Monestier's Complaints About the NAR Settlement's Practice Changes Lack Merit ...................................................... 32

        b. Prof. Monestier's Objections to Counsel's Attorneys' Fee Request Should Also Be Rejected ................................................................ 51

            i. The Eighth Circuit's *T-Mobile* Decision Supports Plaintiffs' Fee Request ................................................................................ 51

            ii. Prof. Monestier's Criticisms of Professor Klonoff Are Unfounded .............................................................................. 54

            iii. One-Third Fees Are Regularly Awarded in Cases with Settlements of Comparable Size ...................................... 55

            iv. Plaintiffs Appropriately Calculated Their Lodestar Using Current Rates ............................................................... 59

            v. Plaintiffs Used Appropriate Billing Practices .................... 63

    4. Black Tie Realty and Vivienne Cunningham Objections (*Gibson* Docs. 527 and 528) ................................................................................ 65

    5. Gonzalez Filings (Doc. 1564) and Peter Gustis Filing (Doc. 1510) ....... 66

C. The Court Should Overrule Objections Submitted by Attorneys and Their Clients Who Filed Competing Cases ................................................................ 67

    1. Broad Settlement Classes Creating Global Peace Are Encouraged ........ 68

    2. The Conspiracy at Issue Is Nationwide in Scope ................................... 72

    3. The Court Should Overrule the South Carolina Objection by Benny D. Cheatman, Douglas W. Fender II, and Dena Marie Fender (Docs. 1558, 1559) ................................................................................................. 74

        a. The Court Should Overrule the South Carolina Objection to the NAR Settlement ........................................................................ 74

        b. The Court Should Overrule the South Carolina Objection to the HSA Settlement. ...................................................................... 81

            i. Nationwide Class Settlement ............................................... 81

            ii. Release of Franchisees Is Appropriate ................................. 81

        c. The Contents of Notice Were Robust ......................................... 83

    4. The Court Should Overrule the Spring Way Objection (Doc. 1563) ...... 86

5.    The Court Should Overrule the New York Objections (Docs. 1560 (Friedman), 1562 (March)) ...................................................... 88

6.    The Court Should Overrule the *Batton* Objections (Doc. 1561 (Mullis))96

7.    The Court Should Overrule the Wang Objection (Docs. 1547, 1548).. 107

    a.    The NAR Release Is Properly Limited to Claims Arising from the Same Factual Predicate ............................................. 108

    b.    Plaintiffs Are Adequate Representatives.................................. 110

    c.    The Settlement Is Not Racially Discriminatory ....................... 111

    d.    The Settlement Amount Is Fair, Reasonable, and Adequate Considering NAR's Ability to Pay............................................ 112

    e.    Mr. Wang's Objection that the Settlement Depletes NAR Financially Supports Approval................................................... 113

    f.    Mr. Wang's Objections to the Practice Changes Are Misguided ................................................................................. 113

    g.    Mr. Wang's Attacks on the *Cy Pres* Doctrine Are Irrelevant ... 114

    h.    Notice Satisfied Due Process and the Requirements of Rule 23114
          i.    The NAR Settlement Adequately Defines the Released Parties 120

VII.   CLASS CERTIFICATION REMAINS APPROPRIATE ........................................... 122

VIII.  CONCLUSION ......................................................................................... 122

**TABLE OF AUTHORITIES**

**Cases**

*Abramson v. Agentra, LLC*, 2020 WL 13469584 (W.D. Pa. Aug. 20, 2020)..............................77

*Adkins v. Nestle Purina PetCare Co.*, 2015 WL 10892070 (N.D. Ill. June 23, 2015) ................ 82

*Albin v. Resort Sales Missouri, Inc*., 2021 WL 5107730 (W.D. Mo. May 21, 2021) ................. 69

*Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720 (8th Cir. 2015) ........................................ 54

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................... 100, 101

*Anderson v. Travelex Insurance Servs. Inc.,* No. 8:18-CV-362, 2021 WL 4307093 (D. Neb. Sept. 22, 2021)........................................................................................................................................... 18

*Barfield v. Sho-Me Power Elec. Co-op.*, 2013 WL 3872181 (W.D. Mo. July 25, 2013)... 116, 119

*Beck-Ellman v. Kaz USA, Inc.*, 2013 WL 1748729 (S.D. Cal. Jan. 7, 2013)............................. 118

*Bishop v. DeLaval Inc.*, 2022 WL 18957112 (W.D. Mo. July 20, 2022) .................................... 23

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) .. 109

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ........................................................ 80

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)........................................................................ 29

*Branson v. Pulaski Bank*, 2015 WL 139759 (W.D. Mo. Jan. 12, 2015)................................... 102

*Brown v. Kansas City Live, LLC*, 931 F.3d 712 (8th Cir. 2019).................................................. 96

*Brown, et. al.*, v. *Google LLC*, 2024 WL 3797001 (N.D. Cal.).................................................... 64

*Bruzek v. Husky Energy Inc.*, 2021 WL 9474270 (W.D. Wis. Aug. 6, 2021) ........................... 117

*Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022)............... 18, 41

*Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003)............................................ 101

*Chrapliwy v. Uniroyal, Inc*., 670 F.2d 760 (7th Cir. 1982) ........................................................ 61

*Christine Asia Co. v. Yun Ma*, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019)........................... 117

*Cleveland v. Whirlpool Corp.*, 2022 WL 2256353 (D. Minn. June 23, 2022) ............................ 18

*Convey Compliance Systems, Inv. v. 1099 Pro, Inc.*, 443 F.3d 327 (4th Cir. 2006) ................. 122

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ..................................... 24, 26, 67, 99

*Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118 (S.D.N.Y. 2001)...................................... 115

*Dusenbery v. United States*, 534 U.S. 161 (2002) ..................................................................... 115

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974).................................................................. 116

*Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752 (10th Cir. 2020)............. 84

*Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ..... 59

*Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579 (5th Cir. 2007) ................................. 28, 29, 65

*Fla. ex rel. Crist v. HCA, Inc.*, 2002 WL 32116840 (M.D. Fla. Apr. 23, 2002) .......................... 88

*Flaum v. Doctor's Assocs., Inc.*, 2019 WL 2576361 (S.D. Fla. Mar. 11, 2019) ......................... 82

*Florece v. Jose Pepper's Restaurants, LLC*, 2021 WL 5042715 (D. Kan. Oct. 29, 2021) .......... 64

*Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461 (E.D. Pa. 2000) ................................................... 117

*Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969 (8th Cir. 2016) ................................... 55

*Good v. Am. Water Works Company, Inc.*, 2016 WL 5746347 (S.D. W. Va. Sept. 30, 2016)..... 85

*Gould v. Alleco, Inc.*, 883 F.2d 281 (4th Cir. 1989) ......................................................... 27, 29, 65

*Great Northern Railroad Company v. Reid*, 245 F. 86 (9th Cir. 1917)...................................... 122

*Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628 (11th Cir. 2015) .............................................. 68

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975).............................. 18, 22, 83, 85

*Gulbankian v. MW Mfrs., Inc.*, 2014 WL 7384075 (D. Mass. Dec. 29, 2014)............................ 68

*H&R Block E. Enterprises, Inc. v. Sanks*, 2017 WL 9804981 (W.D. Mo. July 26, 2017) ........... 65

*Hand v. Beach Ent. Kc, LLC*, 2021 WL 199729 (W.D. Mo. Jan. 19, 2021) .............................. 118

*Health Republic Ins. Co. v. United States*, 2024 WL 4471774 (Fed. Cl. Oct. 10, 2024) ............. 59

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) .................................................................... 81

*Huyer v. Buckley*, 849 F.3d 395 (8th Cir. 2017) ........................................................................ 55

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145 (2d. Cir. 1987) ................................. 104, 116

*In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226 (E.D. Pa. 2009) ......................................................................................................................................... 81

*In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) ............................... 70, 102

*In re Capital One Consumer Data Sec. Breach Litig.*, 2022 WL 18107626 (E.D. Va. Sept. 13, 2022) ....................................................................................................................................... 26

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, 12-MD-2320, 2015 WL 7282543 (D.N.H. Nov. 16, 2015) ........................................................... 88

*In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669 (D. Minn. 1974) ......................................................................................................................................... 23

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ................................. 99

*In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10 (D.D.C. 2019) ............ 104, 105

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021) ..... 103, 104

*In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128 (8th Cir. 1984) ........................................ 23

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800 (8th Cir. 2004) .......... 68, 96, 97, 98

*In re HIV Antitrust Litig.*, 2023 WL 7397567 (N.D. Cal. Nov. 8, 2023) ................................... 106

*In re HP Inkjet Printer Litig.*, 2011 WL 13156938 (N.D. Cal. Mar. 29, 2011) ......................... 88

*In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166 ...................................................... 69

*In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186 (S.D.N.Y. 2005) .................................... 69

309 F.R.D. 573 (N.D. Cal. 2015) ................................................................................................. 24

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) .... 70, 103, 104

*In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ........ 20

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ....................... 23

*In re Lumber Liquidators Chinese-Mfr. Flooring Prod. Mktg., Sales Pracs. and Prod. Liab. Litig.*, 952 F.3d 471 (4th Cir. 2020) ............................................................ 57

*In re Mass. Diet Drug Litig.*, 338 F. Supp. 2d 198 (D. Mass. 2004) ........................................... 115

*In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654 (E.D. Va. 2001) ............................... 69

*In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307 (S.D.N.Y. 2020) . 101, 105

*In re Nat'l Arb. F. Trade Pracs. Litig.,* No. CV 10-2122 (PAM/JSM), 2011 WL 13135575 (D. Minn. Aug. 8, 2011) ......................................................................................................... 48

*In re NorthShore Univ. HealthSystem Antitrust Litig.*, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) ......................................................................................................................... 109

*In re Packaged Ice Antitrust Litig.*, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011) .................. 104

*In re Packaged Seafood Prod. Antitrust Litig.*, 2023 WL 2483474 (S.D. Cal. Mar. 13, 2023) . 117

*In re Pinterest Derivative Litig.*, 2022 WL 2079712 (N.D. Cal. June 9, 2022) ........................ 115

*In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985 (N.D. Ohio 2016) ..................... 20

*In re Pork Antitrust Litig.*, 2022 WL 4238416 (D. Minn. Sept. 14, 2022) ................................... 20

*In re Potash Antitrust Litig.*, 2013 WL 12470850 (N.D. Ill. June 12, 2013) ............................... 55

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) ............................................................................................................................... 68, 69

*In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450 (D.N.J. 1997) ......................................................................................................................... 81

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F. Supp. 3d 269 (E.D.N.Y. 2021) ............................................................................................................. 119

*In re RFC*, 399 F. Supp. 3d 827 (D. Minn. 2019) ....................................................................... 65

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) ..................................................... 63

*In re Sony SXRD Rear Projection T.V. Class Action Litig.*, 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ........................................................................................................................... 22

*In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968 (8th Cir. 2018) ........ 100, 103

*In re Tex. Prison Litig.*, 191 F.R.D. 164 (W.D. Mo. 1999) ................................................... 24, 66

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270 (N.D. Cal. Aug. 24, 2011).... 69

*In re TikTok, Inc., Consumer Privacy Litig.*, 2022 WL 2982782,n.20 (N.D. Ill. July 28, 2022) . 85

*In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849 (8th Cir. 2024)........... 51, 52, 53

*In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554 (9th Cir. 2017) .................................................................................................................................... 106

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013) .................................................................................................................................Passim

*In re Urethane Antitrust Litig.*, 2016 WL 4060156 (D. Kan. July 29, 2016) .................. 56, 57, 63

*In re Washington Pub. Power Supply Sys. Sec. Litig.*, 1988 WL 158947 (W.D. Wash. July 28, 1988)..................................................................................................................................... 104

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) ................................................................................................................................... 24, 25, 26

*In re Wireless*, 396 F.3d 922 (8th Cir. 2005) ........................................................................ 17, 18

*Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477 (8th Cir. 1979)........................................................... 27

*Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996) ............................................... 29

*Keil v. Lopez*, 862 F.3d 685 (8th Cir. 2017) ............................................................. 23, 26, 27, 28

*Khoday v. Symantec Corp.*, 2016 WL 1637039 (D. Minn. Apr. 5, 2016) ................................. 117

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ........................................................... 57, 58

*Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301 (N.D. Ill. 2022) .................................. 109

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ................................................ 26

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No.*, 921 F.2d 1371 (8th Cir. 1990) . 17

*Lowry v. Rhapsody International, Inc.*, 75 F.4th 985 (9th Cir. 2023) .......................................... 58

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)......................................................................... 28

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ................................................................. 84

*Maine State Ret. System v. Countrywide Fin. Corp.*, 2013 WL 6577020 (C.D. Cal. Dec. 5, 2013) ............................................................................................................................ 82

*Marshall v. Nat'l Football League*, 787 F.3d 502 (8th Cir. 2015) ....................................... Passim

*Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) .......................................................... 102

*McCabe v. Six Continents Hotels, Inc.*, 2015 WL 3990915 (N.D. Cal. June 30, 2015) .............. 82

*McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626 (E.D. Pa. 2015) ........................................ 119

*Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650 (S.D.N.Y. 2015) ....................................... 22

*Moehr v. Nat'l Ass'n of Realtorsl*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ....................... 18

*Montgomery v. Beneficial Consumer Disc. Co.*, 2005 WL 497776 (E.D. Pa. Mar. 2, 2005) ..... 115

*Moratis v. W. Penn Multi-List, Inc.*, 2024 WL 4436425 (W.D. Pa. Oct. 7, 2024) ....................... 87

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ............................................. 116

*National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981) ...... 111, 112, 113, 114

*North Dakota v. Lange*, 900 F.3d 565 (8th Cir. 2018) ............................................................... 106

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ....................................................................... 100

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) .................................................... Passim

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................................................. 116

*Poertner v. Gillette Co.*, 618 F. App'x 624 (11th Cir. 2015) ..................................................... 118

*Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198 (W.D. Mo. 2017) ......... 116, 117, 118, 119

*Reid v. I.C. Sys. Inc.*, 2018 WL 11352039 (D. Ariz. July 27, 2018) ......................................... 118

*Retta v. Millennium Prods., Inc.*, 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) ....................... 82

*Ruiz v. Estelle*, 553 F. Supp. 567 (S.D. Tex. 1982) .................................................................... 61

*Sanderson v. Unilever Supply Chain, Inc.*, 2011 WL 5822413 (W.D. Mo. Nov. 16, 2011) ........ 17

*Schutter v. Tarena Int'l, Inc.*, 2024 WL 4118465 (E.D.N.Y. Sept. 9, 2024) .............................. 103

*Shay v. Apple Inc.*, 2024 WL 1184693 (S.D. Cal. Mar. 19, 2024) ................................................ 81

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) ...................................................................... 116

*Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013) .................................................. 61

*South Central Bell Telephone Co. v. Alabama*, 526 U.S. 160 (1999) .......................................... 111

*Spann v. J.C. Penney Corp.*, 314 F.R.D. 312 (C.D. Cal. 2016) .................................................... 69

*Standard Iron Works v. ArcelorMittal*, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) .................. 55

*State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798 (Mo. 2015) ........................................................ 122

*Stetson v. Grissom*, 821 F.3d 1157 (9th Cir. 2016) ................................................................... 59

*Stevens v. Zenith Distrib. Corp. of Kansas*, 1984 WL 21983 (W.D. Mo. July 20, 1984) ........... 59

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011) ....................................................... 70, 103

*Swetz v. GSK Consumer Health, Inc.*, 2021 WL 5449932 (S.D.N.Y. Nov. 22, 2021) .............. 117

*Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848 (S.D. Iowa 2020) ........................................ 18

*Taylor v. Sturgell*, 553 U.S. 880 (2008) .................................................................................. 111

*TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982) ................................. 96

*Thompson v. Edward D. Jones & Co.*, 992 F.2d 187 (8th Cir. 1993) ........................................... 96

*UAW v. General Motors Corp.*, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006) ........................... 85

*United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485 (1950) .......................................... 80

*Van Horn v. Trickey*, 840 F.2d (8th Cir. 1988) .............................................................. 17, 18, 24

*Vargas v. Capital One Financial Advisors*, 559 F. App'x. 22 (2d Cir. 2014) .............................. 84

*Visa Check/Master Money Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D. N.Y. 2003) ....... 52, 53

*Vogt v. State Farm Life Ins. Co.*, 2021 WL 247958 (W.D. Mo. Jan. 25, 2021) ........................... 29

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ................................ Passim

*Whitlock v. FSL Mgmt., LLC*, 2015 WL 13322438 (W.D. Ky. July 13, 2015) ........................... 77

*Zepeda v. PayPal, Inc.*, No. 10-, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) ......................... 88

**Statutes**

15 U.S.C. § 1 ....................................................................................................................... 2

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) .............................................................................. 15, 116, 118

Fed. R. Civ. P. 23(e)(1)(B) ........................................................................................... 17

Fed R. Civ. P. 11(b) ..................................................................................................... 92

Federal Rule of Civil Procedure 23(a) ............................................................... 106, 122

Federal Rule of Civil Procedure 23(e) ................................................................. Passim

Rule 23 ................................................................................................ 28, 29, 117, 118

Rule 23(a) and 23(b)(3) ............................................................................................ 122

Rule 23(b)(3) ............................................................................................................ 122

Rule 23(e)(2) ............................................................................................... 17, 18, 22

Rule 23(e)(3) ............................................................................................................. 18

Rule 23(e)(5)(A) ................................................................................................... 27, 29

Rule 23(f) .................................................................................................................. 23

**Other Authorities**

2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update) ........................ 104

4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) .............. 28, 29

4 Newberg and Rubenstein on Class Actions § 13:35 (6th ed. June 2024 Update) ................... 25

7AA C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1760 (3d ed. June 2024 update) .............................................................................................. 99

7B Wright & Miller, Federal Practice & Procedure § 1798.1 (3d ed. 2005) ............... 71

*Manual for Complex Litigation, Fourth* § 21.312 (2005) .......................................... 104

xiii

## I. INTRODUCTION

Plaintiffs seek final approval of proposed settlements with the National Association of Realtors ("NAR"),[1] and the HomeServices Defendants ("HSA" or "HomeServices") (collectively the "Settling Defendants"). These Settlements together comprise a total settlement fund of almost $700 million. This fund is in addition to other settlements submitted for approval in this case and the *Gibson* action. All told, the total monetary value of settlements across both cases is more than $1 billion. In addition to providing for a monetary recovery for the class, the Settling Defendants obligate themselves to make important changes in their practices, detailed in the Settlement Agreements and summarized in the briefs in support of preliminary approval. *See* Docs. 1458 & 1458-1 (NAR), 1518 & 1518-1 (HSA), 1538 (opt-in entities). These reforms will promote price competition and, over time, are expected to bring about meaningful benefits for consumers.

This Court previously preliminarily approved the proposed settlements. *See* Docs. 1460, 1520, 1540. In granting preliminary approval, the Court directed that notice be disseminated to the Settlement Class (or "the Class"), and preliminarily determined that the Settlements are fair, reasonable, and adequate, and that the Class Representatives and Class Counsel have adequately represented the Settlement Class. *Id.* at 2. Accordingly, the Court held that it would likely approve the Settlements, provisionally certified the proposed Settlement Class, and directed the Parties to issue notice to potential Class members. *Id.* In compliance with the Court's directions, the Claims Administrator, JND, implemented a robust notice program.

The Settlements have been extremely well-received by the Class. As of November 14, 2024, 491,490 Class members have submitted claims, with more claims likely to be submitted

---

[1] Thirteen brokerage firms, 15 non-Realtor MLSs, and 547 Realtor MLSs "opted into" the NAR Settlement.

before the May 9, 2025 claim deadline. In addition, a remarkably small number of objections for a class of this size have been filed with the Court. As discussed herein, the few objections filed fail to identify any reason why the Settlements are not fair, reasonable, and adequate. In support of this Motion, Plaintiffs submit the declarations of Eric Dirks (Ex. 1) (attorney for the Class), Steve Berman (Ex. 2) (attorney for the Class); Marc Seltzer (Ex. 3) (attorney for the Class); Brandon Boulware (Ex. 4) (attorney for the Class); Robert Braun (Ex. 5) (attorney for the Class); Todd Graves (Ex. 6) (attorney); and Jennifer Keough (Settlement Administrator) (Ex. 7).

## II.  BACKGROUND AND SETTLEMENT TERMS

### A.  The Litigation

The *Moehrl* class action was filed in the Northern District of Illinois on March 6, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on 20 Covered Multiple Listing Services ("MLSs") spanning 19 states. (*Moehrl* Doc. 1). The *Burnett* action was filed in this Court on April 29, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on one of four Subject MLSs in Missouri. (*Burnett* Doc. 1).

The Plaintiffs in both actions alleged that NAR and the nation's largest real estate brokerage firms entered into an unlawful agreement in violation of the Sherman Act, 15 U.S.C. § 1, to artificially inflate the cost of commissions in residential real estate transactions. Specifically, Plaintiffs alleged a longstanding conspiracy among Defendants to create, adhere, and enforce NAR rules (a) requiring home sellers to make blanket unilateral offers of compensation to real estate brokers working with buyers, (b) restraining negotiation of those offers, (c) denying buyers information on the commissions being offered, (d) allowing buyer agents to represent that their services are "free," and (e) incentivizing and facilitating steering by brokers towards high commission listings and away from discounted listings (together, the "Challenged Rules").

Plaintiffs claimed that the Challenged Rules are anticompetitive and caused them to pay artificially inflated broker commissions when they sold their homes. Defendants have denied Plaintiffs' allegations.

Defendants filed motions to dismiss the *Burnett* action on August 5, 2019, and this Court denied their motions on October 16, 2019. (*Burnett* Doc. 131). Similarly, Defendants filed motions to dismiss the *Moehrl* action on August 9, 2019, and the Court in that action denied their motions on October 2, 2020. (*Moehrl* Doc. 184). The Parties proceeded with discovery.

On April 22, 2022, this Court granted the *Burnett* Plaintiffs' motion for class certification; appointed Scott and Rhonda Burnett, Jerod Breit, Ryan Hendrickson, Jeremy Keel, and Scott Trupiano as class representatives; and appointed Ketchmark & McCreight, Boulware Law LLC, and Williams Dirks Dameron LLC as co-lead Class Counsel. (*Burnett* Doc. 741). Hollee Ellis and Frances Harvey joined as class representatives in the *Burnett* action with the Third Amended Complaint (*Burnett* Doc. 759).

On March 29, 2023, Judge Wood granted the Plaintiffs' motion for class certification in the *Moehrl* action, appointed Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh as class representatives, and appointed Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP as co-lead Class Counsel. (*Moehrl* Doc. 403).

The Parties in both actions completed over four years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests for production, followed by the production of well over five million pages of documents from the Parties and dozens of non-parties across both actions. *Moehrl* and *Burnett* Plaintiffs briefed numerous discovery motions and other disputes relevant to obtaining evidence supporting their claims. The Parties conducted around 100 depositions in the *Moehrl* action and over 80 depositions

in the *Burnett* action. *Moehrl* Plaintiffs engaged six experts and *Burnett* Plaintiffs engaged five experts supporting their claims and in rebuttal to the nine experts retained by Defendants in each case. Moreover, most experts were deposed in connection with the submission of 24 expert reports in *Moehrl* and 19 expert reports in *Burnett*. The Plaintiffs in both cases have also briefed summary judgment, and the Plaintiffs in *Burnett* proceeded to trial, including against HSA and NAR, and briefed post-trial motions. (Berman Decl. at ¶ 15; Dirks Decl. at ¶¶ 13-14, 22). Much of the discovery focused on the nationwide rules and practices of NAR and its members. Class Counsel and experts in *Burnett* and *Moehrl* analyzed rules, policies, practices, and transaction data, including on a nationwide basis. (Berman Decl. at ¶ 16; Dirks Decl. at ¶ 14). They also evaluated whether those policies and practices differed among the various MLSs. The information and data were not limited to the *Burnett* and *Moehrl* Defendants, but rather focused on the entire industry. *Id.* After Plaintiffs obtained a verdict in *Burnett*, HSA and NAR filed multiple post-trial motions, and, if those motions were unsuccessful, were mounting their merits appeals. (Dirks Decl. at ¶ 22).

After years of aggressive litigation and settlement negotiations, *Moehrl* and *Burnett* Plaintiffs, and the Defendants in those cases, entered into Settlement Agreements that require those Defendants to make important Practice Changes, provide Cooperation in the ongoing litigation, and pay the following amounts:

1. National Association of Realtors: at least $418 million[2];
2. HomeServices Defendants: $250 million;
3. Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere"): $83.5 million;
4. RE/MAX LLC ("RE/MAX"): $55 million; and
5. Keller Williams Realty, Inc. ("Keller Williams"): $70 million.

_____

[2] Plus an additional $30,587,754 paid by opting-in entities under the NAR Settlement.

## B. Settlement Negotiations

Class Counsel and counsel for NAR and HSA engaged in extensive arm's-length settlement negotiations that lasted nearly four years. These included several telephonic and in-person mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal judge, and a mediation with a federal magistrate judge. Although these mediations did not directly result in a Settlement, the Parties continued to engage directly through multiple, intensive in-person and telephonic negotiations over several months, from November 2023 through March 15, 2024, with NAR when they ultimately reached an agreement on the Settlement. Berman Decl. at ¶¶ 8-9; Dirks Decl. at ¶ 19. And multiple, intensive in-person negotiations over several months with HSA which ultimately reached an agreement on the Settlement. *Id.*

The Settling Parties reached the Settlement Agreements after considering the risks and costs of continued litigation, including appeals and the potential bankruptcy of both Defendants. Plaintiffs and Class Counsel believe the claims asserted have merit and that the evidence developed supports their claims. Plaintiffs and counsel, however, also recognize the myriad risks and significant delay that would result from further proceedings in a complex case like this, and believe that the Settlement confers substantial benefits upon Settlement Class Members. Berman Decl. at ¶ 12-13, 15, 12; Dirks Decl. at ¶ 22. Moreover, Class Counsel conducted a thorough financial analysis of NAR's and HSA's ability to pay, which reflected limits on the monetary recovery feasible through either settlement or continued litigation. Berman Decl. at ¶ 19-27; Dirks Decl. at ¶ 20. Finally, the opting in brokerages and non-Realtor MLSs that negotiated an additional payment provided detailed financial records that Plaintiffs carefully analyzed and considered in determining each opt-in's ability to pay. *Id.*; Berman Decl. at ¶¶ 19-27.

## C.     Summary of Settlement Agreements

### 1.  Settlement Class

The proposed Settlement Class in the NAR Settlement Agreement includes all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

- Homes listed on Moehrl MLSs: March 6, 2015 to date of Class Notice;

- Homes listed on Burnett MLSs: April 29, 2014 to date of Class Notice;

- Homes listed on MLS PIN: December 17, 2016 to date of Class Notice;

- Homes in Arkansas, Kentucky, and Missouri, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2018 to date of Class Notice;

- Homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2017 to date of Class Notice;

- For all other homes: October 31, 2019 to date of Class Notice.

NAR Agreement ¶ 21.

The proposed Settlement Class in the HSA Settlement Agreement includes all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

a.     Moehrl MLSs: March 6, 2015 to date of notice;

b.     Burnett MLSs: April 29, 2014 to date of notice;

c.     MLS PIN: December 17, 2016 to date of notice

d.     All other MLSs: October 31, 2019 to date of notice.

HSA Agreement ¶ 17.

## 2. Settlement Amounts

The proposed Settlements provide that the Settling Defendants will pay the following amounts for the benefit of the Settlement Class, for a total of $698,587,754.00:

- NAR: $418 million
- HomeServices Defendants: $250 million
- NAR Settlement Opt-ins (as reflected in the chart below): $30,587,754

| NAR Settlement Opt-ins | Agreed Payment |
|---|---|
| Alaska MLS | $238,800 |
| BAREIS | $736,800 |
| Central Virginia Regional MLS | $100,000 |
| MetroList | $2,280,100 |
| Minot MLS | $26,300 |
| MiRealSource | $100,000 |
| MLS Exchange | $361,300 |
| Real Estate Information Network ("REIN") | $934,100 |
| Richmond MLS | $15,700 |
| SE Alaska MLS | $19,000 |
| Southeast Georgia MLS | $16,800 |
| Spanish Peaks MLS | $15,700 |
| UNYREIS | $250,000 |
| West Penn Multi-List | $895,000 |
| WNYREIS | $250,000 |
| Fathom Holdings, Inc. | $2,950,000 |
| Key Realty, Ltd. | $375,000 |
| Michael Saunders & Company | $1,200,000 |
| Pinnacle Estate Properties, Inc. | $725,000 |
| Rose & Womble Realty Company | $100,000 |
| Brown Harris Stevens | $2,900,000 |
| Shorewest Realtors, Inc. | $6,923,153.89 |
| Silvercreek Realty Group | $350,000 |
| The Agency | $3,750,000 |
| Vanguard | $2,000,000 |
| Watson Realty Corp. | $1,350,000 |
| McGraw Davisson Stewart LLC | $800,000 |
| Downing-Frye Realty, Inc. | $925,000 |

*See* Docs. 163, 297, 348. These amounts are inclusive of all costs of settlement, including payments to Class members, attorney fees and costs, service awards for the Settlement Class Representatives, and costs of notice and administration.

