# Exhibit 7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>      v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>        Defendants. | Case No. 19-CV-00332-SRB |

## DECLARATION OF JENNIFER M. KEOUGH REGARDING NOTICE PLAN PROGRESS

I, Jennifer M. Keough, declare as follows:

1.      I am Chief Executive Officer, President, and Co-Founder of JND Legal Administration LLC ("JND"). I have more than 20 years of legal experience creating and supervising notice and claims administration programs and have personally overseen well over 1,000 matters. I am regularly called upon to submit declarations in connection with JND's notice and administration work. A comprehensive description of my experience is attached as **Exhibit A.**

2.      This Declaration describes the implementation of the Notice Plan, as outlined in my Declaration Regarding Proposed Notice Plan, filed April 19, 2024 [Docket 1458-3].

## NOTICE PROGRAM SUMMARY

3.      The Notice Program mirrored the program used in the Anywhere, RE/MAX, and Keller Williams Settlements and consists of the following elements:

a.      Direct Notice to all potential Settlement Class Members for whom the Settling Defendants provided contact information or for whom contact information was located through third-party data.

b.      A targeted digital effort with the leading digital network (Google Display Network - "GDN"), the top social media platform (Facebook), and a respected programmatic partner (OMTD).

c.      A notice placement in a popular consumer magazine (*Better Homes & Gardens*).

d.      Additional efforts including an internet search campaign to assist interested potential Settlement Class Members in finding the case website, the distribution of a national press release, and sponsorships with popular class action websites (TopClassActions.com and ClassAction.org).

e.      An established case-specific Settlement website where information about the Settlements, as well as copies of relevant case documentation, including but not limited to the Settlement Agreements, the Long Form Notices (attached as **Exhibit B and C**), and the Claim Form (attached as **Exhibit D**), is accessible to Settlement Class Members. Settlement Class Members will also be encouraged to file claims online through a secure portal on the website.

f.      An established toll-free telephone number with an Interactive Voice Recording system ("IVR") and staffed with Settlement Representatives that Settlement

Class Members may call to obtain more information about the Settlements and request copies of the Long Form Notice and Claim Form.

4.　　Based on my experience in developing and implementing class notice programs, I believe the Notice Plan met, and exceeded, the standards for providing the best practicable notice in class action settlements. Each component of the proposed Notice Program is described in more detail in the sections below.

## DIRECT NOTICE

5.　　To prepare direct notice to Settlement Class Members, JND worked with a third-party data aggregation service to acquire contact information for potential Settlement Class Members.

6.　　JND promptly loaded the potential Settlement Class Members' contact information into a case-specific database for the Settlements. A unique identification number was assigned to each potential Settlement Class Member record to identify them throughout the administration process.

7.　　JND conducted a sophisticated email append process to obtain email addresses for as many potential Settlement Class Members as possible. The email append process utilized skip tracing tools to identify any email address by which the potential Settlement Class Member may be reached if an email address was not provided in the initial data. JND then reviewed the data to identify any undeliverable email addresses and duplicate records.

## EMAIL NOTICE

8.　　Prior to sending the Email Notice, JND evaluated the email for potential spam language to improve deliverability. This process included running the email through spam testing

software, DKIM[1] for sender identification and authorization, and hostname evaluation. Additionally, we checked the send domain against the 25 most common IPv4 blacklists.[2]

9.      JND used industry-leading email solutions to achieve the most efficient email notification campaign. Our Data Team is staffed with email experts and software solution teams to conform each notice program to the particulars of the case. JND provided individualized support during the program and managed our sender reputation with the Internet Service Providers ("ISPs"). For this program, we analyzed the data and monitored the ongoing effectiveness of the notification campaign, adjusting the campaign as needed. These actions ensured the highest possible deliverability of the email campaign so that more potential Settlement Class Members received notice.

10.     JND utilized a verification program to eliminate invalid email and spam traps that would otherwise negatively impact deliverability. We then cleaned the list of email addresses for formatting and incomplete addresses to further identify all invalid email addresses.

11.     To ensure readability of the Email Notice, our team reviewed and formatted the body content into a structure that is applicable to all email platforms, allowing the email to pass easily to the recipient. Before launching the email campaign, we sent a test email to multiple ISPs and opened and tested the email on multiple devices (iPhones, Android phones, desktop computers, tablets, etc.) to ensure the email opened as expected.

12.     Additionally, JND included an "unsubscribe" link at the bottom of the Email Notice to allow potential Settlement Class Members to opt out of any additional email notices from JND.

---

[1] DomainKeys Identified Mail, or DKIM, is a technical standard that helps protect email senders and recipients from spam, spoofing, and phishing.

[2] IPv4 address blacklisting is a common practice. To ensure that the addresses being used are not blacklisted, a verification is performed against well-known IP blacklist databases. A blacklisted address affects the reputation of a company and could cause an acquired IP addresses to be blocked.

This step is essential to maintain JND's good reputation among the ISPs and reduce complaints relating to the email campaign.

13.     Emails that are returned to JND are generally characterized as either "Hard Bounces" or "Soft Bounces." A Hard Bounce occurs when the ISP rejects the email due to a permanent reason, such as the email account is no longer active. A Soft Bounce occurs when the email is rejected for temporary reasons, such as the recipient's email address inbox is full.

14.     When an email was returned due to a Soft Bounce, JND attempted to re-send the Email Notice at least three additional times in an attempt to secure deliverability. If the Soft Bounce email continued to be returned after additional attempts were made, the email was considered undeliverable. Emails that resulted in a Hard Bounce were also considered undeliverable.

15.     The email notice campaign commenced on August 17, 2024. JND emailed notice to all potential Settlement Class Members for whom JND obtained a valid email address from the third-party data aggregator, Settling Defendants, or the append process noted above. The Email Notice contained links to the Settlement Website and directed potential Settlement Class Members to visit the website to learn more information and submit an online claim.

16.     As of the date of this Declaration, JND sent 25,940,643 Email Notices, of which 630,535, or 2.4%, bounced back and were not deliverable.

**POSTCARD NOTICE**

17.     JND sent a color Postcard Notice to known potential Settlement Class Members for whom an email address was not available or for whom the Email Notice was deemed ultimately undeliverable.

18.     Prior to sending the Postcard Notice, JND performed address research using the United States Postal Service ("USPS") National Change of Address ("NCOA") database to obtain the most current mailing address information for potential Settlement Class Members. At my direction, JND staff tracked all Postcard Notices returned undeliverable by the USPS and promptly re-mailed Postcard Notices that were returned with a forwarding address. Also, with my oversight, JND staff took reasonable efforts to research and determine if it is possible to reach a potential Settlement Class Member for whom the Postcard Notice was returned without a forwarding address by mailing to a more recent mailing address at which the potential Settlement Class Member may be reached.

19.     As of the date of this Declaration, JND sent 14,460,434 Postcard Notices to potential Settlement Class Members where there was no email address or where the Email Notice was returned as undeliverable. JND tracked 963,558 postcards that were returned as undeliverable. Additionally, JND promptly forwarded 119,651 Postcard Notices to updated addresses.

20.     As of the date of this Declaration, JND sent 222,819 Postcard Notices to updated addresses obtained through advanced address research.

21.     The direct notice program here was extremely successful and reached more than 97.5% of the potential Settlement Class Members. While the direct notice program was extensive, JND also implemented a comprehensive media notice program to supplement the direct notice program, as discussed below.

## DIGITAL NOTICE

22.     JND launched a robust nationwide digital reach effort from August 17, 2024, through September 27, 2024, with the Google Display Network ("GDN") and OMTD, a

6

programmatic partner.[3] In total, the digital reach effort delivered 308,853,377 impressions[4] to adults 35 years of age or older ("Adults 35+"), with an emphasis on adults 35-64 years of age ("Adults 35-64").

23.     To concentrate efforts on potential Settlement Class Members, a portion of the GDN activity specifically targeted homeowners and/or users who searched on Google for key terms related to this matter, such as home improvement, house renovation, home renovation, general contractor, residential general contractors, home building contractors, house renovation ideas, mortgage refinance interest rates, home refinance calculator, mortgage assistance, real estate investing, real estate, real estate agent commission, real estate commission fees, real estate commissions; or users who browsed websites similar to www.hgtv.com or used apps similar to Houzz or Angi: Hire Home Service Pros.

24.     All of the OMTD programmatic impressions targeted users based on length of residency being between 3-10 years and those who were likely homeowners or sold their house 1+ years ago to narrow our focus to potential Settlement Class Members who likely sold a home and moved to a new one during the Class period.

25.     The digital activity was served across all devices (desktop, laptop, tablet and mobile), with a heavy emphasis on mobile devices. The digital ads redirected users to the Settlement website, where Settlement Class Members could access more information about the Settlements, including the Long Form Notice, as well as file a claim electronically.

---

[3] To assist with claims stimulation, the originally proposed activity with Facebook was shifted from the "reach" plan to a digital "conversion" plan detailed in the "Additional Efforts" section. The shift had no negative impact on overall impressions or reach.
[4] Impressions or Exposures are the total number of opportunities to be exposed to a media vehicle or combination of media vehicles containing a notice. Impressions are a gross or cumulative number that may include the same person more than once. As a result, impressions can and often do exceed the population size.

26.     Screenshots of the notices as they appeared on GDN and OMTD, are attached as **Exhibit E**.

27.     From August 17, 2024, through September 27, 2024, JND caused 10,166,810 impressions to be served through Facebook and GDN's Demand Gen platform. The goal of this digital effort was to drive conversions/claim filing. The Facebook conversion effort specifically targeted users with an interest in home insurance, mortgage calculator, mortgage loans, mortgage insurance, or home equity loan. In addition, a portion was allocated towards users who visited the Settlement website, but had not yet submitted a claim (i.e., a "retargeting" effort). The Demand Gen conversion effort targeted Adults 35+, with an emphasis on Adults 35-64, and/or users who searched Google for relevant terms/phrases such as home improvement, house renovation, home renovation, general contractor, residential general contractors, home building contractors, house renovation ideas, mortgage refinance interest rates, home refinance calculator, mortgage assistance, real estate investing, real estate, real estate agent commission, real estate commission fees, real estate commissions. Additionally, the Deman Gen effort targeted users who had demographics/qualities similar to those who had already visited the Settlement website and/or filed an online claim (i.e., "look-alike" targeting).

28.     Screenshots of the notices as they appeared on Facebook and Demand Gen are attached as **Exhibit F**.

## PRINT NOTICE

29.     JND caused a full color half page notice placement to appear in the October 2024 issue of *Better Homes & Gardens* magazine, which was on-sale September 20, 2024. A QR code was placed in the print ad for easy, direct access to the Settlement website through mobile devices.

30.     A copy of the print notice as it appeared in *Better Homes & Gardens* is attached as **Exhibit G**.

## <u>ADDITIONAL EFFORTS</u>

31.     JND implemented additional efforts to further disseminate notice to Settlement Class Members, including an internet search campaign, the distribution of a national press release, sponsorships with popular class action websites, and reminder emails.

32.     ***Google Search Campaign***:  From August 17, 2024 through September 27, 2024, JND caused 83,670 impressions to be served through an internet search campaign. When purchased keywords/phrases related to the Settlements (e.g., content on the Settlement website landing page, legal names of the cases, as well as other case information) were searched, a paid Responsive Search Ad ("RSA") with a hyperlink to the Settlement website would sometimes appear on the search engine results page. When the RSA was clicked on, the visitor was redirected to the Settlement website where they could get more information about the Settlements. The search effort was monitored and optimized for keywords/phrases that resulted in the best click-throughs/conversions.

33.     Screenshots of the RSAs as they appeared online are attached as **Exhibit H**.

34.     ***Press Release***:  JND caused a press release to be distributed on August 19, 2024 to over 6,000 English and Spanish media outlets nationwide. As of the date of this Declaration, the press release was picked up 589 times with a potential audience of 176.7 million.

35.     **Exhibit I** provides an Earned Media Report summarizing the coverage received from the press release. A copy of the press release as distributed in both English and Spanish is also attached as **Exhibit J**.

9

36.     ***Class Action Sponsorships***:  JND implemented sponsorship efforts on two leading class action websites—TopClassActions.com and ClassAction.org—starting on August 21, 2024 through September 23, 2024. Activity included exposure on the class action sites' featured settlement pages and in electronic newsletters, as well as on their social media channels Facebook, Instagram and X (formerly Twitter).

37.     Screenshots of the different placements on the class action sites are attached as **Exhibit K**.

38.     ***Reminder Emails***: JND effectuated an email campaign to Class Members with valid email addresses to remind them to file a claim as well as inform them of the Non-Realtor MLSs and Brokerages that opted into and contributed funds to the NAR Settlement.  A copy of the Reminder Email is attached as **Exhibit L**.

## ADDITIONAL SETTLEMENT NEWS COVERAGE

39.     Key news sources, including ABC News, AP News, CBS News, NBC News, the Washington Post, and the New York Times, as well as others, initially covered the Settlements on March 15, 2024 (See **Exhibit M**). JND tracked additional press coverage beyond the paid press release from July 24, 2024, through September 27, 2024. Over 570 articles were found, of which over 290 appeared during the media campaign period of August 17, 2024, through September 27, 2024. Attached as **Exhibit N** is a sampling of the articles including sources such as MorningBrew.com, USAToday.com, PaloAltoOnline.com, and HarvardPress.com. This news coverage further enhanced the reach and awareness of our Notice Program.

40.     To calculate reach, JND used MRI and a Comscore reach tool. According to these two reputable media reach platforms, the digital reach and print efforts alone reached more than 70% of potential Settlement Class Members, bringing the combined direct notice and media reach beyond 99%. The digital conversion effort, internet search campaign, distribution of the national press release, class action sponsorships, and reminder emails, as well as the notice efforts in the previous settlements and the news coverage received to date extend the overall notice exposure far more.  The reach achieved here and the additional notice exposures delivered is more robust than that of other court-approved notice programs, as well as the standard set forth by the FJC.

**SETTLEMENT WEBSITE**

41.     An informational, interactive Settlement website was developed at my direction by JND staff so that potential Settlement Class Members can obtain more information about their rights and options under the Settlements and submit claims. The website contains, among other things, information about the Settlements, a Frequently Asked Questions section, a list of Key Dates and a list of Important Documents, the ability to download the Long Form Notice and Claim Form in both English and Spanish, the ability to submit claims electronically through a secure claim filing portal, a portal for Settlement Class Members to register to receive updates about the Settlements, and information about how potential Settlement Class Members can access the toll-free telephone number. The Settlement website is mobile-enabled and ADA compliant.

42.     On July 21, 2024, JND updated the Settlement Website to include a section titled, "Multiple Listing Services and Brokerages Opting into the National Association of Realtors

---

[5] Reach is the percentage of a specific population group exposed to a media vehicle or a combination of media vehicles containing a notice at least once over the course of a campaign. Reach factors out duplication, representing the total number of different/net persons.

Settlement," to identify the Non-Realtor MLSs, Brokerages, and Realtor MLSs opting into the NAR Settlement. On September 28, 2024, JND updated the page to include the monetary amounts that the Non-Realtor MLSs and Brokerages agreed to contribute to the Settlement.

43.    On September 25, 2024, the list of Important Documents was updated to include 'Option 2' Opt-In MLS Settlement Agreements, and Opt-In Brokerage Settlement Agreements (the "Agreements"). As of November 14, 2024, the Settlement Website contains all of the fully executed Agreements.

44.    As of November 14, 2024, JND has tracked a total of 2,250,857 unique users to the Settlement Website who registered 12,438,947 page views.

## DEDICATED TOLL-FREE NUMBER

45.    JND established a dedicated toll-free telephone number with an automated IVR, available 24 hours a day, seven days a week, which provides Settlement-related information to potential Settlement Class Members, and the ability to request and receive the notices and the Claim Form by mail, or to speak to a Settlement representative.

46.    As of November 14, 2024, JND received 111,338 calls to the case toll-free number.

## DEDICATED POST OFFICE BOXES

47.    JND established two separate United States Post Office Boxes: one dedicated for potential Settlement Class Members to submit letters, inquiries, and Claim Forms; and one dedicated strictly to receive exclusion requests.

## QR CODE

48.    JND created a QR Code (a matrix barcode) which allows quick and direct access to the Settlement website through mobile devices. The QR Code is included, where practicable, in printed notice documents (i.e., the postcard and print publication notices).

## CLAIMS RECEIVED

49.     The Claim Form explained the claims process and was designed to ensure that filing a claim is as simple as possible. While the printable Claim Form was available to potential Settlement Class Members, the direct notice portion of the Notice Program was designed to drive claimants to the Settlement website where they can utilize an interactive process for claims submission. Online claim forms not only save substantial money in postage but are generally favored by claimants since the wizard feature of the process will walk them through the form step by step and is very user-friendly. The online claim form process prevents claimants from submitting an electronic claim without clicking necessary verifications such as signature. Electronic claims also eliminate the step of manual data entry and generally make processing easier and less expensive.

50.     The interactive Claim Form can be accessed through a secure portal and requests the same information from claimants that is set forth in the printable Claim Form. The interactive Claim Form was also designed to ensure that required information is provided before a claimant can move onto the next step of the Claim Form.

51.     Broadly stated, to complete the Claim Form, the claimant needs to provide its name and contact information as well as identify, to the extent possible, information about the home sale, such as the address of the home sold, date of sale, amount of the total commission paid, and any documents to support the proof of payment.

52.     All claimants may submit Claim Forms electronically through the Settlement website or physically by mail to the established Settlement P.O. Box.

53.     As of November 14, 2024, JND received 491,490 online and mailed Claim Forms, of which 472,680 were submitted online through the Settlement Website and 18,810 by mail.  Of

the 491,490 Claim Forms received, 7,363 were received from the state of South Carolina, 14,890 were received from New York (of which 1,041 were in Brooklyn and 1,538 were in Manhattan), 7,680 were received from the state of Nevada, and 16,544 were received from the state of Pennsylvania.

54.     JND will continue to receive and process Claim Forms and report to Counsel on the status of the claims intake and review. The claim filing deadline is May 9, 2025.

## OBJECTIONS AND OPT-OUTS

55.     Members of the Settlement Classes could have objected to the Settlements by October 28, 2024. Settlement Class Members could also have excluded themselves ("opted-out") of one or more of the Settlements by the same date. The Long Form Notice explained these legal rights (and others) to potential Settlement Class Members.

56.     As of November 14, 2024, JND received or is otherwise aware of 12 objections filed on behalf of 21 individuals. Two of these objections were filed on the docket for *Gibson et al. v. The National Association of Realtors et al.*, Case No. 23-CV-788-SRB, but appear to relate to the NAR Settlement.

57.     As of November 14, 2024, JND received or is otherwise aware of 39 requests for exclusion, of which all were timely and valid. Requests for exclusion that were sent via email were accepted. Attached as **Exhibit O** is a list of all exclusion requests. In JND's opinion, this is a small number of exclusion requests relative to the potential Settlement Class size of more than 30 million.

## BULK FILER SUBMISSIONS

58.     JND has a complete process in place to allow for bulk filer submissions across all of its projects. We have a team that enables bulk filers to streamline the submission of their claims.

JND coordinated with bulk filers in this matter and will continue to do so throughout the claims process.

59.     As of the date of this Declaration, JND received 95,955 bulk filer claims.

## CAFA NOTICE

60.     JND was responsible for effecting notice of the proposed Settlement with each Defendant in the above-captioned action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 ("CAFA"). On April 29, 2024, JND sent CAFA Notice for the NAR Settlement. On August 16, 2024, JND sent CAFA Notice for the Home Services of America Settlement.

## CONCLUSION

61.     In conclusion, the Notice Program provided the best notice practicable under the circumstances, is consistent with the requirements of Rule 23, the due process clause of the United States Constitution, and all applicable court rules; and is consistent with other similar court-approved notice programs. The Notice Program was designed to, and did, effectively reach as many Settlement Class Members as possible and provide them with the opportunity to review a plain language notice with the ability to easily take the next steps to learn more about the Settlements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 19, 2024, in Seattle, Washington.

_____
JENNIFER M. KEOUGH

- EXHIBIT A -

# JENNIFER KEOUGH

## CHIEF EXECUTIVE OFFICER AND CO-FOUNDER





## I. INTRODUCTION

Jennifer Keough is Chief Executive Officer and Co-Founder of JND Legal Administration ("JND"). She is the *only* judicially recognized expert in all facets of class action administration - from notice through distribution. With more than 25 years of legal experience, Ms. Keough has directly worked on hundreds of high-profile and complex administration engagements, including such landmark matters as the $20 billion Gulf Coast Claims Facility, $10 billion BP Deepwater Horizon Settlement, $3.4 billion Cobell Indian Trust Settlement (the largest U.S. government class action settlement ever), $2.67 billion Blue Cross Blue Shield antitrust settlement, $1.5 billion Mercedes-Benz Emissions Settlements, $1.3 billion Equifax Data Breach Settlement, $1 billion Stryker Modular Hip Settlement, National Assoc. of Realtors Settlements of over $1 billion thus far, $600 million Engle Smokers Trust Fund, and $215 million USC Student Health Center Settlement, and countless other high-profile matters.

Ms. Keough has been appointed notice expert in many notable cases and has testified on settlement matters in numerous courts and before the Senate Committee for Indian Affairs. She was appointed in 2022 as a Board member of the RAND Corporation's "Kenneth R. Feinberg Center for Catastrophic Risk Management and Compensation (the Feinberg Center)." Among the Feinberg Center's missions is to identify and promote laws, programs, and institutions that reduce the adverse social and economic effects of natural and manmade catastrophes by:

- Improving incentives to reduce future losses;

- Providing just compensation to those suffering losses while appropriately allocating liability to responsible parties;

- Helping affected individuals, businesses, and communities to recover quickly; and

- Avoiding unnecessary legal, administrative, and other transaction costs.

Ms. Keough is honored to be included on the Board, which consists of only 18 people, three of whom are federal district court judges. She is the only person from the legal administration industry on the Board.

Ms. Keough is also the only female CEO/Co-Founder in the Legal Administration field. She oversees more than 300 employees throughout the country, including at JND's 35,000 square foot Seattle headquarters. She manages all aspects of JND's class action business from day-to-day processes to high-level strategies. Her comprehensive expertise with noticing, claims processing, Systems and IT work, call center, data analytics, recovery calculations, check and electronic payment distribution, and reporting gained her the reputation with attorneys on both sides of the aisle as the most dependable consultant for all legal administration needs. Ms. Keough also applies her knowledge and skills to other divisions of JND, including mass tort, lien resolution, government services, and eDiscovery. Given her extensive experience, Ms. Keough is often called upon to consult with parties prior to settlement, is frequently invited to speak on class action issues and has authored numerous articles in her multiple areas of expertise.

Ms. Keough launched JND with her partners in early 2016. Just a few months later she was named as the Independent Claims Administrator ("ICA") in a complex BP Solar Panel Settlement. Ms. Keough also started receiving numerous appointments as notice expert and in 2017 was chosen to oversee a $300 million restitution program in Canada where every adult in that country was eligible to participate. Also, in 2017, Ms. Keough was named a female entrepreneur of the year finalist in the 14th annual Stevie Awards for Women in Business. In 2015 and 2017, she was recognized as a "Woman Worth Watching" by Profiles in Diversity Journal.

Since JND's launch, Ms. Keough has also been featured in numerous media publications. In 2019, she was highlighted in an Authority Magazine article, "5 Things I wish someone told me before I became a CEO," and a Moneyish article, "This is exactly

how rampant 'imposter syndrome' is in the workforce." In 2018, she was featured in several Fierce CEO articles, "JND Legal Administration CEO Jennifer Keough aids law firms in complicated settlements," "Special Report—Women CEOs offer advice on defying preconceptions and blazing a trail to the top," and "Companies stand out with organizational excellence," as well as a Puget Sound Business Journal article, "JND Legal CEO Jennifer Keough handles law firms' big business." In 2013, Ms. Keough appeared in a CNN article, "What Changes with Women in the Boardroom."

Prior to forming JND, Ms. Keough was Chief Operating Officer and Executive Vice President for one of the then largest legal administration firms in the country, where she oversaw operations in several offices across the country and was responsible for all large and critical projects. Previously, Ms. Keough worked as a class action business analyst at Perkins Coie, one of the country's premier defense firms, where she managed complex class action settlements and remediation programs, including the selection, retention, and supervision of legal administration firms. While at Perkins she managed, among other matters, the administration of over $100 million in the claims-made Weyerhaeuser siding case, one of the largest building product class action settlements ever. In her role, she established a reputation as being fair in her ability to see both sides of a settlement program.

Ms. Keough earned her J.D. from Seattle University. She graduated from Seattle University with a B.A. and M.S.F. with honors.

# II. LANDMARK CASES

Jennifer Keough has the distinction of personally overseeing the administration of more large class action programs than any other notice expert in the field. Some of her largest engagements include the following:

## 1. *In re Blue Cross Blue Shield Antitrust Litig.*

**Master File No.: 13-CV-20000-RDP (N.D. Ala.)**

JND was appointed as the notice and claims administrator in the $2.67 billion Blue Cross Blue Shield proposed settlement. To notify class members, we mailed over 100 million postcard notices, sent hundreds of millions of email notices and reminders, and placed notice via print, television, radio, internet, and more. The call center was staffed with 250 agents during the peak of the notice program. More than eight million claims were received. In approving the notice plan designed by Jennifer Keough and her team, United States District Court Judge R. David Proctor, wrote:

> *After a competitive bidding process, Settlement Class Counsel retained JND Legal Administration LLC ("JND") to serve as Notice and Claims Administrator for the settlement. JND has a proven track record and extensive experience in large, complex matters... JND has prepared a customized Notice Plan in this case. The Notice Plan was designed to provide the best notice practicable, consistent with the latest methods and tools employed in the industry and approved by other courts...The court finds that the proposed Notice Plan is appropriate in both form and content and is due to be approved.*

## 2. *In re Equifax Inc. Customer Data Sec. Breach Litig.*

**No. 17-md-2800-TWT (N.D. Ga.)**

JND was appointed settlement administrator, under Ms. Keough's direction, for this complex data breach settlement valued at $1.3 billion with a class of 147 million individuals nationwide. Ms. Keough and her team oversaw all aspects of claims administration, including the development of the case website which provided notice in seven languages and allowed for online claim submissions. In the first week alone, over 10 million claims were filed. Overall, the website received more than 200 million hits and the Contact Center handled well over 100,000 operator calls. Ms. Keough and her team also worked closely with the

Notice Provider to ensure that each element of the media campaign was executed in the time and manner as set forth in the Notice Plan.

Approving the settlement on January 13, 2020, Judge Thomas W. Thrash, Jr. acknowledged JND's outstanding efforts:

> JND transmitted the initial email notice to 104,815,404 million class members beginning on August 7, 2019. (App. 4, ¶¶ 53-54). JND later sent a supplemental email notice to the 91,167,239 class members who had not yet opted out, filed a claim, or unsubscribed from the initial email notice. (Id., ¶¶ 55-56). The notice plan also provides for JND to perform two additional supplemental email notice campaigns. (Id., ¶ 57)...JND has also developed specialized tools to assist in processing claims, calculating payments, and assisting class members in curing any deficient claims. (Id., ¶¶ 4, 21). As a result, class members have the opportunity to file a claim easily and have that claim adjudicated fairly and efficiently...The claims administrator, JND, is highly experienced in administering large class action settlements and judgments, and it has detailed the efforts it has made in administering the settlement, facilitating claims, and ensuring those claims are properly and efficiently handled. (App. 4, ¶¶ 4, 21; see also Doc. 739-6, ¶¶ 2-10). Among other things, JND has developed protocols and a database to assist in processing claims, calculating payments, and assisting class members in curing any deficient claims. (Id., ¶¶ 4, 21). Additionally, JND has the capacity to handle class member inquiries and claims of this magnitude. (App. 4, ¶¶ 5, 42). This factor, therefore, supports approving the relief provided by this settlement.

### 3. *USC Student Health Ctr. Settlement*

**No. 18-cv-04258-SVW (C.D. Cal.)**

JND was approved as the Settlement Administrator in this important $215 million settlement that provides compensation to women who were sexually assaulted, harassed and otherwise abused by Dr. George M. Tyndall at the USC Student Health Center during a nearly 30-year period. Ms. Keough and her team designed a notice effort that included: mailed and email notice to potential Class members; digital notices on Facebook, LinkedIn, and Twitter; an internet search effort; notice placements in USC publications/eNewsletters; and a press release. In addition, her team worked with USC staff to ensure notice postings around campus, on USC's website and social media accounts, and in USC alumni communications, among other things. Ms. Keough ensured the establishment of an all-female call center,

whose operators were fully trained to handle delicate interactions, with the goal of providing excellent service and assistance to every woman affected. She also worked with the JND staff handling lien resolution for this case. Preliminarily approving the settlement, Honorable Stephen V. Wilson stated (June 12, 2019):

> *The Court hereby designates JND Legal Administration ("JND") as Claims Administrator. The Court finds that giving Class Members notice of the Settlement is justified under Rule 23(e)(1) because, as described above, the Court will likely be able to: approve the Settlement under Rule 23(e)(2); and certify the Settlement Class for purposes of judgment. The Court finds that the proposed Notice satisfies the requirements of due process and Federal Rule of Civil Procedure 23 and provides the best notice practicable under the circumstances.*

### 4.  Gulf Coast Claims Facility (GCCF)

The GCCF was one of the largest claims processing facilities in U.S. history and was responsible for resolving the claims of both individuals and businesses relating to the Deepwater Horizon oil spill. The GCCF, which Ms. Keough helped develop, processed over one million claims and distributed more than $6 billion within the first year-and-a-half of its existence. As part of the GCCF, Ms. Keough and her team coordinated a large notice outreach program which included publication in multiple journals and magazines in the Gulf Coast area. She also established a call center staffed by individuals fluent in Spanish, Vietnamese, Laotian, Khmer, French, and Croatian.

### 5.  In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

**No. 2179 (MDL) (E.D. La.)**

Following the closure of the Gulf Coast Claims Facility, the Deepwater Horizon Settlement claims program was created. There were two separate legal settlements that provided for two claims administration programs. One of the programs was for the submission of medical claims and the other was for the submission of economic and property damage claims. Ms. Keough played a key role in the formation of the claims program for the evaluation of economic and property damage claims. Additionally, Ms. Keough built and supervised the back-office mail and processing center in Hammond, Louisiana, which was the hub of the program. The Hammond center was visited several times by Claims Administrator Pat Juneau -- as well as by the District Court Judge and Magistrate -- who described it as a shining star of the program.

### 6. Loblaw Card Program

Jennifer Keough was selected by major Canadian retailer Loblaw and its counsel to act as program administrator in its voluntary remediation program. The program was created as a response to a price-fixing scheme perpetrated by some employees of the company involving bread products. The program offered a $25 gift card to all adults in Canada who purchased bread products in Loblaw stores between 2002 and 2015. Some 28 million Canadian residents were potential claimants. Ms. Keough and her team: (1) built an interactive website that was capable of withstanding hundreds of millions of "hits" in a short period of time; (2) built, staffed and trained a call center with operators available to take calls twelve hours a day, six days a week; (3) oversaw the vendor in charge of producing and distributing the cards; (4) was in charge of designing and overseeing fraud prevention procedures; and (5) handled myriad other tasks related to this high-profile and complex project.

### 7. Cobell v. Salazar

**No. 96 CV 1285 (TFH) (D. D.C.)**

As part of the largest government class action settlement in our nation's history, Ms. Keough worked with the U.S. Government to implement the administration program responsible for identifying and providing notice to the two distinct but overlapping settlement classes. As part of the notice outreach program, Ms. Keough participated in multiple town hall meetings held at Indian reservations located across the country. Due to the efforts of the outreach program, over 80% of all class members were provided notice. Additionally, Ms. Keough played a role in creating the processes for evaluating claims and ensuring the correct distributions were made. Under Ms. Keough's supervision, the processing team processed over 480,000 claims forms to determine eligibility. Less than one half of one percent of all claim determinations made by the processing team were appealed. Ms. Keough was called upon to testify before the Senate Committee for Indian Affairs, where Senator Jon Tester of Montana praised her work in connection with notice efforts to the American Indian community when he stated: "Oh, wow. Okay... the administrator has done a good job, as your testimony has indicated, [discovering] 80 percent of the whereabouts of the unknown class members." Additionally, when evaluating the Notice Program, Judge Thomas F. Hogan concluded (July 27, 2011):

> ...that adequate notice of the Settlement has been provided to members of the Historical Accounting Class and to members of the Trust Administration Class....

*Notice met and, in many cases, exceeded the requirements of F.R.C.P. 23(c)(2) for classes certified under F.R.C.P. 23(b)(1), (b)(2) and (b)(3). The best notice practicable has been provided class members, including individual notice where members could be identified through reasonable effort. The contents of that notice are stated in plain, easily understood language and satisfy all requirements of F.R.C.P. 23(c)(2)(B).*

## 8. The National Association of Realtors Settlements

### No. 19-cv-00332 (W.D. Miss.)

JND was appointed as Notice and Claims Administrator in the Real Estate Commission Litigation, including the Settlement with the National Association of Realtors for $418 million. In total, JND is handling the administration for all Settling Defendants, with total Settlements valuing over $1 billion thus far. This high-profile nationwide settlement arises from allegations that the Defendants conspired to inflate real estate agent commissions. The initial noticing program included direct notice to more than 37 million potential Class Members and a media effort through both online and print advertising.

In providing Final Approval of the first round of Settlements with Keller Williams, Anywhere, and RE/MAX, (*Burnett v. The National Association of Realtors*, No. 19-cv-00332 (W.D. Miss.)), Judge Stephen R. Bough stated on May 9, 2024:

*At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. As directed by the Court, JND implemented the parties' Class Notice Plan...Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication. Without repeating all the details from Keough's declaration, the Court finds that the direct notice program was extremely successful and reached more than 95% of the potential Settlement class members...The media effort alone reached at least 71 percent of the Settlement Class members....Based on the record, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. The Court further finds that the notice given to the Settlement Class was adequate and reasonable.*

Judge Stephen R. Bough also stated on November 4, 2024 in his final approval order for *Gibson v. The National Association of Realtors*, No. 4:23-cv-00788-SRB (W.D. Miss.):

*At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. As directed by the Court, JND implemented the Class Notice Plan. In connection with their final approval motion, Plaintiffs submitted a declaration of Jennifer M. Keough from JND summarizing the notice that was given to class members and the resulting claims to date, opt-outs, and objections. (Doc. #521-3.). Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication. Without repeating all the details from Keough's declaration, the Court finds that the direct notice program was extremely successful and reached more than 97% of identified Settlement Class members. Nearly 40 million direct notices were mailed or emailed to the Class. JND's digital effort alone delivered more than 300 million impressions, and its press release was picked up at least 495 times with a potential audience of 113 million. In addition to the formal class notice process, and beyond the paid press release, more than 470 news stories addressed the litigation and settlement, including full articles in outlets such as the New York Times, USAToday, and CNN. JND also implemented a Settlement Website that had over 2 million unique visitors and over 11 million page views...Based on the record, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. The Court further finds that the notice given to the Settlement Class was adequate and reasonable.*

### 9.  *Allagas v. BP Solar Int'l, Inc.*

No. 14-cv-00560 (N.D. Cal.)

Ms. Keough was appointed by the United States District Court for the Northern District of California as the Independent Claims Administrator ("ICA") supervising the notice and administration of this complex settlement involving inspection, remediation, and replacement of solar panels on homes and businesses throughout California and other parts of the United States. Ms. Keough and her team devised the administration protocol and built a network of inspectors and contractors to perform the various inspections and other work needed to assist claimants. She also built a program that included a team of operators to answer claimant questions, a fully interactive dedicated website with online claim filing capability, and a team trained in the very complex intricacies of solar panel mechanisms. In her role as ICA, Ms. Keough regularly reported to the parties and the Court regarding the progress of the case's administration. In addition to her role as ICA, Ms. Keough also acted as mediator for those claimants who opted out of the

settlement to pursue their claims individually against BP. Honorable Susan Illston, recognized the complexity of the settlement when appointing Ms. Keough the ICA (December 22, 2016):

> *The complexity, expense and likely duration of the litigation favors the Settlement, which provides meaningful and substantial benefits on a much shorter time frame than otherwise possible and avoids risk to class certification and the Class's case on the merits...The Court appoints Jennifer Keough of JND Legal Administration to serve as the Independent Claims Administrator ("ICA") as provided under the Settlement.*

## 10. *Health Republic Ins. Co. v. United States*

### No. 16-259C (F.C.C.)

For this $1.9 billion settlement, Ms. Keough and her team used a tailored and effective approach of notifying class members via Federal Express mail and email. Opt-in notice packets were sent via Federal Express to each potential class member, as well as the respective CEO, CFO, General Counsel, and person responsible for risk corridors receivables, when known. A Federal Express return label was also provided for opt-in returns. Notice Packets were also sent via electronic-mail. The informational and interactive case-specific website posted the notices and other important Court documents and allowed potential class members to file their opt-in form electronically.

## 11. *In re Mercedes-Benz Emissions Litig.*

### No. 16-cv-881 (D.N.J.)

JND Legal Administration was appointed as the Settlement Administrator in this $1.5 billion settlement wherein Daimler AG and its subsidiary Mercedes-Benz USA reached an agreement to settle a consumer class action alleging that the automotive companies unlawfully misled consumers into purchasing certain diesel type vehicles by misrepresenting the environmental impact of these vehicles during on-road driving. As part of its appointment, the Court approved Jennifer Keough's proposed notice plan and authorized JND Legal Administration to provide notice and claims administration services.

> *The Court finds that the content, format, and method of disseminating notice, as set forth in the Motion, Declaration of JND Legal Administration, the Class Action Agreement, and the proposed Long Form Notice, Short Form Notice, and Supplemental Notice of Class Benefits (collectively, the "Class Notice Documents")*

– including direct First Class mailed notice to all known members of the Class deposited in the mail within the later of (a) 15 business days of the Preliminary Approval Order; or (b) 15 business days after a federal district court enters the US-CA Consent Decree – is the best notice practicable under the circumstances and satisfies all requirements provided in Rule 23(c)(2)(B). The Court approves such notice, and hereby directs that such notice be disseminated in the manner set forth in the Class Action Settlement to the Class under Rule 23(e)(1)...JND Legal Administration is hereby appointed as the Settlement Administrator and shall perform all duties of the Settlement Administrator set forth in the Class Action Settlement.

On July 12, 2021, the Court granted final approval of the settlement:

The Court has again reviewed the Class Notice Program and finds that Class Members received the best notice practicable under the circumstances.

## 12. *In re General Motors LLC Ignition Switch Litig.*

No. 2543 (MDL) (S.D.N.Y.)

GM Ignition Switch Compensation Claims Resolution Facility

Ms. Keough oversaw the creation of a Claims Facility for the submission of injury claims allegedly resulting from the faulty ignition switch. The Claims Facility worked with experts when evaluating the claim forms submitted. First, the Claims Facility reviewed thousands of pages of police reports, medical documentation, and pictures to determine whether a claim met the threshold standards of an eligible claim for further review by the expert. Second, the Claims Facility would inform the expert that a claim was ready for its review. Ms. Keough constructed a database which allowed for a seamless transfer of claim forms and supporting documentation to the expert for further review.

## 13. *In re General Motors LLC Ignition Switch Litig.*

No. 2543 (MDL) (S.D.N.Y.)

Class Action Settlement

Ms. Keough was appointed the class action settlement administrator for the $120 million GM Ignition Switch settlement. On April 27, 2020, Honorable Jesse M. Furman approved the notice program designed by Ms. Keough and her team and the notice documents they drafted with the parties:

*The Court further finds that the Class Notice informs Class Members of the Settlement in a reasonable manner under Federal Rule of Civil Procedure 23(e)(1)(B) because it fairly apprises the prospective Class Members of the terms of the proposed Settlement and of the options that are open to them in connection with the proceedings.*

*The Court therefore approves the proposed Class Notice plan, and hereby directs that such notice be disseminated to Class Members in the manner set forth in the Settlement Agreement and described in the Declaration of the Class Action Settlement Administrator...*

Under Ms. Keough's direction, JND mailed notice to nearly 30 million potential class members.

On December 18, 2020, Honorable Jesse M. Furman granted final approval:

*The Court confirms the appointment of Jennifer Keough of JND Legal Administration ("JND") as Class Action Settlement Administrator and directs Ms. Keough to carry out all duties and responsibilities of the Class Action Settlement Administrator as specified in the Settlement Agreement and herein...The Court finds that the Class Notice and Class Notice Plan satisfied and continue to satisfy the applicable requirements of Federal Rules of Civil Procedure 23(c)(2)(b) and 23(e), and fully comply with all laws, including the Class Action Fairness Act (28 U.S.C. § 1711 et seq.), and the Due Process Clause of the United States Constitution (U.S. Const., amend. V), constituting the best notice that is practicable under the circumstances of this litigation.*

## 14. *Senne v. Office of the Commission of Baseball*

### No. 14-00608-JCS (N.D. Cal.)

Ms. Keough and her team acted as the Settlement Administrator in the $185M settlement encompassing nearly 25,000 minor league baseball players who signed a uniform player's contract and played in certain non-regular season periods from 2009 to 2022. The administration included direct notice by mail and e-mail, a media campaign, a primary distribution, and a redistribution of unclaimed funds to eligible class members. The administration also included a dedicated, bilingual online platform allowing players to submit work period disputes, update their addresses, view settlement payment estimates, and select the method in which they wished to receive their settlement payment. JND overcame unique challenges in the administration which included highly mobile class members who shared residences and sometimes accounts with fellow players, the provision of

multi-lingual services, complex employment and non-employment tax reporting to most states and the federal government, as well as facilitating payment to the significant proportion of players who reside primarily outside the US.

## 15. *Express Freight Int'l v. Hino Motors Ltd.*

No. 22-cv-22483-Gayles/Torres (S.D. Fla.)

JND was retained as the Settlement Administrator in this $237.5 million class action settlement stemming from allegations that the emission levels in certain Hino trucks were misrepresented and exceed regulatory limits. Ms. Keough and her team designed a robust notice program that combined direct notice, a press release, an internet search campaign, and industry targeted digital and publication notice to maximize reach. As the settlement class included numerous fleet owners, the JND team under Ms. Keough's leadership successfully implemented a claim submission process to facilitate the filing of bulk claims that resulted in over 55,000 fleet filer claims. On April 1, 2024 Judge Darrin P. Gayles approved the notice program:

> The Court finds that Settlement Class Notice program was implemented in the manner approved by the Court in its Preliminary Approval Order. See Supplemental Keogh Decl. ¶¶ 4-9, 16. The Court finds that the form, content, and methods of disseminating notice to the Settlement Class Members: (1) comply with Rule 23(c)(2) of the Federal Rules of Civil Procedure as they are the best practicable notice under the circumstances and are reasonably calculated to apprise the Settlement Class Members of the pendency of this Action, the terms of the Settlement, and their right to object to the Settlement; (2) comply with Rule 23(e), as they are reasonably calculated to apprise the Settlement Class Members of the pendency of the Action, the terms of the proposed Settlement, and their rights under the proposed Settlement, including, but not limited to, their right to object to, or opt out of, the proposed Settlement and other rights under the terms of the Settlement Agreement; (3) comply with Rule 23(h), as they are reasonably calculated to apprise the Settlement Class Members of any motion by Settlement Class Counsel for reasonable attorney's fees and costs, and their right to object to any such motion; (4) constitute due, adequate, and sufficient notice to all Settlement Class Members and other persons entitled to receive notice; and (5) meet all applicable requirements of law, including, but not limited to, 28 U.S.C. § 1715, Fed. R. Civ. P. 23(c), (e), and (h), and the Due Process Clause of the United States Constitution.

### 16. *FTC v. Reckitt Benckiser Grp. PLC*

No. 19CV00028 (W.D. Va.)

Ms. Keough and her team designed a multi-faceted notice program for this $50 million settlement resolving charges by the FTC that Reckitt Benckiser Group PLC violated antitrust laws by thwarting lower-priced generic competition to its branded drug Suboxone.

The plan reached 80% of potential claimants nationwide, and a more narrowed effort extended reach to specific areas and targets. The nationwide effort utilized a mix of digital, print, and radio broadcast through Sirius XM. Extended efforts included local radio in areas defined as key opioid markets and an outreach effort to medical professionals approved to prescribe Suboxone in the U.S., as well as to substance abuse centers; drug abuse and addiction info and treatment centers; and addiction treatment centers nationwide.

### 17. *In re Stryker Rejuvenate and ABG II Hip Implant Prods. Liab. Litig.*

No. 13-2441 (MDL) (D. Minn.)

Ms. Keough and her team were designated as the escrow agent and claims processor in this $1 billion settlement designed to compensate eligible U.S. Patients who had surgery to replace their Rejuvenate Modular-Neck and/or ABG II Modular-Neck hip stems prior to November 3, 2014. As the claims processor, Ms. Keough and her team designed internal procedures to ensure the accurate review of all medical documentation received; designed an interactive website which included online claim filing; and established a toll-free number to allow class members to receive information about the settlement 24 hours a day. Additionally, she oversaw the creation of a deficiency process to ensure claimants were notified of their deficient submission and provided an opportunity to cure. The program also included an auditing procedure designed to detect fraudulent claims and a process for distributing initial and supplemental payments. Approximately 95% of the registered eligible patients enrolled in the settlement program.

### 18. *In re The Engle Trust Fund*

No. 94-08273 CA 22 (Fla. 11th Jud. Cir. Ct.)

Ms. Keough played a key role in administering this $600 million landmark case against the country's five largest tobacco companies. Miles A. McGrane, III, Trustee to the Engle Trust Fund recognized Ms. Keough's role when he stated:

*The outstanding organizational and administrative skills of Jennifer Keough cannot be overstated. Jennifer was most valuable to me in handling numerous substantive issues in connection with the landmark Engle Trust Fund matter. And, in her communications with affected class members, Jennifer proved to be a caring expert at what she does.*

### 19. *In re Air Cargo Shipping Servs. Antitrust Litig.*

No. 06-md-1775 (JG) (VVP) (E.D.N.Y.)

This antitrust settlement involved five separate settlements. As a result, many class members were affected by more than one of the settlements, Ms. Keough constructed the notice and claims programs for each settlement in a manner which allowed for the comparison of claims data. Each claims administration program included claims processing, review of supporting evidence, and a deficiency notification process. The deficiency notification process included mailing of deficiency letters, making follow up phone calls, and sending emails to class members to help them complete their claim. To ensure accuracy throughout the claims process for each of the settlements, Ms. Keough created a process which audited many of the claims that were eligible for payment.



# JUDICIAL RECOGNITION

Courts have favorably recognized Ms. Keough's work as outlined above and by the sampling of judicial comments from JND programs listed below.

## 1. Honorable Philip S. Gutierrez

***Grey Fox, LLC v. Plains All Am. Pipeline, L.P.,*** (May 1, 2024)
No. 16-cv-03157-PSG-JEM (C.D. Cal.):

*The Court appoints JND Legal Administration as Settlement Administrator and directs it to carry out all duties and responsibilities of the Settlement Administrator as specified in the Settlement Agreement Section VI (B) and herein.*

## 2. Honorable Daniel J. Calabretta

***Weiner v. Ocwen Fin. Corp.,*** (March 28, 2024)
No. 14-cv-02597-DJC-DB (E.D. Cal.):

*The Court hereby appoints JND Legal Administration as Settlement Administrator... the Court finds that the proposed Notice program meets the requirements of due process under the U.S. Constitution and Rule 23; and that such Notice program, which includes direct notice to Settlement Class Members via e-mail and/or mail to the extent practicable, the establishment of a settlement website, the establishment of a toll-free telephone helpline, and the notice provided via internet search platforms and other online advertisements, is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.*

## 3. Judge Barbara J. Rothstein

***Moore v Robinhood Fin. LLC,*** (February 13, 2024)
No. 21-cv-01571-BJR (W.D. Wash.):

*The Court appoints JND Legal Administration as the Settlement Administrator...The Court finds this manner of giving notice fully satisfies the requirements of Fed. R. Civ. P. 23 and due process, constitutes the best notice practicable under the circumstances, including its use of individual notice to all Settlement Class Members who can be identified with the available data and reasonable effort, and shall constitute due and sufficient notice to all persons entitled thereto.*

### 4. Honorable Jon S. Tigar

***Aberin v. Am. Honda Motor Co., Inc.,*** (February 1, 2024)
No. 16-cv-04384-JST (N.D. Cal.):

*The proposed Class Notice Program consists of (a) a mailed notice ("Class Notice," attached as Exhibit 1 to Plaintiffs' Preliminary Approval Motion), sent to the last known address of Settlement Class Members; (b) email follow-ups to each Settlement Class Member for whom email addresses are known; (c) a social-media component; (d) targeted notice based on search terms used by persons on Google; and (e) a website publication of the Settlement Agreement and Class Notice and other case-related documents at a public website with a domain name related to the action With respect to such Class Notice Program, the Court finds that such Class Notice is fair and adequate. The Court further reaffirms its findings in support of the appointment of JND Legal Administration as Notice Administrator, ECF No. 326, and now appoints JND Legal Administration to serve as Settlement Notice Administrator.*

### 5. Judge Cormac J. Carney

***Doe v. MindGeek USA Incorp.,*** (January 26, 2024)
No. 21-cv-00338 (C.D. Cal.):

*...the Court finds that the notice and plan satisfy the statutory and constitutional requirements because, given the nature and complexity of this case, "a multi-faceted notice plan is the best notice that is practicable under the circumstances."*

### 6. Honorable Jesse M. Furman

***City of Philadelphia v. Bank of Am. Corp.,*** (October 12, 2023)
No. 19-CV-1608 (JMF) (S.D.N.Y.):

*The Court approves the form and contents of the Short-Form and Long-Form Notices (collectively, the "Notices")...In addition to directly mailing notice, JND will run digital ads targeting a custom audience using the Google Display Network (GDN) and LinkedIn in an effort to target likely Class Members...JND will cause the publication notice... to be published in the Wall Street Journal and Investor's Business Daily. JND will also cause an informational press release...to be distributed to approximately 11,000 media outlets nationwide.*

### 7. Chief Judge Stephanie M. Rose

***PHT Holding II LLC v. N. Am. Co. for Life and Health Ins.,*** (August 25, 2023)
No. 18-CV-00368 (S.D. Iowa):

*The Court appoints JND Legal Administration LLC ("JND") as the Settlement Administrator...The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances as well as valid, due and sufficient notice to the Class and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

### 8. Judge Mary Kay Vyskocil

***Advance Trust & Life Escrow Serv., LTA v. PHL Variable Ins. Co.,*** (August 9, 2023)
No. 18-cv-03444 (MKV) (S.D.N.Y.):

*The Court appoints JND Legal Administration LLC ("JND"), which is a competent firm, as the Settlement Administrator... The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances, as well as valid, due, and sufficient notice to the Class, and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

### 9. Honorable Terrence G. Berg

***Chapman v Gen. Motors, LLC,*** (June 29, 2023)
No. 19-CV-12333-TGB-DRG (E.D. Mich.):

*Pursuant to Federal Rules of Civil Procedure 23(c)(2)(B), the Court finds that the content, format, and method of disseminating Class Notice...is the best notice practicable under the circumstances and satisfies all legal requirements, including Federal Rule of Civil Procedure 23(c)(2)(B) and the Due Process Clause.*

### 10. Honorable Virginia M. Kendall

***In re Local TV Advert. Antitrust Litig.,*** (June 14, 2023)
MDL No. 2867 (N.D. Ill.):

*JND Legal Administration is hereby appointed as the Settlement Administrator with respect to the CBS, Fox, Cox Entities, and ShareBuilders Settlements. The Court approves the proposed Notice Program, including the Email Notice, Postcard Notice, Print Notice, Digital Notice, Long Form Notice and the Claim Form...*

## 11. Judge Edward J. Davila

***In re MacBook Keyboard Litig.***, (May 25, 2023)
No. 18-cv-02813-EDJ (N.D. Cal.):

*The Settlement Agreement is being administered by JND Legal Administration ("JND")...the Settlement Administrator provided direct and indirect notice through emails, postcards, and the settlement website, in addition to the press and media coverage the settlement received...the Court finds that the Settlement Class has been provided adequate notice.*

## 12. Honorable David O Carter

***Gutierrez, Jr. v. Amplify Energy Corp.***, (April 24, 2023)
No. 21-cv-01628-DOC-JDE (C.D. Cal.):

*The Court finds that the Notice set forth in Article VI of the Settlement Agreement, detailed in the Notice Plan attached to the Declaration of Jennifer Keough of JND Legal Administration, and effectuated pursuant to the Preliminary Approval Order: (a) constitutes the best notice practicable under the circumstances of this Action; (b) constitutes due and sufficient notice to the Classes of the terms of the Settlement Agreement and the Final Approval Hearing; and (c) fully complied with the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and any other applicable law, including the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.*

## 13. Honorable Joseph C. Spero

***Shuman v. Squaretrade Inc.***, (March 1, 2023)
No. 20-cv-02725-JCS (N.D. Cal.):

*As of February 10, 2023, 703,729 Class Members were mailed or emailed at least one Notice that was not returned as undeliverable, representing over 99.76% of the total Class Member population. Supplemental Declaration of Jennifer Keough Regarding Notice Administration (dkt. no. 140-2) ("Keough Supp. Decl."), ¶ 7. The Court finds that notice was provided in the best practicable manner to class members and fulfills the requirements of due process.*

## 14. Honorable J.P. Boulee

***In re TransUnion Rental Screening Sol. Inc. FCRA Litig.***, (January 6, 2023)
No. 20-md-02933-JPB (N.D. Ga.):

*The Parties have proposed JND Legal Administration as the Settlement Administrator for the Rule 23(b)(2) and Rule 23(b)(3) Settlement Classes. The Court has reviewed the*

materials about this organization and concludes that it has extensive and specialized experience and expertise in class action settlements and notice programs. The Court hereby appoints JND Legal Administration as the Settlement Administrator, to assist and provide professional guidance in the implementation of the Notice Plans and other aspects of the settlement administration.

### 15. Honorable David O Carter

***Gutierrez, Jr. v. Amplify Energy Corp.,*** (December 7, 2022) 21-cv-01628-DOC-JDE (C.D. Cal.):

*The Court appoints JND Legal Administration as the Settlement Administrator in this Action...The Court approves, as to form and content, the Direct Notices, Long Form Notices, and Email notices substantially in the forms attached as Exhibits B-J to the Declaration of Jennifer Keough In Support of Motion for Preliminary Approval of Class Action Settlement and Direction of Notice ("Keough Declaration").*

### 16. Honorable Charles R. Breyer

***In re Volkswagen "Clean Diesel" Mktg., Sales Practice and Prods. Liab. Litig.,*** (November 9, 2022) MDL 2672 CRB (N.D. Cal.):

*The Settlement Administrator has also taken the additional step to allow potential class members to submit claims without any documentation on the settlement website, allowing the settlement administrator to seek out the documentation independently (which can often be found without further aid from the class member). Id. at 5; Third Keough Decl. (dkt. 8076) ¶ 3. On October 6, 2022, the Settlement Administrator also sent reminder notices to the class members who have not yet submitted a claim, stating that they may file a claim without documentation, and their claim will be verified based on the information they provide. Third Keough Decl. ¶ 4. In any case, Lochridge's concerns about the unavailability of documentation have not been borne out by the majority of claimants: According to the Settlement Administrator, of the 122,467 claims submitted, 100,657 have included some form of documentation. Id. ¶ 6. Lochridge's objection on this point is thus overruled...Additionally, the claims process has been unusually successful—as of October 20, 122,467 claim forms have been submitted, covering 22% of the estimated eligible Class vehicles. Third Keough Decl. ¶ 6. This percentage rises to 24% when the Sport+ Class vehicles that have already received a software update (thus guaranteeing their owners a $250 payment without submission of a claim form) are included. Id. This reaction strongly favors approval of the settlement.*

### 17. Honorable Joseph C. Spero

***Shuman v. Squaretrade Inc.,*** (October 17, 2022)
No. 20-cv-02725-JCS (N.D. Cal.):

*JND Legal Administration is appointed to serve as the Settlement Administrator and is authorized to email and mail the approved Notice to members of the Settlement Class and further administer the Settlement in accordance with the Amended Agreement and this Order.*

### 18. Judge Stephen V. Wilson

***LSIMC, LLC v. Am. Gen. Life Ins. Co.,*** (September 21, 2022)
No. 20-cv-11518 (C.D. Cal.):

*JND Legal Administration LLC ("JND") shall be appointed to serve as Class Notice Administrator...*

### 19. Judge Valerie Figueredo

***Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of New York,*** (August 19, 2022)
No. 19-cv-06004 (S.D.N.Y.):

*The Court approves the retention of JND Legal Administration LLC ("JND") as the Notice Administrator.*

### 20. Honorable Dana M. Sabraw

***In re Packaged Seafood Prods. Antitrust Litig. (EPP Class),*** (July 15, 2022)
No. 15-md-02670 (S.D. Cal.):

*An experienced and well-respected claims administrator, JND Legal Administration LLC ("JND"), administered a comprehensive and robust notice plan to alert Settlement Class Members of the COSI Settlement Agreement...The Notice Plan surpassed the 85% reach goal...The Court recognizes JND's extensive experience in processing claim especially for millions of claimants...The Court finds due process was satisfied and the Notice Program provided adequate notice to settlement class members in a reasonable manner through all major and common forms of media.*

## 21. Honorable Charles R. Breyer

***In re Volkswagen "Clean Diesel" Mktg., Sales Practice and Prods. Liab. Litig.,*** (July 8, 2022) MDL 2672 CRB (N.D. Cal.):

*As applied here, the Court finds that the content, format, and method of disseminating Notice—set forth in the Motion, the Declaration of Jennifer Keough on Settlement Notice Plan, and the Settlement Agreement and Release—is state of the art and satisfies Rule 23(c)(2) and all contemporary notice standards. The Court approves the notice program, and hereby directs that such notice be disseminated in the manner set forth in the proposed Settlement Agreement and Declaration of Jennifer Keough on Settlement Notice Plan to Class Members under Rule 23(e)(1).*

## 22. Judge Fernando M. Olguin

***Gupta v. Aeries Software, Inc.,*** (July 7, 2022) No. 20-cv-00995 (C.D. Cal.):

*Under the circumstances, the court finds that the procedure for providing notice and the content of the class notice constitute the best practicable notice to class members and complies with the requirements of due process...The court appoints JND as settlement administrator.*

## 23. Judge Cormac J. Carney

***Gifford v. Pets Global, Inc.,*** (June 24, 2022) No. 21-cv-02136-CJC-MRW (C.D. Cal.):

*The Settlement also proposes that JND Legal Administration act as Settlement Administrator and offers a provisional plan for Class Notice...*

*The proposed notice plan here is designed to reach at least 70% of the class at least two times. The Notices proposed in this matter inform Class Members of the salient terms of the Settlement, the Class to be certified, the final approval hearing and the rights of all parties, including the rights to file objections or to opt-out of the Settlement Class...This proposed notice program provides a fair opportunity for Class Members to obtain full disclosure of the conditions of the Settlement and to make an informed decision regarding the Settlement.*

### 24. Judge David J. Novak

***Brighton Tr. LLC, as Tr. v. Genworth Life & Annuity Ins. Co.,*** (June 3, 2022)
No. 20-cv-240-DJN (E.D. Va.):

*The Court appoints JND Legal Administration LLC ("JND"), a competent firm, as the Settlement Administrator.*

### 25. Judge Donovan W. Frank

***Advance Trust & Life Escrow Serv., LTA v. ReliaStar Life Ins. Co.,*** (June 2, 2022)
No. 18-cv-2863-DWF-ECW (D. Minn.):

*The Court approves the retention of JND Legal Administration LLC ("JND") as the Notice Administrator.*

### 26. Honorable Philip S. Gutierrez

***Andrews v. Plains All Am. Pipeline, L.P.,*** (May 25, 2022)
No. 15-cv-04113-PSG-JEM (C.D. Cal.):

*Court appoints JND Legal Administration as the Settlement Administrator in this Action...The Court approves, as to form and content, the Mail Notice and the Publication Notice, substantially in the forms attached as Exhibits D, E, and F to the Declaration of Jennifer Keough In Support of Motion for Preliminary Approval of Class Action Settlement and Direction of Notice ("Keough Declaration").*

### 27. Judge Victoria A. Roberts

***Graham v. Univ. of Michigan,*** (March 29, 2022)
No. 21-cv-11168-VAR-EAS (E.D. Mich.):

*The Court has received and reviewed...the proposed notice plan as described in the Declaration of Jennifer Keough...The Court finds that the foregoing program of Class Notice and the manner of its dissemination is sufficient under the circumstances and is reasonably calculated to apprise the Settlement Class of the pendency of this Action and their right to object to the Settlement. The Court further finds that the Class Notice program is reasonable; that it constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and that it meets the requirements of due process and Federal Rule of Civil Procedure 23.*

## 28. Honorable Michael Markman

***DC 16 v. Sutter Health,*** (March 11, 2022)
No. RG15753647 (Cal. Super. Ct.):

*The Court approves and appoints JND Legal Administration ("JND") to serve as the notice provider and directs JND to carry out all duties and responsibilities of providing notice and processing requests for exclusion.*

## 29. Honorable P. Kevin Castel

***Hanks v. Lincoln Life & Annuity Co. of New York,*** (February 23, 2022)
No. 16-cv-6399 PKC (S.D.N.Y.):

*The Court appoints JND Legal Administration LLC ("JND"), a competent firm, as the Settlement Administrator...The form and content of the notices, as well as the manner of dissemination described below, meet the requirements of Rule 23 and due process, constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons and entities entitled thereto.*

## 30. Judge David G. Campbell

***In re Arizona Theranos, Inc. Litig.,*** (February 2, 2022)
No. 16-cv-2138-DGC (D. Ariz.):

*The Court appoints JND Legal Administration ("JND") to serve as Class Administrator and directs JND to carry out all duties and responsibilities of the Class Administrator as specified in the Notice Plan...This approval includes the proposed methods of providing notice, the proposed forms of notice attached as Exhibits B through D to the Declaration of Jennifer M. Keough (Doc. 445-1 – "Keough Decl."), and the proposed procedure for class members to opt-out.*

## 31. Judge William M. Conley

***Bruzek v. Husky Oil Operations Ltd.,*** (January 31, 2022)
No. 18-cv-00697 (W.D. Wis.):

*The claims administrator estimates that at least 70% of the class received notice... the court concludes that the parties' settlement is fair, reasonable and adequate under Rule 23(e).*

### 32. Honorable Dana M. Sabraw

*In re Packaged Seafood Prods. Antitrust Litig. (DPP Class),* (January 26, 2022)
No. 15-md-02670 (S.D. Cal.):

*The rigorous notice plan proposed by JND satisfies requirements imposed by Rule 23 and the Due Process clause of the United States Constitution. Moreover, the contents of the notice satisfactorily informs Settlement Class members of their rights under the Settlement.*

### 33. Honorable Dana M. Sabraw

*In re Packaged Seafood Prods. Antitrust Litig. (EPP Class),* (January 26, 2022)
No. 15-md-02670 (S.D. Cal.):

*Class Counsel retained JND, an experienced notice and claims administrator, to serve as the notice provider and settlement claims administrator. The Court approves and appoints JND as the Claims Administrator. EPPs and JND have developed an extensive and robust notice program which satisfies prevailing reach standards. JND also developed a distribution plan which includes an efficient and user-friendly claims process with an effective distribution program. The Notice is estimated to reach over 85% of potential class members via notice placements with the leading digital network (Google Display Network), the top social media site (Facebook), and a highly read consumer magazine (People)... The Court approves the notice content and plan for providing notice of the COSI Settlement to members of the Settlement Class.*

### 34. Judge Alvin K. Hellerstein

*Leonard v. John Hancock Life Ins. Co. of NY,* (January 10, 2022)
No. 18-CV-04994 (S.D.N.Y.):

*The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances as well as valid, due and sufficient notice to the Class and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

### 35. Honorable Justice Edward Belobaba

*Kalra v. Mercedes-Benz Canada Inc.,* (December 9, 2021)
No. 15-MD-2670 (Ont. Super. Ct.):

*THIS COURT ORDERS that JND Legal Administration is hereby appointed the Settlement Administrator to implement and oversee the Notice Program, the Claims*

*Program, the Honorarium Payment to the Class Representative, and the payment of the Levy to the Class Proceedings Fund.*

## 36. Judge Timothy J. Corrigan

***Levy v. Dolgencorp, LLC,*** (December 2, 2021)
No. 20-cv-01037-TJC-MCR (M.D. Fla.):

*No Settlement Class Member has objected to the Settlement and only one Settlement Class Member requested exclusion from the Settlement through the opt-out process approved by this Court...The Notice Program was the best notice practicable under the circumstances. The Notice Program provided due and adequate notice of the proceedings and of the matters set forth therein, including the proposed Settlement set forth in the Agreement, to all persons entitled to such notice. The Notice Program fully satisfied the requirements of the Federal Rules of Civil Procedure and the United States Constitution, which include the requirement of due process.*

## 37. Honorable Nelson S. Roman

***Swetz v. GSK Consumer Health, Inc.,*** (November 22, 2021)
No. 20-cv-04731 (S.D.N.Y.):

*The Notice Plan provided for notice through a nationwide press release; direct notice through electronic mail, or in the alternative, mailed, first-class postage prepaid for identified Settlement Class Members; notice through electronic media—such as Google Display Network and Facebook—using a digital advertising campaign with links to the dedicated Settlement Website; and a toll-free telephone number that provides Settlement Class Members detailed information and directs them to the Settlement Website. The record shows, and the Court finds, that the Notice Plan has been implemented in the manner approved by the Court in its Preliminary Approval Order.*

## 38. Honorable James V. Selna

***Herrera v. Wells Fargo Bank, N.A.,*** (November 16, 2021)
No. 18-cv-00332-JVS-MRW (C.D. Cal.):

*On June 8, 2021, the Court appointed JND Legal Administration ("JND") as the Claims Administrator... JND mailed notice to approximately 2,678,266 potential Non-Statutory Subclass Members and 119,680 Statutory Subclass Members. Id. ¶ 5. 90% of mailings to Non-Statutory Subclass Members were deemed delivered, and 81% of mailings to Statutory Subclass Members were deemed delivered. Id. ¶ 9. Follow-up email notices were sent to 1,977,514 potential Non-Statutory Subclass*

*Members and 170,333 Statutory Subclass Members, of which 91% and 89% were deemed delivered, respectively. Id. ¶ 12. A digital advertising campaign generated an additional 5,195,027 views. Id. ¶ 13...Accordingly, the Court finds that the notice to the Settlement Class was fair, adequate, and reasonable.*

### 39. Judge Mark C. Scarsi

***Patrick v. Volkswagen Grp. of Am., Inc.,*** (September 18, 2021)
No. 19-cv-01908-MCS-ADS (C.D. Cal.):

*The Court finds that, as demonstrated by the Declaration of Jennifer M. Keough and counsel's submissions, Notice to the Settlement Class was timely and properly effectuated in accordance with Fed. R. Civ. P. 23(e) and the approved Notice Plan set forth in the Court's Preliminary Approval Order. The Court finds that said Notice constitutes the best notice practicable under the circumstances, and satisfies all requirements of Rule 23(e) and due process.*

### 40. Judge Morrison C. England, Jr.

***Martinelli v. Johnson & Johnson,*** (September 27, 2021)
No. 15-cv-01733-MCE-DB (E.D. Cal.):

*The Court appoints JND, a well-qualified and experienced claims and notice administrator, as the Settlement Administrator.*

### 41. Honorable Nathanael M. Cousins

***Malone v. Western Digital Corp.,*** (July 21, 2021)
No. 20-cv-03584-NC (N.D. Cal.):

*The Court hereby appoints JND Legal Administration as Settlement Administrator...The Court finds that the proposed notice program meets the requirements of Due Process under the U.S. Constitution and Rule 23; and that such notice program—which includes individual direct notice to known Settlement Class Members via email, mail, and a second reminder email, a media and Internet notice program, and the establishment of a Settlement Website and Toll-Free Number—is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto. The Court further finds that the proposed form and content of the forms of the notice are adequate and will give the Settlement Class Members sufficient information to enable them to make informed decisions as to the Settlement Class, the right to object or opt-out, and the proposed Settlement and its terms.*

## 42. Judge Mark H. Cohen

***Pinon v. Mercedes-Benz USA, LLC and Daimler AG,*** (March 29, 2021)
No. 18-cv-3984 (N.D. Ga.):

*The Court finds that the content, format, and method of disseminating the Notice Plan, as set forth in the Motion, the Declaration of the Settlement Administrator (Declaration of Jennifer M. Keough Regarding Proposed Notice Plan) [Doc. 70-7], and the Settlement Agreement, including postcard notice disseminated through direct U.S. Mail to all known Class Members and establishment of a website: (a) constitutes the best notice practicable under the circumstances; (b) are reasonably calculated, under the circumstances, to apprise settlement class members of the pendency of the action, the terms of the proposed Settlement Agreement, and their rights under the proposed Settlement Agreement; (c) are reasonable and constitute due, adequate, and sufficient notice to those persons entitled to receive notice; and (d) satisfies all requirements provided Federal Rule of Civil Procedure 23, the constitutional requirement of due process, and any other legal requirements. The Court further finds that the notices are written in plain language, use simple terminology, and are designated to be readily understandable by the Settlement Class.*

## 43. Honorable Daniel D. Domenico

***Advance Trust & Life Escrow Serv., LTA v. Sec. Life of Denver Ins. Co.,*** (January 29, 2021)
No. 18-cv-01897-DDD-NYW (D. Colo.):

*The court approves the form and contents of the Short-Form and Long Form Notices attached as Exhibits A and B, respectively, to the Declaration of Jennifer M. Keough, filed on January 26, 2021...The proposed form and content of the Notices meet the requirements of Federal Rule of Civil Procedure 23(c)(2)(B)...The court approves the retention of JND Legal Administration LLC as the Notice Administrator.*

## 44. Honorable Virginia A. Phillips

***Sonner v. Schwabe N. Am., Inc.,*** (January 25, 2021)
No. 15-cv-01358 VAP (SPx) (C.D. Cal.):

*Following preliminary approval of the settlement by the Court, the settlement administrator provided notice to the Settlement Class through a digital media campaign. (Dkt. 203-5). The Notice explains in plain language what the case is about, what the recipient is entitled to, and the options available to the recipient in connection with this case, as well as the consequences of each option. (Id., Ex. E). During the allotted*

*response period, the settlement administrator received no requests for exclusion and just one objection, which was later withdrawn. (Dkt. 203-1, at 11).*

*Given the low number of objections and the absence of any requests for exclusion, the Class response is favorable overall. Accordingly, this factor also weighs in favor of approval.*

### 45. Honorable R. Gary Klausner

***A.B. v. Regents of the Univ. of California,*** (January 8, 2021)
No. 20-cv-09555-RGK-E (C.D. Cal.):

*The parties intend to notify class members through mail using UCLA's patient records. And they intend to supplement the mail notices using Google banners and Facebook ads, publications in the LA times and People magazine, and a national press release. Accordingly, the Court finds that the proposed notice and method of delivery sufficient and approves the notice.*

### 46. Judge Nathanael M. Cousins

***King v. Bumble Trading Inc.,*** (December 18, 2020)
No. 18-cv-06868-NC (N.D. Cal.):

*Pursuant to the Court's Preliminary Approval Order, the Court appointed JND Settlement Administrators as the Settlement Administrator… JND sent court-approved Email Notices to millions of class members…Overall, approximately 81% of the Settlement Class Members were successfully sent either an Email or Mailed Notice… JND supplemented these Notices with a Press Release which Global Newswire published on July 18, 2020… In sum, the Court finds that, viewed as a whole, the settlement is sufficiently "fair, adequate, and reasonable" to warrant approval.*

### 47. Judge Vernon S. Broderick, Jr.

***In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,*** (December 16, 2020)
No. 14-md-02542 (S.D.N.Y.):

*I further appoint JND as Claims Administrator. JND's principals have more than 75 years-worth of combined class action legal administration experience, and JND has handled some of the largest recent settlement administration issues, including the Equifax Data Breach Settlement. (Doc. 1115 ¶ 5.) JND also has extensive experience in handling claims administration in the antitrust context. (Id. ¶ 6.) Accordingly, I appoint JND as Claims Administrator.*

### 48. Honorable Laurel Beeler

***Sidibe v. Sutter Health,*** (November 5, 2020)
No. 12-cv-4854-LB (N.D. Cal.):

*Class Counsel has retained JND Legal Administration ("JND"), an experienced class notice administration firm, to administer notice to the Class. The Court appoints JND as the Class Notice Administrator. JND shall provide notice of pendency of the class action consistent with the procedures outlined in the Keough Declaration.*

### 49. Judge Carolyn B. Kuhl

***Sandoval v. Merlex Stucco Inc.,*** (October 30, 2020)
No. BC619322 (Cal. Super. Ct.):

*Additional Class Member class members, and because their names and addresses have not yet been confirmed, will be notified of the pendency of this settlement via the digital media campaign outlined by the Keough/JND Legal declaration...the Court approves the Parties selection of JND Legal as the third-party Claims Administrator.*

### 50. Honorable Louis L. Stanton

***Rick Nelson Co. v. Sony Music Ent.,*** (September 16, 2020)
No. 18-cv-08791 (S.D.N.Y.):

*The parties have designated JND Legal Administration ("JND") as the Settlement Administrator. Having found it qualified, the Court appoints JND as the Settlement Administrator and it shall perform all the duties of the Settlement Administrator as set forth in the Stipulation...The form and content of the Notice, Publication Notice and Email Notice, and the method set forth herein of notifying the Class of the Settlement and its terms and conditions, meet the requirements of Rule 23 of the Federal Rules of Civil Procedure, due process. and any other applicable law, constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons and entities entitled thereto.*

### 51. Judge Steven W. Wilson

***Amador v Baca,*** (August 11, 2020)
No. 10-cv-1649 (C.D. Cal.):

*Class Counsel, in conjunction with JND, have also facilitated substantial notice and outreach to the relatively disparate and sometimes difficult to contact class of more than 94,000 individuals, which has resulted in a relatively high claims rate of between*

*33% and 40%, pending final verification of deficient claims forms. Their conduct both during litigation and after settlement was reached was adequate in all respects, and supports approval of the Settlement Agreement.*

### 52. Judge Stephanie M. Rose

***Swinton v. SquareTrade, Inc.,*** (April 14, 2020)
No. 18-CV-00144-SMR-SBJ (S.D. Iowa):

*This publication notice appears to have been effective. The digital ads were linked to the Settlement Website, and Google Analytics and other measures indicate that, during the Publication Notice Period, traffic to the Settlement Website was at its peak.*

### 53. Judge Joan B. Gottschall

***In re Navistar MaxxForce Engines Mktg., Sales Practices and Prods.,*** (January 3, 2020)
No. 14-cv-10318 (N.D. Ill.):

*WHEREAS, the Parties have agreed to use JND Legal Administration ("JND"), an experienced administrator of class action settlements, as the claims administrator for this Settlement and agree that JND has the requisite experience and expertise to serve as claims administrator; The Court appoints JND as the claims administrator for the Settlement.*

### 54. Judge Edward M. Chen

***In re MyFord Touch Consumer Litig.,*** (December 17, 2019)
No. 13-cv-3072 (EMC) (N.D. Cal.):

*The Court finds that the Class Notice was the best practicable notice under the circumstances, and has been given to all Settlement Class Members known and reasonably identifiable in full satisfaction of the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process... The Court notes that the reaction of the class was positive: only one person objected to the settlement although, by request of the objector and in the absence of any opposition from the parties, that objection was converted to an opt-out at the hearing.*

### 55. Honorable Steven I. Locke

***Donnenfield v. Petro, Inc.,*** (December 4, 2019)
No. 17-cv-02310 (E.D.N.Y.):

*WHEREAS, the Parties have agreed to use JND Legal Administration ("JND"), an experienced administrator of class action settlements, as the claims administrator*

*for this Settlement and agree that JND has the requisite experience and expertise to serve as claims administrator; The Court appoints JND as the claims administrator for the Settlement.*

### 56. Honorable Amy D. Hogue

***Trepte v. Bionaire, Inc.,*** (November 5, 2019)
No. BC540110 (Cal. Super. Ct.):

*The Court appoints JND Legal Administration as the Class Administrator... The Court finds that the forms of notice to the Settlement Class regarding the pendency of the action and of this settlement, and the methods of giving notice to members of the Settlement Class... constitute the best notice practicable under the circumstances and constitute valid, due, and sufficient notice to all members of the Settlement Class. They comply fully with the requirements of California Code of Civil Procedure section 382, California Civil Code section 1781, California Rules of Court 3.766 and 3.769, the California and United States Constitutions, and other applicable law.*

### 57. Judge Barbara Jacobs Rothstein

***Wright v. Lyft, Inc.,*** (May 29, 2019)
No. 17-cv-23307-MGC 14-cv-00421-BJR (W.D. Wash.):

*The Court also finds that the proposed method of distributing relief to the class is effective. JND Legal Administration ("JND"), an experienced claims administrator, undertook a robust notice program that was approved by this Court...*

### 58. Judge J. Walton McLeod

***Boskie v. Backgroundchecks.com,*** (May 17, 2019)
No. 2019CP3200824 (S.C. C.P.):

*The Court appoints JND Legal Administration as Settlement Administrator...The Court approves the notice plans for the HomeAdvisor Class and the Injunctive Relief Class as set forth in the declaration of JND Legal Administration. The Court finds the class notice fully satisfies the requirements of due process, the South Carolina Rules of Civil Procedure. The notice plan for the HomeAdvisor Class and Injunctive Relief Class constitutes the best notice practicable under the circumstances of each Class.*

### 59. Honorable James Donato

*In re Resistors Antitrust Litig.,* (May 2, 2019)
No. 15-cv-03820-JD (N.D. Cal.):

*The Court approves as to form and content the proposed notice forms, including the long form notice and summary notice, attached as Exhibits B and D to the Second Supplemental Declaration of Jennifer M. Keough Regarding Proposed Notice Program (ECF No. 534-3). The Court further finds that the proposed plan of notice – including Class Counsel's agreement at the preliminary approval hearing for the KOA Settlement that direct notice would be effectuated through both U.S. mail and electronic mail to the extent electronic mail addresses can be identified following a reasonable search – and the proposed contents of these notices, meet the requirements of Rule 23 and due process, and are the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.The Court appoints the firm of JND Legal Administration LLC as the Settlement Administrator.*

### 60. Honorable Leigh Martin May

*Bankhead v. First Advantage Background Serv. Corp.,* (April 30, 2019)
No. 17-cv-02910-LMM-CCB (N.D. Ga.):

*The Court appoints JND Legal Administration as Settlement Administrator... The Court approves the notice plans for the Class as set forth in the declaration of the JND Legal Administration. The Court finds that class notice fully satisfies the requirements of due process of the Federal Rules of Civil Procedure. The notice plan constitutes the best notice practicable under the circumstances of the Class.*

### 61. Honorable P. Kevin Castel

*Hanks v. Lincoln Life & Annuity Co. of New York,* (April 23, 2019)
No. 16-cv-6399 PKC (S.D.N.Y.):

*The Court approves the form and contents of the Short-Form Notice and Long-Form Notice (collectively, the "Notices") attached as Exhibits A and B, respectively, to the Declaration of Jennifer M. Keough, filed on April 2, 2019, at Docket No. 120...The form and content of the notices, as well as the manner of dissemination described below, therefore meet the requirements of Rule 23 and due process, constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons and entities entitled thereto...the Court approves the retention of JND Legal Administration LLC ("JND") as the Notice Administrator.*

## 62. Judge Kathleen M. Daily

***Podawiltz v. Swisher Int'l, Inc.,*** (February 7, 2019)
No. 16CV27621 (Or. Cir. Ct.):

*The Court appoints JND Legal Administration as settlement administrator...The Court finds that the notice plan is reasonable, that it constitutes due, adequate and sufficient notice to all persons entitled to receive notice, and that it meets the requirements of due process, ORCP 32, and any other applicable laws.*

## 63. Honorable Kenneth J. Medel

***Huntzinger v. Suunto Oy,*** (December 14, 2018)
No. 37-2018-27159 (CU) (BT) (CTL) (Cal. Super. Ct.):

*The Court finds that the Class Notice and the Notice Program implemented pursuant to the Settlement Agreement and Preliminary Approval Order constituted the best notice practicable under the circumstances to all persons within the definition of the Class and fully complied with the due process requirement under all applicable statutes and laws and with the California Rules of Court.*

## 64. Honorable Thomas M. Durkin

***In re Broiler Chicken Antitrust Litig.,*** (November 16, 2018)
No. 16-cv-8637 (N.D. Ill.):

*The notice given to the Class, including individual notice to all members of the Class who could be identified through reasonable efforts, was the best notice practicable under the circumstances. Said notice provided due and adequate notice of the proceedings and of the matters set forth therein, including the proposed settlement set forth in the Settlement Agreement, to all persons entitled to such notice, and said notice fully satisfied the requirements of Rules 23(c)(2) and 23(e)(1) of the Federal Rules of Civil Procedure and the requirements of due process.*

## 65. Judge Maren E. Nelson

***Granados v. Cnty. of Los Angeles,*** (October 30, 2018)
No. BC361470 (Cal. Super. Ct.):

*JND's Media Notice plan is estimated to have reached 83% of the Class. The overall reach of the Notice Program was estimated to be over 90% of the Class. (Keough Decl., at ¶12.). Based upon the notice campaign outlined in the Keough Declaration, it appears that the notice procedure was aimed at reaching as many class members as possible. The Court finds that the notice procedure satisfies due process requirements.*

### 66. Judge Maren E. Nelson

***McWilliams v. City of Long Beach,*** (October 30, 2018)
No. BC261469 (Cal. Super. Ct.):

*It is estimated that JND's Media Notice plan reached 88% of the Class and the overall reach of the Notice Program was estimated to be over 90% of the Class. (Keough Decl., at 12.). Based upon the notice campaign outlined in the Keough Declaration, it appears that the notice procedure was aimed at reaching as many class members as possible. The Court finds that the notice procedure satisfies due process requirements.*

### 67. Judge Cheryl L. Pollak

***Dover v. British Airways, PLC (UK),*** (October 9, 2018)
No. 12-cv-5567 (E.D.N.Y.), in response to two objections:

*JND Legal Administration was appointed as the Settlement Claims Administrator, responsible for providing the required notices to Class Members and overseeing the claims process, particularly the processing of Cash Claim Forms...the overwhelmingly positive response to the Settlement by the Class Members, reinforces the Court's conclusion that the Settlement is fair, adequate, and reasonable.*

### 68. Judge Edward J. Davila

***In re Intuit Data Litig.,*** (October 4, 2018)
No. 15-CV-1778-EJD (N.D. Cal.):

*The Court appoints JND Legal Administration ("JND") to serve as the Settlement Administrator...The Court approves the program for disseminating notice to Class Members set forth in the Agreement and Exhibit A thereto (herein, the "Notice Program"). The Court approves the form and content of the proposed forms of notice, in the forms attached as Attachments 1 through 3 to Exhibit A to the Agreement. The Court finds that the proposed forms of notice are clear and readily understandable by Class Members. The Court finds that the Notice Program, including the proposed forms of notice, is reasonable and appropriate and satisfies any applicable due process and other requirements, and is the only notice to the Class Members of the Settlement that is required.*

### 69. Honorable Otis D. Wright, II

**Chester v. The TJX Cos.,** (May 15, 2018)
No. 15-cv-01437 (C.D. Cal.):

*... the Court finds and determines that the Notice to Class Members was complete and constitutionally sound, because individual notices were mailed and/or emailed to all Class Members whose identities and addresses are reasonably known to the Parties, and Notice was published in accordance with this Court's Preliminary Approval Order, and such notice was the best notice practicable ...*

### 70. Honorable Susan J. Dlott

**Linneman v. Vita-Mix Corp.,** (May 3, 2018)
No. 15-cv-01437 (C.D. Cal.):

*JND Legal Administration, previously appointed to supervise and administer the notice process, as well as oversee the administration of the Settlement, appropriately issued notice to the Class as more fully set forth in the Agreement, which included the creation and operation of the Settlement Website and more than 3.8 million mailed or emailed notices to Class Members. As of March 27, 2018, approximately 300,000 claims have been filed by Class Members, further demonstrating the success of the Court-approved notice program.*

### 71. Honorable David O. Carter

**Hernandez v. Experian Info. Sols., Inc.,** (April 6, 2018)
No. 05-cv-1070 (C.D. Cal.):

*The Court finds, however, that the notice had significant value for the Class, resulting in over 200,000 newly approved claims—a 28% increase in the number of Class members who will receive claimed benefits—not including the almost 100,000 Class members who have visited the CCRA section of the Settlement Website thus far and the further 100,000 estimated visits expected through the end of 2019. (Dkt. 1114-1 at 3, 6). Furthermore, the notice and claims process is being conducted efficiently at a total cost of approximately $6 million, or $2.5 million less than the projected 2009 Proposed Settlement notice and claims process, despite intervening increases in postage rates and general inflation. In addition, the Court finds that the notice conducted in connection with the 2009 Proposed Settlement has significant ongoing value to this Class, first in notifying in 2009 over 15 million Class members of their rights under the Fair Credit Reporting Act (the ignorance of which for most Class members was one area on which Class Counsel and White Objectors' counsel*

*were in agreement), and because of the hundreds of thousands of claims submitted in response to that notice, and processed and validated by the claims administrator, which will be honored in this Settlement.*

## 72. Judge Ann D. Montgomery

***In re Wholesale Grocery Prod. Antitrust Litig.,*** (November 16, 2017) No. 9-md-2090 (ADM) (TNL) (D. Minn.):

*Notice provider and claims administrator JND Legal Administration LLC provided proof that mailing conformed to the Preliminary Approval Order in a declaration filed contemporaneously with the Motion for Final Approval of Class Settlement. This notice program fully complied with Fed. R. Civ. P. 23, satisfied the requirements of due process, is the best notice practicable under the circumstances, and constituted due and adequate notice to the Class of the Settlement, Final Approval Hearing and other matters referred to in the Notice.*



# IV. CASE EXPERIENCE

Ms. Keough has played an important role in hundreds of matters throughout her career. A partial listing of her notice and claims administration case work is provided below.

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Aaland v. Contractors.com and One Planet Ops* | 19-2-242124 SEA | Wash. Super. Ct. |
| *A.B. v. Regents of the Univ. of California* | 20-cv-09555-RGK-E | C.D. Cal. |
| *Aberin v. Am. Honda Motor Co., Inc.* | 16-cv-04384-JST | N.D. Cal. |
| *Achziger v. IDS Prop. Cas. Ins.* | 14-cv-5445 | W.D. Wash. |
| *Adair v. Michigan Pain Specialist, PLLC* | 14-28156-NO | Mich. Cir. |
| *Adkins v. EQT Prod. Co.* | 10-cv-00037-JPJ-PMS | W.D. Va. |
| *Advance Trust & Life Escrow Serv., LTA v. PHL Variable Ins. Co.* | 18-cv-03444 (MKV) | S.D.N.Y. |
| *Advance Trust & Life Escrow Serv., LTA v. ReliaStar Life Ins. Co.* | 18-cv-2863-DWF-ECW | D. Minn. |
| *Advance Trust & Life Escrow Serv., LTA v. Sec. Life of Denver Ins. Co.* | 18-cv-01897-DDD-NYW | D. Colo. |
| *Ahmed v. HSBC Bank USA, NA* | 15-cv-2057-FMO-SPx | N.D. Ill. |
| *Alexander v. District of Columbia* | 17-1885 (ABJ) | D.D.C. |
| *Allagas v. BP Solar Int'l, Inc.* | 14-cv-00560 (SI) | N.D. Cal. |
| *Allen v. Apache Corp.* | 22-cv-00063-JAR | E.D. Okla. |
| *Amador v. Baca* | 10-cv-1649 | C.D. Cal. |
| *Amin v. Mercedes-Benz USA, LLC* | 17-cv-01701-AT | N.D. Ga. |
| *Armstead v. VGW Malta Ltd.* | 2022-CI-00553 | Ky. Cir. Ct. |
| *Andrews v. Plains All Am. Pipeline, L.P.* | 15-cv-04113-PSG-JEM | C.D. Cal. |
| *Anger v. Accretive Health* | 14-cv-12864 | E.D. Mich. |
| *Arnold v. State Farm Fire and Cas. Co.* | 17-cv-148-TFM-C | S.D. Ala. |
| *Arthur v. Sallie Mae, Inc.* | 10-cv-00198-JLR | W.D. Wash. |
| *Atkins v. Nat'l. Gen. Ins. Co.* | 16-2-04728-4 | Wash. Super. Ct. |
| *Atl. Ambulance Corp. v. Cullum & Hitti* | MRS-L-264-12 | N.J. Super. Ct. |
| *Backer Law Firm, LLC v. Costco Wholesale Corp.* | 15-cv-327 (SRB) | W.D. Mo. |
| *Baker v. Equity Residential Mgmt., LLC* | 18-cv-11175 | D. Mass. |
| *Bankhead v. First Advantage Background Servs. Corp.* | 17-cv-02910-LMM-CCB | N.D. Ga. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Banks v. R.C. Bigelow, Inc.* | 20-cv-06208-DDP (RAOx) | C.D. Cal. |
| *Barbanell v. One Med. Grp., Inc.* | CGC-18-566232 | Cal. Super. Ct. |
| *Barrios v. City of Chicago* | 15-cv-02648 | N.D. Ill. |
| *Beaucage v. Ticketmaster Canada Holdings, ULC* | CV-20-00640518-00CP | Ont. Super. Ct. |
| *Belanger v. RoundPoint Mortg. Servicing* | 17-cv-23307-MGC | S.D. Fla. |
| *Belin v. Health Ins. Innovations, Inc.* | 19-cv-61430-AHS | S.D. Fla |
| *Beltran v. InterExchange, Inc.* | 14-cv-3074 | D. Colo. |
| *Benson v. DoubleDown Interactive, LLC* | 18-cv-00525-RSL | W.D. Wash. |
| *Bland v. Premier Nutrition Corp.* | RG19-002714 | Cal. Super. Ct. |
| *Blankenship v. HAPO Cmty. Credit Union* | 19-2-00922-03 | Wash. Super. Ct. |
| *Blasi v. United Debt Serv., LLC* | 14-cv-0083 | S.D. Ohio |
| *Bollenbach Enters. Ltd. P'ship. v. Oklahoma Energy Acquisitions* | 17-cv-134 | W.D. Okla. |
| *Boskie v. Backgroundchecks.com* | 2019CP3200824 | S.C. C.P. |
| *Botts v. Johns Hopkins Univ.* | 20-cv-01335-JRR | D. Md. |
| *Boyd v. RREM Inc., d/b/a Winston* | 2019-CH-02321 | Ill. Cir. Ct. |
| *Bradley v. Honecker Cowling LLP* | 18-cv-01929-CL | D. Or. |
| *Brasch v. K. Hovnanian Enter. Inc.* | 30-2013-00649417-CU-CD-CXC | Cal. Super. Ct. |
| *Brighton Tr. LLC, as Tr. v. Genworth Life & Annuity Ins. Co.* | 20-cv-240-DJN | E.D. Va. |
| *Brna v. Isle of Capri Casinos* | 17-cv-60144 (FAM) | S.D. Fla. |
| *Bromley v. SXSW LLC* | 20-cv-439 | W.D. Tex. |
| *Browning v. Yahoo!* | C04-01463 HRL | N.D. Cal. |
| *Bruzek v. Husky Oil Operations Ltd.* | 18-cv-00697 | W.D. Wis. |
| *Burnett v. Nat'l Assoc. of Realtors* | 19-CV-00332-SRB | W.D. Mo. |
| *Careathers v. Red Bull N. Am., Inc.* | 13-cv-369 (KPF) | S.D.N.Y. |
| *Carillo v. Wells Fargo Bank, N.A.* | 18-cv-03095 | E.D.N.Y. |
| *Carmack v. Amaya Inc.* | 16-cv-1884 | D.N.J. |
| *Cavallaro v. USAA* | 20-CV-00414-TSB | S.D. Ohio |
| *Cecil v. BP Am. Prod. Co.* | 16-cv-410 (RAW) | E.D. Okla. |
| *Chapman v. GEICO Cas. Co.* | 37-2019-00000650-CU-CR-CTL | Cal. Super. Ct. |
| *Chapman v. Gen. Motors, LLC* | 19-CV-12333-TGB-DRG | E.D. Mich. |
| *City of Philadelphia v. Bank of Am. Corp.* | 19-CV-1608 (JMF) | S.D.N.Y. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Chester v. TJX Cos.* | 15-cv-1437 (ODW) (DTB) | C.D. Cal. |
| *Chieftain Royalty Co. v. BP Am. Prod. Co.* | 18-cv-00054-JFH-JFJ | N.D. Okla. |
| *Chieftain Royalty Co. v. Marathon Oil Co.* | 17-cv-334 | E.D. Okla. |
| *Chieftain Royalty Co. v. Newfield Exploration Mid-Continent Inc.* | 17-cv-00336-KEW | E.D. Okla. |
| *Chieftain Royalty Co. v. SM Energy Co.* | 18-cv-01225-J | W.D. Okla. |
| *Chieftain Royalty Co. v. XTO Energy, Inc.* | 11-cv-00029-KEW | E.D. Okla. |
| *Christopher v. Residence Mut. Ins. Co.* | CIVDS1711860 | Cal. Super. Ct. |
| *City of Los Angeles v. Bankrate, Inc.* | 14-cv-81323 (DMM) | S.D. Fla. |
| *Cline v. Sunoco, Inc.* | 17-cv-313-JAG | E.D. Okla. |
| *Cline v. TouchTunes Music Corp.* | 14-CIV-4744 (LAK) | S.D.N.Y. |
| *Cobell v. Salazar* | 96-cv-1285 (TFH) | D.D.C. |
| *Common Ground Healthcare Coop. v. United States* | 17-877C | F.C.C. |
| *Condo. at Northpointe Assoc. v. State Farm Fire & Cas. Co.* | 16-cv-01273 | N.D. Ohio |
| *Cooper Clark Found. v. Oxy USA* | 2017-CV-000003 | D. Kan. |
| *Corker v. Costco Wholesale Corp.* | 19-cv-00290-RSL | W.D. Wash. |
| *Corona v. Sony Pictures Entm't Inc.* | 14–CV–09600–RGK–E | C.D. Cal. |
| *Courtney v. Avid Tech., Inc.* | 13-cv-10686-WGY | D. Mass. |
| *Cowan v. Devon Energy Corp.* | 22-cv-00220-JAR | E.D. Okla. |
| *DC 16 v. Sutter Health* | RG15753647 | Cal. Super. Ct. |
| *D'Amario v. Univ. of Tampa* | 20-cv-03744 | S.D.N.Y. |
| *Dahy v. FedEx Ground Package Sys., Inc.* | GD-17-015638 | C.P. Pa. |
| *Dargoltz v. Fashion Mkting & Merch. Grp.* | 2021-009781-CA-01 | Fla. Cir. Ct. |
| *DASA Inv., Inc. v. EnerVest Operating LLC* | 18-cv-00083-SPS | E.D. Okla. |
| *Davis v. Carfax, Inc.* | CJ-04-1316L | D. Okla. |
| *Davis v. State Farm Ins.* | 19-cv-466 | W.D. Ky. |
| *DDL Oil & Gas, LLC v. Tapstone Energy, LLC* | CJ-2019-17 | D. Okla. |
| *DeCapua v. Metro. Prop. and Cas. Ins. Co.* | 18-cv-00590 | D.R.I. |
| *DeFrees v. Kirkland and U.S. Aerospace, Inc.* | CV 11-04574 | C.D. Cal. |
| *Deitrich v. Enerfin Res. I Ltd. P'ship* | 20-cv-084-KEW | E.D. Okla. |
| *de Lacour v. Colgate-Palmolive Co.* | 16-cv-8364-KW | S.D.N.Y. |
| *Delkener v. Cottage Health Sys.* | 30-2016-847934 (CU) (NP) (CXC) | Cal. Super. Ct. |

| CASE NAME | CASE NUMBER | LOCATION |
|-----------|-------------|----------|
| *DeMarco v. AvalonBay Communities, Inc.* | 15-cv-00628-JLL-JAD | D.N.J. |
| *Diel v. Salal Credit Union* | 19-2-10266-7 KNT | Wash. Super. Ct. |
| *Dinsmore v. ONEOK Field Serv. Co., L.L.C.* | 22-cv-00073-GKF-CDL | N.D. Okla. |
| *Dinsmore v. Phillips 66 Co.* | 22-CV-44-JFH | E.D. Okla. |
| *Djoric v. Justin Brands, Inc.* | BC574927 | Cal. Super. Ct. |
| *Doan v. CORT Furniture Rental Corp.* | 30-2017-00904345-CU-BT-CXC | Cal. Super. Ct. |
| *Doan v. State Farm Gen. Ins. Co.* | 1-08-cv-129264 | Cal. Super. Ct. |
| *Dobbins v. Bank of Am., N.A.* | 17-cv-00540 | D. Md. |
| *Doe v. California Dep't. of Pub. Health* | 20STCV32364 | Cal. Super. Ct. |
| *Doe v. MindGeek USA Incorp.* | 21-cv-00338 | C.D. Cal. |
| *Donnenfield v. Petro, Inc.* | 17-cv-02310 | E.D.N.Y. |
| *Dougherty v. Barrett Bus. Serv., Inc.* | 17-2-05619-1 | Wash. Super. Ct. |
| *Doughtery v. QuickSIUS, LLC* | 15-cv-06432-JHS | E.D. Pa. |
| *Dover v. British Airways, PLC (UK)* | 12-cv-5567 | E.D.N.Y. |
| *Duarte v. US Metals Ref. Co.* | 17-cv-01624 | D.N.J. |
| *Dwyer v. Snap Fitness, Inc.* | 17-cv-00455-MRB | S.D. Ohio |
| *Dye v. Richmond Am. Homes of California, Inc.* | 30-2013-00649460-CU-CD-CXC | Cal. Super. Ct. |
| *Edwards v. Arkansas Cancer Clinic, P.A.* | 35CV-18-1171 | Ark. Cir. Ct. |
| *Edwards v. Hearst Commc'ns., Inc.* | 15-cv-9279 (AT) (JLC) | S.D.N.Y. |
| *Elec. Welfare Trust Fund v. United States* | 19-353C | Fed. Cl. |
| *Engquist v. City of Los Angeles* | BC591331 | Cal. Super. Ct. |
| *Expedia Hotel Taxes & Fees Litig.* | 05-2-02060-1 (SEA) | Wash. Super. Ct. |
| *Express Freight Int'l v. Hino Motors, LTD.* | 22-cv-22483 | S.D. Fla. |
| *Family Med. Pharmacy LLC v. Impax Labs., Inc.* | 17-cv-53 | S.D. Ala. |
| *Family Med. Pharmacy LLC v. Trxade Grp. Inc.* | 15-cv-00590-KD-B | S.D. Ala. |
| *Farmer v. Bank of Am.* | 11-cv-00935-OLG | W.D. Tex. |
| *Farris v. Carlinville Rehab and Health Care Ctr.* | 2019CH42 | Ill. Cir. Ct. |
| *Ferrando v. Zynga Inc.* | 22-cv-00214-RSL | W.D. Wash. |
| *Fielder v. Mechanics Bank* | BC721391 | Cal. Super. Ct. |
| *Finerman v. Marriott Ownership Resorts, Inc.* | 14-cv-1154-J-32MCR | M.D. Fla. |
| *Fishon v. Premier Nutrition Corp.* | 16-CV-06980-RS | N.D. Cal. |
| *Fitzgerald v. Lime Rock Res.* | CJ-2017-31 | Okla. Dist. Ct. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Folweiler v. Am. Family Ins. Co.* | 16-2-16112-0 | Wash. Super. Ct. |
| *Fosbrink v. Area Wide Protective, Inc.* | 17-cv-1154-T-30CPT | M.D. Fla. |
| *Franklin v. Equity Residential* | 651360/2016 | N.Y. Super. Ct. |
| *Frederick v. ExamSoft Worldwide, Inc.* | 2021L001116 | Ill. Cir. Ct. |
| *Frost v. LG Elec. MobileComm U.S.A., Inc.* | 37-2012-00098755-CU-PL-CTL | Cal. Super. Ct. |
| *FTC v. AT&T Mobility, LLC* | 14CV4785 | N.D. Cal. |
| *FTC v. Consumerinfo.com* | SACV05-801 AHS (MLGx) | C.D. Cal. |
| *FTC v. Fashion Nova, LLC* | C4759 | |
| *FTC v. Reckitt Benckiser Grp. PLC* | 19CV00028 | W.D. Va. |
| *Gagnon v. Gen. Motors of Canada Co. and Gen. Motors LLC* | 500-06-000687-141 and 500-06-000729-158 | Quebec Super. Ct. |
| *Gehrich v. Howe* | 37-2018-00041295-CU-SL-CTL | N.D. Ga. |
| *Gibson v. Nat'l Assoc. of Realtors* | 23-cv-00788-SRB | W.D. Mo. |
| *Gifford v. Pets Global, Inc.* | 21-cv-02136-CJC-MRW | C.D. Cal. |
| *Gomez v. Mycles Cycles, Inc.* | 37-2015-00043311-CU-BT-CTL | Cal. Super. Ct. |
| *Gonzalez v. Banner Bank* | 20-cv-05151-SAB | E.D. Wash. |
| *Gonzalez-Tzita v. City of Los Angeles* | 16-cv-00194 | C.D. Cal. |
| *Graf v. Orbit Machining Co.* | 2020CH03280 | Ill. Cir. Ct. |
| *Gragg v. Orange Cab Co.* | C12-0576RSL | W.D. Wash. |
| *Graham v. Univ. of Michigan* | 21-cv-11168-VAR-EAS | E.D. Mich. |
| *Granados v. Cnty. of Los Angeles* | BC361470 | Cal. Super., Ct. |
| *Grey Fox, LLC v. Plains All Am. Pipeline, L.P.* | 16-cv-03157-PSG-JEM | C.D. Cal. |
| *Gudz v. Jemrock Realty Co., LLC* | 603555/2009 | N.Y. Super. Ct. |
| *Gupta v. Aeries Software, Inc.* | 20-cv-00995 | C.D. Cal. |
| *Gutierrez, Jr. v. Amplify Energy Corp.* | 21-cv-01628-DOC-JDE | C.D. Cal. |
| *Hahn v. Hanil Dev., Inc.* | BC468669 | Cal. Super. Ct. |
| *Haines v. Washington Trust Bank* | 20-2-10459-1 | Wash. Super. Ct. |
| *Halperin v. YouFit Health Clubs* | 18-cv-61722-WPD | S.D. Fla. |
| *Hanks v. Lincoln Life & Annuity Co. of New York* | 16-cv-6399 PKC | S.D.N.Y. |
| *Harrington v. Wells Fargo Bank NA* | 19-cv-11180-RGS | D. Mass. |
| *Harris v. Chevron U.S.A., Inc.* | 15-cv-00094 | W.D. Okla. |
| *Hartnett v. Washington Fed., Inc.* | 21-cv-00888-RSM-MLP | W.D. Wash. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Hawker v. Pekin Ins. Co.* | 20-cv-00830 | S.D. Ohio |
| *Hay Creek Royalties, LLC v. Mewbourne Oil Co.* | CIV-20-1199-F | W.D. Okla. |
| *Hay Creek Royalties, LLC v. Roan Res. LLC* | 19-cv-00177-CVE-JFJ | N.D. Okla. |
| *Health Republic Ins. Co. v. United States* | 16-259C | F.C.C. |
| *Heathcote v. SpinX Games Ltd.* | 20-cv-01310 | W.D. Wis. |
| *Henry Price Trust v. Plains Mkting* | 19-cv-00390-RAW | E.D. Okla. |
| *Hernandez v. Experian Info. Sols., Inc.* | 05-cv-1070 (DOC) (MLGx) | C.D. Cal. |
| *Hernandez v. Wells Fargo Bank, N.A.* | 18-cv-07354 | N.D. Cal. |
| *Herrera v. Wells Fargo Bank, N.A.* | 18-cv-00332-JVS-MRW | C.D. Cal. |
| *Hicks v. State Farm Fire and Cas. Co.* | 14-cv-00053-HRW-MAS | E.D. Ky. |
| *Hill v. Valli Produce of Evanston* | 2019CH13196 | Ill. Cir. Ct. |
| *Hill-Green v. Experian Info. Solutions, Inc.* | 19-cv-708-MHL | E.D. Va. |
| *Holmes v. LM Ins. Corp.* | 19-cv-00466 | M.D. Tenn. |
| *Holt v. Murphy Oil USA, Inc.* | 17-cv-911 | N.D. Fla. |
| *Hoog v. PetroQuest Energy, L.L.C.* | 16-cv-00463-KEW | E.D. Okla. |
| *Horton v. Cavalry Portfolio Serv., LLC and Krejci v. Cavalry Portfolio Serv., LLC* | 13-cv-0307-JAH-WVG and 16-cv-00211-JAH-WVG | C.D. Cal. |
| *Howell v. Checkr, Inc.* | 17-cv-4305 | N.D. Cal. |
| *Hoyte v. Gov't of D.C.* | 13-cv-00569 | D.D.C. |
| *Hufford v. Maxim Inc.* | 19-cv-04452-ALC-RWL | S.D.N.Y. |
| *Huntzinger v. Suunto Oy* | 37-2018-27159 (CU) (BT) (CTL) | Cal. Super. Ct. |
| *In re Air Cargo Shipping Servs. Antitrust Litig.* | 06-md-1775 (JG) (VVP) | E.D.N.Y. |
| *In re Am. Express Fin. Advisors Sec. Litig.* | 04 Civ. 1773 (DAB) | S.D.N.Y. |
| *In re AMR Corp. (Am. Airlines Bankr.)* | 1-15463 (SHL) | S.D.N.Y. |
| *In re Arizona Theranos, Inc. Litig.* | 16-cv-2138-DGC | D. Ariz. |
| *In re Auction Houses Antitrust Litig.* | 00-648 (LAK) | S.D.N.Y. |
| *In re AXA Equitable Life Ins. Co. COI Litig.* | 16-cv-740 (JMF) | S.D.N.Y. |
| *In re Banner Health Data Breach Litig.* | 16-cv-02696 | D. Ariz. |
| *In re Blue Cross Blue Shield Antitrust Litig.* | 13-CV-20000-RDP | N.D. Ala. |
| *In re Broiler Chicken Antitrust Litig.* | 16-cv-08637 | N.D. Ill. |
| *In re Chaparral Energy, Inc.* | 20-11947 (MFW) | D. Del. Bankr. |
| *In re Classmates.com* | C09-45RAJ | W.D. Wash. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *In re Equifax Inc. Customer Data Sec. Breach Litig.* | 17-md-2800-TWT | N.D. Ga. |
| *In re Farm-raised Salmon and Salmon Prod. Antitrust Litig.* | 19-cv-21551-CMA | S.D. Fla. |
| *In re Gen. Motors LLC Ignition Switch Litig.* | 14-md-2543 | S.D.N.Y. |
| *In re Glob. Tel\*Link Corp. Litig.* | 14-CV-5275 | W.D. Ark. |
| *In re Guess Outlet Store Pricing* | JCCP No. 4833 | Cal. Super. Ct. |
| *In re Intuit Data Litig.* | 15-CV-1778-EJD | N.D. Cal. |
| *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig. (Indirect-Purchasers)* | 14-md-02542 | S.D.N.Y. |
| *In re LIBOR-Based Fin. Instruments Antitrust Litig.* | 11-md-2262 (NRB) | S.D.N.Y. |
| *In re Local TV Advert. Antitrust Litig.* | MDL No. 2867 | N.D. Ill. |
| *In re MacBook Keyboard Litig.* | 18-cv-02813-EDJ | N.D. Cal. |
| *In re Mercedes-Benz Emissions Litig.* | 16-cv-881 (KM) (ESK) | D.N.J. |
| *In re MyFord Touch Consumer Litig.* | 13-cv-3072 (EMC) | N.D. Cal. |
| *In re Navistar MaxxForce Engines Mktg., Sales Practices and Prods. Liab. Litig.* | 14-cv-10318 | N.D. Ill. |
| *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* | 2179 (MDL) | E.D. La. |
| *In re Packaged Seafood Products Antitrust Litig. (DPP and EPP Class)* | 15-md-02670 | S.D. Cal. |
| *In re PHH Lender Placed Ins. Litig.* | 12-cv-1117 (NLH) (KMW) | D.N.J. |
| *In re Pokémon Go Nuisance Litig.* | 16-cv-04300 | N.D. Cal. |
| *In re Polyurethane Foam Antitrust Litig.* | 10-md-196 (JZ) | N.D. Ohio |
| *In re Pre-Filled Propane Tank Antitrust Litig.* | 14-md-02567 | W.D. Mo. |
| *In re Processed Egg Prod. Antitrust Litig.* | 08-MD-02002 | E.D. Pa. |
| *In re Resistors Antitrust Litig.* | 15-cv-03820-JD | N.D. Cal. |
| *In re Ripple Labs Inc. Litig.* | 18-cv-06753-PJH | N.D. Cal. |
| *In re Rockwell Med. Inc. Stockholder Derivative Litig.* | 19-cv-02373 | E.D. N.Y. |
| *In re Sheridan Holding Co. I, LLC* | 20-31884 (DRJ) | Bankr. S.D. Tex. |
| *In re Stryker Rejuvenate and ABG II Hip Implant Prods. Liab. Litig.* | 13-md-2441 | D. Minn. |
| *In re Subaru Battery Drain Prods. Liab. Litig.* | 20-cv-03095-JHR-MJS | D.N.J. |
| *In re The Engle Trust Fund* | 94-08273 CA 22 | Fla. 11th Cir. Ct. |
| *In re TransUnion Rental Screening Sol. Inc. FCRA Litig.* | 20-md-02933-JPB | N.D. Ga. |

| CASE NAME | CASE NUMBER | LOCATION |
|-----------|-------------|----------|
| *In re Unit Petroleum Co.* | 20-32738 (DRJ) | Bankr. S.D. Tex. |
| *In re Volkswagen "Clean Diesel" Mktg., Sales Practice and Prods. Liab. Litig.* | MDL 2672 CRB | N.D. Cal. |
| *In re Washington Mut. Inc. Sec. Litig.* | 8-md-1919 (MJP) | W.D. Wash. |
| *In re Webloyalty.com, Inc. Mktg. & Sales Practices Litig.* | 06-11620-JLT | D. Mass. |
| *In re Wholesale Grocery Prod. Antitrust Litig.* | 9-md-2090 (ADM) (TNL) | D. Minn. |
| *In re Yahoo! Inc. Sec. Litig.* | 17-cv-373 | N.D. Cal. |
| *In the Matter of the Complaint of Dordellas Finance Corp.* | 22-cv-02153-DOC-JDE | C.D. Cal. |
| *James v. PacifiCorp.* | 20cv33885 | Or. Cir. Ct. |
| *Jerome v. Elan 99, LLC* | 2018-02263 | Tx. Dist. Ct. |
| *Jet Capital Master Fund L.P. v. HRG Grp. Inc.* | 21-cv-552-jdp | W.D. Wis. |
| *Jeter v. Bullseye Energy, Inc.* | 12-cv-411 (TCK) (PJC) | N.D. Okla. |
| *Johnson v. Hyundai Capital Am.* | BC565263 | Cal. Super. Ct. |
| *Johnson v. MGM Holdings, Inc.* | 17-cv-00541 | W.D. Wash. |
| *Johnston v. Camino Natural Res., LLC* | 19-cv-02742-CMA-SKC | D. Colo. |
| *Jones v. USAA Gen. Indem. Co.* | D01CI200009724 | D. Neb. |
| *Jordan v. WP Co. LLC, d/b/a The Washington Post* | 20-cv-05218 | N.D. Cal. |
| *Kain v. Economist Newspaper NA, Inc.* | 21-cv-11807-MFL-CI | E.D. Mich. |
| *Kalra v. Mercedes-Benz Canada Inc.* | CV-16-550271-00CP | Ont. Super. Ct. |
| *Kennedy v. McCarthy* | 16-cv-2010-CSH | D. Conn. |
| *Kent v. R.L. Vallee, Inc.* | 617-6-15 | D. Vt. |
| *Kernen v. Casillas Operating LLC* | 18-cv-00107-JD | W.D. Okla. |
| *Khona v. Subaru of Am., Inc.* | 19-cv-09323-RMB-AMD | D.N.J. |
| *Kin-Yip Chun v. Fluor Corp.* | 8-cv-01338-X | N.D. Tex. |
| *King v. Bumble Trading Inc.* | 18-cv-06868-NC | N.D. Cal. |
| *Kissel v. Code 42 Software Inc.* | 15-1936 (JLS) (KES) | C.D. Cal. |
| *Kokoszki v. Playboy Enter., Inc.* | 19-cv-10302 | E.D. Mich. |
| *Komesar v. City of Pasadena* | BC 677632 | Cal. Super. Ct. |
| *Kommer v. Ford Motor Co.* | 17-cv-00296-LEK-DJS | N.D.N.Y. |
| *Konecky v. Allstate* | CV-17-10-M-DWM | D. Mont. |
| *Krueger v. Ameriprise Fin., Inc.* | 11-cv-02781 (SRN/JSM) | D. Minn. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Kunneman Props. LLC v. Marathon Oil Co.* | 17-cv-00456-GKF-JFJ | N.D. Okla. |
| *Lambert v. Navy Fed. Credit Union* | 19-cv-00103-LO-MSN | E.D. Va. |
| *Langan v. Johnson & Johnson Consumer Co.* | 13-cv-01471 | D. Conn. |
| *Langer v. CME Grp.* | 2014CH00829 | Ill. Cir. Ct. |
| *Larson v. Allina Health Sys.* | 17-cv-03835 | D. Minn. |
| *Lee v. Hertz Corp., Dollar Thrifty Auto. Grp. Inc.* | CGC-15-547520 | Cal. Super. Ct. |
| *Lee v. PetroQuest Energy, L.L.C.* | 16-cv-00516-KEW | E.D. Okla. |
| *Leonard v. John Hancock Life Ins. Co. of NY* | 18-CV-04994 | S.D.N.Y. |
| *Lerman v. Apple Inc* | 15-cv-07381 | E.D.N.Y. |
| *Levy v. Dolgencorp, LLC* | 20-cv-01037-TJC-MCR | M.D. Fla. |
| *Linderman v. City of Los Angeles* | BC650785 | Cal. Super. Ct. |
| *Linneman v. Vita-Mix Corp.* | 15-cv-748 | S.D. Ohio |
| *Liotta v. Wolford Boutiques, LLC* | 16-cv-4634 | N.D. Ga. |
| *Lippert v. Baldwin* | 10-cv-4603 | N.D. Ill. |
| *Lloyd v. CVB Fin. Corp.* | 10-cv-6256 (CAS) | C.D. Cal. |
| *Loblaw Card Program* | Remediation Program | |
| *Loftus v. Outside Integrated Media, LLC* | 21-cv-11809-MAG-DRG | E.D. Mich. |
| *LSIMC, LLC v. Am. Gen. Life Ins. Co.* | 20-cv-11518 | C.D. Cal. |
| *Mabrey v. Autovest* | CGC-18-566617 | Cal. Super. Ct. |
| *Macias v. Los Angeles County Dep't. of Water and Power* | BC594049 | Cal. Super. Ct. |
| *Malin v. Ambry Gentics Corp.* | 30-2018-00994841-CU-SL-CXC | Cal. Super. Ct. |
| *Malone v. Western Digital Corp.* | 20-cv-03584-NC | N.D. Cal. |
| *Marical v. Boeing Employees' Credit Union* | 19-2-20417-6 | Wash. Super. Ct. |
| *Markson v. CRST Int'l, Inc.* | 17-cv-01261-SB (SPx) | C.D. Cal. |
| *Martin v. Lindenwood Univ.* | 20-cv-01128 | E.D. Mo. |
| *Martinelli v. Johnson & Johnson* | 15-cv-01733-MCE-DB | E.D. Cal. |
| *McCall v. Hercules Corp.* | 66810/2021 | N.Y. Super. Ct. |
| *McClellan v. Chase Home Fin.* | 12-cv-01331-JGB-JEM | C.D. Cal. |
| *McClintock v. Continuum Producer Serv., LLC* | 17-cv-00259-JAG | E.D. Okla. |
| *McClintock v. Enter.* | 16-cv-00136-KEW | E.D. Okla. |
| *McGann v. Schnuck Markets Inc.* | 1322-CC00800 | Mo. Cir. Ct. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *McGraw v. Geico Gen. Ins. Co.* | 15-2-07829-7 | Wash. Super. Ct. |
| *McKibben v. McMahon* | 14-2171 (JGB) (SP) | C.D. Cal. |
| *McKnight Realty Co. v. Bravo Arkoma, LLC* | 17-CIV-308 (KEW); 20-CV-428-KEW | E.D. Okla. |
| *McNeill v. Citation Oil & Gas Corp.* | 17-CIV-121 (KEW) | E.D. Okla. |
| *McWilliams v. City of Long Beach* | BC361469 | Cal. Super. Ct. |
| *Messner v. Cambridge Real Estate Servs., Inc.* | 19CV28815 | Or. Cir. Ct. |
| *Metzner v. Quinnipiac Univ.* | 20-cv-00784 | D. Conn. |
| *Mid Is. LP v. Hess Corp.* | 650911/2013 | N.Y. Super. Ct. |
| *Miller Revocable Trust v. DCP Operating Co., LP* | 18-cv-00199-JH | E.D. Okla. |
| *Miller v. Carrington Mortg. Serv., LLC* | 19-cv-00016-JDL | D. Me. |
| *Miller v. Guenther Mgmt. LLC* | 20-2-02604-32 | Wash. Super. Ct. |
| *Miller v. Mut. of Enumclaw Ins. Co.* | 19-2-12357-1 | Wash. Super. Ct. |
| *Milstead v. Robert Fiance Beauty Sch., Inc.* | CAM-L-328-16 | N.J. Super. Ct. |
| *Mitchell v. Red Bluff Res. Operating, LLC* | CJ-2021-323 | D. Okla. |
| *Moehrl v. Nat'l Assoc. of Realtors* | 19-cv-01610-ARW | N.D. Ill. |
| *Moeller v. Advance Magazine Publishers, Inc.* | 15-cv-05671 (NRB) | S.D.N.Y. |
| *Mojica v. Securus Techs., Inc.* | 14-cv-5258 | W.D. Ark. |
| *Molnar v. 1-800-Flowers Retail, Inc.* | BC 382828 | Cal. Super. Ct. |
| *Monteleone v. Nutro Co.* | 14-cv-00801-ES-JAD | D.N.J. |
| *Moodie v. Maxim HealthCare Servs.* | 14-cv-03471-FMO-AS | C.D. Cal. |
| *Moore v Robinhood Fin. LLC* | 21-cv-01571-BJR | W. D. Wash. |
| *Muir v. Early Warning Servs., LLC* | 16-cv-00521 | D.N.J. |
| *Mylan Pharm., Inc. v. Warner Chilcott Pub. Ltd.* | 12-3824 | E.D. Pa. |
| *Nasseri v. Cytosport, Inc.* | BC439181 | Cal. Super. Ct. |
| *Nesbitt v. Postmates, Inc.* | CGC-15-547146 | Cal. Super. Ct. |
| *New Orleans Tax Assessor Project* | Tax Assessment Program | |
| *NMPA Late Fee Program Grps. I-IVA* | Remediation Program | CRB |
| *Noble v. Northland* | UWY-CV-16-6033559-S | Conn. Super. Ct. |
| *Novoa v. GEO Grp., Inc.* | 17-cv-02514-JGB-SHK | C.D. Cal. |
| *Nozzi v. Housing Auth. of the City of Los Angeles* | CV 07-0380 PA (FFMx) | C.D. Cal. |
| *Nwabueza v. AT&T* | C 09-01529 SI | N.D. Cal. |

| CASE NAME | CASE NUMBER | LOCATION |
|-----------|-------------|----------|
| *Nwauzor v. GEO Grp., Inc.* | 17-cv-05769 | W.D. Wash. |
| *Oberski v. Gen. Motors LLC and Gen. Motors of Canada Ltd.* | CV-14-502023-00CP | Ont. Super. Ct. |
| *Ocana v. Renew Fin. Holdings, Inc.* | BC701809 | Cal. Super. Ct. |
| *O'Donnell v. Fin. Am. Life Ins. Co.* | 14-cv-01071 | S.D. Ohio |
| *Ostendorf v. Grange Indem. Ins. Co.* | 19-cv-01147-ALM-KAJ | S.D. Ohio |
| *Paetzold v. Metro. Dist. Comm'n* | X07-HHD-CV-18-6090558-S | Conn. Super. Ct. |
| *Palmer v. City of Anaheim* | 30-2017-00938646 | Cal. Super. Ct. |
| *Parker v. Time Warner Entm't Co.* | 239 F.R.D. 318 | E.D.N.Y. |
| *Parker v. Universal Pictures* | 16-cv-1193-CEM-DCI | M.D. Fla. |
| *Patrick v. Volkswagen Grp. of Am., Inc.* | 19-cv-01908-MCS-ADS | C.D. Cal. |
| *Pauper Petroleum, LLC v. Kaiser-Francis Oil Co.* | 19-cv-00514-JFH-JFJ | N.D. Okla. |
| *Pemberton v. Nationstar Mortg. LLC* | 14-cv-1024-BAS (MSB) | S.D. Cal. |
| *Pena v. Wells Fargo Bank* | 19-cv-04065-MMC-TSH | N.D. Cal. |
| *Perchlak v. Liddle & Liddle* | 19-cv-09461 | C.D. Cal. |
| *Perez v. DIRECTV* | 16-cv-01440-JLS-DFM | C.D. Cal. |
| *Perez v. Wells Fargo Co.* | 17-cv-00454-MMC | N.D. Cal. |
| *Peterson v. Apria Healthcare Grp., Inc.* | 19-cv-00856 | M.D. Fla. |
| *Petersen v. Costco Wholesale Co.* | 13-cv-01292-DOC-JCG | C.D. Cal. |
| *Phillips v. Hobby Lobby Stores, Inc.* | 18-cv-01645-JHE; 16-cv-837-JHE | N.D. Ala. |
| *PHT Holding II LLC v. N. Am. Co. for Life and Health Ins.* | 18-CV-00368 | S.D. Iowa |
| *Pierce v. Anthem Ins. Cos.* | 15-cv-00562-TWP-TAB | S. D. Ind. |
| *Pine Manor Investors v. FPI Mgmt., Inc.* | 34-2018-00237315 | Cal. Super. Ct. |
| *Pinon v. Mercedes-Benz USA, LLC and Daimler AG* | 18-cv-3984 | N.D. Ga. |
| *Podawiltz v. Swisher Int'l, Inc.* | 16CV27621 | Or. Cir. Ct. |
| *Press v. J. Crew Grp., Inc.* | 56-2018-512503 (CU) (BT) (VTA) | Cal. Super. Ct. |
| *Pruitt v. Par-A-Dice Hotel Casino* | 2020-L-000003 | Ill. Cir. Ct. |
| *Purcell v. United Propane Gas, Inc.* | 14-CI-729 | Ky. 2nd Cir. |
| *Quezada v. ArbiterSports, LLC* | 20-cv-05193-TJS | E.D. Pa. |
| *Ramos v. Hopele of Fort Lauderdale, LLC* | 17-cv-62100 | S.D. Fla. |
| *Rayburn v. Santander Consumer USA, Inc.* | 18-cv-1534 | S.D. Ohio |
| *RCC, P.S. v. Unigard Ins. Co.* | 19-2-17085-9 | Wash. Super. Ct. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Reed v. Scientific Games Corp.* | 18-cv-00565-RSL | W.D. Wash. |
| *Reirdon v. Cimarex Energy Co.* | 16-CIV-113 (KEW) | E.D. Okla. |
| *Reirdon v. XTO Energy Inc.* | 16-cv-00087-KEW | E.D. Okla. |
| *Rhea v. Apache Corp.* | 14-cv-00433-JH | E.D. Okla. |
| *Rice v. Burlington Res. Oil & Gas Co., LP* | 20-cv-00431-GFK-FHM | N.D. Cal. |
| *Rice v. Insync* | 30-2014-00701147-CU-NP-CJC | Cal. Super. Ct. |
| *Rice-Redding v. Nationwide Mut. Ins. Co.* | 18-cv-01203 | N.D. Ga. |
| *Rich v. EOS Fitness Brands, LLC* | RIC1508918 | Cal. Super. Ct. |
| *Rick Nelson Co. v. Sony Music Ent.* | 18-cv-08791 | S.D.N.Y. |
| *Rocchio v. Rutgers, The State Univ. of New Jersey* | MID-L-003039-20 | N.J. Super. Ct. |
| *Rollo v. Universal Prop. & Cas. Ins.* | 2018-027720-CA-01 | Fla. Cir. Ct. |
| *Rosado v. Barry Univ., Inc.* | 20-cv-21813 | S.D. Fla. |
| *Rosenberg, D.C., P.A. v. Geico Gen. Ins. Co.* | 19-cv-61422-CANNON/Hunt | S.D. Fla. |
| *Roth v. GEICO Gen. Ins. Co. and Joffe v. GEICO Indem. Co.* | 16-cv-62942 | S.D. Fla. |
| *Rounds v. FourPoint Energy, LLC* | CIV-20-00052-P | W.D. Wis. |
| *Routh v. SEIU Healthcare 775NW* | 14-cv-00200 | W.D. Wash. |
| *Ruppel v. Consumers Union of United States, Inc.* | 16-cv-2446 (KMK) | S.D.N.Y. |
| *Russett v. Nw. Mut. Life Ins. Co.,* | 19-cv-07414-KMK | S.D.N.Y. |
| *Saccoccio v. JP Morgan Chase* | 13-cv-21107 | S.D. Fla. |
| *Salgado v. UPMC Jameson* | 30008-18 | C.P. Pa. |
| *Sanders v. Glob. Research Acquisition, LLC* | 18-cv-00555 | M.D. Fla. |
| *Sandoval v. Merlex Stucco Inc.* | BC619322 | Cal. Super. Ct. |
| *Santa Barbara Channelkeeper v. State Water Res. Control Bd.* | 37-2020-00005776 | Cal. Super. Ct. |
| *Schlesinger v. Ticketmaster* | BC304565 | Cal. Super. Ct. |
| *Schulte v. Liberty Ins. Corp.* | 19-cv-00026 | S.D. Ohio |
| *Schwartz v. Intimacy in New York, LLC* | 13-cv-5735 (PGG) | S.D.N.Y. |
| *Seegert v. P.F. Chang's China Bistro* | 37-2017-00016131-CU-MC-CTL | Cal. Super. Ct. |
| *Senne v. Office of the Comm'r of Baseball* | 14-cv-00608-JCS | N.D. Cal. |
| *Sholopa v. Turkish Airlines, Inc.* | 20-cv-03294-ALC | S.D.N.Y. |
| *Shumacher v. Bank of Hope* | 18STCV02066 | Cal. Super. Ct. |
| *Sidibe v. Sutter Health* | 12-cv-4854-LB | N.D. Cal. |

| CASE NAME | CASE NUMBER | LOCATION |
|-----------|-------------|----------|
| *Smith v. Pulte Home Corp.* | 30-2015-00808112-CU-CD-CXC | Cal. Super. Ct. |
| *Soderstrom v. MSP Crossroads Apartments LLC* | 16-cv-233 (ADM) (KMM) | D. Minn. |
| *Solorio v. Fresno Comty. Hosp.* | 15CECG03165 | Cal. Super. Ct. |
| *Solberg v. Victim Serv., Inc.* | 14-cv-05266-VC | N.D. Cal. |
| *Sonner v. Schwabe N. Am., Inc.* | 15-cv-01358 VAP (SPx) | C.D. Cal. |
| *Speed v. JMA Energy Co., LLC* | CJ-2016-59 | Okla. Dist. Ct. |
| *Staats v. City of Palo Alto* | 2015-1-CV-284956 | Cal. Super. Ct. |
| *Stanley v. Capri Training Ctr.* | ESX-L-1182-16 | N.J. Super. Ct. |
| *Staunton Lodge No. 177 v. Pekin Ins. Co.* | 2020-L-001297 | Ill. Cir. Ct. |
| *Steele v. PayPal, Inc.* | 05-CV-01720 (ILG) (VVP) | E.D.N.Y. |
| *Stewart v. Early Warning Serv., LLC* | 18-cv-3277 | D.N.J. |
| *Stier v. PEMCO Mut. Ins. Co.* | 18-2-08153-5 | Wash. Super. Ct. |
| *Stillman v. Clermont York Assocs. LLC* | 603557/09E | N.Y. Super. Ct. |
| *Stout v. The GEO Grp., Inc.* | 37-2019-00000650-CU-CR-CTL | Cal. Super. Ct. |
| *Strano v. Kiplinger Washington Editors, Inc.* | 21-cv-12987-TLL-PTM | E.D. Mich. |
| *Strickland v. Carrington Mortg. Servs., LLC* | 16-cv-25237 | S.D. Fla. |
| *Strohm v. Missouri Am. Water Co.* | 16AE-CV01252 | Mo. Cir. Ct. |
| *Stuart v. State Farm Fire & Cas. Co.* | 14-cv-04001 | W.D. Ark. |
| *Sullivan v. Wenner Media LLC* | 16–cv–00960–JTN–ESC | W.D. Mich. |
| *Swafford v. Ovintiv Exploration Inc.* | 21-cv-00210-SPS | E.D. Okla. |
| *Swetz v. GSK Consumer Health, Inc.* | 20-cv-04731 | S.D.N.Y. |
| *Swinton v. SquareTrade, Inc.* | 18-CV-00144-SMR-SBJ | S.D. Iowa |
| *Sylvain v. Longwood Auto Acquisitions, Inc.* | 2021-CA-009091-O | Fla. Cir. Ct. |
| *Terrell v. Costco Wholesale Corp.* | 16-2-19140-1-SEA | Wash. Super. Ct. |
| *Timberlake v. Fusione, Inc.* | BC 616783 | Cal. Super. Ct. |
| *Tkachyk v. Traveler's Ins.* | 16-28-m (DLC) | D. Mont. |
| *T-Mobile Remediation Program* | Remediation Program | |
| *Townes, IV v. Trans Union, LLC* | 04-1488-JJF | D. Del. |
| *Townsend v. G2 Secure Staff* | 18STCV04429 | Cal. Super. Ct. |
| *Trepte v. Bionaire, Inc.* | BC540110 | Cal. Super. Ct. |
| *Tyus v. Gen. Info. Sols. LLC* | 2017CP3201389 | S.C. C.P. |
| *Udeen v. Subaru of Am., Inc.* | 10-md-196 (JZ) | D.N.J. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Underwood v. NGL Energy Partners LP* | 21-CV-0135-CVE-SH | N.D. Okla. |
| *United States v. City of Austin* | 14-cv-00533-LY | W.D. Tex. |
| *United States v. City of Chicago* | 16-c-1969 | N.D. Ill. |
| *United States v. Greyhound Lines, Inc.* | 16-67-RGA | D. Del. |
| *USC Student Health Ctr. Settlement* | 18-cv-04258-SVW | C.D. Cal. |
| *Van Jacobs v. New World Van Lines, Inc.* | 2019CH02619 | Ill. Cir. Ct. |
| *Vasquez v. Libre by Nexus, Inc.* | 17-cv-00755-CW | N.D. Cal. |
| *Vassalle v. Midland Funding LLC* | 11-cv-00096 | N.D. Ohio |
| *Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of New York* | 19-cv-06004 | S.D.N.Y. |
| *Viesse v. Saar's Inc.* | 17-2-7783-6 (SEA) | Wash. Super. Ct. |
| *Wahl v. Yahoo! Inc.* | 17-cv-2745 (BLF) | N.D. Cal. |
| *Wake Energy, LLC v. EOG Res., Inc.* | 20-cv-00183-ABJ | D. Wyo. |
| *Watson v. Checkr, Inc.* | 19-CV-03396-EMC | N.D. Cal. |
| *Weimar v. Geico Advantage Ins. Co.* | 19-cv-2698-JTF-tmp | W.D. Tenn. |
| *Weiner v. Ocwen Fin. Corp.* | 14-cv-02597-DJC-DB | E.D. Cal. |
| *Welsh v. Prop. and Cas. Ins. Co. of Hartford* | 20-2-05157-3 | Wash. Super. Ct. |
| *White Family Minerals, LLC v. EOG Res., Inc.* | 19-cv-409-KEW | E.D. Okla. |
| *Williams v. Children's Mercy Hosp.* | 1816-CV 17350 | Mo. Cir. Ct. |
| *Williams v. Weyerhaeuser Co.* | 995787 | Cal. Super. Ct. |
| *Wills v. Starbucks Corp.* | 17-cv-03654 | N.D. Ga. |
| *Wilner v. Leopold & Assoc,* | 15-cv-09374-PED | S.D.N.Y. |
| *Wilson v. Santander Consumer USA, Inc.* | 20-cv-00152 | E.D. Ark. |
| *Wornicki v. Brokerpriceopinion.com, Inc.* | 13-cv-03258 (PAB) (KMT) | D. Colo. |
| *Wright v. Lyft, Inc.* | 14-cv-00421-BJR | W.D. Wash. |
| *Wright v. Southern New Hampshire Univ.* | 20-cv-00609 | D.N.H. |
| *Yamagata v. Reckitt Benckiser, LLC* | 17-cv-03529-CV | N.D. Cal. |
| *Yates v. Checkers* | 17-cv-09219 | N.D. Ill. |
| *Yeske v. Macoupin Energy* | 2017-L-24 | Ill. Cir. Ct. |
| *Z.B. v. Birmingham Cmty. Charter High Sch.* | 19STCV17092 | Cal. Super. Ct. |

- EXHIBIT B -

**RESIDENTIAL REAL ESTATE BROKER COMMISSIONS
ANTITRUST SETTLEMENT**

## NOTICE OF PROPOSED SETTLEMENT WITH THE NATIONAL ASSOCIATION OF REALTORS FOR AT LEAST $418 MILLION AND IMPORTANT PRACTICE CHANGES

**If you sold a home and paid a commission to a real estate agent,
then you *may* be part of a class action settlement.**

**Please read this Notice carefully because it may affect your legal rights.**

*Para una notificación en español, visite www.RealEstateCommissionLitigation.com.*

*A federal court has ordered this Notice. It is not from a lawyer, and you are not being sued.*

- This Settlement resolves claims against The National Association of REALTORS® ("NAR") in several lawsuits alleging the existence of an anticompetitive agreement that resulted in home sellers paying inflated commissions to real estate brokers or agents in violation of antitrust law. In addition to releasing the claims in these lawsuits, this Settlement releases all Released Claims that any Settlement Class members have against NAR and the other released parties, as described in Section 10, regardless of whether that Settlement Class member has already brought suit and regardless of whether the Settlement Class member also was a homebuyer during the Applicable Date Ranges.

- The current value of all settlements with NAR and other Defendants is over **$980 million**.

- To be eligible to receive the benefits of the Settlement, you must have: (1) sold a home during the Eligible Date Range (see below); (2) listed the home that was sold on a multiple listing service ("MLS") anywhere in the United States; and (3) paid a commission to any real estate brokerage in connection with the sale of the home. The Eligible Date Range depends on which MLS you listed your home for sale on. The terms "multiple listing service" and "MLS" encompass multiple listing services nationwide, regardless of whether they are affiliated with NAR or not, including, for example, NWMLS, WPMLS, and REBNY/RLS.

- If you have already submitted a claim form in this case for a prior settlement with other Defendants on the website: www.RealEstateCommissionLitigation.com, you do not need to submit another claim form. You may be eligible for a share of multiple settlements. With one claim form, you will receive your share of each settlement that you are eligible for.

---

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 70 of 282

| What Eligible Date Ranges apply to me? | |
|---|---|
| **Where was my home listed?** | **Applicable Date Range** |
| Heartland MLS (encompassing the Kansas City metropolitan area, counties in eastern Kansas, counties in southwest Missouri, and counties in northwest Missouri); <br><br> MARIS MLS (encompassing the St. Louis metropolitan area, counties in eastern Missouri, and counties in western Illinois); <br><br> Columbia Board of Realtors MLS (encompassing Columbia, Missouri and its surrounding areas); *or* <br><br> Southern Missouri Regional MLS (encompassing Springfield and Joplin, Missouri and their surrounding areas). | April 29, 2014 through August 17, 2024 |
| Bright MLS (Delaware, Baltimore, Maryland area, District of Columbia, parts of New Jersey, Philadelphia, Pennsylvania area, Richmond, Virginia areas, parts of West Virginia); <br><br> Carolina/Canopy MLS (Charlotte, North Carolina area, including portions of South Carolina); <br><br> Triangle MLS (Research Triangle Area, North Carolina); <br><br> Stellar MLS (Tampa, Orlando, and Sarasota, Florida areas); <br><br> Miami MLS (Miami, Florida area); <br><br> Florida Gulf Coast (Fort Myers, Florida area); <br><br> Metro MLS (parts of Wisconsin, including the Milwaukee areas); <br><br> Yes MLS/MLS Now (Cleveland, Ohio, Eastern Ohio, and parts of West Virginia); <br><br> Columbus Realtors MLS (Columbus, Ohio areas); <br><br> Northstar MLS (Minnesota, Wisconsin); <br><br> Wasatch Front/Utah Real Estate (Salt Lake City, Utah area); <br><br> REcolorado/Metrolist (Denver, Colorado area); <br><br> Pikes Peak MLS (Colorado Springs, Colorado area); <br><br> GLVAR MLS (Las Vegas, Nevada area); <br><br> SABOR (San Antonio, Texas area); <br><br> ACTRIS/ABOR (Austin, Texas area); <br><br> HAR MLS (Houston, Texas area); <br><br> NTREIS (Dallas, Texas area); <br><br> ARMLS (Phoenix, Arizona area); and <br><br> Realcomp II (Detroit, Michigan area) | March 6, 2015 through August 17, 2024 |

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

| What Eligible Date Ranges apply to me? | |
|---|---|
| **Where was my home listed?** | **Applicable Date Range** |
| MLS PIN (Massachusetts) | December 17, 2016 through August 17, 2024 |
| Arkansas, Kentucky, and Missouri, but not identified above | October 31, 2018 through August 17, 2024 |
| Homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, or Wyoming, but not identified above | October 31, 2017 through August 17, 2024 |
| Any MLS in the United States other than the MLSs listed above | October 31, 2019 through August 17, 2024 |

Your Legal rights are affected whether or not you act. ***Please read this Notice carefully***

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM BY MAY 9, 2025** | The only way to get a payment. |
| **ASK TO BE EXCLUDED BY OCTOBER 28, 2024** | If you do not want to be included in this Settlement with NAR, you must exclude yourself. This is called "opting out." This is the only option that allows you to sue NAR for these same issues again. |
| **OBJECT BY OCTOBER 28, 2024** | You may write to the Court about why you don't like the proposed Settlement. You cannot object if you opt-out. |
| **GO TO A HEARING ON NOVEMBER 26, 2024** | You may ask to speak in Court about the fairness of the proposed Settlement with NAR. |
| **DO NOTHING** | If you do nothing and the Court approves the proposed Settlement, you will get no payment. You will not be able to sue NAR for these same issues again**.** |

- These rights and options – **and the deadlines to exercise them** – are explained in this Notice.

- The Court in charge of this case still has to decide whether to approve the proposed Settlement. Payments will be made if the Court approves the Settlement and after appeals are resolved. Please be patient.

- Along with this proposed settlement with NAR, other proposed settlements have been reached with Anywhere, RE/MAX, Keller Williams, Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, United Real

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*
3

Estate, and certain of their affiliates. Some of those settlements have already received final approval from the District Court. Additional settlements may be reached with other Defendants. See www.RealEstateCommissionLitigation.com for more information about these settlements and any additional settlements. You may not receive any additional written notice about future Settlements, so it is important that you continue to check the website to stay up to date.

# BASIC INFORMATION

| 1. | Why did I get this notice? |
|---|---|

This Notice has been posted for the benefit of potential members of the Settlement Class. If you are uncertain about whether you are a member of the Settlement Class, you may contact the Settlement Administrator at 888-995-0207.

This Notice has been posted because members of the Settlement Class have a right to know about the proposed settlement of class action lawsuits in which they are class members, and about all of their options, before the Court decides whether to approve the Settlement. If the Court approves the Settlement, and after objections or appeals relating to the Settlement are resolved, the benefits provided by the Settlement will be available to members of the Class.

This Notice explains the lawsuits, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them. A full copy of the Settlement Agreement may be viewed at the settlement website: www.RealEstateCommissionLitigation.com. This Notice contains only a summary of the Settlement.

The Court in charge of the Settlement is the United States District Court for the Western District of Missouri. The case before this Court is known as *Burnett et al. v. National Association of Realtors, et al.*, Case No. 19-CV-00332-SRB ("Burnett"). The people who filed this lawsuit are called the Plaintiffs. The people being sued are called the Defendants. Defendants in the *Burnett* action include The National Association of Realtors ("NAR") and the following large real estate brokerage firms: Anywhere, RE/MAX, Keller Williams, and Berkshire Hathaway HomeServices. Of these Defendants, this Settlement concerns only NAR. Notice of additional settlements is also available on the settlement website: www.RealEstateCommissionLitigation.com.

This Settlement also resolves claims against NAR raised in other lawsuits involving alleged anticompetitive conduct, including but not limited to: *Moehrl et al. v. National Association of Realtors et al.,* Case No. 1:19-cv-01610-ARW (Northern District of Illinois) ("Moehrl"); *Umpa v. National Association of Realtors, et al.,* Case No. 4:23-cv-00945 (W.D. Missouri) ("Umpa"); and *Gibson v. National Association of Realtors et al.*, Case No. 23-CV-788-SRB (Western District of Missouri) ("Gibson").

| 2. | What are the lawsuits about? |
|---|---|

The lawsuits claim that Defendants, including NAR, created and implemented rules that require home sellers to pay commissions to the broker or agent representing the buyer and that caused home sellers to pay total commissions at inflated rates. They also allege that Defendants enforced these rules through anticompetitive and unlawful practices.

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 73 of 282

The lawsuits claim that these rules are anticompetitive and unfair, and that they violate antitrust laws. You can read Plaintiffs' complaints at www.RealEstateCommissionLitigation.com. Specifically, the lawsuits allege violations of the Sherman Act (a federal antitrust statute found at 15 U.S.C. § 1 *et seq.*) among other things. The Sherman Act claims apply to home sales that occurred anywhere in the United States during the Eligible Date Range.

| **3.** | **Has the Court decided who is right?** |

Although the *Burnett* Court has authorized notice to be given of the proposed Settlement, this Notice does not express the opinion of the Court on the merits of the claims or defenses asserted by either side of the lawsuits.

NAR disputes Plaintiffs' allegations and denies all liability to Plaintiffs and the Class in the *Burnett*, *Moehrl*, and *Gibson* lawsuits. You can read the Answer filed by NAR in the *Burnett* lawsuit here: www.RealEstateCommissionLitigation.com.

On October 31, 2023, a jury found in favor of Plaintiffs in the *Burnett* action. The parties entered into this proposed Settlement on March 15, 2024, after that verdict.

| **4.** | **Why are these cases class actions?** |

In a class action, one or more people called Class Representatives sue on behalf of other people who have similar claims. The people together are a "Class" or "Class Members." The consumers who sued Defendants — and all the Class Members like them — are called Plaintiffs. The companies they sued are called the Defendants. One court resolves the issues for everyone in the Class – except for those who choose to exclude themselves from the Class.

Here, the *Burnett* Court decided that a class can be certified for settlement purposes because it preliminarily meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts. Specifically, the Court found that: (1) there are numerous people who fit the class definition; (2) there are legal questions and facts that are common to each of them; (3) the Plaintiffs' claims are typical of the claims of the rest of the Class; (4) Plaintiffs, and the lawyers representing the Class, will fairly and adequately represent the Class Members' interests; (5) the common legal questions and facts are more important than questions that affect only individuals; and (6) class treatment will be more efficient than having individual lawsuits.

| **5.** | **Why are there settlements?** |

Although Plaintiffs prevailed at trial in the *Burnett action*, NAR indicated that it would appeal the jury's verdict. Counsel for the Settlement Class investigated the facts and applicable law regarding Plaintiffs' claims and Defendants' defenses, the potential issues on appeal, and NAR's ability to pay. The parties engaged in lengthy arms-length negotiations to reach the Settlement. Plaintiffs and Counsel for the Settlement Class believe that the proposed Settlement is fair, reasonable, and adequate, and in the best interest of the Class.

Both sides agree that by settling, NAR is not admitting any liability or that it did anything wrong. Both sides want to avoid the uncertainties and expense of further litigation.

# WHO IS IN THE SETTLEMENT?

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

5

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 74 of 282

| 6. | How do I know if I am a part of the Settlement? |
|---|---|

You are a part of the Settlement Class if you: (1) sold a home during the Eligible Date Range (as defined above); (2) listed the home that was sold on a multiple listing service (as defined above) anywhere in the United States; and (3) paid a commission to a real estate brokerage in connection with the sale of the home. Note that you are part of the Settlement Class if you meet all three of these conditions, regardless of whether you also were a buyer within the Applicable Date Ranges.

If you are uncertain as to whether you are a member of the Settlement Class, you may contact the Settlement Administrator at 888-995-0207 to find out.

# THE SETTLEMENT BENEFITS

| 7. | What does the Settlement provide? |
|---|---|

If you are a member of the Settlement Class, you are eligible to receive a benefit under the Settlement.

NAR has agreed to pay $418,000,000 into a settlement fund. The current value of all settlements with NAR and other Defendants is over $980 million. In addition, certain (a) REALTOR® MLSs, (b) non-REALTOR® MLSs, and (c) real estate brokerages with a REALTOR® Principal that together with their affiliates have over $2 billion in total sales volume, have agreed to "opt in" and make payments under this Settlement. Those entities (and the amounts they are paying, if anything) will be reflected on the settlement website: www.RealEstateCommissionLitigation.com.

The fund will be distributed to qualifying Settlement Class Members who submit an approved claim form, after any awarded attorneys' fees, expenses, settlement administration costs, and service awards have been deducted.

NAR has also agreed to provide Cooperation and to implement important Practice Changes, including the following:

i. Eliminate and prohibit any requirement by the National Association of REALTORS®, REALTOR® MLSs, or Member Boards that listing brokers or sellers must make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), and eliminate and prohibit any requirement that such offers, if made, must be blanket, unconditional, or unilateral;

ii. Prohibit REALTOR® MLS Participants, subscribers, other real estate brokers, other real estate agents, and their sellers from (a) making offers of compensation on the MLS to buyer brokers or other buyer representatives (either directly or through buyers); or (b) disclosing on the MLS listing broker compensation or total brokerage compensation (i.e., the combined compensation to both listing brokers and cooperating brokers);

iii. Require REALTOR® MLSs to (a) eliminate all broker compensation fields on the MLS; and (b) prohibit the sharing of offers of compensation to buyer brokers or other buyer representatives via any other REALTOR® MLS field;

iv. Eliminate and prohibit any requirements conditioning participation or membership in a REALTOR® MLS on offering or accepting offers of compensation to buyer brokers or other buyer representatives;

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 75 of 282

v.   Agree not to create, facilitate, or support any non-MLS mechanism (including by providing listing information to an internet aggregators' website for such purpose) for listing brokers or sellers to make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers), however, this provision is not violated by (a) a REALTOR® MLS providing data or data feeds to a REALTOR®, REALTOR® MLS Participant, or third party unless the REALTOR® MLS knows those data or data feeds are being used directly or indirectly to establish or maintain a platform for offers of compensation from multiple brokers (i.e. the REALTOR® MLS cannot intentionally circumvent this requirement); or (b) a REALTOR® or REALTOR® MLS Participant displaying both (1) data or data feeds from a REALTOR® MLS and (2) offers of compensation to buyer brokers or other buyer representatives, but only on listings from their own brokerage;

vi.   Unless inconsistent with state or federal law or regulation before or during the operation of the Settlement Agreement, require that all REALTOR® MLS Participants working with a buyer enter into a written agreement before the buyer tours any home with the following:

a.   To the extent that such a REALTOR® or Participant will receive compensation from any source, the agreement must specify and conspicuously disclose the amount or rate of compensation it will receive or how this amount will be determined;

b.   The amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g. "buyer broker compensation shall be whatever amount the seller is offering to the buyer"); and

c.   Such a REALTOR® or Participant may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer;

vii.   Prohibit REALTORS® and REALTOR® MLS Participants from representing to a client or customer that their brokerage services are free or available at no cost to their clients, unless they will receive no financial compensation from any source for those services;

viii.   Require REALTORS® and REALTOR® MLS Participants acting for sellers to conspicuously disclose to sellers and obtain seller approval for any payment or offer of payment that the listing broker or seller will make to another broker, agent, or other representative (e.g., a real estate attorney) acting for buyers; and such disclosure must be in writing, provided in advance of any payment or agreement to pay another broker acting for buyers, and specify the amount or rate of any such payment;

ix.   Require REALTORS® and REALTOR® MLS Participants to disclose to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable (a) in their listing agreement if it is not a government-specified form, (b) in their agreement with buyers if it is not a government-specified form, and (c) in pre-closing disclosure documents if there are any and they are not government-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government form, then REALTORS® and REALTOR® MLS Participants must include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable. NAR also shall require that REALTOR® Member Boards and REALTOR® MLSs, to the extent they publish form listing agreements, buyer representation agreements, and pre-closing disclosure documents for use by REALTORS®, Participants, and/or subscribers, must conform those documents to this paragraph;

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 76 of 282

x.  Require that REALTORS® and REALTOR® MLS Participants and subscribers must not filter or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the buyer broker or other buyer representative assisting the buyer;

xi.  Rescind or modify any existing rules that are inconsistent with the practice changes reflected in the Settlement Agreement;

xii.  Develop educational materials that reflect and are consistent with the practice changes reflected in the Settlement Agreement and eliminate educational materials, if any, that are contrary to it.

xiii.  The practice changes summarized above shall not prevent (a) offers of compensation to buyer brokers or other buyer representatives off of the multiple listing service; or (b) sellers from offering buyer concessions on a REALTOR® MLS (e.g., for buyer closing costs), so long as such concessions are not limited to or conditioned on the retention of or payment to a cooperating broker, buyer broker, or other buyer representative.

The opting-in parties have also agreed to certain cooperation and Practice Changes. You can learn more about the Practices Changes and Cooperation in the NAR Settlement Agreement at www.RealEstateCommissionLitigation.com.

# HOW YOU GET A PAYMENT – SUBMITTING A CLAIM FORM

| 8. | How can I get a benefit? |
|---|---|

*Note: If you have already submitted a claim form in this litigation for a prior settlement with other Defendants through the website: www.RealEstateCommissionLitigation.com, you do <u>not</u> need to submit another claim form. **With one claim form, you will receive your share of each settlement that you are eligible for.***

To receive a benefit, a Settlement Class Member must submit a claim form with information pertaining to and/or evidence of your home sale and commissions paid to the Notice and Claims Administrator. The Notice and Claims Administrator will be responsible for reviewing all claim forms and evidence of purchase to determine whether a claim is an approved claim. The Notice and Claims Administrator will reject any claim that is not: (a) submitted timely and in accordance with the directions on the claim form, the provisions of this Settlement Agreement, and the Preliminary Approval Order; (b) fully and truthfully completed by a Settlement Class Member or their representative with all of the information requested in the claim form; and (c) signed by the Settlement Class Member. Claims that cannot be confirmed by the Settlement Administrator may be subject to challenge, nonpayment, or a reduced share of the available funds.

You can submit a claim form by clicking this link, or by printing off the claim form from this website and returning it to the Settlement Administrator via mail or email on or before May 9, 2025.

*Burnett et al. v. The National Association of Realtors et al.*
c/o JND Legal Administration
PO Box 91479
Seattle, WA 98111

Email: info@RealEstateCommissionLitigation.com

| 9. | When would I get my benefit? |
|---|---|

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 77 of 282

The Court will hold a final Fairness Hearing **at 1:30 PM on November 26, 2024**, in the United States District Court for the Western District of Missouri, 400 E. 9th St., Courtroom 7B, Kansas City, Missouri 64106, to decide whether to finally approve the Settlement. If the Settlement is approved, there may be appeals. Payments to members of the Settlement Class will be made only if the Settlement is approved and after any claims period and appeals are resolved. This may take some time, so please be patient.

| | |
|---|---|
| **10.** | **What am I giving up to get a benefit?** |

Upon the Court's approval of the proposed Settlement, all members of the Settlement Class who do not exclude themselves (as well as their representatives) will release:

(i) NAR; (ii) NAR's Members, Associate Members, and its Member Boards that do not operate an unincorporated MLS on certain conditions, including that they agree to abide by applicable practice changes; (iii) REALTOR® MLSs, as defined in the Settlement Agreement, on certain conditions, including that they agree to abide by applicable practice changes; (iv) any non-REALTOR® MLSs, as defined in the Settlement Agreement, but only on certain conditions, including that they agree to practice changes and pay an additional amount for the benefit of the Class as outlined in Appendix D; (v) qualifying real estate brokerages with a calendar year 2022 Total Transaction Volume for residential home sales of $2 billion or less, including all parents, subsidiaries, affiliates, associates, and franchisees, that have a REALTOR® as a Principal and comply with the practice changes; and (vi) qualifying real estate brokerages with a REALTOR® Principal that, together with their affiliates, have over $2 billion in total sales volume but only on certain conditions, including that they agree to practice changes and pay an additional amount for the benefit of the Class as specified in the Settlement Agreement. Please check the Settlement website for more information about entities participating in this Settlement.

All members of the Settlement Class who do not exclude themselves will release claims whether known or unknown that they ever had, now have, or hereafter may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. "Released Claims" means any and all manner of claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages by anyone in connection with the sale of any residential home (including claims as a seller, buyer, or otherwise), regardless of whether the claim has been brought. The release does not extend to any individual claims that a Class Member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue.

This release may affect your rights, and may carry obligations, in the future. To view terms of the release, review the Settlement Agreement, which is available at www.RealEstateCommissionLitigation.com.

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you do not want a payment from the Settlement, and you want to keep the right to sue or continue to sue NAR and affiliated entities on your own about the legal issues in these cases, then you must

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 78 of 282

take steps to get out. This is called excluding yourself—or is sometimes referred to as opting out of the Settlement Class.

| **11.** | **How do I ask to be excluded?** |
|---|---|

To ask to be excluded, you must execute and send a Request for Exclusion to the Settlement Administrator postmarked on or before the end of **October 28, 2024**. A Request for Exclusion must be personally signed by each potential Settlement Class Member requesting exclusion. Additionally, a Request for Exclusion must include the potential Settlement Class Member's present name and address, a clear and unequivocal statement that the potential Settlement Class Member wishes to be excluded from the Settlement Class as to NAR, and the signature of the putative Settlement Class Member or, in the case of a potential Settlement Class Member who is deceased or incapacitated only, the signature of the legally authorized representative of the putative Settlement Class Member.

*Note: if you did not exclude yourself from previous settlements, you may still exclude yourself from this Settlement.*

If the request is not postmarked on or before **October 28, 2024**, your exclusion will be invalid, and you will be bound by the terms of the Settlement approved by the Court, including without limitation, the judgment ultimately rendered in the case, and you will be barred from bringing any claims against NAR or those affiliated with NAR outlined in paragraph 10 above which arise out of or relate in any way to the claims in the case as specified in the release referenced in paragraph 10 above.

You must mail your Exclusion Request to:

*Burnett et al. v. The National Association of Realtors et al.*
c/o JND Legal Administration – Exclusion Dpt.
PO Box 91486
Seattle, WA 98111

| **12.** | **If I don't exclude myself, can I sue NAR for the same thing later?** |
|---|---|

No. Unless you exclude yourself, you give up any right to sue NAR and those affiliated with NAR for the claims that the Settlement resolves. If you have a pending lawsuit against NAR or certain affiliated entities such as MLSs or small brokers, speak to your lawyer in that case immediately. You may have to exclude yourself from this Class to continue your own lawsuit. Remember, the exclusion deadline is **October 28, 2024**.

| **13.** | **If I exclude myself, can I get benefits from the Settlement?** |
|---|---|

No. If you exclude yourself as to the NAR Settlement, do not send in a claim form to ask for any money. If you exclude yourself only as to NAR, you may still ask for money from the settlements with other Defendants. If you exclude yourself as to NAR, you may sue, continue to sue, or be a part of a different lawsuit against NAR.

# THE LAWYERS REPRESENTING YOU

| **14.** | **Do I have a lawyer in this Settlement?** |
|---|---|

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

10

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 79 of 282

The Court decided that the law firms Ketchmark and McCreight P.C.; Williams Dirks Dameron LLC; Boulware Law LLC; Hagens Berman Sobal Shapiro LLP; Cohen Milstein Sellers & Toll PLLC; and Susman Godfrey LLP, are qualified to represent you and all other Settlement Class Members. These lawyers are called "Class Counsel." You will not be charged for these lawyers. They are experienced in handling similar cases against other entities. More information about the law firms, their practices, and their lawyers' experience is available at: www.kansascitylawoffice.com, www.williamsdirks.com, www.boulware-law.com, www.hbsslaw.com, www.cohenmilstein.com, and www.susmangodfrey.com.

Class Counsel represent the interests of the Settlement Class. You may hire your own attorney to advise you, but if you hire your own attorney, you will be responsible for paying that attorney's fees.

| 15. | How will the lawyers be paid? |
|---|---|

Class Counsel will ask the Court for attorneys' fees, in an amount not to exceed one-third (33.3%) of the settlement fund, plus out-of-pocket expenses incurred during the case. The Court may award less. Class Counsel may also seek compensation for each current and/or former class representative in the actions captioned *Burnett et al. v. The National Association of Realtors et al.*, Case No. 19-CV-00332-SRB, pending in the Western District of Missouri; *Moehrl et al. v. The National Association of Realtors*, Case No. 19-CV-01610-ARW, pending in the Northern District of Illinois; and *Gibson v. National Association of Realtors et al.*, Case No. 23-CV-788-SRB, pending in the Western District of Missouri.

The Class Representatives will make their request for attorneys' fees, costs, and service awards on or before September 13, 2024, and that request will be published at www.RealEstateCommissionLitigation.com.

NAR will pay the fees and expenses that the Court awards from the settlement fund. You are not responsible for any fees or expenses that the Court awards.

# OBJECTING TO THE PROPOSED SETTLEMENT

You can tell the Court that you don't agree with the Settlement or some part of it.

| 16. | How do I tell the Court that I don't like the Settlement? |
|---|---|

If you are a Class Member, you can object to this Settlement if you do not like any part of it, including the forthcoming motion for attorneys' fees, costs and service awards. You can give reasons why you think the Court should not approve it. The Court will consider your view. To object, you must file or send a written objection to the Court, as instructed by the Court, by **October 28, 2024** or you will waive your right to object (whether in opposition to the motion for Preliminary Approval, motion for attorneys' fees, costs and service awards, motion for Final Approval, on appeal, or otherwise) to the Settlement. Be sure to include the case name and number (*Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB*), your name, address, telephone number, your signature, and the reasons you object to the Settlement.

**You must file any objection with the Clerk of the Court at the address below by October 28, 2024:**

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 80 of 282

United States District Court for the Western District of Missouri
400 E. 9th St., Room 7462, Kansas City, Missouri 64106
*Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB*

**You must also send your objection by first class mail, postmarked on or before October 28, 2024,** to Class Counsel and Defendant's Counsel. These documents should be mailed to Class Counsel at:

Williams Dirks Dameron LLC
c/o Eric Dirks
1100 Main Street, Suite 2600
Kansas City MO 64105

and to NAR Counsel at:

Ethan Glass
Cooley LLP
1299 Pennsylvania Ave. NW #700
Washington, DC 20004

Any member of the Settlement Class who does not file and serve an objection in the time and manner described above will not be permitted to raise that objection later.

| 17. | What's the difference between objecting and excluding? |
|---|---|

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to a Settlement only if you stay in it. Excluding yourself is telling the Court that you do not want to be part of a Settlement. If you exclude yourself, you have no basis to object because the Settlement no longer affects you.

# THE COURT'S FAIRNESS HEARING

| 18. | When and where will the Court decide whether to approve the Settlement? |
|---|---|

There will be a final Fairness Hearing to consider approval of the proposed Settlement, **at 1:30 PM on November 26, 2024** at the United States District Court for the Western District of Missouri, 400 E. 9th St., Courtroom 7B, Kansas City, Missouri 64106. The hearing may be postponed to a later date without further notice. Any such postponements will be posted on the Court docket and/or settlement website at www.RealEstateCommissionLitigation.com. The purpose of the hearing is to determine the fairness, reasonableness, and adequacy of the terms of the Settlement, whether the Settlement Class is adequately represented by the Plaintiffs and Class Counsel, and whether an order and final judgment should be entered approving the proposed Settlement. The Court will also consider Class Counsel's application for an award of attorneys' fees and expenses, and any class representative service awards.

You will be represented by Class Counsel at the Fairness Hearing unless you choose to enter an appearance in person or through your own counsel. The appearance of your own attorney is not necessary to participate in the Fairness Hearing.

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 81 of 282

| 19. | Do I have to come to the hearing? |
|---|---|

No. Class Counsel will represent the Settlement Class at the Fairness Hearing, but you are welcome to come at your own expense. If you send any objection, you do not have to come to Court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend if you wish.

| 20. | May I speak at the hearing? |
|---|---|

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *Burnett et al. v. The National Association of Realtors et al.*, Case No. 19-CV-00332-SRB." Be sure to include your name, address, telephone number and your signature. Your Notice of Intention to Appear must be postmarked no later than **October 28, 2024**, and be sent to the Clerk of the Court, Class Counsel and Counsel for NAR, at the addresses in Section 16. You cannot speak at the hearing if you excluded yourself.

# ARE THERE OTHER REAL ESTATE COMMISSIONS LAWSUITS OR OTHER DEFENDANTS?

| 21. | Are there other similar cases? |
|---|---|

In addition to *Burnett*, there are numerous other actions involving similar claims, including: *Moehrl et al. v. Nat'l Ass'n of Realtors et al.*, Case No. 1:19-cv-01610 (N.D. Ill.); *Gibson et al. v. Nat'l Ass'n of Realtors et al.*, Case No. 23-CV-788-SRB (W.D. Mo.); *Nosalek v. MLS Property Information Network, Inc. et al.*, Case No. 20-CV-12244-PBS (D. Mass.); *Batton v. NAR*, Case No. 1:21-cv-00430 (N.D. Ill.); *Batton v. Compass*, Case No. 1:23-cv-15618 (N.D. Ill.); *Burton v. Nat'l Ass'n Realtors*, Case No. 7:23-cv-05666-JD (D.S.C.); *QJ Team, LLC and Five Points Holdings, LLC v. Texas Ass'n of Realtors*, Case No. 4:23-cv-01013 (E.D. Tx.); *March v. REBNY*, Case No. 1:23-cv-09995 (S.D.N.Y.); *1925 Hooper LLC v. Nat'l Ass'n of Realtors*, Case No. 1:23-cv-05392-SEG (N.D. Ga.); *Moratis v. West Penn Multi-List, Inc.*, Case No. 2:23-cv-2061 (W.D. Pa.); *Parker Holding Group, LLC v. Fla. Ass'n of Realtors*, 23-TC-187328252 (Fla. Cir. Ct.); *Grace v. Nat'l Ass'n of Realtors*, Case No. 3:23-cv-06352 (N.D. Cal.); *Masiello v. Arizona Association of Realtors*, Case No. 2:24-cv-00045 (D. Ariz.); *Tuccori v. At World Properties, LLC*, Case No. 2:24-cv-00150 (N.D. Ill.); *Whaley v. Nat'l Ass'n of Realtors*, Case No. 2:24-cv-00105 (D. Nev.); *Fierro v. National Association of Realtors*, Case No. 2:24-cv-00449 (C.D. Cal.); *Friedman v. REBNY et al.*, Case No. 1:23-cv-00405 (S.D.N.Y.); *Willsim Latham v. MetroList*, Case No. 2:24-cv-00244 (E.D. Cal.); *Maslanka v. Baird & Warner Inc.*, 1:24-cv-02399 (N.D. Ill.); *Peiffer v. Latter & Blum Holding, LLC, et al.,* Case No. 2:24-cv-00557 (E.D. La.); *Wang v. Nat'l Ass'n of Realtors et al.*, Case No. 1:24-cv-02371 (S.D.N.Y.); *Jutla v. Redfin Corporation*, 2:24-cv-00464 (W.D. Wash.); *Hartz v. Real Estate One, Inc.*, 1:24-cv-03160 (N.D. Ill.); *Wutsch v. William Raveis Real Estate, Inc.*, FST-CV-24-6067981-S (Conn. Super. Ct.); *Burton v. Bluefield Realty*, Case No. 7:24−cv−01800-JDA (D.S.C.); *1925 Hooper LLC v. Watson Realty Corp.*, Case No. 3:24-cv-00374 (M.D. Fla.); *1925 Hooper LLC v. Arc Realty*, 24-cv-00495 (N.D. Ala.); *Wallach v. Silvercreek Realty Group LLC*, Case No. 1:24-cv-3356 (N.D. Ill.); *Lutz v. Homeservices of America, Inc., et al.* 4:24-cv-10040-KMM (S.D. Fla.); *Davis v. Hanna Holdings, Inc.* 2:24-cv-02374 (E.D. Pa.); among others. The Settlement may release any claims against NAR asserted on behalf of plaintiffs or members of the putative classes in those cases. But the Settlement

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 82 of 282

may not release claims against other unaffiliated Defendants in those cases. If you are a member of a class in any other cases involving similar claims, you may have additional rights to participate in or exclude yourself from ongoing litigation or settlements in those cases.

# GETTING MORE INFORMATION

| 22. | Are there more details available? |
|---|---|

This Notice is only a summary. For a more detailed statement of the matters involved in the lawsuits or the Settlement, you may refer to the papers filed in this case during regular business hours at the office of the Clerk of Court, United States District Court for the Western District of Missouri, 400 E. 9th St, Kansas City, Missouri 64106: *Burnett et al. v. The National Association of Realtors et al.*, Case No. 19-CV-00332-SRB. The full Settlement Agreement and certain pleadings filed in the case are also available at www.RealEstateCommissionLitigation.com, or they can be requested from Class Counsel, identified above / or Settlement Administrator, at: contact information from question 8.

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 83 of 282

# - EXHIBIT C -

**RESIDENTIAL REAL ESTATE BROKER COMMISSIONS
ANTITRUST SETTLEMENT**

## <u>NOTICE OF PROPOSED SETTLEMENT WITH
HOMESERVICES FOR $250 MILLION</u>

**If you sold a home and paid a commission to a real estate agent,
then you *may* be part of a class action settlement.**

**Please read this Notice carefully because it may affect your legal rights.**

*Para una notificación en español, visite www.RealEstateCommissionLitigation.com.*

*A federal court has ordered this Notice. It is not from a lawyer, and you are not being sued.*

- This Settlement resolves claims against HomeServices of America, Inc., BHH Affiliates, LLC, Long & Foster Companies, Inc., and HSF Affiliates, LLC (together, "HomeServices" and also known as "Berkshire Hathaway HomeServices") in several lawsuits alleging the existence of an anticompetitive agreement that resulted in home sellers paying inflated commissions to real estate brokers or agents in violation of antitrust law. In addition to releasing the claims in these lawsuits, this Settlement releases all Released Claims that any Settlement Class members have against HomeServices regardless of whether that Settlement Class member has already brought suit and regardless of whether the Settlement Class member also was a homebuyer during the Applicable Date Ranges.

- The current value of all settlements with HomeServices and other Defendants is over **$980 million**.

- To be eligible to receive the benefits of the Settlement, you must have: (1) sold a home during the Eligible Date Range (see below); (2) listed the home that was sold on a multiple listing service ("MLS") anywhere in the United States; and (3) paid a commission to any real estate brokerage in connection with the sale of the home. The Eligible Date Range depends on which MLS you listed your home for sale on. The terms "multiple listing service" and "MLS" encompass multiple listing services nationwide, regardless of whether they are affiliated with NAR or not, including, for example, NWMLS, WPMLS, and REBNY/RLS.

- If you have already submitted a claim form in this case for a prior settlement with other Defendants on the website: www.RealEstateCommissionLitigation.com, you do not need to submit another claim form. You may be eligible for a share of multiple settlements. With one claim form, you will receive your share of each settlement that you are eligible for.

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 86 of 282

| What Eligible Date Ranges apply to me? | |
|---|---|
| **Where was my home listed?** | **Applicable Date Range** |
| Heartland MLS (encompassing the Kansas City metropolitan area, counties in eastern Kansas, counties in southwest Missouri, and counties in northwest Missouri);<br><br>MARIS MLS (encompassing the St. Louis metropolitan area, counties in eastern Missouri, and counties in western Illinois);<br><br>Columbia Board of Realtors MLS (encompassing Columbia, Missouri and its surrounding areas); *or*<br><br>Southern Missouri Regional MLS (encompassing Springfield and Joplin, Missouri and their surrounding areas). | April 29, 2014 through August 17, 2024 |
| Bright MLS (Delaware, Baltimore, Maryland area, District of Columbia, parts of New Jersey, Philadelphia, Pennsylvania area, Richmond, Virginia areas, parts of West Virginia);<br><br>Carolina/Canopy MLS (Charlotte, North Carolina area, including portions of South Carolina);<br><br>Triangle MLS (Research Triangle Area, North Carolina);<br><br>Stellar MLS (Tampa, Orlando, and Sarasota, Florida areas);<br><br>Miami MLS (Miami, Florida area);<br><br>Florida Gulf Coast (Fort Myers, Florida area);<br><br>Metro MLS (parts of Wisconsin, including the Milwaukee areas);<br><br>Yes MLS/MLS Now (Cleveland, Ohio, Eastern Ohio, and parts of West Virginia);<br><br>Columbus Realtors MLS (Columbus, Ohio areas);<br><br>Northstar MLS (Minnesota, Wisconsin);<br><br>Wasatch Front/Utah Real Estate (Salt Lake City, Utah area);<br><br>REcolorado/Metrolist (Denver, Colorado area);<br><br>Pikes Peak MLS (Colorado Springs, Colorado area);<br><br>GLVAR MLS (Las Vegas, Nevada area);<br><br>SABOR (San Antonio, Texas area);<br><br>ACTRIS/ABOR (Austin, Texas area);<br><br>HAR MLS (Houston, Texas area);<br><br>NTREIS (Dallas, Texas area);<br><br>ARMLS (Phoenix, Arizona area); and<br><br>Realcomp II (Detroit, Michigan area) | March 6, 2015 through August 17, 2024 |

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

2

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 87 of 282

| What Eligible Date Ranges apply to me? | |
|---|---|
| **Where was my home listed?** | **Applicable Date Range** |
| MLS PIN (Massachusetts) | December 17, 2016 through August 17, 2024 |
| Any MLS in the United States other than the MLSs listed above | October 31, 2019 through August 17, 2024 |

Your Legal rights are affected whether or not you act. ***Please read this Notice carefully***

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM BY MAY 9, 2025** | The only way to get a payment. |
| **ASK TO BE EXCLUDED BY OCTOBER 28, 2024** | If you do not want to be included in this Settlement with HomeServices, you must exclude yourself. This is called "opting out." This is the only option that allows you to sue HomeServices for these same issues again. |
| **OBJECT BY OCTOBER 28, 2024** | You may write to the Court about why you don't like the proposed Settlement. You cannot object if you opt-out. |
| **GO TO A HEARING ON NOVEMBER 26, 2024** | You may ask to speak in Court about the fairness of the proposed Settlement with HomeServices. |
| **DO NOTHING** | If you do nothing and the Court approves the proposed Settlement, you will get no payment. You will not be able to sue HomeServices for these same issues again**.** |

- These rights and options – **and the deadlines to exercise them** – are explained in this Notice.

- The Court in charge of this case still has to decide whether to approve the proposed Settlement. Payments will be made if the Court approves the Settlement and after appeals are resolved. Please be patient.

- Along with this proposed settlement with HomeServices, other proposed settlements have been reached with Anywhere, RE/MAX, Keller Williams, the National Association of Realtors, Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, United Real Estate, and certain of their affiliates. Some of those settlements have already received final approval from the District Court. Additional settlements may be reached with other Defendants. See www.RealEstateCommissionLitigation.com for more information about these settlements and any additional settlements. You may not receive any additional written notice about

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 88 of 282

future Settlements, so it is important that you continue to check the website to stay up to date.

# BASIC INFORMATION

| 1. | Why did I get this notice? |
|---|---|

This Notice has been posted for the benefit of potential members of the Settlement Class. If you are uncertain about whether you are a member of the Settlement Class, you may contact the Settlement Administrator at 888-995-0207.

This Notice has been posted because members of the Settlement Class have a right to know about the proposed settlement of class action lawsuits in which they are class members, and about all of their options, before the Court decides whether to approve the Settlement. If the Court approves the Settlement, and after objections or appeals relating to the Settlement are resolved, the benefits provided by the Settlement will be available to members of the Class.

This Notice explains the lawsuits, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them. A full copy of the Settlement Agreement may be viewed at the settlement website: www.RealEstateCommissionLitigation.com. This Notice contains only a summary of the Settlement.

The Court in charge of the Settlement is the United States District Court for the Western District of Missouri. The case before this Court is known as *Burnett et al. v. National Association of Realtors, et al.*, Case No. 19-CV-00332-SRB ("Burnett"). The people who filed this lawsuit are called the Plaintiffs. The people being sued are called the Defendants. Defendants in the *Burnett* action include The National Association of Realtors ("NAR") and the following large real estate brokerage firms: Anywhere, RE/MAX, Keller Williams, and HomeServices. Of these Defendants, this Settlement concerns only HomeServices. Notice of additional settlements is also available on the settlement website: www.RealEstateCommissionLitigation.com.

This Settlement also resolves claims against HomeServices raised in other lawsuits involving alleged anticompetitive conduct, including but not limited to: *Moehrl et al. v. National Association of Realtors et al.,* Case No. 1:19-cv-01610-ARW (Northern District of Illinois) ("Moehrl"); *Umpa v. National Association of Realtors, et al.,* Case No. 4:23-cv-00945 (W.D. Missouri) ("Umpa"); and *Gibson v. National Association of Realtors et al.*, Case No. 23-CV-788-SRB (Western District of Missouri) ("Gibson").

| 2. | What are the lawsuits about? |
|---|---|

The lawsuits claim that Defendants, including HomeServices, created and implemented rules that require home sellers to pay commissions to the broker or agent representing the buyer and that caused home sellers to pay total commissions at inflated rates. They also allege that Defendants enforced these rules through anticompetitive and unlawful practices.

The lawsuits claim that these rules are anticompetitive and unfair, and that they violate antitrust laws. You can read Plaintiffs' complaints at www.RealEstateCommissionLitigation.com. Specifically, the lawsuits allege violations of the Sherman Act (a federal antitrust statute found at

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 89 of 282

15 U.S.C. § 1 *et seq.*) among other things. The Sherman Act claims apply to home sales that occurred anywhere in the United States during the Eligible Date Range.

| 3. | Has the Court decided who is right? |
|---|---|

Although the *Burnett* Court has authorized notice to be given of the proposed Settlement, this Notice does not express the opinion of the Court on the merits of the claims or defenses asserted by either side of the lawsuits.

HomeServices disputes Plaintiffs' allegations and denies all liability to Plaintiffs and the Class in the *Burnett*, *Moehrl*, and *Gibson* lawsuits. You can read the Answer filed by HomeServices in the *Burnett* lawsuit here: www.RealEstateCommissionLitigation.com.

On October 31, 2023, a jury found in favor of Plaintiffs in the *Burnett* action. The parties entered into this proposed Settlement on August 7, 2024, after that verdict.

| 4. | Why are these cases class actions? |
|---|---|

In a class action, one or more people called Class Representatives sue on behalf of other people who have similar claims. The people together are a "Class" or "Class Members." The consumers who sued Defendants — and all the Class Members like them — are called Plaintiffs. The companies they sued are called the Defendants. One court resolves the issues for everyone in the Class – except for those who choose to exclude themselves from the Class.

Here, the *Burnett* Court decided that a class can be certified for settlement purposes because it preliminarily meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts. Specifically, the Court found that: (1) there are numerous people who fit the class definition; (2) there are legal questions and facts that are common to each of them; (3) the Plaintiffs' claims are typical of the claims of the rest of the Class; (4) Plaintiffs, and the lawyers representing the Class, will fairly and adequately represent the Class Members' interests; (5) the common legal questions and facts are more important than questions that affect only individuals; and (6) class treatment will be more efficient than having individual lawsuits.

| 5. | Why are there settlements? |
|---|---|

Although Plaintiffs prevailed at trial in the *Burnett* action, HomeServices indicated that it would appeal the jury's verdict. Counsel for the Settlement Class investigated the facts and applicable law regarding Plaintiffs' claims and Defendants' defenses, the potential issues on appeal, and HomeServices' ability to pay. The parties engaged in lengthy arms-length negotiations to reach the Settlement. Plaintiffs and Counsel for the Settlement Class believe that the proposed Settlement is fair, reasonable, and adequate, and in the best interest of the Class.

Both sides agree that by settling, HomeServices is not admitting any liability or that it did anything wrong. Both sides want to avoid the uncertainties and expense of further litigation.

# WHO IS IN THE SETTLEMENT?

| 6. | How do I know if I am a part of the Settlement? |
|---|---|

You are a part of the Settlement Class if you: (1) sold a home during the Eligible Date Range (as defined above); (2) listed the home that was sold on a multiple listing service (as defined above) anywhere in the United States; and (3) paid a commission to a real estate brokerage in connection

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

5

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 90 of 282

with the sale of the home. Note that you are part of the Settlement Class if you meet all three of these conditions, regardless of whether you also were a buyer within the Applicable Date Ranges. If you are uncertain as to whether you are a member of the Settlement Class, you may contact the Settlement Administrator at 888-995-0207 to find out.

# THE SETTLEMENT BENEFITS

| 7. | What does the Settlement provide? |
|---|---|

If you are a member of the Settlement Class, you are eligible to receive a benefit under the Settlement.

HomeServices has agreed to pay $250,000,000 into a settlement fund. The current value of all settlements with HomeServices and other Defendants is over $980 million. The fund will be distributed to qualifying Settlement Class Members who submit an approved claim form, after any awarded attorneys' fees, expenses, settlement administration costs, and service awards have been deducted.

HomeServices has also agreed to implement Practice Changes and provide Cooperation. You can learn more about the Practices Changes and Cooperation in the Settlement Agreements, which are available at www.RealEstateCommissionLitigation.com.

# HOW YOU GET A PAYMENT – SUBMITTING A CLAIM FORM

| 8. | How can I get a benefit? |
|---|---|

*Note: If you have already submitted a claim form in this litigation for a prior settlement with other Defendants through the website: www.RealEstateCommissionLitigation.com, you do not need to submit another claim form. With one claim form, you will receive your share of each settlement that you are eligible for.*

To receive a benefit, a Settlement Class Member must submit a claim form with information pertaining to and/or evidence of your home sale and commissions paid to the Notice and Claims Administrator. The Notice and Claims Administrator will be responsible for reviewing all claim forms and evidence of purchase to determine whether a claim is an approved claim. The Notice and Claims Administrator will reject any claim that is not: (a) submitted timely and in accordance with the directions on the claim form, the provisions of this Settlement Agreement, and the Preliminary Approval Order; (b) fully and truthfully completed by a Settlement Class Member or their representative with all of the information requested in the claim form; and (c) signed by the Settlement Class Member. Claims that cannot be confirmed by the Settlement Administrator may be subject to challenge, nonpayment, or a reduced share of the available funds.

You can submit a claim form by clicking this link, or by printing off the claim form from this website and returning it to the Settlement Administrator via mail or email on or before May 9, 2025.

*Burnett et al. v. The National Association of Realtors et al.*
c/o JND Legal Administration
PO Box 91479
Seattle, WA 98111

Email: info@RealEstateCommissionLitigation.com

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 91 of 282

| 9. | When would I get my benefit? |
|---|---|

The Court will hold a final Fairness Hearing **at 1:30 PM on November 26, 2024**, in the United States District Court for the Western District of Missouri, 400 E. 9th St., Courtroom 7B, Kansas City, Missouri 64106, to decide whether to finally approve the Settlement. If the Settlement is approved, there may be appeals. Payments to members of the Settlement Class will be made only if the Settlement is approved and after any claims period and appeals are resolved. This may take some time, so please be patient.

| 10. | What am I giving up to get a benefit? |
|---|---|

Upon the Court's approval of the proposed Settlement, all members of the Settlement Class who do not exclude themselves (as well as their representatives) will release HomeServices (and its affiliates, subsidiaries, franchisees, employees, and certain others as specified in the Settlement Agreements).

All members of the Settlement Class who do not exclude themselves will release claims whether known or unknown that they ever had, now have, or hereafter may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. "Released Claims" means any and all manner of claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home (including claims as a seller, buyer, or otherwise), regardless of whether the claim has been brought. The release does not extend to any individual claims that a Class Member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue.

This release may affect your rights, and may carry obligations, in the future. To view terms of the release, review the Settlement Agreement, which is available at www.RealEstateCommissionLitigation.com.

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you do not want a payment from the Settlement, and you want to keep the right to sue or continue to sue HomeServices and affiliated entities on your own about the legal issues in these cases, then you must take steps to get out. This is called excluding yourself—or is sometimes referred to as opting out of the Settlement Class.

| 11. | How do I ask to be excluded? |
|---|---|

To ask to be excluded, you must execute and send a Request for Exclusion to the Settlement Administrator postmarked on or before the end of **October 28, 2024**. A Request for Exclusion must be personally signed by each potential Settlement Class Member requesting exclusion. Additionally, a Request for Exclusion must include the potential Settlement Class Member's present name and address, a clear and unequivocal statement that the potential Settlement Class Member wishes to be excluded from the Settlement Class as to HomeServices, and the signature of the putative Settlement Class Member or, in the case of a potential Settlement Class Member

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 92 of 282

who is deceased or incapacitated only, the signature of the legally authorized representative of the putative Settlement Class Member.

*Note: if you did not exclude yourself from previous settlements, you may still exclude yourself from this Settlement.*

If the request is not postmarked on or before **October 28, 2024**, your exclusion will be invalid, and you will be bound by the terms of the Settlement approved by the Court, including without limitation, the judgment ultimately rendered in the case, and you will be barred from bringing any claims against HomeServices or those affiliated with HomeServices outlined in paragraph 10 above which arise out of or relate in any way to the claims in the case as specified in the release referenced in paragraph 10 above.

You must mail your Exclusion Request to:

*Burnett et al. v. The National Association of Realtors et al.*
c/o JND Legal Administration – Exclusion Dpt.
PO Box 91486
Seattle, WA 98111

| **12.** | **If I don't exclude myself, can I sue HomeServices for the same thing later?** |
|---|---|

No. Unless you exclude yourself, you give up any right to sue HomeServices and those affiliated with HomeServices for the claims that the Settlement resolves. If you have a pending lawsuit against HomeServices or certain affiliated entities such as MLSs or small brokers, speak to your lawyer in that case immediately. You may have to exclude yourself from this Class to continue your own lawsuit. Remember, the exclusion deadline is **October 28, 2024**.

| **13.** | **If I exclude myself, can I get benefits from the Settlements?** |
|---|---|

No. If you exclude yourself as to the HomeServices Settlement, do not send in a claim form to ask for any money. If you exclude yourself only as to HomeServices, you may still ask for money from the Settlements with other Defendants. If you exclude yourself as to HomeServices, you may sue, continue to sue, or be a part of a different lawsuit against HomeServices.

# THE LAWYERS REPRESENTING YOU

| **14.** | **Do I have a lawyer in this Settlement?** |
|---|---|

The Court decided that the law firms Ketchmark and McCreight P.C.; Williams Dirks Dameron LLC; Boulware Law LLC; Hagens Berman Sobol Shapiro LLP; Cohen Milstein Sellers & Toll PLLC; and Susman Godfrey LLP, are qualified to represent you and all other Settlement Class Members. These lawyers are called "Class Counsel." You will not be charged for these lawyers. They are experienced in handling similar cases against other entities. More information about the law firms, their practices, and their lawyers' experience is available at: www.kansascitylawoffice.com, www.williamsdirks.com, www.boulware-law.com, www.hbsslaw.com, www.cohenmilstein.com, and www.susmangodfrey.com.

Class Counsel represent the interests of the Settlement Class. You may hire your own attorney to advise you, but if you hire your own attorney, you will be responsible for paying that attorney's fees.

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 93 of 282

| 15. | How will the lawyers be paid? |
|-----|-------------------------------|

Class Counsel will ask the Court for attorneys' fees, in an amount not to exceed one-third (33.33%) of the settlement fund, plus out-of-pocket expenses incurred during the case. The Court may award less. Class Counsel may also seek compensation for each current and/or former class representative in the actions captioned *Burnett et al. v. The National Association of Realtors et al.*, Case No. 19-CV-00332-SRB, pending in the Western District of Missouri; *Moehrl et al. v. The National Association of Realtors*, Case No. 19-CV-01610-ARW, pending in the Northern District of Illinois; and *Gibson v. National Association of Realtors et al.*, Case No. 23-CV-788-SRB, pending in the Western District of Missouri.

The Class Representatives will make their request for attorneys' fees, costs, and service awards on or before **September 13, 2024**, and that request will be published at www.RealEstateCommissionLitigation.com.

HomeServices will pay the fees and expenses that the Court awards from the settlement fund. You are not responsible for any fees or expenses that the Court awards.

# OBJECTING TO THE PROPOSED SETTLEMENT

You can tell the Court that you don't agree with the Settlement or some part of it.

| 16. | How do I tell the Court that I don't like the Settlement? |
|-----|-----------------------------------------------------------|

If you are a Class Member, you can object to this Settlement if you do not like any part of it, including the forthcoming motion for attorneys' fees, costs and service awards. You can give reasons why you think the Court should not approve it. The Court will consider your view. To object, you must file or send a written objection to the Court, as instructed by the Court, by **October 28, 2024,** or you will waive your right to object (whether in opposition to the motion for Preliminary Approval, motion for attorneys' fees, costs and service awards, motion for Final Approval, on appeal, or otherwise) to the Settlement. Be sure to include the case name and number (*Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB*), your name, address, telephone number, your signature, and the reasons you object to the Settlement.

**You must file any objection with the Clerk of the Court at the address below by October 28, 2024:**

United States District Court for the Western District of Missouri
400 E. 9th St., Room 7462, Kansas City, Missouri 64106
*Burnett et al. v. The National Association of Realtors et al., Case No. 19-CV-00332-SRB*

**You must also send your objection by first class mail, postmarked on or before October 28, 2024,** to Class Counsel and Defendant's Counsel. These documents should be mailed to Class Counsel at:

Williams Dirks Dameron LLC
c/o Eric Dirks
1100 Main Street, Suite 2600

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Kansas City MO 64105

and to HomeServices Counsel at:

Gibson Dunn & Crutcher LLP
c/o Christopher Dusseault
333 South Grand Ave
Los Angeles, CA 90071-3197

Any member of the Settlement Class who does not file and serve an objection in the time and manner described above will not be permitted to raise that objection later.

| 17. | What's the difference between objecting and excluding? |

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to a Settlement only if you stay in it. Excluding yourself is telling the Court that you do not want to be part of a Settlement. If you exclude yourself, you have no basis to object because the Settlement no longer affects you.

# THE COURT'S FAIRNESS HEARING

| 18. | When and where will the Court decide whether to approve the Settlement? |

There will be a final Fairness Hearing to consider approval of the proposed Settlement, **at 1:30PM on November 26, 2024,** at the United States District Court for the Western District of Missouri, 400 E. 9th St., Courtroom 7B, Kansas City, Missouri 64106. The hearing may be postponed to a later date without further notice. Any such postponements will be posted on the Court docket and/or settlement website at www.RealEstateCommissionLitigation.com. The purpose of the hearing is to determine the fairness, reasonableness, and adequacy of the terms of the Settlement, whether the Settlement Class is adequately represented by the Plaintiffs and Class Counsel, and whether an order and final judgment should be entered approving the proposed Settlement. The Court will also consider Class Counsel's application for an award of attorneys' fees and expenses, and any class representative service awards.

You will be represented by Class Counsel at the Fairness Hearing unless you choose to enter an appearance in person or through your own counsel. The appearance of your own attorney is not necessary to participate in the Fairness Hearing.

| 19. | Do I have to come to the hearing? |

No. Class Counsel will represent the Settlement Class at the Fairness Hearing, but you are welcome to come at your own expense. If you send any objection, you do not have to come to Court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend if you wish.

| 20. | May I speak at the hearing? |

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *Burnett et al. v. The National Association of Realtors et al.*, Case No. 19-CV-00332-SRB." Be sure to include your name, address, telephone number and your signature. Your Notice of Intention to Appear must be

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

16

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 95 of 282

postmarked no later than **October 28, 2024**, and be sent to the Clerk of the Court, Class Counsel and Counsel for HomeServices, at the addresses in Section 16. You cannot speak at the hearing if you excluded yourself.

# ARE THERE OTHER REAL ESTATE COMMISSIONS LAWSUITS OR OTHER DEFENDANTS?

| 21. | Are there other similar cases? |
| --- | --- |

In addition to *Burnett*, there are numerous other actions involving similar claims, including: *Moehrl et al. v. Nat'l Ass'n of Realtors et al.,* Case No. 1:19-cv-01610 (N.D. Ill.); *Gibson et al. v. Nat'l Ass'n of Realtors et al.*, Case No. 23-CV-788-SRB (W.D. Mo.); *Nosalek v. MLS Property Information Network, Inc. et al.*, Case No. 20-CV-12244-PBS (D. Mass.); *Batton v. NAR*, Case No. 1:21-cv-00430 (N.D. Ill.); *Batton v. Compass*, Case No. 1:23-cv-15618 (N.D. Ill.); *Burton v. Nat'l Ass'n Realtors*, Case No. 7:23-cv-05666-JD (D.S.C.); *QJ Team, LLC and Five Points Holdings, LLC v. Texas Ass'n of Realtors*, Case No. 4:23-cv-01013 (E.D. Tx.); *March v. REBNY*, Case No. 1:23-cv-09995 (S.D.N.Y.); *1925 Hooper LLC v. Nat'l Ass'n of Realtors*, Case No. 1:23-cv-05392-SEG (N.D. Ga.); *Moratis v. West Penn Multi-List, Inc.*, Case No. 2:23-cv-2061 (W.D. Pa.); *Parker Holding Group, LLC v. Fla. Ass'n of Realtors*, 23-TC-187328252 (Fla. Cir. Ct.); *Grace v. Nat'l Ass'n of Realtors*, Case No. 3:23-cv-06352 (N.D. Cal.); *Masiello v. Arizona Association of Realtors*, Case No. 2:24-cv-00045 (D. Ariz.); *Tuccori v. At World Properties, LLC*, Case No. 2:24-cv-00150 (N.D. Ill.); *Whaley v. Nat'l Ass'n of Realtors*, Case No. 2:24-cv-00105 (D. Nev.); *Fierro v. National Association of Realtors*, Case No. 2:24-cv-00449 (C.D. Cal.); *Friedman v. REBNY et al.*, Case No. 1:23-cv-00405 (S.D.N.Y.); *Willsim Latham v. MetroList*, Case No. 2:24-cv-00244 (E.D. Cal.); *Maslanka v. Baird & Warner Inc.*, 1:24-cv-02399 (N.D. Ill.); *Peiffer v. Latter & Blum Holding, LLC, et al.,* Case No. 2:24-cv-00557 (E.D. La.); *Wang v. Nat'l Ass'n of Realtors et al.*, Case No. 1:24-cv-02371 (S.D.N.Y.); *Jutla v. Redfin Corporation*, 2:24-cv-00464 (W.D. Wash.); *Hartz v. Real Estate One, Inc.*, 1:24-cv-03160 (N.D. Ill.); *Wutsch v. William Raveis Real Estate, Inc.*, FST-CV-24-6067981-S (Conn. Super. Ct.); *Burton v. Bluefield Realty*, Case No. 7:24−cv−01800-JDA (D.S.C.); *1925 Hooper LLC v. Watson Realty Corp*., Case No. 3:24-cv-00374 (M.D. Fla.); *1925 Hooper LLC v. Arc Realty*, 24-cv-00495 (N.D. Ala.); *Wallach v. Silvercreek Realty Group LLC*, Case No. 1:24-cv-3356 (N.D. Ill.); *Lutz v. Homeservices of America, Inc., et al.* 4:24-cv-10040-KMM (S.D. Fla.); *Davis v. Hanna Holdings, Inc.* 2:24-cv-02374 (E.D. Pa.); among others. The Settlement may release any claims against HomeServices asserted on behalf of plaintiffs or members of the putative classes in those cases. But the Settlement may not release claims against other unaffiliated Defendants in those cases. If you are a member of a class in any other cases involving similar claims, you may have additional rights to participate in or exclude yourself from ongoing litigation or settlements in those cases.

# GETTING MORE INFORMATION

| 22. | Are there more details available? |
| --- | --- |

This Notice is only a summary. For a more detailed statement of the matters involved in the lawsuits or the Settlement, you may refer to the papers filed in this case during regular business hours at the office of the Clerk of Court, United States District Court for the Western District of

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB    Document 1595-7    Filed 11/20/24    Page 96 of 282

Missouri, 400 E. 9th St, Kansas City, Missouri 64106: *Burnett et al. v. The National Association of Realtors et al.*, Case No. 19-CV-00332-SRB. The full Settlement Agreement and certain pleadings filed in the case are also available at www.RealEstateCommissionLitigation.com, or they can be requested from Class Counsel, identified above / or Settlement Administrator, at contact information from question 8.

*Questions? Call 888-995-0207 or visit www.RealEstateCommissionLitigation.com to learn more.*

Case 4:19-cv-00332-SRB     Document 1595-7     Filed 11/20/24     Page 97 of 282

**- EXHIBIT D -**

# REAL ESTATE BROKER COMMISSION CLAIM FORM

You may be eligible to receive compensation if you (1) sold a home during the Eligible Date Range; (2) listed the home on a multiple listing service anywhere in the United States; and (3) paid a commission to a real estate agent or broker in connection with the sale of the home. Please refer to the Settlement Notice or visit www.RealEstateCommissionLitigation.com to determine the Eligible Date Ranges.

## The Easiest Way to File is Online at www.RealEstateCommissionLitigation.com.

---

# INSTRUCTIONS FOR COMPLETING THIS CLAIM FORM

---

1. Before completing this Claim Form, please review the Settlement Notice, which is available at www.RealEstateCommissionLitigation.com.

2. Please complete all information requested below. If the information you provide is incomplete, your claim may be rejected.

3. If you sold multiple homes during the Eligible Date Ranges, you will need to submit multiple forms.

4. Please complete all portions of Section A – Claim Information.

5. Please complete all portions of Section B regarding the sale of your home.

6. Please complete all portions of Section C if you have documentation to support the sale of your home.

7. For Section C, Proof of Payment means originals, copies, or images of closing documents reflecting (i) the sale of your home during the Eligible Date Range where your home was listed on an MLS and (ii) the fees paid to all real estate agent(s) or broker(s) involved in the transaction.

8. Please complete and sign the Attestation at Section D.

9. Timing – Your Claim Form must be mailed to the Settlement Administrator, or submitted online, by **May 9, 2025.** Any claims postmarked or electronically submitted after **May 9, 2025**, will be ineligible for a payment. If you are submitting your claim by mail, please send to:

    Residential Real Estate Broker Commissions Antitrust Settlements
    c/o JND Legal Administration
    PO Box 91479
    Seattle, WA 98111

10. Privacy – The information you provide in the Claim Form will not be disclosed to anyone other than the Settlement Administrator, the Court, and the Parties in this case, and it will be used only for purposes of administering this Settlement (such as to review a claim for completeness, truth, and accuracy).

## SECTION A - CLAIMANT INFORMATION

| First Name | M.I. | Last Name |
|---|---|---|
| | | |

**Current Address** *(Street, City, State, Zip Code)*

| Email Address | Phone Number |
|---|---|
| | |

**Mark the box stating your preferred method of payment:**

☐ Payment via Debit Card - *If selecting this option, please double-check that the <u>email address</u> provided above is correct and current.*

☐ Payment via a Settlement Check - *If selecting this option, please double-check that the <u>address information</u> above is correct and current.*

☐ Payment via Zelle – *If selecting this option, please doublecheck that the <u>email address</u> provided above is correct and current.*

☐ Payment via Venmo – *If selecting this option, please double-check that the <u>phone</u> number provided above is correct and current.*

## SECTION B - SALE INFORMATION

**Please complete the following information to the best of your knowledge.
Claim forms with more complete and accurate information are more likely to be approved and paid.**

| | |
|---|---|
| **Address of home sold:** (include city, state and zip) | |
| **Date of Sale\*:** | |
| **Approximate Home Sale Price:** | |
| **Listing Brokerage:** | |
| **Amount of total Commission paid:** | |
| **Amount of commission paid to buyer-side broker:** | |

\*The Date of Sale may be found on your closing statement, settlement statement, HUD statement, settlement letter, or other transaction documents included during the sale and closing of your home.  If you are unsure of the precise date, you may enter your best estimate of the Date of Sale, date range, or month and year of sale.

## SECTION C – DOCUMENTARY PROOF OF PAYMENT

**Please list in the space below any document(s) you have to support your Proof of Payment.** Documents that support your Proof of Payment may include your closing statement, settlement statement, HUD statement, settlement letter, or other transaction documents included during the sale and closing of your home.

_____

_____

**If you are mailing your Claim Form, please enclose your Proof(s) of Payment.
Claim forms with Proof of Payment are more likely to be approved and paid.**

## SECTION D - ATTESTATION

*By submitting this Claim Form and signing below, I hereby affirm that I am at least 18 years of age and that the information provided above, and in any enclosed Proof of Payment, is true and correct.*

Signature: _____     Date: _____

Print Name: _____

Your claim will be submitted to the Settlement Administrator for review.  If you are eligible for a Cash Award, and the proposed settlement is approved, you will be provided payment in the manner you requested above. This process takes time; please be patient.

**Reminder Checklist:**

✓ Please complete all the information requested above and sign the Claim Form.

✓ Enclose your Proof of Payment, if you have it, along with the Claim Form.

✓ Keep a copy of your Claim Form and supporting documentation for your records.

✓ Your claim must be submitted electronically or postmarked by **May 9, 2025**.

✓ Your claim must be submitted electronically at www.RealEstateCommissionLitigation.com or mailed to: Residential Real Estate Broker Commissions Antitrust Settlements c/o JND Legal Administration, PO Box 91479, Seattle, WA 98111. The easiest way to file your claim is online.

✓ If you have any questions, please visit the website at www.RealEstateCommissionLitigation.com; or call 888-995-0207

✓ Please note that the settlement administrator may contact you to request additional information to process your claim.

- EXHIBIT E -





### dangerous rip currents

Tropical Storm Ernesto became a hurricane again Sunday as it headed further out in the northeastern Atlantic, sending powerful swells toward the U.S. East Coast.

**At least 1 death, many rescues »**

| 3. Marlo Thomas | 8. Russia-Ukraine War |
| 4. George Santos | 9. Prince Harry |
| 5. Mike Lynch | 10. Trayon White |

Inside the 47 crucial seconds that saved Kamala Harris's political career

Phil Donahue, legendary daytime talk show host, dies at 88

Video captures North Carolina home collapsing into ocean

Sixers sign Yabusele, the French Olympic star who dunked over LeBron

Honey, I lost the kids: Is Gen Z done with Disney?

**Home sellers who paid a commission to a real estate agent, may be part of Settlements now totaling**

**Over $980 million**

FILE A CLAIM

#### Stories for you

**US** · Associated Press

**A hunter's graveyard shift: grabbing pythons in the Everglades**

"I catch more pythons when that happens," Aycock explained. Aycock, a contractor with the Florida Fish and Wildlife Conservation Commission, has hunted Burmese pythons in the...

💬 154 · 5 min read

**Ad** · Chilewich

**Chilewich Twist Ocean Small Rug**

Made from woven textiles, our floor mats are durable, versatile beautiful and easy to clean. Perfect for use in entryways, dining areas, bedrooms, living areas and kitchens. TO CLEAN: Vacuum to remo...

**US** · Miami Herald

**'We are going to track you down.' Two Broward students jailed for making school threats**

Here's what we know.

💬 739 · 1 min read

**Weather** — Boynton Beach 📍

| | Today | Tue | Wed | Thu |
|---|---|---|---|---|
| | 91° 79° | 92° 78° | 92° 77° | 89° 77° |

Tey, and Family, Tom ride on weekend, Kevin Smith and Tom sharing daughter Suri, 18, with his ex Katie Holmes.

Despite leading a relatively private life now, Connor grew up in Los Angeles and has worked in the entertainment industry in previous years. He acted alongside Will Smith in the 2008 drama *Seven Pounds*, starred in the 2012 action film *Red Dawn* and released music in 2013.

**The PEOPLE Puzzler crossword is here! How quickly can you solve it? Play now!**

Connor is also a passionate fisherman, with much of his Instagram account dedicated to the activity, though he hasn't posted a photo on his grid since April, 2023.

"We used to go fishing a lot when I was a little kid," he told PEOPLE in 2016. "I'm blessed to travel the world as a young kid and now I'm traveling the world working."



Advertisement

Advertisement


Home sellers who paid a commission to a real estate agent, may be part of Settlements now totaling Over $980 million
FILE A CLAIM

Advertisement

Advertisement

# Los Angeles Times



Solving Steve Martin doesn't take that much guesswork



The makers of 'Alien: Romulus' defend their AI-resurrected Ian Holm: 'We did it all with a lot of respect'



Hannah Einbinder breaks down the Season 3 evolution of her 'Hacks' character

## Election 2024 ›



Why her abbreviated campaign has helped Harris pull into the lead, for now



Column: Democrats are embracing that hopey-changey thing again in Chicago. Will it work?



Abcarian: The role of the post-menopausal female in society? JD Vance has some thoughts



Bibles, cryptocurrency, Truth Social and gold bars: A look at Trump's reported sources of income

## California Living ›



After 25 years, I wanted to quit



L.A. Affairs: I slid into my work



Los Angeles Times News Quiz this




Try today's Crossword



Try this week's News Quiz

ADVERTISEMENT



Home sellers who paid a commission to a real estate agent, may be part of Settlements now totaling Over $980 million

FILE A CLAIM

## Subscribers are Reading ›



2024 PARIS OLYMPICS

Here's how to purchase tickets for 2028 Los Angeles Olympic Games



10:18    huffpost.com

≡ ■■    DNC ≡ LATEST UPDATES    Support Us



Home sellers who paid a commission to a real estate agent, may be part of Settlements now totaling **Over $980 million**

**FILE A CLAIM**

**LATEST NEWS** ————————————



10:19

usatoday.com

Q  **USA TODAY**  ☰

Subscribe   Hi, Rachel

convention, House GOP drops Biden impeachment report

**POLITICS** 9:19 a.m. ET Aug. 19

**LIVE**

**Democratic convention live updates: What to expect – and how to watch**

**ELECTIONS** 9:33 a.m. ET Aug. 19



Home sellers who paid a commission to a real estate agent, *may* be part of Settlements now totaling **Over $980 million**

**FILE A CLAIM**

← → + 5 ···



10:17

aol.com

≡ **Aol.**   Help ∨   ✉   Sign in

proposals come with legal,
feasibility concerns

👤 Reuters

**Biden's Democratic
convention moment: an
opening act, not the main
attraction**

See all politics

Home sellers who paid a commission to a
real estate agent, may be part of Settlements
now totaling **over $980 million**    FILE A CLAIM

▌**Business**

| DOW 30 | 40789.84 | S&P 500 | 5563.05 | NASDAQ |
|--------|----------|---------|---------|--------|
|        | +130.08  |         | +8.80   |        |
| ↑      | +0.32%   | ↑       | +0.16%  | ↑      |

🔵 NBC Universal

←   →   +   5   •••

- EXHIBIT F -





10:34



All   Shorts   Videos   Unwatched   Watched

MoneyCoach · 138K views · 8 years ago

Learn more

**Real Estate Settlements Reached**

Home sellers who paid commission to a Real Estate Agent at any brokerage may file a claim.

**Sponsored** · Class Action Lawsuit

HOMEOWNERS   HO2, HO3,

Home   Shorts   Subscriptions   You











- EXHIBIT G -



Better Homes & Gardens

BHG

+ OUR ALL-TIME
FAVORITE
PUMPKINS

NEW TWISTS
ON CINNAMON

VIBRANT
HARVEST
SOUPS

*It's*
SPOOKY
SEASON

OCTOBER 2024 BHG.COM

into smaller pieces in desired shapes.

**2.** Hot-glue a solid line of dried materials along each of the pumpkin's ribs.

**3.** Glue other materials into a loose design between the ribs. Work in one section at a time.

### 🔴 OWL

**1.** Use a washable marker to draw a rough outline of an owl on the pumpkin.

**2.** On a work surface arrange and layer assorted leaves to make the body, head, tail, and wings.

**3.** Transfer the pieces to the pumpkin. Use a toothpick to put a few drops of craft glue on the back of the body leaf; spread the glue and place leaf on pumpkin, holding leaf in place for a minute before adding the next part. Repeat until all leaves are adhered; let dry.

**4.** Drill three small holes into pumpkin at a very sharp angle above where each eye will be. Cut six short twigs for eyelashes. Add a drop of glue to the end of each twig; insert in holes.

**5.** For the eyes, cut off stems of two flowers to 1 inch long each. Drill small holes, add a drop of glue to each stem, and insert stems, positioning flowers as desired; let dry.

**6.** For the perch, break the branch in half. Drill holes at a horizontal angle into pumpkin on each side level with the owl's tail, *opposite*. Add drops of glue near branch ends and insert into holes; glue along branch as needed to hold in place.



### SOPHISTICATED SPIDERS PUMPKIN

**Materials**
- Foam or real pumpkin
- Drill with 5 mm bit
- Painters tape
- White spray paint
- 22-gauge craft wire in antique brass
- 5 mm dowel
- 5 mm conical battery-operated string lights
- Strong craft glue

**Step-by-Step**

**1.** Thoroughly wash, clean out, and dry pumpkin. Drill holes randomly around pumpkin.

**2.** Tape off the pumpkin stem and spray-paint the pumpkin; let dry.

**3.** While the pumpkin dries, create the spiders. For each spider, cut four 6-inch lengths of wire. Twist the wires together in the middle, then twist the center of the wire bundle around a dowel to form a circle for the body; remove the dowel. Bend individual wires into legs. Repeat until you have one spider for each hole.

**4.** From the inside of the pumpkin, insert lights into the holes. Place wire legs over each light. Add a dab of glue on outside of each to secure. ∎

## LEGAL NOTICE

## Nationwide Settlement reached with the National Association of Realtors

### If you sold a home and paid a commission to a real estate agent, you *may* be part of Settlements totaling

# Over $730 million

*Para una notificación en español, visite www.RealEstateCommissionLitigation.com*

## YOUR RIGHTS AND OPTIONS

▶ **File a Claim by May 9, 2025**

▶ **Exclude yourself ("Opt Out") by October 28, 2024**

▶ **Object by October 28, 2024**

▶ **Attend the Hearing on November 26, 2024 at 1:30 p.m. CT**



## QUESTIONS?

**Call 1-888-995-0207 or visit www.RealEstateCommissionLitigation.com**



- EXHIBIT H -



| Google | Real Estate Broker class action | × | 🎤 | 🔍 | 🔍 |

Claim: Real estate commissions lawsuit settlement notices are legitimate.

Fact check by Verify: True. Real estate commissions...

**NPR**
https://www.npr.org › 2024/03/22 › realtor-fee-commis... ⋮

**If you recently sold your home, you might get part of ...**
Mar 22, 2024 — As part of the **settlement**, the National Association of **Realtors** agreed to pay $418 million over the next four years. That's in addition to $210 ...

**Tampa Bay Times**
https://www.tampabay.com › News › Real Estate ⋮

**How the $1.8 billion Realtors lawsuit could reshape ...**
Nov 21, 2023 — ReMax and Anywhere **real estate** were named as defendants in that case as well, but those companies chose to settle for a combined $140 million.

**Sponsored**

realestatecommissionlitigation.com
https://www.realestatecommissionlitigation.com ⋮

**Real Estate Settlements | Totaling Over $980 Million**
Home sellers who paid commission to a **real estate agent** at any **brokerage** may be affected. Home sellers may get a portion of **real estate**...



People also search for ⋮

| Real estate broker class action payout | 🔍 | NAR lawsuit update today | 🔍 |
| Keller Williams class action lawsuit | 🔍 | NAR settlement how to apply | 🔍 |
| Moehrl lawsuit | 🔍 | NAR settlement who gets the money | 🔍 |
| NAR lawsuit explained | 🔍 | real estate commission litigation.com legit | 🔍 |



2:43

google.com

| Open now | Online appointments | Com legit |

RealEstateNews.com
https://www.realestatenews.com › f...

## Florida commissions lawsuit targets largest state association

Dec 6, 2023 — The details: Filed in the 11th Judicial Circuit Court in Miami-Dade County, this potential class action case accuses Florida Realtors and 16 of ...

Sponsored

realestatecommissionlitigation.com
https://www.realestatecommissionlitigation.com

## Real Estate Settlements | Totaling Over $980 Million

Home sellers who paid commission to a real estate agent at any brokerage may be affected. Home sellers may get a portion of real estate settlements totaling over $980 million. See Key Dates. Get More Information.

| FAQ | File a Claim | Important Documents |

More results ⌄      Follow this search

● Abacoa, Jupiter, FL - Based on your places (Home)

Update location

# - EXHIBIT I -

# EXACT MATCH PICKUP

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 1 | Zeta 92.3 FM | Spanish | United States | Broadcast Media | Multicultural & Demographic |
| 2 | Z106.3 FM | English | United States | Broadcast Media | Media & Information |
| 3 | Yuma Sun, Yuma AZ | English | United States | Newspaper | Media & Information |
| 4 | Yuma Sun, Yuma AZ | English | United States | Newspaper | Media & Information |
| 5 | Your Oregon News, Oregon | English | United States | Newspaper | Media & Information |
| 6 | WZZS-FM 106.9 La Número Uno / WTMY-AM 1280 La Número Uno | Spanish | United States | Broadcast Media | Multicultural & Demographic |
| 7 | WYTV-TV ABC-33 [Youngstown, OH] | English | United States | Broadcast Media | Media & Information |
| 8 | WyoToday, Riverton, Wyoming | English | United States | Newspaper | Media & Information |
| 9 | Wyoming Tribune Eagle, Cheyenne, Wyoming | English | United States | Newspaper | Media & Information |
| 10 | Wyoming Press Association, Casper, Wyoming | English | United States | Newspaper | Media & Information |
| 11 | WXIN-TV FOX-59 [Indianapolis, IN] | English | United States | Broadcast Media | Media & Information |
| 12 | WWZW-FM Classic story96.7 [Lexington, VA] | English | United States | Broadcast Media | Media & Information |
| 13 | WWTI-TV ABC-50 [Watertown, NY] | English | United States | Broadcast Media | Media & Information |
| 14 | WWLP-TV NBC-22 [Springfield, MA] | English | United States | Broadcast Media | Media & Information |
| 15 | WWDW 107.7-FM [Alberta, VA] | English | United States | Broadcast Media | Media & Information |
| 16 | WWDN 104.5 FM [Danville, VA] | English | United States | Broadcast Media | Media & Information |
| 17 | WVNS [Beckley, WV] | English | United States | Broadcast Media | Media & Information |
| 18 | WVLA [Baton Rouge, LA] | English | United States | Broadcast Media | Media & Information |
| 19 | WTWO-TV NBC-2/WAWV-TV ABC-38 MyWabashValley [Terre Haute IN] | English | United States | Broadcast Media | Media & Information |

Press Release - Exact Pickup List of Media Outlets
1

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 20 | WTTV [Indianapolis, IN] | English | United States | Broadcast Media | Media & Information |
| 21 | WTRG 97.9-FM [Weldon, NC] | English | United States | Broadcast Media | Media & Information |
| 22 | WTRF [Wheeling, WV] | English | United States | Broadcast Media | Media & Information |
| 23 | WTNH [New Haven, CT] | English | United States | Broadcast Media | Media & Information |
| 24 | WTEN/ WXXA-TV [Albany, NY] | English | United States | Broadcast Media | Media & Information |
| 25 | WTAJ [Altoona, PA] | English | United States | Broadcast Media | Media & Information |
| 26 | WSYR-TV ABC-9 NewsChannel [Syracuse, NY] | English | United States | Broadcast Media | Media & Information |
| 27 | WSPA/WYCW [Spartanburg, SC] | English | United States | Broadcast Media | Media & Information |
| 28 | WSHV 96.7 FM [South Hill, VA] | English | United States | Broadcast Media | Media & Information |
| 29 | WSAV [Savannah, GA] | English | United States | Broadcast Media | Media & Information |
| 30 | WROC/WUHF/WZDX [Rochester, NY] | English | United States | Broadcast Media | Media & Information |
| 31 | WRIC [Richmond, VA] | English | United States | Broadcast Media | Media & Information |
| 32 | WREG [Memphis, TN] | English | United States | Broadcast Media | Media & Information |
| 33 | WRBL [Columbus, GA] | English | United States | Broadcast Media | Media & Information |
| 34 | WQRF/WTVO [Rockford, IL] | English | United States | Broadcast Media | Media & Information |
| 35 | WPTM 102.3-FM [Weldon, NC] | English | United States | Broadcast Media | Media & Information |
| 36 | WPRI/WNAC [Providence, RI] | English | United States | Broadcast Media | Media & Information |
| 37 | WPIX-TV CW-11 [New York, NY] | English | United States | Broadcast Media | Media & Information |
| 38 | WPHL [Philadelphia, PA] | English | United States | Broadcast Media | Media & Information |
| 39 | WOWK-TV CBS-13 [Charleston, WV] | English | United States | Broadcast Media | Media & Information |
| 40 | Woodburn Independent, Woodburn, Oregon | English | United States | Newspaper | Media & Information |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 41 | WOOD [Grand Rapids, MI] | English | United States | Broadcast Media | Media & Information |
| 42 | WNTZ [Alexandria, LA] | English | United States | Broadcast Media | Media & Information |
| 43 | WNOW Frankly Media | English | United States | Broadcast Media | Media & Information |
| 44 | WNCT [Greenville, NC] | English | United States | Broadcast Media | Media & Information |
| 45 | WNCN [Raleigh, NC] | English | United States | Broadcast Media | Media & Information |
| 46 | WNC Business | English | United States | Newspaper | Media & Information |
| 47 | WMPW 105.9 FM [Danville, VA] | English | United States | Broadcast Media | Media & Information |
| 48 | WMICentral.com, Iron Mountain, Michigan | English | United States | Newspaper | Media & Information |
| 49 | WMBD-TV CBS 31 / WYZZ-TV FOX 43 [Peoria, IL] | English | United States | Broadcast Media | Media & Information |
| 50 | WMBB-TV ABC-13 [Panama City, FL] | English | United States | Broadcast Media | Media & Information |
| 51 | WLUS 98.3 FM [Clarksville, VA] | English | United States | Broadcast Media | Media & Information |
| 52 | WLNS-TV CBS-6 [Lansing, MI] | English | United States | Broadcast Media | Media & Information |
| 53 | WLAX-TV FOX 28/45 [La Crosse, WI] | English | United States | Broadcast Media | Media & Information |
| 54 | WKSK 101.9 FM [South Boston, VA] | English | United States | Broadcast Media | Media & Information |
| 55 | WKRN [Nashville, TN] | English | United States | Broadcast Media | Media & Information |
| 56 | WKRG [Mobile, AL] | English | United States | Broadcast Media | Media & Information |
| 57 | WKBN-TV CBS-27 [Youngstown, OH] | English | United States | Broadcast Media | Media & Information |
| 58 | WJZY-TV FOX-46 [Charlotte, NC] | English | United States | Broadcast Media | Media & Information |
| 59 | WJW-TV FOX-8 [Cleveland, OH] | English | United States | Broadcast Media | Media & Information |
| 60 | WJTV-TV CBS-12 [Jackson, MS] | English | United States | Broadcast Media | Media & Information |
| 61 | WJMN-TV CBS 3 [Escanaba, WI] | English | United States | Broadcast Media | Media & Information |

Press Release - Exact Pickup List of Media Outlets

3

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 62 | WJHL-TV/ABC Tri-Cities [Johnson City, TN] | English | United States | Broadcast Media | Media & Information |
| 63 | WJET-TV ABC-24 / WFXP-TV FOX-44 [Erie, PA] | English | United States | Broadcast Media | Media & Information |
| 64 | WJBF [Augusta, GA] | English | United States | Broadcast Media | Media & Information |
| 65 | WIVB [Buffalo, NY] | English | United States | Broadcast Media | Media & Information |
| 66 | Winters Express, Winters, California | English | United States | Newspaper | Media & Information |
| 67 | Windsor Weekly | English | United States | Newspaper | Media & Information |
| 68 | Winchester Sun | English | United States | Newspaper | Media & Information |
| 69 | Wilsonville Spokesman, Wilsonville, Oregon | English | United States | Newspaper | Media & Information |
| 70 | WICZ-TV FOX-40 [Binghamton, NY] | English | United States | Broadcast Media | Media & Information |
| 71 | Wickenburg Sun | English | United States | Newspaper | Media & Information |
| 72 | WIAT [Birmingham, AL] | English | United States | Broadcast Media | Media & Information |
| 73 | WHTM [Harrisburg, PA] | English | United States | Broadcast Media | Media & Information |
| 74 | WHO-TV NBC-13 [Des Moines, IA] | English | United States | Broadcast Media | Media & Information |
| 75 | WHNT [Huntsville, AL] | English | United States | Broadcast Media | Media & Information |
| 76 | WHLF 95.3 FM [South Boston, VA] | English | United States | Broadcast Media | Media & Information |
| 77 | WGNO [New Orleans, LA] | English | United States | Broadcast Media | Media & Information |
| 78 | WGN [Chicago, IL] | English | United States | Broadcast Media | Media & Information |
| 79 | WGHP [Greensboro, NC] | English | United States | Broadcast Media | Media & Information |
| 80 | WFXR [Roanoke, VA] | English | United States | Broadcast Media | Media & Information |
| 81 | WFRV [Green Bay, WI] | English | United States | Broadcast Media | Media & Information |
| 82 | WFOM 106.3 FM / 1230 AM [Atlanta, GA] | English | United States | Broadcast Media | Media & Information |

Press Release - Exact Pickup List of Media Outlets

4

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 83 | WFLA [Tampa, FL] | English | United States | Broadcast Media | Media & Information |
| 84 | WFFF-TV FOX 44 / WVNY-TV ABC-22 [Colchester, VT] | English | United States | Broadcast Media | Media & Information |
| 85 | WETM-TV NBC-18 [Elmira, NY] | English | United States | Broadcast Media | Media & Information |
| 86 | Westside Connect, Sonoma County, California | English | United States | Newspaper | Media & Information |
| 87 | West Virginia Latino News | Spanish | United States | News & Information Service | Multicultural & Demographic |
| 88 | West Valley View, Avondale AZ | English | United States | Newspaper | Media & Information |
| 89 | West Valley City Journal | English | United States | Newspaper | Media & Information |
| 90 | West Linn Tidings, West Linn, Oregon | English | United States | Newspaper | Media & Information |
| 91 | West Jordan Journal | English | United States | Newspaper | Media & Information |
| 92 | WEHT/WTVW [Evansville, IN] | English | United States | Broadcast Media | Media & Information |
| 93 | Webull | English | United States | Financial Data, Research & Analytics | Financial |
| 94 | WDVM-TV IND-25 [Washington, DC] | English | United States | Broadcast Media | Media & Information |
| 95 | WDTN/WBDT [Dayton, OH] | English | United States | Broadcast Media | Media & Information |
| 96 | WDLZ 98.3-FM [Murfreesboro, NC] | English | United States | Broadcast Media | Media & Information |
| 97 | WDKY-TV FOX-56 [Lexington, KY] | English | United States | Broadcast Media | Media & Information |
| 98 | WDHN-TV ABC [Webb, AL] | English | United States | Broadcast Media | Media & Information |
| 99 | WDAF [Kansas City, MO] | English | United States | Broadcast Media | Media & Information |
| 100 | WCNN 680 AM / 93.7 FM [Atlanta, GA] | English | United States | Broadcast Media | Media & Information |
| 101 | WCMH [Columbus, OH] | English | United States | Broadcast Media | Media & Information |
| 102 | WCIA-TV CBS 3 [Champaign, IL] | English | United States | Broadcast Media | Media & Information |
| 103 | WCBD-TV NBC-2 [Charleston, SC] | English | United States | Broadcast Media | Media & Information |

Press Release - Exact Pickup List of Media Outlets

5

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 104 | WBTW [Myrtle Beach, SC] | English | United States | Broadcast Media | Media & Information |
| 105 | WBRE/WYOU [Wilkes-Barre, PA] | English | United States | Broadcast Media | Media & Information |
| 106 | WBOY [Clarksburg, WV] | English | United States | Broadcast Media | Media & Information |
| 107 | WBGH/WIVT [Binghamton, NY] | English | United States | Broadcast Media | Media & Information |
| 108 | WAVY-TV NBC-10 [Portsmouth, VA] | English | United States | Broadcast Media | Media & Information |
| 109 | WATE [Knoxville, TN] | English | United States | Broadcast Media | Media & Information |
| 110 | Washington Daily News | English | United States | Newspaper | Media & Information |
| 111 | Washington City Paper [Washington, DC] | English | United States | Newspaper | General |
| 112 | WANE [Fort Wayne, IN] | English | United States | Broadcast Media | Media & Information |
| 113 | Walnut Creek Magazine | English | United States | Newspaper | Media & Information |
| 114 | Wallowa County Chieftain, Enterprise, Oregon | English | United States | Newspaper | Media & Information |
| 115 | VYRE Business News Global | English | United States | Online News Sites & Other Influencers | Business Services |
| 116 | VYRE Business News Global | English | United States | Online News Sites & Other Influencers | Business Services |
| 117 | VYRE Business News Global | English | United States | Online News Sites & Other Influencers | Business Services |
| 118 | Village Life, El Dorado Hills, California | English | United States | Newspaper | Media & Information |
| 119 | Vida Nueva | Spanish | United States | Newspaper | Multicultural & Demographic |
| 120 | Victoria Advocate [Victoria, TX] | English | United States | Newspaper | Media & Information |
| 121 | Victoria Advocate [Victoria, TX] | Spanish | United States | Newspaper | Media & Information |
| 122 | VCReporter, Ventura County, California | English | United States | Newspaper | Media & Information |
| 123 | Valley Times-News | English | United States | Newspaper | Media & Information |
| 124 | Valley Current, Oregon City, Oregon | English | United States | Newspaper | Media & Information |

Press Release - Exact Pickup List of Media Outlets

6

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 125 | Univision Minnesota | Spanish | United States | Broadcast Media | Multicultural & Demographic |
| 126 | Univision Kansas City | Spanish | United States | Broadcast Media | Multicultural & Demographic |
| 127 | Univision Canada | Spanish | Canada | Broadcast Media | Multicultural & Demographic |
| 128 | Tucson Lifestyle, Tucson, AZ | English | United States | Newspaper | Media & Information |
| 129 | Trinity Journal, Weaverville, California | English | United States | Newspaper | Media & Information |
| 130 | Tri-Valley Times, Pleasanton, California | English | United States | Newspaper | Media & Information |
| 131 | Transporte, Logística & Comercio Internacional | Spanish | United States | Newspaper | Multicultural & Demographic |
| 132 | Toti.com | English | United States | Newspaper | Media & Information |
| 133 | Today's Family Magazine | English | United States | Print Media | Media & Information |
| 134 | Times-News, Twin Falls, Idaho | English | United States | Newspaper | Media & Information |
| 135 | Times of the Islands | English | United States | Newspaper | Media & Information |
| 136 | Times of San Diego | English | United States | Newspaper | Media & Information |
| 137 | The World, Coos Bay, Oregon | English | United States | Newspaper | Media & Information |
| 138 | The Wetumpka Herald | English | United States | Newspaper | Media & Information |
| 139 | The Westside Current, Houston, Texas | English | United States | Newspaper | Media & Information |
| 140 | The Weekend Drive, Detroit, Michigan | English | United States | Newspaper | Media & Information |
| 141 | The Vicksburg Post | English | United States | Newspaper | Media & Information |
| 142 | The Union, Grass Valley, California | English | United States | Newspaper | Media & Information |
| 143 | The Union Democrat, Sonora, California | English | United States | Newspaper | Media & Information |
| 144 | The Tryon Daily Bulletin | English | United States | Newspaper | Media & Information |
| 145 | The Troy Messenger | English | United States | Newspaper | Media & Information |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 146 | The Tidewater News | English | United States | Newspaper | Media & Information |
| 147 | The Tallassee Tribune | English | United States | Newspaper | Media & Information |
| 148 | The Suffolk News-Herald | English | United States | Newspaper | Media & Information |
| 149 | The State Journal | English | United States | Newspaper | Media & Information |
| 150 | The Stanly News & Press | English | United States | Newspaper | Media & Information |
| 151 | The Sheet News, Mammoth Lakes, California | English | United States | Newspaper | Media & Information |
| 152 | The Selma Times-Journal | English | United States | Newspaper | Media & Information |
| 153 | The Roanoke Chowan News Herald | English | United States | Newspaper | Media & Information |
| 154 | The Press, Brentwood, California | English | United States | Newspaper | Media & Information |
| 155 | The Post-Searchlight | English | United States | Newspaper | Media & Information |
| 156 | The Podcast Park | English | United States | Broadcast Media | Media & Information |
| 157 | The Pioneer | English | United States | Newspaper | Media & Information |
| 158 | The Panolian | English | United States | Newspaper | Media & Information |
| 159 | The Palmetto Network | English | United States | Online News Sites & Other Influencers | Media & Information |
| 160 | The Oxford Eagle | English | United States | Newspaper | Media & Information |
| 161 | The Outlook, Gresham, Oregon | English | United States | Newspaper | Media & Information |
| 162 | The News-Review, Roseburg, Oregon | English | United States | Newspaper | Media & Information |
| 163 | The Madras Pioneer, Madras, Oregon | English | United States | Newspaper | Media & Information |
| 164 | The La Grande Observer, La Grande, Oregon | English | United States | Newspaper | Media & Information |
| 165 | The Interior Journal | English | United States | Newspaper | Media & Information |
| 166 | The Greenville Advocate | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 167 | The Gazette-Democrat, Anna, Illinois | English | United States | Newspaper | Media & Information |
| 168 | The Gazette, GTG Gazette, Grant City, Missouri | English | United States | Newspaper | Media & Information |
| 169 | The Gazette, Colorado Springs, Colorado | English | United States | Newspaper | Media & Information |
| 170 | The Gazette, Colorado Springs, Colorado | English | United States | Newspaper | Media & Information |
| 171 | The Farmville Herald | English | United States | Newspaper | Media & Information |
| 172 | The Desert Review, El Centro, California | English | United States | Newspaper | Media & Information |
| 173 | The Demopolis Times | English | United States | Newspaper | Media & Information |
| 174 | The Davis Enterprise, Davis, California | English | United States | Newspaper | Media & Information |
| 175 | The Dam 94.3-FM | English | United States | Broadcast Media | Media & Information |
| 176 | The Daily Titan, Fullerton, California | English | United States | Newspaper | Media & Information |
| 177 | The Daily Sentinel, Grand Junction, Colorado | English | United States | Newspaper | Media & Information |
| 178 | The Daily Sentinel, Grand Junction, Colorado | English | United States | Newspaper | Media & Information |
| 179 | The Daily News, Longview, Washington | English | United States | Newspaper | Media & Information |
| 180 | The Daily Independent, Ridgecrest, California | English | United States | Newspaper | Media & Information |
| 181 | The Daily Californian, Berkeley, California | English | United States | Newspaper | Media & Information |
| 182 | The Daily Astorian, Astoria, Oregon | English | United States | Newspaper | Media & Information |
| 183 | The Community Voice, Rohnert Park, California | English | United States | Newspaper | Media & Information |
| 184 | The Coastland Times | English | United States | Newspaper | Media & Information |
| 185 | The Clemmons Courier | English | United States | Newspaper | Media & Information |
| 186 | The Clanton Advertiser | English | United States | Newspaper | Media & Information |
| 187 | The Clackamas Review, Milwaukie, Oregon | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 188 | The Chillicothe Hometown Voice | English | United States | Newspaper | Media & Information |
| 189 | The Charlotte Gazette | English | United States | Newspaper | Media & Information |
| 190 | The Bulletin, Bend, Oregon | English | United States | Newspaper | Media & Information |
| 191 | The Brewton Standard | English | United States | Newspaper | Media & Information |
| 192 | The Bogalusa Daily News | English | United States | Newspaper | Media & Information |
| 193 | The Best Times, Memphis, Tennessee | English | United States | Newspaper | Media & Information |
| 194 | The Best Times, Memphis, Tennessee | Spanish | United States | Newspaper | Media & Information |
| 195 | The Bee News, Clarence, New York | English | United States | Newspaper | Media & Information |
| 196 | The Atmore Advance | English | United States | Newspaper | Media & Information |
| 197 | The Argonaut, Los Angeles, California | English | United States | Newspaper | Media & Information |
| 198 | The Andalusia Star-News | English | United States | Newspaper | Media & Information |
| 199 | The Advocate-Messenger | English | United States | Newspaper | Media & Information |
| 200 | Tehachapi News, Tehachapi, California | English | United States | Newspaper | Media & Information |
| 201 | Taylorsville Journal | English | United States | Newspaper | Media & Information |
| 202 | Taos News, Taos, New Mexico | English | United States | Newspaper | Media & Information |
| 203 | Taos News | English | United States | Newspaper | Media & Information |
| 204 | Taft Midway Driller, Taft, California | English | United States | Newspaper | Media & Information |
| 205 | SWX Local Sports, Montana | English | United States | Newspaper | Media & Information |
| 206 | SW Connection Newspapers, Eden Prairie, Minnesota | English | United States | Newspaper | Media & Information |
| 207 | SuperLatina TV | Spanish | United States | Blog | Multicultural & Demographic |
| 208 | Sunnyside Sun, Sunnyside, Washington | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 209 | Sugar House Journal | English | United States | Newspaper | Media & Information |
| 210 | Style Magazine | English | United States | Newspaper | Media & Information |
| 211 | Statesman Examiner, Colville, Washington | English | United States | Newspaper | Media & Information |
| 212 | Stage of Life | English | United States | News & Information Service | Multicultural & Demographic |
| 213 | Southern Sports Today | English | United States | Broadcast Media | Media & Information |
| 214 | South Salt Lake Journal | English | United States | Newspaper | Media & Information |
| 215 | South Jordan Journal | English | United States | Newspaper | Media & Information |
| 216 | Smithfield Times | English | United States | Newspaper | Media & Information |
| 217 | Show Continental | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 218 | Sherwood Gazette, Sherwood, Oregon | English | United States | Newspaper | Media & Information |
| 219 | Shelby County Reporter | English | United States | Newspaper | Media & Information |
| 220 | SEGUROS, SALUD, PENSIONES & SEGURIDAD | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 221 | Seattle 24×7 | English | United States | Trade Publications | Tech |
| 222 | Seaside Signal, Seaside, Oregon | English | United States | Newspaper | Media & Information |
| 223 | Santa Ynez Valley News, Santa Ynez Valley, California | English | United States | Newspaper | Media & Information |
| 224 | Santa Maria Times, Santa Maria, California | English | United States | Newspaper | Media & Information |
| 225 | Sangri Times | English | India | Online News Sites & Other Influencers | General |
| 226 | Sandy Post, Sandy, Oregon | English | United States | Newspaper | Media & Information |
| 227 | Sandy Journal | English | United States | Newspaper | Media & Information |
| 228 | San Clemente Journal | English | United States | Print Media | Media & Information |
| 229 | Salisbury Post | English | United States | Newspaper | Media & Information |

Press Release - Exact Pickup List of Media Outlets                                                                                11

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 230 | RSW Living Magazine [Sanibel, FL] | English | United States | Newspaper | Media & Information |
| 231 | Roswell Daily Record, Roswell, New Mexico | English | United States | Newspaper | Media & Information |
| 232 | Rivers of Living Water Mission - Home Page | English | United States | Information Website | Travel & Leisure |
| 233 | Riverton Ranger, Riverton, Wyoming | English | United States | Newspaper | Media & Information |
| 234 | Rio Grande Sun, Espanola, New Mexico | English | United States | Newspaper | Media & Information |
| 235 | Revista MUJERES Internacional | Spanish | United States | Magazine | Multicultural & Demographic |
| 236 | Redmond Spokesman, Redmond, Oregon | English | United States | Newspaper | Media & Information |
| 237 | Redlands Community News, Redlands, California | English | United States | Newspaper | Media & Information |
| 238 | Record Gazette, Banning, California | English | United States | Newspaper | Media & Information |
| 239 | Ravalli Republic, Hamilton, Montana | English | United States | Newspaper | Media & Information |
| 240 | Quiza Me | Spanish | United States | Online News Sites & Other Influencers | General |
| 241 | Queen Creek Tribune, Queen Creek AZ | English | United States | Newspaper | Media & Information |
| 242 | QuadCities WHBF-TV CBS-4 / KLJB-TV FOX-18 [Rock Island, IL] | English | United States | Broadcast Media | Media & Information |
| 243 | Purgula | English | United States | Online News Sites & Other Influencers | Real Estate |
| 244 | Prescott Times, Prescott AZ | English | United States | Newspaper | Media & Information |
| 245 | Prentiss Headlight | English | United States | Newspaper | Media & Information |
| 246 | Prensa Mexicana | Spanish | United States | Newspaper | Multicultural & Demographic |
| 247 | PR Newswire | English | Global | PR Newswire | Media & Information |
| 248 | PR Newswire | Spanish | Global | PR Newswire | Media & Information |
| 249 | Portland Tribune, Portland, Oregon | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 250 | Porterville Recorder, Porterville, California | English | United States | Newspaper | Media & Information |
| 251 | Porterville Recorder, Porterville, California | English | United States | Newspaper | Media & Information |
| 252 | Portal de Financas | English | Brazil | Online News Sites & Other Influencers | Financial |
| 253 | Port Arthur News | English | United States | Newspaper | Media & Information |
| 254 | Pooler Magazine | English | United States | Print Media | Media & Information |
| 255 | Polk County Itemizer-Observer, Dallas, Oregon | English | United States | Newspaper | Media & Information |
| 256 | Play 96.5 FM | Spanish | Puerto Rico | Broadcast Media | Multicultural & Demographic |
| 257 | Pinal Central [Casa Grande, AZ] | English | United States | Newspaper | Media & Information |
| 258 | Picayune Item | English | United States | Newspaper | Media & Information |
| 259 | Pasadena Weekly, Pasadena, California | English | United States | Newspaper | Media & Information |
| 260 | Parish News [New Orleans, LA] | English | United States | Newspaper | Media & Information |
| 261 | Palos Verdes Peninsula News, Palos Verdes Estates, Californi | English | United States | Newspaper | Media & Information |
| 262 | Oregon Family | English | United States | Print Media | Media & Information |
| 263 | Oregon City News, Oregon City, Oregon | English | United States | Newspaper | Media & Information |
| 264 | Orange Leader | English | United States | Newspaper | Media & Information |
| 265 | Omaha Magazine | English | United States | Newspaper | Media & Information |
| 266 | Norwood Town News | English | United States | Newspaper | Media & Information |
| 267 | Northern Michigan NEWSNet | English | United States | Broadcast Media | Media & Information |
| 268 | Norfolk & Wrentham News | English | United States | Newspaper | Media & Information |
| 269 | Ninja Credit Consultants | English | United States | Blog | Financial |
| 270 | NickAds, Grand Junction, Colorado | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 271 | Next Wave Group | English | United States | Online News Sites & Other Influencers | Media & Information |
| 272 | NewsTalk 97.1-FM / WSMY 1080-AM [Weldon, NC] | English | United States | Broadcast Media | Media & Information |
| 273 | Newsradio KOTA [Rapid City, SD] | English | United States | Broadcast Media | Media & Information |
| 274 | NEWSNet West Palm Beach | English | United States | Broadcast Media | Media & Information |
| 275 | NEWSNet Waco | English | United States | Broadcast Media | Media & Information |
| 276 | NEWSNet Tampa | English | United States | Broadcast Media | Media & Information |
| 277 | NEWSNet Sports | English | United States | Online News Sites & Other Influencers | Media & Information |
| 278 | NEWSNet Sioux Falls | English | United States | Broadcast Media | Media & Information |
| 279 | NEWSNet Santa Barbara | English | United States | Online News Sites & Other Influencers | Media & Information |
| 280 | NEWSNet San Antonio | English | United States | Broadcast Media | Media & Information |
| 281 | NEWSNet Salt Lake City | English | United States | Broadcast Media | Media & Information |
| 282 | NEWSNet Sacramento | English | United States | Online News Sites & Other Influencers | Media & Information |
| 283 | NEWSNet Quincy | English | United States | Broadcast Media | Media & Information |
| 284 | NEWSNet Portland | English | United States | Broadcast Media | Media & Information |
| 285 | NEWSNet Pittsburgh | English | United States | Broadcast Media | Media & Information |
| 286 | NEWSNet Orlando | English | United States | Broadcast Media | Media & Information |
| 287 | NEWSNet Odessa | English | United States | Broadcast Media | Media & Information |
| 288 | NEWSNet Norfolk | English | United States | Broadcast Media | Media & Information |
| 289 | NEWSnet Nashville | English | United States | Broadcast Media | Media & Information |
| 290 | NEWSnet Myrtle Beach | English | United States | Broadcast Media | Media & Information |
| 291 | NEWSnet Monterey | English | United States | Online News Sites & Other Influencers | Media & Information |

Press Release - Exact Pickup List of Media Outlets

14

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 292 | NEWSnet Minneapolis | English | United States | Broadcast Media | Media & Information |
| 293 | NEWSnet Miami | English | United States | Broadcast Media | Media & Information |
| 294 | NEWSnet Los Angeles | English | United States | Online News Sites & Other Influencers | Media & Information |
| 295 | NEWSnet Las Vegas | English | United States | Broadcast Media | Media & Information |
| 296 | NEWSnet Hawaii | English | United States | Online News Sites & Other Influencers | Media & Information |
| 297 | NEWSnet Fresno | English | United States | Broadcast Media | Media & Information |
| 298 | NEWSnet Detroit | English | United States | Broadcast Media | Media & Information |
| 299 | NEWSnet Columbus | English | United States | Broadcast Media | Media & Information |
| 300 | NEWSnet Columbia | English | United States | Broadcast Media | Media & Information |
| 301 | NEWSnet Buffalo | English | United States | Broadcast Media | Media & Information |
| 302 | NEWSnet Boise | English | United States | Online News Sites & Other Influencers | Media & Information |
| 303 | NEWSnet Austin | English | United States | Broadcast Media | Media & Information |
| 304 | NEWSnet Augusta | English | United States | Broadcast Media | Media & Information |
| 305 | NEWSnet Atlanta | English | United States | Broadcast Media | Media & Information |
| 306 | NEWSNet | English | United States | Broadcast Media | Media & Information |
| 307 | NewsBlaze US | English | United States | Online News Sites & Other Influencers | Media & Information |
| 308 | News Miner, Fair | English | United States | Newspaper | Media & Information |
| 309 | News Miner, Fair | English | United States | Newspaper | Media & Information |
| 310 | Newport News-Times, Newport, Oregon | English | United States | Newspaper | Media & Information |
| 311 | Newberg Graphic, Newberg, Oregon | English | United States | Newspaper | Media & Information |
| 312 | Newark Life Magazine | English | United States | Print Media | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 313 | New Mexico Press Association, Albuquerque, New Mexico | English | United States | Newspaper | Media & Information |
| 314 | Needles Desert Star, Needles, California | English | United States | Newspaper | Media & Information |
| 315 | NCWLIFE, Wenatchee, Washington | English | United States | Newspaper | Media & Information |
| 316 | NCN: Southeast - News Channel Nebraska [Beatrice, NE] | English | United States | Broadcast Media | Media & Information |
| 317 | NCN: River Country - NewsChannelNebraska [Nebraska City, NE] | English | United States | Broadcast Media | Media & Information |
| 318 | NCN: Platte Valley - News Channel Nebraska [Columbus, NE] | English | United States | Broadcast Media | Media & Information |
| 319 | NCN: Panhandle - News Channel Nebraska [Grand Island, NE] | English | United States | Broadcast Media | Media & Information |
| 320 | NCN: Northeast - News Channel Nebraska [Norfolk, NE] | English | United States | Broadcast Media | Media & Information |
| 321 | NCN: Metro - News Channel Nebraska [Omaha, NE] | English | United States | Broadcast Media | Media & Information |
| 322 | NBC Right Now, Kennewick, Washington | English | United States | Newspaper | Media & Information |
| 323 | Natick Town News | English | United States | Newspaper | Media & Information |
| 324 | Natchez Democrat | English | United States | Newspaper | Media & Information |
| 325 | Napa Valley Register, Napa, California | English | United States | Newspaper | Media & Information |
| 326 | Napa Valley Register, Napa, California | English | United States | Newspaper | Media & Information |
| 327 | Myhighplains | English | United States | Broadcast Media | Media & Information |
| 328 | My Utah News, Salt Lake City, Utah | English | United States | Newspaper | Media & Information |
| 329 | Murray Journal | English | United States | Newspaper | Media & Information |
| 330 | Mountain News, Lake Arrowhead, California | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 331 | Mountain Democrat, Placerville, California | English | United States | Newspaper | Media & Information |
| 332 | Moscow-Pullman Daily News, Moscow, Idaho | English | United States | Newspaper | Media & Information |
| 333 | Moscow-Pullman Daily News, Moscow, Idaho | English | United States | Newspaper | Media & Information |
| 334 | Morningstar | English | Global | Financial Data, Research & Analytics | Financial |
| 335 | Moorpark Acorn, Moorpark, California | English | United States | Newspaper | Media & Information |
| 336 | Montana Standard, Butte, Montana | English | United States | Newspaper | Media & Information |
| 337 | Montana Right Now, Montana | English | United States | Newspaper | Media & Information |
| 338 | Montana Right Now, Montana | English | United States | Newspaper | Media & Information |
| 339 | Montana Latino News | Spanish | United States | News & Information Service | Multicultural & Demographic |
| 340 | Montana Latino News | Spanish | United States | News & Information Service | Multicultural & Demographic |
| 341 | Molalla Pioneer, Molalla, Oregon | English | United States | Newspaper | Media & Information |
| 342 | Mohave Daily News, Bullhead City, AZ | English | United States | Newspaper | Media & Information |
| 343 | Missoulian, Missoula, Montana | English | United States | Newspaper | Media & Information |
| 344 | Millcreek Journal | English | United States | Newspaper | Media & Information |
| 345 | Midvale Journal | English | United States | Newspaper | Media & Information |
| 346 | Middletown Life Magazine | English | United States | Print Media | Media & Information |
| 347 | Middlesboro News | English | United States | Newspaper | Media & Information |
| 348 | Mi Ciudad Tampa Bay | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 349 | Mega TV | Spanish | United States | Broadcast Media | Multicultural & Demographic |
| 350 | Meeting News Northwest, Oregon | English | United States | Newspaper | Media & Information |
| 351 | Medway & Millis News | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 352 | MB News | English | United States | Newspaper | Media & Information |
| 353 | Magnolia State Live | English | United States | Newspaper | Media & Information |
| 354 | Luverne Journal | English | United States | Newspaper | Media & Information |
| 355 | Lowndes Signal | English | United States | Newspaper | Media & Information |
| 356 | Los Angeles Downtown News, Los Angeles, California | English | United States | Newspaper | Media & Information |
| 357 | Lompoc Record, Lompoc, California | English | United States | Newspaper | Media & Information |
| 358 | Lodi News-Sentinel, Lodi, California | English | United States | Newspaper | Media & Information |
| 359 | Lewiston Tribune, Lewiston, Idaho | English | United States | Newspaper | Media & Information |
| 360 | Leesville Leader | English | United States | Newspaper | Media & Information |
| 361 | Ledger Dispatch, Jackson, California | English | United States | Newspaper | Media & Information |
| 362 | Leader Publications | English | United States | Newspaper | Media & Information |
| 363 | Laughlin Times, Laughlin, Nevada | English | United States | Newspaper | Media & Information |
| 364 | Latin Business Today | English | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 365 | Latin Business Today | English | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 366 | Latin Business Hoy | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 367 | Las Vegas Optic, Las Vegas, New Mexico | English | United States | Newspaper | Media & Information |
| 368 | Lake Oswego Review, Lake Oswego, Oregon | English | United States | Newspaper | Media & Information |
| 369 | LaGrange Daily News | English | United States | Newspaper | Media & Information |
| 370 | La Zeta 93.7 FM | Spanish | Puerto Rico | Broadcast Media | Multicultural & Demographic |
| 371 | La Voz Hispanic News [Pasco, WA] | Spanish | United States | Newspaper | Multicultural & Demographic |
| 372 | La Prensa Hispana | Spanish | United States | Newspaper | Multicultural & Demographic |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 373 | La Nueva 94 FM | Spanish | Puerto Rico | Broadcast Media | Multicultural & Demographic |
| 374 | La Ley 107.9 FM | Spanish | United States | Broadcast Media | Multicultural & Demographic |
| 375 | La Familia de Broward | Spanish | United States | Magazine | Multicultural & Demographic |
| 376 | L'Observateur | English | United States | Newspaper | Media & Information |
| 377 | KZZI-FM 95.9 | English | United States | Broadcast Media | Media & Information |
| 378 | KYNT-AM 1450 | English | United States | Broadcast Media | Media & Information |
| 379 | KXRM [Colorado Springs, CO] | English | United States | Broadcast Media | Media & Information |
| 380 | KXMA/KXMB [Bismark, ND] | English | United States | Broadcast Media | Media & Information |
| 381 | KXAN-TV NBC-36 [Austin, TX] | English | United States | Broadcast Media | Media & Information |
| 382 | KWKT-TV FOX-44 / KYLE-TV MyNetworkTV [Woodway, TX] | English | United States | Broadcast Media | Media & Information |
| 383 | KVOA, Tucson, AZ | English | United States | Newspaper | Media & Information |
| 384 | KVEO-TV CBS-4 [Harlingen, TX] | English | United States | Broadcast Media | Media & Information |
| 385 | KULR-8, Billings, Montana | English | United States | Newspaper | Media & Information |
| 386 | KTXL [Sacramento, CA] | English | United States | Broadcast Media | Media & Information |
| 387 | KTVX [Salt Lake City, UT] | English | United States | Broadcast Media | Media & Information |
| 388 | KTVI-TV FOX-2 [St. Louis, MO] | English | United States | Broadcast Media | Media & Information |
| 389 | KTSM [El Paso, TX] | English | United States | Broadcast Media | Media & Information |
| 390 | KTLA [Los Angeles, CA] | English | United States | Broadcast Media | Media & Information |
| 391 | KTAL-TV NBC-6 [Shreveport, LA] | English | United States | Broadcast Media | Media & Information |
| 392 | KTAB/KRBC [Abilene, TX] | English | United States | Broadcast Media | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 393 | KSWB [San Diego, CA] | English | United States | Broadcast Media | Media & Information |
| 394 | KSNW [Wichita, KS] | English | United States | Broadcast Media | Media & Information |
| 395 | KSNT-TV NBC-27 [Topeka, KS] | English | United States | Broadcast Media | Media & Information |
| 396 | KSNF/KODE [Joplin, MO] | English | United States | Broadcast Media | Media & Information |
| 397 | KSEE/KGPE [Fresno, CA] | English | United States | Broadcast Media | Media & Information |
| 398 | KRQE [Albuquerque, NM] | English | United States | Broadcast Media | Media & Information |
| 399 | KRON [San Francisco, CA] | English | United States | Broadcast Media | Media & Information |
| 400 | KREX/KFQX/KGJT [Grand Junction, CO] | English | United States | Broadcast Media | Media & Information |
| 401 | KQRQ-FM 92.3 | English | United States | Broadcast Media | Media & Information |
| 402 | KPVI News 6, Pocatello, Idaho | English | United States | Newspaper | Media & Information |
| 403 | KOLR/KOZL [Springfield, MO] | English | United States | Broadcast Media | Media & Information |
| 404 | KOIN-TV CBS-6 [Portland, OR] | English | United States | Broadcast Media | Media & Information |
| 405 | Kodiak Daily Mirror, Kodiak, AK | English | United States | Newspaper | Media & Information |
| 406 | KNWA/KFTA [Fayetteville, AR] | English | United States | Broadcast Media | Media & Information |
| 407 | KMLK 98.7-FM [El Dorado, AR] | English | United States | Broadcast Media | Media & Information |
| 408 | KMID/KPEJ [Odessa, TX] | English | United States | Broadcast Media | Media & Information |
| 409 | KLXS-FM 95.3 | English | United States | Broadcast Media | Media & Information |
| 410 | KLST/KSAN [San Angelo, TX] | English | United States | Broadcast Media | Media & Information |
| 411 | KLRT-TV FOX-16 [Little Rock, AR] | English | United States | Broadcast Media | Media & Information |
| 412 | KLFY [Lafayette, LA] | English | United States | Broadcast Media | Media & Information |
| 413 | KLAS-TV CBS-8 [Las Vegas, NV] | English | United States | Broadcast Media | Media & Information |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 414 | KKYA-FM 93.1 | English | United States | Broadcast Media | Media & Information |
| 415 | KJUN-TV / KFOL-TV HTV10 [Houma, LA] | English | United States | Broadcast Media | Media & Information |
| 416 | KITV Island News, Honolulu, Hawaii | English | United States | Newspaper | Media & Information |
| 417 | Kingman Miner, Kingman AZ | English | United States | Newspaper | Media & Information |
| 418 | Kilgore News Herald, Kilgore, Texas | English | United States | Newspaper | Media & Information |
| 419 | Kilgore News Herald, Kilgore, Texas | Spanish | United States | Newspaper | Media & Information |
| 420 | KIAH [Houston, TX] | English | United States | Broadcast Media | Media & Information |
| 421 | KHQ-TV, Spokane, Washington | English | United States | Newspaper | Media & Information |
| 422 | KHON [Honolulu, HI] | English | United States | Broadcast Media | Media & Information |
| 423 | KHMT/KSVI [Billings, MT] | English | United States | Broadcast Media | Media & Information |
| 424 | KGET [Bakersfield, CA] | English | United States | Broadcast Media | Media & Information |
| 425 | KFOR [Oklahoma City, OK] | English | United States | Broadcast Media | Media & Information |
| 426 | KFDX-TV NBC-3 / KJTL-TV FOX-18 [Wichita Falls, TX] | English | United States | Broadcast Media | Media & Information |
| 427 | KETK-TV FOX-51 [Tyler, TX] | English | United States | Broadcast Media | Media & Information |
| 428 | Kenbridge Victoria Dispatch | English | United States | Newspaper | Media & Information |
| 429 | KELO [Sioux Falls, SD] | English | United States | Broadcast Media | Media & Information |
| 430 | KDVR [Denver, CO] | English | United States | Broadcast Media | Media & Information |
| 431 | KDAM-FM 94.3 | English | United States | Broadcast Media | Media & Information |
| 432 | KDAF-TV CW-33 [Dallas, TX] | English | United States | Broadcast Media | Media & Information |
| 433 | KCCR-FM 95.3 [Pierre, SD] | English | United States | Broadcast Media | Media & Information |
| 434 | KCCR-AM 1240 [Pierre, SD] | English | United States | Broadcast Media | Media & Information |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 435 | KCAU-TV ABC-9 Siouxland Proud [Sioux City, IA] | English | United States | Broadcast Media | Media & Information |
| 436 | KBEW-AM 1560 / KBEW-FM 98.1 COUNTRY [Blue Earth, MN] | English | United States | Broadcast Media | Media & Information |
| 437 | KARK-TV NBC-4 [Little Rock, AR] | English | United States | Broadcast Media | Media & Information |
| 438 | KARD/KTVE [West Monroe, LA] | English | United States | Broadcast Media | Media & Information |
| 439 | KAMC/KLBK | English | United States | Broadcast Media | Media & Information |
| 440 | Jessamine Journal | English | United States | Newspaper | Media & Information |
| 441 | Ismael Cala Foundation | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 442 | Ismael Cala | Spanish | United States | Blog | Multicultural & Demographic |
| 443 | Ironton Tribune | English | United States | Newspaper | Media & Information |
| 444 | Inyo Register, Bishop, California | English | United States | Newspaper | Media & Information |
| 445 | indica News [San Ramon, CA] | English | United States | Online News Sites & Other Influencers | Media & Information |
| 446 | Imperial Valley Press, El Centro, California | English | United States | Newspaper | Media & Information |
| 447 | Imperial Valley Press, El Centro, California | English | United States | Newspaper | Media & Information |
| 448 | Idaho Latino News | Spanish | United States | News & Information Service | Multicultural & Demographic |
| 449 | Idaho County Free Press, Grangeville, Idaho | English | United States | Newspaper | Media & Information |
| 450 | Hoy en Delaware | Spanish | United States | Newspaper | Multicultural & Demographic |
| 451 | Hopedale Town News | English | United States | Newspaper | Media & Information |
| 452 | hood Magazine | English | United States | Print Media | Media & Information |
| 453 | Holliston Town News | English | United States | Newspaper | Media & Information |
| 454 | Holladay Journal | English | United States | Newspaper | Media & Information |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 455 | Hola Arkansas! | English | United States | Newspaper | Multicultural & Demographic |
| 456 | Hispanic PR Wire | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 457 | Hispanic PR Wire | English | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 458 | Hillsboro Tribune, Hillsboro, Oregon | English | United States | Newspaper | Media & Information |
| 459 | Hi-Desert Star, Yucca Valley, California | English | United States | Newspaper | Media & Information |
| 460 | Herriman Journal | English | United States | Newspaper | Media & Information |
| 461 | Hermiston Herald, Hermiston, Oregon | English | United States | Newspaper | Media & Information |
| 462 | Helena Independent Record, Helena, Montana | English | United States | Newspaper | Media & Information |
| 463 | Hawaii Latino News | Spanish | United States | News & Information Service | Multicultural & Demographic |
| 464 | Hattiesburg.com | English | United States | Online News Sites & Other Influencers | Media & Information |
| 465 | Harlan Enterprise | English | United States | Newspaper | Media & Information |
| 466 | Hanford Sentinel, Hanford, California | English | United States | Newspaper | Media & Information |
| 467 | Gulf & Main Magazine | English | United States | Newspaper | Media & Information |
| 468 | Greenville Business Magazine | English | United States | Newspaper | Media & Information |
| 469 | Green & White Sheet, Tucson, AZ | English | United States | Newspaper | Media & Information |
| 470 | Go! Eastern Oregon, Eastern Oregon | English | United States | Newspaper | Media & Information |
| 471 | Gillette News Record, Gillette, Wyoming | English | United States | Newspaper | Media & Information |
| 472 | Gilbert Sun, Gilbert AZ | English | United States | Newspaper | Media & Information |
| 473 | Geovanny Vicente Romero | Spanish | United States | Blog | Multicultural & Demographic |
| 474 | Geovanny Vicente Romero | English | United States | Blog | Multicultural & Demographic |
| 475 | Gazette-Times, Corvallis, Oregon | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 476 | Gates County Index | English | United States | Newspaper | Media & Information |
| 477 | Gaby Natale | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 478 | Franklin Town News | English | United States | Newspaper | Media & Information |
| 479 | Foresthill Messenger, Foresthill, California | English | United States | Newspaper | Media & Information |
| 480 | Forest Grove News-Times, Forest Grove, Oregon | English | United States | Newspaper | Media & Information |
| 481 | Fontana Herald News, Fontana, California | English | United States | Newspaper | Media & Information |
| 482 | Fayetteville Connect | English | United States | Newspaper | Media & Information |
| 483 | Fairfield Sun Times, Fairfield, Montana | English | United States | Newspaper | Media & Information |
| 484 | FACE Magazine | English | United States | Newspaper | Media & Information |
| 485 | Exponent, Montana State University, Bozeman, Montana | English | United States | Newspaper | Media & Information |
| 486 | Estes Park News, Estes Park, Colorado | English | United States | Newspaper | Media & Information |
| 487 | Estacada News, Estacada, Oregon | English | United States | Newspaper | Media & Information |
| 488 | Essential Magazines, Boca Raton, Florida | English | United States | Newspaper | Media & Information |
| 489 | eNews Park Forest | English | United States | Newspaper | Media & Information |
| 490 | Energía, Industria, Comercio y Minería | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 491 | Ellensburg Daily Record [Ellensburg, WA] | English | United States | Newspaper | Media & Information |
| 492 | Ellensburg Daily Record [Ellensburg, WA] | Spanish | United States | Newspaper | Media & Information |
| 493 | Elko Daily Free Press, Elko, Nevada | English | United States | Newspaper | Media & Information |
| 494 | Elizabethton Star | English | United States | Newspaper | Media & Information |
| 495 | El Zol 106.7 FM | Spanish | United States | Broadcast Media | Multicultural & Demographic |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 496 | El Perico | English | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 497 | El Perico | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 498 | El Colombiano | Spanish | United States | Newspaper | Multicultural & Demographic |
| 499 | Effingham Magazine | English | United States | Print Media | Media & Information |
| 500 | Eastern Progress, Richmond, Kentucky | English | United States | Newspaper | Media & Information |
| 501 | Eastern Progress, Richmond, Kentucky | Spanish | United States | Newspaper | Media & Information |
| 502 | East Oregonian, Pendleton, Oregon | English | United States | Newspaper | Media & Information |
| 503 | East Hanover Florham Park Life | English | United States | Print Media | Media & Information |
| 504 | Draper Journal | English | United States | Newspaper | Media & Information |
| 505 | Discover Our Coast, Astoria, Oregon | English | United States | Newspaper | Media & Information |
| 506 | Diario Horizonte - CT | Spanish | United States | Newspaper | Multicultural & Demographic |
| 507 | Desert News, Apple Valley, California | English | United States | Newspaper | Media & Information |
| 508 | Delta Wind, Bethel AK | English | United States | Newspaper | Media & Information |
| 509 | Davis Journal | English | United States | Newspaper | Media & Information |
| 510 | Davie County Enterprise Record | English | United States | Newspaper | Media & Information |
| 511 | Daily Republic, Fairfield, California | English | United States | Newspaper | Media & Information |
| 512 | Daily Leader | English | United States | Newspaper | Media & Information |
| 513 | Cut Bank Pioneer Press, Cut Bank, Montana | English | United States | Newspaper | Media & Information |
| 514 | Cottonwood Heights Journal | English | United States | Newspaper | Media & Information |
| 515 | Coronado Eagle & Journal, Coronado, California | English | United States | Newspaper | Media & Information |
| 516 | Cordele Dispatch | English | United States | Newspaper | Media & Information |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 517 | Connect Iredell | English | United States | Newspaper | Media & Information |
| 518 | Columbia Gorge News, Hood River, Oregon | English | United States | Newspaper | Media & Information |
| 519 | Columbia County Spotlight, St. Helens, Oregon | English | United States | Newspaper | Media & Information |
| 520 | Columbia Business Monthly | English | United States | Newspaper | Media & Information |
| 521 | Coast River Business Journal, Astoria, Oregon | English | United States | Newspaper | Media & Information |
| 522 | CNYhomepage | English | United States | Broadcast Media | Media & Information |
| 523 | Clearwater Tribune, Orofino, Idaho | English | United States | Newspaper | Media & Information |
| 524 | Clearwater Progress, Orofino, Idaho | English | United States | Newspaper | Media & Information |
| 525 | Claiborne Progress | English | United States | Newspaper | Media & Information |
| 526 | City Sun Times, Scottsdale AZ | English | United States | Newspaper | Media & Information |
| 527 | City News Vegas, Las Vegas, Nevada | English | United States | Newspaper | Media & Information |
| 528 | City News Phoenix, Phoenix AZ | English | United States | Newspaper | Media & Information |
| 529 | City Journals | English | United States | Newspaper | Media & Information |
| 530 | Chinook Observer, Long Beach, Washington | English | United States | Newspaper | Media & Information |
| 531 | Chinook Observer, Long Beach, Washington | Spanish | United States | Newspaper | Media & Information |
| 532 | Chino Champion, Chino, California | English | United States | Newspaper | Media & Information |
| 533 | ChineseWire | English | United States | Online News Sites & Other Influencers | Media & Information |
| 534 | ChicaNOL | Spanish | United States | Blog | Multicultural & Demographic |
| 535 | Chewelah Independent, Chewelah, Washington | English | United States | Newspaper | Media & Information |
| 536 | Chester County Press | English | United States | Newspaper | Media & Information |
| 537 | Cheap Fun Things To Do | English | United States | Online News Sites & Other Influencers | Travel & Leisure |

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 538 | Char-Koosta News, Pablo, Montana | English | United States | Newspaper | Media & Information |
| 539 | Chandler News, Chandler, AZ | English | United States | Newspaper | Media & Information |
| 540 | Central Oregonian, Prineville, Oregon | English | United States | Newspaper | Media & Information |
| 541 | Casper Star-Tribune [Casper, WY] | English | United States | Newspaper | Media & Information |
| 542 | Cape Coral Living Magazine | English | United States | Newspaper | Media & Information |
| 543 | Canby Herald, Canby, Oregon | English | United States | Newspaper | Media & Information |
| 544 | Cal OES News, Sacramento, California | English | United States | Newspaper | Media & Information |
| 545 | Business Tribune, Portland, Oregon | English | United States | Newspaper | Media & Information |
| 546 | Business Class News | English | United States | Blog | Media & Information |
| 547 | Buffalo Bulletin, Buffalo, Wyoming | English | United States | Newspaper | Media & Information |
| 548 | Buenos Dias Nebraska | Spanish | United States | Online News Sites & Other Influencers | Multicultural & Demographic |
| 549 | Bridge Media Networks | English | United States | Broadcast Media | Media & Information |
| 550 | Bradfordville Bugle | English | United States | Newspaper | Media & Information |
| 551 | Boulder Monitor, Boulder, Montana | English | United States | Newspaper | Media & Information |
| 552 | Boreal Community Media | English | United States | Newspaper | Media & Information |
| 553 | Bonita & Estero Magazine | English | United States | Newspaper | Media & Information |
| 554 | BocaLista | Spanish | Puerto Rico | Online News Sites & Other Influencers | Multicultural & Demographic |
| 555 | Bluegrass Live | English | United States | Newspaper | Media & Information |
| 556 | Blue Mountain Eagle, John Day, Oregon | English | United States | Newspaper | Media & Information |
| 557 | Billings Gazette, Billings, Montana | English | United States | Newspaper | Media & Information |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 558 | Big Country News Connection, Spokane, Washington | English | United States | Newspaper | Media & Information |
| 559 | Big Bear Grizzly, Big Bear Lake, California | English | United States | Newspaper | Media & Information |
| 560 | Benzinga | English | United States | Online News Sites & Other Influencers | Financial |
| 561 | Beaverton Valley Times, Beaverton, Oregon | English | United States | Newspaper | Media & Information |
| 562 | Beauregard News | English | United States | Newspaper | Media & Information |
| 563 | Baker City Herald, Baker City, Oregon | English | United States | Newspaper | Media & Information |
| 564 | Austin Daily Herald | English | United States | Newspaper | Media & Information |
| 565 | Aspen Daily News, Aspen, Colorado | English | United States | Newspaper | Media & Information |
| 566 | Aspen Daily News [Aspen, CO] | English | United States | Newspaper | Media & Information |
| 567 | Ashland Town News | English | United States | Newspaper | Media & Information |
| 568 | Arizona Daily Sun, Flagstaff, Arizona | English | United States | Newspaper | Media & Information |
| 569 | Arizona Daily Star [Tucson, AZ] | English | United States | Newspaper | Media & Information |
| 570 | Arcadia News, Phoenix AZ | English | United States | Newspaper | Media & Information |
| 571 | Appeal-Democrat, Marysville/Yuba City, California | English | United States | Newspaper | Media & Information |
| 572 | AP NEWS [The Associated Press] | English | United States | News & Information Service | Media & Information |
| 573 | Antelope Valley Press, Palmdale/Lancaster, California | English | United States | Newspaper | Media & Information |
| 574 | Americus Times-Recorder | English | United States | Newspaper | Media & Information |
| 575 | American Press | English | United States | Newspaper | Media & Information |
| 576 | Alexander City Outlook | English | United States | Newspaper | Media & Information |

Press Release - Exact Pickup List of Media Outlets

| | Outlet Name | Language | Location | Source Type | Industry |
|---|---|---|---|---|---|
| 577 | Albuquerque Journal, Albuquerque, New Mexico | English | United States | Newspaper | Media & Information |
| 578 | Albert Lea Tribune [Albert Lea, MN] | English | United States | Newspaper | Media & Information |
| 579 | Albany Democrat-Herald, Albany, Oregon | English | United States | Newspaper | Media & Information |
| 580 | Alaska Latino News | Spanish | United States | News & Information Service | Multicultural & Demographic |
| 581 | Alabama Now | English | United States | Newspaper | Media & Information |
| 582 | Ahora News (New Jersey) | Spanish | United States | Newspaper | Multicultural & Demographic |
| 583 | Agent Elevated by Agent Inc. | English | United States | Online News Sites & Other Influencers | Real Estate |
| 584 | Agent Elevated by Agent Inc. | English | United States | Online News Sites & Other Influencers | Real Estate |
| 585 | ADVFN | English | United States | Financial News Service | Financial |
| 586 | 99.5 JAMZ [Weldon, NC] | English | United States | Broadcast Media | Media & Information |
| 587 | 2 News, Las Vegas, Nevada | English | United States | Newspaper | Media & Information |
| 588 | One News Page | English | Hong Kong | Information Website | General |
| 589 | One News Page | English | Hong Kong | Information Website | General |

Press Release - Exact Pickup List of Media Outlets                                                                29

- EXHIBIT J -

# Residential Real Estate Broker Commissions Antitrust Settlements - If you sold a home and paid a commission to a real estate agent, you may be a part of class action settlements

USA - English ▾

NEWS PROVIDED BY

**JND Legal Administration** ➙

Aug 19, 2024, 09:19 ET

SEATTLE, Aug. 19, 2024 /PRNewswire/ -- JND Legal Administration

Proposed settlements have been reached with the National Association of Realtors ("NAR") and Home Services of America ("HomeServices"), resolving certain claims, including in lawsuits known as *Burnett v. National Association of Realtors*, Case No. 19-CV-00332-SRB (W.D. Missouri); *Moehrl v. NAR*, Case No. 1:19-cv-01610-ARW (N.D. Illinois); *Umpa v. NAR*, Case No. 4:23-cv-00945 (W.D. Missouri); and *Gibson v. NAR*, Case No. 23-CV-788-SRB (W.D. Missouri). The lawsuits allege the existence of an anticompetitive agreement that resulted in home sellers paying inflated commissions to real estate brokers or agents in violation of antitrust law. Proposed Settlements have also been reached with other Defendants in these actions, including Anywhere Real Estate, RE/MAX, Keller Williams, Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, United Real Estate, and certain of their affiliates. Although the *Burnett* Court has authorized notice to be given of the proposed settlements with NAR and HomeServices, this Notice does not express the opinion of the Court on the merits of the claims or defenses asserted by either side of the lawsuits. Additional settlements may be reached with other Defendants. Go to **www.RealEstateCommissionLitigation.com** for more information about these settlements and any additional settlements, and to submit your email to receive all future notices.

**Am I affected?**

You are a Settlement Class Member and eligible for payment if you: (1) sold a home during the Eligible Date Range; (2) listed the home that was sold on a multiple listing service ("MLS") anywhere in the United States; and (3) paid a commission to any real estate brokerage in connection with the sale of the home. The Eligible Date Range depends on what MLS you listed your home for sale on. Go to **www.RealEstateCommissionLitigation.com** to see the Eligible Date Ranges and to learn more.

## What do the settlements provide?

NAR has agreed to pay at least $418 million, and HomeServices has agreed to pay $250 million, into a Settlement Fund. The current value of *all* Settlements with these and other Defendants is over **$980 million**. The Fund will be distributed to qualifying Settlement Class Members who submit an approved claim form, after any awarded attorneys' fees, expenses, settlement administration costs, and service awards have been deducted. The settling Defendants have also agreed to provide Cooperation and to implement Practice Changes, including that NAR will prohibit sellers and listing agents from making offers of compensation on REALTOR® MLSs to buyer agents. You can learn more about the Practices Changes and Cooperation in the Settlement Agreements, which are available at **www.RealEstateCommissionLitigation.com**.

## How do I get a payment?

***Note: If you have already submitted a Claim Form in these cases for a prior Settlement with other Defendants, you do not need to submit another Claim.***

You must submit a claim form, with information pertaining to and/or evidence of your home sale and commissions paid, by **May 9, 2025**. Claim forms can be submitted online at **www.RealEstateCommissionLitigation.com**. You can also print a claim form at the website and mail it to *Burnett v. National Association of Realtors*, c/o JND Legal Administration, PO Box 91479, Seattle, WA 98111, or email it to **info@RealEstateCommissionLitigation.com**.

## What are my other options?

You may object to or exclude yourself (opt-out) from the Settlements by **October 28, 2024**, or do nothing. If you exclude yourself, you will not receive a settlement payment, but this is the only option that allows you to sue NAR or HomeServices relating to commissions for brokerage services. If you wish to object, the Court will consider your views in deciding whether to approve or reject the proposed settlements. If the Court does not approve the Settlements, no settlement payments will be sent, and the lawsuits will continue. You cannot object

if you opt-out. By <u>doing nothing</u>, you will get no payment, and you will not be able to sue NAR or HomeServices relating to commissions for brokerage services. For more information, including how to object or exclude yourself and to read the full terms of the release, visit **www.RealEstateCommissionLitigation.com**.

**What happens next?**

The Court will hold a hearing on **November 26, 2024** to consider whether to grant final approval of the settlements and award fees and costs to the attorneys representing the class ("Class Counsel"). The Court has appointed the law firms of Ketchmark and McCreight; Williams Dirks Dameron; Boulware Law; Hagens Berman Sobol Shapiro; Cohen Milstein Sellers & Toll; and Susman Godfrey, as Class Counsel. Class Counsel will ask the Court to award an amount not to exceed one-third (33.3%) of the Settlement Fund for attorneys' fees, plus out-of-pocket expenses incurred during the cases. The Court may award less. Class Counsel may also seek compensation for each current and/or former class representative. You will be represented by Class Counsel at the hearing unless you choose to enter an appearance in person or through your own counsel, at your own cost. The appearance of your own attorney is not necessary to participate in the hearing.

**Questions?**

This Notice is only a summary. To learn more, visit **www.RealEstateCommissionLitigation.com**, call toll-free 888-995-0207, email **info@RealEstateCommissionLitigation.com**, or write *Burnett v. National Association of Realtors*, c/o JND Legal Administration, PO Box 91479, Seattle, WA 98111.

SOURCE JND Legal Administration

# Liquidaciones antimonopolio de comisiones de corredores de bienes raíces residenciales: si vendió una casa y pagó una comisión a un agente de bienes raíces, puede ser parte de los acuerdos de demanda colectiva

USA - español ▾

NEWS PROVIDED BY
**JND Legal Administration** ➞
Aug 19, 2024, 09:19 ET

SEATTLE, 19 de agosto de 2024 /PRNewswire-HISPANIC PR WIRE/ -- JND Legal Administration

Se han alcanzado acuerdos propuestos con la Asociación Nacional de Agentes Inmobiliarios ("NAR") y Home Services of America ("HomeServices"), resolviendo ciertos reclamos, incluso en demandas conocidas como *Burnett v. National Association of Realtors*, Caso No. 19-CV-00332-SRB (W.D. Missouri); *Moehrl v. NAR*, Caso No. 1:19 -cv-01610-ARW (N.D. Illinois); *Umpa v. NAR*, Caso No. 4:23 -cv-00945 (W.D. Missouri); y *Gibson v. NAR*, Caso No. 23-CV-788-SRB (W.D. Missouri). Las demandas alegan la existencia de un acuerdo anticompetitivo que resultó en que los vendedores de viviendas pagaran comisiones infladas a corredores o agentes de bienes raíces en violación de la ley antimonopolio. Los Acuerdos propuestos también se han alcanzado con otros Demandados en estas acciones, incluidos Anywhere Real Estate, RE/MAX, Keller Williams, Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, United Real Estate y algunos de sus afiliados. Aunque el Tribunal de *Burnett* ha autorizado que se notifiquen los acuerdos propuestos con NAR y HomeServices, este Aviso no expresa la opinión del Tribunal sobre los méritos de las reclamaciones o defensas afirmadas por ninguna de las partes de las demandas. Se pueden llegar a acuerdos

adicionales con otros Demandados. Visite **www.RealEstateCommissionLitigation.com** para obtener más información sobre estos acuerdos y cualquier acuerdo adicional, y para enviar su correo electrónico para recibir todos los avisos futuros.

**¿Me veo afectado?**

Usted es un Miembro de la Clase del Acuerdo y es elegible para el pago si: (1) vendió una vivienda durante el Intervalo de Fechas Elegible; (2) enumeró la vivienda que se vendió en un servicio de listado múltiple ("MLS") en cualquier lugar de los Estados Unidos; y (3) pagó una comisión a cualquier agente de bienes raíces en relación con la venta de la vivienda. El rango de fechas elegible depende de en qué MLS puso su casa a la venta. Visite **www.RealEstateCommissionLitigation.com** para ver los rangos de fechas elegibles y obtener más información.

**¿Qué proporcionan los acuerdos?**

NAR ha acordado pagar al menos $ 418 millones, y HomeServices ha acordado pagar $ 250 millones, en un Fondo del Acuerdo. El valor actual de *todos los* Acuerdos con estos y otros Demandados es de más de **$ 980 millones**. El Fondo se distribuirá a los Miembros de la Clase del Acuerdo que califiquen y que presenten un formulario de reclamo aprobado, después de que se hayan deducido los honorarios, gastos, costos de administración del acuerdo y premios por servicios de los abogados adjudicados. Los Demandados conciliadores también han acordado proporcionar Cooperación e implementar Cambios de Práctica, incluido que NAR prohibirá a los vendedores y agentes de listado hacer ofertas de compensación en los MLS del REALTOR® a los agentes compradores. Puede obtener más información sobre los Cambios de Prácticas y la Cooperación en los Acuerdos de Liquidación, que están disponibles en **www.RealEstateCommissionLitigation.com**.

**¿Cómo recibo un pago?**

***Nota: Si ya ha presentado un Formulario de Reclamación en estos casos para un Acuerdo anterior con otros Demandados, no necesita presentar otra Reclamación.***

Debe enviar un formulario de reclamo, con información relacionada y/o evidencia de la venta de su casa y las comisiones pagadas, antes del **9 de mayo de 2025**. Los formularios de reclamación se pueden enviar en línea en **www.RealEstateCommissionLitigation.com**. También puede imprimir un formulario de reclamación en el

sitio web y enviarlo por correo a *Burnett v. National Association of Realtors*, c/o JND Legal Administration, PO Box 91479, Seattle, WA 98111, o por correo electrónico a **info@RealEstateCommissionLitigation.com**.

## ¿Cuáles son mis otras opciones?

Puede objetar o excluirse (optar por no participar) de los Arreglos antes del **28 de octubre de 2024**, o no hacer nada. Si <u>se excluye</u>, no recibirá un pago de liquidación, pero esta es la única opción que le permite demandar a NAR o HomeServices en relación con las comisiones por servicios de corretaje. Si desea <u>objetar</u>, el Tribunal considerará sus puntos de vista al decidir si aprueba o rechaza los acuerdos propuestos. Si el Tribunal no aprueba los acuerdos, no se enviarán pagos de acuerdo y las demandas continuarán. No puede objetar si opta por no participar. Al no <u>hacer nada</u>, no recibirá ningún pago y no podrá demandar a NAR ni a HomeServices en relación con las comisiones por los servicios de corretaje. Para obtener más información, incluida la forma de objetar o excluirse y para leer los términos completos del comunicado, visite **www.RealEstateCommissionLitigation.com**.

## ¿Qué sucede después?

El Tribunal celebrará una audiencia el **26 de noviembre de 2024** para considerar si otorga la aprobación final de los acuerdos y los honorarios y costos de adjudicación a los abogados que representan a la clase ("Abogados de la Clase"). El Tribunal ha designado a los bufetes de abogados de Ketchmark y McCreight; Williams Dirks Dameron; Boulware Law; Hagens Berman Sobol Shapiro; Cohen Milstein Sellers & Toll; y Susman Godfrey, como Abogados de la Clase. Los Abogados de la Clase solicitarán al Tribunal que otorgue una cantidad que no exceda un tercio (33.3 %) del Fondo del Acuerdo para los honorarios de los abogados, más los gastos de bolsillo incurridos durante los casos. El Tribunal puede otorgar menos. Los Abogados de la Clase también pueden solicitar una compensación por cada representante de la clase actual y/o anterior. Usted será representado por los Abogados de la Clase en la audiencia, a menos que elija comparecer en persona o a través de su propio abogado, a su propio costo. La comparecencia de su propio abogado no es necesaria para participar en la audiencia.

## ¿Tienes alguna pregunta?

Este Aviso es solo un resumen. Para obtener más información, visite **www.RealEstateCommissionLitigation.com**, llame al número gratuito 888-995-0207, envíe un correo electrónico a **info@RealEstateCommissionLitigation.com**, o escriba *Burnett v. National Association of Realtors*, c/o JND Legal Administration, PO Box 91479, Seattle, WA 98111.

- EXHIBIT K -



| | Visit Official Settlement Website | | Learn More → | | Visit Official Settlement Website | |

## Kia Vehicle Theft

137 Days Left • Featured

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 1/11/25 | Yes |

If you bought or leased one of several Kia vehicles (listed on the settlement website) and it was not equipped with an engine immobilizer, you may be included in this settlement.

Visit Official Settlement Website    Share

## SpinX Gambling (Kentucky)

177 Days Left

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 2/20/25 | N/A |

If you are a Kentucky resident who played Cash Frenzy, Lotsa Slots, Jackpot World (previously known as Jackpot Mania), Jackpot Crush, or Vegas Friends between 2018 and 2021, you may be included in this settlement.

Visit Official Settlement Website    Share

## iFit - NordicTrack, ProForm Touch Screens

252 Days Left

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 5/6/25 | N/A |

You may be covered by this settlement if you bought certain ProForm or NordicTrack workout equipment on or before January 23, 2023.

Visit Official Settlement Website    Share

## Real Estate Broker Commissions

255 Days Left • Featured

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 5/9/25 | Yes |

If you sold a home and paid a commission to a real estate agent, you may be part of class action settlements.

Learn More →    Share

## Toyota Camry HVAC (California)

277 Days Left • New

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 5/31/25 | Yes |

This settlement covers current and former 2012-2015 Toyota Camry XV50 owners and lessees in California.

Visit Official Settlement Website    Share

## Ocwen Loan Servicing - Fees

398 Days Left

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 9/29/25 | N/A |

You may be included in this settlement if you have or had a loan with Ocwen Loan Servicing and paid for broker price opinions or hybrid valuations between 2010 and 2017.

Visit Official Settlement Website    Share

## Toyota - Airbag Control Units

841 Days Left

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 12/16/26 | Yes |

This settlement covers current and former owners and

## Whirlpool Freezers

856 Days Left

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| Varies | 12/31/26 | Yes |

If you bought one of several refrigerators with bottom

## Boohoo - Advertised Sales

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
| --- | --- | --- |
| $10 Gift Card | Varies | N/A |

You may be included in this settlement if you bought products from Boohoo, BoohooMAN, PrettyLittleThing



Log in or sign up for Facebook to connect with friends, family and people you know.

Log In   or   Create new account



JOIN OTHERS IN PURSUING JUSTICE: STAND UP. STAY INFORMED. SHARE YOUR STORIES

LAWSUIT LIST

### Most Visited

- LG Refrigerator Compressor Lawsuits
- Samsung Ice Maker Lawsuits
- Shampoo Hair Loss Lawsuits
- GM Transmission Lawsuits

### Recently Added

- Kia Nightfall Trim Lawsuit
- Influencer Misleading Advertising Lawsuits
- DisplayMax, FixtureMax Day Rate Employees
- Breast Cancer Imaging Insurance Lawsuits

### Featured Lawsuits

- Port-a-Cath Lawsuits
- Tepezza Hearing Loss Lawsuits
- Hair Relaxer Cancer Lawsuits
- Talcum Powder Cancer Lawsuit

### Under Investigation

- Total Loss Rental Car Insurance
- No Artificial Flavors Lawsuit
- Travel Website Privacy Investigations
- Poultry Workers Wage Lawsuit

Forbes          billboard          FOX NEWS          THE HUFFINGTON POST          YAHOO!

## The **Top Resource** for Class Action Lawsuits & Settlements

ClassAction.org's mission is to provide real people with the knowledge, tools and access they need to fight corporate wrongdoing and protect their consumer rights. On our site, you'll find plenty of free legal help tools, knowledge resources and lawsuit and settlement information **you can actually use**, including:

- Our list of active class action lawsuits, mass torts and investigations;
- A full slate of open class action lawsuit settlements and rebates (for some, no proof is required!);
- Breaking legal news, class action case developments and settlement updates in real time;
- Need legal help? Find a class action lawyer;
- Knowledge center – learn all about the class action lawsuit and settlement process; and
- Our free class action lawsuit database.

**Stay informed on what matters**: Get class action lawsuit and settlement news sent to your inbox – sign up for ClassAction.org's free weekly newsletter.

STAY CURRENT

### Sign Up For Our Newsletter

New cases and investigations, settlement deadlines, and news straight to your inbox.

your@email.com

SUBSCRIBE

FEATURED CLASS ACTION SETTLEMENTS

VIEW ALL SETTLEMENTS

### Apple - App Store, iTunes Gift Card Scams

49 Days Left          • Featured

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
|---|---|---|
| Varies | 10/15/24 | N/A |

If you were tricked into buying an App Store or iTunes gift card and provided the redemption code to someone unknown to you at any point between January 2015 and July 2020, you may be covered by this settlement.

### Kia Vehicle Theft

137 Days Left          • Featured

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
|---|---|---|
| Varies | 1/11/25 | Yes |

If you bought or leased one of several Kia vehicles (listed on the settlement website) and it was not equipped with an engine immobilizer, you may be included in this settlement.

### Real Estate Broker Commissions

255 Days Left          • Featured

| TYPICAL SETTLEMENT | DEADLINE | PROOF REQUIRED? |
|---|---|---|
| Varies | 5/9/25 | Yes |

If you sold a home and paid a commission to a real estate agent, you may be part of class action settlements.

SETTLEMENTS

## New Settlements

**Real Estate Broker Commissions**

If you sold a home and paid a commission to a real estate agent, you may be part of class action settlements.

**Fisher-Price Rock 'n Play Sleeper Recall**

You may be covered by this settlement if you own or previously bought a Fisher-Price Rock 'n Play Sleeper.

## Settlements Ending Soon

- **Gifted Healthcare – Data Breach**
  (September 16, 2024)

- **Nevada Restaurant Services – Data Breach**
  (September 17, 2024)

- **Bumble, Badoo Biometric Privacy – Illinois**
  (September 20, 2024)

### Is Walmart Overcharging Customers at Checkout?

Finding a low price at the store is a great feeling, but a recent lawsuit filed against **Walmart** is claiming that the retailer has **charged higher prices for certain merchandise at the register** than what's advertised on pricing stickers.

Frequent shoppers can read up on the details **here**.

### Facebook Privacy Settlement – When Will You Get Your Money?

For those of you who have been wondering where your payment is from the **$725 million deal**, it may take a bit longer than originally thought. Due to appeals, Facebook users may not see any money until sometime in 2025, at the very earliest.

Head over to **this blog post** to learn more about the delay, how we got here, and what might come next in the legal process.

---

## DATA BREACHES

### New Data Breach Investigations

- **American Clinical Solutions**

- **CBIZ Benefits & Insurance Services**

- **Covenant Care California**

- **(PARS) Public Agency Retirement Service**

- **The Facial Pain Center**

- **VeriSource Services**

- **Young Consulting**

### Got a data breach notice?

**Don't throw it out** – and check out our full list of ongoing investigations **here**.

You may be able to help get a class action lawsuit started.

> **View list of data breaches**

---

## SETTLEMENTS

### New Settlements

**Real Estate Broker Commissions**
If you sold a home and paid a commission to a real estate agent, you may be part of class action settlements.

**Bumble, Badoo Biometric Privacy – Illinois**
This settlement covers Bumble and Badoo users who were living or located in Illinois and accessed the apps between November 1, 2016 and December 31, 2021.

**[24]7.ai Customer Service Rep Wages**
This settlement looks to compensate current and former hourly paid customer service representatives who worked for [24]7.ai between February 15, 2020 and June 15, 2024.

### Settlements Ending Soon

- **TaxAct**
  (September 11, 2024)

- **Chemtool Plant – Illinois**
  (September 12, 2024)

- **Direct Express – Denied Fraud Claims**
  (September 12, 2024)

- **Gifted Healthcare – Data Breach**
  (September 16, 2024)

- **Nevada Restaurant Services – Data Breach**
  (September 17, 2024)





Chicken tends to be a low-cost protein option in many households, but attorneys have reason to believe that if you buy your boneless, skinless chicken products at **Kroger or Walmart**, **you may have been overcharged**.

Reports have surfaced that some grocery stores' chicken products are marked with inflated weights, leading attorneys to investigate whether a class action should be filed to **help shoppers get some money back**. **Learn more**.

Losing a loved one is never easy – and the grieving process can be made more difficult when companies use the loss for their own gain.

Specifically, family members have reported being contacted by **Legacy Touch** shortly after their loved ones died with offers to buy personalized keepsakes **featuring the deceased individuals' fingerprints**.

Now, attorneys are looking into whether the fingerprints were **collected without permission**. You can find the details on **this page**.

---

IN OTHER NEWS
∼∼∼

### Lawsuit Claims Lil' Puffs Snacks Contain Lead

Many parents are constantly on the lookout for healthy snacks for their children, and a recently filed lawsuit is claiming that **LesserEvil's Lil' Puffs** may not be the answer.

According to the case, independent lab testing showed that one serving of the snack contained **2.427 micrograms of lead**.

The lawsuit looks to cover all individuals in the United States, except California, who bought LesserEvil Lil' Puffs snacks. You can find the details **here**.

### Real Estate Broker Commissions: New Proposed Settlements Reached

New proposed settlements have been reached in litigation alleging real estate brokerage firms and the **National Association of Realtors** (NAR) **required home sellers to pay inflated total commissions** to real estate brokers or agents in violation of antitrust law.

In the most recent deals, NAR and Home Services of America (also known as Berkshire Hathaway HomeServices) have agreed to pay at least $418 million and $250 million, respectively – bringing the total value of all settlements with these and other defendants to **over $980 million**. If you sold a home that was listed on a multiple listing service anywhere in the U.S. during a certain date range and paid a commission to any real estate brokerage in connection with the home sale, **you may be entitled to a payment**.

Head to **this page** for more information and a link to the official settlement site.

---

DATA BREACHES
∼∼∼

### New Data Breach Investigations

### Got a data breach notice?



ClassAction.org | LAWSUIT LIST | SETTLEMENTS | DATA BREACHES | LEGAL NEWS | LEARN | ABOUT US

CLAIM DEADLINE   May 9, 2025

# Real Estate Broker
## Commission Settlements

If you **sold a home and paid a commission** to a real estate agent, you *may* be part of class action settlements.

Go to www.RealEstateCommissionLitigation.com to learn more.

**Have a question?**
Scroll down to find **frequently asked questions** and answers about this settlement.

### Real Estate Broker Commissions
Settlement Information

BURNETT ET AL. V. NATIONAL ASSOCIATION OF REALTORS ET AL.
19-CV-00332-SRB et al.

| TYPICAL SETTLEMENT | PROOF REQUIRED? |
|---|---|
| Varies | Yes |

| CLAIM DEADLINE | SETTLEMENT TOTAL |
|---|---|
| 5/9/25 | Varies |

**File a Claim**

* You will be taken to the claims administrator site designated by the court to handle this claim.



# Frequently Asked Questions
## About This Settlement

### What's Going On?

Proposed settlements have been reached in lawsuits alleging real estate brokerage firms and trade association National Association of Realtors (NAR) required home sellers to pay inflated total commissions to real estate brokers or agents in violation of antitrust law.

Most recently, NAR and Home Services of America (also known as Berkshire Hathaway HomeServices) have agreed to pay at least $418 million and $250 million, respectively, to settle the claims against them.

Other real estate brokerage firms have also entered into proposed Settlements, including Anywhere Real Estate, RE/MAX, Keller Williams, Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, United Real Estate, and certain of their affiliates. More may settle in the future. The current value of *all* settlements is over **$980 million.**

### Who's Eligible for the Settlements?

The settlements cover anyone who, during certain eligible date ranges, sold a home that was listed on a multiple listing service (MLS) anywhere in the U.S. and paid a commission to any real estate brokerage in connection with the sale of the home.

The covered eligible date ranges depend on which MLS the property was listed on and can be viewed on the official settlement website.

**Note:** The website covers the previous settlements with various real estate brokerages and the more recent proposed settlements detailed here. You may be eligible for more than one.

### How Much Could I Get?

Those who file valid claims will be eligible for a share of the settlements, after any awarded attorneys' fees, expenses, settlement administration costs, and service awards have been deducted. **You may be eligible for a share from multiple settlements** as there are several defendants in the litigation. The current value of all settlements is over $980 million.

As part of the deals, the settling defendants have also agreed to implement certain changes to their practices, including that NAR will ban sellers and listing agents from making offers of compensation on REALTOR® MLSs to buyer agents.

### How Do I File a Claim?

You can file a claim on the official settlement website.

You can access the claim form right here.

**Note:** You only need to file one claim for each home you sold during the eligible date ranges. With one claim form, you will receive your share of each settlement that you are eligible for, including any future settlements. Furthermore, you do not need to have sold your home using one of the settling defendants to make a claim. If you have already submitted a Claim Form for a prior Settlement with other Defendants, you do not need to submit another Claim.

### Is the Website Legit?

**Yes.** It has been designated by the court as the official website for the settlements and where consumers will need to go if they want to submit a claim online.





**National Association of Realtors and HomeServices MLS proposed class action settlements**

## How Millions of Renters Are Earning Valuable Points on Rent

Rent costs are on the rise. Bilt Rewards, launched in 2022 and valued at $3.1B, helps renters earn points on rent to build a path to homeownership. Millions now pay rent with Bilt and earn points for future rent, fitness, travel, and even a down payment.

"I think it's a no-brainer to use Bilt to pay your monthly rent if possible," says The Points Guy.

**JOIN NOW**

Sponsored by: Bilt Rewards

Powered by **LiveIntent**



# Settlements

**$197.5M ATM fees class action settlement**

**$115M Oracle privacy class action settlement**

 **Facebook**

**Top Class Actions**
Sep 5



🏡💰 Are you a homeowner? Did you sell your home using a multiple listing service? Did you pay commission? If so, you may qualify to benefit from settlements worth over $980M! Visit our site to see if you qualify!
#RealEstate #Settlement #Homeowners



TOPCLASSACTIONS.COM
**National Association of Realtors and HomeServices MLS proposed class action**

 Like   Comment   Share



**topclassactions**

## National Association of Realtors and HomeServices MLS
## proposed class action settlements





● ● ●

**topclassactions** 🏡💰 Homeowners! If you sold your home using a multiple listing service and paid commission, you may benefit from recent settlements worth over $980M! Visit the 🔗 in our comments to see if you qualify! **#RealEstate #Settlement #TopClassActions #Homeowner**

**topclassactions**
https://topclassactions.com/lawsuit-settlements/open-lawsuit-settlements/national-association-of-realtors-and-homeservices-mls-proposed-class-action-settlements/



Top Class
Actions

Lawsuits & Settlements ⌄     Legal News ⌄     Class Actions Explained ⌄     I Am a Lawyer     About Us ⌄

**FEATURED & RECENT**

REBATES

## Class Action Rebates | September 2024

→

OPEN CLASS ACTION SETTLEMENTS

**National Association of Realtors and HomeServices MLS proposed class action settlements**

→

WAGE/BENEFITS

**Workers in California may be entitled to unpaid wages or other wage benefits**

→

𝕏 x

**Top Class Actions** @TopCla... · Sep 5
🏠💰 Are you a homeowner? Did you sell your home using a multiple listing service? Did you pay commission? If so, you may qualify to benefit from settlements worth over $980M! Visit our site to see if you qualify! #RealEstate #Settlement



**National Association of Realtors and HomeServices MLS**

bit.ly

- EXHIBIT L -

> **PROPOSED SETTLEMENTS WITH ALL DEFENDANTS NOW TOTAL OVER**
>
> # $1 BILLION
>
> **FILE YOUR CLAIM TODAY!**



# If you sold a home and paid a commission to a real estate agent, you *may* be a part of class action Settlements

> *Para una notificación en español, visite www.RealEstateCommissionLitigation.com*

You were previously sent a notice regarding filing a claim in the Realtors Settlements. This Reminder Notice is being provided to you including to advise that certain (a) REALTOR® MLSs, (b) non-REALTOR® MLSs, and (c) real estate brokerages with a REALTOR® Principal have agreed to "opt in" and to make additional payments and/or practice changes under this Settlement*.

To participate in the Settlements, you must submit a valid claim online at www.RealEstateCommissionLitigation.com or postmarked by mail no later than May 9, 2025. Claim Forms are available at www.RealEstateCommissionLitigation.com. If you have already filed a claim, please disregard this reminder notice.

## FILE A CLAIM

*In total, fifteen non-Realtor MLSs and thirteen real estate brokerages have thus far agreed to "opt in" to the NAR Settlement contributing **a total of $30,587,754** in compensation to the Class.  The non-Realtor MLSs include Alaska MLS, Bay Area Real Estate Information Services, Inc. ("BAREIS"), Central Virginia Regional MLS, MetroList, Minot MLS, MiRealSource, MLS Exchange, Real Estate Information Network ("REIN"), Richmond MLS, SE Alaska MLS, Southeast Georgia MLS, Spanish Peaks MLS, UNYREIS, West Penn Multi-List, and WNYREIS.  The real estate brokerages include Fathom Holdings, Inc., Key Realty, Ltd., Michael Saunders & Company, Pinnacle Estate Properties, Inc., Rose & Womble Realty Company, Brown Harris Stevens/Halstead, Shorewest Realtors, Inc., Silvercreek Realty Group, The Agency, Vanguard, Watson Realty Corp., McGraw Davisson Stewart LLC, and Downing-Frye Realty, Inc.

Additional information, including how much each entity is contributing to the Settlement can be found on the settlement website: Opting In MLSs | National Association of Realtors (realestatecommissionlitigation.com)

- EXHIBIT M -

# Reference List of Articles - March 15, 2024 - April 22, 2024

| Article # | Published by | Date |
|---|---|---|
| 1 | ABC News | 03/15/2024 |
| 2 | AP News | 03/15/2024 |
| 3 | CBS News | 03/15/2024 |
| 4 | Housing Wire | 03/15/2024 |
| 5 | Kiplingers | 03/15/2024 |
| 6 | NBC | 03/15/2024 |
| 7 | Nerd Wallet | 03/15/2024 |
| 8 | PR Newswire NAR Issued Release | 03/15/2024 |
| 9 | Washington Post | 03/15/2024 |
| 10 | NYT | 03/15/2024 |
| 11 | Hollywood Reporter | 03/16/2024 |
| 12 | Axios | 03/18/2024 |
| 13 | Vox | 03/20/2024 |
| 14 | CNBC | 03/21/2024 |
| 15 | Realtor Magazine | 03/22/2024 |
| 16 | Billings Gazette | 03/25/2024 |
| 17 | Orange County Register | 03/25/2024 |
| 18 | Brookings | 03/29/2024 |
| 19 | Curbed | 04/08/2024 |
| 20 | Yahoo Finance | 04/22/2024 |

Earned Media Coverage

https://abcnews.go.com/Business/selling-home-cheaper-after-historic-settlement/story?id=108155826

# Selling a home is about to get cheaper after historic settlement

The NAR represents more than 1.5 million real estate agents.

By Alexis Christoforous

March 15, 2024, 6:09 PM



**A 'For Sale' sign is posted on the lawn in front of a home on March 15, 2024, in Miami, Florida.**

Joe Raedle/Getty Images

The cost of selling a home could soon go down after the National Association of Realtors agreed to a historic settlement.

The powerful trade group, which represents more than 1.5 million real estate agents, reached a nationwide settlement with groups of home sellers who accused the NAR of conspiring to keep broker fees artificially high.

In addition to paying $418 million in damages, the NAR agreed to stop requiring that sellers pay both their broker and a buyer's broker. Housing experts say the longtime

industry standard of a 6% commission is expected to fall 25% to 50%, according to TD Cowen Insights. That could mean significant savings for both buyers and sellers.

At today's 6% commission, a homeowner selling a $400,000 property will spend about $24,000 on broker fees, a cost that is passed on to the buyer. Depending on how much the new rules reduce commissions, that same homeowner could see their broker's fee fall to about $12,000.



A 'For Sale' sign is posted on the lawn in front of a home on March 15, 2024, in Miami, Florida.

Joe Raedle/Getty Images

While the new rules are expected to lower home prices, experts say supply and demand together with the level of mortgage rates, will continue to be the biggest factors impacting the cost of a home.

Among other things, the landmark settlement requires buyers' brokers to enter into written agreements with their buyers and forbids a broker's compensation from being included on listings placed on multiple listing services, a move critics say led agents to steer customers to more expensive homes.

Earned Media Coverage

The deal brings an end to a multitude of antitrust lawsuits against the group. Last year, a federal jury in Missouri found the NAR and two brokerages liable for $1.8 billion in damages for conspiring to keep agent commissions high. Before Friday›s agreement, the two brokerages settled, but the NAR had vowed to appeal the case.

In a statement, the NAR says, "Continuing to litigate would have hurt members and their small businesses. While there could be no perfect outcome, this agreement is the best outcome we could achieve in the circumstances."

Housing experts call the settlement the biggest shakeup in the housing industry in nearly a century, offering more transparency and competition. Alternative business models including flat-fee and discount brokerages could become more widespread, realtors will be allowed to advertise their fees and compete on commissions, and buyers will be able to shop around and choose lower-cost agents.

It may also force some realtors out of the industry over time, if more buyers opt to save money and choose not to use an agent in their home search.

A federal judge is expected to approve the settlement in the coming weeks, and experts say sellers and buyers should see those broker fees reduced by mid-July.

Earned Media Coverage                                                                                                    4

https://apnews.com/article/national-association-of-realtors-agent-commissions-lawsuits-d62a66cb80639be3c4c3b429053a22c5



BUSINESS

# Real estate lawsuit settlement upends decadeslong policies that helped set agent commissions



FILE - A sale sign stands outside a home in Wyndmoor, Pa., Wednesday, June 22, 2022. The National Association of Realtors has agreed on Friday, March 15, 2024, to pay $418 million and change its rules to settle lawsuits claiming homeowners have been unfairly forced to pay artificially inflated agent commissions when they sold their home. (AP Photo/Matt Rourke, File)

BY ALEX VEIGA

Updated 3:03 PM PDT, March 15, 2024

Share

A powerful real estate trade group has agreed to do away with policies that for decades helped set agent commissions, moving to resolve lawsuits that claim the rules have forced people to pay artificially inflated costs to sell their homes.

Under the terms of the agreement announced Friday, the National Association of Realtors also agreed to pay $418 million to help compensate home sellers across the

U.S.

Home sellers behind multiple lawsuits against the NAR and several major brokerages argued that the trade group's rules governing homes listed for sale on its affiliated Multiple Listing Services unfairly propped up agent commissions. The rules also incentivized agents representing buyers to avoid showing their clients listings where the seller's broker was offering a lower commission to the buyer's agent, they argued.

As part of the settlement, the NAR agreed to no longer require a broker advertising a home for sale on MLS to offer any upfront compensation to a buyer's agent. The rule change leaves it open for individual home sellers to negotiate such offers with a buyer's agent outside of the MLS platforms, though the home seller's broker has to disclose any such compensation arrangements.

RELATED COVERAGE



Why are so many voters frustrated by the US economy? It's home prices



Keller Williams agrees to pay $70 million to settle real estate agent commission lawsuits nationwide

The trade group also agreed to require agents or others working with a homebuyer to enter into a written agreement with them. That is meant to ensure homebuyers know going in what their agent will charge them for their services.

The rule changes, which are set to go into effect in mid-July, represent a major change to the way real estate agents have operated going back to the 1990s, and could lead to homebuyers and sellers negotiating lower agent commissions.

Currently, agents working with a buyer and seller typically split a commission of around 5% to 6% that's paid by the seller. This practice essentially became customary as home listings included built-in offers of "cooperative compensation" between agents on both

sides of the transaction.

But the rule changes the NAR agreed to as part of the settlement could give home sellers and buyers more impetus to negotiate lower agent commissions.

"It may take some time for the changes to impact the marketplace, but our hope and expectation is that this will put a downward pressure on the cost of hiring a real estate broker," said Robby Braun, an attorney in a federal lawsuit brought in 2019 in Chicago on behalf of millions of home sellers.

Analysts with Keefe, Bruyette & Woods also anticipate that the NAR rule changes will lead to lower agent commissions and could persuade some homebuyers to skip using an agent altogether.

"In our view, the combination of mandated buyer representation agreements and the prohibition of blanket compensation offers made by listing agents and sellers should result in significant price competition for buyer agent commissions," the analysts wrote in a research note Friday.

While setting the stage for homebuyers to negotiate a more competitive price for their agent's services, the rule changes mean home shoppers will have to factor in how to cover their agent's compensation.

Homebuyers could still ask a prospective home seller for a concession that includes money to help cover the buyer's agent compensation. However, a home seller with multiple offers, for example, could refuse such a request, or opt to go with a bid from a different buyer who isn't asking for such a concession.

"The real solution is for the industry to work to remove regulatory barriers that make it difficult for buyers to include this compensation in their mortgages," said Stephen Brobeck, senior fellow at the Consumer Federation of America.

The NAR faced multiple lawsuits over the way agent commissions are set. In late October, a federal jury in Missouri found that the NAR and several large real estate brokerages conspired to require that home sellers pay homebuyers' agent commissions

Earned Media Coverage                                                                                    7

in violation of federal antitrust law.

The jury ordered the defendants to pay almost $1.8 billion in damages — and potentially more than $5 billion if the court ended up awarding the plaintiffs treble damages.

The settlement, if approved by the court, resolves that and similar suits faced by the NAR. It covers over one million of the NAR's members, its affiliated Multiple Listing Services and all brokerages with a NAR member as a principal that had a residential transaction volume in 2022 of $2 billion or less.

"Ultimately, continuing to litigate would have hurt members and their small businesses," Nykia Wright, NAR's interim CEO, said in a statement. "While there could be no perfect outcome, this agreement is the best outcome we could achieve in the circumstances."

The settlement does not include real estate agents affiliated with HomeServices of America and its related companies.

Last month, Keller Williams Realty, one of the nation's largest real estate brokerages, agreed to pay $70 million and change some of of its agent guidelines to settle agent commission lawsuits.

Two other large real estate brokerages agreed to similar settlement terms last year. In their respective pacts, Anywhere Real Estate Inc. agreed to pay $83.5 million, while Re/Max agreed to pay $55 million.

by Taboola

https://www.cbsnews.com/news/realtor-commission-settlement-nar-national-association-realtors/

# National Association of Realtors to cut commissions to settle lawsuits. Here's the financial impact.

By Megan Cerullo

Edited By Aimee Picchi

Updated on: March 15, 2024 / 8:59 PM EDT / CBS News

It could soon cost homeowners a lot less to sell their homes after a real estate trade group agreed to slash commissions to settle lawsuits against it.

The National Association of Realtors (NAR) agreed on Friday to pay $418 million over roughly four years to resolve all claims against the group by home sellers related to broker commissions. The agreement must still be approved by a court.

Almost 9 in 10 home sales are handled by real estate agents affiliated with NAR. The organization, the country's largest trade association, requires home sellers to determine a commission rate, typically 6%, before listing homes on its property database, known as the Multiple Listing Service, or MLS.

The lawsuits argued that the structure harms competition and leads to higher prices.

"NAR has worked hard for years to resolve this litigation in a manner that benefits our members and American consumers. It has always been our goal to preserve consumer choice and protect our members to the greatest extent possible," NAR interim CEO Nykia Wright said in a statement Friday. «This settlement achieves

both of those goals,»

## How will this impact real estate commissions?

Notably, the landmark deal will slash realtors' standard 6% sales commission fee, potentially leading to significant savings for homeowners. The group had been <u>found liable</u> for inflating agent compensation.

Fees could be slashed by up to 30%, the New York Times reported, citing economists.

That could impact earnings for 1.6 million real estate agents, who could see their $100 billion annual commission pool shrink by about one-third, analysts with Keefe, Bruyette & Woods <u>wrote</u> in a report last year about the pending litigation.

Standard commission rates in the U.S. are among the highest in the world. Real estate agents make money by pocketing a percentage of a home's sale price.

## Could homeowners save money?

Most likely, because homeowners are generally on the hook to pay the 6% commission when they sell their property, although sometimes the fee is split between the buyer and seller.

For instance, a homeowner selling a $1 million property would spend <u>up to $60,000 on agent fees</u>. If commissions are reduced by 30%, that same homeowner would pay a commission of about $42,000.

## How will it impact the housing market?

Housing experts expect the deal to shake up the housing market and even drive down home prices across the board.

Residential brokerage analyst Steve Murray, however, is skeptical that home prices will see a meaningful decrease as a result of the deal.

"It will have the impact of reducing commission costs for sellers; it will save money for sellers to the detriment of buyers," he said, adding, "Sellers don't set home prices based on what their closing costs will be," Murray said. "The market sets home prices."

While lower or more negotiable commission fees could incentivize some new homebuyers, LendingTree senior economist Jacob Channel doesn't expect the market to roar "back to life in the wake of this settlement," while mortgage rates remain high.

"Home prices and [mortgage] rates almost certainly play a much bigger role in someone's homebuying choices than how much they'll need to pay their real estate agent does," he said.

Earned Media Coverage                                                              11

https://www.housingwire.com/articles/nar-settles-commission-lawsuits-for-418-million/

**How the GSEs view collateral risk — and how lenders should be adjusting**

**Prices for pending home sales reach record high**

**AI accelerates lending. For real**

**Tim Quirk on elevating agents with Final Offer's data-driven platform**

LegalReal Estate

# NAR settles commission lawsuits for $418 million

The settlement bans NAR from establishing any sort of rules regarding agent commissions

March 15, 2024, 10:03 am *By Brooklee Han*

The **National Association of Realtors** has agreed to pay $418 million in damages to settle the real estate commission lawsuits. The trade group has also agreed to abolish the "Participation Rule" that required sell-side agents to make an offer of compensation to buyer brokers.

Taken together, the settlement and multiple rule changes will reshape how millions of sellers and buyers transact, and how their representatives get paid.

Some analysts and experts say the changes could wipe out billions in agent commissions in the coming years while accelerating a decline in the number of working real estate agents.

## Settlement terms

NAR's legal counsel approved the settlement agreement early Friday morning. It has yet to be filed in court. Lawyers for the trade organization anticipate the settlement will be filed in the coming weeks, however it will still be subject to court approval.

According to NAR, this settlement brings an end to all of the litigation claims brought by home sellers. However, the lawsuits filed by homebuyers, known as Batton I and Batton II, will continue.

The $418 million settlement will be paid over four years. The funds will be deposited into a trust that is controlled by the court. In settling, the plaintiffs in the landmark Sitzer/Burnett case in Missouri agreed to release NAR from

the jury verdict. In exchange, the NAR will not appeal the case.

## Rule changes for agents and brokers

In addition to the damages payment, the settlement also bans NAR from establishing any sort of rules that would allow a seller's agent to set compensation for a buyer's agent.

Additionally, all fields displaying broker compensation on MLSs must be eliminated and there is a blanket ban on the requirement that agents subscribe to MLSs in the first place in order to offer or accept compensation for their work.

The settlement agreement also mandates that MLS participants working with buyers must enter into a written buyer broker agreement. NAR said that these changes will go into effect in mid-July 2024.

"NAR has worked hard for years to resolve this litigation in a manner that benefits our members and American consumers. It has always been our goal to preserve consumer choice and protect our members to the greatest extent possible. This settlement achieves both of those goals," Nykia Wright, the interim CEO of NAR, said in a statement. "Ultimately, continuing to litigate would have hurt members and their small businesses. While there could be no perfect outcome, this agreement is the best outcome we could achieve in the circumstances. It provides a path forward for our industry, which makes up nearly one-fifth of the American economy, and NAR. For over a century, NAR has protected and advanced the right to real property ownership in this country, and we remain focused on delivering on that core mission."

The trade group also noted that the settlement agreement is not an admission of guilt and that the practice of cooperative compensation is still allowed as long as it is pursued off-MLS.

According to the NAR, buyer brokers still have a variety of ways to be compensated, including via a fixed-fee commission paid directly by the buyer, concessions from the home seller or a portion of the listing broker's compensation.

## Large brokerages must fight their own battles

In a letter to NAR members obtained by **HousingWire**, trade group president Kevin Sears noted that if approved, the settlement agreement would resolve all claims against NAR, as well as all state/ territorial and local Realtor associations, all association-owned MLSs, and all brokerages with an

NAR member as principal that had a residential transaction volume in 2022 of $2 billion or below.

"NAR fought to include all members in the release and was able to ensure more than one million members are included. Despite NAR's efforts, agents affiliated with **HomeServices of America** and its related companies—the last corporate defendant still litigating the Sitzer-Burnett case—are not released under the settlement, nor are employees of the remaining corporate defendants named in the cases covered by this settlement," Sears wrote in his letter.

While the agreement does not cover HomeServices of America or other brokerages with a total transaction volume of over $2 billion in 2022, NAR said it does provide a mechanism for all brokerages and non-Realtor owned MLS to obtain releases from these lawsuits if they wish to take that route. For MLSs that choose to use the release mechanism, Sears' letter notes that they will have to opt into the MLS practice changes that are a part of the agreement and pay a per-subscriber fee to the overall Settlement Fund.

## Who's still on the hook?

The real estate industry commission lawsuit struggles began in March of 2019, when the Moehrl commission lawsuit was first filed in Illinois. A month later, the Sitzer/Burnett suit was filed in Missouri.

These, as well as the other commission lawsuits, allege that real estate industry players, including NAR and many large national firms, have colluded to artificially inflate real estate agent commissions. The lawsuits take aim at NAR's Participation Rule which requires listing brokers to make a blanket offer of compensation to the buyer's broker in order to list a property on the MLS.

In late October, a Missouri jury in the Sitzer/Burnett suit found **Keller Williams**, NAR, and HomeServices of America liable for collusion. So far, no other commission lawsuit trials have taken place.

Prior to the trial, **Anywhere** and **RE/MAX** settled the Sitzer/Burnett, as well as Moehrl and Nosalek suits. Keller Williams reached a settlement agreement in these and other lawsuits in early February 2024.

In addition to paying a collective $208.5 million, in their settlement agreements, the three national real estate firms agreed to no longer require agents to be members of NAR, or follow NAR's Code of Ethics or the MLS Handbook, as well as practice changes, including that the firm will require or encourage agents to make it clear to clients that commissions are negotiable,

that agents will have the freedom to set or negotiate commissions as they see fit, and that agents will not be required to make offers of compensation or accept offers of compensation from cooperating brokers.

All three of the settlements have received preliminary approval from Kansas City-based U.S. District Court judge Stephen Bough. A <u>final approval</u> hearing for the settlement agreements is set to take place in early May.

In addition to the <u>commission lawsuits</u>, NAR has also been locked in an <u>ongoing legal battle</u> with the **Department of Justice** over its commission rules. In early October 2023, the DOJ <u>intervened</u> in the Nosalek <u>commission lawsuit</u> — in which NAR is not a defendant — claiming to have "significant concerns" over the terms of a settlement agreement the plaintiffs reached with defendant **MLS Property Information Network** (MLS PIN).

After objecting to two amended settlement agreements, the DOJ filed a statement of interest in the suit in mid-February 2024. In its <u>statement</u>, the DOJ advocated for an end to the practice of cooperative compensation. On Tuesday, Judge Patti B. Saris, who is overseeing the suit, granted a joint motion filed by MLS PIN and the plaintiffs to file responses to the DOJ's statement, as the parties said they "dispute the factual and legal arguments made in the <u>DOJ's Statement of Interest</u>."

In a statement issued Friday, Gary Acosta, the head of the National Association of Hispanic Real Estate Professionals (NAHREP), said the NAR made the "right choice by prioritizing the protection of its members from unfair liability, and preserving the option of broker cooperation; which reduces the financial burden on minorities and first-time homebuyers."

He added: "A major agreement within the settlement is that broker cooperation would remain legal, but cannot not be expressed or negotiated in the MLS. Broker cooperation can, however, be negotiated outside of the MLS and a seller's willingness to cover buyers' agent commissions can be explicitly expressed on broker websites, and other private platforms. From NAHREP's perspective, this deal point is not ideal for agents or consumers, but obviously better than an outright ban on broker cooperation."

*James Kleimann contributed reporting.*

**Related**

<u>The Real Brokerage settles Umpa commission lawsuit for $9.25M</u>April 8, 2024In "Legal"

<u>Many homebuyers lack knowledge about agent compensation: Redfin</u> April 11, 2024In "Real Estate"

<u>NAR alternative now has 3,800 members</u> April 10, 2024In "Brokerage"

More:

- <u>Commission Lawsuit</u>

- <u>National Association of Realtors</u>

- <u>RE/MAX</u>

Earned Media Coverage

https://www.kiplinger.com/real-estate/home-selling-costs-to-fall-following-nar-settlement



Save up to 74%

Subscribe to Kiplinger

News

# Your Home Selling Costs To Fall Following NAR Settlement

The standard 5% to 6% broker commission on home sales is about to become a thing of the past as the National Association of Realtors agrees to change rules.

Newsletter sign up



(Image credit: Getty Images)



BY ESTHER D'AMICO

PUBLISHED MARCH 15, 2024

The National Association of Realtors (NAR) has agreed to pay $418 million over four years and change certain rules to settle a series of lawsuits over the industry's sales commission fees, a move expected to greatly decrease home-selling costs.

"No longer will homeowners be required under NAR rules to offer compensation to buyers agents," Michael Ketchmark, lead attorney for the plaintiffs in the case, told Kiplinger in an interview. The new rules "will return the sale of homes to the free market and allow technology to benefit sellers of homes."

Those changes will provide a huge opportunity for the cost of selling a home to drop

dramatically, he added.

# Non-negotiable commission rule challenged

In their suit, the home sellers challenged NAR's rule requiring them to make non-negotiable commission offers to brokers to list their homes on MLS databases. A separate case involving similar charges and covering 14 states was also filed in Illinois.

NAR's proposed settlement will resolve the Missouri and Illinois cases for all of those defendants — except for HomeServices of America, which is still litigating the Missouri judgement, Ketchmark said.

Wright said that NAR has worked hard for years to resolve the litigation "in a manner that benefits our members and American consumers." The goal has been to preserve consumer choice and protect the group's members to the greatest extent possible, she said, adding that the settlement achieves both of those goals.

The settlement is currently unavailable for the public to view but is expected to be filed next week. For more on the Missouri case, you can view the District Court for the Western District of Missouri Western Division filing here.

- Home Sellers' Costs Could Soon Be Cheaper Due To This Court Case

- Selling Your Home? Set the Right Price

- What You Can Negotiate When Buying a Home

Earned Media Coverage                                                                                  19

https://www.nbcnews.com/business/real-estate/national-association-realtors-settlement-changes-rcna143634

REAL ESTATE

# What the National Association of Realtors' settlement means for consumers and real estate brokers

New rules could start saving home buyers and sellers thousands of dollars in lower commissions as soon as this summer, but experts say it will take the market some time to digest the changes.

0 of 15 seconds Volume 0%

Proposed settlement could mean end of 6% commissions for realtors

March 15, 2024, 2:42 PM PDT

By Christine Romans and Rob Wile

A groundbreaking $418 million settlement announced Friday by the powerful National Association of Realtors is set to usher in the most sweeping reforms the American real estate market has seen in a century. It could dramatically drive down homebuyers' costs — and push some real estate brokers out of business.

Here's a look at how we got here and what to expect in the months ahead.

## NAR already lost a big case

For decades, the NAR has required home sale listing brokers to provide an offer of compensation to a buyer's agent up front. That usually comes out to about 6%, split between a seller's broker and a buyer's agent.

But that model has come under intensifying scrutiny from critics who have likened it to a cartel. Late last year, a jury in a Kansas City federal court found the longstanding practice to be a form of collusion that artificially inflated real estate fees, awarding a massive $1.78 billion judgment against NAR.

## What changes now for homebuyers and sellers

If the settlement announced Friday is approved by a federal court, the standard 6%

commission goes away. Sellers would no longer have to make a compensation proposal to prospective buyers and their agents. Critics have said the encouraged brokers to push their clients toward more expensive properties.

Another new rule would see homebuyers having to sign an explicit deal with a broker before they start working with one — something experts say would lead many homebuyers to forgo using brokers entirely.

The new rules would kick in within months of approval, currently expected around mid-July.

## What about the next few months?

Everyone involved in the market should expect "a certain amount of uncertainty for the coming months," said Marty Green, principal at mortgage law firm Polunsky Beitel Green.

"The industry will be in transition as everyone digests the settlements and market forces begin working," he predicted. "We will begin to see some creative buyer's agent arrangements that may have been harder to get traction on before."

Home buyers and their agents will need to decide on a commission and put it in writing. Sellers, likewise, will need to work carefully with their listing agents as the new rules come into effect.

## U.S. consumers might save in the long run ...

The changes could mean buyers will save on commissions, eventually bringing U.S. fees more in line with the much lower transaction costs seen in other residential property markets around the world.

Some commissions could even be cut in half, Jaret Seiberg, housing policy analyst for TD Cowen Washington Research Group, told clients in a note Friday.

The new rules "should lead to commissions falling 25% to 50%, which we view as benefiting online real estate brokers," Seiberg wrote, but he warned it's too early to declare "the end of local real estate agents given their local expertise and reputation in neighborhoods. It is why we do not see this following the travel agency model in which online eclipsed local offices."

## ... but buyers could face more confusion

Holden Lewis, a home and mortgage expert at NerdWallet, warned of a "potential negative trade-off": "Buyer-seller negotiations will become more complex, and buyers with plenty of cash might navigate the process more easily than buyers who don't have

a lot of savings," he said. Seiberg flagged a similar concern in his note, saying it could particularly affect first-time buyers with limited means to pay for an agent.

Brokers and agents have come out against the settlement, saying it will make the home-buying process more byzantine for consumers and discounts the important role agents play in helping them navigate it.

"I'm a full-service real estate agent, so when I go to list my client's house, I align their goals with my goal, and that goal is selling for the highest amount possible," said Roy Remick, a realtor based in Northern Virginia, who said he often pays thousands of dollars of his own for services like staging homes to aid the sale process.

"This is ultimately someone saying, 'You guys make too much money,' which I don't think is right for someone to dictate," he said.

Buyers' agents will be left "flying blind" since they won't know how much they'll end up making from a given home, Remick warned. "We'll have to make a bunch of phone calls, because now we don't know what [the commission] is because we can't see it in the MLS. But we've already got an agreement with buyer how much they'll be able to compensate us."



Christine Romans

Christine Romans is the senior business correspondent at NBC News.



Rob Wile

Rob Wile is a breaking business news reporter for NBC News Digital.

Michael Bloom, CNBC contributed.

by Taboola

https://www.nerdwallet.com/article/mortgages/what-nar-settlement-means-for-home-buyers-sellers

MORTGAGES

WHAT THE BIG REALTORS SETTLEMENT MEANS FOR HOME BUYERS AND SELLERS

Advertiser disclosure

# What the Big Realtors Settlement Means for Home Buyers and Sellers

The agreement could mean that home buyers would set their own agents' pay, and sellers might save on commissions.



By Holden Lewis

Updated Mar 15, 2024

Edited by Mary Makarushka



Some or all of the mortgage lenders featured on our site are advertising partners of NerdWallet, but this does not influence our evaluations, lender star ratings or the order in which lenders are listed on the page. Our opinions are our own. Here is a list of our partners.

**FOLLOW THE WRITER**

MORE LIKE THIS Mortgages

A landmark legal settlement between home sellers and the real estate industry could cause a shakeup in the way homes are bought and sold, beginning this summer.

The National Association of Realtors announced Friday that it had agreed to pay $418 million to settle more than a dozen antitrust lawsuits that accused NAR of imposing rules that inflated real estate commissions. NAR admitted to no wrongdoing, according to the news release.

Under the settlement's terms, negotiations between buyers and sellers might become gnarlier. Home sellers would pay smaller commissions, allowing them to keep more of the proceeds from sales. And buyers, not sellers, would decide how much buyer's agents are paid.

The settlement would mark a significant change for buyers, sellers and real estate agents. It's uncertain how real estate markets will make the transition between now and mid-July, when the settlement is due to go into effect.

## What the lawsuits are about

The settlement stems from a federal class-action antitrust lawsuit, Burnett v. National Association of Realtors et al., filed in Kansas City, Missouri. Last October, a jury sided with the plaintiffs, agreeing that NAR and large brokerages conspired to inflate commissions paid by sellers.

It's one of more than 20 similar cases filed in federal courts nationwide, not all of them involving NAR, and the only one that went to trial all the way to a verdict. NAR said the proposed settlement in the Burnett case would resolve all of the lawsuits against the association, and will go into effect in mid-July if the court approves it.

NAR is a trade association with more than 1.5 million members working in the real estate industry. The association said the revised rules would affect anyone who uses a multiple listing service — a database of properties for sale in a geographic area — regardless of whether they are licensed Realtors, which is the designation for real estate agents who are members of NAR.

The lawsuits challenge NAR's cooperative compensation rule, which requires seller's agents to make "blanket unilateral offers of compensation" to buyer's agents. To list a home on an MLS, the seller must make this "blanket unilateral" offer to pay buyer's agents, who influence which houses their clients consider.

Plaintiffs contend that the cooperative compensation rule extorts sellers into paying inflated commissions to buyer's agents. "Home sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients," according to the plaintiffs in a lawsuit in Chicago — Moehrl v. National Association of Realtors et al.

## Buyers would set their agents' pay

With the elimination of cooperative compensation, sellers would no longer have to specify the size of the commission they'll pay buyer's agents. In fact, sellers would be banned under the new agreement from setting commissions for buyer's agents in MLS listings.

Instead, it would be up to buyers to set their own agents' pay. Some buyer's agents might charge flat fees, or an hourly rate, or they might charge a fee for each time they accompany a buyer to a showing. Those business models would exemplify the innovation in the industry that the Department of Justice wants to encourage, according to a filing in yet another court case — Nosalek v. MLS Property Information Network et al, in Boston.

## Negotiations would be more complex

Some observers worry that the new rule would make it even more difficult for buyers who are short on cash.

"If home buyers have to pay their buyers agent outside of settlement, it will increase

their financial burden," said Victoria Ray Henderson via email. Henderson works exclusively as a buyer's agent and owns HomeBuyer Brokerage, operating in Washington, D.C., and its suburbs in Maryland and Virginia. Settlement is another term for a real estate closing.

Buyers wouldn't necessarily have to pay their agents out of pocket. The new rule would allow buyers to ask sellers to pay the buyer's agents at closing. This means that agent compensation might become part of the negotiation.

"Hopefully they'd negotiate the buyer agent compensation and then that would just be included in the mortgage loan," says Stephen Brobeck, senior fellow for the Consumer Federation of America.

## What it means for buyers and sellers this spring

Sometime between now and when the settlement goes into effect in July, buyer's agents might start asking buyers to sign contracts that spell out how much the agents will be paid and at what point in the process. Over the same period, home sellers should consult their listing agents to make sure they're complying with the new rules. This settlement would likely apply to real estate agents whether or not they are members of NAR.

About the author



Holden Lewis

**FOLLOW**

Holden is NerdWallet's authority on mortgages and real estate. He has reported on mortgages since 2001, winning multiple awards. Read more

https://www.prnewswire.com/news-releases/national-association-of-realtors-reaches-agreement-to-resolve-nationwide-claims-brought-by-home-sellers-302090431.html

**PR Newswire**°

- [News](#)
- [Products](#)
- [Contact](#)

Search

- News in Focus
- Business & Money
- Science & Tech
- Lifestyle & Health
- Policy & Public Interest
- People & Culture

# National Association of REALTORS® Reaches Agreement to Resolve Nationwide Claims Brought by Home Sellers



NEWS PROVIDED BY

**The National Association of REALTORS®**

Mar 15, 2024, 09:50 ET

SHARE THIS ARTICLE

CHICAGO, March 15, 2024 /PRNewswire/ -- The National Association of REALTORS® (NAR) today announced an agreement that would end litigation of claims brought on behalf of home sellers related to broker commissions. The agreement would resolve claims against NAR, over one million NAR members, all state/territorial and local REALTOR® associations, all association-owned MLSs, and all brokerages with an NAR member as principal that had a residential transaction volume in 2022 of $2 billion or below.

The settlement, which is subject to court approval, makes clear that NAR continues to deny any wrongdoing in connection with the Multiple Listing Service (MLS) cooperative compensation model rule (MLS Model Rule) that was introduced in the 1990s in response to calls from consumer protection advocates for buyer representation. Under the terms of the agreement, NAR would pay $418 million over approximately four years.

"NAR has worked hard for years to resolve this litigation in a manner that benefits our members and American consumers. It has always been our goal to preserve consumer choice and protect our members to the greatest extent possible. This settlement achieves both of those goals," said Nykia Wright, Interim CEO of NAR.

Two critical achievements of this resolution are the release of most NAR members and many industry stakeholders from liability in these matters and the fact that cooperative compensation remains a choice for consumers when buying or selling a home. NAR also secured in the agreement a mechanism for nearly all brokerage entities that had a residential transaction volume in 2022 that exceeded $2 billion and MLSs not wholly owned by REALTOR® associations to obtain releases efficiently if they choose to use it.

NAR fought to include all members in the release and was able to ensure more than one million members are included. Despite NAR's efforts, agents affiliated with HomeServices of America and its related companies—the last corporate defendant still litigating the *Sitzer-Burnett* case—are not released under the settlement, nor are employees of the remaining corporate defendants named in the cases covered by this settlement.

In addition to the financial payment, NAR has agreed to put in place a new MLS rule prohibiting offers of broker compensation _on the MLS_. This would mean that offers of broker compensation could not be communicated via the MLS, but they could continue to be an option consumers can pursue off-MLS through negotiation and consultation with real estate professionals. Offers of compensation help make professional representation more accessible, decrease costs for home buyers to secure these services, increase fair housing opportunities, and increase the potential buyer pool for sellers. They are also consistent with the real estate laws in the many states that expressly authorize them.

Further, NAR has agreed to enact a new rule that would require MLS participants working with buyers to enter into written agreements with their buyers. NAR continues, as it has done for years, to encourage its members to use buyer brokerage agreements that help consumers understand exactly what services and value will be provided, and for how much. These changes will go into effect in mid-July 2024.

"Ultimately, continuing to litigate would have hurt members and their small businesses," said Ms. Wright. "While there could be no perfect outcome, this agreement is the best outcome we could achieve in the circumstances. It provides a path forward for our industry, which makes up nearly one fifth of the American economy, and NAR. For over a century, NAR has protected and advanced the right to real property ownership in this country, and we remain focused on delivering on that core mission."

"NAR exists to serve our members and American consumers, and while the settlement comes at a significant cost, we believe the benefits it will provide to our industry are worth that cost," said Kevin Sears, NAR President. "NAR is focused firmly on the future and on leading this industry forward. We are committed to innovation and defining the next steps that will allow us to continue providing unmatched value to members and American consumers. This will be a time of adjustment, but the fundamentals will remain: buyers and sellers will continue to have many choices when deciding to buy or sell a home, and NAR members will continue to use their skill, care, and diligence to protect the interests of their clients."

**About the National Association of REALTORS®**
The National Association of REALTORS® is America's largest trade association, representing more than 1.5 million members involved in all aspects of the residential and commercial real estate industries. The term REALTOR® is a registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS® and subscribes to its strict **Code of Ethics**.

**Information about NAR is available at _nar.realtor_. This and other news releases are posted in the newsroom at _nar.realtor/newsroom_.**

For further information contact:
Suzanne Bouhia, 202/383-1050
**sbouhia@nar.realtor**

SOURCE The National Association of REALTORS®

https://www.washingtonpost.com/business/2024/03/15/nar-real-estate-commissions-settlement/

BUSINESS

# Realtors' settlement could dramatically change cost of housing sales

The proposed deal with the National Association of Realtors would upend the rules that critics say help inflate commissions for home sellers.

By Julian Mark

,

Aaron Gregg

 and

Rachel Kurzius

Updated March 15, 2024 at 7:31 p.m. EDT|Published March 15, 2024 at 10:44 a.m. EDT

The National Association of Realtors has agreed to settle litigation that accused the industry group of artificially inflating real estate commissions, setting up a reconfiguration of the housing market that could dramatically lower how much consumers pay in home transactions.

**Get a curated selection of 10 of our best stories in your inbox every weekend.**

Under the proposed deal, the group representing 1.5 million real estate agents would change rules that plaintiffs and consumer advocates say have helped inflate commissions for home sellers, who for decades have paid Realtors 5 to 6 percent of the sale price. The association also would pay $418 million over four years to settle several cases.

"Ultimately, continuing to litigate would have hurt members and their small businesses," said Nykia Wright, interim chief executive of NAR. "While there could be no perfect outcome, this agreement is the best outcome we could achieve in the circumstances."

NAR said it continues to deny wrongdoing.

The rule changes have the strong potential to lower fees paid by sellers in home sales — and may even bring down home prices overall — by aligning fees closer to the true value of services from real estate agents, according to consumer advocates, academics and lawyers involved in the cases.

"There's no doubt in my mind that this is going to bring about tremendous savings to homeowners," said Michael Ketchmark, a plaintiff attorney representing Missouri home sellers in one of the cases, adding that he was confident that agreement would fundamentally change the real estate market and help lower the cost of housing and home sales.

Benjamin D. Brown, managing partner at Cohen Milstein, one of the firms representing the plaintiffs in the Illinois case, said the "settlement will bring sweeping reforms that will help countless American families."

The agreement still needs a federal judge's approval before it can take effect. Some skeptics, such as Redfin CEO Glenn Kelman, questioned whether the agreement would significantly change the status quo.

The Justice Department, which last year asked a federal court to reopen its antitrust investigation into NAR's rules, declined to comment on the settlement.

The association's century-old commissions structure provides that sellers' and buyers' agents split an amount that typically ranges between 5 and 6 percent of the home sale price. Home sellers in Illinois and Missouri alleged in a pair of class-action lawsuits that NAR's rules inflate commissions by requiring sellers' agents to make a compensation offer to list on the Multiple Listing Service, a home selling database.

In October, a Kansas City, Mo., jury found that NAR and major brokerages conspired to keep commissions artificially high and awarded a class of Missouri home sellers $1.8 billion in damages. Meanwhile, the case in Illinois had been moving toward a trial, focused on similar allegations. The agreement announced Friday, if approved by a judge, would resolve those cases and end the long-standing commissions structure, Ketchmark said.

Since the October verdict, experts predicted that the commissions system was poised for change. Not only was it threatened by the class-action cases, but the Justice Department had been asking the U.S. Court of Appeals for the D.C. Circuit to reopen an antitrust investigation into NAR's commissions rules that it had settled in 2020.

Earned Media Coverage                                                                              31

Experts say the proposed rule changes will result in a "decoupling" of commissions that have been traditionally borne by the seller and shared with the buyer's agent — a system that critics say was anticompetitive and kept fees high.

The settlement unveiled Friday would bar seller agents from using multiple listing services — Realtor-accessible databases where new homes are marketed — to post commissions they offer to buying agents. The option to denote buyer compensation will simply not appear in the multiple listing services, according to attorneys involved in the case.

If a federal court approves the settlement, the rules will take effect in July, according to a person close to the settlement talks who spoke on the condition of anonymity because they were not authorized to discuss it publicly.

It's likely that agents representing buyers will have to seek compensation directly from their clients because they will no longer get a guaranteed commission from the seller, according to Sonia Gilbukh, assistant professor at City University of New York Baruch College.

That could make it harder for cash-strapped parties to buy a home, she said. But she added that commissions should decrease, attracting less-experienced Realtors and exerting downward pressure on prices. Sellers, Gilbukh said, probably will see lower transaction costs if they no longer pay buyers' commissions.

"It might take time for the industry to shake out into a new equilibrium," Gilbukh said. "But overall, the reduced transaction fees should bring the [home] prices down."

The new system would not necessarily hurt low- and lower-income buyers, said Jenny Schuetz, a senior fellow at the Brookings Institution focused on housing. Closing costs such as buying down points or paying for title insurance get bundled into mortgage loans, and a buyer agent's fee could similarly be included. Plus, if sellers halve the fee they're paying to real estate agents, they might sell their home at a lower price because they keep more of the proceeds, Schuetz said.

"This doesn't have to be bad for low-income, first-time home buyers if we put in place supports so they understand how the process works, are empowered to negotiate with brokers over this and understand going into it what they're getting," she said.

Steve Brobeck, a senior fellow with the Consumer Federation of America, which has long studied the commissions issue, said that the agreement has the potential to shake

up the industry — and he said it's for the best.

"NAR has done the sensible thing and agreed to try to put this controversial issue behind them," he said.

Consumers "will be the big beneficiaries," said Brobeck, whose organization estimates that they will save $30 billion per year.

Other analysts also expect large savings for consumers. An October report by investment firm Keefe, Bruyette & Woods predicted that changes to the commissions structure could lead to a 30 percent reduction in the $100 billion annually that U.S. consumers pay in real estate commissions.

The settlement would set up two negotiations in the home sale process — one between the buyer and their agent, and another between the seller and their agent, Schuetz said.

"It's going to be really interesting to see, particularly on the buyer side, how much buyers are willing to pay in a fee to their broker to help them purchase a home, when before there was sort of this impression that buyers didn't pay a fee at all," Schuetz said.

In general, she said, people tend to be more sensitive to a tax or fee that is written out, rather than baked into the price. But buyers' needs vary widely, depending on their level of knowledge, the local market and the complexity of the transaction. Ideally, Schuetz said, agents will offer fees that match their skill level and the actual services provided — what others have referred to as an "a la carte" model.

"I could see some buyer's agents marketing themselves as, 'We are a full-service agent, we help you do all the things, we make this easier for you, and we charge a higher fee,' " Schuetz said. "And other buyer's agents saying, 'Hey, we're working with buyers who don't need a ton of help. We're kind of cut-rate, we'll offer you a reasonably low fee.' "

Advertisement

Redfin's Kelman cheered the proposed settlement, but said in a blog post that "it's still unclear if the settlement will end cooperation entirely." The real estate listing platform has long been a critic of the commissions structure and has cast itself as an alternative to the NAR system.

Although the settlement would strip mentions of compensation for buyers' agents from database listings, sellers could still offer money to buyer's agents, thus allowing for some degree of cooperation, Kelman said in his blog post.

"The result could be that agent-to-agent cooperation on fees is weakened but not killed," added Kelman, whose platform pays a majority of its agents a base salary on top of transaction bonuses that range between 1 and 1.5 percent of the sales price.

Nevertheless, he said, the settlement could "reshape agent attitudes about cooperation, and consumer attitudes about fees."

Earned Media Coverage                                                                                         33

After the settlement was announced, investors dumped shares in several of the sector's marquee names. The parent company of eXp Realty saw its stock price decline 9.9 percent and Anywhere Real Estate Inc. — which owns Sotheby's, Century 21 and Coldwell Banker, among others — lost 11.6 percent.

Redfin and fellow housing data aggregator Zillow lost 4.9 percent and 13.5 percent, respectively, as analysts expressed concern that shifting commissions structures could harm their revenue models. A large portion of Zillow's revenue, for example, comes from advertising for buyer's agents, while the company's premium subscription products could lose members if the industry shrinks.

Zillow believes "positive changes for consumers also benefit the agents who serve them well — on both sides of the transaction," a company spokesperson said.

Share

Earned Media Coverage                                                                        34

https://www.nytimes.com/2024/03/15/realestate/national-association-realtors-commission-settlement.html

# Powerful Realtor Group Agrees to Slash Commissions to Settle Lawsuits

The National Association of Realtors will pay $418 million in damages and will amend several rules that housing experts say will drive down housing costs.



The cost of selling a home in the United States could shrink as a result of a global settlement with the National Association of Realtors. Credit...Tony Cenicola/The New York Times



By Debra Kamin

March 15, 2024

American homeowners could see a significant drop in the cost of selling their homes after a real estate trade group agreed to a landmark deal that will eliminate a bedrock of the industry, the standard 6 percent sales commission.

The National Association of Realtors, a powerful organization that has set the guidelines for home sales for decades, has agreed to settle a series of lawsuits by paying $418 million in damages and by eliminating its rules on commissions. Legal counsel for N.A.R. approved the agreement early Friday morning, and The New York Times obtained a copy of the signed document.

The deal, which lawyers anticipate will be filed within weeks and still needs a federal court's approval, would end a multitude of legal claims from home sellers who argued that the rules forced them to pay excessive fees.

In a statement released on Friday morning, Nykia Wright, the interim chief executive of N.A.R., said "It has always been our goal to preserve consumer choice and protect our members to the greatest extent possible. This settlement achieves both of those goals."

Housing experts said the deal, and the expected savings for homeowners, could trigger one of the most significant jolts in the U.S. housing market in 100 years. "This will blow up the market and would force a new business model," said Norm Miller, a professor emeritus of real estate at the University of San Diego.

Americans pay roughly $100 billion in real estate commissions annually, and real estate agents in the United States have some of the highest standard commissions in the world. In many other countries, commission rates hover between 1 and 3 percent. In the United States, most agents specify a commission of 5 or 6 percent, paid by the seller. If the buyer has an agent, the seller's agent agrees to share a portion of the commission with that agent when listing the home on the market.

An American homeowner currently looking to sell a $1 million home should expect to spend up to $60,000 on real estate commissions alone, with $30,000 going to his agent and $30,000 going to the agent who brings a buyer. Even for a home that costs $400,000 — close to the current median for homes across the United States — sellers are still paying around $24,000 in commissions, a cost that is baked into the final sales price of the home.

The lawsuits argued that N.A.R., and brokerages who required their agents to be members of N.A.R., had violated antitrust laws by mandating that the seller's agent make an offer of payment to the buyer's agent, and setting rules that led to an industrywide standard commission. Without that rate essentially guaranteed, agents will now most likely have to lower their commissions as they compete for business.

Economists estimate that commissions could now be reduced by 30 percent, driving down home prices across the board. The opening of a free market for Realtor compensation could mirror the shake-up that occurred in the travel industry with the emergence of online broker sites such as Expedia and Kayak.

"The forces of competition will be let loose," said Benjamin Brown, co-chairman of the antitrust practice at Cohen Milstein and one of the lawyers who hammered out the settlement. "You'll see some new pricing models, and some new and creative ways to provide services to home buyers. It'll be a really exciting time for the industry."

# Turmoil at the National Association of Realtors

The powerful real estate group, which is the largest professional organization in the United States, has come under increasing scrutiny.

- A Landmark Deal: American homeowners could see a significant drop in the cost of selling their homes after the National Association of Realtors agreed to eliminate the standard 6% sales commission in a settlement with six Missouri home sellers.

- Losing Its Grip: The group, which was delivered a one-two punch of scandals in 2023, is facing competition from a new trade group that was started by two prominent real estate agents.

- Sudden Exits: The president of the N.A.R. resigned after just four months into her tenure, becoming the group's second president to abruptly step down. The N.A.R.'s chief executive also recently resigned.

- Harassment Allegations: The leadership exits come after The New York Times exposed complaints of sexual harassment in the N.A.R., including allegations against the group's former president.

The original lawsuit, filed in April 2019 by a group of Missouri home sellers, ended in a verdict of $1.8 billion in October. Because the suit included accusations of antitrust violations, plaintiffs could have been eligible for triple damages of up to $5.4 billion. In exchange for the reduction in damages, the association gave up its right to appeal. The verdict sent shock waves through the real estate industry and has since catalyzed into more than a dozen copycat suits across the country, including a nationwide class-action case that ensnares the country's largest brokerage and its owner, Warren E. Buffett. That brokerage, Berkshire Hathaway, has not settled, but others, including Keller Williams and Re/Max, have settled in separate cases. N.A.R. now joins them.

Under the settlement, tens of millions of home sellers will likely be eligible to receive a small piece of a consolidated class-action payout.

The legal loss struck a blow to the power wielded by the organization, which has long been considered untouchable, insulated by its influence. Founded in 1908, N.A.R. has more than $1 billion in assets, 1.3 million members and a political action committee that pours millions into the coffers of candidates across the political spectrum.

ADVERTISEMENT

The antitrust division of the Department of Justice is continuing its investigation of N.A.R.'s practices, including the organization's oversight of databases for home listings, called multiple listing sites or the M.L.S. The sites are owned and operated by N.A.R.'s local affiliates. For decades, the Justice Department has questioned whether these databases stifle competition and whether some N.A.R. rules foster price-fixing on commissions.

Some experts said the shift on commission structure, and the billions of dollars that would flow into the housing market as a result, could spark a recovery in the housing market, going so far as to say that it could be as significant as the 1930s New Deal, a flurry of legislation and executive orders signed by President Franklin D. Roosevelt designed to stabilize and rebuild the nation's economic recovery following the Great Depression. This included the Better Housing Program, which was designed to make housing and mortgages more accessible and led to the creation of the Federal Housing Administration.

The financial crisis of 2008, when home values imploded, and earlier changes to the mortgage industry in the 1970s and 1980s, including the creation of Freddie Mac and the introduction of the adjustable rate mortgage, also set off permanent transformations. With Friday's settlement, the process of buying and selling a home is now in for another historical change.

"This will be a really fundamental shift in how Americans buy, search for, and purchase and sell their housing. It will absolutely transform the real estate industry," said Max Besbris, an associate professor of sociology at the University of Wisconsin-Madison and the author of "Upsold," a book exploring the link between housing prices and the real estate business. "It will prompt one of the biggest transformations to the housing market since New Deal-era regulations were put in place."

Image

"N.A.R. is finally out of the business of forcing homeowners to pay inflated commissions," said Michael Ketchmark, the Kansas City lawyer behind the home sellers' legal triumph.Credit...Brett Pruitt at East Market Studios

The October verdict landed at a time of swirling controversy for the organization, and in the last five months, its internal turmoil reached a fever pitch. Its chief executive, Bob Goldberg, announced in a closed-door meeting that he would retire, just days after the verdict. His exit followed that of N.A.R. president Kenny Parcell, who resigned in August two days after a Times investigation revealed widespread allegations of sexual harassment.

In January, N.A.R.'s new president, Tracy Kasper, who had stepped into the role early with a pledge of reshaping the organization's culture and fighting the lawsuits at all costs, announced her own sudden exit after N.A.R. said Ms. Kasper was the target of blackmail.

Despite N.A.R.'s turbulence over the last several months, however, there was one constant: their insistence that the lawsuits were flawed and they intended to appeal. With Friday's settlement agreement, N.A.R. gave up the fight.

The settlement includes many significant rule changes. It bans N.A.R. from establishing any sort of rules that would allow a seller's agent to set compensation for a buyer's agent, a practice that critics say has long led to "steering," in which buyers' agents direct their clients to pricier homes in a bid to collect a bigger commission check.

And on the online databases used to buy and sell homes, the M.L.S., the settlement requires that any fields displaying broker compensation be eliminated entirely. It also places a blanket ban on the longtime requirement that agents subscribe to multiple listing services in the first place in order to offer or accept compensation for their work.

N.A.R. has repeatedly insisted that it does not own multiple listing sites, but the majority of them are owned and operated by the local Realtor associations that operate as N.A.R. subsidiaries. Now, with the settlement effectively severing the link between agent compensation and M.L.S. access, many agents are likely to rethink their membership in the association.

"The reset button on the sale of homes was hit today," said Michael Ketchmark, the Kansas City lawyer who represented the home sellers in the main lawsuit. "Anyone who owns a home or dreams of owning one will benefit tremendously from this settlement."

[Debra Kamin](#) reports on real estate, covering what it means to buy, sell and own a home in America today. [More about Debra Kamin](#)

A version of this article appears in print on March 16, 2024, Section A, Page 1 of the New York edition with the headline: Realtors Agree To Cut Their Fees. [Order Reprints](#) | [Today's Paper](#) | [Subscribe](#)



**site categories**

https://www.hollywoodreporter.com/lifestyle/real-estate/national-association-of-realtors-settlement-real-estate-industry-commissions-1235854008/

BY **HADLEY MEARES**

MARCH 16, 2024 9:45AM



Real estate commissions ADOBESTOCK

On Friday morning, March 15, star real estate brokers across the country awoke to the news that the embattled National Association of Realtors (NAR), which represents around 1.5 million agents, had made an industry-altering deal. Not only will NAR settle several lawsuits claiming artificial inflation of commissions to the tune of $418 million, but also it will institute rule changes that may bring soaring real estate prices down while decreasing realtors' commissions significantly.

"NAR has worked hard for years to resolve this litigation in a manner that benefits our members and American consumers. It has always been our goal to preserve consumer choice and protect our members to the greatest extent possible," NAR interim CEO Nykia Wright said in a press release. "This settlement achieves both of those goals."

So seismic was the news that some of the country's biggest brokerages refused to comment to *The Hollywood Reporter* on the deal. If the new rules are approved by a judge, agents will no longer be allowed to bake the industry standard of 5 to 6 percent commission into their MLS listings. Brokers will also be required to sign a buyer's broker agreement directly with clients and not be required to sign up for multiple local MLS sites. Currently, a commission for the buyer's agent is baked into a deal and paid by the seller.

According to *USA Today*, The Consumer Federation of America has predicted commission rates could fall 3 to 4 percent, while homeowners could save $20 billion to $30 billion in commission payments each year. The historic run-up in home prices nationwide over the last decade and a half has been accompanied by a proliferation of TV shows about the high-flying real estate business, including *Million Dollar Listing*, *Selling Sunset*, *Buying Beverly Hills*, *Selling the Hamptons*, *Kendra Sells Hollywood* and *Flip or Flop*.

Many L.A. industry leaders were cautious in their assessment of the proposed agreement. "Regarding the NAR settlement, we are still in the early innings of this game," Stuart Vetterick, broker associate at Hilton & Hyland/Forbes Global Properties, told *THR*. "It will be critical for everyone in and around this industry to pay close attention as each aspect of the plan is worked through and disseminated."

Some believe that slashing standard agent commissions will have a devastating impact on the industry. "There are countries that are structured similar to what I think the Department of Justice [which has been conducting a probe of the real estate industry and its competitive practices] and these plaintiffs are looking for. And in those countries, Australia being a preeminent example, less than 10 percent of buyers use an agent, and when they do, they only

pay one percent. So essentially the buyer agent commission is gone and that is something that could happen in this country," Jason Oppenheim told *THR* in 2023. "If buyers aren't required to have agents in the U.S., in the future you'll see a million jobs lost. You'll see 500,000 to 750,000 agents leave the profession, and you'll see probably a quarter million people who work at large brokerages lose their jobs."

A vocal critic of NAR, which dominates the industry via its MLS system, is celebrity real estate agent Mauricio Umansky, co-founder of The Agency brokerage and star of Netflix's *Buying Beverly Hills* real-estate reality series. Earlier this year, Umansky and New York-based Compass agent Jason Haber announced a new, alternative trade association to NAR named the American Real Estate Association. They also set up an alternative nationwide listing database to rival MLS, the National Listing Service.

"The American Real Estate Association believes NAR's decision to settle this lawsuit unequivocally demonstrates a lack of interest in serving their members or safeguarding consumer interests," Umansky said in a statement to *THR*. "American Real Estate Association is actively collaborating with Fannie Mae and HUD to bolster the buyer's incentive program to include commissions. NAR's self-serving involvement in this settlement is primarily aimed at ensuring the organization's financial stability over the next several years. As industry leaders, it's imperative that we remain vigilant in safeguarding the interests of buyers while also fostering a transparent and equitable real estate market for all stakeholders."

Thomas Ma, founder of Real Messenger, which aims to give brokers control over their listings, is more positive, believing a new day is dawning in the world of real estate. "We are witnessing a monumental shift in the real estate market. Agents will need to compete on commission rates, which may impact service quality, and prospective buyers will shop around for the best deal before committing to a purchase," says Ma. "We are entering a new era where brokers will transparently advertise their fees, signaling the biggest change in the housing market in a century. Are these changes ultimately good for the consumer? Time will tell."

Not all celebrity real estate agents are worried about the proposed changes, remaining confident that their services will continue to be highly valued, especially by high-net-worth individuals when selling luxury properties. Michael Reisor, a real estate agent with Douglas Elliman's Eklund | Gomes team in Austin, Texas, told *The Washington Post* regarding the settlement, "It does put the emphasis on what we always felt was most important: You have to be showing value to your clients, and you have to be providing exceptional service and communication constantly. And nobody should be paying for a service if they don't feel that there's value there."

If the NAR settlement and changes are approved, they are expected to go into effect in mid-July, giving brokerages just a few precious months to figure out what it all means. But most are up for the challenge (not that they have much of a choice). "Change creates opportunity, and in this case, the true professionals in our business will now be charged with articulating the value we've always demonstrated," says Nick Segal, managing broker of Carolwood Estates. "We are ready for this new reality and will continue to provide tremendous value to both the buyers and sellers we have the privilege to serve."



Illustration: Brendan Lynch/Axios

https://www.axios.com/2024/03/18/nar-settlement-home-buying

The powerful National Association of Realtors last week agreed to settle a big lawsuit and change the way real estate agents get paid — from effectively a standard commission to something truly negotiable.

**Why it matters:** The deal could open up a tightly controlled market to genuine competition, and create opportunities for new players and business models in a relatively old-fashioned world.

- It could do for real estate what the internet did for stock trading — bring down broker fees.

**The impact:** That'll likely mean lower costs for sellers, who brought the lawsuit as a class action. The impact on buyers is more complicated.

**How it works now:** Sellers pay a 5%-6% commission on the sale price of their home.

- Typically, the seller's agent and buyer's agent split the commission.

- It effectively means the buyer's agent is working for the seller — a conflict of interest. (Agents, of course, dispute this characterization and say their reputations depend on them doing a good job for buyers.)

**Under NAR rules** sellers are *required* to advertise the buyer agent commission on the Multiple Listing Service, the database where real estate agents put homes for sale.

- There's even a specific box just for this number.

- Homebuyers don't see the number, but their agents do. The risk is that agents are incentivized to steer clients to the higher-fee deals — putting their interest in a higher fee above the buyer's interest in finding a good house.

**That box goes away** if the court approves this settlement. Sellers could no longer promise a commission to buyers' agents.

- It seems like a bureaucratic little detail — a box! — but the implications are massive.

**Key question:** How will buyer agents get paid? A few possibilities:

- A flat fee out of the buyer's pocket.

- Buyer agrees to pay a percentage of the sale price to the broker or pays an hourly rate. Maybe they skip having a broker at all.

- The real estate industry is emphasizing that a seller could still actually cover the buyer agent's fee. But that would have to be negotiated later on in the deal process — as a concession. Just as now sellers sometimes offer a cash credit on a deal to cover repairs or other things.

**Follow the money:** Future home sellers are clear winners here. They should be able to keep more of the proceeds when they sell a house.

- **Another potential winner:** Online and discount real estate brokerages that offer lower commission rates, per a note from TD Cowen.

- "You'll probably see a cottage industry of no-frills Realtors," says Marty Green, a real estate lawyer based in Dallas.

**Yes, but:** The picture for first-time buyers and those with tight budgets is murkier.

- They'll no longer get a real estate agent for free — and might wind up paying out of pocket for the service, depleting cash they need for that down payment and other fees. And it's not clear if they can roll an agent's fee into a mortgage. That may require regulatory changes.

- But were buyers ever getting a *free* agent?

**The bottom line:** Most observers believe commissions will fall — a lot. Possibly to as low as 1%-1.5% per agent on each side, says Steve Brobeck, a senior fellow at the Consumer Federation of America.

**What's next:** The settlement could go into effect as early as July, but the big changes won't happen fast.

- "It'll take a long time for a truly competitive marketplace to emerge," says Brobeck, who's pushed for reforms like this for decades. "The industry will resist this."

Share on facebook (opens in new window)

Share on twitter (opens in new window)

Share on linkedin (opens in new window)

Share on email (opens in new window)

Go deeper

https://www.vox.com/money/24106230/nar-realtors-settlement-real-estate-house-prices

# Could a major lawsuit against realtors mean lower home prices?

What the National Association of Realtors settlement means for buyers and sellers.

By Whizy Kim@whizyk  Mar 20, 2024, 9:50am EDT

## Share this story

- Share this on Facebook
- Share this on Twitter
- SHARE All sharing options



A realtors' trade group has agreed to a major settlement that could mean lower fees for home sellers. Getty Images

Whizy Kim is a reporter covering how the world›s wealthiest people wield influence, including the policies and cultural norms they help forge. Before joining Vox, she was a senior writer at Refinery29.

Are home prices about to fall?

That's the question many of us are asking after the National Association of Realtors,

the trade group representing the industry, agreed to cough up $418 million as part of an antitrust lawsuit alleging that the group had artificially inflated realtor commissions that home sellers pay — which, in turn, helped inflate home prices.

Until now, home sellers paid about 6 percent of the sale price toward a fee that would be split between their own agent and the buyer's agent. Experts are divided on exactly how much impact this will have on home buyers, who will now likely have to start paying their agents themselves. The median sale price of homes as of late 2023 was about $417,700 — 6 percent of that amounts to a little over $25,000.

As Business Insider's James Rodriguez noted, lower fees don't automatically mean homes will be cheaper. In certain cases, it's possible that sellers might list their home for the same price they would have before the settlement, and pocket more of the sale. But lower commission fees can also encourage more homeowners to list their property on the market, which could lower house prices overall.

The fact is, this real estate settlement is still too new for anyone to know for sure what the ripple effects will be. But one potential winner is tech companies in the real estate space, such as Zillow and Redfin, which have made it more feasible for people to start the home-buying process on their own instead of with a real estate agent. Vox spoke to Sonia Gilbukh, a real estate professor at City University of New York, Baruch College, to explore some of the possible outcomes.

The following conversation has been edited for length and clarity.

What was the problem with the old way realtor commissions worked? And how does this settlement change that?

It used to be that when a seller hired their agent to list a property for sale, they were paying the full commission for the transaction, which was approximately 6 percent — sometimes 5 and a half. The selling agent would then offer about half of that commission to the buyer's side. Then the buyer's agent will bring their clients to show all the properties, and if they end up buying the house, [the buyer's agent] would be entitled to that commission that the seller agent was advertising for the property.

There were several rules that were part of the NAR settlement. Can you explain the new rule that sellers can't advertise buyer agents' commissions on the multiple listing service, or MLS, the portal that many realtors subscribe to in order to share and receive information about for-sale homes?

Yes, so the settlement is that they can no longer say, "I'm going to offer the buyer agent 3 percent," for example, or 2.5 percent. So now, what happens is that the buyer's agent basically would have no way to know whether they're going to be paid for the work that they do. So something will have to change. Most likely, the buyer agents will have to directly negotiate with the buyer on the commission that they're going to receive on a

transaction.

Is it still possible that the seller's agent would pay the buyer agent's fee?

I think if they really wanted to, they could still post it on their website — there are ways to communicate that. But I think it would be harder to sell that as an industry standard, to the seller. Because the way it worked before is that the selling agent would say, "If you want to sell your house, we have to offer the buyer agent 3 percent, the industry standard. If we don't, then the buyer agents are not going to show your house to their clients and you're not going to be able to sell." Now I feel like it would be harder to make that argument.

I'm guessing that new ways of compensating buyer agents will emerge — maybe some flat fee services, or they'll negotiate to get paid a percentage of the deal but out of the buyer's pocket. I don't think they're going to be able to keep the status quo.

I've been seeing in various reports that the old system, of the seller paying both agents, incentivized a practice called "steering." Can you explain what that is, and is it really common?

Steering is a practice where the buying agent will not show, or discourage their buyers from properties that offer lower commissions.

Maisy Wong, Panle Jia Barwick, and Parag Pathak have a paper called Conflicts of Interest and Steering in Residential Brokerage, and they show that when buyer agents are offered less than the industry standard, the homes have more trouble selling. That's basically their conclusion, that the buyer agents are steering their clients away from homes that offer lower commissions to them. I think there's some potentially alternative explanations — if you offer less commission than the standard, maybe you're particularly hard to deal with, difficult to negotiate with. But we certainly do see that in the data, that if you're offering less than the standard, you were potentially jeopardizing your sale outcomes.

The plaintiffs for this lawsuit were home sellers. Beyond lower fees, what does this mean for sellers? Are there other benefits for them?

Well, we don't know what's going to happen, but let's say that they're no longer responsible for the buyer commission, then the sellers are going to be paying a 3 percent transaction cost. Now, of course, most people who sell their house also then buy a different house — so they're still going to be paying the buyer commission on the new house that they buy.

I think what's going to come out of this decoupling of the commission — that the buyer is going to pay for their agent, the seller's going to pay for their agent — is that the commissions are going to become more negotiable.

And what will happen for buyers? Will some of them forgo hiring a realtor at all? Will the process of searching for a home look different?

I was talking to my mother-in-law, who is a real estate agent, and she actually owned a brokerage before. She was telling me that she views buyers to be in one of two categories: Either you're a first-time buyer, or you're somebody who's selling their house and also buying something else. Those who are selling and then buying, they probably have a relationship with their agents, they probably want their agents to help them buy. So it could be a similar scenario of the status quo for them, with the possibility of maybe shaving a little bit more off the commission.

For new buyers, I think the option of paying a flat fee is going to be more attractive, because it's going to be cheaper for them to pay a flat fee of, say, $2,000 for you to help me navigate the paperwork or something like that.

Will this mean that home prices fall?

I think eventually, if the transaction costs are going to fall, because the commissions are going to become cheaper and more negotiable. That will put a downward pressure on houses — I also think that will bring more people to sell their homes, because the transaction fee falls, people are going to be more likely to move.

I see. But you said "eventually," so it's not necessarily something we might see right away.

Yeah, I think it's hard to know what's going to happen — how buyer agents are going to be compensated, and [if] we still have buyer agents at all. We're in this period of murky transition. For now, it's pretty easy to sell because there's just not a lot of inventory. But there's not a lot of transactions actually happening.

I'm curious why we used this structure in the first place. Why have sellers typically paid both selling and buying agents?

It became the industry standard [in a period when] we had no information out there. We didn't have Zillow. So buyer agents had a monopoly on information; if I'm not compensated as a buyer agent, or if my compensation is uncertain, then I'm going to only show [clients] the listings where I'm also the seller agent. When the commission structure changed, it improved the cooperation between agents, so they ended up showing their clients listings from other agencies. So that was actually really good.

But of course, now we have Zillow. And the potential for [buyer agents] to steer their clients only to their listings is very limited right now. There's sort of no need for this system anymore.

Since commissions have historically been paid as a percentage of the sale, did that incentivize agents to show more expensive listings?

For the selling side, they have the incentive to sell at the highest price, essentially. But when you talk to agents, their main objective is to have the transaction happen in the first place. If they put the price too high, they risk the transaction not happening at all, then it's not really a good trade-off. There's also this thinking that the big houses sort of subsidize the salaries of the agents, who then also work with cheaper homes.

Some experts seem to think that this settlement will mean some real estate agents exit the industry. Do you think that's likely? And if there are fewer realtors, is that good or bad for home buyers?

I think that's very likely. I think most new people who come into the profession start out as buying agents, so if their compensation is going to fall, it's not going to be worth it for them to enter anymore.

I do think it's a good thing overall. I actually have a paper, with my co-author Paul Goldsmith-Pinkham, about the experience of real estate agents, and we find that over a quarter of all agents in the market have no experience at all. I think those are the people most likely to exit. As a result, we're going to have more experienced real estate intermediaries, and more competitive pricing. So I do think it's overall a good thing for consumers.

What's the housing market like right now? Is it a seller's market or a buyer's market?

I think it's still a seller's market, but it's sort of artificial, because we still have pretty low inventory. So yes, houses are selling quickly, but mostly because there aren't a lot of homes for sale. Once we're past this lock-in period — right now, most of the homes have been sold on really low mortgage rates, so it's hard for sellers to sell and buy something new, because mortgage rates are so much higher. But eventually people will start moving, and eventually they'll be paying off their loans. So maybe eventually the [mortgage] rates will also drop.

What else is possible in terms of reform and change in the real estate industry?

They could just straight-up outlaw sellers paying buyer commissions — but the current settlement essentially all but does that.

Are there reasons other than the long-term possibility of lower home prices for sellers and buyers to get excited about this settlement? Just how important is it?

I think it's important. I think there's going to be more experienced agents out there to represent buyers and sellers. I think the prices are going to drop — a little or a lot, we don't know yet — but I think they'll have to adjust. I think there's going to be more people willing to move homes because the transaction cost of doing that is going to be lower.

The point you make about more homes just being on the market — that seems huge, because as you said before, one of the biggest roadblocks we're facing is low inventory.

Yes, yeah.

I do want to say that, even though I've done extensive research on inexperienced agents, I do think that experienced professionals are really valuable. People should seek help, because [buying a property] is the most important transaction in their lives, probably.

Earned Media Coverage                                                                50

https://www.cnbc.com/2024/03/20/what-the-settlement-on-home-sale-commissions-means-to-you.html

# What a $418 million settlement on home-sale commissions may mean for you

PUBLISHED WED, MAR 20 2024·2:03 PM EDT·UPDATED THU, MAR 21 2024·12:45 PM EDT

Ana Teresa Solá

SHARE Share Article via FacebookShare Article via TwitterShare Article via LinkedInShare Article via Email

## KEY POINTS

- The National Association of Realtors agreed to a $418 million settlement in an antitrust lawsuit last week.

- The proposed settlement is likely to change the way Americans buy and sell homes.

- While it may take time for these changes to materialize, here's what to consider if you're entering the housing market this year.



**WATCH NOW**

VIDEO 04:21

## Redfin CEO reacts to NAR's $418 million commission lawsuits settlement

A landmark class-action lawsuit may change the way Americans buy and sell homes.

The National Association of Realtors agreed to a $418 million settlement last week in an antitrust lawsuit where a federal jury found the organization and several large real-estate brokerages had conspired to artificially inflate agent commissions on the sale and purchase of real estate.

The NAR's multiple listing service, or MLS, used at a local level across areas in the U.S., facilitated the compensation rates for both a buyer's and seller's agents.

At the time of listing a property, the home seller negotiated with the listing agent what the compensation would be for a buyer's agent, which appeared on the MLS. However, if a seller was unaware they could negotiate, they were typically locked into paying the listed brokerage fee.

More from Personal Finance:
When (and if) you'll get student loan forgiveness
The easiest way for newbies to start investing
FAFSA 'fiasco' may result in fewer students going to college

The proposed settlement would have the commission offer completely removed from

the NAR's system and home sellers will no longer be responsible for paying or offering commission for both the buyer and seller agents, said real estate attorney Claudia Cobreiro, the founder of Cobreiro Law in Coral Gables, Florida.

"The rule that has been the subject of litigation requires only that listing brokers communicate an offer of compensation," the NAR wrote in a press release.

"Commissions remain negotiable, as they have been," the organization wrote.

However, some of these changes may take time to materialize, experts say.

## Settlement process 'can take some time'

If a settlement agreement is accepted within a lawsuit between two people, the court generally won't look at the settlement. Yet, in a federal class-action lawsuit, one that affects a large number of people, there will be a period for the court and interested parties to review the settlement and offer commentary and feedback on the agreement, Cobreiro said.

"That's the process that we're about to enter, and that process can take some time," she said.

As proposed, the settlement would have the NAR completely remove commissions from its MLS system by July. That may be optimistic, Cobriero said.

"It would be more realistic to see this being implemented later this year," she said.



5:36A PACIFIC
**REDFIN CEO ON NAR SETTLEMENT**
CNBC

WATCH NOW

VIDEO 04:49

## Redfin CEO on NAR settlement: People should have a voice in how much a real estate agent gets paid

In the meantime, it's "business as usual" for buyers and sellers, Cobreiro said. "There is nothing that agents should be doing differently currently in their ongoing transactions."

A buyer or seller already in the market is probably not going to be affected by the settlement unless their property happens to be on the market a little longer than what's customary, she said.

"The big gray area here is how will buyer [agent] commissions be handled moving forward," said Cobreiro, as there is no finalized agreement yet that clearly indicates how that will be handled.

## What the settlement could mean for homebuyers

The settlement agreement doesn't say that the buyer's agent will not be paid nor that the buyer's agent cannot charge fees.

"The big question here is who is going to pay for those services moving forward. Will it ultimately be a buyer that will have to get the buyer's agent's commission together, on top of closing costs and on top of down payment?" Cobreiro said.

While commission fees are negotiable between involved parties, knowing what cards you have on the table as a homebuyer will be more important now than before. Using an agent will still be a smart way to achieve that, experts say.

"A great local agent can give you a competitive advantage," said Amanda Pendleton, a home trends expert at Zillow Group. That's especially true as low-priced starter homes are expected to remain in demand, she said.

Here are two things to know about how the settlement could change the process of buying a home:

1. Buyers could be responsible for their agent fees: Historically, real estate commissions typically come out of the seller's pocket, and are split between the buyer's and seller's agents.

As a result of the settlement, the seller will no longer be responsible for commission fees for a buyer's agent. So this is a new potential charge buyers need to consider in their budget. Historically, if a buyer's agent got half of a 5% or 6% commission, that equaled thousands of dollars.

For example: The median home sale price by the end of 2023 was

Earned Media Coverage                                                                                54

$417,700, [according to the Federal Reserve](). That would mean commissions at a 5.37% rate — the 2023 average rate, [according to Lending Tree]() — amount to roughly $22,430, about $11,215 of which might go to the buyer's agent.

But bypassing an agent's services may not lead to direct savings, especially for first-time buyers, experts say. You could put yourself at risk by leaving the homebuying process entirely to the seller and their agent, said Cobreiro.

Sometimes things show up in your [home inspection report]() that merit a credit from the seller, but if you don't have an agent, the seller's agent may not volunteer that, said Cobreiro.

Doing so would be a breach of their fiduciary duty to the seller, and it affects their commission if the price of the property declines, she said.

"Signing the contract is the least of it; there's so many things that happen throughout the transaction that really require the expertise and the navigation by someone who understands the process," she said.

2. Buyers may be required to sign a contract early on: If buyers become responsible for their agent's commission, you're likely to see more agents asking buyers to sign a buyer-broker agreement upfront, before the agent starts helping them find a property.

Most brokerages have a buyer agency agreement, but it's common for real estate agents to wait to present the contract.

"They want to win the person's business, they don't want to scare them with having to sign any contracts," said Steven Nicastro, a former real estate agent who writes for Clever Real Estate.

Moving the contract talks to earlier in the process is a precaution to protect buyer's agents in the market.

"That could lead to negotiations actually taking place at the first meeting between a buyer and the buyer's agent," Nicastro said.

Know you can negotiate the commission rate as well as the duration of the contract, which can span from three months to a year, Cobreiro said.

https://www.nar.realtor/magazine/real-estate-news/law-and-ethics/the-truth-about-the-nar-settlement-agreement

# The Truth About the NAR Settlement Agreement

March 22, 2024

Legal

## Share

Share

Misinformation has been pervasive in the media over real estate commissions. Here are the facts you should know.



© artisteer - iStock/Getty Images Plus

The national conversation around real estate commissions reached a crescendo since the National Association of REALTORS® announced a settlement agreement that would resolve litigation brought on behalf of home sellers related to broker commissions. Brokers and agents have their own questions about what comes next for their businesses, while at the same time trying to answer consumer inquiries. And many headlines aren't separating fact from fiction, feeding misinformation to you and your clients.

Let's clear the air: There's no doubt the litigation—including copycat lawsuits that were filed after the Sitzer-Burnett verdict—caused considerable uncertainty in an industry already dealing with the effects of low inventory and interest rate increases. The settlement, which must be approved by a judge, provides a path forward for real estate professionals, REALTOR® associations, brokerages, MLSs and other industry stakeholders. Most importantly, it gives NAR members the chance to refocus on their core mission to support buyers and sellers.

## Facts First

There's much the media has gotten wrong about NAR's settlement, which would require the association to pay $418 million over four years. Some outlets have suggested that NAR previously set or guided commissions to a standard rate of 6%. Even President Joe Biden, in recent comments, misspoke in suggesting that the settlement makes commissions negotiable for the first time.

You know that is false. NAR does not set commissions, and commissions were negotiable long before this settlement. They are and will remain entirely negotiable between brokers and their clients. And housing prices are dictated by market forces beyond members' control.

Getting the facts right is important, especially because the settlement agreement is complex. NAR is continuing to engage with media to correct inaccurate reporting about the settlement. Members are also encouraged to refer to official NAR sources, like facts.realtor, for the most accurate and up-to-date information about the settlement and what it means for consumers.

The settlement achieves two important goals: protecting members to the greatest extent possible and preserving consumer choice. The proposed settlement:

1. Resolves claims against NAR and nearly every member; all state, territorial and local REALTOR® associations; all association-owned MLSs; and all brokerages with an NAR member as principal whose residential transaction volume in 2022 was $2 billion or below.

2. Preserves cooperative compensation as an option for consumers looking to buy or sell a home—as long as such offers of compensation occur off of the MLS.

NAR fought for a release that covered all industry players, but large settlements reached by other corporate defendants shaped the negotiations. Throughout the settlement process, NAR also engaged with a diverse range of members to consider their perspectives and interests.

"Ultimately, continuing to litigate would have hurt members and their small businesses," NAR Interim CEO Nykia Wright said in a statement. "While there could be no perfect outcome, this agreement is the best outcome we could achieve in the circumstances. It provides a path forward for our industry, which makes up nearly one-fifth of the American economy, and NAR. For over a century, NAR has protected and advanced the right to real property ownership in this country, and we remain focused on delivering on that core mission."

## How To Know If You're Covered

Nearly every member is covered by the release NAR negotiated in the settlement. The members not covered are those affiliated with HomeServices of America, the last co-defendant in the Sitzer-Burnett litigation, and the employees of the co-defendants in the Gibson and Umpa cases.

If you are affiliated with any of the following brokerage groups and are an independent contractor licensee, you are covered by the proposed settlement, even if your brokerage may not be covered:

- At World Properties LLC

- Compass Inc.

- Douglas Elliman Inc.

- Douglas Elliman Realty LLC

- eXp Realty LLC

- eXp World Holdings Inc.

- Hanna Holdings Inc.

- HomeSmart International LLC

- Howard Hanna Real Estate Services

- Real Broker LLC

- The Real Brokerage Inc.

- Realty ONE Group Inc.

- Redfin Corporation

- United Real Estate

- Weichert, REALTORS®

All other REALTORS® who are members of NAR on the date of class notice are covered by the release. The date of class notice is anticipated to be in mid-July.

Members on the date of class notice and state/territorial and local REALTOR® associations must abide by the practice changes set forth in the agreement, but they do not need to take any other action in order to benefit from the negotiated release.

The release does not cover brokerage firms with residential transaction volume above $2 billion in 2022, despite NAR's effort to include them. For those companies, the settlement provides an avenue to pursue inclusion in the release but does not obligate them to do so.

## Changing Business Practices

The settlement agreement also mandates two key changes to the way members and MLS participants do business.

1. NAR agreed to create a new MLS rule prohibiting offers of

compensation on the MLS. This would mean that offers of compensation could not be communicated via an MLS, but they could continue to be an option consumers could pursue off-MLS through negotiation and consultation with real estate professionals.

2. NAR also agreed to create a new rule requiring MLS participants working with buyers to enter into written agreements with their buyers before the buyer tours a home. NAR has long encouraged its members to use written agreements to help consumers understand exactly what services and value they provide, and for how much.

NAR continues to deny any wrongdoing and maintains that cooperative compensation is in the best interest of consumers. NAR members can use these changes as an opportunity to explain their clients' options. Both changes would go into effect in mid-July under the terms of the proposed settlement.

NAR considered a range of legal options throughout the litigation process, including reaching a settlement or continuing to appeal the Sitzer-Burnett verdict and litigate the related copycat cases. The latter could have forced the association to file for Chapter 11 bankruptcy protection, leaving members, associations, MLSs and brokerages exposed.

## Resources for Members

NAR is committed to supporting members through these changes. Members can get the facts about the settlement at facts.realtor, which is regularly updated with new information and resources, including FAQs.

For those who want to prepare for the new MLS rule requiring buyer representation agreements, consider taking the Accredited Buyer's Representative (ABR®) designation course(link is external), which NAR is offering to members at no cost through the end of the year.

"NAR exists to serve our members and American consumers, and while the settlement comes at a significant cost, we believe the benefits it will provide to our industry are worth that cost," NAR President Kevin Sears said in a statement.

"NAR is focused firmly on the future and on leading this industry forward. We are committed to innovation and defining the next steps that will allow us to continue providing unmatched value to members and American consumers.

"This will be a time of adjustment, but the fundamentals remain: Buyers and sellers will continue to have many choices when deciding to buy or sell a home, and NAR members will continue to use their skill, care and diligence to protect the interests of their clients."

Search REALTOR® Magazine

https://billingsgazette.com/news/state-regional/nar-settlement-montana-mar-housing-market-home-sales/article_b0e62ef6-e892-11ee-9d49-7b6f3dfbf34f.html



BUSINESS

# Proposed national lawsuit settlement could impact home buying in Montana

**Christina Macintosh**

Mar 25, 2024

If you're looking to buy a house sometime after mid-July, you might want to study up on some negotiation tactics.

If a proposal to settle various lawsuits against the National Association of Realtors (NAR) is approved by the courts, negotiation between buyers and buyer's agents for the price of services will become a part of the home-buying process.

Realtors would like to underscore that the change is still just a proposal, subject to court approval. But Realtors across Montana are looking towards the future and what the settlement could mean for the industry.

Earned Media Coverage

"I'm 24 years in the business and this is clearly the single largest change to the way real estate works that I've ever seen," said Brint Wahlberg, a Realtor in Missoula.

The class-action lawsuits — an original suit filed in 2019 led to "copycat" suits across the nation — allege that NAR and its affiliates withhold information about buyer broker compensation from buyers, which limits the ability of buyers to negotiate a more favorable price for services and leads to less competition between Realtors.

The new rules seek to introduce more competition into the market, to do what competition in a market is supposed to do: lower costs and improve quality.

While these new rules could ultimately lower the cost of broker's services for home buyers, the change could also lead to difficulties in paying for these services, because mortgage financing does not allow for compensation for an agent, according to Realtors.

"Where there's going to be a need for anything changed, it's going to be at the national level," said Cindi Siggs, CEO of the Gallatin Association of Realtors, of changes to mortgage rules.

The settlement, if approved, would apply to the 1.5 million Realtors who are members of NAR — including 5,617 Realtors in Montana — and the buyers they serve. The settlement will also require buyer brokers to have written agreements with their buyers, though Montana is one of 13 states that already require this.

Jaymie Bowditch, a lawyer for the Montana Association of Realtors, said the changes will be discussed "extensively" at an upcoming MAR meeting in April.

"MAR will probably start trying to provide some information on some mechanisms by which we can now seek to structure compensation for buyer agents," Bowditch said in a video posted to MAR's Facebook.

Currently, the vast majority of buyer brokers are paid through a commission on the sale of the home — ostensibly by the seller, who sets a commission for the broker. This offer is listed on the multiple listing service (MLS), the platform through which Realtors list and view properties.

But the Department of Justice sees who is footing the bill a little differently.

*Listen now and subscribe: Apple Podcasts | Google Podcasts | Spotify | YouTube | RSS Feed | SoundStack | All Of Our Podcasts*

"Buyer broker fees, though nominally paid by the home's seller, are ultimately paid out of the funds from the purchase price of the house," reads a press release.

NAR maintains that the fee paid to a buyer's agent has always been negotiable. But almost all MLS systems do not show buyers the commission offered to buyer brokers for different homes, according to the DOJ. Buyer brokers were even able to advertise their services as free before **the practice was prohibited by NAR** in 2021 in response to lawsuits.

 "These rules also make home buyers both less likely and less able to negotiate a discount or rebate off the offered commission," reads a Q&A on the case by the DOJ.

Amber Parish, president of the Billings Association of Realtors, and Mike Lake, CEO of Big Sky MLS, said that within their organizations, buyers can always ask their buyer broker about the commission price.

But if the proposed settlement is approved, buyers will be taking a more active role in determining the price of buyer broker services. This new era will not only require negotiation on the part of buyers, as well as advocacy on the part of buyer brokers.

"If a buyer's agent can't explain their value, they're going to have a hard time with these changes and maybe this industry isn't for them," Wahlberg said. "If it washes out people that have a hard time adapting, I don't think that's a bad

thing."

The number of Realtors increased between February 2019 and February 2024, by 13.5% nationally and 26% in Montana.

"Like any industry, you see an ebb and flow when times get tough versus when times are easy," Wahlberg said, noting that the Missoula Organization of Realtors shrunk from about 700 Realtors in 2007 to 500 by 2011.

Realtors warn that buyers who choose to forego a Realtor could end up spending more money later, addressing problems that could have been alerted by a Realtor and negotiated with the seller.

"People need protection and guidance in a transaction," Siggs said.


As for guidance for Realtors, the extent of NAR guidelines for state and local groups remains to be seen.

"As MAR, we have already had a couple of calls, including a Zoom, and we will be working through this, hopefully with some direction and assistance from NAR," Bowditch said.

That said, he said that payment models with "absolutely not" be determined by NAR.

"NAR has not always been the best at being forthcoming about changes," Parish said. "With legal issues, you kind of have to keep your mouth shut on those."

Parish hopes to have more information on new requirements with sufficient time to train agents and appropriately update the MLS system before any changes go into effect.

Earned Media Coverage                                                                                          65

https://www.ocregister.com/2024/03/25/sold-a-home-recently-heres-what-youll-get-from-the-418-million-realtor-settlement/

NEWS

HOUSING

Explainer, News

# Sold a home recently? Here's what you'll get from the $418 million Realtor settlement

Here are four key takeaways from the National Association of Realtors pact ending price-fixing lawsuits.



A home recently sold in Santa Ana on Friday, March 22, 2024. The National Association of Realtors has agreed to pay $418 million and change its rules to settle lawsuits claiming homeowners have been unfairly forced to pay artificially inflated agent commissions when they sold their home. (Photo by Leonard Ortiz, Orange County Register/SCNG)



By JEFF COLLINS | JeffCollins@scng.com | Orange County Register

PUBLISHED: March 25, 2024 at 8:00 a.m. | UPDATED: March 25, 2024 at 8:00 a.m.

Sold a home in the last four years?

Congratulations. You're entitled to a piece of the $418 million Realtor settlement fund.

But don't expect a big windfall.

Since you will be among 21 million other Americans who are part of the "settlement class," the amount per seller — after deducting attorneys' fees — could be as low as $13.

That's a pittance compared with the $18,000-$22,000 commission Southern California sellers typically pay buyers' agents — on top of what they paid their own agents.

"It's not going to be a lot of money," said Jack Miller, president and chief executive of Orange County-based consulting firm T3 Sixty. "It's not really a financial thing. The rules changes are the bigger deal here."

See also: Accused of price-fixing, Realtors talk change at annual convention in Anaheim

The size of the seller payout is one of four key takeaways from the 107-page settlement reached this month between plaintiffs in more than 20 class-action lawsuits and the National Association of Realtors.

Homeowners and their attorneys argued in federal lawsuits across the nation that the decades-old practice of requiring sellers to post compensation offers for buyer agents amounted to price-fixing, keeping the 5-6% commission rate artificially high.

NAR called those claims meritless and vowed to appeal.

Faced with protracted litigation, NAR decided to settle on behalf of its 1.5 million members and more than 200 Realtor-affiliated groups named as defendants.

Under the settlement, announced March 15, NAR agreed to pay $418 million, or less than a quarter of the $1.8 billion a Kansas City jury order it to pay Missouri home sellers in October.

In addition, the trade group agreed to revise its commission rules, dropping the requirement that sellers post offers of compensation in a listing database called an MLS or multiple listing service.

Some billed the agreement as an "earthquake" that's likely to topple the standard 6% commission rate.

A senior fellow for the Consumer Federation of America predicted commissions could fall as much as 30% over the next few years as buyer agents compete for business.

Some real estate professionals pushed back, denying that commissions will fall much, if at all.

One industry blogger called the settlement a "total victory for NAR," arguing things will change little.

The settlement must win court approval before becoming effective, possibly in July.

Here are key takeaways from that settlement.

1. Buyers and their agents must sign a contract

While most home sellers sign listing agreements with their agents, only about a fifth of California buyers sign contracts, according a California Association of Realtors estimate.

Under the settlement, Realtors and buyers must enter into a written agreement before the buyer can tour any homes. The contract must specify the amount or rate of agents' compensation.

The amount of compensation can't be an open-ended phrase like, "whatever amount the seller is offering the buyer's agent."

See also: Realtor associations deluged with 'copycat' commission lawsuits

Agents also can no longer say their services are free unless they're actually working pro bono.

"It's going to be a different game," said Art Carter, chief executive of the California Regional Multiple Listing Service, which covers most of Southern California. "For the first time, buyers and their agent are going to be under contract for the entirety of their relationship, and that discussion is going to happen up front."

CRMLS General Counsel Edward Zorn called the mandatory buyer contracts "the change that's going to impact the consumer the most."

2. How buyer agents get paid will be up for grabs

The settlement doesn't spell out how buyer agents get paid, so it's possible sellers will continue to pay buyer's commissions — or that some sellers will pay buyer commissions while some buyers will pay their own fees.

While the settlement prohibits offers of buyer-agent compensation on the MLS, sellers still can use the MLS to make offers of "concessions," which buyers can use to pay closing costs, pay for repairs — or to pay their broker fees.

Listing agents also can still make compensation offers by any means outside the MLS — such as on their own websites.

Industry officials are hoping federal lending rules will be changed, allowing buyers to use part of their mortgage to pay their broker fees.

Zorn believes some buyers may include a request in their purchase agreement asking the seller to pay their broker fees.

"Now the buyer and the seller are negotiating how the buyer agent gets paid," he said.

Since current rules prevent veterans receiving VA loans from paying commissions, the

Department of Veterans Affairs also will need to revise those regulations.

Miller, the T3 Sixty CEO, predicted some buyers will face a difficult period as the industry goes through a transition.

"Consumers, especially first-time homebuyers (and) lower-income consumers … are struggling just to get the down payment together," Miller said. "To place the additional cost or burden on them of paying an agent for representation may make homeownership totally unattainable for them."

3. Will commissions really drop?

Industry insiders challenge media reports that commission rates or home prices are about to fall because of the settlement.

Rancho Cucamonga agent Laurel Starks was rankled by headlines like "Homebuying's 6% commission is gone."

"Blatantly false narratives have been published by mainstream media," Starks said in an email. "Fictional statements are being published as though they are fact."

Some observers also question the speculation that home sellers will lower their prices since they're saving money on commissions. Miller and others note that bidding wars over a limited supply of homes are driving up home prices, not commissions.

"We think (sellers are) going to keep the money," Miller said. "They are going to sell their home for what the market will bear."

On the other hand, economists and consumer advocates expect commissions to drop by as much as $30 billion a year because of increased agent competition.

Consumer advocate Stephen Brobeck believes the NAR settlement will make price-fixing much more difficult.

"Buyers as well as sellers will be able to negotiate rates, which will be more transparent," said Brobeck, a senior fellow at the Consumer Federation of America. "Discount brokers will be empowered to compete more effectively with agents trying to maintain 5-6% rates."

He predicted commissions will decline by 20-30% over the next several years, "which represents tens of billions of dollars of annual consumer savings."

Real estate commissions total about $100 billion a year, according to one industry estimate.

Rob Hahn of Las Vegas, a former industry consultant who writes a real estate blog under the moniker Notorious R.O.B., has an entirely different take on the settlement.

Asked how much commissions will drop, he said, "None. Zero. … Nothing changes."

The settlement doesn't eliminate seller-paid buyer commissions, he said. And it will do little to

end the practice of "steering," or directing clients to homes offering the biggest commissions.

"Agents already are out there saying, I'm just going to call that agent and say, 'What are you guys offering?' "

If the listing agent says, "Nothing, we're not required to," he wrote, some agents will say, "Good luck selling (that house)."

"Steering is illegal, and yet, it happens all the time," Hahn said. "I don't know this settlement changes any of that."


4. Who qualifies for settlement payments?

Anyone who sold a home after Oct. 31, 2019, will be eligible for a payment, so long as it was listed in an MLS and a commission was paid.

Sellers should receive notification if they're entitled to a payment.

More than 21 million homes sold in that period, NAR figures show.

Assuming legal fees consume one-third of the settlement, that leaves just under $300 million for home sellers, or just over $13 apiece.

"Homeowners will get a cup of coffee, and lawyers will get millions," Hahn said.

The total settlement pool is expected to reach about $2 billion once payments are included from large brokerages such as Re/Max, Anywhere, Keller Williams and others still negotiating, the Consumer Federation's Brobeck said. That would raise individual payments to $63 per seller.

"But," Brobeck added, "the main goal of the litigation was to change industry policies and practices, and that will certainly occur."

**The Home Stretch:** Our weekly newsletter breaks down the news on affordability, renting, buying, selling & more.


SIGN UP

By signing up, you agree to our Terms of Use, Privacy Policy, and to receive emails from The Orange County Register.

https://www.brookings.edu/articles/how-will-the-national-association-of-realtors-settlement-affect-the-cost-of-selling-or-buying-a-home/

**COMMENTARY**

# How will the National Association of Realtors settlement affect the cost of selling or buying a home?

**Ben Harris** and **Liam Marshall**

March 29, 2024



Shutterstock / Gorodenkoff

Earlier this month, the National Association of Realtors (NAR) reached a settlement agreement to resolve a series of lawsuits against the organization. The key issue in the lawsuits was the practice of "tying," whereby NAR members require that commissions paid to buyers' agents be set by the seller's agent when a home is listed. These NAR

practices dominate the realty market in the United States, as close to 90% of all homes sold are listed through a Multiple Listing Service (MLS). The settlement agreement could upend the entire realty market and meaningfully change how Americans buy and sell homes. Given the size of the market—each year American consumers pay around $100 billion in real estate commissions—the agreement has also the potential to impact the U.S. economy more broadly.

# Why is the practice of "tying" buyer and seller commissions harmful?

The practice of tying commissions—whereby MLSs mandate that buyers' agents be offered a pre-determined commission—has been shown to inhibit competition and drive-up fees. Under tying arrangements, the compensation for a buyer's agent is established before the buyer can be sure of the quantity or quality of the services their agent will provide. Not only does this make it harder for buyers to negotiate fees, tying also means that sellers may have to offer higher commissions to maximize the chance they sell their home. The pressure to offer high commissions largely occurs through the practice of "steering," whereby buyers' agents can tacitly direct their clients to favor those homes which offer the industry standard commission. A study by economists Panle Jia Barwick, Parag A. Pathak, and Maisy Wong found that homes which failed to offer buyers' agents at least 2.5% commission had a 5% less chance of being sold, and those that did sell would spend an average of eight additional days on the market.

The anticompetitive impact of tying is exacerbated by several factors. First, in ten states, buyers are legally prohibited from receiving rebates on their commissions—meaning that the commission paid to buyers' agents cannot be negotiated. Second, buyers are generally unaware of the commission levels offered by prospective home sellers, with only one in roughly 600 local MLSs permitting brokers to publish commissions offered to buyers' agents. This severe lack of transparency means that homebuyers may be unaware of their agents' incentive to steer them toward high-commission properties.

Public pressure to reform the realty market may be stunted by perceptions about who ultimately pays for realty services. Although the seller directly funds the buyer's commission out of the proceeds from the sale, economic theory dictates that the buyer ultimately bears a portion the burden (or "incidence") of the buyer's commission as the purchase price of the home would be lower in the absence of commissions.

# Are there other competition concerns unrelated to tying?

Yes. One concern is around steering by buyers' agents away from properties offered for sale outside of the MLS—namely "for sale by owner" (FSBO) properties. Here, buyers' agents—who often represent both buyers and sellers in a local market—have a long-term incentive to discourage home sales that are not listed by an agent. An additional concern is that some state-level policies require sellers' agents to offer a minimum level of services. This essentially prohibits sellers from offering brokers ultra-low commissions or fees to list their homes with the MLS and discourages consumers from pursuing "a la carte" realty services. Thirteen states and Washington D.C. have effectively banned a la carte services, while in nine states, consumers can only purchase a la carte services after waiving their "right" to full-service representation.

# What are the details of the settlement agreement?

On March 15, 2024, NAR offered a settlement to resolve several lawsuits claiming that NAR's policies drove up commission prices and harmed home sellers. The settlement comes in the wake of the October 2023 verdict to the Sitzer-Burnett case, which directed NAR and some of the nation's largest real estate brokerages to pay $1.8 billion in damages. The verdict accompanies a series of similar lawsuits with targets that included

NAR, regional realtor associations, real estate brokerages, and listing services. The agreement would protect NAR and most of its members from these lawsuits and reduce the damages they must pay.

If the agreement is approved, NAR will pay $418 million in damages. More importantly, tied compensation for sellers' and buyers' agents will no longer occur on MLSs. Furthermore, buyers and their agents will have to explicitly agree about what services agents will provide, online MLS databases will no longer display commission rates, and NAR will also be required to permit real estate agents to be paid for their work without subscribing to an MLS.

# What is the state of play with various lawsuits?

In addition to protecting NAR and most of its members, the proposed settlement agreement would cover many NAR-affiliated organizations, including regional realtors' associations. That said, the settlement does not cover all members of NAR; employees of larger brokerages and those working for corporate defendants who have not settled Sitzer-Burnett (or its many follow-ups) are not protected. The agreement does provide these groups with the option to adopt the rules of the settlement and contribute to the settlement payment to be released from liability.

Furthermore, this settlement does not resolve all the legal troubles that NAR and the rest of the real estate industry are facing. Class-action lawsuits brought by home buyers are ongoing. The Department of Justice also continues to pursue NAR commission rules. In February 2024, the Department of Justice asked a judge to deny a settlement agreement for a different class-action suit, arguing that the changes to cooperative compensation proposed by the agreement were insufficient to reduce commissions.

# What does this mean for how Americans buy and sell their homes?

The outcome is unclear and will likely depend on whether the settlement is approved in a federal court. If the settlement is approved, the practice of tying and steering will likely come to an end—meaning that homebuyers can better negotiate on the level of commission and more easily seek alternative compensation models, such as paying by the hour, flat-fee compensation, or purchasing sharply reduced levels of service. Home sellers, too, will likely be less pressured to list through the MLS and/or with a licensed agent.

These alternative models and practices will almost certainly mean lower costs of housing transactions, although the magnitude is unclear. Analysts often look to comparable countries, where sellers' commissions are typically below 2%, to project the evolution of the American market. Commissions falling to this level would amount to tens of billions in annual windfalls to American households that engage in real estate transactions.

# How will this impact the U.S. economy?

This windfall would likely be treated as a gain in wealth—similar to a rise in stock prices—and would disproportionately benefit middle-class families who have an outsized share of their wealth invested in housing. Because consumers typically spend only a small share of their gains in wealth, such a windfall is unlikely to meaningfully influence consumer demand.

The decline in the average commission could also improve geographic mobility. The "all-in" costs of buying and selling a home in the United States—including realtor commissions, fees to lenders or mortgage brokers, charges for title services, and transfer

taxes—can exceed 10% of a home's value in many markets. This high transaction cost can effectively serve as a tax on mobility, which has been falling for decades. Reduced mobility makes it difficult for people to relocate to areas with better jobs, limiting their lifetime earnings. Research has shown a negative association between transaction taxes and housing turnover, indicating that lower commissions might lead to a reversal in the long-term decline in mobility.

The impact on the labor market is unclear, especially for the nation's roughly 2 million real estate agents. One plausible outcome might be the number of agents declining over time, with those remaining in the realty market taking on a higher number of home transactions each year. Another plausible outcome is that the market experiences a boom in innovation and entrepreneurship, with new business entrants experimenting with various models of home buying and selling.

### AUTHORS



**Ben Harris** **Vice President and Director** - Economic Studies, **Director** - Retirement Security Project@ econ_harris



**Liam Marshall** **Research Assistant** - Economic Studies

https://www.curbed.com/article/nar-settlement-broker-commission-new-york.html

What Does This Big Settlement About Broker Commissions Mean for New York?

**10 COMMENTS**

---

**THE BUSINESS OF BROKERING** UPDATED APR. 8, 2024

# What Does This Big Settlement About Broker Commissions Mean for New York?



By Kim Velsey, *Curbed's real-estate reporter*



Photo: halbergman/Getty

It's been a tough spring for the National Association of Realtors. In March, the powerful trade group reached a $418 million settlement over agent commissions, agreeing to

eliminate its rules on sales commissions, practices that plaintiffs claimed artificially inflated sales commissions. Industry types all seem to agree that this will likely have far-reaching implications for people who work in the real-estate industry and homeowners — the New York *Times* wrote that housing experts expect it "could trigger one of the most significant jolts in the U.S. housing market in 100 years." Then, in early April, a federal appeals court ruled that the Department of Justice's previously settled antitrust probe into the trade group's policies could be reopened. Per Reuters, the court ruled that the government hadn't made a commitment "to refrain from either opening a new investigation or reopening its closed investigation" in its previous settlement.

## So what's this lawsuit about Realtor commissions all about?

In October, a federal jury ruled that the National Association of Realtors had conspired to artificially inflate commissions and ordered the powerful trade group to pay damages of $1.8 billion. The ruling was the result of an anti-trust suit brought by a group of Missouri home sellers in 2019, which argued that the industrywide practice of requiring the seller to pay both the seller's and buyer's agent commissions, and other practices that resulted in a nationwide standard of 5 to 6 percent, which is much higher than in many other countries, violated anti-trust laws.

While NAR initially vowed to appeal the ruling, the group has undergone internal tumult with a sexual-harassment scandal and a series of leaders departing in quick succession. There were other compelling reasons to settle: Because the case involved anti-trust violations, the plaintiffs could have been eligible for triple damages of $5.4 billion, the *Times* reported. And separate litigation in Chicago expected to go to trial this year could have threatened a damages award of more than $40 billion, according to *The Wall Street Journal.*

In addition to the suit against NAR, there are more than a dozen copycat class-action suits against the country's largest brokerages. Some have settled their suits — Anywhere Real Estate, which includes the Corcoran Group, Sotheby's International Real Estate, Coldwell Banker, and Century 21, paid $83.5 million in September. Others, notably Warren Buffett's HomeServices of America, have not.

## What does the NAR settlement mean for sellers and buyers?

The most immediate impact is expected to be a drop in commissions — economists who

spoke with the *Times* estimated that they could fall by 30 percent — as a result of home sellers being able to more easily negotiate fees with their agents. And buyers, who must now pay their own agents, may elect to forgo one altogether, or opt for pared-down services, like having an agent prepare an offer and a contract, while conducting home searches, inspections, and other parts of the sales process alone. Whether that's a good thing or a bad thing is debatable: While sites like Zillow and Redfin have made it easier to find homes, brokers argue that buyers benefit from representation, and if they must pay agents out of their own pockets, many will opt not to use one — to their detriment.

There is a widespread hope that a reduction in commissions, which are baked into sales prices, may cause home prices to fall, but that remains to be seen.

## What does the NAR settlement mean for real-estate agents?

Besides less money, at least for some, it's widely believed that it will lead to a winnowing of the industry — *The Wall Street Journal* reports that the shake-up could drive out hundreds of thousands of agents.

The settlement will also have implications for Multiple Listings Services across the country, the dominant way that agents outside New York City list their properties. (In New York, the Real Estate Board of New York, REBNY, which is not affiliated with NAR, has its own real-estate listings service.) Previously, getting a listing in the MLS — a necessity of selling in many markets — required joining NAR and following its rules. If that's no longer necessary, "you're going to see innovation," says Jason Haber, a Compass agent who recently launched an alternative broker-trade group, the American Real Estate Association.

## Like what?

It's hard to say this early on. Some have likened the fallout to the demise of travel agents and the rise of online booking sites like Expedia and Kayak. One thing is certain, though: Expect more tech start-ups to try to get a piece of the action. We've already had emails from several. What remains to be seen is whether the increased competition will actually lead to lower prices or improve buyers' and sellers' experiences.

## What does this mean for New Yorkers?

New York agents aren't part of NAR, so while the settlement doesn't directly impact things here, the consequences are expected to reverberate throughout the industry. Many of the brokerages operating in the city have already reached separate settlements

over agent commissions, and in January REBNY underlined implemented new rules prohibiting listing brokers from paying buyers' agents.

## Does this mean renters don't have to pay brokers anymore?

No, the changes only apply to seller and buyer commissions. Renters still have to pay commissions, which once averaged 12 percent but have increasingly crept up to 15 percent and, in some cases, much more. Last year, City Councilmember Chi Ossé introduced a bill that would require whoever hires the rental broker — in most cases, the landlord — to pay the fee. It didn't pass, but a few weeks ago, Ossé reintroduced it.

## And what's the deal with the DOJ investigation that was reopened in April?

While it seemed like the $418 settlement might help NAR close the book on anti-trust litigation, on April 5 a Federal Appeals Court ruled that the DOJ could re-open an investigation into the trade group that had been closed three years earlier, after the DOJ and NAR reached a settlement. In 2021, however, the DOJ moved to reopen, according to Reuters, citing a "continuing threat of anticompetitive effects of NAR's rules." With the latest ruling, the DOJ can re-open its investigation. NAR is not pleased — in a statement Friday, the group said that, "the government should be held to the terms of its contracts."

Earned Media Coverage                                                                    80

https://finance.yahoo.com/personal-finance/nar-settlement-182020981.html

**yahoo!finance**

# What the NAR settlement means for home buyers and sellers



Yahoo Personal Finance· Getty Images

Robin Hartill, CFP®

Updated Mon, Apr 22, 202410 min read

Suppose you sold a $400,000 home under the long-established norms of the real estate business. You probably paid $20,000 to $24,000 in agent commissions, which your listing agent split with the buyer's agent.

Were their services worth the price? For years, the question was scarcely asked. Commissions were an assumed part of the transaction, unofficially non-

negotiable.

However, the default real estate commission of 5% to 6% could be on its way out. A recent settlement the National Association of Realtors (NAR) agreed to is expected to disrupt the traditional commissions model and force agents to compete on pricing.

What does the NAR settlement mean for you if you're buying or selling a home? Here's what we know about the potential ramifications.

Read more: How to buy a house

## What is the NAR settlement?

In 2019, a group of Missouri home sellers filed a class-action lawsuit against the National Association of Realtors, claiming antitrust violations and alleging that its practices inflated commissions. A jury sided with the plaintiffs, awarding a nearly $1.8 billion verdict against the powerful trade group that represents about 1.5 million real estate professionals last October.

To settle that lawsuit, along with several similar suits, NAR agreed to pay $418 million to people who have sold homes in recent years. The group also agreed to two rule changes:

- When agents list homes on the Multiple Listing Services (MLS) databases, they'll no longer be allowed to include the buyer agent's compensation.

- Buyers will need to have written agreements with their agents.

NAR denied any wrongdoing in settling the lawsuits. A federal court still needs to sign off on the agreement. If approved, the new rules are expected to take

effect in mid-July.

Also read: How to sell your house without a Realtor

## Does the agreement kill the 6% commission?

No. The agreement doesn't directly change how much real estate agents earn in commission. And NAR is adamant that it "does not set commissions, and commissions were negotiable long before this settlement," according to a website post.

To list a home on the MLS, agents historically have had to include buyer commissions. Though it's always been possible to advertise a commission of less than 2.5% to 3% on the MLS, listing agents have often warned sellers against doing so because buyer agents may "steer" their clients away from properties that advertise lower compensation. Or they may filter listings on the MLS to display only those with at least a 2.5% commission. Fear of steering is a "strong deterrent" to sellers who might otherwise reduce commission offers, according to the U.S. Department of Justice, which has an ongoing antitrust investigation into NAR's practices.

Meanwhile, potential buyers have had no incentive to negotiate the commission downward because sellers pay that cost. Many economists argue that buyers do pay for commissions because they're baked into the home's selling price. But since the money isn't directly coming out of their pockets, buyers have long been blissfully unaware of commissions, with some believing agent services are free.

Under the new rules, commissions for buyer agents can't be listed on the MLS. Meanwhile, buyers would need their own agreement that specifies compensation before they work with an agent. (Sellers could still cover the cost

Earned Media Coverage                                                                                    83

of the buyer agent's commission, but we'll get to that shortly.) The new rules are expected to make commissions more transparent and competitive in the real estate industry.

"I do believe the commissions will drop," said Sophia Gilbukh, assistant professor of real estate at Baruch College's Zicklin School of Business in New York City. "Even if the compensation structure remains cooperative, the commissions will become more salient to buyers and sellers, and they will be more inclined to negotiate with their agent."

Read more: 12 questions to ask when buying a home

## Does the NAR settlement ban agents from advertising commissions?

No. Agents will still be allowed to discuss and advertise commissions. They simply won't be able to do so via the MLS.

"Compensation to the buyer's broker could be posted on the websites of brokerage firms and individual agents, individual property websites, social media, and other advertising resources engaged by the brokerage firms and their agents," said Debra Dobbs, real estate broker with The Dobbs Group of Compass in Chicago.

Sellers could still use the MLS to advertise concessions for buyers, including help with closing costs. But the offer can't be contingent on a buyer working with or paying an agent.

## How could the settlement change real estate commissions?

More competition is likely to drive commissions downward, but it could also prompt agents to offer non-traditional pricing for their services. More agents

could offer flat fees, hourly charges, and a la carte pricing instead of charging a percentage of the home's selling price.

"As listing agents, we may need to get more creative in how we market our services and distinguish our value propositions to sellers," said Jim Gray, a Keller Williams agent in Rochester, N.Y. "This could mean pulling apart traditionally bundled offerings like home prep, photography, marketing, showings, negotiations, and closings into separate packages and pricing models. We'll need keen negotiation skills to explain why our comprehensive expertise justifies hiring us rather than just paying a bare minimum to list on the MLS."

Buyer's agents could also charge for individual services like home tours, negotiation, and help with paperwork instead of charging a flat percentage of the sale price.

A recent working paper by economists at the Federal Reserve Bank of Richmond found that a cost-based commission model could save Americans about $30 billion on real estate commissions each year, a savings of about 30%.

Read more: What do real estate agents do, and do you need one?

## Will buyers have to pay their agent's commission?

Buyers will need to negotiate commissions with their agent when they sign a contract. That doesn't necessarily mean that buyers will have to pay the cost, though. When the buyer makes an offer to the seller, the question of who pays the buyer's agent could become yet another point of negotiation.

A homebuyer in a hot market may find it tough to convince a seller to pay their agent's cost. But sellers may agree to foot the bill if they'd otherwise be forced

Earned Media Coverage                                                                                  85

to accept a lower price.

"It is difficult to know how this will shake out, but it is conceivable that the buyer agent commission will become a concession offered by the seller to attract more buyers," Gilbukh said.

One wrinkle, though, is that commissions generally can't be financed into a mortgage under Frannie Mae, Freddie Mac, and Federal Housing Administration (FHA) guidelines. Under the current rules, a buyer seeking to finance closing costs would likely need to get a personal loan, which carries a higher interest rate than a mortgage. That would increase their debt-to-income ratio, which could in turn make it harder to get approved for a mortgage.

Stephen Brobeck, senior fellow at the Consumer Federation of America, an advocacy group that has called for commission decoupling, believes government lending rules should change to allow buyers to include commissions in their mortgages.

"Before commissions can be included in mortgages, buyer agent compensation is likely to be in flux," Brobeck said. "We believe that most sellers will continue to be willing to provide funding to buyers to pay their agents. In some cases, this will take the form of sellers agreeing to raise their list price, thus allowing the commission to be included in the mortgages."

## What would that mean for first-time homebuyers?

Paying an agent's commission could be especially tough for first-time homebuyers, who often struggle to save cash for a down payment as it is.

"If banks and lending institutions do not find a way to include their agent's compensation in the purchase price, first-time homebuyers will face a significant financial burden that could prevent them from buying a home or

[result in them] forgoing representation," Dobbs said.

First-time homebuyers often lack access to cash and liquid assets, plus they usually don't have an established relationship with a real estate agent.

"I think this makes them more likely to explore agent services alternatives to the traditional model that is likely to emerge," Gilbukh said. "For example, an a la carte service where buyers can pay per viewing of each property they desire to visit. Or a fixed fee service to help buyers draft and offer and/or finalize the deal."

But some observers worry that price-conscious first-time buyers could be tempted to skimp on important services.

"There's a legitimate risk of buyers under-investing in professional representation across all phases to save a few bucks," Gray said. "This leaves them more vulnerable to potentially costly missteps during complex processes like negotiating inspection items, securing optimal financing terms, or handling contracts."

## Will the NAR settlement agreement bring down home prices?

So perhaps the most burning question surrounding the NAR tentative settlement is: Will lower commissions lead to lower home prices?

Housing experts generally believe that any resulting drop in home prices would be modest.

"Decreased transaction costs will help bring prices down slightly," Gilbukh said. "I also think that it allows people to move more often because it will effectively lower the relocation cost."

It's possible that more competition would have a greater impact on the prices of more expensive homes, according to an Urban Institute report. That's because many costs of marketing a home are relatively fixed. In other words, you'd incur similar costs whether you're selling a $200,000 home or a $2 million home. So, an agent might be inclined to lower their commission on a higher-priced home.

The lack of housing supply is the main driver of stubbornly high housing prices. The shortage of affordable homes has been an issue for well over a decade but was exacerbated by the pandemic. More recently, high interest rates are driving many homeowners who locked in rock-bottom rates in 2020 and 2021 to stay put rather than sell and take out a new mortgage at a significantly higher rate.

Researchers at the Urban Institute wrote that the "deep housing shortage" will offset any savings from lower fees. "As such, fee reductions will not substantially affect home affordability, so policymakers should continue focusing on increasing housing supply to make homeownership more attainable in the long run," the authors wrote.

Another issue, according to Brobeck, is that home prices generally have the buyer's agent commission built into the list price. But what happens once that 2.5% to 3% no longer automatically falls to the seller?

"If it is not removed, and buyers end up paying this commission, then they will effectively have been charged twice, with the seller receiving the main benefit," Brobeck said.

Additionally, if the buyer and their agent can't convince the seller to reduce the price accordingly, buyers could wind up paying even more.

"This is one reason that in the future, it will be even more important for buyers to employ very competent buyer agents," Brobeck said. "Many lack this

competence."

Read more: Is this a good time to buy a house?

## I recently sold my home. Am I getting a piece of that $418 million?

Possibly. As with any class-action lawsuit, a large chunk will go to attorneys, but millions of people who sold homes are expected to qualify for a piece of the settlement, including those who sold their homes as far back as 2014.

To find out whether you're eligible, go to realestatecommissionlitigation.com.

- EXHIBIT N -

https://www.morningbrew.com/daily/stories/2024/08/18/buying-a-home-is-going-through-changes

## Buying a home is going through changes

**This new dog-eat-dog system for brokers could push many of the "mediocre" ones to leave the industry.**

Thomas Northcut/Getty Images

By Neal Freyman

August 18, 2024

Sweeping changes have come to the complicated and expensive process of buying a house in the US, with the goal of making it slightly less complicated and expensive.

On Saturday, a class-action settlement with the National Association of Realtors (NAR) went into effect, ripping up the playbook on how real estate agents are compensated. The NAR was accused of artificially inflating commission rates, which have historically ranged from 5% to 6%, a higher fee than the rest of the world. Consumer advocates hope the new rules will lead to lower commissions, shift power away from agents, and add transparency into what's been an opaque system.

### How it worked before Saturday

The 5%–6% fee was shouldered by the home seller and split between the seller's agent and the buyer's agent. So, for a home that sold for $450,000, the seller would need to cough up $27,000 in fees for both brokers, per CNN.

### How it works now

The most immediate change for anyone buying a home: You will have to sign a written contract with the agent representing you before they show you a house. That means the type of compensation your agent will receive is up to you and them to negotiate—it could be a commission as low as 1.5%, say, or a flat fee.

Because many buyers are new to negotiating with brokers and could be taken advantage of, consumer groups have created draft templates to simplify the process.

**On the seller's side,** they still have the option to cover the commission of the buyer's broker, which may lead to more and better offers.

### What will happen next?

Housing experts say that if commission rates decrease due to the new rules, they'll do so gradually and not suddenly (and they've already been creeping lower since the settlement was reached in March).

Meanwhile, this new dog-eat-dog system for brokers could push many of the "mediocre" ones to leave the industry, while the highest-performing agents will still get their bag, Axios reports.

**One more thing:** If you've sold a property in the last five years, you could be entitled to a slice of the settlement. See if you're eligible here.

https://www.usatoday.com/story/money/personalfinance/real-estate/2024/08/24/new-real-estate-could-impact-black-buyers/74902118007

## Residential real estate was confronting a racist past. Then came the commission lawsuits

Andrea Riquier

USA TODAY

Late in 2020, the National Association of Realtors issued an unusual statement – an apology.

"NAR initially opposed passage of the Fair Housing Act in 1968, and at one time allowed the exclusion of members based on race or sex," said the Washington-based group, which boasts over 1.5 million member real estate agents. "This discrimination was part of a systematic policy of residential racial segregation, led by the federal government and supported by America's banking system and real estate industry, and driven by practices like redlining."

Speaking onstage at a public event, Charlie Oppler, the group's then-president, added, "Because of our past mistakes, the real estate industry has a special role to play in the fight for fair housing."

But just a few years later, the fight for equitable homeownership may have taken a step back. By decoupling the commission paid to buyer brokers from seller proceeds, the landmark class-action lawsuits brought against NAR and other large national brokerages on behalf of consumers have unintended consequences, advocates say.

The concern: Black buyers, who often come to the house hunt with the deck stacked against them, will be further disadvantaged by having to pay more money out of pocket for an agent to represent them – or will choose to go without representation in a transaction that's expensive, confusing and laden with unfamiliar pain points.

"With the ability to purchase a home, a lot of times the barrier is the down payment and the closing costs," said Amber Lewis, who owns New Era Real Estate Group in Cleveland. "With the new rules, asking our buyers to bring additional funds to the table to pay that commission becomes another barrier."

**What are the barriers to homeownership?**

One of the biggest challenges for Black and other minority buyers is that many are not just first-time buyers, but the first among their generation in their families to purchase property. Just 45.3% of Black Americans are homeowners, compared to 74.4% for whites, Census data shows.  Thanks in large part to higher rates of homeownership, white Americans have $1.4 million in household wealth, on average, nearly six times that of Black families, at $227,554, according to the Federal Reserve's Survey of Consumer Finances.

"These communities, because they've been knocked out of homeownership opportunities in an unfair, unjust, and discriminatory fashion, don't have a parent who has wealth built up in home equity," said Lisa Rice, president of the National Fair Housing Alliance. "They can't go to the 'Bank of Mom and Dad' to get money to pay the buyer's agent. Because they are low-wealth, although not necessarily low-income, they also disproportionately have student loan debt."

Many Black buyers also lack the informal wisdom that comes from shared experience, said Dr. Courtney Johnson Rose, president of the National Association of Real Estate Brokers, an organization of Black real estate professionals. In the biggest financial transaction most people make in a lifetime, having a support system to guide decisions on everything from mortgage rates to sump pumps is critical.

"This is a classic example of people who had a ladder built for them, climbed up the ladder, and now they're pulling it up behind them," Rice said.

**Adapting to change after new real estate rules take effect**

The changes that went into effect Aug. 17 are ruffling some feathers around the country, with many housing market observers most concerned about the impact on homebuyers.

"Did our jobs just get a little harder? Yes, absolutely," said Sabrina Brown, founder of Pink Key Real Estate, a brokerage in Fresno, California. "Did it make it more difficult for Black and brown communities? Yes, now there's an additional layer of compensation. I think it's going to scare them away from having a conversation about homeownership."

NAR did not want the changes, but made them as a result of the settlements, Nate Johnson, the group's head of advocacy, said in an interview. "We had to land somewhere in terms of satisfying the plaintiffs and also protecting the needs of consumers."

In an email, Michael Ketchmark, the attorney who successfully sued NAR and several brokerages, told USA TODAY, "We examined this issue extensively and worked with consumer advocates for low-income and minority home buyers. Every state has assistance programs for first-time homebuyers to cover down payments. Under the old rules, minority buyers seldom used these programs because the money was being taken from the homeowners. This will change under the free market."

Lawyers with Cohen Milstein and Hagens Berman Sobol Shapiro, the other major plaintiff's attorneys, did not respond to requests for comment.

**'Pocket listings' raise concerns**

While changes to the commission structure have grabbed most of the attention, many observers are also concerned about the erosion of the centralized databases that previously housed all information about real estate listings.

A confirmation that the seller would pay the buyer's broker was generally included on most listings. Now that piece of information may not be included, which will force buyers and their brokers to reach out to each seller or their agent individually.

"Say there's a home on the market," Rose said. "Two offers come over and now it's the seller's discretion which to take." In many situations, the more attractive offer will be one with a mortgage that doesn't take as long to process, or one that's all cash. In fewer, but not zero, situations, it may be one from an agent who's part of the same social circles as the listing agent.

"I am concerned," said Denise Franklin, a long-time real estate agent in Greenville, South Carolina. "We may see more fair housing complaints and lawsuits."

Franklin works with many first-time buyers who obtain mortgages backed by government agencies like the Federal Housing Administration. Those loans, which are designed to reach marginal borrowers, can take longer to process and may be more prone to hiccups than those backed by Fannie Mae and Freddie Mac. In 2023, 1 out of 5 FHA-insured mortgage loans was made to a Black borrower.

Some sellers' agents may choose to avoid such situations altogether, and keep listings amongst themselves rather than share them widely, many advocates think.

"There are homes now in certain communities that will never go on the market. We will never get to see them. They're just being marketed amongst a network. Guess what? Black professionals are not part of that network," NAREB's Rose said.

The practice of keeping such "pocket listings" defies the logic of scoring a higher sale price via a broader audience, NAR's Johnson said, not to mention violating fair housing rules.

Still, "fair housing groups have been fighting pocket listings for decades and decades," Rice told USA TODAY. "Discrimination is not logical. We need a fully transparent system for all houses on the market, that all real estate agents can see what's available and what's on the market."

One policy solution might be to have an agency like the Department of Housing and Urban Development maintain listings, she suggested. FHA and some other mortgage programs are part of HUD.

In a statement to USA TODAY, Julia Gordon, HUD's assistant secretary for housing, said, "HUD is closely monitoring the impact of National Association of Realtors settlement – and the potential for buyers of color and low-income buyers to be disadvantaged by the new practices. We remain laser-focused on addressing the barriers that prevent people of color and low-income people from achieving homeownership, including how the lack of generational wealth among some buyers of color can prevent them from meeting the funding requirements needed to purchase a home.



**What happens next?**

For Brown, the real estate agent in Fresno, seller agents shouldn't just market their listings more broadly – they should also be nudging their clients to offer as much compensation to the buyer's broker as possible, in order to reach the widest possible audience.

"We are not competition, we are in this together to do what's best for everyone," she said. "Buyers want to buy and sellers want to sell and we are in the middle helping them negotiate that."

NAR and others maintain that by forcing buyers to have honest conversations with their brokers, the value of the real estate transaction will become clearer.

"Buyers will be better prepared and have a better understanding of what the buying process looks like," Johnson said. "From an agent's standpoint, it creates the opportunity to become better at demonstrating our value proposition. If we're not doing that, it forces the buyer to go elsewhere."

Among fair housing advocacy groups, Rice said, discussions are underway about how best to take action.

While few housing observers would have considered the MLS ideal, "at least it lent a high degree of transparency in terms of what was on the market. We cannot decouple the seller's commission with the buyers' commission. We need to have a construct where the sellers pay for the buyers' commission."

Meanwhile, some agents, like Denise Franklin, are already seeing people exit the market.

"We've had others say, 'We're just going to hold off right now,'" Franklin said. "One of our team members took a home off the market because they said there's just too much confusion."

Franklin added: "We've gone back, we haven't gone forward."

USA Today Network

Recommendations are independently chosen by our editors. Purchases you make through our links may earn us a commission.

USAToday.com  -  8.24.24                                                                                           3

https://www.paloaltoonline.com/real-estate/2024/09/18/a-home-sellers-guide-to-navigating-new-real-estate-commission-rules/


# A home seller's guide to navigating new real estate commission rules

Under new real estate commission rules, it is now clear that home sellers have a wide range of choices when deciding how to sell their property.

The process of selling a home significantly changed on Aug. 17 when new real estate rules took effect as part of the National Association of Realtors' court settlement over how broker commissions are negotiated.

In light of these new rules, the association has created a resource guide to help home sellers understand the new process and options available for offering compensation as they begin working with an agent who is a Realtor.

Under the new guidelines, it is now clear that it's up to the seller to determine offers of compensation.

Sellers have a wide range of choices when deciding how to sell their property. This includes choosing to pay only their agent a commission fee or deciding to also offer a commission, or other form of compensation, to the buyer's agent.

Here's what sellers need to know as they consider their marketing strategies and options related to offering compensation to a buyer's agent:

### What is an offer of compensation and why make one?

An offer of compensation is when the seller, or their agent, compensates another agent for bringing a buyer to successfully close the transaction on the sale of their home.

It's our mission to inform the community through fact-based journalism, hold government accountable, and build deeper relationships through coverage that makes a difference in people's daily lives. We rely on community support to continue our mission. Support local news today.

Compensating a buyer's agent can be a compelling strategy for attracting potential buyers: Offers of compensation help reduce out-of-pocket costs for prospective buyers, which in turn may bring more potential buyers to a property.

These costs can be especially significant for first-time buyers, lower- to middle-income buyers or those from underserved communities.

### Are offers of compensation mandatory?

No. It is up to the seller to determine if making an offer of compensation is the best approach for selling their property. Agents who are Realtors — a licensed real estate agent who belongs to the National Association of Realtors — can help answer a seller's questions and guide them to make a decision that works for them.

### As a seller, does my agent need my permission to offer compensation to a buyer's agent?

Yes. Your agent can only offer compensation or make a payment to a buyer's agent if they have your written approval and signoff on the amount.

### What types of compensation can I offer?

Many options are available for sellers to discuss with their agent. These could include a flat fee paid directly to the buyer's agent or allowing your agent to share a part of their compensation with the buyer's agent. You also could consider offering a buyer certain concessions, such as covering closing costs, to make the total home purchase more affordable for them.

**How will a buyer's agent know if there is an offer of compensation?**

If you approve an offer of compensation, it can be shared through common marketing methods such as flyers, signs, brokerage websites, social media posts, or simply through a phone call or email. Under the new rules, offers of compensation, however, cannot be listed on Multiple Listing Services (MLSs), which are private databases that are created, maintained and paid for by real estate professionals to help their clients buy and sell property.

**Do I have to advertise an offer of compensation if I decide to make one?**

No. Advertising can help get the word out to bring more buyers to the table, but you also can choose not to advertise and instead negotiate the offer in a purchase agreement.

**You mention concessions – what does that mean?**

A seller concession is different from an offer of compensation. It is when a seller covers certain costs associated with purchasing a home for the buyer. Concessions can make homeownership more accessible for buyers by reducing upfront expenses. These can cover things like some transaction costs or property repairs.

https://harvardpress.com/Features/Feature-Articles/real-estate-rule-changes-give-buyers-and-sellers-options160local-agents-brokers-react

## Real estate rule changes give buyers and sellers options; local agents, brokers react

by Julie Gowel  ·  Friday, September 27, 2024

On Aug. 17, two new rules instituted by the National Association of Realtors (NAR) went into effect, changing the way home buyers and sellers engage with Realtors. The first is that real estate seller agents and brokers are prohibited from entering compensation in the Multiple Listing Service (MLS). The second is that agents and brokers must enter into a contract with a buyer before showing any properties.

In 2022, a class action lawsuit was brought against NAR in Missouri that claimed the organization "required home sellers to make a blanket offer of compensation to any potential buyer's broker as a condition of listing their home," according to court documents.

NAR denied any wrongdoing but agreed to a settlement in March of 2024 that changed the nature of real estate transactions.

**No compensation on MLS**

Traditionally, when a person wanted to sell their home, they would include a commission in the listing that would cover the fees of both seller and buyer agents. Typically, that fee would be somewhere between 5 and 6%, as negotiated by the seller and their agent, and would be split between the two professional agencies.

Sellers were never required to cover buyer agent fees. This practice was considered tradition, as explained by Devens residents and local William Raveis real estate agents Tammy and Dave Haschig: "If you're a buyer, it's hard to come up with the deposit money, the money to pay the attorneys, the money for all the closing costs, and then moving costs," said Tammy. "It made sense for the seller listing agent to offer to pay that compensation for the buyer's agent."

If sellers were never required to compensate buyers' agents, how did the practice become litigious? "Somehow the issue got raised, and that's how it blew up into [a class action suit]," said Dave. "There is nothing wrong with wanting transparency, honesty, and clarity, because it is a confusing process, but I think the lawsuit was unnecessary."

Unnecessary, because most agents and brokers were already educating their clients on the benefits of including compensation in the listing. "When the seller offers to pay the buyer's agent compensation," said Harvard resident and Compass agent Shannon Boeckelman, "it allows the buyer to roll that compensation into their mortgage. That is a huge benefit because now they don't have to bring that cash to the table, but they can finance it over a 30-year period."

The long-standing tradition of sellers offering buyers' agents compensation affected home values and appraisals, as explained by owner of Harvard's Hazel & Company Real Estate, Suzanne Dutkewych. She said that sellers list their homes taking the commission into account. "They might value the home at a million dollars," said Dutkewych. "But if it's a 4% commission, they're going to list at $1,040,000 in order to pay the agents. The buyer is paying that extra $40,000 because we've increased the price of that property."

Many buyers, including first-timers, are choosing to view only properties that are offering buyer's agent compensation. Since sellers can no longer list this information in MLS, buyer's agents must contact each listing agent directly to find out if the compensation is included.

"I was lucky to have a listing that went on market two weeks prior to the mandated change," said Ann Cohen, former Harvard resident and agent for Barrett Sotheby's Realty International. "My seller clients wanted to try offering no compensation. We didn't receive any offers that first week, so we tried changing the listing to offer buyer agents a competitive commission. [We] received an offer immediately, and the buyer agent was paid in the traditional way. My interpretation of this de facto experiment was that even at the million dollar level, buyers were not putting in offers on properties where the buyer agent was not going to be compensated."

**Buyer's agent contracts**

On the other side of the transaction are buyer's agent contracts. Up until last month, anyone could reach out to a real estate agent or broker and ask to see a property listing. The two would meet up, see the property, make each other's acquaintance, and decide if they would like to continue working together.

Now, to show a home, an agent and buyer must enter into a contract. That contract will list the services the buyer can expect to receive. "That's something that I've always done," said Harvard resident and Harborside Realty broker Steve Nigzus. "It's a way of having a discussion with somebody, to talk to them about your services, and how you will be paid."

Amy Balewicz, Harvard resident and team lead for Amy Balewicz Homes, a division of KW, pointed out that buyers can find property easily online. MLS listings get pushed through popular sites like Zillow and Redfin, which offer a plethora of digital resources. She believes her value as an agent lies in her expertise and does not take issue with spelling that out in a contract. "We know the market," said Balewicz. "We live and breathe these areas. We work hard to find properties, especially with inventory being so low and [the market] being competitive. We found homes for our buyers numerous times that weren't ever publicly listed."

Other real estate professionals think the new rule actually has a negative impact on buyers. "From a consumer protection standpoint," said Tammy Haschig, speaking about herself and business partner and husband Dave, "You just met me, and I'm asking you to sign a contract with me that will make me your sole representative on this search. To us, that seems backwards. We were willing to give people the opportunity to get to know us before signing a contract."

**The long-term impact**

The rule changes rolled out last month are still too fresh to determine their overall impact on the market. Mortgage lending rules, appraisal values, and marketing techniques need to be tweaked, and that takes time. It is unknown if these rule changes will create a barrier to entry into the profession of real estate.

"I think that buyer agents, especially new or inexperienced, will struggle more with this," said Balewicz. "It's about being confident about what you are worth and being able to communicate why it's important to work with an agent and pay the fee."

"There's so much, legally, financially, and emotionally involved in the transaction of a home purchase," said Tammy Haschig. "Buyers need to make sure they have representation to look out for their best interests."

What are those interests? See "Buyer's agent menu" for a list of services buyers should consider before signing a contract with an agent.

- EXHIBIT O -



**RESIDENTIAL REAL ESTATE BROKER COMMISSIONS ANTITRUST LITIGATION**
**Exclusion Report**
**(as of November 14, 2024)**

| # | JND ID | Status | Name | Postmarked | NAR | HSA |
|---|--------|--------|------|-----------|-----|-----|
| 1 | DUL93WD2VM | Valid | JOHN WESOLAK | 8/21/24 | X | X |
| 2 | NSHX3NL4D5 | Valid | RHONDA WESOLAK | 8/21/24 | X | X |
| 3 | NW4B5PXC98 | Valid | STEPHAN OTTO | 8/28/24 | X | X |
| 4 | NRLHY4Q7ZG | Valid | HAO ZHE WANG | 8/31/24 | | X |
| 5 | NT3QG97Z4D | Valid | WANG ZHEN HUA | 9/1/24 | X | X |
| 6 | NNMDBW8KQF | Valid | CAI CAI HUA | 9/1/24 | X | X |
| 7 | D8H6XW5LQT | Valid | STEPHANIE K. FRENCH | 9/9/24 | X | X |
| 8 | DZU7WLFSVR | Valid | MICHAEL MIKULA | 9/10/24 | X | |
| 9 | NULYT9B2RG | Valid | HEATHER HARRIS | 9/11/24 | X | X |
| 10 | DLBRTSYK2Z | Valid | PATRICIA A. UNTALAN | 9/16/24 | X | X |
| 11 | DPUJRY5LXT | Valid | STEPHEN TRAVIS SCOTT | 9/24/24 | X | X |
| 12 | DHJAXSZY36 | Valid | JASON D. KNIGHT | 9/28/24 | X | X |
| 13 | DW3LSFUT6V | Valid | RUTH B. MERRITT | 9/29/24 | X | X |
| 14 | D7XRPQYC28 | Valid | LOLITTA YAMPEY JORG | 9/30/24 | X | X |
| 15 | D7FVS46CNH | Valid | MICHAEL A. DUCKETT | 10/2/24 | X | X |
| 16 | D7KXA4BD53 | Valid | HANNIBAL TRAVIS | 10/3/24 | X | X |
| 17 | DDHE5U9CYP | Valid | ERNALEE E. SLATER | 10/10/24 | X | X |
| 18 | N8SAJ659YX | Valid | KENNETH W. SLATER | 10/10/24 | X | X |
| 19 | D75QHXFTPV | Valid | CAROLYN S. JENNINGS | 10/16/24 | X | X |
| 20 | N3GUNSDJ45 | Valid | DON THRASHER | 10/17/24 | X | X |
| 21 | NECRBNZATW | Valid | BARBARA THRASHER | 10/17/24 | X | X |
| 22 | NNSYQUT9VX | Valid | ILDIKO TENYI | 10/21/24 | X | X |
| 23 | N6MFL8357C | Valid | BRIAN TIMOTHY FITZPATRICK | 10/26/24 | X | X |
| 24 | NJEP3GD8T7 | Valid | ABANDONED HOMES PROJECT SCATTERED SITE I LLC | 10/28/24 | X | X |
| 25 | NCVP37E6GL | Valid | ABANDONED HOMES PROJECT SCATTERED SITE II LLC | 10/28/24 | X | X |
| 26 | NUPZBGXH7N | Valid | PRO REO SETTLEMENT SERVICES, LLC | 10/28/24 | X | X |
| 27 | D25DFLPHNS | Valid | STEVEN EWALD | 10/28/24 | X | X |
| 28 | DBRCNQ5G6F | Valid | JAMES EDWARDS | 10/28/24 | X | X |
| 29 | DF7RLKQU8Z | Valid | JORDAN KULLMANN | 10/28/24 | X | X |
| 30 | DHD8FQXPCR | Valid | BEN SHADLE | 10/28/24 | X | X |
| 31 | DSC5T9BLE6 | Valid | COLLEEN DUVAL | 10/28/24 | X | X |
| 32 | DSGC3UDBJ7 | Valid | TIMOTHY CARUSO | 10/28/24 | X | X |
| 33 | DUW5MXDQVR | Valid | THEODORE P. BISBICOS | 10/28/24 | X | X |
| 34 | NPUSR2ZMXW | Valid | BRENTON R. STRINE | 10/28/24 | X | X |
| 35 | NTKD4NPBZ3 | Valid | SCOTT DAVIS | 10/28/24 | X | X |
| 36 | NUHX8G3E9L | Valid | LISA SHANKUS | 10/28/24 | X | X |
| 37 | NV937XBQ86 | Valid | MYA BATTON | 10/28/24 | X | X |
| 38 | NCFJ3TX2LU | Valid | AMBER J. WILLIAMSON | 10/28/24 | X | X |
| 39 | NEG6CKPRTL | Valid | MARLENE Y. WILLIAMSON | 10/28/24 | X | X |