UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Case No: 4:19-cv-00332-SRB<br><br>Judge Stephen R. Bough |

**NATIONAL ASSOCIATION OF REALTORS'® SUGGESTIONS IN SUPPORT OF FINAL APPROVAL OF THE PROPOSED NATIONWIDE CLASS SETTLEMENT**

The NAR settlement is fair, reasonable, and adequate. It reflects years of hard-fought litigation, and the realities of what would happen if the parties continued to fight. On one hand, NAR's appeal of the October 2023 trial verdict was strong, as shown by the fact that two separate courts dismissed similar claims as a matter of law immediately in the jury verdict's wake. *Grace v. RE/MAX Holdings, Inc.*, 2024 WL 2761188, at *4 (N.D. Cal. May 29, 2024); *Moratis v. W. Penn Multi-List, Inc.*, 2024 WL 4436425, at *4 (W.D. Pa. Oct. 7, 2024). On the other hand, just to get to that victory years from now, NAR would have gambled its own existence, as well as that of its members and their small businesses, state, local, and territorial REALTOR® associations, and multiple listing services—and even put buyers and sellers of real estate in the United States (including the Settlement Class) at high risk for irreparable harm. While the settlement was not what NAR wanted, it was the only path guaranteed to avoid a catastrophic outcome.

Despite immense publicity and notice, there only were eight objections to NAR's settlement from individuals and five from lawyers that brought cases years after *Moehrl* and *Sitzer* (in fact, all but one brought their cases after the October 2023 jury verdict). The lawyer objections are unveiled attempts to preserve the pile-on cases they brought, which simply look to impose a tax on NAR and its members, and not raise any true concerns with the settlement. *See, e.g.*, *Gulbankian v. MW Mfrs., Inc.*, 2014 WL 7384075, at *3 (D. Mass. Dec. 29, 2014) ("in assessing the weight of objections to class settlement agreements, the district court may properly consider the fact that the most vociferous objectors were persons enlisted by counsel competing with [lead] counsel for control of the litigation") (citation omitted). Nevertheless, all of the objections either complain about immaterial matters or could have been addressed by simply opting-out of the NAR settlement.

Five objections incorrectly claim that NAR and its members should have given more concessions than the record-setting $418 million and monumental practice changes.[1] But those arguments are based on misunderstandings about the *Moehrl*[2] and *Sitzer*[3] cases, NAR and its membership, how the settlement works, and some bad math. Nevertheless, NAR had strong appeal arguments, which would have wiped out any recovery by the Settlement Class, and the parties released in the NAR settlement could not pay anywhere near the October 2023 jury verdict, as those objectors seem to suggest should have happened. Additionally, the practice changes address every issue raised in *Moehrl* and *Sitzer*. If objectors wanted to try to obtain more, they should have opted-out.

---

[1] *See* Nordquist, ECF 1537; Wang, ECF 1547; Monestier, ECF 1552; Cheatham, ECF 1558; Mullis, ECF 1561; Spring Way, ECF 1563.
[2] *Moehrl v. Nat'l Ass'n of REALTORS* (*Moehrl*), No. 19-cv-01610 (N.D. Ill.)
[3] *Burnett v. Nat'l Ass'n of REALTORS* (*Sitzer*), No. 19-cv-00332 (W.D. Mo.)

Four objections (all filed by lawyers from pile-on cases) incorrectly claim the settlement release should have carved out the pile-on cases and allowed for never-ending litigation that would have the potential to destroy NAR's members and irreparably disrupt buyers and sellers of real estate.[4]  But a nationwide release of all claims the Settlement Class members could bring against NAR, its members and their businesses, state, local, and territorial REALTOR® associations, and multiple listing services was critical to NAR—just like most class settlements, NAR could not settle and have itself or its members subject to seriatim pile-on cases.  And, while NAR vigorously sought to have all members and their businesses protected, the Settlement Class refused to release thousands of members and dozens of brokerages in the NAR settlement.  Without protecting the individuals and small business who were released in the NAR settlement (whose dues made up the $418 million payment by NAR), those people and their businesses would have faced existential litigation costs—and be forced to defend *NAR's* rules.  Again, if objectors wanted to try to obtain more, they should have opted-out.

