# EXHIBIT – B –

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

DON GIBSON, LAUREN CRISS,    )
JOHN MEINERS, and DANIEL     )
UMPA, individually and       )
on behalf of all others similarly situated,    )
                             )    Case No. 4:23-cv-00788-SRB
        Plaintiffs,          )
                             )
    v.                       )
                             )
THE NATIONAL ASSOCIATION OF  )
REALTORS, et al.,            )
.                            )
        Defendants.

## <u>ORDER</u>

Before the Court is Plaintiffs'[1] Motion for Final Approval of Settlements with Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, and United Real Estate (collectively, "Settling Defendants"). (Doc. #521.)[2] Preliminary approval was granted on April 30, 2024, July 15, 2024, and July 16, 2024. *See* Docs. 163, 297, 348. Notice to the Settlement Class commenced July 23, 2024, and Class members were provided with an opportunity to opt out of, or object to, the Settlements. A small number of Class members filed objections. (Doc. #451, Doc. #464, Doc. #467, Doc. #470, Doc. #471, Doc. #485, Doc. #527, and Doc. #528.) The Settling Defendants filed Suggestions in Support of Final Approval. (Doc. #522.) The Court held a hearing on October 31, 2024, at which arguments were presented for and against final approval. Having considered the arguments at the hearing and reviewed the written submissions, and based on all materials in the record, the motion for final

---

[1] "Plaintiffs" are Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa.
[2] The Settling Defendants are identified with specificity in their Suggestions in Support of Final Approval of the Settling Defendants' Class Settlements. (Doc. #522.)

approval is GRANTED.

The Court hereby ORDERS the following:

1.       Unless defined herein, all defined terms in this Final Approval Order and any accompanying Judgment shall have the respective meanings set forth in the Settlement Agreements.

2.       At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. As directed by the Court, JND implemented the Class Notice Plan. In connection with their final approval motion, Plaintiffs submitted a declaration of Jennifer M. Keough from JND summarizing the notice that was given to class members and the resulting claims to date, opt-outs, and objections. (Doc. #521-3.). Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication. Without repeating all the details from Keough's declaration, the Court finds that the direct notice program was extremely successful and reached more than 97% of identified Settlement Class members. Nearly 40 million direct notices were mailed or emailed to the Class. JND's digital effort alone delivered more than 300 million impressions, and its press release was picked up at least 495 times with a potential audience of 113 million. In addition to the formal class notice process, and beyond the paid press release, more than 470 news stories addressed the litigation and settlement, including full articles in outlets such as the New York Times, USAToday, and CNN. JND also implemented a Settlement Website that had over 2 million unique visitors and over 11 million page views.

3.       As of October 21, 2024, over 463,000 claims have been made. The claims period extends until May 9, 2025. This extended claims period is valuable because additional settlements covering the same Settlement Class (with minor variations on the length of the class periods) have

been reached with other defendants, and the notice process for those settlements will provide additional opportunities to submit claims.

4.      In contrast to the massive scale of the notice program and the large volume of claims, there were only 8 objections (encompassing 11 total objectors) and 46 opt outs from the Settlement Class.

5.      Based on the record, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law.  The Court further finds that the notice given to the Settlement Class was adequate and reasonable.

6.      The notice fully and accurately informed members of the Settlement Class of all material elements of the Settlements.  The Settlement Class Members received notice of: (a) the pendency of the Actions; (b) the terms of the proposed Settlements, including the Released Claims, Released Parties, and Releasing Parties; (c) their rights under the proposed Settlement, including how to receive the benefits offered by the Settlements; (d) their right to exclude themselves from the Settlement Class and the proposed Settlements; (e) their right to object to any aspect of the proposed Settlements; (f) their right to appear at the Final Approval Hearing; (g) Class Counsel's request for attorneys' fees and expenses and an incentive award to the Class Representatives; and (h) the binding effect of this Final Judgment and Order Approving Settlement on all Persons who did not timely exclude themselves from the Settlement Class.  Some of the objectors challenged certain aspects of the notice program.  The Court addresses those objections below and finds that they present no valid challenge to the notice.

7.      The Court also finds that the appropriate state and federal officials were timely notified of the Settlement Agreements under the Class Action Fairness Act of 2005 (CAFA), 28

U.S.C. § 1715, and that ninety (90) days have passed without comment or objection from any governmental entity.

8.      For the purposes of the settlement of the claims against Compass, Douglas Elliman, HomeSmart, Real Brokerage, Realty ONE, United Real Estate, and only for that purpose, the Court certifies the following class, except for those timely opting out:

> a.      All persons who sold a home that was listed on a multiple listing service[3] anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:
>
> > i.      October 31, 2019 to date of Class Notice.

9.      For the purposes of the settlement of the claims against Redfin, and only for that purpose, the Court certifies the following class, except for those timely opting out:

> a.      All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:
>
> > i.      Homes in Nevada: January 15, 2018 to date of Class Notice;
> >
> > ii.      Homes in California: October 2, 2019 to date of Class Notice; and
> >
> > iii.      For all other homes: October 31, 2019 to date of Class Notice.

10.      For the purposes of the settlement of the claims against Engel & Völkers and @properties, and only for that purpose, the Court certifies the following class, except for those timely opting out:

---

[3] MLS includes non-NAR multiple listing services, including NWMLS, WPMLS, and REBNY / RLS.

4

a. All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

   i. Homes in Arkansas, Kentucky, and Missouri: October 31, 2018 to date of Class Notice;

   ii. Homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming: October 31, 2017 to date of Class Notice;

   iii. For all other homes: October 31, 2019 to date of Class Notice.

11. The Court finds that certification of the Settlement Class is warranted in light of the Settlements under the prerequisites of Federal Rule of Civil Procedure 23(a) because: (1) the members of the Settlement Class are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Settlement Class; (3) Plaintiffs' claims are typical of the claims of the Settlement Class Members; and (4) Plaintiffs and Co-Lead Counsel will fairly and adequately represent the interests of the Settlement Class Members.

12. The Court finds that certification of the Settlement Class is warranted in light of and solely for purposes of the Settlements under Federal Rule of Civil Procedure 23(b)(3) because common issues, including whether Settling Defendants entered into any conspiracy, predominate over any questions affecting only individual members of the Settlement Class in the settlement context, and settlement of the Actions on a class basis is superior to other means of resolving the Actions as to Settling Defendants.

13. The Court reaffirms the appointment of Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa, as the Settlement Class Representatives. The Court finds that the

Settlement Class Representatives have and will fairly and adequately protect the interests of the Settlement Class because: (1) the interests of the Settlement Class Representatives are consistent with those of Settlement Class Members; (2) there appear to be no conflicts between or among the Settlement Class Representatives and the other Settlement Class Members; (3) the Settlement Class Representatives have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this litigation; and (4) the Settlement Class Representatives and Settlement Class Members are represented by qualified, reputable counsel who are experienced in preparing and prosecuting large, complicated class action cases, including those concerning violation of the antitrust laws.

14. In making these findings, the Court has considered, *inter alia*, (1) the interests of the Settlement Class Members in individually controlling the prosecution or defense of separate actions; (2) the impracticality or inefficiency of prosecuting or defending separate actions; (3) the extent and nature of any litigation concerning these claims already commenced; and (4) the desirability of concentrating the litigation of the claims in a particular forum.

15. As discussed below in response to objections from competing cases, the Court has specifically considered that the settlement class is nationwide and releases claims arising from sales of homes listed on NAR and non-NAR MLSs, including all claims on behalf of sellers arising from the same factual predicate. Plaintiffs here plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges certain NAR rules as well as rules adopted by the Residential Listing Service ("RLS") of the Real Estate Board of New York ("REBNY"). (*See* Doc. #232, Consolidated Am. Compl., ¶ 182.) The Complaint includes specific allegations regarding the particular anticompetitive policies adopted in REBNY RLS. *Id*. The Complaint alleges that, as a result, "Defendants' conspiracy has had the following anticompetitive effects

*nationwide*," including in REBNY RLS: (a) "Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes— thereby substantially inflating the cost of selling their homes"; (b) "Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers."; (c) "Home sellers have paid inflated buyer-broker commissions and inflated total commissions."; (d) "The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation"; (e) Price competition among brokers to be retained by home buyers has been restrained." *Id*. ¶ 225 (emphasis added); *see also id*. ¶¶ 28, 227 (describing "nationwide" impact).

16. Here, the Court finds that certifying a nationwide class is warranted, including because Plaintiffs have conducted extensive discovery into the alleged nationwide conspiracy and have thoroughly litigated the claims, providing a robust factual record on which to assess the claims and base negotiations. A nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class, a nationwide settlement will conserve judicial and private resources, and Class members were fully apprised of the settlement class definition through the notice process. As the Court explains more thoroughly below, it was both justified and necessary to achieve any settlement for the Settlement Class to include all multiple listing services for residential real estate nationwide, however the multiple listing services were named (e.g., real estate listing service), and regardless of whether the services were affiliated or associated with NAR or not. Moreover, the only way that the Settlements were possible was if they provided for a nationwide recovery and release.

17. As a general matter, "the law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371,

1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"). *See also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'" (quoting *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate) . The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005). However, the Court does not rely on any presumption in favor of settlements here because these settlements need no presumption to be found fair, reasonable, and adequate.

18.     The determination whether a class action settlement is "fair, reasonable, and adequate" is "committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Van Horn v. Trickey*, 840 F.2d 604, 606-07 (8th Cir. 1988). The ultimate question is whether the settlement is "fair, reasonable, and adequate." *In re Wireless*, 396 F.3d 922, 932 (8th Cir. 2005).

19.     Rule 23(e)(2) includes four factors the Court must consider, when evaluating settlement fairness. Those factors are whether:

(A) the Class Representatives and Class Counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;

(C) the relief provided for the Class is adequate, taking into account:

     (i)      the costs, risks, and delay of trial and appeal;

     (ii)     the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;

     (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

     (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

20.     The Eighth Circuit has also set forth four factors that a court should consider in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *In re Wireless*, 396 F.3d 922, 932 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975); *Van Horn*, 840 F.2d at 607 (8th Cir. 1988). *See also Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 861 (S.D. Iowa 2020) (finding analysis of certain Rule 23(e)(2) factors will "necessarily include analysis of [certain] related *Van Horn* factors"); *Anderson v. Travelex Insurance Services Inc..*, No. 8:18-CV-362, 2021 WL 4307093, at *2 (D. Neb. Sept. 22, 2021) (approving settlement under Rule 23(e) by evaluating *Van Horn* factors); *Cleveland v. Whirlpool Corp.*, No. 20-cv-1906, 2022 WL 2256353 (D. Minn. June 23, 2022) (evaluating settlement under Rule 23(e)(2) factors and *Van Horn*).

