UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, AND JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Case No. 19-CV-00332-SRB<br><br>Hon. Stephen R. Bough |

**RESPONSE OF OBJECTOR TANYA MONESTIER
TO PLAINTIFFS' MOTION AND SUGGESTIONS IN SUPPORT OF FINAL APPROVAL OF
SETTLEMENTS WITH THE NATIONAL ASSOCIATION OF REALTORS, HOMESERVICES
DEFENDANTS, AND OPT-IN ENTITIES**

I am filing this response to correct the Plaintiffs' many inaccurate assertions regarding my objection. As such, it solely focuses on responding to Plaintiffs' motion as it concerns my specific objection, not to reiterate arguments that have already been made in my objection.

Preliminary Explanation of Evidence Proffered in Support of Objection

Plaintiffs continually lament that my objection is based on a "handful" of incidents, anecdotal evidence, "one example,"[1] or isolated occurrences. Plaintiffs seem to be holding me—an objector in a class action settlement—to a standard that no human being could ever live up to. I am expected to know *for certain* what is happening behind closed doors at brokerages across the United States. How am I supposed to get that information? How is anyone (except, perhaps, NAR) able to get that information?

Instead, I did the next best thing. I searched for documents from realtor associations representing hundreds of thousands of realtors that were in the public domain. I watched training videos put on by lawyers for state associations or by specialized training personnel. I looked at social media forums where anonymity breeds honesty. I watched YouTube videos from real estate influencers with thousands of followers. I poured over NAR guidance. I read articles on Inman, the leading trade publication, to get a sense of how the settlement was being implemented. I had conversations with an attorney at a state realtor organization who gave me an inside perspective on whether my understanding of what was happening was correct.[2] I liaised with leading consumer protection advocates about what they were seeing. And I prepared the objection in three weeks' time. I'm not sure how much more "evidence" Plaintiffs need or want. But it seems that both Plaintiffs and Defendants are being willfully blind to the problems that plague the settlement.

Moreover, at what point do what Plaintiffs characterize as "isolated" incidents become part of a pattern? Plaintiffs continually discount the examples I provided as not sufficient evidence of anything.[3] But the argument begins to ring a little hollow the twentieth time Plaintiffs seek to discount as one-offs the workarounds and deceptive behavior designed to keep commissions high.

Plaintiffs' Predictable Character Attacks

In my original objection, I stated "I expect Plaintiffs and Defendants to similarly cast doubt on my qualifications, background, or motives to muddy the waters for this Court."[4] Plaintiffs' response to my submission is just as I predicted: an ad hominem attack on me and a complete mischaracterization of almost all my arguments. For instance, Plaintiffs write:

> Prof. Monestier, who teaches contract law and other subjects at the University of Buffalo Law School, attempts to leverage her academic position to lend credibility to

---
[1] Plaintiffs' Motion and Suggestions in Support of Final Approval, at p. 48 (hereinafter "Final Approval Motion").
[2] Understandably, this individual does not wish to be named for fear that he or she may face professional repercussions.
[3] "But her arguments that the NAR Settlement should be rejected rely entirely on anecdote and conjecture." (p. 30); "but does so based primarily on purportedly unscrupulous conduct by agents that occurred within the first few weeks after the practice changes were implemented" (*Id.*); "alleged examples of buyer brokers seeking to modify their disclosed compensation" (p. 41); "again provides only one example" (p. 43); "a single email from a broker and a Reddit post as the only support for the "workaround"" (p. 43); "because of anecdotal reports from a handful of real estate agents" (p. 46); "the objection identifies one example of a listing agent not agreeing to take a listing unless the seller agreed to offer compensation" (p. 47); ":Nor are the three examples identified in the objection of "[r]ealtors exploiting the settlement to get new business" reasons to reject the Settlement." (p. 48); "unfortunate examples of Realtors unethically misrepresenting the Settlement to force buyers into buyer broker agreements" (p. 50).
[4] Notably, the attorneys in this case couldn't even be bothered to spell my name correctly, referring to me as Tonya, not Tanya. *See* Final Approval Motion at iii, p. 44, p. 27. *See also* Boulware and Dirks declarations.

> her objections and to repeatedly disparage Co-Lead Counsel and the experts assisting with the litigation. But in contrast to the antitrust economists and real estate industry experts who were consulted in developing the practice changes reflected in the NAR Settlement, Prof. Monestier does not appear to have any economics or antitrust expertise. Nor does she appear to have had any professional background in real estate. . . . She fails to show that she is more qualified than this Court to judge the time, effort, and value of Co-Lead Counsels' contributions to the Class.

They also state "Prof. Monestier provides no evidence of expertise on attorneys' fees and acknowledges her lack of experience or qualifications."[5]

I am not sure how Plaintiffs think I am "leveraging" my academic position. To the extent that my knowledge of contract law, consumer protection and real estate bears on the strength of my objection, the Court is free to consider it. Moreover, an objector does not need to be an expert in real estate, antitrust, attorneys' fees, or anything else, in order to file an objection.

Moreover, counsel erroneously posit that I "repeatedly disparage Co-Lead Counsel and the experts assisting with the litigation."[6] This is not remotely true. Having an opinion that differs from the Plaintiffs' paid experts, probing their assumptions,[7] correcting Plaintiffs' misstatements of law and fact, pointing out inconsistencies in public filings, and criticizing systemic issues that plague class actions is not "disparag[ing]" anyone.

There is no obligation on me to show I am "more qualified" than this Court to assess the value of the settlement. I simply have seen mountains of evidence calling into question the value of this settlement and I want to share that with the Court.

<u>PLAINTIFFS' CONTENTION THAT "PROFESSOR MONESTIER FAILS TO OFFER ANY REALISTIC AND CONSTRUCTIVE ALTERNATIVE TO THE NAR SETTLEMENT PRACTICE CHANGES."</u>

At the outset of their submission, Plaintiffs fault me for not offering a realistic and constructive alternative to the settlement. My understanding is that an objector's role is simply to explain why the settlement is not fair, adequate and reasonable *as written*. I do not believe that objectors are actually permitted to offer and argue for alternatives to the settlement, and indeed might be faulted for doing so.

