IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA BURNETT, JEROD BREIT, JEREMY KEEL, HOLLEE ELLIS, and FRANCES HARVEY, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | CASE NO. 4:19-CV-00332-SRB |
| Plaintiffs, | ) ) ) | SUGGESTIONS IN OPPOSITION TO FINAL APPROVAL OF THE PROPOSED NATIONWIDE CLASS |
| vs. | ) ) | SETTLEMENT BY OBJECTORS BENNY CHEATHAM, ROBERT |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP. (n/k/a ANYWHERE REAL ESTATE, INC.), HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) ) ) | DOUGLAS, DOUGLAS FENDER, AND DENA FENDER |
| Defendants. | ) ) | |

The Objectors named above make these suggestions in opposition to the national settlement with the National Association of Realtors and the Home Services Defendants. They stand on their previously filed objection, ECF 1558, and incorporate those objections made by Nordquist, ECF 1537; Wang, ECF 1547; Monestier, ECF 1552; and Spring Way, ECF 1563 by reference. Further, they would incorporate suggestions made in opposition to this approval, to include Monestier, ECF 1600. Objectors submit these suggestions to emphasize certain points.

**I. The Settlement is Not Fair, Adequate, or Reasonable.**

Objectors would take the position, as they have consistently throughout this litigation in their objections to the previous settlements, that these settlements do not satisfy either Rule

1

23(e)(2) or the *Van Horn* factors.

**A. Settlement Counsel has not Adequately Represented the Class**

It is true that some members of the Settlement Counsel litigated this case to a substantial jury verdict on behalf of a 500,000 person class of Missourians. This was certainly a tour de force in trial advocacy. However, Counsel almost immediately abandoned that jury verdict for pennies on the dollars and many more mouths to feed. Rather than continuing with the regional classes that they originally believed were proper, Counsel has now become much more interested in settling as much of the case as they can and bargaining away those pieces of the case they are uninterested in pursuing. They have admitted as much, saying that they did not wish to bring actions against what they consider to be "small brokerages." Plaintiff's Motion for Final Approval, ECF 1595 at 90.

Counsel further defends this by arguing that "the Settling Defendants refused to settle on anything less than a nationwide basis, because doing so would leave them exposed to potentially crippling liability. They therefore insisted that the Settlement Class include all 'Multiple Listing Services,' regardless of whether they were affiliated with the NAR." *Id*. at 13. This does not follow. A non-NAR affiliated MLS would have no right to contribution against the NAR, since they are not affiliated. While certainly the conspiracy occurred within the non-NAR MLSs, they have no relationship by which contribution could be demanded. But to provide them releases allows Lead Counsel to repeatedly claim that they are providing "global peace." Just so, NAR members, no matter their size, would not be able to look to the NAR for contribution because they independently acted and agreed to commit the anti-competitive behavior at issue here. What has happened here is that the NAR wanted to insulate its members from liability. Counsel was

happy to allow that, so long as they were able to litigate against certain large brokerages that Counsel felt were relatively easy pickings.

**B. The Relief is Not Adequate**

$418 million is a large figure. Indeed, the more than $1 billion Counsel repeatedly touts as settlements in this case is also a large figure. However, the size of the class and the length and breadth of the illegal activity here, dwarfs those figures. It may be that $418 million for a release of the NAR alone is all that could be had. However, this settlement aims to settle not just NAR's liability, but the liability of almost the entire industry, a liability to the American working people that runs toward trillions, not billions of dollars. Yet Lead Counsel has decided to set a threshold as to who should pay and who should not, despite not a single brokerage headquartered in Alabama or Louisiana, for instance, has a total transaction volume of more than $2 billion in the relevant period. Entire States' real estate markets will be largely unaffected by the costs of this settlement and, as Prof. Monestier ably points out, real estate companies, regional associations, and the MLSs themselves have already contrived to dodge the "historic and significant practice changes" Lead Counsel is so very proud of. In addition, in many of these real estate markets, the practice changes simply are not mandatory on the large, local brokerages because those brokerages are franchisees of previously released entities and, as argued there and in our objection, the language of those settlements is not mandatory on those franchisees.

**C. The Risks of Continued Litigation Have Been Exaggerated**

The NAR, in its suggestions in support of the settlement, assert that they believe a strong appeal existed. They support this argument by relying on *Grace v. RE/MAX Holdings, Inc.,* 2024 WL 2761188 (N.D. Cal. May 29, 2024) and *Moratis v. West Penn Multi-List*, *Inc.*, 2024 WL

4436425. In both cases, the NAR asserts "courts dismissed similar claim as a matter of law." NAR's Suggestion in Support of Final Approval, ECF 1597 at 1. However, in both those cases the Courts distinguished the rules at issue in those MLSs from the NAR's rules. Further undermining the NAR's claim that those cases are on firm footing is that both MLSs, BAREIS and West Penn, have now purportedly opted into this settlement agreement. As any trial lawyer knows, the primary uncertainty is what a jury will do, not what a Court will. But even granting that the NAR could win on appeal, the settlement recovery here discounts to almost zero the likelihood of Plaintiff's success.

**D. The Settling Defendants' Financial Condition**

This factor, like many of the factors discussed above, is ill suited to the kind of settlement before the Court today. The issue is not simply that the NAR is capable of paying more. Rather it is that the industry is capable of paying more. Counsel and the NAR have created a false dichotomy within the real estate industry of large brokerages and small brokerages without taking account of the regional variations between what is a large or small brokerage. Objectors have no interest in suing Louisiana real estate companies for inflating Louisianan real estate commissions, but someone there should determine what is a large or small brokerage given local conditions and who can pay more or less, not lawyers and Judges in Kansas City. This is an unprecedented situation, that a national industry brought together so many participants to agree to such a breathtaking scheme, carried it out for so long, but enforced it so locally.

