# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT, )
HOLLEE ELLIS, FRANCES HARVEY, )
and JEREMY KEEL, on behalf of )
themselves and all others similarly situated, )
       )    Case No. 19-CV-00332-SRB
       Plaintiffs, )
       )
THE NATIONAL ASSOCIATION OF )
REALTORS, REALOGY HOLDINGS CORP., )
 HOMESERVICES OF AMERICA, INC., )
BHH AFFILIATES, LLC, HSF AFFILIATES, )
LLC, RE/MAX LLC, and KELLER )
WILLIAMS REALTY, INC., )
       )
       Defendants )

## ORDER

Before the Court is Plaintiffs'[1] Motion for Final Approval of Settlements with the National

Association of Realtors ("NAR"), HomeServices Defendants, and certain brokerages and multiple

listing services ("MLSs") that have opted into the NAR Settlement (as defined by the NAR

Settlement Agreement and any additional agreements entered with opting-in entities). (Doc.

#1595.) Preliminary approval was granted on April 23, 2024, as to the NAR Settlement and

August 8, 2024, as to the HomeServices Defendants. (Doc. #1460, #1520.) Notice to the

Settlement Class commenced on or around August 17, 2024, and Class members were provided

with an opportunity to opt out of, or object to, the Settlements. The Court received several

objections from Class members and several filings regarding one or more of the settlements from

individuals who do not state or otherwise indicate that they are Class members. Seventeen are

from Objectors without pending follow-on suits: (1) Khyber Zaffarkhan (Doc. #1539); (2) Robert

Duthler (Doc. #1541); (3) Tanya Monestier (Doc. #1552 and #1600); (4) Black Tie Realty (filed

---

[1] "Plaintiffs" are Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, Jeremy Keil, Christopher
Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, Jane Ruh, Don Gibson, Lauren Criss,
and John Meiners.

in *Gibson* Doc. #527); (5) Vivienne Cunningham (filed in *Gibson* Doc. #528); (6) Arturo Gonzalez (Doc. #1564, #1528); (7) Peter Gustis (Doc. #1510); (8) Chia and Herbert Whitehouse (Doc. #1609); (9) Jeffrey Nordquist (Doc. #1517, #1537, #1404); (10) Michael C. Mead (Doc. #1532); (11) Larry Giammo (Doc. #1405); (12) Diane Knizer (Doc. #1439); (13) PulteGroup Inc. (Doc. #1445); (14) Anthony Phillips (Doc. #1488); (15) Sharon Saunders (Doc. #1454); (16) Cynthia Goralski (Doc. #1453); and (17) Rosalie Doyle, Jessica Winters, John Guerra (Doc. #1605). The remainder are from six sets of objectors with follow-on cases encompassed by the Settlement Class in this case: (1) Hao Zhe Wang (Docs. #1547, #1548); (2) Robert Benjamin Douglass, Benny D. Cheatham, Douglas W. Fender II, and Dena Marie Fender (Doc. #1555, #1558, #1559, #1606); (3) Robert Friedman (Doc. #1560); (4) James Mullis (Doc. #1561); (5) Monty March (Doc. #1562); and (6) Spring Way Center, LLC, Nancy Wehrheim, John and Nancy Moratis, Danielle and Jesse Kay, Kaitlyn Slavic, and Maria Iannome (Doc. #1563). The Settlement Class and Settling Defendants filed Suggestions in Support of Final Approval. (Doc. #1595, #1596, #1597.) The Court held a hearing on November 26, 2024, at which arguments were presented for and against final approval. Having fully considered the arguments at the hearing and in the written submissions, and based on all materials in the record, the motion for final approval is GRANTED.

The Court hereby ORDERS the following:

1.      Unless defined herein, all defined terms in this Final Approval Order and any accompanying Judgment shall have the respective meanings set forth in the Settlement Agreements.

2.      At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. In connection with their final approval motion, Plaintiffs submitted a declaration of Jennifer M. Keough from JND summarizing the notice that was given to Class members and the resulting claims to date, opt-outs, and objections. (Doc. #1595-7.) As

2

directed by the Court, JND implemented the Class Notice Plan. Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication. As stated in that declaration, nearly 40 million direct notices were mailed or emailed to the Class. JND's digital notice effort delivered more than 300 million impressions. More than 500 news stories addressed the litigation and settlement, including full articles in outlets such as the ABC News, CBS News, NBC News, and the New York Times. JND also implemented a Settlement Website that had over 2 million unique visitors and over 12 million page views. The Court finds that the direct notice program was adequate and reached more than 99% of identified Settlement Class members.

3. As of November 14, 2024, over 491,000 claims have been made. The claims period extends until May 9, 2025. This extended claims period allows additional settlements covering the same or similar Settlement Classes with other Defendants, and the notice process for those settlements will provide additional opportunities to submit claims.

4. Despite the reach of the notice program and large volume of claims, there were only a small number of objections and other filings in total by non-Class members criticizing one or more of the Settlements (encompassing 36 total objectors and other filers) and 39 opt-outs from the Settlement Class.

5. Based on the record, the Court finds that the notice given to the Settlement Class was the best notice practicable under the circumstances and satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. The Court further finds that the notice given to the Settlement Class of the NAR and HomeServices Settlements, separately, together, and in light of the previously approved settlements, was adequate and reasonable.

6. The notice fully and accurately informed members of the Settlement Class of all material elements of the NAR and HomeServices Settlements. The Settlement Class Members received notice of: (a) the pendency of the Actions; (b) the terms of the proposed Settlements,

3

including the Released Claims, Released Parties, and Releasing Parties; (c) their rights under the proposed Settlements, including how to receive the benefits offered by the Settlements; (d) their right to exclude themselves from the Settlement Class and the proposed Settlements; (e) their right to object to any aspect of the proposed Settlements; (f) their right to appear at the Final Approval Hearing; (g) Class Counsel's request for attorneys' fees and expenses; and (h) the binding effect of any final judgment and order approving the Settlements on all Persons who did not timely exclude themselves from the Settlement Class. Some of the objectors challenged certain aspects of the notice program. The Court addresses those objections below and overrules.

7.     The Court also finds that the appropriate state and federal officials were timely notified of the NAR and HomeServices Settlement Agreements under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1715, and that ninety (90) days have passed without objection as to entry of approval from any governmental entity.

8.     For the purposes of the settlement of the claims and potential claims against Released Parties as defined in the NAR agreement, the Court certifies the following class, except for those timely opting out: All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

- Homes listed on Moehrl MLSs: March 6, 2015 to date of Class Notice;

- Homes listed on Burnett MLSs: April 29, 2014 to date of Class Notice;

- Homes listed on MLS PIN: December 17, 2016 to date of Class Notice;

- Homes in Arkansas, Kentucky, and Missouri, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2018 to date of Class Notice;

- Homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming, but not on the Moehrl MLSs, the Burnett MLSs, or MLS PIN: October 31, 2017 to date of Class Notice;

4

- For all other homes: October 31, 2019 to date of Class Notice.

9. For the purposes of the settlement of the claims against the HomeServices Defendants, the Court certifies the following class, except for those timely opting out: All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

- Moehrl MLSs: March 6, 2015 to date of Class Notice;

- Burnett MLSs: April 29, 2014 to date of Class Notice;

- MLS PIN: December 17, 2016 to date of notice;

- All other MLSs: October 31, 2019 to date of Class Notice.

10. The Court finds that certification of the Settlement Class is warranted under Federal Rule of Civil Procedure 23(a) because: (1) the members of the Settlement Class are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Settlement Class; (3) Plaintiffs' claims are typical of the claims of the Settlement Class Members; and (4) Plaintiffs and Co-Lead Counsel will fairly and adequately represent the interests of the Settlement Class members.

11. The Court finds that certification of the Settlement Class is warranted in light of and solely for purposes of the Settlements under Federal Rule of Civil Procedure 23(b)(3) because common issues, including whether Settling Defendants entered into any conspiracy, predominate over any questions affecting only individual members of the Settlement Class in the settlement context, and settlement of the Actions on a class basis is superior to other means of resolving the Actions as to Settling Defendants.

12. The Court reaffirms the appointment of Plaintiffs Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, Jeremy Keil, Christopher Moehrl, Michael Cole, Steve Darnell, Jack

Ramey, Daniel Umpa, Jane Ruh, Don Gibson, Lauren Criss, and John Meiners, as the Settlement Class Representatives. The Court finds that the Settlement Class Representatives have and will fairly and adequately protect the interests of the Settlement Class because: (1) the interests of the Settlement Class Representatives are consistent with those of Settlement Class members; (2) there appear to be no conflicts between or among the Settlement Class Representatives and the other Settlement Class members; (3) the Settlement Class Representatives have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this litigation; and (4) the Settlement Class Representatives and Settlement Class members are represented by qualified, reputable counsel who are experienced in preparing and prosecuting large, complicated class action cases, including those concerning violation of the antitrust laws.

13.     In making these findings, the Court has considered, *inter alia*, (1) the interests of the Settlement Class members in individually controlling the prosecution or defense of separate actions; (2) the impracticality or inefficiency of prosecuting or defending separate actions; (3) the extent and nature of any litigation concerning these claims already commenced; and (4) the desirability of concentrating the litigation of the claims in a particular forum.

14.     As discussed below in response to objections relating to several follow-on cases, the Court has specifically considered that the Settlement Class is nationwide and releases claims arising from sales of homes listed on NAR and non-REALTOR® MLSs, including all claims on behalf of Class Members, as sellers, buyers, or otherwise, arising from the same factual predicate. The Settlements resolve, among others, the *Gibson* case where Plaintiffs plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges certain NAR rules as well as rules adopted by the Residential Listing Service ("RLS") of the Real Estate Board of New York ("REBNY"). *See Gibson* Doc. #232, Consolidated Am. Compl., ¶ 182. That Complaint includes specific allegations regarding particular policies adopted in REBNY RLS that the Plaintiffs allege

6

to be anticompetitive. *Id.* The Complaint alleges that, as a result, "Defendants' conspiracy has had the following anticompetitive effects *nationwide*," including in REBNY RLS: (a) "Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes"; (b) "Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers"; (c) "Home sellers have paid inflated buyer-broker commissions and inflated total commissions"; (d) "The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation"; and (e) "Price competition among brokers to be retained by home buyers has been restrained." *Id.* ¶ 225 (emphasis added); *see also id.* ¶¶ 28, 227 (describing "nationwide" impact).

15. Here, the Court finds that certifying a nationwide class is warranted, including because Plaintiffs have conducted extensive discovery into the alleged nationwide conspiracy and have thoroughly litigated the claims, providing a robust factual record on which to assess the claims and base negotiations. A nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class, a nationwide settlement will conserve judicial and private resources, and Class members were fully apprised of the settlement class definition through the notice process. As the Court further explains below, the record reflects that it was both justified and necessary to achieve any settlement for the Settlement Class to include all MLSs for residential real estate nationwide, however the MLSs were named in *Gibson* (e.g., real estate listing service), and regardless of their formal affiliation with NAR. Moreover, the only way that the Settlements were possible was if they provided for a nationwide recovery and release.

16. As a general matter, "[t]he law strongly favors settlements" and "[c]ourts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d

7

1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("[A] strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'" (quoting *Uponor, Inc*, 716 F.3d at 1063)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate). The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005). However, the Court finds the NAR and HomeServices Settlements, separately, together, and in light of the previously approved settlements, fair, reasonable, and adequate, regardless of any such presumption.

17.     The determination whether a class action settlement is "fair, reasonable, and adequate" is "committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Van Horn v. Trickey*, 840 F.2d 604, 606-07 (8th Cir. 1988); *see also In re Wireless*, 396 F.3d 922, 932 (8th Cir. 2005) (the ultimate question is whether the settlement is "fair, reasonable, and adequate").

18.     Rule 23(e)(2) includes four factors the Court must consider, when evaluating settlement fairness. Those factors are whether:

(A) the Class Representatives and Class Counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the Class is adequate, taking into account:

(i)     the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

19. The Eighth Circuit has also set forth four factors that a court should consider in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *In re Wireless*, 396 F.3d 922, 932 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975)); *Van Horn*, 840 F.2d at 607 (8th Cir. 1988); *see also Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 861 (S.D. Iowa 2020) (finding analysis of certain Rule 23(e)(2) factors will "necessarily include analysis of [certain] related *Van Horn* factors"); *Anderson v. Travelex Insurance Services Inc.*., No. 8:18-CV-362, 2021 WL 4307093, at *2 (D. Neb. Sept. 22, 2021) (approving settlement under Rule 23(e) by evaluating *Van Horn* factors); *Cleveland v. Whirlpool Corp.*, No. 20-cv-1906, 2022 WL 2256353 (D. Minn. June 23, 2022) (evaluating settlement under Rule 23(e)(2) factors and *Van Horn*).

20. Under Federal Rule of Civil Procedure 23(e)(2), the Court finds that the Settlements with Settling Defendants, as set forth in the Settlement Agreements, are fair, reasonable, and adequate.

21. First, Settlement Class Representatives and Class Counsel have adequately represented the Class. Class Counsel were appointed to serve as lead counsel in *Moehrl* and in this case after the courts overseeing both cases found they would adequately represent the class.

*Burnett*, No. 19-CV-00332-SRB, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022); *Moehrl*, No. 19-cv-01610, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023). Class Counsel subsequently obtained a jury verdict in this case against NAR, HomeServices, and Keller Williams. In *Gibson*, this Court appointed them as Interim Co-Lead Class Counsel for an alleged nationwide class with responsibility for any settlements. *Gibson* Doc. #180. Altogether, Class Counsel have obtained over $1 billion in proposed and approved settlements as well as significant practice change relief. Likewise, the Class Representatives have bought and sold homes and have demonstrated their commitment to the litigation by responding to discovery, providing relevant documentation, and participating in the settlement process.

22.     Second, the record reflects that the NAR and HomeServices Settlements were separately conducted at arm's length. The settlement negotiations were contentious and hard fought. And each occurred only after NAR and HomeServices provided Class Counsel with sufficient financial information for Plaintiffs to make an informed decision about settlement. Dirks Decl. at ¶¶ 20-23; Berman Decl. at ¶¶ 19-27. There is no indication that any of the Settlements were the result of anything other than tough negotiations. The lengthy history of this litigation, which has proceeded for years through class certification and a trial, is further evidence of the arm's length nature of these Settlements.

23.     Third, for the reasons stated above, the relief for the Class is fair and adequate. The NAR and HomeServices Settlements, separately, together, and in light of the previously approved settlements, provide for a significant financial recovery to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including appeal, and the Settling Defendants' financial resources. The Settlements also include meaningful changes to the Settling Defendants' policies, including removal of offers of compensation on the MLS. The parties naturally dispute the strength of their claims and defenses. The Settlements

10

reflect a compromise based on the parties' educated assessments of their best-case and worst-case litigation outcomes. The best-case outcome for Plaintiffs is upholding the verdict on appeal as to NAR and HomeServices Defendants, and then actually receiving the awarded damages from Defendants. But "[a]ntitrust cases are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020). And it would make little sense to continue litigating against the Settling Defendants where they do not have the ability to pay the full judgment sought. Dirks Decl. at ¶ 20-23; Berman Decl. at ¶¶ 20, 23.

24.    Against these risks, the NAR and HomeServices Settlements combined provide for an almost $700 million recovery, as well as substantial practice changes. *See In re Pork Antitrust Litig.,* No. 18-1776, 2022 WL 4238416, at *2 (D. Minn. Sept. 14, 2022) (granting final approval of antitrust settlement that provided "substantial relief against the backdrop of a great deal of uncertainty where the merits are highly contested" in case involving alleged price-fixing conspiracy among pork processing companies); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 995-96 (N.D. Ohio 2016) (granting final approval of settlement in light of "real possibility that [plaintiffs] could have received much less—even zero—from a jury at trial or following an appeal"). The NAR and HomeServices Settlements also account for only part of the recovery that the Class has obtained, or could obtain, in connection with the claims arising from the alleged conspiracy. Specifically, Class Counsel obtained other settlements with other defendants that this Court previously finally approved, and have ongoing litigation against additional defendants. Although some Class members have objected that they may not recover every dollar they paid to real estate agents, that is the nature of settlements, which necessarily reflect a compromise.

25. In addition, the record reflects that the proposed method for distributing relief to the Class, including the proposed method for processing Class member claims, will be effective. The Court-appointed notice and claims administrator, JND, will work with Class Counsel in processing Class member claims and distributing relief. JND has extensive experience in distributing relief in connection with large and complex class action settlements. Keough Decl. at ¶¶ 1, 47-51. JND will be responsible for reviewing claim forms and evidence to determine whether claims should be approved, and any claim that cannot be confirmed may be subject to challenge, nonpayment, or a reduced share of the available funds. *See* Settlement Notice at ¶ 8. Class members with approved claims will have several options for receiving payment, including by debit card, Zelle, Venmo, or check. *See* Claim Form at p 1. Finally, as discussed below, the attorneys' fee request is reasonable and in line with Eighth Circuit precedent.

26. Fourth, the NAR and HomeServices Settlements, separately, together, and in light of the previously approved settlements, treat Class members fairly and equitably relative to each other. The practice change relief applies to all Class members nationwide. With respect to the monetary relief, every person who meets the class definition is eligible to submit and receive compensation for a claim. That is all that is required. *Petrovic*, 200 F.3d at 1152–53 ("We do not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards."). In addition, the settlement website advises both that: (i) settlement payment "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 12.

