IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION, Case No. 4:19-CV-00332-SRB

RHONDA BURNETT, JEROD BREIT, )
JEREMY KEEL, HOLLEE ELLIS, )
AND FRANCES HARVERY, ON BEHALF )
OF THEMSELVES AND ALL OTHERS )
SIMILARLY SITUATED, Plaintiffs, )
)
v. )
)
THE NATIONAL ASSOCIATION OF )
REALTORS, et al. )

# HAO ZHE WANG'S MOTION FOR RECONSIDERATION AND FOR EVIDENTIARY HEARING REGARDING KEOUGH DECLARATION

Plaintiff in the Southern District of New York action, *Wang v. National Association of Realtors*, 24-CV-2371, filed an objection in the instant case to the National Association of Realtors settlement (Dkt.1547) and appeared in person at the November 26 Fairness Hearing and addressed the Court at the hearing. The Court granted the *Burnett* Plaintiffs' Motion for Final Approval of that settlement (Dkt.1595) at the hearing and issued its order to that effect the following day (Dkt.1602).

At the hearing, the *Wang* objector questioned the earnestness of the class counsel in this case in enforcing the series of settlements the Court already approved earlier. The counsel offered no such details about their enforcement effort of the earlier settlements and gave no reassurance about their future enforcement in the courtroom either. Rather, the class counsel chose to talk up their plan to take future legal action against violations of the settlement agreements outside the courtroom and pander to the media to angle for a heroic portrayal of themselves on the newspapers. This will not do. The *Wang* objector thus moves the Court to reconsider its final approval of the National Association of Realtors settlement and withhold the

approval until the class counsel come up with evidence of enforcement actions they already took and a concrete, verifiable plan and budget for future enforcement actions.

In its order for final approval, the Court also adopted the arguments in the *Burnett* Plaintiffs' motion wholesale, including the motion's heavy reference to and reliance on Declaration of Jennifer M. Keough Regarding Notice Progress (Dkt.1595-7). The Keough Declaration shows the design of the notice progress to be deeply flawed and racially discriminatory; the outcome the Keough Declaration reported proves to be racially discriminatory as well, as one may readily predict from the racist methodology of the notice regime the settlement administrator designed. The Court should reconsider its final approval of the National Association of Realtors settlement, and the *Wang* objector moves the Court to hold an evidentiary hearing to examine the flawed design of the notice regime and the racially disparate impact the regime has had and would continue to have for future noticing and claims processing.

The *Wang* objector also does not believe the Court's order fairly and adequately addressed the myriad issues raised in his objection. It is not his intention to rehash all the arguments except to incorporate them by reference and ask the Court to review them again and not through the lens of the class counsel's unfair and frequently incorrect characterization and reconsider its order to grant final approval in light of that review.

## I. Time for Class counsel to Stop Playing Media and Start Answering Questions in Court

In his objection, the *Wang* objector related that as late as May 2024, two Keller Williams listing brokers in North Carolina refused to allow him to see their listings until he agreed to use

Keller Williams's buyer broker services. Later, other objectors also shared stories of defendants' new coercive sales tactics against buyers. In their motion for final approval of the National Association of Realtors settlement the class counsel repeated this single refrain: that all these stories were *violations* of the settlement agreement and did not represent what the class counsel bargained for with the defendants.

Between the service of his objection on October 25 and the Fairness Hearing on November 26, the class counsel had more than one month to investigate Keller Williams's egregious violations of the settlement, at least in North Carolina. The *Wang* objector challenged the class counsel in the courtroom to give an account of what they had done in that month to investigate Keller Williams's sales tactics for buyer broker services in North Carolina and how they were enforcing the Keller Williams's agreement that received the Court's final approval in May 2024.

Inside the courtroom, the class counsel chose not to answer any of the questions the *Wang* objector posed to them. Then they went out of the courtroom to con the general public about what happened in the courtroom by telling the *Wang* objector's hometown paper that "Anyone who thinks they can continue to fix commissions on new websites or side deals is foolish and wrong…We will take legal action to enforce the settlement agreement. It's time to let the free market finally work."[1] What a cheeky and phony statement!

