```
1          IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
2                   WESTERN DIVISION

3   SCOTT AND RHONDA BURNETT,          )
    RYAN HENDRICKSON, JEROD BREIT,     )
4   SCOTT TRUPIANO, and JEREMY KEEL,   )
    on behalf of themselves and all    )
5   others similarly situated,         )
                     Plaintiffs,       )Case No.
6          vs.                         )19-CV-00332-SRB
                                       )
7   THE NATIONAL ASSOCIATION OF        )Kansas City, Missouri
    REALTORS, et al.,                  )November 26, 2024
8                    Defendants.       )

9           ...........................
             TRANSCRIPT OF SETTLEMENT HEARING
10       BEFORE THE HONORABLE STEPHEN R. BOUGH
           UNITED STATES DISTRICT COURT JUDGE
11

12     Proceedings recorded by electronic stenography
              Transcript produced by computer
13

14                    APPEARANCES

15  For the Plaintiffs:      MR. ERIC L. DIRKS
                             Williams Dirks Dameron LLC
16                           1100 Main Street,Suite 2600
                             Kansas City, Missouri 64105
17
                             MR. MICHAEL S. KETCHMARK
18                           MR. SCOTT A. McCREIGHT
                             Ketchmark & McCreight PC
19                           Two Hallbrook Place
                             11161 Overbrook Road, Suite 210
20                           Leawood, Kansas 66211

21
    For the Defendant        MR. CHRISTOPHER D. DUSSEAULT
22  HomeServices of America: Gibson, Dunn & Crutcher LLP
                             333 South Grand Avenue
23                           Los Angeles, California 90071

24

25                         1
```

```
                        APPEARANCES
                        (continued)

For the Defendant NAR:   MR. ETHAN GLASS
                         Cooley LLP
                         1299 Pennsylvania Avenue NW Ste 700
                         Washington, DC 20004


                         MS. SARAH M. TOPOL
                         Cooley LLP
                         55 Hudson Yards
                         New York, New York 10001

For objector March:      MR. MICHAEL MORRIS BUCHMAN
                         Motley Rice LLC
                         800 Third Street, Suite 2401
                         New York, New York 10022


For the South Carolina   MR. PATRICK E. KNIE
objectors:               Knie & Shealy
                         PO Box 5159
                         Spartanburg, South Carolina 29304

For objector             MS. ELLIE McKIM
Robert Friedman:         Berman Tabacco
                         One Liberty Square
                         Boston, Massachusetts 02109

For objector James       MR. RANDALL PAUL EWING, JR.
Mullis:                  Korein Tillery
                         205 North Michigan Avenue, Ste 1950
                         Chicago, Illinois 60601

For objector Spring Way: MR. BRUCE C. FOX
                         Obermayer Rebmann Maxwell & Hippel
                         525 William Penn Place, Suite 1710
                         Pittsburgh, Pennsylvania 15219


Also Present:            MR. CHRISTOPHER BOWER
                         United States Department of Justice


                         MR. NATE BROWN

                         MR. HAO ZHE WANG
                               2
```

1

2          THE COURT:  Good afternoon.  Welcome back, everyone.

3  Welcome back, Mr. Glass.

4          MR. GLASS:  Thank you, Your Honor.

5          THE COURT:  Who will be speaking on behalf of the

6  plaintiffs?  Mr. Ketchmark?  Oh, Mr. Dirks is back.

7          MR. DIRKS:  I will.

8          THE COURT:  From the defense?

9          MR. GLASS:  Your Honor, I'll be speaking on behalf

10 of the National Association of Realtors.

11         MR. DUSSEAULT:  Good afternoon, Your Honor.  Chris

12 Dusseault.  I'll be speaking on behalf of HomeServices.

13         THE COURT:  Wonderful.  Thank you.

14         Mr. Dirks, sir, we're here today because of your

15 client's motion.  What would you like to tell me about it,

16 sir?

17         MR. DIRKS:  That's right, Your Honor.  It feels a

18 little bit like Groundhog Day; so I'm going to keep it quick.

19         We're here on our motion for final settlement

20 approval that's document 1595 and plaintiffs' motions for

21 attorneys' fees and costs, which is document 1535.

22         Yet again, the common sense and the law support

23 approving these motions.  These settlements before you today

24 are just under $700 million and practice change relief

25 including removal of the mandatory offer of compensation rule.

                                 3

1    Again, peace is achieved, and the recovery and the practice

2    changes are substantial.

3            Notice here was -- reached even more class members.

4    We've had now three significant rounds of notice, a combined

5    reach of 99 percent of the class.  Settlement's been

6    well-received.  Claims continue to come in.  Class members

7    still have another six months to file claims.

8            As of last week, we had over 491,000 claims.  13

9    objections covering 23 people.  We've been overinclusive in

10   that.  There's some kind of random filings that were unhappy

11   with the litigation.  We consider them objectors and responded

12   to those as well.

13           THE COURT:  Some of them unhappy with me too.

14           MR. DIRKS:  That's right, Your Honor.  You can't

15   make everybody happy.

16           39 exclusions.  There are claims made in the state

17   of New York of over 14,000, almost 15,000; South Carolina over

18   7,000; Nevada over 7,600; Pennsylvania of over 16,000.  Those

19   are class members who are participating and making a claim.

20           Again, this court has overseen the litigation for

21   five years now.  It's in the best position to determine the

22   strengths and weaknesses and risks of the case.  I do -- for

23   all those reasons, the court should approve this motion, both

24   motions.

25           A couple of administrative matters.  As the court

                                    4

has seen, there's been a lot of last-second filings.  I just wanted to make sure on the same page on those.  There was a filing by Mr. Whitehouse, doc 1609.  To the extent it's considered an objection, it's not timely.

The Whitehouses filed an objection to the first round, the Anywhere round of settlements, and the court -- and that was doc 1424, and the court overruled that.  So that's an untimely objection but in any event should be overruled.  It wasn't addressed in our briefing, and it wasn't addressed in the proposed order.

Same with the Department of Justice's statement of interest.  That's doc 1603.  NAR responded to that in doc 1611, and we responded to that in doc 1613.  Again, that was filed after we filed our approval motion and submitted a proposed order.

THE COURT:  While we're talking about that one, it seems that the government is concerned that this -- my order here in some way limits their ability to enforce antitrust laws at some future time.  Would you like to address if that's also your understanding of their contention?

MR. DIRKS:  Yes, it is.  And plaintiffs' position, you may hear different positions from the Department of Justice and NAR.  Plaintiffs' position is this is a private settlement.  It doesn't address what the government can or cannot do.

5

```
 1          Paragraph 59 of the settlement agreement
 2   specifically says that the government may come after NAR, and
 3   if there's a judgment in that case, that would override
 4   anything that's contrary here.
 5          So our position is there's nothing about this
 6   private settlement that binds the government, the Department
 7   of Justice, from further action against NAR.
 8              THE COURT:  Is Mr. Hughes or Mr. Ray here?
 9              MR. BOWER:  Chris Bower on behalf of the United
10   States.
11              THE COURT:  Welcome, Mr. Bower.  How are you, sir?
12              MR. BOWER:  Very good.
13              THE COURT:  We'll make sure you have an opportunity
14   to speak.  Thank you.
15              MR. BOWER:  Great.
16              MR. DIRKS:  Two more late filings.  There was a
17   motion for intervention filed by a group of Texas NAR members.
18   That's document 1605.  We responded yesterday or maybe this
19   morning even in document 1614.  Again, untimely but was not in
20   our motion or in our proposed order.
21          And then on my way into the courthouse today,
22   document 1616 was filed by the Pennsylvania objectors
23   purporting to incorporate by reference other objections.  That
24   is untimely and the court should overrule that as well.
25          If you have any questions for me, I'll be happy to
```
6

1  answer them.  Otherwise, I'm happy to sit down and let other

2  folks talk.

3          THE COURT:  Thank you, Mr. Dirks.

4          Mr. Glass.

5          MR. GLASS:  Good afternoon, Your Honor.  It's good

6  to see you again.

7          THE COURT:  Good to see you, sir.

8          MR. GLASS:  Your Honor, may it please the court,

9  Ethan Glass on behalf of the National Association of Realtors.

10 With me today, Sarah Topol you might remember from trial, our

11 general counsel Lesley Muchow, and our senior counsel Charlie

12 Lee.

13          Your Honor, maybe I'll start with the Department of

14 Justice to make very clear what NAR's position is with regard

15 to the DOJ.  NAR is not going to use any settlement to impair

16 the Department of Justice's ability to enforce antitrust laws.

17          However, there is one very important piece that I

18 think needs to be made clear.  If the Department of Justice

19 wants to investigate or bring a case against NAR for following

20 the court's order in the final approval, that creates a very

21 serious problem because that is a collateral attack on a

22 finally approved settlement as well as this court's order.

23          So the very narrow circumstance that I'd like to

24 raise with the court with regard to the DOJ is the

25 circumstance of if we are doing what we are required by this

                              7

court's order to do, that we cannot then be sued for complying with the court's order.

Now, if the Department of Justice had a concern with either the settlement's provisions or the court's final approval, there was a process under our Rule 23 where the Department of Justice could have come in, could have made an objection, and there could have been a discussion. And that is the process that's set forth in the federal rules to address concerns with what's required under the court's order.