The Settlement Amounts are non-reversionary: once the Settlements are finally approved by the Court and after administrative costs, litigation expenses, and attorney fees are deducted, the net funds will be distributed to Settlement Class members with no amount reverting back to the Settling Defendants, regardless of the number of opt-outs or claims made. These amounts are in addition to the over $300 million obtained in the related Settlements that already received final approval.

### 3. Practice Changes

#### a. NAR Practice Changes

The Settlement requires NAR (and its affiliates, as a condition of any release) to make several significant practice changes.[3] Among these required practice changes is the complete elimination of disclosing cooperative compensation offers on Realtor MLSs. In particular, NAR must eliminate any existing requirements, and it is required to prohibit Realtor MLSs and Member Boards from adopting any requirements, that (i) "listing brokers or sellers must make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers)"; or that compensation "offers, if made, must be blanket, unconditional, or unliteral." NAR Agreement ¶ 58(i). As part of these changes, NAR must require that Realtor MLSs "eliminate all broker compensation fields on the MLS" and "prohibit the sharing of the offers of compensation to buyer brokers or other buyer representatives . . . . via any other REALTOR® MLS field." NAR

---

[3] This is intended only as a non-comprehensive summary of the practice changes reflected in the NAR Settlement Agreement. The complete set of practice changes are reflected in the Settlement Agreement itself. *See* Doc. 1458-1.

Agreement ¶ 58(iii). NAR must also "eliminate and prohibit any requirements conditioning participation or membership in a REALTOR® MLS on offering or accepting offers of compensation to buyer brokers or other buyer representatives." NAR Agreement ¶ 58(iv). In addition, NAR must prohibit anyone using an MLS from making cooperative compensation offers on the MLS. NAR Agreement ¶ 58(ii)(a).

The required practice changes also prevent NAR, Member Boards, and Realtor MLSs from recreating an MLS-like system under a different name and from facilitating others' efforts to do so. NAR Agreement ¶ 58(v). This includes express restrictions on: (i) providing "listing information to an internet aggregator" that uses it to facilitate listing brokers or sellers making cooperative compensation offers; and (ii) "providing data or data feeds" to a Realtor, Realtor MLS Participant, or third party where this data is used to facilitate offers of compensation on listings from more than one brokerage.

In addition, the practice changes require increased pricing transparency to sellers and buyers. Before touring a home with a buyer, all Realtor MLS Participants working with buyers must enter into a written agreement that specifies and "conspicuously discloses the amount or rate of compensation" the broker will receive "from any source." NAR Agreement ¶ 58(vi), (a). Moreover, that amount "must be objectively ascertainable and may not be open-ended (e.g., 'buyer broker compensation shall be whatever amount the seller is offering to the buyer')." NAR Agreement ¶ 58(vi)(b). And such a Realtor "may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer." NAR Agreement ¶ 58(vi)(c). With respect to sellers, Realtors and Realtor MLS Participants must "conspicuously disclose" and obtain advance, written approval for "any payment or offer of payment that the listing broker or seller will make to another broker, agent, or other representative

(e.g., a real estate attorney) acting for buyers" and must specify the "the amount or rate of any such payment." NAR Agreement ¶ 58(viii).

NAR must also generally "prohibit REALTORS® and REALTOR® MLS Participants from representing to a client or customer that their brokerage services are free or available at no cost to their clients" and must require them to "disclose to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable," including in listing agreements, buyer representation agreements, and pre-closing disclosure documents. NAR Agreement ¶ 58(vii), (ix).

NAR must also adopt, for the first time, rules expressly and directly prohibiting steering by Realtors and Realtor MLS Participants, including that they "must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered . . . ." NAR Agreement ¶ 58(x).

Moreover, the Agreement includes several monitoring and enforcement mechanisms and incentives. As a condition for obtaining releases under the Settlement, Realtors, Realtor Member Boards, and Realtor MLSs must not only comply with the relevant practice changes, but they must also "agree[] to provide ***proof*** of such compliance if requested by Co-Lead Counsel." NAR Agreement ¶ 18(b), (c), (d). In addition, the Settlement Agreement requires NAR to track whether certain of its affiliates have satisfied the conditions for obtaining relief. It affords "[a]ny Settlement Class Member . . . the right to inquire of [NAR] as to whether a Person is a REALTOR®, REALTOR-Associate® Member, or REALTOR® Member Board and has satisfied the conditions for being a 'Released Party,'" and requires NAR to "promptly provide this information." NAR Agreement ¶ 18(b). It also requires NAR to "develop educational materials" consistent with "each provision in these practice changes, and to eliminate [any contrary] materials." NAR Agreement ¶ 58(xiii).

These practice changes have been cited as changes that will "drive down housing costs."[4] And although early, change is beginning to happen, as discussed below in Part VI(B)(3). Plaintiffs agreed to these practice changes in consultation with leading experts, including Profs. Einer Elhauge and Roger Alford. Dr. Elhauge is a Professor of Law and Economics at Harvard University, was the Chairman of President Obama's Antitrust Advisory Committee, and is well regarded as a leading mind in economics and the law in the United States. Prof. Roger P. Alford is Professor of Law at University of Notre Dame and a former Deputy Assistant Attorney General at the Antitrust Division of the U.S. Department of Justice during President Trump's administration. Dirks Decl. at ¶ 26.

Finally, entities opting into the NAR Settlement are also bound by the relevant practice changes. *See* NAR Agreement ¶ 18(b)-(f).

### b. HSA Practice Changes

The Settlement requires HSA (and its affiliates, as a condition of any release) to make several significant practice changes as follows:

i.   advise and periodically remind HomeServices's company-owned brokerages, franchisees (if any), and their agents that there is no HomeServices requirement that they must make offers of compensation to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;

ii.  require that any HomeServices company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective

---

[4] Debra Kamin, *Powerful Realtor Group Agrees to Slash Commissions to Settle Lawsuits*, N.Y. Times (Mar. 15, 2024), https://www.nytimes.com/2024/03/15/realestate/national-association-realtors-commission-settlement.html; *see also*, Scott Horsley, *Buying or Selling a Home? How the Real Estate Fee Structure Impacts You,* NPR (Mar. 22, 2024), https://www.npr.org/2024/03/22/1239486107/realtor-fee-commission-homes-for-sale ("Overall expenses are expected to be significantly lower."); Julian Mark, Aaron Gregg & Rachel Kurzius, *Realtors' Settlement Could Dramatically Change Cost of Housing Sales*, Washington Post (Mar. 15, 2024), https://www.washingtonpost.com/business/2024/03/15/nar-real-estate-commissions-settlement/.

home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then HomeServices will require that any company-owned brokerages and their agents (and recommend and encourage that any HomeServices franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii. prohibit all HomeServices company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free (unless they are, in fact, not receiving any compensation for those services from any party);

iv. require that HomeServices company-owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

v. prohibit HomeServices company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi. advise and periodically remind HomeServices company-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii. for each of the above points, for company-owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

viii. display offers of compensation made by listing brokers or agents, where such compensation data is available and/or provided by HomeServices own brokerages for all active listings by HomeServices on its own brokerage website(s), and shared on bhhs.com or that brokerage's associated HomeServices regional franchise network website(s), and require company owned brokerages (and recommend and encourage that franchisees and agents) include their cooperative compensation offers (if any) on any listings that they publicly display or share with prospective buyers through IDX or VOW displays, or through any other form or format. For purposes of this paragraph, "HomeServices own brokerage" includes HomeServices' subsidiary-owned brokerages and its franchisees.

HSA Agreement ¶ 51.

### 4. Release of Claims Against Settling Defendants

#### a. NAR

Upon entry of a final judgment approving the Settlement, the Settlement Agreement will release and discharge: (i) NAR; (ii) NAR's Members, Associate Members, and its Member Boards that do not operate an unincorporated MLS on certain conditions, including that they agree to abide by applicable practice changes; (iii) Realtor MLSs, as defined in the Settlement Agreement, on certain conditions, including that they agree to abide by applicable practice changes; (iv) any non-Realtor MLSs, as defined in the Settlement Agreement, but only on certain conditions, including that they agree to practice changes and pay an additional amount for the benefit of the Class as outlined in Appendix D; (v) real estate brokerages that, together with their affiliates, have $2 billion or less in total sales volume, have a Realtor as a Principal, and comply with the practice changes; and (vi) real estate brokerages with a Realtor Principal  that, together with their affiliates, have over $2 billion in total sales volume but only on certain conditions, including that they agree to practice changes and pay an additional amount for the benefit of the Class as outlined in Appendix C. NAR Agreement ¶ 18.

The Settlement Agreement, if approved, ends litigation with NAR, Realtor MLSs, and small brokerages. It also provides a framework for larger brokerages and non-Realtor MLSs to resolve potential liabilities. Importantly, any entity receiving a release must agree to practice changes described in the Settlement.[5]

_____

[5] The NAR Settlement Agreement also expressly excludes from the Release a variety of individual claims that Class Members may have concerning product liability, breach of warranty, breach of contract, or tort of any kind (other than a breach of contract or tort based on any factual predicate

### b. HomeServices

Upon the Effective Date, Plaintiffs and the Settlement Class will release and discharge HSA and its subsidiaries, affiliated franchisees, independent contractors, and certain other representatives from any and all claims arising from or relating to "conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." HSA Agreement ¶¶ 7, 13-15, 29–31. The complete terms of the releases are contained in the Settlement Agreement.

The Settlement Agreement, however, does nothing to abrogate the rights of any member of the Settlement Class to recover from any other Defendant, including Berkshire Hathaway Energy. HSA Agreement ¶ 63. The Settlement Agreement also expressly excludes from the Release a variety of individual claims that class members may have concerning product liability, breach of warranty, breach of contract, or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Action). Also exempted are any "individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue in these Actions." HSA Agreement ¶ 31.

_____

in this Action). Also exempted are any "individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue in these Actions." NAR Agreement ¶ 36.

### D. Application for Award of Attorneys' Fees, Costs, and Class Representative Incentive Awards

The Settlements authorize Class Counsel to seek attorneys' fees and costs incurred in prosecuting the litigation. Plaintiffs submitted their application for an award of attorney fees and costs to be paid out of the Settlement Fund. *See* Doc. 1535.

## III. NOTICE WAS EFFECTIVELY DISSEMINATED TO THE SETTLEMENT CLASS

The Settlement Notice Plan was robust and implemented in compliance with the requirements of the Court's Preliminary Approval Order consistent with Rule 23 and due process requirements. In consultation and collaboration with the Parties, the Settlement Administrator, JND Legal Administration ("JND"), provided Notice to Settlement Class members in the manner approved by the Court through first-class U.S. mail, electronic mail, and digital and print publication. Keough Decl. at ¶ 3. The Notice Plan "met, and exceeded, the standards for providing the best practicable notice in class action settlements." Keough Decl. at ¶ 4. The notices complied with Rule 23(c)(2)(B), in that they "clearly and concisely state in plain, easily understood language": a description of the nature of the case; the class definition; a description of the claims; issues, or defenses; that a Settlement Class member may enter an appearance through an attorney; that a class member may appear at the Fairness Hearing; the time and manner for opting out or objecting; the binding effect of a class judgment; and the manner by which to obtain further information. *See* Fed. R. Civ. P. 23(c)(2)(B).

The Notice Program consisted in part of direct notices, in the form of postcard and email notice to all potential Settlement Class members that JND and Class Counsel were able to locate. Postcard notice was sent to over 14 million addresses, and email notice was sent to over 25 million email addresses. Keough Decl. at ¶¶ 16, 19.

In addition to the extensive direct notice program, JND also implemented a comprehensive digital and electronic media notice program which reached over 70% of the Settlement Class members. Keough Decl. at ¶ 40. The digital portion of the media effort alone delivered more than 308 million impressions. *Id*. at ¶ 22. The media notice program also included a press release and press coverage that resulted in over 500 news stories with an additional 176 million potential viewers. *Id*. at ¶ 34, 39. Combined, the notice programs reached **99%** of the class. *Id*. at ¶ 40.

JND also established and maintained a Settlement Website that had over 2 million unique visitors and over 12 million page views. *Id*. at ¶ 44.

## IV. THE REACTION OF THE MEMBERS OF THE SETTLEMENT CLASS TO THE SETTLEMENTS HAS BEEN OVERWHELMINGLY POSITIVE

The Class's reaction to the Settlements has been positive and strongly supports final approval. As of November 14, 2024, JND has received 491,490 claims. Keough Decl. at ¶ 53. Because the funds are non-reversionary, all of the money from the net Settlement fund will be distributed to authorized Claimants. Plaintiffs expect that the claims rate will rise because Settlement Class members are eligible to submit claims through May 9, 2025.

In contrast, only 39 Settlement Class members requested exclusion from the Settlements and there were only, at most 13 objections[6] filed on behalf of 23 objectors total. These objections are discussed in Part VI, below.

## V. LEGAL STANDARDS AND SETTLEMENT APPROVAL

Federal Rule of Civil Procedure 23(e) sets out a two-part process for approving class settlements. The Court already completed the first stage of the approval process, often called

---

[6] Out of an abundance of caution, Plaintiffs' counsel include the Gonzalez filing (Doc. 1564) and Gustis filing (Doc. 1510) as objections.

"preliminary approval," when it determined that "the Court will likely be able to approve the Settlements," and ordered that notice be directed to the class. Fed. R. Civ. P. 23(e)(1)(B). Now that notice has been disseminated and reaction of the Class members has been received, the Court can make its final decision whether to approve the Settlements.

As a general matter, "the law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'") (quoting *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced Class Counsel that settlement was fair, reasonable, and adequate).

A. **The Standard for Reviewing a Proposed Settlement of a Class Action**

The determination of whether a class action settlement is "fair, reasonable, and adequate is committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions, and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Van Horn v. Trickey*, 840 F.2d at 604, 606-07 (8th Cir. 1988) (cleaned up). The ultimate question is whether the settlement is "fair, reasonable, and adequate." *In re Wireless*, 396 F.3d 922, 932 (8th Cir. 2005). Rule 23(e)(2) includes four factors the Court must consider, when evaluating whether a settlement is fair, reasonable, and adequate. Those factors are whether:

(A) the Class Representatives and Class Counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the Class is adequate, taking into account:

    (i)      the costs, risks, and delay of trial and appeal;

    (ii)     the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;

    (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Eighth Circuit has also set forth four factors that a court should consider in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *In re Wireless*, 396 F.3d at 932 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975)); *Van Horn*, 840 F.2d at 607; *see also Swinton v. SquareTrade, Inc.,* 454 F. Supp. 3d 848, 861 (S.D. Iowa 2020) (analysis of certain Rule 23(e)(2) factors will "necessarily include analysis of [certain] related *Van Horn* factors"); *Anderson v. Travelex Insurance Servs. Inc..*, No. 8:18-CV-362, 2021 WL 4307093, at *2 (D. Neb. Sept. 22, 2021) (approving settlement under Rule 23(e) by evaluating *Van Horn* factors); *Cleveland v. Whirlpool Corp.*, No. 20-cv-1906, 2022 WL 2256353 (D. Minn. June 23, 2022) (evaluating settlement under Rule 23(e)(2) and *Van Horn*).

### B.    The Settlements Satisfy Each of the Rule 23(e)(2) Factors

*First*, Settlement Class Representatives and Class Counsel have adequately represented the Class and will continue to do so. Class Counsel were appointed to serve as lead counsel in both *Moehrl* and this case after both courts found Class Counsel would adequately represent the class. *Burnett*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022); *Moehrl*, 2023 WL 2683199 (N.D. Ill. Mar.

29, 2023). Class Counsel subsequently won a jury trial in this case. And, in *Gibson*, the Court appointed Class Counsel with responsibility for any settlements for the nationwide class. *Gibson*, Doc. 180. Altogether, Class Counsel have obtained over $1 billion in proposed and approved settlements as well as historic practice change relief. Likewise, the Class Representatives have bought and sold homes and have demonstrated their commitment to the litigation by responding to discovery, providing relevant documentation, attending depositions, participating in the settlement process, and for many, testifying at trial.

*Second*, as discussed above, each Settlement was conducted in good faith and at arm's length by experienced counsel on both sides. The NAR and HSA settlements were reached only after years of negotiations and a jury trial. Each settlement also occurred only after Settling Defendants provided Class Counsel with sufficient financial information for Plaintiffs to make an informed decision about the adequacy of any settlement. Dirks Decl. at ¶¶ 20, 23; Berman Decl. at ¶¶ 19-27. The lengthy history of the real estate commission litigation, which has proceeded for years through class certification in both *Moehrl* and a trial in this case, provides ample evidence of the skill and tenacity Class Counsel brought to the negotiation of the Settlements.

*Third*, for the reasons stated above, the relief obtained for the Settlement Class is fair and adequate. The Settlements provide significant financial recoveries to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including potential appeals, and taking into account the Settling Defendants' financial resources. The Settlements also include meaningful changes to the Settling Defendants' policies that are likely to benefit consumers for years to come through lower commissions. The Parties dispute the strength of their claims and defenses. The Settlements reflect a compromise based on the Parties' well-informed assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes. Plaintiffs' best-case scenario was defending a verdict on appeal and obtaining

a recovery from any resulting bankruptcy. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020) ("Antitrust cases are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute."). Plaintiffs' worst-case outcome was receiving nothing after an appellate reversal or as unsecured creditors in a bankruptcy. And the only way that the Settlements were possible was if they provided for a nationwide recovery and release. Dirks Decl. at ¶ 24.

Against this risk, the NAR and HSA Settlements provide for nearly $700 million recovery and substantial practice changes. *See In re Pork Antitrust Litig.,* No. 18-1776, 2022 WL 4238416, at *2 (D. Minn. Sept. 14, 2022) (granting final approval of antitrust settlement that provided "substantial relief against the backdrop of a great deal of uncertainty where the merits are highly contested" in a case involving alleged price-fixing conspiracy among pork processing companies); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 995-96 (N.D. Ohio 2016) (granting final approval of a settlement in light of "real possibility that [plaintiffs] could have received much less—even zero—from a jury at trial or following an appeal").

Some Class members have objected that they may not recover every dollar they paid to real estate agents. That objection not only assumes that the total amount of their *payments* (rather than their overcharges) would be recoverable as damages, it also fails to account for the risks of litigation and the limitations on Defendants' ability to pay any higher sums. The essence of the settlement compromise requires giving up the "highest hopes" in return for the certainty of payment, because attempting to obtain more risks no recovery at all.

The Court-appointed notice and claims administrator, JND, will work with Class Counsel in processing Class member claims and distributing settlement funds to the Class. JND has extensive experience with claims distribution in connection with large and complex class action settlements. Keough Decl. at ¶¶ 1, 49-54. Under Class Counsel's supervision, JND will be

responsible for reviewing claim forms and evidence of purchase to determine whether a claim qualifies for payment, and any claim that cannot be substantiated may be subject to challenge, nonpayment, or a reduced share of the available funds. *See* Settlement Notice at ¶ 9. Class members with approved claims will have several options for receiving payment, including by debit card, Zelle, Venmo, or check. *See* Claim Form at p. 1.[7]

Finally, the attorneys' fee request is reasonable and in line with Eighth Circuit precedent. *See* Pls.' Mot. for Attorneys' Fees, Doc. 1535.

*Fourth*, the Settlements treat Class members fairly and equitably relative to each other. The practice change relief applies equally to all Class members nationwide. With respect to the monetary relief, every person who meets the class definition is eligible to submit a claim and receive compensation. The settlement website advises both that: (i) settlement payments "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 12.[8] That is all that is required. *See Petrovic*, 200 F.3d at 1152–53 ("We do not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards."). Finally, there are no requested service awards under these settlements.

## C.    The *Van Horn* Factors Also Support Approval

The *Van Horn* factors provide additional support for the Settlements.

---

[7] *See* https://www.realestatecommissionlitigation.com/claimformlanding.
[8] *See* https://www.realestatecommissionlitigation.com/nar-faq.

## 1. The Merits of the Plaintiffs' Cases, Weighed Against the Terms of the Settlement

As discussed above under the Rule 23(e)(2) factors, the Settlements reflect a compromise based on the Parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes, including potential financial outcomes of the Settling Defendants.

## 2. The Settling Defendants' Financial Condition

The fairness, adequacy, and reasonableness of the Settlements are supported by the Settling Defendants' financial condition and their inability to satisfy a judgment. Dirks Decl. at ¶¶ 20-23. In order to evaluate the Settling Defendants' financial condition, Plaintiffs reviewed the financial information of the Settling Defendants and their ability to pay. *Id.*; Berman Decl. at ¶¶ 19-27. Class Counsel firmly believe these amounts are reasonable in light of the Settling Defendants' financial limitations. Dirks Dec. at ¶¶ 20-23. Moreover, "a defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 125 (8th Cir. 1975) (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

## 3. The Complexity and Expense of Further Litigation

Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the voluminous briefing in *Moehrl* and in this case, which includes extensive class certification and summary judgment briefing, as well as post-trial briefing. In addition, Plaintiffs

engaged in extensive appellate briefing, including briefing Rule 23(f) petitions in both *Moehrl* and *Burnett* as well as two separate appeals in this case concerning arbitration issues, and a petition for certiorari to the United States Supreme Court.

By contrast, the Settlements provide for certain recovery for the Class. In light of the many uncertainties of continued litigation, a significant and certain recovery weighs in favor of approving the proposed Settlements. *See In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669, 678 (D. Minn. 1974) (approving settlement where price-fixing claims faced "substantial roadblocks" on top of the "difficulties inherent" in prevailing on such claims); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1137 (8th Cir. 1984) (affirming final approval of settlement where "no reported opinion addresses the precise [merits] question presented here," which created "a substantial question whether [plaintiff] would prevail"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) ("Any verdict would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement.") (cleaned up).

### D.    The Amount of Opposition to the Settlements

The Settlement Class Representatives in this action have approved the Settlements. More than 491,000 Class members have submitted claims, while only a small handful have objected and only 39 have opted-out. Keough Decl. at ¶¶ 53, 57. This supports granting final approval. *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) (determining with respect to a settlement class of approximately 3.5 million households, in which "only fourteen class members submitted timely objections," the "amount of opposition is minuscule when compared with other settlements that we have approved"); *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129-SRB, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) ("A low number of opt-outs and objections in comparison to class size

23

is typically a factor that supports settlement approval" (quoting *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015)); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) (of the 4,838,789 settlement class members who were sent notice, only 620 (0.012%) opted out of the settlement and only 33 (0.00068%) objected to the settlement, which "are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement"); *In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) ("The objectors represent only about 8 per cent of the class, and this relatively low level of opposition to the settlement also indicates its fairness. The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement.") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)); *see also, e.g.*, *Van Horn*, 840 F.2d at 607 ("the amount of opposition to the settlement" is a key factor to be considered in the settlement approval process); *Marshall*, 787 F.3d at 513 ("We have previously approved class-action settlements even when almost half the class objected to it.").

## VI. THE COURT SHOULD CONSIDER AND OVERRULE EACH OBJECTION

Class Counsel received 13 objections or complaints on behalf of 23 purported objectors and other individuals. Seven are from *pro se* objectors: (1) Khyber Zaffarkhan (Doc. 1539); (2) Robert Duthler (Doc. 1541); (3) Tonya Monestier (Doc. 1552); (4) Black Tie Realty (*Gibson* Doc. 527); (5) Vivienne Cunningham (*Gibson* Doc. 528); (6) Arturo Gonzalez (Doc. 1564), and (7) Peter Gustis (Doc. 1510).[9] The remainder are from six sets of objectors with copycat cases

---

[9] The Gonzalez and Gustis filings are not objections, but Plaintiffs include them to the extent they could be construed as such.

encompassed by the Settlement Class in this case: (1) Hao Zhe Wang (Doc. 1547); (2) Robert Benjamin Douglas, Benny D. Cheatman, Douglas W. Fender II, and Dena Marie Fender (Docs. 1558 and 1559); (3) Robert Friedman (Doc. 1560); (4) James Mullis (Doc. 1561); (5) Monty March (Doc. 1562); and (6) Spring Way Center, LLC, Nancy Wehrheim, John and Nancy Moratis, Danielle and Jesse Kay, Kaitlyn Slavic, Maria Iannome (Doc. 1563).

### A.     Overview and Legal Standard

As an initial matter, the Court has already overruled objections that are similar, and in many cases substantially identical, to each of the objections here. *See Burnett*, May 9, 2024 Order Granting Final Approval, Doc. 1487 at 13-29 (overruling objections); *Gibson*, November 4, 2024 Order Granting Final Approval, Doc. 530 (same). Although "[n]o particular standard governs judicial review of objections," courts evaluate objections in "determining whether the settlement meets Rule 23's fairness standard." 4 Newberg and Rubenstein on Class Actions § 13:35 (6th ed. June 2024 Update). "[T]he trial court has some obligation to consider objections but is given significant leeway in resolving them." *Id.*

For a class of this size, or any size, the number of objections received is remarkably low. Indeed, there are only, at most, thirteen sets of objections before the Court. This is out of a class comprised of millions of home sellers. This means that 99.99% of the Class did not object. And the claims made as of November 14, 2024 exceed objectors by more than 20,000-to-1. While the Court should consider the merits of each objection, objections by a tiny minority should not prevent approval of the Settlements as fair, reasonable, and adequate. *See Marshall*, 787 F.3d at 513–14 ("The district court refused to give credence to the vocal minority" and "the court aptly noted that 'only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement'"); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559, 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) ("[t]he

Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)). The Class's actions here reflect even stronger support for the Settlements than in *Marshall* or *In re Wireless*.

"[I]n determining whether to approve a class action settlement, the issue is not whether everyone affected by the settlement is completely satisfied. Instead, the test is whether the settlement, *as a whole*, is a fair, adequate, and reasonable resolution of the class claims asserted." *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915, 2022 WL 18107626, at *8 (E.D. Va. Sept. 13, 2022) (emphasis added). "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (cleaned up); *see also Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (cleaned up). "Objections that the settlement fund is too small for the class size, or that a defendant should be required to pay more to punish and deter future bad behavior, while understandable, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement." *Capital One*, 2022 WL 18107626, at *8.

As discussed above, and as this Court provisionally determined in its Preliminary Approval Orders, the relief provided by the Settlements is "fair, reasonable, and adequate, in accordance with Rule 23(e) of the Federal Rules of Civil Procedure." *See* Docs. 1460, 1520. Importantly, any Class members who did not like the Settlements had the option to exclude themselves from the Settlement Class and to pursue damages and any other relief on an individual basis—as a small number of Class members have done. This favors approval of these Settlements.

*See, e.g.*, *Marshall*, 787 F.3d at 513 (affirming class settlement, stating that objectors "were not required to forgo what they believed to be meritorious claims—they could have opted out of the settlement to pursue their own claims, as some class members did"). When weighed against the risks of and time required for litigation through a potential class judgment after trial, these immediate benefits strongly support a finding that the settlement relief is fair, reasonable, and adequate. *See Keil*, 862 F.3d at 697.

### B. The Court Should Overrule the Pro Se Objections: Zaffarkhan (Doc. 1539); Duthler (Doc. 1541); Tonya Monestier (Doc. 1552); Black Tie Realty (*Gibson* Doc. 527); Vivienne Cunningham (*Gibson* Doc. 528); and complaints from Arturo Gonzalez (Doc. 1564) and Peter Gustis (Doc. 1510).[10]

#### 1. Zaffarhan Objection (Doc. 1539)

The Court overruled Mr. Zaffarkhan's same objection in *Gibson*. Doc. 530 at 19-21. It should be overruled here for the same reasons. Mr. Zaffarkhan's objection does not comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." Nor does Mr. Zaffarkhan provide basic information about the homes he claims to have sold, including whether he hired a listing broker, whether the homes were listed on an MLS, or how any broker fees he paid may have been allocated among those brokers. Additionally, based on the limited information provided, Mr. Zaffarkhan's claimed 2016 home sale appears to fall outside of the settlement class period. Thus, Mr. Zaffarkhan has not established he has standing to object for that sale. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.") (citing *Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979));

---

[10] Previous *pro se* objections lodged during the Anywhere round of final approval were previously overruled. *See* Doc. 1487 at 13-14.

*Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 580 (5th Cir. 2007) ("[O]nly class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) (while "Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members," and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Even considering Mr. Zaffarkhan's objections, none of them show that the Settlements should be rejected. *First*, Mr. Zaffarkhan objects that the monetary recovery is inadequate because the Settlements (and other proposed and approved settlements in related cases) will not fully compensate him for the entirety of any commissions he may have paid. It is true that Class members will likely receive from these settlements only a portion of their best-day-in-court damages. But that fact is true for essentially any settlement and is not grounds for declining to approve the particular proposed Settlements here. *Keil*, 862 F.3d at 696. As described herein, Plaintiffs sought to obtain the largest recovery they could in light of the risks of continued litigation, Settling Defendants' ability to pay limitations. Mr. Zaffarkhan's objection does not account for or otherwise address those risks and limitations. Nor does he opine that these Settling Defendants could reasonably have paid more. Further, the objection does not account for the fact that the proposed Settlements would resolve claims against only one set of Defendants and do not release claims against other Defendants (e.g., in the *Gibson* litigation) against whom Plaintiffs continue to seek relief on behalf of the class.

*Second*, Mr. Zaffarkhan's objection notes Plaintiffs' requests to recover attorneys' fees, costs and expenses, and service awards. To the extent Mr. Zaffarkhan is objecting that Plaintiffs'

attorneys' fee request is too high because it reduces the class recovery, Plaintiffs provided extensive legal authority and factual justification for their request. *See* Pls.' Mot. for Attorneys' Fees, Doc. 1535; *see also Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (paying attorneys out of the fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170, 2021 WL 247958, at *1 (W.D. Mo. Jan. 25, 2021) ("When a class action creates a common fund for the benefit of the class members, the Court may award class counsel reasonable attorneys' fees 'equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.'") (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244-45 (8th Cir. 1996)). In addition, to the extent Mr. Zaffarkhan disagreed either with the amount of his recovery or the attorneys' fee request, he was free to opt-out of the Settlements and retain an attorney to pursue claims individually. But he chose not to do so.

### 2. Duthler Objection (Doc. 1541)

Mr. Duthler fails to provide any information reflecting that he is a class member with standing to object to the Settlements. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder*, 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Mr. Duthler comply with Rule 23(e)(5)(A), which requires that the "objection

must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."

Mr. Duthler objects that the requested attorney fees are too high, but he does not explain why, aside from making baseless accusations that Co-Lead Counsel have somehow violated federal RICO and antitrust laws by filing a fee petition with the Court. Plaintiffs showed their request is reasonable. *See* Doc. 1535; *see also* Part VI(b)(3)(b), below, discussing Monestier objection. Mr. Duthler also argues in a single sentence that the settlement should not be approved because "[t]here is no valid evidence" that sellers were "ever denied to negotiate the fee asked by the Realtor." Doc. 1541 at 1. A jury disagreed with Mr. Duthler's assessment of the evidence, which, regardless, would not be a basis for rejecting the Settlements.

### 3. Monestier Objection (Doc. 1552).

Prof. Tanya J. Monestier filed a lengthy objection challenging the NAR Settlement Agreement's practice changes and Plaintiffs' attorneys' fee request.[11] But her arguments that the NAR Settlement should be rejected rely entirely on anecdote and conjecture. In her objection, Prof. Monestier ignores the Settlement's enforcement provisions, and then baselessly speculates that Co-Lead Counsel and the Court will not enforce the Settlement's practice change requirements. She likewise criticizes certain of the Settlement's practice changes—but does so based primarily on purportedly unscrupulous conduct by agents that occurred within the first few weeks after the practice changes were implemented, and that she admits generally violates the Settlement and will be redressable by enforcing it.

---

[11] Prof. Monestier devotes a single page of her 122-page objection to the monetary relief component of the NAR Settlement. Doc. 1552 at 96. Her arguments regarding the adequacy of the monetary recovery are addressed elsewhere in this brief. They do not show that recovery was inadequate in light of the risks of continued litigation, including NAR's ability to pay limitations.

Despite her voluminous criticisms, Prof. Monestier fails to offer any realistic and constructive alternative to the NAR Settlement practice changes that would create a better and more competitive marketplace. Instead, she advocates for returning to the "old" system—even though a jury deemed that system anticompetitive and found that the brokers enforcing and operating under it had overcharged consumers by more than a billion dollars in Missouri alone. The NAR Settlement arises from a particular case challenging a particular set of practices; it cannot and will not cure every ill in the entire real estate industry.

The Settlement does, however, make important changes to how homes are bought and sold, especially to those practices that are at the heart of the *Moehrl*, *Burnett*, and *Gibson* litigations. This includes eliminating industry-wide rules mandating cooperative compensation to brokers working with buyers and restricting commission negotiations. It will take time for the full effect of these reforms to be felt. But the early evidence suggests that they are already resulting in a more competitive and consumer-friendly marketplace. Consumers are increasingly empowered to ask questions and negotiate. And preliminary studies show that commissions are beginning to decline as a result of the Settlement. The Court should not accept Prof. Monestier's invitation to return the real estate market to the anticompetitive and anti-consumer system that existed before this litigation.

Prof. Monestier's attacks on counsel are equally unmerited. Prof. Monestier, who teaches contract law and other subjects at the University of Buffalo Law School, attempts to leverage her academic position to lend credibility to her objections and to repeatedly disparage Co-Lead Counsel and the experts assisting with the litigation. But in contrast to the antitrust economists and real estate industry experts who were consulted in developing the practice changes reflected in the NAR Settlement, Prof. Monestier does not appear to have any economics or antitrust expertise. Nor does she appear to have had any professional background in real estate (beyond publishing

two academic articles addressing a topic unrelated to the NAR Settlement), until she apparently took interest in the Settlement a few months ago. She fails to show that she is more qualified than this Court to judge the time, effort, and value of Co-Lead Counsels' contributions to the Class.

Prof. Monestier's various criticisms of Plaintiffs' fee request are likewise unfounded. Plaintiffs' attorneys' fee request is in line with Eighth Circuit precedent. And, although no lodestar cross check is required in the Eighth Circuit, Plaintiffs' hourly rates are consistent with prevailing rates in complex antitrust litigation. As explained in greater detail below, Prof. Monestier's objection should be overruled on all grounds.

### a. Prof. Monestier's Complaints About the NAR Settlement's Practice Changes Lack Merit

Prof. Monestier objects that the NAR Settlement has "absolutely no enforcement mechanism." Doc. 1552 at 6. This is not only false, but obviously so. The NAR Settlement expressly includes multiple enforcement and monitoring mechanisms each of which Prof. Monestier either ignores in her objection or describes inaccurately.

First, the NAR Settlement Agreement expressly provides that "[t]he Court shall retain jurisdiction over the implementation and *enforcement* of" the Settlement Agreement, including the practice change provision. NAR Agreement ¶ 82 (emphasis added). This gives Plaintiffs the ability, and the Court the authority, to enforce the Settlement, including against NAR, which in turn is required under the Settlement to "use its *best efforts* to implement the practice changes specified" in the Agreement. *Id.* ¶ 60 (emphasis added). Prof. Monestier ignores this provision in her objection.

Second, under the NAR Settlement Agreement, Plaintiffs and the Court have authority to enforce the Settlement Agreement *directly* (i.e., not solely through NAR) against the vast majority of MLSs in the United States. The Settlement Agreement includes an opt-in structure that

permitted Realtor and non-Realtor MLSs to agree to submit to the Court's jurisdiction, including for purposes of enforcing the settlement, as one of several conditions for obtaining a release.[12] These MLSs also have to provide "proof of compliance" with the required practice changes when requested by Co-Lead Counsel. Every significant Realtor MLS in the country—in total, 547 Realtor MLSs—opted into the Settlement. In addition, 15 non-Realtor MLSs opted in as well (including by agreeing to make additional payments to the Class). This is a significant benefit of the Settlement that likely could not have been achieved through the existing litigation and would otherwise have required filing additional lawsuits suing hundreds of MLSs. Negotiating with and tracking potential opt-in MLSs required considerable effort by Co-Lead Counsel. The full list of these opting in MLSs has been reflected on the Settlement website since well before the objection deadline. Prof. Monestier nevertheless ignores these provisions in her objection.

Third, under the NAR Settlement Agreement, Plaintiffs and the Court have authority to enforce the Settlement Agreement *directly* against 13 large brokerage firms around the Country that have opted into the Settlement. This is separate from and in addition to the practice change relief agreed to by other brokerages that Plaintiffs have settled with outside of the NAR Settlement framework and any brokerages that may agree to future settlements or be subject to a judgment

_____

[12] *See, e.g.*, NAR Agreement, App'x B ¶ 4 ("As a condition for being a Released Party, as that term is defined in the Settlement Agreement, stipulating MLS agrees to be bound by the practice changes…."); *id.* ¶ 7 ("Stipulating MLS agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel."); *id.* ¶ 8.vi (Stipulating MLS "agree[s] that the Settlement Agreement and Appendix B shall not preclude Plaintiffs from seeking the production of non-privileged documents in its possession, custody, or control"); *id.* ¶ 15 ("The Court shall retain jurisdiction over the implementation and enforcement of the Settlement Agreement and the Settlement, including Appendix B."); *id.* ¶ 16 ("Stipulating MLS submits to the exclusive jurisdiction of the Court for the purposes of interpreting and enforcing the terms of Appendix B, including but not limited to, the practice changes contained therein.").

following litigation.[13] These brokerages also have to provide "proof of compliance" with the required practice changes when requested by Co-Lead Counsel. As with the opting in MLSs, the full list of these opting in brokerages was prominently reflected on the Settlement website well in advance of the objection deadline. Prof. Monestier nevertheless ignores these provisions as well in her objection.

Fourth, the Settlement Agreement creates substantial incentives for Realtor MLSs, member boards, brokerages, and individual agents to abide by the Settlement terms. These entities and individuals only become "Released Parties" if they "compl[y] with the practice changes reflected" in the Settlement Agreements and "agree[] to provide proof of such compliance if requested by Co-Lead Counsel." NAR Agreement ¶ 18.b, c, e, f. The Settlement Agreement also requires NAR to track compliance by its members and member boards and gives individual Class members "the right to inquire of the National Association of REALTORS® as to whether" these entities and individuals "satisfied the conditions for being a 'Released Party,'" including by complying with the Settlement's practice changes. NAR Agreement ¶ 18.b, e.

This fourth set of enforcement mechanisms are the only ones that Prof. Monestier directly addresses in her objection at all. In doing so, however, Prof. Monestier misconstrues these

---

[13] *See, e.g.*, NAR Agreement App'x B ¶ 4 ("As a condition for being a Released Party, as that term is defined in the Settlement Agreement, stipulating MLS agrees to be bound by the practice changes…."); *id.* ¶ 7 ("Stipulating MLS agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel."); *id.* ¶ 8.vi ("agree that the Settlement Agreement and Appendix B shall not preclude Plaintiffs from seeking the production of non-privileged documents in its possession, custody, or control"); *id.* ¶ 15 ("The Court shall retain jurisdiction over the implementation and enforcement of the Settlement Agreement and the Settlement, including Appendix B."); *id.* ¶ 16 ("Stipulating MLS submits to the exclusive jurisdiction of the Court for the purposes of interpreting and enforcing the terms of Appendix B, including but not limited to, the practice changes contained therein."); *see also* NAR Agreement ¶ 67 ("In order to be included as a Released Party, each REALTOR® MLS must among other requirements agree to be bound by the practice changes in Paragraph 68…").

provisions and inaccurately suggests that they are the *only* available enforcement mechanisms. For instance, Prof. Monestier claims that the provisions requiring NAR to enforce and monitor compliance with the Settlement is "[s]ort of like the fox guarding the henhouse." Doc. 1552 at 6. But she ignores the fact that the requirement that NAR enforce the Settlement Agreement is only one of several enforcement mechanisms and is itself subject to Court enforcement. The other enforcement mechanisms described above authorize Plaintiffs and the Court to directly enforce the Settlement Agreement, including against NAR and opting in brokerages and MLSs.

Prof. Monestier also inaccurately describes several provisions in the Settlement Agreement as *permitting* Co-Lead Counsel to "ask for proof of compliance." Doc. 1552 at 88. In fact, these provisions do not simply authorize Co-Lead Counsel to request proof of compliance with the Settlement Agreement—they *require* various entities and individuals to provide such proof. If they do not, they will be in violation of the Settlement Agreement, lose the benefits of the release, or both. These compliance requirements thus facilitate Plaintiffs' and the Court's ability to enforce the Settlement without having, for instance, to serve and enforce subpoenas.

Prof. Monestier's remaining objections regarding the NAR Agreement's enforcement mechanisms consist largely of personal attacks against Court-appointed Co-Lead Counsel, who she derogatorily refers to as "a handful of Plaintiffs' lawyers." Doc. 1552 at 88. Prof. Monestier's claims that Co-Lead Counsel will not enforce the Settlement once it is approved is pure speculation that is contradicted by Counsel's vigorous prosecution of this litigation for half a decade. Prof. Monestier nevertheless argues that Co-Lead Counsel have a "huge conflict of interest" in enforcing the Settlement, but her explanation is illogical. *Id.* She supposes that Co-Lead Counsel will not enforce the Settlement because doing so might somehow cause the Settlement to be "rescinded," which she believes would in turn put Co-Lead Counsel's attorneys' fees at risk. *Id.* However, under the Agreement's plain language, once the Settlement is finally approved, NAR will not have any

recission rights, and so the conflict of interest she conjures is illusory. Indeed, if anything, Prof. Monestier's argument favors promptly *approving* the Settlement—not rejecting it.

Prof. Monestier's other supposed "evidence" that Co-Lead Counsel will not enforce the Settlement is a two-paragraph interview excerpt, in which one of the attorneys representing Plaintiffs referenced the Settlement Agreement's prohibition on MLSs serving as a vehicle for cooperative compensation offers. *Id.* Prof. Monestier makes the convoluted and unsupported leap that somehow in referencing *this* Settlement Agreement requirement, Co-Lead Counsel must be ignoring the other requirements reflected in the Settlement Agreement, which in her view must also mean that Co-Lead Counsel will not enforce those other provisions. The NAR Settlement Agreement is 109 pages long. It is obviously unrealistic to expect Plaintiffs' counsel to address every aspect of that Agreement in a short interview. Even so, in citing to a cherry-picked excerpt, Prof. Monestier ignores repeated statements from the same interview in which the quoted attorney makes clear that Co-Lead Counsel intend to vigorously enforce the Settlement Agreement.[14] Indeed, the title of the interview is "Every move you make, we'll be watching you." And finally, if agents or brokers violate the practice change requirements, then they are not released and Prof. Monestier (or any person) can sue those agents or brokers herself.

Prof. Monestier also objects that the practice changes themselves should be rejected. She claims that the practice changes were "concocted by lawyers without a full appreciation of how

---

[14] *See, e.g.*, Andrea Brambila, *Michael Ketchmark: Every move you make, we'll be watching you*, Inman (Aug. 19, 2024), https://www.inman.com/2024/08/19/michael-ketchmark-every-move-you-make-well-be-watching-you/ ("We've been monitoring what's been happening in the industry with a lot of these webinars and training programs, just seeing how people are interpreting this and what their intention is. If anyone thinks they're going to be able to avoid the application of this settlement agreement and the law by creating some new forms or hiding this cooperation on new websites, they're wrong. If we get any sense that people or corporations are doing that out there as a way around this, we plan on taking swift legal action.").

this would play out in the real world." Doc. 1552 at 5. This criticism is ironic given that Prof. Monestier herself is a law professor who teaches contract law (not antitrust, real estate, or economics) and whose CV reflects minimal "real world" real estate industry or antitrust expertise.[15] Her criticism also ignores the fact that, in contrast to her background, the practice changes reflected in the NAR Settlement were developed in consultation with economic and real estate industry experts—and were not simply "concocted by lawyers" as she claims. Doc. 1552 at 6. Prof. Monestier likewise ignores the fact that Co-Lead Counsel too have extensive antitrust expertise and deep knowledge of the real estate industry based on a half-decade's worth of painstaking factual and expert discovery buttressed by extensive research into real estate industry practice.

Prof. Monestier purports to identify "workarounds" or "breaches" of the Settlement Agreement practice changes that, in her view, show that the NAR Settlement should be rejected. However, the fact that Prof. Monestier considers many of her examples to violate the Settlement Agreement *supports* approving the Settlement—not rejecting it—as approving the Settlement would facilitate Co-Lead Counsels' and the Court's ability to protect sellers and buyers from conduct that is anticompetitive and anti-consumer. Additionally, while Prof. Monestier seeks to frame the supposed "workarounds" as "a widespread practice," she does not reference any statistical evidence and omits the preliminary evidence that has emerged in the less than three months since the Settlement practice changes took effect. Doc. 1552 at 18. Indeed, in her own August 2024 Report on Buyer Representation Agreements Post NAR Settlement, Prof. Monestier

---

[15] Prof. Monestier has written two articles involving the real estate industry in 2019 and 2024—neither of which involved the anticompetitive NAR rules at issue in this litigation. *See* Doc. 1552 at 12.

makes clear that she "do[es] not claim that the [buyer representation] forms [she was able to review] are a representative sample of all the forms out there[.]"[16]

Preliminary evidence reflects that, in the short time since the NAR Settlement was announced in March 2024 and implemented in August 2024, consumers are already beginning to benefit from lower broker commissions and an increased ability to negotiate. For instance, a study by the real estate company Redfin found that "[c]ommissions trended slightly lower following the National Association of Realtors (NAR) settlement, dropping from an average of 2.42% in March to 2.35% in August, when the new changes went into effect . . . before dropping by a single basis point to 2.34% in October."[17] A Redfin agent based in Chicago indicated that "[s]ellers are more and more wanting to pay 2 percent to a buyer's agent" and "[n]ow we're negotiating commission more frequently."[18] Redfin also reported that transparency on commissions with home buyers and sellers was increasing as "[i]nstead of negotiating on the MLS, agents are engaging through phone calls and text messages[.]"[19] Anecdotally, since the Settlement, consumers are seeking to negotiate and lower commissions from the standard 3%.[20]

---

[16] Tanya Monestier, Report on Buyer Representation Agreements Post NAR Settlement at 2 (Aug. 2024), https://www.law.buffalo.edu/content/dam/law/content/faculty-staff/monestier-report-on-bra-post-nar-settlement.pdf.

[17] Mark Worley, *Real Estate Agent Commissions Hold Steady Since New Industry Rules Were Implemented*, Redfin (Oct. 31, 2024), https://www.redfin.com/news/buyers-agent-commission-october-2024/.

[18] *Id.*

[19] Jeff Andrews, *Agent commissions are being negotiated more often, but it's a 'tale of two markets'*, HousingWire (Sept. 9, 2024), https://www.housingwire.com/articles/buyer-agent-commission-negotiations-increase/.

[20] *See* Asking a realtor to lower their commission, Reddit, https://www.reddit.com/r/RealEstateAdvice/comments/1f8h07r/asking_a_realtor_to_lower_their _commission/?rdt=48561 (last visited Nov. 18, 2024) (Post from three months ago stating: "Would it be reasonable to ask if [the agent] would be open to lowering the commission to 2% for selling our home? [. . .] Edit: seems like the consensus is yes, this is a reasonable ask."); Lower

Further, a recent study, "Contract & Commission Study: The Initial Impact of the NAR Settlement," conducted by RISMedia, a real estate news publication, surveyed "more than 1,300 agents and brokers from every part of the country" and found "a drop of 68 basis points (0.68%) compared to the full year before" when "[a]sking agents and brokers to report the average commission rate for buyer and listing agents for transactions over the last month (timed to include only those that took place after the August 17 deadline for policy changes)[.]"[21] RISMedia reports this "is very significant, translating to a loss of $2,870 in commission on a median-priced home" and "appeared to be mostly taken from the buy-side, in line with what would be expected if the drop was catalyzed by policy changes (which were mostly projected to affect buyer agents)."[22] The study also found evidence of competition happening in the market for commissions, as "[w]hile inexperienced buyer agents brought in 2.58% on average leading up to the settlement, they only got paid 1.82% post-August 17—more than three quarters of a percentage point lower. [. . .] By comparison, veteran buyer agents only saw a 10-basis point drop post-settlement, from

Commission real estate agents in Houston?, Reddit, https://www.reddit.com/r/houston/comments/1f9mydu/lower_commission_real_estate_agents_in_houston/ (last visited Nov. 18, 2024) (Post from two months ago stating: "I'm planning to sell my home in Houston and could use some advice. I know NAR opens up the possibility of paying less at sale time, so I'd like to know who you went with to sell your home for less."); Low Commission Real Estate Agents in Florida?, Reddit, https://www.reddit.com/r/florida/comments/1gdefoz/low_commission_real_estate_agents_in_florida/ (last visited Nov. 18, 2024) (Recent post stating: "I am putting my home on the market soon and I'm looking for low commission realtors to help with the sale. I want to minimize fees while still getting great service, so I'm hoping to find an agent or agency that offers lower commissions but doesn't compromise on quality.").

[21] *RISMedia's 2024 Contract & Commission Study: The Impact of the NAR Settlement*, RISMedia (Oct. 28, 2024), https://www.rismedia.com/reports/settlement-shock-rismedias-2024-contract-commission-study/.

[22] *Id.*

2.68% to 2.58%[.]"[23] Further, an analyst for investment bank TD Cowen Insights told investors that it estimates real estate commissions could fall between 25% to 50%.[24]

In addition to disregarding evidence of the meaningful impact that the NAR Settlement practice changes are already having, Prof. Monestier's objection ignores the fact that those practice changes have only been in place for a few months (since August 17, 2024). In contrast, the challenged anticompetitive NAR buyer broker commission rules were in place for more than three decades, with NAR and the real estate industry engaging in similar anticompetitive conduct going back more than a century. The *Burnett* and *Moehrl* Plaintiffs' expert economists and other scholars and consumer advocates have always been clear that it will take time for the full impact of the practice changes to be reflected in real estate industry pricing and practices. *See* Elhauge Class Cert. Rebuttal Report, at ¶¶ 55-56, *Moehrl v. Nat'l Assn. of Realtors*, 1:19-cv-01610 (N.D. Ill.) (Doc. 372).[25] In fact, this Court in approving class certification in *Burnett* recognized Plaintiffs' economist Dr. Shulman's assessment that it would take "the course of several years . . . to see significant market adjustment in the Northwest MLS," a non-NAR MLS that previously modified

---

[23] *Id.*

[24] David Goldman & Anna Bahney, *The 6% commission on buying or selling a home is gone after Realtors association agrees to seismic settlement*, CNN Business (Mar. 15, 2024), https://cnn.com/2024/03/15/economy/nar-realtor-commissions-settlement/index.html.

[25] *See also* Jeff Ostrowski, *The future of real estate commissions*, Bankrate (Aug. 16, 2024), https://www.bankrate.com/real-estate/real-estate-commissions-lawsuit-impact/ (quoting Stephen Brobeck, senior fellow at the Consumer Federation of America: "Over time, more agents will feel free to offer different types of compensation, and more consumers will comparison shop and negotiate commissions in a more transparent marketplace"); Whizy Kim, *Could a major lawsuit against realtors mean lower home prices?*, Vox (Apr. 25, 2024), https://www.vox.com/money/24106230/nar-realtors-settlement-real-estate-house-prices (interviewing real estate professor Sonia Gilbukh who remarked on the importance of the settlement: "I think there's going to be more experienced agents out there to represent buyers and sellers. I think the [home] prices are going to drop – a little or a lot, we don't know yet – but I think they'll have to adjust. I think there's going to be more people willing to move homes because the transaction cost of doing that is going to be lower").

certain of its anticompetitive rules. *Burnett v. NAR*, 2022 WL 1203100, at *13 (W.D. Mo. Apr. 22, 2022).

Professor Monestier's objection is based on the unrealistic expectation that the full force of practice changes to an anticompetitive system that has been in place for many decades will be felt immediately. *See* Elhauge Class Cert. Report, at ¶¶ 29-33, *Moehrl v. Nat'l Assn. of Realtors*, 1:19-cv-01610 (N.D. Ill. June 7, 2022) (Doc. 324-6). Thus, the fact that Prof. Monestier points to purported examples of confusion and violations within the first few weeks after the Settlement Agreement went into effect, and before it has even been approved and fully enforced, is neither surprising, nor a basis for rejecting the Settlement Agreement.

Plaintiffs next address several of the specific "workaround" examples Prof. Monestier discusses, each of which demonstrates that the Settlement Agreement should be approved (rather than rejected).

*Amending the Disclosed Buyer Broker Compensation*: Prof. Monestier contends that the Settlement should be rejected based on alleged examples of buyer brokers seeking to modify their disclosed compensation with buyers to increase broker compensation after they have already toured homes with buyers. To the extent some buyer brokers are engaging in such conduct, it is generally prohibited under the NAR Settlement. Indeed, Prof. Monestier herself acknowledges as much. *See* Doc. 1552 at 20. The Settlement protects consumers from conduct where an agent seeks to increase the previously disclosed compensation with the buyer once the agent learns the compensation the seller is offering.

*Seller-Paid Bonuses*: Prof. Monestier also claims there are provisions in agreements[26] that permit a broker working with a buyer to collect unspecified bonuses from the seller *in addition* to the compensation agreed to with the buyer in a written agreement. The Settlement prohibits such conduct, as "the amount of compensation reflected [in the required written agreement] must be objectively ascertainable and may not be open-ended (e.g., 'buyer broker compensation shall be whatever amount the seller is offering to the buyer'), and the broker "may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer." NAR Agreement ¶ 58(vi)(b) & (c). A broker working with a buyer is therefore unable to receive any compensation other than the specific compensation disclosed to the buyer prior to touring a home—regardless of whether that compensation is styled as a "bonus" or otherwise.

*Touring or Showing Agreements*: The Settlement does not specify the duration of the binding price disclosure agreement that brokers must enter into with a buyer, as long as the disclosure occurs prior to the broker touring any home with that buyer. The disclosure can be a time-limited agreement that specifies the amount of compensation the buyer broker will receive for homes toured during the period of that agreement. As Prof. Monestier herself indicates, however, the Settlement does not permit brokers to collect more in compensation than specified in the touring agreement for homes viewed during the scope of the agreement. *See* Doc. 1552 at 35.

---

[26] Throughout Prof. Monestier's objection, she includes screenshots of MLS, and state and local Realtor association forms, which often appear in draft form and contain highlighting and notes from unknown sources. The objection typically indicates these forms are on file with the author, or provides no citation. Prof. Monestier also cites in several places to forms from Northwest MLS, but Northwest MLS is among a handful of non-Realtor MLSs that did *not* opt into the NAR Settlement, and so is not subject to its requirements. Doc. 1552 at 23, 73, 75 n.165. To the extent Prof. Monestier believes Northwest MLS has engaged in anticompetitive conduct, she is certainly free to pursue her own litigation. But her examples from Northwest MLS are irrelevant to approval of the NAR Settlement.

*Guaranteed Minimum Level of Compensation Up to a Maximum*: To the extent there are provisions in written agreements that ask a buyer to vaguely agree to a minimum amount of compensation they will pay their buyer broker and a maximum amount of compensation the buyer broker will receive if the seller is paying, this is impermissible and the Settlement prohibits such conduct. Before touring a home with a buyer, a broker working with a buyer must enter into a written agreement with the buyer that discloses the amount of compensation the broker will receive in a way that "must be objectively ascertainable and may not be open-ended[.]" NAR Agreement ¶ 58(vi)(b). Moreover, Prof. Monestier does not offer evidence reflecting that this "issue" is widespread—indeed, she indicates she has only been able to find one state Realtor association that has published a buyer representation agreement containing such a provision. Doc. 1552 at 37-38.

*Agent Accepting Whatever Is Being Offered by the Cooperating Broker*: Prof. Monestier again provides only one example in which a draft buyer agreement seems to permit the buyer broker to receive compensation equal to the amount being offered to a cooperating broker, even if that amount is more than the amount the buyer has agreed to. *See* Doc. 1552 at 40. To the extent such a provision exists in a buyer agreement, the Settlement clearly prohibits such conduct as a broker "may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer." NAR Agreement ¶ 58(vi)(c).