Three objections complain about the Settlement Class attorneys' fees.[5]  NAR takes no position on that issue, except that under the NAR settlement, "[i]n the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to the National Association of REALTORS®, based upon written instructions provided by the National Association of REALTORS®, the full amount of the attorneys' fees and costs paid

---

[4] *See* Mullis, ECF 1561; Cheatham, ECF 1558; Friedman, ECF 1560; March, ECF 1562.
[5] *See* Zaffarkhan, ECF 1539; Duthler, ECF 1541; Monestier, ECF 1552.

to Co-Lead Counsel from the Settlement Fund, including any accrued interest." ECF 1458-1 at 47-48. Thus, NAR does not discuss that issue further herein.

NAR's response below recognizes that the Court has received hundreds of pages on similar objections and the Settlement Class's responses to the objections to the NAR settlement. ECF 1464; ECF 1469; ECF 1471; ECF 1473; ECF 1478; ECF 1595; ECF 1596. *See also* Pl.'s Mot. for Final Approval, *Gibson v. Nat'l Ass'n of REALTORS* (*Gibson*), No. 23-cv-00788 (W.D. Mo. Oct. 24, 2024), ECF 521; Defs' Mot. for Final Approval, *Gibson*, (Oct. 24, 2024), ECF 522. Therefore, NAR incorporates those submissions herein by reference—except where any of their arguments are not supported by the plain language of the NAR agreement, ECF 1458-1—and makes this brief submission to support the NAR settlement.

## I. BACKGROUND

On March 15, 2024, after nearly five years of hard-fought litigation and an October 2023 jury trial in Sitzer, NAR and the Settlement Class—represented by a nationwide consortium of plaintiffs' lawyers from *Moehrl* and *Sitzer*—reached a settlement, subject to the Court's approval, with NAR paying $418 million and making changes to its rules and policies. ECF 1458-1.

To this day, NAR is confident that it and its members had done nothing wrong, and that its rules at issue in *Moehrl* and *Sitzer* benefitted consumers; and, NAR looked forward to the review of the jury verdict by this Court and the Eighth Circuit. But, in the wake of the jury's verdict in this case, lawyers across the country immediately started filing dozens of pile-on lawsuits based on the NAR rules at issue in *Moehrl* and *Sitzer*, with no end in sight.[6] Thus, NAR, its members

---

[6] *See, e.g.*, *Gibson*; *Batton v. Compass*, No. 23-cv-15618 (N.D. Ill.); *Burton v. Nat'l Ass'n REALTORS*, No. 23-cv-05666 (D.S.C.); *QJ Team, LLC & Five Points Holdings, LLC v. Tex. Ass'n of REALTORS*, 23-cv-01013 (E.D. Tx.); *March v. REBNY*, No. 23-cv-09995 (S.D.N.Y.); *1925 Hooper LLC v. Nat'l Ass'n of REALTORS*, 23-cv-05392 (N.D. Ga.); *Moratis v. W. Penn Multi-List, Inc.*, No. 2:23-cv-2061 (W.D. Pa.); *Parker Holding Grp, LLC v. Fla. Ass'n of REALTORS*, No. 23-TC-187328252 (Fla. Cir. Ct.); *Grace v. Nat'l Ass'n of REALTORS*, No. 23-cv-06352 (N.D.

and their businesses, and United States real estate in general were presented with a new and existential threat.

The NAR settlement was the only reasonable path, for NAR, the Settlement Class, and home buyers and sellers. And, reflecting that reality, there were a nominal amount of objections and opt-outs to the NAR settlement, despite the fact that almost all of the objections to the NAR settlement were made publicly (by many of the same objectors) with regard to the prior two settlement rounds in this case and the related *Gibson* case. ECF 1469 at 20-62 (describing and addressing objections); Pl.'s Mot. for Final Approval, *Gibson*, Oct. 24, 2024, ECF 521 at 20-52 (same).