21.     Under Federal Rule of Civil Procedure 23(e)(2), the Court finds that the Settlements with Settling Defendants, as set forth in the Settlement Agreements, are fair, reasonable and adequate.

22.     First, Settlement Class Representatives and Class Counsel have adequately represented the Class and will continue to do so. Class Counsel were previously appointed to serve

as lead counsel in *Moehrl* and *Burnett* after the courts overseeing those cases found they would adequately represent the class. *Burnett*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022); *Moehrl*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023). Class Counsel subsequently won a jury trial in *Burnett*. And, in this case, the Court appointed them as Interim Co-Lead Class Counsel with responsibility for any settlements.(Doc. #180.) Altogether, Class Counsel have obtained over $1 billion in proposed and approved settlements as well as historic practice change relief. Class Counsel will continue to represent the class as they have done in navigating the settlement process. Likewise, the Class Representatives have bought and sold homes and have demonstrated their commitment to the litigation by responding to discovery, providing relevant documentation, and participating in the settlement process.

23.     Second, each Settlement was conducted at arm's length. The settlement negotiations were contentious and hard fought. Most of the settlements were reached only with the assistance of an experienced mediator. And all occurred only after Settling Defendants provided Class Counsel with sufficient financial information for Plaintiffs to make an informed decision about settlement. Dirks Decl. at ¶¶ 21-22; Berman Decl. at ¶¶ 2, 6-11. There is no indication that any of the Settlements are the result of anything other than tough negotiations. The lengthy history of the real estate commission litigation, which has proceeded for years through class certification and a trial in the *Burnett* case, demonstrates the arm's length nature of these Settlements.

24.     Third, for the reasons stated above, the relief for the Class is fair and adequate. The Settlements provide a significant financial recovery to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including appeal, and the Settling Defendants' financial resources. The Settlements also include meaningful changes to

the Settling Defendants' policies. The parties naturally dispute the strength of their claims and defenses. The Settlements reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes. Plaintiffs' best-case scenario is obtaining class certification, prevailing and recovering on the merits at trial, upholding a verdict on appeal, and then actually receiving the awarded damages from Defendants. But "experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020) ("Antitrust cases are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute."). And it would make little sense to try the case against the Settling Defendants where none of them has the ability to pay anywhere near the judgment amount sought. D Dirks Decl. at ¶ 22; Berman Decl. at ¶¶ 11-12.

25.     Against these risks, the Settlements provide at least a $110.6 million recovery from the nine Settling Defendants, as well as substantial practice changes. *See In re Pork Antitrust Litig.,* No. 18-1776, 2022 WL 4238416, at *2 (D. Minn. Sept. 14, 2022) (granting final approval of antitrust settlement that provided "substantial relief against the backdrop of a great deal of uncertainty where the merits are highly contested" in case involving alleged price-fixing conspiracy among pork processing companies); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 995-96 (N.D. Ohio 2016) (granting final approval of settlement in light of "real possibility that [plaintiffs] could have received much less—even zero—from a jury at trial or following an appeal"). The Settlements are also supported by the fact that this is a partial settlement of the claims arising from the alleged conspiracy; Class Counsel have continued to work

to achieve additional recoveries on behalf of the Class, including an agreement with NAR to eliminate the Mandatory Offer of Compensation Rule. Although some Class members have objected that they may not recover every dollar they paid to real estate agents, that is true of nearly every settlement. A guaranteed full recovery to every class member would have been untenable, perhaps resulting in no recovery at all.

26. In addition, the Settlements effectively distribute relief to the Class, including via the proposed method for processing class member claims. The Court-appointed notice and claims administrator, JND, will work with Class Counsel in processing Class member claims and distributing relief. JND has extensive experience in distributing relief in connection with large and complex class action settlements. Keough Decl. at ¶¶ 1, 47-51. JND will be responsible for reviewing claim forms and evidence of purchase to determine whether a claim is an approved claim, and any claim that cannot be confirmed may be subject to challenge, nonpayment, or a reduced share of the available funds. *See* Settlement Notice at ¶ 9. Class members with approved claims will have several options for receiving payment, including by debit card, Zelle, Venmo, or check. *See* Claim Form at p 1. Finally, as discussed below, the attorneys' fee request is reasonable and in line with Eighth Circuit precedent.

27. Fourth, the Settlements treat Class Members fairly and equitably relative to each other. Reviewing the terms of the proposed Settlements, it is clear that under the plain language of the Settlements, no class member is treated differently from any other. The practice change relief applies the same to all Class members nationwide. With respect to the monetary relief, every person who meets the class definition is eligible to submit and receive compensation for a claim. That is all that is required. *Petrovic*, 200 F.3d at 1152–53 ("We do not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual

awards."). The settlement website advises both that: (i) settlement payment "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 11.

28.     Finally, the requested service awards are reasonable and in line with other cases recognizing the work performed by the class representatives. The *Van Horn* Factors also support settlement approval. As discussed above under the Rule 23(e)(2) factors, the Settlements reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes, including potential financial outcomes of the Settling Defendants. The merits of the plaintiffs' case weighed against the terms of the settlement supports approval. Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the voluminous briefing in *Moehrl* and *Burnett*, which includes extensive class certification and summary judgment briefing, as well as post-trial briefing in *Burnett*. In addition, plaintiffs have engaged in extensive appellate briefing, including Rule 23(f) petitions in both *Moehrl* and *Burnett* as well as two separate appeals in the *Burnett* litigation concerning arbitration issues, and a denial of certiorari by the United States Supreme Court. By contrast, the Settlements provide for certain and swift recovery for the Class. In light of the many uncertainties of continued litigation, a significant and certain recovery weighs in favor of approving the proposed Settlements. *See In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669, 678 (D. Minn. 1974) (approving settlement where price-fixing claims faced "substantial roadblocks" on top of the "difficulties inherent" in prevailing on such claims); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1137 (8th Cir. 1984) (affirming final approval

13

of settlement where "no reported opinion addresses the precise [merits] question presented here," which created "a substantial question whether [plaintiff] would prevail"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) ("Any verdict would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement.") (cleaned up).

29. The fairness, adequacy, and reasonableness of the Settlements are also supported by the Settling Defendants' financial condition and their inability to satisfy a judgment. As discussed above, in order to evaluate the Settling Defendants' financial condition, Plaintiffs reviewed the financial information of each Settling Defendant and its ability to pay. Class Counsel attested that these amounts are reasonable in light of limitations on the Settling Defendants' ability to pay. "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 125 (8th Cir. 1975) (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

30. As discussed above, the litigation has been, and if it were to proceed forward, will be complex and expensive to prosecute. This is not merely hypothetical. The Court has observed first-hand the complexity and expense of the litigation. Settling Defendants have and would raise

numerous procedural and legal challenges to the case if they were not settling. (*See* Doc. #522, p. 6-12.)

31.    Finally, the amount of opposition to the settlement is minimal and supports settlement. The Settlement Class Representatives in this action have approved the Settlements. More than 463,000 Class members have submitted claims, while only a small handful have objected and 46 opted out.  Keough Decl. at ¶¶ 51, 55.  This supports granting final approval.  *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) (determining that with a settlement class of approximately 3.5 million households, and "only fourteen class members submitted timely objections," the "amount of opposition is minuscule when compared with other settlements that we have approved"); *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129-SRB, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval") (quoting *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015)); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) (of the 4,838,789 settlement class members who were sent notice, only 620 (0.012%) opted out of the settlement and only 33 (0.00068%) objected to the settlement, which "are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement"); *In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) ("The objectors represent only about 8 per cent of the class, and this relatively low level of opposition to the settlement also indicates its fairness.  The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement.") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)); *see also, e.g.*, *Van Horn*, 840 F.2d at 607 ("the amount of

opposition to the settlement" is a key factor to be considered in the settlement approval process); *Marshall*, 787 F.3d at 513 ("We have previously approved class-action settlements even when almost half the class objected to it.").

32.     This Court's order granting final approval of the Settlements is also supported by the substantial benefits to the class afforded by the practice changes obtained by the Settlements. Those changes include Settling Defendants, and their subsidiaries and affiliates, making the following practice changes, to the extent they are not already implemented, within six months of the Settlement Effective Date:

   i.    advise and periodically remind company-owned brokerages, franchisees (if any), and their agents that there is no company requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

   ii.   require that any company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms.  In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then Settling Defendant will require that any company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

   iii.  prohibit all company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

   iv.   require that company-owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

   v.    prohibit company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and

16

eliminate any internal systems or technological processes that may currently facilitate such practices);

   vi.   advise and periodically remind company-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities; and

   vii.   for each of the above points, for company-owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

*See* Settlement Agreements at ¶ 49.

33.    The Court has carefully considered each of the timely filed objections. All objections are overruled. As an initial matter, the Court has already overruled objections that are similar, and in some cases identical, to each of the objections here. *See Burnett*, May 9, 2024 Order Granting Final Approval, (Doc. #1487, p. 13-29.) In any event, the Court finds that none of the objections provides a basis for denying final approval of the Settlements. *See Marshall*, 787 at 513–14 ("The district court refused to give credence to the vocal minority" and "the court aptly noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement.").

34.    The Court ordered "all objectors and their attorneys to appear in person at the October 31, 2024, hearing at 10:30A.M. to argue their objections." (Doc. #510.) This order is not outside the Court's purview. *See Fauley v. Metro. Life Ins. Co.*, 52 N.E.3d 427, 438-39 (Ill. App. Ct. 2016) ("requiring class members to be present in court to object did not violate their due-process rights" when the Court ordered "if you want the Court to consider your objection, then you must also appear at the final approval hearing."); *In re Train Derailment Near Amite La.*, on Oct. 12, 2002, No. CIV.A. MDL 1531, 2006 WL 644494, at *2 (E.D. La. Jan. 27, 2006) ("To preserve the right to be heard at the Fairness Hearing in opposition to the settlement, the objecting Class Member must appear at the federal court in person not later than 8:30 a.m. on the date the

Fairness Hearing is to begin and register with Class Counsel."); *Dennings v. Clearwire Corp*., No. C10-1859JLR, 2013 U.S. Dist. LEXIS 105462, at *8 (W.D. Wash. July 26, 2013) (finding when the Court ordered objectors' counsel's in person appearance, "[i]f Objectors' counsel intends to litigate in the State of Washington, he must be prepared to appear in Washington when ordered to do so by the court.").