Plaintiffs mischaracterize my position as "advocat[ing] for returning to the 'old' system."[8] This is not my position—and it is not possible to read my objection in this way. My actual position, which Plaintiffs are undoubtedly aware of, is that sellers and listing agents should *not* be permitted to offer compensation to buyers' agents in advance, which is abundantly clear to anyone who reads my submission.[9] In short, I share the opinion of the Department of Justice as articulated in its statement

---

[5] Final Approval Motion, at p. 55.
[6] *Id.* at p. 31.
[7] For instance, I argued that "Dr. Economides' projections, however, are based on a variety of assumptions that simply don't hold true. No doubt, these assumptions were grounded in what the parties represented was theoretically the intent of the settlement."
[8] Final Approval Motion, at p. 31.
[9] The settlement has not meaningfully decoupled anything because sellers (and/or listing agents) are still permitted to offer buy-side commission in advance. As long as this is possible, the current system of seller-financed commissions will remain intact. Objection, at pg. 5.

of interest in the Nosalek case.[10] Alternatively, I laid out at p. 93 of my Objection exactly what the Court would need to do to salvage the settlement.

<u>PLAINTIFF'S LONG-AWAITED CLARIFICATION ON THE PRACTICE CHANGES</u>

I am grateful that Plaintiffs *finally put on the record* what the settlement allows and does not allow. Finally, realtors and other industry participants will have some guidance.

1. **Amending Buyer Agreement to Increase Compensation is Not Permitted**

Plaintiffs state:

> Amending the Disclosed Buyer Broker Compensation: Prof. Monestier contends that the Settlement should be rejected based on alleged examples of buyer brokers seeking to modify their disclosed compensation with buyers to increase broker compensation after they have already toured homes with buyers. *To the extent some buyer brokers are engaging in such conduct, it is generally prohibited under the NAR Settlement*. Indeed, Prof. Monestier herself acknowledges as much. See Doc. 1552 at 20. The Settlement protects consumers from conduct where an agent seeks to increase the previously disclosed compensation with the buyer once the agent learns the compensation the seller is offering.

If the practice of modifying an agreement upward is not permitted, why is president of NAR telling reporters that it is permitted? Why is almost every single realtor association, MLS, or private brokerage, including the ability to amend upward in their forms? Why is almost every single realtor association, MLS, or private brokerage providing training (captured on video) that encourages and trains realtors on how to amend upward? Why hasn't NAR issued practice guidance saying that realtors are not permitted to amend upward?

The evidence I have amassed in this respect is not anecdotal. I have reviewed over two dozen association forms, forms from private brokerages, and watched a number of training sessions—everyone in the industry believes there is a green light to amend an agreement upward. Plaintiffs and Defendants have seen this play out over six months, since the settlement was announced, and have done absolutely nothing to correct what is a widespread misunderstanding of the settlement.

2. **Seller-Paid Bonuses Not Allowed**

Plaintiffs state:

> Seller-Paid Bonuses: Prof. Monestier also claims there are provisions in agreements that permit a broker working with a buyer to collect unspecified bonuses from the seller in addition to the compensation agreed to with the buyer in a written agreement. The Settlement prohibits such conduct, as "the amount of compensation reflected [in the required written agreement] must be objectively ascertainable and may not be open-ended (e.g., 'buyer broker compensation shall be whatever amount the seller is offering to the buyer'), and the broker "may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer." NAR Agreement ¶ 58(vi)(b) & (c). *A broker working with a buyer is*

---

[10] https://www.justice.gov/d9/2024-02/420087.pdf.

> *therefore unable to receive any compensation other than the specific compensation disclosed to the buyer prior to touring a home—regardless of whether that compensation is styled as a "bonus" or otherwise.*

The same comments apply. Multiple real estate forms contemplate agents receiving these bonuses via an amendment. Official training sessions are also explaining how to make sure agents get these bonuses. This is all information in the public domain and that Plaintiffs and Defendants are aware of and/or should have been aware of it. Why have they waited six months to "clarify" the settlement agreement? In the meantime, sellers and buyers are losing out on the money they were supposed to be saving from this settlement.

### 3. Touring Agreements

Plaintiffs state:

> Touring or Showing Agreements: The Settlement does not specify the duration of the binding price disclosure agreement that brokers must enter into with a buyer, as long as the disclosure occurs prior to the broker touring any home with that buyer. *The disclosure can be a time-limited agreement that specifies the amount of compensation the buyer broker will receive for homes toured during the period of that agreement.* As Prof. Monestier herself indicates, however, the Settlement does not permit brokers to collect more in compensation than specified in the touring agreement for homes viewed during the scope of the agreement.

The first part of the paragraph is a little nebulous. But I take Plaintiffs to be saying that the touring agreement *itself* must specify the amount of compensation the buyer will receive. If the touring agreement says "zero" and the buyer then proceeds to put an offer on the property, the buyer broker will get zero. The parties cannot enter into a subsequent agreement at 3% compensation to cover a property that was toured under a 0% compensation agreement, even if styled as a different type of agreement.

Many of these touring agreements are in the public domain—most notably, that of Zillow.[11] Zillow's agreement specifies a free touring period, but then contemplates a subsequent agreement to provide brokerage services at a specified commission rate: "If Broker is going to provide Buyer with brokerage services beyond the Touring Services, Buyer and Broker will enter into a separate agreement, including compensation, for such additional brokerage services."

According to Plaintiff's filing, this is not permitted. Yet, Plaintiffs and Defendants have been aware, or should have been aware, of Zillow's touring agreement since it was announced nearly six months ago. Zillow operates in all 50 states. If I am correct in my understanding, then Zillow is violating the terms of the NAR settlement agreement by offering "free" initial services followed by a negotiated percentage. Again, my question is simply why Plaintiffs and Defendants have continued to allow practices surrounding these touring agreements to continue unabated?