**E. Class Members Should Not Be Left to Hope Other Class Members Fail to Exercise Their Rights.**

The NAR and Lead Counsel have repeatedly pointed out that this settlement is non-reversionary and thus the true recovery to each Class Member is not ascertainable until the end

of the Claims period. The NAR puts this as "the proper denominator is how many class members submit claims, not how many received notice." ECF 1597 at 9. This asks the Court to approve this settlement in the hopes that some number of Class Members fail to exercise their right to claim benefits. If this is the case, that NAR makes that the compensation is adequate assuming some portion of absent class members fail to claim, then they admit that the settlement amount is too low.

### F. The Amount of Opposition to the Settlement

This factor is couched in such a way that it burdens the objector rather than the proponent of the settlement. It is unclear why the amount of opposition is more important than the amount of support. Here, the actual number of class members does not appear to be known. The closest approximation appears to be nearly 40 million notice having gone out. Of that number, "over 491,000 have apparently submitted claims. This is hardly the overwhelming support that NAR and Lead Counsel touts. As the NAR says, what matters is "how many class members submit claims," and that number is something like 1 percent of eligible home sellers. The numbers cited at ECF 1595, p. 36, do more to demonstrate that these settlements, in which aggrieved parties received less than a fast food meal as is to be expected here, have soured the American people on Class Action recovery generally.

## II. The Opt-Ins Were Not Effective

### A. Due Process Requires that Class Members Have Notice of Settlement Terms

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965 (1985), requires that Absent Class Members receive "notice plus an opportunity to be heard." *Phillips* at 812. Here, a settlement agreement was preliminarily approved by this Court. That agreement contained

5

Case 4:19-cv-00332-SRB   Document 1606   Filed 11/25/24   Page 5 of 8

within it certain deadlines and requirements that became part of this Court's order. Lead Counsel and the NAR have both repeatedly asserted that this agreement was the result of extremely hard fought negotiations, so presumably each of those terms was the result of those negotiations. That settlement agreement was published to class members at the time as though it were the final agreement. Lead Counsel now says that that process was a farce. Instead, all that needed to be done to bring a settlement with a brokerage under the umbrella of the NAR settlement was for "Plaintiffs and the Stipulating Parties [to] properly agree[] in writing, which ha[s] the effect of extending those deadlines." ECF 1595 at 89. If the Court holds with that reasoning, the preliminary approval of the Settlement Agreement no longer means anything. Indeed, Plaintiff and Stipulating Parties could very well have agreed to anything, slipped it into this settlement umbrella, and asked for the Court to approve it.

Importantly, the way that this approval process has proceeded with respect to the opt-in brokerages has focused the attention of both Rule 23(e)(2) and *Van Horn* on the NAR and not the alleged opt-in brokerages. The 13 brokerages have essentially sought shelter under the NAR's umbrella and avoided the scrutiny that they would ordinarily receive in a class action settlement process. Due process requires exacting compliance with the terms published to the Absent Class and this Court's approved guidelines and deadlines.

Further, in this case, execution dates matter within the terms of the Settlement Agreement. Again, these terms were the product of apparently arms length, hard fought negotiations. Without these dates, potential objectors could not determine whether the opt-in agreements were properly executed. Lastly, the terms of each settlement agreement were not published on the settlement website. With due respect to Mr. Dirks, only four of the non-NAR

6

MLS settlement agreements were published on the settlement website.

### B. No "Small" Brokerage Effectively Opted Into This Agreement

As argued in our objection at ECF 1558-1 at 9, Plaintiffs and the NAR created a regime in which "small" brokerages must agree to provide information to Lead Counsel on request. Plaintiff now claims that they did no such thing. Instead, Plaintiffs assert that small brokerages simply have to provide information on request and that "those who do not comply are not released." Plaintiff's Motion for Final Approval, ECF 1595 at 91. The problem with this position is that Absent Class Members cannot know and could not have known at the expiration of the class notice period what brokerages were being released. Indeed, this Court does not know what brokerages are being released because "small" brokerages are now in a superposition – both released and unreleased – until Lead Counsel measures their agreement to comply. This Court, then, and Absent Class Members may discover in six years that a particular "small" brokerage, one that had $1.9 billion in total transaction volume, for instance, was never released when it refuses to provide information to Lead Counsel. Of course, at that point the Statute of Limitations would have run against that brokerage. This goes to the very heart of the process required by *Phillips*.

### C. The Opt-In Compensation is Not Sufficient to Excuse This Constitutional Error

The NAR does not take the position that it expected its Settlement Agreement to be altered at will by other parties. Instead, it claims that "the benefits of the opt-ins" outweigh any error because those opt-ins brought $30,587,754 to the settlement. However, this is less than one dollar per noticed class member. This dollar does not excuse the massive Constitutional error that Lead Counsel's reasoning leads to.

## VII. Conclusion

For the foregoing reasons and the reasons listed in the objections to this settlement, the Objectors ask that this Court not to approve this settlement.

        KNIE & SHEALY

        */s/ Patrick E. Knie*

        Patrick E. Knie
        pat@knieshealy.com
        Federal I.D. No. 2370
        Matthew W. Shealy
        matt@knieshealy.com
        Federal I.D. No. 12823
        P.O. Box 5159
        250 Magnolia Street
        Spartanburg, S.C. 29304
        Telephone No. (864) 582-5118
        Telefax No. (864) 585-1615

        Mitch Slade
        MITCH SLADE LAW OFFICE, P.A.
        FEDERAL I.D. NO. 5352
        P.O. Box 1007
        Spartanburg, S.C. 29304
        Telephone: (864)582-4212
        mitch@mitchsladelaw.com

        ATTORNEYS FOR OBJECTORS

November 25, 2024