27. Finally, there are no requested service awards under the NAR and HomeServices Settlements.

28.     The *Van Horn* factors also support settlement approval. As discussed above under the Rule 23(e)(2) factors, the NAR and HomeServices Settlements each reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes, including potential financial outcomes of the Settling Defendants. Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the voluminous briefing in *Moehrl* and in this case, which includes extensive class certification and summary judgment briefing and evidence, as well as post-trial briefing. In addition, Plaintiffs have engaged in extensive appellate briefing, including Rule 23(f) petitions in both *Moehrl* and this case, as well as two separate appeals concerning arbitration issues, and a denial of certiorari by the United States Supreme Court. NAR and HomeServices Defendants were poised to lodge several post-verdict challenges and appeals. By contrast, the NAR and HomeServices Settlements provide for certain and swift recovery for the Class. In light of the many uncertainties of continued litigation, a significant and certain recovery weighs in favor of approving the proposed Settlements. *See In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669, 678 (D. Minn. 1974) (approving settlement where price-fixing claims faced "substantial roadblocks" on top of the "difficulties inherent" in prevailing on such claims); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1137 (8th Cir. 1984) (affirming final approval of settlement where "no reported opinion addresses the precise [merits] question presented here," which created "a substantial question whether [plaintiff] would prevail"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) ("Any verdict inevitably would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement.") (cleaned up).

13

29. The fairness, adequacy, and reasonableness of the NAR and HomeServices Settlements, separately, together, and in light of the previously approved settlements, are also supported by the Settling Defendants' financial condition and their inability to satisfy a judgment. As discussed above, the record reflects that, in order to evaluate the Settling Defendants' financial condition, Plaintiffs reviewed financial information pertaining to each Settling Defendant and considered each's ability to pay. These amounts are reasonable in light of limitations on the Settling Defendants' ability to pay. "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Grunin*, 513 F.2d at 125 (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

30. As discussed above, the litigation has been complex and expensive, and if it were to proceed without settlement would remain so. If they did not settle, the Settling Defendants would likely raise numerous challenges on appeal. The Court has observed first-hand the complexity and expense of the litigation.

31. Finally, the amount of opposition to the NAR and HomeServices Settlements is minimal and supports approval of the Settlements. The Settlement Class Representatives have approved the Settlements. More than 491,000 Class members have submitted claims, while only a small handful have objected and 39 opted out. Keough Decl. at ¶¶ 53, 57. This supports granting final approval. *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) (determining with a settlement class of approximately 3.5 million households, where "only fourteen class members

14

submitted timely objections," the "amount of opposition is minuscule when compared with other settlements that we have approved"); *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129-SRB, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) ("[A] low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval") (quoting *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015)); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) (of the 4,838,789 settlement class members who were sent notice, only 620 (0.012%) opted out of the settlement and only 33 (0.00068%) objected to the settlement, which "are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement"); *In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) ("The objectors represent only about 8 per cent of the class, and this relatively low level of opposition to the settlement also indicates its fairness. The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement.") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)); *see also, e.g.*, *Van Horn*, 840 F.2d at 607 ("the amount of opposition to the settlement" is a factor to be considered in the settlement approval process); *Marshall*, 787 F.3d at 513 ("We have previously approved class-action settlements even when almost half the class objected to it.").

32.     This Court's order granting final approval of the Settlements is also supported by the substantial benefits to the class afforded by the practice changes obtained by the NAR and HomeServices Settlements.

33.     The Court has carefully considered each of the timely filed objections, and arguments made at the final approval hearing. All objections are overruled. As an initial matter, the Court has already overruled objections that are similar, and in many cases identical, to each of

the objections here. *See Burnett*, May 9, 2024 Order Granting Final Approval (Doc. #1487, p. 13-29); *Gibson*, Nov. 5, 2024 Order Granting Final Approval (Doc. #530). In any event, the Court finds that none of the objections provides a basis for denying final approval of the Settlements. *See Marshall*, 787 F.3d at 513–14 ("The district court refused to give credence to the vocal minority" and "the court aptly noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement.").

34.     The Court also ordered "all objectors and their attorneys to appear in person at the November 26, 2024, hearing at 1:30P.M. to argue their objections." (Doc. #1566). This order is within the Court's discretion, particularly in light of the recent events in these cases that necessitated such appearances. *See Fauley v. Metro. Life Ins. Co.,* 52 N.E. 3d 427, 438-39 (Ill. App. Ct. 2016) ("requiring class members to be present in court to object did not violate their due-process rights" when the Court ordered "if you want the Court to consider your objection, then you must also appear at the final approval hearing."); *In re Train Derailment Near Amite La., Oct. 12, 2002*, No. CIV.A. MDL 1531, 2006 WL 644494, at *2 (E.D. La. Jan. 27, 2006) ("To preserve the right to be heard at the Fairness Hearing in opposition to the settlement, the objecting Class Member must appear at the federal court in person not later than 8:30 a.m. on the date the Fairness Hearing is to begin and register with Class Counsel."); *Dennings v. Clearwire Corp.*, No. C10-1859JLR, 2013 WL 3870801, at *8 (W.D. Wash. July 26, 2013) (finding when the Court ordered objectors' counsel's in person appearance, "[i]f Objectors' counsel intends to litigate in the State of Washington, he must be prepared to appear in Washington when ordered to do so by the court."). Moreover, the Court has the authority to issue orders that supplement or modify the Class Notice, and it has done so here with sufficient advance notice for all Class members to appear at the final approval hearing if they wanted to be heard.

35.    Objectors may not "essentially insert[] [themselves] into the dispute and then, without explaining why, refuse[] to play by the rules that the district court set." *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 858 (8th Cir. 2024). An objector in *T-Mobile* refused to cooperate with counsel's efforts to conduct discovery ordered by the district court, claiming "that by subjecting her to a deposition, the district court 'unduly encumbered' her due-process right to be heard." *Id*. Both the Eighth Circuit and District Court disagreed with her refusal to follow the court's orders and struck her objection. *Id*. Similarly here, after the Court ordered their appearance, many objectors mailed letters protesting the Court's order and requesting excusal for various reasons. Failure to comply with a Court's order can result in an objection being struck or waived. *See Ferron v. Kraft Heinz Foods Co.*, No 20-CV-62136-RAR, 2021 WL 2940240, at *41 (S.D. Fla. July 13, 2021) (finding when an objector failed to follow the Court order of appearing after providing the Court intent to appear at the final approval hearing, he provided the Court "sufficient grounds alone to strike his Objection."); *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 682 (D. Colo. 2014) ("As a threshold matter, National Roofing's objection failed to comply with the Court's order . . . [t]hus, National Roofing's objection is deemed waived[.]"). All Objectors who did not appear in person failed to comply with the Court's order. Therefore, all objections filed by such Objectors are waived for failing to comply with the Court's order.

36.    Objectors Chia and Herbert Whitehouse (Doc. #1609); Monty March (Doc. #1594, #1593, #1562); Robert Benjamin Douglass, Benny D. Cheatham, Douglas W. Fender II, and Dena Marie Fender (Doc. #1555, #1558, #1559, #1606); Nancy Wehrheim, John and Nancy Moratis, Danielle and Jesse Kay, Kaitlyn Slavic, and Maria Iannome (Doc. #1563); James Mullis (Doc. #1561); Robert Friedman (Doc. #1560); Tanya Monestier (Doc. #1552, #1600); Robert Duthler (Doc. #1541); Khyber Zaffarkhan (Doc. #1539); Jeffrey Nordquist (Doc. #1517, #1537. #1404); Michael C. Mead (Doc. #1532); Arturo Gonzalez (Doc. #1564, #1528); Peter Gustis (Doc. #1510);

17

Anthony Phillips (Doc. #1488); Sharon Saunders (Doc. #1454); Cynthia Goralski (Doc. #1453); PulteGroup Inc. (Doc. #1445); Diane Knizer (Doc. #1439); Larry Giammo (Doc. #1405); Rosalie Doyle, Jessica Winters, John Guerra (Doc. #1605); Black Tie Realty (filed in *Gibson* Doc. #527); and Vivienne Cunningham (filed in *Gibson* Doc. #528) did not appear in person at the Final Settlement Hearing. All Objectors who did not appear in person failed to comply with the Court's order. Therefore, all objection filed by the above-named Objectors who did not appear in person at the November 26, 2024, Final Settlement Hearing, are waived for failing to comply with the Court's order.

37. Separate from this waiver, the Court has carefully considered the objections, and overrules each on its merits.

38. Objections or complaints were received on behalf of 36 purported objectors and other individuals. Seventeen are from Objectors without pending follow-on suits: (1) Khyber Zaffarkhan (Doc. #1539); (2) Robert Duthler (Doc. #1541); (3) Tanya Monestier (Doc. #1552 and #1600); (4) Black Tie Realty (filed in *Gibson* Doc. #527); (5) Vivienne Cunningham (filed in *Gibson* Doc. #528); (6) Arturo Gonzalez (Doc. #1564, #1528); (7) Peter Gustis (Doc. #1510); (8) Chia and Herbert Whitehouse (Doc. #1609); (9) Jeffrey Nordquist (Doc. #1517, #1537. #1404); (10) Michael C Mead (Doc. #1532); (11) Larry Giammo (Doc. #1405); (12) Diane Knizer (Doc. #1439); (13) PulteGroup Inc. (Doc. #1445); (14) Anthony Phillips (Doc. #1488); (15) Sharon Saunders (Doc. #1454); (16) Cynthia Goralski (Doc. #1453); and (17) Rosalie Doyle, Jessica Winters, and John Guerra (Doc. #1605). The remainder are from six sets of objectors with follow-on cases entirely or partially encompassed by the Settlement Class: (1) Hao Zhe Wang (Docs. #1547 and #1548); (2) Robert Benjamin Douglass, Benny D. Cheatham, Douglas W. Fender II, and Dena Marie Fender (Docs. #1555, #1558, #1559, and #1606); (3) Robert Friedman (Doc. #1560); (4) James Mullis (Doc. #1561); (5) Monty March (Doc. #1562); and (6) Spring Way

18

Center, LLC, Nancy Wehrheim, John and Nancy Moratis, Danielle and Jesse Kay, Kaitlyn Slavic, and Maria Iannome (Doc. #1563).

**Objections from Objectors Without Pending Follow-On Suits**

39.     The Court overruled Khyber Zaffarkhan's same objection in *Gibson*. (*see Gibson* Doc. #530, p. 19-21.) His objections are overruled here for the same reasons. Mr. Zaffarkhan represents that he paid commissions across two home sales in 2016 and 2020. Mr. Zaffarkhan's objection does not comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." Nor does Mr. Zaffarkhan provide basic information about the homes he claims to have sold, including whether he hired a listing broker, whether the homes were listed on an MLS, or how any broker fees he paid may have been allocated among those brokers. Additionally, based on the limited information provided, Mr. Zaffarkhan's claimed 2016 home sale appears to fall outside of the settlement class period. Thus, Mr. Zaffarkhan has not established he has standing to object for at least that sale. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.") (citing *Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979)); *Feder v. Elec. Data Sys. Corp.,* 248 F. App'x 579, 580 (5th Cir. 2007) ("[O]nly class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581.

40.     Even considering Mr. Zaffarkhan's arguments, none shows that the NAR or

HomeServices Settlements should be rejected. *First*, Mr. Zaffarkhan objects that the monetary recovery is inadequate because the Settlements (and other proposed and approved settlements in related cases) will not fully compensate him for the entirety of any alleged overcharges he may have paid. It is true that Class members will likely only receive from these Settlements a portion of their best-day-in-court damages. But that fact is true for essentially any settlement and is not grounds for declining to approve the particular proposed Settlements here. *Keil*, 862 F.3d at 696. The record supports the finding that Plaintiffs sought to obtain the largest recovery they could in light of the risks of continued litigation, including each Settling Defendant's ability to pay limitations. *Second*, Mr. Zaffarkhan objects to Plaintiffs' requests to recover attorneys' fees, costs, and expenses on the ground that it would come from the common fund. That objection is overruled. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (paying attorneys out of the fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170, 2021 WL 247958, at *1 (W.D. Mo. Jan. 25, 2021) ("When a class action creates a common fund for the benefit of the class members, the Court may award class counsel reasonable attorneys' fees 'equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.'") (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244-45 (8th Cir. 1996)).

41.     Robert Duthler fails to provide any information reflecting that he is a Class member with standing to object to the Settlements. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder*, 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule

23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Mr. Duthler comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."

42.    Mr. Duthler objects that the requested attorneys' fees are too high, but he does not explain why, aside from accusing Co-Lead Counsel of violating federal RICO and antitrust laws by filing a fee petition with the Court. As discussed elsewhere in this opinion, Plaintiffs' fee and cost request is reasonable. (Doc. #1535.) Mr. Duthler also argues in a single sentence that the settlement should not be approved because "[t]here is no valid evidence" that sellers were "ever denied to negotiate the fee asked by the Realtor." (Doc. #1541, p. 1.) A jury disagreed with Mr. Duthler's assessment of the evidence, which, regardless, would not be a basis for rejecting the Settlements.  Mr. Duthler's objections are overruled.

43.    Professor Tanya J. Monestier, an attorney, filed an objection challenging the NAR Settlement Agreement's practice changes and enforcement provisions, and challenging Plaintiffs' attorneys' fee request. (Doc. #1552 and #1600.) Prof. Monestier's objections are unfounded, and overruled.

44.    Professor Monestier first objects that the NAR Settlement has "absolutely no enforcement mechanism." (Doc. #1552, p. 7.) The Court finds that this objection is inconsistent with the NAR Settlement's actual language, which reflects multiple enforcement mechanisms. For instance, the NAR Settlement Agreement expressly provides that "[t]he Court shall retain jurisdiction over the implementation and *enforcement* of" the Settlement Agreement, including its practice change provisions. NAR Agreement (Doc. #1458-1, ¶ 82) (emphasis added). In addition,

under the NAR Settlement Agreement, Plaintiffs and the Court have authority to enforce the Settlement Agreement directly against the vast majority of MLSs in the United States. The Settlement Agreement includes an opt-in structure that permitted Realtor and non-Realtor MLSs to agree to submit to the Court's jurisdiction, including for purposes of enforcing the settlement, as one of several conditions for obtaining a release.[2] These MLSs are also required to provide "proof of compliance" with the required practice changes when requested by Co-Lead Counsel. Every significant Realtor MLS in the country—in total, 547 Realtor MLSs—opted into the Settlement. In addition, 15 non-Realtor MLSs opted in as well (including by agreeing to make additional payments to the Class). Further, under the Agreement, Plaintiffs and the Court have authority to enforce the Settlement Agreement directly against 13 large brokerage firms around the Country that have opted into the Settlement. And the Settlement Agreement creates substantial incentives for Realtor MLSs, member boards, brokerages, and individual agents to abide by the Settlement terms. These entities and individuals only become "Released Parties" if they "compl[y] with the practice changes reflected" in the Settlement Agreements and "agree[] to provide proof of such compliance if requested by Co-Lead Counsel." NAR Agreement ¶ 18.b, c, e, f. The Settlement Agreement gives individual Class members "the right to inquire of the National Association of REALTORS® as to whether a Person is a REALTOR®, REALTOR-Associate® Member, or REALTOR® Member Board and has satisfied the conditions for being a 'Released

---

[2] *See, e.g.*, NAR Agreement, App'x B ¶ 4 ("As a condition for being a Released Party, as that term is defined in the Settlement Agreement, stipulating MLS agrees to be bound by the practice changes…."); *id.* ¶ 7 ("Stipulating MLS agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel."); *id.* ¶ 8.vi (Stipulating MLS "agree[s] that the Settlement Agreement and Appendix B shall not preclude Plaintiffs from seeking the production of non-privileged documents in its possession, custody, or control"); *id.* ¶ 15 ("The Court shall retain jurisdiction over the implementation and enforcement of the Settlement Agreement and the Settlement, including Appendix B."); *id.* ¶ 16 ("Stipulating MLS submits to the exclusive jurisdiction of the Court for the purposes of interpreting and enforcing the terms of Appendix B, including but not limited to, the practice changes contained therein.").

22

Party,'" including by complying with the Settlement's practice changes. NAR Agreement ¶ 18.b, e.

45.     Professor Monestier speculates that Co-Lead Counsel will not enforce the Settlement. This speculation is not only premature given that the Settlement Agreement was not yet approved at the time of her objection; it is also inconsistent with Counsel's vigorous prosecution of this litigation for half a decade. Professor Monestier supposes that Co-Lead Counsel will not enforce the Settlement because doing so might somehow cause the Settlement to be "rescinded," which would in turn put Co-Lead Counsel's attorneys' fees at risk. (Doc. #1552, pp. 88-89.) However, under the Agreement's plain language, once the Settlement is finally approved, NAR will not have any recission rights, and so there is no conflict of interest. Professor Monestier's argument, at most, favors approving the Settlement.

46.     Professor Monestier also objects to the NAR Settlement's practice changes. She claims that the practice changes were "concocted by lawyers without a full appreciation of how this would play out in the real world." (Doc. #1552, p. 5.) The record reflects, however, that the NAR Settlement's practice changes were developed in consultation with economic and real estate industry experts. Co-Lead Counsel too have extensive antitrust expertise and have developed knowledge of the real estate industry based on a half-decade's worth of detailed factual and expert discovery and research.

47.     Professor Monestier identifies several supposed "workarounds" or "breaches" of the Settlement Agreement practice changes that, in her view, demonstrate that the NAR Settlement should be rejected. However, the fact that Professor Monestier considers many of her examples to violate the Settlement Agreement supports approving the Settlement, rather than rejecting it, as approving the Settlement would facilitate the Settlement's enforcement. Professor Monestier

claims that these supposed "workarounds" are "widespread," but she does not provide sufficient evidence to assess that claim and the examples she does provide are anecdotal and speculative.

48.     The fact that Professor Monestier points to purported examples of confusion and violations within the first few weeks after the Settlement Agreement went into effect, and before it has even been approved and fully enforced, is neither surprising, nor a basis for rejecting the Settlement Agreement. The practice changes have only been in place since August 17, 2024. By comparison, the challenged NAR rules were in place for decades. The record in this case reflects that it can take "several years . . . to see significant market adjustment." *Burnett v. NAR*, No. 19-CV-00332-SRB, 2022 WL 1203100, at *13 (W.D. Mo. Apr. 22, 2022).