It should be noted that all these different anecdotes of brokers doing side deals poured into the courtroom not because individual realtors were going rogue. What the market is witnessing is the entire industry just testing a hundred different ways to skirt and undermine the settlement agreement in a hundred local markets. The ultimate objective is the same: to continue

---

[1] https://www.nytimes.com/2024/11/26/realestate/nar-settlement-approval-commissions.html?searchResultPosition=1.

to cow buyers into using buyer broker services. The defendants are just doing it in a different way in each local market – and class counsel are letting them because class counsel want to pretend each instance is just some local aberrations in order to quickly get their cut in the settlement money.

The class counsel's advice to class members was "Mr Wang is free to take whatever action he wants." What cheekiness for class counsel to tell class members to fight all the settlement violations on their own. And what irony it was that the class counsel would then step out of the courtroom and baby-talk the gullible New York Times correspondent that they were the heroic trust busters and defenders of American consumers.

It is time the class counsel stop talking up about enforcement actions that never happened in front of the media and step back into the courtroom and account for their failure to enforce the settlement agreements that received the Court's final approval months ago and present class members with a concrete, credible, and verifiable plan to enforce the National Association of Realtors settlement.

Until the class counsel give the Court and class members a chance to audit their enforcement efforts since May 2024 – and certainly since October 25, 2024 when the *Wang* objection was filed – and until the class counsel outline a detailed action plan for enforcing the National Association of Realtors settlement, the Court should put the final approval of the settlement on hold. At a minimum, class members for the National Association of Realtors settlement deserve to know how many attorneys and how many hours the class counsel have budgeted for enforcing the settlement agreement. Class members deserve legal representation that would vigorously defend the interests of class members in the future and not just walk away with their pot of the money and totally forget about their clients who continue to be deceived,

intimidated and coerced into using buyer brokers, which is the fate the class members in the Keller Williams settlement they represented already suffered.

**II.      Notice was Inadequate, and Keough's Methodology Is Blatantly Racist**

The Court found that "the direct notice program was adequate and reached more than 99% of identified Settlement Class members" and based this finding on the Keough Declaration. Keough offers in her declaration alternately misleading numbers and clearly made-up numbers that do not add up. Moreover, her methodology is blatantly racist, and the notice process she put in place had a patently racially discriminatory outcome.

1. Keough's numbers are contradicted by Defendant NAR's numbers

Defendant NAR reported $5.13 million home sales in 2022,[2] which would translate to over 50 million transactions over a ten-year eligibility period. Keough reported sending out 14,460,434 direct notices, out of which one million were returned as undeliverable, and she claimed "the direct notice program here was extremely successful and reached more than 97.5% of the potential Settlement Class Members."

13 million delivered direct notices do not translate to 97.5% of 50 million potential class members. Not even close. Keough is cooking numbers, and the Court should drag Keough to the courtroom to explain her math. It was sanctionable conduct for class counsel to rely on Keough's facially implausible numbers in their motion.

2. Keough's statistics derived from nebulous concept of "unique visitors"

---

[2] https://www.nar.realtor/newsroom/nar-forecasts-4-78-million-existing-home-sales-stable-prices-in-2023.

Keough's declaration touted two million unique visitors to her settlement administration websites. But the declaration is vague on its definition of "unique visitors."

Google's definition for "unique visitors" is "the number of unduplicated (counted only once) visitors to your website over the course of a specified time period."[3]

"To be more precise, Google identifies the same IP address by placing a cookie. Google can't identify the actual person. If the same visitor enters from a different device or browser, each will count as a unique visitor."[4] Other digital analytics vendors use metrics different from Google's to arrive at the count of unique visitors, and these vendors promote themselves for using metrics different from Google's.[5] Keough did not disclose which metric she used in the declaration, which makes her statistics highly dubious and utterly meaningless.

Another reason "unique visitors" can be unreliable is that nowadays "users can erase cookies."[6] Google itself promotes its Chrome browser by highlighting how easy it is for users to erase cookies: Chrome users can set the browser to automatically delete cookies at the end of each week, each day, or even each session of Chrome use. So Keough's number is bound to be quite inflated. Her declaration shed no light on what method she employed to discount the number of duplicative visits from "unique visitors" who were really the same individuals who repeatedly deleted cookies her website set in their browsers. So we cannot be sure just how inflated Keough's numbers really are.

3. <u>The notice process was designed not to reach Asian American homeowners</u>

---

[3] https://www.similarweb.com/blog/research/market-research/unique-visitors/.
[4] Ibid.
[5] https://blog.atinternet.com/en/visits-visitors-unique-visitors-what-are-the-differences-for-the-web-analyst/.
[6] https://www.similarweb.com/blog/research/market-research/unique-visitors/.