The Department of Justice failed to do that. In fact, they only filed their statement of interest Sunday night. So I want to make clear that we are not looking for immunity as the Department of Justice suggests. We are not looking to preclude any ability for the Department of Justice to conduct an investigation of potential anticompetitive conduct.

We only want to make sure that we are not in a situation where by merely complying with a United States federal court order, we're then subject to a collateral attack from the DOJ or anybody else.

And that's the second piece is the DOJ seems to suggest that other people could sue NAR or its members for complying with this court's order. And so I just want to make absolutely clear that that is really our concern is not to be squeezed.

8

1     THE COURT:  How do I -- how do I address that

2 concern in this settlement or other orders?

3     MR. GLASS:  Thank you, Your Honor.  You don't need

4 to.  So as we cited, Justice Ginsburg in a concurrence in an

5 antitrust case said those questions are for a later time.

6 They're not for class approval, settlement approval time.  And

7 this is why --

8     THE COURT:  Did your cocounsel assist in that case

9 cited by -- written by Justice Ginsburg?

10     MR. GLASS:  May have.

11     The critical question is what exactly does the

12 Department of Justice want to do to NAR?  As far as we can

13 tell from the Department of Justice's filing and our several

14 meetings with the DOJ, the DOJ doesn't know what it wants to

15 do.  It wants to preserve the ability to do anything.  So I

16 think that leaves the question to be unripe for this court.

17     What we suggest is that the court enter final

18 approval, as it has in the other cases, issue its order, and

19 then if at some later time a dispute arises where we believe

20 that the Department of Justice is challenging this court's

21 order and the Department of Justice believes it's not, then we

22 can come back in front of Your Honor and we can have the

23 discussion with Your Honor and Your Honor can rule.  But to

24 ask the court to hypothetically and in abstract say that there

25 may be some potential issue that NAR is -- and its members are

         9

1    unable to argue it's only doing because of court order, that's

2    the bridge too far.

3              And so we ask that the court just enter the final

4    approval and that if the Department of Justice has some issue

5    in the future and we can't come to a resolution with the

6    Department of Justice, we'll be back before Your Honor.  And

7    that's the right time.

8              THE COURT:  And would it be NAR's position that I

9    should put something in the -- this particular order that says

10   I retain jurisdiction over any disputes about the enforcement

11   of this?

12             MR. GLASS:  Absolutely, Your Honor, and I believe --

13   I don't want to speak for plaintiffs.  I believe that is our

14   intent all along is that any disputes surrounding the

15   settlement or the final approval will come back in front of

16   Your Honor.  And so if it's a situation where there's a

17   dispute over the interpretation of your order, Your Honor, we

18   would expect that that would come back before Your Honor.  We,

19   of course, can't speak for the Department of Justice, but that

20   is our intent.

21             THE COURT:  Sure, sure.

22             MR. GLASS:  Your Honor, now that I've put that

23   aside, the court has received mountains of paper, but there is

24   some -- a really important point that I want to make sure that

25   I highlight for the court.  The settlement between NAR and the

                                10

1  class was the path forward.  It was the path forward for NAR.

2  It was the path forward for the class.  It was the path

3  forward for Multiple Listing Services, realtor associations,

4  our members, their businesses.  It was the path that allowed

5  the entire world to move on and conduct business in the

6  regular course.

7          I want to take the court back to March of 2024.

8  Now, it seems like a long time ago because it kind of was, but

9  we settled on March 15th, 2024.  Prior to that settlement,

10 there were dozens of pending pile-on cases against NAR, its

11 members, Multiple Listing Services, realtor associations.

12 There were hundreds of defendants.  Every day new cases were

13 being filed, and there was no end in sight.  So the critical

14 piece that NAR received by the settlement was certainty, was

15 allowing us all to move forward.

16         Now, NAR felt pretty confident about its appeal of

17 the jury verdict, but NAR still faced uncertainty.  One, to

18 even get to an Eighth Circuit decision would take years, and

19 in the meantime, it would put at risk NAR, its education,

20 services, resources, and support for all real estate.  It also

21 would have risked extinction, not only for NAR but for all of

22 those members, small businesses, associations, multiple

23 listing services who had been or would be sued.

24         And I'll tell you that we're lucky that we were able

25 to pay the litigation costs to actually get to a decision.

11

Most of the people who were sued would have been put out of business just by hiring lawyers. So they would never have been able to vindicate whether they were right or wrong, and they would have had to go out of business to pay lawyers to defend NAR's ruling.

Also in March prior to our settlement, the marketplace was confused. We can all go back and look at the press coverage, but I can tell you from our touches with consumers and members, that there was a huge question mark on whether or not every broker in the country was going to be sued. Was it a liability to even be a real estate broker anymore? Could you have a real listed business providing real estate brokerage services without the risk that you were going to have extinction level litigation?

Second, consumers were confused as well. Consumers received piecemeal reports about what happened in this courtroom, what the verdict was about. They were unsure they would even have the access to brokerage, the choice to hire brokerage. Again, if they want to hire brokers, it's okay. If they want to hire a nonrealtor, that's okay, but there was a question about what does this mean for buyers and sellers.

Now, we were faced with a potential catastrophe. Had NAR done what it wanted to do, which is proceed through to an appeal before the Eighth Circuit, there was a risk that all of those entities were going to either be put out of business

1   or materially change, and a material change is we -- no good

2   for anybody.

3            As I remind the court, 3 to 5 percent of the U.S.

4   economy runs through real estate.  So the gamble on waiting

5   two years for a decision from the Eighth Circuit was seriously

6   gambling with everybody's money.

7            So over a long period of time, we had hard-fought

8   negotiations for the settlement, and I'll tell you that on the

9   NAR side, we have a leadership team, and that leadership team

10  debated, discussed, scrutinized, and analyzed every potential

11  settlement, every discussion that we had with the plaintiffs.

12  And they ended up reluctantly agreeing to what is on the

13  paper.

14           On the other side, we negotiated with a large group

15  of very experienced antitrust class counsel.  It's actually

16  amazing in retrospect that we were able to get to a deal in

17  that context.

18           THE COURT:  I went through a couple weeks of trial

19  with you all.  I recall.

20           MR. GLASS:  So in the end, we ended up with a

21  settlement that gave extensive concessions by the National

22  Association of Realtors and its members.

23           First, we gave up our right to appeal.  We didn't

24  want to but we did.

25           Second, we gave $418 million which is the largest

13

1  amount of any defendant.  In fact, it's almost double what the

2  next largest defendant is paying, and it's a significant

3  portion of the fund that these 400,000 claimants are going to

4  receive.  And that's even though the National Association of

5  Realtors didn't receive one penny in commissions throughout

6  this time period.  NAR's paying the most.

7          Second, NAR agreed to about a dozen practice

8  changes.  Again, these are practice changes that were heavily

9  discussed and negotiated.  Those practice changes were

10  actually effective in August.  NAR agreed to put in place

11  those practice changes as promptly as it could, even before it

12  had final approval, to make sure that we were in a place that

13  we could come to this court and say it's a fair deal.

14          And NAR agreed to a settlement that did not have a

15  comprehensive release.  So there's been a lot of discussion by

16  the objectors about the releases this and releases that.  But

17  from NAR's perspective, the release was much less than we

18  wanted.  The release still left a significant portion of our

19  members' businesses exposed to litigation, and, in fact, a lot

20  of those members have had to pay significant amounts of money

21  to the class settlement fund because they weren't covered by

22  the NAR settlement.

23          So why did NAR do this?  It did it because it had a

24  responsibility to provide certainty to everyone, to NAR, to

25  its members, to their businesses, to associations, to Multiple

                                  14

Listing Services, to buyers and sellers.  And I'm proud to

say, and the facts are in the plaintiffs' brief, over 99.99

percent of the class has embraced this settlement.

Now, there's a small amount of objectors, and I

already spoke to you about the Department of Justice.  Our

concern is not that we provided immunity but instead that we

not be precluded from defending ourselves; that if the

Department of Justice doesn't like something that we're

ordered by the court to do, that we're not getting stuck

between a court order and a DOJ investigation.  And that's for

a later date.

The second group is a number of pile-on lawsuits,

all of which were filed years after this plaintiffs' group

brought their case.

THE COURT:  Were all those pile-on or copycat or

additional lawsuits, whatever we want to call them, they were

all filed within days or shortly thereafter the verdict in

this case?

MR. GLASS:  All but one.  So the one case that was

filed before the verdict was the case in Chicago, but that was

years after the first Chicago case, *Moehrl*, was brought and

the case that went to trial here was brought.  And then every

single other case was brought immediately after the jury

verdict in this case.  And they were continuing.  It was

basically from November 1st through March, new lawsuits on a

1    regular basis.

 2          Now, what the bulk of those people object to is that

 3    they want to be able to bring their own case.  Your Honor,

 4    Federal Rule of Civil Procedure 23 provides a route to bring

 5    your own case.  There was notice and there was an opt-out.  So

 6    they could have protected themselves by merely opting out.

 7          The fact that they chose to stay in the class, to

 8    get the benefits of the class relief at the same time that

 9    they're saying that the class relief isn't enough is

10    inconsistent.  Their choice not to opt out means that their

11    objections, that there wasn't enough and they wanted to have

12    more or they want to bring another case, is invalid.

13          The last thing I'll mention is that there were a

14    number of -- we took the same approach as Mr. Dirks --

15    statements, objections, et cetera, varying to the relief is

16    great but people aren't following it to the relief is bad and

17    there should be no relief.  The plaintiffs address much of

18    that in their brief.