*Tailoring the Buyer Representation Agreement to Seller-Offered Compensation*: Prof. Monestier identifies a single email from a broker and a Reddit post as the only support for the "workaround" of brokers entering into house-specific representation agreements with buyers that are tailored to the commission being offered by the seller of each home. *See* Doc. 1552 at 41. Yet she attempts to frame this as a "common way of circumventing the intent of the settlement[.]" *Id.* Her two examples of truncated quotations lack context on the exact language that would appear in the written agreements between the buyer and their broker or when the agreements are being

entered into. Under the Settlement, the written agreement needs to be entered into between a broker and the buyer they are working with before the buyer tours "any" home and must "conspicuously disclose the amount or rate of compensation" the broker will receive "from any source." NAR Agreement ¶ 58(vi)(a). If a provision is being tailored to the commission being offered by a particular seller and is left open-ended in the written agreement to be filled in based on whatever the seller or listing broker is offering, or is being entered into after touring a home with the broker and learning what the seller is offering, that is inconsistent with the Settlement.

Prof. Monestier also argues the Settlement should be rejected based on scenarios she herself states are not a "breach of the settlement agreement" and in fact are "likely consistent with the wording of the settlement agreement." Doc. 1552 at 39. For example, Prof. Monestier raises the "workaround" of buyer brokers subsequently orally agreeing to waive commissions that exceed the rate previously agreed in writing to be paid by the seller. In such a scenario, the buyer broker has entered into a written agreement with the buyer prior to touring a house that discloses the amount of commission the broker will receive, and consistent with NAR Agreement (e.g., ¶ 58(vi)(c)), the broker does not receive "compensation for brokerage services from any source that *exceeds* the amount or rate agreed to in the agreement with the buyer." It is difficult to address such a hypothetical scenario for the purpose of determining whether it raises consumer protection or other issues absent a full set of facts. But based on the limited set of facts Prof. Monestier provides, it appears that contrary to her claims, the broker is not "agreeing to be compensated at whatever amount the seller authorizes[.]"[27] *See* Doc. 1552 at 39. The buyer and her broker have

_____

[27] The guidance offered by the Arizona Association of Realtors that Prof. Monestier references (Doc. 1552 at 37) makes this point clear: "Q10. In stating the rate of compensation in the Agreement to Show Property, can the parties agree to write in 'buyer broker compensation shall

entered into a written agreement that clearly specifies the amount or rate of compensation the Realtor will receive from any source and the buyer is free to negotiate that amount. The buyer can then choose later to agree to waive any amount of commission for her broker that exceeds the rate agreed in writing to be paid by the seller. To the extent Prof. Monestier has identified concerns about buyer brokers being untruthful to buyers somehow, depending on the representations made, that may create a separate issue outside the purview of the Settlement.

Nor is the presence of multiple models of compensation in the marketplace a basis to reject the Settlement. This is consistent with both the nature of a free and competitive marketplace and the Settlement's practice changes, which do not specify a single compensation rate or model. The objection identifies three scenarios of Realtors acting to "perpetuate the system of seller-paid broker compensation" that are misleadingly framed as "widespread," unsupported by the handful of examples referenced, and provide no basis for rejecting the Settlement. *See* Doc. 1552 at 42-51.

*First*, Prof. Monestier contends that listing agents are informing sellers that if they do not offer compensation, they will not receive offers from buyers. But many of the examples she points to explicitly reflect listing agents *not* making up front offers of buyer broker compensation. For instance, Prof. Monestier cites to a comment by a broker in Minnesota, but that broker states that she is "a broker in group B [abandoning cooperative compensation]." Doc. 1552 at 44. And in another of her examples, Prof. Monestier misleadingly presents a screenshot from a brokerage in Philadelphia, which she herself admits reflects that "not all properties listed by this broker offered compensation in advance[.]" *Id.* at 46-47. And in Prof. Monestier's example of a Compass Realty

be whatever amount the seller is offering by way of a co-broke?' A10. No. The amount of compensation must be objectively ascertainable and may not be open-ended. This is required by the NAR Settlement." *Buyer-Broker Agreement to Show Property Frequently Asked Questions*, Arizona Realtors, https://www.aaronline.com/2024/07/08/buyer-broker-agreement-to-show-property-frequently-asked-questions/.

script, the hypothetical agent informs the seller that they are "not required to offer a commission to a buyer's agent" and that "ultimately the choice is [the seller's.]" *Id.* at 45. Moreover, to the extent Realtors are informing sellers that they must offer a certain amount of buyer broker compensation or buyers will not make offers on their homes, such conduct is now prohibited by NAR,[28] and the Settlement's practice changes make clear that Realtors must disclose to prospective sellers that broker commissions are fully negotiable.

*Second*, the Settlement requires that a broker may not "filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the broker assisting the buyer." NAR Settlement ¶ 58.x. But it does not prohibit a buyer from considering a particular seller's willingness to cover some part of the already agreed buyer-side broker compensation as part of the home search process. This objection from Prof. Monestier misleadingly suggests that the Settlement must not be working because of anecdotal reports from a handful of real estate agents that in the less than three months since the practice changes went into effect, many sellers are still covering buyer broker commissions.[29] *See* Doc. 1552 at 49 n. 108,

---

[28] *See* Consumer Guide: REALTORS'® Duty to Put Client Interests Above Their Own, Nat'l Assn. of Realtors, https://www.nar.realtor/the-facts/consumer-guide-realtors-duty-to-put-client-interests-above-their-own ("The REALTOR® Code of Ethics prohibits 'steering' buyers toward homes because the REALTOR® will be paid more, or away from homes because the REALTOR® will be paid less. Similarly, the REALTOR® Code of Ethics prohibits a REALTOR® from telling a seller that buyers will be 'steered' toward homes because the REALTOR® will be paid more, or away from homes because the REALTOR® will be paid less."); *see also id.* ("A REALTOR® should explain to their seller the benefits and costs of the various types of marketing that can be done for a listing, and how potential buyers might respond to such marketing. A REALTOR® is ethically prohibited from telling a seller that their home will be hidden from buyers unless the seller pays a particular type or amount of compensation.").

[29] The objection quotes a "personal finance and real estate expert" as "confident that the NAR Settlement has not changed anything[,]" Doc. 1552 at 51, but omits that in the same article, this individual stated: "Maybe in the long run this will all sort out where buyers pay a little bit less and sellers pay a little bit less, but I don't know" and that she was glad more people are aware that

---

50; August 10, 2022 Schulman Merits Reply Report, Doc. 922-3 at ¶ 101-02 (observing that even with a rule change, it would take time for commissions to drop; "it is atypical for business behavior and institutions to evolve or change dramatically overnight").

Nor do the Inman surveys referenced in the objection, conducted less than two months after the practice changes went into effect, indicate the Settlement is not working. Doc. 1552 at 51. The objection selectively quotes language from the surveys on sellers continuing to cover buyer commissions. It entirely omits Inman's findings that "nearly 3 in 10 agent respondents . . . say they have observed a reduction in commissions as a percentage of the purchase price since the August deadline[,]" "49 percent of agents told [Inman] Intel in late September that a significant share of their [seller] clients . . . are now asking whether they are obligated to cover the buyer's commission[,]" and "Nearly 1 in 5 active homebuyers in early October said their signed agreement with their buyer's agent stipulated they would pay only 1.5 percent of the purchase price or less[.]"[30] As discussed above, this short time period is wholly insufficient to assess the impact of the Settlement's practice changes, and the objection omits discussion of post-Settlement empirical evidence that indicates the Settlement is already starting to positively affect consumers' ability to negotiate lower commission amounts.

_____

commissions are negotiable: "So, you might as well ask and then decide if that's the person you still want to have representing you at full price, or if there's somebody else who might be able to do almost as good a job for you for a little less[.]" *See* Herb Weisbaum*, How New Rules Could Change Real Estate Agent Commissions*, Consumers' CheckBook (Oct. 17, 2024), https://www.checkbook.org/washington-area/consumers-notebook/articles/How-New-Rules-Could-Change-Real-Estate-Agent-Commissions-7869. The objection also fails to include any mention of Consumer Federation of America's senior fellow Stephen Brobeck's opinion in this same article that he "expects the commissions to decline over time[.]" *Id.*
[30] *See* Daniel Houston, *Majority of sellers know they aren't on hook for buyer commission: Pol*l, Inman (Oct. 17, 2024), https://www.inman.com/2024/10/18/majority-of-sellers-know-they-arent-on-hook-for-buyer-commission-poll/.

*Third*, the fact that the objection identifies *one* example of a listing agent not agreeing to take a listing unless the seller agreed to offer compensation to the buyer's broker is no basis to reject the Settlement. *See* Doc. 1552 at 43-44. Prof. Monestier does not contend that *no* real estate agents will take listings where the seller does not agree to offer buyer broker compensation up front. In fact, she states that the seller discussed in this example was able to hire a different broker. *Id.* at 43 n.99. And Prof. Monestier makes this exact point to sellers in her post-NAR Settlement The Ultimate Seller's Guide To Real Estate Commissions And Signing A Listing Agreement, where she states: "Also consider what you are comfortable doing on the buyer-side. Some brokerages will (essentially) require you to pay buyer-side commissions if you want to hire them; others won't. Figure out strategically what is best for you. If the listing agent you've chosen won't accommodate what you want to do, find another agent. There are millions of them out there!"[31]

Nor are the three examples identified in the objection of "[r]ealtors exploiting the settlement to get new business" reasons to reject the Settlement. Doc. 1552 at 51-63. All of the examples are premised on inaccurate understandings of what the Settlement requires, involve deceptive conduct by real estate agents that is not permissible under the Settlement or NAR's Code of Ethics (or both), and reflect longstanding issues in the real estate industry that predated the Settlement's existence. *See, e.g.*, *In re Nat'l Arb. F. Trade Pracs. Litig.*, No. CV 10-2122 (PAM/JSM), 2011 WL 13135575, at *4 (D. Minn. Aug. 8, 2011) (rejecting objector's argument based on a "misinterpretation of the settlement"). The *Burnett* and *Moehrl* cases involved challenges to a particular set of anticompetitive NAR rules. The Settlement should not be rejected

---

[31] Tanya Monestier, The Ultimate Seller's Guide To Real Estate Commissions and Signing A Listing Agreement at 12, https://www.law.buffalo.edu/content/dam/law/content/faculty-staff/monestier-sellers-guide.pdf.

because some preexisting anticonsumer practices that were not challenged in this case are not fully addressed in the Settlement.

As Prof. Monestier herself recognizes, the NAR Settlement "does not require *the buyer* to have a representation agreement in place to view the property, put an offer on it, or purchase it", nor does it require buyers to enter into exclusive representation agreements. Doc. 1552 at 52. What the Settlement does require is:

> [A]ll REALTOR® MLS Participants working with a buyer enter into a written agreement before the buyer tours any home with the following: to the extent that such a REALTOR® or Participant will receive compensation from any source, the agreement must specify and conspicuously disclose the amount or rate of compensation it will receive or how this amount will be determined; the amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer"); and such a REALTOR® or Participant may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer[.]

NAR Agreement ¶ 58(vi). In other words, the Settlement requires brokers working with a buyer to enter into a binding, transparent disclosure of the commission amount—but it does not require that this "written agreement" be a buyer representation agreement (i.e., an agency agreement) or be exclusive.

*First*, the "open house' debacle" discussed in Prof. Monestier's objection involves a clear and unethical misrepresentation of the Settlement. Prof. Monestier contends that when some unrepresented buyers are attending open houses, certain listing agents are forcing these buyers to sign binding representation agreements. Doc. 1552 at 52-60. This conduct is not reflective of the Settlement, which as discussed above, does not require buyer representation agreements or unrepresented buyers to sign a written agreement before visiting an open house. If brokers are tricking buyers into signing representation agreements at open houses, this is highly unethical conduct, as the letter from the Colorado Department of Regulatory Agencies warned brokers and agents in Colorado. *Id.* at 58. The example also reflects Prof. Monestier's many criticisms of dual

agency, a longstanding practice in some areas that existed prior to the Settlement and that was not directly challenged in the *Burnett* or *Moehrl* cases. Indeed, the agent from Phoenix quoted in Prof. Monestier's objection makes clear he has been engaging in the practice of trying to snag buyer clients at open houses "throughout [his] almost 20 year-long real estate career[.]" *Id.* at 57. And Prof. Monestier's own June 2024 Report on CAR Proposed Seller Listing Agreement, prior to the Settlement practice changes going into effect, states that the use of open houses to obtain dual agency representation is "already a common practice," citing a Reddit post from roughly a year ago.[32]

*Second*, the example of the so-called "driveway debacle," where an agent tricks a buyer into singing a buyer representation agreement to see a house is another misinterpretation of the Settlement and example of unethical conduct (to the extent it occurs). Doc. 1552 at 60-62. As discussed above, the Settlement does not require buyers to sign a representation agreement in order to see a home. A broker makes this very point clear in a Reddit post cited in Prof. Monestier's objection: "After the recent NAR ruling took effect, many realtors are saying that it is now required that house buyers sign a buyers agreement in order to view a house. This is not true." *Id.* at 61.

*Lastly*, the example of listing agents "insist[ing] that they are not legally permitted to show the house without having a representation agreement in place" is a gross misrepresentation of the Settlement and, again, is unethical conduct. *Id.* at 62. While the objection highlights unfortunate examples of Realtors unethically misrepresenting the Settlement to force buyers into buyer broker agreements, none of these examples are consistent with the practice change requirements of the Settlement. Nor do they warrant rejecting the Settlement from being approved and brokers and

---

[32] *See* Tanya Monestier, Report on CAR Proposed Seller Listing Agreement at 12 n.24 (June 2024), https://www.law.buffalo.edu/content/dam/law/content/faculty-staff/monestier-report-on-sla.pdf.

agents being held responsible for implementing the changes as written and increasing commission transparency for buyers and sellers.

### b. Prof. Monestier's Objections to Counsel's Attorneys' Fee Request Should Also Be Rejected

Prof. Monestier's various criticisms of Plaintiffs' fee request are likewise unfounded. First, the recent Eighth Circuit decision in *T-Mobile* supports Plaintiffs' fee requests. Second, Prof. Monestier's attacks on Professor Klonoff are unsupported and turn basic principles of expert reliability on their head. Third, Plaintiffs' request for one-third of the settlement in fees is in line with comparable settlements. Fourth, although no lodestar cross check is required in the Eighth Circuit, Plaintiffs' hourly rates are consistent with prevailing rates in complex antitrust litigation. Fifth, Plaintiffs' billing practices were appropriate, and Plaintiffs provided sufficient information about their lodestar.

### i. The Eighth Circuit's *T-Mobile* Decision Supports Plaintiffs' Fee Request

Prof. Monestier repeatedly cites the Eighth Circuit's recent *T-Mobile* decision. That decision, however, strongly supports Plaintiffs' fee request and directly refutes many of Prof. Monestier's arguments.

First, the Eighth Circuit specifically considered and rejected an objectors' argument that fee percentages should be automatically reduced in so-called "megafund" cases. The Eighth Circuit "decline[d] to hold that a court must award a reduced percentage in megafund cases." *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 860 (8th Cir. 2024). The Eighth Circuit noted the reasoning of multiple courts that a "megafund approach could create perverse incentives" and "may encourage counsel to seek 'quick settlements at sub-optimal levels.'" *Id.* (collecting cases). It explained that "a per se rule requiring a percentage reduction in every megafund case would introduce arbitrary and formulaic rules into an inquiry that needs to be

anything but." *Id*. Instead, "the determination of a reasonable fee is a wide-ranging inquiry that seeks to account for a variety of case-specific circumstances." *Id*. Prof. Monestier's reliance on the megafund doctrine and percentages awarded in other megafund cases in courts that have adopted it defies the Eighth Circuit's specific instructions that the attorney fee should be awarded based on the specific circumstances of the case and that a per se rule for megafund cases is inappropriate.

Second, Prof. Monestier repeatedly emphasizes that in *T-Mobile* the Eighth Circuit reversed a district court's award of a 22.5% fee request. Doc. 1552 at 107-08. But Prof. Monestier's discussion of *T-Mobile* overlooks the Eighth Circuit's clear instruction that the determination of a reasonable fee should account for case-specific circumstances. Prof. Monestier makes no attempt to examine the very different circumstances between *T-Mobile* and this litigation. As the Eighth Circuit explained, in *T-Mobile*, "Class counsel worked on the case for just a matter of months, conducted relatively little discovery, and engaged in no substantial motions practice, save for responding to a motion to remand." 111 F.4th at 861. In short, that case had "barely gotten off the ground." *Id.*  By contrast, Plaintiffs here litigated these cases over a five-year period through class certification, summary judgment, and, in *Burnett*, a trial—and then obtained a $1.8 billion jury verdict. Cases with entirely different circumstances warrant entirely different fee percentages. To impose a reduced fee percentage on class counsel because of the extraordinary results they achieved, after many years of hard-fought litigation, would have the perverse result of encouraging counsel to seek "quick settlements at sub-optimal levels." *Id.*

Third, in *T-Mobile*, the Eighth Circuit cited approvingly to a decision in the *Visa Check/Master Money Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D. N.Y. 2003). *Id.* In that case, the attorneys had litigated the case for nearly seven years until they settled on the eve of trial. There, the attorneys had initially submitted a fee request that represented a lodestar multiplier of

9.6. *Visa Check*, 297 F. Supp. 2d at 522. The district court reduced that fee request to a "multiplier of about 3.5, which it thought was reasonable given that counsel had risked several years on a case that would yield them nothing had they lost at trial." *T-Mobile*, 111 F.4th at 862 (citing *Visa Check*, 297 F. Supp. 2d at 524-25.). Here, Plaintiffs are requesting an almost identical lodestar multiplier of 3.63 (as of August 31, 2024, though that multiplier will continue to decline) as the one that the Eighth Circuit endorsed, despite the fact that, unlike in *Visa*, Plaintiffs' counsel here fully took the risk and litigated the case to a jury verdict.

Fourth, Prof. Monestier cites to statement in *T-Mobile* where the Eighth Circuit said that a lodestar multiplier request of 9.6 was too high and that such a multiplier would mean that counsel could make $7,000 to $9,500 an hour, "which we think no reasonable class member would willingly pay to an attorney to help resolve this claim, especially when, as here, dozens of other attorneys were offering their assistance." 111 F.4th at 861. The Eighth Circuit indicated that "[r]educing to, say, half of what was requested (resulting in fees of $3,500 to $4,750 per hour) could hardly be considered a penalty." *Id.* at 861. Here, Plaintiffs have asked for a lodestar multiplier of 3.63 and the average composite rate for all of Plaintiffs' timekeepers in this matter is approximately $855.[33] Awarding a multiplier of 3.63 would lead to a rate of approximately $3,100 dollars per hour across Plaintiffs' timekeepers. This is significantly below the rate of $3,500 to $4,700 that the Eighth Circuit indicated would be appropriate in *T-Mobile*. Furthermore, unlike in *T-Mobile*, where a number of firms sought to be appointed lead counsel after a nationally publicized data breach incident, the counsel in these cases pioneered them—there were no other firms competing to be appointed as lead. This reflects the significant risk that Co-Lead Counsel

---

[33] As set forth in the Klonoff declaration, Doc. 1535-1 at 24, Plaintiffs expended approximately 107,500 hours to date in the litigation, and have a total lodestar of approximately $92 million.

took on by litigating these cases.

### ii. Prof. Monestier's Criticisms of Professor Klonoff Are Unfounded

Prof. Monestier does not substantively dispute Professor Klonoff's extensive credentials. Indeed, Prof. Monestier's primary criticism appears to be that Professor Klonoff has too often been accepted as an expert on attorney fees by a court. Doc. 1552 at 99-101. This stands *Daubert* on its head, where an expert's qualifications and experience support—not discredit—the reliability of their testimony. *See e.g., Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 726 (8th Cir. 2015) (expert's "extensive credentials" supported the reliability of his testimony).

Notably, the sole source for Prof. Monestier's criticism is a single article by Professor Mullinex that lumps Professor Klonoff in with several highly-respected experts, including Professors Arthur Miller, William Rubenstein, and Brian Fitzpatrick. Doc. 1552 at 99-101. Each of these experts has been repeatedly recognized as a leading expert in the field. Notably, Prof. Monestier herself in other portions of her filings repeatedly cites to those same experts whom Professor Mullinex criticized. For example, in a subsequent filing, Prof. Monestier touted the credentials of Professor William Rubenstein, stating that Professor Rubenstein "literally wrote the book on class action litigation" and attached as an exhibit a declaration filed by Professor Rubenstein.[34] Yet this is one of the same experts whom Prof. Monestier claims is unreliable and part of a "cottage industry" of experts who testify too frequently. *Id.* at 100. Prof. Monestier's flagrant inconsistency highlights the baselessness of her critique of Professor Klonoff and other highly regarded experts in this field.

Prof. Monestier also highlights that Professor Klonoff has offered opinions in 20 cases. *Id.*

---

[34] *See* Doc. 1575 at 9.

54

at 99. But these cases occurred over a period of 15 years. Nor does Prof. Monestier identify any inconsistencies in the opinions offered by Professor Klonoff. As set forth in Professor Klonoff's declaration, Professor Klonoff's testimony in support of fee requests is consistent with his academic research that fees must be sufficient to attract the best lawyers to take the risk of bringing difficult and cutting-edge cases. *See* Klonoff Decl at ¶113. In contrast, Prof. Monestier provides no evidence of expertise on attorneys' fees and acknowledges her lack of experience or qualifications. *See* Doc. 1552 at 101 n. 213 ("I have not done as extensive research on the attorney fee issues as I would have liked").

### iii. One-Third Fees Are Regularly Awarded in Cases with Settlements of Comparable Size

The Eighth Circuit has repeatedly recognized that a "[fee] award in the amount of one-third of the total settlement fund" is "in line with other awards in [this] Circuit." *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017); *see also Galloway v. Kansas City Landsmen, LLC,* 833 F.3d 969, 973 (8th Cir. 2016) (noting that, in the district court's experience, "33% is in the middle of the range that attorneys performing contingency fee work" typically charge). Courts have also consistently awarded fees representing one-third of the settlement fund in antitrust class actions.[35] Professor Klonoff in his original declaration collected 51 separate examples where fees between 30 to 33 percent were awarded in so-called "mega-fund" cases, even though only 12 of those 51 cases involved a trial. ECF 1535, Ex. 1 at 90-91. A fee amount of one-third of the settlement fund is also consistent with the market rate that is negotiated when sophisticated large corporations bring antitrust class cases as plaintiffs. One specific study examined *seventeen years* of antitrust

---

[35] *Standard Iron Works v. ArcelorMittal,* No. 1:08-CV-06910, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (awarding class counsel 33% of $163.9 million common fund); *In re Potash Antitrust Litig.*, 2013 WL 12470850, at *1 (N.D. Ill. June 12, 2013) (awarding class counsel 33% of $90 million common fund).

cases litigated on contingency where large corporations were named plaintiffs. "[t]he potential damages in many of these cases were enormous," the fixed percentage fee request "of one-third *heavily* dominated."[36]

Despite this extensive authority, Prof. Monestier claims that one-third of fees are almost never awarded in cases with billion-dollar settlements. In particular, Prof. Monestier then spends several pages attempting to explain away the fact that one-third fee requests were recently awarded by Judge Lungstrum in two comparable settlements, *In re Urethane* and *Syngenta*.

Most notably, *In re Urethane*, has a very similar set of facts as this one. Like this case, that case was tried to verdict in the Kansas City area and resulted in a jury verdict of over $1 billion. The case ultimately settled for approximately $835 million with the final defendant while appeals were pending (bringing total settlements to nearly $1 billion). The Court in that purported megafund case ultimately awarded attorneys' fees of 33%. Judge Lungstrum explained in detail the reasons that it awarded 33% as fees:

> All cases present unique circumstances, but it is difficult to imagine a case in which an award at the highest percentage would be more appropriate than in this case. As already discussed, counsel achieved an incredible result for the class, in a case with an extreme amount of risk at all stages of the litigation, and they obtained that result because they won what is reported to be one of the largest verdicts of its kind in United States history. Counsel had to build this case on their own, without the help of a governmental investigation or prosecution, after other counsel had declined to pursue it, and they toiled for many years, at great expense to themselves, with a very real risk that they would not recover anything from this defendant.

*In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016). That logic applies with equal force here. Plaintiffs' Counsel developed this case without a governmental investigation or prosecution. Plaintiffs' Counsel pursued this case on their own for

---

[36] Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 at 1161 (2021) (emphasis in original), available at https://ir.lawnet.fordham.edu/flr/vol89/iss4/4.

more than five years, expending a tremendous amount of time and money in the process. Plaintiffs' Counsel took the risk of litigating the case through a jury verdict, and obtained the largest antitrust jury verdict in United States history. As the court in *Urethane* found, this is exactly the kind of case where an award at the highest percentage is appropriate.

Prof. Monestier's sole distinction from *Urethane* and *Syngenta* is that class members in those cases obtained more in settlements on a per class member basis than the class did here.[37] But as the Court in *Urethane* explained, the fee request it approved was not based on the nominal result obtained per class member, but instead on a variety of factors, including the risk of litigation, the expense invested by class counsel, and the skill with which the case was litigated. Applying those factors here supports the fee request. Prof. Monestier's analysis also pays no attention to the important ability-to-pay considerations that led to the monetary value of the Settlements that were reached here. Counsel for Plaintiffs obtained the most that could reasonably be obtained from the Settling Defendants in light of their financial condition. Numerous courts recognize that ability to pay is an important factor in evaluating the fairness of the settlement. *In re Lumber Liquidators Chinese-Mfr. Flooring Prod. Mktg., Sales Pracs. and Prod. Liab. Litig.*, 952 F.3d 471, 485 (4th Cir. 2020) ("Lumber Liquidators' potential inability to pay litigated judgments in both MDLs weighs in favor of the [district] court's adequacy ruling"); *Lane v. Facebook, Inc.*, 696 F.3d 811, 823-24 (9th Cir. 2012) (affirming settlement in light of the district court's conclusion that additional damages would be "annihilative" to defendant company that was "on the verge of bankruptcy").

Prof. Monestier's analysis also depends entirely on her idiosyncratic view that the injunctive relief reached in the NAR Settlement is meaningless. As set forth in detail elsewhere,

---

[37] *Urethane* was a direct purchaser case involving a class of approximately 2,200 class members.

Prof. Monestier's opinions are at odds with the overwhelming majority of analyses of the impact of the injunctive relief provisions of this Settlement. Prof. Monestier's citation to the Ninth Circuit's decision in *Lowry v. Rhapsody International, Inc.* is particularly instructive. In that case, the Ninth Circuit reversed the award of attorneys fees and remanded to the district court for further consideration of the "actual benefit provided to the class." 75 F.4th 985, 988 (9th Cir. 2023). In that case, the parties litigated the case for only several weeks before moving to stay the litigation to pursue the settlement. *Id.* at 990. The eventual settlement that was reached resulted in the defendant paying only $52,841.05 to class members. *Id.* The sole injunctive relief was a requirement that the defendant establish an advisory board with an annual budget of at least $30,000 to promote its own business. *Id.* In exchange for those minimal benefits to the class, counsel for plaintiffs were awarded $1.7 million in attorney fees—thirty times larger than the aggregate amount paid to class members. *Id.* at 991. This litigation differs in every respect. Plaintiffs litigated this case through verdict, obtained significant injunctive relief, and seek fees recovered that is in light with comparable cases. The "actual benefit" to the class here is significant and differentiates this action from the ones that Prof. Monestier relies on. Furthermore, Prof. Monestier's proposed principle that the fee percentage should be based on the amount recovered by each class member is completely contradictory to the basic purpose of class actions. Class actions are a procedural device that were specifically created to allow groups of parties to collectively prosecute meritorious claims that would be too expensive and difficult to litigate individually based on the size of each class member's damages. Prof. Monestier's principle that attorney fees should be decreased if each individual claimant recovered a relatively small amount would disincentivize attorneys from pursuing the very cases for which class actions were designed to enable.