## II. ARGUMENT

"The law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990). Class action settlements are to be approved when they are "fair, reasonable, and adequate[.]" Fed. R. Civ. P. 23(e)(2) (listing factors to consider). "Such a determination is committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal

---

Cal.); *Masiello v. Ariz. Ass'n of REALTORS*, No. 2:24-cv-00045 (D. Ariz.); *Tuccori v. At World Properties, LLC*, No. 24-cv-00150 (N.D. Ill.); *Whaley v. Nat'l Ass'n of REALTORS*, No. 24-cv-00105 (D. Nev.); *Fierro v. Nat'l Ass'n of REALTORS*, No. 2:24-cv-00449 (C.D. Cal.); *Friedman v. REBNY.*, No. 1:23-cv-00405 (S.D.N.Y.); *Willsim Latham v. MetroList*, No. 2:24-cv-00244 (E.D. Cal.); *Maslanka v. Baird & Warner Inc.*, No. 1:24-cv-02399 (N.D. Ill.); *Peiffer v. Latter & Blum Holding, LLC*, No. 2:24-cv-00557 (E.D. La.); *Wang v. Nat'l Ass'n of REALTORS*, No. 24-cv-02371 (S.D.N.Y.); *Jutla v. Redfin Corp.*, No. 24-cv-00464 (W.D. Wash.); *Hartz v. Real Est. One, Inc.*, No. 24-cv-03160 (N.D. Ill.); *Wutsch v. William Raveis Real Est., Inc.*, No. FST-CV-24-6067981-S (Conn. Super. Ct.); *Burton v. Bluefield Realty*, No. 24-cv-01800 (D.S.C.); *1925 Hooper LLC v. Watson Realty Corp.*, No. 24-cv-00374 (M.D. Fla.); *1925 Hooper LLC v. Arc Realty*, No. 24-cv-00495 (N.D. Ala.); *Wallach v. Silvercreek Realty Grp. LLC*, No. 24-cv-3356 (N.D. Ill.); *Lutz v. Homeservices of Am., Inc.*, No. 24-cv-10040 (S.D. Fla.); *Davis v. Hanna Holdings, Inc.*, No. 24-cv-02374 (E.D. Pa.).

bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly."
*Van Horn v. Trickey*, 840 F.2d 604, 606-07 (8th Cir. 1988) (citation omitted).

Generally, the number of objections to the NAR settlement is remarkably low—especially for a class of this size. Indeed, there are only thirteen objections before the Court, meaning greater than 99.99% of the Class did not object. While the Court should consider each objection, objections by a tiny minority should not prevent approval of the Settlement as fair, reasonable, and adequate. *See Marshall v. Nat'l Football League*, 787 F.3d 502, 513–14 (8th Cir. 2015) ("The district court refused to give credence to the vocal minority" and "the court aptly noted that only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement."); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) ("The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement") (cleaned up). In any event, none of the objections warrant modification or rejection of the Settlement.

  A. **NAR's Concessions Are Fair, Reasonable, and Adequate.**

    1. **NAR and Its Members Are Paying $418 Million—Far More Than Any Other Defendant.**

Some objectors complain that the staggering $418 million sum paid by NAR in connection with the NAR settlement is unfair, unreasonable, or inadequate because the $418 million payment divided by the number of class notices leaves a recovery for each noticed class member that is less than they paid for brokerage services. *See* Monestier, ECF 1552 at 96; Douglass, ECF 1558 at 27; Friedman, ECF 1560 at 13-15; Mullis, ECF 1561 at 7-10; March, ECF 1562, at 15-17; Spring Way, ECF 1563 at 7-9. However, "[a]s courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does

not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (cleaned up). "Objections that the settlement fund is too small for the class size, or that a defendant should be required to pay more to punish and deter future bad behavior, while understandable, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement." *In re Cap. One Consumer Data Sec. Breach Litig.*, 2022 WL 18107626, at *8 (E.D. Va. Sept. 13, 2022). Each of these objections takes as a certainty that every class member would recover every dollar they paid an agent—but that is wrong.

**First**, NAR had a strong appeal, which could have resulted in class members receiving nothing. As Class Counsel acknowledges, the settlement terms reflect a compromise cognizant of that reality and the litigation risk to plaintiffs as well. ECF 1595 at 5. In fact, after the October 2023 trial, two separate courts dismissed pile-on cases based on similar allegations as failing to state a claim as a matter of law. *Grace*, 2024 WL 2761188 at *4; *Moratis*, 2024 WL 4436425 at *4.