35. Objectors may not "essentially insert[] [themselves] into the dispute and then, without explaining why, [they] refuse[] to play by the rules that the district court set." *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 858 (8th Cir. 2024). An objector in *T-Mobile* refused to cooperate with counsel's efforts to conduct discovery ordered by the district court, claiming "that by subjecting her to a deposition, the district court 'unduly encumbered' her due-process right to be heard." *Id*. Both the Eighth Circuit and District Court disagreed with her refusal to follow the court's orders and struck her objection. *Id*. Similarly here, after the Court ordered their appearance, many objectors mailed letters protesting the Court's order and requesting excusal based on the cost of travel (*See* Doc. #512-1; Doc. #520), family care requirements (*See* Doc. #524-2, Doc. #523-1), or a death in the family (*See* Doc. #519-1). However, these excuses do not play "the rules that the district court has set." *Id*. Failure to comply with a Court's order can result in an objection being struck or waived. *See Ferron v. Kraft Heinz Foods Co.*, No 20-CV-62136-RAR, 2021 U.S. Dist. LEXIS 129955, at *41 (S.D. Fla. July 13, 2021) (finding when an objector failed to follow the Court order of appearing after providing the Court intent to appear at the final approval hearing, he provided the Court "sufficient grounds alone to strike his Objection."); *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 682 (D. Colo. 2014) ("As a threshold matter, National Roofing's objection failed to comply with the Court's order . . . [t]hus, National Roofing's objection is deemed waived[.]") Further, while objectors may "have to spend one

18

thousand ($1,000.00) dollars for a flight, hotel, and other out of town expenses" if they had to personally travel, this pales in comparison to the $13,147,775.19 in reasonable and necessary expenses exhausted by Plaintiffs' counsel in curating the current settlement for the Class. (Doc. 520-1, p. 2.) After issuing the order, the Court stated on the record at the Final Settlement Hearing important reasons for requiring Objectors' in person appearance. (Doc. #526.) Mr. Zaffarkhan, Mr. Wischer, Mr. Dyer, Ms. Cunningham, Mr. Douglass, Mr. Cheatham, Mr. Fender, Mrs. Fender, Mr. Friedman, Mr. March, and Mr. Mullis did not personally appear at the Final Settlement Hearing. All Objectors who did not appear in person failed to comply with the Court's order. Therefore, all objections filed by the above named Objectors who did not appear in person at the October 31, 2024, Final Settlement Hearing, are waived for failing to comply with the Court's order.

36.     Four objections were submitted by individuals acting without counsel. (Doc. #451 (Khyber Zaffarkhan), Doc. #485 (Terry Wischer), Doc. #527 (Mark Dyer), Doc. #528 (Vivienne Cunningham)). These objections cast no doubt on the fairness, adequacy, or reasonableness of the Settlements. They are overruled.

37.     Mr. Zaffarkhan represents that he paid commissions across two home sales in 2016 and 2020. Mr. Zaffarkhan's objection does not comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." Nor does Mr. Zaffarkhan provide basic information about the homes he claims to have sold, including whether he hired a listing broker, whether the homes were listed on an MLS, or how any broker fees he paid may have been allocated among those brokers. Additionally, based on the limited information provided, Mr. Zaffarkhan's claimed 2016 home sale appears to fall outside of the settlement class

period. Thus, Mr. Zaffarkhan has not established he has standing to object for at least that sale. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.") (citing *Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979)); *Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 580 (5th Cir. 2007) ("[O]nly class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

38.     Even considering Mr. Zaffarkhan's arguments, none shows that the Settlements should be rejected. *First*, Mr. Zaffarkhan objects that the monetary recovery is inadequate because the *Gibson* settlements (and other proposed and approved settlements in related cases) will not fully compensate him for the entirety of any alleged overcharges he may have paid. It is true that Class members will likely only receive from these settlements a portion of their best-day-in-court damages. But that fact is true for essentially any settlement and is not grounds for declining to approve the particular proposed settlements here. *Keil*, 862 F.3d at 696. As described herein, Plaintiffs sought to obtain the largest recovery they could in light of the risks of the continued litigation, and including each Settling Defendant's ability to pay limitations. Mr. Zaffarkhan's objection does not account for or otherwise address those risks and limitations. Nor does he opine that these particular Settling Defendants could reasonably have paid more. Further, although Mr. Zaffarkhan acknowledges that "the Settlement Fund will continue to grow," (Doc. #451, p. 3 n.1),

his objection does not account for the fact that the proposed Settlements would resolve claims against only one set of defendants and do not release claims against other defendants against whom Plaintiffs continue to seek relief on behalf of the class. *Second*, Mr. Zaffarkhan's objection notes Plaintiffs' requests to recover attorneys' fees, costs and expenses, and service awards. That objection is overruled. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (paying attorneys out of the fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170, 2021 WL 247958, at *1 (W.D. Mo. Jan. 25, 2021) ("When a class action creates a common fund for the benefit of the class members, the Court may award class counsel reasonable attorneys' fees 'equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.'") (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244-45 (8th Cir. 1996)). In addition, to the extent Mr. Zaffarkhan disagreed either with the amount of his recovery or the attorneys' fee request, he was free to opt out of the settlements and retain an attorney to pursue claims individually. But he chose not to do so.

39. Terry Wischer objects that sellers could not have been harmed by Defendants' conduct. (Doc. #485.) As an initial matter, Mr. Wischer does not indicate whether he is a class member who sold an eligible home during the class period. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder,* 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself

does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]").  The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Mr. Wischer comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."

40.      In any event, Mr. Wischer's objection that sellers could not have been injured is incorrect both legally and factually.  Under binding Supreme Court precedent, only direct purchasers are ordinarily eligible to sue for damages, and they may recover the entirety of any overcharge paid without consideration of any amount that may have been passed on to others. *See, e.g.*, *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1997); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).  Consistent with this case law, in similar cases, courts have held that home sellers (and not buyers) are direct purchasers under federal antitrust law, and a jury concluded that those sellers were injured.  *See Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 308-11 (N.D. Ill. 2022); *Burnett*, Verdict Form (Doc. #1294 at ECF 2.)  Even if he had standing, Mr. Wischer's objection is overruled.

41.      Mark Dyer objects that requiring buyers to sign a representation agreement before they have the opportunity to know the broker does not serve the best interest of the public.  (Doc. #527.)  As an initial matter, Mr. Dyer does not indicate whether he is a class member who sold an eligible home during the class period.  *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder,* 248 F. App'x at 580 ("only class members have standing to object to a settlement.  Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of

standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Mr. Dyer comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." As such, Mr. Dyer's objection is overruled.

42.     Vivienne Cunningham objects that requiring buyers to sign a representation agreement before they have the opportunity to know the broker does not serve the best interest of the public. (Doc. #528.) As an initial matter, Ms. Cunningham does not indicate whether she is a class member who sold an eligible home during the class period. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder,* 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Ms. Cunningham comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." As such, Ms. Cunningham's objection is overruled.

43. Four objections were lodged by counsel for plaintiffs in other cases alleging the same or similar claims as those in this case, as well as *Moehrl* and *Burnett*. None of these cases is a certified class. All are at the infancy of the litigation. All were filed after and appear to have been derived from this case, *Moehrl*, and *Burnett*. Each of these objectors could have opted out of the Settlements and pursued their own claims, but instead each chose to object. *See Marshall*, 787 at 520. None of these objections furthers the interest of Class members who will benefit from both the monetary and practice change relief afforded by the Settlements.

44. The South Carolina objectors argue that the aggregate monetary recovery reflected across all of the settlements in this action and the *Burnett* action is too low. But they do not argue that any particular settlement in this action is inadequate. They do not argue what total amount would have been reasonable and adequate, only that they do not like what was obtained. Nor do they seriously assert that the Settlements were the product of collusion or any conflict. The applicable standard is whether the settlements are fair, reasonable, and adequate—not whether they provide complete relief to all Class members. *See Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 54 (W.D.N.Y. 2018) ("The court's task, then, is simply to decide whether the settlement agreement *as written* is fair, reasonable, and adequate, not whether the parties or the court could conceivably have come up with a 'better' agreement."). "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil*, 862 F.3d at 696; *see also Pro. Firefighters Ass'n of Omaha, Loc. 385*, 678 F.3d at 649 ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (approving settlement despite the fact

Case 4:23-cv-00788-SRB Document 1590-3 Filed 11/04/24 Page 25 of 60

that "the settlement amount would not begin to cover the total costs of medical treatment for the class which easily could amount to billions of dollars" and holding "[t]he fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate"), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

45.     Nor must a settlement exhaust all of a settling defendant's financial resources in order to be deemed fair, reasonable, and adequate.  *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate.") (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) ("While it is undisputed that [the settling defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate."); *Grunin*, 513 F.2d at 125 (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

46.     In reaching these settlements, Class Counsel, who have extensive antitrust experience and have vigorously litigated similar cases for years, sought to obtain the best possible recovery for the Class.  There is no suggestion here, nor could there be, that Class Counsel were uninformed, lacked experience and expertise, or were somehow prevented from negotiating the best deal possible for the Class.  To the contrary, Class Counsel negotiated based on their extensive knowledge of the issues, including liability, damages, the risks of continued litigation, and the financial condition of the Settling Defendants.  Class Counsel also thoroughly analyzed the finances of each of the Settling Defendants, including the risk that each could file for bankruptcy

protection, which likely would have resulted in lower recoveries, if any, for the Class than were obtained via the Settlements. Berman Decl., ¶ 12.

47.     The South Carolina Objectors also purport to object to the scope of the release reflected in the Settlements—but their objection misconstrues what the releases actually say and do. And in any event the court finds the scope of release to be fair, reasonable and adequate. In addition, the South Carolina Objectors refer to "Realtors" being released, but it is unclear whether they intended to object to the release of individual real estate agents or, instead, to "local entities" whose brokers are NAR members. *Id.* Regardless, the South Carolina Objectors have not sued individual real estate agents and do not explain how complex and expensive antitrust suits could proceed against millions of individual real estate agents. Moreover, the release of individual real estate agents was bargained for as part of the settlement agreement. Such releases of employees and agents of defendants are common and appropriate. *See In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 240 (E.D. Pa. 2009) (overruling objection to release of independent sales agents of insurance company because "the release of agents is a necessary component of the settlement agreement in order to provide finality. Otherwise, dissatisfied policyholders could sue the defendants' agents who would then, in turn, look to the defendants for indemnity or contribution.") (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450, 522-23 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)); *Shay v. Apple Inc.*, No. 3:20-cv-1629, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.") (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010)); *Maine State Ret. System v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2013 WL 6577020, at *7, *17 (C.D. Cal. Dec. 5, 2013) (overruling

objection that argued "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Prods., Inc.*, No. 15-CV-1801, 2017 WL 5479637, at *8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third party retailers was inappropriate: "this argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims . . . . Millennium is a manufacturer that sells its products through various retailers, so any claims Ference purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling allegations asserted here. This objection is overruled."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) (approving class settlement with broad releases including non-parties, such as member banks, insurance companies and Swiss governmental entities).