### 4. Guaranteed Minimum Level of Compensation Up To a Maximum

Plaintiffs state:

> To the extent there are provisions in written agreements that ask a buyer to vaguely agree to a minimum amount of compensation they will pay their buyer broker and a maximum amount of compensation the buyer broker will receive if the seller is paying,

---

[11] https://www.zillow.com/agent-resources/blog/zillow-touring-agreement-nar-settlement/.

this is impermissible and the Settlement prohibits such conduct. . . . Moreover, Prof. Monestier does not offer evidence reflecting that this "issue" is widespread—indeed, she indicates she has only been able to find one state Realtor association that has published a buyer representation agreement containing such a provision.

Plaintiffs somehow fault me for only being able to "find one state Realtor association that has published a buyer representation agreement containing such a provision."[12] The onus is not on me, an objector, to "find" proof of non-compliance; this is part of Plaintiffs' and Defendants' obligations.

The Georgia Association of Realtors consists of over 50,000 members.[13] These 50,000 realtors are using forms which do not comply with the NAR settlement. These forms were promulgated months ago, and Plaintiffs and Defendants have done nothing about them. Moreover, the reason I was only able to "find" one state Realtor association is because almost all associations and brokerages keep their non-compliant forms behind paywalls so that people like me can't see them. Yet, NAR would have the authority to examine and audit these forms to ensure compliance with the settlement but has chosen not to do so.

5. **Tailoring Compensation to Specific Property**

Plaintiffs state:

> If a provision is being tailored to the commission being offered by a particular seller and is left open-ended in the written agreement to be filled in based on whatever the seller or listing broker is offering, or is being entered into after touring a home with the broker and learning what the seller is offering, that is inconsistent with the Settlement.

Plaintiffs' position on this goes even further than my interpretation of the settlement. My view was that tailoring was permitted under the terms of the settlement. As long as an agreement was entered into prior to touring, it could be tailored to the compensation offered by the particular seller.

Apparently, this is not permitted—and I am grateful that Plaintiffs put that on the record. Why is Defendant not informing realtors of this? This practice may not be as widespread as some of the other ones but it is definitely happening. Instead, NAR cryptically suggests the opposite of what Plaintiffs are now saying: "**NAR Policy Will Not Dictate:** Term of the agreement (e.g., one day, one month, one house, one zip code)."[14]

6. **Brokers Waiving Commissions**

Plaintiffs appear to say that buyer brokers may agree to waive compensation, though concede that "depending on the representations made, that may create a separate issue outside of the purview of the Settlement."[15] I agree that this is consistent with the wording of the settlement. But Plaintiffs fail to grapple with the issue presented in my objection: "With that said, it certainly is not what the settlement agreement envisioned—in effect, the realtor is agreeing to be compensated at whatever amount the seller authorizes, which is what the settlement was attempting to avoid."[16]

---

[12] Final Approval Motion, at p. 43.
[13] https://atlantaagentmagazine.com/2022/03/07/georgia-realtors-president-outlines-whats-in-store-for-members-in-2022/.
[14] https://www.nar.realtor/the-facts/written-buyer-agreements-101.
[15] Final Approval Motion, at p. 45.
[16] Final Approval Motion, at p. 39.

### 7. Advance Offers of Compensation

For whatever reason, there is still some lingering confusion among industry participants as to whether the settlement permits sellers and/or listing agents to offer compensation to buyer brokers in advance. I believed that the settlement clearly permitted this, but when Mr. Ketchmark was asked to confirm this directly, he refused to do so.

Plaintiffs' submission makes it clear that sellers are permitted to offer compensation to buyers in advance and that (apparently) listing agents can refuse to represent sellers who do not agree in advance to allow the agent to share his or her commission.

PLAINTIFFS' STATEMENT THAT COMMISSIONS HAVE COME DOWN SINCE THE SETTLEMENT

Plaintiffs state that "preliminary evidence reflects that, in the short time since the NAR Settlement was announced in March 2024 and implemented in August 2024, consumers are already beginning to benefit from lower broker commissions. . ."[17] They then refer to a Redfin report and a RisMedia report and state that I "disregarded evidence of the meaningful impact that the NAR Settlement practice changes are already having."[18] Indeed, Plaintiffs made the point at least one more time that I willfully ignored the data: "Professor Monestier . . . omits the preliminary evidence that has emerged."[19]

Plaintiffs might want to check their dates before making these accusations. The RisMedia report and the Redfin study came out *after* I had already filed my objection on October 23, 2024.[20] It is hard to "disregard" something that hasn't been published yet.

Moreover, the Redfin study that the Plaintiffs cite as supporting the "meaningful" impact that the settlement is already having is entitled "Real Estate Agent Commissions Hold Steady Since New Industry Rules were Implemented." The article reads "So far, increased negotiations *haven't resulted* in a significant decline in commissions in Redfin's data." And it states that in some cases, commissions have increased: "Buyer's agent commissions for homes listed under $500,000—the most common type of transaction in our data—*rose* slightly from an average of 2.41% in August to 2.43% in October."[21]

Other studies have found the same thing—i.e., the NAR Settlement has had no impact on commissions:

> Despite headlines a few months ago that predicted the end of real estate as we know it, with many agents and brokers fearing they would have to find new jobs, a study by AccountTECH found that there has been little to no movement in commission numbers since industry rule changes took effect. The evidence is substantiated by Mike DelPrete's analysis of commissions dating back to last September.[22]

---

[17] *Id.* at p. 38.
[18] *Id.* at p. 40. Plaintiffs also make this claim at p. 37 ("Professor Monestier . . . omits the preliminary evidence that has emerged…").
[19] *Id.* at p. 37.
[20] Redfin study released Oct. 31, 2024; RisMedia study released Oct. 29, 2024.
[21] *Id.*
[22] https://www.biggerpockets.com/blog/new-study-says-nar-settlement-had-no-real-impact-on-commissions. https://www.mikedp.com/articles/2024/11/20/post-settlement-buyer-agent-commissions-remain-unchanged ("There has been no change in average buyer agent commissions since the settlement took effect in August 2024.").

The AccountTECH study looked at 625 real estate offices in the study and 17,358 transactions.[23] The study was widely reported and disseminated by Morningstar, a reputable and well-known investment research company.[24]

The RisMedia study appears to be somewhat of an outlier and am not sure why it yielded different results compared to the Redfin study. But it appears to be the only study to have concluded that the NAR settlement was making a difference in commission rates. I am not saying that the settlement has or has not impacted commissions—but the Plaintiffs' attempt to characterize any potential change in commissions at this point as "meaningful" is disingenuous.