49.     In addition, despite the recency of the Settlement, there is at least some preliminary evidence reflecting that, in the short time since the NAR Settlement was announced and implemented, broker commissions have begun to fall. For instance, a Redfin study found that buyer's agent "[c]ommissions trended slightly lower following the National Association of Realtors (NAR) settlement, dropping from an average of 2.42% in March to 2.35% in August, when the new changes went into effect . . . before dropping by a single basis point to 2.34% in October."[3] A Redfin agent based in Chicago indicated that "[s]ellers are more and more wanting to pay 2% to a buyer's agent" and "[n]ow we're negotiating commissions more frequently."[4] Redfin also reported that transparency on commissions with home buyers and sellers was increasing as "[i]nstead of negotiating on the MLS, agents are engaging through phone calls and text messages[.]"[5]

---

[3] Mark Worley, *Real Estate Agent Commissions Hold Steady Since New Industry Rules Were Implemented*, Redfin (Oct. 31, 2024), https://www.redfin.com/news/buyers-agent-commission-october-2024/.
[4] *Id.*
[5] Jeff Andrews, *Agent commissions are being negotiated more often, but it's a 'tale of two markets'*, HousingWire (Sept. 9, 2024), https://www.housingwire.com/articles/buyer-agent-commission-negotiations-increase/.

50.     Another study, "Contract & Commission Study: The Initial Impact of the NAR Settlement," conducted by RISMedia, a real estate news publication, surveyed "more than 1,300 agents and brokers from every part of the country" and found "a drop of 68 basis points (0.68%) compared to the full year before" when "[a]sking agents and brokers to report the average commission rate for buyer and listing agents for transactions over the last month (timed to include only those that took place after the August 17 deadline for policy changes)[.]"[6] RISMedia reports this "is very significant, translating to a loss of $2,870 in commission on a median-priced home" and "appeared to be mostly taken from the buy-side, in line with what would be expected if the drop was catalyzed by policy changes (which were mostly projected to affect buyer agents)."[7] The study also found evidence of competition happening in the market for commissions, as "[w]hile inexperienced buyer agents brought in 2.58% on average leading up to the settlement, they only got paid 1.82% post-August 17—more than three quarters of a percentage point lower. [. . . ] By comparison, veteran buyer agents only saw a 10-basis point drop post-settlement, from 2.68% to 2.58%[.]"[8]

51.     The NAR Settlement's practice changes cannot be viewed in a vacuum. The NAR Settlement reflects a negotiated compromise of a case challenging a particular set of practices. There are also limits both to the scope of the federal antitrust laws and this Court's injunctive relief authority. As a result, the NAR Settlement cannot be expected to address every act of misconduct that may arise in the real estate industry. Moreover, crediting Professor Monestier's objection would risk reverting to rules that a jury determined violate federal antitrust law. Given these practical constraints, Professor Monestier does not offer a realistic alternative to the Settlement

---

[6] *RISMedia's 2024 Contract & Commission Study: The Impact of the NAR Settlement*, RISMedia (Oct. 28, 2024), https://www.rismedia.com/reports/settlement-shock-rismedias-2024-contract-commission-study/.
[7] *Id.*
[8] *Id.*

Agreement's practice changes that would create a better and more competitive marketplace than they do.

52.     Professor Monestier's various criticisms of Plaintiffs' fee request are likewise overruled. Although Professor Monestier cites the recent *T-Mobile* decision, that decision supports Plaintiffs' fee request. The Eighth Circuit in *T-Mobile* considered and rejected an objectors' argument that fee percentages should be automatically reduced in so-called "megafund" cases. The court "decline[d] to hold that a court must award a reduced percentage in megafund cases." *T-Mobile*, 111 F.4th at 860. The Eighth Circuit noted the reasoning of multiple courts that a "megafund approach could create perverse incentives" and "may encourage counsel to seek 'quick settlements at sub-optimal levels.'" *Id.* (collecting cases). It explained that "a per se rule requiring a percentage reduction in every megafund case would introduce arbitrary and formulaic rules into an inquiry that needs to be anything but." *Id*. Instead, "the determination of a reasonable fee is a wide-ranging inquiry that seeks to account for a variety of case-specific circumstances." *Id*. Professor Monestier's reliance on the megafund doctrine and percentages awarded in other megafund cases in courts that have adopted it is inconsistent the Eighth Circuit's instruction that attorneys' fees should be awarded based on the specific circumstances of each case, without applying a per se rule for so-called megafunds.

53.     Second, the objection repeatedly states that in *T-Mobile* the Eighth Circuit reversed a district court's award of a 22.5% fee request. (Doc. #1552, p. 107-08.) But Professor Monestier does not address the very different circumstances in *T-Mobile* and this litigation. As the Eighth Circuit explained, in *T-Mobile*, "Class counsel worked on the case for just a matter of months, conducted relatively little discovery, and engaged in no substantial motions practice, save for responding to a motion to remand." 111 F.4th at 861. In short, that case had "barely gotten off the ground." *Id.* By contrast, Plaintiffs here spent many thousands of hours litigating these cases over

a five-year period through class certification, summary judgment, trial, and several appeals—and then obtained a $1.8 billion jury verdict. To impose a reduced fee percentage on class counsel because of the extraordinary results they achieved, after many years of hard-fought litigation, would have the perverse result of encouraging counsel to seek "quick settlements at sub-optimal levels." *Id.*

54. Third, in *T-Mobile*, the Eighth Circuit cited approvingly to a decision in *Visa Check/Master Money Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D. N.Y. 2003). *Id.* In that case, the attorneys had litigated the case for nearly seven years until they settled on the eve of trial. There, the attorneys had initially submitted a fee request that represented a lodestar multiplier of 9.6. *Visa Check*, 297 F. Supp. 2d at 522. The district court reduced that fee request to a "multiplier of about 3.5, which it thought was reasonable given that counsel had risked several years on a case that would yield them nothing had they lost at trial." *T-Mobile.*, 111 F.4th at 862 (citing *Visa Check*, 297 F. Supp. 2d at 524-25). Here, Plaintiffs are requesting an almost identical lodestar multiplier of 3.63 (as of August 31, 2024, though that multiplier will continue to decline) as the one that the Eighth Circuit endorsed, despite the fact that, unlike in *Visa*, Plaintiffs' counsel here fully took the risk and litigated the case to a jury verdict.

55. Fourth, Professor Monestier cites to a statement in *T-Mobile* where the Eighth Circuit said that a lodestar multiplier request of 9.6 was too high and that such a multiplier would mean that counsel could make $7,000 to $9,500 an hour, "which we think no reasonable class member would willingly pay to an attorney to help resolve this claim, especially when, as here, dozens of other attorneys were offering their assistance." 111 F.4th at 861. The Eighth Circuit indicated that "[r]educing the fee award to, say, half of what was requested (resulting in fees of $3,500 to $4,750 per hour) could hardly be considered a penalty." *Id.* Here, Plaintiffs have asked for a lodestar multiplier of 3.63 and the average composite rate for all of Plaintiffs' timekeepers in

27

this matter is approximately $855.[9] Awarding a multiplier of 3.63 would lead to a rate of approximately $3,100 dollars per hour across Plaintiffs' timekeepers. This is significantly below the rate of $3,500 to $4,700 that the Eighth Circuit indicated would be appropriate in *T-Mobile*. Furthermore, unlike in *T-Mobile*, where a number of firms sought to be appointed lead counsel after a nationally publicized data breach incident, the counsel in these cases pioneered them—there were no other firms competing to be appointed as lead. This reflects the significant risk that Co-Lead Counsel took on by litigating these cases.

56.     Likewise, the Court rejects Professor Monestier's criticisms of Professor Klonoff, whose credentials are extensive. As set forth in Prof. Klonoff's declaration, Prof. Klonoff's testimony in support of fee requests is consistent with his academic research that fees must be sufficient to attract the best lawyers to take the risk of bringing difficult and cutting-edge cases. *See* Klonoff Fee Decl. (Doc. #1535-1) at ¶113. In contrast, Prof. Monestier provides no evidence of expertise on attorneys' fees and acknowledges her lack of experience or qualifications. (*See* Doc. #1552, p. 101 n. 213) ("I have not done as extensive research on the attorney fee issues as I would have liked").

57.     The Eighth Circuit has repeatedly recognized that a "[fee] award in the amount of one-third of the total settlement fund" is "in line with other awards in [this] Circuit." *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017); *see also Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 973 (8th Cir. 2016) (noting that, in the district court's "experience, 33% is in the middle of the range that attorneys performing contingency fee work" typically charge). Courts have also consistently awarded fees representing one third of the settlement fund in antitrust class

---

[9] As set forth in the Klonoff Fee Declaration, Doc. #1535-1 at 24, Plaintiffs expended approximately 107,500 hours to date in the litigation, and have a total lodestar of approximately $92 million.

actions.[10] Prof. Klonoff in his original declaration collected 51 separate examples where fees between 30 to 33 percent were awarded in so-called "mega-fund" cases, even though only 12 of those 51 cases involved a trial. Klonoff Fee Decl. at ¶¶ 90-91.

58.     In particular, Prof. Monestier attempts to explain away the fact that one-third fee requests were recently awarded by Judge Lungstrum in two comparable settlements, *In re Urethane* and *Syngenta*. But these cases are similar to this one and each involved a large settlement after trial – just like this case. Judge Lungstrum explained in detail the reasons for awarding 33% as fees:

> All cases present unique circumstances, but it is difficult to imagine a case in which an award at the highest percentage would be more appropriate than in this case. As already discussed, counsel achieved an incredible result for the class, in a case with an extreme amount of risk at all stages of the litigation, and they obtained that result because they won what is reported to be one of the largest verdicts of its kind in United States history. Counsel had to build this case on their own, without the help of a governmental investigation or prosecution, after other counsel had declined to pursue it, and they toiled for many years, at great expense to themselves, with a very real risk that they would not recover anything from this defendant.

*In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016). That logic applies with equal force here. Plaintiffs' Counsel developed this case without a government suit. Plaintiffs' Counsel then pursued this litigation on their own for more than five years, expending a tremendous amount of time and money in the process. Plaintiffs' Counsel took the risk of litigating the case through a jury verdict, and obtained one of the largest antitrust jury verdicts in United States history. As the court in *Urethane* found, this is exactly the kind of case where an award at the highest percentage is appropriate.

59.     Prof. Monestier's analysis also depends on her view that the injunctive relief

---

[10] *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (awarding class counsel 33% of $163.9 million common fund); *In re Potash Antitrust Litig.*, No. 1:08-CV-069102013, WL 12470850, at *1 (N.D. Ill. June 12, 2013) (awarding class counsel 33% of $90 million common fund).

reached in the NAR Settlement is meaningless. Prof. Monestier's opinions are inconsistent with analyses of the impact of the injunctive relief provisions of this Settlement, which suggest that consumers may save billions of dollars per year. The value of injunctive relief further supports Plaintiffs' requested fees.

60.    Prof. Monestier argues that Class Counsel's current hourly billing rates are too high. However, the Court finds that the rates of Class Counsel are both consistent with the market rates of other lawyers practicing complex litigation of this type, including the firms defending this case, and that any increases in those rates over time are consistent with the recent rise in rates across the profession. The Court further finds that the use of current billing rates is appropriate. Courts have repeatedly stated that "in an attorney's fee motion, counsel may use billing rates as of the date of the motion if needed to account for the delay of payment." *Health Republic Ins. Co. v. United States*, No. 16-259, 2024 WL 4471774, at *6 (Fed. Cl. Oct. 10, 2024) (collecting cases). Moreover, in conducting a lodestar crosscheck, the records and billing practices provided to the Court were helpful and the Court need not engage in green eyeshade accounting. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005), *as amended* (Feb. 25, 2005) ("At the same time, we reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records."). Prof. Monestier's objections are overruled.

61.    Black Tie Realty, Mark Dyer, objects that requiring buyers to sign a representation agreement before they have the opportunity to know the broker does not serve the best interest of the public. (*Gibson* Doc. #527.) As an initial matter, Mr. Dyer does not indicate whether he is a class member who sold an eligible home during the class period. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to

30

settlement proposals."); *Feder,* 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Mr. Dyer comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." As such, Mr. Dyer's objection is overruled.

62.     Vivienne Cunningham objects that requiring buyers to sign a representation agreement before they have the opportunity to know the broker does not serve the best interest of the public. (*Gibson* Doc. #528.) As an initial matter, Ms. Cunningham does not indicate whether she is a class member who sold an eligible home during the class period. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder,* 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Ms. Cunningham comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector,

to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." As such, Ms. Cunningham's objection is overruled.

63. Even considering the merits of Mr. Dyer and Ms. Cunningham's filings, they do not offer a reason for rejecting the NAR Settlement. Both criticize the NAR Settlement for purportedly "requiring buyers to sign a representation agreement before they have had the opportunity to get to know or trust the broker." (*Gibson* Doc. #527, p. 1) (*Gibson* Doc. #528, p. 1.) As Plaintiffs' counsel have stated, the purpose of this requirement is to give buyers transparency into what their broker is being paid and the authority and incentive to negotiate that amount.

64. Moreover, Mr. Dyer and Ms. Cunningham do not explain why requiring up-front pricing transparency would be harmful to buyers. They claim that imposing such a requirement before a buyer has "the opportunity to know or trust the broker" would be bad and "could result in strained relationships." (*Gibson* Doc. #527, p. 1.) But they do not explain how or why. It is common for businesses providing services to discuss their pricing with their customers before providing that service. That way, customers know ahead of time what they are paying and have the ability to negotiate with the business and "shop around." Mr. Dyer and Ms. Cunningham do not explain why real estate brokerages services are different.

65. The Court previously denied Arturo Gonzalez's "Motion for Class Members to have Certification Vacated and Class Members Settlement to be Vacated." (*See* Doc. #1565, #1577, #1601) (denying Doc. #1564, #1571, #1598). To the extent the submission by Mr. Gonzalez is treated as an objection, Mr. Gonzalez does not appear to be a class member, but rather a member of NAR who does not like the outcome of the case and that a class was certified. He has no standing to object, does not state he is objecting, and appears to be critical of the underlying litigation and the practice changes at issue in the NAR Settlement. Moreover, even if he had standing with respect to the present Settlement, his displeasure with the case outcome and the

32

Settlement is no basis for the Court to reject the Settlement. *See In re Tex. Prison Litig.*, 191 F.R.D. at 175 ("The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement." (citing *DeBoer*, 64 F.3d at 1178)). His objections are overruled.

66.     Similarly, Peter Gustis, who indicates he is a real estate agent, filed a document prior to class notice "to oppose summary judgment sought by plaintiffs." (Doc. #1510.) There is no summary judgment motion pending, nor was there on the date of his filing. To the extent the submission could be considered an objection, Mr. Gustis does not appear to be a class member, but rather a real estate agent who does not like the outcome of the case. He has no standing to object, does not state he is objecting, and appears to be critical of the underlying litigation. Moreover, even if he had standing with respect to the present Settlements, his displeasure with the case outcome and the Settlements is not a basis for the Court to reject the Settlements. His objections are overruled.

67.     Objectors Herbert and Chia Whitehouse filed their objection on November 25, 2024, the day prior to the Final Settlement hearing. Untimely objections are barred by the terms of the Court's orders granting preliminary approval. As such, Herbert and Chia Whitehouse's objection is struck.

68.     Further, the Whitehouses object based on an "anti-consumer and anti-competitive loophole in the Practice Changes required by the proposed NAR Settlement." (Doc. #1609, p. 1.) However, as discussed in Professor Monestier's objection review, the Whitehouses do not present evidence that the alleged "anti-consumer practice of double dipping" loophole is currently being used or that it is widespread. As such, the Whitehouse's objection is overruled.

69.     Jeffry Nordquist objects to "the inclusion criteria being different depending on the realtors involved" and requests that the inclusion criteria "be harmonized across all affected parties

33

to include closing dates ranging from October 31, 2019 through February 1, 2024." (Doc. #1404.) As an initial matter, Mr. Nordquist does not indicate whether he is a class member who sold an eligible home during the class period. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder*, 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Mr. Nordquist comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." As such, Mr. Nordquist's objection is overruled.

70. While Michael C. Mead provides the Court paperwork concerning the sale of property, his objection does not comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." Insofar as his filing is an objection, it is overruled.

71. Larry Giammo, who indicates he is a real estate agent, filed an objection claiming that the "Practice Changes stipulated in Paragraph 58(ii) and (iii) constitute an inappropriate and harmful restraint of trade on sellers." (Doc. #1405, p. 1.) Mr. Giammo does not appear to be a class member, but rather a real estate agent who does not like the outcome of the case and has provided no evidence of his class membership. He has no standing to object. *See Gould*, 883 F.2d at 284

34

("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder*, 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Mr. Giammo's objection is overruled.

72.     Diane Knizer objects "to the payment of attorneys fees out of the settlement amount." (Doc. #1439, p. 1.) She believes that "defendants should be required to pay the full settlement amount in addition to attorneys fees." (Doc. #1439, p. 1.) This objection is overruled. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (paying attorneys out of the fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170, 2021 WL 247958, at *1 (W.D. Mo. Jan. 25, 2021) ("When a class action creates a common fund for the benefit of the class members, the Court may award class counsel reasonable attorneys' fees 'equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.'") (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244-45 (8th Cir. 1996)).

73.     The Pulte Group objection is overruled. First, courts repeatedly hold that parties do not need to include a detailed allocation formula in class notice or formulate one before final settlement approval, which rejects Pulte's contention. See *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1135-36 (Del. 2008); *In re Johns-Manville Corp.*, 340 B.R. 49, 70 (S.D.N.Y. 2006); *In re Agent Orange Prod. Liab. Litig.* MDL No. 381, 818 F.2d 145, 170 (2d Cir. 1987); *In re*

35

*Polyurethane Foam Antitrust Litig.*, No. 1:10MD2196, 2015 WL 1639269, at *6 (N.D. Ohio Feb. 26, 2015); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, No. MDL 551, 1988 WL 158947, at *3 (W.D. Wash. July 28, 1988); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94C897, 1996 WL 167347, at *5 (N.D. Ill. Apr. 4, 1996). "[C]ourts frequently approve" class settlements and allocation plans "separately," 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update), because it "is appropriate, and often prudent, in massive class actions to follow a two-stage procedure" and defer consideration of the plan of distribution until after final settlement approval. *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 480 (S.D.N.Y. 1998)).