Asian Americans are 7.2% of the American population, according to the latest US Census.[7] According to Defendant NAR, homeowner rate among Asian Americans is on par with national average.[8] So Asian Americans would represent roughly 7% of the class members. Despite all this, Keough chose not to advertise on any Asian-language newspaper, websites or other outlets.

In advertising on 589 websites and news outlets, Keough decided to not advertise on any Chinese, Hindi, Korean, Japanese, Urdu, or Arabic ones. Keough was not asked to design a label on a bottle of aspirin where the manufacturer simply does not have enough space to print warning in more than one or two languages. Keough advertised on *six hundred* channels or media outlets, so out of the six hundred she could have advertising through just thirty or forty Asian-language outlets to reach out to that 7% of the Asian American class members.

Comically, Asia is not completely absent from Keough's mind. She took the trouble to advertise in two newspapers in Hong Kong: two English papers targeting the American expats there. For Keough, Asia is obviously a geographic concept – it is where her fellow white folks go visit – but it is not a concept of race such that among her fellow Americans there might be millions upon millions of people of Asian descent and that to do her job adequately and fairly as a settlement administrator – and probably later claims administrator – she ought to reach out to Asian American class members and give them a chance to partake in the objection and claims process. The way Keough turned on her blinders on race is astounding.

4. <u>The notice process in fact did not reach Asian American consumers</u>

---

[7] https://www.census.gov/library/stories/2021/08/improved-race-ethnicity-measures-reveal-united-states-population-much-more-multiracial.html.
[8] https://www.nar.realtor/magazine/real-estate-news/asian-hispanic-homeownership-surges-to-record-highs.

The demographic makeup of the opt-outs offers a snapshot of the harmful impact of Keough's racist design of the notice process. She listed 39 names for the opt-outs. Three are Asian names. Out of the three, one opt-out received notice of the settlement not from JND but from the defendant counsel, the class counsel astutely observed in their motion for final approval. The other two opt-outs learned of the settlement personally from the first opt-out and never from JND. In other words, none of Asian American opt-outs were reached by Keough's notice program. This is an extraordinary result.

Because Keough's notice program for the National Association of Realtors settlement did not yield a single Asian American opt-out, the Court should question whether the lack of Asian American opt-outs were a result of her flawed design of the notice. It is going to be hard for Keough to explain away the fact that she did not reach a single opt-out of the Asian race.

5. <u>Keough's notice program should – and can – be quickly audited</u>

Because of the racist design of the notice program and because of its apparent failure to yield opt-outs of class members of Asian descent, the Court should hold an evidentiary hearing on whether Keough's design of the notice program effectively reach class members of Asian descent.

Whether Keough effectively reached class members of all races or whether her design actually suppressed notice to – and response from – class members from minority racial groups can be easily tested and audited. The Court can randomly draw 300 or 500 names from class members who filed their claims and compare the racial makeup of these 300 or 500 claimants against Defendant NAR's own data of the percentage of Asian homeowners – or Black and Hispanic homeowners – from the past few years.

If Keough's notice suppressed Asian or Black or Hispanic class members' right to learn about the settlement and depressed their numbers in filing claims, the Court should urgently impose a condition on the settlement to drop JND as the settlement administrator. Given that the settlement administration would be overseen by a uniformly white group of lawyers who have demonstrated little sensitivity to minority homeowners, it is all the more important to ensure the administrator itself is mindful of the rights and interests of minority claimants under the settlement.

### III. Conclusion

The Court should urgently hold an evidentiary hearing to determine the truthfulness of the Keough Declaration and the reliability of her numbers and to discern whether her racist methodology had adversely impacted the rights of Asian, Black and Hispanic class members to learn of the settlement and to participate in the claims process, opt out or object to it.

The Court should make the class counsel account for their effort to enforce the earlier settlements reached with Keller Williams and other defendants and to propose and budget for the enforcement of the National Association of Realtors settlement.

The Court should reconsider the final approval for the National Association of Realtors settlement and put it on hold until class members can be reassured that they are not being treated differently because of their race and that after the big pay for the class counsel the latter will look after their interests and earnestly enforce the settlement agreement.

Regards,
Hao Zhe Wang