19          What I'll tell you is in the end, the settlement

20    agreement's plain language controls.  What the plaintiffs say,

21    what the third parties say, what the objectors say, it's all

22    irrelevant.  What matters is what the plain language says and

23    what the court's final approval order says.  And then we will

24    be subject, NAR will be subject to a binding obligation from a

25    United States federal court with the penalty of contempt to

                                    16

Case 4:19-cv-00332-SRB    Document 1640    Filed 12/04/24    Page 16 of 65

1    follow that.

2          And the idea that a class settlement would not be

3    approved because people think that we're going to violate the

4    order is inconsistent with our whole system.  Every single

5    class settlement could be accused of that.  What I can tell

6    you is that as an officer of the court, I take very seriously

7    the obligations.  I know the National Association of Realtors

8    takes very seriously its obligations, and the plaintiff said

9    several times that if we don't, we'll all be back here before

10   Your Honor and Your Honor will be able to take appropriate

11   action.

12         So, Your Honor, all the objections lack merit.  We

13   respectfully request final approval, and I'll reserve whatever

14   time I have just in case I need to respond to an objector.

15         THE COURT:  Thank you.

16         MR. GLASS:  Thank you, Your Honor.

17         THE COURT:  Mr. Dusseault, sir.

18         MR. DUSSEAULT:  Good afternoon.  Chris Dusseault

19   from Gibson Dunn on behalf of HomeServices.

20         THE COURT:  Mr. Dusseault, I'm sorry.

21         MR. DUSSEAULT:  Absolutely fine.  Thank you, Your

22   Honor.

23         I'm going to be very brief and make just two points

24   that are specifically directed to the HomeServices settlement

25   to which there have only been three specific objections that

                              17

1   are directed to our settlement.  The first is a point of which
 2   Your Honor is very aware, which is that this court has already
 3   granted final approval of settlement with the three other
 4   corporate defendants in the *Burnett* case.
 5        The objectors notably, despite the many arguments
 6   they do make, make no argument as to why the outcome as to our
 7   settlement should be any different than those other three.
 8   And there is no reason.  The substantive terms of the
 9   settlement are substantially the same.  Notice process was
10   substantially the same.  The conduct changes are substantially
11   similar as well.  The objections are virtually identical, in
12   some cases word for word the same, as the ones you've already
13   considered, and the only meaningful difference, frankly, is
14   that the compensation paid is the greatest in our case as
15   compared to the other three.
16        So it's our view that no reason has been presented
17   to the court to come to a different outcome as to HomeServices
18   than you did as to the other three.  And obviously the court
19   has also granted final approval of additional settlements in
20   the Gibson case as to which many of the same objections were
21   made.
22        The second point I would make, Your Honor, is that
23   just to be clear on the record from the perspective of the
24   person who was involved in negotiating this settlement, the
25   very issues that the objectors raise and they talk about class

                                   18

relief being nationwide.  They talk about franchisees getting

release.  They talk about people not being able to turn around

and say, well, now I'm an indirect purchaser or buyer whereas

all I released was my direct purchaser or seller claim.

Those issues were all of critical importance to

getting a deal done for the very reason that Mr. Glass

mentioned, which is you're looking for peace and closure here.

That's what you're trying to look for.  The plaintiffs were

aware of that, and you can't have an outstanding outcome like

you have in this case in our settlement if a company like

HomeServices faces, you know, a panoply of other lawsuits

throughout the country or everyone just changing their legal

theory or saying, well, we released you but we're going to go

after all of your franchisees.

So the settlement is good for the class members.

It's a good outcome for the parties involved, and we would

urge the court to grant final approval.

THE COURT:  Thank you.

MR. DUSSEAULT:  Thank you.

THE COURT:  Mr. Bower, sir.

MR. BOWER:  Yes, Your Honor.  Good afternoon.

THE COURT:  Good afternoon.  Did you work with

Mr. Glass when he was at the DOJ?

MR. BOWER:  Unfortunately not.  I would have learned

a lot.

19

```
1           I just joined in 2020.

2           THE COURT:  Congratulations.

3           MR. BOWER:  Thank you.  Thanks for the opportunity

4   to speak at today's hearing.

5           The Department of Justice filed a statement of

6   interest on two narrow issues.  First, the department wanted

7   to ensure that defendants would not be able to use this

8   settlement as a shield against our investigation or any future

9   enforcement actions.

10          Now, the court might find that the settlement is

11  adequate and in the interest of the private litigants under

12  Rule 23, but that doesn't mean that it effectively remedies

13  past or current violations.

14          THE COURT:  How long has the DOJ been kind of

15  sniffing around on this?  Because they were an interested

16  party at the very beginning of this lawsuit, and then forgive

17  me if I'm describing it wrong, in essence just watched up

18  until this statement of interest.  I feel like there was

19  issues going on prior to this lawsuit that -- "sniffing

20  around" might not be the right word.  Investigating.  How

21  long, do you know?

22          MR. BOWER:  So we've been in litigation with NAR

23  about our ability to investigate certain practices that are

24  related to this litigation, and those were only resolved this

25  year.  And they're still --
```

1          THE COURT:  Way before this lawsuit, you were

         2   engaged looking at NAR; is that fair?

         3          MR. BOWER:  We were prohibited from -- our CID was

         4   squashed by the district court, and then we succeeded on

         5   appeal and that's up -- they filed cert recently on that.

         6          So we were able to issue a CID earlier this year in

         7   May.  So that's when we were specifically investigating NAR.

         8          THE COURT:  But you've been investigating NAR for a

         9   decade?

        10          MR. BOWER:  The department has been investigating

        11   issues in the real estate space, including conduct by NAR, for

        12   decades.

        13          THE COURT:  Okay.  Thank you.

        14          MR. BOWER:  Sure.

        15          So as I mentioned, the court might find that the

        16   settlement's adequate for the private litigants, but that does

        17   not mean that it effectively remedies current or past

        18   violations.  NAR filed a response to our statement, which

        19   construes our concerns as a res judicata issue.  They are not.

        20          What we're asking of the court is to make clear that

        21   its Rule 23 decision does not address whether the settlement

        22   effectively remedies past or current antitrust violations.

        23   That question is not before the court, and we're asking the

        24   court to make that explicit.

        25          Second, we wanted to raise concerns about the

                                      21

provision in the settlement that requires buyer brokers to obtain a signed agreement from buyers before showing a home. We think that provision is facially problematic because it's an agreement that restricts how brokers compete. The department wants to protect its ability to investigate that provision and bring an enforcement action if necessary.

In response to Mr. Glass' earlier statements, NAR itself has made clear in its filing in its response to our statement that it's only required to follow the provisions of the settlement insofar as those provisions aren't illegal. But how else would one determine whether or not the provision is illegal and violates the antitrust laws except for through an enforcement action? So that's what we're trying to preserve here.

The department wants to protect its ability to investigate and to enforce the antitrust laws, and we're asking the court to make clear that it's not your intention to immunize provisions in the settlement from antitrust enforcement by the government.

I'm happy to take any more questions, Your Honor.

THE COURT: Do you have any problem with saying that any disputes about the enforcement of my settlement agreement order should come back in front of me?

MR. BOWER: I think we would object to that. I think we would reserve the right to file an enforcement action

22

```
 1   in any proper forum.

 2          THE COURT:  I can understand the confusion of

 3   everybody here; plaintiffs, NAR, DOJ.  The DOJ's been looking

 4   around at this for a while.  I hear there's change coming at

 5   the DOJ next year.  You may have heard the same.  Who knows

 6   what's going to happen, right?

 7          And let's say you do start some sort of

 8   investigation or file an enforcement action, NAR may believe

 9   that it's somewhat contradictory to my order that they're then

10   following.  Help me understand more why if it's issues that

11   are in my order now that we have a DOJ statement of interest

12   in my case and you've been an interested party in my case

13   since the beginning, why that all shouldn't come back here.

14          MR. BOWER:  Your Honor, I'm just not in a position

15   to waive any right to file an enforcement action in any court

16   that is proper.

17          THE COURT:  Probably we shouldn't call Judge Garland

18   right now?

19          MR. BOWER:  Probably not.  That's all I can say.

20          THE COURT:  That's all you can say.  Okay.

21   Appreciate you, sir.  You might -- before you go all the way

22   back, you might just hang close because we're going to discuss

23   this a little bit more.

24          MR. BOWER:  Thanks, Your Honor.

25          MR. GLASS:  Hi, Your Honor.  I promise not to do
                                23
```

this to every objector, but if I may respond to a couple

things.

THE COURT:  Yeah.  And I won't let you.

MR. GLASS:  Absolutely fair.

So, first, this particular investigation that

Mr. Bower's talking about has been open since the first Trump

administration.  It is true that we were able to get in the

United States District Court for the District of Columbia an

injunction against that investigation, but it has nothing to

do with what they're arguing here.

The argument there was we had settled with the

Department of Justice and they were repudiating on that

settlement.  That did not prevent the Department of Justice in

any way from filing the brief and intervention that it did in

this case, this particular case, showing up in this court in

the last six months.

And this is the problem with a Sunday at 7 p.m.

central time filing when there's a final approval hearing on

Tuesday at 1 p.m. central time is that we are being -- you are

being put in a very difficult position for no reason.  If

there truly was concern with the written buyer agreement,

that's long past.