### iv. Plaintiffs Appropriately Calculated Their Lodestar Using Current Rates

Prof. Monestier spends several pages in her objection making various assertions that Plaintiffs misstated their billing rates. Prof. Monestier's sole evidence is that counsel for Plaintiffs charged lower rates in previous years than their current rates. But Plaintiffs' Declarations clearly stated that their submitted rates reflected their current rates as of 2024. *E.g.*, Doc. 1535-5 at ¶ 3, Ex. A (Berman Fee Decl.). Courts have repeatedly stated that "[i]n an attorney's fee motion, counsel may use billing rates as of the date of the motion if needed to account for the delay of payment." *Health Republic Ins. Co. v. United States*, No. 16-259, 2024 WL 4471774, at *6 (Fed. Cl. Oct. 10, 2024) (collecting cases). As the Ninth Circuit stated, the district court may use "an hourly rate that reflects the prevailing rate as of the date of the fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases." *Stetson v. Grissom,* 821 F.3d 1157, 1166 (9th Cir. 2016). Courts use current rates "even though the litigation spans a number of years." *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 3:02-cv-1152-M, 2018 WL 1942227, at *17 (N.D. Tex. Apr. 25, 2018). Prof. Monestier identifies no legal authority stating that current rates should not be used in calculating lodestar. *See generally Stevens v. Zenith Distrib. Corp. of Kansas*, No. 78-0477-CV-W-6, 1984 WL 21983, at *4 (W.D. Mo. July 20, 1984) (discussing Eighth Circuit precedent that endorsed the usage of current rates).

Prof. Monestier repeatedly claims that the current rates are false based on the percentage increase that they represent over prior years. For example, Prof. Monestier challenges the rates of three Susman Godfrey partners because the 2024 rates included in the fee application are higher than the rates they charged seven years ago in 2017. However, as set forth in the accompanying declaration, Susman Godfrey takes a mix of work that includes both hourly billing and contingency matters. The rates charged by Mr. Seltzer and all of Susman Godfrey's attorneys are the same,

current rates that are charged to hourly clients—ranging from large corporations to individuals. *See* Declaration of Marc Seltzer, Ex. 3 at ¶ 7. Susman Godfrey examines and, as appropriate, raises those hourly rates each year based on inflation adjustments and a review of market rates charged by peer firms. *Id.* at ¶ 9. The rates charged by Mr. Ketchmark, another attorney criticized by Prof. Monestier, are also equal or lower than the rates that he charges corporate clients in complex litigation. *See* Declaration of Todd Graves, Ex. 6.

Furthermore, the increases that Prof. Monestier observes are consistent with the broader legal market, which has seen significant increases in the rates paid for lawyers engaged in complex litigation. For example, public reporting on bankruptcy filings indicates that the top hourly rate for bankruptcy partners was $1,745 as of 2018.[38] By 2024, the top rate for bankruptcy partners exceeded $2,500.[39] A 2024 survey of large law firms reported that hourly rates had increased 36% since 2022 and 83% over the last ten years.[40] That same survey also found that the average partner rate was $1,114. Another 2024 survey of AmLaw 50 law firms performed by PriceWaterhouseCoopers illustrated that the median standard billing rate for equity partners was $1,595 and for associates was $1,032. That is consistent with the hourly rates for partners in this case, which generally ranged from $785 to $1,500. *See* Dirks Decl. at ¶ 35 (explaining inflation in the legal marketplace since 2022).

In particular, Defendants in this case were consistently represented by elite law firms. The

---

[38] Michael Corkery, *At Toys 'R' Us, a $200 Million Debt Problem Could Lead to $348 Million in Fees*, N.Y. Times (May 11, 2018), https://www.nytimes.com/2018/05/11/business/toys-r-us-bankruptcy.html.
[39] David Thomas, *Legal Fee Tracker: A $24 mln-a-year partner? Billing rates propel historic pay gains*, Reuters (Oct. 24, 2024), https://www.reuters.com/legal/legalindustry/legal-fee-tracker-24-mln-a-year-partner-billing-rates-propel-historic-pay-gains-2024-10-24/.
[40] *Id.*; *See also* Dirks Decl. at ¶ 35 (stating that salaries for new lawyers at Co-Lead Counsel's firm has more than doubled since 2022 due to inflation in the market).

most appropriate comparator for Plaintiffs' counsel's rates are the rates that were charged by the firms whom they litigated the case against. *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) ("[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services."); *See, e.g.*, *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case." (citation omitted)); *Ruiz v. Estelle,* 553 F. Supp. 567, 589 (S.D. Tex. 1982) ("In an action for which no adequate parallel can be found, the best example of a fee paid for similar work is that paid by opposing counsel in the same action.").

Plaintiffs' lodestar rates are significantly below the publicly available information about the current market rates for the specific firms that represented NAR and HSA in this litigation. NAR is currently represented by Cooley LLP. In a 2023 fee application in a bankruptcy proceeding, *In re Endo International PLC*, Cooley reported a blended rate across all timekeepers of $1,094 and a blended rate for all attorneys of $1,160.78.[41] This blended rate represented time billed from 2022 to 2024. This is significantly above the blended current rate for Plaintiffs' timekeepers of approximately $850.

Cooley provided information about the billing rates for specific timekeepers. Current 2024 rates for partners ranged from approximately $1,475 to $1,985. Current 2024 rates for associates ranged from approximately $875 to $1,375. Current 2024 rates for paralegals ranged from $425 to $625. Again, this is significantly above the average rates for Plaintiffs' timekeepers.

These rates show the reasonableness of Plaintiffs' proposed market rates. For example,

---

[41] Cooley Fee Application at 2, *In re Endo International PLC, et al.*, Case No. 22-22549 (Bankr. S.D. N.Y. May 23, 2024) (Doc. 4316).

Prof. Monestier criticizes the hourly rate of Mr. Seltzer—an attorney with 50 years of experience who is billing $2,200 an hour. By comparison, Cooley is billing Aaron Pomeroy, an attorney with 20 years of experience, at $1,985 an hour.[42] Cooley's rates also show the significant rise in legal rates over the last several years that has occurred across the entire market. For example, Mr. Cullen Speckhart, a partner and member of the Missouri bar, had a billing rate of $1,225 in 2022, which had increased to $1,925 by 2024.[43]

HomeServices is currently represented by Gibson Dunn in this litigation. Gibson Dunn filed a fee application in May 2024 during bankruptcy proceedings for The Tattooed Chef. In particular, the work that Gibson Dunn sought compensation for was serving as litigation counsel for a bankrupt entity in a securities class action lawsuit and a related investigation. Gibson Dunn reported current hourly rates for its attorney timekeepers ranging from $770 to $1,810.[44] Four different partners billed on the case, with rates ranging from $1,750 to $1,810. Notably, Gibson Dunn's current hourly billing rate for Brian Yang, a fifth-year associate, was $1,145—comparable to the rate for experienced *partners* at multiple firms representing Plaintiffs in this action.[45] Attorneys with comparable experience at Plaintiff firms had significantly lower billing rates.[46]

---

[42] *Id.* at 6.

[43] *Id*.

[44] Gibson Dunn Fee Application at 27, *In re Itella International LLC, et al.*, 2:23-bk-14154-SK (Bankr. C.D. Cal. May 22, 2024) (Doc. 984). The $770 rate was for Shinhae Oh, a second year associate. *Id.* at 25. All other attorneys at Gibson Dunn had hourly rates above $1,000.

[45] *Id*. at 27. Brandon Boulware, a partner at Boulware LLC, had a rate of $1,250 per hour. Ben Brown, a partner at Cohen Milstein Sellers & Toll PLLC, had a rate of $1,125 per hour. Jeannie Evans, a partner at Hagens Berman Sobol & Shapiro LLP, had a rate of $950 per hour. Each of these attorneys have more than 20 years of experience. *See* ECF 1535, Exs. 4, 5, 7.

[46] Steven Ketchmark, a third year associate at Ketchmark & McCreight P.C., had a rate of $600. Erin Lawrence, an of counsel at Boulware Law LLC, with more than 10 years of experience, had

Collectively, the rates at the specific firms that counsel for Plaintiffs successfully litigated against are significantly higher than the rates used to calculate Plaintiffs' lodestar. This shows that Plaintiffs' rates fairly reflect market rates, particularly for the complex antitrust litigation at issue.

### v. Plaintiffs Used Appropriate Billing Practices

Prof. Monestier claims that Plaintiffs have not put forward evidence of appropriate billing practices and did not submit billing records. Plaintiffs did put forward evidence of their billing practices, the hours worked by each timekeeper, and the substantive tasks performed by each firm in the litigation in declarations that have been filed with their fee motions. *See* ECF 1392, Exs. 1-6. This is sufficient because courts have repeatedly held that full billing records are not required to be submitted for the purposes of performing the lodestar cross-check. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005), *as amended* (Feb. 25, 2005) ("we reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records.").[47]

———————————

a billing rate of $850. Sabrina Merold, a fourth year associate at Cohen Milstein Sellers & Toll PLLC, had a billing rate of $595. Alex Aiken, a seventh year associate at Susman Godfrey LLP, had a billing rate of $800. *See* ECF 1535, Exs. 3, 4, 6, 7.

[47] *See also In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) ("Objectors note that they have not been allowed to examine the billing records, but because the records are used only for a cross-check and not to determine the actual amount of the award, it is less important for objectors to be able to dispute particular hours. Moreover, the Court has had the opportunity to review the records. If it were awarding damages based on the lodestar, the Court might very well reduce some of the hourly rates slightly and might very well be able to find some places in which the hours expended were excessive. This was an exceedingly complex case, however, and the Court cannot say that the hours needed to litigate the case

Prof. Monestier also makes no attempt to substantively examine the documentation that was submitted, including the extensive descriptions of the work that each firm performed. Instead, Prof. Monestier relies entirely on a separate case, *Brown v. Google*, a privacy class action against Google where no monetary relief was obtained. *Brown, et. al.*, v. *Google LLC*, No. 4:20-cv-03664, 2024 WL 3797001 (N.D. Cal.). In that case, Google opposed Plaintiffs' counsel's fee request as excessive and criticized Plaintiffs for litigating the case with an "army of 72 attorneys." *Id.* But that case, where Plaintiffs failed to obtain any monetary relief for the class, only illustrates the efficiency with which these cases were litigated. Here, the three Missouri firms litigated the case through a jury verdict over a five-year period and obtained a $1.8 billion dollar jury verdict. The Court knows firsthand the efficiency with which Plaintiffs litigated the case.

Prof. Monestier claims, without any support, that non-attorney time should not receive a lodestar multiplier. She then proceeds to cite a case calculating and *accepting* a market rate for paralegals that shows this Court and nearby courts routinely include non-attorney time as part of the lodestar calculation.[48] Prof. Monestier also ignores the fact that the deserved salaries of non-attorneys have been advanced for more than five years by the attorneys who have litigated this case. The lodestar multiplier reflects the risk that attorneys undertake when they litigate a case on contingency. Part of that risk involves the necessary investment in staff required to litigate a case

———————————————

reasonably would not be in the range of the hours actually expended. Moreover, the amounts at issue justified use of the best counsel charging the highest rates (just as Dow used similarly high-priced counsel in the litigation)").

[48] Doc. 1552 at 117, n.282 (citing *Florece v. Jose Pepper's Restaurants, LLC*, No. 20-2339-ADM, 2021 WL 5042715, at *7 (D. Kan. Oct. 29, 2021)). Prof. Monestier also ends her quotation from that case in a misleading fashion, omitting that in the next sentence the court ruled that it "will rely on the $200 [paralegal] rate" because the overall fees sought were reasonable and supported by the applicable legal factors. 2021 WL 5042715, at *7.

of this magnitude and complexity. For that reason, it is well-established that staff time is routinely included in lodestar calculations by courts in this circuit.[49]

### 4. Black Tie Realty and Vivienne Cunningham Objections (*Gibson* Docs. 527 and 528) [50]

Mark Dyer (owner of Black Tie Realty) and Vivienne Cunningham submitted nearly identical filings. Both describe themselves as "real estate professional[s]," and NAR's website reflects that both are members of NAR.[51] By contrast, they do not include any information reflecting that they are class members, as opposed to NAR members who do not like the outcome of the case. As a result, they do not have standing to object. *See, e.g.*, *Gould*, 883 F.2d at 284; *Feder*, 248 F. App'x at 580 (5th Cir. 2007).

Even to the extent their filings are considered, they do not offer a reason for rejecting the Settlement. Both objectors criticize the NAR Settlement for purportedly "requiring buyers to sign a representation agreement before they have had the opportunity to get to know or trust the broker." Doc. 527 at 1; Doc. 528 at 1. But this misstates what the NAR Settlement actually says. The NAR Settlement requires that brokers working with buyers sign a binding price disclosure before the buyer tours any home. *See* NAR Agreement ¶ 58(vi). This gives buyers transparency into what their broker is being paid and the authority and incentive to negotiate that amount. Contrary to

---

[49] *H&R Block E. Enterprises, Inc. v. Sanks*, No. 16-00206-CV-W-GAF, 2017 WL 9804981, at *2 (W.D. Mo. July 26, 2017) (including paralegal time in lodestar calculation and commending work that entire team did in litigating the case); *In re RFC*, 399 F. Supp. 3d 827, 846 (D. Minn. 2019) (including paralegal fees in lodestar calculation).

[50] Although these objections were filed in the *Gibson* docket, the filers state that they are writing to express "concerns regarding the . . . National Association of Realtors (NAR) settlement."

[51] *See* Mark Dyer, *Nat'l Assn. of Realtors*, https://directories.apps.realtor/memberDetail/?personId=2833118&officeStreetCountry=US&memberLastName=Dyer; Vivienne Cunningham PA, *Nat'l Assn. of Realtors*, directories.apps.realtor/memberDetail/?personId=2690955&officeStreetCountry=US&memberLastName=Cunningham PA.

both objectors' suggestions, however, the NAR Settlement does *not* require buyers to enter a "buyer representation agreement" (i.e., a buyer agency agreement), nor does it require that a buyer work with one broker or agent exclusively.

Moreover, the objectors provide no explanation of why requiring up-front pricing transparency is harmful to buyers. They vaguely claim that imposing such a requirement before a buyer has "the opportunity to know or trust the broker" would be bad and "could result in strained relationships." Doc. 527 at p. 1. But they do not explain how or provide any support for these claims. It is, of course, commonplace for service workers in many (if not most) industries to disclose their pricing to their customers before providing a service. That way customers know ahead of time what they are paying and have the ability to "shop around." Indeed, it also already typical for brokers representing *sellers* to disclose their pricing up front as part of a listing agreement. The objectors fail to explain why requiring up-front price transparency works in nearly every other industry (including for listing brokerages), but would not work for buyers and their brokers.

### 5.  Gonzalez Filings (Doc. 1564) and Peter Gustis Filing (Doc. 1510)

The Court denied Mr. Gonzalez's "Motion for Class Members to have Certification Vacated and Class Members Settlement to be Vacated." *See* Docs. 1565, 1577 (denying Docs. 1564, 1571). To the extent the submission by Arturo Gonzalez could be considered an objection, Mr. Gonzalez does not appear to be a class member, but rather a member of NAR who does not like the outcome of the case and that a class was certified. He has no standing to object, does not state he is objecting, and appears to be critical of the underlying litigation and the practice changes at issue in the NAR Settlement. Moreover, even if he had standing with respect to the present Settlements and his complaints were ripe, his displeasure with the case outcome and the Settlement is no basis for the Court to reject the Settlements. *See In re Tex. Prison Litig.*, 191 F.R.D. 164, 175

(W.D. Mo. 1999) ("The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement." (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995))).

Similarly, Realtor Peter Gustis filed a document prior to class notice "to oppose summary judgment sought by plaintiffs." Doc. 1510. To the extent the submission could be considered an objection, Mr. Gustis does not appear to be a class member, but rather a member of NAR who does not like the outcome of the case. He has no standing to object, does not state he is objecting, and appears to be critical of the underlying litigation. Moreover, even if he had standing with respect to the present Settlements and his complaints were ripe, his displeasure with the case outcome and the Settlement is not a basis for the Court to reject the Settlements.

### C. The Court Should Overrule Objections Submitted by Attorneys and Their Clients Who Filed Competing Cases

Six sets of objections were filed by plaintiffs and counsel who filed copycat cases after *Moehrl* and *Burnett*; none of these cases has been certified, and all are in their infancy. Each is derivative of *Moehrl* and *Burnett* and was filed only after, and on the back of, Class Counsel's successes. Indeed, five of the six sets of objections are by litigants who did not even file a case until *after* the favorable verdict *Burnett* Plaintiffs obtained and *after* the *Gibson* complaint was filed. Each of these cases arises out of the same alleged illegal course of conduct—the requirement that a seller pay for the buyer's broker. Yet objectors now seek to distinguish their cases in an effort to blow up the important monetary and practice change relief made available in the Settlements. Each of these objectors could have opted out of the Settlements and pursued their own claims, but instead each chose to object, which does not support rejecting the Settlements. *See Marshall*, 787 F.3d at 520. None of these objections furthers the interest of Class members

who will benefit from both the monetary and practice change relief afforded by the Settlements.

Such objections lodged by attorneys filing competing cases should be viewed with skepticism. *See, e.g.*, *Gulbankian v. MW Mfrs., Inc.*, No. 10-cv-10392, 2014 WL 7384075, at *3 (D. Mass. Dec. 29, 2014) ("[I]n assessing the weight of objections to class settlement agreements, the district court may properly consider the fact that the most vociferous objectors were persons enlisted by counsel competing with [lead] counsel for control of the litigation") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998)); *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 633 (11th Cir. 2015) (affirming trial court in overruling objector whose competing case would be barred by settlement approval and stating "the Court now has serious concerns" about the objector's "ulterior motive").

Each of these objectors fails to address the essential problem underlying their position: the alternative to a nationwide settlement is sprawling litigation comprised of potentially dozens of local suits that would bankrupt Settling Defendants in the event any one case succeeds. Each objector nevertheless apparently seeks such a result, even though it would harm the Class members by likely leaving them with no relief. They do so instead of supporting these landmark Settlements that will change the way homes are bought and sold and save money for consumers nationwide. Copycat counsels' objections should be rejected.

### 1. Broad Settlement Classes Creating Global Peace Are Encouraged

Each copycat objector seeks to attack the scope of the Settlement—hoping the Court will discard the Settlements to carve out their uncertified litigation. In their own ways, they each claim that the scope of the Settlements is broader than the certified classes in *Burnett* and *Moehrl*. In the settlement context, courts regularly certify broader classes. *See, e.g.*, *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically

pleaded. In fact, most settling defendants insist on this."); *Smith v. Atkins*, 2:18- cv-04004-MDH (W.D. Mo.); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 318 (C.D. Cal. 2016) (court can "expand the scope of a settlement class") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 325-26 (3d Cir. 1998)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-cv-1827, 2011 WL 13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("For the history of class certifications, courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated. Courts have noted that concerns about manageability and/or the class-wide applicability of proof (which can serve to limit or defeat class certification for trial) are in large part no longer relevant when establishment of a defendant's liability is replaced by a settlement."); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("[A] court may approve a settlement class broader than a litigation class that has already been certified."); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 661 (E.D. Va. 2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (same).

In any event, the Settlements settle and specifically release claims made in *Gibson*. *See* NAR Agreement p. 1 (defining the "Actions" to include *Gibson* and *Umpa*); HSA Agreement ¶ 1 (defining the "Actions" to include *Gibson*). The *Gibson* complaint reflects nationwide claims and alleges that the conspiracy's scope impacted transactions including in non-Realtor MLSs such as RLS/REBNY. Thus, a nationwide settlement does not expand the geographic scope of the class pleaded in the settled "actions."

Even so, broader classes are often a practical prerequisite to reaching any settlement because a defendant will not agree to any meaningful settlement unless it can obtain global peace. *See, e.g.*, *Albin v. Resort Sales Missouri, Inc*., No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5

(W.D. Mo. May 21, 2021) (reasoning that the absence of "a single nationwide class action" would "discourage class action defendants from settling") (quotation omitted); *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 103 n.5, 106 (2d Cir. 2005) ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country. Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability" (quotation omitted)); *In re Literary Works in Elec. Databases Copyright Litig*., 654 F.3d 242, 247-48 (2d Cir. 2011) ("Parties often reach broad settlement agreements encompassing claims not presented in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle."); *Sullivan v. DB Invs., Inc*., 667 F.3d 273, 310-11 (3d Cir. 2011) (en banc) (affirming nationwide settlement in an antitrust case and stating: "[Without] global peace . . . there would be no settlements."). Conversely, because global peace is most valuable to defendants, defendants will pay more to obtain it, thus benefitting class members. *See, e.g.*, *In re BankAmerica Corp. Sec. Litig*., 210 F.R.D. 694, 705 (E.D. Mo. 2002) ("[Defendants] paid both classes of plaintiffs more in the instant global settlement out of a desire to obtain 'total peace' than they would have paid either group of plaintiffs individually.").

That is exactly what happened in this case. The Settling Defendants refused to settle on anything less than a nationwide basis, because doing so would leave them exposed to potentially crippling liability. They therefore insisted that the Settlement Class include all "multiple listing services," regardless of whether they were affiliated with NAR. To get the benefits of the Settlements, Plaintiffs therefore agreed to settle on a nationwide basis. Thus, the Settlements are in the best interest of all Class members, because, among other things, settlement was not possible on a piecemeal basis, and enforcement of the *Burnett* verdict alone would have bankrupted the

Settling Defendants. In other words, the alternative to settling on a nationwide basis would not have been a greater recovery for South Carolina, New York, or buyer Class members—it would have resulted in no recovery at all due to near certain bankruptcy by each of the Settling Defendants.

Accordingly, here, certifying a nationwide class covering all MLSs for all of sellers' claims that arose out of the same factual predicate is warranted for several reasons. First, the alleged conspiracy is nationwide in nature with a nationwide impact, and so a nationwide settlement is justified. *See, e.g.*, *Burnett* Third Amended Complaint (Doc. 759) at ¶ 38 (alleging nationwide conspiracy and effect). Due to the nationwide scope of the alleged conspiracy and the likelihood of unlimited lawsuits asserting claims far exceeding Defendants' limited resources, the only path to a resolution was through a nationwide settlement.

Second, Plaintiffs have conducted extensive discovery into the alleged nationwide conspiracy and have thoroughly litigated the claims, providing a robust factual record on which to assess the claims and base negotiations, including expert testimony that the alleged conspiracy affected home sales across the country, regardless of which MLS was used and whether it was affiliated with NAR. *See, e.g.*, Parts VI(C)(1)-(2), below.

Third, Plaintiffs could have made nationwide allegations covering all MLSs in this action as they did in *Gibson* and *Umpa*, actions which are settled by and released under the Settlements. Fourth, a nationwide settlement will conserve judicial and private resources as compared to protracted piecemeal litigation across the country, and also results in a greater recovery for the class, which will not have to bear the costs associated with piecemeal antitrust litigation. 7B Wright & Miller, Federal Practice & Procedure § 1798.1 (3d ed. 2005) ("Clearly, a single nationwide class action seems to be the best means of achieving judicial economy.").

Fourth, Class members were fully apprised of the Settlement class definition through the

notice process and had the opportunity to opt out if they felt they could do better on their own. The Class Notice did not distinguish between Realtor MLSs and Non-Realtor MLSs, and the claims administrator has been accepting claims from sellers in non-NAR MLSs. Keough Decl. at ¶ 53. If the copycat objectors or any other sellers did not want to get paid under the Settlement, they could have opted out if that was really their desire. *Marshall*, 787 F.3d at 520.

### 2. The Conspiracy at Issue Is Nationwide in Scope

The South Carolina, Pennsylvania and New York objectors claim that the rules at issue are different in their respective jurisdictions. This is wrong. Each alleges an identical conspiracy raised in *Burnett* and *Moehrl,* yet attempts to draw distinctions without a difference. Discovery addressed the corporate policies that applied to franchisees and affiliates in South Carolina, New York, and Pennsylvania. Indeed, Canopy MLS, which includes part of South Carolina, is one of the Covered MLSs in the *Moehrl* litigation. And Plaintiffs received data for transactions in South Carolina, New York, and Pennsylvania, as well as nationwide. Dirks Decl. at ¶ 14. The *Burnett* trial specifically addressed whether the conspiracy was different in South Carolina, Pennsylvania, and New York. It is not. Indeed, Plaintiffs' experts in both *Burnett* and *Moehrl* specifically analyzed rules implemented by non-NAR MLSs, including Northwest MLS, WPMLS, and REBNY, and concluded that Realtors operating in these jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of Ethics and are thereby incentivized to require sellers to make unilateral offers of compensation to buy-side brokers/agents." August 10, 2022 Schulman Merits Reply Report, Doc. 922-3 at ¶ 75; *see also* Elhauge Class Cert. Report, Appendix C at ¶ 398, *Moehrl v. Nat'l Assn. of Realtors* (N.D. Ill. June 7, 2022) (Doc. 324-6) (addressing Non-NAR MLSs and concluding "it was common among these MLSs to adopt restrains that were identical or similar to those imposed by NAR"). Indeed, Dr. Schulman opined that NAR's nationwide presence defeats any alleged distinctions in non-NAR MLSs. *See* August 10, 2022 Schulman

Merits Reply Report, Doc. 922-3 at ¶ 12, ("Dr. Wu's reference to certain individual U.S. markets that have some type of modified Adversary Commission Rule [including West Penn and REBNY] is not appropriate given the ongoing nationwide influence of anticompetitive NAR policies and practices and the nationwide presence and impact of the Corporate Defendants and their requirements that brokers and agents affiliated with them comply with anticompetitive NAR policies and practices."); *id.* at ¶ 67 (discussing REBNY/RLS Rules and stating: "These rules, which are mandatory for all participants in the RLS, effectively serve the same purpose as the Adversary Commission Rule."); *id.* at ¶ 74 ("any agents who are REALTORS® and/or belong to an office affiliated with the Corporate Defendants are still bound by the Adversary Commission Rule via the NAR Code of Ethics, which states '[i]n cooperative transactions REALTORS® shall compensate cooperating REALTORS®.'"); *id.* at ¶ 95 ("As described above, the Corporate Defendants adhere to and require compliance with the NAR Code of Ethics. Therefore, in all transactions with a Corporate Defendant agent acting as a listing agent, those agents were barred from allowing a seller to offer a zero percent buyer agent commission by the NAR Code of Ethics."); *id.* at ¶ 97 ("In addition, Corporate Defendants' presence in NAR, as well as their national presence, uniform agreements, policies, and guidelines for their subsidiaries and franchisees make it highly unlikely that they would deviate from their established nationwide practices in the United States."); January 28, 2022 Schulman Class Certification Reply Report, Doc. 637-4 at ¶ 58 ("[I]t is not surprising agents and brokers affiliated with the Corporate Defendants would continue the practice of having sellers make unilateral compensation offers to buyer brokers for properties" on non-Realtor MLSs); *id.* at ¶ 61 (noting that because the corporate culture transcends individual MLSs, it would not be expected for their behavior to differ in an non-NAR MLS); Doc. 1325, Trial Transcript 237:19-238:8 (conspiracy operates the same in South Carolina and Missouri).

As expressly alleged in *Gibson*, and supported by expert analysis in *Burnett* and *Moehrl*, the vast majority of MLSs nationwide are formally controlled by local Realtor associations that are required to implement the challenged rules, but the conspiracy exists nationwide through, among other things, NAR's Code of Ethics and national broker practices that transcend all MLSs. *See Gibson* Amended Complaint (Doc. 232) at ¶ 182 (describing in detail NAR's and its members' control over and influence of MLSs not exclusively owned or operated by NAR associations); *see also id.* ¶¶ 225, 227 (describing nationwide impact of the conspiracy).

### 3. The Court Should Overrule the South Carolina Objection by Benny D. Cheatman, Douglas W. Fender II, and Dena Marie Fender (Docs. 1558, 1559)

The lawyers prosecuting copycat cases in South Carolina filed two objections on behalf of four home sellers in South Carolina—one objecting to the NAR Settlement (Doc. 1558) and one objecting to the HSA settlement (Doc. 1559). The South Carolina objectors did not file suit until *after* the *Burnett* verdict and after *Gibson* was filed. Instead of a global resolution, certainty, and practice changes, they seek to unwind the Settlements, which would result in protracted, inefficient, and costly piecemeal litigation that would unnecessarily proceed on a state-by-state basis and yield worse results for Class members, including their own clients.