**Second**, NAR's public finances show that $418 million is fair, reasonable, and adequate. NAR is not required to settle for an amount that would cripple it. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate."); *Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678 F.3d 640, 649 (8th Cir. 2012) ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *Marshall*, 787 F.3d at 520 ("The plaintiffs who opted out of the settlement could have brought their own individual or collective action against the NFL and potentially obtained the direct financial payout they allege is lacking in this settlement."); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 125 (8th Cir. 1975) (affirming antitrust settlement and

7

explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

NAR is paying the class over 55% of its total assets. *See* IRS, Form 990: NAR 2022 (Nov. 14, 2023), https://apps.irs.gov/pub/epostcard/cor/361520690_202212_990O_2023121222090784.pdf. As shown by NAR's last filed Form 990, it had $747,089,599 net assets, which includes illiquid assets, and NAR is paying $418 million of those net assets to the class. *Id.* at Part 1. Moreover, NAR's public finances show that NAR's remaining total assets are dangerously close to its operating expenses. In a normal year, NAR spends approximately $250-300 million in expenses. *Id*. In its settlement, NAR has committed to pay $418 million without any clear visibility into NAR's future revenues—which are based primarily on membership dues. *Id*. at Part VIII. Since NAR receives all of its membership dues at the beginning of the year, and many of NAR's members have complained about NAR settling (many wanted NAR to continue to defend the rules in *Moehrl* and *Sitzer*), NAR has taken a significant risk in agreeing to $418 million.

The NAR settlement should not be rejected simply to force NAR and its members to continue to litigate on some unfounded assumption by the objectors that there was more money to be had. *See Dekro v. Stern Bros. & Co.*, 571 F. Supp. 97, 101 (W.D. Mo. 1983) (approving class action settlement and crediting the "uncertain[ty]" regarding "whether defendant could pay a substantially greater judgment at some time in the future, especially if defendant incurred considerable additional expense in the defense of this action").

The fairness and adequacy of the financial component of NAR's Settlement Agreement is even more apparent when compared with the other settlements reached to date. Despite receiving zero commissions and no revenues related to the rules challenged in *Moehrl* and *Sitzer* specifically

or home sales generally, NAR's financial contribution is nearly twice as much as the next-highest figure paid by any settling defendant, HomeServices of America, which has agreed to a $250 million payment, and many multiples greater than any other announced settlement. It is *more than double* the settlements paid by NAR's co-defendants in *Burnett combined*. The current value of all settlements with NAR and other defendants is over $1 billion.

**Third**, the objections are based on bad math. The proper denominator is how many class members submit claims, not how many received notice. And, there is nothing to support the objectors' claims that the entire value of commissions paid to an agent for his or her service should be returned to the consumer. In the first-filed action, *Moehrl*, for example, the plaintiffs only sought a fraction of the amount paid to the seller's broker. Pls' Opp'n. to Mot. for Summ. J. at 73-74, *Moehrl* (Feb. 26, 2024), ECF 486.

**Fourth**, the objectors who propose a tax on NAR's members and their businesses misunderstand from where the $418 million that NAR is paying comes. NAR does not receive commissions or any payments related to home sales or commissions; as just shown, its primary source of revenue is member dues. Thus, the $418 million payment is directly attributable to the members and their small business who are receiving the release—the released members and small business are paying for this settlement. In fact, unfortunately, even some members who paid dues are not receiving releases under the NAR settlement.

**Fifth**, as the Court correctly surmised, the NAR settlement offers further benefits to the Settlement Class by practice changes and by including negotiated pathways "for various multiple listing services and brokerages to opt-in to the settlement, which may provide still further financial compensation to the Settlement Class." ECF 1487 at 10. To date, the additional settlements reached via these pathways have resulted in an additional $30,587,754 in contributions to the NAR

9

settlement fund from brokerages and multiple listing services that had to make an additional payment to be included in the release. *See Multiple Listing Services & Brokerages Opting into the Nat'l Ass'n of REALTORS Settlement*, https://www.realestatecommissionlitigation.com/nar-opt-in.