48. The same is true with respect to releases of franchisees. *See Flaum v. Doctor's Assocs., Inc.*, No. 16-CV-61198, 2019 WL 2576361, at *3 (S.D. Fla. Mar. 11, 2019) (final approval of settlement releasing all Subway franchisees in suit against Subway franchisor); *Adkins v. Nestle Purina PetCare Co.*, No. 12-CV-2871, 2015 WL 10892070, at *4 (N.D. Ill. June 23, 2015) (final approval of settlement releasing variety of non-parties, including suppliers, manufacturers, retailers, and franchisees); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-4818, 2015 WL 3990915, at *3 (N.D. Cal. June 30, 2015) (preliminary approval of settlement releasing franchisees) & ECF No. 167 (Feb. 8, 2016) (ordering final approval of settlement).

49. The South Carolina Objectors also object to the adequacy of the class notices. In doing so, they do not argue that the method for distributing class notice was ineffective. As noted above, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. South Carolina objectors argue that the notices

lacked the following information, which they claim was necessary for class members to decide whether to participate in the Settlements: (1) the fact of jury verdict in *Burnett*; (2) an explanation of the size of the class; and (3) information "for class members to evaluate whether there could be better outcomes in their own jurisdictions." (Doc. #464, pp. 5-7.) None of these is a basis for rejecting the Settlements.

50. The Court finds that Class members were provided with the information the South Carolina Objectors advocate for and sufficiently informed class members of their rights. Moreover, "the mechanics of the notice process are left to the discretion of the court subject t only to the broad 'reasonableness' standards imposed by due process." *Grunin*, 513 F.2d at 120 . "As a general rule, the contents of a settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with (the) proceedings." *Id.* at 122 (quotation omitted). "Valid notice of a settlement agreement 'may consist of a very general description' of settlement terms." *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (quoting *Grunin*, 513 F.2d at 122).

51. The Court finds the notice here easily satisfied this standard. Among other things, notice apprised Class members of the nature of the action; the class claims and issues; and the settlement terms. It also advised Class members of their options, including their right to file objections, opt out, and appear at the fairness hearing. And it explained how Class members could obtain additional information including by contacting Class Counsel, contacting the claims administrator, and through the settlement website, which included numerous key case documents, FAQs, and every Settlement Agreement.

52.     Courts are unanimous that not every detail of the litigation need be included in settlement notices and have rejected objections seeking the inclusion of every conceivable detail. *See, e.g.*, *Vargas v. Capital One Financial Advisors*, 559 F. App'x. 22, 27 (2d Cir. 2014) (a settlement notice need only apprise class members of the settlement terms and "of the options that are open to them in connection with the proceedings," and, consequently, rejecting objector's arguments that notice was inadequate because it failed affirmatively to advise unsatisfied class members to opt out and failed to calculate the damages sustained by each individual class member); *In re TikTok, Inc., Consumer Privacy Litig.*, 2022 WL 2982782, at *18 n.20 (N.D. Ill. July 28, 2022) ("Rule 23 does not require the settlement notice to contain every last bit of information necessary to file an objection."); *Good v. Am. Water Works Company, Inc.*, 2016 WL 5746347, *9 (S.D. W. Va. Sept. 30, 2016) ("The basic requirements of Rule 23 and due process are intended to ensure that notices fairly and reasonably apprise class members of a pending action affecting their rights and their options with respect to that action, but those requirements should not transform the notice into a long brief of the parties' positions, precise in every detail and slated in such fashion as to please every litigant." (quotation omitted)).  Notices do not need to include every detail because "[c]lass members are not expected to rely upon the notices as a complete source of settlement information."  *Grunin*, 513 F.2d at 122; *see also UAW v. General Motors Corp.*, 2006 WL 891151, *33 (E.D. Mich. Mar. 31, 2006) ("It is inevitable that some details will be omitted from a notice, but the fact that the notices do not fully explore certain issues is immaterial.  Class members are not expected to rely upon the notices as a complete source of settlement information." (cleaned up)).  For instance, in *Petrovic*, the Eighth Circuit rejected the "contention that a mailed notice of settlement must contain a formula for calculating individual awards" because "[t]he notice described with sufficient particularity the stakes involved: the

settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic v. Amoco Oil Co.*, 200 F.3d at 1152–53.

53.     Moreover, notices that are overly long and complex are counter-productive because they reduce the likelihood that Class members will actually review and understand essential information. *See Kagan v. Wachovia Securities, L.L.C.*, 2012 WL 1109987, at *10 (N.D. Cal. Apr. 2, 2012) ("[The proposed notice] is simply too long.  The Court is concerned that few class members will read a fifteen-page, single-spaced Class Notice.").

54.     Finally, the Court finds the vast majority of class members from South Carolina favor approval of the Settlements.  Although the claims deadline is still months away, over 6,600 South Carolina residents have already submitted claims; and none have objected (aside from the clients of class counsel with competing class litigation).  Keough Decl. at ¶ 51.  If the Settlements are not approved, these class members risk receiving no compensation for their injuries.

55.     The New York Objectors, Friedman and March,[4]  argue their cases are "wholly distinct" from the *Gibson* case (Doc. #467, p. 3) and should not be subject to the nationwide releases reflected in the Settlements. They further assert that their claims do not share the same "factual predicate" as the *Gibson* case.

56.     First, the basis behind the New York objection is unequivocally rebutted by the plain language of the *Gibson* Complaint.  Plaintiffs here plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges rules adopted by the Residential Listing Service ("RLS") of the Real Estate Board of New York ("REBNY"). (*See* Doc. #232), Consolidated Am. Compl., ¶ 182.  There is no basis to claim that the *Gibson* case does not share a "factual predicate"

---

[4] The New York Objectors have stated that they are collectively objecting only to the Compass, Douglas Elliman, @properties, and Engel & Volkers Settlements.

with claims challenging the same RLS rules that are referenced in the *Gibson* complaint. Even so, the Complaint further alleges that anticompetitive restraints, including those promulgated by NAR, apply to brokers nationwide, including to non-NAR MLSs like NWMLS, WPMLS, and REBNY RLS because:

> these MLSs and their participating brokerages are generally subject to the same or similar anticompetitive restraints that apply in MLSs that are under NAR's formal control, including because: (i) all realtor members of non-NAR MLSs are subject to NAR's Code of Ethics; and (ii) each non-NAR MLS has adopted the same or similar anticompetitive restraints as those imposed by NAR on its affiliated MLSs.

*Id.*

57. The Complaint alleges that, as a result, "Defendants' conspiracy has had the following anticompetitive effects *nationwide*," including in NWMLS, WPMLS, and REBNY RLS: (a) "Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes— thereby substantially inflating the cost of selling their homes"; (b) "Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers."; (c) "Home sellers have paid inflated buyer-broker commissions and inflated total commissions."; (d) "The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation"; (e) Price competition among brokers to be retained by home buyers has been restrained." *Id.* ¶ 225 (emphasis added); *see also id.* ¶¶ 28, 227 (describing "nationwide" impact).

58. Plaintiffs also allege that any non-NAR MLS are controlled by, "NAR-aligned brokerages and are not fully independent from NAR." *See id.* ¶ 182 (describing in detail NAR's and its members' control over and influence of MLSs not exclusively owned or operated by NAR associations). Plaintiffs also point out that there are more than 17,000 NAR members in the New

York City area alone.  *See* https://www.realtor.com/realestateagents/new-york_ny. Thus, the Court rejects the New York Objectors' claim that the Settlement is limited to NAR only MLSs.

59.     Second, the New York Objectors' argument that their claims do not share the same "factual predicate" as the *Gibson* case (Doc. #467, p.  2; Doc. #470, p. 3) is contradicted by their own prior judicial admissions.  Although the New York Objectors *argue* that their cases are "wholly distinct and unrelated" to this one, they and their counsel filed complaints expressly linking their claims to the rules challenged in *Gibson*, including those adopted by NAR.  *See* Class Action Compl. at  ¶ 73, *March v. REBNY*, 1:23-cv-09995 (S.D.N.Y. Nov. 13, 2023); *Friedman v. REBNY*, 1:24-cv-0405 (S.D.N.Y. Jan. 18, 2024).  As the New York Objectors' own complaints reflect, the challenged NAR and REBNY rules are functionally identical.[5]

60.     Third, consistent with Plaintiffs' allegations in *Gibson*, the evidentiary records in *Burnett* and *Moehrl* reflect that: (i) the REBNY RLS rules challenged here were anticompetitive in similar ways to the challenged NAR rules; and (ii) the challenged NAR rules applied nationwide, including to transactions in REBNY RLS.  Plaintiffs' experts analyzed rules implemented by non-NAR MLSs, including REBNY/RLS, (8-10-22 Schulman Reply Rept., *Burnett* Doc. #922-3, pp. 23-25) and concluded that Realtors operating in those jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of Ethics and are thereby incentivized to require sellers to make unilateral offers of compensation to buy-side brokers/agents."  *Id.* at ¶ 75.  Prof. Einer Elhauge further opined as part of a detailed, multi-page

---

[5] The New York Objectors also assert that some of the Settling Defendants took positions before the Judicial Panel on Multidistrict Litigation ("JPML") that are inconsistent with the position that the claims in *Gibson*, *March*, and *Friedman* all share the same factual predicate.  To the contrary, the JPML proceedings, on balance, support finding that these cases all have the same factual predicate.  Moreover, as Settling Defendants explained, their positions before the JPML do not support the New York Objectors' arguments here. Some of Settling Defendants even withdrew the submissions quoted by March and Friedman.  (*See* Doc. #522, pp. 20-22.)

analysis of REBNY's rules that "the RLS rules, like the NAR [Buyer Broker Commission Rule (BBCR)], required listings to include an offer of buyer-broker compensation whenever sellers wanted to sell to buyers who were represented by buyer-brokers" and "had several other restraints similar to the NAR version of the BBCR." Elhauge Class Cert. Rebuttal Report, at ¶ 67, *Moehrl v. Nat'l Assn of Realtors* (N.D. Ill. Oct. 18, 2022) (Doc. #372.) The Court is familiar with the REBNY and other non-NAR MLS policies and practices because they were discussed at length in *Burnett*. The Court finds that the challenged REBNY rules share the same common nucleus of operative fact, and thus the same factual predicate, as *Burnett* and *Gibson*, and therefore were not "wholly distinct" from *Burnett* or *Gibson*, as the New York Objectors contend.