Plaintiffs make the bizarre comment that "Professor Monestier's objection is based on the unrealistic expectation that the full force of practice changes to an anticompetitive system that has been in place for many decades will be felt immediately."[25] I don't know what basis Plaintiffs have for characterizing this as my "expectation." It is certainly not my expectation that practice changes will be "felt immediately." It is my position that this settlement will not realize its potential to impact meaningful change because of the multiple workarounds and practices that the Plaintiffs and Defendants are ignoring.

Plaintiffs fault me for "omit[ing] discussion of post-Settlement "empirical" evidence that indicates the Settlement is already starting to positively affect consumers' ability to negotiate lower commission amounts." Apparently, the "empirical evidence" I'm ignoring is a survey done by a trade publication, Inman.[26] Indeed, I did ignore that survey. Deliberately. The fact that sellers now know they are not necessarily "on the hook for buyer commission" does not strike me as something to write home about.[27] But since Plaintiffs think that survey was meaningful, I will point out other things addressed in the survey found that Plaintiffs probably don't want this Court to hear:

- More than **81 percent of active homebuyers** surveyed in early October said they either **failed to negotiate a lower fee** with their agent, or **did not attempt to negotiate** at all, according to the latest Inman-Dig Insights consumer survey.

- More than **89 percent of active sellers** said they are **not taking a firm stance** against covering the buyer's commission — although many said they were withholding the fee as a starting point in negotiations with buyers.[28]

In short, the survey found that it was largely business as usual for realtors, something that is being confirmed day in and day out.

<u>Plaintiffs Are Turning a Blind Eye to Deceptive Practices That Undermine the Settlement</u>

Plaintiffs fail to grapple with the interrelated practices I identify which serve to perpetuate the current system of seller paid compensation, arguing essentially that none of this is their problem.

*Listing Agents Telling Sellers They Will Not Get Offers*

---

[23] https://www.morningstar.com/news/pr-newswire/20241112ne53294/60-days-after-nar-settlement-commission-rates-mostly-holding-steady.
[24] *Id.*
[25] Final Approval Motion, at p. 41.
[26] *Id.* at p. 47.
[27] https://www.inman.com/2024/10/18/majority-of-sellers-know-they-arent-on-hook-for-buyer-commission-poll/
[28] *Id.*

With respect to listing agents telling their clients if they don't offer compensation in advance, they will not get offers, Plaintiffs dismissively contend, "such conduct is now prohibited by NAR."[29] And yet, it happens all the time. But because it takes place behind closed doors, it can't be tracked, monitored or addressed. Like so much in this case, a rule without any consequences.

*Buyer Self-Steering*

Plaintiffs are a little more measured in their response to the steering problem I identified. Plaintiffs state, "But it does not prohibit a buyer from considering a particular seller's willingness to cover some part of the already agreed buyer-side broker compensation as part of the home search process."[30] Plaintiffs therefore admit that buyers are permitted to self-steer based on knowledge of "already agreed buyer-side broker compensation." If any sort of steering based on compensation is permitted, sellers will be pressured into offering buy-side compensation in advance, which is how this whole lawsuit started.

*Agents Refusing to Take Listings If Seller Doesn't Offer Buy-Side Compensation*

Plaintiffs concede that listing agents are permitted to refuse to take listings where the seller does not agree to pay compensation in advance. Their solution to this problem is just to tell the seller to hire someone else:

> Prof. Monestier does not contend that no real estate agents will take listings where the seller does not agree to offer buyer broker compensation up front. In fact, she states that the seller discussed in this example was able to hire a different broker.[31]

Plaintiffs fail to recognize the logical consequence of their argument. If listing agents are permitted to insist on 5-6% commission (to include a split with the buyer broker), then all listing agents could do this. And we are back to square one. The practice is not immune from scrutiny simply because some brokers choose not to implement it.

*Agent Unethical Conduct*

Plaintiffs casually dismiss all the unethical conduct that is occurring: "All of the examples are premised on inaccurate understandings of what the Settlement requires, involve deceptive conduct by real estate agents that is not permissible under the Settlement or NAR's Code of Ethics (or both), and reflect longstanding issues in the real estate industry that predated the Settlement's existence."[32]

When realtors *en masse* have "inaccurate understandings of what the Settlement requires" and are engaging in "deceptive conduct . . . that is not permissible," it is incumbent on Plaintiffs and Defendants to do something. Instead, Plaintiffs have stood idly by while Defendant failed to police the practices of its own organization in response to this settlement.[33] Plaintiffs blithely dismiss these as "unfortunate" examples of "Realtors unethically mispresenting the settlement" but appear to wash their hands of any sort of obligation to do lift a finger to do anything about it.[34]

---

[29] *Id.* at p. 46.
[30] Final Approval Motion, at p. 46.
[31] *Id* at p. 48. Plaintiffs ignore the fact that this listing agent refused to take a listing in a jurisdiction that had banned cooperative compensation because the seller would not pre-authorize compensation to the buyer broker.
[32] *Id.*
[33] I agree that some of these issues pre-dated the settlement. However, the settlement's requirement to have a buyer broker agreement signed prior to touring a property is the direct cause of all this confusion and unscrupulous conduct.
[34] Final Approval Motion, at p. 50.

9

PLAINTIFFS OVERSTATE THE ENFORCEMENT MECHANISMS IN PLACE

Plaintiffs spend about five pages of their submission arguing that the enforcement mechanisms in place are robust. Interestingly, they don't even point to one example of how they have been actively enforcing the agreement. They just point to a statement of Mr. Ketchmark *threatening* to enforce the agreement: "We'll be watching you."