74. This is because "court approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update). "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement." *In re Agent Orange*, 818 F.2d at 170. Further, the formation of a plan of allocation "is a difficult, time-consuming process." *Id.* "To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished." *Id.* Relatedly, "if a hearing on a settlement must follow formulation of a distribution plan, then reversal of any significant aspect of the plan on appeal . . . would require a remand for reconsideration of the settlement, followed by yet another appeal." *Id.* As courts have held, "[t]here is no sound reason to impose such procedural straitjackets upon the settlements of class actions." *Id.*

36

75. Among the cases rejecting Pulte's contention is the primary authority Pulte relies on: *Petrovic*. The Eighth Circuit in *Petrovic* stated that it did "not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards" and dismissed the same objection Pulte raises because "[t]he notice described with sufficient particularity the stakes involved: the settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic*, 200 F.3d at 1152–53. The same is true here. The notice explains the claims being settled and released. (Doc. #1442-2, pp. 4, 6 (Anywhere & RE/MAX notice); Doc. #1442-3, pp. 4, 6 (Keller Williams notice).) It also states the total settlement amounts. (Doc. #1442-2, p. 5 (Anywhere & RE/MAX notice); Doc.#1442-3, p. 5 (Keller Williams notice).)

76. Further, just as in *Petrovic*, class members could obtain more information on the allocation process by contacting counsel or the settlement administrator. 200 F.3d at 1153. For those class members who did email and/or call and inquire about allocation, class counsel explained that class members are unlikely to receive the full value of their claims, but that settlement proceeds will be distributed equitably and reduced on a pro rata basis. Class counsel further explained that—subsequent to notice going out—there were additional settlements benefitting the class, and others expected, making it premature to set a detailed allocation formula or provide estimates of how much each class member would recover. Dirks Decl. ¶ 29.

77. *Second*, Pulte's objection that there is no mechanism for homebuilding companies to make bulk claim submissions is meritless. Pulte Objs. at 1–2, 4–6. Class Counsel have submitted evidence that, the claims administrator worked with bulk filers who wished to submit multiple claims—exactly what Pulte is requesting through its objections. Keough Decl. 54. The objection is overruled.

78.    *Third*, Pulte's objection to the notice campaign previously approved by the Court does not raise any due process concerns.  Pulte Objs. at 1–2, 6–7.  Pulte complains that it "did not receive notice," Pulte Objs. at 6, but obviously it did—otherwise it would not have been able to raise its objections before the deadline.  Thus, as Pulte itself acknowledges, the "notice issues" it raises are "moot."  Pulte Objs. at 7; *see also In re Pinterest Derivative Litig.*, No. C21-05385-WHA, 2022 WL 2079712, at *2 (N.D. Cal. June 9, 2022) ("[T]hough delayed, Mr. Sweeney received actual notice of the proposed settlement, voiced his objections, and has been heard. Having been heard, Mr. Sweeney's objections [to notice] are OVERRULED."). The Court has already found that the notice program constituted the best notice practicable.  Pulte's objection is overruled

79.    Anthony Phillips objects that the monetary recovery is inadequate because the Settlements will not fully compensate him for the entirety of any alleged overcharges he may have paid. It is true that Class members will likely only receive from these Settlements a portion of their best-day-in-court damages. But that fact is true for essentially any settlement and is not grounds for declining to approve the particular proposed Settlements here. *Keil*, 862 F.3d at 696. The record supports the finding that Plaintiffs sought to obtain the largest recovery they could in light of the risks of continued litigation, including each Settling Defendant's ability to pay limitations. Further, Mr. Phillips' objection does not comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." Nor does Mr. Phillips provide basic information about homes he may have sold, including whether he hired a listing broker, whether the homes were listed on an MLS, or how any broker fees he paid may have been allocated among those brokers. Thus, Mr. Phillips has not established he has standing. See *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates

38

allowing only class members to object to settlement proposals.") (citing *Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979)); *Feder*, 248 F. App'x at 580 ("O]nly class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Mr. Phillips' objection is overruled.

80.     Sharon Saunders objects to "the New Hampshire claim dates" because extending the dates would provide "us seniors in retirement condos, a fairer share." (Doc. 1454, p. 1.) Ms. Saunders provide basic information about homes she may have sold, including whether she hired a listing broker, whether the homes were listed on an MLS, or how any broker fees she paid may have been allocated among those brokers. Thus, Ms. Saunders has not established she has standing to object. See *Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.") (citing *Jenson*, 591 F.2d at 482 n.7); *Feder*, 248 F. App'x at 580 ("O]nly class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Ms. Saunder's objection is overruled.

81.     Cynthia Goralski objects to the amount of attorney's fees, costs and service awards. (Doc. 1453.) As an initial matter, Ms Goralski does not indicate whether she is a class member

who sold an eligible home during the class period. *See Gould,* 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder,* 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder,* 248 F. App'x at 581. Nor does Ms. Goralski comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." Additionally, as discussed elsewhere in this opinion, Plaintiffs' fee and cost request is reasonable. (Doc. #1535.) As such, Ms. Goralski's objection is overruled.

82.     Rosalie Doyle, Jessica Winters, and John Guerra objected and moved to intervene two business days before the Final Settlement hearing. (Doc. #1605.) As such, their intervention is untimely. Rule 24 expressly requires such a motion, whether as of right or permissive, to be timely. See Rule 24(a) and (b); *Osby v. Citigroup,* No. 5:07-CV-06085-NKL, 2012 WL 12906156, at *2 (W.D. Mo. May 29, 2012) (citing *United States v. Union Elec. Co.,* 64 F.3d 1152, 1158 (8th Cir.1995)). The Court denied their motion to intervene because the current Class Representatives are adequate representatives of the class and in consideration of how the extensive progression of the litigation prior to their motion being filed that the existing parties would be prejudiced by the delay in moving to intervene. *See Union Elec. Co.,* 64 F.3d at 1159. (Doc. #1617.) Concerning their objections, Doyle, Winters, and Guerra indicate they are NAR members or brokers. None appear to be or have provided evidence that they are class members. As such, Doyle, Winters, and

Guerra do not have standing to object. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder*, 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Ms. Doyle, Ms. Winters, and Mr. Guerra's objections are overruled.

**Objections from Follow-On Litigants**

83.     Six sets of objections were received from plaintiffs and their counsel who filed their own cases after *Moehrl* and *Burnett*. None of these cases have certified classes, and all appear to be in their infancy.

84.     Several of these objections make arguments of various kinds challenging the scope of the Settlements and their releases. In the settlement context, however, courts regularly certify classes that are broader in some respect than the classes that were originally litigated. *See, e.g.*, *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this."); *Smith v. Atkins*, 2:18- cv-04004-MDH, Order Approving Settlement, at ECF 53 (W.D. Mo. June 26, 2020) (approving settlement of nationwide class with 2-year practice change requirement); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 318 (C.D. Cal. 2016) (court can "expand the scope of a settlement class") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 325-26 (3d Cir. 1998)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-cv-1827, 2011 WL

13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("For the history of class certifications, courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated. Courts have noted that concerns about manageability and/or the class-wide applicability of proof (which can serve to limit or defeat class certification for trial) are in large part no longer relevant when establishment of a defendant's liability is replaced by a settlement."); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("[A] court may approve a settlement class broader than a litigation class that has already been certified."); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 661 (E.D. Va. 2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (same).

85.     Broader classes are often a practical prerequisite to reaching any settlement because a defendant will not agree to any meaningful settlement unless it can obtain global peace. *See, e.g.*, *Albin v. Resort Sales Missouri, Inc*., No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (reasoning that the absence of "a single nationwide class action" would "discourage class action defendants from settling") (quotation omitted); *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 103 n.5, 106 (2d Cir. 2005) ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country. Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability" (quotation omitted)); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247-48 (2d Cir. 2011) ("Parties often reach broad settlement agreements encompassing claims not presented in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle."); *Sullivan v. DB Invs., Inc*., 667 F.3d 273, 310-11 (3d Cir. 2011) (en banc) (affirming nationwide

42

settlement in an antitrust case and stating: "[Without] global peace . . . there would be no settlements."). Conversely, because global peace is most valuable to defendants, defendants will pay more to obtain it, thus benefitting class members. *See, e.g.*, *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 705 (E.D. Mo. 2002) ("[Defendants] paid both classes of plaintiffs more in the instant global settlement out of a desire to obtain 'total peace' than they would have paid either group of plaintiffs individually.").

86. Moreover, some of the objections challenge the nationwide geographic scope of the Settlements. But the Settlements' nationwide scope does not expand the geographic scope of the class pleaded in the settled "actions." Among the actions settled and released is *Gibson*. *See* NAR Agreement p. 1 (defining the "Actions" to include *Gibson* and *Umpa*); HomeServices Agreement (Doc. #1518-1) ¶ 1 (defining the "Actions" to include *Gibson*). The *Gibson* complaint reflects nationwide claims and alleges that the conspiracy's scope impacted transactions nationwide, including in non-Realtor MLSs such as RLS/REBNY. *See Gibson* Amended Complaint (Doc. #232) at ¶¶ 182, 225, 227.

**The Court Overrules the South Carolina Objections by Benny D. Cheatham, Robert Douglass, Douglas W. Fender II, and Dena Marie Fender (Doc. #1555, #1558, #1559, and #1606.)**

87. The South Carolina objection to the NAR Settlement is overruled.

88. The South Carolina objectors raise various complaints about the opt-in process, each of which this Court rejects. The South Carolina objectors note that the NAR Settlement Agreement contained "certain deadlines" that could apply to two types of parties—"opt-in brokerages" and "opt-in Non-REALTOR MLSs." These provisions of the NAR Settlement Agreement created a mechanism for certain brokerages and MLSs to "opt in" to the Settlement, including by making additional settlement payments beyond the $418 million to be paid by NAR and by agreeing to adopt certain practice changes, as detailed in the Appendices to the NAR

Settlement Agreement. *See* NAR Agreement at 42–48, 58–67 (Appendix B), 68–91 (Appendix C), and 92–116 (Appendix D).

89.     The South Carolina objectors complain that they do not believe some opt-in parties "met" certain deadlines reflected in the NAR Settlement for opting in. But even to the extent that is true, for any of the opting-in entities, each relevant opt-in agreement—NAR Agreement at 68–91 (Appendix C), and at 92–116 (Appendix D)—states that the agreements "may be modified or amended" by Plaintiffs and the Stipulating Party. The record reflects that Plaintiffs and the Stipulating Parties entered into written supplemental opt-in agreements, and so any alleged "non-compliance" with deadlines reflected in the NAR Settlement Agreement would have been cured by the Parties' subsequent written agreements.

90.     The South Carolina objectors also complain that certain opt-in settlement agreements posted to the case website did not initially contain dates or signatures. Class Counsel has attested that: (i) each opt-in agreement was executed (even if an unexecuted version of some agreements was initially posted); (ii) the complete terms of each such agreement were provided to class members through the settlement website; and (iii) the name of each opting in MLS and brokerage was identified on the settlement website. *See* Dirks. Decl. at ¶¶ 27-30. Nothing more is required. *Cf. Whitlock v. FSL Mgmt., LLC,* No. 3:10CV-00562-JHM, 2015 WL 13322438, at *3 (W.D. Ky. July 13, 2015) ("Contrary to Defendants' argument, failure of the parties to sign the settlement agreement prior to notifying the Court of their settlement of the case does not render the settlement agreement non-binding"); *Abramson v. Agentra, LLC,* No. CV 18-615, 2020 WL 13469584, at *3 (W.D. Pa. Aug. 20, 2020) ("In the absence of any evidence that suggests, let alone establishes, that there was any remaining dispute over a material term, Agentra's refusal to sign the agreement to which it agreed does not make the settlement unenforceable").

91.     Next, the South Carolina objectors take issue with the release of certain NAR

44

member brokerages with under $2 billion in 2022 total transaction volume. That objection is overruled. NAR is a membership organization whose membership dues are paying for the Settlement, at least in part. The record supports that NAR would not have settled if the release did not include, at a minimum, its small agent and broker members—and certainly would not have settled for the amount it did (i.e., at least $418 million). Dirks Decl. at ¶ 25. Moreover, this Court doubts whether it would be feasible or cost effective for the Class to bring expensive antitrust litigation to recover funds from thousands of small brokerages that could not afford to pay significant amounts. And Class Counsel negotiated to carve out from the release dozens of larger brokerages and have pursued settlements and/or litigation with many of them in order to recover additional funds for the Class. Dirks Decl. at ¶ 25.

92.     Importantly, even for smaller brokerages, they are released "only if that brokerage . . . (iii) complies with the practice changes reflected in Paragraphs 58(vi)-(x) of this Settlement Agreement and agrees to provide proof of such compliance if requested by Co-Lead Counsel[.]" NAR Agreement at 16–17 (¶ 18.e). The objectors dismiss this benefit to the Class by claiming it means nothing without requiring the brokerages to "agree in writing." Objectors cite no authority to support the notion that a settlement must include such a requirement as a condition for obtaining a release. Even so, the Settlement Agreement is clear: those who do not comply are not released.

93.     The South Carolina objectors assert that the $2 billion cutoff for non-opt-in brokerages is "arbitrary." The record reflects that this cutoff was the subject of negotiations between NAR and Class Counsel, which Plaintiffs showed took into account the size a brokerage would likely need to be in order to pay sufficient amounts toward a settlement or litigated judgment in order to make litigation a realistic or cost-effective option for the Class.

94.     The Court also overrules the objection that franchisees or affiliates of other Settling Parties obtained releases "without being forced to agree to comply with practice changes[.]" The

45

objectors' belief that Keller Williams, Anywhere Real Estate, RE/MAX, and "Berkshire Hathaway"—an entity which is not and has never been a party to any of these related actions—are not subject to practice changes is flatly wrong. Anywhere, RE/MAX, and Keller Williams agreed to substantial practice changes. And the HomeServices Defendants agreed to similar practice changes. HomeServices Agreement at 32–34 (¶ 51). Put simply, no brokerage is released without practice changes.

95.     The objection that the notice "does not list the size of the verdict or the much smaller class certified for trial in *Burnett*" is also overruled. Objectors cite no authority reflecting that this information is required. Even so, Class members were provided with the information the South Carolina objectors advocate for. First, the long form notices indicated that "[o]n October 31, 2023, a jury found in favor of Plaintiffs in the *Burnett* action." The amount of the verdict was also reflected in Plaintiffs' Motion for Attorneys' Fees, which was posted on the settlement website. *See, e.g*., Doc. #1535 at 7, 12. Second, the notices reflect that the Settlement Class includes homes listed on MLSs throughout the country over a multi-year period. Any reasonable person would have understood such a class to encompass millions of home sellers. Even so, Plaintiffs' preliminary approval briefing, which was posted on the settlement website, made this point explicitly, advising that "Plaintiffs estimate that Settlement Class Members number in the millions, dispersed across the United States." *See, e.g*., Doc. #1458 at 16. Information regarding the *Burnett* litigation class was provided to Class members as well, including through the most recent complaint, which was posted to the settlement website.

96.     In addition, "the mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process." *Grunin*, 513 F.2d at 120. "As a general rule, the contents of a settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that

46

are open to them in connection with (the) proceedings." *Id.* at 122 (quotation omitted). "Valid notice of a settlement agreement 'may consist of a very general description' of settlement terms." *Uponor, Inc.*, 716 F.3d at 1065 (quoting *Grunin*, 513 F.2d at 122). The notice here easily satisfied this standard.

97.     Nor do the South Carolina objectors cite any authority that would have required Plaintiffs to provide information beyond what was reflected in the class notice. With good reason. Courts are unanimous that not every detail of the litigation need be included in settlement notices and have rejected objections seeking the inclusion of every conceivable detail. *See, e.g.*, *Vargas v. Cap. One Fin. Advisors*, 559 F. App'x. 22, 27 (2d Cir. 2014) (a settlement notice need only apprise class members of the settlement terms and "of the options that are open to them in connection with the proceedings," and, consequently, rejecting objector's arguments that notice was inadequate because it failed affirmatively to advise unsatisfied class members to opt out and failed to calculate the damages sustained by each individual class member); *In re TikTok, Inc., Consumer Priv. Litig.*, No. 20 C 4699, 2022 WL 2982782, at *18 n.20 (N.D. Ill. July 28, 2022) ("Rule 23 does not require the settlement notice to contain every last bit of information necessary to file an objection."); *Good v. Am. Water Works Co.*, No. CV 2:14-01374, 2016 WL 5746347, *9 (S.D. W. Va. Sept. 30, 2016) ("The basic requirements of Rule 23 and due process are intended to ensure that notices fairly and reasonably apprise class members of a pending action affecting their rights and their options with respect to that action, but those requirements should not transform the notice into a long brief of the parties' positions, precise in every detail and slated in such fashion as to please every litigant." (quotation omitted)).

98.     Notices do not need to include every detail because "[c]lass members are not expected to rely upon the notices as a complete source of settlement information." *Grunin*, 513 F.2d at 122; *see also UAW v. Gen. Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151, *33

47

(E.D. Mich. Mar. 31, 2006) ("It is inevitable that some details will be omitted from a notice, but the fact that the notices do not fully explore certain issues is immaterial. Class members are not expected to rely upon the notices as a complete source of settlement information." (cleaned up)). For instance, in *Petrovic*, the Eighth Circuit rejected the "contention that a mailed notice of settlement must contain a formula for calculating individual awards" because "[t]he notice described with sufficient particularity the stakes involved: the settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic*, 200 F.3d at 1152–53.