But what we're saying is very, very important, which

is that if NAR is compelled under pain of contempt to require

written buyer agreements, it can't be that there is an

investigation, a litigation, or anything by someone
challenging NAR for doing that and circumventing this court's
order.

So I think the solution that Your Honor has proposed
is the right one. If that's what they want to do, they should
come back to this court and they should talk to this court
about its order. Not sue NAR in a far-flung district where we
may have the difficulty of getting before this court.

One last thing -- I'm sorry, Your Honor.

THE COURT: Would you or someone else on your team
email everybody in this -- all the lawyers in this litigation
maybe by noon tomorrow some language. As I'm writing the
language out, I have very unsophisticated current language of
you want any disputes back in front of me. I think maybe the
language could be a little bit more artfully crafted, and
Mr. Dirks is going to tell me it's already in there at
paragraph --

MR. DIRKS: Yeah. You're exactly right, Your Honor.
I was going to point out paragraph 174 in the proposed order,
which says, The court retains continuing and exclusive
jurisdiction over all matters related to the administration
and consummation of the settlements and to interpret,
implement, administer, and enforce, and it goes on. I do
think that that addresses the concern.

MR. GLASS: It was only paragraph 174, Your Honor.
25

1                    MR. DIRKS:  The final one.

          2                    MR. GLASS:  Yeah.  Just ten seconds on the first

          3       thing Mr. Bower said.

          4                    We are not arguing that this settlement prevents the

          5       Department of Justice from investigating past or future

          6       antitrust violations.  That is not our argument.  We are not

          7       going to argue that because we settled, we're now immune and

          8       we can go out and price fix or engage in other criminal

          9       conduct.

         10                    It's really just this very narrow focus of once

         11       we're ordered by a court to do something, the time has passed

         12       for somebody to order -- have the court order something else,

         13       and they shouldn't be able to then just sue NAR over its

         14       compliance with the court's order.

         15                    Thank you, Your Honor.

         16                    THE COURT:  Are you okay with paragraph 174 as

         17       written?

         18                    MR. GLASS:  Yes, we are.  Thank you, Your Honor.

         19                    THE COURT:  Mr. Bower, sir, anything additional?

         20                    MR. BOWER:  I'm sorry.  What was your question, Your

         21       Honor?

         22                    THE COURT:  Anything additional?

         23                    MR. BOWER:  No, no.  I'm sorry.  I thought you said

         24       more questions.

         25                    THE COURT:  Well, next we're up to objections, and I

                                              26

believe they are currently in inverse order of being filed
because I have a wonderful courtroom deputy who knew I wanted
a notebook so I could read each and every one of them, which I
have done.

So we're just going to go through them in inverse
order. Our friends from South Carolina requested more time.
I'm reluctant to give everybody ten minutes because of the
volume that we have. I'm asking everybody to try to limit it
to five minutes. As in the past, I don't have a stop clock on
anybody, and as long as you're talking about important,
relevant topics and you're not getting too far off and you're
not just -- I can read and I do read. So if you're going to
read to me, I'll cut you off at three minutes. If you are
going to tell me something insightful and give me a good
summary of your arguments, I'll be more than glad to listen.

But I also don't want to spend the rest of the day
here and probably like many of our local counsel, I'll see you
at the chamber of commerce dinner tonight at five o'clock.

So first up, Document No. -- and I'll -- for the
record because, as all of you know, we get lots of people
interested in the docket and lots of people who like to
question my rulings in newspaper articles and in filings. I
try to be overinclusive in allowing objectors here.

My goal is anybody I can think was objecting about
anything relevant here, I put them in the notebook. So

1  someone will complain that I called their name and they

2  weren't here and they were really objecting about something

3  else.  But I'm trying to be overinclusive rather than

4  underinclusive on the objectors.

5       1609 is the Whitehouse folks.  Anybody here?  Mr. or

6  Mrs. Whitehouse?

7       Next we've got 1594 and 1553, Monty March and our

8  friends from South Carolina.

9       MR. BUCHMAN:  Good afternoon, Your Honor.  Michael

10 Buchman.

11       THE COURT:  Come on up, Mr. Buchman.  Well, sir,

12 some of my criticisms of some of the objectors is they would

13 never be able to float the $13 million in litigation expenses.

14 I can't say we could say that about Motley Rice.

15       MR. BUCHMAN:  Good afternoon, Your Honor.  Thank

16 you.

17       THE COURT:  Good afternoon.

18       MR. BUCHMAN:  Not quite sure how to respond to that

19 but it's noted.  Thank you very much, Your Honor.  I

20 appreciate being able to appear and lodge an objection on

21 behalf of plaintiff Monty March.

22       We represent Mr. March in connection with claims

23 involving REBNY Manhattan.  There's also the Friedman action

24 which involves REBNY Brooklyn.  Briefly, Your Honor, I've

25 limited my presentation to about two or three minutes.  I am

28

1  aware of your position, and I will endeavor to honor that.

2          There is no factual support from which to conclude

3  that the REBNY conspiracy alleged in the March and Friedman

4  actions arises out of the same factual predicate as alleged in

5  the NAR action.  REBNY and REBNY RLS are not parties to the

6  NAR settlement.  The March action is not a copycat action.

7  The Burnett complaint contains no mention of REBNY or REBNY

8  RLS.

9          And indeed, Your Honor, the March action was the

10 first filed action in this country concerning REBNY New York

11 and REBNY Manhattan specifically regarding commercial -- or,

12 sorry, regarding residential real estate transactions in

13 Manhattan.

14         The *Umpa* complaint makes mere passing reference to

15 REBNY New York.  That action was filed after the March action.

16 NAR and REBNY have no affiliation.  REBNY actually broke away

17 from NAR in 1994 and has promulgated its own rules and its own

18 regulations concerning New York City's residential real estate

19 market.  The two have absolutely nothing to do with one

20 another.

21         And counsel for REBNY made clear during the JPML

22 proceedings that there is no association between NAR and REBNY

23 New York.  The rules are different.  The market is different.

24 The defendants are different.  The time period in the March

25 and Friedman actions are different than the time period in

                                29

1    this action.  There is no nexus between REBNY Manhattan, REBNY

2    Brooklyn, and the NAR actions that are before this court.

3         Plaintiffs in this action cite portions of the March

4    complaint to contend that we allege the same factual

5    predicate.  That's simply not the case.  What we did, Your

6    Honor, was we alleged facts concerning the REBNY market

7    involving its different roles concerning its different market

8    concerning its different time period and different defendants.

9         The bullet point they cite on page 91 from our -- of

10    their brief from our complaint merely demonstrates this

11    similar effects, the similar effects, and the separate and

12    distinct conspiracies, not the same facts.

13         Plaintiffs' assertion that there are 17,000 NAR

14    members in New York City in their papers is irrelevant.  What

15    matters is where the transaction occurred and what rules

16    govern, and in REBNY Manhattan, REBNY rules govern.  NAR

17    actions do not -- sorry.  NAR rules do not regulate that

18    market, and, again, REBNY counsel said to the JPML that when

19    you're dealing with REBNY Manhattan, it's REBNY's rules that

20    governs, not NAR's rules, not even NAR's code of ethics, which

21    plaintiffs suggest in this case that their code of ethics

22    govern in REBNY Manhattan.  They simply do not.

23         The fact of the matter is that the opt-in defendants

24    have repeatedly conceded that the REBNY conspiracy is separate

25    from NAR.  REBNY members transacting in REBNY New York do not

30

operate under the NAR rules because REBNY has its own rules,
which REBNY members are required to abide by.

And let me add to that point. There is a written
requirement when agents and brokers in Manhattan join REBNY.
There is a form that they need to fill out, and at the bottom
of that form, there's a check box, and that check box
specifies that that member or agent will abide exclusively by
REBNY's rules and REBNY's code of conduct when conducting
business in REBNY New York City, the five boroughs of New York
City.

But what is most telling here is that -- what is
most telling here to demonstrate there's no identical factual
predicate between the NAR and REBNY actions is the requirement
as part of this settlement that there is a condition for
opt-in defendants to withdraw all of their admissions
highlighting the numerous and detailed distinctions between
the NAR and REBNY rules and actions as judicially admitted
before the JPML in writing and at oral argument.

Plaintiffs in this action realize that there is no
identical factual predicate between the NAR and REBNY actions,
and they want nothing to do with any prior assertions made by
sophisticated REBNY market players which undermine their
alleged nationwide conspiracy in an effect to rope in the
REBNY plaintiffs like the March and Friedman plaintiffs into
this action.

31

```
 1              I know I'm probably just about going over my time
 2    limit.  I have one more point very briefly to make.
 3              And that is we've heard mention here this afternoon
 4    about 14,000 claims that were filed from New York.  I want to
 5    be very clear.  We've looked at those claims.  Those 14,000
 6    claims were from the state of New York.  They were not New
 7    York City specific.  So the assertion that 14,000 claims
 8    support this settlement from REBNY Manhattan is not correct.
 9              Thank you, Your Honor.
10              THE COURT:  Thank you.  Mr. Knie, 1593 from South
11    Carolina.
12              MR. KNIE:  Yes, Your Honor.
13              THE COURT:  Welcome back, sir.
14              MR. KNIE:  My third trip here, Your Honor.
15              I'd say that we have complied with all the deadlines
16    and have responded to the court's orders and not only am I
17    here but my two colleagues are here because of your court's
18    order that all objectors and all attorneys for objectors be
19    present.  I do appreciate the leniency on the time.
20              THE COURT:  It's hard to tell a guy with a southern
21    accent no.  You've used it before with juries.
22              MR. KNIE:  I was born in Connecticut, Judge, but
23    I've lived in South Carolina for about 60 years.
24              So, anyway, Your Honor, as an initial matter and the
25    court well knows this, the court is here today to act as a
                                  32
```

fiduciary to protect the rights of 35 million home sellers in this precertification fairness hearing.