#### a. The Court Should Overrule the South Carolina Objection to the NAR Settlement

The South Carolina objection to the NAR Settlement gets basic facts wrong and misunderstands or misstates the terms of the Settlement while citing virtually no authority to support any of their mistaken complaints. As just one example, the objectors claim Plaintiffs obtained a verdict against "Berkshire Hathaway, [which is] another settling party." Doc. 1558-1 at 2. Not true; Berkshire Hathaway, Inc. was not a party at the *Burnett* trial and is not a Defendant in any of the cases filed post-verdict challenging residential real estate commission rules and

practices. The South Carolina objectors routinely get basic facts and dates wrong. Their arguments should not be credited, and their objections should be overruled. Plaintiffs below address six issues that the South Carolina objectors raise.

*First*, the South Carolina objectors note that the NAR Settlement Agreement contained "certain deadlines" that could apply to two types of parties—"opt-in brokerages" and "opt-in Non-REALTOR MLSs." Doc. 1558-1 at 5–15; *see also* NAR Agreement at 42–48 (describing opt-in procedures and requirements). These provisions of the NAR Settlement Agreement created a mechanism for certain brokerages and MLSs to "opt in" to the Settlement, including by making additional settlement payments beyond the $418 million to be paid by NAR and by agreeing to adopt certain practice changes, as detailed in the Appendices to the NAR Settlement Agreement. *See* NAR Agreement at 42–48, 58–67 (Appendix B), 68–91 (Appendix C), and 92–116 (Appendix D).

The South Carolina objectors raise various complaints about the opt-in process, but many of their contentions are simply wrong, misunderstand the Settlement, or are illogical and unsupported by any legal authority. *See* Doc. 1558-1 at 5–15. To start, for all their "deadline" calculations, they use the wrong date for the Order granting Preliminary Approval, claiming it occurred "on April 19, 2024." Doc. 1558-1 at 7. Not true: the Court's Order granting Preliminary Approval to the NAR Settlement was entered April 23, 2024. Doc. 1460.

Then, without citing any case law or even attempting to describe any potential prejudice, unfairness, or inadequacy, the South Carolina objectors complain that they do not believe certain opt-in parties "met" certain deadlines. Doc. 1558-1 at 5–15. They ignore that each relevant opt-in agreement—NAR Agreement at 68–91 (Appendix C), and at 92–116 (Appendix D)—includes terms stating that the agreements "may be modified or amended" in a "writing executed by

Plaintiffs and Stipulating Party." NAR Agreement at 89–90, 115.[52] Plaintiffs and the Stipulating Parties duly entered these opt-in agreements in writing, and any alleged "non-compliance" with any of the deadlines in the Settlement Agreement (to the extent there even are any) are excused and cured by the Parties' subsequent written agreement.

The South Carolina objectors' position also defies logic and lacks any legal support. They repeatedly describe the deadlines as "mandatory" and contend that after the "deadlines" passed, then these opt-in parties "ceased to be eligible to become a Released Party." Doc. 1558-1 at 7–8. Nonsense; neither law nor logic supports concluding that settlement with these parties became impossible after any stated deadlines allegedly "passed." Plaintiffs and the Stipulating Parties properly agreed in writing, which had the effect of extending those deadlines, as expressly permitted by the Settlement Agreement and the relevant appendices.

The South Carolina objectors also complain that certain of the opt-in settlement agreements that were posted to the class action website— https://www.realestatecommissionlitigation.com/, and specifically these two portions of it: (1) https://www.realestatecommissionlitigation.com/nar-opt-in and (2) https://www.realestatecommissionlitigation.com/nar-documents—do not contain dates or signatures.[53] The South Carolina objectors do not, however, raise any challenges to the reasonableness, fairness, and adequacy of these Settlements. Nor is there any requirement that a signed version of an agreement be available for purposes of determining fairness. Here: (i) each and every opt-in agreement was executed; (ii) the complete terms of each such agreement were

---

[52] Both opt-in agreements also contain terms stating that they shall "be interpreted in a manner to sustain their legality and enforceability." NAR Agreement at 89, 114.

[53] The South Carolina objectors mistakenly refer to the case website as "realestatelitigation.com." *See* Doc. 1558-1 at 9. That is the wrong website (indeed, as of November 15, 2024, it does not appear to exist). Perhaps the South Carolina objectors simply have not been looking in the correct places for the opt-in agreements at issue.

provided to class members through the settlement website; and (iii) the name of each opting in MLS and brokerage was identified on the settlement website. *See* Dirks. Decl. at ¶¶ 27-30. Because most of the more than 550 MLS opt-in agreements included identical language, Plaintiffs did not separately post each identical agreement—though the language reflected in those agreements was provided to class members and the MLSs participating in the Settlement were identified. That is more than is required. *Cf., Whitlock v. FSL Mgmt., LLC,* No. 3:10CV-00562-JHM, 2015 WL 13322438, at *3 (W.D. Ky. July 13, 2015) ("Contrary to Defendants' argument, failure of the parties to sign the settlement agreement prior to notifying the Court of their settlement of the case does not render the settlement agreement non-binding"); *Abramson v. Agentra, LLC,* No. CV 18-615, 2020 WL 13469584, at *3 (W.D. Pa. Aug. 20, 2020) ("In the absence of any evidence that suggests, let alone establishes, that there was any remaining dispute over a material term, Agentra's refusal to sign the agreement to which it agreed does not make the settlement unenforceable").

*Second*, the South Carolina objectors take issue with the release of certain NAR member brokerages with under $2 billion in 2022 total transaction volume ("TTV"). Doc. 1558-1 at 15–17, 18–20. NAR is a membership organization and would not have settled if the release did not include, at a minimum, its small agent and broker members—and certainly would not have settled for at least $418 million. Dirks Decl. at ¶ 25. Moreover, bringing expensive antitrust litigation to recover funds from thousands of small brokerages that could not afford to pay significant amounts would not have been realistic or cost effective for the Class. Nevertheless, Class Counsel negotiated to carve out from the release dozens of larger brokerages and have pursued settlements and/or litigation with most of them in order to recover additional funds for the Class. Dirks Decl. at ¶ 25.

Moreover, even for smaller brokerages, they are released "only if that brokerage … (iii) complies with the practice changes reflected in Paragraphs 58(vi)-(x) of this Settlement

Agreement and agrees to provide proof of such compliance if requested by Co-Lead Counsel[.]" NAR Agreement at 16–17 (¶ 18(e)). The South Carolina objectors suggest brokerages must "take the positive step of agreeing to provide certain information to Co-Lead Counsel," and complain that no evidence of such an agreement has been provided. Doc. 1558-1 at 9. But this misreads the Settlement Agreement. Proof of compliance must be shown only if requested by Co-Lead Counsel. The objectors dismiss these considerable practice changes by claiming they mean nothing without requiring the brokerages to "agree in writing." Objectors cite no authority to support the idea that a settlement must include such a requirement as a condition for obtaining a release. *See also* Part VI(C)(3)(b)(ii) (citing authority justifying the release of non-parties). Even so, the Settlement Agreement is clear: those who do not comply are not released.

The South Carolina objectors also assert that the $2 billion cutoff for non-opt-in brokerages is "arbitrary," and that the case would have been better dealt with on a state-by-state basis. But there was nothing arbitrary about this cutoff. It was the subject of extensive negotiations between NAR and Co-Lead Counsel, who considered what size a brokerage would likely need to be in order to pay sufficient amounts toward a settlement or litigated judgment in order to make litigation a realistic or cost effective option for the Class. Moreover, the South Carolina objectors do nothing to explain how state-by-state resolution is any less arbitrary, especially considering that many brokers, MLSs, and markets cross state lines.[54] Like many complaints brought by other objectors, this argument boils down to the South Carolina objectors' unsubstantiated belief that the settlement

---

[54] For example, the Heartland MLS, serving the county in which this Court sits, operates in many counties across Kansas and Missouri. *About Heartland MLS*, KANSAS CITY ASS'N OF REALTORS®, https://kcrar.com/kcrar-members/heartland-mls/about-heartland-mls/ (last visited November 14, 2024).

amount could have been larger. This is not a proper basis on which to reject this settlement. *See* Parts V(C)(2), VI(A).

In sum, the Settlement obtained valuable practice changes for the Class from released brokerages, and the release of non-parties is appropriate considering that the only way this Settlement was possible was to provide a nationwide release. *See* Dirks Decl. at ¶ 24; *see also* Part VI(C)(1).

*Third*, the South Carolina objectors complain that franchisees or affiliates of other Settling Parties obtained releases "without being forced to agree to comply with practice changes" and that this "fact" could "strengthen" these Parties' alleged "market dominance." Doc. 1558-1 at 17–18. But their belief that Keller Williams, Anywhere Real Estate, RE/MAX, and "Berkshire Hathaway"—an entity which is not and has never been a party to any of these related actions—are not subject to practice changes is flatly wrong.[55] Anywhere, RE/MAX, and Keller Williams agreed to substantial practice changes. *See* Doc. 1469 (Plaintiffs' Motion for Final Approval) at 16–17; Doc 1192-3 (Anywhere Agreement) at 19–21 (¶ 51); Doc. 1192-4 (RE/MAX Agreement) at 19–22 (¶ 51); Doc. 1371-1 (Keller Williams Agreement) at 21–23 (¶ 53). And the HSA Defendants (owned by Berkshire Hathaway Energy Company, which is not released) agreed to similar practice changes. HSA Agreement at 32–34 (¶ 51). Put simply, no brokerage is released without practice changes.

*Fourth*, the South Carolina objectors complain the notice "does not list the size of the verdict or the much smaller class certified for trial in *Burnett*." Doc. 1558-1 at 23. They cite no authority reflecting that this information is required. Even so, Class members were provided with

---

[55] Moreover, their complaints about "Keller Williams, Anywhere Real Estate [and] RE/MAX" are misplaced and not at issue here, as those Settlements received final approval. *See* Doc. 1487.

the information the South Carolina objectors advocate for. First, the long form notices indicated that "[o]n October 31, 2023, a jury found in favor of Plaintiffs in the *Burnett* action." The amount of the verdict was also reflected in Plaintiffs' Motion for Attorneys' Fees, which was posted on the settlement website. *See, e.g.*, Doc. 1535 at 7, 12. Second, the notices reflect that the Settlement Class includes homes listed on MLSs throughout the country over a multi-year period. Any reasonable person would have understood such a class to encompass millions of home sellers. Even so, Plaintiffs' preliminary approval briefing, which was posted on the settlement website, made this point explicitly, advising that "Plaintiffs estimate that Settlement Class Members number in the millions, dispersed across the United States." *See, e.g.*, Doc. 1458 at 16. Information regarding the *Burnett* litigation class was provided to Class members as well, including through the most recent complaint, which was posted to the settlement website. *See generally* Part III.

*Fifth*, the South Carolina objectors next complain that the class was "impermissibly expanded," Doc. 1558-1 at 24, but the only case they cite, *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), does not mention settlement. Nationwide settlements creating global peace are encouraged. *See* Part VI(C)(1). Moreover, their contentions that other cases (including the "seminal" case *United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485 (1950)) had results where only a "local real estate board was guilty of price fixing while the national association was not" undercuts their criticism of this groundbreaking nationwide settlement. Doc. 1558-1 at 25. That highlights the risks involved in antitrust litigation and the probability that, absent this nationwide settlement that will benefit Class members throughout the country, localized cases might well have proceeded to different results around the country, including potential defense verdicts.

*Sixth*, the South Carolina objectors deride this historic and important Settlement as "insufficiently remunerative" and as providing only "a paltry" recovery. Doc. 1558-1 at 27. That

ignores reality and the substantial settlement funds obtained to date, with the current total amount exceeding **one billion dollars**. Other portions of this brief rebut such factually misplaced and legally insufficient criticisms about the monetary relief Plaintiffs have secured for the class. *See* Parts V(C)(2), VI(A).

### b. The Court Should Overrule the South Carolina Objection to the HSA Settlement.

#### i. Nationwide Class Settlement

As discussed above in Parts VI(C)(1)-(2), a nationwide settlement is the *only* realistic way to achieve a settlement. It is also the only way to ensure that the Settling Defendants can pay anything to any Class member. Any other result would risk either a loss for Plaintiffs or crippling financial ruin for the Defendants—benefitting no Class member.

#### ii. Release of Franchisees Is Appropriate

The South Carolina objectors also purport to object to the scope of the releases reflected in the HSA Settlement. But the release of franchisees was bargained for as part of the Settlement Agreement. Such releases are common and appropriate. *See In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 240 (E.D. Pa. 2009) (overruling objection to release of independent sales agents of insurance company because "the release of agents is a necessary component of the settlement agreement in order to provide finality. Otherwise, dissatisfied policyholders could sue the defendants' agents who would then, in turn, look to the defendants for indemnity or contribution.") (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450, 522-23 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)); *Shay v. Apple Inc.*, No. 3:20-cv-1629, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.") (citing *Hesse*

*v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010)); *Maine State Ret. System v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2013 WL 6577020, at *7, *17 (C.D. Cal. Dec. 5, 2013) (overruling objection that argued "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Prods., Inc.*, No. 15-CV-1801, 2017 WL 5479637, at *8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third party retailers was inappropriate: "this argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims . . . . Millennium is a manufacturer that sells its products through various retailers, so any claims Ference purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling allegations asserted here. This objection is overruled."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) (approving class settlement with broad releases including non-parties, such as member banks, insurance companies, and Swiss governmental entities).

The same is true with respect to releases of franchisees. *See Flaum v. Doctor's Assocs., Inc.*, No. 16-CV-61198, 2019 WL 2576361, at *3 (S.D. Fla. Mar. 11, 2019) (final approval of settlement releasing all Subway franchisees in suit against Subway franchisor); *Adkins v. Nestle Purina PetCare Co.*, No. 12-CV-2871, 2015 WL 10892070, at *4 (N.D. Ill. June 23, 2015) (final approval of settlement releasing variety of non-parties, including suppliers, manufacturers, retailers, and franchisees); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-4818, 2015 WL 3990915, at *3 (N.D. Cal. June 30, 2015) (preliminary approval of settlement releasing franchisees) & ECF No. 167 (Feb. 8, 2016) (ordering final approval of settlement). Absent such releases, HSA has said that it would have, through the very act of settling the litigation, exposed itself to potential litigation by their franchisees. It further said it would not have settled at all, thus reducing the overall recovery to the Class.

Finally, South Carolina objectors do not identify any HSA franchisee who they claim should not be released. Nor does it appear that the South Carolina Objectors have sued any such franchisee.

### c. The Contents of Notice Were Robust

The South Carolina objectors also object to the adequacy of the class notice. In doing so, they do not argue that the form of class notice or manner for distributing that notice was deficient. Instead, they assert that the notices lacked enough information about the potential value vis-a-vis each class member. But the notices reflect that the Settlement Class includes homes listed on MLSs throughout the country over a multi-year period. Any reasonable person would have understood such a class to encompass millions of home sellers. Moreover, as discussed above in connection with the South Carolina objectors' criticism of the NAR settlement, Plaintiffs' preliminary approval briefing, which was posted on the settlement website, made this point explicitly, advising that "the Settlement Class Members number in the millions, dispersed across the United States." *See, e.g.*, Doc. 1518 at 16.

In addition, "the mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process." *Grunin*, 513 F.2d at 120. "As a general rule, the contents of a settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with (the) proceedings." *Id.* at 122 (quotation omitted). "Valid notice of a settlement agreement 'may consist of a very general description' of settlement terms." *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (quoting *Grunin*, 513 F.2d at 122).

The notice here easily satisfied this standard. Among other things, it apprised Class members of the nature of the action; the class claims and issues; and the settlement terms. It also

advised Class members of their options, including their right to file objections, opt-out, and appear at the fairness hearing. And it explained how Class members could obtain additional information including by contacting Class Counsel, contacting the claims administrator, and through the settlement website, which included numerous key case documents, FAQs, and every Settlement Agreement.

Courts regularly find that similar notices satisfy Rule 23's requirements. *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (rejecting objectors' argument that notice was defective because it did not adequately explain the scope of liability releases where the notice explained that certain claims were being released and "provided a link to the settlement website, a description of the opt out procedure, and a toll free number to pose questions to the claims administrator" for more information); *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 764 (10th Cir. 2020) (rejecting objections to notice that described the "general" terms of the settlement and explained how to get further information); *In re Uponor*, 716 F.3d at 1065 (notice that generally described claims being released, "provided a link to the settlement website, a description of the opt out procedure, and a toll free number to pose questions to the claims administrator," was adequate); *Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ("The notice adequately described the nature of the pending action, the claims asserted therein, and the general terms of the proposed settlement. It informed the shareholders that additional information was available from the court's files. It also informed them of the time and place for the settlement hearing and their right to participate therein.").

Nor do the South Carolina objectors cite any authority that would have required Plaintiffs to provide information beyond what was reflected in the class notice. With good reason. Courts are unanimous that not every detail of the litigation need be included in settlement notices and have rejected objections seeking the inclusion of every conceivable detail. *See, e.g.*, *Vargas v.*

*Capital One Financial Advisors*, 559 F. App'x. 22, 27 (2d Cir. 2014) (a settlement notice need only apprise class members of the settlement terms and "of the options that are open to them in connection with the proceedings," and, consequently, rejecting objector's arguments that notice was inadequate because it failed affirmatively to advise unsatisfied class members to opt out and failed to calculate the damages sustained by each individual class member); *In re TikTok, Inc., Consumer Privacy Litig.*, 2022 WL 2982782, at *18 n.20 (N.D. Ill. July 28, 2022) ("Rule 23 does not require the settlement notice to contain every last bit of information necessary to file an objection."); *Good v. Am. Water Works Company, Inc.*, 2016 WL 5746347, *9 (S.D. W. Va. Sept. 30, 2016) ("The basic requirements of Rule 23 and due process are intended to ensure that notices fairly and reasonably apprise class members of a pending action affecting their rights and their options with respect to that action, but those requirements should not transform the notice into a long brief of the parties' positions, precise in every detail and slated in such fashion as to please every litigant." (quotation omitted)).

Notices do not need to include every detail because "[c]lass members are not expected to rely upon the notices as a complete source of settlement information." *Grunin*, 513 F.2d at 122; *see also UAW v. General Motors Corp.*, 2006 WL 891151, *33 (E.D. Mich. Mar. 31, 2006) ("It is inevitable that some details will be omitted from a notice, but the fact that the notices do not fully explore certain issues is immaterial. Class members are not expected to rely upon the notices as a complete source of settlement information." (cleaned up)). For instance, in *Petrovic*, the Eighth Circuit rejected the "contention that a mailed notice of settlement must contain a formula for calculating individual awards" because "[t]he notice described with sufficient particularity the stakes involved: the settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic v. Amoco Oil Co.*, 200 F.3d at 1152–53.

**4.  The Court Should Overrule the Spring Way Objection (Doc. 1563)**

The Pennsylvania objection was filed by the plaintiffs and lawyers who brought another case filed after the *Burnett* verdict. The Pennsylvania objectors claim that the Pennsylvania real estate industry is somehow unique. But this is contradicted by the Pennsylvania objectors' own Amended Complaint, which says the opposite: "Defendants' anticompetitive practices are not unique--as they represent western Pennsylvania's local version of collusive practices that are widespread within the residential real estate industry." Amended Complaint (Doc. 30) at ¶ 11, *Moratis v. West Penn Multi-List, Inc.*, et al, No. 23-cv-2061 (W.D. Pa.). The Amended Complaint further stated: "Recently, a federal jury in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-00332-SRB (Western District of Missouri), found that rules, policies, and practices similar in both design and effect to those at issue here violated federal antitrust law. The jury in *Burnett* imposed a historic ten-figure judgment on the defendants." *Id*. The Complaint further alleges: "Like the defendants in *Burnett*, Defendants' conduct unlawfully restrains trade and competition, harms home sellers in the form of inflating the cost of selling a house (therefore eating into the equity a seller may have accrued in his or her property), and is, therefore, violative of federal antitrust law." *Id*. at ¶ 12. Thus, the Pennsylvania objectors' own allegations reflect that a nationwide class settlement is appropriate due to the similarity of practices and alleged anticompetitive effect across the United States. Indeed, even in their objection, Pennsylvania objectors admit that Pennsylvania MLSs "used similar mechanisms" to accomplish the conspiracy (Doc. 1563 at 3), and that "the framework and incentive for this iteration of the conspiracy was made by NAR and the franchisors" *Id.* at 6.

Moreover, the Pennsylvania objectors' accusation that "[t]hese plaintiffs did not conduct any discovery regarding the operation of related conspiracies in other states and regions, including Western Pennsylvania" is wrong. *Id.* at 4; *see* Parts VI(C)(1)-(2), above (discussing economist

inquiry into non-NAR MLSs, including West Penn); *see also, e.g.*, August 10, 2022 Schulman Merits Reply Report, Doc. 922-3 at ¶ 80 (observing that there are 6,355 NAR members operating in West Penn MLS). Moreover, their own brief demonstrates that HSA franchisees (who were required to be NAR members and/or follow NAR's Code of Ethics) were operating in the West Penn MLS. Doc. 1563 at 2 (noting objectors sold through a HomeServices agent).

In addition, the court in *Moratis* dismissed the objectors' claims against West Penn MLS. *Moratis v. W. Penn Multi-List, Inc.*, No. 2:23-CV-2061, 2024 WL 4436425, at *1 (W.D. Pa. Oct. 7, 2024). This is contrary to the Pennsylvania objectors' assertions that they could do better in their own regional cases. If anything, the Settlements appear to be the best way, if not the only way, for Pennsylvania class members to obtain any recovery. Thus, the Pennsylvania objectors' argument that the recovery under the Settlements is insufficient rings hollow.

Similarly, the Pennsylvania objectors' argument that HSA could have paid more lacks support. It supposes, without any evidence, that HSA's parent company would step in and pay into the Settlement. It would not. And the objection ignores that the HSA Settlement expressly excludes HSA's parent company from the release. *See* HSA Agreement ¶ 14. Or that Plaintiffs have, in fact, sued HSA's parent company in *Gibson*.

Next, the Pennsylvania objectors' argument that the Settlement should not release HSA's franchisees is legally and factually wrong. As discussed above, this argument is contrary to the law and contrary to the realities of the litigation. See Part VI(C)(3)(b), above.

The Pennsylvania objectors' argument that the practice change relief should not contain a sunset provision should also be rejected. A time limitation on practice changes is common and reasonable. No company wishes to stay under the enforcement power of a court indefinitely, nor does a court wish to retain indefinite jurisdiction. For these reasons, injunctive relief settlements with sunset provisions are routinely approved, often for shorter periods than the five-year periods

at issue here. *See, e.g.*, *Smith v. Atkins*, 2:18- cv-04004-MDH, Order Approving Settlement, at ECF 53 (W.D. Mo. June 26, 2020) (approving settlement of nationwide class with 2-year practice change requirement); *Zepeda v. PayPal, Inc.*, No. 10-CV-1668, 2017 WL 1113293, at \*13 (N.D. Cal. Mar. 24, 2017) (approving final settlement with expiration of injunctive relief after two years: "ensuring that Defendants maintain such practices until two years following the date of the Preliminary Approval Order"); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, No. 12-MD-2320, 2015 WL 7282543, at \*10 (D.N.H. Nov. 16, 2015) (approving final settlement and overruling objections "that the injunctive remedies go away in five years" and observing the injunctive relief "provides a valuable benefit to the class" and just because the injunction is not as broad as some class members wanted "does not make this settlement inadequate"); *Fla. ex rel. Crist v. HCA, Inc.*, No. 03-CV-177, 2002 WL 32116840, at \*4 (M.D. Fla. Apr. 23, 2002) (entering a final consent judgment in a Sherman Act case, in which monetary payments and injunctive relief were provided and the judgment was set to expire in five years); *In re HP Inkjet Printer Litig.*, No. 05-CV-3580, 2011 WL 13156938, at \*5 (N.D. Cal. Mar. 29, 2011) (order approving settlement with injunctive relief expiring within at least three years). Not to mention that the Settlements at issue here provide a longer period of injunctive relief than other settlements that have been reached in other real estate commission antitrust suits. *See Nosalek v. MLS Property Information Network, Inc.,* No. 20-cv-12244 (D. Mass,) (Doc 268-1) ¶ 9(a) (MLS PIN injunction of three years).

Finally, the Pennsylvania objectors' argument that the long form notice is insufficient also fails for the same reasons discussed above. See Part VI(C)(3)(c), above.

### 5. The Court Should Overrule the New York Objections (Docs. 1560 (Friedman), 1562 (March))

Attorneys who filed two copycat cases in New York federal courts after both the *Burnett*

verdict and the *Gibson* complaint have submitted objections to the Settlements on behalf of their clients, Robert Friedman and Monty March (the "New York Objectors"). The New York Objectors claim their cases are distinct from the alleged NAR conspiracy and that the brokerage defendants "have no connection to NAR." Doc. 1560 at 3. They further assert that their claims do not share the same "factual predicate" as in this or the *Gibson* case. They are wrong. And the Court has already rejected these arguments. *See Gibson* Doc. 530 at ¶¶ 55-67.

*First*, each brokerage being released under the NAR Settlement, by definition, has a NAR affiliation. Only NAR-affiliated brokerages and agents are included in the scope of the release. *See* NAR Agreement ¶ 18(b), (e)-(f). And no brokerage that is unaffiliated with NAR is released. *See id.* ¶¶ 18(e)-(f) (requiring released brokerages to have a "REALTOR® as a Principal with membership in the National Association of Realtors®"). Moreover, with respect to the HSA settlement, extensive evidence was introduced in this case reflecting the involvement in NAR of HSA and its franchisees. *E.g.*, Order Denying Summary Judgment, (Doc 1019) at p. 5 (discussing HomeServices requirement that its franchisees be NAR members and/or follow NAR's Code of Ethics). Thus, the New York objectors are simply wrong.

*Second*, the Settlements specifically settle and release claims made in *Gibson*. *See* NAR Agreement  p. 1 (defining the "Actions" to include *Gibson* and *Umpa*); HSA Agreement  ¶ 1 (defining the "Actions" to include *Gibson*). The *Gibson* complaint specifically alleges that the conspiracy existed in non-NAR MLSs such as RLS/REBNY. As discussed in the *Gibson* Complaint:

> The RLS offers an MLS service in New York City—primarily in Manhattan. Until recently, the RLS rules created a default rule that the compensation offered to buyer-brokers would be equal to 50% of the total compensation received by the listing broker. Moreover, the RLS rules required that any change in the original listing had to be entered into RLS, thus requiring that any change had to apply to all buyer-brokers and thus maintaining a requirement of blanket offers. RLS rules also restrained negotiation of offered buyer-broker commissions by providing,

"Any negotiation of the reduction of a brokerage commission must be done with both the Exclusive Broker and the Co-Broker's approval of the commission reduction."

*Gibson* Amended Complaint (Doc. 232) at ¶ 182. Given this language, the ground for rejecting the New York objection is open and shut. There is no basis to claim that the *Gibson* case's challenge to REBNY RLS rules does not share a "factual predicate" with other claims challenging those same RLS rules. That Complaint alleges that, as a result, "Defendants' conspiracy has had the following anticompetitive effects *nationwide*," including in REBNY RLS: (a) "Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes"; (b) "Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers."; (c) "Home sellers have paid inflated buyer-broker commissions and inflated total commissions."; (d) "The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation"; and (e) "Price competition among brokers to be retained by home buyers has been restrained." *Id*. ¶ 225 (emphasis added); *see also id*. ¶¶ 28, 227 (describing "nationwide" impact).

The New York objectors ignore that the supposed non-Realtor MLS at issue in their cases is, in fact controlled by, "NAR-aligned brokerages and [is] not fully independent from NAR." *See id*. ¶ 182 (describing in detail NAR's and its members' control over and influence of MLSs not exclusively owned or operated by NAR associations). Indeed, there are more than 17,000 NAR members in the New York City area alone.[56] Thus, to claim that these real estate agents are parties

---

[56] *See* New York, NY REALTORS® & Real Estate Agents realtor.com, https://www.realtor.com/realestateagents/new-york_ny.

to a REBNY-only conspiracy is wrong.

*Third*, the New York objectors' assertion that their claims do not share the same "factual predicate" is contradicted by their own prior judicial admissions. Although the New York objectors *now* maintain that their cases are "wholly distinct and unrelated" to this one,[57] they and their counsel filed complaints expressly linking their claims to the rules challenged in this case and *Gibson*, including those adopted by NAR. For instance, the *March* complaint, which was filed two weeks after the *Burnett* verdict and the *Gibson* Complaint, alleges:

- **"NAR regulations include, in effect, the same rule as REBNY** that mandates the payment of commission by a Seller Broker to a Buyer Broker." Class Action Compl. at ¶ 73, *March v. REBNY*, 1:23-cv-09995 (S.D.N.Y. Nov. 13, 2023) (emphasis added).