One objector claims that some of the opt-ins were a few days late. ECF 1558 at 5-15. While NAR was not involved in those opt-ins, and thus leaves any response to the Settlement Class and the opt-ins themselves, NAR notes that the opt-ins are adding to the class recovery—and without the opt-in process, the Settlement Class likely would not have received that extra money. Just the crushing burden of litigation costs and exposure could have been existential for those entities; in fact, even class notice, which costs millions itself, could have been devastating. Thus, the benefits of the opt-ins exceed any perceived minor process objections.

Therefore, NAR's $418 million payment is fair, reasonable, and adequate.

### 2. The Practice Changes Resolve Every Issue Raised in *Moehrl* and *Sitzer*.

Most of the objectors ignore that, in addition to paying $418 million, NAR and its members have agreed to sweeping practice changes. Even the one objector who discusses those practice changes agrees (at the beginning of her 120-page objection) that "[t]he settlement makes sense," before she declares the practice changes "an abject failure" despite only being in place for a few months. *See* Monestier, ECF 1552 at 5; *but see* Dyer, *Gibson*, ECF 527 (objecting that the practice changes are too much of a concession); Cunningham, *Gibson*, ECF 528 (same). The reality is that the NAR settlement directly addresses what *Moehrl*, *Sitzer*, and all the pile-in cases are about: the settlement requires NAR to repeal the rules challenged in *Moehrl* and *Sitzer*, it prohibits offers of compensation on the multiple listing service, and it requires buyers (if they want to use a broker) to agree with that broker to how much they are willing to pay/value their broker. In fact, as an act of good faith, NAR agreed to adopt the practice changes before it received final approval from this

Court. Thus, while NAR maintains that the rules challenged in *Moehrl* and *Sitzer* benefit consumers, the class is receiving significant non-monetary concessions from NAR (which they would not receive if litigation pushed NAR and its members into bankruptcy)—in addition to $418 million.

      **B.    There Is No Basis to Carve Out Claims Brought in the Pile-On Case or by Other Serial Litigants**

A critical component of the NAR settlement, as with all class settlements, is to provide NAR with certainty. It also was critical to NAR that the certainty would extend to its members and their small businesses and state, local, and territorial associations of REALTORS® and Association-owned multiple listing services because (1) NAR only exists because of the members that the settlement releases and (2) any alleged liability that is released by the NAR settlement was based on NAR's rules. A handful of objectors have claimed that the NAR settlement should have allowed them to pursue their own claims, some based on geography (class definition), some based on how much they think their claims are worth (released claims), and some based on the released party. Of course, NAR would not agree to a Swiss cheese release riddled with holes and exceptions that expose itself and its members (who, as discussed above, funded NAR, simply followed NAR rules, and will follow the practice changes). And, if any class member did not want to provide the release, they had the right to opt-out—which none of these objectors did. *See Marshall*, 787 F.3d at 513 (affirming class settlement, stating that objectors "were not required to forgo what they believed to be meritorious claims—they could have opted out of the settlement to pursue their own claims, as some class members did").

      **1.    The Nationwide Settlement Class Is Fair, Reasonable, and Adequate**

The pile-on objectors criticize the Settlement for resolving claims against the Released Parties with a nationwide class. *See* Douglas, ECF 1558 at 24-27; Friedman, ECF 1560 at 11-15;

March, ECF 1562 at 4-10; Spring Way, ECF 1563 at 5-7. As previously, this Court should overrule those objections which are without merit. As the Eighth Circuit has recognized, "[t]here is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded." *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004). Not only is this common practice, but it is necessary in complex class-action litigation to ensure finality for defendants and global settlements that run to the benefit of plaintiffs. *See Albin v. Resort Sales Mo.*, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (concluding that the absence of "a single nationwide class action" would "discourage class action defendants from settling" (quotation omitted)); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005) ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country.").