61.     The slight differences that the New York Objectors contend exist between the relevant NAR and REBNY rules are not material or sufficient to create a distinct factual predicate. Objectors ask the Court to define factual predicate too narrowly, thereby needlessly creating piecemeal litigation arising from the same conduct – a practice courts routinely reject. *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (overruling objection that "settlement contained an overbroad release" since it permissibly released only claims related to the factual subject of the litigation); *In re Literary Works in Elec. Databases Copyright Litig.,* 654 F.3d 242, 248 (2d Cir. 2011) (finding that objectors took an "overly narrow view" of factual predicate where claims arose from same underlying facts); *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 765-66 (10th Cir. 2020) (same); *see also In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 272 F. App'x 9, 13 (2d Cir. 2008) (finding reliance on different documents for misrepresentation claims based on investment losses did not create separate factual predicate where claims were each based on reliance on misleading opinions by defendants). Accordingly, claims involving properties listed on non-NAR

33

MLSs like NWMLS, WPMLS, and REBNY RLS all share the same factual predicate as those involving properties listed on NAR-affiliated MLS.[6]

62.     The New York Objectors assert that the Class Representative "do not have standing" to settle their claims.  (Doc. #467, p. 13.)  But the Class Representatives allege that they were injured as part of the same alleged anticompetitive conspiracy that impacts sellers of homes on REBNY RLS.

63.     The New York Objectors argue that the total settlement amount is inadequate to fully compensate them for their injuries.  But as described above, that is not the proper legal standard for assessing adequacy.  The New York Objectors further claim that Plaintiffs have not provided evidence of the Settling Defendants' ability to pay limitations.  The court disagrees.  *See* Berman Decl. at ¶¶ 2, 6-11.  In addition, Settling Defendants Douglass Elliman and Compass are publicly traded companies whose financial records are publicly accessible.

64.     Although the New York Objectors state that the practice changes reflected in the settlements are a "commendable step in the right direction," they argue those changes could have been stronger and lasted longer.  (Doc. #470, p. 15.)  But that is true in essentially any settlement that is the product of compromise and is not a basis for rejecting the Settlements here.  *See, e.g.*, *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, No. 12-MD-2320, 2015 WL 7282543, at *10 (D.N.H. Nov. 16, 2015) (approving final settlement and overruling objections "that the injunctive remedies go away in five years" and observing the injunctive relief "provides a valuable benefit to the class" and just because the injunction is not as broad as some class members wanted "does not make this settlement inadequate").

---

[6] To the extent that the New York Objectors rely on Second Circuit case law applying an "identical factual predicate" test, the Court finds that it does not support a different conclusion than Eighth Circuit precedent on the facts presented here. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005).

65.     The New York Objectors also argue that Class members who sold homes on REBNY have not been given guidance on whether they "will be provided a *pro rata* distribution" or if the higher commissions that some of those Class members paid will be reflected in claim payments.  The Court disagrees.  The settlement website advises both that: (i) settlements payment "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 11.

66.     Objector Friedman asserts, with no basis whatsoever, that the Settlements' inclusion of sellers who listed homes on REBNY "appears to be the product of a so-called 'collusive settlement.'"  (Doc. #467, p. 14.)  As discussed above at length, Class Counsel diligently sought to obtain the largest possible recovery on behalf of the nationwide class they were appointed to represent, given the strength and risks of the litigation, including the Settling Defendants' financial limitations.  The New York Objectors fail to point to any evidence suggesting otherwise, beyond the mere fact that overlapping claims in a different lawsuit are within the scope of the release.  That is not a basis for rejecting the Settlements.

67.     The Court finds the vast majority of Class members from New York favor approval of the Settlements. Although the claims deadline is still months away, over 13,000 New York residents have already submitted claims; and none have objected (aside from the clients of counsel with competing class litigation).  Keough Decl. at ¶ 51.  If the Settlements are not approved, many of these Class members risk receiving no compensation for their injuries.

68.     The *Batton* objectors seek to carve out indirect purchaser buyer claims from the releases.  But every class member sold a home during the class period, and most also bought

homes. After all, few people sell a home without first buying it. And most home sellers then buy a different home with the proceeds because they need somewhere to live. Thus, most Class members had possible claims both as home sellers and home buyers. Yet Settling Defendants quite reasonably balked at paying large amounts in settlement only to have the same people they just paid sue them again for the same alleged antitrust conspiracy.

69. The parties solved this problem by crafting the releases to incorporate the Eighth Circuit's "same factual predicate" standard, and to otherwise comply with federal law. This standard recognizes that basic fairness stops a party from suing twice for the same wrong. When cases go to final judgment, res judicata bars relitigating not only the claims tried, but also claims that "could have been raised" in that action. *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 714 (8th Cir. 2019). The same holds true in class actions litigated to conclusion. *In re General Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803 (8th Cir. 2004). And for class judgments that arise from settlement, courts have developed a parallel test that gives preclusive effect to all claims – even those not pleaded – that "arise out of the same factual predicate as the pleaded claims." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013). The same rules apply because "'the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action.'" *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982)).

70. Each settlement incorporates the *Uponor* standard by limiting the term "Released Claims" to include only causes of action "arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions . . . ." Settlement Agreements at ¶ 11. In addition, "[f]or avoidance

of doubt" as to enforceability, the releases "extend[] to, but only to, the fullest extent permitted by law." Settlement Agreements at ¶ 28. By using these legal terms of art, the parties correctly restricted the releases' scope. The Class members would have been bound by res judicata if the case had proceeded to final judgment, and the releases impose no greater preclusive effect from settlement. Every Class member was free to weigh their competing claims and make a choice. They could have opted out and would be free to pursue buyer claims either individually or in the *Batton* cases[7] (should a court ever certify those classes). And people with buyer-only claims are completely unaffected because they are not part of the class.

71. The *Batton* objectors argue that the settlements release indirect purchaser buyer claims "for no additional consideration." (Doc. #471, p. 8.) Having properly limited the scope of the releases based on the "same factual predicate" standard, however, the Court finds the parties were under no further obligation to assign separate settlement values to every distinct claim that class members might have asserted. As the Eighth Circuit recognized in *In re General American Life Insurance Co. Sales Practices Litigation*, 357 F.3d 800, 805 (8th Cir. 2004), that argument ignores "the way settlements usually work."

72. Like the objectors here, the *General American* plaintiff tried to void a class settlement release by complaining that "the class representative gave away all modal-billing claims (in the release) and received nothing in exchange for them." *Id*. Thus, the argument went, class members (including the plaintiff) received compensation for one type of claim, but "plaintiff and others similarly situated received nothing for their modal-billing claims." *Id*. But the Eighth

---

[7] References to the *Batton* cases include each of the following actions: (1) *Batton et al. v. The National Association of Realtors, et al.*, No. 21-cv-00430 (N.D. Ill), (2) *Batton et al. v. Compass, Inc. et al.*, No. 23-cv-15618 (N.D. Ill.), and (3) *Lutz et al. v. Homeservices of America, Inc. et al.*, No. 24-cv-10040 (S.D. Fl.).

37

Circuit rejected this contention because it ignored the give-and-take nature of the settlement process:

> It simply is not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims, were released. The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefitted, and a claims-evaluation procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things.

*Id.*; *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005) (quoting same). The Eighth Circuit further declined to enmesh itself in trying to determine "the relative value of the modal-billing clams," and instead deferred to the judgment of the class representative and class counsel that releasing all claims arising from the same factual predicate "was a proper thing to give up to obtain the benefits offered by General American." *In re General Am.*, 357 F.3d at 805.

73.     Plaintiffs here bargained for and obtained great benefits: money at the limits of Defendants' ability to pay, along with injunctive relief eliminating the challenged business practices. This relief is immediate, eliminating litigation and bankruptcy risk threatened by complex additional proceedings. But every negotiation has two sides, and Plaintiffs made the judgment that providing a release tracking federal law by releasing all claims arising from the same conspiracy was "a proper thing to give up to obtain the[se] benefits." *Id.* There was no "discount applied" to buyer claims because "[n]o part of the consideration on either side" was "keyed to any specific part of the consideration of the other." *Id.* Rather, a complete release – including indirect purchaser buyer claims – was "part of the consideration necessary to obtain [one of] the largest

38

antitrust settlement[s] in history." *Wal-Mart Stores*, 396 F.3d at 113. Nor were any class members bound by this determination involuntarily; dissenters retained the right to opt out. The *Batton* objectors have offered no evidence to enable the Court to second-guess Plaintiffs' determination, and the Court declines to do so.

74.     The *Batton* objectors also argue that indirect purchaser buyers require their own subclass. Yet "[a] class need not be subdivided merely because different groups within it have alternative legal theories for recovery or because they have different factual bases for seeking relief." 7AA C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1760 (3d ed. June 2024 update). Rather, conflicts arise (and subclasses are required) only "when the class is found to have members whose interests are divergent or antagonistic." *Id.*; *see also DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) ("There is no indication that DeBoer's interest was antagonistic to the remainder of the class or that the claims were not vigorously pursued."). *Cf. Petrovic,* 200 F.3d at 1146 ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members."). No such division of interest is presented here.

75.     The only people included in the settlement – and thus the only people giving any release – are people who sold homes during the class period.[8] Their interests are common and focused on achieving the greatest relief for the class. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests

---

[8] People who only bought homes during the class period are not class members. They have released nothing and can continue to litigate indirect purchaser claims should they so desire.

are not antagonistic for representation purposes."). That many of these class members also bought homes during the class period does not make their interests divergent or antagonistic.

76. The Supreme Court's decisions in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), provide no support for objectors' argument. As the Eighth Circuit has recognized, *Amchem* and *Ortiz* were completely different product liability cases that involved stark conflicts of interest not present here. *Petrovic*, 200 F.3d at 1146. Both cases represented attempts to settle all asbestos cases, now and forever. *Id.* The "injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured." *Id.* Worse yet, the diseases had a latency period of up to 40 years, meaning that many class members currently suffered from no illness. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 975 (8th Cir. 2018) (discussing *Amchem*). The Eighth Circuit stated that this latency period created an inherent conflict "between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size)." *Petrovic*, 200 F.3d at 1146. Adding to the problem, "the settlement offered no assurance that sufficient funds would remain to protect the interests" of future claimants. *In re Target Corp.*, 892 F.3d at 975 (discussing *Amchem*). In other words, both *Amchem* and *Ortiz* involved a strong likelihood that some claimants would be paid, but others (numbering in the hundreds of thousands) would receive nothing. That concern is not present here, where every Class member sold a home and therefore will receive compensation.