Plaintiffs believe that I did not fully address all the enforcement mechanisms in the agreement. They say I "ignore[d]" certain enforcement mechanisms.[35] I did not. I simply focused on actual and concrete enforcement mechanisms versus generic statements regarding "authority" to enforce.[36]

Plaintiffs deal with the crux of my submission as follows:

> Prof. Monestier also inaccurately describes several provisions in the Settlement Agreement as permitting Co-Lead Counsel to "ask for proof of compliance." Doc. 1552 at 88. In fact, these provisions do not simply authorize Co-Lead Counsel to request proof of compliance with the Settlement Agreement—they require various entities and individuals to provide such proof. . . .[37]

I did not inaccurately describe the section. I wrote "(1) Co-Lead Counsel may ask for proof of compliance with practice changes *and NAR is required to provide that proof*."[38] They do not take issue with the assertion that requesting proof of compliance is left to the discretion of counsel.

Plaintiffs then say that:

> Prof. Monestier's remaining objections regarding the NAR Agreement's enforcement mechanisms consist largely of personal attacks against Court-appointed Co-Lead Counsel, who she derogatorily refers to as "a handful of Plaintiffs' lawyers."[39]

I am not sure what Plaintiffs consider to be a "personal attack."[40] I am pointing out widely recognized issues that scholars have been commenting on for decades: the fact that counsel has a financial interest in the settlement being approved and collecting their fees. Since Plaintiffs seem to think my

---

[35] The provisions that a court retain jurisdiction over the settlement and that parties use best efforts to implement it is a corollary of any settlement agreement and not unique to this one. Indeed, they would be implied terms, even if not reduced to writing.

[36] Plaintiffs make a big deal out the fact that they have "authority to enforce the Settlement directly . . . against the vast majority of MLSs" and the "authority to enforce the Settlement Agreement *directly* against 13 large brokerage firms [that have opted-in." It is not clear what this even means; but having the "authority" to do something is different than actually doing something. Plaintiffs also characterize the "substantial incentives" that released parties have to "abide by" the Settlement terms as some sort of enforcement mechanism.

[37] Final Approval Motion, at p. 35.

[38] Objection, at p. 88.

[39] Final Approval Motion, at p. 45.

[40] Plaintiffs appear to be very aggrieved by these perceived attacks: "Prof. Monestier's attacks on counsel are equally unmerited." (p. 31); "Prof. Monestier's remaining objections regarding the NAR Agreement's enforcement mechanisms consist largely of personal attacks against Court-appointed Co-Lead Counsel, who she derogatorily refers to as "a handful of Plaintiffs' lawyers." (p. 35); "The rates charged by Mr. Ketchmark, another attorney criticized by Prof. Monestier . . ." (p. 60). Plaintiffs continually commend themselves on years of "hard-fought litigation" against some of the most elite lawyers in the country (p. 52). *See also* Declaration of Brandon Boulware at p. 5 ("On the defense side were more than thirty of the best and largest law firms in the country. Defendants' army of lawyers fought vigorously."); Declaration of Steve Berman at p. 6 ("To the contrary, the negotiations were contentious, hard fought . . ."). Yet, they are personally chagrined when an academic—who they proceed to disparage—points out logical fallacies in their arguments and dares to question their billing rates.

10

explanation is "illogical,"[41] I will try to state my position again. Right now (prior to final enforcement), both Plaintiffs and Defendants want the settlement approved. Plaintiffs' attorneys will only get paid for their years of work if the settlement is approved. Therefore, at this point, it stands to reason that Plaintiffs will not look too hard for implementation issues which might put the kybosh on the settlement being approved. And, if the settlement *is* approved and they receive their attorneys' fees, then Plaintiffs will logically move on to other things. There is not much of an incentive post-settlement to actively pursue violations of the settlement. None of these comments had anything to do with *the particular attorneys in this case.* These are systemic issues that plague class settlements involving certain types of injunctive relief.

Notably, the Plaintiffs ignore the crux of my enforcement argument: that enforcement is largely outsourced to a Defendant that is disincentivized to actively police the settlement.[42]

<u>Response to Plaintiffs' Inaccurate Characterization of My Request to Disapprove Attorney's Fees</u>

*"Attacks on Professor Klonoff"*

Plaintiffs claim that I have "attack[ed]" Professor Klonoff. They write:

> Notably, the sole source for Prof. Monestier's criticism is a single article by Professor Mullinex that lumps Professor Klonoff in with several highly-respected experts, including Professors Arthur Miller, William Rubenstein, and Brian Fitzpatrick. Each of these experts has been repeatedly recognized as a leading expert in the field. Notably, Prof. Monestier herself in other portions of her filings repeatedly cites to those same experts whom Professor Mullinex criticized. For example, in a subsequent filing, Prof. Monestier touted the credentials of Professor William Rubenstein, stating that Professor Rubenstein "literally wrote the book on class action litigation" and attached as an exhibit a declaration filed by Professor Rubenstein. Yet this is one of the same experts whom Prof. Monestier claims is unreliable and part of a "cottage industry" of experts who testify too frequently. Prof. Monestier's flagrant inconsistency highlights the baselessness of her critique of Professor Klonoff and other highly regarded experts in this field.[43]

Plaintiffs apparently believe everything is an attack. I did not "attack" Professor Klonoff. In fact, at the outset of my submission, I quoted approvingly from one of his recent articles. In fact, when I taught Class Actions in the past, I used Professor Klonoff's textbook to teach from. I don't take issue with Professor Klonoff's qualifications or credentials. I simply disagree with his conclusion and point out some flaws in methodology.

---

[41] Final Approval Motion, at p. 35. I have spoken with Professor Fitzpatrick recently and he has a copy of my objection; I am confident he did not feel "attacked" by my submission. I also had an email conversation with Professor Rubenstein who, far from feeling attacked, commended me on my excellent objection. So, Plaintiffs can reserve their indignation on behalf of at least these two experts.

[42] This outsourcing of supervisory and enforcement responsibility to individuals who necessarily have a conflict of interest is hugely problematic. Many brokers themselves don't understand the rules and are openly flouting them. And we expect these same people to make sure that their agents are playing by the rules of the game? It is laughable that Plaintiffs and Defendants have created the functional equivalent to a regulatory scheme with no one to enforce it other than the people who are bound by it and have every interest in finding ways around it.

[43] Final Approval Motion, p.54.