99.    The South Carolina objectors vaguely suggest in several places that the Settlements should be rejected due to differences in local markets. But the objectors fail to state what these differences are or why they matter. Discovery addressed the corporate policies that applied to franchisees and affiliates in South Carolina (as well as New York and Pennsylvania). Indeed, Canopy MLS, which includes part of South Carolina, is one of the "Covered MLSs" in the *Moehrl* litigation. And Plaintiffs received and their experts analyzed data for transactions in South Carolina (and New York and Pennsylvania), as well as nationwide. Dirks Decl. at ¶ 14.

100.    For the reasons stated above, the objection that the Settlement class was "impermissibly expanded" (Doc. #1558-1, p. 24) is also overruled, as is the objection that the NAR Settlement is too small.

101.    The South Carolina objections to the HomeServices Settlement are likewise overruled.

102.    The South Carolina objectors object to the release of HomeServices' franchisees but the record reflects that this was bargained for as part of the HomeServices Settlement Agreement. Moreover, such releases are common and appropriate. *See Flaum v. Dr.'s Assocs., Inc.*, No. 16-CV-61198, 2019 WL 2576361, at *3 (S.D. Fla. Mar. 11, 2019) (final approval of

48

settlement releasing all Subway franchisees in suit against Subway franchisor); *Adkins v. Nestle Purina PetCare Co.*, No. 12-CV-2871, 2015 WL 10892070, at \*4 (N.D. Ill. June 23, 2015) (final approval of settlement releasing variety of non-parties, including suppliers, manufacturers, retailers, and franchisees); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-4818, 2015 WL 3990915, at \*3 (N.D. Cal. June 30, 2015) (preliminary approval of settlement releasing franchisees) & ECF No. 167 (Feb. 8, 2016) (ordering final approval of settlement); *see also Shay v. Apple Inc.*, No. 3:20-cv-1629, 2024 WL 1184693, at \*8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.") (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010)); *Maine State Ret. System v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2013 WL 6577020, at \*7, \*17 (C.D. Cal. Dec. 5, 2013) (overruling objection that argued "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Prods., Inc.*, No. 15-CV-1801, 2017 WL 5479637, at \*8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third party retailers was inappropriate: "this argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims . . . . Millennium is a manufacturer that sells its products through various retailers, so any claims Ference purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling allegations asserted here. This objection is overruled."); *Wal-Mart Stores*, 396 F.3d at 108–09 (approving class settlement with broad releases including non-parties, such as member banks, insurance companies, and Swiss governmental entities).

103. The South Carolina objectors also object to the adequacy of the class notices. In doing so, they do not argue that the method for distributing class notice was ineffective. Instead, they assert that the notices lacked certain information. For the reasons noted elsewhere, the Court

49

finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law.

**The Court Overrules the Spring Way Objection (Doc. #1563.)**

104.     The Pennsylvania objection to the Settlements is overruled. The Pennsylvania objectors' claim that the Pennsylvania real estate industry is unique is contradicted by their own Amended Complaint, which says the opposite: "Defendants' anticompetitive practices are not unique--as they represent western Pennsylvania's local version of collusive practices that are widespread within the residential real estate industry." Amended Complaint (Doc. #30) at ¶ 11, *Moratis v. West Penn Multi-List, Inc.*, et al, No. 23-cv-2061 (W.D. Pa.). The Amended Complaint further stated: "Recently, a federal jury in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-00332-SRB (Western District of Missouri), found that rules, policies, and practices similar in both design and effect to those at issue here violated federal antitrust law. The jury in *Burnett* imposed a historic ten-figure judgment on the defendants." *Id*. Even in their objection, the Pennsylvania objectors admit that Pennsylvania MLSs "used similar mechanisms" to accomplish the conspiracy (Doc. #1563, p. 3), and that "the framework and incentive for this iteration of the conspiracy was made by NAR and the franchisors" *Id.* at 6.

105.     Moreover, the Pennsylvania objection that the plaintiffs in this case "did not conduct any discovery regarding the operation of related conspiracies in other states and regions, including Western Pennsylvania" is wrong. Plaintiffs' discovery addressed real estate industry practices in Pennsylvania, and Dr. Schulman observed that there are 6,355 NAR members operating in West Penn Multi-List ("WPML"). *See* August 10, 2022 Schulman Merits Reply Report, Doc. #922-3 at ¶ 80. Moreover, objectors' own brief demonstrates that franchisees of the

50

HomeServices Defendants, one of the settling defendants here, were operating in the West Penn Multi-List. (Doc. #1563, p. 2) (noting objectors sold through a HomeServices agent).

106.    In addition, the court in *Moratis* dismissed the objectors' claims against West Penn Multi-List. *Moratis v. W. Penn Multi-List, Inc.*, No. 2:23-CV-2061, 2024 WL 4436425, at *1 (W.D. Pa. Oct. 7, 2024). This undermines the Pennsylvania objectors' assertions that they would do better in their own regional cases. Thus, the Pennsylvania objectors' argument that the recovery under the Settlements is insufficient is overruled.

107.    Similarly, the Pennsylvania objectors' argument that the HomeServices Defendants could have paid more lacks support. It supposes, without any evidence, that HomeServices' parent company would step in and pay into the Settlement. And the objection ignores that the HomeServices Settlement expressly excludes HomeServices' parent company from the release. *See* HomeServices Agreement ¶ 14.

108.    Next, the court rejects the Pennsylvania objectors' argument that the Settlement could or should not release HomeServices' franchisees. As discussed above, this argument is contrary to the law and contrary to the realities of the litigation.

109.    The Pennsylvania objectors' argument that the practice change relief should not contain a sunset provision is also overruled. A time limitation on practice changes is both common and reasonable. No company wishes to stay under the enforcement power of a court indefinitely, nor does a court wish to retain indefinite jurisdiction. For these reasons, injunctive relief settlements with sunset provisions are routinely approved, often for shorter periods than the five-year period at issue here. *See, e.g.*, *Smith v. Atkins*, 2:18- cv-04004-MDH, Order Approving Settlement, at ECF 53 (W.D. Mo. June 26, 2020) (approving settlement of nationwide class with two year practice change requirement); *Zepeda v. PayPal, Inc.*, No. 10-CV-1668, 2017 WL 1113293, at *13 (N.D. Cal. Mar. 24, 2017) (approving final settlement with expiration of

51

injunctive relief after two years: "ensuring that Defendants maintain such practices until two years following the date of the Preliminary Approval Order"); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Pracs. Litig.*, No. 12-MD-2320, 2015 WL 7282543, at *10 (D.N.H. Nov. 16, 2015) (approving final settlement and overruling objections that "the injunctive remedies go away in five years" and observing the injunctive relief "provides a valuable benefit to class members" and just because the injunction is not as broad as some class members wanted "does not make this settlement inadequate"); *Fla. ex rel. Crist v. HCA, Inc.*, No. 03-CV-177, 2002 WL 32116840, at *4 (M.D. Fla. Apr. 23, 2002) (entering a final consent judgment in a Sherman Act case, in which monetary payments and injunctive relief were provided and the judgment was set to expire in five years); *In re HP Inkjet Printer Litig.*, No. 05-CV-3580, 2011 WL 13156938, at *5 (N.D. Cal. Mar. 29, 2011) (order approving settlement with injunctive relief expiring within at least three years). Indeed, the Settlements provide for a longer period of injunctive relief than settlements that have been reached in other real estate commission antitrust suits. *See Nosalek v. MLS Property Information Network, Inc.*, No. 20-cv-12244 (D. Mass.) (Doc 268-1) ¶ 9(a) (MLS PIN injunction of three years).

110.    Finally, the Pennsylvania objectors' argument that the long form notice is inadequate fails for the same reasons discussed above.

**The Court Overrules the New York Objections (Docs. #1560 (Friedman), #1562 (March))**

111.    The Friedman and March objections to the NAR Settlement, both submitted on behalf of plaintiffs who brought class action antitrust suits on behalf of home sellers who listed properties on a listing service called REBNY RLS, are also overruled. The New York objectors claim their cases are distinct from the conspiracy alleged here and that the brokerage defendants "have no connection to NAR." Doc. #1560 at 3. They further assert that their claims do not share the same "factual predicate" as in this or the *Gibson* case. The Court has already rejected these

52

arguments. *See Gibson* Doc. #530 at ¶¶ 55-67.

112. *First*, each person and entity being released under the NAR Settlement, by definition, has a NAR affiliation. *See* NAR Agreement ¶ 18.b, e-f (requiring released brokerages to have a "REALTOR® as a Principal with membership in the National Association of Realtors®"). NAR would not have settled without protecting its affiliates.

113. *Second*, the Settlements specifically settle and release claims made in *Gibson*. *See* NAR Agreement p. 1 (defining the "Actions" to include *Gibson* and *Umpa*); HomeServices Agreement ¶ 1 (defining the "Actions" to include *Gibson*). The *Gibson* Complaint specifically alleges that the conspiracy extended to non-NAR MLSs such as RLS/REBNY. (*See* Doc. #232), Consolidated Am. Compl., ¶ 182. There is no basis to claim that the *Gibson* case does not share a "factual predicate" with claims challenging the same RLS rules that are challenged in the *Gibson* complaint. Even so, the Complaint further alleges that anticompetitive restraints, including those promulgated by NAR, apply to brokers nationwide, including to non-NAR MLSs like NWMLS, WPML, and REBNY RLS because:

> these MLSs and their participating brokerages are generally subject to the same or similar anticompetitive restraints that apply in MLSs that are under NAR's formal control, including because: (i) all realtor members of non-NAR MLSs are subject to NAR's Code of Ethics; and (ii) each non-NAR MLS has adopted the same or similar anticompetitive restraints as those imposed by NAR on its affiliated MLSs.

*Id*.

114. The Complaint alleges that, as a result, "Defendants' conspiracy has had the following anticompetitive effects *nationwide*," including in REBNY RLS: (a) "Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes"; (b) "Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers"; (c) "Home sellers have paid inflated buyer-broker commissions and

53

inflated total commissions"; (d) "The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation"; and (e) "Price competition among brokers to be retained by home buyers has been restrained." *Id*. ¶ 225 (emphasis added); *see also id*. ¶¶ 28, 227 (describing "nationwide" impact).

115.     Plaintiffs also allege that any non-NAR MLSs are controlled by "NAR-aligned brokerages and are not fully independent from NAR." *See id*. ¶ 182 (describing in detail NAR's and its members' control over and influence of MLSs not exclusively owned or operated by NAR associations). Plaintiffs also point out that there are more than 17,000 NAR members in the New York City area alone. *See* https://www.realtor.com/realestateagents/new-york_ny. Thus, the Court rejects the New York objectors' claim that the Settlement is limited only to NAR MLSs.

116.     *Third*, the New York objectors' argument that their claims do not share the same "factual predicate" is also contradicted by their own prior judicial admissions. Although the New York objectors now argue that their cases are "wholly distinct and unrelated" to this one, they and their counsel filed complaints expressly linking their claims to the rules challenged in *Burnett*, including those adopted by NAR. *See* Class Action Compl. ¶ 73, *March v. REBNY*, 1:23-cv-09995 (S.D.N.Y. Nov. 13, 2023); *Friedman v. REBNY*, 1:24-cv-0405 (S.D.N.Y. Jan. 18, 2024). As the New York objectors' own complaints reflect, the challenged NAR and REBNY rules are functionally identical.[11]

117.     *Fourth*, consistent with the *Gibson* Plaintiffs' allegations, the evidentiary records

---

[11] The New York objectors also assert that some of the Settling Defendants took positions before the Judicial Panel on Multidistrict Litigation ("JPML") that are inconsistent with the position that the claims in *Gibson*, *March*, and *Friedman* all share the same factual predicate. To the contrary, the JPML proceedings, on balance, support finding that these cases all have the same factual predicate. Moreover, as Settling Defendant NAR explained, its position before the JPML does not support the New York objectors' arguments here. NAR supported consolidation of these exact cases. *See* Doc. #1597 at 13-14.

in *Burnett* and *Moehrl* reflect that: (i) the REBNY RLS rules challenged here were anticompetitive in similar ways to the challenged NAR rules; and (ii) the challenged NAR rules applied nationwide, including to transactions in REBNY RLS. Plaintiffs' experts analyzed non-NAR MLSs, including REBNY/RLS, and concluded that Realtors operating in those jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of Ethics and are thereby incentivized to require sellers to make unilateral offers of compensation to buy-side brokers/agents." August 10, 2022 Schulman Merits Reply Report, Doc. #922-3 at ¶ 75. Prof. Einer Elhauge further opined as part of a detailed, multi-page analysis of REBNY's rules that "the RLS rules, like the NAR [Buyer Broker Commission Rule (BBCR)], required listings to include an offer of buyer-broker compensation whenever sellers wanted to sell to buyers who were represented by buyer-brokers" and "had several other restraints similar to the NAR version of the BBCR." Elhauge Class Cert. Rebuttal Report, at ¶ 67, *Moehrl v. Nat'l Assn. of Realtors* (N.D. Ill. Oct. 18, 2022) (Doc. #372).[12] The New

---

[12] *See also* Elhauge Class Cert. Report, Appendix C at ¶ 398, *Moehrl v. Nat'l Assn. of Realtors* (N.D. Ill. June 7, 2022) (Doc. #324-6) (addressing Non-NAR MLSs and concluding "it was common among these MLSs to adopt restrains that were identical or similar to those imposed by NAR"); *See* August 10, 2022 Schulman Merits Reply Report, Doc. #922-3 at ¶ 12, ("Dr. Wu's reference to certain individual U.S. markets that have some type of modified Adversary Commission Rule [including West Penn and REBNY] is not appropriate given the ongoing nationwide influence of anticompetitive NAR policies and practices and the nationwide presence and impact of the Corporate Defendants and their requirements that brokers and agents affiliated with them comply with anticompetitive NAR policies and practices."); *id.* at ¶ 67 (discussing REBNY/RLS Rules and stating: "These rules, which are mandatory for all participants in the RLS, effectively serve the same purpose as the Adversary Commission Rule."); *id.* at ¶ 74 ("any agents who are REALTORS® and/or belong to an office affiliated with the Corporate Defendants are still bound by the Adversary Commission Rule via the NAR Code of Ethics, which states '[i]n cooperative transactions REALTORS® shall compensate cooperating REALTORS®.'"); *id.* at ¶ 95 ("As described above, the Corporate Defendants adhere to and require compliance with the NAR Code of Ethics. Therefore, in all transactions with a Corporate Defendant agent acting as a listing agent, those agents were barred from allowing a seller to offer a zero percent buyer agent commission by the NAR Code of Ethics."); *id.* at ¶ 97 ("In addition, Corporate Defendants' presence in NAR, as well as their national presence, uniform agreements, policies, and guidelines for their subsidiaries and franchisees make it highly unlikely that they would deviate from their established nationwide practices in the United States."); January 28, 2022 Schulman Class Certification Reply Report, Doc. #637-4 at ¶ 58 ("[I]t is not surprising agents and brokers affiliated with the Corporate Defendants would continue the practice of having sellers make unilateral compensation offers to buyer brokers for properties" on non-Realtor MLSs); *id.* at ¶ 61 (noting that because the corporate culture transcends individual MLSs, it would not be expected for their behavior to differ in a

York objectors ignore or misrepresent these analyses.[13] *See also Burnett* Doc. #1330, Trial Tr. at 1908:6-7 (noting that in REBNY "[t]his is one version of the practice of cooperative compensation"); Ex. 4613A (Doc. #1398-52) (REBNY rules discussed at *Burnett* trial).

118. The Court is familiar with the REBNY and other non-NAR MLS policies and practices because they were discussed at length in *Burnett*. The Court finds that the challenged REBNY rules share a common nucleus of operative fact, and thus the same factual predicate, as *Burnett* and *Gibson*, and therefore were not "wholly distinct" from *Burnett* or *Gibson*, as the New York objectors contend.

119. The slight differences that the New York objectors contend exist between the relevant NAR and REBNY rules do not a create a distinct factual predicate. Objectors ask the Court to define factual predicate too narrowly, thereby needlessly creating piecemeal litigation arising from the same conduct – a practice courts routinely reject. *See, e.g.*, *Uponor, Inc.*, 716 F.3d at 1065 (overruling objection that "settlement contained an overbroad release" since it permissibly released only claims related to the factual subject of the litigation); *Literary Works,* 654 F.3d at 248 (finding that objectors took an "overly narrow view" of factual predicate where claims arose from same underlying facts); *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 765-66 (10th Cir. 2020) (same); *see also In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 272 F. App'x 9, 13 (2d Cir. 2008) (finding reliance on different documents for misrepresentation claims based on investment losses did not create separate factual predicate where claims were each based on reliance on misleading opinions by defendants). Accordingly,

---

non-NAR MLS); Doc. #1325, Trial Transcript 237:19-238:8 (conspiracy operates the same in South Carolina and Missouri).

[13] The New York objectors also incorrectly assert that NAR's Mandatory Offer of Compensation Rule was adopted in 1996—after REBNY left NAR. Doc. #1562 at 3. In fact, the *Gibson* Complaint makes clear the rule was originally adopted in 1992 and then amended in 1996. *Gibson* Amended Complaint (Doc. #232) at ¶¶ 133, 136.

claims involving properties listed on non-NAR MLSs like NWMLS, WPML, and REBNY RLS all share the same factual predicate as those involving properties listed on NAR-affiliated MLSs.[14]

120.    Friedman's objection that the NAR Settlement's release provisions release certain small NAR-affiliated brokerages is without merit. The record reflects that NAR likely would not have settled if the release did not include, at a very minimum small member agents and brokers. Dirks Decl. at ¶ 25. And Friedman ignores the fact that each brokerage only receives a release if it complies with the NAR practice changes—which is a significant benefit to the Class. *See* NAR Agreement ¶ 18.e. NAR would not have settled without a nationwide release.