And, frankly, I believe that these -- their rights are being trampled on because they're asking to give up their right for a jury trial in exchange for approximately $35 each. The court may say, well, they've got a right to opt out, but to opt out, you've got to have the information and know whether you should opt out. And if you look at the class notices, there's no information in the class notices to help a potential opt-out understand whether they're getting $35, $1,000 or $5,000.

In the present case, the average damage per home seller in the United States is $14,000. Obviously, $35 is not nearly enough to in any way compensate them for their loss.

The Sherman Antitrust Act cases are different from consumer class actions because the victims are entitled to ample compensation. The Supreme Court case of *Blue Shield of Virginia v. McCready* outlines that very specifically. Obviously $35 is not substantial compensation.

Now, when I say these settlements are inadequate, I mean, we've got a $1.8 billion verdict and that involved 500,000 Missourians, and that has been bartered away for a national class. And they've only gotten 60 percent of the verdict, about a billion dollars towards settlement.

In contrast one of the plaintiffs' firms, Cohen &

33

Milstein, in what was always a national class action, *In re Urethane*, took a $400 million verdict and parlayed it into a billion dollar settlement.  The exact opposite is happening here.  While I'm mentioning that law firm, in its website they acknowledge that the average home seller has been damaged by thousands of dollars, yet the same time they're here as proponents of this settlement today.

One of the factors that the court must consider is the financial condition of the settling parties.  There has been no independent report of an economist presented by these parties.  Instead the court has asked to rely on self-serving declarations of plaintiffs' counsel saying that, you know, we negotiated these settlements real hard and we think they're fair.

Well, first of all they're not economists, they're not statisticians, they're not mathematicians.  They're attorneys.  It's clear that this court as a gatekeeper needs more information to approve this settlement.

We wrote plaintiffs' counsel requesting financial information, and I've got copies of that letter.  I would like to hand up a copy to the court as an exhibit, if I may.

THE COURT:  Sure.

MR. KNIE:  I would like to address the opt-in briefly.  The opt-in proposal is clearly inequitable because it arbitrarily chooses a cutoff of $2 billion a year and

34

1  arbitrarily chooses the year of 2022.  In the poor state of
2  South Carolina, we only have one firm that earned over $2
3  billion a year in 2022.  The next largest firm earned $1.6
4  billion.  Why should they get out without paying a dime?  It
5  seems to me that there should be a sliding scale from the
6  richest to the poorest firms, but everybody should pay their
7  way.
8          The settling parties agreed to hard deadlines to opt
9  in and specific requirements to do so.  This court approved
10 those deadlines and requirements.  Almost all of those were
11 not met or, otherwise, the documents were not properly
12 executed.
13         We asked -- we wrote counsel and said could we
14 please get that information that was missing because class
15 counsel in its filings claimed that they had fully-signed
16 documents.  I would like to hand up that letter as well, Your
17 Honor.  And we've heard nothing in response.
18         May I approach?
19         THE COURT:  I marked the previous one Court Exhibit
20 A, and I'll mark this one Court Exhibit B.
21         MR. KNIE:  Thank you, Your Honor.
22         THE COURT:  You might wrap her up.
23         MR. KNIE:  And I'm about finished, Your Honor.
24         So we would submit that the opt-ins should not now
25 be approved by the court since they did not meet the deadlines

1  and they did not file what they set as their own rules and
2  regulations.
3          Another problem is that the brokerages of less than
4  $2 billion a year is they are released without providing any
5  proof of certain practice changes.  There's no evidence that
6  any practice changes have been accomplished.  Nobody has said
7  we'll comply.  Basically it's going to be business as usual,
8  Your Honor.  There's no consideration for their release.
9          In short, the proposed settlement is inadequate.  It
10 lacks due process and should be rejected by this court.
11         THE COURT:  Thank you.
12         MR. KNIE:  Thank you.
13         THE COURT:  Sir, just confirming, none of your
14 clients were able to make it today?
15         MR. KNIE:  They were not.
16         THE COURT:  Thank you.
17         MR. KNIE:  If I could address that, Your Honor.  No
18 Federal Circuit Court has ever said that an objector or an
19 objector's attorney had to be present.  There are just two
20 district court attorneys from outside the Eighth Circuit that
21 address that.
22         THE COURT:  Thank you.
23         Mr. Buchman, I've got your letter about Mr. March.
24 I'm assuming Mr. March isn't present, true?
25         MR. BUCHMAN:  That's correct, Your Honor.  When we
                                36

```
 1    filed our objection, it was provided he could speak through
 2    counsel and he was prepared to do that and filed his papers
 3    under that assumption.
 4              THE COURT:  Thank you.
 5              MR. BUCHMAN:  Thank you.
 6              THE COURT:  How about 1563 which was filed by
 7    Mr. Andrew Horowitz and Bruce Fox.
 8              MR. FOX:  Yes, Your Honor.
 9              THE COURT:  Come on up.
10              MR. FOX:  May it please the court, Bruce Fox on
11    behalf of the objectors from the Western District of
12    Pennsylvania.  We substantially accede to and agree with the
13    arguments that have been made by the other objectors.  They're
14    no different in our case.
15              We do represent six objectors from western
16    Pennsylvania, and one of them is here with me today, Francois
17    Bitz.  He's in the back of the courtroom.
18              The others, Your Honor, were simply not able to
19    attend.  They're working people and they couldn't get away for
20    this hearing given their finances and other obligations.
21              But, Your Honor, western Pennsylvania is also a
22    unique environment.  We have a local real estate market with
23    its own local players, including the West Penn Multi-List.
24    Now, that's not associated with NAR in any way.  In western
25    Pennsylvania, we had a conspiracy, restraint of trade between
                                37
```

that local MLS and the local brokerages that has harmed the
western Pennsylvania home sellers for years.

Now, we've discussed in our papers why we think our
case is different.  It's not associated with NAR.  It's not
dependent upon the NAR rules, and it's a local dispute.  The
absent class members in our case, like everywhere else, have
been forced to give up their right to a jury trial in exchange
for what amounts to a coupon settlement.

Now, NAR purports to sell on its own behalf but also
on behalf of smaller brokerages, which while smaller, were
also active participants in the conspiracies.  These smaller
brokerages are released by the settlement agreement without
having to pay anything at all, and the settlement amount is
miniscule in proportion to the actual damages sustained by the
settlement class, and it's tiny even in proportion to the jury
verdict that was awarded here in the Western District of
Missouri.

The settlement amount is purportedly based upon
ability to pay, but as with all the defendants, we also have
not received any financial information despite the fact that
we have asked for it as well from NAR.  We've been completely
stonewalled.

Now, since the objection deadline, NAR has shown to
be profligate in its spending and grossly irresponsible.  Just
last week, Your Honor, a *New York Times* article published on

Tuesday, front page article, entitled, Chauffeured cars and
Broadway tickets, inside the National Realtors group.  The *New*
*York Times* revealed the extent of NAR's excesses and financial
abuses.

I won't recount them here, Your Honor, but the
pattern of behavior revealed that NAR is very unusual and
alarming for a nonprofit, and it makes it even more difficult
to give credence to the unverified claims that NAR cannot
afford to pay more to pay a just amount under these
circumstances.  Given its profligate spending and its
behavior, the court should carefully scrutinize NAR's finances
and permit objectors to take discovery.

Also regarding HomeServices, HomeServices is paying
only $250 million.  This is a settlement on behalf of not only
HomeServices itself but also franchisees across the nation.
The franchisees made money by fixing inflated commissions, but
are paying nothing in the settlement.

The proposed settlement doesn't account for the
franchisees' ability to pay.  No information has been provided
about any of the franchisees' ability to pay.  Forcing the
franchisees to contribute would generate a much larger
settlement fund for the class members, of course.  There are
resources there that haven't even been tapped or investigated.

Instead this settlement seeks to take away western
Pennsylvania home sellers' ability to collect damages from the

39

franchisees and replace it with what amounts to a coupon

settlement while the franchisees pay nothing.

Let me conclude by pointing out that the amount of

the proposed settlements are, as Mr. Knie ably argued,

vanishingly small compared to the harm that has been done.

Those amounts are based on representations of the now aligned

plaintiffs and defendants which the objectors have never been

able to review or independently evaluate.

The practice changes have been calculated to allow

conspirators across the nation to continue to impose inflated

commissions on customers just through other means other than

the MLS.  Many of those issues concerning the practice

changes, Your Honor, have been the subject of other objections

which we have incorporated by reference into our objections.

So for these reasons, the western Pennsylvania

objectors ask that the motion to approve settlement be denied.

THE COURT:  Did you tell me your client's name was

Mr. John Mauritz, the gentleman who's here?

MR. FOX:  Yes, that's Mr. Francois Bitz, B-i-t-z,

and he is representing Spring Way Center, LLC.  He's the sole

member of that.

THE COURT:  Oh.  Thank you.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Mr. Mullis, Document No. 1561.  Welcome

back, sir.