- **"Like the REBNY Listing Service rule, the NAR Handbook and Code of Ethics** require residential real estate Sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home on a MLS owned or controlled by a local NAR association. If a buyer, represented by a Buyer's Broker, purchases residential real estate, under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the listing agreement." *Id.* at ¶ 81 (emphasis added).[58]

- "REBNY Listing Service rules specifically require the Seller to make a non-negotiable offer of compensation (as a commission) to the Buyer Broker when listing Manhattan residential real estate for sale and to pay the Buyer Broker's commission." *Id.* at ¶ 9.

- "This rule forces a Seller to pay the Buyer Broker's commission, eliminates negotiation of the Buyer Broker's compensation, artificially inflates the Buyer Broker's commission, and substantially increases the transaction cost of the Seller." *Id.*

Similarly, the *Friedman* complaint, filed more than two months after the *Burnett* verdict and the *Gibson* complaint, admits that "NAR rules similar to the [REBNY] broker allocation rules

---

[57] Doc. 1560 at 3.
[58] *See also id.* ¶¶ 81-100 (detailing NAR's anticompetitive rules, prior litigation challenging those rules, and the close relationship of both to REBNY's rules).

have been found to be anticompetitive." Class Action Compl., at 23, *Freidman v. REBNY*, 1:24-cv-0405 (S.D.N.Y. Jan. 18, 2024). The Complaint further alleges:

- "A jury has already found NAR and several brokerage firms liable for violating federal and state antitrust under a theory of liability similar to that alleged in this complaint." *Id*. at ¶ 84 (citing *Burnett* verdict).

- "Like REBNY, both NAR and MLS PIN established rules that require Sellers to make blanket, unilateral, and effectively non-negotiable offers of compensation to Buyer Brokers whenever Seller Brokers list a home for sale on an MLS. If a Buyer represented by a Buyer Broker purchases a home under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the applicable listing agreement." *Id*. at ¶ 85.

- "The Broker Commission Allocation Rules also require Defendants to list residential properties . . .with blanket offers of Buyer Broker commissions at the time of listing. This helps ensure that Defendants both dominate REBNY Brooklyn's residential real estate market and steer home buyers to listings with high Buyer Broker commissions." *Id.* at ¶ 3.

- "Defendants' conspiracy has artificially inflated broker commissions to a range of 5-6% of the sale price in nearly all residential real estate transactions in REBNY Brooklyn—half of which automatically goes to the Buyer Broker—an overcharge that is borne entirely by the home seller. In a competitive market, the home seller negotiates and pays a fee to the Seller Broker, while the home buyer that employs the services of a broker negotiates and pays a fee to the Buyer Broker. In a market unrestrained by the Broker Commission Allocation Rules, brokers would be forced to compete on price, and home sellers would pay substantially less in broker fees when selling residential real estate." *Id*. at ¶ 4.

As the New York objectors' own complaints reflect, the challenged NAR and REBNY rules are functionally identical. Indeed, in alleging, for instance, that "the NAR regulations include, in effect, the same rule as REBNY," counsel for the New York objectors certified in federal court that: (i) they had conducted a reasonable inquiry into their allegations, and (ii) "to the best of [their] knowledge, information, and belief" those allegations had "evidentiary support." Fed R. Civ. P. 11(b). The New York objectors are not permitted to walk back those allegations now simply because they may not be able to litigate their copycat cases if the Settlements they challenge are approved.

*Fourth*, consistent with Plaintiffs' allegations, the evidentiary records in *Burnett* and *Moehrl* reflect that: (i) the REBNY RLS rules challenged here were anticompetitive in similar ways to the challenged NAR rules; and (ii) the challenged NAR rules applied nationwide, including to transactions in REBNY RLS. Plaintiffs' experts analyzed non-NAR MLSs, including REBNY/RLS, and concluded that Realtors operating in those jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of Ethics and are thereby incentivized to require sellers to make unilateral offers of compensation to buy-side brokers/agents." 8-10-22 Schulman Reply Rept., *Burnett* Doc. 922-3 ¶ 75. Prof. Einer Elhauge further opined as part of a detailed, multi-page analysis of REBNY's rules that "the RLS rules, like the NAR [Buyer Broker Commission Rule (BBCR)], required listings to include an offer of buyer-broker compensation whenever sellers wanted to sell to buyers who were represented by buyer-brokers" and "had several other restraints similar to the NAR version of the BBCR." Elhauge Class Cert. Rebuttal Report, at ¶ 67, *Moehrl v. Nat'l Assn. of Realtors* (N.D. Ill. Oct. 18, 2022) (Doc. 372). The New York objectors ignore or misrepresent these analyses.[59] *See also Burnett* Doc. 1330, Trial Tr. at 1908:6-7 (noting that in REBNY "[t]his is one version of the practice of cooperative compensation"); Ex. 4613A (Doc. 1398-52) (REBNY rules discussed at *Burnett* trial). Thus, the challenged REBNY rules were not "wholly unrelated" to *Burnett* or *Gibson*.

Finally, the New York objectors tack on a laundry list of other objections almost entirely devoid of legal authority or explanation. To the extent the Court considers these objections at all, it should reject them.

(A) Friedman attacks the NAR Settlement's release provisions which release certain small

_____

[59] The New York objectors also incorrectly assert that NAR's Mandatory Offer of Compensation Rule was adopted in 1996—after REBNY left NAR. Doc. 1562 at 3. In fact, the *Gibson* Complaint makes clear the rule was adopted in 1992. *Gibson* Amended Complaint (Doc. 232) at ¶¶ 133, 136.

NAR-affiliated brokerages. NAR would not have settled if the release did not include, at a very minimum, small agents and brokers. Dirks Decl. at ¶ 25. Class Counsel negotiated strenuously to carve out from the Settlement's release larger brokers that were more likely to have a meaningful ability to pay a settlement or litigated judgment. *Id*. And Friedman ignores the fact that each brokerage (or MLS for that matter) only receives a release if it complies with the NAR practice changes—which is a significant benefit to the Class. *See* NAR Agreement ¶ 18(e).

(B) The New York objectors assert that the Class Representatives "do not have standing" to settle their claims. Doc. 1560 at 13. Yet they fail to point to any authority showing whether or how Class Representative standing is relevant to settlement approval. Regardless, the Class Representatives allege that they were injured as part of the same nationwide anticompetitive conspiracy that impacts sellers of homes on REBNY RLS. That is sufficient.

(C) The New York objectors complain that the total settlement amount is inadequate to fully compensate them for their injuries. But as described above, that is not the proper legal standard for assessing adequacy. The New York objectors further claim that Plaintiffs have not provided evidence of the Settling Defendants' ability to pay limitations. That is incorrect. *See* Berman Decl. at ¶¶ 19-27. In addition, as a non-profit, certain of NAR's financial records are publicly accessible. Despite that fact, the New York objectors make no effort to analyze those public records or explain how they show that the Settlements are inadequate.

(D) The New York objectors complain that the practice changes could have been stronger and lasted longer. Doc. 1562 at 18. But that is true in essentially any settlement that is the product of compromise and is not a basis for rejecting the Settlements here. Even so, the New York objectors say nothing about what other practice changes should have been included or how it would have been practical to obtain such practice changes from the Settling Defendants, rather than from REBNY—which is not released by the Settlements.

(E) The New York objectors also incorrectly assert that Class members who sold homes on REBNY have not been given guidance on whether they "will be provided a *pro rata* distribution" or if the higher commissions some of those Class members paid will be reflected in claim payments. Doc. 1562 at 17. In fact, the settlement website advises both that: (i) settlement payments "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 12.[60]

(F) Objector Friedman asserts, with no basis whatsoever, that the Settlements' inclusion of sellers who listed homes on REBNY "appears to be the product of a so-called 'collusive settlement.'" Doc. 1560 at 15. As discussed above at length, Class Counsel diligently sought to obtain the largest possible recovery on behalf of the nationwide Class, given the strength and risks of the litigation, including the Settling Defendants' financial limitations. The New York objectors fail to point to any supposed evidence suggesting otherwise, beyond the mere fact that overlapping claims in a different lawsuit are within the scope of the release. That is not a basis for rejecting the Settlements.

Finally, the vast majority of Class members from New York favor approval of the Settlements. Although the claims deadline is still months away, 14,890 New York residents have already submitted claims; and none have objected (aside from copycat litigants). Keough Decl. at ¶ 53. If the Settlements are not approved, many of these Class members risk receiving no compensation for their injuries.

---

[60] https://www.realestatecommissionlitigation.com/nar-faq.

### 6. The Court Should Overrule the *Batton* Objections (Doc. 1561 (Mullis))

The *Batton* objectors seek to carve out indirect purchaser buyer claims from the releases. But that request ignores reality. Every Class member sold a home during the class period, and most also bought homes. After all, few people sell a home without first buying it. And most home sellers then buy a different home with the proceeds because they need somewhere to live. Thus, most Class members had possible claims both as home sellers and home buyers. Yet, Settling Defendants quite reasonably balked at paying large amounts in settlement only to have the same people they just paid sue them again for the same alleged antitrust conspiracy.

The Parties carefully crafted the releases to incorporate the Eighth Circuit's "same factual predicate" standard, and to otherwise comply with federal law. This standard recognizes that basic fairness stops a party from suing twice for the same wrong. When cases go to final judgment, res judicata bars relitigating not only the claims tried, but also claims that "could have been raised" in that action. *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 714 (8th Cir. 2019). The same holds true in class actions litigated to conclusion. *In re General Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803 (8th Cir. 2004). And for class judgments that arise from settlement, courts have developed a parallel test that gives preclusive effect to all claims—even those not pleaded—that "arise out of the same factual predicate as the pleaded claims." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013). The same rules apply because "'the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action.'" *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982)).

Each Settlement incorporates the *Uponor* standard by limiting the term "Released Claims" to include only causes of action "arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged

in the Actions . . . ." NAR Agreement ¶ 17; HSA Agreement ¶ 13. In addition, "[f]or avoidance of doubt" as to enforceability, the releases "extend[] to, but only to, the fullest extent permitted by law." NAR Agreement ¶ 34; HSA Agreement ¶ 29. By using these legal terms of art, the Parties correctly restricted the releases' scope. The Class members would have been bound by res judicata if the case had proceeded to final judgment, and the releases impose no greater preclusive effect from settlement. The releases also apply only to people who accept benefits under the settlement. Every Class member is free to weigh their competing claims and make a choice. If they choose to accept benefits under the Settlement, then they release all claims, including indirect purchaser buyer claims. Or they can opt out and pursue buyer claims either individually or in *Batton* (should a court ever certify that class). And people with buyer-only claims are completely unaffected because they are not part of the class.

The *Batton* objectors argue that the Settlements release indirect purchaser buyer claims "for *no* additional consideration." Doc. 1561 at 8. Having properly limited the scope of the releases based on the "same factual predicate" standard, however, the Parties were under no further obligation to assign separate settlement values to every distinct claim that Class members might have asserted. As the Eighth Circuit recognized in *In re General American Life Insurance Co. Sales Practices Litigation*, 357 F.3d 800, 805 (8th Cir. 2004), that argument ignores "the way settlements usually work."

Like the objectors here, the *General American* plaintiff tried to void a class settlement release by complaining that "the class representative gave away all modal-billing claims (in the release) and received nothing in exchange for them." *Id*. Thus, the argument went, class members (including the plaintiff) received compensation for one type of claim, but "plaintiff and others similarly situated received nothing for their modal-billing claims." *Id*. But the Court rejected this contention because it ignored the give-and-take nature of the settlement process:

It simply is not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims, were released. The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefitted, and a claims-evaluation procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things.

*Id.*; *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005) (quoting same). The Eighth Circuit further declined to enmesh itself in trying to determine "the relative value of the modal-billing clams," and instead deferred to the judgment of the class representative and class counsel that releasing all claims arising from the same factual predicate "was a proper thing to give up to obtain the benefits offered by General American." *In re General Am.*, 357 F.3d at 805.

The same applies here. Plaintiffs bargained for and obtained great benefits: money at the limits of Defendants' ability to pay, along with injunctive relief eliminating the challenged business practices (which over time could provide significant future benefits from lower commissions). This relief is immediate and certain, eliminating litigation and bankruptcy risk threatened by complex additional proceedings. But every negotiation has two sides, and Plaintiffs made the judgment that providing a release tracking federal law by releasing all claims arising from the same conspiracy was "a proper thing to give up to obtain the[se] benefits." *Id.* There was no "discount applied" to buyer claims because "[n]o part of the consideration on either side" was "keyed to any specific part of the consideration of the other." *Id.* Rather, a complete release—including indirect purchaser buyer claims—was "part of the consideration necessary to obtain [one of] the largest antitrust settlement[s] in history." *Wal-Mart Stores*, 396 F.3d at 113. Nor were any Class members bound by this determination involuntarily; dissenters retained the right to opt-out.

The *Batton* objectors have offered no evidence to enable the Court to second-guess Plaintiffs' determination, and the Court should decline to do so.

The *Batton* objectors also argue that indirect purchaser buyers require their own subclass. Yet "[a] class need not be subdivided merely because different groups within it have alternative legal theories for recovery or because they have different factual bases for seeking relief." 7AA C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1760 (3d ed. June 2024 update). Rather, conflicts arise (and subclasses are required) only "when the class is found to have members whose interests are divergent or antagonistic." *Id.*; *see also DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) ("There is no indication that DeBoer's interest was antagonistic to the remainder of the class or that the claims were not vigorously pursued."). *Cf. Petrovic*, 200 F.3d at 1146 ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members."). No such conflict of interest is presented here.

The only people included in the settlement—and thus the only people giving any release— are people who sold homes during the class period.[61] Their interests are common and focused on achieving the greatest relief for the class. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."). That many of these Class members also bought homes during the class period does not make their interests divergent or antagonistic.

---

[61] People who only bought homes during the class period are not Class members. They have released nothing and can continue to litigate indirect purchaser claims for damages should they so desire.

The Supreme Court's decisions in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), provide no support for objectors' argument. As the Eighth Circuit has recognized, *Amchem* and *Ortiz* were completely different product liability cases that involved stark conflicts of interest not present here. *Petrovic*, 200 F.3d at 1146. Both cases represented attempts to settle all asbestos cases, now and forever. *Id.* The "injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured." *Id.* Worse yet, the diseases had a latency period of up to 40 years, meaning that many class members currently suffered from no illness. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 975 (8th Cir. 2018) (discussing *Amchem*). The Eighth Circuit stated that this latency period created an inherent conflict "between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size)." *Petrovic*, 200 F.3d at 1146. Adding to the problem, "the settlement offered no assurance that sufficient funds would remain to protect the interests" of future claimants. *In re Target Corp.*, 892 F.3d at 975 (discussing *Amchem*). In other words, both *Amchem* and *Ortiz* involved a strong likelihood that some claimants would be paid, but others (numbering in the hundreds of thousands) would receive nothing. That concern is not present here, where every Class member sold a home and therefore will receive compensation. The Settlements leave no Class members out.

The *Batton* objectors imply that *Amchem* and *Ortiz* require subclasses whenever Class members claim different amounts or types of damage. But *Petrovic* forecloses that argument. *Petrovic* was a class action arising from underground oil seepage originating from a petroleum refinery. In crafting settlement relief, the parties created three zones, labeled A, B, and C. Claimants in Zone A, situated above the underground oil, were "guaranteed to receive 54 percent

of the value of their properties." *Petrovic*, 200 F.3d at 1145. Claimants in the surrounding Zone B were guaranteed $1,300 per property. *Id*. And claimants in Zone C, the area farthest removed from the oil, could apply for compensation only by proving damage. *Id*. Faced with objectors from different zones, the Eighth Circuit held that *Amchem* and *Ortiz* required no subclasses: "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable." *Id*. at 1146. Indeed, "almost every settlement will involve different awards for various class members." *Id*.

The same is true here. Every Class member stands to gain from the settlements, both in terms of money and injunctive relief. Each Class member could try to prove individual damages at trial and these amounts would all vary. But courts approve class settlements all the time that forgo these individual determinations. Indeed, the most common method for allocating settlement funds in antitrust cases is on a *pro rata* basis. *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a *pro rata* basis."); *see also Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving *pro rata* distribution of settlement fund as fair and reasonable).

*Amchem* and *Ortiz* also presented procedural settlement problems not presented here. As the Eighth Circuit recognized, each involved a settlement before litigation, presenting the district court with a complaint, proposed class, and proposed settlement all at the same time. *Petrovic*, 200 F.3d at 1145-46. This deprived the trial courts of "'the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.'" *Id*. at 1146 (quoting *Amchem*, 521 U.S. at 620). This case, by contrast, arises from facts extensively developed during the litigation and trial, giving the Court an extensive record on which to base its findings. *Id*. In

addition, *Amchem* and *Ortiz* presented the possibility of collusion between class counsel and the defendants. *Id.* No objector meaningfully alleges here any facts reflecting such collusion in connection with these settlements. The difficulties associated with *Amchem* and *Ortiz* therefore are not present.[62]

The *Batton* objectors also fail to demonstrate that the class representatives or counsel provided inadequate representation. The mere fact that some Class members might allege indirect purchaser buyer claims presents no divergent interests that would preclude general representation of an undivided class. This is because "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'" *Petrovic*, 200 F.3d at 1148 (quoting 7A Wright, Miller, and Kane, *Federal Practice and Procedure: Civil* 2d § 1769 at 367 (2d ed. 1986)). All Class members here "share the common objective" of ending Defendants' anticompetitive conspiracy and recovering the excessive commissions they paid as a result of that conspiracy. *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1064 (8th Cir. 2013).

The *Batton* objectors brush aside the valuable injunctive relief obtained by the Settlements. But the financial payments to Class members are "not the only, or perhaps even the primary, benefit of the settlement agreement[s]." *Marshall*, 787 F.3d at 509. Rather, "the injunctive relief

---

[62] The *Batton* objectors' other cases are similarly distinguishable. *See In re Bank of America Securities Litig.*, 210 F.R.D. 694, 712 (E.D. Mo. 2002) (finding settlement unreasonable where it allocated no damages to set of claims that plaintiffs had previously pursued and represented as among the strongest in the case); *Branson v. Pulaski Bank*, No. 4:12-CV-01444-DGK, 2015 WL 139759, at *6-7 (W.D. Mo. Jan. 12, 2015) (rejecting settlement where there was no evidence of the merits of plaintiffs' claims and settlement appeared to stem from unequal bargaining power); *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 385-87 (D. Minn. 2013) (rejecting proposed settlement submitted the day after complaint was filed when the court had no information about the potential damages or relative strengths and weaknesses of claims). The rest are cases where there were intractable conflicts between subclasses of class members holding present, known claims and those holding claims for potentially future, unknown injuries.

offered under the settlement[s] has value to all class members." *In re Target Corp.*, 892 F.3d at 974 n.6; *accord Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (argument that some class members "receive no money" fails because it "fails to acknowledge the injunctive relief offered by the settlement," which "is intended to benefit all class members regardless of individual monetary recovery."). The practice changes achieved by the Settlements completely remake the residential housing market and will save **all** Class members **many billions** of dollars by lowering commissions on future home sales.

The *Batton* objectors also ignore the fact that the only people included in the Settlements are people who sold homes during the class periods. People who only bought homes are not Class members. Individuals who only purchased houses during the class periods can litigate indirect purchaser buyer claims any way they desire, whether individually or in *Batton*. *Batton* itself will continue to be litigated. This is not a case where anyone is releasing claims without compensation. Instead, all Class members "share the common objective of maximizing their recovery from [Defendants] for the same alleged misconduct." *Schutter v. Tarena Int'l, Inc.*, No. 21-CV-3502, 2024 WL 4118465, at *5 (E.D.N.Y. Sept. 9, 2024).

For these reasons, Objectors' reliance on *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), is off the mark. *Literary Works* involved a settlement that placed claims in groups A, B, and C (each group arising under a different provision of the Copyright Act). *Literary Works*, 654 F.3d at 246. If claims exceeded a set cap, then Category C claims would be reduced first and might be eliminated entirely. *Id*. The Second Circuit therefore found a lack of adequate representation because Category A and B claims were "more lucrative" than Category C and "because the reduction of Category C claims could 'deplete the recovery of Category C-only plaintiffs in their entirety before the Category A or B recovery would be affected.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir.

2021) (quoting *Literary Works*, 654 F.3d at 252, 254). The settlement agreements here, by contrast, present "no risk that any members of the class will have their ability to get settlement benefits reduced to zero because some other members got more relief from the settlement." *Id.* Instead, "all class members are entitled to the same class benefits." *Id*. Again, the fact that many Class members both bought and sold a home presents no "fundamental conflict" that requires the use of subclasses or additional lawyers.

The *Batton* objectors also complain that "the settling parties have not made any plan of allocation available." Doc. 1561 at 5. But this argument is premature and can be raised in the allocation phase. "[C]ourt approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update). "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d. Cir. 1987).[63] Once the allocation plan is proposed, the Court will be in a position to consider that plan and approve "a

_____

[63] *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551, 1988 WL 158947, at *4 (W.D. Wash. July 28, 1988) ("[D]eferral of allocation decisions is routinely followed in" these circumstances because "the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved."); *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known."); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011) (developing plan of allocation is properly delayed until after final approval of settlement where "the potential for additional settlements with other Defendants . . . may affect the final plan of allocation"); *Manual for Complex Litigation, Fourth* § 21.312 (2005) ("Often . . . the details of allocation and distribution are not established until after the settlement is approved.").

second notice to Class Members, followed by a right to object and/or file a claim." *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019). That distribution decision will be "governed by the same standards of review applicable to approval of the settlement as a whole, *i.e.,* the distribution plan must be fair, reasonable and adequate." *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020). Any Class members who disagree with the proposed allocations—e.g., because they believe that plan insufficiently compensates home purchases—will be able to present such argument to the Court at that time. Nor do any Class members need allocation information in deciding whether to opt-out of the settlements. The Eighth Circuit rejects the notion that Class members must be provided "a formula for calculating individual awards" when receiving notice—a description of the "potential aggregate payout" is enough. *Petrovic*, 200 F.3d at 1153.

Finally, the *Batton* objectors are wrong in arguing that buyer claims lie outside the same factual predicate as seller claims. In fact, releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the settling defendant arising out of the same conspiracy, including when those direct purchasers may also have indirect-purchaser claims. *See, e.g.*, *In re Transpacific Passenger Air Transportation Antitrust Litigation* (N.D. Cal, 07-cv-5634), ECF No. 900-2 § 1.11 (releasing "any and all claims . . . on account of, arising from, or in any way related to, the pricing of passenger air transportation by JAL or Defendants . . . with respect to the facts, occurrences, transactions or other matters that were alleged or could have been alleged [in the action] . . . regardless of legal theory, and regardless of the type or amount of relief or damages claimed"); *In re: Processed Egg Products Antitrust Litigation* (E.D.P.A., MDL 2002), ECF No. 349-1 ¶ 25 (similar); *In re Intuniv Antitrust Litigation* (D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar); *In re: Prograf Antitrust Litigation* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re Pre-Filled Propane Tank Antitrust*

*Litigation* (W.D. Mo. 14-md-2567 / MDL No. 2567), ECF No. 362-1 ¶ 12 (similar); *In re HIV Antitrust Litigation* (N.D. Cal, 19-cv-02573), ECF No. 711-2 at 11-12 (similar); *In re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637), ECF No. 3324, ¶ 26 (similar). Courts have approved these settlements even over objections that the settlement improperly released or otherwise devalued a subset of claims. *See In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554, 555-56 (9th Cir. 2017) ("The district court properly certified the settlement class and was not obligated to create subclasses for purchasers of U.S.-originating travel and direct purchasers of airfare. Federal Rule of Civil Procedure 23(a) does not require a district court to weigh the prospective value of each class member's claims or conduct a claim-by-claim review when certifying a settlement class."); *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 7397567, at *1 (N.D. Cal. Nov. 8, 2023) (rejecting indirect purchasers' request to set aside portion of direct-purchaser settlement).

Simply comparing the *Batton* complaint with Plaintiffs' complaint here shows that the buyer claims arise from the same factual predicate as the seller claims. *See also Batton I,* Mar. 5, 2021 Plaintiffs' Initial Joint Status Report, No. 21-cv-00430, at Doc. 48 ("In filing this case, Plaintiff took the position that this case is related to *Moehrl v. NAR et al.*"); *Id.* at Doc. 59 – Transcript of Proceedings held on Mar. 23, 2021 (reflecting Mullis's counsel's representation that *Moehrl* "raises substantially similar allegations"). All such claims arise from the same common nucleus of operative facts, and any Class member with both seller and buyer claims would "ordinarily be expected to try them all in one judicial proceeding." *North Dakota v. Lange*, 900 F.3d 565, 568-69 (8th Cir. 2018). The Court therefore should reject the *Batton* objectors' attempt to force claim splitting between the seller and buyer claims.

### 7. The Court Should Overrule the Wang Objection (Docs. 1547, 1548)

Plaintiffs received a pro se objection from Hao Zhe Wang, Doc. 1548, who filed his own lawsuit against NAR and others. *See Wang v. National Association of Realtors, et. al.*, No. 24-cv-02371 (S.D.N.Y.). He opted out of prior settlement agreements in the case. *See* Doc. 1435 (asking to be excluded "from the Settlement Class as to Anywhere, RE/MAX, and Keller Williams"); Keough Dec. at Ex. O (exclusion from HSA Settlement). Mr. Wang raises a litany of complaints about the real estate industry, but many of the issues he complains about were the subject of this lawsuit and addressed by the practice changes Plaintiffs negotiated in the NAR Settlement. Mr. Wang complains that NAR rules—in particular, the Buyer-Broker Commission Rule: (1) caused sellers to set the commission offered to buyer brokers, not buyers, leading to inflated commissions; (2) allowed buyer brokers to market their services as free, when they are not (and agents were often trained to do so); (3) limited negotiations of offered commissions; and (4) restricted the disclosure of the commissions being offered to consumers. Docs. 1547 & 1548 at 6, 9, 16, 19. Indeed, the "background" section of Mr. Wang's objections copies allegations and arguments made by Plaintiffs as if they were Mr. Wang's own. Such rules, of course, were the crux and target of the underlying litigation, and the practice changes in Paragraph 58 of the NAR Settlement are aimed at ending those practices. Many of Mr. Wang's complaints about the industry, then, are addressed by the Settlement Agreement Mr. Wang is now objecting to. Many of his objections thus, support approving the Agreement, not rejecting it.

Setting those issues to the side, Mr. Wang appears to object to the NAR settlement on nine grounds—although his objections are not always clear. None of Mr. Wang's objections, as best they can be understood, have merit.

### a. The NAR Release Is Properly Limited to Claims Arising from the Same Factual Predicate

Mr. Wang first and principally recites a litany of unsupported claims that NAR rules bar listing brokers from submitting offers from unrepresented buyers to their seller clients and allow buyer-brokers to market their services as free—which he claims are anticompetitive and illegal because they forced him to use a buyer broker when he did not want to. *Id.* at 5–20. Mr. Wang then seeks a declaration that hypothetical "direct purchaser" claims and consumer protection and false advertising claims are not released by the settlement. *Id.* at 2, 20–25.

It is unclear exactly what claims Mr. Wang believes should not be released. But none of the claims suggested should prevent approval of the Settlement. The claims he cites either are not released, are properly released as arising from the same factual predicate as the claims asserted in this action, or are simply nonexistent.

First, if Mr. Wang is asserting that claims by home buyers who *never* sold a home should not be released—that is, claims from individuals who only bought homes during the relevant period—then his assertions are irrelevant. Those claims are not released—contrary to Mr. Wang's suggestion, *Id.* at 35 (asserting that "the settlements robbed" "buyers who never sold a house" "blind to benefit" sellers)—because the "Settlement Class" includes only individuals "who *sold* a home" and satisfy other criteria. NAR Agreement ¶ 21 (emphasis added). The Settlement Class does not include individuals who only *purchased* a home or release any claims by any such persons.