Here, the alleged conspiracy is nationwide in nature with alleged nationwide impact, and so a nationwide settlement is justified. *See, e.g.*, ECF 759 at ¶ 38 (alleging nationwide conspiracy and effect). Not only that, but the Settlement explicitly resolves the similar putative nationwide class actions *Umpa v. National Association of REALTORS* (*Umpa*), No. 23-cv-00945 (W.D. Mo.)[7], and *Gibson*. *See* ECF 1458-1 at 1. Combined with the likelihood of unlimited lawsuits asserting claims exceeding NAR's limited resources, the only path to a resolution was through a nationwide settlement, which benefits the Settlement Class, including because it saves them from the substantial costs associated with piecemeal antitrust litigation. 7B Wright & Miller, Federal Prac. & Proc. § 1798.1 (3d ed. 2005) ("Clearly, a single nationwide class action seems to be the best means of achieving judicial economy."). This Court has agreed that the nationwide scope of the

---

[7] *Umpa* was consolidated with *Gibson* on April 23, 2024. *Umpa*, ECF 245.

settlement classes containing identical defining language of the already-approved brokerage settlements in *Burnett* and *Gibson* are appropriate and approved them. ECF 1487 at 6-7, 20; Order at 6-7, *Gibson*, (Nov. 11, 2024), ECF 530. There is no reason it should reach a conflicting result here, and the objectors offer none.

### 2. The Scope of the Released Claims Is Fair, Reasonable, and Adequate

A serial plaintiff and the pile-on objectors criticize the NAR settlement for resolving *all* claims Settlement Class members may have against Released Parties based on the same factual predicates. *See* Wang, ECF 1547 at 20-38; Douglas, ECF 1558 at 24-27; Friedman, ECF 1560 at 4-15; Mullis, ECF 1561 at 5-10; March, ECF 1562 at 4-15; Spring Way, ECF 1563 at 5-7 They make various arguments, like their claims are only in certain geographic areas or only on behalf of the class members who also claimed to be harmed by the NAR rules in *Moehrl* and *Sitzer* "buyers." And the Court already rejected these objections in the context of the prior 12 settlement in these cases and *Gibson*. *See* ECF 1487 at 28 ("The homebuyer claims by homeseller Class Members indisputably arise out of the same alleged conspiracy and the same factual predicates as the asserted homeseller claims."), 20 (finding that the scope of the settlements applies to claims class members may have had regarding "all multiple listing services," regardless of whether they were affiliated with NAR"); Order at 35-37, *Gibson*, (Nov. 11, 2024), ECF 530 (finding the scope of released claims covers claims Class Members may have had as home buyers, consistent with the "same factual predicate" standard); at 33-34 ("claims involving properties listed on non-NAR MLSs like NWMLS, WPMLS, and REBNY MLS all share the same factual predicate as those involving properties listed on NAR-affiliated MLS."). In fact, the case is stronger for the NAR settlement. Despite Mullis and March misleadingly citing other defendants' filings with the JPML to suggest that NAR opposed consolidation of these cases with *Gibson*, NAR actually supported consolidation of these exact cases. Resp. of Def. Nat'l Ass'n of REALTORS in Supp. of Transfer

of Actions to N.D. Ill. for Coordinated or Consol. Pretrial Proc. at 2, 7-8, *In re Real Est. Comm'n Litig.*, MDL No. 3100 (JPML Jan. 26, 2024), ECF 295 (arguing for consolidation of all commission-related cases, including *Batton*, *March*, and *Friedman*).

### 3. The Scope of the Released Parties Is Fair, Reasonable, and Adequate

Certain objectors claim the NAR settlement should only have released NAR. *See Wang*, ECF 1547 at 45-49; Douglas, ECF 1558 at 5-23; March, ECF 1562 at 15-18; Friedman, ECF 1560 at 10-15, Spring Way, ECF 1563 at 5-7. As a preliminary matter, the releases are too narrow; NAR fought hard to achieve a release for all brokerages, multiple listing services, REALTORS®, and REALTOR® Associations that were being sued because of NAR rules and policies. That the release was more limited represents an enormous, hard fought concession from NAR, and has permitted Class Counsel to negotiate and obtain hundreds of millions of dollars in additional recovery for the Settlement Class. ECF 1595 at 7. That NAR wished to obtain more and Class Counsel sought to achieve less reflects nothing other than the hard-fought nature of this settlement, and does not render the Settlement unfair, unreasonable, or inadequate. *Keil*, 862 F.3d at 696 ("As courts routinely recognize, 'a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate.'").