77. The *Batton* objectors imply that *Amchem* and *Ortiz* require subclasses whenever Class members claim different amounts or types of damage. But *Petrovic* forecloses that

argument. *Petrovic* was a class action arising from underground oil seepage originating from a petroleum refinery. In crafting settlement relief, the parties created three zones, labeled A, B, and C. Claimants in Zone A, situated above the underground oil, were "guaranteed to receive 54 percent of the value of their properties." *Petrovic*, 200 F.3d at 1145. Claimants in the surrounding Zone B were guaranteed $1,300 per property. *Id.* And claimants in Zone C, the area farthest removed from the oil, could apply for compensation only by proving damage. *Id.* Faced with objectors from different zones, the Eighth Circuit held that *Amchem* and *Ortiz* required no subclasses: "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable." *Id.* at 1146. Indeed, "almost every settlement will involve different awards for various class members." *Id.*

78.     The same is true here. Every Class member stands to gain from the settlements, both in terms of money and injunctive relief. Each Class member could try to prove individual damages at trial and these amounts would all vary. But courts approve class settlements all the time that forgo these individual determinations. Indeed, the most common method for allocating settlement funds in antitrust cases is on a *pro rata* basis. *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a *pro rata* basis."); *see also Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving *pro rata* distribution of settlement fund as fair and reasonable).

79.     *Amchem* and *Ortiz* also presented procedural settlement problems not presented here. As the Eighth Circuit recognized, each involved a settlement before litigation, presenting the district court with a complaint, proposed class, and proposed settlement all at the same time.

*Petrovic*, 200 F.3d at 1145-46.  This deprived the trial courts of "'the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.'"  *Id*. at 1146 (quoting *Amchem*, 521 U.S. at 620).  This case, by contrast, arises from facts extensively developed during the *Burnett* litigation and trial, giving the Court an extensive record on which to base its findings.  *Id*.  In addition, *Amchem* and *Ortiz* presented the possibility of collusion between class counsel and the defendants.  *Id*.  No objector meaningfully alleges here any facts reflecting such collusion in connection with these settlements.  The difficulties associated with *Amchem* and *Ortiz* therefore are not present.[9]

80.    The *Batton* objectors also fail to demonstrate that the class representatives or counsel provided inadequate representation.  The mere fact that some Class members might allege indirect purchaser buyer claims presents no divergent interests that would preclude general representation of an undivided class.  This is because "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'"  *Petrovic*, 200 F.3d at 1148 (quoting 7A Wright, Miller, and Kane, *Federal Practice and Procedure: Civil* 2d § 1769 at 367 (2d ed. 1986)).  All Class members here "share the common objective" of ending Defendants' anticompetitive conspiracy and recovering the excessive commissions they paid as a result of that

---

[9] The *Batton* objectors' other cases are similarly distinguishable. *See In re Bank of America Securities Litig.*, 210 F.R.D. 694, 712 (E.D. Mo. 2002) (finding settlement unreasonable where it allocated no damages to set of claims that plaintiffs had previously pursued and represented as among the strongest in the case); *Branson v. Pulaski Bank*, No. 4:12-CV-01444-DGK, 2015 WL 139759, at *6-7 (W.D. Mo. Jan. 12, 2015) (rejecting settlement where there was no evidence of the merits of plaintiffs' claims and settlement appeared to stem from unequal bargaining power); *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 385-87 (D. Minn. 2013) (rejecting proposed settlement submitted the day after complaint was filed when the court had no information about the potential damages or relative strengths and weaknesses of claims). The rest are cases where there were intractable conflicts between subclasses of class members holding present, known claims and those holding claims for potentially future, unknown injuries.

conspiracy. *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1064 (8th Cir. 2013).

81.     The *Batton* objectors brush aside the valuable injunctive relief obtained by the settlements. But the financial payments to Class members are "not the only, or perhaps even the primary, benefit of the settlement agreement[s]." *Marshall*, 787 F.3d at 509. Rather, "the injunctive relief offered under the settlement[s] has value to all class members." *In re Target Corp.*, 892 F.3d at 974 n.6; *accord Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (argument that some class members "receive no money" fails because it "fails to acknowledge the injunctive relief offered by the settlement," which "is intended to benefit all class members regardless of individual monetary recovery.").

82.     The *Batton* objectors also ignore the fact that the only people included in the settlements are people who sold homes during the class period. People who only bought homes are not Class members. Such "buyer only" individuals have released nothing and can litigate indirect purchaser buyer claims any way they desire, whether individually or in the *Batton* cases. Those cases will continue to be litigated. The sole limitation imposed is that people who accept settlement benefits here cannot turn around and pursue a second recovery for the same conduct. This is not a case where anyone is releasing claims without compensation. Instead, all Class members "share the common objective of maximizing their recovery from [Defendants] for the same alleged misconduct." *Schutter v. Tarena Int'l, Inc.*, No. 21-CV-3502, 2024 WL 4118465, at *5 (E.D.N.Y. Sept. 9, 2024).

83.     For these reasons, Objectors' reliance on *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), is not persuasive. *Literary Works* involved a settlement that placed claims in groups A, B, and C (each group arising under a different provision

Case 4:23-cv-00788-SRB   Document 1599-3   Filed 11/04/24   Page 44 of 60

of the Copyright Act). *Literary Works*, 654 F.3d at 246. If claims exceeded a set cap, then Category C claims would be reduced first and might be eliminated entirely. *Id*. The Second Circuit therefore found a lack of adequate representation because Category A and B claims were "more lucrative" than Category C and "because the reduction of Category C claims could 'deplete the recovery of Category C-only plaintiffs in their entirety before the Category A or B recovery would be affected.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir. 2021) (quoting *Literary Works*, 654 F.3d at 252, 254). The settlement agreements here, by contrast, present "no risk that any members of the class will have their ability to get settlement benefits reduced to zero because some other members got more relief from the settlement." *Id*. Instead, "all class members are entitled to the same class benefits." *Id*. Again, the fact that many Class members both bought and sold a home presents no "fundamental conflict" that requires the use of subclasses or additional lawyers.

84.    The *Batton* objectors also complain that "the settling parties have not made any plan of allocation available." (Doc. #471, p. 5.)  But this argument is premature and should be raised in the allocation phase.  "[C]ourt approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update).  "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d.

Case 4:23-cv-00788-SRB   Document 1599-3   Filed 11/04/24   Page 45 of 60

Cir. 1987).[10]  Once the allocation plan is proposed, the Court will be in a position to consider that plan and approve "a second notice to Class Members, followed by a right to object and/or file a claim." *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019). That distribution decision will be "governed by the same standards of review applicable to approval of the settlement as a whole, *i.e.,* the distribution plan must be fair, reasonable and adequate." *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020). Any Class members who disagree with the proposed allocations—e.g., because they believe that plan insufficiently compensates home purchases—will be able to present such argument to the Court at that time.  Nor do any Class members need allocation information in deciding whether to opt out of the settlements.  The Eighth Circuit rejects the notion that class members must be provided "a formula for calculating individual awards" when receiving notice – a description of the "potential aggregate payout" is enough.  *Petrovic*, 200 F.3d at 1153.

85.     Finally, the Court disagrees with the *Batton* objectors' argument that buyer claims lie outside the same factual predicate as seller claims.  In fact, releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the settling defendant arising out of the same conspiracy, including when those direct purchasers may also have indirect-purchaser claims.  *See, e.g.*, *In re Transpacific Passenger Air Transportation*

---

[10] *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551, 1988 WL 158947, at *4 (W.D. Wash. July 28, 1988) ("[D]eferral of allocation decisions is routinely followed in" these circumstances because "the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved."); *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known."); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011) (developing plan of allocation is properly delayed until after final approval of settlement where "the potential for additional settlements with other Defendants . . . may affect the final plan of allocation"); *Manual for Complex Litigation, Fourth* § 21.312 (2005) ("Often . . . the details of allocation and distribution are not established until after the settlement is approved.").

*Antitrust Litigation* (N.D. Cal, 07-cv-5634), ECF No. 900-2 § 1.11 (releasing "any and all claims . . . on account of, arising from, or in any way related to, the pricing of passenger air transportation by JAL or Defendants . . . with respect to the facts, occurrences, transactions or other matters that were alleged or could have been alleged [in the action] . . . regardless of legal theory, and regardless of the type or amount of relief or damages claimed"); *In re: Processed Egg Products Antitrust Litigation* (E.D.P.A., MDL 2002), ECF No. 349-1 ¶ 25 (similar); *In re Intuniv Antitrust Litigation* (D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar); *In re: Prograf Antitrust Litigation* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re Pre-Filled Propane Tank Antitrust Litigation* (W.D. Mo. 14-md-2567 / MDL No. 2567), ECF No. 362-1 ¶ 12 (similar); *In re HIV Antitrust Litigation* (N.D. Cal, 19-cv-02573), ECF No. 711-2 at 11-12 (similar); *In re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637), ECF No. 3324, ¶ 26 (similar). Courts have approved these settlements even over objections that the settlement improperly released or otherwise devalued a subset of claims. *See In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554, 555-56 (9th Cir. 2017) ("The district court properly certified the settlement class and was not obligated to create subclasses for purchasers of U.S.-originating travel and direct purchasers of airfare. Federal Rule of Civil Procedure 23(a) does not require a district court to weigh the prospective value of each class member's claims or conduct a claim-by-claim review when certifying a settlement class."); *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 7397567, at *1 (N.D. Cal. Nov. 8, 2023) (rejecting indirect purchasers' request to set aside portion of direct-purchaser settlement).

86.     Comparing the complaints in the *Batton* cases with Plaintiffs' complaint here shows that the buyer claims arise from the same factual predicate as the seller claims. *See also Batton I*, Mar. 5, 2021 Plaintiffs' Initial Joint Status Report, No. 21-cv-00430, at Doc. #48 ("In filing this

case, Plaintiff took the position that this case is related to Moehrl v. NAR et al."); *Id.* at Doc. #59 – Transcript of Proceedings held on Mar. 23, 2021 (reflecting Mullis's counsel's representation that *Moehrl* "raises substantially similar allegations"). All such claims arise from the same common nucleus of operative fact, and any class member with both seller and buyer claims would "ordinarily be expected to try them all in one judicial proceeding." *North Dakota v. Lange*, 900 F.3d 565, 568-69 (8th Cir. 2018). The Court therefore rejects the *Batton* objectors' attempt to force claim splitting between the seller and buyer claims. The seller and buyer claims share the same factual predicate.