11

Moreover, Plaintiffs seem not to comprehend that one can make a systemic critique of a practice without it being an "attack" on the individual participants. Professor Mullenix describes a "system" which is fundamentally suspect and should be viewed with trepidation. This context is important to elucidate so that a Court has a full appreciation of the dynamics at play.

*Attorney Billing Rates*

Plaintiffs erroneously state that "Prof. Monestier repeatedly claims that the current rates are false based on the percentage increase that they represent over prior years."[44] I did not say the rates were "false." I said that "This Court should, at the very least, look into these billing anomalies. From an outside perspective, it looks like counsel created special billing rates just for this case which are highly inflated and different from what they have publicly represented constitute their normal billing rates."[45] This assertion is 100% true—by Plaintiffs' own admission.

The burden is on Plaintiffs to establish the reasonableness of their fee—not on me to challenge it. From what I understand Plaintiffs to be saying:

1. They are charging all the time attorneys and staff spent on the case since *Burnett* was filed in 2019 at 2024 rates, even though those rates are *much* higher than 2019 rates.

2. The previous rates charged by some counsel did not reflect their antitrust rates, which are higher than their rates for other cases.[46]

Through these admissions, Plaintiffs have answered my question: "Are these the rates that they charge anyone off the street? Or are these inflated, "we-are-pursing-a-class-action" rates?."[47] The rates that Plaintiffs are seeking to be compensated at *already* reflect the time delay for non-payment, and premium rates for complex antitrust cases.[48] Now they are seeking a 3.62 multiplier on rates that already build-in consideration of risk, complexity and delay.

In short—and to make this point as clear as possible—the Court must calculate the reasonable rate for an attorney in Kansas City, Missouri prosecuting an antitrust case.[49] That number should be the average rate for that attorney across the five-year time span.[50] Then, that number needs to be applied

---

[44] *Id. at* p. 59.
[45] Plaintiffs Motion in Support of Attorneys' Fees, at p. 116.
[46] Boulware Declaration at p. 7 ("As Professor Monestier acknowledges, the rates for my firm discussed in her Objection were mentioned in an Order dated over three years ago in a very different kind of litigation. See Doc. 1552 at 115 (citing Florece v. Jose Pepper's Restaurants, LLC, No. 20-2339- ADM, 2021 5042715 (D. Kan. Oct. 29, 2021). Professor Monestier noted the Florece case involved "wage and hour" claims under the Fair Labor Standards Act. Id. 21. In contrast, the case against NAR and HomeServices involved novel antitrust theories, and courts frequently recognize that "[a]ntitrust cases are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute."").
[47] Objection at p. 109.
[48] Boulware Declaration, at p. 8 ("Naturally, my firm's rates have increased since 2021 and are higher in antitrust litigation, a specialty field that carries greater risk and requires substantially more time and resources."). *See also* Dirks Declaration at p. 9 (stating that higher rates reflect "tak[ing] on more risky and complex cases to the exclusion of more routine cases that have a quicker and more likely recovery.").
[49] The billing rates of your highly paid adversaries is not the reasonable billing rates in Missouri.
[50] Any other result would encourage delay and fee hikes over the span of years to yield a higher lodestar and lower multiplier. *See* Smith v. Vill. of Maywood, 17 F.3d 219, 221 (7th Cir. 1994) ("We have described two methods of compensating for the delay in payment of attorney's fees. One method is to calculate the fee award using the attorney's current rates. The other method is to "base the award on the rates the lawyers charged when they rendered the services to the [client] and to add interest on that amount to the present.").

to a reasonable number of hours worked (to account for billing inefficiencies and overstaffing). That is how the lodestar is calculated. That lodestar then can be used to do a cross-check.

What Plaintiffs are doing is having the court declare that their stated hours, which already account for complexity and risk, *are* de facto the reasonable rates for these services in Missouri and every single hour that was billed was reasonable. That then produces the lodestar which results in a 3.62 multiplier.

I am confident that if the lodestar calculation were performed correctly, it would yield a much higher multiplier than 3.62.[51]

Plaintiffs point this Court to the Western District of Missouri's decision in *Stevens*.[52] The *Stevens* case reaffirms my position:

> In *Hensley,* the court stated that the most useful starting point for making a determination as to reasonableness is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." The court should require adequate documentation to support these figures; inadequate documentation justifies a reduction in the fee award.[53]

The Plaintiffs have put into play the lodestar multiplier cross check and are hanging their hat, in part, on the fact that 3.62 reaffirms the reasonableness of the fee. In order to have that argument stand, the lodestar must be accurate and based on reasonable rates times reasonable hours. Plaintiffs have not established either. With respect to the latter, Plaintiffs contend that they don't have to provide this Court or objectors with evidence of what they did during the "107,500 hours of labor" they expended on the case.[54] We are just supposed to take Plaintiffs' word that every hour spent billing was reasonable, efficient and necessary. The proposition is belied by the *Stevens* case Plaintiffs themselves rely on: "The court should require adequate documentation to support these figures; inadequate documentation justifies a reduction in the fee award."[55]

*What Plaintiffs Do Not Address*

What is notable about Plaintiffs submissions is all the things they don't address about attorneys' fees:

i) How to reconcile this case with all the studies showing that a *far* lower fee is customarily awarded in mega-fund cases.

ii) What is the denominator for Professor Klonoff's sample of cases? He identifies fifty out of how many mega-fund cases settled over the past thirty years?

---

[51] Plaintiffs cite *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005), <u>as amended</u> (Feb. 25, 2005). The case is apt as it illustrates how an inaccurate lodestar rate perverts the multiplier: "In performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter.14 That did not occur here. Had the hourly rates been properly blended, taking into account the approximate hourly billing rates of the partners and associates who worked on the case, the multiplier would have been a higher figure, alerting the trial court to reconsider the propriety of its fee award."
[52] "Prof. Monestier identifies no legal authority stating that current rates should not be used in calculating lodestar. *See generally* Stevens v. Zenith Distrib. Corp. of Kansas, No. 78-0477-CV-W-6, 1984 WL 21983, at *4 (W.D. Mo. July 20, 1984) (discussing Eighth Circuit precedent that endorsed the usage of current rates)."
[53] *Id.* at *2.
[54] https://www.realestatecommissionlitigation.com/admin/api/connectedapps.cms.extensions/asset?id=531be9fd-470c-4944-b497-dfde7049c6e1&languageId=1033&inline=true.
[55] Stevens v. Zenith Distrib. Corp. of Kansas, No. 78-0477-CV-W-6, 1984 WL 21983, at *2 (W.D. Mo. July 20, 1984).