121.    The New York objectors also assert that the Class Representative "do not have standing" to settle their claims. (Doc. #1560, p. 13.) The New York objectors do not provide any explanation for or cite any authority pertaining to the concept of "settlement standing." Regardless, the *Gibson* complaint alleges that class members were injured as part of the same alleged anticompetitive conspiracy that impacts sellers of homes on REBNY RLS. That is sufficient.

122.    The New York objectors argue that the total settlement amount is inadequate to fully compensate them for their injuries. But as described above, that is not the proper legal standard for assessing adequacy. The New York objectors further claim that Plaintiffs have not provided evidence of the Settling Defendants' ability to pay limitations. That is incorrect. *See* Berman Decl. at ¶¶ 19-27. In addition, as a non-profit, certain of NAR's financial records are publicly accessible. Despite that fact, the New York objectors make no effort to analyze those public records or explain how they show that the Settlements are inadequate.

123.    The New York objectors complain that the practice changes could have been

---

[14] To the extent that the New York objectors rely on Second Circuit case law applying an "identical factual predicate" test, the Court finds that it does not support a different conclusion than Eighth Circuit precedent on the facts presented here. *See Wal-Mart Stores.* 396 F.3d 96.

stronger and lasted longer. (Doc. #1562, p. 18.) But that is true in essentially any settlement that is the product of compromise and is not a basis for rejecting the Settlements here. *See, e.g.*, *Colgate-Palmolive*, 2015 WL 7282543, at *10 (approving final settlement and overruling objections "that the injunctive remedies go away in five years" and observing the injunctive relief "provides a valuable benefit to class members" and just because the injunction is not as broad as some class members wanted "does not make this settlement inadequate"). Even so, the New York objectors say nothing about what other practice changes should have been included or how it would have been practical to obtain such practice changes from the Settling Defendants, rather than from REBNY—which is not released by the Settlements.

124. The New York objectors also argue that Class members who sold homes on REBNY have not been given guidance on whether they "will be provided a *pro rata* distribution" or if the higher commissions that some of those Class members paid will be reflected in claim payments. Doc. #1562 at 17. The Court disagrees. The settlement website advises both that: (i) settlements payment "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 12.

125. Objector Friedman asserts, without stating any basis for the claim, that the Settlements' inclusion of sellers who listed homes on REBNY "appears to be the product of a so-called 'collusive settlement.'" Doc. #1560 at 15. As discussed above at length, the record supports that Class Counsel diligently sought to obtain the largest possible recovery on behalf of the nationwide class they were appointed to represent, given the strength and risks of the litigation, including the Settling Defendants' financial limitations. The New York objectors fail to point to any evidence suggesting otherwise, beyond the mere fact that overlapping claims in a different

58

lawsuit are within the scope of the release. That is not a basis for rejecting the Settlements.

126.     The Court observes that the vast majority of Class members from New York favor approval of the Settlements. Although the claims deadline is still months away, 14,890 New York residents have already submitted claims; and none have objected (aside from those litigating follow-on cases). Keough Decl. at ¶ 53. If the Settlements are not approved, many of these Class members risk receiving no compensation for their injuries.

**The Court Overrules the *Batton* Objection (Doc. #1561 (Mullis))**

127.     The *Batton* objectors seek to carve out indirect purchaser buyer claims from the releases. But every Class member sold a home during the class period, and most also bought homes. After all, few people sell a home without first buying it. And most home sellers then buy a different home with the proceeds because they need somewhere to live. Thus, most Class members had possible claims both as home sellers and home buyers. Yet NAR and HomeServices would not have paid the large amounts in settlement only to have many of the same people they just paid sue them again for the same alleged antitrust conspiracy.

128.     The parties addressed this by crafting releases that incorporate the Eighth Circuit's "same factual predicate" standard and limiting their scope to the extent permitted by federal law. The same factual predicate standard recognizes that a party may be precluded from suing twice for the same wrong. When cases go to final judgment, res judicata, for instance, bars relitigating not only the claims tried, but also other claims that "could have been raised" in that action. *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 714 (8th Cir. 2019). The same holds true in class actions litigated to conclusion. *In re Gen. Am.*, 357 F.3d at 803. And for class judgments that arise from settlement, courts have developed a parallel test that gives preclusive effect to all claims – even those not pleaded – that "arise out of the same factual predicate as the pleaded claims." *Uponor, Inc.*, 716 F.3d at 1065. Similar rules apply because "'the situation is analogous to the barring of

59

claims [under res judicata] that could have been asserted in the class action.'" *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982)).

129.    Each Settlement incorporates the *Uponor* standard by limiting the term "Released Claims" to include only causes of action "arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions . . . ." NAR Agreement ¶ 17; HomeServices Agreement ¶ 13. In addition, "[f]or avoidance of doubt" as to enforceability, the releases "extend[] to, but only to, the fullest extent permitted by law." NAR Agreement ¶ 34; HomeServices Agreement ¶ 29. By using these legal terms of art, the parties permissibly restricted the releases' scope. Every Class member was free to weigh potential competing claims and make a choice. They could have opted out and maintained the freedom to pursue buyer claims either individually or in the *Batton* cases[15] (should a court ever certify those classes). And people who did not sell during the relevant time, and may have buyer-only claims, are completely unaffected because they are not part of the Settlement Class.

130.    The *Batton* objectors argue that the Settlements release indirect purchaser buyer claims "for no additional consideration." (Doc. #1561, p. 8.) Having properly limited the scope of the releases based on the "same factual predicate" standard, however, the Court finds the parties were under no further obligation to assign separate settlement values to every distinct claim that Class members might have asserted. As the Eighth Circuit recognized in *In re General American*

---

[15] References to the *Batton* cases include each of the following actions: (1) *Batton et al. v. The National Association of Realtors, et al.*, No. 21-cv-00430 (N.D. Ill), (2) *Batton et al. v. Compass, Inc. et al.*, No. 23-cv-15618 (N.D. Ill.), and (3) *Lutz et al. v. Homeservices of America, Inc. et al.*, No. 24-cv-10040 (S.D. Fl.).

*Life Insurance Co. Sales Practices Litigation*, 357 F.3d 800, 805 (8th Cir. 2004), that argument ignores "the way settlements usually work."

131.    Like the objectors here, the *General American* plaintiff tried to void a class settlement release by complaining that "the class representative gave away all modal-billing claims (in the release) and received nothing in exchange for them." *Id*. Thus, the argument went, class members (including the plaintiff) received compensation for one type of claim, but "plaintiff and others similarly situated received nothing for their modal-billing claims." *Id*. But the Eighth Circuit rejected this contention because it ignored the give-and-take nature of the settlement process:

> It simply is not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims, were released. The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefitted, and a claims-evaluation procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things.

*Id*.; *accord Wal-Mart Stores*, 396 F.3d at 113 (quoting same). The Eighth Circuit further declined to enmesh itself in trying to determine "the relative value of the modal-billing clams," and instead deferred to the judgment of the class representative and class counsel that releasing all claims arising from the same factual predicate "was a proper thing to give up to obtain the benefits offered by General American." *In re Gen. Am.*, 357 F.3d at 805.

132.    Plaintiffs here bargained for and obtained many benefits: money at the limits of Defendants' ability to pay, along with injunctive relief eliminating the challenged NAR rules and business practices. This relief is immediate, eliminating the litigation and bankruptcy risks threatened by complex additional proceedings. But every negotiation has two sides, and Plaintiffs made the reasonable judgment that providing a release tracking federal law by releasing claims

61

arising from the same conspiracy was "a proper thing to give up to obtain the[se] benefits." *Id.* There was no "discount applied" to buyer claims because "[n]o part of the consideration on either side" was "keyed to any specific part of the consideration of the other." *Id.* Rather, a complete release – including indirect purchaser buyer claims – was "part of the consideration necessary to obtain [one of] the largest antitrust settlement[s] in history." *Wal-Mart Stores*, 396 F.3d at 113. Nor were any class members bound by this determination involuntarily; dissenters retained the right to opt-out. The *Batton* objectors have offered no evidence to enable the Court to second-guess Plaintiffs' determination, and the Court declines to do so.

133. The *Batton* objectors also argue that those Class members with potential indirect purchaser claims require their own subclass. Yet "[a] class need not be subdivided merely because different groups within it have alternative legal theories for recovery or because they have different factual bases for seeking relief." 7AA C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1760 (3d ed. June 2024 update). Rather, conflicts arise (and subclasses are required) only "when the class is found to have members whose interests are divergent or antagonistic." *Id.*; *see also DeBoer*, 64 F.3d at 1175 ("There is no indication that DeBoer's interest was antagonistic to the remainder of the class or that the claims were not vigorously pursued."). *Cf. Petrovic,* 200 F.3d at 1146 ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members."). No such division of interest is presented here.

134. The only people included in the settlements – and thus the only people giving any release – are people who sold homes during the class period.[16] Their interests are common and

---

[16] People who only bought homes during the class period are not Settlement Class members. They have released nothing and can continue to litigate indirect purchaser claims should they so desire.

focused on achieving the greatest relief for the class. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."). That many of these Class members also bought homes during the class period does not make their interests divergent or antagonistic.

135.    The Supreme Court's decisions in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), provide no support for objectors' argument. As the Eighth Circuit has recognized, *Amchem* and *Ortiz* were very different product liability cases that involved stark conflicts of interest not present here. *Petrovic*, 200 F.3d at 1146. Both cases represented attempts to settle all asbestos cases, now and forever. *Id.* The "injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured." *Id.* Worse still, the diseases had a latency period of up to 40 years, meaning that many class members currently suffered from no illness. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 975 (8th Cir. 2018) (discussing *Amchem*). The Eighth Circuit stated that this latency period created an inherent conflict "between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size)." *Petrovic*, 200 F.3d at 1146. Adding to the problem, "the settlement offered no assurance that sufficient funds would remain to protect the interests" of future claimants. *In re Target Corp.*, 892 F.3d at 975 (discussing *Amchem*). In other words, both *Amchem* and *Ortiz* involved a strong likelihood that some claimants would be paid, but others (numbering in the hundreds of thousands) would receive nothing. That concern is not present here, where every Class member sold a home and therefore will receive compensation.

63

136.    The *Batton* objectors imply that *Amchem* and *Ortiz* require subclasses whenever Class members claim different amounts or types of damage. But *Petrovic* forecloses that argument. *Petrovic* was a class action arising from underground oil seepage originating from a petroleum refinery. In crafting settlement relief, the parties created three zones, labeled A, B, and C. Claimants in Zone A, situated above the underground oil, were "guaranteed to receive 54 percent of the value of their properties." *Petrovic*, 200 F.3d at 1145. Claimants in the surrounding Zone B were guaranteed $1,300 per property. *Id*. And claimants in Zone C, the area farthest removed from the oil, could apply for compensation only by proving damage. *Id*. Faced with objectors from different zones, the Eighth Circuit held that *Amchem* and *Ortiz* required no subclasses: "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable." *Id*. at 1146. Indeed, "almost every settlement will involve different awards for various class members." *Id*.

137.    The same is true here. Every Class member stands to gain from the settlements, both in terms of money and injunctive relief. Each Class member could try to prove individual damages at trial and these amounts would all vary. But courts approve class settlements all the time that forgo these individual determinations. Indeed, the most common method for allocating settlement funds in antitrust cases is on a *pro rata* basis. *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a *pro rata* basis."); *see also Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving *pro rata* distribution of settlement fund as fair and reasonable). And if a Class member does not like this result, they could opt-out.

138.     *Amchem* and *Ortiz* also presented procedural settlement problems not presented here. As the Eighth Circuit recognized, each involved a settlement before litigation, presenting the district court with a complaint, proposed class, and proposed settlement all at the same time. *Petrovic*, 200 F.3d at 1145-46. This deprived the trial courts of "'the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.'" *Id.* at 1146 (quoting *Amchem*, 521 U.S. at 620). This case, by contrast, arises from facts extensively developed during the *Burnett* litigation and trial, giving the Court an extensive record on which to base its findings. *Id.* In addition, *Amchem* and *Ortiz* presented the possibility of collusion between class counsel and the defendants. *Id.* No objector meaningfully alleges here any facts reflecting such collusion in connection with these settlements. The difficulties associated with *Amchem* and *Ortiz* therefore are not present.[17]

139.     The *Batton* objectors also fail to demonstrate that the class representatives or counsel provided inadequate representation. The mere fact that some Class members might allege indirect purchaser buyer claims presents no divergent interests that would preclude general representation of an undivided class. This is because "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'" *Petrovic*, 200 F.3d at 1148 (quoting 7A Wright, Miller, and Kane, *Federal Practice and Procedure: Civil* 2d § 1769 at 367 (2d ed. 1986)).

---

[17] The *Batton* objectors' other cases are similarly distinguishable. *See BankAmerica.*, 210 F.R.D. at 712 (finding settlement unreasonable where it allocated no damages to set of claims that plaintiffs had previously pursued and represented as among the strongest in the case); *Branson v. Pulaski Bank*, No. 4:12-CV-01444-DGK, 2015 WL 139759, at *6-7 (W.D. Mo. Jan. 12, 2015) (rejecting settlement where there was no evidence of the merits of plaintiffs' claims and settlement appeared to stem from unequal bargaining power); *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 385-87 (D. Minn. 2013) (rejecting proposed settlement submitted the day after complaint was filed when the court had no information about the potential damages or relative strengths and weaknesses of claims). The rest are cases where there were intractable conflicts between subclasses of class members holding present, known claims and those holding claims for potentially future, unknown injuries.

All Class members here "share the common objective" of ending Defendants' alleged anticompetitive conspiracy and recovering the excessive commissions they paid as a result of that conspiracy. *Uponor, Inc.*, 716 F.3d at 1064.

140.    The *Batton* objectors brush aside the valuable injunctive relief obtained by the settlements. But the financial payments to Class members are "not the only, or perhaps even the primary, benefit of the settlement agreement[s]." *Marshall*, 787 F.3d at 509. Rather, "the injunctive relief offered under the settlement[s] has value to all class members." *In re Target Corp.*, 892 F.3d at 974 n.6; *accord Sullivan*, 667 F.3d at 329 (en banc) (argument that some class members "receive no money" fails because it "fails to acknowledge the injunctive relief offered by the settlement," which "is intended to benefit all class members regardless of individual monetary recovery.").

141.    The *Batton* objectors also ignore the fact that the only people included in the Settlements are people who sold homes during the class period. People who only bought homes are not Class members. Such "buyer only" individuals have released nothing and can litigate indirect purchaser buyer claims any way they desire, whether individually or in the *Batton* cases. Those cases will continue to be litigated. The sole limitation imposed is that people who accept settlement benefits here cannot turn around and pursue a second recovery for the same conduct. This is not a case where anyone is releasing claims without compensation. Instead, all Class members "share the common objective of maximizing their recovery from [Defendants] for the same alleged misconduct." *Schutter v. Tarena Int'l, Inc.*, No. 21-CV-3502, 2024 WL 4118465, at *5 (E.D.N.Y. Sept. 9, 2024).

142.    For these reasons, objectors' reliance on *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), is not persuasive. *Literary Works* involved a settlement that placed claims in groups A, B, and C (each group arising under a different provision of the Copyright Act). *Literary Works*, 654 F.3d at 246. If claims exceeded a set cap, then Category

66

C claims would be reduced first and might be eliminated entirely. *Id*. The Second Circuit therefore found a lack of adequate representation because Category A and B claims were "more lucrative" than Category C and "because the reduction of Category C claims could 'deplete the recovery of Category C-only plaintiffs in their entirety before the Category A or B recovery would be affected.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir. 2021) (quoting *Literary Works*, 654 F.3d at 252, 254). The settlement agreements here, by contrast, present "no risk that any members of the class will have their ability to get settlement benefits reduced to zero because some other members got more relief from the settlement." *Id.* Instead, "all class members are entitled to the same class benefits." *Id*. Again, the fact that many Class members both bought and sold a home presents no "fundamental conflict" that requires the use of subclasses or additional lawyers.

143.     The *Batton* objectors also complain that "the settling parties have not made any plan of allocation available." Doc. #1561 at 5. But this argument is premature and should be raised in the allocation phase. "[C]ourt approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update). "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d. Cir. 1987).[18] Once the

---

[18] *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551, 1988 WL 158947, at *4 (W.D. Wash. July 28, 1988) ("[D]eferral of allocation decisions is routinely followed in" these circumstances because "the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved."); *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and

allocation plan is proposed, the Court will be in a position to consider that plan and approve "a second notice to Class Members, followed by a right to object and/or file a claim." *In re Domestic Airline*, 378 F. Supp. 3d at 22. That distribution decision will be "governed by the same standards of review applicable to approval of the settlement as a whole, *i.e.,* the distribution plan must be fair, reasonable and adequate." *Namenda Direct Purchaser*, 462 F. Supp. 3d at 316. Any Class members who disagree with the proposed allocations—e.g., because they believe that plan insufficiently compensates home purchases—will be able to present such argument to the Court at that time. Nor do any Class members need allocation information in deciding whether to opt out of the settlements. The Eighth Circuit rejects the notion that class members must be provided "a formula for calculating individual awards" when receiving notice – a description of the "potential aggregate payout" is enough. *Petrovic*, 200 F.3d at 1153.