40

```
 1              MR. EWING:  Good to see you again, Your Honor.

 2              THE COURT:  You too.

 3              MR. EWING:  So we're a bit differently situated than
```
most of the other objectors.  First, our case was filed in
January of 2021, almost four years ago.  We looked at these
allegations of the other two cases that were on file, and we
thought they were missing something, which was essentially
that buyer broker commissions get passed on to home buyers.
Everybody knows that.  The defendants have said it in this
litigation, the Department of Justice has said it.  Our
experts are going to show it.  It's a simple fact that buyer
broker commissions impact the prices paid by home buyers.  So
that's why we brought our case.

              And we're not here to have you reject the
settlement.  The settlement can stand on its own terms with
the release language that's currently in there, the identical
factual predicate language.

              What we're actually objecting to is the inclusion of
additional language in the order that goes even further and
applies that test to our case, and that shows that they
actually know -- the parties know how to use clear language
when they want to.  If they wanted to say in the settlement
agreement, you know, all claims for anybody who ever bought a
home on an MLS based on antitrust violations are released,
they could have.  They could have done that in the notice.

                                 41

```
 1    No, they save that language just for the order on the day
 2    before.
 3            Now, Mr. Glass said 3 to 5 percent of the economy is
 4    affected by housing.  I think this might be the largest
 5    antitrust case there possibly ever is, and there needs to be
 6    somebody here advocating for home buyers.  Nobody in this
 7    courtroom has --
 8            THE COURT:  I hear the Visa one is even bigger.
 9            MR. EWING:  It might be.  But nobody in this
10    courtroom is advocating for homebuyers.  Now, the reason our
11    claims should not be released is because they are different
12    claims.  I received a response to responses and objections
13    from NAR and HomeServices last week in our other cases.
14            I asked for the expert reports and the deposition
15    transcripts that were created in this litigation, and here's
16    what I was told by NAR.  No, because it's different claims and
17    different parties.  That's their position last week.
18            That was plaintiffs' position when they went to the
19    JPML six months ago and said all these settlements mean all
20    these cases should be consolidated except for the one that's
21    different, and it should stay different.  And that was their
22    co-defendants' position when they were asked by Judge Wood
23    last year at the status hearing, These settlements that are
24    coming in place from my understanding, they don't require any
25    stay in the *Batton* case and don't have any impact in the
```

42

*Batton* case. And their co-defendants, not them in fairness, their co-defendants, but with the same settlement release language said, That's correct, Your Honor, they don't have any impact on this case. And it should stay that way because that's how Mr. Mullis has litigated.

These cases have been litigated separately for three years, and they're trying to introduce a claim preclusion argument because they can't actually find any cases to apply the identical factual predicate test to indirect purchaser claims. There are none. They haven't addressed any of the ones that are in our papers. So they come up with a claim preclusion argument. The claim preclusion is based on transactions, black letter law, different transactions, different claims.

But if it was a claim preclusion argument, in the four years that the *Batton* case was being litigated, why didn't a single defendant move to dismiss for claim splitting or to transfer or to stay? The defendants were happy to litigate this case separately, and when the defendants raised the pass-through issue in opposition to class cert and in opposition to summary judgment, the plaintiffs said we don't have to set that off because under federal law, direct purchasers don't have to set off any benefits or, you know, damages that they would have passed on to other people.

And that's right. And they got the benefit of that

43

because they stood in here and they said we are limiting our case to direct purchasers and they should have to abide by that decision. This case should be settled on the basis in which it was litigated.

You've heard the defendants say that it was critical as part of the negotiations to resolve the indirect purchaser claims and to buy peace yet at the same time in their papers, they say, well, these claims are still going on. So we don't actually -- and if it was that critical to resolve the indirect purchaser claims, you would have thought they would have brought in the counsel who was litigating them for four years.

So we don't actually have any evidence or any knowledge whatsoever that these claims were actually part of a meaningful negotiation as opposed to generic release language that's now being used while they're working together to strangle the *Batton* claims. And they shouldn't be able to do that under Rule 23 because Rule 23 requires equitable treatment of all class members. Supreme Court has said that.

And there are -- there are people who bought homes in this class who are going to get less damages because it's going to go to people who only sold homes. There are people who bought a whole bunch of homes in this class who are going to get less damages because it's going to go to people who bought a whole lot less homes, and that is inequitable

44

treatment.

The only rebuttal they have to any of that is the cited 1992 case 26 years before the 2018 amendments to Rule 23 came out, years before *Amchem* and *Ortiz*, a 1992 Eighth Circuit case that says, well, it's enough that everybody can make a claim. That's equitable treatment. That's not the law anymore, Your Honor. That might have been the law 30 years ago, but that's not the law anymore.

Somebody needs to make sure when these funds are being distributed, that a basic economic principle everybody in this courtroom knows exists isn't just being made to pretend like it doesn't exist anymore.

That's all I have, Your Honor, unless you have any questions.

THE COURT: Thank you. Mr. Mullis wasn't able to make it this time?

MR. EWING: Mr. Mullis is a registered nurse and given the timing and he had work today and also with Thanksgiving, he was not able to make it. So he followed the original notice, which was mail, which is the form in which due process rights are protected.

Thank you, Your Honor.

THE COURT: Robert Friedman, Document No. 1560.

MS. McKIM: Good afternoon, Your Honor. Ellie McKim with Berman Tabacco for objector Robert Friedman.

```
 1              THE COURT:  What was your last name?

 2              MS. McKIM:  McKim, M-c-K-i-m.

 3              THE COURT:  Welcome.

 4              MS. McKIM:  Thank you.

 5              Your Honor, I won't rehash all the arguments

 6    contained in our briefing or that have been articulated by the

 7    other objectors' attorneys.  I'd just like to highlight a

 8    couple of key points particular to the Friedman objection in

 9    response to recent issues emphasized in the settling parties'

10    papers.

11              First of all, Your Honor, we understand that this

12    court has already ruled on the factual predicate issue in the

13    course of the previous settlement, and while we respectfully

14    disagree for the reasons set forth in our papers, I'd like to

15    briefly address the parties' repeated characterization of the

16    Friedman complaint as a copycat or a pile-on case.

17              In fact, Your Honor, nothing could be further from

18    the truth.  The Friedman complaint was carefully and

19    extensively researched to identify which trade organization

20    operated in REBNY Brooklyn, to analyze its differing governing

21    rules, its distinct agreements, and enforcement mechanisms.

22    The results of this analysis showed that the REBNY conspiracy

23    is separate and distinct from the NAR conspiracy.

24              To the extent that the NAR conspiracy is referenced

25    in our complaint, it is only by way of comparison.  They are
```
                                    46

1  not the same conspiracy.  NAR is not a defendant in Friedman,
2  and tellingly REBNY is not a defendant in this case, nor is it
3  a settling party.

4         Secondly, Your Honor, the plaintiffs offered no
5  authority to support the unprecedented proposal through which
6  the NAR settlement would release with zero cash contribution
7  six defendants in the Friedman action, small brokerages who
8  operate substantially or exclusively in New York under REBNY
9  and not NAR rules.

10         As we noted in our reply brief, NAR's own final
11  approval brief confirms the limited nature of which entities
12  and what conduct are covered by the release that NAR is paying
13  for.  The releases must apply to NAR members for liability
14  related to following NAR's rules.  That's all.

15         And that makes sense.  Why would NAR pay to release
16  entities that neither contribute to NAR nor are subject to
17  liability for following NAR's rules?

18         Another problematic aspect of the settlement is that
19  the plaintiffs would have this court believe that it could
20  approve a release of prior misconduct simply by virtue of a
21  defendant's after-the-fact decision to join NAR.  The proposed
22  settlement agreement requires only that a single principal
23  need be a NAR member at the time of the class notice.

24         So all a brokerage has to do to excuse years of
25  anticompetitive conduct in REBNY Brooklyn is manage to prop up

                                47

1    a single NAR member during the time between those years of

2    misconduct and when the class notice was sent out.

3            With respect to the practice changes touted

4    throughout the settlement papers, as Friedman says in his

5    papers, REBNY's rules were voluntarily amended in January of

6    2024 purportedly to address the anticompetitive conduct at

7    issue making the practice changes of questionable, if any,

8    value to REBNY class members.

9            We also raise Rule 23(e) fairness, adequacy, and

10   reasonableness issues with the settlements that, as we state

11   in our reply, the settling parties have not addressed.  We

12   submit that any of those issues warrant denial of final

13   approval here.  We seek only to protect our REBNY class

14   members' rights and ask that this court deny final approval or

15   in the alternative exercise the court's authority under the

16   severability provisions to strike the opt-in provisions of the

17   settlement and the releases of noncontributing defendants.

18           Happy to answer any questions Your Honor has.

19   Otherwise, thank you for your time.

20           THE COURT:  Mr. Friedman wasn't able to make it?

21           MS. McKIM:  Unfortunately, no, he was not, Your

22   Honor.  We did submit a declaration setting forth the reasons

23   why he was unable to attend.

24           THE COURT:  Thank you.

25           Mr. Knie, I just want to make sure, I've got several

                                  48

different objections filed by your firm.  I'm assuming all of those were incorporated into your oral arguments.

MR. KNIE:  Yes, Your Honor.  There was only one objection that was filed for this hearing.  It should have been filed shortly before the deadline.

THE COURT:  Very good.  I have multiple documents.