Second, if Mr. Wang objects to releasing antitrust claims by home buyers who were *also* sellers, challenging the same rules challenged in this action, then such claims are properly

released—whether styled as direct or indirect purchaser claims.[64] As discussed above in responding to the *Batton* objectors, claims by home buyers challenging the same rules are based on the same conspiracy and the same harm that was the subject of this litigation: inflated commissions. Such claims thus stem from the same factual predicate as those alleged here and are properly released. Mr. Wang concedes this at one point. He acknowledges that the "lawsuits against NAR . . . that have asserted *indirect purchaser* claims . . . stemmed from the same factual predicates as the home-seller suits." Docs. 1547 & 1548 at 21. He also acknowledges—as Plaintiffs highlighted above—that courts regularly hold that releases in direct-purchaser cases can include those class members' indirect purchaser claims. *Id.* at 28–29. Accordingly, there is nothing improper with including indirect purchaser claims in the release here.

Third, to the extent Mr. Wang contends that NAR rules that once permitted buyer brokers to market their services as free violated consumer protection statutes and made NAR liable for false advertising, Plaintiffs challenged these rules—and secured practice changes barring such

_____

[64] Such claims are properly styled indirect purchaser claims, contrary to Mr. Wang's suggestion. Mr. Wang ignores that home buyer claims were, in fact, brought as *direct purchaser* claims in the *Leeder* (now *Batton*) case. They were dismissed because home buyers are indirect purchasers, not direct purchasers. *Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 309–11 (N.D. Ill. 2022) (holding that "homebuyers like Leeder [are] indirect purchasers" because "[i]t is the home seller who agrees in their listing agreement to pay a single, total commission, and the buyer-broker's compensation comes from that fund"). As the court there explained, "the buyer-broker's commission will be deducted from the home seller's proceeds from the sale," making the home seller the direct purchaser even if—as Mr. Wang emphasizes, Docs. 1547 & 1548 at 2—the funds are provided by the home buyer. *Id.* Mr. Wang suggests *Illinois Brick* and the direct-purchaser rule should not apply because a home sale differs from the sale of a good (like a Hermes bag). *Id.* at 30–31. But Mr. Wang offers no support for courts limiting *Illinois Brick* solely to sales of goods and not services, and courts apply the doctrine to the sale of services regularly. *See, e.g.*, *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (healthcare services); *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 2018 WL 2383098, at *6 (N.D. Ill. Mar. 31, 2018) (same). Mr. Wang also suggests that Plaintiffs labelled home sellers as direct purchasers for strategic reasons. That is false. Plaintiffs argued they and their fellow home sellers are direct purchasers because, consistent with the lengthy analysis in *Leeder*, they are.

109

marketing. *Id.* at 2, 19. A claim, like Mr. Wang's, challenging the same rules, even under a different legal theory, clearly implicates the same factual predicate and may be released in a class settlement.

Finally, to the extent Mr. Wang is alleging that NAR rules purportedly bar listing brokers from submitting offers from unrepresented buyers to their home seller clients, *Id.* at 5–20, no such rules exist to Plaintiffs' counsels' knowledge.

In sum, while Mr. Wang objects that certain ill-defined claims cannot properly be released in the Settlement, the claims he cites either are not released, are properly released as arising from the same factual predicate, or are nonexistent. His objections on this point thus fail to show that approval is inappropriate. It must also be emphasized that there is a simple solution to Mr. Wang's complaint that *his* purportedly valuable claims should not be released: he could have opted-out to assert them. He knows this. He opted-out for other settlements in this and related cases. Instead, he seeks to prevent valuable relief flowing to class members and other consumers to further his own perceived interests. The Court should reject his objections about the claims covered by the release.

### b. Plaintiffs Are Adequate Representatives

Mr. Wang next contends that Plaintiffs failed to adequately represent the interests of home sellers who were also home buyers because they did not assert claims as home buyers. *Id.* at 2, 26–28. Plaintiffs explain in response to the *Batton* objectors why Plaintiffs were adequate representatives of such class members: the class representatives were also home buyers and they had the same interest and objective as their fellow Class members—ending Defendants' anticompetitive conspiracy and recovering the excessive commissions they paid.

The cases Mr. Wang cites do not support his argument. The Second Circuit in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* held that the class representatives "adequately represented the

claims" at issue; the decision supports Plaintiffs, not Mr. Wang. 396 F.3d 96, 109–113 (2d Cir. 2005). *National Super Spuds, Inc. v. New York Mercantile Exchange* held that the named plaintiffs could not represent the class because they were not part of it. 660 F.2d 9, 17 (2d Cir. 1981). Plaintiffs here are plainly part of the class: they sold homes on an MLS during the relevant time period. Finally, *Taylor v. Sturgell* and *South Central Bell Telephone v. Alabama* are far afield. *Taylor* explained the instances when nonparty preclusion applies—that is, when a party who was not a party to a prior lawsuit is nonetheless bound by the results of the earlier suit—and rejected the "virtual representation" doctrine. *Taylor v. Sturgell*, 553 U.S. 880, 891–904 (2008). *South Central Bell Telephone Co.* likewise addressed whether nonparty preclusion should apply. *South Central Bell Telephone Co. v. Alabama*, 526 U.S. 160 (1999). This Court is not presently considering whether a prior lawsuit has any preclusive effect.

### c. The Settlement Is Not Racially Discriminatory

Mr. Wang thirdly contends that the settlement is racially discriminatory because racial minorities and first-generation Americans tend not to inherit and then sell homes; they instead buy homes. Thus, the argument seems to go, they will have more claims as home buyers than as home sellers. Docs. 1547 & 1548 at 2–3, 34–38

This objection is nothing more than inflammatory rhetoric without any basis in fact or reality. The settlement treats every class member equitably. No provision relies on any racial classifications whatsoever. Likewise, the settlement website advises both that: (i) settlement payments "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement

may be reduced on a pro rata basis." Settlement FAQ 12.[65] Again, nothing depends on any racial classifications. Finally, Mr. Wang fails to offer a shred of evidence that racial minorities or first-generation Americans bought more homes than they sold during the class period and were, on net, buyers. That is, he has presented zero evidence of disparate impact. All he has offered is speculation and stereotype.

Mr. Wang also suggests the settlement is somehow discriminatory because it does not include individuals who *only* bought a home. Again, Mr. Wang does not support his assumption that racial minorities are, on net, buyers during the statute of limitations period. Further, this assertion is flatly inconsistent with his earlier objection that the settlement should not include any home buyer claims. Regardless, another lawsuit—the *Batton* case—is pressing claims on behalf of a putative class of home buyers. They have an avenue to vindicate their rights there.

### d. The Settlement Amount Is Fair, Reasonable, and Adequate Considering NAR's Ability to Pay

Mr. Wang several times asserts that class members will only get $10 and suggests this is too low. Docs. 1547 & 1548 at 32. It is unclear whether this is intended as an objection to the amount of settlement. If it is, Mr. Wang has zero basis for asserting class members will get $10. That is his speculation.

More fundamentally, this objection ignores that Plaintiffs carefully analyzed the financial situation of NAR and reached an agreement that accounted for the limits of NAR's ability to pay. Mr. Wang seems to acknowledge this in other portions of his objections, recognizing that "the settlement represents an exceedingly large portion of [NAR's] total assets" and NAR has "mostly exhausted its financial resources." *Id.* at 42. Given that Plaintiffs struck a deal at the limits of

---

[65] *See* https://www.realestatecommissionlitigation.com/nar-faq.

NAR's ability to pay, the Settlement is reasonable. Asserting the Settlement amount is too low without analyzing whether NAR could reasonably pay more is unhelpful. The implication is that Plaintiffs should have demanded more and forced NAR into bankruptcy. That would not have benefited the Class. The Settlement ensures payment to Class members for the harms suffered.

### e. Mr. Wang's Objection that the Settlement Depletes NAR Financially Supports Approval

Contradicting his objection that the Settlement amount is insufficient, Mr. Wang recognizes, as mentioned, that the Settlement accounted for the limits of NAR's ability to pay. Mr. Wang nonetheless, and counterintuitively, contends that Plaintiffs should have settled for less to preserve NAR's ability to pay settlements or judgments in *other* undefined, hypothetical lawsuits. *Id.* at 41–43.

Mr. Wang's objection fails for several reasons. First, it assumes the existence of valid claims against NAR that NAR would willingly compromise. Mr. Wang identifies none. His objection is entirely speculative. Second, accepting the objection would perversely encourage settlements for less, not more, to the detriment of class members to preserve a defendant's assets. Rule 23 requires the opposite. Third, accepting Mr. Wang's objection would open the floodgates. It would invite objections from anyone who could possibly have a claim against a defendant—no matter how speculative or unripe—on the ground that the settlement could undercut the ability of that defendant to pay other settlements or judgments.

### f. Mr. Wang's Objections to the Practice Changes Are Misguided

Mr. Wang next objects to the NAR practice changes because, he claims, two agents in North Carolina recently informed him that he needed an agent to put an offer on a home. *Id.* at 3, 32–34. Mr. Wang's objection on this point does not warrant rejection of the Agreement. Nothing in the Agreement sanctions or permits that conduct. Mr. Wang is free to take whatever action he

sees fit against those agents, contrary to his suggestion that he cannot. *Id.* at 34. If Mr. Wang's contention is that the Agreement should bar such practices, it is not possible to foresee every conceivable unlawful or unsavory practice in the industry and try to ban it. This lawsuit was aimed at specific rules and conduct—rules requiring sellers to offer compensation to buyer brokers, limiting the negotiation of those offers, and related rules—and Plaintiffs secured practice changes after hard-fought negotiations to stop the practices challenged. No settlement is going to correct every ill in an industry, but that does not make the settlement inadequate. The practice changes here seek to end the conduct challenged in this lawsuit, which is all that can be hoped.

### g.  Mr. Wang's Attacks on the *Cy Pres* Doctrine Are Irrelevant

Mr. Wang objects to the non-reversionary clause in the Settlement Agreement because he believes it will cause funds that should go to class members to be distributed to a nonprofit or similar organization under the *cy pres* doctrine. *Id.* at 3, 38–41. Mr. Wang misunderstands the Settlement and how funds will be distributed. Funds will be paid to Class members who make claims and will not be distributed under the *cy pres* doctrine in the first instance. All Mr. Wang's missives against that doctrine are thus irrelevant. The non-reversionary clause is, in fact, to the benefit of the class. It ensures that funds from the Settlement will not revert to NAR and will instead go to harmed Class members.

### h.  Notice Satisfied Due Process and the Requirements of Rule 23

Mr. Wang objects to the notice provided to Class members on three grounds. Each is meritless.

First, he objects that the notice was inadequate because, he claims, he did not receive mail notice and some other Class members may not have either. *Id.* at 43. Mr. Wang, however, clearly received notice of the settlements, even if not mail notice. He claims he learned about this settlement—and other related settlements—through press coverage in the *New York Times*, and he

timely raised his objections. His complaints about a purported lack of notice are thus moot and meritless. *See In re Pinterest Derivative Litig.*, 2022 WL 2079712, at *2 (N.D. Cal. June 9, 2022) ("[T]hough delayed, Mr. Sweeney received actual notice of the proposed settlement, voiced his objections, and has been heard. Having been heard, Mr. Sweeney's objections [to notice] are OVERRULED."); *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 123–24 (S.D.N.Y. 2001) (overruling objection that notice was inadequate where objector received notice via the *Wall Street Journal* but not via mail). In any event, Mr. Wang fails to tell the Court that he was personally provided notice of the NAR Settlement on June 19, 2024. *See Wang v. National Association of Realtors, et. al.*, No. 24-cv-02371 (S.D.N.Y.) at Doc. 51.

Furthermore, Mr. Wang's assertion that other Class members may not have received notice is pure speculation. Mr. Wang does not offer any declarations, affidavits, or any other evidence to support this assertion, nor are there any other indications that notice has somehow been deficient.

Finally, even accepting the premise that there may be some Class members who did not receive notice in the mail (though many did), that does not violate due process requirements. "[A]ctual notice to all class members is not required." *Dornberger*, 203 F.R.D. at 123–24 (approving notice plan and concluding that "reasonable efforts were taken to notify all members of the class," where part of the class received direct mail notice and part of the class was covered by publication notice); *see also Dusenbery v. United States*, 534 U.S. 161, 170–71 (2002) (holding that "actual notice" is not required by the Due Process Clause; rather, "it requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action"); *Montgomery v. Beneficial Consumer Disc. Co.*, 2005 WL 497776, at *5 (E.D. Pa. Mar. 2, 2005) ("The requirement of 'best notice practicable under the circumstances' has consistently been held *not* to require actual notice for every class member." (emphasis in original)); *In re Mass. Diet Drug*

115

*Litig.*, 338 F. Supp. 2d 198, 209 (D. Mass. 2004) (neither "Rule 23 nor due process, however, requires that each class member receive actual notice").

Instead, both due process and Rule 23 require the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (notice "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'" (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950))). This is a different standard than the "actual notice" standard advocated by Mr. Wang. *See Barfield v. Sho-Me Power Elec. Co-op.*, 2013 WL 3872181, at *14 (W.D. Mo. July 25, 2013) ("[T]he Court is only required to provide the best practicable notice to those members identifiable by reasonable effort—not achieve actual notice on every potential class member."); *see also Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994) (concluding that the standard for class notice is "best practicable", rather than "actually received" notice).

"[I]ndividual notice" is to be provided "to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974) ("[I]ndividual notice must be provided to those class members who are identifiable through reasonable effort."). And "when class members' names and addresses cannot be determined with reasonable efforts, . . . publication of the settlement notice is adequate and appropriate." *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 212 (W.D. Mo. 2017), *aff'd*, 896 F.3d 900 (8th Cir. 2018); *see also In re Agent Orange*, 818 F.2d at 168 (constructive notice by publication is sufficient "as to persons whose whereabouts or interests c[an] not be determined through due diligence" (citing *Mullane*, 339 U.S. at 317–18)).

Here, the court-approved notice plan provided for direct mail notice to every Class member who could be located through reasonable effort—specifically, every Class member for whom the

Settling Defendants "provide[d] contact information or for whom contact information [could be] located via other means (e.g., third-party data)." Doc. 1458-3 at 6. To reach Class members who could not be individually identified through reasonable efforts, the court-approved notice plan provided for publication notice through the consumer magazine *Better Homes & Gardens* and digital advertising "with the leading digital network (Google Display Network – 'GDN'), the top social media platform (Facebook), and a respected programmatic partner (OMTD)." *Id.* Courts time and time again have approved similar notice plans—plans that included individual notice for class members who can be identified through reasonable efforts plus publication notice to reach those who could not. *See, e.g.*, *Swetz v. GSK Consumer Health, Inc.*, 2021 WL 5449932, at *3 (S.D.N.Y. Nov. 22, 2021) (finding that notice plan that included "direct notice" to "identified Settlement Class Members," a nationwide press release, and "notice through electronic media— such as Google Display Network and Facebook"—was the "best notice practicable"); *Pollard*, 320 F.R.D. at 211–12 (approving notice plan where direct notice was provided to the fraction of the class who could be identified with reasonable efforts and publication notice in magazines and using banner advertisements was use to notify most of the class).[66]

The notice plan here reached 99% of the Class. Keough Decl. at ¶ 40. Courts have repeatedly approved notice plans with less reach. *E.g.*, *In re Packaged Seafood Prod. Antitrust Litig.*, 2023 WL 2483474, at *2 (S.D. Cal. Mar. 13, 2023); *Bruzek v. Husky Energy Inc.*, 2021 WL

_____

[66] *See also Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *16 (S.D.N.Y. Oct. 16, 2019) (concluding settlement notice campaign satisfied Rule 23 where it consisted of mailed notices and publication of the summary notice once in each of three newspapers and once over *PR Newswire*); *Khoday v. Symantec Corp.*, 2016 WL 1637039, at *7 (D. Minn. Apr. 5, 2016) (approving notice plan consisting of direct notice and "supplemental notice" through "online social media" and "national publication"); *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 475 (E.D. Pa. 2000) (approving individual notice plus notice "through one-time publication in USA Today and on the Internet through the Business Wire").

9474270, at *2, 4 (W.D. Wis. Aug. 6, 2021); *Reid v. I.C. Sys. Inc.*, 2018 WL 11352039, at *3 (D. Ariz. July 27, 2018); *Beck-Ellman v. Kaz USA, Inc.*, 2013 WL 1748729 at *3–4, *8–9 (S.D. Cal. Jan. 7, 2013); *see also Pollard*, 320 F.R.D. at 212–13 (approving notice plan where there was a dispute as to whether it reached 49% or 73.7% of class members). Indeed, "[t]he Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable." *Hand v. Beach Ent. Kc, LLC*, 2021 WL 199729, at *2 (W.D. Mo. Jan. 19, 2021).

It is of no moment that some hypothetical Class members may not have received mail notice. The notice plan provided the best notice practicable under the circumstances, which is what due process and Rule 23 require.

Second, Mr. Wang asserts that the Parties should have subpoenaed the housing sales records of "local governments" across the country because they will show "each property transaction in the country." Docs. 1547 & 1548 at 44. But again, due process requires the "best notice that is *practicable*," and individual notice "to all members who can be identified through *reasonable* effort." Fed. R. Civ. P. 23(c)(2)(B) (emphasis added). Subpoenaing records from local governments across 50 states is anything but practicable or reasonable and would have been redundant given that JND utilized third-party aggregated data sources for notice. It would be a costly and hugely time-consuming effort that would delay relief to Class members. It also would not provide the necessary information. The records would show sales, but that does not mean they would also provide *current contact information* for purposes of sending notice. And notice here is already robust, reaching 99% of Class members. Courts have rejected similar objections in similar circumstances—where notice was already robust and the additional avenues suggested by objectors would be expensive and not make much difference. *See Poertner v. Gillette Co.*, 618 F. App'x 624, 630 (11th Cir. 2015) (rejecting objection that the parties should have subpoenaed the customer records of "a handful of major retailers" because obtaining this information would be

"difficult, expensive, and essentially fruitless"); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F. Supp. 3d 269, 274 (E.D.N.Y. 2021) ("Here, where providing consumers with individual notice will offer no significant incremental benefit, the added financial and administrative burdens caused by using 22 subpoenas in an attempt to identify the addresses of consumer class members are not justified."); *Pollard*, 320 F.R.D. at 210–11 (overruling objection that the parties should "have obtained state hunting license records" because the objectors failed to "set forth if these records are attainable, the mechanisms the parties must utilize to obtain the records, the costs associated with obtaining these records, and whether the parties would be required to file suit in every state to attain these records").

Third, Mr. Wang objects that the Court required Class members to *mail* opt outs and objections, requiring them to incur postage costs. Docs. 1547 & 1548 at 44–45. This objection is likewise meritless. Courts routinely order opt outs and objections to be mailed. *See Rogowski v. State Farm Life Ins. Co.*, No. 4:22-cv-00203-RK (W.D. Mo. Dec. 16, 2022), ECF No. 54, at 4; *Barfield v. Sho-Me Power Electric Cooperative*, No. 2:11-cv-4321-NKL (W.D. Mo. Dec. 5, 2014), ECF No. 541, at 5–7; *see also In re AXA Equitable Life Ins. Co. COI Litig.*, No. 1:16-cv-00740-JMF (S.D.N.Y. June 22, 2023), ECF No. 705, at 4–5, 6; *Advance Trust & Life Escrow Servs., LTA v. PHL Variable Insurance Co.*, No. 1:18-cv-03444 (S.D.N.Y. Aug. 9, 2023), ECF No. 271, at 5–6. Courts have also overruled objections like Mr. Wang's, reasoning that "requiring opt-out by mail is not unduly financially burdensome." *Howerton v. Cargill, Inc.*, WL 6976041, at *3 (D. Haw. Dec. 8, 2014); *accord McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 641 n.14 (E.D. Pa. 2015) ("Mailing a request is not unreasonably burdensome."). In any event, JND did accept opt outs provided electronically. Keough Decl. at ¶57.

i.    **The NAR Settlement Adequately Defines the Released Parties**

Finally, Mr. Wang objects that Paragraph 18 of the NAR Settlement Agreement, which defines the "Released Parties," is vague and unconscionable because Class members purportedly cannot determine if certain brokerages are released or not. Docs. 1547 & 1548 at 3, 45–49. Mr. Wang identifies Brown Harris Stevens and Halstead as the only examples. *Id.* at 46.

Mr. Wang is wrong. Paragraph 18 of the NAR Settlement clearly spells out who is released. It provides:

- Under Paragraph 18(a), NAR and relevant NAR personnel and affiliated entities are released.

- Under Paragraphs 18(b) and 18(c), members of NAR, associate members, Member Boards, and NAR MLSs—and relevant personnel and affiliated entities—are released under circumstances, including if they comply with certain practice changes and agree to provide proof of compliance.

- Under Paragraph 18(d), non-NAR MLSs—and relevant personnel and affiliated entities—are released under circumstances, including if they comply with certain practice changes and agree to provide proof of compliance, and if they agree to payment under the terms of Appendix D. The non-NAR MLSs who opted in under this provision were reported to the Court and available on the public docket on September 30, 2024. Dkt. No. 1538. They are also listed on the settlement website at: https://www.realestatecommissionlitigation.com/nar-opt-in.

- Under Paragraph 18(e), real estate brokerages "with a calendar year 2022 Total Transaction Volume for residential home sales of $2 billion or less"—and relevant personnel and affiliated entities—are released under circumstances, including if they comply with certain practice changes and agree to provide proof of compliance. Paragraph 25 of the NAR Settlement Agreement provides that "[t]he 'Sales Volume' reflected in the T360 Real Estate Almanac shall serve as an irrebuttable presumption of a Person's 'Total Transaction Volume.'" That information can be accessed here: https://www.t3trends.com/intel/top-brokerages-in-2023/.

- Under Paragraph 18(f), real estate brokerages "with a calendar year 2022 Total Transaction Volume for residential home sales in excess of $2 billion"—and relevant personnel and affiliated entities—are released under circumstances, including if they comply with certain practice changes and agree to provide proof of compliance, and if they pay the amounts specified in Appendix C. Brokerages who opted in under this provision were reported to the Court and available on the

120

public docket on September 30, 2024. Dkt. No. 1538. They are also listed on the settlement website at: https://www.realestatecommissionlitigation.com/nar-opt-in.

- Finally, Paragraphs 18(g) and 18(h) identify certain entities that are not released.

Thus, Paragraph 18 plainly identifies releasees under the Agreement.

Specific to Mr. Wang's objections, it can readily be determined that Brown Harris Stevens and Halstead are Released Parties. Halstead merged into Brown Harris Stevens in 2020, so they are now under the same corporate umbrella.[67] According to the T360 Real Estate Almanac, Brown Harris Stevens had a 2022 sales volume in excess of $2 billion.[68] Thus, Brown Harris Stevens falls under Paragraph 18(f) of the NAR Settlement Agreement. It would be a "Released Party" only if it agreed to comply with certain practice changes and to provide proof of compliance, and if it paid under the provisions of Appendix C.

Brown Harris Stevens did that. Brown Harris Stevens agreed to pay $2.9 million and enact relevant practice changes. This was reported to the Court and posted on the public docket on September 30, 2024. Doc. 1538. In addition, Class members were told that any brokerages that opted into the NAR Settlement would be listed on www.RealEstateCommissionLitigation.com. *Id.* Brown Harris Stevens is listed as one such brokerage on the website.[69] Thus, Mr. Wang could have readily ascertained that Brown Harris Stevens (and by extension Halstead) is among the

---

[67] Kevin Zimmerman, *Realtor Halstead merged into Brown Harris Stevens,* Westfair Business Journal (June 15, 2020), https://westfaironline.com/real-estate/realtor-halstead-merged-into-brown-harris-stevens/.

[68] T3 Sixty, *Top Brokerages in 2023,* 2023 Real Estate Almanac 295 (June 2023), https://www.t3trends.com/intel/top-brokerages-in-2023/ (listing Brown Harris Stevens at #20 with a 2022 sales volume of $10.45 billion).

[69] https://www.realestatecommissionlitigation.com/nar-opt-in.

Released Parties. His objection to Paragraph 18 is meritless.[70]

## VII. CLASS CERTIFICATION REMAINS APPROPRIATE

In its Preliminary Approval Orders, the Court provisionally certified the Settlement Class for settlement purposes, finding that the class met each of Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and that the class met each of Rule 23(b)(3)'s predominance and superiority requirements. The Court was able to draw on its experience of overseeing related litigation for over five years in doing so. Nothing has changed since the Court's ruling to call into question the Court's conclusions regarding class certification. Accordingly, for the reasons set forth in the Preliminary Approval Motions and Orders, Plaintiffs ask that the Court certify the Settlement Class.

The Settlement Class definition satisfies the requirements of Rule 23(a) and 23(b)(3). Accordingly, Plaintiffs request that the Court certify the Settlement Class for settlement purposes.

## VIII. CONCLUSION

The Settlement Agreements in this action with NAR, HomeServices, and opting in entities achieve the goals of the litigation, benefit the Settlement Class, and account for the risks and uncertainties of continued, vigorously contested nationwide litigation. For the reasons set forth

---

[70] The cases cited by Mr. Wang are inapposite. None addressed the objection Mr. Wang is making: a settlement should be voided because the identities of releasees cannot be ascertained. *Great Northern Railroad Company v. Reid* is a one-hundred-year-old decision from the Ninth Circuit considering whether a "release should [have been] canceled for fraud or mistake" in light of injuries unknown when the release was signed. 245 F. 86, 89 (9th Cir. 1917). *Convey Compliance Systems, Inv. v. 1099 Pro, Inc.* is a Fourth Circuit decision applying Minnesota law that likewise concerned whether a release barred unknown injuries. 443 F.3d 327, 331–33 (4th Cir. 2006). Finally, Mr. Wang cites the concurrence of *State ex rel. Hewitt v. Kerr*, not the controlling opinion, where the concurring justice argued that an arbitration clause was not enforceable because it was "nothing more than an agreement to 'arbitrate' with absolutely no further indication of how, when or under what circumstances any arbitration would be conducted. 461 S.W.3d 798, 823–24 (Mo. 2015) (Teitelman, J., concurring). None of these decisions bears on the issue here.

herein, the Settlements are fair, reasonable, and adequate, and merit final approval. Plaintiffs therefore respectfully request that the Court certify the Settlement Class, consider and overrule all objections to the Settlements, grant final approval of the Settlements, approve the requested attorneys' fees and expenses, and enter a final judgment as to the Settling Defendants. Plaintiffs will also submit a Proposed Final Approval Order for consideration by the Court.

November 20, 2024                                    Respectfully Submitted,


**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Rio S. Pierce (*pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
riop@hbsslaw.com

Jeannie Evans (*pro hac vice*)
Nathan Emmons (Mo. Bar. No. 70046)
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
jeannie@hbsslaw.com
nathane@hbsslaw.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Robert A. Braun*
Robert A. Braun (*pro hac vice*)
Benjamin D. Brown (*pro hac vice*)

Sabrina Merold (*pro hac vice*)
1100 New York Ave. NW, Fifth Floor

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Eric L. Dirks*
Eric L. Dirks                    MO # 54921
Michael A. Williams        MO # 47538
1100 Main Street, Suite 2600
Kansas City, MO 64105
Tele: (816) 945 7110
Fax: (816) 945-7118
dirks@williamsdirks.com
mwilliams@williamsdirks.com

**BOULWARE LAW LLC**

*/s/ Brandon J.B. Boulware*
Brandon J.B. Boulware      MO # 54150
Jeremy M. Suhr                  MO # 60075
1600 Genessee Street, Suite 956A
Kansas City, MO 64102
Tele:    (816) 492-2826
Fax:    (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

**KETCHMARK AND MCCREIGHT P.C.**

*/s/ Michael Ketchmark*
Michael Ketchmark              MO # 41018
Scott McCreight                    MO # 44002
11161 Overbrook Rd. Suite 210
Leawood, Kansas 66211
Tele:    (913) 266-4500

Washington, DC 20005
Telephone: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

Daniel Silverman (*pro hac vice*)
769 Centre Street, Suite 207
Boston, MA 02130
Telephone: (617) 858-1990
dsilverman@cohenmilstein.com

**SUSMAN GODFREY L.L.P.**

*/s/ Marc M. Seltzer*
Marc M. Seltzer (*pro hac vice*)
Steven G. Sklaver (*pro hac vice*)
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Beatrice C. Franklin (*pro hac vice*)
One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
bfranklin@susmangodfrey.com

Matthew R. Berry (*pro hac vice*)
Floyd G. Short (*pro hac vice*)
Alexander W. Aiken (*pro hac vice*)
401 Union St., Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
mberry@susmangodfrey.com
fshort@susmangodfrey.com
aaiken@susmangodfrey.com

*Attorneys for Plaintiffs and the Class*

mike@ketchmclaw.com
smccreight@ketchmclaw.com

*Attorneys for Plaintiffs and the Class*