NAR, a voluntary professional association of members that offered insurance for following its rules could never have settled unless, at minimum, its members, member boards, and most of the small businesses which would be put out of business by massive litigation costs were released. And these people paid: through their NAR dues and their compliance with the practice changes in the NAR settlement. A release of these people was not only appropriate, but necessary. *See In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, 263 F.R.D. 226, 240 (E.D. Pa. 2009) (overruling objection to release of independent sales agents of insurance company because "the

14
Case 4:19-cv-00332-SRB   Document 1597   Filed 11/21/24   Page 14 of 17

release of agents is a necessary component of the settlement agreement in order to provide finality. Otherwise, dissatisfied policyholders could sue the defendants' agents who would then, in turn, look to the defendants for indemnity or contribution.") (citation omitted), *aff'd*, 148 F.3d 283 (3d Cir. 1998)); *Shay v. Apple Inc.*, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.") (citation omitted); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2013 WL 6577020, at *7, *17 (C.D. Cal. Dec. 5, 2013) (overruling objection arguing that "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Prods., Inc.*, 2017 WL 5479637, at *8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third-party retailers was inappropriate: "[T]his argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims. . . . Millennium is a manufacturer that sells its products through various retailers, so any claims [objector] purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling allegations asserted here. This objection is overruled.") (internal citation omitted); *Wal-Mart Stores*, 396 F.3d at 108-09 (approving class settlement with broad releases against non-parties, including member banks, insurance companies, and Swiss governmental entities).

## **CONCLUSION**

For the foregoing reasons, in addition to the reasons set forth in Plaintiffs' Motion in Support of Final Approval, the Settlement with NAR is fair, reasonable, and adequate and should be finally approved.

Dated: November 21, 2024

Respectfully submitted,

| | |
|---|---|
| */s/ Ethan Glass* | |
| Ethan Glass (*pro hac vice*) | William A. Burck (*pro hac vice*) |
| Samantha Strauss (*pro hac vice*) | Michael D. Bonanno (*pro hac vice*) |
| Georgina Inglis (*pro hac vice)* | Christopher G. Michel (*pro hac vice*) |
| COOLEY LLP | Michael J. Sebring (*pro hac vice*) |
| 1299 Pennsylvania Avenue, NW | Rachel G. Frank (*pro hac vice*) |
| Suite 700 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| Washington, DC 20004-2400 | 1300 I Street NW, Suite 900 |
| (202) 776-2244 | Washington, DC 20005 |
| eglass@cooley.com | (202) 538-8000 |
| sastrauss@cooley.com | williamburck@quinnemanuel.com |
| ginglis@cooley.com | mikebonanno@quinnemanuel.com |
| | christophermichel@quinnemanuel.com |
| Beatriz Mejia (*pro hac vice*) | michaelsebring@quinnemanuel.com |
| COOLEY LLP | rachelfrank@quinnemanuel.com |
| 3 Embarcadero Center, 20th Floor | |
| San Francisco, CA 94111 | John Bash (*pro hac vice*) |
| (415) 693-2000 | QUINN EMANUEL URQUHART |
| mejiab@cooley.com | & SULLIVAN, LLP |
| | 300 West 6th Street, Suite 2010 |
| Sarah Topol (*pro hac vice*) | Austin, TX 78701 |
| COOLEY LLP | (737) 221-7006 |
| 55 Hudson Yards | johnbash@quinnemanuel.com |
| New York, NY 10001 | |
| (212) 479-6000 | |
| stopol@cooley.com | |

Charles W. Hatfield (MO Bar # 40363)
Alexander C. Barrett (MO Bar # 68695)
STINSON LLP
230 W. McCarty Street
Jefferson City, MO 65101
(573) 636-6263
chuck.hatfield@stinson.com
alexander.barrett@stinson.com

***Attorneys for Defendant the NATIONAL ASSOCIATION OF REALTORS®***

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2024, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

/s/ *Ethan Glass*
Ethan Glass (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC  20004-2400
Phone (202) 776-2244
Fax (202) 842-7899
eglass@cooley.com

***Attorney for Defendant the NATIONAL ASSOCIATION OF REALTORS®***