87. Finally, the Court finds that Mr. Mullis appears to be a Nevada resident. Over 7,200 Nevada residents have already submitted claims; and none have objected (aside from the clients of class counsel with competing class litigation). Keough Decl. at ¶ 51. If the Settlements are not approved, these class members risk receiving no compensation for their injuries.

88. The Court finds the requirements of Rule 23(g) of the Federal Rules of Civil Procedure are met, and the Court reaffirms the appointment of the law firms of Ketchmark and McCreight P.C., Williams Dirks Dameron LLC, Boulware Law LLC, Hagens Berman Sobol Shapiro LLP, Cohen, Milstein, Sellers & Toll, PLLC, and Susman Godfrey LLP as Co-Lead Counsel for the Settlement Class ("Class Counsel").

89. The 46 persons and entities identified in the Parties paperwork (*see* Exhibit L to Keough Decl.) have timely and validly requested exclusion from the Settlement Class and are therefore excluded from the Settlement Class and are not bound by this Order, and may not make any claim upon or receive any benefit from the Settlements, whether monetary or otherwise. Nothing in this order should be construed as a determination by this Court that the excluded persons and entities are members of the Settlement Class or that they meet other prerequisites,

such as standing, for bringing claims alleged in the Actions. Each Settlement Class member who is not listed in Exhibit L to the Keough Declaration is bound by this Order and will remain forever bound, including by releasing all Released Claims of Releasing Parties against Released Parties. The Court specifically approves these releases as set forth in the Settlement Agreements.

90. Members of the Settlement Class, unless they excluded themselves from the Settlement Class, are hereby enjoined from filing, commencing, prosecuting, intervening in, or pursuing as a plaintiff or class member any Released Claims against any of the Released Parties, which include Settling Defendants' franchisees and affiliated brokerages, and agents affiliated with those franchisees or affiliated brokerages. *See* 28 U.S.C. § 1651; *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 914 (8th Cir. 2010) (noting that "the district court has the inherent ability to protect its own jurisdiction over the dispute pending before it"); *Janson v. LegalZoom.com, Inc.*, 2012 WL 13047852, at *2 (W.D. Mo. Apr. 30, 2012) ("In order to protect the continuing jurisdiction of the Court, prevent a multiplicity of lawsuits, and protect and effectuate the Court's Judgment in this Litigation, Plaintiffs and Class Members . . . are barred and enjoined from instituting, commencing, or continuing to prosecute . . . any action in this Court, any other state or federal court, or any other tribunal or forum of any kind, against any Released Party that asserts any claims that are Released Claims under the terms of the Settlement[.]") (granting final approval); *accord Almanzar v. Home Depot U.S.A., Inc.*, 2024 WL 36175, at *13 (E.D. Cal. Jan. 3, 2024); *Smith v. Floor & Decor Outlets of Am., Inc.*, 2017 WL 11495273, at *6 (N.D. Ga. Jan. 10, 2017); *In re Ortho. Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 188 (E.D. Pa. 1997). Released Claims include claims that arise from or relate to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered,

obtained, or paid to brokerages in connection with the sale of any residential home. For the avoidance of doubt, this injunction extends to claims arising from or relating to transactions where Settlement Class Members either sold or purchased a home on any multiple listing service nationwide, regardless of affiliation or association with NAR or not, and thus includes, *e.g.*, NWMLS, WPMLS, and REBNY/RLS. This injunction does not extend to any individual claims that a plaintiff or class member may have against his or her own broker or agent based on breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

91.     This Order does not settle or compromise any claims by Class Representatives or the Settlement Class against entities or persons other than Released Parties, and all rights against any other person or entity are specifically reserved.

92.     Settling Defendants shall issue payment in accordance with the Settlement Agreement.

93.     Plaintiff's request for service awards for Class Representatives is hereby approved. The Court finds these individuals not only put their names on the line to advance the litigation, but that they have provided invaluable work on behalf of the Class through participating in discovery and the settlement process. Courts routinely approve service awards to compensate class representatives for the services they provide and the risks they incur on behalf of the class. The factors for deciding whether the service awards are warranted are: "(1) actions the plaintiffs took to protect the class's interests, (2) the degree to which the class has benefited from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing litigation." *Caligiuri*, 855 F.3d at 867. Here, Plaintiffs seek a service award of $10,000 per Settlement Class Representative.

The Settlement Class Representatives performed important work on the case, including time-consuming gathering of facts and documents and assisting Class Counsel with the specifics of their transactions. That work materially advanced the litigation and protected the Settlement Class's interests. *Id.* Indeed, without their time and effort, these Settlements would have been impossible. Finally, the requested service awards are consistent with other awards approved in the Eighth Circuit. *Tussey*, 850 F.3d 951, 961–62 (8th Cir. 2017) (approving $25,000 service awards); *Rogowski*, 2023 WL 5125113, at *6 (approving $25,000 service awards for named plaintiffs); *Wolfert v. UnitedHealth Group, Inc.,* No. 08-CV-01643 (E.D. Mo. Aug. 21, 2009), ECF No. 38 at 4–5 (approving a service award of $30,000). Accordingly, Plaintiffs' request falls within a fair range of service awards—especially given the landmark nature of this litigation. The Court will therefore approve the requested service awards for each Settlement Class Representative.

94.     Class Counsel has adequately represented the Class. Their application for an award of attorneys' fees and reimbursement of costs as set forth in the Motion for Attorneys' Fees and Costs (Doc. #399) is hereby approved and shall be paid in accordance with the Settlement Agreements.

95.     Courts in the Eighth Circuit typically use the "percentage-of-the-fund method" to award attorneys' fees from a common fund. *See, e.g.*, *Rawa v. Monsanto Co.*, 934 F.3d 862, 870(8th Cir. 2019). "In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established,'" *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999)), or even "preferable,'" *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-4321, 2015 WL 3460346, at *3 (W.D. Mo. June 1, 2015) (quoting *West v. PSS World Med., Inc.*, No. 13-CV-574, 2014 WL 1648741, at *1 (E.D. Mo. Apr. 24,

2014)). The percentage method aligns the interests of the attorneys and the class members by incentivizing counsel to maximize the class's recovery. *See Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 (8th Cir. 1996) ("[T]he Task Force [established by the Third Circuit] recommended that the percentage of the benefit method be employed in common fund situations.") (citing *Court Awarded Attorneys Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 255 (3rd Cir. 1985))). The Court will therefore use the percentage approach to award fees in this case. This Court and others within the Eighth Circuit confirm that one-third of the common fund is an appropriate amount for class counsels' fees in complex class actions, including antitrust litigation. Eighth Circuit and Missouri courts "have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions." *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) (quoting *In re Xcel,* 364 F. Supp. 2d at 998); *see also Rawa*, 934 F.3d at 870 ("courts have frequently awarded attorneys' fees ranging up to 36% in class actions") (quoting *Huyer*, 849 F.3d at 399); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1064 (D. Minn. 2010) (holding fee award of 33% reasonable); *In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir.2002) (affirming fee award representing 36% of the settlement fund as reasonable)); *In re Xcel,* 364 F.Supp.2d at 998 (collecting cases demonstrating that district courts routinely approve fee awards between 25% and 36%). Just recently, this District approved one-third of the fund in a settlement valued at $325 million. *See Rogowski v. State Farm Life Ins. Co.*, No. 22-CV-203, 2023 WL 5125113, *4-5 (W.D. Mo. April 18, 2023). Thus, judges in the Western District of Missouri and the Eighth Circuit routinely apply the one-third-of-the-fund fee calculation, even to large settlements.

96.    In doing so, courts typically consider some or all of the relevant factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *See In re Target*

*Corp. Customer Data Security Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018). The *Johnson*

factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*In re Target,* 892 F.3d at 977 n.7. To be sure, "[m]any of the *Johnson* factors are related to one

another and lend themselves to being analyzed in tandem." *Swinton v. SquareTrade, Inc.*, 454 F.

Supp. 3d 848, 886 (S.D. Iowa 2020). Therefore, courts in the Eighth Circuit often focus on the

most relevant *Johnson* factors in evaluating fee requests. *See Huyer*, 849 F.3d at 398–400

(affirming trial court's award of one-third of the common fund after review of Johnson factors 1-

5 only); *In re Xcel*, 364 F. Supp. 2d at 993; *Tussey v. ABB, Inc.*, No. 06-CV-4305, 2019 WL

3859763, at *2 (W.D. Mo. Aug. 16, 2019); *Yarrington*, 697 F. Supp. 2d at 1062; *Hardman v. Bd.*

*of Educ. of Dollarway, Arkansas Sch. Dist.*, 714 F.2d 823, 825 (8th Cir. 1983). The Court has

considered the *Johnson* factors here, and finds that each weighs in favor of Plaintiffs' fee request.

*See also* Klonoff Fee Dec. at ¶¶ 24, 34, 39.

97.     Here, Class Counsel's time and labor invested was substantial and necessarily

precluded other work. In addition to the over 105,000 hours they have dedicated to the litigation

through July 31, 2024, Class Counsel were also required to expend over $13 million of their own

money toward the combined litigation. That work was undertaken without any guarantee of

payment. Moreover, the litigation faced low odds of early settlements given the attack on

practices that were central to the real estate brokerage industry. *See, e.g.*, *How the $1.8 Billion*

*Real-Estate Commissions Lawsuit Came to Be*, Wall Street Journal, November 26, 2023

("Antitrust cases almost always settle before trial, giving attorneys some assurance they will get paid something. But in this case, the damages were so high and the threat to the industry so existential that plaintiff attorneys thought it unlikely NAR would settle."). Indeed, NAR took the position that the cases were "baseless." *See, e.g., Realtor Group Moves to Dismiss Class Action Lawsuit Alleging Collusion,* Forbes, May 21, 2019 ("According to John Smaby, president of NAR, all three claims have no merit. 'In today's complex real estate environment, REALTORS and Multiple Listing Services promote a pro-consumer, pro-competitive market for home buyers and sellers, contrary to the baseless claims of these class action attorneys,' he said. 'Our filing today shows the lawsuit is wrong on the facts, wrong on the economics and wrong on the law.'"). In sum, "the extraordinary level of work and result achieved here in the face of enormous risk warrants a substantial fee percentage." Klonoff Fee Decl. at ¶ 88.