13

iii) The most important factor in the attorney fee analysis: the degree of success Plaintiffs had in securing relief for the class. Plaintiffs never once contest that per capita relief will be nominal.

iv) How to overcome *T-Mobile* precedent.[56] While Plaintiffs wish to say the case is different because it settled early, the fact remains that the 8th Circuit was skeptical about large awards in mega-fund cases.[57]

Additionally, Plaintiffs do not believe I provided them with enough of a basis for distinguishing *In re Urethane* and *Syngenta*.[58] Accordingly, I will add for the Court's consideration:

- The Court in *Syngenta* approved a lodestar rate of $500/hour for attorneys and less for contract attorneys and staff.[59] This was in 2018, not long before the *Burnett* case was filed.
- The multiplier in *Syngenta* was 1.4,[60] far less than the claimed 3.62 multiplier in this case (a multiplier I believe is artificially low).
- Plaintiffs' counsel in *Syngenta* worked a total of more than 1.2 million hours; by contrast, in this case, counsel worked 107,500 hours.[61] In other words, the attorneys in *Syngenta* worked *ten times as many hours* as the attorneys in the instant litigation.
- *In re Urethane* is distinguishable on the basis of its extraordinary result: "In almost 25 years of service on the bench, this Court has not experienced a more remarkable result"[62]
- The plaintiffs in *In re Urethane* turned a $400 million verdict into a billion-dollar settlement. In contrast, here, the Plaintiffs turned a $1.8 billion verdict on behalf of residents of one state against a couple of defendants into a less than one billion dollar settlement with well over one dozen defendants.
- *In re Urethane* spanned eleven years, more than double what counsel has spent litigating the instant case.

---

[56] Plaintiffs assert that "That decision, however, strongly supports Plaintiffs' fee request and directly refutes many of Prof. Monestier's arguments." If *T-Mobile* so "strongly support[ed]" Plaintiffs' fee request, why is the only reference to the case buried as a "cf" in a footnote on page 13 in the Plaintiffs' Motion for Attorneys' Fees? .

[57] Plaintiffs do not adequately address this statement: "If we permitted the fee award here to stand, it would mean that counsel could make $7,000 to $9,500 an hour, which we think no reasonable class member would willingly pay to an attorney to help resolve this claim, . . . . Reducing the fee award to, say, half of what was requested (resulting in fees of $3,500 to $4,750 per hour) could hardly be considered a penalty." Plaintiffs cleverly ignore the "class counsel" and "attorney" parts of the quote. They write:

> Here, Plaintiffs have asked for a lodestar multiplier of 3.63 and the average composite rate for all of Plaintiffs' timekeepers in this matter is approximately $855.33 Awarding a multiplier of 3.63 would lead to a rate of approximately $3,100 dollars per hour across Plaintiffs' timekeepers.

The Eighth Circuit did not refer to the "blended fee" "across . . . timekeepers." It said that awarding $7,000-$9,000 an hour to an attorney is ridiculous.

[58] Final Approval Motion, at p. 57 ("Prof. Monestier's sole distinction from Urethane and Syngenta is that class members in those cases obtained more in settlements on a per class member basis than the class did here.").

[59] In re Syngenta AG MIR 162 Corn Litig., 357 F. Supp. 3d 1094, 1115 (D. Kan. 2018)("In addition, the Court finds that the hourly rates used by counsel (averaging under $ 500 per hour, with lower amounts for contract attorney and non-attorneys.").

[60] *Id*. The total lodestar amount is approximately $ 357 million, which yields a multiplier of only 1.4 on an award of $ 503 million.

[61] In re Syngenta AG MIR 162 Corn Litig., 357 F. Supp. 3d 1094, 1112 (D. Kan. 2018).

[62] In re: Urethane Antitrust Litig.., No. 04-1616-JWL, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016).

14

- Class members in *In re Urethane* "would still receive approximately 1.4 times the amount of their actual damages" even after attorneys' fees were factored in[63]
- Counsel in *In re Urethane* spent over 193,000 hours on the case, nearly double the amount of time spent here.[64]

I think it is clear why the *Sygenta* and *In re Urethane* were decided the way they were; there are no parallels between those cases and the instant case.

*Factually Misleading Statements*

I think it is important to point out some instances where Plaintiffs have played fast-and-loose with their factual statements and statements concerning case law and other authority:

1) Plaintiffs discuss Visa Check/Master Money Antitrust Litigation, 297 F. Supp. 2d 503 (E.D. N.Y. 2003) in an effort to support their claimed 3.62 multiplier. They state, "Here, Plaintiffs are requesting an almost identical lodestar multiplier of 3.63 (as of August 31, 2024, though that multiplier will continue to decline) as the one that the Eighth Circuit endorsed . . ."[65] What they fail to disclose is that the court in *Visa Check* "award[ed] attorneys' fees in the amount of $220,290,160.44. This amount represents approximately 6.511% of the Fund."[66] If Plaintiffs would like to change their request to that ask for 6.5%, I would not oppose it.

2) Plaintiffs state that "One specific study examined seventeen years of antitrust cases litigated on contingency where large corporations were named plaintiffs. "[t]he potential damages in many of these cases were enormous," the fixed percentage fee request "of one-third *heavily* dominated. Despite this extensive authority, Prof. Monestier claims that one-third of fees are almost never awarded in cases with billion-dollar settlements." Plaintiffs have created a misimpression as to Professor Fitzpatrick's findings—he simply stated that plaintiffs *asked for* 33%, not that they were awarded 33%. As Plaintiffs well know, Professor Fitzpatrick's research very plainly reveals awards in the neighborhood of 10-15% for cases like this.