144.     Finally, the Court disagrees with the *Batton* objectors' argument that buyer claims lie outside the same factual predicate as seller claims. In fact, releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the settling defendant arising out of the same conspiracy, including when those direct purchasers may also have indirect-purchaser claims. *See, e.g.*, *In re Transpacific Passenger Air Transp. Antitrust Litig.* (N.D. Cal, 07-cv-5634), ECF No. 900-2 § 1.11 (releasing "any and all claims . . . on account of, arising from, or in any way related to, the pricing of passenger air transportation by JAL or Defendants . . . with respect to the facts, occurrences, transactions or other matters that were alleged or could have been alleged [in the action] . . . regardless of legal theory, and regardless of

---

process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known."); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011) (developing plan of allocation is properly delayed until after final approval of settlement where "the potential for additional settlements with other Defendants . . . may affect the final plan of allocation"); *Manual for Complex Litigation, Fourth* § 21.312 (2005) ("Often . . . the details of allocation and distribution are not established until after the settlement is approved.").

the type or amount of relief or damages claimed"); *In re: Processed Egg Products Antitrust Litig.* (E.D.P.A., MDL 2002), ECF No. 349-1 ¶ 25 (similar); *In re Intuniv Antitrust Litig.* (D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar); *In re: Prograf Antitrust Litig.* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re Pre-Filled Propane Tank Antitrust Litig.* (W.D. Mo. 14-md-2567 / MDL No. 2567), ECF No. 362-1 ¶ 12 (similar); *In re HIV Antitrust Litig.* (N.D. Cal, 19-cv-02573), ECF No. 711-2 at 11-12 (similar); *In re Broiler Chicken Antitrust Litig.* (N.D. Ill. 16-cv-8637), ECF No. 3324, ¶ 26 (similar). Courts have approved these settlements even over objections that the settlement improperly released or otherwise devalued a subset of claims. *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, 701 F. App'x 554, 555-56 (9th Cir. 2017) ("The district court properly certified the settlement class and was not obligated to create subclasses for purchasers of U.S.-originating travel and direct purchasers of airfare. Federal Rule of Civil Procedure 23(a) does not require a district court to weigh the prospective value of each class member's claims or conduct a claim-by-claim review when certifying a settlement class."); *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 7397567, at *1 (N.D. Cal. Nov. 8, 2023) (rejecting indirect purchasers' request to set aside portion of direct-purchaser settlement).

145.     Comparing the complaints in the *Batton* cases with Plaintiffs' complaint here shows that the buyer claims arise from the same factual predicate as the seller claims. *See also Batton I*, Mar. 5, 2021 Plaintiffs' Initial Joint Status Report, No. 21-cv-00430, at Doc. #48 ("In filing this case, Plaintiff took the position that this case is related to Moehrl v. NAR et al."); Doc. #59 – Transcript of Proceedings held on Mar. 23, 2021 (reflecting Mullis's counsel's representation that *Moehrl* "raises substantially similar allegations"). All such claims arise from the same common nucleus of operative fact, and any class member with both seller and buyer claims would "ordinarily be expected to try them all in one judicial proceeding." *North Dakota v. Lange*, 900 F.3d 565, 568-69 (8th Cir. 2018). The Court therefore rejects the *Batton* objectors' attempt to force

69

claim splitting between the seller and buyer claims. The seller and buyer claims share the same factual predicate.

146. Finally, the Court finds that Mr. Mullis appears to be a Nevada resident. Over 7,600 Nevada residents have already submitted claims; and none have objected (aside from the clients of class counsel with competing class litigation). Keough Decl. at ¶ 53. If the Settlements are not approved, these Class members risk receiving no compensation for their injuries.

**The Court Overrules the Wang Objection (Docs. #1547, #1548)**

147. Plaintiffs received a pro se objection from Hao Zhe Wang to the NAR Settlement. (Doc. #1547, #1548.) Mr. Wang previously filed his own lawsuits against NAR and others after the jury verdict in *Burnett. See Wang v. Nat'l Assn. of Realtors, et. al.*, No. 24-cv-02371 (S.D.N.Y.). He has opted out of other settlement agreements in this case. (Doc. #1435) (asking to be excluded "from the Settlement Class as to Anywhere, RE/MAX, and Keller Williams"); Keough Decl. at Ex. O (exclusion from HomeServices Settlement). But in the case of the NAR Settlement, he did not opt out and instead submitted an objection.

148. In his objection, Mr. Wang raises several complaints about the real estate industry, many of which are addressed by the practice changes reflected in the NAR Settlement. In particular, Mr. Wang asserts that the NAR rules at issue in this litigation: (1) caused sellers to set the commission offered to buyer brokers, not buyers, leading to inflated commissions; (2) allowed buyer brokers to market their services as free, when they are not (and agents were often trained to do so); (3) limited negotiations of offered commissions; and (4) restricted the disclosure of the commissions being offered to consumers. (Docs. #1547, #1548, pp. 6, 9, 16, 19.) Plaintiffs made similar allegations in this case. Mr. Wang's complaints are addressed by the Settlement Agreement

Mr. Wang is now objecting to. Those objections, thus, support approving the Agreement, not rejecting it.

149.    Mr. Wang also claims that unspecified NAR rules purportedly bar listing brokers from submitting offers from unrepresented buyers to their seller clients and allow buyer brokers to market their services as free. He claims these practices are anticompetitive and illegal because they forced him to use a buyer broker when he did not want to. Mr. Wang further seeks a declaration that "direct purchaser" claims and consumer protection and false advertising claims are not released by the Settlement. These objections do not support rejecting the NAR Settlement.

150.    First, to the extent Mr. Wang's objection concerns claims by persons who only bought homes during the relevant period, which Mr. Wang is not, those claims are not released by the NAR Settlement. The "Settlement Class" and release are limited to persons "who *sold* a home." NAR Agreement ¶ 21 (emphasis added).

151.    Second, if Mr. Wang objects to releasing claims arising from the same factual predicate by home buyers who *also* sold a home that challenge the same rules at issue in this action, those claims are properly released (as discussed above regarding the *Batton* objectors). Indeed, Mr. Wang concedes that the "lawsuits against NAR . . . that have asserted *indirect purchaser* claims . . . stemmed from the same factual predicates as the home-seller suits." (Doc. #1547, #1548, p. 21.) He also acknowledges that courts regularly hold that releases in direct-purchaser cases can include those class members' indirect purchaser claims. (Doc. #1547, #1548, p. 28–29.) Accordingly, Mr. Wang does not show there is anything improper with the NAR Settlement's release of class members' indirect purchaser claims.[19]

---

[19] Related to this point, Mr. Wang contends that Plaintiffs failed to adequately represent the interests of home sellers who were also home buyers because Plaintiffs did not assert claims as home buyers. The Court overruled a similar objection from the *Batton* objectors and overrules Mr. Wang's objection for the same reasons.

71

152.    Third, to the extent Mr. Wang contends that NAR rules that once permitted buyer brokers to market their services as free violated consumer protection laws and were false advertising, those same rules were challenged in this case, were replaced with language clarifying this conduct was prohibited in 2022, and are further addressed in the NAR Settlement's practice changes. (Doc. #1547, #1548, pp. 2, 19.) The NAR Settlement may permissibly release claims challenging the same rules that were at issue in this case, and that implicate the same factual predicate as this case, even where those claims are plead under a different legal theory.

153.    Finally, to the extent Mr. Wang asserts that NAR bars listing brokers from submitting offers from unrepresented buyers to their home seller clients forcing him to incur expenses for brokerage services, *Id.* at 5–20, he does not cite to any rules reflecting such a prohibition.

154.    In sum, Mr. Wang's objections to the NAR Settlement's releases fail to show that the NAR Settlement should not be approved.

155.    Mr. Wang's next objection, that the settlement is racially discriminatory, is also overruled. The NAR Settlement on its face treats every class member equitably and does not reflect any racial classifications. Nor does Mr. Wang present any evidence that the Settlement will have a disparate impact on any protected groups.

156.    Mr. Wang also makes several contradictory arguments concerning the monetary recovery reflected in the NAR Settlement. First, Mr. Wang suggests that the settlement amount is too low. In other portions of his objection, however, he acknowledges that "the settlement represents an exceedingly large portion of [NAR's] total assets" and that NAR has "mostly exhausted its financial resources." Second, Mr. Wang contends that Plaintiffs should have settled for less to preserve NAR's ability to pay settlements or judgments in other lawsuits. Those objections are overruled. The record supports the conclusion that the settlement amount

72

appropriately reflects the strengths and weaknesses of the case and the risks and costs of continued litigation, including limitations on NAR's financial resources. And there is no basis for rejecting a settlement for providing for *too* large a recovery. Endorsing such a rule would perversely encourage settlements for less, not more, to the detriment of Class members.

157. Mr. Wang's objection to the practice changes is also overruled. He claims two agents in North Carolina recently informed him that he needed an agent to put an offer on a home. (Doc. #1547, #1548 pp. 3, 32–34.) But nothing in the Settlement Agreement appears to require retaining a buyer broker.

158. Mr. Wang objects to the NAR Settlement Agreement's requirement that any settlement funds will not revert to NAR regardless because he appears to believe it will cause funds that should go to Class members to be distributed to a nonprofit or similar organization under the *cy pres* doctrine. Mr. Wang misunderstands this requirement, which benefits Class members. It ensures that funds will be paid to Class members who make claims, regardless of how many claims are submitted. It does not require any funds to be paid under the *cy pres* doctrine in the first instance. This objection is overruled.

159. Finally, the Court overrules Mr. Wang's objections to the class notice. As outlined above, the notice satisfies the requirements of due process and Rule 23. Mr. Wang states that he did not personally receive notice in the mail. But Mr. Wang's objection reflects that he received actual notice of the settlements. And the settlement agreement itself is reflected in the docket of a lawsuit he filed against NAR and others. *See Wang v. Nat'l Assn. of Realtors, et. al.*, No. 24-cv-02371 (S.D.N.Y.) at Doc. #51. His complaints about a purported lack of notice are thus meritless. *See In re Pinterest Derivative Litig.*, No. C 20-08331-WHA, 2022 WL 2079712, at *2 (N.D. Cal. June 9, 2022) ("[T]hough delayed, Mr. Sweeney received actual notice of the proposed settlement, voiced his objections, and has been heard. Having been heard, Mr. Sweeney's objections [to

73

notice] are OVERRULED."); *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 123–24 (S.D.N.Y. 2001) (overruling objection that notice was inadequate where objector received notice via the *Wall Street Journal* but not via mail).

160. Mr. Wang's supposition that other Class members may not have received notice is also not well-taken. The record reflects that Class Counsel together with the appointed notice administrator JND implemented a notice plan that provided notice through direct mail and other means to millions of Class members. Even accepting that some Class members may not have received notice through direct mailings, that does not show that the notice plan was inadequate under Rule 23 or the requirements of due process. "[A]ctual notice to all class members is not required." *Dornberger*, 203 F.R.D. at 123–24 (approving notice plan and concluding that "reasonable efforts were taken to notify all members of the class," where part of the class received direct mail notice and part of the class was covered by publication notice); *see also Dusenbery v. United States*, 534 U.S. 161, 170–71 (2002) (holding that "actual notice" is not required by the Due Process Clause; rather, "it requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action"); *Montgomery v. Beneficial Consumer Disc. Co.*, No. CIV.A. 04-CV-2114, 2005 WL 497776, at *5 (E.D. Pa. Mar. 2, 2005) ("The requirement of 'best notice practicable under the circumstances' has consistently been held *not* to require actual notice for every class member." (emphasis in original)); *In re Mass. Diet Drug Litig.*, 338 F. Supp. 2d 198, 209 (D. Mass. 2004) (neither "Rule 23 nor due process, however, requires that each class member receive actual notice").

161. Instead, both due process and Rule 23 require the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (notice "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an

74

opportunity to present their objections'" (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). This is a different standard than the "actual notice" standard advocated by Mr. Wang. *See Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-04321-NKL, 2013 WL 3872181, at *14 (W.D. Mo. July 25, 2013) ("[T]he Court is only required to provide the best practicable notice to those members identifiable by reasonable effort—not achieve actual notice on every potential class member."); *see also Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994) (concluding that the standard for class notice is "best practicable", rather than "actually received" notice).

162. And the standard was met here. The notice plan here reached 99% of the Class. Keough Decl. at ¶ 40. Courts have repeatedly approved notice plans with less reach. *E.g.*, *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15MD2670 DMS(MDD), 2023 WL 2483474, at *2 (S.D. Cal. Mar. 13, 2023); *Bruzek v. Husky Energy Inc.*, No. 18-CV-697-WMC, 2021 WL 9474270, at *2, *4 (W.D. Wis. Aug. 6, 2021); *Reid v. I.C. Sys. Inc.*, No. CV-12-02661-PHX-ROS, 2018 WL 11352039, at *3 (D. Ariz. July 27, 2018); *Beck-Ellman v. Kaz USA, Inc.*, No. 3:10-CV-02134-H-DHB, 2013 WL 1748729 at *3–4, *8–9 (S.D. Cal. Jan. 7, 2013); *see also Pollard v. Remington Arms Co.*, 320 F.R.D. 198, 212–13 (8th Cir. 2018) (approving notice plan where there was a dispute as to whether it reached 49% or 73.7% of class members). Indeed, "[t]he Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable." *Hand v. Beach Ent. Kc, LLC*, No. 4:18-CV-00668, 2021 WL 199729, at *2 (W.D. Mo. Jan. 19, 2021).

163. The Court also overrules Mr. Wang's objection that the Court required Class members to *mail* opt-out and objection notices, requiring them to incur postage costs. (Doc. #1547, #1548, p. 44–45.) Courts routinely order opt-outs and objections to be mailed. *See Rogowski v. State Farm Life Ins. Co.*, No. 4:22-cv-00203-RK (W.D. Mo. Dec. 16, 2022), ECF No. 54, at 4;

*Barfield v. Sho-Me Power Elec. Coop.*, No. 2:11-cv-4321-NKL (W.D. Mo. Dec. 5, 2014), ECF No. 541, at 5–7; *see also In re AXA Equitable Life Ins. Co. COI Litig.*, No. 1:16-cv-00740-JMF (S.D.N.Y. June 22, 2023), ECF No. 705, at 4–5, 6; *Advance Trust & Life Escrow Servs., LTA v. PHL Variable Ins. Co.*, No. 1:18-cv-03444 (S.D.N.Y. Aug. 9, 2023), ECF No. 271, at 5–6. Courts also routinely overrule objections like Mr. Wang's, reasoning that "requiring opt-out by mail is not unduly financially burdensome." *Howerton v. Cargill, Inc.*, No. CIV. 13-00336 LEK, 2014 WL 6976041, at *3 (D. Haw. Dec. 8, 2014); *accord McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 641 n.14 (E.D. Pa. 2015) ("Mailing a request is not unreasonably burdensome."). In any event, JND has indicated that it accepted opt-outs that were submitted electronically. Keough Decl. at ¶ 57.

164.     Finally, Mr. Wang objects that Paragraph 18 of the NAR Settlement Agreement, which defines the "Released Parties," is vague and unconscionable because Class members purportedly cannot determine if certain brokerages are released or not. (Docs. #1547, #1548, pp. 3, 45–49.) Mr. Wang identifies Brown Harris Stevens and Halstead as the only examples. *Id.* at 46. Class members were advised that any brokerages that opted into the NAR Settlement would be listed on www.RealEstateCommissionLitigation.com. *Id.* Brown Harris Stevens is listed as one such brokerage on that website.[20] And according to news reports, Halstead merged into Brown Harris Stevens in 2020.[21] Thus, Mr. Wang could have readily ascertained that Brown Harris Stevens (and by extension Halstead) is among the Released Parties.

165.     In addition, Paragraph 18 of the NAR Settlement clearly describes which parties are released and under what circumstances. Illustrating as much, it can readily be determined that

---

[20] https://www.realestatecommissionlitigation.com/nar-opt-in.
[21] Kevin Zimmerman, *Realtor Halstead merged into Brown Harris Stevens,* Westfair Business Journal (June 15, 2020), https://westfaironline.com/real-estate/realtor-halstead-merged-into-brown-harris-stevens/.

76

Brown Harris Stevens and Halstead are Released Parties. According to the T360 Real Estate Almanac, Brown Harris Stevens had a 2022 sales volume in excess of $2 billion.[22] Thus, Brown Harris Stevens falls under Paragraph 18.f of the NAR Settlement Agreement. It would be a "Released Party" only if it agreed to comply with certain practice changes and to provide proof of compliance, and if it paid under the provisions of Appendix C. Brown Harris Stevens opted in by agreeing to pay $2.9 million and enact relevant practice changes. This was reported to the Court and posted on the public docket on September 30, 2024. Doc. #1538. Accordingly, Mr. Wang objection to Paragraph 18 is overruled.

**The Settlement Class, Settlement Processing, Attorneys' Fees, Injunction, and Related Issues**

166.     The Court finds the requirements of Rule 23(g) of the Federal Rules of Civil Procedure are met, and the Court reaffirms the appointment of the law firms of Ketchmark and McCreight P.C., Williams Dirks Dameron LLC, Boulware Law LLC, Hagens Berman Sobol Shapiro LLP, Cohen, Milstein, Sellers & Toll, PLLC, and Susman Godfrey LLP as Co-Lead Counsel for the Settlement Class ("Class Counsel").

167.     The 39 persons and entities identified by Class Counsel (*see* Exhibit O to Keough Decl.) have timely and validly requested exclusion from the Settlement Class and are therefore excluded from the Settlement Class, are not bound by this Order, and may not make any claim upon or receive any benefit from the Settlements. Nothing in this Order should be construed as a determination by this Court that the excluded persons and entities are members of the Settlement Class or that they meet other prerequisites, such as standing, for bringing claims alleged in the Actions. Each Settlement Class member who is not listed in Exhibit O to the Keough Declaration

---

[22] T3 Sixty, *Top Brokerages in 2023,* 2023 Real Estate Almanac 295 (June 2023), https://www.t3trends.com/intel/top-brokerages-in-2023/ (listing Brown Harris Stevens at #20 with a 2022 sales volume of $10.45 billion).

is bound by this Order and will remain forever bound, including by releasing all Released Claims of Releasing Parties against Released Parties. The Court specifically approves these releases as set forth in the Settlement Agreements.