MR. KNIE:  And there are previous objections we filed for the previous hearings.

THE COURT:  I had 1606 and 1555, but I appreciate your statement.  Thank you.

Professor Monestier, 1552.

Mr. Wang, 1548.  How are you, sir?

MR. WANG:  I'm good.  Thank you very much for granting me this accommodation.

THE COURT:  I appreciate your follow-up and making sure you followed the rules, and I'm glad you got your laptop in.

MR. WANG:  Thank you.  And I probably have to ask a bit more than ten minutes because I prepared three and a half pages to summarize my objection and also to answer plaintiffs' criticism of my objection.  So --

THE COURT:  You're going to need to limit it to ten minutes.  I promise you I've read this.  I even granted you the opportunity to bring in your laptop.

MR. WANG:  Sure.

49

```
 1            THE COURT:  Let's keep it even keel here.

 2            MR. WANG:  Sure.  Of the objectors present in the

 3    room, I prepared probably one of the longest objections and

 4    received 15 pages of very unfair attacks and

 5    mischaracterization of my arguments in the plaintiffs' motion.

 6            I'm not a serial objector.  I'm not a lawyer.  I

 7    write cases and use where a defendant in a two-sided market

 8    apparently chose to deceptively structure a transaction in a

 9    way in order to like use Illinois Bricks to deny real direct

10    purchasers recovery for antitrust injuries, and when I read

11    this case on the page of New York Times last year, I just saw

12    a perfect example of that deceptive structuring.  So here we

13    are.

14            I ask for three things.  One, for class members who

15    are also homebuyers the court should clarify that the

16    settlement agreement does not preclude their direct purchaser

17    claims as homebuyers against defendants.

18            Two, for class members who paid more commissions as

19    homebuyers than they did as sellers, the court should reduce

20    the payout to home sellers in order to reserve a piece of the

21    pie to homebuyers who suffered greater and more direct losses

22    as direct purchasers of defendants' home -- of the defendants'

23    services and home sellers.

24            Mr. Glass misspoke earlier when he said all

25    objectors wanted more money for the class.  I don't.
```

```
 1          Three, for class members who have been harmed by
 2     opt-in brokers, the court should provide a mechanism to
 3     challenge their opt-ins.
 4          The DOJ earlier expressed concerns the settlement
 5     would force homebuyers to use buyer brokers before they could
 6     buy a house and requested that this court -- if this court
 7     approves the settlement, it should clarify that such approval
 8     does not preclude any claims of this kind of misconduct
 9     against homebuyers.
10          In my SDNY complaint, I said this is something that
11     defendants have always forced buyers to do, and that SDNY --
12     SDNY complaint I said basically they have bundled or tied
13     homebuyers' use of free MSL [sic] service, quote --
14     quote/unquote to buyer broker services.
15          The MSL information is nominally free, but buyers
16     cannot really make use of the information until they hire and
17     pay for buyer brokers.  And I allege this coercive sale of
18     buyer broker services violated all sorts of state law, and the
19     tying of MSL services and the buyer broker services also
20     violated Sherman Act.
21          Now we have heard plaintiffs' answer to my
22     objection.  They said, and I quote, To the extent Mr. Wang is
23     alleging NAR rules bar listing brokers from submitting offers
24     from unrepresented buyers to their home seller clients, no
25     such rules exist to plaintiff counsel's knowledge.  No such
```
51

rule exists to plaintiff counsel's knowledge.  So poor research and prepleading investigation is fatal to plaintiffs' sense of triumph here.

The gist of my complaint is that defendants' conspiracy is first and foremost against homebuyers, the coercive sale and the tying and bundling.  Plaintiffs are not aware of such practices.  So they did not allege the same conduct in their lawsuit.  So my factual allegations are different from the plaintiffs, and my allegations were never investigated and never submitted to the jury here in Missouri.

I further allege that homebuyers are direct purchasers of buyer broker services.  Just because defendants always tried to structure a transaction in a two-sided market to make it look like home sellers are paying for the commission on both sides does not mean home sellers are actually paying buyer brokers.

This is just a ruse meant to deceive the buyers, their lenders, and Fannie Mae and Freddie Mae [sic], which will not finance homebuyers' use of buyer brokers unless the expenses appear to be paid by home sellers.  In realty buyers pay their own brokers.  On the day of closing, the buyer's attorney just cuts a check for the buyer's broker like she does for the buyer's mortgage broker, the title insurance, the attorney herself and probably the home inspector, the oil tank inspector, and lead paint inspector.

52

1          As I explained in my objection, the relationship

2   between buyer's broker and the listing broker is totally

3   different from the relationship between, say, manufacturer and

4   distributor or between supplier and manufacturer that we see

5   in other *Illinois Bricks* cases.  So homebuyers are the direct

6   purchasers of buyer broker services.

7          Plaintiffs' counsel had nothing to say about that in

8   their complaint or in their response to my objection.  I don't

9   deny that listing brokers' commission was also inflated, but

10  it was only a directive and secondary result of the

11  defendants' conspiracy against homebuyers.

12         I'm paying plaintiff -- I'm saying plaintiff counsel

13  has collusively or foolishly ignored the defendants'

14  conspiracy against homebuyers being the real reason of

15  inflated broker fees in the U.S. market.

16         Be it foolishness or collusion, defendants got every

17  reason to go along with this lie, and this is why plaintiff

18  counsel got to trial so fast.  They bought into the

19  defendants' lie that homebuyers are indirect purchasers of

20  buyer broker services.  So that works in the defendants' favor

21  and limits their liability.

22         Today we see the final act of this collusion.

23  Plaintiffs came to this court asking to categorically preclude

24  all buyers' direct purchaser claims, again in cahoots with

25  defendants to limit defendants of liability to homebuyers even

                              53

though they conceded their understanding -- plaintiff
counsel's understanding of the facts to be totally different
from mine.

In our adversary legal system, if plaintiffs do not
allege something, if they don't get to do discovery, they
don't get to make the jury make any factual findings related
to something plaintiffs never alleged. So this is how our
legal system works, and this is how our legal system protects
plaintiffs who make different factual allegations by giving
them a chance to conduct their own investigation and prosecute
their own claims.

Plaintiff counsel say the court should overrule my
objection because, again, I quote, Mr. Wang first and
principally recites a litany of unsupported claims that NAR
rules bar listing brokers from submitting offers from
unrepresented buyers to their seller clients and allow buyer
brokers to market their services for free.

Well, if it's unproven, that's because it hasn't
gotten to discovery, and it won't go in to discovery if my
buyer claims are precluded because of my membership in the
home seller class. It's important that plaintiff counsel now
conceded they haven't made the same allegation. So the
Missouri jury never had a say on it. That's enough reason to
say there can be no res judicata for buyers' direct purchaser
claim.

54

1          My second point is simple.  Because plaintiff

2     counsel collusively bought into defendants' lie in order to

3     reduce the number of factual disputes in this case and to be

4     the first to take their case to trial and also because buyers

5     haven't got a chance to prove their facts in court yet, I want

6     to make sure there is enough left of NAR's carcass so that

7     buyers can still pick some meat off their bones.

8          It's unacceptable that NAR is becoming rapidly

9     judgment proof because of its collusive settlement with home

10    sellers.  Racial minorities are far more likely to pay more in

11    buyer commission than in seller commission.  So NAR's

12    collusion with home seller plaintiffs to settle this case is

13    in effect a collusion against buyers in racial minority

14    communities.

15         If we look around the room today and the plaintiff

16    counsel, counsel from both sides, I don't think we can say

17    with a lot of confidence that racial minorities are being

18    protected in these settlements.  Given NAR's history of

19    inventing racial competence and redlining, it doesn't surprise

20    me that NAR wants to spit on our faces with its dying breath.

21    But the court has no business sanctioning this settlement.

22         And speaking of realtors being racists, Exhibit 8 is

23    Homestead (phonetic).  It withheld to repairs to my apartment,

24    sent stalkers to my door in the middle of the night because in

25    a building full of lawyers, judges, bankers, Homestead decided

55

1    it should make an example of an Asian guy for joining
    2    rebellion against Homestead.
    3            So when the Cooley lawyers told me that their client
    4    was going to settle in this case, I told them over several
    5    phone calls that I would have a huge problem with the
    6    settlement if they let Homestead opt in.  Each time they told
    7    me that they don't know whether Homestead would opt in.  Each
    8    time they said this is out of their hands under the settlement
    9    agreement, whether Homestead opts in or not.
   10            So this gives rise to a second problem.  Before
   11    class members accept this settlement, they got no idea which
   12    parties they're actually settling with and how they may
   13    challenge such opt-ins.  Cooley certainly doesn't know.
   14            THE COURT:  Mr. Wang, you've gone way over ten
   15    minutes.  If you'll look back there, I'm going to give you
   16    until three o'clock.  That gives you four more -- on that
   17    clock back there.  I'll give you until three.
   18            MR. WANG:  Mr. Glass' argument just now that we can
   19    always return to this court to resolve any ambiguity and
   20    openness in settlement agreement is not good enough because
   21    the ambiguity and openness impacted class members' decision to
   22    give this assent -- to give assent to this agreement already.
   23            I just want to quickly address a few points
   24    plaintiff and defendant counsel make in their motion for final
   25    approval.  One, NAR pretends Section 58 -- paragraph 58 is no
                                      56

big deal. NAR says buyers are free to hire a broker or not.
So why not say that in the settlement agreement? Instead we
got paragraph 58.