98. "Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees." *Yarrington*, 697 F. Supp. 2d at 1062 (quoting *In re Xcel*, 364 F. Supp. 2d at 994); Theodore Eisenberg & Geoffrey Miller, *Attorney Fees In Class Action Settlements: An Empirical Study*, 1 J. Emp. L. Studies 27, 27, 38 (2004) ("Fees are also correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees . . . . [This] is widely accepted in the literature.")). "Unless that risk is compensated with a commensurate award, no firm, no matter how large or well-financed, will have the incentive to consider pursuing a case such as this." *Tussey*, 2019 WL 3859763, at *3. "Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success." *Been v. O.K. Industries, Inc.*, No. 02-CV-285, 2011 WL 4478766, at *9 (E.D. Okla. Aug. 16, 2011). And critically, "[t]he risks plaintiffs' counsel faced must be assessed as they existed in the

morning of the action, not in light of the settlement ultimately achieved at the end of the day." *In re Xcel*, 364 F. Supp. 2d at 994.

99. Because antitrust claims are especially complex, expensive, and difficult to prosecute, courts have recognized that antitrust settlements should result in attorneys' fees equal to one-third of the fund. *See In re Peanut Farmers Antitrust Litig.,* No. 19-CV-00463, 2021 WL 9494033, at *6 (E.D. Va. Aug. 10, 2021) ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane Antitrust Litig.*, No. 04-CV-1616, 2016 WL 4060156, at *5 (D. Kan. July 29, 2016) (awarding one-third of $835 million settlement, noting "a one-third fee is customary"); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 100, 106 (E.D. Pa. 2013) (awarding one-third of the settlement fund as attorneys' fees in which court relied upon the fact that class counsel had litigated a number of hotly contested *Daubert* challenges). *See also* Klonoff Fee Decl. at ¶¶ 41.

100. Here it is undeniable that the antitrust claims at issue in these cases were challenging to prosecute.

101. Courts often judge class counsel's skill against the "quality and vigor of opposing counsel . . . ." *In re Charter Commc'ns, Inc.*, MDL No. 1506 All Cases, No. 02-CV-1186, 2005 WL 4045741, at *29 (E.D. Mo. June 30, 2005) (citing *In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004)). In the litigation, Class Counsel faced off against no fewer than thirty highly-respected law firms over the course of the litigation. Although Class Counsel's team included some of the country's most accomplished class action and trial lawyers, Defendants also hired some of the country's most prominent and respected defense attorneys. This weighs heavily in favor of the requested award.

102.     In the Eighth Circuit, courts have "frequently awarded attorneys' fees ranging up to 36% in class actions." *Huyer*, 849 F.3d at 399.   Courts have recognized that prosecution of antitrust claims should result in a one-third-of-the-fund fee award.  *See In re Peanut Farmers,* 2021 WL 9494033, at *6 ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane*, 2016 WL 4060156, at *5 (awarding one-third of $835 million antitrust settlement, noting "a one-third fee is customary").

103.     Moreover, the requested one-third fee award is equal to or less than what the actual Named Plaintiffs—those with the most on the line and most involved in the case—agreed to at the outset of the case.  Class representatives in *Burnett* agreed to 35%.  Dirks Fee Decl. at ¶29. Class representative in *Moehrl* agreed to up to 33.3%. Berman Fee Dec. at ¶ 6.  These factors also support Plaintiffs' request. Klonoff Fee Decl. at ¶¶ 60-61, 77-78.

104.     Here, the Fund is pure cash and non-reversionary; so, the Settlements, plus interest earned until its distribution, require no further valuation.  In requesting a fee as a percentage of the Fund, Class Counsel necessarily seeks a fee proportionate to the degree of monetary success obtained.

105.     Equally important, the Settlements include significant practice change relief which require the Settling Defendants, among other things, to not enforce the Mandatory Offer of Compensation Rule and to train their agents that commissions are negotiable.  Counsel is not seeking any additional fee for this valuable relief on these Settlements, but the value of that relief is substantial in itself and should be considered when evaluating the fee that is sought.  *See* Klonoff Fee Fee Dec. at ¶¶ 96-98.

106.     Here, the request is supported by both the size of the recovery and the results obtained as compared to the risk of a lesser recovery or none at all.  Moreover, the Settlements

represent only a part of the recovery to the Class because Class Counsel have continued to prosecute these joint and several liability claims against other Defendants. Thus, any past and future settlements or judgments will also benefit the Class. This factor supports a contingency percentage of one-third, particularly given the benefits achieved. Importantly, success—including "exceptional success"—is not measured solely by the maximum damages alleged but must be evaluated against any "unusually difficult or risky circumstances and the size of plaintiffs' recovery." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204–05 (S.D. Fla. 2006).

107.    Although a lodestar crosscheck is "not required" in the Eighth Circuit, *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017); *PHT Holdings II, LLC v. N. Am. Co. Life & Health Ins.*, 2023 WL 8522980, at *7 (S.D. Iowa Nov. 30, 2023)[11]—performing such a crosscheck here confirms that the requested fee is reasonable and should be approved. As noted above, Class Counsel have spent over 105,000 hours through July 31, 2024 in *Gibson*, *Umpa*, *Burnett*, and *Moehrl*. These hours result in an overall lodestar through July 31, 2024 of $90,853,364. Dirks Fee Decl. at ¶ 43. Combined with the fee already awarded in *Burnett*, the current fee request constitutes an approximately 1.17 multiplier on lodestar which is well within the range of reasonableness. *See* Klonoff Fee Dec. at ¶¶ 29, 122; *Rawa*, 934 F.3d at 870 (observing a lodestar multiplier of 5.3 is within the bounds of reasonableness); *Huyer v. Buckley*, 849 F.3d 395, 399–400 (8th Cir. 2017) (observing lodestar multipliers of up to 5.6 times class counsel's lodestar to be in the reasonable range for a lodestar crosscheck); *In re T-Mobile Customer Data Security Breach Litigation*, No. 23-2744, 2024 WL 3561874, at *6 (8th Cir. July 29, 2024) (observing that in a case

---

[11] "'[T]o overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services.'" *Rawa*, 934 F.3d at 870 (quoting *In re Charter Commc'ns*, 2005 WL 4045741, at *18). *Cf. In re T-Mobile Customer Data Security Breach Lit.*, No. 23-2744, 2024 WL 3561874, at *7 (8th Cir. July 29, 2024 (observing a crosscheck is not required but can be warranted "when a megafund case settles quickly")).

that settled early in the litigation, a multiplier of 5.3 is on the "high" side of reasonableness) (citing *Rawa*, 934 F.3d at 870)); *In re Charter Commc'ns, Inc., Sec. Litig.*, No. 4:02-cv-1186-CAS, 2005 WL 4045741, at *18 (E.D. Mo. Jun. 30, 2005) (finding 5.61 lodestar multiplier reasonable); *In re Syngenta AG MIR 162 Corn Litig.*, 2019 WL 1274813, at *5 (D. Kan. Mar. 20, 2019) ("a multiplier of 3 is well within the range allowed in other cases involving large settlements").

108.    Additionally, upon review the Court finds that Plaintiffs' request of fees of one-third of the fund is reasonable in light of the Eighth Circuit precedent in *In re T-Mobile Customer Data Security Breach Litigation*.  Unlike the parties in *T-Mobile*, who following "a few days of mediation, and less than a month after class counsel had filed the complaint," agreed to the basic terms of a settlement, here Plaintiffs have spent more than five years, $13,147,775.19 in reasonable and necessary expenses, and 105,000 hours working on the *Gibson*, *Moehrl*, and *Burnett* cases.  *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th at 855; Dirks Fee Decl. at ¶ 9. Additionally, Plaintiffs' counsel dealt with over thirty different firms representing multiple Settling Defendants. The current settlement was only reached after significant arms-length and adversarial negotiations with each Settling Defendant.  While "recovery in a particular case [may] stem[] more from class size than attorney effort and so might merit a lower fee award," given the immense time and effort by Plaintiffs' counsel with multiple Settling Defendants and their respective counsels, Plaintiffs' request of fees of one-third of the fund is reasonable.  *Id*. at 860.

109.    The Court also grants Plaintiffs' request for their costs.  The expenses submitted were reasonable expenses in such a large and complex litigation.

110.    The Settlement Administrator shall be paid in accordance with the Settlement Agreement.

111. The Court authorizes payments to be made from the Escrow Accounts under the Settlement Agreements as qualified settlement funds ("QSF") as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations and retains continuing jurisdiction as to any issue that may arise in connection with the formation or administration of the QSFs. Co-Lead Counsel are, in accordance with the Settlement Agreements, authorized to withdraw up to the amounts allowed by the Settlement Agreements out of the Escrow Accounts.

112. Co-Lead Counsel are directed to prepare and submit for Court approval a plan of allocation for the Settlement Fund, and to propose a schedule for comment and Court review. The proposed plan of allocation must be posted to https://www.realestatecommissionlitigation.com and emailed to all individuals who submit a claim in order to provide those individuals an opportunity to comment on the plan. After the plan of allocation is proposed and an opportunity to comment has been provided, the Court will evaluate the proposed plan and any objections thereto. The Court's review of the plan of allocation will be conducted separately from this final review of the Settlements. The Court believes that this additional layer of protection to the Class bolsters the Court's finding that the Settlement treats class members equitably.

113. Pursuant to Federal Rule of Civil Procedure 54(b), this Court directs entry of final judgment of dismissal with prejudice and without costs (except as provided in the Settlements) as to the defendants covered by the Settlements. This case contains claims against multiple parties, and there is no just reason to delay the entry of final judgment as to these Settling Defendants, especially considering the practice change relief and money to be paid to the class should not be delayed.

114. Settling Defendants have denied any liability, fault, or wrongdoing of any kind in connection with the allegations in the Actions, and as such, neither the Settlements, nor any of

their respective terms or provisions, nor any of the negotiations or proceedings connected with the Settlements shall be construed as an admission or concession of the truth of any of the allegations, or of any liability, fault, or wrongdoing of any kind by Settling Defendants.

115.    The Court expressly retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlements and to interpret, implement, administer and enforce the Settlements (including with respect to the scope of the Settlement Class, Released Claims, and Released Parties), in accordance with their terms, and to implement and complete the claims administration process, in accordance with the Settlements, for the benefit of the Settlement Class.  The Court does this for the purpose of satisfying the requirements of *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), concerning the obligation of a Court entering a settlement agreement to speak clearly when it wishes to retain jurisdiction.

 **IT IS SO ORDERED.**


 /s/ Stephen R. Bough_____
 STEPHEN R. BOUGH
 UNITED STATES DISTRICT JUDGE

Dated: November 4, 2024