3) Plaintiffs state "Prof. Monestier's sole distinction from Urethane and Syngenta is that class members in those cases obtained more in settlements on a per class member basis than the class did here. . . . Prof. Monestier's analysis also pays no attention to the important ability-to-pay considerations that led to the monetary value of the Settlements that were reached here. Counsel for Plaintiffs obtained the most that could reasonably be obtained from the Settling Defendants in light of their financial condition. Numerous courts recognize that ability to pay is an important factor in evaluating the fairness of the settlement."[67] Plaintiffs are confusing factors that are relevant to the fairness of the settlement with what an appropriate fee award is. The fact that the Defendant has a "limited ability to pay" is not at all relevant in justifying a 33% fee award.

---

[63] *Id.* at *7.
[64] *Id.*
[65] Final Approval Motion, at p. 53.
[66] In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003), aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96 (2d Cir. 2005).
[67] Final Approval Motion, at p. 57.

15

4) Plaintiffs state "Prof. Monestier's analysis [of attorneys' fees] also depends entirely on her idiosyncratic view that the injunctive relief reached in the NAR Settlement is meaningless."[68] I specifically carved out the value (or non-value) of the injunctive relief in making arguments about attorneys' fees. Plaintiff premised their fee motion exclusively on the monetary value of the settlement, not on the injunctive relief—and I responded accordingly. Plaintiffs can't have it both ways: either they need to quantify the value of the injunctive relief and include it in the benefit to the class for ascertaining attorneys' fees or not. They can't just make unsupported statements that there's $1 billion in cash and a ton of other (speculative) value so that they get a 33% fee.

5) Plaintiffs state, "Prof. Monestier's principle that attorney fees should be decreased if each individual claimant recovered a relatively small amount would disincentivize attorneys from pursuing the very cases for which class actions were designed to enable." Again, I am not sure if Plaintiffs actually believe that my position is that attorneys' fees should not be awarded where individuals claimants receive a small amount, or whether they are just trying to muddy the waters. My argument is that attorneys' fees are primarily based on the results that an attorney has obtained for a class member. Here, that result is not-so-good in monetary terms. It represents 0.001% of my actual harm. That should be a consideration in deciding whether attorneys should get 33% or some amount less than 33%.

6) Plaintiffs state: "Prof. Monestier claims, without any support, that non-attorney time should not receive a lodestar multiplier. She then proceeds to cite a case calculating and accepting a market rate for paralegals that shows this Court and nearby courts routinely include non-attorney time as part of the lodestar calculation. Prof. Monestier also ignores the fact that the deserved salaries of non-attorneys have been advanced for more than five years by the attorneys who have litigated this case." Once again, Plaintiffs cobble together completely different things to paint an unrepresentative picture. I stated in my motion that I was not originally aware that non-attorney rates can be used in calculating "attorneys' fees." There is an open question as to whose fees are in and whose fees are out. I then claimed that, in any event, the paralegal rates were not at market rate (and cited the case to that effect). The Plaintiffs then proceed to suggest that I am "ignor[ing] that the deserved salaries of non-attorneys have been advanced" by the plaintiffs. I frankly don't even understand the point— but I will reiterate that these deserving paralegals, law clerks, investigators, and other staff will not be sharing in the contingency fee spoils.

7) Plaintiffs state "Prof. Monestier's reliance on the megafund doctrine and percentages awarded in other megafund cases in courts that have adopted it defies the Eighth Circuit's specific instructions that the attorney fee should be awarded based on the specific circumstances of the case and that a per se rule for megafund cases is inappropriate." I did not rely on any sort of megafund doctrine; I simply argued that the size of the settlement and the reality of economies of scale involving megafunds need to be considered.

8) Plaintiffs state" "Prof. Monestier's primary criticism appears to be that Professor Klonoff has too often been accepted as an expert on attorney fees by a court. This stands *Daubert* on its head, where an expert's qualifications and experience support—not discredit—the reliability

---

[68] *Id.*

16

of their testimony." Professor Klonoff was not proffered as a *Daubert* witness. *Daubert* applies to scientific or technical expertise.[69] Determining the reasonableness of fees is the sole province of the Court. That attorneys charging thousands of dollars an hour for their elite services don't know this is worrisome.

***

It is hard to believe that Plaintiffs' submission could be so riddled with misstatements and mischaracterizations of basic facts and law. Either Plaintiffs genuinely don't understand many of my arguments, or they are trying to confuse the Court by grossly mischaracterizing them. All while continually accusing me of "ignor[ing],"[70] "baselessly speculat[ing],"[71] "attacking,'"[72] "misconstruing,"[73] "inaccurately suggest[ing],"[74] "inaccurately describ[ing],"[75] "mak[ing] . . . convoluted and unsupportable leap[s],"[76] "disregarding evidence,"[77] "misleadingly fram[ing],"[78] "misleadingly suggest[ing],"[79] making "unsupported" attacks,[80] exhibiting "flagrant inconsistency,'"[81] and "claim[ing] without support."[82]

This takes legal gaslighting to a whole new level. I stand by everything I wrote. There was nothing that I ignored, mischaracterized or misrepresented.

---

[69] Kurtis B. Reeg & Cawood K. Bebout, *What's It Is All About, Daubert,* 55 J. MO. B. 369 (1997)("This decision demands an evaluation of whether the reasoning or methodology underlying the testimony is scientifically valid and can be applied to the facts at issue. In *Daubert* the Supreme Court provided four nondefinitive factors that trial courts should consider in making this determination. First, the court should evaluate whether the theory or technique can be and has been tested. Second, the court must determine whether the theory or technique has been subjected to peer review and publication. Third, the court should consider the known or potential rate of error. Finally, the court should evaluate the general acceptance of the theory in the scientific community.").
[70] Final Approval Motion, at pp. 30, 34, 37, 40, 64.
[71] *Id.*
[72] *Id.* at p. 31.
[73] *Id.* at p. 34.
[74] *Id.* at p. 35.
[75] *Id.*
[76] *Id.* at p. 36.
[77] *Id.* at p. 40.
[78] *Id.* at p. 45.
[79] *Id.* at p. 46.
[80] *Id.* at p. 51.
[81] *Id.* at p. 54.
[82] *Id.* at p. 64.