168.    Members of the Settlement Class, unless they excluded themselves, are hereby enjoined from filing, commencing, prosecuting, intervening in, or pursuing as a plaintiff or class member any Released Claims against any of the Released Parties. *See* 28 U.S.C. § 1651; *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 914 (8th Cir. 2010) (noting that "the district court has the inherent ability to protect its own jurisdiction over the dispute pending before it"); *Janson v. LegalZoom.com, Inc.*, No. 2:10-CV-04018-NKL, 2012 WL 13047852, at *2 (W.D. Mo. Apr. 30, 2012) ("In order to protect the continuing jurisdiction of the Court, prevent a multiplicity of lawsuits, and protect and effectuate the Court's Judgment in this Litigation, Plaintiffs and Class Members . . . are barred and enjoined from instituting, commencing, or continuing to prosecute . . . . any action in this Court, any other state or federal court, or any other tribunal or forum of any kind, against any Released Party that asserts any claims that are Released Claims under the terms of the Settlement[.]") (granting final approval); *accord Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-CV-0699-KJN, 2024 WL 36175, at *13 (E.D. Cal. Jan. 3, 2024); *Smith v. Floor & Decor Outlets of Am., Inc.*, No. 1:15-CV-04316-ELR, 2017 WL 11495273, at *6 (N.D. Ga. Jan. 10, 2017); *In re Ortho. Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 188 (E.D. Pa. 1997). Released Claims include claims that arise from or relate to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home. For the avoidance of doubt, this injunction extends to claims arising from or relating to transactions where Settlement Class members either sold or purchased a home on any MLS nationwide, regardless of affiliation or

78

association with NAR or not, and thus includes, *e.g.*, NWMLS, WPML, and REBNY/RLS. This injunction does not extend to any individual claims that a plaintiff or class member may have against his or her own broker or agent based on breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

169. This Order does not settle or compromise any claims by Class Representatives or the Settlement Class against entities or persons other than Released Parties, and all rights against any other person or entity are specifically reserved.

170. Settling Defendants shall issue payment in accordance with the Settlement Agreements.

171. Class Counsel has adequately represented the Class. Their application for an award of attorneys' fees and reimbursement of costs as set forth in the Motion for Attorneys' Fees and Costs (Doc. #1535) is hereby approved and shall be paid in accordance with the Settlement Agreements.

172. Courts in the Eighth Circuit typically use the "percentage-of-the-fund method" to award attorneys' fees from a common fund. *See, e.g.*, *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019). "In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established,'" *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (quoting *Petrovic*, 200 F.3d at 1157), or even "preferable,'" *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-4321, 2015 WL 3460346, at *3 (W.D. Mo. June 1, 2015) (quoting *West v. PSS World Med., Inc.*, No. 13-CV-574, 2014 WL 1648741, at *1 (E.D. Mo. Apr. 24, 2014)). The percentage method aligns the interests of the attorneys and the class members by incentivizing counsel to maximize the class's recovery. *See Johnston*, 83 F.3d at 245 ("[T]he Task Force [established by the Third

79

Circuit] recommended that the percentage of the benefit method be employed in common fund situations.") (citing *Court Awarded Attorneys Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237, 255 (3rd Cir. 1985)).

173. The Court will therefore use the percentage approach to award fees in this case. This Court and others within the Eighth Circuit confirm that one-third of the common fund is an appropriate amount for class counsel's fees in complex class actions, including antitrust litigation. Eighth Circuit and Missouri courts "have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions." *Huyer*, 849 F.3d at 399 (quoting *In re Xcel,* 364 F. Supp. 2d at 998); *see also Rawa*, 934 F.3d at 870 ("courts have frequently awarded attorneys' fees ranging up to 36% in class actions") (quoting *Huyer*, 849 F.3d at 399); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1064 (D. Minn. 2010) (holding fee award of 33% reasonable); *In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir.2002) (affirming fee award representing 36% of the settlement fund as reasonable); *In re Xcel,* 364 F.Supp.2d at 998 (collecting cases demonstrating that district courts routinely approve fee awards between 25% and 36%). This District recently approved one-third of the fund in a settlement valued at $325 million. *See Rogowski v. State Farm Life Ins. Co.*, No. 22-CV-203, 2023 WL 5125113, *4-5 (W.D. Mo. April 18, 2023). Thus, judges in the Western District of Missouri and the Eighth Circuit routinely apply the one-third-of-the-fund fee calculation, even to large settlements.

174. In doing so, courts typically consider some or all of the relevant factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *See In re Target Corp.*, 892 F.3d at 977. The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee;

80

(6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 977 n.7. To be sure, "[m]any of the *Johnson* factors are related to one another and lend themselves to being analyzed in tandem." *Swinton.*, 454 F. Supp. 3d at 886. Therefore, courts in the Eighth Circuit often focus on the most relevant *Johnson* factors in evaluating fee requests. *See Huyer*, 849 F.3d at 398–400 (affirming trial court's award of one-third of the common fund after review of Johnson factors one to five only); *In re Xcel*, 364 F. Supp. 2d at 993; *Tussey v. ABB, Inc.*, No. 06-CV-4305, 2019 WL 3859763, at *2 (W.D. Mo. Aug. 16, 2019); *Yarrington*, 697 F. Supp. 2d at 1062; *Hardman v. Bd. of Educ. of Dollarway, Arkansas Sch. Dist.*, 714 F.2d 823, 825 (8th Cir. 1983). The Court has considered the *Johnson* factors here, and finds that each weighs in favor of Plaintiffs' fee request. *See also* Klonoff Fee Decl. at ¶¶ 24, 34, 39.

175.    Here, Class Counsel's time and labor invested was substantial and necessarily precluded other work. In addition to the over 107,500 hours they have dedicated to the litigation through August 31, 2024, Class Counsel also expended over $16,528,352.83 of their own money toward the combined litigation. That work was undertaken without any guarantee of payment. Moreover, the litigation faced low odds of early settlements given the litigation challenged practices that were central to the real estate brokerage industry.[23] Indeed, NAR took the position that the cases were "baseless."[24] In sum, "the extraordinary level of work and result

---

[23] *See, e.g.*, *How the $1.8 Billion Real-Estate Commissions Lawsuit Came to Be*, Wall Street Journal (Nov. 26, 2023), https://www.wsj.com/real-estate/how-the-1-8-billion-real-estate-commissions-lawsuit-came-to-be-106433d1 ("Antitrust cases almost always settle before trial, giving attorneys some assurance they will get paid something. But in this case, the damages were so high and the threat to the industry so existential that plaintiff attorneys thought it unlikely NAR would settle.").

[24] *See, e.g.*, *Realtor Group Moves to Dismiss Class Action Lawsuit Alleging Collusion*, Forbes (May 21, 2019), https://www.forbes.com/sites/alyyale/2019/05/21/realtor-group-moves-to-dismiss-class-action-lawsuit-alleging-collusion/ ("According to John Smaby, president of NAR, all three claims have no merit.

achieved here in the face of enormous risk warrants a substantial fee percentage." Klonoff Fee Decl. at ¶ 88.

176.    "Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees." *Yarrington*, 697 F. Supp. 2d at 1062 (quoting *In re Xcel*, 364 F. Supp. 2d at 994); Theodore Eisenberg & Geoffrey Miller, *Attorney Fees In Class Action Settlements: An Empirical Study*, 1 J. Emp. L. Studies 27, 27, 38 (2004) ("Fees are also correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees . . . . [This] is widely accepted in the literature."). "Unless that risk is compensated with a commensurate award, no firm, no matter how large or well-financed, will have the incentive to consider pursuing a case such as this." *Tussey*, 2019 WL 3859763, at *3. "Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success." *Been v. O.K. Indus., Inc.*, No. 02-CV-285, 2011 WL 4478766, at *9 (E.D. Okla. Aug. 16, 2011). And critically, "[t]he risks plaintiffs' counsel faced must be assessed as they existed in the morning of the action, not in light of the settlement ultimately achieved at the end of the day." *In re Xcel*, 364 F. Supp. 2d at 994.

177.    In addition, the complexity and difficulty of prosecuting the claims in this case supports the requested attorneys' fees. Courts regularly award one-third of the fund in antitrust suits involving especially complex, expensive, and difficult to prosecute claims. *See In re Peanut Farmers Antitrust Litig.,* No. 19-CV-00463, 2021 WL 9494033, at *6 (E.D. Va. Aug. 10, 2021) ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane*, 2016 WL 4060156, at *5 (awarding one-third of $835 million settlement, noting "a one-

<hr />

'In today's complex real estate environment, REALTORS and Multiple Listing Services promote a pro-consumer, pro-competitive market for home buyers and sellers, contrary to the baseless claims of these class action attorneys,' he said. 'Our filing today shows the lawsuit is wrong on the facts, wrong on the economics and wrong on the law.'").

third fee is customary"); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 100, 106 (E.D. Pa. 2013) (awarding one-third of the settlement fund as attorneys' fees in which court relied upon the fact that class counsel had litigated a number of hotly contested *Daubert* challenges)*; see also* Klonoff Fee Decl. at ¶ 41.

178.    Courts often judge class counsel's skill against the "quality and vigor of opposing counsel . . . ." *In re Charter Commc'ns, Inc.*, No. 4:02-CV-1186, 2005 WL 4045741, at *17 (E.D. Mo. June 30, 2005) (citing *In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004)). In the litigation, Class Counsel faced off against no fewer than thirty highly-respected law firms over the course of the litigation. Although Class Counsel's team included some of the country's most accomplished class action and trial lawyers, Defendants also hired some of the country's most prominent and respected defense attorneys. This weighs heavily in favor of the requested award.

179.    In the Eighth Circuit, courts have "frequently awarded attorneys' fees ranging up to 36% in class actions." *Huyer*, 849 F.3d at 399. Courts have recognized that prosecution of antitrust claims should result in a one-third-of-the-fund fee award. *See In re Peanut Farmers,* 2021 WL 9494033, at *6 ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane*, 2016 WL 4060156, at *5 (awarding one-third of $835 million antitrust settlement and noting "a one-third fee is customary").

180.    Moreover, the requested one-third fee award is equal to or less than what the actual Named Plaintiffs—those with the most on the line and most involved in the case—agreed to at the outset of the case. Class representatives in *Burnett* agreed to a 35% fee. Dirks Fee Decl. (Doc. #1535-2) at ¶29. Class representative in *Moehrl* agreed to a fee of up to 33.3%. Berman Fee Decl. (Doc. #1535-5) at ¶ 6. These factors also support Plaintiffs' request. Klonoff Fee Decl. at ¶¶ 60-61, 77-78.

181. The Fund is also cash only and non-reversionary; so, the Settlements, plus interest earned until its distribution, require no further valuation. In requesting a fee as a percentage of the Fund, Class Counsel necessarily seek a fee proportionate to the degree of monetary success obtained.

182. Here, the request is supported by both the size of the recovery and the results obtained as compared to the risk of a lesser recovery or none at all. Moreover, the Settlements represent only a part of the recovery to the Class because Class Counsel have continued to prosecute these joint and several liability claims against other Defendants. Thus, any past and future settlements or judgments will also benefit the Class. This factor supports a contingency percentage of one-third, particularly given the benefits achieved. Importantly, success—including "exceptional success"—is not measured solely by the maximum damages alleged but must be evaluated against any "unusually difficult or risky circumstances and the size of plaintiffs' recovery." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204–05 (S.D. Fla. 2006).

183. The requested fee award is also supported by the significant practice change relief reflected in the Settlements which require the Settling Defendants, among other things, to eliminate and not enforce industry-wide rules mandating compensation offers to cooperating broker on all MLS listings. *See* Economides Fee Decl. (Doc. #1535-13) at ¶¶ 8-11, 18. Counsel is not seeking any additional fee for this valuable relief on these Settlements, but the value of this relief is substantial and is appropriately considered in evaluating the fee that is sought. *See* Klonoff Fee Decl. at ¶¶ 96-98; *see also* Economides Fee Decl. at ¶¶ 13-17 (discussing how "even preliminary, relatively small decreases in buyer broker commission rates substantially lower the overall cost of housing transactions"). As set forth in Professor Economides' declaration, "for every shift of 0.1% in the average commission rate (e.g. from 2.66% to 2.56%) the total commission paid would be lowered by $2.1 billion." Economides Fee Decl. at ¶ 16.

84

184.    A lodestar crosscheck is "not required" in the Eighth Circuit. *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017); *PHT Holdings II, LLC v. N. Am. Co. for Life & Health Ins.*, No. 4:18-CV-00368-SMR-HCA, 2023 WL 8522980, at *7 (S.D. Iowa Nov. 30, 2023).[25] However, performing such a crosscheck here confirms that the requested fee is reasonable and should be approved. As noted above, the Court finds that Class Counsel have reasonably expended over 107,500 hours through August 31, 2024 in prosecuting the *Gibson*, *Umpa*, *Burnett*, and *Moehrl* matters, and the Class Counsel's hourly rates are reasonable, including because they are consistent with the market rates of other lawyers practicing complex litigation of this type, including the firms defending this case. These hours result in an overall lodestar through August 31, 2024 of $92,338,583. Dirks Fee Decl. at ¶ 42. When considered together with fees previously awarded in *Burnett* and *Gibson*, the current fee request results in an approximate 3.6 multiplier on lodestar, which is well within the range of reasonableness. *See* Klonoff Fee Decl. at ¶¶ 29, 122; *Rawa*, 934 F.3d at 870 (observing a lodestar multiplier of 5.3 is within the bounds of reasonableness); *Huyer*, 849 F.3d at 399–400 (observing lodestar multipliers of up to 5.6 times class counsel's lodestar to be in the reasonable range for a lodestar crosscheck); *In re T-Mobile Customer Data Security Breach Litig.*, 111 F.4th at 861 (observing in a case that settled early in the litigation that a multiplier of 5.3 is on the "high" side of reasonableness) (citing *Rawa*, 934 F.3d at 870)); *In re Charter Commc'ns, Inc., Sec. Litig.*, No. 4:02-cv-1186-CAS, 2005 WL 4045741, at *18 (E.D. Mo. Jun. 30, 2005) (finding 5.61 lodestar multiplier reasonable); *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2019 WL 1274813, at *5 (D. Kan. Mar. 20, 2019) ("a multiplier of

---

[25] "'[T]o overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services.'" *Rawa*, 934 F.3d at 870 (quoting *In re Charter Commc'ns*, 2005 WL 4045741, at *18). *Cf. In re T-Mobile Customer Data Security Breach Lit.*, 111 F.4th at 862 (observing that a lodestar crosscheck is not required but can be warranted "when a megafund case settles quickly").

3 is well within the range allowed in other cases involving large settlements"). Moreover, Class Counsel has continued to work on the litigation. *See* Dirks Decl. at ¶ 41. Plaintiffs' request of fees of one-third of the fund is reasonable.

185.    Additionally, upon review, the Court finds that Plaintiffs' request of fees of one-third of the fund is reasonable in light of the Eighth Circuit precedent in *In re T-Mobile Customer Data Security Breach Litigation*. Unlike the parties in *T-Mobile*, who following "a few days of mediation, and less than a month after class counsel had filed the complaint," agreed to the basic terms of a settlement, here Plaintiffs have spent more than five years, $16,528,352.83 in reasonable and necessary expenses, and 107,500 hours working on the *Gibson*, *Moehrl*, and *Burnett* cases. *T-Mobile*, 111 F.4th at 855; Dirks Fee Decl. at ¶ 47. Additionally, Plaintiffs' counsel dealt with over thirty different firms representing multiple Settling Defendants. The current settlement was only reached after significant arms-length and adversarial negotiations with each Settling Defendant. While "recovery in a particular case [may] stem[] more from class size than attorney effort and so might merit a lower fee award," given the immense time and effort expended by Plaintiffs' counsel with multiple Settling Defendants and their respective counsel, Plaintiffs' request of fees of one-third of the fund is reasonable. *T-Mobile*, 111 F.4th at 860.

186.    The Court also grants Plaintiffs' request for their costs. The expenses submitted were reasonable expenses in such a large and complex litigation.

187.    The Settlement Administrator shall be paid in accordance with the appropriate NAR or HomeServices Settlement Agreement.

188.    The Court authorizes payments to be made from the Escrow Accounts under the Settlement Agreements as qualified settlement funds ("QSF") as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations and retains continuing jurisdiction as to any issue that may arise in connection with the formation or administration of the QSFs. Co-Lead Counsel are, in

accordance with the Settlement Agreements, authorized to withdraw up to the amounts allowed by the Settlement Agreements out of the Escrow Accounts.

189. Co-Lead Counsel are directed to prepare and submit for Court approval a plan of allocation for the Settlement Fund, and to propose a schedule for comment and Court review. The proposed plan of allocation must be posted to https://www.realestatecommissionlitigation.com and emailed to all individuals who submit a claim in order to provide those individuals an opportunity to comment on the plan. After the plan of allocation is proposed and an opportunity to comment has been provided, the Court will evaluate the proposed plan and any objections thereto. The Court's review of the plan of allocation will be conducted separately from this final review of the Settlements. The Court believes that this additional layer of protection to the Class supports the Court's finding that the Settlements treat Class members equitably.

190. Settling Defendants have denied any liability, fault, or wrongdoing of any kind in connection with the allegations in the Actions, and as such, neither the Settlements, nor any of their respective terms or provisions, nor any of the negotiations or proceedings connected with the Settlements shall be construed as an admission or concession of the truth of any of the allegations, or of any liability, fault, or wrongdoing of any kind by Settling Defendants.

191. The Court retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlements and to interpret, implement, administer and enforce the Settlements (including with respect to the scope of the Settlement Class, Released Claims, and Released Parties), in accordance with their terms, and to implement and complete the claims administration process, in accordance with the Settlements, for the benefit of the Settlement Class. The Court does this for the purpose of satisfying the requirements of *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), concerning the obligation of a Court entering a settlement agreement to speak clearly when it wishes to retain jurisdiction.

**IT IS SO ORDERED.**

                                          /s/ Stephen R. Bough
                                          STEPHEN R. BOUGH
                                          UNITED STATES DISTRICT JUDGE

Dated: November 27, 2024

88