Realtors will say this provision requires all buyers
to enter into a written agreement before they can allow buyers
to see a property, and ordinary buyers off the street will
believe it based on the wording of this settlement agreement.
This situation is not even new.

Like I said, I was always required to use buyer's
broker before I could make an offer on the property, but this
provision now will give defendants new moral authority to do
so. For two parties to say buyers are free to hire a broker
or not is to tell a lie in open court. It's a lie when we
look at NAR's past conduct. It's a lie when we look at what's
happening now.

The two sides are now saying, let's not worry about
the preclusive effect of NAR settlement on some hypothetical
future matters about buyers being forced to use buyer broker
services. Well, I have a not so hypothetical matter. It's a
pending matter sitting in SNY for almost a year, and Judge
Lehrburger said we're staying the matter until Judge Bough
first gets a say on whether the Missouri case might preclude
any of my claims against the defendants. So it's not
hypothetical anymore.

Two, for every story of the defendants' new coercive

sales tactics against buyers, plaintiff counsel repeats this
single line. Oh, it's just a violation of the settlement
agreement. That was also just a violation of the settlement
agreement.

So we must now ask the plaintiff counsel if this
coercive sales tactics violated the settlement agreement,
shouldn't you have done something about it?

Keller Williams' settlement agreement already
received final approval from this court. What they have done
in the past months, plaintiff counsel thinks they heard my
allegation that Keller Williams' agent continued to force
buyers to hire a buyer's broker before they can even make an
appointment to see their listings. If you haven't done
anything to enforce earlier agreements, why should the court
believe you'll do -- enforce the NAR agreement and don't say,
oh, opt out and sue them. I'm a class member and you're the
class counsel. You ask the court to pay you tens of millions
of dollars. Shouldn't you do your job and enforce your
agreements?

You haven't shown yourselves to be vigorously
enforcing these earlier agreements, and to say you may finally
start to take your job seriously from today, well, it's
holiday season, but I don't believe in wishful thinking.

So I'll just stop here and thank you very much for
the time.

```
 1          THE COURT:  Thank you, sir.  Thank you.

 2          No. 1541, Robert Duthler.

 3          No. 1539, Zaffarkahn.

 4          No. 1537, Jeffrey Nordquist.

 5          No. 1532, Michael Mead.

 6          No. 1528, Art Gonzales.

 7          No. 1510, Peter Gustis.

 8          No. 1488, Anthony Phillips.

 9          No. 1454, Sharon Saunders.

10          No. 1453 Cynthia G-o-r-a-l-s-k-i.

11          No. 1445, PulteGroup.

12          No. 1439, Diane Knizer.

13          No. 1405, Larry Giammo, G-i-a-m-m-o.

14          Is there anyone I failed to call that has an

15  objection?

16          Anyone else like to be heard?

17          Anything in response --

18          MR. BROWN:  Yes, Your Honor.

19          THE COURT:  Come on up, sir.  Welcome, sir.  What's

20  your name?

21          MR. BROWN:  Yes, Honor.  I'm Nate Brown.  I'm for

22  the intervenors Rosalie Doyle, John Guerra, and Jessica

23  Winters.

24          THE COURT:  And were those the Texas folks?

25          MR. BROWN:  Yes, Your Honor.  I'd like to start with
                              59
```

a point that seems to have been ignored and has been missed,

and that's the early results of the proposed implementation or

the early implementation of the proposed rules has already

exhibited negative effects on the market.

          We have seen a decline in existing home sales in the

third quarter by 1 percent in price and 1 1/2 percent in

volume.  Meanwhile, their new home sale counterparts, which

are not included in the preclusions of the proposed

settlement, have shown an increase of 3.2 percent in price --

in volume and 6 percent in price.

          So the -- we've had a unique opportunity for the

plaintiffs to test their market thesis, which is that an

antitrust violation was occurring, and instead, we have seen

that what they've done is they've shifted the market towards

new home sellers.

          We have not seen an increase by volume in existing

homes, which you would think would have happened with lowering

commissions and rules that are designed to help consumers.  By

these estimates, we're looking at a market repression of

somewhere in the numbers of $100 billion, what we're going to

project annually --

          THE COURT:  Here's my question for you.  I

understand you've got some complaints about how this is

playing out.  It's Round, R-o-u-n-d?

          MR. BROWN:  Brown.

```
 1            THE COURT:  Brown.  I got close.  That's pretty
 2     close.
 3            So Mr. Brown, here's my concern:  This case was
 4     filed in 2019.  We're basically to 2025.  We can see it.
 5            I think it's fair to characterize this is a late
 6     motion to intervene.  Why don't you get just to the
 7     intervention part before you get to what merits your potential
 8     class representatives would bring.
 9            MR. BROWN:  Sure, yes.  So I think the reason for
10     the intervention is I think there was a potential that the
11     plaintiffs were right.  We are in a unique opportunity where
12     they are allowed to test their market thesis by the early
13     implementation.  The numbers for the U.S. Census Bureau did
14     not come out until October 24th, which had resoundingly said
15     that their attempt to play spell cast on the market and target
16     a low 1.5 percent buyer's commission rate was wrong.  It just
17     simply didn't work.
18            And it's hurt -- and it's a harm to consumers.  It's
19     a harm to sellers, and this is dead weight loss in the --
20            THE COURT:  Do you have any case law that would
21     support intervening six years after, five years after a
22     lawsuit?
23            MR. BROWN:  Yes, Your Honor.  *Union Electric* has,
24     which is an Eighth Circuit case, has -- particular members of
25     that case were -- had intervened right before a consent decree
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

was filed for the purpose of appealing. They had waited a
long time. They intervened, I believe, for the purpose to
just appeal.

So it wasn't that -- the question on timeliness of
intervention is the prejudice to the existing parties, right.
So we're intervening for the purpose to appeal this case. We
don't agree with the final disposition of it. So we're not
intervening -- we're not prejudicing the parties in that we're
asking them to restart discovery and litigation. It's a very
limited purpose. We just want the opportunity to appeal.

THE COURT: Okay. Thank you. Appreciate you, sir.

Mr. Dirks, sir.

MR. DIRKS: Yes, Judge. Almost everything that you
heard has been addressed in our lengthy papers. So I'm not
going to repeat that. Couple things that stood out to me that
maybe weren't in the papers or were a little shocking to me,
first of all, let me just say the only expert testimony, the
only economist analysis was what we presented. You've heard
arguments, but you've heard no evidence from anyone.

I do want to say the Black Tie and the Cunningham
objections that were filed in Gibson appear to be related to
this settlement. Those are Gibson 527 and 528. The court
already overruled them, but just out of -- in the interest of
overinclusiveness, just want to raise that in that they're not
here to make an objection.

                          62

```
 1            And I do want to -- just couple things that I heard
 2    that just aren't true.  The REBNY presentation said that our
 3    cases had nothing to do with the REBNY MLS.  What he didn't
 4    tell you is this case settled Gibson.  Gibson has allegations
 5    directly about nonNAR MLSs and specifically REBNY.
 6            He also said that there was no evidence of claims
 7    made within REBNY.  That's not true.  In the Keough
 8    declaration over a thousand claims have been made in New York
 9    City, and over a thousand claims have been made in Brooklyn.
10            The other thing I heard that's just flat out not
11    true, I believe this was the Mullis presentation, that somehow
12    we suggested that Mullis should not be part of the purported
13    MDL.  That's not true.  We did not say that.
14            So unless the court has any other questions, you've
15    got I think a hundred pages or more of briefing from us; so
16    I'm not going to rehash all that.
17            THE COURT:  Thank you, Mr. Dirks.
18            MR. DIRKS:  Thanks, Judge.
19            THE COURT:  Mr. Glass.
20            MR. GLASS:  Thank you, Your Honor.  Again, Ethan
21    Glass for the National Association of Realtors.
22            I'm just going to say we disagree with a lot of the
23    things that the objectors said.  Unless the court finds any of
24    them material, I'm not going to go through a list, but we do
25    very much appreciate the court's time over many, many years,
                                  63
```

1   many, many hearings and as the court has read, 1,600 filings.

2   This is a case that has long been fought and NAR appreciates

3   the court.

4           THE COURT:  Thank you, sir.

5           Mr. Dusseault.  Did I get it closer?  I can say

6   Mr. Frye [sic] all day, but that's just because we've been

7   together for several decades.

8           MR. DUSSEAULT:  Your Honor, thank you.  I've heard

9   it a lot of different ways.  I take no offense whatsoever.

10          All I wanted to say is there are only three of the

11  objections that are directed to the HomeServices' settlement

12  of 1593, 1563, and 1561.  Everything that was raised has been

13  raised in the papers.  We've responded to everything and,

14  again, there does not seem to be any reason for a different

15  handling of those objections than in the prior cases.

16          Thank you.

17          THE COURT:  We're going to grant Motion No. 1595.

18  I'll get an order out as soon as possible.  I appreciate

19  everyone's patience and everyone's best ability to treat each

20  other respectfully in this highly contentious matter.  Thank

21  you for that and Happy Thanksgiving.

22          ***********************

23

24

25
                              64

REPORTER'S CERTIFICATE

1

2

3          I certify that the foregoing pages are a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7   _____        _____
        Date                    /s/Gayle M. Wambolt
8                                GAYLE M. WAMBOLT, CRR, RMR
                                 United States Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65